# EXHIBIT G
# TO DECLARATION OF
# THERESA J. FUENTES
# ISO OPPOSITION TO MIL NO. 6

California State Association of Counties



1100 K Street
Suite 101
Sacramento
California
95814

Telephone
916.327.7500

Facsimile
916.441.5507

**Expert Report of Paul McIntosh**
*Coleman et al. v. Schwarzenegger* (No. CIV-S-90-0520-LKK-JFM-P (E.D. Cal)
*Plata et al. v. Schwarzenegger* (No. C01-1351-THE (N.D. Cal)
August 13, 2008

Since July 2007, I have served as the Executive Director of the California State Association of Counties (CSAC), a nonprofit corporation that promotes and represents the interests of California's 58 counties at the state and federal level. As the CSAC Executive Director, I have overarching responsibility over our association's efforts to identify, advance, and advocate for county budget and policy priorities.

I have more than 25 years of local government experience, 19 of those as a chief executive. Immediately prior to joining CSAC, I served as the Chief Administrative Officer of Butte County, California for five years. Prior to my tenure in Butte County, I served as the Chief Administrative Officer of El Dorado County, California; the Deputy County Administrator for Solano County, California; the County Administrator for Hernando County, Florida; and the County Manager of Mohave County, Arizona.

In the capacity of county manager/chief administrative officer, I have served as the senior executive responsible for the overall conduct and operation of all county functions and activities, reporting to the Board of Supervisors or County Commissioners ("board"), depending on the jurisdiction. The position carries overall responsibility for policy development, program planning, fiscal management, administration and operation of all county functions under the board and all county programs and activities. A county manager/chief administrative officer serves as an advisor to the board and provides policy guidance and coordination of the activities of constitutional officers to accomplish board goals and objectives. As county manager/executive, I was vested with full responsibility over the operations and administration of county services and functions, including those in the criminal justice system (sheriff, probation, district attorney, and public defender) as well as the health and human services systems (child welfare system, indigent health, mental health, alcohol and drug treatment, among others). My office was charged with — and I had ultimate authority over — fiscal management of all county departments and functions, including supervising and directing the preparation of the annual county budget. In the performance of budget responsibilities, it was my responsibility to review, evaluate, and provide recommendations to the board regarding all departmental requests and all items in the proposed budget including expenditures, revenues, and reserves.

During my tenure in Solano County, I was responsible for the County's Capital Projects Improvement Program. Among the projects for which I had primary responsibility were the construction of the Solano County Justice Center ($45

CSAC/ 00001

million), the county's central detention facility; a restoration of the Solano County Historic Courthouse ($1.2 million); and a remodel of the Solano County Hall of Justice. Each of these projects required significant research into and examination of the local criminal justice system, interaction among county justice partners, assessment of criminal justice systems and processes contributing to the county's jail population, and consideration of detention and release policies and practices.

The County of Santa Clara has requested my expert opinion, on behalf of the statewide association of counties, regarding the likely impacts of the court's potential actions in the *Coleman* and *Plata* matters. I am not being compensated by Santa Clara County or any other party for preparing this report and testimony. Further, I have not testified in any trials or participated in depositions in the past four years.

CSAC has been monitoring the *Coleman* and *Plata* court proceedings over the last year and participated financially in the initial phases of the efforts by the intervening local law enforcement coalition, represented by Martin J. Mayer. Subsequently, individual counties have intervened in the matters; CSAC, as an association, has no independent standing as an intervener. Over the last 18 months, particularly following the passage of AB 900 (Chapter 7, Statutes of 2008), the Public Safety and Offender Rehabilitation Services Act, my two staff who cover justice issues — Elizabeth Howard and Rosemary Lamb — have been actively engaged in policy discussions and implementation efforts with state and local officials. Through the course of these efforts, my staff and I have had an opportunity to discuss directly with county officials the general aspects of local and state correctional systems, as well as the significance and potential local impacts of the two state prison overcrowding cases before the three-judge court.

Specifically, my staff conducts bi-weekly conference calls on corrections matters that involve the participation of county officials — elected supervisors as well as staff from a range of county departments (probation, mental/behavioral health, and others). The issue of the *Coleman* and *Plata* matters is a regular agenda item, and counties have weighed in with general descriptions of anticipated impacts of an early release or population cap. Further, my staff significantly interacted with county officials as part of a series of 10 regional workshops last year on AB 900. Additionally, CSAC hosted a corrections reform workshop at our annual statewide conference in December 2007, which included participation from state officials, community-based agencies and county representatives. Lastly, my staff participates in a bi-weekly corrections discussion with the California Mental Health Directors Association, and we keep in regular contact on corrections matters with our public safety affiliates as well as with the California Department of Corrections and Rehabilitation (CDCR).

2

CSAC/ 00002

In preparation for rendering the opinions outlined below, I am drawing on the following specific references and research, in addition to my own expertise as a long-time county administrator:

- Interview with Elizabeth Howard, Legislative Representative in the area of Administration of Justice, CSAC;
- Interview with Rosemary Lamb, Legislative Analyst in the area of Administration of Justice, CSAC;
- Memo of September 14, 2007 memo to Martin J. Mayer, *Potential County Impacts Resulting from a Prison Population Cap*, prepared by Ms. Howard and Ms. Lamb;
- *Who's in Prison? The Changing Demographics of Incarceration* (2006) by the Public Policy Institute;
- *Do the Crime, Do the Time? Maybe not in California* (2006) by the California State Sheriffs Association;
- *Drug Treatment in the Criminal Justice System: The Current State of Knowledge* (2003) by Mears et al from the Urban Institute Justice Policy Center;
- *Stretched Thin 2008: State Budget Cuts Undermine County Human Services Programs*, California Budget Project. (2008);
- *Division of Adult Operations, Mentally Ill Parolee Population* (2008) California Department of Corrections and Rehabilitation;
- Mental Health and Substance Abuse Treatment Costs from Santa Clara County; and
- Urban Counties Caucus Parole Realignment Survey Results (County Aggregates), May 1, 2008.

The September 2007 memo referenced above was prepared for Martin J. Mayer in an effort to articulate the broad county impacts — outside of those expected to be experienced in the public safety community — expected if the court were to carry out either a prison population cap and/or an early release of state prison inmates. The Urban Counties Caucus (UCC) survey was an effort undertaken to identify the likely impacts of a budget proposal to realign responsibility to counties for certain lower-level parolees. That survey solicited cost estimates from the 11 most populous counties that comprise the UCC. The figures offered by counties reflect estimates — both a high and low range — that can be reasonably relied upon for purposes of considering likely impacts of a prison population release or population cap. The UCC survey is based on counties assuming responsibility for 71,000 parolees, as outlined in the Legislative Analyst's Office 2008 parole realignment proposal. It should be noted that the UCC is a county advocacy organization legally separate from CSAC, with its own staff. While my staff reviewed a draft of the survey instrument, CSAC was not involved in the parole realignment data collection or analysis.

This statement offers my expert testimony, based on my direct experience as a county administrator and as a representative of the statewide association of

3

CSAC/ 00003

California's 58 counties, regarding the likely impacts of either a state prison population cap or an early release of prisoners. We will be working in the short-term to supplement these opinions by surveying individual counties regarding their opinions, estimates, and experience with parolees that could augment our statements regarding expected impacts.

For purposes of this statement, I am assuming that the action of the court could include the release of a significant number of prison inmates (10,000 to 40,000), followed by a population cap to allow the state to maintain a designated level of inmates. I have focused primarily on the broad county impacts in the social services area, given that we anticipate the local law enforcement coalition of interveners will adequately address public safety issues.

## Opinion #1: Counties presently have very limited ability to address the needs of its population.

Counties bear responsibility for sheriffs' operations, including detention, jail medical services, and general law enforcement duties in the unincorporated areas; prosecution and defense functions; probation supervision and programming for juvenile and adult offenders; and the broad range of health and human services that contribute toward the treatment and diversion of the offender population.

Currently, however, demand for these county services far outstrips capacity. There are waiting lists for mental health and substance abuse treatment services — services that many state prison inmates will require when they to return to our communities. It is well documented that 70% of inmates suffer from some degree of alcohol and/or drug addiction and that 20% suffer from a mental illness.[1,2] Probation officers, district attorneys and public defenders are overburdened with enormous caseloads that threaten their ability to adequately complete the duties required of them. Counties are struggling to operate their criminal justice systems. Additionally, counties are currently facing great challenges in our efforts to serve our residents; any increase in service demands will negatively affect counties.

Further, the fiscal health of counties is declining. In a time of reduced revenue — driven by declining property, sales and corporate taxes — and the persistent economic decline of the last two years, county service demands are on the increase. Counties rely on the state for funding for many programs that we carry out on behalf of the state. However, funding is not keeping pace with the growing need. Since 2001, for example, the state has withheld cost-of-living increases in a number of county-administered health and human services programs. Counties

---

[1] California Department of Corrections and Rehabilitation. (2008). *Division of Adult Parole Operations, Mentally Ill Parolee Population.*
[2] Mears, Daniel P. et all. (2003) *Drug Treatment in the Criminal Justice System: The Current State of Knowledge.*

4

CSAC/ 00004

have been required to absorb cost increases to cover necessities (e.g., employee salary and benefits, gas, rent) — the state estimates that for the current year counties have been shorted over $600 million in state General Fund and $400 million in accompanying federal funds, totaling over $1 billion statewide[3]. This fact is significant, given that counties have very little discretionary money, and redirected funds to cover costs are taken at the expense of other programs and services at the local level, further exacerbating already difficult financial situations locally.

### Opinion #2: Early release of state prisoners will have a significantly negative impact on county mental health systems.

County mental health departments are the providers of last resort for those in need of mental health treatment and/or for those on Medi-Cal. The mental health system throughout California has been seriously underfunded given demand for at least the past decade. As a result, county mental health departments are stretched beyond their means to meet the needs of their residents with mental illness. Often times there is a significant amount of time between an individual's initial contact with a mental health department for an assessment and their first counseling and/or psychiatric appointment. Unless an individual is in crisis and is deemed to be a threat to him/her self or others, no immediate referral can be made, given that most counties have existing waiting lists for services.

Furthermore, the State of California's local parole departments are currently unable to meet the needs of their existing parolee populations. For example, some counties have no parolee services provided by the state within their jurisdictions. Therefore, parolees in their jurisdiction go without services, travel great distances for services, or attempt to access services provided by the already strained county system. It is only natural to assume that if a number of inmates were ordered to be released early by the three-judge panel, the state would not be able to provide the needed mental health services to these individuals and the burden will be transferred to counties. Counties are not equipped to take on additional responsibilities. The quality of care will be jeopardized if caseloads increase any further.

For example, assuming that the federal court were to release 40,000 inmates early and, using current data, regarding prevalence rates and cost for mental health treatment (provided by Santa Clara County), approximately 10% (4,000) of these individuals released early will require inpatient mental health treatment and another 10% (4,000) will require outpatient mental health treatment. At an annual cost of $19,380 per individual, it would cost $77.5 million annually to provide inpatient mental health treatment to those individuals in need of such treatment and $19.4 million annually to treat those released who are in need of outpatient mental health treatment (using $4,839 as an annual cost per individual). The

---

[3] California Budget Project. (2008). Stretched Thin 2008: *State Budget Cuts Undermine County Human Services Programs.*

CSAC/ 00005

inpatient and outpatient components collectively yield a total annual cost for mental health treatment to $96.4 million. If the goal is to truly reduce overcrowding over the long term and decrease the likelihood that these individuals will not return to the criminal justice system at any level, the state would need to invest a substantial amount of resources either into their state parole system or into local treatment programs administered by counties and community-based agencies in order for these systems to treat these offenders upon their return to the communities. It should be noted, as well, that these are not one-time costs but, rather, ongoing operational costs that would need to be funded annually for the foreseeable future.

### Opinion #3: An early release of prisoners would have a significant negative impact on county alcohol and drug treatment systems.

As stated earlier, approximately 70% of inmates suffer from some form of addiction. County alcohol and drug treatment programs face many of the same dilemmas as county mental health departments. They have existing waiting lists for services, decreasing budgets, and fewer resources.[4] Add to this the fact that the state parole department does not have adequate resources to provide the substance abuse treatment needed by many parolees; therefore, the state — if it assumes a surge in the parolee population associated with an early release — will experience the same crisis counties will. An early release of prisoners will likely impact county alcohol and drug treatment programs given that almost 3 out of 4 parolees are in need of some level of substance abuse treatment.

With decreasing budgets and resources counties will be unable to meet these soon-to-be parolees' needs. Counties are currently experiencing severe budget deficits and will be confronted with a difficult decision regarding which population to serve: the non-criminal offenders already awaiting services or prisoners/parolees who will otherwise face a lapse in treatment if counties are unable to provide services when they show up at their door?

Similar to mental health needs, if substance abuse needs go unaddressed, overcrowding and recidivism will not be reduced. Releasing inmates early without adequate resources at the local level may reduce the state prison population, but it will have negative effects locally. Without readily available treatment, these individuals will likely revert back to old habits and resume destructive, addictive behaviors. At an annual cost of $4,369 to treat an offender, using the current prevalence rate of 70%, it will cost $122.3 million to treat 28,000 (70% of 40,000) offenders in the community. Again, these would be annual costs that would require ongoing funding each year for the foreseeable future.

---

[4] As an example, counties will receive $25 million less in funding in 2007-08 for delivering treatment service required by Proposition 36 initiative. In 2006-07, counties received $145 million; the 2007-08 budget provides only $120 million for this purpose. Full funding to address current need rises to $209.3 million, according to county estimates.

6

*Opinion #4: An early release of prisoners would have a significant negative impact on the county health departments.*

Any discussion regarding the early release of prisoners should not be undertaken without discussing the possibility of releasing elderly and sick inmates who require greater costs to incarcerate and who, presumably, pose a lower public safety risk. If any number of these inmates were released early, it would likely be to the benefit of the state to be relieved of caring for these inmates. The cost of housing, transporting, and caring for elderly inmates is estimated to be two or three times higher than for other inmates.[5] The cost of these inmates' care will quickly shift from the state to the county that absorbs the population. Given that these new parolees will likely have no insurance or be on Medi-Cal (which can take anywhere from nine months to a year from application to confirmation of coverage) counties will surely take on more responsibilities for their care – especially if the ill parolee has no family support system.

Under California Welfare and Institutions Code Section 17000 counties are responsible for health care for low income uninsured residents who have no other sources of care, mostly "medically indigent adults," ages 21 to 64, without children. The county obligation under Section 17000 states:

*"Every county… shall relieve and support all incompetent, poor, indigent persons and those incapacitated by age, disease, or accident, lawfully resident therein, when such persons are not supported by their relatives or friends, by their own means or by state hospitals or other state or private institutions."*

Of equal importance is the rate of disease in California's prisons that will likely result in most, if not all, inmates requiring some form of medical care. And, if they do not receive that medical care, greater costs will be incurred by counties and private health providers due to the spread of infection because of parolees' untreated medical conditions. According to the 2005 report done by the Public Policy Institute of California (PPIC), 16% of prisoners self report that they have tuberculosis. HIV infection rates vary from 1% to 4% of the prison population. HIV rates are higher for female inmates than male inmates. Lastly, 33% of California's inmates have hepatitis C. County health departments will face further economic hardship when they treat these illnesses for an unspecified number of parolees without adequate resources; however, the real danger lies in the costs to the county and to human life when these parolees do not seek any care at all.

*Opinion #5: An early release program would, given parolees difficulties in securing employment, have a significant negative impact on counties.*

The PPIC reports that 44% of California's inmates do not have a high school diploma compared to 21% of the rest of Californians. The State Employment

---

[5] Bailey, Amanda and Hayes, Joseph M. Hayes. (2006) *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California.

7

Development Department is not adequately staffed to receive an influx of individuals requiring job location assistance nor are these soon to be paroled inmates qualified to fill most positions without having obtained a high school diploma. Past research has suggested a correlation between poverty and crime.[6] If these parolees are unable to sustain themselves – they will be unable to maintain housing and unable to contribute to their family's livelihood.

The result of these parolees being unable to lead self-sustaining lives will affect counties in a number of ways. Some of these parolees will seek aid from county programs such as the General Relief Program, which is funded completely out of a county's general fund. General Relief provides short-term financial assistance and social services to indigent residents. Additionally, since these parolees are not employed, they will seek training from local job training programs, but until they obtain employment they will not be able to contribute to a county's tax base – only taking from the county in the form of services. These additional demands will substantially threaten counties' financial health.

## Opinion #6: A prison population cap would have a significant negative effect on the local criminal justice system.

A prison population cap would negatively affect the local criminal justice system in a number of ways. According to the 2006 California State Sheriffs Association Report on jails, there are 20 county jails that are under a court imposed population cap and 12 that are under a self-imposed population cap[7]. These caps resulted in approximately 111,000 inmates being released from county jails early and approximately 109,000 pretrial releases in 2005. Counties do not believe that population caps are the answer to resolving our state's overcrowding problems as the existing population caps on jails have not proven to be successful strategies at the local level. A cap at the state level will only further aggravate the problem at the local level and merely shift the state's problem to counties.

Currently, there are a number of new and vacant judgeships that continue to go unfilled. This creates a backlog of cases in the courts and results in civil cases taking years to come to trial as they are prioritized second to criminal cases. Caseloads for county district attorneys and public defenders are growing and would only continue to do so if more offenders remain locally. Growing caseloads make it difficult for attorneys to perform their job to the best of their ability and threaten both victims and the accused from receiving the best representation possible. A population cap will only exacerbate this growing problem in California's counties.

---

[6] Bailey, Amanda and Hayes, Joseph M. Hayes. (2006). *Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California.
[7] California State Sheriffs Association. (2006). *Do the Crime, Do the Time? Maybe not in California.*

8

Mental health and substance abuse treatment services will be severely affected by the imposition of a population cap. Some county jails are structured in such a way that the county mental health department funds and provides mental health services to inmates in county jails. Any population cap will presumably impose a freeze on the transfer of county inmates to state prison, requiring county mental health departments to provide care to a growing number of inmates who are awaiting transfer to state prisons as well as their routine county jail patient population.

Ultimately, no matter if the court implements a population cap, releases prisoners early or implements some other measure(s) to reduce overcrowding, it is imperative that any solution be coupled with a substantial investment in programs and services to address the needs of the influx of offenders in local communities. Presently, counties cannot provide all the resources needed by their residents despite their best efforts. It will not benefit any level of government or any resident of California – with or without a criminal history – if the gap in resources is not addressed. As with the health and mental health costs noted before, there would need to be an ongoing commitment of funding, growing each year with demand and business costs. It is my firm belief and that of my peers working in the counties, that until there are adequate resources at the local level to treat those with mental health and substance abuse issues, our state and the local governments within it, we will never resolve the systemic correctional crisis.

Any significant, one-time release of prisoners back into the community will completely overwhelm an already fragile and strained county service delivery system. At a time when county budgets already are suffering from the impact of a current economic downturn and decreasing revenues, we also are anticipating dramatic cuts to local mental health and substance abuse programs as a result of state budget actions now pending. Our counties simply will not be able to accommodate the demands of this population, and we are certain that our systems will fail under the overwhelming pressure.

The fabric of the county safety net system is already severely stretched. Ultimately, counties simply do not have the resources to absorb the significant costs associated with serving prisoners in the community.

My qualifications are outlined in my curriculum vitae, which is attached.

Sincerely,

*Paul McIntosh*

Paul McIntosh

CSAC/ 00009