# EX D TO
# DECL. OF THERESA J. FUENTES
# ISO OPP TO PLAINTIFFS'
# MIL NO. 7

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

--o0o--

| | |
|---|---|
| RALPH COLEMAN, et al., | No. Civ S 90-0520 LKK JFM P |
| Plaintiffs, | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |
| _____/ | |
| MARCIANO PLATA, et al., | |
| | No. C01-1531 TEH |
| Plaintiffs, | |
| | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |
| _____/ | |

**CERTIFIED COPY**

Deposition of

PAUL McINTOSH

Monday, September 29, 2008

Reported by:
THOMAS J. LANGE, CSR No. 4689
Registered Merit Reporter
Job No.: 20035LR



PHILLIPS LEGAL SERVICES
SACRAMENTO DEPOSITION REPORTERS
350 UNIVERSITY AVENUE, SUITE 270
SACRAMENTO, CA 95825
916.927.3600 · 916.927.3605 (FAX)
WWW.PHILLIPSDEPO.COM

```
 1                      APPEARANCES
 2
 3  For the Plaintiffs:
 4       K&L GATES LLP
 5       By: EDWARD P. SANGSTER
 6       Attorney at Law
 7       55 Second Street, Suite 1700
 8       San Francisco, California  94105-3493
 9       415.882.8200
10
11  For California Department of Corrections &
12  Rehabilitation:
13       OFFICE OF THE ATTORNEY GENERAL
14       By: KYLE A. LEWIS
15       Deputy Attorney General
16       455 Golden Gate Avenue, Suite 11000
17       San Francisco, California  94102-7004
18       415.703.5677
19
20
21
22
23
24
25
```

```
 1                    CONTINUED APPEARANCES
 2
 3  For County of Santa Clara:
 4        COUNTY OF SANTA CLARA
 5        OFFICE OF THE COUNTY COUNSEL
 6        By: THERESA FUENTES
 7        Deputy County Counsel
 8        70 W. Hedding Street
 9        9th Floor, East Wing
10        San Jose, California 95110-1770
11        408.299.5917
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

```
 1            BE IT REMEMBERED that on Monday, the 29th day
 2  of September, 2008, commencing at the hour of 10:02 a.m.
 3  at the offices of Phillips Legal Services, 350
 4  University Avenue, Suite 270, Sacramento, California,
 5  before me, THOMAS J. LANGE, a Certified Shorthand
 6  Reporter in and for the State of California, personally
 7  appeared

 8                         PAUL McINTOSH
 9  called as a witness herein, who, having been duly sworn,
10  was thereupon examined and interrogated as hereinafter
11  set forth.

12                            --oOo--

13                  EXAMINATION BY MR. SANGSTER
14  Q.        Mr. McIntosh, I introduced myself a moment ago,
15  but again my name is Ed Sangster, and I represent the
16  plaintiffs in connection with the three judge proceeding
17  that involves a possible prisoner release order.
18            Have you ever had your deposition taken before?
19  A.        Yes, I have.
20  Q.        How many times?
21  A.        Once.
22  Q.        When was that?
23  A.        Approximately 1991.
24  Q.        Did that have anything to do with prisoners?
25  A.        No.
```

```
 1  Q.       All right.  So the numbers you're talking about
 2  are the numbers to change the paradigm in treatment?
 3  A.       Exactly.
 4  Q.       In treatment of parolees?
 5  A.       That is what the Governor was talking about
 6  with rehabilitation, is change the paradigm which we
 7  philosophically agree a hundred percent.  The problem is
 8  there is a huge price tag in making that change.  We
 9  didn't want there to be sticker shock.
10  Q.       You don't want that sticker shock being paid
11  out of counties' budgets?
12  A.       Hell, no.
13           Can I just say no?
14  Q.       You can't unsay it.
15           Couple of questions about your supplemental
16  report.  First of all, who participated in drafting the
17  questions that were part of the survey?
18  A.       It was Elizabeth Howard and Rosemary Lamb and
19  myself, and I don't know if Theresa had any discussion
20  with Elizabeth or Rosemary prior to that.  They didn't
21  represent that to me.
22  Q.       Why did you not survey the counties on public
23  safety or impact on criminal justice?
24  A.       Well, this supplemental was to supplement my
25  report.  My report is predicated upon the impact of the
```

1 social welfare fabric due to the potential release of
2 parolees, not to the criminal justice or public safety.
3 Other intervenors are dealing with that issue.
4 Q.       Have you reviewed the actual responses from the
5 counties to the point where you're satisfied that the
6 supplemental report accurately summarizes those
7 responses?
8 A.       Yes.
9 Q.       You did that personally, right?
10 A.      Yes, I did.
11 Q.      You did it before the deposition here today?
12 A.      Yes, I did. We actually went through them
13 today again.
14 Q.      We went through some of them, not nearly all of
15 them?
16 A.      Right.
17 Q.      On page 1 of the supplemental report, you refer
18 to an infusion of dedicated, ongoing resources to
19 support the population. That's in the third full
20 paragraph.
21 A.      Yeah, that is basically what I was talking
22 about, the paradigm shift. We don't have as dedicated
23 resources.
24 Q.      All right.
25 A.      Currently.

```
 1  Q.        You don't have them now?
 2  A.        No.
 3  Q.        So what you're saying is that the county is
 4  going to release -- strike that.
 5            What you're saying is that the state is going
 6  to release a lot of parolees all at once, you need
 7  substantial additional funding in order to make the
 8  reintegration successful?
 9  A.        That is correct.
10  Q.        And you're talking about funding that's not
11  currently being provided for the existing parolees?
12  A.        That's correct, or our existing what you might
13  call nonparolee population, we are not serving citizen
14  Joe Blow, let alone parolees, adequately.
15  Q.        How much -- maybe we just covered this.
16            I was going to ask you how much money you would
17  need in the way of dedicated additional resources.  Is
18  that the 300 to 400,000 per parolee?
19  A.        Yes.
20  Q.        And --
21  A.        Let me stipulate, though, that 3 to 400,000
22  goes beyond those social fabric costs we were looking
23  at.  That figure derived from looking at holistic costs
24  to a county, which was more than beyond these programs.
25  Q.        Right.  Well, what would -- what would the
```

```
 1 parolees cost the counties just for social services?
 2 A.        Probably half that at least, if not a little
 3 bit more.
 4 Q.        150,000, to 200,000?
 5 A.        Yeah.  What we have, we have not calculated
 6 into these social services costs is the education and
 7 training costs that would be necessary for those
 8 parolees to successfully reenter society and become
 9 gainfully employed.  We are simply talking about mental
10 health and drug and alcohol services being a hundred to
11 150,000 per parolee.
12 Q.        And over what period of time were you going to
13 need these resources?
14 A.        Constantly.  It's been not just the one time
15 shot.  First -- well, you have one time costs to gear
16 up; you've got facility costs and some material supply
17 costs that you would have, which would be one time in
18 nature, but the staffing and the program costs would be
19 ongoing.
20           And we don't have any statistics on any kind of
21 retraining or recidivism out of that program to come
22 back in.  We look at current treatment on drug and
23 alcohol and the success rate of that -- or even under
24 Prop 36, Prop 63.  It's not very high so we can
25 anticipate that even putting that amount of money into
```

1  initial services, there would need to be ongoing
2  follow-up treatment.
3       And we are also operating under the assumption
4  that if you open this spigot, that there is going to be
5  a fairly constant flow until the state is able to build
6  sufficient capacity to stop that flow. It's not just a
7  one-time infusion of inmates or parolees.
8  Q.   What's the basis for that assumption?
9  A.   The operation of the criminal justice system.
10 You got a -- somewhere, somehow, people are coming back
11 into our society. If you got 172,000 inmates in prison,
12 we are going to release 40,000, that takes it down to
13 132,000.
14       If a new inmate comes in, are you going to
15 raise the cap or are you going to release somebody? If
16 there is -- if they are going to come in, you're going
17 to release somebody that's going to go back out, they're
18 going to get kicked out the back end.
19 Q.   You're not taking into account that people are
20 being released in the ordinary course right now?
21 A.   Sure I am. This is in addition to that, and we
22 have got initiatives that are going to be voted on next
23 month that would even make it worse.
24 Q.   When you talk about vacancy rates in positions
25 that some counties are experiencing in item No. 2 on

1  page 2 of Exhibit 4 --
2  A.      Yeah, yeah.
3  Q.      -- what's the reason for the vacancies?
4  A.      Well, a lot of these vacancy rates are
5  psychiatrists and psychologist and social clinical
6  workers.  If you go through the reports, I refer to some
7  of that earlier, and one of the reasons is that the
8  state, through -- what's he called -- the master,
9  federal master or receiver or whatever, Mr. Kelso, he
10 raises the salary of the psychiatrists and the prison
11 mental health workers and we immediately lost a wide
12 array of psychologists and psychiatrists at the local
13 level who went to work for the state.
14 Q.      How many?
15 A.      I've got some figures in here from various
16 counties, what they lost.  In Los Angeles, lost several.
17 Just take some time and go -- I'll go through and tell
18 you it's virtually across the board.
19         Let's see.  It's been under other impacts, I
20 think.  Yeah, Fresno lost five psychiatrists last fiscal
21 year.  It's not been able to fill its psychiatric
22 positions.  That's on page 3 of 28.  The department has
23 lost it's psychologists and psychiatrists to state
24 prisons and correctional institutions due to the
25 inability to compete in salary and compensation.  They

1  have four full time psychiatrists. They lost five out
2  of nine in Fresno County.
3           Fresno County. Lassen County doesn't talk
4  about the number lost but it talks about significant
5  caseloads and I can just tell you that I know that
6  counties who had psychiatrists or psychologists on staff
7  have lost those positions.
8           I know Los Angeles talked about it in here.
9  The Los Angeles County currently has 40 vacancies for
10 psychiatrist positions, 40 vacant psychologist
11 positions, and 56 vacant licensed social worker
12 positions. That's -- they have out of 4,000 positions
13 within the department, they have 670 of those are open
14 positions. That's on page 9 of 28.
15 Q.      Other than Fresno and Los Angeles, are there
16 any other counties that reported to you having vacancies
17 in positions?
18 A.      Well, I'm still looking at the surveys in
19 general. But I know I've had this discussion with
20 county administrators since the order came out. I know
21 there are -- just across the board, counties who have
22 these positions now find it difficult to recruit and
23 retain these positions.
24          I know from my experience in Butte County even
25 before the state raised the salaries for those

1 positions, it was difficult to find and hire, retain
2 these types of positions because of the nature of the
3 work. There is a lot better opportunities for people
4 with those skills than working with inmates in these
5 populations.
6          San Bernardino County doesn't talk about the
7 number of vacancies. They simply tell us how many they
8 have.
9 Q.       How many people, how many positions they
10 currently have?
11 A.      Yeah, San Bernardino says they have 83
12 psychiatrists, psychiatric technicians and mental health
13 nurses. Staff is currently experiencing about 12
14 percent vacancy rate. So 12 percent out of they say 187
15 prelicensed and clinical therapists and lead therapists.
16 This is in response to question one on their written
17 narrative. It does not have a page number.
18          San Joaquin, they're down six and --
19 Q.      I'm sorry. Which county?
20 A.      San Joaquin. This is page 17 of 28.
21          During the same period, the department has only
22 been able to hire one psychiatrist at a .75, what's
23 called a full-time-equivalent basis. In other words,
24 they will work three-quarters of the hours.
25 Q.      Are these vacancies caused by hiring freezes or

1 something different, or do you know?
2 A.    The vacancies are caused by these people going
3 to more lucrative positions.
4 Q.    You've identified four counties that have
5 vacancies in their social service.
6 A.    In those key mental health treatment areas.
7 Q.    Okay.
8 A.    Psychiatrists, psychologists, and mental health
9 clinicians. Those are critical positions to providing
10 mental health services. And what happens is that when
11 you are down a psychiatrist or psychologist, then the
12 length of time for diagnosis and treatment just expands.
13 I mean you're not going to have people treated.
14        Shasta doesn't report the figures, but I know
15 they have lost. Again, I have had this conversation
16 with many of the county administrators regarding the
17 difficulty in hiring and retaining staff. Tuolumne
18 County, average length of time for an adult client to be
19 seen by their primary clinician is 31 days.
20 Q.    Right now we are focused on vacancy rates.
21 A.    It lists the vacancies. They tell us that they
22 have 1.3 psychiatrists, 4 licensed clinicians and 2.5
23 nurses. These don't tell me the vacancies.
24        It's had a tremendous impact, not just on
25 parolee services or jail mental health services but

1 mental health services in general.
2 Q.     So at least in the survey you conducted there
3 were one, two, three, four counties that reported having
4 vacancies. And then in addition to that, there are some
5 counties such as Shasta that you've spoken to that you
6 know have problems with vacancies?
7 A.     Yes.
8 Q.     This is when we are talking about staffing
9 vacancies?
10 A.    We are talking specifically about
11 psychiatrists, psychologists, and mental health
12 clinicians.
13 Q.    That's all the questions I have for you, sir.
14 A.    Okay.
15 Q.    Thank you very much.
16        MS. FUENTES: Hang on. I have a few.
17            EXAMINATION BY MS. FUENTES
18 Q.    Just to follow up on that last question that
19 Mr. Sangster asked, if the county did not report a
20 vacancy during your survey, does that mean that they
21 don't have vacancy?
22 A.    No. We didn't specifically ask them to list
23 the number. Some of them offered that information.
24 Q.    Okay. Your opinions -- are your opinions based
25 solely on the survey rules or something else?

1 statements regarding expected impacts.

2          We took the 58 counties and we did a kind of a
3 cross-section of those. We looked at urban, suburban,
4 and rural counties. We looked at southern counties,
5 northern California counties. We looked at Bay area
6 counties, valley counties and of that identified 20
7 counties that we surveyed for follow-up information. Of
8 those 20 counties, 14 responded.

9 Q.     Okay. And you said that you wanted to augment
10 your statements regarding expected impacts?

11         MR. SANGSTER: I couldn't hear what you said.
12 Regarding what?

13         MS. FUENTES: I'm reading from the report where
14 it says augment our statements regarding expected
15 impacts.

16         THE WITNESS: Just to back up our assumptions
17 and opinions in here with more current data to support
18 those assumptions, and there is nothing in the surveys,
19 that doesn't support what was already in the original
20 report. I think it just strengthens the assumptions
21 that are in there.

22 Q.     BY MS. FUENTES: Does the survey results change
23 your opinions at all?

24 A.     No, not at all.

25 Q.     All right. Your supplemental report, there's a

EXAMINATION BY MR. LEWIS

Q.    Mr. McIntosh, if the 40,000 inmates or persons in prison that were going to be released, if that was spread out over six months rather one fell swoop of 40,000, was spread out over time or managed out, are the counties still in the position to handle an increase of these kinds of persons coming back into their services or does that change your opinion?

A.    No, they are not in capacity to handle that. If it's -- 40,000 spread over six months or 40,000 spread over a year, it's still 40,000 people coming into the system. If it's 40,000 all at once, I will tell you that 30,000 are going to be waiting in line because there is no way the counties can gear up to handle the surge. Even if it's a slow release of inmates to reach that 40,000 over 6 months or 9 months or 12 month periods of time, it's going to be a tremendous burden on the counties.

    MR. LEWIS:  No further questions.

    MR. SANGSTER:  I have a couple of follow-ups.

FURTHER EXAMINATION BY MR. SANGSTER

Q.    Exhibit 4, supplemental report, is dated September 24th, last Wednesday.

A.    Right.

Q.    Is that when you provided it to Ms. Fuentes?

```
 1            MR. SANGSTER:  I'm not asking her.
 2            THE WITNESS:  The final report?
 3   Q.       BY MR. SANGSTER:  The one you signed, is that
 4   when you provided it to her, last Wednesday?
 5   A.       No, actually it was provided to her on Friday
 6   because I reviewed the final draft Friday morning.
 7   Q.       Why did you date it on the 24th?
 8   A.       That is when we prepared the earlier draft.
 9   Q.       Did you provide the earlier drafts to
10   Ms. Fuentes?
11   A.       I didn't.  I don't know if my staff did or not.
12   Q.       I want to change the assumption that some of
13   the lawyers just asked you about.  I want you to assume
14   that the court orders the release of 1,000 inmates per
15   month for 40 months.
16            How would you go about evaluating the impact on
17   the counties?
18   A.       How would I go about evaluating the impact?
19   Q.       Yeah.
20   A.       I would look at the cost of service, what those
21   thousand are, depends on where they are or what their
22   service requirements are.  I can tell you today, today's
23   capacity of counties based on my knowledge and
24   expertise, there would be a thousand people that are
25   currently being seen that wouldn't be seen.
```

```
 1  Q.      That's because the counties already can't
 2  handle the needs of the existing population?
 3  A.      Exactly right. We have unmet needs today that
 4  are not being served. You're just going to add to that.
 5  Q.      Okay. That's all the questions I have.
 6          (The deposition adjourned at 3:09 p.m.)
 7
 8                         --oOo--
 9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

# REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 9th day of October, 2008.

*[signature]*

THOMAS J. LANGE, Calif. CSR No. 4689
Registered Merit Reporter