JONES & MAYER
Martin J. Mayer (SB # 73890)
Michael R. Capizzi (SB # 35864)
Kimberly Hall Barlow (SB # 149902)
Ivy M. Tsai (SB # 223168)
3777 North Harbor Boulevard
Fullerton, California 92835
(714) 446-1400; Fax (714) 446-1448
e-mail: mjm@jones-mayer.com
e-mail: mrc@jones-mayer.com
e-mail: khb@jones-mayer.com
e-mail: imt@jones-mayer.com

Attorneys for Intervenor-Defendants
SAN DIEGO COUNTY SHERIFF WILLIAM B. KOLENDER, ORANGE COUNTY SHERIFF-CORONER SANDRA HUTCHENS, PLACER COUNTY SHERIFF EDWARD N. BONNER, BUTTE COUNTY SHERIFF-CORONER PERRY L. RENIFF, CALAVERAS COUNTY SHERIFF DENNIS DOWNUM, LOS ANGELES COUNTY SHERIFF LEE BACA, SANTA CLARA COUNTY SHERIFF LAURIE SMITH, SAN BENITO COUNTY SHERIFF CURTIS HILL, STANISLAUS COUNTY SHERIFF ADAM CHRISTIANSON, MENDOCINO COUNTY SHERIFF TOM ALLMAN, TEHAMA COUNTY SHERIFF CLAY PARKER, LASSEN COUNTY SHERIFF STEVE WARREN, YOLO COUNTY SHERIFF ED PRIETO, SANTA BARBARA COUNTY SHERIFF BILL BROWN, KERN COUNTY SHERIFF DONNY YOUNGBLOOD, SAN MATEO COUNTY SHERIFF GREG MUNKS, YUBA COUNTY SHERIFF STEVE DURFOR, CONTRA COSTA COUNTY SHERIFF WARREN RUPF, SHASTA COUNTY SHERIFF TOM BOSENKO, RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR., VENTURA COUNTY SHERIFF BOB BROOKS, SOLANO COUNTY SHERIFF GARY R. STANTON, SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES, SUTTER COUNTY SHERIFF JIM DENNEY, LAKE COUNTY SHERIFF ROD MITCHELL, GLENN COUNTY SHERIFF LARRY JONES, TUOLUMNE COUNTY SHERIFF JIM MELE, FRESNO COUNTY SHERIFF MARGARET MIMS, MONTEREY COUNTY SHERIFF MIKE KANALAKIS, MONO COUNTY SHERIFF RICHARD SCHOLL, HUMBOLDT COUNTY SHERIFF GARY PHILP, EL DORADO COUNTY SHERIFF JEFF NEVES, MERCED COUNTY SHERIFF MARK PAZIN, DEL NORTE COUNTY SHERIFF DEAN WILSON, SAN JOAQUIN COUNTY SHERIFF STEVE MOORE, AMADOR COUNTY SHERIFF MARTIN RYAN, INYO COUNTY SHERIFF WILLIAM LUTZE, STANISLAUS COUNTY CHIEF PROBATION OFFICER JERRY POWERS, VENTURA COUNTY CHIEF

| | |
|---|---|
| 1 | PROBATION OFFICER KAREN STAPLES, SOLANO COUNTY CHIEF PROBATION OFFICER |
| 2 | ISABELLE VOIT, SANTA BARBARA COUNTY CHIEF PROBATION OFFICER PATRICIA STEWART, |
| 3 | BUTTE COUNTY CHIEF PROBATION OFFICER JOHN WARDELL, SAN LUIS OBISPO COUNTY CHIEF |
| 4 | PROBATION OFFICER KIM BARRETT, CONTRA COSTA COUNTY CHIEF PROBATION OFFICER |
| 5 | LIONEL CHATMAN, INYO COUNTY CHIEF PROBATION OFFICER JIM MOFFETT, |
| 6 | SHASTA COUNTY CHIEF PROBATION OFFICER BRIAN RICHART, YOLO COUNTY |
| 7 | CHIEF PROBATION OFFICER DON MEYER, FRESNO COUNTY CHIEF PROBATION OFFICER |
| 8 | LINDA PENNER, MARIPOSA COUNTY CHIEF PROBATION OFFICER GAIL NEAL, CITY OF |
| 9 | WHITTIER POLICE CHIEF DAVE SINGER, CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES, |
| 10 | CITY OF PASADENA POLICE CHIEF BARNEY MELEKIAN, CITY OF ALHAMBRA POLICE |
| 11 | CHIEF JIM HUDSON, CITY OF FREMONT POLICE CHIEF CRAIG STECKLER, CITY OF |
| 12 | GROVER BEACH POLICE CHIEF JIM COPSEY, CITY OF SANTA CLARA POLICE CHIEF STEVE |
| 13 | LODGE, CITY OF VACAVILLE POLICE CHIEF RICH WORD, CITY OF WOODLAND POLICE CHIEF |
| 14 | CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF MACE McINTOSH, CITY OF PASO ROBLES POLICE |
| 15 | CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO POLICE CHIEF MICHAEL BILLDT, CITY OF |
| 16 | ATWATER POLICE CHIEF RICHARD HAWTHORNE, NATIONAL CITY POLICE CHIEF ADOLFO GONZALES, |
| 17 | CITY OF DELANO POLICE CHIEF MARK DeROSIA, CITY OF MODESTO POLICE CHIEF ROY WASDEN, |
| 18 | CITY OF FRESNO POLICE CHIEF JERRY DYER, AND CITY OF DELANO CHIEF OF CORRECTIONS GEORGE |
| 19 | GALAZA |

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No: CIVS90-0520 LKK-JFMP |
| Plaintiffs, | **THREE-JUDGE COURT** |

-2-

DECLARATION OF EXPERT WITNESS JOHN INGRASSIA

|  |  |
|---|---|
| vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>   Defendants. | [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)]<br>**DECLARATION OF EXPERT WITNESS JOHN INGRASSIA** |
| MARCIANO PLATA, et al.,<br>   Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>   Defendants. | Case No.: C01-1351 TEH<br>**THREE-JUDGE COURT** |

I, JOHN INGRASSIA, hereby declare as follows:

1. I am the Sheriff's Commander assigned to the Detention Services Bureau in the San Diego County Sheriff's Office. I have held this position since April 2008.

2. I have been employed with the San Diego Sheriff's Department for approximately 19 years.

3. Prior to my employment with the San Diego Sheriff's Department I obtained my Bachelor of Science Degree in Criminal Justice Administration from San Diego State University. I graduated from San Diego State University in August 1989. I then attended Sheriff's Academy commencing in January, 1990.

4. My entire career in the Sherrff's Department has been within detention-related assignments. When I first started in the San Diego Sheriff's Department I was a Deputy assigned to the jails. I was a Deputy for approximately three and one-half years. I was then promoted to Sergeant in 1993. I was assigned to two of our detention facilities with a shift or line supervisor capacity.

5. In 1998, I was assigned as the Classification Sergeant of the jail Population Management Unit. I stayed there until 2001. The classification unit screens all new inmates coming into the facilities, the unit identifies the classification level based on

violence, it identifies the inmates' prior criminal history, it assigns the inmates to housing units, manages the population on a daily basis and transfers inmates between facilities.

6. In 1998, I was also part of the transition team that opened up our Central Jail downtown. In addition, in 2001, I was assigned to start up a Quality Assurance Unit for our Detention Services Bureau. The unit was called Standards of Compliance. This unit is a quality assurance component of detentions. The unit audits policies and procedures of detention facilities and ensures that both are being followed at various detention facilities.

7. I was promoted to Lieutenant in 2002 and assigned as Shift Watch Commander at one of our facilities. I then became the facility Commander at one of our smaller facilities. In 2004 I was promoted again and obtained the position of Captain. Additionally, I became the Facility Commander of two facilities. After that I was assigned as Detention Support Captain. My duties included supervising specialized units as well as providing support for Command staff for special projects.

8. In April of this year I was promoted to Commander. I was not assigned to the area of detention; instead I went in that direction because I had an interest in it since college. I choose to pursue a career in detentions versus law enforcement based on an interest in the field I developed in college. The Sheriff's Department offers a bifurcated system in which one could choose to spend their entire career in detention-related assignments and promote through the ranks.

9. My current position covers all aspects of detention, including ensuring that necessary policies are implemented and day to operations are conducted in order to maintain the Sheriff's Department's self-determined population caps and the court ordered population caps. The population statistics for the San Diego County Sheriff's Department, from 1960 through the fiscal year of 2007-08 show that over time the population of San Diego County's jails have increased. The Board Rated Capacity of a facility is established by the Corrections Standards Authority, which was the prior Board of Corrections. The rated capacity means the recommended maximum number of individuals who should be held at that facility at any given time.

10. The standards by which a rated cell/ dorm/ facility is determined is listed in

-4-
DECLARATION OF EXPERT WITNESS JOHN INGRASSIA

Title 24 of the California Code of Regulations. Title 24 lists cell size, day room space, the number of toilets and wash basins; all which are factors that determine how many inmates should be in a cell. Based on my many years of experience in detentions, it is my view that it is important to have and know the rated capacity of any detention facility because of staff safety, inmate safety, security, the public's safety and humane environment for the inmate population.

11. The San Diego County Sheriff's Department jail system has a Corrections Standards Authority (CSA) rated capacity of 4,802 inmates and a combined state court ordered/ self rated capacity limit of 5, 601 inmates. The jail system's average daily population (ADP) for Fiscal Year (FY) 2008/2009 was 5, 229 inmates. The highest single day population during this period was 5, 497 inmates which was 695 inmates over the CSA rated capacity.

12. Starting in the late 1970's, the Sheriff's Department began implementing several strategies to control the inmate population level. These strategies included severely restricting the booking acceptance criteria for misdemeanor arrests. The current acceptance criteria for misdemeanor arrests is so restrictive that only those arrests with a serious public safety nexus are accepted for booking. There is also a conditional custody release program in place that allows for the releasing of inmates with a promise to appear in court for charges of being under the influence of alcohol and or drugs. These are just two of many programs in place designed to reduce the number of inmates that either are accepted for booking or held through the arraignment process.

13. In addition to the restrictive acceptance criteria, there are several early release mechanisms in place designed to significantly reduce the time spent in custody for inmates sentenced to local incarceration in lieu of prison. Sentenced inmates receive credit for up to one-third of their total sentence per California Penal Code Section 4019, five days off of their sentence per Penal Code section 4024.1, and ten percent off of their remaining sentence as per state court order. Certain female offenders are eligible to receive an additional fourteen days off of their sentence. A Sheriff's inmate sentenced to one year in custody will more than likely serve less than fifty-five percent of this sentence in jail.

14. It is my opinion that the San Diego Sheriff's Department has exhausted all means in which to control the county inmate population level in its existing facilities in order to maintain compliance with court ordered capacity limits. Therefore, any state prisoner release order that changes current practices would result in the Sheriff's failure to maintain compliance with the state court ordered capacity limits. The Sheriff's Department sends as many as 900 inmates per month to state prisons and almost sixty percent of these inmates are parole violators. Returning these inmates early to the county or limiting the number of inmates that can be sent to state prison will undoubtedly cause our inmate population numbers to rise beyond reasonable control and could result in the potential doubling of the current inmate population.

11. In response to the Legislative Analyst's proposal to realign to counties responsibility for a segment of the parolee population currently under the supervision of the Department of Corrections and Rehabilitation in early 2008, I was part of a team that put together a response to the proposal to assess the potential impacts to the entire County of San Diego criminal justice system if a large number of parolees were to become the responsibility of the County rather than the State. A true and correct copy of the County's response to that proposal is attached hereto as Exhibit 1 (LEISDSD0001). While this proposal was to shift financial and programming responsibility for parolees to the County, this information is very useful in understanding the potential impact of a summary release or early release of a like amount of state prisoners.

12. Because our County jail facilities are already at their maximum load, there are very few "low risk" or misdemeanants in our population who can be released to make room for new arrestees, particularly those with history of violence or those who are on parole when arrested again. This will force us to release people into the community, whether they are newly arrested parolees, or high risk/violent felony suspects/detainees in order to maintain our population cap in the absence of additional jail facilities being built in San Diego County to address the projected addition of county inmates. This would inevitably result in more high risk people being let out in our community, with a commensurate need for additional probation officers, housing services, district attorney and public defender services, additional mental health programming, facilities and

-6-
DECLARATION OF EXPERT WITNESS JOHN INGRASSIA

services needed, and additional need for drug and alcohol programs. The cost of meeting this need is staggering. But it is not the financial impact that is of concern. The reality is that even if all the money to meet this extra need were available today – and it is not -- it would be years before the additional facilities, personnel and services could be in place. The Department is planning in the long term to take over another facility, but this acquisition, if it can occur, is likely to be five or more years out. As a result, it would be impossible to avoid release of higher and higher risk criminals into the community, whether from the state prison to parole or from the County jail to the community, or both.

13. In 2007, 9,855 pre-trial detainees were required to be released pretrial due to the lack of housing capacity in the jail; 9,007 sentenced jail inmates were required to be released before their county jail sentences were completed due to the lack of housing capacity in the jail.

14. I believe that releasing inmates from State Prison, prior to the conclusion of the term would mean that the inmates would be returning to San Diego County, which is where they came from. Based on recidivism rates, those inmates would reoffend and would be back in Sheriff's custody. And if there were capacity limits placed on sending them back to State prison, we would have the inmates that would have been in Prison that were let out. The Department would have inmates that should be sentenced and sent to State prison that we can no longer send. Therefore, it would impact the Department's ability to remain in compliance with court orders as well as have a negative impact on public safety.

15. The type of inmates who would be released from prison – usually multiple time offenders with a history of substance abuse, often with mental health care needs and failures to comply with terms of probation or parole – upon a new arrest, would be booked and housed in the Department's facility until an appropriate decision has been made on whether they would be violated on parole or sentenced to a new term in prison. The majority of these inmates would not meet the criteria for any of these shortened or diversionary programs.

I declare under penalty of perjury under the laws of the State of California that the

-7-

1  foregoing is true and correct. Executed this 30 day of OCTOBER at San Diego,
2  California.

JOHN INGRASSIA





## COUNTY OF SAN DIEGO

## UCC SURVEY RESPONSE

### Probation Department - Based on the realignment of 4,875 - 5,865 parolees

Question 1) Estimated impact on the Probation Department assuming the optimal level of services is provided. Please share with us how you define optimal services and what formula you used to determine cost.

### Definition of Optimal Services

Services presented here are evidence based comprehensive services using a balanced approach of monitoring and control, and rehabilitation to effect lasting behavior change to best protect public safety.

Note: The statute under which probation will have authority to supervise parolees is unclear. Whether they would be supervised on parole or probation is the main question to be answered. If it is to be probation supervision, there are additional legalities to be resolved.

### Probation Department estimated costs:

LOW RANGE (4,875 parolees): $30.4 million
- 174 Staff (supervision, investigation and associated costs): $21.1 million
- Contracted vocational services: $9.3 million

HIGH RANGE (5,865 parolees): $36.8 million
- 212 Staff (supervision, investigation and associated costs): $27.5 million
- Contracted vocational services: $11.1 million

### Housing Services – Potential additional cost

The State currently provides minimal housing to parolees in the form of hotel vouchers and other types of transitional housing. This estimate is based on subsidized housing for up to 12 months after parolees are released from prison.
- LOW RANGE (4,875 parolees):   $30.7 million
- HIGH RANGE (5,865 parolees):   $36.9 million

What is the caseload size that your county assumes for these offenders?
- 50:1

What is the average length of supervision for these clients that your estimate assumes?
- From five months (pursuant to the requirements under SB 1453, Penal Code §2933.4, if they meet the requirements for conditions of parole as a low-level, nonviolent offender) to one year.

What number of peace officer staff does your estimate assume will be required to supervise this population?

EXHIBIT 1   (LEISDSD0001)

- For 4,875 parolees, SDC would need 122.5 peace officers.
- For 5,865 parolees, SDC would need 150 peace officers.

What number of support staff (clerks, probation aids, etc.) does your estimate assume?
- For 4,875 parolees, SDC would need 51.5 support staff.
- For 5,865 parolees, SDC would need 62 support staff.

Are you assuming that additional contract providers will be required for things such as drug testing, etc.? If so, please explain.
- Yes. For housing, job development/vocational, mental health and substance abuse as described below.

## Sheriff Department

Question 2) Estimated impact on the Sheriff/Department of Corrections. Given that the revocation process is as yet unspecified, what local law enforcement impacts can be anticipated and/or articulated, with dollar amounts if feasible?

### Sheriff population increase:
Estimated increase in jail population (70% of 5,865) of approximately 4,100 inmates: 1,300 inmates in first year; 1,400 in years two and three.

### Assumptions:
- 5,865 inmates would be returned to San Diego County with 70% re-offending within three years; 1,300 of which will occur in year one. Worst case scenario is all 1,300 offenders will be in custody at the same time. Best case scenario, based on the belief that the average length of stay will be much longer for re-offenders, is 845 (65%) re-offenders will be in custody at the same time thus increasing the daily jail population by that amount.
- The estimated average length of stay could range between 60 and 180 days.

### Sheriff cost to incarcerate re-offenders:
Re-offenders will have extensive criminal histories resulting in high bail amounts, higher probability that plea bargains will not occur early in the judicial process and more inmates choosing to go to trial.
- Based on 60 day length of stay: $5.6 to $8.6 million annually
- Based on 180 day length of stay: $16.8 to $25.9 million annually

### Assumptions
Cost estimates are based upon the projected number of inmates incarcerated per year; multiplied by the average bed cost per day ($110.69); multiplied by the estimated average length of stay of these re-offenders. The bed cost figure is the current number based upon the existing facilities' operating costs.

With the projected number of parolees to be transferred and the number required to be held in local custody, expansion of an existing facility or new construction will need to occur in order to accommodate the additional inmates.

## District Attorney

Question 3) Estimated impact on the District Attorney

District Attorney estimated costs:
LOW RANGE (new cases and probation revocation cases): $1.2 million
(Includes staff costs only, no ancillary costs included)
HIGH RANGE (new cases and probation revocation cases): $1.4 million
(Includes staff costs only, no ancillary costs included)

New Cases:
It is estimated that the potential number of new cases is between 1,521 and 1,830.
- Percentage resolved prior to trial: 94.5%;  Cost per case: $473
- Percentage to trial: 5.5%;  Cost per Case: $3,465

Probation Revocations:
It is estimated that there will be between 1,901 and 2,287 probation revocation cases.
- Cost per Case: $98
- This assumes adjudication processes for this population will be similar to probation processes in place today.

## Public Defender and Alternate Public Defender
Question 4) Estimated impact on the Public Defender and Alternate Public Defender

Public Defender and Alternate Public Defender estimated costs:
LOW RANGE Total: $3.5 million (Includes staff costs and ancillary costs)
HIGH RANGE Total: $4.2 million (includes staff costs and ancillary costs)

New cases:
It is estimated that the potential number of new cases is between 1,521 and 1,830.
- Cost per case: $1,400

Probation Revocations:
It is estimated that there will be between 1,901 and 2,287 probation revocation cases.
- Cost per Case: $285
- This assumes adjudication processes for this population will be similar to probation processes in place today.

## Mental Health Department
Question 5) Estimated impact on Mental Health Department (including pharmacy)
Please observe the sample methodology suggested by Santa Clara County.

(a) Estimated impact on the Mental Health Department (including pharmacy) based on number of parole clients per LAO estimates.

Assume 10% of parolees for intensive treatment (Full Service Partnership), Pharmacy costs included:
   Cost per client @ $27K each
   - LOW RANGE:  4,875 parolees x 10% = 488 @ $27K = $13.2 million/year

- HIGH RANGE: 5,865 parolees x 10% = 587 @ $27K = $15.8 million/year

Assume 10% of parolees for outpatient treatment:
 Cost per client @ $2K each
- LOW RANGE:  4,875 parolees x 10% = 488 @ $2K = $1.0 million/year
- HIGH RANGE: 5,865 parolees x 10% = 587 @ $2K = $1.2 million/year

Pharmacy Cost estimate: Include Average cost per client and total:
 Cost per client @ $750 each
- LOW RANGE: 4,875 parolees x 10% in outpatient treatment = 488 x 47% receiving medication = 229 @ $750 = $0.2 million/year
- HIGH RANGE:  5,865 parolees x 10% in outpatient treatment = 587 x 47% receiving medication = 276 @ $750 = $0.2 million/year

Total costs including both intensive and outpatient treatment and pharmacy:
LOW RANGE:   $14.3 million per year
HIGH RANGE:  $ 17.2 million per year

(b) What new/expanded service capacity is required to treat adult probation (parolees) with mental illness? Use your county's Mental Health Services Act CSS program costs as basis: Full Service Partnership slots & outpatient slots.
- There will be a 63% expansion required for intensive services.
- There will be a 4% expansion in outpatient services from the existing level. 5,865 parolees x 10% (rate of need for outpatient treatment) = 586.5 new outpatient slots needed in addition to the existing 13,500 slots; 586.5/1300.

## Alcohol and Drug Services
Question 6) Estimated impact on County Alcohol and Drug Treatment. Assume that 70% of the parolee population will need services of some sort. Use a "per episode" cost and multiply it by the number of parolees in your county that will need alcohol and drug treatment services (70% of the total number of parolees expected to be returned your county). An episode includes the course of treatment from entrance to treatment to discharge and can include various modalities. Santa Clara provided the example below.

Alcohol and Drug Services cost estimate for 70% of the parolee population:
LOW RANGE (4,875 parolees):   $20.7 million
HIGH RANGE (5,865 parolees):  $24.9 million

Assume 25% Residential @ $50 per bed day for 6 months.
- LOW RANGE:  4,875 x 70% = 3,413 x 25% = 853 x 183 days = 156,123 x $50 = $7.8 million
- HIGH RANGE:  5,865 x 70% = 4,106 x 25% = 1,026 x 183 days = 187,828 x $50 = $9.4 million

Assume 75% Non-Residential @ $70 per day, 3 times per week, for 6 months
- LOW RANGE:  4,875 x 70% = 3,413 x 75% =2,559 x 12 days per month = 30,713 x 6 months = 184,275 x $70 = $12.9 million

- HIGH RANGE: 5,865 x 70% = 4,106 x 75% = 3,079 x 12 days per month = 36,950 x 6 months = 221,697 x $70 = $15.5 million

Alcohol and Drug Services cost estimate for 80% of parolee population.
Assume 80% of parole population need services based upon SB 618 prison re-entry program experience.
LOW RANGE (4,865 parolees): $23.5 million
HIGH RANGE (5,865 parolees) $28.3 million

Assume 25% Residential @ $50 per bed day for 6 months.
- LOW RANGE: 4,875 x 80% = 3,900 x 25% = 975 x 183 days = 178,425 x $50 = $8.9 million
- HIGH RANGE: 5,865 x 80% = 4,692 x 25% = 1,173 x 183 days = 214,659 x $50 $10.7 million

Assume 75% Non-Residential @ $70 per day, 3 times per week, for 6 months
- LOW RANGE: 4,875 x 80% = 3,900 x 75% =2,925 x 12 days per month = 35,100 x 6 months = 210,600 x $70 = $14.7 million
- HIGH RANGE: 5,865 x 80% = 4,692 x 75% = 3,519 x 12 days per month = 42,228 x 6 months = 253,368 x $70 = $17.7 million

County of San Diego
Survey completed by: Dorothy Thrush, Public Safety Finance Director
Phone # 619-531-4599