PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

K&L Gates LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT**<br><br>**EXPERT REPORT OF BARRY KRISBERG Ph.D.** |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT** |

1

2

3

4    Dated:  September 8, 2008        By:

5

6                                          EDWARD P. SANGSTER

7                                          ed.sangster@klgates.com

8                                          K&L Gates LLP
                                           Attorneys for Plaintiffs
9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

                                            2

### Expert Report of Barry Krisberg, PhD

## I. Qualifications

I have been the president of the National Council on Crime and Delinquency (NCCD) since 1983. Having just celebrated its 100th anniversary, the NCCD is the nation's oldest and most respected criminal justice research organization. I have been known internationally for my research and expertise on juvenile and criminal justice issues and I am frequently called upon by elected officials, the judiciary, and the media. The NCCD is often asked by governors and legislatures in many states to assist in designing justice programs. Most recently, I worked in Illinois, Texas, and Florida to help rebuild very troubled juvenile corrections systems. I have worked in a variety of roles in California to design and evaluate reforms in the state corrections system. My complete curriculum vitae are presented in Attachment A.

I received my master's degree in criminology and a doctorate in sociology, both from the University of Pennsylvania. I have held several educational posts. I was a faculty member in the School of Criminology at the University of California at Berkeley and as an adjunct professor with both the Hubert Humphrey Institute of Public Affairs at the University of Minnesota and the Department of Psychiatry at the University of Hawaii. I am currently a lecturer in the Legal Studies Department and at the Boalt Hall School of Law at the University of California, Berkeley. Most recently, I gave an advanced seminar for Boalt Hall students on "Legal and Policy Issues in Prisoner Reentry."

In 1979 I was asked by Health and Welfare Secretary Mario Obledo to serve on a Task Force to investigate the over-representation of people of color in California prisons. In the 1990s I was appointed by the Legislature to serve on the California Blue Ribbon Commission on Inmate Population Management. Previously, I was asked by the Legislature to conduct a study on alternatives to prison. More recently I was asked by the California Senate Budget Committee to

1

organize a California Task Force on Prison Crowding. I also was appointed by CDCR to serve on an Expert Panel on Adult Offender Recidivism Reduction Programs.

My memberships have included the Juvenile Justice Committee of the International Association of Chiefs of Police, the National Association of Juvenile Correctional Administrators, and the Association of Criminal Justice Researchers. I was past president and fellow of the Western Society of Criminology and was the Chair of the California Attorney General Bill Lockyer's Research Advisory Committee.

In 1993 I was the recipient of the August Vollmer Award, the American Society of Criminology's most prestigious award. The Jessie Ball duPont Fund named me the 1999 Grantee of the Year for outstanding commitment and expertise in the area of juvenile justice and delinquency prevention.

In 2002, I was appointed to by the California Attorney General to chair an Expert Panel to investigate the conditions in the California Youth Authority. In 2004 I was named in a consent decree to help develop remedial plans and to monitor many of the mandated reforms in the Youth Authority. I am often asked by California counties and the Chief Probation Officers of California to provide training on a range of corrections issues.

I have numerous books and articles to my credit and serve on the editorial board of the prestigious journal *Crime and Delinquency*.

I am frequently called upon by private foundations to assist with the design, implementation, and evaluation of programs—both their own and those of the public sector. The Annie E. Casey Foundation engaged me to assess the effectiveness of their Juvenile Detention Alternatives Initiative, the single largest private program for juvenile justice system reform in the country. The Walter S. Johnson Foundation supported me to lead a Blue Ribbon Commission on California's policy of out-of-state placement of delinquent youth. Baptist Community Ministries

2

has sought my expertise on assessing the needs of troubled youth in the greater New Orleans area, and the Robert Wood Johnson Foundation asked that I prepare a white paper on delinquency and substance abuse. The California Endowment selected me to evaluate a five-county effort to improve mental health services in juvenile detention facilities. The California Endowment has also funded me to lead a 13-city network to reduce gang violence in California. The Irvine Foundation asked me to assess the value of inmate rehabilitation programs at Lancaster State Prison. Several California foundations and the JEHT Foundation funded me to conduct a comprehensive study of California women prisoners. In the late 1990s, the San Francisco Foundation funded me to examine the implementation of a new inmate classification system at San Quentin. I have been regularly consulted by the California Office of the Inspector General, especially on issues relating to the Division of Juvenile Justice (DJJ).

I have supervised NCCD research studies funded by the National Institute of Justice on Early Release in the Illinois Department of Corrections and on the Use of Electronic Monitoring in Oklahoma. I have also been asked by the National Institute of Corrections to provide training to a number of jurisdictions on jail classification systems and to provide assistance to the District of Columbia Department of Corrections. I am regularly consulted by the Special Litigation Unit of the US Department of Justice on investigations under the Civil Rights of Institutionalized Persons Act, and I testified before the National Commission on the Elimination of Prison Rape at their request.

In the past five years, I have served as a joint expert witness in *Farrell v. Cate*, a case that involves a Consent Decree on conditions in the DJJ. In that capacity, I was deposed on April May 19, 2008 and testified in Alameda County Superior Court on April 24 and May 23, 2008. I was also deposed in July 2006 in cases entitled Fonda Whitfield and The Estate of Deon Whitfield v. State of California et al., Case No. Cv-04-2729 GEB (JFM); Allen Feaster and

3

Gloria Feaster and the Estate of Durrell Feaster v. State of California et al., Case No. CV-04-2730 GEB (JFM). The cases stemmed from the January 19, 2004, suicide deaths of two young wards in the same cell, Deon Whitfield and Durrell Feaster at Preston.

## II. Expert Opinions

I was retained by the plaintiffs in July of 2008 to be an expert in these proceedings and have reviewed many documents, depositions, interrogatories, and other expert reports and statistical data relevant to the Coleman and Plata proceedings. I have been asked to render an opinion on whether the accelerated release of CDCR inmates would create a danger to public safety. My fee is $300 per hour for work related to these cases.

### A. Done properly, a population cap in the California state prison system would not have an adverse effect on public safety.

My extensive review of the available data reveals that millions of prisoners in other states as well as inmates in numerous California county jail systems have been released early in response to population pressures with no adverse effect on serious crime. Indeed, the most solid empirical evidence on the experience of other states that have accelerated prisoner release to reduce population is that such releases are uniformly safe and, if done properly, actually reduce crime.

### 1. All rigorous studies of other state prison systems' early release programs demonstrate that such programs do not endanger public safety

My opinion is based on a thorough review of empirical research over the past 22 years in states that have accelerated the release of prison inmates. In March of 2007, my colleague Carolina Guzman and I conducted an extensive review of the published literature on early release and public safety. This review utilized the library resources of the National Institute of Corrections, the National Criminal Justice Reference Service, the James Cotton-NCCD Criminal

Justice Collection at Rutgers University, and the Bancroft Library at the University of California Berkeley. This review identified 14 peer-reviewed articles, dissertations, state agency reports, and national studies. These materials covered the period from 1981 to 2004 and covered Canada and the states of California, Washington, Wisconsin, Illinois, Texas, Colorado, Montana, Michigan, and Florida. In addition, one study covered early releases from a large jail in the Northeast U.S. Attachment B includes a brief overview of these 14 studies and the full citation of authors and sources.

Overall, this literature showed that the recidivism rates of prisoners released early were comparable to those who served their full terms. In some instances the recidivism rate among the early release group was lower than those inmates who served their full terms. We found that early release programs actually lowered recidivism rates of released inmates when they were targeted at selected low-risk offenders, especially those convicted of substance abuse or property crimes. Further, early release produced lower rates of recidivism if there were provisions made for community-based supportive services such as housing, employment, or drug treatment. In addition to the recidivism data, virtually all of the studies illustrated that overall crime rates were either stable or declining during the periods when prisoners were being released early. The following discussion reviews some of the specific studies in greater detail.

Washington began accelerating the parole of inmates to reduce prison crowding in 1979. The Legislature mandated that the most serious felons and sexual psychopaths could not be part of the early release program. The research covered 1,674 inmates that were released an average of 6 months early. The comparison group consisted of inmates released in the 12 months before this program. The recidivism rates of the two groups were virtually identical over the next five years. The Washington state crime rate was roughly constant during the period of the early release.

In 1970, the California Department of Corrections selected a cohort of 1,310 inmates who

5

were eligible for parole. Half of the group members were randomly selected and paroled an average of 6.6 months earlier than their scheduled dates. The CDC researchers found no statistically significant differences between the two groups in terms of returning to prison based on either a new conviction or a parole violation. There was no evidence that this experiment had any effect on the state crime rate.

Colorado immediately released 126 prisoners after the courts ruled that they should have gotten good time credits based on their jail behavior during pre-sentence confinement. There were no statistically significant differences in the re-arrest rates for the accelerated released inmates compared to those who were not released. Again, there was no discernable impact on the Colorado crime rate.

The Montana legislature placed a cap on its prison population in 1993, in part, by decreasing the amount of time served by its prison inmates. The researchers examined inmates who received accelerated good time credits, those sentenced to community-based parole programs, and those who received a regular parole date. The recidivism rates of these offenders were roughly the same as historical Montana recidivism rates. During the period of the prison cap, the crime rate in Montana showed a modest decline.

A Texas study examined a sample of 2,072 prisoners released from the Texas Department of Corrections in 1983. Approximately 29% of these cases were Early Mandatory Releases— inmates selected for release up to 180 days prior to their regular release dates. The researchers found that the return rate to prison was similar for the early release cases compared to others that were released on their regular sentence dates. It was also noted that in 1983, when mandatory release was fully operating, Texas saw the largest drop in 20 years in its state crime rate.

Two studies from Wisconsin followed 1,886 inmates who received mandatory releases after being rejected for parole and another cohort of 892 inmates who were subject to Special Action

6

Release to reduce crowding. In both studies, there was no evidence that releasing selected inmates had any negative effects on recidivism or general public safety. During the course of these programs, the crime rate in Wisconsin declined by over 5% from 1984 to 1988.

With a grant from the National Institute of Justice, the NCCD conducted research on the early release program of the Illinois Department of Corrections (IDOC) that operated from 1980 to 1983. Early releases of up to 90 days were ordered by Governor James Thompson to prevent violence in Illinois's crowded prisons. By 1983, these releases had reduced the average daily population of IDOC by roughly 2,500 inmates. The NCCD study showed that the prisoners who were released early actually had a lower recidivism rate than those released after serving their full terms. Inmates were selected for early releases that were closest to their regular release dates. Wardens were asked to flag cases in which the inmates had presented significant problems while incarcerated. It might be that the early release population possessed a slightly lower risk of re-offending than the group that served their full terms, but the selection of inmates for release process was really driven by how soon inmates would be released anyway.

Illinois's crime rate declined during the years of early release. In 1990 the Illinois Legislature modified the program and actually increased the number of days to 180 by which inmates' sentences could be reduced. The NCCD examined the cases of 4,640 inmates. The early releases had the same recidivism rates as the other released inmates. The later cohort of early-release inmates actually possess lower post-prison failure rates compared to the original group of inmates with accelerated discharges (their releases were advanced to180 days vs. 90 days). For both cohorts, the majority of subsequent crimes were for nonviolent misdemeanors. Crime rates continued to decline even as early releases were increased in Illinois.

A Michigan Task Force on Jail and Prison Crowding found that the state's crime rate continued to trend downward from 1991 to 2004. The crime drop in Michigan closely paralleled

7

the national decline in crime during this same period. This was a period in which the Governor had capped the prison population and the county jails were advancing the release of many inmates.

Under court pressures, Florida employed house arrest and intensive supervision for offenders who were otherwise bound for state prisons. Inmates usually served short prison stays of roughly 90 days and then were released to intensive community supervision. With funding from the National Institute of Justice, the NCCD studied 630 offenders in this program, known as Community Control. During an 18-month follow-up period, the offenders in the Community Control Program had a lower rate of recidivism than similar offenders who served prison terms of approximately 9 months. A larger study of Community Control was conducted by the Florida Office of Inspector General. This analysis found that the majority of released prisoners that returned to prison or jail did so because they violated conditions of supervision and not because of new crimes. As with the other jurisdictions mentioned above, Florida's crime rate declined during the period when Community Control was operating.

Research on early parole of jail inmates in Philadelphia showed that adding in community-based drug treatment services increased the proportion of successes among the early released inmates from 66% to 78%. Those who actually completed the drug treatment programs had twice the success rate of those with less than 6 months in treatment. This study showed that while early paroled jails inmates had relatively low recidivism rates, the addition of drug treatment could substantially improve their post-release success rates.

Finally, I found in my March 2007 literature review several studies of offenders who received accelerated parole from Canadian prisons in the mid 1990s. Studies of both men and women prisoners who received early parole showed that they had relatively low post-release failure rates. These offenders did better than comparable inmates who served their full terms, and

the subsequent offenses were primarily violations of parole conditions, minor crimes, and overwhelmingly nonviolent offenses.

Others involved in California corrections concur with my opinion. For example, Matthew Cate, the current director of CDCR, testified that corrections experts have indicated that "if done properly," one can reduce the prison population "without negatively impacting crime rates in society."[1] Loren Buddress, Chief Probation Officer for San Mateo County, believes that, given funding to provide appropriate services, "a controlled release of inmates from state prison would not negatively impact public safety."[2] According to Sonoma County Sheriff William Cogbill, putting programs in place would reduce recidivism, and if provided with sufficient funding for programs in conjunction with a prisoner release order, Sonoma County "could mitigate those impacts to public safety to the degree that it wasn't an issue."[3]

### 2.   Early release of jail inmates in California has not had an adverse effect on crime rates

There has been extensive use of early release and diversion in California counties in response to court orders to reduce jail overcrowding. Although these practices have not been subject to the rigorous and in-depth research that I have described above, the aggregate data supports the position that early release done properly does not weaken public safety.

I examined data from the Board of Corrections on the extent of releases of jail inmates in California counties due to court orders to manage crowding, and analyzed this data in relations to changes in the crime rates of these counties. For crime rates, I used the FBI's Uniform Crime Reports and looked at the most serious crimes that most criminologists use to examine crime trends and to compare jurisdictions. These offenses include homicide, aggravated assault, forcible rape, robbery, burglary, grand larceny, auto theft, and arson. The FBI uses these offenses

---

[1] Cate Deposition, page53.
[2] Buddress Deposition, pages 50-51.
[3] Cogbill Deposition, pages 36-38 and 39-40.

as an index of crime because they are among the most serious offenses, and these crimes have a high probability of being reported by citizens to the police. I will refer to these offenses throughout my report as "serious crimes." Although data on reports for misdemeanors and less serious offenses are less consistently available for all California counties, I examined 10-year trend data from the California Department of Justice on arrests for misdemeanors. From 1997-2006 the California Department of Justice reported that statewide misdemeanor arrests declined from 1,033,196 to 939,046 – a reduction of 9%. The rate per 100,000 of misdemeanor arrests dropped from 4,011 to 3,260 – a reduction of 18%.[4]

I examined data on individual California counties in releases and the number of crimes, the five-year trends, and the more recent two-year trends. From 1996 to 2006, using 21 counties for which there was complete data, over 1.7 million jail inmates were released due to overcrowding.[5] These were jail inmates that the counties reported to the Board of Corrections (now known as the Corrections Standards Authority) that they had released either via diversion or shorter sentences pursuant to a court order to limit the capacity of their jails. In this same period, the number of serious crimes reported dropped by 18%. During the five years from 2001 to 2006, there were 764,277 inmates released from 22 counties.[6] The number of reported crimes was largely unchanged in these locales. During the most recent three-year period for which complete data are available (2004-2006), there were 416,767 inmates released in 24 counties due to court orders, but the number of reported crimes declined by 7% in these same counties.[7]

---

[4] (http://stats.doj.ca.gov/cjsc_statsprof06/004A.htm)

[5] Amador, Butte, Calaveras, Eldorado, Fresno, Humboldt, Kern, Los Angeles, Merced, Orange, Placer, San Benito, San Diego, San Joaquin, Santa Barbara, Shasta, Solano, Stanislaus, Tehama, Tuolumne, and Yolo.
[6] Same list as above adding in data from San Mateo.
[7] This group includes also data from Inyo and Ventura.

I also analyzed the trends in individual counties but this showed no consistent relation between the volume of jail release due to court ordered population caps and changes in reported crimes across the counties. For example, from 2002-2004, 13 counties ( Amador, Calaveras, Fresno, Humboldt, Inyo, Los Angeles, Orange, Placer, San Mateo, Santa Barbara, Shasta, Ventura, and Yolo) had an increase in capacity-based releases and a decrease in crime. Another 8 counties (Butte, El Dorado, San Diego, Merced, San Benito, Stanislaus, Tehama and Tuolumne) had a decrease in releases and a decrease in crime. Only 3 counties (Kern, San Joaquin, and Solano) experienced a rise in both releases and crime.

I looked at patterns in the largest counties (Los Angeles, Orange, and San Diego) as well as a number of mid-sized or smaller counties. Here again, no consistent pattern linked changes in crime with increases or decreases in jail releases due to court orders. Put simply, the accelerated release of jail inmates neither lowers the crime rate nor increases it. This finding is entirely consistent with the studies that I reviewed earlier in this report.

At the local level, testimony from corrections professionals supports the inference, drawn from the statistics discussed above, that early releases from local jails have not adversely impacted public safety.  San Diego County has implemented a variety of diversion and early release programs to control the population in its county jails.  William Ingrassia, Commander of the Detention Bureau for San Diego County, was unaware of any specific detriment to public safety caused by these programs.[8] Sonoma County likewise functions under a population cap. Sheriff Cogbill was unaware of any particular crimes that were committed by inmates who were released early.[9]

> **B.      Studies show that if early releases are accompanied by resources for evidence-based programs for this population, there will be a positive effect on public safety**

---

[8] Ingrassia Deposition, pages 55-60.
[9] Cogbill Deposition, pages 23-24.

There is a significant population of people who are safer to society if provided appropriate programs in their communities rather than being warehoused in overcrowded, violent prisons. We can generally identify these inmates who pose a very low risk of recidivism, given proven risk classification tools. Further, there are well-tested assessment tools that can identify and prioritize the treatment needs for individual prisoners. There is a growing body of research identifying program interventions such as Cognitive Behavioral Therapy and Therapeutic Communities that produce measurable progress for inmates with various treatment needs. We can identify the programs, given numerous studies with concrete data showing positive effects on recidivism rates. It is also common sense. A low risk offender will have a better chance of succeeding in the community and becoming a productive member of society if they are enrolled in substance abuse programs or job training programs in the community. Compare this plan to the same convict sitting idle on a tripled bunk in an overcrowded, violent gym with minimal yard time and no work or educational opportunities, consorting with more sophisticated criminals or prison gangs. The CDCR's Expert Panel on Adult Offender Recidivism Reduction Programs (2007) gave numerous examples from states such as Pennsylvania, Ohio and Arizona that are making significant programs in matching appropriate services to offenders as a method of reducing future criminality.

C.     **The critics of early release make faulty assumptions about the relationship between correctional practices and public safety.**

Arguments against accelerated release generally ignore several key facts. First, it is important that virtually every inmate selected for early release under the programs suggested by Dr. Austin in his expert reports and used in California counties under population caps will be released soon anyway. Most accelerated release programs will shorten the prison stays of inmates by six

months or less.

As the President of John Jay College, Jeremy Travis has reminded us in his book, *But They All Come Back*, all but death row inmates and prisoners with life sentences eventually return to the community. Although it is true that some released inmates will re-offend, being released several months sooner is not likely to have an impact on that fact. A National Research Council report, released in 2007, reviewed studies on the correlates of prisoners who recidivate and suggested that post-release opportunities including employment, housing, and positive family supports can reduce these failure rates  So data on the current recidivism rates of California inmates are not especially relevant to evaluating early release.  Further, respected psychologist such as Professor Craig Haney of the University of California, Santa Cruz have argued that prisons actually **debilitate** inmates, increasing their mental health problems and diminishing their abilities to function in the free world.[10] This means that longer prison stays may actually increase recidivism rates. Data from CDCR reviewed by Dr. James Austin suggests that the longer the time served the higher the post-release failure rates.

Second, there is growing evidence that careful selection of inmates for early release can improve the programs' outcomes if there are focused efforts to match inmate's needs to services in the community.  Well designed and implemented programs can actually lower prison populations and advance public safety. The Pew Trusts has recently issued reports illustrating examples of this win-win situation. There are several highly effective risk and needs assessment systems that are available. For example, the NCCD approach known as Correctional Management Classification (CMC) has shown its ability to assist in the community supervision of released offenders in states such as Florida, Wisconsin, and South Carolina. Offenders who were supervised by parole or probation staff trained in CMC had much lower rates of failure than

---

[10] Craig Haney, *Reforming Punishment: The Psychological Limits of Pains of Imprisonment,*  Washington, D.C.: American Psychological Association, 2006.

other parolees. There are several valid assessment tools available to CDCR to effectively screen out the high-risk inmates and permit better community supervision.

There is solid evidence that effective services in the period right after discharge can substantially cut down on recidivism. The CDCR's own Expert Panel on Adult Offender Recidivism Reduction Programs offers a blueprint designed by nationally known corrections leaders and researchers that is based on the best available research. Further, a recent report of the National Research Council on Parole, Desistence from Crime, and Community Integration (2007) offers the best evidence-based models for cutting down on post-release crime. The Urban Institute, the Council of State Governments, and the National Institute of Corrections all have tremendous resource materials on properly managing the prison reentry process.

All of these authoritative sources have shown that the provision of transitional housing, access to health care and mental health services, drug treatment, and vocational services can ease the reentry process and reduce subsequent criminality. It is recommended that planning for reentry services occur early in the incarceration period and that offenders leave prison with specific reentry plans.

The critics of early release exploit the image of inmates being randomly dumped into communities without reentry planning or effective services. If early release is accompanied by funding for proven reentry services, it would be a safe and effective population reduction strategy, the cost of which is far less than building and operating more prison and jail beds. Further, community-based reentry programs can be up and running far more quickly. Critics have argued that such services do not presently exist in sufficient quantity at the local level, but there is no logical reason why this community capacity could not be expanded with appropriate state funding and commitment.

Several counties such as Alameda, San Diego, Santa Barbara, San Mateo, and San Francisco

have built sophisticated reentry strategies that merge county and state resources and involve both public and private agencies. These counties offer a range of ideas on how the CDCR could safely manage the early release of inmates. Many of these efforts are currently being researched, but the preliminary reports from the localities have been promising. Most important, these local efforts illustrate that communities have stepped up to better respond to the needs of released inmates.

Alameda County has been operating Project Choice for several years. Current Attorney General Jerry Brown was instrumental in getting this innovative collaboration started when he was Oakland's Mayor. This program is a partnership between the CDCR, several agencies in Alameda County Government in the City of Oakland, as well as a number of community-based organizations such as the Mentoring Center. The goal is to identify offenders in CDCR who will soon be released back to Alameda County and to build individual community support plans for these offenders. The services include job placement, health care, temporary housing, substance abuse services, and peer-counseling. The Oakland Police Department, Alameda Probation Department, and the CDCR Parole Division worked collaboratively to plan and implement the program. Initially begun to reduce the failure rates of offenders released from state facilities, Project Choice also works with inmates released from the county jail.

Santa Barbara County worked with the NCCD to plan and design a community collaboration to assist released inmates from state prisons and the county jail. Funded initially by local philanthropists and the Gerbode Foundation, this program includes a consortium of non-profit organizations and public agencies such as the Santa Barbara Recovery Center. The program staff contact selected low risk inmates in advance of their release (usually 90 days) and begin joint planning with the offender about the needed services when the person returns to Santa Barbara County. Top law enforcement leadership including the Sheriff, the District Attorney, and the Police Chiefs from all major cities has been involved in the program. The Santa Barbara team

works closely with the CDCR Parole Division and was recently funded by CDCR to build and operate a local reentry center that will serve both state and local inmates.

San Mateo County asked the NCCD to assist a multi-agency task force to help the County strengthen its reentry services. This task force was chaired by the Chair of the County Board of Supervisors and included all pertinent county agencies and community-based groups. The initial planning was partially supported by a grant to NCCD from the San Francisco Foundation. Now the services are part of the regular county budget. San Mateo County chose to dedicate a full-time probation officer to assist in reentry planning. The County is attempting to link its rehabilitation programs in the jail to Project Bridge that connects released offenders to similar services in the community. The County is also doing a careful assessment of existing substance abuse service and looking to plug any gaps in these services.

San Diego County has received substantial state and foundation funding to strengthen its local prison reentry services. The San Diego effort is primarily focused on getting released inmates into jobs. There are also a range of supportive services including counseling, health care and housing.

San Francisco has formed an ongoing multi-agency Reentry Council under the leadership of Mayor Gavin Newsome and the Board of Supervisors. The Reentry Council, which has dedicated staffing, also includes the DA, the Sheriff, the Superior Court and the Probation Department. Many community agencies and organizations of formerly incarcerated persons meet monthly to plan new services and to ensure that existing programs for released jail inmates are well-coordinated. The SF Reentry Council has been working hard to reduce barriers to employment for low risk offenders and the Council has paid particular attention to diverting low level offenders from jail sentences.

Besides the reentry programs that I have briefly described above, there are many county jail

16

systems in California that have responded to court-imposed inmate releases have employed a broad range of programs as safe alternatives to total confinement. Attachment C illustrates the extent of court-imposed releases and lists the sorts of programmatic alternatives that have been employed. The interrogatories gathered from most of the intervenor counties offer detailed policy and procedures being used in these counties for home electronic monitoring, work programs, county parole, or work furlough programs, weekend work programs, house arrest, day reporting programs, and drug treatment placements, to name a few existing alternatives. There is also information from the counties about inmate classification systems that are being used to identify the lower-risk inmates for these alternative programs. A recent report by the Chief Probation Officers of California (2007) entitled, *Adult Services Plan: Serving 18-25 year olds – Best Practices* contains an range of excellent programs that California probation leadership assert would allow them to divert many offenders from state prison, if funded appropriately.

Third, some skeptics of early release also suggest that modest reductions in sentences will have a significant impact on the deterrent value of the penal system. The research on deterrence by Franklin Zimring and Gordon Hawkins[11] suggests that it is the timely application of penalties, rather than their severity that exerts a real deterrent effect. There is no reliable scientific evidence showing that minor reductions in time served compromise the deterrent value of the penal system.

Reviewing CDCR data reported in *California Prisoners and Parolees* reveals that between 1978 and 2007, the median time served for prisoners who were committed for property crimes and many drug offenses actually went down. The corresponding median time served for violent offenders and serious sex offenders went up during that same time period. But, the state witnessed a drop in crime for both violent and nonviolent offenses. The largest crime decline was

---

[11] Franklin Zimring and Gordon Hawkins, *Deterrence: The Legal threat in Crime Control*, Chicago: University of Chicago Press, 1973.

for burglary. (California Department of Justice 2007, *Crime in California*, Sacramento, California, 2008.)

The extent of time reductions for good behavior for nonviolent offenders has been changed repeatedly. The Legislature has changed the criteria for prison commitments versus sentences to county jails. However, there is no empirical research showing a clear relationship between these sentencing changes and crime rates, especially for the property offenders and minor offenders who would be subject to early release orders. The notion that modest early release will embolden potential offenders is more an "urban legend" than an established fact. Sentences and time served have varied over time, and they vary across jurisdictions. Current penalties are based on political decisions of state officials, not on the science of penology.

### D.    Defendants' expert Dr. Marquart makes significant errors in his report

I have reviewed Dr. James Marquart's expert report of August 14, 2008, and Dr. James Austin's expert report of August 27, 2008. I fully agree with Dr. Austin's criticisms of Dr. Marquart's report, contained in pages five through eight of Dr. Austin's report.

### Concluding Observations

There are a wide variety of methods though which the CDCR could provide some relief for its severe crowding crisis. These approach encompass programs and policies that either divert offenders from admission or re-admissions to CDCR or those measures that would modestly reduce the time served for non-violent and non-dangerous offenders. Both strategies have been safely and successfully employed in a number of other states and in California over the past 25 years. Moreover, many California counties faced with severe crowding and court-mandated capacity limits have successfully diverted or accelerated the releases over 1.7 million jail inmates over the past 10 years. Crime rates went down during that same time frame.

Prison and jail population and recidivism reduction programs can be successful in relieving

population pressures and keeping the public safe if they include (1) effective screening through validated risk and needs assessment tools; and (2) the provision of services in the community including transitional housing, mental health and health care, and substance abuse counseling. Under these circumstances the recidivism rates of diverted or released offenders is often lower than for those who complete their regular terms. But, it must be added that the best research does not show public safety problems that have been created by early release programs, even if the community treatment or supervision resources are not increased.

The current recidivism rates of released CDCR prisoners are quite high. Further, there is ample evidence that the level of crowding has contributed to a high level of violence within CDCR's institutions. Both inmates and staff have been victims of this prison violence. Moreover, the present inadequate system of prison mental health care and the idleness of many inmates make it more likely that these recidivism rates will remain high. Thus, the status quo that is made worse by severe crowding is threatening to community safety. A better managed and designed penal system could help California reduce risks to the public.

September 8, 2009

Barry Krisberg, PhD

# ATTACHMENT A

BARRY ALAN KRISBERG, Ph.D.
Biographical Sketch, Page 20

## BARRY ALAN KRISBERG, Ph.D.
## CURRICULUM VITAE

### PRESENT POSITION:

President, National Council on Crime and Delinquency (NCCD), Oakland, California

### EDUCATION:

1971    University of Pennsylvania, Ph.D. (Sociology)
1968    University of Pennsylvania, M.A. (Criminology)
1967    University of Pennsylvania, B.A. (Sociology)

### PROFESSIONAL EXPERIENCE:

| | |
|---|---|
| 1983 to date | President, NCCD |
| 2007 | Lecturer, Boalt Hall School of Law, University of California, Berkeley |
| 2003-present | Lecturer, Legal Studies Program, University of California, Berkeley |
| 2004-2005 | Alameda County Superior Court Appointee, Farrell v. Allen Consent Decree Monitor |
| 2003-2004 | Head of Expert Panel, Review of the California Youth Authority re Farrell v. Allen |
| 2002-2003 | Consultant to the California Inspector General on the Youth Authority |
| 1990-1995 | Faculty, National Judicial College |
| 1979-1983 | Research Director, NCCD |
| 1984-1987 | Adjunct Professor, Hubert Humphrey Institute of Public Affairs, University of Minnesota |
| 1982 | Lecturer, Legal Studies Program, University of California, Berkeley |
| 1977-1979 | Senior Research Associate, NCCD |
| 1971-1977 | Assistant Professor, School of Criminology, University of California, Berkeley |
| 1976 | Lead Consultant on Delinquency Prevention, National Commission on Standard and Goals for Juvenile Justice and Delinquency Prevention |

### PUBLICATIONS:

2005    *Redeeming Our Children: The Quest for the Juvenile Justice Ideal,* Woodland Hills, Sage
Publications.

2005    "Juvenile Offending" (with Angela Wolf), in Heilbrun, Sevin Goldstein, and Redding (Eds.),
*Juvenile Delinquency* (pp. 67-84), New York: Oxford University Press.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 2

2004    Book review of "Causes of Conduct Disorder and Juvenile Delinquency." Social Service Review 78 (September 2004): 520-522.

2004    *Juvenile Justice in Florida: What Kind of Future?* (with Vanessa Patino, MPA), Oakland CA: National Council on Crime and Delinquency.

2004    *Reforming Juvenile Justice Through Comprehensive Community Planning* (with Giselle Barry and Emily Sharrock), Oakland, CA: National Council on Crime and Delinquency.

2003    "The End of the Juvenile Court: Prospects for Our Children" in Hawkins, Myers Jr., and Stone (Eds.), *Crime Control and Social Justice: The Delicate Balance* (pp. 93-105), Westport, CT: Greenwood.

2002    "The Role of Faith-Based Groups with High-Risk Youths" *Health and Spirituality Connection,* (Summer).

2002    "Should the Juvenile Court Survive?" in, Silverman, Thornberry, Cohen, and Krisberg (Eds.) *Crime and Justice at the Millennium,* Boston, MA: Kluwer Academic Publishers.

2002    *Crime and Justice at the Millennium* (with Robert Silverman, Terence P. Thornberry, and Bernard Cohen), Boston, MA: Kluwer Academic Publishers.

2001    "The Plight of Children Whose Parents Are in Prison" (with Carolyn Temin), Oakland, CA: National Council on Crime and Delinquency.

2001    "Juvenile Detention Alternatives Initiative Evaluation Report@ (with Sharon Jones, Madeline Wordes, and Judy Wallen), Oakland, CA: National Council on Crime and Delinquency.

2000    AAdvising Criminal Justice Policy Through Experimental Evaluations: Introduction@ (with Karl Schumann), *Crime and Delinquency*, Vol. 46:147-155.

2000    AAdvising Criminal Policy B Are Experimental Evaluations Important?@ *Experimente in Stra. Frecht,* Bremen, Germany: Bremer Institut für Kriminalpolitik.

1999    ASubstance Abuse and the Juvenile Justice System,@ Oakland, CA: National Council on Crime and Delinquency.

21

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 3

1999    AA Comprehensive Approach to Reducing Youth Violence,@ Oakland, CA: National Council on Crime and Delinquency.

1998    AA Blame Culture,@ *European Journal on Criminal Policy and Research*, 6:598-600.

1998    AThe Evolution of an American Institution,@ *Crime and Delinquency*, Vol. 44:5-8.

1998    AThe Impact of the Juvenile Justice System and Prospects for Graduated Sanctions in a Comprehensive Strategy@ (with James C. Howell, Ph.D.) in Rolf Loeber & David P. Farrington (Eds.) *Serious and Juvenile Offenders*, Thousand Oaks, CA: Sage Publications.

1997    *The Impact of the Justice System on Serious, Violent, and Chronic Juvenile Offenders*, San Francisco, CA: National Council on Crime and Delinquency.

1997    *Reducing Crime in America*, San Francisco, CA: National Council on Crime and Delinquency.

1997    ADe Debatte um Jugendgewalt in den USA@ in *Kinder- Und Jugend- Kriminalität in Deutschland*, Berlin, Germany.

1996    ARescuing Our Youth From the Tragedy of Violence,@ *Notes From the Field*, Jessie Ball Dupont Fund, No. 5.

1996    AShould the Government Have a Major Role in Reducing Juvenile Crime?@ *Congressional Digest*, Volume 75 No. 8-9.

1995    *A Sourcebook: Serious, Violent, & Chronic Juvenile Offenders* (with James C. Howell, Ph.D.; J. David Hawkins, Ph.D.; and John J. Wilson, Esq.), Thousand Oaks, CA: Sage Publications.

1995    ADe schijn-oorlog tegen de misdaad@ in *Justitiële verkenningen*, Journal 21, No.9.

1994    ADistorted by Fear: The Make Believe War on Crime@ in *Social Justice: A Journal of Crime, Conflict and World Order*, Vol. 21, No.3, Thousand Oaks, CA: Sage Publications.

1994    *Images and Reality: Juvenile Crime, Youth Violence, and Public Policy* (with Michael Jones), San Francisco, CA: National Council on Crime and Delinquency.

1993    *Reinventing Juvenile Justice* (with James Austin), Newbury Park, CA: Sage Publications. Japanese edition: Sage Publications and Orion Literary Agency.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 4

1993    "Juveniles in State Custody: Prospects for Community-Based Care of Troubled Adolescents"
(with David Onek, Michael Jones, and Ira Schwartz), *Focus* (May).

1992    *Excellence in Adolescent Care: The Thomas O'Farrell Youth Center*, San Francisco, CA:
National Council on Crime and Delinquency.

1992    *Juvenile Justice: Improving the Quality of Care*, San Francisco, CA: National Council on Crime
and Delinquency.

1992    "Youth Crime and Its Prevention: A Research Agenda" in Ira M. Schwartz (ed.) *Juvenile Justice:
The Policy Research Agenda for the 1990s*, Columbus, OH: The Ohio State University Press.

1992    *National Trends in Juvenile Confinement: 1979-1989*, (with Robert DeComo and Norma
Herrera), Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

1991    ALouisiana Juvenile Justice at the Crossroads@ (with Peter Freed and Michael Jones), *Focus*
(October).

1991    "Are You Now or Have You Ever Been a Sociologist," *Journal of Criminal Law and
Criminology*, 82:141-155.

1991    *Juveniles Taken Into Custody Research Program: Report to the Nation*, (with Robert DeComo,
Norma Herrera, Martha Steketee, and Sharon Roberts), Washington, DC: Office of Juvenile
Justice.

1990    *Unlocking Juvenile Corrections* (with James Austin and Patricia Steele), San Francisco, CA:
National Council on Crime and Delinquency.

1990    *Juveniles Taken Into Custody: Developing National Statistics* (with Terence P. Thornberry and
James Austin), Washington, DC: Office of Juvenile Justice and Delinquency Prevention.

1990    "Juvenile Justice Reform: Then and Now," *Law and Social Inquiry* (December).

1989    *Demonstration of Post Adjudication Non-Residential Intensive Supervision Programs:
Assessment Report* (with Orlando Rodriguez, Audrey Bakke, Deborah Neuenfeldt, and Patricia
Steele), San Francisco, CA: National Council on Crime and Delinquency.

1988    "California's Juvenile Justice System in Turmoil" in John Kirlin (ed.) *California Policy Choices
1988*, Sacramento: School of Public Administration, University of Southern California.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 5

1988    *Juvenile Justice Reform: The Bellwether States* (with John Blackmore and Marci Brown), Ann Arbor, MI: Center for Youth Policy, The University of Michigan.

1988    *The Juvenile Court: Reclaiming the Vision*, San Francisco, CA: National Council on Crime and Delinquency.

1988    "The Treatment of Violent Juvenile Offenders," *Newsletter of the American Psychological Association: Division 37*, Oklahoma City, OK: APA Division of Child, Youth, and Family Services.

1988    *San Francisco Jail Needs Assessment* (with associates), San Francisco, CA: National Council on Crime and Delinquency.

1988    *The Impact of Juvenile Court Sanctions* (with James Austin, Patricia Steele, and Karen Joe), San Francisco, CA: National Council on Crime and Delinquency.

1988    "Preventing and Controlling Violent Youth Crime: The State of the Art" with Ira Schwartz (ed.) *Violent Juvenile Crime*, Minneapolis, MN: Hubert Humphrey Institute of Public Affairs.

1987    "The Incarceration of Minority Youth" (with Ira Schwartz, Gideon Fishman, Zvi Eisikovitz, Edna Aultman, and Karen Joe), *Crime and Delinquency*, Vol. 33:2.

1986    "Juvenile Corrections: Is There a Future?" (with Allen Breed), *Corrections Today* (December).

1986    "The Watershed of Juvenile Justice Reform" (with James Austin, Ira Schwartz, and Paul Litsky), *Crime and Delinquency*, Vol. 32:5.

1986    *Juvenile Justice: The Vision and the Constant Star*, San Francisco, CA: National Council on Crime and Delinquency.

1985    "The Effectiveness of Supervised Pretrial Release" (with James Austin and Paul Litsky), *Crime and Delinquency*, Vol. 31:519-537.

1985    *Planning Study for the Colorado Division of Youth Services* (with James Austin and associates), San Francisco, CA: National Council on Crime and Delinquency.

1985    "Incarceration in the United States: The Extent and Future of the Problem" (with James Austin), *Annals*, 478:15-30.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 6

1984    "Youth in Confinement: Justice by Geography" (with Ira Schwartz and Paul Litsky), *Journal of Research on Crime and Delinquency*, Vol. 21:153-181.

1984    "Dealing with Offenders: The California Prison Crisis" (with James Austin) in J. J. Kirlin and P. R. Winkler (eds.) *California Policy Choices, 1984*, Sacramento, University of Southern California, Public Affairs Center.

1984    *Rethinking Juvenile Justice: National Statistical Trends* (with Paul Litsky and Ira Schwartz), Minneapolis, MN: Hubert Humphrey Institute of Public Affairs.

1983    "Rethinking Juvenile Justice" (with Ira Schwartz), *Crime and Delinquency*, Vol. 29:333-364.

1983    *Evaluation of the Bail Reform Act of 1979* (with James Austin), Sacramento, CA: Office of Criminal Justice Planning.

1982    *Nevada Prison Masterplan* (with James Austin), San Francisco, CA: National Council on Crime and Delinquency.

1982    "Intended and Unintended Consequences of Juvenile Justice Reform in the United States@ (with James Austin), *Pravention Abweichendern Verhaltens*, Munich, Germany: Juventa-Verlag.

1982    "The Unmet Promises of Alternatives to Incarceration" (with James Austin), *Crime and Delinquency*, Vol. 28:374-409.

1981    *National Evaluation of Delinquency Prevention* (with associates), San Francisco, CA: National Council on Crime and Delinquency Research Center.

1981    "Wider, Stronger and Different Nets: The Dialectics of Criminal Justice Reform" (with James Austin), *Journal of Research on Crime and Delinquency*, Vol. 18:165-196.

1980    "Themes of Violence and Gang Youth," *Annales Internationales de Criminologie*, 18:9-18.

1980    "The Utility of Process Evaluation: Crime and Delinquency Programs" in Malcolm Klein and Kathy Teilman (ed.) *Handbook of Criminal Justice Evaluation*, Newbury Park, CA: Sage Publications.

1980    *A New Correctional Policy for California* (with associates), Sacramento, CA: Joint Rules Committee, California Legislature.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 7

1980    *Sourcebook on Alternatives to Incarceration in California* (with associates), Sacramento, CA: Joint Rules Committee, California Legislature.

1979    *Preliminary Report of the National Evaluation of Delinquency Prevention* (with associates), San Francisco, CA: National Council on Crime and Delinquency.

1978    *Pioneering in Delinquency Prevention: The California Experience* (with associates), San Francisco, CA: National Council on Crime and Delinquency.

1978    *The Children of Ishmael: Critical Perspectives on Juvenile Justice* (with James Austin); Palo Alto, CA: Mayfield Press.

1977    "Delinquency Prevention": a report of *Task Force on Juvenile Justice and Delinquency Prevention, National Commission on Standards and Goals*, Washington DC: Government Printing Office.

1976    *Changing Jails*: a pamphlet, San Francisco, CA: Northern California American Civil Liberties Union.

1976    *Preventing Delinquency: A Comparative Analysis of Theories* (ed.), Washington, DC: National Institute of Juvenile Justice and Delinquency Prevention.

1975    *Crime and Privilege*, Englewood Cliffs: Prentice-Hall.

1975    *The Gang and the Community: An Ethnographic Study of Twenty-Two Gang Leaders*, San Francisco, CA: R and E Associates.

1975    "Ethical Issues in Evaluating Criminal Justice Demonstration Projects" (with Paul Takagi) in Reidel and Chappel (eds.) *Evaluating Criminal Justice Programs*, New York, NY: Praeger.

1974    Review of H. P. Newton and E. Erikson's "In Search of Common Ground," *Issues in Criminology* (Fall).

1974    "Teaching the New Criminology,@ *Crime and Social Justice* (Fall).

1974    "The Politics of Delinquency Prevention: The Case of the Urban Leadership Training Program," *Social Policy* (July-August).

1974    "Gang Youth and Hustling: The Psychology of Survival," *Issues in Criminology* (Spring).

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 8

1974    "The Sociological Imagination Revisited," *Canadian Journal of Criminology and Corrections* (April).

1973    "Prediction in Criminology: An Appraisal of Research Methods," *Quaderni di Criminologia Clinica* (December and January).

1972    Review of Humphries' Tearoom Trade, *Issues in Criminology* (Winter).

1972    "Prison Legal Libraries: A Criminologist's View," *Prison Legal Libraries: Idea into Reality*, Berkeley, CA: School of Librarianship, University of California (April).

1971    *Urban Leadership Training: A Study of Twenty-Two Gang Leaders*, University of Pennsylvania, Dissertation.

## AWARDS:

1999        Jessie Ball duPont Fund Award
1997        Youth Link, The Singapore-America Experience
            People=s Association Youth Movement
1996        Twenty Years of Service
            NCCD Board of Directors
1993        August Vollmer Award
            American Society of Criminology

## MEMBERSHIPS:

American Society of Criminology
Division on People of Color and Crime, American Society of Criminology
International Society of Criminology
National Association of Juvenile Correctional Administrators
Chair, California Attorney General's Policy Advisory Committee on Research

Past member, California Blue Ribbon Commission on Inmate Population Management
Past President and Fellow, Western Society of Criminology

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 9

## Barry A. Krisberg, Ph.D.

Barry A. Krisberg has been the president of the National Council on Crime and Delinquency (NCCD) since 1983. He is known nationally for his research and expertise on juvenile justice issues and is called upon as a resource for professionals and the media.

Dr. Krisberg received his master's degree in criminology and a doctorate in sociology, both from the University of Pennsylvania.

Dr. Krisberg has held several educational posts. He was a faculty member in the School of Criminology at the University of California at Berkeley. He was also an adjunct professor with the Hubert Humphrey Institute of Public Affairs at the University of Minnesota. He is currently Clinical Professor of Psychiatry at the University of Hawaii and a lecturer in the legal studies department of the University of California at Berkeley.

Dr. Krisberg was appointed by the legislature to serve on the California Blue Ribbon Commission on Inmate Population Management. His memberships include the American Correctional Association, the National Association of Juvenile Correctional Administrators, and the Association of Criminal Justice Researchers. He is past president and fellow of the Western Society of Criminology and is the Chair of the California Attorney General's Research Advisory Committee. In 1993 he was the recipient of the August Vollmer Award, the American Society of Criminology's most prestigious award. The Jessie Ball duPont Fund named him the 1999 Grantee of the Year for his outstanding commitment and expertise in the area of juvenile justice and delinquency prevention. Dr. Krisberg was appointed to chair an Expert Panel to investigate the conditions in the California Youth Authority. He has recently been named in a consent decree to help develop remedial plans and to monitor many of the mandated reforms in the Youth Authority.

Dr. Krisberg has several books and articles to his credit including <u>Crime and Privilege: Juvenile Justice: Redeeming Our Children,</u> and <u>A Sourcebook: Serious, Violent, & Chronic Juvenile Offenders</u> with James C. Howell, Ph.D.; J. David Hawkins, Ph.D.; and John J. Wilson, Esq.

Dr. Krisberg is frequently called upon by private foundations to assist with the design, implementation and evaluation of programs—both their own and those of the public sector.  For example, most recently, he was the Chair on an expert panel reviewing the conditions and policies of the California Youth Authority. The Annie E. Casey Foundation engaged him to assess the effectiveness of their Juvenile Detention Alternatives Initiative, the single largest private program for juvenile justice system reform in the country. The Walter Johnson Foundation supported him to lead a Blue Ribbon Commission on California's policy of out-of-state placement of delinquent youth. Baptist Community Ministries has sought his expertise on assessing the needs of troubled youth in the greater New Orleans area and the Robert Wood Johnson Foundation asked that he prepare a white paper on delinquency and substance abuse.

# ATTACHMENT A

**BARRY ALAN KRISBERG, Ph.D.**
Biographical Sketch, Page 10

Dr. Krisberg regularly appears as an expert on national network news shows about criminal justice issues and is frequently consulted by the leading print media.

# Attachment B

**Effect of Early Release from Prison on Public Safety:
A Review of the Literature**

**National Council on Crime and Delinquency**
April, 2007

## Significance

Prison crowding is the most critical problem facing the criminal justice system in the US. Several approaches have been undertaken to alleviate this problem, ranging from "front-door" solutions such as reducing prison admissions or reducing the sentence lengths of those admitted, "back-door" solutions of increasing the number of releases from prison through parole release, and finally, through "capacity expansion" or by building more prisons. However, the rate of incarceration continues to pose a burden to prisons and jails.

## Methods

The National Council on Crime and Delinquency (NCCD) conducted an extensive review of published literature on "early release" and "public safety" in March, 2007, for this report. The literature reviewed included approximately 14 peer-reviewed articles, dissertations, state reports, and policy-related and national data reports. The reports used data from 1981 to 2004. This review examines the issue of early release from prison in different geographical settings and at different times and its impact on public safety over the span of 22 years.

## Highlights

No attempt has been made to compare the methods and validity of the studies reviewed. However, these studies contribute to the discourse around early release as an effective strategy to address prison overcrowding and its effect on prisoners and prison staff. In most cases early release is evaluated in terms of its impact on recidivism and public safety.

The cited literature shows:
- The recidivism rates among early release prisoners and those serving full term are comparable.
- In some cases the recidivism rate among the early release groups was *lower* than that of the full-term groups.
- Early release programs are most effective when they are targeted to specific types of offenders: substance abusers or property-related offenses.
- In addition to report data, crime data in the states where studies took place show decreases even as early release was being implemented.

Literature Review on Effect of Early Release from Prison on Public of Safety

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 1. Sims, B., O'Connell, J., *Early Release: Prison Overcrowding and Public Safety Implications.* Washington (State) Office of Financial Management, 1985. | Setting: Olympia, **Washington** Summary: First early release programs to attempt to control inmate population started in 1979. During early release efforts, inmates were paroled early at the discretion of the state Board of Prison Terms and Paroles. Starting in 1982, legislation prohibited early release of inmates convicted of treason, any class A felony, or inmates found to be sexual psychopaths. In 1983 the law was amended to prohibit the early release of inmates legally defined as violent offenders. The study group totaled 1,674 inmates released an average of six months earlier than their expected released dates (starting in 1979). | Longitudinal comparison assessment of six different cohorts participating in a court-mandated Prison Overcrowding Reform. The early release cohorts were compared to a historical comparison group. The comparison group includes 1,867 inmates released between July, 1978 and July, 1979. This period is the 12 months immediately preceding the first early release program. Outcomes: Effect of early release on public safety, as measured by recidivism rates of early release inmates, is measured at one, two, and three years following release and compared with a historical comparison group. | Similar rates of recidivism were found among the early release group when compared to the historical comparison group. Combined recidivism rate (y1-y5) for early release: 12.3% vs. 12.1% for comparison group. The types of offenses committed by early release prisoners were not substantially different than those committed by the comparison group. For example, 28.7% of the offenses committed by early release prisoners who reoffended were classified as property offenses, vs. 27.2% of the comparison group. The crime rates in Washington state remained constant from 1981 to 1984, showing the early release program had no net effect on these rates. |
| 2. Berecochea, J.E., Jaman, D.R., *Time Served in Prison and Parole Outcome: An Experimental Study.* California Department of Corrections, Research Unit, No. 2, 1981. | Setting: **California** Summary: All male felons who received a parole date during the period from March through August, 1970. Using this list, the authors generated a random assignment of inmates to have their parole advanced by six months. The groups were divided as follows: Total: 1,310 n=637 experimental who had their terms reduced by six months; and n=673 controls who did not. | Randomized study design, where the experimental group (early release) served an average of 31.3 months, while the control group served 37.9, for a difference of 6.6 months. Outcomes: most serious disposition at two different time periods: first 12 months following release and the first 24 months. | "A reduction of six months in prison terms has *no statistically significant effect* upon recidivism on parole within the first two years following release." This means that the experimental group (early release) did not differ from the controls in their likelihood of returning to prison (by a court conviction, for a new felony, or as a result of a parole violation short of a new conviction.) In California, from 1981 to 1984, there was a reduction and then plateau in the crime rate. Source: CA Criminal Justice Center's Website: http://ag.ca.gov/cjsc/keyfacts.php, accessed, April 4, 2007. |

31

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 3. Malak, P.A., *Early Release*. Colorado Division of Criminal Justice, 1984. | Setting: **Colorado** Summary: 126 early release cases after Supreme Court Ruling People vs. Chavez. In this case, the supreme court ruled that inmates sentenced to the Department of Corrections must be granted good time credit for pre-sentence confinement in local jails. | Case comparison analysis of recidivism rate as measured by re-arrest between early release prisoners and determinate sentence release prisoners during February and March, 1983. Re-arrests were measured within eight months of the date of release. **Measures**: demographics, offenses for which they were sentenced to prison, and prior criminal history. | A comparison of re-arrest rates for those released early as a result of the Chavez ruling shows that those released early were *no* more likely to be arrested for another crime than those offenders not in early release. In fact, only 39% of those released early were arrested as compared to 36% of those serving a full term. In Colorado, total index crimes decreased from a peak of 7,773.5 per 100,000 residents in 1980 to 4,281.5 in 1998. Source: Crime in Colorado, from the Colorado Legislative Council website: http://www.state.co.us/gov_dir/leg_dir/lcsstaff/ accessed April 4, 2007. |
| 4. Leonardson, G., *Results of Early Release: Study Prompted by Passage of HB 685 (1993)*, Montana Board of Crime Control, 1997. | Setting: **Montana** Summary: In 1993 the Montana State Legislature enacted HB 685, which was designed to cap the prison population, in part, by decreasing the average time spent in prison. | Historical information on 667 inmates from 1990-1993. This list contained persons who were in early release program (accelerated good time), regular paroles or sentenced to one of the community-based parole programs. All were surveyed after one year of supervision. | Overall, less than 1/3 of the persons in the study were arrested for a new crime during the one year follow-up period. This percent is close to the historical Montana average of 33.3%. That is, early release did not result in more offenses. Crime rates in Montana showed a decrease from a rate of 177 per 100,000 residents in 1994 to 132 per 100,000 in 1997, according to the FBI Uniform Crime Reports. |
| 5. Eisenberg, M., *Release Outcome Study: Early Mandatory Release*. State of Texas Board of Pardons and Paroles, Division of Budget and Planning, 1985. | Setting: **Texas** Summary: A sample of 2,072 cases released from the Texas Department of Corrections. 55% of the sample consisted of parolees, 16% were mandatory supervision cases, and 29% were early mandatory release (EMR) cases. (EMR utilizes the Board's authority to release selected inmates up to 180 days prior to their mandatory release date.) | Systematic review of a sample of cases released from the Texas Department of Corrections between January and June, 1983, and followed for one year. **Outcome**: no reports of violations, no arrests, convictions, or incarceration during the one year follow-up period | The return rate to the Department of Corrections was similar among the mandatory and early mandatory release cases. During the year of this early mandatory release period (1983), Texas reported one of the most significant *decreases* in offenses in the 20 years prior. |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 6. Wisconsin Department of Health and Social Services, *Identifying Parole Candidates among Mandatory Release Inmates.* Wisconsin Parole Board, 1984. | Setting: **Wisconsin** correctional facilities<br>Summary: 1,886 inmates who received mandatory release (MR) after being rejected for parole<br>The MR group emerged as part of an effort to identify groups of inmates rejected for parole who, because they exhibit low rates of post release criminal behavior, may warrant more favorable consideration in future parole decisions. | Quasi-experimental cohort design with a one year follow up.<br><br>Outcome: criminal activity rates of parole and mandatory releases. | This study found that inmates who received the discretionary parole (those in MR but initially rejected for parole, n=1886) were much less likely to be returned to prison for criminal activity than inmates who received a mandatory release (15% vs. 23% respectively) during the one year follow up period.<br><br>Crime rates decreased from 3,975 per 100,000 residents in 1984 to 3,757 per 100,000 in 1988, according to the FBI Uniform Crime Reports. |
| 7. Wisconsin Department of Health and Social Services, *Special Action Release: Three Year Follow up.* Wisconsin Division of Corrections, 1985. | Setting: **Wisconsin**<br>Summary: The Special Action Release (SAR) program started in 1981 to reduce crowding in adult penal institution by releasing carefully selected offenders three or more months prior to their scheduled prison discharge. During its initial phase, SAR inmates received a 90-day early discharge. A total of 892 SAR participants with 90-135 days of early release were reviewed. | Case comparison among two different SAR groups:<br>90-day early release (n=606) and 135-day early release (n=286)<br>Post-release behavior was observed over a 6- and 12-month follow up period as follows:<br><br>New sentence: Conviction of new felony offense, criminal parole violation, and technical parole violation. | At 6-month follow up, only 7% of the 135-day SAR group and 6% of the 90-day SAR group had committed felony offenses for which they were convicted and sentenced.<br><br>In this study, *no evidence* was found that early release extension from 90 to 135 days resulted in a disproportionate increase in criminal activity.<br><br>Crime rates decreased from 3,975 per 100,000 residents in 1984 to 3,757 per 100,000 in 1988, according to the FBI Uniform Crime Reports. |
| 8. Austin, J., *Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy. Crime and Delinquency,* Vol 32, No. 4, October 1986: 404-502. | Setting: **Illinois**, 1980-1983<br>Summary: Inmates released early (before end of sentence period) and inmates completing term.<br>Population Size: Over 21,000 prisoners, representing over 2/3 of all prison releases were early release. | Longitudinal (30 months), random sample panel design of prison inmates in early release programs and those completing terms (n=1,600).<br><br>Comparisons: inmate's prior criminal history, institutional conduct, time served, method of prison release, social and personal characteristics, and criminal behavior after release from prison. | Prisoners who were released early did not have a higher probability of being arrested or returned to prison than those prisoners serving their full prison term (42% vs. 49% respectively), although the criminality characteristics of the prisoners were different.<br>By 1983 the Illinois prison population was reduced by approximately 2,500 inmates as a direct result of early release.<br><br>During the period of the study, crime rates in Illinois decreased from 800 per 100,000 residents in 1986 to 796 per 100,000 in 1987 according to the FBI Uniform Crime Reports. |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 9. Austin, J., Boylard, M., *The Effectiveness of Reduced Prison Terms on Public Safety and Cost: Evaluation of the Illinois Supplemental Meritorious Good Time Program.* National Council on Crime and Delinquency, 1993. | Setting: **Illinois** Summary: The 1990 HB3838, Public Act 86-1090, which took effect in Illinois on July, 1990, made selected inmates eligible for a 180-day early prison release (Supplemental Meritorious Good Time [SGMT]), instead of the 90-day early release. This study reviewed 4,640 cases of inmates who were awarded an average of 61.7 days of SGMT. | Random review of cases of inmates awarded SMGT by December 1990. Two main measures of recidivism were used: Follow-up arrest—those arrested, at least once during the year after release from prison; Return to prison rate—the proportion of released inmates who were returned to prison including both new sentences and parole violations. | Inmates released via the Supplemental Meritorious Good Time (SMGT) had the *same* recidivism rates as those inmates not released via the SMGT. Inmates released under the SMGT had lower recidivism rates than those released under regular meritorious good time (out 180 days early vs. 90 days early). The vast majority of the re-arrests were for nonviolent misdemeanor crimes. Crime rates in Illinois decreased from 959 per 100,000 residents in 1993 to 886 per 100,000 in 1996 according to the FBI Uniform Crime Reports. |
| 10. Michigan Task Force in Jail and Prison Overcrowding. *Final Report.* March, 2005. | Setting: **Michigan** Summary: Review of Michigan's prison population growth, early release programs and crime trends to propose strategies to effectively address and alleviate prison overcrowding. | Review of statewide crime reports. | County jails have been releasing offenders early since 1982. The *number* of index crime offenses in Michigan generally has been dropping for the last decade: down 29 percent from 1991 to 2004. The concurrent decline in the Michigan crime *rate*—6,138 per 100,000 residents in 1991 and 4,144 in 2000—closely parallels that of the nation as a whole. (The US rate of serious crime declined every year from 1991 to 2000.) National Institute of Corrections, website: http://www.nicic.org/Features/StateStats/?State=MI#1 accessed April 4, 2007. |
| 11. Wagner, D., Baird, C., *Evaluation of the Florida Community Control Program.* National Institute of Justice, 1993. | Setting: **Florida** Summary: The Florida Community Control Program (FCCP) is an intensive supervision, house arrest program that seeks to reduce prison and jail crowding while ensuring public safety. | Case review of 630 Florida Community Control Program (FCCP) offenders in 1985. | During an 18-month follow up, the Florida Community Control Program (FCCP) had *lower* rates of new convictions. Only 19.7% of the FCCP group had a new offense, compared to 24.3% of new offenses among those offenders who spent 9-months in prison. In Florida, the crime rates declined from 1,188 per 100,000 residents in 1993 to 1,137 per 100,000 in 1994. Florida Statistical Analysis Center: FDLE, (1989-2005). Crime in Florida, Florida uniform crime report [Computer program]. Tallahassee, FL). |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 12. Florida Office of the Auditor General. *Performance Audit of the Implementation of Control Release Supervision Administered by the Florida Parole Commission and the Department of Corrections.* Tallahassee, FL, 1994. | Setting: **Florida** Summary: 7,481 inmates released to a term of a court-imposed supervision (probation or community control). As part of the early release decision, the Authority determines whether to impose a term of control release supervision. | Audit review of offender release data from fiscal year 1987-88 through 1992-93. | For the 1991-92 fiscal years, offenders in the Control Release Supervision served an average of 7.7 months in jail and prison prior to release, and were placed on an average term of supervision of 17.6 months. 60% of these offenders returned to jail or prison as the result of violation of specific conditions of supervisions not because of *new crimes.* |
| 13. Zanis, D., Mulvaney, F., Coviello, D., Alterman, A.I., Savitz, D., Thompson, W., The Effectiveness of Early Parole to Substance Abuse Treatment Facilities on 24-month Criminal Recidivism. *Journal of Drug Issues,* Vol 03, No 1, 2003: 223-236. | Setting: Urban jails in **Northeastern United States** (Funded by City of Philadelphia). Summary: 569 offenders who met criteria for substance abuse or dependence; had no other psychiatric disorders; and served at least half of their minimum sentence. | Self-select case study design. 87% of offenders were paroled to a community-based substance abuse treatment program and 13% who were early paroled were not enrolled into a substance abuse program. Measures: Time in substance abuse program, age, gender, race, number of prior convictions, type of substance abuse/dependence, and two year follow up on new criminal convictions. | 78% of the offenders released to the community-based substance abuse treatment program reported *no new convictions* in comparison to 66% of those early release offenders that did not participate in treatment. Furthermore, of those offenders who participated in and completed treatment, only 11.8% were convicted of a new crime vs. 29% who did not complete treatment (e.g., less than 6 months in treatment). |
| 14. Verbrugge, P., Nunes, K., Johnson, S., Taylor, K., *Predictors of Conditional Release among Substance Abusing Women Offenders.* Correctional Service Canada, 2002. | Setting: **Canada** Summary: The sample under study consisted of federally sentenced women who were granted a conditional release between 1995 and 2000 and identified at intake as having substance abuse problems. In this study, conditional release included day parole (halfway homes), full parole, and statutory release. | Case review of 483 women offenders who were serving or had recently served federal sentences under the supervision of Correctional Services Canada (CSC). 73% of the women were released on day parole; 9% were released on full parole and 18% were released at their statutory release date. Outcome: Revocation was defined as a woman having been admitted to federal custody after conditional release and before reaching a warrant expiry. | Approximately one half of the offenders, or 52% successfully completed their sentences in the community or had been successfully living in the community for at least one year post release when the follow up period ended. Within those who had had their conditional release revoked, most returned with a miscellaneous, nonviolent offense (these included offenses related to breaches of parole). In 2001, Canada posted its lowest crime rate in 25 years with 7,655 incidents per 100,000 people. Source: Statistics Canada, 2001, released by the Canadian Centre for Justice Statistics (CCJS). |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 15. Grant, B.A., *Day Parole: Effects of Corrections and Conditional Release Act* (1992). Ottawa, Correctional Services of Canada, 1996. | Setting: **Canada:** Data comes from the National Parole Board and from the Correctional Service of Canada. Summary: A total of 1,087 cases of male offenders who completed day parole in 1990-91 were reviewed. Day parole, for purposes of this setting is defined as release from prison to a halfway house where offenders reside, participate in treatment programs, attend school, work, and look for work and accommodation that will be needed for further full release. These halfway houses may be operated by the Correctional Service of Canada or a Community Residential Centre operated privately on a fee-for-service basis. | Systematic case review of 1,087 male offenders in day parole. Outcomes: New offenses by day parole sample. | Overall, the results of this study indicate that the offenders released prior to their full parole eligibility are less likely to fail than those released after this date. The failure of the day parole sample, as measured by new offenses was about 10% for the one year time period. |

36

# Attachment C

| EARLY RELEASE - CALIFORNIA COUNTIES | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | CAP | | Case 1 | Case 2 | Case 3 | Consolidated | Consent Decree | Number of People Released (Jan. 1, 1995 until Present, unless otherwise noted) | Actions and Mechanisms |
| County | Yes | No | | | | | | | |
| Amador | | No | Accelerated release mechanism pursuant to Penal Code section 4024.1 | Penal Code section 3081 | | No Date | | 365 | |
| Butte | Yes | | Floyd E. Jones et al v. Hal Brooks | | | Dec-85 | | 2,501 | Home Electronic Monitoring and Work Alternative Programs |
| Calaveras | Yes | | County of Calaveras v. Sheriff Bill Nuttall | | | Jan-92 | | 7,537 | No Alternatives |
| Contra Costa | | No | | | | | | | |
| Del Norte | | No | | | | | | | |
| El Dorado | Yes | | County of El Dorado v. McDonald | | | Sep-91 | | 2,855 | Home Electronic Monitoring Program |
| Fresno | Yes | | John B Cruz v County of Fresno | | | 1994 | | 26,210 | Adult Offender Work Program, Work Furlough/Electronic Monitoring Program |
| Glenn | | No | | | | | | | |
| Humboldt | Yes | | In re Inmates of Humboldt County Jail | | | May-88 | | 263 (2004-2007) | County Parole; School or Work Furlough, Sheriff's Work Alternative Program |
| Inyo | | No | Penal Code sections 2024 et seq | | | No date | | 134 | |

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| Kern | Yes | *Anderson, et al v. County of Kern, et al* | | | Oct-92 | 47,062 | Electronic Monitoring Program, County Parole, Sheriff's Work Release Program |
| Lassen | | No | | | | | |
| Los Angeles | Yes | *Rutherford v. Block, US District Court Civil Case* | | | No Date | 547,300 | Community Based Alternatives to Custody Program |
| Mendocino | | No | | | | | |
| Merced | Yes | *Nicholas Torres, et al. v. County of Merced, et al.* | | | Apr-93 | 1,622 (01/2004-03/2008) | Alternative Work Program, Electronic Home Detention Program |
| Mono | | No | | | | | |
| Orange | Yes | *Stewart v. Gates* | | | May-78 | Info not released | Info not released |
| Placer | Yes | *Michael Harris, et al. v. County of Placer, et al* | | | Mar-90 | 36,821 | Adult Work Release Project, Adult Day Reporting Center, Electronic Monitoring, Drug Court/Track III, Risk-Based Detention, Driver's Risk Inventory II, Juvenile continuum of care services |
| San Benito | | No | | | | 1,620 | |
| San Diego | Yes | *Hudler v. Duffy, 5/12/1980* | *Armstrong v. San Diego County Board of Supervisors, 11/8/1990* | | Oct-93 | 62,640 (1999-2007) | The Connections and Connections II Program |
| San Joaquin | Yes | *Johnnie S. Smith, et al.* | *Daniel S. Gonzales, et al.* | | 12/17/90 | 49,271 | Alternative Work Program, Electronic Monitoring Program, Alternative Drug and Alcohol Program, Cite and Releases, Felony Own Recognizance Releases, Book and Releases |

| San Luis Obispo | No | | | | | | |
|---|---|---|---|---|---|---|---|
| San Mateo | No | | | | | | |
| Santa Barbara | Yes | | Inmates of Santa Barbara v. Sheriff John Carpenter | | | early 1980s | 13,244 | changed housing criteria; citation releases for nonviolent misdemeanor charges, increase limits for traffic and out-of-county warrants, Electronic monitoring, increased maximum sentence criteria for Sheriff's Work Alt. Program, early release criteria |
| Shasta | Yes | | *County of Shasta v. Jim Pope* | Proposed Order No. 115258 | Internal Policies and Procedures of CA Penal Code | | 14,371 | Sheriff's Work Release Program, Home Electronic Confinement Program |
| Solano | No | | Accelerated release mechanism pursuant to Penal Code section 4024.1 | | | | 4,754 | |
| Stanislaus | Yes | | *Rodriguez v. County of Stanislaus* | | | May-92 | 24,761 | Classification and early release procedures; Alternative Work Program, The Work/School Furlough and Job Trainning Program, Sheriff's Parole |
| Sutter | Yes | | *Dempsey W. Haller, et al. v. The County of Sutter, et al.* | | | Sep-94 | None | Work/Educationg Furlough Program; Work Release Program |

| | | | | | | | | |
|---|---|---|---|---|---|---|---:|---|
| Tehama | Yes | | *Dennis Wyckoff, et al. v. The County of Tehama, et al.* | | | Apr-98 | | 30 | Work Furlough Program, Weekend Work Program and House Arrest; County Parole |
| Tuolum ne | Yes | | Stipulation Order in *Donald G. Ercoli, et al. v. County of Tuolumne,* has since expired | | | Dec-94 | | None | Jail Overflow Work Crew |
| Ventura | No | | accelerated release mechanism pursuant to Penal Code section 4024.1 | | | No Date | | 13,685 | |
| Yolo | Yes | | *Roy et al v. County of Yolo et al* | | | Aug-97 | | 2,551 | Electronic Surveillance Program, Work Furlough, Sheriff's Working Inmate Program |
| Yuba | | No | No mechanism s in place | | | | | None | |

40

1

**PROOF OF SERVICE**

2

STATE OF CALIFORNIA, CITY AND COUNTY OF SAN FRANCISCO

3

      I am employed in the county of San Francisco, State of California.  I am over the age of 18 and not a party to the within action; my business address is **K& L GATES LLP, 55 Second Street,**

4

**Suite 1700, San Francisco, CA 94105**.

5

      On **September 8, 2008**, I served the foregoing document(s):

6

**EXPERT REPORT OF BARRY KRISBERG PH.D.**

7

together with an unsigned copy of this declaration, on all interested parties in this action addressed and sent as follows:

8

All documents were sent to the following persons in the following manner:

9

10

Edmund G. Brown Jr.
David S. Chaney
Rochelle C. East

11

**rochelle.east@doj.ca.gov**
Vickie P. Whitney

12

Deputy Attorney General
P.O. Box 944255

13

Sacramento, CA 94244-2550

14

Paul B. Mello, Esq.
Hanson & Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA  94105
**pmello@hansonbridgett.com**

15

Lead Counsel for County Intervenors
Ann Miller Ravel

16

Theresa Fuentes
**Theresa.fuentes@cco.sccgov.org**

17

Office of the County Counsel
70 West Hedding, East Wing, 9th Floor

18

San Jose, CA 95110

19

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
**skaufhold@akingump.com**
Teresa Wang
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

20

California Correctional Peace Officers'
Association (CCPOA) Intervenors

21

Natalie Leonard
**nleonard@cbmlaw.com**

22

Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP

23

44 Montgomery Street, Suite 400
San Francisco, CA 94104

24

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
**akeck@sonoma-county.org**
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

25

26

27

28

1

1

District Attorney Intervenors

California Sheriff, Probation, Police Chief

2

William E. Mitchell

and Corrections Intervenors

**wemitchell@rivcoda.org**

Jones & Mayer LLP

3

Assistant District Attorney

Martin J. Mayer

Riverside County District Attorney's Office

**mjm@jones-mayer.com**

4

4075 Main Street, First Floor

Michael R. Capizzi

Riverside, CA 92501

**mrc@jones-mayer.com**

5

Kimberly Hall Barlow

khb@jones-mayer.com

6

Elizabeth R. Feffer

**erf@jones-mayer.com**

7

3777 North Harbor Boulevard

Fullerton, CA 92835

8

9

Rochelle East

**rochelle.East@doj.ca.gov**

10

Office of the Attorney General

455 Golden Gate, Suite 11000

11

San Francisco, CA 94102-7004

12

13

[ XX ]  **BY MAIL (By Following Office Business Practice):**  By placing a true copy thereof

14

enclosed in a sealed envelope(s).  I am readily familiar with this firm's practice of collection and processing correspondence for mailing.  It is deposited with the U.S. Postal Service on

15

that same day in the ordinary course of business.  I placed such envelope(s) for collection and mailing on that date following ordinary business practice.

16

[ ]     **BY FACSIMILE:**  The recipient(s) have confirmed in writing that service by facsimile is

17

acceptable to them.  I transmitted the documents listed above by facsimile transmission from a facsimile machine, whose telephone number is (415) 249-1001 to the facsimile number of

18

the offices of the addressee(s) as indicated above.  The above-described transmission was reported as complete without error by a transmission report issued by the facsimile

19

transmission machine upon which the said transmission was made immediately following the transmission.  A true and correct copy of the transmission report is attached hereto.

20

[ ]     **BY FEDERAL EXPRESS**:  I deposited such envelope in a box or other facility regularly

21

maintained by Federal Express, an express service carrier, or delivered to a courier or driver authorized by said express service carrier to receive documents in an envelope designated by

22

the said express service carrier, addressed as above, with delivery fees paid or provided for, to be transmitted by Federal Express.

23

[ ]     **BY PERSONAL SERVICE:**  I personally delivered such envelope(s) to each addressee(s)

24

I declare under penalty of perjury under the laws of the State of California that the above is

25

true and correct.

26

Executed on September 8, 2008, at San Francisco, California.

27

28

_____

**Margarita V. Reyes**

2

PROOF OF SERVICE