STEVEN M. WOODSIDE #58684
County Counsel
ANNE L. KECK #136315
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
Telephone: (707) 565-2421
Fax: (707) 565-2624
swoodsid@sonoma-county.org
akeck@sonoma-county.org

Attorneys for Intervenors THE
COUNTY OF SONOMA, SONOMA
COUNTY SHERIFF/CORONER
WILLIAM COGBILL, SONOMA
COUNTY DISTRICT ATTORNEY
STEPHAN PASSALACQUA,
and SONOMA COUNTY CHIEF
PROBATION OFFICER ROBERT OCHS

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____ /<br>MARCIANO PLATA, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____ / | No.   CIV S-90-0520 LKK JFM P<br>**THREE-JUDGE COURT**<br><br>No. C-01-1351 THE<br>THREE-JUDGE COURT<br><br>**TRIAL DECLARATION OF SONOMA COUNTY SHERIFF-CORONER WILLIAM COGBILL (SUBMITTED BY SONOMA COUNTY INTERVENORS)**<br><br>Trial Date:   November 18, 2008<br>Time:           1:30 p.m.<br>Ctrm:           USDC Ceremonial Courtroom |

I, Sheriff-Coroner William Cogbill, hereby declare as follows:

1. I am the Sheriff-Coroner of the County of Sonoma, and am a named intervenor in this proceeding. The matters set forth below are based on my personal knowledge or information and belief. If called to testify regarding such matters, I could and would competently testify thereto.

## I. BACKGROUND

2. My formal educational background is as follows: (a) Bachelors Degree in Administration of Justice from Golden Gate University; (b) graduate of FBI National Academy, Quantico, Virginia; (c) graduate of FBI Executive Development School, Quantico, Virginia; (d) Advanced, Supervisory, Administrative and Executive P.O.S.T. certifications, State of California.

3. I am an elected public official and have held the office of Sheriff-Coroner of the County of Sonoma for more than 6 years. Prior to that time, I spent 3 years as a police officer with Petaluma City Police Department before moving to the Sonoma County Sheriff's Department, where I have been employed for the past 30 years. In addition to the Office of Sheriff-Coroner, I have served in the capacity of a Deputy Sheriff with special assignments (SWAT, FTO, Defensive Tactics Instructor), Detective, Sergeant with special assignments (FTO, Tactical Team, Street Crimes, DT Supervisor), Lieutenant and SWAT Commander, Chief of Police of the Town of Windsor (pursuant to contract with the County), and Patrol Captain.

4. As Sheriff-Coroner, I am the chief law enforcement officer of the County, and am responsible for law enforcement activities of the Sonoma County Sheriff's Department as well as its detention activities. During my tenure as Sheriff-Coroner, I have devoted approximately 50% of my time on law enforcement matters, and 50% of my time on jail and detention matters.

///
///
///

## II. IMPACT OF PRISONER RELEASE ORDER ON SONOMA COUNTY'S CRIMINAL JUSTICE REFORM EFFORTS

5. For the past 3 years, I (and many other Sonoma County public officers) have devoted a substantial amount of time, energy and resources to analyzing the needs and capacity of the Sonoma County jails, and developing strategies for the future. The Sonoma County jails have previously exceed recommended population levels over a period of a couple of years, and I anticipate that population will again reach capacity despite our best efforts to manage our jail population. Accordingly, we need to either increase the amount of inmate housing available (build a new jail), or decrease the number of inmates requiring jail housing (through jail alternatives).

6. To analyze options and possible responsive strategies, Sonoma County has done extensive factual review and analysis on these issues, contained in two reports: (a) the Adult Detention Planning Staff report, Adult Detention Projections, Final Report dated January 2006 (prepared by the General Services Department and Sheriff's Department), a true and correct copy of which is attached hereto as Exhibit "A"; and (b) the Sonoma County, California Corrections Master Plan, dated December 2007, prepared by David M. Bennett [attached to the Expert Report of David M. Bennett (Submitted by Sonoma County Intervenors) dated August 15, 2008, as Exhibit "C"]. I was personally involved in the preparation of both of these reports. Both reports have been filed with the clerk of the Board of Supervisors, submitted to the Board of Supervisors in connection with public meetings, and are public records and reports setting forth the activities of the County that are maintained in the ordinary course of the County's business.

7. These two reports, and the underlying data they summarize, demonstrate that Sonoma County's lack of resources to address the needs of inmates (substance abuse treatment, education, job training, etc.) and adequately supervise and provide treatment programs for probationers, has caused Sonoma County to suffer a significant amount of criminal recidivism – which causes even more strain on the criminal justice system and attendant resources. In addition, the unavailability of mental health care in the community

has caused the jail to essentially become a mental health facility, which must care for those mental health patients who have not received proper treatment, decompensated, and committed crimes.

8. To address these problems before they reach crisis level, Sonoma County has invested substantial funds, energies and resources in the last few years to develop and implement criminal justice reforms that we believe will have a significant impact on the local and state inmate populations. (See Corrections Master Plan, attached to the Expert Report of David M. Bennett (Exhibit "C").) These reforms represent substantial changes in the way we do business, but I believe that the data and evidence-based practices presented by our consultant David Bennett demonstrate that they will be successful in not only better utilizing our limited resources, but also effectuating a reduction in recidivism and an overall healthier, safer community. Such effects will ultimately result in fewer criminals being sent to state prison, which in turn will assist in lessening prison overcrowding. If we are successful in our reform efforts, we hope to be able to be used as a model for other counties around the state.

9. However, plaintiffs' request in this proceeding for a prisoner release order would severely jeopardize and likely prevent us from being able to implement our intended reforms. An influx of state prisoners into Sonoma County would require us to divert our funds and resources dedicated to our reform efforts to instead manage the increased impact such release would have on our County. Due to the high rate of recidivism of state prisoners, a release of inmates would have significant negative public safety impacts, requiring us to dedicate more resources to address new crimes committed, increased jail bookings, and further tax our limited mental health and drug/alcohol treatment programs.

10. Even if the prisoner release was a one-time release, or a limited release over time, the impact of such release would be felt by the County over an extended period, requiring such a diversion of resources that we would be unable to accomplish any significant reform. This is due to the fact that an early release of prisoners – without proper diversion, treatment, supervision and programming – would just permit them to cycle

through the local criminal justice system more times in a given period, requiring dedication of more system resources, without addressing the underlying recidivism problems.

11. I also believe that the release of thousands of inmates from state prisons will negatively impact Sonoma County by shifting the burden of responsibility, incarceration and treatment from the State to the local level. The overcrowding and resource availability/allocation problems that currently exist in the State prisons will consequently be placed in the laps of county jails, including ours. Because Sonoma County has more limited resources to address these issues than the State, we are less able to accommodate the requirements and needs of this population – resulting in a worse situation and less sthan we have today.

12. I believe that there are reforms, other than a prison population cap, that can be accomplished by the State that will serve both to lessen prison overcrowding and at the same time reduce recidivism. These alternative reforms are set forth in the expert reports submitted by David Bennett, presented by Sonoma County Intervenors. Mr. Bennett has convinced me that his proposed reforms for Sonoma County, and his suggested reforms for the state prison, will be effective, and I encourage you to consider the details of his proposal.

### III. PROPOSED LIST OF STIPULATED FACTS

13. I have reviewed the statement of facts set forth below. I am informed and believe that they were provided to counsel for the parties for review. I reviewed these facts, and based on my information and belief, they appear true and correct. These facts are verified in public records (including but not limited to, Exhibit "A" hereto, and exhibits to the expert reports of David Bennett submitted in connection herewith), are based on my personal knowledge, or are based on information provided to me by my staff at my direction. The purpose for submitting these facts is to provide factual background to the opinions expressed in this Declaration, as well as to provide support for the expert opinions of David Bennett.

///

///

A.   **JAIL CAPACITY AND HOUSING**

14.   Thirty-two counties in California have jails with Population caps; in 2005, 155,000 sentenced jail inmates were released early in California due to jail overcrowding, and jail bookings that year were at a 10-year high.

15.   Sonoma County's two detention facilities have a "rated capacity" that consists of the number of beds currently installed and approved by the Corrections Standards Authority for housing in each facility, consistent with security and classification requirements. As of June 1, 2008, the total rated capacities of Sonoma County detention facilities are as follows: the rated capacity of the Main Adult Detention Facility is 894; the rated capacity of the North County Detention Facility is 561.

16.   The rated capacity of the Sonoma County detention facilities do not reflect classification, gender and security requirements that require certain segments of the inmate population to be separately housed from each other; accordingly, to ensure proper housing is available based on classification factors, the Sonoma County jails aim for a jail population of less than 85% of total rated capacity.

17.   For several years, the Sonoma County jails were required to house a population that was close to or exceeded 85% of their total rated capacity; during the time period January 28, 2004 through October 18, 2006, the Sonoma County Sheriff's Department sought and obtained orders from the Sonoma County Superior Court on a monthly basis to release inmates early pursuant to the provisions of Penal Code section 4024.1.

18.   Since approximately October 18, 2006, Sonoma County jails have been able to maintain jail populations at or less than 85% of total rated capacity due to increasing the number of beds through double-bunking (thereby increasing total rated capacity), as well as other factors, such as:

   a.   Certain criminal justice reforms recommended by Sonoma County's Consultant David Bennett have been instituted which have resulted in efficiencies of time management in the court processes, resulting in swifter justice;

b. Sonoma County has increased its cite and release program, such that individuals who had previously been housed in jail are now being released based on a promise to appear (due to lack of available space in the jail); and

c. Increased immigration enforcement by the Department of Homeland Security, Immigration and Customs Enforcement, has resulted in deportation of individuals previously housed in Sonoma County jails on a consistent basis (recidivism).

19. As of July 29, 2008, there were 653 individuals incarcerated in the Sonoma County Main Adult Detention Facility, and 352 individuals incarcerated in the Sonoma County North County Detention Facility, for a combined total of 1005 inmates as of that date; as of October 2008, total population has reached approximately 1055.

20. Approximately 39% of Sonoma County jail inmates are on "hold" status, including holds for warrants issued by other counties, holds for probation violation processing, immigration holds, holds for the California Department of Corrections and Rehabilitation, and other state holds.

21. In 2007, approximately 1,200 offenders were held in Sonoma County jails en route to California prison custody.

22. Sonoma County is currently facing a back-up of inmates who have been ordered by the Court to go to a State psychiatric hospital under Penal Code Section 1370 to restore their competency.

23. State psychiatric hospitals refuse to accept such inmates upon commitment due to unavailable bed space; the time the jail must continue to house these inmates before they are accepted into the state hospital has increased dramatically in the last two fiscal years, from an average wait of 60 days in fiscal year 2006/2007, to an average wait of 95 days in fiscal year 2007-2008.

**B.   RE-ARREST AND RECIDIVISM**

24. Sonoma County's jail citation release program (used to manage the jail population) showed a 43 percent failure-to-appear rate for both misdemeanors and felonies – a figure that is more than twice the national average.

25. Sonoma County's re-arrest rate for the population released by the jail on its citation release program – meaning an arrest for a new crime prior to the disposition of the case for which the person had been released from jail – is approximately 29% for misdemeanors and 50% for felonies; the average number of such re-arrests is 1.6 for both misdemeanors and felonies.

26. The number of prior arrests for each person who is ultimately re-arrested in Sonoma County averages 4.8 arrests.

27. The average time inmates spend in custody in the Sonoma County jails is 10.1 days for misdemeanants, and 37.8 days for felons.

28. Of the prison inmates released each year in California, about 70% are re-incarcerated within 3 years – a figure almost two times the national average; many such individuals end up back in the Sonoma County jails after previously being sent to State prison, either on parole violations or on new charges.

## C.   SERVICES AND PROGRAMS UNAVAILABLE

29. Out of the total number of inmates released from California state prisons each year, approximately 20% of them have mental health needs, 65% have substance abuse problems, 70% are unemployed, 22% are gang members, and a significant number are in need of stable housing.

30. Mental health needs are significantly under-met in Sonoma County. For example, in June of 2007, the County was forced to close its only inpatient psychiatric emergency hospital, due to budget cuts and lack of adequate funding.

31. Because the County's only inpatient emergency psychiatric hospital closed in June of 2007, the Sonoma County jails must now continue to house misdemeanor defendants who have been declared incompetent to stand trial, but who have been ordered to be treated for the purpose of rendering them competent under the provisions of Penal Code Section 1370.

///

///

32. Sonoma County law enforcement agencies and Sonoma County jail officials transport persons in need of inpatient psychiatric hospitalization to a facility in Fairfield, Solano County, pursuant to an agreement between the counties.

33. Sonoma County has substantial waiting lists for residential drug abuse and alcohol treatment programs, and this limitation of resources causes a back-up in the jail; inmates who are ordered to residential treatment programs are often required to stay in jail either in the absence of jail sentences or well past their jail terms – in 2005, the average wait in jail for inmates enrolled in TASC (Treatment Accountability for Safer Communities Program) for residential treatment programs was 9 weeks.

34. Data shows that as of the year 2002, on any given day, approximately 412 Sonoma County residents were seeking publicly-funded alcohol and drug treatment that was not available; such number has only increased over time.

### D. INADEQUATE PROBATION SUPERVISION

35. Sonoma County's current probation caseload is too large for its probation officers to effectively supervise: 25-30 probation officers presently supervise approximately 3,074 probationers (the number of individual probationers supervised per probation officer ranges from 50 to 380).

36. Due to insufficient treatment, education and supervision resources, probation officers do not have adequate tools to properly supervise probationers and lower recidivism rates.

### E. COUNTY RESOURCES UNAVAILABLE

37. Sonoma County tax revenues have decreased in the last two years, requiring that both the Sheriff's Department and Probation Department scale back on their budgets – resulting in fewer available resources.

38. The Sonoma County Administrative Office has informed the Sheriff's Department that it will be required to reduce its budget for the 2009/2010 fiscal year by 12 % – an amount of $8,598,862; the Probation Department and other county departments are facing similar cuts.

### F. SONOMA COUNTY'S CRIMINAL JUSTICE SYSTEM REFORM

39. The Sonoma County Board of Supervisors has authorized county departments to proceed to effectuate the reforms described in the Sonoma County Corrections Master Plan, dated December 11, 2007, prepared by expert consultant David M. Bennett.

40. Sonoma County is committed to this reform effort, and has already invested a tremendous amount of time, energy, funds and other resources to effectuate the Master Plan.

41. As a general matter, the Master Plan demonstrates a commitment to addressing issues via "upstream intervention" – starting at the booking phase, which is intended to shorten the time for completing criminal proceedings, shorten the time in jail, effectively address rehabilitation and treatment issues at an early stage, and provide a continuum of effective supervision to reduce recidivism.

42. A prison population cap would prevent Sonoma County from effecting its Master Plan, as such a cap would require Sonoma County to expend its finite resources in addressing the consequences of the cap rather than its Master Plan.

43. The citizens of Sonoma County would be dis-served – in both the short-term and the long-term – by the County's inability to reform its criminal justice system through the Master Plan, as the cycle of recidivism and the ineffective/inefficient use of public resources would continue.

I declare and affirm under penalty of perjury under the laws of the United States that the foregoing is true and correct.

Executed this 30th day of October, 2008, in Sacramento, California.

William Cogbill