indicate that most inmates currently in jail are probably not appropriate for alternative programs because of the nature of their crime and that anyone who could be released to an alternate program has already been released. Alternate and treatment programs have changed and expanded over time, but most often they apply to the same type of lower risk offenders and are not applicable to the more hardened and/or violent inmates remaining in jail. Brief descriptions of the current alternative and treatment programs are in Appendix B.

## Comparison to Other Jurisdictions

Sonoma County jail statistics were compared to national and statewide averages and to five comparable counties in California to see if there is something unusual about Sonoma. Data was gathered from the US Department of Justice Bureau of Justice Statistics (DOJ), California Board of Corrections Facilities Standards and Operations Division (BOC) and California Department of Finance (DOF).

<u>Comparable Counties:</u> Jail data from five counties close in population to Sonoma County was studied. The five counties and their relevant characteristics are listed as follows (per DOF Estimates for January 1, 2005):

| County | Population | % Growth since 2004 | Largest City | Population | Per Capita Income (1999) |
|---|---|---|---|---|---|
| San Joaquin | 653,333 | 2.7% | Stockton | 279,513 | $21,544 |
| Stanislaus | 504,482 | 2.0% | Modesto | 207,634 | $21,790 |
| **Sonoma** | **478,440** | **0.7%** | **Santa Rosa** | **156,268** | **$32,492** |
| Monterey | 425,102 | 0.6% | Salinas | 152,677 | $29,393 |
| Solano | 421,657 | 1.0% | Vallejo | 121,221 | $25,176 |
| Santa Barbara | 419,260 | 1.0% | Santa Barbara | 90,518 | $30,218 |

Sonoma County is not quite in the middle of the comparable counties in terms of population. It has experienced the least amount of recent growth except for Monterey County and it has the highest per capita income.

<u>Crime Rate:</u> As reported by the State Department of Justice, Sonoma County has the second lowest crime rates (violent and property crimes) of the six counties:



2003 Crime Rates

|              | Violent Crime Rate | Property Crime Rate |
|--------------|--------------------|---------------------|
| San Joaquin  | 860.1              | 3124.5              |
| Stanislaus   | 635.5              | 2937.5              |
| Sonoma       | 381.6              | 1247.2              |
| Monterey     | 490.4              | 1735.7              |
| Solano       | 534.5              | 1851.9              |
| Santa Barbara| 270.3              | 895.2               |

*Crime rates = number of crimes per 100,000 population per State Department of Justice

<u>ADP:</u> As reported in the BOC's *Jail Profile Survey 2005 First Quarter*, the following compares the ADP for the comparable counties:



<u>Incarceration Rate:</u> The DOJ reports in their *Prison and Jail Inmates at Midyear 2004* report that Incarceration Rates for jails nationwide grew from 19.3 per 10,000 in 1995 to 24.3 per 10,000 in 2004. As noted above, Sonoma County's Incarceration Rate for 2005 was 23.8, very close to the national average, at least for that point in time. The statewide average is lower than the national average. Statewide, the Incarceration Rate was 21.01 per 10,000 according to the BOC *Jail Profile Survey 2005 First Quarter*. Sonoma County, by comparison has a higher Rate. However, Sonoma County's Rate is the lowest of the comparable counties except for San Joaquin County, as shown on the following:



Review of Incarceration Rates for a variety of counties in California, shows that the Rates are not directly related to how urban the county is or how much population it has. For instance, Los Angeles County, which has the largest inmate population in the United States, has an Incarceration Rate of 16.65. Napa County, which has about the same population as Humboldt County has a Rate of 18.98 compared to Humboldt's 28.86. San Francisco County, which is close in population to Fresno County, has a Rate of 22.36 compared to Fresno's Rate of 33.75. Obviously, there are other factors at work that impact Incarceration Rates.

Gender: Both the DOJ and BOC report that the female population in jails is growing faster than the male population. According to the DOJ *Prison and Jail Inmates at Midyear 20*, nationwide, female inmate population averaged 10.2% of the total inmate population in 1995 and has grown to 12.3% of the total in 2004. This compares to the California statewide average of 12.8% and Sonoma County's female inmate percentage of 13.0% (per BOC *Jail Profile Survey 2005 First Quarter*). The following graph compares the percentage of female inmates of the comparable counties:



Sentenced vs. Pretrial: The percentage of the pretrial population (termed "unconvicted" by the DOJ and "non-sentenced" by the BOC) is growing faster than the sentenced population, both nationwide and statewide. Nationwide, the pretrial ("unconvicted") population was 56.0% of the total in 1995 but grew to 60.3% in 2004. At the statewide level, the pretrial ("non-sentenced") population grew from 59% in 1995 to 66% in 2004. Sonoma County's percentage of pretrial inmates (56%) is lower than the nationwide and statewide averages, and lower than the comparable counties. Since this is a relative comparison, the lower the percentage of the pretrial inmates indicates that the Sonoma County has a relatively large population of sentenced inmates as compared to the other counties. The difference may be related to the crowding experienced by the comparable counties (see next section below) and their efforts to reduce jail population through alternatives and sentencing. Another explanation might be that Sonoma County is more aggressive with pretrial alternatives to incarceration. However, more evaluation would need to be done to confirm the cause of this difference. Looking at the comparable counties for the first quarter of 2005, the comparison is as follows:



Percent Occupied: As stated at the beginning of this Report, there is statewide problem of jail "population pressures and capacity constraints," which is also reflected nationwide. The DOJ reports that more inmates than new beds are being added to the nation's jails and that population is reaching total rated capacity. Looking at the comparable counties, Sonoma County is in better shape than the rest when it comes to percent of capacity occupied. However, in order to effectively operate a jail, the facility must provide more beds than the ADP to accommodate peak populations and classification (see the discussion regarding Operating Capacity above). The generally accepted practice is that ADP should not exceed 85% of the capacity or else there will be problems. The jail population in 2004 exceeded the jail's recommended operating capacity and, based on the historic trend of growth, Sonoma County may soon be facing the crowding problems experienced by the comparable counties. With that in mind, the following reflects the percentage occupied by the comparable counties:



Percent Occupied based on ADP from BOC *Jail Profile Survey 2005 First Quarter* and rated capacity reported in the BOC *Jail Profile Annual Report 2004*

Conclusions: Sonoma County adult detention trends and characteristics are consistent with the statewide and nationwide averages and compare favorably with five comparable counties. There are 2 areas that differ: Sonoma's pretrial population is not as large a percentage of the overall population and the percent of the jail capacity occupied is not as high. As mentioned above, these traits may be related.

## Factors Affecting Jail Population:

Inmate population is the result of crime in the community and what the community does about it. Crime and response to crime are influenced by multiple factors. Some these factors include:

- **County population and demographic changes:** County population is forecasted to grow from 474,993 in 2005 to 715,298 in 2030 per State DOF, a 50% increase in the next 25 years. This projection suggests the County will become more urban, and, generally, more densely populated urban areas have a larger crime rate. The DOF also predicts that the general population is getting older with the residents over 60 years old going from less than 20% of the population now to almost 30% of the population in 2030. Crime rates normally decline in older age groups. However, the age group at risk for most criminal activities (20 to 39 years old) is also increasing and is predicted to remain proportionally the same over the next 25 years (about 26% of the total population).
- **Economy:** A widely held assumption is that the better the economy the lower the crime. People with jobs and personal income are generally less inclined to commit a crime. However, the economy in Sonoma County has raised the cost of living, especially housing costs, to a level that most people, even with good paying jobs, cannot afford. It is uncertain how this economic paradox will affect crime and jail population. Another economic factor that may impact jail population is the growing casino presence in Sonoma County. It is uncertain what influence this change will have on criminal activity.
- **Public opinion:** Public opinion affects several aspects of criminal justice including the focus of law enforcement, disposition of criminal cases and sentencing. Public opinion can also lead to new laws that address crime and punishment. The Substance Abuse Crime Prevention Act of 2000 is a good example of how public opinion, as expressed in a state election, can affect criminal justice and jail population. Other examples of public opinion affecting criminal justice include the lower tolerance and increased penalties for drunk driving in the 1980's and for domestic violence in the 1990's.
- **Legislation:** Public opinion often leads to new laws or changes to existing laws that expand or narrow what is considered crime and affect the delivery of criminal justice. Other legislation that is more administrative or financial in nature can also affect jail population by shifting responsibilities or cost between state and county or between county and city.
- **Alcohol and drug abuse:** Inmates arrested for alcohol and drug crimes are the largest segment of the inmate population. Changes that affect the causes of alcohol and drug use, or the community response to these kinds of crimes, will impact jail population. More and better treatment and prevention education may reduce abuse and recidivism.

- **Mental health:** The number of inmates with mental illness is increasing. Drug induced mental illness is also on the rise. How the community addresses this issue will impact jail population. The recently enacted Mental Health Services Act (MHSA) and Sonoma County's plan for it may have a positive impact on jail population.
- **Juvenile delinquency:** Juvenile delinquency often leads to adult crime. Many of the same factors that affect adult crime also affect juvenile crime. How the community deals with juvenile crime will eventually have an impact on jail population.
- **Gangs:** There appears to be a growing issue of gangs in Sonoma County. Gangs not only lead to more crime but also cause a problem for jail management. As described above, separation of gang members in jail can be a serious issue.
- **Law enforcement resources and focus:** The number of law enforcement officers and their focus has a direct impact on jail population. One of the stated reasons for the inaccuracy of the Murray projections is the reduction in the Santa Rosa police force and the subsequent reduction in "free patrol" time during which officers are directed to "look for crime." Santa Rosa Police Department and the Sheriff's Department both continue to have several vacancies. One can assume that if these vacancies were filled, there would be more arrests and more bookings.
- **Criminal justice policy and process:** The manner in which criminal cases are managed and processed has a direct impact on jail population starting with decisions about criminal charges and prosecution through adjudication and sentencing. Delays in the process for incarcerated inmates have an immediate impact on length of stay.
- **Availability of detention beds:** If more detention beds become available, criminal justice practice may change to take advantage of them, such as law enforcement sweeps or more and longer detention sentencing. At a minimum, early release will probably be discontinued once there are sufficient jail beds.
- **Booking Fees:** Booking fees have a significant impact on jail population. They act as a financial disincentive for booking offenders and law enforcement agencies may not be booking low-level offenders because of them. If booking fees are reduced or eliminated in the future, there may be an increase in bookings, especially for misdemeanors.

Because there are so many variables that impact jail population, many of which are beyond County control, it is impossible to accurately predict what jail population will be at any given time in the future. No one can predict what will happen next in local, state, national and international events, all of which can impact crime, arrests and incarceration. However, it is clear that jail population is growing and jail facilities must expand to accommodate that growth. The focus of this Report is to establish the size and type of detention facility to plan and, even though accurate projections may be impossible, some kind of inmate population projection must be used.

## Previous Jail Population Projections

Sonoma County has had jail population projections done by professional consultants over the last few years. These previous projections proved to be inaccurate, at least in the short

term (they still may prove to be accurate in the long term). The Vitetta Group issued their *Long Range Detention and Treatment Facilities Planning* report in March 1998. In preparing for facility expansion planning, the projections were updated by Christopher Murray and Associates with their *Jail Population Projection* report issued in September 2001. With the passage of time since these projections were developed, staff has the opportunity to evaluate their accuracy.

<u>Vitetta Projections:</u> Vitetta developed a "baseline" ADP projection based on Department of Finance (DOF) population projections for the "at-risk" age group of 20-34 years old. Vitetta projected the number of bookings and length of stay per booking based on historic data,. ADP was then calculated using the formula: ADP = (Bookings x Average Length of Stay)/ 365. The resulting projection showed ADP growing 1747 by 2015 (projections were taken to 2016). Subsequent to the baseline projection, Vitetta and County staff developed a list of recommendations that could reduce jail population and the projections were revised accordingly. A number of those recommendations have been implemented. The "revised" projections showed projected ADP for 2015 dropping to 1602. The following graph shows the Baseline and Revised projections compared to actual ADP:



|  | 2000 | 2005 | 2010 | 2015 |
|---|---|---|---|---|
| Actual* | 1087 | 1137 |  |  |
| Vitetta Baseline | 1118 | 1330 | 1540 | 1747 |
| Vitetta Revised | 1044 | 1218 | 1406 | 1602 |

*2005 actual population is through 11/27/05

<u>Murray Projections:</u> Murray studied historic trends for arrests, bookings, and average length of stay for 21 different crime types. Using DOF projections for the "at-risk" population (Murray used ages 18 through 35 as the at-risk group), arrest forecasts for each crime type were developed. Then, using booking rates and average length of stay for each crime type, ADP was calculated. The resulting ADP projections showed a much steeper growth than Vitetta with 1966 ADP in 2015 and 2151 ADP in 2020.



|         | 2000 | 2005 | 2010 | 2015 | 2020 |
|---------|------|------|------|------|------|
| Actual* | 1087 | 1137 |      |      |      |
| Murray  | 1087 | 1436 | 1714 | 1966 | 2151 |

*2005 actual population is through 11/27/05

While the Murray projections were developed using a much more detailed approach than the Vitetta projections, they have, so far, proven to be less accurate. By 2005, the projections were more than 26% higher than the actual ADP. Looking at the 4 years since the Murray projections were done shows how far off they were:



|         | 2000 | 2001 | 2002 | 2003 | 2004 | 2005 |
|---------|------|------|------|------|------|------|
| Murray  | 1087 | 1157 | 1227 | 1296 | 1366 | 1436 |
| Actual* | 1087 | 1070 | 1016 | 1045 | 1131 | 1137 |

*2005 actual population is through 11/27/05

Murray prepared a report explaining the discrepancy (Appendix C). In summary, Murray found that his projections for misdemeanors was very close to the actual experience, but

County of Sonoma Adult Detention Projections Staff Report                Page 20 of 25

that the projections for felonies was "almost immediately unreliable." Felony drug forecasts represented 46% of the forecast error followed by felony property crimes and a catchall category of "other felonies." After consulting with County staff, Murray concluded that the foremost reason for the forecast error was the Proposition 36 Substance Abuse and Crime Prevention Act (SACPA), which had just taken effect in summer 2001 as the forecast was being finalized. According to Murray's report, there were far fewer drug arrests than anticipated and drug treatment programs were expanded and proved to be very successful. While Prop 36 would not impact the number of arrests, it may have influenced treatment success. Murray surmises that felony property arrests were influenced by the reduction in drug crimes. Another factor he points to is the reduction in law enforcement in Santa Rosa that occurred at the same time and may have led to a reduction in "free patrol" during which officers are free to "look for crime."

Also, there may have been a "blip" in SCAPA's impact on jail population. When SCAPA took effect, all drug arrests from that point in time were to be treated as first time arrests and eligible for treatment in lieu of detention. Even repeat offenders who had been arrested multiple times would be treated as first time offenders. As these repeat offenders continue to be arrested they become ineligible for treatment and will end up in jail. The dip in jail population between 2001 and 2003 may be in part due to this anomaly in the law.

Another factor that may be influencing the difference between the Murray projections and the actual population is the use of early release since early 2004, which is keeping jail population "artificially" lower than it would otherwise be. It is interesting to note that the slope of actual jail population growth seems to parallel the Murray Projection since 2002. It could be that the impact of SCAPA, law enforcement vacancies and early release is temporarily restraining jail population but that the long-term trend will eventually catch up with the Murray Projection.

## Proposed Strategy for Facility Planning

Murray's projections proved to be higher than actual population growth and may represent a high end forecast. If the high-end forecast is used for planning, it may lead to overbuilding the expansion and spending more funds sooner than strictly necessary. To establish a range of ADP projections, staff first looked at what jail population would be if the incarceration rate held steady but general County population increased per DOF projections. The history of the incarceration rate indicates that it has climbed over time from 18.34 per 10,000 in 1990 to 23.80 per 10,000 in 2005. It is likely that the incarceration rate will continue to grow. Therefore, this projection should be considered the low end of the range of possible jail growth. The inmate projections using a steady incarceration rate are as follows:

|  | 2005 | 2010 | 2015 | 2020 | 2025 |
|---|---|---|---|---|---|
| General Population* | 486,634 | 515,968 | 559,376 | 602,783 | 659,041 |
| Steady Incarceration Rate (2004) | 23.80 | 23.80 | 23.80 | 23.80 | 23.80 |
| Jail Population (Steady Rate) | 1158 | 1228 | 1331 | 1435 | 1569 |

*per State Dept. of Finance

A straight line, linear projection of the past historic ADP provides another projection that may help in facility planning. The linear projection of ADP since 1982 falls roughly in the middle between the low-end projection (steady incarceration rate) and the high-end projections prepared by Christopher Murray.



|  | 2010 | | 2015 | | 2020 | | 2025 | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
|  | ADP | Incar | ADP | Incar | ADP | Incar | ADP | Incar |
| **Murray Projections** | 1714 | 33.2 | 1966 | 35.1 | 2151 | 35.7 | 2335 | 35.4 |
| **Trendline** | 1407 | 27.3 | 1588 | 28.4 | 1744 | 29.4 | 1921 | 29.6 |
| **Steady Incarc Rate** | 1228 | 23.8 | 1331 | 23.8 | 1435 | 23.8 | 1569 | 23.8 |

It is assumed that future jail growth will fall somewhere within the above range of projections, but given all the factors that influence jail population, it is impossible to precisely predict where it will be within the range. Because of the uncertainty, jail facilities should be planned with as much flexibility and expansion capability as possible. Therefore, staff recommends the following approach for facility expansion planning:

- Develop a long-range phased and flexible master plan using the Murray (high-end) projections for the year 2025 to establish the full build out of the master plan. By using the high end of the range to establish facility layout and infrastructure (such as buried utilities and support services, such as kitchen), future expansion will be more easily and economically implemented. Also, the jail site is limited in area and planning a large facility on the site will preserve space for future expansion. This is the same approach used in planning the recently completed Juvenile Justice Center in which 140 beds were provided but another 100 beds are planned for and can be added without expanding the utilities or support facilities that serve them.
- Planning for phased expansion means that the full build out of the master plan can be achieved in smaller projects over time instead of building it all at once. It is recommended that the first phase of the expansion meet the trend line (mid-range) projections for 2020. This is a conservative approach to avoid overbuilding the

facility and overspending county funds before it's needed. Using 15 year projections for the first phase is recommended because of how long it takes to fund, design and build jails. It will probably take 5 years or longer to design and build the first phase of expansion, meaning the expansion would not be ready to occupy until 2011 at the earliest. Funding for the expansion may take even longer, delaying the move-in beyond 2011. If Phase 1 expansion is based on an earlier date (say 2015), and if the trend line projections prove correct, the expanded jail would be overcrowded within a few years after phase 1 is complete. Expanding for 2020 projections will buy the County some time before the next expansion would have to begin.

- Jail housing should include separate housing for males and females, general population housing with varying security levels, special housing for Administrative Segregation, Protective Custody, Mental Health and Medical, and separate housing for pretrial and sentenced inmates (Reception housing is no longer needed because of a new streamlined process for inmate classification that no longer relies on 72-hour observation). The following assumptions are recommended to establish sizes of these different housing types:
    - Gender breakdown should be based on projections for male and female ADP using trend line from 1982 through 2005. The resulting projections show the female population growing as a percentage of the overall population from 13.5% of the total in 2005 to 14.7% of the total by 2025. This proportion of females in jail is still below the proportions in some of the comparable counties, but is consistent with past experience in Sonoma County.
    - Assume 75% of total population will require "general population" housing and 25% will be require special housing for Administrative Segregation, Protective Custody, Mental Health and Medical. Since 1998, general population has fluctuated between 78% and 81%. However, this is most likely because of limited Special Housing and several inmates in general population should have been in Special Housing.
    - Assume 62% of total ADP will be pretrial inmates. Since 1999, pretrial population has grown from 50% to 58% in 2005. This is still well below the statewide average of 66% and the comparable counties, which range from 60% to 74%. It is assumed that growth of the pretrial population in Sonoma County will continue but will flatten out once it reaches 62%.
    - Total operating capacity should equal 118% ("peaking factor") of total ADP. Different consultants use different peaking factors when calculating operating capacity. The general consensus is that, overall, the ADP should not exceed 85% of the operating capacity, or in other words, the operating capacity should be 118% of the ADP. However, small segments of the population, such as Administrative Segregation, Protective Custody or female inmates, fluctuate more drastically. Therefore, a larger peaking factor should be used for smaller housing types with the total overall peaking factor equal to 118%.
- The expansion should include enough beds to make up for the recently installed double bunking and should have provisions for further double bunking. Double

bunking should be reserved as a contingency for future use if jail population increases faster than planned.
- The expansion should also provide "swing" housing units that can be used for different inmate classifications

Following this strategy, the following tables show the operating capacity by housing types for the long-range master plan and the first phase of expansion:

### Master Plan (Murray 2025 projection)

|  | Housing Type | ADP | Peaking Factor | Operating Capacity |
|---|---|---|---|---|
| **Male** | | | | |
| Pretrial (62%) | Gen Pop (75%) | 926 | 1.14 | 1055 |
|  | Special (25%) | 309 | 1.25 | 386 |
| Sentenced (38%) | Gen Pop (75%) | 567 | 1.14 | 647 |
|  | Special (25%) | 189 | 1.25 | 236 |
| **Subtotal** | | 1991 | | 2324 |
| **Female** | | | | |
| Pretrial (62%) | Gen Pop (75%) | 160 | 1.25 | 200 |
|  | Special (25%) | 53 | 1.25 | 67 |
| Sentenced (38%) | Gen Pop (75%) | 98 | 1.25 | 123 |
|  | Special (25%) | 33 | 1.25 | 41 |
| **Subtotal** | | 344 | | 430 |
| **Total** | | 2335 | 1.18 | 2755 |

### Phase 1 Expansion (Trend line 2020 Projection)

|  | Housing Type | ADP | Peaking Factor | Operating Capacity |
|---|---|---|---|---|
| **Male** | | | | |
| Pretrial (62%) | Gen Pop (75%) | 693 | 1.14 | 790 |
|  | Special (25%) | 231 | 1.25 | 289 |
| Sentenced (38%) | Gen Pop (75%) | 425 | 1.14 | 484 |
|  | Special (25%) | 142 | 1.25 | 177 |
| **Subtotal** | | 1491 | | 1740 |
| **Female** | | | | |
| Pretrial (62%) | Gen Pop (75%) | 118 | 1.25 | 149 |
|  | Special (25%) | 39 | 1.25 | 49 |
| Sentenced (38%) | Gen Pop (75%) | 72 | 1.25 | 90 |
|  | Special (25%) | 24 | 1.25 | 30 |
| **Subtotal** | | 253 | | 318 |
| **Total** | | 1744 | 1.18 | 2058 |

These represent the target capacities for these housing types. The actual number of beds provided will depend on how the facility is laid out and the appropriate size of each housing unit. For instance, 64 beds has been the normal operating capacity for a direct supervision, general population housing unit. The Phase 1 expansion target for male, pretrial, general population is 790 beds. However, 790 does not divide evenly by 64 so the number of beds provided for this housing type could end up being 832 (or 13 units at 64 beds each).

Comparing the target capacities to the existing capacity shows that they represent significant facility growth. Expansion planning will actually include more beds than what is shown as an increase in order to replace housing that is substandard and, in the case of the consolidation concept, to replace beds that are already in place at NCDF. The following is for comparison purposes only to show what the increase in capacity will be:

| Existing Capacity (2005) | Phase 1 Capacity | Increase over Existing | Master Plan Capacity | Increase over Existing |
|---|---|---|---|---|
| 1404 | 2058 | 654 | 2755 | 1351 |

## Interim Measures

In response to the growing population, the Courts and Sheriff have implemented an early release program in which inmates are released up to eight (8) days early at the end of their sentence. The Sheriff's Department has also started the installation of double bunks in single bunk cells at MADF. In 2005, 90 cells were retrofitted with second bunks. 268 additional cells have been identified for double bunking. Additional bunks beyond the current 90 will require additional staff. Other measures are being taken to harden the cell doors in the R Module in order to accommodate inmates needing a higher security level. Also, project requests have been submitted to divide the day rooms and recreation yards in the Mental Health Module and R Module in order to meet requirements for "out of cell" time for the inmates in these housing modules. These measures follow years of adjustments in housing and classification in order to provide adequate separation and security for the growing inmate population.

Double bunking is inconsistent with the Sheriff's operating philosophy and will add stress to staff, create safety issues, reduce inmate accountability and increase wear and tear on the facility. However, planning, design and construction of an expansion will take several years (MADF Expansion completed in 1997 took 5 years to design and build) and in order to maintain the appropriate operating capacity, installation of more beds will be required. If the trend line projections prove to be correct, installing all of the additional beds possible will provide adequate operating capacity through the year 2010.

## Next Steps

In conclusion, jail population has reached the operating capacity of the existing detention facilities. Further growth is inevitable and the County must take steps to expand its detention facilities to accommodate the growth. Therefore, staff recommends that the Board take the following actions:

- Approve the proposed jail population projections and planning strategy
- Authorize staff to proceed with facility planning including:
    o Update existing expansion plans to match the proposed projections
    o Develop conceptual plans for a consolidated jail facility at the County Administration Center.

The planning consultant, Hellmuth, Obata + Kassabaum, Inc. is already under contract for the planning, with funding appropriated for the effort in the Capital Project Budget. If the Board approves, planning can begin in January and staff will return to the Board with the results in early summer 2006.