# Appendix A
# Crime Categories

## MISCELLANEOUS CRIMES
Beyond Parent Control
City/County Ord
Civil Charges
County Parole
Curfew
Escape
F-Escape
F-Hit-and-Run
F-Weapons
M-Contr Delinq Minor
M-Disorderly Conduct
M-Disturb the Peace
M-Fail.Appr Non-tr
M-Flight-Escape
M-Gambling
M-Hit-and-Run
M-Liquor Laws
M-Malicious Mischi
M-Nonsupport
M-Traffic
M-Vehic Manslaughter
M-Viol of Probation
M-Weapons
Misdem (old)
None (avg)
Other Detent (old)
Other Detention
Other Juvenile
Other Misdemeanor
Prob Hold
Runaway
Truancy
Unknown
Vehicle Cd Infract
Vehicle Cd Misdem

## VIOLENT CRIMES
F-Assault
F-Forcible Rape
F-Homicide
F-Kidnapping
F-Manslaughter
F-Robbery
M-Assault & Battery

## NO RELEASE CRIMES
Calif Dept of Corrections
CYA
Detainer
F-Other Felony
F-Viol Prob/Parole
Federal Offenses
Felony (old)
H-Felony Fugitive
INS
Other Holds
Outside Warrant Fe
Outside Warrant-Mi
Parole Hold (old)
State Parole
Warrant Hold (old)
Witness/Prot.

## SEX CRIMES
F-Lewd & Lascivious
F-Other Sex Law Vi
F-Unlawful Sex Int
M-Annoying Child
M-Indecent Exposure
M-Lewd Conduct
M-Obscene Matter
M-Prostitution
M-Sex Assault/Animal

## SUBSTANCE ABUSE/ SALES CRIMES
F-Dangerous Drugs
F-Drunk-Driving
F-Marijuana
F-Narcotics
F-Other Drug Viol
M-Dangerous Drugs
M-Drunk
M-Drunk-Driving
M-Glue Sniffing
M-Marijuana
M-Other Drug Viol

## PROPERTY CRIMES
F-Arson
F-Bookmaking
F-Burglary
F-Forgery
F-Motor Vehic Theft
F-Theft
M-Arson
M-Checks/Credit Ca
M-Joy riding
M-Other Theft
M-Petty Theft
M-Posses Burgl Too
M-Trespassing
M-Vandalism

# Appendix B
# Alternative and Treatment Programs

## Pretrial Alternative Programs

Citation Release (from jail): Alleged offenders are released from jail on citation to appear in court. This program is used for low-level crimes. In 2004, a total of 3445 inmates were released under this program (includes "Book, print and release" citations). If citation release was not used for these inmates and they spent the average length of stay in jail for pretrial inmates (2004 pretrial ALOS was 10.7), the total ADP saved would be 101. Offenders can also be cited and release in the field by the arresting officer, but no data was available for this form of cite and release.

Court Ordered Own Recognizance ("OR"): Alleged offenders are released from jail on a promise to appear in court. In 2004, 822 inmates were released under this program. If OR was not used for these inmates and they spent the average length of stay in jail for pretrial inmates (2004 pretrial ALOS was 10.7), the total ADP saved would be 24.

Pretrial Supervised Own Recognizance ("SOR): Inmates are released from jail and supervised by the Probation Department while pending Court proceedings. The current maximum capacity for SOR is 180. However, between September 2004 and September 2005, the average monthly population using SOR has been 182 with the peak monthly population of 226 in September 2005. In 2004, a total of 1055 inmates were released under this program. In October 2004, the Board of Supervisors approved funding for a 2-year pilot program to increase the capacity of SOR from 150 to 180. A Mid-Term Report for this program has been prepared by staff and will be presented to the Board of Supervisors. It is assumed that the saved ADP equals the average monthly population for the year, which is 182.

Bail and Bail Bond Release: Temporary release of an inmate who provides security as a promise to appear in Court. In 2004, 4432 inmates were released under this program. If bail/bail bond release was not used for these inmates and they spent the average length of stay in jail for pretrial inmates (2004 pretrial ALOS was 10.7), the total ADP saved would be 130.

## Sentenced Alternative Programs

Supervised Electronic Confinement ("SEC"): Sentenced offenders are confined to their home and monitored electronically by the Probation Department while they serve their sentence. The maximum capacity of SEC is 75. Between September 2004 and September 2005, the daily average population varied between a high of 54 and a low of 27. It is estimated that during this period almost 12,600 jail bed days were saved through SEC, or roughly 34 annual ADP.

Work Furlough: Inmates are allowed to continue their employment while serving their sentence in custody. Because the inmate remains in custody when they are not working,

this program does not save any jail bed days. On the average, there are between 15 and 17 inmates in this program.

Work Release: In lieu of serving time in custody, offenders perform labor on Supervised Adult Crews (SAC). 10 offenders work on each crew and on the average number there are 48 work crews per day. Between September 2004 and September 2005, the monthly averages of participants in this program ranged from 232 to 388. It is estimated that this program saves about 60 annual ADP.

Parole: Offenders are released from jail during the latter portion of their sentence and supervised by a Probation Officer until their sentence is complete. Over the years, parole has declined because the average inmate in sentenced custody has become a more hardened offender who does not qualify for parole. From September 2004 through September 2005, the average daily population varied from 10 to 22, with a total of 5906 jail beds saved in 12 months, which roughly equates to 16 annual ADP.

Early Release: The Court and Sheriff have the authority to release inmates early when they reach the end of their sentence. The Court, under Penal Code 4024.1, can release inmates up to 5 days early and the Sheriff, under Penal Code 4018.6, can release an inmate up to 3 days early. While this is not the preferred approach to controlling jail population, it has been used since February 2004. From February 2004 through July 2005 (early release is still being used) a total of 9452 jail bed days were saved which equals approximately 18 annual ADP. Once jail capacity is expanded, early release will probably be discontinued.

Domestic Violence Court:  The Sonoma County Domestic Violence Court began operation in July 1998. The court was a collaborative effort of the District Attorneys Office, Public Defenders Office, Probation Department, the Sheriff's Department, and the Courts. The Sonoma County Board of Supervisors provided funding for Court staffing.

The mission of the Court is to attempt early resolution of cases, and to ensure compliance with the conditions of probation, which includes domestic violence counseling. The majority of defendants come before the Court in custody and case resolution can take place in as little as three days. Typically, upon case resolution, the defendant is released from custody on a grant of probation that includes a 52-week batterers counseling program. Program compliance is monitored through frequent court reviews. If a convicted defendant complies with the conditions of probation, it is unlikely that the person would spend any more time in jail than that spent at time of arrest. The Court reduces jail bed days, but it is not possible to quantify the savings in ADP.

## Alcohol and Drug Treatment Programs

Substance Abuse Crime Prevention Act of 2000 ("SACPA"): SACPA became effective July 1, 2001. The Act requires that drug treatment be offered to any person convicted of a non-violent crime (first or second offense) involving drug possession or being under the influence of drugs or a drug related violation of probation or parole. For the first three

years since the SACPA became effective, 1380 offenders have been placed in treatment with 361 of them completing the program so far. Alcohol and Other Drug Services Division (AODS) of the Department of Health Services, which oversees the treatment portion of SACPA, has studied the outcomes of the program and estimates that those who have completed the program have a lower recidivism rate than those who have no intervention (81% for no intervention versus 45% for successful completion) and spend fewer days in jail if they do re-offend (84 days for no intervention versus 7 days for successful completion). While it is probably impossible to accurately quantify how many jail beds this program avoids, staff estimates that offenders in SACPA at its current level equate to 28 annual ADP (difference between the no intervention clients and successful completion clients jail days, multiplied by the sample group of 136 and then divided by 365 days).

Starting Point: This program, which started as a 2-year pilot program in October 2004, provides drug and alcohol treatment for in-custody male inmates, whose sentence includes community based residential treatment. Inmates in custody not sentenced to community based treatment can also volunteer to be in Starting Point. Prior to Starting Point, inmates sentenced to treatment would often have to wait in jail, sometimes for as long as 14 months, until a residential treatment bed became available. Starting Point allows the treatment to begin while the offender is in custody, which effectively reduces the amount of time in the residential treatment program once they get there, which increases the turn around for the treatment beds. In the first year of operation, 325 inmates have participated in the Starting Point program. Staff estimates that this program has saved 14,600 jail bed days, which equates to an annual ADP of 40. There is also evidence that Starting Point reduces recidivism, which saves even more jail beds. A Mid-Term Report for this program has been prepared by staff and will be presented to the Board of Supervisors.

Drug Court: The Sonoma County Drug Court Treatment Program is collaboration between the justice system and the alcohol and other drug treatment system. Adults who are arrested for nonviolent offenses and acknowledge that they have a problem with drugs or alcohol are referred to Drug Court. The Drug Court Team reviews all cases for admission to the Drug Court program with the approval of the Judge. If the client is in custody, they are released, they sign the DC agreement, and treatment begins immediately. The Drug Court Program is designed to treat approximately 100 clients at any given time for at least 12 months in primarily intensive outpatient treatment with random drug testing. Consequently, it has the potential of reducing the jail population by 100 people at capacity. The past three years, the Drug Court program has averaged 55 clients per day or a 55 ADP in the adult detention facilities. While in drug court treatment and out of custody, these clients are working, reuniting with their families, addressing medical and dental issues, and learning to become productive citizens in the community.

Residential Treatment: AODS operates the Orenda Center, which has 20 beds for short-term residential treatment, 11 beds for long-term residential treatment and a Detox unit with 30 beds for short-term detoxification. Seven of the short-term residential treatment beds are set aside for offender use only. The others are used on a first come first served

basis. AODS also contracts for 105 residential treatment beds in non-profit, community based programs for offenders sentenced by the Court to such treatment. All together there are 112 treatment beds set aside for offenders and they are typically filled. Given the existing capacity of treatment beds and the ongoing demand for them, it is estimated that this program saves 112 ADP.

Residential treatment is often included in the sentencing of offenders guilty of drug and alcohol related crimes and the limited availability of these treatment beds often caused inmates to wait in jail until beds opened up. With the implementation of Starting Point, these beds can serve more offenders in a shorter amount of time. Even with Starting Point, inmates continue to wait in jail until outside residential treatment beds open up. A snapshot taken on December 2 showed that there were 92 inmates in jail waiting for treatment beds, 33 of which had been fully adjudicated and sentenced, and could move immediately into treatment beds if they were available. However, the waiting time has been dramatically reduced. For example, the average wait in jail for inmates enrolled in the TASC (Treatment Accountability for Safer Communities) program was 22 weeks from 2002 to 2004. In 2005 the average wait dropped to 9 weeks.

The 30 short-term detoxification beds at Orenda reduce bookings by providing law enforcement with a less expensive option for non-violent offenders instead of booking them into jail. During fiscal year 2004/05 there were 2833 admissions to the Detox unit, with a little less than 20% for 4-6 hour holds admitted by law enforcement (mainly from Santa Rosa PD). For many years, law enforcement could drop an offender off at Orenda for free. A $50 fee is now being charged. Even with the fee, about 560 offenders were taken to Orenda Detox during fiscal year 04/05. Without these beds, these offenders would be booked in jail. ADP savings does not apply because these offenders most likely would not occupy a jail bed.

Outpatient Treatment: Annually over 1000 inmates are referred from TASC (Treatment Accountability for Safer Communities), SACPA or Drug Court to participate in various AOD outpatient programs while under court or probation supervision for a period of a few months to a year duration. These referrals come either directly from court and/or jail or as aftercare when residential treatment is completed. As a result of these outpatient treatment services, it is estimated that on any given day an average of 175 jail bed days are saved. The outpatient status clients are to comply with TASC treatment requirements as a condition of probation and therefore any violation of probation (VOP) would result in return to court for a VOP hearing and considerable jail time and possible completion of sentence.

## Mental Health Programs

Forensic Assertive Community Treatment ("FACT"): The Mentally Ill Offender Crime Reduction Grant program, authorized by Senate Bill 1485 (1998), provided grants to local governments for funding demonstration programs for treatment of nonviolent mentally ill offenders to reduce crime and jail population. Using these grant funds, Sonoma County established the FACT program. Grant funding discontinued at the end of fiscal year 2003/2004. During its 5 years of operation, the FACT program enrolled 149

offenders and provided them with integrated services including intensive case management, counseling, medication and testing. Staff evaluation of the outcomes indicated that offenders who participated in the program for one year or more had a dramatic reduction of days in jail, hospitalization, failures to appear in court, convictions and new felony offenses. 90 clients who completed 12 or more months of the program had more than 80% reduction of the days they spent in jail (8098 days prior to enrollment versus 1496 after treatment). The jail day savings roughly equals an annual ADP of 18.

Mental Health Services Act (MHSA): Following the termination of the FACT program, state voters approved the Mental Health Services Act (MHSA) in 2004. MHSA provides funds to local governments to promote mental health treatment in the community. Sonoma County has prepared a proposed plan for use of its MHSA funds, which includes partial reinstatement of the FACT program. The reinstated program will serve 50 mentally ill offenders coming directly from jail through the Drug Court. This plan is subject to approval by the Board of Supervisors and the State. If this reduced program achieves half of the ADP savings of the original FACT program, the ADP savings would be 9.

Mental Health Discharge Liaison/Probation Officer: October 2004, a 2-year pilot program was funded to create a Mental Health Discharge Plan Liaison and a Mental Health Probation Officer to facilitate and expedite the evaluation and placement of mentally ill inmates into appropriate treatment programs. The Discharge Liaison works with the inmate and the various program providers to find the right fit and the Probation Officer supervises the inmate after they are released from jail to a community based facility. A Mid-Term Report for this program has been prepared by staff and will be presented to the Board of Supervisors.

# Appendix C

# Briefing Paper:
## The 2001 Jail Population Forecast – What Went Wrong?

### Background



The population forecast prepared in the summer of 2001 estimated that there would be 1,311 inmates in the Sonoma County Jails by March 2004. In reality, there were 1,114 - almost 200 fewer than, and 15 percent below, the forecast. Why did this happen?

First, it is necessary to understand how the forecast was prepared. The jail population forecast began with analysis of historical trends in arrests, jail admissions, and average length of stay for 21 different crime types in Sonoma County. Arrest rates were compared to five other counties selected for comparability by a forecast workgroup made up of criminal justice professionals from Sonoma County. That analysis was presented to the workgroup in three lengthy workshops. The workgroup, which included representatives from all parts of the county's criminal justice system, set the assumptions used in the forecast. Some of the assumptions set by this group proved accurate, some were wildly off.

### The Felony Forecast Was Far Off – The Misdemeanor Forecast Wasn't

There were assumptions set for fourteen felony and seven misdemeanor crime types. The felony forecast was almost immediately unreliable. The misdemeanor forecast tracked actual experience well for the first year and, after an interval where the forecast exceeded actual experience, once again appears to be accurately predicting the number of misdemeanants in jail.





### Assumptions About the Most Serious Offenders Proved Accurate

The forecast for the number of violent offenders in jail was one of the most accurate components of the entire projection. In the jail population projection, violent offenses included homicide, felony assault, rape and robbery. Actual experience was very similar to the projection.

## THREE CRIME TYPES ACCOUNT FOR 90 PERCENT OF THE FORECAST ERROR

Discrepancies in the forecasts for felony drug offenses, felony property offenses, and a catch-all category of "other felonies," account for approximately 90 percent of the error in the 2001 forecast. As of March 2004, the shortfall in felony drug offenders in jail alone accounts for 46 percent of the forecast error.







## WE KNOW WHAT HAPPENED – DO WE KNOW WHY IT HAPPENED?
After first understanding what happened, the next step was to try to figure out why it happened. To help determine the causes for these errors, as many members of the original forecast workgroup as could be assembled were brought together to review the information that is summarized above and to discuss the factors that they think are likely responsible. Foremost among these was Proposition 36 and the effectiveness of local drug and alcohol programs.

At the time the forecast was prepared, Proposition 36 had only recently past and no one knew what the effect might be. What happened was there were far fewer arrests and somewhat shorter lengths of stay in jail. At the same time, grant monies were used to expand drug treatment in Sonoma County. It is reported that these programs experienced very high completion rates and exceptionally low re-arrest rates. These two factors, fewer arrests and excellent success in treatment programs, are believed to the reason why this part of the forecast was so wrong.

It is also believed that the reduction in felony property offenses was likely influenced by the reduction in drug crimes as fewer thefts and burglaries were committed to support drug habits.

The other factor believed to be responsible for the reduced number of property and "other felony" offenders is the reduction in police that took place during this time in Santa Rosa. The primary impact of this force reduction was a significant reduction is "free patrol" time from approximately 30 percent of shift to about five percent of shift. Free patrol time is the time officers have when they are not responding to calls. Instead of having nearly 2.5 hours per shift to "look for crime," free patrol time was reduced to less than a half hour. A reduction in arrests for lower level crimes is consistent with such a change in resources.

## CONCLUSION

By March 2004, the 2001 jail forecast was about 15 percent higher than actual experience. Many of the assumptions set by the county criminal justice professionals who participated in the jail forecast assumptions-setting workshop in 2001 have held up well over time. Some, like the forecast of violent criminals in jail, were quite precise. A few assumptions, notably those dealing with felony drug, felony property, and miscellaneous "other" felonies, were very far from the mark. Out of the 21 crime-types for which forecast assumptions were made, those associated with these three categories were responsible for 90 percent of the forecast error.

The forecast was made shortly after passage of Proposition 36. The actual effects of this proposition, coupled with expanded and highly successful substance abuse treatment programs in Sonoma County and with a reduced law enforcement presence in Santa Rosa, are believed to be the reasons why actual experience differed so much from expectations.

## ATTACHMENT D
## CRIMINAL JUSTICE COUNCIL

**Purpose**: The Council serves as a forum for information sharing and problems solving on issues that impact the criminal justice system. Capital projects, operational issues, budget issues and departmental issues impacting other agencies are presented and discussed at these meetings.

**Formed:** The Criminal Justice Council (CJC), originally known as the Criminal Justice System Advisory Group and funded by County Justice System Subvention Program (CJSSP) revenue. The advisory group was a broadly based 17 member advisory group of Criminal Justice department heads and representatives of non-profit agencies who provided services to offenders who made recommendation of the use of CJSSP revenue. The group evolved into the current structure and membership and was utilized to assist with population and construction issues arising from the federal consent decree.

**Structure:** The Council generally functions as a group of the whole. Sub-committees have been formed occasionally for specific problem solving tasks. The jail oversight committee was utilized twice and charged with developing options to address jail population and crowding issues. In FY 04-05, the committee developed options and made recommendations to the CAO/Board on the creation/expansion of alternative programs for certain populations housed within the jail. In addition, a task force was formed to review and make recommendations for alternatives to the use of the Norton Inpatient Psychiatric Unit (IPU) for mentally ill inmates where the court had referred them for competency issues.

Members, in coordination with the CAO, submit topics to be placed on the meeting agenda.

**Scheduled Meetings:** Meetings are scheduled the second Wednesday of every other month throughout the year, from 12:00pm to 1:30pm.

### Members:
Criminal Justice Board Liaison
Criminal Justice Department Heads (Sheriff, Probation, District Attorney, Public Defender)
Superior Court Executive Officer
Superior Court Presiding Judge (criminal)
Petaluma Police Chief
Santa Rosa Police Chief (representative of the Chief's Association)
Director General Services
Director Health Services
Div. Director -Mental Health
Div. Director -Alcohol and Other Drugs (AODS)
County Administrator (facilitator)

## Detention Planning Deliverable - Timeline

| Topic | Recommendation/Action | Date to BOS/comment |
|---|---|---|
| 1.  Sheriff Dept. Regional Jail Report | Sheriff recommends not to study further the County's participation in a regional jail facility with other nearby counties.  Requests Board Accept Sheriff's recommendation | Dec 11th |
| 2.  HOK's Jail Facility Planning Study ( consolidated versus dual jail facility | Staff recommends jail facilities be consolidated.  Request Board to adopt a policy to plan for the consolidation of NCDF with MADF at the County Center over time | Dec 11th |
| 2.b  Jail Development Plan and Justice Precinct Options | Informational to Board.  Present development plan for use of land for jail expansion and the relationship of the jail to future courthouse options at the County Center | Dec 11th |
| 2.c  Five Jail Expansion Options | Informational to Board.  Present scope, capital and operational costs for each option.   This will also include information from the Jail Financing Committee, as to potential sources of funding and requirements to access those funding choices. | Dec 11th |

## Detention Planning Deliverable - Timeline

| Topic | Recommendation/Action | Date to BOS/comment |
|-------|----------------------|---------------------|
| 3. Work session on AB 900 | Present information to Board, identify conditions that would need to be present for county to indicate to state it would be willing to consider a partnership on a re-entry facility. | Could go on Dec. 11th meeting, or could be separate. |

| Topic | Recommendation/Action | Date to BOS/comment |
|-------|----------------------|---------------------|
| 4. Receipt of David Bennett Conceptual Plan | Present results of David Bennett study to Board. Report identifies conceptual enhancements to Sonoma County's corrections system (facilities and programmatic). Board requested to receive report. | Could go on Dec. 11th |
| 4a. Programming for Jail Expansion | Architect's office/HOK will need to evaluate conceptual recommendations from Bennett report and assess impact on facilities. Will require additional budget allocation this work. | Would go to Board along with David Bennett conceptual plan. |
| 4. b Planning Phase of work for Bennett study | Request direction from Board to proceed to next phase of work: take Bennett recommendations from conceptual to actual program design, with development of budget and funding plan. Will need to award a contract with Bennett for a second phase of work; will require budget to do so. | Anticipate a contract could be ready for approval by Board in late January. Length of planning phase likely to be 6 to 8 months at least, due to competing demands for staff focus on annual budget process. Recommendations won't be available for consideration during 08/09 budget process. |

ANALYSIS OF
CRIMINAL JUSTICE SYSTEM AND
ALTERNATIVES TO INCARCERATION
REQUEST FOR PROPOSALS
August 18, 2006

## 1.     Background:  Project Opportunity

Sonoma County seeks independent, objective consultant services to evaluate the extent to
which it is maximizing the use of cost effective programs that provide alternatives to
incarceration, how criminal justice system practices influence jail population and jail bed
days for pre-trial and sentenced inmates, and what possible best management practices
can be used in the system to relieve pressure on jail population without affecting
community safety.

Sonoma County is approaching maximum capacity at our two adult detention facilities,
called the Main Adult Detention Facility and the North County Detention Facility. To
begin a capital expansion plan, a population projection study was completed in January
2006 which anticipated inmate population through the year 2025. Based on existing
programs and systems, the projections indicate that the County needs to substantially
expand the jail to house the projected population.

Due to the magnitude of the expansion project, it is anticipated that planning and
construction will take five to eight years before a new facility will be operational. A
preliminary cost estimate of $200 million is based on an outdated study. The updated cost
estimates will likely be higher.  This will be the largest capital project in the history of the
County.  Construction of the facility will likely be phased to meet projected needs
without overbuilding at the front end.

In order to help manage inmate population and lessen the population pressure on existing
detention facilities, the County uses a number of programs and practices to provide or
support alternatives to incarceration. These include pretrial alternative
programs/practices, sentenced alternative programs/practices, alcohol and drug treatment
programs, and mental health programs (identified in Attachment A). These programs and
practices are estimated to have saved the County approximately 850 average daily
population (ADP) in the most recent annual period by reducing inmate length of stay
(LOS) or providing an alternative to incarceration. These programs/practices are
managed or influenced by the activities of the Sonoma County criminal justice system
partners. A description of this partnership is provided in Attachment B.

Due to the anticipated and unprecedented jail expansion need and cost impacts, the Board
of Supervisors is interested in assessing the efficiency of the practices of the criminal
justice system and in ensuring that the County is maximizing the use of cost effective
detention alternative programs and practices.

## 2.    Project Concept and Project Goals

This project will evaluate practices within the criminal justice system and programs that serve as alternatives to incarceration to:

A.    Identify opportunities to reduce adjudication time and pre-trial and pre-sentence length of stay for inmates by reviewing the current intake and processes necessary for adjudication by the justice departments and the court;

B.    Review the existing programs that constitute alternatives to incarceration or that can shorten the length of inmate stay in detention facilities to determine the cost effectiveness of these programs and whether they can or should be expanded;

C.    Recommend new alternatives based on concrete information, including relevant published studies in the field of criminal justice and/or established best management practices, as well as local data;

D.    Identify where criminal justice system practices and alternative programs overlap to identify areas where change or adjustment may be addressed most efficiently.

E.    Provide recommendations to the agencies and departments within the Sonoma County criminal justice system on how to develop or continue the use of analytic tools useful in on-going evaluation of practices and programs.

## 3.    Scope of Work

The scope of work to be performed will result in a report (in electronic and hard copy format) with a level of analysis sufficient to meet the goals outlined above. The analysis of the criminal justice system practices (Goal A above) should, at a minimum, answer the following questions:

1.  What practices/procedures within the system influence pre-trial or pre-sentence length of stay (including but not limited to practices by local police agencies, number of courtrooms, calendaring, plea bargaining, judge availability, continuances, trial prep, settlement conferences, availability of attorneys, records/communications activities, availability of probation staff to conduct required investigations, inmate transportation/handling, and other practices within the criminal justice system)?
2.  What practices can be expanded, changed, or eliminated to reduce the pretrial and sentenced Length of Stay (LOS)?
3.  What control or influence does the county have over recommendations identified in 2 above?

2

      4. To what extent are criminal justice system partners making effective use of management information systems to reduce LOS? If these tools are not in use, what recommendations can be made as to their cost benefit?

      5. Provide recommendations for changes in practices/procedures so County staff can consider this information in facilities planning.

The analysis of the alternatives to incarceration (Goals B and C above), should, at a minimum, answer the following questions for each existing and potentially additional program:

      1. How effective is it in reducing jail time, short and long-term, at different service levels? Answers should rely on local data when available, and other data as appropriate. (Note: Attachment E, Summary of Data Availability for Current Alternatives, provides information on the availability of local data.)

      2. How much does the program cost at current service levels (see Attachment A for data on costs of Sonoma County programs.)?

      3. What other benefits does it provide, and what are the financial benefits to the County (if they can be measured)?

      4. What is the maximum number of inmates appropriate for the alternative at current funding levels?

      5. As appropriate, do community treatment resources exist to support growth in the program?

      6. Is there a changing nature of jail inmates that affects the use of a program? For example, are more mentally ill or "hardened" inmates entering the system that would affect the use of a program?

      7. How do criminal justice departments, cities and courts influence activities relative to each alternative program?

      8. What evaluation model should be established for future review of the program's outcomes, ensuring that counts of jail day savings are not duplicative?

      9. What recommendations can be made for sizing current and potential new alternative programs which may affect the need for jail expansion?

The analysis of alternatives should address the potential for double-counting those who could participate in more than one program. The analysis of alternatives should also review the County's recent analysis of alternatives "Adult Detention Projections Report" (Attachment C) and provide comments on the assumptions regarding jail alternative programs.

The report should include enough information for the County to make reasonable decisions on any recommended changes in criminal justice system practices and decisions on the range of alternative programs it could provide, including the costs and benefits of each.

The County is not seeking recommendations from this study on facilities' needs. This project is one of three concurrent projects to inform the County's detention facilities expansion/replacement planning efforts. Information will be shared about these other projects as appropriate for effective coordination.

Additional work: At it's discretion and upon the successful completion of the project herein, the County may conduct an objective evaluation to determine if it is in the County's best interest to continue to work with the selected vendor to complete further analysis and/or implement recommendations. Should the evaluation demonstrate that this approach is in the County's best interest, the County may attempt to negotiate arrangements with the selected vendor.

## 4.    Project Management Approach and Roles

### A. Stakeholders

The following County Departments are stakeholders in this project:

County Administrator's Office
Sheriff's Department
District Attorney's Office
Public Defender's Office
Probation Department
Health Services Department
General Services Department, Architect's Office

The Sonoma County Superior Court, an agency of the state, is also a stakeholder in this project.

### B. Project Owners

The County has also established a Project Owner group with the following membership:
- County Administrator- Bob Deis
- County Sheriff- Bill Cogbill
- District Attorney- Stephan Passalaqua
- Public Defender- John Abrahams
- Chief Probation Officer- Bob Ochs
- Director of Health Services- Rita Scardaci
- Representative from Sonoma County Superior Court

The Project Owners will ensure that resources are available within their respective departments to support the consultant in the timely completion of this project. They will understand the policy implications of potential outcomes. They will review the

4

consultant's work at designated milestones within the project and provide comment and guidance.

Each Project Owner will designate a departmental liaison to the consultant to facilitate the exchange of information and access to data necessary for the successful completion of this project. This will include the provision of information about each jail alternative program the department oversees, interacts with or supports. The department will provide reports, data or statistics, policies, procedures, and information as to the current approach to evaluating each of its program and associated outcomes. In addition, each department will provide information on court practices or process and how they are perceived to influence the effectiveness of each jail alternative program within their scope of responsibility.

   C.  Other Groups

This study may involve interview/ data collection from two other groups:

Sonoma County Law Enforcement Chief's Association
Sonoma County Superior Court's Best Practices Group

Contact with these groups will be arranged through the Project Owners, as appropriate.

The Project Owners are members of the Criminal Justice Council. Information about this project and its progress will be shared with the Criminal Justice Council on an ongoing basis. Information about the Criminal Justice Council is included in Attachment D.

   D.  Board of Supervisors

The County Board of Supervisors has substantial interest in this project and are the Project sponsors.

   E.  Project Manager

Jennifer Murray, Deputy County Administrator, will serve as the County's project manager and primary contact person for this project. She is responsible for the overall delivery and quality of the project. Her e-mail address is jmurray2@sonoma-county.org.

**Minimum Meeting Attendance Expectations**
The selected consultant should be prepared to meet in person periodically with the Project Manager and Project Owners. Your proposal should clearly identify all anticipated meeting milestones with these individuals. At a minimum, meetings should occur when the project is initiated, as initial analyses are completed and draft findings and recommendations are available, and to present the final draft report to the project owners. The consultant will be called upon to facilitate meetings with the project owners. The consultant should also provide a written project status report and meeting (in person or via telephone) at least every other week with the Project Manager. After the Project

Owners have accepted the draft report, the Consultant will be expected to present the final report to the Board of Supervisors at a scheduled time to be determined.

## 5.    Estimated Project Completion

The County desires to complete this project no later than May 1, 2007. However, the County is open to an alternate project completion date if additional time is needed to best address the breadth of our area of inquiry.

## 6.    Submittal Requirements

Proposers must submit (1) electronic copy, one (1) signed original, and ten (10) copies of the signed proposal by an officer of the firm authorized to bind the proposer to a service agreement.    Proposals must be enclosed in a sealed envelope or package and clearly marked "Alternatives to Incarceration Project."    Proposals are due before 5:00 p.m. on October 6, 2006 and shall be submitted to:

> Sonoma County Administrator's Office
> Attention:  Jennifer Murray, Deputy County Administrator
> 575 Administration Drive, Suite 104A
> Santa Rosa, CA  95403

*The proposal due date is subject to change.  If the proposal due date is changed, all known recipients of the original RFP will be notified of the new date.*

### Finalist Interviews

Should the County determine to conduct interviews of finalists, interviews are scheduled for October 26, 2006.

### Schedule

| Date | Event |
|---|---|
| August 18, 2006 | Release Request for Proposals |
| September 7, 2006; 9:00 a.m. Pacific time | Pre-Proposal Conference* |
| September 18, 2006 | Responses to Questions |
| October 6, 2006, 5:00 p.m. | Proposals Due |
| October 9-20, 2006 | Proposals Evaluated by County |
| October 26, 2006 | Finalist Interviews Conducted |
| November 1, 2006 | Selection Recommendation |
| November 14, 2006 | BOS Awards Contract |

6

*Pre-Proposal Conference: The County will host a pre-proposal teleconference on September 7, 2006. Potential proposers are encouraged to submit questions via mail or e-mail in advance to Jennifer Murray, the County Project Manager, by September 5, 2006. The pre-proposal conference call will be the last opportunity to ask questions regarding the RFP. The County will e-mail responses to questions not answered on the teleconference by September 15, 2006. The teleconference number is (707) 565-7582. To ensure all potential proposers may participate, potential proposers are limited to one line each for this call.

## Content of Proposals
Proposals must contain the following:

Responses to this RFP should describe the firm and the services it provides. Please include the following information:

A. *General*
  1. A cover letter identifying the proposer's principle place of business, signed by an officer of the firm authorized to contract with the County and acknowledging and accepting all terms of the scope of work, Professional Services Agreement, and insurance requirements.
  2. The individual or firm name, full mailing address and telephone number, and the name and e-mail address of the primary project manager. This project manager must be capable of following this project from beginning to end.
  3. Describe the qualifications and expertise of the firm in the area of analyzing both alternatives to incarceration and criminal justice systems, including:
      - Identify the public agencies for which you have provided relevant services within the last five years. Include full contact information (name, address, telephone number, and e-mail address) for at least one primary contact person in each agency. The County may interview any or all of the client references provided. It is the responsibility of the proposer to ensure that the clients' contact information is correct.
      - Describe the type of work you performed and the principal consultants/staff who performed the work.
      - Identify any published studies or other relevant work on directly related subject matter.
  4. Provide resumes of the principal(s) who would provide the requested services and other key staff or subcontractors who may provide support.
  5. Provide a statement regarding any conflict that your firm or any key staff may have regarding the proposed services. The statement should not only include actual conflicts but also any working relationships that may be perceived as a conflict. If no potential conflicts of interest are identified, please affirm in your proposal.

7

    **6.**    Provide a statement that you agree to submit the required insurance endorsements. The County's Workers' Compensation and Commercial General Liability requirements are stated in the Attached Agreement for Services (See Attachment E).

B.   *Work Plan/Approach*

This section should establish the proposer's understanding of the County's objectives and requirements, demonstrate the proposer's ability to meet those requirements and outline clearly and concisely the plan for accomplishing the specified work.

1.    Describe in reasonable detail how your firm would accomplish the work and satisfy the County's objectives described in Section 2 of this RFP. Include a proposed timeline including key project steps or phases.

2.    Describe the extent to which project principals will be involved in each step or phase of the project.

3.    Describe information, documents, staff assistance, facilities or other resources you would require from the County to complete your work. Declare any other critical assumptions upon which your work plan is based.

4.    Identify any decision milestones you would require from the Project Owners in order to proceed with any next steps in the project.

5.    Describe a communication plan for keeping the Project Manager and Project Owners, and Departmental Liaisons informed during this project.

C.   *Project Milestones, Deliverables, and Costs.*

Include a project plan with milestones, deliverables, and the complete costs for each deliverable, showing costs for labor, materials, travel, office expenses, and administration. The total cost for the project should also be clearly specified.

Specify the hourly rates for all members of the project team.

Describe each project deliverable.

**7.**    **General Information**

A.   Rights and Regulations

Sonoma County reserves the right to request additional documentation or information from, to interview, or to enter into discussions with any or all proposers prior to selecting the most qualified proposer. After selecting the top-ranked proposer, the County may discuss the scope of work and items they believe they can accomplish within the budget with any proposer.

Sonoma County reserves the right to accept any proposal and to negotiate an agreement with any proposer. The successful proposer will be required to comply with all applicable equal opportunity laws and regulations.

Sonoma County reserves the right to reject any or all proposals, or to waive any defect or irregularity in a proposal. The County further reserves the right to award the agreement to the proposer that, in the County's judgment, best serves the needs of Sonoma County.

All Proposers submit their proposals to the County with the understanding that the recommended selection of the review committee is final and subject only to review and final approval by the Board of Supervisors.

Upon submission, all proposals shall be treated as confidential documents until the selection process is completed. Once the selections are made, all proposals shall be deemed public record. In the event that a proposer desires to claim portions of its proposal exempt from disclosure, it is incumbent upon the proposer to clearly identify those portions with the word "Confidential" printed on the top right hand corner of the page. The County will consider a proposer's request for exemptions from disclosure; however, the County will make a decision based upon applicable laws. An assertion by a proposer that the entire proposal, or large portions, is exempt from disclosure will not be honored.

B.    Precontractual Expenses

The County shall not be liable for any precontractual expenses incurred by the proposer or selected contractor or contractors. The County shall be held harmless and free from any and all liability, claims, or expenses whatsoever incurred by, or on behalf of, any person or organization responding to this RFP.

C.    Alternatives

If proposers take exception or make alterations to any requirement of the RFP, alternatives must be submitted as separate proposals and so noted on the cover of the proposal. The County reserves the right to consider such alternative proposals, and to award an agreement based thereon if it is determined to be in the County's best interest and such proposal satisfies all minimum qualifications specified in the RFP. Proposers must indicate in the cover letter that the proposal offers an alternative to the RFP.

D.    Lobbying

Any party submitting a proposal or a party representing a proposer shall not influence or attempt to influence any member of the selection committee, any member of the Board of Supervisors, or any employee of the County of Sonoma, with regard to the acceptance of a proposal. Any party attempting to influence the RFP process through ex-parte contact may be subject to rejection of their proposal.

E.    Agreement

Proposers shall be willing to provide the required insurance and accept the terms of the County Professional Services Agreement. A sample of the Agreement is included as Attachment F. With few exceptions, the general terms will not be negotiated. *Article 5 of Attachment F, Indemnification of the Agreement, will not be negotiated.* Proposers must include in the cover letter a statement as to the willingness to sign an agreement with the existing contractual language. Statements must include specifics as to any contractual language the proposers wish to change. Please note that any exceptions or changes to the Agreement may constitute grounds to reject the proposal. Please note that if you submit a proposal that does not address exceptions to the agreement you are accepting all terms and conditions contained therein.

F.    Duration

All proposals will remain in effect and legally binding for at least 120 days.

G.    Cancellation of Intent to Awards

Time is of the essence in awarding the agreements. The County reserves the right to cancel any intent to award and proceed with the awards to other contractors if any selected contractor has not signed the agreement within two weeks after the notification of intent of award.

## 8.    Selection Process

Proposals will be reviewed by a selection committee and will be evaluated using the following criteria (note that there are no value or ranking implied in the order of this list):

A. Qualifications, including:

1. A demonstrated history of providing similar services to comparable entities by the principals proposed to conduct this project.

2. Experience in evaluating programs that serve as alternatives to jail and in the evaluation of criminal justice systems is essential.

3. Demonstrated implementation of recommendations from prior work is essential. Proposals should indicate when the consultant has participated directly in the implementation, and when implementation was accomplished by clients.

4. Quality of consultant's work as verified by references.

B. Cost.

10

C. The quality of the proposal's plan to complete the scope of work, including the consultant's understanding of the County's needs, the approach to the project, and the proposed method for program evaluation.

The County may evaluate any information from any source it deems relevant to the evaluation. False, incomplete, or unresponsive statements in a proposal may be sufficient cause for its rejection. At the County's discretion, finalists will be invited to a personal interview.

**Attachments**

A.       Description of Existing Alternatives to Incarceration Programs/Practices
A1.      Community Based Organizations
B.       Description of Criminal Justice System Members
C.       Adult Detention Projections Report
D.       Criminal Justice Council Description
E.       Draft Agreement for Services