IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN AND NORTHERN DISTRICTS OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | Case No: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | Case No.: C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>DECLARATION OF RIVERSIDE COUNTY<br>DISTRICT ATTORNEY RODRIC PACHECO<br>SUBMITTED IN ADDITION TO LIMITED<br>DIRECT TESTIMONY BY DISTRICT<br>ATTORNEY DEFENDANT INTERVENORS |

EXHIBIT C, 1-8

Attachments to Declaration of District Attorney Rodric Pacheco

# EXHIBIT C
# 1

# The Social Benefits of
# Confining Habitual Criminals

*by Kent Scheidegger & Michael Rushford*
*Criminal Justice Legal Foundation*

The short history of American criminal justice policy can be compared to a series of mood swings based largely upon the crime rate and to a lesser extent on the political and cultural fashion of the time. The cyclical nature of rising and dropping crime rates appears to correspond to the level of public and political resolve to aggressively capture and incapacitate criminal offenders. In periods when crime rates and public concern about crime have been relatively low, the premium on aggressive law enforcement appears to diminish, while programs attempting to socialize rather than punish offenders enjoy popularity in political and academic circles. Later, as crime rates and public concern about crime increase, such increases are accompanied by political pressure for a return to aggressive law enforcement and the incapacitation of criminals.

The simple truth is that imprisonment works. Locking up more criminals for longer periods reduces the level of crime. The benefits of doing so far offset the costs.

## I. THE CURRENT CYCLE

The national reduction in crime over the past eight years (1990-1998)[1] is rooted in a crime policy cycle which began in the mid-1970s as the public responded to a doubling of the rate of serious crimes between 1965 and 1975.[2] The initial indicators in California, which played a leading role in this cycle, included a ballot initiative to reinstate capital punishment in 1972,[3] the Legislature's adoption of the "Use a Gun, Go to Prison" law in 1975,[4] the override of the Governor's veto of another death penalty law in 1977,[5] and the adoption of strict sentencing increases for habitual criminals as part of the "Victims' Bill of Rights" initiative in 1982.[6]

The sentence increases in the 1982 initiative represented a major statewide policy shift toward lengthened incarceration of habitual felons. In accordance with the new law, a California judge could sentence a convicted felon to an additional five years in prison for each prior felony conviction. A 1995 study led by Berkeley law professor Franklin Zimring, a well-known opponent of tough sentencing, credited increased incarceration with a marked drop in burglary and larceny crimes between 1980 and 1991, but found the evidence more ambiguous for violent offenses.[7]

This ambiguity may be explained, at least in part, by a statistical anomaly the Zimring group appears to have overlooked. In 1986, right in the middle of the study period, a change in the law on reporting domestic violence[8] caused a dramatic jump in the number of aggravated assaults reported.[9] The Zimring study's conclusions on assault are thus suspect. For robbery, the one method in the study with the strongest facial validity (*i.e.*, the one that does not depend on dubious year-to-year projection methods) shows a strong negative correlation between increases in imprisonment and robbery rates.[10] That leaves only homicide and rape with credible data showing no increase in

©2000 by the Board of Trustees of the Leland Stanford Junior University

incapacitation.[11]  But these offenses were severely punished even at the beginning of the study period, so a sentence increase would be expected to have less of an effect.[12]  Another possible explanation is that the study's premise that there were no "major social dislocation or changes" in the study period[13] is partially false.  The "crack epidemic" of the late 1980s is widely believed to have caused a temporary bump in the rates of homicide and robbery.[14]  The most credible portions of this study are consistent with the view that imprisonment is effective in reducing crime.

In the early 1990s several states began to adopt sentence increases for habitual criminals. Washington state's adoption of Initiative 593 in November of 1993,[15] which mandated life in prison without parole upon conviction of a third violent felony, set a standard duplicated in some form by several other states.  California's "Three Strikes and You're Out" law (Three Strikes) modified this approach by providing increased sentences for all repeat felons and a top term of 25 years to life for those convicted of any felony who had two prior convictions for violent or serious felonies.[16]  While California's earlier sentencing and procedural reforms corresponded with a 10 percent reduction in the crime rate between 1991 and 1994,[17] after adoption of the Three Strikes in 1994 the crime rate plummeted over 21 percent during the next 3 years.[18]

The political debate over adoption of the Three Strikes and the "Victims' Bill of Rights" initiative 12 years earlier included predictions that the prison population would rise at an extraordinary rate requiring huge outlays of funds for prisons at the expense of "education for our children"[19] and other funding needed to address the "root causes of crime."[20]  Critics argued that such funds would be better spent addressing the "root causes of crime."  At the beginning of the current decade, the public was also warned that the influx of crime-prone young male offspring of the baby boom generation would bring an increase in crime rates.[21]

Neither of these predictions has come true.  The tougher sentencing policies have increased the rate of adults sent to prison but not at the alarming levels predicted.  In 1981, before the "Victims' Bill of Rights" was adopted, California kept 114 persons per 100,000 population in state prison.  Six years later, as the sentencing law took effect, the rate rose to 231.  Three years following adoption of the Three Strikes (1997) the rate was 475.[22]  During the 15-year period between 1982 and 1997, as the state more than tripled its prison commitment rate with a focus on incarcerating habitual felons,[23] the number of California victims of serious crime dropped from 4,777.1 per 100,000 in 1982 to 2,381.4 per 100,000 in 1997, less than half the previous figure.[24]  Over this same period, state revenues for K-12 education, measured in inflation-adjusted dollars per pupil, did not shrink as predicted, but grew.[25]  The increase of young males in the population may well have contributed to the growth in the rate of incarceration, especially over the past 7 years, but it appears that the correct criminal justice policies were in place to prevent the predicted rise in crime.

## II. COMMON SENSE AND EMPIRICAL EVIDENCE

The idea that increased incarceration of criminals will reduce the rate of crime has two bases in common sense.  First, incentives matter.  When the incentives to engage in or refrain from a particular behavior change, the number of people who choose to engage in that behavior changes. This principle is the basis of much of behavioral psychology and all of economics.  In criminology, this effect is called deterrence.[26]  Second, the crime rate is determined by the number of criminals,

3

not by the availability of victims, and removing a criminal from the street to prison prevents him from committing crimes against the general public.[27] Reducing crime by direct restraint is called incapacitation.

The anti-incarceration hypothesis that neither effect is significant, *i.e.*, that prison neither deters nor incapacitates, is extremely difficult to swallow. There will always be some people who cannot be deterred because they act without thinking. There will always be some who do not need to be deterred because their character and conscience would prevent them from committing crimes even if they could do so with impunity. Between the wild beasts and the saints, though, there will always be a large segment of the population that refrains from crime out of fear of the consequences, *i.e.*, that is deterrable, and the size of that segment naturally depends on the severity of the consequences. For incapacitation, the often-heard notion that if we incarcerate one criminal another will take his place[28] assumes that there are a fixed number of places. This assumption makes no sense. As high as the rates of burglary and robbery are, there are still far more targets than crimes each year.[29]

The anti-incarceration hypothesis is so strongly contrary to basic principles that it would take powerful empirical evidence to support it. In fact, there is substantial empirical reason to believe that imprisonment works.

For an initial, admittedly simplistic overview, Figure 1 plots incarceration versus crime. The solid line represents the FBI crime index per 100,000 population.[30] The dotted line represents prisoners in custody per 1,000 index crimes.[31] As imprisonment fell sharply in the 1960s, the crime rate more than doubled. As imprisonment remained low in the 1970s, the crime rate continued its rise. As imprisonment rose in the 1980s, the crime rate fluctuated, dropping in the early part of the decade then rising during the crack epidemic of 1985-1990. Finally, as imprisonment rose sharply in the 1990s, the crime rate went steadily down, although the rate still remains far above where it was in 1960.

**Figure 1.**



These time-line data provide an indication, but not proof. There is a possibility that other changes occurring in society could account for the crime rate changes. The claim is often made, for example, that the sharp increase in crime in the 1960s was due primarily, if not entirely, to the young males of the "baby boom" reaching their peak crime-prone years.[32] There can be no doubt that punishment is only one of many factors affecting crime rates. The simple time-line data need to be confirmed by other methods that control, at least partially, for these other variables.

The Bureau of Justice Statistics recently published an interesting comparison of American and English crime statistics.[33] Comparing trends in the United States with those of another country with a similar heritage and government and with its own postwar "baby boom" shores up the conclusions from the simple time-line data. The study shows that the risk of criminal punishment has been rising in the United States but falling in England.[34] Crime rates have risen in England but fallen in the United States.[35] Rates of robbery, assault, burglary, and auto theft are now higher in England than in the United States.[36]

A more sophisticated cross-jurisdictional comparison was done by University of Chicago economist Steven Levitt.[37] Levitt grappled with the problem of separating cause from effect in the connection between crime rates and incarceration rates. "Increased incarceration is likely to reduce the amount of crime, but there is also little question that increases in crime will translate into larger prison populations."[38] This creates a measurement problem called "simultaneity bias."[39] To control this effect, Levitt compared states where statewide prison overcrowding litigation had capped the use of incarceration with states not subject to such caps.

Levitt found that an adverse decision in prison overcrowding litigation slowed the growth of the prison population by 13.7-19.7 percent. This caused an increase in violent crime of 7.9-8.3 percent, and an increase in property crime of 5.7-6.2 percent.[40] Applying the rates derived from this study to the 272 percent increase in per capita incarceration in the United States from 1971 to 1993, Levitt concluded that violent crime would be 70 percent higher and property crime would be 50 percent higher without that increase.[41] Thus, in 1993 *alone*, over 1.3 million people were spared from aggravated assault, robbery, rape, and murder by the increase in incarceration.[42]

## III. COSTS AND BENEFITS

Is the benefit of reducing crime through tough sentencing worth the cost? The answer, we believe, is quite clearly yes. In 1994, during the debate over Three Strikes, RAND Corporation produced a study predicting a 22-34 percent reduction in crime at a cost of $4.5-6.5 billion.[43] The law appears to have a much lower cost than predicted.

RAND's cost figures were based on prison population projections showing, for example, about 250,000 prisoners by 1999 under Three Strikes, compared with about 120,000 under prior law.[44] The actual prison population at present is 159,706, closer to RAND's "prior law" figure than its Three Strikes figure.[45] In part, the lower cost is the result of court decisions implementing Three Strikes less severely than RAND anticipated.[46] It also appears likely, though, that tougher sentencing is simply more effective than anticipated at bringing down the crime rate and thus reducing the number

of repeat felons who need to be imprisoned. RAND's projections were based on an assumption of zero deterrent effect,[47] a highly doubtful assumption.

Levitt estimated the social benefit of reduced crime, in 1992 dollars, of $53,900 per prisoner per year.[48] Compared to an incarceration cost of $20,758, even in 1999 dollars,[49] this is a "bargain" in purely dollar terms. But the cost of crime, and the benefit of preventing it, cannot really be reduced to dollars. Murder, rape, and household burglary inflict injuries beyond monetary compensation.[50]

Opponents of strong sentencing call for spending the dollars instead on government programs to address "root causes."[51] The simple answer is that there is no consensus on what the root causes are or that government spending can do much about them. Indeed, there is a substantial body of opinion that Great Society programs that were supposed to be the answer are instead a major part of the problem.[52]

Tough sentencing is effective and economically efficient. We can and should investigate crime prevention and operate pilot programs to find out what works on the front end of criminal careers. We should not, however, turn career criminals loose on the streets to prey upon innocent people.

---

## NOTES

1.   *See* Figure 1 and notes 29 & 30, *infra*, and accompanying text.

2.   BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, SOURCEBOOK OF CRIMINAL JUSTICE STATISTICS 1997, at 261 (Kathleen Maguire & Ann L. Pastore eds., 1998) (FBI Crime Index was 2,449.0 in 1965, and 5,298.5 in 1975).

3.   CAL. CONST. art. 1, § 27; Proposition 17, 1972 General Election.

4.   CAL. PENAL CODE § 1203.06.

5.   1977 Cal. Stat. ch. 316, at 1255-1266, *amending* CAL. PENAL CODE §§ 190-190.3 and *enacting* CAL. PENAL CODE §§ 190.4-190.6.

6.   CAL. PENAL CODE § 667, subd. (a).

7.   FRANKLIN E. ZIMRING ET AL., 7 C.P.S. BRIEF NO. 10, ESTIMATING THE EFFECT OF INCREASED INCARCERATION ON CRIME IN CALIFORNIA, 11 (Cal. Policy Seminar July 1995).

8.   *See* CAL. PENAL CODE § 13730 (requiring, by Jan. 1, 1986, recording of all calls, written incident report, and monthly reports).

9.   BUREAU OF CRIMINAL STATISTICS AND SPECIAL SERVICES, CAL. DEP'T OF JUSTICE, CRIME AND DELINQUENCY IN CALIFORNIA 1980-1989, at 12 (1990). The National Crime Survey, which is not affected by reporting rates, showed a decrease in aggravated assaults nationwide the same year. BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION IN THE UNITED STATES: 1973-88 TRENDS 31 (1991).

10.  ZIMRING, *supra* note 7, at 8, Table 6 (r = -0.66).

11.  *Id.*

12. For example, a five-year enhancement for a prior felony conviction under the Victims' Bill of Rights would be expected to have a greater impact on a burglar whose base term is four years, *see* CAL. PENAL CODE § 461(1) (Deering 1999), than it would on a murderer who would otherwise be sentenced to 25-to-life, *see* CAL. PENAL CODE § 190(a) (Deering 1999).

13. ZIMRING, *supra* note 7, at 1.

14. *See, e.g.,* Fox Butterfield, *Decline of Violent Crimes Is Linked to Crack Market*, N. Y. TIMES, Dec. 28, 1998, at A18.

15. 1994 Wash. Laws, ch. 1 § 1. *See* WASH. REV. CODE §§ 9.94A.120(4), 9.94A.392.

16. CAL. PENAL CODE § 667(e)(2)(A)(ii) (Deering 1999).

17. CRIMINAL JUSTICE STATISTICS CENTER, CAL. DEP'T OF JUSTICE, CALIFORNIA CRIMINAL JUSTICE PROFILE 1998, Table 1. (FBI Crime Index per 100,000 population in California was 6,776.6 in 1991 and 6,094.8 in 1994).

18. *Id.* (4,807.6 in 1997).

19. Ballot Pamp., Gen. Elec. (Nov. 18, 1994), argument against Proposition 184, p. 37 (Mark Klaas, Terrence Starr, Mary Bergan).

20. PETER W. GREENWOOD, ET AL., THREE STRIKES AND YOU'RE OUT: ESTIMATED BENEFITS AND COSTS OF CALIFORNIA'S NEW MANDATORY-SENTENCING LAW 32-34 (1994); Paul Feldman, *'3 Strikes' Should Spare Youths, Marchers Say*, L. A. TIMES, Aug. 4, 1994, at B3.

21. Demographic studies predicted the fraction of young men (ages 10-24) in California to rise from 1 in 8 in 1995 to 1 in 7.5 in 2000. "We expect the highest crime rates in the year 2000 . . . ." Candace McCoy, *From Sociological Trends of 1992 to the Criminal Courts of 2020*, 66 S.CAL. L. REV. 1967, 1975 (1993). A very abrupt reversal of trends would be required for that prediction to come true.

22. SOURCEBOOK, *supra* note 2, at 491.

23. *Id.*

24. BUREAU OF CRIMINAL STATISTICS AND SPECIAL SERVICES, CAL. DEP'T OF JUSTICE, CRIME AND DELINQUENCY IN CALIFORNIA 1982, at 7 (1983); CRIMINAL JUSTICE STATISTICS CENTER, CAL. DEP'T OF JUSTICE, CALIFORNIA CRIMINAL JUSTICE PROFILE 1997, at 5 (1999).

25. In fiscal year 1982-83, California school districts had revenues of $11,379,419,943. CAL. STATE CONTROLLER, ANNUAL REPORT OF FINANCIAL TRANSACTIONS CONCERNING SCHOOL DISTRICTS AND COMMUNITY COLLEGE DISTRICTS OF CALIFORNIA, FISCAL YEAR 1982-1983 xii. Average daily attendance was 4,170,237, *id.*, at xiii, yielding $2729/pupil. Fourteen years later, school district revenue was $33,288,819,000 and average daily attendance was 5,458,537, CAL. STATE CONTROLLER, SCHOOL DISTRICTS ANNUAL REPORT, FISCAL YEAR 1996-97, at v (1998), or $6098/pupil. The Consumer Price Index for the beginning of each fiscal year (July) was 97.5 for 1982 and 157.0 for 1996. Bureau of Labor Statistics, Consumer Price Index, All Urban Consumers (Aug. 17, 1999) <ftp://ftp.bls.gov/pub/special.requests/cpi/cpiai.txt>. Adjusting the 1996 number to 1982 dollars yields $3787/pupil, a 39% increase in inflation-adjusted, per-pupil revenue over 1982.

26. *See, e.g.,* 1 WAYNE R. LAFAVE & AUSTIN W. SCOTT, JR., SUBSTANTIVE CRIMINAL LAW § 1.5(a)(4), at 33-34 (1986).

27. *See* JAMES Q. WILSON, THINKING ABOUT CRIME 145-146 (2d ed. 1983). There are, of course, many crimes committed within prison. Even so, the vast majority of people are protected from those criminals safely locked away.

28.   *See, e.g.,* ERNEST VAN DEN HAAG, PUNISHING CRIMINALS 54 (1975) ("by and large crime rates will be independent of incapacitation . . . of any number of easily replaceable offenders").

29.   For example, in 1993 there were 60 residential burglaries per 1,000 households, LISA BASTIAN, BUREAU OF JUSTICE STATISTICS, NCJ-151658, U.S. DEP'T OF JUSTICE, CRIMINAL VICTIMIZATION 1993, at 2 (1995), so 940 residences per 1,000 were not burglarized. *See* WILSON, *supra* note 27, at 146. The argument does have facial validity for consensual crimes with a market, such as drug dealing and prostitution, but not for crimes against specific, unwilling victims, such as burglary or robbery.

30.   SOURCEBOOK, *supra* note 2, at 261 (1960-1996 data); FEDERAL BUREAU OF INVESTIGATION, U.S. DEP'T OF JUSTICE, CRIME IN THE UNITED STATES 1997, at 5 (1998) (1997 data). The 1998 figure is from preliminary data indicating the percentage drop from 1997. *See* Federal Bureau of Investigation, Preliminary Statistics 1998 Press Release (May 16, 1999) <http://www.fbi.gov/pressrm/pressrel/prls4-98.htm>.

31.   SOURCEBOOK, *supra* note 2, at 502.

32.   *See, e.g.,* Ted Gest, *A crime rise that stumps the experts,* U. S. NEWS & WORLD REPORT, May 5, 1986, at 24.

33.   BUREAU OF JUSTICE STATISTICS, U.S. DEP'T OF JUSTICE, CRIME AND JUSTICE IN THE UNITED STATES AND IN ENGLAND AND WALES 1981-96 (Patrick A. Langan & David P. Farrington eds., 1998).

34.   *Id.* at iv, 36-37. For example, total incarceration risk (chance of capture and conviction times length of punishment) for burglary increased by two-thirds in the United States between 1981 and the mid-1990s but dropped over two-thirds in England. *Id.* at 37.

35.   *Id.* at iii, 1-6. For example, burglary increased 54 percent in England from 1981 to 1996 and decreased 43 percent in the United States in the same period.

36.   *Id.* at iii.

37.   Steven D. Levitt, *The Effect of Prison Population Size on Crime Rates: Evidence from Prison Overcrowding Litigation,* 109 Q. J. ECON. 319 (1996).

38.   *Id.* at 322.

39.   *Id.*

40.   *Id.* at 335.

41.   *Id.* at 337-38.

42.   See SOURCEBOOK, *supra* note 2, at 261 (1,926,020 violent crimes in 1993).

43.   PETER W. GREENWOOD ET AL., THREE STRIKES AND YOU'RE OUT: ESTIMATED BENEFITS AND COSTS OF CALIFORNIA'S NEW MANDATORY-SENTENCING LAW xii (1994).

44.   *Id.* at 25. These numbers are taken off a graph. RAND did not publish data tables for these numbers in its report.

45.   Cal. Dep't of Corrections, *CDC Facts* (visited Feb. 1, 1999) <http://www.cdc.state.ca.us/factsht.htm>.

46.   *See, e.g.,* People v. Superior Court (Romero), 13 Cal.4th 497, 504, 917 P.2d 628, 629-630 (1996) (court has discretion to strike a prior conviction for purposes of Three Strikes sentencing).

47.   GREENWOOD, *supra* note 43, at 16.

48.    Levitt, *supra* note 37, at 345.

49.    *CDC Facts*, *supra* note 45.

50.    *See* Mike Maguire, *The Impact of Burglary Upon Victims*, 20 Brit. J. Criminology 261 (1980) (psychological impact of burglary). We trust this statement is self-evident for murder and rape.

51.    *See* Greenwood, *supra* note 43; American Civil Liberties Union, Briefing Paper, No. 2, Crime and Civil Liberties (1997) ("A serious anti-crime strategy must deal, first and foremost, with the root causes of crime—persistent poverty, lack of educational and employment opportunities, racial discrimination and social alienation"). Although not using the term, the "root cause" philosophy was exemplified by the President's Commission on Law Enforcement and Administration of Justice, The Challenge of Crime in a Free Society (1967) and Ramsey Clark, Crime in America 67 (1970) (arguing for "programs that attack the major underlying causes of crime"). The President's Commission argued that attacking housing problems was attacking crime. The Challenge of Crime in a Free Society, at 6. In other words, the building of the now-infamous, crime-ridden government housing projects was originally promoted by the "root cause" movement as a crime *prevention* measure.

52.    *See, e.g., Contract with America—Welfare Reform: Hearings Before the Subcomm. on Human Resources of the House Comm. on Ways and Means*, 104th Cong., Ser. 104-44, at 826 (1995)(testimony of Penny Young).

# EXHIBIT C
# 2

# **Who Is In Our State Prisons?**

### From the Office of California State Senator George Runner

On almost a daily basis Californians read that our state prison system is too big, too expensive, growing at an explosive pace, and incarcerating tens of thousands of low level offenders who could be effectively treated and returned to our streets as productive citizens. More often than not, tough penalties under laws like Three Strikes are identified as the cause of alleged unfairness in sentencing and relentless growth within our correctional system. Seldom are facts allowed to intrude into the analysis. Instead, the issues of cost, size of the prison system, and the profile of the inmate population are, through ignorance or design, scrambled and distorted so that the public is misled and confused.

The facts, however, are available. Both the FBI and California Department of Correction and Rehabilitation publish reports, available online, identifying total inmate populations and the offenses for which those inmates were sentenced.

## STATE INCARCERATION RATES, 2005, BY QUINTILE



SOURCE: Bureau of Justice Statistics, "Prison & Jail Inmates at Midyear 2005"

1

Earlier this year the Pew Institute published One in 100: Behind Bars in America 2008 a decidedly critical evaluation of U.S. prison policy. The report nonetheless correctly identifies California's incarceration rate (prison and jails) as very ordinary with at least 20 other states reporting more inmates per 100,000 residents.

On January 1, 2008 Texas, with 13 million fewer people, had more prison inmates than California. The report in addition demonstrates that California is on the bottom fifth of all states regarding recent growth in prison population. This is because the much discussed explosion in California's recent prison population simply has not occurred. California had 12.5% of the national population as well as 12.5% of the inmates incarcerated in all state prisons.

During the past 10 years (April 30, 1998 through April 30, 2008) California's total inmate population has grown an average of less than 1% per year, slower than the composite inmate population growth rate for the other 49 states and considerably slower than California's overall population growth. Accordingly, California has a lower prison incarceration rate in 2008 than it did in 1998.



**Inmates in California Prisons per 100,000 Residents Since 1998**
April 30, 1998 - April 30, 2008

The fact that California's prison population is quite typical in relationship to its overall population was previously reported in Understanding California Corrections (2006), a University of California publication. That report, while critical of prison rehabilitation programs, helps clarify both the relative level of incarceration in California and the demographics of the inmates. It observes that two-thirds of the overall growth in

2

the prison population since 1994 (the year voters approved Three Strikes), is due to crimes against the person (especially robbery, assault, and homicide), whereas only 10% is due to drug related convictions. Moreover, for every 100 serious felonies reported in California there are approximately 40 adult arrests but only five offenders sentenced to state prison.

    Indeed few criminal offenders are sent to state prison for a first, second, or even third felony unless they have committed murder, rape, or robbery with a firearm. A federal survey of inmates in state and federal facilities reported that 47% of the inmates in California prisons were violent recidivists while another 33% were non-violent recidivists. Of the 19% percent of inmates who were first time felons most had committed violent crimes against the person. Many California inmates had more than one prior felony conviction including 14% with two prior felony convictions, 25% with 3 to 5 prior felony convictions, 17% with 6 to 10 prior felony convictions, and 12% with 11 or more prior felony convictions. In addition, almost 60% of all inmates were already on parole or probation at the time they committed their most recent felony.

    The slow growth and increasingly violent makeup of California's inmate population is at odds with the loud but unsupported claims of opponents of the criminal justice system and in stark contrast to the dire consequences predicted after the passage of "Three Strikes."



3

**Three Strikes:** California Crime Totals After the First Five Years: 1994-1999

| Offense* | Murder | Rape | Robbery | Burglary | Auto Theft |
|---|---|---|---|---|---|
| **1993** | 4,095 | 11,754 | 126,347 | 413,671 | 319,225 |
| **1999** | 2,006 | 9,443 | 60,027 | 223,828 | 168,465 |
| **Offense Decrease 1993-1999** | (2,089) ↓ | (2,311) ↓ | (66,320) ↓ | (189,843) ↓ | (150,760) ↓ |
| **\*\*Rate Decrease 1993-1999** | 54% ↓ | 25% ↓ | 56% ↓ | 50% ↓ | 51% ↓ |

\*    Source of crime statistics is the California Crime Index (DOJ).
\*\* Rate comparison per 100,000 population for respective years.

Opponents of tough criminal laws cannot accept that penalties deter crime. They presume that the same number of people will commit a crime whether the penalty is 5 years, 10 years, or 20 years. They are wrong. Since 1999, certain offenses with low penalties like vehicle theft have surged while the number of residential burglaries, which constitute "strikes," have remained lower. When tough penalties contribute to fewer crimes there are also fewer criminals being sent to state prison.



California Inmates Committed to State Prison for Burglary & Vehicle Theft in 1994, 1999, & 2007

6

While penalties for residential (1st degree) burglary increased under Three Strikes (1994) the number of inmates sentenced to prison for residential burglary has declined from 3036 in 1994 to 2036 in 2007. As a consequence, the total number of inmates in California prisons serving sentences for 1st degree burglary has dropped from 9442 (in 1994) to 7056 (in 2007). During the same period of time, the total number of inmates serving sentences for 2nd degree burglary and vehicle theft (non-strike offenses) has increased by more than 3000.

There are many things wrong with our prison system and a need for more investment in early interventions and rehabilitation programs as well as additional facilities. In the last 10 years California has added almost 5 million people to its population but has opened only one new prison. Since 1999 gang crimes including homicides have increased and have been more difficult to prosecute than other crimes. Our prisons are further strained because we are required to house more than 30,000 alien felons, many of them gang involved. They should be in Federal prisons. But for this disproportionate number of alien felon inmates, (more than the total of Texas, New York, Florida and Arizona combined) California's incarceration rate would fall below the national average.



In 2003 about 75 % of Criminal Aliens Were Incarcerated in Just 5 States: California Housed More Alien Offenders Than the Next Four Largest States Combined. Source: Federal Government Accountability Office.

Under the circumstances California's laws and law enforcement have served the public remarkably well. Many people who advocate more offender education and fewer prison cells are, like the path to hell, driven by good intentions. Nonetheless before we begin to release prisoners or reduce criminal penalties in the hope of reducing inmate populations the public is entitled to know who resides in our state prisons and who will be returning to our streets. Armed with the facts most rational citizens will conclude that we need both more books and more bars.

# EXHIBIT C

# 3

738

November 15, 1989

# TIME TO DEAL WITH AMERICA'S PRISON CRISIS

## INTRODUCTION

Increasingly in America, crime does not lead to punishment. While reported crime rates have risen by more than 24 percent over the last decade, many convicted criminals serve only a small portion of their prison sentence behind bars or do not go to prison at all. Even those convicted of violent crimes typically serve only half their sentence in prison. And although as many as 83 percent of all Americans will be victims of a violent crime during their lifetime, some 55 percent of these crimes currently go unreported, and only 48 percent of reported crimes result in an arrest.[1]

Drugs have been the most important factor in the rising crime rate. From 1980 to 1986, the number of Americans convicted of federal drug law violations, including manufacturing, use, or distribution of drugs, jumped by 134 percent. In 1986, drug violations accounted for the sentences almost half of all state prison inmates. And over one-third of all state prison inmates were using drugs when they committed their crimes.[2]

Failing to Meet Demand. In short, America is experiencing a national crime emergency. The rapid increase in crime, fueled by the proliferation of drugs, is overloading the correctional system. The number of inmates in

---

1  U.S. Department of Justice, Bureau of Justice Statistics, *Report to the Nation on Crime and Justice*, Second Edition, March 1988.
2  U.S. Department of Justice, *Bureau of Justice Statistics Special Report*, "Drug Use and Crime: State Prison Inmate Survey, 1986," July 1988. See also Jeffrey A. Eisenach, "Winning the Drug War: What the States Can Do," The Heritage Foundation *State Backgrounder*, No. 715/S, July 7, 1989.

federal and state prisons has almost doubled over the last decade and stands at 673,565[3] according to the most recent figures. Despite the public's get-tough-on-crime attitude and insistence on harsh, punitive sentences, the criminal justice system simply cannot meet the demand for swift and certain penalties.

**Releasing Dangerous Criminals.** Faced with an overpopulated prison system, officials increasingly are forced to release inmates long before they complete their sentence. In many cases, however, these officials have no choice, since federal district court judges have placed state facilities under court order to reduce the population, declaring that crowded conditions inflict "cruel and unusual punishment." These orders, based on the 8th Amendment to the Constitution, involve no formal definition of overcrowding, but are based instead on arbitrary standards, which differ from one judge to the next. The orders often force prison authorities to release dangerous criminals prematurely without considering the potential risk to the community.

An alarming number of prisoners released early go on to commit further crimes. In a special series on Florida's early-release program, the *Orlando Sentinel* reports that, from February 1987 to March 1989, one out of four prisoners released early was rearrested. A total of 2,180 crimes were committed by these prisoners, including eleven murders or murder attempts. "[These] inmates don't need to work for [early release]," explains the *Sentinel*, "or to perform heroic deeds. They get it simply because they are in a prison system that is forbidden by federal court order from crowding cells."[4] Similarly, Oklahoma City government officials attributed a three-month, 36 percent jump in the crime rate to the state's early-release program.[5]

**Small Dent.** The overcrowding problem will get worse in the future. While the 1988 federal and state prison population growth averaged 800 additional beds a week, this year's growth is running almost 1,800 additional beds a week.[6] This is placing enormous strains on the prison system, which will

---

3  U.S. Department of Justice, Bureau of Justice Statistics, press release, "Prison Population Jumps 7.3 Percent in Six Months," September 10, 1989.

4  Sean Holton and Mark Vosburgh, "Special Report: Crime Before its Time," *The Orlando Sentinel*, August 13-16, 1989.

5  Susan Darst Williams, "Good Time/Early Release: Out Before Their Time," *Corrections Compendium*, July 1986.

6  U.S. Department of Justice, Bureau of Justice Statistics, press release, *op. cit.*

trigger more court orders. And studies indicate that the number of prisoners in the federal system alone will more than double over the next decade.[7] Moreover, although the Senate has thrown its support behind George Bush's anti-drug proposal and has approved his request for $1 billion to finance federal prison construction for fiscal 1990,[8] Congress has not taken steps to provide prison space quickly and inexpensively. This means the new funds will make only a small dent in the overcrowding problem.

It is time for Congress to acknowledge that a crime emergency exists — that there is a steadily rising crime rate[9] coupled with an acute shortage of prison space at both the federal and state levels. Instead of passively allowing the courts to shift the burden from the prisons back to the streets, lawmakers need to take decisive action to provide more prison space as quickly and economically as possible. Congress should, among other steps:

♦ ♦ Authorize the federal Bureau of Prisons (BOP) to use closed military bases, vacant dormitories, tent housing, and other low-cost space to house nonviolent prisoners.

♦ ♦ Authorize BOP to contract with private firms to build and manage facilities, to provide prison space faster and less expensively.

♦ ♦ Authorize BOP to finance the construction of prisons through lease or lease-purchase arrangements.

To address the problem of early release of prisoners, Congress should:

♦ ♦ Direct U.S. district courts to require an inmate to prove that crowded conditions do, in fact, inflict cruel and unusual punishment upon him.

♦ ♦ Hold federal district court judges accountable for all sentencing and early-release decisions by requiring that they maintain records available to the public specifying each offender's criminal background, prison sentence, and portion of sentence completed.

Senator Phil Gramm, the Texas Republican, and several other legislators are expected to introduce a number of these recommendations before the end of the year in a comprehensive anti-crime package. This legislation would be an important step forward, authorizing the federal government to provide additional prison space quickly and inexpensively — in some cases at no cost to the taxpayer. Without legislation of this kind, Americans face the prospect

---

7  The U.S. Sentencing Commission estimates that the federal prison population will rise from 42,000 in 1987 to 92,000 in 1997. U.S. Department of Justice, Bureau of Justice Statistics, "Our Crowded Jails: A National Plight," June 1988. Joan Petersilia of Rand Corporation projects that the population in large state prisons alone will increase 25 percent to 98 percent over the next eight years. Todd Clear, *Research in Corrections*, National Institute of Corrections and Robert J. Kutak Foundation, March 1988.

8  This is a provision of H.R. 3015, the anti-drug spending bill.

9  While the crime rate decreased by 2 percent from 1975 to 1977, it rose by 24 percent from 1977 to 1987. U.S. Department of Justice, Federal Bureau of Investigation, *Crime in the United States*, 1988.

of more and more prisoners returning to the streets before their sentences are complete.

## JUDICIAL INTERVENTION IN THE PRISON SYSTEM

In 1970, there were no prison facilities under court order. Today, some forty states are under order to improve prison conditions in at least one of their facilities. Because of these court orders, many of these prisons are subject to population caps, which limit the number of inmates a facility legally can house. In 1985 alone, states were forced to release over 18,600 inmates before they completed their sentences, many of these because of orders to reduce the prison population.[10]

These judicial orders, however, extend far beyond what most Americans would consider such legitimate rights of prisoners as proper health care and safety.[11] Court orders can challenge every aspect of prison life from the quality of medical and food services to sanitation, education, recreation, availability of law libraries, staff training methods, and other alleged rights. Moreover, judicial sanctions imposed for "inhumane" conditions affecting a small number of inmates often are applied to the entire correctional facility. In other cases, court orders are placed on an entire state correctional system.[12]

**Testing the Limits.** The recent expansion of judicial intervention, aimed at protecting what courts deem certain rights of prisoners, followed a 1969 Supreme Court decision that upheld the legal right of state inmates to challenge prison conditions in a federal court.[13] Since that decision, prisoners and civil rights attorneys have tested the limits of inmate rights in the federal court system. The Bureau of National Affairs, a private company that publishes reports on the activities of the federal government, notes that in 1976, almost 20,000 petitions were filed in federal courts by inmates requesting improved conditions. By 1987, that number had increased to more than 37,000.[14]

---

10 U.S. Department of Justice, National Institute of Justice and American Correctional Association, *National Directory of Corrections Construction*, Second Edition, April 1988.

11 Samuel Jan Brakel, "Prison Reform Litigation: Has the Revolution Gone Too Far," *Corrections Today*, August 1987.

12 Nine states are facing federal court orders over their entire prison systems.

13 *Johnson v. Avery*, 393 U.S. 483, 1969.

14 Allen F. Breed, "Special Masters Ease Prison Reform," *Corrections Today*, May-June 1979. See also, *Sourcebook of Criminal Justice Statistics, op. cit.*

Furthermore, judges often have unrealistic expectations of how quickly or inexpensively state officials can implement court-ordered reforms. Observes Samuel Jan Brakel, a research attorney for the American Bar Foundation, "The substantive legitimacy of the reform...may be undermined when court orders disregard the pace at which changes can realistically be made and absorbed."[20] Careless rulings can mean wasting millions of tax dollars, as money is spent to introduce court-ordered remedies and to pay for attorney fees and court costs.[21]

**Special Masters.** While the ability of judges to make wise decisions is limited, their power to enforce decisions on prison managers has increased. One reason for this is the increased role of "special masters." The function of a special master is to provide a judge with background information on the operations of the particular prison under scrutiny. Viewed as the expert in prison management, the special master was intended to be the court's neutral adjunct to the prison system. But in practice, court-appointed special masters have evolved into significant players in the court bureaucracy. Rather than performing their original neutral function, special masters today are quasi-executive officials serving as extensions of the court, carrying out a judge's agenda for reform.[22]

A number of studies find that recent judicial intervention in prison operations has led to more prison violence, since court orders can undermine the state's authority over inmates, weaken prison staff morale, and trigger a breakdown in the system's method of enforcing inmate discipline.[23] *The*

---

20 Samuel Jan Brakel, "Prison Reform Litigation: Has the Revolution Gone Too Far?" *Corrections Today*, August 1987.

21 See "Inside America's Toughest Prison," *Newsweek*, October 6, 1986: "(*Ruiz v. Estelle* plaintiff attorney) William Bennett Turner keeps winning in court. He's received a (Judge) Justice-ordered $1.2 million fee and he's proud of his achievements." The costs for special masters and monitors in court orders issued against the Texas Department of Corrections have amounted to a range of $500,000 to $750,000 per year (Samuel Jan Brakel, *op. cit.*).

22 *Ibid.*

23 Malcolm M. Feeley and Roger A. Hanson, *op. cit.* See also Kathleen Engel and Stanley Rothman, "The Paradox of Prison Reform: Rehabilitation, Prisoners' Rights, and Violence," *Harvard Journal of Law and Public Policy*, 1984; John J. DiIulio, *Governing Prisons: A Comparative Study of Correctional Management* (New York: Free Press, 1987); and Bradley Chilton, *Guthrie v. Evans: Civil Rights, Prison Reform, and Institutional Reform Litigation*, Ph.D. thesis, University of Georgia, 1988.

*famous* 1972 *Ruiz v. Estelle* case in Texas is an example of how sweeping reforms can lead to alarming results. In this case, the Texas Department of Corrections (TDC) was required by federal district court judge William Wayne Justice to introduce major changes, despite the warnings of correction officials that the measures could provoke inmate violence.[24] Prior to the federal court decrees, TDC was considered one of the best managed systems in the nation.[25]

Following Judge Justice's order, requiring wide-ranging changes carried out between 1974 and 1978, the Texas system began to fall apart. The rate of staff turnover escalated; the number of homicides and assaults reached all-time highs; and prison gang leaders replaced the pro-administration "building tender" inmates who previously had helped prison officials maintain discipline and order.[26] Judge Justice and his staff had told TDC that his court would not merely reform the state's prison system, but would revolutionize it. They were right.

**No Correlation.** Despite the Texas episode, many courts continue to limit crowding because they assume it leads to violence.[27] However, a number of studies strongly dispute this. For instance, an analysis of the Texas prison system in 1983 found no correlation between crowding and cases of violence.[28] The Bureau of Justice Statistics comes to the same conclusion, based on a survey conducted between 1983 and 1984. In fact, the survey found that violence was more prevalent in less crowded prisons.[29]

John DiIulio also finds that facilities with higher inmate densities have a lower rate of inmate violence. Men's Colony, a maximum-security prison in California, is one of the most overcrowded facilities in the country. Yet there has been a decline in violence as the population has risen. DiIulio attributes

---

24 Among the multitude of changes required by Judge Justice, TDC had to terminate the use of building tenders, a system where inmate leaders were chosen by prison officials to maintain order by influencing and disciplining the rest of the inmates; overhaul the inmate classification system and hold fewer prisoners in maximum security; provide inmates with access to state-of-the-art medical care; and provide single-cell housing for all prisoners. See DiIulio, "Prison Discipline and Prison Reform," *op. cit.*

25 Compared with other state prison systems of a similar size, Texas had one of the lowest rates of violence. The cost per inmate in Texas was well below the national average, and Texas was the only state to have a fully accredited education program within its penal system. See DiIulio, *The Public Interest, op. cit.*

26 *Ibid.*

27 There have, in fact, been very few studies on the impact of crowding on inmate disturbances. See Paul B. Paulus, *Prison Crowding: A Psychological Perspective* (New York: Springer-Verlag, 1988).

28 Study conducted by Sheldon Eklund-Olson, in Robert G. Leger, "Perceptions of Crowding, Racial Antagonism, and Aggression in a Custodial Prison," *Journal of Criminal Justice,* 1988.

29 U.S. Department of Justice, Bureau of Justice Statistics, "Population Density in State Prisons," *op. cit.*

this inverse relationship to improvements in management and discipline as the facility took in more prisoners.[30]

### The Supreme Court's "Hands-off" Approach

Despite the federal district courts' affinity for judicial intrusion, the Supreme Court has in fact ruled that it is not the role of the judicial system to administer prisons. As the Court declared in a 1976 case, "...the problems of prisons in America are complex and intractable, and, more to the point, they are not readily susceptible of resolution by decree. Most require expertise, comprehensive planning, and the commitment of resources, all of which are peculiarly within the province of the legislative and executive branches of government."[31]

Similarly, in a 1988 case concerning Occoquan Prison, a facility operated by Washington, D.C., the U.S. Court of Appeals reversed a U.S. District Court's decision to impose caps on the number of inmates admitted to the prison. Writing for the majority, Judges Kenneth Starr and Laurence Silberman wrote that a population cap "[carries] with it the high danger of judicially intruding...into the most fundamental arenas for decision-making reserved in a democratic society to the political branches."[32] The Supreme Court also has declared that "lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system."[33]

Despite these declarations, the Supreme Court has not taken steps to dissuade federal judges from such orders. Federal district court judges generally have not hesitated to require prisons to provide various privileges and amenities for their inmates, such as serving hot meals at a specific temperature or providing comfortable meeting rooms and recreation facilities.

---

30 John J. DiIulio, Jr., *Governing Prisons: A Comparative Study of Correctional Management* (New York: Free Press, 1987).
31 *Procunier v. Martinez*, 416 U.S. 396, 404-05, 1974.
32 Rick Glaser, "Singing the D.C. Prison Blues," *Legal Times*, August 8, 1988.
33 *Jones v. North Carolina Prisoners' Union, Inc.*, 433 U.S. 119, 125, 1977.

# HOW TO PROVIDE EMERGENCY PRISON SPACE

Although the courts use poor judgment in trying to solve overcrowding, often handing down orders that frustrate prison authorities, there still is no question that America faces an underlying shortage of prison space. The court orders simply turn an acute problem into a crisis. At the end of 1987, more than 40,000 prisoners were held in federal prisons designed to hold 29,000, and there were 533,000 inmates in state prisons designed to hold no more than 500,000 prisoners.[34]

If criminals are to receive swift and certain penalties, more prisons need to be built. And while state spending has risen faster for prisons than for any other major program in the 1980s, construction has not kept pace with the influx of prisoners.[35] The only way many jurisdictions can find space for new inmates is to place some current inmates on probation. Some offenders never make it to prison at all. In the District of Columbia earlier this year, the police were forced to drop plans to make a mass arrest of drug dealers when they learned there was no prison space available to house them.[36]

Yet, there are quick, inexpensive ways to obtain badly needed prison space. For example, existing facilities, such as closed military bases and vacant dormitories, can be used to hold nonviolent offenders, thereby freeing prisons for inmates convicted of violent crimes. Many states, and to a lesser extent the federal government, are exploring ways to convert existing buildings to prison use and to use innovative short-term solutions. Among the approaches:

### 1) Closed military bases.

The Commission on Base Realignment and Closure targeted 145 military facilities for closure or contraction.[37] Barracks, brigs, and other existing facilities, serving no other useful purpose on closed bases, could be converted easily into minimum or nonsecurity prisons for minor drug offenders and other nonviolent criminals. Besides providing the badly needed space, the prisons would create new jobs in the district and boost the local economy. Using closed military facilities to hold prisoners is not new. Maxwell Air Force Base in Montgomery, Alabama, has been used as a federal prison since

---

34 Richard B. Abell, "Beyond Willie Horton," *Policy Review*, No. 47, Winter 1989.

35 Thomas B. Edsall, "States' Prison Programs Are Fastest-Growing Cost," *Washington Post*, August 8, 1989. States collectively spend about $65 million a week on prison construction, alone: Scott Ticer, "The Search for Ways to Break Out of the Prison Crisis," *Business Week*, May 5, 1989. Also, the states collectively have proposed close to $3 billion for fiscal 1990 to build and expand prisons. Al Pagel, "Military Bases — Sites for Prisons?" *Corrections Compendium*, January-February 1989.

36 Michael Isikoff, "Bennett's Anti-Drug Initiative Making Little Headway in D.C.," *The Washington Post*, October 17, 1989.

37 U.S. Senate Republican Policy Committee, "Bursting at the Beams: America's Overcrowded Prisons," April 19, 1989.

the 1930s. In addition, there are two converted bases in Florida: an 800-bed minimum security prison camp at Elgin Air Force Base and a 120-bed facility at Tyndall Air Force Base. Officials revamped a dormitory and administration building into prisons at Tyndall at a total cost of only $75,000.[38] Senator Jesse Helms, the North Carolina Republican, has proposed an amendment (H.R. 3072) to the defense appropriations bill, that the Commission on Alternative Utilization of Military Facilities give top priority to converting closed bases into minimum security prisons.

**2) Closed dormitories, hospitals, warehouses, and other vacant buildings.**

One of the greatest advantages to converting closed buildings, besides saving taxpayer dollar, is that the structures are already in place and comply with zoning regulations. Several jurisdictions already are converting closed buildings into prisons. Harris County, Texas, is revamping a 63-year-old warehouse in Houston into a 4,200-bed detention center. The facility is scheduled for completion next year and will cost the county a total of $78 million.[39]

**3) Tent facilities.**

Facing crowded jail conditions, state officials in Hudson County, New Jersey, held 100 inmates last August in tents placed next to the County Jail Annex, while additional cells were being built.[40] A number of states, including Florida and Texas, have tried to set up tent housing on prison grounds but were prevented from doing so by federal court orders declaring that such conditions were "inhumane."[41]

**4) Prefabricated or modular facilities.**

Prefabricated construction also may be a source of at least temporary prison space. Modulars are manufactured, standardized units that can be assembled on concrete flooring.[42] An increasing number of private businesses are entering the prefab prison construction market, providing a wide range of designs that vary in size, level of security, and materials used for construction.

Costs of these prefabricated units vary from $4,000 to $30,000 per bed, compared with prison construction costs of about $90,000 per bed. Loudon County, Virginia, for instance, paid construction costs of only $98,000, or $4,000 per bed, for a prefabricated work release jail. The facility was built by

---

38 Pagel, *op. cit.*
39 Andrew H. Malcolm, "Aged Inmates Pose Problem for Prisons," *New York Times*, February 24, 1988.
40 Associated Press, "100 Inmates Moving to Tents," *New York Times*, August 8, 1989.
41 Conversation with Stan Czerniak, Security Administrator, Florida Department of Corrections, September 12, 1989.
42 In some cases, flooring is also pre-manufactured.

Surfside "6" Industries of McLean, Virginia, out of steel and concrete shipping containers, and the 23-bed facility was completed in only two weeks.[43]

## PRIVATIZATION OF PRISON OPERATIONS

Faced with pressures to provide more permanent prison space both to comply with court orders and to respond to citizen pressures, state and local governments have been examining ways to build and manage facilities at lower cost. One such approach that seems to be paying off is privatization. States and localities increasingly are granting correctional agencies much broader authority to contract out to nonprofit organizations in the private sector. In addition, over two dozen for-profit organizations now provide some form of correctional service.[44]

These private organizations can achieve significant savings for governments facing tight budgets. In a 1989 study comparing the costs of managing a public and a private prison, Charles H. Logan, Associate Professor of Sociology at the University of Connecticut, and Bill W. McGriff, County Auditor for Hamilton County, Tennessee, estimate that the privately operated prison in Hamilton County costs the county between 4 percent and 8 percent less to operate than the cost would be if the county operated it.[45] Similarly, private corrections firms, such as Corrections Corporation of America (CCA), U.S. Corrections Corp., and Wackenhut Services, Inc., claim to be able to save the government between 5 percent and 10 percent in operational costs.[46] One major reason for the savings is that private firms are not burdened by bureaucratic red tape and cumbersome government restrictions, so they can be innovative and flexible and thereby stretch dollars further.

Contracting Out. Besides using private organizations to manage prison facilities, a rising number of state and local governments are contracting out to the private sector for the design, financing, and construction of prisons. These arrangements often involve a consortium of firms who are able to take

---

43 Richard Abell, "Office of Justice Programs Review: Conference Address Highlights NSA Partnership," *The National Sheriff*, August-September 1989.

44 Keon S. Chi, "Prison Overcrowding and Privatization: Models and Opportunities," *The Journal of State Government*, The Council of State Governments, March/April 1989.

45 Because of the hidden costs of government-run prisons and the fact that costs incurred by public prisons are different from those incurred by private and not easily compared, underestimating government costs is likely. Logan and McGriff conclude the actual cost savings under private operation is more likely between 5 and 15 percent. See Charles H. Logan and Bill W. McGriff, "Comparing Costs of Public and Private Prisons: A Case Study," *NIJ Reports*, U.S. Department of Justice, National Institute of Justice, September/October 1989.

46 Scott Ticer, *Business Week*, *op. cit.*

advantage of design innovations and creative financing packages to build facilities faster and less expensively. For example, Colorado has contracted with a group of for-profit firms to provide the state with a $40 million medium-secure prison. American Correctional Systems, Inc., will design and manage the facility; Bechtel Group, Inc., will construct the prison; Daewoo International Corp. of South Korea will handle the financing; and Shearson Lehman Brothers, Inc., will underwrite the enterprise.[47]

## WHAT CONGRESS SHOULD DO TO DEFUSE THE PRISON CRISIS

The combination of a rising crime rate and a shortage of prison space constitutes a national crime emergency. Congress needs to take swift action to deal with this emergency. In addition to the pending anti-crime spending bill, Congress should take swift action on a package of measures being readied by Senator Phil Gramm, the Texas Republican. The legislation, to be introduced soon, should help put an end to the current revolving-door process by which convicted criminals reappear legally on the streets long before their sentences are complete.

When considering the Gramm proposals or any prison legislation introduced by other lawmakers, Congress should make sure that final legislation will at the very least:

**1) Direct the federal district courts to refrain from requiring prisons to release dangerous inmates because of prison population caps.**

Courts today base orders on the "totality of conditions" or general conditions affecting inmates as a class, not on specific conditions affecting inmates individually. Before issuing orders for "inhumane" conditions, judges should require proof from a plaintiff in prison that he or she was, in fact, subjected to cruel and unusual punishment. When unacceptable conditions are found, judges should be instructed to consider alternative measures to immediate early release as a way of rectifying the problem. A prisoner should be released only as a last resort and after a judge is convinced that no alternative remedy exists and that the inmate creates no danger to the community.

**2) Authorize the U.S. Attorney General to limit the special master's authority in the federal district court.**

The role of special master should be limited to providing the federal court with background information on the prison facility under scrutiny. Special masters should not have the authority to interfere in the management or operation of a prison.

---

47 See Dana C. Joel, "A Guide to Prison Privatization," Heritage Foundation *State Backgrounder*, No. 650/S, May 24, 1988.

**3) Authorize the U.S. Attorney General to require that public records be maintained on all federal prisoners.**

To hold federal judges accountable to the public for their decisions on sentences and early releases, records should be kept detailing each offender's criminal history, court-ordered sentence, and portion of sentence completed. All records should be available to the public upon request.

**4) Authorize the General Services Administration, in consultation with the U.S. Attorney General, to identify at least twenty parcels of federal surplus land that can be sold to state and local governments for building state prisons and county jails.**

One of the greatest challenges for states and localities is finding suitable sites for prisons. Impediments, such as obtaining voter approval to build a prison in a particular district or finding available land away from a large population center, can slow down the construction process considerably. The federal government should identify suitable parcels of federal surplus land that could be sold to those states and localities wishing to purchase the land for prison use.

**5) Authorize the Commission on Alternative Utilization of Military Facilities to give top priority to converting the facilities into minimum security prisons.**

If the amendment pending in the Senate defense appropriations bill does not become law, Congress should reintroduce the provision as part of the anti-crime package.

**6) Authorize the federal Bureau of Prisons (BOP) to use easily available, inexpensive forms of housing to hold nonviolent offenders, in order to free existing prison space for more dangerous inmates.**

BOP should be instructed to identify and convert appropriate vacant government facilities into prisons to hold nondangerous offenders. BOP also should be expressly permitted to make greater use of temporary structures, such as tents and modular units, to hold nonviolent inmates awaiting available prison space.

**7) Direct the federal courts to allow states to hold non-violent prisoners in tents, while permanent facilities are under construction.**

Tents have been used successfully by a few states. Other states, such as Florida and Texas, also would use tents if officials were assured that the courts would not issue orders prohibiting their use.

**8) Authorize BOP to contract out to the private sector the design, financing, building, and management of secure, as well as nonsecure, prison facilities.**

BOP contracts out most of its nonsecure Community Treatment Centers, or halfway houses, as well as a number of detention centers, but has not received authorization from Congress to contract out the management of more secure

# EXHIBIT C
# 4

http://www.latimes.com/news/local/crime/la-me-jail14may14,0,1903078,full.story
*From the Los Angeles Times*

# Releasing Inmates Early Has a Costly Human Toll

A shortage of jail beds puts career criminals back on the streets, where they often commit new offenses.
By Jack Leonard, Megan Garvey and Doug Smith
Times Staff Writers

May 14, 2006

Mario Moreno should still have been behind bars the night he climbed into the passenger seat of a stolen car with two fellow gang members.

He was carrying a rifle, some cartridges and, in his jacket pocket, a bag of marijuana. "Let's go do this," the car's driver recalled Moreno saying as they headed into the turf of a rival black gang.

They drove by a liquor store at 89th Street and Central Avenue in South Los Angeles. Two older black men were standing outside.

Moreno, 18, aimed his weapon out the driver's-side window and fired. One bullet killed Darrell Dennard, 53, a grandfather who slept in an alley behind a nearby fish market and got by doing odd jobs. He had just bought a lottery ticket. It was about 9 p.m. on Oct. 11, 2004.

If not for a chronic shortage of jail beds in Los Angeles County, Dennard's killer would have been in jail four more months. Moreno had been convicted of possessing a sawed-off shotgun — a felony. A probation officer called him a "danger to the community," and a judge sentenced him to a year in jail, the county maximum. Six days later he was released into a work program. Since his arrest, he had served a total of 53 days.

Moreno joined more than 150,000 county inmates who have been released during the last four years after serving fractions of their sentences. Thousands, like Moreno, committed violent crimes when they would otherwise have been locked up, even with time off for good behavior.

The large-scale releases started in mid-2002, when Sheriff Lee Baca had to make major budget cuts. Unwilling to lay off patrol officers, he chose to close jails.

As a result, nearly everyone now sentenced to 90 days or less is let go immediately. Many others leave after serving no more than 10% of their time, making Los Angeles County Jail sentences among the weakest in the nation.

A Los Angeles Times investigation of early releases since Baca's jail closures began found:

• Nearly 16,000 inmates — more than 10% of those released early — were rearrested and charged with new crimes while they were supposed to be incarcerated.

• Nearly 2,000 of those rearrested were released early a second time, only to be arrested again while they should have been behind bars. Hundreds of those people cycled through jail three or more times. One example of the revolving door: A 55-year-old woman was released early in 2002 on an assault charge, only to be rearrested three days later on suspicion of another assault. Over the next three years, she was released early 15 times and rearrested 19 times when she was supposed to be locked up.

• Sixteen men, including Moreno, were charged with murders committed while they should have been in jail. Nine are awaiting trial; seven have been convicted in the homicides.

• More than a fourth of those rearrested were charged with violent or life-endangering crimes, including 518 robberies, 215 sex offenses, 641 weapons violations, 635 drunk-driving incidents, 1,443 assaults and 20 kidnappings.

Many of these inmates probably would have committed new offenses even if they had served full sentences. But the early releases have given career criminals more time on the streets to commit additional crimes, endangering the public.

Juvenal Valencia, 21, was convicted of assault with a deadly weapon, released early and then cycled in and out of jail twice more after early releases. Prosecutors have now charged him with first-degree murder in a drive-by shooting that left one man dead and five others wounded. He has pleaded not guilty. At the time of the killing, Valencia had two months left to serve for a probation violation.

In recent years, sheriff's clerks have routinely disregarded sentences handed down by judges. In some cases, inmates are freed despite instructions from a judge that they must serve their full sentences.

"That puts us all in peril," said Los Angeles City Atty. Rocky Delgadillo. "I think criminals have learned from this that there is a way to beat the system.... For many, a few days in jail has become just a cost of doing business."

Los Angeles Police Chief William J. Bratton, who led the Boston and New York police departments before taking over in Los Angeles in late 2002, said the situation has frustrated officers on the street and made policing harder.

"It's an amazing system. I've never seen anything like it," he said. "The police, prosecutors and judges — sometimes even a jury — have made decisions, and you have the ability to arbitrarily undo all of that."

In recent interviews, Baca defended his decision to release inmates early as a "last resort," saying he had little choice but to shut down jail facilities when he had to cut millions of dollars from his budget.

At the time, Baca warned that crime would increase if he weren't given more money. "In a public safety fashion, the net will be cut and the floodgate will be open to more crime," Baca told county supervisors at a 2002 board meeting to which he had brought a thousand supporters.

Now, he says, the public is paying the consequences.

"I knew that there are people in our county jails that are so unstable that even if they're only in there for a minor crime, they're capable of committing a bigger crime," he said. "You just can't predict who that person is going to be, specifically."

A bond measure of up to $500 million to fund improvements to — and expansion of — the jail system is being considered for the November ballot.

But even if the extra millions come through, sheriff's officials say they won't be enough to fix long-neglected jails.

The sheriff has little control over who comes into his jails. In recent years, bookings have steadily increased, partly the result of a jump in arrests by Los Angeles police. And more than a thousand jail beds are regularly taken up by prisoners awaiting transfer to state facilities, a process that takes weeks.

Today, the county has about 19,000 jail beds in use. Baca says he would need at least 30,000 — and additional deputies — to end early release.

'A Truly Innocent Victim'

Darrell Dennard was always better at taking care of others than himself. When his grandmother was gravely ill, he stayed with her day and night, bathing and feeding her until she died. But he chose to make his home on the streets of South Los Angeles where he'd grown up, preferring his tidy bedroll to numerous offers of a warm bed.

A little over a week before Moreno killed him, Dennard's mother, Gladys Derrick, visited her son in the alley behind the fish market. She brought travel-size lotions and shampoos and a basket of "all kinds of things he didn't have to cook." He was "always good company," she said.

"It's not very often that you have a truly innocent victim," said LAPD Det. John Skaggs, who investigated the killing. "This of course is that case."

Half a dozen members of Dennard's family were in the Compton courthouse on March 27 to see Moreno sentenced to state prison for voluntary manslaughter, a plea prosecutors said they offered because

witnesses wouldn't testify.

Dennard's sister wore a T-shirt printed with her brother's smiling image and the dates marking his life: 9/26/51-10/11/04.

Moreno, a member of one of the county's most notorious gangs, Florencia 13, smiled at his family when he entered the courtroom. A girlfriend powdered her nose. His mother, her hair tied back in two long braids, read a Bible.

Dennard's brother, Howard McZeal, addressed the court.

"I'd like to know why my brother isn't here," McZeal said, his voice cracking. "What did he do to you?"

Moreno stared straight ahead.

Until speaking to a Times reporter shortly before the sentencing, Dennard's family had no idea that his killer had gotten out of jail with months still to serve.

"A gang member arrested with a sawed-off shotgun? That [jail time] was a camping trip to him, a business junket," McZeal said later.

"If that man had still been in jail, Darrell would still be alive."

**A Crush of Inmates**

A generation ago, no one in Los Angeles got out of jail early.

When beds were full, inmates were housed in hallways, common rooms, the pews of the jail's chapel and anywhere floor space was available. In the summer of 1983, with the building filled to twice its capacity, hundreds of inmates were given four blankets each and slept under the stars on the roof of Men's Central Jail.

By then a class-action lawsuit filed on behalf of inmates by the American Civil Liberties Union was making its way through the court system. A federal court found the overcrowding to be cruel and unusual punishment and ordered the county to stop overloading its jails. At the time, more than 22,000 inmates were being housed in space meant for half as many. County officials, under a federal consent decree, agreed to open new facilities.

In 1988, the judge allowed the county to institute what was to be a temporary solution to the overcrowding: early release.

The number of early releases ebbed and flowed, but by the late 1990s it had slowed to a trickle. Then, in mid-2002, Baca faced two years of budget shortfalls, forcing $167 million in cuts.

County supervisors said they had little choice but to rein in spending. During that time, state and county governments were reeling from losses in tax revenue caused by fallout from the dot-com bust. Other county departments were also hit hard.

"We did what we could to maintain" the sheriff's funding, said Supervisor Yvonne Brathwaite Burke.

Baca was already dealing with a jail system that had lost 5,000 beds in a decade, mostly from earthquake damage. In little more than a year, he closed three more jails and shut down parts of four others, reducing the number of inmates by another 5,000.

The cuts saved more than $50 million. But they also guaranteed a new wave of early releases.

Baca's critics point to "nonessential" pet projects, like rehabilitation programs in the jail, that could have been cut to keep inmates in jail longer.

"That's nice, but that's not our job. Our job is custody," said Los Angeles County Sheriff's Sgt. Paul Jernigan, who works in Men's Central and is one of four candidates running against Baca in the June 6 election.

But the sheriff said these programs amounted to a fraction of the money he needed to save. With cuts down to the bone, he said he faced laying off deputies or closing the jails.

"If you were to ask the community, 'I'll take away five police cars in your neighborhoods or I'll do early release,' " they'll say, 'Don't take away the five radio cars. Now manage your jail the best way you can.' So I did," he said.

In the last two years, Baca's department has benefited from an increase in county revenue from property taxes, fueled by a surging real estate market. More than half the beds closed since 2002 have been reopened. The department has the funds, but not the staff, to reopen the remaining 2,500 beds.

And there is still the problem of aging and outdated facilities at a time of growing pressure to reduce violence among inmates and relieve overcrowding that has continued despite the large-scale early releases.

In Men's Central, cells designed for three inmates are filled with six. Last week, U.S. District Judge Dean D. Pregerson described the practice as "simply not consistent with basic values," noting that inmates did not even have the space to stand up and take a step or two. Pregerson, who oversees the still-open civil rights case on jail conditions, said the situation "should not be permitted to exist in the future."

## A Balancing Act

Last year, 32 of California's 58 counties — including Orange, San Diego, San Bernardino and Riverside — released inmates before they had completed their jail sentences.

Los Angeles County, with the largest jail system in the nation, has led the way. In the 3 1/2 years before Baca closed jails, about 10,000 inmates were let out prematurely. In the 3 1/2 years that followed, almost 150,000 were released three or more days early.

With fewer beds, the sheriff has also had to loosen standards on who qualifies for early release.

"By lowering that criteria, you're qualifying more hardened criminals," said Sheriff's Capt. Bill Bengtson.

Until The Times asked for data, sheriff's officials had not tracked how often inmates were rearrested when they would otherwise have been behind bars. In February, the officials hastily conducted an analysis of rearrests before giving the newspaper data on more than 2 million bookings into the jail since 1999.

The Sheriff's Department analysis, which looked at the seven years of data as a whole, concluded that inmates released early were no more likely to re-offend than those who were not.

But The Times found distinct differences when it compared the years before the jail closures with those after. As fewer served full terms, rearrests within 90 days of release increased for all inmates. Those released early after the policy change were more likely to be rearrested within 90 days than inmates who served their full jail time.

The Times analysis also showed that although the number of inmates released early increased 15-fold after mid-2002, arrests of people with time left on their sentences rose about 60-fold, from 266 to 15,775. Rearrests for violent and life-threatening crimes soared from 74 before the jail closures to more than 4,000 since.

Among the perpetrators: Hector Aguilar, who left jail Sept. 1, 2004, with three months left on his sentence for domestic violence. Four days later, he opened fire with an AK-47 assault rifle on a sheriff's patrol car, missing two deputies inside. He pleaded guilty to assault with a deadly weapon and was sentenced to 43 years in state prison.

In deciding which inmates deserve the most time, sheriff's officials try to balance overcrowding against the need to keep dangerous criminals locked up.

The inmate pool for early release is limited to about 10% of the jail population — convicts sentenced by judges to less than a year. The remaining inmates are awaiting trial or transfer to state prison for longer sentences, or are incarcerated for parole violations under a contract with the state.

Since late 2004, a small number of beds — now about 75 — has been reserved for inmates sentenced to jail

who have been identified by the LAPD as chronic, dangerous offenders. They do their full time. Occasionally, inmates arrested for specific crimes in specific areas are also kept longer. In recent months, for example, sheriff's deputies have cracked down on prostitution in parts of South Los Angeles and Compton. Current guidelines say prostitutes arrested there "shall serve 100% of their sentence, and shall NOT be released [early]."

Guidelines issued by the sheriff spell out which inmates in the 10% pool qualify for early release: Those in jail for manslaughter, sex offenses and child abuse, along with violators of gang injunctions, do all of their time. For nearly all other convictions, inmates serve a fraction of their sentences. Women, who are housed in separate, less crowded facilities, usually do no more than 25%. Men serve no more than 10%.

If jailers had the room, a typical inmate given a year in jail would spend about 243 days behind bars after discounts for good behavior and work. As it is now, an inmate eligible for a 10% release would serve just 24 days.

"That's a disaster," said Los Angeles County Dist. Atty. Steve Cooley. "Obviously, if they aren't in, they can be out committing crimes."

### 'Get Them Out'

Most of the time, the decision to free an inmate comes down to a simple mathematical calculation. A first-time offender is treated the same as a career criminal. There is no penalty for prisoners who have been rearrested while on early release. Prior convictions for violent crimes are not taken into consideration.

Each day the decision of who goes home early is made in cramped cubicles at the county's Inmate Reception Center. Sheriff's clerks work eight-hour shifts, reviewing inmate files to identify those who meet the sheriff's criteria for early release.

On a recent morning, Pamela Broom's desk was stacked with a dozen or so manila envelopes, filled with paperwork on candidates for early release.

Broom pulled the envelope of Rosa Louise Degraw. A blond, plump face glared from a booking photo. The jail's computer showed that Degraw was serving a 180-day jail sentence for battery and vandalism. With time off for good behavior, she was supposed to serve about four months.

Degraw's sentencing documents contained an explicit directive from the judge: "No early release."

Instead, 33 days after she was booked, Degraw was eligible to go.

"The sheriff says, 'It doesn't mean anything. I've got to get them out of my jails,' " said Broom's supervisor, Greg Sivard.

Degraw had landed in jail after repeatedly violating her probation requirements following a conviction for battery and vandalism. Among her battery victims: her mother.

Broom said she has little time to reflect on whom she is releasing.

"I'd be in a mental ward," said Broom, who finds anywhere from two to 40 inmates each day to release early. "You follow the criteria. You get paid to do your job, not have opinions."

In red ink on the envelope, she marked Degraw free to go.

Two and half hours later, Degraw, 23, pushed her way through a metal jail door onto Bauchet Street in downtown Los Angeles.

She was angry she'd served as much time as she had. Dressed in the same white tank top and blue jeans she had come to jail in, Degraw said she believed she'd serve only 10% of her sentence. Still, she said, the extra time made her want to avoid coming back.

"The longer you make them stay in there and think about it, the chances are less that they'll get out and do something else," she said.

Degraw said she planned to reunite with her 4-year-old son and try again to earn her high school equivalency degree. For the immediate future, she had other plans: "I'm going to drink me a bottle of Southern Comfort today."

**Freed Without a Review**

In 2003, Baca tried to reassure the public about his early-release program.

"It should be clear to those who are listening that we are going to put them in programs and ankle bracelet monitoring," Baca said, appearing on KCET-TV Channel 28's "Life and Times" in April 2003. "They're not just walking out the door with no obligations."

For a few months in 2003, jailers reviewed criminal histories before approving early release. Then they abandoned the effort, saying it was too time-consuming. Since then, inmates have been freed without anyone looking at their full criminal past. Many had long arrest records.

More than 4,400 released early after the jail cuts had been prosecuted for assaults with deadly weapons or seriously injuring people. Today, the department has far fewer inmates on electronic monitoring and other types of supervision than it did in 2001.

Elsewhere, jail officials do more to determine which inmates are likely to endanger public safety. In Portland, Ore., the Multnomah County Sheriff's Department examines the criminal records of inmates so convicts with violent pasts do more time regardless of their most recent offenses.

After questions from The Times, Los Angeles County Sheriff's Chief Marc Klugman said the department would consider once again looking at criminal histories and other factors to determine whether an early release was appropriate.

Baca said judges and prosecutors also bear some responsibility. He said they are well aware that he is releasing inmates early, yet continue to agree to plea bargains that send dangerous offenders to jail instead of prison.

**Creative Sentencing**

In 2002, Vincent Jeffery led sheriff's deputies on a chase through the streets of South L.A., hitting speeds of more than 80 mph, running eight red lights and crashing into a motorist. A deputy said Jeffery, who had a 20-year record and 10 aliases, pulled a gun on him when he tried to make a routine traffic stop.

On Sept. 30, 2002, Los Angeles County Superior Court Judge James R. Brandlin sentenced Jeffery, 36, to two years in County Jail. Eight months later, he was back on the street.

Brandlin, who had called Jeffery a "tremendous risk to public safety," demanded answers in a letter to Baca.

The sheriff had his aides look into the case. Jeffery, Baca wrote back to the judge, had been released properly by sheriff's officials struggling to keep the jail population down.

"While this may not meet with your approval," Baca wrote, "I sincerely hope that it allays any concerns you have that Mr. Jeffery was incorrectly released." Brandlin declined to comment for this story.

As more and more inmates realized that there was little risk of serving full sentences, fewer accepted deals to serve their time under house arrest or through community service. And as alternative sentences dwindled, more pressure was put on the jails.

"You tell a guy now, 'Hey, 30 days Caltrans,' " Cooley said. "He says ... 'You know what, I don't need all that jazz. Give me my time.' "

Cooley said frustrated prosecutors and judges seek creative ways to "beat the sheriff's sentencing system."

Here's how prosecutors and one judge made sure that a defendant served his time.

In September, sheriff's deputies caught Steven Torres strolling through his Compton neighborhood carrying a large glass bong and a small pipe containing drug residue. He was on probation for previously carrying a

concealed weapon. A search of his home turned up another handgun — a serious violation.

His probation officer wrote that Torres should "spend a suitable amount of time in local custody" to show him that "criminal behavior will not be tolerated."

At a November hearing, where Torres pleaded no contest, Superior Court Judge Xenophon F. Lang Jr. told him he would "serve 90 actual days in the County Jail" and ordered him to surrender to the jail in January to await sentencing.

In March, at Torres' sentencing hearing, Lang smiled at the bulky defendant before him in handcuffs. The judge reminded Torres of the 90-day sentence he had proposed earlier.

"It appears he has done that," Lang said with a chuckle, ordering Torres released on probation.

**Fatal Consequences**

On Oct. 30, 2003, Jose Rafael Garcia stopped his motorcycle at a red light in East Los Angeles. It was about 9:30 p.m. The 31-year-old father of two had finished a day of construction work and was idling at 3rd Street and Arizona Avenue.

Randy Morones, 33, had been rousted from a jail bed about 2 a.m. It was his 11th day in jail on a drug conviction. He had been sentenced to six months.

In 1999 and again in 2000, he had been convicted of beating a girlfriend and sent to state prison. His latest offense marked his seventh stay in County Jail in four years. Since 1989, he had been convicted of drunk driving four times.

None of this mattered when Morones again came up for early release. Because he had served 10% of his jail time, he was free to go.

Morones left the downtown jail complex about 8:30 a.m. By evening, he was drinking beer at a friend's house. Then he climbed behind the wheel of his 18-foot motor home and headed to his parents' Pico Rivera home, speeding along 3rd Street.

Witnesses said he didn't even hit the brakes as he approached the red light at Arizona. He slammed into Garcia, throwing him more than 130 feet and killing him. Morones ran from the crash site, but witnesses caught and held him until deputies arrived.

In September 2004, a jury found Morones guilty of second-degree murder and gross vehicular manslaughter while drunk. At his sentencing, Morones apologized to Garcia's family: "I wish the Lord took my life instead of an innocent man."

He was sentenced to 20 years to life in state prison.

Galdino Garcia wept when he spoke recently of the crash and his memories of his brother.

A Mexican immigrant, Jose played guitar in Latin rock bands. He spent time riding his motorcycle in the San Gabriel Mountains, telling his family that the rides made him feel like he was "caressed by God."

Galdino Garcia said he blames the justice system as well as Morones.

"I believe in the law, but that was one of my questions: Why did they let him out early?" Galdino said. "They never answered me that question."

---

*Times researcher Maloy Moore and staff writers Robin Fields and Stuart Pfeifer contributed to this report. Data analysis by Doug Smith and Sandra Poindexter.*

(INFOBOX BELOW)

Recidivism

After early releases mushroomed in mid-2002, all county inmates were more likely to be rearrested within 90 days after being released. But the rearrest rate almost tripled for those let out early.

|  | Before jail closures | After jail closures |
|---|---|---|
| Full term | 13.1% | 18.5% |
| Early release | 7.7% | 20.6% |

Does not include inmates released after Sept. 30, 2005

Source: Los Angeles County Sheriff's Department. Data analysis by Sandra Poindexter

(INFOBOX BELOW)

Free to re-offend

From July 2002 to December 2005, the number of inmates who should have been in jail who were:

| | |
|---|---|
| Released early | 148,229 |
| Rearrested | 15,775 |
| Charged with assault | 1,443 |
| Charged with robbery | 518 |
| Charged with a sex offense | 215 |
| Charged with murder | 16 |

Sources: L.A. County Sheriff's Department; L.A. Superior Court

# EXHIBIT C
# 5

**S F Gate/ S F Chronicle ESCAPING THE MYTH OF 'THREE STRIKES' STATE PRISON LAW** Debra J. Saunders

Sunday, July 6, 2008 In 1994, Californians saw a state criminal justice system that too often let the worst criminals out of prison to wreak destruction and hurt the innocent, only to be sent back to prison for worse crimes. Fresno parent Mike Reynolds had been pushing Sacramento to pass a "three strikes" measure after the murder of his 18-year-old daughter, Kimber, during a robbery in 1992. Then the rape and murder of Petaluma's 12-year-old Polly Klaas - kidnapped from her home by another violent career criminal - confirmed the voters' worst fears. The public was ready. The Legislature was afraid. And both Sacramento and California voters passed tough "three strikes" measures. This being California, there was a pro-criminal lobby that warned against the law, which mandated a 25-year-to-life term for the third offense by criminals who had already committed two serious or violent felonies. It also increased penalties for a second strike. Longer sentences for career offenders? Horrors. Critics duly seized on state Department of Corrections forecasts, which ominously predicted that within five years, the prison population would more than double, from 124,813 to 245,554. The state would have to build 20 new prisons just to keep up. Within three years, opponents charged, prison spending would outstrip state spending on higher education. Almost 15 years later, it turns out many of the so-called experts were wrong - and the voters were right. In approving the tough-on-crime measure, California residents didn't have to pay for an inmate population explosion or a bunch of new prisons. What voters got instead was a law that, for the most part, has worked the way it was supposed to. Fact: California's inmate count was 171,444 last year - far below the grim projections. In part because other prisons already were in the works by the time voters approved "three strikes," Sacramento authorized and completed not 20 new prisons in five years, but only one new prison in the past 14 years. And that happened while the state population grew from 33 million to 38 million. Yet critics won't even admit they were wrong. What's worse, they want the public to believe that their horror stories actually came to pass. Every few years, lacking solid statistics, they throw out anecdotes - like the repeat offender who was sentenced under "three strikes" after snatching a pizza from a group of children - to argue that a draconian law has turned California into the Prison State, where petty criminals routinely are put away for life. Why? Because they don't believe in harsh sentences for career criminals. They want repeat offenders to do long time on the installment plan. State Sen. George Runner, R-Lancaster (Los Angeles County), decided to fight back - with facts. His office put together a seven-page paper - "Who Is In Our State Prisons?" - that debunks many of the oft-repeated "three strikes" misinformation that paints California as a state that over-incarcerates. The paper points to a study released in February by the Pew Center's Public Safety Performance Project, which placed California in the middle quintile of American states in terms of inmates per capita. For the record, the Pew Center has been critical of "three strikes" laws. Think that California prisons are teeming with petty offenders? Think again. The Runner paper cites a federal survey that found that 47 percent of California inmates are repeat violent offenders, and 33 percent are repeat nonviolent offenders. Most of the rest are first-time felons who committed crimes against people - think murder, manslaughter, robbery, assault, kidnapping, rape or other sex offenses. California's crime rate fell dramatically after "three strikes" passed. In 1993, the year before voters approved the measure, the FBI ranked California fourth

among the states for total crimes per 100,000 people; in 1999, the murder rate had been cut in half, and California's crime rate had fallen to 29th place. As far as Runner is concerned, long penalties have made California safer. The "three strikes" law, he said, "keeps people in prison longer. It also makes people's behavior change." His aide Charlie Fennessey points to burglary convictions as proof that criminals have changed their behavior to keep up with the changed laws. After 1994, he found, some crimes - second-degree burglary and car theft, which are not "three strikes" offenses - increased to earlier levels, but first-degree burglary, a "three strikes crime," remained flat. "There's no rational explanation as to why the trends in burglaries would be bifurcated," Fennessey said, "unless it had something to do with the penalties." Adam Gelb of the Pew Center provided an alternate explanation. Although he has not studied California's "three strikes" law, he noted, "There is a very common occurrence in courtrooms across the country. It's called 'losing the gun.' " The theory is that criminals are behaving as before, but officers of the court are charging criminals for lesser offenses to avoid "third strike" overkill. "There's no evidence that anyone on the street knows the going rates for what their sentence is going to be or how those punishment rates have increased or decreased over time," Gelb said. "To say that 'three strikes' has worked, the question is: Compared to what? Since there is so little evidence in any context that longer punishment acts as a general or a special deterrent, it's hard to say that California taxpayers have gotten their money's worth and could not have prevented more crime with a variety of strategies." Michael Rushford of the Criminal Justice Legal Foundation in Sacramento conceded that some prosecutors may be under-charging to avoid the longer sentences for repeat offenders. But many prosecutors are not. And the Runner report shows that the "three strikes" law has locked up career criminals - which means that voters got from "three strikes" what they wanted. Seth Unger of the California Department of Corrections and Rehabilitation told me that more than 1,000 third-strikers entered California prisons in 1995-96, but only 294 third-strikers entered the system 10 years later. Something has changed. Said Unger, "What 'three strikes' was designed to do was cut down on the churning of the prison population. We know that people (who are third-strikers) are not going to be coming back any time soon through the front gates, because they're not getting released." When "three strikes" was put on the ballot in 1994, I voted no, because I believed that the third strike should apply only to a serious or violent offense. I, too, believed that low-level offenders, not career criminals, would be locked behind bars for decades for petty crimes. So why can't other critics just admit they made a mistake? "The fundamental reason that critics of tough criminal penalties cannot come to grips with the facts is their unshakable belief that longer sentences inevitably increase prison population," the Runner report said. As if on cue, a February Pew Center paper asserted that laws like "three strikes" drive up the prison population. "Opponents of tough criminal laws cannot accept that penalties deter crime," the Runner report said. It's that simple. It appears that petty criminals have either left the state or changed their ways. If they committed crimes, some at least committed different crimes. And when some small-time thug did get nicked for a small crime, it turned out the guy had a host of priors and couldn't stay out of prison to save his life. Rather than celebrate the fact that California prisons are protecting the public by keeping violent, serious and repeat offenders behind bars, some California policy leaders actually want to neuter the "three strikes" measure or even get rid of the law. Perhaps the "three strikes" supporters should follow the example

of their opponents: Argue that if we get rid of "three strikes," not only will crime surely go up, but worse, we'll also have to build 20 new prisons. We'll start to spend more on prisons than we spend on higher education. If we get rid of "three strikes," the prison population will explode. And this time, the dire predictions might turn out to be true. **Who's in prison** California state prison population (male) as of Dec. 31, 2007: **160,144**

| CRIME | PRISONERS | PERCENT OF PRISON POPULATION |
|---|---|---|
| Murder | 22,005 | 13.7 |
| Manslaughter | 3,556 | 2.2 |
| Roberry | 18,920 | 11.8 |
| Assault & Battery w/deadly weapon | 23,276 | 14.5 |
| Rape, Child Molestation & other sex crimes | 14,812 | 9.2 |
| Kidnapping | 2,428 | 1.5 |

| | | |
|---|---:|---:|
| Crimes against people subtotal | 84,997 | 52.9 |
| Burglary | 12,379 | 7.7 |
| Arson | 409 | 0.3 |
| DUI (with priors or injury) | 2,320 | 1.4 |
| Escape | 109 | 0.1 |
| Felon in possession of a weapon | 6,532 | 3.8 |
| Theft with a prior felony | 3,821 | 2.4 |
| Drug manufacture, sale, or possession for sale | 18,711 | 11.8 |
| Lesser offense with serious or violent priors | 9,620 | 7 |

| | | |
|---|---|---|
| Total inmates convicted of crimes against people, serious or violent crimes, or crimes aggravated by prior felony convictions** | 13,898 | 86.7 |

# EXHIBIT C
# 6

# Los Angeles Times

# Do the time, lower the crime;
## Too many people behind bars? The statistics suggest otherwise.

By James Q. Wilson

Do we have too many people in prison?

If you read a recent report by the Pew Center on the States, you would think so. As its title proclaimed, more than one in 100 American adults is in jail or prison. For young black males, the number is one in nine.

The report's authors contend that the incarceration rate represents a problem because the number of felons serving time does not have a "clear impact" on crime rates — and that all those inmates are costing taxpayers too much money to house. But nowhere in the report is there any discussion of the effect of prison on crime, and the argument about costs seems based on the false assumption that we are locking people up at high rates for the wrong reasons.

In the last 10 years, the effect of prison on crime rates has been studied by many scholars. The Pew report doesn't mention any of them. Among them is Steven Levitt, coauthor of "Freakonomics." He and others have shown that states that sent a higher fraction of convicts to prison had lower rates of crime, even after controlling for all of the other ways (poverty, urbanization and the proportion of young men in the population) that the states differed. A high risk of punishment reduces crime. Deterrence works.

But so does putting people in prison. The typical criminal commits from 12 to 16 crimes a year (not counting drug offenses). Locking him up spares society those crimes. Several scholars have separately estimated that the increase in the size of our prison population has driven down crime rates by 25%.

The Pew writers lament the fact that this country imprisons a higher fraction of its population than any other nation in the world, including Russia. But what they ignore is what the United States gets in return for its high rate of incarceration. For instance, in 1976, Britain had a lower robbery rate than did California. But then California got tough on crime as judges began handing out more prison sentences, and Britain became soft as laws were passed encouraging judges to avoid prison sentences. As a result, the size of the state's prison population went up while Britain's went down. By 1996, Britain's robbery rate was one-quarter higher than California's. Compared with those of the U.S. overall, Britain's burglary and assault rates are twice as high, according to a comparative study done by the U.S. Bureau of Justice Statistics.

These differences in crime rates involve many countries with low imprisonment rates. The robbery rate in the U.S. is not only lower than that in Britain but also that in Australia, Canada, the Netherlands, Poland, Portugal, Scotland and Spain, according to the same study. The imprisonment rate in these countries is one-fifth to one-tenth that in the United States.

You cannot make an argument about the cost of prisons without taking into account the benefit of prisons. The Pew report makes no effort to do this. Instead, it argues that spending on prisons may be crowding out spending on education. For instance, tax dollars spent on higher education in the U.S. have increased much more slowly than those spent on corrections. The report does not ask whether the slower growth may be in part because of the sharp increase in private support for public universities, much less whether society gets as much from universities as it does from prisons.

But Pew rightly points to problems in the nation's imprisonment policy and in what it does (or, typically, doesn't do) to prevent crime in the first place. Take California. It has failed to manage well the health — especially the mental health — problems of many of its inmates. Federal judges are in the process of imposing tough new rules to rectify the problem. Nor has the state found good ways to integrate former inmates back into society. Instead, parole officers routinely send people back to prison if they misbehave — and sometimes the return orders are for minor violations.

California does not handle drug offenders wisely either. Just how big this problem is remains uncertain because some inmates involved in serious crimes plead out to drug offenses to avoid tougher prison sentences. For serious drug users who have not committed a major crime, the goal should be to get them into a community treatment program and keep the offenders there.

*Cont.*

To do that, we might emulate the HOPE (Hawaii's Opportunity for Probation with Enforcement) project in Honolulu. The program, started by state Judge Steven Alm in 2004, aims to get probationers to stay in a treatment program. Alm makes offenders take a random, mandatory drug test every week. If they fail, he immediately sends them to jail for a short time to discourage them from being on drugs. Within four years, according to a study by professors Mark Kleiman of UCLA and Angela Hawken of Pepperdine University, the violation rate among HOPE probationers fell by 90%. (Oddly, the Pew report, in discussing our "excessive" use of prison, makes no mention of the fact that there are about as many felons on probation as there are in prison.)

There is more that could be done to prevent young people from embarking on a life of crime. The Pew report rightly notes the success of the High/Scope Perry Preschool Project in Michigan, which began in the 1960s. The project has reduced delinquency among children of (mostly) poor black women by exposing them to a high-quality preschool program.

What we have learned from High/Scope is especially noteworthy because a random sample of youngsters were enrolled in the preschool program and the results were compared with those of a control group.

The Pew report could have mentioned at least 10 other crime-prevention programs that work. They can be found in "Blueprints for Violence Prevention," published by the Institute of Behavioral Science at the University of Colorado, and include Big Brothers/Big Sisters, nurse home-visitation programs and various special education programs in high schools. All were rigorously tested by controlled experiments in at least two locations.

But even with prevention programs, there will always be many people in prison. A major challenge for scholars today is to discover better ways of placing ex-inmates back into the community. If such methods can be devised, we can reduce the large number of parolees who are sent back to prison for violating the terms of their release.

But we should not suppose that, except for some minor drug offenders, we imprison too many people. There are still people who ought to be in prison and are not. There are more than 1 million felons on probation, in many cases because prisons are overcrowded, according to the Bureau of Justice Statistics. There are violent gang members who are hard to arrest and convict because their neighbors are afraid to go to the police or testify against them.

It is discouraging to read a report by an important private organization that can do no better than say we incarcerate too many people, get nothing from it and are stealing money from higher education.

*James Q. Wilson teaches public policy at Pepperdine University and previously taught at UCLA and Harvard University. He is the co-editor of the new book "Understanding America: The Anatomy of an Exceptional Nation."*

**March 30, 2008**

# EXHIBIT C
# 7

**Jailhouse blues: federal judges seem infinitely solicitous of the inmates of state prisons, and nearly indifferent to their victims, past and future. How can law-abiding citizens begin to redress the balance? - includes related article on the Hughes Amendment that would reduce jail sentences**

Wesley Smith

IN 1989 Kenny Parker filed suit against Nevada state officials for "cruel and unusual punishment." His complaint? They had given him a jar of creamy peanut butter, whereas he had explicitly ordered chunky. One of Parker's jailmates--convicted firstdegree murderer David Bean--is suing the state because the jeans he was given were too tight, "causing rashes and epileptic seizures." Another Nevada inmate, convicted child molester Chris Chapman, is suing for copies of the North American Man-Boy Love Association newsletter, as a matter of First Amendment rights. Iowa prisoner Art Hartsock, wanting to "see what I'm missing while I'm in here," has demanded greater access to pornography.

These "rights" violations seem less constitutional than comical, but they are taken seriously by the federal judiciary. In 1993, the nation's prisoners filed over 53,000 lawsuits in federal court, generally against state governments. While most cases are dismissed as frivolous, the litigation explosion has cost the states hundreds of millions of dollars in legal fees and in the costs of complying with the courts' orders. In 1993 Nevada alone spent about $700,000 in direct legal costs defending against suits like Parker's.

These legal costs, however, are dwarfed by the indirect costs on society as a whole. Most governors, state attorneys, and other criminal-justice officials say the prisoners'-rights movement is making state prisons ungovernable. And federally imposed prison population caps and other decrees aimed at alleviating "overcrowding" have forced the early release of tens of thousands of violent criminals.

Judicial Tsunami

IN 1966 prisoners filed 218 suits in federal court to remedy arguably inhumane treatment in federal, state, and county prisons. Then the federal judiciary opened the floodgates. By 1980 prisoner suits had increased twentyfold. In 1993 prisoners filed 53,713 lawsuits in federal courts--7,615 more suits than the Federal Government filed against criminals.

By 1993, four-fifths of all state prison systems and roughly one-third of the five hundred largest local jails were under federal-court supervision. And the courts are mostly not content to set broad guidelines for the states to interpret. In Arizona, for example, federal judges tell state prison officials the types of publications and typewriters they must buy for prisoners and the number of law clerks they must hire for the state's prison law libraries. (Delaware Attorney General Charles Oberly II says such rulings mean state prisoners have better access to law materials than be does.)

In South Carolina, Federal Judge James McMillan has given the state orders to purchase specific recreational equipment for prisoners, including three sets of horseshoe equipment, three guitars, five frisbees, fifty decks of playing cards, and a piano. In Alabama a federal judge orders the state to provide inmates air conditioning and televisions. In other states federal judges are seeing state-sponsored "cruel and unusual punishment" in prisons lacking basketball courts, weight rooms, televisions, workshops, or single-occupancy cells.

Under the guise of constitutional jurisprudence, the federal judiciary has aggressively replaced the criminal-justice policies of the fifty states with its own. Groups like the ACLU's National Prison Project argue that states must treat prisoners much as they do citizens at large. Federal judges have agreed; and in their pursuit to elevate the legal status of prisoners to that of law-abiding people, they have removed the concept of prison as punishment, and with it much of the deterrent effect of imprisonment.

Of course, prisoners have been quick to adopt this distorted view of their moral and legal status. An Illinois inmate demanded the right to use his cell as his place of residence for conducting drug-related activities. A Nevada inmate sued for the right to cross-dress, and 14 death-row inmates in California sued for the right to procreate through artificial insemination. Florida's Robert Procup sued when he got just one bread roll on his dinner plate, and sued again when prison officials failed to provide him a salad at lunch. When told by ABC's John Stossel that he was, after all, being punished, Procup replied, "Nobody sentenced me to punishment. They sentenced me to be separated from society"--a recurring theme of the prisoners'-rights movement. Procup was convicted of murder for cementing his business partner into a storage shed.

While federal judges see such decisions as principled constitutionalism, most prisoners see them as a weakness that demands to be exploited. Art Hartsock, the prisoner who won for himself and other inmates at Anamosa State Prison the right to view pornographic magazines, is now preparing for another suit. His reasoning: "Every dollar they spend fighting a lawsuit is a dollar they can't spend building a place to lock me up."

At age 15 Willie Bosket killed two New York subway riders "for the experience." He has also tried to kill two prison guards, which is why prison officials chain him to his cell door for five minutes each day before moving him. Of the chaining Bosket says, "I feel several things. I feel humiliated. I feel an affront to my dignity. I feel vulnerable." A federal court afforded him a jury trial to decide whether he would continue to be chained. At his trial Bosket told jurors his only regret was that he had not killed the guard. He vowed to kill again.

Most criminals show a psychology of denial for their criminal actions. Nevada Deputy Attorney General Anne Cathcart says criminals "come into prison denying any wrongdoing, and they are constantly presented with further reasons to blame others. Unlimited access to federal courts gives them an added tool to vent their anger and rebel against the system."

This undermines rehabilitation efforts generally, as prisoners quickly learn that contempt for the system is rewarded. But the federal bench has even prohibited specific state rehabilitation

plans as violative of prisoners' rights. After Governor Gerald Baliles discovered in 1986 that 85 per cent of Virginia inmates were illiterate, he started a program that linked reading proficiency to early parole. The ACLU threatened suit, saying prisoners had a right to parole without literacy tests, so Baliles made the program voluntary and consequently much less successful. Governor Fife Symington thought pornography might not be healthy for Arizona inmates, many of whom are sex offenders, so he decided last January to prohibit all pornographic materials in the state's prisons. That sounded reasonable to Arizona citizens, but Federal Judge Muecke didn't agree; he has begun contempt hearings against the state.

Each to His Own Religion

FEDERAL encroachment took a dramatic leap forward last November when Congress passed the Religious Freedom Restoration Act. RFRA severely limits the power of government to restrict a prisoner's religious activities.

Before RFRA, a state could restrict certain practices in prison to maintain order. For instance, Illinois forbade inmates belonging to Aryan Nation's religious arm, the Church of Jesus Christ Christian, to distribute literature calling for the extermination of Jews and blacks. In 1992 they sued the state for the right to do so. Shortly after RFRA became law, they amended their complaint with newfound RFRA rights. Under this new standard Illionis will almost certainly lose. Susan O'Leary, deputy chief legal counsel for the state, predicts that this will incite riots in Illinois prisons, which have a 66 per cent black population.

In 1987, the followers of Yahweh Ben Yahweh and his "Temple of Love" demanded the right to distribute hate literature among inmates and lost in court. They are now suing again under RFRA and have already won at the district-court level. The Temple of Love, like Aryan Nation, is seeking attorney fees and monetary damages for religious rights denied them before RFRA even became law. These remedies do not take into account the costs to the states of hiring additional guards or building new cells to separate these inmates from others for their protection.

Even before RFRA, some federal courts were reluctant to define what constitutes a genuine religion. A federal court in 1974 declared The Church of the New Song a religion; this church requires Harvey's Bristol Cream, filet mignon, and marijuana for its religious ceremonies. In Indiana inmates calling themselves the Black Gangster Disciples are claiming a "new Muslim" status, even though prison officials believe their aim is to infiltrate their gang into the older Muslim group. In Colorado, inmate Robert Howard, a practicing Satanist, is suing for the right to religious materials including the Satanic Bible, passages of which command the sacrificing of a "preferably Christian" female virgin and the using of candles made from the fat of unbaptized babies. With RFRA, states will have little discretion in restricting so-called religious activities such as these in order to maintain security.

Religion-based demands for special diets are particularly costly to the states. Nevada Attorney General Frankie Sue del Papa says providing a special religious diet winds up adding 65 per cent to the total cost of imprisoning one inmate. California Attorney General Dan Lungren

estimates that if only 2 per cent of the national inmate population demands special religious diets, it will cost the states at least $177 million annually.

Even if a state ultimately wins such a case, its taxpayers still lose. Since RFRA allows a state to restrict a religious practice only in a way that is least burdensome to the prisoner, few courts will be able to dismiss frivolous claims on summary judgment. Evidentiary hearings, expert witnesses, and transportation of prisoners and state's witnesses to the hearings will be required to determine if the state is using a "least restrictive" penology. And since RFRA applies retroactively, cases already won by states will be relitigated.

According to a Senate staffer who worked to modify RFRA, "Congress imagined Baptist preachers holding Bible studies in prison. Who could be against that? They failed to realize it would be Satanists, white supremacists, and those wanting better lunches that would really take advantage of RFRA protections." Of course, the more reasonable inmate requests that RFRA was aimed at protecting, like Bible classes, were rarely denied. And now, since all "religions" will be entitled to equal treatment, states will be forced to eliminate legitimate religious programs in order to avoid suits by other "religious" groups demanding equal funding.

The Ignored Right

AS THE definition of prisoners' rights has mushroomed, basic constitutional rights like personal safety have actually diminished. Prisons have become more violent than ever before, and America's streets have become more dangerous, as federal judges force the early release of violent criminals to reduce "cruel and unusual" overcrowding.

Although the Supreme Court in Rhodes v. Chapman declared double bunking was not, per se, cruel and unusual, it reaffirmed the right of the federal judiciary to decide the constitutionality of state prison conditions by looking at the "totality of the circumstances." By the early 1980s the lower federal courts had begun to set prison population limits that forced the release of prisoners by the tens of thousands in the following years.

After a court in 1981 imposed a population cap in Texas prisons, the state parole board increased early releases by over 400 per cent, with inmates serving an average of 2 months for every year sentenced. This was followed by a 29 per cent surge of crime in Texas during the next decade, at a time when crime decreased nationally. The courts also mandated population reductions in county jails in Texas and across the country, forcing them to increase pre-trial releases. In Cook County, Illinois, almost 30,000 accused criminals are released before trial each year for this reason. Of that group, 67 per cent are rearrested on felony charges before their cases come to trial, over 25 per cent of them for violent crimes.

The personal tragedies this federal policy has created are reported with numbing frequency in the nation's newspapers. Last June, Loran Cole, like other "nonviolent" criminals, was released early from a Florida prison to alleviate overcrowding; he had served only 18 months of a 66-month sentence for grand theft. Eight months later Cole was charged with the murder of John

Edwards, an 18-year-old student at Florida State, and the kidnapping and rape of Edwards's sister. In Texas, Michael Blair served 18 months of a 10-year sentence for burglary and indecency with an 11-year-old girl (his actual crime, sexual assault, had been plea-bargained down). While still on parole in 1993, he raped and murdered 7-year-old Ashley Nicole Estell after kidnapping her from a park in an upscale Dallas community. Had he served even half his time, Blair would have been in prison on the day Ashley and her family went to the park. Kenneth McDuff was convicted and sentenced to death in 1968 for first-degree murder, for killing three teenagers execution style. McDuff's death sentence was commuted to life imprisonment when the Supreme Court outlawed capital punishment in 1972. This made him eligible for parole, which he got in 1989. Since then, he has been linked to the rape and murder of four women.

Just the threat of court-ordered releases has been enough to push state parole boards to release prisoners early. Between 1983 and 1993 the Georgia parole board released 36,006 violent and sex offenders--including 2,772 multiple sex offenders--after they had served an average of 36 per cent of their sentences. In 1989, Governor Joe Frank Harris released 13,000 "nonviolent" prisoners under an emergency program to reduce prison populations when inmates threatened federal lawsuits. Since then the Georgia parole board has accelerated thousands of paroles. Although the parole board insists the released prisoners were "nonviolent," Clayton County Superior Court Judge Kenneth Kilpatrick says the early release of even nonviolent felons increases both nonviolent and violent crime, because short imprisonment suggests to criminals that any crime brings light punishment.

According to Department of Justice statistics, three-fourths of all violent criminals convicted in 1989 were back on the streets by December of 1993. Safe Streets Alliance President James Wootton [see sidebar, page 41] points out that 3.2 million criminals are out on parole or probation. Even modest early releases have been devastating. A study in Illinois in the early 1980s found that 21,000 prisoners released just 3 months early committed 23 homicides, 32 rapes, 262 arsons, 681 robberies, 2,472 burglaries, and 2,572 assaults during that 3-month period. Nationally, almost one-third of all violent crimes are committed by criminals on parole or pre-trial release. The federal courts have no apparent concern for the victims, however, but focus exclusively on the injustices they perceive as being committed against prisoners.

A Return to Sanity

ALTHOUGH Congress is now posturing as the field marshal in the war on crime, it has done little to halt federal judicial intervention, and has actively undermined state criminal justice through legislation like RFRA. Congressmen Charles Canady (R., Fla.), Preston Geren (D., Tex.), and others are pushing for amendments to the 1994 crime bill that would prevent federal judges from using one prisoner's suit to take over administration of an entire prison, would prohibit federally imposed population caps, and would impose fees on prisoners filing suit. Many states are considering reforms of their own, such as delaying parole for prisoners who filed fraudulent or malicious suits, and are urging Congress to pass legislation requiring that all state grievance procedures be exhausted before a federal suit can be filed.

These proposals, however, will not substantially reduce existing caseloads, since inmates have little incentive not to sue as long as the federal courts waive most court fees for inmates and continue to entertain frivolous suits. These solutions will fail because they ultimately rely on the discretion of federal judges, who are not accountable to the states or their citizens for their actions and who reveal an outright contempt for self-governance.

If Congress wants to make a meaningful contribution to criminal-justice reform, it should dramatically limit federal-court jurisdiction over state prison administration. Article III of the Constitution gives Congress this power. If senators and congressmen refuse to use it, they should be held accountable by the voters for the foolish decisions of the federal judiciary in releasing criminals to rape and murder a second, third, and fourth time.

But there is no indication that Congress is willing to do so; therefore the states themselves will need to take matters into their own hands. They may be forced to confront Washington, as Governor Symington is doing in defying the federal court order that allows pornography in Arizona's prisons.

Governors like Symington, Mike Leavitt of Utah, and George Allen of Virginia, and hundreds of other state and local law-enforcement officials, see the current fight over control of state prisons as a small part of a larger problem. The federal judiciary's activism stems from an abstract theory of individual rights that disregards the rights of the community. Deliberately detached from the effects of their decisions on society, federal judges have acted as if they intended to strip communities of any power to defend themselves.

As recently elected Virginia Attorney General James Gilmore has said, it is the states' responsibility to make streets "as safe for our children as it was for us when we were growing up." The success of that agenda will be determined in large measure by the power of the states to free themselves from Washington's control.

Creating the Revolving Door

AS THE House and Senate meet in conference to reach a compromise on the Crime Bill, they are focusing on the two most widely debated provisions of the House version: the ban on various assault weapons and the Racial Justice Act, which allows the use of racial statistics to overturn deathpenalty cases.

Less noticed but potentially far more significant is the Hughes Amendment, which could seriously affect the ability of state law-enforcement officials to reduce crime. Offered by New Jersey Congressman William Hughes, the provision puts state corrections under the virtual control of bureaucrats at the Justice Department and discourages states from keeping violent criminals behind bars.

In order to receive federal funds under Hughes, states must create an "integrated approach" to corrections that maintains an "appropriate" balance between the traditional imprisonment of convicted criminals and more modern rehabilitation programs that allow criminals earlier

access to society. Of course the "appropriate" nature of the balance will be decided by the U.S. attorney general, who has sole discretion to deny funds to any state not meeting the new correctional standards.

The Hughes approach has been hard for state and local law-enforcement officials to swallow, as they are already seeing one-third of all crimes in their jurisdictions committed by criminals out on parole or probation, thanks to encroachment into state prison administration by the federal courts. Hughes would give the Justice Department a baseball bat to wield against states that choose to reduce crime by insulating society from convicted criminals. Advocates of the bill say there is no bat, because the program is purely voluntary--the states can opt out of federal funds if they choose. But this is not politically realistic, with the crime wave straining most state and local law-enforcement budgets.

The $3 to $13 billion in funds available to the states can be leveraged by the Justice Department to guarantee dramatic results. In 1974 Senator Birch Bayh believed juvenile criminals should not be punished for most crimes, and proposed a bill, which passed, that withheld funds from states that did not agree. Despite objections from juvenile-court judges, district attorneys, and police, juvenile justice systems were completely restructured in all fifty states, even when sometimes as little as $200,000 in federal funds was at stake. The result was a dramatic increase in crime by violent repeat juvenile offenders. Almost all the recent Florida tourist killings, and the murder of Michael Jordan's father, were committed by violent repeat juvenile offenders freed under systems created on the Bayh model, at a time when Congress, just as now, vowed to "get tough on crime."

After a decade-long debate over root causes and rehabilitation, one hard fact remains: criminals cannot commit crimes if they are in prison. The numbers are clear. If states or localities reduce the number of violent criminals on parole, crime statistics drop. In Houston's 6th district, constable Victor Trevino and his volunteer "Zebra" squad have rounded up over three thousand violent criminals on parole since 1991; over that same period, crimes committed by that group of criminals had dropped 60 per cent. Last year overall crime in their precinct dropped 10 per cent, while Houston overall experienced a 20 per cent increase. Governors like California's Pete Wilson and Virginia's George Allen are trying to emulate states like Utah, that have tough parole policies, and relatively low crime rates. But Hughes will change all that.

COPYRIGHT 1994 National Review, Inc.
COPYRIGHT 2004 Gale Group

# EXHIBIT C

# 8

FEATURES:
# Bail, Humbug!

By Sarah B. Vandenbraak

*Why Criminals Would Rather Be in Philadelphia*

Francis A. Biunno, a Philadelphia trial judge, had just sentenced a murderer to death. He then turned to the courtroo and asked the public to reflect on the breakdown of our democratic system that had led to the killing.

The murder in question was of a 21-year-old rookie police officer, Daniel Boyle, who stopped a stolen car in North Pl car, Edward Bracey, fired numerous shots through the windshield of the patrol car, hitting the young officer in the he; captured the fatal shots and the fallen officer's final words. A few days later Danny's father, veteran Philadelphia poli only son.

This tragedy didn't have to happen. Philadelphia police, Judge Biunno said, had previously arrested Bracey for car tl without bail or supervision under terms of an order issued by a federal court. Twice Bracey had failed to show up for justice when he killed Officer Boyle. This killing wouldn't have taken place, Biunno suggested, if the federal court had

Criticism of a federal court on the part of a local trial judge is highly unusual. But Biunno's statement reflected the an Philadelphia harbor toward a federal order that has wreaked havoc on their city's criminal-justice system. The court c cap on the number of inmates in Philadelphia prisons, and it sharply restricts the ability of judges to imprison defend;

Last year, the city's judges were forced to release defendants in 15,000 cases. Thanks to the court order, the city no defendants who have been charged with a crime but do not even bother to show up for trial. Philadelphia police arre: again, only to see them immediately released. In the nine years since the order was approved by Judge Norma Sha| defendants released under federal court order have gone on to commit tens of thousands of crimes—including thous murder, rape, and robbery.

The federal court's order is technically called a "consent decree," because it was agreed to by a previous mayor of P consent of the governed. Philadelphia's elected leaders, including its present mayor, its district attorney, and most of the consent decree but powerless to overturn it. Philadelphia may be the home of the Liberty Bell, but the federal co the principles expressed in the Declaration of Independence and the Constitution. The Philadelphia prisons, which h sentenced prisoners, have been the subject of various class-action lawsuits since 1972. Past conditions in the prisor years, many experts have observed inadequate medical care that has led to the death of inmates, unsanitary food pr poor plumbing, ventilation, and heating.

In 1986, these conditions prompted inmates at an old, decrepit facility called Holmesburg Prison to file a lawsuit agai mayor decided to settle the case rather than go to trial. The resulting federal consent decree, agreed to by Goode's l medical care or other conditions in the city's prisons. Rather, it sought to limit the number of prisoners, and, more im defendants accused of broad categories of crime. The architects of the plan apparently presumed that reducing the i prison environment for the remaining inmates.

Instead of individualized bail review, with Philadelphia judges considering a criminal defendant's dangerousness to o decree requires a "charge-based" system of prison admissions. Suspects charged with so-called "non-violent" crime robbery with a baseball bat, burglary, drug dealing, vehicular homicide, manslaughter, terroristic threats, and gun ch; detention.

In determining pretrial detention, Philadelphia judges can no longer consider a defendant's prior record, his history o health history, his ties to the community, or his drug or alcohol dependency. These factors become completely irrele loaded Uzi and a plane ticket out of the country cannot be detained before trial in Philadelphia.

As a result of this system, Philadelphia has become an especially attractive location for drug dealing. Narcotics agen routinely apprehend (and are forced to release) drug couriers, who have been assured that carrying over $100,000 c

One newly arrested drug dealer, knowing that he would be released in a matter of hours, cheerfully gave his pretrial where he could be reached——in Cali, Colombia.

Another drug dealer, Walter Lewis, unwittingly schooled undercover narcotics officers on the benefits of dealing drug awaiting trial in Philadelphia for drug dealing but had already been released because of the federal consent decree. neighboring Montgomery County arranged a narcotics deal on City Line Avenue, the street dividing Montgomery Cou arrived, he tried to convince the undercover officers to move the drug deal to the Philadelphia side of the street. He c be sent to jail if they stayed in Montgomery County. After the officers refused to move, Lewis mistakenly let greed gu officers immediately arrested him, and he went straight to jail, where he remained until trial. If the deal had occurred released in a matter of hours.

The consent decree has crippled Philadelphia's already struggling criminal-justice system. Once criminals knew that no matter how many times they failed to appear for court, Philadelphia began recording unprecedented fugitive rates Goldkamp and Kay Harris, nationally recognized experts on the bail process, found, for example, that 76 percent of : fugitives within 90 days of their arrest. Nationally, only 26 percent of drug dealers become fugitives within one year o percent of Philadelphia defendants charged with aggravated assault—a crime not subject to the release provisions o appear for court.

The skyrocketing fugitive rate has produced a system with more defendants in fugitive status than awaiting trial. In th new bench warrants (the arrest document issued when a criminal defendant does not appear for a court hearing) we under the federal consent decrees, representing 74 percent of all the bench warrants issued during this period. Unde fugitives in Philadelphia has nearly tripled from 18,000 to almost 50,000, equivalent to a year's worth of criminal pros consent decree, state courts are powerless to compel a defendant's appearance in court.

Unfortunately for Philadelphians, the defendants released because of the consent decree do not lay low—they just k 18-month period (1993 and the first six months of 1994), Philadelphia police rearrested 9,732 defendants released b defendants were charged with 79 murders, 959 robberies, 2,215 drug dealing crimes, 701 burglaries, 2,748 thefts, 9 assaults, 264 gun-law violations, and 127 drunk-driving incidents.

These crimes cannot all be attributed to the federal consent decree; some defendants would have been released un But apparently half or more of these crimes could have been prevented. Goldkamp and Harris found that pretrial det decree committed crimes at more than twice the rate of defendants released under state-court bail programs. Within federally released defendants were rearrested for new crimes, compared with an 8 percent rearrest figure for compa

Retailers complain of a sharp increase in shoplifting and robberies by criminals immune from incarceration. In April, the fifth time in 1995 because of the Philadelphia prison cap. In the last six months, Philadelphia police have arreste once for robbing a pharmacy with a starter pistol while threatening to kill the victims, and once for drug dealing. Pem seven times and, as of this writing, is a fugitive on three of his cases. Philadelphia's criminal-justice system just keep and over again, but can't do anything until they commit a crime so serious that the consent decree finally permits the

The consent decree also weakens the effectiveness of programs for criminal defendants who never would have beer are no longer allowed to sanction those criminal defendants who violate conditions of bail, fail to appear for trial, or c programs have atrophied into virtual non-existence. Conditional-release programs providing drug treatment, aimed a recently acquired lives of drugs and crime, are forced to wait for offenders to become serious criminals with a long-te

The case of Frederick Hightower vividly demonstrates the absurdity of the consent decree. Hightower was a trained family who became addicted to crack at age 29. He quickly turned to burglaries.

Given Hightower's age, lack of prior criminal-justice contacts, and long-term ties to the community, the local court sy pretrial detention process) probably would have released him without bail for his first two burglaries. But by the time the local judge would have suspected a drug problem, sent him to jail, and permitted his conditional release (again w into an in-patient drug treatment program. If this had worked (admittedly an optimistic outlook) and he had remained prime candidate for a sentence of probation with the condition of continued drug treatment.

But the federal consent decree wouldn't allow the local criminal-justice system to operate. Without the threat of pretri enter a drug treatment program. Philadelphia wasn't permitted to keep Hightower in jail until he was finally arrested f

was no longer a candidate for probation. Instead he received a 10-year maximum sentence, and must serve a minim
is eligible for parole.

The cost of this folly: numerous crime victims with substantial financial losses (and he surely wasn't caught every tim
(a few years, at a cost of approximately $25,000 a year, instead of a few days); increased court costs (each one of h
witnesses, prosecutors, defense lawyers, and court personnel), less chance of drug rehabilitation (the treatment can
tax revenues (Hightower was a skilled, employed taxpayer).

The Philadelphia Federal Courthouse overlooks Independence Hall, the cradle of American liberty and the Constituti
court's consent decree tramples on the right of Philadelphians to a democratic political system.

Mayor Ed Rendell and District Attorney Lynne Abraham, both elected Democrats, won office pledging to do what the
prisoner-release provisions of the consent decree. Philadelphia's top leaders, including most of the city council, are u
court's rules on pretrial release of defendants are a serious threat to public safety, effectively decriminalizing propert
the financial viability of the city. But the federal court has rejected all challenges to the consent decree, and shows no
the issue. Philadelphia's elected leaders are powerless to change agreements made by a prior administration, and se
justice priorities.

Our democratic system presumes that policies made by today's elected leaders, whether by legislation, regulation, o
their successors in office. Through periodic elections, the public can throw out arrogant public officials who try to insu
change or from the will of the electorate. Philadelphians do not consent to the consent decree that is destroying their
Philadelphia's elected leaders be allowed to do the job for which they were elected. Isn't that what America's indepen

Copyright © 2007 by the Board of Trustees of Leland Stanford Junior University
Phone: 650-723-1754