1    PRISON LAW OFFICE
     DONALD SPECTER, Bar No. 83925
2    STEVEN FAMA, Bar No. 99461
     ALISON HARDY, Bar No. 135966
3    SARA NORMAN, Bar No. 189536
     REBEKAH EVENSON, Bar No. 207825
4    1917 Fifth Street
     Berkeley, CA 94710
5    Telephone: (510) 280-2621

6    K & L GATES LLP
     JEFFREY L. BORNSTEIN, Bar No. 99358
7    EDWARD P. SANGSTER, Bar No. 121041
     RAYMOND E. LOUGHREY, Bar No. 194363
8    55 Second Street, Suite 1700
     San Francisco, CA 94105-3493
9    Telephone: (415) 882-8200

10   THE LEGAL AID SOCIETY -
     EMPLOYMENT LAW CENTER
11   CLAUDIA CENTER, Bar No. 158255
     600 Harrison Street, Suite 120
12   San Francisco, CA 94107
     Telephone: (415) 864-8848

13

14   Attorneys for Plaintiffs

     ROSEN BIEN & GALVAN, LLP
     MICHAEL W. BIEN, Bar No. 96891
     JANE E. KAHN, Bar No. 112239
     AMY WHELAN, Bar No. 215675
     MARIA V. MORRIS, Bar No. 223903
     LISA ELLS, Bar No. 243657
     315 Montgomery Street, 10th Floor
     San Francisco, CA 94104
     Telephone: (415) 433-6830

     BINGHAM, McCUTCHEN, LLP
     WARREN E. GEORGE, Bar No. 53588
     Three Embarcadero Center
     San Francisco, CA 94111
     Telephone: (415) 393-2000

15    IN THE UNITED STATES DISTRICT COURTS

16    FOR THE EASTERN DISTRICT OF CALIFORNIA

17    AND THE NORTHERN DISTRICT OF CALIFORNIA

18    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

19    RALPH COLEMAN, et al.,
                  Plaintiffs,

20                vs.

21    ARNOLD SCHWARZENEGGER, et al.,

22                Defendants

23

24    MARCIANO PLATA, et al.,
                  Plaintiffs,

25                vs.

26    ARNOLD SCHWARZENEGGER, et al.,
                  Defendants

27

28

No. Civ S 90-0520 LKK-JFM P

**THREE-JUDGE COURT**

No. C01-1351 TEH

**THREE-JUDGE COURT**

**DECLARATION OF STEVEN FAMA IN SUPPORT OF PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 9**

I, Steven Fama, declare:

1. I am a member of the Bar of this Court and an attorney at the Prison Law Office, one of the counsel of record for the Plaintiff classes. I have personal knowledge of the matters set forth herein and if called as a witness I could competently so testify. I make this declaration in support of Plaintiffs' Opposition to Defendants' Motions in Limine Number 9.

2. Attached hereto as Exhibit A is a true and correct copy of relevant excerpts of the final transcript of the December 10, 2007 deposition of Ronald Shansky, M.D.

3. Attached hereto as Exhibit B is a true and correct copy of relevant excerpts of the final transcript of the December 18, 2007 deposition of Jeanne Woodford.

4. Attached hereto as Exhibit C is a true and correct copy of relevant excerpts of the final transcript of the September 15, 2008 deposition of Jeanne Woodford.

5. Attached hereto as Exhibit D is a true and correct copy of relevant excerpts of the final transcript of the October 1, 2008 deposition of Doyle Wayne Scott.

6. Attached hereto as Exhibit E is a true and correct copy of relevant excerpts of the final transcript of the December 11, 2007 deposition of Pablo Stewart, M.D.

7. Attached hereto as Exhibit F is a true and correct copy of relevant excerpts of the final transcript of the September 18, 2008 deposition of Pablo Stewart, M.D.

8. Attached hereto as Exhibit G is a true and correct copy of relevant excerpts of the final transcript of the September 16, 2008 deposition of Joseph Lehman.

9. Attached hereto as Exhibit H is a true and correct copy of relevant excerpts of the final transcript of the October 4, 2008 deposition of Ronald Shansky, M.D.

10. Attached hereto as Exhibit I is a true and correct copy of relevant excerpts of the final transcript of the December 14, 2007 deposition of Doyle Wayne Scott.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct, and that this declaration is executed on this 30th day of October

1  30, 2008 in Berkely, California.

2

3                                                     /s/ Steven Fama

4                                                     _____
                                                      Steven Fama
5                                                     Attorney for Plaintiffs

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT A

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | NO. 2:90-cv-00520 LKK JFM P |
| ) | |
| ARNOLD SCHWARZENEGGER, ) | |
| et al., ) | |
| ) | |
| Defendants. ) | |
| _____ ) | |
| MARCIANO PLATA, et al., ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| vs. ) | |
| ) | |
| ARNOLD SCHWARZENEGGER, ) | *Certified Copy* |
| et al., ) | |
| ) | |
| Defendants. ) | |

---o0o---

DEPOSITION OF RONALD M. SHANSKY, M.D.

Monday, December 10, 2007

---O0O---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

1       A.    Not that I recall.  In part because I didn't

2    know what there was other than what I could get through

3    their discussions with me in terms of things that would

4    address the issue.

5       Q.    Did plaintiffs' counsel suggest that you

6    review the receiver's reports?

7       A.    Yes.

8       Q.    And did they suggest that you review all of

9    the documents that you reviewed in preparation for

10   coming to your opinions in this case?

11      A.    Yes.

12      Q.    Did you conduct any of your own research

13   outside of the review of those documents and your

14   inspections of the facilities regarding the issues in

15   this case?

16      A.    No research, no.

17      Q.    Did you obtain any other documents, other than

18   the documents that plaintiffs' counsel provided you, in

19   order to reach your opinions in this case?

20      A.    Not that I recall.

21      Q.    Did you prepare any draft reports prior to

22   your report which was submitted on or about

23   November 9th, 2007?

24      A.    Not really.  The process was I went -- there

25   were a series of repeats, I went through the documents

DEPOSITION OF RONALD M. SHANSKY, M.D.           48

1    and my site visit, I first of all identified key areas

2    of problems in which I felt overcrowding was an issue.

3    I then discussed with them my understanding of where

4    documentation regarding these issues from the materials

5    I had could be found.  And then out of that they put

6    together a draft which I reviewed on the computer and we

7    kind of went back and forth in terms of developing

8    something that I -- for which I was comfortable with all

9    that was said.

10        Q.   Did you keep copies of those earlier drafts of

11   the -- well, strike that.

12             Did you keep a copy of the original draft

13   report that was prepared by the PLO and provided to you?

14        A.   The original -- I didn't have a copy, I had

15   the computer.  It was on a -- what do they call that? --

16   an internet -- there was some way of accessing it like

17   through a law firm web space or something.  But you

18   would know this better than me.  But something like

19   that, that's how I was reviewing it.

20        Q.   So you reviewed it online somehow?

21        A.   Yes.

22        Q.   You never had a hard copy of it?

23        A.   Correct.

24        Q.   Do you know approximately when you reviewed

25   the first draft of the report on the website for lack of

DEPOSITION OF RONALD M. SHANSKY, M.D.          49

1   don't believe that particular question is answerable.

2      Q.   Again I'm not very smart.  What do you mean by

3   that particular question isn't answerable?

4      A.   The question is what is the most important

5   original contributing factor to the current

6   unconstitutionality?  One would have to get into

7   metaphysical guesstimating to get into a heavy

8   description of that and I felt that wouldn't be useful

9   here.

10      Q.   And I'm not going to ask you to either,

11   Dr. Shansky.  Probably because I couldn't keep up.

12      So ultimately the definition of primary cause

13   that you've articulated today is the one that is used in

14   the report that was drafted by you and the PLO?

15      A.   Yes.  Hopefully that's clear from it.  But I'm

16   not an objective reader so --

17      Q.   During the course of your drafting -- or

18   strike that.

19      During the course of your engagement as an

20   expert in this case have the attorneys from the Prison

21   Law Office asked you to change your opinion in any way?

22      A.   No.  I think they know that would be wasting

23   their time.

24      Q.   And I just have to do this so I'm just going

25   to go through the list.

1    A.    Yes.

2    Q.    Have any of the attorneys for the Prison Law

3    Office asked you to modify your opinion in any way?

4    A.    No.

5    Q.    And you wouldn't?

6    A.    No.   You get what you get when you hire me and

7    you may like it and you may not like it but that's what

8    it is.

9    Q.    I'm going to direct you to page 51 of your

10   report, paragraph 139.  The last sentence reads, "In

11   order to develop and implement a constitutionally

12   adequate healthcare system in a reasonable time frame

13   and avoid further unnecessary suffering and death,

14   California must reduce and stabilize the prison

15   population."  Do you see that?

16   A.    Yes.

17   Q.    What do you mean by "a reasonable time frame"?

18   A.    A reasonable time frame is one in which the

19   receiver, A, makes timely decisions to use the authority

20   and, B, the implementation occurs at a pace which is

21   understandable given the difficulties and the multiple

22   factors involved in implementing complex human service

23   programs.

24   Q.    Is there some time period that would

25   constitute a reasonable time frame in your mind?

1          STATE OF CALIFORNIA   )   ss.

2              I, the undersigned, a Certified Shorthand

3     Reporter of the State of California, hereby certify that

4     the witness in the foregoing deposition was by me duly

5     sworn to testify to the truth, the whole truth, and

6     nothing but the truth in the within-entitled cause; the

7     said deposition was taken at the time and place therein

8     stated; that the testimony of said witness was reported

9     by me, a Certified Shorthand Reporter and a

10    disinterested person, and was thereafter transcribed

11    under my direction into typewriting; that the foregoing

12    is a full, complete and true record of said testimony;

13    and that the witness was given an opportunity to read

14    and, if necessary, correct said deposition and to

15    subscribe the same.

16             I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, nor in any way

19    interested in the outcome of the cause named in said

20    action.

21             IN WITNESS WHEREOF, I have hereunto set my

22    hand this 11th day of December, 2007.

23

24                              _____
                                CERTIFIED SHORTHAND REPORTER
25

# EXHIBIT B

00001

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,        )
                              )
            Plaintiffs,       )
                              )
      vs.                     )  NO. 2:90-cv-00520 LKK JFM P
                              )
ARNOLD SCHWARZENEGGER, et     )
al.,                          )
                              )
            Defendants.       )
_____)
MARCIANO PLATA, et al.,       )
                              )
            Plaintiffs,       )
                              )
      vs.                     )
                              )
ARNOLD SCHWARZENEGGER, et     )
al.,                          )
                              )
_____Defendants._____)

---o0o---

DEPOSITION OF JEANNE S. WOODFORD
Tuesday, December 18, 2007
---o0o---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

00046

1   there, either.

2        Q.   Did you provide either a handwritten or draft

3   copy of your report to the Prison Law Office?

4        A.   No, I did not.

5        Q.   Did the Prison Law Office provide either a

6   handwritten or written or electronic copy of your report

7   to you?

8        A.   I was interviewed.  I mean, I sat down and had

9   an interview.

10            MR. SPECTER:  He just asked you about whether

11  we provided you an electronic copy, which to you meaning

12  her possession?

13            MR. MELLO:  Let me just ask the question again

14  and I'll try to be clear.

15       Q.   Was the first draft of your expert report

16  provided to you either in handwriting, in a hard paper

17  copy or electronically by the Prison Law Office?

18       A.   It was provided to me electronically.

19       Q.   And do you believe that first draft of your

20  expert report is being produced today?

21       A.   Well, I don't know that -- it wasn't really a

22  draft.  I'm not a computer person so it was, as I

23  understand it, a web based, so sent to me web based and

24  I may have to ask Don how this worked.  I didn't receive

25  a draft, per se.

00047

1     Q.   The first time you saw the writing, the words,

2   which ultimately was your report was by way of the

3   internet?

4     A.   I accessed it using the internet, yes.

5     Q.   And just so I'm clear, you didn't actually

6   type up the first draft of your expert report, correct?

7     A.   No, I did not.

8     Q.   That's correct?

9     A.   That's correct.

10    Q.   And the first draft of your report was

11  available via the internet, correct?

12    A.   Via a program utilizing the internet.

13    Q.   And I believe -- did you provide any

14  handwritten notes or writings to the Prison Law Office

15  or to any of the plaintiffs' counsel prior to the

16  drafting of your first report?

17    A.   Oh, yes, actually I did provide some typed

18  notes, that's correct.  I recall that now.

19    Q.   Did you produce those typed notes that you

20  provided to the Prison Law Office today?

21    A.   Yes.

22         MR. MELLO:  I have in front of me five pages

23  of typed up notes and the title on the first page is

24  Conversations with the Governor.  I'm going to ask that

25  this portion of the documents that you produced today be

00050

1    out?

2        A.    I'm not sure.

3        Q.    Did you print it out?

4        A.    No.

5        Q.    Did you make any notes in writing while you

6    were reviewing this initial draft report?

7        A.    I made -- no, I did not.

8        Q.    As you reviewed this first draft report did

9    you speak to anybody at that time right then and there

10   as you were looking at it about proposed changes or

11   revisions to the report?

12       A.    I -- well, I didn't speak to anybody about

13   proposed changes.  I did have my husband help me make

14   changes on the computer.

15       Q.    So you accessed the document and actually made

16   changes to it?

17       A.    Yes.

18       Q.    And, as you sit here today, can you tell me

19   the difference between the first draft report that you

20   saw on the internet and the final draft that you signed

21   on or about November 9th, 2007?  Do you know what

22   changes you made with the help of your husband who is

23   apparently more computer savvy?

24       A.    Right.  That was his help.  Generally I do

25   know but not specific word changes.

00053

1       Q.    Okay.  On how many occasions were you

2    interviewed by Mr. Specter or any plaintiffs' attorney

3    prior to the drafting of the report?

4       A.    I believe only one.

5       Q.    And, again, that was the one interview with

6    Mr. Specter alone that you described earlier?

7       A.    Yes, that's correct.

8       Q.    When I say, "described," I'm overstating

9    what's been testifying to so let me ask you this.  How

10   long was that interview?

11      A.    I believe it was about an hour.

12      Q.    Did you take any notes during that interview?

13      A.    I don't think I did, no.

14      Q.    Did Mr. Specter take any notes during that

15   interview?

16      A.    I don't remember.

17      Q.    And during that interview or at any time were

18   you asked to change any of your opinions in this case?

19      A.    No, I was not.

20      Q.    If I asked you to change your opinion in this

21   case, would that help?

22      A.    No, it wouldn't.

23      Q.    Are there any additional documents that you

24   plan to review prior to the new Phase I trial whenever

25   that may be?

1              STATE OF CALIFORNIA    )    ss.

2         I, the undersigned, a Certified Shorthand

3  Reporter of the State of California, hereby certify that

4  the witness in the foregoing deposition was by me duly

5  sworn to testify to the truth, the whole truth, and

6  nothing but the truth in the within-entitled cause; the

7  said deposition was taken at the time and place therein

8  stated; that the testimony of said witness was reported

9  by me, a Certified Shorthand Reporter and a

10 disinterested person, and was thereafter transcribed

11 under my direction into typewriting; that the foregoing

12 is a full, complete and true record of said testimony;

13 and that the witness was given an opportunity to read

14 and, if necessary, correct said deposition and to

15 subscribe the same.

16         I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any way

19 interested in the outcome of the cause named in said

20 action.

21         IN WITNESS WHEREOF, I have hereunto set my

22 hand this _3rd_ day of _January_, 2007.

23

24                              _____
                               CERTIFIED SHORTHAND REPORTER

25

EXHIBIT C

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE TO
PURSUANT SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

    vs.                    CASE NO. 2:90-cv-00520
                                LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

                        THREE-JUDGE COURT

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA, et al.,

        Plaintiffs,

    vs.                    CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JEANNE WOODFORD

SEPTEMBER 15, 2008
10:00 a.m.

425 Market Street, 25th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

```
 1   BY MR. MELLO:
 2       Q    Okay.  Take a look at the document and tell me
 3   when you're prepared to answer questions about it.
 4            How's that, Don?  Still not good enough, I'm
 5   sure.
 6            MR. SPECTER:  Well, I don't know what you want
 7   her to do, but ...
 8            MR. MELLO:  I'll send her to specific places
 9   in the document.
10            THE WITNESS:  I was just going to ask that.
11            MR. SPECTER:  Are you going to ask her whether
12   that's her report, and then you can ask her questions --
13            MR. MELLO:  Right.
14            MR. SPECTER:  -- about it.
15            THE WITNESS:  Okay.
16   BY MR. MELLO:
17       Q    Okay.  Does this appear to be a true and
18   correct copy of your supplemental expert report in this
19   case from August of 2008?
20       A    Yes.
21       Q    Okay.  On the last page ...
22       A    Mm-hm.
23       Q    Page -- or second-to-the-last page, page 15,
24   does that appear to be a copy of your signature?
25       A    Yes.
```

22

1      Q    So you believe you signed this report?

2      A    I do believe I signed this report.

3      Q    How, if at all, did you determine what

4  documents to review in preparing your supplemental

5  report?

6      A    I spent quite a bit of time with Don Specter,

7  and in our conversations, determined what I should

8  review.

9      Q    Did you specifically say, "I want to see any

10  particular documents" before preparing your supplemental

11  report?

12     A    I -- I don't know that I used that

13  terminology.  We talked about my need to review the

14  Receiver's plan and some other documents, yes.

15     Q    So you specifically remember requesting to

16  review the Receiver's plan; is that correct?

17     A    Yes, I remember a discussion about that, yes.

18     Q    Okay, and which plan are you talking about?

19     A    Where's the list of documents?

20          MR. SPECTER:  At the end.

21          THE WITNESS:  I want to make sure I --

22          MR. MELLO:  Yes.

23          THE WITNESS:  -- call it the right name.

24     Q    Yeah.  It's page 16.

25     A    Federal Receiver's Turnaround Plan of Action.

 1      A    No, I did not.

 2      Q    Did you type out what has been marked as

 3   Exhibit 2?

 4      A    No, I did not.

 5      Q    Did you dictate Exhibit 2 into a dictaphone or

 6   some other machine?

 7      A    No, I did not.

 8      Q    Did you dictate Exhibit 2 to Mr. Specter?

 9      A    Well, I don't know that I would use the word

10   dictate, but we certainly had lots of conversations

11   about what I would want to put into my supplemental

12   report based on my observations in touring the prisons

13   and based on what I had read.

14      Q    Did you dictate your supplemental report to

15   anybody else at the Prison Law Office, like Miss Norman

16   or somebody else?

17      A    I did not dictate it, but I had conversations

18   with Miss Norman about what I wanted to see in the

19   supplemental report.

20      Q    Okay.  And can you tell me what you told

21   Miss Norman about what you wanted to see in the

22   supplemental report?

23      A    Well, I talked about what I had -- my

24   observations of the different prisons, what I saw in

25   terms of the overcrowded situations in each of the

28

1    prisons.  I talked about it -- at -- probably have to go

2    through this, like, paragraph by paragraph to -- to

3    answer your question fully.  But I talked about examples

4    of issues like at Soledad, when we were in Central,

5    seeing inmates who had canes, trying to maneuver the

6    stairs to get to their second-floor cells.

7         I talked about the case I saw at Corcoran with

8    the inmate in the standalone SHU unit, who appeared to

9    be having some distress.  What else did I talk about?  I

10   talked about the 114A's and -- and the lack of

11   documentation about inmate participation.  What else?

12        I know that I had a conversation with her

13   about Soledad CTF, in particular in discussing North,

14   CTF North, and at North, while they had managed to get

15   better control of the inmates since I had last been

16   there making observation, that they had to do that by

17   keeping more inmates in their cell for longer periods of

18   time, which is, while it's safer for the inmates to be

19   out, it was causing much more in-cell time, and they

20   were barely getting more time out of their cell than

21   inmates in SHU or AdSeg.  SHU is S-H-U, and AdSeg is

22   administrative segregation.  The -- about idleness of

23   inmates, that there was very little going on for inmates

24   at -- at CTF North and even at South.

25        At Corcoran, I made observations about the

1    cleanliness of the units, because it was -- the --

2    Corcoran was much cleaner than it had been in the past,

3    but at the same time, it was really clear that they were

4    struggling to comply with the provisions of providing

5    health care to those inmates there. Talked about --

6    there's different terms used for this, but chronic care

7    inmates at Corcoran. The -- they used to call them

8    boarders. There's different names that have been given

9    to them, that there still wasn't a plan for how to

10   address that population, that they were still being held

11   within the medical facility there but without a program.

12   There was no program designed for those individuals. I

13   talked about -- what else did I talk about?

14        Q    I see you reviewing to your -- reviewing

15   your -- or referring to your supplemental report. Is

16   that refreshing your recollection with respect to what

17   you discussed with Miss Norman?

18        A    Yes. When I'm -- I mean, I'm not reading it

19   word for word, but seeing keywords reminds me to talk

20   about something that I saw or observed while on my

21   tours.

22        Q    Okay. I didn't mean to cut you off, if you

23   want to continue you can, or I can try to speed it up.

24   It's up to you.

25        A    It's really up to you.

1    Done by researchers throughout the United States.

2        Q    You testified that you had numerous

3    discussion -- strike that.

4            You testified that you had discussions with

5    Mr. Specter and Miss Norman regarding the drafting of

6    your report, correct?

7        A    Yes, uh-huh.

8        Q    Did Ms. Norman or Mr. Specter ask you to

9    change any of your opinions in this case?

10       A    No, they did not.

11       Q    Did Ms. Norman or Mr. Specter provide for you

12   the first draft of your report, written draft of your

13   report?

14       A    Yes.

15       Q    Did you suggest any changes to the first draft

16   of your written report?

17       A    Yes.

18       Q    Do you recall the changes that you requested

19   in the first draft of your written report?

20       A    I -- I probably will not remember them all.  I

21   asked -- I do recall describing -- asking that the -- my

22   description of what was happening at CTF Central be

23   included in the report, the inmates having difficulty

24   going up the graded staircases.  Let's see, what else?

25   The example of the correctional officer talking about

1    the unclassified inmates being in the dorm, I added that

2    in.   Or -- or made a little -- it was in there, but I

3    made a little change as to the wording of that.

4         Q    Do you recall the change?

5         A    Do you remember what paragraph that is?

6         Q    I don't.  I'm sorry.  I'm not finding it.

7    Sorry.

8         A    Okay.  I must have went past it.  I must be

9    tired because I'm not finding it.

10        Q    Okay.  It's all right.  Do you recall any

11   other specific changes that you requested in the report?

12        A    The only other one that's coming to mind is

13   the cleanliness of Lancaster.  I added some comments

14   about that because I really did find the prison to be

15   very, very dirty.

16        Q    Okay.  Did you print out a copy of -- or

17   strike that.

18             How did you receive a copy of the first draft

19   of your report?

20        A    It was Web-based so that it comes up on the

21   screen, and you make your changes.

22        Q    Okay.  And will you please provide me your

23   password?  No, never mind.

24             Was that an RBG Web base -- you would go to

25   the Rosen Bien Web site?  You can answer.

1          A     I don't know.

2          Q     Okay.  But you would go on -- would you type

3     your changes, actually, into the document?

4          A     Yes, uh-huh.

5          Q     Okay. But you did not do the initial draft of

6     typing up your report, correct?

7          A     No, I did not do my initial draft of typing up

8     the report.

9          Q     That was provided to you on the Web-based

10    system, correct?

11         A     It was provided to me on the Web-based system,

12    but it did reflect what I wanted in the report, yes.

13         Q     Of course.

14               Why don't we take a two-minute break.  Let me

15    check a couple things.

16                         (Break taken)

17            (The deposition concluded at 12:59 p.m.)

18

19                              *  *  *

20

21

22

23

24

25

119

1          REPORTER'S CERTIFICATION

2

3          I, Quyen N. Do, Certified Shorthand Reporter, in

4     and for the State of California, do hereby certify:

5

6          That the foregoing witness was by me duly sworn;

7     that the deposition was then taken before me at the time

8     and place herein set forth; that the testimony and

9     proceedings were reported stenographically by me and

10    later transcribed into typewriting under my direction;

11    that the foregoing is a true record of the testimony and

12    proceedings taken at that time.

13          IN WITNESS WHEREOF, I have subscribed my name

14    this 22nd day of September 2008.

15

16

17          |s|  _Quyen N. Do_____

            Quyen N. Do, RPR, CSR No. 12447

18

19

20

21

22

23

24

25

Telephone: 415.591.3333
Facsimile: 415.591.3335

PAULSON
REPORTING & LITIGATION SERVICES, LLC

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

www.paulsonreporting.com

# EXHIBIT D

                    UNITED STATES DISTRICT COURT
              FOR THE EASTERN DISTRICT OF CALIFORNIA
                AND THE NORTHERN DISTRICT OF CALIFORNIA
            UNITED STATES DISTRICT COURT COMPOSED OF THREE
         PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

          Plaintiffs,

       vs.                    CASE NO. 2:90-cv-00520
                                   LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,
                              THREE-JUDGE COURT
          Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,


          Plaintiffs,

       vs.                    CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

          Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


                         DEPOSITION OF

                      DOYLE WAYNE SCOTT

                       OCTOBER 1, 2008

                         10:12 a.m.



                 425 Market Street, 26th Floor

                  San Francisco, California



        Reported by Quyen N. Do, RPR, CSR No. 12447

dc646be9-bdf5-4703-a99e-aee7ff94875b

1        Q    All right.  I might ask you about preparation

2    of your supplemental report first.  Who did you speak

3    with in connection with preparing your supplemental

4    report?

5        A    Sara Norman.

6        Q    All right.  Did you speak with any of the

7    other experts disclosed by Plaintiffs?

8        A    No.

9        Q    Did you review any of the other expert reports

10   reviewed by Plaintiffs -- or, I'm sorry, submitted by

11   Plaintiffs in this case?

12       A    I -- I don't believe I did prior to my

13   supplemental report.

14       Q    All right.  So you drafted the supplemental

15   report exclusive of reviewing any of their reports?

16       A    I don't believe I did.

17       Q    Have you --

18            MS. NORMAN:  I'm sorry.  For clarification,

19   are you talking about the supplemental reports of the

20   other experts or are you talking about --

21            MR. LEWIS:  Thank, you.  That's a good point.

22       Q    (By Mr. Lewis)  In your instance, you

23   reviewed -- or you've prepared a first report, and

24   you've prepared a supplemental report.

25       A    Correct.

1      Q    Sara.  And then did you look it over and make

2  changes to it from that basis?

3      A    I did.

4.     Q    Did Plaintiffs' counsel, maybe, ask you to

5  change any of your opinions or modify any of your

6  opinions as your supplemental report was being

7  developed?

8      A    No.

9      Q    I notice that you brought these documents or

10  that your counsel handed me an identifying stack of

11  documents that Plaintiffs' counsel gave to Miss Norman.

12  Are there any other documents that you reviewed aside

13  from materials that have already been produced and these

14  in preparation for today's deposition?

15      A    I don't believe so.

16      Q    And then other than these documents right

17  here, would there be any other documents that you would

18  want to give me that you may have in your possession

19  that you brought with you today?

20      A    No.

21      Q    Okay.  Are there any other materials that you

22  plan to review before trial?

23      A    Well, if there are updated quarterly

24  Receiver's reports, I will probably look at those.  If

25  there are any updated expert reports, I will probably

1    look at those.

2        Q    And are there any other, I guess, persons,

3    experts, people that you plan to interview before

4    testifying at trial in this matter?

5        A    Not at this time.

6        Q    Okay.  Do you plan to further supplement your

7    report in writing before trial?

8        A    Not at this time.

9        Q    All right.  I am now going to ask the reporter

10    to mark Exhibit 1.  It is the supplemental report that

11    you produced --

12        A    Okay.

13        Q    -- in August of 2008.

14                (Exhibit 1 marked)

15    BY MR. LEWIS:

16        Q    All right.  Sir, take a minute, if you could,

17    to look at that and just make sure it's a true and

18    correct copy of what you think you produced.

19        A    Yes.

20        Q    All right, so that looks like an accurate

21    copy --

22        A    Yes.

23        Q    -- of what you produced?  Good.

24        A    It does.

25        Q    Does this supplemental report contain all of

dc646be9-bdf5-4703-a99e-aee7ff94875b

1   your written opinions that you have formed since

2   releasing your initial report back in, say, September of

3   2007?

4       A    Yes.

5       Q    In your opinion, what are the specific

6   deficiencies in the delivery of medical care at

7   California prisons that currently arise from -- that are

8   currently the result, I'm sorry, of the care being

9   inadequate?

10      A    What you say --

11      Q    You want me to restate the question?

12      A    Please.

13      Q    All right.  What are the specific deficiencies

14  in the delivery of medical care at California prisons

15  that currently result in care being inadequate?

16      A    Well, first, I looked -- I didn't look at the

17  quality of care.  That was the other experts'.  They

18  were charged with that.  I looked at the operational

19  issues that impact the delivery of -- of the medical

20  care, and I -- I would be happy to discuss that with

21  you, if that's what you want.

22      Q    So then your focus is on how operational

23  aspects may affect the delivery of medical care?

24      A    Yes.

25      Q    I understanded, from reviewing your CV, that

108

REPORTER'S CERTIFICATION

1

2

3        I, Quyen N. Do, Certified Shorthand Reporter, in

4    and for the State of California, do hereby certify:

5

6        That the foregoing witness was by me duly sworn;

7    that the deposition was then taken before me at the time

8    and place herein set forth; that the testimony and

9    proceedings were reported stenographically by me and

10   later transcribed into typewriting under my direction;

11   that the foregoing is a true record of the testimony and

12   proceedings taken at that time.

13        IN WITNESS WHEREOF, I have subscribed my name

14   this 7th day of October 2008.

15

16        |S|

17        _____

         Quyen N. Do, RPR, CSR No. 12447

18

19

20

21

22

23

24

25

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT E

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

      Plaintiffs,

vs.                                    CIV S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

      Defendants.

_____/

MARCIANO PLATA, et al.,

      Plaintiffs,

vs.                                    No. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

      Defendants.

_____/


Deposition of

PABLO STEWART, M.D.

Tuesday, December 11, 2007


Reported by:

SHARON CABELLO, RPR

CSR No. 3080

Job No. 58268

Esquire Deposition Services

520 Capitol Mall, Ste. 250, Sacramento, CA  95814 916-448-0505

f080ab1a-924c-4ab1-917f-1bf9dae05662

1    report?

2    A.       Yes.

3    Q.       Who helped you?

4    A.       Mr. Nolan.

5    Q.       Who did the first draft?

6    A.       Well, by that question you are implying that

7    there's a second draft or a third draft.  There was one

8    working document that was created in a variety of ways,

9    by my dictating, by my discussion with Mr. -- dictating

10   to Mr. Nolan, by my discussion with Mr. Nolan.  And

11   then Mr. Nolan prepared certain sections of it which I

12   reviewed.

13   Q.       Can you tell me which sections of the report

14   were prepared by Mr. Nolan and approved by you?

15   A.       Well, the entire report was approved by me.

16   The entire report was -- prepared is not right --

17   formatted, constructed in the computers at Mr. Nolan's

18   law firm.

19   Q.       Let me put it another way.  Formatted to me

20   means putting in Roman Numerals and numbers next to

21   paragraphs, and making left or right justifications,

22   that kind of thing, all the things I am really bad at

23   doing with computers.

24            The actual substance, the actual wording of

25   the report, was that done by you?  Did you create each

f080ab1a-924c-4ab1-917f-1bf9dae05662

1    and every sentence in this report?

2    A.        In conjunction with Mr. Nolan.

3    Q.        Do you have within your computer or other hard

4    copy files or digital files any earlier working copies

5    of this document?

6    A.        No.

7    Q.        So as you were working on this document with

8    Mr. Nolan did you maintain any particular sections of

9    this document in a separate file on your computer?

10   A.        No.

11   Q.        So you continually updated this document as

12   you worked on it?

13   A.        Yes.

14   Q.        Did you keep any particular notes of your

15   work?

16   A.        No.

17   Q.        No handwritten notes?

18   A.        No handwritten notes.

19   Q.        When you took the tours of the facilities did

20   you take notes?

21   A.        I didn't take notes.

22   Q.        Did you make notes after you returned to your

23   hotel that night?

24   A.        After the tours is when Mr. Nolan had his

25   laptop and I was dictating to him about my observations

f080ab1a-924c-4ab1-917f-1bf9dae05662

1    of the tours.

2    Q.        After you dictated, let's say that evening,

3    did you review what you dictated that evening?

4    A.        No.

5    Q.        Do you have your own laptop?

6    A.        I do have my own laptop.

7    Q.        Did you take it with you on the tours?

8    A.        No.

9    Q.        Did you leave it in your hotel room?

10   A.        I didn't use my laptop at all in the

11   preparation of this document -- well, except in the

12   larger sense where I was given emails of some of the

13   attachments we have already talked about.  But my

14   laptop doesn't contain any drafts or sections of this

15   report.

16   Q.        Do you have any disk containing earlier drafts

17   of this report or any section of this report?

18   A.        No.

19   Q.        Aside from talking with Mr. Nolan, did you

20   talk with anyone else about this report as it was being

21   prepared?

22   A.        My work was limited to speaking with

23   Mr. Nolan.

24   Q.        Your report talks about overcrowding.  Can you

25   tell me what is your definition of overcrowding?

f080ab1a-924c-4ab1-917f-1bf9dae05662

REPORTER'S CERTIFICATE

I certify that the witness in the foregoing
deposition was by me duly sworn to testify in the
within-entitled cause; that said deposition was taken
at the time and place therein named; that the testimony
of said witness was reported by me, a duly Certified
Shorthand Reporter of the State of California
authorized to administer oaths and affirmations, and
said testimony was thereafter transcribed into
typewriting.

I further certify that I am not of counsel or
attorney for either or any of the parties to said
deposition, nor in any way interested in the outcome of
the cause named in said deposition.

IN WITNESS WHEREOF, I have hereunto set my hand
this 13th day of December, 2007.

SHARON CABELLO
Certified Shorthand Reporter
State of California
Certificate No. 3080

127

# EXHIBIT F

Page 128

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

U.S. DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284 TITLE 28 U.S. CODE


RALPH COLEMAN, et al.,

        Plaintiffs,

    vs.               No. CIV S 90-0520
                        LKK-JFMP
ARNOLD SCHWARZENEGGER, et al.,

        Defendants.
_____/

MARCIANO PLATA, et al.,

        Plaintiff,
    vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.
_____/


Deposition of

PABLO STEWART, M.D.

Volume 2, Pages 128 through 298

September 18, 2008


Reported by:
CARRIE PEDERSON
CSR No. 4373, RPR, RMR, CRR
Job No. 60864

381fa0ea-faa5-4de1-bde1-684e94dcff10

1    answer it because I can't understand his report.

2         MS. WHELAN:  I can state my objection,

3    and then he can answer.

4         MS. TILLMAN:  If you can state it without

5    coaching your witness, that would be extremely

6    helpful.

7         MS. WHELAN:  So I object to the extent

8    that his report speaks for itself.

9         THE WITNESS:  I don't have an independent

10   memory of that bed plan or any opinions that are

11   based on that as we sit right here.

12   BY MS. TILLMAN:

13        Q  Did you write your report?

14        A  Yes.

15        Q  When did you write your report?

16        A  In the weeks after the tour.

17        Q  And did you work with anybody in writing

18   that report?

19        A  I worked with Ms. Whelan.

20        Q  And did you use her computer in writing

21   that report?

22        A  Yes.

23        Q  Did you use your own computer in writing

24   that report?

25        A  I used my computer in that I had a

381fa0ea-faa5-4de1-bde1-684e94dcff10

Coleman-Plata v. Schwarzenegger

Page 178

1       A   No.

2       Q   Did you have -- let me strike that.

3           While you were writing this report, did

4   you send the latest version of the report to

5   plaintiff counsel so that she would be aware that

6   you had just updated or added information to that

7   report?

8       A   I did not send the report anywhere.  It

9   was held, if you will, in the computer system at

10  Ms. Whelan's law firm.

11      Q   Uh-huh.  Did you receive any specific

12  instructions from Ms. Whelan or any other member

13  of the Rosen, Bien & Galvan law firm in regards

14  to the information to be placed in that report

15  while it was being prepared?

16      A   I was not told what to put in the report.

17      Q   Are you aware of what information, if

18  any, was placed in the report by any member of

19  the Rosen, Bien & Galvan firm as it was being

20  prepared?

21      A   The firm formatted it for me.  All the

22  information put in here was either put in

23  directly by myself, I dictated it to Ms. Whelan,

24  or certain references to other documents that

25  were put in here, I reviewed personally.

381fa0ea-faa5-4de1-bde1-684e94dcff10

1      Q   To the extent that the report references
2   joint plaintiffs' trial exhibits with specific
3   numbers, did you put that information in there?
4      A   No.
5      Q   To the extent the information contains
6   information that was dictated by you, was that
7   the information that was dictated at the time of
8   the tour?
9      A   It was information that was dictated at
10  the time of the tour as well as information that
11  I dictated sitting in Ms. Whelan's office.
12     Q   Are you saying, then, that there were
13  times during the preparation of this document
14  that you went to Ms. Whelan's office and dictated
15  what should be in the report?
16     A   Yes.
17     Q   And how often did that occur?
18     A   That occurred maybe three times over the
19  course of a couple weeks.
20     MS. WHELAN:   I'm just going to object as
21  vague and ambiguous about whether you mean the
22  dictation or coming to the firm.
23  BY MS. TILLMAN:
24     Q   Dictated.  Does that change your answer?
25     A   No.

Coleman-Plata v. Schwarzenegger

Page 180

1        Q   Aside from the references to the

2    plaintiffs' trial exhibits in that report, can

3    you specifically identify what information was

4    placed in that report by persons other than

5    yourself?

6            MS. WHELAN:  Object.  Lacks foundation.

7            THE WITNESS:  What do you mean,

8    "particularly"?

9    BY MS. TILLMAN:

10       Q   Can you delineate for me which part of

11   that report was written by you and which part was

12   not written by you?

13       A   Physically typed in by me or dictated by

14   me?

15       Q   Yes.

16       A   The entire report was -- is a product of

17   my work.  As you said, these references to

18   certain documents, I didn't put them in.  They

19   were put in by whoever formatted the report.  But

20   the entire report is my work.

21           MS. WHELAN:  Lisa, if we could just think

22   about a break sometime soon, I think we've

23   probably been going --

24           MS. TILLMAN:  Sure.  I'll ask Chad to

25   help me out with that because I don't have my

381fa0ea-faa5-4de1-bde1-684e94dcff10

```
 1              REPORTER'S CERTIFICATE
 2          I certify that the witness in the
 3    foregoing deposition,
 4              PABLO STEWART, M.D.,
 5    was by me duly sworn to testify in the
 6    within-entitled cause; that said deposition was
 7    taken at the time and place therein named; that
 8    the testimony of said witness was reported by me,
 9    a duly Certified Shorthand Reporter of the State
10    of California authorized to administer oaths and
11    affirmations, and said testimony was thereafter
12    transcribed into typewriting.
13          I further certify that I am not of
14    counsel or attorney for either or any of the
15    parties to said deposition nor in any way
16    interested in the outcome of the cause named in
17    said deposition.
18          IN WITNESS WHEREOF, I have hereunto set
19    my hand this 21st day of September, 2008.
20
21
22
23                    CARRIE PEDERSON
                      Certified Shorthand Reporter
24                    State of California
25                    Certificate No. 4373
```

298

# EXHIBIT G

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.

                          CASE NO. 2:90-cv-00520
                                 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,
      THREE-JUDGE COURT

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,

    Plaintiffs,

vs.

                          CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

    Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOSEPH DENNIS LEHMAN

SEPTEMBER 16, 2008
10:05 p.m.

425 Market Street, 26th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

P A U L S O N
REPORTING & LITIGATION SERVICES
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

1   state of Washington relative to reducing or changing the

2   criteria which people went to prison.

3   BY MS. JOHNSON:

4        Q    Well, if you look at page 2 of your report, in

5   paragraph 5, you identify a few topics that Plaintiffs'

6   counsel asked you opine on.  And what I'm asking you is,

7   when they first contacted you about retaining you, did

8   they tell you what they wanted you to opine on?  How did

9   these topics you identify develop?

10            MR. SPECTER:  Okay, those are multiple

11   questions.  It's compound, so --

12            MS. JOHNSON:  Okay, well, we'll take it one at

13   a time.  I was trying to give him an example because he

14   didn't seem to understand what I was getting at.

15            THE WITNESS:  The --

16            MR. SPECTER:  Wait.  Wait, wait.  Let her --

17            MS. JOHNSON:  We'll take it one at a time.

18            MR. SPECTER:  -- ask her question.

19   BY MS. JOHNSON:

20        Q    So --

21        A    Okay.

22        Q    -- when Plaintiffs' counsel first contacted

23   you, what did they define as your task?

24            MR. SPECTER:  That lacks foundation.

25            THE WITNESS:  The question was my

1    understanding of what the conditions in California

2    system were.  The -- certainly, the conversation led to

3    the issue of the overriding effect of overcrowding, and

4    subsequently its impact on programming within the

5    field's -- the prison system.

6    BY MS. JOHNSON:

7        Q    Okay, so if you look at -- who was the person

8    who first contacted you from Plaintiffs' counsel?

9        A    I believe it was Don Specter.

10       Q    If you look at paragraph 5 on page 2 ...

11       A    Mm-hm.

12       Q    When did it become clear to you that the

13   topics identified in paragraph 5 were the topics that

14   you were to opine on?

15       A    In my -- my first conversations with him.

16       Q    Who prepared the first draft of this report?

17       A    I had conversations with Don Specter.  We had

18   a conversation about my perceptions of the system, and

19   he drafted the report, and then, over the course of

20   several conversations, telephone conversations, the --

21   the final draft was created.

22       Q    He must have sent you a first draft at some

23   point, right?

24       A    Electronically.

25                (Sotto voce discussion had between

1       Q    -- is that correct?

2            How was it communicated to you that you were

3  to access the draft through the Internet?

4       A    I believe Don and I don't know if one of his

5  staff or not, but I know that Don and I talked about how

6  to access it.

7       Q    So that wasn't done through e-mail either?

8       A    No, it was not.

9       Q    And the comments you made on the draft to Don,

10  were -- you never made written comments?

11      A    No, I did not.

12      Q    Do you know what, if anything, you asked Don

13  to change in the report that ultimately got produced?

14      A    I -- I know I -- we talked a little bit about

15  the overriding effects of overcrowding.  I know that I

16  had a conversation about the difficulty of timely access

17  when there wasn't sufficient custody staff.  In -- I

18  commented specifically about the -- my perceptions in

19  the inadequacy of the classification process and its

20  effects, particularly in regard to that.

21      Q    Anything else?

22      A    I -- I believe that's the main discussions.

23      Q    Had you served as an expert in any type of

24  lawsuit before being retained by Plaintiffs' counsel in

25  this proceeding?

1      A    No.

2      Q    Whose decision was it that you weren't going

3 to prepare your own report but that Plaintiffs' counsel

4 was going to initially draft it for you?

5      A    I was working.  I asked Don to do that based

6 on our initial conversation.

7      Q    Did Plaintiffs' counsel just remind you of

8 that fact in your conversation outside or --

9      A    No, he did not.

10     Q    Other than Don Specter, who did you speak to

11 in connection with preparing your report?

12     A    I do not believe I talked to anybody about

13 preparing the report.  I -- I think I had conversations

14 about when to connect with Don from his staff.

15     Q    I wasn't specifically asking about

16 conversations with someone to prepare the report.  I was

17 asking about in connection with the report; did you

18 speak with anyone else?

19     A    I believe I talked to somebody in the office

20 about arranging the telephone call.

21     Q    Arranging a telephone call with Mr. Specter?

22     A    Yes.

23     Q    Okay, did you talk to -- for example, you

24 mentioned that you read the expert report of James

25 Austin.

1   report online, the first time you viewed it?

2       A    I don't think it was -- I don't think it was

3   that long time.  I can't remember how long, though.

4       Q    Okay.

5       A    Matter of days.

6       Q    And, after you first viewed it online, you

7   then had subsequent conversations with Mr. Specter about

8   the report?

9       A    That's correct.

10      Q    And were there edits made to that report based

11  on those conversations?

12      A    There were -- yes.

13      Q    Were there --

14      A    I don't know if you call them edits, but, I

15  mean, they're -- based on our conversations, there were

16  changes made.

17      Q    Okay.  So was the version of the report that

18  you first saw online pretty different from the version

19  of the report that we have before us today?

20      A    In substance it was -- it was based on my

21  conversation with him.  In substance, it was accurate.

22  I added things, as I indicated in previous testimony,

23  what we added.

24      Q    Okay.  Okay, that's all the questions I had

25  about that.

160

## REPORTER'S CERTIFICATION

I, Quyen N. Do, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 23rd day of September 2008.

[S]

_Quyen N. Do_

Quyen N. Do, RPR, CSR No. 12447

**PAULSON**

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT H

Page 1

        IN THE UNITED STATES DISTRICT COURTS

      FOR THE EASTERN DISTRICT OF CALIFORNIA

      AND THE NORTHERN DISTRICT OF CALIFORNIA

   UNITED STATES DISTRICT COURT COMPOSED OF THREE

         JUDGES PURSUANT TO SECTION 2284,

           TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,    No. Civ S 90-0520 LKK-JFM P

      vs.

ARNOLD SCHWARZENEGGER,

et al.,

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA,
et al.,
        Plaintiffs,   No. CO1-1351 TEII
      vs.
ARNOLD SCHWARZENEGGER,
et al.,
        Deposition of RONALD MARK SHANSKY, M.D.,
called for examination, taken pursuant to notice,
agreement and by the provisions of the Rules of

Civil Procedure for the United States District
Courts pertaining to the taking of depositions,
taken before PATRICIA A. ARMSTRONG, a Notary

Public within and for the County of DuPage, State
of Illinois, and a Certified Shorthand Reporter,
No. 084-1766, of said state, taken at Courtyard
Marriott, 6520 South Cicero Avenue, Chicago,
Illinois, on the 4th day of October, 2008 at
9:00 a.m.

Page 95

1    with a depopulation strategy for a significant

2    number of the prisons, 2012 was not an unrealistic

3    target.

4          Q.    And how many prisons would that be

5    with an unknown population reduction?

6          MS. HARDY:   Objection; calls for

7    speculation.

8    BY MR. MELLO:

9          Q.    And I only say "unknown," because you

10   didn't provide me one and --

11         A.    I didn't, but I did say significant,

12   I did say significant.

13         Q.    Right.

14         A.    I mean, it is speculative, but I

15   would say more than 10 percent of their prisons.

16         Q.    Dr. Shansky, what has been marked

17   as -- what exhibit is this, 2 what?

18         A.    2-C.

19         Q.    2-C.   Did you type up 2-C?

20         A.    No.

21         Q.    Did you dictate 2-C?

22         A.    No.

23         Q.    Did you handwrite 2-C?

24         A.    No.

25         Q.    Who prepared the first draft of that

1    report?

2         A.    Well, the way we did it was we had a

3    meeting, an all-day meeting the day after my

4    tours.  And I summarized the relevant findings and

5    the relevant areas that I wanted to talk about in

6    my report, and went over some of the data that I

7    had.  And then had the lawyers for the Prison Law

8    Office research within those areas relevant

9    information.

10             I then reviewed on the computer, and

11   then we had multiple discussions of changes,

12   additions that I felt were important until there

13   was a final version.

14        Q.    How long after your tours did that

15   all-day meeting occur?

16        A.    The next day.

17        Q.    And who was at that all-day meeting?

18        A.    Alison, Steve and Don was in for at

19   least part of it.

20        MS. HARDY:  It was a great week, Paul.

21        MR. MELLO:  I am sure.

22        THE WITNESS:  And I had the red eye that

23   night.

24        MR. MELLO:  Oh, boy.

25   BY MR. MELLO:

1    Q.    Now, what type of relevant

2  information did the Prison Law Office fill into

3  your report?

4    A.    From some of the documents, the

5  staffing information, from some of the Receiver's

6  documents, Receiver's statements related to the

7  areas that I wanted to talk about, those kinds of

8  things.

9    Q.    So when the report cites to specific

10 statements of the Receiver in reports, et cetera,

11 was that information provided by the Prison Law

12 Office?

13   A.    Most of the specific quotes, yes.

14   Q.    You said you reviewed it on the

15 computer; correct?

16   A.    Yes.

17   Q.    And did you make changes directly

18 into the document?

19   A.    No, over the phone.

20   Q.    To whom?

21   A.    To Steve and Alison.

22   Q.    You didn't get Don to do any typing

23 for you?

24   A.    No.

25   MR. MELLO:    Let the record reflect to date

1    that I use the word "surprised," and every time I
2    do in a question, Don punches me in the nose.
3    BY MR. MELLO:

4        Q.    Can you recall any specific changes
5    you requested in the report?

6        A.    There were some word changes and then
7    there were a few content changes in terms of what
8    I felt best expressed my view of crowding as the
9    primary inhibitor, for want of a better word,
10    inhibitor to constitutionality.

11                I wanted to convey was that with the
12    current knowledge of unconstitutionality and the
13    plans of the Receiver and the Receiver's estimates
14    of accomplishing those plans, and given that
15    external things like population are beyond the
16    Receiver's direct control, that to not depopulate
17    as a strategy to more rapidly bring about
18    constitutionality, knowing that the timeline to
19    constitutionality would be extended could be
20    construed by the courts as deliberate
21    indifference.

22        Q.    So is your point that it will take
23    longer to get to constitutional levels without a
24    depopulation plan?

25        A.    Yes.

101

1   STATE OF ILLINOIS     )

2                         )

3   COUNTY OF DU PAGE     )

4              I, Patricia Ann Armstrong, a Notary

5   Public within and for the County of DuPage, State

6   of Illinois, and a Certified Shorthand Reporter of

7   said state, do hereby certify:

8              That previous to the commencement of

9   the examination of the witnesses, the witness was

10  duly sworn to testify the whole truth concerning

11  the matters herein;

12             That the foregoing deposition

13  transcript was reported stenographically by me,

14  was thereafter reduced to typewriting under my

15  personal direction and constitutes a true record

16  of the testimony given and the proceedings had;

17             That the said deposition was taken

18  before me at the time and place specified upon

19  written interrogatories;

20             That I am not a relative or employee

21  or attorney or counsel, nor a relative or employee

22  of such attorney or counsel for any of the parties

23  herein, nor interested directly or indirectly in

24  the outcome of this action.

25

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

Ronald Mark Shansky, M.D.                                October 4, 2008

102

1          IN WITNESS WHEREOF, I do hereunto set

2    my hand and affix my seal of office at Chicago,

3    Illinois, this 7th day of October, 2008.

4

5

6                    /s/ Patricia Ann Armstrong

7                    Notary Public, DuPage County,

8                    Illinois.

9                    My commission expires 03/23/09.

10

11   C.S.R. Certificate No. 84-1766.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT I

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, 28 UNITED STATES CODE

RALPH COLEMAN, et al.,          )
                                )
            Plaintiffs,          )
                                )
        vs.                      )  NO. 2:90-cv-00520 LKK JFM P
                                )
ARNOLD SCHWARZENEGGER, et       )
al.,                            )
                                )
            Defendants.          )
_____)
MARCIANO PLATA, et al.,          )
                                )
            Plaintiffs,          )
                                )
        vs.                      )
                                )
ARNOLD SCHWARZENEGGER, et       )
al.,                            )
                                )     *Certified Copy*
            Defendants.          )
_____)

---o0o---

DEPOSITION OF DOYLE W. SCOTT

Friday, December 14, 2007

---o0o---

REPORTED BY: KRISTIE L. HUBKA, CSR NO. 5974

PROFESSIONAL REPORTING SERVICES   (800) 261-4814

```
 1    records that gave the history of the offenders.
 2        Q.    Anything else you can think of that would be
 3    needed?
 4        A.    I probably will later on but those are the
 5    things that come to mind immediately.
 6        Q.    Okay.  Exhibit 1 is your report, correct?
 7        A.    Yes.
 8        Q.    When was the first time you saw the first
 9    draft of this report?
10        A.    Just a few days before it was completed.
11        Q.    Did you type up the first draft of your
12    report?
13        A.    No.
14        Q.    Did you provide notes or handwritten notes to
15    the Prison Law Office to draft the first -- strike that.
16             Did you provide any handwritten notes to the
17    Prison Law Office in order to provide you with the first
18    draft of the report?
19        A.    They took notes from my observations.  They
20    interviewed me and took notes from my observations.
21        Q.    When did they interview you?
22        A.    Actually we interviewed in between facilities
23    while it was fresh on everybody's mind.  Don would sit
24    in the back seat of the car and take notes as I gave him
25    my observations.
```

1      Q.   And you had a little bit of time between CIM

2  and Avenal?

3      A.   We did, in fact, yes.

4      Q.   As a matter of fact, you should get some kind

5  of award for that ride with Don and Steve, right?

6      A.   I kept him busy writing.

7          MS. NORMAN:  Objection.

8      Q   (By Mr. Mello) So they interviewed you as

9  you drove between CIM and Avenal, correct?

10     A.   It wasn't so much as an interview as I just

11  gave them my observations and they took notes.

12     Q.   And you then toured Avenal, correct?

13     A.   Yes.

14     Q.   And on the same day did you tour another

15  institution?

16     A.   Yes.

17     Q.   And was that Valley State?

18     A.   Correct.

19     Q.   And did you provide your observations to

20  Mr. Specter in the car between Avenal and Valley State

21  Prison for Women?

22     A.   I don't recall.  Sometime that day I did.  I

23  don't recall specifically when.

24     Q.   And then you went to Valley State, correct?

25     A.   Yes.

1    Q.    It's true that you did not draft the first

2    report, correct?

3    A.    No, I did not prepare the document.

4    Q.    Did you prepare any of the draft reports?  And

5    I see that there are several here which I'll ask you

6    about.

7    A.    I edited every line of the re- -- from the

8    first draft on and added my own verbiage in a number of

9    places.

10    Q.    You've reviewed a lot of information so far in

11    this case, correct?

12    A.    I have.

13    Q.    Do you plan on reviewing any other materials

14    prior to your testimony at the Phase I trial?

15    A.    It's possible if there's new reports issued

16    between now and then I might.

17    Q.    As you sit here, can you think of anything

18    specifically you will review prior to your trial

19    testimony?

20    A.    Not unless there's some new information that

21    comes forward.

22    Q.    Do you plan to interview or speak to anybody

23    else about this matter prior to the Phase I trial which

24    is in February?

25    A.    Other than my attorneys?

1          STATE OF CALIFORNIA   )   ss.

2              I, the undersigned, a Certified Shorthand

3    Reporter of the State of California, hereby certify that

4    the witness in the foregoing deposition was by me duly

5    sworn to testify to the truth, the whole truth, and

6    nothing but the truth in the within-entitled cause; the

7    said deposition was taken at the time and place therein

8    stated; that the testimony of said witness was reported

9    by me, a Certified Shorthand Reporter and a

10   disinterested person, and was thereafter transcribed

11   under my direction into typewriting; that the foregoing

12   is a full, complete and true record of said testimony;

13   and that the witness was given an opportunity to read

14   and, if necessary, correct said deposition and to

15   subscribe the same.

16             I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, nor in any way

19   interested in the outcome of the cause named in said

20   action.

21             IN WITNESS WHEREOF, I have hereunto set my

22   hand this 18th day of December, 2007.

23

24                        _____
                          CERTIFIED SHORTHAND REPORTER
25