1   ROD PACHECO
    District Attorney, County of Riverside
2   4075 Main Street, First Floor
    Riverside, California 92501
3   Telephone: (951) 863-8436
    Fax: (951) 955-0190
4   William E. Mitchell
    Assistant District Attorney
5   (CSB # 108483)

6   Attorneys for Intervenors
    ROD PACHECO, District Attorney, Riverside
7   BONNIE M. DUMANIS, District Attorney, San Diego
    TONY RACKAUCKAS, District Attorney, Orange
8   JAN SCULLY, District Attorney, Sacramento
    CHRISTIE STANLEY, District Attorney, Santa Barbara
9   MICHAEL A. RAMOS, District Attorney, San Bernardino
    ROBERT J. KOCHLY, District Attorney, Contra Costa
10  DAVID W. PAULSON, District Attorney, Solano
    GREGG COHEN, District Attorney, Tehama
11  TODD RIEBE, District Attorney, Amador
    BRADFORD R. FENOCCHIO, District Attorney, Placer
12  JOHN R. POYNER, District Attorney, Colusa
    MICHAEL RAMSEY, District Attorney, Butte
13  GERALD T. SHEA, District Attorney, San Luis Obispo
    EDWARD R. JAGELS, District Attorney, Kern
14  GREGORY TOTTEN, District Attorney, Ventura
    VERN PIERSON, District Attorney, El Dorado
15  CLIFFORD NEWELL, District Attorney, Nevada
    RONALD L. CALHOUN, District Attorney, Kings
16  DONALD SEGERSTROM, District Attorney, Tuolumne

17
    Attorneys for District Attorney Defendant Intervenors
18

19              IN THE UNITED STATES DISTRICT COURTS
        FOR THE EASTERN AND NORTHERN DISTRICTS OF CALIFORNIA
20      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
           PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
21

22                                          Case No: CIV S-90-0520 LKK JFM P
    RALPH COLEMAN, et al.,
23                                          **THREE-JUDGE COURT**
                Plaintiffs,
24      vs.

25  ARNOLD SCHWARZENEGGER, et al.,

26          Defendants.
                                            Case No.: C01-1351 TEH
27  MARCIANO PLATA, et al.,
                                            **THREE-JUDGE COURT**
28
                                    -1-

Declaration Of Bonnie Dumanis Submitted In Addition To Direct Testimony By District Attorney Defendant
Intervenors

|  |  |  |
|---|---|---|
| 1 | Plaintiffs, | DECLARATION OF SAN DIEGO COUNTY |
| 2 | vs. | DISTRICT ATTORNEY BONNIE DUMANIS SUBMITTED IN ADDITION TO DIRECT |
| 3 | ARNOLD SCHWARZENEGGER, et al., | TESTIMONY BY DISTRICT ATTORNEY DEFENDANT INTERVENORS |
| 4 | Defendants. | |

**DECLARATION OF BONNIE DUMANIS**

1.   I, Bonnie Dumanis, declare:

2.   I am the elected District Attorney of San Diego County.

3.   The elected District Attorneys of the counties of Riverside, Orange, Sacramento, San Bernardino, Santa Barbara, San Luis Obispo, Contra Costa, Solano, Tehama, Amador, Colusa, Placer, Butte, Kern, Ventura, El Dorado, Nevada, Tuolumne, and Kings have joined with me to intervene in these proceedings pursuant to 18 U.S.C. § 3626(a)(3)(F) to oppose any court-ordered release of prison inmates.

4.   At issue in these proceedings are allegations that the delivery of medical care to inmates with serious medical needs (*Plata* class plaintiffs) and the delivery of mental health care to inmates with serious mental disorders (*Coleman* class plaintiffs) are so inadequate that the constitutional rights of these inmates under the Eighth Amendment are being violated. While the District Attorney Intervenors recognize and acknowledge that the State of California has a legal obligation to establish and maintain a constitutional level of prison healthcare, a prisoner release order or prison population cap should not be imposed as a remedial measure to address the alleged constitutional inadequacies in this case.

5.   I received my Juris Doctorate from Western State University, College of Law, which is now Thomas Jefferson School of Law in 1976 and served as a prosecutor for 12 years under former District Attorney Ed Miller. During my tenure I handled many cases ranging from misdemeanors to possession of drugs, to serious and violent felony offenses. I appeared in court thousands of times and had occasion to evaluate the effect of rehabilitation programs and punishment on offenders of all types.

6.   From 1990-1994, I was a Juvenile Court Referee. During this period there were many rehabilitation programs both in California as well as in other states that could be utilized as an alternative to the California Youth Authority. As the primary goal of the juvenile justice system was rehabilitation, I often took advantage of these programs. While

-2-

assigned to the Juvenile Court, I had occasion to observe the effects of early intervention, rehabilitative efforts and punitive sanctions.

7.  I was elected to the Municipal Court in 1994. During this period I participated in the creation of one of the first Drug Courts in San Diego, which has since been recognized as a national model. Its success is largely attributable to the availability of graduated sanctions for program failure.

8.  In 1998, I was elected to the San Diego Superior Court. During my tenure on the bench, I assisted in the creation of the Domestic Violence Court, which has received statewide recognition. This program stresses accountability and treatment for batterers and has been proven to reduce recidivism among perpetrators.

9.  As Superior Court judge I had occasion to tour many state prisons, state hospitals and youth authority facilities and parole facilities in the community.

10. Since taking the office of District Attorney in January 2003, I have focused on crime prevention, reducing recidivism and helping victims, in addition to criminal prosecution. We have staff dedicated to public outreach and we routinely have public forums in the community to address issues relating to public safety.

11. I support many community and civic organizations. I am President of the California District Attorneys Association, I serve on the California State Bar Association Board of Governors, I am a Commissioner for California Peace Officers Standards and Training, I am a member of the San Diego County Police Chiefs and Sheriff's Association, I am past president of the Lawyers Club of San Diego, I have served on the Board of Directors of the San Diego Bar Association, and for two years I have served on the Judicial Nominees Evaluation Commission.

12. I have taught at the University of California Addiction Training Center at San Diego, the National Drug Court Institute, the National Judicial College, the California Judicial College, and the University of San Diego School of Law.

13. It is difficult to determine the actual impact of a prison cap or prison release order on the administration of criminal justice within the State and within County of San Diego without prior notice as to the specifics of any contemplated orders. Many different permutations of a prison release order are possible. There are many unintended consequences of each potential order; consequences that will have detrimental effects on public safety and the administration of justice.

-3-

14. There are sufficient less intrusive means other than a prison release order that have the potential to alleviate prison crowding while the prison healthcare delivery system is remediated through the efforts of the Court appointed Receiver. While there is no question that prison overcrowding exists, recent policy changes, legislative changes, and changes in attitudes have demonstrated the potential to lower state prison populations without a prison cap or prison release order. These changes will be less intrusive than a prisoner release order or population cap and they will involve far less adverse consequences on local communities and the administration of justice. They will, however, take time and funding to demonstrate results.

15. In CDCR's spring 2008 projections, there is already evidence that prison population is going down. In the past year there has been a 0.8 percent decrease in the adult institution population and an increase in discharges from parole. (16.4 percent) Factors that CDCR recognizes as being responsible for the population reduction include: lower admissions from court, lower returns to custody, and shorter sentences and lengths of stay. Additional factors may also result in a reduction of prison population.

16. Out of State Transfers

The transfer of prisoners out of state to Arizona, Oklahoma, Tennessee and Mississippi should be continued and expanded upon as a temporary safety valve while other measures that address recidivism are given time to demonstrate their effectiveness in reducing the prison population.

17. SB 618 (Re-Entry)

In 2005, the San Diego District Attorney's Office proposed legislation to allow cooperative efforts between CDCR, County Boards of Supervisors, law enforcement, probation, District Attorney's offices and defense attorneys to offer enhanced services to prisoners reentering the community after fulfilling their full prison terms. SB 618 was chaptered and San Diego was the first county in California to implement such a program. Our SB 618 program has shown all indications that it will be extremely successful in lowering recidivism rates among that group of offenders that have been identified by CDCR as having the highest recidivism rates – felons who commit nonviolent property crimes and drug offenses.

-4-

18.  <u>Community Protection Act</u>

Passed in1994, this legislation provides for enhanced probation services as an alternative provided to the court for those who have failed on traditional grants of probation. This potentially affords the defendant a last chance effort to rehabilitate before being sent to State Prison. The need for increased funding and/or state funding of probation departments has been repeatedly studied and recommended as an effective mechanism to reduce recidivism, promote rehabilitation and lower the number of defendants being sent to prison.

19.  AB 900 (Pending)

The District Attorney Intervenors continue to support the full implementation of AB900.

20.  There are three different rehabilitative programs that are legislatively mandated that divert offenders from prison and that have the potential, with increased state funding, to be more effective as rehabilitative tools and prison population reduction measures.

1.) Proposition 36: The Substance Abuse and Crime Prevention Act

Proposition 36 was passed in November 2000 and allows drug users to avoid incarceration upon treatment in designated programs. While this program was expected to reduce prison commitments for those in need of drug treatment, studies have demonstrated that the program is not as successful as Drug Court programs insofar as there is no custodial sanction for dropping out, failing tests, and lack of participation. The recidivism rate is still high; in fact it is higher than before the initiative passed. Nevertheless these programs divert otherwise prison eligible felons back onto the streets and into programs, albeit one of limited effectiveness.

2.) Drug Court:

This is another diversion program designed for drug users and addicts with graduated sanctions for failure to comply with the program. This is also designed to treat drug abuse, rehabilitate and reduce recidivism. As this voluntary program strikes at the root of the problem, it has proved to be successful.

3.) Mental Health Courts:

As part of the Legislature's recently passed authority for Intermediate Parole Sanctions, there is authority for a creating Mental Health Courts that are modeled after Drug Courts. This diversion program is designed to provide enhanced psychiatric treatment as an alternative to incarceration resulting in enhanced rehabilitation and reduced recidivism.

-5-

San Diego is currently in the process of evaluating the idea of a mental health court.

21. It is reasonable to anticipate that a prisoner release order could take the form of the early release of thousands of sentenced prisoners and a resulting cap on the overall prison population. Approximately 7.6 percent of prisoners at CDCR were committed from San Diego County. Assuming a statewide release of 30,000 prisoners, over 2,280 could be released to San Diego prior to the completion of their prison terms. Such an order would have adverse consequences for the local community, law enforcement and the criminal justice system.

22. If we were to transfer these inmates to local detention facilities to finish their terms, it would result in the release of defendants serving misdemeanor and felony-probation sentences and those accused of felony crimes that are awaiting trial. The alternative would be to release prisoners directly to the community with little or no supervision from an already overwhelmed parole department. Additionally, a prison population cap would quickly result in state prison bound jail inmates being held in county jails awaiting available prison space, causing further displacement and release of those inmates who belong in county jail. Our county jails could quickly become little more than holding cells for CDCR or mini-prisons.

23. I would expect crime to increase, especially property and theft offenses. Those who commit second-degree burglary, shop-lifting, auto theft, identity theft, drug sales, and other non-violent crimes would quickly learn that there was no room in the jail to hold them pending trial. The increased amount of crime would create a direct threat to public safety and put additional strains on local law enforcement. It would become more difficult to adjudicate cases as defendants who should have been held in custody awaiting trial fail to appear in court. Additional adverse consequences should be expected. The unavailability of local custody as an alternative to a state prison commitment could actually increase the number and length of prison commitments.

24. As a former superior court judge I am familiar with the conduct of the criminal justice system from the judicial perspective. I am familiar with sentencing rules, procedures and practices. I have placed defendants on probation, revoked grants of probation, and sentenced criminals to state prison. I am aware that a state prison commitment, where state prison is not mandated by law, is earned only after repeated failures on probation. It is not the consequence of first choice for most judges who have the alternative of

-6-

imposing grants of felony probation.

25. Grants of felony probation are only effective when there are incentives for compliance and consequences for non-compliance with the terms and conditions of probation. If state prison is not available as a consequence for non-compliance because of a prisoner release order or prison population cap, then probation becomes an ineffective tool for rehabilitation and punishment. Public safety would be put at risk by felons who are aware there are no risks of incarceration for violations of probation.

26. The criminal justice system devotes resources to drug programs such as Prop 36, drug court, and other treatment programs through probation. Drug court programs are effective because there are consequences of incarceration for failure to complete the program. Without those consequences fewer defendants will enroll in the programs and we will lose important tools for addressing addiction and associated criminal behavior.

27. Most convicted felons consider Prop 36, drug court or felony probation a more desirable outcome than a commitment to state prison. But if state prison is not a realistic alternative because of a prisoner release order then fewer convicted felons will opt for programs or probation, choosing instead to be sentenced to state prison knowing their commitment will be a turnaround or a paper commitment. Nor will local custody be an option because the local jails will be filled with state prisoners early-released and those who are state prison bound. The practical anticipated result is that there will be no incarceration for many who commit felony crimes.

28. When criminals realize the dynamics involved there will be no deterrent to much criminal behavior. The criminal justice system will be much less effective and public safety will be put at risk.

29. Prosecutors and possibly even judicial officers may compensate for early release by seeking and imposing harsher sentences that together with early release would result in a fair disposition of the case. There will likely be many more trials, putting increased burdens on the entire criminal justice system. Greater staffing will be required in the courts, the Public Defender's Office and the District Attorney's Office to handle the additional case load.

30. Alternatively, to provide incentive for the defendants to accept probation, courts may be tempted to delete custody conditions altogether, which may tend to eviscerate the notion

-7-

1    of punishment as a consequence of criminal conduct. Defendants who are not put in

2    custody for criminal conduct will not be deterred from committing crimes in the future.

3  31.  Because of the prisoner release order or population cap, many who are accused of felony

4    crimes will not be incarcerated while awaiting trial. With little ability to incarcerate

5    those awaiting trial, many victims of crimes will be put at risk. More restraining orders

     will be required in an attempt to protect victims and more law enforcement will be

6    needed to investigate violations of those orders.

7  32.  It is further anticipated that the resources of the prosecutor's office will be overwhelmed

8    as more cases go to trial. Resources devoted to programs aimed at reducing crime and/or

9    rehabilitation of criminal defendants will likely be diverted and public safety will be put

10    at risk as crime increases.

11  33.  Overwhelmed law enforcement will need to direct resources to increased street crimes

     and fewer resources will be available to conduct the investigations needed to solve crimes

12    and prepare cases for prosecution.

13  34.  To alleviate an already overburdened parole system, earned parole or summary parole has

14    been contemplated. This also would have a negative impact. Technical violations

15    including positive drug tests, failure to report and associating with known gang members

16    will not result in a return to custody. Effectively there would be no consequence.

17    Without the threat of incarceration as a deterrent, there is no incentive to comply with

     conditions of parole.

18  35.  The community would likely see an increase in crime as the defendant parolee's drug

19    problem is not addressed and he is ignoring parole conditions. This is a direct threat to

20    public safety. Law enforcement will need more resources to deal with parolees who

21    should be returned to prison but instead are on the street.

22  36.  In the 1980's, the deinstitutionalization of mentally ill persons resulted in the release of

23    thousands onto the streets. Many had nowhere to go and were not equipped to re-

     integrate successfully back into the community. There was no access to treatment and/or

24    medication. Local governments had no funding or infrastructure available for the

25    increased need. The mentally ill did not obtain better health and medical health care on

26    the outside. To the contrary, the social problem we have today with respect to the

27    untreated mentally ill and the homeless population was created by deinstitutionalization.

28    The appropriate solution to the problems was ignored.

-8-

37.    A prison release order for the purpose of enhancing medical and mental health care will have the same effect on drug addicts and other felons; it will fail with respect to those released. It is not only a disservice to the public but to the prisoners themselves. It sets them up for failure. Prisoners and parolees should not be released into the community without effective rehabilitation programs available to ensure their success. A prison release order is not the answer and any population reductions realized in the short term will be overshadowed by the resulting increased crime and recidivism in the long term. Instead, the court should focus on reducing recidivism through enhanced reentry services, enhanced probation services, enhanced prison programs. These measures can effectively lower the prison population by reducing recidivism, rather than artificially lowering the population by reducing punishment.

38.    As President of the California District Attorneys Association, I have become familiar with the fact that the issues facing San Diego with respect to a prisoner release order are not exclusive to San Diego. To the contrary, many elected District Attorneys in the state have expressed the same or similar concerns with respect to a prison release order. Criminal activities without adequate consequences for the perpetrators are a concern to everyone.

39.    Significant measures to alleviate prison crowding and promote rehabilitation of inmates have already been signed into law in Assembly Bill 900, and the funding and implementation of these measures should be prioritized and expedited. The District Attorney Intervenors support the full implementation of AB 900, and the continued efforts of the *Plata* receiver to improve the quality and delivery of healthcare in the prisons. The *Plata* Receiver has the authority to identify prisoners with serious unmet medical needs which rise to the level of a constitutional deprivation and devise remedial plans to address those unmet needs. The Receiver has defined what a "constitutional" level of healthcare means and what it consists of in the context of California's prisons. Detailed and specific strategic plans to achieve the required reforms have been formulated, work is underway and significant progress has been made.

40.    It is critical that these efforts, the transfer of prisoners out of state, as well as the expansion of programs that can effectively reduce recidivism, like the SB618 program in San Diego County, be coordinated in order to maximize the efficient use of resources and

-9-

1  to expedite the reforms that will alleviate the health and safety issues which concern us
2  all.

3  41.  We support the ongoing efforts to improve prison health care. However, a prisoner
4  release order and/or a prison population cap that would result in the release or non-
5  admission of thousands of healthy felons have no apparent nexus to solving the issues
   that gave rise to these proceedings. With all of the promising work in progress directed
6  at alleviating the conditions that gave rise to the possible need for a prisoner release
7  order, reform legislation awaiting implementation, and the availability of less intrusive
8  alternative measures that would result in a reduction of the prison population, it is the
9  opinion of the District Attorney Intervenors that a prisoner release order directed at the
10  entire California state prison system is unwarranted. The Court should deny the
   Plaintiffs' request.
11

12  Being present in the City of San Diego, California, I declare under penalty of perjury and
13  under the laws of the State of California and the United States of America that the
14  foregoing is true and correct.

15

16  Dated: October 30, 2008

17

18  BONNIE DUMANIS
    DISTRICT ATTORNEY
19  COUNTY OF SAN DIEGO

20  RESPECTFULLY SUBMITTED,

21

22  DATED:    October 30, 2008    ROD PACHECO, DISTRICT ATTORNEY
                                   COUNTY OF RIVERSIDE
23
24  By:_____/s/_____
         WILLIAM E. MITCHELL
25       Attorneys for District Attorney Intervenors
26
27
28
-10-
Declaration Of Bonnie Dumanis Submitted In Addition To Direct Testimony By District Attorney Defendant Intervenors