1  ROD PACHECO
   District Attorney, County of Riverside
2  4075 Main Street, First Floor
   Riverside, California  92501
3  Telephone: (951) 955-5542
   Fax: (951) 955-9566
4  William E. Mitchell
   Assistant District Attorney
5  (CSB # 108483)
   Attorneys for District Attorney Defendant Intervenors
6  ROD PACHECO, District Attorney, Riverside
   BONNIE M. DUMANIS, District Attorney, San Diego
7  TONY RACKAUCKAS, District Attorney, Orange
   JAN SCULLY, District Attorney, Sacramento
8  CHRISTIE STANLEY, District Attorney, Santa Barbara
   MICHAEL A. RAMOS, District Attorney, San Bernardino
9  ROBERT J. KOCHLY, District Attorney, Contra Costa
   DAVID W. PAULSON, District Attorney, Solano
10 GREGG COHEN, District Attorney, Tehama
   TODD RIEBE, District Attorney, Amador
11 BRADFORD R. FENOCCHIO, District Attorney, Placer
   JOHN R. POYNER, District Attorney, Colusa
12 MICHAEL RAMSEY, District Attorney, Butte
   GERALD T. SHEA, District Attorney, San Luis Obispo
13 EDWARD R. JAGELS, District Attorney, Kern
   GREGORY TOTTEN, District Attorney, Ventura
14 VERN PIERSON, District Attorney, El Dorado
   CLIFFORD NEWELL, District Attorney, Nevada
15 RONALD L. CALHOUN, District Attorney, Kings
   DONALD SEGERSTROM, District Attorney, Tuolumne
16

17            IN THE UNITED STATES DISTRICT COURTS
18      FOR THE EASTERN AND NORTHERN DISTRICTS OF CALIFORNIA
        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
19       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 20  RALPH COLEMAN, et al.,<br><br>21         Plaintiffs,<br>22         vs.<br>23  ARNOLD SCHWARZENEGGER, et al.,<br>24         Defendants. | Case No:  CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| 25  MARCIANO PLATA, et al.,<br>         Plaintiffs,<br>26         vs.<br>27  ARNOLD SCHWARZENEGGER, et al.,<br>28         Defendants. | Case No.: C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br>DECLARATION OF SAN DIEGO COUNTY DEPUTY DISTRICT ATTORNEY LISA RODRIGUEZ SUBMITTED IN LIEU OF DIRECT TESTIMONY BY DISTRICT ATTORNEY DEFENDANT INTERVENORS |

# DECLARATION OF LISA RODRIGUEZ

1.  I, Lisa Rodriguez, declare:

2.  I am a Deputy District Attorney with the San Diego County District Attorney's Office.

3.  I have been employed in this capacity since 1998. Prior to that, I was employed as a deputy city attorney with the San Diego City Attorney's Office, prosecuting misdemeanors.

4.  In 2005, San Diego County District Attorney Bonnie Dumanis recognized that California's high recidivism rate was causing not just public safety risks, but a significant economic burden to our taxpayers. In an effort to stem this unacceptable rate of recidivism, District Attorney Dumanis and the San Diego Community Roundtable began researching proven, successful prison rehabilitation and reentry programs throughout the country. As a result, DA Dumanis wrote and Senator Jackie Speier sponsored Senate Bill 618, which authorizes counties to develop a comprehensive multi-agency plan to prepare non-violent offenders for re-entry into their communities upon their release on parole. On October 5, 2006, Governor Arnold Schwarzenegger signed Senate Bill 618 into law. San Diego's District Attorney's Office, Sheriff's Department, Public Defender's Office, Probation Department and the California Department of Corrections and Rehabilitation (CDCR), including the Parole Division, joined together to make the program a reality. In May 2006, I was assigned to oversee the implementation and administration of the SB 618 Community Re-Entry Program. As the Program Supervisor, it was my responsibility to design and implement the courtroom process, including eligibility and training. The first participants were enrolled in this multi-agency re-entry program in February of 2007.

5.  The SB 618 Community Reentry Program is a comprehensive, multi-agency program designed to transition non-violent parolees back into the community from prison through treatment, education and vocational assistance. SB 618 is intended to address the high rates of recidivism by providing an evidence-based plan for reintegration into the community. The rehabilitation process begins at the time of the plea bargain and ends eighteen months after release from prison. A detailed explanation of the SB 618 Community Reentry Program, including procedures and the text of supporting legislation is set forth and attached to this declaration in **EXHIBIT A** – "Symposium: SB 618 Community Reentry Program, March 13, 2008."

6. The program is offered to all eligible candidates on a first-come, first-serve basis. Every week, there are six total spots currently available countywide for both men and women. The program is only offered at the readiness conference after a non-violent defendant pleads guilty to a felony and agrees to a stipulated prison sentence of no more than six years and no less than eight months, with actual time to serve of no less than four months and no more than three years. Prior to sentencing, candidates for the program receive dental and mental health assessments, as well as literacy, vocational and substance abuse testing. Candidates also meet with a probation officer and a CDCR Correctional Counselor. Based upon the results of the assessments, the interviews, and a review of both the criminal history and CDCR records, a Multi-Disciplinary Team meets with the candidate to prepare a Life Plan. This Life Plan will follow the participant throughout his or her time in prison and for up to eighteen months after release on parole. It will be a living, fluid document that will change as the defendant's needs and goals change.

7. At sentencing, the defendant signs a contract agreeing to participate in the program. The abstract of judgment is prepared in less than forty-eight hours and defendants are transferred to the closest correctional facilities to San Diego: Richard J. Donovan (RJD) and the California Institute for Women (CIW). As all of the prison assessments have already been completed (except medical) at the local level, the time at the Reception Centers is decreased dramatically and inmates are quickly assigned to general population to begin their programming.

8. While a participant is serving the prison sentence, a Prison Case Manager will ensure the participant has access to the vocational, substance abuse, or educational programming needed to achieve the goals set forth in the life plan. As a direct result of the implementation of San Diego's SB 618 Program, both RJD and CIW are instituting new vocational programs at their facilities, including Welding, Electronics, Cabinetry, and Cosmetology.

9. Six months before a participant is released from prison, a Community Case Manager will begin to meet with the participant to start planning the transition from prison back into San Diego County. When a participant is released from prison, the Community Case Manager will meet him or her at the prison doors to assist in obtaining housing, treatment, education, employment, medication, tattoo removal, and even obtaining identification.

10. Finally, the Community Case Manager will meet regularly with the participant and his or her Parole Agent, as well as hold Community Roundtable Meetings. The Roundtable Meetings will be comprised of the participant, the parole agent, and any community members the participant chooses to invite. If a participant has a specific need that must be met in order to be successful, the Community Case Manager will work with the participant, the parole agent, and the Roundtable to ensure a smooth transition into the community.

11. Participants must be in custody and legal residents of San Diego County. Sex or arson registrants are ineligible, as are any defendants previously convicted of an offense involving infliction of great bodily injury or death. Defendants with prior violent felony convictions are screened on a case-by-case basis by the District Attorney's Office, if a five-year period of time has elapsed since the defendant was released from prison for the prior crime. The majority of current participants have been convicted of property or drug related crime, including: 204 for violations of Vehicle Code section 10851, and Penal Code sections 459, 496, 487, 484, 530.5, 470; 121 for violations of Health and Safety Code sections 11352, 11350, 11351.5, 11377, 11378; and 9 for felony violations of Vehicle Code section 23152. Most have extensive criminal histories

12. Due to housing limitations by CDCR, defendants who have previously been in protective housing or security housing are ineligible, as are defendants with prison gang affiliations. Certain medical and mental health conditions may also be exclusionary factors.

13. SB 618 is currently functioning almost as designed. We intended to have the medical assessments done locally to reduce time spent in the prison reception center, but because of the *Plata* Receiver's requirements that has not been possible.

14. With the SB 618 program, the cooperative efforts of the sheriff's department, the probation department, CDCR, parole, and the DA's office has eliminated the silo effect that had an inmate moving from one location to the next to the next throughout the system without any real coordination. Inmates were virtually lost within the system and then released back into the community. All of these different agencies work together from the time the defendant pleads and agrees to go to prison and volunteers to participate in the SB 618 program. The individual attention matters. I have seen a physical and psychological difference in the 30 days between the time of the plea and the time a participant comes back for his or her sentencing. It is because they have hope and

they are excited about the program and that something might change for them. As they go through the program everyone is interacting and talking about these individuals and keeping tabs on them. When they get released on parole, I am aware if somebody commits an offense and I work with the parole and with the community case managers. The participants have increased supervision and they have a better chance of success.

15.    A prisoner release order would have adverse effects on the success of the SB 618 program. Many of the people released would be SB 618 participants, and early release would compromise the completion of programming scheduled in the prison setting. There would be greater competition for the already strained resources of community housing and rehabilitative programs. Staff resources of Community Case Managers and parole agents are not sufficient to handle increased numbers of released participants. Releasing more people to compete for limited parole and rehabilitation services will not alleviate the problem of recidivism, it will exacerbate it.

16.    As mentioned earlier, the program is only offered at the readiness conference after a non-violent defendant pleads guilty to a felony and agrees to a stipulated prison sentence of no more than six years and no less than eight months, with time to serve of no less than four months and no more than three years. The current breakdown of terms being served by program participants is shown in the following table:

| TOTAL SENTENCE IN MONTHS | # OF PARTICIPANTS |
| --- | --- |
| 8 months | 2 |
| 12 | 1 |
| 16 | 87 |
| 24 | 93 |
| 28 | 9 |
| 32 | 28 |
| 36 | 60 |
| 40 | 1 |
| 44 | 6 |
| 48 | 31 |
| 56 | 2 |
| 60 | 12 |
| 72 | 18 |
| | 350 TOTAL |

17.    While the program is just beginning to show results, the indications are that it will be an enormous success. The first participants enrolled in SB 618 in February of 2007. There are currently over 350 participants (approximately 85 percent male) in various stages of the SB 618 program. As of October 5, 2008, 70 participants have already been released

---

1    from prison and five have successfully discharged from parole, but are still receiving SB

2    618 services. Many of the parolees are gainfully employed and others are successfully

3    seeking addiction treatment. Examples of two SB 618 success stories are set forth and

4    attached in **EXHIBIT B**.   There have been four returns to prison for technical parole

5    violations and they remain in the program. Three participants have pending felony

     charges, and one participant has been convicted of a new crime and sentenced to prison.

6    One parolee was convicted of a new felony offense, but not sentenced to prison, and he

7    has remained a program participant.

8    18.   The San Diego Association of Governments, Criminal Justice Research Division is

9    conducting an on-going impact and process evaluation of the SB 618 program. The

10   purpose of the impact evaluation is to determine whether participation improves

     reintegration and reduces recidivism. The evaluation is actually comparing SB 618

11   participants to a control group of individuals who would have been eligible to receive

12   services but were not included in the program. The SANDAG report, "Improving

13   Reentry for Ex-Offenders in San Diego County: SB 618 First Annual Evaluation Report,

14   March 2008," is attached to this declaration, labeled **EXHIBIT C**, and hereby

15   incorporated.

16   19.   Six people per week can enter the program right now and the weekly quota is regularly

     filled. Often, there are people begging to get into the program, but have to be turned

17   away. It is estimated that there are about 20 individuals per week countywide that would

18   meet all the eligibility requirements. We have applied for additional funding to expand to

19   at least 12 participants per week. Based on CDCR statistics for 2007, San Diego sent a

20   total of 4450 new admissions and parolees with new terms to prison. This breaks down

21   to approximately 75 men and 10 women each week that San Diego County sends to state

22   prison. Clearly, if 20 per week could be included in the SB 618 program, 25 percent of

     San Diego's convicted felons would have a better chance of becoming productive

23   members of the community then they now have without the program.

24

25   20.   The SB 618 program can turn the prison and parole system into what it was intended to

26   be, a system that attempts to rehabilitate people so they do not come back through the

27   system. Recidivism will never be eliminated, but it can be decreased by providing people

28   with some tools that will assist them in making the right choices when they are released.

21.    The positive effects of the SB 618 program will be less crime, less costs for the county and the state for housing people who commit crimes, and less costs for the investigation and prosecution of people who commit crimes. It is a win/win situation. In my opinion, based on my experience with the SB 618 program over the last two years, replicating the SB 618 program in other counties would have a dramatic impact on reducing the prison population by lowering the recidivism rate of nonviolent repeat offenders.

Being present in the City of San Diego, California, I declare under penalty of perjury and under the laws of the State of California and the United States of America that the foregoing is true and correct.

Dated: October 23, 2008

 

 

 

LISA RODRIGUEZ
Deputy District Attorney

RESPECTFULLY SUBMITTED,

DATED:    October 30, 2008        ROD PACHECO, DISTRICT ATTORNEY
COUNTY OF RIVERSIDE

By:_____/s/_____
WILLIAM E. MITCHELL
Attorneys for District Attorney Intervenors

1    Being present in the City of San Diego, California, I declare under penalty of perjury and

2    under the laws of the State of California and the United States of America that the

3    foregoing is true and correct.

4

Dated: October 23, 2008

5

6

7                                                    LISA RODRIGUEZ
                                                     Deputy District Attorney

8

9                                        RESPECTFULLY SUBMITTED,

10

11   DATED:    October 30, 2008          ROD PACHECO, DISTRICT ATTORNEY
                                         COUNTY OF RIVERSIDE

12                                       By:_____/s/_____
                                            WILLIAM E. MITCHELL
13                                          Attorneys for District Attorney Intervenors

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Declaration Of Lisa Rodriquez Submitted In Lieu Of Direct Testimony By District Attorney Defendant Intervenors

# EXHIBIT A

# County of San Diego
# District Attorney's Office



# Symposium: SB 618 Community
# Reentry Program

# March 13, 2008

# San Diego Reentry Program (SB618)

What is the SB618 Reentry Program?
A comprehensive, multi-agency program designed to assist, educate, treat addictions and transition parolees into the community.

Current Availability
* There are only six total spaces available per week.
* The new week begins every Thursday and ends on Wednesday.
* The program is only available in the Central and East County Divisions.
* The goal is to expand to all county courthouses.

Eligibility Criteria
* *Only available* at Readiness Conference
    * East County: Pre-prelim Readiness Conference in Department 2
    * Central: Departments 29, 30 and 31
    * Never available after a jury trial.
    * Space availability must be cleared through the DA Disposition Unit.
* *Only available* when Defendant and the People enter into a Stipulated Prison Sentence for a new prison term
    * The sentence must be at least 8 months and no more than 72 months
    * The time to serve must be no less than 4 months and no more than 36 months
* *Only available* if Defendant is a legal resident of San Diego County.
* *Only available* if Defendant is *in custody*.
* *Only available* if the current crime is a non-violent felony.

Exclusionary Criteria
* Defendants convicted of a violent offense pursuant to Penal Code section 667.5(c).
* If the defendant committed any crime (including the current one) wherein the victim suffered death, great bodily injury or a permanent disability, the defendant is permanently excluded.
* Other prior convictions for violent felonies within Penal Code section 667.5(c) that do not involve death, great bodily injury or permanent disability will be screened on a case by case basis if the defendant has been out of custody for at least five years and has committed no other violent crime in the interim.
* Eligibility for Prop 36 treatment.
* 290 Registration
* Arson (457.1) Registration
* Security Housing Unit placement for violent acts within the last year.
* Protective Housing Unit placement for safety concerns within the last year.
* Documented Prison Gang affiliation.
* Felony holds by another jurisdiction.
* Inmates assigned by CDCR regulations to a classification score of Level IV – this score would preclude placement at Richard J. Donovan Correctional Facility.
* May be excluded due to special needs programs pursuant to CDCR regulations which may include, but are not limited to, permanent wheelchair use, medical needs, psychiatric needs, protective custody needs, or developmental needs.

<u>Important Notes:</u>
- SB 618 SCREENING IS NOT PART OF THE NEGOTIATION PROCESS.
- There should be no reference to the SB 618 program on the change of plea form.
- Defendants must be advised during the change of plea that they may or may not get into the SB 618 program, but they will serve their prison sentence either way.

<u>Procedure:</u>
- Defendant signs a change of plea form with a stipulated prison sentence as agreed between the People and the Defendant.
- DDA informs Defense Counsel of the defendant's eligibility to be screened.
- Defense counsel advises Defendant of eligibility.
- Defendant and Defense Counsel sign Letter of Intent and Waiver.
- <u>During the oral Change of Plea, the Court must:</u>
  - Take Judicial Notice of Defendant's application to be screened for the SB 618 program, and
  - Advise Defendant that whether or not the defendant is accepted into the program, the defendant will be sentenced to the agreed upon prison term.
- Sentencing is set for due course or later.
- The Court's Clerk certifies the letter of intent, and provides a copy of the letter of intent and the original waiver to the DDA, who faxes them to the Sheriff and the Probation Department.
- <u>Defendant is screened</u>
  - Defendant is transferred to George Bailey or Las Colinas
  - Dental and psychological screening are conducted the SDSO
  - Probation administers the assessments and testing.
  - Defendant is screened by Department of Corrections and Rehabilitation Classification Counselor.
  - Life plan is created by Multi-Disciplinary Task Force and Defendant.
- If Defendant is found acceptable by all participants and still wants to participate, Defendant signs Contract at sentencing.
- <u>On the day of Sentencing:</u>
  - Court sentences Defendant to original stipulated prison sentence, but also states on the record "The Court takes judicial notice that the defendant has read, reviewed and signed the SB618 contract and has agreed to abide by the program requirements."
  - Court Clerks prepare abstract of judgment within 48 hours.
- Defendant is promptly transported to Donovan or CIW to begin prison sentence.

SB 618 Senate Bill - CHAPTEREDBILL NUMBER: SB 618      CHAPTERED

BILL TEXT

CHAPTER 603
FILED WITH SECRETARY OF STATE OCTOBER 6, 2005
APPROVED BY GOVERNOR OCTOBER 6, 2005
PASSED THE SENATE SEPTEMBER 8, 2005
PASSED THE ASSEMBLY AUGUST 31, 2005
AMENDED IN ASSEMBLY AUGUST 25, 2005
AMENDED IN ASSEMBLY JUNE 30, 2005
AMENDED IN SENATE APRIL 6, 2005


INTRODUCED BY   Senator Speier


FEBRUARY 22, 2005

An act to add Section 1203.8 to the Penal Code, relating to sentencing.


LEGISLATIVE COUNSEL'S DIGEST


SB 618, Speier Sentencing: programs.
Under existing law, the Legislature finds and declares that programs should be available for inmates, including educational programs that are designed to prepare nonviolent felony offenders for successful reintegration into the community. Under existing law, the Legislature encourages the development of policies and programs designed to educate and rehabilitate nonviolent felony offenders.
This bill would authorize a county to develop a multi agency plan to prepare and enhance nonviolent felony offenders' successful reentry into the community, and would require that plan be developed by, and have the concurrence of, the presiding judge, the chief probation officer, the district attorney, the local custodial agency, and the public defender, or their designees, for submission to the board of supervisors for its approval. The bill would further authorize the Department of Corrections and Rehabilitation to enter into an agreement with up to 3 counties to implement the above provisions and to provide funding for the purpose of the probation department carrying out its assessments, and would make specified findings and declarations in that regard.

THE PEOPLE OF THE STATE OF CALIFORNIA DO ENACT AS FOLLOWS:

SECTION 1. (a) The Legislature finds and declares that the successful reintegration of parolees into society depends upon the proper assessment of the offenders' risks and needs prior to entry into the prison system and appropriate direction of offenders into facilities and programs that are available to address risks or needs.

(b) The Legislature recognizes that the transfer of the assessment function from the Department of Corrections and Rehabilitation to the community in which an offender committed his or her crime and to which the offender will likely be paroled may represent an effective and efficient means to perform an assessment.

(c) The Legislature encourages the participation of the Department of Corrections and Rehabilitation and interested counties to develop and implement plans to transfer assessment functions to local probation departments and courts, with the goal of improving public safety in the community and to better enable parolees to become contributing members of society.

SEC. 2. Section 1203.8 is added to the Penal Code, to read:

1203.8. (a) A county may develop a multi agency plan to prepare and enhance nonviolent felony offenders' successful reentry into the community. The plan shall be developed by, and have the concurrence of, the presiding judge, the chief probation officer, the district attorney, the local custodial agency, and the public defender, or their designees, and shall be submitted to the board of supervisors for its approval. The plan shall provide that when a report prepared pursuant to Section 1203.10 recommends a state prison commitment, the report shall also include, but not be limited to, the offender's treatment, literacy, and vocational needs. Any sentence imposed pursuant to this section shall include a recommendation for completion while in state prison, all relevant programs to address those needs identified in the assessment.

(b) The Department of Corrections and Rehabilitation is authorized to enter into an agreement with up to three counties to implement subdivision (a) and to provide funding for the purpose of the probation department carrying out the assessment. The Department of Corrections and Rehabilitation, to the extent feasible, shall provide to the offender all programs pursuant to the court's recommendation.

# SAN DIEGO COUNTY SENATE BILL 618
## REENTRY PROGRAM MULTIAGENCY PLAN
## FISCAL YEAR 2006-2007

## I.    PROGRAM OVERVIEW

### Introduction

It has become increasingly clear to law enforcement, the Courts, legislature, and the public that many criminal offenders rotate in and out of State prisons, presenting a significant public safety risk to the residents of California.  Since at least ninety-five percent (95%) of all State prisoners will eventually be released back into our communities, recidivism is a problem that cannot be ignored (BJA 2003).  The current structure of the California penal system has not effectively stemmed the tide of recidivism plaguing our communities. Under the leadership of San Diego County District Attorney Bonnie Dumanis, the San Diego Reentry Roundtable, and the California Department of Corrections and Rehabilitation (CDCR), Senate Bill (SB) 618 was introduced, a bill that would authorize counties to develop a multiagency plan to prepare non-violent felony offenders for successful reentry into society. Authored by State Senator Jackie Speier, SB 618 was signed into law by Governor Schwarzenegger on October 6, 2005, and became effective January 2006. There is no sunset date for this law.

The San Diego Reentry Roundtable and its thirteen (13) work groups developed the San Diego County SB 618 Reentry Program Multiagency Plan. The Roundtable is comprised of representatives from correctional institutions, law enforcement, faith-based and community-based organizations, governmental agencies, local planning members, universities, community members, former prisoners, and concerned citizens. As

required by SB 618, representatives from the Superior Court, District Attorney's Office, Sheriff's Department, Probation, Public Defender's Office also played leading roles in the plan development, and concur with the plan. The California Department of Corrections and Rehabilitation (CDCR), Adult Parole, Richard J. Donovan Correctional Facility (RJD), and the California Institute for Women (CIW) greatly contributed to the development of the plan.

The Reentry Roundtable SB 618 Work Groups reviewed the body of scholarly literature relating to effective correctional practices and identified evidence-based strategies to reduce recidivism to our State Prisons by helping non-violent offenders become contributing, law-abiding citizens. The San Diego County SB 618 Reentry Program incorporates evidence-based practices that have been evaluated utilizing rigorous and scientifically recognized standards and methodologies. The program incorporates these practices and reengineers specific components of the correctional and rehabilitative practices within CDCR to prepare offenders for a more successful reentry into society.

The San Diego County SB 618 Reentry Program Multiagency Plan is intended to be a dynamic document. As lessons are learned in the program implementation phase, appropriate changes will be made to the Plan. The goal of the Reentry Roundtable to share the program framework and evaluation results so that other Counties may replicate our local success.

### Program Purpose

The purpose of the program is to assist non-violent felony offenders from San Diego County with successful completion of the conditions of their parole. The program does not affect the length of an offender's prison sentence. Rather, it takes advantage of the

sentence to treat any alcohol and drug addictions and improve educational and vocational skills.

**Program Vision**

The Reentry Roundtable's vision for the San Diego County SB 618 Reentry Program is to improve public safety through the implementation of a community and evidence-based program to reduce recidivism and improve offender success in community reentry.

**Scope of the National and Statewide Recidivism Problem**

In its 2005 Strategic Plan, CDCR stated, "There is no systematic approach from the time of the arrest to the time of [an offender's] reintegration back into the community" (YACA 2006). The accuracy of this acknowledgment is evidenced by State and local recidivism statistics and points to the current system's failure to prepare offenders to successfully reenter our communities.

The Department of Justice, Bureau of Justice Statistics published a report entitled *Recidivism of Prisoners Released in 1994.* The report tracked recidivism of inmates released from prison in 15 states in 1994, representing two-thirds of all prisoners released in the United States that year. The study tracked 272,111 former inmates for three years and documented the rates of rearrest reconviction and reincarceration. According to the report, "Within 3 years from their release in 1994, fifty-two percent (52%) were back in prison, serving time for a new prison sentence or for a technical violation of their release, like failing a drug test, missing an appointment with their parole agent, or being arrested for a new crime" (BJA 2002).

Like the national statistics, California's recidivism statistics are alarming. In 2002, felons released to parole supervision recidivated at a rate of 40 percent within the first year, 53 percent within the second, and 57 percent within the third year of release (CDCR 2006). In 2004, 31 percent of the felons released to parole supervision statewide had been incarcerated as a result of a drug offense conviction (CDCR, 2004). Upon release it is likely that parolees encounter a lack of available community-based substance abuse services targeted at their level of need, thus hastening their return to prison.

### Scope and Nature of the Local Recidivism Problem

The recidivism problem in San Diego County exceeds both the National and Statewide numbers. In 2002, felons released from state prison to parole supervision in San Diego County recidivated at a rate of 43 percent within the first year, 55 percent within the second, and 60 percent within the third year of release (CDCR 2006). In 2005, San Diego County committed 4,231 males and 485 females, a total of 4,716 people, for new felony offenses to the California State Prison system (CDCR 2006). In 2004, 1,379 San Diego County offenders (33 percent of the total new felony commitments) were returned to prison for a new crime with a new term (CDCR 2005). These figures do not include additional offenders returned to prison for violating the conditions of parole.

The link between substance abuse and crime leading to incarceration is highlighted in local research. According to the San Diego Association of Governments (SANDAG), a local research and public policy advisory organization, the majority of the adults detained in San Diego County were under the influence of drugs at the time off arrest. In SANDAG's 2004 report titled, *Adult Arrestee Drug Use in the San Diego*

*Region Report*, a random sample of 804 arrestees booked into a San Diego County Sheriff's jail showed:

> ➤ "Over two-thirds (69%) of male arrestees and almost three-quarters (72%) of female arrestees tested positive for some street drug- the highest percentage in the past five years."

> ➤ "The percent of arrestees who tested positive for methamphetamine in 2004 (43% of males and 42% of females) was significantly higher than five years earlier."

> ➤ "Around two-thirds of these adults reported using methamphetamine before going to work/school in the past year."

These statistics illustrate San Diego County's recidivism problem, specifically with recidivists who have substance abuse issues.

### Current Practices

Currently, law enforcement and correctional entities, including CDCR and California counties, focus on performing tasks necessary to meet their own organizational responsibilities in managing and serving offenders in jail, prison, or on parole. This "silo" approach to service delivery diminishes the overall effectiveness of law enforcement's management of offenders. Little emphasis and few resources have ever been allotted for coordination between, and within, State and County law enforcement and other agencies involved in serving offenders. As a result, offenders move from one law enforcement agency to another without a full assessment of their strengths and needs, and without an understanding of how to manage each offender.

More specifically, when a repeat offender is apprehended, very little historical information from CDCR is made available to the Courts, Probation, the District Attorney,

the Public Defender or the Sheriff. This problem is compounded when offenders transfers to the prison, since State archive information is not readily available, and in many instances, County information is not passed on to CDCR.

Offender assessments take place in the Prison Reception Centers (RC), located within State prisons. The RCs conduct assessments focused on Court mandated medical service and academic testing. Inmates are not assessed for drug and alcohol abuse even though the vast majority of offenders have one or both problems. Prison assessments also do not include vocational or criminogenic assessments

Inmates may spend from four (4) months to two (2) years in the Prison Reception Centers where they receive no vocational or academic training. Since the length of stay for the average prisoner in the CDCR system is 24.1 months, some inmates are released directly from the RCs back to the community without having had access to any substantive training (CDCR 2006). Inmates can spend time in prison working in prison jobs or receiving academic training that is not tailored to the inmates' individual needs. During incarceration in the general population, prison inmates currently have limited access to vocational programs as all of the vocational programs at RJD and some of the programs at CIW were eliminated in 2002 due to budget cuts.

Once an inmate paroles, the State provides a set of used clothing, $200 cash, and a taxi to the nearest downtown area. While some community resources are available to parolees and offered by the Parole Agent, parolees are not adequately prepared to fully benefit from the resources offered.

Finally, there is no comprehensive plan available to develop a reasoned response to all the assessments and other information available for each inmate. No staff is tasked with coordinating the services and response to each offender.

Consequently, inmates are placed in prison programs with little regard to what the inmate needs to stay out of prison once released; in fact most emphasis is placed on what the prison needs to operate. Many inmates serve their time with minimal or no rehabilitative programming geared toward their successful return to the community. This lack of effective coordination is a major contributor to the high rate of recidivism and the concomitant impact on the crime rate.

## II.    EVIDENCE-BASED PRACTICES

The underpinnings for the San Diego County SB 618 Reentry Program are based on correctional interventions that have been evaluated utilizing rigorous and scientifically recognized standards and methodologies. The principles that frame the program are based in the wrap around service approach which is a logically linked set of comprehensive services based on individual needs. In addition, the program is based in proven correctional interventions that reduce offender risk and recidivism and that contribute to a general increase in public safety.

**Evidence-Based Principals Incorporated in the SB 618 Reentry Program Design**

(Andrews and Bonta, 1998; Petersilia, 2004; Sherman et al; 1997)

- o  Use of actuarially-based instruments to assess offenders risk and needs.
- o  Services should be intensive, lasting 3 to 12 months.
- o  Increase incentives for positive reinforcements.
- o  Therapeutic communities with transitional care.
- o  Cognitive behavioral approach for lower risk offenders.
- o  Drug treatment programs that include transitional care.

o  Vocational education program.

o  Multi-component correctional industry program.

o  Community employment program.

o  Psychosocial community-based interventions.

## III.    SB 618 REENTRY PROGRAM OVERVIEW

The SB 618 Reentry Program is aligned with CDCR's new mission: "To improve public safety through evidence-based crime prevention and recidivism reduction strategies" (YACA, 2006). San Diego's SB 618 Reentry Program will serve as a model for the reform of California State prison and parole practices. The following describes specific steps in the reform model.

### Target Population

Eligible Participants will be non-violent male and female felony offenders, committed to either Richard J. Donovan Correctional Facility (RJD), or the California Institute for Women (CIW) pursuant to SB 618, who will be released to parole supervision in San Diego County. Participants must have no history of sexual or arson offenses.

Offenders who committed a violent offense five years prior to being screened may be eligible to be considered on a case-by-case basis. The program is voluntary to ensure that individuals are motivated to change and will actively utilize the program services. Once admitted to the program, individuals will be referred to as "Participants". Individuals with substance abuse issues are eligible. Since drugs and alcohol play such a leading role in the commission of crime, it is estimated that approximately 80% of the

program target population will require substance abuse treatment. (Refer to

**Attachment A** for more detailed information regarding eligibility criteria.)

**Steps in the San Diego County SB 618 Reentry Program Model:**

**Pre-sentence Activities**

**Step One -- Comprehensive Assessment-** The San Diego County Probation

Department will serve as the lead agency and teams with the Sheriff's Department to

transfer the assessment process for Participants from the CDCR Reception Centers to

two San Diego County Jails - specifically, Las Colinas Detention Facility and George

Bailey Men's Detention Facility. The Probation Department will conduct a strength

based assessment that will focus on the participant's dynamic and static risk factors and

profile criminogenic needs. Sheriff's Department will also conduct a comprehensive

array of physical, behavioral health (includes substance abuse and mental health),

educational, vocational assessments.


**Step Two – Life Plan-** The San Diego County Probation Department will work with a

multidisciplinary team to develop a "Life Plan" for each Participant. The Life Plan will be

in addition to the existing Presentence Report (PR)[1]. The PR is currently prepared by

the Probation Department for the Court, as mandated by California statute. The PR

contains information about the offender's personal and criminal history. The Life Plan

will be in addition the PR and articulate a course of action that will help put the

Participant on track towards successful reentry. It will include input from the Participant,

their family, the multidisciplinary team, and the assessment results. The Life Plan will

---

[1] Also known as Presentence Investigation Report and SB 42 Report.

follow the Participant through their incarceration and reentry into the community and will be utilized to provide offenders with needed services. The Life Plan will be a dynamic document, changing as Participants reach measurable goals.

## Post-sentence Activities

**Step Three – Expeditious Movement to Prison and Service Access** – Since the County will complete the assessments and the initial classification while in local custody, the Participant will bypass the State Prison Reception Center and transfer directly to the correctional facility general population (RJD or CIW, where the initial classification will be reaffirmed) where they will serve their sentence and have more immediate access to needed services more expeditiously than in the past.

## In-Custody Activities

. **Step Four – Prison Case Management** – Participants will receive Prison Case Management services while incarcerated to ensure that they receive the prison services articulated in the Life Plan, to the extent possible. The Prison Case Manager will work with the Participant to modify the Life Plan when appropriate.

**Step Five – Prison Vocational Services** – CDCR is in the process of developing four different vocational training programs. The programs will focus on jobs in high growth industries with strong job attainment opportunities in the local community. The programs will augment those already offered to Participants while they are serving their prison terms.

## Pre-release Activities

**Step Six – Pre-release Case Management –** Six months prior to release, the Prison Case Manager, the Participant, Parole Agent, and the Community Case Manager will meet and revise the Life Plan, with a focus on the reentry plan for housing, transportation and immediate enrollment in community supports such as substance abuse and mental health service, work readiness training and placement.

**Step Seven –Community Case Management –** Upon release, the Community Case Manager will meet the Participant at the door of the prison and transport them to their residence. The Community Case Manager will be on call 24 hours a day for the first 72 hours after the Participant's release to provide crisis intervention services. This is a precarious time for former prisoners as they often relapse into risky behaviors upon release from prison. The Participant will be pre-enrolled in community services and will immediately begin accessing those services. The Community Case Manager, in close collaboration with the Parole Agent, will broker services for the Participant on a continual basis and will ensure the services match the Life Plan and the Participant's needs. Community Case Management will take place for up to twelve (12) months as needed.  Contacts between the Community Case Manager and the Participant will become less frequent over time as the Participant demonstrates success as outlined in the Life Plan.

o *Phase I – Month 1* – Community Case Manager conducts face-to-face contact with the Participant at least *weekly*.

o *Phase II – Months 2-4* - Community Case Manager conducts face-to-face contacts with Participant at least *bi-weekly*.

o *Phase III – Months 5-12* – Community Case Manager conducts face-to-face contacts with Participant at least *monthly*.

**Step Eight – Transitional care** – Transitional care services will continue to be available to the Participant for an additional six (6) months on an as-needed-basis to include case management, community, and faith-based organizational support.

## IV.    PERFORMANCE EVALUATION

San Diego Association of Governments (SANDAG), a local research and public policy advisory organization, will conduct the process and impact evaluations. The Criminal Justice Research Division of SANDAG is uniquely qualified to complete the San Diego County SB 618 Reentry Program evaluation, as it has significant experience in the area of correctional program evaluation and have access to law enforcement databases.

SANDAG will monitor the impact of the program following up with Participants at 6, 12, 24, and 36 months following release from prison.  Although most Participants will be under parole supervision, it is important to define the Participant "success" in the program, not just Participant performance on parole.  It is believed that program Participants will be significantly more successful than those not participating.  The evaluation will include research questions relating to both Impact and Process

measures. Data will be collected from a wide variety of sources including the SB 618 program data base, public entity sources and criminal justice repositories. The evaluation plan is included as **Attachment C** of this document.

SANDAG researchers will serve as the Chair and work in cooperation with the SB 618 Evaluation Committee. The Evaluation Committee will be comprised of representatives from the District Attorney's Office, Probation, Sheriff's Department, Superior Court, Public Safety Group, CDCR, University of California San Diego and community-based organizations.

## Outcome Measures

**Outcome measures will include, but are not limited to:**

**IMPACT**

1. Rate of recidivism among SB 618 Participants
2. Number and level of rule/parole violations committed pre- and post-release
3. Level and type of improvements made in Participant's area of assessed risk/need (using scores from pre and post assessments)
4. Rate of successful completion of parole conditions.

**PROCESS**

1. Type and intensity of services provided pre- and post-release
2. Level of appropriateness of services received to risks/needs identified in assessments

## V.    COMPREHENSIVE CROSS-TRAINING

The County of San Diego in collaboration with the University of California San Diego, Department of Psychiatry, Center for Criminality & Addiction Research, Training

& Application is preparing a series of training and cross-training events. The events will be targeted at 3 separate groups; policy makers, management level and line staff providing direct services. The goal of cross-trainings are to; reinforce the evidence-based practices relating to case management and other services, establish an effective multi-system collaboration, and define common grounds of understanding of the goals and objectives of the San Diego County SB 618 Reentry Program.

# SB618 REENTRY LIFE PLAN

## Section 1: Personal Information

| 1. Full Name | | | | |
|---|---|---|---|---|
| Last: | First: | Middle: | | Suffix: |

**2. Aliases/Other Names:**

| 3. Date of Birth: | 4. Place of Birth: (City/County/State/Country) | 5. **Social Security Number:** |
|---|---|---|

**6. Untied States Citizen if Born Outside the United States** ☐ Yes ☐ No
If No, Resident Alien with Proper Documentation? ☐ Yes ☐ No
If Yes, Resident Alien Card #

| 7. **Sex** | 8. **Height** | 9. **Weight** | 10. **Hair** | 11. **Eyes** |
|---|---|---|---|---|

| 12. **Primary Language:** | 13. **Other Languages Spoken with Fluency:** |
|---|---|

**14. Address at Time of Arrest**

| Number/Street: | | Apt/Unit: |
|---|---|---|
| City: | State: | Zip: | Phone: |

**15. Address Where you Expect to Reside Upon Release:** ☐ Unknown ☐ Same as Above

| Number/Street: | | Apt/Unit: |
|---|---|---|
| City: | State: | Zip: | Phone: |

**16. Mailing Address, If Different from Above**

| Number/Street: | State: | Zip: | Phone: |
|---|---|---|---|

**17. Emergency Contact Information**

| Name | Relationship: |
|---|---|

| Number/Street: | | Apt/Unit: |
|---|---|---|
| City: | State: | Zip: | Phone: |

**18. With Whom do you Expect to Live?**

| Name: | Relationship: |
|---|---|
| Name: | Relationship: |
| Name: | Relationship: |

## Section 2: Court Case Information

| 19. Court Case No.: | 20. Court (Dept. & Judge): | 21. SB618 Probation Officer: |
|---|---|---|
| 22. Sentencing Date: | 23. CDCR # | 24.CII #: |

| 25. Conviction (Status and Description): |
|---|

| 26. Stipulated Sentence: | 27. Victim Restitution Amount Ordered: | 28. Earliest Projected Release Date |
|---|---|---|

**SB618 REENTRY LIFE PLAN**

## Section 3: Employment History

| From: (mm/yy) | To: (mm/yy) | Salary: | Employer's Name | Position |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## Section 4: Educational/Vocational Training

| From: (mm/yy) | To: (mm/yy) | Institution | Highest Level Attained | Degree/Certification |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

## SB618 REENTRY LIFE PLAN

### Section 5: Relatives and Significant Others

**1. Relationship Status:**
- [ ] Single
- [ ] Separated, How Long?
- [ ] Married, Year?:
- [ ] Domestic Partner, How Long?
- [ ] Divorced, Year?
- [ ] Widowed, Year?

**2.** [ ] Spouse    [ ] Significant Other    [ ] Domestic Partner    [ ] N/A

| Name: | | Relationship: | |
|---|---|---|---|

| Number/Street: | | | Apt/Unit: |
|---|---|---|---|

| City: | State: | Zip: | Phone: |
|---|---|---|---|

**3. Closet Relative/Friend Not Living in Residence (but living in San Diego County)**

| Name: | | Relationship: | |
|---|---|---|---|

| Number/Street: | | | Apt/Unit: |
|---|---|---|---|

| City: | State: | Zip: | Phone: |
|---|---|---|---|

### Children:

| Name: | Sex | DOB | Lives With (Location) | Child Support | | |
|---|---|---|---|---|---|---|
| | | | | Paid | Rec'd | Ordered |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |

**Notes:**

**SB618 REENTRY LIFE PLAN**

## Section 6: Community Support/Resources (i.e. Churches, Prof. Orgs, AA/NA Sponsors)

| Resource Type | Name |
|---|---|
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |
|  |  |

Notes:

## Section 7: Government Support/Resources

| Resource Type | | Name |
|---|---|---|
| SSI | ☐ |  |
| Welfare | ☐ |  |
| Medical | ☐ |  |
|  | ☐ |  |
|  | ☐ |  |
|  | ☐ |  |

Notes:

SB618 Reentry Life Plan

File: Personal Info.

# SB618 REENTRY LIFE PLAN

| Section 8: Needs, Risks and Strengths | | | | |
|---|---|---|---|---|
| Risk Level | Area of Concern (COMPAS) | Strength | Assessment Tool | Score |
| | Criminal Involvement | ☐ | COMPAS | |
| | History of Non-Compliance | ☐ | ASUS | |
| | History of Violence | ☐ | ASI | |
| | Current Violence | ☐ | IDEAS | |
| | Criminal Associates/Peers | ☐ | Myers-Briggs | |
| | Financial Problems/Poverty | ☐ | TABE | |
| | Vocational/Educational Problems | ☐ | CASAS | |

| | Area of Concern | Strength | Needs | High | Med | Low |
|---|---|---|---|---|---|---|
| | Criminal Thinking | ☐ | | | | |
| | Family Criminality | ☐ | Substance Abuse | ☐ | ☐ | ☐ |
| | Social Environment | ☐ | Education | ☐ | ☐ | ☐ |
| | Leisure and Recreation | ☐ | Vocational | ☐ | ☐ | ☐ |
| | Residential Instability | ☐ | | | | |
| | Social Adjustment Problems | ☐ | | | | |
| | Socialization Failure | ☐ | | | | |
| | Criminal Opportunity | ☐ | | | | |
| | Criminal Personality | ☐ | | | | |
| | Social Isolation | ☐ | | | | |
| | | ☐ | | | | |
| | | ☐ | | | | |
| | | ☐ | | | | |

| Other Needs Areas: | | Gender Responsive Areas | |
|---|---|---|---|
| | Area of Concern | | Area of Concern |
| ☐ | Transportation | ☐ | Medical |
| ☐ | Family | ☐ | Trauma |
| ☐ | Reunification | ☐ | Vocational/Financial |
| ☐ | Spirituality | ☐ | Parenting/Child Care |
| ☐ | Mental Illness | ☐ | Legal Protection |
| ☐ | | ☐ | |

SB618 Reentry Life Plan

File: Personal Info.

## SB618 REENTRY LIFE PLAN

**Section 9: Recommended Steps to Address Risks**

| Substance Abuse: | | **Risk Score** | | |
|---|---|---|---|---|
| Goal: | | | | |
| Issue: | | | | |
| | | | | |

**In Prison/Community Corrections Program:**

| Goal: | | | |
|---|---|---|---|
| Issue: | | | |
| | | | |

| Task: | | | | | | |
|---|---|---|---|---|---|---|
| Program: | | Referral Date: | | Completion Date: | | Code: |

| **Reentry:** | | **Reassessment Score:** | |
|---|---|---|---|
| Goal: | | | |
| Issue: | | | |
| | | | |

| Task: | | | | | | |
|---|---|---|---|---|---|---|
| Program: | | Referral Date: | | Completion Date: | | Code: |

| **Reassessment Results:** | | | |
|---|---|---|---|
| Goal: | | | |
| Issue: | | | |
| | | | |

| Task: | | | | | | |
|---|---|---|---|---|---|---|
| Program: | | Referral Date: | | Completion Date: | | Code: |

**Notes:**

| Date | Name | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

## SB618 REENTRY LIFE PLAN

### Section 9: Recommended Steps to Address Risks (cont.)

| Vocational: | | | Risk Score | |
|---|---|---|---|---|
| Goal: | | | | |
| Issue: | | | | |
| | | | | |
| | | | | |
| **In Prison/Community Corrections Program:** | | | | |
| Goal: | | | | |
| Issue: | | | | |
| | | | | |
| | | | | |
| Task: | | | | |
| Program: | | Referral Date: | Completion Date: | Code: |
| | | | | |
| **Reentry:** | | | Reassessment Score: | |
| Goal: | | | | |
| Issue: | | | | |
| | | | | |
| | | | | |
| Task: | | | | |
| Program: | | Referral Date: | Completion Date: | Code: |
| | | | | |
| **Reassessment Results:** | | | | |
| Goal: | | | | |
| Issue: | | | | |
| | | | | |
| | | | | |
| Task: | | | | |
| Program: | | Referral Date: | Completion Date: | Code: |

**Notes:**

| Date | Name | |
|---|---|---|
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

SB618 Reentry Life Plan

File: Personal Info.

## SB618 REENTRY LIFE PLAN

### Section 9: Recommended Steps to Address Risks (cont.)

| Educational: | | | | Risk Score | | | |
|---|---|---|---|---|---|---|---|
| Goal: | | | | | | | |
| Issue: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| **In Prison/FRCCC/Community Corrections Program:** | | | | | | | |
| Goal: | | | | | | | |
| Issue: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Task: | | | | | | | |
| Program: | | Referral Date: | | Completion Date: | | Code: | |
| | | | | | | | |
| **Reentry:** | | | | Reassessment Score: | | | |
| Goal: | | | | | | | |
| Issue: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Task: | | | | | | | |
| Program: | | Referral Date: | | Completion Date: | | Code: | |
| | | | | | | | |
| **Reassessment Results:** | | | | | | | |
| Goal: | | | | | | | |
| Issue: | | | | | | | |
| | | | | | | | |
| | | | | | | | |
| Task: | | | | | | | |
| Program: | | Referral Date: | | Completion Date: | | Code: | |

| Notes: | | |
|---|---|---|
| Date | Name | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |
| | | |

# SB618 REENTRY LIFE PLAN

## Section 10: Case Notes

| Mental Health Specialist | Date | |
|---|---|---|
| | | |

| Educational/Vocational Specialist | Date | |
|---|---|---|
| | | |

| Medical Comments | Date | |
|---|---|---|
| | | |

| Probation Officer | Date | |
|---|---|---|
| | | |

| Classification Agent Comments | Date | |
|---|---|---|
| | | |

SB618 Reentry Life Plan                                      File: Personal Info.

**SB618 REENTRY LIFE PLAN**

## Section 10: Case Notes (Cont.)

| PC Manager Comments | Date | |
|---|---|---|
| | | |

| Parole Agent Comments | Date | |
|---|---|---|
| | | |

| CC Manager Comments | Date | |
|---|---|---|
| | | |

| Participant Comments | Date | |
|---|---|---|
| | | |

## Benefits of Joining the SB 618 Re-Entry Programs

By agreeing to the attached contract and becoming an SB 618 Program participant you will gain some of the following:

- While in prison, you may receive the following resources:
- Designated housing
- Priority for prison programs/services [e.g. vocational training, SAP (Substance Abuse Program), life skills, PIA (Prison Industries Authority) placement, work]
- Educational services (e.g. high school diploma, A.A. degree, college credit)
- Placement at RJD or CIW
- SB 618 Certificate Programs
- Other pre-release services such as help obtaining an ID, driver's license, birth certificate, social security, etc.

After release, you may receive the following resources to help you reenter into a community:

- Job readiness and placement assistance (e.g. soft skills training, occupational support, etc.)
- Family reunification services
- Counseling (e.g. substance abuse, mental health, faith-based support, mentoring, 12-step)
- Educational services
- Case manager support
- Child support guidance
- Legal aid
- Budget planning
- Clothing
- Tattoo Removal
- Health Services
- Appropriate housing
- Transportation assistance
- Eligibility processing for public peer-support services

## San Diego SB 618 Reentry Program

## PARTICIPANT CONTRACT

Name: _____

Case No.:_____

In addition to the rules and regulations governing your incarceration and parole, the following describe the obligations and benefits of participating in the San Diego Reentry program.

I understand that...

. . . the validity of this contract is conditioned upon my eligibility for the SB 618 Reentry Program. If at any time after the execution of this agreement and in any phase of the SB 618 Reentry Program, it is discovered that I am, in fact, ineligible to participate in the program, I may be immediately terminated from the program. _____

. . . I am entitled to participate in SB 618 for up to eighteen months (or otherwise determined by my SB 618 team) post-release, which includes a Continuing Care component consisting of six months. _____

. . . during the entire course of the SB 618 Reentry Program, I will be required to attend roundtable sessions, treatment sessions, have regular and frequent contact with my case manager, submit to random drug testing, remain clean and sober, and law-abiding. I agree to abide by the rules and regulations imposed by the SB 618 Reentry Team and/or parole agent. I understand that if I do not abide by these rules and regulations, I may be sanctioned or terminated from the program. _____

. . . sanctions during incarceration may include assignment to another institution, may affect credit earning status, increased drug testing, loss of privileges and resources, removal from program and such other sanctions deemed appropriate by the SB 618 Reentry team. _____

. . . post-release sanctions may include more frequent drug testing, more frequent supervision, loss of privileges and resources, community service and such other sanctions deemed appropriate by the SB 618 Reentry team. _____

. . . I will be tested for the presence of drugs and alcohol in my system on a random basis according to procedures established by the California Department of Corrections and Rehabilitation, the SB 618 Reentry team, and/or treatment provider or case manager. I understand that I will be given a location and time to report for my drug test. I understand that it is my responsibility to report to the assigned location at the time given for the test. I understand that if I am late for a test, or miss a test, it will be considered positive and I may be sanctioned. _____

. . . substituting, altering or trying in any way to change my body fluids for purposes of testing will be grounds for immediate termination from the SB 618 Reentry Program. _____

I will not possess drugs (including marijuana), or drug paraphernalia. I will not associate with people who use or possess drugs, nor will I be present while drugs are being used by others. I may also be asked to abstain from the use of alcohol and association with alcohol. _____

. . . I may not possess any weapons while I am participating in the SB 618 Reentry Program. I will dispose of any and all weapons in my possession, and disclose the presence of any weapons possessed by anyone else in my household. Failure to dispose and/or disclose may result in termination from the SB 618 Reentry Program and possible prosecution for illegal possession of any weapon. _____

I agree to inform any law enforcement officer who contacts me that I am an SB 618 Reentry Program participant and to report any law-enforcement contact to my parole agent and case manager. _____

. . . I may not work as a confidential informant with any law enforcement agency while I am an SB 618 Reentry Program participant, nor may I be made or encouraged to work as a confidential informant as a condition of my full participation in the SB 618 Reentry Program. _____

If I am a recovering addict and/or alcoholic, I will inform all treating physicians and may not take narcotic or addictive medications or drugs. If a treating physician deems necessary to treat me with narcotic or addictive medications or drugs, I must disclose this to my treatment provider, parole agent and case manager. _____

. . . SB 618 case managers will work to place me in programs best suited for my success and subject to availability and agree that I will not leave any SB 618 referred program without prior approval from my treatment provider, parole agent or case manager and the SB 618 Reentry team. _____

. . . my full participation in my reentry plan may include residential placement, vocational training, education, and/or anger management, parenting or relationship counseling. I understand that I may be asked to sign a contract for each reentry program. I will abide by the rules and regulations of my assigned programs. _____

. . . successfully completing the SB 618 Reentry Program makes me eligible to participate in a graduation ceremony. _____

. . . during the early phases of reentry, I may be precluded from working or from gaining employment. I further understand that within the time directed by the SB 618 Reentry team, I will seek employment, job training and/or further education as approved by the SB 618 Reentry team, and that failure to do so may result in sanctions or termination. _____

. . . I have the right to submit grievances, and that I will be given a full and fair hearing in this regard. _____

I agree to keep the SB 618 Reentry team, treatment provider or case manager and parole agent advised of my current address and phone number at all times and whenever changed. My place of residence is subject to SB 618 Reentry team approval. _____

I agree to disclose all SB 618 program-related assessments and all associated records, including Confidential Substance Abuse Information during my participation in the SB 618 program. I understand that any information obtained from this release will be kept apart from the Court file. _____

. . . termination from or failure to complete the SB 618 Reentry Program cannot be a basis for withdrawing my previously entered guilty plea. _____

. . . that the successful completion of the SB 618 Reentry Program may be independent of my parole term. _____

. . . participation in the SB 618 Reentry Program is a privilege, not a right, and that it is a unique opportunity to obtain information, skills, services, and associations to help me change my life and fulfill my potential. I promise to give SB 618 my honest and best efforts. _____

I reviewed this contract with the participant.

_____     _____
SB 618 Probation Officer                                          Date

I have read the above contract and I understand what I have read. I am willing to enter into this agreement with the Senate Bill 618 Reentry Program.

_____     _____
Participant's Signature                                          Date

_____     _____
Attorney for Participant                                          Date

## DUTIES AND RESPONSIBILITIES OF THE SB 618 REENTRY TEAM

In consideration of the promises made by the above-referenced participant, the SB 618 Reentry team (by and through its individual members) does herein promise:

- To closely monitor Participant's progress and sobriety in order to provide structure and incentives to remain motivated, drug and alcohol free;
- To assess, evaluate, and guide Participant into and through appropriate programs for successful reentry;
- To coordinate and provide services which will assist participant in meeting needs, obtaining guidance, and fulfilling one's potential;
- To consider each case on individual merits and circumstances, while remaining consistent within guidelines;
- To hold all Participants accountable for their own behavior, and to respond in a therapeutically appropriate manner;
- To treat Participants with due dignity and respect, and to listen with an open mind;
- To keep team members current and trained in all facets of maintaining the highest caliber and most enduringly successful SB 618 Reentry Program;
- To encourage graduates to return to the SB 618 Reentry Program (after completion) to mentor new participants and demonstrate what can be accomplished by honestly working this program.
- To participate in SB 618 Reentry team meetings: weekly for the first month, bi-weekly the next 3 months, and monthly for the last 8 to 12 months.

_____          _____
Parole Agent's Signature                                      Date


_____          _____
SB 618 Community Case Manager                          Date

**San Diego's SB 618 Process and Impact Evaluation Plan**
**Prepared by: Dr. Cynthia Burke, SANDAG**
**May 1, 2006**

## OVERVIEW

To determine if SB 618 was implemented as planned in San Diego County and what impact these efforts had, both a process and impact evaluation will be conducted. These evaluation efforts will be lead by researchers from the Criminal Justice Research Division of SANDAG who have extensive experience conducting "action research" in partnership with local public safety agencies and other community partners. To ensure that the research design and on-going results are valid and relevant, SANDAG researchers will chair and work in cooperation with the SB 618 research committee that is composed of representatives from the District Attorney's Office, the County's Public Safety Group, UCSD, as well as representatives from the San Diego Reentry Roundtable. They will also attend SB 618 leadership committee meetings and share research results in a timely fashion to ensure the program is informed regarding what works.

## RESEARCH DESIGN

To determine if SB 618 resulted in improved service delivery and reduced recidivism, it is necessary to ask, "Compared to what?" For the current evaluation, a randomized design will be implemented in which all eligible candidates who meet program criteria and agree to participate in this project are randomly assigned to receive treatment services offered as part of SB 618 (the treatment group) or to received "treatment as usual" (the comparison group). Because program staff currently expect that there will be more demand than spots available, and it is not yet known if treatment services will benefit clients, randomly determining who receives services is actually the most equitable method possible. Using a randomized design provides the strongest research design possible to answer the "compared to what" question because program and research staff knows that theoretically, both groups are equivalent on all characteristics starting out. Therefore, if later differences are determined, it is clear that it is the intervention and not some other factor (e.g., willingness to participate, conditions that varied in the system in the past, etc.) that caused this difference.

To determine how this assignment should be done, a pipeline study will be conducted prior to client randomization to determine what proportion will be eligible beginning in October 2006. That is, depending on the number eligible and the number of program spots, there could be 1:1, 2:1, or 3:1 (for example) clients randomized to the treatment group for each randomized to the comparison group.

To answer the research questions that will be addressed as part of the process and impact evaluations, multiple methodologies will be used. Utilization of multiple methods of information

gathering will address inherent weaknesses that would exist if we relied on only one (e.g., self-report, historical, etc).

It should be noted that the research design for this project will be finalized once the project team has a clearer understanding of the resources that will be available for the evaluation in mid-May. Also, this current research design assumes that funding will be available for at least four years to ensure that an adequate sample of program clients can be followed over time after release from prison to measure recidivism and other outcomes of interest.


## PROCESS EVALUATION

The following 11 process evaluation questions are proposed to be addressed as part of the current project.

1. Was the program implemented as designed? What modifications were made and why?
2. What was the nature of partnerships that developed and what systematic changes resulted, if any?
3. How many inmates were screened for eligibility and how many were eligible?
4. What were the characteristics of eligible and non-eligible clients?
5. What were eligible clients' risks and needs?
6. What types of services were provided to clients in prison? What was the dosage/intensity of services provided in prison? Did these services related to the needs identified during assessment?
7. What services were clients referred to after release? How many post-release services were accessed? Did these services relate to the needs identified during assessment?
8. Were services culturally-competent and gender-responsive?
9. Did clients receive services for the risks and needs identified in assessment?
10. How many individuals completed the program and what factors predicted successful completion?
11. How do program staff and partners view SB 618 efforts and were views on rehabilitation changed as a result of participation?


## IMPACT EVALUATION

The following 9 impact evaluation questions are proposed to be addressed as part of the current project. To the extent possible, data will be compiled for both the treatment and comparison group to answer each of these questions. Currently, the follow-up periods include 6, 12, 24, and 36 months post-release (following incarcerations estimated to be 4 to 12 months in length).

1. What was the number and level of rule violations committed by client in prison?
2. Did clients make improvements in their areas of assessed risk and need (e.g., employment, substance abuse, medication management)?
3. Was recidivism reduced? (Utilizing the CDC as well as a modified definition of recidivism for local use)

4. Did clients have fewer parole violations post-release?
5. Was crime in the County reduced?
6. Did client create or resume healthy attachments to outside social institutions post-release (e.g., support groups, residential treatment, NA/AA, educational/vocational, faith)?
7. What improvements were made in clients' family and/or social bonds?
8. What was client's level of satisfaction with services received?
9. What was level of clients' family members' satisfaction with services received?

## PROPOSED METHODOLOGIES/DATA COLLECTION STRATEGIES

- Attendance and review of program minutes
- Analysis of data in the program database (related to needs, service provision, exit status, and behavior while incarcerated)
- More detailed analysis of program assessment information (at intake and possibly exit/follow-up)
- Survey of program partners involved in program implementation and management
- Survey of staff responsible for direct provision of services
- Exit customer satisfaction questionnaires
- Follow-up interviews with sample of clients and family members
- Collection of recidivism data from local and state databases
- Qualitative information from case studies/vignettes
- Other follow-up data available from parolee files
- Some form of cost-benefit analysis if possible

## PROPOSED PRODUCTS/SCHEDULE OF DELIVERABLES

- Monthly update on program numbers (assessed, eligible, entered, exited)
- Quarterly research overviews
- Bi-annual research reports

## SB 618 Participant Flow Chart



Is the defendant eligible?
- Yes
- No

Does the defendant agree to plead guilty to a stipulated prison term?
- Yes
- No → Goes to prelim or jury trial

Defendant is advised of eligibility for SB618. Does defendant decide to be screened by signing letter of intent?
- Yes
- No → Enter declined into CMS

Enter acceptance into CMS & begin assessment process
- Vocational/Educational Mental Health & Medical Substance Abuse
- Pre-sentence Investigation
- Classification

Develop Life Plan & MDT

MDT makes modification to the Life Plan or approves as is

Is participant accepted?
- Yes
- No → Entered into CMS

**LIFE PLAN MODIFICATIO**

- Sentenced to prison & signs contract
- Sheriff transports participant to RJD/CIW
- Participant enters reception center PCM begins
- Participant enters general population interim housing
- Classification Committee (UCC) Institutional Classification Committee (ICC) Unit
- Participant is transferred to permanent housing and begins programming
- 6 months pre-release PCM & CCM coordinate (further planning for release)
- Release Parole
- Post Release services begin
- Paroles discharge & aftercare services begin

**SB 618 Participant Flow Chart Key**
- District Attorney's Office
- Sheriff
- Probation
- RJD & CIW
- Community Case Manager

RJD- RJ Donovan State Prison
CIW- California Institute for Woman
CMS- Case Management System
MDT- Multi-Disciplinary Team
PCM- Prison Case Manager
CCM- Community Case Manager

49

# EXHIBIT B

## SB 618 PARTICIPANT SUCCESS STORIES

**CASE 1:** Jeffrey Kantra

After a long history of substance use/ abuse enmeshed with an equally long history of criminality to support his addiction; Jeffrey K. became a SB 618 participant after accepting a stipulated plea which would put him on a bus headed to his first state prison term. A man in his mid-40's; Jeffrey initially self-described himself as a "dope addict with no future"... and (he) "does not know where to begin in getting his life back." He also shared that he did not feel he had ever been availed any help in the past regarding the barriers and challenges in his life and that he has huge "trust issues" when it comes to the criminal justice system and opening himself up to strangers for help.

While incarcerated, and per his goals in his SB 618 Life Plan, Jeffrey participated actively in the prison Substance Abuse Program. He became a group facilitator for the SAP Program. In keeping with Jeffrey's primary goal to address his drug addiction; Jeffrey actively sought to be screened and accepted in to both, the Drug Treatment Furlough and SB 1453 Program(s). SB 618 advocated for Jeffrey to be enrolled in both programs. Jeffrey was accepted in both. Ninety days prior to his parole, Jeffrey was transferred to the Drug Treatment Furlough to finish out his sentence. Jeffrey successfully completed the Drug Treatment Furlough Program.

During his entire term and prior to his release, Jeffrey frequently met with his Prison Case Manager and Community Case Manager to devise a re-entry plan which would support his goals and lessen the challenges he had faced earlier in his life. Throughout this entire process Jeffrey took a very committed approach to the work of addressing his problematic past while developing a solution-focused future. Given Jeffrey's diminished self-esteem and trust issues; this process was a huge step for Jeffrey.

Once released on parole, and per the primary goals he had developed on his Life Plan for his community re-entry, Jeffrey entered Residential Drug Treatment. After five months in his residential drug treatment program, Jeffrey was able to receive certificates for successful completion of drug treatment and successful completion of SB 1453. Jeffrey was now officially discharged from parole.

Today Jeffrey is celebrating two years and two months of sobriety. Jeffrey has re-united with his mother and family. Jeffrey was recently promoted in his job as a chef with a charter fishing company and is now the company's head chef. Jeffrey lives independently and regularly attends NA meetings and remains in frequent contact with his SB 618 Community Case Manager. Jeffrey recently told his case manager, "I never dreamed I could get my life back and be as happy as I am today."

**CASE 2:** Justin Brown

Mr. Brown entered SB 618 after accepting a stipulated sentence for drug-related charges. Reviewing Justin B.'s criminal history (jacket) it was obvious he had a long history of addiction, gang affiliation, and criminality. Justin B. was a mutable termer who was very familiar with "doing time."

While incarcerated, Justin voluntarily attended the Substance Abuse Program at R. J. Donavon Prison. Additionally, he actively met with his SB 618 Prison Case Manager prior to beginning his work with his Community Case Manager.

The initial meeting with Justin by the Community Case Manager was an unexpected experience. As Justin approached the dayroom table for his first meeting, one could see his past without having to open his "criminal jacket." Justin is a fairly young man who has his past tattooed all over his torso, in fact, not much of his visible skin is not adorned with some type of gang allegiance from his street-life. His first words came with tears. "I have a son", he stated. "I want to change my life so that I can be his father again."

From that initial meeting forward, Justin put his heart and sole in to addressing his recovery. With advocacy from SB 618, Justin was screened and accepted in to the Drug Treatment Furlough and the SB 1453 Program(s). Justin completed both programs successfully and was discharged from parole after 150 days of treatment.

Justin obtained full time employment while completing his treatment and now works serving an elder-care residential facility. Since beginning his employment, he has already received a raise and also receives full medical and dental benefits from his employer. Justin has entered a tattoo removal program through SB 618 and has begun to remove all of his gang tattoos.

Justin remains closely connected to the recovery community and attends regular NA meetings. Justin is celebrating one year and three months of sobriety.

Justin now lives independently with his two brothers. He is taking care of his younger brother who has begun to get in to trouble. Justin has re-united with his son and sees him weekly. Justin says that he, "...loves being a father." Justin has recently begun attending classes to complete his G.E.D. Justin recently told his Community Case Manager, "I want to show my young brother and older brother that someone can change."