IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN AND NORTHERN DISTRICTS OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No:  CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No.:  C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>DECLARATION OF SAN DIEGO COUNTY DEPUTY DISTRICT ATTORNEY LISA RODRIGUEZ SUBMITTED IN LIEU OF DIRECT TESTIMONY BY DISTRICT ATTORNEY DEFENDANT INTERVENORS |

EXHIBIT C

Attachments to Declaration of Deputy District Attorney Lisa Rodriquez

# EXHIBIT C

# IMPROVING REENTRY FOR EX-OFFENDERS IN SAN DIEGO COUNTY: SB 618 FIRST ANNUAL EVALUATION REPORT

## MARCH 2008

**Darlanne Hoctor Mulmat, M.A.**
**Elizabeth Doroski**
**Cynthia Burke, Ph.D.**
**Lisbeth Howard**



*401 B Street, Suite 800 • San Diego, CA 92101-4231 • (619) 699-1900*

This evaluation was funded by the California Department of Corrections and Rehabilitation (CDCR) through SB 618. Preliminary findings presented in this first annual evaluation report are those of the authors and do not necessarily reflect the official position or policies of the CDCR. SB 618 partner agencies, SANDAG, or its Board of Directors. Material in this publication may be reproduced, provided full credit is given to its source.

# ABSTRACT

TITLE:            Improving Reentry for Ex-Offenders in San Diego County:
                  SB 618 First Annual Evaluation Report

AUTHOR:           San Diego Association of Governments

DATE:             March 2008

SOURCE OF         San Diego Association of Governments (SANDAG)
COPIES:           401 B Street, Suite 800
                  San Diego, CA 92101
                  (619) 699-1900
                  www.sandag.org

NUMBER OF
PAGES:            130

ABSTRACT:         In October 2005, California Senate Bill 618 (SB 618) was
                  signed into law. This law is based on the concept that
                  providing tangible reentry support services will increase
                  parolees' reintegration into the community. As the first
                  county authorized to create a multi-agency plan, San Diego,
                  through leadership from the District Attorney's Office,
                  brought together a diverse group of stakeholders to develop
                  policies and programs to educate and rehabilitate non-violent
                  felony offenders. Key program components, which are based
                  on best practices, include conducting screenings and
                  assessments and providing case management and services to
                  meet identified needs. The process begins before sentencing
                  and continues through imprisonment, as well as up to 18
                  months post release. As part of this effort, process and impact
                  evaluations are being conducted by SANDAG. This first annual
                  evaluation report describes project implementation to date,
                  outlines the research methodology, and presents preliminary
                  information from the process evaluation.

# TABLE OF CONTENTS

EXECUTIVE SUMMARY .................................................................................................................. 1

CHAPTER 1: INTRODUCTION AND PROJECT OVERVIEW ................................................ 7
    Introduction.................................................................................................................... 9
    Literature Review .......................................................................................................... 9
        Incarceration and Recidivism in California and the U.S. ............................. 9
        Rehabilitation: Recent Changes in Focus ....................................................... 12
        What Works in Reducing Recidivism ............................................................. 13
    Project Overview .......................................................................................................... 16
        Program Background....................................................................................... 16
        Key Program Components ............................................................................. 17
        Evaluation Overview....................................................................................... 25
    Program Implementation: Milestones and Modifications.............................................. 26
        Milestones ...................................................................................................... 26
        Modifications ................................................................................................. 27
    Summary ...................................................................................................................... 28

CHAPTER 2: EVALUATION METHODOLOGY .................................................................. 29
    Introduction.................................................................................................................. 31
    Research Overview ....................................................................................................... 31
    Process Evaluation........................................................................................................ 31
        Research Questions......................................................................................... 32
        Data Sources and Measures ........................................................................... 33
        Analysis Plan................................................................................................... 38
    Impact Evaluation......................................................................................................... 38
        Research Questions......................................................................................... 39
        Data Sources and Measures ........................................................................... 39
        Research Design .............................................................................................. 40
        Sampling Methods.......................................................................................... 41
        Analysis Plan................................................................................................... 44
    Sample Description........................................................................................................ 48
        Current Sample Size........................................................................................ 49
        Participant Characteristics .............................................................................. 50
        Prior Criminal History..................................................................................... 51
    Summary ...................................................................................................................... 51

CHAPTER 3: PROCESS EVALUATION ................................................................................ 53
    Introduction ............................................................................................................ 55
    Sample Descriptions ............................................................................................. 55
        Program Partners ............................................................................................ 55
        Key Staff ....................................................................................................... 56
    Perspectives on Program Implementation and Management ............................................. 57
        Program Partners ............................................................................................ 57
        Key Staff ....................................................................................................... 61
    Adherence to Design and Program Modifications ............................................................. 63
        Program Partners ............................................................................................ 63
    Partnership and Systemic Changes ................................................................................. 64
        Program Partners ............................................................................................ 64
        Key Staff ....................................................................................................... 67
    Provision of Culturally Competent and Gender-Responsive Services .................................... 68
        Program Partners ............................................................................................ 68
        Key Staff ....................................................................................................... 69
    Lessons Learned ....................................................................................................... 69
        Program Partners ............................................................................................ 69
        Key Staff ....................................................................................................... 71
    Summary .................................................................................................................. 73

CHAPTER 4: LESSONS LEARNED ................................................................................... 75
    Introduction ............................................................................................................ 77
    Lessons Learned ....................................................................................................... 77
        What Has Worked Well? .................................................................................... 77
        What Could Have Been Done Differently? ............................................................. 78
        What Else Should Other Potential Sites Know From the
           San Diego Experience? ............................................................................... 79

REFERENCES ................................................................................................................ 81

APPENDICES
    Appendix A    SB 618 Legislation ................................................................................. 91
    Appendix B    SB 618 Exclusion/Termination Criteria ....................................................... 95
    Appendix C    SB 618 Participant Flow Chart .................................................................. 99
    Appendix D    Participant Program Forms ....................................................................... 103
    Appendix E    Data Elements ....................................................................................... 121

**Executive Summary: SB 618 San Diego Prisoner Reentry Program First Annual Evaluation Report**

### Introduction and Project Background

As historically high numbers of ex-offenders parole to California communities, the issue of reentry poses a significant problem to policy makers, public safety officials, and community leaders alike. Reentry is a key issue facing many communities because, over the last 30 years, more individuals have been locked up than ever before, due in part to changes in many jurisdictions from indeterminate sentencing to determinate sentencing (which mandates specific sentence type and length for many crimes). As a result, between 1984 and 2005, the rate of sentenced prisoners across the United States increased 161 percent (from 188 to 491 per 100,000 population) and in 2006, 23 California prisons were overcrowded and operating at capacity.

At the same time that more offenders have been locked up for longer periods of time, many rehabilitation programs that were offered in prisons have been cut back or eliminated completely. These changes have been related to budget constraints associated with detaining a greater number of individuals at one time. Thus, many of the issues these offenders entered prison with and which may have been related to their criminal activity (such as substance abuse and illiteracy), have gone unaddressed during the confinement period, decreasing the chances of successful reintegration.

With researchers and policy makers across the country noting these trends and their implications for communities, there has been more attention to determining how this revolving door to prison can be closed for a greater number of individuals, increasing public safety, and ensuring best use of citizens' tax dollars.

### What is Senate Bill 618?

Senate Bill 618 (SB 618) (Speier), passed into law in January 2006, is one of several efforts across California to reduce recidivism and increase the probability of successful reentry, addressing concerns cited about the State's correctional system by the Little Hoover Commission in 2003 and 2007. Authored by the San Diego County District Attorney's (DA) Office, SB 618 is based on best practices and the concept that providing tangible reentry support services will increase parolees' chances of successful reintegration into the community.

Although SB 618 allowed for the possibility of three California counties to implement a program, San Diego County was the first, and at the time of this report, the only one authorized to create a multi-agency plan and develop policies and programs to educate and rehabilitate non-violent felony offenders. The diverse group of program partners, led by the DA's Office, includes the California Department of Corrections and Rehabilitation (CDCR), San Diego County Public Defender's Office, San Diego County Superior Court, San Diego County Defense Bar, San Diego County Sheriff's Department, San Diego County Probation Department, University of California, San Diego, and Comprehensive Training Systems, Inc.

### What will the Evaluation do?

The Criminal Justice Research Division of SANDAG is conducting both an impact and a process evaluation of SB 618.

The purpose of the impact evaluation is to determine whether participation in SB 618 improved reintegration and reduced recidivism (being returned to prison for a parole violation or a new felony conviction), and identify the conditions under which the program was most likely to accomplish these goals. Additionally, the impact evaluation will determine whether the reentry program was cost-effective relative to traditional procedures and whether positive change was realized in other areas of participants' lives (e.g., employment). To answer the impact evaluation questions, the most rigorous research design possible, given programmatic constraints, is being used in which

SB 618 participants are compared to individuals who would have been eligible to receive services but were not approached to do so. To help mitigate possible confounding factors between the two groups, statistical techniques (such as propensity score matching) will be used to ensure equivalency so the effect of receiving SB 618 services can be isolated to determine if goals are met.

The purpose of the process evaluation is to determine if the program was implemented as planned, measure what system changes were made, and assess program operations. More specifically, research questions to be answered include:

» How was the program implemented and managed?

» How well did the partners work together to accomplish program goals?

» How many individuals were screened and agreed to participate in the program, and what were their characteristics?

» Were participants' needs adequately assessed and were gender-responsive and culturally competent services provided to meet these needs during detainment and after release?

To answer these process and impact evaluation questions, data will be collected from both archival (e.g., program assessment data, service data, criminal history) and original sources (e.g., key staff and program partner surveys, participant surveys, and follow-up interviews). Additionally, research staff will monitor other factors that could affect SB 618 participants, including changes at the State level (such as legislation that releases individuals from parole at earlier points in time), track staffing, and observe all key program activities.

## What do the Preliminary Process Evaluation Findings Reveal?

### Participants

While the SB 618 Program became operational in March 2007, research clients were not identified until July 2007 to allow time for program startup. Between then and November 2007, 189 individuals were offered the chance to participate and 120 took advantage of this opportunity (63%). The comparison group, which includes individuals who were deemed eligible but not offered the program between March and November 2007 included another 120 individuals.

> **Who is Eligible for SB 618?**
>
> All participants are selected from the DA's felony prosecution caseload. The opportunity to apply for the program is offered to both male and female nonviolent offenders. To be considered, the candidate must be in local custody (i.e., not out on bail), be a legal resident of San Diego County, and agree (or stipulate) to a prison sentence for the instant offense of 8 to 75 months. Those with prior convictions for great bodily injury or murder are excluded, as are arson and sex registrants. Candidates with prior violent convictions over 5 years old are evaluated on a case-by-case basis. All SB 618 participants are housed at either Richard J. Donovan Correctional Facility (RJD) or the California Institute for Women (CIW) and, therefore, must meet any housing restrictions at these facilities.

To date, SB 618 treatment group clients range in age from 19 to 61 (average age of 35 years), are mostly male (86%), and represent a variety of ethnic groups (44% White, 28% Black, 23% Hispanic, and 4% other). Almost half were most recently sentenced for a property crime (47%), 40 percent for a drug-related crime, and the rest (13%) for some other type of offense. Most had extensive criminal histories, with an average of nine prior charges (range one to 41).

### Staff Perceptions

During the second half of 2007, 32 program partners (individuals who have been integral participants in planning and managing the SB 618 Program) and 14 key staff (individuals who work directly with participants) were surveyed. The purpose of these surveys was to understand their perceptions regarding how well program implementation and management had gone; what challenges have been successfully addressed and which still remained; and what lessons can be shared with other jurisdictions. Key findings included the following:

» Partners and staff feel that while program implementation and management have not been without challenges, they have gone well overall. A key factor perceived as contributing to success in these areas has been the high level of communication among the partners and the general feeling of collaboration that has been demonstrated.

» Program components that have been noted as being particularly effective have included the multi-disciplinary team meetings, the pre-sentence screening and assessment process, and the Life Plan.

» Some challenges have included communication issues between the local and State level, program modifications (which have lengthened the time participants must remain in the prison reception center and not receive services), and smaller than expected eligible participant numbers initially. In addition, concern has been expressed regarding how prison case management has been implemented. However, despite these challenges, there appears to be consensus that the program will result in long-term systemic change, including a shift in focus to rehabilitation and the provision of wrap-around services.

**Lessons Learned**

While program implementation is still occurring, lessons have been learned through the process. The following "lessons learned" were documented from the process evaluation results through December 2007, as well as from feedback given by representatives from each of the partner agencies.

**What Has Worked Well?**

» *Conducting more thorough assessments:* Assessments are conducted locally before a participant enters prison to begin the life planning process. Key staff and program partners surveyed indicated that these assessments are effective.

» *Utilizing an interdisciplinary team approach:* Attention was paid to best practices in developing the SB 618 Program by incorporating the interdisciplinary team approach. The Multi- Disciplinary Team (MDT) meetings held prior to the participant's sentencing were noted as particularly effective by key staff and program partners surveyed as part of the process evaluation.

» *Ensuring ongoing communication between program partners:* A culture of open communication has been fostered among program partners and key staff across agencies through weekly Operational Procedures Subcommittee meetings. There have been several examples of problem solving through open communication during these meetings. For example, in response to discussions about prison funding constraints related to obtaining college textbooks, as of

**What are the Key Components of SB 618?**

Incorporating evidence-based practices, the local SB 618 Program is a unique compared to traditional California correctional practices in a number of ways, including:

• Service provision begins at the time of sentencing and continues up to 18 months after release from custody.

• Participants' needs are assessed before the prison sentence begins and an individualized Life Plan is created by a Multi-Disciplinary Team, composed of program staff. The Life Plan can be modified and is created to ensure services are provided that meet identified needs.

• Case management, both during prison and after release, is provided to ensure services are provided to meet identified needs.

• Upon release, a Community Roundtable (comprised of the Community Case Manager, Parole Agent, Vocational Services Coordinator, and other individuals identified by the ex-offender) meets regularly to ensure reintegration challenges are addressed.

December 2007, UCSD is in the process of purchasing the books through grant savings in the budget for community case management.

» *Creating a project-specific database:* The District Attorney's Office Information Systems staff developed a Web-based data management system specifically for the local SB 618 Program. This user-friendly database captures data on each participant from screening/assessment through graduation, including the Life Plan. The database has been crucial to program partners, key staff, and the evaluators in monitoring program implementation.

**What Could Have Been Done Differently?**

» *Acknowledging that certain positions require certain skill sets:* Case management at RJD was provided by educators, while CIW used social workers to fill this role. Over the course of program implementation, qualitative differences between the case management provided at CIW and RJD became apparent and program partners concluded that the PCM role (which includes advocating for the participant during their incarceration) requires social work staff.

» *Anticipate to the greatest degree possible the logistical needs and possible pitfalls for service delivery:* Prior funding cuts dismantled vocational programming and overcrowding required filling programming space with bunks for inmates. As a result, the implementation of vocational, as well as other services has been delayed, particularly at RJD. As a result, RJD faced considerable bureaucratic hurdles to remodel classrooms, purchase up-to-date equipment, hire

instructors, and obtain portable classrooms for programming.

**What Else Should Other Potential Sites Know from the San Diego Experience?**

» *Factors beyond a program's control can significantly impact program implementation:* To streamline prison entry and access to programming, according to the SB 618 legislation, assessments are to be conducted locally. However, as the program was being implemented, a federal court gave a Medical Receiver oversight of all CDCR medical services, who required medical assessment in prison, duplicating the local screenings and delaying entry into in-prison programs.

» *Remain committed to instituting best practices, despite delays that may occur along the way:* A key component of the initial program design, and a best practice, was the provision of behavior health services. Program partners continue to investigate ways for its implementation with CDCR assessing the cost-effectiveness of the proposed behavioral health contract.

**What is Expected in the Coming Year?**

During 2008, research and program staff will continue to work in close collaboration to document service provision and adherence to key goals and milestones. The first participant exited prison in November 2007, and the first treatment group participant from the research sample is expected to reenter the community in early 2008, which will allow for additional opportunity for information to be compiled regarding service provision in prison and in the community, changes in participant need over time, and recidivism.

# CHAPTER 1
# INTRODUCTION AND PROJECT OVERVIEW

## INTRODUCTION

As historically high numbers of ex-offenders parole to California communities, many of whom have issues related to substance abuse, education, employment, housing, and health, the issue of reentry poses a significant problem to policymakers, public safety officials, and community leaders. Along with this issue are concerns related to public safety, as many individuals return to custody in the immediate years following release. One of several efforts across California to reduce recidivism and increase the probability of successful reentry is Senate Bill 618 (SB 618). This law is based on the concept that providing tangible reentry support services will increase parolees' chances of successful reintegration into the community. This first annual evaluation report, prepared by the San Diego Association of Governments (SANDAG), describes this effort and relates it to the current status of reentry in California and the U.S. and what experts in the field know about best practices. In addition, the research design is described and preliminary results from the process evaluation are provided. Future reports will be prepared on an annual basis, supplementing quarterly updates and expanding to provide answers to other research questions (described in Chapter 2) as more data are available.

## LITERATURE REVIEW

### Incarceration and Recidivism in California and the U.S.

Over the past two decades, there has been considerable growth in the number of individuals under the supervision of the criminal justice system. As Figure 1.1 shows, between 1984 and 2005, the rate of sentenced prisoners under the jurisdiction of state and federal correctional authorities across the U.S. increased 161 percent, from 188 per 100,000 population in 1984 to 491 in 2005. In California, the growth rate was slightly higher (188%), but showed a similar trend (Pastore & Maguire, no date). At the end of 2006, federal and state correctional authorities had jurisdiction over 1.57 million prisoners, an increase of almost three percent from 2005 and an increase that was not limited to a few large jurisdictions, with prison populations increasing in 41 of the 50 states between 2005 and 2006 (Sabol, Couture, & Harrison, 2007). As a result, 23 states and the federal system were operating at more than 100 percent of their highest capacity in 2006 (Sabol et al.). Further, national estimates suggest that if rates of first incarceration remain unchanged, 6.6 percent of all persons born in the U.S. in 2001 will go to state or federal prison during their lifetime, up from 5.2 percent in 1991 and 1.9 percent in 1974 (Bonczar, 2003).

According to the California Department of Corrections and Rehabilitation (CDCR) (no date-b), a total of 161,773 individuals were in a State prison in the second quarter of 2007, with 323,203 under some form of CDCR jurisdiction. While CDCR notes that the total institution population growth rate has slowed over the past year (less than 1% from 2006 to 2007, compared to 5% from 2005 to 2006), the most recent projections are that the population in State institutions (which includes prisons, camps, and other facilities) will increase eleven percent, to 191,886 in 2013 (from 173,312 in 2007) (CDCR, no date-a).

**Figure 1.1**
**BOTH U.S. AND CALIFORNIA HAVE HAD CONSIDERABLE**
**GROWTH IN INCARCERATION RATES**



*SOURCES: Bureau of Justice Statistics; SB 618 First Annual Evaluation Report, March 2008, SANDAG*

At the same time that more individuals are being incarcerated in California, many are being released. During the first half of 2007, a total of 126,330 individuals were released across California, with 90 percent returning to the county of their last legal residence. According to CDCR (no date-b), almost eight percent of the incarcerated population came from San Diego County and approximately 34,000 were described as returning to Region IV (San Diego/Southern California).

The common question that arises when discussing the explosion in prison populations and subsequent numbers of individuals reentering the community is how did we get to this point? In reviewing research that addresses this question, it becomes clear that a shift occurred approximately 30 years ago when a groundswell of public intolerance to higher crime emerged (National Institute of Corrections [NIC], no date). Policy shifts that occurred as a result were the implementation of stiffer penalties and refocusing time spent in prison as "punishment" rather than "rehabilitation."

During this same time period, indeterminate sentencing (in which judges are given broad discretion in meting out sentence terms) was coming under scrutiny by stakeholders from various sides of the political spectrum, including civil rights advocates (who believed judges may not always have been fair in their sentencing decisions), as well as political conservatives who preferred a more concrete sentencing structure to minimize a judge's tendency toward leniency (Austin, Clear, Duster, Greenberg, Irwin, McCoy, Mobley, Owen, & Page, 2007).

According to experts in the field, under indeterminate sentencing, prisoners were more motivated to obey prison rules and participate in rehabilitative programs in order to convince parole boards they were ready to be law-abiding citizens if granted release (NIC, no date). However, with the change to determinate sentencing in many states (including California in 1976), there was less incentive for good behavior and as a greater number of individuals were incarcerated for longer periods of time, the increased cost of housing these individuals also resulted in a drastic paring down of rehabilitative programs (Austin et al., 2007; Travis, Solomon, & Waul, 2001).

These two related policy shifts (de-emphasizing rehabilitation and determinate sentencing) also led to a third factor that increased prison population - a rise in the number of individuals returning to prison, either after not successfully reintegrating into society and committing a new offense, or because of a technical violation while under parole supervision. For example, in one analysis (Langan & Levin, 2002) utilizing 1994 discharge data from prisons in 15 states (including California), the researchers found that within three years of the inmates' release, 68 percent were rearrested for a new offense, 47 percent were reconvicted for a new crime, and 52 percent were back in prison serving time for a new sentence or a technical violation. When Solomon, Kachnowski, and Bhati (2005) examined what type of supervision this sample of ex-offenders received and how it was related to being reincarcerated, they concluded that parole supervision had little effect on the largest group of released prisoners (males who were drug, property, or violent offenders), mandatory supervision[1] was the least successful type of supervision, and discretionary release was only beneficial to select offenders, including females, individuals with few prior arrests, public order offenders, and technical violators.

In California, where almost all inmates are placed under a Parole Agent's direct supervision through mandatory release (as opposed to discretionary supervision or unconditional release with no supervision), the range of interventions for parole violators may be more narrow than is desirable, as reflected by increasing parole revocation rates. For example, the percentage of parolees returning to prison in California grew from 25 percent in 1980 to 71 percent in 2000 (Little Hoover Commission, 2003) and around two-thirds of all prison commitments in California were returning parolees, versus one-third nationally (Petersilia, 2006). Thus, while crime across the country is considerably lower than it was decades earlier (Petersilia), jurisdictions across the country are spending large amounts of money[2] on a system that, in the long run, may not be in the best interest of public safety or the community in general.

---

[1] Mandatory supervision involves prisoners being conditionally released to supervision after serving a portion of their original sentence, less any good time credits earned. Discretionary supervision involves prisoners being conditionally released to supervision based on a statutory or administrative determination of eligibility by a parole board or other authority (Solomon et al., 2005).

[2] In FY 2007, the budget for CDCR was $8.75 billion dollars and the average yearly cost of housing an inmate was $35,587 (CDCR, no date-b).

## Rehabilitation: Recent Changes in Focus

While criminal justice professionals and researchers have long studied what strategies are most effective in reducing recidivism in general (e.g., Melton & Pennell, 1998; Sherman, Gottfredson, MacKenzie, Eck, Reuter, & Bushway, 1997), the term "prisoner reentry" is fairly new and reflects increased attention to the fact that as more individuals are incarcerated, more will be returning to our communities. For example, in 2000 Travis noted the vast majority of prisoners are eventually released, often after lengthy sentences, resulting in a situation where these individuals are less prepared for life in society and have fewer resources to assist with this reintegration process than in the past. The result, according to Travis, is "a lost reentry opportunity" where "parole supervision is now as likely to end up in revocation as in reintegration" (p. 4).

With increased attention focused on this potential crisis, additional resources began to be directed at the issue of reentry at the national level. For example, in his 2004 State of the Union Address, President George W. Bush proposed a "four-year, $300 million prisoner reentry initiative to expand job training and placement services, to provide transitional housing, and to help newly released prisoners get mentoring, including from faith-based groups." Since then, the Prisoner Reentry Initiative, which is supported by a diverse group of federal partners (the U.S. Departments of Justice, Education, Health and Human Services, Housing and Urban Development, and Labor), has been implemented, reflecting that the issue of reentry is not solely under the purview of the criminal justice system (www.reentry.gov).

In California, the Little Hoover Commission published a report in 2003 that sent a clear message regarding the need to reverse the trend of the past several decades of locking offenders up and failing to address underlying factors that may have contributed or been related to their illegal activity:

> California's parole system is a billion-dollar failure. As the State built and filled prisons over the last 20 years, the number of felons who serve their time and are given a bus ticket home has swelled to 125,000 a year. But the real problem is that a growing percentage of those 125,000 parolees are unprepared to get a job, steer clear of drugs and alcohol, and find a home. Not surprisingly, before long most of these parolees are back on a bus to prison (p. i).

In elaborating on these series of strong statements, the Commission described four fundamental problems with California's system as it existed at the time: 1) the time in prison is not being used to prepare inmates for their eventual release; 2) available resources – particularly those in communities – are not being used to help parolees get a job and stay out of trouble; 3) when inmates do get into trouble, the vast majority go back to prison, even if drug treatment, short jail stays, or some other intervention would cost less and do more to help them refrain from crime; and 4) thousands of times each year, parole revocation is used in lieu of prosecution for parolees who are suspected of committing new serious crimes.

Four years later, these concerns were repeated with the release of a second report (Little Hoover Commission, 2007) that described the failing correctional system as "the largest and most immediate crisis facing policymakers" (p. i) and stated that "California's parole system remains a billion dollar failure." In this follow-up report, the Little Hoover Commission acknowledged the

ambitious efforts of Governor Schwarzenegger since his election in 2003 to rework the system, but also noted that politics has continued to "trump good policy in correctional reform efforts" (p. i)[3].

## What Works in Reducing Recidivism

Although the research designs of prisoner reentry programs that have been evaluated vary in complexity, a large body of work offers direction regarding what should be provided to ex-offenders in order to reduce recidivism, from sentencing to incarceration, and from reentry in the community to how program partners collaborate. Therefore, when San Diego stakeholders began envisioning the SB 618 Program, they based its design on the literature regarding proven strategies (i.e., evidence-based practices) as related to prisoner reentry. This section outlines this literature, including new findings to serve as a resource for the program as implementation continues to evolve. The research team will continue to add to this review as part of the evaluation effort.

### *Sentencing*

The starting point in the literature is sentencing. According to best practices, offenders should be maintained in the community whenever possible (i.e., when they are deemed low-risk for re-offending) because community-based services are more effective in reducing recidivism than programs in institutional settings (Andrews, 2006; Matthews, Hubbard, & Latessa, 2001; Sherman et al., 1997). Distinguishing between high- and low-risk offenders requires objective, standardized, reliable, and valid assessment tools that identify not only risk, but also needs and responsivity to direct programming and supervision decisions (Andrews; Aos, Miller, & Drake, 2006; Latessa, no date; Lowenkamp & Latessa, 2005; Lowenkamp, Latessa, & Holsinger, 2006; Matthews et al.; Reentry Policy Council, 2005; Petersilia, 2007).

Within the choice of community supervision as a sentence, the literature is also clear that the most intensive treatment and intervention programs should be reserved for offenders at high risk for re-offending (Andrews, 2006; Latessa, no date; Lowenkamp & Latessa, 2004; Lowenkamp & Latessa, 2005; Lowenkamp et al., 2006) and to achieve intensive supervision, 40 to 70 percent of an offender's time (i.e., majority of the waking hours) should be occupied by the program (Matthews et al., 2001). Research has also documented that successful community supervision requires high levels of advocacy in order to ensure access to community services for offenders (Andrews; Matthews et al.; Sherman et al., 1997).

### *Incarceration*

After an individual has been sentenced to custody, it is essential that this time includes a focus on changing at-risk behaviors, especially substance abuse (Reentry Policy Council, 2005). Both in-prison therapeutic community interventions (e.g., drug treatment) and prison-based education programs to address reduced opportunities for stable employment and decent wages have received particular attention for their effectiveness (Aos et al., 2006; Reentry Policy Council; Stemen, 2007; Waul & Travis, 2002). In addition, community-based health care providers should be utilized to address the physical and mental health needs of prisoners while in custody so that service options are expanded and the receipt of treatment following release is facilitated (Reentry Policy Council).

---

[3] SB 618 is one of several efforts in California to change current practices in corrections. As described in Chapter 2, part of the evaluation effort will include tracking other statewide efforts initiated by the legislature and the Governor's Office as they relate and could possibly impact this effort in San Diego County.

### Community Reentry

The period of time immediately following release is considered critical to the success of individuals' reintegration into society (Andrews, 2006; Matthews et al., 2001). As such, a great deal of research has been conducted regarding which factors are associated with improved outcomes. Highlights from this work are described below.

- Upon release from custody, supervision should be treatment-oriented rather than focused upon violation detection. For example, drug treatment should continue, with responses to non-compliance issues including increased treatment, rather than more incarceration time (Aos et al., 2006).

- Interventions should be highly structured, involving multiple treatment components that are skill-oriented (e.g., development of social, academic, and employment skills) (Matthews et al., 2001; Sherman et al., 1997).

- Behavioral programs should be used to replace anti-social associations and behavior with pro-social ones by reinforcing clearly identified overt behavior. These programs should include structured social learning that teaches new skills while consistently reinforcing pro-social behaviors and attitudes; cognitive behavioral programs that target attitudes, values, peers, substance abuse, and anger; and family-based interventions that train families on appropriate behavioral techniques (Andrews, 2006; Aos et al., 2006; Latessa, no date; Lowenkamp & Latessa, 2005; Matthews et al., 2001; Reentry Policy Council, 2005; Sherman et al., 1997).

- There should be frequent contact between program participants and staff that is interpersonally sensitive and constructive (Matthews et al., 2001; Sherman et al., 1997).

- A detailed service plan should include the ex-offender in the process, and the services outlined in this plan should be matched with learning style, motivation, and aptitude (Byrne, Taxman, & Young, 2002). In addition, a range of interventions should target those particular needs revealed through the assessment process (Andrews, 2006; Latessa, no date; Lowenkamp & Latessa, 2005; Lowenkamp et al., 2006; Matthews et al., 2001; Reentry Policy Council, 2005; Sherman, et al., 1997).

- With respect to employment issues, the focus should be on providing training related to how to find and keep a job, as well as the skills associated with specific professions (Aos et al., 2006).

- Informal social supports (e.g., family members, society, and peer groups) should be included proactively in the decision-making process regarding reentry plans (Backer, Guerra, Hesselbein, Lasker, & Petersilia, 2005; Byrne et al., 2002; Matthews et al., 2001; Petersilia, 2007; Reentry Policy Council, 2005).

- For low-risk offenders, reentry plans should focus on returning them back to the environments that made them low-risk (Lowenkamp & Latessa, 2004). That is, strategies should build upon previously existing social supports and employment, rather than starting with a blank slate.

- Program participation should be cultivated through positive reinforcement/incentives, with a structured hierarchy of sanctions for non-compliance that includes a 4:1 ratio of rewards to punishments; punishments that are meted out swiftly and consistently; and a process in which punishments are followed by instruction on pro-social alternatives (Byrne et al., 2002; Matthews et al., 2001; Pew Center on the States, 2007; Reentry Policy Council, 2005).

- To adequately meet the needs of female offenders and increase their chance for successful reentry, current research recommends implementing gender-specific programming that acknowledges the needs of women offenders are different than their male counterparts and provides a safe environment fostering dignity and respect, while addressing substance abuse, trauma, mental health, socioeconomic, and family reunification issues (Bloom, Owen, & Covington, 2003; Sydney, 2005).

### *Staffing and Collaborative Partners*

Programs designed with all the components proven to effectively address reentry issues may not succeed if the partnerships and staffing are not effective. With respect to staffing, recruitment, hiring, performance reviews, and professional development should all focus on the skills and motivation necessary to delivering services, and also be matched to the needs of the population receiving services (Matthews et al., 2001). With respect to effective partnerships, the following elements have been documented as increasing the probability of success.

- Objectives and goals are concrete, attainable, related to community needs, and shared by all participants (Backer et al., 2005).

- Membership is clearly defined; an appropriate cross-section of the community includes those directly affected (e.g., families of offenders, faith-based organizations, victim advocacy groups); and all members have the necessary skills and knowledge to participate in the collaboration (Backer et al., 2005) and are involved in all levels of implementation (e.g., policy development, operational practice, and staff decision-making) (Byrne et al., 2002).

- The working process includes mutual respect, trust, understanding, ability to compromise, flexibility, adaptability, clear leadership, and frequent open communication. This communication utilizes both formal and informal methods (Backer et al., 2005).

- There are detailed plans regarding frequency of meetings, agendas, decision-making processes, and responsibilities (Byrne et al., 2002).

- A full-time project director is needed to provide strong leadership (Byrne et al., 2002).

- There are sufficient resources allocated for the program, including funding, staffing, and a favorable political/social climate (Backer et al., 2005; Byrne et al., 2002).

### What Does Not Work

The above best practices are based on evaluations of successful programs. There is also something to be learned from programs that have failed to achieve positive outcomes. For example, the evaluation of New York's Project Greenlight[4] by the Vera Institute of Justice and subsequent roundtable discussion of the findings highlighted two important considerations in the success of prisoner reentry programs. First, cultural compatibility between staff and the target population is needed. Second, participants' trust in staff and the decision-making process impacts program compliance. Examples of ways to cultivate trust are including participants in the decision-making process, applying rules consistently without bias, acknowledging participants' rights and treating them with dignity and respect, and having honest communication illustrating that participants' concerns have been considered (Campbell, 2005).

## PROJECT OVERVIEW

### Program Background

As previously noted, the San Diego SB 618 Program was designed to incorporate best practices to provide a continuum of care to participants from incarceration through their graduation from the program 18 months after release. What follows is an overview of the program as it was envisioned, describing its key partners and program service components, as well as noteworthy milestones and modifications occurring between January 2006 and December 2007.

### SB 618 Legislation

In response to California's growing crisis of recidivism and subsequent prison overcrowding, the San Diego County District Attorney's (DA) Office authored the SB 618 legislation in 2005. The bill was successfully steered through the legislature by State Senator Jackie Speier (D-San Francisco/San Mateo), resulting in its passage into law in October 2005 and became effective January 1, 2006 (see Appendix A for a copy of the bill). This bill is based on the concept that providing tangible reentry support services will increase parolees' reintegration into the community. Although the bill allowed for the possibility of three California counties to implement a program, San Diego County was the first one authorized to create a multi-agency plan and develop policies and programs to educate and rehabilitate non-violent felony offenders. As part of this plan, male offenders sentenced to Richard J. Donovan (RJD) Correction Facility [5] and female offenders sentenced to the California Institution for Women (CIW) [6] would be eligible for the program. The bill emphasized a shift in responsibility for conducting assessments from CDCR to local agencies. At the time of this report, CDCR's intention was to move forward with the San Diego County program before making any further budgetary commitments to other counties.

---

[4] Project Greenlight was launched in 2002 in the State of New York with the goal of reducing recidivism among male ex-offenders leaving prison by assisting them with challenges they may face as part of the reentry process. While the program was also based on best practices from research literature, Vera Institute researchers found arrest rates among program participants were significantly higher than those of two comparison groups.

[5] RJD is located approximately 24 miles south of downtown San Diego. According to CDCR statistics accessed on December 5, 2007, RJD had a total population of 4,684, a design capacity of 2,200, and a staffed capacity of 4,796.

[6] CIW is the nearest women's facility, located approximately 90 miles northeast of downtown San Diego in Riverside County. According to CDCR statistics accessed on December 5, 2007, CIW had a total population of 2,663, a design capacity of 1,325, and a staffed capacity of 2,669.

### *Program Partners*

One of the many positive aspects of the SB 618 Program is the unprecedented collaboration between local and state agencies. Coordinated by the DA's Office and representatives from CDCR, stakeholders began meeting in November 2005 to begin the task of hammering out a forward-thinking, best practices approach to reentry. Since that time, a core group of program partners – referred to as the Operational Procedures Committee – has met weekly to implement the program and confront issues and challenges as they arise. In June 2006, the local SB 618 leadership submitted its multi-agency plan to the County Board of Supervisors, which unanimously approved it, paving the way for full implementation. Table 1.1 shows each of the SB 618 Program partners and their function(s) within the program, including the DA's Office, Defense Bar, Sheriff's Department, Probation Department, CDCR (RJD, CIW, and Parole), Grossmont Cuyamaca Community College District, University of California, San Diego (UCSD), and Comprehensive Training Systems, Inc. (CTS).

## Key Program Components

Incorporating evidence-based practices learned from national models, as shown in Table 1.2, the local SB 618 Program provides case management services to participants to facilitate their successful reintegration into their community, family, and social structure. This level of care begins with the administration of several standardized screenings and assessments to determine level of risk and identify primary needs. Program services continue throughout the duration of participants' prison sentence and are facilitated by a designated Prison Case Manager (PCM). The PCM meets regularly with participants and ensures they receive expedited access to programs (education, vocation, and drug treatment). Six months prior to release, a seamless transition of services is provided by the PCM and the Community Case Manager (CCM) who, with the participants, meets to review the Life Plan, make any adjustments, and discuss concrete steps for transitioning to the outside world. Once released, the participants continue to receive consistent care from the CCM, the Vocational Services Coordinator (VSC), and the Community Roundtable (a body comprised of the CCM, Parole Agent, VSC, and other individual(s) deemed useful to their successful reentry).

### *Eligibility and Exclusion Criteria*

All SB 618 participants are culled from the DA's felony prosecution caseload[7]. All SB 618 participants serve their prison sentences at either RJD or CIW. The opportunity to apply for the program is offered to both male and female non-violent offenders[8]. To be considered for the program, the candidate must be in custody, a legal resident of San Diego County, and have previously agreed (or "stipulated") to a prison sentence of 8 months to 72 months. Individuals with prior convictions for great bodily injury or murder are excluded, as well as arson and sex registrants. Offenders with a violent conviction over five years old are evaluated on a case-by-case basis. The program is not available after sentencing. Participation in the SB 618 Program does not affect the individual's prison sentence in any way. For more detailed information about eligibility and exclusion criteria, see Appendix B.

---

[7] The DA prosecutes all felony and misdemeanor offenses occurring within the County of San Diego, with the exception of misdemeanors in the cities of San Diego and Poway.
[8] Offenders who committed a violent offense more than five years prior may be considered for the program on a case-by-case basis.

**Table 1.1**
**PROGRAM PARTNERS AND THEIR SB 618 FUNCTION**

| | |
|---|---|
| California Department of Corrections and Rehabilitation Division of Community Partnerships | Cooperates with staff from the District Attorney's office to provide leadership and direct program activities. |
| San Diego County District Attorney's Office | Authored SB 618 legislation; coordinates subcommittees to design and implement the local program; provides leadership; pre-screens cases for eligibility; coordinates local court process to facilitate process of program entry; developed and maintains SB 618 database. |
| San Diego County Public Defender's Office | Facilitates resolution to legal issues unrelated to the current case and potentially impacting reentry. |
| San Diego County Defense Bar | Confirms offenders' eligibility and willingness to participate. |
| San Diego County Sheriff's Department | Administrator of local jail facilities; transports participants from jail to prison; conducts medical/dental/mental health screenings. |
| San Diego County Probation Department | Serves as fiscal agent for local SB 618 contracts; conducts pre-sentencing interviews with participants; administers assessments; coordinates and staffs multi-disciplinary team (MDT) meetings. |
| CDCR – Richard J. Donovan (RJD) | Prison for male inmates; conducts medical screenings; classifies all inmates for housing status; provides prison case management and rehabilitative programs (education, vocation, drug treatment); administers assessments. |
| CDCR – Correctional Institute for Women (CIW) | Prison for female inmates; conducts medical screenings; classifies all inmates for housing status; provides prison case management and rehabilitative programs (education, vocation, drug treatment); administers assessments. |
| CDCR – Parole | Supervises participants post-release; participates in Community Roundtable; administers assessments. |
| Grossmont Cuyamaca Community College District | Correctional education services contractor with the Sheriff's Department; administers assessments. |
| University of California, San Diego (UCSD) | Subcontractor providing community case management; prepares participant, family, and community for reentry; administers assessments; participates in MDT and Community Roundtable; under separate contract, serves as SB 618 training coordinator. |
| Comprehensive Training Systems, Inc. (CTS) | Subcontractor providing post-release vocational services for participants with needs unmet through community services; administers pre-release assessments; participates in Community Roundtable. |

SOURCE: SB 618 First Annual Evaluation Report, March 2008, SANDAG

**Table 1.2**
**SB 618 PROGRAM DESIGN COMPONENTS RELATED TO BEST PRACTICES**

| |
|---|
| ➢  Program starts at signing of Letter of Intent. |
| ➢  Ongoing needs assessment conducted. |
| ➢  Community Case Manager (CCM) provides advocacy and brokerage. |
| ➢  Custody time is focused on rehabilitation. |
| ➢  Services are tailored to meet identified needs. |
| ➢  Services include drug treatment and vocational training. |
| ➢  Physical and mental health needs are addressed. |
| ➢  Treatment orientation continues upon release from custody. |
| ➢  Emphasis is placed on high-quality staff contact. |
| ➢  Life Plan created with input from the participant. |
| ➢  Life Plan builds on identified strengths. |
| ➢  Life Plan evolves throughout program participation and includes input from community members upon prison release. |
| ➢  Staff roles are clearly defined and collaboration and community are emphasized. |
| ➢  Services are gender-responsive and culturally-competent. |

*SOURCE: SB 618 First Annual Evaluation Report, March 2008, SANDAG*

### Participant Enrollment Process

Between March and May 2007, all potential cases pre-screened for the program were initially heard at the San Diego Superior Court's downtown branch, the largest of the four operated in San Diego County. This focus on one court was related to funding and staffing constraints which resulted in an enrollment cap of six participants per week. Beginning in May 2007, the decision was made to expand participant selection to a second courthouse located in the City of El Cajon in East San Diego County, and increase enrollment to seven per week to account for smaller than expected numbers during start-up. By the summer of 2007, enrollment had increased and the one hundredth client enrolled in August 2007. At the time of this report, plans were underway to expand to the other two San Diego County courthouses (North County and South Bay) and open enrollment slots to all eligible individuals beginning October 2008. A detailed diagram outlining how individuals are identified, screened, and enrolled in SB 618 is provided in Appendix C.

### Screening and Assessment

A cursory pre-screening of potential participants is conducted by a trained Deputy District Attorney (DDA) in order to identify individuals who are potentially eligible based on type of current offense, criminal history, and potential prison sentence of 8 to 72 months with time to serve of 4 to 36 months. When the defendant decides to plead guilty and agrees to the stipulated sentence, they express their agreement to participate by signing a Letter of Intent (LOI) and Release of Information Waiver (Appendix D) at the time the court takes the change of plea. At this point, a sentencing date is set for at least 20 court days from the date of the plea, during which time more formal screenings and assessments are conducted by the Sheriff's Department, Probation Department, and CDCR

classification[9]. Within 14 days of court referral, four standardized assessments are conducted to determine the level of risk for substance abuse and recidivism, and the need for life skills, basic education, and literacy training. Table 1.3 summarizes the timing of these assessments, which go beyond what is traditionally assessed when inmates are sentenced to prison. Along with the assessments, a Probation Officer conducts a thorough pre-sentencing interview with the participant to explore the facets of the participant's criminal and personal history. At the sentencing hearing, the participants are required to sign a Contract (Appendix D) between themselves and the program indicating what is expected of both parties throughout program participation.

**Table 1.3**
**ASSESSMENT TIMING DESIGN**

| Assessment | Pre | Mid | Post |
|---|---|---|---|
| Medical/Dental | Pre-MDT | None | None |
| ASI | Pre-MDT | 30 days after prison release | Treatment Exit |
| CASAS* | Pre-MDT | None | None |
| Coleman (Mental Health) | Pre-MDT | Unknown | Unknown |
| COMPAS | Pre-MDT | 6 months prior to release | Program exit |
| O*NET** & Myers-Briggs | Post-imprisonment | None | None |
| TABE*** | Pre-MDT | Every 6 months | When get GED |

*Based on data through November 30, 2007, there are no duplicate identification numbers for CASAS data. However, 45 are marked as midpoint assessments and 5 indicate that they are post assessments.

**O*NET is based on the interests, values, and abilities.

***The TABE is only re-administered for participants with no high school diploma or GED. Initially, literacy is assessed. However, reassessments include reading and math.


### Multi-Disciplinary Team and Life Plan Development

The local SB 618 Program incorporates a best practices approach by developing a MDT to discuss a participant's eligibility and level of risk and need based on standardized assessments. The MDT is comprised of staff from Probation, CDCR, and UCSD. MDT meetings are held within 14 days of the participant's referral by the court and before sentencing. The purpose of the MDT meeting is to discuss the results of the screenings, assessments, and pre-sentencing interview; agree on the participant's suitability for the program; and create a course of action for services and case management. These meetings take place at one of two local jails (Las Colinas Detention Facility for females and George Bailey Detention Facility for males), and allow participants to meet the MDT members, ask questions, and learn more about the program and their role in it.

Unique to the SB 618 Program is the creation of the "Life Plan" (Appendix D), a formal and dynamic document that charts the participant's needs and progress from assessment to program completion. Information maintained in the Life Plan includes personal demographics, results from the various screenings and assessments, and case management notes entered by the PCM and CCM pre- and

---

[9] CDCR classifications screen to determine appropriate housing placement. For example, RJD does not accept inmates who are HIV positive or who are confined to a wheelchair because the prison is not equipped to meet these special needs. However, CIW is able to accommodate these special needs for female inmates.

post-release. It also provides a section for participants to add their own comments and give feedback. At no particular point in service delivery does any one program staff member make a stand-alone decision regarding the participant's course of programming. Rather, decisions are made by consensus among program staff and the participant. Three forums at which the Life Plan is formally discussed include: 1) prior to prison at the MDT meeting; 2) during incarceration through discussions between the PCM and CCM; and 3) post-release at the Community Roundtable meetings. The Life Plan is made available to participants throughout their involvement in the program, with the intention that it will be particularly useful as they reintegrate into their family and community.

### Prison Services

#### Prison Case Management

One of the unique features of the SB 618 design is ongoing case management during the participants' prison sentence. This feature is believed to encourage participants to remain constructively engaged while serving time. The role of the PCM is to advocate on behalf of the participants as they maneuver through the complex prison system, and ensure that participants are expedited into classes and programs relevant to their Life Plan objectives. At the time of this report, the professional backgrounds differed among PCMs at the two prisons. At CIW, the role of PCM is filled by Social Workers and, at RJD, it is filled by education professionals. The program is designed for one PCM to maintain a caseload of approximately 60 participants. As the number of participants increases, additional PCMs will be hired to maintain this caseload size.

While participants are in the prison reception center[10] awaiting final classification and housing placement, the PCMs meet with them to begin the engagement process and discuss services and programming options. Once participants transition to permanent housing within the general population, the PCM and participant meet regularly to review and update the Life Plan and ensure the participant is expedited into appropriate programs. Program partners believe the benefit of entering programs more quickly will be an additional enticement for program recruitment.

#### Vocational Training

Over the past few decades, many vocational training programs in California's prisons, including RJD, were dismantled as a result of the emphasis on "punishment" rather than "rehabilitation" (CDCR Expert Panel, 2007). Since 2005, when CDCR shifted its emphasis to "rehabilitation," prisons have struggled to restore these programs, but have encountered bureaucratic hurdles in doing so. For example, RJD, which in 2002 had all of its 19 vocational programs completely cut due to budgetary constraints, found it necessary to remodel classrooms, install new equipment, ensure safety standards were met, and recruit and hire new instructors in order to provide SB 618 participants with relevant vocational training. As of December 2007, RJD offered one vocational class (welding) and had hired a new instructor for a second program (machine shop) on November 30, 2007, with classes to begin on January 7, 2008. Two other programs (electronics and cabinet making) were awaiting the hire of instructors.

---

[10] All newly arriving inmates are processed at one of CDCR's 14 prison reception centers where inmates are screened and evaluated before being assigned to one of the State's 33 prisons. Both RJD and CIW have a reception center within their facilities, with the time spent in the reception center averaging around 60 days (Petersilia, 2006).

Unlike RJD, CIW's vocational programs were not negatively impacted by budget cuts to the same degree, with training continuing to be provided in sewing, construction, graphic arts, word processing, and technical services. In addition, CIW staff is hoping to offer a cosmetology program in the future, but as of December 2007, did not have sufficient space to implement it.

## Education

According to prior research, individuals involved in the justice system are less likely to have completed higher education, compared to those with no history of incarceration. For example, around two in five (41%) inmates and one in three (33%) probationers have not completed high school or obtained a General Equivalency Diploma (GED), compared to 18 percent of the general population. In addition, dropping out of school has been found to be negatively associated with employment (prior to incarceration) and positively associated with recidivism (Harlow, 2003). However, the relationship between educational attainment and an increased propensity for criminal activity is not necessarily a simple one. It is important to note that individuals who recidivate usually have criminal histories that began at an earlier age than non-recidivists, act out in more hostile and non-conformist ways, have suffered from abuse in the past, have mental health issues, and are often homeless, unemployed, and addicted to alcohol and other drugs. While not having the ability to read does not cause one to commit crime, it can be an important part in the equation (Newman, Lewis, & Beverstock, 1993). With these findings in mind, it is clear that by improving a prisoner's educational status, gains will also be made to their self-esteem and their chances of obtaining gainful employment upon release.

Upon entering local custody, participants are administered the Test of Basic Education (TABE) which rates an individual's basic educational skills[11]. Based on the TABE results[12], SB 618 participants can enroll in level-appropriate classes, such as basic literacy, GED coursework, or college classes to give them a more certain foothold upon release. While both CIW and RJD offer college coursework (as of December 2007), both prisons were experiencing bureaucratic obstacles in obtaining funding to purchase textbooks for those participants who had already enrolled in college courses. As of December 2007, UCSD is in the process of purchasing college textbooks for SB 618 participants using grant savings.

## Substance Abuse Treatment

According to Petersilia's 2006 report, *Understanding California Corrections*, 21 percent of California's prison inmates are serving time for a drug-related offense, 43 percent have a "high need" for alcohol treatment, and 56 percent are facing a "high need" for drug treatment (compared to the national average of 49%). Based on these statistics, as well as data from the DA's caseload, local SB 618 leaders expect the majority of program participants will be confronting serious substance abuse issues. Prison substance abuse programs (SAP) are administered by CDCR's recently created Division of Addiction and Recovery Services (DARS) (formerly the Office of Substance Abuse Programs [OSAP])[13]. According to CDCR's Web site, DARS administers both in-prison and community aftercare substance abuse treatment, which adheres to the therapeutic community model, and provides gender-specific services for women. CDCR contracts with two

---

[11] Non-SB 618 participants receive the TABE in the prison reception center.

[12] The initial assessment examines literacy. Reassessments, administered only to those without a high school diploma or GED, examine reading and math.

[13] In February 2007, the California Office of the Inspector General issued a report to the Governor outlining myriad problems within CDCR's OSAP. One result from this report was the restructuring and renaming of OSAP to DARS.

outside agencies (Amity at RJD and Mental Health Systems, Inc. at CIW) to provide in-prison substance abuse programs. The PCMs also coordinate random drug testing of SB 618 participants who have been assessed as needing substance abuse treatment. Drug treatment furlough programs in San Diego County (i.e., Freedom House for men and Lighthouse for women) are available to eligible inmates as another option for receiving drug treatment while serving their prison sentence.

### Post-Release Services

As the number of parolees returning to the community soars, it is clear that neighborhood leaders and public safety officials have a vested interest in exploring strategies to reduce recidivism and promote a productive way of life for parolees[14]. With this in mind, SB 618 was designed to include a seamless transition of case management between prison and the neighborhood. As previously mentioned, in addition to being supervised by a Parole Agent, participants receive post-release case management by the CCM, as well as vocational services as needed by the VSC. All of these professionals, as well as the participant and any other individuals (i.e., family, friends, and clergy) deemed helpful to reentry efforts, meet regularly as the Community Roundtable. These post-release services are described in more detail below.

### Community Case Management

As discussed in the literature review, community-based services that include intensive advocacy have been shown to be more effective in reducing recidivism than institutional programs (Andrews, 2006; Matthews et al., 2001; Sherman et al., 1997). As such, program partners subcontracted with UCSD's Center for Criminality and Addiction Research, Training and Application (CCARTA), in May 2007 to provide community case management. The role of the CCM is multi-pronged and includes pre-release discussions with the PCM and the participant to review and revise the Life Plan as necessary. This pre-release engagement strategy is rooted in the belief that by putting a helpful face to life on the other side of the prison door and creating a structured plan of action, the participant will begin to see that successful reintegration can be a reality. At this time, the CCM and participant discuss concrete plans for where the participant will reside immediately after release.

The CCM's role is to further ensure a seamless transition by meeting participants at the prison gate and transporting them directly to the agreed-upon residence. The CCM remains on-call for 72 hours after the participants' release to answer any questions and continue the momentum of post-release engagement and motivation. Once in the community, participants meet with their CCM on a regular basis to receive resources and services. CCMs also conduct two post-assessments: the Addiction Severity Index (ASI) for substance abuse issues; and the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS) which explores criminogenic risk factors. Both of these assessments are also conducted prior to the MDT. Currently, UCSD has three full-time staff devoted to the project, including one Program Manager, one CCM, and one Housing Specialist (who assists participants in finding stable and affordable housing). Their caseload is 30 to 1 and as the number of participants increases, UCSD will hire additional staff to meet the demand.

---

[14] Community supervision within SB 618 focuses on motivation to change, rather than graduated sanctions. However, a list of sanction options Parole can use for noncompliance is available in cases where a therapeutic focus fails to change behavior.

**Vocational Services**

The SB 618 Program includes a VSC staffed by Comprehensive Systems Training, Inc., which subcontracted with Probation in September 2007. The VCM's role in the program begins while participants are in prison by administering the Occupational Information Network (O*NET) and Myers-Briggs assessments within 90 days of the participants' incarceration. If after release a participant requires assistance with vocational readiness beyond what is currently offered in the community, the VSC will assist with job readiness skills and resources, as well as creating positive linkages with prospective employers to maximize participants' vocational success.

**Behavioral Health Services**

One of the original features built into the SB 618 Program was to incorporate post-release case management that focuses on participants' behavioral health, including substance use and mental health needs. This service component not only adheres to best practices (Osher, Steadman, & Barr, 2003) but is considered vital by program partners to serve the high number of participants anticipated to be struggling with serious substance abuse and mental health issues.

**Community Roundtable**

Another best practices approach is one that includes informal social supports and the community in the participant's reentry plan (Backer et al., 2005; Byrne et al., 2002; Matthews et al., 2001; Petersilia, 2007; Reentry Policy Council, 2005). The local SB 618 Program has followed that guidance by developing the Community Roundtable, a multi-disciplinary forum which formalizes regular meetings (no fewer than two per month) among the participant, Parole, CCM, and VSC to discuss existing needs, review the Life Plan, and ensure that the participant is on the right path. In addition to the above-mentioned professionals, participants are encouraged to invite to the Roundtable any individuals they feel are supportive of their success. This person could include family, friends, sponsors, and clergy. The Community Roundtable is another example where decisions regarding the participant's Life Plan are made in concert with the participant and program staff.

## Program Services Compared to "Treatment as Usual"

While the previous discussion has highlighted what services are provided to SB 618 participants, the effect of the services cannot be easily understood without having a comparison group which receives "treatment as usual." While more information is provided in Chapter 2 regarding the research design and how this comparison group is selected, Table 1.4 outlines the differences between services available to SB 618 participants and those receiving "treatment as usual" within the prison and parole systems. Specifically, while prisoners not in SB 618 complete a pre-sentence interview with Probation, have priority access to prison services, are eligible for parole supervision, and can access community services, they do not receive the full array of services previously described.

**Table 1.4**
**SB 618 SERVICES COMPARED TO "TREATMENT AS USUAL"**

|  | Treatment as Usual |
|---|---|
| **Prior to Entering Prison** | |
| Pre-sentencing interview with Probation | Yes |
| Screening and assessment | No |
| Individualized Life Plan | No |
| MDT meeting | No |
| **In Prison** | |
| Prison case management | No |
| Expedited entry into prison services | No |
| Access to all prison services | Yes |
| Vocational assessment in prison | No |
| **Post Release** | |
| Community case management | No |
| Parole supervision | Yes |
| Vocational services | No |
| Community Roundtable | No |
| Access to community services | Yes |

*SOURCE: SB 618 First Annual Evaluation Report, March 2008, SANDAG*

## Evaluation Overview

CDCR believes a formal evaluation of the SB 618 Program is warranted to show other interested parties how the program was designed, implemented, and whether or not it worked for participants. Discussions were held throughout 2006 with various researchers to provide expertise in developing a research design and offer insights into best practices learned from other jurisdictions. SANDAG's Criminal Justice Research Division was a regular participant at these early meetings and was selected to conduct the independent process and impact evaluations. SANDAG contracted with the Probation Department in September 2006 to complete a three-year evaluation, with the possibility of an extension to continue collecting and analyzing outcome data.

SANDAG has a rich 30-year history serving as the Clearinghouse for crime data analysis for the San Diego region. Over the years, SANDAG has conducted various reentry-related research studies with a variety of populations (e.g., programs for adults, juveniles, and mentally ill offenders); collaborated with the DA's Office on the Reentry Mapping Network, part of a cross-site project managed by the Urban Institute and funded by the Anne E. Casey Foundation; and served as an active member of the San Diego Reentry Roundtable[15] since its inception in 2003.

---

[15] The Reentry Roundtable is a local collaborative comprised of approximately 200 community members, private and governmental agencies, and formerly incarcerated individuals. Meeting monthly, the Roundtable serves as a forum to share information, discuss ways to provide integrated services, review existing policies and procedures, and recommend necessary changes.

## PROGRAM IMPLEMENTATION: MILESTONES AND MODIFICATIONS

### Milestones

Since SB 618 legislation was signed into law and a multi-agency plan was approved in San Diego County (24 and 18 months ago, respectively, at the time of this first report), a number of key program milestones have been documented. As shown in Table 1.5, these have included enrolling the first (February 2007) and one hundredth (August 2007) client, as well as seeing the first participant released from prison (November 2007). In addition, staff has actively engaged and educated various stakeholders, created a program database, and filled additional key staff positions.

**Table 1.5**
**SB 618 PROGRAM MILESTONES**

| | |
|---|---|
| SB 618 is signed into law by Governor Schwarznegger | October 2005 |
| DA and CDCR coordinate ongoing meetings to finalize program design | November 2005 – June 2006 |
| San Diego County Board of Supervisors approves the Multi-Agency Plan | June 2006 |
| SANDAG is selected as independent evaluator of SB 618 | September 2006 |
| Presentation on SB 618 to local stakeholders at the executive level | October 2006 |
| Presentation on SB 618 to local community and service providers | November 2006 |
| First participant enrolled in program | February 2007 |
| Program officially began with weekly intakes | March 2007 |
| To increase numbers of eligible and willing individuals, program expands to the El Cajon/East County Courthouse | May 2007 |
| DA's database is operational and program partners and key staff are trained to use the database | May 2007 |
| UCSD coordinates training for staff at CIW and RJD about SB 618 Program elements | June 2007 |
| First participant signs Informed Consent formally enrolling him in the evaluation | July 2007 |
| First vocational program re-established at RJD | August 2007 |
| One hundredth participant enrolled in program | August 2007 |
| Vocational services contractor hired | September 2007 |
| Training held for defense bar | September 2007 |
| First participant is released from prison | November 2007 |

*SOURCE: SB 618 First Annual Evaluation Report, March 2008, SANDAG*

## Modifications

While program staff is committed to maintaining program fidelity and adhering to proven practices, several administrative decisions were already made which necessitated changes to the original design. While a description of how staff viewed these decisions is provided in Chapter 3, they are highlighted here to provide context for later analyses.

- **Streamlining Entrance Into Programming:** In February 2006, the Medical Receiver[16] announced he would not honor San Diego County's medical screening, requiring that they be readministered in the prison reception centers. Dental assessments have also been duplicated in the reception center after completion by the Sheriff's Department. As a result, one of the enticements to enrolling in SB 618 was eliminated (bypassing the reception center and thereby more quickly assimilating into the general prison population). Once participants enter the reception center, the length of stay prior to transfer into the general population has been longer than intended. For example, the transfer of paperwork between CIW and CDCR classifications is slow. Scanners are being installed to expedite this process. The program's anticipation of reducing costs by eliminating time spent in reception may not be realized to the extent originally planned. The program is currently focusing on reducing the time participants spend in reception.

- **Loss of Behavioral Health Component:** In April 2007, one month after the program was implemented, CDCR announced that it would not fund the SB 618 behavioral health services (i.e., for substance use and mental health needs) component, opting instead to continue filling Substance Abuse Services Coordinating Agencies (SASCA)[17]-funded drug treatment beds rather than expending new monies for a broader range of behavioral health services. However, program partners are still committed to pursuing this service component and are in discussions with CDCR.[18]

- **Inclusion of CCCMS[19] Inmates:** The program was initially restricted from keeping Correctional Clinical Case Management System (CCCMS) inmates because these individuals were not able to be housed in the Minimum Security Facility (MSF) at RJD (one of the locations where SB 618 clients are housed) without a "double override" (a process used in classifying inmates in which classification staff can "override" a housing restriction). However, in August 2007, CDCR agreed to temporarily[20] allow CCCMS inmates to remain in the MSF, paving the way for them to participate in SB 618.

---

[16] As a result of a 2001 class action lawsuit brought against the State of California which found the prison's medical system violated inmates' constitutional rights under the eighth amendment, a federal judge transferred all authority for managing prison medical care to a court-appointed Medical Receiver. The mission of the Medical Receiver is to ensure that medical care within the California prisons meets constitutional guidelines.

[17] The Substance Abuse Services Coordinating Agencies (SASCA) are instrumental in placing parolees into community-based programs within the county to which they parole.

[18] CDCR is reviewing the cost effectiveness of the proposed behavioral health contract.

[19] Inmates classified CCCMS are housed in the general population and participate in prison programming. If taking prescribed medication, they are seen periodically by a psychiatrist. Inmates with more serious mental health needs are classified EOP (Enhanced Outpatient Program) and are provided separate housing in a more structured therapeutic environment.

[20] This issue requires negotiations with the union.

- **Limited Programming at RJD:** Budgetary cuts in 2002 all but eliminated vocational programming at RJD (similar to prisons throughout California). In addition, overcrowding in the prison has resulted in bunks filling rooms traditionally reserved for rehabilitative programs. As a result, vocational and other services have been limited during 2007. Program partners continue to discuss solutions at weekly Operational Procedures Subcommittee meetings. CDCR is in the process of obtaining portable classrooms to rectify this problem.

## SUMMARY

In response to California's growing crisis of recidivism and subsequent prison overcrowding, the San Diego County District Attorney's Office sponsored and drafted SB 618 in 2005, which was signed into law in October 2005, and became effective January 2006. The program's design phase included unprecedented collaboration among CDCR and San Diego County agencies, resulting in the first SB 618 participant enrolling into the program in March 2007. Key components of SB 618 include providing an array of screenings and standardized assessments prior to the individual entering prison to identify risks and needs and match appropriate services to address those needs. Additionally, seamless case management, vocational assistance, and input from a multi-disciplinary team are incorporated. This first annual evaluation report produced by SANDAG provides an overview of relevant literature, describes program implementation to date, outlines the research methodology, and provides preliminary process evaluation results.

# CHAPTER 3
# PROCESS EVALUATION

## INTRODUCTION

A key component of the process evaluation is gaining feedback from staff members responsible for program implementation and management (i.e., program partners), as well as the provision of services (i.e., key staff). In 2007, the first annual surveys were distributed to these individuals to get their perspectives regarding program implementation and management, how well current program components are operating, how well partners are working with one another, and what areas for improvement exist. Their responses are summarized to provide preliminary information related to four of the process evaluation questions. Future reports will include additional process information from these groups as the surveys are readministered, as well as when data are collected from other sources (e.g., participants themselves).

## SAMPLE DESCRIPTIONS

### Program Partners

In July 2007, an electronic version of the program partner survey was distributed to 41 individuals. In addition, a hard copy was mailed to one partner who did not have the ability to complete the survey online. The list of individuals who were invited to participate in this survey was created with input from the Operational Procedures Subcommittee and was defined as "individuals who have been integral participants in planning and managing the SB 618 Program (either currently or in the past), whether or not they have had direct contact with SB 618 participants." A total of 32 surveys were completed and returned, yielding a 76 percent response rate.

Surveys were returned by a diverse sample, reflecting the Operational Procedures Subcommittee itself[1]. Specifically, 28 percent were currently employed by the California Department of Corrections and Rehabilitation (CDCR), 22 percent by the District Attorney's (DA) Office, 19 percent by the Probation Department, 16 percent by the Sheriff's Department, 6 percent by the Public Defender, 6 percent by the University of California, San Diego (UCSD), and 3 percent by the County's Public Safety Group. Half (50%) of these individuals reported first becoming involved in SB 618 from 12 to 18 months prior (January through June 2006), one-quarter (25%) were involved even before the passage of the legislation, and the rest reported being involved between 6 and 12 months (16%) or less than 6 months (9%).

---

[1] Based on attendance recorded in the meeting minutes from August 2006 through November 2007, the following organizations were consistently represented at these weekly meetings: Sheriff's Department (2.1 attendees on average), District Attorney's Office (6.1), the California Department of Corrections and Rehabilitation (2.1), California Institution for Women (1.1), Parole (1.2), Probation (3.1), the University of California, San Diego (.8), and Richard J. Donovan Correctional Facility (2.7). In addition, in preparation for prison releases in November 2007, one to two representatives from Comprehensive Training Systems, Inc. began attending in mid-September 2007. Other groups periodically represented included the San Diego County Public Safety Group, Public Defender, the faith community, and Mental Health Systems, Inc.

## SUMMARY

As part of the process evaluation, surveys are being conducted on an annual basis with program partners, individuals represented on the SB 618 Operational Procedures Subcommittee and involved in program implementation/management, as well as with key staff who have direct contact with participants either in- or out-of-custody. In 2007, the first series of surveys was conducted, which resulted in input from 32 program partners representing a total of seven agencies and 14 key staff who were involved in client screening, assessment, and/or case management. According to the feedback from these individuals, it appears that while program implementation and management were not without challenges, both have gone well overall, which reflects the close level of collaboration and communication among local team members, as well as good staffing and leadership. As part of the implementation process, necessary modifications were made, some of which were seen as having a positive impact on the program (such as expanding the program), while others were perceived to have had a negative effect (such as the decision to duplicate medical assessments). Staff was clear in noting that some components, such as the MDT, were working better than others (e.g., prison case management). However, most of the partners and staff at different levels were similarly optimistic that the program would result in long-term system changes, including a stronger focus on rehabilitation. Some issues identified from this effort included the need to revisit the eligibility criteria in the future with the possibility of broadening it, further examining information flow between program partners and key staff, and identifying the extent of possible problems related to prison case management and prison programming as the program continues to grow.

# CHAPTER 4
# LESSONS LEARNED

## INTRODUCTION

Senate Bill 618 (SB 618), authored by the San Diego County District Attorney's (DA) Office, was passed into law in 2005 with the goal of reducing recidivism and increasing the probability of successful reentry for individuals leaving prison and returning to California communities. SB 618 is based on best practices and the concept that providing tangible reentry support services will increase parolees' chances of successful reintegration into the community. Information is provided in this first annual evaluation report regarding the program itself, as well as details regarding the process and impact evaluation. Preliminary information from key staff and program partner surveys is also described. In this last chapter, preliminary "lessons learned" during the first year of implementation are outlined.

## LESSONS LEARNED

While program implementation is still occurring, and the first program participant is exiting prison and reentering the community, it is important to summarize some key points that have been learned to date as part of this project. The following "lessons learned" were documented from the process evaluation results through December 2007, as well as from feedback given by representatives from each of the partner agencies. In compiling this list, emphasis was placed on documenting relevant information for other jurisdictions interested in implementing a similar program. As additional information is obtained over time, this list will be updated.

### What Has Worked Well?

- **Conducting more thorough substance use and vocational assessments**: As part of SB 618, assessments are conducted locally, beginning before a participant is transferred to the prison reception center. During program development, partners thoroughly discussed which assessments should be conducted and agreed that additional information would be useful regarding participants' substance use and vocational needs. The information gained from these assessments is used in the creation of each participant's Life Plan. Because this is a dynamic document administered and modified over the course of the participant's enrollment in the program, it allows the program staff to measure improvement. Key staff and program partners surveyed as part of the process evaluation indicated that these assessments are effective.

- **Utilizing an interdisciplinary team approach**: Attention was paid to best practices in developing the SB 618 program by incorporating interdisciplinary team approaches at two key points in a participant's progress. The first of these is the Multi-Disciplinary Team (MDT) meeting held prior to the participant's sentencing to review their eligibility and discuss screening and assessment results. These meetings are staffed by a Probation Officer, Community Case Manager (CCM), and the prison classification officer. The second of these interdisciplinary forums, the Community Roundtable, is convened on an ongoing basis from the participant's release to their exit from the program. In attendance are the Parole Agent, CCM, participant, and any other individuals significantly involved in the participant's reentry effort. The MDT meetings were noted as particularly effective by key staff and program partners surveyed as part of the process evaluation.

- **Ensuring ongoing communication between program partners**: A culture of open communication has been fostered among program partners and key staff across agencies through weekly Operational Procedures Subcommittee meetings. These meetings were first convened in November 2005 and have been regularly attended by key individuals to discuss issues, brainstorm possible solutions, and come to agreement on the best course of action. There have been several examples of problem solving through open communication during these meetings. For example, in response to discussions about prison funding constraints related to obtaining college textbooks, as of December 2007, UCSD is in the process of purchasing the books through grant savings in the budget for community case management.

- **Creating a project-specific database**: One of the more behind-the-scenes successes of the San Diego SB 618 program is the development of a Web-based data management system designed specifically for the local SB 618 program. With frequent input from program partners and key staff, the District Attorney's Office Information Systems staff created a user-friendly database that captures data on each participant from screening/assessment through graduation. Hands-on training was provided to all users, and the DA's staff has been flexible in revising the system when new data elements are needed. Recently, the DA staff completed the automation of the Life Plan to allow it to be updated on-line and shared among program staff. The database has also proven crucial to program partners, key staff, and the evaluators in monitoring program implementation.

## What Could Have Been Done Differently?

- **Acknowledging that certain positions require certain skill sets**: The role of Prison Case Manager (PCM) at the women's prison (CIW) was filled by social workers and at the men's prison (RJD), these positions were filled by educators. This staffing difference was debated early in the design stages of the program, with CIW staff emphasizing a history of using social workers for any type of case management. RJD staff felt their educational staff were fully up to the task of providing appropriate case management services, and the program partners agreed to implement the program with this staffing difference in place. However, over the course of program implementation, qualitative differences between the case management provided at CIW and RJD became more apparent and program partners concluded that the PCM role (which includes advocating for the participant during their incarceration) might be better suited to social work staff.

- **Anticipate to the greatest degree possible the logistical needs and possible pitfalls for service delivery**: The implementation of vocational services at the RJD facility was delayed in 2007 due in large part to drastic funding cuts that occurred in 2002, which essentially dismantled all vocational programming inside many California prisons, including RJD. These cuts resulted in a loss of the infrastructure needed by RJD to provide vocational training for participants. As a result, RJD faced considerable bureaucratic hurdles to remodel classrooms, purchase up-to-date equipment, and hire instructors. Prison overcrowding in RJD limited programming because inmates are housed in areas traditionally used for rehabilitative services. As of the completion of this report, the California Department of Corrections and Rehabilitation (CDCR) is still in the process of obtaining portable classrooms for programming. It would be beneficial for other jurisdictions to take stock of their existing programming resources and fully develop their capabilities prior to implementation. Being proactive in this regard could help avoid facing time-consuming bureaucratic hurdles delaying full implementation.

## What Else Should Other Potential Sites Know From The San Diego Experience?

- **Factors beyond a program's control can significantly impact program implementation**: A key component of the original SB 618 design was conducting assessments locally, rather than waiting until a participant arrived at the prison reception center. However, as the program was being implemented, a federal court decision was made for a Medical Receiver to have complete oversight of all CDCR medical services. The first individual appointed to this Receivership position made the decision that medical screenings conducted by San Diego County should not be honored. Similarly, mental health services are under the auspices of a Receiver who has not approved local mental health assessments. As a result, duplicate screenings occurred, and decreases in the amount of time spent at the reception center will be smaller than originally anticipated. The Medical Receiver and SB 618 program partners continue to be in communication and plan to revisit these issues in the hope of allowing the local screenings. Future reports will examine the length of time in the reception center for both the treatment and comparison groups to examine the impact of these policies and any changes that may arise from ongoing negotiations.

- **Remain committed to instituting best practices, despite delays that may occur along the way**: A key component of the initial program design, and a best practice, was the provision of behavior health services (i.e., for substance use and mental health issues). While it was not feasible for this to be put into place as early as planned, program partners remain committed to it and are continuing to investigate ways for its implementation with CDCR assessing the cost-effectiveness of the proposed behavioral health contract. In the interim, residential drug treatment is available through Substance Abuse Services Coordinating Agencies (SASCA), though mental health services are still lacking.

To date, the SB 618 prisoner reentry program in San Diego has developed a process and implemented it. The Operational Procedures Subcommittee continues to be the primary forum for candidly working out issues. Over the next year, the evaluation will continue to document the process of program implementation and begin to assess program impact as individuals are released from prison and begin the reentry process in the community.

# SB 618 EXCLUSION/TERMINATION CRITERIA

1.  Unable to be endorsed to RJD-I or RJD-III or CIW due to the following:

    A.  Medical Needs
        - Americans with Disabilities Act (ADA) requirements - Mobility/Vision/Hearing
        - Special Needs-HIV, dialysis
        - Outpatient Hospital Unit (OHU) or assisted living needed
        - Long-term care facility needed
        - Not medication or treatment compliant

    B.  Protective Custody Needs
        - Requires placement at Sensitive Needs Yard (SNY)
        - Requires placement outside of Southern CA
        - Requires out-of-state placement
        - Requires placement at another institution due to specific enemy currently located at facility/unable to separate on yard

    C.  Psychiatric Needs
        - Requires acute care
        - Requires intermediate care
        - Requires hospitalization

    D.  Developmental Needs
        - Requires level of care not provided at RJD

2.  Changed Mind/Now Prefers

    - Camp
    - California Out-of-State Placement (COCF)
    - Restitution Center
    - Work Furlough
    - Community Correctional Facility (CCF/MCCF)
    - Transfer to another institution
    - Mothers Community Program

3.  Changed Goals/No Longer Interested in

    - Drug Treatment
    - Education
    - Vocational Training

4.  Behavioral Problems

    - Serious Rules Violation
    - Administrative Segregation Unit (ASU) Placement
    - Security Housing Unit (SHU) Placement
    - Psychiatric Services Unit (PSU) Placement

5.    Obtained Parole Violation with a New Term Central File

- Prior behavioral/programming concerns noted
- Placement Score Level IV
- Prior prison gang membership or debrief noted

6.    Prison Gang Membership

7.    Refused to Sign Consent

8.    Exhibits Lack of Motivation to Complete Program (example, aftercare component)

9.    Further Review of Records Indicate

- Potential Immigration Customs and Enforcement (ICE) hold
- Hold, Warrant or Detainer which would result in inmate not paroling to the community upon completion of time served, but picked up by another agency for further action
- Restrict participation due to past Good Cause Finding by the Board of Parole Hearings, but not conviction, for sex or other serious offense which gives Multidisciplinary Team members concern
- Potential Mentally Disordered Offender per screening results

10.   Wants Out-of-State Parole (unable to complete aftercare component)