PRISON LAW OFFICE
DONALD SPECTER BAR NO.: 83925
STEVEN FAMA BAR NO.: 99641
E. IVAN TRUJILLO BAR NO.: 228790
GENERAL DELIVERY
SAN QUENTIN, CALIFORNIA 94964
TELEPHONE: (415) 457-9144

BINGHAM, MCCUTCHEN, LLP
WARREN E. GEORGE BAR NO.: 53588
THREE EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA 94111
TELEPHONE: (415) 393-2000

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN BAR NO.: 096891
JANE E. KAHN BAR NO.: 112239
AMY WHELAN BAR NO.: 215675
LORI RIFKIN BAR NO.: 244081
SARAH M. LAUBACH BAR NO.: 240526
315 MONTGOMERY STREET, 10TH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830

HELLER, EHRMAN, WHITE & MCAULIFFE
RICHARD L. GOFF BAR NO.: 36377
701 FIFTH AVENUE
SEATTLE, WASHINGTON 98104
TELEPHONE: (206) 447-0900

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER BAR NO.: 158255
LEWIS BOSSING BAR NO.: 227402
600 HARRISON STREET, SUITE 120
SAN FRANCISCO, CA 94107
TELEPHONE: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | No.: Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants | |
| MARCIANO PLATA ,et al., | No. C01-1351 THE |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | **EXPERT REPORT OF PABLO STEWART, M.D.** |
| vs.    Defendants | |

## TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ................................................................................ 1

II.  OPINIONS .......................................................................................... 9

    A.   Opinion 1:  Overcrowding Within The CDCR Is The Primary Cause Of The Constitutional Violations Currently Experienced By *Coleman* And Plata Class Members ......................................................................... 9

        1.   My Knowledge and Experience with Overcrowded Systems ........................... 9

        2.   The Characteristics Typically Seen in Overcrowded Systems ...................... 11

        3.   The CDCR is a Severely Overcrowded System ............................................. 14

            (a)  Broad Reviews of the CDCR and Crowding ........................................... 14

                The Governor's Declaration of a State of Emergency ........................... 15

                The Receiver's 6/11/07 Supplemental Report on Overcrowding .......... 15

                Receiver's 5/15/07 Report on Overcrowding ...................................... 16

                    The Receiver's overview of the current overcrowding crisis .......... 16

                    Historical factors at work in creating the current crowding crisis .............................................................................................. 17

                    Staffing problems associated with the current overcrowding crisis .............................................................................................. 17

                    Intake and processing burdens associated with overcrowding ........ 18

                    Impact of overcrowding on bed space for various categories of prisoners ................................................................................... 19

                    Impact of overcrowding on reception centers ................................. 20

                    Problems with new construction projects ......................................... 21

                    Overcrowding-related lockdowns ................................................... 21

                    Overcrowding-related competition for space and resources between medical and mental health providers ................................ 22

                    Overcrowding related CTC/MHCB bed shortages .......................... 23

                    The Receiver's conclusions ........................................................... 23

                The *Coleman* Special Master's Report on Overcrowding ...................... 24

i

Delays in access to higher levels of care ......................................... 24

Delays in construction projects to remedy shortages at higher
levels of care. ................................................................................. 25

Access to Mental Health Crisis Beds (MHCBs) ............................... 25

Inadequate staffing ........................................................................... 26

Adequate treatment and office space for clinicians. ........................ 27

Increasing demand for mental health services due to
overcrowding .................................................................................... 28

(b) Evidence Concerning Overcrowding-Induced Constitutional Violations at
the Individual Prisons I Visited ................................................................. 29

(i) Deuel Vocational Institute (DVI) Tour ........................................... 29

Inadequate Office and Treatment Space at DVI ........................ 31

DVI's Practice of Housing Suicidal Inmates in Administrative
Segregation Units ..................................................................... 33

Access to Higher Levels of Care at DVI .................................... 35

Medication Management Problems at DVI ................................. 35

Inadequate Medical Records at DVI ......................................... 37

Medical Care Issues .................................................................. 38

The High Level of Acuity of Mentally Ill Inmates at DVI ............ 38

(a) Interview with DVI *Coleman* Class  Member B ............................ 39

(b) Interview with DVI *Coleman* Class Member C ............................ 40

(c) Interview with DVI *Coleman* Class Member D ............................ 40

(d) Interview with DVI *Coleman* Class Member E ............................ 41

(e) Interview with DVI *Coleman* Class Member F ............................ 41

(f) Interview with DVI *Coleman* Class Member G ............................ 42

The March 2007 Suicide of *Coleman* Class Member H at DVI
Illustrates the Severe Consequences of Overcrowding-Related
Problems .................................................................................. 42

(ii) California State Prison Solano Tour ............................................. 45

Solano Tour Overview ............................................................... 45

Overcrowding in the H-Dorm at Solano .................................................. 45

Staph Infections ........................................................................................ 46

The High Level of Acuity of Mentally Ill Inmates at Solano ................... 46

Solano's Significant Mental Health Population, Including in
Administrative Segregation ...................................................................... 47

Medication Problems ................................................................................ 48

(iii)  Salinas Valley State Prison (SVSP) Tour ..................................................... 51

SVSP Tour Overview ................................................................................ 51

Custody Staff Vacancies Are Impacting Clinical Care at SVSP. ............. 52

Impact of Use of Contract or Registry Staff on Quality of Care at
SVSP .......................................................................................................... 52

Fragmented Care at SVSP Due to Over-Reliance on Contract Case
Managers .................................................................................................... 52

Impact of Excessive Lockdowns at SVSP ................................................ 53

CCCMS Care on C-Facility ...................................................................... 53

Suicide of SVSP CCCMS *Coleman* Class Member P Who Was
Classified As a Medical Necessity Case ................................................... 54

Interviews with C-Facility CCCMS patients ............................................ 57

EOP Care on D-Facility ............................................................................ 57

Access to ICF care at the SVSP DMH programs ...................................... 58

Problems With Access to MHCB Care and Other Higher Levels of
Care at SVSP ............................................................................................. 58

Deficient Medication Distribution Practices at SVSP .............................. 60

Impact of Gym Housing on SVSP CCCMS Inmate .................................. 62

Interviews with CCCMS Inmates at SVSP ............................................... 62

(1)    Interview with SVSP *Coleman* Class Member U .......................... 62

(2)    Interview with SVSP *Coleman* Class Member V .......................... 63

(c) Evidence of Overcrowding's System-Wide Impact in Various Areas of
Prison Administration and In the Delivery of Health Care ............................. 63

(1)  Timely Access to Appropriate Levels of Mental Health Care
     -- Access to Programs/Sufficient Beds........................................... 64

     Specific Areas Where Failure to Access Higher Levels of
     Care is Most Dangerous................................................................ 68

     MHCB Access ............................................................................. 68

     Access to DMH Care ................................................................... 69

     Movement of EOP and CCCMS Inmates Out of Reception
     Centers ....................................................................................... 69

(2)  Access to Medication. ................................................................. 71

(3)  Improper "Overflow" Housing of Suicidal Inmates ..................... 71

     The Suicide of *Coleman* Class Member W at CSP-
     Sacramento in May of 2007 in an OHU Demonstrates the
     Dangerousness of Using These Units to House Suicidal
     Inmates........................................................................................ 73

(4)  The Impact of Overcrowding on Suicide Rates ............................ 75

     The Suicide of *Coleman* Class Member X illustrates various
     overcrowding-related care issues as well as the dangers of
     housing suicidal inmates in administrative segregation .................. 78

(5)  Staffing Shortages ....................................................................... 78

(6)  Adequate Treatment and Office Space for Clinicians to Use. ....... 79

4.  Overcrowding is the Primary Cause of the Constitutional Violations in
    the CDCR .......................................................................................... 81

    The Persistence of the Constitutional Violations Present in the
    CDCR Demonstrates that They Are Caused by Overcrowding............... 81

    The *Coleman* Special Master has Found that Overcrowding has
    undermined progress that was being made in various areas .................... 82

    The Percentage of Caseload Inmates in the CDCR is Increasing
    Faster that the Overall Population........................................................... 82

    In Many Instances, the Overcrowded Conditions Themselves Are
    the Cause of the Unconstitutional Mental Health Care ........................... 83

B.  Opinion 2:  Other Remedial Efforts Will Not Succeed In Remedying The
    Underlying Constitutional Violations. .................................................... 85

## EXPERT REPORT OF PABLO STEWART, M.D.

### I.   INTRODUCTION

1.      I am a physician licensed to practice in California, with a specialty in clinical and forensic psychiatry.  A true and correct copy of my current curriculum vitae is attached hereto as **Exhibit A**.

2.      In 1973, I earned a Bachelor of Science Degree at the United States Naval Academy in Annapolis, Maryland, with a major in chemistry.  In 1982, I received my Doctor of Medicine from the University of California, San Francisco, School of Medicine.  In 1985, I received the Mead-Johnson American Psychiatric Association Fellowship for demonstrated commitment to public sector psychiatry and was selected as the Outstanding Psychiatric Resident by the graduating class of the University of California, San Francisco, School of Medicine.  In 1985-1986, I served as the Chief Resident of the U.C. San Francisco Department of Psychiatry at San Francisco General Hospital and was responsible for direct clinical supervision of seven psychiatric residents and three to six medical students.

3.      Throughout my professional career, I have had extensive clinical, research, and academic experience in the diagnosis, treatment, and prevention of mental illnesses in correctional and other institutional contexts.  In my work, I have specialized in community and correctional treatment programs for individuals with chronic and severe mental illnesses, as well as substance abuse and related disorders.  I have also specialized in diagnosis, treatment, and care programs for persons with Major Depressive Disorder and Post Traumatic Stress Disorder (PTSD), in the management of patients with dual diagnoses and the application of psychotropic medication to such individuals, and in the history and use of psychotropic medications in institutionalized populations.  I have designed and taught courses in correctional psychiatry at the University of California, San Francisco.  I have also designed and taught courses on the protocols for identifying

1

and treating psychiatric patients with various disorders and have supervised psychiatric residents in teaching hospitals.  I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance abuse, and preventative medicine.

4.      I also have extensive experience managing, monitoring, and reforming correctional mental health systems.  Between 1986 and 1990, I was the Senior Attending Psychiatrist for the Forensic Unit of the University of California, San Francisco, which was located at San Francisco General Hospital.  In that capacity, I had administative and clinical responsibility for a 12-bed maximum security psychiatric ward and worked as the liason with the Jail Psychiatric Services of the City and County of San Francisco.  My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

5.      Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco.  In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital.  At the time, mental health care in the San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992).  In the 1980s, San Francisco's jails were overcrowded, and the *Stone* consent decree included remedies designed to limit overcrowding.   While I was working as the Director of Forensic Services in San Francisco, the plaintiffs in the *Stone* case brought contempt proceedings against the City because of ongoing overcrowding that they asserted violated the consent decree.

6.      I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions.  For ten years, between April 1990 and

2

February of 2000, I served as both a medical and a psychiatric expert for the United

States District Court for the Eastern District of California in the consent decree case

*Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636.   Among other things, that case

involved the provision of adequate psychiatric care to mentally ill inmates at the

California Medical Facility (CMF) in Vacaville, California.   The *Gates* Consent Decree

included various restrictions on overcrowding, and at times the parties in the case agreed

to limitations on the size of the population of mentally ill inmates at CMF in order to

prevent the mental health programs there from being overwhelmed and undermined by

excessive transfers of mentally ill prisoners from other prisons.   During my time

monitoring CMF, California introduced its new state-wide Mental Health Services

Delivery System (MHSDS) as part of the implementation of the remedy in the *Coleman*

case.   Given the requirements of the new MHSDS being implemented at CMF, the

California Department of Corrections and Rehabilitation (CDCR) limited the number of

inmates allowed to transfer to CMF in order to give the new MHSDS programs the

ability to provide adequate psychiatric care.

      7.      My experiences working on the *Gates* case also informed me about the

difficulty of providing mental health services in locked, high security units.   As part of

the *Gates* case, CMF was forbidden from housing mentally ill inmates in its Willis Unit,

a three-tier administrative segregation unit, because of the severity of conditions and the

acknowledged difficulty of providng adequate mental health services in this type of

setting.

      8.      Between October 1996 and July 1997, I served as a psychiatric expert for

the United States District Court for the Northern District of California in the case of

*Madrid v. Gomez*, 889 F. Supp. 1146 (N.D. Ca. 1995), an omnibus case involving

psychiatric care and other issues at Pelican Bay State Prison in Cresent City, California.

In my work on that case, I gained first-hand knowledge concerning the severe impact of

prolonged isolation in segregation units on mentally ill inmates, as well as a concrete

understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in lock up units in order to prevent any further decompensation, since housing in these units by itself contributes to psychiatric instability.

9.      Between July of 1998 and February of 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and treatment facilities operated by the State of Georgia.  In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities.  The Agreement encompassed mental health care, medical care, educational services, and treatment programs.  Overcrowding was a major issue in the Georgia case.  It was clear from the outset of the monitoring that overcrowding severely limited the ability of staff in the Georgia youth facilities to meet the medical and mental health needs of the youths in their charge.  As part of the Agreement to address overcrowding, Georgia was required to limit the intake of youths from the counties into their state juvenile system in order to prevent the fragile mental health system from being overwhelmed.  Also as part of the monitoring in that case, Georgia created significant new mental health treatment programs with dedicated staffing and capacity limitations, including most significantly a new inpatient treatment facility for boys and a second new inpatient treatment facility for girls.  The Agreement also included a provision forbidding the prior practice of housing suicidal youths in administrative segregation units, and required "mainstream" housing and suicide watch monitoring of such youths.  The youths would go to school and work during the day, and would continue their suicide watch in their housing units overnight.  This provision was introduced because it had become clear under the prior practices that suicidal youths frequently would not come forward with their suicidal feelings because they did not want to be locked down in administrative segregation for suicide watch.

4

This demonstrated to me the dangerous and damaging nature of isolation in locked units for suicidal individuals. It also demonstrated to me the dangerous nature of punitive suicide watch conditions when they discourage suicidal individuals from coming forward and seeking treatment.

10. Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayer's Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between attorneys representing New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison. The treatment program implemented in the unit was based in part on the treatment standards for the Psychiatric Security Unit (PSU) mental health care programs in California. New Mexico implemented the new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental decompensation.

11. I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan. In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California. In that inspection, we looked at overcrowding and whether the level of psychiatric care being provided met constitutional minimums, based on the number of wards and the limited number of staff. We concluded that the facility was badly overcrowded and understaffed. At the time, the facility consisted entirely of locked units, and the inspection found that the staff failed to provide minimally adequate medical and mental

5

health services, that the facility locked down its wards excessively, that medication delivery was faulty, that the level of ward access to yard and recreation was insufficient, and that the institution's suicide prevention efforts were underdeveloped, overwhelmed, and ineffective. All of these problems were, in my opinion, closely correlated with the extensive overcrowding that existed at that time at that institution. Moreover, these types of problems are typical in the overcrowded systems with which I have been involved in one capacity or another.

12.    Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility. It did not involve overcrowding. The case did involve issues around excessive lock-downs of suicidal youths. One of the remedies implemented as a result of the proceedings was a requirement that the institution handle all cases of suicidal wards on an "outpatient basis" in the regular housing units, and that any suicidal behavior that could not be handled in this manner would result in a transfer to an outside psychiatric hospital. The case also involved general medical and psychiatric conditions.

13.    I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse. These presentations and publications include: "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing

6

People of Different Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994).

14.     I am currently a Diplomate of, and have served as an Examiner for, the American Board of Psychiatry and Neurology.

15.     Since 1986, I have held academic appointments as Clinical Instructor, Assistant Clinical Professor, Associate Clinical Professor, and Clinical Professor in the Department of Psychiatry, University of California, San Francisco, School of Medicine.  I received the Henry J. Kaiser Award for Excellence in Teaching in 1987 and was selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic years 1988-1989, 1990-1991, and 1994-1995.  I designed, planned, and taught "Drug and Alcohol Abuse" and "Alcoholism," one-unit courses covering major aspects of drug and alcohol abuse; supervised fourth year medical students in the care of dually diagnosed patients at the Psychiatric Continuity Clinic, Haight Ashbury Free Clinic; facilitated a weekly psychiatric intern seminar on "Psychiatric Aspects of Medicine," and lectured on addictionology and substance abuse to the School of Pharmacy, University of California,

San Francisco. I also coordinated a course on Prisoner Health at UC San Francisco School of Medicine between January 2002 and January 2004.

16.    I have held numerous positions with responsibility for ensuring the quality of clinical services provided by inpatient and community-based programs. From 1997 to 1998, I was Director of Clinical Services for San Francisco Target Cities Project. I also served as (1) Medical Director of the Comprehensive Homeless Center, Department of Veterans Affairs Medical Center in San Francisco, where I had overall responsibility for the medical and psychiatric services at the Homeless Center; (2) Chief of the Intensive Psychiatric Community Care Program, Department of Veterans Affairs Medical Center in San Francisco, a community-based case management program; (3) Chief of the Substance Abuse Inpatient Unit, Department of Veterans Affairs Medical Center in San Francisco, where I had overall clinical and administrative responsibilities for the unit; and (4) Psychiatrist, Substance Abuse Inpatient Unit, where I provided consultation to the Medical/Surgical Units regarding patients with substance abuse problems.

17.    I also served as a Physician Specialist to the Westside Crisis Center, San Francisco, from 1984 to 1987, and to the Mission Mental Health Crisis Center from 1983 to 1984. I was the Chief of Psychiatric Services at the Haight Ashbury Free Clinic from 1991 until February 2006. I also worked as a Technical Assistance Consultant to the Center for Substance Abuse Treatment, which is part of the Substance Abuse and Mental Health Services Administration of the United States Department of Health and Human Services.

18.    I have also been employed as Psychiatric Consultant to the San Francisco Drug Court and to the Hawaii Drug Court.

19.    I currently work as a private psychiatric consultant and as a Clinical Professor in the Department of Psychiatry at the University of California, San Francisco, School of Medicine.

20.     I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata* cases as an expert on prison medical care and prison psychiatry and the impact of overcrowding on prisoners' medical and mental health, including how prison overcrowding detrimentally affects prisoners' mental health and interferes with the ability of prison officials to meet the existing and increased medical and mental health needs of the prisoners in an overcrowded system.  I have also been asked to render my opinion with respect to whether overcrowding within the California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* class.  Finally, I have been asked to address whether other relief – that does not address overcrowding – will remedy the ongoing constitutional violations in a timely and effective manner.  My opinions, based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my tours of Deuel Vocational Institute (DVI), California State Prison/Solano (Solano), and Salinas Valley State Prison (SVSP), and on my professional knowledge and my experiences working in similarly overcrowded correctional settings, are set forth below.

21.     Prior to rendering any opinions, I reviewed a variety of reports, documents and other materials relevant to the current condition of the CDCR.  A complete list of the materials I have reviewed is attached hereto as **Appendix B**.

II.     **OPINIONS**

22.     My opinions and bases for them are as follows.

A.      **Opinion 1:  Overcrowding Within The CDCR Is The Primary Cause Of The Constitutional Violations Currently Experienced By *Coleman* And *Plata* Class Members.**

1.      **My Knowledge and Experience With Overcrowded Systems**

23.     My opinion that overcrowding within the CDCR is the primary cause of the ongoing constitutional violations is based on my experience with other overcrowded

9

correctional systems and mental health programs, on my knowledge of the psychiatric

and social science literature regarding the effects of overcrowded jail and prison

conditions on the mental health of inmates, on the documents I have reviewed as part of

my preparation of my opinion in this case, on the prison tours conducted in this case, and

on my personal experiences assessing and treating individual inmates within the context

of overcrowded correctional systems.  In particular, my opinion is based on my

experiences managing psychiatric care in the San Francisco County jail system in the

1980s, when it was overcrowded.  It is also based on my experiences with the

overcrowded youth corrections system in Georgia.  Overcrowding was also an important

factor in the failure of the California Youth Authority to provide adequate medical and

mental health care to its wards that was revealed in my inspection of the N.A. Chaderjian

Youth Corrections Facility in 2003 for the USDOJ.  In addition, while the psychiatric

programs at the California Medical Facility were not typically overcrowded during the

time that I served as an expert on the *Gates v. Deukmejian* case, there were times when

the quality of care in the Outpatient Psychiatric Program (which became the Enhanced

Outpatient Program (EOP) when the institution transitioned to *Coleman* programs) was

undermined by a combination of insufficient staffing to meet the severity of the mental

health problems presented in the EOP setting, along with insufficient treatment space,

insufficient custodial staff, and a lack of back-up coverage when clinicians were out sick

or on vacation.  As discussed below, I encountered similar conditions on my recent

prison tours of Deuel Vocational Institute, California State Prison Solano, and Salinas

Valley State Prison.

24.     In addition, I am familiar with the manner in which housing conditions

that tend to worsen mental illness among chronic mentally ill patients become more

common in an overcrowded system.  For example, it is well established that prolonged

isolation and lack of stimulus of the sort that is commonly experienced when inmates are

housed in administrative segregation and other high security housing units for long

periods of time tend to exacerbate both the symptoms of mental illness and the underlying pathologies themselves. Indeed, these conditions are known to even cause symptoms of mental illness in individuals with no psychiatric history prior to being confined in this manner for long periods of time. Similarly, it is well established among psychiatrists that environmental and social stress of the type experienced in crowded dormitories tends to aggravate mental illness. In addition to finding these conditions at CDCR prisons with full mental health treatment programs, they are also common in reception centers that screen, assess, and process inmates when they first enter a prison system. Reception centers typically confine inmates to their cells for much of the day either for security reasons or because they do not have much out-of-cell programming available. In overcrowded systems such as the CDCR today, inmates tend to spend significantly longer periods of time in reception centers.

### 2.    The Characteristics Typically Seen in Overcrowded Systems

25.    In my professional opinion, overcrowded prison systems are characterized by several types of endemic correctional and care delivery problems which tend to reinforce and exacerbate each other. Two closely intertwined problems endemic to overcrowded systems are the shortages of staff and treatment space. In addition to the fact that there are simply more inmates for correctional officers to monitor, for mental health workers to treat, and for medical staff to treat, there is also frequently less treatment space in which to provide services to these inmates, and fewer correctional officers to provide escorts to medical and psychiatric appointments.

26.    A third endemic problem in overcrowded systems is that there are increased population pressures on administrative segregation and other locked units, and inmates tend to stay in these units for longer periods of time. In crowded systems, there are pressures to double-cell psychiatrically-impaired inmates in administrative segregation. In addition, overflow administrative segregation units are often created in

11

overcrowded systems, which stretches limited staffing resources and yard space and results in the institution being less able to provide inmates with access to basic privileges like yard, and showers.   Because of this, the inmates in these units spend more and more time locked in their cells, and have fewer interactions with other individuals.

27.    A fourth endemic problem is that the number of inmates experiencing psychiatric crisis, medical problems, and/or psychiatric decompensation tends to soar,[1] causing overcrowding in mental health care units responsible for providing suicide watch and other forms of crisis psychiatric care. This often results in the creation of "overflow" crisis units, which are ill equipped to provide the level of psychiatric care required by this population.

28.    A fifth common problem is that access to inmate work, exercise, vocations, counseling, and education programs tends to be reduced and/or in many cases eliminated, leading to greater idleness on the part of inmates.

29.    A sixth endemic problem is the overcrowded, dangerous, and chaotic housing environments themselves.  Given the shortage of space to house inmates, more vulnerable mentally ill inmates are housed in crowded gyms, dayrooms, and other make-shift environments where the stress of living in close quarters and the threat of violence exacerbate their mental illness.  Due to their overwhelmingly overcrowded nature, these make-shift housing units threaten both the health of the inmates confined within them and the public health.

---

[1]  *See* P. Paulus, G. McCain, V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," *Environment and Behavior* 8 (1976) at 283, 288; P. Paulus, G. McCain, V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," *Environmental Psychology and Nonverbal Behavior* 3 (1978) at 107, 115; V. Cox, P. Paulus, G. McCain, "Prison Crowding Research," *American Psychologist* 39 (1984) at 1148, 1159; E. Sieh, "Prison Overcrowding:  The Case of New Jersey," *Federal Probation* 53 (1989) at 41; B Walker and T. Gordon, "Health Risks and High Density Confinement in Jail and Prisons," *Federal Probation* 44 (1980) at 53.  *See also* Joint Pls' Trial Ex. 27 (*Plata* Receiver's June 11, 2007 Supplemental Report on Overcrowding) at 3 (discussing increasing risk of "communicable disease outbreaks" in overcrowded CDCR units).

30.     As discussed in greater detail below, all of these features appear to be present in the CDCR at this time.

31.     One striking feature of many of these characteristics of overcrowded systems is the manner in which they often operate in a feedback loop, with each problem reinforcing and heightening the impact of the other problems, making the problems much more severe much more quickly than would otherwise be expected.  For example, it is well documented in psychiatric and social science literature concerning overcrowding that victimization and violence increase in overcrowded systems, due to less effective surveillance by understaffed correctional officers, the stressors of living in close quarters, and the stress on inmates caused by reduced access to programs and services.[2]  As a result of this increase in victimization and violence, administrative segregation units tend to expand into overflow units.  This produces several feedback effects.  First, because administrative segregation units require additional staff to escort inmates to all of their appointments and to feed inmates in their cells, the expanded use of these units tends to exacerbate staffing shortages at the institution.  Second, because overcrowded administrative segregation units provide less programming to inmates and take longer to process inmates out of the units, in my experience, more inmates in administrative segregation decompensate and require crisis care.  Third, because overcrowded systems need to expand their administrative segregation units into "overflow areas," and because administrative segregation units often need to single cell a greater proportion of their population, the expansion of these units tends to exacerbate overcrowding in the rest of the prison.  Similar effects take place in overcrowded reception center units, where

---

[2] *See* E. Mergargee, "The Association of Population Density, Reduced Space, and Uncomfortable Temperature with Misconduct in a Prison Community."  The Governor also noted this overcrowding-related problem in his Declaration of a State of Emergency related to overcrowding.  *See* Joint Pls' Trial Ex. 1 (Governor's 10/4/06 Proclamation Re: Overcrowding) at ¶ 2.  The most recent annual CDCR report on incidents in 2006 also suggests that the increase in incidents may be due to the increased population pressure.  *See* Joint Pls' Trial Ex. 7 (CDCR September 2007 Report, "Inmate Incidents in Institutions, Calendar Year 2006") at 2 (noting that "the rate of incidents per 100 average institution daily population increased from 8.7 in 2005 to 9.2 in 2006" and stating that "In 2006, the increase in the number of incidents could possibly  be related to the increase in institutions and camps population.").

inmates are often locked for extended periods of time in conditions that resemble administrative segregation conditions.   As I saw first-hand when I toured SVSP, many general population units in the CDCR today are frequently on a "lockdown" or "modified program" due to custody issues relating to violence and understaffing.  Programs, activities, and mental health care are restricted, delayed, or cancelled when this happens.

32.    A similar feedback process takes place with respect to understaffing. Because overcrowded systems tend not to have enough staff and enough treatment space, inmates tend to have less access to needed medical and mental health care, ultimately creating a class of sicker prisoners who require more treatment staff than would otherwise be necessary.   However, once this process has started, it becomes more difficult to recruit new staff members, who typically do not want to work in a system where they do not have private office space or adequate spaces in which to provide treatment to their patients.  In addition, because inmates whose mental illness goes un-treated or under-treated are more likely to decompensate and incur disciplinary violations as a result, this problem also worsens the problem of expanding, staffing intensive administrative segregation units.  The resulting increase in need for crisis mental health care also creates overcrowded crisis units, which cannot provide adequate care to inmates who decompensate under the pressures of overcrowding.  This, in turn, leads to the placement of inmates who would ordinarily go to a crisis bed unit into "alternative" or "overflow" settings, such as administrative segregation units.

### 3.    The CDCR is a Severely Overcrowded System

33.    It is my opinion that the CDCR is a severely overcrowded system.   There is significant evidence of overcrowding in both broad system-wide reviews of the CDCR as a whole, and in specific reports concerning individual institutions and individual problems.

(a)     **Broad Reviews of the CDCR and Crowding**

34.     I have reviewed a variety of evidence documenting system-wide overcrowding in the CDCR, including (1) various statements by the Governor, and (2) the reports on Overcrowding by the Receiver and the Special Master, and (3) portions of several detailed overcrowding studies done by the January 2007 Little Hoover Commission Panel, the Deukmejian Review Panel's 2004 Report, and the June 27, 2007 Expert Panel Report and Recommendations on Overcrowding.  In addition I have reviewed population data for CDCR, including the mental health populations at the prisons from January 2003 to July 2007.  All of this evidence strongly supports the finding that the CDCR is severely overcrowded.

The Governor's Declaration of a State of Emergency

35.     The Governor's October 4, 2006 Proclamation of a State of Emergency contains several very frank admissions about the effects of overcrowding in the CDCR. The Proclamation declares that "conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified [in the proclamation], due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state." Joint Pls' Trial Ex. 1 at ¶ 2.  In his Proclamation, the Governor also correctly listed some of the commonly recognized effects of overcrowding, noting that "overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state."  *Id.*

The Receiver's 6/11/07 Supplemental Report on
Overcrowding

36.     In his June 11, 2007 Supplemental Report on Overcrowding, the *Plata* Receiver notes several characteristics of overcrowded systems are present currently in the CDCR.  *See* Joint Pls' Trial Ex. 27 (6/11/07 Receiver's Supplemental Report on

Overcrowding).  <u>First,</u> he notes the increased violence between prisoners: "Overcrowding has resulted in increasing numbers of prisoner disturbances and 'lockdowns' by prison authorities in response.  Because of the heightened security measures associated with lockdowns, medical care to the inmates is delayed and made substantially more time-consuming and cumbersome."  *Id.* at 3.  <u>Second,</u> he documents the increased medical needs of inmates in the overcrowded CDCR:  "The risk of communicable disease outbreaks in the prisons, as well as their transference to local communities is increased substantially by overcrowding and the attendant rapid movement of prisoners between prisons."  *Id.*  <u>Third,</u> he notes the severe and detrimental effects of the staffing shortages caused by overcrowding on medical and mental health care:  "The extent of overcrowding in the prisons means that the entire health care system – medical, dental and mental health – is increasingly burdened.  Because of staffing shortages and the overwhelming number of prisoners needing care, prison staff often must decide with which set of class action remedial orders they will comply at the expense of others."  *Id.*  <u>Fourth,</u> he notes that overcrowding has led to shortages of space and beds, which in turn causes "competition between the various providers over resources, space, beds, and the like."  *Id.* at 4.  <u>Fifth,</u> the Receiver explains that the lack of adequate space makes it more difficult to hire clinical staff, noting that "existing staff shortages and inadequate clinical space" are among the factors that "make developing a competent medical staff a daunting challenge."  *Id.* at 2.

Receiver's 5/15/07 Report on Overcrowding

37.     Many of these findings echo and build upon the Receiver's First Report on Overcrowding, which was filed with the Court on May 15, 2007, and which is discussed below.  *See* Joint Pls' Trial Ex. 26 (5/15/07 Receiver's Report Re: Overcrowding).

16

<u>The Receiver's overview of the current overcrowding crisis</u>

38.     The Receiver's First Report on Overcrowding begins with an overall assessment of current overcrowding, explaining that "[T]he specifics of prison crowding are far worse than previously explained by State officials."  Joint Pls' Trial Ex. 26 (5/15/07 Receiver's Report Re: Overcrowding) at 1.  The Receiver goes on to explain that the institutional problems which led to his appointment in 2005 also contribute to the severity of the overcrowding crisis:  "The State's response to decades of overcrowding is similar; despite various task forces, numerous studies and reports and Special Sessions, California has not instituted any effective response to the worsening overcrowding crisis."  *Id.* at 2.  Moreover, the "degree of operational chaos within the CDCR, the institutional paralysis in many State agencies, and trained incompetence are even worse than indicated by the Court's findings [in connection with the appointment of the Receiver in October 2005]."  *Id.*

<u>Historical factors at work in creating the current crowding crisis</u>

39.     Next, the Receiver looks at the history of the current crisis.  The Receiver finds that the current crisis is an inevitable consequence of decades of CDCR policies and decisions that tolerate overcrowding:  "[O]vercrowding is ingrained in the CDCR style of constructing and managing prisons.  Crowding-related policies that do not provide adequate clinical and program space are now an accepted practice of CDCR prison planning, as is California's practice of offering inadequate salaries and failing to provide adequate hiring programs which have created crisis levels of shortages of clinical personnel and correctional officers."  *Id.* at 8.  In fact, "despite massive waves of construction [over the last ten years], prison overcrowding has grown worse in California."  *Id.* at 9.  The Receiver also found that the CDCR has an "institutionalized acceptance of overcrowding" and a consequent "lowering of correctional standards to

accommodate overcrowding," as seen in its facilities master plans, which call for up to nearly 200 percent crowding rates. *Id.* at 10.

Staffing problems associated with the current overcrowding crisis

40.     The Receiver also found widespread staffing problems of the type that I witnessed first hand during my tours of DVI, Solano, and Salinas Valley State Prison. He notes that overcrowding "is accompanied by serious staffing shortfalls for both clinical providers and correctional officers." *Id.* at 11. The shortages impact almost every category of clinical, custodial, and managerial staff, and the staffing shortages are worse now than they were five years ago in every category except for registered nurses. *Id.* at 11-13. The Receiver also points out staffing and recruitment problems are exacerbated by the State's decision to house prisoners in "mega-prisons" in remote locations. *Id.* at 14. The Receiver also found that in some of the communities where prisons are located, "there may not be enough competent clinicians to both provide medical care for an unlimited number of State prisoners and for the public also," and that continuing to raise salaries for prison doctors in these areas might have "a resulting disruptive impact on the availability of clinicians for county and private health care programs." *Id.* at 46, 26.

41.     In my experience, it is extremely difficult to recruit and retain good clinical staff in a correctional environment in the best of times. In overcrowded systems, with the attended violence, high acuity, shortages of office space, these ordinary recruitment problems are compounded and become significantly more difficult to overcome.

42.     The custody side of these staffing problems was illustrated by comments from DVI staff during my tour there to the effect that even though DVI, which is centrally located in a relatively inexpensive area, can recruit as many staff members as they need, the CDCR intentionally maintains a custody vacancy rate of seven percent

18

(7%) at DVI to allow the CDCR to reduce custody vacancies at more remote, undesirable prisons.

<u>Intake and processing burdens associated with</u>
<u>overcrowding</u>

43.    The Receiver also found that the extraordinary number of prisoner intakes and transfers in the overcrowded system increases the stress of various parts of the CDCR's medical and mental health delivery systems. *Id.* at 14-18. The "constant churning of parolees into and out of the CDCR (and between CDCR institutions) requires special clinical and correctional support staff at reception centers and in the 'receiving and release' units at each state prison." *Id.* at 13. "[C]rowding driven movement," as prison officials search for open beds, "adversely impacts. . . health care delivery" by overburdening intake screening, out-going screening, records update and transfer, medication delivery, and special transport during the process, and by disrupting of patient-clinician relationships and clinical programs. *Id.* at 16. "Movement into and out of the CDCR, as well as between CDCR prisons has now reached crisis proportions." *Id.* at 17.

44.    These movement-related problems were evident during my tour of DVI, where staff members told me that they process approximately 500 new arrivals a week in their Receiving and Release department, with roughly 25 percent of the new arrivals being identified as mentally ill. Even after significant expansions of its Receiving and Release areas, there was not enough space at DVI at the time of my tour to allow for confidential psychiatric screenings, to permit confidential clinical contacts, or to allow same-day psychiatric screening of new arrivals.

<u>Impact of overcrowding on bed space for various categories</u>
<u>of prisoners</u>

45.    The Receiver found that overcrowding is also particularly felt "not only in the overall numbers, but also in the population pressures created by a lack of beds for

specific classifications of prisoners," such as maximum security beds. *Id.* at 17-18 (emphasis removed).

46.     Similarly, during my tour of the DVI reception center, it was clear that mentally ill prisoners with protective custody needs spent significantly longer periods in the reception center waiting for transfer to a more complete mental health program. Staff at SVSP also confirmed during my tour there that its similar population of protective custody inmates – known as "SNY" (for Special Needs Yard) inmates – who were also in need of EOP level of care would typically wait for extremely long periods in administrative segregation for a placement to open up at MCSP in the only EOP SNY program in the whole CDCR, unless they were willing to waive their SNY status.

Impact of overcrowding on reception centers

47.     The Receiver also notes that one category particularly affected by overcrowding is reception centers.   All prisoners entering the CDCR must be processed through a reception center, but "none of the CDCR's designated reception centers were designed or constructed with adequate clinical space. To make matters worse, as the original prisons designated for reception became overwhelmed by the influx of parole violators, the CDCR was forced to 'convert' general population prisons into reception centers," but did so without providing "adequate additions to clinical staff or clinical space." *Id.* at 19.

48.     These reception center space problems were evident in my tour of DVI, which was a general population prison until it was converted to a reception center a few years ago.  Staff explained during my tour that DVI's extensive vocational programs (hence the name of the institution) were all shut down when DVI converted into a reception center institution.  In addition, because it was not designed as a reception center, it has been difficult to find space for various reception center functions.  For example, during the DVI tour I saw a small classroom where at any given time six

psychologists simultaneously conduct reception center mental health assessments for new arrivals. These assessments are mandated to be confidential by the *Coleman* Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 *Coleman* Program Guide) at 12-2-4 and 12-2-5. In my experience, conducting screenings in non-confidential settings results in under-identification of mental illness.

### Problems with new construction projects

49.     One of the most disturbing findings in the Receiver's report is that even the CDCR's "newest and most modern prisons" were "designed with clinic space which is only one half that necessary for the real life capacity of the prisons." Joint Plfs' Trial Ex. 26 (Receiver's Report Re: Overcrowding) at 19 (emphasis removed). Indeed, the Receiver found that CDCR building projects often go astray: "while millions of dollars have been allocated for prison health care space projects during the past five years, the great majority of the project[s] were never completed; indeed, some projects do not appear to exist." *Id.* at 20.

### Overcrowding-related lockdowns

50.     The Receiver also reports that overcrowding causes lockdowns which "call for a radically different form of medical delivery than the services provided under normal general population conditions" because "clinical staff must go from cell to cell to see the prisoner/patient, or small groups o[f] individual prisoners must be escorted by correctional officers to and from clinic areas," so that lockdowns "inhibit the delivery of medical care and increase the staffing necessary for such care." *Id.* at 29-30.

51.     The difficulty of providing clinical treatment in an administrative segregation unit was clear to me in the administrative segregation unit known as "K-Wing" at DVI. The clinical leadership at DVI reported that although they have the necessary clinical staffing available, they are unable to hold any groups for their EOP inmates in the administrative segregation unit because of the absence of space. In

addition, I witnessed a case manager contact occurring in administrative segregation while touring the unit. The meeting took place in the front office of the unit, and there were two custody officers at the table with the inmate-patient. In addition, other custody staff members were going in and out of the room during the clinical interview. Such an environment affords zero privacy and is clinically inappropriate.

52.    The problem of delivering care in a locked down environment was also evident in the CCCMS program on C-Facility at Salinas Valley State Prison when I visited that institution on November 1, 2007. Staff and inmates alike reported during the tour that the Facility has been locked-down almost continually for the last two to three years. I spoke with a Dr. Williams on C-Facility who told me that due to the frequency of lock-downs on the yard, a group consisting of 8 sessions would typically take between ten months and a full year to complete. In addition, the level of acuity exhibited by the CCCMS inmates I interviewed on the yard was quite high, often exceeding the minimum requirements for EOP level of care. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-3 (EOP treatment criteria). In addition, I noted that the inmates were not psychiatrically stable and required more mental health treatment than they were receiving to control their illness.

Overcrowding-related competition for space and resources
between medical and mental health providers

53.    The Receiver also reports that "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman, Perez, Armstrong* or *Plata* they will fail to comply with because of staff shortages and patient loads." *Id* at 30.

22

54.     This problem was also evident on my tours. For example, at DVI, staff
reported that the 26 Outpatient Housing Unit (OHU) cells used to be divided equally
between medical cases and mental health cases. However, DVI staff reported that in the
last year, generally only 4 of these OHU beds are available to mental health patients
because the remaining beds in the unit are occupied by medical placements. Similarly, at
SVSP, the number of MHCB beds generally available to psychiatric cases has been
reduced from 10 in the past to 8 and sometimes fewer due to the use of these CTC beds
by medical patients.

Overcrowding related CTC/MHCB bed shortages

55.     The Receiver's report also documents the related problem of CTC bed
shortages. "[B]ecause of the failure, for more than fifteen years, to provide an adequate
number of inpatient beds for prisoners with very serious mental illnesses, prison CTC
beds confined many patients in a mental health 'crisis' creating shortages of CTC beds
for medical needs which, at times, pits medical staff against mental health staff. In
similar fashion, the failure by the CDCR to plan for and construct beds for aged and
disabled prisoners has lead to a practice of using the CTC beds for sheltered living
housing, creating similar tensions." *Id.* at 31. As noted above, this problem was evident
at DVI (in competition for OHU beds) and in the CTC units at SVSP.

The Receiver's conclusions

56.     The Receiver reaches a number of critical conclusions based on these
findings. First, he points out that "[o]vercrowding interferes with the Receiver's ability
to successfully remedy the constitutional violations at issue..." *Id.* at 24. Second, he
finds that overcrowding has created a "culture of cynicism, fear, and despair which
makes hiring and retaining competent clinicians extremely difficult." *Id.* at 25. Third, he
finds that overcrowding also makes it difficult to hire staff because of the sheer numbers
required to support the population, the frequent movement of inmates and the remote

23

locations where California has placed its mega-prisons. *Id.* at 25-26.   Fourth, he finds that the cost and duration of the Receiver's remedial efforts are adversely affected by overcrowding because it creates severe barriers to the recruitment and hiring of new clinical and support staff and competent health care managers and executives, leads to an extraordinarily high "velocity of prisoner movement in the CDCR," which necessitates the construction of thousands of medical beds and extensive clinical and support space, and places a heavy burden on contracts with outside providers for medical support services. *Id.* at 26-28.   Fifth, he concludes that overcrowding "has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public"; the risk of an outbreak of infectious and communicable diseases "cannot be underestimated." *Id.* at 30.

57.   In short, because of overcrowding, the Receiver reports, many prisons simply cannot provide adequate medical, mental health, and dental services. *Id.* at 30.

The <em>Coleman</em> Special Master's Report on Overcrowding

58.   Special Master Keating filed a report on overcrowding on May 31, 2007. The report is consistent with the findings of the *Plata* Receiver in many respects, but it covers the problems with mental health care delivery associated with overcrowding in greater detail.

Delays in access to higher levels of care

59.   The Special Master's report is very stark in underscoring the impact of overcrowding on access to higher levels of care, particularly access to MHCB crisis units and DMH inpatient care units: "The inadequacy of beds appropriate to the treatment needs of inmates, particularly at the highest level of treatment needs, is compounded by severe overcrowding.   The back-up of inmate/patients awaiting transfer to inpatient DMH programs fill MHCB units, which, in turn, cannot provide crisis intervention to other inmate/patients who need to be stabilized." Joint Pls' Trial Ex. 35 (Special Masters'

24

5/31/07 Report on Overcrowding) at 9.   The Special Master also explains that in the face

of these limitations on referrals, eventually, clinicians no longer even try to refer

appropriate cases to higher levels of care:  "Not surprisingly, harassed clinicians often

choose not to undertake the frustrating struggle for a referral that will not bring

movement for weeks or months, and increasing numbers of truly psychotic

inmate/patients are trapped in EOPs that cannot meet their needs."  *Id.* at 10.  Despite this

evidence of a widespread failure to refer all appropriate cases to higher levels of care,

during my visit to SVSP, Department of Mental Health staff reported that the waiting list

for their inpatient program has risen from 80 inmates six months ago to 110 inmates at

the time of my tour on November 1, 2007.

   60. This reported failure to refer to higher levels of care was confirmed in my

site visits.  In general, it was my experience that the level of acuity among mentally ill

inmates at the EOP level of care was extraordinarily high.  While at DVI, I met with a

number of EOP inmates that, due to the severity of their mental illness, required

stabilization in a crisis unit and/or inpatient psychiatric treatment in one of the

Department of Mental Health inpatient programs.  *See* Paragraphs 100 to 105, *infra*.

Delays in construction projects to remedy shortages at<br>higher levels of care.

   61. The Special Master also explains that additional mental health beds will

take a long time to construct:  "Sadly, construction of the beds identified as needed to

meet defendants' projected needs for acute and intermediate inpatient care will not be

completed until FY2011/12." *Id.* at 9.  Since the Special Master wrote this report in May,

defendants have amended their beds expansion plans and further delayed many projects

for new inpatient and MHCB projects.  According to the new plans, if all goes according

to plan, defendants will finally have built sufficient beds to meet the needs of the

*Coleman* class by January 2014, at the earliest.  *See Coleman* Pls' Trial Ex. 12 (*Coleman*

Special Master's 9/24/07 Report and Recommendations on Defendants' August 2007
Supplemental Bed Plan) at 11.

Access to Mental Health Crisis Beds (MHCBs)

62.    The Special Master's Report explains that "[o]ver the past three years,
however, the number of inmate patients referred to a MHCB level of care has regularly
and significantly exceeded the number of MHCBs available in CDCR, resulting in the
placement of inmate patients in need of a MHCB level of care in a variety of temporary
housing alternatives, which often lacked the heightened monitoring and treatment
essential to the MHCB level of care." *Id.* at 3.   According to the Special Master, these
alternative placements have included Outpatient Housing Units (OHUs), which are
unlicensed infirmaries for temporary housing of inmates for up to 72 hours, mental health
outpatient housing units (MH-OHUs) and other temporary holding cells, including,
frequently, administrative segregation cells. *Id.*  "Between MHCBs, OHUs, MH OHUs
and other alternative placements, some 300 to 350 seriously mentally ill inmate/patients
are confined in one or another of these facilities on any given day." *Id.* at 4.

63.    This shortage of MHCB beds was confirmed in the oversubscribed MHCB
unit that I visited at SVSP during my tour on November 1, 2007, where psychiatrically
decompensating suicidal inmates are frequently housed in makeshift holding cells for
long periods of time.  Several of these "holding cells" are small upright cages that are
completely inadequate for inmates with serious mental health problems.  Similarly, at
DVI, staff reported during my October 29, 2007 tour that transfers to MHCB beds at
other institutions are virtually impossible, and that its own OHU, which essentially is
acting as an overflow MHCB unit, does not have enough space, resulting in the creation
of an overflow unit to the overflow unit.  Due to the lack of space in the OHU, DVI often
houses suicidal inmates in its administrative segregation unit.

26

Inadequate staffing

64.     The Special Master's Report attempts to quantify the impact of current staffing shortages, finding that the "CDCR ends up with sufficient staff to provide full mental health services to roughly two-thirds of its mental health caseload." *Id.* at 11. Next, the Special Master reviews current vacancy rates for psychiatrists, case managers, and psychiatric technicians, and calculates that for these three categories the combined vacancy rate is 43.94 percent. *Id.* Although the Special Master explains that some of these vacancies are covered by contract employees, he notes that even when such contract employees' coverage is included, the functional vacancy rate is still 19.68 percent. *Id.*

65.     In my experience, there are problems with heavy reliance on registry and contract staff. The heavy use of such staff members can create problems with diagnostic consistency, continuity of care, inappropriate use of psychotropic medication with resulting excessive medication changes, poor monitoring of acuity over time, and poor follow up care. In addition, such practitioners are often not familiar with procedures for referring patients to higher levels of care.

66.     Moreover, the Special Master notes that this discussion of vacancies and their impact, "does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians." *Id.* at 12.

Adequate treatment and office space for clinicians

67.     After discussing the finding by the Receiver that poor long-term planning and construction policies in the past have resulted in the medical department in the CDCR having only half the needed treatment space, Mr. Keating states that past planning decisions "may, indeed, have left the medical side of healthcare with just half a loaf of needed clinical space. The cost to future mental health programming space was even greater. . . .  None of the 19 CDCR institutions planned and built in the boom of the 80s

and 90s gave any thought to space that might be needed for mental health purposes. Instead . . . medical and mental health practitioners in CDCR were left to scramble for clinical space originally designed to meet just half of anticipated medical needs alone." *Id.* at 5.

68.     This lack of space has a particularly severe impact upon mental health programming in restrictive locked units: "Each succeeding compliance report over the past two years, for example, has documented the decline in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program inmate/patients in administrative segregation units, repeatedly attributed to the acute absence of adequate space." *Id.* at 6.

69.     But the impact of space shortages is felt more generally as well: "The growing problems reflect the impact of overcrowding. The sheer number of inmates needing all sorts of time out of their cells for all sorts of reasons puts incredible pressure on available space. When gyms, dayrooms and all-purpose rooms are filled with bunks and inmates, past accommodations for the use of these spaces for group activities for mentally ill inmates evaporate." *Id.* at 7.

70.     The Master concludes his discussion on programming space shortages by noting that "[e]xcessive population, thus, results in a reduction of programming space now occupied by inmate bunks, greater competition for use of the diminishing available space; fewer escorting correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide treatment." *Id.* at 7.

Increasing demand for mental health services due to<br>overcrowding

71.     The Special Master also notes that "the inevitable result of severe overcrowding is that everyone also spends more and more time in their cells. General yards are more crowded, less well supervised and increasingly dangerous. . . . Work or

vocational opportunities shrink in the expanding population." *Id.* at 7. The Master also explains that these conditions lead to more conflict between inmates: "Disturbances occur more frequently, with resulting increases in the number and duration of lock-downs." *Id.* This in turn means that "inmates must spend increasingly larger chunks of their days in their cells, or much more dangerously, in one of those triple-bunked 'non-traditional' spaces." The Master concludes that such conditions "inevitably escalates the incidence of mental illness and exacerbates the condition of those already mentally fragile and vulnerable." *Id.* at 7-8.

72.    As discussed below, my site visits uncovered striking examples of most of these overcrowding-induced problems discussed in the reports by the Receiver and the Special Master.

### (b)    Evidence Concerning Overcrowding-Induced Constitutional Violations at the Individual Prisons I Visited.

#### (i)    Deuel Vocational Institute (DVI) Tour:

73.    I toured Deuel Vocational Institute (DVI) on October 29, 2007. As part of my tour, I spoke with a number of staff members and inmates at the institution. At the time of my visit, DVI was severely overcrowded – staff reported during the tour that DVI has a design capacity of 1,861 and a current population of 3,748, meaning that the current population is 201 percent of design capacity. (However, these numbers do not comport with the most recently CDCR population report posted on the CDCR website, dated October 29, 2007, which states that DVI's population as of midnight on October 24, 2007 was 3,855 with a capacity of 1,627, meaning that the current population is actually 236.9 percent of capacity. *See* Joint Pls' Trial Ex. 24 (October 24, 2007 CDCR Weekly Population Report) at 2.

74.    Recently, the population of DVI's mental health programs has been growing rapidly. In a September 19, 2007 report provided to the *Coleman* monitors in

connection with an October 2, 2007 tour of the institution, DVI staff members report that while at the beginning of the year, 22 percent of DVI's population consisted of mentally ill individuals, by September the inclusion rate had risen by three percentage points to 25%. *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 1. The report also notes that "DVI remains a busy and at times chaotic reception center process receiving as much as 150 inmates daily." *Id.* One sign that overcrowding may be creating a more acutely ill population in need of greater mental health services is the fact that in places like DVI, the number of mentally ill prisoners is growing faster than the number of prisoners overall. Between January of 2007 and October 24, 2007, the overall population at DVI actually fell from 3,954 to 3,855. *See* Joint Plfs' Trial Ex. 22 and 24 (CDCR weekly population reports from January 10, 2007 and October 24, 2007).

75.     During my tour of DVI on October 29, 2007, staff reported that as of the day of the tour, the mental health population at DVI was 933, or 25% of the overall population of 3,748. Staff also broke down the placements of mental health cases at DVI as follows: there were 879 CCCMS inmates (including 364 in reception center general population, 101 in administrative segregation, 425 in the reception center protective custody or SPU unit, and 11 in the infirmary); there were 54 EOP inmates (including 14 in reception center general population, 20 in administrative segregation, 17 in the reception center protective custody unit, and 3 in the infirmary).

76.     During the tour of DVI, I interviewed 9 inmates in the visiting room of the institution. I also interviewed two EOP administrative segregation inmates during my tour of the K-wing administrative segregation unit. As discussed in greater detail below, my clinical impression of this group of inmates as a whole was that both the EOPs and the CCCMS patients that I met were more acutely ill than the EOP and CCCMS patients I encountered in the late 1990s while working at CMF. Clinical staff at DVI also indicated that they believe the clinical acuity of the patients they are treating at EOP level

of care frequently makes them appropriate for referrals to higher levels of care – MHCB and DMH inpatient programs – that are simply unavailable.

77.     In both my October 29, 2007 tour of DVI and in the documents I reviewed in preparing for the tour, there was substantial evidence of serious problems at the institution related to endemic overcrowding in the CDCR.  These problems were the same problems highlighted in the system-wide reports of the *Coleman* Special Master and the Plata Receiver discussed above.

<u>Inadequate Office and Treatment Space at DVI</u>

78.     The September 2007 report from DVI staff to the *Coleman* monitors notes that one "of DVI's biggest challenges in terms of the Mental Health Department remains treatment space access and utilization." *See Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 2.  The report also explains that despite a 65% increase in staffing, DVI has had very little increase in office and treatment space. *Id.* "Unfortunately, this has meant long wait times for inmates receiving treatment and overcrowded offices, as there are at times 8-10 doctors sharing offices in our ever increasing and growing mental health staff." *Id.*  Moreover, "at the present time there is no group therapy occurring in Ad Seg for EOP inmates given space limitations." *Id.*

79.     My tour of DVI on October 29, 2007 confirmed that these shortages are interfering with the delivery of mental health care to the caseload population, as noted above.  During my tour of the K-Wing administrative segregation unit, I saw that a case manager conference was taking place in the staff office at the front of the unit.  There were two custody officers at the table while the inmate was having his individual counseling session, and there were people walking in and out of the room.   This is not an appropriate, confidential setting for a case manager conference.  Confidentiality is a critical component of meaningful mental health treatment.

80.     During the tour of the unit, the Chief Psychiatrist and Chief Psychologist also explained that due to space limitations, much of the treatment provided to caseload inmates in administrative segregation is provided at cell-front, through the cell door, which is both non-confidential and not conducive to meaningful clinical assessments or meaningful therapy.   They also confirmed that although DVI now has enough clinicians to hold groups for EOP inmates in its administrative segregation unit, no effort has been made to conduct such groups because there is no suitable treatment space available. *Coleman* Class Member A, one of the two mentally ill inmates I spoke with in the K-Wing administrative segregation unit, told me that he had been at DVI in administrative segregation as an EOP inmate since his arrival at DVI on August 17, 2007 (73 days as of the date of the tour) and that he had not received any group treatment and only sporadic cell-front case manager contacts.   The court-approved *Coleman* Program Guide requires the CDCR to transfer inmates to an EOP administrative segregation hub within 30 days of placement in an administrative segregation unit, and requires that all reception center EOP inmates be transferred to a mainline EOP program within 60 days. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-7-7 (EOP Ad Seg) and 12-1-13 (Timeline Chart).

81.     My tour of DVI also revealed that there is currently a severe office space shortage for clinical staff.   During the tour, I visited a clinician office on the L-2 area which houses the desks of 8 clinicians.   The clinicians I spoke with during the tour reported that even with 8 desks crammed into the office, they frequently have to share individual desks with other clinicians.   I also observed that 3-5 mental health staff members working in the OHU must share a small office in a converted cell.

82.     Lack of adequate and appropriate space for reception center psychological screening was also apparent at DVI.   While touring the areas where reception center processing takes place, we were shown a small classroom where 6-8 clinicians typically administer the 31-question psychological screening instrument given to all inmates

32

entering the CDCR. This is not an appropriate place to conduct a confidential mental health assessment, and, in my experience, could result in under-identification of mentally ill individuals.

83.     In addition, during the tour of DVI, the mental health leadership indicated that they had hoped to have space in the new Receiving and Release area to conduct these psychological assessments on the same day that inmates arrive, but that due to lack of sufficient space they are forced to screen inmates in a different part of the prison, which requires them to conduct the screening on the next day after arrival.

### DVI's Practice of Housing Suicidal Inmates in its Administrative Segregation Units

84.     A serious overcrowding-related problem acknowledged by DVI in the September 19, 2007 Institutional Summary report to the *Coleman* monitors has to do with the use of administrative segregation cells instead of the infirmary for suicide-watch patients. The report states that:

> Another significant problem at DVI has to do with the increased use of medical beds in the OHU [or "outpatient housing unit," a name given to unlicensed CDCR infirmaries], most likely driven by ongoing Plata requirements. While the number of inmates referred to the OHU for acute mental health treatment has not increased, the number of beds that the mental health inmates have access to continues to decrease. As a result, we are frequently forced to overflow inmates to areas other than the OHU given the paucity of treatment space in our OHU. This has resulted in a significant increase of inmates being housed in Administrative Segregation, specifically K-wing pending a bed opening up in the OHU.

*Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman*

Tour Binder for 10/2/07 expert tour) at 2.

85.     During my tour of DVI on October 29, 2007, staff confirmed this problem, reporting that although the 26-bed OHU used to be one-half designated for mental health cases, in recent months, only 4 of the 26 OHU beds are generally available to mental

health cases. At the time of my tour, there were 3 mental health inmates in the holding

cells in the OHU, another 5 mental health patients in the OHU beds that are typically

occupied by medical cases, and one inmate on suicide watch in the L-Wing

administrative segregation unit. Staff stated it was very unusual that so many beds were

available in the OHU for mental health patients. DVI staff reported that they have 11

cells in the L-Wing unit for OHU-overflow/suicide watch and that these cells are

frequently used. This is remarkable because, in effect, the OHU is itself an overflow unit

to the fully licensed MHCB units. The administrative segregation overflow OHU is

essentially an overflow unit to an overflow unit.

86.    In my opinion, housing suicidal inmates in administrative segregation

units, particularly ones as harsh, dirty and noisy as K-Wing and L-Wing at DVI, is a very

dangerous practice, both because of its potential to exacerbate suicidal behavior, and

because of its potential to discourage inmates from reporting their true feelings for fear of

being housed in such a unit. Indeed, the dangerousness of these units is evident from the

*Coleman* Court's Order that defendants undertake extensive modifications to their

administrative segregation programs to increase monitoring of all inmates in these units

to address the increased risks of suicide. *See* 6/8/06 Order at ¶ 1 (noting "escalating

percentage of suicides occurring in administrative segregation units"). Although DVI is

now using L-Wing in lieu of K-Wing, and L-Wing does in fact represent a slight

improvement over the extremely harsh conditions of K-Wing, it is still an administrative

segregation unit. Moreover, the cells in L-1 appeared to have been hastily retrofitted to

be suicide-proof. They are also small and dirty, and the paint on the walls of the cells I

observed was peeling badly.

87.    In its *Coleman* Corrective Action Plan for the October 2, 2007 tour by the

*Coleman* Special Master's experts, DVI acknowledges some ancillary problems with

using administrative segregation in this manner (at the time of the report, only K-Wing

was being used in this manner). *See Coleman* Pls' Trial Ex. 30 (DVI 10/2/07 CAP, item

14) at 26. "This overflow into K-wing, however, has caused other problems with regards to access to inmates given the low number of custody escort officers to both meet the needs of the OHU and their overflow inmates in K-wing, as well as the large number of mental health clinicians currently working in Ad Seg and their access to their CCC[MS] and EOP inmate's living in this housing unit. Although additional [escort] officers have been added to the mix, it is still inadequate to meet the ever increasing mental health need." *Id.* at 26-27.

### Access to Higher Levels of Care at DVI

88.     Another problem underscored by DVI mental health staff during my tour of the institution on October 29, 2007 is their inability to access licensed Mental Health Crisis Bed (MHCB) units at other prisons for DVI's suicidal inmates. During the tour, the Chief Psychiatrist, the Health Care Manager, and the Chief Psychologist all expressed to me that they are almost never able to transfer inmates needing higher levels of care to an MHCB unit or to one of the DMH inpatient programs.

89.     In their September 2007 Report to the *Coleman* experts, DVI staff likewise noted that although the institution has hired more treatment staff for its OHU units, "our effectiveness to actually move inmates to crisis facilities is limited as CTC's are not actively discharging inmates. As a result, additional beds for DVI mental health emergencies are never available." *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07) at 2. A more detailed review of the issue as part of DVI's Corrective Action Plan (CAP) item 10 noted that 97 percent of the cases transferred from DVI's OHU to an MHCB unit were not compliant with *Coleman* court-ordered time-frames for such transfers and noted that "DVI continues to experience significant problems with the transfer of inmates from the OHU to crisis beds or other higher levels of care." *Coleman* Pls' Trial Ex. 30 (DVI 10/3/07 Tour Documents, CAP item 10) at 15.

Medication Management Problems at DVI

90.     Another crowding-related problem discussed by DVI staff during my tour, and also documented in detail in the Special Master's Eighteenth Monitoring Report, is medication management. During my tour of DVI, Dr. Coppola, the Chief Psychiatrist, acknowledged serious problems with medication continuity and medication practices generally and stated that medication is a "major area where we need to make changes" to improve the delivery of care. During my tour, DVI staff also reported that due to large processing volumes of new inmates coming into the reception center, which typically number 100 new inmates a day, they are unable to check with counties when an inmate arrives reporting that he was on a medication that does not match documentation in the records from the sending county.

91.     According to the Special Master's most recent 18th monitoring report, DVI's medication practices suffer in the following respects:

- Medication on intra-institutional transfers was timely in only 40 percent of cases;

- Medication renewals were timely in 89 percent of the cases, but this was achieved through the use of 90-day bridging orders, and follow-up appointments were often delayed for periods of up to six weeks;

- Poor tracking of follow-up on medication non-compliance;

- Inaccurate recordings of MARs in 47 percent of cases;

- Timely follow-up appointments with psychiatrists in only 40 percent of cases;

- Problems with lab testing;

- Low medication compliance rates, at 40 to 57 percent for patients on anti-depressant medication, 37 to 40 percent for those on antipsychotic medication, and 73 percent for patients on Valproic acid.

36

*See* Joint Pls' Trial Ex. 36 (Special Master's Eighteenth Monitoring Report) at 96-97.

92.     In my experience, these types of medication management problems are very typical in overcrowded systems.  In overcrowded systems, medical staff becomes stretched thin and there is not enough time for clinical staff to consult closely with each inmate when administering medication to check for side effects, to ensure that the medication is being taken, and to ensure the efficacy of the particular medication prescribed.  Of note, no effort is currently being made on the part of the medication dispensers to monitor to any degree the clinical efficacy of a given medication.  This contributes to medication non-compliance and results in inadequate feedback to treating clinicians concerning instances of medication non-compliance and/or lack of medication efficacy.

<u>Inadequate Medical Records at DVI</u>

93.     During my tour of DVI on October 31, 2007, I visited the medical records in the OHU unit.  Staff showed me an area where un-filed medical records are kept.  In my estimation, there were between four and five feet of un-filed medical records.  This kind of backlog of medical records is dangerous and unacceptable.  Both medical and mental health clinicians need to have up-to-date information in a patient's medical record in order to provide minimally adequate care.

94.     During the tour, DVI staff also estimated that about one-third of the time when they meet with patients, they do not have access to the inmate's medical record during the clinical encounter.  This is a dangerous clinical situation because staff does not have access to the patient's entire medical and mental health history, including such critical information as drug allergies, prior diagnoses and treatment history.  Also, when staff enters clinical information on loose sheets of paper, there is a risk that important clinical observations will never make it into the permanent file.

37

95.     The report to the *Coleman* experts by DVI staff in connection with the
10/2/07 *Coleman* experts' tour included a Corrective Action Plan (CAP) report on
medical records. *See Coleman* Pls' Trial Ex. 30 (CAP Item 23, page 46). The report
notes that as of September 7, 2007, there were 62 inches of loose medical records waiting
to be filed (more than five feet of un-filed records). *Id.*

### Medical Care Issues at DVI

96.     During my tour of DVI, the institution's new Chief Medical Officer
candidly admitted that he believes that DVI is running 40% over capacity in terms of its
ability to deliver medical care.

### The High Level of Acuity of Mentally Ill Inmates at DVI

97.     During my tour of DVI, I was surprised by the high level of acuity of
many of the EOP and CCCMS inmate-patients I met, both during the tour of the
institution and during the interview with class members at the end of the tour. DVI's
Chief Psychiatrist, Dr. Coppola, stated during the tour that he thinks that one effect of
overcrowding on his caseload population is that his patients are very sick, and that it is
difficult to move these sick patients to higher levels of care. He said that he sees an
increase in illness "in terms of both incidence and severity." I agree with Dr. Coppola
that the level of acuity among patients at DVI was very high. He also agreed with my
assertion that the current mental illness incidence rate of approximately 25% of the
institution's population is higher than that seen in other correctional settings.

98.     As noted above, in my work as a court-appointed expert in the *Gates* case
at CMF between 1990 and 2000, I was present for the implementation of the new
MHSDS system at CMF and I evaluated and worked with inmates who were classified as
CCCMS and EOP. In my view, the inmates who I met at DVI and Solano who were
CCCMS and EOP were much more acutely ill than the typical EOP or CCCMS inmates I
knew when working at CMF.

99.     This high level of acuity was confirmed by my interviews with EOP and CCCMS inmates at DVI during the October 29, 2007 tour.

(a)     Interview with DVI *Coleman* Class
        Member B:

100.    While at DVI on October 29, 2007, I interviewed *Coleman* Class Member B, an EOP inmate, and reviewed his Unit Health Records ("UHR"). According to his UHR, *Coleman* Class Member B has a "history of cutting and burning" himself and is diagnosed with Major Depressive Disorder. *Coleman* Class Member B is currently housed in the reception center EOP program for protective custody inmates. He had been in the reception center at DVI waiting for a transfer to an EOP program for more than six months, since April 17, 2007. He is taking very serious psychotropic medications including Seroquel, Depakote, Remeron and Effexor. *Coleman* Class Member B told me that medication has been a big problem for him at DVI. He indicated that DVI staff members "don't give it to you all the time" and that when medication has lapsed, it takes a long time to see a psychiatrist and get a renewal. *Coleman* Class Member B indicated that he is very frustrated because he was sexually assaulted as a child and would like to get treatment around this issue, but he has been unable to access individual therapy for this problem. He indicated that he goes to a one-hour group five days a week, but that it is mostly just a "check-in" group and that he does not believe he is receiving meaningful treatment from the group. Thus, he is getting five hours a week of the same group, rather than the 10 hours a week of EOP care mandated by the Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-8 (10 hours of treatment per week requirement for EOP inmates). In addition, because he is in a reception center, he is confined to his cell most of the time. Once he is transferred to an EOP program at a mainline institution, *Coleman* Class Member B will hopefully receive much more out-of-cell time and be able to participate in significantly greater programming. *Coleman* Class Member B has a history of suicide attempts and self-mutilation. Although my interview

with *Coleman* Class Member B was time limited, in my opinion, a stay of more than six months in the reception center under these conditions is clinically deleterious to an inmate like *Coleman* Class Member B with serious, chronic mental illness and a history of suicidal ideation and self-mutilation.

(b)    Interview with DVI *Coleman* Class Member C:

101.    *Coleman* Class Member C is a reception center CCCMS inmate who arrived at DVI on March 30, 2006, roughly 18 months ago. He reported to me that he is diagnosed as "paranoid and bipolar;" his medical record reflects a diagnosis of "Mood Disorder NOS." In general, an NOS diagnosis is an appropriate provisional diagnosis while a clinician is completing a thorough diagnostic workup. In my professional opinion, a diagnosis of Mood Disorder NOS is inappropriate when a patient has been in the same institution for 18 months. *Coleman* Class Member C is taking Seroquel, Neurontin, and Celexa. *Coleman* Class Member C was agitated when I interviewed him because he has recently been taken off of Wellbutrin, which he indicated was helping him. When I asked him how his long stay in reception center is affecting him, he stated "it's making me real mad … and then when I get mad I start threatening them and I get written up." Apparently, he has received a number of 115s during his stay at DVI, which may be one reason for the delay in transferring him to a mainline institution. In my opinion, *Coleman* Class Member C is inappropriately diagnosed and is not receiving adequate treatment. His inadequate treatment is contributing to his agitation and disciplinary problems.

(c)    Interview with DVI *Coleman* Class Member D:

102.    I also interviewed *Coleman* Class Member D during the tour of DVI. *Coleman* Class Member D is an EOP inmate currently housed in the K-Wing administrative segregation unit. He has been at DVI since March 14, 2006. He has been in administrative segregation since February of 2007. The *Coleman* Program Guide

40

requires that EOP inmates be moved from reception centers to a mainline EOP program within 60 days, or 30 days if clinically indicated. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13. *Coleman* Class Member D stated that on September 2, 2007 he battered an officer after missing his morning medications. His medical record reflects a current diagnosis of Schizoaffective Disorder. He is on a variety of medications including Zyprexa, Seroquel, and Prozac. He indicated that he hears voices if he does not take his medications. In my opinion, *Coleman* Class Member D has a serious mental illness and is decompensating under the pressures of his prolonged stay in administrative segregation, where he getting very little treatment except for his medications.

(d) <u>Interview with DVI *Coleman* Class Member E:</u>

103. *Coleman* Class Member E is a reception center EOP inmate who has been housed in DVI's administrative segregation unit since his arrival at DVI on August 7, 2007. *Coleman* Class Member E is currently serving a term for a parole violation. He is on a number of serious psychotropic medications including Zyprexa, Depakote, and Risperdal. He is currently housed in the K-Wing administrative segregation unit on the second floor. He said he gets his medications every day, but he has not received any group therapy. According to his medical record, he is diagnosed with Schizoaffective Disorder. My clinical assessment of *Coleman* Class Member E is that he remains very psychotic and that he is decompensating in administrative segregation and requires access to a higher level of care. Some of his mental health clinicians appear to be concerned about the same symptoms I noticed in my interview with him. An October 2, 2007 psychiatric technician note in his medical record states: "look for symptoms of decompensation."

(e)     Interview with DVI *Coleman* Class Member F:

104.    *Coleman* Class Member F is a CCCMS administrative segregation inmate. He arrived at DVI on August 29, 2007 from the Sacramento County jail. According to his medical record, he is diagnosed with Schizophrenia, Paranoid Type. My clinical assessment of *Coleman* Class Member F is that he is severely psychotic and requires a higher level of care than he is currently receiving.

(f)     Interview with DVI *Coleman* Class Member G:

105.    *Coleman* Class Member G is a general population reception center EOP inmate who has been at DVI since August 14, 2007. The current diagnosis listed in his health record is "Psychotic Disorder, NOS." The Medication Administration Record (MAR) in his medical file shows that *Coleman* Class Member G refused to take his medications on 5 of the last 7 days. In my clinical opinion, *Coleman* Class Member G is very severely mentally ill. He is acutely psychotic. It is unclear whether his recent refusal of medication represents a worsening of his psychiatric disability or his informed decision to refuse medication. Regardless, he clearly needs close monitoring and supervision, which in my estimation based on the tour of DVI will be difficult for him to obtain in the overcrowded reception center.

**The March 2007 Suicide of *Coleman* Class Member H at DVI Illustrates the Severe Consequences of Overcrowding-Related Problems:**

106.    Several of DVI's overcrowding-related problems appear to have played a role in a successful suicide at DVI in the spring of 2007. In preparing this report, I reviewed the suicide report for *Coleman* Class Member H, who died on March 9, 2007. *See Coleman* Pls' Trial Ex. 26 (September 18, 2007 Suicide Report *Coleman* Class Member H and June 18, 2007 Executive Summary) at 5. *Coleman* Class Member H, a "severely mentally ill" schizophrenic, spent four days in CDCR custody prior to his death by hanging on Friday March 9, 2007 in the protective custody unit on West Hall. *Id.* at 2.

42

Although *Coleman* Class Member H reported to staff that he was taking psychiatric medications when he arrived at DVI on March 4, 2007, he was not seen for an initial assessment by psychiatric staff or referred for an urgent medication evaluation by a psychiatrist as required by the *Coleman* Program Guide. *Id.* at 3, 5. He reportedly asked nurses and other staff members for his medications and told officers on several occasions that he needed to leave his cell. *Id.* at Suicide Report at 11.

107.    The CDCR Suicide Report for *Coleman* Class Member H identified four serious failures that may have played a role in *Coleman* Class Member H's suicide. First, the Suicide Report notes that CPR was not initiated at the scene when custody staff discovered the inmate hanging in his cell. *Id.* at Executive Summary of Suicide Report at 5. In the course of the investigation into the death, it was revealed the Chief Medical Officer at DVI, who has since been suspended, personally countermanded CDCR policy by directing that custody officers should not conduct CPR at the scene when discovering a suicidal inmate, but should instead bring the individual to the institution's infirmary. *Id.* In my view, this serious problem is probably not related to overcrowding.

108.    Second, when he arrived at DVI, *Coleman* Class Member H reported to staff that he was taking psychiatric medications. The jail transfer sheet failed to document his medications. However, DVI staff did not make any effort to verify his medication claim with the sending jail, and *Coleman* Class Member H was not seen within 24-hours by a psychiatrist for a medication review as required by the *Coleman* Program Guide. *Id.* at 5. Indeed, he was never seen by a psychiatrist during the four days he spent at DVI prior to his death. *Id.*

109.    In my view, this second problem is related to overcrowding. During the tour of DVI, this issue was discussed with the mental health leadership and the screening nurse in R&R, who all indicated that given the huge volume of new arrivals each day and the limited space for processing staff, <u>DVI still does not have the resources to follow up on undocumented medication claims by calling county jails</u>. This is a serious problem.

The period immediately after an inmate arrives at jail or prison is a high risk period for inmate suicides, and this risk is exacerbated when inmates have gaps in medication.

110.   A third problem documented in the Suicide Report and Corrective Action Plan for *Coleman* Class Member H is that *Coleman* Class Member H's mental health screening by a DVI psychologist was conducted at cell-front in the presence of *Coleman* Class Member H's cell-mate. The Suicide Report notes: "The cellmate may have been pressuring *Coleman* Class Member H, and may have influenced his responses. Furthermore, it is extremely difficult to observe an inmate while talking through the side of a solid door. This does not allow for an adequate clinical assessment." *Id.* at Suicide Report at 12. The author of the suicide report attempted to find out why these screenings were not taking place in a confidential setting, and received two possible explanations. The first explanation was that "custody staff was not cooperative with facilitating out of cell interviews for protective custody inmates due to the presence of non-protective housing inmates in that area at times." *Id.* at 5-6. In my experience, this type of difficulty with housing multiple categories of prisoners with special needs in a single housing unit is more common in overcrowded systems. The second explanation for the failure to conduct out of cell screenings in the Suicide Report is that "[a]fter further inquiry, at the direction of the Chief Deputy, it became apparent that the mental health clinicians were not asking for inmates to be removed from their cells for interviews, in the interest of getting them done the day after their arrival to the institution (a local policy)." *Id.* at 6.

111.   In my opinion, this third problem is also overcrowding-related. DVI is a busy, chaotic reception center that must manage a number of different populations, including a large protective custody population, a large mental health caseload, a significant population of disabled inmates, and a significant population of inmates with severe medical conditions. During the tour of DVI, staff reported that they often screen 100 new inmate arrivals five days a week. As the Receiver found in his report, this

44

churning of the reception center population due to overcrowding creates severe pressures on DVI's staff to cut corners in order to process all of the inmates in a timely manner. It appears that confidential out-of-cell mental health screenings have been sacrificed at DVI under the pressures of overpopulation.

112.    The suicide report includes a fourth problem which does not appear to be overcrowding-related.

### (ii)    California State Prison - Solano Tour

Solano Tour Overview

113.    I toured California State Prison Solano ("Solano") on Wednesday October 31, 2007. According to the most recent CDCR population report dated October 24, 2007, as of midnight on October 24, 2007, Solano had a population of 6,051 and a design capacity of 2,610, for a population at 231.8 percent of capacity. Joint Pls' Trial Ex. 24 (CDCR Weekly Population Report, October 24, 2007).

Overcrowding in the H-Dorm at Solano

114.    The overcrowding in H-Dorm at Solano (on the Level III yard) was severe and extremely disturbing. The dorm is a converted gym that Solano has filled with triple bunks due to the burgeoning population. While I was there, the dorm (and the rest of the prison) was on lockdown status, meaning that the majority of the inmates were physically in the dorm during my visit. It was noisy and chaotic, with multiple televisions playing at a high volume. Staff informed us that the dorm has a capacity of 226 inmates; there were 220 housed there during my tour.

115.    The H-Dorm at Solano has been a source of great anxiety and stress for *Coleman* class members housed there. One CCCMS inmate who I interviewed during the tour (*Coleman* Class Member I) told me that he came "unwound" in the H-Dorm. He said he could not sleep, in part because of the dense population and in part because of the "constant, roaring engine of noise." His sleep deprivation became so severe that he

45

began to hear voices in the fans. Another class member, *Coleman* Class Member J, did not become a *Coleman* class member until he was housed in the H-Dorm. *Coleman* Class Member J also described severe sleep deprivation, which then caused him to become depressed and paranoid. He described the desperation he felt living in a very overcrowded dorm with no hope of moving out. Mental health staff recorded *Coleman* Class Member J's problems as "adjustment disorder" secondary to his housing unit. The housing conditions in places like the H-Dorm, where there is constant activity, sensory overload, extreme sleep deprivation and loss of control, have been shown to cause or exacerbate mental illness. "Intensive Care Unit" (ICU) psychosis, a well-established clinical condition, for instance, is also caused by these conditions. As *Coleman* Class Member I and *Coleman* Class Member J demonstrate, people become extremely agitated, depressed, psychotic and potentially violent when living in these conditions.

Staph Infections:

116.   I interviewed eight *Coleman* class members during my tour of Solano. Of the eight class members, two (*Coleman* Class Member K and *Coleman* Class Member L) had serious staph infections that Solano was treating with heavy doses of antibiotics. *Coleman* Class Member K, who was housed in the H-Dorm, told me that his staph infection caused an abscess on his arm, which medical staff drained earlier in the day. *Coleman* Class Member L was housed in Building 11. Another class member, *Coleman* Class Member M, told me that his cellmate also had a staph infection. Staph infections are a sign of poor hygiene, and they are a serious consequence of overcrowding that could grow more serious over time if these dorms and cells continue to be crowded with ill patients in the current manner. They can also become a threat to public health more generally, as antibiotics used to control these infections select for more treatment-resistant strains of the staph bacteria.

46

The High Level of Acuity of Mentally Ill Patients at
Solano:

117.   As in my tour at DVI, I was also surprised by the high level of acuity of

many of the EOP and CCCMS inmate-patients I met at Solano.  I encountered several

CCCMS class members during the tour and in post-tour interviews that appeared to need

a higher level of care.  For instance, *Coleman* Class Member L told me that although he

was currently CCCMS, he had previously been in the EOP program during a prior prison

term.  Based on my familiarity with the MHSDS from my work at CMF and Pelican Bay

and my clinical experience, my opinion is that *Coleman* Class Member L requires an

EOP level of care.  In systems that lack adequate higher acuity mental health beds, it is

not uncommon for patients to be kept at a lower level of care than their mental illness

truly warrants.

Solano's Significant Mental Health Population, Including
in Administrative Segregation:

118.   The Special Master was concerned about Solano's significant mental

health population during the 18th round of monitoring, noting that, "[t]he size of the

mental health caseload, 1,555, exceeded its capacity of 1,199 by 30 percent," and

recording that 111 out of 378 inmates in administrative segregation were on the mental

health caseload.  Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at

76.  The day that I visited Solano, the population was very similar.  Staff reported that

there were 1,517 CCCMS and 10 EOP class members.  They also reported that 105 of the

328 inmates housed in administrative segregation were on the mental health caseload (2

EOPs and 103 CCCMS).  This means that while *Coleman* class members constitute

approximately 20% of the total CDCR population, they represent 32% of the population

in administrative segregation at Solano.

119.   In my opinion, housing inmates with serious mental health issues in

administrative segregation units is a very dangerous practice given the lack of stimulation

47

in those units and the nearly constant seclusion in cells. This is particularly true in light of the Special Master's observation in his 18th monitoring report that, "[i]n [Solano's] administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 85. During my tour of Building 10, which is an administrative segregation unit, I observed a psychiatric technician administering the 31-question mental health survey for new intakes into the unit. Although the Program Guide requires that these types of interviews occur in a confidential setting, the psychiatric technician was asking the questions at cell-front. See Joint Pls' Trial Ex. 9 (Program Guide) at 12-7-12 ("Interviews of inmates will be held in a private setting unless the security of the institution or the safety of staff will be compromised. Screening and evaluation interviews and treatment activities are accomplished in existing interview rooms and exercise areas within current ASU units."). In my opinion, this is a dangerous practice that relates to overcrowding; staff members do not have the office and treatment space that they need to administer clinically appropriate evaluations in a confidential setting (or there are insufficient custody staff to escort the patients to an appropriate setting).

<u>Medication Problems:</u>

120.   I also observed several problems with the medication administration process at Solano. This is consistent with the Special Master's observations during the 18th round of monitoring: "During the monitoring period, medication management [at Solano] remained a collection of haphazard practices without oversight or standardized practices and procedures" and "non-compliance with medication did not reliably trigger referrals to prescribers." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 79. These problems were also apparent to me during my tour. In light of the infrequent appointments with psychiatrists and the very brief interactions between patients and staff in the pill lines, Solano cannot adequately monitor the efficacy of

medications, medication side effects, or patient compliance with medications as effectively as necessary. I discussed medication distribution with several staff members, including Dr. Kumar, the Chief Psychiatrist, Ms. Bibby, a Psychiatric Technician in the administrative segregation unit, Dr. Naku, the Pharmacist in Charge (PIC), Joel Williams, a supervising Registered Nurse and several class members. Mr. Williams explained that medical staff members at the pill windows are not in a position to monitor medications since they do not have patient records with them when they distribute the medications. He also explained that staff is supposed to report patient non-compliance only when a patient misses his medications for three days in a row. Even when medical staff does report non-compliance, however, Nurse Williams explained that the information only flows one way—the pill line staff never knows if anything is done in response to their reports.

121.    In addition, several class members I spoke with raised medication concerns that I found quite disturbing. An EOP class member housed in administrative segregation, for instance, told me that he is currently taking Zyprexa. When I asked him whether medical staff took his blood when he was first prescribed Zyprexa, he said that he did not think they had. He also could not remember any medical staff drawing his blood anytime since that initial prescription. Atypical antipsychotics such as Zyprexa carry with them certain metabolic risks that can only be addressed by regular monitoring of certain blood parameters. These metabolic risks include Type II diabetes, as well as significantly elevated cholesterol and triglyceride levels. Several other class members also confirmed problems with medications as noted by the Special Master. They complained, for instance, that the pill lines were very long and that they sometimes had to choose between taking their medications or going to the chow hall before it closed. If they chose to go to the chow hall, they were not allowed to go back to the pill line later and therefore were forced to skip doses. Other class members were taking medications too early in the day. *Coleman* Class Member N is currently taking 30 mg. of Remeron,

49

which he receives at 4:30 or 5:00 p.m. This is a very high dose of Remeron to be taking so early in the day, which results in his becoming extremely sedated for several hours in the late afternoon and evening, thus further disrupting his sleep/wake cycle. Still other class members reported that their prescriptions sometimes lapsed, including *Coleman* Class Member O and *Coleman* Class Member K. *Coleman* Class Member O is currently taking Prozac (60 mg.), Remeron (15 mg.) and Risperdal (2 mg. twice per day). *Coleman* Class Member O's medical file reflected that he was initially prescribed his medications on July 6, 2007. When they expired on October 6, 2007, however, the clinicians at the medication window renewed them without a doctor's order (*Coleman* Class Member O did not see a doctor until 10/25/07). This is a very dangerous and illegal practice because it precludes the patient from having adequate assessment of the efficacy and safety of his medication. *Coleman* Class Member K, who has been prescribed Lexapro for Post Traumatic Stress Disorder, did not receive his medications for several days when he was transferred to administrative segregation.

122.    In my opinion, the medication problems at Solano are clear symptoms of overcrowding and understaffing. Effective mental health care depends on regular monitoring of medications for their efficacy, the presence of side effects, and patients' compliance. In order to do this, doctors and medication dispensers must have manageable caseloads. Due to overcrowding and understaffing, Solano staff is not able to administer and monitor medications in an effective way. This problem is clearly documented in the Special Master's reports and was also apparent to me during the tour. The Special Master wrote in his 18th Report: "[n]early six months after the mental health caseload reached 1,550, 30 percent over its cap, access to treatment and the quality of mental health treatment were inadequate. Caseloads typically numbered 140 to 160." Joint Pls' Trial Ex. 36 at 83. Long pill lines, infrequent clinician contacts, and lapsed prescriptions are dangerous conditions that seriously undermine both mental health and medical care.

50

**(iii)   Salinas Valley State Prison (SVSP) Tour**

SVSP Tour Overview:

123.   I toured Salinas Valley State Prison (SVSP) on November 1, 2007.  SVSP is a Level IV high security institution located south of the city of Salinas in the Salinas Valley.  According to the most recent CDCR population report dated October 29, 2007, as of midnight on October 24, 2007, SVSP had a population of 4,112 and a design capacity of 2,372, for a population at 173.4 percent of capacity. Joint Pls' Trial Ex. 24 (CDCR Weekly Population Report, October 24, 2007) at 2.  Thus, in many respects, SVSP is less overcrowded than DVI, which is at 236.9 percent of design capacity according to the same report, and Solano, which is listed at 231.8 percent of design capacity. *Id.*.

124.   Nevertheless, there were significant overcrowding-related problems present in our tour of SVSP.  During an initial meeting with the SVSP Warden and SVSP's clinical leadership for medical and mental health at the beginning of the tour, staff reported a number of relevant facts.  Staff indicated that roughly 38 percent of the population at SVSP is mentally ill.  Staff also indicated that 80 percent of the cases of suicidal ideation admitted to "holding cells" at SVSP do not result in an admission to the MHCB unit.

Clinical and Custody Staff Vacancies Are Impacting Clinical Care at SVSP

125.   There was also significant information reported concerning staffing levels. During the morning meeting, Department of Mental Health (DMH) staff members present, including Victor Brewer, the director of the Salinas Valley Psychiatric Program, an inpatient treatment program at SVSP run by DMH, stated that DMH is still having staffing problems in some categories due to salary competition from the CDCR.  SVSP staff reported that in the medical staff area, roughly 50 percent of the medical providers are full-time staff and the other 50 percent are contract employees.  In the mental health

department, Dr. Kalie, the Chief Psychologist, reported that 14.5 of 29 psychologist positions are vacant and that there are no registry employees available to cover the vacancies.

126.   The Warden reported that although custody staffing levels have improved lately, at one point in the last year, SVSP was 200 custody officers short out of 840 total positions. The Warden reported a current custody staff vacancy rate of 97 out of 795 positions, or 12.5 percent. He also indicated that the biggest area where SVSP has problems recruiting custody staff is in recruiting and retaining Sergeants. He stated that SVSP currently has a vacancy rate for Sergeants of 27 percent. Clinical staff answered "yes" during the morning meeting when I asked if the high vacancy rate among custody staff has a negative impact on medical and mental health care.

Impact of Use of Contract or Registry Staff on Quality of<br>Care at SVSP

127.   Dr. Lee, the Chief Medical Officer and Health Care Manager at SVSP, acknowledged during the opening meeting that there are serious drawbacks associated with the use of contract and registry staff at SVSP. He indicated that reliance on such staff was not ideal because (a) such staff members come and go frequently, causing continuity problems, (b) such staff members do not have the same commitment to care as full-time correctional staff, and (c) such staff members have to be trained over and over again, draining the amount of time available for health care managers to take care of other business. He also indicated that he believes that the use of contractors "has had an impact on the delivery of care."

### Fragmented Care at SVSP Due to Over-Reliance on
### Contract Case Managers:

128.    I was able to personally discuss the impact of over-reliance on contract clinicians with some of the inmates I interviewed while at SVSP. Several inmates I spoke with during the tour complained about speaking with a different psychiatrist every time they had an appointment with their psychiatrist. These inmates also complained about the resulting frequent medication changes when they changed clinicians.

### Impact of Excessive Lockdowns at SVSP:

129.    During the morning meeting, staff acknowledged that there have been numerous and frequent lockdowns at SVSP during recent years. They indicated that at the present time, all four Facilities at SVSP are locked down. During the tour, I was able to observe the impact of excessive lock-downs in two areas, CCCMS treatment programs on C-Facility, and EOP treatment programs on D-Facility.

### CCCMS Care on C-Facility:

130.    During the morning meeting, staff reported that C-Facility, a Level IV CCCMS yard, has been locked down almost continuously for the last two years. When I visited C-Facility, I spoke with Dr. Williams, who indicated that there are three groups for CCCMS inmates on C-Facility. I also personally reviewed the waiting list for these groups. Each of the three groups had a long waiting list: The waiting list for the life prisoner process group was 46 inmates, with the longest wait person on the waiting list since 2/10/06; the waiting list for the anger management group was 27 inmates, with the longest wait person on the waiting list since 9/11/06; and the waiting list for the coping skills group was 33 inmates, with the longest wait person on the waiting list since 7/10/06.

131.    These delays are not surprising given the near constant lock-downs on the yard. Dr. Williams stated that a typical 8-meeting group held on the yard would

generally take 10 months to a year to complete due to the frequent lockdowns. She also said that in some years the mental health staff only completes two or three groups in the entire year. In my opinion, disrupting group therapy for this long a time period would make the group ineffective. This is because there is a complete lack of continuity between the sessions and the group basically has to restart every time it meets.

132.    Dr. Williams also stated that in her estimation roughly five of every seven inmates she treats are in the CCCMS treatment program on the basis of "medical necessity." Under the Program Guide, "medical necessity" is a treatment category for inmates who do not have a qualifying serious mental illness, but who require treatment for short term mental health episodes involving less severe mental illness. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-5. In my opinion, this is an extraordinarily high percentage of cases to be medical necessity, and it either reflects under-diagnosis and treatment, or else a high level of acuity on the part of inmates who would not normally qualify for the MHSDS. Either explanation is bothersome and is likely a reflection of the impact of overcrowding on mental health care.

133.    Dr. Williams also provided me with a print-out listing the diagnosis and medications for these CCCMS inmates on her caseload. *See Coleman* Pls' Trial Ex. 32 (SVSP Current Mental Health Listing-Case Manager, from SVSP tour of C-Facility). A review of these CCCMS medical necessity patients revealed that they were being treated with multiple psychotropic medications including anti-psychotics and anti-depressants. Of note, their stated diagnoses did not "match" the severity of the psychotropic medications being given. When I mentioned this issue to Dr. Gregory, a new psychiatrist working on C-Facility, she expressed the same concerns about incorrect diagnoses, as well as about medication mismanagement issues among the patients she was seeing.

Suicide of SVSP CCCMS *Coleman* Class Member P Who
Was Classified As a Medical Necessity Case:

134.    In the preparation of this report, I reviewed an internal CDCR Suicide

Report and Corrective Action Plan, concerning the suicide of *Coleman* Class Member P

at SVSP on November 5, 2006. *Coleman* Pls' Trial Ex. 24 (2/20/07 Suicide Report and

Corrective Action Plan for Suicide of *Coleman* Class Member P). *Coleman* Class

Member P had an extensive history of mental health treatment while in prison. *Id.* at

Suicide Report at 2-7. According to the Suicide Report, *Coleman* Class Member P had at

various points been on a *Keyhea* order for involuntary medication, and had been treated

in the Psychiatric Services Unit at CSP-Sacramento for nearly two years between June

2001 and April 2003. *Id.* During this period, he had six crisis bed admissions for

suicidal ideation and was admitted on two occasions to the acute inpatient psychiatric

program operated by the state Department of Mental Health at the California Medical

Facility in Vacaville. *Id.* He arrived at SVSP in 2005 and was placed in the EOP

program there. *Id.* He appears to have been discharged from the EOP program at SVSP

because of his refusal to participate in treatment activities. *Id.* In May of 2005, his

diagnosis was changed from an Axis I diagnosis to a diagnosis of "predominant Axis II

characterological symptoms" and he was discharged to CCCMS and appears to have been

continued on the CCCMS caseload as a medical necessity case. *Id; see also* Joint Pls'

Trial Ex. 9 (September 2006 Program Guide) at 12-3-5 (CCCMS medical necessity

standard). After he was made CCCMS, he continued to refuse treatment, although a

clinician interviewed him on August 30, 2005 and concluded that he was exhibiting some

psychotic processes. *Id.* He was referred to a psychiatrist medication line several times

for possible initiation of antipsychotic medications, "but was never seen due to the

shortage of psychiatrists, and no antipsychotic medications were prescribed for the

inmate." *Id.* at 5. *Coleman* Class Member P finally saw a psychiatrist in late March of

2006 and he was prescribed an anti-anxiety medication. *Id.* at 6. In June of 2006, he was

continued in the CCCMS program on the basis of "medical necessity." *Id.* He repeatedly asked for Seroquel but was not given the medication. *Id.*

135.   In my opinion, *Coleman* Class Member P appears to have been extremely mentally ill for someone in the CCCMS program based on medical necessity receiving treatment, and there appear to have been severe problems with access to psychiatrists and appropriate medication in his case. In May and June of 2006, he was treated at the CCCMS level of care while in the CCCMS administrative segregation program. *Id.* at 6. He was continued on CCCMS status through October of 2006. *Id.* at 7. On October 11, 2006, he apparently requested that he be removed from the caseload; and he was removed from the CCCMS program in a treatment team meeting on October 18, 2006. *Id.* On October 17, 2006, however, *Coleman* Class Member P was prescribed Effexor, a drug commonly used to treat depression and anxiety, although it is unclear whether he ever received this medication and it appears that the medication order may have been cancelled when he was removed from the caseload on October 18, 2006. *Id.* Inmates on psychotropic medications cannot be removed from the caseload pursuant to the Program Guide. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-13 (standards for removal from CCCMS caseload requires inmates not be on psychiatric medication). Nevertheless, he was removed from CCCMS care and placed in the stand-alone administrative segregation unit at SVSP on October 26, 2006. *Coleman* Pls' Trial Exhibit 24 (Suicide Report of *Coleman* Class Member P) at Executive Summary at 5. A court order in the *Coleman* case forbids the housing of caseload inmates in the stand-alone administrative segregation units used in the CDCR because of the harsh conditions there. *See* 10/10/02 Order.

136.   In my opinion, this suicide reflects serious problems with the adequacy of diagnosis and treatment of chronically mentally ill inmates with serious mental health histories at SVSP. The case also reflects the serious consequences of some of the medication delivery problems I witnessed at SVSP, and the serious consequences of the

over-use of medical necessity diagnoses. If *Coleman* Class Member P had been maintained in the CCCMS program, he would have been seen more frequently and could not have been placed in the stand-alone administrative segregation unit. Other overcrowding-related problems that have played a role in this suicide include the severe shortage of psychiatrists at SVSP, the medication distribution problems at SVSP, and improper removals of patients from the MHSDS program.

Interviews with C-Facility CCCMS patients:

137.    I also interviewed and reviewed the medical records of several inmates on C-yard, the unit that staff stated had been on nearly continuous lockdown for the last two and a half years. The first two inmates I randomly selected appeared to be cases where inmates who might not normally be mentally ill were being treated as if they had serious mental illnesses. These cases reflect the impact of prolonged lockdowns on individuals whose mental illness would otherwise not require formal intervention. The third inmate I selected randomly off of Dr. Williams' caseload on C-Yard and interviewed was *Coleman* Class Member Q. *Coleman* Class Member Q's medical record reflects a diagnosis of "Schizoaffective Disorder." *Coleman* Class Member Q complained to me that his medications are changed every time he sees his psychiatrist. He also stated that he is very stressed out due to the fact that he never gets out of his cell due to a pending appeal. He indicated that he hears voices and that when he is not on his medications he can become violent, depressed and suicidal. He said that he is trying to hold it together, is having difficulty sleeping, and indicated that he feels like he might "fall out." In my view, *Coleman* Class Member Q is severely mentally ill and needs at least an EOP level of care. I believe he would have been classified as EOP when I worked as an expert at CMF and Pelican Bay in the late 1990s.

EOP Care on D-Facility:

138.   During the morning meeting at the outset of my tour of SVSP, clinical staff members stated that they believe the frequent lockdowns have the biggest impact on EOP programs on D-Facility, because a number of the groups offered to EOP inmates on D-yard take place across the yard, and when the yard is closed, inmates cannot access these treatment spaces. I interviewed four inmates in the D-3 EOP program during my tour. All four inmates indicated that D-Facility has been frequently locked down in recent months. Based on these interviews, it appears that helpful groups are provided to these inmates when the yard is not locked down. However, when the yard is locked down, these inmates all appear to struggle with the stress of confinement to their cells for extended periods of time and experience mental health difficulties.

Access to ICF care at the SVSP DMH programs:

139.   DMH staff reported during the morning meeting on the tour that the waiting list for access to DMH inpatient care programs at SVSP is currently 111 cases. Staff reported that after the new DMH intermediate inpatient care programs opened last year in D-5 and D-6 at Salinas Valley and in P-2 and P-3 at CMF, the waiting list for SVPP intermediate inpatient care program dropped from about 120 down to 80. However, now the waiting list has gone back up to over 110 inmates.

Problems With Access to MHCB Care and Other Higher
Levels of Care at SVSP:

140.   I observed serious problems with crisis care for suicidal inmates while touring SVSP. It is clear that SVSP has a severe shortage of MHCB beds for its patients and that SVSP routinely employs a variety of make-shift "overflow" housing environments for such inmates. Dr. Chase, the CTC psychologist in charge of the MHCB unit, stated that the MHCB beds are always full. She indicated that inmates frequently stay in the MHCB unit for longer than the ten-day maximum mandated in the

58

*Coleman* Program Guide, especially if they are waiting for a placement in DMH. Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-5-1 (mandating maximum MHCB length of stay of 10 days). She also indicated that DMH can refuse referrals and sometimes does refuse referrals. She stated that generally the census is 5-8 MHCB patients and that in her experience working in the unit since May of 2007, up to 3 of the 8 MHCB beds are sometimes used by medical patients. She indicated that the unit refers cases to an outside MHCB unit at least once a week.

141.   Dr. Chase also indicated that the institution uses a variety of overflow holding cells due to the MHCB shortage. She indicated that three "dry cells," which are tiny freestanding upright cages with mesh wiring surrounding them (and no toilet) are routinely used during the day to house suicidal inmates. I observed these small holding cages on the tour of SVSP and they are extremely confined and are clinically inappropriate locations to assess suicidality and to have confidential psychiatric interviews with suicidal inmates. At night, these inmates are transferred into one of four holding cells outside the entrance to the CTC which are known as "wet cells" because they have toilets. SVSP also routinely uses "BPT cells" located on each yard for overflow suicide watch. This report was consistent with the findings of the Special Master in the most recent progress report. *See* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 153 (noting that holding cells "were in use daily and frequently housed inmates overnight. The holding cells in daily use were stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses. . . . Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells."). The MHSDS system never intended to permit the use of holding cells, particularly one where a patient is required to sit in a wire mesh holding cell without access to minimum health and safety standards. The use of these non-authorized, unlicensed "treatment settings"

results in an exacerbation of the underlying mental illness which led to the mental health crisis.

142.   While in the MHCB unit, I spoke with *Coleman* Class Member R, a seriously mentally ill patient who has been waiting for referral to the Department of Mental Health acute inpatient program since August 30, 2007. The Program Guide standard for transfer of an inmate to the acute DMH program at CMF is within 10 days of referral. *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13. Staff on the unit explained that *Coleman* Class Member R has chronic self-injurious behavior. He had been in a small safety cell near the front of the CTC unit since October 7, 2007, more than three weeks at the time of my November 1, 2007 tour, because he is too psychotic and paranoid to return to his cell – he believes that CDCR staff makes the floor vibrate in his MHCB cell and so he refuses to return to it. *Coleman* Class Member R is taking Depakote and Thorazine. He is alternately diagnosed as having Bipolar and Schizoaffective Disorders. His transfer has been delayed in part because he has 500 custody points, and must undergo a special review process before being sent to the acute DMH program at CMF. In my opinion, it is clinically inappropriate to keep this actively psychotic, paranoid inmate in a safety cell for such a long period of time. It is also inappropriate for him to remain in the MHCB unit for several months. He requires an expedited transfer to a higher level of care in DMH.

143.   The difficulty of accessing higher levels of care was evident from my conversation with Dr. Chase, who stated that at one point during the summer the MHCB unit had a very sick homicidal inmate waiting for more than 100 days for a transfer to a higher level of care. She also expressed that in her opinion the general acuity level of her MHCB patients is extremely high, in part because of the difficulty of transferring cases to DMH care.

Deficient Medication Distribution Practices at SVSP

144.    During my tour of SVSP, I spoke with staff members in various areas of the institution about medication management practices.  The most significant interviews I conducted on this topic were with two psychiatric technicians on C-Facility who distribute medications.  According to these individuals, because of the high security level on the yard, medication delivery is always done at cell-front through the open food port. These individuals stated that their interaction with each inmate includes giving the inmate the pill, doing a mouth check through the cell door, and moving on.  In my opinion, this is a seriously deficient medication distribution practice, because the individuals dispensing the medication are not taking the time to speak with patients about possible side effects they are having, and about whether or not their medication is working.  Also, it is difficult to observe inmates taking their medications through food ports in cell doors. In a fully functional medication distribution system, these staff members would provide feedback to treating psychiatrists about medication compliance, whether the medications were having the desired clinical effect and about whether inmates are experiencing side effects.  This kind of feedback is critical to basic psychiatric care.

145.    I encountered one medication problem that better medication practices at SVSP should have caught when interviewing inmates in the D-3 EOP program.  At the end of the SVSP tour I interviewed inmate *Coleman* Class Member S.  *Coleman* Class Member S recently had his dosage of his medications raised by his psychiatrist.  During his interview, *Coleman* Class Member S told me that he thinks his medications are making him worse, and resulting in severe daytime sedation, and that he is experiencing other side effects.  He went on to state that he was required to wait for his next regularly scheduled psychiatrist appointment to address the issues.  An effective medication delivery system would provide timely information to clinicians about these kinds of side effects and would result in improved medication compliance at SVSP.

61

146.   In his most recent 18th Monitoring Report, Special Master Keating noted that SVSP has significant medication management issues. *See* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 148 (noting that "SVSP did not appear to have a functioning mechanism to manage medication . . . Medication continuity remained problematic when inmates were relocated between yards, were released from the MHCB, or arrived from other prisons."). In my experience, these medication management problems are closely associated with both staffing shortages and an oversubscribed system.

Impact of Gym Housing on SVSP CCCMS Inmate:

147.   During my SVSP tour, I was told that although the institution had all four gyms filled and triple-bunked a month before my visit, these housing units had been emptied in the month before the tour. At the time of my tour, the only remaining gym in operation was on A-yard, and that gym was in the process of being emptied out. During the tour, I visited the A-gym and spoke to inmates about conditions there. Although it was no longer crowded, several inmates said living in the gym had been extremely stressful when the gym was full. I spoke with one inmate, *Coleman* Class Member T, who is CCCMS. He stated that he takes anti-psychotics and an anti-depressant and that he has found it extremely stressful to be housed in the gym. He stated that he was very stressed out and felt that he could "lose it" at any time. In my opinion, the stress of being housed in a gym is clinically harmful to this CCCMS inmate.

Interviews with CCCMS Inmates at SVSP:

148.   I also interviewed two CCCMS inmates on A-Yard at SVSP.

(1)   Interview with SVSP *Coleman* Class Member U:

149.   *Coleman* Class Member U is a CCCMS inmate serving a term of life without the possibility of parole living in A-yard protective custody housing. He was

62

recently taken off Wellbutrin and stated that he is becoming more depressed. He stays in his cell 24 hours a day, seven days a week, but comes out of his cell to take care of his hygiene and to eat. He was concerned about the loss of his television after being written up for refusing to work. He was very depressed, agitated, and stated that he sometimes has thoughts of suicide. In my clinical opinion, he is very depressed and needs more intensive treatment than the CCCMS system provides, including medication for his depression.

(2)   Interview with SVSP <em>Coleman</em> Class Member V:

150.   <em>Coleman</em> Class Member V is a CCMCS inmate who is refusing medications. He has a history of EOP treatment. He indicated that he used to take Wellbutrin, Neurontin, Paxil and Seroquel. He told me that he is able to communicate telepathically with his fiancé, who is out on the street. He appears to be very mentally ill. He may be appropriate for CCCMS treatment, but he needs to be watched closely for signs of decompensation, and he should be encouraged to take medication.

151.   In conclusion, my impression of the level of clinical acuity of the majority of the inmates I encountered at SVSP was that they exceeded the stated treatment criteria for the current MHSDS treatment program to which they were assigned. <em>See</em> Joint Pls' Trial Ex. 9 (September 2006 Program Guide). In addition, they were not receiving appropriate psychiatric care.

(c)   <strong>Evidence of Overcrowding's System-Wide Impact in Various Areas of Prison Administration and in the Delivery of Health Care</strong>

152.   There is substantial evidence in the <em>Coleman</em> Special Master's 18th Monitoring Report and in other sources of evidence I reviewed in connection with my preparation of this opinion that the overcrowding-induced problems I personally observed at DVI, Solano and SVSP are also affecting the delivery of mental health care at prisons system-wide. <em>See</em> Joint Pls' Trial Ex. 36 (18th Progress Report) and discussion of same

63

herein, *infra*. These system-wide problems affect almost every one of the critical components of a constitutionally-adequate mental health care system that were identified by the *Coleman* court in its July 23, 2007 Order. *See* 7/23/07 Order at 4 (describing the key elements of a constitutional mental health system as identified in the *Coleman* Court's decision on the merits of this case in 1995 in *Coleman v. Wilson*, 912 F. Supp 1282, 1305 (E.D. Cal. 1995)).   In addition, there is ample evidence of another overcrowding-related problem that causes constitutional violations – overcrowded administrative segregation units that are unsafe for mentally ill inmates.

(1)   <u>Timely Access to Appropriate Levels of Mental</u>
<u>Health Care -- Access to Programs/Sufficient Beds.</u>

153.   Overcrowding is interfering with the ability of the CDCR to meet Court-mandated timelines for transfers to treatment programs at every different level of care in its mental health system.  On March 3, 2006, the *Coleman* court ordered defendants to immediately implement the Revised Program Guide ("Program Guide"), which provides the protocols for the provision of mental health care in the CDCR.  *See* 3/3/06 Order.  I have reviewed the standards in the Program Guide relevant to this declaration.  *See* Joint Pls' Trial Ex. 9 (September 2006 Program Guide).  One of the key elements of the Program Guide is the transfer timeline chart that sets forth the required timeframes for transferring inmates to various levels of care.  Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1-13.  The ability of a system to meet these timeframes is indispensable to the provision of adequate mental health care.  In relevant part, these timeframes are set forth below:

> <u>Reception Centers</u>:  EOP transfers should occur within 60 days, or 30 days if clinically indicated.  CCCMS transfers should occur within 90 days, or 60 days if clinically indicated.

> <u>MHCB</u>:  MCHB transfers should occur within 24 hours of referral.

64

DMH: Transfers to DMH acute placements should occur within 10 days of referral, if accepted to DMH. Referral must be completed within 2 working days of identification. Transfers to DMH intermediate care placements should occur within 30 days of referral, if accepted to DMH. Referral must be completed within 5-10 working days.

EOP: Transfers to general population ("GP") EOP programs should occur within 60 days, or 30 days if clinically indicated.

EOP Administrative Segregation Unit ("ASU") Hub: EOP inmates housed in the regular ASU should transfer to an EOP ASU Hub within 30 days of placement in the regular ASU or within 30 days of referral to EOP level of care.

PSU: EOP inmates housed in the ASU who are endorsed for the PSU must be transferred within 60 days of endorsement.

154. Defendants do not appear to be meeting any of these transfer timeframes. There are extensive findings of fact in the Special Master's 18th Report concerning the lack of appropriate and timely access for *Coleman* class-members to these levels of care, and concerning the role of overcrowding limiting such access. The problem is most severe at the highest levels of care. In the most recent report, the *Coleman* Special Master found that system-wide, "access was limited for Mental Health Crisis Beds, acute inpatient care beds at DMH facilities, and care in Psychiatric Services Units for segregated inmates in Enhanced Outpatient Programs. The concomitant over-use of Outpatient Housing Units continued. Access to DMH acute inpatient care reached its nadir at the end of the monitoring period when Atascadero State Hospital imposed significant restrictions on admission of CDCR inmates." *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 2-3.

155. One critical element of this failure to refer is that over time, discouraged clinicians routinely fail to refer all appropriate cases to higher levels of care. This, in turn, means that the inmates waiting for transfer become more gravely ill. In my experience, problems with failure to make appropriate referrals to higher levels of care are common in overcrowded systems. The Special Master's 18th Report finds numerous

examples of this problem. *See, e.g., id.* at 138 (at Avenal State Prison the monitors' review "of records for inmates with multiple OHU and or MHCB admissions revealed little evidence of consideration by the IDTT or assigned clinician of the need for higher levels of care."); at 233 (at CIM 33 percent of MHCB admissions were inmates who had three or more MHCB admissions in the prior six months, and the monitor's review of some of these cases "revealed that consideration of the need to refer these inmates to higher levels of care or to expedite their transfers into EOP had not been documented."); at 256 (at RJD the "monitor's expert also found decompensating inmates in administrative segregation, indicating that still more needed to be done to promote and implement an appropriate threshold for referring inmates to higher levels of care."). The *Coleman* Court recognized this pattern in CDCR in its June 28, 2007 Order: "Indeed, from other sources the court has learned that at least some CDCR clinicians have stopped referring patients to DMH because of its refusal to accept referrals." 6/28/07 Order (Docket 2301) at 3, fn. 2.

156. Thus, sometimes even a downward trend of referrals does not necessarily reflect decreasing demand for higher levels of care. The effect of decreased referrals is to skew the data provided as to waiting lists and numbers of beds needed, and, based on my experience and observations, the data currently provided by CDCR likely under-represents the need for higher levels of mental health treatment.

157. The State admits that it does not have enough beds at nearly every level of care right now (Fiscal Year 2007/2008), including a current shortage of the following mental health beds: 52 male acute beds; 49 male Level IV intermediate care facility beds; 370 male EOP beds; 42 male EOP-ASU beds; 42 male PSU beds; 138 female EOP beds, and; 15 female EOP-ASU beds. *See Coleman* Pls' Trial Ex. 12 (9/24/07 Special Master's Report and Recommendations at Exhibit A -- Defendants' Supplemental Bed Plan) at 82.

158.    In addition, the *Coleman* Special Master recently reported in his Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan that "[f]inding available beds in either of these programs [MHCB and inpatient DMH] remains a daily challenge that still exceeds CDCR's capability...." *Id.* at 3. In June 2007, the Court found that "Defendants are providing to class members only twenty-six percent of the beds at ASH called for by their plan. That is unacceptable." 6/28/07 Court Order at 3:4-5. The Special Master also concluded that recent events, including the population crisis, implementation of the *Plata* Receivership, and defendants' newest bed plan, "have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR." *Coleman* Pls' Trial Ex. 5 (4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Beds) at 9-10. In May 2006, the court described the effect of the shortage of intermediate care facility beds and mental health crisis beds in the CDCR: "It is undisputed that the shortage is leaving critically mentally ill inmates languishing in horrific conditions without access to immediately necessary mental health care." 5/02/06 Order at 2:16-18.

159.    The documents that I reviewed indicate that the defendants do not anticipate being able to meet the need for mental health beds at every level of care until 2014, at best. The *Coleman* Special Master concluded in his Report filed September 24, 2007 that full implementation of defendants' latest proposed bed plan "will stretch out" to January 2014. *See Coleman* Pls' Trial Ex. 12 at 11. Moreover, the Special Master also noted that "objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively." *Id.* at 12. The Special Master further

suggests that actual implementation of defendants' bed plan may be unlikely to occur within a decade. *Id.* at 13.

160.    While the Department is building its new facilities over the course of the next seven years, it presumably intends to continue to operate provisional units that do not meet full licensing standards for inpatient programs at Salinas Valley State Prison and the California Medical Facility. The D-5 and D-6 DMH intermediate inpatient treatment program units at SVPP and the P-2 and P-3 units at CMF are operating as interim intermediate care programs, and the court waived the licensing requirements so that they could meet the emergency overflow need for inpatient care beds. *See* 5/02/06 Order.

161.    These units do not have the appropriate treatment space for mental health patients at this acuity, nor do they have the resources to provide yard and out-of-cell time in the appropriate manner. For example, in the SVPP D-5 and D-6 units, all mental health treatment occurs on the dayroom floor. On October 18, 2007, the court ordered defendants to develop and submit proposals for developing "adequate mental health treatment and counseling space" at these SVPP and CMF units. 10/18/07 Order at 6:7-8.

<u>Specific Areas Where Failure to Access Higher Levels of Care is Most Dangerous:</u>

162.    There are three main areas where overcrowding in the CDCR appears to be causing extremely serious problems with access to higher levels of care, and non-compliance with the transfer guidelines set forth above from the Program Guide – (1) crisis bed access, (2) access to DMH inpatient care, and (3) transfers out of the reception centers to higher levels of care, such as EOP programs.

<u>MHCB Access:</u>

163.    The 18th Monitoring Report of the Special Master documents severe, endemic problems with access to MHCB beds and with the use of inadequate alternative sites for housing suicidal inmates who need MHCB care but are unable to access it. *See*

*generally*, Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master). The Eighteenth Report confirmed what I saw at DVI, reporting that "DVI had difficulty transferring inmates to MHCB beds at other prisons." *Id.* at 98. At Mule Creek, the institution was forced to open a 5-bed overflow wing to its MHCB unit in its administrative segregation unit. *Id.* at 53. At San Quentin State Prison, the Special Master's monitors noted that "there were 78 to 101" mental health placements in its unlicensed OHU each month, some of whom were so severely mentally ill that waiting for placement in the DMH acute inpatient unit. *Id.* at 92. At Wasco State Prison, overflow cases from the MHCB unit were frequently housed in "[h]olding cells in the CTC, the B Facility chapel, or in administrative segregation..." *Id.* at 184. Although I did not see any specific cases of failure to refer to the MHCB unit during my tour of Solano, the 18th Report of the Special Master documents "[t]wo cases in which referrals to the MHCB unit should have been made but were not, indicated that more improvement was needed (see Exhibit E, Case Reviews 3, 11)." *Id.* at 82.

Access to DMH Care:

164.    The Eighteenth Report also documents the severe problems CDCR institutions are having with accessing DMH care at every level, noting that "approximately one third of DMH referrals did not result in transfers" and noting that poor access to DMH "was attributed principally to lack of bed availability." *Id.* at 321. After years of plans to address this lack of sufficient MHCB and DMH beds, defendants' latest August 2007 plan to address these bed shortages will not be completed until 2014 at the earliest. *See Coleman* Pls' Trial Ex. 12 (*Coleman* Special Master's Report and Recommendations on Defendants' August Bed Plan) at 11.

165.    In my opinion, capacity problems at the highest levels of care are typical of overcrowded systems. The effects of overcrowding include both creating new mental health needs and exacerbating existing mental health needs. As a result, overcrowding

69

creates additional demands at every level of care, with the most significant capacity problems at the highest level of care.

Movement of EOP and CCCMS Inmates Out of Reception Centers:

166.    This is an area where I witnessed first hand the impact of delays in reception center treatment programs when I toured DVI. My clinical impression of the inmates I encountered at DVI in the administrative segregation program and in the EOP and CCCMS program is that they exceed the stated treatment for the MHSDS programs to which they were assigned. *See* Joint Pls' Trial Ex. 9 (Program Guide). This impression was confirmed by the clinical leadership at DVI, who candidly stated that they are routinely treating inmates in their EOP program that should be treated at a higher level of care that is not accessible to them because of bed shortages. The Special Master also highlighted the severity of this problem in the recommendations section at the end of the 18th Monitoring report, his most recent:

> Over time, insufficient mental health staffing has exacted a particularly high toll on the care of the growing EOP population entering CDCR institutions. It has led to ever longer waiting periods for EOP inmates in reception. Inmates languished there without care, leading to an increase in cases of decompensation.

Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 330. The Special Master goes on to explain that, despite the May 1, 2006 Court Order requiring limited treatment for EOP inmates in reception centers, "EOP inmates continued to wait for transfers in reception center for excessively longer periods of time." *Id.* at 331. Mr. Keating also noted the need for "vigilance" in monitoring the adequacy of care during these long waits. *Id.* There are numerous system-wide examples of this failure to refer inmates in a timely fashion out of reception centers in the Special Master's Eighteenth Monitoring Report. *Id.* In my opinion, this type of back-up in the reception center caseload is typical of overcrowded systems.

167.   The reception center EOP program appears to be a "stopgap" response to the overwhelming population pressures in CDCR.   The guideline for the RC EOP Program approved by the Court is not equal to the care mandated by the Program Guide for EOP patients. *Compare* Joint Pls' Trial Ex. 9 (Program Guide, Chapter 4 at 12-4-8, setting forth standard of 10 hours per week), *with Coleman* Pls' Trial Ex. 9 (Special Master's 7/2/07 Report on Reception Center EOP Programs, discussing lower standard of care). Yet, in July 2007, the *Coleman* Special Master reported to the Court that this is the care that will be provided to a significant number of inmates requiring an EOP level of care: "Apart from EOP inmates in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions." *Coleman* Pls' Trial Ex. 9 (7/02/07 Special Master's Report and Recommendations on Defendants' EOP Treatment Program in Reception Centers) at 28.

(2)     Access to Medication.

168.   The many problems with medication distribution that I observed on my tours are also problems which appear to be widespread.  In the summary section of the Eighteenth Progress Report, the Special Master explains that in the area of medication distribution and continuity "fewer than half of institutions were compliant with medication continuity on intra-institutional transfers," and that "[r]esponsiveness to medication non-compliance was another area in which most institutions failed to comply with guidelines." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 315-16.   In my opinion, medication issues of this type are typical in overcrowded systems.

(3)     Improper "Overflow" Housing of Suicidal Inmates

169.     The problems with alternative, overflow housing arrangements for suicidal

inmates was one of the most severe problems among many severe problems that I

encountered in my tours.  These problems also appear to be widespread, according to the

most recent report of the Special Master.  *See* id. at 326-27.  The Special Master explains

that this problem is an outgrowth of the MHCB shortage: "Inmates turned away from

MHCBs are housed in alternative accommodations such as OHUs, MHOHUs and so-

called holding cells, but these accommodations often do not afford the heightened level

of treatment and observation that suicidal persons require.  Worse yet, many inmates in

these MHCB-alternative sites are never moved to actual MHCBs."  *Id.* at 332-333.  This

was a serious problem at DVI, where suicidal inmates are routinely held in an overflow

unit to the OHU unit (which is itself an MHCB overflow).   Moreover, at DVI, this

overflow was in its administrative segregation unit.  The 18th Monitoring Report of the

Special Master also notes that suicidal inmates were being placed in administrative

segregation units at Mule Creek State Prison. *See id.* at 53 (MCSP using five cells in

administrative segregation for inmates waiting for access to its MHCB beds).

170.     The dangers associated with this type of alternative housing for suicidal

inmates are clear.  First, such arrangements discourage suicidal inmates from coming

forward and seeking treatment.  Second, such shortages discourage clinicians from

making appropriate referrals to higher levels of care.   There was nowhere for DVI staff

members to send their acutely suicidal or psychiatrically decompensating inmates in

administrative segregation and on suicide watch.  As a result, DVI is forced to provide

treatment at levels of care it is not staffed or licensed to provide – crisis level treatment to

inmates in its EOP program, and longer term inpatient treatment to its OHU crisis bed

patients.  The Special Master's 18th Report included examples from various prisons

around the state of inmates who were decompensating and not being referred to a higher

level of care.  *See, e.g.,* Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special

Master) at 220 (LAC: "Two inmates seen by the monitor's expert were acutely mentally ill in administrative segregation for weeks rather than being sent to higher levels of care (see Exhibit R, Case Reviews 2, 3)").

171.    Documentation provided by defendants on a recent October 29, 2007 *Coleman* expert tour at CSP-Sacramento shows that even after that institution constructed a new, expanded unlicensed OHU, known as a mental health OHU (MH-OHU), the institution continued to rely on various ad-hoc "overflow" holding cells to house suicidal individuals experiencing a mental health crisis. *See Coleman* Pls' Trial Ex. 17 (October 5, 2007 Memo from CSP-Sacramento on Use of Alternative Sites for Crisis Bed Patients, produced to plaintiffs on October 29, 2007 *Coleman* tour). According to this report, between May 29, 2007 and September 28, 2007, CSP-Sacramento used so called "ZZ beds" on 62 occasions, and used so-called "contraband cells" on three occasions when the institution's MHCB beds and two OHU units were at capacity. *Id.*

> The Suicide of *Coleman* Class Member W at CSP-Sacramento in May of 2007 in an OHU Demonstrates the Dangerousness of Using These Units to House Suicidal Inmates:

172.    The dangerousness of the use of alternative unlicensed OHU placements rather than MHCB beds is illustrated by the suicide in May of 2007 of *Coleman* Class Member W at CSP-Sacramento. The suicide also highlights several other serious care problems relating to overcrowding. *Coleman* Class Member W committed suicide on May 28, 2007 in an Outpatient Housing unit at CSP-Sacramento. *See Coleman* Pls' Trial Ex. 25 (August 2007 Suicide Report for *Coleman* Class Member W) at Executive Summary of Suicide Report at 1. He was 31 years old at the time of his death. *Id.* *Coleman* Class Member W had taken psychotropic medication in the community for five years and came into the CDCR with a diagnosis of Bipolar Disorder. *Id.* at 2. He had been hospitalized in the community a half-dozen times and had a significant history of suicide attempts, including jumping off a bridge. *Id.* He was noted to be on suicide

73

watch in the county jail at the time of his sentencing. *Id.* He entered the CDCR at the
North Kern State Prison (NKSP) reception center on May 19, 2006 and was continued on
Depakote and Seroquel, which he had been prescribed in jail. *Id.* He was initially placed
at the CCCMS level of care. *Id.* at 3. A few months later, he was made EOP for a short
period of time after having had six admissions to the MHCB unit at NKSP for suicidality,
but his EOP designation got "lost" and he was continued as a CCCMS inmate. *Id.*
During his crisis bed admissions he was described as "extremely manic and psychotic
with grave disability, including symptoms of confusion, disorganization, lability, flight of
ideas, pressured speech, paranoia, irrational behavior, restlessness, confabulation and
suicidal ideation." *Id.*

  173. *Coleman* Class Member W was transferred to Folsom State Prison as a
CCCMS inmate on January 23, 2007, after more than six months in the reception center
at NKSP. *Id.* at 3. When he was transferred to Folsom, he was on Depakote, Seroquel,
and Risperdal. *Id.* After some medication changes in February and March of 2007, his
compliance with his medications dropped off dramatically. *Id.* On April 29, 2007, he
was seen by a psychologist and counseled about the importance of medication
compliance. *Id.* at 4. *Coleman* Class Member W was seen again on May 8, 2007 and his
medications were changed. *Id.* He was seen again by a psychiatrist on May 21, 2004,
was nervous and shaking, and complained about side-effects from his medication. *Id.*
He was seen again by a psychiatrist on May 24, 2007, and reported that he had been
feeling suicidal for one week and wanted to throw himself off the tier. *Id.* A suicide risk
assessment was completed and his risk was noted to be high. *Id.* He was referred and
transferred to a crisis bed at CSP-Sacramento. *Id.* However, after he arrived at CSP-
Sacramento, he did not go to the MHCB. *Id.* Instead, he was housed in the Mental
Health OHU and placed on suicide precautions. *Id.* The next day, May 25, 2007, a
treatment team recommended that he be admitted to the MHCB unit. *Id.* However, he
was never so admitted. *Id.* at 5. After several days on a suicide precaution protocol that

only called for hourly checks, which violates CDCR policy, staff was preparing to discharge him when he was found hanging in his cell, on May 28, 2007. *Id.*

174.   The Suicide Review for *Coleman* Class Member W concluded that "unwise" medication changes contributed to his problems. *Id.* It also concluded that once he was transferred to CSP-Sacramento, "[t]he standard of care was not adequate, as he was only given hourly checks and orders for more frequent checks were apparently disregarded. State policy requires checks at least every 15 minutes at staggered intervals. Had such frequent checks been done, the likelihood that he could have successfully completed an act of suicide would have been substantially decreased." *Id.* The Suicide Review also raised several other serious questions about his care, noting that he should have been referred to DMH for inpatient care from NKSP following his six crisis bed admissions. *Id.* at 6 (problem 2). The review also questioned his removal from EOP level of care, apparently through mistake. *Id.* at 3.

175.   In my opinion, another serious question raised by the suicide is the decision to place an inmate with a very high risk of suicide and a history of serious suicide attempts into an unlicensed outpatient housing unit rather than admitting him to an MHCB unit. This inmate's level of dysfunction and his mental health history were such that staff should have recognized his need for crisis stabilization using medication changes and closely monitoring both his suicidality and his response to medication. This suicide also appears to raise serious questions about medication management and the response to the inmates' medication side-effects.

(4)   The Impact of Overcrowding on Suicide Rates:

176.   Another potential indicator of the impact of overcrowding on the mental health of CDCR inmates is the current high rate of suicides in the CDCR. At least one

reputable study has linked overcrowding to increased rates of suicide.[3]

177.    The suicide rate in the CDCR has been very high in recent years. The CDCR's own internal analysis of the suicide rate in 2005 found that the rate was 21.9 per 100,000, significantly above the national average for prisons of 14 per 100,000, as calculated by the Bureau of Justice Statistics. *See Coleman* Pls' Trial Ex. 16 (Defendants' 2005 Annual Report of Suicides) at 3. However, I am informed and believe that this rate does not include a number of additional deaths which plaintiffs contend were suicides. In any event, the suicide rate is significantly higher than the national average. In 2006, the CDCR reported a total of 43 suicides to plaintiffs counsel in e-mail notifications. *See Coleman* Pls' Trial Ex. 18 (Defendants' 2006 e-mail suicide notifications of suicides). According to CDCR population reports, the population of the CDCR in mid-2006 was 171,960. *See Coleman* Pls' Trial Ex. 37 (July 5, 2006 Weekly Population Report) at 1. Given that population, the 43 suicides in 2006 yields a suicide rate of 25 per 100,000 inmates – nearly double the national average of 14 per 100,000. While suicide rates vary from year to year, the rates of suicide for 2005 and 2006 are very high, and a cause for concern.

178.    As noted above, overcrowding increases both the prevalence and the severity of mental illness. Put another way, overcrowding both creates new mental illness and makes existing mental illness worse. Since many or most suicides are due to the presence of severe mental illness or the onset of a severe mental health crisis, it is clinically reasonable to anticipate a higher suicide rate in an overcrowded system. Another way to think about the correlation between overcrowding and suicide rates is to see overcrowding as a broad environmental factor increasing the risk of suicides by creating a larger class of at-risk individuals.

---

[3] See Meredith Huey and Thomas McNulty, "Institutional Conditions and Prison Suicide: Conditional Effects of Deprivation and Overcrowding" in The Prison Journal (December 2005) at 490.

179.    In my experience as a physician, suicidality is clearly correlated with the acuity level of a person's mental health condition. In a system where clinicians are forced to keep and treat inmates at lower levels of care than what is clinically appropriate due to the absence of adequate beds at higher levels of care, one would expect to see an increase in suicide rates. The Mental Health Service Delivery System that was developed to provide the full spectrum of mental health care to CDCR inmates was not designed to treat severely psychotic or seriously suicidal inmates in its lower levels of care.

180.    Moreover, overcrowding creates surveillance and treatment failures among the population of potential suicides. Other problems present in the overcrowded CDCR today that a clinician would anticipate would create a greater risk of suicides are (1) inadequate clinical and custodial staffing, (2) inadequate medication practices, (3) the use of overflow cells and cages for suicidal inmates, and (4) over reliance on registry or contract mental health clinicians.

181.    Another factor that may be responsible for the high rate of suicides in the CDCR is the high rate at which mentally ill individuals in the CDCR are confined to administrative segregation and other high-security units. Data provided by the defendants in this case demonstrates that somewhere between 29.3 percent and 46.6 percent of the inmates in administrative segregation units are mentally ill. *See Coleman* Pls' Trial Ex. 38 (June 8, 2007 CDCR Health Care Placement Unit Chart, showing that 46.68 percent of all inmates in administrative segregation are mentally ill; however, the figures in the chart for administrative segregation capacity are not added up correctly – the actual total capacity using the figures given for individual institutions should be 8,782, which yields a prevalence rate for mentally ill in CDCR administrative segregation units of 29.3 percent). The rate of mentally ill inmates in the higher custody Security Housing Units (SHUs) is even higher. The same chart shows that 40 percent of all inmates in SHU units are mentally ill. *Id.* (this portion of the chart appears to be added

77

correctly). As noted above, administrative segregation and SHU units are dangerous for mentally ill inmates because such individuals tend to decompensate when they are isolated and locked in their cells for long periods of time and do not have adequate access to programs and exercise. In addition, the staff intensive nature of housing inmates in administrative segregation makes it extremely difficult to deliver treatment in these environments. Finally, it can be difficult to identify decompensation in these units because there are so few programming opportunities through which staff can observe the inmate's level of functioning.

182.   The *Coleman* court and Special Master have recognized the dangerous nature of administrative segregation units for mentally ill individuals. On June 1, 2007, the *Coleman* court ordered defendants to develop further plans to reduce the risks of suicide in its administrative segregation and other high security units. *See* 6/1/07 Order at ¶¶ 4, 5. One issue included in defendants' plans to reduce the risks of suicide in these units is the development of 753 necessary walk-alone exercise yards in order to permit mentally ill inmates to have access to yard. *See Coleman* Pls' Trial Ex. 39 (Defendants' 10/29/07 Small Management Yard Plan). Defendants' new plan called for the construction of 476 walk-alone yards for administrative segregation inmates by January of 2010, even though the court ordered defendants to complete all of the necessary yards by "the end of fiscal year 2008/2009." 6/1/07 Order at ¶ 4 and 10/29/07 Small Yard Management Plan at 3.

183.   The reasons given by defendants' for the delay in implementing this relatively straightforward project provides evidence as to the reason that defendants cannot address the underlying constitutional violations in this case without a remedy that addresses overpopulation. In their plan, defendants give the following reasons why they cannot meet the *Coleman* court's 24-month time frame: (1) there is no funding for the projects in this years budget, (2) the Government Code requires approval from the Department of Finance and the State Public Works Board for the projects, (3) a 45-day

notice period to the Joint Legislative Budget Committee is required, (4) the Public

Contracting Code requires competitive bidding for the projects, which is time-consuming,

(5) the procurement process for the projects takes 23 weeks for some parts of the project

and 33 weeks for some other parts of the project.  *Id.*  Defendants also noted that in the

interim, they are unable to maximize the use of existing yards because of custody

shortages.  *Id.* at 3.

> The Suicide of *Coleman* Class Member X illustrates
> Various Overcrowding-Related Care Issues as Well as the
> Dangers of Housing Suicidal Inmates in Administrative
> Segregation.

184.    *Coleman* Class Member X committed suicide on January 18, 2006 in an

administrative segregation unit at the Richard J. Donovan State Prison (RJD).  *Coleman*

Pls' Trial Ex. 27 (April 6, 2006 Suicide Report for *Coleman* Class Member X) at

Executive Summary of Suicide Report at 1.  Class Member X had never received mental

health treatment in the community, but he received treatment previously while in jail and

in the CDCR.  *Id.* at 2.  He arrived at RJD on October 3, 2005 with a diagnosis of

Psychosis NOS and Mood Disorder NOS.  *Id.*  He had been treated at the jail with

Seroquel.  *Id.*  When he was seen initially by a CDCR psychiatrist, he was prescribed a

tapered dose of Seroquel for two weeks, and then taken off of medication.  *Id.*  On

October 18, 2005, he suffered an apparent psychotic episode including delusions,

auditory hallucinations, and paranoia.  *Id.*  One psychiatrist ordered a prescription of

Seroquel for him by telephone.  *Id.*  Later that morning *Coleman* Class Member X told

another psychiatrist who evaluated him that he was hearing voices telling him they were

going to kill him.  *Id.*  He was then placed into administrative segregation, apparently for

safety concerns stemming from his statements that someone was going to kill him.  *Id.*

On October 19, 2005, he was evaluated by a psychologist and reported increased auditory

hallucinations.  *Id.*  He also asked for a medication change.  *Id.*  On November 3, 2005,

he was seen by yet another psychiatrist who continued him on the same medication,

Seroquel. *Id.* On December 6, 2005, he was seen by a third psychiatrist to whom he reported paranoid thoughts "such as thinking cellmate is poisoning food." *Id.* at 3. The psychiatrist diagnosed him with Psychosis NOS and increased his Seroquel dosage from 600 mg to 800 mg, however his medication administration record (MAR) for the month of December shows that he only received his medication on one or two days. *Id.* Apparently he was not placed on the mental health caseload during this entire period.

185.   Despite his medication non-compliance, he does not appear to have been seen again by mental health staff until January 10, 2006, when he was given a mental health screening and placed in the CCCMS program for the first time. *Id.* There were numerous discrepancies in the inmate's medication records, but he appears to have been prescribed Quetiapine starting January 3, 2006. *Id.* Coleman Class Member X made multiple lacerations to his wrists on January 17, 2006. *Id.* He reported gambling debts. *Id.* No suicide risk assessment was conducted. *Id.* He was referred to custody staff who decided to re-house him into the administrative segregation unit pending an investigation into his claims concerning his gambling debts. *Id.* Mental health staff members in the administrative segregation unit were not aware of his self-injurious behavior. *Id.* The next day, reportedly after being told by custody staff that he could be double celled, he was found hanging in his cell. *Id.*

186.   The internal CDCR suicide review for this case found several serious problems with the manner in which his care was handled. *Id.* at 4-5. First, *Coleman* Class Member X's self-injurious behavior on January 17, 2006 was apparently not reported to mental health staff in the administrative segregation unit. *Id.* Second, the mental health clinician who evaluated *Coleman* Class Member X after he cut his wrists did not conduct a suicide risk assessment. *Id.* Third, he was never given an initial mental health screening when he arrived at RJD. *Id.* There was no documentation of the mental health evaluation he was allegedly given three months later on January 10, 2006. *Id.* Fourth, there were serious problems with medication administration records, and serious

discrepancies between the pharmacy medication records, Medication Administration Records, and medication orders in the inmate's medical record. *Id.*

187.   Another serious issue noted in the Suicide Report is that the psychologist who evaluated *Coleman* Class Member X on January 17, 2006 and failed to conduct a suicide risk assessment did not have the inmate's health record available at the time of the interview. *Id.* at Suicide Report at 8.

188.   In my opinion, this case illustrates a number of the problems and risks that a mentally ill patient faces in the CDCR today. First, the inmate was not properly screened for mental illness. Second, when he exhibited signs of psychiatric distress and suicidality, he was not appropriately responded to, was not given a suicide risk assessment, and in fact was placed into an administrative segregation unit, a dangerous place for suicidal inmates. Third, when he complained about medication side effects, and when, according to his MAR, he stopped taking his medication for a month, he was not referred to a psychiatrist for an assessment. Fourth, his suicidal gestures were discounted, and his behavior was not reported to mental health staff members in administrative segregation who should have monitored him. Fifth, he was not appropriately assessed for placement in the mental health treatment program. These are the types of problems that take place in an overburdened, overcrowded system when staff does not have enough time with each patient and systems break down.

(5)   Staffing Shortages

189.   It is also clear that staffing shortages are currently endemic in the CDCR's mental health system. In the 18th Monitoring Report, the Special Master found that "high vacancy rates in mental health staffing continued throughout CDCR institutions," and that vacancy rates were a "significant obstacle to compliance with the *Coleman* Program Guide." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 330. He also found the staffing problem to be particularly damaging to EOP inmates entering reception centers. *Id.*

(6)     Adequate Treatment and Office Space for
Clinicians to Use.

190.    It is also clear that the problem of adequate office and treatment space is
endemic in the CDCR.  The 18th Report explains that during the review period,
"[c]ompetition for mental health treatment and clinical office space sharpened with
growth in the overall healthcare infrastructure against the backdrop of already
overcrowded prisons."  Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special
Master) at 2.

191.    The Special Master's Report contains numerous concrete examples of
individual institutions that are unable to provide adequate care because of space
shortages.  In many institutions and housing units, including Mule Creek State Prison,
Solano, and Sierra Conservation Camp, group therapy is impossible because of lack of
space. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 55-56 (in
MCSP's EOP Administrative Segregation program "eight holding cells used for group
treatment were unable to accommodate the unit's census of 40 to 60 inmates" and group
sessions and case manager contacts took place on the dayroom floor); 55 (MCSP Level
IV EOP program had "insufficient group treatment space"); 61 (at SCC, treatment space
in administrative segregation "remained insufficient"); 84 (at Solano four CCCMS
groups were formed "but did not meet for lack of suitable space."); 85 (Solano: "In
administrative segregation, mental health treatment and mandated outdoor recreation
were stymied by inadequate space."); 178 (at CMC: "Lack of sufficient clinical staff
caused [group treatment] options to be limited.  Lack of space exacerbated CMC's
difficulties with meeting Program Guide group requirements."); 204 (at NKSP: space
limitations caused cancellation of groups administrative segregation).

192.    In a number of other institutions, the lack of space means that case
manager contacts and even therapy contracts take place in public setting that affords no
confidentiality. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at

42 (at HDSP "[m]ental health assessments and case manager contacts in reception center routinely occurred in non-confidential settings. Assessments were conducted at dayroom tables that afforded limited privacy."); 55 (at MCSP "case manager contacts occurred in cubicles on the dayroom floor, which afforded inadequate visual and auditory privacy"); 64 (at CMF clinical interviews with suicidal inmates done in the middle of busy B-1 clinic which lacks a confidential interview area – "conversation was difficult at times. Confidentiality was not expected."); 72 (CMF: "Roughly three dozen 3CMS inmates [in administrative segregation] did not have confidential meetings due to lack of space, escorts, and schedules."); 83 (Solano: "Lack of space was problematic throughout the institution, making the greatest impact on group treatment and on confidential contacts in administrative segregation."); 133 (PVSP: "Treatment space was inadequate for all aspects of mental health services, and all areas were affected adversely."); 168 (CTF: "Obstacles to confidential out of cell [case manager] contracts included escorts and space.").

193.    At many institutions, the lack of space means that clinicians share offices. Since the offices are used for confidential therapy sessions with clients this interferes with that ability of existing staff members to provide treatment, and also makes it more difficult to attract and retain clinicians. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 221 (CCI: "Mental health staff calculated that 6,000 more feet of treatment and office space were needed to meet treatment requirements."); 304 (VSPW: "In the general population EOP program, a shortage of office and program space and average caseloads of 125 inmates presented daily challenges. Three or more clinicians typically shared an office."); 127 (SATF: "lack of adequate office and programming space in four of seven of CSATF's yards hindered the delivery of mental health treatment. Case managers and psychiatrists often competed for limited office space, which routinely disrupted scheduled appointments."); 177 (CMC EOP administrative segregation: "Office space was available for only two clinicians and was unlikely to be

remediate pending completion of a long-term reconstruction plan. Treatment space was also insufficient. Reportedly, these working conditions hampered the institution's ability to attract and retain staff in the administrative segregation EOP program.").

194. At the California Medical Facility, space limitations mean that sometimes therapy is conducted in a small closet holding a microwave oven, and other sessions are held in what appears to be a bathroom. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 73 (CMF: "The quality of [CCCMS] treatment was compromised by lack of suitable treatment space for individual contacts and by scheduling difficulties. Staff reported that . . . clinical meetings in some housing units were held in a closet that contained a microwave oven used by staff. Other treatment sessions were held in a small room equipped with a toilet.").

195. Finally, at VSPW, the lack of space means that treatment often takes place outside on the yard on benches. *Id.* at 304 ("Clinicians routinely interviewed inmates in non-confidential public areas, including on outdoor benches.").

### 4. Overcrowding is the Primary Cause of the Constitutional Violations in the CDCR

196. These overcrowding-induced conditions that currently exist in the CDCR violate the rights of inmates to constitutionally adequate medical and mental health care. The conclusion that overcrowding is the primary cause of these violations is inescapable for several reasons.

The Persistence of the Constitutional Violations Present in the CDCR Demonstrates that They Are Caused by Overcrowding:

197. First, taken together, the range of Constitutional violations discussed above, including inadequate suicide monitoring and prevention, inability to timely access appropriate levels of care, inability to timely access mental health clinicians due to

staffing shortages, and inadequate medication management practices are unusual in a system that has been under Court supervision for ten years. These serious, dangerous violations this late in the remedial process are typical indicators of a system plagued by severe overcrowding. In a non-overcrowded system, the Constitutional violations are more readily addressed by such interventions as increased staff and increased programming. However, in a system overwhelmed by crowding, these traditional remedies are woefully inadequate. This appears to be the case in the CDCR where remedial efforts have resulted in significant expansions of staffing and programming activities, yet the constitutional violations persist or even worsen.

> The *Coleman* Special Master has found that overcrowding has undermined progress that was being made in various areas

198.    The *Coleman* Special Master has observed that, although there was a period of time when it seemed that defendants might be making progress in terms of their bed plan and the provision of treatment, the overcrowding crisis has overwhelmed this hope. In his April 12, 2007 Report to the Court, he concluded: "By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health plan." *See* 4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds at 8.

> The Percentage of Caseload Inmates in the CDCR is Increasing Faster that the Overall Population:

199.    Another factor that demonstrates that overcrowding is the primary cause of the constitutional violations is the fact that the percentage of caseload inmates in the CDCR is increasing faster than the overall CDCR population. Between January of 2003

and July of 2007, the population of the CDCR grew from 159,743 to 172,897, an increase of 8.2 percent. *Coleman* Pls' Trial Ex. 34 and 35 (Monthly population figures downloaded from the CDCR website for January 2003 and July 2007). During the same period, the MHSDS caseload of EOP and CCCMS inmates grew from 24,599 to 32,039, an increase of 30.2 percent. *Coleman* Pls' Trial Ex. 36 (CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports). Thus, during this period of roughly four and one-half years, the mental health caseload grew at four times the rate of increase for the overall population.

200.    This is typical of systems where overcrowding is the primary cause of the constitutional violations because, as I have stated previously, overcrowding creates new mental health needs and exacerbates existing mental health needs. I encountered numerous examples of this on my various prison tours in preparing this opinion. As the data supports, the net result of overcrowding is a greater incidence of mental illness. In addition, this greater prevalence of mental illness presents at a more acute level. Traditional remedial efforts such as increased staffing will be insufficient to remedy this problem. Finally, as stated previously, overcrowding expands demand at the highest levels of care and creates static backlogs of patients that make it difficult to assess the true demand for services.

<u>In Many Instances, the Overcrowded Conditions
Themselves Are the Cause of the Unconstitutional Mental
Health Care:</u>

201.    The causal link between overcrowding and unconstitutional mental health care is clear and direct in the many CDCR housing units where space shortages from overcrowding directly result in long-term living arrangements that are harmful to the mental health of *Coleman* class members. For example, CCCMS inmates are routinely triple-bunked in chaotic, overcrowded dorms where they experience damaging levels of stress and fear of predation. It is clear that the mentally ill inmates I interviewed at

86

Solano who also had staph infections would not have been as ill if they were not living in overcrowded conditions. Similarly, mentally ill inmates are retained for extended periods in Reception Centers and in locked down general population units, where they are locked in their cells for most of the day and receive little or no programming or mental health services. Such environments add to the instability of mentally ill individuals. Another context in which the link is clear is improper placements in administrative segregation, where caseload inmates are often unable to access care and experience decompensation. Yet another context where this link between overcrowded conditions and constitutional deprivations is very direct is suicide watches in holding cells, cages, tanks, administrative segregation units, and other unsafe, unlicensed, and improperly supervised environments. These same harsh conditions, as discussed earlier, also increase the demand for mental health services in prisoners in the general population who, in a properly operating, not overcrowded system, would not need mental health services. Isolation, seclusion, idleness, violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding. These conditions exacerbate mental illness and are serious barriers to the provision of minimally adequate mental health and medical care.

202.     There are a number of examples in the Special Master's Eighteenth Monitoring Report of overcrowding-related conditions directly interfering with access to constitutional mental health care. *See* Joint Pls' Trial Ex. 36 (Special Master's 18th Report) at 12 (Noting that at CSP-Sacramento, "[a]s predicted by staff, the expansion of EOP and PSU beds challenged the institution's ability to sustain previous levels of compliance. The amount of treatment provided to each EOP inmate was reduced, and more contacts were made at cell-front."); 84 (Solano: "rising caseloads, poor access to treatment associated with prolonged modified programming [lock-downs] in one yard, and ducat problems forced clinicians to resort too often to quarterly visits that were little more than a cursory check-in, many of which occurred at cell-front or in locations that compromised visual or auditory privacy. Under these conditions, a subset of sick inmates

got sicker, and clinicians sometimes missed, or failed to respond appropriately to, signs of mental illness."); 113 (Corcoran: "A high turnover rate among caseload inmates in concert with shortages of staff psychiatrists and lack of suitable treatment space continued to impede the delivery of mental health treatment and prevent CSP/Corcoran from meeting Program Guide requirements."); 126 (CSATF: "Large caseloads, turnover, and long-term leaves combined to reduce compliance with Program Guide requirements. . . . Mental health staff response to referrals was often slow."); 127 (CSATF Administrative Segregation: "Case managers assigned to administrative segregation reportedly barely had time to complete weekly contacts."); 155-156 (SVSP CCCMS administrative segregation: describing "structural impediments" to delivering adequate care including inadequate staffing and space constraints.); 237 (CIM: In the administrative segregation units, a "work group to improve strained relationships between custody and mental health found that the problem was related largely to increased administrative segregation population and physical plant.").

### B.     Opinion 2:  Other Remedial Efforts Will Not Succeed In Remedying The Underlying Constitutional Violations.

203.     In my opinion, no other relief will remedy the underlying constitutional violations except a remedy which results in a substantial reduction in the prison population.

204.     I am aware that the *Coleman* court has issued at least seventy-seven orders intended to induce the State to provide constitution levels of mental health treatment in the CDCR. The *Coleman* court concluded in its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel: "Since February of 1996, this court has issued at least seventy-seven substantive orders to defendants in an effort to bring the CDCR's mental health care delivery system into compliance with the requirements of the Eight Amendment. Taken together, these orders

88

have contained directives aimed at all of the aforementioned requirements for a constitutionally adequate mental health care delivery system. In addition, the Special Master and his staff have spent hundreds of thousands of hours working with the parties to develop program guidelines for a constitutionally adequate system and monitoring defendants' implementation of those guidelines. During the same period of time, the Special Master has filed seventeen semi-annual monitoring reports and fifty-five other reports reflecting the results of these efforts." 7/23/07 Order at 4:13-21.

205.   Having worked as a correctional expert and having worked on the *Gates* and *Madrid* cases, I am very familiar with the monitoring team working for the court on the *Coleman* case. Moreover, having reviewed the recent monitoring reports and the other documents in this case, it is clear that very intensive remedial monitoring efforts have been going on in the *Coleman* case for many years. In my opinion, the large team of national experts working as court-appointed experts in the *Coleman* case has a great deal of collective experience working with troubled correctional systems. Nonetheless, after ten years of intensive monitoring and other remedial efforts, the CDCR remains plagued by serious constitutional deficiencies in its delivery of mental health care. I agree with the *Coleman* Special Master that the reason for this sorry state of affairs is that whatever tentative progress was made early on in this case has been overwhelmed by the massive population expansion in recent years.

206.   From reviewing the docket in the *Coleman* case, I am aware that these more than seventy-seven orders have attempted to address issues of staffing, space, quality of treatment, and bed availability, among others. These include numerous orders concerning such critical issues as adequate MHCB capacity (see, e.g., 1/15/01, 12/20/01, 10/8/02 Orders); access to DMH beds (see, e.g., 5/22/98, 7/26/99, 8/28/00, 4/4/01, 6/27/01, 3/4/02, 5/7/02, 10/8/02, 1/19/04, 7/9/04, 6/30/07 Orders); and staffing (see, e.g., 2/17/96, 6/17/98, 8/25/99, 1/19/99, 7/26/99, 1/13/00, 4/27/00, 8/28/00, 6/13/02, 10/8/02, 3/3/06 Orders).

207.    Persistent shortages of beds at every level, lack of adequate mental health and custodial staff, and inadequate treatment and programming space clearly reflect the overcrowding crisis.  In my opinion, more orders by the Court along these lines of those discussed above will not remedy the underlying Constitution violations at this time.  The system is simply too overwhelmed by the population for these orders to be effective as long as the population continues to remain at current levels.

208.    I am also aware that the State has proposed construction of new prisons and re-entry facilities as the bulk of its solution to the overcrowding crisis.  I have reviewed the Receiver's analysis in his Reports regarding overcrowding and the further demands for mental health and medical staffing, and treatment space that building these new prisons and re-entry facilities will create.  As the Receiver notes, building more prisons and re-entry facilities will require additional staff, and will spread existing overtaxed staff among more facilities.  See Joint Pls' Trial Ex. 26 (Receiver's 5/15/07 Report Re Overcrowding) at 40-41.  The building timeline for the beds contemplated by AB 900 does not anticipate any new beds until 2009, and most of the beds will be built much later.  *See Coleman* Pls' Trial Ex. 40 (January 2007 CDCR Estimated Construction Schedule for Infill Bed Plan, Ex. 20 to Receivers 5/15/07 Report).  Moreover, as the delays associated with the CDCR's plans to construct walk-alone yards demonstrate, construction projects involving government agencies are rarely finished by the anticipated dates.  In my opinion, any added capacity for mental health and medical treatment that this prison construction may create will take far too long to be sufficient as a remedy to the current constitutional violations, which are extremely urgent and life-threatening.  This plan also fails to address the other persistent, intractable overcrowding-related problems that are present in the CDCR, such as clinical and custody shortages, adequate medication management practices, and sufficient beds at the highest levels of care.

90

209.   Similarly, the alternative remedy proposed by defendants for beds at the MHCB and inpatient level will not be finished until 2014 – seven years from now -- at the earliest, even assuming there are no bureaucratic delays or construction delays. *See Coleman* Plfs. Trial Ex. 12 (9/24/07 Special Master's Report on Defendants' August 2007 Bed Plan). That plan is unacceptable.   Mentally ill *Coleman* class members are daily suffering dangerous denials of mental health care and medical care that place them, their fellow inmates, the officers who supervise them, and the public at risk.  In the interim, the only way to correct the endemic denials of appropriate mental health care that currently exist in the CDCR is to significantly reduce the population.  No other remedy will result in a constitutional mental health care system in the CDCR.

Dated: 11|9|07

PABLO STEWART, M.D.

# APPENDIX A

<u>CURRICULUM VITAE</u>

*PABLO STEWART, M.D.*
824 Ashbury Street
San Francisco, California 94117
(415) 753-0321; fax (415) 753-5479; e-mail: pab4emi@aol.com
(Updated 8/02/2007)

| | |
|---|---|
| <u>EDUCATION:</u> | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy Annapolis, MD, B.S. 1973, Major: Chemistry |
| <u>LICENSURE:</u> | California Medical License #GO50899<br>Hawai'i Medical License #MD11784<br>Federal Drug Enforcement Agency #BS0546981<br>Diplomat in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

## ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-<br>Present | <u>Academic Appointment:</u> Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>Present | <u>Academic Appointment:</u> Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 -<br>June 1995 | <u>Academic Appointment:</u> Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 -<br>July 1989 | <u>Academic Appointment:</u> Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

## EMPLOYMENT:

| | |
|---|---|
| December 1996-<br>Present | <u>Psychiatric Consultant</u><br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues. (Client list available upon request). |

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project.</u>   Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service training's for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>   Overall clinical/administrative responsibility for the IPCC, a community based case management program. Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center. This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u> Clinical responsibility for patients admitted to SAIU. Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco.</u>   Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.   Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u> Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward. Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.   Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

| July 1985<br>June 1986 | Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital. Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatric course for UCSF second year medical students. |
|---|---|
| July 1984 -<br>March 1987 | Physician Specialist, Westside Crisis Center, San Francisco, CA. Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | Psychiatric Consultant, Marin Alternative Treatment, (ACT). Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA. Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | Psychiatric Resident, University of California, San Francisco. Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | Infantry Officer - United States Marine Corps. Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

HONORS AND AWARDS:

| | |
|---|---|
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nation-wide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>Present | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 - | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report*. |
| May 2001-<br>Present | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |

| | |
|---|---|
| February 2006-<br>January 2007 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>Present | President, Human Services Commission, City and County of San Francisco. |

## UNIVERSITY SERVICE:

| | |
|---|---|
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| July 2003-<br>June 2007 | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
|---|---|
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>Present | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 -<br>June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |

| | |
|---|---|
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 - August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE:

| | |
|---|---|
| February 2006-<br>Present | Board of Directors, Physician Foundation at California Pacific<br>Medical Center. |
| June 2004-<br>Present | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>Present | Organizational/Psychiatric Consultant, State of Hawaii,<br>Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement,"<br>New Mexico Corrections Department (NMCD).    This is a<br>settlement arrived at between plaintiffs and the NMCD regarding<br>the provision of constitutionally mandated psychiatric services for<br>inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>Present | Juvenile Mental Health and Medical Consultant, United<br>States Department of Justice, Civil Rights Division, Special<br>Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training<br>Alliance's Alcohol and Drug Disability Technical Assistance<br>Project.     This Project provides assistance to programs and<br>communities that will have long lasting impact and permanently<br>improve the quality of alcohol and other drug services available to<br>individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and<br>Delinquency (NCCD) in its monitoring of the State of Georgia's<br>secure juvenile detention and treatment facilities. NCCD is acting<br>as the monitor of the agreement between the United States and<br>Georgia to improve the quality of the juvenile justice facilities,<br>critical mental health, medical and educational services, and<br>treatment programs. NCCD ceased to be the monitoring agency<br>for this project in June 1999. At that time, the Institute of Crime,<br>Justice and Corrections at the George Washington University<br>became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign<br>Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance<br>Abuse Treatment, Substance Abuse and Mental Health Services<br>Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer<br>Center (ATTC), University of California, San Diego. |

| | |
|---|---|
| December 1992 - December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991- February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 - June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.   Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996- July 1997 | Psychiatric Expert for the U. S. Federal Court in the case of Madrid v. Gomez. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 - January 2000 | Psychiatric Expert for the U.S. Federal Court in the case of Gates v. Deukmejian.   Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 - December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.   Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July - December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality Hospitality House, San Francisco, CA. Advised youth services staff on client management. Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

## SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 - Present | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 - Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991- June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 - May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.   San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1.   (10/12/1990).   "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.   Grand Rounds.   Department of Psychiatry, University of California, San Francisco, School of Medicine.  (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.   Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference.   (3/3/1991).   "Planning a Satisfying Life in Medicine."

4.   24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.   Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.   Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.   First International Conference of Mental Health and Leisure.   University of Utah. (7/9/1992).  "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.   American Group Psychotherapy Association Annual Meeting.  (2/20/1993).  "Inpatient Groups in Initial-Stage Addiction Treatment."

9.   Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10.  University of California, Extension.   Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.  American Psychiatric Association Annual Meeting.   (5/26/1993).   "Issues in the Treatment of the Dual Diagnosis Patient."

12.  Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13.  Utah Medical Association Annual Meeting.  (10/7/93).  "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14.  Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15.  Haight Ashbury Free Clinic's 27th Anniversary Conference.  (6/10/94).  "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16.   University of California, San Diego.   Addiction Technology Transfer Center Annual Summer Clinical Institute:  (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98).  "Treating Multiple Disorders."

17.   National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18.   Value Behavioral Health/American Psychiatry Management Seminar.   (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19.   Grand Rounds.  Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20.   San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project.   (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21.   First Annual Conference on the Dually Disordered.   (3/10/1995).   "Assessment of Substance Abuse."  Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22.   Delta Memorial Hospital, Antioch, California, Medical Staff Conference.  (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient."  Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23.   Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada.   (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24.   The Labor and Employment Section of the State Bar of California.   (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25.   American Group Psychotherapy Association, Annual Training Institute.  (2/13-2/14/96), National Instructor - Designate training group.

26.   American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27.   Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28.   International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29.   Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

30.   Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31.    Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32.    Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33.    DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34.    The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35.    The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36.    American Group Psychotherapy Association, Annual Training Institute, (2/16-2/28/1998), Intermediate Level Process Group Leader.

37.    "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., in conjunction sponsored this seminar with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38.    "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39.    Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40.    Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41.    Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42.    "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

43.    "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, PEEL MEMORIAL HOSPITAL, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22 & 2/5/99)

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.    "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", Third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.    15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.    "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.    "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.    "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.    "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.    "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.    "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.    1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.    "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.    "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87.    "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88.    "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89.   "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90.   "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91.   "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92.   "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93.   "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94.   "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95.   "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96.   "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97.   "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98.   "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99.   "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101.   "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102.   National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.  "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.   "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunderoad Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105.   "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues. 2001California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

120. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

121. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

122. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

123. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

124. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

125. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

126. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137.   Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138.   "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.   Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.   "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141.   "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.   "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143.   "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144.   "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)


PUBLICATIONS:

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and outcome in a short-term therapy group for schizophrenic outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group process in short-term outpatient therapy groups for schizophrenics*. Group, Volume 13, Number 2, Summer 1989.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues*. Journal of Psychoactive Drugs, Vol. 23(4) Oct-Dec 1991, 387395.

4)   Banys, P., Clark, W.H., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, W.H., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers*. The Journal of Nervous and Mental Disease, Vol 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W. O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trail Of Tyrosine for Cocaine Dependence*. Journal of Psychoactive Drugs, Vol. 28(3), July-September 1996

7)    Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999

8)    Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)    Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. By Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)   Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)   James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)   Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

# APPENDIX B

# APPENDIX B TO PABLO STEWART'S DECLARATION

| DOCUMENT |
| --- |
| Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency (October 4, 2006) |
| Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29, 2007) |
| Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007) |
| Reforming Corrections:  Report of the Corrections Independent Review Panel, June 30, 2004 (Gov. Deukmejian, Chairman) |
| Mental Health Services Delivery System Program Guide (September 2006) |
| Memorandum from Jane Kahn Re: *Coleman* Revised Program Guide Basics (October 17, 2007) |
| Judge Karlton's 3/3/06 Order Regarding Defendants' Revised Program Guide (Coleman Docket 1773) |
| Mental Health Population Chart – Placement Per Institution, as of July 27, 2007 (September 25, 2007) |
| Program Guide Overview, from Mental Health Services Delivery System Program Guide (September 2006) |
| Exhibit A to Defendants' Plan to Address Suicide Trends In Administrative Segregation Units (October 2, 2006) (Coleman Docket 1990) |
| Exhibit A in Support of Defendants' Submission of Plan for Reception Center/EOP Inmates (July 31, 2006) (Coleman Docket 1928) |
| Allocated Case Manager Positions and Vacancies for EOP Ad Seg Hub Institutions, as of July 2007 (September 25, 2007) |
| Memorandum from CDCR Re: Revised 30 Minute Welfare Check Process (December 12, 2006) |
| Judge Karlton's 9/14/07 Order Granting Defendants' Request for Extension of Time to File Plan for Small Management Yards in Administrative Segregation Units (Coleman Docket 2418) |
| Judge Karlton's 10/20/06 Order Approving Defendants' Plan for Provision of Acute and Intermediate Care and Mental Health Crisis Beds (Coleman Docket 1998) |
| Judge Karlton's 6/7/06 Order Requiring Defendants to Develop Plan to Address Suicide Trends in Administrative Segregation Units (Coleman Docket 1830) |
| Receiver's Report Regarding Overcrowding and Appendices to same (May 15, 2007) (Plata Docket 673 and 674) |
| Receiver's Supplemental Report Regarding Overcrowding (June 11, 2007) (Plata Docket 705) |
| *Coleman* Special Master's Report Regarding Overcrowding (May 31, 2007) (Coleman Docket 2253) |
| *Coleman* Special Master's 18th Monitoring Report (July 30, 2007) (Coleman Docket 2334 through 2334-11) |
| *Coleman* Special Master's 17th Monitoring Report, Part A (2/14/07) (Coleman Docket 2140 through 2140-3) |
| *Coleman* Special Master's 17th Monitoring Report, Part B (4/02/07) (Coleman Docket 2180 through 2180-5) |
| *Coleman* Special Master's 17th Monitoring Report, Part C (6/13/07) (Coleman Docket 2274 through 2274-7) |
| Office of the Inspector General (OIG), Special Review into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas (October 2007) |

| DOCUMENT |
|---|
| Memorandum from CDCR Re: Standardization of Mental Health Crisis Bed Admission Procedures (July 21, 2005) |
| Report on Status of Funding for Acute, Intermediate and Mental Health Crisis Bed Plan, filed September 11, 2006 (Coleman Docket 1969) |
| Judge Karlton's 5/2/06 Order Regarding Defendants' Long Range Bed Plan (Coleman Docket 1800) |
| *Coleman* Special Master's 5/9/06 Report and Recommendations on Suicides in the California Department of Corrections in the Calendar Year 2004 (Coleman Docket 1806) |
| *Coleman* Special Master's 5/14/07 Supplemental Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation (Coleman Docket 2210) |
| *Coleman* Special Master's 7/2/07 Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (Coleman Docket 2302) |
| *Coleman* Special Master's 9/24/07 Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan (Coleman Docket 2432 through 2432-3) |
| CDCR, 2004 Annual Suicide Report (September 26, 2005) |
| CDCR, 2005 Annual Suicide Report (September 8, 2006) |
| Collection of 43 Email Notifications from CDCR Regarding 2006 Suicides (Received between January and December 2006) |
| Collection of 29 Email Notifications from CDCR Regarding 2007 Suicides (Received between January and November 3, 2007) |
| CDCR Suicide Report for *Coleman* Class Member "P" |
| CDCR Suicide Report for *Coleman* Class Member "W" |
| CDCR Suicide Report for *Coleman* Class Member "H" |
| CDCR Suicide Report for *Coleman* Class Member "GG" |
| CDCR Suicide Report for *Coleman* Class Member "FF" |
| CDCR Suicide Report for *Coleman* Class Member "X" |
| Judge Henderson's 2/14/07 Order Continuing Hearing on Plaintiffs' Motion to Convene a Three-Judge Panel (Plata Docket 608) |
| Judges Karlton and Henderson's 7/23/07 Orders Granting Plaintiffs' Motion to Convene Three-Judge Panel (Coleman Docket 2320, Plata Docket 780) |
| Three Judge Panel Order Bifurcating Proceedings and Setting Deadlines for Phase I (October 10, 2007) (Coleman Docket 2456, Plata Docket 880) |
| Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion to Convene a Three-Judge Panel and Exhibits, and Supporting Declarations of Joan Petersilia, Doug McKeever, Margaret McAloon, Scott Kernan, Kathryn P. Jett and Deborah Hysen (May 24, 2007) (Coleman Docket 2238) |
| Declaration of Scott Kernan in Support of Defendants' Response to Receiver's Supplemental Report Re: Overcrowding (June 18, 2007) (Coleman Docket 2287) |
| Defendants' Brief Re: Expert Panel's Report on Reentry and Recidivism and Its Relation to Pending Motion to Convene a Three Judge Panel and Declarations of Kathryn Jett and Joan Petersilia (July 11, 2007) (Coleman Docket 2310) |
| Sample Declarations of Pablo Stewart from *Morales* and *Prieto* Matters |
| Defendants' Report and Plan for Improvement of Enhanced Outpatient Programs n Administrative Segregation Units (July 11, 2007) (Coleman Docket 2311) |

| DOCUMENT |
| --- |
| Defendants' Responses and Objections to Special Master Keating's Report on Defendants' Plan to Provide Enhanced Outpatient Program Care at Reception Centers (July 12, 2007) (Coleman Docket 2313) |
| Defendants' Statement in Response to Court Order Re: Compliance with Items to Reduce Suicides in Administrative Segregation Units and Declaration of Doug McKeever (July 30, 3007) (Coleman Docket 2335) |
| Defendants' Ex Parte Motion Re: Request for Extension of Time, Declaration of Misha Igra, and Proposed Order (July 30, 2007) (Coleman Docket 2336) |
| Defendants' Statement of Compliance Re: Television and Radio Accessibility in Administrative Segregation Units (August 13, 2007) (Coleman Docket 2363) |
| Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards, Declaration of Hysen, and Proposed Order (August 29, 2007) (Coleman Docket 2393) |
| Judge Karlton's 9/14/07 Order Granting Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards (Coleman Docket 2418) |
| Defendants' Response to Court Order Re: Small Management Yard (October 29, 2007) (Coleman Docket 2492) |
| Defendants' Supplemental Report Re: Television and Radio Accessibility in Administrative Segregation Units (August 21, 2007) (Coleman Docket 2382) |
| Defendants' Statement of Compliance Re: Television and Radio Accessibility in Administrative Segregation Units (August 13, 2007) (Coleman Docket 2363) |
| Memorandum from CSP-SAC, entitled "Report On Use of Alternate Sites for Crisis Bed Patients" (October 5, 2007) (20th Round SAC Tour Binder) |
| 5/8 Day Follow Charts for Inmates that Were Removed from Observation Units in 2006 |
| OHU-I and OHU Follow-Up/Wellness Check Charts for 3/1/07 to 9/28/07 |
| Office of the Inspector General (OIG) Special Review Into the Death of Correctional Officer Manuel A. Gonzalez, Jr. on January 10, 2005 at the California Institution for Men (March 16, 2005) |
| "Repairs Needed After California Institution for Men Riot - Prison Officials Say Understaffing Left Guards in Jeopardy," Inland Valley Daily Bulletin (September 29, 2005) |
| "16-Year Veteran CDC Correctional Officer Dies From Inmate Stabbing Attack," CDCR Press Release (January 10, 2005) |
| "Major Prison Disturbance at the California Institution for Men in Chino," CDCR Press Release (December 30, 2006) |
| "Massive Riot at CIM," Officer.com Police Forums & Law Enforcement Forums, http://www.forums.officer.com/forums (December 31, 2006) |
| P. Paulus, G. McCain, & V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," Environment and Behavior 8 (1976) at 233, 288 |
| P. Paulus, G. McCain, & V. Cox, "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," Environmental Psychology and Nonverbal Behavior 3 (1978) at 107, 115 |
| V. Cox, P. Paulus, & G. McCain, "Prison Crowding Research," American Psychologist 39 (1984) at 1148, 1159 |
| Judge Karlton's 6/1/07 Order Adopting Special Master's Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation (Coleman Docket 2255) |
| |

| DOCUMENT |
|---|
| Selection of Documents from the DVI *Coleman* Tour Binder (October 2-4, 2007 Monitoring Tour) |
| *Coleman* Docket |
| Documents received during expert tour of Deuel Vocation Institution on October 29, 2007 |
| Documents received during expert tour of CSP – Solano on October 31, 2007 |
| Documents received during expert tour of Salinas Valley State Prison on November 1, 2007 |
| CDCR Report Regarding *Inmate Incidents in Institutions, Calendar Year 2006* (Published September 2007) |
| CDCR Weekly Population Report, October 24, 2007 |
| CDCR Weekly Population Report, July 5, 2006 |
| CDCR Weekly Population Report, January 10, 2007 |
| Judge Karlton 6/28/07 Order Re: DMH Salary Increases and Atascadero State Hospital |
| *Coleman* Specials Masters Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds and the Need for Approval of Some Components of Dec 2006 Bed Plan and Exhibit A (April 12, 2007) (Docket 2186) |
| Judge Karlton 10/18/07 Order Adopting Special Master's September 24, 2007 Report in Full (Coleman Docket 2461) |
| CDCR Health Care Placement Unit Chart, June 8, 2007 |
| CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports |

## PROOF OF SERVICE

I, Kate Richardson, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On November 9, 2007, I served the following documents:

**1) PLAINTIFFS' DISCLOSURE OF EXPERT TESTIMONY**

**2) EXPERT REPORT OF JAMES AUSTIN, Ph.D.**

**3) EXPERT REPORT OF CRAIG HANEY, M.D.**

**4) EXPERT REPORT OF PABLO STEWART, M.D.**

I served the documents on the persons listed below, as follows:

| | |
|---|---|
| [ ] | **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons listed below and providing them to a professional messenger service for service. (A declaration by the messenger is attached hereto as a separate document.) |
| [ X ] | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |
| [ ] | **By overnight delivery.** I enclosed the documents in a sealed envelope or package provided by Federal Express and addressed it to the persons listed below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier and I arranged to pay for all fees for delivery. |
| [ ] | **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below from Rosen Bien & Galvan's facsimile transmission telephone number, (415) 433-7104. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached. |
| [ ] | **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addressed listed below. I did not receive, within a reasonable time |

1

after the transmission, any electronic message or other indication that the transmission was unsuccessful.

2

3   **All documents were sent to the following persons in the following manner:**

4   By United States Mail

5   Lisa A. Tillman
    Deputy Attorney General
6   1300 I Street, Suite 125
    Sacramento, CA 95814
7

8   Paul B. Mello, Esq.
    Hanson, Bridgett, Marcus, Vlahos &
9   Rudy, LLP
    425 Market Street, 26th Floor
10  San Francisco, CA  94105

11

12  California Correctional Peace Officers'
    Association (CCPOA) Intervenors
13  Ronald Yank
    Gregg MacClean Adam
14  Carroll, Burdick & McDonough, LLP
    44 Montgomery Street, Suite 400
15  San Francisco, CA 94104

16

17  District Attorney Intervenors
    Rod Pacheco
18  Charles Hugues
    District Attorney
19  County of Riverside
    4075 Main Street, First Floor
20  Riverside, CA 92501

21

22

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

California Sheriff, Probation, Police Chief
and Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Michael R. Capizzi
Kimberly Hall Barlow
Elizabeth R. Feffer
3777 North Harbor Boulevard
Fullerton, CA 92835

23      I declare under penalty of perjury under the laws of the State of California that the

24  foregoing is true and correct, and that this Proof of Service was executed on this __ day of

25  November, 2007 at San Francisco, California.

26
                                                    _____
27                                                  Kate Richardson

28