EXHIBIT H

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | ) No. Civ S 90-0520 LKK-JFM P |
| Plaintiffs, | ) **THREE-JUDGE COURT** |
| vs. | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| Defendants | ) |
| MARCIANO PLATA ,et al., | ) No. C01-1351 THE |
| Plaintiffs, | ) **THREE-JUDGE COURT** |
| vs. | ) |
| ARNOLD SCHWARZENEGGER, et al., | ) **PLATA PLAINTIFFS' THIRD SUPPLEMENTAL** |
| | ) **RESPONSE TO DEFENDANT TILTON'S FIRST** |
| Defendants | ) **SET OF INTERROGATORIES** |

| | |
|---|---|
| **PROPOUNDING PARTIES:** | DEFENDANT TILTON |
| **RESPONDING PARTIES:** | *PLATA* PLAINTIFFS |
| **SET NUMBER:** | ONE |

Pursuant to Federal Rule of Civil Procedure 33 and the general rules governing discovery, Plaintiffs hereby submit the following Third Supplemental Response to Defendant Tilton's First Set of Interrogatories to Plaintiff Plata:

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1.      Plaintiffs have not completed their investigation of the facts relating to this case, have not completed their discovery in this action and have not completed their preparation for trial. As of the date of Plaintiffs' response, Defendants continue to wrongfully withhold responsive and material documents that both the Magistrate Judge and the Three Judge Courts have ordered be produced. Therefore, these responses, while based on diligent factual exploration, reflect only Plaintiffs' current state of knowledge, understanding, and belief with regard to the matters about which inquiry has been made. Plaintiffs reserve the right to supplement these responses with subsequently obtained or discovered information. With regard to each interrogatory, Plaintiffs reserve the right, notwithstanding these answers and responses, to employ at trial or in any pretrial proceeding herein information subsequently obtained or discovered, information the materiality of which is not presently ascertained, or information Plaintiffs do not regard as coming within the scope of the Interrogatories as Plaintiffs understand them.

2.      These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety, admissibility, privacy, privilege, and any and all other objections that would require exclusion of any statement contained herein if any such Interrogatories were asked of, or any statement contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

3.      Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. Plaintiffs' answers or objections to any interrogatory are not an admission of any fact set forth or assumed by that interrogatory. In addition, each of Plaintiffs' answers to an interrogatory

-1-

1  or part of any interrogatory is not a waiver of part or all of any objection she might make to that form

2  of interrogatory, or an admission that such answer or objection constitutes admissible evidence.

3  Plaintiffs assert these objections without waiving or intending to waive any objections as to

4  competency, relevancy, materiality or privilege.

5      4.   Plaintiffs object to each and every interrogatory to the extent that Defendants are

6  requesting information that is privileged pursuant to the attorney-client privilege, the work product

7  doctrine, the right to privacy, or any other applicable privilege or doctrine.  Plaintiffs object to the

8  Definition of "PLAINTIFFS" which specifically includes "attorneys" and therefore by definition seeks

9  information in violation of the attorney-client privilege and the work product doctrine.  Plaintiffs

10  object to the Instructions provided by Defendants insofar as they specifically call for information

11  protected by the attorney-client privilege and work-product doctrine, such as requiring Plaintiffs to

12  "furnish all information available to you, including information in the possession of

13  your…attorneys…" and asking for information that is "obtained or developed by you or your counsel."

14      5.   Plaintiffs object to each and every interrogatory to the extent that Defendants are

15  requesting information that is neither relevant to the subject matter of this action or reasonably

16  calculated to lead to the discovery of admissible evidence.

17      6.   Plaintiffs object to the Interrogatories to the extent that they seek information available

18  to Defendants through public sources or records, and on the grounds that they subject Plaintiffs to

19  unreasonable and undue annoyance, oppression, burden and expense.  Plaintiffs further object to the

20  Requests to the extent that such Requests are unduly burdensome because much or all of the

21  information requested in the Interrogatories is in the possession of Defendants, has been filed with

22  Court, or is otherwise equally or more available to Defendants than to Plaintiffs.

23      7.   Plaintiffs object to the Interrogatories to the extent that they are vague and ambiguous

24  and do not include adequate definition, specificity, or limiting factors.

25      8.   Plaintiffs object generally to each interrogatory to the extent that it seeks information

26  prepared by expert consultants.  Plaintiffs' retained experts completed reports on November 9, 2007,

27  August 15 and 27, 2008, and will be providing at least two additional expert reports in September, as

28

JS219-4]

required by the Three-Judge Court's orders. Many of Defendants' Interrogatories request information that was or will be provided in whole or in part through expert testimony.

9.    Plaintiffs object generally to each interrogatory that involves an opinion or contention that relates to fact or the application of law to fact upon the ground that such Interrogatories are premature and inappropriate until after discovery has been completed. Plaintiffs moreover object to Interrogatories requesting "each and every" and/or "any and all" fact(s) or piece(s) of evidence on a particular topic, as such contention Interrogatories are unduly burdensome, oppressive, and inappropriate.

Subject to and without waiving the foregoing objections, and incorporating them by reference into each of the responses provided below, Plaintiffs hereby respond as follows:

## RESPONSES TO INTERROGATORIES

**INTERROGATORY NO. 1:**

Do PLAINTIFFS contend that no other relief, other than a PRISONER RELEASE ORDER *("mean[ing] any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison ass et forth in the Prison Litigation Reform Act (PLRA) at 18 U.S.C. section 3626(g)(4)."),* will remedy the failure of the Office of the Receiver to provide constitutionally adequate medical care to Plaintiffs?

**RESPONSE TO INTERROGATORY NO. 1:**

In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. It is also vague and ambiguous to the extent that it suggests that the failure to provide constitutionally adequate medical care to Plaintiffs is the sole responsibility of the Office of the Receiver. Further, Plaintiffs object to the terms "remedy" and "constitutionally adequate" as vague and ambiguous. Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege.

35219-4]

1  Without waiving and subject to its objections, Plaintiffs respond that they do contend that no

2  other relief, other than a PRISONER RELEASE ORDER (as defined in Defendant's Tilton's First set

3  of Interrogatories) will remedy the Defendants' and the Office of the Receiver's inability to provide

4  constitutionally adequate medical care to Plaintiffs.

5  **INTERROGATORY NO. 2:**

6  State all facts that relate to PLAINTIFFS' contention set forth in response to interrogatory

7  number 1.

8  **RESPONSE TO INTERROGATORY NO. 2:**

9  In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

10  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

11  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. It is vague

12  and ambiguous to the extent that it suggests that the failure to provide constitutionally adequate

13  medical care to Plaintiffs is the sole responsibility of the Office of the Receiver. Further, Plaintiffs

14  object to the terms "remedy" and "constitutionally adequate" as vague and ambiguous. Plaintiffs also

15  object to the extent that it would require disclosure of information protected by the attorney-client

16  privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further object on the

17  grounds that this interrogatory is premature: Discovery is still on going, Defendants have still not

18  produced all documents requested and depositions have not yet been taken. This premature discovery

19  will result

20  Without waiving and subject to its objections, Plaintiffs respond as follows: All facts set forth

21  in Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit Prison

22  Population, filed on November 13, 2006 in Plata v. Schwarzenegger; All facts referenced in Plaintiffs'

23  expert report due on November 9, 2007.

24  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

25  Incorporating and without waiving all objections and General Objections stated above, Plaintiff

26  responds as follows: all facts set forth or referenced in Plaintiffs' Expert reports that have and will be

27  submitted to Defendants according to the expert discovery schedule, including in all exhibits and

28

J5219-4]

1   documents relied on and listed in those reports; and all facts set forth or referenced in depositions taken

2   to date including in the exhibits for all depositions taken to date.

3   **INTERROGATORY NO.3:**

4       Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response to

5   interrogatory number 1.

6   **RESPONSE TO INTERROGATORY NO. 3:**

7       In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

8   grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

9   to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. It is vague

10  and ambiguous to the extent that it suggests that the failure to provide constitutionally adequate

11  medical care to Plaintiffs is the sole responsibility of the Office of the Receiver. Plaintiffs also object

12  to the extent that it would require disclosure of information protected by the attorney-client privilege,

13  work-product doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that

14  this interrogatory is premature: Discovery is still on going, Defendants have still not produced all

15  documents requested and depositions have not yet been taken. This premature discovery will result in

16  piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

17      Without waiving and subject to its objections, Plaintiffs respond as follows: Governor

18  Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding;   Publicly

19  available articles and photographs; CDCR's Inmate Population, Rehabilitation, and Housing

20  Management Plan; Relevant portions of the Record Transcript from the October 5, 2006 Hearing in

21  *Madrid v. Tilton*, Case No. 90-3094 TEH; Findings of Fact and Conclusions of Law Re Appointment

22  of Receiver, entered October 3, 2005; Corrections Independent Review Panel, "Reforming

23  Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management; CDCR Population

24  Statistics, dated November 1, 2006;  Relevant portions of the Record Transcript from the April 26 and

25  27, 2006 Hearing in *Coleman v. Schwarzenegger*, 90-0520 LKK; Memorandum written by John

26  Dovey, entitled "Memorandum Re: Modification to Correctional Operations Due to Compelling

27  Operational Need," dated October 25, 2006; Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J.

28  Michael Keating, Jr., dated September 1, 2006; Governor Schwarzenegger's Proclamation to convene a

35219-4]

special session of the Legislature, issued June 26, 2006; Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006; Office of the Inspector General, "Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006, Exec. Summary; California Department of Corrections (CDCR) Spring 2007 Adult Population Projections; Ruling on Submitted Matter: Petition for Writ of Mandate, Injunction and Declaratory Relief, *California Correctional Peace Officers' Association v. Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed Feb. 20, 2007; Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007;  Draft Seventeenth Monitoring Report on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, issued by the Special Master on or about May 4, 2007, in *Coleman v. Schwarzenegger*, No. Civ S 90-0520 LKK; Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of May 9, 2007;  Dr. Joan Petersilia, "Understanding California Corrections, "May 29, 2007; Declaration of Scott Kernan in Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v. Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed January 19, 2007; Plata Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007;  California State Sheriffs' Association, "Do the Crime, Do the Time? Maybe Not, in California: Jail Cell Shortage is Upsetting the Balance," June 2006; all monitoring reports prepared by Plaintiffs and sent to Defendants in *Plata v. Schwarzenegger*; all reports commissioned by or prepared by the Office of the Receiver; any additional documents referenced in our expert report due on November 9, 2007; pleadings, orders and documents filed in this *Plata v. Schwarzenegger* and *Coleman v. Schwarzenegger.*

**PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3**

Incorporating all objections and General Objections stated above, Plaintiff responds as follows: All documents, articles and photographs referenced in *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007:  (1) Report of Jeanne Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4) Report of James Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney; photographs from the CDCR website, www.cdcr.ca.gov.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

Incorporating and without waiving all objections and General Objections stated above, Plaintiff responds as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants according to the expert discovery schedule, including all exhibits and documents relied on and listed in those reports; and all depositions taken to date including the exhibits for all depositions taken to date.

**INTERROGATORY NO. 4:**

Do PLAINTIFFS contend that the plans of the Office of the Receiver, as set forth in the Receiver's Quarterly Reports and Plan of Action dated May 2007 will fail to result in DEFENDANTS providing constitutionally adequate medical care to PLAINTIFFS?

**RESPONSE TO INTERROGATORY NO. 4:**

In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Further, Plaintiffs object to the term "constitutionally adequate" as vague and ambiguous. Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege.

Without waiving and subject to its objections, plaintiff responds that this interrogatory is so ambiguous, vague as to time and overbroad that it cannot be answered by Plaintiffs: It asks whether Plaintiffs contend that the plans of the Office of the Receiver will fail to result in Defendants providing constitutionally adequate medical care to Plaintiffs without specifying a time period. Further, it asks whether Plaintiffs contend that a broad plan which is "subject to revision...as it is developed" and which merely sets forth an "overall direction", "articulates high level steps" and requires that "a number of time-phased inter-related remedial programs" be instituted", see plan at page 3, will fail to result in Defendants providing constitutionally adequate care to Plaintiffs.

**PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.4**

Incorporating all objections and General Objections stated above, Plaintiff responds as follows: Plaintiffs do contend that the preliminary plans set forth in the Receiver's Quarterly Reports filed on June 20, 2007 (5th Quarterly Report) and September 25, 2005 (6th Quarterly Report) (the "Quarterly

-7-

35219-4]

1    Reports") and Plan of Action dated May 2007 will fail to result in Defendants providing

2    constitutionally adequate medical care to Plaintiffs .

3    **INTERROGATORY NO.5**

4        State all facts that relate to PLAINTIFFS' contention set forth in response to interrogatory

5    number 4.

6    **RESPONSE TO INTERROGATORY NO. 5:**

7        In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

8    grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

9    relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

10   Further, Plaintiffs object to the term "constitutionally adequate" as vague and ambiguous.  Plaintiffs

11   also object to the extent that it would require disclosure of information protected by the attorney-client

12   privilege, work-product doctrine, or any other applicable privilege.  Plaintiffs further object on the

13   grounds that this interrogatory is premature: Discovery is still on going, Defendants have still not

14   produced all documents requested and depositions have not yet been taken.  This premature discovery

15   will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

16       Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is so

17   ambiguous, vague as to time and overbroad that it cannot be answered by Plaintiffs: It asks whether

18   Plaintiffs contend that the plans of the Office of the Receiver will fail to result in Defendants providing

19   constitutionally adequate medical care to Plaintiffs without specifying a time period.  Further, it is

20   unintelligibly vague, ambiguous and overboard in that it asks whether Plaintiffs contend that a broad

21   plan which is "subject to revision...as it is developed" and which merely sets forth an "overall

22   direction", "articulates high level steps" and requires that "a number of time-phased inter-related

23   remedial programs" be instituted", see plan at page 3,  will fail to result in Defendants providing

24   constitutionally adequate care to Plaintiffs.

25   **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

26       Incorporating all objections and General Objections stated above, Plaintiff responds as follows:

27   All facts referenced in *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007:  (1)

28   Report of Jeanne Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4)

35219-4]

1  Report of James Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney; all facts referenced in

2  Plaintiffs' Response to Receiver's Plan of Action, filed June 29, 2007 in this action.

3  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

4        Incorporating and without waiving all objections and General Objections stated above, Plaintiff

5  responds as follows: all facts set forth or referenced in Plaintiffs' Expert reports that have and will be

6  submitted to Defendants according to the expert discovery schedule, including in all exhibits and

7  documents relied on and listed in those reports; and all facts set forth or referenced in depositions taken

8  to date including in the exhibits for all depositions taken to date.

9  **INTERROGATORY NO. 6:**

10        Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response to

11  interrogatory number 4.

12  **RESPONSE TO INTERROGATORY NO. 6:**

13        In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

14  grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

15  relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

16  Plaintiffs object to the term "constitutionally adequate" as vague and ambiguous. Plaintiffs also object

17  to the extent that it would require disclosure of information protected by the attorney-client privilege,

18  work-product doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that

19  this interrogatory is premature: Discovery is still on going, Defendants have still not produced all

20  documents requested and depositions have not yet been taken. This premature discovery will result in

21  piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs

22        Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is so

23  ambiguous, vague as to time and overbroad that it cannot be answered by Plaintiffs: It asks whether

24  Plaintiffs contend that the plans of the Office of the Receiver will fail to result in Defendants providing

25  constitutionally adequate medical care to Plaintiffs without specifying a time period. Further, it is

26  unintelligibly vague, ambiguous and overbroad in that it asks whether Plaintiffs contend that a broad

27  plan which is "subject to revision…as it is developed" and which merely sets forth an "overall

28  direction", "articulates high level steps" and requires that "a number of time-phased inter-related

-9-

35219-4]

1 remedial programs" be instituted", see plan at page 3, will fail to result in Defendants providing

2 constitutionally adequate care to Plaintiffs.

3 **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

4     Incorporating all objections and General Objections stated above, Plaintiff responds as follows:

5 *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007: (1) Report of Jeanne

6 Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4) Report of James

7 Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney; all documents, articles and

8 photographs referenced therein; the Receiver's Report re Overcrowding, filed on May 15, 2007 in this

9 action; Plaintiffs' Response to Receiver's Plan of Action, filed June 29, 2007 in this action; Receiver's

10 Quarterly Reports filed on June 20, 2007 (5th Quarterly) and September 25, 2005 (6th quarterly report)

11 and Plan of Action dated May 2007.

12 **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

13     Incorporating and without waiving all objections and General Objections stated above, Plaintiff

14 responds as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants according

15 to the expert discovery schedule, including all exhibits and documents relied on and listed in those

16 reports; and all depositions taken to date including the exhibits for all depositions taken to date.

17 **INTERROGATORY NO. 7**

18     Do PLAINTIFFS contend that a PRISONER RELEASE ORDER will not adversely affect

19 public safety?

20 **RESPONSE TO INTERROGATORY NO. 7:**

21     In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

22 grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

23 relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

24 Plaintiffs object to the term "adversely affect" as it is vague and ambiguous.  Plaintiffs also object to

25 the extent that it would require disclosure of information protected by the attorney-client privilege,

26 work-product doctrine, or any other applicable privilege.

27     Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

28 premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

35219-4]

1  Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

2  2007 order. This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

3  imposes an undue burden on Plaintiffs. Plaintiffs reserve the right to raise additional objections when

4  and if a response to this interrogatory is needed.

5  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

6      Incorporating herein all General Objections and other objections stated above, Plaintiffs

7  respond as follows: Plaintiffs do contend that a PRISONER RELEASE ORDER need not adversely

8  affect public safety.

9  **INTERROGATORY NO. 8:**

10      State all facts that relate to PLAINTIFFS' contention set forth in response to interrogatory

11  number 7.

12  **RESPONSE TO INTERROGATORY NO. 8:**

13      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

14  grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

15  relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

16  Plaintiffs object to the term "adversely affect" as it is vague and ambiguous. Plaintiffs also object to

17  the extent that it would require disclosure of information protected by the attorney-client privilege,

18  work-product doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that

19  this interrogatory as premature: Discovery is still ongoing, defendants have still not produced all

20  documents requested and depositions have not yet been taken. This premature discovery will result in

21  piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

22      Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

23  premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

24  Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

25  2007 order. This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

26  imposes an undue burden on Plaintiffs.

27  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

28

1  Incorporating herein all General Objections and other objections stated above, Plaintiffs

2  respond as follows: facts as set forth in Governor Schwarzenegger's 2008-09 budget proposal,  reports

3  such as *Accelerated Release: A Literature Review*, January 2008, available at http://www.nccd-crc.org,

4  and all reports cited therein; Expert Panel on Adult Offender and Recidivism Reduction Programming,

5  Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June

6  29, 2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out*

7  (January 2007); *Reforming Corrections:  Report of the Corrections Independent Review Panel*, June

8  30, 2004 (Former Gov. Deukmejian, Chairman); Petersilia, Joan, *Understanding California*

9  *Corrections*, California Policy Research Center, University of California (May 2006)

10  (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf); Final Report and

11  Recommendations, Feb. 2008, Blue Ribbon Commission on Jail Overcrowding, County of Santa

12  Barbara, (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf); Governor's Rehabilitation

13  Strike Team Report, *Meeting the Challenges of Rehabilitation in California's Prison and Parole*

14  *System*, December 2007

15  (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf).

16  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

17  Incorporating and without waiving all objections and General Objections stated above,

18  Plaintiffs further object on the basis that this interrogatory calls for an expert opinion.  Plaintiffs'

19  experts have submitted expert reports and will submit additional reports, according to the expert report

20  discovery schedule.

21  Without waiving and subject to all the objections stated above, Plaintiffs respond as follows:

22  further responsive facts are set forth in Plaintiffs' Expert reports; were raised in the depositions that

23  were taken to date; and are contained in documents in the custody and control of Defendants.

24  **INTERROGATORY NO. 9:**

25  Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response to

26  interrogatory number 7.

27  **RESPONSE TO INTERROGATORY NO. 9:**

28

35219-4]

1    In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

2    grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

3    relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

4    Plaintiffs object to the term "adversely affect" as it is vague and ambiguous.  Plaintiffs also object to

5    the extent that it would require disclosure of information protected by the attorney-client privilege,

6    work-product doctrine, or any other applicable privilege.  Plaintiffs further object on the grounds that

7    this interrogatory as premature: Discovery is still ongoing, defendants have still not produced all

8    documents requested and depositions have not yet been taken.  This premature discovery will result in

9    piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

10    Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

11    premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

12    Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

13    2007 order.  This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

14    imposes an undue burden on Plaintiffs.

15    **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO.9:**

16    Incorporating herein all General Objections and other objections stated above, Plaintiffs

17    respond as follows:  the Governor Schwarzenegger's 2008-09 budget proposal,  reports such as

18    *Accelerated Release: A Literature Review*, January 2008, available at http://www.nccd-crc.org, and all

19    reports cited therein, Expert Panel on Adult Offender and Recidivism Reduction Programming, Report

20    to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29,

21    2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out*

22    (January 2007); Reforming Corrections:  Report of the Corrections Independent Review Panel, June

23    30, 2004 (Former Gov. Deukmejian, Chairman); Petersilia, Joan, *Understanding California*

24    *Corrections*, California Policy Research Center, University of California (May 2006)

25    (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf); Final Report and

26    Recommendations, Feb. 2008, Blue Ribbon Commission on Jail Overcrowding, County of Santa

27    Barbara, (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf); Governor's Rehabilitation

28    Strike Team Report, *Meeting the Challenges of Rehabilitation in California's Prison and Parole*

-13-

35219-4]

1  *System*, December 2007

2  (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf).

3  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

4           Incorporating and without waiving all objections and General Objections stated above,

5  Plaintiffs respond as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants

6  according to the expert discovery schedule, including all exhibits and documents relied on and listed in

7  those reports; all depositions and exhibits from depositions taken to date; and other documents that are

8  in the custody and control of Defendants.

9

10  Dated:  September 8, 2008                                     PRISON LAW OFFICE

11

12                                                      By:_____

13                                                              Zoe Schonfeld
                                                                Attorneys for Plaintiffs
                                                                MARCIANO PLATA, ET AL.

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

35219-4]

EXHIBIT I

| | |
|---|---|
| 1 | PRISON LAW OFFICE<br>DONALD SPECTER, Bar No. 83925 |
| 2 | STEVEN FAMA, Bar No. 99641<br>E. IVAN TRUJILLO, Bar No. 228790 |
| 3 | SARA NORMAN, Bar No. 189536<br>ALISON HARDY, Bar No. 135966 |
| 4 | REBEKAH EVENSON, Bar No. 207825<br>1917 Fifth Street |
| 5 | Berkeley, CA 94710<br>Telephone: (510) 280-2621 |

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | ) No. Civ S 90-0520 LKK-JFM P<br>)<br>) **THREE-JUDGE COURT**<br>)<br>)<br>)<br>)<br>)<br>)<br>) |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | ) No. C01-1351 THE<br>)<br>) **THREE-JUDGE COURT**<br>)<br>) **PLATA PLAINTIFFS' THIRD SUPPLEMENTAL**<br>) **RESPONSE TO DEFENDANT**<br>) **SCHWARZENEGGER'S FIRST SET OF**<br>) **INTERROGATORIES** |

5219-4]

| | |
|---|---|
| **PROPOUNDING PARTIES:** | DEFENDANT SCHWARZENEGGER |
| **RESPONDING PARTIES:** | *PLATA* PLAINTIFFS |
| **SET NUMBER:** | ONE |

Pursuant to Federal Rule of Civil Procedure 33 and the general rules governing discovery, Plaintiffs hereby submit the following Third Supplemental Response to Defendant Schwarzenegger's First Set of Interrogatories to Plaintiff Plata:

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1. Plaintiffs have not completed their investigation of the facts relating to this case, have not completed their discovery in this action and have not completed their preparation for trial. As of the date of Plaintiffs' response, Defendants continue to wrongfully withhold responsive and material documents that both the Magistrate Judge and the Three Judge Courts have ordered be produced. Therefore, these responses, while based on diligent factual exploration, reflect only Plaintiffs' current state of knowledge, understanding, and belief with regard to the matters about which inquiry has been made. Plaintiffs reserve the right to supplement these responses with subsequently obtained or discovered information. With regard to each interrogatory, Plaintiffs reserve the right, notwithstanding these answers and responses, to employ at trial or in any pretrial proceeding herein information subsequently obtained or discovered, information the materiality of which is not presently ascertained, or information Plaintiffs do not regard as coming within the scope of the Interrogatories as Plaintiffs understand them.

2. These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety, admissibility, privacy, privilege, and any and all other objections that would require exclusion of any statement contained herein if any such Interrogatories were asked of, or any statement contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

3. Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. Plaintiffs' answers or objections to any interrogatory are not an admission of any fact set forth or assumed by that interrogatory. In addition, each of Plaintiffs' answers to an interrogatory

-1-

35219-4]

1  or part of any interrogatory is not a waiver of part or all of any objection she might make to that form

2  of interrogatory, or an admission that such answer or objection constitutes admissible evidence.

3  Plaintiffs assert these objections without waiving or intending to waive any objections as to

4  competency, relevancy, materiality or privilege.

5        4.    Plaintiffs object to each and every interrogatory to the extent that Defendants are

6  requesting information that is privileged pursuant to the attorney-client privilege, the work product

7  doctrine, the right to privacy, or any other applicable privilege or doctrine.  Plaintiffs object to the

8  Definition of "PLAINTIFFS" which specifically includes "attorneys" and therefore by definition seeks

9  information in violation of the attorney-client privilege and the work product doctrine.  Plaintiffs

10  object to the Instructions provided by Defendants insofar as they specifically call for information

11  protected by the attorney-client privilege and work-product doctrine, such as requiring Plaintiffs to

12  "furnish all information available to you, including information in the possession of

13  your...attorneys..." and asking for information that is "obtained or developed by you or your counsel."

14        5.    Plaintiffs object to each and every interrogatory to the extent that Defendants are

15  requesting information that is neither relevant to the subject matter of this action or reasonably

16  calculated to lead to the discovery of admissible evidence.

17        6.    Plaintiffs object to the Interrogatories to the extent that they seek information available

18  to Defendants through public sources or records, and on the grounds that they subject Plaintiffs to

19  unreasonable and undue annoyance, oppression, burden and expense.  Plaintiffs further object to the

20  Requests to the extent that such Requests are unduly burdensome because much or all of the

21  information requested in the Interrogatories is in the possession of Defendants, has been filed with

22  Court, or is otherwise equally or more available to Defendants than to Plaintiffs.

23        7.    Plaintiffs object to the Interrogatories to the extent that they are vague and ambiguous

24  and do not include adequate definition, specificity, or limiting factors.

25        8.    Plaintiffs object generally to each interrogatory to the extent that it seeks information

26  prepared by expert consultants.  Plaintiffs' retained experts completed reports on November 9, 2007,

27  August 15 and 27, 2008, and will be providing at least two additional expert reports in September, as

28

35219-4]

1  required by the Three-Judge Court's orders. Many of Defendants' Interrogatories request information

2  that was or will be provided in whole or in part through expert testimony.

3      9.    Plaintiffs object generally to each interrogatory that involves an opinion or contention

4  that relates to fact or the application of law to fact upon the ground that such Interrogatories are

5  premature and inappropriate until after discovery has been completed. Plaintiffs moreover object to

6  Interrogatories requesting "each and every" and/or "any and all" fact(s) or piece(s) of evidence on a

7  particular topic, as such contention Interrogatories are unduly burdensome, oppressive, and

8  inappropriate.

9      Subject to and without waiving the foregoing objections, and incorporating them by reference

10  into each of the responses provided below, Plaintiffs hereby respond as follows:

11  **RESPONSES TO INTERROGATORIES**

12  **INTERROGATORY NO. 1:**

13      Do PLAINTIFFS seek a PRISONER RELEASE ORDER *("mean[ing] any order, including a*

14  *temporary restraining order or preliminary injunctive relief that has the purpose or effect of reducing*

15  *or limiting the prison population, or that directs the release from or nonadmission of prisoners to a*

16  *prison as set forth in the Prison Litigation Reform Act (PLRA) at 18 U.S.C. section 3626(g)(4). "),* in

17  this matter?

18  **RESPONSE TO INTERROGATORY NO. 1:**

19      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

20  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

21  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs

22  also object to the extent that it would require disclosure of information protected by the attorney-client

23  privilege, work-product doctrine, or any other applicable privilege.

24      Without waiving and subject to its objections, Plaintiffs respond that they seek a PRISONER

25  RELEASE ORDER (as defined in Defendant's Schwarzenegger's First Set of Interrogatories).

26  **INTERROGATORY NO. 2:**

27      If PLAINTIFFS' response to interrogatory number 1 is affirmative, describe with specificity

28  the PRISONER RELEASE ORDER that PLAINTIFFS seek in this matter.

35219-4]

1  **RESPONSE TO INTERROGATORY NO. 2:**

2      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

3  grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

4  relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

5  Plaintiffs also object to the extent that it would require disclosure of information protected by the

6  attorney-client privilege, work-product doctrine, or any other applicable privilege.

7      Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

8  premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

9  Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

10 2007 order.  This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

11 imposes an undue burden on Plaintiffs.  Plaintiffs reserve the right to raise additional objections when

12 and if a response to this interrogatory is needed.

13 **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

14     Incorporating herein all General Objections and other objections stated above, Plaintiffs

15 respond as follows:  A PRISONER RELEASE ORDER that would require that Defendants develop a

16 plan (within 30 days of the date of such an order) to immediately reduce the population by 15,000

17 prisoners so that no prisoners are housed in what are commonly referred to as "ugly" or "bad" beds,

18 *i.e.*, those in gymnasiums, dayrooms, triple-bunks, and other locations not intended for housing, and to

19 reduce the prison population in each CDCR prison to each facilities' design capacity over a three year

20 period, with most of the reduction in the first two years.

21 **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 2:**

22     Incorporating and without waiving all objections and General Objections stated above,

23 Plaintiffs also object to this interrogatory on the grounds that the term "PRISONER RELEASE

24 ORDER," while defined by reference to the statutory definition, is vague, ambiguous, and overbroad

25 as used by Defendants, as the statute has rarely, if ever, been interpreted by the federal courts, and the

26 question of whether a particular order is a "Prisoner Release Order" depends on a range of complex

27 factual and legal elements, including deciding whether an order "has the purpose or effect" of

28 "reducing or limiting population" or "directing the release from or nonadmission of prisoner.  Plaintiffs

-4-

]5219-4]

1  further object on the basis that this interrogatory calls for an expert opinion. Plaintiffs' experts have

2  submitted expert reports and will submit additional reports, according to the expert report discovery

3  schedule.

4       Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:

5  further responsive information is contained in Plaintiffs' Expert Reports.

6  **INTERROGATORY NO. 3:**

7       Identify all DOCUMENTS that describe the PRISONER RELEASE ORDER that

8  PLAINTIFFS seek in this matter.

9  **RESPONSE TO INTERROGATORY NO. 3:**

10      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

11  grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

12  relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

13  Plaintiffs also object to the extent that it would require disclosure of information protected by the

14  attorney-client privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further

15  object on the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have

16  still not produced all documents requested and depositions have not yet been taken. This premature

17  discovery will result in piecemeal disclosure of information thereby imposing an undue burden on

18  Plaintiffs.

19      Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

20  premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

21  Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

22  2007 order. This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

23  imposes an undue burden on Plaintiffs. Plaintiffs reserve the right to raise additional objections when

24  and if a response to this interrogatory is needed.

25  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

26      Incorporating herein all General Objections and other objections stated above, Plaintiffs

27  respond as follows: Plaintiffs are unaware of any such documents.

28  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 3:**

35219-4]

1  Incorporating and without waiving all objections and General Objections stated above,

2  Plaintiffs also object to this interrogatory on the grounds that the term "PRISONER RELEASE

3  ORDER," while defined by reference to the statutory definition, is vague, ambiguous, and overbroad

4  as used by Defendants, as the statute has rarely, if ever, been interpreted by the federal courts, and the

5  question of whether a particular order is a "Prisoner Release Order" depends on a range of complex

6  factual and legal elements, including deciding whether an order "has the purpose or effect" of

7  "reducing or limiting population" or "directing the release from or nonadmission of prisoner. Plaintiffs

8  further object on the basis that this interrogatory calls for an expert opinion. Plaintiffs' experts have

9  submitted expert reports and will submit additional reports, according to the expert report discovery

10  schedule.

11  Subject to and without waiver of the above-stated objections, Plaintiffs respond as follows:

12  Plaintiffs' Expert reports and all underlying documents upon which those reports rely.

13  **INTERROGATORY NO. 4:**

14  Do PLAINTIFFS contend that DEFENDANTS are failing, as of the date PLAINTIFFS'

15  response, to provide constitutionally adequate medical care to PLAINTIFFS?

16  **RESPONSE TO INTERROGATORY NO. 4:**

17  In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

18  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

19  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs

20  also object to the term "failing" and "constitutionally adequate" as vague and ambiguous. Plaintiffs

21  further object to the extent that it would require disclosure of information protected by the attorney-

22  client privilege, work-product doctrine, or any other applicable privilege.

23  Without waiving and subject to its objections, Plaintiffs respond that they do contend that

24  DEFENDANTS are failing, as of the date PLAINTIFFS' response, to provide constitutionally

25  adequate medical care to PLAINTIFFS.

26  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 4:**

27

28

J5219-4]

1    Incorporating and without waiving all objections and General Objections stated above,

2  Plaintiffs respond that they do contend that Defendants are failing, as of the date of Plaintiffs'

3  response, to provide constitutionally adequate medical care to Plaintiffs.

4  **INTERROGATORY NO. 5:**

5    If PLAINTIFFS' response to interrogatory number 4 is affirmative, state all facts that relate to

6  YOUR contention that DEFENDANTS are failing to provide constitutionally adequate medical care to

7  PLAINTIFFS.

8  **RESPONSE TO INTERROGATORY NO. 5:**

9    In addition to the general objections stated above, Plaintiffs object to this interrogatory on the

10  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

11  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs

12  also object to the term "failing" and "constitutionally adequate" as vague and ambiguous. Plaintiffs

13  further object to the extent that it would require disclosure of information protected by the attorney-

14  client privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further object on

15  the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not

16  produced all documents requested and depositions have not yet been taken. This premature discovery

17  will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

18    Without waiving and subject to its objections, Plaintiffs respond as follows: All facts set forth

19  in Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit Prison

20  Population, filed on November 13, 2006 in *Plata v. Schwarzenegger*; All facts referenced in Plaintiffs'

21  expert report due on November 9, 2007.

22  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 5:**

23    Incorporating and without waiving all objections and General Objections stated above,

24  Plaintiffs further object on the basis that this interrogatory calls for an expert opinion. Plaintiffs'

25  experts have submitted expert reports and will submit additional reports, according to the expert report

26  discovery schedule.

27

28

35219-4]

1   Without waiving and subject to all the objections stated above, Plaintiffs respond as follows:

2   further responsive facts are set forth in Plaintiffs' Expert reports; were raised in the depositions that

3   were taken to date; and are contained in documents in the custody and control of Defendants.

4   **INTERROGATORY NO. 6:**

5   Identify all DOCUMENTS that relate to PLAINTIFFS' contention that DEFENDANTS are

6   failing to provide constitutionally adequate medical care to PLAINTIFFS.

7   **RESPONSE TO INTERROGATORY NO. 6:**

8   In addition to the general objections stated above, Plaintiffs object to this interrogatory on the

9   grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

10  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs

11  also object to the term "failing" and "constitutionally adequate" as vague and ambiguous .  Plaintiffs

12  further object to the extent that it would require disclosure of information protected by the attorney-

13  client privilege, work-product doctrine, or any other applicable privilege.  Plaintiffs further object on

14  the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not

15  produced all documents requested and depositions have not yet been taken.  This premature discovery

16  will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

17  Without waiving and subject to its objections, Plaintiffs respond as follows: Governor

18  Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding;   Publicly

19  available articles and photographs; CDCR's Inmate Population, Rehabilitation, and Housing

20  Management Plan; Relevant portions of the Record Transcript from the October 5, 2006 Hearing in

21  *Madrid v. Tilton*, Case No. 90-3094 TEH; Findings of Fact and Conclusions of Law Re Appointment

22  of Receiver, entered October 3, 2005; Corrections Independent Review Panel, "Reforming

23  Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management; CDCR Population

24  Statistics, dated November 1, 2006;  Relevant portions of the Record Transcript from the April 26 and

25  27, 2006 Hearing in *Coleman v. Schwarzenegger*, 90-0520 LKK; Memorandum written by John

26  Dovey, entitled "Memorandum Re: Modification to Correctional Operations Due to Compelling

27  Operational Need," dated October 25, 2006; Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J.

28  Michael Keating, Jr., dated September 1, 2006; Governor Schwarzenegger's Proclamation to convene a

PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4]

1  special session of the Legislature, issued June 26, 2006; Statement of CDCR Acting Secretary James

2  Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1,

3  2006; Office of the Inspector General, "Accountability Audit, Review of the Audits of the California

4  Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004,"

5  April 2006, Exec. Summary; California Department of Corrections (CDCR) Spring 2007 Adult

6  Population Projections; Ruling on Submitted Matter: Petition for Writ of Mandate, Injunction and

7  Declaratory Relief, *California Correctional Peace Officers' Association v. Schwarzenegger*, No.

8  06CS01568 (Sacramento Superior Ct.), filed Feb. 20, 2007; Senate Budget and Fiscal Review

9  Committee Subcommittee No. 4, Agenda of April 12, 2007;  Draft Seventeenth Monitoring Report on

10  the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, issued by the

11  Special Master on or about May 4, 2007, in *Coleman v. Schwarzenegger*, No. Civ S 90-0520 LKK;

12  Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of May 9, 2007;  Dr. Joan

13  Petersilia, "Understanding California Corrections," May 29, 2007; Declaration of Scott Kernan in

14  Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v.*

15  *Schwarzenegger*,  No. 06CS01568 (Sacramento Superior Ct.), filed January 19, 2007; Plata

16  Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007;  California

17  State Sheriffs' Association, "Do the Crime, Do the Time?  Maybe Not, in California: Jail Cell Shortage

18  is Upsetting the Balance," June 2006; all monitoring reports prepared by Plaintiffs and sent to

19  Defendants in *Plata v. Schwarzenegger*; all reports commissioned by or prepared by the Office of the

20  Receiver; any additional documents referenced in our expert report due on November 9, 2007;

21  pleadings, orders and documents filed in this *Plata v. Schwarzenegger* and *Coleman v.*

22  *Schwarzenegger.*

23  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 6:**

24      Incorporating all objections and General Objections stated above, Plaintiff responds as follows:

25  *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007:  (1) Report of Jeanne

26  Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4) Report of James

27  Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney; all documents, articles and

28  photographs references therein.; photographs from the CDCR website, www.cdcr.ca.gov.

1  **SUPPLEMENTAL RESPONSE TO PRIOR RESPONSES TO INTERROGATORY NO. 6:**

2        Incorporating and without waiving all objections and General Objections stated above,

3  Plaintiffs respond as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants

4  according to the expert discovery schedule, including all exhibits and documents relied on and listed in

5  those reports; all depositions taken to date and exhibits admitted into evidence during the depositions

6  taken to date; other documents that are in the custody and control of Defendants; all public speeches

7  and comments made to date by named Defendants and their agents; Plata Receiver's Reports; and the

8  Plata Receiver's Turnaround Plans.

9  **INTERROGATORY NO. 7:**

10        Do PLAINTIFFS contend that a reduction in the California Department of Corrections and

11  Rehabilitations (CDCR's) adult inmate population will enable DEFENDANTS to provide

12  constitutionally adequate medical care to PLAINTIFFS?

13  **RESPONSE TO INTERROGATORY NO. 7:**

14        In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

15  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

16  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.   Plaintiffs

17  also object to the extent that it would require disclosure of information protected by the attorney-client

18  privilege, work-product doctrine, or any other applicable privilege.

19        Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

20  extremely vague, overly broad and unintelligible: it does not specify any time period.  Further, the term

21  "reduction" is nowhere defined, making the interrogatory unintelligibly vague and ambiguous.

22  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 7:**

23        Incorporating all objections and General Objections stated above, Plaintiff responds as follows:

24  Plaintiffs do contend that if the overcrowding issues identified by Plaintiffs' experts were addressed,

25  that will enable Defendants to provide constitutionally adequate medical care to Plaintiffs. See

26  *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007:  (1) Report of Jeanne

27  Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4) Report of James

28  Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney.

[5219-4]

**INTERROGATORY NO. 8:**

If PLAINTIFFS' response to interrogatory number 7 is affirmative, state with specificity the amount of that population reduction.

**RESPONSE TO INTERROGATORY NO. 8:**

In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege.

Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is extremely vague, overly broad and unintelligible: it does not specify any time period. Further, the term "reduction" is nowhere defined, making the interrogatory unintelligibly vague and ambiguous. Plaintiffs further respond that this interrogatory is premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order.  This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs. Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is needed.

**PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Incorporating herein all General Objections and other objections stated above, Plaintiffs respond as follows: the amount of such a population reduction should be calculated by subtracting the cumulative design capacity of all CDCR prisons from the entire prison population at the time of a PRISONER RELEASE ORDER.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 8:**

Incorporating and without waiving all objections and General Objections stated above, Plaintiff responds as follows:  further responsive facts are set forth in Plaintiffs' Expert reports; were raised in the depositions that were taken to date; and are contained in documents in the custody and control of Defendants.

-11-

1  **INTERROGATORY NO. 9:**

2      Identify all DOCUMENTS that describe or explain the reduction identified in response to

3  interrogatory number 8.

4  **RESPONSE TO INTERROGATORY NO. 9:**

5      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

6  grounds that it is vague, ambiguous and overbroad; and to the extent that it seeks information not

7  relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.

8  Plaintiffs also object to the extent that it would require disclosure of information protected by the

9  attorney-client privilege, work-product doctrine, or any other applicable privilege.  Plaintiffs further

10  object on the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have

11  still not produced all documents requested and depositions have not yet been taken.  This premature

12  discovery will result in piecemeal disclosure of information thereby imposing an undue burden on

13  Plaintiffs.

14      Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

15  extremely vague, overly broad and unintelligible: it does not specify any time period.  Further, the term

16  "reduction" is nowhere defined, making the interrogatory unintelligibly vague and ambiguous.

17  Plaintiffs further respond that this interrogatory is premature as it is not relevant to Phase 1 of this

18  litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

19  Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order.  This premature discovery seeks to

20  avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

21  Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

22  needed.

23  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

24      Incorporating herein all General Objections and other objections stated above, Plaintiffs

25  respond as follows: Plaintiffs are aware of no such document.  Population reports and design capacity

26  can be found on the California Department of Corrections' website, at www.cdcr.ca.gov.

27  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 9:**

28

PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4]

1    Incorporating and without waiving all objections and General Objections stated above,

2    Plaintiffs respond as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants

3    according to the expert discovery schedule, including all exhibits and documents relied on and listed in

4    those reports; exhibits admitted into evidence during the depositions taken to date; and other

5    documents that are in the custody and control of Defendants.

6    **INTERROGATORY NO. 10:**

7    Do PLAINTIFFS contend that a reduction in the CDCR's adult inmate population will

8    enable the Office of the Receiver to provide constitutionally adequate medical care to

9    PLAINTIFFS?

10   **RESPONSE TO INTERROGATORY NO 10:**

11   In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

12   grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

13   to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.   Plaintiffs

14   also object to the terms 'reduction" and "constitutionally adequate" as vague and ambiguous.

15   Plaintiffs also object to the extent that it would require disclosure of information protected by the

16   attorney-client privilege, work-product doctrine, or any other applicable privilege.

17   Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

18   extremely vague, overly broad and unintelligible: it does not specify any time period, and further that

19   the term "reduction" is nowhere defined in the interrogatories making the interrogatory unintelligibly

20   vague.

21   **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 10:**

22   Incorporating all objections and General Objections stated above, Plaintiff responds as follows:

23   Plaintiffs do contend that if the overcrowding issues identified by Plaintiffs' experts were addressed,

24   that will enable the Receiver to provide constitutionally adequate medical care to Plaintiffs.  See

25   *Coleman* and *Plata* Plaintiffs' expert reports filed on November 9, 2007:  (1) Report of Jeanne

26   Woodford; (2) Report of Doyle Wayne Scott; (3) Report of Ronald Shansky; (4) Report of James

27   Austin; (5) Report of Pablo Stewart; (6) Report of Craig Haney.

28   **INTERROGATORY NO. 11:**

1    If PLAINTIFFS' response to interrogatory number 10 is affirmative, state with

2    specificity the amount of that population reduction.

3    **RESPONSE TO INTERROGATORY NO. 11:**

4    In addition to the General Objections stated above, plaintiffs object to this interrogatory on the

5    grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

6    to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs

7    also object to the terms 'reduction" and "constitutionally adequate" as vague and ambiguous.

8    Plaintiffs also object to the extent that it would require disclosure of information protected by the

9    attorney-client privilege, work-product doctrine, or any other applicable privilege.

10   Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

11   extremely vague, overly broad and unintelligible: it does not specify any time period, and further that

12   the term "reduction" is nowhere defined in the interrogatories making the interrogatory unintelligibly

13   vague. Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

14   premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007

15   Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30,

16   2007 order. This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus

17   imposes an undue burden on Plaintiffs. Plaintiffs reserve the right to raise additional objections when

18   and if a response to this interrogatory is needed.

19   **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

20   Incorporating herein all General Objections and other objections stated above, Plaintiffs

21   respond as follows: the amount of such a population reduction should be calculated by subtracting the

22   cumulative design capacity of all CDCR prisons from the entire prison population at the time of a

23   PRISONER RELEASE ORDER.

24   **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 11:**

25   Incorporating and without waiving all objections and General Objections stated above, Plaintiff

26   responds as follows: further responsive facts are set forth in Plaintiffs' Expert reports; were raised in

27   the depositions that were taken to date; and are contained in documents in the custody and control of

28   Defendants.

-14-
PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4]

**INTERROGATORY NO. 12:**

Identify all DOCUMENTS that describe or explain the reduction identified in response to interrogatory number 11.

**RESPONSE TO INTERROGATORY NO. 12:**

In addition to the General Objections stated above, plaintiffs object to this interrogatory on the grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs also object to the terms 'reduction" and "constitutionally adequate" as vague and ambiguous. Plaintiffs also object to the extent that it would require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not produced all documents requested and depositions have not yet been taken. This premature discovery will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is extremely vague, overly broad and unintelligible: it does not specify any time period, and further that the term "reduction" is nowhere defined in the interrogatories making the interrogatory unintelligibly vague. Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is premature as it is not relevant to Phase 1 of this litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order. This premature discovery seeks to avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs. Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is needed.

**PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

Incorporating herein all General Objections and other objections stated above, Plaintiffs respond as follows: Plaintiffs are aware of no such document. Population reports and design capacity can be found on the California Department of Corrections' website, at www.cdcr.ca.gov.

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 12:**

[5219-4]

1  Incorporating and without waiving all objections and General Objections stated above,

2  Plaintiffs respond as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants

3  according to the expert discovery schedule, including all exhibits and documents relied on and listed in

4  those reports; exhibits admitted into evidence during the depositions taken to date; and other

5  documents that are in the custody and control of Defendants.

6  **INTERROGATORY NO. 13:**

7  State each and every policy that you contend DEFENDANTS must adopt to achieve the

8  population reduction set forth in response to interrogatory numbers 8 and 11.

9  **RESPONSE TO INTERROGATORY NO. 13:**

10  In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

11  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

12  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Plaintiffs

13  also object to the extent that it would require disclosure of information protected by the attorney-client

14  privilege, work-product doctrine, or any other applicable privilege.

15  Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

16  extremely vague, overly broad and unintelligible: it does not specify any time period, and further that

17  the term "reduction" is nowhere defined in the interrogatories making the interrogatory unintelligibly

18  vague. Plaintiffs further respond that this interrogatory is premature as it is not relevant to Phase 1 of

19  this litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

20  Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order. This premature discovery seeks to

21  avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

22  Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

23  needed.

24  **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

25  Incorporating herein all General Objections and other objections stated above, plaintiffs

26  respond as follows:  Plaintiffs reiterate their objection that this interrogatory is vague and overly broad.

27  A large number of different policies and/or combination of different policies could achieve the

28  population reduction set forth in response to interrogatories number 8 and 11.  It is defendants'

35219-4]

1 | responsibility, not plaintiffs' responsibility, to determine which specific policies or combination

2 | thereof will achieve the necessary population reduction. Furthermore, plaintiffs do not have access to

3 | all data necessary to make such a determination.

4 |      Defendants can achieve the population reduction by limiting the number of prisoners entering

5 | CDCR prisons and by reducing the time prisoners spend in CDCR custody. Specifically, defendants

6 | could consider policies which include, but are not limited to: funding community corrections programs

7 | to divert prisoners with sentences of fewer than 24 months; providing intensive probation supervision

8 | for 18-25 year old offenders; replacing discretionary day for day earned time with statutory day for

9 | day credits, with provisions that only disciplinary conduct can result in lost days; providing

10 | supplemental program credits for prisoners complying with case management plan and for prisoners

11 | who complete rehabilitative programs; transferring low-risk prisoners with fewer than 12 months to

12 | serve to parole; discharging low-risk offenders from parole if arrest-free for 12 months; using a

13 | validated risk assessment procedure to release non-violent, non-sex offenders from prison without

14 | parole; developing a parole sanctions matrix based on the risk to re-offend level of the offender and

15 | the seriousness of the violation (the matrix should preclude low-risk parolees from being returned to

16 | prison for technical violations or misdemeanors); implementing a validated risk assessment instrument

17 | throughout CDCR; immediately hiring sufficient staff to calculate credits and to process outgoing

18 | prisoners; greatly expand the availability of alternative sanctions as recommended by the parole

19 | sanctions matrix; diverting new court commitments with county subsidy grants; automatically

20 | restoring good-time credits for all prisoners with non-serious misconduct (classes d, e, and f);

21 | expanding pre-release planning services for mentally ill, developmentally disabled, and other special

22 | needs inmates to include benefits applications with the social security and veterans' administrations;

23 | redirecting funds to counties to manage parolees with mental illness, including, for example: (a)

24 | increasing mental health services on parole to include placement in appropriate housing to reduce

25 | recidivism, (b) funding community-based alternatives to returns to custody for parole violations that

26 | are caused by symptoms of mental illness, (c) expanding mental health courts in the counties to reduce

27 | prison commitments for mentally ill offenders; enacting legislation to create a sentencing commission;

28 | releasing specified non-violent offenders earlier than their original release date, as recently proposed

[35219-4]

by the Governor; diverting low-risk parolees who have violated the terms of their parole supervision requirements; providing more rehabilitation programs in prison; reducing time served through the addition or increase of good conduct, work and program participation credits for prisoners with retroactive application; enacting legislation to adjust length of parole supervision; instituting the recommendations as set forth in Governor Schwarzenegger's 2008-09 budget proposal,  reports such as *Accelerated Release: A Literature Review*, January 2008, available at http://www.nccd-crc.org, and all reports cited therein, Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29, 2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007); *Reforming Corrections: Report of the Corrections Independent Review Panel*, June 30, 2004 (Former Gov. Deukmejian, Chairman); Petersilia, Joan, *Understanding California Corrections*, California Policy Research Center, University of California (May 2006) (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf); Final Report and Recommendations, Feb. 2008, Blue Ribbon Commission on Jail Overcrowding, County of Santa Barbara, (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf); Governor's Rehabilitation Strike Team Report, *Meeting the Challenges of Rehabilitation in California's Prison and Parole System*, December 2007 (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf).

**SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 13:**

Incorporating and without waiving all objections and General Objections stated above, Plaintiff responds as follows:  further responsive facts are set forth in Plaintiffs' Expert reports; were raised in the depositions that were taken to date; and are contained in documents in the custody and control of Defendants.

**INTERROGATORY NO. 14:**

Identify all DOCUMENTS that describe or explain the policies identified in response to interrogatory number 13.

**RESPONSE TO INTERROGATORY NO. 14:**

[5219-4]

1    In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

2    grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

3    to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.   Plaintiffs

4    also object to the extent that it would require disclosure of information protected by the attorney-client

5    privilege, work-product doctrine, or any other applicable privilege.  Plaintiffs further object on the

6    grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not

7    produced all documents requested and depositions have not yet been taken.  This premature discovery

8    will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

9    Without waiving and subject to its objections, Plaintiffs respond that this interrogatory is

10   extremely vague, overly broad and unintelligible: it does not specify any time period, and further that

11   the term "reduction" is nowhere defined in the interrogatories making the interrogatory unintelligibly

12   vague.  Plaintiffs further respond that this interrogatory is premature as it is not relevant to Phase 1 of

13   this litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

14   Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order.  This premature discovery seeks to

15   avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

16   Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

17   needed.

18   **PRIOR SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

19   Incorporating herein all General Objections and other objections stated above, Plaintiffs

20   respond as follows: Publicly available reports including: Governor Schwarzenegger's 2008-09 budget

21   proposal, *Accelerated Release: A Literature Review*, January 2008, available at http://www.nccd-

22   crc.org, and all reports cited therein, Expert Panel on Adult Offender and Recidivism Reduction

23   Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in*

24   *California* (June 29, 2007); Little Hoover Commission, *Solving California's Corrections Crisis: Time*

25   *is Running Out* (January 2007); *Reforming Corrections:  Report of the Corrections Independent*

26   *Review Panel*, June 30, 2004 (Former Gov. Deukmejian, Chairman); Petersilia, Joan, *Understanding*

27   *California Corrections*, California Policy Research Center, University of California (May 2006).

28   (http://www.ucop.edu/cprc/documents/understand_ca_corrections.pdf); Final Report and

-19-

35219-4]

1  Recommendations, Feb. 2008, Blue Ribbon Commission on Jail Overcrowding, County of Santa

2  Barbara, (http://www.sbsheriff.org/documents/FullFinalBRCReport.pdf); Governor's Rehabilitation

3  Strike Team Report, *Meeting the Challenges of Rehabilitation in California's Prison and Parole*

4  *System*, December 2007

5  (http://www.cdcr.ca.gov/news/docs/GovRehabilitationStrikeTeamRpt_012308.pdf).

6  **SECOND SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 14:**

7        Incorporating and without waiving all objections and General Objections stated above,

8  Plaintiffs respond as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants

9  according to the expert discovery schedule, including all exhibits and documents relied on and listed in

10  those reports; exhibits admitted into evidence during the depositions taken to date; and other

11  documents that are in the custody and control of Defendants.

12  **INTERROGATORY NO. 15:**

13        Do PLAINTIFFS contend that crowding in the primary cause of the failure of

14  DEFENDANTS  to provide constitutionally adequate medical care to PLAINTIFFS?

15  **RESPONSE TO INTERROGATORY NO. 15:**

16        In addition to the General Objections stated above, plaintiffs object to this interrogatory on the

17  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

18  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.   Further,

19  the term "constitutionally adequate" is vague and ambiguous.  Plaintiffs also object to the extent that it

20  would require disclosure of information protected by the attorney-client privilege, work-product

21  doctrine, or any other applicable privilege.

22        Without waiving and subject to its objections, Plaintiffs respond that they do contend that

23  crowding in the primary cause of the failure of DEFENDANTS  to provide constitutionally adequate

24  medical care to PLAINTIFFS.

25  **INTERROGATORY NO. 16:**

26        State all the facts that relate to PLAINTIFFS' contentions set forth in response to

27  interrogatory number 15.

28  **RESPONSE TO INTERROGATORY NO. 16:**

-20-
PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4]

1    In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

2    grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

3    to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Further, the

4    term "constitutionally adequate" is vague and ambiguous. Plaintiffs also object to the extent that it

5    would require disclosure of information protected by the attorney-client privilege, work-product

6    doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that this

7    interrogatory is premature: Discovery is still ongoing, Defendants have still not produced all

8    documents requested and depositions have not yet been taken. This premature discovery will result in

9    piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

10    Without waiving and subject to its objections, Plaintiffs respond as follows: All facts set forth

11    in Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit Prison

12    Population, filed on November 13, 2006 in *Plata v. Schwarzenegger*; All facts referenced in Plaintiffs'

13    expert report due on November 9, 2007.

14    **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 16:**

15    Incorporating and without waiving all objections and General Objections stated above, Plaintiff

16    responds as follows: facts set forth or referenced in Plaintiffs' Expert reports that have and will be

17    submitted to Defendants according to the expert discovery schedule, including in all exhibits and

18    documents relied on and listed in those reports; facts set forth or referenced in depositions taken to date

19    including in the exhibits for all depositions taken to date; facts set forth or referenced in documents

20    that are in the custody and control of Defendants.

21    **INTERROGATORY NO. 17:**

22    Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response

23    to interrogatory number 15.

24    **RESPONSE TO INTERROGATORY NO 17:**

25    In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

26    grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

27    to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Further, the

28    term "constitutionally adequate" is vague and ambiguous. Plaintiffs also object to the extent that it

-21-

[35219-4]

would require disclosure of information protected by the attorney-client privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further object on the grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not produced all documents requested and depositions have not yet been taken. This premature discovery will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

Without waiving and subject to its objections, Plaintiffs respond as follows: Governor Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding; Publicly available articles and photographs; CDCR's Inmate Population, Rehabilitation, and Housing Management Plan; Relevant portions of the Record Transcript from the October 5, 2006 Hearing in *Madrid v. Tilton*, Case No. 90-3094 TEH; Findings of Fact and Conclusions of Law Re Appointment of Receiver, entered October 3, 2005; Corrections Independent Review Panel, "Reforming Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management; CDCR Population Statistics, dated November 1, 2006; Relevant portions of the Record Transcript from the April 26 and 27, 2006 Hearing in *Coleman v. Schwarzenegger*, 90-0520 LKK; Memorandum written by John Dovey, entitled "Memorandum Re: Modification to Correctional Operations Due to Compelling Operational Need," dated October 25, 2006; Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J. Michael Keating, Jr., dated September 1, 2006; Governor Schwarzenegger's Proclamation to convene a special session of the Legislature, issued June 26, 2006; Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006; Office of the Inspector General, "Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006, Exec. Summary; California Department of Corrections (CDCR) Spring 2007 Adult Population Projections; Ruling on Submitted Matter: Petition for Writ of Mandate, Injunction and Declaratory Relief, *California Correctional Peace Officers' Association v. Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed Feb. 20, 2007; Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007; Draft Seventeenth Monitoring Report on the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, issued by the Special Master on or about May 4, 2007, in *Coleman v. Schwarzenegger*, No. Civ S 90-0520 LKK;

{5219-4}

1  Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of May 9, 2007; Dr. Joan

2  Petersilia, "Understanding California Corrections," May 29, 2007; Declaration of Scott Kernan in

3  Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v.*

4  *Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed January 19, 2007; Plata

5  Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007; California

6  State Sheriffs' Association, "Do the Crime, Do the Time? Maybe Not, in California: Jail Cell Shortage

7  is Upsetting the Balance," June 2006; all monitoring reports prepared by Plaintiffs and sent to

8  Defendants in *Plata v. Schwarzenegger*; all reports commissioned by or prepared by the Office of the

9  Receiver; any additional documents referenced in our expert report due on November 9, 2007;

10  pleadings, orders and documents filed in this *Plata v. Schwarzenegger* and *Coleman v.*

11  *Schwarzenegger.*

12  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 17:**

13       Incorporating and without waiving all objections and General Objections stated above, Plaintiff

14  responds as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants according

15  to the expert discovery schedule, including all exhibits and documents relied on and listed in those

16  reports; depositions taken to date including the exhibits for all depositions taken to date; and

17  documents that are in the custody and control of Defendants.

18  **INTERROGATORY NO. 18:**

19       Do PLAINTIFFS contend that crowding is the primary cause of the failure of the Office of the

20  Receiver to provide constitutionally adequate medical care to PLAINTIFFS?

21  **RESPONSE TO INTERROGATORY NO. 18:**

22       In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

23  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

24  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Further, the

25  terms "crowding" and "constitutionally adequate" are vague and ambiguous. This interrogatory is

26  also vague and ambiguous to the extent that it suggests that the failure to provide constitutionally

27  adequate medical care to Plaintiffs is the sole responsibility of the Office of the Receiver. Plaintiffs

28

[85219-4]

1  also object to the extent that it would require disclosure of information protected by the attorney-client

2  privilege, work-product doctrine, or any other applicable privilege.

3          Without waiving and subject to its objections, Plaintiffs respond that they do contend that

4  crowding is the primary cause of the inability of the Office of the Receiver and Defendants to provide

5  constitutionally adequate medical care to Plaintiffs.

6  **INTERROGATORY NO. 19:**

7          State all the facts that relate to PLAINTIFFS' contention set forth in response to interrogatory

8  number 18.

9  **RESPONSE TO INTERROGATORY NO. 19:**

10          In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

11  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

12  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Further, the

13  terms "crowding" and "constitutionally adequate" are vague and ambiguous. This interrogatory is

14  also vague and ambiguous to the extent that it suggests that the failure to provide constitutionally

15  adequate medical care to Plaintiffs is the sole responsibility of the Office of the Receiver. Plaintiffs

16  also object to the extent that it would require disclosure of information protected by the attorney-client

17  privilege, work-product doctrine, or any other applicable privilege. Plaintiffs further object on the

18  grounds that this interrogatory is premature: Discovery is still ongoing, Defendants have still not

19  produced all documents requested and depositions have not yet been taken. This premature discovery

20  will result in piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

21          Without waiving and subject to its objections, Plaintiffs respond as follows: All facts set forth

22  in Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit Prison

23  Population, filed on November 13, 2006 in *Plata v. Schwarzenegger*; All facts referenced in Plaintiffs'

24  expert report due on November 9, 2007.

25  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 19:**

26          Incorporating and without waiving all objections and General Objections stated above, Plaintiff

27  responds as follows: facts set forth or referenced in Plaintiffs' Expert reports that have and will be

28  submitted to Defendants according to the expert discovery schedule, including in all exhibits and

-24-

35219-4]

1  documents relied on and listed in those reports; facts set forth or referenced in depositions taken to date

2  including in the exhibits for all depositions taken to date; and facts set forth or referenced in documents

3  that are in the custody and control of Defendants.

4  **INTERROGATORY NO. 20:**

5      Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response to

6  interrogatory number 18.

7  **RESPONSE TO INTERROGATORY NO 20:**

8      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

9  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

10  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. This

11  interrogatory is also vague and ambiguous to the extent that it suggests that the failure to provide

12  constitutionally adequate medical care to Plaintiffs is the sole responsibility of the Office of the

13  Receiver. Plaintiffs also object to the extent that it would require disclosure of information protected

14  by the attorney-client privilege, work-product doctrine, or any other applicable privilege. Plaintiffs

15  further object on the grounds that this interrogatory is premature: Discovery is still ongoing,

16  Defendants have still not produced all documents requested and depositions have not yet been taken.

17  This premature discovery will result in piecemeal disclosure of information thereby imposing an undue

18  burden on Plaintiffs.

19      Without waiving and subject to its objections, Plaintiffs respond as follows: Governor

20  Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding;   Publicly

21  available articles and photographs; CDCR's Inmate Population, Rehabilitation, and Housing

22  Management Plan; Relevant portions of the Record Transcript from the October 5, 2006 Hearing in

23  *Madrid v. Tilton*, Case No. 90-3094 TEH; Findings of Fact and Conclusions of Law Re Appointment

24  of Receiver, entered October 3, 2005; Corrections Independent Review Panel, "Reforming

25  Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management; CDCR Population

26  Statistics, dated November 1, 2006;  Relevant portions of the Record Transcript from the April 26 and

27  27, 2006 Hearing in *Coleman v. Schwarzenegger*, 90-0520 LKK; Memorandum written by John

28  Dovey, entitled "Memorandum Re: Modification to Correctional Operations Due to Compelling

-25-

35219-4]

1   Operational Need," dated October 25, 2006; Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J.

2   Michael Keating, Jr., dated September 1, 2006; Governor Schwarzenegger's Proclamation to convene a

3   special session of the Legislature, issued June 26, 2006; Statement of CDCR Acting Secretary James

4   Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1,

5   2006; Office of the Inspector General, "Accountability Audit, Review of the Audits of the California

6   Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004,"

7   April 2006, Exec. Summary; California Department of Corrections (CDCR) Spring 2007 Adult

8   Population Projections; Ruling on Submitted Matter: Petition for Writ of Mandate, Injunction and

9   Declaratory Relief, *California Correctional Peace Officers' Association v. Schwarzenegger*, No.

10  06CS01568 (Sacramento Superior Ct.), filed Feb. 20, 2007; Senate Budget and Fiscal Review

11  Committee Subcommittee No. 4, Agenda of April 12, 2007;  Draft Seventeenth Monitoring Report on

12  the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, issued by the

13  Special Master on or about May 4, 2007, in *Coleman v. Schwarzenegger*, No. Civ S 90-0520 LKK;

14  Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of May 9, 2007; Dr. Joan

15  Petersilia, "Understanding California Corrections," May 29, 2007; Declaration of Scott Kernan in

16  Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v.*

17  *Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed January 19, 2007; Plata

18  Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007;  California

19  State Sheriffs' Association, "Do the Crime, Do the Time?  Maybe Not, in California: Jail Cell Shortage

20  is Upsetting the Balance," June 2006; all monitoring reports prepared by Plaintiffs and sent to

21  Defendants in *Plata v. Schwarzenegger*; all reports commissioned by or prepared by the Office of the

22  Receiver; any additional documents referenced in our expert report due on November 9, 2007;

23  pleadings, orders and documents filed in this *Plata v. Schwarzenegger* and *Coleman v.*

24  *Schwarzenegger*.

25  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 20:**

26         Incorporating and without waiving all objections and General Objections stated above, Plaintiff

27  responds as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants according

28  to the expert discovery schedule, including all exhibits and documents relied on and listed in those

-26-

PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4]

1 reports; depositions taken to date including the exhibits for all depositions taken to date; and additional

2 documents that are in the custody and control of Defendants.

3 **INTERROGATORY NO. 21:**

4     Do PLAINTIFFS contend that no other relief, other than a PRISONER RELEASE ORDER,

5 will remedy the failure of DEFENDANTS to provide constitutionally adequate medical care the

6 PLAINTIFFS?

7 **RESPONSE TO INTERROGATORY NO. 21:**

8     In addition to the General Objections stated above, plaintiffs object to this interrogatory on the

9 grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

10 to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Further,

11 the term "constitutionally adequate" is vague and ambiguous.  Plaintiffs also object to the extent that it

12 would require disclosure of information protected by the attorney-client privilege, work-product

13 doctrine, or any other applicable privilege.

14     Without waiving and subject to its objections, Plaintiffs respond that they do contend that no

15 other relief, other than a PRISONER RELEASE ORDER (as defined in Defendant's Tilton's First set

16 of Interrogatories) will remedy the failure of Defendants  to provide constitutionally adequate medical

17 care to Plaintiffs.

18 **INTERROGATORY NO. 22:**

19     State all facts that relate to PLAINTIFFS' contention set forth in response to interrogatory

20 number 21.

21 **RESPONSE TO INTERROGATORY NO. 22:**

22     In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

23 grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

24 to this litigation nor reasonably calculated to lead to the discovery of admissible evidence.  Further, the

25 term "constitutionally adequate" is vague and ambiguous.  Plaintiffs also object to the extent that it

26 would require disclosure of information protected by the attorney-client privilege, work-product

27 doctrine, or any other applicable privilege.  Plaintiffs further object on the grounds that this

28 interrogatory is premature: Discovery is still ongoing, Defendants have still not produced all

85219-4]

1  documents requested and depositions have not yet been taken. This premature discovery will result in

2  piecemeal disclosure of information thereby imposing an undue burden on Plaintiffs.

3      Without waiving and subject to its objections, Plaintiffs respond as follows: All facts set forth

4  in Plaintiffs' Notice of Motion and Motion to Convene a Three Judge Panel to Limit Prison

5  Population, filed on November 13, 2006 in *Plata v. Schwarzenegger*; All facts referenced in Plaintiffs'

6  expert report due on November 9, 2007.

7  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 22:**

8      Incorporating and without waiving all objections and General Objections stated above, Plaintiff

9  responds as follows: facts set forth or referenced in Plaintiffs' Expert reports that have and will be

10  submitted to Defendants according to the expert discovery schedule, including in all exhibits and

11  documents relied on and listed in those reports; facts set forth or referenced in depositions taken to date

12  including in the exhibits for all depositions taken to date; and facts set forth or referenced in documents

13  that are in the custody and control of Defendants.

14  **INTERROGATORY NO. 23:**

15      Identify all DOCUMENTS that relate to PLAINTIFFS' contention set forth in response to

16  interrogatory number 21.

17  **RESPONSE TO INTERROGATORY NO. 23:**

18      In addition to the General Objections stated above, Plaintiffs object to this interrogatory on the

19  grounds that it is vague, ambiguous and overbroad; to the extent that it seeks information not relevant

20  to this litigation nor reasonably calculated to lead to the discovery of admissible evidence. Plaintiffs

21  also object to the extent that it would require disclosure of information protected by the attorney-client

22  privilege, work-product doctrine, or any other applicable privilege. Further, the term "constitutionally

23  adequate" is vague and ambiguous. Plaintiffs further object on the grounds that this interrogatory is

24  premature: Discovery is still ongoing, Defendants have still not produced all documents requested and

25  depositions have not yet been taken. This premature discovery will result in piecemeal disclosure of

26  information thereby imposing an undue burden on Plaintiffs.

27      Without waiving and subject to its objections, Plaintiffs respond as follows: Governor

28  Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding;   Publicly

PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES,
NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

]5219-4]

available articles and photographs; CDCR's Inmate Population, Rehabilitation, and Housing

Management Plan; Relevant portions of the Record Transcript from the October 5, 2006 Hearing in

*Madrid v. Tilton*, Case No. 90-3094 TEH; Findings of Fact and Conclusions of Law Re Appointment

of Receiver, entered October 3, 2005; Corrections Independent Review Panel, "Reforming

Corrections," June 2004, Chapter 7, Inmate/Parolee Population Management; CDCR Population

Statistics, dated November 1, 2006; Relevant portions of the Record Transcript from the April 26 and

27, 2006 Hearing in *Coleman v. Schwarzenegger*, 90-0520 LKK; Memorandum written by John

Dovey, entitled "Memorandum Re: Modification to Correctional Operations Due to Compelling

Operational Need," dated October 25, 2006; Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J.

Michael Keating, Jr., dated September 1, 2006; Governor Schwarzenegger's Proclamation to convene a

special session of the Legislature, issued June 26, 2006; Statement of CDCR Acting Secretary James

Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1,

2006; Office of the Inspector General, "Accountability Audit, Review of the Audits of the California

Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004,"

April 2006, Exec. Summary; California Department of Corrections (CDCR) Spring 2007 Adult

Population Projections; Ruling on Submitted Matter: Petition for Writ of Mandate, Injunction and

Declaratory Relief, *California Correctional Peace Officers' Association v. Schwarzenegger*, No.

06CS01568 (Sacramento Superior Ct.), filed Feb. 20, 2007; Senate Budget and Fiscal Review

Committee Subcommittee No. 4, Agenda of April 12, 2007; Draft Seventeenth Monitoring Report on

the Defendants' Compliance with Provisionally Approved Plans, Policies, and Protocols, issued by the

Special Master on or about May 4, 2007, in *Coleman v. Schwarzenegger*, No. Civ S 90-0520 LKK;

Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of May 9, 2007; Dr. Joan

Petersilia, "Understanding California Corrections," May 29, 2007; Declaration of Scott Kernan in

Opposition to Writ of Mandate, *California Correctional Peace Officers' Organization v.*

*Schwarzenegger*, No. 06CS01568 (Sacramento Superior Ct.), filed January 19, 2007; Plata

Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007; California

State Sheriffs' Association, "Do the Crime, Do the Time? Maybe Not, in California: Jail Cell Shortage

is Upsetting the Balance," June 2006; all monitoring reports prepared by Plaintiffs and sent to

1  Defendants in *Plata v. Schwarzenegger*; all reports commissioned by or prepared by the Office of the

2  Receiver; any additional documents referenced in our expert report due on November 9, 2007;

3  pleadings, orders and documents filed in this *Plata v. Schwarzenegger* and *Coleman v.*

4  *Schwarzenegger.*

5  **SUPPLEMENTAL RESPONSE TO INTERROGATORY NO. 23:**

6       Incorporating and without waiving all objections and General Objections stated above, Plaintiff

7  responds as follows: Plaintiffs' Expert reports that have and will be submitted to Defendants according

8  to the expert discovery schedule, including exhibits and documents relied on and listed in those

9  reports; depositions taken to date including the exhibits for all depositions taken to date; and additional

10  documents that are in the custody and control of Defendants.

11

12  Dated:  September 8, 2008                 PRISON LAW OFFICE

13

14                            By:

15                            Zoe Schonfeld

                          Attorneys for Plaintiffs

16                            MARCIANO PLATA, ET AL.

17

18

19

20

21

22

23

24

25

26

27

28

PLATA PLAINTIFFS' THIRD SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST SET OF INTERROGATORIES, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

35219-4

EXHIBIT J

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

KIRKPATRICK & LOCKHART PRESTON
GATES ELLIS LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
ERNEST GALVAN Bar No. 196065
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LORI RIFKIN, Bar No. 244081
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | ) No. Civ S 90-0520 LKK-JFM P <br> ) <br> ) **THREE-JUDGE COURT** <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |
| MARCIANO PLATA ,et al., <br><br> Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | ) No. C01-1351 TEH <br> ) <br> ) **THREE-JUDGE COURT** <br> ) <br> ) **PLATA PLAINTIFFS' SUPPLEMENTAL** <br> ) **RESPONSE TO DEFENDANT** <br> ) **SCHWARZENEGGER'S FIRST REQUEST** <br> ) **FOR PRODUCTION OF DOCUMENTS** |

35219-4]

**PROPOUNDING PARTIES:**   DEFENDANT SCHWARZENEGGER

**RESPONDING PARTIES:**   PLAINTIFFS MARCIANO PLATA, ET AL. (PLAINTIFFS)

**SET NUMBER:**   ONE

Pursuant to Federal Rule of Civil Procedure 34 and the general rules governing discovery, Plaintiffs submits the following responses to Defendant Schwarzenegger's First Set of Requests for Production of Documents to Plaintiffs Marciano Plata, et al. (Plaintiffs).

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1. Plaintiffs have not completed their investigation of the facts relating to this case, have not completed their discovery in this action and have not completed their preparation for trial. As of the date of Plaintiffs' response, Defendants continue to wrongfully withhold responsive and material documents that both the Magistrate Judge and the Three Judge Courts have ordered be produced. Therefore, these responses, while based on diligent factual exploration, reflect only Plaintiffs' current state of knowledge, understanding, and belief with regard to the matters about which inquiry has been made. Plaintiffs reserve the right to supplement these responses with subsequently obtained or discovered information. With regard to each request for production, Plaintiffs reserve the right, notwithstanding these answers and responses, to employ at trial or in any pretrial proceeding herein information subsequently obtained or discovered, information the materiality of which is not presently ascertained, or information Plaintiffs do not regard as coming within the scope of the Requests for Production as Plaintiffs understand them.

2. These responses are made solely for the purpose of this action. Each answer is subject to all objections as to competence, relevance, materiality, propriety, admissibility, privacy, privilege, and any and all other objections that would require exclusion of any statement contained herein if any such Requests for Production were asked of, or any statement contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

3. Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. Plaintiffs' answers or objections to any request for production are not an admission of any fact set forth or assumed by that request for production. In addition, each of Plaintiffs' answers

-1-

PLATA PLAINTIFFS' SUPPLEMENTAL RESPONSE TO DEFENDANT SCHWARZENEGGER'S FIRST REQUEST FOR PRODUCTION OF DOCUMENTS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[65219-4]

1  to a request for production or part of a request for production is not a waiver of part or all of any

2  objection she might make to that form of request for production, or an admission that such answer or

3  objection constitutes admissible evidence.  Plaintiffs assert these objections without waiving or

4  intending to waive any objections as to competency, relevancy, materiality or privilege.

5         4.     Plaintiffs object to each and every request for production to the extent that Defendants

6  are requesting information that is privileged pursuant to the attorney-client privilege, the work product

7  doctrine, the right to privacy, or any other applicable privilege or doctrine.  Plaintiffs object to the

8  Definition of "PLAINTIFFS" which specifically includes "attorneys" and therefore by definition seeks

9  information in violation of the attorney-client privilege and the work product doctrine.  Plaintiffs

10  object to the Instructions provided by Defendants insofar as they specifically call for information

11  protected by the attorney-client privilege and work-product doctrine, such as requiring Plaintiffs to

12  "furnish all information available to you, including information in the possession of

13  your...attorneys..." and asking for information that is "obtained or developed by you or your counsel."

14         5.     Plaintiffs object to each and every request for production to the extent that Defendants

15  are requesting information that is neither relevant to the subject matter of this action or reasonably

16  calculated to lead to the discovery of admissible evidence.

17         6.     Plaintiffs object to the Requests for Production to the extent that they seek information

18  available to Defendants through public sources or records, and on the grounds that they subject

19  Plaintiffs to unreasonable and undue annoyance, oppression, burden and expense.  Plaintiffs further

20  object to the Requests for Production to the extent that such Requests for Production are unduly

21  burdensome because much or all of the information requested in the Requests for Production is in the

22  possession of Defendants, has been filed with Court, or is otherwise equally or more available to

23  Defendants than to Plaintiffs.

24         7.     Plaintiffs object to the Requests for Production to the extent that they are vague and

25  ambiguous and do not include adequate definition, specificity, or limiting factors.

26         8.     Plaintiffs object generally to each request for production to the extent that it seeks

27  information prepared by expert consultants.  Plaintiffs' retained experts completed reports on

28  November 9, 2007,  August 15 and 27, 2008, and will be providing at least two additional expert

35219-4]

1  reports in September, as required by the Three-Judge Court's orders. Many of Defendants' Requests

2  for Production request information that was or will be provided in whole or in part through expert

3  testimony.

4      9.    Plaintiffs object generally to each request for production that involves an opinion or

5  contention that relates to fact or the application of law to fact upon the ground that such Requests for

6  Production are premature and inappropriate until after discovery has been completed. Plaintiffs

7  moreover object to Requests for Production requesting "each and every" and/or "any and all" fact(s) or

8  piece(s) of evidence on a particular topic, as such requests are unduly burdensome, oppressive, and

9  inappropriate.

10     Subject to and without waiving the foregoing objections, and incorporating them by reference

11  into each of the responses provided below, Plaintiffs hereby respond as follows:

12            **RESPONSES TO REQUESTS FOR PRODUCTION**

13  **REQUEST FOR PRODUCTION NO. 1:**

14     Any and all DOCUMENTS that YOU identified in response to interrogatory no. 3 of

15  Defendant Arnold Schwarzenegger's First Set of Interrogatories to Plaintiffs.

16  **RESPONSE TO PRODUCTION NO. 1:**

17     Plaintiffs object to this request on the grounds that its defined terms render it vague and

18  ambiguous. Plaintiffs further object to this request to the extent that it is overbroad both in time and

19  scope, and as a consequence, unduly burdensome and harassing; to the extent that it seeks documents

20  that are not relevant to this action and is not reasonably calculated to lead to the discovery of

21  admissible evidence; to the extent that it seeks information that is in the possession, custody or control

22  of Defendant; and to the extent that it would require disclosure of information protected by the

23  attorney-client privilege, the work-product doctrine, or any other applicable privilege. Plaintiffs

24  further object on the grounds that this request is premature: Discovery is still ongoing, Defendants

25  have still not produced all documents requested and depositions have not yet been taken. This

26  premature discovery will result in piecemeal disclosure of information thereby imposing an undue

27  burden on Plaintiffs.

28

35219-4]

1       Subject to and without waiving the foregoing objections, Plaintiffs respond that this

2  interrogatory is beyond the scope of permissible discovery. It is not relevant to Phase 1 of this

3  litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

4  Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order. This premature discovery seeks to

5  avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

6  Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

7  needed.

8  **SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 1:**

9       Incorporating and without waiving all objections and General Objections stated above,

10  Plaintiffs respond as follows: Plaintiffs have already produced responsive documents. Additional

11  responsive documents are within the custody and control of Defendants. Documents responsive to

12  document requests related to findings from expert reports will be produced according to the schedule

13  for the production of such documents.

14  **REQUEST FOR PRODUCTION NO. 3:**

15       Any and all DOCUMENTS that YOU identified in response to interrogatory no. 9 of

16  Defendant Arnold Schwarzenegger's First Set of Interrogatories to Plaintiffs.

17  **RESPONSE TO PRODUCTION NO. 3:**

18       Plaintiffs object to this request on the grounds that its defined terms render it vague and

19  ambiguous. Plaintiffs further object to this request to the extent that it is overbroad both in time and

20  scope, and as a consequence, unduly burdensome and harassing; to the extent that it seeks documents

21  that are not relevant to this action and is not reasonably calculated to lead to the discovery of

22  admissible evidence; to the extent that it seeks information that is in the possession, custody or control

23  of Defendant; and to the extent that it would require disclosure of information protected by the

24  attorney-client privilege, the work-product doctrine, or any other applicable privilege. Plaintiffs

25  further object on the grounds that this request is premature: Discovery is still ongoing, Defendants

26  have still not produced all documents requested and depositions have not yet been taken. This

27  premature discovery will result in piecemeal disclosure of information thereby imposing an undue

28  burden on Plaintiffs.

1      Subject to and without waiving the foregoing objections, Plaintiffs respond that this

2 interrogatory is beyond the scope of permissible discovery.  It is not relevant to Phase 1 of this

3 litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

4 Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order.  This premature discovery seeks to

5 avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

6 Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

7 needed.

8 **SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 3:**

9      Incorporating and without waiving all objections and General Objections stated above,

10 Plaintiffs respond as follows: Plaintiffs have already produced responsive documents.  Additional

11 responsive documents are within the custody and control of Defendants.  Documents responsive to

12 document requests related to findings from expert reports will be produced according to the schedule

13 for the production of such documents.

14 **REQUEST FOR PRODUCTION NO. 4:**

15      Any and all DOCUMENTS that YOU identified in response to interrogatory no. 12 of

16 Defendant Arnold Schwarzenegger's First Set of Interrogatories to Plaintiffs.

17 **RESPONSE TO PRODUCTION NO. 4:**

18      Plaintiffs object to this request on the grounds that its defined terms render it vague and

19 ambiguous.  Plaintiffs further object to this request to the extent that it is overbroad both in time and

20 scope, and as a consequence, unduly burdensome and harassing;  to the extent that it seeks documents

21 that are not relevant to this action and is not reasonably calculated to lead to the discovery of

22 admissible evidence; to the extent that it seeks information that is in the possession, custody or control

23 of Defendant; and to the extent that it would require disclosure of information protected by the

24 attorney-client privilege, the work-product doctrine, or any other applicable privilege.  Plaintiffs

25 further object on the grounds that this request is premature: Discovery is still ongoing, Defendants

26 have still not produced all documents requested and depositions have not yet been taken.  This

27 premature discovery will result in piecemeal disclosure of information thereby imposing an undue

28 burden on Plaintiffs.

[35219-4]

1  Subject to and without waiving the foregoing objections, Plaintiffs respond that this

2  interrogatory is beyond the scope of permissible discovery. It is not relevant to Phase 1 of this

3  litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

4  Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order. This premature discovery seeks to

5  avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

6  Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

7  needed.

8  **SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 4:**

9  Incorporating and without waiving all objections and General Objections stated above,

10  Plaintiffs respond as follows: Plaintiffs have already produced responsive documents. Additional

11  responsive documents are within the custody and control of Defendants. Documents responsive to

12  document requests related to findings from expert reports will be produced according to the schedule

13  for the production of such documents.

14  **REQUEST FOR PRODUCTION NO. 11:**

15  Any and all DOCUMENTS that YOU identified in response to interrogatory no. 9 of

16  Defendant James Tilton's First Set of Interrogatories to Plaintiffs.

17  **RESPONSE TO PRODUCTION NO. 11:**

18  Plaintiffs object to this request on the grounds that its defined terms render it vague and

19  ambiguous. Plaintiffs further object to this request to the extent that it is overbroad both in time and

20  scope, and as a consequence, unduly burdensome and harassing; to the extent that it seeks documents

21  that are not relevant to this action and is not reasonably calculated to lead to the discovery of

22  admissible evidence; to the extent that it seeks information that is in the possession, custody or control

23  of Defendants; and to the extent that it would require disclosure of information protected by the

24  attorney-client privilege, the work-product doctrine, or any other applicable privilege. Plaintiffs

25  further object on the grounds that this request is premature: Discovery is still ongoing, Defendants

26  have still not produced all documents requested and depositions have not yet been taken. This

27  premature discovery will result in piecemeal disclosure of information thereby imposing an undue

28  burden on Plaintiffs.

35219-4]

1    Subject to and without waiving the foregoing objections, Plaintiffs respond that this

2  interrogatory is beyond the scope of permissible discovery. It is not relevant to Phase 1 of this

3  litigation, as set forth in the Judges' October 10, 2007 Order Bifurcating Proceedings and Setting

4  Deadlines For Phase 1 and Judge Moulds' October 30, 2007 order. This premature discovery seeks to

5  avoid the orderly plan set forth in those orders, and thus imposes an undue burden on Plaintiffs.

6  Plaintiffs reserve the right to raise additional objections when and if a response to this interrogatory is

7  needed.

8  **SUPPLEMENTAL RESPONSE TO REQUEST FOR PRODUCTION NO. 11:**

9    Incorporating and without waiving all objections and General Objections stated above,

10  Plaintiffs respond as follows: Plaintiffs have already produced responsive documents. Additional

11  responsive documents are within the custody and control of Defendants. Documents responsive to

12  document requests related to findings from expert reports will be produced according to the schedule

13  for the production of such documents.

14

15  Dated: September 8, 2008                    PRISON LAW OFFICE

16

17                    By: _____

18                        Zoe Schonfeld
                        Attorneys for Plaintiffs
19                        MARCIANO PLATA, ET AL.

20

21

22

23

24

25

26

27

28

35219-4]

EXHIBIT K

# SECOND SUPPLEMENTAL EXPERT REPORT OF RONALD M. SHANSKY, M.D.

## SEPTEMBER 10, 2008

## TABLE OF CONTENTS

I       EXPERT QUALIFICATIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.     BASES FOR EXPERT OPINIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

III.    EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS
        DRAMATICALLY OVERCROWDED . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

IV.     THE PRISON HEALTH CARE FACILITIES STILL ARE
        INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE
        MEDICAL CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        A.    Reception Center Clinical Areas Continue to be Inadequate for
              the High Volume of Medical Contacts . . . . . . . . . . . . . . . . . . . . . . . . . 7

        B.    The Severe Shortage of Clinical and Office Space Described in
              My First Report Has Not Changed in the Last Six Months . . . . . . . . . . . 9

              1.    NKSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 10

              2.    SATF's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 12

              3.    PVSP's Clinical Space is Inadequate . . . . . . . . . . . . . . . . . . . . . 13

              4.    CSP-Solano's Clinical Space is Inadequate . . . . . . . . . . . . . . . . 13

              5.    Receiver's Assessment of Other Prisons' Medical Space . . . . . . 14

                    a.  California Rehabilitation Center (CRC) . . . . . . . . . . . . . . . 14

                    b.  California Training Facility – Soledad (CTF) . . . . . . . . . . . 14

                    c.  Mule Creek State Prison (MCSP) . . . . . . . . . . . . . . . . . . . . 15

V.      THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT
        FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL
        CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    CDCR Still Cannot Fill Some Vacancies . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.    NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

i

2.      SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

3.      PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

4.      HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

B.      Some Prisons Are Still Allocated Too Few Providers . . . . . . . . . . . . . . 19

C.      Use of Registry Still Cannot Resolve Staffing Shortfalls . . . . . . . . . . . 19

D.      Clinical Staff Shortages Continue to Result in Delayed and
        Inadequate Care . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

1.      NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

2.      SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

3.      PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

4.      Solano . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

5.      HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E.      Inspected Prisons Still too Shortstaffed to Implement Required
        Programs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

1.      NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

2.      SATF . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

3.      PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

4.      SOL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

5.      HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

VI.   PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY
      CARE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

A.      PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

B.      SOL . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

C.      HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

D.      NKSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

VII.   MEDICATION MANAGEMENT PROBLEMS . . . . . . . . . . . . . . . . . . . . . . . . . 28

VIII.  OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS . . . . 29

      A.   Quality of Medical Records Continues to be Poor at Inspected
          Prisons . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

      B.   CDCR Continues to Rely on Inadequate Tracking Systems . . . . . . . . . 31

IX.    THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE
      ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL
      CONTACTS AT SOME PRISONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

      A.   PVSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

      B.   HDSP . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

X.     THERE ARE MORE PRISONERS REQUIRING SPECIALIZED
      PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN
      ACCOMMODATE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

XI.    IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO
      REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS . . . . . . . . 35

XII.   OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF
      INFECTIOUS DISEASE TRANSMISSION . . . . . . . . . . . . . . . . . . . . . . . . . 35

XIII.  CONCLUSIONS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

# SECOND SUPPLEMENTAL EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## I.    EXPERT QUALIFICATIONS

1.    I am a Physician Consultant specializing in correctional medicine and continuous quality improvement, and a voluntary attending physician for the Cook County Hospital, Department of Medicine, in Chicago, Illinois. My C.V. is attached.

2.    I have provided two prior reports in this matter, on November 9, 2007 and on December 6, 2007. My November report sets forth my complete academic and professional career.

3.    I have listed all of my publications on my attached C.V. I have not published additional publications since my November 2007 report.

4.    I am billing the plaintiffs $250 an hour, my usual billing rate. For testimony, my rate is $350 an hour. I have not testified in any cases since November 9, 2007.

## II.    BASES FOR EXPERT OPINIONS

5.    I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison medical care and health care administration, and the impact of overcrowding on prisoners' medical care, including how prison overcrowding detrimentally affects prisoners' access to health care and interferes with the ability of prison officials to meet the existing and increased medical needs of the prisoners in an overcrowded system. I have also been asked to render my opinion with respect to whether overcrowding in the California Department of

Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes. My opinions are based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my earlier inspections of California Institution for Men (CIM), Avenal State Prison (ASP), Valley State Prison for Women (VSPW), San Quentin State Prison (SQ) and High Desert State Prison (HDSP), on my more recent inspections of North Kern State Prison (NSKP), the Substance Abuse and Treatment Facility at Corcoran (SATF), Pleasant Valley State Prison (PVSP), California State Prison at Solano (SOL), and a second inspection of HDSP, and on my professional experiences working in similarly overcrowded correctional settings. A list of the documents I have reviewed is attached.

6.     During my inspections, I spoke to medical staff throughout the facilities, including the Health Care Managers, Chief Medical Officers, physicians, nurses and schedulers. The staff members at each prison were consistently cooperative, provided me with the files, logbooks, documents, records and data I requested, and ensured my full access to the facilities I wished to inspect.

7.     In my first report, I concluded that the CDCR's medical delivery system was operating in a state of crisis that harmed prisoners with serious medical concerns and placed them at substantial risk of harm because the number of prisoners in the system far outstripped the capacity of the system to provide care. Having completed the five recent prison inspections and reviewed recent documents, including the Receiver's Seventh and Eighth Reports and his Turnaround Plan of Action, my opinion is unchanged:  the CDCR's medical care

2

delivery system cannot provide a constitutional level of care because the prison system incarcerates far more prisoners than can be adequately treated with the resources, staffing and facilities available in the CDCR. In short, it is my opinion that overcrowding is the primary cause of the constitutional violations in the CDCR for *Plata* class members.

8.    I also concluded in my first report that it will not be possible to achieve a constitutional level of health care in the CDCR in the foreseeable future, unless the prison population is significantly reduced. My opinion has not changed. The limitations on the CDCR, including staffing, administrative resources and especially treatment space, are so severe that the only avenue for building a constitutional health care delivery system is to reduce the demand on the system by lowering the number of patients it serves.

9.    While I believe that reducing the population is necessary to achieve a constitutional level of medical care, population reduction alone will not, in a vacuum, produce a constitutionally adequate medical delivery system. For example, if the population were reduced at a prison facility, but that prison lacked sufficient numbers of physicians, the care would still be unconstitutional. Reducing overcrowding is not a panacea, but crowding is the primary cause of the ongoing inadequate medical care in the CDCR system. Overcrowding is the one factor that negatively impacts almost every other matter that must be addressed to create a minimally adequate medical care delivery system for California's prisons.

10.    Reducing the population in the system to a manageable level is the only way to create an environment in which other reform efforts, including strengthening medical management, hiring additional medical and custody

3

staffing, and improving medical records and tracking systems, can take root in the foreseeable future. Continuing efforts to build a constitutional system under the current overcrowded conditions will guarantee that the unconstitutional conditions, and preventable suffering, will exist for a substantially longer period of time than would be the case if the population were reduced.

11. The Receiver has tools to fix the health care system, but has no tool within his purview, to deal with external pressures such as overcrowding. The Receiver's mandate is to remove the Court's direct control of the CDCR health care delivery system as quickly as possible. It is my opinion that, if the current overcrowding is not remedied, the Court's involvement in overseeing the health care system will certainly extend many years.

## III. EACH OF THE PRISONS I INSPECTED IN AUGUST, 2008 IS DRAMATICALLY OVERCROWDED.

12. According to the CDCR's August 20, 2008 population statistics, there were 159,823 prisoners housed in CDCR prisons and camps, which is 191% over the prison system's design capacity. Jt. Pls' Trial Ex. 98. The five prisons that I inspected are all, like the system itself, significantly overcrowded, and at some prisons, the higher security classification prisoners are the most significantly overcrowded. All five of the prisons currently house prisoners in "non-traditional" beds, including bunks in gyms and day rooms that were not designed for housing.

13. North Kern State Prison was built for 2,694 prisoners. *Id.* As of August 20, 2008, the prison was at 204% capacity, housing 5,496 prisoners. *Id.* Most NKSP prisoners, over 4,600, are housed in the Reception Center. *Id.* The remainder of the population is made up of 297 Level I prisoners and 581 Level III prisoners. *Id.* NKSP also serves as a health care "hub" for an additional 2,000

4

prisoners housed in community corrections facilities who receive health care at the prison.

14.     The Substance Abuse Treatment Facility and Prison at Corcoran was designed to hold 3,424 prisoners, but the total population as of August 20 was 7,121, *i.e.*, 208% of design capacity. *Id.*

15.     Pleasant Valley State Prison, built for 2,308 prisoners, now houses 5,199, making it among the state's most overcrowded prisons at 225% of design capacity. *Id.* That prison houses primarily Level III and IV prisoners (over 4,900), and has a small minimum security facility (MSF) housing fewer than 300 Level I and II prisoners. *Id.* While the MSF is less crowded than most other facilities, at 131% of design capacity, the Level III/IV facilities are currently at 234% of design capacity. *Id.* The prison staff also provides care to prisoners at a community care facility with approximately 400-500 patients.

16.     California State Prison, Solano, with 5,607 Level II and Level III prisoners in space designed for 2,610, is at 214% capacity. *Id.* The Level III prisoners are slightly more crowded than the Level II prisoners, with rates of 225% and 206% respectively. *Id.*

17.     High Desert State Prison has 4,472 prisoners in a prison built for 2,324. *Id.* With fewer than 1,000 Level I, II and III prisoners, the majority of the prisoners are either Level IV (approximately 2,850) or in the Reception Center (approximately 640). *Id.* Both of these populations are very overcrowded: the Level IV prisoners are housed at 253% of design capacity, and the Reception Center prisoners are housed at 319% of design capacity. *Id.*

## IV.  THE PRISON HEALTH CARE FACILITIES STILL ARE INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE.

18.    The Receiver recognized the critical shortage of health care facilities in his Turnaround Plan of Action,

> The facilities available for providing health care services within CDCR are woefully inadequate. . . . We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily operations.

Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25.  Based on my site inspections and review of documents, I believe the Receiver accurately describes the critical shortage of adequate clinical space for the existing prison population.  These conditions, which are also described in my first report, create insurmountable barriers to providing timely medical care with appropriate confidentiality safeguards. Additionally, I believe that the lack of clinical and medical office space creates an unprofessional working atmosphere that likely impedes CDCR's recruitment and retention efforts.

19.    The Receiver's Turnaround Plan includes plans to build and upgrade clinical spaces around the state.  I understand, however, that the Receiver has yet to obtain funding for this construction plan, and has recently had to move to hold the Governor in contempt for failing to provide financial support for the plan. Except at two prisons, *actual construction of clinical space has yet to begin.*  Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44.

20.    Even if the Receiver were able to obtain immediate funding for his construction project, his target date for completion of the clinical upgrade program

is not until 2012, more than three years from now.  Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 25-26.

A.    **Reception Center Clinical Areas Continue to be Inadequate for the High Volume of Medical Contacts.**

21.    In my initial report, I documented the significant space limitations at the Reception Center located at the California Institution for Men in Chino.  The space limitations that I observed at the North Kern State Prison for reception center processing were as bad as the conditions I found at CIM.  NKSP, a prison with a population of approximately 5,500 prisoners, including approximately 4,800 RC prisoners, receives approximately 500 new RC prisoners each week.

22.    Under the *Plata* Inmate Medical Policies and Procedures, prisoners arriving at a Reception Center undergo a health screening on their day of arrival. Policies and Procedures, 4-2-1.  "Licensed health care staff shall conduct interviews with inmate-patients in a manner that ensures the privacy of their health care information subject to the safety and security concerns of the institution." *Id.* Reception Center prisoners must be provided a "complete history and physical examination performed by a Nurse Practitioner, Physician Assistant, or a Physician and Surgeon" within 14 days of arrival.  P&P's, 4-2-2.  The medical facilities that I observed at NKSP were inadequate for this purpose.

23.    Arriving RC prisoners are delivered to the Receiving and Release area at NKSP.  In this large open area, prisoners are interviewed, have their vital signs taken and receive a TB test, among other things, before proceeding to a housing unit.  The initial health screening, which consists of an interview by an RN and administration of the TB test, takes place for most prisoners in a small

office just off the R&R area. Two nurses conduct interviews simultaneously, with prisoners sitting back to back, separated only by a shoulder-high divider. I was told that a third nurse sometimes conducts these medical interviews at a desk in the open receiving area, where prisoners and staff circulate. Neither of these situations affords the necessary confidentiality for these critical initial health care encounters.

24.    I questioned Dr. Emam, the facilities Chief Physician and Surgeon, about these conditions. He indicated that space is so limited, that there is no other space available in which these interviews may be performed. I believe that, given the lack of confidentiality for these encounters, prisoners are less likely to provide accurate information about sensitive medical and psychiatric conditions.

25.    According to Dr. Emam, prisoners at NKSP are seen by a physician or mid-level provider for their medical history and physical examination within two to three days. I inspected the area where these encounters take place. The area contains a series of very small rooms, each equipped with two chairs and a medical exam table. The exam table, however, functions as a desk for the medical provider, and the rooms are so small that it would be very difficult if not impossible to perform an actual physical examination in them. Dr. Emam acknowledged that the "exams" that take place are in fact simply medical interviews, primarily for the purpose of determining what type of housing is appropriate for the prisoner.

26.    Adequate physical examinations are not performed on NKSP prisoners, despite the P&P requirements, which are based on the basic principle that incoming prisoners must undergo a comprehensive exam upon arrival so that

8

an adequate treatment plan may be developed and implemented. A physical exam, as opposed to a medical interview, is necessary because some conditions can be identified and confirmed only through physical examination of the patient.

27.    Dr. Emam told me that the prison lacks the space to provide actual physical examinations for the high number of incoming Reception Center prisoners arriving daily at NKSP, and that, in any case, he lacks the physician staff to provide that service. The failure to provide a true physical examination creates the risk that certain medical conditions will not be timely identified and/or treated.

28.    The Receiver has piloted a Reception Center screening process at San Quentin State Prison that, according to the Receiver, "provides integrated medical, dental, and mental health screening on the day of arrival as well as laboratory testing, medication review and administration, and referrals to providers based on national guidelines." Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report) at 7. The Receiver states that he intends to implement standardized reception center screening processes at the major reception center prisons by January 2009. *Id.* However, the Receiver frankly acknowledges that "[t]he most formidable challenge to progress at all the sites will be inadequacies in physical space and environment." *Id.*

29.    Based on my review of the facilities available at NKSP, I do not believe that the Receiver's pilot Reception Center screening program can be implemented at that prison, without creating additional clinical examination facilities.

**B.    The Severe Shortage of Clinical and Office Space Described in My First Report Has Not Changed in the Last Six Months.**

30.    As noted above, the Receiver has concluded that the facilities

available for medical care delivery are "woefully inadequate." That is consistent with my findings during my November 2007 inspections, and is further supported by my observations during my most recent inspections.

### 1.    NKSP's Clinical Space is Inadequate

31.    At NKSP, the clinical spaces available for medical encounters following Reception Center processing and for the mainline prisoners are inadequate for the number of prisoners requiring medical attention.

32.    NKSP is divided into five prison yards, denominated A-E.  Yards B, C and D house only Reception Center prisoners awaiting transfer to a permanent institution.  Yard A houses both general population prisoners (*i.e.*, prisoners who have been classified and endorsed to stay at NKSP) as well as Reception Center prisoners, and Yard E, a minimum security facility, houses only mainline prisoners.

33.    Each of the yards A-D has medical clinic space consisting of one exam room, a very small office in which the LVN prepares medications for distribution, a very small medical supply room, a dental clinic and a dentists' office.

34.    Each yard is supposed to run at least two medical lines each day, one for the RN doing face-to-face triage, and one for the primary care provider (PCP) doing sick call.  The yard medical clinics on A-D cannot accommodate simultaneous RN and PCP lines in the one available exam room.  Accordingly, NKSP has created three exam spaces on B yard in an area that formerly housed custody offices, in which the RNs are now conducting face-to-face triage for yards B, C and D on Second and Third Watch (*i.e.*, 8 a.m. to 2 p.m., and approximately

3 p.m. to 9 p.m.). The NKSP staff members refer to this area as the Reception Center Medical Clinic (RCMC).

35.    While the clinical space allocated to the RNs in the RCMC is objectively adequate for performing screenings, data provided to me by the scheduler shows that prisoners are regularly not seen for their scheduled appointments. The fact that some prisoners going to the RCMC must be escorted from other yards for their appointments may contribute to this problem.

36.    For example, I reviewed the nurse triage tracking data for the week of August 18, 2008 for prisoners from D-yard. Joint Pls' Trial Ex. 36. During that week, of the 119 appointments schedule, more thant 50% (61) did not take place. While the tracking form states that five prisoners were not seen because of a yard change, one paroled and one was at a different medical appointment, the primary reason stated for the missed appointment was "lockdown," "out of time," or "short nurses." I strongly suspect that the location of the clinic on a different yard means that the triage line runs slower, resulting in fewer patients being seen timely.

37.    I was told that patients who are not seen for their appointment are given an appointment on the next available triage line, usually two days later. However, I reviewed D-yard's August 18-22 nursing tracking data, and found that of the 14 patients who were scheduled but not seen on August 18, just three patients were rescheduled and seen that week, while ten were either rescheduled but not seen, or not rescheduled within the week. *Id.* (One prisoner transferred or paroled.)

38.    The A-yard prisoners do not go to the RCMC for nurse triage. Because the PCP runs a sick call line in the only medical exam room, the RN does

face-to-face triage in the hallway, with the prisoner sitting in a chair, within several feet of the prisoners awaiting their appointments. The RN states that, if she decides she needs an exam table for these encounters, she must wait until the PCP is between patients, and then use that office. The triage encounters cannot be maintained confidential under these circumstances; thus, the RN's ability to obtain reliable information from their patients is critically impaired.

39.    Prisoners who are housed in the Administrative Segregation Units on A-yard and D-yard are seen for RN triage and for sick call encounters in a meeting room in the housing unit. It is not set up with any medical equipment. Without necessary medical equipment, including an exam table, the medical staff cannot provide adequate medical care.

### 2.    SATF's Clinical Space is Inadequate

40.    The Substance Abuse and Treatment Facility at Corcoran is one of the largest prisons in the system, with approximately 7,000 prisoners housed on seven yards, A-G. Each of the prison yards has its own clinic, with an exam room for the RN performing triage, and a second room for the PCP seeing patients for sick call.

41.    At SATF, the medical staff reported that there were 1,200 overdue primary care appointments. I was told that, in an effort to address the backlog, SATF had on the day of my visit three CDCR physicians from the Central Office, whose mission was to visit, at their cell front, prisoners who had submitted sick call slips to determine what medical care they required, if any. I was told that primary care providers will be performing cell front triages two days a week, every two weeks, for the foreseeable future.

42.    The SATF staff said that the physicians were seeing patients in the housing units at their cell fronts because SATF lacked exam space for them to use for these medical encounters. Such encounters, which take place with custody officers and fellow prisoners within earshot, are not an adequate substitute for clinical encounters in a private, medically equipped setting.

### 3.    PVSP's Clinical Space is Inadequate

43.    Dr. Igbinosa, the Chief Medical Officer at PVSP, reported that he is currently authorized to hire 14 primary care providers to care for the 5,200 prisoners at PVSP. If he were able to fill all primary care positions, he advised me that he would not have the space for them.

44.    Dr. Igbinosa further related that he would like to have more specialty providers from the outside community provide care to prisoners on-site at the prison. Although some specialists do currently see patients at the prison periodically, Dr. Igbinosa said that he cannot expand this program because he lacks the necessary clinical space to accommodate the providers.

### 4.    CSP-Solano's Clinical Space is Inadequate

45.    At SOL, the Annex Clinic, which serves the needs of the approximately 1,750 prisoners housed at the prison's Facility 4, is located in what had been an area used for education programs, and the space is still used for education programs as well as prison classification committee activities. The main patient encounter area is a small room in which patients are seen by one of three primary care providers who work in the room. The room is divided into three medical encounter areas by five foot tall wood and cloth partitions or screens. The

three patient encounter areas are immediately adjacent to one another, such that a conversation in one can be heard in the others. This space does not provide for adequate patient confidentiality. A PCP also sees patients in the Annex Clinic's main work room. There, a thin hospital bed style curtain separates the patient and PCP from the clinic's other business.

46. All available space in SOL's medical clinics was being used. SOL does not have adequate space for its current complement of PCPs to work in, let alone additional PCPs should the prison hire such additional staff.

### 5. Receiver's Assessment of Other Prisons' Medical Space

47. I reviewed operational assessments prepared for the Receiver regarding several of the CDCR prison facilities.

### a. California Rehabilitation Center (CRC)

48. The January 2008 operational assessment regarding the CRC conducted by the Receiver's office concluded that all medical spaces are in urgent need of repair, and that, "[f]or the most part, none of the existing areas occupied by health care clinicians are clinically appropriate." Jt. Pls' Trial Ex. 100. (California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Rehabilitation Center) at 15.

### b. California Training Facility – Soledad (CTF)

49. A review of CTF conducted by CDCR and Receiver staff in March 2007 determined that the prison's Central Facility clinic is so crowded and has such limited space that "[i]nmates that are ducatted for health care usually wait for hours to see the provider," the North Facility clinic is "very small based on the number of inmate-patients being served," and that the South Facility clinic area,

although the newest physical plant of the three facility clinics at the prison, was

"built to support an inmate population of 510 inmates and not the current housing

of more than 1000 inmates." Jt. Pls' Trial Exh. 99 (Operational Assessment,

review conducted in March 2007) at 2-3.

### c. Mule Creek State Prison (MCSP)

50.    The December 2007 operational assessment report regarding MCSP

conducted by the Receiver's office concluded, "[a]ll of the Facility Clinics are

undersized for the quantity of inmate/patients seen on a daily basis and lack[]

appropriate holding/waiting space for inmate/patients ducated to be seen by health

care providers." Jt. Pls' Trial Ex. 101 (Operational Assessment for Access to Care

at Mule Creek State Prison) at 7. The assessment also pointed out that although

Mule Creek's "size and overall design . . . is likely one of the most manageable . .

. anywhere within the State . . . ", it is "no exception" to the "system wide barrier"

of "serious space deficiencies for clinical staff," which have existed at "[a]ll of the

CDCR facilities the Review Team has visited . . . ." *Id.* at 28.

51.    The Receiver plans to address medical facility deficiencies at

existing prisons by assessing those prisons' needs, developing plans and then

upgrading or constructing necessary facilities. The Receiver's Plan provides that

assessments, plans and will be done on a phased and serial basis. The

assessments are scheduled to be completed by January 2010. The target date for

completing all upgrades and construction is January 2012. Jt. Pls' Trial Ex. 56

(Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of

Action) at 25-26.

52.    As of June 2008, Avenal and San Quentin were the only two existing

prisons at which medical facility construction upgrades had begun. Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report) at 39-44. Avenal was scheduled to have construction completed in July 2009. *Id.* at 40. San Quentin had some projects completed; most projects there were scheduled to be completed in February 2009 with the final project (the central health services building) scheduled to be done in April 2010. *Id.* at 42-44.

53.    NKSP, SATF and SOL, where, as discussed above, clinic space is inadequate, are in the final group of 13 prisons scheduled to be assessed and to have upgrades completed (by 2012) . Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Exh. 1 – Receiver's Turnaround Plan of Action) at 26. Thus, in the best case -- if the Receiver's timetable has no slippage at all – tens of thousands of prisoners will continue to be incarcerated in prisons with inadequate medical facilities for the next three plus years.

## V.    THE NUMBER OF CLINICIANS CONTINUES TO BE INSUFFICIENT FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE.

54.    In my previous report, I stated that overcrowding creates pressures on the system that make hiring and retaining sufficient numbers of clinicians and other medical workers exceedingly difficult, and that California's overcrowding crisis has created a situation where the prisons, and particularly the more remote prisons, are unable to hire and retain enough health care staff to address the medical needs of the prisoner-patient population. Based on my most recent inspections and my review of the vacancy data from May 2008, my opinion remains unchanged.

## A.    CDCR Still Cannot Fill Some Vacancies

55.    Even after the Receiver substantially raised salaries for medical staff, the vacancy rates at some prisons remain high. The May 2008 vacancy and registry report provided by the *Plata* health care support division shows on-going serious problems in hiring primary care providers (PCPs), and even with having adequate numbers of such providers on site. Jt. Pls' Trial Ex. 35 (*Plata* Vacancy/Registry Report, May 2008) at 1. The report shows that statewide there was a 25 percent vacancy rate in primary care provider positions; the vacancy rate adjusted to account for PCP employees on leave in May was 35 percent. *Id.* Further, the report shows that in May the prisons statewide had a shortfall of 56 PCPs even after temporary, overtime, and contract/registry PCPs used to reduce vacancies were taken into account. *Id.* Consistent with this statewide vacancy report, four of the five prisons I inspected in August have had critical, on-going problems filling their primary care positions with state employees.[1]

### 1.    NKSP

56.    According to the *Plata* Vacancy/Registry Report for May 2008, NKSP had a total of 16 primary care provider positions, of which 6.6 were unfilled, for a vacancy rate of 41%. *Id.* at 12.

57.    Dr. Emam, the acting Chief Physician and Surgeon at NKSP advised me that the prison had very recently succeeded in hiring some primary care providers, but that it has been extremely difficult to fill the vacant positions. He reported that the prison continued to have two line physician vacancies and that

---

[1]  CSP-SOL, the fifth prison I visited, did not have an adequate allocation of PCP positions. See Part V.B, below. Further, as discussed above (see Part IV.B), the prisons, including CSP-SOL, do not have adequate clinic space for PCPs to see prisoner-patients.

that they had also been unable to fill the Chief Physician and Surgeon position that he has been filling on a temporary basis.

### 2.    SATF

58.    The May 2008 Vacancy Report shows that SATF had 13 primary care positions allocated, of which one was filled with a state physician, but that person was on leave. *Id.* at 15.

59.    The Report shows that SATF hired 7.7 registry providers at that time to deliver primary care. *Id.*

60.    When I inspected the prison, Dr. Enenmoh, the acting Chief Medical Officer, advised me the prison still had just one state employee physician, and that recruiting for the physician positions, and for the unfilled Chief Physician and Surgeon position, had been very difficult.  He had eight contract physicians and two contract mid-level providers.

### 3.    PVSP

61.    The May 2008 Vacancy Report shows that PVSP had 14.8 allocated primary care positions.  At that time, PVSP had just one state employee primary care provider.  The prison contracted with 5.1 registry primary care providers. *Id.* at 13.

62.    According to Dr. Igbinosa, as of the date of my inspection, the prison had the equivalent of eight full-time primary care practitioners.  He explained that it is extremely difficult to recruit medical professionals to work at the prison because it is so remote.  Most contract providers currently providing care at the prison live in Los Angeles or San Francisco and commute to the prison on an intermittent basis.  One physician commutes from Chicago twice a month,

for a week each time. Dr. Igbinosa said that none are willing to relocate to the Central Valley. He noted that, even when candidates at hiring fairs express interest in working at PVSP, they often retract their application when they realize that they can earn the same CDCR salary and live in or near an urban environment. As a consequence, PVSP has too few primary care providers to care for the number of patients at the prison.

### 4.    HDSP

63.    The May 2008 Vacancy Report shows that HDSP had 8.0 allocated primary care positions, and that two were vacant in May. *Id.* at 10. However, on the date that I inspected High Desert in August 2008, Chief Medical Officer Dr. Swingle advised me that, although HDSP appeared to have four state physicians, all four were either on leave or stripped of their clinical privileges.

### B.    Some Prisons Are Still Allocated Too Few Providers

64.    At SOL, the prison is authorized 9.0 staff primary care provider (PCP) positions. The health care manager stated that the prison was making a request to add two more staff PCP positions, so that there would be a total of eleven. The chief medical officer, however, said that the prison needs a total of 13 PCP staff positions, given the number of medical encounters.

### C.    Use of Registry Still Cannot Resolve Staffing Shortfalls

65.    The heavy use of registry providers is, as I explained in my initial report, a stop-gap measure that mitigates harm to individual patients in the short-term, but is not an adequate long-term solution. Solano's Chief Medical Officer, Dr. Traquina, indicated that there is a rapid turnover in registry personnel, and it is difficult to build a medical care delivery program with staff who do not intend to

make a substantial time investment at the prison.

66.    Because registry physicians tend to turn over quickly, the prisons end up spending time doing extensive on-the-job training repeatedly, which is time-consuming and detracts from patient care delivery.

**D.    Clinical Staff Shortages Continue to Result in Delayed and Inadequate Care**

67.    At each prison I inspected in August, there were delays in triaging patients' sick call slips, and in primary care visits, because the clinicians were unable to keep up with the heavy demand for medical care.

68.    At most of the prisons I inspected, the staff reported that, although there are backlogs of patients waiting to see their primary care providers, the staff does triage to ensure that the sicker patients are seen first on the primary care provider lines. The defendants have not, however, demonstrated a method for this triage or that they evaluate or track whether this triage is effective.

**1.    NKSP**

69.    At NKSP, I reviewed the tracking data for the D-yard primary care provider sick call line for the week before my inspection, August 18-22. Jt. Pls' Trial Ex. 37. I found that the clinic had scheduled 94 appointments, but that the primary care provider had not seen 27 (29%) of those patients. The most common reasons cited on the tracking instrument were that the clinician ran out of time, or did not have the patient's Unit Health Record.

**2.    SATF**

70.    At SATF, the prison's Health Care Manager, Gayle Martinez, reported that SATF had a backlog of 1,200 overdue primary care appointments. The prison has a far greater demand for services than the staff at SATF can

deliver.

71.    I interviewed the Office Technicians and reviewed sick call slips on four of the seven prison yards (A, C, E and G). I found that, on each of the yards, it usually takes two to six days for prisoners to see a nurse for a triage appointment. (These appointments are supposed to occur within one business day of receipt of the patient's sick call slip.) For example, on E-yard, I reviewed the stack of sick call slips for the patients scheduled to see the RN on August 27. The sick call slips were marked received on August 21-25.

72.    On each of the four prison yards I inspected, the Office Technicians reported, and the sick call slips demonstrated, that it takes roughly four weeks for primary care appointments, once the patient has been referred to the primary care line on a routine basis.

### 3.    PVSP

73.    I was told by PVSP staff that the wait for routine primary care provider appointments is two to four weeks.

### 4.    Solano

74.    At SOL, there are major delays for routine appointments with a primary care provider at each of the prison's three clinics (Primary, Sattelite, and Annex). In the Primary clinic, it takes 16 weeks for such an appointment. In the Satellite clinic, it takes six to eight weeks. In the Annex clinic, the backlog is eight to ten weeks, even with primary care provider appointments taking place on Saturdays. The Primary clinic also has a backlog of face-to-face appointments with registered nurses; such appointments take about ten days to occur, even though the clinic had run triple lines of such appointments on weekends.

### 5.    HDSP

75.    At each of the four main medical clinics at HDSP there are significant delays for routine appointments with a primary care provider (PCP). In "A" facility clinic, routine appointments are scheduled six weeks after a nurse determined that patient should be seen by such a provider. In "B" facility clinic, such appointments are scheduled approximately 16 weeks after such determinations. In "C" facility clinic, such appointments are scheduled approximately eight weeks after such determinations. In "D" facility clinic, such appointments are scheduled approximately 4 weeks after such determinations.

76.    The "C" and "D" facility clinics also had backlogs for routine registered nurse face-to-face triage appointments; those appointments are scheduled two and four to five days, respectively, after the prisoner's written request for medical attention was received.

77.    The HDSP CMO was not surprised, during the file reviews, to find that documents are placed in UHRs without having the practitioners review them, and the follow-up with PCPs are not timely scheduled. These documents include CT scan, ultrasound, and consultation reports. She was also not surprised that the files demonstrated substantial treatment delays. She advised me that HDSP lacked the staff and resources to treat the number of prisoners at the facility.

### E.    Inspected Prisons Still too Shortstaffed to Implement Required Programs.

78.    Because there are too few clinical staff members to provide adequate treatment to the number of prisoners incarcerated, some prisons have failed to fully implement certain essential medical programs.

### 1.  NKSP

79.    For example, as explained above, NKSP has a large reception center, and thus is tasked with processing arriving prisoners and classifying them for transfer to permanent prisons. Given the acute staffing shortage, coupled with the lack of clinical exam space, NKSP has been unable to provide incoming prisoners with the required comprehensive physical examination. Instead, these prisoners are simply undergoing a second medical interview, several days after their initial interview with an RN.

80.    Additionally, based on my review of a sample of unit health records (UHR), I believe required follow-up appointments with primary care providers are not being done for a substantial number of patients. I reviewed 13 UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I found that nine of the 13 UHRs lacked documentation of a timely follow-up with a physician, and eight lacked required documentation of the service or hospital visit.

### 2.  SATF

81.    At SATF, I visited four prison yard clinics. In none of these clinics was the staff maintaining an "Urgent/Emergent Log Book." Each yard is supposed to have an Urgent/Emergent Log book, in which the staff records each encounter in which a prisoner reports an urgent or emergent condition. P&P, 4-12-1. These logs play an important role in continuity of care, because the primary care provider assigned to each yard clinic is required to review the log each work

day to determine whether any patients require further follow-up. P&P 4-12-3. Without this link, I believe some patients who do require urgent follow-up attention will fail to receive it.

82.    I reviewed 11 UHRs for prisoners who had transferred to SATF two weeks earlier and had significant medical conditions. Based on these records and the available documentation, I concluded that for ten of the eleven patients, medically necessary follow-up had not occurred. The problems I identified included missed medications and lapsed chronic care follow-up visits with a primary care provider.

83.    Additionally, the UHRs lacked documentation of required primary care follow-up appointments. I reviewed nine UHRs for prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. I was unable to find documentation of a PCP follow-up in four records. For three of those four medical records, there was also no documentation from either the hospital or specialist regarding the encounter. Some patients who receive medical attention off-site but are not adequately followed up by their primary care providers upon return to prison will be at serious risk of harm because necessary treatment will either lapse, or not be ordered.

84.    The SATF medical staff advised me that they are unable to schedule timely follow-ups in many cases because they have too few medical providers for the number of prisoners requiring treatment.

### 3.    PVSP

85.    I reviewed the UHRs for 23 prisoners sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care.  According to the UHRs, 12 of 23 prisoners did not receive timely follow-up appointments.  Eleven of the 23 UHRs were missing required documentation, including ER reports, consult reports, etc.

### 4.    SOL

86.    At Solano, I reviewed 14 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should be in the file for minimally adequate care.  I found that just seven of the files contained documentation of timely follow-up, and in four UHRs, required documentation of the offsite medical encounter was missing.

### 5.    HDSP

87.    At HDSP, I reviewed 15 records of patients sent offsite approximately one month before my inspection (either for scheduled or unscheduled appointments) for whom documentation of the offsite visit and follow-up with the PCP should have been in the file for minimally adequate care. In eleven cases, there was no documentation of a timely PCP  follow-up visit, and in nine cases, there was missing documentation. My review uncovered other serious problems.  For example, one patient was ordered an urgent MRI of the brain on July 8, 2008.  There was no documentation that the MRI had occurred as

of August 29, 2008.

## VI.    PLAINTIFFS ARE STILL NOT RECEIVING TIMELY SPECIALTY CARE

88.    Although defendants have added contract specialty providers, the prisons I inspected still cannot schedule timely "high priority" visits in a large number of cases. PCPs request offsite specialty appointments on a "high priority" basis when the patient has an urgent medical need, and these appointments are supposed to be scheduled within 14 days of the request for services. P&P 4-8-1. The demand for care, particularly for the high priority cases, continues to overwhelm the resources available to the defendants. Additionally, some facilities have proven unable to obtain timely reports from the specialty providers, resulting in unnecessary treatment delays. (See paras. 80, 83, 85-87 above.)

### A.    PVSP

89.    At PVSP, the offsite aging specialty report included 55 high priority referrals as of August 27, 2008. *Plata* Pls' Trial Ex. 38. Of those, 11 had been pending for over 14 days, yet had no appointment scheduled, and of those scheduled, 19 were scheduled to take place more than 14 days after the referral. Thus, well over half of the PVSP patients are unable to receive timely high priority appointments.

### B.    SOL

90.    The situation at SOL was worse. There, 63 high priority off-site specialty appointments were listed on the aging report for such appointments. *Plata* Pls' Trial Ex. 39. None were scheduled for a date within 14 days of the primary care provider request. Most of these urgent referrals – approximately 40 – did not yet even have an appointment date; four of these cases had been already

26

pending at least 20 weeks, four others at least 15 weeks, three others at least 10 weeks, and another approximately one dozen between four and eight weeks. Of the approximately two dozen high priority off-site specialty referrals that had appointment dates scheduled, about 12 were scheduled to take place more than approximately five weeks after approval, with a few of these being scheduled four to five months (or longer) after approval. Another approximately one dozen were scheduled to take place three or four weeks after the approval date.

### C.    HDSP

91.    At HDSP, 48 high priority off-site specialty referrals were listed on the aging report. *Plata* Pls' Trial Ex. 40. Only one was scheduled for a date within 14 days of the primary care provider request, as required for these urgent referrals by the court-approved policies. Three other referrals were scheduled to take place between 14 and 21 days after the approval date. Seven other high priority referrals had appointments scheduled, with dates ranging from four to eight weeks after the approval date. The vast majority of the urgent off-site specialty referrals – 37 of the cases – did not yet even have an appointment date with the requested specialty provider. Approximately 20 cases without an appointment date scheduled had been pending for at least six weeks; half of these had been pending for more than two months.

### D.    NKSP

92.    At NKSP, of the 70 listed high priority offsite specialty referrals, 22 (31%) had been pending for more than 14 days and had no appointment scheduled. *Plata* Pls' Trial Ex. 41. Twelve more were scheduled, but more than 14 days had elapsed between the referral and the appointment. Nearly half the appointments

Case 2:90-cv-00520-KJM-SCR    Document 3219-2    Filed 10/30/08    Page 90 of 106

currently listed as "high priority" NKSP will not take place within the required timeframe.

93.    When specialists see CDCR prisoners or when prisoners are seen for certain procedures, the service provider must provide the sending prison with a report of the encounter. The CDCR primary care provider then uses that report to determine the prisoner's treatment plan.

94.    Based on my reviews of unit health records at NKSP and PVSP, I concluded both prisons have a serious problem obtaining these records.

## VII.    MEDICATION MANAGEMENT PROBLEMS

95.    In my initial report, I found that defendants' medication delivery systems were inadequate for the size of the population they serve, and were plagued by short-staffing at a number of prisons. Based on my most recent inspections and my review of the report by Pablo Stewart, M.D., it is still my opinion that the defendants' medication delivery system is inadequate for the population it serves. Because there are too many prisoners, coupled with too few staff and insufficient resources, the system suffers from medication delays and inadequate treatment documentation. Some prisoners continue to receive their medication late, or not at all, and suffer as a result.

96.    The Receiver is rolling out a new medication delivery system under the auspices of Maxor. At SATF, the Maxor system was initiated in April 2008. The staff reported that they continued to find "bugs" in the system, and that the biggest issue was that refills were not being provided timely. The staff also reported that the system was considerably more labor-intensive than the previous system, requiring additional clerical work, and yet the prisons were not provided

additional clerical support positions.

97.    In its annual report to the Receiver for 2007, Maxor recognizes that

overcrowding significantly impacts its ability to deliver medications:

> **Overcrowding:** The impact of overcrowding on the system's abilities to provide timely and effective delivery of necessary medications is significant. A clear example of this impact was noted at San Quentin. San Quentin receives 75-80 new prisoners each day and presumably transfers out or releases about the same number. Overcrowding however, forces a series of "compaction" moves resulting in as many as 300-400 separate prisoner moves each day in order to free up appropriate housing for the offenders. This constant "churn" of prisoners within the institution keeps the healthcare staff chasing prisoner movement to ensure medications can be delivered in a timely fashion. . . . This takes time, and in some cases, the medications are simply returned to the medical area to try to determine where the prisoner is housed. During this time, the prisoner patient is not getting his medications and may complain to staff – who in turn – reorders the medications, resulting in duplicate work.

Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. 6) at 29.

## VIII.  OVERCROWDING FUELS DYSFUNCTION IN MEDICAL RECORDS

98.    As I explained in my first report, health care records are a critical

component of any adequate medical delivery system. Unless medical records and

scheduling information are managed, organized, and maintained effectively,

appropriate health care services cannot be provided. Overcrowding continues to

make it impossible for CDCR to perform these essential functions.

### A.    Quality of Medical Records Continues to be Poor at Inspected Prisons.

99.    Although the Receiver has long-term plans to develop an electronic

medical record, those plans are unlikely to come to fruition for years. In the

meantime, California relies on paper medical records (except at Pelican Bay State

Prison). At each of the prisons I inspected, I found that the medical records were

unwieldy, rarely organized chronologically and, in general, poorly maintained.

Retrieving useful information from the files invariably requires considerable time sifting through extraneous reports, misfiled documents and outdated materials. At the same time, certain documents that would be extremely useful, such as an updated "Problem List" for each file, which is required by the court-ordered *Plata* Policies and Procedures, are typically missing.

100.    There are dangerous widespread delays in filing medical documents at HDSP. After I had provided HDSP medical staff with a list of the names and CDCR numbers of the prisoners whose unit health records (UHRs) I wanted to review, someone from the prison went through medical records' loose filing (documentation not yet placed in individual patient UHRs) to find any documents for the patients whose charts I was going to review. These documents were then brought to the room where I reviewed the UHRs. The documentation retrieved from loose filing included documents more than a month old, including, for example, the result of a CT Scan received by the prison in July. More alarming, most of the documents in loose filing, some of which had been received a month before my site visit, had not yet been initialed as reviewed by a primary care provider.

101.    In addition, Dr. Swingle, the HDSP Chief Medical Officer, reported that the transcribing of dictated primary care provider notes was "several months" behind at the prison. This means that documentation of a PCP-patient encounter is missing in the UHR. This, combined with the backlog in loose filing described above, creates dangerous risks because medical staff members who provide care to the patient have no idea what assessments were made previously or, in some cases, what diagnostic test results were obtained.

**B.   CDCR Continues to Rely on Inadequate Tracking Systems**

102.   CDCR's tracking and information systems cannot keep up with the overwhelming data requirements in the system's overcrowded prisons. In support of his Seventh Quarterly Report, the Receiver submitted a February 6, 2008 report entitled "Patient Identification Assessment." Jt. Pls' Trial Ex. 67 (Receiver's Seventh Quarterly Report, Exh. 1.]  There, the consultant concluded that "the information technology environment within the medical care side of the CDCR is not a 'system' . . . it is *an act of desperation.*" *Id.* at 5, emphasis in the original. The report further explains that, because the defendants cannot identify and link previous diagnostic and treatment information across prison sites, they face risks including "the possibility of significant errors during patient treatment . . . [and the] inability to identify individuals with chronic and/or communicable conditions upon reincarceration. . . ." *Id.*

103.   The Report explains that these problems are magnified in the CDCR due to several factors, including "overcrowding in the prisons (increasing the risk of communicable disease transmission) . . . ." *Id.*  "Due to debilitating technology and record management practices, pulling together a cohesive picture of the inmate's health status is a significant challenge, and currently is near impossible. This puts continuity of care at risk." *Id.* at 6.

104.   I agree with this report that the information systems currently in place in the CDCR are inadequate, and place prisoners at risk of harm.

**IX.   THERE ARE STILL NOT ENOUGH CUSTODY OFFICERS TO ENSURE ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL CONTACTS AT SOME PRISONS.**

105.   As the Receiver explained in his Turnaround Plan in June 2008,

Health care services are meaningful only if patient-inmates have timely access to those services. In a correctional setting, issues of access are inextricably intertwined with control and supervision of inmate movement by custody staff. System-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services.

Jt. Pls' Trial Ex. 56, (Receiver's Eighth Quarterly Report, Exh. 1 -- Turnaround Plan of Action) at 5.

106.    The Receiver has added additional custody teams to facilitate timely medical appointments, but his overall plan does not call for the full implementation of these additional custody allocations until July 2011, "contingent upon recruiting and training sufficient numbers of correctional officers to fill the new health care access posts." *Id.* at 6.

107.    At some of the prisons I inspected, prisoners are unable to access medical care appointments based on custody shortages. When a prison yard is placed on "modified program" status, *i.e.,* either all prisoners or some racial subgroups must be escorted to the clinics, often in shackles, there are often significant delays in treatment. These delays arise because there are not enough custody officers to move the prisoners in and out of the clinics on a timely basis, so far fewer prisoners are seen in the clinics.

A.    **PVSP**

108.    I was told by custody staff that the B-yard at PVSP has been locked down during the last two months. The appointment tracking data for PVSP for the month of August (through August 14) shows the dramatic drop off in completed patient appointments on B-yard. *Plata* Pls' Trial Ex. 42 (PVSP Physician

Appointment Statistics, August 2008). During the first two weeks of August, primary care providers on yards A, C and D saw 258, 193 and 215 prisoners, respectively. On B-yard, the primary providers saw 118 prisoners during the same period. Indeed, on August 7, two providers were scheduled to see 42 patients, but just ten patients were seen. *Id.* The reasons stated on the tracking list were "alarms, LD [presumably lockdown]; no escorts." *Id.*

109.    The tracking statistics for the RN triage appointments likewise reflect a drop for completed patient triage appointments for B-yard patients. *Plata* Pls' Trial Ex. 43 (PVSP RN Appointment Statistics, August 2008). While A, C and D completed 215, 121 and 129 triage appointments, B-yard nurses completed just 98, or fewer than ten appointments per clinic day. *Id.* The reasons provided for the cancelled appointments included, "lockdown," "no escorts," and "alarms." *Id.*

110.    Additionally, on B-yard, the staff advised me that it took one business day from the date of collection of sick call slips to the date of the face-to-face triage appointment. However, when I questioned the office technician further about the scheduling, he stated that because the yard was on lockdown, he had to schedule prisoners for their triage appointments by race/gang affiliation, with each subgroup having one day a week for appointments. Thus, he was able to schedule timely RN triage appointments in only a handful of cases.

**B.    HDSP**

111.    At HDSP, the prison routinely has what the Warden describes as rolling lockdowns, in which half of the prison's four main housing facilities are locked down at any one time because the prison does not have enough correctional

officers to operate all facilities without using overtime. When there is such a lockdown on the two HDSP facilities used to house maximum custody prisoners, access to medical care is affected because such prisoners must be escorted to the medical clinics. When there is a lockdown in "D" facility, the primary care provider will be able to see between 12 and 20 patients a day, instead of the 20 that can be seen if there is no lockdown.

## X.   THERE ARE MORE PRISONERS REQUIRING SPECIALIZED PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN ACCOMMODATE

112.   In my first report, I agreed with the Receiver's opinion that the CDCR is currently unable to accommodate the housing needs of medical patients requiring specialized placement. My opinion has not changed.

113.   In his Turnaround Plan of Action, the Receiver discusses his plan to expand facilities to accommodate the 10,000 state prisoners "whose medical and/or mental condition requires separate housing to facilitate appropriate, cost-effective access to necessary health care services." Jt. Pls' Trial Ex. 56 (Receiver's Eighth Quarterly Report, Ex. 1 – Turnaround Plan of Action) at 27. The Receiver explains these facilities must be built because "CDCR does not have adequate clinical, administrative and housing facilities to support constitutionally adequate health care." *Id.*

114.   As the Receiver explained in his Eighth Quarterly report, the current lack of medically appropriate housing for medically fragile prisoners can have dire consequences. "Simply stated, before constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment facilities to provide such care.* Unless and until these facilities are

constructed, the major health care class action cases will continue indefinitely. Likewise, prisoners will continue to die unnecessarily." Jt. Pls' Exh. 56 at 46. (Emphasis in the original.)

115.   I understand that defendants have failed to provide the Receiver with the necessary funding for the construction, and the Receiver recently moved for contempt against the Governor and the State Controller for their failure to provide the funding.  To my knowledge, no construction has yet begun on this essential project.

## XI.   IT WILL TAKE YEARS FOR THE RECEIVER'S TURNAROUND PLAN TO REMEDY THE UNCONSTITUTIONAL MEDICAL CONDITIONS

116.   On June 6, 2008, the Receiver submitted to the Court a "Turnaround Plan of Action" designed to correct constitutional deficiencies in the California prison health care system.  I have reviewed the Receiver's Turnaround Plan.

117.   In his August 5, 2008 newsletter, the Receiver wrote that the Turnaround Plan "consists of over two dozen complex projects, initiatives and programs. Any one of these major projects would be enough to challenge an ordinary department." Jt. Pls' Trial Ex. 102 (August 5, 2008 Newsletter from the Receiver.) I agree that the plan is enormously complex, and I believe that it will take years to remedy the current unconstitutional conditions.  The timeframe to reach a constitutionally adequate medical delivery system will be delayed if crowding is not reduced.

## XII.   OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF INFECTIOUS DISEASE TRANSMISSION

118.   I have not changed my opinion that the overcrowded housing conditions, and in particular, the conditions in the non-traditional beds, including

the converted gyms, create potential breeding grounds for disease.

## XIII. CONCLUSIONS

119.    Based on all that I have set forth above and in my previous reports, I continue to believe that overcrowding is the primary cause of the current state of medical crisis in the CDCR. I do not believe the Receiver and the CDCR will be able to address and resolve the critical medical care deficiencies until the need for services within the system is significantly reduced, and I still believe that some of the hiring gains for clinicians will be lost if these systemic issues are not addressed, because many newly-hired clinicians will be unwilling to risk their professional credentials and reputations by practicing in an environment where their patients are at risk of harm because, among other things, adequate clinical space is scarce, appointments are not scheduled, complete medical records are unavailable, and medications are not timely delivered.

Dated: _____9·9·08_____        _____
                                    Ronald Shansky, M.D.

ATTACHMENT A

# RONALD MARK SHANSKY, M.D.

## CURRICULUM VITAE

1441-G North Cleveland
Chicago, IL  60610

312-787-3365 Residence
312-919-9757 Cell
rshansky@rshanskymd.com

## *ACADEMIC TRAINING*

Bachelor of Science, University of Wisconsin, 1967
Doctor of Medicine, Medical College of Wisconsin, 1971
Master of Public Health, University of Illinois School of Public Health, 1975

## *PROFESSIONAL LICENSE*

Licensed Physician (Illinois) No. 36-46042

## *INTERNSHIP AND RESIDENCY TRAINING*

Internship – Cook County Hospital, July 1971-1972
Residency – Internal Medicine, Cook County Hospital, July 1972-1974

## *BOARD CERTIFICATION AND FELLOWSHIPS*

Diplomate of the American Board of Internal Medicine – September 1978
Diplomate of the American Board of Quality Assurance and Utilization Review Physicians – 1992
Elected Fellow of the Society of Correctional Physicians – 1999

## *EMPLOYMENT*

Medical Director, Center for Correctional Health & Policy Studies, Washington, D.C. Jail –
  2004 to 2006
Consultant, Corrections Medicine and Continuous Quality Improvement – 1993 to present on a full-time
  basis; and throughout career while holding other positions
Medical Director, Illinois Department of Corrections – 1982-1993, 1998-1999
Attending Physician, Department of Medicine, Cook County Hospital – 1978 to Present
Surveyor (part-time), Joint Commission on Accreditation of Healthcare Organizations – 1993-1997
Staff Physician, Metropolitan Correctional Center of Chicago – 1975-1982

## CONSULTATIONS

Condition of Confinement Reviews for PricewaterhouseCoopers,
  reviewing detention facilities housing federal detainees; 2000–Present
Essex County Jail, Newark, N.J.
Michigan Department of Corrections
Montana Department of Corrections
New Mexico Department of Corrections
Polk Correctional Center, Raleigh, N.C.
South Dakota Department of Corrections

## APPOINTMENTS

Member of Medical Oversight Team reviewing the Ohio prison system – 2005 to present
Court Monitor, De Kalb County Jail, Decatur, Georgia – 2002-2005
Consultant, California Department of Corrections – 2000
Court Monitor, Milwaukee County Jail – 1998 to present
Court Monitor, Essex County Jail, Newark, NJ – 1995 to present
Medical Expert, State of Michigan – 1995
Consultant to Special Master, *Madrid v. Gomez*, Pelican Bay Prison, California Department of
  Corrections – 1995
Medical Expert, State of New Mexico – 1994
Consultant, Connecticut Department of Corrections – 1994
National Advisory Board of the National Center for Health Care Studies – 1991
Illinois AIDS Interdisciplinary Advisory Council – November 1985
Illinois AIDS Caretaker Group – November 1985
Task Force to Rewrite American Public Health Association Standards for Medical Services in
  Correctional Facilities – 1983
Corrections Subcommittee, Medical Care Section, APHA – 1983
Preceptor, then Clinical Associate Professor, Department of Preventive Medicine and Community Health,
  Abraham Lincoln School of Medicine, University of Illinois, Chicago, Illinois – 1972-1979
Clinical Associate Professor, Department of Medicine, Ravenswood Medical Center, Chicago,
  Illinois – 1979-1981
Director, Phase 1 and 2 Program at Cook County Hospital for the Abraham Lincoln School of
  Medicine – 1976-1978
Medical Director, Uptown People's Health Center – September 1978
Director, General Medicine Clinic, Department of Medicine, Cook County Hospital – 1975
Director, Clinical Services, Department of Internal Medicine, Cook County Hospital – 1975
Associate Attending Physician, Department of Internal Medicine, Cook County Hospital – 1974-1975
Instructor, Illinois College of Optometry, Chicago, Illinois – 1972-1974

## COMMITTEE MEMBERSHIPS

Chairman, State of Illinois AIDS Caretakers Committee – 1985
Chairman, Corrections Subcommittee, Medical Care Section – 1983
Chairman, Medical Records Committee, Cook County Hospital – 1981
Member, Executive Medical Staff, Cook County Hospital – 1979
Member, Task Force to Rewrite the *Standards for Health Services in Correctional Institutions* –
  published 1986

## PROFESSIONAL ORGANIZATIONS

Society of Correctional Physicians – President, 1993-1995
American Public Health Association – 1974 to present
American Correctional Health Services Association – 1988
American Correctional Association – 1982
Federation of American Scientists – 1974-1981

## CIVIC

Mutually agreed upon expert, Milwaukee County Jail – 2001
Mutually agreed upon expert, *Inmates v. Essex County Jail*, 1995 to present
Appointed Receiver by Judge William Bryant, Medical and Mental Health Programs, District of Columbia Jail, *Campbell v. McGruder* – 1995
Mutually agreed upon neutral expert, State of Montana, *Langford v. Racicot* – 1995
Mutually agreed upon neutral expert, State of Vermont, *Goldsmith v. Dean* – 1996
Executive Committee Overseeing Health Care, Puerto Rico Administration of Corrections – 1993
Appointed by Judge Gerald Jenks, District Court for the Central District of Utah, as Impartial Expert in the matter of *Henry v. Deland* – 1993
Appointed by Magistrate Claude Hicks Jr., U.S. District Court in Macon, Georgia as Medical Expert in the matter of *Cason v. Seckinger* – 1993
Appointed by Judge Owen M. Panner, District of Oregon, as Special Master in *Van Patten v. Pearce* involving medical services at Eastern Oregon Correctional Institution – December 1991
Appointed by Allan Breed, Special Master, *Gates* case, as Medical Consultant regarding California Medical Facility in Vacaville
Appointed by Judge M. H. Patel, Special Master, case involving San Quentin Prison – 1989 to 1995
Selected as part of delegation to inspect the medical services provided to Palestinian detainees in the Occupied Territories and Israel by Physicians for Human Rights – 1989
Appointed by U.S. District Judge Williams as member of medical panel monitoring medical services in Hawaii Prison System – 1985
Appointed by U.S. District Judge Black to evaluate medical services in the Florida Prison System –1983
Appointed by U.S. District Judge Kanne as monitor to the Lake County, Indiana Jail in the litigation of the *Jensen* case (H74-230) – 1982
Appointed by U.S. District Judge J. Moran as Special Master of the Lake County, Illinois Jail in the litigation of *Kissane v. Brown* – 1981
Board Member, Health and Medicine Policy Research Group, Chicago, Illinois – 1980
Appointed to Advisory Committee, State of Alabama, Department of Mental Health – 1980
Appointed as consultant to the State of Alabama, Department of Mental Health – 1979
Consultant, U.S. Department of Justice Civil Rights Division, Special Litigation Section – 1977
Appointed by U.S. District Judge J. Foreman to a three-member panel of medical experts to advise on health conditions at Menard Correctional Center, Menard, Illinois – 1976

*AWARDS*

Armond Start Award for Excellence in Correctional Medicine, Society of Correctional Physicians – 1999

American Correctional Health Services Association Distinguished Service Award – 1992

*PUBLICATIONS*

Michael Puisis, editor, Ronald Shansky, associate editor, *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G., Shansky, R., chapter: "The Challenges of Improving Quality in the Correctional Health Care Setting," in *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G.; Shansky, R.; Kim, S., chapter: "Using Performance Improvement Measurement to Improve Chronic Disease Management in Prisons," in *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Anno, B.J., Graham, C., Lawrence, J., and Shansky, R. *Correctional Health Care – Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates.* National Institute of Corrections, 2004.

Schiff, G., Shansky, R., chapter: "Quality Improvement in the Correctional Setting," in *The Clinical Practice in Correctional Medicine,* 1998.

How-To Manual, *Quality Improvement in a Correctional System,* State of Georgia, Department of Corrections, 1995.

*Journal of Prison and Jail Health,* Editorial Board; 1988 – present.

Shansky, R., "Advances in HIV Treatment: Administrative, Professional and Fiscal Challenges in a Correctional Setting," *Journal of Prison and Jail Health,* Volume 9, Number 1.

B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System,* 1991; Member of Editorial Advisory Board.
Coe, J., Kwasnik, P., Shansky, R., chapter: "Health Promotion and Disease Prevention" in B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System,* 1991.

Hoffman, A.; Yough, W.; Bright-Asare, P.; Abcariam, H.; Shansky, R.; Fitzpatrick, J.; Lidlow, E.; Farber, M.; Summerville, J.; Petani, C.; Orsay, C.; Zal, D., "Early Detection of Bowel Cancer at an Urban Public Hospital: Demonstration Project," *Ca – A Cancer Journal for Clinicians,* American Cancer Society, Nov/Dec 1983, Vol. 33, No. 6.

Mehta, P.; Mamdani, B.; Shansky, R.; and Dunea, G., "Double Blind Study of Minoxidil and Hydralazine." Sixth International Conference of Nephrology, Florence, Italy – June 1975.

## PRISONS INSPECTED

State of Alabama Prisons at Kilby, Holman, Fountain, Tutweiller, Staton, and Draper
Parchman State Prison, Mississippi Jefferson County and Birmingham City Jails, Alabama
Arizona State Prison, Florence, Arizona
Washington County Jail, Fayetteville, Arkansas
California Medical Facility, Vacaville
California State Penitentiary, San Quentin
Colorado State Penitentiaries, Centennial, Fremont, Territorial
District of Columbia Jail at Occoquan
Florida Prison System
Florida County Jails, including Monroe County, Pasco County and Polk County
Krome Detention Facility (INS), Miami, Florida
Department of Juvenile Justice, State of Georgia
Georgia Diagnostic Center, Jackson, Georgia
Hawaii Prison System
Menard Correctional Center, Illinois
Rock Island County Jail, Rock Island, Illinois
Indiana State Penitentiary, Michigan City, Indiana
Indiana Reformatory, Pendleton, Indiana
Lake County Indiana Jail, Crown Point, Indiana
Maine State Prison, Thomaston, Maine
State Prison of Southern Michigan
New Hampshire State Penitentiary, Concord
New York City Jails
Sing Sing Penitentiary, New York
Ohio Women's Prison
State of Vermont Prison System
Walla Walla State Penitentiary, Washington
Wisconsin State Penitentiaries at Waupan, Fox Lake, Taycheedah and Dodge

## SURVEYED MEDICAL PROGRAMS

Federal Bureau of Prisons, approximately 20 facilities

## INTERNATIONAL INSPECTION

Israeli Prisons and Jails Housing Palestinian Detainees

ATTACHMENT B

# DOCUMENTS REVIEWED BY DR. SHANSKY

CDCR Weekly Population Report, as of Midnight, August 20, 2008

Plata Vacancy/Registry Report, May 2008

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at California Rehabilitation Center

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at the California Training Facility

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Mule Creek State Prison

California Prisoner Health Care Receivership Corporation, Operational Assessment for Access to Care at Avenal State Prison

NKSP Tracking Forms for D-Yard RN Line, dated August 18-22, 2008

NKSP MD/PCP Line, 2nd Watch, dated August 18-22, 2008

PVSP Offsite Aging Report, dated August 27, 2008

SOL Offsite Aging Report, dated August 28, 2008

HDSP Offsite Aging Report, dated August 29, 2008

NKSP Offsite Aging Report, dated August 25, 2008

PVSP Physician Appointment Statistics, August 2008

PVSP RN Appointment Statistics, August 2008

August 5, 2008 Newsletter from the Receiver

Receiver's Seventh Quarterly Report and Exhibits

Receiver's Eighth Quarterly Report and Exhibits

Report of Pablo Stewart, M.D., August 15, 2008

Various Logbooks maintained at inspected facilities and reviewed on-site