# EXHIBIT A

Gregg McLean Adam, No. 203436
Natalie Leonard, No. 236634
James W. Henderson, Jr., No. 071170
**CARROLL, BURDICK & McDONOUGH** LLP
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:     415.989.5900
Facsimile:     415.989.0932
Email:          gadam@cbmlaw.com
                jstoughton@cbmlaw.com


Daniel M. Lindsay, No. 142895
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS' ASSOCIATION**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634
Telephone:     916.372.6060
Facsimile:     916.372.9805
E-Mail:        dan.lindsay@ccpoa.org

Attorneys for Intervenor California Correctional Peace
Officers' Association

IN THE UNITED STATES DISTRICT COURTS

FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| MARCIANO PLATA, *et al.*,<br><br>        Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>        Defendants. | No. Civ C01-1351 TEH (N.D. Cal.) *and*<br><br>No. Civ S90-0520 LKK-JFM (E.D. Cal.)<br><br>**THREE-JUDGE COURT** |
| RALPH COLEMAN, *et al.*,<br><br>        Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>        Defendants. | **DIRECT TESTIMONY
DECLARATION OF ERIC ADELMAN**<br><br>**TRIAL DATE:  NOVEMBER 18, 2008** |

CBM-SAC\SA067516.3

-1-

1        I, Eric Adelman, state as follows:

2        1.    I am a correctional officer employed by the California Department of

3    Corrections and Rehabilitation ("CDCR") at the California Medical Facility ("CMF") in

4    Vacaville, California.  I have been employed as a correctional officer since 1993.  Based

5    upon my work as a correctional officer, I have personal knowledge of the matters stated

6    herein and, if called upon to do so, could and would testify competently to them.

7        2.    From 1993 to 1994, I worked as a correctional officer at San Quentin.  I

8    transferred to CMF in February of 1994 and have been there ever since.

9        3.    At CMF my first assignment was as a vacation relief officer.  As a

10   vacation relief officer, I would be scheduled to work as a correctional officer in various

11   positions at CMF replacing officers who were taking vacation or leave.

12       4.    My next position at CMF was as a visiting officer.  In this position, I

13   monitored inmates who were receiving visitors.

14       5.    My next position at CMF was a control room officer and after that I was

15   a search and escort officer in Unit 4.  Unit 4 consisted of general population inmates most

16   of whom were HIV positive.  As a search and escort officer, I had various duties including

17   searching inmates, escorting inmates to various places, and emergency responses.

18       6.    My next position was as a wing officer in one of the housing units.  In

19   that position, I was responsible for the safety and security of the wing, the counting and

20   feeding of inmates, releasing inmates to go to scheduled appointments, escorting inmates

21   to showers and other duties as needed.

22       7.    In my next position, I was again a control room officer and after that my

23   next position was as a relief officer for the Unit 2 facility, where I worked in various

24   positions.

25       8.    My next position was in the Administrative Segregation facility ("Ad-

26   Seg").  After that, I worked as a security officer for two construction projects at CMF.

27       9.    I next worked in Q Wing, a Department of Mental Health unit.  My duties

28   included escorting inmates in that Unit to meetings with doctors and psychiatrists,

CBM-SAC\SA067516.3                     -2-

**DIRECT TESTIMONY DECLARATION OF ERIC ADELMAN**

1  assisting in emergency responses and extracting inmates from cells when needed plus

2  other duties as required.

3      10.   Inmates in the Department of Mental Health Unit did not leave their Unit

4  for treatment.  Rather, their treatment was received within the Unit.

5      11.   Since February, 2008, I have been a health care access escort officer in

6  the Health Care Access Unit.

7      12.   The positions that I have identified above have enabled me to work in

8  various locations throughout CMF and on all watches.

9      13.   The Healthcare Access Unit where I currently work coordinates the

10  transporting of inmates to their medical appointments.  In this position, I escorted inmates

11  to the various health clinics in the CMF facility.

12      14.   As a healthcare access escort officer, I continue to have access to

13  virtually all of the housing units at CMF.  Based on my observations of these units, it is

14  my belief that some units are overcrowded.  Some inmates are confined to twelve-man

15  dormitories and that creates an overcrowded condition.  This results in me not being able

16  to see everybody when I come into the room due to the number of inmates and their

17  personal property crowding the area.  The crowded conditions also create more tension

18  and the potential for violence among the inmates.

19      15.   There have been occasions where I have escorted inmates for medical

20  appointments but they have not been seen due to the number of other inmates being seen

21  on that day.

22  //

23  //

24  //

25  //

26  //

27  //

28  //

CBM-SAC\SA067516.3

-3-

**DIRECT TESTIMONY DECLARATION OF ERIC ADELMAN**

16.    I have become aware that certain inmates have come down with infectious diseases including tuberculosis and methicillin-resistant Staphylococcus aureus ("MRSA") which I understand is a staph infection that is not responsive to antibiotics. Correctional officers such as myself are not told by the medical staff which, if any, of the inmates had infectious conditions nor, to my knowledge, are the inmates with infectious conditions isolated from either the inmate population or correctional staff.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed this 29 day of October, 2008 at _Davis_, California.

_____
ERIC ADELMAN

**DIRECT TESTIMONY DECLARATION OF ERIC ADELMAN**

# EXHIBIT B

Gregg McLean Adam, No. 203436
Natalie Leonard, No. 236634
James W. Henderson, Jr., No. 071170
**CARROLL, BURDICK & McDONOUGH** LLP
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:     415.989.5900
Facsimile:      415.989.0932
Email:          gadam@cbmlaw.com
                jstoughton@cbmlaw.com


Daniel M. Lindsay, No. 142895
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS' ASSOCIATION**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634
Telephone:     916.372.6060
Facsimile:      916.372.9805
E-Mail:         dan.lindsay@ccpoa.org

Attorneys for Intervenor California Correctional Peace
Officers' Association

IN THE UNITED STATES DISTRICT COURTS
FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| MARCIANO PLATA, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>        Defendants. | No. Civ C01-1351 TEH (N.D. Cal.) *and*<br><br>No. Civ S90-0520 LKK-JFM (E.D. Cal.)<br><br>**THREE-JUDGE COURT** |
| RALPH COLEMAN, *et al.*,<br><br>        Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>        Defendants. | **DIRECT TESTIMONY DECLARATION OF GARY BENSON**<br><br>**TRIAL DATE: NOVEMBER 18, 2008** |

1    I, Gary Benson, state as follows:

2        1.    I am a correctional officer employed by the California Department of

3    Corrections and Rehabilitation ("CDCR").  I commenced my employment with the CDCR

4    in 2002 at Pelican Bay State Prison.  Based upon my work as a correctional officer, I have

5    personal knowledge of the matters stated herein and, if called upon to do so, could and

6    would testify competently to them.

7        2.    In 2004, I transferred to Folsom State Prison ("FSP") where I have

8    continued to work as a correctional officer up to the present time.

9        3.    When I first started at FSP, I was assigned to Visiting.  I worked in

10   Visiting for three years and then was assigned to the Folsom Transitional Treatment

11   Facility ("FTTF") which is a drug rehabilitation program.  The FTTF was a housing unit

12   but it is not the same as a regular housing unit in FSP because it was a dorm rather than

13   cells.

14       4.    After working at the FTTF for approximately a year, I transferred to the

15   Treatment Triage Area ("TTA") clinic, which is the main clinic at FSP.  It is an urgent

16   care and emergency clinic that is open 24 hours a day.  My duties at the TTA clinic

17   include safety and security of the clinic.  During my shift, I typically am the only

18   correctional officer present at the clinic facility.  In connection with ensuring the security

19   of the area, I am responsible for observing the inmates that are there receiving treatment

20   and keeping watch over the narcotics and medical instruments that are contained in the

21   clinic.

22       5.    In addition to the positions indicated above, I have worked a substantial

23   amount of overtime since coming to FSP.  In the course of working that overtime, I have

24   handled most of the positions that are assigned to correctional officers on all of the shifts.

25   In certain of those positions, my duties have included escorting inmates who have been

26   injured or are going for medical treatment or psychiatric evaluation.

27

28

CBM-SAC\SA067517.2                                -2-

6. Based on my observations at FSP since arriving there in 2004, I believe that inmate overcrowding has had several detrimental impacts on the health of inmates and staff and the ability to provide medical care to the inmate population at FSP.

7. With respect to the TTA clinic, there are simply too many inmates for that clinic to function effectively. First, the waiting area for the clinic consists of a caged area of approximately 12 x 20 feet. On a daily basis they will have forty to fifty inmates packed into that waiting area and some of them can be there for several hours. When that area fills up, an additional eighteen to twenty inmates are allowed to stand in the hallway in front of the treatment area. I have had inmates come and tell me that they would rather go back to their cell than to be locked up in the cage for hours while waiting for medical treatment.

8. The treatment room of the clinic, where services are provided, is grossly inadequate for the inmates who need it. This room itself is small and actually can only accommodate two gurney-confined patients at a time. I recall one situation this past August in which two inmates confined to gurneys were already being treated in the clinic when a third inmate arrived on a gurney. Since there was no room to treat him, he was placed, bleeding, on a Stokes Litter in the hallway, where he was surrounded by approximately fifteen to twenty other inmates waiting for services.

9. The clinic itself is not limited to only two patients at a time and as many as six can be treated. However, this creates situations where there can be six patients, as many as three doctors, and five nurses all in this small room, as well as additional inmates seeking treatment. This puts a tremendous stress on my ability to do my job since I have to keep watch, not only on the inmates but the numerous locations where narcotics and surgical instruments are kept within that room.

10. In addition, because of overcrowding, there are inadequate facilities to provide treatment to inmates with contagious staph infections. During the time that I have been at FSP (and prior to that at Pelican Bay State Prison) there have been no facilities available to isolate inmates who had contagious staph infections.

11.    I have seen situations where inmates have come to the clinic with large infections that have burst and are bleeding.  These inmates are given antibiotics and then sent back to their housing units.  They are not isolated and remain in contact with other inmates as well as staff.  These inmates continue to use the same housing facilities as non-infected inmates including showers and toilets.

12.    I am aware of a specific type of staph infection known as methicillin-resistant Staphylococcus aureus, or as it is more commonly known, MRSA.  MRSA is a staph infection that has proven to be resistant to antibiotics and is highly contagious.  I have knowledge of this because I contracted MRSA while I was working at the FTTF facility in 2006.

13.    I believe that I contracted my MRSA from coming in contact with inmates in the FTTF who had the MRSA condition at that time.  I did not have contact with anyone else whom I knew or believed to have MRSA at that time, other than inmates.

14.    My MRSA condition was such that I was required to be hospitalized on two different occasions and underwent two surgical procedures.  At the time that I was hospitalized with MRSA, I was placed in an isolation room and a large sign was posted outside my door indicating that I had MRSA.  I have never seen any such procedures utilized for any inmates who had MRSA at FSP.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct and that this declaration was executed this 29 day of October, 2008 at _Sacramento_ California.

_Gary L Benson_

GARY BENSON

# EXHIBIT C

Gregg McLean Adam, No. 203436
Natalie Leonard, No. 236634
James W. Henderson, Jr., No. 071170
**CARROLL, BURDICK & McDONOUGH** LLP
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:    415.989.5900
Facsimile:    415.989.0932'
Email:        gadam@cbmlaw.com
              jstoughton@cbmlaw.com


Daniel M. Lindsay, No. 142895
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS' ASSOCIATION**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634
Telephone:    916.372.6060
Facsimile:    916.372.9805
E-Mail:       dan.lindsay@ccpoa.org

Attorneys for Intervenor California Correctional Peace
Officers' Association

IN THE UNITED STATES DISTRICT COURTS

FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| MARCIANO PLATA, *et al.*,<br><br>   Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>   Defendants. | No. Civ C01-1351 TEH (N.D. Cal.) *and*<br><br>No. Civ S90-0520 LKK-JFM (E.D. Cal.)<br><br>**THREE-JUDGE COURT** |
| RALPH COLEMAN, *et al.*,<br><br>   Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>   Defendants. | **DIRECT TESTIMONY DECLARATION OF BRENDA M. GIBBONS**<br><br>**TRIAL DATE: NOVEMBER 18, 2008** |

I, Brenda M. Gibbons, state as follows:

1.    I am currently employed as a correctional officer by the California Department of Corrections and Rehabilitation ("CDCR") at Salinas Valley State Prison ("SVSP"). I have been employed by CDCR as a correctional officer since 1994. Based upon my work as a correctional officer, I have personal knowledge of the matters stated herein and, if called upon to do so, could and would testify competently to them.

2.    As a correctional officer, I was first assigned to the Correctional Training Facility at Soledad ("CTF") from 1994 to 1996. During that time, I worked as a tower officer, a dorm officer and a search and escort officer.

3.    I transferred to SVSP in 1996 and have worked there continuously up to the present time. As a correctional officer, I have worked at SVSP in the following positions: tower officer, floor officer, kitchen officer, mental health officer and yard officer.

4.    Since 1998 or 1999, I have been assigned as a floor officer in Facility D Building 4 ("D-4"), Floor 1. I have also occasionally worked overtime in various other positions. I currently work the second shift (which runs from 6:00 a.m. to 2:00 p.m.) but I previously worked the night shift (10:00 p.m. to 6:00 a.m.) on Floor 1 of D-4.

5.    Floor 1 of D-4 houses mental health patients and specifically patients who are a part of the Enhanced Outpatient program ("EOP"). Inmates in this program are housed separately from the general population and are supposed to receive structured treatment activities and mental health services.

6.    Based on my observations, including my familiarity with the inmate population at SVSP since 1996, I believe that there is significant overcrowding of inmates at SVSP generally. This has had adverse consequences on the delivery of medical services to the EOP inmates in D-4. For example, I have observed shortages of emergency vehicles, correctional officer escorts to take inmates to receive medical treatment, holding cells and safety cells. I have also observed situations where prescribed medical equipment such as special pillows and mattresses for specific inmate medical

1    conditions were not available.  There is also a lack of specialized facilities for the inmates

2    in D- 4.  That Building has two cells that are designated as "ADA Cells" which are larger

3    and fitted to accommodate wheelchair bound inmates.  There have been occasions where

4    there have been more ADA EOP inmates than could be accommodated in these two cells.

5    On some occasions, such inmates have had to remain in the Ag-Seg Unit, which houses

6    general population inmates, until there is an available cell.  I have also witnessed

7    situations where a wheelchair bound inmate's status has been changed from DPW, which

8    means a wheelchair is required, to DPO or DPM which indicates only that the inmate has

9    a mobility impairment and does not require a wheelchair.  Such reclassified inmates have

10   been put into regular cells and the wheelchairs are left outside the cells.

11          7.    On Floor 1 of D-4, most of the cells house two inmates.  In my

12   observation, when there are two inmates to a cell, particularly in a mental health unit,

13   there is a higher potential for violence involving the inmates than if they are single-celled

14   (e.g. one inmate per cell).

15          8.    In addition, due to general overcrowding conditions at SVSP, there are

16   frequently delays in obtaining materials and services including food, laundry and medical

17   treatment.  For example, clean laundry is frequently unavailable for the inmates and I have

18   observed situations where inmates have done their own laundry either in the sinks used for

19   the service of food or in the toilets.  Based on my training and duties as a correctional

20   officer, such conduct presents a specific problem with respect to the spread of infectious

21   diseases in the institution because laundering in the sinks or toilets does not adequately

22   clean soiled laundry.

23          9.    With respect to canteen privileges, I have seen situations where the

24   inmates have had emotional outbursts when they learned that the canteen services had

25   been delayed or cancelled due to the inability of the canteen to accommodate all of the

26   inmates.  In addition, there are too many inmates housed Floor 1 of D- 4 for the staff

27   assigned, especially during the night watch (10:00 p.m. to 6:00 a.m.).  The fact that there

28   are too many inmates to be adequately monitored led to one self-help remedy of which I

CBM-SAC\SA067524.3                              -3-

1  observed involving an inmate who suffered from seizures. This inmate devised a warning

2  system in which he wore a helmet with a string attached to bottles in an adjacent cell. If

3  he had a seizure, the inmate in the adjacent cell could see or hear the bottles shake and

4  could then summon help.

5      10.  My reason for coming forward in this is to help make conditions better

6  for everyone including inmates and the correctional staff. However, I am concerned about

7  speaking up about the problems that I have observed in the delivery of medical care,

8  overcrowding or other related topics because I fear that the CDCR will retaliate against

9  me.

10      I declare under penalty of perjury under the laws of the United States of

11  America that the foregoing is true and correct and that this declaration was executed this

12  29 day of October, 2008 at SALINAS , California.

13

14  _____

15  BRENDA M. GIBBONS

16

17

18

19

20

21

22

23

24

25

26

27

28

# EXHIBIT D

1  Gregg McLean Adam, No. 203436
   Natalie Leonard, No. 236634
2  James W. Henderson, Jr., No. 071170
   **CARROLL, BURDICK & McDONOUGH** LLP
3  Attorneys at Law
   44 Montgomery Street, Suite 400
4  San Francisco, CA  94104
   Telephone:    415.989.5900
5  Facsimile:    415.989.0932
   Email:        gadam@cbmlaw.com
6                jstoughton@cbmlaw.com

7
   Daniel M. Lindsay, No. 142895
8  **CALIFORNIA CORRECTIONAL**
   **PEACE OFFICERS' ASSOCIATION**
9  755 Riverpoint Drive, Suite 200
   West Sacramento, CA 95605-1634
10 Telephone:    916.372.6060
   Facsimile:    916.372.9805
11 E-Mail:       dan.lindsay@ccpoa.org

12 Attorneys for Intervenor California Correctional Peace
   Officers' Association
13

14              IN THE UNITED STATES DISTRICT COURTS
       FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA
15     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
16

17 MARCIANO PLATA, *et al.*,                    No. Civ C01-1351 TEH (N.D. Cal.) *and*

18              Plaintiffs,                      No. Civ S90-0520 LKK-JFM (E.D. Cal.)

19     v.
                                                **THREE-JUDGE COURT**
20 ARNOLD SCHWARZENEGGER, *et al.*,

21              Defendants.

22 ─────────────────────────────                **DIRECT TESTIMONY**
                                                **DECLARATION OF RUBEN LEIJA,**
23 RALPH COLEMAN, *et al.*,                     **JR.**

24              Plaintiffs,

25     v.                                       **TRIAL DATE:  NOVEMBER 18, 2008**

26 ARNOLD SCHWARZENEGGER, *et al.*,

27              Defendants.

28

CBM-SAC\SA067521.1                        -1-

DIRECT TESTIMONY DECLARATION OF RUBEN LEIJA, JR.

1    I, Ruben Leija, Jr. state as follows:

2        1.    I am a correctional officer employed by the California Department of

3    Corrections and Rehabilitation ("CDCR") and currently work at the Chuckawalla Valley

4    State Prison ("CVSP"), one of the "desert institutions". I have been employed as a

5    correctional officer by the CDCR for twelve years. All of my employment as a

6    correctional officer has been at CVSP. Based upon my work as a correctional officer, I

7    have personal knowledge of the matters stated herein and, if called upon to do so, could

8    and would testify competently to them.

9        2.    As a correctional officer, I have worked in a variety of positions at CVSP

10    including yard officer and a housing unit officer. My current position is that of Housing

11    Unit Officer. In that capacity I have been assigned to Housing Unit D-10 ("D-10") since

12    December 2007. The D-10 Unit houses three hundred and forty inmates. Based on my

13    observations, this is more inmates than should be housed there. In D-10, as well as

14    Housing Unit C-8, where I have also worked, inmates are kept in cubicles with three

15    tiered bunks in rows that are only two to three feet away from one another. This living

16    arrangement creates safety concerns, as it is difficult to monitor the activities that are

17    going on in these units because of the number of bunks and inmates.

18        3.    In addition, for the three hundred and forty inmates in D-10, there are

19    approximately eight toilets, ten sinks and twelve shower heads. This limited number of

20    facilities has proven, from my observations, to be inadequate from the standpoint of

21    personal hygiene and health of the inmates. In addition, the inmates have to wait in line to

22    use these facilities creating tensions between the inmates and I have seen numerous fights

23    break out among inmates waiting in line to use these facilities. I have also observed that

24    there is also a sanitation problem as it is difficult for the porters to keep the toilets clean

25    given their heavy and constant use.

26        4.    In addition, I have observed outbreaks of a gastrointestinal ailment and

27    the flu among the inmates in the housing units where I have served. There are no means

28    available to isolate those inmates who first contract these illnesses and the illnesses

CBM-SAC\SA067521.1                                            -2-

DIRECT TESTIMONY DECLARATION OF RUBEN LEIJA, JR.

1  quickly spread to many of the other inmates within those units. This also creates

2  problems with the delivery of medical services to treat these aliments.

3      5.    In addition, I have had inmates advise me that they have been told they

4  have contagious staph infections. I have also seen these conditions first hand on certain of

5  the inmates. These inmates are not isolated from the other inmates but continue to shower

6  and interact with the rest of the inmate population in the Unit. I have also had situations

7  where inmates will come back from scheduled medical appointments upset and angry, and

8  they tell me that they were not seen by any medical personnel for their condition.

9      6.    The overcrowding also has the effect of discouraging some inmates from

10  seeking medical care even when it is available. Inmates are sometimes hesitant to report

11  infections to the doctor for fear that they will be shunned by the other inmates in their

12  Housing Unit. For example, I witnessed one inmate who, rather than seek medical care,

13  chose to have a friend scrape the staph infection on his back with a spoon each night. I

14  found out about this practice when the person doing the scraping got scared of what he

15  saw and brought the inmate to me to see his condition.

16      I declare under penalty of perjury under the laws of the United States of

17  America that the foregoing is true and correct and that this declaration was executed this

18  30 day of October, 2008 at Indio        , California.

19

20  _____
    RUBEN LEIJA, JR.

21

22

23

24

25

26

27

28

CBM-SAC\SA067521.1                          -3-

**DIRECT TESTIMONY DECLARATION OF RUBEN LEIJA, JR.**

# EXHIBIT E

Gregg McLean Adam, No. 203436
Natalie Leonard, No. 236634
James W. Henderson, Jr., No. 071170
**CARROLL, BURDICK & McDONOUGH** LLP
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone:    415.989.5900
Facsimile:    415.989.0932
Email:        gadam@cbmlaw.com
              jstoughton@cbmlaw.com


Daniel M. Lindsay, No. 142895
**CALIFORNIA CORRECTIONAL
PEACE OFFICERS' ASSOCIATION**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634
Telephone:    916.372.6060
Facsimile:    916.372.9805
E-Mail:       dan.lindsay@ccpoa.org

Attorneys for Intervenor California Correctional Peace
Officers' Association

IN THE UNITED STATES DISTRICT COURTS
FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| MARCIANO PLATA, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>Defendants. | No. Civ C01-1351 TEH (N.D. Cal.) *and*<br><br>No. Civ S90-0520 LKK-JFM (E.D. Cal.)<br><br>**THREE-JUDGE COURT** |
| RALPH COLEMAN, *et al.*,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, *et al.*,<br><br>Defendants. | **DIRECT TESTIMONY
DECLARATION OF KEVIN
RAYMOND**<br><br>**TRIAL DATE: NOVEMBER 18, 2008** |

1        I, Kevin Raymond, state as follows:

2        1.    I am currently employed as a correctional officer by the California

3    Department of Corrections and Rehabilitation ("CDCR") and have been so employed

4    since September 1990.  Based upon my work as a correctional officer, I have personal

5    knowledge of the matters stated herein and, if called upon to do so, could and would

6    testify competently to them.

7        2.    I began my career as a correctional officer at Folsom State Prison

8    ("FSP") as a permanent intermittent employee ("PIE").  As a PIE, I was assigned to

9    different positions and different shifts at FSP and California State Prison, Sacramento. .

10        3.    In December 1991, I transferred to the Northern California Women's

11    Facility ("NCWF") in Stockton, California, where I worked until March 2003.  My first

12    post there was a PIE position.  Then my time base changed to permanent full-time and I

13    became a vacation relief officer and later a holiday relief officer.  Next, in approximately

14    1993, I became a search and escort officer.  My duties in that position included escorting

15    inmates to and from medical appointments inside and outside the prison.

16        4.    My next position at NCWF was a post in the prison kitchen.  Thereafter, I

17    was assigned to Visiting and finally was a yard officer until NCWF closed in 2003.

18        5.    Thereafter, from March 2003 to October 2006, I was formally assigned as

19    a correctional officer to FSP, but I actually performed a series of assignments for the

20    California Correctional Peace Officers' Association ("CCPOA"), the exclusive bargaining

21    agent for California State Bargaining Unit 6, that involved negotiations with the CDCR.

22    One of these activities involved touring the State with two CDCR lieutenants to update

23    each correctional institution regarding changes in the formula for funding correctional

24    officer custody staff at those facilities.  During these assignments I continued to be paid as

25    a correctional officer by the CDCR.

26        6.    After that, in October 2006, I remained assigned to FSP as a correctional

27    officer but from that point up to the present, I am on detached duty to the CDCR Office of

28    Facilities Management ("OFM").  I have been on detached duty to the OFM for the past

CBM-SAC\SA067556.2                               -2-

1    two years, with the exception of two months in the summer of 2007, when I was doing an

2    assignment for the CCPOA.

3         7.    In my current position at the OFM, I serve as a liaison between the rank

4    and file correctional officers and the OFM with regard to the construction of new

5    correctional facilities and the staffing of those facilities. By new correctional facilities, I

6    mean those facilities that are being built outside the walls of any existing institutions.

7    This can, in some situations, involve the building of an additional housing facility that is

8    actually immediately adjacent to an existing facility and is intended to be a part of that

9    facility, but is physically outside of the walls of the existing facility.

10        8.    Because of my position at OFM, I am familiar with the procedures

11   utilized by the CDCR to determine the amount of staff to be allocated to both existing and

12   new correctional facilities.

13        9.    The national standard established for designating correctional staff for

14   facilities was one correctional officer for every sixty four inmates based on design

15   capacity. However, the design capacity was based on one inmate per cell. When the

16   number of inmates per cell increases or other areas have converted into housing units, the

17   ratio of inmates to correctional officers will increase. The prisons do have other methods

18   for obtaining additional correctional staff when the inmate population increases beyond

19   design capacity. For one thing, there are packages known as overcrowding packages

20   which provide funds for the hiring of additional correctional staff to deal with

21   overcrowding conditions; note that some institutions use some of these positions to

22   address not only overcrowding, but also other needs within the facility, which should

23   actually be addressed in the base staffing package. In addition, at some prisons,

24   management will utilize general funds to provide for non-budgeted staffing needs. In

25   theory, these positions are intended to be temporary and such needs should be included as

26   permanent positions in the next fiscal year budget. However, in reality many of these

27   temporary positions are carried over as non-budgeted positions into the next fiscal year.

28   //

CBM-SAC\SA067556.2

-3-

**DIRECT TESTIMONY DECLARATION OF KEVIN RAYMOND**

1        10.   It should also be noted that with respect to new facilities, CDCR proposes

2    custody staffing levels related to medical care, but these suggestions may or may not

3    match the recommendations of the Healthcare Receiver; I am not aware of any procedure

4    to share the proposed custody staffing packages with the Receiver for comment.

5        I declare under penalty of perjury under the laws of the United States of

6    America that the foregoing is true and correct and that this declaration was executed this

7    $29^{nd}$ day of October, 2008 at _SACRAMENTO_ California.

8

9    KEVIN RAYMOND

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CBM-SAC\SA067556.2

-4-

**DIRECT TESTIMONY DECLARATION OF KEVIN RAYMOND**

# EXHIBIT F

1    Gregg McLean Adam, No. 203436
     Natalie Leonard, No. 236634
2    James W. Henderson, Jr., No. 071170
     **CARROLL, BURDICK & McDONOUGH** LLP
3    Attorneys at Law
     44 Montgomery Street, Suite 400
4    San Francisco, CA  94104
     Telephone:    415.989.5900
5    Facsimile:    415.989.0932
     Email:        gadam@cbmlaw.com
6                  jstoughton@cbmlaw.com

7
     Daniel M. Lindsay, No. 142895
8    **CALIFORNIA CORRECTIONAL
     PEACE OFFICERS' ASSOCIATION**
9    755 Riverpoint Drive, Suite 200
     West Sacramento, CA 95605-1634
10   Telephone:    916.372.6060
     Facsimile:    916.372.9805
11   E-Mail:       dan.lindsay@ccpoa.org

12   Attorneys for Intervenor California Correctional Peace
     Officers' Association
13

14                  IN THE UNITED STATES DISTRICT COURTS
            FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA
15          UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
               PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
16

17   MARCIANO PLATA, *et al.*,

18              Plaintiffs,              No. Civ C01-1351 TEH (N.D. Cal.) *and*

19        v.                            No. Civ S90-0520 LKK-JFM (E.D. Cal.)

20   ARNOLD SCHWARZENEGGER, *et al.*,   <u>**THREE-JUDGE COURT**</u>

21              Defendants.

22   _____        **DIRECT TESTIMONY
                                         DECLARATION OF DEBBRA
23   RALPH COLEMAN, *et al.*,           ROWLETT**

24              Plaintiffs,

25        v.                            **TRIAL DATE: NOVEMBER 18, 2008**

26   ARNOLD SCHWARZENEGGER, *et al.*,

27              Defendants.

28

CBM-SAC\SA067515.2                       -1-

DIRECT TESTIMONY DECLARATION OF DEBBRA ROWLETT

1    I, Debbra Rowlett, state as follows:

2    1.    I am currently employed as a correctional officer by the California

3    Department of Corrections and Rehabilitation ("CDCR").  Based upon my work as a

4    correctional officer and a Medical Technical Assistant ("MTA") for CDCR, I have

5    personal knowledge of the matters stated herein and, if called upon to do so, could and

6    would testify competently to them.

7    2.    I received a nursing credential from Sierra College.  I am a licensed

8    vocational nurse ("LVN") and have been licensed as an LVN by the State of California

9    for over twelve (12) years.

10    3.    In the mid to late 1990s I was employed as a LVN at Sutter Auburn Faith

11    Hospital, Sutter Memorial Hospital, Bi-Valley Medical Clinic and Sutter General

12    Hospital.

13    4.    In 1998 I was hired by CDCR.  My first assignment was as an MTA at

14    the California Medical Facility ("CMF") in Vacaville.  In my first position, I was assigned

15    to an area called "G-1" and worked the first watch (10:00 p.m. to 6:00 a.m.)

16    5.    I next worked at CMF as a medication nurse, dispensing medications to

17    inmates at various units.

18    6.    My next position, also at CMF, was as an MTA in a specialty clinic

19    where outside doctors specializing in specific areas of medicine such as gastroenterology,

20    optometry, ophthalmology and cardiology would come in to see patients.

21    7.    I then transferred to the California State Prison at Solano ("CSP Solano").

22    My first position there was as a vacation relief nurse where I filled in for other LVNs who

23    were on vacation.  I later took a position as an MTA for the specialty clinic where my

24    duties were similar to those performed at the specialty clinic at CMF.  I started at CSP

25    Solano in 2000.

26    9.    I worked in the specialty clinic until I changed my position to

27    correctional officer in June 2007.  I have continued to work at CSP Solano as a

28    correctional officer up to the present time.  My first position as a correctional officer was

CBM-SAC\SA067515.2                                    -2-

1   as a holiday relief position. After three months I was then assigned to an overcrowding

2   staff position. Overcrowding staff positions are positions created because of the

3   overcrowding within the institutions. In the overcrowding position, I worked in Buildings

4   21, 22 and 23.

5           10.   Buildings 21, 22 and 23 are dorm living areas and contain no cells. My

6   duties as an overcrowding officer included observing the breakfast line and distribution of

7   lunch to inmates. I have also worked the yard and have gone on hospital runs. Also

8   included in my duties was searching the inmates' living areas and patting down inmates.

9           11.   I worked in Buildings 21, 22 and 23 for approximately four to five

10  months and then transferred as a correctional officer to the specialty clinic at CSP Solano

11  in February 2008. I am still assigned to the specialty clinic as a correctional officer,

12  although I am currently on medical leave. My duties in the specialty clinic include

13  ensuring inmates make their appointments and providing security for the area.

14          12.   There are numerous conditions at CSP Solano that I have observed and

15  that I feel have created significant problems relating to the health of the inmates and the

16  delivery of such care, and I believe these are due, at least in part, to the overcrowding of

17  the inmates incarcerated in that facility.

18          13.   For one thing, the living conditions in the dorms are unsanitary and

19  unhealthy. Due to the overcrowding, one of the gyms at CSP Solano is currently being

20  used as a temporary dormitory and I have worked there. The bunks in the gym are three

21  beds high which negatively affects my ability to observe the inmates who are residing in

22  the gym. In addition, each inmate has only six cubic feet of space for personal

23  possessions and no additional space is provided for any medical supplies that an inmate

24  may require.

25          14.   Because of the large numbers of inmates living in the gym, the

26  ventilation system does not function sufficiently and the outside doors are kept open

27  during good weather to allow in additional air. However, this has also resulted in birds

28  flying into the gym. These birds tend to congregate at the ceiling and they peck away at

CBM-SAC\SA067515.2                              -3-

1    the ceiling materials causing pieces of those materials to come down into the areas where

2    the inmates and staff are located and where they eat their meals. In addition, the birds

3    defecate while in the building.

4        15.    Another problem with the gym is that there are an inadequate number of

5    toilets for the number of inmates housed there. The toilets are in constant use and it is

6    difficult to keep them clean. Further, due to the delays in the laundry service, inmates are

7    given buckets in which to clean their clothes. Sometimes several inmates will share the

8    same bucket for cleaning clothes. This situation creates the potential for the transmission

9    of communicable diseases through the common use of such buckets.

10       16.    The overcrowding also has created problems in the delivery of medical

11    care to the inmates. The number of inmates who are receiving drugs and medications has

12    increased significantly from when I first started working at CDCR. The number of

13    inmates currently receiving medications precludes staff from following through to verify

14    that inmates are in fact taking the medications that has been prescribed to them. Although

15    our job training dictates that we do so, there simply isn't enough time to watch and make

16    sure that each inmate consumes the medication that is provided to him. There have been

17    several occasions where I have found pills in the ground in the prison yard which

18    indicates to me that some inmates are not taking the medications that have been prescribed

19    to them.

20       17.    I have also observed that overcrowding has adversely impacted other

21    aspects of medical care provided to inmates. While I was both an MTA and a correctional

22    officer, I observed many situations where inmates with scheduled appointments were not

23    able to be seen by healthcare practitioners due to the volume of inmates requiring medical

24    services. I have had situations where inmates have come up to me and stated that they had

25    put in a request for a medical appointment days before and had still not received an

26    appointment, but that it was no longer necessary as their symptoms were no longer

27    present. I have also seen several situations where inmates have received initial treatment

28    for a condition but then there have been a substantial delays in setting up and conducting

1  follow-up treatment.  There have also been situations where I have seen delays of two to

2  three days for inmates either receiving new prescribed medications or renewals of

3  medications.

4      18.    The waiting room at the clinic was frequently overcrowded with inmates

5  and was usually in a filthy condition.  The one bathroom for the waiting room was only

6  cleaned once a day.  The ventilation in that area is also inadequate given the large

7  numbers of inmates present.  The medical staff has conducted examinations and treatment

8  in the same room where the secretary who schedules appointments works, due to the lack

9  of other available space.

10      I declare under penalty of perjury under the laws of the United States of

11  America that the foregoing is true and correct and that this declaration was executed this

12  30th day of October, 2008 at Vacaville, California.

13

14  _____
    DEBBRA ROWLETT

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CBM-SAC\SA067515.2                          -5-

**DIRECT TESTIMONY DECLARATION OF DEBBRA ROWLETT**