PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS** |

OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................................. 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 4

    A.    *Coleman* Special Master Report on Desert Institutions Documenting the Impact of the CDCR Overcrowding ................................ 4

    B.    Staffing Vacancies at Desert Institutions ........................................................ 7

    C.    Special Master's Report on CDCR Suicides Filed September 12, 2008 ................................................................................................................ 8

II.    LEGAL ARGUMENT ........................................................................................ 11

    A.    Evidence Regarding Level of Compliance with Constitutionally Adequate Mental Health Care At The Five Desert Prisons Has Probative Value Which Is Not Substantially Outweighed By Any Speculative Danger of Unfair Prejudice, Confusion of the Issues, or Considerations of Undue Delay, Waste of Time or Needless Presentation of Cumulative Evidence ........................................... 11

CONCLUSION ................................................................................................................... 13

-i-

NO. C01-1351 TEHOPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Daubert v. Merrell Dow Pharmaceuticals*, Inc.,
   509 U.S. 579 (1993) ............................................................................................................. 11

*Obrey v. Johnson*,
   400 F.3d 691 (9th Cir. 2005) ............................................................................................... 12

*Schultz v. Butcher*,
   24 F.3d 626 (4th Cir. 1993) ................................................................................................. 12

*White v. Ford Motor Co.*,
   500 F.3d 963 (9th Cir. 2007) ............................................................................................... 12

**Rules**

Fed. R. Evid. 401, Adv. Committee Notes .............................................................................. 11

Fed. R. Evid. 403 ............................................................................................................... 11, 12

Rule 403 .................................................................................................................................. 12

-ii-
NO. C01-1351 TEHOPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

# INTRODUCTION

Plaintiffs oppose defendants' motion for an in limine order "to exclude any and all evidence, reference to evidence, testimony, or argument of alleged noncompliance at five institutions within the California Department of Corrections and Rehabilitation for the purpose of showing that overcrowding is the primary cause of the alleged unconstitutional inadequacies in the delivery of medical or mental health in California's prisons." *Coleman* Docket 3087 at 2.

Defendants make no showing whatsoever in support of their argument that evidence of unconstitutional deficiencies in *medical* care at these five desert prisons should be excluded for any reason and therefore the motion in limine must be denied as to *Plata* medical care issues and evidence about overcrowding and deficiencies at these five desert prisons will be part of the trial in any event.

While defendants do make an argument in support of their motion in limine to exclude evidence of mental health care deficiencies at the five desert prisons, the motion should be denied as to this evidence too. The CDCR is a complex, extremely overcrowded, 33-prison system characterized by rapid transfers, mission changes and ongoing emergencies. Overcrowding overwhelms the ability of the CDCR to appropriately screen, classify and transfer inmates in need of specialized mental health care. The evidence concerning defendants' inability to comply with existing *Coleman* court orders to exclude *Coleman* class members from the five desert prisons due to the extreme danger from heat is both relevant and probative.

More than seven years after the Court ordered defendants to exclude *Coleman* class members from these desert prisons, a steady flow of prisoners continue to be transferred to these prisons from reception centers throughout the CDCR. Nor have defendants complied with the court orders to promptly transfer class members away from these desert prisons to mental health programs once they are identified. The results have included unnecessary deaths and suffering including three recent suicides at the desert prisons discussed in the most recent Special Master Report on Suicides [Docket 3030].

-1-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

1    CDCR is a vast prison system which covers the entire state of California from the
2    Oregon border to the Mexican border, with 33 prisons operating at more than 190 percent
3    capacity. In such an overcrowded and dispersed system, the ability to appropriately screen
4    prisoners entering the reception centers, and then classify, endorse and transfer them to
5    appropriate institutions is a Herculean challenge. The ability of the desert institutions to
6    rapidly transfer those prisoners who they have inappropriately received, or who become
7    *Coleman* class members, or who decompensate and require a mental health crisis bed
8    ("MHCB"), is particularly germane to the key questions facing this Court --- is overcrowding a
9    primary cause of the CDCR's inability to provide constitutionally adequate mental health care.

10    In their motion regarding the five desert institutions — California Correctional Center
11    (CCC), Calipatria State Prison (CAL), Centinela State Prison (CEN), Chuckawalla Valley
12    State Prison (CVSP) and Ironwood State Prison (ISP) — defendants argue that any reference to
13    evidence, testimony, or argument concerning non-compliance with *Coleman* court orders is
14    improper and unduly prejudicial because these prisons have small *Coleman* populations;
15    because of their desert locations and heat risks, *Coleman* class members are excluded from
16    these locations. Docket 3087 at 2-3.

17    Defendants base their motion to exclude evidence regarding the delivery of mental
18    health services at the desert institutions upon the "small and temporary" size of the *Coleman*
19    class. *Id* at 4. They provide no evidence to establish that this *Coleman* sub-class housed in the
20    desert institutions is in fact "temporary." Their motion ignores the impact of the system-wide
21    overcrowding on CDCR's ability to transfer appropriate (non-*Coleman*) prisoners to the desert
22    institutions, to screen and identify prisoners with mental health needs at the desert institutions,
23    to provide the necessary treatment while *Coleman* class members wait for transfer to a prison
24    with mental health treatment, and to transfer *Coleman* class members within the required
25    timeframes. Docket 1262, *Coleman* Court Order dated 4/4/01 (adopting the transfer timelines).

26    The *Coleman* Special Master has measured constitutionally adequate mental health care
27    by CDCR's capability to correctly screen prisoners in the reception centers and transfer
28    mentally ill prisoners to institutions with mental health programs, by the ability of desert

-2-
[249408-1]

institutions to transfer mentally ill prisoners to prisons with mental health programs and to MHCBs, and by the ability of prisons to provide care to those mentally ill prisoners who must wait for appropriate clinical transfers. Clearly, the ability to transfer mentally ill prisoners to appropriate prisons and levels of care will be impacted by the availability of mental health beds system-wide.[1] It is not insignificant, that these five desert institutions, which defendants seek to exclude from trial evidence, are also seriously overcrowded, including one operating at a startling 221% of design capacity.[2] In addition, as discussed below, the *Coleman* Special Master has reported that these overcrowded desert institutions routinely receive mentally ill prisoners inappropriately transferred from reception centers and other prisons, and are routinely unable to transfer prisoners requiring MHCB level of care in a timely manner. All of this evidence is relevant and probative to the critical questions facing this Court: whether overcrowding is the primary cause of the constitutional violations in the delivery of mental health care.

Defendants' attempt to restrict the introduction of any evidence at trial regarding these five desert institutions because of the size of their *Coleman* populations has no basis in law and should be denied. In fact, this evidence is clearly "relevant evidence" under the Federal Rules

---

[1] The desert prisons are required by Court order and the *Coleman* Program Guide to transfer identified *Coleman* class members to prisons with Enhanced Outpatient (EOP) programs, Correctional Clinical Case Management System (CCCMS) programs and Mental Health Crisis Beds (MHCB) within specific timelines. EOPs must be transferred within 21 days if inappropriately transferred, or within 60 days of referral or 30 days of referral if clinically indicated. CCCMS must be transferred within 30 days if inappropriately transferred, or within 90 days of referral or 60 days of referral if clinically indicated. Any prisoner referral to an MHCB shall be transferred within 24 hours of referral. Declaration of Jane E. Kahn in Support of Plaintiffs' Opposition to Defendants' Motions in Limine Nos. 3, 10-12 and 14-16, Plaintiffs' Opposition to Defendants' Motion to File Exhibit JJ Under Seal, and Plaintiffs' Motion to Strike ("Kahn Decl."), **Exhibit A** (Program Guide Overview, 12-1-13). Note: The September 2006 version of the *Coleman* Program Guide is the newest version.

[2] All five of the desert institutions were operating well over design capacity on October 15, 2008. CCC was at 147.6%, CAL was at 185.8%, CEN was at 221.7%, CVSP was at 178.9%, and ISP was at 192.9%. Kahn Dec, **Exhibit B** (Weekly CDCR Population Data for October 15, 2008).

-3-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

of Evidence, Rule 401.

## FACTUAL AND PROCEDURAL BACKGROUND

A.  *Coleman* Special Master Report on Desert Institutions Documenting the Impact of the CDCR Overcrowding

As a result of the tragic deaths of three seriously mentally ill prisoners on psychotropic medications from heat stroke, the *Coleman* Court ordered defendants to develop an implement a heat emergency plan that required tracking and special housing of *Coleman* class members on psychotropic medications and special procedures for heat emergencies to reduce the risk of additional unnecessary deaths.  These procedures are in place at all CDCR prisons.  Due to the extreme temperatures that are common in the California desert, a decision was made to exclude *Coleman* class members from these prisons completely rather than attempting to comply with the requirements of the heat injunction in those conditions.  In addition, defendants had great difficulty in recruiting and retaining mental health clinicians to work at these prisons.  The exclusion order was the "solution" to both of these problems.  *Coleman* Court Order, filed 4/4/01 ¶ 4 [Docket 1262].

To comply with these orders, CDCR reception centers are prohibited from transferring *Coleman* class members to these five desert prisons.  In recognition of defendants' inability to appropriately screen all incoming prisoners in reception, and the fact that prisoners who were initially properly housed at these institutions will from time to time become ill and require mental health care, the *Coleman* Program Guide also has transfer timelines for the removal of *Coleman* class members from these desert prisons.  Docket 1753 at 12-1-13; 12-3-13.

The Special Master has regularly monitored the five desert institutions, as well as the other 28 CDCR institutions, and has reported on their compliance with *Coleman* Program Guide requirements.  Twentieth Monitoring Report of the Special Master on the Defendants' Compliance with Provisionally Approved Plans, Policies and Protocols, Part A, ("Special Master's 20th Report") Docket 3029-7, 3029-8 at 286-306.  In this most recent monitoring report to the Court, the *Coleman* Special Master made specific findings regarding the impact of CDCR overcrowding on the ability of the desert institutions to transfer prisoners requiring a

-4-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

Mental Health Crisis Bed[3]:

> Desert prisons, like most other CDCR prisons, did not have adequate access to MHCBs. Nearly half of the OHU admissions at CEN lasted longer than 72 hours, and two-thirds of these excessive stays were related to delayed access to MHCBs. CAL rescinded nine of 21 MHCB referrals because beds were not immediately available, and eight of 12 transfers to an MHCB took one to two weeks. ISP reported that 80 percent of transfers to an MHCB were untimely.

Special Master's 20th Report, Docket 3029-9 at 354.

The dangers of housing mentally ill prisoners at the desert institutions, because of the extreme temperatures, has resulted in careful monitoring by the *Coleman* Special Master of the numbers and source of inappropriate transfers of mentally ill prisoners to desert institutions, and of the time that it takes to transfer these prisoners to a mental health program. Conditions at Ironwood State Prison were so inadequate, that the Special Master was unable to even trust the data he was provided by the prison: "Due to vacancies among clerical staff, tracking data relevant to EOP and 3CMS transfers were incomplete and unreliable. The flawed data indicated that ISP treated approximately 122 3CMS during the reporting period, at least 45 of whom were housed in administrative segregation." Special Master's 20th Report, Docket 3029-7 at 288.

The *Coleman* Special Master noted that defendants, seven years after a Court order prohibiting them from doing so, continued to transfer mentally ill prisoners to the desert institutions from the reception centers. Such inappropriate transfers implicate poor screening and/or classification errors by overwhelmed reception center staff:

> CAL received 22 3CMS inmates and four EOP inmates that were inappropriately transferred from RCs. Staff reported that a large proportion of the inappropriate transfers came from the RJD. Only

---

[3] None of the five desert institutions have licensed MHCBs. If a patient is admitted to an OHU for suicide watch or suicide precaution, that patient must be transferred to an MHCB within 24 hours. *Coleman* Program Guide, Docket 1753 at 12-10-12.

> half of the inmates inappropriately transferred to CAL were returned to MHSDS programs within required timeframes (*i.e.*, 21 days for EOP inmates and 30 days for 3CMS inmates). The institution took two weeks to identify two inappropriately transferred 3CMS inmates, raising concerns about the reliability of the bus screening process.

Special Master's 20th Report, Docket 3029-7 at 294.

At CVSP, the Special Master reported that "[i]nappropriate transfers to CVSP continued to account for about half of its MHSDS population." Docket 3029-8 at 303. In fact, "63 3CMS inmates were inappropriately transferred to CVSP, the majority of whom were from CIM, NKSP, DVI, RJD and WSP." *Id* at 305.

However, there were also "home-grown" mentally ill prisoners at the desert prisons. A "home-grown" *Coleman* class member refers to a prisoner that was not previously identified as mentally ill before his transfer to a desert prison. The *Coleman* Special Master found that the number of "home-grown" class members had recently increased dramatically at one of the desert institutions:

> [t]he number of EOP inmates treated at CEN during the reporting period increased six fold to 24. Twenty-three of these inmates were placed at that level of care while at the institution. It was unclear why the number of EOP referrals grew dramatically during the reporting period.

Special Master's 20th Report, Docket 3029-7 at 300.

The desert prisons — CAL, CEN, ISP, CVSP and CCC — although clearly designated as prisons where mentally ill prisoners should not be transferred and retained, continued to receive inappropriately transferred *Coleman* class members from many of the reception centers during the 20th round of monitoring. Inadequate reception center screening, classification errors, or, perhaps, the only empty seat on the bus, resulted in continuing inappropriate transfers of mentally ill prisoners to the desert institutions. In addition, the number of "home-grown" *Coleman* class members at these prisons has continued to increase.

There is nothing de minimis or irrelevant about these ongoing violations of *Coleman* Court orders and policies designed to protect the life and safety of *Coleman* class members

from the risks associated with housing in the dangerous environment where these prisons are located.

### B. Staffing Vacancies at Desert Institutions

Although the *Coleman* Program Guide prohibits the placement of mentally ill prisoners at the desert institutions, there is a small mental health staff allocated to each of these institutions to cover the basic mental health requirements for all prisoners that are specified in the *Coleman* Program Guide[4] and to provide services to those *Coleman* class members who are housed there temporarily.

Similar to many of the CDCR institutions, the desert institutions have also experienced difficulty hiring mental health clinicians. There remote locations make recruiting and retention of mental health care clinicians a special challenge. In August 2008, CDCR reported the following mental health staffing vacancy data for the five desert institutions:

| | | | | |
|---|---|---|---|---|
| CAL: | 22.5 Positions Established | 17.5 Filled | 5 Vacant | 23.91% vacancy rate |
| CCC: | 11.7 Positions Established | 7.5 Filled | 4.25 Vacant | 31.5% vacancy rate |
| CEN: | 22.7 Positions Established | 15 Filled | 7.7 Vacant | 19.09% vacancy rate |
| CVSP: | 17 Positions Established | 14.5 Filled | 2.5 Vacant | 14.1 vacancy rate |
| ISP: | 24.7 Positions Established | 14 Filled | 10.76 Vacant | 24.27% vacancy rate |

Kahn Dec., **Exhibit C** (Enclosure 2, CDCR DCHCS, Mental Health Institution Vacancies by Institution, by Classification as of August 2008)

At some of the desert institutions which are allocated skeletal clinical positions, vacancies can

---

[4] OHU assessments by clinical staff including a treatment team assessment and suicide risk assessment; psychiatric technician screening and rounding requirements for all prisoners housed in administrative segregation unit; weekly case manager meeting with all mentally ill prisoners housed in administrative segregation; a 31 question initial screening of all prisoners upon arrival at the prison and referral to a mental health clinician for further evaluation if warranted; suicide risk assessments and five day clinical follow-ups for all prisoners admitted to an OHU or an MHCB for suicide observation. Docket 1753 at Chapter 2: Reception Center Processing; Chapter 3: CCCMS at 12-3-5 to 12-3-6, 12-3-11 to 12-3-13; Chapter 5: Mental Health Crisis Bed; Chapter 7: Administrative Segregation Care; and Chapter 10: Suicide Prevention and Response.

1 result in a prison operating with no psychiatry staffing.  For example, at CCC and ISP, all of
2 the allocated psychiatry positions were vacant in August 2008.  *Id.*

3       The staffing vacancy rates among the mental health staff allocated to the desert
4 institutions, coupled with the persistent pattern of inappropriate transfers of mentally ill
5 prisoners to these desert institutions, is relevant and probative evidence for this Court to
6 consider in its evaluation of whether overcrowding is the primary cause of the constitutional
7 violations in mental health care.

8       **C.    Special Master's Report on CDCR Suicides Filed September 12, 2008**

9       The *Coleman* Special Master monitors suicides at all of the prisons, including the desert
10 institutions.  In his most recent suicide report, filed 9/12/08, there is a discussion of three
11 suicides that occurred in the desert institutions.  Docket 3030.  Each of these disturbing
12 suicides indicated a lack of compliance with the *Coleman* Program Guide and *Coleman*
13 Suicide Prevention standards.

14       The first suicide occurred at ISP.  Docket 3030-3 at 18.  The prisoner, a 25-year old
15 Hispanic male, committed suicide by hanging in his administrative segregation unit.  He was
16 not on the mental health caseload.  It was noted in the CDCR Suicide Report that this prisoner
17 had been assaulted on the yard, and had reported to his counselor significant safety concerns.
18 Just prior to his death, the prisoner's neighbor reported to the correctional officer that he had
19 been seen crying in his cell and the information was passed on to a psychiatric technician.  The
20 psychiatric technician saw the prisoner at his cell door, and then had him taken to a room
21 where an officer translated for her.  He was returned to his cell and was seen the next day by
22 the psychiatric technician, but she did not complete a suicide risk assessment before returning
23 him to his housing unit.  This violated *Coleman* Program Guide standards.  Docket 3030-3 at
24 22.  The prisoner was discovered at approximately 7:03 p.m. that evening by a correctional
25 officer who was walking a tier in the administrative segregation unit and observed him hanging
26 from the top bunk in cell.  Docket 3030-3 at 19.  The Special Master found that this suicide
27 may well have been preventable, based:

28

-8-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

> [O]n the grossly inadequate emergency response by both custody and medical staff. The failure of custody staff to initiate CPR promptly and to engage in a cell extraction and other security measures, rather than cutting the inmate down and starting CPR, was inexcusable. Further, the very long delay in removing the noose from the inmate's neck (approximately 27 minutes) very likely made any efforts at CPR inadequate as the inmate was not receiving proper ventilation. Thirdly, the correctional officer's refusal to assist in CPR when medical staff were tiring is another gross failure on the part of custody staff. Lastly, the failure of medical staff to know how to effective [sic] utilize the AED, which based on several indications to shock the inmate implies that the inmate may have been salvageable with proper emergency procedures, is a significant deviation from medical practice and the standard of care.

Docket 3030-3 at 22-23.

The second suicide occurred at CVSP. Docket 3030-3 at 48. The prisoner, a 26-year old Hispanic male, committed suicide by hanging in the administrative segregation unit. He was at the CCCMS level of care and had been placed on the mental health caseload on May 12, 2006. According to the CDCR Suicide Report, the temperature inside the prisoner's cell was 120 degrees. The CDCR Suicide Report identified a number of policy violations in administrative segregation including: the inmate was not housed appropriately for heat medications; he was reportedly not offered yard for more than seven weeks; and he was single-celled even though he requested a cellmate. In discussing this suicide, the Special Master noted that the records provided for review were:

> [A]mong the worst that this reviewer had ever seen within the CDCR because it was incomplete. The progress notes consisted of a stamped "site visit" and the clinician's signature, with no details of the inmate's actual mental status, symptoms, etc., with the exception of a note by the CMO in which he referred to a report by a psych tech, but the CMO appeared not to have personally evaluated the inmate. This review concluded that the suicide report was silent on this abysmal documentation, which made it virtually impossible to have any retrospective review of the status of the inmate during the course of his treatment by mental health staff. This was not only a failure at the facility level, but a failure at the DCHCS level to allow such documentation to exist without there

-9-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

being corrective actions, including possible referrals to the PPEC regarding the specific clinicians.

Docket 3030-4 at 5.

Finally, the Special Master's Report concludes that this inmate should have been referred to an MHCB bed for crisis care on an emergency basis based on the acuity of his mental illness:

> "[a]lthough the policy on transfers from desert institutions to mental health treatment institutions requires transfer within 90 days or expedited transfer within 60 days, there is no prohibition by policy against emergency referral of inmates who are acutely mentally ill to an appropriate higher level of care. However, the failure to refer this inmate for crisis care is, in my opinion, another factor that makes this death very possibly preventable." Docket 3030-4 at 5.

The third suicide occurred at CEN. Docket 3030-6 at 11. The prisoner, a 31-year old Hispanic male, committed suicide by laceration in a general population housing unit. He was not on the mental health caseload although a review of his file showed a history of mental health care within the CDCR. He had previously been classified as both EOP and CCCMS, and had prior MHCB admissions for suicidality. The Special Master's Report notes that: "He appears to have been placed in the MHSDS at the EOP level of care, subsequently removed (in 3/05) and "cleared" at CEN in 2/06. While policies do not appear to have been followed [for his removals from levels of care], he neither sought nor appeared to require mental health services after his initial period of confinement." Docket 3030-6 at 13-14. If Program Guide standards had been followed, this man would have remained on the caseload and would have been housed away from the danger of the desert prisons where his suicide might have been prevented.

The *Coleman* Special Master monitors suicide prevention as part of the regular monitoring process. During the 20th round of monitoring he observed that the desert institutions were able to implement some, but not all of the CDCR Suicide Prevention Plan. For example, at ISP the *Coleman* Special Master found that a "large proportion of non-

MHSDS inmates placed in administrative segregation were not properly screened … No cells in administrative segregation had been retrofitted for intake … Logs used to record the completion of thirty-minute welfare checks contained sporadic misses, some as long as two to four hours." Special Master's 20th Report, Docket 3029-7 at 287.  At CAL the *Coleman* Special Master found that "[w]elfare checks were poorly implemented." *Id* at 292.  At CEN, the *Coleman* Special Master reported that: "[c]ompliance with completion of SRACs [suicide risk assessment checklist] upon admission to the OHU declined during the reporting period." *Id* at 298.  Regardless of the size of the *Coleman* population at each prison, the CDCR Suicide Prevention Plan must be implemented fully.  The *Coleman* suicide prevention policies provide services such as screening and prompt mental health attention for all prisoners in CDCR, not just *Coleman* class members.  The failure of the desert prisons to comply with these policies is relevant to the issues before this Court.

## II. LEGAL ARGUMENT

### A. Evidence Regarding Level of Compliance with Constitutionally Adequate Mental Health Care At The Five Desert Prisons Has Probative Value Which Is Not Substantially Outweighed By Any Speculative Danger of Unfair Prejudice, Confusion of the Issues, or Considerations of Undue Delay, Waste of Time or Needless Presentation of Cumulative Evidence

To be relevant, evidence need only have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." *Daubert v. Merrell Dow Pharmaceuticals*, Inc., 509 U.S. 579, 587 (1993).  This is a liberal standard.  *Id*.  The evidence does not need to prove an ultimate fact; it can be merely a step in proving some fact that itself is an ultimate, intermediate or evidentiary fact.  Fed. R. Evid. 401, Adv. Committee Notes.

Relevant evidence may be excluded if its "probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed. R. Evid. 403.  In a bench trial, however, the concerns about unfair prejudice, confusion of the issues, or misleading the jury are lessened, as the court can be expected to "hear relevant evidence, weigh its probative value and reject any improper inferences."

1   *Schultz v. Butcher*, 24 F.3d 626, 632 (4th Cir. 1993). Exclusion of evidence under Rule 403
2   should be done through "case-by-case determinations, requiring examination of the
3   surrounding facts, circumstances, and issues." *Obrey v. Johnson*, 400 F.3d 691, 698 (9th Cir.
4   2005).

5         Evidence that risks unfair prejudice is evidence that "suggest decision on an improper
6   basis." *White v. Ford Motor Co.*, 500 F.3d 963, 977 (9th Cir. 2007). Where evidence is
7   probative and a proper factor in a fact-finder's analysis, "any "prejudice" experienced [from
8   the admission of the evidence is] not "unfair" as that term is used in Rule 403." *Id*.

9         Similarly, the only delay considered under Rule 403 is "undue delay." Fed. R. Evid.
10  403. Evidence should be excluded only if it "clearly involve[s] delay that [is] "undue" or a
11  "waste of time." *Obrey*, 400 F.3d at 691.

12        The evidence defendants seek to exclude in their motion in limine — any and all
13  evidence, reference to evidence, testimony, or argument of alleged noncompliance at the five
14  desert institutions within CDCR for the purpose of showing that overcrowding is the primary
15  cause of the alleged unconstitutional inadequacies in the delivery of medical and mental health
16  care — is relevant and probative to the key issues facing the Court. The probative value of this
17  evidence substantially outweighs any unexplained danger of unfair prejudice, confusion of the
18  issues or an undue delay or waste of time. In fact, defendants do not explain what evidence
19  they deem to be prejudicial or confusing and only object to the introduction of this evidence
20  due to the size of the *Coleman* class at the desert institutions.

21        In fact, however, evidence regarding the ability of the desert institutions to comply with
22  the specific Court orders and *Coleman* Program Guide requirements that apply to these five
23  institutions provides an important and unique lens through which to view the impact of
24  overcrowding on the *Coleman* class.

25        Rick Johnson, Chief of the Health Care Placement Oversight Program (HC-POP),
26  confirms that the desert institutions' "extreme heat conditions put mentally ill inmates on
27  certain psychotropic medications at risk for adverse health risks." Declaration of Rick Johnson
28  in Support of Defendants' Motion in Limine Number 11, Docket 3088 ¶ 6. His office, which

-12-
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NUMBER 11 TO EXCLUDE ANY EVIDENCE OF ALLEGED NON-COMPLIANCE AT DESERT INSTITUTIONS, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249408-1]

is tasked with transferring *Coleman* class members to appropriate beds, also reviews weekly reports on the transfer of *Coleman*-caseload prisoners from these five desert institutions to institutions with available mental health beds appropriate for their care. *Id.* ¶ 8. However, Mr. Johnson fails to explain why *Coleman* class members have been inappropriately transferred to desert institutions from reception centers despite *Coleman* Program Guide prohibitions against such transfers. Clearly the ability of CDCR to manage its reception center processing to ensure that vulnerable *Coleman* class members are not erroneously transferred to dangerous environments is relevant, probative evidence for this Court to consider at trial.

## CONCLUSION

The Court should deny defendants' motion for an in limine order to exclude evidence of noncompliance at the five desert institutions for the purpose of showing that overcrowding is the primary cause of the on-going constitutional violations in the delivery of medical and mental health care within CDCR. Defendants have failed to show that the probative value of this evidence is substantially outweighed by the danger of unfair prejudice and is improper. This evidence of noncompliance at the five desert institutions is relevant and probative evidence which will assist the Court in making its determination whether overcrowding within CDCR is the primary cause of the system-wide constitutional violations in mental health and medical care.

Dated: October 30, 2008

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

By: */s/ Jane E. Kahn*
    Jane E. Kahn
    Attorney for *Coleman* Plaintiffs and on
    Behalf of *Plata* Plaintiffs