PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br>  Plaintiffs, <br><br>  v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>  Defendants. | No. Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br>  Plaintiffs, <br><br>  v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br>  Defendants. | No. C 01-1351 TEH <br> **THREE-JUDGE COURT** <br><br> **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN** |

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

# TABLE OF CONTENTS

**Page**

INTRODUCTION ............................................................................................................... 1

ARGUMENT ...................................................................................................................... 2

    I.    Dr. Gilligan Is Extremely Well Qualified To Provide Expert Testimony Regarding The Relationships Between Mental Illness And Violence In Criminal Justice Involved Populations .................................................. 3

    II.    Dr. Gilligan Employed Sound Methodology In Reaching His Conclusions. .............................................................................................. 5

        A.    Dr. Gilligan's Conclusion That A Prisoner Release Order That Includes An Incremental Decrease In Length Of Stay And/Or Diversion Of Mentally Ill Offenders Would Not Harm Public Safety, But Could Improve It, Is Based On Sound Science. ........................ 5

        B.    Dr. Gilligan's Conclusion That California Has A Framework In Place Which Can Be Used To Improve Public Safety By Diverting Or Releasing Mentally Ill Offenders In A Manner That Ends The Current Harmful Cycle Of Frequent Short-Term Incarceration Has A Sound Basis In The Facts. ........................................... 6

    III.    Dr. Stewart Has Extensive Experience in Community Mental Health, as Well as Jail and Prison Settings, Rendering Him Highly Qualified to Opine About the Public Safety Consequences of Diversion or Other Population Reduction Measures ............................................................................... 8

    IV.    Dr. Stewart's Conclusions that Population Reduction Measures Must Include *Coleman* Class Members, that Class Members Can Be Included without Jeopardizing Public Safety and that Public Safety Would Actually Improve with Enhanced Services Are Based on Sound Science and Experience ............................................................................... 10

CONCLUSION ................................................................................................................. 11

-i-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

# TABLE OF AUTHORITIES

**Page**

**Cases**

*Kumho Tire Co. v. Carmichael*,
    526 U.S. 137 (1999) .................................................................................................... 2

*Martin v. Fleissner GmbH*,
    741 F.2d 61 (4th Cir. 1984) ......................................................................................... 7

*United States v. Cavely,*
    318 F.3d 987 (10th Cir. 2003) ..................................................................................... 7

**Rules**

Fed. R. Evid. 702 ................................................................................................................ 2

-ii-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

# INTRODUCTION

Defendants have brought a frivolous motion *in limine* asking the Court to exclude expert testimony that can assist the Court in its statutory duty to "give substantial weight to any adverse impact on public safety" when fashioning relief in this case. Plaintiffs offer the expert opinions of psychiatrist Dr. James Gilligan, an internationally-known authority on violence prevention and mental illness, and psychiatrist Dr. Pablo Stewart, who has over 23 years of experience in community mental health, including service to mentally ill persons with co-occurring substance abuse and criminal-justice involved populations. Defendants cannot seriously dispute the qualifications of these experts, or the solid grounding of their opinions in scientifically sound research, decades of experience, and extensive examination of the facts regarding California corrections and community mental health. Defendants can only stitch together a few out-of-context deposition snippets, including pointless memory tests and candid admissions by the experts that they did not learn the details of every aspect of the California public mental health system.

In addition, regarding Dr. Gilligan, Defendants' motion *in limine* number 12 is fraught with the same myopic rejection of expertise from outside of California that has greatly contributed to the severe dysfunction of California's correctional and parole systems and to the resulting overcrowding crisis.[1] Dr. Gilligan is precisely the type of internationally respected expert on violence reduction that California should be heeding to end the cycle of criminalization of the mentally ill, a cycle that its own proffered mental health expert has characterized as "tragic."[2] Instead, Defendants launch this pointless attack, saying that because Dr. Gilligan has not walked through a parole outpatient clinic, his four decades of study and experience on violence reduction among mentally ill offenders can have no application to

---

[1] *See* Little Hoover Commission, Solving California's Corrections Crisis, Time Is Running Out, at pages 11, 13.

California.[3]  This is an absurd contention, which the Court should reject.

## ARGUMENT

Dr. Gilligan and Dr. Stewart's testimony will enable this Court to consider decades' worth of experience, both practical and academic, regarding a key issue this Court must decide: What are the public safety consequences, if any, of prison population reduction measures? When "scientific, technical or other specialized experience will assist the trier of fact to understand evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify" as long as the testimony is based on sufficient facts or data, is the product of "reliable principles and methods" and the witness has appropriately applied those principles and methods to the facts of the case.  Fed. R. Evid. 702.  Moreover, any one type of knowledge is sufficient to permit expert testimony, whether it be scientific, technical, or based on specialized experience:  "Nothing in this amendment is intended to suggest that experience alone—or experience in conjunction with other knowledge, skill, training or education—may not provide sufficient foundation for expert testimony."  Fed. R. Evid. 702 advisory committee's note; *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156 (1999) ("no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience.").

Here, Dr. Stewart and Dr. Gilligan are forensic psychiatrists, academic professors, and nationally-recognized experts with direct and pertinent experiences, over the course of many years, that form the bases of their opinions.  They are qualified to provide opinions, have fully supported those opinions, and offer essential expertise to the trier of fact.

---

[2] Declaration of Jane E. Kahn in Support of Plaintiffs' Oppositions to Defendants' Motions *in Limine* Nos. 3, 10-12, 14-16, Exhibit L at 10 (Expert Report of Gail Bataille, MSW, Aug. 15, 2008).

[3] Defendants also overlook Dr. Gilligan's very extensive experience with mentally ill offender projects in California, described in more detail below.

**I.  Dr. Gilligan Is Extremely Well Qualified To Provide Expert Testimony Regarding The Relationships Between Mental Illness And Violence In Criminal Justice Involved Populations**

Defendants cannot reasonably dispute Dr. Gilligan's expertise gained in over 40 years of experience in the treatment of criminal-justice involved persons with mental illness, the establishment and operation of a statewide psychiatric prison hospital system, the authorship of leading publications and studies on violence reduction, and his experience in numerous initiatives aimed at reducing violence among persons with mental illness in the criminal justice system, including major projects in California involving large county jail systems and the former California Department of Corrections.  *See* Expert Report of James Gilligan, M.D., Aug. 15, 2008, Exhibit Q to the Declaration of Paul Mello, Docket No. 3118, at ¶¶ 1-15.

Contrary to Defendants' assertions, Dr. Gilligan has extensive experience in California that is directly relevant to issue on which he offers opinion in this case.  From 1997 to 2004, Dr. Gilligan worked with the San Francisco County Sheriff to design and evaluate the Resolve to the Stop the Violence Program (RSVP), a project aimed at reducing recurrences of violence among persons with histories of serious, recent and often multiple violent crimes.  Dr. Gilligan has published peer-reviewed research on this California-based program.  *See* James Gilligan and Bandy Lee, "The Resolve to Stop the Violence Project: Reducing Violence In The Community Through a Jail-Based Initiative," Journal of Public Health, Vol. 27, No. 2 (Oxford University Press, April 2005), at pages 143-148; Bandy Lee and James Gilligan, The Resolve to Stop the Violence Project: Transforming an In-House Culture of Violence Through a Jail-Based Programme," Journal of Public Health, Vol. 27, No. 2 (Oxford University Press, April 2005), at pages 149-155.  The RSVP program that Dr. Gilligan helped to establish has been expanded to at least one CDCR prison.  Kahn. Decl., Ex. M at 36:25-37-25 (9/19/08 Deposition of Dr. James Gilligan).

In 1999 and 2000, Dr. Gilligan served as a consultant to a member of the California state senate on violence prevention in California prisons, resulting in the publication of a *Violence in California Prisons: A Proposal for Research into Patterns and Cures.  Coleman* Docket 3118, Ex. Q at 5 (Mello Decl.)  In performing this work for the California State

-3-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

1  Legislature, Dr. Gilligan had contact with many corrections officials, including the head of the
2  department. Kahn. Decl., Ex. M at 35:7-13. In addition, Dr. Gilligan has been called into the
3  Los Angeles County Jail as a consultant during a recent period of riots and unrest in the jail
4  system. *Id.* at 36:5-13.

5  Both in and beyond California, Dr. Gilligan has devoted his entire career to working
6  with mentally ill offenders. Dr. Gilligan's psychiatric residency beginning in 1967 was in
7  prison psychiatry, including service as a supervisor for psychiatric residents in a prison mental
8  health program. Kahn. Decl., Ex. M at 26:4-9. In 1977, Dr. Gilligan established the
9  Massachusetts state prison mental hospital at Bridgewater State Hospital under the direction of
10 the United States District Court. *Id.* at 25:18-27:9; *Coleman* Docket 3118, Ex. Q at ¶¶ 5-8
11 (Mello Decl.). Dr. Gilligan's responsibilities at Bridgewater State Hospital included oversight
12 of pre-release planning for severely mentally ill prisoners. Kahn. Decl., Ex. M at 31:12-25.

13 Dr. Gilligan has been sought out as an expert consultant on violence reduction by
14 municipal, state, and national governments, including, among others, the Boston Police
15 Department in 1992 as part of a complex strategy to reduce community violence, the New
16 York City Corrections Department to address needs for in-patient psychiatric care at Rikers
17 Island jail, the British Parliament on crime reduction strategies, including the relationships
18 between mental illness and crime, the prosecutorial staff of the World Court in the Hague, the
19 World Health Organization's Department of Injuries and Violence Prevention, the World
20 Economic Forum in Geneva, the National Prison Rape Elimination Commission, the National
21 Commission on Safety and Abuse in American Prisons, the New York Correctional
22 Association. In addition, Dr. Gilligan is a past president of the International Association for
23 Forensic Psychotherapy. *Coleman* Docket 3118 Ex. Q at 3-6 (Mello Decl.).

24 Dr. Gilligan is clearly qualified to assist this Court regarding any possible adverse
25 impact on public safety that would result from any incremental release or diversion of
26 prisoners with mental illness.

27
28

-4-
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS.
STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

II. **Dr. Gilligan Employed Sound Methodology In Reaching His Conclusions.**

　　A. **Dr. Gilligan's Conclusion That A Prisoner Release Order That Includes An Incremental Decrease In Length Of Stay And/Or Diversion Of Mentally Ill Offenders Would Not Harm Public Safety, But Could Improve It, Is Based On Sound Science.**

Contrary to Defendants' arguments, there is nothing "subjective" or "unsupported" about Dr. Gilligan's opinions regarding the relative risks posed by releases or diversions of mentally ill prisoners compared to non-mentally ill prisoners. Dr. Gilligan based this conclusion on peer reviewed scientific research that is so widely accepted in the field that even Defendants' proffered experts have endorsed it:

> Dr. James Gilligan provides extensive comment on the characteristics of mentally ill prisoners, what is known and generally accepted in the literature about the prevalence and predictors of violence among individuals with mental illness in comparison with the prevalence and predictors and of violence in the general population. Dr. Gilligan poses the question: (paragraphs 34 ff.) Are mentally ill offenders (MIO's) as a group more dangerous than non-MIO offenders? He cites a research study (unpublished manuscript) of California parolees (#36) that concludes mentally ill offenders are no more likely than non-mentally ill offenders to commit violent crimes after release from prison. He further cites and discusses a meta-analysis (Bonta and Hanson, 1998,) that finds persons with severe mental illness were neither "more nor less likely than the non-mentally ill to re-offend" and that individuals with certain serious psychiatric disorders including schizophrenia and major depression are actually less likely to re-offend with only a modest increased risk of violence among paroled mentally ill offenders that is related to other risk factors including past violence.
>
> In my career as a County Mental Health Director, I have had extensive experience in locating and implementing mental health services in community settings. I have often had to confront public fear and distortions regarding the violence potential of individuals with mental illness and I have made many of the same arguments and cited much of the same research that Dr. Gilligan references.

Kahn Decl., Ex. N at 1-2 (Rebuttal Report of Gale Bataille, MSW, 8/27/08); *see also* Kahn Decl., Ex. O at 271:16-272:23 (Bataille Deposition).

Nor is there anything "subjective" or "unsupported" about Dr. Gilligan's opinion that public safety would be improved if corrections and parole stopped "churning" mentally ill

-5-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

offenders through short-term technical parole revocations that interrupt treatment and community adjustment. Dr. Gilligan grounded this opinion in part on the research that CDCR itself has commissioned from its consultant Dr. Joan Petersilia, among others, on the harmful effects of "churning" parolees in and out of the community on frequent short-term violations. *See Coleman* Docket 3118, Ex. Q at 11-18 and authorities cited therein (Mello Decl.).

### B. Dr. Gilligan's Conclusion That California Has A Framework In Place Which Can Be Used To Improve Public Safety By Diverting Or Releasing Mentally Ill Offenders In A Manner That Ends The Current Harmful Cycle Of Frequent Short-Term Incarceration Has A Sound Basis In The Facts.

Defendants cherry pick some deposition excerpts in which Dr. Gilligan admits that he does not know the names of certain California statutes, and does not know every detail of the California public mental health system. These vignettes cannot overcome the enormous factual record reviewed by Dr. Gilligan and presented in his report as the basis for his conclusion that California has a basic framework in place to improve public safety outcomes by ending the current "churning" of the mentally ill in and out of state prisons. Every assertion of fact regarding the California parole and mental health system in Dr. Gilligan's two reports is supported by the state's own documentation of its programs. *See Coleman* Docket 3118, Ex. Q at 29-35 (Mello Decl.); *Id.,* Ex. R at 13-15 (Rebuttal Report of James Gilligan MD, 8/27/08). Dr. Gilligan's extensive review of the state's own documentation of its parole and community mental health resources in light of his tremendous experience and knowledge in the field of violence prevention among mentally ill offenders represents a sound methodology with which to reach the conclusions that Dr. Gilligan has reached—that certain elements can improve public safety outcomes compared to the status quo, and that a framework for these elements is already in place. Defendants' motion appears to suggest that instead of reviewing this mountain of data regarding the statewide system, Dr. Gilligan should have just taken a walking tour of a parole outpatient clinic. The Court should reject this argument, and admit Dr. Gilligan's testimony.

There is no need to detain the Court for long with Defendants' cherry-picked deposition excerpts. That Dr. Gilligan could not pass a memory test on the 50-states' idiosyncratic names

-6-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

1  for civil commitment statutes does not disqualify him as an expert on community mental
2  health. Moreover, Defendants misstate the testimony by asserting that "Dr. Gilligan was not
3  aware of the Lanterman-Petris-Short Act." *Coleman* Docket 3091 at 3-4 (MIL No. 12). The
4  question-and-answer they cite shows he was quite aware that California, like nearly every other
5  state, has a civil commitment statute. Moreover, in this testimony he was suggesting that
6  California actually start using its civil commitment statute, instead of releasing persons in crisis
7  right from prison isolation units directly to the streets. That defense counsel saw this critically
8  important testimony as a chance to test Dr. Gilligan's memory on obscure statutory names says
9  nothing about Dr. Gilligan's qualifications. Kahn Decl., Ex. M at 44:5-46:9; 186:14-187:7
10  (Deposition of Dr. Gilligan).

11  Defendants similarly make a hash of Dr. Gilligan's testimony when they assert that "he
12  had no familiarity with the availability of mental health services within the State of
13  California." *Coleman* Docket 3091 at 3:14-15 (MIL No. 12). The cited deposition testimony
14  (Gilligan Depo. 11:22-24, 25:14-15), says nothing of the kind, but merely contains answers to
15  questions about Dr. Gilligan's work in New York and Massachusetts. Defendants completely
16  distort the context of their quote of Dr. Gilligan saying that he does not "know California in
17  that much detail" at page 3, line 19 of their Motion *in Limine*. The full question and answer
18  show that defense counsel was quizzing Dr. Gilligan on details of which of California's 58
19  counties received "a higher level of parolees" than other counties. Kahn Decl., Ex. M at 79:15-
20  25. An expert does not need to know the county-by-county details to reach sound conclusions
21  regarding a statewide system of care. *See Martin v. Fleissner GmbH*, 741 F.2d 61, 64 (4th Cir.
22  1984) (holding that an expert knowledgeable about a particular subject need not be precisely
23  informed about all of the details of the issues raised in order to offer an admissible opinion).

24  Defendants' attack on Dr. Gilligan's assumption that the California mental health
25  system includes mental health hospitals, mental health clinics, and mental health centers is
26  similarly unavailing. There is nothing wrong with an expert witness basing an opinion partly
27  on assumptions. *United States v. Cavely,* 318 F.3d 987, 997 (10th Cir. 2003). Defendants do
28  not state that these assumptions are wrong; they do not deny that California has mental health

-7-

[249337-1]

hospitals, mental health clinics, and mental health centers. If Defendants have a basis to challenge Dr. Gilligan's assumptions in this area—and they assert none in their motion *in limine*—that is the purpose of cross-examination. *Id.* Dr. Gilligan's opinions regarding the size and capacity of the overall statewide mental health system in comparison to the relatively small number of persons with severe mental illness who would be included in a prisoner release order was supported at every stage by hard facts drawn right from the state's own documents and studies. *Coleman* Docket 3118, Ex. Q at 26-35 (Mello Decl.); *Id.,* Ex. R at 12-15. Neither the presence of certain well-founded assumptions, nor any other ground asserted by Defendants, merits exclusion of any part of Dr. Gilligan's testimony.

### III. Dr. Stewart Has Extensive Experience in Community Mental Health, as Well as Jail and Prison Settings, Rendering Him Highly Qualified to Opine About the Public Safety Consequences of Diversion or Other Population Reduction Measures

Dr. Stewart's experience and opinions are similarly unassailable. Defendants' claim that Dr. Stewart is "unfamiliar with the community mental health care system in California" is absurd. Since the mid-1980s, Dr. Stewart has worked extensively in community mental health settings in California, including as follows:

- Dr. Stewart was a physician specialist for Mission Mental Health Crisis Center in San Francisco, providing clinical services to crisis care patients.

- Dr. Stewart was a psychiatrist consultant for Marin Alternative Treatment (ACT), providing evaluation and treatment services to residential drug and alcohol clients.

- Dr. Stewart was a physician specialist at Westside Crisis Center in San Francisco, where he provided clinical psychiatric consultations and was responsible for crisis operations.

- Dr. Stewart was the Senior Attending Psychiatrist in the Forensic Unit at the University of California, San Francisco General Hospital, where he operated a 12-bed, maximum security psychiatric ward.

- Dr. Stewart was the Director of Forensic Psychiatric Services for the City and County of San Francisco, which included the jail population as well as patients housed in the forensic unit at San Francisco General Hospital.

- Dr. Stewart was a Psychiatrist in the Substance Abuse Inpatient Unit at the Veteran Affairs Medical Center [in San Francisco], where he had clinical responsibilities for all admitted patients.

- Dr. Stewart served as the Chief of the Substance Abuse Inpatient Unit at the Veteran Affairs Medical Center.

-8-

PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

- Dr. Stewart was the Medical Director of the "Comprehensive Homeless Center" of the Department of Veterans Affairs Medical Center.
- Dr. Stewart was the Director of Clinical Services at the San Francisco Target Cities Project, which had a Central Intake Unit, the ACCESS Project and the San Francisco Drug Court.

*Coleman* Docket 3063 (pages 93-113) at Appendix A (Dr. Stewart's Curriculum Vitae, which was also an exhibit to his deposition). Dr. Stewart also emphasized his extensive experience during his first deposition in the case: "When I left the County Hospital I took a lateral move to the Veterans Hospital…And that was in September of 1990…I continued to be the primary care physician for my patients at the Veterans Hospital up until I left there in November 1996." Kahn Decl., Ex. T at 22:10-18 (12/11/07 Deposition). He also explained his work at the Haight Ashbury Clinic: "During my second year of my psychiatric residency I started working at the Haight Ashbury Free Medical Clinic in San Francisco and I stayed there until February of 2006…There are several sections of the clinic…I was working in the drug rehabilitation and – Drug Detoxification and Rehabilitation Center, commonly referred to as Detox. And we were licensed by the State as an outpatient drug and alcohol, and I believe we were also a primary health clinic for the City." *Id.* at 22:25-23:21. Dr. Stewart also explained that he was the "psychiatric consultant for the San Francisco drug courts" during which time he "would often have drug court clients who were incarcerated." *Id.* at 24:21-24. He explained his relationship with a Department of Mental Health (DMH) hospital: "I had a very long relationship with Napa State Hospital where I was a consultant for them for a number of years...they contracted through the Haight Ashbury Free Clinic for us to provide free training to the staff at Napa State Hospital…I would go there once a month, maybe once every two months and provide training and consult on particularly difficult patients." *Id.* at 41:5-14.

Dr. Stewart also has extensive experience in jail and prison settings, where he has treated the full spectrum of clients with mental illness ranging from those who need low-level medication monitoring to acutely psychotic or suicidal patients. He worked for several years as a liaison with jail psychiatric services for the City and County of San Francisco and later became the Director of Forensic Psychiatric Services, which also included direct clinical and

-9-
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

administrative responsibility for the jail. He also specializes in diagnosis, treatment, and care programs for persons with Major Depressive Disorder and Post-Traumatic Stress Disorder (PTSD), in the management of patients with dual diagnoses, and has studied the history of psychotropic medications in institutionalized populations. Since 1996, Dr. Stewart has served as a psychiatric expert or consultant to various federal courts, state correctional agencies and the U.S. Department of Justice. *Coleman* Docket 3118-6, Ex. U at ¶¶ 3-12 (Mello Decl.) Between 1990 and 2000, he served as a medical and psychiatric expert for the Court-appointed Mediator, Allen Breed, in *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636, a case concerning California Medical Facility (CMF), and previously worked as a psychiatric expert for the Special Master in the *Madrid v. Gomez* case, N.D. Cal. Case No. CIV 90-3094 a case concerning Pelican Bay State Prison (PBSP). His experience also extends beyond California—he has worked in various capacities for the juvenile detention and treatment facilities operated by the State of Georgia, for the State of New Mexico Corrections Department (NMCD), and as a consultant with the U.S. Department of Justice for California and Michigan juvenile facilities. *Coleman* Docket 3063, Appendix A (CV).

### IV. Dr. Stewart's Conclusions that Population Reduction Measures Must Include *Coleman* Class Members, that Class Members Can Be Included without Jeopardizing Public Safety and that Public Safety Would Actually Improve with Enhanced Services Are Based on Sound Science and Experience.

Dr. Stewart lays out well-reasoned, factually accurate, and scientifically supported opinions regarding the public safety risks of population reduction measures. He explains the very small population of *Coleman* class members that would require intensive psychiatric services in the community, a number that approximates those who require such care behind prison walls (noting that EOP class members make up only 3 percent of the total prison population and that class members in DMH inpatient settings equal less than 0.5 percent). *Coleman* Docket 3063 at ¶ 134 (8/15/08 Report of Dr. Pablo Stewart). He also explains in some detail the programs that already exist in the communities, including city and county hospitals and clinics, private contractors, parole office clinics, non-profits and the Veterans Administration. *Id.* at ¶ 135. While he notes that existing programs can appropriately absorb

-10-
PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION IN LIMINE NO. 12 REGARDING EVIDENCE FROM PLAINTIFFS' EXPERTS DRS. STEWART AND GILLIGAN, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[249337-1]

the targeted populations that might be subject to population reduction measures, those programs are "currently underfunded and would benefit from a significant increase in their resources." Indeed, according to Dr. Stewart, "California needs to do a much better job with community mental health programs and improvements in those programs would benefit society as a whole in many ways." *Id.* at ¶135. Moreover, Dr. Stewart agrees with many of the conclusions that defendants' own Regional Parole Administrators advocate, including evidence-based practices that are proven to reduce recidivism. They advocate integrated medical, psychiatric, psychological and chemical dependency services, for instance, as well as the availability of social workers and therapists for parolees, the provision of case management services, and the provision of a continuum of care between prison and parole. *Id.* at ¶ 136. Dr. Stewart has studied co-occurring chemical dependency and mental health issues, has published articles on the topic, and has been a provider and supervisor of case management services throughout his career. He is eminently qualified to opine about the success of these programs, therefore, and the improvements to public safety that would result if Defendants implemented them.

## CONCLUSION

For all of the reasons stated above, plaintiffs respectfully request that this Court deny Defendants' motion in limine to exclude Dr. Stewart's and Dr. Gilligan's testimony and evidence regarding the public safety consequences of prison population reduction measures. Both Dr. Stewart and Dr. Gilligan are nationally-recognized experts that bring years of clinical, community, and academic experience to this case, including on the key issue of public safety. Their testimony should be admitted.

Dated: October 30, 2008

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

*/s/ Ernest Galvan*
Ernest Galvan
Attorneys for *Coleman* Plaintiffs and on behalf of the *Plata* Plaintiffs