1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile: (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12              UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14          AND THE NORTHERN DISTRICT OF CALIFORNIA

15      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

18  RALPH COLEMAN, et al.,               No. 2:90-cv-00520 LKK JFM P

19              Plaintiffs,              **THREE-JUDGE COURT**

20      v.

    ARNOLD SCHWARZENEGGER, et al.,
21
                Defendants.

22  MARCIANO PLATA, et al.,              No. C01-1351 TEH

23              Plaintiffs,              **THREE-JUDGE COURT**

24      v.                               **TRIAL AFFIDAVIT OF ROBIN
                                         DEZEMBER**
25  ARNOLD SCHWARZENEGGER, et al.,
                                         **To: Three-Judge Panel**
26              Defendants.

27

28

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

I, Robin Dezember, declare:

1.      I am employed by the California Department of Corrections and Rehabilitation in the position of Chief Deputy Secretary of Health Care Services within the Division of Correctional Health Care Services. I offer this written testimony on the delivery of mental health care services within the California Department of Corrections and Rehabilitation in light of the Plaintiffs' request for a prisoner release order to address the alleged overcrowding of the CDCR population.

2.      I have personal knowledge of the facts stated in this declaration and, if called to testify upon those facts would do so competently.

## I.      Current Position and Background

3.      Before I started my career, I obtained a bachelors degree from Arizona State University in 1966, and proceeded to achieve a juris doctorate degree from the University of California, Hastings College of Law in 1969.

4.      I have served government agencies in a variety of management positions for over thirty-five years. I am a fellow with the National Commission on Correctional Healthcare. I have been a member of the faculty of the Graduate School of Criminal Justice at Sacramento State University and the Graduate School of Public Administration at Golden Gate University.

5.      As Chief Deputy Secretary of Health Care Services since January, 2007, I am responsible for developing the administrative structure to support, at the least, a constitutionally adequate mental health care system and dental care delivery system. I have reorganized and expanded the central and regional administrative structures necessary for supporting the growth and maintenance of appropriate care of inmates within CDCR.

6.      My work as Chief Deputy Secretary draws upon the experience gained in a lengthy career dedicated to serving government agencies. That career has included the following positions, in brief:

        a.      I was the Executive Officer and Chief Hearing Representative for the

1

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

California Board of Prison Terms from 1976 to 1982, responsible for the management of all aspects of the Parole Board's operations, including budgets, personnel, policy development and due process hearings.

       b.     I was the Undersecretary of the California Youth and Adult Correctional Agency from 1982 to 1986, an appointee of Governor Deukmejian. In that position, I was responsible for the overall administration of the Departments of Corrections and Youth Authority, Parole Board, and Board of Corrections. My tenure as Undersecretary dovetailed with the "boom" in prison construction. I created the New Prison Policy Committee and, as chairman, initiated the State's multi-billion dollar prison expansion program using public/private sector partnership for Program Management. I also established the first California Corrections Manager's Council comprised of selected representatives of state sheriffs, chief probation officers, and state juvenile and adult correctional agencies.

       c.     With the end of my tenure as Undersecretary, I left the public sector and joined the construction management firm of Kitchell, Inc. as Senior Vice President. From 1986 to 1993, I provided executive leadership for the firm's Program Management services, involving more than $5 billion in public capital expenditure projects for the further expansion of the California Department of Corrections.

       d.     In 1993, Governor Wilson appointed me Deputy Director and Assistant Chief Counsel of Health Care Services for the California Department of Corrections. In that position, I developed the policy, procedures, and organizational structure for creating a new comprehensive, standardized Health Care Delivery System based on managed care concepts. I initiated strategic planning and management for all health care services provided by 4,500 staff in 32 institutions throughout the state. I developed a remedial plan for and initiated implementation of a Mental Health Services Delivery System in response to the then-recent injunctive order in *Coleman v. Wilson*. I initiated final implementation of remedies that enabled termination of a class action brought by women prisoners for medical services, entitled *Shumate v. Wilson,* No. CIV

- 2 -

S-95-0619 (E.D. Cal.).

    e.    After some 25 years of executive-level work, I returned to school and obtained a Masters degree in Health Services Management from Golden Gate University, San Francisco, in 1994.

    f.    In 1997, Governor Wilson appointed me Chief Deputy Director for Finance Policy within the California Department of Finance. I represented the Governor and the Director of Finance on more than 60 boards, commissions, and finance authorities. My position encompassed serving as Chair of the State Public Works Board, which governs the state's capital outlay process, and member of the California Health Facilities Finance Authority, which reviews and approve funding mechanisms for the development and expansion of private health care facilities.

    g.    In 1999, I joined Jacobs Facilities, Inc. as the Director of Government Programs. In this executive level position, I was responsible for program and management development for government capital programs in the Western Region within the public sector markets of corrections, justice, education and general public institutions.

    h.    I formed a private consulting firm, RJ Dezember Associates, in 2001, to provide consulting services on various issues of California state and local government. I also consulted with other government agencies, including the State of Pennsylvania, on their corrections systems.

    i.    In 2007, I rejoined CDCR in my present position.

## II.    Overview

    7.    I understand this Three-Judge Panel has been convened to address the issue of CDCR's overcrowding and its impact, if any, on the delivery of mental health care services to CDCR inmates.

    8.    Because of my tenure with CDCR, I am uniquely positioned to speak to the mental health care delivery system and its compliance with the *Coleman* court orders. I was employed as the Deputy Director and Assistant Chief Counsel of Health Care

- 3 -

Services within CDCR when the *Coleman* injunction issued in 1995. I have spent a good portion of my career collaborating with the *Coleman* Special Master to establish and meet mandates for mental health care and, more specifically, to meet the mentally ill inmates' need for mental health care services. Indeed, in 1995, J. Michael Keating, Jr. was appointed to serve as the special master in the *Coleman* case. I had already established a successful working relationship with him when he was appointed Special Master in the *Shumate* case in 1997. With the termination of the *Shumate* case as an exemplar, I have worked towards the termination of the *Coleman* case.

9.    I am familiar with the elements of a constitutionally adequate mental health care system, as stated in the published decision of *Coleman v. Wilson*, as well as the ensuing orders of that Court. I recognize that the trial court found CDCR violated the Eighth Amendment because CDCR showed deliberate indifference to the mental health needs of inmates. I submit that CDCR now demonstrates a consistent and integrated approach to the care of mentally ill inmates. That approach has been manifested in the development and implementation of established and systemic mechanisms to ensure the elements of a constitutionally compliant mental health care system – such as sufficient and appropriate beds, staff, medication management, record keeping, suicide prevention measures – are met today and continue to be met tomorrow.

10.    By this declaration, I respectfully submit to the Three-Judge Panel information regarding the mental health services delivery system. Because my tenure with CDCR permits the benefit of a retrospective view, my discussion will often compare and contrast the state of the mental health services delivery system at time of judgment in 1995 to the state of the mental health services delivery system today. I will discuss the breadth of the mental health population and the spectrum of mental health care services provided to that population. I will also address the housing of the mentally ill inmates of CDCR.

//

- 4 -

### III.    CDCR Has an Integrated, Multidisciplinary Approach
### To Inmates' Mental Health Care Needs

11.    The fundamental requirements of an adequate mental health service delivery system in CDCR center on a few primary elements that together form the basis for effective care.  These elements are: (a) uniform policies and procedures for the delivery of mental health care; (b) appropriately licensed and credentialed clinical staff and support staff, both in the prisons and in central office headquarters, with sufficient number to perform their responsibilities; (c) appropriate space for the provision of mental health services to the inmate-patient population that can accommodate services of a growing population, especially for the higher treatment levels that require residential care; and (d) an adequate information management system for recordkeeping and medication management; and an adequate suicide prevention protocol. *See Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal. 1995).

12.    I would add another, overarching element to ensure a functional mental health care system continues to perform:  a system of management within the prison setting that continually assesses routinely acquired service delivery information in terms of compliance with established process and performance indicators and, upon identifying issues of non-compliance, engages the processes necessary for their resolution.  The management structure must be able to establish and rely on forecasts of the demand for services into a reasonable future time period and the development of plans to address this demand.  These management elements have been initiated in the last two years.

13.    Plans that should result from these forecasts would prepare for expanding the services delivery system, generate the resources necessary to meet the forecasted demand, and engage the entire spectrum of prison services, including mental health service delivery in an overall program of compliance with policies and procedures.  It is necessary, however, for all of these management actions to function together for if one of them is missing the result will be unsatisfactory.   With adequate management, the

- 5 -

mental health care services delivery system will better meet the needs of the mentally ill inmate and address identified deficiencies notwithstanding population growth.

IV.  **Defendants Have Achieved Court-Approved Mental Health Care Policies and Procedures**

14.    At the time the *Coleman* case was tried before Magistrate Moulds, CDCR lacked a uniform set of systemwide policies for identifying those individuals who have mental health care needs and providing that care.   Magistrate Mould's Findings and Recommendations noted: "The CDC lacks an adequate mechanism for screening for mental illness, either at the time of reception or during incarceration, and has lacked adequate screening since at least 1987." (Defs.' Trial Ex. 1273 which is a true and correct copy of *Coleman* F&Rs, filed June 6, 1994, 31:10-20.)  Neither standardized forms nor procedures for mental health screening existed. (*Id.* at 31:15-25.)

15.    By the time the Court entered its decision in 1995, CDCR had already established a statewide mental health screening process with referrals for mental health treatment.  In 1997, an initial set of policies and procedures (the "Program Guide") were adopted by CDCR and provisionally approved by the *Coleman* Court.

16.    That set of provisional policies matured into a final set of policies and procedures approved by the *Coleman* Court in March 2006. (*See* Defs.' Trial Ex. 1042 which is a true and correct copy of *Coleman* Court Order, filed 3/06; Defs' Trial Ex. 1147 which is a true and correct copy of the 2006 Program Guide.) This development of the 1997 provisional policies into the court-approved 2006 policies involved lengthy and laborious discussions of various draft policies, procedures and forms by a team of CDCR's top mental health clinicians with Plaintiffs' attorneys and the Special Master's team.  The discussions occurred in day-long meetings and spanned over three years.

17.    Through this process, Defendants were able to obtain consensus with the Special Master's team and Plaintiffs' counsel, as much as possible, on the very language of the policies, procedures, and forms stated in what became known as the Revised Program Guide.

- 6 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

18.    I personally participated in many of these all-day negotiation sessions. I recall the Special Master stating that the Revised Program Guide provided for mental health care well beyond the mere requirements of a constitutionally adequate mental health care system under the Eighth Amendment. Based upon my work and expertise as an administrator of correctional health care, I agree that the Program Guide provides for the care of mentally ill inmates in a manner that comports with, if not exceeds, the Eighth Amendment and the care seen in correctional institutions in other states.

19.    Compared to the provisionally approved Program Guide of 1997, the Revised Program Guide of 2006 provided for "enhanced standards for mental health care applicable in all CDCR institutions." (Defs.' Trial Ex. 1109 which is a true and correct copy of *Coleman* Special Master's 17th Report, Part A, filed May 4, 2007, internal pp. 3-4.)

20.    The Program Guide provides for several different levels of care to meet different patient needs, as follows:

a.    Correctional Clinical Case Management System (CCCMS): Inmates receiving this level of care are able to function well in the General Population with some mental health treatment. These inmate-patients are provided individual therapy at least once every 90 days, medication management by a psychiatrist at least once every 90 days, and group therapy as indicated by the inmate-patient's treatment plan.

b.    Enhanced Outpatient Program (EOP): Inmates receiving this level of care are segregated from the General Population in yards dedicated to these inmates because they require significant services to function well. These inmate-patients are provided weekly contact with a primary clinician, medication management by a psychiatrist at least once every 30 days, and structured treatment activities 10 hours per week.

c.    Psychiatric Services Unit (PSU): The purpose of the PSU is to assure the effective delivery of EOP services to inmates who have been diagnosed as having a serious mental disorder and are serving a security housing unit term.

- 7 -

     d.     Mental Health Crisis Beds: Inmates receive this level of care because of a short-term need for intensive mental health care services, generally not to exceed 10 days. This level of care provided 24-hour inpatient care, evaluation, and treatment for inmate-patients who require mental health services to prevent danger to themselves or others, or who have mental conditions which cause grave disability.

     e.     Inpatient Non-Acute Intermediate Care Facility (ICF): Inmates receive this level of care because of a longer-term need for intensive mental health care services delivered by the Department of Mental Health (DMH).

     f.     Day Treatment Program: This program with 44 beds is operated by the DMH at the California Medical Facility. It is designed for patients needing transitional outpatient care, essentially a step down from intermediate to Enhanced Outpatient Program level of care.

     g.     Inpatient Acute Care: The Department of Mental Health delivers this 24-hour inpatient care in licensed facilities. Inmates who require mental health treatment to prevent danger to themselves or others, or who have mental conditions which cause grave disability (such as an inability to use food, clothing, or shelter in appropriate ways) receive individual and group therapy as well as medication management by a psychiatrist.

     21.     The 2006 Program Guide contains standardized mental health forms for screening and referring patients to appropriate levels of care, including subsets of the mental health population such as exhibitionists. (Defs' Trial Ex. 1146 which is a true and correct copy of Defs' Plan to Provide Care to Exhibitionists, July 2007 and August 2007.) The referrals of patients requiring inpatient intermediate and acute care beds are governed by a memorandum of understanding, revised every two years or so, between CDCR and DMH for DMH to provide such inpatient mental health care to CDCR patients. The working partnership between CDCR and DMH for inpatient care has been enhanced by the use of Coordinated Clinical Assessment Teams to discuss, on a weekly basis, the merits of any decisions on referrals. (See Defs.' Trial Ex. 1274 which is a true

- 8 -

and correct copy of *Coleman* Order, July 9, 2004.)  When DMH noticed some referred patients did not have a therapeutic level of psychotropic medications in their bloodstreams, CDCR responded by requiring blood reference value testing.  (Defs.' Trial Ex. 1275 which is a true and correct copy of CDCR Memo, April 4, 2008.)  As more fully discussed below, the CDCR-DMH partnership has also engendered the development of additional inpatient mental health care beds within existing prison sites.

22.    The population of mental health care patients served by CDCR has expanded from the certified class of inmates with serious mental disorders certified as *Coleman* class members at the start of this case to include those parolees within the physical custody of CDCR who are awaiting parole revocation hearings and who meet *Coleman* care criteria.  (*See* Defs.' Trial Ex. 1276 which is a true and correct copy of *Coleman* Order, filed August 8, 2008.)  In accord with the *Coleman* court order merging these two populations, the CDCR-DMH memorandum of understanding as well as submitted draft plan to provide mental health care to these parolees acknowledges both of these populations as patients under the *Coleman* Program Guide standards.  (Defs.' Trial Ex. 1193 which is a true and correct copy of *Coleman/Valdivia* Draft Mental Health Plan, Draft MOU, September 2008.)

23.    This reliable and standard set of policies and procedures governing mental health service delivery has been disseminated to and implemented by CDCR and DMH clinicians.  Training for clinical practitioners has occurred and will continue to occur regularly, especially with the adoption of any significant policy or procedure.

24.    The Program Guide is now subject only to an annual revision process. This revision process enables the further development of mental health care policies in timely fashion, and takes into account the views of the *Coleman* Special Master, the Special Master's team of court-appointed monitors, Plaintiffs' attorneys, and, on certain overlapping issues between the medical and mental health care systems, the *Plata* Receiver. Indeed, the annual revision process to enable publication of the 2008 Revised Program Guide has occurred, with distribution of the draft 2008 Revised Program Guide

- 9 -

to Plaintiffs' counsel and the *Coleman* Special Master for review earlier this year and distribution of the final 2008 Revised Program Guide to the field in the offing. (Defs.' Trial Ex. 1148 which is a true and correct copy of the 2008 Revised Program Guide.)

25.   The *Coleman* Special Master himself declared, as of this past year, that "several CDCR institutions were substantially compliant" with the Program Guide and court-ordered standards. (Defs.' Trial Ex. 1112 which is a true and correct copy of *Coleman* Special Master's 20th Report, filed September 12, 2008 at 6.)

26.   In my opinion, CDCR has accomplished the establishment of an adequate mental health delivery system by preparing, distributing, training, and implementing the court-approved Program Guide since 2006.

## V.   The CDCR Suicide Prevention Program Has Already Been Found Adequate

27.   Throughout the course of the *Coleman* case, Defendants have addressed the risk of suicide among inmates. Indeed, Defendants' suicide prevention measures were recognized and approved by the trial court in 1994.

28.   Even as early as 1990, CDCR had a Suicide Prevention Program in place. (Defs.' Trial Ex. 1273 which is a true and correct copy of *Coleman* F & R, 71:3-5, and *cites therein*.) Indeed, the Suicide Prevention Program was "standardized and enhanced in 1990." (*Id.*) The program consisted of three major components: staff education, prevention, and assessment. (*Id.*, 71:5-7, and *cites therein*.)

a.   Education of Correctional Officers: A suicide Prevention Handbook was published for in-service training for correctional officers. (Defs.' Trial Ex. 1273 which is a true and correct copy of *Coleman* F & R, 71:11-13, and *cites therein*.) Further, correctional officers received suicide prevention training as part of the curriculum at the Department of Corrections Training Academy and as part of their on-the-job training. (*Id.* at 71:11-23.)

b.   Prevention: the Suicide Prevention Program enabled identification of inmates who are potential suicide risks and the placement of such individuals under 'suicide watch.' (*Id.* at 72:1-9.)

- 10 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

c.    Assessment: A psychological autopsy on each inmate who committed suicide was mandated by the Suicide Prevention Program. The autopsies included a "description of how the suicide was accomplished, as well as specific recommendations on how to prevent a similar occurrence and timelines for implementation of the specific recommendations." (*Id.* at 72:10-17.) The psychological autopsy was sent to both CDCR Health Care Services and the warden of the institution where the suicide occurred in order to enable action upon its recommendations. (*Id.* at 72:17-21.)

29.    In 1994, the trial court noted the decline in the CDCR suicide rate, from a high of 77 per 100,000 inmates in 1982 to 14 per 100,000 inmates in 1992. (Defs.' Trial Ex. 1273 which is a true and correct copy of *Coleman* F&R, 70:18-22.) Further, the suicide rate for male inmates in the CDC "appears to be lower than the rate in the general population; in 1992, the suicide rate for male inmates in the CDC was 14 per 100,000 inmates, while the rate for non-imprisoned males was 20 per 100,000." (*Id.* at 70:22-71:2.) The suicide rate for female inmates was "relatively low" with only 2 suicides committed by females of the 181 suicides that occurred within CDCR from 1980 to 1990. (*Id.* at 70, n. 45.)

30.    The trial court specifically found "defendants have designed an adequate suicide prevention program and have taken many of the steps necessary to implement that program." (*Id.* at 75:1-6.) The full deployment of the 1990 Suicide Prevention Program was hindered only by the "severe understaffing in mental health care." (*Id.* at 75:4-6.)

31.    Since the entry of judgment in 1995, Defendants have expanded the Suicide Prevention Program already declared adequate by the trial court and obtained sufficient staffing to enable its full implementation.

32.    The Suicide Prevention Program now consists of a multi-faceted and multi-disciplinary approach to preventing suicides. In other words, mental health clinicians, correctional officers, and facility management personnel are now involved in responding

- 11 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

to and preventing suicides in CDCR's inmate population.

33.    Mental health clinicians receive direction on the prevention of suicides from several administrative sources.  First, the 2006 Program Guide contains an entire chapter dedicated to delineating the identification of inmates at risk for suicide (whether already a patient within the Mental Health Services Delivery System or not) and the treatment of such inmates.  The Program Guide provides a clear set of guidelines for screening inmates for the risk of suicide, with a uniform questionnaire used at reception centers and before placement into an administrative segregation unit.  A range of responses to the individual inmate's suicide risk may be undertaken, from placement on suicide watch with one-to-one monitoring of the inmate to referral to a higher level of mental health care.

34.    The Program Guide also informs the clinicians of their ability to access a *Coleman* class member's history of suicide attempts.  In accord with the *Coleman* court order of June 9, 2005, CDCR has diligently worked to create a database within the Mental Health Tracking System to record *Coleman* class members' history of suicide attempts and gestures.  The clinicians are responsible for ensuring a record of an inmate's history of attempted suicide, if any, is maintained and considered as part of the treatment protocol.

35.    Within my organization and at my direction, mental health care clinicians receive in-service training on suicide prevention protocols.  I have a designated Suicide Prevention and Response Coordinator for CDCR Health Care Services who designs and delivers the suicide risk assessment training for CDCR's mental health clinicians.  (*See also* Decl. Canning in Support Def. MIL No. 10, at ¶ 2.)  Further, the Coordinator delivers a monthly suicide prevention videoconference for 300-350 CDCR clinical staff.  (*Id.*)

36.    At my direction, the psychological autopsies discussed in the *Coleman* trial court continue to this day, but in expanded form under the rubric "Suicide Report."  (*See also* Decl. Canning in Support Defs.' Mot. In Limine No. 10, ¶ 4.)  This report, prepared by a psychologist at CDCR Headquarters, addresses the suicides of individual inmates

- 12 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

that have occurred within the confines of CDCR.   (*Id.*)   In preparing these reports, the psychologist visits the facility where the suicide occurred, interviews available witnesses (such as cellmates, co-workers, housing officers, work supervisors) and mental health care providers, conducts reviews of the inmate's central files and unit health record (including any and all mental health records), reviews the reports of other investigators (such as the investigating officers' incident report, any coroner's report, medical death review reports), reviews visiting and telephone records, views personnel effects, and sometimes interviews family members. (*Id.*) Each Suicide Report provides a summary of the possible distal and proximal causes of the suicide, the victim's apparent mental health status before their death, any mental health care provided to the victim, the emergency response measures undertaken, and, as appropriate, recommendations concerning any deficient practices by correctional or clinical staff that may have contributed to a suicide (in accord with the January 12, 2004 *Coleman* court order).   (*Id.* at ¶¶ 4, 5.)   The Suicide Report assists in the development of any quality improvement plan, which must be submitted within 180 days of any suicide in accord with the *Coleman* court order of June 13, 2002. (*Id.*) These Suicide Reports are analyzed in the preparation of an annual executive report on suicides presented to CDCR executives. (Defs.' Trial Ex. 1171 which is a true and correct copy of the 2006 Annual Report on Suicides within CDCR.)

37.    Correctional officers today continue to receive particular training on appropriate responses to suicide gestures and attempts by an inmate. As much as clinicians have an understanding of the mental health needs of an inmate, the correctional officers' ongoing work with the inmates enables an opportunity to become familiar with an inmate's daily habits and often life issues, such as "bad news" from court or the loss of a loved one. Correctional officers are now trained in identifying possible mental health issues and the means of referring an inmate for a mental health evaluation.

38.    Because correctional officers are often the "first responders" at a suicide,

- 13 -

they are now responsible for providing life-saving cardiopulmonary resuscitation (CPR) to those inmates who have attempted suicide and show no obvious signs of demise. (*See* Defs.' Trial Ex. 1279 which is a true and correct copy of *Coleman* Order, June 9, 2005.) In 2006 and 2007, CDCR filed a proof of compliance with this court mandate, including declarations from each of the wardens of the 33 institutions attesting to the completion of CPR training (with the provision of cutdown kits and microshields for CPR) by the correctional officers within their employ. (*See* Defs.' Trial Ex. 1279 which is a true and correct copy of *Coleman* Order, June 9, 2005; Defs.' Trial Ex. 1280 which is a true and correct copy of *Coleman* Stipulated Order, February 13, 2006.) In addition, CDCR requires correctional officers to complete a standard incident report detailing the reasons CPR was not undertaken in response to a suicide event. This uniform incident report is reviewed by the warden and by headquarters staff to ensure compliance with the mandatory provision of CPR by correctional officers.

39.    Further, since the CDCR's voluntary moratorium on using remote videocameras to monitor "at risk" inmates in March 2006, CDCR has engaged in one-to-one in-person monitoring of inmates at risk for suicide. (Defs.' Trial Ex. 1311 which is a true and correct copy of *Coleman* Stipulated Order, filed July 5, 2006.)

40.    The suicide prevention program of 1990 has now been expanded beyond clinicians and correctional officers to include facilities management staff. This expansion to facilities management arose in response to the *Coleman* Special Master's report recognizing certain features of administrative segregation units as a possible cause in the suicide rates. He noticed, upon reviewing data routinely supplied by CDCR for 2004 suicides that 69.2% of those suicides occurred within administrative segregation units. (Defs.' Trial Ex. 1268 which is a true and correct copy of *Coleman* Special Master's Report on Suicides Completed Within CDCR in Calendar Year 2004, filed December 18, 2006 at 1.) Court monitors found 73% of suicides occurred within single cells, with 43% occurring in single cells in administrative segregation or secure housing units. Some 85% committed suicide by hanging. (Defs.' Trial Ex. 1281 which is a true and correct

- 14 -

copy of Patterson & Hughes, *Review of Completed Suicides in the CDCR, 1999 to 2004*, Psychiatric Services (June 2008) Vol. 59, No. 6, p. 678.) Further, of the suicides within administrative segregation, 53% of such suicides occurred within three weeks of placement. (*Id.*)

41.    Correctional and Health Care staff of CDCR examined each of these findings on suicide events in a collaborative effort with the Special Master's team and Plaintiffs to create an appropriate plan to reduce suicides in administrative segregation units. (Defs.' Trial Ex. 1279 which is a true and correct copy of *Coleman* Order, June 9, 2005; Defs.' Trial Ex. 1282 which is a true and correct copy of *Coleman* Order, June 8, 2006.) The plan borne of this collaborative work, and ultimately approved by the Court, relied upon correctional officers, facility management, and clinicians to reduce suicides by several means: (a) replacing the large-mesh ventilation screens used for hanging with small-mesh ventilation screens; (b) creating intake cells with no attachment points for newly-placed inmates in administrative segregation units to stay for the first 72 hours of their stay; (c) screening inmates for suicide risk before placement in administrative segregation units; (d) permitting inmates television and other electronic appliances within administrative segregation yards; (e) requiring 30-minute (at staggered intervals) welfare checks of inmates within administrative segregation units; (f) creating additional small management yards to enable greater outdoor exercise time; and (g) double-celling of inmates within administrative segregation units, where possible. (Defs.' Trial Ex. 1141 which is a true and correct copy of *Coleman* Def. Plan to Reduce Suicides in Ad Seg, filed October 2, 2006, as amended in *Coleman* Def. Response to Objections to Submitted Plan, December 1, 2006; Defs.' Trial Ex. 1268 which is a true and correct copy of *Coleman* Special Master's Report on Plan to Prevent Suicides in Administrative Segregation Units, filed December 18, 2006, pp. 4-10; Defs.' Trial Ex. 1153 which is a true and correct copy of CDCR March 12, 2007 Memo re. Television in Administrative Segregation Units; Defs' Trial Ex. 1157 which is a true and correct copy of Defs.' Supp. Report re. Television Access, filed August 2007; Defs.' Trial Ex. 1182 which is a true and

- 15 -

correct copy of Department of Finance Letters to Legislature, dated May 2008.)

42.    I defer to the Chief Deputy Secretary of Facilities Construction and Management, Deborah Hysen, and the Undersecretary of Operations, Scott Kernan, on the status of some of the above items. I can state, however, that the 30-minute welfare checks of inmates within administrative segregation units have been implemented.

43.    Given the nature of suicides, the efficacy of this multi-disciplinary approach to suicide prevention is best evaluated over the course of years. (*See* Defs.' Trial Ex. 1281 which is a true and correct copy of Patterson & Hughes, *Review of Completed Suicides in the CDCR, 1999 to 2004*, Psychiatric Services (June 2008) Vol. 59, No. 6, p. 678.)

44.    The Suicide Report discussed above provides Headquarters with the necessary information to audit and evaluate at least the implementation of this multi-disciplinary approach to suicide prevention. Because each Suicide Report discusses causes of the suicide and makes recommendations to prevent such suicides, the Suicide Report assists in the development of any quality improvement plan, which must be submitted within 180 days of any suicide. (*See* Defs.' Trial Ex. 1283 which is a true and correct copy of *Coleman* Order, June 13, 2002; *see also* Defs.' Trial Ex. 1279 which is a true and correct copy of *Coleman* Order, June 9, 2005.) Further, the Suicide Report or suicide review process can refer any member of the mental health, medical, or custody staff, initially judged to have been responsible for incompetence, malfeasance, negligence to another investigatory and/or disciplinary channel.

45.    While some may assert the suicide rates have increased since the entry of judgment in 1995, that assertion is only partly correct. What can be said is that the suicide rate varies. Just as the *Coleman* trial court viewed a ten-year database that showed a decline in suicide rates over the interval of 1980 to 1990, so the *Coleman* Special Master has found a variation in the suicide rates over time. (*See* Defs.' Trial Ex. 1273 which is a true and correct copy of *Coleman* F &Rs at p. 70; Defs.' Trial Ex. 1284 which is a true and correct copy of *Coleman* Special Master's Report on Suicides

- 16 -

Completed Within CDCR in Calendar Year 2005, filed November 16, 2007, p. 10.)

46.    There are certain demographic features that appear among those who commit suicide, regardless of their incarceration status. Drs. Ray Patterson and Kerry Hughes, psychiatrists who serve as *Coleman* monitors, stated, "The third leading cause of death in U.S. prisons is suicide, exceeded by natural deaths and deaths from AIDS. At least six well-known demographic characteristics of persons who commit suicide are shared by the U.S. general population and the incarcerated subpopulation, including age, gender, ethnicity, drug ad alcohol abuse, history of psychiatric treatment, and prior suicide attempts. For the community, more than 90% of people who die by suicide have a combination of those risk factors, such as male gender and increasing age. For the incarcerated population, these risk factors are similar with the exception of the highest rates of suicide being in the 31 to 40 age range because of fewer numbers of inmates age 41 and older." (Defs.' Trial Ex. 1281 which is a true and correct copy of Patterson & Hughes, *Review of Completed Suicides in the CDC*R, 1999 to 2004, Psychiatric Services (June 2008) Volume 59, Number 6, p. 677.) I am aware that the CDCR suicide rate over the past few years has been above the national average for correctional institutions. It is too early to determine the impact of CDCR's most recent suicide prevention measures on the occurrence of suicide. I believe suicide to be a very complicated phenomenon that rests on many individual factors, and not solely on the conditions within a correctional setting.

47.    In my opinion, CDCR has acted since 1990 and continues to act to present day with deliberation and care to reduce the suicide rate among the inmate population.

## VI.    Improvements in Mental Health Care Staffing

48.    A broad array of mental health clinicians staff the mental health services delivery system in order to identify and treat mentally ill inmates. They include psychiatrists, psychologists, psychiatric social workers, nurses, occupational therapists, and recreational therapists. The growth in the mental health clinical staffing, particularly in the core areas of psychiatrists, psychologists, and social workers, from the start of this

- 17 -

case in 1994 to today is significant: in July 1994, CDCR had approximately 248 such clinical positions available statewide; in June 2008, CDCR had 2,396 such clinical positions statewide. (*See* Defs.' Ex. 1269 which is a Chart of 1994 Mental Health Care Positions; Defs.' Trial Ex. 1235 which is a chart of CDCR 2008 Mental Health Care Positions.)

49.   This growth reflects not only better service to the mentally ill inmates but also better management of the mental health services system. By way of background, in the 1980s and 1990s, CDCR underwent a series of studies and reports on its path to formulating a methodology to determine the number of mental health positions for a constitutionally adequate system. In fiscal year 1991/92, CDC had a total of 277.4 positions authorized for mental health care, with some 208 positions filled. (*Id.* at p. 26.) Yet, one report found 732 staff positions would be necessary to adequately staff mental health care for an inmate population of 119,000 inmates. (*Id.* at p. 37:7-13, *cites therein.*) The fiscal year 1992/93 budget for CDC contained only 376.6 authorized mental health care positions to serve an inmate population of 113,000. (*Id.*)

50.   Sometime before 1997, CDCR adopted the Prevalence Mix formula to obtain additional mental health staff as the mental health population within each level of care grew. The population projections, created twice per year, established the number of patients expected for each level of care and were used to support budget requests. This was the beginning of a uniform methodology for providing staff.

51.   CDCR often complied with court orders to recruit and retain staff at particular institutions with the use of retention and recruitment bonuses. By 2006, it became apparent that the use of these bonuses resulted in a skewed staffing resources between institutions and between CDCR and DMH. (*See* Defs.' Trial Ex. 1305 which is a true and correct copy of *Coleman* Special Master's Report on DMH Clinicians' Salary, filed 1/30/07.) Further, with the *Coleman* court's approval of the Program Guide, additional staff was needed to implement the provisions of the Program Guide.

52.   Because the staffing methodology up until 2006 relied upon the population,

- 18 -

CDCR lacked a staffing methodology to obtain Program Guide-mandated staffing based upon the workload requirements outlined in those mental health care policies.

53.    The *Coleman* Special Master responded with a recommendation that Defendants submit a budget package to pursue this immediate need for staffing resources necessary to implement the Program Guide and, more significantly, the budget package include funding for an appropriate staffing tool to objectively evaluate and measure the need for staffing resources.

54.    With the benefit of the court order adopting the Special Master's findings and recommendations, CDCR prepared and presented to the special session of the Legislature, held in August 2006, a budget proposal for the allocation of some 530.65 permanent and 21.2 limited term positions, together with an allocation of sufficient funding to execute and complete a workload study.  The Legislature supported that request.

55.    With the influx of those 530.65 permanent and 21.2 limited term positions, CDCR concentrated its efforts on the recruitment of competent staff.

56.    By December 15, 2006, the skewed nature of mental health clinician pay between CDCR institutions was remedied when the *Coleman* court approved an across-the-board pay increase for CDCR clinicians, with a waiver of certain Government Code sections that would otherwise create a barrier to the expedited pay package.  (Defs.' Trial Ex. 1285, *Coleman* Order, December 15, 2007.)  A similar pay package for DMH clinicians was approved by the Court in June 2007 to avoid any competition for staffing resources between these two partners in inmate mental health care.  (Defs.' Trial Ex. 1286 which is a true and correct copy of *Coleman* Order, June 28, 2007.)

57.    Even with the increase in pay, the *Coleman* Special Master found, "Staffing shortages among supervisory and line psychiatrists and clinicians remained the single most significant barrier to the effective delivery of mental health services in CDCR institutions." (Defs.' Trial Ex. 1109 which is a true and correct copy of *Coleman* Special Master's 17th Report, Part A, filed June 13, 2007, p. 161.)

- 19 -

58.    In response, CDCR launched a focused recruitment and hiring program in November 2007. (Defs.' Trial Ex. 1287 which is a true and correct copy of *Coleman* Order, August 2, 2007; Defs.' Trial Ex. 1288 which is a true and correct copy of Def. CDCR Recruitment Plan, November 2007.)  Streamlined hiring, targeted recruitment of mental health clinicians, and marketing of CDCR salaries and benefits were a few of the tactics employed to address outstanding mental health care vacancies.   In addition, CDCR obtained a resolution from the State Personnel Board to compress hiring ranks and so increase the number of candidates for mental health positions. (Defs.' Trial Ex. 1170 which is a true and correct copy of State Personnel Board Resolution, 6/14/07.) Certain employment examinations have been put on-line to further enhance recruitment. (Defs.' Trial Ex. 1189 which is a true and correct copy of the CDCR Memorandum re. Online Exams.)

59.    Overall clinical staff vacancies in prisons have been reduced over time from 23.6% in January 2008 to 19.7% in June 2008 as a result of the focused recruitment and hiring program initiated in November 2007. (Defs.' Trial Ex. 1288 which is a true and correct copy of *Coleman* Def. Recruitment Plan, October 2007; Defs.' Trial Ex. 1235 which is a true and correct copy of Chart of Mental Health Care Positions and Vacancies.)  This vacancy rate has improved measurably over this brief period of time. The recruitment and hiring program is continuing its focus on filling all of the positions established in recent budgets.

60.    The highest vacancy rate in the Mental Health Program had been for psychiatrists, at 50.3% in January 2008.  This vacancy rate was reduced to 32% in June 2008.  Psychologist vacancies were reduced from 24.8% vacancies in January 2008 to 22.6% in June 2008.

61.    CDCR has developed new positions to meet the demand for mental health care services. The "pool" of available clinicians hired by CDCR for its Mental Health Program includes psychologists and licensed clinical social workers who perform some of the core functions for services delivery.

- 20 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

62.    To further address this shortfall in mental health clinicians, CDCR has initiated and sponsored a new Mental Health Therapist civil service classification, the approval for which currently is pending approval by the State Personnel Board.  This classification will permit CDCR and other state agencies access to additional properly licensed and credentialed clinicians that have, to date, been unavailable within the civil service to work alongside licensed clinical social workers.  Within this therapist classification, Marriage and Family Therapists (MFT) will be able to be hired along with licensed clinical social workers to improve CDCR staffing to provide services appropriate to their scope of licensure for the Mental Health Program.  MFTs are licensed by the California Board of Behavioral Sciences, the same Board that licenses Licensed Clinical Social Workers, who already are employed in the CDCR Mental Health Program.  Over 29,000 of these MFT clinicians currently are licensed in California.  CDCR has also obtained court approval to employ osteopaths with appropriate credentials to provide mental health care services.  (Defs.' Trial Ex. 1057 which is a true and correct copy of *Coleman* Order, April 8, 2008.)

63.    These additions to the "pool" of available and competent clinicians will assist CDCR in its efforts to fill its clinical position vacancies on a permanent basis and thereby reduce the overall vacancy rate.  CDCR presently relies upon contract staff to fill certain positions, particularly in unattractive or remote geographic locations.  As the Coleman Special Master has noted, the use of contractors resulted in a lowering of the functional vacancy rate for the core mental health positions of psychiatrists, psychologists, psychiatric social workers, and psych techs to 17% in September 2007 through February 2008.  (Defs.' Trial Ex. 1112 which is a true and correct copy of *Coleman* Special Master's 20th Report, Part, A, p. 356.)

64.    The quality of mental health clinicians has not been sacrificed over the quantity of clinicians.  For example, CDCR clarified its standards for employment as a CDCR psychiatrist.  CDCR initiated and completed a program to evaluate the competency of those psychiatrists that were neither board certified nor board eligible.

- 21 -

1    (Defs.' Trial Ex. 1289 which is a true and correct copy of the *Coleman* Stipulated Order,

2    September 11, 2006.)

3          65.      While meeting the immediate need for mental health clinicians, CDCR has

4    worked closely with the Special Master's staff in finalizing the mental health workload

5    study and so meeting the long-term need for an approved staffing methodology. (Defs.'

6    Trial Ex. 1174 which is a true and correct copy of the *Coleman* Special Master's Report,

7    dated July 12, 2008; Defs.' Trial Ex. 1168 which is a true and correct copy of the CDCR

8    Workload Study.) The mental health workload study, approved on September 23, 2008

9    as part of the State Budget, establishes accurate a formula for determining, at each

10   prison site, the staffing levels needed for the delivery of mental health care services

11   necessary to comport with the Program Guide.

12          66.      The staffing of Headquarters management has not gone overlooked. A

13   *Coleman* court order enabled CDCR's use of salary differentials to develop a

14   headquarters management and staffing structure that recognizes and accounts for the

15   management of mental health services as a major program of the CDCR. (Defs.' Trial

16   Ex. 1291 which is a true and correct copy of the *Coleman* Order, filed March 7, 2005.)

17   By February 2007, the "allocations of headquarters staffing quintupled the number of

18   positions available at the Division of Correctional Health Care Services to enhance,

19   among other policy and monitoring capabilities, the ability to compile, collate and

20   analyze data on CDCR's mental health system." (Defs.' Trial Ex. 1109 which is a true

21   and correct copy of the *Coleman* Special Master's 17th Report, Part A, filed February 9,

22   2007, p. 103.) That additional headquarters staffing has made possible centralized

23   oversight, direction, and responsibility for a mental health care services delivered at each

24   of the 33 CDCR institutions.  Attached is a set of charts illustrating the organization of

25   CDCR Health Care Services Division. (Defs.' Trial Ex. 1220 which is a true and correct

26   copy of the CDCR Health Care Regional Administration Chart; Defs.' Trial Ex. 1260

27   which is a true and correct copy of CDCR Executive Management Chart.)

28          67.      With the use of prison-based staffing methodology for essential services

- 22 -

and core headquarters responsibility for management and staffing of the Mental Health Program, the mental health services delivery system is now at a point at which its succession as well as success can be sustained.

68.     Staffing in both the prisons and Mental Health headquarters has reached a level such that the services required of each now can be provided with reduced reliance on overtime or contracted positions. Establishing this staff capability is a major accomplishment and coupled with the knowledge of the approved program represented in the Guide, moves this Mental Health Program further toward its compliance goals.

69.     I expect that this combination recruitment efforts, streamlined hiring, and an expanded pool of appropriate clinicians that are available for hiring into CDCR soon will eliminate the clinical vacancies in our prison Mental Health Program. These staffing actions reflect the kind of management attention to the issues of staffing the mental health services delivery system that shows deliberate interest in the care of the mentally ill inmate and in complying with the Program Guide standards, notwithstanding population growth.

### VII.     Mental Health Care Beds

70.     In 1995, the identified population of inmates requiring mental health care was 7.9%. The designated beds for mental health inmates were insufficient, as follows:

a.     Inpatient hospital care was provided predominantly at California Medical Facility and Atascadero State Hospital by the Department of Mental Health (708 beds), with 18 inpatient beds at the California Institution for Men staffed by CDCR personnel.

b.     Enhanced Outpatient Program Beds were provided at three institutions (California Medical Facility, California Men's Colony and California Institution for Women) in the amount of 2,421 beds.

c.     Crisis beds: provided on an "informal" basis within each institution, depending upon available resources. Some 30 to 40% of the infirmary beds were used for mental health crisis care.

- 23 -

d.    Outpatient care: provided on an "informal" basis and primarily limited to medication only, with psychological services dependant upon the availability of staff.

(Defs.' Trial Ex. 1273 which is a true and correct copy of the *Coleman* F&Rs, filed June 6, 1994, pp. 43-44.)

71.    CDCR endeavored to create a decentralized system of mental health care to enable access to mental health services at every institution.  The mental health population, hovering now at 20% of the overall CDCR population, requires housing and treatment space for some 28,000 patients at the Correctional Clinical Case Management System housed with general population inmates and for the remaining patients – those within Enhanced Outpatient Program, Mental Health Crisis Beds, inpatient intermediate and inpatient acute care – housed separately from the general population.  Inpatient intermediate and inpatient acute care has expanded beyond Atascadero State Hospital and California Medical Facility to now include other Department of Mental Health hospitals, such as Coalinga and Patton State Hospitals, and to include DMH facilities located on CDCR sites (Vacaville Psychiatric Program and Salinas Valley Psychiatric Program).

72.    The endeavor to create sufficient space for the mental health services delivery system was, to some extent, stymied by the physical design of the prisons and state hospitals themselves.  The *Plata* Receiver "traces Defendants' lack of adequate clinical space to the design decisions made in the 1980s."  (Defs.' Trial Ex. 1292 which is a true and correct copy of the *Coleman* Special Master's May 31, 2007 Response to Court's May 17, 2007 Request for Information, p. 5.)  These prisons were designed and built to accommodate population growth, with "infrastructure, including just water, wastewater, electrical and mechanical components, needed to meet anticipated overcrowding of as much as 190 percent in cells and 140 percent in dormitories."  (*Id.*) In contrast, these same prisons were not designed and made "no provision" for any expansion of medical care space beyond the initial 100% of capacity.  (*Id.* at pp. 4, 5.)

- 24 -

Even worse, "none of the 19 CDCR institutions planned and built in the boom of the 80s and 90s gave any thought to the space that might be needed for mental health purposes." (*Id.* at p. 5.)  A similar failure in design vision occurred with the Department of Mental Health, which discovered in 1998 that it had "no facilities of its own in which to provide the level of inpatient care needed by CDCR for high custody inmates with a history of violence or escape." (*Id.* at p. 8.)  As a result, such patients often wait for an appropriate inpatient bed staffed by the DMH within a DMH facility located at a CDCR site, such as Vacaville Psychiatric Program or Salinas Valley Psychiatric Program.

73.    CDCR and DMH have engaged in ongoing efforts to create additional mental health care space and housing in CDCR facilities.  For instance, in 2004, the Salinas Valley Psychiatric Program, within Salinas Valley State Prison, activated and filled 64 intermediate care beds. (Defs.' Trial Ex. 1293 which is a true and correct copy of the *Coleman* Special Master's 14th Report, filed February 11, 2005, p. 176)  Two years later,  DMH added 112 intermediate inpatient care beds, particularly designed for high custody (Level IV) inmates, to  Salinas Valley Psychiatric Program.  (Defs.' Trial Ex. 1109 which is a true and correct copy of the *Coleman* Special Master's 17th Report, Part A, filed February 9, 2007, p. 114.)  At the same time, CDCR created an additional 11 mental health crisis beds as well as a new 64-bed Psychiatric Services Unit at California State Prison, Sacramento.  (Defs.' Trial Ex. 1294 which is a true and correct copy of the *Coleman* Special Master's 16th Report, filed December 14, 2006, p. 5.)  Kern Valley State Prison opened in 2005 and then opened its mental health crisis bed unit in 2006.  (Defs.' Trial Ex. 1109, *Coleman* Special Master's 17th Report, Part C, filed June 11, 2007, pp. 2-3.)  By 2007, the California Medical Facility had converted two units, P-2 and P-3, to intermediate care beds for Level III and Level IV inmates, with a total capacity of 66 intermediate care beds.  (Defs.' Trial Ex. 1111 which is a true and correct copy of the *Coleman* Special Master's 19th Round Report, filed July 25, 2008, p. 20.)

74.    The impact of increased mental health beds is easily seen.  In January 2008, California State Prison-Sacramento activated an additional sixty-four Psychiatric

- 25 -

Services Unit beds, increasing state-wide capacity of Psychiatric Services Unit beds to 384 and resulting in a decrease in the waitlist for such beds decreased from 79 on January 1, 2008 to 22 on July 18, 2008. (Defs.' Trial Ex. 1185 which is a true and correct copy of the California State Prison, Sacramento, Psychiatric Services Unit Activation Memorandum, January 2008.) In June 2008, the California Medical Facility opened a fifty-bed mental health crisis bed unit. While the October 1, 2007 census for such mental health crisis beds was 215 with a wait list of 33, by July 21, 2008, the mental health crisis bed census was 301 and the wait list was at 16. Kern Valley State Prison recently opened 96 sensitive needs yard-Enhanced Outpatient Program beds, allowing for the transfer of many Enhanced Outpatient Program patients who were placed in an administrative segregation unit for safety reasons to be moved to a sensitive need yard bed. (Defs.' Trial Ex. 1186 which is a true and correct copy of the Kern Valley State Prison Activation Memorandum, August 2008.)

75.    In sheer numbers, the mental health delivery system has increased dramatically over the years. As the attached chart shows, CDCR now provides at institutions across the State: 25,072 beds for those inmates requiring correctional clinical case management system level of care; 3,763 Enhanced Outpatient Program beds; 336 mental health crisis beds; 26 mental health outpatient beds; and 384 psychiatric services unit beds. (Defs.' Trial Ex. 1247 which is a true and correct chart of CDCR Facilities.) In addition, there are 801 acute and intermediate care beds provided and/or staffed by the Department of Mental Health. (Id.) Notably, some of these units, such as Psychiatric Services Units to house those mentally ill inmates requiring enhanced outpatient care and posing administrative segregation unit issues, did not exist in 1997.

76.    Because the policy and procedure has been to provide segregated housing to mentally ill patients receiving Enhanced Outpatient Patient care or higher levels of (inpatient) care, that means that such mentally ill patients of CDCR are not housed within triple-bunked gymnasiums or dayrooms. They are thus insulated from the impact, if any, of the overall crowding of CDCR housing facilities.

- 26 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

77.    Likewise, those mentally ill inmates requiring inpatient care within a mental health crisis bed, an acute bed or an intermediate care bed are in mental health units separated from the general population of inmates and, due to licensure requirements, immune from the triple-bunking seen in gymnasiums and dayrooms.

78.    While mentally ill inmates at the lowest level of outpatient care, Correctional Clinical Case Management Services, are permitted to be housed in general population areas, the data shows that the majority, some 80 percent, of these patients are in traditional housing and not in "non-traditional settings" of dayrooms and gymnasiums. (Defs.' Trial Ex. 1252 which is a true and correct copy of a CDCR Chart of Non-Traditional Beds.)

79.    Even at CDCR reception centers, inmates awaiting screening and transport to appropriate mental health beds are given care. By way of background, reception centers screen (incoming) inmates for mental health care needs. Those inmates found to need Enhanced Outpatient Program care are endorsed for transfer and placement in an institution with that level of care. Should an Enhanced Outpatient Program bed not be immediately available, then those mentally ill patients requiring Enhanced Outpatient Program care are given enhanced outpatient care while in reception centers awaiting transfer. (Defs.' Trial Ex. 1142 which is a true and correct copy of the CDCR Plan to Provide EOP Care in Reception, dated October 2007, with supplement December 2007; Defs.' Trial Ex. 1179 which is a true and correct copy of CDCR Plan to Provide EOP Care in Reception, dated May 1, 2008.) This provision of EOP care in reception centers is an interim means for meeting the needs of mentally ill inmates while a permanent solution, the construction of additional EOP beds, is underway.

80.    CDCR Mental Health recognizes that the long-term forecast for an increase in the mental health population must be met. CDCR has plans to create more treatment and housing space for *Coleman* class members, particularly those inmates requiring high-custody inpatient beds. Indeed, the Special Master has found the high custody inpatient beds to be of critical importance, remaining critical regardless of the overall

- 27 -

population of CDCR or even a release of CDCR inmates. (Defs.' Ex. 1192 which is a true and correct copy of the *Coleman* Special Master's May 31, 2007 Response to Court's May 17, 2007 Request for Information.)

81.    CDCR, in collaboration with DMH, has created a series of plans to address the need for acute and intermediate inpatient beds and the need for mental health crisis beds, as described in *Coleman* court orders. (Defs.' Trial Ex. 1042 which is a true and correct copy of the *Coleman* Order of March 3, 2006, Defs.' Trial Ex. 1296 which is a true and correct copy of the *Coleman* Order of May 2, 2006.) Because Defendants were ordered to coordinate their compliance efforts, particularly those involving bed planning and construction, with the Receiver, the bed plans have been developed with the Receiver's input. (Defs.' Trial Ex. 1297 which is a true and correct copy of the *Coleman* Order, October 20, 2006.)

82.    In August 2007, Defendants submitted a long-term plan for the provision of mental health care beds. That plan was premised upon the construction of 'consolidated care centers', housing both medical and mental health (inpatient and Enhanced Outpatient Program) beds in conjunction with the Receiver. (Defs.' Trial Ex. 1139 which is a true and correct copy of the August 2007 Bed Plan; Defs.' Trial Ex. 1298 which is a true and correct copy of the Special Master's Report on the August 2007 Bed Plan, filed September 2007.)

83.    In contrast to previously-submitted bed plans, the hallmark of the August 2007 bed plan was its utilization of a validated mental health bed forecast methodology by an outside vendor, Navigant Consulting. The bed-demand forecast and its resultant bed plan also is an essential aspect of management that was re-initiated in 2006.

84.    The August 2007 long-term bed plan presented a comprehensive program for developing and constructing the space and beds needed to provide adequate mental health services for the growing population over the next 5 years. The plan results in over 7,400 residential mental health beds (Enhanced Outpatient Program, mental health crisis bed, acute inpatient and intermediate inpatient care.) Under the August 2007

- 28 -

mental health bed plan, CDCR anticipated building in the consolidated care centers the following: 2,532 general population Enhanced Outpatient Program beds and 709 high-custody Enhanced Outpatient Program beds for men, plus 168 general population Enhanced Outpatient Program and 15 Enhanced Outpatient Program high-custody beds for women, for a total of 3,424 Enhanced Outpatient Program beds. The plan included an additional 150 Enhanced Outpatient Program beds at California State Prison, Los Angeles County. Further, acute and intermediate care beds will be constructed to meet the forecasted needs of mental health care patients.

85.   The August 2007 bed plan was approved by the *Coleman* court, with the caveat that CDCR and DMH submit an additional plan concerning the staffing and accreditation of the inpatient care beds. (Defs.' Trial Ex. 1038 which is a true and correct copy of the *Coleman* Court order of October 2007.)

86.   The July 2008 mental health bed plan presented the Department of Mental Health as the agency responsible for staffing the new inpatient mental health beds and thus providing its expertise in creating a therapeutic environment for these mentally ill inmates. (Defs.' Trial Ex. 1175 which is a true and correct copy of the July 2008 Mental Health Bed Plan.) In preparing the July 2008 mental health bed plan, CDCR noticed changes in the population projections for the Enhanced Outpatient Program level of care. (*See* Defs.' Trial Ex. 1162 which is a true and correct copy of the Navigant/Misener Forecast Report, June 2008.) Thus, the July 2008 bed plan proposed a different configuration of Enhanced Outpatient Program beds in the consolidated care centers (also known as consolidated health care facilities): 2,245 general population Enhanced Outpatient Program beds and 598 high custody Enhanced Outpatient Program beds for men, plus 255 general population Enhanced Outpatient Program beds and 27 high-custody Enhanced Outpatient Program beds for women, for a total of 3,125 new beds. CDCR also anticipates adding an additional 67 general population Enhanced Outpatient Program beds at California Medical Facility. That raises the total new Enhanced Outpatient Program beds in the proposed plan to 3,192.

- 29 -

87.    The construction of the beds depicted in the July 2008 bed plan presently are subject to coordination with the construction of medical beds by the Receiver in *Plata*. I understand a modification of the CDCR Long-term Mental Health Bed Plan may require re-submittal for *Coleman* court approval by the end of 2008 depending on the results of this coordination. Whether these beds are to be included within the Receiver's construction program or they are to proceed as CDCR separate projects, the commitment to their completion remains.

88.    CDCR has persevered in the development of mental health care space at existing facilities and now in new facilities with the Department of Mental Health, and possibly shared with the Receiver's medical care system.

89.    Clearly, the construction of mental health care space is a core element of an adequate mental health services delivery system. Yet this element, like the other elements, is management-driven. When well served by management, these elements together form the basis for compliance notwithstanding population growth.

### VIII.    Record Keeping, Pharmacy, and Information Technology

90.    As the head of CDCR Health Care, I am aware that compliance in both the *Plata* and *Coleman* actions has been impeded by the lack of adequate recordkeeping, pharmacy, and medication management systems. Indeed, the medical, mental health, and medication records of patients have been consistently maintained in hard copy fashion, requiring dedicated staff to maintain the files and make those files available to clinicians working with patients. CDCR has explored various means of bringing electronic recordkeeping to its institutions. The actual installation of electronic technology is often stymied by the aged conditions of buildings, including the challenge of wiring walls containing asbestos and lacking appropriate electrical infrastructure.

91.    Under the Coordinated Courts' recent order, the development of an automated electronic information system is to be undertaken by the *Plata* Receiver. (Defs.' Trial Ex. 1299, Coordinated Courts' Order, filed June 28, 2007.) I understand from the *Plata* Receiver that this new information system should become operational

- 30 -

over the next 18-24 months. The system will provide comprehensive data to inform all aspects of mental health care and management. The provision of this data readily and on a regular basis will enable the timely and appropriate delivery of medications and mental health care programming to patients. Such information technology will support day-to-day management, quality management committees, program evaluation, performance assessments, and overall patient care.

92. The Coordinated Courts also vested the Receiver with responsibility for the pharmacy. (Defs.' Trial Ex. 1299, Coordinated Court's Order, filed June 28, 2007.) A majority of *Coleman* class members are reliant on timely and appropriate medication for their mental illnesses. CDCR Mental Health anticipates the Receiver's efforts to improve pharmacy will serve to improve the medication management of Coleman class members.

93. The CDCR anticipates this cooperative relationship with the Receiver on information technology and pharmacy issues will enable a finding of compliance on those elements of an adequate mental health care system.

## IX.    Quality Management Systems

94. The *Coleman* trial court noticed the complete lack of any peer review or other quality management system within CDCR Mental Health Care. (Defs.' Trial Ex. 1273, Coleman F&Rs, filed June 6, 1994.)

95. CDCR now employs a Quality Management system for Mental Health both in its prisons and in Mental Health Headquarters. This system is a variant of such systems that are prevalent within the health care industry. Its fundamental elements are comprised of a committee structure with membership made up of all stakeholders within the respective prisons, regular documented meetings, routine identification of problems in the delivery of services, attention to the corrective actions identified by court monitors, and a structured process of multi-disciplined quality improvement teams operating under the committee's direction to resolve problems and recommend corrective actions. Corrective actions may involve the custody or administrative functions as well as the direct provision of mental health services.

- 31 -

96.    Similarly, Mental Health Headquarters operates a Quality Management Committee system that includes centrally-directed actions, such as facility construction, policy determination, staff recruitment and others, as well as addressing systemic issues that inhibit prison staff's ability to reach appropriate levels of compliance with governing policy and procedure. Together with the prison-based committees, this Headquarters committee provides a broad process of problem resolution that operates alongside day-to-day management activities.

97.    In 2003 CDCR successfully experimented with the Program Support and Quality Management efforts; CDCR has revived those efforts now. A primary element of Headquarters operations is the Program Support Team aspect of the Compliance Unit. Individual teams of clinical and administrative staff are assigned to particular prisons to assist in the development of the quality improvement processes, as well for the resolution of specific ongoing problems that require correction. These Headquarters-based teams become a tool for connecting prisons struggling to achieve regular compliance with the expertise provided through the "team" and support that is designed to improve overall performance.

98.    This aspect of the Headquarters organization is now operational and provides effective focus on performance outcomes. Over time this effort will provide an adjunct to the staffing and facility development aspects of this system that will tend toward establishing the teamwork that is needed to achieve compliance.

99.    Another element of management that has not been present in CDCR is Program Evaluation, an organizational element of headquarters that conducts regular, annual reviews of the Mental Health Program in each prison. It serves to monitor general and selected elements of program requirements and produces a score for each prison with respect to compliance in each element. Program Evaluation is just now under development and is expected to begin its initial evaluations in early 2009.

100.    Also in development is the Mental Health Utilization Management (UM) function. This function is intended to provide assurance that mental health patients are

- 32 -

TRIAL AFFIDAVIT OF ROBIN DEZEMBER
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

placed in the level of care required by their condition and are appropriately transferred through proper levels of care in a timely manner. This UM function focuses on the specific patients in the mental health caseload and provides assurances that they are being treated in accordance with the Program Guides and their level of mental health acuity.

101.    It is notable that the former Special Master Keating noted in his May 31, 2007 report that CDCR had come close in 2003 to achieving a degree of success that had not been achieved up to that time. He also stated that the reduction of population in CDCR would not have an appreciable impact on the care provided to the *Coleman* caseload. (Defs.' Trial Ex. 1292, *Coleman* Special Master's Report, filed May 31, 2007.)

## X.    Summary

102.    The Mental Health organization in headquarters has been completely revamped to incorporate all of the above-described management functions that can assure continued improvement in the provision of necessary services. This restructured organization establishes the ability of CDCR to continue to make gains on compliance with the requirements of the Mental Health Program.

103.    Now organized to provide specific staff attention to court compliance, this new organization also produced 5 plans for additional services required by the *Coleman* court that are now pending with the Court for approval: (1) plan to utilize fully the Intermediate Care beds at Atascadero State Hospital; (2) plan to improve Enhanced Outpatient Care in administrative segregation; (3) plan to further improve mental health assessments for caseload inmates subject to the disciplinary process; (4) plan to improve Enhanced Outpatient Services in reception centers; and (5) a plan to improve staff recruitment and hiring. (*See* Defs.' Trial Exs. 1177-1181 which are true and correct copies of Defs.' Five Plans, May 1, 2008.) These plans are being implemented as feasible by CDCR even pending court approval, although modifications based on testing may be required.

104.    As a government manager with extensive experience, I am confident that

- 33 -

the management elements described above, if continued with due diligence and support will achieve full compliance with the Program Guides whether or not population growth continues.

I declare under penalty of perjury that the foregoing is true and correct. Executed in Sacramento, California on October 30, 2008.


ROBIN DEZEMBER


- 34 -