1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5677
   Facsimile: (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

                                   HANSON BRIDGETT LLP
                                   JERROLD C. SCHAEFER - 39374
                                   PAUL B. MELLO – 179755
                                   S. ANNE JOHNSON – 197415
                                   SAMANTHA D. TAMA – 240280
                                   RENJU P. JACOB - 242388
                                   425 Market Street, 26th Floor
                                   San Francisco, CA 94105
                                   Telephone: (415) 777-3200
                                   Facsimile: (415) 541-9366
                                   jschaefer@hansonbridgett.com
                                   pmello@hansonbridgett.com
                                   ajohnson@hansonbridgett.com
                                   stama@hansonbridgett.com
                                   rjacob@hansonbridgett.com

## UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | No. 2:90-cv-00520 LKK JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants | No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** <br><br> **TRIAL AFFIDAVIT OF KATHY JETT** <br><br> **To: Three-Judge Panel** |

- 1 -

1    I, Kathy Jett, declare:

2    1.    I am currently the Undersecretary of Programs for the California

3 Department of Corrections and Rehabilitation (CDCR), and have held this position since

4 September 2007. I have personal knowledge of the facts stated in this declaration and if

5 called to testify about those facts could and would do so competently.

6                     I.    **CURRENT POSITION AND BACKGROUND**

7    2.    As the Undersecretary of Programs, I am tasked with overseeing program

8 development for CDCR which requires that I implement the recommendations of

9 CDCR's Expert Panel on Adult Offender Recidivism Reduction Programs (Expert Panel),

10 the recommendations of the final Rehabilitation Strike Team report, and the provisions of

11 Assembly Bill 900.

12    3.    Before becoming the Undersecretary of Programs, I was the lead member

13 of the Governor's Rehabilitation Strike Team. The Rehabilitation Strike Team was

14 created by Governor Schwarzenegger on May 11, 2007 to expedite the implementation

15 of Assembly Bill 900. In my role as the lead member of the Rehabilitation Strike Team, I

16 led a team of state and national experts to examine the readiness of CDCR to implement

17 and expand rehabilitation programs as required by Assembly Bill 900 and to recommend

18 approaches that would reduce recidivism and decrease victims in the community. The

19 Rehabilitation Strike Team also adopted the Expert Panel's recommendations to develop

20 structured guidelines to respond to technical parole violations based on the seriousness

21 of the offender, risk to re-offend, and the seriousness of the violation.

22    4.    In addition to acting as the lead member of the Rehabilitation Strike Team,

23 I also served concurrently as the Director of CDCR's Division of Addiction and Recovery

24 Services. Before becoming the Director of CDCR's Division of Addiction and Recovery

25 Services, in November 2000, I was appointed to be the Director of the California

26 Department of Alcohol and Drug Program following the passage of the Substance Abuse

27 and Crime Prevention Act (also known as Proposition 36). The Substance Abuse and

28 Crime Prevention Act changed state law to allow first and second-time nonviolent, simple

- 2 -

1  drug possession offenders the opportunity to receive substance abuse treatment instead
2  of incarceration.

3       5.    Before I served as Director of the California Department of Alcohol and
4  Drug Program, I was the Director of the Attorney General's Crime and Violence
5  Prevention Center. In that role, I advised the Attorney General on effective crime
6  prevention policies and strategies administering crime prevention grant programs and
7  guiding local community efforts. I have worked in California state government for over
8  30 years.

9  II.   <u>OVERVIEW</u>

10       6.    In my current capacity as Undersecretary of Programs, I am tasked with
11  overseeing the design and implementation of an integrated rehabilitation services
12  delivery plan for inmates and parolees, entitled the Adult Programs Rehabilitative
13  Programming Reform Project Work Plan (Plan).

14       7.    The approach to addressing rehabilitation of California's inmate population
15  is unlike any other program initiated by CDCR. This comprehensive approach
16  incorporates the requirements of three key documents: (1) Assembly Bill 900, (2) Expert
17  Panel Report, and (3) final Rehabilitation Strike Team report. The new approach
18  changes how an inmate is placed into programs while in custody and on parole. The
19  offenders are assessed and placed into the right program at the right time.

20       8.    This program was evidence-based on models used in other states, and is
21  designed to reduce the rate of recidivism in two respects: (1) by ensuring that each
22  individual offender's criminogenic needs are being met to ensure success upon release,
23  and (2) by identifying high-risk offenders such that resources may be properly allocated
24  and focused on these individuals who require a greater level of supervision during
25  incarceration and while on parole. The anticipated reduction in recidivism in turn will free
26  up much needed space in reception centers and throughout CDCR.

27  ///

28  ///

- 3 -

1          III.    **THE REHABILITATION STRIKE TEAM**

2          9.      The Rehabilitation Strike Team was tasked with the following: (1)

3  assessing existing CDCR rehabilitation programs and space; (2) researching, selecting,

4  and adopting an integrated rehabilitation services delivery plan (case management plan)

5  for inmates and parolees including, but not limited to, substance abuse treatment,

6  education, job training, counseling, and life skills, as well as  developing a plan to

7  integrate all elements of inmate job training (such as vocational education, Prison

8  Industry Authority, institution inmate labor, and private partnerships) to ensure the most

9  efficient and effective use of resources; (3) adopting CDCR's Correctional Offender

10  Management Profiling for Alternative Sanctions (COMPAS) as the appropriate inmate

11  intake and pre-release needs assessment tool for California; (4) researching, selecting,

12  and adopting a system of inmate incentives for program participation; (5) working with

13  CDCR senior management to develop a plan to immediately begin reducing the number

14  of lockdown days (i.e. days that the movement of inmates outside of their cells is

15  restricted) so that inmates can participate in programming; and (6) developing

16  expenditure priorities for the $50 million in rehabilitation and treatment supplement funds

17  authorized by Assembly Bill 900, Section 28(b).

18          10.     The Rehabilitation Strike Team concluded its operations in December

19  2007. The Rehabilitation Strike Team's successful efforts were attributable in part to

20  work previously completed by the Expert Panel.  The Expert Panel was tasked with

21  reviewing the then-existing rehabilitation programs offered by CDCR for adult offenders,

22  and providing a blueprint for improving current programs and their effectiveness.

23          11.     During my tenure as lead member of the Rehabilitation Strike Team from

24  May 2007 to September 2007, the Rehabilitation Strike Team was able to expand

25  substance abuse treatment programs available to parolees; prioritize expenditures for

26  the $50 million in rehabilitation and treatment supplement funds authorized by Assembly

27  Bill 900; draft technical amendments to Assembly Bill 900; help expedite three contracts

28  to hire consultants to assist CDCR in: (1) developing a risk assessment tool (*see*

- 4 -

1  discussion below); (2) developing a parole violation matrix with the Center for Effective
2  Public Policy, and (3) improving the accuracy of CDCR's prison population.

3         12.    As described previously, as Undersecretary of Programs, I also oversaw
4  the design and implementation of an integrated rehabilitation work plan, also known as
5  the Master Work Plan for Rehabilitative Programming. This Plan integrates the
6  strategies to reduce recidivism which are contained in the June 2007 Expert Panel
7  Report, the December 2007 Rehabilitation Strike Team Report, and Assembly Bill 900.
8  Based on the recommendations and directions of each of these three documents, the
9  Plan is based on the California Logic Model (prepared by the Expert Panel) which is an
10 offender case management system that provides steps from reception to parole
11 including (1) a risk and needs assessment and a secondary assessment; (2) a case
12 management plan; (3) delivery of programs; (4) measurement of individual progress; (5)
13 preparation for reentry; (6) reintegration in communities and follow-up; and (7) and
14 evaluation of program fidelity. A true and correct copy of CDCR's Adult Programs
15 Rehabilitative Programming Reform Project Work Plan is marked as Defendants' Trial
16 Exhibit 1184.

17        13.    Each of these aspects of the offender case management plan enable
18 inmates' criminogenic needs to be met so that they will program and develop the skills
19 they will need for a successful reintegration into society upon release from prison. The
20 Plan also ensures that CDCR appropriately allocates its resources to those high-risk
21 offenders who are most in need of a higher level of supervision. Additionally, the Plan
22 assesses an inmate's progress in prison and is updated to reflect any successes or
23 achievements obtained such as obtaining a G.E.D. This periodic evaluation of an
24 inmate's progress is designed so that once an offender is released on parole, his or her
25 criminogenic needs can continue to be met. Based on similar models adopted in other
26 states, these programs are designed to reduce the rate of recidivism and, in turn, reduce
27 overcrowding within CDCR's institutions.

28 ///

- 5 -

## IV.    REHABILITATION STRIKE TEAM RECOMMENDATIONS.

14.    The Rehabilitation Strike Team prepared several reports, including a final report with recommendations in December 2007.  The Rehabilitation Strike Team made 4 specific recommendations: (1) development of an Offender Accountability and Rehabilitation Plan, which is a personalized case management plan created at reception center intake and updated throughout the prison sentence so that it is specifically tailored to the individual inmate's needs and risks and also directs inmates and CDCR staff to appropriate rehabilitation programs and services in prison and on parole; (2) creation of training curriculum focused on rehabilitation for correctional and rehabilitation staff at CDCR, which would be utilized by local community colleges; (3) creation and implementation of the New Start program; and (4) creation and implementation of a new Parole Violator Decision-making Instrument that will weigh the risks and needs of the parolee and seriousness of the parole violation and provide intermediate sanctions for minor parole violations instead of parole revocation.  The Plan described above implemented the Rehabilitation Strike Team's recommendations for an Offender Accountability and Rehabilitation Plan, New Start program, and Parole Violator Decision-making Instrument.

## V.    ASPECTS OF THE ADULT PROGRAMS REHABILITATIVE PROGRAMMING REFORM PROJECT PLAN (PLAN)

### A.    Risk and Needs Assessment.

15.    The risk elements of COMPAS were validated for use in California in 2007, and COMPAS is currently in the process of being implemented system-wide.  When an inmate first arrives at a CDCR reception center for intake, the inmate's risk and needs are assessed and a case management plan is created.  COMPAS also evaluates the specific needs of individual inmates as they relate to academic, substance abuse, anger management, vocational education, and behavior modification.  By identifying those high-risk offenders, resources may be appropriately focused on those offenders to provide increased supervision, thus increasing their chances for success.  A true and

- 6 -

1  correct copy of the Correctional Offender Management Profiling for Alternative Sanctions

2  (COMPAS) is marked as Defendants' Trial Exhibit 1190.

3       16.    COMPAS is currently being used to evaluate risk and needs in 12

4  institutions, and by the Division of Adult Parole Operations. All reception centers should

5  assess all incoming inmates by the first week of February 2009. The initial risk and

6  needs assessment for all inmates is scheduled to be completed by June 30, 2009.

7  **B.    Case Management Plan.**

8       17.    The risk and needs information provided by COMPAS assesses an

9  inmate's criminogenic needs upon his or her entry into CDCR and creates a case

10  management plan tailored to each specific inmate with the goal of giving each inmate

11  the skills he or she needs to develop before reentry into society. The Plan is designed

12  such that inmates are assessed throughout their term in CDCR to monitor progress and

13  achievement, allowing for adjustment of the plan accordingly. Additionally, an inmate's

14  case management plan follows him or her during incarceration through parole. The case

15  management plan is reviewed and monitored by the offender's Correctional Counselor I

16  while incarcerated and then by the parole agent at the time of parole, to ensure that

17  each parolee continues to have his or her crimongenic needs met. This program is in its

18  beginning stages.

19  **C.    Delivery of Programs.**

20       18.    As an additional aspect of the Plan, it is my responsibility to assess

21  CDCR's rehabilitative programs and identify any impediments to the use of these

22  rehabilitative programs so as to increase utilization of these academic and vocational

23  education programs by inmates. When I began the task of looking for ways to improve

24  CDCR's current programs, I discovered that the programs were being under-utilized.

25  Two major impediments existed: gang activity and lockdowns. Gang activity causes

26  inmates to be focused on criminal behavior rather than on successful programming for

27  reentry into the community. In addition, gang activity causes lockdowns, which shut

28  down programs to ensure the safety and security of the institution. CDCR implemented

- 7 -

1    Operation Changing Tides in March 2008 in response to my finding. Operation
2    Changing Tides was a 10-day operation designed to gather intelligence about the
3    activities of the prison gangs and disruptive groups at California State Prison, Solano,
4    and to identify, validate, and remove inmates aligning themselves with prison gangs or
5    participating in violent acts. Operation Changing Tides was successful in identifying
6    inmates involved in prison gangs, and resulted in a reduction in activity that leads to
7    lockdowns which impeded access to rehabilitation programs. CDCR is now developing
8    a performance-based budgeting system to ensure that institutions are managing to
9    ensure inmate access to programs.

10          19.    CDCR has also improved its lockdown response such that programs,
11   institutions, and camps are quickly unlocked so that inmates can attend their programs.
12   Based on my observations, lockdowns have been significantly reduced in both length
13   and frequency since September 2007. Since my appointment to Undersecretary of
14   Programs, there has only been one statewide lockdown.

15          20.    As Undersecretary of Programs, I selected for implementation three new
16   programs for in-custody offenders: CALM (anger management), "Thinking for a Change"
17   (cognitive skills training program to reduce criminal thinking), and a Life Skills program
18   for a low-risk offender's track. Admission into the programs is prioritized based on the
19   risk level of the offender. Inmates with high or medium risk levels will be assessed and
20   placed into the appropriate program tracks. I am also in the process of determining the
21   best model to implement for programs aimed at treatment of sex offenders. Family,
22   Marital, and Relationship programs will be implemented at a later stage of the inmate's
23   stay -- programs are being reviewed for adoption.

24   D.     Measurement of Individual Progress.

25          21.    The Correctional Counselor will act as case manager and will evaluate an
26   inmate's progress on a monthly basis. The case manager will meet with various staff
27   responsible for the inmate's programming, such as the inmate's work site supervisor or
28   substance abuse counselor, to discuss the inmate's progress through the case

- 8 -

TRIAL AFFIDAVIT OF KATHY JETT
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)                    1658361.2

1  management plan. In my current capacity as Undersecretary, I am working with

2  wardens to develop a system of in-custody incentives that would encourage inmates to

3  participate in programs, and in the future, progress through their case management plan

4  successfully.

5  **E.    Preparation for Reentry.**

6        22.    The integrated rehabilitation plan implements the Rehabilitation Strike

7  Team's recommendation that CDCR develop a prison-to-employment program. CDCR

8  collaborated with the California Workforce Investment Board in September 2007 to hold

9  job forums with employers. These job forums helped build employer relationships with

10  CDCR in order to increase job opportunities for parolees. CDCR adopted the

11  Rehabilitation Strike Team's recommended program, New Start, which is a streamlined

12  offender employment placement system. CDCR has been developing New Start since

13  September 2007, and has received approval of its budget proposal requesting funding

14  for several positions within this program. Beginning in October 2008, CDCR started

15  filling these positions. CDCR and the California Workforce Investment Board are in the

16  process of developing an interagency agreement that will enable the California

17  Workforce Investment Board to match parolees with jobs in the community.

18  **F.    Reintegration into Communities.**

19        23.    COMPAS is also used by the Division of Adult Parole Operations. A new

20  assessment for risks and needs is done before parole. Upon parole, the offender's

21  parole agent becomes the case manager for the parolee. The parole agent uses the

22  COMPAS assessment to match a parolee with programs, housing, treatment, and

23  education in the community. The risk assessment measures the offender's risk to

24  reoffend. The parole agent also facilitates employment through the New Start program.

25        24.    CDCR is establishing secure reentry facilities to ensure reintegration of

26  offenders into their communities. My responsibilities include the program design for

27  reentry programs, and require me to participate actively in community meetings.

28  ///

- 9 -

**G.    Follow-Up and Evaluation of Program Fidelity.**

25.    The integrated rehabilitation plan structures consistent evaluations of programs and periodically updates and validates the risk assessment tools. CDCR established full-time positions to develop policies, procedures, and tools to measure the effectiveness of programs over time.

26.    The integrated plan is being implemented in three "tracks." "Tracks" are implemented simultaneously, instead of in stages. Under this method, institutions will not have to wait to implement the next track, but rather different institutions will be on different tracks depending on the progress of the individual institutions. Track I focuses on improving the programs currently offered by CDCR. Track II focuses on building and testing the offender case planning process. Track III implements the integrated rehabilitation plan in all institutions, secured reentry facilities, and parole units.

## VI.    INMATE POPULATION REDUCTION MEASURES

27.    During my tenure as Undersecretary of Programs, there has been a reduction in the prison population. The estimated result of the full implementation of the Plan is a further reduction in the prison population. The Plan requires a completed foundation and proof process for success before full implementation can be completed. The integrated rehabilitation Plan is based on research and successful implementation in other states, which has been modified for California's population. The Plan's full implementation should reduce recidivism by targeting high-risk offenders, focusing resources on those individuals, and ensuring that they receive the programming and assistance they need to successfully reintegrate into society.

28.    In September 2007, CDCR finalized its 13 month discharge policy, which has assisted in lowering the prison population. Certain eligible parolees who remain discipline free for 12 months are released from parole at the 13th month. This helps to reduce the prison population by limiting the number of parolees who may return to prison on technical parole violations. On May 15, 2007, as part of his official duties, Tom Hoffman, Director of CDCR's Division of Adult Parole Operations, issued a

- 10 -

1    memorandum describing this new discharge policy.  I am familiar with CDCR's 13 month

2    discharge policy, and a true and correct copy of the May 15, 2007 memorandum

3    regarding the release of parolees under authority of California Penal Code section 3001,

4    is marked as Defendants' Trial Exhibit 1191.

5          29.    I have also assisted with CDCR's In-Custody Drug Treatment Program so

6    that parole violators may receive substance abuse treatment while serving their parole

7    revocation time at county jail facilities or in a community-based drug treatment program.

8    I secured a contract for 1,800 in-custody drug treatment beds for those parolees with

9    mental illness and substance abuse issues (known as dual diagnosis beds).  CDCR

10   continues to make efforts to establish community-based drug treatment programs

11   designed for parolees with violation charges pending.

12         30.    CDCR also emphasized increasing the ability to place parolees into

13   community-based programs like the In-Custody Drug Treatment Program and use of

14   intermediate sanctions instead of complete parole revocation.  Currently, the emphasis is

15   on placing parolees with mental health and substance abuse needs into these programs.

16         31.    When I first became the lead member of the Rehabilitation Strike Team,

17   CDCR budgeted for 1,800 in-custody drug treatment program beds, but could not get the

18   contracts or community facilities to implement the program.  As lead member, I worked

19   with the California treatment program associations, the *Valdivia* Special Master, and the

20   Board of Parole Hearings directly.  And then as Undersecretary of Adult Programs, I

21   transferred the responsibility for the in-custody drug treatment program beds from the

22   Division of Adult Parole Operations to the Division of Addiction and Recovery Services,

23   CDCR was able to meet a long-standing court order.  In August 2008, for the first time,

24   the in-custody drug treatment program was fully utilized.

25         32.    CDCR also has a Drug Treatment Furlough program that allows inmates to

26   serve the last 120 days of their prison term in a community-based drug treatment

27   program.  The Drug Treatment Furlough program has funding for 500 beds at any given

28   time.  Under my leadership, CDCR is reaching full capacity for these beds.

1      33.    Currently in the pilot project phase are Day Reporting Centers, which will

2   provide programming for parolees who did not receive the programs needed while in

3   custody.  Day Reporting Centers have been successful in other states.  While parolees

4   are in the community, they are evaluated for risks and needs, similar to COMPAS

5   (though all centers will use COMPAS in the future).  The center will take the evaluation

6   and match the parolee to a service.  Parolees will go to the center everyday to receive

7   the services they need.  Services offered will generally include academic, vocational

8   education, life skills, drug treatment and housing issues.  Currently the centers are being

9   planned for a minimum of five counties.

10      34.    Once offenders are discharged from parole, CDCR has no authority to

11   seek funding or offer programs.  I have been meeting with communities to educate them

12   on the needs of their offender community members.  Many communities are not serving

13   the offender population and do not understand the community's role in reducing

14   recidivism.  CDCR established seven new Regional Community Administrator positions

15   at the Career Executive Assignment level to act as liaisons with and to educate the

16   community.  These positions will be filled in the coming months.  I am also working to

17   form a collaborative effort between CDCR and the counties to share services to best

18   meet offender needs and continue programming while in the community.  I am assessing

19   the resources and services that CDCR currently provides to the community, and this

20   assessment will determine what county programs exist, whether those programs are

21   serving parolees, and where there are gaps in services and programs.  CDCR's plan is

22   to seek gap services funding to assist local communities.

23      35.    Lastly, CDCR executed contracts for 2,000 additional substance abuse

24   program slots within approximately eight prisons.

25      36.    At California State Prison, Solano, CDCR will be increasing the substance

26   abuse program by 500 inmates.  Two new modulars are being installed to provide the

27   space for inmates assigned to Yard 3 to participate in the substance abuse program,

28   vocational, and academic programs.

- 12 -

TRIAL AFFIDAVIT OF KATHY JETT
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

1658361.2

# VII.    SUMMARY

37.    Full implementation of the Adult Programs Rehabilitative Programming Reform Project Work Plan is designed to ensure that all inmates receive the necessary programming and education that they will need to reintegrate successfully into society upon release.  The Plan also enables CDCR to direct its resources to those high-risk offenders who will need greater supervision.  And because the Plan follows an offender from his or her initial intake at a reception center, through his or her incarceration and continues after release and during parole, this allows CDCR to identify the criminogenic needs of offenders at every phase of their incarceration.  By addressing an offender's criminogenic needs throughout incarceration and parole, and utilizing other evidence-based tools like the Parole Violator Decision-making Instrument, California should see both a reduction in overcrowding and recidivism, and an increase in public safety.  These dramatic results will be evident in the near future as the Plan continues to be rolled out throughout the State.

I declare under penalty of perjury that the foregoing is true and correct.  Executed in Sacramento, California on October 29, 2008.

KATHRYN P. JETT

- 13 -

TRIAL AFFIDAVIT OF KATHY JETT
(CASE NOS. 2:90-CV-00520 LKK JFM P AND C01-1351 TEH)

1658361.2