EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
Senior Assistant Attorney General
JONATHAN L. WOLFF
Supervising Deputy Attorney General
LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
KYLE A. LEWIS – State Bar No. 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile: (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>            Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>__THREE-JUDGE COURT__ |
| MARCIANO PLATA, et al.,<br><br>            Plaintiffs,<br><br>   v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>            Defendants. | No. C01-1351 TEH<br><br>__THREE-JUDGE COURT__<br><br>**TRIAL AFFIDAVIT OF MATTHEW CATE**<br><br>**To: Three-Judge Panel** |

-1-

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1    I, Matthew Cate, declare:

2        1.     I am the Secretary of the California Department of Corrections and

3    Rehabilitation (CDCR).    I have personal knowledge of the facts stated in this declaration

4    and if called to testify about those facts could and would do so competently.

5                        I.        **Current Position and Background**

6        2.     I was appointed Secretary of the CDCR on May 16, 2008.  As Secretary, I

7    have responsibility for and oversight of CDCR's overall operations.  The mission of the

8    CDCR is to enhance public safety through safe and secure incarceration of offenders,

9    effective parole supervision, and rehabilitative strategies to successfully reintegrate

10   offenders into our communities.  The CDCR is charged with achieving reform and

11   rehabilitation while maintaining public safety.

12       3.     Prior to my appointment as Secretary, I served as Inspector General for the

13   State of California.  As Inspector General, I was responsible for, among other things,

14   public oversight of the CDCR.  Since 2007, I also served as the chair of the California

15   Rehabilitation Oversight Board and in that capacity was responsible for reporting to the

16   state legislature on the progress made by the CDCR in fulfilling its obligation to provide

17   effective rehabilitative programs to California's inmates and parolees.

18       4.     Prior to becoming California's Inspector General, I served as a state and

19   local prosecutor.  From 1996 to 2004, I served as a Deputy Attorney General at the

20   California Department of Justice.  In that capacity, I supervised a team of trial and

21   appellate prosecutors, managed a criminal trial caseload of political corruption matters,

22   and provided counsel to county grand juries.  In 2003, while working on federal fraud

23   and corruption matters, I was cross-designated as a Special Assistant United States

24   Attorney.  From 1994 to 1996, I was a Deputy District Attorney for Sacramento County,

25   last serving in a special assignment prosecuting juvenile rape and murder cases.  Prior

26   to joining the public sector, I worked as a business litigation attorney with Downey,

27   Brand, Seymour & Rohwer.  I have also held several positions as an instructor of legal

28
                                    -2-

1  and law enforcement-related topics, including standards training for peace officers. I

2  earned my Doctor of Jurisprudence from the University of Oregon School of Law and a

3  bachelor of science degree in business administration from Linfield College.

## II.    Overview

5      5.    CDCR opposes Plaintiffs' request for a prisoner release order. CDCR is

6  dedicated to providing necessary and appropriate medical and mental health care to its

7  inmates. CDCR's position is that overcrowding is not the primary cause of the alleged

8  constitutional inadequacies in the delivery of medical and mental health care in

9  California's prisons; that alternatives other than a prisoner release order exist to address

10  the alleged inadequacies in the delivery of medical and mental health care as well as

11  overcrowding; and that a prisoner release order would have an adverse impact on public

12  safety and the local criminal justice systems.

13      6.    As I explain below, California has a large inmate population, but it is not

14  disproportionately large when the size of California's resident population is taken into

15  consideration. Since the Plata Court's appointment of a Receiver, CDCR has not been

16  in charge of providing medical care to inmates, but it continues to cooperate with the

17  Receiver's efforts to provide and improve delivery of medical care. Improvements made

18  in connection with medical staffing and facilities are outlined in the trial affidavits of Scott

19  Kernan, Undersecretary of Operations for CDCR, and Deborah Hysen, Chief Deputy

20  Secretary of Facilities Planning, Construction and Management.

21      7.    CDCR remains responsible for the provision of mental health care to

22  inmates. As touched upon below and described in greater detail by Robin Dezember,

23  the Chief Deputy Secretary of Health Services for CDCR, in his trial affidavit, CDCR has

24  made significant improvements in the delivery of mental health care to its inmates and is

25  dedicated to continuing to make improvements and to providing needed mental health

26  care. Also, in his trial affidavit Mr. Kernan addresses improvements related to staff

27  training regarding mental health issues, and in her trial affidavit, Ms. Hysen addresses

28

-3-

1   improvements in mental health facilities.

2      8.      CDCR has made efforts to address overcrowding, including transferring

3   inmates out of state, and has ongoing plans in place to help stabilize and reduce the size

4   of the prison population, which are described below and are also detailed in the trial

5   affidavits of Mr. Kernan; Kathy Jett, Undersecretary of Programs for CDCR; and Thomas

6   Hoffman, Director of the Division of Adult Parole Operations for CDCR.

7                    III.    CDCR's Inmate Population

8      9.      California is the nation's most populous state, with a total resident

9   population of about 36.5 million.  This information was obtained from the U.S. Census

10  Bureau's 2007 Population Estimates, which is available on the internet at

11  http://factfinder.census.gov/servlet/GCTTable?_bm=y&-geo_id=01000US&-

12  _box_head_nbr=GCT-T1-R&-ds_name=PEP_2007_EST&-_lang=en&-format=US-9S&-

13  _sse=on.  A true and correct copy of the U.S. Census Bureau's 2007 Population

14  Estimates obtained from the internet on October 17, 2008 is marked as Defendants' Trial

15  Exhibit 1253.

16     10.     As of August 27, 2008, the total CDCR inmate population was 172,057.  Of

17  this total, 156,352 were in in-state Institutions, 6,312 were in Community Correctional

18  Centers, 4,788 were in out-of-state Institutions, 4,386 were in Camps, and 219 were in

19  Department of Mental Health State Hospitals.  This information was obtained from

20  CDCR's Weekly Report of Population as of Midnight August 27, 2008, published on

21  September 2, 2008, by the Data Analysis Unit of the Estimates and Statistical Analysis

22  Section Offender of the Information Services Branch of the CDCR.  The Data Analysis

23  Unit compiles and publishes weekly population information for the CDCR as part of its

24  official, authorized duties and the Weekly Reports of Population are an official CDCR

25  publication.  A true and correct copy of the August 27, 2008 Weekly Report of Population

26  is marked as Defendants' Trial Exhibit 1203.

27     11.     CDCR has 33 adult prisons.  A true and correct copy of a map of

28                                      -4-

1    California's Correctional and Rehabilitation Facilities is marked as Defendants' Trial

2    Exhibit 1254.

3         12.    CDCR oversees the statewide coordination and support of the Community

4    Correctional Facilities (CCF) program that provide necessary housing and services for

5    inmates serving a sentence of 18 to 24 months or less, who meet the CCF eligibility

6    criteria for minimum to medium security housing. The mission of the CCF program is to

7    provide safe and secure inmate housing while maximizing opportunities for rehabilitation

8    through participation in work, vocational and academic programs, substance abuse

9    treatment and self-help programs.  CCF Administration currently oversees thirteen

10   (13) facilities including:  six public CCFs, four private CCFs (including one female CCF)

11   and three private Modified Community Correctional Facilities, which are considered to be

12   a more secure environment with enhanced physical plant features and enhanced

13   security staffing.

14         13.    CDCR's Conservation Camps Program provides the State of California's

15   cooperative agencies with an able-bodied, trained workforce for fire suppression and

16   other emergencies such as floods and earthquakes.  Fire crews also work on

17   conservation projects on public lands and provide labor on local community service

18   projects.  Adult inmates assigned to the camps are carefully screened and medically

19   cleared.  Only minimum custody inmates – both male and female – may participate in

20   the Conservation Camps Program.  To be eligible, they must be physically fit and have

21   no history of violent crime including kidnapping, sex offenses, arson or escape.  Neither

22   the Community Correctional Facilities' nor the Camps' populations exceed design

23   capacity to any significant degree and are not overcrowded.

24         14.    The CDCR institutional population has four types of inmate

25   admission/return statuses: 1) New Admissions, 2) Parole Violators Returned With a New

26   Term, 3) Parole Violators Returned to Custody, and 4) Parolees Pending Revocation.

27   New Admissions are inmates who are serving their first prison commitment from a court.

28

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1    Parole Violators Returned With a New Term are parolees who have received a court

2    sentence for a new crime and been returned to prison. Parole Violators Returned to

3    Custody are parolees who violated a condition of parole and were returned to CDCR.

4    Parolees Pending Revocation are parolees who have been charged with violating a

5    condition of parole and placed in CDCR custody pending investigation to determine if

6    revocation time will be assessed.

7         15.    As of June 30, 2008, 63.5% (108,676) of the CDCR institutional population

8    were New Admissions, 25.2% (43,111) were Parole Violators Returned With a New

9    Term, 9.2% (15,689) were Parole Violators Returned to Custody, and 2.1% (3,593) were

10   Parolees Pending Revocation.   These figures are set forth in Table 1 of the Prison

11   Census Data report as of June 30, 2008, published in August 2008, by the Data Analysis

12   Unit (Prison Census Data report), a true and correct copy of which is marked as

13   Defendants' Trial Exhibit 1255.   The Prison Census Data report was compiled and

14   published as part of the official, authorized duties of the Data Analysis Unit and is an

15   official CDCR publication. In 2007, 84% of parolees referred to the Board of Parole

16   Hearings were referred for a misdemeanor or felony violation, while only 16% were

17   referred for purely technical violations. This information was generated by the Division of

18   Adult Parole Operations, IT Division, based on data in the Revocation Scheduling and

19   Tracking System, and is reflected in a chart prepared by the IT Division, a true and

20   correct copy of which is marked as Defendants' Trial Exhibit 1255. Purely technical

21   failures can include, among other things, missing or failing a drug test.

22        16.    As of June 30, 2008, 52.6% (89,921) of the CDCR institutional population

23   were in prison for Crimes Against Persons, 20% (34,275) were in prison for Property

24   Crimes, 19.3% (32,933) were in prison for Drug Crimes, and 8.1% (13,940) were in

25   prison for Other Crimes. These figures are set forth in Table 3 of the Prison Census

26   Data report.

27        17.    As of June 30, 2008, the largest group of offenders were inmates convicted

28

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)                                    1658544.3

1 | of 1st and 2nd Degree Murder, at 13.8% (23,525) of the population. When combined
2 | with Manslaughter (1.9%) and Vehicular Manslaughter (0.4%), Homicide convictions
3 | make up 16.1% (27,466) of the population. The second largest group of offenders were
4 | inmates convicted of Robbery, at 11.9% (20,285) of the population. Together, these
5 | offense groups account for 28% (47,751) of all inmates. The third largest group of
6 | offenders were inmates convicted of 1st and 2nd Degree Burglary, at 8.0% (13,685) of
7 | the population. Accordingly, Homicide, Robbery, and Burglary convictions account for
8 | over one-third (61,436) of all inmates. These figures are set forth in and derived from
9 | Table 2 of the Prison Census Data report. In addition, 13.4% (22,886) of inmates meet
10 | the Sex Registration Requirement. This figure is set forth in Table 9 of the Prison
11 | Census Data report. Assault with a Deadly Weapon accounts for 7.0% (11,954) of
12 | inmates.

13 |       18.       According to the CDCR Office of Research, Offender Information Services
14 | Branch, crimes against persons were the single most significant source of the increase
15 | in the prison population between 1997 and 2007. The number of inmates in prison for
16 | crimes against persons increased from 65,028 in 1997 to 88,612 in 2007, a total
17 | increase of 23,854. In sharp contrast, the number of inmates in prison for drug offenses
18 | decreased from 41,459 in 1997 to 33,738 in 2007. Because the number of inmates
19 | incarcerated for drug offenses declined in that 10-year period, the growth in the inmates
20 | incarcerated for crimes against persons accounts for more than 100 percent of the total
21 | increase in the prison population from 1997 to 2007. As part of its official duties, the
22 | Office of Research, Offender Information Services Branch provides research-based
23 | information to CDCR administrators, staff, and others outside the Department. The
24 | Office of Research, Offender Information Services Branch derived this information
25 | regarding the growth in the prison population from Table 9, page 17 of the official CDCR
26 | publication, California Prisoners & Parolees 2007, a true and correct copy of which is
27 | marked as Defendants' Trial Exhibit 1261. A true and correct copy of the spreadsheet
28 |

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1     showing the Offender Information Service Branch's calculation is marked as Defendants'

2     Trial Exhibit 1261A. The substantial decline since 2001 in the number of inmates

3     incarcerated based on drug offenses is due in part to the implementation of Proposition

4     36 and the drug courts.

5          19.     One-third of the institutional population comes from Los Angeles County.

6     This figure is set forth in Table 7 of the Prison Census Data report.

7          20.     As of June 30, 2008, the mean (or average) age of the institutional

8     population, for both men and women, was 37. This figure is set forth in Table 6 of the

9     Prison Census Data report. 53.8% of the institutional population is 35 and over. Women

10    make up 6.7% (11,401) of the institutional population. These figures are derived from

11    Table 5 of the Prison Census Data report.

12              **IV.    How CDCR's Inmate Population Compares to Other States**

13         21.     The next most populous state in the United States is Texas, with

14    approximately 23.9 million residents, or 12.6 million fewer residents than California. This

15    information was obtained from the U.S. Census Bureau's 2007 Population Estimates,

16    which is marked as Defendants' Trial Exhibit 1253. According to its Statistical Report for

17    Fiscal Year 2007, as of August 31, 2007, the Texas Department of Criminal Justice

18    housed 152,661 inmates in its state facilities—only 20,000 fewer inmates than CDCR. A

19    copy of the Texas Department of Criminal Justice, Statistical Report, Fiscal Year 2007,

20    published July 2008, is available on the official website of the Texas Department of

21    Criminal Justice at

22    http://www.tdcj.state.tx.us/publications/executive/Fiscal%20Year%202007%20Statistical

23    %20Report.pdf. A true and correct copy of the Texas Department of Criminal Justice's

24    Statistical Report, Fiscal Year 2007 obtained from the internet on October 17, 2008 is

25    marked as Defendants' Trial 1256.

26         22.     According to the U.S. Department of Justice, Office of Justice Programs,

27    Bureau of Justice Statistics, as of December 31, 2006, the incarceration rate for

28

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1  prisoners sentenced to more than one year in either State or Federal prisons was 501

2  per 100,000 U.S. residents.  Among the States, the incarceration rate for prisoners

3  sentenced to more than 1 year ranged from a high of 846 per 100,000 persons in

4  Louisiana to a low of 151 per 100,000 in Maine.  California's incarceration rate was 475,

5  below that of 16 other States, including Texas, which had an incarceration rate of 683

6  per 100,000 residents.  This information is available in the Prisoners in 2006 Bulletin,

7  published in December 2007 by the U.S. Department of Justice, Office of Justice

8  Programs, Bureau of Justice Statistics, at page 6 and Appendix Table 6.  The Prisoners

9  in 2006 Bulletin is available on the official website of the U.S. Department of Justice at

10  http://www.ojp.usdoj.gov/bjs/pub/pdf/p06.pdf.  The Bureau of Justice Statistics published

11  the Prisoners in 2006 Bulletin as part of the legally mandated National Prisoner Statistics

12  program, which collects statistics on prisoners at midyear and yearend.  A true and

13  correct copy of the Prisoners in 2006 Bulletin obtained from the internet on October 17,

14  2008 is marked as Defendants' Trial Exhibit 1257.

15        23.     According to the California Department of Justice, for the period from 2001

16  through 2006, fewer than 1 in 5 felony convictions resulted in a prison sentence in

17  California.  During the same period, by far the most common disposition of convicted

18  felons was probation with jail.  Also, during that same period, sentencing to prison

19  decreased from 21.5% to 18.8% for drug offense convictions, while sentencing to

20  probation increased from 18.1% to 34.2%.  This information is available from Crime in

21  California 2006, published by the California Department of Justice, Criminal Justice

22  Statistics Center, at Table 41 "Adult Felony Arrestees Convicted, 2001-2006".  The

23  Criminal Justice Statistics Center published Crime in California 2006 pursuant to the

24  California Attorney General's duty to collect, analyze, and report statistical data, which

25  provide valid measures of crime and the criminal justice process to government and the

26  citizens of California.  Crime in California 2006 is available on the official website of the

27  California Department of Justice at

28

-9-

1    http://ag.ca.gov/cjsc/publications/candd/cd06/preface.pdf.  A true and correct copy of

2    Crime in California 2006 is marked as Defendants' Trial Exhibit 1258.

3         24.    The probability of being sentenced to prison for a felony conviction in

4    California is lower than the average nationwide percentage.  According to the most

5    recent available official statistics of the U.S. Department of Justice, 40% percent of

6    felons were sentenced to prison by State courts in 2004.  This information is derived

7    from Table 1.2 of the U.S. Department of Justice, Office of Justice Programs, Bureau of

8    Justice Statistics' publication, "State Court Sentencing of Convicted Felons 2004 -

9    Statistical Tables," which is available at the official U.S. Department of Justice website at

10    http://www.ojp.usdoj.gov/bjs/pub/html/scscf04/tables/scs04102tab.htm.  A true and

11    correct copy of Table 1.2 of the State Court Sentencing of Convicted Felons 2004 -

12    Statistical Tables, which was obtained from the internet on October 24, 2008 is marked

13    as Defendants' Trial Exhibit 1221.

14         25.    The average prison sentence imposed in California is currently 47.2

15    months and the average time served is 23.9 months.  This information is available on the

16    official CDCR website for Second Quarter 2008 Facts and Figures at

17    http://www.cdcr.ca.gov/Divisions_Boards/Adult_Operations/Facts_and_Figures.html/.  A

18    true and correct copy of the Second Quarter 2008 Facts and Figures is marked as

19    Defendants' Trial Exhibit 1310.  According to the most recent available official statistics

20    of the U.S. Department of Justice, the average (or mean) prison sentence imposed

21    nationwide by State courts in 2004 was 57 months.  This information is derived from

22    Table 1.3 of the U.S. Department of Justice, Office of Justice Programs, Bureau of

23    Justice Statistics' publication, "State Court Sentencing of Convicted Felons 2004 -

24    Statistical Tables," which is available at the official U.S. Department of Justice website at

25    http://www.ojp.usdoj.gov/bjs/pub/html/scscf04/tables/scs04103tab.htm.  A true and

26    correct copy of Table 1.3 of the State Court Sentencing of Convicted Felons 2004 -

27    Statistical Tables, which was obtained from the internet on October 24, 2008 is marked

28

-10-

1    as Defendants' Trial Exhibit 1221. According to the most recent available official

2    statistics of the U.S. Department of Justice, the average nationwide estimated time

3    served in State prison was 32 months. This information is derived from Table 1.5 of the

4    U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics'

5    publication, "State Court Sentencing of Convicted Felons 2004 - Statistical Tables,"

6    which is available at the official U.S. Department of Justice website at

7    http://www.ojp.usdoj.gov/bjs/pub/html/scscf04/tables/scs04105tab.htm. A true and

8    correct copy of Table 1.5 of the State Court Sentencing of Convicted Felons 2004 -

9    Statistical Tables, which was obtained from the internet on October 24, 2008 is marked

10   as Defendants' Trial Exhibit 1221.

11          26.    Since California is the most populous state, simply enforcing the law and

12   incarcerating convicted criminals at a relatively ordinary rate for the United States results

13   in a high number of prisoners.

14                        **V.    Population Trends**

15          27.    Twice a year, CDCR publishes population projections. The Estimates and

16   Statistical Analysis Section of the Office of Research is responsible for the semiannual

17   publication of the Population Projections as part of its official duties. A true and correct

18   copy of the official CDCR Adult Population Projections, 2008-2013, published in Spring

19   2008 is marked as Defendants' Trial Exhibit 1161.

20          28.    The Fall 2007 Population Projections indicated that the growth in the

21   CDCR inmate population would continue through 2013, even though the growth had

22   been slowing for the prior twelve months. By the time the Spring 2008 Projections were

23   produced, simultaneous decreases in four major population drivers resulted in a reversal

24   of the trend, projecting a decrease in institution population from 171,126 in 2008 to

25   167,535 in 2013, a drop of 3,591 over the six years. This compares to a projected

26   increase of 16,468 in the previous projection (Fall 2007) for the same time period

27   (175,418 to 191,886). These projections result in a population forecast for June 2013

28
                                        -11-

1    that is lower than projected in Fall 2007.  The Projected Institution Populations for June

2    30, 2008 through June 30, 2013 are set forth in the Table B in the Appendix of the

3    Spring 2008 Population Projections.

4         29.    The factors behind the reduction, including lower admissions from court,

5    lower returns to custody, and shorter sentences and lengths of stay resulted in a

6    dramatic reversal in the projected population trend.

7                **VI.    Provision of Medical Care to Inmates**

8         30.    Since the appointment of the Receiver in the Plata case to manage the

9    delivery of medical care to inmates, CDCR is not in charge of the provision of medical

10   care.  All medical staff, from Chief Medical Officers to Licensed Vocational Nurses, are

11   hired by and report to the Receiver.  CDCR's role is to coordinate and cooperate with the

12   Receiver's efforts to deliver medical care to inmates.  As Secretary of the CDCR, my

13   understanding is that the delivery of medical care to inmates has improved significantly

14   since the Receiver's appointment.

15               **VII.    Provision of Mental Health Care to Inmates**

16        31.    In my tenure as Secretary of the CDCR, I have become familiar with the

17   improvements made and significant milestones met by CDCR in providing mental health

18   care to inmates.  In the past 13 years, CDCR has made tremendous improvements in

19   the provision of mental health care to its inmates.  They include developing and

20   implementing a uniform set of system-wide policies and procedures, hiring qualified

21   clinicians and other staff, and providing segregated housing to mentally ill inmates who

22   need enhanced outpatient care or higher.  These improvements are detailed by Mr.

23   Dezember, the Chief Deputy Secretary of Health Services for CDCR, in his trial affidavit.

24            **VIII.    Addressing the Size of the Inmate Population**

25        32.    As Secretary of the CDCR, I am a member of the Association of State

26   Correctional Administrators.  Through my participation in that Association, I have learned

27   that many State's correctional directors have experienced crowding problems, which

28

-12-

1    they have attempted to address with various tools from additional capacity to out-of-state

2    transfers. It is a common struggle among all correctional administrators. California is

3    not alone in having to work out population size and flow problems.

4        33.    CDCR has a goal of eliminating its nontraditional beds. It plans to address

5    the size of the California inmate population through a combination of programs such as

6    reduced recidivism through parole reform; enhanced clerical support to enable timely

7    discharge of parolees; a construction plan; a re-entry plan; staffing increases; general

8    reform efforts related to the rehabilitation of California's offenders; and out-of-state

9    transfers. The specifics of CDCR's plan to increase capacity is set forth in the Integrated

10   Strategy to Address Overcrowding in CDCR's Adult Institutions, a true and correct copy

11   of which is marked as Defendants' Trial Exhibit 1196.

12       34.    The Governor's Proposed Budget for Fiscal Year 2008/09 submitted in

13   January 2008 proposed a population reduction based on a budgetary goal of a 10%

14   reduction in expenditures. The proposed 10% budget reduction goal was directed at all

15   State agencies and departments to satisfy the State Constitutional mandate of a

16   balanced budget. The recommendations for achieving a population reduction to reach a

17   10% reduction in expenditures were ultimately rejected. The January 2008 Budget was

18   a preliminary proposal, was not approved by the Legislature, and was in fact superseded

19   by a May revised budget.

20   **A.    Parole Reform**

21       35.    CDCR plans to implement parole reform to reduce recidivism. Reduced

22   recidivism will result in a decrease in the prison population. Mr. Kernan, the Chief

23   Deputy Secretary of Adults Operations for CDCR, and Mr. Hoffman, the Director of the

24   Division of Adult Parole Operations for CDCR, address the details of the proposed

25   parole reforms in their trial affidavits. The particular challenge of parole reform is the

26   need to exercise extraordinary care to ensure that the risks to public safety are properly

27   balanced with the possible benefits of a reduction in the prisoner population. There are

28

-13-

1  individual safety concerns of possible individual victims that have to be considered as

2  well as the impact on the overall crime rate. As Secretary, I want to ensure that

3  whatever CDCR does to try to impact its prison population does not cause more

4  victimization in our society.

5        36.    The best correctional science says that in determining whether to revoke

6  an offender's parole status or discharge a prisoner from parole, the risk of the offender

7  committing a crime needs to be accurately assessed. With respect to treatment of

8  parole violations, a parole violation decision-making instrument should be applied to help

9  guide the parole officer and ultimately the parole board or deputy commissioner in

10  making better parole decisions, including revocation decisions.

11        37.    In some other states, District Attorneys handle parolees who have been

12  involved in new criminal activity and deal with them through the court system. In

13  California, the District Attorney makes a determination as to which crimes to prosecute

14  based on his or her own policies and discretion. There are times when the District

15  Attorney will make a decision to let the parole system revoke the person and send them

16  back to prison because the offender will get about the same amount of time on a parole

17  violation as they would after a misdemeanor adjudication and conviction and sentence.

18        38.    CDCR is implementing a risk assessment tool and parole violation

19  decision-making instrument for the parole revocation process. If a parolee has violated

20  his or her parole, but has shown to be low risk, he or she may be safely handled through

21  a more serious alternative sanction. Alternatively, if a parolee who violates his or her

22  parole and is seen as a high risk, he or she may have his or her parole revoked for the

23  safety of the community.

24  **B.    Rehabilitation**

25        39.    Effective rehabilitation will help reduce recidivism and thereby reduce the

26  prisoner population. Kathy Jett, the Undersecretary of Programs for CDCR, addresses

27  in detail the plan for improving access to and providing appropriate rehabilitation

28

-14-

1  programs to inmates.

2      40.    To further its rehabilitative mission, the CDCR pulled together an Expert

3  Panel on Adult Offender and Recidivism Reduction Programming.  The intent of the

4  Expert Panel's recommendations was to provide more rehabilitative programming to

5  prisoners.  The Expert Panel did not address in any way the delivery of medical or

6  mental health care.

7      41.    A particular priority for rehabilitation of inmates is drug and alcohol

8  treatment.  Since February 2007, the Department has made improvements from the

9  ground up.  CDCR now has a plan to assess its inmates both generally as to their need

10  for drug and alcohol care and also to do secondary assessments that would assess the

11  severity of their addiction, which will allow CDCR to get the right inmates into programs.

12  CDCR has also moved drug and alcohol treatment programs from institutions that were

13  more frequently locked down to institutions that are not locked down as often.  CDCR

14  has a greater rate of participation in those programs than it had before.

15      42.    CDCR now understands that the timing of who is treated and when is

16  important, and that is a foundational component.  A treatment bed is not needed for each

17  prisoner with a drug and alcohol problem.  The science says that inmates are better

18  served going through drug and alcohol programs in their last year, and then immediately

19  going into community aftercare upon release.  The plan is for the Department to first

20  utilize all its beds for those inmates who are in their last year.  An inmate with a drug

21  problem with a year to serve should have priority over an inmate with 5 years to serve.

22      43.    CDCR is working on expanding its substance abuse programs by 2,000

23  slots, meeting phase I requirements of AB 900.  By December 2008, an additional 2,000

24  slots will be in the planning phase.

25      44.    CDCR also now understands the connection of aftercare better, and its

26  planning for new beds always includes planning for aftercare and provision of that kind

27  of treatment, which is foundational.  The Department is also now implementing both a

28

-15-

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1    therapeutic community and cognitive behavioral program. It has also improved the nuts

2    and bolts of the daily operation of running a good program for inmates. CDCR has

3    worked to ensure that providers are on time and that officers are able to get the inmates

4    to the programs.

5    **C.    In-Fill and Re-Entry Beds**

6         45.    As explained in the Integrated Strategy to Address Overcrowding in

7    CDCR's Adult Institutions, CDCR has a plan to increase its capacity by constructing in-fill

8    beds at existing facilities and building new re-entry facilities, as authorized by AB 900 as

9    later amended in Senate Bill 81. The current status of these efforts are described by

10    Deborah Hysen, the Chief Deputy Secretary of Facilities Planning, Construction and

11    Management, in her trial affidavit.

12         46.    With respect to re-entry, effective re-entry requires more than just beds.

13    CDCR plans to work to improve its relationship with local law enforcement to achieve a

14    good handoff from prison to parole and parole to the local community. CDCR also plans

15    to reach out to the community via its community liaisons to let the local providers know

16    which offenders are coming out and when so they can get services to those people right

17    away and know who they are and what their needs are. It is especially important to

18    ensure that CDCR gets a good handoff with the mentally ill parole population so that

19    they receive the needed services that are available in the community.

20    **D.    Out-Of-State Transfers**

21         47.    As of August 29, 2008, approximately 4,852 inmates were placed in out-of-

22    state institutions. We currently plan to place up to a total of 8,000 inmates out-of-state,

23    as necessary and appropriate. CDCR will also seek authorization to transfer more than

24    8,000 inmates out-of-state, if necessary.

25    ///

26    ///

27

28

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3

1

IX.    **Summary**

2      48.    CDCR will continue to work with the Plata Receiver to improve medical

3   care to inmates.  CDCR will continue its own efforts, in coordination with the Special

4   Master, to improve the delivery of mental health care to inmates.  Independent of the

5   issues regarding the delivery of medical and mental health care, CDCR has taken efforts

6   to stabilize and reduce its inmate population.  CDCR's focus here is to eliminate

7   nontraditional beds and free up programming space in order to facilitate its rehabilitative

8   mission.  Improvements in rehabilitation and reforms in parole will help reduce the prison

9   population.  CDCR also plans to increase its capacity as funds are available.  In the

10  interim, CDCR will continue to transfer inmates out-of-state to its currently authorized

11  limit of 8,000 and will seek additional authorization as necessary.

12      I declare under penalty of perjury that the foregoing is true and correct and that

13  this Affidavit was executed on October 30, 2008, at Sacramento, California.

14

15

16                                    MATTHEW CATE

17

18

19

20

21

22

23

24

25

26

27

28

- 17 -

TRIAL AFFIDAVIT OF MATTHEW CATE
(2:90-CV-00520 LKK JFM P)(C01-1351 TEH)

1658544.3