# SUPPLEMENTAL REPORT OF JAMES AUSTIN, Ph.D.

*Coleman v. Schwarzenegger et al.*,

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.*,

No. C01-1351 T.E.H.

SEPTEMBER 25, 2008

This report is a rebuttal to the September 15, 2008 reports of Jerry Dyer and Jerry Powers and the September 22, 2008 "supplemental" report of James Marquart. It is based on the reports of those individuals, and also based upon the same information as my earlier reports. I also received and relied upon a copy of a draft report relied upon by James W. Marquart. That draft report, authored by Ryken Grattet, Joan Petersilia and Jeffrey Lin, is titled "Parole Violations and Revocations in California" (draft July 24, 2008).

**Rebuttal to September 15, 2008 Report of Jerry Dyer**

1. Mr. Dyer's report incorrectly analyzes the impact of the reforms identified in my August 15, 2008 report. Mr. Dyer erroneously claims that the reforms would result in 16,000 serious felony crimes over a three year period. Mr. Dyer's estimate of 16,000 new serious crimes rests on two fundamental errors: 1) he is mistaken when he assumes that there will be 1,920 new releases; and 2) he is mistaken when he assumes that 70% of those (or 1,344) will each commit 12 crimes before they are arrested. Moreover, Mr. Dyer is mistaken about the financial impact of a reduction in the prison population.

2. First, Mr. Dyer's estimate of 1,920 new parolees is incorrect. Mr. Dyer derives the 1,920 figure by estimating Fresno's portion of an estimated 40,000 additional prisoners who would be suddenly released who under current policies would never be released. Current state policies are resulting in over 140,000 prison releases a year. The reform policies analyzed in my report would serve to significantly reduce the number of technical parole violation re-releases. The other reforms I analyze (diverting short term prisoners to parole and moderately reducing the length of stay by only four months) will have a small and short-lived impact on the number of releases, and only in the first year the reforms are implemented. (See my August 15, 2008 report at 40-41).

   Under the policies I analyze in my report, there would be an additional 500-600 releases to Fresno county during the first year of the reform's implementation. (see Table 11 in my August 15, 2008 report). Thereafter the number of releases to Fresno would return to the current level. And as my August 15, 2008 report explains, all of the individuals released under the policies I analyze are individuals *who would otherwise be released,* usually within months.

3. Second, Mr. Dyer incorrectly assumes that 70% of releasees will commit 12 crimes each. This assumption is based upon the erroneous contention that all – or most -- of the parolees in Fresno are "career criminals." In fact, research consistently shows that the vast majority of released prisoners are not career criminals. The primary research on career criminals was first conducted by the Rand Institute on California prisoners. That and subsequent research showed that an estimated 10% of admitted and released prisoners were "career criminals" and that most admitted and released prisoners committed very few if any crimes per

year.[1] Dyer misstates or misunderstands the 10% figure. If one were to apply the 10% figure to Mr. Dyer's (incorrect) estimate of 1,920 new releases, one would expect that 192 of the releasees would be "career criminals." If one were to apply the 10% figure to my estimate of 550 new releases, one would expect that 55 of the releasees would be career criminals. However, even this number overstates the expected results of my proposals, because the policies I outline (e.g. granting good time credits for engaging in recidivism-reducing behavior) would encourage lawful behavior and reduce crime.

4. Thus, Mr. Dyer's assumption that 70% of released parolees will commit 12 crimes each is a vast exaggeration.

5. Mr. Dyer's conclusion of 16,000 new serious felonies also rests upon the erroneous – and unsupported -- assertion that parolees are involved in a proportionally large percentage of crimes.

    In fact, studies by the US Department of Justice show that inmates released in a given year account for less than 5 percent of all arrests in a given jurisdiction. *Recidivism of Prisoners Released in 1994*, June 2002, Bureau of Justice Statistics, U.S. Department of Justice, at 5, table 5. Studies that I have conducted for Texas, Illinois and Michigan show the same results – that released parolees represent a small proportion of all persons who are arrested in a given year.

6. Mr. Dyer also makes the same incorrect assumption that other defense witnesses have made -- that increasing the number of parolees will produce more crime. Data from Fresno County prove that this is not true. Between 1996 and 2005, the number of violent crimes reported in Fresno County declined from 7,837 to 5,574. Serious property crimes also declined from 27,795 to 22,452. Similarly, during the same time period the violent crime rate dropped from 1,018 per 100,000 to 625 per 100,000 and the property crime rate dropped from 3,611 to 2,516 per 100,000. At the very same time that crime rates were declining, the numbers of persons being released from prison to parole in Fresno County were increasing from 3,794 in 1995 (1,816 first paroles and 2,071 re-paroles) to 5,067 (2,002 first paroles and 3,065 re-paroles).

7. Mr. Dyer's report describes the serious drug problem in Fresno County, and the county's lack of resources. He describes three parolees who committed crimes. But it is important to remember that all of these problems exist – and all of the alleged crimes were committed -- under the current system. I demonstrate in my August 15 and August 27, 2008 reports that the short-term incremental increase in parolees will not have an adverse impact on the county's criminal justice system

---

[1] Peter Greenwood and Susan Turner, *Selective Incapacitation Revisited: Why High-Rate Offenders Are Hard to Predict*, Santa Monica, CA, RAND, 1987. Christy A. Visher also found methodological weaknesses in the study; *see* "The Rand Inmate Survey: A Reanalysis," *Criminal Careers and "Career Criminals,"* Vol. 2, Alfred Blumstein et. al., eds., Washington, D.C., National Academy Press, 1986.

because, at most, the new parolees will account for less than one percent of the county's total arrests or jail bookings.

8. There is a way that a prison population reduction could improve public safety and the administration of criminal justice. If, upon a prison population reduction, CDCR reallocated funds currently used to imprison inmates to community resources, the state could improve public safety and the administration of criminal justice.

9. For example, every 10,000 inmates by which the prison population is reduced would produce an estimated savings of $220 million per year (CDCR's budgeting process assumes that each reduction in the population of an overcrowded prison would produce annual cost savings of $21,990). CDCR could and should use these savings, in part, to fund local treatment services for released prisoners.

10. A prison population reduction and an accompanying reallocation of resources compares favorably with the current practices of 1) revoking technical violators, warehousing them for 2-4 months in overcrowded and unsafe reception centers and then re-releasing them, and 2) keeping prisoners incarcerated for an average of four months longer with minimal services and releasing them to the community.

**Rebuttal to September 15, 2008 Report of Jerry Powers**

11. Mr. Powers, too, incorrectly analyzes the impact of the population-reducing measures described in my earlier reports. Mr. Powers erroneously claims that, if 30,000 additional prisoners were released (in a time period he does not specify), that would "result in" 16,200 recidivists. But as noted in my report, the policies I analyze involve reducing the length of stay, or diverting out of prison, inmates who would otherwise be released in a few short months. And my report demonstrates that there would be no significant change in the number of persons released from prison who are being re-arrested and returned to prison. In other words, the reduced length of stay and diversion would cause a short-term increase in the number of releases, but would not **result** in any new recidivists.

12. Mr. Powers incorrectly assumes that reducing the prison population will result in "the inability of the counties to send new commitments to the CDCR." There is no reason to believe that this is true. Under the population reduction programs I analyzed, there would be no change in the number of New Court and Parole Violators with a New Sentences that are currently occurring.

13. Mr. Powers points out the need for additional programs at the local level. As noted above, my recommendations on how to lower the CDCR prison population could generate savings amounting to hundreds of millions of dollars per year, which could be used to fund the programs recommended by Mr. Powers.

3

**Rebuttal to September 22, 2008 Report of James Marquart**

14. Although Dr. Marquart's graphs appear, at first glance, to show a direct correlation between imprisonment rates and crime rates, a closer analysis of the data – and the multitude of research on the topic -- shows no such relationship exists. Indeed, Dr. Marquart himself concedes in his report that his dramatic graphs show nothing more than that "something is 'going on'" but that, whatever it is, it is not "as simple as depicted on the charts."

15. While it is true that California's crime rates have dropped since the early 1990s, the same is true for all other states, regardless of their incarceration rates. In my August 15 report, I explain that crime rates have been dropping in all jurisdictions across the country, including jurisdictions where incarceration rates also declined. (August 15 Report at 12, figures 2 and 3). Dr. Krisberg's report provides further analysis and demonstrates that crime rates dropped in numerous jurisdictions – including jurisdictions throughout California -- while the prisons and jails were reducing their inmate populations. Reducing the prison population, by itself, will not increase crime rates.

16. Dr. Marquart's analysis (at p. 2) mis-states my discussion of the relationship between imprisonment and crime. My complete statement is *"But in general, there is no relationship between crime rates and imprisonment rates."* I was referring to whether states with higher incarceration rates have lower crimes rates. In general, they do not. Nor does decreasing incarceration rates necessarily increase crime or crime rates.

17. Dr. Marquart's report, like the others submitted by defendants, paints a dire picture of available recidivism-reducing programming, and of recidivism rates among parolees. A few points bear mentioning:

    First, those problems exist today, and California nonetheless releases parolees every day.

    Second, parolees account for a very small portion of the crimes committed (according to the Justice Department study cited above, less than 5%).

    Third, most parolees who commit crimes do so in the first six months to one year after release. It is a myth that parolees steadily commit crimes at the same rate over time. *See* Ryken Grattet, Joan Petersilia, Jeffrey Lin, "Parole Violations and Revocations in California," Draft Report July 24, 2008. Thus, any short-term increase in the number of parolees will also have only a short-term impact.

18. Dr. Marquart opines that diverting some technical parole violators would be "irresponsible" because "many of the so-called technical violators were returned to prison for criminal violations." (Marquart at 18). My report – like CDCR's

Expert Panel Report -- recognizes that some technical violators have been arrested for criminal behavior and proposes to divert fewer than half of the technical parole violators (August 15, 2008 Report at 25).

In any event, Dr. Marquart vastly overstates the "criminal violations." An arrest is not the same thing as a conviction. Many of the parolees arrested in California were not -- or could not be -- convicted of any crime. Indeed, a recent draft study (conducted by CDCR consultant Joan Petersilia, among others) concluded that "because the [parole] board operates under a more lenient standard of evidence, there is a greater possibility that factually innocent criminal parole violators may be returned to custody." Grattet, *et.al.*, at 14. That same study found that 35% of the "criminal only" parole violations cases "involve 'drug use' -- typically identified through a failed urinalysis and generally considered to be among the least serious types of violations." *Id.* at 94 n. 56. In short, a substantial number arrested for crimes are in fact innocent of those crimes, or have committed minor offenses. In my experience, I believe it to be highly unlikely that prosecutors who believed they could prove a serious criminal case in court would choose to use parole revocations instead, when a parole violation results in confinement for a maximum of 12 months.

19. Dr. Marquart also opines that "a prisoner release order will have major ramifications for the State parole system" by increasing the number of parolees. Marquart at 11. But my report also analyzes providing "good time" credits for parolees, and discharging violation-free parolees, which would result in a *reduction* in the number of parolees.

5

20. Dr. Marquart is wrong to suggest that reducing the prison population would increase recidivism because of the lack of programs available in the community. The dearth of programs is the status quo, and prisoners are released every day. As I demonstrated in my August 15, 2008 report, reducing inmates' length of stay does not impact recidivism rates. CDCR could *improve* public safety by implementing recidivism-reducing programs. And as I explain above, reducing the prison population would free-up hundreds of millions of dollars now being spent on ineffective incarceration to provide such programming both in prison and in the community.

Dated: September 25, 2008

_____

James Austin, PhD.

6

The dearth of programs is the status quo, and prisoners are released every day. As I demonstrated in my August 15, 2008 report, reducing inmates' length of stay does not impact recidivism rates. CDCR could *improve* public safety by implementing recidivism-reducing programs. And as I explain above, reducing the prison population would free-up hundreds of millions of dollars now being spent on in-effective incarceration to provide such programming both in prison and in the community.

Dated: September 25, 2008

_____
James Austin, PhD.