1  PRISON LAW OFFICE
   DONALD SPECTER BAR NO.: 83925
2  STEVEN FAMA BAR NO.: 99641
   E. IVAN TRUJILLO BAR NO.: 228790
3  GENERAL DELIVERY
   SAN QUENTIN, CALIFORNIA  94964
4  TELEPHONE: (415) 457-9144

5  ROSEN, BIEN & GALVAN, LLP
   MICHAEL W. BIEN BAR NO.: 096891
   JANE E. KAHN BAR NO.: 112239
6  AMY WHELAN BAR NO.: 215675
   LORI RIFKIN BAR NO.: 244081
7  SARAH M. LAUBACH BAR NO.: 240526
   315 MONTGOMERY STREET, 10TH
8  FLOOR
   SAN FRANCISCO, CALIFORNIA  94104
9  TELEPHONE: (415) 433-6830

10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
   CLAUDIA CENTER BAR NO.: 158255
11 LEWIS BOSSING BAR NO.: 227402
   600 HARRISON STREET, SUITE 120
12 SAN FRANCISCO, CA  94107
   TELEPHONE:  (415) 864-8848

13

   Attorneys for Plaintiffs
14

BINGHAM, MCCUTCHEN, LLP
WARREN E. GEORGE BAR NO.: 53588
THREE EMBARCADERO CENTER
SAN FRANCISCO, CALIFORNIA  94111
TELEPHONE: (415) 393-2000

HELLER, EHRMAN, WHITE &
MCAULIFFE
RICHARD L. GOFF BAR NO.: 36377
701 FIFTH AVENUE
SEATTLE, WASHINGTON  98104
TELEPHONE: (206) 447-0900

15           IN THE UNITED STATES DISTRICT COURTS
16         FOR THE EASTERN DISTRICT OF CALIFORNIA
           AND THE NORTHERN DISTRICT OF CALIFORNIA
17  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
18

19 RALPH COLEMAN, et al.,

20         Plaintiffs,

21     vs.

22 ARNOLD SCHWARZENEGGER, et al.,

23         Defendants

24 MARCIANO PLATA ,et al.,

25         Plaintiffs,
       vs.

26 ARNOLD SCHWARZENEGGER, et al.,

27     vs.        Defendants

28

)  No.: Civ S 90-0520 LKK-JFM
)
)  **THREE-JUDGE COURT**
)
)
)
)
)
)
)
)  No. C01-1351 TEH
)
)  **THREE-JUDGE COURT**
)
)
)  **EXPERT REPORT OF JAMES AUSTIN,**
)  **PH.D.**
)

# TABLE OF CONTENTS

**Page**

I.      INTRODUCTION ................................................................................ 1

II.     MY EXPERT OPINIONS IN THIS ACTION ...................................... 5

III.    HISTORY OF OVERCROWDING IN THE CALIFORNIA SYSTEM ............... 6

    A.      Causes and Effects of Severely Overcrowded Prison Systems ........................ 9

    B.      Overcrowding In the California Prison System ............................................. 10

        1.      Significant Delays in Processing and Classifying Prisoners..................... 10

        2.      Excessive Inter-Facility Transfers ........................................................... 12

        3.      Lack of Access to Meaningful Medical, Mental Health Treatment and Rehabilitative Programs ...................................................... 12

        4.      Mis-Housing of Inmates ........................................................................... 14

        5.      Serious Incidents and Safety..................................................................... 15

        6.      Inability to Conduct Valid Individual Needs / Risk Assessments ........... 16

        7.      The Failure of the Work Incentive Program ............................................. 18

IV.     DEFENDANTS' CURRENT EFFORTS TO ADDRESS OVERCROWDING WILL NOT BE EFFECTIVE ............................................. 19

    A.      Building New Prisons ................................................................................... 19

    B.      Out of State Transfers .................................................................................. 20

    C.      Administrative Discharge of Parolees ......................................................... 21

V.      CONCLUSIONS............................................................................................... 21

### EXPERT REPORT OF JAMES AUSTIN, Ph.D.

## I.     INTRODUCTION

1.     I received my Ph.D. in sociology from the University of California at Davis in 1980.  I also hold a Master of Arts degree in sociology from De Paul University in Chicago, Illinois, which I obtained in 1975, and a Bachelor of Arts in sociology from Wheaton College in Wheaton, Illinois, which I obtained in 1970.  I am currently the President of JFA Institute, a non-profit corrections consulting firm that works in partnership with federal, state and local government agencies to implement more effective criminal justice policies.  My complete academic and professional experience is set forth more fully in my curricula vitae, which is attached as **Appendix A.**

2.     I have been involved in correctional planning and research for more than 30 years.  From 1970 to 1974, I worked as a correctional sociologist in the Illinois Department of Corrections.  From 1974 to 1982, I was a research associate at the National Council on Crime and Delinquency in San Francisco.  Beginning in 1982, I became the Executive Vice President of the National Council on Crime and Delinquency and continued in that post until 1998.  Between 1999 and 2003, I was a research Professor in the Department of Sociology at the George Washington University in Washington, D.C., where I was also the Director of the "Institute for Crime, Justice and Corrections."  Since founding the JFA Institute in 2003, I have also acted as its President.

3.     In my current position, I and my staff evaluate criminal justice practices and design research-based policy solutions in a variety of areas including prison population simulation modeling and projections, offender risk assessment and classification systems, parole and probation guidelines, and special needs programs evaluation, including mental health programs.  In 1991, I was named by the American Correctional Association as the recipient of the Peter P. Lejin's

1

Research Award for my research contributions to the field of corrections. In 1999, I received the Western Society of Criminology Paul Tappin award for outstanding contributions in the field of criminology. From 1999 to 2003, I served as Chair of the National Policy Committee for the American Society of Criminology.

4.    I am currently serving as the director for several large research and evaluation programs, including the Justice Reinvestment Initiative, funded by the Council of State Governments, and the Correctional Options Program, funded by the Bureau of Justice Assistance (BJA), a division of the U.S. Department of Justice.

5.    I have extensive experience working with correctional systems experiencing crowding and population-related challenges. I am currently working in the states of Maryland, Nevada, Texas, Rhode Island, Connecticut, Arizona, Pennsylvania, and Louisiana to safely reduce their prisons populations. In 1981 and 1986, I served on the National Academy of Sciences National Panels on Sentencing and Prison Overcrowding. I was appointed to the Governor's Task Force on Prison Crowding for Nevada in 1991.

6.    In the 1980s I conducted a major study funded by the US Department of Justice of the use of early release by Governor James Thompson's administration to control the level of crowding in the Illinois prison system. That study found that modest reductions in the length of imprisonment (60-120 days) would have significant impact on prison crowding without jeopardizing public safety.

7.    I have served as an expert or consultant to various federal courts and correctional systems. I was jointly appointed by the Department of Justice and the Georgia Department of Juvenile Justice and the Louisiana Department of Youth Services to monitor those states' compliance with a Memorandum of Agreement

2

concerning the conditions of confinement in Georgia's and Louisiana's youth facilities. I have also been a consultant for the National Institute of Corrections on jail and prison classification systems. In that capacity, I have assisted more than 25 states and numerous jail systems to develop and implement objective prisoner classification systems. Currently, I am working with parole boards to develop risk assessment systems for prisoners eligible for release in Texas, Pennsylvania, Maryland, Nevada, Rhode Island, and the US Parole Commission. In the recent past I have worked with the parole boards in Kentucky, West Virginia, and Oklahoma on these same issues.

8.    Between 1995 and 1997, I directed Congressionally-mandated evaluations of the Washington, D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, and of the D.C. Department of Youth Services Agency operations, classification system, staffing levels, physical plant, mental health, information services and program services.

9.    I also have substantial experience specifically with the California adult and juvenile correctional systems. I conducted research on the CDC prison classification, evaluated the Los Angeles County Jail Boot Camp program, assessed the extent of over-representation of minorities in the California juvenile justice system, developed a risk assessment system for Alameda County, served on the Robert Presley Institute, conducted an evaluation of institutional violence at San Quentin, co-directed a study of the effects of AB2 on pretrial release, and assisted in the development of the California Alternatives to Incarceration report for the legislature. In 2003, I served on the Advisory Committee of the Little Hoover Commission, which produced a Report on the California Prison System titled "Back to the Community: Safe & Sound Parole Policies." As noted later on, I recently authored a proposal for a model re-entry program for Lancaster

prison that was requested by YACA Secretary Roderick Hickman and then CDC Director Jeanne Woodford.

10.     I was also recently invited to participate in the California Department of Corrections and Rehabilitation's "Expert Panel on Adult Offender Reentry and Recidivism Reduction" ("Expert Panel"). Joint Pls' Trial Ex. 2. The Expert Panel was created to complete two primary tasks:  (1) review the current programs being offered by the CDCR to its adult offenders and comment on their effectiveness reducing recidivism and; (2) make recommendations as to how the CDCR could improve its program offerings, organizational culture, and environment to better reduce the adult offender recidivism rate.  I was one of several nationally recognized experts in the field of corrections who studied these issues and produced a final report, which was published in June of 2007.  I remain on the Expert Panel and am completing tasks associated with the implementation of the Panel's recommendations.

11.     As a member of the Expert Panel, I conducted a tour of the California Men's Colony (CMC) on April 6, 2007.  Prior to that, I made two visits to the Lancaster prison in 2005 as part of the aforementioned re-entry proposal. My most recent visit to Lancaster was on November 2, 2007, as an expert for this case.

12.     The Expert Panel created two sub-committees to study recidivism and reentry issues, including the "Program Review Sub-Committee" which reviewed the current program offerings and the "Model Program Sub-Committee" which provided recommendations to improve the current program offerings and the underlying systems in which the programs operated.  I was a member of the latter sub-committee.

13.     One of the key conclusions that I and the Expert Panel as a whole reached was that the CDCR would have to address severe overcrowding before it had any hope of reducing recidivism rates or improving programming.

14.     I am billing the plaintiffs $150 an hour, my usual billing rate. I have not testified as an expert in either a deposition or a trial in the past four years. A list of the publications I authored in the past ten years is included in Appendix A.

## II.     MY EXPERT OPINIONS IN THIS ACTION

15.     I have been retained by plaintiffs' counsel in the *Plata* and *Coleman* cases as an expert in prison administration and the impact of overcrowding on prisoners' medical and mental healthcare. I have also been asked to render my opinion with respect to whether overcrowding within the California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes and whether the CDCR's current strategies to address overcrowding will be effective. In addition, I have been asked whether, in my opinion, other court-ordered relief that does not address overcrowding would be effective in addressing the underlying Constitutional violations in a timely manner.

16.     The opinions set forth in this declaration are based on my extensive experience studying and researching correctional systems, including my recent work on the Expert Panel, on my review of data and documents provided to me by plaintiffs' counsel and on my visits to California State prisons, including, most recently, my expert tour at CSP-Lancaster on November 2, 2007.

17.     In preparation for this report, I have reviewed the following documents (among others): Governor Schwarzenegger, *Prison Overcrowding State of Emergency Proclamation* (October 2006); Assembly Bill 900; CDCR, *Fall Adult Population Projections* (October 2007); Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by*

*the California Department of Corrections and Rehabilitation* (February 2007); the
SEIU report entitled *CDCR Reforms for Safer Communities* (March 2007); and the
*Independent Review Panel Report on Reforming Corrections, Section 7:*
"Inmate/Parolee Population Management." A complete list of the documents
provided to me by plaintiffs' counsel is attached as **Appendix B**.

      18.    This report is also based on documents and data that I received while
working on the Expert Panel on Adult Offender Recidivism Reduction Programs,
including current population trend data (admissions, releases, and the daily
population).

## III.    HISTORY OF OVERCROWDING IN THE CALIFORNIA SYSTEM

      19.    The California prison system has undergone major changes in its
population over the past 40 years. Prior to the early 1980s the size of the
California prison population fluctuated significantly but remained largely stable.
It was not until after Determinate Sentencing Law (DSL) was passed in 1977
which sought to remedy the unchecked discretionary powers of the Board of
Prison Terms (BPT), that overcrowding became significant. After the DSL
became law a large number of laws were passed by the legislature and signed into
law by the various Governors that served to increase the number of persons being
sentenced to prison and lengthen their period of confinement. The Stanford
Criminal Justice Center identified approximately 80 substantive changes to the
California Penal Code since 1977, all of which served to increase the use and/or
length of imprisonment. Some of the more significant changes were
enhancements for firearms, sex crimes, crimes committed while on bail,
carjacking, use of drugs, restrictions on judges being allowed to strike additional
punishments, domestic violence, and persons committing crimes with prior felony
convictions (three and two strikes laws).

20.    As these legislative actions took hold, the CDCR prison population began to rise. In about ten years, the prison population increased by nearly 100,000 inmates from 25,000 in 1980 to 120,000 in 1993. In order to keep pace with this historic increase, the CDCR began a massive prison construction effort to keep pace with the growth.

21.    As shown in the following chart, the gap between the institutional population (excluding the camps and community correctional centers) and the design capacity of the CDCR institutions has been steadily widening ever since CDCR has been reporting its design bed capacity. Specifically, there has been no progress by the state in reducing its over-crowding situation for approximately 20 years (or more).

**Figure 1: Yearly Institutional Populations as Compared to Institutional Design Capacities**



7

22.     The current CDCR projection (Fall 2007) shows there is no immediate relief in sight.  Joint Pls' Trial Ex. 19.  The segment of the CDCR population that is most disconcerting is the institutional population where crowding is the greatest.  The Fall Forecast as summarized below shows that the CDCR Institutional population will increase another 16,000 inmates over the next five years (*see* Joint Pls' Trial Ex. 19 at Table 1):

Population Projections Unit
Estimates and Statistical Analysis Section
Offender Information Services Branch

Department of Corrections and Rehabilitation
State of California
August 30, 2007

**Fall 2007 Adult Population Projections**

Table 1
Institution Population
June 30, 1998 through June 30, 2013

| As of June 30 | Total | Total Males | Male Felons | Male Addicts[1] | Male Others[2] | Total Females | Female Felons | Female Addicts[1] | Female Others[2] |
|---|---|---|---|---|---|---|---|---|---|
| Actual |
| 1998 | 158,207 | 147,001 | 144,805 | 1,924 | 272 | 11,206 | 10,594 | 562 | 50 |
| 1999 | 162,064 | 150,581 | 148,621 | 1,703 | 257 | 11,483 | 10,949 | 495 | 39 |
| 2000 | 162,000 | 150,793 | 148,754 | 1,776 | 263 | 11,207 | 10,620 | 535 | 52 |
| 2001 | 161,497 | 150,785 | 148,853 | 1,668 | 264 | 10,712 | 10,261 | 403 | 48 |
| 2002 | 157,979 | 148,153 | 146,455 | 1,351 | 347 | 9,826 | 9,453 | 311 | 62 |
| 2003 | 160,931 | 150,851 | 149,449 | 1,104 | 298 | 10,080 | 9,752 | 270 | 58 |
| 2004 | 163,500 | 152,859 | 151,493 | 1,086 | 280 | 10,641 | 10,339 | 261 | 41 |
| 2005 | 164,179 | 153,323 | 152,016 | 966 | 341 | 10,856 | 10,528 | 283 | 45 |
| 2006 | 172,561 | 160,812 | 159,616 | 908 | 288 | 11,749 | 11,335 | 366 | 48 |
| 2007 | 173,312 | 161,424 | 160,325 | 800 | 299 | 11,888 | 11,571 | 281 | 36 |
| Projected |
| 2008 | 175,418 | 163,242 | 162,213 | 734 | 295 | 12,176 | 11,889 | 253 | 34 |
| 2009 | 179,105 | 166,549 | 165,535 | 719 | 295 | 12,556 | 12,275 | 248 | 33 |
| 2010 | 183,171 | 170,163 | 169,154 | 714 | 295 | 13,008 | 12,729 | 247 | 32 |
| 2011 | 186,137 | 172,628 | 171,620 | 713 | 295 | 13,509 | 13,230 | 247 | 32 |
| 2012 | 189,226 | 175,573 | 174,365 | 713 | 295 | 13,653 | 13,575 | 247 | 31 |
| 2013 | 191,886 | 177,728 | 176,720 | 713 | 295 | 14,158 | 13,880 | 247 | 31 |

[1] Civil Narcotic Addict commitments.
[2] Others include county diagnostic cases, other state federal prisoners, county safekeepers and Juvenile Justice (JJ) wards.

23.     What is most interesting is that the prison population is projected to continue to grow despite little if any increases in new court commitments.  There has been an accelerated increase in persons being admitted to parole which I believe may be a reflection of the greater use of the Bridging Program that serves to reduce the average length of stay.  But despite lower than expected admissions and higher number of parole releases, the population will continue to increase in large part due to the two and three strike laws and the reluctance of the Board of

8

Prison Terms to release persons eligible for parole (these people consist largely of persons sentenced under an indeterminate sentence of life with the possibility of parole – there are an estimated 25,000 prisoners with such a sentence in the current CDCR population).

### A.     Causes and Effects of Severely Overcrowded Prison Systems

24.     Prison systems typically rely on two definitions of capacity. The first and most restrictive is the so called "design capacity." This definition reflects the original design of the facility based on the architectural design that was approved for construction and occupancy by the state consistent with existing standards. Design capacity reflects what the maximum population should be based on in light of the facility's infrastructure (plumbing, electrical, ventilation, heating and cooling systems, program and administrative space). The second definition is typically referred to as the "operational capacity" which allows for a higher capacity by 1) increasing the staffing pattern to accommodate a larger population, 2) converting the existing housing areas to accommodate more prisoners (by double or triple celling or placing temporary bunks in open areas), and 3) converting program space into housing units. By definition, operational capacity if it exceeds the design capacity for an extended period of time will place undue stress on the infrastructure and will not allow the facility to operate as designed.

25.     Finally, in planning new facilities and evaluating the capacity of the existing facilities, one must take into account the security levels of the inmate population and special needs populations (administrative segregation, protective custody, severe mental health, and severe medical restrictions) which cannot be housed in the general (or mainline) populations. Furthermore there are fluctuations in the daily population which are caused by surges in admissions and releases. For all of these reasons it is accepted practice to add a 10% peaking

9

factor that will ensure the facility is not crowded for an extended period of time. What this means is that the bed capacity needs to be increased by 10% to ensure the residual inmate population is housed according to their custody levels and special needs.

**B.    Overcrowding In the California Prison System**

26.    There are many negative effects on the delivery of mental health, medical and other critical services that are directly linked to the current level of crowding and can only be addressed by reducing the CDCR institutional population to a more acceptable capacity figure. The Expert Panel, of which I was a member, concluded that the level of prison crowding must first be reduced before any meaningful programming can occur. This was the very first recommendation that the Panel embraced due to the obvious burdens that overcrowding places on the California system. It was our considered opinion, based on facility tours and many presentations by the CDCR, that effective treatment programs could not be implemented until crowding and its associated consequences were addressed. This recommendation along with all of the others (with one exception) made by the Panel have been adopted by the CDCR. *See* Joint Pls' Trial Ex. 49. What follows is a summary of the effects crowding has on prison systems and on California's system, in particular.

**1.    Significant Delays in Processing and Classifying Prisoners**

27.    The CDCR reception centers have a mandate to process and transfer (to a mainline institution) new receptions from the counties within 60 days of admission to a reception center. It should be noted at the outset that this 60 day limit is excessive and does not meet typical correctional practices in other state correctional systems (Maryland, Georgia, Virginia, Arizona, Louisiana, Texas,

Illinois, and Michigan to name just a few I am familiar with). But even this overly generous 60 day limit is being violated on a routine basis by the CDCR.

28.    The major reasons for the delays, as observed at the Lancaster facility, all relate to overcrowding: 1) lack of sufficient legal analysts to compute critical sentence, good time and release dates, 2) significant delays obtaining medical and central files from storage for parole violators, 3) a cumbersome medical and mental health screening process to clear prisoners for transfer, and 4) a lack bed capacity at the other CDCR facilities.

29.    Additional problems also plagued the reception process at Lancaster, all of which relate to overcrowding and understaffing. I was informed by staff, for instance, that of the 13 staff budgeted to be legal analysts, only 10 positions were filled. Of those 10, two were on medical leave, one was on a restricted basis, and three were on probation, leaving only 7 full-time and fully trained staff. Even though Lancaster has been transformed to a reception center, which would greatly increase the volume of analysts' work, there was no adjustment of the analyst positions to be funded.[1] For these and other reasons, I was told by CDCR staff that there was a two month backload in the number of prisoners to be processed. I also learned that the medical screening process requires prisoners to remain in the initial housing unit for three days just to have the TB screening test confirmed. This 3 day waiting process is, to my knowledge, unique to the CDCR. Long delays were also reported in having the classification screening process completed simply because staff were waiting for the necessary clearances from medical and

---

[1]    The very fact that Lancaster became a reception center is likely a result of overcrowding. In overcrowded systems, the administrators must constantly adjust and readjust the missions of their prisons because there are simply not enough beds for all the varying populations that come in, whether it be differences based on security level, sensitive needs, medical needs, mental health needs or other factors.

mental health staff. The delays occur because there are not enough staff, the process is not automated (and will not be automated for several years) and because there are too many prisoners entering the system. Shortages of bed space, offices, custody officers and treatment spaces also contributed to the delays.

### 2.    Excessive Inter-Facility Transfers

30.    Crowding also results in large numbers of inter facility transfers to keep any facility from becoming too crowded. The basis for such transfers is based on bed availability rather than the prisoner service needs. In 2005 there were a total of 387,446 admissions to all of the CDCR facilities with 237,005 being intra-facility admissions. Joint Pls' Trial Ex. 52 at 3. With a prison population of approximately 168,000 in 2005, this means the overall length of stay averages out to be about 160 days. Clearly there is significant variation among the facilities and prisons, but these admissions and length of stay numbers are more reflective of a county jail system rather than a state prison system. This constant movement of the prisoner population and how it disrupts the delivery of meaningful medical and mental health services has been noted elsewhere by the Receiver in his overcrowding report. Joint Pls' Trial Ex. 26 at 15-17 and Exhibits 10-12 to same.

### 3.    Lack of Access to Meaningful Medical, Mental Health Treatment and Rehabilitative Programs

31.    The excessive delays at the reception centers also mean that newly admitted prisoners will not be able to participate in meaningful programs that can serve to reduce their recidivism rates. Furthermore, the large prison populations, that exceed both design and operating capacities, place undue stress on the infrastructure both at the reception centers and at the "mainline" facilities. This "undue stress" means that there are insufficient staff and program space to handle

the number of prisoners who require such services. The Expert Panel found that only 21% of the current prisoner population was participating in proven recidivism reduction programs (education, vocational training, substance abuse, and prison industries). Joint Pls' Trial Ex. 2 at 148. And this figure does not show how many are completing these programs before being released or transferred to another facility.

32.    At the Lancaster facility, of the 3,222 prisoners in the reception center yards on November 2, 2007, there were zero inmates participating in such programs. 1,512 were assigned to the Bridging Program, which has not proven to have any positive impact on recidivism, and another 19 were assigned to support services – another program that has little if any rehabilitative value. The facility could not produce numbers on how many prisoners have completed programs while assigned to Lancaster.

33.    Collectively, these factors result in large numbers of prisoners either not participating in educational, vocational, substance abuse, and mental health programs or having long delays in enrolling in such programs. If such meaningful participation is lacking, one cannot expect any significant reduction in the recidivism rates.

34.    Other programming is also significantly affected by overcrowding. At Lancaster, for instance, we learned that inmates housed in a converted gymnasium had not received yard all week long (our tour was on a Friday). The Sergeant on the yard explained that custody staff were not available to run the yard program because they were being diverted to other tasks, such as escorting inmates to the medical clinic. Ironically, he blamed the cancellation of yard for these inmates living in an extremely overcrowded Gym on "The Plata Receiver" who had apparently requested custody staff to provide necessary escorts and security to facilitate medical appointments. The Sergeant indicated that yard

13

cancellation this happens quite frequently; a problem that relates to custody
staffing shortages throughout the CDCR.

### 4. Mis-Housing of Inmates

35.    In crowded facilities, there is a tendency to mix prisoners with
differing custody levels in the same housing units. While there is always going to
be some level of overlap in custody levels, the extent of mis-housing should not be
pervasive. During my tour of Lancaster, I observed several practices that would
suggest mis-housing. The facility has had a change in mission and has been
converted to a major reception center for Southern California. On the date of the
tour there were approximately 3,200 inmates in reception status. While they wait,
they must be housed with other inmates who will eventually be classified at
differing custody levels (Levels I –IV).

36.    Further, it was observed and confirmed by staff that in the reception
housing areas and elsewhere, prisoners were told to "self-select" the cell mates
rather than staff having and directing a well structured housing plan. In the areas
that have "infill beds" (bunk beds which number approximately 900) there is no
formal structured process for determining who is assigned to the bunk beds.
Known as an internal classification system, such a plan would ensure that
prisoners are housed according to their security and programs needs. These
inmates were awaiting a custody designation to be completed by their Correctional
Counselor. There is an extreme amount of delay in having prisoners so classified.
Staff reported that inmates were routinely spending several months in the
reception status.

37.    The Special Master also noted significant delays in reception for
EOP class members, in particular. During the 18th Monitoring round of tours, the
Special Master determined that ten of sixteen EOP inmates in the Lancaster

reception center during the review period were not transferred to an EOP mainline program within the mandated 60-day time period and two-thirds of expedited transfers for clinically more acute cases were not successful. Joint Pls' Trial Ex. 36 at 216.

### 5.    Serious Incidents and Safety

38.    With crowding one can expect increases in serious incidents, including assaults. This has already been acknowledged in the Governor's proclamation and the Kernan declaration citing the increased dangers for staff and inmates. Joint Pls' Trial Exs. 1 and 11 at 2-3. It goes without saying that a dangerous environment is not conducive to treatment.

39.    The CDCR reports that both the number and rate of serious incidents have been steadily increasing. In CY2006, there was a total of 14,490 officially reported such incidents of which the vast majority (approximately 9,000) were assaults with and without a weapon. Joint Pls' Trial Ex. 7 at 2-4. Given the number of staff per inmate and the high density of inmates in the housing units, these figures must be considered to be quite conservative as they do not take into account unreported assaults, robberies, thefts, and other serious crimes. The assault rate of approximately 5.6 per 100 (or 5,600 per 100,000 inmate population) is 20 times the aggravated assault rate reported by the FBI for the nation of 288 per 100,000 population. While the CDCR population is not comparable to the US resident population, the extremely high rate of assaults still indicates how dangerous the environment is and that it is worsening.

40.    The Expert Panel Report noted that lockdowns are frequently invoked at many CDCR facilities due to the large number of serous incidents occurring within the CDCR. Joint Pls' Trial Ex. 2 at 9 and Appendix F. The Expert Panel reported that there were nearly 450 such lockdowns in 2006. But

this is a conservative figure as it excludes the major reception centers. The Panel also noted that such lockdowns greatly restrict the implementation of effective treatment and rehabilitative programs. This is consistent with the Special Master's finding in the 18th Monitoring report that, "reported [] lockdowns in November 2006 and January 2007 [at LAC] disrupted EOP treatment." Joint Pls' Trial Ex. 36 at 208.

41.    While touring the Lancaster facility, I was struck by the use of security vests by all union staff (including correctional counselors), the constant presence of guns in the housing control units, the frequent use of lockdowns, and the more frequent tactic of having inmates fall to the ground in the yards when so ordered or risk being shot (the associate warden at Lancaster said these warnings occur 4-5 times a week). Correctional counselors stated they are afraid to conduct pre-parole interviews and classification screenings even in rooms within the housing units. Such interviews are often conducted on the open floor of the housing unit with the armed officer in the control prepared to shoot the inmate should he make any aggressive actions toward the correctional counselor. This process is done regardless of the prisoner's security level.

### 6.    Inability to Conduct Valid Individual Needs / Risk Assessments

42.    One of the key foundations of successful rehabilitative programs is the capacity to assess the criminogenic risk and associated program needs of the prisoner. The need for such services applies to both the EOP and CCCMS prisoners as well as other inmates. The non EOP and CCCMS inmates are important, as the CDCR believes that its extraordinary recidivism rates (the highest in the country at 70 percent) can be significantly reduced by assigning inmates to appropriate services that will lower recidivism rates and thus reduce crowding. It should be noted that the Expert Panel estimated that the current

16

CDCR population would be reduced by no more than 4,400 inmates by improving recidivism rates alone (compared to a bed savings of 38,000 to 44,000 through other population reduction strategies). Joint Pls' Trial Ex. 2, Appendix E at 98.

43.    Such a valid assessment process is not occurring within the CDCR as noted by the Expert Panel report and as observed by me as part of the tours at Lancaster and CMC. They are not occurring for two reasons. First, the CDCR has not implemented a risk and needs assessment tool at the reception centers. Second the environment for the Correctional Counselors is so chaotic, disorganized and inefficient that conducting a reliable and valid assessment is not feasible.

44.    At Lancaster, there are 32 Correctional Counselor I (CCI) positions, of which only 24 were filled as of the tour. This amounts to a caseload of more than 200 prisoners per counselor. Their work is to complete a security risk score (CDC 849, 840, or 841 forms) and then a recommended institutional placement plan. The office that the CCIs work out of is cluttered with a wide variety and number of miscellaneous office and computer equipment. There are no individual offices or office spaces. Staff have inadequate work space and equipment. The IT support is dysfunctional with staff having to share computers that have access to the OBIS and other important data bases. I have already noted that interviews are conducted in open settings within the overcrowded housing units. Even attempting to administer a well structured needs assessment instrument (which is not being used) in these conditions would not produce reliable or valid results.[2]

---

[2]    Space limitations (and/or staffing shortages) also affect EOP inmates. The Special Master noted during the 18th round of monitoring that "[a] staff audit [at LAC] found 50 to 87 percent of inmates in one general population EOP building were not offered the option of meeting their case managers in a setting that afforded confidentiality." Joint Pls' Trial Ex. 36 at 218.

### 7.    The Failure of the Work Incentive Program

45.    Crowding is also requiring the CDCR to exploit the original intentions of the Work Incentive Program (WIP) that serve to reduce the proper assignment of inmates to programs that meet their rehabilitative needs.  Because the CDCR needs to expedite releases, it is using the WIP to place inmates in the first available program or work assignment regardless of their need for such a program or their expected release date.  This practice is a result of overcrowding in that counselors do not have the time to assess inmates or the programming space (available substance abuse, vocational or educational slots) for the huge number of inmates in the California system.  As the Expert Panel found, recidivism rates will remain high without targeted programs for those who need them most, thereby abolishing any hope that there will be a reduction in the number of readmissions to the CDCR due to released prisoners' parole violations and new crimes.

46.    In my opinion the number of prisoners with their associated mental health, medical, rehabilitative and security needs far exceeds the resources that can now be provided by the CDCR.  Currently, the size of the CDCR institution population is overwhelming the CDCR's administrative, program service, housing and security infrastructure and support systems.  Moreover this situation will remain at its current level until the institutional population is adjusted to meet the CDCR resources, including the CDCR's staffing capabilities, infrastructure capacity, and available housing and programming space.  This opinion is consistent with the Expert Panel's report, which made reducing crowding its number one recommendation.

## IV.    DEFENDANTS' CURRENT EFFORTS TO ADDRESS OVERCROWDING WILL NOT BE EFFECTIVE

### A.    Building New Prisons

47.    The primary method offered by the CDCR to reduce the agreed upon level of crowding was to rapidly construct a large number (16,000 – 18,000) of prison beds that would replace the temporary (in-fill) beds that exist at the CDCR institutions.  At Lancaster, there are some 870 in-fill or temporary beds located in the four housing units and three gyms (which eliminate certain recreation and other large group activities –especially during periods of inclement weather.) Another 16,000 re-entry beds and 8,000 medical and mental health new prison beds would also be constructed pursuant to Assembly Bill 900 (AB900).

48.    In my previous declaration submitted in this case, I stated that I did not have confidence that the state will be able to stabilize the growth of the prison population or achieve any significant reductions in the prison population in the next few years.  Joint Pls' Trial Ex. 50 at 3.  I also stated that the state's "'plan' to reduce overcrowding is not a plan, as that term is normally understood.  It is deficient in that there are no detailed supporting documents, data analysis or time timetables that show how the CDCR can meet the massive and unprecedented construction timelines…As such, [the State's proposal] is not a plan but a series of goals that have no factual basis.  The CDCR's goals for construction and implementation of new programs are not likely to be met." *Id.*

49.    On this latter point, it was interesting to note during my tour at Lancaster on November 2, 2007 that the AB900 construction schedule is already far behind schedule and that leadership staff at the Lancaster facility were completely unaware of the number and type of beds to be constructed at Lancaster over the next 12 months.  According to AB900 and the CDCR, construction for 400 new dormitory beds was to start at Lancaster in 45 days.  Joint Pls' Trial Ex. 26 (Exhibit 20 at 2).  Central office staff indicated during the tour that such

construction will not occur for some time due to legal and legislative challenges to the program's funding. An additional 264 Substance Abuse Treatment Beds are also scheduled for construction beginning in March 2010. In total the 664 beds will not fully address the replacement of some 870 temporary beds at Lancaster. Nor is there any staffing pattern estimates and costs associated with the activation of these beds.

### B.    Out of State Transfers

50.    Even the component of AB900 that calls for 8,000 inmates to be transferred to out-of-state, private facilities, which is the only action that would directly reduce crowding in the CDCR, will be extremely difficult to achieve and maintain by the CDCR. This population is dynamic and will constantly need to be replaced as the transferred inmates are released to parole or return to the CDCR for security, medical and mental health reasons. To date the CDCR has not modeled its capacity to keep the out of state transfer population at the 8,000 level. To date that population is nearing only 3,500. Furthermore, according to CDCR officials, there are an estimated 4,000 people in the county jails awaiting transfer into the prison system right now but who cannot be transferred due to lack of space. This means the out of state transfer program, to date, has not been able to impact the crowding situation.

51.    As I noted in my previous declaration, with the exception of the 8,000 transfers, none of the measures set forth in AB900 are designed to reduce the prison population. Instead, if implemented, they will solely increase the physical capacity of the prison system, and will require commensurate increases in staff, administration, and program space. Joint Pls' Trial Ex. 50 at 3. Simply adding more space for prisoners will not alleviate the other significant problems the California system has, such as severe custody and clinical staffing shortages and antiquated administrative processes.

**C.    Administrative Discharge of Parolees**

52.    I also commented on the State's memorandum seeking to end parole
for certain parolees who complete 13 months of successful parole. Joint Pls' Trial
Ex. 50 at 6. As I stated in that prior declaration, that plan will have a negligible
effect on the prison population as those parolees are very unlikely to be readmitted
to prison on parole violations. Even if they were readmitted on technical
violations, their short period of imprisonment (3 months or less) would have
virtually no effect on the current 170,000 prison population.

**V.    CONCLUSIONS**

53.    In my opinion, overcrowding within the California Department of
Corrections and Rehabilitation (CDCR) is the primary cause of the current
unconstitutional conditions experienced by members of the *Coleman* and *Plata*
classes. Until the level of crowding is significantly lowered, the CDCR will
continue to be unable to meet the basic medical and mental health needs of the
current institutional prison population.

54.    It is also my opinion that the only remedy that will fulfill the
requirements set forth by the *Coleman* and *Plata* Courts will be a prompt and safe
reduction of the prison population to a level that will allow the CDCR to deliver
the necessary level of services with their existing resources (not resources the
CDCR projects or wishes to have in the future).

Dated:  November 9, 2007

James Austin, Ph.D.

21

## James Austin

MAJOR POSITIONS HELD

2003 – Present                *President, The JFA Associates*, Washington, D.C.


1999 -2003                    *Research Professor and Director, Institute for Crime,*
                              *Justice, and Corrections*, Department of Sociology,
                              The George Washington University, Washington, D.C.

1982 - 1998                   *Executive Vice President*
                              National Council on Crime and Delinquency
                              San Francisco and Washington, D.C.

1974 - 1982                   *Research Associate*
                              National Council on Crime and Delinquency
                              San Francisco

1970 - 1974                   *Correctional Sociologist*
                              Illinois Department of Corrections
                              Joliet, Illinois

EDUCATION

B.A.                          1970, Wheaton College, Wheaton, Illinois, Sociology

M.A.                          1975, De Paul University, Chicago, Illinois, Sociology

Ph.D.                         1980, University of California, Davis, California,
                              Sociology


RELEVANT PROFESSIONAL EXPERIENCE


2002 – present                *Director*,  Justice Reinvestment Initiative, Council of
                              State Governments.

1998 – Present                *Director,* Correctional Options Program (Bureau of
                              Justice Assistance,  U.S. Department of Justice)


2005 – 2006                   *Director*, Review of Escapes from the Bureau of
                              Prisons Community Correctional Centers in the

|               | District of Columbia. (DC Criminal Justice Coordinating Council). |
|---------------|-------------------------------------------------------------------|
| 2003 – 2006   | *Director*, Assessment of Sexual Assault in the Texas Prison System. (National Institute of Justice). |
| 2002 – 2006   | *Director,* Parole Guidelines System Project, Maryland Parole Commission. (Baltimore Open Society Institute). |
| 2003 – 2006   | *Director*, Validation Study of the Alameda County Juvenile Detention Risk Assessment System (Alameda County, California). |
| 2002—2006     | *Independent Expert,* Office of Youth Development, Louisiana Department of Public Safety and Corrections, Jointly Appointed by State of Louisiana and U.S. Department of Justice, Civil Rights Division |
| 2003-2004     | *Director,* Evaluation And Redesign Of Systems For Berks County Pretrial And Sentenced Populations. (Berks County, PA). |
| 2003          | *Juvenile Corrections Expert*, US Department of Justice, Civil Rights Division, California Youth Authority. |
| 2002          | *Juvenile Corrections Expert*, US Department of Justice, Civil Rights Division, Santa Clara County Detention Center. |
| 2002 – 2003   | *Director*, Validation of the Pennsylvania Parole Guidelines. Pennsylvania Board of Probation and Parole. (Pennsylvania Commission on Crime and Delinquency). |
| 2001 – 2003   | *Director,* Development of the Kentucky Parole Risk Assessment System.  Kentucky Parole and Pardon Board. |
| 1998 – 2004   | *Monitor*, Georgia Juvenile Justice Corrections System, Jointly Appointed by State of  Georgia and U.S. Department of Justice, Civil Rights Division. |

| | |
|---|---|
| 1997 - Present | *Director*, National Technical Assistance Program for External Prison Classification Systems (Oregon, Wisconsin, Virginia, Tennessee, Texas, Oklahoma, and Montana) (National Institute of Corrections) |
| 1996 - Present | *Director,* National Technical Assistance Program for Internal Prison Classification Systems (Washington State, Oregon, Missouri, South Dakota, Connecticut, Colorado, and Florida) |
| 1996 - 1999 | *Director*, National Survey of Juveniles in Adult Correctional Facilities (Bureau of Justice Assistance), GWU. |
| 1996 - 1999 | *Director,* National Multi-Site Boot Camp Evaluation (Adult and Juvenile) (National Institute of Justice), GWU. |
| 1995 - 1999 | *Director*, Evaluation of "Three Strikes and You're Out" Laws in California and Nationally, (National Institute of Justice), NCCD |
| 1996 - 1999 | *Director*, National Survey of Privatization in Corrections (adult and juvenile facilities) (Bureau of Justice Assistance), NCCD. |
| 1992 - 1997 | *Director*, Correctional Options Evaluation (National Institute of Justice and Bureau of Justice Assistance), NCCD |
| 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Youth Services Agency (YSA) operations, classification system, staffing levels, physical plant, mental health, information services and program services, (National Institute of Corrections, Bureau of Prisons), NCCD |
| 1992 - 1997 | *Director*, National Structured Sentencing Evaluation (Bureau of Justice Assistance), NCCD |
| 1995 - 1997 | *Director*, Congressionally mandated evaluation of the D.C. Department of Corrections operations, classification system, staffing levels, and physical plant, including, comprehensive cost analysis of long- |

|  | term options for the Lorton Complex, (National Institute of Corrections, Bureau of Prisons), NCCD |
|---|---|
| 1991 - 1997 | *Director*, Design and Implementation of the New York City Department of Corrections Objective Jail Classification System (Consent Decree, New York City Department of Corrections), NCCD |
| 1991 - 1995 | *Director*, Philadelphia Prison System Classification and Population Projections Project (Consent Decree, City of Philadelphia), NCCD |
| 1991 - 1994 | *Director*, Evaluation of Jail Drug Treatment Programs (National Institute of Justice), NCCD |
| 1990 - 1993 | *Director*, Evaluation of the Los Angeles Sheriff's Boot Camp Program (National Institute of Justice), NCCD |
| 1991 - 1993 | *Director*, Design and Implementation of the Cook County Objective Jail Classification System (Cook County Sheriff's Department), NCCD |
| 1990 - 1991 | *Director*, California Assessment of the Overrepresentation of Minority Youth in Juvenile Justice (Office of Criminal Justice Planning), NCCD |
| 1988 - 1992 | *Director*, Experimental Test of Electronic Monitoring Program, Oklahoma Department of Corrections (National Institute of Justice), NCCD |
| 1987 - 1992 | *Director*, Experimental Test of the Prison Management Classification System (National Institute of Corrections and Washington Department of Corrections), NCCD |
| 1986 - 1990 | *Director*, National Jail Classification Project (NIC), NCCD |
| 1985 - 1987 | *Co-Director*, California Youth Authority Parole Risk Study (Packard Foundation and CYA), NCCD |
| 1984 - 1986 | *Co-Director*, Study of Institutional Violence at San Quentin (Consent Decree, California Department of Corrections, NCCD |

| | |
|---|---|
| 1982 - 1987 | *Co-Director*, Experimental Study of Juvenile Court Probation Services, Salt Lake City, Utah (OJJDP), NCCD |
| 1983 - 1985 | *Co-Director*, Illinois Department of Corrections Early Release Evaluation (NIJ), NCCD |
| 1980 - 1984 | *Co-Director*, Supervised Pretrial Release Test Program (NIJ/LEAA), NCCD |
| 1981 - 1983 | *Co-Director*, Evaluation of California AB2 Bail Reform Act (OCJP), NCCD |
| 1980 | *Senior Research Associate*, California Alternatives to Incarceration Study (State Legislature), NCCD |

SPECIAL APPOINTMENTS

| | |
|---|---|
| 2006 – present | Expert Panel on Adult Offender and Recidivism Reduction Programming, California Department of Corrections and Rehabilitation |
| 2003 | Advisory Committee, The Little Hoover Commission Report on California Prison System |
| 1999- 2003 | Chair, National Policy Committee, American Society of Criminology |
| 1987 - 1994 | Trustee, Robert Presley Institute of Corrections Research and Training |
| 1991 | Governor's Task Force on Prison Crowding, State of Nevada |
| 1988 | Governor's Task Force on Corrections, State of Oregon |
| 1981, 1986 | National Academy of Sciences, National Panels on Sentencing and Prison Overcrowding |

EXPERT WITNESS/LITIGATION

| | |
|---|---|
| 1987 - 1989 | Office of the Special Masters, Ruiz v. Lynaugh, Evaluation of the TDC Classification System and Inmate Violence |

|  | Appointed by Court to produce evaluation report of classification system to determine if inmate violence had been reduced. |
|---|---|
| 1989 - 1991 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. State of Florida: Florida Department of Corrections, et al.</u>, Case No. TCA 86-7330 (N.D. Fla) |
|  | Expert Witness Retained by Plaintiffs to determine whether women should be excluded from certain post positions in the DOC. |
| 1990 - 1991 | King County (Seattle, Washington) District Attorney's Office, <u>Hammer v. King County</u> |
|  | Expert Witness Retained by Defendants to determine if minority staff was being discriminated against. |
| 1990 - 1991 | Office of the Attorney General, State of Texas, <u>Lamar v. Collins</u> |
| 1991 | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties was appropriate.<br>Office of the Attorney General, State of Texas, <u>Alberti v. Sheriff of Harris County, et al.</u>, No. CA-H-72-1094 |
|  | Expert Witness Retained by Defendants to determine if use of local incarceration rates by selected counties were appropriate. |
| 1991 - 1992 | U.S. Department of Justice, Civil Rights Division, <u>U.S. v. The Parish of Orleans Criminal Sheriff's Office</u> |
|  | Expert Witness Retained by Plaintiffs to determine the appropriateness of excluding females from certain post positions within the jail. |
| 1991 - 1994 | <u>Calvin R. vs. Illinois Department of Corrections</u>. Consent Decree. |

|  | Appointed by Court to produce evaluation of classification system and to implement internal classification system to reduce inmate violence. |
|---|---|
| 1995 | International Fidelity Insurance Co. et al. v. Charles Nobel et al: In the United States District Court of the Southern District of Texas, Houston Division. |
|  | Expert Witness Retained by Defendants to determine the Failure to Appear rates for defendants released on surety bond versus O.R. |
| 1995 | Sandra Herrera, et al., v Pierce County, et al. |
|  | Retained by Plaintiffs to evaluate whether inmates were being properly classified and housed in the local jail. |
| 1995 - 1996 | Montoya v. Gunter, et al. |
|  | Retained by Defendants to determine whether inmate who was killed while incarcerated had been properly classified and housed. |
| 1995 - 1997 | Inmates A,B,C and D v. Illinois Department of Corrections<br>Consent Decree |
|  | Appointed by Court to produce evaluation of the level of control of housing and job assignments by gangs. |
| 1995 - 2002 | USA v. Michigan and Cain v. Michigan Consent Decrees |
|  | Expert witness retained by Defendants to help Department of Corrections reach compliance with court order regarding classification system. |
| 1996 | Rentschler v. Carnahan et al. |
|  | Retained by Defendants to evaluate the impact of crowding at the Colorado maximum security prison. |
| 1997 | Carlos Morales Feliciano v. Pedro Rossello Gonzales<br>Consent Decree |

Retained by Special Master to conduct a comprehensive assessment of the inmate classification system that was designed and partially implemented by the Administration of Corrections.

1998 - 1999            Southern Ohio Correctional Facility (Civil Action No. C-1-93-436).

Retained by the Ohio Department of Rehabilitation and Correction to serve as an expert witness on classification issues as they pertain to the Lucasville riot.

1998 - 1999            Busey et al. v. Corrections Corporation of America

Retained by CCA to develop an objective classification system for the Youngstown facility and have all inmate's properly classified according to the classification criteria.

1998 - 2000            Holloway, et al., v. King County

Retained by plaintiff's counsel to examine the validity of client's claims that sexual harassment of female correctional officers by male inmates was being encouraged by male correctional officers and departmental policy.

2001                   Gartrell et al., v. Ashcroft et al.

Retained by plaintiffs to examine if BOP inmates placed in Virginia Department of Corrections are unnecessarily having their expression of religious freedoms unnecessarily restricted?

2001 - present         Austin, et al., v. Wilkinson, et al.

Retained by defendants to examine the classification process used to assign inmates to the Ohio State Penitentiary – a high maximum security prison.

PUBLICATIONS

## **Books**

1996                It's About Time: America's Imprisonment Binge (with
                    John Irwin), Second Edition, Belmont, CA: Wadsworth
                    Publishing.

1993                It's About Time: America's Imprisonment Binge (with
                    John Irwin), First Edition, Belmont, CA: Wadsworth
                    Publishing.

1993                Reinventing Juvenile Justice (with Barry Krisberg),
                    Beverly Hills, CA: Sage Publications.

1978                The Children of Ishmael: Critical Perspectives on
                    Juvenile Justice (with Barry Krisberg),

## **Articles**

2006                "How Much Risk Can We Take?  The Misuse of Risk
                    Assessment in Corrections."  2006.  Federal
                    Probation. Vol. 70, No. 2: 58-63.

2004                Richards, Stephen C., James Austin, and Richard S.
                    Jones. 2004. "Thinking About Prison Release and
                    Budget Crisis in the Blue Grass State." Critical
                    Criminology: An International Journal, Vol. 12, No.3:
                    243-263.

2004                Richards, Stephen C., James Austin, and Richard S.
                    Jones. 2004. "Kentucky's Perpetual Prisoner
                    Machine: It's All about Money." Review of Policy
                    Research, Vol. 24, No. 1 (at press).

2003                "Why Criminology Is Irrelevant", Criminology and
                    Public Policy, Vol. 2, No.3: 557-564

2003                "Three Strikes Laws", in Current Controversies in
                    Criminology, Ronald Weitzer, ed., Prentice Hall:
                    Upper Saddle River, NJ.

| | |
|---|---|
| 2003 | "The Use of Science to Justify The Imprisonment Binge", Convict Criminology, Jeffrey Ian Ross and Stephen C. Richards, eds., Wadsworth: Belmont, CA. |
| 2003 | "Its About Time: America's Imprisonment Binge", Punishment and Social Control, Aldine De Gruyter: New York, NY. |
| 1999 | "Are We Better Off?: Comparing Private and Public Prisons in the United States", Current Issues in Criminal Justice. Vol. 11 (2): 177-201. |
| 1999 | "The Impact of 'Three Strikes and You're Out'", Punishment and Society, Vol 1(2): 131-162. |
| 1998 | "The Limits of Prison Drug Treatment", Corrections Management Quarterly, Vol. 2, Issue 4, Fall 1998, pp. 66-74. |
| 1996 | "The Effect of 'Three Strikes and You're Out' on Corrections" in Three Strikes and You're Out: Vengance as Public Policy, David Shichor and Dale K. Sechrest, eds., Sage Publications: Thousand Oaks, CA. |
| 1996 | "Are Prisons A Bargain?: The Case of Voodoo Economics", Spectrum, Spring 1996, pp. 6-24. |
| 1995 | "The Overrepresentation of Minority Youths in the California Juvenile Justice System: Perceptions and Realities" in Minorities in Juvenile Justice, Kimberly Kempf Leonard, Carle E. Pope, and William H. Fyerherm, eds., Sage Publications: Thousand Oaks, CA. |
| 1994 | "Three Strikes and You're Out: The Likely Consequences". St. Louis University Public Law Review, 14, 1, pp. 239-258. |
| 1993 | "Classification for Internal Purposes: The Washington Experience" (with Chris Baird, and Deborah Nuenfeldt), Classification: A Tool for Managing Today's Offenders, Laurel, MD: American Correctional Association. |

1993            "Objective Prison Classification Systems: A Review",
                Classification: A Tool for Managing Today's
                Offenders, Laurel, MD: American Correctional
                Association.

1986            "Using Early Release to Relieve Prison Crowding:
                A Dilemma in Public Policy," Crime and Delinquency
                (October):404-501

1986            "Evaluating How Well Your Classification System Is
                Operating," Crime and Delinquency (July):302-321

1985            "Incarceration in the United States: The Extent and
                Future of the Problem," The Annals (March):15-30

1983            "Assessing the New Generation of Prison
                Classification Models," Crime and Delinquency
                (October):561-576

1982            "Do We Really Want to Get 'Tough on Crime'?"
                Corrections Today, Vol. 44, No. 6:50-52

1982            "Bail Reform in California: The Passage of AB2" (with
                E. Lemert), Pretrial Services Annual Journal, 1982,
                Vol V:4-23

1982            "Review of Fatal Remedies: The Ironies of Social
                Intervention" (Sam D. Seiber) in Crime and
                Delinquency, Vol. 20, No. 4:639-641

1982            "The Unmet Promise of Alternatives to Incarceration"
                (with B. Krisberg), Crime and Delinquency, Vol. 28,
                No. 3:374-409

1982            "Promises and Realities of Jail Classification," Federal
                Probation, Vol. 46, No. 1:58-67

1981            "Wider, stronger, and different nets: the dialectics of
                criminal justice reform" (with B. A. Krisberg), Journal
                of Research in Crime and Delinquency, Vol. 18,
                No. 1:165-196

1980            Instead of Justice: Diversion,
                Ph.D. Dissertation, University of California, Davis

**AWARDS**

| | |
|---|---|
| 1999 | Recipient of the Paul Tappin award for outstanding contributions in the field of criminology, Western Society of Criminology |
| 1991 | Recipient of the Peter P. Lejins Research Award, American Correctional Association |

# APPENDIX B TO JIM AUSTIN'S DECLARATION

| DOCUMENT |
|---|
| Governor Schwarzenegger's Proclamation Regarding Prison Overcrowding, State of Emergency (October 4, 2006) |
| Expert Panel on Adult Offender and Recidivism Reduction Programming, Report to the State Legislature, *A Roadmap for Effective Offender Programming in California* (June 29, 2007) |
| Little Hoover Commission, *Solving California's Corrections Crisis: Time is Running Out* (January 2007) |
| Reforming Corrections:  Report of the Corrections Independent Review Panel, June 30, 2004 (Gov. Deukmejian, Chairman) |
| Mental Health Services Delivery System Program Guide (September 2006) |
| Memorandum from Jane Kahn Re: *Coleman* Revised Program Guide Basics (October 17, 2007) |
| Judge Karlton's 3/3/06 Order Regarding Defendants' Revised Program Guide (Coleman Docket 1773) |
| Mental Health Population Chart – Placement Per Institution, as of July 27, 2007 (September 25, 2007) |
| Program Guide Overview, from Mental Health Services Delivery System Program Guide (September 2006) |
| Exhibit A to Defendants' Plan to Address Suicide Trends In Administrative Segregation Units (October 2, 2006) (Coleman Docket 1990) |
| Exhibit A in Support of Defendants' Submission of Plan for Reception Center/EOP Inmates (July 31, 2006) (Coleman Docket 1928) |
| Allocated Case Manager Positions and Vacancies for EOP Ad Seg Hub Institutions, as of July 2007 (September 25, 2007) |
| Memorandum from CDCR Re: Revised 30 Minute Welfare Check Process (December 12, 2006) |
| Judge Karlton's 9/14/07 Order Granting Defendants' Request for Extension of Time to File Plan for Small Management Yards in Administrative Segregation Units (Coleman Docket 2418) |
| Judge Karlton's 10/20/06 Order Approving Defendants' Plan for Provision of Acute and Intermediate Care and Mental Health Crisis Beds (Coleman Docket 1998) |
| Judge Karlton's 6/7/06 Order Requiring Defendants to Develop Plan to Address Suicide Trends in Administrative Segregation Units (Coleman Docket 1830) |
| Receiver's Report Regarding Overcrowding and Appendices to same (May 15, 2007) (Plata Docket 673 and 674) |
| Receiver's Supplemental Report Regarding Overcrowding (June 11, 2007) (Plata Docket 705) |
| *Coleman* Special Master's Report Regarding Overcrowding (May 31, 2007) (Coleman Docket 2253) |
| *Coleman* Special Master's 18th Monitoring Report (July 30, 2007) (Coleman Docket 2334 through 2334-11) |
| *Coleman* Special Master's 17th Monitoring Report, Part A (2/14/07) (Coleman Docket 2140 through 2140-3) |
| *Coleman* Special Master's 17th Monitoring Report, Part B (4/02/07) (Coleman Docket 2180 through 2180-5) |
| *Coleman* Special Master's 17th Monitoring Report, Part C (6/13/07) (Coleman Docket 2274 through 2274-7) |
| Office of the Inspector General (OIG), Special Review into the California Department of Corrections and Rehabilitation's Release of Inmate Scott Thomas (October 2007) |

| DOCUMENT |
|---|
| Memorandum from CDCR Re: Standardization of Mental Health Crisis Bed Admission Procedures (July 21, 2005) |
| Report on Status of Funding for Acute, Intermediate and Mental Health Crisis Bed Plan, filed September 11, 2006 (Coleman Docket 1969) |
| Judge Karlton's 5/2/06 Order Regarding Defendants' Long Range Bed Plan (Coleman Docket 1800) |
| *Coleman* Special Master's 5/9/06 Report and Recommendations on Suicides in the California Department of Corrections in the Calendar Year 2004 (Coleman Docket 1806) |
| *Coleman* Special Master's 5/14/07 Supplemental Report and Recommendations on Defendants' Plan to Prevent Suicides in Administrative Segregation (Coleman Docket 2210) |
| *Coleman* Special Master's 7/2/07 Report and Recommendations on Defendants' Enhanced Outpatient Treatment Programs in Reception Centers (Coleman Docket 2302) |
| *Coleman* Special Master's 9/24/07 Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan (Coleman Docket 2432 through 2432-3) |
| Judge Henderson's 2/14/07 Order Continuing Hearing on Plaintiffs' Motion to Convene a Three-Judge Panel (Plata Docket 608) |
| Judges Karlton and Henderson's 7/23/07 Orders Granting Plaintiffs' Motion to Convene Three-Judge Panel (Coleman Docket 2320, Plata Docket 780) |
| Defendants' Supplemental Brief in Opposition to Plaintiffs' Motion For Referral to a Three-Judge Panel, Exhibits and Supporting Declarations of Joan Petersilia, Doug McKeever, Margaret McAloon, Scott Kernan, Kathryn P. Jett and Deborah Hysen (May 24, 2007) (Coleman Docket 2238) |
| Declaration of Scott Kernan in Support of Defendants' Response to Receiver's Supplemental Report Re: Overcrowding (June 18, 2007) (Coleman Docket 2287, Plata Docket 718) |
| Defendants' Brief Re: Expert Panel's Report on Reentry and Recidivism and Its Relation to Pending Motion to Convene a Three-Judge Panel and Declarations of Joan Petersilia and Kathryn P. Jett (July 11, 2007) (Coleman Docket 2310) |
| Declarations of Pablo Stewart, Samples from *Morales* and *Prieto* Matters |
| Defendants' Report and Plan for Improvement of Enhanced Outpatient Programs in Administrative Segregation Units (July 11, 2007) (Coleman Docket 2311) |
| Defendants' Responses and Objections to Special Master Keating's Report on Defendants' Plan to Provide Enhanced Outpatient Program Care at Reception Centers (July 12, 2007) (Coleman Docket 2313) |
| Defendants' Statement in Response to Court Order Re: Compliance with Items to Reduce Suicides in Administrative Segregation Units and Declaration of Doug McKeever (July 30, 3007) (Coleman Docket 2335) |
| Defendants' Ex Parte Motion Re: Request for Extension of Time, Declaration of Misha Igra, and Proposed Order (July 30, 2007) (Coleman Docket 2336) |
| Defendants' Statement of Compliance Re: Television and Radio Accessibility in Administrative Segregation Units (August 13, 2007) (Coleman Docket 2363) |
| Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards, Declaration of Hysen, and Proposed Order (August 29, 2007) (Coleman Docket 2393) |
| Judge Karlton's 9/14/07 Order Granting Defendants' Ex Parte Request for an Extension of Time Re: Small Management Yards (Coleman Docket 2418) |
| Office of the Inspector General (OIG) Special Review Into the Death of Correctional Officer Manuel A. Gonzalez, Jr. on January 10, 2005 at the California Institution for Men (March 16, 2005) |
| "Repairs Needed After California Institution for Men Riot - Prison Officials Say Understaffing Left Guards in Jeopardy," Inland Valley Daily Bulletin (September 29, 2005) |

| DOCUMENT |
|---|
| "16-Year Veteran CDC Correctional Officer Dies From Inmate Stabbing Attack," CDCR Press Release (January 10, 2005) |
| "Major Prison Disturbance at the California Institution for Men in Chino," CDCR Press Release (December 30, 2006) |
| "Massive Riot at CIM," Officer.com Police Forums & Law Enforcement Forums, http://www.forums.officer.com/forums (December 31, 2006) |
| California Department of Corrections, Fall 2007 Adult Population Projections: 2008-2013 (http://www.cdcr.ca.gov) |
| California State Auditor, High Risk: The California State Auditor's Initial Assessment of High-Risk Issues the State and Select State Agencies Face (May 2007) |
| Office of the Inspector General (OIG) Special Review Into In-Prison Substance Abuse Programs Managed by the CDCR (February 2007) |
| SEIU Report on CDCR Reforms for Safer Communities (March 2007) |
| Memorandum from Amy Whelan Re: Topics for James Austin Report (November 4, 2007) |
| CDCR Report Regarding *Inmate Incidents in Institutions, Calendar Year 2006* (Published September 2007) |
| Various RBG-created charts of California Prison Population Data for January 2003-September 2007 (November 6, 2007) |
| CDCR Department Operations Manual, Chapter 5 - Custody and Security Operations (December 31, 2006) |
| Plaintiffs' First Request for Inspection (October 2, 2007) |
| Defendants' Supplemental Bed Report (August 17, 2007) (Coleman Docket 2375) |
| *Coleman* Special Master's Supplemental Report and Recommendations on Defendants' Enhanced Outpatient Treatment Program in Reception Centers (August 15, 2007) (Coleman Docket 2369) |
| Selection of Documents from the CSP-Lancaster *Coleman* Tour Binder (May 15-18, 2007 Monitoring Tour) |

1

## PROOF OF SERVICE

2       I, Kate Richardson, declare that I am a resident of the State of California, am over the

3   age of eighteen years and am not a party to the within action.  I am employed with Rosen,

4   Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco,

5   California 94104.  On November 9, 2007, I served the following documents:

6       **1) PLAINTIFFS' DISCLOSURE OF EXPERT TESTIMONY**

7       **2) EXPERT REPORT OF JAMES AUSTIN, Ph.D.**

8
        **3) EXPERT REPORT OF CRAIG HANEY, M.D.**
9

10      **4) EXPERT REPORT OF PABLO STEWART, M.D.**

11      I served the documents on the persons listed below, as follows:

| | |
|---|---|
| [ ] | **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons listed below and providing them to a professional messenger service for service.  (A declaration by the messenger is attached hereto as a separate document.) |
| [ X ] | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices.  I am readily familiar with my firm's practice for collecting and processing correspondence for mailing.  On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid.  I am a resident or employed in the county where the mailing occurred.  The envelope or package was placed in the mail at San Francisco, California. |
| [ ] | **By overnight delivery.** I enclosed the documents in a sealed envelope or package provided by Federal Express and addressed it to the persons listed below.  I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier and I arranged to pay for all fees for delivery. |
| [ ] | **By fax transmission.**  Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below from Rosen Bien & Galvan's facsimile transmission telephone number, (415) 433-7104.  No error was reported by the fax machine that I used.  A copy of the record of the fax transmission, which I printed out, is attached. |
| [ ] | **By e-mail or electronic transmission.**  Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addressed listed below.  I did not receive, within a reasonable time |

12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

1        after the transmission, any electronic message or other indication that the transmission was unsuccessful.

2

3    **All documents were sent to the following persons in the following manner:**

4       By United States Mail

5       Lisa A. Tillman                    Republican Assembly and Senate Intervenors

6       Deputy Attorney General          Steven S. Kaufhold

       1300 I Street, Suite 125          Akin, Gump Strauss Hauer & Feld, LLP

7       Sacramento, CA 95814           580 California Street, 15th Floor

                                             San Francisco, CA 94104

8

      Paul B. Mello, Esq.                  Lead Counsel for County Intervenors

9       Hanson, Bridgett, Marcus, Vlahos &    Ann Miller Ravel

       Rudy, LLP                         Theresa Fuentes

10      425 Market Street, 26th Floor       Office of the County Counsel

       San Francisco, CA  94105          70 West Hedding, East Wing, 9th Floor

11                                        San Jose, CA 95110

12      California Correctional Peace Officers'   County of Sonoma Intervenors

13      Association (CCPOA) Intervenors      Anne L. Keck, Deputy County Counsel

       Ronald Yank                       Steven Woodside

14      Gregg MacClean Adam          575 Administration Drive, Room 105A

       Carroll, Burdick & McDonough, LLP     Santa Rosa, CA 95403

15      44 Montgomery Street, Suite 400

       San Francisco, CA 94104

16

      District Attorney Intervenors        California Sheriff, Probation, Police Chief

17      Rod Pacheco                   and Corrections Intervenors

       Charles Hugues                 Jones & Mayer LLP

18      District Attorney               Martin J. Mayer

       County of Riverside            Michael R. Capizzi

19      4075 Main Street, First Floor       Kimberly Hall Barlow

       Riverside, CA 92501            Elizabeth R. Feffer

20                                         3777 North Harbor Boulevard

21                                        Fullerton, CA 92835

22

23       I declare under penalty of perjury under the laws of the State of California that the

24 foregoing is true and correct, and that this Proof of Service was executed on this __ day of

25 November, 2007 at San Francisco, California.

26

27                                      Kate Richardson

28