# SUPPLEMENTAL REPORT OF DOYLE WAYNE SCOTT

*Coleman v. Schwarzenegger et al.*,

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.*,

No. C01-1351 T.E.H.

AUGUST 2008

## Supplemental Report of Doyle Wayne Scott

1. I submit the present report to supplement my report dated November 9, 2007. Since writing that report, I have not authored any publications. I have not testified as an expert witness in court, but I have testified in one deposition: my deposition taken in this case, on December 14, 2007.

2. Neither my curriculum vitae nor the rate my company, MGT of America, is charging plaintiffs for my work on this case, has changed.

3. Since completing my expert report for this case in November 2007, I have toured four more California prisons: Folsom State Prison (Folsom) and the California State Prison-Sacramento on June 3, 2008, and the California State Prison-Solano (Solano) and Deuel Vocational Institution (DVI) on June 4, 2008. On these tours, I was allowed open access to staff, prisoners, medical and custody records and information. I was not blocked from speaking to any staff or asking any question, and all of my questions were answered. I have also reviewed additional documents, listed in Appendix A to this Supplemental Report.

Overcrowded conditions continue to endanger health and safety of California's prisoners

4. The additional tours and documents serve to confirm the conclusion in my original report: California's prisons remain drastically overcrowded, which makes the state unable to keep prisoners and staff safe and to provide for the health care needs of prisoners. I agree with former CDCR Secretary Jim Tilton, that the overcrowding – and

1

the use of dayrooms, gymnasiums, hallways, and other inappropriate places for housing prisoners – "has reduced the availability of program and recreation space that is essential for positive inmate programming. There is widespread agreement among correctional experts that chronic idleness produces negative psychological and behavioral effects in prison." Joint Pls' Trial Ex. 72 at 15 (CDCR Presentation to the Senate Select Committee on Prison Population Management and Capacity, August 15, 2006). I further agree with Mr. Tilton that

> [i]dleness-related frustration increases the probability of interpersonal conflict and assaults in prison. Overcrowding simultaneously reduces the opportunities for staff to effectively monitor inmate behavior and drastically limits the options to reduce animosities between inmates by separating them or sending them to different facilities. Thus, there is less for inmates to do, fewer outlets to release the resulting tension, a decreased staff capacity to identify inmate problems, and fewer options to solve them if and when they do.

*Ibid.* Moreover, my assessment of the present situation in California's prisons comports with Mr. Tilton's in 2006: "the risk of catastrophic failure in a system strained from severe overcrowding is a constant threat. . . . [I]t is my professional opinion this level of overcrowding is unsafe and we are operating on borrowed time." *Ibid.*

5. Prisoners continue to be housed in unacceptable conditions that endanger their health and safety. Prisoners in Folsom (in Building Two) were double-celled in six-by-eight foot cells, with two bunks, a toilet and sink, and a desk crowded into the cells with the two prisoners. There was hardly any unencumbered space in those cells, and they were extremely narrow. Prisoners in these units spent very little time outside these

cells. There were no dayrooms in the units. Although there was a large yard, they spent little time on it and what time they spent was in groups of several hundred with very few staff. (I saw only one staff on the yard on my tour.) It is inhumane to warehouse prisoners two to a cell under such conditions.

6. Inadequate out-of-cell or out-of-gym time was a common complaint on these recent tours, as on my first round of tours. Staff at Solano told me that administrative segregation prisoners do not receive even the required 10 hours per week of outdoor recreation, because there is simply not enough space available to provide them access to safe exercise.

7. Cells in Folsom's Building Five were seven by nine feet, double-celled, and had solid metal doors. These doors make direct supervision extremely difficult – staff cannot tell what is going on in the cells. Under these circumstances, staff are even less likely to be able to respond appropriately to medical and mental health emergencies, given their inability to see what is happening in the cells, which delays response (because they will need appropriate security and staff to be able to open the doors) and increases mistrust.

8. These cells doors were also individually keyed on the first tiers, making quick exit in an emergency extremely difficult and escorts far more time-consuming and staff-intensive. The staffing on these units was inadequate, given the solid doors.

9. Nontraditional or "ugly" beds are still very much a common practice in

3

California's prisons. A converted gymnasium at Solano (H Building) contained 225 triple bunks – a wall of sound and bodies and noise. As was often the case in areas with significant numbers of people housed where people were never intended to be housed, many of the over-used toilets and showers were broken. Z Dorm at DVI was a similar mass of people.

10. DVI, a reception center for the San Francisco Bay Area, is extraordinarily overcrowded. The design capacity is 1700 and the count, the day I was there, was just short of 4000. All but approximately 640 prisoners were there for reception processing. The prison is so overcrowded that prisoners being released are carefully timed with new arrivals so that beds are immediately swapped. Every available space was in use for offender housing: most dayrooms at DVI are used for offender housing. I saw dayrooms with 40 inmates in double and triple bunks, using showers in the bottom tier of the associated cellblock. There were beds along all the outer walls and in the central area, leaving just enough space to walk, but not enough to do anything else. There was no recreation space at all.

11. The Receiver has written extensively about how the physical structure of CDCR facilities poses a serious barrier to delivery of adequate care:

> The facilities available for providing health care services within CDCR are woefully inadequate. Through years of neglect, the facilities have long since passed the time when modest investments could remedy the problem. We are dealing not with deferred maintenance, but with some facilities that are literally falling apart. In addition, investments in health care facilities have significantly lagged behind growing inmate populations, so much so that available clinical space is less than half of what is necessary for daily

4

operations.

Joint Pls Trial Ex. 56, Exhibit 1, at 25 (Federal Receiver's Turn-Around Plan of Action, June 6, 2008, attached as Exhibit 1 to Receiver's Eighth Quarterly Report.) The Receiver has also documented serious problems resulting from the custody understaffing that I discussed in my initial report, noting that "[s]ystem-wide, CDCR lacks the custody staff and organizational structure and processes to ensure that patient-inmates are reliably escorted and/or transported to medical appointments. As a result, patient-inmates are often denied timely access to health care services, substantially increasing the risk that patient-inmates' health will further deteriorate and increasing the overall costs of providing health care services." *Id.* at 5. Several examples he provides are worth quoting at length, because they demonstrate the serious harms to prisoners and staff that result from the understaffing that follows from the current overcrowding crisis:

> Information obtained continues to underscore the serious repercussions of the deficient numbers of custody staff to supervise clinic operations and medication administration to patient-inmates. For example, at one level III/IV institution, a facility clinic was left unsupervised while the correctional officer escorted a patient-inmate back to the housing unit. While the officer was away several prisoners attacked and viciously stabbed a rival gang member 13 times while secured within the holding tank in the facility clinic. At another institution, investigators pursuing suspected criminal conduct in a facility clinic caught patient-inmates stealing syringes and other medical supplies via surveillance cameras. This facility clinic did not have correctional officer posts allocated for the supervision of patient-inmate movement inside the clinic areas.

Joint Pls Trial Ex. 67 at 12-13 (Receiver's Seventh Quarterly Report).

> At present, the CDCR does not have any housing units designed to adequately provide for the needs of developmentally disabled prisoners.

5

> Patient C was a 36 year old prisoner with the functional IQ of a nine-year old, and documented seizure disorders. An adaptive evaluation dated July 14, 2005 required "close supervision" in order to remind Patient C to take his medications. However, instead of being placed in a medical sheltered living unit (no such facilities exist in CDCR), Patient C was confined to an overcrowded dormitory in one of California's most deteriorated prisons. In late 2007, Patient C began to encounter problems with medication management and his behavior. On November 9, 2007, as the result of an alleged battery, Patient C was transferred (without his medical records) to a nearby high security prison administrative segregation unit. Thereafter, between November 9, 2007 and January 4, 2008, Patient C "missed" four medical appointments (the exact causes for the "missed" appointments is currently under investigation). On January 17, 2008, Patient C returned to dormitory housing; however, there is no indication that the necessary close supervision to remind him to take his medications was provided. Indeed, given the age and structure of the dormitory, and the limited staffing at this facility, it does not appear reasonable to expect minimally adequate care for developmentally disabled prisoners to be delivered at the prison where he had been housed. On January 27, 2008 another prisoner in the dormitory reported to correctional officers that Patient C was having a seizure. Prisoner C died the same day.

Joint Pls Trial Ex. 56 at 48-49 (Receiver's Eighth Quarterly Report).

12.     By placing prisoners in such settings, and requiring staff to work under these conditions, California is placing itself at serious risk, as the Governor noted in his State of Emergency Proclamation, from increased violence from enforced idleness, deteriorating mental and physical health from inadequate access to exercise and the outdoors. Further, these overcrowded conditions breed fear, anonymity, and mistrust on the part of custody staff which lead to an increased risk of inappropriate responses by such staff to medical and mental health needs, especially in emergencies.

13.     I agree with the Receiver that "[c]ustody resources needed to facilitate

6

access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services." Joint Pls Trial Ex. 67 at 5 (Receiver's Seventh Quarterly Report).

California has no meaningful plan to fix its overcrowding problems

14. The CDCR's "Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions" (Integrated Strategy) is an inadequate plan to address this crisis for several reasons. Joint Pls Trial Ex. 73. First, even if CDCR were to build the "infill" and "secure reentry facilities" they note in the plan, these spaces will not be available for prisoners to move in for years. CDCR predicts building 4,800 infill beds and 3,000 reentry beds in Phase I, and "up to" 3,800 additional infill beds and 8,000 additional reentry beds to follow. *Id.* at 3. CDCR predicts that the first 1000 infill beds will not be ready for occupancy until FY 2010/11, with the next 3,800 not available until FY 2011/12. *See* Integrated Strategy at Chart 1A, Priority Projects, May Revision Pop. Only 500 reentry beds will be available in FY 2009/10, with 500 more the next year, and an additional thousand added for each of the next several years. *Id.* Some of the beds intended to provide relief for this emergency will not be available until 2013. *Id.* CDCR's building projects will provide prisoners with minimal relief from the emergency conditions for many years to come, an unacceptable state of affairs.

15. Second, I have serious doubts as to whether CDCR is capable of accomplishing what they set out to do in this strategic plan. The plan itself admits that

7

"CDCR has yet to build any of the infill beds authorized by AB 900" at its passage in May 2007 because they have not been able to find sites and because of "unforeseen limitations of infrastructure, community concerns with prison expansion, staffing difficulties, and scope of construction." *Id.* at 2. These should not have been "unforeseen" problems – these are exactly the problems faced in siting and building prison facilities. CDCR's current facilities have been severely understaffed and have a severely decaying infrastructure, as I point out in my original report; local communities are always concerned with prison expansion. These problems are nothing new. This plan admits CDCR's planning shortcomings for the last several years but provides no assurances that CDCR now has the capacity to accomplish what it promises.

16. Further, the plan states that "the projects have been on hold" because of recent population projections, a budget crisis, and "settlement deliberations" in this case. *Id.* at 2-3. If the state were serious about building new facilities, and were committed to this as a meaningful solution to the crisis, it would not make such excuses.

17. Third, the infill bed numbers – 4,800 beds in Phase I, 3,800 more in Phase II – are based on *overcrowded* housing – denoted on these charts as "HOC," or "housing overcrowding capacity," instead of "DBC," or "design build capacity." Prisoners in the new facilities, then, might not initially be living in gymnasiums or hallways, as they are now, but they will still be overcrowded. California will be in the same position with the new beds as with the old, replicating the same conditions that led to inadequate staffing

8

and treatment space, inadequate out-of-cell time, and overworked and overstressed staff and violent, frustrated prisoners.

18. The state's AB 900 Strike team concluded that housing should be at no more than 130% of design bed capacity in the long term, based on national standards. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007). That is a realistic and appropriate place for CDCR to be, to ensure that its prisons are safe and provide legally required services. I caution, however, that while this number might be appropriate for new construction, it should be used carefully in CDCR's old, decaying facilities, with their failing infrastructure. Crowding prisoners at 130% is an appropriate goal for CDCR, speaking broadly, but some facilities might only be able to support and provide appropriate health care for smaller numbers.

19. Fourth, the Integrated Strategy is extremely vague on reform provisions. The document states that CDCR's strategy "relies upon a reform component" to "effectively reduce overcrowding consistent with CDCR's mission to reduce recidivism," but does not say what that reform component is. Joint Pls Trial Ex. 73 at 5 (CDCR's Integrated Strategy). In fact, CDCR has not even decided what this "reform component" will look like: "our integrated approach incorporates summary parole *or an alternative reform measure* that would safely reduce average daily population by approximately 8,000 inmates when fully implemented." *Ibid.* (emphasis added). This aspiration is a far

9

cry from an actual strategic plan.

20. Fifth, the plan says nothing about funding sources for any of the building or reform components. Although AB 900 does provide some funding, it is not clear to me that it would cover all of the building proposed in this plan and, in particular, the undefined reform components. California's current budget crisis shows that unfunded promises are very risky propositions.

21. The bottom line was stated properly by Mr. Tilton, in a statement currently on the CDCR's website; I would simply add medical care to his list of mental health care, education, and other basic needs that cannot be supplied under current conditions: "[t]he Department of Corrections owns the responsibility to assist inmates who are willing to change their ways with basic tools, of education, life skills, drug treatment and mental health, so they can get better when they leave Corrections -- not worse. But until I get overcrowding reduced -- then I don't have the opportunity to provide the program that I believe is my charge." (Viewed on the CDCR website on August 6, 2008, at http://www.cdcr.ca.gov/News/Background_Info.html.)

Date: August 13, 2008

Doyle Wayne Scott

10

APPENDIX A

## Documents reviewed for supplemental report of Doyle Wayne Scott

CDCR Data Analysis Unit, Weekly report of population as of midnight August 6, 2008.

CDCR Presentation to the Senate Select Committee on Prison Population Management and Capacity, August 15, 2006.

*Plata* Receiver's Seventh Quarterly Report.

*Plata* Receiver's Eighth Quarterly Report.

Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007.

CDCR, Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions.

Senate Budget and Fiscal Review, Subcommittee No. 4 Agenda, Thursday, March 15, 2007.

James Austin and Jeff Beard, Assessment of the Impact of Prison Population Reductions on Counties and Public Safety (power point presentation).