**Report of Ronald Shansky, M.D.**

**November 9, 2007**

## TABLE OF CONTENTS

I.      EXPERT QUALIFICATIONS...............................................................1

II.     BASES FOR EXPERT OPINIONS...................................................2

III.    THE PRISON HEALTH CARE FACILITIES ARE INADEQUATE
        FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL
        CARE............................................................................................3

        A.    Reception Center Clinical Areas Are Inadequate for the High
              Volume of Medical Contacts......................................................4

        B.    There is a Severe Shortage of Health Care Clinical and Office
              Spaces in Mainline Prisons ..................................................5

        C.    Older Prisons Lack Clinical Space and the Space that Is
              Allocated to Health Care Is Inappropriate.....................................7

              1.    San Quentin ..............................................................7

              2.    CIM..........................................................................10

        D.    Space Shortages Impair Health Care Delivery Statewide......................11

IV.     THE NUMBER OF CLINICIANS IS INSUFFICIENT FOR THE
        NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE ..............13

        A.    CDCR Has Been Unable to Fill Vacancies at Some Prisons.....................15

        B.    Some Prisons Allocated too few Primary Care Providers.........................16

        C.    Use of Registry Providers Cannot Resolve Staffing Shortfalls ....................17

        D.    Staff Shortages Result in Delayed Care.............................................18

        E.    Prisons Too Short-Staffed to Implement Required Programs.....................19

V.      CDCR HAS BEEN UNABLE TO CONTRACT WITH A SUFFICIENT
        NUMBER OF SPECIALTY PROVIDERS TO MEET THE NEEDS
        OF STATE PRISONERS ON A TIMELY BASIS ..............................21

        A.    Delays in Access to Care Harmful and Even Fatal ...............................21

        B.    Some Prisons Have Long-Standing Delays in Specialty Care
              Access......................................................................................22

1.  Avenal Inspection ...................................................................22

2.  HDSP................. ......................................................24

3.  Plaintiffs Counsel's Findings .............................................24

VI.  THE CDCR HAS INADEQUATE STAFF AND RESOURCES TO
ENSURE THE TIMELY AND APPROPRIATE DISTRIBUTION OF
MEDICATIONS.................................................................28

A.  Some Prisons Unable to Fill LVN Positions ....................................29

B.  The Shortage of LVNs is Causing Medication Delays and Inadequate
Recordkeeping ..................................................................31

C.  The *Coleman* Special Master Uncovered Pervasive Problems with
Medication Delivery ...............................................................33

VII.  THE OVERCROWDING CRISIS OVERWHELMS CDCR'S ABILITY TO
ADEQUATELY MANAGE AND MAINTAIN MEDICAL RECORDS AND
PATIENT SCHEDULING NFORMATION.................................35

A.  Medical Records Staff Are Incapable of Maintaining Orderly
Medical Files Due to the Sheer Numbers of Prisoners ..................35

1.  The Quality of Medical Records at Many Prisons is
Poor ............................................................37

B.  CDCR's Medical Scheduling and Tracking System Is
Inadequate ..................................................................41

VIII.  THERE ARE NOT ENOUGH CUSTODY OFFICERS TO ENSURE
ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND
CLINICAL CONTACTS ..................................................45

IX.  THERE ARE MORE PRISONERS REQUIRING SPECIALIZED
PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN
ACCOMMODATE.................................................46

X.  OVERCROWDING INCREASES THE RATE AND SERIOUSNESS
OF INFECTIOUS DISEASE TRANSMISSION ..................................48

XI.  CONCLUSIONS.................................................50

# EXPERT REPORT OF
# RONALD M. SHANSKY, M.D.

## I.    <u>EXPERT QUALIFICATIONS</u>

1.  I am a Physician Consultant specializing in correctional medicine and continuous quality improvement, and a voluntary attending physician for the Cook County Hospital, Department of Medicine, in Chicago, Illinois.  I received my Medical Degree from the Medical College of Wisconsin in 1971, and did my Internship and Residency at Cook County Hospital between 1971 and 1974.  I received my Masters Degree in Public Health from the University of Illinois School of Public Health in 1975.  My CV is attached.

2.  In my 36 years as a physician, I have focused almost exclusively on correctional health care issues.  My correctional health care experience includes seven years work as a staff physician at the Metropolitan Correctional Center of Chicago, twelve years as Medical Director of the Illinois Department of Corrections five years as a medical consultant to the California Department of Corrections, and involvement with over two dozen other correctional systems as either a court-appointed expert/monitor/special master or as a consultant retained by the correctional system.  During the course of my career, I have inspected over 200 prisons and jails worldwide, but primarily in the United States.

3.  In 1995, U.S. District Court Judge William Bryant appointed me Receiver of the District of Columbia Jail Medical and Mental Health Programs, a position I held for five years.  The jail that I was responsible for was under a federal court-ordered population cap.

4.  I am the associate editor of *The Clinical Practice in Correctional Medicine*, Second edition, 2006.  I have listed all of my publications on my attached C.V.

1

5.  I am billing the plaintiffs $250 an hour, my usual billing rate.  During the last four years, the only case in which I have testified under oath is *Plata v. Schwarzenegger*, on June 8, 2005.

## II.    BASES FOR EXPERT OPINIONS

6.  I have been retained by plaintiffs counsel in the *Plata* and *Coleman* cases as an expert in prison medical care and health care administration, and the impact of overcrowding on prisoners' medical care, including how prison overcrowding detrimentally affects prisoners' access to health care and interferes with the ability of prison officials to meet the existing and increased medical needs of the prisoners in an overcrowded system.  I have also been asked to render my opinion with respect to whether overcrowding with California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman* and *Plata* classes.  My opinions are based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my recent inspections of California Institution for Men (CIM), Avenal State Prison (ASP), Valley State Prison for Women (VSPW), San Quentin State Prison (SQ) and High Desert State Prison (HDSP) and on my professional experiences working in similarly overcrowded correctional settings.

7.  A list of the documents provided to me by plaintiffs counsel is attached.  Included on that list are reports that plaintiffs counsel drafted during the last year based on prison tours they performed throughout the state, in the presence of CDCR counsel.  I understand that these reports were generally drafted within one month of the visit, and that, with one exception, [1]  no objections have been raised to these reports, or to the

---

[1] I am aware that the Receiver's office did object to an earlier report submitted regarding San Quentin

2

plaintiffs' reports submitted in the preceding years.

8.  Having toured five of the state's prisons very recently, and having acted as a consultant to the CDCR until mid-2006, I find that these reports accurately describe the kind of problems I observed while touring prisons and was aware of while consulting with the Department.

9.  To meet the community standard of care, a medical care system must be able to provide timely service that is clinically appropriate, and must have reliable processes to ensure continuity of care.  Having toured five state prisons in October and November 2007, and reviewed documents provided by plaintiffs counsel, including the Receiver's Reports, I believe that, despite improvements including greater numbers of primary care providers at some prisons and improved specialty contracting, the CDCR's medical delivery system continues to operate in a state of crisis that harms prisoners with serious medical concerns and places them at substantial risk of harm because the number of prisoners far outstrips the capacity of the system to provide care.

## III.  THE PRISON HEALTH CARE FACILITIES ARE INADEQUATE FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE

10.  As the Receiver's Consultant, Dr. Kent Imai, recently noted, the "CDCR medical staff has been working in an environment of care characterized by crowded and poorly equipped clinical areas." Joint Pls' Trial Ex. 34, at 9. (Receiver's Death Report).  I agree.  The CDCR does not have enough facilities to adequately accommodate the number of medical encounters necessary to provide adequate care.   In the newer prisons, the clinic space allocated for medical and mental health exams and professional offices is insufficient for the number of staff and patients, and in the older prisons, what little space

State Prison (SQ).

there is for health care functions is often inadequate. Given the current prison population, the prison system lacks sufficient space to provide timely medical care, with appropriate confidentiality safeguards.

**A.    Reception Center Clinical Areas Are Inadequate for the High Volume of Medical Contacts**

11.  Reception Centers present a particular problem: all prisoners entering the massive system must be processed through one of these specialized locations, but "none of the CDCR's designated reception centers were designed or constructed with adequate clinical space. To make matters worse, as the original prisons designated for reception became overwhelmed by the influx of parole violators, the CDCR was forced to 'convert' general population prisons into reception centers," but did so without providing "adequate additions to clinical staff or clinical space." Joint Pls' Trial Ex. 26, at 19 (Receiver's May 15, 2007 Overcrowding Report.)   With too many prisoners flowing through limited space and inadequate screening staff, the screening process itself breaks down.

12.  This problem is illustrated at CIM's Reception Center, where most of the new arrivals receive the required history and physical examinations in a building that the prison refers to as "the hub." Because the RC must process a certain number of prisoners each day, and this number exceeds the number of patients that can be adequately treated, the prison squeezes too many prisoners and too many providers into the available treatment area. The screening exams are conducted by primary care providers (PCPs) in two adjacent rooms with an open door between the two rooms. Each of the rooms has two areas for PCPs to conduct exams. As such, four history and physical exams can be, and often are, conducted simultaneously. The two exam areas in each room are separated by only a thin white fabric folding screen that is approximately five to six feet tall.

Conversations between a PCP and prisoner patient on one side of the screen can be heard by those on the other side, as can conversations between the two adjacent rooms. With the number of prisoners being processed through this area simultaneously, the prison's screening process is compromised. Given the current, overcrowded conditions in the CIM reception screening area, the clinicians cannot obtain reliable patient histories because, without confidentiality safeguards, some prisoners will withhold vital health care information.

> ### B.     There is a Severe Shortage of Health Care Clinical and Office Spaces in Mainline Prisons

13.  The prisons to which prisoners are assigned after being processed through a reception center also do not have adequate space for medical encounters. The state's "newest and most modern prisons" were "designed with clinic space which is only one-half that necessary for the real-life capacity of the prisons." Joint Pls' Trial Ex. 26, at 19. (May 15, 2007 Receiver's Overcrowding Report.) Emblematic of this problem is Kern Valley State Prison, the state's newest institution, which "was planned, designed, and subsequently constructed knowing full well that the medical, mental health, and dental space and staffing would be entirely insufficient for the prison's actual population." *Id.* at 22. "CDCR has a long-standing policy and practice of constructing new prisons with design capacity limitations on clinical space and thereafter operating those facilities at 200 percent design capacity." *Id.* at 27:19-23. Even simply expanding telemedicine at the prisons, necessary for adequate patient care, often faces the "insurmountable barrier" of being unable to find a room adequate for the telemedicine purposes "because California's prisons were constructed without adequate clinical or office space for the numbers of inmates housed at the prison." *Id.* at 28:12-17.

14.  The Receiver indicates that all California prisons require facilities upgrades to provide safe, appropriate space for medical staff and patients, including clinic, office, and medical support services (e.g., medical records). *Id.* at 27:10 - 28:1 and Joint Pls' Trial Ex. 32, at 79:24-28. (Receiver's Sixth Report.)  The additional space is necessary "primarily" because of overcrowding and the fact that the prisons were built without adequate clinical and medical support facilities.  Joint Pls' Trial Ex. 26 at 27:10 - 28:1. (Receiver's Overcrowding Report.)

15.  The amount of needed clinical and related support space has not been determined.  Joint Pls' Trial Ex. 26, at 27:19-23.  (Receiver's Overcrowding Report.)  The Receiver states a master schedule for these upgrades, even with a "very aggressive" timetable – and assuming that funding is available – calls for completion of construction by the end of 2011, four years from now.  Joint Pls' Trial Ex. 32, at 80:27 - 81.2. (Receiver's Sixth Report.)  No completion date has been publicly established by the Receiver for the statewide project to establish 5,000 beds (with associated clinic and office space) for housing and treating medical patients (along with 5,000 beds for mental health patients).  Id. at 77:9 - 79:22.

16.  I observed a critical shortage of space at VSPW, where a gymnasium was recently converted into a living facility to accommodate an influx of 400 additional female prisoners into the prison.  The prison had set up a small exam room off the gymnasium from which medications are distributed and where the RN can do face-to-face triage appointments.  The room is accessible only by walking through the prisoners' bathroom and shower area.  I waited 10-15 minutes for a female custody officer to clear the bathroom of women before I could enter the exam room to interview the female RN.  The location of this exam area is unprofessional and degrading for the women prisoners and for

6

the clinicians required to work there. Moreover, the fact that the exam area is restricted to females raises concerns about how the male supervising nurse will be able to adequately oversee this clinic. VSPW staff advised me, however, that they had to open the clinic space in the gymnasium, despite its shortcomings, because the additional gym prisoners had placed too great a strain on the existing clinics. Forcing professionals to work under such conditions will likely create hiring and retention problems.

17. At ASP, each clinic has but two rooms available for medical examinations, a very small medication distribution room, and the clinic scheduler must work in an open area immediately adjacent to where patients wait and vital signs are taken, making it difficult to run double PCP lines in the yard clinics. As described below, ASP should be running double PCP lines whenever possible, because there are backlogs of hundreds of prisoners awaiting medical appointments on each yard. The backlogs cannot be cleared, however, so long as there is no place for the appointments to occur.

### C.    Older Prisons Lack Clinical Space and the Space that Is Allocated to Health Care Is Inappropriate.

#### 1.    San Quentin

18. With overcrowding at 200% of capacity for Reception Center prisoners, and 187% for the 1700+ Level II prisoners, the dearth of appropriate clinical space at California's oldest prison, San Quentin, is particularly acute. As a result, the prison has resorted to using ill-equipped, wholly unprofessional and possibly dangerous designated clinic areas in a desperate, but unsuccessful, attempt to provide adequate and timely care to prisoners.

19. The clinic serving the 1200 Reception Center prisoners housed in the West Block Housing Unit (approximately 900+ prisoners) and the gymnasium, which was

converted into housing for 350+ prisoners, illustrates the problems that overcrowding has caused. San Quentin has created a make-shift medical "clinic" in what used to be a shower/bathroom area. This clinic area typically serves the gym prisoners on one day each week, and prisoners from West Block on the other four days. It consists of a room balkanized into approximately a half dozen very small treatment areas, demarcated with shoulder-height partitions creating semi-private exam areas for the RNs and primary care providers, and areas for LVNs to take vital signs and do dressing changes. A smaller adjoining room still has a toilet in it (that apparently is not used), but the rest of the hardware has been removed to accommodate a cramped, narrow exam room. On the day I visited, the two-room clinic area was staffed with two RNs, two physicians and one mid-level provider, in addition to several LVNs, and was very crowded with very limited confidentiality.

20. These crowded working conditions impede the ability of conscientious clinicians to provide adequate care, will likely create significant hiring retention problems and may be unsafe for the clinicians. Two of the young women physicians working in this clinic described the conditions as isolating, very noisy and wholly unprofessional, and making it difficult for them to work efficiently. They raised concerns that they may not be safe, because the custody officers do not stay in the clinics, and because the windows to the crowded gym are covered. While window covering facilitates privacy for the patients, it raises security concerns for the clinicians working there. Although they may carry personal alarms, the physicians pointed out that there are only a handful of custody officers in the gym overseeing 350+ prisoners, and that they are generally congregated at their work area at the far end of the gymnasium. Additionally, the five or six clinicians assigned to the clinic share just two telephones, making it very difficult for physicians in

8

particular to make calls to the pharmacy, laboratory, x-ray department and specialty consultants for information necessary to treat their patients. They reported the clinic has lacked a working fax machine for weeks, further stymieing communications with other providers. Even the best doctors cannot work effectively under these conditions, and one of the doctors acknowledged that she is often unable to see all of the patients assigned to her on a given day.

21. In a mainline tiered housing unit for hundreds of prisoners, SQ has also converted three small offices, formerly occupied by custody officers, into "clinic" areas in an effort to accommodate the growing number of SQ prisoners in that housing unit. These rooms are not appropriate for health care delivery because they are very noisy and also may not be secure for the clinicians who work in them. Several of the SQ doctors described their dilemma in deciding whether to increase their personal security by leaving the clinic door open while seeing patients, or closing it to lessen the considerable din from the prisoners in the housing unit making effective communication, and even coherent thought, challenging.

22. In another of the small exam areas in that same tiered housing unit, the RN performs face-to-face triage in a small, cramped area from which medications for hundreds of inmates are also administered, twice daily. The room lacks an exam table. Without appropriate clinic space for the number of patients that must be seen, SQ is forced to create substandard exam areas throughout the prison.

23. The dramatic overcrowding in San Quentin has pushed the prison administration to designate work areas that, because they are so substandard, will make retaining competent clinicians difficult. In order to build a competent, committed and professional team of clinicians to develop a constitutionally adequate medical care

9

delivery system, the CDCR must provide a professional environment in which to practice medicine. The clinical space allocated at San Quentin is so substandard and creates such a stressful environment that, while the prison has been able to attract some highly trained young physicians in the short term (two state physicians I spoke to had worked at San Quentin for six weeks or less), I believe the prison's capacity to retain physicians is seriously jeopardized by both the physicians' perception of personal safety issues and the unprofessional conditions. The treatment delays at SQ will only worsen if the prison is not capable of retaining qualified physicians.

2.    **CIM**

24. Housing prisoners at 167% of capacity, CIM's mainline facilities are, like the Reception Center facilities, so over-taxed that fundamental medical confidentiality rights are routinely ignored. In the West facility clinic at CIM, two PCPs share one room and simultaneously see patients for sick call and other encounters. A thin fabric folding screen separates the area in which the doctors see patients from a single exam table which the PCPs must share, as the room is not large enough to accommodate a second table. In the same clinic, the registered nurse conducts face-to-face triage appointments with patients in a large room that is shared by another nurse (who may be seeing patients) and an office technician. These arrangements cannot provide for minimally adequate patient-provider privacy. Moreover, the medical treatment area is so small that there is no medically appropriate waiting area, so sick patients must wait for appointments on a small bleacher outside the clinic, exposed to the elements.

25. The prison has been unable to afford the nursing staff adequate clinical space in other clinics as well. In the East clinic at CIM, some nursing encounters are conducted in a large open area that does not provide for minimally adequate patient-provider privacy.

10

In the Elm Hall clinic, the PCP and registered nurse must use the same relatively small space for medical patient encounters, and that same space is also used by nursing staff to distribute medication and document that activity. There is also a shortage of office space at CIM for medical supervisors and staff. These conditions will exacerbate overcrowding problems – clinicians will be unable to obtain essential information from their patients, and they are more likely to resign over frustration with the working conditions, further worsening the clinician shortage. (See section IV, below.)

### D.    Space Shortages Impair Health Care Delivery Statewide

26. Plaintiffs' on-site inspections have found that, consistent with the Receiver's finding, the space allocated for medical care at the prisons is insufficient for the number of prisoners who must be treated in the clinics. These overcrowded conditions around the state have resulted in treatment delays, a failure to implement required medical programs, and substandard working conditions.

27. Given the overcrowding, prison managers must be vigilant in responding to outbreaks of disease. In prisons that must respond to these public health issues, the space shortage is felt even more acutely. For example, San Quentin's West Block housing unit was under a lockdown and quarantine during the month of July. Nurses reported that, for a period of about two weeks, very few West Block prisoners were escorted to the Gymnasium/West Block clinic for nurse triage. The nurses said that they did go to West Block and tried to do triage at the sergeant's desk, but this was not effective, as there was no available exam space. Plata Pls' Trial Ex. 27, at 5. (Letter, September 7, 2007.) Without alternative clinic facilities, the RN triage system essentially broke down for the duration of the disease outbreak.

28. Even without the stress of quarantine, most of the prisons lack sufficient space

11

to fulfill their medical duties under the Policies and Procedures. At Pleasant Valley State Prison (PVSP), staff report that space is a problem even though there are three rooms in each yard clinic dedicated to medical encounters; staff also state that in addition to more medical exam rooms more space is needed for medication distribution and work by phlebotomists. Plata Pls' Trial Ex. 23, at 7. (Letter, July 24, 2007.) At that prison, clinics for patients with Hepatitis C cannot be regularly held because of space constraints. *Id.* at 12.

29. At the Substance Abuse Treatment Facility at Corcoran (SATF), managers state that even if the prison were fully staffed with primary care providers (PCPs), timely and adequate PCP appointments could not be provided because of a lack of space. Plata Pls' Trial Ex. 32, at 3. (Letter, October 19, 2007.)

30. California Correctional Center (CCC) medical managers and staff state that they lack the space necessary to provide medical care to the number of prisoners in their custody. Plata Pls' Trial Ex. 31, at 2. (Letter, October 18, 2007.) Among the more serious of the space-related problems, as described by CCC staff, are: (1) a Main Clinic waiting area that routinely has 60 to 70 patients although the rated fire marshal capacity is 46 (there is no alternative space available, and having patients wait outside, aside from security/custody concerns, is not practical, particularly during the winter months); (2) inadequate numbers of medical exam rooms in the Main Clinic area given the number of primary care providers (PCPs) and patients to be seen; (3) an OHU that is not large enough to house all patients who need that level of care on any given day; (4) a Triage & Treatment Area (TTA) too small for patients and workers who must use it, particularly since space in the TTA must be regularly used by a PCP because of the lack of adequate space in the Main Clinic; (5) "temporary space" for FTF triage for registered nurses (and

their patients) on two prison yards, described as "small closets" without sinks or toilet facilities; (6) an extremely crowded medical records space; and (7) no dedicated space for a telemedicine clinic, meaning that such services must be provided in an existing medical exam room (which of course results in that room being unavailable for an on-site PCP or RN).

31. At Mule Creek State Prison there also is insufficient clinical space. Clinical staff pack the small clinics. The space allocation to the pharmacy, which functions out of two separate rooms, is a long-standing issue. The physical therapist does not have adequate or permanent space. Plata Pls' Trial Ex. 30, at 5. (Letter, October 9, 2007, at 5.)

32. At ASP, the current medical clinic and other medical-related spaces are inadequate to treat the approximately 7500 prisoners at that facility. There is not enough space for on-site specialty providers, or for medical records. The building that used to house administrative segregation prisoners (Facility 1, Building 140) has no medical room or adequate alternative area for exams or assessments. Plata Pls' Trial Ex. 17, at 1. (Letter, May 30, 2007.)

33. At California Men's Colony (CMC), the area allotted to the nurse responsible for doing the initial medical interview for incoming prisoners is a small office that serves as a "pass-through" area and appeared to be shared with a custody officer; the prison's warden reported that it was not an appropriate space for these interviews. Plata Pls' Trial Ex. 25, at 7. (Letter, August 3, 2007.)

## IV.    THE NUMBER OF CLINICIANS IS INSUFFICIENT FOR THE NUMBER OF PRISONERS WHO REQUIRE MEDICAL CARE

34. Overcrowding creates pressures on the system that make hiring and retaining sufficient numbers of clinicians and other medical workers exceedingly difficult.

California's overcrowding crisis has created a situation where the prisons, and particularly the more remote prisons, are unable to hire and retain enough health care staff to address the medical needs of the prisoner-patient population.

35. As the Receiver concluded, "Many CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman, Perez, Armstrong,* or *Plata* they will fail to comply with because of staff shortages and patient loads." Joint Pls' Trial Ex. 26, at 30. (Receiver's Overcrowding Report.)  And, according to the Receiver, not only did the CDCR's staffing situation significantly worsen during the period from 2002 to 2007, but "the true scope of clinical staff shortfalls is actually *far worse* than the numbers" set forth in the Receiver's report because the system has additional staffing needs not yet factored into the vacancy rates. *Id.* at 11-12.  I agree.

36. Based on its review of four years of correctional system audits, the Office of the Inspector General also acknowledges that insufficient clinical staffing for the growing population makes the medical care delivery problem intractable.  "[I]t must be recognized that efforts to address problems in these areas [including inadequate medical care] have been severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes." Joint Pls' Trial Ex. 46, at ES-1.  (Office of the Inspector General, Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004, April 2006, vol. 1.)  I agree with the Receiver and the Inspector General that

14

the CDCR has been seriously understaffed, both in terms of clinical vacancies and an overall lack of sufficient allocated positions.

### A.    CDCR Has Been Unable to Fill Vacancies at Some Prisons

37.   Despite substantial pay increases in the last eighteen months, the CDCR health care staff remains riddled with vacancies.  The statewide September 2007 staffing figures for CDCR shows a total of 355.63 staff PCP positions at all prisons (PCPs includes physician and surgeons, nurse practitioners, and physician assistants), with only 220.75 state employee civil servants in those positions.  Plata Pls' Trial Ex. 33, at 1.  (Mark IV Vacancy Report Requested for the Following Positions.)   This shortfall of approximately 135 PCPs computes to a vacancy rate for state physicians of approximately 38 percent.

38.   The Receivership reports that it will address the physician shortage by raising salaries as high as necessary to staff the prisons.   Joint Pls' Trial Ex. 26, at 24-26. (Receiver's Overcrowding Report.)  As the Receiver frankly acknowledges, this will likely be enormously expensive.  Indeed, he points out that hiring the necessary clinicians and implementing a constitutionally adequate system "may all but bankrupt the State of California." *Id.* at 41.  Even with unlimited resources, however, there are likely some physician vacancies that may never be filled because they are located in remote prisons where qualified individuals choose not to live.  As noted in the Receiver's May 15, 2007 Overcrowding Report, CDCR's recruitment challenges are intensified by the system's practice of locating "mega-prisons" in remote locations "far from the urban centers where it may be possible to recruit adequate numbers of competent clinicians." *Id.*  at 14. Overcrowding inhibits the CDCR from limiting the number and type of patients sent to these remote facilities, because all the other prisons are filled beyond their capacity.

39.  Some of the toughest vacancies to fill in the CDCR are at the prisons with the

greatest overcrowding. Now at well over 200% capacity, VSPW is the most overcrowded of the women's prisons. Located in the central valley town of Chowchilla, the prison has had a physician vacancy for years, and earlier converted two other physician positions to mid-level positions because they considered the physician positions unfillable. The prison recently received authorization to hire an additional five physicians and two mid-level providers. Dr. Virk, VSPW's Chief Medical Officer, frankly admitted that given his inability to fill the existing single physician position, he was unlikely to be able to fill the additional positions allocated. In the two months since the extra positions had been allocated, he had received little interest, and he had just two candidate interviews scheduled. He acknowledged that he did not know whether either candidate had the necessary credentials (*i.e.*, board eligibility or certification).

40. At 256% capacity, ASP is the most crowded prison in the state. At ASP, I learned that of the 10.5 PCP positions, only three were state employees and none of the five physician positions were filled by a state employee.

### B.    Some Prisons Allocated too few Primary Care Providers

41. The prisons lack sufficient numbers of clinicians to treat the current level of need, not only because of clinician vacancies, but also because the prisons are often allocated too few medical care workers. So, even if the prisons were able to fill all of their vacant health care positions, which they have not been able to do to date, despite the above-mentioned pay raises, the prisons would still be unable to handle the level of need given the current overcrowding.

42. The Chief Physician and Surgeon at HDSP, for example, stated that at least two additional PCP positions were needed at the prison given the number of PCP-patient medical encounters that are needed to comply with the policies. The Chief also pointed

16

out that the ratio of PCPs to prisoner-patients at HDSP was 1-to-660, which he reported was the highest among the prisons in the CDCR northern region. At ASP, the Chief Physician and Surgeon told me that the prison needed up to six additional PCP positions if encounters required by policy were to be timely provided.

43. CDCR staff members have also raised these issues during plaintiffs counsel's tours. Dr. Dudley Lee, Health Care Manager at Salinas Valley State Prison, explained that he believed the "need is greater than the capacity" with respect to the number of PCPs allocated SVSP relative to the needs of its population, which is getting sicker, older, and has increasingly acute concerns. Explaining this phenomenon, Dr. Lee pointed to the fact that SVSP receives medically-vulnerable prisoners, including those who cannot go to institutions with a risk of Valley Fever and those who require better oxygen (SVSP is at sea-level). Additionally, Dr. Lee pointed to the fact that SVSP shares grounds with the Department of Mental Health (DMH), whose patients often have more acute health issues. Plata Pls' Trial Ex. 29, at 2-3. (Letter, October 4, 2007.)

44. A physician at Calfornia State Prison at Sacramento (SAC) reported that the prisoners at that prison, which has a heavy mental health load, have a higher medical acuity than is found at many other prisons. He stated that CDCR's current method for calculating physician staffing is strictly population-based, and thus fails to account for the greater medical needs of the sicker populations at prisons like SAC. Plata Pls' Trial Ex. 12, at 2. (Letter, March 8, 2007.)

### C.     Use of Registry Providers Cannot Resolve Staffing Shortfalls

45. Unable to fill existing vacancies, some prisons, including VSPW and ASP, have been forced to use registry providers to fill in for their chronically vacant positions, in an attempt to mitigate the effects of the lack of state employees. While use of registry

17

providers can be useful in the short term to ensure that individual patients are seen in a timely manner, it is at most a stop-gap measure that is inadequate as a long-term solution. As VSPW's Dr. Virk explained to me, the registry providers have no investment in the development of a competent system of care because they have only a short-term commitment to the prison, and will leave for other employment when a higher registry rate is offered elsewhere.

**D.    Staff Shortages Result in Delayed Care**

46.    In any system, inadequate medical staffing, whether due to unfillable vacancies or insufficient allocation of positions, will result in delayed care. In a dramatically overcrowded system like the CDCR's the treatment delays become more acute. Consistent with my expectations, I found significant appointment delays at the prisons I toured, as have plaintiffs' counsel over the course of the last year.

47.    At ASP, I learned that there are large numbers of pending PCP appointments, with all but one of the six yard clinics having over 400 such appointments pending with two of the yard clinics (4 and 5) having more than 700 and 600 pending, respectively. A single PCP is assigned to each yard clinic, and sees between 20 and 25 patients per day. Each day, a number of patients must be added to each clinic's PCP appointment list who did not otherwise have a pending appointment, based on an urgent referral from a nurse or other policy requirements. Given the numbers, there is no question that ASP is not in compliance with policy requirements regarding the timeliness of PCP appointments. Plaintiffs' counsel in May 2007 reported that routine appointments were taking four to six weeks in most yard clinics (see Plata Pls' Trial Ex. 17, at 3), and such delays are consistent with my observations.

48.    At CIM, the prison staff is unable to ensure that required intake history and

physical exams are conducted within the 14-day period mandated by policy.  I reviewed a three-page list provided on the tour that, among other things, showed that approximately 30 percent of those receiving their H&P exam on the day of our inspection were in violation of policy as they received the exam more than 14 days after arrival.

49.  At HDSP, the Chief Physician and Surgeon told me that there were backlogs for patients to see a PCP in all of the clinics.

50.  Plaintiffs' counsel also uncovered significant delays for routine and urgent primary care appointments at prisons throughout the state prison system.  The staff at Corcoran State Prison reported four week delays for their primary care provider lines. Plata Pls' Trial Ex. 24, at 3-4.  (Letter, July 25, 2007.)  Several of the clinics at PVSP reported three to four week delays for the PCP lines.  Plata Pls' Trial Ex. 23, at 6.  (Letter, July 24, 2007.)  Richard J. Donovan Prison (RJD) reported delays of up to a month for its PCP lines.  Plata Pls' Trial Ex. 22, at 6.  (Letter, July 18, 2007.)  Centinela State Prison had delays of up to three months.  Plata Pls' Trial Ex. 9, at 1.  (Letter, February 8, 2007.) .

### E.    Prisons Too Short-Staffed to Implement Required Programs

51.  The Policies and Procedures adopted in *Plata* pursuant to the settlement require the prisons to implement certain programs, including a chronic care program, which requires identification of all patients with chronic conditions, a comprehensive documented initial intake exam by a PCP, and follow-up exams with a PCP that typically occur every three months but which can been more or less frequent depending on the PCP's assessment of the patient's acuity and the degree of control of the chronic condition(s).  The policies also require development of a preventive care program that tracks preventive services provided to qualified prisoners.

52.  With too few primary care providers to meet the most immediate needs of the

19

current population, some prisons are unable to develop required medical programs. For example, ASP has not yet implemented the required chronic care program. Large numbers of additional PCP encounters/appointments will be necessary at ASP once the chronic care program is implemented, particularly given certain characteristics of the inmate population. The Correctional Health Services Administrator stated during my visit that ASP housed approximately 1,200 prisoners over 50 years of age. The elderly tend to have chronic medical conditions. Further, two of ASP's yards are CDCR-designated for housing mobility impaired inmates, many who use wheelchairs. Prisoners with mobility impairments also tend to have more chronic conditions than those who are not disabled. As such, the need for required medical encounters will rise substantially as ASP further implements the required policies.

53. At VSPW, Dr. Virk reported to me that his prison has not been able to develop the required preventive health care program due to a lack of primary care providers.

54. The Policies and Procedures also require specific appointments be scheduled in relation to specialty care consultations. Not surprisingly, plaintiffs' counsel found that, with insufficient primary care provider staffing, the prisons are regularly failing to schedule or conduct these appointments. California State Prison at Solano (SOL), for example, fails to schedule these post-consultation appointments consistently, and getting reports after specialty appointments has been a problem in some specialties. Plata Pls' Trial Ex. 21, at 8. (Letter, July 10, 2007.)

55. The CDCR Policies and Procedures require that patients referred to a specialist on a routine basis see their PCP each 30 days pending the specialty appointment to review whether the consult is necessary, and whether it should be expedited. Prisoners awaiting an urgent referral must be seen every seven days pending the appointment, for the same

reason.  The 30-day interim appointments are not scheduled at SOL.  Plata Pls' Trial Ex. 21, at 8-9.)  (Letter, July 10, 2007.)  The seven-day interim appointments are not scheduled at California Medical Facility (CMF).  Plata Pls' Trial Ex. 16, at 8-9.  (Letter, May 7, 2007.)

## V.    CDCR HAS BEEN UNABLE TO CONTRACT WITH A SUFFICIENT NUMBER OF SPECIALTY PROVIDERS TO MEET THE NEEDS OF STATE PRISONERS ON A TIMELY BASIS

56.  The CDCR cannot provide specialty services, including in urgent (high priority) cases, in accord with policy requirements for all prisoners who need such services because, as  result of overcrowding, the number of prisoners who need such services exceeds the capacity of the providers available to CDCR, and/or is so great that CDCR cannot adequately track and schedule such cases.

### A.    Delays in Access to Care Harmful and Even Fatal

57.  When the need for specialty care exceeds the capacity of the available providers, patients are at risk of serious harm, including preventable death.  Due to CDCR overcrowding, members of the plaintiff class are suffering serious harm, and some have died, because they had no access, or delayed access, to specialty care.

58.  The Receiver's review of calendar year 2006 deaths identified a preventable death in which there was a five-week delay in availability of an appointment for a specialist and, in 11 cases among the possible preventable deaths, there were delayed referrals (excessive time before appointment is available).  The Receiver also identified "[s]ystemic and pervasive prolonged delays in specialty referrals" as one of the "systemic lapses" found when reviewing all deaths.  Joint Pls' Trial Ex. 34, at 6-8.)  (Receiver's Death Report.)  The Receiver reports that "an increasing number of prisoners in the more remote prisons has  placed a heavy burden on the very limited number of hospitals and

21

specialty providers . . . ."  Joint Pls' Trial Ex. 26 at 28:8-10.  (Receiver's Overcrowding Report.)

**B.    Some Prisons Have Long-Standing Delays in Specialty Care Access**

**1.    Avenal Inspection**

59.  Consistent with what the Court's Receiver has reported, I identified serious specialty care delays at certain of the prisons I visited, driven by the prisons' inability to arrange for timely consultations for the numbers of prisoners who needed them.  I found some of the worst delays at ASP.

60.  One of the largest and most over-crowded prisons, ASP is located in the Central Valley, a substantial drive from the urban areas where hospitals and specialty care providers are concentrated, yet relatively close to a half-dozen prisons that also compete for specialty services.  At ASP, managers and administrators told me there were delays with specialty services for inmates and that the basic problem was unavailability of specialty providers compared to the number of prisoners who need such services, particularly for cardiology and orthopedics.  They further stated that they must use the same providers used by a number of other prisons who also need specialty appointments for their patients.

61.  The delays identified were amply documented by ASP's scheduling records.  I reviewed two aging reports printed the day of my visit.  These reports, respectively, list 316 pending high priority (a.k.a. urgent) and 977 pending routine specialty referrals.  For each referral, the list sets forth, among other things, the number of days that have elapsed between the date of the request for the specialty service and the appointment date (if one has been scheduled).  Approximately 105 of the pending high priority referrals were listed as having an appointment date.  Of these, only two were going to take place within the 14

22

day period required by CDCR policy for such appointments.  Of the high priority cases
with appointment dates, approximately 50 were scheduled to occur more than three months
after the high priority referral was approved, with many taking several months.  Another
approximately two dozen of these cases were scheduled to have appointments between two
and three months of the urgent referral.   The list also included another approximately 210
cases ordered as high priority for which no appointment date was listed.  All except 14 of
these unscheduled high priority cases were listed as pending for more than 14 days, with
the vast majority shown as pending for more than a month (with some considerably
longer).  These delays in urgently ordered specialty care services create an extreme risk for
the prisoners who need the care.   Joint Pls' Trial Ex 34, at 4 and 8.  (Receiver's Death
Report.)

      62.  Moreover, the aging report for routine specialty referrals showed
approximately 285 cases with a scheduled appointment date.  Of these, about 150 were
scheduled to occur more than three months after the specialty referral was made, and thus
exceeded the policy time-frame requirements for such appointments.   Approximately
three dozen of these appointments, according to the report, would take place six months or
more after the referral.  The list also contained approximately 700 other routine specialty
appointments that had yet to be scheduled, with at least 175 of them shown to have been
already pending for more than three months (and thus already in excess of policy
requirements).  Again, the delays in specialty care create a risk for the prisoners who need
care.

      63.  ASP managers and staff stated when providing me the aging reports that they
were not confident that the reports were entirely accurate.  Specifically, they indicated that
some referrals listed as pending may have actually already taken place, but were still on

the list because after being completed had not been "closed" in the IMSATS program by a previous worker who was replaced a few weeks ago. To address the matter, ASP was going to have a staff person review the Unit Health Records for all the prisoners on the two lists totaling 1,300 pending specialty appointments, to determine which, if any, could be deleted based on the service having been already provided.

64. The specialty service delays at ASP may not be as broad, in terms of the numbers of prisoners impacted, as indicated in the aging reports. But to the extent that the aging report data is incorrect, then it reflects that the prison has more patient data than it is capable of processing, leaving ASP unable to determine who actually needs the services, with the distinct possibility of prisoners being double-scheduled (and thus delaying specialty services for other prisoners still actually in need of an appointment). The proposed investigation of 1300 files could take weeks to complete, and the diversion of a staff person on this task will likely slow records processing in other areas. It is apparent that ASP's population exceeds its capacity for scheduling and tracking. This chaos is as dangerous to prisoners as the extreme delays discussed above.

### 2. HDSP

65. At HDSP on November 1st, I was also provided an aging report showing pending both off-site high priority and routine specialty appointments. The high priority section of the report listed 47 pending cases. Under policy requirements, these appointments are to take place within 14 days of the order. More than one-half of the 47 high priority referrals on the list are shown has having been pending for a period longer than that permitted by policy, or having taken place outside the policy's time limits.

### 3. Plaintiffs Counsel's Findings

66. The reports of plaintiffs' counsel over the last year, consistent with findings of

24

the Receiver and my observations, also show specialty services delays, rooted in an insufficient number of providers for the number of patients requiring care.

67.   At SATF, it was reported in May and September 2007 that off-site specialty services were in crisis, with managers and staff making clear that the number of prisoner-patients who need specialty services, including those who need such services urgently, far exceeded the number of timely appointments that the prison was able to obtain from specialty service providers.  Plata Pls' Trial Ex. 32, at 2-3. (Letter, October 19, 2007.) Urgent appointments, including for cardiology and oncology, were identified that had been pending for roughly three, four, or six months.  *Id.*  These delays occur despite a well organized utilization review and specialty scheduling unit at the prison, and despite the prison making repeated requests to providers in individual cases.  *Id.*  Most high priority off-site consults were not yet scheduled to take place, or would likely take place (i.e., in those cases in which the prison had not yet received an appointment date for an approved high priority consult even though, for example, 30 days had passed), until two or three months after the consult was ordered.  There are also, per the "aging report" provided by the schedulers, and by report of the schedulers and managers themselves, dozens of routine referrals that had not or would not occur within the 90 day period required by policy. SATF schedulers and managers state that these delays were caused by too many patients needing specialty services compared to the number of appointments SATF is able to obtain.  *Id.*

68.   At PVSP, there were 165 pending high priority off-site specialty appointments. Of these, 82 had not been scheduled.  Some of the unscheduled appointments had been waiting for consults for almost a year; some of these appointments appeared to be diagnostics for Valley Fever or its associated diseases.  There was a wait of three to five

25

months for some urgently requested lumbar punctures.  Plata Pls' Trial Ex. 23, at 1-3.)
(Letter, July 24, 2007.)

    69.  There were also 949 pending routine off-site appointments at PVSP.  Some
specialties showed concerning delays in scheduling routine appointments, including:
abdominal ultrasounds; bone scans; GI referrals; colonoscopies; ENT referrals; liver
biopsies; nephrology; orthopedic surgery; pain management; sleep study; and urology
consults.  (Of 21 referrals for abdominal ultrasounds, five were unscheduled for between
4-13 months; of seven referrals for bone scans, all were unscheduled, and four had been
pending between 3-8 months; of 62 colonoscopy referrals, more than half had been
waiting more than 90 days, and 11 unscheduled appointments had been pending between
four months - one year; of 24 ENT referrals, four had been unscheduled seven months - 15
months; 47 pending liver biopsy referrals, 12 unscheduled for over four months; five
pending nephrology appointments, all scheduled between 5-8 months out; 12 pending
orthopedic surgery appointments, none scheduled, eight 4 months or more out; eight pain
management appointments, four unscheduled for 6 or more months, 4 scheduled 5 months
or more out; 12 pending sleep study appointments, none scheduled, 11 pending for 4-17
months; eight urology consult appointments, seven unscheduled and pending 6-13
months.)  *Id.* at 1-3.

    70.  At SOL, there was a backlog of specialty services cases, including some
routine referrals that been pending for more than six months and a few for more than a
year.  Plata Pls' Trial Ex. 21, at 8.  (Letter, July 10, 2007.)  At California Rehabilitation
Center (CRC), roughly one-third of routine specialty appointment (83 of 293) were
pending past 90 days and two-thirds of urgent appointments (21 of 32) were pending past
14 days.  Plata Pls' Trial Ex. 18, at 4-5.  (Letter, June 6, 2007.)

71. At SAC, there was a backlog of orthopedic referrals. Plata Pls' Trial Ex. 12, at 7. (Letter, March 8, 2007.) At Chuckawalla Valley State Prison (CVSP), some urgent specialty referrals were taking over two months to occur. Plata Pls' Trial Ex. 20, at 9. (Letter, July 2, 2007.)

72. At California Institution for Women (CIW), off-site specialty scheduling was in disarray. There was no accurate tracking method and no one knew how many appointments were pending.  Urgent referrals were frequently taking several months. Plata Pls' Trial Ex. 15, at 4-5.  (Letter, May 7, 2007.)

73. At Kern Valley State Prison (KVSP), documentation regarding several unscheduled urgent appointments were observed in mid-July that had been pending since February and March, 2007.  Staff provided documentation that showed other urgent specialty referrals that had been pending for six months to a year.  Plata Pls' Trial Ex. 26, at 9. (Letter, August 15, 2007.)

74. Telemedicine specialty services at PVSP also had a high number of unscheduled appointments, including dozens of patients with Hepatitis C who could not be scheduled to see the infectious disease specialist because the ordered liver biopsy had not been performed because of an extreme (six to twelve month) backlog for the off-site provider who performed the biopsies. Plata Pls' Trial Ex. 23, at 12. (Letter, July 24, 2007.)

75. At COR, on-site specialty services were reported to be not all scheduled timely, due to the volume of the requests, as well as limitations by providers. Plata Pls' Trial Ex. 24, at 7. (Letter, July 25, 2007.)

76. At CEN, there were approximately 20-30 routine off-site pending appointments over the policy required time-frames. Plata Pls' Trial Ex. 9, , at 5. (Letter, February 8,

27

2007.)

77. Even prisons that are more successful at scheduling routine appointments may have problems scheduling timely urgent appointments. At CMF, plaintiffs found the prison had been unable to meet the 14-day timeline in the overwhelming majority of high priority (urgent) specialty cases. Of 38 high priority appointments that had been scheduled as of April 25, 2007, just one was scheduled within 14 days of the referral. Some of these high priority referrals were scheduled several months after the referral was ordered. Plata Pls' Trial Ex. 16, at 8. (Letter, May 7, 2007.)

78. All of this data demonstrates a specialty care system that is overwhelmed by the sheer number of prisoner-patients. It is questionable whether there are enough specialty services in the state, and certainly in some regions of the state, to meet the needs of the prison population.

## VI. THE CDCR HAS INADEQUATE STAFF AND RESOURCES TO ENSURE THE TIMELY AND APPROPRIATE DISTRIBUTION OF MEDICATIONS

79. A system to ensure the timely delivery of the correct medication to the correct patient, with accurate documentation of what has been administered, is essential to an adequate health care delivery system.

80. Defendants' medication delivery systems are inadequate for the size of the population they serve, and are plagued by short-staffing at a number of prisons. Too many prisoners, with too few staff and insufficient resources, leads inevitably to medication delays and inadequate treatment documentation. The result is that prisoners receive their medications late or not at all, and suffer as a result. As Dr. Imai reports, "[t]he dispensing of prescribed drugs is often delayed, and there is an unreliable system for refilling medications for the treatment of chronic medical disease such as diabetes, hypertension,

asthma and coronary heart disease." Joint Pls' Trial Ex. 34, at 9. (Receiver's Death Report.)

81. The shortcomings in the medication delivery system are rooted in overcrowding – quite simply, there are more patients requiring medications than the prison has the resources or staffing to address. Most critically, the system lacks the necessary nursing staff to ensure the adequate distribution of medications. Licensed Vocational Nurses (LVNs) are now an essential component in the CDCR's medication distribution system.[2] The Receiver reports that, despite substantial recruitment efforts, the LVN positions have been difficult to fill at some prisons. Joint Pls' Trial Ex. 31, at 24. (Receiver's Fifth Report.) As of June, 2007, there were more than 300 LVN positions vacant statewide (out of approximately 925). *Id.* Medication delivery issues are further compounded at some prisons where the pharmacies have had insufficient staffing.

### A.    Some Prisons Unable to Fill LVN Positions

82. CDCR's need for qualified LVNs simply exceeds the supply of LVNs willing to work in the prison system. The prisons report significant problems hiring and retaining LVNs, across the state.

83. VSPW has been unable to fill all of its LVN vacancies. At that prison, there were four vacant LVN positions as of the end of October 2007, and the Director of Nursing reported retention problems with the LVNs that they hired. She recalled that seven LVNs had quit since June. She pointed out that the demands of running a pill line in prison are significantly higher than the demands of most LVN positions in the community, and that this made it difficult for the prison to keep these employees. At

---

[2] Until recently, this function was fulfilled by Medical Technical Assistants (MTAs).) As of May 31, 2007. the Receiver converted all positions for Medical Technical Assistants into License Vocational Nurse (LVN) positions. Receiver's Fifth Report, at 23.

HDSP, the prison had six vacant LVN positions of 25 allocated.

84. The medical managers at a number of prisons have reported to plaintiffs' counsel that they have been unable to hire and/or retain LVNs. At CMC, plaintiffs' counsel learned in July 2007 that almost three quarters of the LVN positions were vacant. Plata Pls' Trial Ex. 25, at 3. (Letter, August 3, 2007.) Medical managers at SVSP reported in January 2007 that they had received few applications for the LVN positions and were unlikely to find candidates to fill them. Plata Pls' Trial Ex. 7, at 2. (Letter, January 29, 2007.) In May, 2007, staff at CVSP reported a 25% vacancy rate for LVNs and retention problems. Plata Pls' Trial Ex. 20, at 2-3. (Letter, July 2, 2007.) In May 2007, RJD had 25.94 vacancies for 43.94 LVN positions. Plata Pls' Trial Ex. 22, at 1. (Letter, July 18, 2007.) To cover the vacant LVN positions, RJD was using "forced overtime" with the remaining LVNs to cover many posts and the staff reported that, on one June weekend, the shortage was so acute that even the Supervising Registered Nurses (SRNs) had to fill LVN posts. *Id.* at 1. In June 2007, Corcoran reported a 40% vacancy rate for their 50 LVN positions, and they anticipated receiving 18 additional LVN positions that they likely cannot fill. Plata Pls' Trial Ex. 24, at 2. (Letter, July 25, 2007.) In June 2007, fewer than half of the LVN positions at PVSP were filled with state employees. Plata Pls' Trial Ex. 23, at 6. (Letter, July 24, 2007.)

85. Prisons with LVN shortages scramble to work with the limited resources they have. The CMC medical managers reported that, in order to build in some continuity with the limited LVN staff available, most of the LVNs were being trained to work in only one area. While this promotes stability in certain work areas, the supervisors acknowledged that this policy creates other strains on the system. Most significantly, the prison has no staffing depth, and is very challenged when an LVN is sick or on vacation. Plata Pls' Trial

Ex. 25, at 3. (Letter, August 3, 2007.)

### B.    The Shortage of LVNs is Causing Medication Delays and Inadequate Recordkeeping

86.  The fact that the CDCR has too few LVNs, given the size of the prison population, has a critical impact on medication delivery in both mainline and lockdown units, in terms of ensuring that the right patient gets the right medications in a timely manner, and in terms of maintaining necessary documentation and a complete medical history.

87.  At VSPW, the prison assigned a wide variety of responsibilities to the LVNs, possibly more than is reasonable given the overcrowded conditions at that prison.  The LVNs stationed in the yard clinics were responsible for, *inter alia*, medication distribution and record-keeping (including insulin administration), following up with the pharmacy on medication inquiries, doing blood pressure checks, changing dressings and responding to emergency alarms in their yards.  Emergency alarms sound for a number of reasons, including inmate assaults on inmates or staff, medical emergencies and false alarms.  Once the alarm goes off, medication distribution (as well as all movement on the affected yard) is suspended while the LVNs respond to the call with emergency equipment.  Following the emergency, the LVNs would resume the medications line.

88.  The LVNs' duties have become more complex because the emergency alarms at VSPW have apparently increased in the last year, as I would expect given the rapid increase in population.  CDCR's population data shows that the number of inmates at VSPW has increased by 400 during the last six months, from approximately 3850 to 4250, apparently due to the closure of the women's facility at the California Rehabilitation Center (CRC).  At 3,850, VSPW was at 195% capacity, and the addition of 400 prisoners

31

was not accompanied by any additional construction, so the extra prisoners have been housed in converted day rooms and in the converted gymnasium. VSPW's Director of Nursing reported that the number of alarms had increased significantly during this period.

89. The VSPW LVNs were not able to demonstrate compliance with their assigned duties. They are supposed to maintain medication administration records and treatment logs. I reviewed these documents on two of the four prison yards at VSPW and determined that the records were incomplete, lacking vital information. For example, the treatment log for blood pressure checks on one yard was supposed to track the blood pressures for patients for whom PCPs had ordered them. I found that the patient records often lacked the date of the order, the duration of the checks, the name of the ordering PCP and, in many cases, any indication that blood pressure checks had been performed. The LVNs confirmed that they do not track whether prisoners show up for their PCP-ordered blood pressure checks. Blood sugar checks for insulin dependent diabetics lacked critical information about dosage and the time of treatment. Based upon my conversations with the LVNs in the clinic and their supervisors, I believe these treatment lapses occur because there are too few LVNs for the number of VSPW prisoners.

90. Plaintiffs' report documents that CMC likewise has a high reported LVN vacancy rate and has also had care deficiencies based on having too few personnel to document medication distribution. Plaintiffs' counsel documented that at that prison, the medications for mainline prisoners are dispensed from a central office on each of the housing yards. The medications are not pre-packaged for each patient. Instead, they are stacked on shelves around the room, and the LVNs must review the Medication Administration Record (MAR) of each patient who arrives at the window, gather the prescribed medications and distribute them, patient by patient. This is a very time-

consuming process, and Dr. Greenman stated that, following the transition from MTAs to LVNs, medication lines lengthened.  Plata Pls' Trial Ex. 25, at 8.  (Letter, August 3, 2007.)

91.  CMC's method for distributing medications makes it virtually impossible to track on a daily basis when patients fail to show up for their medications.  Under the P&Ps, a prisoner who misses three consecutive days of a nurse-administered or DOT medication, or fails to pick up a "carry" medication (i.e., a medication that is provided to the patient for self-administration) for three days, must be referred to the scheduler for an urgent appointment with his PCP for medication follow-up counseling, and the referral must be initiated on the third consecutive day of the no-show or refusals.  Policies & Procedures, 4-11-6.  CMC staff readily admitted that they cannot review all of the hundreds of MARS on each yard each day to comply with this requirement, which is unsurprising given their level of staffing.  (Plata Pls' Trial Ex. 25, at 2 and 8.)  (Letter, August 3, 2007.)

### C.    The *Coleman* Special Master Uncovered Pervasive Problems with Medication Delivery

92.  A medical delivery system that is insufficiently staffed for the existing treatment needs will result in significant medication errors.  As I would expect in light of the staffing shortages, the Coleman Special Master has documented extensive medication delivery problems throughout the state prison system.  See Joint Pls' Trial Ex. 36 (*Coleman* Special Master's 18th Report, filed July 30, 2007) at 47 (MCSP: "[m]edication expiration gaps were reportedly common"); 161, 292 (California Training Facility (CTF) and Central California Women's Facility (CCWF), respectively:  "Medication continuity was problematic"); 210 (California State Prison, Los Angeles County (LAC): "medication management remained problematic"); 223, 285 (California Correctional Institution (CCI)

and CIW, respectively:  "Medication continuity remained problematic").

93.  There are breakdowns in continuity of medication in numerous areas, including: inter and intra-institutional transfers, renewals upon expiration, and initiation upon arrival.  See, *id.* at 26 (staff at Pelican Bay State Prison (PBSP) "reported interruptions in medication continuity, particularly when renewals were due"); 50 (MCSP: "Medication continuity was not sustained for new arrivals.  Staff audits found that 41 percent of new arrivals with current orders received medication within 24 hours of arrival, down from 82 percent during the previous quarter"); 89 (SQ "continuity of medication upon arrival and intra-institutional relocations was problematic."); 96 (Deuel Vocational Institution:  "Timely medication for newly arriving inmates remained problematic. . . . Medication continuity on intra-institutional transfers occurred timely in only 40 percent of cases."); 148 (SVSP "Medication continuity remained problematic when inmates were relocated between yards...or arrived from other prisons."); 190 (KVSP medication audits "revealed problems with continuity of medication upon inmates' arrival at the institution, their movements within the institution, and the renewal of medication orders.")

94.  In addition, the Special Master found disruptions to continuity of medication when patients transferred to administrative segregation, transferred from the CTC, and experienced institutional lockdowns.  See *id.* at 9 (SAC: "Staff audits found continuing problems with medication continuity when medication orders needed to be renewed and when inmates were discharged from the correctional treatment center (CTC)"); 17 (Folsom State Prison "medications sometimes expired in administrative segregation, according to psych techs."); 148 (SVSP "Medication continuity remained problematic when inmates . . .were released from the MHCB")

95.  In a functioning institutional health care system, a patient's non-compliance

34

with critical medications should trigger follow-up with the prescribing provider. This is not happening reliably or on time, in at least some prisons. See *id.* at 79 (SOL: "non-compliance with medication did not reliably trigger referrals to prescribers."); 108 (COR: "Response to medication non-compliance remained inconsistent."); 121 (SATF: "[O]nly 53 to 63 percent of documented cases of medication non-compliance were referred to mental health"); and, 122 SATF: "inmates throughout the institution were frequently found to have non-therapeutic levels of medication in their blood."; 137 (ASP: "Inmates referred for [medication] non-compliance were seen within five days in only 48 percent of cases, according to data in records"); 161 (CTF: "Referrals for non-compliance and hoarding were not made consistently"); 199 (North Kern State Prison (NKSP): "timely referral and follow up [to medication non-compliance] occurred in less than 20 percent of cases.")

96. Based on my prison inspections, review of the documents and experience as a clinician and medical administrator, I believe these significant, ongoing breakdowns in the medication delivery processes are caused by having more prisoner-patients than can be adequately treated by the staff that CDCR can hire.

## VII.  THE OVERCROWDING CRISIS OVERWHELMS CDCR'S ABILITY TO ADEQUATELY MANAGE AND MAINTAIN MEDICAL RECORDS AND PATIENT SCHEDULING INFORMATION

97. Clinical care is not the only requirement for the constitutional delivery of health care services. Unless medical records and scheduling information are managed, organized, and maintained effectively, appropriate health care services cannot be provided. Overcrowding makes it impossible for CDCR to perform these essential functions.

### A. Medical Records Staff Are Incapable of Maintaining Orderly Medical Files Due to the Sheer Numbers of Prisoners

35

98.  An organized, current medical record, whether maintained electronically or on paper, is essential to the provision of adequate medical care and must provide the PCP comprehensive information about the patient to enable the PCP to determine the patient's history and future treatment.  Indeed, an accurate medical record is particularly critical in a system like the CDCR, where prisoners are unlikely to have a single consistent primary care provider, due to staffing shortages, use of physician registry and inter and intra-prison transfers, and where the primary care provider may not have access to a fax machine, computer or even a telephone, to request current lab results, consultation reports, x-ray reports, and the like.  All CDCR prisons currently use paper medical records (except PBSP), with each prisoner's health care documents required to be organized in a file referred to as the "Unit Health Record" (UHR).  As I describe below, overcrowding makes it impossible for CDCR to adequately and appropriately maintain UHRs.

99.  The lack of adequate records is a long-standing issue that significantly impedes the delivery of health care and can have fatal consequences.  In 2005, the Court found that medical records at most prisons were either in a shambles or non-existent.  Plata Pls' Trial Ex. 1, at 20:18-19. (Findings of Fact and Conclusions of Law, October 3, 2005.) "Incomplete medical records" was identified in the review of calendar year 2006 deaths as one of the significant systemic lapses of care identified in the review.  Joint Pls' Trial Ex.34, at 7-8.  (Receiver's Death Report.)  That review also identified "lost medical information" as one of the kinds of poor provider communication in seven possibly preventable deaths.  *Id*. at 7.

100.  The CDCR health care data system is remarkable for its lack of computers

with connections to one other, both within and between prisons. The CDCR's network, such as it exists, has very limited capacity to store and transfer data and suffers multiple outages and failures daily. Joint Pls' Trial Ex.32, at 53:17-25. (Receiver's Sixth Report.) For these reasons, it cannot be used to house, access, or store data. *Id.* at 53:19-20. As the Receiver has stated, "an effective computer network is essential to providing medical staff access to clinical information." *Id.* at 53:23-25.

### 1.  The Quality of Medical Records at Many Prisons is Poor

101.  Consistent with the findings of the Court's Receiver and his staff, I found that medical records at certain prisons are dangerously incomplete. On October 29, 2007, I visited CIM. That prison houses 3,500 plus reception center prisoners, receiving each week about 500 new arrivals (and transferring out each week approximately the same number). It also houses approximately 2,650 minimum custody inmates. Based on what I observed and was told by prison staff when inspecting CIM on October 29, 2007, the medical records for the reception center prisoners, as explained below, are fragmented and often incomplete, meaning that nurses, doctors, and others do not have an adequate basis to assess and evaluate medical concerns.

102.  For the more than 3,500 reception center prisoners typically housed at CIM, the medical records are maintained in up to three and sometimes even four separate files. There are several reasons for this fragmentation. First, a large percentage of prisoners received at CIM are parole violators and/or persons who have served a previous term in prison. The UHRs for these prisoners, containing the medical records from previous CDCR term(s), are stored at a southern regional facility. It typically takes about two or

37

three weeks to receive these prisoners' UHRs from the regional office. As such, these UHRs, which hold all previous medical records, are not available to the PCP who conducts the new arrival history and physical exam, which is supposed to take place within two weeks of reception, or to other PCPs who see the patient in the yard clinics for "sick call." Further, if a new arrival prisoner's UHR is not in fact forwarded by the regional office, CIM must then contact the regional office and request it. This is not an unusual occurrence; the time it takes to receive such requested UHRs varies but it can take months. A log I reviewed on October 30th indicated that the UHRs of four prisoners who arrived at CIM on July 2, 2007 had not yet been received.

103. During the time when prisoners' UHRs are not available, CIM medical records staff file health care documents generated in the yard clinics and elsewhere (e.g., results of tests ordered by a PCP) in plain manila folders, referred to as flimsies, that are marked with each prisoner's name and number. Sometimes, if a prisoner is seen at a CIM clinic, and a UHR or flimsy is not provided or cannot be located, the clinic medical staff will make their own flimsy for a prisoner. This sometimes means that a prisoner will have two flimsy files containing medical records, plus the formal UHR.

104. In addition, every newly received reception center prisoner at CIM, whether or not a UHR and/or flimsy or flimsies are available and being used, has critical medical records placed in yet another file, known as the "yellow jacket." The CIM yellow jacket files hold all health care documentation related to the required new arrival screening and assessments, including the initial nursing evaluation, tuberculosis testing, and the initial history and physical exam by a primary care provider. These yellow jacket files, and the

medical records in them, are not provided to the yard medical clinics when a patient is seen there, but instead are kept in a central processing area or provided only to medical staff conducting the required new arrival health care history and physical exam. The medical documents in the yellow jackets are placed in the patients' UHR or flimsy – and thus at least in theory are available to other medical staff – only after all required reception center health care functions are completed, which can take two or more weeks. Adequate care is not possible with fragmented medical records.

105. CIM reception center medical records are also often incomplete, in addition to being fragmented. I observed in the CIM Reception Center Central medical records office approximately five linear feet of "loose filing"(documents waiting to be placed in prisoner-patient's unit health records (UHRs), including documents in yellow jackets waiting to be incorporated into UHRs. There were also two cardboard boxes full of unsorted health care documents waiting to be added to the loose filing. This amount of filing existed despite the record office being open 12 hours a day. I was told, and a spot check of some of the documents in the loose filing indicated, that the unfiled medical documents ranged in date back as long as one month. Adequate care is not possible, and serious harm to patients is risked, when medical records are incomplete.

106. At ASP on October 30, 2007, I was told that the medical records office constantly has approximately four feet of loose filing, despite the fact that the medical records department runs two shifts on weekdays and is also staffed on weekends. Moreover, I found loose filing that had not yet reached the medical records department. I observed a large plastic milk crate in the Yard Five medical clinic that was full

(overflowing, actually) with unorganized health care records, dating back at least two weeks and including PCP progress notes (on which the results of individual examinations are documented). This crate also included a large (approximately four inches thick) pile of medication distribution stickers, each of which documented that a particular prisoner had received a particular medication. I was told that each of the stickers needed to be placed on an individual piece of paper, and then placed in each prisoner's UHR, so that there would be a record of what medications were given to what prisoner. It was obvious that the amount of documents generated had simply overwhelmed the staff's capacity to timely and properly place documents in prisoners' UHRs.

107. At HDSP on November 1, 2007, I was informed that medical records staff pull 1400-1500 UHRs per week for various health care providers, and that approximately three feet of loose filing is generated each week. The medical records department has been short-staffed (unable to fill all allocated positions) for months, but uses overtime to increase the amount of work done. Despite using overtime, the amount of accumulated loose filing over the last two months has remained at 107 inches; these documents waiting to be filed are two to three weeks old. This means that the UHR received by a nurse or PCP may not include the most recent documentation. In addition, medical records staff no longer fastens documents in the UHR, as required by policy and good practice, but instead is "drop-filing," meaning that papers are simply placed into UHRs. This practice greatly increases the chance of documents being lost or misplaced.

108. My findings regarding inadequate medical records are consistent with those reported by plaintiffs' counsel over the last year. At LAC, plaintiffs' counsel reviewed

40

approximately 25 UHRs, finding that progress notes were rarely in chronological order, and in several files progress notes from different years were mixed up. Additionally, in most of the files records were misplaced within the folder. Several clinicians asked about the issue all agreed that the poor organization of the UHRs was a significant problem. Plata Pls' Trial Ex. 14, at 10. (Letter, April 18, 2007.)

109. Very recently, staff at CCC reported to plaintiffs' counsel that they had a large amount of loose filing in medical records, with records supervisors stating that some of the documents were as old as six months. This loose filing backlog exists despite efforts such as utilizing overtime and additional staff from the prison next door. Plata Pls' Trial Ex. 31, at 2. (Letter, October 18, 2007.)

## B. CDCR's Medical Scheduling and Tracking System Is Inadequate

110. Patients cannot receive adequate care if they cannot get timely appointments with clinicians. Timely appointments cannot be made without an effective scheduling and tracking system. CDCR has proven itself incapable of developing such systems due in large part to the sheer numbers of patients and their vast and growing need for coordinated appointments.

111. The CDCR medical services tracking system is, to use the Receiver's terms, "primitive" and "increasingly unreliable." Joint Pls' Trial Ex 29, at 42:13-16. (Second Receiver's Report.) The CDCR's "Access" based Inmate Medical Scheduling and Tracking System (IMSATS), first implemented in 2003-2004, was never intended to last more than a year or two, given its data load limitations. In addition, the system requires some level of experience with it to operate it correctly; for example, medical encounters

41

must be "closed out" in order for the system to work properly. Inconsistent data entry, as one physician manager indicated, regularly corrupts the information and schedules that are subsequently generated. This makes scheduling and coordinating patient appointments difficult or impossible.

112. The Receiver has determined that the CDCR's "primitive computerized tracking system . . . because of either programming errors or inappropriate input process continues to 'lose' patients with chronic diseases." Joint Pls' Trial Ex. 29, at 36:11-15. (Second Receiver's Report.) I agree. Moreover, because the scheduling systems for medical, mental health and dental care are all separate and independent, there is no way to avoid scheduling conflicting appointments. Further, some prisons do not have IMSATS, and rely on paper-based processes for medical scheduling and tracking that do not permit adequate tracking of appointments and patient needs.

113. At some of the prisons I visited, I observed or was informed of matters related to medical scheduling and tracking that were consistent with the findings of the Court's Receiver regarding the inadequacies of medical scheduling and tracking. At ASP, for example, I was provided two IMSATS computer generated "aging" reports listing all pending off-site specialty referrals. One listed 316 pending high priority (urgent) specialty referrals, while the other report listed 977 pending routine referrals. ASP managers and staff were convinced that the data was not entirely accurate, and that some of the referrals listed as pending had actually taken place or were otherwise not necessary. As noted above, the prison had determined it would have to review the UHRs for all 1,300 listed referrals in order obtain accurate scheduling information, an extremely time-consuming

and labor intensive task. If the aging reports are accurate, then patients are unable to see specialists within the required timelines. If they are not, then the prison's scheduling system is incapable of ensuring that patients are scheduled and seen timely.

114. My opinion and findings regarding inadequate medical scheduling and tracking are consistent with the reports by plaintiffs' counsel over the last year. Specifically, counsel reported that at SOL there were inadequate numbers of staff to enter data into the computer based scheduling system, and staff reported problems with the program in that appointments even when completed stay listed as pending. Thus, data entered can be incomplete or incorrect. Plata Pls' Trial Ex. 21, at 17. (Letter, July 10, 2007.)

115. At CRC, a manual paper-based system was being used to track specialty consult requests and appointments, and as such managers could not easily determine the extent of delays. Plata Pls' Trial Ex. 18, at 6. (Letter, June 6, 2007.) The prison also had no method to track those prisoner-patients who needed to be offered required preventive care tests (fecal occult blood tests). *Id.* at 11.

116. At CMF, the prison had implemented the IMSATS program, but was not producing key indicator reports because the prison did not have confidence in the data produced. Plata Pls' Trial Ex. 16, at 10. (Letter, May 7, 2007.)

117. CCWF was experiencing significant computer problems. Some of the computers were extremely slow, taking up to thirty seconds for the computer to open a screen that generally opens instantly. Obviously, this greatly limits the Office Technicians' (OTs) productivity. CCWF staff also reported that IMSATS itself also has

problems. For example, appointments that have been closed are reportedly still reopening for no reason. Plata Pls' Trial Ex. 8, at 2-3. (Letter, February 7, 2007.)

118. At CIW, patients were not all being timely scheduled for medical appointments, and there was no doubt that part of the scheduling difficulties result from problems with the IMSATS program. Further, some of the computers at CIW were very slow. CIW' staff members stated they had raised this issue, but did not know how to fix it. Plata Pls' Trial Ex. 15, at 4-5. (Letter, May 7, 2007.)

119. At CCC, managers and staff identified medical scheduling and tracking as an extreme challenge. The IMSATS computer program is not being provided to CCC, and so the prison must make do with what is essentially a hand-kept, paper-only process. As prison managers stated, this is a very labor intensive approach. The amount of scheduling and tracking is expected to increase as CCC more consistently schedules patients for follow-up and other appointments (e.g., chronic care), as required by the policies. CCC staff stated that this effort will require additional dedicated clerical staff and additional space, imposed on currently inadequate space. Plata Pls' Trial Ex. 31, at 2. (Letter, October 18, 2007.)

120. Calipatria State Prison (CAL) reported that it would not receive the IMSATS computer tracking program. The current system for tracking sick call requests was to write them in a log book. However, on C facility this logbook had a large gap where it did not indicate any 7362s were received. This gap was from 4/17/07 to 5/4/07. Plata Pls' Trial Ex. 19, at 6. (Letter, June 25, 2007.)

121. SATF's computers are not networked. The challenges this creates for medical

scheduling and tracking are obvious, particularly given the spread-out nature of the prison and its large population. In addition, most clinics only have a single old and very slow computer. Plata Pls' Trial Ex. 32, at 6. (Letter, October 19, 2007.)

## VIII. THERE ARE NOT ENOUGH CUSTODY OFFICERS TO ENSURE ADEQUATE ACCESS TO MEDICAL APPOINTMENTS AND CLINICAL CONTACTS.

122. In prisons, custody officers are integral to the medical care delivery system because they facilitate patients' access to their primary care providers and tertiary care. Custody escorts for medical care are particularly critical in California's overcrowded facilities, where overcrowding-related disturbances are frequently followed by prisoner "lockdowns." Joint Pls' Trial Ex. 26, at 29. (Receiver's Overcrowding Report.) "Lockdowns call for a radically different form of medical delivery than the services provided under normal general population conditions." *Id.* at 29. Whereas general population prisoners usually leave their housing units for yard clinic appointments, medication lines, etc., "[u]nder lockdown conditions, clinical staff must go from cell to cell to see the prisoner/patient, or small groups or individual prisoners must be escorted by correctional officers to and from clinic areas." *Id.* at 29-30. Whether the clinicians go to the patients, or the patients are escorted to the clinicians, "lockdowns inhibit the delivery of medical care and increase the staffing necessary for such care." *Id.* at 30.

123. The CDCR has a shortage of custody officers, based on high vacancy rates and a failure to allocate a sufficient number of custody positions. In April 2002, there were 1,179 correctional officer vacancies. By January 2007, that number had risen to 1,915. *Id.* at 12. The CDCR estimates that, when unbudgeted positions are included (*i.e.*, custody assignments to posts to guard at community hospitals and to monitor at nontraditional beds), the actual custody officer shortage is between 2,400 and 2,700. *Id.* at

12.

124.  The Receiver's conclusions are corroborated by plaintiffs' counsels' findings. At SVSP in June 2007, Warden Evans discussed that SVSP's serious custody staff shortages (at 26%) have impacted methods of care delivery.  Because of these shortages, facilities are shut down on a rotational basis and there is not enough staff to do medication passes on the yards.  Medication therefore must be delivered cell-to-cell.  Plata Pls' Trial Ex. 29, at 2.  (Letter, October 4, 2007.)

125.  At San Quentin, nurses complained to plaintiffs counsel that custody officers were not available to escort prisoners with urgent or emergency medical symptoms to the clinic for a same-day appointment.  Plata Pls' Trial Ex. 27, at 5.  (Letter, September 7, 2007.)  This problem was vividly illustrated in the case of one prisoner whose 7362 was picked upon July 30, and was scheduled for nurse triage on August 2.  This prisoner's listed symptoms included coughing blood, chest pains and high blood pressure.  When asked why the patient was not brought to the clinic immediately, the nurse indicated that he should have been, but that she believed it would have been futile to ask the custody officers to bring him down, based on her experience.  *Id.* at 5.

## IX.    THERE ARE MORE PRISONERS REQUIRING SPECIALIZED PLACEMENT FOR MEDICAL REASONS THAN CDCR CAN ACCOMMODATE

126.  Recognizing that "the CDCR has neither planned for nor provided adequate medical beds for disabled prisoners, aged inmates and prisoners who need some form of sheltered living due to their medical or mental health conditions," the Receiver has proposed the addition of approximately 5,000 medical beds.  Joint Pls' Trial Ex. 26, at 27. (Receiver's Overcrowding Report.)  Based on my review of documents and my site visits,

I agree that the CDCR is currently unable to accommodate the housing needs of medical patients requiring specialized placement.

127. At HDSP, for example, plaintiffs' counsel found in October 2006 that the number of Long Term Care (LTC) patients in the prison's Correctional Treatment Center had swelled to 20 patients. Many of these patients were of a higher acuity than previously housed in the CTC (some were transfers from CTCs at prisons in the Valley Fever epidemic region). The staff reported that these patients greatly impacted the PCP workload in the CTC, and there were no medical records showing that these patients were seen by a primary care provider every three days, as required. Moreover, the prison did not have the CTC equipment necessary to provide adequate treatment to the increased number of LTC patients, including for lifting and bathing patients. Plata Pls' Trial Ex. 10, at 2. (Letter, February 9, 2007.)

128. Some prisoners with medical disabilities require housing accommodations that may be provided in a general population setting. For example, prisoners with seizure disorders may require placement on a lower bunk, and those with orthopedic injuries may require housing on a lower tier of multi-floored cell block. Some prisons, including San Quentin, have consistently failed to ensure that these medical needs are adequately accommodated. In August 2006 and again in June 2007, plaintiffs counsel identified numerous cases in which prisoners complained that the physician orders for housing on the ground floor and/or a lower bunk were ignored. Plata Pls' Trial Exs. 3 and 4, at 8-9 and 5-7. (SQ *Armstrong* Report, June 20, 2007 and SQ *Armstrong* Report, August 30, 2006.)

129. In an especially egregious example of improper housing, San Quentin inmate Cole, whose knees buckle frequently and whose feet are often swollen and numb or painful, reports that he was forced to spend months on an upper bunk in violation of

47

medical staff's order that he be housed in a lower bunk, even after repeatedly bringing the violation to the attention of building staff. Joint Pls' Trial Ex. 12, at ¶¶ 2-8. (Declaration of Peter Cole.) In 2006, Mr. Cole states he fell from his upper bunk while trying to climb down using his cane, crashed into the lockers below and punctured and broke his jaw and tore his left rotator cuff. He needed ten stitches in his cheek and had his jaw wired shut. *Id.* at ¶¶ 9-10. Mr. Cole remained in the Correctional Treatment Center for two months, where he vomited his liquid diet and tore the wire in his jaw. *Id.* at ¶¶ 11-13.

130. Transfers for prisoners needing special accommodations because they have mobility impairments (*e.g.* wheelchair users) are delayed, presumably because of a shortage of appropriate housing. For the period of February to May, 2007, plaintiffs counsel determined that out of 79 prisoners with disabilities requiring placement accommodations based on their physical or medical condition, more than one-third were not transferred to an appropriate placement within seven days, as required by court order in *Armstrong v. Schwarzenegger.* Plata Pls' Trial Ex. 3, at 15-16. (June 20, 2007 SQ *Armstrong* Report.)

## X.    OVERCROWDING INCREASES THE RATE AND SERIOUSNESS OF INFECTIOUS DISEASE TRANSMISSION

131. The Governor states that overcrowding puts "[l]arge numbers of inmates" at an "increased, substantial risk for transmission of infectious diseases." Joint Pls' Trial Ex. 1, at 1. (Governor's Proclamation.) The Receiver has also concluded that "overcrowding has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public." Joint Pls' Trial Ex. 26, (Receiver's Overcrowding Report.) Although a system-wide outbreak has thus far been avoided, "given the number of prisoners, conditions in gyms and hallways converted to housing units, the velocity of prisoner movement between institutions and in and out of the CDCR

48

itself, the risk of such an outbreak cannot be underestimated." *Id.* I agree that the CDCR's current overcrowded conditions make the system ripe for an infectious disease outbreak.

132. Some prisons have been hard-hit by infectious diseases. In the Fourth Report, the Receiver recounts an instance in which an outbreak of potentially deadly tuberculosis was narrowly averted in 2006, with significant costs to the system:

> A twenty-year-old man spent three months in three San Diego County jails prior to his November 2, 2006 transfer to the R.J. Donovan Reception Center. As a result of routine testing, RJ Donovan showed that he had florid, highly infectious tuberculosis. Almost immediately thereafter Donovan was closed to inmate movement, creating enormous stress on the already overcrowded prison and jail systems. Because so many inmates were exposed during his San Diego jail stay, and because many of those inmates had transferred to prisons throughout the state, the contact investigation effort was massive and required months of follow-up of potentially infected inmates and staff.

Joint  Pls' Trial Ex. 30,  at 71.  (Receiver's Fourth Bi-Monthly Report.)

133. In the same report, the Receiver documents that the rate of gastroenteritis outbreaks was dramatically higher in the 2006/2007 norovirus season. Outbreaks at SOL and Chuckawalla Valley State Prison caused managers to shut down inmate movement for extended periods in November, 2006. *Id.* PVSP had an outbreak in its triple-bunked gymnasium. *Id.* at 72. An outbreak at San Quentin in December and January affected approximately 900 prisoners and 50 staff members, causing the prison to stop accepting prisoners for a period. *Id.*

134. The California Division of Occupational Safety and Health recently fined CDCR for its failure to investigate eight bacterial infections and for not reporting two staph infections between June 2006 and May 2007. Joint Pls' Trial Ex. 44. (Sacramento

49

Bee, November 1, 2007.)

135.  The housing conditions I observed and, in particular, the converted gymnasiums at ASP, VSPW and San Quentin, create textbook breeding grounds for infectious diseases.  Indeed, one of the physicians I spoke to in the gymnasium clinic reported concerns regarding the recent incidence of virally-related skin conditions that could be the beginning of an outbreak.  Until CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases, including staph infections, tuberculosis and influenza, a risk that is exacerbated by the fact that prisoners move frequently, both within and between institutions.

## XI.   CONCLUSIONS

136.  Based on all that I have set forth above, I believe that overcrowding is the primary cause of the current state of medical crisis in the CDCR.  The Receiver and the CDCR will be unable to address and resolve the critical medical care deficiencies until the need for services within the system is significantly reduced.  Moreover, I believe that the hiring gains for clinicians made in the past year will be lost if these systemic issues are not addressed, because many newly-hired clinicians will be unwilling to risk their professional credentials and reputations by practicing in an environment where their patients are at risk of harm because among other things adequate clinical space is scarce, appointments are not scheduled, complete medical records are unavailable, and medications are not delivered.

137.  As the Receiver has already informed the Governor, "It will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels."  Joint Pls' Trial Ex. 55, at 1.  (July 24, 2006 Letter, Receiver to Governor Schwarzenegger.)  I agree.  Creating a constitutionally adequate medical system

with the current population level is practically impossible. Creating such a system while the population continues to grow steadily, adding thousands of prisoners each year, is inconceivable.

138. The CDCR lacks the necessary infrastructure, staffing and systems to deliver adequate medical care to the current population. As the Receiver notes, "The consequences of severe overcrowding in the prisons, including specifically the CDCR's disorganized response to overcrowding, have continued to divert the Receiver's resources from his primary task of building a constitutionally adequate health care system." Joint Pls' Trial Ex. 27, at 4. (Supplemental Overcrowding Report.) The CDCR, in concert with the Receiver, cannot simultaneously develop a competent medical care delivery system in facilities that lack necessary space and staffing, and address the growing needs of an ever-increasing number of patients. Until the existing overcrowding situation is addressed, CDCR is locked into a "crisis-response" approach where it can focus only on putting out "fires" rather than system-building.

139. As a former Receiver tasked with building a constitutionally adequate medical care system in an unstable environment, I understand one must reduce on-going stresses in the system to stabilize the health care delivery situation. I was able to successfully implement a constitutionally adequate system in the District of Columbia jail in the required time frame because there was a population cap on the facility. In order to develop and implement a constitutionally adequate system in a reasonable time frame and avoid further unnecessary suffering and death, California must reduce and stabilize the prison population.

Date: November 9, 2007                    ___/s/ Ronald M. Shansky____
                                          RONALD M. SHANSKY, MD

51

# APPENDIX A

# RONALD MARK SHANSKY, M.D.

## CURRICULUM VITAE

1441-G North Cleveland
Chicago, IL  60610

312-787-3365 Residence
312-919-9757 Cell
rshansky@rshanskymd.com

### ACADEMIC TRAINING

Bachelor of Science, University of Wisconsin, 1967
Doctor of Medicine, Medical College of Wisconsin, 1971
Master of Public Health, University of Illinois School of Public Health, 1975

### PROFESSIONAL LICENSE

Licensed Physician (Illinois) No. 36-46042

### INTERNSHIP AND RESIDENCY TRAINING

Internship – Cook County Hospital, July 1971-1972
Residency – Internal Medicine, Cook County Hospital, July 1972-1974

### BOARD CERTIFICATION AND FELLOWSHIPS

Diplomate of the American Board of Internal Medicine – September 1978
Diplomate of the American Board of Quality Assurance and Utilization Review Physicians – 1992
Elected Fellow of the Society of Correctional Physicians – 1999

### EMPLOYMENT

Medical Director, Center for Correctional Health & Policy Studies, Washington, D.C. Jail –
  2004 to 2006
Consultant, Corrections Medicine and Continuous Quality Improvement – 1993 to present on a full-time
  basis; and throughout career while holding other positions
Medical Director, Illinois Department of Corrections – 1982-1993, 1998-1999
Attending Physician, Department of Medicine, Cook County Hospital – 1978 to Present
Surveyor (part-time), Joint Commission on Accreditation of Healthcare Organizations – 1993-1997
Staff Physician, Metropolitan Correctional Center of Chicago – 1975-1982

## CONSULTATIONS

Condition of Confinement Reviews for PricewaterhouseCoopers,
  reviewing detention facilities housing federal detainees; 2000–Present
Essex County Jail, Newark, N.J.
Michigan Department of Corrections
Montana Department of Corrections
New Mexico Department of Corrections
Polk Correctional Center, Raleigh, N.C.
South Dakota Department of Corrections

## APPOINTMENTS

Member of Medical Oversight Team reviewing the Ohio prison system – 2005 to present
Court Monitor, De Kalb County Jail, Decatur, Georgia – 2002-2005
Consultant, California Department of Corrections – 2000
Court Monitor, Milwaukee County Jail – 1998 to present
Court Monitor, Essex County Jail, Newark, NJ – 1995 to present
Medical Expert, State of Michigan – 1995
Consultant to Special Master, *Madrid v. Gomez*, Pelican Bay Prison, California Department of
  Corrections – 1995
Medical Expert, State of New Mexico – 1994
Consultant, Connecticut Department of Corrections – 1994
National Advisory Board of the National Center for Health Care Studies – 1991
Illinois AIDS Interdisciplinary Advisory Council – November 1985
Illinois AIDS Caretaker Group – November 1985
Task Force to Rewrite American Public Health Association Standards for Medical Services in
  Correctional Facilities – 1983
Corrections Subcommittee, Medical Care Section, APHA – 1983
Preceptor, then Clinical Associate Professor, Department of Preventive Medicine and Community Health,
  Abraham Lincoln School of Medicine, University of Illinois, Chicago, Illinois – 1972-1979
Clinical Associate Professor, Department of Medicine, Ravenswood Medical Center, Chicago,
  Illinois – 1979-1981
Director, Phase 1 and 2 Program at Cook County Hospital for the Abraham Lincoln School of
  Medicine – 1976-1978
Medical Director, Uptown People's Health Center – September 1978
Director, General Medicine Clinic, Department of Medicine, Cook County Hospital – 1975
Director, Clinical Services, Department of Internal Medicine, Cook County Hospital – 1975
Associate Attending Physician, Department of Internal Medicine, Cook County Hospital – 1974-1975
Instructor, Illinois College of Optometry, Chicago, Illinois – 1972-1974

## COMMITTEE MEMBERSHIPS

Chairman, State of Illinois AIDS Caretakers Committee – 1985
Chairman, Corrections Subcommittee, Medical Care Section – 1983
Chairman, Medical Records Committee, Cook County Hospital – 1981
Member, Executive Medical Staff, Cook County Hospital – 1979
Member, Task Force to Rewrite the *Standards for Health Services in Correctional Institutions* –
  published 1986

## PROFESSIONAL ORGANIZATIONS

Society of Correctional Physicians – President, 1993-1995
American Public Health Association – 1974 to present
American Correctional Health Services Association – 1988
American Correctional Association – 1982
Federation of American Scientists – 1974-1981

## CIVIC

Mutually agreed upon expert, Milwaukee County Jail – 2001
Mutually agreed upon expert, *Inmates v. Essex County Jail*, 1995 to present
Appointed Receiver by Judge William Bryant, Medical and Mental Health Programs, District of Columbia Jail, *Campbell v. McGruder* – 1995
Mutually agreed upon neutral expert, State of Montana, *Langford v. Racicot* – 1995
Mutually agreed upon neutral expert, State of Vermont, *Goldsmith v. Dean* – 1996
Executive Committee Overseeing Health Care, Puerto Rico Administration of Corrections – 1993
Appointed by Judge Gerald Jenks, District Court for the Central District of Utah, as Impartial Expert in the matter of *Henry v. Deland* – 1993
Appointed by Magistrate Claude Hicks Jr., U.S. District Court in Macon, Georgia as Medical Expert in the matter of *Cason v. Seckinger* – 1993
Appointed by Judge Owen M. Panner, District of Oregon, as Special Master in *Van Patten v. Pearce* involving medical services at Eastern Oregon Correctional Institution – December 1991
Appointed by Allan Breed, Special Master, *Gates* case, as Medical Consultant regarding California Medical Facility in Vacaville
Appointed by Judge M. H. Patel, Special Master, case involving San Quentin Prison – 1989 to 1995
Selected as part of delegation to inspect the medical services provided to Palestinian detainees in the Occupied Territories and Israel by Physicians for Human Rights – 1989
Appointed by U.S. District Judge Williams as member of medical panel monitoring medical services in Hawaii Prison System – 1985
Appointed by U.S. District Judge Black to evaluate medical services in the Florida Prison System – 1983
Appointed by U.S. District Judge Kanne as monitor to the Lake County, Indiana Jail in the litigation of the *Jensen* case (H74-230) – 1982
Appointed by U.S. District Judge J. Moran as Special Master of the Lake County, Illinois Jail in the litigation of *Kissane v. Brown* – 1981
Board Member, Health and Medicine Policy Research Group, Chicago, Illinois – 1980
Appointed to Advisory Committee, State of Alabama, Department of Mental Health – 1980
Appointed as consultant to the State of Alabama, Department of Mental Health – 1979
Consultant, U.S. Department of Justice Civil Rights Division, Special Litigation Section – 1977
Appointed by U.S. District Judge J. Foreman to a three-member panel of medical experts to advise on health conditions at Menard Correctional Center, Menard, Illinois – 1976

## AWARDS

Armond Start Award for Excellence in Correctional Medicine, Society of Correctional Physicians – 1999

American Correctional Health Services Association Distinguished Service Award – 1992

## PUBLICATIONS

Michael Puisis, editor, Ronald Shansky, associate editor, *The Clinical Practice in Correctional Medicine, second edition,* 2006.

Schiff, G., Shansky, R., chapter: "The Challenges of Improving Quality in the Correctional Health Care Setting," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Schiff, G.; Shansky, R.; Kim, S., chapter: "Using Performance Improvement Measurement to Improve Chronic Disease Management in Prisons," in *The Clinical Practice in Correctional Medicine, second edition*, 2006.

Anno, B.J., Graham, C., Lawrence, J., and Shansky, R. *Correctional Health Care – Addressing the Needs of the Elderly, Chronically Ill, and Terminally Ill Inmates.* National Institute of Corrections, 2004.

Schiff, G., Shansky, R., chapter: "Quality Improvement in the Correctional Setting," in *The Clinical Practice in Correctional Medicine*, 1998.

How-To Manual, *Quality Improvement in a Correctional System*, State of Georgia, Department of Corrections, 1995.

*Journal of Prison and Jail Health*, Editorial Board; 1988 – present.

Shansky, R., "Advances in HIV Treatment: Administrative, Professional and Fiscal Challenges in a Correctional Setting," *Journal of Prison and Jail Health*, Volume 9, Number 1.

B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991; Member of Editorial Advisory Board.
Coe, J., Kwasnik, P., Shansky, R., chapter: "Health Promotion and Disease Prevention" in B. Jaye Anno, Ph.D., *Prison Health Care: Guidelines for the Management of an Adequate Delivery System*, 1991.

Hoffman, A.; Yough, W.; Bright-Asare, P.; Abcariam, H.; Shansky, R.; Fitzpatrick, J.; Lidlow, E.; Farber, M.; Summerville, J.; Petani, C.; Orsay, C.; Zal, D., "Early Detection of Bowel Cancer at an Urban Public Hospital: Demonstration Project," *Ca – A Cancer Journal for Clinicians*, American Cancer Society, Nov/Dec 1983, Vol. 33, No. 6.

Mehta, P.; Mamdani, B.; Shansky, R.; and Dunea, G., "Double Blind Study of Minoxidil and Hydralazine." Sixth International Conference of Nephrology, Florence, Italy – June 1975.

## PRISONS INSPECTED

State of Alabama Prisons at Kilby, Holman, Fountain, Tutweiller, Staton, and Draper
Parchman State Prison, Mississippi Jefferson County and Birmingham City Jails, Alabama
Arizona State Prison, Florence, Arizona
Washington County Jail, Fayetteville, Arkansas
California Medical Facility, Vacaville
California State Penitentiary, San Quentin
Colorado State Penitentiaries, Centennial, Fremont, Territorial
District of Columbia Jail at Occoquan
Florida Prison System
Florida County Jails, including Monroe County, Pasco County and Polk County
Krome Detention Facility (INS), Miami, Florida
Department of Juvenile Justice, State of Georgia
Georgia Diagnostic Center, Jackson, Georgia
Hawaii Prison System
Menard Correctional Center, Illinois
Rock Island County Jail, Rock Island, Illinois
Indiana State Penitentiary, Michigan City, Indiana
Indiana Reformatory, Pendleton, Indiana
Lake County Indiana Jail, Crown Point, Indiana
Maine State Prison, Thomaston, Maine
State Prison of Southern Michigan
New Hampshire State Penitentiary, Concord
New York City Jails
Sing Sing Penitentiary, New York
Ohio Women's Prison
State of Vermont Prison System
Walla Walla State Penitentiary, Washington
Wisconsin State Penitentiaries at Waupan, Fox Lake, Taycheedah and Dodge

## SURVEYED MEDICAL PROGRAMS

Federal Bureau of Prisons, approximately 20 facilities

## INTERNATIONAL INSPECTION

Israeli Prisons and Jails Housing Palestinian Detainees

# APPENDIX B

**Documents Reviewed by Ronald M. Shansky, M.D.**

Governor Schwarzenegger's Proclamation of a State of Emergency regarding prison overcrowding

Findings of Fact and Conclusion of Law re Appointment of Receiver, entered October 3, 2005

Dr. Peter Farber-Szekrenyi's Letter to Robert Sillen and J. Michael Keating, Jr., dated September 1, 2006

Statement of CDCR Acting Secretary James Tilton on the Legislature's Failure to Act on Critical Prison Reform Legislation, issued September 1, 2006

Office of the Inspector General, "Accountability Audit, Review of the Audits of California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004," April 2006, Exec. Summary

California Department of Corrections (CDCR) Spring 2007 Adult Population Projections

Analysis of CDCR Death Reviews 2006, by Kent Imai, Receiver's Office August 20, 2007

Recommendations for Coccidioidomycosis Mitigation in Prisons Hyperendemic Areas of California, submitted by Dr. Winslow June 2007

Memorandum by Dr. Winslow to Sillen, Prevention and Treatment of Coccidioidomycosis at Pleasant Valley State Prison, May 21, 2007

Memorandum from Dr. Harold Tate to Martin Teel re Physician Staffing at CCI, July 23, 2007

Memorandum from Jenny Klein to Mariana Teel re Status of MDE and RN appointments by yard

Receiver's Motion For Waiver of State Law re Receiver Career Executive Assignment Positions; Exhibits

Receiver's Supplemental Report re Overcrowding

10.29.07 List of CIM Overdue Physicals

11.01.07 Sac Bee Article "Folsom Prison Staph Infections Bring Fines; Health Agency Levies $21,000 for Failure to Probe, Report Cases."

Monthly Report of Population, June 30, 1995

Weekly Report of Population October 24, 2007

Weekly Report of Population June 1, 2005

07.24.06 Letter from Receiver to Governor Schwarzenegger, Assemblymember Nunez and Senator Perata

Declaration of Peter Cole in Support of Motions for Enforcement and Further Remedial Orders and for a Three Judge Panel (From Armstrong)

18th Report of the Special Master on the Defendant's Compliance with Provisionally Approved Plans, Policies and Protocols; Exhibits A-W

Specialty Aging Reports from ASP and HDSP

CDCR's Mark IV Vacancy Report (October 2006 through September 2007)

Letter from Receiver to Schwarzenegger, et al. Regarding Additional Perspective for the Upcoming Special Session of the Legislature (July 24, 2006)

**Receiver's Overcrowding Report and Selected Exhibits**

Overcrowding Report

CDCR Inmate Population Table 6/30/1997 - 4/40/2007. (Exhibit 2)

January 2007 Little Hoover Commission Report, "Solving California's Corrections Crisis: Time is Running Out". (Exhibit 4)

CDCR Facilities Master Plan 1993-1998 - August 12, 1994. (Exhibit 5)

CDCR Facilities Master Plan 1995-2000 - August 24, 1995. (Exhibit 6)

CDCR Facilities Master Plan 1998-2003 - February 23, 1998. (Exhibit 7)

Comparison of Health Care Staff Vacancies Between January 2002 and January 2007. (Exhibit 8)

CDCR Inmate Movement Table February 1, 2007 - February 28, 2007. (Exhibit 11)

CDCR Inmate Movement Table March 1, 2007 - March 31, 2007. (Exhibit 12)

Bed Conversions Occurring from Fiscal Year 2/03 to 6/07. (Exhibit 13)

CDCR Prototypical Prison Policy Design Criteria. (Exhibit 17)

Kern Valley State Prison Base Staffing Profile (Exhibit 18)

National Commission on Correctional Health Care, 2003. (Exhibit 22)

Clinical Space Table (Exhibit 23)

**Receiver's Periodic Reports:**

1st Bi-Monthly Report
2nd Bi-Monthly Report
3rd Bi-Monthly Report
4th Bi-Monthly Report
5th Quarterly Report
6th Quarterly Report

## PLAINTIFF'S REPORTS:

Armstrong Reports:
San Quentin, August 29-30, 2006
San Quentin, March 27-28 and June 19-20, 2007

Plata Reports:
Substance Abuse Treatment Facility, October 19, 2007
California Correctional Center, October 18, 2007
Mule Creek State Prison, October 9, 2007
Salinas Valley State Prison, October 4, 2007
Deuel Vocational Institute, September 24, 2007
San Quentin State Prison, September 7, 2007
Kern Valley State Prison, August 15, 2007
California Men's Colony, August 3, 2007
Corcoran State Prison, July 25, 2007
Pleasant Valley State Prison, July 24, 2007
Richard J. Donovan Correctional Facility, July 18, 2007
California State Prison - Solano, July 10, 2007
Chuckawalla Valley State Prison, July 2, 2007
Calipatria State Prison, June 25, 2007
California Rehabilitation Center, June 6, 2007
Avenal State Prison, May 30, 2007
California Medical Facility, May 7, 2007
California Institution for Women, May 7, 2007
California State Prison - Los Angeles County, April 18, 2007
High Desert State Prison, March 30, 2007
California State Prison - Sacramento, March 8, 2007
Richard J. Donovan Correctional Facility, March 1, 2007
High Desert State Prison, February 9, 2007
Salinas Valley State Prison, January 29, 2007
Centinela State Prison, February 8, 2007
Central California Women's Facility, February 7, 2007
Centinela State Prison, October 24, 2006
Pleasant Valley State Prison, October 12, 2006