# EXHIBIT E

# Review of Completed Suicides in the California Department of Corrections and Rehabilitation, 1999 to 2004

Raymond F. Patterson, M.D.
Kerry Hughes, M.D.

_Objective:_ The purpose of this extended review is to assist health care managers, clinicians, prison administrators, and custody staff in identifying and responding effectively to prisoners who present a substantial risk of suicide in the foreseeable future. _Methods:_ The California Department of Corrections and Rehabilitation (CDCR) is the largest state-operated prison system in the country, with a census range of 155,365 to 163,346 prisoners between 1999 and 2004. The authors conducted a review of all 154 suicides that occurred in CDCR during this period and examined several factors related to the suicide, including demographic characteristics of the inmate, health care information, suicide method, custody information, and emergency response. _Results:_ The analysis of trends in this six-year review reveals that prisoners who completed suicide were similar to those who took their lives in the community in age distribution and mental health factors. The analysis also found that this group of prisoners who committed suicide had other characteristics or commonalities related specifically to their incarceration. In this review 60% of the suicides were judged to have been foreseeable, preventable, or both. _Conclusions:_ Although suicide is not predictable, the terms "foreseeable" and "preventable" are used to indicate cases in which the risk of suicide was elevated or events occurred that should have triggered clinical or custodial reactions that would have reduced the likelihood of completed suicide. This review provides clues to recognize inmates at elevated risk and identifies some of the health care practices and conditions of confinement to consider for provision of an adequate suicide prevention program. (_Psychiatric Services_ 59:676–682, 2008)

This review examines prisoner suicides that occurred in the California Department of Corrections and Rehabilitation (CDCR) from 1999 to 2004. The review was conducted pursuant to _Coleman v. Schwarzenegger_, a federal district court case decided in late 1995 in which the plaintiffs, a certified class of state prison inmates, successfully challenged the adequacy of mental health services available to them. The litigation culminated in the appointment of a special master and a deputy master to oversee the development and implementation of a constitutionally sound mental health services program in CDCR. These persons were appointed by the court to remedy constitutionally inadequate mental health care and to promote other constitutional requirements in the program.

CDCR's mental health services delivery system is intended to provide reasonable access to screening, assessment, and treatment for prisoners with serious mental illness. The mental health services delivery system comprises several levels of care, including the correctional clinical case management system (that is, an outpatient program for prisoners within the prison setting), the enhanced outpatient program (which consists of specialized housing units with enhanced mental health treatments), mental health crisis bed units with 24-hour nursing care (that is, an infirmary setting) for suicidal prisoners or prisoners in crisis, and acute and intermediate inpatient care in programs operated by the California Department of Mental Health located within two CDCR facilities and within hospitals run by the California Department of Mental Health that are outside CDCR.

This review is not intended to provide a comprehensive analysis of the mental health services and programs provided by CDCR. Rather, it focuses solely on the suicides that occurred in CDCR during the covered six-year span; on the recorded events before, during, and after each suicide that help facilitate an analysis of the potential suicide risk; and on the clinical and custodial factors relevant to each completed suicide.

## Methods

The data on demographic characteristics, health care, and custody presented in this study are based largely

Dr. Patterson is affiliated with the Department of Psychiatry, Howard University College of Medicine, Washington, D.C., and with the Department of Psychiatry, Georgetown University, Washington, D.C. Dr. Hughes is with the Department of Psychiatry, Morehouse School of Medicine, Atlanta, Georgia. Send correspondence to Dr. Patterson at 1904 R St., N.W., Washington, D.C. 20009 (e-mail: rpattersonmd@earthlink.net).

on comprehensive reviews conducted at both institutional and central-office levels by CDCR mental health, custody, and administrative personnel. The compilation of the data collected originally occurred as part of CDCR's internal process for the review of individual suicides. At the direction of the special master in the *Coleman* case in 1999, two court-appointed psychiatric experts (the authors of subsequent annual installments and this six-year study) collaborated in the generation of the first annual suicide review.

The development of a more effective individual suicide review process became one of the early goals of the authors' annual suicide reviews, and the process was influenced by the National Commission on Correctional Health Care's standards and recommendations (1). Each annual review generated refinements in the compilation and analysis of collected data, which in turn contributed to substantive and procedural improvements in suicide prevention policies and practices. All of this took place in a state correctional system that has a designated capacity of 79,477 beds and an annual population average of 159,893 for the six-year review period, exceeding the rated capacity by approximately 200% (2).

In addition to the suicide review documents prepared by CDCR personnel, the authors also compiled data from prisoners' health and classification records, autopsy reports, and inmate suicide notes (when available). These data were further supplemented by the observations and reports of the mental health experts in the *Coleman* case and monitors at facilities where suicides occurred, as well as by insights and information provided by counsel for plaintiffs in the *Coleman* case.

The sifting of the available demographic data together with the circumstances surrounding each death that were discernible from the attendant records permitted the identification of some shared characteristics that suggested a heightened potential risk of suicide for some categories of prisoners. Similarly, a close reading of the historical clinical and custody documentation surrounding each completed suicide helped identify some common clinical failures and conditions of confinement that seemed to contribute to the translation of the potential for suicide into reality.

## Results

The third leading cause of death in U.S. prisons is suicide, exceeded by natural deaths and deaths from AIDS (3). At least six well-known demographic characteristics of persons who commit suicide are shared by the U.S. general population and the incarcerated subpopulation, including age, gender, ethnicity, drug and alcohol abuse, history of psychiatric treatment, and prior suicide attempts (4,5). For the community, more than 90% of people who die by suicide have a combination of those risk factors, such as male gender and increasing age (4,5). For the incarcerated population these risk factors are similar with the exception of the highest rates of suicide being in the 31 to 40 age range because of fewer numbers of inmates aged 41 and older. The rates for inmates older than 50 are 9%, similar to the 14% rate in the community (4). In prisons, such as the CDCR, younger inmates comprise the majority of inmates, with declines in numbers over time. The percentage of suicide reflects these declining numbers by age but is consistent with prevalence in the community (4,5). From 2000 to 2002 state prisoner suicide rates ranged from 13 to 14 suicides per 100,000 prisoners for every age group over 18 (6). Men are four times more likely than women to commit suicide (7). Non-Hispanic Caucasian males are the highest-risk group (7). The rate of suicide is highest among non-Hispanic Caucasian men, regardless of whether they are inside or outside of correctional facilities (5,7). Family conflict, bereavement, and loss of support are well-known risk factors. First incarceration, which usually takes place in a jail, is a widely known risk factor, as described by Metzner and Hayes (5,8) and others (6,9–11).

In contrast to society at large, where ready access to a handgun is identified as a risk factor and handguns are the most common method of suicide, hanging was the most frequently employed method of suicide in custody found in this and other studies. This was not surprising in view of the crucial role played by a readily accessible method. In the sample presented here, hanging was employed in 85% of cases. This finding was consistent with the literature on incarcerated populations (5,6,8) and with the Missouri samples of completed suicides in prisons (N=37) described by Daniel and Fleming (11), who found that hanging was the most frequent method of suicide, employed in 81% of cases.

Although the suicide rate in jails dropped more than 50% between 1983 and 2002 in the United States, from 129 per 100,000 down to 47 per 100,000, as described by Mumola (6), jails continue to have a much higher rate of suicide than prisons. Suicide rates in state prisons also dropped, from 34 per 100,000 in 1980 to 16 per 100,000 in 1990, with further decline to 14 per 100,000 by 2004 (5–7,9).

Recently there have been indications that suicide rates among Hispanics and suicide attempts among young African-American men are rising nationwide (6). Regarding the incarcerated population, non-Hispanic Caucasian inmates commit suicide at the highest rate (96 per 100,000), compared with rates of 30 per 100,000 among Hispanics in custody and rates of 16 per 100,000 among African Americans in custody (6). In the sample presented here, the number of Hispanic men who committed suicide approached that of non-Hispanic Caucasians, while the number of African Americans who committed suicide remained low.

The body of literature on suicide risk factors suggests hypotheses—some already codified in standards promulgated by the American Correctional Association and the National Commission on Correctional Health Care (1,12)—that should elicit keen interest among those charged with the care of incarcerated individuals.

The accompanying tables provide graphic representation of the demographic data collected during each of the six years covered in the study.

The number of annual suicides oc-

*Table 1*

California Department of Corrections and Rehabilitation population, suicide rate, and housing and location of suicide

| Variable | Population (at end of year) | Total suicides (N=154) | Suicide rate per 100,000 | Single-cell housing | | Administrative segregation or secure housing unit | | Mental health crisis bed unit | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | N | % | N | % | N | % |
| Year | | | | | | | | | |
| 1999 | 160,970 | 25 | 15.5 | 20 | 80 | 9 | 36 | 2 | 8 |
| 2000 | 160,855 | 15 | 9.3 | 12 | 80 | 8 | 53 | 0 | — |
| 2001 | 155,365 | 30 | 19.3 | 25 | 83 | 12 | 40 | 6 | 20 |
| 2002 | 158,099 | 22 | 13.9 | 15 | 68 | 6 | 27 | 1 | 5 |
| 2003 | 160,722 | 36 | 23.1 | 22 | 61 | 20 | 56 | 3 | 8 |
| 2004 | 163,346 | 26 | 15.9 | 22 | 85 | 19 | 73 | 3 | 12 |
| Average | 159,893 | 26 | 16.2 | 19 | 73 | 12 | 46 | 3 | 12 |

curring during the covered period ranged from a low of 15 in 2000 to a high of 36 in 2003. On the basis of the institutional population of CDCR at the end of each of these respective years, the suicide rate ranged from 9.3 per 100,000 to 23.1 per 100,000. The variability in the annual rate of suicides is tracked for each of the covered years in Table 1.

The wide range of variability illustrates the pitfalls of comparing annual rates of an event with a low base rate event in a small, fluctuating population. Even with large samples, a minimum of five years of data are needed for meaningful analysis because of year-to-year variability and other factors affecting mental health resources (10,11,13).

Table 1 also provides a breakdown of the annual end-of-year overall CDCR population and the annual number of suicides per year in each type of housing unit where prisoners resided at the time of their deaths. Three different types of housing units were examined: single cell, administrative segregation or secure housing, or mental health crisis bed. Single-cell units are defined as one inmate per cell and can be for the general population or for inmates with specialized needs. Administrative segregation and secure housing units can have one or two persons in a cell. Administrative segregation consists of housing units where inmates are generally locked in their cells 23 hours per day, for days to months at a time, and secure housing units are a "super maximum" security setting where inmates are typically locked in their cells for 23 hours per day for one to many years. Mental health crisis bed units or outpatient housing units have one person in a cell and have nursing and clinical staff on the units 24 hours per day. The breakdown of suicides occurring in single-cell housing in administrative segregation or secure housing units and in the general population (that is, nonspecialized housing units) is also included in Table 1. The data indicate that 73% of all suicides were completed in single cells, while 46% of completed suicides occurred in single cells in administrative segregation or secure housing units and 12% occurred in mental health crisis beds.

These findings regarding the importance of environmental stressors unique to prison conditions, such as isolation, punitive sanctions, severely restricted living conditions, and acquisition of new charges or imposition of an unexpected sentence were consistent with previous reports (11,14,15). We found that the conditions of deprivation in locked units and higher-security housing were a common stressor shared by many of the prisoners who committed suicide. Liebling (16) found that recent punishment, segregation, long or unexpected sentences, and high levels of reported distress, including symptoms of depression and anxiety, were reported by a sample of men who attempted suicide. In Liebling's (16) sample of 50 cases, 24% had recently experienced punishment or were in segregation and 22% had recently received a long or an unexpected sentence.

Among the 154 prisoners who committed suicide during the six-year period, 149 (97%) were male, and four (3%) were female. Sixty-two (40%) were Caucasian, 55 (36%) were Hispanic, 25 (16%) were African American, four (3%) were Asian, and eight (5%) were of another race or ethnicity. Seventy-three (47%) of the prisoners who completed suicide were aged 31–40 years, 42 (27%) were 18–30 years, 24 (16%) were 41–50 years, 14 (9%) were older than 50 years, and one (1%) was younger than 18 years.

The methods utilized by prisoners who completed suicide included hanging (N=131, or 85%), lacerations or exsanguinations (N=9, or 6%), overdose (N=5, or 3%), and other (N=9, or 6%).

Among prisoners who completed suicide during the six-year period, 73% had a history of mental health treatment, and 62% had a history of suicidal behavior or statements. The breakdown of these numbers for each year is provided in Table 2.

Among the 154 suicides completed during the covered period, 87 (56%) involved prisoners on the mental health caseload. Table 3 provides the breakdown. One caveat: prisoners housed in a mental health crisis bed unit or a Department of Mental Health inpatient program may have been at any level of care before their placement in those beds, including "none." The level of mental health care for the 87 prisoners included in the CDCR mental health caseload at the time of their suicides was as follows: five (3%) were at the Department of Mental Health inpatient

(hospital) level of care; two (1%) were at a crisis level of CDCR care (in a mental health crisis bed unit, outpatient housing unit, or transitional care unit); 27 (18%) were in the enhanced outpatient program; and 53 (34%) were in the correctional clinical case management system program.

These findings are consistent with Daniel and Fleming's ten-year review (11) of prison suicides in Missouri. These findings point to the need for thorough suicide risk assessment of prisoners who appear to be relatively high functioning or who are found not to be in need of ongoing mental health treatment. In the group of suicides presented here, 59 (38%) were not in need of mental health treatment (as determined by the CDCR clinical treatment staff), a percentage that was higher than Daniel and Fleming's finding that nearly 30% of the prisoners who committed suicide over a ten-year period in Missouri presented with no mental health problems (11). For eight (5%) inmates, mental health treatment status was unknown because of missing data. In our California sample, like the Missouri sample, the prevalence of prior treatment was higher than current need for treatment. Both findings reflect a well-known indicator of elevated suicide risk in society at large—that is, history of psychiatric treatment. A total of 112 of 154 (73%) of the persons who committed suicide in our sample had a history of psychiatric

treatment; however, 101 of the 112 (90%) had axis I diagnoses. Seventy-three percent of the total Missouri sample had been diagnosed as having an axis I disorder at some point in the past, and 66% of our total sample had a diagnosis of an axis I disorder at some point in the past (11).

Also reviewed were emergency responses to inmates who were unresponsive when they were discovered and who subsequently were determined to have committed suicide. The reviews focused on the timely initiation and continuation of cardiopulmonary resuscitation (CPR) by first responders. Policy requires that CPR be initiated and continued with very few exceptions, exceptions such as the presence of rigor mortis, lividity, or obvious trauma, such as severe head injury or decapitation. For the

six-year review period, CPR was performed in a timely and appropriate manner on 107 inmates who committed suicide (69%), CPR was not performed in a timely and appropriate manner on 42 inmates (27%), and it could not be determined on the basis of the available documentation whether CPR was performed in a timely or appropriate manner on five inmates (3%). These results are presented by year in Table 4.

Sixty percent of all the suicides covered in this six-year period were either foreseeable or preventable, and some were both. The term "foreseeable" refers to cases in which already known and reasonably available information about an inmate indicates the presence of a substantial or high risk of suicide that requires responsive clinical, custody, or administrative in-

**Table 2**

Mental health history of persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides (N=154) | Mental health caseload at time of death | | Previous mental health treatment | | Previous suicidal activity | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 16 | 64 | 18 | 72 | 17 | 68 |
| 2000 | 15 | 8 | 53 | 11 | 73 | 11 | 73 |
| 2001 | 30 | 16 | 53 | 22 | 73 | 19 | 63 |
| 2002 | 22 | 10 | 45 | 14 | 64 | 12 | 55 |
| 2003 | 36 | 23 | 64 | 27 | 75 | 18 | 50 |
| 2004 | 26 | 13 | 50 | 20 | 77 | 15 | 58 |
| Average | 26 | 14 | 54 | 19 | 73 | 15 | 58 |

**Table 3**

Level of care received by persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | Correctional clinical case management system | | Enhanced outpatient program | | Mental health crisis bed, outpatient housing unit, transitional care unit | | Department of Mental Health | | None | | Unknown[a] | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % | N | % | N | % | N | % |
| Year | | | | | | | | | | | | | |
| 1999 | 25 | 10 | 40 | 6 | 24 | 0 | — | 0 | — | 8 | 32 | 1 | 4 |
| 2000 | 15 | 4 | 27 | 3 | 20 | 0 | — | 1 | 7 | 0 | — | 7 | 47 |
| 2001 | 30 | 7 | 23 | 6 | 20 | 0 | — | 3 | 10 | 14 | 47 | 0 | — |
| 2002 | 22 | 9 | 41 | 0 | — | 0 | — | 1 | 5 | 12 | 55 | 0 | — |
| 2003 | 36 | 16 | 44 | 6 | 17 | 2 | 6 | 0 | — | 12 | 33 | 0 | — |
| 2004 | 26 | 7 | 27 | 6 | 23 | 0 | — | 0 | — | 13 | 50 | 0 | — |
| Total | 154 | 53 | 34 | 27 | 18 | 2 | 1 | 5 | 3 | 59 | 38 | 8 | 5 |

[a] Unknown because of missing data.

**Table 4**

Cardiopulmonary resuscitation (CPR) performed on persons who committed suicide in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | CPR performed | | CPR not performed | | Unknown | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 15 | 60 | 8 | 32 | 2 | 8 |
| 2000 | 15 | 11 | 73 | 4 | 27 | 0 | — |
| 2001 | 30 | 20 | 67 | 9 | 30 | 1 | 3 |
| 2002 | 22 | 16 | 73 | 6 | 27 | 0 | — |
| 2003 | 36 | 29 | 81 | 5 | 14 | 2 | 6 |
| 2004 | 26 | 16 | 62 | 10 | 38 | 0 | — |
| Total | 154 | 107 | 69 | 42 | 27 | 5 | 3 |

terventions to prevent self-harm. The term foreseeable is not to imply "predictable," because suicide is not predictable, but rather to refer to the presence of an elevated risk to substantial or high risk, which requires appropriate clinical or custodial intervention or monitoring.

The term "preventable" applies to situations where if some additional information had been gathered or some additional interventions had been undertaken, usually as required in existing policies and procedures, the likelihood of a completed suicide might have been substantially reduced. The concept includes, but is not limited to, situations where inmates report self-injurious behaviors or threats but do not receive appropriate evaluation or treatment, are not transferred to a more clinically appropriate or safe environment, or fail to receive appropriate lifesaving procedures, such as timely CPR.

Table 5 shows the breakdown of foreseeable and preventable suicides by year. Major contributing factors in foreseeable or preventable deaths included inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts. In numerous cases, multiple such factors contributed to the outcome.

**Discussion**

During the period covered by this review, both the scope and quality of CDCR's review process improved significantly. In 1999 psychological autopsies were rarely included in reviews, and many of the psychological autopsies were conducted by personnel who were clinically involved directly or indirectly with the specific inmate who committed suicide. By 2004 clinicians not involved in specific inmates' care and treatment had performed psychological autopsies for all inmates who had committed suicide. In 1999 the special master's reports recommended improvements in the review process that included clarification of the duties of local reviewers, mandated time frames for completion of reviews, and the development of corrective action plans. Subsequent procedural recommendations focused on specific timelines for the preparation of responsive corrective action plans by institutions.

The review process did not focus solely on procedural elements. From the beginning of the study period the annual review helped prompt substantive changes and improvements in suicide prevention policy and practices, including, for example, requirements for increased clinical monitoring of prisoners in high-security units, both for those who were and for those who were not on the mental health caseload; the development of clinical and custody follow-up monitoring regimens for suicidal prisoners discharged from mental health crisis beds and their alternatives; the effective provision of group therapy for prisoners on the mental health caseload in administrative segregation units; the development of routinely administered suicide risk assessments; efforts to keep suicidal prisoners out of cells with heating, ventilating, and air conditioning vents with large-mesh screens to facilitate hanging; a ban on the substitution of video monitoring for the personal observation of prisoners on suicide watch; and the development and implementation of improved CPR policies and practices.

The suicides by four female inmates and the sharp rise in the number of suicides in locked units, particularly administrative segregation, led to greater attention to both areas. Failure to use a suicide risk assessment instrument as required by departmental policy was a factor in the female suicides, and corrective measures were taken. The rising rate of

**Table 5**

Foreseeable or preventable suicides in the California Department of Corrections and Rehabilitation

| Variable | Total suicides | Foreseeable or preventable | | Not foreseeable or preventable | | Unable to determine | |
|---|---|---|---|---|---|---|---|
| | | N | % | N | % | N | % |
| Year | | | | | | | |
| 1999 | 25 | 8 | 32 | 6 | 24 | 11 | 44 |
| 2000 | 15 | 11 | 73 | 3 | 20 | 1 | 7 |
| 2001 | 30 | 14 | 47 | 13 | 43 | 3 | 10 |
| 2002 | 22 | 10 | 45 | 12 | 55 | 0 | — |
| 2003 | 36 | 29 | 81 | 7 | 19 | 0 | — |
| 2004 | 26 | 21 | 81 | 5 | 19 | 0 | — |
| Total | 154 | 93 | 60 | 46 | 30 | 15 | 10 |

suicide in administrative segregation initiated a two-year effort to analyze the causes and prescribe remedies. The latter have included, among other initiatives, custody monitoring of new arrivals at 30-minute intervals, preplacement mental health screenings, better tracking of history of suicidal behavior, easing of property restrictions for protective custody prisoners, and improved physical safety in cells for newly arrived prisoners. Several of these remedies were based upon data indicating that suicides occurred most often within three weeks of a prisoner's placement in an administrative segregation unit. In the California cases, 39 of 74 (53%) of the suicides that occurred in administrative segregation or secure housing units occurred within three weeks of placement. Individuals housed in administrative segregation and secure housing units are more isolated than those in the general prison population, and these housing changes may represent a very different and stressful environment for inmates as they are placed in these environments because they incurred charges or for safety and protective custody reasons (typically these environments involve 23 hours per day in cell confinement with some exceptions for out-of-cell time for yard activities and showers).

## Conclusions

Over the six years of the study, the suicide review process has identified characteristics that ought to draw the attention of staff to certain categories of prisoners, including the following:

ꞌ Prisoners with a history of serious mental illness

ꞌ Prisoners with a history of suicide attempts

ꞌ Prisoners housed in a single cell, particularly in administrative segregation or a secure housing unit

ꞌ Prisoners expressing safety concerns with associated anxiety and agitation

ꞌ Prisoners with serious medical concerns

ꞌ Prisoners with both severe personality disorders and coexisting mental illness

ꞌ Prisoners whose legal status has undergone significant change—for example, individuals returning from court after denial of appeals and those receiving third-strike determinations or other additions to their sentences

ꞌ Caucasian prisoners, although the number of suicides among Hispanic prisoners increased rapidly during the six-year period.

The above categories may help identify prisoners who might warrant focused attention. CDCR's experience with completed suicides over the study period highlights both clinical practices and physical conditions that ought to be addressed, including the following:

ꞌ The failure of clinical staff to refer potentially suicidal prisoners to programs with more intensive monitoring and care

ꞌ The provision of prompt and adequate access to higher levels of monitoring and care to prisoners identified as potentially suicidal

ꞌ The elimination of physical safety deficiencies in cells and other housing for prisoners most at risk of suicide—for example, large mesh vents or other protuberances regularly used for hanging

ꞌ The lack of adequate confidential interviewing space in most high-custody housing units, which inhibits the ability and willingness of potentially suicidal prisoners to communicate effectively with clinicians about their risk of suicide

ꞌ Clinicians' failure to review fully and carefully available documentation, such as health and classification records, for indices of prior suicidal activity or ideation

ꞌ The timely completion of all of the documentation associated with the institutional or departmental elements of the suicide review process, including the documentation of implemented remedies and adverse personnel actions.

This review suggests the following recommendations and considerations for correctional administrative, clinical, and custody staff members to assist in their efforts to establish and manage an effective suicide prevention program:

ꞌ The development and timely implementation of effective policies and procedures

ꞌ Training and supervision of all staff regarding adherence to policies and procedures

ꞌ Development and implementation of a systematic quality management process with review of all completed suicides

ꞌ Use of screening criteria, clinical rounds, and timely access to care for inmates in isolated conditions of confinement, especially administrative segregation

ꞌ Access and timely transfers to higher levels of care when indicated

ꞌ Provision of a timely and complete emergency response system, including CPR, first aid, and transfer to medical units or facilities

ꞌ Consideration of the impact of overcrowding and staffing deficiencies.

Prisons and prison life create enormous stress, even for individuals who are mentally healthy. The strain for offenders with mental illness, who are often both fragile and intensely vulnerable, sometimes exceeds their ability to cope. One surpassingly critical purpose of mental health services in prisons is to help identify such individuals for intervention and provide the monitoring, treatment, and physical safety needed for their survival. This review attempts to provide some clues about recognizing prisoners most at risk of suicide and to identify some of the failed practices and inadequate conditions that often combine to prevent the provision of adequate protection and treatment. This review identifies several risk factors, as well as necessary administrative, clinical, and custody staff involvements and responsibilities for an effective suicide prevention program.

### Acknowledgments and disclosures

The authors thank J. Michael Keating, Jr., J.D., special master appointed through *Coleman v. Schwarzenegger*, Matthew A. Lopes, Jr., J.D., deputy special master appointed through *Coleman v. Schwarzenegger*, and the other team experts and monitors also appointed through the case. The authors also thank the California Department of Corrections and Rehabilitation and plaintiffs counsel for their diligence and assistance.

The authors report no competing interests.

## References

1. Standards for Health Services in Prisons, 5th ed. Chicago, National Commission on Correctional Health Care, 2003

2. California Department of Corrections and Rehabilitation (CDCR), 2007. Available at www.CDCR.ca.gov

3. Metzner JL: Class action litigation in correctional psychiatry. Journal of the American Academy of Psychiatry and the Law 30:19–29, 2002

4. Moscicki EK: Epidemiology of completed and attempted suicide: toward a framework for prevention. Clinical Neuroscience Research 1:310–323, 2001

5. Metzner JL, Hayes LM: Suicide prevention in jails and prisons, in Textbook of Suicide Assessment and Management. Edited by Simon RI, Hales RE. Arlington, Va, American Psychiatric Publishing, 2006

6. Mumola CJ: Suicide and Homicide in State Prisons and Local Jails: Bureau of Justice Statistics Special Report. Washington, DC, US Department of Justice, Aug 2005

7. Web-Based Injury Statistics Query and Reporting System (WISQARS). Atlanta, Ga, Centers for Disease Control and Prevention, National Center for Injury Prevention and Control, 2006. Available at www.cdc.gov/ncipc/wisqars

8. Hayes LM: National study of jail suicides: seven years later. Psychiatric Quarterly 60: 7–29, 1989

9. Hayes LM: Prison suicide: an overview and guide to prevention. Prison Journal 75: 431–456, 1995

10. Hayes LM: National and state standards for prison suicide prevention: a report card. Journal of Correctional Health Care 3:5–38, 1996

11. Daniel AE, Fleming BA: Suicides in a state correctional system, 1992–2002: a review. Journal of Correctional Health Care 12:24–35, 2006

12. Standards for Adult Correctional Facilities, 4th ed. Lanham, Md, American Correctional Association, 2003

13. White TW, Schimmel DJ, Frickey R: A comprehensive analysis of suicide in federal prisons: a fifteen-year review. Journal of Correctional Health Care 9:321–343, 2002

14. Liebling A: Vulnerability and prison suicide. British Journal of Criminology 36: 173–187, 1995

15. Way BB, Sawyer DA, Barboza S, et al: Inmate suicide and time spent in special disciplinary housing in New York State prison. Psychiatric Services 58:558–560, 2007

16. Liebling A: Prison suicide and prisoner coping. Crime and Justice 26:283–359, 1999

## Submissions for Datapoints Column Invited

Submissions to the journal's Datapoints column are invited. Datapoints encourages the rapid dissemination of relevant and timely findings related to clinical and policy issues in psychiatry. National data are preferred. Areas of interest include diagnosis and practice patterns, treatment modalities, treatment sites, patient characteristics, and payment sources. The analyses should be straightforward, so that the figure or figures tell the story. The text should follow the standard research format to include a brief introduction, description of the methods and data set, description of the results, and comments on the implications or meanings of the findings.

Datapoints columns, which have a one-page format, are typically 350 to 400 words of text with one or two figures. The maximum total word count—including the title, author names, affiliations, references, and acknowledgments—is 500. Because of space constraints, submissions with multiple authors are discouraged; submissions with more than four authors should include justification for additional authors.

Inquiries or submissions should be directed to column editors Amy M. Kilbourne, Ph.D., M.P.H. (amy.kilbourne@va.gov), or Tami L. Mark, Ph.D. (tami.mark@thomson.com).

# EXHIBIT F

RALPH COLEMAN, et al., v.  ARNOLD SCHWARZENEGGER, et al.,

CASE NO. CIV S-90-0520 LKK JFM P


EXHIBIT A

DEFENDANTS' PLAN TO ADDRESS SUICIDE TRENDS IN
ADMINISTRATIVE SEGREGATION UNITS

STATE OF CALIFORNIA – DEPARTMENT OF CORRECTIONS AND REHABILITATION                                          Arnold Schwarzenegger, *Governor*

**DIVISION OF CORRECTIONAL HEALTH CARE SERVICES**
P. O. Box 942883
Sacramento, CA 94283-0001



October 2, 2006

J. Michael Keating, Jr.                    via:    Lisa Tillman
Office of the Special Master                       Deputy Attorney General
2351 Sussex Lane                                   Department of Justice
Fernandina Beach, FL  32034                        1300 I Street, Suite 125
                                                   P. O. Box 944255
                                                   Sacramento, CA  94244-2550

RE:    **ADMINISTRATIVE SEGREGATION UNIT SUICIDE REDUCTION PLAN**

Dear Mr. Keating:

In compliance with the *Coleman* court order of June 8, 2006, please find enclosed the
*Administrative Segregation Unit Suicide Prevention Plan*, which details the California
Department of Corrections and Rehabilitation's (CDCR) plan to address the suicide trends in
the administrative segregation units.

If you need clarification on any aspect of this plan, please contact me at (916) 327-0033, or
Doug McKeever, Director (A), Mental Health Program, Division of Correctional Health Care
Services (DCHCS), at (916) 327-1168.

Sincerely,

PETER FARBER-SZEKRENYI, DR., P.H.                  JOHN DOVEY
Director                                           Director
Division of Correctional Health Care Services      Division of Adult Institutions

Enclosure

J. Michael Keating, Jr.
Page 2


cc:    James Tilton, Secretary, CDCR
       Kingston Prunty, Undersecretary, CDCR
       Bruce Slavin, General Counsel, Office of Legal Affairs, CDCR
       Kathleen Keeshen, Chief Deputy General Counsel, Office of Legal Affairs, CDCR
       Marisela Montes, Chief Deputy Secretary, Adult Programs, CDCR
       David Runnels, Chief Deputy Secretary, Adult Operations, CDCR
       Renee Kanan, M.D., MPH, Deputy Director, DCHCS, CDCR
       Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations
         Branch, DCHCS, CDCR
       George A. Sifuentes, Deputy Director, Office of Facilities Management, CDCR
       Doug McKeever, Director (A), Mental Health Program, DCHCS, CDCR
       Michael Stone, Staff Counsel, Office of Legal Affairs, CDCR
       Vicki O'Shaughnessy, Staff Services Manager II, Clinical Programs and Policy Unit,
         DCHCS, CDCR

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

## ADMINISTRATIVE SEGREGATION UNIT
## SUICIDE PREVENTION PLAN

### I.    OVERVIEW OF COURT ORDER

On May 9, 2006, the *Coleman* Special Master filed the <u>Report on Suicides Completed in the California Department of Corrections [and Rehabilitation] in Calendar Year 2004</u>. The Special Master recommended that the California Department of Corrections and Rehabilitation (or Department) be required to:

> "...*develop by May 31, 2006 a plan for dealing with the escalating percentage of suicides occurring in administrative segregation units. The plan must be based on an analysis of the causes for the increasing rate and, depending on the outcome of the analysis, provide adequate resources of mental health and/or custody staff, create sufficient confidential interview space and/or enhance the quality of mental health services provided in administrative segregation units.*"

The Department responded to the recommendation by requesting to collaborate with the Special Master's experts, and to extend the completion of the plan by requesting the Court adopt August 31, 2006, as the date for completion of the plan.

Plaintiffs' counsel filed a series of responses to the report and requested that the Department obtain the necessary funding to implement any plan in September 2006, collaborate with Plaintiff's suicide expert, and include a schedule for implementation within the plan.

On June 8, 2006, Lawrence K. Karlton, Senior Judge, United States District Court, issued an order adopting the recommendation of the Special Master and the timeframe of August 31, 2006, for completion of the plan. He ordered the Department to:

> "...*include, as appropriate, a budget and implementation schedule for any policy and procedure changes, staffing or budget augmentation, and, if necessary, include a mechanism for obtaining mid-year funding on or before September 30, 2006.*"

In the course of discussions with Plaintiffs' counsel, the Department submitted a draft plan by September 5, 2006, and Plaintiffs' counsel agreed to permit an extension of the deadline for submission of the final plan to October 2, 2006. The Court approved the request for an extension of the deadline for the following plan:

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

---

II.    **DESCRIPTION OF ANALYSIS OF CONTRIBUTING FACTORS RELATED TO SUICIDES IN ADMINISTRATIVE SEGREGATION UNIT**

The Department's Division of Correctional Health Care Services Suicide Prevention and Response Focused Improvement Team met in early June and identified a methodology for the analysis of causes (contributing factors) of increased suicides in Administrative Segregation Units and the preparation of a plan for submission to the *Coleman* court. The process included an in-house analysis of identifiable common factors of all Administrative Segregation Unit suicides in 2004, and an external consultation with a panel including the Special Master's experts, the plaintiff's expert, and California Department of Corrections and Rehabilitation's experts. In addition, the Suicide Prevention and Response Focused Improvement Team undertook a review of ideas or initiatives focused on Administrative Segregation Unit suicide risk reduction that have not been implemented, and identified current policies that have been partially implemented.

The Suicide Prevention and Response Focused Improvement Team met to reach consensus about general areas to investigate in the analysis of contributing factors to Administrative Segregation Unit suicides. The Suicide Prevention and Response Focused Improvement Team identified five major areas (contributing factors) that can contribute to an Administrative Segregation Unit suicide, including: mental health treatment issues; family/external social issues; custodial factors; in-prison safety/social issues; substance abuse issues; and "other", (See Attachment A). Each factor had several components identified by the Suicide Prevention and Response Focused Improvement Team. Subsequently, acting as independent reviewers, two members of the Division of Correctional Health Care Services senior mental health staff read each report of a suicide in Administrative Segregation Unit during 2004. The reviewers identified and tallied the number of times a general factor and its secondary components appeared in the report as contributing factors leading to the inmate's suicide. The reviewers conferred to identify contributing factors that each had identified. Finally, the reviewers compared their findings to those in the Special Master's expert report for each suicide. At the end of the process the tallies for each major contributing factor and its components were totaled to identify the most prominent contributing factors that were identified in the reports (and in Dr. Patterson's reviews) as leading to the suicide of the inmate.

The most frequent factors identified by the reviewers were (listed from most to least frequently identified): Mental Health, Custodial Factors, In-Prison/Safety, Other Issues, Family/External Issues. Within the Mental Health factor the most frequently identified secondary factor was inadequate suicide risk or mental health assessments, underestimation of acuity, lack of referral to a higher level of care, decompensation, and poor follow-up. Custodial issues included change in commitment time, the fact of Administrative Segregation Unit placement, and other factors such as District Attorney referrals, long Administrative Segregation Unit term, imposition of Security Housing Unit term, or violent rules violation. In-prison Safety/Social Issues encompassed fearfulness, reports of being threatened by others, and removal of a peer group.

Simultaneously with the review of 2004 suicides in Administrative Segregation Unit, the Suicide Prevention and Response Focused Improvement Team reviewed its meeting minutes, Action Item Log, and suicide prevention policy memoranda from the past two years to identify practices and policies that either had not been implemented or had been partially implemented to be part of the presentation to the expert consensus panel.

---

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

---

## III.    DESCRIPTION OF EXPERTS MEETING

The expert panel was conceived as a method to bring together subject-matter experts in suicide prevention and to reach consensus on a number of areas and actions to assist the Department in developing the court-ordered plan.

The Department sponsored three experts from around the nation: John Stoner, Ph.D., Colorado Department of Corrections; Thomas White, Ph.D., formerly Federal Bureau of Prisons; and Bill Kissel, M.S., formerly Georgia Department of Corrections. All three have been involved in training in suicide prevention, correctional mental health service delivery, and prison litigation. Plaintiff's expert was Lindsay Hayes, M.S. of the National Center for Institutions and Alternatives, an acknowledged national expert on jail/prison suicide prevention. The Special Master's experts were Jeffrey Metzner, M.D. and Ray Patterson, M.D. Both are acknowledged experts in correctional mental health services delivery and prison suicide issues.

On July 14, 2006, the consensus panel met in San Francisco for eight hours. In addition to the expert participants, others included Special Master J. Michael Keating, Division of Correctional Health Care Services Mental Health Program staff (Drs. Chaiken, McAloon, Steenman, Canning, and Program Director Doug McKeever), Teresa Schwartz, Associate Director, General Population Levels III & IV from the Division of Adult Institutions; Michael Stone, Staff Counsel, of the California Department of Corrections and Rehabilitation Office of Legal Affairs; plaintiff's counsel Jane Kahn and Lori Rifkin.

After introductions and a review of the agenda, Drs. Chaiken and Canning presented background and statistical data on suicides in Administrative Segregation Unit, highlights of the Division of Correctional Health Care Services suicide prevention policy, mental health services in Administrative Segregation Unit, and current and recent initiatives to reduce the risk of suicide in Administrative Segregation Units. In addition, staff presented an overview and the results of the contributing factors analysis.

Discussion by the participants centered on a variety of issues: environmental/physical plant factors, screening and evaluation issues, custodial procedures, and monitoring and auditing of practices.

## IV.    PANELISTS' AND PLAINTIFFS/COUNSELS' RECOMMENDATIONS ON MEANS TO ADDRESS SUICIDE TRENDS IN ADMINISTRATIVE SEGREGATION UNITS

During the afternoon, the panel participants discussed the following recommendations that should be considered for inclusion in the plan submitted to the court.

A. Environmental/Physical Plant:

1) Intake Cells: A percentage of cells in each Administrative Segregation Unit statewide should be reserved for new arrivals. Inmates newly housed into Administrative Segregation Units would be housed in these intake cells. The expert panel recommended that inmates be housed in intake cells for 'two to three weeks. The Department

---

September 29, 2006                                                                                      Page 3 of 14

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

---

recommends that inmates be housed in intake cells for a minimum of 72 hours. These cells would be located in areas that afford more opportunity for observation and interaction between custody staff and the inmate. (Note: Subsequent to the expert panel, Suicide Prevention and Response Focused Improvement Team determined that if, on initial arrival in Administrative Segregation Unit, an inmate can safely be housed with a cellmate, then the inmate would not need to be placed into one of the designated intake cells, since having a cellmate has proven to be a protective factor against suicide risk.)

2) Intake Cells: All intake cells should be retrofitted to reduce availability of hanging attachment sites.
   - When possible, beds should be concrete slab construction.
   - Dangerous protrusions should be eliminated and if possible replaced with "pull away" fixtures.
   - Vent coverings should be installed to reduce use of vent openings as attachment sites for ligatures.
   - Light coverings should be retrofitted to prevent use as attachment sites.
   - If possible, cell doors should be retrofitted or replaced with doors having more window area to increase visibility of cell interior.

B. Custodial Procedures

1) Title 15 Requirements: During the time that inmates are housed in the Administrative Segregation Unit intake cells, or are within the first two to three weeks after placement into Administrative Segregation Unit, the Department should ensure they receive all Title 15 requirements for out-of-cell time and privileges.

2) Confidential Mental Health Interviews: All inmates housed in Administrative Segregation Unit who meet with mental health staff should have their interviews in private settings (affording confidentiality of sight and sound from other inmates and confidentiality of sound from staff). Custody should announce these interviews as "health appointments" to avoid stigmatization and possible retribution of other inmates.

3) Reduction in Length of Stay: The length of time inmates remain in Administrative Segregation Units should be shortened.

4) Return-from-Court ("Bad News") Information: Inmates returning from court dates often experience increased distress due to "bad news" such as additional incarceration time or adverse court proceedings such as loss of parenting rights. Several institutions have created standardized ways to capture this information and alert mental health staff about possible mental health crises. Division of Correctional Health Care Services Suicide Prevention and Response Focused Improvement Team should standardize a statewide system to capture such information and communicate that information to mental health staff utilizing a combination of methods developed at Folsom State Prison and the California Correctional Institution.

---

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

C. Mental Health Screening, Coordination, and Treatment

   1) Pre-placement Suicide Prevention Screening: All inmates placed into Administrative Segregation Unit should have a brief suicide risk screening done as part of their pre-placement medical screening. Results of the brief suicide-risk screening should be used to determine any need for further mental health evaluation, and should be noted in the chart on a chrono.

   2) Post-placement Screening: All inmates receive the 31-item screening according to Mental Health Service Delivery System Program Guide timelines. The information available in the Mental Health Tracking System regarding Suicide Risk Factors should be used in order to corroborate self-report from the 31-item screening. The screening interview should be administered in a private, confidential setting. If an inmate refuses screening, a mental health clinician should contact the inmate at cell-front, should review the Unit Health Record, and should contact custody staff in the Administrative Segregation Unit to gather additional information regarding the inmate's mental state.

   3) Daily Coordination: By policy memorandum of May 2005, the Department requires that each morning an assigned Licensed Psychiatric Technician should meet with Administrative Segregation Unit staff (including a Sergeant) to solicit information about new arrivals in Administrative Segregation Unit or inmates who may require clinical attention. Henceforth, this meeting should include the assigned Administrative Segregation Unit mental health clinician (social worker or psychologist). Suicide risk data on new arrivals should be available at the meeting to alert custody staff. Clinical concerns should be discussed.

   4) Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub Institutions: When an inmate is referred to the Administrative Segregation Unit Enhanced Outpatient Program level of care, there should be a 60 day period of time before the receiving Administrative Segregation Unit Hub Institution can refer the inmate-patient back to Correctional Clinical Case Management System level of care.

D. Quality Management

   1) Auditing Case Manager Review of Rounds Notes: Institutional mental health supervisors should regularly audit Administrative Segregation Unit case manager's assessment/review of the License Psychiatric Technician weekly notes including who needs referral for further evaluation for higher level of care.

   2) Audit of Screening Refusals: Supervisory staff should regularly audit the percentage of inmates who refuse initial Administrative Segregation Unit mental health screening interviews. If the frequency of refusals exceeds 30% in a 30-day period, a Quality Improvement Team should be created to determine the cause of the refusals and a strategy to improve voluntary participation by inmates in the screening process.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

3) Audit of Administrative Segregation Unit Suicide Prevention: Regional Quality Management Assistance Teams should regularly audit the quality of suicide prevention efforts statewide in Administrative Segregation Unit including adherence to all Mental Health Services Delivery System Program Guide requirements, evaluation of the quality of screening and rounds, quality of the daily staff meeting, adherence to suicide prevention measures such as provision of an inmate-orientation pamphlet, and compliance with out-of-cell contacts. A report should be sent through the chain of command to the Health Care Manager and Warden of each institution, and reviewed by the Suicide Prevention and Response Focused Improvement Team.

E. Non-Disciplinary Segregation

Inmates in Administrative Segregation Units for non-disciplinary reasons should be placed in different housing and/or receive more property than is allowed in disciplinary segregation.

F. Custody Welfare Checks

Custody hourly rounds standard, should be increased to include a welfare check every 30 minutes to determine that every inmate is alive, and accounted for.

G. Double Celling

Every effort should be made to double-cell inmates in Administrative Segregations Units, when possible.

H. Emergency Response – Continuous Quality Improvement

Continuous Quality Improvement in Emergency Response is critical to preventing suicides. The Department should make every effort to ensure compliance with current policies.

V. CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION'S RESPONSES TO RECOMMENDATIONS AND IMPLEMENTATION PLAN

The following describes the plan to implement suicide prevention recommendations in Administrative Segregation Units. Recommendations that were not fully adopted are discussed.

A1)    Intake Cells:

A percentage of cells in each Administrative Segregation Unit statewide will be retrofitted to reduce the opportunity for inmates to commit suicide. The institutions have been surveyed to determine average intake by Administrative Segregation Unit building and the most appropriate location for the "Intake Cells" based upon proximity to staff traffic and ease of observation from control booths, where applicable. The number and location of cells to be retrofitted has been developed based upon the data received from the institutions, (See Attachments B and C). Inmates newly housed into Administrative Segregation Units will be housed in these intake cells, when they cannot be celled with a cell partner. Inmates that are double celled upon intake will be celled where the vacancy

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

exists.    The Department recommends that inmates be housed in intake cells for a
minimum of 72 hours.  These cells will be located in areas that afford more opportunity
for observation and interaction between custody staff and the inmate. (Note: Subsequent
to the expert panel, Suicide Prevention and Response Focused Improvement Team
determined that if, on initial arrival in Administrative Segregation Unit, an inmate can
safely be housed with a cellmate, then the inmate would not need to be placed into one of
the designated intake cells, since having a cellmate has proven to be a protective factor
against suicide risk.)

**A2)    Retrofit Intake Cells:**
The Division of Adult Institutions has identified 406 cells disbursed among 64 housing
units at 33 adult prisons to be designated as Administrative Segregation Unit Intake Cells.
To the degree possible, the proposed intake cells will be retrofitted to reduce availability
of hanging attachment points.  Proposed retrofit modifications include:
- the installation of concrete slab beds,
- the elimination of protrusions in the cell,
- the replacement of cell vents or the installation of cell vent coverings,
- the replacement of cell light fixtures or the installation of light coverings, and
- the replacement or modification of cell doors to increase visibility of cell interior.

Given the diversity (physical plant design, age, construction materials, etc.) of the
Administrative Segregation Unit cells at each of the Department's prisons, the
Department must be thoughtful, discerning, and deliberate in their planning and
implementation of the proposed retrofits.  The Office of Facilities Management must
perform site-by-site Architectural and Engineering assessments (architectural, structural,
mechanical) to develop project scopes, designs, project cost estimates and schedules.
Architectural and Engineering design is imperative given potential impacts to: building
foundations due to the weight of proposed concrete bed slabs; to Heating, Ventilation,
and Air Conditioning systems; and air and smoke evacuation flows due to vent
coverings/modifications, and to the integrity of cell security due to the need for increased
cell visibility.

Based upon a priority list developed by the Division of Correctional Health Care
Services, the Office Of Facilities Management has developed a three phase plan to assess,
design and implement the proposed physical plant retrofit.  The Office of Facilities
Management estimates that the conversion of all 406 cells can be accomplished using a
three-phased approach with the following schedule:
- **Phase one** includes 160 cells disbursed among 27 housing units at 11 prisons.
  The Office of Facilities Management will conduct site-by-site Architectural and
  Engineering assessments and associated design work during the 2007/2008 Fiscal
  Year, with construction modifications (special repairs) taking place during the
  2008/2009 Fiscal Year.
- **Phase two** includes 132 cells disbursed among 21 housing units at 11 prisons.
  The Office of Facilities Management will conduct site-by-site Architectural and
  Engineering assessments and associated design work during the 2008/2009 Fiscal

Case 2:90-cv-00520-KJM-SCR    Document 3232-1    Filed 10/30/08    Page 20 of 56
Case 2:90-cv-00520-LKK-JFM    Document 1990    Filed 10/02/2006    Page 11 of 36

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

Year with construction modifications (special repairs) taking place during the 2009/2010 Year.

- **Phase three** includes 114 cells disbursed among 16 housing units at 11 prisons. The Office of Facilities Management will conduct site-by-site Architectural and Engineering assessments and associated design during the 2009/2010 Fiscal Year with construction modifications (special repairs) taking place during the 2010/2011 Fiscal Year.

**B1) Title 15 Requirements:**

The Department will ensure Title 15 requirements for out of cell time and privileges are a priority for all inmates during the first three weeks after placement in the Administrative Segregation Unit.

Institutions will be directed to develop methods to identify inmates in their first three days of Administrative Segregation Unit placement to staff in the units. An identifying marker, including date of intake, will be used on the cell front to indicate where newly placed Administrative Segregation Unit inmates are housed upon intake.

Within the constraints of physical plant limitations, every institution is expected to immediately ensure that inmates in the Administrative Segregation Units are offered access to the exercise yard for the departmental minimums, as identified in the California Code of Regulations, 3343(h). Institutions with Small Management Yard facilities should offer newly placed Administrative Segregation Unit inmates access to "Walk-Alone" yard as quickly as possible, within the guidelines of the classification process, and with safety and security as top priorities.

Staff shall account for out-of-cell time for inmates assigned to Administrative Segregation Unit, including, but not limited to, California Department of Corrections and Rehabilitation 114-D, Segregation Order and California Department of Corrections and Rehabilitation Rule Violation Report hearings, Unit Classification Committee, Institutional Classification Committee, medical ducats, interviews, visiting, showers, yard and all other out of cell periods. All out-of-cell time for inmates assigned to Administrative Segregation Unit shall be documented on the California Department of Corrections 114-A, Detention/ Segregation Record. Institutions shall continue to audit the California Department of Corrections 114-A, Detention/ Segregation Records on a weekly basis to ensure compliance with departmental mandates.

Presently, the Office of Audits and Compliance completes reviews throughout the year of administrative segregation and due process operations at various institutions. One portion of this audit evaluates institutional compliance with access to exercise yards for inmates housed in Administrative Segregation. These reports are submitted to the Directorate and assigned to the appropriate Associate Director for assessment and response.

No later than **October 30, 2006,** a survey will be distributed to every institution that maintains Administrative Segregation Units. Each institution will be directed to provide

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

current information regarding the number and location of Small Management Yards for inmates housed in Administrative Segregation Units. In addition, on a monthly basis each institution will be required to assess, record, and track the current yard access provided to inmates in Administrative Segregation Unit. Finally, each institution will need to provide a list of barriers to meeting the mandated hours of yard access, (i.e. staffing issues, physical plant issues, etc.). This information will be used to assess the need for additional resources to meet the mandated out of cell time.

For the past several years, the Department has been implementing a plan to increase the number of Small Management Yards available as part of the Department's Five Year Infrastructure Plan. A recent review reflects the Department's total Small Management Yard need at 1,342 yards, with 921 being constructed and/or funded as of Fiscal Year 2006/2007. This leaves 441 Small Management Yards that need to be funded and constructed in future years. The Division of Adult Institutions and Office of Facilities Management will continue to work collaboratively to assess current allocation and location of Small Management Yards at each institution and incorporate the findings of the aforementioned survey into the Small Management Yard planning process. The Administration will continue to request additional resources, to the extent needed, through the annual budget process, (See below Section VII *Fiscal Impact*).

**B2)**     **Confidential Mental Health Interviews:**
Current estimates indicate that appropriate space in Administrative Segregation Units can be prioritized for the purpose of providing Confidential Mental Health Interviews. The Division of Adult Institutions and Office of Facilities Management will work collaboratively to assess current space availability for these interviews at each institution to validate these current estimates. In addition, Division of Adult Institutions and Office of Facilities Management will complete an assessment of additional resources needed (plant and staffing)[1]. The Administration will request additional resources, to the extent needed, through the annual budget process, (See below Section VII *Fiscal Impact*).

**B3)**     **Reduction in Length of Stay:**
A Sensitive Needs Yard for Level IV inmates will be available at Mule Creek State Prison in January 2007, which is expected to reduce length of stay for qualifying inmates.

In December 2005, Mr. Dave Runnels, then Deputy Director of the Division of Adult Institutions, directed institutions in Administrative Segregation Overflow status to begin producing Corrective Action Plans outlining the institution's plan to reduce the number of inmates in Administrative Segregation Unit Overflow. These reports are submitted and reviewed on a monthly basis.

In addition, a separate weekly report is compiled by the Institution Support Division, detailing the status of all Administrative Segregation Unit buildings in terms of current

---

[1] This assessment will consider the appropriation recently approved by the Legislature for the Budget Change Proposal that was submitted in August 2006, which included dedicated custody personnel assigned to Administrative Segregation Unit mental health escorts, and additional clinical staff for Administrative Segregation Units statewide.

Case 2:90-cv-00520-KJM-SCR    Document 3232-1    Filed 10/30/08    Page 22 of 56
Case 2:90-cv-00520-LKK-JFM    Document 1990    Filed 10/02/2006    Page 13 of 36

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

capacity, population and single-cell inmates, (See Attachment D). Issues related to Administrative Segregation Unit housing that are identified in this review are referred to the appropriate Associate Director for response and follow-up. Conference Calls with impacted Wardens are periodically scheduled to develop strategies for Administrative Segregation Unit reduction through timely release of inmates, completion of investigations and disciplinary proceedings.

On a monthly basis, the Office of Audits and Compliance completes an *Audit of Administrative Segregation and Due Process Operations* at a different prison. While this audit does not specifically address the issue of "Length of Stay", it does evaluate that institution's compliance with the 90 day review of cases. These reports are submitted to the Directorate and assigned to the appropriate Associate Director for assessment and response.

The Computer Statistics (or COMPSTAT) review process implemented in April 2006 by the Secretary of Corrections is an in-depth analysis of each institution's performance based upon statistical data. This information is compiled by the COMPSTAT unit and shared with the Secretary of Corrections and the Director of the Division of Adult Institutions, among others, during a formal presentation. The COMPSTAT format has been modified to include the Administrative Segregation Average Length of Stay for both Administrative Segregation Units and Administrative Segregation Unit Overflows.

The Division of Adult Institutions is working to identify barriers to the transportation of endorsed inmates to appropriate programs from Administrative Segregation Units throughout the State. The Director of Corrections will be issuing a memorandum to all institutions directing them to review the status of all inmates currently in Administrative Segregation Unit with stays beyond 30 days. Institutions will be required to identify inmates awaiting transfer, disciplinary hearings and District Attorney review. In addition, the memorandum will direct institutions to take aggressive steps to ensure the expeditious release of inmates from the Administrative Segregation setting, as soon as possible within Departmental policy.

*The Department has reviewed and adopts each of the recommendations stated above in Section IV. subsections B4 through D3. In order to implement these recommendations the Department plans to complete the following:*

**B4)    Return-from-Court ("Bad News") Information:**
A policy change adopting the aforementioned recommendation will be implemented system-wide by December 2006. In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C1)    Pre-placement Suicide Prevention Screening:**
A pre-placement suicide prevention screening in accordance with the aforementioned recommendation will be implemented by June 2007.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

---

**C2)**  **Post-placement Screening:**
Direction was provided to institutional staff via the following memoranda:

- *Transfer of Mental Health Tracking System Suicide History Information,* (Attachment E), and
- *Plan to Reduce Suicide Risk in Administrative Segregation Units,* (Attachment F).

In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C3)**  **Daily Coordination:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**C4)**  **Minimum Stay at Enhanced Outpatient Administrative Segregation Unit Hub Institutions:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**D1)**  **Auditing Case Manager Review of Weekly Rounds Notes:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F). In addition, the Department will update the Mental Health Services Delivery System Program Guide to include this recommendation during the annual revision in January 2007.

**D2)**  **Audit of Screening Refusals:**
Direction was provided to institutional staff via the *Plan to Reduce Suicide Risk in Administrative Segregation Units* Memorandum, (Attachment F), with an audit system to be developed by the end of October 2006. A memorandum will be distributed in November 2006 system-wide requiring an audit of compliance. In addition, the Quality Management Assistance Team will conduct an initial audit of compliance at selected institutions in January 2007, and at all institutions in March 2007.

**D3)**  **Audit of Administrative Segregation Unit Suicide Prevention:**
The Quality Management Assistance Team will conduct an initial audit of compliance, as recommended above, at selected institutions in January 2007, and at all institutions in March 2007.

---

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

**E)**    **Non-Disciplinary Segregation**

The Division of Adult Institutions believes the recommendation for separate housing and/or property retention by inmates placed in Administrative Segregation Unit housing for non-disciplinary reasons would compromise the safety and security of the institution, it's staff and inmates remanded to the custody of the Department.

Providing inmates who are in Administrative Segregation Units for non-disciplinary reasons with more personal property than those who are in Administrative Segregation Units for disciplinary reasons may lead to stigmatization and possible retribution of other inmates. The Division of Adult Institutions believes that inmates allowed additional property would be subjected to pressure in the form of threats of physical attack, and psychological torment. This pressure would be intended to influence those inmates to relinquish their personal property to other inmates placed in Administrative Segregation Unit for disciplinary reasons. In addition, this change would readily identify inmates processed into Administrative Segregation Unit with their property as being confidential informants or as needing special protection from General Population inmates. Any of these circumstances would make the non-disciplinary inmates difficult to house on any general population facility for the remainder of their prison term.

Attempting to accomplish this by separating inmates within the housing unit may work for short periods of time, but Administrative Segregation Unit populations vary too significantly to rely on the disciplinary/non-disciplinary qualifier as a secure and practical determinant of housing. Some institutions may be able to utilize different tiers or sections of housing units to separate these populations, however, the demands on bed-space would ultimately result in these populations being housed in proximity to one another.

Due to the Department's current housing crisis, separate housing for inmates placed in Administrative Segregation Units for disciplinary and non-disciplinary reasons is unreasonable. This modification would seriously reduce available bed space for both Administrative Segregation and General Population housing.

In addition, an inmate's placement status into an Administrative Segregation Unit is not usually as simple as disciplinary/non-disciplinary. Many inmates who do not have pending disciplinary issues, but fear for their safety, have this fear as a result of behavior that is inconsistent with State Law, Departmental Regulations, and Institution Policies. Examples of these behaviors are participating in narcotics activity for which the inmate fails to pay, or gang activity where the inmate is unable to follow through with activities the gang has ordered.

The Department maintains continued skepticism regarding additional property allowances for non-disciplinary Administrative Segregation Unit placement inmates. However, the Division of Adult Institutions will assess the success of the property portion of the Madrid court-ordered Pilot Project at Pelican Bay State Prison (Pelican Bay State Prison Administrative Segregation Correctional Clinical Case Management System Mental Health Management Program) following the one year anniversary of its implementation, beginning on **March 6, 2007**. The assessment will be submitted to the Court no later than **May 31, 2007**.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

---

**F)    Custody Welfare Checks**

The American Correctional Association standard for a "Welfare Check" is, *"All special management inmates shall be personally observed by a correctional officer at least every 30 minutes at an irregular schedule. Inmates who are violent or mentally disordered or who demonstrate unusual or bizarre behavior shall receive more frequent observation."* American Correctional Association 4-4257.

Currently, custody staff assigned to Administrative Segregation Units are required to perform *hourly* security checks to ensure inmates are accounted for and secured within their assigned housing. Requiring a 'Welfare Check' of all inmates housed in Administrative Segregation Unit *every 30 minutes* would further strain the resources available to the Department.

The Division of Adult Institutions is unable to proceed with the recommendations of the experts as they relate to hourly Welfare Checks at this time. However, Division of Adult Institutions will re-evaluate the impact of implementation of this proposal in terms of workload impact and resource allotment. Division of Adult Institutions will complete an assessment of resources necessary to implement this recommendation, and submit a request for resources to the Legislature through the budgetary process.

**G)    Double Celling**

The California Department of Corrections and Rehabilitation currently double-cells inmates in Administrative Segregation whenever possible. Institutions with physical plant limitations (over/under cell design) house inmates in single-cell situations for extended periods of time. In addition, some inmates have classification criteria that prohibit double-celling. Wardens will be encouraged to place inmates into double-celled housing whenever possible, especially when the inmate is initially placed into Administrative Segregation Unit.

**H)    Emergency Response**

The California Department of Corrections and Rehabilitation is reviewing and aggressively investigating failures by staff to initiate Cardio-Pulmonary Resuscitation during emergency response.

The Director of the Division of Adult Institutions will be issuing a memorandum directing Wardens to provide all assigned Administrative Segregation Unit staff with refresher training regarding their responsibility to immediately initiate Cardio-Pulmonary Resuscitation when the inmate's condition warrants Cardio-Pulmonary Resuscitation. This training will be ordered to be completed no later than **October 31, 2006**, with Proof of Practice submitted to the appropriate Associate Director.

Division of Correctional Health Care Services
Administrative Segregation Unit Suicide Reduction Plan

___

## VI.    CLINICAL ROUNDING IN ADMINISTRATIVE SEGREGATION UNITS

The Department will continue to provide daily rounds by a Licensed Psychiatric Technician (or by a mental health clinician) for all inmates housed in Administrative Segregation Units. Resources to facilitate compliance with this requirement were included with the Budget Change Proposal that was submitted to the Legislature in August 2006. The Mental Health Services Delivery System Program Guide will be revised through the annual revision procedure in January 2007 to delete language that indicates possible future reduction in this requirement for inmate-patients not included in the Mental Health Services Delivery System.

## VII.    FISCAL IMPACT

To the extent that components in this plan are found to result in the need for additional resources, the Administration will submit a budget request to the Legislature for consideration through the annual budget process. Requests are made to the Legislature in January, and can also be made during the spring process. To the extent that resources are needed in the current fiscal year, these resources could be secured through either Item 9840-001-0001, Budget Act of 2006, or through a supplemental appropriation from the Legislature, whichever is determined to be most appropriate.

___

ATTACHMENT A

STATE OF CALIFORNIA

ADMINISTRATIVE SEGREGATION UNIT SUICIDE PREVENTION PLAN

DEPARTMENT OF CORRECTIONS & REHABILITATION

## CONTRIBUTING FACTOR ANALYSIS – SUICIDES IN ASU

Reviewer: _____    Institution: _____    CDC#: _____

Inmate's Age at time of death: ___    Ethnicity: ___    LOC: ___    Custody Level: ___

| Mental Health Treatment | Family/External Social Issues | Custodial Factors | In-Prison Safety/Social Issues | Substance Abuse | Other |
|---|---|---|---|---|---|
| Decompensation | Bereavement | Commitment time | Fearful | Type | Poor communication between custody and MH staff |
| Poor follow-up | Other loss | Change in commitment time | Assault victim | | Poor identification of individual needs that should have over-ridden ASU rules. Rule |
| Non-compliance | Lack of support | Paroling | Received threats | | Emergency Response |
| Inadequate treatment | Perceived threat to family | DA referral | Debts | | Medical Condition |
| Emotional change in response to stress factors | | RVRs – 90 days | Relationship | | |
| Cognitive change in response to stress factors | | Long ASU > 90 days | Other | | |
| Inadequate Suicide Risk Assessment | | SHU term | | | |
| | | Fact of ASU placement | | | |
| | | First time in ASU | | | |
| | | Violent RVR | | | |
| | | Single Cell | | | |

Page 1 of 2

September 25, 2006

ADMINISTRATIVE SEGREGATION UNIT SUICIDE PREVENTION PLAN

## LIST OF ACRONYMS

ASU    Administrative Segregation Unit

CDC    California Department of Corrections

LOC    Level of Care

MH    Mental Health

DA    District Attorney

RVR    Rules Violation Report

SHU    Secured Housing Unit

September 25, 2006

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEPT 05 INTAKE | DEC 05 INTAKE | MAR 06 INTAKE | JUNE 06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 3-DAY INTAKE | # OF CELLS TO BE MODIFIED | CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| ASP - UNIT 140 | 270 | 30 | 70 | 100 | 120 | 80 | 7.87 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CAL - ASU #1 | Stand Alone | 24 | 26 | 24 | 26 | 25 | 2.46 | 3 | 100, 101, 102 |
| CAL - A5 | 270 | 71 | 93 | 83 | 75 | 80.5 | 7.92 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CCC - LASSEN, Bldg 4 | 270 | 120 | 50 | 120 | 80 | 92.5 | 9.10 | 9 | 123, 124, 125, 126, 127, 224, 225, 226, 227 |
| CCI - UNIT II | Old Style | 39 | 29 | 19 | 49 | 34 | 3.34 | 3 | |
| CCI - 4A ASU | 180 | 87 | 143 | 78 | 125 | 108.25 | 10.65 | 11 | 111, 112, 113, 114, 115, 116, 212, 213, 214, 215, 216 |
| CCI - 4B ASU | 180 | 19 | 23 | 27 | 38 | 26.75 | 2.63 | 3 | 113, 114, 115 |
| CCWF | 270 | 33 | 38 | 58 | 42 | 42.75 | 4.20 | 4 | 124, 125, 126, 127 |
| CEN - C6 | Stand Alone | 112 | 106 | 96 | 114 | 107 | 10.52 | 11 | 101 through 111 |
| CEN - A5 | 270 | 99 | 56 | 73 | 77 | 76.25 | 7.50 | 8 | 124, 125, 126, 127, 224, 225, 226, 227 |
| CIM - PALM HALL | Telephone | 80 | 75 | 80 | 70 | 76.25 | 7.50 | 8 | 118 through 125 |
| CIM - CYPRESS HALL | Telephone | 70 | 80 | 75 | 80 | 76.25 | 7.50 | 8 | 110 through 117 |
| CIW | 270 | 20 | 130 | 110 | 30 | 72.5 | 7.13 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| CMC - Central ASU | Quad | 152 | 165 | 143 | 190 | 162.5 | 15.98 | 16 | 4151, 4152, 4197, 4198, 4254, 4255, 4256, 4257, 4295, 4296, 4297, 4298, 4302, 4303, 4345, 4346 |
| CMC - B4 Annex | Quad | 9 | 9 | 16 | 21 | 13.75 | 1.35 | 1 | 102 |
| CMF - UNIT IV | Telephone | 29 | 35 | 14 | 35 | 28.25 | 2.78 | 3 | 101, 102, 103 |
| CMF - I3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| CMF - P3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| CMF - S3 | Telephone | 20 | 20 | 20 | 20 | 20 | 1.97 | 2 | 301, 302 |
| COR - 3A03 | 270 | 50 | 56 | 84 | 50 | 60 | 5.90 | 6 | 123, 124, 125, 126, 127, 128 |
| COR - ASU1 | Stand Alone | 31 | 42 | 85 | 50 | 52 | 5.11 | 5 | 101 through 105 |
| COR - 4B1R | 180 | 29 | 29 | 29 | 29 | 29 | 2.85 | 3 | 113, 114, 115 |
| CTF - O WING | Telephone | 40 | 80 | 100 | 95 | 78.75 | 7.75 | 8 | 101 through 108 |
| CTF - X WING | Telephone | 20 | 40 | 50 | 45 | 38.75 | 3.81 | 4 | 101 through 104 |
| CVSP | 270 | 74 | 115 | 61 | 105 | 88.75 | 8.73 | 9 | 123, 124, 125, 126, 127, 224, 225, 226, 227 |
| DVI - J WING | Telephone | 300 | 300 | 300 | 300 | 300 | 29.51 | 30 | 101 through 130 |
| FSP - UNIT IV ASU | Telephone | 60 | 60 | 60 | 70 | 62.5 | 6.15 | 6 | 101 through 106 |
| FSP - UNIT I ASU O/F | Telephone | 18 | 14 | 14 | 26 | 18 | 1.77 | 2 | 101, 102 |

September 25, 2006

Case 2:90-cv-00520-KJM-SCR   Document 3232-1   Filed 10/30/08   Page 30 of 56
Case 2:90-cv-00520-LKK-JFM   Document 1990   Filed 10/02/2006   Page 21 of 36

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEP 05 INTAKE | DEC 05 INTAKE | MAR 06 INTAKE | JUNE 06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 3 DAY INTAKE | # OF CELLS TO BE MODIFIED | THE CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| HDSP - Z UNIT | Stand Alone | 14 | 20 | 21 | 20 | 18.75 | 1.84 | 2 | 101, 102 |
| HDSP - D7 | 180 | 31 | 20 | 16 | 21 | 22 | 2.16 | 2 | 113 & 114 |
| HDSP - D8 | 180 | 56 | 46 | 49 | 52 | 50.75 | 4.99 | 5 | 112, 113, 114, 115, 116 |
| ISP - A5 | 270 | 41 | 46 | 36 | 79 | 50.5 | 4.97 | 5 | 123, 124, 125, 126, 127 |
| KVSP - ASU #1 | Stand Alone | | | | | 0 | 0.00 | 5 | 101 through 105 |
| KVSP - ASU #2 | Stand Alone | | | | | 0 | 0.00 | 5 | 101 through 105 |
| KVSP - B1 | 180 | | | | | 0 | 0.00 | 10 | 112, 113, 114, 115, 116, 212, 213, 214, 215, 216 |
| LAC - ASU1 | Stand Alone | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 101 through 107 |
| LAC - A5 | 270 | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| LAC - A4 | 270 | 61 | 49 | 61 | 106 | 69.25 | 6.81 | 7 | 124, 125, 126, 127, 224, 225, 226 |
| MCSP - Fac C, Bldg 12 | 270 | 24 | 30 | 32 | 43 | 32.25 | 3.17 | 3 | 124, 125, 126 |
| NKSP - D6 | Wing Nut | 60 | 50 | 60 | 40 | 52.5 | 5.16 | 5 | 101, 102, 103, 143, 144 |
| NKSP - A4 | Wing Nut | 30 | 40 | 30 | 50 | 37.5 | 3.69 | 4 | 101, 102, 103, 104 |
| PBSP - ASU 1 | Stand Alone | 50 | 51 | 50 | 51 | 50.5 | 4.97 | 5 | 101 through 105 |
| PBSP - A1 | 180 | 13 | 6 | 25 | 48 | 23 | 2.26 | 2 | 113, 114 |
| PBSP - A2 | 180 | 13 | 25 | 0 | 25 | 15.75 | 1.55 | 2 | 113, 114 |
| PVSP - ASU #1 | Stand Alone | 40 | 78 | 66 | 76 | 65 | 6.39 | 6 | 101 through 106 |
| PVSP - Fac D | 270 | 35 | 27 | 32 | 38 | 33 | 3.25 | 3 | 124, 125, 126 |
| RJD - Fac 2, Bldg 6 | 270 | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| RJD - Fac 2, Bldg 7 | 270 | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| SAC - ASU | Stand Alone | 41 | 49 | 47 | 64 | 50.25 | 4.94 | 5 | 101 through 105 |
| SAC - A6 | 180 | 38 | 25 | 23 | 26 | 28 | 2.75 | 3 | 113, 114, 115 |
| SAC - A7 | 180 | 0 | 0 | 31 | 48 | 19.75 | 1.94 | 2 | 113, 114 |
| SATF - ASU | Stand Alone | 48 | 54 | 42 | 63 | 51.75 | 5.09 | 5 | 101 through 105 |
| SATF - Fac E | 270 | 24 | 66 | 63 | 38 | 47.75 | 4.70 | 5 | 123, 124, 125, 126, 127 |
| SCC | 270 | 162 | 104 | 121 | 80 | 116.75 | 11.48 | 12 | 123, 124, 125, 126, 127, 128, 223, 224, 225, 226, 227, 228 |
| SOL - FAC 2, BLDG 10 | 270 | 63 | 36 | 70 | 57 | 56.5 | 5.56 | 6 | 123, 124, 125, 126, 127, 128 |
| SOL - FAC 2, BLDG 9 | 270 | 50 | 30 | 30 | 30 | 35 | 3.44 | 3 | 124, 125, 126 |

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

| PRISON | BUILDING DESIGN | SEPT '05 INTAKE | DEC '05 INTAKE | MAR '06 INTAKE | JUNE '06 INTAKE | AVERAGE MONTHLY INTAKE | AVERAGE 30 DAY INTAKE | # OF CELLS TO BE MODIFIED | CELLS TO BE MODIFIED |
|---|---|---|---|---|---|---|---|---|---|
| SQ - CARSON UNIT | Telephone | 150 | 150 | 150 | 150 | 150 | 14.75 | 15 | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| SQ - CARSON UNIT | Telephone | 150 | 150 | 150 | 150 | 150 | 14.75 | 15 | 8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23 |
| SVSP - D1 | 180 | | | | 0 | 0 | 0.00 | 4 | |
| SVSP - D2 | 180 | | | | 0 | 0 | 0.00 | 4 | |
| SVSP - D8 | 180 | | | | 0 | 0 | 0.00 | 4 | |
| SVSP - D9 | Stand Alone | 62 | 94 | 97 | 82 | 83.75 | 8.24 | 7 | |
| VSPW | 270 | 33 | 13 | 23 | 10 | 19.75 | 1.94 | 2 | 124, 125 |
| WSP - D6 | Wing Nut | 120 | 120 | 120 | 120 | 120 | 11.80 | 12 | 101, 102, 103, 104, 105, 106, 143, 144, 145, 146, 147, 148 |
| WSP - FAOR | 270 | 30 | 30 | 30 | 30 | 30 | 2.95 | 3 | 124, 125, 126 |

Page 3 of 4

September 25, 2006

Attachment B

# ADMINISTRATIVE SEGREGATION UNIT INTAKE CELL CONVERSION ANALYSIS CHART

## LIST OF PRISON ACRONYMS

| Institution | |
|---|---|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FSP | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

September 25, 2006

Attachment C

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

| PRISON | BUILDING DESIGN | # OF CELLS IN UNIT | # OF CELLS TO BE MODIFIED | % OF CELLS UP TO BE MODIFIED |
|---|---|---|---|---|
| ASP - UNIT 140 | 270 | 100 | 8 | 8.00% |
| CAL - ASU #1 | Stand Alone | 100 | 3 | 3.00% |
| CAL - A5 | 270 | 100 | 8 | 8.00% |
| CCC - LASSEN, Bldg 4 | 270 | 100 | 9 | 9.00% |
| CCI - UNIT II | Old Style | 24 | 3 | 12.50% |
| CCI - 4A ASU | 180 | 64 | 11 | 17.19% |
| CCI - 4B ASU | 180 | 64 | 3 | 4.69% |
| CCWF | 270 | 35 | 4 | 11.43% |
| CEN - C6 | Stand Alone | 100 | 11 | 11.00% |
| CEN - A5 | 270 | 100 | 8 | 8.00% |
| CIM - PALM HALL | Telephone | 102 | 8 | 7.84% |
| CIM - CYPRESS HALL | Telephone | 102 | 8 | 7.84% |
| CIW | 270 | 32 | 7 | 21.88% |
| CMC - B4 Annex | Quad | 151 | 16 | 10.60% |
| CMC - Central ASU | Quad | 104 | 1 | 0.96% |
| CMF - UNIT IV | Telephone | 150 | 3 | 2.00% |
| CMF - I3 | Telephone | 38 | 2 | 5.26% |
| CMF - P3 | Telephone | 38 | 2 | 5.26% |
| CMF - S3 | Telephone | 18 | 2 | 11.11% |
| COR - 3A03 | 270 | 100 | 6 | 6.00% |
| COR - ASU1 | Stand Alone | 100 | 5 | 5.00% |
| COR - 4B1R | 180 | 64 | 3 | 4.69% |
| CTF - O WING | Telephone | 144 | 8 | 5.56% |
| CTF - X WING | Telephone | 84 | 4 | 4.76% |
| CVSP | 270 | 100 | 9 | 9.00% |
| DVI - J WING | Telephone | 143 | 30 | 20.98% |
| FSP - UNIT IV ASU | Telephone | 138 | 6 | 4.35% |
| FSP - UNIT I ASU O/F | Telephone | 36 | 2 | 5.56% |
| HDSP - Z UNIT | Stand Alone | 100 | 2 | 2.00% |
| HDSP - D7 | 180 | 64 | 2 | 3.13% |
| HDSP - D8 | 180 | 64 | 5 | 7.81% |
| ISP - A5 | 270 | 100 | 5 | 5.00% |
| KVSP - ASU #1 | Stand Alone | 100 | 5 | 5.00% |
| KVSP - ASU #2 | Stand Alone | 100 | 5 | 5.00% |
| KVSP - B1 | 180 | 64 | 10 | 15.63% |
| LAC - ASU1 | Stand Alone | 100 | 7 | 7.00% |
| LAC - A5 | 270 | 100 | 7 | 7.00% |
| LAC - A4 | 270 | 100 | 7 | 7.00% |
| MCSP - Fac C, Bldg 12 | 270 | 100 | 3 | 3.00% |

Attachment C

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

| PRISON | BUILDING DESIGN | TOTAL CELL IN UNIT | # CELLS MODIFIED | % OF CELLS TO BE MODIFIED |
|---|---|---|---|---|
| NKSP - D6 | Wing Nut | 100 | 5 | 5.00% |
| NKSP - A4 | Wing Nut | 100 | 4 | 4.00% |
| PBSP - ASU 1 | Stand Alone | 100 | 5 | 5.00% |
| PBSP - A1 | 180 | 100 | 2 | 2.00% |
| PBSP - A2 | 180 | 100 | 2 | 2.00% |
| PVSP - ASU #1 | Stand Alone | 100 | 6 | 6.00% |
| PVSP - Fac D | 270 | 100 | 3 | 3.00% |
| RJD - Fac 2, Bldg 6 | 270 | 100 | 12 | 12.00% |
| RJD - Fac 2, Bldg 7 | 270 | 100 | 12 | 12.00% |
| SAC - ASU | Stand Alone | 100 | 5 | 5.00% |
| SAC - A6 | 180 | 64 | 3 | 4.69% |
| SAC - A7 | 180 | 64 | 2 | 3.13% |
| SATF - ASU | Stand Alone | 100 | 5 | 5.00% |
| SATF - Fac E | 270 | 100 | 5 | 5.00% |
| SCC | 270 | 100 | 12 | 12.00% |
| SOL - FAC 2, BLDG 10 | 270 | 100 | 6 | 6.00% |
| SOL - FAC 2, BLDG 9 | 270 | 100 | 3 | 3.00% |
| SQ - CARSON UNIT | Telephone | 238 | 15 | 6.30% |
| SQ - DONNER UNIT | Telephone | 152 | 15 | 9.87% |
| SVSP - D1 | 180 | 64 | 4 | 6.25% |
| SVSP - D2 | 180 | 64 | 4 | 6.25% |
| SVSP - D8 | 180 | 64 | 4 | 6.25% |
| SVSP - D9 | Stand Alone | 100 | 7 | 7.00% |
| VSPW | 270 | 44 | 2 | 4.55% |
| WSP - D6 | Wing Nut | 100 | 12 | 12.00% |
| WSP - FAOR | 270 | 100 | 3 | 3.00% |
| | | 5977.00 | 406.00 | 6.79% |

September 25, 2006

Page 2 of 3

Attachment C

# PERCENTAGE OF ADMINISTRATIVE SEGREGATION UNIT CELLS TO BE MODIFIED TO INTAKE CELLS

## LIST OF PRISON ACRONYMS

| Institution | |
|---|---|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FSP | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

Attachment D

# Weekly Population/Budgeted Capacity Division of Adult Institution Analysis

## 15-Sep-06

| Institution | Per Fiscal Year 05/06 May Revise Institution Activation Schedule | | | | Weekly Population (Based on Classification Services Unit Weekly Population Report) | | Division of Adult Institution Calculation | | |
|---|---|---|---|---|---|---|---|---|---|
| | Single Celled Administrative Segregation Cells/Design Capacity | Double Celled Budgeted Capacity Number of Beds | Supplemental Number of Single Celled | % Overflow | Weekly Population | Number of Inmates Single Celled | Number of Cells Required to House Population | Over Single Cell Capacity | Overflow Required |
| ASP | 100 | 175 | 25 | 175% | 141 | 5 | 73 | NO | NO |
| CAL | 200 | 300 | 100 | 150% | 304 | 20 | 162 | YES | NO |
| CCC | 100 | 175 | 25 | 175% | 170 | 0 | 85 | NO | NO |
| CCI**** | 210 | 327 | 93 | 156% | 277 | 114 | 196 | NO | NO |
| CEN | 200 | 350 | 50 | 175% | 293 | 66 | 180 | NO | NO |
| CIM/CRC | 203 | 356 | 50 | 175% | 290 | 44 | 167 | NO | NO |
| CMC | 226 | 226 | 226 | 100% | 254 | 216 | 235 | YES | YES |
| CMF | 164 | 164 | 164 | 100% | 173 | 173 | 173 | YES | YES |
| COR**** | 307 | 460 | 154 | 150% | 427 | 137 | 282 | NO | NO |
| CTF | 192 | 228 | 156 | 119% | 282 | 183 | 233 | YES | YES |
| CVSP | 100 | 175 | 25 | 175% | 122 | 3 | 63 | NO | NO |
| DVI | 235 | 303 | 167 | 129% | 404 | 156 | 280 | YES | YES |
| FOL | 138 | 138 | 138 | 100% | 188 | 143 | 166 | YES | YES |
| HDSP | 228 | 343 | 113 | 150% | 294 | 102 | 198 | NO | NO |
| ISP | 100 | 175 | 25 | 175% | 211 | 1 | 106 | YES | YES |
| KVSP | 264 | 396 | 132 | 150% | 322 | 40 | 181 | NO | NO |
| LAC | 300 | 450 | 150 | 150% | 410 | 160 | 285 | NO | NO |
| MCSP | 100 | 175 | 25 | 175% | 179 | 79 | 129 | YES | YES |
| NKSP | 100 | 175 | 25 | 175% | 123 | 36 | 80 | NO | NO |
| PBSP**** | 164 | 246 | 82 | 150% | 321 | 75 | 198 | YES | YES |
| PVSP | 200 | 350 | 50 | 175% | 311 | 14 | 183 | NO | NO |
| RJD | 200 | 350 | 50 | 175% | 344 | 162 | 253 | NO | YES |
| SAC | 292 | 406 | 178 | 139% | 281 | 169 | 225 | NO | NO |
| SATF | 200 | 325 | 75 | 163% | 290 | 103 | 197 | NO | NO |
| SCC | 100 | 175 | 25 | 175% | 162 | 3 | 83 | NO | NO |
| SOL | 200 | 350 | 50 | 175% | 410 | 52 | 231 | YES | YES |
| SQ | 379 | 379 | 379 | 100% | 451 | 451 | 451 | YES | YES |
| SVSP | 292 | 439 | 145 | 150% | 440 | 107 | 274 | YES | NO |
| WSP | 100 | 175 | 25 | 175% | 205 | 68 | 137 | YES | YES |
| **FEMALE INSTITUTIONS** | | | | | | | | | |
| CCWF | 35 | 61 | 9 | 174% | 40 | 10 | 25 | NO | NO |
| CIW | 32 | 56 | 8 | 175% | 32 | 0 | 16 | NO | NO |
| VSPW | 44 | 76 | 12 | 173% | 112 | 0 | 56 | YES | YES |
| **Total** | 5705 | 8479 | 2931 | | 8263 | 2892 | 5578 | | |

\* Based on Classification Services Unit Population Management Weekly report. The single celled count reported may not accurately reflect operations at the institutions.

\*\* The number of single celled inmates are subtracted from the population. The population is then divided by 2, providing the number of cells needed to double cell the population. To reach the total number of cells needed, add back in the number of inmate single celled.

\*\*\* Based on the numbers provided and the calculation of cells, whether your institution should be operating in overflow

\*\*\*\*California Correctional Institute, California State Prison - Corcoran, Pelican Bay State Prison house some Administrative Segregation Unit inmates in Secured Housing Units. Those inmates, as reported on the Classification Services Unit Weekly Population report, who are Administrative Segregation Unit inmates in Secured Housing Units beds are backed out of weekly population numbers.

Attachment D

## Weekly Population/Budgeted Capacity Division of Adult Institution Analysis
### 15-Sep-06

## LIST OF ACRONYMS

Institution

| | |
|------|-------------------------------------------------------|
| ASP | Avenal State Prison |
| CAL | Calipatria State Prison |
| CCC | California Correctional Center |
| CCI | California Correctional Institution |
| CCWF | Central California Women's Facility |
| CEN | Centinela State Prison |
| CIM | California Institution for Men |
| CIW | California Institution for Women |
| CMC | California Men's Colony |
| CMF | California Medical Facility |
| COR | Corcoran State Prison |
| CRC | California Rehabilitation Center |
| CTF | Correctional Training Facility |
| CVSP | Chuckawalla Valley State Prison |
| DVI | Deuel Vocational Institution |
| FOL | Folsom State Prison |
| HDSP | High Desert State Prison |
| ISP | Ironwood State Prison |
| KVSP | Kern Valley State Prison |
| LAC | California State Prison, Los Angeles County |
| MCSP | Mule Creek State Prison |
| NKSP | North Kern State Prison |
| PBSP | Pelican Bay State Prison |
| PVSP | Pleasant Valley State Prison |
| RJD | R.J. Donovan Correctional Facility at Rock Mountain |
| SAC | California State Prison, Sacramento |
| SATF | California Substance Abuse Treatment Facility |
| SCC | Sierra Conservation Center |
| SOL | California State Prison, Solano |
| SQ | San Quentin State Prison |
| SVSP | Salinas Valley State Prison |
| VSPW | Valley State Prison for Women |
| WSP | Wasco State Prison |

State of California                                                 California Department of Corrections and Rehabilitation

# Memorandum                                                           Attachment E

Date        :   October 2, 2006

To          :   Health Care Managers
                Chiefs of Mental Health

Subject     :   TRANSFER OF MENTAL HEALTH TRACKING SYSTEM SUICIDE HISTORY
                INFORMATION

Over the last year mental health clinicians have been providing suicide history data regarding their patients to be entered into the Mental Health Tracking System (MHTS) consistent with a *Coleman* court order. This data is then used to generate the Inmate Profile (IP) which includes suicide history and alerts.

Beginning October 2, 2006, whenever a Mental Health Services Delivery System inmate transfers from one California Department of Corrections and Rehabilitation (CDCR) institution to another CDCR institution, or whenever a confidential Medical/Mental Health Transfer Form 7371 is sent, the IP generated by the MHTS will be included in the transfer envelope.

At the receiving institution the IP will be reviewed by the Receiving and Release Registered Nurse (RN) for referral consideration based on current needs and then forwarded to the Mental Health Program for input into the institution's MHTS.

Your local Operating Procedure (OP) should include all points in this process including:

- How MHTS staff at the sending institution is informed that an inmate is transferring so they can generate the IP.

- How MHTS staff will ensure the IP gets to the nursing staff responsible for generating the transfer envelope.

- How the receiving institution will utilize the IP suicide history information in the bus screening process.

- How at the receiving institution the IP is routed to the MHTS staff for input.

- The Operating Procedure for referral of a positive bus screening to mental health clinicians should be reiterated consistent with the Mental Health Program Guides policy.

Health Care Managers
Chiefs of Mental Health
Page 2

All inmates who are being placed in Administrative Segregation Unit shall have the IP generated and reviewed by the Licensed Psychiatric Technician (LPT) prior to their mental health screening (This will require LPTs to have access to the MHTS to generate IPs)

If you have any questions, please contact Margaret McAloon, Ph.D., Chief Psychologist, Clinical Operations, Mental Health Program, Division of Correctional Health Care Services (DCHCS) at (916) 324-6102.


PETER FARBER-SZEKRENYI, DR., P.H.
Director
Division of Correctional Health Care Services


cc:    Brigid Hanson, Deputy Director, DCHCS
       Christine Martin, Special Assistant to the Director, DCHCS
       Yulanda Mynhier, Deputy Director (A), Health Care Administrative Operations
           Branch, DCHCS
       Dwight Winslow, M.D., Statewide Medical Director (A), DCHCS
       Regional Administrators, DCHCS
       Regional Medical Directors, Clinical Services, DCHCS
       Doug McKeever, Program Director, Mental Health Program, DCHCS
       Andrew Swanson, Chief Psychiatrist, Mental Health Program, DCHCS
       Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
       Margaret McAloon, Ph.D., Chief Psychologist, Clinical Operations, Mental
           Health Program, DCHCS
       Senior Psychologist Supervisors and Specialists, DCHCS Headquarters
       Susan Turner, Statewide Director of Nursing, DCHCS
       Lisa Tillman, Deputy Attorney General, Department of Justice
       Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs
       Sharon Riegel, Health Program Specialist, DCHCS

State of California                                      California Department of Corrections and Rehabilitation

# Memorandum

Date      :  October 2, 2006

To        :  Wardens
             Health Care Managers
             Chiefs of Mental Health

Subject   :  **PLAN TO REDUCE SUICIDE RISK IN ADMINISTRATIVE SEGREGATION UNITS**

**BACKGROUND**

On June 8, 2006 the California Department of Corrections and Rehabilitation (CDCR) was
ordered by the *Coleman* court to:

> *"develop . . . a plan for dealing with the escalating percentage of suicides occurring in
> administrative segregation units. The plan must be based on an analysis of the causes for the
> increasing rate and, depending on the outcome of the analysis, provide adequate resources of
> mental health and/or custody staff, create sufficient confidential interview space and/or
> enhance the quality of mental health services provided in administrative segregation units."*

In 2004, 69 percent of the suicides committed in CDCR occurred in Administrative
Segregation Units (ASU), while only approximately five percent of CDCR inmates were in
ASU at any given time. Over time data indicates that about half of the inmates who commit
suicide in ASU are not included in the Mental Health Services Delivery System (MHSDS) at
the time of their death. Inmates are particularly likely to complete suicides during the first
weeks after placement in ASU, with a disproportionate number occurring in the first
72 hours.

Recognizing that housing in ASU places inmates at higher risk, the Department has
implemented a number of initiatives to reduce suicides in ASU over the last two years.
Currently, custody and clinical staff are required to hold daily morning meetings in ASU to
discuss potential suicide risk of new arrivals to the unit, and to communicate about any
inmates who demonstrate changes in behavior. Current policy also requires hourly custody
security checks, and documentation of all pertinent information relative to ASU inmate
services and activities on the CDCR Form 114-A. Additionally, all inmates who arrive in
ASU must receive an orientation pamphlet, which describes some of the stressors related to
placement in ASU, and contains information about how to request mental health services.
Please ensure that all current policies and procedures regarding suicide prevention in ASU
are in place.

In response to the court order, CDCR began to analyze causes of suicides in ASU in order to
formulate a comprehensive suicide prevention plan. The plan integrates a number of
initiatives and involves personnel, policies, and practices across the Division of Adult
Institutions (DAI), the Division of Correctional Health Care Services (DCHCS), and the
Office of Facilities Management (OFM).

CDC 1617 (3/89)

Page 2

Some elements of the plan can be implemented immediately, while others will be implemented over a series of months and years. CDCR has collected initial data required to develop a plan to create ASU Intake Units with cells retrofitted to reduce access to attachment cites for hanging and to increase visibility into the cells.

This memo details initial suicide prevention measures and gives direction on implementation of these policy changes. Additional changes in policies and procedures will be implemented via memoranda and will be incorporated into the MHSDS 2006 Program Guide on an annual basis. All institutions are expected to comply with the changes and implementation timetable, and will be held accountable for compliance and implementation.

## POST-PLACEMENT SCREENING

Currently, all inmates placed into ASU receive the 31-item screening according to MHSDS Program Guide timelines.

Effective immediately, mental health staff shall conduct the screening interviews in private and confidential settings. The settings will afford confidentiality of sight and sound from other inmates, and confidentiality of sound from staff. All mental health appointments, including the screening interviews shall be announced by custody staff as a "health appointment" to avoid stigmatization and possible retribution by other inmates. Every effort shall be made to encourage inmates to attend these appointments.

If an inmate refuses the screening, the clinician shall contact the inmate at his/her cell-front, review the inmate's Unit Health Record (UHR), and contact custodial staff in the inmate's unit to collect information regarding the inmate's mental state. The clinician shall note the inmate's refusal and the results of the data collection on an Interdisciplinary Progress Note and place it in the inmate's UHR.

## AUDITING OF ASU SCREENING REFUSALS:

Effective immediately, each institution will develop a local procedure to audit the rate of refusal of initial ASU mental health screenings. The institution's Chief of Mental Health, or designee, shall be responsible for conducting the audit and evaluating the results. The audit tool shall include, at a minimum: the number of inmates admitted to ASU in the last calendar month, the number of mental health screenings completed in that month and the number of inmates who refused to participate in the screening in a private, confidential setting. The procedure will identify a process for review and quality improvement if inmate screening

Page 3

refusals exceed 30 percent. This procedure shall include a process to identify reasons for refusals, and a plan to encourage increased participation in screenings.

## DAILY COORDINATION OF ASU

By memorandum of May 9, 2005, all institutions were directed to "develop a procedure for alerting Mental Health Staff to new arrivals in ASU within 24 hours". This policy included a morning 'check-in' meeting between (at minimum) an ASU Sergeant and designated ASU Mental Health personnel. During the meeting, involved personnel identify new arrivals, discuss current issues, and share any pertinent information regarding risk factors and prevention strategies.

Effective immediately, the morning meeting shall be attended by the assigned ASU mental health clinician (psychologist or social worker). Suicide risk data, from the Mental Health Tracking System Report, shall be communicated to custody staff, and relevant clinical concerns about inmates shall be discussed. Salient clinical information from this meeting shall be documented in the inmate's UHR and if necessary, a referral for mental health services shall be made at the appropriate level of urgency.

## MINIMUM STAY AT ENHANCED OUTPATIENT PROGRAM ASU HUB INSTITUTIONS

Inmates transferred to Enhanced Outpatient Program ASU hub institutions for treatment of severe mental disorders and clinical decompensation can appear to be clinically improved and stable for up to several weeks after their arrival at the receiving institution. This may lead the hub institution to prematurely return the inmate to the sending institution without adequate treatment. Subsequently the inmate may return to their pre-transfer state of clinical decompensation.

Effective immediately, to avoid premature returns of inmate-patients and provide adequate time for observation and evaluation at EOP ASU hub institutions, all inmates transferred to EOP ASU hub institutions for treatment shall be held at the hub institution for no less than 60 days from the date of reception.

## AUDITING CASE MANAGER REVIEW OF WEEKLY ASU ROUNDS NOTES

Currently, CDCR policy requires that a weekly summary of the daily clinical rounds of ASU MHSDS inmate-patients is placed in each inmate's UHR. It is expected that clinical case

Page 4

managers assigned to the ASU regularly review the weekly summaries for inmate-patients on their clinical caseloads as part of their ongoing monitoring of inmate clinical condition.

Effective immediately, each institution will develop a local procedure to ensure the ASU case managers are regularly reviewing the weekly ASU clinical rounds documentation for their assigned inmate-patients.

The institution's Chief of Mental Health, or designee, will be responsible for conducting and evaluating the results of the audit. The procedure shall include a requirement that case managers document in the UHR that they have reviewed the weekly summaries of rounds for their caseload inmate-patients. The procedure will also include details of the audit of case managers' reviews.

The audit tool will include, at a minimum, information about the number of inmate-patients assigned to a case manager, the number of weekly reviews expected (number of inmate-patients on the case manager's caseload times the number of weeks the inmates were housed in ASU), and the number of weekly reviews documented by the case manager. The procedure will also include a process to correct deficient audits (i.e. training and/or progressive disciplinary action for clinicians who do not meet this requirement).

## DOUBLE CELLING

Statistical information suggests that suicide risk is substantially reduced when inmates have a cellmate. Therefore, Wardens are encouraged to place inmates into double-celled housing whenever possible, especially when the inmate is initially placed into ASU.

## MEETING TITLE 15 REQUIREMENTS

One of the contributing factors to inmate suicides is the restricted movement within the ASU environment. Inmates housed in the ASU, during the first three weeks after ASU placement, shall receive priority access to "Out-of-Cell" time, such as mandated exercise yard and showers.

Staff shall account for out-of-cell time for inmates assigned to ASU, including, but not limited to, CDCR 114-D, Segregation Order and CDCR Rule Violation Report hearings, Unit Classification Committee, Institutional Classification Committee, medical ducats, interviews, visiting, showers, yard and all other out of cell periods. All out-of-cell time for inmates assigned to ASU shall be documented on the CDC 114-A, Detention/ Segregation Record. Institutions shall continue to audit the CDC 114-A, Detention/ Segregation Records on a weekly basis to ensure compliance with departmental mandates.

Page 5

Within the constraints of physical plant limitations, every institution is expected to immediately ensure that inmates in the ASU's are offered access to the exercise yard for the departmental minimums as identified in the California Code of Regulations, 3343 (h). Institutions with "Walk-Alone" yard facilities should offer newly placed ASU inmates access to Walk-Alone yard as quickly as possible, within the guidelines of the classification process, and with safety and security as top priorities.

In the near future, each institution will be asked to provide current information regarding the number and location of "Walk Alone" yards for inmates housed in Administrative Segregation Units. In addition, each institution will be required to assess the current yard access provided to inmates in ASU, and the tracking of that access. Finally, each institution will need to provide a list of barriers to meeting the mandated hours of yard access (i.e. staffing issues, physical plant issues, etc...). All of this information will be used to assess the need for additional resources to meet the mandated out of cell time.

CDCR is committed to implementing the recommendations described above, related to the prevention of inmate suicides. Each institution shall be responsible for revising their Local Operating Procedures to include the policy changes in this memorandum and to ensure that all staff assigned to ASU are provided On-the-Job (OJT) training regarding the directives above. The local institutions' Suicide Prevention and Response, Focused Improvement Teams shall review all policies, training materials, and audits, to ensure continuous quality improvement in ASU suicide prevention efforts. **Please send a copy of new ASU Local Operating Procedures and OJT sign in sheets on or before December 1, 2006:**

- For custody staff, to your respective Associate Director.
- For mental health staff to Sharon Riegel, Health Program Specialist (Fax number 916-324-6621).

**The headquarters Quality Management Assistance Teams will audit compliance with all aspects of this memorandum by January 1, 2007.**

If you have questions about this memorandum involving custody issues, please contact Mary Neade, Correctional Counselor II, Division of Adult Institutions, at (916) 322-7997. For questions regarding clinical issues, please contact Robert Canning, Senior Psychologist (A), at (916) 324-8050.

PETER FARBER-SZEKRENYI, DR. P.H.                JOHN DOVEY
Director                                        Director
Division of Correctional Health Care Services   Division of Adult Institutions

Page 6

**cc:**
Brigid Hanson, Deputy Director, DCHCS
Shama Chaiken, Ph.D., Chief Psychologist, Mental Health Program, DCHCS
Michael Stone, Staff Counsel, Correctional Law Unit, Office of Legal Affairs
Andrew Swanson, Chief Psychiatrist, Mental Health Program, DCHCS
Margaret McAloon, Chief Psychologist, Clinical Operations, Mental Health
     Program, DCHCS
Doug McKeever, Program Director, Mental Health Program, DCHCS
Sharon Riegel, Health Program Specialist, DCHCS
Senior Psychologist Supervisors and Specialists, DCHCS Headquarters
Susan Turner, Statewide Director of Nursing
Lisa Tillman, Deputy Attorney General, Department of Justice
Christine Martin, Special Assistant to the Director, Health Care Services Division
Dave Runnels, Chief Deputy Secretary, Division of Adult Operations
Scott Kernan, Deputy Director, Division of Adult Operations

# EXHIBIT G

SANFORD JAY ROSEN[1]
MICHAEL W. BIEN
ERNEST GALVAN

KAHN[2]

## ROSEN, BIEN & GALVAN, LLP
ATTORNEYS AT LAW
315 MONTGOMERY STREET, TENTH FLOOR
SAN FRANCISCO, CALIFORNIA 94104
TELEPHONE: (415) 433-6830
FAX: (415) 433-7104
EMAIL: rbg@rbg-law.com

HOLLY BALDWIN
LISA ELLS
GAY C. GRUNFELD
SHIRLEY HUEY[3]
MEGHAN LANG
SARAH LAUBACH
ANNE MANIA
NURA MAZNAVI
MARIA MORRIS[4]
THOMAS NOLAN
LORI RIFKIN[5]
LOREN STEWART
KENNETH WALCZAK[6]
AMY WHELAN
SARAH OLSON ZIMMERMAN[6]

January 2, 2008

Stacy A. Marsala
Vine, McKinnon & Hall
2959 Promenade Street, Suite 200
West Sacramento, CA 95691

Re:    Deposition Transcript of Ralph Coleman, C-09970
       *Coleman v. Schwarzenegger*
       Date Taken: December 13, 2007
       VM & H File No.: 07-468
       Our File No. 489-3

Dear Ms. Marsala:

The following are changes and/or corrections to the transcript of Ralph Coleman's deposition taken on December 13, 2007:

Page 19, L: 3: Add: after "San Quentin", the following: "for non-disciplinary reasons."

Page 19, L: 10: Add: after "seg", the following: "for non-disciplinary reasons."

Page 24, L. 23: Delete: "The first time and"

Page 25, L. 14: Delete: "Yes". Add: "No."

Page 25, L. 17: Add: before "seven man dorm", the following: "In 1979 I was not housed in a dorm but I saw a."

Page 56, L. 20: Delete: "No, I did not." Add: "Yes."

Page 57, L. 19: Delete: "No, I did not." Add: "Yes."

Page 57, L. 24-25: Delete: "I haven't seen them since that time. That's the reason why." Add: "Yes, Dr. Schwimmer."

Page 58, L. 3: Delete: "not."

Page 58, L. 21: Delete: "No." Add: "I believe I did."

[1] MEMBER OF THE CONNECTICUT AND THE CALIFORNIA BAR
[2] OF COUNSEL
[3] MEMBER OF THE WASHINGTON, D.C. AND THE CALIFORNIA BAR
[4] MEMBER OF THE NEW YORK AND THE CALIFORNIA BAR
[5] MEMBER OF THE CONNECTICUT, NEW YORK AND THE CALIFORNIA BAR
[6] MEMBER OF THE ILLINOIS AND THE CALIFORNIA BAR

Stacy A. Marsala
January 2, 2008
Page 2

Page 69, L. 24: Add: after "sometimes.", the following, "However, in the summer of 2006, my building was locked down for approximately 45 to 60 days."

Page 79, L 8:  Add: after "he said", the following, "that my medication was to be administered HS, at hour of sleep."


Please feel free to contact me with any questions regarding these changes.

Sincerely yours,

ROSEN, BIEN & GALVAN, LLP

By: Jane E. Kahn

JEK:
Cc:    Misha Igra
       Lisa Tillman
       Coleman Co-counsel

## PROOF OF SERVICE

I, Sofia Millham, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On January 2, 2008, I served the following document:

**PLAINTIFFS' CHANGES AND/OR CORRECTIONS TO THE TRANSCRIPT OF RALPH COLEMAN'S DEPOSITION TAKEN ON DECEMBER 13, 2007**

I served the documents on the persons listed below, as follows:

| | |
|---|---|
| [ ] | **By messenger service.** I served the documents by placing them in an envelope or package addressed to the persons listed below and providing them to a professional messenger service for service. (A declaration by the messenger is attached hereto as a separate document.) |
| [ X ] | **By United States mail.** I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |
| [ ] | **By overnight delivery.** I enclosed the documents in a sealed envelope or package provided by Federal Express and addressed it to the persons listed below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier and I arranged to pay for all fees for delivery. |
| [ ] | **By fax transmission.** Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below from Rosen Bien & Galvan's facsimile transmission telephone number, (415) 433-7104. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached. |
| [ ] | **By e-mail or electronic transmission.** Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addressed listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. |

**All documents were sent to the following persons in the following manner:**

**By United States Mail**

Lisa A. Tillman
Deputy Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814

Paul B. Mello, Esq.
Hanson, Bridgett, Marcus, Vlahos & Rudy, LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

California Correctional Peace Officers'
Association (CCPOA) Intervenors
Ronald Yank
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

District Attorney Intervenors
Rod Pacheco
Charles Hugues
District Attorney
County of Riverside
4075 Main Street, First Floor
Riverside, CA 92501

California Sheriff, Probation, Police Chief
and Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Michael R. Capizzi
Kimberly Hall Barlow
Elizabeth R. Feffer
3777 North Harbor Boulevard
Fullerton, CA 92835

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this Proof of Service was executed on this 2nd day of January, 2008 at San Francisco, California.

Sofia Millham

# EXHIBIT H

# Vine, McKinnon & Hall
### Certified Shorthand Reporters - A Professional Corporation

Date:  December 18, 2007

To:  Litigation Coordinator

From:  Terry White Office Manager

Re:  Deposition of: Ralph Coleman, C-09970
       Case Title: Coleman v. Schwarzenegger
       Case No.: 2:90-cv-00520 LKK JFM P
       Date(s) Taken:  December 13, 2007
       VM&H File No.:  07-468

Please find enclosed a copy of the above-listed deposition transcript.

Please have the inmate's counselor make the necessary arrangements for the inmate to review his deposition testimony.  He may have as much time as he requires to review the transcript, but he is not entitled to a copy of it.

Arrangements should be made so that the inmate can review the transcript with his hands free.  I have also enclosed a copy of our letter to the inmate, which instructs the inmate on the reading and correction procedures that should be followed.

Please return the transcript to me after the inmate has completed his review.  I have provided a self-addressed envelope for your convenience.

Thank you.

cc:  Original
     VM&H File No.  07-468
     Counsel

Enclosures:  Copy of transcript
             Self-addressed envelope

**2959 Promenade Street, Suite 200, West Sacramento, CA  95691**
**(916) 371-3376  Fax (916) 371-3840**

# EXHIBIT I

Deposition of Ralph Coleman taken on December 13, 2007

```
 1          I, RALPH COLEMAN, have read my deposition
 2   consisting of the preceding pages 4 through 85 taken on
 3   Thursday, December 13, 2007, and I hereby certify that:
 4   (Check one)
 5   _____ ✓    I have made changes and/or corrections I
 6                        deem necessary as reflected on the
 7                        attached page(s) and that I now approve
 8                        my deposition as true and correct.
 9   _____      I have no corrections.
10                                    Ralph Coleman
                                      RALPH COLEMAN
11
                                      --oOo--
12   _____
13   FOR VINE, McKINNON & HALL USE ONLY:
     (Check one)
14
     _____      Signature waived.
15
     _____      I certify that the witness was given
16                        the statutory allowable time within
                          which to read and sign the
17                        deposition, and the witness failed
                          to appear for such reading and
18                        signing.
19   _____      I certify that the witness has read
                          the deposition and has signed said
20                        deposition and/or the Deposition
                          Correction List.  Changes and/or
21                        corrections, if any, are appended
                          hereto.
22
                          Other:
23   _____
                          By _____
24                        Vine, McKinnon & Hall
                          Certified Shorthand Reporters
25   Dated: _____   VM&H File No. 07-468
```

86

**Vine, McKinnon & Hall (916) 371-3376**

# EXHIBIT J

# Vine, McKinnon & Hall
### Certified Shorthand Reporters - A Professional Corporation

January 7, 2008

**RECEIVED**

**JAN 0 8 2008**

Misha D. Igra,
Dept. Of Justice
Office Of The Attorney General
1300 I Street, Suite 125
Sacramento, CA 95814

**Rosen, Bien & Galvan**

Re:   Notification of Corrections Made in Deposition Transcript

>  VMH File Number: 07-468
>  Case Title:  Coleman v. Schwarzenegger
>  Deponent:  Ralph Coleman
>  Date(s) Taken:  December 13, 2007

Dear Counsel:

This office has received notification by mail that the deponent listed above wishes to make certain changes and/or corrections to his/her original deposition transcript.

The deponent's correspondence received by us will be appended directly to the original transcript.  The enclosed copy of that correspondence is for your use.

Thank you for your attention to this matter.

Sincerely,

*Terry White*

TERRY WHITE
Office Manager

Enclosure

cc:  Original
File No. 07-468
Jane Kahn, Esq.
Dan Ackerman, Deputy DA

**2959 Promenade Street, Suite 200, West Sacramento, CA 95691**
**(916) 371-3376  Fax (916) 371-3840**