# EXHIBIT L

# Preliminary Expert Report from

# Gale Bataille, MSW

Expert Opinion of Gale Bataille, M.S.W. Regarding the Probable Impact of a Coleman Class Prison
Release Order Submitted on August 15, 2008

## (I) Statement of all opinions the witness will express and the basis and reasons for them

As an expert witness, my opinion will address the probable impact on California's county-based community
mental health system and the seriously mentally ill individuals it serves if the California Department of
Corrections and Rehabilitation (CDCR) is court ordered to implement a correctional facility population
reduction through a prisoner release order.

Based upon my background as a County Mental Health Director in California for over 17 years including
active statewide leadership in the development of community mental health policy, financing and program
design since 1975, it is my expert opinion that adequate plans and services are not in place—nor can these
plans and services be put in place without a funding increase and adequate program planning and
implementation lead time, to respond to a release of even 15,000 offenders including all classes of mentally
ill (Coleman class) prisoners.  In fact-even if counties were given up to a year for mental health program
planning and implementation, it will not be possible to adequately staff needed augmented program
services because of the current professional mental health workforce shortage in California—and
nationally.   In addition, the imposition of a population cap on state prisons (whether through a court order
or a legal settlement agreement) will have an immediate and significant impact on county law enforcement,
jails, probation departments and the local health, human services and mental health services as these
agencies will be required to serve offenders who would previously been sent to state prisons, in the
community or in jails and local institutional settings.  The concerns and objections expressed by the
California State Association of Counties (CSAC) in its Corrections Policy: Principles and Guidelines
(adopted as revised 5/22/08) and the California Mental Health Directors Association (CMHDA) as well as
CSAC  in separate policy responses to the Legislative Analyst Offices 2008-09 budget proposal for "parole
realignment" are equally germane to the likely adverse consequences of a prisoner release plan.

An accelerated release of prisoners who meet Coleman class criteria can be anticipated to have adverse—
and potentially serious consequences for the released prisoners; community mental health systems and the
(non-offender status) mentally ill children, adults and older adults they serve; a potentially negative impact
on community safety if adequate supervision, treatment services and programs are not in place at the time
of the prisoner release; and potentially long-term negative consequences to the development of public
mental health services in the future.

I will provide testimony that addresses how the above issues could reasonably be expected to be affected by release criteria and proposals described in Coleman Plaintiff's April 17, 2008 Supplemental Responses to Defendant Arnold Schwarzegger's First Set of Interrogatories.

I will address the following specific issues that inform and constitute the basis for my expert opinion as follows:

**1. Population definition/characteristics and implications for community based care service needs;**

**2.  Mental health service requirements and capacity of CDCR Parole Outpatient Clinics and public mental health departments to meet service requirements--including outpatient as community support services as well access to psychiatric treatment in institutional/secure settings;**

**3. Effectiveness of currently available outpatient mental health services to mentally ill offenders— the need for new and evidence-based approaches;**

**4. Potential adverse impact of Coleman population release on public safety, the future growth/development of community mental health systems, and community acceptance of individuals with mental illness.**

**1.  Population definition/characteristics and implications for care**—What is a reasonable estimate of the increased population of mentally ill prisoners that would be released to community parole status?  What are the characteristics/needs of this population?

**(a) Estimate of population likely to be released**

On the basis of Special Master Keating's Special Master's Response to the Court's May 17,2007 Request for Information it is reasonable to assume that "the percentage of the caseload census in the overall population is a predictable 19-20 percent. (pg. 14)  Therefore, if 15,000 prisoners are released on parole status, 19-20 percent of prisoners-or up to 3000 of these newly released parolees will have serious mental illness as assessed by CDCR.  The various proposals for prisoner release focus on the release of "low risk" offenders but it should be assumed that a substantial portion of these individuals who have received psychiatric treatment while incarcerated have a significant risk of exacerbation of their psychiatric symptoms when released to community settings.   In addition, Plaintiff's April 17,2008 supplemental response to Interrogatory No. 4 states subject to a number of objections that prisoner release order would need reduce the prison population in all of the different categories of Coleman class including 3-CMS, EOP and inpatient level of care to achieve constitutionally adequate mental health care in the state prison

2

system.

**(b) Anticipated characteristics of population likely to be released**

There is little discussion in any of these proposals of how mentally ill offender psychiatric symptoms, characteristics and needs are likely to appear different in the community in contrast to the contained environment of prison facilities and to what extent members of the mentally ill released parolee population might be at greater risk for recidivism—especially if they do not access and receive prompt and adequate services. Of greatest concern is the lack of specific acknowledgement and planning for a population that has co-occurring psychiatric and substance abuse disorders. Approximately 50% of individuals who are served in the community based mental health system have co-occurring substance abuse/use disorders— with a higher prevalence (75-80%) reported among homeless, psychiatric emergency, hospitalized and incarcerated populations. There is a higher prevalence of substance abuse disorders in the population of mentally ill prisoners. Co-occurring mental health and substance use disorders are the assumption-not the exception among individuals who have contact with the criminal justice system. Client assessments (and services) must focus on integrated models of care. Of the 19-20 percent of prisoners who have diagnosed psychiatric disorders, 80-90 percent can be projected to have a history of co-occurring substance abuse. There is a significant and growing body of research and practice literature and public mental health system experience that finds that integrated mental health/substance abuse treatment must be provided to address the needs (and likelihood of relapse) of individuals with serious mental illness with co-occurring substance use disorders.

**(c) Eligibility of released inmates as "target population" for county/public mental health services**

It should not be assumed that all inmates assessed by CDCR staff to meet criteria for serious mental illness in the prison setting will meet public mental health services eligibility criteria (including Federal Medicaid) as seriously mentally ill with a functional impairment that qualifies them for Medicaid or mental health indigent care services. It is not uncommon for correctional systems to include within the classification of mentally ill prisoners individuals with developmental disabilities and/or cognitive disorders that are not the result of mental illness, and are not within the target/treatment responsibility of the public mental health system. It is the experience of County Mental Health systems that it is particularly difficult (if not sometimes impossible) to access community based or institutional/inpatient services for individuals with developmental disabilities and traumatic brain injuries/cognitive disorders.

Potentially divergent assumptions about the criteria used to define mentally ill target populations can lead to faulty program design and even conflict among well-intended partners in criminal justice reform. This may

3

lead to unrealistic expectations that public mental health systems have the resource capacity and can effectively and safely treat a population with developmental disabilities, cognitive disorders, character disorders and high "criminogenic" risks. To the extent that a prisoner release plan anticipates access to counties' public mental health services, the following issues related to the target population to be treated must be considered. (This opinion will address separately the extent to which resource capacity exists or can be brought on-line in a timely manner.)

- Mental health/criminal justice program initiatives must be explicit about the target population to be served—including whether this is an expanded population that requires new funding resources and services that are beyond the current scope of the public mental health system. Understanding and effectively responding to released prisoner needs will require assessment and service development that addresses gender and culture specific impacts including trauma and victimization.
- Not all psychiatric disorders are amenable to treatment modalities offered in the public sector and individuals with certain personality and social disorders that are accompanied by criminal behaviors do present supervision and public safety concerns. Local mental health systems that develop or contract to serve these higher risk populations must distinguish specialty criminal justice services from the broader public mental health system and be clear about inherent risks and responsibilities in serving a new population.
- It is critical that there be agreed upon and broadly applied "risk assessment" tools and procedures for criminal justice involved populations. Risk and needs assessments should follow the individual's progress through local and State institutions and services.

**(d) Recommendation regarding Coleman class target population to be considered for community parole**

Given the concerns and challenges described above regarding the population of mentally ill prisoners that could be subject to release, I strongly recommend that only those mentally ill individuals assessed as having the greatest level of psychiatric stability and the greatest potential to "voluntarily" follow-up on outpatient care be considered for early release. There should be no requirement of CDCR that a release plan include prisoners who qualify for all of the CDCR levels of care: 3-CMS, EOP or Crisis/inpatient services. The most seriously mentally ill prisoners (EOP) should be considered for early release-if and only if there are intensive supervision and treatment services available to serve the released prisoner immediately upon release and if there are provisions for inpatient care negotiated as part of the service agreement.

4

While professionals have limited capacity to accurately predict the behavior or the course of mental illness of parolees regardless of the care given to a pre-release risk assessment, release of high need prisoners without adequate services in place could set back future program development by CDCR or counties. In addition, the mandated release of seriously mentally ill prisoners at the predicted prevalence 19-20% prevalence level in the prison population would have extremely limited positive impact mental health services in the prison system. Special Master Keating states: "even the release of 100,000 inmates would likely leave the defendant with a largely unmitigated need to provide intensive mental health services to program populations that would remain undiminished by a reduction of some 19,000 3CMS (case management level mentally ill inmates in the general prison population.) …Only a targeted release of seriously mentally ill inmates will serve quickly to reverse current deficiencies, especially of bed and program space. Still, the most seriously mentally ill inmate/patients in CDCR are unlikely to be among those released pursuant to any of the provision of defendants' Assembly Bill 900." (pg 15)

## 2. Mental health services needs, requirements and capacity for services provision—

The May 2008 report to the Three Judge Panel by Court appointed Settlement Referee, Elwood Lui and Settlement Consultant, Peter Siggins, submitted as part of a proposed settlement agreement, a potential program for "Local Diversionary Alternatives for Low-Risk Individuals" (A. 1.-pg 7ff). In addition, in the April 17th Supplemental Responses to Defendants Interrogatories, the Coleman Plaintiff's articulated proposals that Defendants could consider as prison overcrowding reduction measures "available to them that can be done safely and, in light of the dangerous overcrowding in the prison system right now, could actually improve public safety." (April 17th Supplemental Interrogatories, No. 6, pg. 9-11) It is my opinion that both of these proposals/reports fail to take into account the capacity of either the CDCR Parole Outpatient Clinics or California's county mental health departments to provide the level of community mental health care and community support services or the psychiatric institutional care that will be necessary if there is a rapid release of seriously mentally ill prisoners. In addition, neither of these reports acknowledges or proposes a reasonable time frame for planning and implementing the array of services/programs that are considered. It should also be understood that even a prisoner release that does not include Coleman class seriously mentally ill prisoners will have a impact on community mental health resources and services.

The following issues must be addressed in order to accomplish a safe, humane and effective release of seriously mentally ill prisoners:

- Who is responsible for the provision of mental health outpatient and inpatient care to mentally ill parolees?

5

- What is the capacity of CDCR Mental Health Parole Outpatient Clinics (CDCR-POC) to serve additional mentally ill parolees?

- What is the capacity of county-based public mental health systems to meet additional service demands and how would public/community mental health programs be impacted by an increase in mentally ill parolees requiring services—including the impact if a Settlement Agreement is adopted whereby counties are responsible for provision of "local diversionary alternatives to incarceration for low-risk individuals"?

- What is required to implement additional services/programs for mentally ill offenders?  What are the structure, scope and responsibility and capacity of California's county-based community mental health system to provide State and Federally mandated mental health services?

**(a)  What agency/system is responsible for funding and providing mental health and inpatient care to parolees?**

A clear agreement must be developed between CDCR and counties regarding responsibility and accountability for mental health treatment responsibility for parolees, particularly as the Courts and/or the State moves toward reducing the prison population.  Historically, CDCR staff have attempted to refer active parolees to county operated (or county contracted) outpatient, intensive outpatient and institutional services while counties have taken the position that services to this population is not a county mental health responsibility.  Clarification of responsibility for the funding and provision of outpatient, intensive outpatient and acute inpatient care  has been the subject of multiple discussions between representatives of the California Mental Health Directors Association on behalf of county mental health departments and CDCR staff.  A March 28, 2008 report released by the CDCR Division of Adult Parole Operations regarding the mentally ill parolee population states:

> "Consistent with the terms of the *Valdivia v Schwarzenegger* federal court injunction, effective January 8, 2007, the California Department of Corrections and Rehabilitation (CDCR) no longer incarcerates parolees solely for psychiatric treatment (psych-return).  Therefore, when a parolee requires mental health treatment above the level of care available from the Parole Outpatient Clinics (POC), CDCR relies on the counties, and other community-based providers, to obtain necessary mental health services.  Specifically, parolees are brought to the county mental health facilities for a California Welfare and Institutions Code (WIC) §5150 evaluation.  Oftentimes, a parolee resident does not meet the criteria for continued county services via the WIC §5150 process, but will still require a structured level of care in order to prevent negative outcomes in the community.  With the

6

end of the psych-return process, this level of care must now be provided by community-based mental health facilities." (pg. 2 of cited report).

To the best of my knowledge, counties are fulfilling their responsibility to provide WIC 5150 assessments and acute treatment pursuant to the Valdivia court decision, however, counties maintain that provision of non-5150 related community mental health services remain the responsibility of CDCR directly or via contract. Counties' position that they have limited responsibility for parolee mental health services is further supported by the restriction in 2004 Mental Health Services Act (Proposition 63) which prohibits use of MHSA funds for parolee services or law enforcement/justice system functions. (See **SECTION 7**. Section 5813.5 is added to Part 3 of Division 5 of the Welfare and Institutions Code, to read: "...Funds shall not be used to pay for persons incarcerated in state prison or parolees from state prisons."This prohibition was included in the act because of the concern of the drafters of the ballot proposition that all new resources to meet the critical unmet needs of mentally ill individuals in our communities would be subsumed by the unmet needs in the state corrections system.

Clarification of funding and service provision responsibility for parolees is of particular concern to public mental health systems in light of their inability to meet current community demand for state and federally mandated services.   There have been indicators of progress as CDCR has begun to negotiate contracts with several counties to provide intensive and wrap around services to parolees either directly or via contracted agency providers. However, a "phase one" release of 15,000 prisoners with a projected 3,000 requiring POC services—a 13% increase in the parole outpatient clinic will create additional pressures on all services with potentially negative parolee impacts if this issue is not resolved.

**(b) What is the capacity of CDCR Mental Health Parole Outpatient Clinics (CDCR-POC) to serve additional mentally ill parolees?**

I would defer to CDCR staff regarding services capacity of the CDCR POC but on the basis of my prior experience as a County Mental Health Director in both San Mateo and Solano Counties and as Deputy Director in Contra Costa County, it is my opinion that the Parole Outpatient Clinic System historically and currently is unable to meet the needs of the mentally ill parolee population.  This service capacity gap can only be expected to increase if there is a rapid release of POC eligible parolees.  CDCR reported a total of 22, 219 parolees eligible for POC services in February 2008.  Four thousand and eight (4008) of this population was designated as EOP and in need of higher level mental health services.  The release of 15,000 inmates represents a projected 13% increase in the eligible mental health population based on previously discussed estimating methodology.  I believe that this conclusion is supported by the actual

7

current numbers of authorized direct service positions to serve the POC client population and a June 2006 FINAL REPORT ON THE MENTAL HEALTH SERVICES CONTINUUM PROGRAM (MHSCP) OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION—PAROLE DIVISION that was conducted under contract by the *Integrated Substance Abuse Programs (ISAP) at the University of California, Los Angeles to conduct a process and outcome evaluation of the Mental Health Services Continuum Program (MHSCP).*

The MHSCP evaluation found that parolees with the highest level of mental health need (EOP) had a higher recidivism and prison return rate than the CCCMS population: 60.9% of EOP parolees were returned to prison within 12 months, relative to 53.4% of CCCMS parolees; (pg. 18)  In addition the evaluation finds a "a strong relationship between the number of POC sessions attended and recidivism risk for all seriously mentally ill parolees.   Specifically, "the greater number of POC contacts a CCCMS/EOP parolee has, the less likely he or she is to be returned to prison. Interestingly, the greatest decline in recidivism risk occurs for parolees who have attended a POC more than four times." (pg. 26)  Even without a finding related to the mode/type of services provided by POC which would reflect current evidence on best practice, it is clear that increased frequency and numbers of contacts with a direct service provider reduced recidivism for the POC population.

The previously cited March 28, 2008 Adult Parole Division report provides staff: client caseload ratios for direct service POC staff as follows:

| Statewide Parole Outpatient Clinic Classifications--February 2008 | |
| --- | --- |
| Parolee to Clinician Ratio | |
| Staff Psychiatrist 41 | 542:1 |
| Clinical Psychologist 47 | 473:1 |
| Clinical Social Worker  128 | 174:1 |
| Total authorized positions equal 239 including 23 non case carrying supervisory positions. | |

In my experience, these client: clinician ratios dramatically exceed generally accepted community standards for effective services and it is further my understanding that these ratios are significantly higher than standards for care in the State's correctional facilities.  In community mental health settings, outpatient case management caseloads of 50:1 are considered too high to provide effective services other than referral and brokerage. Although there is no consistent psychiatrist caseload standard in county mental health departments, it is my opinion and experience that the POC psychiatrist caseloads of 542:1 are at least a third higher and more typically close to double the full time equivalent caseloads of community

8

psychiatrists.

Any prisoner release program that does not insure adequate capacity for even the most basic outpatient services can be expected to fail as measured by parolee recidivism—and if there is a population cap that affects returns to prison, it can be anticipated that these individuals will put new demands on the county programs and local jails.

**(c) What is the capacity of county-based public mental health systems to meet additional service demands and how would public/community mental health programs be impacted by an increase in mentally ill parolees requiring services**—including the impact if a Settlement Agreement is adopted whereby counties are responsible for provision of "local diversionary alternatives to incarceration for low-risk individuals"?

California's county-based public mental health system does not currently have the financial, resource or workforce capacity to dramatically increase the availability of services to seriously mentally ill parolees within a short period of time such as the next several years.

**Financial resources are inadequate and not keeping up with current costs**--California's public community mental health system is operated by 56 counties and two cities with function as the local Medi-Cal mental health plan for Medicaid beneficiaries and indigent care and other related services. (The remaining two of the 58 counties having opted to have services provided through neighboring county mental health plans.) Several key legislative and administration initiatives in the early 1990's: Realignment and Medi-Cal (managed care) Consolidation crafted a State and County relationship in which the State Department of Mental Health directly operated the state hospital system and retained regulatory and quality assurance functions while counties became responsible for the design and provision of community mental health services (and purchased state hospital and acute psychiatric beds) at the local level. County mental health services have been primarily funded through a combination of State Sales Tax and Vehicle License Fees-VLF (Realignment known as the Bronzan-McCorquodale Act, (Chapter 89, Statutes of 1991) and Federal Medicaid funds. Since 2000, it has been necessary for counties to allocate an increasing share of counties' sales tax and VLF revenues to providing a 50% required match to drawn down federal Medicaid funding for Medicaid beneficiaries that require mental health services. This has reduced the level of funding available for services to indigent individuals who do not qualify for federal Medicaid or SSI-linked Medicaid benefits. Indigent services (other than 5150 related services) are provided for seriously mentally individuals only to the extent that resources are available. In addition, the distribution formula for Realignment funds established in 1991 did not undo historical inequities in resource allocation—through growth formula distributions did provide additional funds to under-resourced counties.

9

In 2004, voters approved the Mental Health Services Act (MHSA or Proposition 63) in order to increase the availability and quality of community mental health services to seriously mentally ill and emotionally disturbed children, youth, adults and older adults.  It has been widely recognized that California's public mental health system was and still remains unable to meet the needs of the State's seriously mentally ill population with tragic consequences including the "criminalization of mentally ill individuals" and increased homelessness.   Target distributions (subject to the submission of successful applications/MHSA plans) were based on a formula that took into account unmet service needs and populations in poverty as well as the historical resource base of each county.  Although it is difficult to quantify unmet need, DMH Annual Planning Estimates issued in June 2005 provide documentation of the very real—and unevenly distributed gaps Californian's face in the availability of public sector mental health services.
(http://www.dmh.ca.gov/DMHDocs/docs/letters05/05-02_Encl-1.pdf)


Although the Mental Health Services Act has generated additional resources for the development of new and expanded services, sales tax, VLF and Medicaid funds that support core county mental health services have either decreased or not kept pace with the cost of doing business. At this time there are several California counties that may not have sufficient funds to provide federally mandated Medicaid services and have notified the State-or are considering notifying the State, that they intend to "opt out" and return the program to the State to administer. With the economic slow down of the last several years, many counties have been forced to cut services equivalent to the level of any new services added through the MHSA. These key findings are documented in a March 2006 Report from the California Mental Health Directors Association on History and Funding Sources of California's Public Mental Health System.  The gap between funding and need has only gotten worse as the State and local economies continue in a down-turn thus public mental health systems do not have the financial resources to serve a new population of seriously mentally ill parolees and meet their current state and federal obligations to serve other seriously mentally ill residents.

**(d) There is an overall lack of sufficient outpatient and inpatient program capacity including inpatient psychiatric and sub-acute locked institutional/secure settings**

The gap in availability of outpatient community services is most directly related to availability of professional and trained professional staffing that is discussed below under "the workforce crisis) –although counties are also struggling with having adequate facilities for service provision of clinic based services.  As will be further discussed in my comments on effective/evidence based practices for a seriously mentally ill parole and/or probation population, public mental health systems have learned that case management/coordination and clinical services **are not sufficient in and of themselves** to support the

community stabilization and rehabilitation of seriously mentally ill individuals. Findings of the President's New Freedom Commission on Mental Health (2003) and the preponderance of literature on community mental health supports the importance of a range of community support services including supported housing, educational and vocational services, substance abuse treatment, integrated treatment for individuals with co-occurring substance abuse and psychiatric disorders, family education and support and health services. Access to these community supports and services is routinely cited as essential to the successful re-entry for mentally ill prisoners in national studies such as the Report on Re-entry of the Council of State Governments and the reports cited by the Plaintiffs as the basis for the development of safe and effective prison population reduction plans. (April 17, 2008 Supplemental Interrogatory Responses, pg. 9) It is my opinion based on my experience as a County Mental Health Director and my current work as a corrections-focused policy consultant to the California Mental Health Directors Association, that community support services—particularly supported employment opportunities and supervised or supported housing are inadequate to meet the needs of current public mental health clients. These critical community support services—especially residential and supported housing facilities, cannot be brought on-line quickly, or in the next few years. The crisis California faces in the lack of adequate, stable and supported housing for persons with mental illness has been highlighted in the Mental Health Services Act of 2004 and in the Governor's 20-year plan to end homelessness, but it is recognized that it is a long term proposition—estimated to require 20 years to fund and develop the necessary special needs housing.

However, there is an even more immanent crisis that communities are confronting related to the lack—and growing shortage of inpatient psychiatric beds. This gap in bed access and capacity varies significantly by state geographic region. For example, inpatient costs and profits relative to other medical specialties and the need for hospitals to upgrade to meet OSHPD earthquake safety standards, has led to a dramatic decline in the number and availability of inpatient psychiatric beds in the San Francisco Bay Area over the past 5-10 years. In northern and more rural California, counties are forced to transport long distances for inpatient care—particularly with the closure of Shasta County's inpatient psychiatric health facility.

If there is a prisoner release (assumed to be 15,000-40,000 CDCR prisoners for the purposes of this report) over the next several years, and a projected 19-20% or 3,000-7,600 of those parolees are classified as seriously mentally ill, I would expect significant additional demand for crisis and inpatient psychiatric care that the current public (and private) mental health system cannot safely meet. Even if a prisoner release does not include Coleman class seriously mentally ill individuals, it is reasonable to expect an increase in demand for outpatient, but particularly for psychiatric emergency/crisis and psychiatric inpatient care. The Coleman class of prisoners only includes individuals who meet criteria for serious mental illness but the general population subject to release will have mental health problems that particularly if there is increased

11

substance use in the community, will result in depression, "suicidality" and psychotic symptoms (including psychosis NOS) that require assessment and treatment. These individuals will typically not have SSI-linked Medi-Cal and will become the indigent care responsibility of the counties.

In addition the *Valdivia v Schwarzenegger* federal court injunction of 2007 (previously cited) prohibits CDCR from returning parolees to state correctional facilities for psychiatric treatment—a practice that was used prior to the injunction. There is currently a lack of clarity and agreement between the State Department of Mental Health, county mental health departments and CDCR about agency responsibility and requirements for insuring parolee access to 5150 evaluation and treatment. This is by no means just a financial responsibility question but also a question of how timely assessment and treatment is assured to the parolee once he/she is taken to a 5150 facility as an "inmate". Are 5150 facilities—including private psychiatric hospitals obligated to admit? If an extended evaluation or hold is necessary who is responsible for providing the treatment services and security services? Who is responsible for payment? Under what circumstances would the individual be admitted to a DMH inpatient facility and with what priority? Is the court clear about the differences in the obligation of counties who are responsible for LPS services and which often contract with private hospital facilities for LPS services, and DMH which directly operates only state hospital and prison mental health facilities. These concerns and issues about access to crisis evaluation and inpatient care will be intensified if there is a Coleman class prisoner release. It is critical that the Courts ensure that a plan and capacity is in place to provide crisis evaluation, psychiatric inpatient care and locked sub-acute (locked Imp's) for mentally ill parolees. Failure to identify, quantify and plan capacity to meet this need will almost inevitably result in parolees experiencing community psychiatric crises that cannot be adequately and safely addressed. Currently it is estimated that 7-10% of local law enforcement patrol officer encounters involve individuals with psychiatric disorders—with a significantly higher percentage involving substance use. (Munitz, Griffin)

**(e) The workforce crisis**

Funding short-falls are not the only challenge to counties as they work to provide core community mental health services. The mental health/behavioral health workforce is not adequate to meet current needs—let alone the expanded and focused needs of a justice involved mental health population. Special Master Keating's 5/17/07 report discusses critical vacancy rates of mental health staff at CDCR facilities—and the uneven geographic distribution of vacancies: "...defendants cannot meet at least a substantial portion, amounting in some loose amalgam, to about 33% of acknowledged mental health needs with current staffing resources." (Special Masters Report, PG 14) Just as vacancies are distributed unevenly across State Correctional facilities, critical vacancies in community mental health staffing impact counties disproportionately. Additional challenges include:

12

- Availability/capacity of management, administrative and technical staff to plan, design, implement and supervise new/expanded programs (whether county-operated or contracted with community agency providers); and

- Critical workforce shortages that have resulted in a lack of professionals (and trained paraprofessionals) required providing treatment and rehabilitation programs in community mental health programs and as has been well documented--in correctional facilities.

In addition, the impact of wage competition that was driven by CDCR prison and state hospital health care needs has been well documented and in a number of instances has resulted in high county mental health department vacancy rates in critical professional classes including psychiatrists and licensed clinicians. The shift of currently incarcerated populations to community care will only increase California's behavioral health workforce crisis—especially for skilled professionals.  Public mental health systems also confront workforce skill and training gaps.  Our workforce is not fully trained in providing therapeutic service interventions identified as best practices for the justice involved mental health population.  The focus of state and local agencies on corrections reform and rehabilitation and county mental health MHSA workforce education and training initiatives may provide new opportunities and resources for designing career pathways and collaborative training ventures but these ventures will take time to roll-out and a conscious investment in creating the workforce of the future.  Even with the best case scenario and rapid attention to workforce development and training initiatives it will take several years to increase the availability of personnel to provide enhanced correctional mental health services.  Failure to take on the challenge of workforce development and failure to provide lead time to educate, recruit and train mental health direct service providers will result in lack of access to needed and appropriate levels and intensity of services—which will only exacerbate the current CDCR POC dilemma with high recidivism and the potential of community backlash and negative consequences including death and suicide for a disturbed and sometime disturbing justice involved mental health population.

In order to create expanded workforce capacity, the State and counties should consider cooperative investments in initiatives such as:

- Specialized masters, post-graduate and continuing education programs in forensic assessment and treatment strategies.  For example, the City University of New York's John Jay College of Criminal Justice has recently established a partnership with Arizona State University develop cross-county criminology programs enhance research efforts and strengthen ties between academia and practitioners" (John Jay College Press Announcement 6/18/08) California should be at the forefront of creating such academic training partnerships.

- Community college based initiatives for case management and other paraprofessional staff;

13

- Regional and distance learning best practices training for clinicians and other providers.
- Best practices learning partnerships such as the MIOCR grantees' learning collaborative facilitated by California Institute of Mental Health.

**(f) Additional comments on specific proposals put forth in Supplemental Response to Interrogatory No. 6.**

Although I have discussed problems that would impact implementation of many of the prisoner release options identified by the Plaintiffs, I will comment directly on several of the options identified in Supplemental Response to Interrogatory No. 6. "The Plaintiff's state (pg. 9): "Defendants have numerous, evidence-based population reductions available to them that can be done safel and, in light of the dangerous overcrowding in the prison system right now, could actually improve public safety." While I agree that some of the proposed options have merit, I do not believe that any of the options—if applied to a seriously mentally ill and/or a mentally ill population with co-occurring substance abuse history, can be rapidly, effectively and safely be implemented in the community. My discussion above documents the extreme difficulty local mental health departments and related community service providers face in meeting current, let alone expanded demands. A rapid release of mentally ill prisoner, without adequate and immediately accessible services and resources may reduce overcrowding conditions in the state prison system but it would do so at the cost of increasing risk for many of these prisoners and our communities.

- 2.-*"Provide intensive probation supervision for 18-25 year old offenders."* This option appears to propose a shift of released prisoner supervision from parole to local probation departments under a program of intensive probation supervision. An investment in this younger population, including those transition age youth/young adults with mental illness and a very high rate of co-occurring psychiatric and substance use/abuse disorders could help to interrupt the cycle of relapse/recidivism and incarceration for this population. The caution and concern here—like with many of the other options is that intensive probation supervision must be accompanied by treatment and community integration supports and services. Effective treatment for transition age young adults (TAY) is rarely clinic based and requires the development of staff and resource intensive flexible wraparound services. In general, a seriously emotionally disturbed transition age young adult—including justice system involved TAY's should receive services based on a 1:10 or maximum 1:15 provider to client ratio. The community planning guidelines for the development of transition age youth "full service partnerships" developed by the State Department of Mental Health (posted on DMH-MHSA website) are useful in designing programs. In the San Francisco Bay Area, these programs cost up to $40,000 per year for participant—still a cost savings compared to

14

incarceration.

- 9. *"Implement a Validated Risk Assessment Instrument throughout CDCR..."*  The availability and CDCR progress re: implementing a the COMPASS risk assessment tool is a positive step in preparing prisoners and agencies that serve prisoner for community release.  However, to my knowledge the COMPASS is not universally completed for all prisoners assessed as "low-risk" and comprehensive data on the individual and aggregate COMPASS assessments has not been provided to the county agencies that should have this information to design effective re-entry plans in collaboration with CDCR.  As the CSAC response to the 2008 LAO Parole Realignment Proposal, risk assessment must also focus on more than the most recent violation and incarceration since prisoner whose current offense is low-risk may have committed very serious prior offenses that must be acknowledged in designing community services.

- 11.-*"Expand Alternative Sanctions...to include drug treatment programs, mental health programs providing residential, day treatment ..."*    There is not current capacity to provide cited residential treatment and care in either County Alcohol and Other Drug (AOD) systems on Mental Health Departments.  Some counties do not have mental health residential treatment facilities and via personal communication, I am aware that there are already concerns that AOD residential treatment beds are being "bought up" by CDCR resulting in diminished access to these critical programs for non-parole populations.  The vast majority of counties no longer provide adult day treatment programs but rather have moved to supported and more integrated community support services including supported employment, consumer self-help centers, and supported education.

- 12. *"Divert new court commitments with county subsidy grants similar to SB 81 for housing/treatment of non-violent offenders.."*  See previous comment (No. 11) regarding lack of residential facilities.  While it would be possible to develop these residential treatment facilities— generally operated by community provider agencies, it would be a multi-year process at best to site (including community use permits), build/rehabilitate  facilities.  As is well known, community "nimbyism" is also a major barrier to the development of these facilities—and particularly for facilities that serve justice system involved individuals.

- 14. *"Expand Pre-Release Planning services for mentally ill, developmentally disabled, ad other special needs inmates..."*  This is a critical step for any release plan to work.  Although it is beyond my scope in this expert witness report, I also believe that it is critical to insure that there are adequate plans and provisions for the eventual discharge of individuals with developmental disabilities.  There is an even more serious gap in availability of appropriate community-based

15

services for the DD population and as a result, these individuals inappropriately end up in psychiatric institutions and jails.

- 15. *"Redirect funds to counties to manage parolees with mental illness...including (cites, housing and treatment facility placements...and expansion of mental health courts)"* CSAC and its affiliates (See CSAC position on LAO 2008 Parole Realignment Proposal) have stated that a well planned and appropriate realignment of low-risk parolees may ultimately make sense and that many of the best practices in supervision, treatment and rehabilitation would equally address the needs of both parolees and county probationers, however, CSAC opposed this proposal due to lack of clarity and risk-assessment of the population to be "re-aligned", lack of adequate funding guarantees and lack of fully thought out plan that could be expected to succeed. In addition, CSAC and other statewide organizations such as CMHDA were, and remain convinced that any initiative that focuses solely on the back-end of the system through a prison population cap without a equal and parallel development of community based prevention and early interventions services will ultimately fail. And, the consequences of failure to implement prevention and early intervention programs—will be felt in our already over-crowded jail and in our communities.

- 16. *"Establish specialized mental health parole units to provide appropriate supervision, access to treatment, housing and reintegration with the community."* My concerns about access to services and supports have been stated previously. I believe that it would be a positive step to establish specialized mental health parole units with significantly lower caseloads—and that would gain expertise in serving seriously mentally ill parolees. A successful precedent for this type of special population based unit can be found in some of the successful Mentally Ill Offender Crime Reduction grants from the Corrections Standards Authority. (Note: this successful program no longer has funding.)

## 3. Increasing the availability of effective and evidence-based services to mentally ill parolees

Both Referee's (unadopted-draft) Settlement Proposal and Coleman Plaintiff's Supplemental Responses to Defendants' Interrogatories assert that effective and evidence-based re-entry programs that should be put in place to address the populations needs—which Coleman Plaintiffs assert should include all CDCR classifications of CDCR prisoners including the most seriously psychiatrically disturbed. I have reviewed and am familiar with the majority of the cited reports as well as additional nationally recognized reports including but not limited to the Criminal Justice/Mental Health Consensus Project Report and the Re-Entry Report or the Council of State Government, the National GAINS Center for People with Co-Occurring

16

Disorders in the Justice System including the APIC Model: A Best Practice Approach to Community Re-entry from Jails for Inmates with Co-occurring Disorders (Osher, Steadman, and Barr). California's 2007 AB 900 "Rehabilitation Strike Force" report Meeting the Challenges of Rehabilitation in California's Prison and Parole System reviews current research on effective offender treatment. I have also been involved in the design and implementation of effective programs for mentally ill offenders including two MIOCR grants, a mental health court, and the CONREP program for conditional release of mentally ill offenders from the state hospital system and have personal experience with the importance—and the difficulty of implementing best practices in "real world" community environments.

There is a consensus, both nationally and in California, regarding the importance of providing targeted, effective and evidence-based clinical and community support services to parolees and other justice system involved seriously mentally ill individuals in order to prevent recidivism and re-incarceration. And there is agreement that a continuum of services should be available that can be tailored to the specific needs of the mentally ill individual—in order to avoid either over or under-treatment. This growing expert consensus stresses the importance of establishing a coordinated continuum of prevention, early intervention, treatment and rehabilitation that provides/insures access to behavioral health services that are coordinated with justice system intervention and/or sanction and supervision.

**In my opinion however, there is a chasm between this growing expert consensus regarding effective treatment and practices and the knowledge/practice base in the field—both among CDCR POC clinicians and within county mental health and AOD service providers.** The following are several examples of the gap between evidence-based treatment knowledge and practice in the field.

- The 2007 California Expert Panel on Adult Offender and Recidivism Reduction Programming offers a clear opinion that "the CDCR does not offer a sufficient quantity of evidence-based rehabilitation programs" and includes specific recommendations related to the effectiveness of cognitive/behavioral skills training and therapy (CBT), however, there is no evidence that most POC and public mental health department clinicians are trained and/or competent in CBT.
- Integrated Services for Individuals with serious mental illness and co-occurring mental health disorders—I have addressed the prevalence of co-occurring substance use disorders among seriously mentally ill prisoners—generally understood to be over 75%. In addition, there is clear evidence and a growing consensus that these individuals can only be treated effectively through integrated mental health/substance abuse services. However, there are very few community mental health or substance programs that provide this integrated approach. Any serious effort to promote community release of prisoners—and reduce their 70% recidivism rate, must develop explicit plans for specialized co-occurring disorder treatment. This cannot be achieved without an

17

investment of funding and time to put programs on the ground.

- Community integration supports:  Effective mental health/criminal justice services require, state-of-the-art treatment resources, but also health care services, income support, housing, education, jobs and access to social and leisure activities.  This means that mental health/criminal justice initiatives must fundamentally rely on other community agencies and institutions and foster social inclusion. Effective parole re-entry initiatives should include specific plans for community integration supports that are specific to each county that would receive paroled offenders.

- Gender, sexual orientation, and culture/race and ethnicity impact access and design of effective mental health treatment interventions and services.  One size does not fit all in program design. This understanding of the importance of culturally specific mental health services is  largely lacking in the national literature and research on effective practices for the criminal justice involved population.  For example, services for women must be gender focused and take into account prevalent experiences of victimization, abuse, trauma and re-dramatization both in the community and in institutions.  California has much to offer in developing and documenting services that are responsive to culture, gender and sexual orientation  and these issues must be considered in offender release plans

- Transition Age Youth-Young Adults in the Justice System—There is a growing body of effective practice, both service design and specific therapeutic interventions that identify and address the needs of youth as they transition to young adulthood.  However, the very structure of criminal justice system institutions create barriers to implementing transition age focused services and supports.  For example, the most recent round of Mentally Ill Offender Crime Reduction Grants funded innovative programs for adolescent or adults but were precluded from funding programs that focused on bridging these systems.


## 4.  Potential adverse impact of Coleman population release on community safety and risk, the development of community mental health systems, and community acceptance of individuals with mental illness

An accelerated release of prisoners who meet Coleman class criteria can be anticipated to have adverse— and potentially serious consequences for the released prisoners; community mental health systems and the (non-offender status) mentally ill children, adults and older adults they serve; a potentially negative impact on community safety if adequate supervision, treatment services and programs are not in place at the time of the prisoner release; and potentially long-term negative consequences to community acceptance and the development of public mental health services in the future.

18

The focused discussions and conclusions of a special CSAC taskforce that was established to develop a response to the LAO's 2008-09 budget proposal to release up to 72,000 "low-risk" offenders (subsequently "refined" and reduced to a projected 50,000 offenders) and shift community supervision responsibility from parole to local probation departments, describes the concerns that county agencies and communities would have if there were a prisoner release order. In my opinion (and as a member of this CSAC representing CMHDA), these concerns would be magnified in the event of a release order that included all Coleman classes of seriously mentally ill prisoners. It is relevant to note that the legislature did not ultimately support the parole realignment proposal because of the concerns raised by CSAC, CMHDA and others. The CSAC taskforce report (which was accepted by the CSAC Board) had several key conclusions:

- The LAO Parole Realignment proposal focused on "the wrong end of the corrections system and targets the wrong population." The CSAC taskforce advocates a "front-end"/community focus on intercepting criminal justice at risk/involved persons through prevention, early intervention and diversion programs rather than "expecting counties to succeed with offenders who have been subject to severely overcrowded prison conditions,…exposed to harmful criminal influences, and received little in the way of services or preparation for reintegration."

- "Better outcomes cannot be assured…" especially in light of the lack of adequate local services to a substantially larger existing population at the local that is "presently receiving inadequate supervision and services because of a lack of funding."

- "Our existing system needs attention…a realignment of a significant new population will only place additional pressures on a strained and under-funded system.

Rather than a prisoner release plan that fails to take into account the need to prepare communities for prisoner reintegration, CSAC recommended the implementation of recommendations contained in the CDCR Expert Panel Report on Adult Offender and Recidivism Reduction (2007) including establishing community diversion programs to reduce the pressure for state incarceration, the development of community re-entry facilities for low risk offenders, reform of the parole system to expand community supervision for low-risk offenders, and strengthening state/local partnerships to develop the array of prevention, diversion and re-entry services strategies. It is my opinion that these strategies—including an extensive focus on creating and expanding both CDCR-POC and community mental health and substance abuse provider capacity are far more likely than a prison release program to result in a prison population reduction that can both be implemented and sustained over time.

I have just received and briefly reviewed several documents that describe Receiver Kelso's plans for providing additional mental health care for Coleman class prisoners. (Declaration of William Proctor in

Support of Motion of Receiver J. Clark Kelso for Order Adjudging Defendants in Contempt for Failure to Fund Receiver's Remedial Projects and/or for an Order Compelling Defendants to Fund Such Projects dated August 13, 2008 and the Operational Guidelines Report, California Health Care Facility, California Prison Health Care Receivership Corporation dated July 8, 2008.) In my opinion, the proposed construction and operation of improved mental health facilities and treatment through the construction and staffing of Consolidated Health Care Facilities (CHFC's)—to include 5000 beds and treatment facilities for seriously mentally ill inmates/patients, offers a more reasonable and considered resolution to the impact of overcrowding on Coleman class prisons than a potential prisoner release to communities that are unprepared to meet their needs. It is also my opinion and caution that this plan to operated CHFC's can only provide part of the long term solution. As was at least partially envisioned under the provisions of AB 900, there is also a continuing and urgent need for the State to insure the development of community capacity to provide prevention, early intervention and treatment services that will address and reduce the number of seriously mentally ill individuals who become involved in the criminal justice system. Addressing either approach to resolving this crisis in isolation will fail in the long run. I reserve the right to supplement and update my analysis of the information addressed above as time permits in the future.

**I will conclude this report with a brief summary of my opinion about the likely consequences of an inadequately planned, funded or implemented prisoner release program(s) for seriously mentally ill prisoners.**

Consequences for released prisoners—Our current fail-first system has already demonstrated that there is every reason to expect that prisoners with serious mental illness and a criminal history will fail to follow-up on mental health and substance abuse treatment, including taking psychiatric medications, in the absence of an effectively functioning system of low caseload parole/probation supervision and easily accessible evidence-based mental health treatment, including integrated mental healthsubstance abuse services. Seventy-five-eighty percent of these individuals have a prior history of substance use/abuse that dramatically exacerbates psychiatric symptoms and this is one of the key factors that is known to be predictive of increased violence/harm to self or others. There is a much higher risk of suicide in this population than the general public. It is likely that these individuals will continue to experience high recidivism rate that CDCR currently reports—and that they will use a disproportionate share of local criminal justice and mental health and other health and social services. Nationally recognized programs, including California's MIOCR and CONREP programs have demonstrated that mentally ill offenders can achieve a much higher level of psychiatric stability, rehabilitation and assume positive community roles if appropriate supervision, services and supports are in place.

Negative impact on community mental health systems—California's county-based community mental health systems are already over-burdened and unable to address the needs of their seriously mentally ill

populations. Even in the face of a continuing budget crisis, the passage of the Mental Health Services Act of 2004 brings hope that over time a better resourced and more effective public mental health system of care will be able to focus on prevention and early intervention services that can reduce or mitigate some of the consequences of serious mental illness to affected individuals, their families and communities. More effective and timely interventions and services have been demonstrated to reduce community, institutional and criminal justice system costs. However, public mental health systems must also function to help counties manage their population and community risk. An ill-planned and poorly resourced prisoner release order is likely to result in county mental health departments being forced to shift the balance of their resources to address community safety issues—with a higher percentage of community treatment resources being directed to high-end/high cost crisis and inpatient/institutional services to a justice involved/parolee population that is assessed to present a danger to themselves or others as a result of mental illness. This shifts the balance of resources to highest cost interventions at the expense of prevention and less costly community-based services. Ultimately, the lack of adequate prevention, early intervention treatment and diversion resources will perpetuate the cycle of the criminalization of individuals with mental illness who are then incarcerated in our jails and prisons.

Impact on law enforcement, the courts and county jails—Seven to ten percent of local police officer community incidents involve individuals who have (broadly defined) mental health issues. When mentally ill individuals commit crimes, even relatively low level crimes, they cycle through the local criminal justice system. They are among the most difficult and costly inmates in local jails—and serve sentences that are disproportionately long in relation to their offense. With few exceptions, county jails do not have facilities or the capacity to provide appropriate or effective mental health care—and do not have correctional facility based involuntary inpatient psychiatric treatment options. County correctional facilities are forced to house inmates who are incompetent to stand trial for felony offenses—not uncommonly for 6 months or longer because state hospitals have staffing shortages and will not admit. DA's and Public/Private Defenders find preparation, prosecution and defense of cases involving individuals with serious mental illness-among their most challenging and time-consuming. Superior Courts are establishing mental health and behavioral health courts at an increasing rate and though these courts have positive results, they are labor intensive for both the justice system and treatment providers. County Probation Departments have extremely high caseloads and typically "bank" cases that are assessed as lower level risk. Probation Departments rarely have the resources for the more intensive supervision demonstrated to be a contributor to lower recidivism in multiple MIOCR grant-funded programs to reduce recidivism and re-arrest. This is the local criminal justice system as it currently struggles to respond to individuals with mental illness and co-occurring psychiatric and substance abuse disorders. A prisoner release—and particularly a prisoner release that includes Coleman class seriously mentally ill prisoners will have a significant negative impact on an already over-burdened system. This could also have the effect of reducing or eliminating some of the very

21

programs that are proving effective for the justice involved mentally ill population—simply as a result of increased demand and pressures on the local criminal justice system.

Potential impact and implications for community acceptance of individuals with mental illness—The first US Surgeon General's Report on Mental Health (1999) and the subsequent US Surgeon General's Report Supplement on Mental Health:Culture Race and Ethnicity (2001) identified stigma and discrimination as the greatest barriers to mentally ill individuals accessing needed treatment. The general public's fear of individuals with mental illness and discriminatory practices related to this fear including a lack of understanding of mental illness have historically created barriers to the development of community mental health services and facilities—particularly, specialized treatment facilities and housing.  Over the past decade, there has been progress in public awareness and acceptance of individuals with mental illness. There has even been an increase in awareness of the importance of addressing the unnecessary "criminalization" of seriously mentally ill individuals—and, in my opinion some small reduction in the automatic assumption on the part of the general public that individuals with mental illness are more violent than the general population.  However, an inadequately planned and implemented Coleman class mentally ill prisoner release (or even a general prisoner release without adequate supervision and community service supports,) is likely to result in an increase in community incidents.  Even a small number of these incidents has the potential of slowing or reversing the gains of mental health advocates and the mental health system over the past ten years.  A strong and effective community mental health system—and one that mentally ill individuals are not afraid and ashamed to use,  is one of the keys to reducing the criminalization of individuals with mental illness—and ultimately to reducing the State's prison population.

Mentally ill prisoners have a right to humane and effective services, but in my opinion, the key to effective care and the reduction of over-crowding in our institutions is to insure the availability of sufficient resources in our communities that prevent avoidable incarceration and to insure that an appropriate array of effective supervision, treatment and community support services are fully available and accessible to insure safe community integration and rehabilitation when individuals with mental illness do commit crimes.

I reserve the right to supplement this report as additional information becomes available.

**(II) the data or other information considered by the witness in forming opinion; Include list of reports and references reviewed**

The following publications, reports and data were reviewed in preparation and as citations for this report.

1)  A letter from the California State Association of Counties to Martin J. Mayer dated September 14, 2007 entitled "Potential County Impacts Resulting from a Prison Population Cap."

2)  Plaintiff Coleman's Supplemental Responses to Defendants' Interrogatories, set one, served April 11, 2008.

3)  The July 2, 2008 scheduling order issued by the Three-Judge Panel.

4)  The Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division dated June 30, 2006.

5)  Coleman Special Master Keating's Response to the Coleman Court's May 17, 2007 Request for Information.

6)  The Coleman Special Master's report on suicides at CDCR for calendar year 2005.

7)  R. Patterson and K. Hughes. 2008. "Review of Completed Suicides in the California Department of Corrections and rehabilitation, 1999-2004." *Psychiatric Services.* 59 (June): 676-682.

8)  Status Report filed by Settlement Referee and Consultant dated June 2, 2008.

9)  Supplemental Status Report filed by Settlement Referee and Consultant dated June 30, 2008.

10)  Draft Settlement Proposal dated May 27, 2008.

11)  California Prisoners & Parolees, 2006, Offender Information Services, Data Analysis Unit.

12)  Mentally Ill Parolee Population, 3-28-2008, Report by the CDCR Division of Adult Parole Operations.

13)  Ca Prevalence Rates for Serious Mental Illness:
http://www.dmh.ca.gov/Statistics_and_Data_Analysis/CNE/p5wsmi01_caindex1.htm

14) DMH—Mental Health Services Act; Annual Planning Estimates for the Three-Year Community Services and Supports Funding, 2005
http://www.dmh.ca.gov/DMHDocs/docs/letters05/05-02_Encl-1.pdf

15)  DMH Mental Health Services Act Five-Year Workforce Education and Training Development Plan for the Period April 2008- April 2013, CA Dept. of Mental Health (2008)
http://www.dmh.ca.gov/Prop_63/MHSA/Workforce_Education_and_Training/docs/MHSA_FiveYear

Plan_5-06-08.pdf

16)  Mental Health Services Act "Progress Report" July 2008, CA DMH
http://www.dmh.ca.gov/Prop_63/MHSA/Publications/docs/ProgressReports/MHSA_Progress_July2
008.pdf

17)  Corrections Reform: County Policy Principles and Guidelines, California State Association of
http://www.csac.counties.org/images/users/1/CSAC%20Corrections%20Policy%20Revision_%20a
dopted%20by%20BOD%2052208.pdf

18)  Implementation of AB 900, CMHDA Testimony Provided Senate Budget and Fiscal Review
Committee No. 4, Patricia Ryan, Executive Director, CMHDA, April 11, 2008,
http://www.cmhda.org/public_policy/documents/State%20Docs/State%20Advocacy_Legislative%2
0Letters/Assembly%20Bills/0804_AB%20900_CMHDA%20testimony%20to%20Sen%20Budget%2
0subcom4-4-08gbfinal.pdf

19)  History and Funding Sources of California's Mental Health System, Patricia Ryan, Executive
Director CMHDA, 2006, CMHDA Website Library http://www.cmhda.org/breaking_news/news.html

20)  CDCR Report, Integrated Strategy to Address Overcrowding in CDCR's Adult Institutions,
June 2008 http://www.cdcr.ca.gov/News/docs/2008_06_18_REDUCE_overcrowding_Docs.pdf

21)  Report of the Re-Entry Policy Council: Charting the Safe and Successful Return of Prisoners
to the Community. Council of State Governments. Reentry Policy Council. New York: Council of
State Governments, 2005. http://www.reentrypolicy.org/report

22)  New Freedom Commission on Mental Health Report to the President,  2003,
www.mentalhealthcommission.gov/index.html

23)  Teplin, LA, Abram, KA, & McClelland, GM (1996) Prevalence of psychiatric disorders among
incarcerated women: I. Pretrial jail detainees. Archives of General Psychiatry, 53, 505-512

24)  Mark R. Muntz, MD & Patricia A. Griffin PhD.,"Use of the Sequential Intercept Model as An
Approach to Decriminalization of People with Mental Illness," PSYCHIATRIC SERVICES ♦
ps.psychiatryonline.org ♦ April 2006   Vol. 57   No. 4

25)  Criminal Justice Mental Health Consensus Project, Council of State Governments. Criminal
Justice / Mental Health Consensus Project. New York: Council of State Governments. June 2002.
Web citation:  Consensusproject.org

26)  National GAINS Center, Co-Occurring Disorders and Justice Center, Center for Mental Health
Services, Evidence Based Practice and Expert Panel Reports available on website
http://gainscenter.samhsa.gov/html/

27)  US Surgeon General's Report on Mental Health (1999) and US Surgeon General's Report
Supplement on Mental Health: Culture Race and Ethnicity (2001)

24

28) Declaration of William Proctor in Support of Motion of Receiver J. Clark Kelso for Order Adjudging Defendants in Contempt for Failure to Fund Receiver's Remedial Projects and/or for an Order Compelling Defendants to Fund Such Projects dated August 13, 2008

29) Operational Guidelines Report, California Health Care Facility, California Prison Health Care Receivership Corporation dated July 8, 2008

### (III) any exhibits that will be used to summarize or support them;

At this time there are no exhibits attached to support this report.

### (IV) the witness's qualifications, including a list of all publications authored in the previous 10 years;

See attached Resume. I have a Masters in Social Work from San Francisco State University and have worked as an upper level manager in three California' County Mental Health Systems from 1981-2008 including holding the position of Mental Health Director in two Bay Area counties for over 17 years. I have held active leadership roles in the California Mental Health Directors Association (CMHDA) including serving as President and on the Governing Board and most recently as Chair of the CMHDA Forensic Committee. Since retiring as a County Mental Health/Behavioral Health Director in January 2008, I have provided consultation services to CMHDA on corrections policy and community corrections issues including the development of CMHDA legislative testimony regarding AB 900 implementation issues and the LAO's Parole Realignment Proposal. I represent CMHDA on various task forces and committees related to mental health corrections issues and corrections reform including:

--CA Judicial Counsel: Judicial Task Force on Criminal Justice Collaboration on Mental Health Issues and serve on two sub-committee regarding Re-entry Services and Co-occurring Mental Health and Substance Abuse Disorders.

CA State Association of Counties (CSAC) Corrections Issues and Implementation Work Group as well as the CSAC Administration of Justice Parole Realignment Task Force that was formed to analyze and respond to the Legislative Analyst Office's 2008 budget proposal to release non-violent offenders and realign significant State Parole functions to County Probation Departments.

As Mental Health Director for San Mateo County (5/2001-1/2008) I served on local corrections related committees and task forces including: Superior Court of San Mateo's Mental Health Court Planning and Oversight Committee as well as the Board of Supervisors Criminal Justice Committee and its Re-entry Sub-committee.

Recent workshop and conference presentations:

25

- The Stanford Executive Sessions on Sentencing and Corrections, "California Corrections Reform: State/Local Partnerships, participant and speaker—6/2007

- From Words to Deeds IV: Changing the Paradigm for Criminal Justice and Mental Health, sponsored by the Council on Mentally Ill Offenders, workshop moderator— 2007

- California Mental Health Policy Forum; "Mental Health and Criminal Justice: Serving our Communities Together"-9/2007

- CSAC Annual Conference, Workshop on AB 900 Implementation, presenter—11/2007

- California Mental Health Directors Association All Directors Meeting; organized and panel presenter on "Community Corrections: Politics, Policy and Practice" -6/2008

**Publications:**

Abbott, Beverly, Gale Bataille, Sandra Goodwin, Co-Editors "Women and Mental Illness" The Journal of NAMI California, December 1999, Vol.10, No. 4., and authors of "Gender Matters", pg. 4-7.

Bataille, Gale, Ken Anderson and Susan Penner, "Solano County's Experience: A Public/Private Sector Venture in Managed Mental Health", Administration & Policy in Mental Health, Jan. 1995,Vol 22, No. 3.

Bataille, Gale, "Psychotherapy and Community Support: Community Mental Health Systems in Transition", New Directions in Mental Health Services, 1990, #48, Jossey-Bass, Inc.

Bataille, Gale and Crowell, Areta, "Why Not California? Dual Diagnosis and Fragmented Care", Journal of the California Alliance for the Mentally Ill, Winter 1991, Vol. 2, No. 2.


**(v) a list of all other cases in which, during the previous 4 years, the witness testified as an expert at trial or by deposition**

I have not served as an expert witness or testified at any trial during the previous 4 years.


**(VI) statement of the compensation to be paid for the study and testimony in the case.**

I have agreed to a compensation rate of $200.00 per hour for expert witness report preparation including research, review of documents and drafting the report.  I have agreed to compensation rate of $250.00 per hour for expert witness depositions, testimony and related activities.

*Gale Bataille, MSW*

Gale Bataille, M.S.W.

August 15, 2008

26

# EXHIBIT A

(510) 224-0248
gale.bataille@mac.com

# Gale G. Bataille, M.S.W.

**Qualifications Summary:**

Senior Executive with over thirty years of experience in planning, program development, administration and financial management of mental health and alcohol and drug abuse services and systems.

**Education:**

Masters in Social Work, San Francisco State University, California, 1984, Specialization in Program Operations/Administration

B.A. with Honors in Psychology, Oberlin College, Ohio 1969

**Work History:**

**Independent Consultant, March 2008 – present**
Consultation regarding mental health and behavioral health policy and systems development with particular focus on community mental health systems change processes and criminal justice policy as it impacts local systems of behavioral health care.

**San Mateo Mental Health Division, Health Services Department**
**Director, Behavioral Health and Recovery Services, May 2001 – Jan. 2008**
As County Mental Health Director, directed all service and administrative functions of County Mental Health Service and effective 6/2007 mental health and alcohol and other drug services with a $115 million budget, over 400 staff and multiple contracted community and institutional services. Active in statewide leadership functions related to community mental health policy and services provision.   Retired 2008.

**Assistant Director, Mental Health Services, October 2000 – May 2001**
Supervised managed care functions including coordination with State agencies; human resources, contract and budget development administration.

**Health and Social Services Department, Solano County, CA**
**Mental Health Director, 1990 – 2000**
Directed County Mental Health Division with a $31 million budget and over 225 staff and contracted community and institutional services.  Developed and implemented California's first county-operated Mental Health Managed Care System; implemented services redesign in order to manage risk, insure access, quality and continuity of services; enhanced community support services to seriously mentally ill children and adults; promoted consumer self-help and peer support services; implemented cultural competence plan cited for excellence by WICHE.

**Deputy Director for Alcohol, Drug Abuse and Mental Health Services, Contra Costa County Health Services Department, 1984-2000**
Supervised three Regional Mental Health Centers, Case Management,

Alcohol and Drug Programs with combined budgets of $25 million; directed program planning; developed contract monitoring system; designed policy and program(s) for substance abusing mentally ill persons including award of Federal demonstration grant (1987) for co-occurring disorders.

Chief of Planning and Evaluation 7/82 – 11/83

Continuing Care Director, 1/81 – 6/82

**Bay Area Community Services, Inc.,** Oakland, California

Director, Allso House 1974 – 1980

Developed and directed a 15 bed residential treatment facility for seriously mentally ill adults. President of California Association of Social Rehabilitation Agencies (CASRA) 1979 – 80

**American Friends Service Committee, Community Relations Division,** Philadelphia, PA 1972 –1973

Staff to National Woman's Project and consultant to women's self-help and consciousness raising groups.

**Health Information Project,** Philadelphia, PA, Founder & Staff, 1970 –1972

**Organizational And Professional Activities:**

**Workshops/Conferences:** Presenter and conference organizer for workshops regarding Community Corrections, Mental Health Managed Care, Co-Occurring Disorders, System Change, Consumer Empowerment and Self-Help, Wellness and Recovery, Children's System of Care, Women's Mental Health and Employment Services for Psychiatrically Disabled Adults.

**California Mental Health Directors Association**

Emeritus Mental Health Director member, January 2008- present

President 1995 – 1996;President Elect 1994 -1995; Sec/Tres 1993 –1994

Governing Board/Executive Committee, 1991 – 2000; 2006-2008

Chair, Forensic Committee 2006-2008

AB 3632 CMHDA Task Force-2003-present

Future of State Hospitals Committee, Co-Chair with California Department of Mental Health, 1993 – 1994

Chair, Greater Bay Area Mental Health Directors, 1991 – 1993

Chair, State Hospital Task Force/Long Term Care Committee, 1990 – 1993

Co-Chair, Employment Services Committee, 1989 – 1991

**California Institute for Mental Health Services**

President of Board, 1996 – 2000; Board of Directors, 1993 – 2006

Center for Multicultural Development Advisory Committee, May 2000 – present

**Mental Health Consumer Concerns, Inc.,** Board of Directors, May 2008 - present

**California Mental Health Planning Council**, 1996 – 2000
Appointed 1/96, Executive Committee, Chair, Policy and Planning Committee, 1/2000 – 12/2000

**Women's Mental Health Policy Council**, founding member, Steering Committee, 1998 – 2005

**American College of Mental Health Administration**, Fellow, 1997–present

**Governor's Committee for the Employment of Disabled Persons**, Appointed member, 10/93 – 3/96

State Department of Mental Health/State Department of Alcohol and Drug Programs Dual Diagnosis Task Force, member, 1994 – 1997
Solano County Children's Policy & Planning Committee, 1993 – 9/2000
Juvenile Justice Coordinating Council, Solano County, 1997 – 9/2000
Community Cancer Task Force, Coalition for Better Health, 1997
Robert Wood Johnson Foundation, Fighting Back Partnership, Vallejo, California, Steering Committee, 1991 – 1993

**Professional Publications:**

Abbott, Beverly, Gale Bataille, Sandra Goodwin, Co-Editors "Women and Mental Illness" The Journal of NAMI California, December 1999, Vol.10, No. 4., and authors of "Gender Matters", pg. 4-7.

Bataille, Gale, Ken Anderson and Susan Penner, "Solano County's Experience: A Public-Private Sector Venture in Managed Mental Health", Administration & Policy in Mental Health, January 1995, Vol 22, No. 3.

Bataille, Gale, "Psychotherapy and Community Support: Community Mental Health Systems in Transition", New Directions in Mental Health Services, 1990, #48, Jossey-Bass, Inc.

Bataille, Gale and Crowell, Areta, "Why Not California? Dual Diagnosis and Fragmented Care", Journal of the California Alliance for the Mentally Ill, Winter 1991, Vol. 2, No. 2.

# EXHIBIT M

1            IN THE UNITED STATES DISTRICT COURTS

2         FOR THE EASTERN DISTRICT OF CALIFORNIA

3          AND THE NORTHERN DISTRICT OF CALIFORNIA

4     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6                      -    -    -

7   RALPH COLEMAN, et al.,              )

8                    Plaintiffs,        )    CERTIFIED COPY
                                        )
9       vs.                             )No. CIV S90-0520
                                        )LKK-JFM P
10  ARNOLD SCHWARZENEGGER, et al.,      )THREE-JUDGE COURT
                                        )
11                   Defendants.        )
    ─────────────────────────────────  )
12  MARCIANO PLATA, et al.,             )
                                        )
13                   Plaintiffs,        )
                                        )
14      vs.                             )No. C01-1351 TEH
                                        )THREE-JUDGE COURT
15  ARNOLD SCHWARZENEGGER, et al.,      )
                                        )
16                   Defendants.        )
    ─────────────────────────────────  )

17

18                   DEPOSITION OF

19                JAMES GILLIGAN, MD

20             SAN FRANCISCO, CALIFORNIA

21                SEPTEMBER 19, 2008

22  ATKINSON-BAKER, INC.
    COURT REPORTERS
23  800.288.3376

24  REPORTED BY:  DAWN A. STARK, CSR NO. 7847

25  FILE NO. A207E46

1

1              Feel free to take a look at it (indicating).

2       A.    Uh-huh.

3              (Witness reviewing document.)

4              I'd say that's up to date, yes.

5       Q.    Okay.  No more -- I'll strike that.

6              Were there any publications of any articles

7  written or authored by you since this curriculum vitae

8  was provided to us in August 2008?

9       A.    No.

10      Q.    I just want to kind of ask you a few questions

11 about your background.

12             First, I noticed, in your expert report, that

13 you indicated that you established a clinical director

14 position for Prison Health Services around that time; is

15 that correct?

16      A.    That's "Prison Mental Health Services".

17      Q.    "Prison Mental Health Services"?

18      A.    Yes.

19      Q.    In establishing that position, does that mean

20 that you actually served in that position?

21      A.    Yes.

22             I was the clinical director of the Prison

23 Mental Health Services for the Department of Correction

24 of the State of Massachusetts.

25      Q.    And at the time you established that position

                                                          11

1          Is this person dangerous?  Should the person be

2   evaluated for competency to stand trial?  Should the

3   person, you know, be evaluated as to whether they can be

4   held criminally responsible?

5          Q.    Forensic evaluations?

6          A.    Forensic evaluations, yes.

7          Q.    Do you know if the system of providing mental

8   health care to parolees at these state department mental

9   health clinics is still viable in the State of

10  Massachusetts today?

11         A.    You know, I probably shouldn't attempt to say,

12  because I've -- you know, I'm no longer working within

13  Massachusetts.

14         I've been in New York for the last several

15  years, so I probably shouldn't even try to answer that.

16         It's possible changes have occurred that I'm

17  just not aware of.

18         Q.    The last time that you worked in that field of

19  providing mental health services to inmates, other than

20  the Massachusetts Department of Corrections, then, was

21  from 1982 to 1991?

22         A.    Well, actually, I ran the Prison Mental Health

23  program -- sorry, I ran the Bridgewater state hospital,

24  as medical director, from 1977 to 1981.

25         Then I ran the Prison Mental Health Service

1  from 1982 to '91.

2          In 1992, I then became director of the

3  Bridgewater Hospital.

4          Even in prior years, from 1967 to 1977, I did

5  part-time work, first as a psychiatric resident in prison

6  psychiatry, and then as a supervisor for psychiatric

7  residents who were working in a prison mental health

8  program that was established before the court orders that

9  began to take place only in the late 1970s.

10      Q.   So, what I'm seeing on your CV, which is in

11  Appendix A of your report, is December '91 to

12  December '92, medical director, Bridgewater State

13  Hospital and Center for the Study of Violence?

14      A.   Uh-huh.

15      Q.   When it says "medical director," I have to

16  wonder:  Does that mean that you provided or ensured the

17  provision of medical care to the patients of Bridgewater

18  State Hospital as opposed to mental health care?

19      A.   Well, we -- actually, I think the most accurate

20  answer to that would be no, in the sense that the term

21  "medical director" referred to the psychiatrist-in-chief,

22  but there was a separate medical team that was

23  responsible for providing straight medical care.

24      Q.   Did they report to you?

25      A.   How did that work?

 1              No.   They were independent of me.   They had a

 2   separate contract with the Department of Correction.

 3              So, they reported to the Department of

 4   Correction and -- for some of that time, as I recall, I

 5   believe they also -- well, I know I reported to the

 6   federal judges, not to the Department of Correction.

 7              I believe the medical -- the medical staff

 8   reported to the -- well, it would have been either the

 9   judges or the Department of Correction.

10              I'm actually not sure.

11      Q.   Okay.

12      A.   That was --

13      Q.   I understand.

14      A.   -- not my job.

15      Q.   In the course of your work in Massachusetts and

16   New York and elsewhere, have you ever had the opportunity

17   to work with J. Michael Keating, Junior, on any

18   correctional issues?

19      A.   Not that I can recall.

20      Q.   It doesn't sound familiar to you?

21      A.   No.

22      Q.   Okay.   I just thought I'd ask you.   Apparently,

23   you both occupied a similar territory in a similar part

24   of the world.

25              Now, I notice that at one point, you indicated

```
 1              No, there were no orders, that I'm aware of,

 2   from the courts to release, say, a particular fraction of

 3   the prison population or to reduce the population to a

 4   particular number.

 5   BY MS. TILLMAN:

 6        Q.   Was there any discussion about doing so with

 7   the courts?

 8        A.   Let me think.

 9              I can't recall anything that would fit that

10   description or that definition.

11        Q.   Okay.

12        A.   I mean, I was constantly involved in -- both in

13   the state mental hospital, but also in the prison, in

14   engaging in psychiatric evaluations, or supervising the

15   ones that did occur, of prisoners, one at a time, as to

16   whether or not they could safely be -- either leave the

17   state mental hospital or leave the prison.

18              I mean, there were occasions when people were

19   about to leave, and I would be asked by the correctional

20   staff or by my colleagues in the Prison Mental Health

21   Service to evaluate somebody who people were concerned

22   might be actively mentally ill and/or, you know, say,

23   dangerous to others or self by virtue of mental illness,

24   and evaluate whether the person might need inpatient

25   care, for his safety or the safety of the public.
```

31

1    a way somewhat similar to this report (indicating).

2        Q.    Okay.

3        A.    I mean, if you go on Amazon.com, it was listed

4    as a book, but it was really more like a pamphlet.

5        Q.    Was it subject to any peer review?

6        A.    No.

7        Q.    When you did this research to prepare this

8    book, were you in contact with any employees of the

9    California Department of Corrections and Rehabilitation

10   on this issue?

11       A.    Oh, yes.

12             I talked with many people, from the secretary

13   of the department on down --

14       Q.    Okay.

15       A.    -- as well as to many legislators, yes.

16       Q.    Did you undertake any tours of any CDCR

17   facilities in the preparation of this book?

18       A.    I'm trying to recall.

19             I don't believe I did that, that I can

20   recall --

21       Q.    Have you ever --

22       A.    -- in California.

23       Q.    I'm sorry.

24             Have you ever visited any California Department

25   of Corrections and Rehabilitation jail facility or prison

                                                              35

1    facility?

2        A.    No.

3            MR. GALVAN:  Objection.  Compound, jail or

4    prison.

5            THE WITNESS:  Jails, I've visited very

6    extensively; the San Francisco jails and also the

7    Los Angeles County jail.

8            I was called in as a consultant when they were

9    having one of their more serious riots.  I think it was a

10   couple of summers ago.

11           So, I've been in both San Francisco and

12   Los Angeles jails, including, at times, when they were in

13   the state of emergency crisis.

14   BY MS. TILLMAN:

15       Q.    Have you been in any state prisons?

16       A.    I don't believe I've been in any state prisons,

17   that I can recall.

18       Q.    Have you been in any of the state mental health

19   hospitals operated by the Department of Mental Health or

20   the State of California?

21       A.    No -- I'm trying to recall.

22           I know I've talked with people who have worked

23   in those settings about their work, but I haven't been

24   inside them.

25       Q.    Have you had any discussions with Jean Woodford

1  about this San Francisco experiment on violence and

2  prevention in the San Francisco County jails?

3      A.   Well, it would depend on which experiment you

4  were talking about.

5           The one I was involved with was called "RSVP,"

6  the Resolve to Stop the Violence Program.

7      Q.   Okay.  Did you have conversations with Ms.

8  Woodford about that?

9      A.   I don't recall her name.

10     Q.   Okay.

11     A.   The person I worked with most closely were the

12  people -- well, first of all, the sheriff, Michael

13  Hennessey; the assistant or associate sheriff, Michael

14  Morgan; and the director of programs, Sunny Schwartz.

15     Q.   Was there any experiment, that you were aware

16  of and a part of, to reduce violence in the San Francisco

17  County jails, other than RSVP?

18     A.   No.  That was the only one that I was involved

19  with.

20     Q.   Are you aware of whether RSVP is still being

21  implemented in the San Francisco County jails?

22     A.   There was a follow-up and attempt to apply and

23  adapt the RSVP model to female inmates in the jail, and

24  as I recall, there's kind of an attenuated version of

25  RSVP that is continuing.

1        A.    I am not aware of any reason to question the

2   clinical judgment of the people who were categorizing

3   them.

4            I used the data that they used.

5        Q.    Okay.  When we speak of the immediate release

6   of 15,000 inmates, with possibly 21 percent of them from

7   the Coleman caseload, do you have any concerns about the

8   release of the mentally ill offender who is in an acute

9   care bed within a state hospital?

10       A.    Again, I'm not sure I'm understanding.

11           You're talking about people in the prison or

12  people in a DMH hospital?

13       Q.    In a DMH hospital, who would be subject to a

14  prisoner release order.

15       A.    Well, I want to say my concern would be that if

16  their legal status was changing from being a prisoner to

17  not being a prisoner, that, itself, wouldn't change their

18  mental status.

19           I would take it for granted that the Department

20  of Mental Health hospital would make an evaluation as to

21  whether the person was dangerous to him or herself or

22  another by reason of mental illness.

23           If they determined that that was the case, they

24  would petition the court to have the person committed to

25  the hospital, unless the person voluntarily agreed to --

1        Q.    Is that what happens in New York?

2        A.    That's what happens in Massachusetts.

3        Q.    Are you familiar with the

4   Lanterman-Petris-Short Act?

5        A.    I am not, no.

6        Q.    Are you familiar with whether or not the

7   Department of Mental Health of the State of California

8   has the ability to petition the court for an involuntary

9   commitment of a state prisoner before they're subject to

10  parole?

11        MR. GALVAN:   Objection.   Calls for a legal

12  conclusion.

13        You can answer.

14        THE WITNESS:   I would say that's actually not

15  what I'm talking about.

16        I'm talking about what would happen after they

17  were no longer under the jurisdiction of the parole board

18  or the Department of Correction.

19  BY MS. TILLMAN:

20        Q.    If a prisoner release order from the

21  Three-Judge Panel issued, is it your belief that those

22  California Department of Correction prisoners who are

23  receiving mental health care at an acute level within the

24  Department of Mental Health hospital should not be

25  subject to immediate release?

1      A.    I'm not saying that across the board, but I'm

2  saying I would hope that it would depend on the mental

3  status and the behavioral status of the person

4  involved.

5      Q.    Would that be true, also, for the members of

6  the Coleman class who, at the time of a prisoner release

7  order, are receiving Enhanced Outpatient Program care

8  within a California Department of Corrections and

9  Rehabilitation prison?

10         MR. GALVAN:  Objection.  Vague and ambiguous as

11  to what "that" is.

12  BY MS. TILLMAN:

13      Q.    You spoke of an individual evaluation before,

14  having a prisoner being released as part of an immediate

15  prisoner release order?

16      A.    Uh-huh.

17      Q.    Would you expect that evaluation to be

18  conducted on every mentally ill patient within the

19  California Department of Corrections in implementing any

20  prisoner release order?

21      A.    I would assume that it would be likely to be

22  required of EOP patients.

23         Let me go back a step and say:  What I'm

24  talking about is something that I would hope would apply

25  to any individual who comes into contact with the mental

1  not defendants should abandon the plan to create more

2  mental health beds at particular sites and simply go

3  full-speed ahead on providing the type of resources that

4  we saw in Massachusetts for the diversion and community

5  treatment of mental health offenders?

6      A.    If I'm understanding your question correctly,

7  and stop me if I'm not, I would strongly recommend that

8  the emphasis be on trying to treat the mentally ill

9  within the mental health system rather than diverting

10  them to the correctional system.

11          If the state were going to build mental health

12  treatment facilities or outpatient clinics, I would

13  strongly hope they would do that within the mental health

14  framework rather than a correctional framework.

15      Q.    Are you aware of any particular county in the

16  State of California that will receive a higher level of

17  parolees than any other county?

18      A.    I'm not specifically aware of numbers, but I

19  would say I wouldn't be surprised if there weren't

20  differences, based on the populations of different

21  counties, if they're different, but just as much the

22  different socioeconomic characteristics of the different

23  counties, to the extent those exist.

24          I can't break it down, though.  I don't know

25  California in that much detail.

1  review during today's deposition.

2        MR. GALVAN:  You can still answer.

3        THE WITNESS:  I'd have to say I just don't know

4  for sure.

5        I mean, as I say, these names begin to be a

6  little bit of a blur.

7        MR. GALVAN:  Okay.  New subject.

8     Q.  Are you familiar with general principles behind

9  civil commitment laws for the mentally ill?

10    A.  Yes.

11        MS. TILLMAN:  Objection.  Vague and ambiguous

12  as to which state.

13        MR. GALVAN:  Okay.

14    Q.  Are you familiar with the national movement --

15  with any national movement, at any time, to enact civil

16  commitment laws for the mentally ill?

17    A.  Well, I know the American Law Institute came up

18  with a series of standards, probably four decades ago or

19  so, which were applied in almost all of the 50 states.

20    Q.  What are the basic principles of those

21  standards?

22    A.  They often use exactly identical language.

23    Q.  Okay.  Under those standards, what are the

24  basic criteria for committing someone?

25    A.  Well, somebody -- I mean, the basic principle

186

```
 1    is that somebody is so disabled, by reason of mental

 2    illness, that they are a danger to themselves or

 3    others.

 4         Q.   Do you make it a point to know the exact names

 5    of every statute in all 50 states that have been

 6    developed under those principles?

 7         A.   No.

 8         Q.   Did you review any information to show that

 9    there are now any number of parolees being released into

10    the population with mental illness?

11         A.   Yes.

12         Q.   Did you develop any opinions as a result of

13    reviewing that information?

14         A.   Well, what it led me to think is that the

15    status quo is that mentally ill parolees are being

16    released into the state all the time, and I mean by the

17    thousands.

18              The problem with that, that I'm concerned

19    about, is that because they are turning in and out --

20    they're like ping-pong balls.

21              I mean, they're going back and forth between

22    the parole board system in the community and the prisons.

23              They spend an average of four months in the

24    prisons when they return.

25              They wind up spending a much longer time in the
```

```
 1                    REPORTER'S CERTIFICATION

 2

 3

 4            I, DAWN A. STARK, CSR No. 7847, Certified

 5    Shorthand Reporter, certify:

 6            That the foregoing proceedings were taken

 7    before me at the time and place therein set forth, at

 8    which time the witness was put under oath by me;

 9            That the testimony of the witness, the

10    questions propounded, and all objections and statements

11    made at the time of the examination were recorded

12    stenographically by me and were thereafter transcribed;

13            That the foregoing is a true and correct

14    transcript of my shorthand notes so taken.

15            I further certify that I am not a relative or

16    employee of any attorney of the parties, nor financially

17    interested in the action.

18            I declare under penalty of perjury under the

19    laws of California that the foregoing is true and

20    correct.

21            DATED this 1st day of October , 2008.

22

23

24            _____

25            DAWN A. STARK, CSR No. 7847
```

```
 1              REPORTER'S CERTIFICATION OF CERTIFIED COPY

 2

 3

 4

 5

 6

 7              I, DAWN A. STARK, CSR No. 7847, a Certified

 8    Shorthand Reporter in the State of California, certify

 9    that the foregoing pages 1 through 193 constitute a true

10    and correct copy of the original deposition of JAMES

11    GILLIGAN, MD, taken on September 19, 2008.

12              I declare under penalty of perjury under the

13    laws of the State of California that the foregoing is

14    true and correct.

15

16              DATED this 1st day of October, 2008.

17

18

19              _____

20              DAWN A. STARK, CSR No. 7847

21

22

23

24

25
```

# EXHIBIT N

# REBUTTAL REPORT

# OF GALE BATAILLE, MSW

## Gale Bataille—Rebuttal to Plaintiffs' Reports
August 27, 2008

### (i)  Rebuttal and professional opinion regarding Plaintiffs' Expert Opinion reports as they pertain to:

1.  Plaintiff's assumptions about the characteristics of the Coleman class population and the needs of these Coleman class prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities on parole.

2 The potential impact of a prisoner release order on public safety given various potential prisoner release scenarios envisioned by the plaintiffs;

3. The capacity of California's mental health programs to meet the needs of Coleman class parolees as well as the needs of the general population of released prisoners who may experience mental health needs.  I will discuss my opinion that Plaintiff's expert witnesses do not appear to have sufficient or current knowledge of the capacity—or more importantly, California's lack of resource capacity to meet the needs of released Coleman class prisoners in the following areas of mental health services:  CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services;

4.  Additional recommendations regarding potential strategies and services to more effectively and safely reduce the population in California's prisons including plans described by CDCR, CSAC, CMHDA and several legislative initiatives.


I have reviewed Plaintiffs expert witness reports by James Gilligan, M.D.; Joseph Lehman; James Austin PhD; and Pablo Steward M.D.  In addition, I have reviewed the reports of County Interveners—San Mateo County and Santa Clara County and Defendants' expert witness, James Marquart, Ph.D.  My comments and expanded opinions are based on references cited in my report submitted on August 15th as well as a June 25, 2008 updated report on psychiatric bed closures from the California Hospital Association's Center for Behavioral Health and telephonic communication with representatives of the California Mental Health Directors Association.


### 1.  Plaintiff's assumptions about the characteristics of the Coleman class population, including violence potential and the needs of these prisoners for mental health and integrated mental health/substance use treatment if they are released to our communities.

Dr. James Gilligan provides extensive comment on the characteristics of mentally ill prisoners, what is known and generally accepted in the literature about the prevalence and predictors of violence among individuals with mental illness in comparison with the prevalence and predictors and of violence in the general population. Dr. Gilligan poses the question: (paragraphs 34 ff.)  Are mentally ill offenders (MIO's) as a group more dangerous than non-MIO offenders?  He cites a research study (unpublished manuscript) of California parolees (#36) that concludes mentally ill

1

offenders are no more likely than non-mentally ill offenders to commit violent crimes after release from prison. He further cites and discusses a meta-analysis (Bonta and Hanson, 1998,) that finds persons with severe mental illness were neither "more nor less likely than the non-mentally ill to re-offend" and that individuals with certain serious psychiatric disorders including schizophrenia and major depression are actually less likely to re-offend with only a modest increased risk of violence among paroled mentally ill offenders that is related to other risk factors including past violence.

In my career as a County Mental Health Director, I have had extensive experience in locating and implementing mental health services in community settings. I have often had to confront public fear and distortions regarding the violence potential of individuals with mental illness and I have made many of the same arguments and cited much of the same research that Dr. Gilligan references. However, there are certain characteristics and environmental factors that do correlate with increased violence potential of persons with mental illness as well as those with criminal justice involvement and the general public. As is acknowledged by Dr. Gilligan, **"Criminal history, antisocial personality, <u>substance abuse</u>**, and family dysfunction" were the most powerful predictors [of violence,] in mentally ill and non-mentally ill parolees. While, there are common predictors or correlates of future criminal behavior for mentally ill and non mentally ill populations, Dr. Gilligan and the other Plaintiff's experts generally fail to discuss and take into consideration **that there is an extremely high rate of co-occurring substance abuse within the mentally ill justice involved population—at least 75 % of mentally ill prisoners.** [Note: I provided an extensive discussion of this issue in my 8-15-08 Expert Opinion.] The use/abuse of alcohol and other drugs is often a trigger and antecedent to psychiatric de-compensation that may lead to (brief) psychotic episodes **and** as noted by Bonta and Hansen (pg. 139) "Hallucinations and delusions may trigger anti-social acts in the immediate situation and have high predictive validity in the short-term...however such symptoms may have little predictive validity in the long term." One of the few other predictors of future violence is a prior history of violence. It is reasonable to assume that mentally ill individuals who are incarcerated in the state's correctional facilities have a significantly higher rate of prior violence in their histories than individuals with mental illness who live in our communities.

My intention in raising these concerns is not to argue that mentally ill prisoners are violent and should not be released. Rather, I would argue that it is critical to develop a clear understanding of the risks and characteristics of the mentally ill prisoner and parole population and to responsibly plan to meet the supervision, treatment and rehabilitation needs of this population when they are released into the community. Even if we accept the general conclusion of Dr. Gilligan that there is no greater risk of violence in the seriously mentally ill parolee population than among other parolees, any episodes of violence committed by mentally ill parolees will be magnified by the press and can be expected to lead to disproportionate fear and discriminatory responses by the public. It is almost inevitable that there will be such community incidents in the future—just as it is inevitable that there will be violent acts committed by parolees who are not mentally ill. I am concerned that in his effort to combat over-blown stereotypes of violent mentally ill persons, Dr. Gilligan fails to adequately acknowledge the population risks that exist and fails to adequately advocate for effective plans or services to address the needs of seriously mentally ill parolees. The question that must be considered is whether the Courts, the State and local mental health systems will be able to say to the public when a mentally ill parolee commits an act of violence (as will inevitably occur)--that this incident must be understood as a rare exception, no more likely to happen than an incident of violence in the general public, because State and local mental health

2

systems have been put in place to insure needed supervision and treatment. In my opinion we are not in a position to make that assertion.

2.    **What elements should be included in prisoner release order that appropriately considers public safety in light of prisoner release scenarios envisioned by the Plaintiffs?**

Plaintiff's expert witness reports generally concur that a prisoner release order including Coleman class prisoners can be safely implemented if there is a range/types of services in place to provide appropriate supervision, community support and mental health services to parolees. What is lacking in all of the Plaintiff's expert reports are specifics that either demonstrate that adequate services are in place or that there is an adequate plan to have these services in place **prior to a Coleman class prisoner release.**

**Gilligan Opinion**--Dr. Gilligan asks: "Would a prisoner release order that includes an incremental decrease in length of stay or diversion of mentally ill offenders adversely impact safety?" He concludes (16. b) that a responsible prisoner release program that provides the basic elements of treatment and support to mentally ill offenders—including pre-release planning, access to care in the community including services to individuals with co-occurring mental illness and addiction would not adversely impact public safety. Dr. Gilligan argues that a responsible release plan would reduce the "churning" of mentally ill prisoners that results in short incarcerations with prisoners emerging "sicker than when they went in" and acknowledges that "without adequate plans for treatment services in the community this "churning" will continue. (# 25) He comments positively on his experience with a 1997-2004 program for violence reduction conducted with San Francisco County's correctional facilities that resulted in a 100% reduction in institutional violence and 83% reduction in re-arrest for violent crimes. However, good results for a pilot program in San Francisco County--which has an exemplary jail mental health service, has been a leader in supporting community based services and has greater access to resources than most California counties, don't translate to other California counties.

We must consider the impact if the numbers of seriously mentally ill parolees are increased under a Coleman release order. Dr. Gilligan states that large numbers of individuals are already recidivating--over 6000 per year. This is a reflection of insufficient and inadequate treatment services for CCCMH and EOP parolees.

What Dr. Gilligan fails to provide in his expert opinion is any real data that proves that California has a plan, is prepared, or capable of providing supervision, community mental health/substance abuse treatment and support services that would constitute the "responsible prisoner release program" that he supports.

**Austin Opinion**--James Austin discusses the problems with California's "catch and release program" that results in a high rate of technical parole violations and high re-incarceration rates. Austin argues that imprisonment of parole violators "actually worsens public safety because it disrupts any effort to stabilize parolees and the communities in which they reside." Austin discusses various methods for diversion and sentence reductions, and argues using data from

3

Amador, Fresno and Los Angeles counties, that there would be a minimal impact on local jails and corrections systems. In my experience working in three counties (Contra Costa, Solano and San Mateo) even the "minimal" effects that Austin describes would have serious consequences for California's counties overcrowded jails and high probation caseloads. Austin argues, "If a diversion program is implemented simultaneously with providing evidence-based programming, public safety might actually improve because research shows that technical parole violators and low-risk offenders have higher recidivism rates when incarcerated, and lower recidivism rates when provided appropriate evidence-based programming in the community." (#91-pg. 39)

In my opinion, Austin provides no evidence that such diversion programs are in place and he fails to address the impact on public safety if adequate diversion plans and resources are not in place prior to a prisoner release.

**Lehman Opinion**—Joseph Lehman offers his opinion that prison over-crowding can be reduced while maintaining public safety through implementing recommendations contained in CDCR's Expert Panel to Reduce Overcrowding where he served as Chair of the Model Program Sub-Committee. Included in the recommendations he cites is the importance of developing partnerships between state and local corrections agencies. I would add that these partnerships must be expanded to include partnerships with counties and their network of mental health, health and social services agencies that will be impacted and may be called upon to play key roles in serving released Coleman class prisoners. Lehman provides no opinion about the progress that the State has made in implementing these Model Program recommendations, nor does he identify which of these recommendations must be implemented in order to implement an effective prison population reduction plan that will maximize safety for released seriously mentally ill parolees or the public.

**Stewart Opinion**—Pablo Stewart, M.D. states that "the State can include the Coleman class in population reduction plans without adversely affecting public safety and should do so. Moreover, if the State enhanced the services provided to released individuals, public safety would improve." (Part 02, Opinion 3, pg. 3) He goes on to state: "When considering the public safety impacts of such a program,...**it is important to understand who these individuals are** and what systems already exist in the community." Dr. Stewart documents in extensive detail that poor mental health care in CDCR prisons actually means that accurate assessments—including diagnosis, level of care needs and risk assessments, are not available for prisoners who may be released to community parole status under a Coleman class release. According to Stewart:

- "The severe shortage of mental health beds has created a system that houses a significant portion of Coleman class members at lower levels of care than the patients clinically required. A significant number of class members who I interviewed at the EOP level of care, for instance, required inpatient psychiatric hospitalization. ...I was struck by the very high acuity of the patients I encountered during my tours because they were much sicker, as a whole, than the Coleman class members I encountered between 1990 and 2000." (# 88, pg. 36-37) Dr. Stewart provides examples of cases of prisoner who are classified as Coleman class seriously mentally ill but "where medical files fail to note Dementia due to HIV disease and Cognitive Disorder NOS" (89 a./b.) as well as serious medication non-compliance issues (99) and problems with medical records. (102)

4

In my opinion, Stewart's assessment of conditions within CDCR prisons logically leads to the question of why the Court, counties or our communities should be in any way assured that we have adequate information about the needed level of community treatment supports for a Coleman prisoner release. According to Stewart, prison conditions of overcrowding, incomplete diagnoses, lack of access to treatment and placement at the appropriate levels of care, lack of appropriately prescribed and monitored medications has led to a population whose symptoms and severity is increasing and worsening. These conditions in CDCR operated prisons, as disturbing as they are, raise very serious questions about who might be released in a prisoner release program and whether CDCR-POC or other contracted providers would be prepared to offer the necessary treatment and supervision need to insure both parolee safety and access to appropriate care—and potentially community safety.

Dr. Stewart discusses the various levels of care that are provided to Coleman class prisoners (CCCMS, EOP...) in the prisons and cites CDCR Program Guide Standards of Care that "recognize that there is a spectrum of needs within the CCCMH group **and that in the community CCCMH individuals would need parallel levels of treatment**, with many needing medication and follow-up, and some who would benefit from additional case management that would include assistance with accessing community mental health services, substance abuse treatment, housing, benefits and employment.... Just as in prison, the vast majority of parolees will rarely require more intensive levels of mental health care such as crisis care, day treatment or hospitalization, in the community." (#133) Dr. Stewart goes on to state that far smaller number of EOP parolees can be expected to require more intensive levels of care. I do not understand how Dr. Stewart can make any assumption regarding the number and needs of EOP parolees given his previously cited critique of classification/diagnosis and care in the prisons.

I would concur with the general description of the range of services described by Dr. Stewart as necessary to treat and stabilize CCCMH and EOP parolee populations with several key exceptions:

    --It cannot be assumed that the standards of care and clinician ratios in correctional facilities should appropriately be applied to community settings—and in fact as I documented in my 8-15 opinion, CDCS POC caseloads exceed those in California's prisons—not a standard to be emulated.

    --Dr. Stewart cites day treatment as a service that should be provided, yet day treatment is not considered state of the art treatment in contrast to Assertive Community Treatment (ACT) or intensive rehabilitative and wrap around services—which are. In addition he does not provide adequate discussion of the need for integrated services for co-occurring mental health/substance abuse disorders when it is generally understood that individuals with serious mental illness and substance use/abuse usually fail—or are not accepted in traditional drug treatment programs. Based on prevalence data at least 75% of CCCMH and EOP parolees will have co-occurring substance use/abuse.

    --Neither Dr. Stewart nor any of the other Plaintiffs' experts provide an adequate discussion/description of the critical need and lack of availability of integrated services for seriously mentally ill individuals with co-occurring substance abuse disorders.

    -- Dr. Stewart appears to imply (or assume) that there are adequate and appropriate resources in the community for effective outpatient level of services to the CCCMS Coleman class of parolees. However, I have demonstrated in my

8/15 opinion (Ref: pg. 8) that the POC does not have sufficient staffing to provide adequate outpatient and case management services to the current parole population.

Dr. Marquart, an expert witness retained by Coleman Defendants states: "However diversion, without the proper community support systems will simply lead to additional recidivism." (PG 14) And, "...prior to any release order, there must be the proper infrastructure established to handle the already burdensome workload in the parole division and in probation...The ripple effect of a blanket release order will severely strain county level mental health departments, county alcohol and drug treatment programs, housing, and foster additional competition for jobs in local communities, as well as strain local criminal justice, systems, especially county jails. (PG 15-16.)  Marquet discusses the Texas experience with prison caps and prisoner releases detailing the negative impacts on local jails, communities and community safety.  Does California want to emulate the failed Texas program?

My greatest concern with the opinions of Drs. Gilligan, Austin and Stewart is that simply asserting that seriously mentally ill prisoners can be safely released if there is a "responsible release program" (Gilligan) and basic agreement among experts that a spectrum of services is required (Gilligan, Austin, Stewart) provides no assurance that a plan is in place or that services exist to support a Coleman class prisoner release program.  Further, I have seen no documentation or quantification of the range and numbers of providers and programs that would be required. Dr. Stewart asserts that local systems are in place to provide the needed services to Coleman class · released prisoners—though he does acknowledge that these programs are under-funded and would "benefit" from a significant increase in their resources. The fact that several Regional Parole Administrators has initiated efforts to reach agreements with providers in their regions (Stewart, 141-143) for parolee services is laudable—but woefully inadequate to address the true task at hand.

## 3.  California does not have accessible and adequate mental health programs to meet the needs of Coleman class parolees under an expedited prisoner release

California does not have the current capacity to meet the supervision, mental health or other community support needs if there were a prisoner release of 15,000-40,000 or more prisoners including Coleman class prisoners.  I have presented information in my 8-15 Expert Opinion regarding California's lack of adequate mental health care for our current populations of seriously mentally ill adults—both those who are under the care of counties and those who are treated through the Parole Outpatient system.  I will not reiterate this information but I will provide additional data to demonstrate the severity of this crisis in accessibility, availability and appropriateness of care.  However, my overriding concern is that Plaintiffs' expert witness reports provide inadequate support and guidance to support the Court's decision-making due to:

- Extremely limited (or outdated) knowledge of the structure and institutional responsibilities of the various partners in California's system of institutional and community mental health care

6

- And, demonstrate no knowledge or understanding of the capacity—or more importantly, California's lack of resource capacity to meet the needs of released Coleman class prisoners in the following areas of mental health services:  CDCR parole outpatient clinics; State Department of Mental Health programs; county and private psychiatric emergency services and acute psychiatric and chemical dependency inpatient hospitals, and county operated or contracted community mental health and mental health/substance abuse services.

**(a)  What systems/agencies are responsible for the provision of basic and intensive (including hospital) care to seriously mentally ill parolees?**

I discussed this question at some length in my 8-15 opinion (Bataille Section 2.a. (pg 6)).  I am concerned that in particular, Dr. Stewart states: "It is my understanding that some public mental health treatment providers currently refuse to provide treatment to parolees because there remains confusion and disagreements about whether the county or the State is responsible for paying for mental health care for these persons." (Stewart # 136)  Dr. Stewart then goes on to discuss the "Mentally Disordered Offender-MDO law" and LPS Conservatorships as avenues for care that would address issues regarding treatment responsibility for seriously mentally ill parolees.

- MDO programs are State Department of Mental Health operated (state hospitals) or contracted with either counties or community agencies for mentally ill offenders who are conditionally released from state hospitals-CONREP.  Counties are not required under statute to operate CONREP programs though some have chosen to do so under state contract.  Whether the State Department of Mental Health (DMH) could be funded and legally expand the definition of the MDO population to include a broader class of Coleman class prisoners/parolees is a question that should be posed to DMH.

- With regard to the use of LPS conservatorships, it is my experience and understanding that counties/local jurisdictions are generally very reluctant to place individuals who remain on parole on LPS conservatorships.  Individuals may be held under LPS for a 5150 evaluation and initial treatment period in an inpatient setting as a danger to themselves/others or gravely disabled—but I believe it is extremely rare for parolees to have a concurrent parole status and an LPS conservatorship related to a "grave disability".  The filing of an LPS conservatorship and the resulting institution of a public or private guardianship process is really not appropriate or necessary in a circumstance where the custodial responsibility is established through the criminal courts and parole. County mental health systems and the LPS civil commitment door is the wrong "door number one" to knock on for services to seriously mentally ill parolees.

Community mental health services are structured and based on voluntary participation—even when individuals are participating in mental health services as probationers through the guidance of a mental health court.   County mental health systems are not bound by conditions of parole unless they are providing services to parolees under a contract with CDCR.  There are several counties that are negotiating with CDCR to provide parolee services—but these services are separate and distinct from core county mental health services in their eligibility criteria and would receive direct funding from CDCR (with the exception of insuring access to Medi-Cal revenues).

7

Dr. Stewart further cites (#140) the Coleman Court in its August 8th order and states that "these laws can be used to ensure that public safety considerations are met when releasing or diverting mentally ill offenders from prison." In my 8-15 opinion (pg. 12) I raise a number of concerns related to the implementation of the Valdivia order. Those questions remain but it is not simply a matter of whether CDCR POC and counties understand and comply with this guidance—it is equally a matter of whether it is actually even possible to provide timely access to 5150 acute psychiatric admissions of mentally ill parolees.

**(b) Access to acute psychiatric and chemical dependency inpatient care has dramatically declined from 1995 to 2006**

A June 25, 2008 updated report of the California Hospital Association's Center for Behavioral Health provides dramatic and disturbing data regarding the decline in psychiatric inpatient beds in California from 1995-2006 as follows:

- Inpatient psychiatric beds have dropped from 9353 to 6424: a 31.3% decrease and only 5515 of those beds serve adults.

- Inpatient chemical dependency beds have dropped from 1400 to 818 for a 41.6% decrease

- This drop in bed numbers is paralleled by a decrease in the actual number of facilities: psychiatric facilities have decreased from 181-142 or < 21.5% and chemical dependency inpatient facilities have decreased from 55 to 34 or < 38.2%

- The National average is 1 psyc. bed for every 2536 people: CA average is 1:5675 and according to CHA national experts estimate the need at 1 psyc. bed per 2000

- Chemical dependency beds compare at national average of 1bed:39,336 while CA has 1 CD bed:44,569

The availability of beds is also not distributed to insure geographic accessibility with 25 counties having not public or private inpatient beds. This data including charts regarding number and type of beds by county can be accessed at: http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf.

**(c) Plaintiffs expert opinions on access and resources available for community mental health outpatient treatment of seriously mentally ill parolees**

In particular both Gilligan and Stewart appear to assume that community mental health services; integrated services for persons with co-occurring mental health and substance use disorders, and the range of community support services—particularly housing, either are available or could readily be increased if funding were provided. This is simply not accurate. I have previously addressed the gaps and serious resource challenges-including human and financial resources, that confront community mental health services in my 8-15 opinion.

**(d) I would add the following comments regarding county/community mental health services to my 8-15-08 report:**

- Santa Clara and San Mateo's reports as Intervener Counties clearly document both the crisis in the availability of resources to treat their existing populations of seriously mentally ill adults. Their reports make it clear that they cannot absorb new parolees—

8

particularly seriously mentally ill parolees without significant additional treatment and supervision/custodial resources. It should be understood that Santa Clara and San Mateo are widely recognized to be among the best funded and most comprehensive county mental health services in the State—both in their historical State and Federal funding base, and as a result of these counties allocating discretionary county funds to mental health and substance abuse services. Both counties also document their efforts to reduce structural deficits that include programs reductions or holding allocated positions vacant in mental health services.

- The majority of California's other counties face even more severe under-funding of mental health systems and do not have or have not chosen to provide discretionary local dollars to increase mental health services. As Medi-Cal providers, counties are obligated to provide assessments and medically necessary treatment to all Medi-Cal beneficiaries that meet diagnostic and functional impairment criteria. As indigent care providers, counties are responsible for providing services to seriously mentally ill adults—**to the extent resources are available.** I do not have data regarding the numbers or percentage of CCCMH and EOP parolees would be Medi-Cal beneficiaries under a Coleman release but it is reasonable to assume that there would be a high percentage of these individuals who do not qualify for SSI-linked Medicaid. It cannot be assumed that county mental health systems have the capacity to assume a new responsibility for parolees—particularly indigent parolees. **In fact, there are currently three counties: Riverside, Shasta and Glenn, that have provided written notification to the State Department of Mental Health that they are considering returning the Medi-Cal program to the State due to the lack of sufficient local dollars to provide the required 50% match required to draw down federal Medicaid (Realignment sales tax and vehicle license fees).**

- In my opinion, a substantial Coleman class prisoner release would have a substantial negative impact on the conditions and treatment of these individuals when they re-offend and re-arrested. These parolees are likely to be held in local jails because of a State prison population cap system and lack of access to forensic state hospital beds. Almost half of California counties' correctional facilities are currently operating under their own jail population caps. If current conditions remain constant, additional numbers of seriously mentally ill parolees—even if they are eligible for admission to state hospitals will be held in inadequate conditions and receive inadequate care in local jails. DMH typically has a waiting list of over 300 local inmates who are pending state hospital forensic commitments/placements as has been reported to the CMHDA Forensic Committee by DMH administrators for at least the past three years. This is yet another way that a poorly planned and implemented Coleman prisoner release will simply transfer the problem of inadequate (and potentially unconstitutional) mental health care from the State level to the local level.

- In my opinion, Drs. Gilligan and Stewart under-estimate the numbers of current parolees as well as the increased numbers of parolees who would require intensive services under a Coleman release order. There is variation in cost across counties, but it is reasonable to assume that effective EOP level "assertive community treatment" (or as these programs are increasing called in California, "full service partnerships") can be estimated to cost an annual average of $15,000-$30,000 per individual. If one

9

estimates 506 new EOP parolees (per Gillian #54) with a 30,000 prisoner release, it will cost $8-16 million dollars in basic mental health treatment costs—excluding the cost of hospitalization or local incarceration should that become necessary. This estimate does not include intensive services to the current parole population—a population that is being significantly "under-treated" and that has a higher recidivism rate than the general parole population. This projection also does not take into account the extent to which prisoners who are assessed as CCCMH and are treated in the general prison population, will actually require more intensive follow-up due to greater access to drugs of abuse and failure to follow through on psychiatric medications, outpatient therapy and other conditions of parole. The UCLA Final Report on the Mental Health Services Continuum Program of the California Department of Corrections and Rehabilitation-Parole Division dated June 30, 2006 documents a significant rate of parolee failure to follow through on outpatient services and a correlation between decreased CDCR-POC contacts and recidivism and re-offense.

## 4. Additional recommendations to effectively and safely reduce the population in California's prisons including the plans described by CDCR, CSAC, CMHDA and several legislative initiatives.

In my opinion, it is possible and critically important to plan and implement a responsible program of community mental health treatment and support services that can effectively and safely meet the needs of seriously mentally ill prisoners as they are released from California's correctional facilities. However, I am concerned that the Plaintiff's expert witness reports either fail to understand or minimize the need for an investment prior to the size of prisoner release that would be required to reduce prison overcrowding in California.

I would urge the Courts and other parties to make a realistic assessment of what it would take to bring effective services and programs on-line—and then identify financing and a timeline to accomplish this task. I believe that significant progress has been made in settlement negotiations in this proceeding—even though final agreement was not reached. It is also important to give consideration to positive program developments including but not limited to:

- CDCR's AB 900 implementation plan(s);
- Legislative pilot programs such as SB 618 (Speier) that plan and implement a continuity of care and case management model that follows offenders through all levels of incarceration and community release; and
- Pending legislation such as SB 1851 (Steinberg) that defines a community system of care for seriously mentally ill parolees (based on the lessons of the Mental Health Services Act; Mentally Ill Offender Crime Reduction grant programs and the AB 2034 Integrated Services for Homeless Mentally Ill Persons) and AB 2541 (Bass) that promotes mental health/behavioral health courts.

It is also critically important that we understand and learn from past experience. California should not and cannot afford to dump mentally ill prisoners into our communities without adequate care and supervision. We've witnessed the consequences of the closure of state hospitals in the late

1960's through the 1970's when the promise was broken that dollars and services would follow these vulnerable individuals into the community.  Any Court or State action to provide humane and constitutional mental health care in prisons, must include a commitment that appropriate care will also be provided to criminal justice involved individuals in our communities.  The destructive cycle of criminalization of individuals with mental illness must be broken--and we must keep that promise.

**(II) the data or other information considered by the witness in forming opinion; Include list of reports and references reviewed**

--California Hospital Association's Center for Behavioral Health, Updated Report on Psychiatric Bed Closures, June 25, 2008,

http://www.calhealth.org/public/press/Article/107/CBH_PsycBedClosures.pdf

--CMHDA, 8/25 conference call communication with Patricia Ryan, Executive Director-CMHDA, Don Kingdon, PhD, Assistant Director-CMHDA, Karen Baylor, PhD, San Luis Obispo, Behavioral Health Director and Co-Chair, CMHDA Forensic Committee and Nancy Pena, PhD, President of CMHDA and Mental Health Director, Santa Clara County.

--CMHDA, 8/26 personal e mail communication from Pat Ryan, Executive Director of CMHDA regarding county notification to State Department of Mental Health that 3 counties are considering "opting out" of the mental health Medi-Cal program.

*Gale Bataille*

Gale Bataille

11

# EXHIBIT O

**Golden Gate Reporting**

1              IN THE UNITED STATES DISTRICT COURTS
          FOR THE EASTERN DISTRICT OF CALIFORNIA
2           AND THE NORTHERN DISTRICT OF CALIFORNIA
    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
3    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

4

5    RALPH COLEMAN, et al.,

6                  Plaintiffs,
                                Case No. Civ S 90-0520 LKK-JFM P
7    vs.

8    ARNOLD SCHWARZENEGGER, et al.,

9                  Defendants.
    _____/
10

MARCIANO PLATA, et al.,
11                                  Case No. C01-1351 TEH
              Plaintiffs,
12
    vs.
13                                  RECEIVED
    ARNOLD SCHWARZENEGGER, et al.,
14                                  SEP 2 9 2008
                  Defendants.
15    _____/
                                    Rosen, Bien & Galvan
16

17              DEPOSITION OF GALE BATAILLE

18

19    DATE:         September 16, 2008

20    TIME:         9:36 a.m.

21    LOCATION:     ROSEN, BIEN & GALVAN, LLP
                    315 Montgomery Street, Tenth Floor
22                  San Francisco, California  94104

23    REPORTED BY:  Katy Leonard
                    Certified Shorthand Reporter
24                  License Number 11599

25

                                              Page 1

## Golden Gate Reporting

1    A. No.

2        I said I had no reason to not believe his

3    statement.

4        Q. If I ask you to take that as an assumption

5    now --

6        A. Mm-hm.

7        Q. -- and that nothing is being done to keep that

8    33 percent in when their release date comes, that

9    they're simply released to the street in whatever state

10   that they're in --

11       A. Mm-hm.

12       Q. -- do you think that would have an --

13       A. Because their sentence is up?

14       Q. Their sentence is up.

15       A. So, the State couldn't do anything about

16   keeping them.

17       Q. No.

18       A. Okay.

19       Q. They just release them untreated.

20       A. Okay.

21       Q. Is that, in your opinion, good for public

22   safety?

23       MR. ANTONEN: Objection. Vague as to "good"

24   and "public safety."

25       MR. GALVAN: Including safety.

Page 270

1    MR. ANTONEN: To the extent you can answer.

2    THE WITNESS: I believe that anyone who is

3    released into the community, whether they've gotten

4    treatment or haven't gotten treatment, needs treatment

5    when they get in the community. And we need to be sure

6    that that's available.

7    THE REPORTER: May we take a break so I can

8    change my disc?

9        It's full.

10       MR. GALVAN: Sure.

11       (Off the record from 5:46 p.m.

12       until 5:50 p.m.)

13       MR. GALVAN: Okay.

14       Back on the record.

15   BY MR. GALVAN:

16       Q. Is it correct to say that you don't agree with

17   Dr. -- you don't disagree with Dr. Gilligan that persons

18   with mental illness are not inherently more dangerous

19   than other people?

20       A. Okay.

21       Let me reframe the -- rephrase the question.

22       So, your question is, do I agree with

23   Dr. Gilligan that people with mental illness are no more

24   dangerous than the general population?

25       You gave me a double negative, and I just

Page 271

1    wanted to make sure I've got it.

2        Q. Yes.

3        A. Um, if you compare the general populations of

4    persons with mental illness with the general population,

5    um, they are no more dangerous. There are, however,

6    certain predictors where a subset of that mentally ill

7    population is more dangerous than the general

8    population, or can be more dangerous. But I've spent

9    many years citing those same reports in trying to locate

10   community facilities.

11       Q. When you say you've "spent many years citing

12   those same reports," what do you mean?

13       A. The basic research on violence and mental

14   illness, because -- so, I've looked at those reports,

15   because I have had the experience of working in a number

16   of different communities to locate mental health

17   facilities.

18       Q. And what conclusion do you draw from the basic

19   research on mental illness and violence?

20       A. My conclusion -- and I believe this is what

21   the research largely says. I mean, there's some nuances

22   in it, but -- is that the general population of mentally

23   ill folks is no more dangerous.

24       The predictors where there may be an increased

25   risk has to do with past history of violence, has to do

Page 272

1    with substance use and abuse and medication compliance.

2    Those are the -- those are some of the main ones.

3        And in those situations, particularly where

4    someone has a history of any kind of violence or is

5    using substances, there is a greater risk.

6        Q. Would you agree with the statement that

7    putting people in prison for mental health treatment is

8    not effective?

9        A. I don't think people are put in prison for

10   mental health treatment. I don't believe that's why

11   anyone is committed to state prison. They're committed

12   to state prison because they've committed a crime;

13   right?

14       Q. Right.

15       But would you agree with the statement that

16   putting people in prison for mental health treatment is

17   not effective?

18       A. I will state what I just said: I don't think

19   anyone would put someone in prison to get them mental

20   health treatment. That's not why people go to prison.

21       Q. Did you review the documents in this case in

22   which the Department noted that it stopped returning

23   people to prison solely for psychiatric treatment in

24   January, 2007?

25       A. Mm-hm.

Page 273

69 (Pages 270 to 273)

1        CERTIFICATION OF DEPOSITION OFFICER

2

3        I, KATY LEONARD, duly authorized to administer

4    oaths pursuant to Section 2093(b) of the California

5    Code of Civil Procedure, hereby certify that the

6    witness in the foregoing deposition was by me sworn to

7    testify to the truth, the whole truth and nothing but

8    the truth in the within-entitled cause; that said

9    deposition was taken at the time and place therein

10   stated; that the testimony of the said witness was

11   thereafter transcribed by means of computer-aided

12   transcription; that the foregoing is a full, complete

13   and true record of said testimony; and that the witness

14   was given an opportunity to read and correct said

15   deposition and to subscribe the same.

16        I further certify that I am not of counsel or

17   attorney for either or any of the parties in the

18   foregoing deposition and caption named, or in any way

19   interested in the outcome of this cause named in said

20   caption.

21

22

23

24   _____

25   KATY LEONARD, CSR 11599

Page 298