# EXHIBIT P

---

AB 900 Strike Team ISSUE MEMO NO. _____1_____

SUBJECT: VALIDATION OF IN-FILL BED PLAN      Date:

Prepared by:  Deborah Hysen, Chair, Facilities Strike Team

Reviewed by:  CDCR Executive Cabinet

---

**History Statement**

Assembly Bill 900 (AB 900), The Public Safety and Offender Rehabilitation Services Act of 2007, specifies that the Department of Corrections and Rehabilitation (CDCR) design, construct, or renovate prison housing units, prison support buildings and programming space in order to add up to 7,484 beds at the following prison facilities:

1) Pleasant Valley State Prison
2) California State Prison, Los Angeles County
3) Calipatria State Prison
4) Centinela State Prison
5) Salinas Valley State Prison
6) Kern Valley State Prison
7) Wasco State Prison
8) North Kern State Prison
9) Mule Creek State Prison
10) Pelican Bay State Prison

AB 900 further specifies that any new beds constructed pursuant to the pertinent section "shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment programs, and prerelease planning..."

The purpose of beds constructed pursuant to this section is to replace the temporary beds currently in use, and they are not intended to house additional inmates. For the purposes of this section, "temporary beds" shall be defined as those that are placed in gymnasiums, classrooms, hallways or other public spaces that were not constructed for the purpose of housing inmates.

CDCR had done some preliminary planning in anticipation of AB 900 and in January 2007 completed the In-fill Bed Plan. One main strategy of the plan was to

1

build Level Two dorms housing approximately 4,000 inmates in a new "co-mingled" Level I/II Minimum Security Facility at the ten institutions. One of the basic early planning premises for the infill bed plan was that the "co-mingled" beds represented the best chance for accelerated construction and activation to meet short-term needs. This was based on their location outside the secure perimeter, dormitory construction is less complicated than cell construction and their existing support space that could be leveraged to support new construction/remodeling.

The remaining beds under this phase would be a mix of various dorm and celled housing types within the prisons secure perimeter and assumed to be more difficult and time consuming to build.

**Problem Statement:**

1. *The original AB 900 in-fill bed solution does not align with the mid to long range bed needs of CDCR.*

2. *The January 2007 In-fill Bed plan (which formed some of the cost and bed numbers used in AB 900) if implemented would not meet the AB 900 requirement which states " any new beds shall be supported by rehabilitative programming for inmates, including, but not limited to, education, vocational programs, substance abuse treatment programs, employment programs, and prerelease planning."*

3. *The CDCR has a need to activate additional housing capacity in the short term.*

**Discussion**

After AB 900 was chaptered and the combined AB 900 Strike teams fully examined the in-fill solutions, some basic questions were asked about whether the addition of so many dorm beds aligned with the mid to long range bed needs of CDCR. Secondly, questions were also raised about the disruption to the operation of the various Minimum Support Facilities (MSF) as the new larger co-mingled Level I/II facilities were being built.

Enough doubt about the efficacy of this construction solution was raised that the Chief Deputy Secretary for Facility Planning, Construction, and Management, who is also the AB 900 Facilities Strike Team Chair, called a daylong meeting that examined the solutions offered up in the January 2007 In-fill Bed Plan and discussed alternate scenarios that would optimize construction opportunity and mid to long range operational need. This group included representatives from the Division of Adult Institutions, Division of Correctional Health Care Services, Division of Education and Vocational Programs, Office of Community Partnerships, the Rehabilitation and Facilities Strike Teams, the Office of Facilities Management, and consultant staff.

CDCR020804

The discussions focused around what the bed needs of the Department are now and in the future, what the in-fill bed program should accomplish and how much and what types of program spaces, should be included operating at what percentage of Design Bed Capacity (DBC) in order to meet the legal and legislative intent of AB 900 and the predicted outcome of improved public safety and reduced recidivism.

In addition, the participants of that meeting determined that there are serious operational and construction issues with building individual structures within the secure perimeter. The Office of Facilities Management (OFM) will still need to meet with the Division of Adult Institutions (DAI) to determine if any of the original In-fill Program projects proposed within the secure perimeter of existing prisons should still be pursued. To fully meet the requirements of AB 900 it may be necessary to construct enough additional space to meet the definition of "fully programmed" (The exceptions to the disruption caused by building within the secure perimeter is the particularly well located and available land at Wasco and Delano which would support the efficient construction of Reception center facilities.)

The AB 900 requirement that each new bed (DBC and HOC) be "fully programmed" drives significant capital expenditures based on CDCR's traditional bricks and mortar, single shift, 5-day week approach to providing program. Similarly, this requirement further complicates the implementation of a number of the proposed infill beds (Reception, Ad-Seg) that could result in the recapture of previously converted General Population beds that were originally built with program space at 100% Design Bed Capacity (DBC). To mitigate this, the Department must aggressively identify, evaluate and pursue the implementation of:
- innovative inmate programs that are less space intensive
- innovative alternative program delivery methods
- increased use of dayrooms, gyms, etc. once temporary housing is eliminated
- seven day program operations (alternative workweek schedules; i.e., 3-on, 4-off, extended days)

Determining the clearest course of action that balances the short, mid and long term needs of the Department (particularly dorms vs. cells) is further complicated by three major unknown factors that defy our current population projection and gap chart analysis process of determining future bed needs. These are:
1. Out-of-State Beds – Our continued ability to contract with private vendors and transfer inmates out-of-state is subject to court intervention.
2. Three Judge Court on Overcrowding – The Federal Court has empanelled a three judge court to evaluate CDCR's overcrowding and potentially impose a population cap and/or order a population reduction.

3

3. Reentry Beds – Reentry bed facilities are in the earliest stages of planning and the time frames for bed activations are uncertain. Similarly their effect on future beds needs is unclear.

Based upon the consensus agreements reached by the meeting participants, as well as follow-on discussions with various executive staff, on the two major issues: 1.) the type of beds, and 2.) the percentage of overcrowding to be allowed in the in-fill program, the following alternative solutions are presented:

**1. Types of beds.**

Alternative Solutions:

A. Stay with the current solution as identified in the January 2007 In-fill Bed Plan which primarily would construct co-mingled level I/II expanded MSF facilities. This solution would include adding two E-bed dormitory housing units (400 beds) and concomitant upgrades to create a Level Two facility.

   Advantages:
   1. Cheap to build.
   2. It is the solution that drove the costs presented in AB 900.
   3. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

   Disadvantages:
   1. Does not align with the mid and long term needs for celled housing.
   2. Constructing an addition while operating a MSF will create operating disruptions and will increase the time and cost of the construction by a definite but not yet quantifiable margin.
   3. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.
   4. Does not fully meet the fully programmed requirements of AB 900.

A1. Build the expanded MSF option as presented in the January 2007 In-fill Bed Plan, but add the necessary "program" space to make it compliant with AB 900 requirements. This would require adding more than 40,000 square feet of space and would require that the new MSF perimeter be considerably enlarged.

   Advantages:
   1. Meets the AB 900 "fully programmed" criteria.

   Disadvantages:
   1. Does not align with the mid and long term needs for celled housing.

4

2. Constructing an addition while operating a MSF will create operating disruptions and will increase the time and cost of the construction by a definite but not yet quantifiable margin.
3. Is almost as costly to build per inmate as a fully programmed 500 celled semi-autonomous facility.

A2. Design and build one E-Bed type dorm at existing MSF facilities (up to 17). Provide program space at 100% DBC and assume double shifting for any HOC. Provide augmentations to support space for DBC and HOC. Have Inmate Ward Labor (IWL) program provide construction. Removing existing IWL hiring barriers (TAU appointments; resolving salary differential for Construction Supervisor series) will have to be addressed to expedite construction.

Advantages:
1. Cheapest to build.
2. Meets AB 900 "fully programmed' criteria.
3. Potential for least CEQA impact on schedule.
4. Rapid mobilization/construction by IWL.
5. Less disruptive to MSF operation than "co-mingled" alternatives.
6. Best chance of meeting short term need for beds and Summer 2009 construction completion.

Disadvantages:
1. The Department is currently not able to keep existing MSF beds full.
2. Higher risk associated with "overriding" to placement outside of secure perimeter to keep beds full.
3. Does not align with the mid and long term needs for celled housing.

B. Design and build 500 – celled housing units (270 Level IV or Level III as dictated by bed needs) in semi-autonomous fully programmed facilities These facilities will be located on CDCR owned land at existing prison locations, but will have a separate secure perimeter from the existing prison or MSF.

Advantages:
1. Meets the programming requirements of AB 900.
2. Aligns with CDCR mid and long term needs for celled beds.
3. The 270 Level IV will better meet the long term need for beds.
4. The 270 Level III is less expensive to build.
5. Does not interfere with the MSF facility during construction.
6. Should not add significant time to the design and construction schedule.
7. Eliminates the issues of administering a level I/II co-mingled population.

5

CDCR020807

8. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

Disadvantages:
1. Is significantly more costly than building dorm facilities.
2. Although a preliminary assessment indicates that there is enough buildable space at several institutions, some of them may need substantial upgrades in infrastructure but achievable within the available funding.
3. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.

C. Design and build five E-bed design dormitory housing units in semi-autonomous fully programmed facilities. These facilities will be located on CDCR – owned land at existing prison locations, but will have a separate secure perimeter from the existing prison and the MSF.

Advantages:
1. Meets the programming requirements of AB 900.
2. The E-Bed dorm design is less costly than the 270 dorm design.
3. Does not interfere with the MSF facility during construction.
4. Should not add significant time to the design and construction schedule.
5. Is less costly than building an all cell configuration.
6. Eliminates the issues of administering a level I/II co-mingled population.
7. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

Disadvantages:
1. The E-Bed dorm does not lend itself to future conversion to a celled facility.
2. Although a preliminary assessment indicates that there is enough buildable space at several institutions some of them may need substantial upgrades in infrastructure but achievable within the available funding.
3. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.

C1. Design and build five 270 design dormitory housing units in semi-autonomous fully programmed facilities. These facilities will be located on CDCR – owned land at existing prison locations, but will have a separate secure perimeter from the existing prison and the MSF.

CDCR020808

Advantages:
1. Meets the programming requirements of AB 900.
2. The 270 dorm design lends itself to future conversion to cells (level IV or Level III), providing flexibility in meeting future bed needs.
3. Does not interfere with the MSF facility during construction.
4. Should not add significant time to the design and construction schedule.
5. Is less costly than building an all cell configuration.
6. Eliminates the issues of administering a level I/II co-mingled population.
7. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

Disadvantages:
1. Future conversion to cells will require swing space capacity to vacate the housing unit.
2. Future funding will be required for conversion.
3. Original construction cost plus conversion construction cost exceeds original costs for celled construction.
4. Although a preliminary assessment indicates that there is enough buildable space at several institutions some of them may need substantial upgrades in infrastructure but achievable within the available funding.
5. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.

D. Design and Build a 500 – celled reception facility. These facilities will be located on CDCR – owned land at existing prison locations, but will have a separate secure perimeter from the existing prison and the MSF. These facilities would replace a like facility within the secure perimeter that was originally designed to house general population inmates and was also designed with program space for DBC. Bed recapture over and above DBC will be dependant upon the dependant upon the Department's ability to implement innovative, less space intensive programs. Moving the inmates from the old reception facility to the new one will free up the old facility to house inmates in temporary beds. There are 36 general population housing units in the system operating as converted reception facilities.

In addition to the recapture of general population 270 celled housing with program space, there is also the possibility of performing the work necessary for a Level III to IV conversion at some sites before the beds are backfilled. During this time the facility could be refreshed and harden to enhance its utility and useful life. The OFM will conduct an analysis to determine the benefits (scope, schedule, costs, population impacts) of such an occupied vs. unoccupied approach in the near future.

7

CDCR020809

Advantages:
1. Provides a reception center with its own perimeter security.
2. Minimizes the operation of two separate missions behind one secure perimeter.
3. Provides for the recapture of general population celled housing originally constructed with program space.
4. May facilitate refresh and hardening to Level IV capacity.
5. Avoids costs of building significant amounts of program space and associated equipment.
6. Does not interfere with the MSF facility during construction.
7. Should not add significant time to the design and construction schedule.
8. Eliminates the issues of administering a level I/II co-mingled population.
9. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

Disadvantages:
1. Is significantly more costly than building dorm facilities.
2. Although a preliminary assessment indicates that there is enough buildable space at several institutions some of them may need substantial upgrades in infrastructure but achievable within the available funding.
3. Does not fully meet the requirements of AB 900 without increasing the programming space for the GP inmates above the DBC who will be moved into the old reception facility.
4. If programming space for the above population is provided it will involve some new construction within the secure perimeter. This could be avoided by better utilization of existing program space by the implementation of less space intensive programs or a 7 day a week program with staff working a 12 hour, 3 day shift.
5. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.

E. Design and build up to 11 infill Wingnut celled housing units total at North Kern State Prison and Wasco State Prison for reception processing within their existing secure perimeter. These facilities would replace like housing units within their secure perimeter, or at other facilities, that were originally designed to house general population inmates and was also designed with program space for DBC. Bed recapture over and above DBC will be dependant upon the dependant upon the Department's ability to implement innovative, less space intensive programs. Moving the inmates from the converted reception facility to the new one will free up the old facility to

8

house inmates in temporary beds. There are 36 general population housing units in the system operating as converted reception facilities.

In addition to the recapture of general population 270 celled housing with program space, there is also the possibility of performing the work necessary for a Level III to IV conversion at some sites before the beds are backfilled. During this time the facility could be refreshed and harden to enhance its utility and useful life. The OFM will conduct an analysis to determine the benefits (scope, schedule, costs, population impacts) of such an occupied vs. unoccupied approach in the near future.

Advantages:
1. Provides additional reception center beds within an existing reception center's secure perimeter.
2. Less costly per bed than standalone facility as existing space can be leveraged.
3. Provides for the recapture of general population celled housing originally constructed with program space.
4. May facilitate refresh and hardening to Level IV capacity.
5. Avoids costs of building significant amounts of program space and associated equipment.
6. Minimizes the operation of two separate missions behind one secure perimeter.
7. Does not interfere with the MSF facility during construction.
8. Should not add significant time to the design and construction schedule.
9. Eliminates the issues of administering a level I/II co-mingled population.
10. Four thousand beds can be constructed by January 1, 2014 in accordance with the requirement of AB 900.

Disadvantages:
1. Is significantly more costly than building dorm facilities.
2. Although a preliminary assessment indicates that there is enough buildable space at the two institutions, they may need substantial upgrades in infrastructure but achievable within the available funding.
3. Does not fully meet the requirements of AB 900 without increasing the programming space for the GP inmates above the DBC who will be moved into the old converted reception housing.
4. If programming space for the above population is provided it may involve some new construction within the secure perimeter, if innovative space-saving programs are not implemented.
5. Using the current legal and regulatory constraints imposed on CDCR design and construction may not be able to meet an expected Summer of 2009 completion.

9

**Recommended solution:**

The recommended solution is a combination of aspects of A2, B, C, C1, D, and E. It is recommended that approval be given to move on the following in priority order:
1. Design and build of up to 17 Level I dorms in 3 different phases, as identified by further analysis during the next few weeks. Phase 1 will consist of 5 dorms (100 DBC) at sites where CEQA (leverage reviews already in progress) and other site constraint provide the least impediment to either their construction, or the construction of future beds. The goal would be spring 2009 activation. Phase 2 will consist of 5 dorms (100 DBC) at sites where CEQA efforts has not already begun, and will not impede future construction. The goal would be to follow Phase 1 by 3 – 6 months. Phase 3 would be remaining viable sites that maybe wrapped up in large CEQA reviews due to other proposed bed construction at the site.

2. Design and build a semi-autonomous facility at Kern Valley State Prison. The Division of Adult Institutions will have to identify which type (celled, dorm, reception, or general population) in the near future.

3. Design and build up to 11 infill Wingnut celled housing units total at North Kern State Prison and Wasco State Prison for reception processing within their existing secure perimeter.

4. Design and build a 500 – celled reception facility at the California Correctional Institution (CCI). This facility will will have a separate secure perimeter from the existing prison and the MSF. The intent would be to refresh and harden the 500 bed quick build facility at CCI to a Level IV facility.

Additionally, the department should immediately begin an intensive 30 day work effort with DAI, OFM, HCSD, DEVOP, OCE, etc, to further identify and develop the remaining aspects of the plan. The should reflect the departments short, mid, and long term needs, optimizing matching of bed needs, schedule of construction, cost of construction, and furtherance of rehabilitation and recidivism reduction.

CDCR and consultants are now analyzing cost, space and time alternatives to develop more refined site specific solutions to find an optimum 4000 plus bed program that puts the initial beds on line by mid 2009 and rapidly sequences the completion of succeeding facilities so that the AB900 benchmark of 4000 fully programmed beds constructed by 1-1-2014 is exceeded.

CDCR020812

## 2. Level of Overcrowding:

Alternative solutions:

A. Continue CDCR's operating policy and operate the in-fill bed program at the Housing Overcrowding (HOC) level of 190% for these celled type facilities and build full programming space for long term operation at 190% of DBC.

   Advantages:
   1. Does not create a system of facilities with different occupancy rules.
   2. Meets the full requirements of AB 900.

   Disadvantages:
   1. AB 900 did not account for full programming in its cost estimates.
   2. Is more expensive than to build program space for a lesser percentage of overcrowding.
   3. If the prison population is reduced so that the system is run at a lesser percentage of overcrowding than HOC there will be excess program space.
   4. Does not start the process which leads to a desirable standard of overcrowding.

B. Operate the in-fill facilities at the Independent Review Panel (IRP) suggested overcrowding standard of 145% of DBC and build programming space to support this number.

   Advantages:
   1. Meets the full requirements of AB 900.
   2. Is less expensive than to build programming space for HOC.
   3. Starts the process which leads to operating the system at the IRP standard of 145% of DBC. Or the Federal Standard of 130% of DBC.
   4. Uses less scarce land than building program space to HOC.

   Disadvantages:
   1. If operated above the 145% of DBC, will not be in alignment with AB 900 requirements.

C. Operate the in-fill facilities at the Federal Bureau of Prison standard of 130% of DBC.

   Advantages:
   1. Meets the full requirements of AB 900.

11

CDCR020813

   2. Is less expensive than to build programming space for HOC.
   3. Starts the process which leads to operating the system at the IRP standard of 145% of DBC. Or the Federal Standard of 130% of DBC.
   4. Uses less scarce land than building program space to HOC.

   Disadvantages:
   1. If operated above the 130% of DBC, will not be in alignment with AB 900 requirements.
   2. Is less likely to result in a permanent standard than the 145% IRP standard.

D. Operate the in-fill facilities at Design Bed Capacity (DBC) and build programming space to support this number.

   Advantages:
   1. Fully meets the requirements of AB 900.
   2. Costs less than any of the other alternatives.
   3. Uses the least amount of valuable space.

   Disadvantages:
   1. Creates a serious anomaly in how the prison system is operated.
   2. Probably has no support from any financially interested stakeholder
   3. If operated above the DBC will not be in alignment with AB 900.

**Recommended Solution:**

B. It is recommended that CDCR operate the in-fill bed program at the IRP overcrowding standard of 145% of Design Bed Capacity. Although it will require strong discipline to keep these new programs (which are in close proximity to similar facilities being run at essentially 200 percent of DBC) from running above the 145% level it will set a precedent to begin the process to bring the entire system to this workable level of overcrowding

Decision:

_____ Recommendation approved as presented

_____ Recommendation approved with revisions (specify below)

_____ Alternative # A approved as presented

12

CDCR020814

_____ Alternative # A approved with revisions (specify below)

_____ Alternative # B approved as presented

_____ Alternative # B approved with revisions (specify below)

_____ Alternative # C approved as presented

_____ Alternative # C approved with revisions (specify below)

_____ Alternative # D approved as presented

_____ Alternative # D approved with revisions (specify below)

_____ Disapproved

_____ No decision; additional information needed (specify below)

Comments:


_____           _____
JAMES E. TILTON                                        Date
Secretary
California Department of Corrections and Rehabilitation

13