# EXHIBIT Q

# Reforming Corrections

Report of the

## Corrections Independent Review Panel

Presented to

## Governor Arnold Schwarzenegger

June  2004

**Corrections Independent Review Panel**

### Chairman
Governor George Deukmejian

### Executive Director
Joseph Gunn

### Principal Consultant
Robin J. Dezember

### Program Consultant
George Camp

### Team Leaders

| | |
|---|---|
| Solange Brooks | Office of the Inspector General |
| Brenda K. Epperly, R.N. | Department of Corrections |
| Nancy L. Faszer | Office of the Inspector General |
| Tammy McGuire | California Youth Authority |
| Michael Pickett | Department of Corrections, Retired |
| Richard Ross | Federal Bureau of Investigation, Retired |
| Tim Rougeux | Department of Corrections |
| Bill Shepherd | Department of Corrections |
| Dewey C. Willis | California Youth Authority, Retired |

### Project Editor
Anne Jackson        Office of the Inspector General

### Executive Assistant to Governor Deukmejian
Yolanda Campagna

### Panel Members

| | |
|---|---|
| Art Aclaro | California Highway Patrol |
| Ken Baird | Board of Prison Terms |
| Mark C. Clemons | California Highway Patrol |
| Maureen Cudahy | Department of Corrections |
| Michael Dust | California Highway Patrol |
| Bob Findlay | California Highway Patrol |
| Laurence E. Finney | Office of the Inspector General |
| Ron Frantz | Board of Prison Terms |
| Kevin M. Frost | Department of Corrections |
| Bryan Kingston | Department of Corrections |
| William J. Languemi | California Highway Patrol |
| Matthew S. Lynch | California Highway Patrol |
| Roy Mabry | Department of Corrections |
| Chris C. Main | California Highway Patrol |
| Amy R. Mangan | California Highway Patrol |
| Daniel Marshall | Department of Corrections |
| Carrie Nevans | Labor and Workforce Development Agency |
| John Petropoulos | California Youth Authority |
| Jennifer J. Santos, Esq. | Department of Corrections |
| Carlene Scott | Department of Corrections |
| Bryan Shill | Board of Prison Terms |
| Allan L. Sloan | California Youth Authority, Retired |
| Colonel Ted Westerman | United States Army, Retired |
| Carole Ylst | Department of Corrections, Retired |

### Student Intern
Francis Yau



June 30, 2004


The Honorable Arnold Schwarzenegger
Governor of California

Dear Governor Schwarzenegger,

I am pleased to present the Corrections Independent Review Panel's final report, "Reforming Corrections", on future directions for California's correctional system. This report details the findings and recommendations of our panel.

Although our panel had a very tight time schedule, I believe the report represents the most comprehensive analysis of the corrections system to date and I am positive that our recommendations, when implemented, will once more elevate California to a national leadership role.

Thank you for your consistent support of our activities over the past few months. We look forward to discussing this report with you, with members of your Administration and with members of the Legislature.

Most Cordially,

George Deukmejian
35th Governor of California
Chairman
Corrections Independent Review Panel

# Contents

**Page**

**Introduction**                                                               **i**

**1**   **A Reorganization Plan for Corrections**                              **1**

**2**   **Ethics and Culture**                                                **19**

**3**   **Employee Investigations and Discipline**                           **27**

**4**   **Use of Force**                                                      **41**

**5**   **Personnel and Training**                                           **51**

**6**   **Risk Management and Health Care**                                   **87**

**7**   **Inmate/Parolee Population Management**                             **121**

**8**   **Ward/Parolee Population Management**                               **163**

**9**   **Closures**                                                        **199**

**10**  **Labor Contract**                                                  **229**

**11**  **Information Technology**                                           **233**

**Appendices**

**A: Implementation**                                                        **2**
**B: Legal Discussion**                                                      **5**
**C: Proposed Statutory and Constitutional Changes**                         **8**
**D: Bibliography**                                                         **59**
**E: Individual Contacts**                                                  **83**

# Introduction

California's $6 billion correctional system suffers from a multitude of problems — out-of-control costs; a recidivism rate far exceeding that of any other state; reported abuse of inmates by correctional officers; an employee disciplinary system that fails to punish wrongdoers; and the failure of correctional institutions to provide youth wards and inmates with mandated health care and other services. The result has been a succession of costly lawsuits and a threat by a U.S. District Court judge to place the state's prisons under federal receivership.

Recognizing that immediate improvements must be made, Governor Arnold Schwarzenegger appointed an independent panel to examine the entire corrections system and recommend changes. Headed by former Governor George Deukmejian, the Corrections Independent Review Panel is made up of 40 members, including Executive Director, Joseph Gunn, who also co-directed the 2000 investigation into the Ramparts scandal at the Los Angeles Police Department, and independent correctional consultants Robin Dezember and George Camp. The other members of the panel include representatives on loan from the Department of Corrections, the California Youth Authority, the Office of the Inspector General, the Board of Prison Terms, the California Highway Patrol, and the Labor and Work Force Development Agency.

Over the space of three and a half months during the spring of 2004, the panel reviewed hundreds of pages of published information pertaining to the state correctional system; sponsored and attended workshops and forums on correctional issues; and interviewed dozens of correctional experts in California and across the nation. Those interviewed include present and former members of the Governor's staff; active and retired wardens of California state prisons; present and former state legislators; employees of the Department of Corrections and the California Youth Authority; members of the Little Hoover Commission; the leadership of the California Correctional Peace Officers Association; and concerned citizens.

From that study emerged a picture of a correctional system in need of drastic and fundamental reform, beginning with its very structure. At present, the Secretary of the Youth and Adult Correctional Agency has no control over line operations. Instead, more than 30 wardens and superintendents operate the state's prisons and youth correctional facilities independently with little training for the job and no consistency in carrying it out.

The correctional system is also affected by a code of silence that punishes whistle-blowers and impedes investigation of alleged misconduct. Discipline is not uniform. Training is almost non-existent. Traditional management functions have been negotiated away in a labor agreement between the state and the correctional officers union. Lawsuit after lawsuit has been successful in challenging the way health care is provided to California inmates and youthful offenders. And inmates and youthful offenders cycle in and out of institutions with little effort made to provide education and rehabilitation services to keep them from re-offending.

In this report, the Corrections Independent Review Panel presents 237 recommendations to address those problems. The recommendations begin with a proposed reorganization of the state's correctional system. The reorganization includes a Civilian Corrections Commission to bring a public voice, accountability, and transparency to state correctional agencies. The new organizational structure will also establish central control over budget; internal affairs; personnel and training; risk management; research and planning; information technology; health care; and labor relations.

The code of silence and the need for cultural change will be addressed through rigorous selection and training and through clear sanctions for misbehavior. Discipline for misconduct will be consistent, fair, and certain. And the state's high recidivism rate will be addressed through sustained investment in education and rehabilitation services to inmates and youthful offenders while they are in custody and on parole to ensure that they do not return. The changes will require a shift in attitude toward non-violent offenders to allow them to receive community-based alternatives to incarceration. This is not about coddling criminals— this is about protecting the public by ensuring that offenders do not commit a second crime.

At one time, California's correctional system was looked upon as the national leader. Innovative and daring, California pioneered the way for standards that were adopted by other jurisdictions as a model of efficiency. Although not all of the recommendations presented in this report can be accomplished in a short period of time, they should be looked upon as a blueprint for future budgets and policy decisions that will enable California to reclaim its former excellence as a national corrections leader.

Changing the corrections system is a huge task that will require significant outlays of money, changes in law and policy, and a dramatic change in organizational culture. But in the end, the changes will not only be cost effective, they will also go a long way toward making our communities safer.

# A Reorganization Plan for Corrections

To a significant extent, the problems of California's Correctional system grow out of its structure. The Secretary of the Youth and Adult Correctional Agency, for example, has no control over line operations. Instead, the state's 32 prison wardens and eight juvenile institution superintendents each operate independently, with little consistency in procedures and minimal help from headquarters. Lines of responsibility are blurred by layers of bureaucracy between managers and functions. Accountability is conspicuously absent, as is transparency for the public into the system's inner workings. Clear, uniform policies governing the system's most vital functions — fiscal matters, personnel and training, internal affairs, information technology, and health care — are equally lacking. Boards, commissions, and other entities that have evolved over the decades perform duplicate and overlapping functions. And the system's organizational structure has not kept pace with the massive growth in inmate population or with the vast geographical spread of the institutions.

The sheer size and complexity of the correctional system, the critical nature of its mission, and the severity of the problems dictate the need for wholesale reform, and that reform should begin with the system's organizational structure. The Corrections Independent Review Panel therefore proposes that the state's correctional agencies be reorganized according to the plan described in this chapter. While the restructuring alone will not produce the necessary reforms, it will serve as the foundation for cleaning up the prison system, reining in costs, curbing misconduct, holding correctional administrators accountable for the system's performance, and making communities safer by doing more to ensure that inmates and youth wards leave custody better prepared to function in society.

## Background

The state correctional system is presently comprised of the Youth and Adult Correctional Agency and its subordinate departments, boards, and commissions, which consist of the Department of Corrections, the California Youth Authority, the Board of Corrections, the Board of Prison Terms, the Youth Authority Board, the Narcotic Addict Evaluation Authority, the Prison Industry Authority, and the Commission on Correctional Peace Officer Standards and Training.  The agency is organized as follows:

**The Youth and Adult Correctional Agency.** The Youth and Adult Correctional Agency was established in January 1980 with the enactment of California Government Code Sections 12850-12856. The agency is headed by the Secretary of the Youth and Adult Correctional Agency, who reports directly to the Governor and is responsible for general oversight of the agency's subordinate entities. The Secretary represents the Governor in overseeing correctional agencies and reports to the Governor on legislative, budgetary, and administrative matters affecting corrections, but has no direct operational responsibility for the subordinate departments, boards, and commissions. The Secretary is appointed by the Governor and is subject to Senate confirmation.

- **The Department of Corrections.** The Department of Corrections is responsible for managing the state's adult prison and parole systems and is the largest entity under the Youth and Adult Correctional Agency. The department operates 32 prisons and 39 camps with approximately 162,700 inmates and supervises another 148,700 adult parolees.  The department has approximately 49,300 employees, including an administrative staff of approximately 3,500.

- **The California Youth Authority.** The California Youth Authority is responsible for managing the state's youth correctional facilities and parole system. The department operates eight youth facilities and three conservation camps housing approximately 4,200 wards and supervises another 4,200 parolees. The department has approximately 4,900 employees, including an administrative staff of approximately 370.

- **The Board of Prison Terms.** The Board of Prison Terms conducts parole hearings for inmates sentenced to life terms and conducts parole revocation hearings for all parolees alleged to have violated parole terms and conditions. The board also conducts hearings involving sexually violent predators and mentally disordered offenders. In addition, the board has the authority to review prisoners' requests for reconsideration of denial of good-time credits, to set parole length, and to process foreign prisoner transfer requests. The board is also responsible for investigating clemency applications and for reviewing cases of inmates sentenced to life without possibility of parole. The Board of Prison Terms is comprised of nine commissioners appointed by the Governor, with the advice and consent of the Senate.

- **The Youth Authority Board.** The Youth Authority Board, which replaced the former Youthful Offender Parole Board under SB 459, effective January 1, 2004, makes parole decisions for wards committed to the California Youth Authority. The board is responsible for discharges of commitment, orders to parole and conditions, revocation or suspension of parole, and disciplinary appeals. The board is located within the California Youth Authority and is composed of six members, including the Director of the California Youth Authority, who serves as the board's ex officio nonvoting chair. Members are appointed by the Governor with the advice and consent of the Senate.

- **The Narcotic Addict Evaluation Authority.** The Narcotic Addict Evaluation Authority determines suitability for release of individuals committed into the "civil addict" program — a civil commitment to the California Rehabilitation Center for adult offenders whom the court believes would be best served through this alternative to prison. The program currently serves approximately 1,500 civil addicts who are housed at the California Rehabilitation Center and an additional 2,200 parolees.  The Narcotic Addict Evaluation Authority is composed of seven members appointed by the Governor.

- **Prison Industry Authority.** The Prison Industry Authority operates service, manufacturing, and agricultural industries at 22 of the state's adult prisons. The authority provides

2

work assignments for approximately 6,000 inmates and is self-supported through the sale of its products and services. Policy for the Authority is set by the Prison Industry Board. This board is composed of eleven non-compensated members who include the Director of the Department of Corrections, the Director of the Department of General Services, and other members appointed by the Governor, the Senate and the Assembly.

- **The Board of Corrections.** The Board of Corrections is responsible for development and enforcement of standards for construction and operation of county and city jails and juvenile halls, and for standards and training of county and city corrections officers. It also administers grants and other funding programs for construction and operation of county and city corrections programs and gathers and reports information regarding county and city jails and juvenile correctional facilities. The board consists of 15 members, including the Secretary of the Youth and Adult Correctional Agency (who serves as its chairperson), the Director of the Department of Corrections, and the Director of the California Youth Authority. The other members are appointed by the Governor and include county and city corrections officials, administrators of community-based correctional programs, and members of the public.

- **The Commission on Correctional Peace Officer Standards and Training.** The Commission on Correctional Peace Officer Standards and Training establishes standards for the training of state youth and adult correctional peace officers. Training provided by the Department of Corrections and the California Youth Authority are required to conform to these standards. The commission is composed of six commissioners and six alternate commissioners. The Governor appoints three members and their alternates, the Director of the Department of Corrections appoints two members and their alternates, and the Director of the California Youth Authority appoints one member and one alternate.

**The Office of the Inspector General.** The Office of the Inspector General provides independent oversight of the Youth and Adult Correctional Agency and its subordinate agencies. The office performs audits of the state's correctional agencies, conducts investigations into alleged misconduct by correctional administrators and employees, and reviews investigations conducted by correctional agencies. The Inspector General is appointed by the Governor, reports directly to the Governor, and is subject to Senate confirmation.

## Recommendations

The Corrections Independent Review Panel recommends that the state's correctional system be restructured as described in the following pages. The proposed reorganization accomplishes the following:

- It gives the public an active voice and role in corrections by creating a Civilian Corrections Commission at the highest level of the organization and assigning the commission authority to approve policy and provide direction to the correctional administration. In so doing, it opens the operations of the correctional system to public view.

- It retains the Office of the Inspector General as the entity responsible for independent oversight of the correctional system and also situates the Office of the Inspector General as the auditing and investigative arm of the Civilian Corrections Commission.

- It restructures the Youth and Adult Correctional Agency as the Department of Correctional Services, and it merges the central management and support functions of the Department of Corrections and the Department of the Youth Authority into the new department. The Department of Correctional Services will be headed by the Secretary of Correctional Services, who will serve as a member of the Governor's cabinet.

- It opens the channels of communication from the top of the organization to the field operation levels.

- It eliminates legislative confirmation of appointments except the commissioners that direct the organization.

- It provides the Secretary of the Department of Correctional Services with the ability to effectively manage the department by giving that office the power to appoint individuals to key managerial positions.[1]

- It "flattens" the organization by removing layers of bureaucracy that have obscured lines of authority and accountability between top managers and the functions for which they are responsible.

- It supports the need for custody and parole operations to work in concert to prepare inmates for release into society from the moment they enter an institution.

- It improves efficiency by eliminating the Board of Prison Terms, the Narcotic Addict Evaluation Authority Board, the Youth Authority Board, and the Prison Industry Board, and the Joint Venture Policy Advisory Board, while retaining all necessary functions.  The functions of the former boards will be merged into units of the Department of Correctional Services.

- It transfers the administrative support of the Prison Industry Authority, the Joint Venture Program, and the Free Venture Program to the Department of Correctional Services and assigns responsibility for operation of these programs to new Regional Directors of Operations.

---

[1] This provision will require a constitutional amendment to allow state officers appointed by the Governor to make more than one exempt appointment.

- It moves the Board of Corrections into the new Department of Correctional Services and renames it the Corrections Standards Authority. It also assigns the Corrections Standards Authority responsibility for establishing the first coordinated state and local strategic planning effort for the youth and adult correctional systems. In addition, it gives the Corrections Standards Authority responsibility for setting standards and conducting inspections of state prisons and youth facilities.

- It eliminates the Commission on Correctional Peace Officer Standards and Training and transfers the responsibilities of the commission for setting training standards for state youth and adult correctional peace officers to the new Corrections Standards Authority inside the Department of Correctional Services.

- It establishes for the first time a high-level Risk Management office to identify policies and practices that present legal and fiscal risks to the State's correctional system.

- It elevates information technology to a policy level directly under the Secretary of the Department of Correctional Services to help bring about consistency and modernization in the department's information technology system.

- It enhances the ability of the new Department of Correctional Services to manage its wide array of institution and parole responsibilities by concentrating youth and adult field operations under regional directors who will be fully responsible for all operations in designated geographic regions and who will be accountable to a common director of operations and programs.

- It closely integrates parole operations with institution programs and makes regional directors responsible for preparing inmates and wards for eventual return to the community from the moment they enter a prison or youth facility until they are released from parole.

- It enhances the effectiveness of the organization by combining common functions and centralizing authority for policy making and coordination of statewide concerns.

- It elevates the importance of personnel, training, and employee discipline and ensures uniformity and accountability by placing those functions directly under the responsibility of executive management.

The new flattened organizational structure will directly connect the top layer of management to every aspect of the organization's performance. Operations will be carried out by

key managers, whose authority and responsibilities are clearly defined. Managers and staff will be empowered to carry out assigned responsibilities and will be held accountable for performance.

Organization Chart A on the following page illustrates the main components of the new organization. Many of these recommendations are discussed in more detail in subsequent chapters in this report.

## Department of Correctional Services
### Chart A

Organizational chart showing:

- **Governor**
  - Office of Inspector General
  - **Civilian Corrections Commission**
    - Inspection and Control
    - **Secretary of Correctional Services**
      - Corrections Standards Authority
      - Office of Research and Planning
      - Office of Fiscal Management
      - Office of Health Care Administration
      - Office of Risk Management
      - Office of Information Technology
      - Office of Personnel and Training Development
      - Office of Internal Affairs
      - Office of Labor Relations
      - **Director of Youth Operations**
        - Hearings Administration
        - Regional Director — Facilities, Parole
        - Regional Director — Facilities, Parole
      - **Director of Adult Operations**
        - Hearings Administration
        - Regional Director — Prisons, Parole (×6)

Key components of the proposed reorganization are described below.

## Civilian Corrections Commission

The Civilian Corrections Commission will bring public scrutiny and a public voice to correctional policies and operations by approving policy, bringing correctional activities into the open, and making the correctional system transparent to the public. The Civilian Corrections Commission will report directly to the Governor and will make recommendations to the Governor for the appointment of the Secretary of the new Department of Correctional Services. The commission will provide directives to the Secretary of the Department of Correctional Services and will have the power to appoint or remove the Inspector General. In addition, the commission will review and approve the proposed department budget before it is submitted to the Governor. The Commission will have five members and will be appointed by the Governor and confirmed by the Senate, with at least one commissioner selected on the basis of his or her expertise in the area of youthful offender treatment and rehabilitation. The Commissioners will serve at the pleasure of the Governor for a period not to exceed 10 years.  Commissioners may not have been affiliated with the state's correctional agencies in the past and may not be otherwise affiliated with the Department of Correctional Services. The commission's policy and meeting agendas will be published and the meetings will be open to the public.

## Office of the Inspector General

The Office of the Inspector General will serve as the independent investigative and auditing arm of the Civilian Corrections Commission and will also be responsible for independent oversight of the correctional system. As such, the Office of the Inspector General will have authority to audit any aspect of correctional operations and to conduct investigations into alleged misconduct by correctional managers and employees. The Office of the Inspector General will also review investigations conducted by the Department of Correctional Services into alleged misconduct by correctional officers and civilian correctional employees and will monitor the department's handling of misconduct complaints. The Civilian Corrections Commission shall appoint the Inspector General, who shall serve a five-year term. The term may be renewed for one additional term of five years at the discretion of the Civilian Corrections Commission. The Civilian Corrections Commission may otherwise remove the Inspector General for incompetence, neglect of duty, or corruption at any time. All non-confidential reports of the Office of the Inspector General will be discussed by the commission in public session. To ensure the independence of the Inspector General, the commission may not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation.

## The Department of Correctional Services

The Youth and Adult Correctional Agency will be restructured into a new, more streamlined Department of Correctional Services headed by the Secretary of Correctional Services. The administrative and management support functions of the Youth and Adult Correctional Agency and its constituent entities will be consolidated into the new department as follows:

8

**Secretary of Correctional Services.** The Secretary of the Department of Correctional Services will function as the chief operational executive of the Department of Correctional Services. The Secretary will be appointed by the Governor from a pool of three candidates recommended by the Civilian Corrections Commission and will represent the commission in the Governor's cabinet. The Secretary can be removed by the Civilian Corrections Commission. The Secretary will have direct authority over and responsibility for every aspect of department operations and will carry out the directives of the Civilian Corrections Commission. The Secretary's Office includes the following (See Chart B):

· **Undersecretary for Correctional Services.** The Undersecretary acts at the direction of the Secretary and assists the Secretary in carrying out the duties and responsibilities of that office.

· **General Counsel.** The General Counsel, with a staff of attorneys, serves as the Secretary's primary legal adviser. As such, the General Counsel will coordinate the department's legal activities, provide the Secretary with legal counsel, review policy drafts, and analyze proposed legislation affecting the department.

· **External Affairs Office.** The External Affairs Office, directed by the Assistant Secretary for External Affairs, acts as the department's liaison to the news media, community groups, and other organizations.

· **Victim Services Office**. The Victim Services Office, directed by the Assistant Secretary for Victim Services, is responsible for all victim-related services previously provided by departments and boards under the Youth and Adult Correctional Agency. These responsibilities include, but are not limited to, training on victims' rights and issues, notification to victims of the release, death, or escape of an inmate or ward, notification to victims of parole consideration hearings, and collection of restitution fines from inmates and for forwarding the funds to the Victim Compensation and Government Claims Board.

· **Legislative Affairs Office.** The Legislative Affairs Office, directed by the Assistant Secretary for Legislative Affairs, responds to information requests from the Legislature, analyzes federal and state legislation affecting the department, coordinates the development of department-sponsored legislation, and monitors legislatively mandated reports required of the department.

· **Equal Employment Opportunity Office.** The Equal Employment Opportunity Office, directed by the Assistant Secretary for Equal Employment Opportunity, is responsible for developing and implementing department policy and strategies to prevent discrimination and retaliation in the workplace. The office also responds to complaints of discrimination and works cooperatively with the Equal Employment Opportunities Commission and the Department of Fair Employment and Housing.

**Office of Inspection and Control.** Directed by the Assistant Secretary for Inspection and Control, the Office of Inspection and Control will be responsible for conducting internal audits at the direction of the Secretary of Correctional Services to ensure that administrative and operational policies and directives are properly implemented. The Office of Inspection and Control gives the Secretary the ability to closely monitor the management and financial activities of the department and provides the Secretary with the information needed to implement necessary corrective action. The operations of the office should be guided by the *Standards for the Professional Practice of Internal Auditing* issued by the Institute of Internal Auditors. These standards will ensure that issues selected for audit are those that present the highest risk to the department.

**Correctional Standards Authority.**  The Board of Corrections will be renamed the Correctional Standards Authority to clarify its role in the new department. In addition to assuming the functions of the Board of Corrections, the new Correctional Standards Authority will set standards for adult prisons and youthful offender facilities and will conduct inspections of the institutions. It will also set standards for training state youth and adult correctional peace officers and will develop the first coordinated state and local strategic planning effort for juvenile correctional systems.

## Policy and Support Functions

The policy and support functions of the Department of Correctional Services report directly to the Secretary of Correctional Services. These functions consist of the following. (See also Organization Chart C, Appendix).

**Office of Research and Planning.** Filling a critical gap in the existing correctional system, the Office of Research and Planning will provide management with the research, data analysis, evaluation, and assessment necessary for effective planning and decision making. The office will also manage an interagency agreement with one of the state universities to perform inmate and ward population projections. Directed by the Deputy Secretary for Research and Planning, the office will provide management with the ability to respond to changing conditions and is placed high in the organizational structure to emphasize the importance of this vital resource.

**Office of Fiscal Management.** The Deputy Secretary for Fiscal Management is the department's chief fiscal officer and reports directly to the Secretary of Correctional Services. The Office of Fiscal Management will be responsible for the financial accountability of department operations and for ensuring that the department adheres to its budget. As such, the office will have responsibility for contract processing and procurement; budget and accounting management; and facility planning. It will use existing financial management systems and will develop additional systems as necessary to direct the development of the budget and monitor its compliance. The Office of Fiscal Management will work with all units of the organization in carrying out its responsibilities.

**Office of Health Care Administration.**  The Office of Health Care Administration, directed by the Deputy Secretary for Health Care Administration, will provide policy direction and consultation for the department's health care operations, while Regional Directors for youth facilities and adult prisons will be responsible for ensuring inmate and ward access to health care services. The Office of Health Care Administration will include professional staff responsible for oversight of mental health, medical, and dental services, inmate/ward death review policy functions, and parole outpatient services, along with special program managers for specifically assigned functions.

**Office of Risk Management.** Directed by the Deputy Secretary for Risk Management, the Office of Risk Management adds a much-needed function to the correctional system by identifying practices, policies, and conditions that represent potential legal or fiscal risks to the department. The office will carry out this function in part by reviewing and analyzing performance reports from each region and making recommendations to alleviate risk. The office will also review inmate/ward/parolee appeals and grievances to identify issues and patterns to be addressed. In addition, the office will manage policy development for the department and will include a policy compliance unit to ensure that policies are followed.

The Office of Risk Management will be responsible for litigation response and compliance, encompassing defense against individual inmate litigation, class action lawsuits, and contract litigation. To ensure continued compliance with court orders, the Office of Risk Management will include a new—and vital— litigation compliance unit comprised of staff from key units of the department.

In addition, the Deputy Secretary for Risk Management will chair a Risk Management Committee comprised of the Deputy Secretary for Internal Affairs, the Deputy Secretary for Personnel and Training; the Director of Adult Operations, and the Director of Youth Operations. The committee will be responsible for identifying employees whose conduct may indicate unfitness for duty and for identifying those in need of employee assistance services to prevent problems from worsening. The committee will also review critical incidents to identify the need for changes in policy or training.

**Office of Information Technology.** Directed by the Deputy Secretary for Information Technology, the Office of Information Technology is placed high in the organizational structure to centralize information technology policies and operations and bring about consistency and modernization in the department's information technology capabilities. This office will coordinate the department's information technology functions, including customer relations and support, project management, and the development and maintenance of computer applications. For most activities, the department will rely on contracted professional consultants under the supervision of information technology program managers.

**Office of Personnel and Training Development.** Directed by the Deputy Secretary for Personnel and Training Development, the Office of Personnel and Training Development is

responsible for staff selection, training, and personnel management. Its high placement in the organizational structure underscores the vital importance of these functions to department goals. The office is responsible for recruitment, health and safety awareness programs, pre-employment screening examinations, background checks, and other related duties. It administers a wellness program by providing behavioral science professionals to the prisons and youth facilities. The office will develop and coordinate training throughout the department, including core academies and in-service training. It will also provide management with succession planning to provide a path for employee career advancement.

**Office of Internal Affairs**. Investigations into allegations of serious misconduct by department staff will be conducted by the Office of Internal Affairs to ensure uniformity and fairness in the investigative and discipline process. Directed by the Deputy Secretary for Internal Affairs, this office will include a staff of attorneys who will report to a supervising attorney and will serve as legal advocates on behalf of the department in employee disciplinary matters. In addition, under the direction of the Office of Internal Affairs a "use-of-force investigative team" will be assigned to each of the regions in youth and adult operations to investigate serious use-of-force incidents at youth facilities and adult prisons. These teams are discussed further in the Use-of-Force chapter.

**Office of Labor Relations.** This office will be directed by the Deputy Secretary for Labor Relations and will act as the department's representative on matters involving management authority and practices and on employee grievances related to union contracts. This includes responsibility for negotiations in all matters with employee unions except for negotiations involving compensation, which are handled by the Department of Personnel Administration.

## Operations

The operations functions of the Department of Correctional Services consist of the following (See also Organization Chart D, Appendix).

**Director of Youth Operations.** The Director of Youth Operations will be responsible for overall management of youth facilities, camps, and parole operations through two regional directors. This environment includes specialized treatment as part of a therapeutic environment for treatment of youthful offenders committed to state custody because they cannot be successfully treated in community programs. The director will be responsible for the policy development and oversight of the following functions:

- security operations including emergency operations plans;
- ward and parolee programming;
- educational services
- ensuring the delivery of health care services;
- substance abuse programs; and,
- The Free Venture Program.

Furthermore, the Director of Youth Operations will be responsible for:
· ward classification and transportation;
· coordinating gang intelligence with local law enforcement;
· maintenance of correctional case records

**Director of Adult Operations.**  The Director of Adult Operations will be responsible for overall management of adult prison and parole operations through six regional directors. The director will be responsible for the policy development and oversight of the following functions:
· security operations including emergency operations plans;
· inmate and parolee programming, including education and job training;
· ensuring the delivery of health care services;
· substance abuse programs;
· community correctional facilities;
· prison industries; and,
· The Joint Venture Program.

Furthermore, the Director of Adult Operations will be responsible for:
· inmate classification and transportation;
· coordinating gang intelligence with local law enforcement;
· maintenance of correctional case records

**Regional Directors – Youth.**  Each of the two Regional Directors – Youth will be responsible for the management of youth facilities, camps, and parole operations in a designated geographic region, consistent with policies generated by department management under the direction of the Secretary of Correctional Services.  The Regional Directors – Youth will report to the Director of Youth Operations.  Inherent in the duties of the Regional Directors will be responsibility for preparing wards for parole from the date of reception through release.  The duties of the Regional Directors will include responsibility for:
· all support functions, including budgeting, accounting, training coordination, and discipline;
· administration of policies set out by the Director of Adult Operations for:
    · security operations;
    · ward and parolee programming coordination;
    · educational services;
    · delivery of health care services;
    · substance abuse programs; and,
    · the Free Venture Program;
· coordination with local law enforcement;
· coordination of community services;
· coordination of delinquency prevention services;
· development and implementation of the ombudsman program, which acts as the department's liaison to wards and family members.

**Regional Directors – Adult.** Each of the six Regional Directors – Adult will be responsible for the management of adult prisons and parole operations in a designated geographic region, consistent with policies generated by department management under the direction of the Secretary of Correctional Services. The Regional Directors – Adult will report to the Director of Adult Operations. Inherent in the duties of the Regional Directors will be responsibility for preparing inmates for parole from the date of reception through release. The duties of the Regional Directors will include responsibility for:

- all support functions, including budgeting, accounting, training coordination, and discipline;
- administration of policies set out by the Director of Adult Operations for:
    - security operations;
    - inmate and parolee programming coordination;
    - delivery of health care services;
    - substance abuse programs;
    - community correctional facilities;
    - prison industries; and,
    - the Joint Venture Program;
- coordination with local law enforcement;
- coordination of community services;
- development and implementation of the of the ombudsman program, which acts as the department's liaison to inmates and family members.

Dividing the state's adult prison system into six regions, each under the direction of a Regional Director will help bring management control to prisons and parole operations in a vast geographic area. Regional Directors will be similar to Directors of Corrections in smaller states. While responsive to policy direction from the Director of Adult Operations, Regional Directors will bring operational management to a level of the correctional system in a manner not previously applied and help ensure that the state's 32 prisons, 37 camps, and 180 parole units operate within applicable policies.

**Hearings Administration.** Two Hearing Administration offices — one for adult inmates and one for youths—will report to the Director of Adult Operations and the Director of Youth Operations, respectively. The Hearing Administration office for adult inmates will assume the duties of the Board of Prison Terms, including conducting parole consideration hearings for inmates sentenced to life terms with the possibility of parole; establishing terms and conditions for inmates released on parole in California; and conducting parole revocation hearings for violation of parole terms and conditions. The Hearing Administration office for youths will assume the powers and duties of the Youth Authority Board, including conducting hearings concerning discharge of commitment; orders and conditions of parole; revocation or suspension of parole; and appeals concerning modification of early release dates.

## Fiscal Implications

Consolidation of functions in the executive and administrative areas will result in savings through the elimination of overlapping and duplicative activities. Based on normal employee attrition in the administrative services functions, the Corrections Independent Review Panel estimates potential savings of approximately $20 million annually within three years of implementation.

# Appendix

## Department of Correctional Services
## Office of the Secretary

### Chart B



## Department of Correctional Services
## Central Management

### Chart C



**Secretary of Correctional Services**

**Office of Research and Planning**
- Research
- Planning
- Data Analysis
- Manage the Outsourcing of Population Projections

**Office of Fiscal Management**
- Accounting
- Budget
- Procurement & Contract Services
- Facilities Management

**Office of Health Care Administration**
- Mental Health Services
- Medical Services
- Dental Services
- Inmate/Ward Death Review
- Parole Outpatient Clinic Services

**Office of Risk Management**
- Inmate Appeals
- Litigation Response and Compliance
  - Individual Inmate/Parole Litigation
  - Class Action Lawsuits
  - Contract Litigation
- Litigation Management
- Policy Development
- Policy Compliance Management

**Office of Information Technology**
- Application Development and Maintenance
- Customer Relationship Management
- Project Management
- Technology Planning
- Systems Administration and Network Support
- Technical Support

**Office of Personnel and Training Development**
- Training
  - Core Academies
  - In-Service Training
  - Succession Planning
- Personnel
  - Recruitment and Selection
  - Personnel Management
  - Health & Safety Awareness Programs
  - Wellness Program Management

**Office of Internal Affairs**
- Investigation of Allegations of Serious Misconduct
- Investigation of Serious Use of Force Incidences
- Legal Advocacy

**Office of Labor Relations**
- Labor Contract Management and Negotiations
- Contract Grievance

17

# Department of Correctional Services Operations

## Chart D



**Director of Youth Operations**

Facilities and Parole

- Security Operations, including Emergency Operations Plans
- Ward and Parolee Programming
- Educational Services
- Ensure Delivery of Health Care Services
- Substance Abuse Programs
- Free Venture Program
- Ward Classification and Transportation
- Coordination of Gang Intelligence with Local Law Enforcement
- Maintenance of Correctional Case Records

**Regional Director - Youth**

Facilities and Parole

- All Support Functions, including Budgeting, Accounting, Training Coordination, and Discipline
- Administration of Security Operations
- Administration of Ward and Parolee Programming Coordination
- Administration of Educational Services
- Administration of the Delivery of Health Care Services
- Administration of Substance Abuse Programs
- Administration of the Free Venture Program
- Coordination with Local Law Enforcement
- Coordination of Community Services
- Coordination of Delinquency Prevention Services
- Development and Implementation of the Ombudsman Program

**Director of Adult Operations**

Institutions and Parole

- Security Operations, including Emergency Operations Plans
- Inmate and Parolee Programming, including Education and Job Training
- Ensure Delivery of Health Care Services
- Substance Abuse Programs
- Community Correctional Facilities
- Prison Industries
- The Joint Venture Program
- Inmate Classification and Transportation
- Coordinate Gang Intelligence with Local Law Enforcement
- Maintenance of Correctional Case Records

**Regional Director - Adult**

Institutions and Parole

- All Support Functions, including Budgeting, Accounting, Training Coordination, and Discipline
- Administration of Security Operations
- Administration of Inmate and Parolee Programming Coordination
- Administration of the Delivery of Health Care
- Administration of Substance Abuse Programs
- Administration of Community Correctional Facilities
- Administration of Prison Industries
- Administration of the Joint Venture Program
- Coordination with Local Law Enforcement
- Coordination of Community Services
- Development and Implementation of the Ombudsman Program

# Ethics and Culture

Recent events have brought to light an insidious "code of silence" within California's correctional institutions. Although a reluctance to report wrongdoing by co-workers is common in any workplace, the code of silence that has taken hold in the state's prisons and juvenile facilities is deeply destructive, profoundly unacceptable, and symptomatic of an urgent need for cultural reform in the state correctional system.

By allowing misconduct to go unreported and unpunished, the code of silence undermines the very purpose of the correctional system to safely house those committed to its custody and to help them prepare for return to the community. It also damages public safety and erodes the public trust, and demoralizes the majority of correctional officers who perform a difficult job with diligence and professionalism. No positive change can take place in the correctional system until the culture of the entire organization is reformed from the top down and the code of silence is decisively eliminated.

## Background

In wrenching testimony to the Legislature in early 2004, correctional employees described in graphic detail the harmful effects of the code of silence in the state's correctional institutions. The department's newly appointed director also acknowledged the code's existence, noting: "Being with the department for 25 years, I have experienced the code of silence first hand. I think there's no question it exists."[1]

Although loyalty among teammates and coworkers who spend significant amounts of time together is natural and desirable, a code of silence that turns a blind eye to serious misbehavior and targets those who try to stop it far exceeds the bounds of tolerance. In effect, the code of silence shifts loyalties from the organizational mission to the organization's members. The code of silence within California's correctional system encourages unethical behavior by allowing it to operate secretly and is indicative of an organizational culture of fear and hypocrisy.

*What fosters a code of silence?* Studies have provided clues into the roots of a code of silence. A study by the National Institute of Ethics involving 3,714 peace officers and academy recruits from 42 states found codes of silence to be common in law enforcement agencies throughout the country and also showed that such a code grew out of a belief that reporting misconduct would be futile. The study reported that in one survey that asked 451 officers who had witnessed misconduct but remained silent what they thought would have happened had they reported the misbehavior; only 88 respondents said they believed that those committing the misconduct would have been disciplined. The remaining 363 ex-

---

[1] Associated Press, "New Prisons Chief Says Corrosive 'Code of Silence' Must End," NBC TV Channel 4, Los Angeles (Last visited March 23, 2004), http://www.nbc4.tv/news/2919779/detail.html.

pressed the belief that either they themselves would have been ostracized, or that the administration would have done nothing about the misconduct.[2]

Administrators may have different reasons for not acknowledging misconduct. Fearing their own termination should serious misconduct be exposed, otherwise honest administrators may choose to hide the misconduct rather than address it. But when subordinates perceive that administrators lack the will or the means to address unacceptable, unethical, and even criminal behavior, employee confidence in the organization erodes. Such an environment may lead some employees to justify their own unethical activities and cause ethical employees to remain silent out of fear of the wrongdoers, resulting in a self-perpetuating cycle of misbehavior.

Testimony at the recent legislative hearings clearly illustrated just such a model of self-perpetuating misconduct in the California Department of Corrections, leading senators to describe the department as an institution tarnished from the top down — one that punishes employees who try to do right and protecting those who do wrong.[3] The atmosphere at the hearings was so charged with fear of retaliation by wrongdoers that extra security was provided in the legislative chambers. Witnesses expressed fear for their safety and one senator reported receiving a death threat.[4]

The special master appointed by the U.S. District Court in a lawsuit against the Department of Corrections concerning misconduct by correctional officers at Pelican Bay State Prison described how the department's destructive culture eventually entangles new employees:

> *The correctional officer recruits who seek employment within the CDC do so with high expectations and positive motives, consistent with other applicants who seek a career in law enforcement. The young men and women who seek CDC employment are not taking peace officer jobs to commit crimes or lie or cover-up the abuses of their co-workers. Somehow, however, the rookie correctional officers who go to work for the CDC are forced to adopt the code of silence.[5]*

---

[2] National Institute of Ethics, *Police Code of Silence Facts Revealed*, by Neal Trautman
http://www.aele.org/loscode2000.html [Last visited March 24, 2004.].
[3] Don Thompson (Associated Press), "Prison System Blasted by Lawmakers, New Administration," *North County Times (San Diego)* (January 20, 2004) http://www.nctimes.com/articles/2004/01/21/news/state/1_20_0422_21_25.txt.
[4] Thompson, "Prison System Blasted by Lawmakers, New Administration," *North County Times.*
[5] United States District Court, Northern District of California, *Special Master's Report Re: Department of Corrections "Post Powers" Investigations and Employee Discipline,* by John Hagar, Special Master, January 15, 2004, p. 79.

***What can be done?*** Transforming the culture of the Department of Corrections and the California Youth Authority into one in which personal integrity and loyalty to the department mission consistently take precedence over loyalty to co-workers suspected of wrong-doing, requires a vigorous, multi-pronged approach. The effort should be guided by quality management principles incorporating clear objectives and purpose; key performance measures; consistent monitoring; and a system of correction and reward.  Quality management principles accomplish the following:

- Provide clarity of purpose in each employee's job;
- Link each person's work to the department's mission;
- Foster continual improvement;
- Bring accountability to all department levels.

Specific tools available in this effort include:

- ***A formal cultural assessment.*** An organization's official culture is embodied in its mission statement, procedures, rules and operational routines, and is communicated to its members through official training and written policies. Informal sub-cultures, on the other hand, may run counter to the official or intended culture. A formal cultural assessment, conducted by an outside entity, can identify the values, assumptions, attitudes, expectations, and practices that detract from the mission. Such an assessment can be an effective first step in aligning the informal culture with the organization's mission and helping the organization focus on strategic objectives. A number of organizations, including the National Institute of Corrections, provide cultural assessment services. The National Institute of Corrections has provided such services to at least one California prison in the past.

- ***A clear mission statement.*** A well-crafted mission statement defines a common purpose for the organization and is integral to quality management. Clear objectives are necessary in order to motivate members to fulfill an organization's mission, to prevent miscommunication, and create shared values, fairness, and an ethical model at all organizational levels. The present mission statement of the Youth and Adult Correctional Agency falls short of fulfilling that purpose. The mission statement reads:

    *Our mission is to develop and implement effective and innovative correctional policy, create a coordinated correctional system which is responsive to the citizen's right to public safety and governmental accountability, and maintain a reputation for excellence and integrity.* [6]

---

[6] Youth and Adult Correctional Agency, *Mission Statement*, www.yaca.ca.gov/ [last visited May 11, 2004.]

- *Integrity at the top.* Cultural transformation must begin at the highest levels of department management. The chief administrator must be a role model for integrity, must communicate that the department values integrity, and must require the same behavior and philosophy from all managers and supervisors. Commitment by the first-line supervisors to these principles is crucial and deserving of specific training. Such measures are crucial to restoring employee confidence in management's integrity.

- *Recruiting and selecting employees.* Recruiting practices should select candidates of high moral character. The selection process should include thorough and detailed background investigations conducted by specially trained investigators who are held accountable for the quality of their investigations.

- *Training.* Indoctrination and training should be designed to prepare recruits to positively influence the correctional environment and to insulate them from negative influences. During the first year of employment, each new academy graduate should be assigned to a field training officer specifically selected and trained for that purpose. The initial probationary employment period should be viewed as part of the recruitment process, with ethical conduct one of the primary criteria by which field training officers evaluate probationers. Field training officers should administer regular examinations to probationers, should themselves be selected for their ethical conduct, and should be rewarded through appropriate salary enhancements.

  Academy ethics training should present relevant, real-life situations commonly faced by correctional officers and should specifically discuss the code of silence. A representative from the Office of the Attorney General could be invited to deliver a presentation to academy cadets on corruption in law enforcement and the consequences of observing a code of silence. Classroom ethics training should be required every two years of all employees, including management, and instructors should incorporate ethical perspectives into all of the classes they teach. Training in ethics must also reach beyond the classroom, with supervisors and trainers taking advantage of "teachable moments" presented throughout in the course of the work day to instruct employees and reinforce ethical behavior. (See Chapter 5, *Personnel and Training,* for additional discussion in this area.)

- *A code of conduct.* A clearly defined code of conduct to which all employees, including management, are held accountable should include language specifically requiring employees to report misconduct and a statement to be signed by each employee affirming that they have no knowledge of unreported wrongdoing and will report any misconduct they encounter in the future. The code of conduct can be supplemented by guidelines from management governing situations and circumstances employees commonly encounter. Standards for sworn employees should also define expected behavior off-duty.

- *Disciplinary sanctions.* Discipline must be fair, timely, and consistently administered to all employees, regardless of rank or position.  The department should develop a set of

22

model disciplinary guidelines as a tool to ensure that similar infractions receive similar and fair disciplinary action. Disciplinary sanctions for violating the code of conduct should be clearly defined and included in the code. The department should publicize investigation results and disciplinary actions in a manner consistent with applicable statutes and rules concerning employee privacy. (See Chapter 3, *Employee Investigations and Discipline*, for additional discussion.)

- *Providing a way to report misconduct.* Management must provide a means for employees to report misconduct, anonymously if necessary, without fear of reprisal. The process must include rules to protect those who report misconduct. It must also include disciplinary action against those who fail to report misconduct and against those who retaliate against employees who do report it. To avoid discouraging employees who have failed to report misconduct in the past from coming forward, the disciplinary scale should be graduated to allow less harsh sanctions for those who failed to report immediately, but who later volunteer information about misconduct. A report by an independent review panel of an investigation into the Los Angeles Police Department Rampart scandal, noted that harsh discipline for failing to report misconduct, in some instances deterred reporting by those who might otherwise have reconsidered their initial inclination to keep quiet.[7]

- *Monitoring performance.* Monitoring employee performance is essential to the quality management model. Monitoring should be based on key performance measures and should include an assessment of an employee's adherence to the department's code of conduct.  Measuring performance through monitoring or audit techniques provides the evidence for needed improvements and for recognition of excellence. Key performance measures incorporate desired or necessary results that can be evaluated to determine the extent to which an employee's performance meets the organization's mission.  Performance indicators might include the number of disciplinary actions involving the employee, complaints from inmates or co-workers, consistency in performing prescribed tasks, involvement in use-of-force incidents, and awards or commendations received. Annual employee appraisals should include a rating of each employee's adherence to the department's code of conduct, and supervisors at all levels should be evaluated annually by employees under their direct supervision, anonymously if necessary. This assessment provides management with an important perspective by which to rate supervisor effectiveness. Having a consistently updated and accurate computer database is critical to monitoring and to evidence-based management.

---

[7] Rampart Independent Review Panel, *Report to the Los Angeles Board of Police Commissioners Concerning the Operations, Policies and Procedures of the Los Angeles Police Department in the Wake of the Rampart Scandal*, November 16, 2000, p. 11.

- *Recognition of meritorious actions*. Recognizing and rewarding ethical behavior is just as important as disciplining unethical behavior in building a positive cultural environment**.** Employees who have displayed exceptional moral courage or have been influential models of ethical behavior should be publicly commended.

- *Cross-functional teams.* Using cross-functional teams to solve problems can foster a positive cultural environment by lessening territoriality, sparking creativity, motivating employee innovation, and leading to an atmosphere of continual improvement.[8;9] In a traditional model, when a problem arises, management assigns the task of resolving the problem to one segment of the organization, even if the problem affects the organization as a whole. In contrast, a cross-functional team, or "matrix management" model, assigns the problem to a manager whose organizational unit most closely relates to the problem. That manager then forms a cross-functional team of members from key parts of the organization and leads the team in a strategic effort to address the problem. The combined expertise of the diverse organizational units enhances the team's capability of solving the problem and helps eliminate barriers that develop when separate divisions act independently. Cross-functional teams are a powerful vehicle for addressing problems common to the whole organization, including those involving organizational and cultural reform. They can be especially effective where the issues to be addressed lend themselves to a project orientation, such as managing specific litigation or monitoring policy compliance.

- *Structuring the organization to promote accountability.* The organizational structure must closely connect management with staff, clearly define lines of authority and accountability, and support effective communication. (Chapter 1, *A Reorganization Plan for Corrections*, presents the panel's recommendations in this area.)

---

[8] International Organization for Standardization, *Quality Management Principles*, www.iso.ch/iso/en/iso9000-14000/iso9000/qmp.html#Principle3 [last visited May 4, 2004.]

[9] Strategic Futures Consulting Group, Inc., "Cross Functional Teams," http://www.strategicfutures.com/crossfun.htm [last visited May 4, 2004.]

## Recommendations

The Corrections Independent Review Panel recommends that the new Department of Correctional Services take the following actions:

- Arrange with an outside entity to conduct a cultural assessment of the state correctional system to identify issues needing reform. Arrange for a follow-up assessment every two years.

- Ensure that Department of Correctional Services managers and administrators serve as role models for integrity and that they require the same behavior from employees.

- Provide a means for employees to report misconduct, anonymously if necessary, without fear of reprisal.

- Strengthen recruiting standards to select candidates of high moral character.

- Conduct thorough and detailed background investigations of all peace officer applicants. The investigations should be performed by specially trained investigators who are held accountable for the quality of the investigations.

- Assign new academy graduates to a field training officer during the probationary period. Field training officers should be selected on the basis of proven job experience and positive ethical behavior and should be specifically trained to mentor and critique new employees.

- Require every employee to sign an official code of conduct that clearly defines cooperating in a code of silence as misconduct. Include in the code an affirmation that the employee has no knowledge of unreported wrongdoing and will report any future misconduct. Accompany the code of conduct with a list of the disciplinary sanctions to be imposed for violating the code.

- Discipline employees who fail to report misconduct or who retaliate against or harass employees who do report misconduct.

- Demand that the off-duty conduct of peace officers be identical to the high standards required on duty.

- Enhance academy training to include ethical considerations relevant to every employee's specific job.

- Require in-service training in ethics at least every two years for all employees.

- Invite the Office of the Attorney General to lecture on the "code of silence" and corruption during department training.

- Establish a system of accountability that includes performance measures by which to evaluate employees and monitor levels of achievement.

- Develop a new mission statement that succinctly expresses the department's goals and objectives.

- Include a rating of each employee's adherence to the code of conduct in the annual employee appraisal. Supervisors should be evaluated annually by the staff who report directly to them.

- Administer discipline fairly, timely, and consistently to all employees, regardless of rank or position.

- Establish a new commendation: the "medal of integrity," to be publicly awarded to employees who have displayed exceptional moral courage.

- Publicize commendation and disciplinary actions at a level of detail that will not violate applicable statutes or rules.

- Employ "quality management" principles and methods, such as the use of cross-functional teams and evidence-based decision models.

- Develop an organizational structure that supports accountability at all levels.

- Select and train supervisors to display the leadership and courage necessary to reinforce the ethical principles of the department.

## Fiscal Implications

The cost of conducting initial cultural assessments at all California youth and adult correctional facilities and headquarters offices would total approximately $1.6 million dollars. The cost is based on estimates from a nationally recognized expert in conducting cultural assessments at correctional facilities and assumes a cost of $40,000 for each of California's 32 adult facilities and $30,000 for each of the state's eight youth correctional facilities.

# Employee Investigations and Discipline

*The basis of effective government is public confidence, and that confidence is endangered when ethical standards falter, or appear to falter.*

—*John F. Kennedy, April 27, 1961*

Ensuring that employees conduct themselves appropriately is an essential function of an employer. The most important administrative tool in achieving that goal is an expeditious and equitable internal investigation and employee discipline processes that sanctions those found guilty of misconduct and clears those wrongfully accused. In recent years, the California Department of Corrections has come under repeated and widespread criticism for failings in this regard. A series of legislative hearings in early 2004 brought to light an atmosphere of corruption and fear among Department of Corrections employees that obscures misconduct, derails internal affairs investigations, subjects whistle-blowers to retaliation, and shields those guilty of wrongdoing.[1] Following scrutiny of internal affairs investigations at Pelican Bay State Prison by the U.S. District Court, the Department of Corrections is under court order to correct deficiencies in its internal affairs investigation process. Revelations about these problems are not new. A special master appointed by the court noted in January 2004 that the department failed to correct deficiencies in its internal affairs process reported two years earlier by the Office of the Inspector General.[2]

The Department of Corrections failure to adequately address misconduct damages the reputation of its employees and undermines public confidence in the department's ability to carry out its mission. The Corrections Independent Review Panel therefore sought to identify measures the new Department of Correctional Services could take to ensure integrity in the employee investigation and discipline process in both its adult and its youth correctional systems. In that effort, the panel reviewed the employee investigation and discipline processes used by the Department of Corrections and the California Youth Authority and examined reports by Senate Select Committees on Government Oversight and the California Correctional System, the U.S. District Court, and the Office of the Inspector General. The panel also attended legislative hearings, interviewed experts in the field of investigation and employee discipline, and polled correctional agencies nationwide.

As a result of its study, the panel found a lack of standardized procedures for internal investigations and employee discipline to be a key deficiency. The panel found another deficiency to be inadequate record-keeping of misconduct complaints, use-of-force incidents, internal investigations, and employee disciplinary actions. The panel identified three

---

[1]  Briefing Paper, California State Senate, Committee on Government Oversight, *Senate Select Committees on Government Oversight and the California Correctional System,* (Sacramento, California, January 16, 2004), p. 2.
[2]  United States District Court for the Northern District of California, *Madrid Special Master's Report Re Department of Corrections "Post Powers" Investigation and Employee Discipline,* by John Hagar (San Francisco, California, January 15, 2004),  p. 69.

main elements necessary for effective change. First, complaints, use-of-force incidents, and employee investigations must be recorded, assessed, and monitored at a central location. Second, a vertical investigation team model must be implemented. Third, documents related to employee discipline also must be drafted at a central location. Elevating and reorganizing internal affairs units within the new Department of Correctional Services as described in *Chapter 1, A Reorganization Plan for Corrections,* will further help to bring integrity and accountability to the employee investigation and discipline processes.

## Fiscal Impact

At present, the Department of Corrections and the California Youth Authority treat employee investigations and discipline as two separate activities. Implementing the panel's recommendations will link both processes, standardize procedures, and improve quality control. According to testimony presented at a recent California State Senate hearing, the Department of Corrections paid the State Personnel Board approximately $1.3 million in fees for discipline appeals during fiscal year 2002-03.[3]  Although the precise savings to be realized from a more efficient and trustworthy process cannot be precisely quantified, the changes can be expected to save money by lessening the potential for employees to appeal discipline cases and pursue civil litigation.

## Background

In March 2002, the California Office of the Inspector General published the results of an audit that identified problems with the California Department of Corrections employee investigation and discipline practices. The audit found that needless complexity delayed the processing of cases and that several other factors impeded the department's ability to process cases swiftly and effectively.[4]  The Office of the Inspector General reported that statutory time limits were often exceeded, which precluded the department from taking disciplinary action in 43 percent of cases.[5]  Although internal due dates had been established to ensure that investigations are completed on time and discipline imposed before statutory time limits expire, the Office of the Inspector General noted that the department lacked an adequate system for monitoring case progress and ensuring that the due dates were met.[6]

The Office of the Inspector General also noted that employees involved in imposing employee discipline lacked the knowledge and skill to successfully carry out the various levels of the discipline process. Often, individuals assigned to draft proposed disciplinary actions

---

[3]  California State Senate, Committee on Government Oversight, "State Employee Discipline and the Personnel Board," Sacramento, California, March 22, 2004, p. 3; 8.

[4]  Office of the Inspector General, "Review of the Employee Disciplinary Process, California Department of Corrections," Sacramento, California, March 2002.

[5]  *Ibid.*, p. 3.

[6]  Office of the Inspector General, "Special Review of the Office of Investigative Services, California Department of Corrections," Sacramento, California, October 2001, p. 2.

were not attorneys, nor were they assisted by legal counsel unless specifically requested. The same untrained individuals who drafted the actions were frequently called upon to act as the department's advocate at State Personnel Board hearings.[7]

The Inspector General also found the department did not monitor or evaluate a number of discipline cases appealed to the State Personnel Board that were settled before the hearing. Over a three-year period, 426 of 750 cases— 57 percent of the discipline appeal cases filed with State Personnel Board by Department of Corrections employees—were either settled or withdrawn before the hearing process.[8]

In January 2004, a draft report by the special master appointed by the U.S. District Court, Northern District of California in the Pelican Bay State Prison case *Madrid v. Gomez* reiterated the findings of the Office of the Inspector General. That report noted in addition that high-ranking Department of Corrections officials sanctioned a "code of silence" during the prosecution of a correctional supervisor and a correctional officer, attempting to silence whistle blowers, block investigations, hide facts, and cover up staff misconduct.[9]

Hearings before the California State Senate on January 20 and 21, 2004 revealed allegations of unethical practices, targeting of whistle blowers, and cover-ups condoned by top California Department of Corrections officials.[10] The briefing paper for the Senate hearing relied on the draft report prepared by the U.S. District Court Special Master. The Department of Corrections acknowledged a need to reform its investigation and discipline processes in February 2004 and submitted a remedial plan to the federal court.[11]

***The need for consolidation.*** At present, the Department of Corrections and the California Youth Authority each have independent internal affairs units, and each of the internal affairs units, in turn, has separate units for conducting investigations and for processing staff discipline. Audit authorities have found the investigative and disciplinary practices of both departments to be "overly bureaucratic"— a characteristic that translates into fiscal waste, inequitable applications of staff discipline, and losses at the appeal level.[12]

---

[7]  Office of the Inspector General, *Review of the Employee Disciplinary Process, California Department of Corrections*, Sacramento, California, March 2002, p. 4.

[8]  Stephen A. Jennings, Assistant Chief Counsel (Acting), Employment Law Unit, Legal Affairs Division, California Department of Corrections, memorandum to Joyce Hayhoe, Deputy Secretary (Acting), Legislation, Youth and Adult Correctional Agency, December 18, 2003.

[9]  U. S. District Court for the Northern District of California, *Madrid Special Master's Report Re Department of Corrections "Post Powers" Investigation and Employee Discipline,* by John Hagar, San Francisco, California, January 15, 2004.

[10]  Briefing Paper, California State Senate, Committee on Government Oversight, *Senate Select Committees on Government Oversight and the California Correctional System,* (Sacramento, California, January 16, 2004), p. 1, 2.

[11]  California Department of Corrections, In Response to Special Master's Draft Report Regarding " Post Powers" Investigations and Employee Discipline, February 2004, p. 1.

[12]  California State Senate, Committee on Government Oversight, *State Employee Discipline and the Personnel Board,* Sacramento, California, March 22, 2004, pp. 3, 8.

*A model for a new internal affairs office*. A more effective system would merge internal investigation and staff discipline functions for all Department of Correctional Services divisions into one full-service internal affairs office reporting directly to the Secretary. The new internal affairs office would be charged with recording public complaints; monitoring serious use-of-force incidents; conducting serious staff misconduct investigations; overseeing less-serious staff misconduct investigations; preparing documentation to be served on employees found to be involved in misconduct; and representing the department during the appeal process. (*Chapter 4, Use of Force*, presents additional information on the handling of use-of-force incidents.)

The new internal affairs office would include the following three essential components:

- A central intake unit
- Multiple vertical investigation teams
- A disciplinary drafting unit.

The internal affairs office would have a headquarters and regional offices and would include attorneys from the former Employment Law Unit of the Department of Corrections Legal Affairs Division. The central intake unit and the disciplinary drafting unit would be located in the internal affairs headquarters office, while the regional offices would be made up of multiple vertical prosecution teams. The first task for the new internal affairs office would be to create a comprehensive internal affairs policy and procedures manual and to conduct the necessary training for the internal affairs staff.

The design and functions of the central intake unit, the vertical investigation teams, and the disciplinary drafting unit would be as follows:

- *Central intake unit.* The central intake unit would be responsible for issuing tracking numbers and monitoring requests for investigation, serious use-of-force incidents, and complaints as required by California Penal Code Section 832.5.

    A "Request for Investigation" is a formal request to investigate an allegation of staff misconduct submitted by an authorized authority. The Central Intake Unit will process all Requests for Investigation.

    A "complaint" is an allegation of staff misconduct that violates a law, regulation, or policy; and if proven true, could result in adverse action and/or criminal prosecution. Complaints may be received from various sources: members of the public, employees, inmates, wards, families of inmates and wards, or government representatives. Complaints may be submitted to local facilities or offices. Not all complaints result in a request for investigation being submitted.

    At present the Department of Corrections does not record requests for investigation, complaints, and serious use-of-force incidents at a central location. Instead,

when staff misconduct is alleged, each hiring authority makes an independent decision whether to investigate locally, refer the case to the regional Internal Affairs Office, or not investigate at all. The result is inconsistency and inefficiency in the handling of investigations, complaints, and use-of-force incidents.

In contrast, under the new model, the new central intake unit would administer a central database that issues consecutive tracking numbers to hiring authorities (the warden, superintendent, parole administrator, health care manager, or other individual authorized to decide personnel issues) [13] for all requests for investigations, complaints of alleged staff misconduct, and serious use-of-force incidents. The same number would be used to track an incident from receipt to final disposition. The automated system should be networked for statewide data entry access. (*Chapter 11, Information Technology*, discusses the need for an information technology system capable of tracking requests for investigation, serious use-of-force incidents, and complaints of employee misconduct statewide.)

The central intake unit would be responsible for monitoring the progress of the complaint throughout the process, while hiring authorities would retain responsibility for responding to and resolving complaints in their designated areas. Hiring authorities would electronically forward requests for investigation and notifications of serious use-of-force incidents to the central intake unit through the central database and would be responsible for entering information associated with complaints into the database. Complaints requiring a request for investigation would be forwarded to the central intake unit. The procedure for handling complaints is depicted in Appendix 1 to this chapter.

Serious use of force incidents reported by hiring authorities would receive a tracking number from the central intake unit and would be assigned to subject matter experts in a regional internal affairs office for review. If, upon review of the incident, it appears that an employee action violated policy, a request for investigation would be initiated.

All requests for investigation would be analyzed, classified, and assigned for investigation by the central intake unit. Investigations would be either assigned to a regional internal affairs office or returned to the hiring authority for local assignment. The central intake unit would monitor case progress regardless of where the investigation is conducted. The procedure for handling requests for investigation is depicted in Appendix 2 to this chapter.

---

[13]  California Government Code Sections 19050, 19572 and 19574; California Code of Regulations, Title 2, Division 1, Chapter1, Subchapter 1, Article 1, Section 3.5.

Serious misconduct cases — defined as involving allegations of criminal actions, behavior jeopardizing safety and security, or negatively impacting the departments operation or reputation — would be assigned to an internal affairs investigator at the regional level.

Less-serious misconduct cases — behavior related to job performance, actions within the normal scope of supervisory functions, and behavior that does not pose a threat to safety and security — would be assigned to a supervisor at the local level, certified to conduct internal affairs investigations.

- *Vertical investigation teams.* The vertical prosecution model, in which an investigator and a prosecutor are assigned responsibility for a case from inception through resolution, is used by law enforcement in the investigation and prosecution of criminal cases. The coordinated effort reduces the potential for errors and increases the possibility for successful prosecution. [14]

The same model can be successfully applied to employee investigations. Under the vertical model, each employee investigation would be assigned to a team comprised of an attorney and an investigator. If the employee appeals a disciplinary action taken as a result of an investigation, the original case attorney would serve as the department's advocate.

When a case is assigned to a regional vertical investigation team, the attorney and the investigator would prepare an investigative plan. The investigator would be primarily responsible for conducting the investigation with support from the attorney.

When a case is assigned locally, a local investigator/supervisor and a regional team would be assigned simultaneously. The local investigator would be responsible for conducting the investigation with oversight provided by the regional team.

At the conclusion of the investigation, the attorney from the assigned regional vertical investigation team would become responsible for preparing a statement of facts — a summary of the evidence gathered during the investigation. The investigation and statement of facts would then be forwarded to the hiring authority. The hiring authority would be responsible for determining whether the evidence supports or refutes the allegations, determine the findings of the investigation, and assess discipline if necessary.

- *Disciplinary drafting unit.* If the hiring authority determines that the facts support the allegations and warrant discipline, he or she will assess a penalty using a

---

[14] W. Spelman, *Repeat Offenders.* Police Executive Research Forum: Washington, D.C., 1990.

penalty matrix. The penalty matrix would specify uniform sanctions for various types of misconduct to provide a consistent method for applying staff discipline. The matrix should allow the hiring authority latitude to impose a penalty within a range, based on mitigating or aggravating factors. Any deviation from the prescribed range should require documented justification. The matrix would also serve as a tool to educate employees regarding the consequences of misconduct.

After designating the penalty using the matrix, the hiring authority would request that the disciplinary drafting unit prepare the proposed disciplinary action. The disciplinary drafting unit would prepare all documents to ensure quality control and uniformity. The drafted action would then be given to the hiring authority for service to the employee.

**The employee discipline process.** The Office of the Inspector General found that the Department of Corrections does not monitor or evaluate disciplinary cases appealed to the State Personnel Board that are settled before hearing. Employees involved in the internal discipline system lacked the knowledge and skills necessary to navigate the Adverse Personnel Action process.[15] During a forum held on April 1, 2004, state prison wardens likewise told the Corrections Independent Review Panel that they had never received training in the responsibilities of hiring authorities with respect to pre-disciplinary hearings and the adverse action settlement process.

The staff disciplinary process includes the following elements:

- **Predisciplinary hearing**. Pursuant to *Skelly vs. State Personnel Board* (1975), employees are afforded the right to a pre-disciplinary hearing during which the employee may present information in an effort to reduce or eliminate the proposed discipline.[16] To improve the staff disciplinary process, the new Department of Correctional Services should establish clear policies and procedures for conducting pre-disciplinary hearings. The policy should clearly define the criteria for modifying a penalty and should require justification for any penalty modification to be thoroughly documented.[17]

- **Settlement negotiations.** Similarly, policies and procedures should be developed to ensure that settlement of staff disciplinary matters is fair and equitable. The policy should clearly define criteria for determining whether the settlement is appropriate based upon independent case factors and the application of the

---

[15] Office of the Inspector General, "Review of the Employee Disciplinary Process, California Department of Corrections" March 2002, p. 4.

[16] *Skelly v. State Personnel Board* (1975) 15 Cal. 3d 194, 215, 124 Cal. Rptr. 14, 28-29.

[17] California Department of Corrections, Operations Manual, Section 33030.11.

penalty matrix. The department should require the hiring authority to confer with a department attorney before stipulating to a settlement.

*Employee disciplinary appeal process.* The existing employee disciplinary appeal process is costly and ineffective. Under the present process, Department of Corrections and California Youth Authority employee disciplinary actions can be appealed to the State Personnel Board for final action, where a large percentage are overturned. In fiscal year 2002-03, the Department of Corrections paid the State Personnel Board approximately $1.3 million in appeal hearing fees.[18]  In 2002, more than 60 percent of the Department of Corrections and California Youth Authority actions decided by the State Personnel Board were either revoked or modified.[19]

The inability of the Department of Corrections and the California Youth Authority to take disciplinary action against employees found to have engaged in misconduct undermines the credibility of the departments' commitment to requiring appropriate conduct and fosters the perception that misconduct is accepted.[20]

A more effective employee disciplinary appeal process would eliminate appeals for lower level penalties, such as short-term suspensions and letters of reprimand, and replace the State Personnel Board appeal process with an internal employee discipline appeal panel. The internal employee discipline appeal panel should consist of designated department managers and one member selected by the Civilian Corrections Commission. Panel members would be trained in the consistent application of discipline.

*Information technology.* At present, the Department of Corrections lacks a central processing and tracking system for complaints, use-of-force incidents, and investigations. As a result, the department must query multiple databases and manual records when responding to requests for information relative to complaints, serious use-of-force incidents, and investigations.

Needed is a comprehensive database to collect data associated with complaints against employees, serious use-of-force incidents, employee investigations, and staff disciplinary actions. The purpose of the data management system would be to provide a complete account of case activity from start to finish. The system should be capable of formatting information contained in the database into real-time reports for specific audiences. The data should be managed and accessed based on rules governing personnel practices. Due to

---

[18]  California State Senate, Committee on Government Oversight, *State Employee Discipline and the Personnel Board* (Sacramento, California, March 22, 2004), p. 3.

[19]  *Ibid.*, p 5.

[20]  *Ibid.*, p. 8.

confidentiality requirements associated with the data, the internal affairs office should administer and monitor the database.

- *Complaints against staff.* As a component of the data management system, all complaints of employee misconduct would be recorded, properly assessed, and accounted for. All complaints should be tracked to final disposition to include referrals for investigation.

- *Employee investigations.* As a second component of the new data management system, all facets of the staff investigation and discipline process should be tracked. The system should allow real-time monitoring, statewide networking capabilities, and an early warning signal to ensure statutory time limits are met. To improve training and performance objectives and to signal the need for revision of regulations and policies, the system should include trend analysis abilities to identify areas of concern. The database should allow designated employees from all regions to electronically send requests for investigation and enter staff complaints.

    In addition to general case tracking information, the system should include the following:
    - Standard misconduct codes;
    - Case progression dates;
    - Real-time case status;
    - Final case disposition and action;
    - Prosecution referrals and dispositions;
    - Total investigative case hours;
    - Cases associated with the same incident; and
    - Investigations identified as criminal or administrative.

*Website and toll-free hotline.* The employee investigation and discipline system should include an internal affairs website to provide employees and the public with information relative to the complaint and investigative processes. The website should include the following:

- A toll-free number for reporting misconduct to the internal affairs office;
- Telephone numbers of regional offices;
- The employee code of ethics and code of conduct;
- The penalty matrix;
- Monthly summary of adverse actions; and
- Links to related sites, such as the Department of Fair Employment and Housing and the Bureau of State Audits.

*Public reports.* The employee investigations and discipline system should include a published quarterly summary report of adverse actions taken in order to reinforce consistent

application of penalties. The transparency of the disciplinary process can also serve as a training tool to emphasize proper employee conduct and can help to restore public and employee confidence in the integrity of the system.

**Staffing and training.** Staffing for the internal affairs office would come from the internal affairs units of the Department of Corrections and the California Youth Authority and would be based upon past investigative caseload and existing resources. All employees would be trained in the causes for adverse action and related penalties. Training would occur at the academy or during initial employee orientation, with annual refresher training conducted locally.

## Recommendations

The Corrections Independent Review Panel recommends that the new Department of Correctional Services take the following actions to improve the employee investigation and discipline system:

- Merge internal investigation and staff discipline functions for all Department of Correctional Services divisions into one-full-service internal affairs office reporting directly to the Secretary.

- Establish clear policies and procedures to govern internal affairs investigations, the pre-disciplinary hearing process, settlement negotiations, and employee disciplinary appeals.

- Establish a central intake unit responsible for assessing all requests for internal investigations, complaints of staff misconduct, and serious use-of-force incidents.

- Implement a vertical investigation team model for all internal affairs investigations.

- Establish a disciplinary drafting unit responsible for developing a penalty matrix and preparing all written notices of disciplinary action.

- Provide training to hiring authorities and attorneys in procedures governing internal investigations, the *Skelly* hearing process, settlement negotiations, and the staff disciplinary appeal process.

- Replace the existing State Personnel Board appeal process with an internal employee discipline appeal panel.[21]

---

[21] This recommendation would require a state constitutional amendment and is discussed further in the Appendices to this report under *Implementation, Legal Considerations and Appendices.*

- Create a central database to record and track all allegations of staff misconduct.

- Create a central database to record and track serious use-of-force incidents.

- Establish a central database to track all facets of the employee investigation and discipline processes.

- Establish an internal affairs information website and a toll-free hotline for reporting misconduct.

- Publish quarterly adverse action summaries.

- Provide initial and annual training to all employees in causes for adverse action and related penalties.

**Appendix 1**

## PROPOSED COMPLAINT PROCESS



**Appendix 2**

## PROPOSED INVESTIGATIVE
## CASE ACTIVITY FLOWCHART



**This Page Left Blank**

# Use of Force

Correctional employees must sometimes use force to control inmates and protect both staff and inmates. Often the need for force arises in a volatile situation requiring on-the-spot decisions. With the high potential for injury in such circumstances, clear policies governing the use of force are vital. Use-of-force policies should define when force is justified, how it may be used, and what kind of force may be applied. Equally vital is a process for monitoring the use of force throughout the correctional system and for ensuring consistent disciplinary sanctions against employees who violate use-of-force policies or where the use of force is found to have been excessive and/or unnecessary.

A successful class-action lawsuit against the state has highlighted the need for substantive change in California's correctional system use-of-force policies and practices. In this case, the court has supported plaintiffs' claims of unjustified and excessive use of force and violation of the constitutional prohibition against cruel and unusual punishment. Underlying the deficiencies is the absence of system-wide policies for managing and controlling the use of force in the state's correctional institutions.

The Corrections Independent Review Panel examined use-of-force policies employed in Department of Corrections and California Youth Authority institutions and parole operations. The panel also visited Pelican Bay State Prison, the subject of a court-ordered remedial plan governing the use of force, and reviewed the state's use-of-force training, monitoring, review, and disciplinary policies. As a result of that study, the panel recommends the new Department of Correctional Services develop a core system-wide use-of-force policy. The policy should accommodate the difference between types and conditions of force between adult and youth institutions and between institution and parole operations. As part of the core policy, the department should institute specific use-of-force training, monitoring, investigation, and discipline processes.

## Fiscal Impact

Implementation of the panel's recommendations would result in potentially significant savings that cannot presently be quantified. Savings would result from a reduction in incidents involving unjustified, excessive, or negligent use of force, which in the past have resulted in significant costs to the State for litigation and medical expenses. Costs would be incurred for implementation of recommendations calling for improved use-of-force training and development of a comprehensive use-of-force database.

## Background

State regulations and federal law provide the general framework for the use of force in correctional settings, allowing force to be used under certain conditions. Title 15 of the California Code of Regulations provides that force may be used as a last resort to gain

compliance with a lawful order.[1]  In the federal civil action *Madrid v. Gomez*, which successfully challenged the use of force at Pelican Bay State Prison, on grounds of violation of the eighth amendment to the U.S. Constitution, the U.S. District Court also noted the necessity for the use of force:

> *Perhaps the paramount responsibility of prison administrators is to maintain the safety and security of both staff and inmates…. Prison officials have the 'unenviable task of keeping dangerous men in safe custody under humane conditions.' There is no question that this demanding and often thankless undertaking will require prison staff to use force against inmates. Indeed, responsible deployment of force is not only justifiable on many occasions, but absolutely necessary to maintain the security of the institution.  As one expert at trial succinctly stated, when it comes to force it is "as dangerous to use too little as it is to use too much."* [2]

Recent events have demonstrated, however, that use of force at California's adult prisons and youth correctional facilities have sometimes exceeded acceptable limits and better accountability within their use-of-force policies is necessary.

**The State's use-of-force policies are undergoing revision.** As a result of the *Madrid v. Gomez* case, the U.S. District Court ordered the Department of Corrections to develop a remedial plan to address the use of force at Pelican Bay State Prison and assigned a court-appointed special master to oversee the revision of the institution's use-of-force policy. With the *Madrid* case as a guide, the Department of Corrections has also adapted the use-of-force policy and made it applicable to the other adult prisons, in parole operations, and is presently considering formal policy changes.[3]  Following recent incidents at state youth facilities, including the videotaped beating of a ward, and litigation brought against the State concerning use of force in youth institutions, the California Youth Authority is also in the process of revising its use-of-force policies to make them consistent with the Pelican Bay *Madrid v. Gomez* remedial plan.[4]

The Corrections Independent Review Panel found the California Youth Authority's draft use-of-force policy to be generally consistent with the *Madrid* plan, with differences in firearm usage and fight intervention specific to youthful offender incarceration.[5]  The panel also found, however, that the State's other efforts to bring use-of-force policies into line with the Pelican Bay remedial plan do not adequately take into account differences in

---

[1] California Code of Regulations, Title 15, Section 3268 (a)(1).

[2] *Madrid v. Gomez*, Case C90-3094-THE, U.S. District Court, Northern District of California, Findings of Fact, Chief Judge Thelton E. Henderson, January 10, 1995, page 14.

[3] Joe McGrath, Warden, Pelican Bay State Prison, interview, Sacramento, California, May 6, 2004.

[4] Major Daryl Ballard, California Youth Authority, interview, Sacramento, California, March 24, 2004.

[5] Department of the Youth Authority Institutions and Camps Manual, Section 2080, Use of Force, page 2, draft policy, May 18, 2004.

appropriate use of force between institution and parole operations. In addition, the panel found that the proposed policies statewide fall short of the *Madrid* plan in providing for systematic review of use-of-force incidents and collection of use-of-force data.

***Use-of-force policies for parole operations do not provide for adequate review.*** Department of Corrections parole agents are presently subject to the same use-of-force policies that govern correctional officers, even though the duties of parole agents differ from those of officers assigned to institutions. To accommodate those differences, in 2003 the parole division began developing a separate use-of-force policy that would be more consistent with parole field operations.[6] The Corrections Independent Review Panel found, however, that the parole division's proposed use-of-force policy does not meet the standards of the *Madrid* plan with respect to review of use-of-force incidents and collection of use-of-force data. The deputy director of the parole division suggested to the panel that use-of-force incidents may be under-reported.[7] A survey of the state's four parole regions found that parole agents performed approximately 30,000 arrests in 2003, yet only 71 use-of-force incidents were reported.[8] Use-of-force incidents in California Youth Authority parole operations also appear to be under-reported. A California Youth Authority staff member told the panel that the department's parole division does not report use of force and attributed the lack of reporting to the fact that parole agents operate with less direct supervision than correctional officers in institutions.[9]

***Development of the Pelican Bay use-of-force remedial plan.*** Pelican Bay has served as a laboratory for the development of a use-of-force policy that could be applied throughout the system. A special unit at the prison, the *Madrid* Compliance Unit, is responsible for gathering use-of-force reports, reviewing use-of-force incidents for compliance with the remedial plan, and presenting use-of-force reports to the prison's Executive Review Committee, which reviews use-of-force incidents. According to the warden, acceptance and fine-tuning of the use-of-force policy occurred over a period of ten years with the guidance and approval of the U.S. District Court through the assigned special master. The warden reported that successful implementation of the new policy resulted from extensive formal and informal training, with group training and one-on-one discussions crucial to officers' full understanding.[10] The comprehensive training contrasts with formal use-of-force training provided to Department of Corrections line staff, which consists of an eight-hour block

---

[6] Deputy Director Rick Rimmer, Parole and Community Services Division, Department of Corrections, interview, Sacramento, California, May 7, 2004.

[7] *Ibid.*

[8] C. Toni, Parole Agent III, California Department of Corrections Parole and Community Services Division, e-mail message, May 17, 2004.

[9] Mark Gantt, Assistant Director, Department of Youth Authority, Office of Professional Standards, interview, Sacramento, California, May 27, 2004.

[10] Joe McGrath, Warden, Pelican Bay State Prison, Interview, Sacramento, California, May 6, 2004.

of instruction at the academy with emphasis on deadly force incidents.[11]  As a result of the training and implementation process at Pelican Bay, the warden said institution employees are highly knowledgeable about the details of the *Madrid* remedial plan and that the majority are overwhelmingly committed to the use-of-force policy.[12]  One employee, a union representative told the Corrections Independent Review Panel, "[W]ithin the remedial plan we know what we can and cannot do, what to expect from managers and their review process, and it can even protect us from false inmate accusations down the road."[13]

*A model use-of-force policy.* The use-of-force policy developed at Pelican Bay contains key elements upon which to build a statewide use-of-force policy. Central components include an effective process for reviewing use-of-force incidents; timely and thorough investigations into incidents involving use-of-force; and collection of use-of-force data in a database. Unifying the institution and field operations of the former Youth and Adult Correctional Agency departments into the new Department of Correctional Services will allow for development and implementation of a standardized use-of-force policy covering similar functions and job requirements. Every staff member will be provided a personal copy of the policy. The following describes the components of a model use-of-force policy.

- *Use-of-force review process.* The review and critique process is essential for adequate monitoring of the use of force. In the *Madrid* case, the court noted: "[T]he risk that force will be misused is considerably enhanced when prison administrators fail to implement adequate systems to regulate and monitor its use."[14]  Under the remedial plan in effect at Pelican Bay State Prison, use-of-force incidents are reviewed by the *Madrid* Compliance Unit and the prison's Executive Review Committee. The *Madrid* review process includes review and critique from first line supervisors up to the warden of *all* use of force incidents.

  Unique in the *Madrid* process is a use-of-force analyst who represents a "common person" perspective and is responsible for conducting an in-depth analysis of the documentation of each use-of-force case.[15]  The analyst applies specific standards identified by the U.S. Supreme Court in *Hudson v. McMillian* relating to justification for the use of force.[16]  Those factors consist of the extent of injury suffered; the need for the application of force; the relationship between the need and the amount of force used; the threat reasonably perceived by responsible officials; and any effort made to temper the severity of a forceful response. The analyst

---

[11] California Department of Corrections Basic Correction Officers Academy, lesson plan, Use-of-Force Policy.

[12] Joe McGrath, Warden, Pelican Bay State Prison, interview, Sacramento, California, May 6, 2004.

[13] Rick Newton, correctional officer, Pelican Bay State Prison and chapter president, Crescent City, California Correctional Peace Officers Association, conversation, April 30, 2004.

[14] *Madrid v. Gomez,* Findings of Fact, Page 18.

[15] Richard Kirkland, Chief Deputy Warden, Pelican Bay State Prison, interview, Crescent City, California, April 29, 2004.

[16] *Hudson v. McMillian,* 112 S. Ct. (1992).

prepares written recommendations addressing whether the force used was in compliance with policy, procedure, training, and applicable law and whether the reviews were complete. The analyst is also responsible for tracking the matter and verbally presenting the case and recommendations to the Executive Review Committee on a fixed schedule.[17]  The success of the analyst function is dependent upon the direct support of the institutional head.[18]

The use of force review processes being developed or presently in use in other Department of Corrections and California Youth Authority institutions and parole regions generally draw from the *Madrid* use-of-force review process, but are not as detailed, standardized, or consistent in every institution and parole region. Some adult institutions, for example, have a use-of-force coordinator who performs a clerical compilation function, rather than the analytical function performed at Pelican Bay State Prison by the *Madrid* Compliance Unit. The Parole and Community Services Division of the Department of Corrections does not conduct the structured analytical review of use-of-force incidents, nor does the California Youth Authority.

- *Investigation of use of force.* A comprehensive use-of-force policy must include a process for conducting timely and comprehensive investigations of use-of-force incidents. The investigation process should include a system for identifying acts that require mandatory investigations and should include classifying use-of-force incidents that resulted in specific consequences. The policy should also include a special unit for investigating use-of-force incidents.

Categorizing the use of force by type and consequence allows for focus on those of highest risk. Labeling use-of-force incidents as either level I or II with level II the most serious, allows for prioritizing the focus of attention. Level II designation is only for those consequences that were the direct result of staff action. An incident report containing medical information identifying a qualifying injury would have to be reviewed to determine if it was caused by staff. If not caused by staff, the incident would follow the level I review process. A level II use-of-force includes any of the following acts:

- Discharge of a firearm, including warning shots;
- Strikes, blows, or kicks against a handcuffed subject;
- Canine bites

---

[17]  Pelican Bay State Prison Use of Force Policy, revised July 2003, pages 45-46.
[18]  Susan Hernandez, Associate Government Program Analyst, *Madrid* Compliance Unit, Pelican Bay State Prison, interview, Crescent City, California, April 29, 2004.

Level II use-of-force incidents also include use of force likely to have caused or that did result in death or serious bodily injury, with the latter defined as an impairment of physical condition including the following:

- Loss of consciousness;
- Concussion;
- Bone fracture;
- Protracted loss or impairment of function of a bodily member or organ;
- A wound requiring suturing, and
- Serious disfigurement[19]

All Level II incidents should be investigated by a specialized team as described below. The results of the investigation should be reported to the hiring authority for a determination of whether the incident was consistent with policy and training; whether proper tactics were employed; whether lesser-force alternatives were reasonable; and whether discipline is warranted. The determination of the hiring authority would be reviewed and approved at the regional level. Under the model use-of-force process, the Civilian Corrections Commission would conduct an additional review of investigations involving death or in incidents where death was likely.

All use of force incidents not classified as level II would automatically be classified as level I. Level I incidents do not trigger an automatic investigation, but if during an incident review a level I incident appears to have violated policy, the matter can be referred to the Internal Affairs Central Intake Unit, as outlined in *Chapter 3, "Employee Investigations and Discipline."*

Establishment of a specialized team from the Office of Internal Affairs designated to investigate only use-of-force incidents would ensure consistency and quality of fact gathering. In addition to the qualifications for an internal affairs assignment, team members should be specially trained. This team could be called the use-of-force investigative team. The team would be immediately notified of a level II incident and would respond to the scene. To ensure prompt response to incidents, the team should be regionally based.

If, during the incident investigation specific personnel are identified as possibly committing misconduct, a personnel investigation would be initiated by internal affairs. (See chapter three, *"Employee Investigations and Discipline."*)

---

[19]  Pelican Bay State Prison Use of Force Policy, revised July 2003, page 2.

46

At present, complaints from inmates and parolees of excessive use of force do not receive uniform consideration throughout the Department of Corrections.[20] Unless an inmate complains immediately, the complaint is not considered during the review process. Since a large number of civil actions brought against correctional institutions arise from such complaints, a mechanism for including inmate and parolee complaints in the use-of-force review process should be in place. All complaints and allegations against peace officers brought by inmates, parolees, and citizens of unnecessary or excessive use of force should be investigated pursuant to California Penal Code Section 832.5. These complaints should be reviewed at the institution level regardless of the timeliness of the complaint and matched with the use-of-force incident review package and should also be forwarded to Internal Affairs Central Intake Unit for assignment. After reviewing the use-of-force package and complaint, however, the warden or hiring authority may request that the use-of-force investigation team conduct the investigation if the complaint appears to be serious. The team will audit a percentage of the use-of-force complaint investigations completed by each parole region and institution on an annual basis.

- **Use-of-force database**: Without an accurate collection of data about force used against inmates or parolees, the department cannot assess what future actions should be taken to manage the use of force. Don Specter, Director of the Prison Law Office commented about the California Department of Corrections "it is too big and much too diverse; without information there is no management."[21]

The *Madrid* remedial plan specifically requires a use-of-force database.

> The Use of Force Compliance Unit shall maintain a database system that will provide key information relating to the use of force at PBSP.(Pelican Bay State Prison).  This data shall be maintained as a reporting tool to provide the Warden and management staff monthly and quarterly reports, as well as ad hoc reports regarding the use of force.  The reports will provide a means of evaluating trends, reasons for the applications of force, and the factors involved.[22]

Moreover, at present, there is no common system or methodology at the California Department of Corrections in institutions for tracking and detailing use-of-force incidents in a database. The same is true of the parole regions. [23]

---

[20] Joseph McGrath, Warden, Pelican Bay State Prison, Interview, Sacramento, California, May 6, 2004.

[21] Don Specter, Director, Prison Law Office, forum held in Sacramento, California, April 15, 2004.

[22] Pelican Bay State Prison, Use-of-Force Policy, July 2, 2003, page 47.

[23] Rick Rimmer, Deputy Director, California Department of Corrections, Parole and Community Services Division, interview, Sacramento, California, May 7, 2004.

The proposed use-of-force policy of the California Department of Corrections, however, makes a database permissive, and the use-of-force policy of the Parole and Community Services Division does not mention the need for a database at all.[24] [25]

The California Youth Authority also lacks a uniform system for gathering information regarding use of force. A summary report of a review of six of the California Youth Authority's fourteen facilities, conducted at the request of the California Attorney General, noted that "each institution uses different categories for reporting violent incidents or use of force… and…, as with other YA [Youth Authority] correctional issues, statistical data on use of force are scant and not consistent across facilities. Central office reviews a limited number of reports."[26]

The *Madrid* plan does not specify the content and specific use of the database, saying only that it is to contain "key information; be used as a reporting tool to provide the Warden and management staff monthly and quarterly as well as ad hoc reports… to evaluate trends, reasons for application of force, and factors involved."[27]

The draft use-of-force policy of the Department of Corrections requires only that "the use of force analyst/coordinator shall log and track all incidents."[28] The implication of the department's proposed policy is to establish a record of some kind but provides no specific detail or organizational purpose for the database.

In the *Madrid* remedial plan, reports were to be prepared for the warden and the U.S. District Court for the purpose of measuring management compliance with court-imposed requirements. These reports are still prepared, although there are no defined standards against which the data is compared.[29] Under the model use-of-force policy described here, the new Department of Correctional Services would identify critical use-of-force facts to be assembled and define how those facts are to be analyzed and for what purpose they are to be used.

---

[24] California Department of Corrections Operations Manual, draft, Article 25, Section 52100.21, Use of Force.

[25] California Department of Corrections Operations Manual, draft, Chapter 8, Article 45, Parole Use-of-Force Policy.

[26] Barry Krisberg, Ph.D., *General Correctional Review of California Youth Authority,* December 2003, pp. 24 and 31.

[27] Pelican Bay State Prison, Use of Force Policy, revised July 2003, page 47.

[28] California Department of Corrections Operations Manual, draft Article 25, Section 52100.19.4, Use of Force.

[29] Joe McGrath, Warden, Pelican Bay State Prison, interview, Sacramento, California, May 6, 2004.

## Recommendations

The Corrections Independent Review Panel recommends that the new Department of Correctional Services take the following actions:

- Implement a standardized use-of-force policy applicable to all peace officers, but with elements specific to the differences among adult prisons, youth correctional facilities, and adult and youth parole operations.

- Implement an enhanced training program covering the new use-of-force policy.

- Implement the *Madrid* review and compliance unit analyst for all use-of-force incidents for adult prisons, youth correctional facilities, and adult and youth parole operations.

- Establish a regional use-of-force investigation team to investigate any staff use of force that results in serious bodily injury or death and any other serious application of force.

- Create a classification list of use-of-force consequences and acts that will mandate an investigation by the use-of-force investigation team.

- Require investigations of inmate/parolee/ward/citizen complaints regarding use of force and consider the complaint during the use of force review and critique process.

- Establish a standardized statewide network database for use-of-force incidents that defines critical facts relative to use of force.

- Define how use-of-force data will be analyzed and used.

## Fiscal Impact

Implementing the recommended standardized use-of-force policy, review procedures, investigation practices, and use-of-force database would result in an undetermined savings through an anticipated reduction in litigation related to use of force. Adopting the recommended policies derived from the guidelines already approved by the U.S. District Court would act as a deterrent against future class action suits.

At present, litigation costs resulting from use-of-force incidents are substantial. As of May 1, 2004, there were 370 non-class action inmate and parolee court cases pending

against the Department of Corrections alleging excessive use of force.[30] Reducing the number of use-of-force incidents would also be expected to result in fewer injuries to staff and inmates.

The state would incur additional costs in implementing a standardized use-of-force policy as follows:

- Costs would be added to training for curriculum development, academy training, in-service and specialized training for the general staff, analyst, and use-of-force investigation team.

- Additional cost would be incurred by providing each peace officer with a personal copy of the use-of-force policy as a means of providing accountability.

- The creation of a new use-of-force analyst position would entail additional cost.

- A cost would be incurred for implementing a statewide network database for collecting use-of-force data.

- Increased internal affairs staff to support the proposed use-of-force teams.

---

[30] Jennifer Santos, California Department of Corrections, Legal Affairs Division, May 1, 2004.

# Personnel and Training

The foundation of any organization is in its personnel. In California's correctional system, this foundation amounts to more than 54,000[1] individuals as diverse and vibrant as the state itself. The budget for salaries and benefits comprises more than $3,925,583,000.[2] This constitutes 5.6 percent of the general fund. At the state level, this significant investment in human resources supervise and control more than 308,400 inmates, wards, and parolees in order to protect California's citizens. [3]

The key to any successful organization is simple. Hire the best people available and train them to do their jobs with professionalism and integrity. In addition, establish a command succession plan so that the best and the brightest can be promoted through the organization into leadership positions. These activities cement the foundation.

Currently, the state's correctional departments and boards fail to meet these requirements. A hiring plan is nonexistent and background investigations for applicants are weak. The academies that instruct in the fundamental components of sworn officer jobs are under various administrators and are disjointed. There is no systematic plan to provide uniform in-service training. Supervisory and mid-management training is minimal, and command training or executive development is absent. Further, current job descriptions for most key positions are nonexistent or outdated, and no centralized office to manage personnel resources exists.

Accordingly, the Office of Personnel and Training should be established to provide accountability and uniformity in the hiring, deployment, and training of all employees. The panel also recommends that a behavior science unit be established within the Office of Personnel and Training to assist employees in coping with stress in the workplace. This effort should include providing a psychologist in every institution and youth facility.

To transform the personnel and training functions of the Department of Correctional Services into an efficient, professional operation, the following recommendations are offered:

- Organize and develop a personnel management structure that is effective and responsive to the needs of the mission and its employees; and,

- Design a continuum of training that begins with the preparation of the basic academy recruit, follows through the probationary phase, continues with in-service training and prepares for leadership positions.

---

[1] January 2004 California Governor's Budget
[2] *Ibid.*
[3] California Department of Corrections Fact Sheet, www.corr.ca.gov, April 27, 2004; and California Youth Authority, www.cya.ca.gov, April 30, 2004

# Fiscal Impact

Implementing the recommendations to achieve an effective and responsive personnel management structure and redesign the training function will have an initial fiscal impact. Actual costs are estimated where possible. Most recommendations modify and re-engineer the manner in which business is being conducted, eliminate waste, and streamline bureaucracy with no extra cost. Department of Correctional Services will realize long-term substantial savings with the addition and retention of more qualified, well-trained employees which will reduce the Department's exposure to civil liability.

## Building an Effective Personnel Management Structure

The basic personnel management structure of the existing correctional departments and boards is flawed with waste and abuse. The classification structure is so distorted that an outsider would not realize that correctional counselors don't counsel, managers don't manage, analysts don't analyze and some parole agents perform administrative duties in institutions. The result is that state government is paying top dollar for functions that can be done by lesser paid employees.

The classic example is of positions classified, and compensated at professional levels when a substantial part of the work is clerical or technical. Upon closer review one would find that the typical position classified as associate governmental program analyst would be more appropriately classified at a lower-paid technical class due to the absence of analytical work. The same holds true for some sworn officer positions. The prevailing use of peace officers performing work that can be done by employees in other lower-paid classifications must be evaluated. For example, a position at an institution mail room may be classified as lieutenant with a top monthly salary of $6,030, but only 40 percent of the duties may reflect lieutenant's work and the remaining 60 percent could be done by a person in an office technician position at the much lower salary of $2,998 per month.[4]

At headquarters, using sworn officers to perform administrative duties has received attention in the past, but has not been permanently addressed. The matter is more complex than simply prohibiting the practice. There is a true need for the current field knowledge that sworn officers bring to headquarters, and it is desirable for headquarters staff to be abreast of the practices and concerns of the field. For example, in writing regulations and policies for parole, it is advantageous to consult with parole agents. However, when sworn officers remain at headquarters for extended periods of time, the relevance that made them valuable is gone, and the high salary and benefit package of sworn officers makes the practice expensive for California taxpayers.

---

[4] Department of Personnel Administration, 51st Edition of the California State Civil Service Pay Scales, www.dpa.ca.gov, May 14, 2004.

## Background

*Classification review.* It is essential that one of the first actions taken by the Office of Personnel and Training be that of a comprehensive classification review of all positions within the Department of Correctional Services to ensure appropriateness of classes.  This clarifies the responsibilities of each job and assists in identifying the skills, knowledge, and abilities required to carry out the tasks. Rectifying the classification structure is not simply a bureaucratic exercise; it optimizes the effective use of talent and funding to carry out the mission.

If the philosophy of re-entry and subsequent recommendations in this report are adopted, it will be essential to review the duties of various classifications, particularly the correctional counselor classes on the adult side and the youth correctional officer and counselor classes within youth corrections.  The philosophy of re-entry includes that on arrival to the correctional departments, the inmate or ward should be in programming designed to assist in preparation for eventual release into society.  This philosophy fundamentally changes how the duties of the classifications mentioned above are carried out.  Since the duties change, new competencies for the job should be delineated, and employees with the appropriate skills will need to be recruited.  A classification review will help clarify the changes in these responsibilities.

After the appropriate classes are identified, job descriptions for all positions should be developed and provided to employees.  This clarifies the responsibilities of each job and assists in identifying the competencies required to carry out the tasks.

*The need for an effective management information system.* The managers at the existing correctional departments and boards do not have an automated centralized system for gathering, storing, and extracting personnel and training data.  Typical personnel functions such as performance evaluations often go undone. The current systems do not generate automatic reports for managers to plan, organize, and execute the personnel functions. Training may go unrecorded; a unit may keep a manual, paper-record of training, or input information into a stand-alone program that lacks system-wide connectivity.

The Department of Correctional Services should develop a management information system to accommodate personnel and training databases, provide easy access, and generate periodic reports.  The proper, centralized storage and retrieval of information would facilitate the management of personnel resources and training.  The system can also make possible the distribution of information to Department of Correctional Services employees through the design and implementation of an interactive system via the Internet.  In the Los Angeles Unified School District, all employees have access to job information and can test and track scores of their job competencies.[5]  The Department of Correctional Services should do the same and should extend it a step further by including a complementary system for employee evaluations and training.

---

[5] Anita Ford, Human Resources Director, Los Angeles Unified School District, April 29, 2004.

The Internet-based employee data system would work in the following manner: Department of Correctional Services employees may enter the department web site, look up the competencies required to be an institutional correctional peace officer, a parole agent, or an information officer, and test their knowledge of the job requirements. If an area of deficiency is identified – say, in report writing – the employee could then find a community college class, in-service training session, or a departmental course that would help with the area of deficiency.  Armed with this information, the employee could take positive steps to improve his/her professional skills and take control of his/her career advancement. The information could also be used by the employee to provide information to his/her supervisor regarding areas of interest and professional development.

*Performance evaluations.* Supervisors must conduct timely performance evaluations based on the duties assigned and reflected in the job description. Contrary to good business practices, at present, the correctional departments and boards do not conduct performance reviews in a timely manner. Performance evaluations help the employee focus on improved job performance.  The evaluations identify strengths and weaknesses, help the supervisor and employee manage a plan for training and future advancement, and improve communication and morale among employees and supervisors.

*Salary compaction.* Currently the compaction within the correctional peace officer structure does not allow for the proper incentive to promote.  It is more advantageous for a correctional officer to remain in a rank-and-file class than to promote to sergeant with the added responsibilities of supervision.  The compaction continues throughout the supervisory, managerial, and executive positions. (Please refer to Appendix, Tables 1-6.) At the top executive levels, recruiting for talent becomes more difficult because the salaries are not commensurate with the responsibilities. A Federal Bureau of Prisons warden who oversees a prison of typically less than 1,500 inmates has a maximum salary of $136,466, compared to a salary of $118,000 for a California warden with the responsibility for prisons ranging from 2,500 to 7,000 inmates.[6]  The directors of the correctional departments also have responsibility for large health care delivery systems for inmates and wards under their custody, yet their salary does not reflect the complexity of the responsibilities when compared to other hospital executives.[7]  In order for Department of Correctional Services to be competitive with the rest of the correctional community, it is recommended that periodic salary reviews be conducted for proper adjustments.

*Recruitment and selection.*  Much attention has been focused on the culture and public image of the state correctional system.  In order to change and improve the culture and image, it is imperative to recruit and retain highly qualified individuals for all positions, with a primary focus on correctional peace officer classifications. It is also crucial to ensure

---

[6] Federal Bureau of Prisons, Salary Table 2004-LA, GS-15.

[7] Hospital Executive Pay, Median Base Salary and Total Cash Compensation Table, source: 2003 Hay Hospital Compensation Survey (www.ache.org).

the competitiveness of the Department of Correctional Services with other local, state, and nationwide law enforcement agencies in the recruitment and retention of qualified peace officers. The Corrections Independent Review Panel recommends a two-tiered approach to achieve these goals:

- Improve the department's ability to recruit and retain more qualified employees than the current applicants.

- Expedite the department's hiring process, while ensuring its thoroughness to ensure the department's retention of qualified applicants.

***Improve the department's ability to recruit and retain qualified employees.*** To ensure that the Department of Correctional Services builds a foundation that will facilitate a positive public image and culture, it is imperative the department's highest priority be the recruitment of the best qualified individuals with a primary focus on peace officer classifications.[8] Historically, the California Department of Corrections and the California Department of Youth Authority have struggled to be competitive in the area of recruitment with traditional law enforcement agencies in California and the rest of the country. City police departments, county sheriff departments, and other state and federal law enforcement agencies have traditionally been the primary focus of individuals looking toward a law enforcement career.[9] In fact, the California Department of Corrections and the California Youth Authority have received applicants who have failed in their attempts to be hired by other agencies.  Furthermore, many current employees were attracted to the California Department of Corrections and the California Youth Authority solely for the competitive salary and benefit package.[10] This demonstrates a severe problem in the recruitment of dedicated individuals who are attracted to the mission of either agency. The California Department of Corrections recruitment program is ineffective and the California Youth Authority recruitment program is nonexistent.[11] To address these problems, the new Department of Correctional Services should take the following actions:

- ***Recruitment plan.*** The Department of Correctional Services must develop a comprehensive annual recruitment plan that includes public relations, as well as advertising.  The recruitment plan should focus on reaching all qualified individuals and attracting as many applicants as possible.[12] In the past, many elements of California's diverse population have been neglected in the recruitment process. Some cultures do not trust law enforcement and do not consider law enforcement a viable career option.  The California Highway Patrol has successfully used the "El Protector" Program to reach out to the Hispanic community.[13]

---

[8] May, 2000, Strike Team Report, page ii, California Department of the Youth Authority.
[9] Walter Allen III, Director, California Youth Authority, May 13, 2004.
[10] Jeanne Woodford, Director, California Department of Corrections, April, 19, 2004.
[11] Walter Allen III, Director, California Youth Authority, May 13, 2004.
[12] May, 2000, Strike Team Report, page ii, California Department of the Youth Authority.
[13] Ivan Tien, Recruitment Officer, California Highway Patrol, April 29, 2004.

The use of specialized recruitment and educational programs can be helpful in breaking down cultural barriers, thereby increasing the potential pool of qualified applicants. In addition to applicants from California's diverse population, the Department of Correctional Services recruitment efforts should extend beyond the borders of California.

- *Public relations plan.* The department should develop a public relations plan focused on an increased effort to positively contact the public, spread the message that the Department of Correctional Services offers meaningful careers with competitive salaries and benefits, and is a partner in the community. This can be accomplished through the development of trained departmental public relations officers who respond to requests to appear at job fairs, high schools, colleges, church groups, and any other community group that wishes to learn more about the Department of Correctional Services.

  Most California Department of Corrections institutions and California Youth Authority facilities are making strides in communicating with local community leaders and participating in community service programs. A good example of this is the California Medical Facility in Vacaville, which currently participates in many community service programs that benefit the community and foster a good relationship with the local citizens and leaders. Examples of these programs are bike refurbishing for local youths, donations from inmates for the local homeless population, and holiday gifts for the local senior community.[14] However, this information and other success stories are not reaching the public.[15]

  The Department of Correctional Services should also implement community service programs during academy training. The California Highway Patrol uses one eight-hour day of academy training to perform a community project. The cadets work at different hospitals, schools, and community organizations. This experience teaches the cadets the importance of teamwork and community involvement and positively influences public opinion.[16]

- *Advertising campaign.* As part of the recruitment plan, the Department of Correctional Services should use advertising to educate the general public about correctional peace officer roles and responsibilities. The Department of Correctional Services should also develop an automated phone message containing public education and recruitment information. The advertising campaign and phone message should focus on the many avenues of promotion available in the profession and the different job opportunities a career with the department

---

[14] Steve Norris, Lieutenant, Administrative Assistant, California Department of Corrections, April 20, 2004.
[15] Walter Allen III, Director, California Youth Authority, May 13, 2004.
[16] Alfredo Vasquez, Sergeant, California Highway Patrol Academy, May 12, 2004.

offers.  Further, the campaign should focus on creating a positive public image for the department.  Advertising via the Internet, television, radio, magazines, and newspapers should constitute the major components of the campaign.

- **Incentive points.**  To attract more qualified candidates for peace officer positions, the Department of Correctional Services should offer incentive points for certain desired qualities, such as education, law enforcement experience, and prior military experience. Currently, correctional officers and youth correctional officers have minimum hiring requirements similar to most traditional law enforcement agencies.[17]  The minimum hiring requirements for these positions are 21 years of age or older, United States citizenship, high school graduation or the equivalent, and no felony convictions.[18]  If the Department of Correctional Services simply raises its minimum hiring requirements, potential applicants would more than likely seek employment with other law enforcement agencies.  For these reasons, the use of incentive points for a college degree, law enforcement experience, or prior military experience would attract a more qualified applicant without raising minimum hiring qualifications.  The incentive points would be added to the applicant's final test score, resulting in a higher score and a better likelihood of being offered employment.

  Currently both California Department of Corrections and the California Youth Authority give military preference points.  Specifically, applicants receive 10 points as a veteran or 15 points as a disabled veteran.[19]  The Department of Correctional Services should continue this practice to remain competitive when pursuing applicants with a military background.  Many law enforcement agencies, including California's state correctional agencies, desire applicants with military experience.  Applicants with a military background tend to be more disciplined, more mature, and are accustomed to working in a regimented environment.[20]

  The Department of Correctional Services should also offer incentive points to applicants with a college degree or 60 college units.  An applicant with a college degree is desired to raise the overall education level within the department.

  The Department of Correctional Services should also offer incentive points to applicants with law enforcement experience.  These applicants would bring a level of experience and knowledge which would greatly benefit the Department.

---

[17] http://www.chp.net/stoappl.htm, April 20. 2004; and http://www.sacsheriff.com, April 22, 2004.

[18] http://www.corr.ca.gov/, April 20, 2004; and http://www.cya.ca.gov/, April 20, 2004.

[19] http://www.corr.ca.gov/, May 12, 2004, Calleen Allen, Personnel Technician, California Youth Authority, May 12, 2004.

[20] Matthew Lynch, Sergeant, California Highway Patrol Academy, May 14, 2004.

- **Recruitment bonus.** To attract more qualified applicants, the Department of Correctional Services should offer an incentive or bonus to employees who successfully recruit individuals who are hired. Historically, employees are the best recruitment tool for any organization. The incentive or bonus would encourage current employees to become even more involved in the recruitment process, thus attracting more applicants. The bonus could be a monetary award or possibly extra time off. Currently, the California Highway Patrol offers an extra 8 hours of time off to employees who recruit an individual who ultimately attends the academy.[21]

- **Recruitment partnership with employee organizations.** The Department of Correctional Services should ensure that they establish a recruitment partnership with all employee organizations that represent their employees. This type of partnership is critical to any successful recruitment plan. The partnership will provide more recruitment resources and open more avenues to the recruitment of qualified applicants. The partnership will also demonstrate the benefits of both the department and the employee organizations that will influence potential recruits.

**Expediting the department's hiring process.** The Department of Correctional Services must shorten its hiring process while still providing thorough pre-employment background investigations to protect the department from "at risk" employees. The current hiring process for the California Department of Corrections and the California Youth Authority can take up to one year. Currently, both agencies are experiencing trouble retaining qualified candidates during the hiring process. Many applicants find employment with other law enforcement agencies while waiting to be hired by the Department of Corrections or the California Youth Authority. The Corrections Independent Review Panel is recommending all background investigations be a maximum of 60 days in length and that the practice of continuous testing be implemented to expedite the hiring process.

- **Timeliness of background investigations.** The Department of Correctional Services should keep the background investigation portion of its hiring process to a maximum of 60 days while conducting thorough professional investigations. Both the California Department of Corrections and the California Youth Authority are currently averaging 90 days per background investigation and some investigations may take several months.[22] In an effort to reduce the length of these investigations to 90 days with current staffing, the quality has been compromised.[23] This increases the potential of both agencies to hire "at risk" employees and to be exposed to civil liability. Staffing and funding must be sufficient to ensure thorough and timely investigations.

---

[21] Matthew Lynch, Sergeant, California Highway Patrol Academy, May 14, 2004.
[22] Peter Inge, Background Investigator, California Youth Authority, April 22, 2004; and Rene Medina, Lieutenant, California Department of Corrections, May 12, 2004.
[23] Nancy Baldwin, Assistant Director, California Youth Authority, April 12, 2004.

- **_Private background investigators._**  The Department of Correctional Services should contract with private background investigators to supplement civil service staffing levels to ensure background investigations are thorough and completed on time.  All investigators must also receive formal training before engaging in casework.  Currently, California Department of Corrections investigators receive 40 hours of training, which must continue or be expanded.[24]  During the 2000-01 fiscal year, the California Department of Corrections completed 4,746 background investigations for peace officer applicants. Of those investigated, 3,039, or 64 percent, were cleared for hire.[25]  Currently the California Highway Patrol is averaging 40 hours of investigation per applicant.[26]  The California Department of Corrections and the California Youth Authority are averaging just 11 hours.[27]  Nearly all investigative work for the California Department of Corrections and the California Youth Authority are completed from the office without any field work.  For the California Youth Authority, personal interviews of prior employers, family members, and friends are not done.[28]  Home visits and visits to prior places of employment have been discontinued.  It is clear that both the California Department of Corrections and the California Youth Authority are not staffed sufficiently to ensure that quality background investigations are conducted and completed on time.  Thorough and detailed background investigations are critical and must be properly funded and staffed to establish a professional culture in any department.[29]

- **_Components of background investigations._**  The Department of Correctional Services should expand the current components of background investigations for all peace officer applicants. Background investigators must have the flexibility to properly investigate any issue revealed during the investigation.  This practice will ensure that the department is protected against employees who could expose the department to civil liability. Currently the California Department of Corrections uses the following components during background investigations for all peace officer applicants:[30]

    - Criminal history checks with federal, state and local law enforcement agencies.
    - Employment history.
    - Military history.
    - Verification of Selective Service registration.

---

[24] Rene Medina, Lieutenant, California Department of Corrections, May 12, 2004.
[25] Rene Medina, Lieutenant, California Department of Corrections, May 12, 2004.
[26] Dave Fedullo, Sergeant, Hiring Unit, California Highway Patrol, May 13, 2004.
[27] Rene Medina, Lieutenant, California Department of Corrections, May 12, 2004.
[28] Nancy Baldwin, Assistant Director, California Youth Authority, April 12, 2004.
[29] Walter Allen III, Director, California Youth Authority, May 13, 2004.
[30] Rene Medina, Lieutenant, California Department of Corrections, May 12, 2004.

- References and landlords.
- Department of Motor Vehicles driver records.
- Verifying education and citizenship requirements for the position.
- Legal responsibly (compliance with child support, student loans etc.)
- Inmate file reviews on applicants having inmate relatives or acquaintances.
- Gang affiliations.
- Illicit drug use.

The Department of Correctional Services should continue using all of the above background investigation components and should add the following components.

- Investigate the possibility of racial bias.
- Investigate the possibility of sexual harassment.
- Investigate integrity and honesty issues.
- Conduct personal interviews with prior employers, neighbors, friends, and family.

The Department of Correctional Services should review this list on an annual basis and make any changes needed.

- **Continuous testing.** For the Department of Correctional Services to further shorten the hiring process, the practice of continuous testing for applicants should be implemented. Continual testing allows an applicant to file an application at anytime and be scheduled for the next available test. For all entry level peace officer positions and other classifications needing a large number of new hires, a testing cycle should be completed at least once each calendar quarter. This would create hiring lists from which new hires could be selected as needed. After a specific amount of time, possibly one or two years, the list would be abolished. This would ensure the integrity of the information gathered during the hiring process.

**Fiscal impact.** Sufficient staffing in the areas of background investigations and applicant testing will have an initial fiscal impact. This impact can be buffered through the use of retired law enforcement officers to complete background investigations and senior volunteers to fulfill some support staff duties.[31] The practice of contracting out to the private sector for background investigations should be explored as a possible cost saving measure. The use of private background investigators can cost as much as $150.00 per partial investigation; however the possibility of negotiating a lower contract

---

[31] Walter Allen III, Director, California Youth Authority, May 13, 2004.

price exists.[32]  Additionally, the Department of Correctional Services will see future fiscal savings with the addition and retention of more qualified employees, which will reduce the department's exposure to civil liability.

**Centralized deployment.** Currently the correctional departments lack a system for manpower, or succession planning.  Proper manpower planning – that is, filling vacancies with suitably qualified personnel in a timely manner – is key to the operation of any organization.  The process is presently scattered and unruly. With the exception of graduates from the basic academies, vacancies are filled by management who announce, interview, and select candidates at the individual institutions and field offices throughout California. Management often does not have access to a pool of qualified candidates.  In some areas with one or two-person positions, replacements may not occur for eight to nine months after vacancies occur.[33]  The management of existing correctional departments cannot strategically deploy personnel to needed areas because the system lacks organization and has few controls in place.

It is expected that by 2006 there will be a mass exodus of qualified employees in both the Department of Corrections and the Department of Youth Authority.[34]  With the move to a flatter organizational structure, fewer layers of middle management are available to fill upper-level roles. It is important that potential successors are identified early and given appropriate training so that when the time comes for their move to more senior roles, disruption is minimized. This cannot be done without a centralized, strategic deployment process for human resources management. Therefore, it is recommended that all assignments, transfers, and promotions are done from the central Office of Personnel and Training, where a database, or centralized pool, of the total supply of persons available and fitted for service will be kept.

**Behavioral science unit.** The correctional environment can be dangerous and volatile.  On the average, nine officers are assaulted in California's state prisons every day.[35] Correctional officers must respond to emergencies quickly with measured and effective action.  The psychological effects resulting from stressful encounters continue long after the events occur.  When an officer is attacked on a tier –*gassed* with urine, excrement, or other bodily fluids or stabbed—everyone is affected. The awareness of ever-present danger can leave nerves on edge and cause job performance to suffer. It is a difficult job.  Most police departments across the nation are aware of this and some have a psychologist in house to address results from traumatic incidents and perform critical incident debriefing.  The Department

---

[32] Bob Ford, Employment Background Investigations Inc., April 27, 2004.

[33] Frank E. Renwick, Deputy Director, Administrative Services Division, California Department of Corrections, May 21, 2004 telephone interview, " . . . *return to work coordinator position might take eight to nine months to recruit <fill>* . . . "

[34] Jeanne Woodford, Director, California Department of Corrections, April 18, 2004 interview; and Sylvia Garcia, Chief Deputy Director, California Youth Authority, May 28, 2004 interview.

[35] California Correctional Peace Officers Association website, www.ccpoa.org, May 17, 2004.

of Correctional Services should assign a psychologist to each prison and youth facility to address the needs of employees who may be experiencing personal problems associated with work or home.  Doctor-patient confidentiality should be observed and honored.  The psychologist should also conduct critical incident debriefing. All psychologists should report to the chief psychologist at the behavior science unit.

## Providing a Continuum of Training

*Academies.* The academies of the correctional departments need to be consolidated and refined.  Currently, there is little or no coordination between academies, which leads to inefficiency.  The Department of Youth Authority recently conducted an academy for seven cadets.  In some cases, the officers do not complete the academy before assuming the responsibilities of the position – sergeants, lieutenants, and casework specialists may start work without attending necessary training.  Personnel in the high echelons of the correctional career system lack a command college to prepare them for the responsibilities of the positions. Lastly, ethics training is not embedded and interconnected to every aspect of the profession, thus neglecting to indoctrinate correctional peace officers with the fundamental values required for professional accountability. To address these problems, the Department of Correctional Services should take the following actions:

- *Consolidate academies.*  The Department of Correctional Services should consolidate the basic academies for adult correctional peace officers and youth correctional peace officers.  Because these academies provide the fundamental components of corrections, universal core training that flows from common competencies can be addressed in one academy.  Subsequently, training for job-specific specialties for each peace officer classification can be provided separately.

  One universal basic academy would facilitate lateral mobility of employees and decrease redundancies in training.  It also affords opportunities for achieving improved communication and synchronization between the various Department of Correctional Services operational components.  It forces coordination into the structure.  The potential for achieving cost savings in terms of economies of scale (such as developing instructional materials, trainee testing instruments, selection and preparation of instructors) is significant.

- *All academies should be under one academy administrator*. Placing all academies under one academy administrator will ensure consistency among academies.  It also centralizes the responsibility for the on-going evaluation to regularly update curricula and provides a repository for best practices in training.  The academy administrator will be able to respond to policy changes and adjust training accordingly in a timely manner.

- *Completion of academy before assuming responsibilities.* Correctional peace officers carry out critical and complex responsibilities that are too significant to perform without the necessary prerequisite training. All academies should be completed before an officer assumes the responsibilities of a position. The basic academy is a must for new officers; however, the value of the subsequent academies is just as important. The sergeant and lieutenant academies are as significant as the basic academy and should be completed before the employee assumes the position. For example, upon promotion to sergeant, a correctional officer suddenly faces multiple safety, liability, credibility and professional issues involving up to 20 employees that are now his or her responsibility. At minimum, he/she now has to understand the supervisor's role in the state's disciplinary system. Sometimes, the newly appointed sergeant must supervise former colleagues and needs a new set of skills to accomplish the additional responsibility. The officer should be transferred upon promotion so that he or she does not supervise employees in the group that were his/her own peers. In the upper echelons of the correctional peace officer structure, a command college, similar to the California Commission on Peace Officer Standards and Training Law Enforcement Command College, should be developed.

- *Training location.* Presently, the basic academies for both youth and adult correctional peace officers are located in the northern part of the state, which results in recruitment and operational problems. The training duration for each cadet is 16 weeks. All new correctional officers are considered department employees, stay on academy grounds while in training, and receive full wages. Both the California Department of Corrections and the California Youth Authority have experienced reluctance by many applicants to commit to such a long time away from home. Some drop out of the academy before completion. Some cadets would rather attend the training close to home where they could go home at night. The duration and location are part of the reason for low recruitment, particularly from the small communities where institutions are located.

  The California Community College system provides low-cost training to students who desire to pursue education and training for careers in public safety, including corrections. This system, located throughout California with 109 colleges, is already "in the business" of educating and training peace officers and can easily provide equivalent training for correctional peace officers.[36] Thus, it is recommended that the basic academy be shortened by accepting community college training certificates in specific areas. It is also recommended that college credits be granted for academy training. The shortened academy will be an option for those who have the community college courses; however, the full academy will continue for those cadets who have not attended the community college system.

---

[36] California Community Colleges Chancellor's Office, www.ccco.edu, May 16, 2004.

It is further recommended that the 40-acre Richard A. McGee Correctional Training Center in Galt, California be the Department of Correctional Services main training facility with two satellite operations in the southern and central parts of the state. The satellite operations, working in conjunction with the California Community College system, will provide a training structure and access to all geographic areas within the state.

- *Preparation of academy instructors.* In the existing correctional departments, academy instructors historically have not undergone a rigorous selection process. On the contrary, in some cases academy instruction has become an assignment where individuals who have not worked well elsewhere have been placed on a temporary basis. Some instructors do not want to leave the academy, causing their field experience to become dated. This can have devastating consequences to the quality of academy instruction and the forging of cadets' character at the basic academy. The California Department of Corrections discovered that it could not grant college credits for academy instruction through San Joaquin Delta Community College because a significant number of instructors did not have the minimum qualifications for instruction at the community college level.

  The Department of Correctional Services should select and train the "best and brightest" to be academy instructors. To ensure consistency and excellence in the selection of instructors, a new selection process should be developed that includes, at a minimum, a recommendation by the candidate's warden or parole administrator, an oral interview, a written assignment, and a 15-20 minute presentation before other academy instructors. All academy instructors should undergo a rigorous preparation on how to teach. Furthermore, academy instructor assignments should be limited to a minimum of two years and a maximum of four years to create a systematic rotation and keep current with the field. This should also bring new energy and enthusiasm to the classroom.

*Elimination of Commission on Correctional Peace Officers Standards and Training.*
It is recommended that the Commission on Correctional Peace Officers Standards and Training be eliminated and the functions of setting standards for the selection and training of state correctional peace officers be moved to the new Corrections Standards Authority (formerly the Board of Corrections). Further, it is recommended that the apprenticeship program administered by the Commission on Correctional Peace Officers Standards and Training be eliminated and a training officer program be established. It is also recommended the Commission on Correctional Peace Officers Standards training budget and personnel be transferred to the Corrections Standards Authority to provide resources to the new entity. Since the Commission on Correctional Peace Officers Standards and Training has not been able to perform its tasks with the current year budget, an assessment should be accomplished to determine additional resources needed for the Corrections Standards Authority to assume the Commission on Correctional Peace Officers Standards and Training functions.

64

The Commission on Correctional Peace Officers Standards and Training, a regulatory commission, is currently within Youth and Adult Correctional Agency.[37] The Commission on Correctional Peace Officers Standards and Training is a joint management-employee panel responsible for establishing job training standards for correctional staff and monitoring compliance with those standards. The commission administers the correctional peace officer apprenticeship program. It develops, approves, and monitors selection and training standards applied by the Departments of Corrections and the Youth Authority.

The Commission on Correctional Peace Officers Standards and Training has proven to be ineffective because the structure is that of a collective bargaining table. Every issue brought before the commission is viewed as a win-lose matter instead of focused on training correctional peace officers. Members of the Commission on Correctional Peace Officers Standards and Training committees are ill-equipped to address the issues presented to them at the policy-making level, and instead focus on the mundane details. An example of this is lesson plan reviews, which are mired in too much detail and result in significant delays in approving needed training material. Further, the Commission on Correctional Peace Officers Standards and Training's budget is insufficient to recruit and develop the staff needed to fully carry out its mandate as described in the Penal Code.[38] The Commission on Correctional Peace Officers Standards and Training is bureaucratic in its operations, and has become a hindrance to the training of state correctional peace officers.

The Commission on Correctional Peace Officers Standards and Training was to become a department of approximately 70-80 employees, based on budgets developed in 2000. Due to budgetary restraints, however, this has not happened. On the contrary, during last fiscal year, the Commission on Correctional Peace Officers Standards and Training budget was cut in half, leaving it unable to conduct business. A verbal report was presented at the April 29, 2004, meeting on the plan to accomplish the Commission on Correctional Peace Officers Standards and Training duties with reduced personnel. The plan is for all programs that are not required by the Penal Code to be "shelved."

The purpose of the Commission on Correctional Peace Officers Standards and Training is to enhance the training and professionalism of California's state correctional peace officers to ensure the safety and security of the officers. Given its importance to the safety and security of the correctional officers and of the public that depends on them, the Commission on Correctional Peace Officers Standards and Training has the authority to monitor program compliance by the Department of Corrections and the California Youth Authority and may disapprove training courses created by the department if it is determined that the courses do not meet the Commission on Correctional Peace Officers Standards and Training prescribed standards. Management classifications are not subject to this mandate.

---

[37] California Penal Code § 13600-13602 and 6126.1.
[38] *Ibid*.

To carry out its training standards task, the Commission on Correctional Peace Officers Standards and Training requires that all lesson plans developed must be approved by the Commission on Correctional Peace Officers Standards and Training prior to implementation. Some lesson plans have been disapproved numerous times (two examples were in the review process from October, 2003 until April, 2004) with new findings on the same material each time they were submitted.[39] After the review committee recommends approval for a lesson plan, it is forwarded to the commission. Since the commission meets monthly, it could take another month to approve the lesson plan. In the April 25, 2002 Commission on Correctional Peace Officers Standards and Training public meeting, a spokesman for the Department of Youth Authority stated:

> *In light of the shallowness of the proceedings of the Curriculum Review Committee, it is the Department's firm position that the current performance of the Curriculum Review committee is detrimental to the mission of the Youth Authority, hence, detrimental to the common good of the people of this state.[40]*

The system is very unresponsive. Altering training due to court mandates or officer safety takes no priority and goes through the same extended process.[41] The extreme detail of lesson plan scrutiny and the lengthy time required to approve lesson plans is not consistent with industry best practices or procedures adopted at the Peace Officers Standards and Training (POST) or the Board of Corrections.[42]

*Apprenticeship program.* The apprenticeship program for correctional peace officers should be eliminated and a program establishing field training officers should be established. When the budget was cut in half last fiscal year, the commission attempted to shut down the apprenticeship program, but the California Correctional Peace Officers Association filed a petition for writ of mandate in Sacramento County Superior Court on March 4, 2004, for the Commission on Correctional Peace Officers Standards and Training to continue administering and monitoring the Apprenticeship Program. At the April 29, 2004 Commission on Correctional Peace Officers Standards and Training public meeting, the commission reported that it had reached an agreement to continue implementation of the apprenticeship program with reduced staff and funding. Oversight of the program reverted to the institutions.[43]

---

[39] Rick Winistorfer, Chief Division Training Coordinator, Parole and Community Services Division, April 29, 2004 interview.

[40] Commission on Correctional Peace Officers Standards and Training Public Meeting, April 25, 2002, Gary Parks, Training Officer.

[41] Rick Winistorfer, Chief Division Training Coordinator, Parole and Community Services Division, April 29, 2004 interview.

[42] Interview with Assistant Executive Director Dimiceli, Assistant Executive Director Snow and Assistant Executive Director Reed, Peace Officer Standards and Training, March 29, 2004; and Thomas McConnell Executive Director, Board of Corrections, March 29, 2004.

[43] Commission on Correctional Peace Officers Standards and Training Public Meeting on Apprenticeship, April 29, 2004.

The apprenticeship program lost Veterans Administration certification for veteran partici-pation because the program was not in compliance with the Veterans Administration stan-dards.[44]  It was also reported that there are 1800 apprentices in the database that should be removed.  Some of these have been in the database since 1991, well beyond the time limits for apprentices.[45]  Many stakeholders agree that the apprenticeship program has become a "paper shuffle nightmare," with a much reduced value to training.[46]

**Field training officer positions.**  The field training officer is a proven concept in law en-forcement and corrections organizations throughout the United States.[47]  California Peace Officer Standards and Training has certified courses not only for entry-level field training officers, but also certified courses for "update" training.[48]  California Parks and Recreation, California Highway Patrol, and most local law enforcement agencies use the field training officer concept.  In all of these programs, a new officer is assigned to a field training officer for a specified length of time. The field training officer bridges a gap in training by provid-ing immediate feedback to the officer on probation and providing an example of how to do the job correctly.

Although there are many descriptions of field training in law enforcement agencies throughout the country, all have certain common elements.  The following description points to the type of program needed by the new Department of Correctional Services:

> *Field Training has a significant impact on the individual new officer in terms of imprinting attitudes, style, values, and ethics in carrying out the duties of police work that will remain throughout a career.  Consequentially, it is probably the most effective influence on the future direction of a department.*
>
> *The law enforcement department head and his or her field training managers must, there-fore, be certain that the field training program which introduces officers to the department not only develops the necessary technical skills but also reflects the policing philosophy of the department and the community that it serves.*
>
> *The field training staff has the monumental responsibility of building the future of the department through the people they train.  To assure success in this task, the field training*

---

[44] Carlos Sanchez, Chief of Training, California Department of Corrections, March 30, 2004, "We lost the Veterans program in August of last year."

[45] California Correctional Peace Officer Standards and Training Public Meeting on Apprenticeship, April 29, 2004.

[46] Lance Corcoran, California Correctional Peace Officer Association, April 12, 2004, "paper nightmare for CO's and sergeants;"  and Carlos Sanchez, Chief of Training, California Department of Corrections, March 30, 2004, "Apprenticeship program is a paper mill;" and Paul Bestolarides, Ed.D., Academy Administrator, California Department of Corrections Academy interview, March 26, 2004, "not useful;" and Pat LeSage and Richard Tatum, California correctional Supervisors Organization interview May 11, 2004, "Yes, it is a paper mill. Its time-consuming and it is worthless."

[47] Montana Department of Corrections Field Training Officer Program, (http://www.cor.state.mt.us/resources/ training.asp).

[48] California Peace Officer Standards and Training website (www.post.ca.gov/catalog/2476.htm).

*program must have a training philosophy that ensures that every student is given the maximum opportunity to show that he or she can do the job. In order to accomplish this, the program must create a positive environment in which learning is maximized and in which students are able to perform to the best of their ability. The approach must be fair, firm, friendly, and, above all, professional. The example set must be beyond reproach. Evaluation must be sincere and given in a straightforward manner emphasizing the positive as well as the negative aspects of performance.*

*At no time should probationary officers be demeaned or ridiculed. Even the least capable student must be treated with respect and compassion. No student should ever be treated in a way that deprives that student of his or her dignity. Every effort must be made to ensure that the stress felt by the student is caused by the job and not from the words or actions of the field trainers.*[49]

Field training must be standardized, not only in the training material, but also in the standards of evaluation. The program should be able to identify weaknesses in the selection standards and weaknesses in academy instruction. It should provide for remedial training when necessary and for recommendations to supervisors evaluating probation performance. The program should strive to include lessons learned in the field through experience, or best practices.

The program would have a field training officer assigned to every probationary correctional officer and parole agent for the entire length of the probation period. The probationary period should start upon graduation from the basic academy and should extend for one year. The field training officer would provide a daily evaluation to the probationary employee and a weekly evaluation to the probationary employee's supervisor.

The field training officer must be chosen for being above standard in all areas and for having a desire to teach. The field training officer must realize that training is the first priority and evaluation is secondary. Field training officers must conduct themselves in a professional manner, teach department policy and procedures, maintain the highest skill and knowledge, and set an example by appearance and attitude. Many organizations require a minimum of two to five years in the job before an officer becomes eligible for consideration as a field training officer. Field training officers of the Department of Correctional Services should attend field training officer training certified by the Correctional Standards Authority. To reward field training officers for the added field training officer responsibilities, they should receive a 5 percent incentive pay raise while fulfilling field training officer responsibilities and the position should be recognized as a positive factor for promotion. Some organizations recognize field training officers through uniform modifications. The department could consider a collar tab or pin to recognize field training officer status for uniformed personnel.

---

[49] Bloomington Police Department Field Training Manual, page 6 (http://www.in-nafto.org/ftomanual.pdf).

- *Fiscal impact.* A cost would be associated with a pay raise of 5 percent for every field training officer during the time they are performing field training officer duties.

***Departmental communication.*** The need to change the culture and public image of the state correctional system is critical. In order to make this change, the Department of Correctional Services must make communication from the top to the bottom of the organization a major priority. At present, this type of communication is nonexistent in the California Department of Corrections and the California Youth Authority. The current California Youth Authority Director, Walter Allen III, gave an example of this problem. He related that his holiday message to his employees took approximately three months to disseminate.[50] This situation will certainly hinder the ability of management to have its vision realized. Lack of communication can expose front line peace officers to safety hazards.

To address this issue, the Corrections Independent Review Panel recommends that the Department of Correctional Services provide a means for management and first-line supervisors to communicate with frontline peace officers on a daily basis. Currently, the California Department of Corrections and the California Youth Authority personnel working frontline peace officer positions and their first-line supervisors work eight-hour shifts. Both agencies primarily operate on a daily basis using three eight-hour shifts that do not overlap. This creates a situation in which pre-shift exchange of information between two frontline employees occurs only during the post relief process.[51] The current process does not allow for the dissemination of critical officer safety information or an expeditious avenue for management to deliver priority information. Furthermore, the present system does not provide a forum for frontline supervisors to provide training or even to contact their subordinates on a daily basis prior to shift. This practice is unacceptable and raises significant problems in officer safety, supervision effectiveness, and department communication. Following are measures to address the problems:

- ***30-minute pre-shift briefing.*** The Department of Correctional Services must establish a 30-minute pre-shift briefing for all frontline peace officer positions. This briefing should be proctored by an immediate supervisor or an officer in charge in the absence of a supervisor. The supervisor should be given designated information to relate to the officers and should be allowed to deliver other information at his or her own discretion. A 30-minute pre-shift briefing will also give supervisors the ability to contact subordinates prior to shift on a daily basis. This will lead to a higher degree of supervision and accountability.

- ***Pre-shift briefing book.*** The Department of Correctional Services must create and maintain a briefing book to be used by each unit participating in the 30-minute

---

[50] Walter Allen III, Director, California Youth Authority, May 13, 2004.
[51] Walter Allen III, Director, California Youth Authority, May 13, 2004, Roy Mabry, Lieutenant, California Department of Corrections, May 13, 2004.

pre-shift briefing. Proper maintenance of the binder is critical and should be the responsibility of a supervisor. Examples of items contained within the binder include officer safety updates, critical management information, and normal operational information such as promotional exam announcements. In addition, the binder must have the capacity to log the names and numbers of officers who received the daily information and the supervisor who delivered it.

- *Training program for the 30-minute pre-shift briefing.* The Department of Correctional Services should implement a training program to be accomplished during the 30-minute pre-shift briefing. There are two good examples of such programs. The California Department of Corrections uses a "Six Minute Training" at its San Quentin facility, which allows mandatory training to be delivered in short spurts on a daily basis.[52] The California Highway Patrol uses a program called "Solid Realistic On-going Verifiable Training," which is designed for and used at pre-shift briefings. This program delivers supplemental training in the form of realistic scenarios on a daily basis.[53] Either program would allow the Department of Correctional Services to deliver training to its employees on a daily basis and in turn ensure that employees are better trained and the department is less vulnerable to civil liability.

- *Eight and one-half hour work day.* To facilitate the pre-shift briefing, the Department of Correctional Services frontline peace officers and their supervisors should be required to work eight and one half hour days as opposed to eight-hour days. An eight and one-half hour work day would allow all shifts to overlap by 30 minutes, thereby providing the time needed for 30-minute pre-shift briefings.

**In-service training.** Training is the responsibility of management. Nowhere is this responsibility more visible than in the in-service training program. Department internal training is essential to maintaining safe, efficient institutions and to carrying out the department mission. A well-developed in-house program provides timely, state-of-the-art workforce instruction and also elevates the profession. It is integral to employee image outside the organization, and it boosts employee morale. Further, a robust training program has the added advantage of lateral communication among the field training managers through meetings, conferences, and periodic consultations. This cross-pollination of information can be significant in identifying best practices across institutions. Last, a well-organized in-service program can capture baseline information to be used for risk assessment and litigation avoidance. Regrettably, this is not the current state of the in-service training program in California's correctional system.

---

[52] Jeanne Woodford, Director, California Department of Corrections, April, 19, 2004.
[53] Matthew Lynch, Sergeant, California Highway Patrol, May 15, 2004.

Lack of resources, both in personnel and funding, has greatly affected in-service training programs for the last few years.[54] Central training offices in headquarters do not collect data on a regular basis. No database that is common to headquarters, institutions, and field parole offices exists. In fact, each institution has designed its own method of tracking in-service program compliance, yet reports are not sent to headquarters. Furthermore, the in-service training managers scattered throughout California institutions and parole offices have not had a meeting in the past two years, and rarely have the latest training information. The correctional departments do not use distance learning, computerized lessons, Internet options, or other delivery of training methods currently in widespread use by other institutions that train adults, such as technical schools, colleges and universities. At one time, the Office of Departmental Training did develop CD-ROMs for distribution, including an initial CD-ROM on training for correctional officers involved in cell-extractions. At first, the efforts of the office to capture and distribute training on various correctional procedures appeared to have very positive results. Regrettably, short-sighted planning and scarce resources did not provide for more than one person to create the CD-ROMs, and when the one person responsible for the program left the department, the program ended.[55]

Not only is the gathering and distribution of data absent, but mandated training is not periodically reviewed, and the basis for training is often unclear.[56] That is, one can find the training considered "mandated training" in department manuals, but there is no source – law, regulation or court case – for the authorization or rationale. The exception is the uniformity found in the section published in the California Department of Corrections Operations Manual covering Health Care Services.

The selection process for in-service training instructors and their preparation to teach also needs attention. Because there is no uniform mechanism throughout the system, documenting and maintaining subject-matter experts is nearly impossible. Employees attend training-for-trainers (commonly called T4T) courses in various areas, yet they are not required to teach classes, but are simply available to teach. In-service training managers have reported that it is often difficult to persuade an employee who is T4T certified to actually teach, due to conflict in schedules, vacations, or other job requirements. Some have even alluded that employees attend T4T because it looks good on the resume, not because of a sincere desire to teach. This wasteful and irrational practice has existed for the past five years.[57]

---

[54] Carlos Sanchez, Chief, Office of Departmental Training, California Department of Corrections, Interview March 30, 2004.
[55] Carlos Sanchez, Chief, Office of Departmental Training, California Department of Corrections, Interview March 30, 2004; and, Marty Jones, Chief, Office of Departmental Training, California Department of Corrections, (Retired).
[56] Miki Vohryzek-Bolden, Ph.D., Peggy Giannoni, Ph.D., and Sue Cote, J.D., Ph.D. "Correctional Peace Officer Training – California Department of Corrections and California Youth Authority," California State University, Sacramento, October 2001.
[57] *Ibid.*

Under the new organization plan, the Department of Correctional Services has the opportunity to build a solid in-service training program. It is recommended that the new program include a central control for quick response to changes in the law, court decisions, personnel safety, and management policy. A central control would also be used for monitoring course enrollment, validating course completion, and standardizing training requirements and presentations. All Department of Correctional Services personnel should be able to know the training requirements for their jobs, as well as for cross-training and for promotions. In-service managers should meet periodically to exchange information, remain consistent, and focus on the plan for the following year. In addition, careful consideration should be given to developing a process for selecting and training instructors. If the department invests in T4T training, the employee should sign a contract to teach a specified number of in-service classes within the next two years. A commitment further than two years could be unworkable due to normal rotation and the possibility of delivering dated training material.

In-service training planning should include incorporating technology in the delivery of training, as other states have done. This not only maximizes the ability to deliver training, but also enables employees to take responsibility for their own professional development. One of the most innovative in-service training programs can be found in the State of Oklahoma. Oklahoma has set up an interactive network of training that is based on the Internet.[58] The program allows personnel to see what courses are required, sign up for the course on-line, sign up for Council on Law Enforcement Education and Training, which is equivalent to California Peace Officers Standards and Training, and download some courses on-line or by e-mail. It provides the schedule, time, and location for courses that are not downloaded. It also provides locations for computer access to reach the in-service training Internet site throughout the state. Some examples of the downloadable courses are: *Corrections Report Writing, Inmate Rights, Privileges and Responsibilities,* and *Awareness and Prevention of Sexual Harassment.* When the on-line course is completed it is automatically entered for credit into the personnel database. The site lists annual training requirements for all positions. Thus, if an employee wishes to cross-train into another job, it is easy to access the annual training requirements for the targeted position. The quarterly training newsletter can also be found on line to inform employees of updated information on training and provide an updated list of videos that may be signed out for training classes or individual viewing.

The Department of Correctional Services should move in the direction of incorporating technology into its in-service training program. To facilitate this endeavor, it is recommended the department begin by centralizing in-service training function at the Richard A. McGee Academy in Galt. Developing videos and CD-ROMs, implementing and maintaining a training website, and modifying course materials that respond to policy changes will require a cadre of personnel with specialized information technology and instructional

---

[58] www.doc.state.ok.us/Training

material writing skills. The rotation of instructor personnel through the academy would provide the operational interface for course modification.  The academy could be the central repository for instructor course materials, including video enactments for training demonstrations. Centralizing this function at the academy would provide for on-site personnel (including cadets) to participate in enactment demonstrations. This would facilitate the taping of various endings to training videos, very much like the system used at the Folsom Firing Range for scenario-based instruction.

*Supervisory/managerial/executive training.*  A well-trained management team tends to meet and exceed performance expectations at a much higher level than those that are not. Due to budget concerns, the current department has had to limit training to that required by the California Department of Corrections Operations Manual, the courts, or other governing bodies. The Department of Correctional Services can develop successful supervisors, managers, and executive staff by investing in the following areas:

- Providing job-specific training for supervisors, managers, and executive staff.

- Providing clear guidance to supervisors, managers, and executive management regarding job expectations and routine evaluations of their work.

*Providing job-specific training for supervisors, managers, and executive staff.* The California Department of Corrections has experienced exceptional growth during the past 15 years. A training program for managers was originally put in place to address the needs of modern-day employee and to train managers for the challenges of running an institution. As the department grew, however, training failed to keep up with the demands. Currently, there is no training program for new managers, supervisors, or those preparing to promote. Instead, individuals must rely on unofficial on-the-job training, which may be inconsistent with the values of the department. To address the problem, the new Department of Correctional Services should take the following actions:

- *Develop and provide supervisory, managerial, and executive staff training before employees assume these positions, whether classified as custody or non-custody.* In an April 1, 2004 panel discussion, current and former Department of Corrections wardens noted that leadership, fiscal review, and personnel management training is essential to the warden's role.[59]  Some of the wardens said they were promoted to supervisors or managers without receiving the required supervisory training. Some wardens said they received very little executive training to prepare them for the extensive responsibilities associated with serving as warden of an institution. Systems and policies not only differ among prisons; but also differ among facilities within a prison. Providing standardized training for supervisors, managers, and executive management will foster standardized processes in each institution and consistency throughout the department.

---

[59] Warden's panel. April 1, 2004.

The Department of Corrections lacks an effective method for tracking training completed by employees. Often, supervisors, including sergeants, lieutenants, and supervising nurses, are promoted without completing the required training for several months, and they may not complete it at all. Employee training is tracked at each institution individually.[60] To support and mentor supervisors and managers to become leaders for the new department, appropriate training must be made available.  The majority of the training for supervisors and managers could be accomplished through distance learning, through current video-conferencing techniques, or by using the California Department of Corrections Internet site.  Training does have associated costs that cannot be fully projected at this time.

- *Develop a mentorship model for supervisory, managerial, and executive staff positions.*

    Successful private companies mentor in-house employees to help them develop into the supervisors and managers who have a broad base of knowledge about all aspects of the company. In a study of 300 nationwide corporations, a core group of 20 companies including Intel Corporation, Fed Ex Corporation, and General Electric Company were found to be the most successful at building leaders from inside the company because they followed well-defined strategies and offered more training than other companies.[61]  General Electric uses training for current staff from a leadership institute dedicated to training and educating managers. Hewlett Packard spent $325 million in 2003 on training and staff development.  Many law enforcement agencies are also using and realizing success from mentorship programs. The Department of Correctional Services should train and mentor its own staff to become the supervisors, managers and leaders of the state's future correctional system.

- **Create supervisory, managerial, and executive staff training that emphasizes vision, leadership, and ethics.**

    *Leadership is not a static condition. It is a constantly changing process of developing yourself and helping to develop others. - Peter Drucker*

    In 2002 the California Department of Corrections sent several employees to attend the California Public Safety Leadership and Ethics Program training. This program was created by a collaborative effort of several public agencies and the Phi Theta Kappa International Honor Society and Leadership Development

---

[60] Interview with Carlos Sanchez, Chief of Departmental Training, Sacramento, California, March 25, 2004.
[61] Kalb, L. "Trained to Supervise; Many companies stress in-house programs". Sacramento Bee, Business. March 16, 2004.

Program.[62] This six-week training brought together firefighters, correctional officers, wardens, sheriffs, and other public safety employees to learn skills in developing a personal philosophy of leadership, leadership of others, organizational leadership and the ethics and challenges of leadership. One of the aims of this program was to train trainers, who would then take the training out to other employees. Approximately 60 people from the California Department of Corrections, including current director, Jeanne Woodford (who is an avid supporter of this program), were trained as trainers. Yet, due to funding and overtime issues, the program did not continue, nor has there been any substantial training performed by these trainers.[63] This training is an example of training that could ensure that the Department of Correctional Services stays current in the areas of leadership and ethics. This type of training is essential and must be properly funded.

**Providing managers with routine evaluations and clear guidance on job expectation.**
The Department of Correctional Services must provide supervisors, managers, and executive management every possible opportunity to succeed. These individuals must be given a clear understanding of the responsibilities of their positions.  They must also receive performance evaluations to ensure that they grow in their positions and know how to improve their performance. To accomplish that purpose, the Department of Correctional Services should take the following actions:

- *Develop specific job objectives in the job description for all managers, and executives, and rate job performance by these objectives at least annually.*
  The specific job objectives and method of rating job performance must be standardized to ensure consistency. The National Institute of Corrections provides an example of a program that provides standardization. The institute contends that the basics of management are (1) clear policy, (2) training based on that policy, (3) supervision to enforce policy, (4) inspection to validate that staff follow policy, and (5) correction of deviation from policy. This self-correcting loop then begins again. In most National Institute of Corrections training programs, participants develop individual action plans or initiate projects to implement in their agencies. After the training, they may be requested to provide information about implementation to help the National Institute of Corrections assess the impact of its training on their agencies. In some cases, technical assistance is available to help them implement their action plans.[64]

  These basic management steps must be incorporated into the performance evaluations of each manager and evaluated at least annually. Clear standards lead to

---

[62] California Public Safety Leadership and Ethics Program, Personal Leadership Development Journal and Plan, April 2002.
[63] Interview with Jeanne Woodford, Director, Department of Corrections, April 19, 2004.
[64] National Institute of Corrections Website. http://nicic.org/Services/TrainingServices.aspx

better accountability of employee actions and help identify employees who need further training or mentorship.

- ***Establish an internet-based human resources information center for career progression, training and to reduce the isolation of individual institutions.***

  This system should be available to all Department of Correctional Services employees. The system should provide information regarding promotional requirements, a self-test component to determine strengths and weaknesses, and a way to communicate throughout the department. This would not only improve the quality of all employees, it would encourage more employees to make promotion a goal.

## Recommendations

The following is a summary of recommendations for developing a personnel management structure that is effective and responsive to the department's mission and its employees:

- Establish an Office of Personnel and Training reporting directly to the Secretary.

- Conduct classification evaluation of all positions within the Department of Correctional Services to ensure appropriateness of classes and to promote efficient use of human resources.

- Develop job descriptions for all positions, including executives.

- Establish a management information system to accommodate personnel and training data bases, provide easy access, and generate periodic reports.

- Establish a web-based human resources information center for career progression.

- Adjust salaries to be commensurate with responsibility and conduct periodic salary adjustment studies.

- Conduct timely performance evaluations based on job competencies.

- Develop an annual recruitment plan to ensure the recruitment and retention of qualified employees.

- Create an annual advertising campaign within the annual recruitment plan designed to attract qualified employees and build a positive public image.

- Develop an annual public affairs plan within the annual recruitment plan designed to attract qualified employees and build a positive public image.

- Award hiring preference points for peace officer applicants with college credits, law enforcement experience, and/or military experience.

- Complete all pre-employment background investigations within 60 days.

- Contract with private background investigators to supplement staffing levels to ensure that background investigations are thorough and completed on time.

- Ensure that all pre-employment background investigations are thorough and contain mandatory components to ensure that the Department is protected from "at risk" applicants.

- Use continual testing to reduce the length of the current hiring process for all entry-level peace officer positions and other classifications needing a large number of new hires.

- Complete all assignments, transfers, and promotions from the central Office of Personnel and Training, where a data base, or centralized pool, of the total supply of persons available and groomed for service will be kept.

- Establish a behavioral science unit within the Office of Personnel and Training and the position of chief psychologist to direct it.

- Assign a trained psychologist to each youth and adult institution to address the needs of employees, assist with critical incident debriefing, and report to the chief psychologist within the behavioral science unit.

- Offer an incentive or bonus to employees who successfully recruit individuals who are hired.

- Establish a recruitment partnership with all employee organizations that represents their employees.

The following is a summary of recommendations needed to redesign a continuum of training that begins with the preparation of the basic academy recruit, follows through the probationary phase, continues with in-service training and prepares for leadership positions:

- Consolidate the basic academies for youth and adult correctional peace officers.

- Centralize academies under one academy administrator.

- Ensure that officers complete core academies before assuming the responsibilities of the position.

- Develop a command college for the upper echelons of the correctional peace officer career ladder.

- Transfer officers upon acceptance of promotion so that they do not supervise employees who were peers before promotion.

- Shorten the basic academy by accepting community college training certificates in specific areas.

- Award college credits for academy training.

- Designate the Richard A. McGee Correctional Training Center in Galt, California the Department of Correctional Services main training facility, and develop two satellite training operations in the southern and central part of the state.

- Centralize the in-service training program at the Richard A. McGee Correctional Academy at Galt, CA.

- Select and train the "best and brightest" to be academy instructors.

- Develop a new selection process for academy instructors that includes a recommendation by the candidate's warden or parole administrator, an oral interview, a written assignment, and a 15-20 minute presentation before other academy instructors.

- Limit academy instructor assignments to create a systematic rotation.

- Eliminate the Commission on Correctional Peace Officers Standards and Training.

- Eliminate the Correctional Peace Officer apprenticeship program for entry-level state correctional peace officer classes.

- Move the responsibility and resources for setting standards for training of state correctional peace officers to the new Corrections Standards Authority.

- Move the responsibility and resources for setting selection standards for entry-level state correctional peace officers to the Corrections Standards Authority.

- Move the responsibility and resources for developing, approving, and monitoring standards for advanced rank-and-file and supervisory state correctional peace officers to the Corrections Standards Authority.

- Establish in the Corrections Standards Authority, the responsibility and resources for developing, approving and monitoring selection standards and training standards for correctional training officers.

- Establish a field training officer program with appropriate selection criteria and training.

- Develop, approve, and monitor standards for a newly designated field training officer.

- Begin the probationary period for correctional peace officers upon graduation from the basic academy. The probationary period should be one year.

- Implement a 30 minute pre-shift briefing for all Department of Correctional Services frontline peace officer positions and their supervisors.

- Require all units participating in pre-shift briefings to maintain a briefing book containing information to be disseminated at briefings.

- Implement a training program to be utilized during the 30 minute pre-shift briefing.

- Establish an eight and one half hour workday for all Department of Correctional Services frontline peace officer positions and their first-line supervisors.

- Develop and provide supervisory, managerial, and executive staff training before employees assume these positions, whether classified as custody or non-custody.

- Develop and provide a mentorship model for supervisory, managerial, and executive staff positions.

- Create supervisory, managerial, and executive staff training that emphasizes vision, leadership and ethics.

- Develop specific job objectives in the job description for all managers and executives, and rate job performance by these objectives at least annually.

- Establish a web-based human resources information center for career progression and training and to reduce the isolation of individual institutions.

**REFORMING CORRECTIONS**

# Appendix

**TABLE 1**

**Annual Salary and Scope of Responsibilities for Top Corrections Administrative Officials**

| State | Maximum Annual Salary | Total Offender Population | Total Staff |
|-------|----------------------|--------------------------|-------------|
| **California** | $131,412 | 308,485 | 54,036 |
| Federal Bureau of Prisons | $136,000 | 176,500 | 34,500 |
| New Jersey | $123,070 | 27,000 | 9,500 |
| New York | $136,000 | 113,000 | 43,000 |
| Texas | $150,000 | 226,045 | 39,780 |

**Annual Salary & Scope of Responsibilities for Corrections Wardens**

| State | Maximum Annual Salary | Average Offender Population | Average Staff |
|-------|----------------------|----------------------------|---------------|
| **California** | $108,588 | 4,761 | 1,258 |
| Federal Bureau of Prisons | 136,900 | 1,675 | 321 |
| New Jersey | 117,205 | 1,929 | 679 |
| New York | 124,583 | 1,855 | 464 |
| Texas | 63,819 | 1,310 | 349 |



**TABLE 2**

**Monthly Salary Structure for Institutional Custody Classes**

| Class | Salary Range |
|---|---|
| Cadet | $2352.00 |
| Correctional Officer | $ 2427.00 - $ 4885.00 |
| Correctional Sergeant | $4407.00 - $5353.00 |
| Correctional Lieutenant | $4962.00 - $6030.00 |
| Correctional Captain | $6551.00 - $7223.00 |
| Facility Captain | $6551.00 - $7223.00 |
| Correctional Administrator | $7036.00 - $7758.00 |
| Chief Deputy Warden | $7391.00 - $8148.00 |
| Warden | $8369.00 - $9049.00 |
| Regional Administrator | $5768.00 - $9830.00 |

**Source:  California Department of Corrections**

**R**EFORMING **C**ORRECTIONS

TABLE 3



**Monthly Salary Structure for Parole Agent Classes**

Parole Agent I, Adult Parole — $4002.00 - $6181.00

Parole Agent II, Adult Parole (Specialist) — $5317.00 - $6781.00

Parole Agent II, Adult Parole (Supervisor) — $5582.00 - $6781.00

Parole Agent III, Adult Parole — $5853.00 - $7114.00

Parole Administrator I, Adult Parole — $7129.00 - $7860.00

Parole Administrator II, Adult Parole — $7387.00 - $8144.00

Regional Administrator — $5768.00 - $9830.00

**Source: California Department of Corrections**

82

TABLE 4



Monthly Salary Structure for Correctional Counselors

Source: California Department of Correction

TABLE 5



**Monthly Salary Structure for Internal Affairs Classes**

Special Agent: $4975.00 - $6718.00

Senior Special Agent: $5962.00 - $7208.00

Special Agent-In-Charge: $7071.00 - $7796.00

Source: California Department of Corrections

TABLE 6

**Monthly Salary Structure for Fire Captain / Fire Chief**

Fire Captain: $3345.00 - $4885.00

Fire Chief: $4730.00 - $5750.00

**This Page Left Blank**

# Risk Management and Health Care

Operating an adult and youth prison system exposes the state to many risks. It must protect the safety of its employees – most of whom work in high-risk and often dangerous environments where inmates and wards may attack.  Simultaneously, it must provide humane housing and care for tens of thousands of inmates and wards. When poorly managed or ignored, the risks translate into injured employees, inmates, or wards and sometimes result in costly lawsuits or court settlements.

Effectively managing risk requires a risk management system that identifies, controls, and lessens the impact of potential events. It requires a decision-making structure that constantly assesses safety, resources, services, legal responsibilities, and policies, and it requires vigilant planning, checking, and adjustment of business practices to address and reduce risk.

To assess the effectiveness of risk management in the state correctional system, the Corrections Independent Review Panel reviewed the risk management practices at the Department of Corrections, the California Youth Authority, and other law enforcement agencies in the state. As a result of that review, the panel recommends significant changes to the state's current practices. Specifically the panel recommends that the new Department of Correctional Services adopt a "top-down" approach to risk management. The panel also recommends that the Department of Correctional Services include an Office of Risk Management that reports directly to the Secretary of Correctional Services. That office should have responsibility for overall planning and implementation of the risk management program. A cornerstone of the new Office of Risk Management would be an "early warning" system that combines effective communication between levels of the organization, careful trend analysis in inmate complaints, and rigorous self-audit to ensure compliance with policy and corrective actions. This system, in turn, will contribute to greater accountability at all levels of the organization.

At present, significant risk in the state correctional system is in its system for providing health care services to inmates and wards, which has frequently been criticized for poor management and quality of care. Health care also represents the largest litigation expense for the department.  After reviewing the health care delivery models of several other states, the panel recommends that the new Department of Correctional Services create an Office of Health Care Administration to administer health care services for inmates and wards. In addition, the new department should explore entering into an agreement with the University of California to explore ways to improve the efficiency and efficacy of health care services. The panel also recommends the new Department of Correctional Services increase its use of contracted health care services.

## The Office of Risk Management

The Department of Corrections and the California Youth Authority presently lack a risk management system that effectively coordinates critical risk management functions such as communication, litigation support, self-audit, analysis, and policy development. Numerous oversight entities, including the Bureau of State Audits, the Office of the Inspector General, the Senate Advisory Commission, the National Institute of Corrections, the Little Hoover Commission, the Board of Corrections, medical experts, consultants and the California Legislative Analyst Office have identified deficiencies in both of these departments that can be attributed either directly or indirectly to ineffective risk management and poor account-ability for managing risk.

To remedy the problem, the Corrections Independent Review Panel recommends that the new Department of Correctional Services create an Office of Risk Management to coordi-nate and implement a department-wide risk management strategy. Critical to this strategy will be improved communication between levels of the organization, an effective "early warning" system to identify and mitigate risks, and coordination of litigation activities both internally and with the Office of the Attorney General. The Office of Risk Management should also assume responsibility for and streamline the process used to create and revise department regulations.

## Fiscal Impact

In fiscal year 2002-03, costs incurred by the Department of Corrections for plaintiffs' attor-ney fees and federal court monitors in five major class action lawsuits totaled $5.9 million.[1] Implementing the risk management system recommended here could reduce future litiga-tion and settlement costs and lower expenditures for employee resources now spent to carry out court-imposed sanctions.[2] In addition to reducing the number of lawsuits and adverse court rulings, implementing the recommendations would improve operations and thereby reduce the number of inmate appeals. It is not anticipated that staff resources would be eliminated as a result of the panel's recommendations.

## Background

The lack of a monitoring, correcting, and accountability process that feeds into a review and revision of regulations, procedures, and training, has resulted in numerous class action lawsuits against the Department of Corrections and millions of dollars in costs for settle-ment expenses, court monitoring, and plaintiff's attorney fees. The same problems with self-auditing, correcting, and staff accountability exist at the California Youth Authority.

---

[1]  The five major class action lawsuits are: *Coleman v. Wilson; Plata v. Davis; Madrid v. Wilson; Armstrong v. Wilson; and Clark v. Davis.*

[2]  The Department of Corrections Legal Affairs Division estimates total payments of approximately $5,952,000 in fiscal year 2002-03 for plaintiffs' attorney's fees and special master fees alone in the *Armstrong, Clark, Coleman, Madrid, and Plata* cases. That amount does not include the millions of dollars that must be set aside to implement court mandates resulting from the class action lawsuits.

The California Youth Authority has been the subject of numerous reviews by outside experts that found significant systemic problems.[3] The Board of Corrections spearheaded an effort in 2000 to improve the institutional operations of the California Youth Authority. After a thorough review, the board's recommendations included improving communication among superintendents, strengthening media activities, improving health care services, implementing a computerized maintenance tracking system, restructuring the ward discipline policy, assessing Americans with Disabilities Act compliance, implementing efforts to support and further the department's rehabilitative mission, and strengthening the department's present and future leadership.[4]

The California Youth Authority is now under federal court scrutiny as a result of the class action lawsuit *Farrell v. Harper,* filed by the Prison Law Office.[5] A settlement agreement has been written and is currently being reviewed for approval by the California Youth Authority administration. Implementing an effective risk management system is critical to enabling the new Department of Correctional Services to resolve present litigation, reduce future litigation costs, and help ensure effective use of state dollars.

***Risk management must be coordinated from the highest levels of the organization.*** To establish an effective risk management program, the new Department of Correctional Services should establish an Office of Risk Management headed by a Deputy Secretary of Risk Management who will report directly to the Secretary of Correctional Services. The office will consolidate divisions, units, and existing staff from the current Department of Corrections and California Youth Authority.

The new Office of Risk Management will add a necessary function to the new department by identifying practices, policies, and conditions that represent potential legal or fiscal risks. Centralizing this function allows formerly piece-meal efforts to identify risks—which have often been treated as low priority—to be scrutinized and systematically tracked and to lead to the development and implementation of statewide risk management plans.

After evaluating the department's current practices and speaking with experts from across the country, the panel identified five critical areas on which the new Office of Risk Management should focus:

- Organization structure and communication
- Litigation support and coordination
- Development of an "early warning" system
- Assuming control over and streamline the regulation process
- Increasing accountability throughout the department

---

[3] Jerry Thomas Consulting, "Evaluation of sex offender programs," September 2003, p. 2;
Michael Puisis and M. LaMarre, "Review of Health Care Services in the CYA," August 2003, p. 6.
[4] Board of Corrections, "Institutions Operations Quality Assurance Project", California Youth Authority, October 2000.
[5] *Farrell v. Harper,* Superior Court for the State of California, County of Alameda.

## Organization Structure and Communication

The new Office of Risk Management will take responsibility for a department-wide risk management strategy. To effectively integrate the current structure of individual groups focused on discrete risks and processes, the Office of Risk Management will create a new organizational structure and ensure clear communication across the department's operating units.

***Executive risk management committee.*** The new Office of Risk Management will use a committee approach to manage risk. At the first level will be the executive risk management committee, chaired by the Deputy Secretary of Risk Management, and comprised of other deputy secretaries within the new department. The executive risk management committee will report directly to the Secretary of Correctional Services. By virtue of its placement, this headquarters executive-level committee will have a "birds-eye" view of the department's risks and can map strategies and policy to mitigate the risks. The primary function of the executive risk management committee will be to advise the Secretary on risk management issues and to develop an overall risk management strategy. This committee must also establish the risk management methodologies and reporting standards used throughout the organization, and empower the regional risk management committees to monitor risk in their regions and report their results to the executive committee. The committee will also oversee the internal audit function that ensures compliance with the risk management strategies. Special areas of focus could include training, personnel assignment changes or counseling, and developing and recommending regulation and procedure changes to the Secretary.

***Regional risk management committees.*** The second-level risk management committee will be a sub-committee to the executive level and will operate in each of the department's eight regions – six adult regions and two youth regions. The eight regional risk management committees will be chaired by their respective regional directors and will include wardens, superintendents, regional parole managers, and the risk management coordinators from that region. This committee will make reports to the executive-level risk management committee and will develop implementation and training plans for recommendations made by the executive-level committee.

Each institution should have an assigned risk management coordinator, who will report to the warden or superintendent and serve as a coordinator for risk management implementation and training at the institutional level. This coordinator will also be a permanent member of the local institution's existing quality management committee and will identify risk management issues and facilitate communication between the institution and the regional risk management committee.

***Communication is key.*** The Secretary of Correctional Services will conduct regular meetings and receive risk assessment reports from the Directors of Youth and Adult Operations—whose participation on the executive risk management committee will keep them apprised of risk management matters. Similarly, the regional risk management committees

must meet regularly to assess risk management issues within their respective regions and to communicate information from the executive risk management committee to the local institutions.

The importance of communication was expressed by a risk management expert from the California Highway Patrol, who told the Corrections Independent Review Panel that the strategic function of executive management is to review field and staff operations and provide counseling, assistance, and guidance. Effective risk management techniques and procedures should be recognized by executive management in its meetings, and input should be provided to the Secretary of Correctional Services for consideration of new regulations and procedures, and statewide application.[6]

Similar comments were made during a correctional forum organized by the panel in April 2004 that assembled correctional experts from across the country. During the forum discussions, Secretary Joseph Lehman, Secretary of the Washington State Department of Corrections, commented on the importance of presenting evidence-based policies and procedures to positively maintain working relationships with the legislature:

> *What changed our dialogue with the Washington State Legislature is that we approached our requests based on applied risk management principles and evidence-based practices (a direct result of applying audit recommendations and industry standards in risk management). What we can argue effectively is evidence-based practices.*[7]

Successful management planning requires the participation of each employee. Administrators should ensure that members of their divisions have an opportunity to contribute to the process of proposing strategies and goals and to the development of associated action plans. Encouraging participation from employees at all levels acknowledges that every member has an important part in the development and implementation of an effective management plan.[8] It also imparts the message that risk management is the responsibility of all employees in the department.

The new organizational structure for the Office of Risk Management should facilitate good communication and more effective assessment and mitigation of risk. But beyond the new structure, the department must develop a strong sense of accountability through all levels of the organization.

---

[6] Interview with Assistant Chief Ed Fincel, California Highway Patrol, Risk Management Expert, May 5, 2004.
[7] Remarks by Joseph Lehman, Secretary of the Washington State Department of Corrections, Correctional Forum panel discussion, April 27, 2004.
[8] California Highway Patrol "Command Management Planning Manual," page 1-2.

# Accountability

***The Inspector General has found that the department lacks accountability.***  The Office of the Inspector General has conducted approximately 45 separate audits of Department of Corrections procedures, systems, and management practices.  In each instance, the Office of the Inspector General identified systemic problems of ineffective operational procedures, lack of accountability, and the absence of an effective process for correcting known problems. One significant example is an October 2002 report of the Office of the Inspector General, titled, "Management Review of the Audit Functions of the California Department of Corrections Office of Compliance."[9]  The report states:

> *…that the Office of Compliance does not follow appropriate professional standards in performing its audit functions and that audit activity is inadequately coordinated with the needs of executive management and is not targeted towards issues posing the highest risk to the department.  The review also revealed a fragmented internal audit organization in which ineffective planning and monitoring of audit assignments has led to a significant backlog of reports.*

***Accountability begins with an annual risk management plan.***  Guided by the recommendations from the executive risk management committee, the Secretary of the new Department of Correctional Services should develop an annual risk management plan.  The function of risk management planning, leading to accountability, is one of selecting organizational objectives and the policies, programs and procedures for achieving those objectives. An effective risk management program requires (1) identification of risks, (2) minimization of risks, (3) monitoring risk management program results, and (4) management accountability. Above all, there must be a strong commitment to the program at all levels in the department.[10]

***"If you can predict it, you can prevent it."***  The primary purpose of risk management planning is to design and maintain a system that will eliminate or minimize risks and enhance organizational accountability.[11]  A periodic planning and review process should be conducted in sufficient depth to properly evaluate the effectiveness of the new department's risk management practices.  A sound system of internal auditing, accounting, and administrative control provides the tools for use by management to continuously evaluate and, as necessary, improve operations.[12]

---

[9]  Office of the Inspector General, "Management Review of the Audit Functions of the California Department of Corrections Office of Compliance," October 2002, p. 1.

[10]  "Report of the Rampart Investigation" (a division of the Los Angeles Police Department), Independent Review Panel, Executive Summary, November 16, 2000, p. 136.

[11]  Assistant Chief Ed Fincel, California Highway Patrol, Risk Management Expert, interview, May 5, 2004.

[12]  Commander Stuart Maislin, Los Angeles Police Department, Risk Management Group, interview, May 5, 2004.

***Accountability also requires periodic assessment and measurement of performance.*** The Office of Risk Management must ensure command-level accountability for risk management throughout the new department. According to a former director of California Department of Corrections, staff accountability and responsibility in large and complex agencies require the practice of eight management principles: (1) leadership, (2) setting goals and objectives, (3) clear role definition, (4) administering consequences, (5) standardization, (6) walk-the-talk, (7) systems and data, and (8) provide feedback.[13]

Managers at all department levels must be held accountable for employee performance and excessively risky conduct that occurs within their operations. All levels of management must be committed to controlling risk by implementing appropriate systems for preventing and controlling predictable trends that have an adverse impact to the organization.[14] Regular reviews should be conducted by the Directors of Youth and Adult Operations to ensure that risk management plans are effectively implemented. In turn, performance evaluations for these administrators should depend on how well they successfully, or unsuccessfully, implemented their plans and fulfilled the department's risk management expectations. When exceptions are found during these evaluations – whether positive or negative – the deviation from the established norm should be evaluated and shared with the department's Risk Management Committee.

As shown in Table 1, many law enforcement agencies use a results-based performance measurement system. One popular management accountability model was implemented by the New York City Correction Department in 1994, and was later used by the Los Angeles Police Department in the late 1990s. The accountability model used by New York City Correction Department asserts that every unit within the department affects how the agency performs its mission as a whole. Managers must be agency-focused, not narrowly unit-oriented, and they must be aware of and participate together in realizing the agency's goals and objectives. Monthly accountability meetings, involving all managers are held to discuss facility conditions, identify problem areas, and develop strategies for achieving objectives. The staff reporting during these meetings is judged solely on their knowledge of their commands and their skills at problem solving, not on their public speaking abilities or how well they recite numbers. Those unable to grasp the program are replaced. Conversely, those who embrace the concept of accountability and its results are promoted through the ranks.[15] [16] Similarly, the Operations Chief of the Los Angeles Police Depart-

---

[13] James H. Gomez, President and Chief Executive Officer of the California Association of Health Facilities and former Director of the California Department of Corrections from April 1991 through January 1997, speaking at a Correctional Forum panel discussion on April 27, 2004.

[14] Gary L. Johnson, Executive Director of the Texas Department of Criminal Justice, remarks during a Correctional Forum panel discussion on April 27, 2004.

[15] Thomas McCarthy, "TEAMS Turns Around the New York City Correction Department," *Large Jail Network Bulletin* (1999)

[16] Deputy Commissioner Thomas Antenen, Office of Public Information, New York City Department of Corrections, interview, April 30, 2004.

ment conducts a formal monthly performance evaluation of commanders from various department commands. Commanders are not admonished for having problems in their commands, but for not having action plans to resolve the problems experienced by their commands.[17]

To provide a model for exceptional performance by wardens Secretary Lehman of the Washington State Department of Corrections noted:

> There are five questions to ask top performing wardens to find out how effectively they deal with an issue: (1) What alternatives or options were considered? (2) What were the expected results? (3) What data was tracked? (4) What barriers were encountered? (5) What actions were taken to improve the problem?[18]

**There must be consequences for poor performance.** Monthly meetings are not only a good means of evaluating staff performance, but also an opportunity to help staff understand expectations and consequences. During a meeting with several correctional experts, in Sacramento on April 27, 2004, former Director of Corrections, James H. Gomez and Secretary of Washington State Department of Corrections, Joseph Lehman, shared a perspective on the topic of accountability,

> If you want people to be accountable and responsible, there must be clear consequences and that means firing them when they are no longer productive to the organization. It is also important to help them understand the 'why' when issuing policy. You need to make sure your people understand policy so they can be more accountable.[19]

Secretary Lehman added, *"When they do not understand the 'why' of a policy, you will only get compliance and not commitment."*[20]

## Litigation Support and Coordination

The Office of Risk Management must support and coordinate all litigation within the new department, including class action, individual inmate lawsuits, and contract-related litigation, and must also supervise compliance with court orders. To accomplish this function, the Office of Risk Management must develop a strong relationship with the Office of the Attorney General, effectively use the department's own attorneys, and use a team strategy when monitoring compliance or defending the department.

---

[17] Detective Jeff Godown, Office of Operations, Los Angeles Police Department Detective, interview, May 3, 2004.

[18] Joseph Lehman, Secretary of the Washington State Department of Corrections, remarks during a Correctional Forum panel discussion on April 27, 2004.

[19] James H. Gomez, President and Chief Executive Officer of the California Association of Health Facilities, and former Director of the California Department of Corrections from April 1991 through January 1997, remarks during a Correctional Forum panel discussion, April 27, 2004.

[20] Joseph Lehman, Secretary of the Washington State Department of Corrections, during a Correctional Forum panel discussion, April 27, 2004.

*A strong and clear relationship with the Office of the Attorney General is critical.*  An important component of any risk management program is a strong litigation function that works effectively with all stakeholders to meet litigation challenges.  Lawsuits expose the departments to millions of dollars of risk.  Whether or not cases are high profile, all litigation requires effective representation by litigators and their support staff.  At present the departments use the legal services of the Office of the Attorney General pursuant to Government Code Section 12511, for the defense of civil litigation brought against them.  Litigation services cannot be provided in-house unless there is a conflict of interest declared by the Office of the Attorney General and approved by the Department of Finance.[21]  A team approach between the new department and the Office of the Attorney General will advance the efforts to reduce the number and fiscal impact of civil cases.[22]

To ensure that the Office of Risk Management obtains satisfactory legal services from the Office of the Attorney General, it must identify reasonable performance measures to ensure that the legal services are being adequately provided.  This is especially important if the department is to be held accountable for losses that occur in litigation arising from employee performance.  An equitable way to create those performance measures is to require the Office of the Attorney General and the new Department of Correctional Services to enter into a memorandum of understanding regarding the scope and terms of the representation.[23]  A memorandum of understanding would allow all parties to articulate their concerns at the outset, negotiate mutually acceptable terms and limitations, set measurable standards for service and, most importantly, provide recourse to the parties for breach of the memorandum of understanding.

In addition to developing clear performance measures, the Office of Risk Management should hold regular meetings with the Office of the Attorney General to discuss case strategy and resolution, including which cases to settle.  Further, at the end of each case, the Office of Risk Management should conduct a case assessment to improve its risk management policies, employee training programs, internal procedures, and litigation protocols with the staff members of the Office of the Attorney General.

*Litigation response will also include teams of in-house attorneys.*  These attorneys will work with the Office of the Attorney General staff to provide departmental supervision, participate in case defense and strategy, monitor conflicting counsel contracts, and develop and report on the fiscal impact of proposed and actual settlements and judgments.  A team of legal processing staff will also provide assistance with discovery, processing of subpoenas, and training on litigation-related matters.  By working together, these litigation re-

---

[21] Government Code Section 12511 provides that the **Attorney General** has charge, as **attorney**, of all legal matters in which the State is interested, except the business of The Regents of the University of California and of such other boards or officers as are by law authorized to employ attorneys.
[22] Interview with Chief Counsels of the Youth Authority, Debra Ashbrook, the Department of Corrections, Kathleen Keeshen, the Bureau of Prison Terms, Terry Farmer, and the Prison Industry Authority, David Beales, April 20, 2004.
[23] See proposed legislation in the appendices to this report.

sponse components would perform litigation trend analysis, and identify areas of risk requiring department-wide change.

***Cross-functional teams are especially effective for litigation compliance.***  The use of inter-disciplinary—or cross-functional teams—enables the Office of Risk Management to efficiently solve department-wide problems.  Headed by a risk management project manager, a cross-functional compliance management team will be responsible for initial planning and continued compliance with major litigation or other risk management issues. These compliance teams will be comprised of staff from key organizational units throughout the department. The staff on these teams report directly to risk management project managers from the Office of Risk Management for the duration of the project despite being officially assigned to other organizational units of the new department.

## Developing an "Early Warning" System

A key component of an effective risk management strategy is developing a method to pinpoint risks that exceed acceptable levels.  Part of this strategy is accomplished by creating a sound organizational and communication structure, but this new structure must also identify useful data and measure and monitor the data for "early warning" signals of risk. One of the first challenges for the executive and regional risk management committees will be to identify the top 10 or 20 potential risks within the department and recommend a strategic plan.

***Inmate appeals should be used as an early warning indicator.***  The Department of Corrections has an established inmate/parolee appeal system that is designed to ensure that every inmate/parolee has an avenue to file a complaint regarding "*any departmental decision, action, condition, or policy which they can demonstrate as having an adverse effect upon their welfare*". The ability of inmates to address real concerns and issues in a timely manner is an important management tool for administrators. [24, 25]  The new department must review these appeals to see if there are any trends, similarities, common errors by staff, or lack of clarity in a regulation or procedure. This analysis will determine whether there is a problem and what needs to be addressed to prevent the problem in the future.  This type of analysis and corrective action is the cornerstone of an effective risk management function in the new department. Before any effective analysis of the inmate/parolee appeals can occur, however, serious deficiencies within the existing process must be remedied.

***First, the inmate appeal process must be fixed.***  The Office of the Inspector General conducted a formal review of the Inmate Appeals Branch, as well as reviews of specific institutions, and found that the inmate appeals system is seriously flawed.[26] In a February 2001

---

[24] California Code of Regulations, Title 15, Division, Article 8 Section 3084 Inmate Appeals
[25] Department of Corrections Operations Manual, Section 54100.1, Inmate/Parolee Appeals
[26] Office of the Inspector General, "Review of  Inmate Appeals Branch," February 2001; Office of the Inspector General audits at Salinas Valley State Prison, March 2000; California Rehabilitation Center, August 2000 California Substance Abuse Treatment Facility at Corcoran, February 2001; Salinas Valley State Prison,  September 2003

report, the Inspector General noted that the appeals process was deficient in quality, untimely, and inadequate in substance and accuracy. Further, in its review of the Inmate Appeals Branch and four institutions, the Office of the Inspector General identified lack of training and standardization as significant impediments to an effective appeals system.[27]

Based on the known deficiencies in the department's inmate/parolee appeal process, as articulated in various Inspector General reports, the Corrections Independent Review Panel concluded that the appeal process should be streamlined. Currently, there are too many steps in the appeal process, there is no statewide analysis of appeal statistics, and there is lack of detail in the appeals data. As an example, at the first level of review, inmate discipline is the most appealed issue within the department. However, the department does not know what specific issues or concerns are being raised by inmates and parolees about the inmate disciplinary process because the department statistics do not adequately reflect the details of the complaints. The complaints are simply categorized as "discipline." Further study should be conducted to determine whether the problem is a training issue or a poorly written regulation. At the California Youth Authority, ward grievances are tracked in a similar manner.[28, 29]

Similarly, inmates frequently appeal medical issues, yet the highest level of review does not involve a medical staff person. This lack of medical staff at the highest appeal level is a potential liability for the department.

The current appeal process for the Department of Corrections consists of one informal level of review and three formal levels. The current system requires the informal, first, and second level of appeal review be conducted at the local level. Each appeal must be reviewed by the appeals office, given a category, logged into the stand-alone database, and forwarded to the appropriate supervisor or manager. The inmate is interviewed at either the first or second level of appeal review in order to ensure that the issue is thoroughly understood. The third level of review is conducted at the Director of Corrections level by the Inmate Appeals Branch.

***Some appeals should be stopped after the first denial.*** Some appeal issues do not warrant being carried through all levels of review. For example, if an inmate appeals not receiving half-time credit reduction while on a work assignment waiting list, the appeal response (answer) would deny the inmate's request because under California law, half-time credit is not allowed unless the inmate actually has a work assignment. In this situation, the initial answer should end the process because the appeal response will not change at a higher level. Yet, under the current system the inmate is allowed to continue to appeal the decision all the way to the department director level. This is a waste of staff time and resources. The

---

[27] *Ibid.*
[28] California Code of Regulations, Title 15, Division, Article 5, Ward Grievance Procedures
[29] Department of Youth Authority, "Institutions & Camps Operations Procedures," Section 7000-7140

Office of Risk Management should consider revising the regulations to streamline the appeals process. This should include limiting the type of appeals that can be appealed to the highest levels of the department.

***Better analysis of appeal statistics is needed.*** Each institution and regional parole office maintains an inmate appeal tracking system, but these stand-alone databases are not linked to the current Inmate Appeals Branch appeal tracking database, which is responsible for the third level of appeal review.  Moreover, the lack of a centralized, system-wide database makes it impossible to complete any thoughtful analysis of appeals to identify any potential risk management issues or trends. Instead, only basic raw data is compiled.  As shown in Tables 2 and 3, the Department of Corrections tracks the number of appeals completed and granted at the first, second, and third levels of appeal. [30]  Also, it categorizes appeals into 18 broad categories, which is useful for identifying the prevalence of appeals by category, such as property, medical, or discipline.  Yet, because it only has raw data, the department can not "drill down" into the data and understand the possible causes of appeals and, in turn, determine where improvements in regulations, procedures, or training could be addressed as a risk management function.  The current appeal data system must be enhanced into a state-wide database that serves the risk management needs both at an institutional and statewide level.

***Best practices and "lessons learned" can be found in many places.*** As noted above, the appeals process has no system in place to capture lessons learned from completed and granted appeals at the three levels of appeal review.  The Office of Risk Management must develop systems and processes that will identify problems and best practices throughout the Department of Correctional Services.

Litigation and court filings are another area where careful analysis might reveal lessons learned. However, currently the Department of Corrections and the California Youth Authority both lack a coordinated system that would make it possible to review court filings in order to resolve litigation early on and to revise regulations, procedures, or training to eliminate or reduce the potential for another case on the same issue.  Also, because there is no system to pass lessons learned from litigation to the field, there is no proactive action or motivation to take steps to reduce future loss.[31]  To solve this gap in communication, the executive risk management committee should recommend to the Secretary a system for disseminating the information of lessons learned from litigation and critical incidents at the institutions and facilities.

---

[30]  The Inmate Appeals Branch does not capture the total number of appeals filed, only the number of appeals that have been completed, *(i.e.,* responded to).

[31]  Interview with Chief Counsels of the Youth Authority, Debra Ashbrook, the Department of Corrections, Kathleen Keeshen, the Bureau of Prison Terms, Terry Farmer, and the Prison Industry Authority, David Beales, April 20, 2004..

A similar point was made during two separate interviews conducted by the panel with Donald Specter, Director of the Prison Law Office,[32] and the Chief Counsels of the California Youth Authority, the Department of Corrections, the Board of Prison Terms, and the Prison Industry Authority,[33] who expressed a need for the department to document and communicate the lessons learned from civil cases against the departments resolved via trial, judgment, or settlement. The preparation of assessment reports on civil cases that have been resolved should include detailed procedures for reducing the reoccurrence and costs of similar lawsuits. Information from resolved cases should be incorporated into employee training programs and used to improve department policies and procedures on an ongoing basis.

Lastly, a comprehensive risk management system includes the ability to identify patterns of at-risk performance by individual employees and groups of employees that, when analyzed, would be an early warning for management. Managers can make informed decisions about employees or monitor at-risk employees with an automated computer system that systematically identifies critical risk factors such as patterns of use of force, critical incidents, overtime, sick leave, employee injuries, total personnel strength, appeals, grievances, active/new court filings, and other factors relevant to risk management as determined appropriate by the Secretary. [34]

## Streamlining Policy Practices

At present, the Department of Corrections and the California Youth Authority use an unnecessarily cumbersome and time-consuming internal process to create and revise regulations and procedures that govern their respective operations. The process is made even more complex by a requirement that once regulations and procedures are approved internally they must be further approved by another government agency, the Office of Administrative Law. The panel recommends that this slow and archaic process be streamlined by having the Civilian Corrections Commission approve department regulations and procedures.

*The current process of changing internal regulations and procedures is too cumbersome.*
The current Department of Corrections internal process requires that any policy or regulation change be first described in a policy concept statement, which is then routed through the chain of command for review and approval by each one of the department's deputy directors and the department director. If the policy concept is approved, the next step requires that draft language be developed with input from both internal and external stakeholders. The draft language is then circulated to all deputy directors for review and

---

[32]  Donald Specter, Prison Law Office, interview, April 15, 2004.
[33] I interview with Chief Counsels of California Youth Authority, Debra Ashbrook, California Department of Corrections, Kathleen Keeshen, Bureau of Prison Terms, Terry Farmer, and Prison Industry Authority, David Beales, April 20, 2004.
[34]  Commander Stuart Maislin, Los Angeles Police Department, interview, May 5, 2004.

approval. If the various deputy directors have suggested changes, the new language must once again be routed to all other deputy directors for review and approval. Once all deputy directors have approved the draft language, it is presented to the director of the Department of Corrections for final approval.

The California Youth Authority has a similar process, but after internal review of existing regulations and policies, it "works around" the formal process by publishing new or revised policies in the form of manuals so as to implement operational changes before revising the affected regulation.

A Department of Corrections project to revise inmate property regulations and procedures clearly illustrates the cumbersome and time-consuming nature of the existing policy revision process. This project has been "in process" for more than fifteen years. To further illustrate the impact of this convoluted policy approval process, in fiscal year 2000-01, 10,291 appeals were filed regarding inmate property. The staff time required in each case to interview the inmate, investigate the allegation, and respond to the appeal would have been reduced if the department had implemented a new inmate property regulation and procedure years ago, instead of being restricted by the current practices and regulations.

***Regulations must also be approved by the Office of Administrative Law.*** Under the Administrative Procedures Act (Government Code, Sections 11340 through 11359) the Office of Administrative Law must approve the department's regulations. This requirement adds further delay and complexity when policies or regulations need changing. The Office of Administrative Law has summarized its requirements in a 25-page document titled "How to Participate in the Rulemaking Process." First, an initial statement of reasons for the proposed change must be prepared along with the data relied upon to support the proposed change, alternatives considered, and impact on jobs within the state.[35] The department must then publish the proposed changes, send a copy to any person who has requested one, hold public hearings on the proposed changes, and post the proposed changes on its website.[36] The department must then *"consider all relevant matter presented to it before adopting, amending, or repealing any regulation"* and the department must respond to any written comment received in the final statement of reasons.[37]

Not all agencies, however, are required to follow the Administrative Procedures Act. According to the Government Code, Section 11340.9, certain functions of the Franchise Tax Board and the State Board of Equalization are exempt from the Act.

***The new Civilian Corrections Commission could approve new or revised regulations.***
Effective management of the new Department of Correctional Services will require new

---

[35]  California Government Code, Sections 11346.2 and 11346.3
[36]  California Government Code, Section 11346.4
[37]  California Government Code, Sections 11346.8 and 11346.9

regulations and revisions to old regulations. The new department can accomplish this more quickly and still provide public input by using the Civilian Corrections Commission to approve regulations. As discussed in more detail in Chapter 1 of this report, *A Reorganization Plan for Corrections,* the Commission will hold periodic public meetings at which appropriate consideration and public comments will be accepted regarding any proposed changes to the internal management of the Department of Correctional Services. This new process will allow the department to revise regulations in a timely manner in adherence to the evolving standards of conditions of confinement and relevant court orders. (See the appendix to this report for proposed statutory changes in this regard.)

## Recommendations

The Corrections Independent Review Panel recommends the following actions be taken:

- Establish an Office of Risk Management in the new Department of Correctional Services

- Establish a position for the Deputy Secretary of this office.

- Establish an executive-level Risk Management Committee.

- Establish a Risk Management sub-committee in each region.

- Establish a Risk Management Coordinator position at each institution.

- The Secretary of the Department of Correctional Services should develop an annual risk management plan that will provide specific risk management objectives for the department during the next year.

- The Office of Risk Management should approve the type of standardized risk management statistical data collection that is compiled and evaluated monthly by the Regional Directors.

- The executive level Risk Management Committee should meet regularly to evaluate risk factors of employee performance and institutional operations.

- The executive level Risk Management Committee should recommend to the Secretary a system for disseminating "lessons learned" that could play a significant role in the department's risk management efforts.

- The Secretary of Correctional Services should receive quarterly risk assessment reports from the Directors of Youth and Adult Operations to assist with planning and strategy development to prevent adverse fiscal impact to the department.

- The Directors of Youth and Adult Operations should convene monthly meetings

with their respective Regional Directors to discuss performance issues and risk prevention measures.

- The Regional Directors should review the monthly operational performance of their respective subordinate administrators based on department risk management statistical data and provide direction and guidance to subordinate managers.

- Youth superintendents, regional parole managers, and prison wardens should conduct monthly meetings with their respective staffs to discuss performance issues and risk prevention strategies.

- The new department should establish an operational memorandum of understanding with the Office of the Attorney General.

- The Deputy Secretary of Risk Management and the Chief Assistant of the Attorney General's Office should meet monthly to discuss the status of litigation cases.

- The new department should revise the California Code of Regulations to identify specific types or issues of appeals that can and cannot be filed at the next level after an appeal is denied.

The Office of Risk Management should do the following:

- Develop clear and concise regulations that require wardens, parole administrators and executive staff to be interactive in the appeals/grievance process as a risk management function.

- Develop a training program that provides guidance to Inmate Appeals Branch examiners and Institution/Regional Parole Appeals Coordinator in how to appropriately and accurately respond to inmate and ward appeals.

- Revise regulations and policy to mandate that inmate/parole appeals related to medical/dental/mental health care and treatment be responded to by licensed medical staff at each level of appeal review.

- Develop a networked system-wide appeals database via improved information technology.

- Propose legislative changes to the California Government Code to eliminate the applicability of the Administrative Procedures Act to the new Department of Correctional Services.

- Revise the California Department of Corrections Operations Manual, Section 12010 to streamline the internal regulation and procedure revision process.

# Improving Health Care Services

The administration of health care for state prison inmates has been criticized in recent years for providing inadequate health care, not complying with and resolving ongoing federal litigation, and not managing its budget.  As a result, instead of improving and optimizing its health care system on its own, the Department of Corrections has been forced to act via multiple federal court orders.[38]  Meanwhile, the department's annual health care budget has rapidly escalated to $1 billion in the past five years.  Effective plans to address or control the federal court's concerns about quality and accessible care and the rising costs remain elusive.  In the words of one critic, *"there is no evidence that a health care system exists."*[39] Similar concerns have been expressed about the health care services provided to wards at the California Youth Authority.[40][41]  Litigation against the California Youth Authority, *Farrell v. Harper,* also concerns health care services. A settlement in that case is pending and is expected to include extensive requirements for the reform of health care and other services in California Youth Authority institutions.

The Corrections Independent Review Panel recommends that the new Department of Correctional Services create an Office of Health Care Administration that will oversee an orderly transition from the current health care system to one that is largely operated by contracted health care providers. Because this transition would take place in phases over several years, the panel recommends that the new Department of Correctional Services initiate discussions with the University of California for the development of a pilot project to improve correctional health care delivery and determine the potential for a single source health care provider. In addition, the new Office of Health Care Administration should initiate interim contracts with other private health care providers. Lastly, the panel recommends that the new department obtain accreditation for its health care programs, take steps to resolve a chronic nursing shortage, improve pharmacy services, and delegate responsibility for seriously mentally ill inmates and wards to the Department of Mental Health.

## Fiscal Impact

Following implementation of the panel's recommendations, the budget from the Health Care Services Division would be combined with the Youth Authority's health care budget to form the total health care budget for the new Department of Correctional Services. This combined budget must remain in place to support the panel's transitional and long-term recommendations and allow the recommendations to be fully implemented.  As efficiencies generate cost savings, the savings should be invested in information technology infrastructure, electronic medical records, telemedicine capabilities, contracts with community providers and personnel training and education.

---

[38] *Armstrong, Coleman, Clark, Madrid, and Plata*

[39] Dr. Louis Vismara, Consultant to the Senate Rules Committee, interview May 4, 2004.

[40] Patterson and Trupin, "Report of Findings of Mental Health and Substance Abuse Treatment Services to Youth in CYA," December 2003, pgs. 10, 13-16,

[41] Puisis & LaMarre, "Review of Health Care Services in the California Youth Authority (CYA)," August 22, 2003. Pgs 42-58.

## Background

The provision of health care in the Department of Corrections by its current method has resulted in cost increases from $566 million in fiscal year 1999-00 to $879 million in fiscal year 2002-03.[42]  The per inmate per year cost for health care provision has escalated from $3,521[43][44] in fiscal year 1999-00 to $5,461 per year or $14.96 per day in fiscal year 2002-03.[45]

*Health care services are provided to inmates and wards by a variety of staff.*  Doctors, nurses, psychiatric technicians, psychiatrists, social workers, psychologists, dentists, dental assistants, laboratory technicians, radiological technicians, and medical technical assistants are the primary providers of health care. Inmate medical care that cannot be provided in one of the four prison hospitals or sixteen correctional treatment centers (step-down facilities) is provided by local community hospitals, usually under a negotiated contract rate. Specialty medical services such as dermatology and orthopedics, when not available within the department are also contracted with local providers. As oversight to this, the current Department of Corrections Health Care Services Division provides direction on policy and clinical operations to each prison. The Health Care Services Division is also responsible for contract management, utilization of services, and all clinical aspects of litigation compliance.

A similar system exists in the California Youth Authority.  The Youth Authority is gradually evolving towards a health care service delivery system comprised of correctional treatment centers, intermediate care facilities, intensive treatment programs, specialized behavior treatment programs, specialized counseling programs, sex offender programs and outpatient housing units.

*Class action lawsuits.* The Department of Corrections is currently involved in multiple class-action lawsuits, the two most prominent of which are *Coleman v. Wilson* and *Plata v. Davis.*  The *Coleman* case went to trial and the federal court ruled that the department was "deliberately indifferent" to the mental health needs of seriously mentally ill inmates.  The department in this case has been under federal court monitoring by a special master since 1995.  The *Plata* class action case alleged constitutional violations in the provision of medical care to all inmates.  This case was resolved with a settlement agreement that requires the department to establish and implement system-wide standards of medical care on an eight-year implementation schedule that began in 2003. Reaching compliance with the results of these primary cases promises to be a long and costly effort.

*Costs for contracted health care and pharmacy services are out of control.* The Health Care Services Division is responsible for medical contracts with community hospitals and pro-

---

[42] Department of Corrections, Health Care Services Division report provided by Lindsay Grater, April 26, 2004.
[43] *Ibid.*
[44] Population data from http://www.corr.ca.gov/OffenderInfoServices/Reports/Projections/S00Pub.pdf
[45] Population data from http://www.corr.ca.gov/OffenderInfoServices/Reports/Projections/F03pub.pdf

viders for health care that is not provided by the department.  An April 2004 Bureau of State Audits report stated that the department does not negotiate for the best rates, that staff is untrained in contract negotiation, and that medical contract costs are rising.[46]

Similarly, pharmacy costs have been rising.  In July 2003, the Office of Inspector General conducted a survey of the pharmaceutical expenditures of the department. The survey revealed that despite a two percent decrease in the inmate population between fiscal years 1999-00 and 2002-03, the department's pharmaceutical expenditures increased 111 percent, from $63 million in 1999-00 to $133 million in 2002-03. During the same period, the national consumer price index for pharmaceutical drugs increased only 22 percent.  California's prison population is comparable in size to those of the Federal Bureau of Prisons and the Texas state prison system, yet costs have increased at a much faster rate.[47] In Texas, pharmacy costs were approximately $39.9 million in 2001 and decreased in 2002 to approximately $36.2 million.[48]

## The Office of Health Care Administration

The Corrections Independent Review Panel recommends that the new Department of Correctional Services create an Office of Health Care Administration to replace the extensive organization currently in place in the Department of Corrections. This new office will include a headquarters office, comprised of several senior project or program managers experienced in health care, to manage a series of individual provider contracts.  The panel recommends a similar management structure in each of the eight regions (six adult and two youth) to provide local health care contract management.  These regional managers would participate in the development of a statewide contract management plan with the headquarters staff and would receive contract management training prior to assuming duties in their assigned regions. The Office of Health Care Administration would become primarily a policy and management oversight organization under the direction of an experienced health care administrator and would rely on other parts of the new department, such as fiscal and risk management, for support.

In addition to administering and managing the individual provider contracts, the Office of Health Care Administration will develop major policies concerning the primary programs of medical, mental health, public health, dental, and quality management.  Also, it will oversee the implementation of these policies by the specific program and contract managers in each of the eight regional offices of the new department.  Each local manager would be assigned responsibility for one of these primary programs in their region.  The administration of policy in the primary programs may be carried out through a committee structure in the central office and in the regional offices.

---

[46] California Bureau of State Audits, "CDC: Needs to Better Ensure that it Obtains Medical Services Contracts that are in the State's Best Interest and its Payments are only for Valid Medical Claims," April 6, 2004.

[47] Office of the Inspector General, "Survey of Pharmaceutical Expenditures," p. 3, July 2003.

[48] PowerPoint presentation provided by E.J. Pedersen, President, University of Texas Medical Branch ,Texas Department of Criminal Justice, "*What is Correctional Managed Care?,*" May 26, 2004.

The new Office of Health Care Administration will eventually replace the existing Health Care Services Division.  Many of the Health Care Services Division's current functions will be shifted to other units of the new department and to the various contracted service providers.  (See Table 4)

***Experienced, qualified managers will likely require higher salaries.*** One problem the new office will face is obtaining managers with the necessary skills and experience to effectively administer service provider contracts. A survey of salaries will be necessary to determine the level of pay necessary to acquire the managers needed to operate the new system of health care.  These managers will work at all levels: central office, regional offices, and local institutions.  If the recommendations made by the panel are to be successful, the new department must attract project managers who are well-versed in health care issues, contract negotiation, and managing contractors across a state as large as California.

In addition to being challenged to obtain experienced and qualified managers, the new Department of Correctional Services must also address employee recruitment and retention problems within its existing health care system.  Even though the panel's recommendations may eventually lead to private or university-managed health care services, it may be several years before the recommendations are fully implemented.  Meanwhile, there are many types of health care practitioners that the department has difficulty retaining.  These include nurses, physicians, psychiatrists, psychologists, and pharmacists.

It is currently so difficult for the department to recruit and retain individuals from many of these professions that it frequently uses registries – a form of "temporary" employment agency for health professionals – to fill vacant positions.  This is a costly solution for two reasons.  First, because the registries charge "market" rates plus an overhead fee for these practitioners, the hourly rate is much higher than what the department currently pays its employees.  Second, registry staff is unfamiliar with the department's practices and procedures, may prescribe more costly treatment and therefore require greater supervision.  To remedy this problem, the new department should also conduct a survey of salaries for these professions and seek appropriate salary adjustments where justified.

***Establish a correctional health care advisory group.***  This group will provide consultation on policy and direction to the Office of Health Care Administration for the development of an integrated system of health care.  The state of Florida has instituted a group of advisors that provide independent oversight and review of all health care operations.[49]  The new department should endeavor to establish a similar advisory group. This group will provide objective data and opinion on correctional health care, educating both internal and external staff regarding the trends in the correctional health care specialty.  This group will make recommendations to the Secretary of Correctional Services for all aspects of health care in

---

[49] Florida Corrections Commission, 1995 Final Report retrieved online from http://www.fcc.state.fl.us/fcc/reports/final95/health.html

the new department.  In addition, the inclusion within this advisory group of the primary clinical directors of the health services and mental health departments can serve to assist in addressing public health needs and mental health treatment.

To fully implement the panel's recommendations, the Office of Health Care Administration will need to use a phased approach – a series of simultaneous activities designed to complete the overall management structure for the new system of health care. These tasks together form a three-phase plan where each phase is in transition until all health care is provided by a single-source contractor.  The first phase involves creating the new organizational structure for the Office of Health Care Administration.  The second phase transitions the current health care provision by state employees into one in which certain health care services are contracted with several different providers.  During this transitional period, certain improvements will be necessary because they cannot wait until the final phase is fully implemented.  This includes obtaining accreditation for the medical facilities, reducing pharmacy costs, improving mental health services, and recruiting more nurses.  In the third phase, the panel recommends that the new Department of Correctional Services develop a relationship with the University of California to address various options, including management or provision of health services within current department institutions.

This entire three-phase implementation will be overseen by the central office staff and the local program managers within the Office of Health Care Administration and will be managed simultaneously.  (Note: program managers must be experienced managers who may be but are not expected to be clinicians.)

## An Interagency Agreement with the University of California

The panel looked at the best practices from other state correctional departments as possible solutions. A few states have contracted with their state universities to provide all health care for their correctional departments. Other states have contracts with private companies to provide management only or management and staffing for inmate health care.  Still others have a combination of both contracts with private companies and a contract with state universities. As recommended earlier, the Department of Correctional Services must develop both an immediate plan and a long-term plan to streamline and improve the delivery of health care.  The panel recommends developing an interagency agreement with the University of California that would include addressing the goal of producing the long-term solution.

*Explore an interagency agreement with the University of California.*  The panel discussed with University of California officials the concept of developing an interagency agreement for certain aspects of health care services throughout the prisons and youth institutions.[50] The initial task for the new Department of Correctional Services is to enter into discussions

---

[50] Meeting with Dr. Michael Drake, Vice President of Health Affairs, University of California, Oakland, California, May 3, 2004,

with the university about the university's ability to provide advice and consultation on approaches to improve the efficiency and efficacy of health care. University officials expressed willingness to meet with the new department to discuss potential levels of university participation.

These levels of participation may include one or more of the following:
- On-going advice and consultation by university faculty experts.
- Membership of university officials on committees or panels pertaining to correctional health care services and policies.
- Contracting with university campuses to provide specialty services (such as telemedicine).
- University faculty or staff providing a range of health care services at the institutions of the new Department of Correctional Services.
- Establishment of a pilot project to provide health services involving one or more institutions with potential expansion of the pilot project in future years.

***Other states are using contracts with universities and private providers.*** For example, the Texas Department of Criminal Justice improved access to care, improved chronic care compliance, and saved dollars by contracting with the University of Texas Medical Branch.[51] In 1993, the 73rd Texas Legislature established a committee called the Correctional Managed Health Care Committee to develop a managed health care plan for the entire Texas Department of Criminal Justice system. The committee developed and implemented plans leading to the university system assuming responsibility for all health care for inmates. The Texas State Comptroller has estimated that this program has produced an overall cost savings of $125 million in the first five years despite the fact that the prison population has doubled during that same period.[52]

In addition to Texas, the Ohio Department of Corrections reports decreased costs and increased quality through its contractual agreement with Ohio State University. Before contracting with the university, corrections contracted with local hospitals and had little success negotiating best rates. Now Ohio gets Medicaid rates for inpatient hospitalizations and Medicare rates for specialty services from the university.[53] This has led to major cost savings for the department.

In total, thirty-eight state corrections departments have employed some form of privatization of healthcare.[54] In addition to Texas and Ohio, Arizona, Iowa, Massachusetts,

---

[51] University of Texas Medical Branch, Ben Raimer, MD, "Correctional Health Care in the Texas Department of Criminal Justice", 2002, p. 1
[52] Government West, "Correctional Health Care In the Texas Department Of Criminal Justice", online http://www.govwest.com/correctional_hea.asp
[53] Telephone interview with Kay Northrup, Deputy Director of Health Care, Ohio Department of Corrections, Columbus, Ohio, April 16th, 2004.
[54] National Institute of Corrections, "Corrections Agency Collaborations with Public Health", p.2-3. September 2003.

and Connecticut have formed contracts with university providers to provide much or all of the inmate health care services. Other states may have a partial contract with a university hospital or a private vendor. A contract with university systems and/or private contractors allows the correctional staff to focus on what they know best, custody operations, and allows health care experts to provide health care.

***Support for university-provided health care to inmates and wards.*** There is support in the community and the literature for university-provided health care to inmates and wards. In 2001 the California Policy Research Center sponsored a research by University of California, Santa Cruz, Professor Nancy Stoller, to look at access to care issues for women prisoners in California. Dr. Stoller found that the primary problems in the four women's prisons centered on access to care, inadequate management, dependence on medical technical assistants who have a dual and sometimes conflicting role of custody and medical care, and lack of accreditation for the health care programs.[55] The report of that research recommends that clinical services be provided by an independent, non-profit agency, such as the Department of Health Services or the University of California. Dr. Stoller concluded that the advantages of using a university are improved access to care, prestige for the services provided, increased inmate confidence in health care providers, in-depth experience, opportunities to teach interns and residents from the medical school about inmate care, medical ethics and increased opportunity for current on-going education for staff,[56][57] but notes there are some potential problems that statewide provision of services would present for the University of California.[58]

Donald Specter, Director of the Prison Law Office in San Francisco, who has brought several health care-related cases against the department, also suggests the idea of contracting health care services from the University of California.[59]

***Key logistical issues require further study.*** An accurate assessment of the costs of operation for the institutions in a potential University of California "pilot region" is essential in order to establish a cost base for the agreement, along with a clear delineation of the scope of services to be provided. In order to facilitate an interagency agreement, a specific description of needed expertise, consultation, or any other potential assistance should be established by a special task force of health care, custody, financial and other managers (potentially including university managers). This would serve as a basis to discuss a pilot project that would be of benefit to both parties.

---

[55] Stoller, Nancy, "Improving Access to Health Care for California's Women Prisoners" California Program on Access to Care, (Santa Cruz, 2001) The views and recommendations in this report are those of the author and do not necessarily represent those of the California Policy Research Center or the Regents of UC.
[56] *Ibid.*
[57] Telephone interview with Nancy Stoller, Professor of Community Studies, UC Santa Cruz, Santa Cruz, California, May 7, 2004.
[58] *Ibid.*
[59] Interview with Donald Specter, Prison Law Office, Sacramento, California, April 16, 2004.

*Upon full implementation, the Office of Health Care Administration's functions change.* The evolving relationship between the department and the contracted health care is expected to require eventually only policy, liaison, and oversight functions to be carried out by the Office of Health Care Administration.  In summary, the restructuring of correctional health care results in a relatively small central office headed by an experienced health care administrator, supported by a group of program managers providing policy, oversight, and contract management of a full range of private provider health care services.  The system of care that is to be developed would be in transition for a period of up to five years, in which time the pilot project of the University of California could expand. Litigation management is retained within the department pending the dismissal of the lawsuits during this period.

During this transition period, there are several improvements – discussed in the next section – to the health care system that the Office of Health Care Administration must address. These cannot wait until the university pilot project is fully implemented.

## Interim Contracts and Other Improvements

While the new Office of Health Care Administration pursues the panel's primary recommendation for a university-managed health care system, it must simultaneously develop contracts for health care services elsewhere in the state. In addition, the department's health care system will continue to need improvements in mental health services, pharmacy services, accreditation of treatment facilities, and nursing recruitment.

*Contracted health care services.* Simultaneous with a pilot project developed in conjunction with the university, the new office of Health Care Administration must also develop contract management and direct provision of health care services for regions of institutions that are not included in the initial pilot project.  The office should develop these contracts with active consultation with university representatives, who could assist in selecting providers and scopes of service as a means of preparing a foundation for expansion of the university pilot program into other regions. Necessary contracts should be developed as independent, related functions and would include: mental health services, medical primary care, medical specialty care, community in-patient care, pharmacy (procurement, inventory management, prescriptions and dispensing management), dental care, utilization management, invoice review and approval, ancillary services, clinical registries and a re-emphasis of the responsibility of the Department of Mental Health for mental health services for adult inmates and wards.

The use of contracted health care providers is intended to address deficiencies in health care services identified by the courts in the *Coleman* and *Plata* cases rather than asserting that specific cost savings may be obtained through this method.  However, it is clear from these two cases that the management of health care and the qualifications of many of the clinicians providing it need improvement.  Experts in both of these cases have expressed major concern and frustration over the inability of the current medical and psychiatric staff

to comply successfully with the established policies and the court's orders.[60]  Under proper, qualified management, use of private providers of discrete sets of services has the potential to improve this situation.  Moreover, the use of contracted providers is recommended as a transitional strategy pending the development and outcomes of the initial pilot project.

***Mental health services.***  In part because of litigation, the need for mental health services has rapidly increased within the Department of Corrections over the past few years. Mental Health Services are provided to approximately 17 percent of the current inmate population. Despite the *Coleman* litigation, which required the department to meet its constitutional obligation and seven years of monitoring by a court-appointed special master, the department has not been able to resolve this case.  As a result of the *Coleman* litigation, the department established a decentralized system of mental health care.

Similar mental health service problems exist within the California Youth Authority, which has been described as having a patchwork of specialized mental health programs unique to their respective institutions with differences in staffing, operating procedures, and physical resources.[61]  A December of 2003 report of findings of mental health treatment services in youth facilities, conducted by two subject matter experts, was highly critical of the department's programs and services. The report found that:

> *Mental health care provided by the CYA is not adequate and does not conform to community standards or to the professional standards identified….and that….the vast majority of youths who have mental health needs are made worse instead of improved by the CYA correctional environment.* [62]

One possible solution to the gap in mental health services is to clarify the role of the Department of Mental Health, which is mandated by law to provide for the needs of the mentally ill population within California.  For the prison population, the Department of Corrections is required to negotiate agreements with the Department of Mental Health to provide mental health services for inmates on a limited and contractual basis.  The Department of Mental Health acts as a "gate keeper" and determines which inmates it accepts into Department of Mental Health facilities based on various inmate characteristics and behaviors.  Additionally, the Department of Mental Health has the authority to return any inmate it believes is a danger to its staff.

Because the Department of Mental Health is the unquestioned state expert in providing care for seriously mentally ill patients, the panel recommends that it not be allowed the

---

[60] *Dr. Jeffrey Metzner, court appointed expert in Coleman; and Dr. Ronald Shansky, medical expert in Plata, April 2004.*
[61] California Youth Authority, Statewide Health Care Program, Kip Lowe, Deputy Director, Health Care Services, April 2004.
[62] Report of Findings of Mental Health and Substance Services to Youth in (CYA) facilities, Eric Trubin, Ph.D and Raymond Patterson, M.D., December 2003.

option of rejecting inmates referred by the new Department of Correctional Services.  Instead, the Department of Mental Health should be designated by statute to provide mental health services for state prison inmates at the "enhanced outpatient" and "inpatient" levels of care. (Enhanced outpatient care refers to inmates who require a structured housing unit and weekly clinical staff contact in order to function within the prison setting. Inpatient care refers to those inmates who are a danger to themselves or others because of a mental illness and need inpatient care with 24-hour nursing support.) The budget of the Department of Correctional Services can be adjusted to delegate funds to the Department of Mental health for this care.

*Pharmacy services.*  Although the panel recommends that the department negotiate an agreement with the University of California under which the university would eventually provide or oversee the provision of pharmacy services, there are several improvements that the new department should initiate immediately. The department should change the pharmacy program structure from a decentralized system with pharmacies in each institution to a system with two or three regional pharmacies or one large central pharmacy, consistent with the model used in other states.[63]  During the period that it takes for the transition plan, the new department will need to contract with a professional pharmacy benefits manager to provide consistent pharmacy management services throughout the state.  According to a report by Fox Systems Inc., a consulting firm retained by the Department of Corrections in 2001, that change would provide the following benefits:

- Allow more efficient operations and possibly the use of automated dispensing machines.
- Increase buying power of pharmaceuticals to negotiate for best price.
- Increase standardization of operations and prescribing practices.
- Reduce the impact of staff turnover and vacancies in rural areas where pharmacist recruitment is difficult.
- Reduce prescription errors. [64]

In addition to a centralized pharmacy, the new department must develop new pharmacy software to streamline the procurement and dispensing process.  Currently, each institution maintains its own independent pharmacy database using the Pharmacy Prescription Tracking System, a badly outdated 20-year old information system that lacks the capability to perform functions needed to control costs, prevent drug waste, fraud and abuse and is not linked with other institution pharmacies.[65]

---

[63] Fox Systems, Inc.  Health Care Services Division Pharmacy Services; Current Pharmacy Services Process. November 6, 2001.

[64] Fox Systems, Inc.  Health Care Services Division Pharmacy Services; Alternatives for Improvement December 20, 2001.

[65] Office of the Inspector General. "Survey of California Department of Corrections Pharmaceutical Expenditures," July 2003.

***Better coordination in transporting inmates who require medical services.*** The department incurs significant overtime costs to transport inmates to medical services. In addition, delays in accessing medical services are attributable to transportation problems. A general inability to make these transfers on a timely basis is one of the major ongoing concerns of the *Coleman* special master. To mitigate these problems, the department should develop a training process for non-clinical institution staff that educates them about the requirements for access to care within the institutions and the custody administration's responsibilities for this function. A "health care transport team" would assure prompt and efficient transportation of inmates and wards to necessary health care appointments or admissions outside of the institutions. This team would be responsible for health care transports only.

***Statutory changes required.*** Changes in state law are needed to support the application of the recommended contracting process. Current California law has specific guidelines for civil service employees and contract employees. In order to provide authority for the contracts that are required in this recommendation, contract language needs to conform with the exceptions to the civil service requirements for use of state employees. One or more of these exceptions can be utilized in the transitional organization, especially the one permitting temporary pilot projects: all private provider contracts need to be so characterized, or the exception for costs savings. Additional authority should not be needed for contracting with the university. (See the appendix to this report for recommended statutory changes.)

***Nursing recruitment and retention.*** Similar to the proposed improvements to the pharmacy services, certain nursing problems need correcting. The nursing shortage in California and the nation are reaching all-time highs.[66] This has severely affected the Department of Corrections. Currently the department has 244 vacant registered nurse positions, which is a 22 percent vacancy rate statewide. Some institutions with a large medical mission have up to a 50 percent vacancy rate.[67] One idea is to link graduating nursing students with a correctional nursing clinical experience. This would move the eligible candidates closer to the actual vacancies and increase the success of filling vacant positions.

Another method the department could use to reduce its nursing shortage would be to develop a nursing student sponsorship "20/20" program, similar to one that has been successfully used in the Department of Mental Health. (In that program, the Napa State Hospital and Napa Community College have a cooperative agreement.) In the 20/20 program, nursing students are hired into a full-time job and would work 20 hours for the new Department of Correctional Services while attending college in an accredited nursing program. The students would be required to sign an agreement to work full-time for the department following completion of the nursing program for the same period of time that

---

[66] Keating, S. & Sechrist, K. "The Nursing Shortage in California: The Public Policy Role Of The California Strategic Planning Committee For Nursing". Online at http://www.nursingworld.org/ojin/topic14/tpc14_2.htm
[67] California Department of Corrections, Director's Monthly Report, April 2004, provided by Richard Curtis, R. N. Recruiter, Selections and Standards Division, Sacramento, California.

they were sponsored.  This becomes a training/internship program for future civil service nurses, creating a nursing "pipeline."

One possible source for the nursing students in a 20/20 program would be medical technical assistants or psychiatric technicians currently working for the Department of Corrections or the California Youth Authority who apply for and are accepted into an accredited registered nursing program. Nursing students who do not currently work for the department could also apply for sponsorship. Positions for these sponsorship nurses could come from existing registered nurse vacancies.

The 20/20 sponsorship program would assist the department in meeting the nursing shortages by providing a means of achieving career goals of qualified employees and supplying a future pool of nurses.

*Registry services.*  The various nursing registries with which the Department of Corrections presently contracts are not meeting all of the department's needs.  In fiscal year 2000-01 the department spent approximately $6.1 million for approximately 48,600 nursing hours needed to fill staff vacancies.  Registry nurses may work one day for the department or several months filling in for staff vacancies, medical leave, and sick days.  The state currently contracts with several different registries.  The registries charge differing rates and may have different levels of expectations for the nurses they hire, resulting in inconsistent services to the department.  To resolve this problem, the Office of Health Care Administration should develop a regionalized approach to registry services. One possibility for help in developing a nursing registry would be to partner with the Foundation for California Community Colleges, a non-profit corporation that is an official auxiliary organization of the Board of Governors of the Community Colleges.  The foundation provides management services that bring together cost-effective solutions for government agencies and ongoing benefit for the community college system.

*Accreditation for health care programs.*  As has been discussed elsewhere in this report, the Department of Corrections is involved in a class action lawsuit, *Coleman v. Wilson*.  In that case, the court concluded that there were system-wide deficiencies that demonstrated the prison's "deliberate indifference" to inmate mental health needs.  The court concluded its findings by ordering the Department of Corrections to implement various forms, policies, standards, consulting experts, procedures and regulations to improve the situation.[68]  In order to prevent the implication of deliberate indifference, a department must know what the problems in the department are and take action to correct them.  To accomplish this, many correctional departments across the United States seek outside recommendations as an additional means of monitoring their health care programs, keeping up to date on best practices, and getting an independent look at their health care operations.  This type of scrutiny is provided by seeking accreditation for each institution.

---

[68] Coleman v. Wilson, U.S. District Court, Eastern District of California.

Accredited institutions have a stronger defense against litigation because seeking accreditation indicates an interest in problem identification and improving the practices of the health care program.  Accreditation also assists an institution in identifying processes that are working well.  It also improves staff morale, as staff feel a sense of professionalism when their institution is given accreditation and deemed "among the best" in the nation.[69]  Accreditation also gives the institution a set of industry standards from which to coordinate internal processes and policies.  Finally, accreditation would link California with many other states to identify and share best practices.

Accreditation also makes good sense from a risk management perspective.  Accreditation standards have helped the nation's correctional facilities improve the health of their inmates, provide efficient, effective care, improve program effectiveness, and reduce the risk of litigation and inmate complaints. There are several options available for seeking accreditation.

The California Medical Association has been providing accreditation to detention facilities since 1979. The program is operated through the association's Institute for Medical Quality branch.[70]

The National Commission on Correctional Health Care and the American Correctional Association has published national standards for accreditation of institutions. Both are respected entities, experienced in corrections. The commission focuses solely on health care in prisons and has developed extensive experience with prison health care programs.[71]

The new Department of Correctional Services should seek accreditation after the implementation of the new contracted medical services.

---

[69] Interview Ronald Shansky, MD., Board Member National Commission on Correctional Healthcare and California Department of Corrections consultant for Plata settlement, March 15, 2004.
[70] California Medical Association, Website, www.cmanet.org accessed May 12, 2004.
[71] Stoller, Nancy  "Improving Access to Health Care for California's Women Prisoners" California Program on Access to Care, Santa Cruz, 2001. p. 12.

## Recommendations

The new Department of Correctional Services should take the following actions:

- Establish an Office of Health Care Administration.

- The objective of the new Office of Health Care Administration should be to establish a new system of health care based on managed care practices.

- Establish a top level health care administrator to manage the Office of Health Care Administration, and support this position with experienced program managers, resulting in a new, streamlined central office function.

- Establish program managers at the regional level to manage local health care service delivery.

- Conduct a salary survey to demonstrate the salary levels required in order to obtain the experienced managers needed to manage this complex process.

- Utilize the Litigation Management section of the Risk Management Unit of the new department to provide monitoring and implementation of court-ordered requirements.

- Establish an agreement with the University of California for the development and operation of a pilot project at a defined group of institutions.  This project needs to be managed strategically with the goal of expanding it to the entire health care system of the new department.

- Provide a transitional organization that will establish contracted health care services at the regional and local level in areas where the university pilot project is not yet operational.

- Establish a management group with members from the new department with university involvement to plan and implement the transition from current operations to the new planned health care provision.

The new Office of Health Care Administration should take the following actions:

- Utilize private health care providers for management and provision of all health care direct services by clinical specialty: one contractor to provide for mental health services, medical primary care, medical specialty care, community hospital in-patient care, pharmacy, dental services, utilization management, invoice control, laboratory and x-ray, and necessary clinical staff registries.

- Purchase and implement a statewide pharmacy database system .

- Transfer responsibility to the Department of Mental Health for mental health care of seriously mentally ill inmates and wards.

- Ensure that the private health care provider contracts are managed specifically by designated, experienced program managers in the regions, overseen by program managers in the new central office.

- Provide specialized training for custody administration on their responsibilities for assuring inmate and ward access to health care within the institutions.  This is an especially critical component when contracted entities will provide direct services.

- Establish dedicated "health care transportation teams" to transport inmates and wards who require higher levels of care provided outside of the institutions.

- Establish a Correctional Health Care Policy Advisory Committee that includes representation from the University of California, the health care community, and state health officials.

- Develop a relationship with the Foundation for California Community Colleges and community college registered nursing programs to facilitate recruitment of nurses into the new Department of Correctional Services.

- Develop an interagency agreement with the Foundation for California Community Colleges to provide services for developing and operating a sponsorship program or "20/20" program at several institutions to sponsor nursing students in these community colleges.

- Utilize the institutions as clinical sites for local community college nursing programs.

- Contract with the Foundation for California Community Colleges to develop a regional registry of nursing services through a Foundation for California Community Colleges "cooperative purchase contract" with a qualified vendor(s).

- Require health care programs at each institution to achieve and maintain accreditation by a nationally recognized correctional entity.

# Appendix

### TABLE 1
### Accountability Models Used by Various Organizations

| Organization | Accountability Model | Total Employees | Inmate Population | Prisons/ Jails |
|---|---|---|---|---|
| Federal Bureau of Prisons | *Results-Based | 33,000 | 130,000 | 100 |
| Texas Department of Criminal Justice | *Results-Based Success Through Active and Responsible Supervision (STARS) | 25,000 | 144,500 | 60 |
| Florida Department of Corrections | Results-Based Environmental Health & Safety Manual | 25,000 | 80,000 | 54 |
| Los Angeles County Sheriff's Department | Results-Based Sheriff's Critical Issues Forum (SCIF) | 12,000 (7,000 sworn) | 19,000 | 8 |
| Washington State Department of Corrections | *Results-Based | 9,100 | 15,000 | 13 |
| New York City Corrections Department | Results-Based **TEAMS | 11,000 | 14,000 | 15 |
| Los Angeles Police Department | Results-Based **COMSTAT (Computer Statistics) | 13,000 (9,100 sworn) | Not applicable | 12 |
| California Highway Patrol | ***Results-Based Command Assessment Program | 10,000 (7,000 sworn) | Not applicable | 0 |

*Source:  Correctional Forum Panelists (John Vanyur, Federal Bureau of Prisons, Gary Johnson, Texas, Joseph Lehman, Washington State), April 27, 2004.

**LAPD's Computer Statistics (COMSTAT) was inspired by New York City Department of Correction's Total Efficiency Accountability Management System (TEAMS).

***Interview with Assistant Chief Ed Fincel, California Highway Patrol, May 5, 2004.

TABLE 2
Summary of appeals completed and granted by fiscal year
for each level of appeal review

| Fiscal year | 1st Level | | | 2nd Level | | | 3rd Level | | |
|---|---|---|---|---|---|---|---|---|---|
| | Completes | Granted | % | Completes | Granted | % | Completes | Granted | % |
| 1998-1999 | 51717 | 21924 | 42.4 | 28346 | 9221 | 32.5 | 9214 | 677 | 7.3 |
| 1999-2000 | 59852 | 26577 | 44.4 | 30012 | 10780 | 35.9 | 7108 | 688 | 9.7 |
| 2000-2001 | 65496 | 29518 | 45.1 | 34951 | 12503 | 35.8 | 10628 | 769 | 7.2 |
| 2001-2002 | 66885 | 30548 | 45.7 | 36054 | 13601 | 37.7 | 19846 | 707 | 3.6 |
| 2002-2003 | 66126 | 30549 | 46.2 | 36643 | 13877 | 37.9 | 14104 | 511 | 3.6 |

TABLE 3
Summary of top three categories of appeals and the percentage
it represents of the total number of appeals completed
at each level of appeal review by fiscal year

| Fiscal year | 1st Level | | | 2nd Level | | | 3rd Level | | |
|---|---|---|---|---|---|---|---|---|---|
| | Category | Number | % of total | Category | Number | % of total | Category | Number | % of total |
| 1998 \| 1999 | Property | 8690 | 16.8 | Discipline | 7800 | 27.5 | Discipline | 2378 | 25.8 |
| | Staff | 7520 | 14.5 | Staff | 3272 | 11.5 | Staff | 1170 | 12.7 |
| | Medical | 7246 | 14.0 | Medical | 3047 | 10.7 | Medical | 962 | 10.4 |
| 1999 \| 2000 | Property | 8990 | 15.0 | Discipline | 7300 | 24.3 | Discipline | 1493 | 21.0 |
| | Medical | 8289 | 13.8 | Medical | 3554 | 11.8 | Staff | 1102 | 15.5 |
| | Staff | 8039 | 13.4 | Staff | 3407 | 11.4 | Medical | 805 | 11.3 |
| 2000 \| 2001 | Property | 10291 | 15.7 | Discipline | 8395 | 24.0 | Discipline | 2108 | 19.8 |
| | Medical | 8952 | 13.7 | Medical | 4361 | 12.5 | Staff | 1219 | 11.5 |
| | Staff | 8709 | 13.3 | Staff | 3902 | 11.2 | Medical | 1139 | 10.7 |
| 2001 \| 2002 | Property | 9632 | 14.4 | Discipline | 8092 | 22.4 | Discipline | 3759 | 18.9 |
| | Medical | 9176 | 13.7 | Medical | 4412 | 12.2 | Staff | 3119 | 15.7 |
| | ADA | 7835 | 11.7 | Staff | 3981 | 11.0 | Medical | 2581 | 13.0 |
| 2002 \| 2003 | Medicine | 10226 | 15.5 | Discipline | 8021 | 21.9 | Discipline | 2300 | 16.3 |
| | Property | 9228 | 14.0 | Medical | 5122 | 14.0 | Staff | 2092 | 14.8 |
| | ADA | 8510 | 12.9 | Staff | 4008 | 10.9 | Medical | 1975 | 14.0 |

TABLE 4
**Current Health Care Services Division functions that will move
to the new Department of Correctional Services**

| Current  functions | Transfers to the New Department of Correctional Services: |
|---|---|
| Information Systems | Office of  Information Technology |
| Policy and Planning Coordination | Policy Unit, Office of Risk Management |
| Training and Education Unit | Office of Personnel and Training |
| Clinical Program Support and Evaluation Unit | Office of Risk Management |
| Medical Appeals Analyst<br>• 32 Analysts one in each prison | Appeals Unit, Office of Risk Management |
| Field Management Section<br>• Regional Administrators (3) | Eliminate |
| Field Management Section<br>• Quality Management Assistance Teams | Compliance Unit, Office of Risk Management |
| Contracts Unit | Eliminate |

# Inmate/Parolee Population Management

California's prison system presently holds more than 162,000 adult inmates, with another 114,000 former inmates under state parole supervision. The cost of that system now approaches $6 billion. The size of the prison population has resulted in part from tough-on-crime sentencing policies of recent decades, but the state has also been widely criticized for fueling the numbers by not doing a better job of preparing inmates to return to society. Approximately 90 percent of state prison inmates are eventually released on parole, and at present, more than half return to prison. A 2003 study by the Little Hoover Commission concluded that inmates are not prepared for their release from prison. Department of Corrections reports show that 43 percent of inmates released from prison in 1999 were sent back to prison within a year and that 56 percent returned within two years. Many of those returned to prison are parolees who are sent back for violating the conditions of parole, rather than for committing new crimes, and many of those go back for relatively short periods of time—an average of 5 ½ months. The vast numbers of parolees returning to prison help drive both the size of the prison population and the cost of the system. In 2001 more than 74,000 (47 percent) of the average daily prison inmate population of 157,000 was made up of parole violators.

To identify solutions to these problems the Corrections Independent Review Panel interviewed dozens of correctional experts, examined published studies, and researched the custody and parole practices of other states. As a result of that analysis, the panel recommends that the new Department of Correctional Services undertake several actions to better manage the inmate and parolee populations. The panel concluded that California can reduce the growing cost of managing its adult prison population by addressing three key factors that influence the size of that population — the length of time inmates serve in prison; the training and treatment they receive during incarceration to decrease the likelihood that they will return; and the services they receive during parole to help them remain crime-free and successfully integrate into society.

Underlying the panel's recommendations is the fundamental principle that the main goal of prison is to protect public safety, but that public safety is best served by a system that not only locks up criminals, but also helps inmates prepare for release and improves opportunities for parolees to stay out of prison. For those efforts to succeed, the custody and parole systems must work in concert, beginning with the first day inmates enter prison and continuing until parolees are released from supervision.

The length of time an inmate serves in prison depends on the sentence imposed by the court and on "time credits" earned by the inmate through in-prison work and program activities. The training and treatment inmates receive in prison includes education and other programs offered in accordance with goals identified for each inmate. And parole services include both surveillance and programs such as job placement and drug abuse treatment.

To address the length of time inmates spend in prison, the panel recommends eliminating the current time-credit system for non life-term offenses and adopting instead a "presumptive" sentencing structure that more effectively encourages inmates to achieve identified goals during incarceration. As an immediate measure to shorten prison terms, the panel recommends enhancing time credits inmates can earn in return for accomplishing specified goals. As a further means of reducing the prison population, the panel recommends identifying older inmates who could safely be released early, consistent with similar programs operating in several other states. To better prepare inmates for release, the panel recommends providing inmates with much greater access to in-prison education, vocational classes, life-skills training, re-entry services, and drug treatment. Those efforts should be guided by a research-based needs and risk assessment of each inmate upon entry into prison and should include a programming plan designed specifically to address the inmate's identified needs.

To reduce the number of parolees who return to prison, the panel recommends changes that will enable parole agents to concentrate the most intensive supervision on parolees who represent the greatest risk to the community and improving services to help parolees reintegrate into society. The changes should include a risk-assessment of each parolee. The risk-assessment tool should be updated regularly to reflect any changes in the demographics of the parole population. Parolees identified through risk assessment as very low risk should be discharged from parole after three months. In addition, the panel recommends increasing the number of substance abuse treatment beds in the community and continuing implementation of the Department of Corrections "new parole model," which includes pre-release planning, electronic monitoring, and residential treatment as an alternative sanction for technical parole violations. The new Department of Correctional Services should also implement effective research and data-collection capabilities to precisely identify the most effective and efficient methods of supervising parolees.

In implementing these reforms, the first order of business should be determining the operable capacity of the state's prisons—the maximum capacity of the prisons to house inmates safely and securely while providing effective education, training, and treatment. The second order of business should be to determine the appropriate staffing needed to operate each prison and to provide inmates with needed programming. To improve strategic planning capabilities, the panel recommends that the new Department of Correctional Services contract with one of the state universities to undertake responsibility for inmate population projections.

## Fiscal Impact

The department saves money with each inmate and parolee it safely removes from the prison and parole population. The present average cost of housing an inmate is $28,439 per year, and the average cost of supervising a parolee is $2,930 per year. Some of the recommendations presented here require an initial investment, but can be expected to save money in the future by improving the chances for inmates and parolees to succeed, thereby reducing the numbers who return to prison and shrinking the overall prison population.

Other recommendations may immediately reduce prison and parole populations and thereby produce savings upon implementation.

## Laying the Groundwork for Reform

Every day, hundreds of thousands of inmates and parolees are housed, supervised, and moved around within the state prison and parole systems. Managing this population is complex and challenging. In today's environment, prison administrators must contend with severe overcrowding, the potential for violence, court mandates to provide constitutionally adequate conditions of confinement, budget cuts that have reduced staffing, and burgeoning inmate population levels, fueled in large part by former inmates cycling back into prison.

The key to reforming the system lies in reducing the numbers. That effort will require attention to sentencing practices, time-credit policies that allow inmates to reduce sentences, early-release for low-risk offenders, and a commitment to programs that help inmates and parolees reintegrate into society. For programming to succeed, in turn, the system must free up programming space and provide adequate staffing to provide program services and run the institutions. Strategic planning for that task will require accurate population projections, knowledge of the system's basic operable capacity, and a determination of necessary staffing levels.

### Background

Operable prison capacity — the maximum capacity of the prisons to securely house inmates and provide effective programming— differs from both design capacity and maximum "safe and reasonable" capacity. "Design capacity" is the term used for the past 50 years to designate the number of inmates a prison is designed to accommodate according to standards developed by the Commission on Accreditation and the American Correctional Association.[1] The number can be based on any combination of single-occupancy cells, double-occupancy cells, single- or double-bunked multiple occupancy rooms, or dormitories. The standards take into account the need for humane conditions, as well as the need to prevent violence and move inmates to and from programs, such as mental health care, education classes, and drug abuse treatment. In California, design capacity is based on one inmate per cell, single bunks in dormitories, and no beds in space not designed for housing. The design capacity of California's male prison system, including the capacity of the state's new prison at Delano, is 76,879 inmates.  (See Table 1).[2]

---

[1] California's actual prison capacity has never been limited to design capacity due to an ever-growing prison population. Actual prison population is represented here as a percentage of design capacity to provide a conceptual framework to convey the volume of prisoners that must be managed within the existing fixed environment.

[2] This report focuses primarily on the male prison population, which comprises 88 percent of the state's total prison population. According to the Department of Corrections "Monthly Report of Population as of April 30, 2004," compiled by the Offender Information Services Branch, the institution population on that date totaled 161,394, with 141,763 male inmates and 9,638 female inmates in the state's prisons and 9,993 male and female inmates in other types of facilities, such as contracted jail beds, public and private community correctional facilities, and other placements.

Maximum "safe and reasonable" capacity, in contrast to design capacity, refers to the maximum number of inmates who can safely and reasonably be housed in the prison system. That number takes into account the "safe and reasonable" capacity of individual housing units according to inmate custody levels, staffing levels, and the physical structure of the units. Level IV facilities, with a greater potential for violence, for instance, have a lower maximum safe and reasonable capacity than Level II and Level III facilities. The safe and reasonable capacity of each prison can be determined by totaling the safe and reasonable capacities of each housing unit in the prison, and the safe and reasonable capacity of the system can be estimated by combining the totals for each prison. The Department of Corrections has determined the maximum safe and reasonable capacity of the general population and reception center housing to be 190 percent of design capacity, while other housing can be filled only to between 100 and 160 percent of design capacity. Overall, the department has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 inmates - 179 percent of design capacity.

*Defining operable capacity.* Operable capacity, which takes into account space needed for effective programming in addition to safety and security, is greater than design capacity, but far less than maximum safe and reasonable capacity. A group of experienced California prison wardens told the panel at a recent forum that the operable capacity of the state's prisons to support full inmate programming in a safe and secure environment is 111,309 inmates, or 145 percent of design capacity.

*The state's prison system presently far exceeds operable capacity.* California prisons are presently filled to the breaking point, with populations exceeding both design capacity and "safe and reasonable capacity," and far exceeding operable capacity. With 141,763 male inmates in a prison system designed to hold 76,879, as of April 30, 2004, the state's prisons were operating at more than 184 percent of design capacity. That number exceeds the prison system's safe and reasonable capacity by 4,000 inmates — and it exceeds operable capacity by 30,000 inmates.

Even those numbers understate some of the overcrowding. Accommodating the present inmate population has been accomplished by confining two inmates in cells designed for one, by double- and triple-bunking inmates in dormitories designed for single bunks, and by converting activity space into inmate housing areas. As Chapter 9 of this report notes, more than 9,500 male inmates are presently housed in activity space that was never designed for housing. Because Level IV inmates are generally more violent and cannot be crowded to the same degree as other inmate levels, Level IV celled housing units have now reached 152 percent of design capacity and may not realistically be filled beyond that point. As a result, greater numbers of inmates are forced into other housing, which has raised Level III housing to 201 percent of design capacity, and Level II housing to 220 percent. Consequently, the overall population of male prisons exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage. Reception centers, for example, which house all inmates entering prison, are housing a population of 20,000 male inmates in space designed for only 8,500 — putting reception centers at 236 percent of design capacity.

*Female prisons are also overcrowded.* Female prisons are nearly as crowded as the male prisons although they do not experience the same levels of violence. The population of female prisons as of April 2004 stood at 9,945 inmates, compared to a design capacity of 5,830.  The most severely crowded female prisons operate from 173 to 184 percent of design capacity.[3]  The effects of crowding in these prisons are as severe as in the male prisons, even with lower levels of violence.  While these prisons do not represent the same challenges for security as their male counterparts, the recommendations in the Report for inmate programming apply equally to both.

*Staffing reductions have accompanied overcrowding.* From fiscal year 1990-91 to 2004-05, more than 5,000 positions were reduced from the state prison workforce through various legislative budget reductions. During the same period, almost 1,200 additional positions were cut from the headquarters and parole staff.[4] The positions cut have extended throughout the system, and have included correctional officer, vocational and classroom teacher and other support staff positions, with a marginal number of correctional officer positions retained to perform essential security functions. Although some positions have been added to accommodate increases in prison population, these have not been sufficient to offset the overall reductions.

*Overcrowding and inadequate staffing impedes programming.* Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security. While the prisons attend to the primary objective of safety and security, they are able to pay little attention to inmate programming.[5] As a consequence, programs have been curtailed, which in turn has increased inmate idleness — ironic, in that effective programming would actually enhance internal security. Instead, combined with the reductions in security and non-security staff, the crowded conditions and lack of programming have elevated security risks and increased the probability of violent confrontations. Meanwhile, inmate programs such as education and substance abuse treatment that might reduce recidivism cannot be delivered because space intended to be used for such programs is instead used to house inmates.

The current situation in California prisons is untenable, and changes are required to bring about necessary controls. Before consideration is given to implementing the recommendations in this report concerning inmate programs, the safety and operability of the prisons must be improved. This report substantiates that education and other programs for inmates contribute to public safety.  The environment that is needed for these programs to work must first be created and that requires:

- Violence control;
- Opening up program space by reducing prison population;

---

[3] <u>Monthly Report of Population as of Midnight April 30, 2004</u>.  Department of Corrections, Offender Information Services Branch
[4] <u>Summary of Reductions</u>, Department of Corrections, Budget Management Branch
[5] Warden's Forum on Prison Capacity, CIRP, May 26, 2004

- Adding staff necessary to implement specific effective programs; and
- Exploring creative measures for the use of existing resources.

The reduction of prison population may be accomplished through the use of the new parole model (which reduces returns to prison), the initiation of a program of increased credits for time served, and adoption of a new sentencing approach for the majority of inmates who otherwise would receive determinate sentences. These options are discussed below.

***Violence must be brought under control to make programming possible.*** The violence potential of Level IV inmates, especially in crowded conditions, severely challenges the development of a program environment in male prisons. To support programming that emphasizes preparing inmates for re-entry into the community, order and control of potentially violent inmates is necessary.[6] Implementing a violence control program has the potential both to provide this needed order and control and to begin the process of improving inmate behavior through programming. Violence control programs use special support staff and a system of rewards to implement programs known to be effective, such as anger management courses designed to control violence and produce the means for violent inmates to improve behavior. The violence control program is endorsed by the National Institute of Corrections and used effectively in 20 other states.[7] This program will permit the new department to begin to take the initial steps necessary to establish an environment in the prisons that can foster a broader application of inmate programming and the "re-entry philosophy."

***Increased staff and program space are needed to support effective programming.*** Increases in both program space and staff are required to make effective inmate programming possible. Once operable capacity is determined and accurate population forecasts are made, the Department of Correctional Services can use a standardized staffing model to identify when staffing levels must increase or decrease. The new Department of Correctional Services should undertake a project to determine the appropriate staffing required for the operation of each type of institution, including management, custody, health care, and all other programs. Mission and capacities of institutions should be carefully designated so as to distinguish them on the basis of their mission, physical plant, specific inmate/ward supervision and programming requirements, and any other special consideration for a particular institution. Prisons can generally be divided into two types: modern prisons constructed after 1984 and older prisons constructed before 1984.

While standard staffing "packages" were approved for activating the prisons built after 1984, these packages should be used only for reference and should be updated to reflect

---

[6] Fifty-eight percent of the current inmate population was sentenced to prison under a determinate sentence and will eventually be released for return to the community, according to *Prison Census Data as of December 31, 2003* provided by the Department of Corrections, Offender Information Services Branch.

[7] Department of Corrections, Violence Control Program Budget Change Proposal for fiscal year 2003-04.

position reductions, redirections, accommodations for "overcrowding," court decisions, and other mandates that have affected staffing allocations. Input from operating wardens should be incorporated in determining the final results of the staffing project to ensure the operability of the institutions. The results should then be reconciled with the current budget for each of the institutions. Other recommendations in this report should be considered with respect to their applicability to the staffing project. The completion of this project can result in a more stable environment for current management and future planning for the continued development of the new department.

*Population projections.* Projecting future institution population is a matter of extreme importance for the department. Providing effective management of inmates and wards is the fundamental mission of the new Department of Correctional Services and can be done only when forecasts of increasing or decreasing population are as accurate as possible, reflect the types of inmates and wards that will require housing, and support effective programs to encourage successful re-entry to parole or aftercare programs. The current method used to forecast institution populations has been shown to be remarkably accurate over a substantial period of years and appears to provide the best basis for planning to accommodate this population, but even this method cannot be 100 percent accurate and "surprises" or emergencies can occur, as when unexpected numbers of inmates arrive at prison reception centers. This kind of emergency prompts criticism of correctional management that at best alleges an inability to plan effectively, and at worst alleges manipulation of the population forecasts.

Notwithstanding the demonstrable accuracy of the current method of projecting population relative to any other forecasting method for this purpose, uncertainty and distrust undermine the credibility of administrators in carrying out their designated responsibilities. A change in methodology appears not to be required. A change in the manner in which the methodology is used is recommended. The new Department of Correctional Services should consider an interagency agreement with one of the state universities that is active both in corrections education and research to undertake the responsibility for population projections. Management of this university relationship should be assigned to the new Office of Research and Planning.  Taking these important steps will move the vital function of population projections to a neutral site that has both experience and interest in the management and research value of this process. This move will provide independent credibility for the results. In addition, cooperative research between the new Department of Correctional Services and the selected university can be used to maintain and improve the current population projection model where warranted, and the information generated through the process can be used for other decision-making purposes. The costs of implementing this change are unknown at this time. The panel expects that the university-based researcher would supplement the current staff of the department.

*Reducing the amount of time served in prison.* At present, most California Department of Corrections prisoners can reduce the length of their prison terms by staying out of trouble and having a "work assignment" inside the prison. Work assignments are broadly defined

to include education and vocational training as well as more traditional work that supports the operation of the prison, such as gardening, maintenance, or food-service. Most prisoners earn "day-for-day" credit, in which they earn one day off their sentence for each day they have a work assignment. Prisoners who are on a waiting list for an assignment earn one day off for every two days they are unassigned. Beginning in January 2003, inmates housed in the department's conservation camps can earn "two-for-one" credit or two days off their sentence for each day they are otherwise eligible to earn sentence credits.[8]

***Methods to reduce sentences.*** Short-range and long-range methods are available to reduce the average time served in prison sentences. The average length of time served in prison, the number of new admissions, and the number of parole violators returning to the prison system are the three major factors that influence the prison population. If the amount of time served drops significantly or the number of felons committed to prison declines, then the prison population will also decline. The Corrections Independent Review Panel proposes two methods that will motivate inmates to improve themselves in prison and will result in less time served in prison. (The panel also discusses changes to the parole system later in this chapter.) Both methods alter or expand the sentence-reduction credit process, but differ in how quickly the methods can generate benefits once implemented. The first method, called presumptive sentencing, will require a long implementation period and will only apply to newly committed inmates. The second method can be implemented immediately after minor statutory change, and will enhance the amount of sentence-reduction credits that inmates can earn—providing that the inmates accomplish certain goals.

***"Presumptive sentencing" focuses prisoners on preparing for release.*** Inmates serving determinate sentences have a prescribed term imposed at the time of commitment to prison, the actual length of which is subject to change based on the application and removal of sentence-reduction credits for work and other activities. The credit system was originally intended to provide incentives for the inmates to improve themselves and thus reduce the actual time they need to serve in prison by taking advantage of opportunities to work or participate in education programs. It was to serve a dual function of making inmates more manageable in prison while improving their chances for a successful return to the community.

Due in part to the sheer size of the system, the administration of many of its provisions has become automatic, and coupled with its complexities it has become a system in which sentence-reduction credits have become a "right" to be protected. The responsibility of prison officials has shifted from making programs available to making sure the inmates are "programming." Likewise, the focus of inmates has shifted from preparing themselves for parole through treatment and education to simply earning sentence-reducing credits by any means. The system is not the incentive system contemplated but has become instead a constant struggle for obtaining sentence-reduction credits increasingly viewed as a right in a prison structure in which funding for programs has diminished.

---

[8] Penal Code, Section 2933.3

Numerous corrections officials expressed to the panel growing frustration in trying to safely manage inmates who have no particular incentive to behave under the current system. An alternative, such as a "presumptive sentence," can return both simplicity and incentives to the administration of prison sentences. Under such a system a presumptive term and a maximum term would be established by a sentencing judge. The maximum term would be the same term as would be assigned under the current sentencing laws. The presumptive term would be a smaller portion of the maximum term (perhaps 50 percent). In selecting the presumptive term, the judge considers that it includes "good behavior" so that the presumptive term becomes the actual time to be served *provided that* good behavior is maintained by the inmate. Good behavior is further defined as completing a "program plan" that is assigned to the inmate upon arrival at prison[9]. (The program plan would need to address specific deficiencies or needs of the inmate and prescribe solutions that are flexible enough to work in the department's varied prison settings.) The inmates would be reviewed periodically by a social worker or counselor to determine their progress with the plan.

Under a presumptive sentencing model, the inmate would be eligible for release after completing the presumptive term. However, actual release would require verification that the inmate actually completed the requirements — the presumptive elements — of the sentence. The details of such an approval process would require more specific development by the new Department of Correctional Services, but one recommended method would be to have the Hearings Administration identified in Chapter 1 of this report conduct a review to verify completion. If, after consideration of the inmate's progress, the Hearings Administration determined that the inmate had completed the prescribed requirement, the inmate would be released. Alternatively, if the Hearings Administration determined that the inmate had not completed the requirements, the inmate would be denied release until he or she had completed the requirements (or until the maximum term elapsed.) Other methods of administering this process should also be considered by the new Department of Correctional Services.

***Presumptive sentencing supports re-entry programming.*** A presumptive sentencing model supports a needed shift in the department's philosophy toward a "re-entry" orientation. The concept of a presumptive sentencing model provides a focus on eventual re-entry into the community as well as providing incentives for inmates to behave. It also requires a shift in the capability of the new Department of Correctional Services toward a "re-entry philosophy" that focuses on the eventual release of the inmate.  Public safety is served not just by incarceration, but by both incarceration and a prison term dedicated to improving the chances for successful re-entry. Presumptive sentencing will provide an incentive to in-

---

[9] An option would be to tie this process back to the community by having the sentencing judge approve or prescribe the content of the plan.  There are a number of obstacles to implementing this option, including ensuring that the plan is prepared in advance of sentencing and making sure that the judge prescribes a plan that is actually available in the prison.

mates to take the responsibility of completing the program plan and to officials who will have the responsibility of developing and administering it.

It is important to note that the recommendation for a presumptive sentencing model is to replace the current structure of determinate sentences only, as a means of including this sentencing method in a comprehensive correctional approach focusing on successful re-entry. It does not include the current structure for life sentences or the "two-strike" and "three-strike" sentences, which are beyond the scope of this recommendation. In December 2003 there were about 90,500 inmates (58 percent) serving determinate sentences. The remaining 42 percent of the inmates were serving life sentences, two-strike, or three-strike sentences.[10] (Programs for these inmates should be developed as a secondary priority and are not considered in this report.)

The Corrections Independent Review Panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. The presumptive sentencing model would require further development by the new department, and the panel recommends that the new department charter a special commission to fully develop this important sentencing reform.

***Goal-oriented sentence reduction credits could be increased quickly.***  Under the current sentence-reduction credit system, most of the department's inmates are limited to day-for-day credits, although some can earn more. (Fewer than 4,000 inmates housed in conservation camps earn two-for-one credits.) Inmates earn their day-for-day credits by participating in work, academic, or vocational activities; however, there is no requirement that the inmate fulfill any specific goals or even complete the training. The panel proposes that the department create a bonus sentence-reduction credit that would supplement existing credits and reward completion of education, vocational, or drug-treatment programs that are proven to reduce inmate recidivism.

This bonus sentence reduction credit would provide incentives for inmates' work activities by rewarding *completion* of academic, vocational, or drug-treatment goals. For example, an inmate could earn a 90-day sentence reduction for completing a literacy program or a college-level class, or a 180-day reduction for completing a drug-treatment course or a vocational certificate. Larger sentence reductions could be awarded to inmates who complete more rigorous programs, such as a two-year college degree. To implement this concept, the department would need to develop specific policies and procedures, and develop legislation to amend the California Penal Code to grant the authority for inmates to earn additional time credits.

***Release of low-risk inmates to community supervision.*** Other states have successfully formed partnerships with law schools to identify and consider for release low-risk older

---

[10] California Department of Corrections, "Characteristics of the Inmate Population," Table 10, February 2004.

and geriatric inmates.  The California Department of Corrections currently houses more than 3,700 inmates who are between 55 and 59 years of age, and nearly 3,100 aged 60 or older[11]. The Legislative Analyst's Office, in its fiscal year 2003-04 Budget Analysis, recommended that California consider early release of elderly inmates.  In its analysis, the Legislative Analyst noted that California does not track the cost of incarcerating elderly inmates, but that several other states do and that these other states have estimated that elderly inmates cost two to three times the amount needed to house younger inmates. The Legislative Analyst further reported that New York, for example, estimated its annual cost of housing elderly inmates to be between $50,000 and $75,000 each.  The National Center of Institutions and Alternatives estimated the annual cost of confining elderly inmates at $69,000 – nearly three times the national average of $22,000 to incarcerate other inmates.[12]

The Legislative Analyst's Office noted that housing nonviolent elderly inmates is not a good use of scarce resources when they represent a low risk to society.[13] While the majority of these offenders should remain in custody because of the serious, violent, or sexual nature of their crimes, a small percentage could be considered for early release. Statistics published by the U.S. Department of Justice indicate that recidivism drops significantly as inmates age—from over 50-percent nationally for inmates between ages18 and 29 to about 2-percent for inmates aged 55 or older.[14]

In a December 2003 analysis for the Legislative Analyst, the Department of Corrections estimated that release of non-serious, non-violent inmates aged 55 or older would reduce the inmate population by 657 and result in savings of $10.5 million in fiscal year 2005-06, if these provisions become effective on January 1, 2005. In the first fiscal year, the institution population would be reduced by about 332 inmates, resulting in savings of $5 million. Full-year savings would occur in fiscal year 2006-2007, when institution population would be reduced by 657 inmates, resulting in savings of $11 million. The institution savings would be offset by the cost of supervising these offenders on parole. Also, these savings are based on the average cost of incarceration for all inmates.[15]

In its calculations, the department assumed certain elderly inmates would be excluded from eligibility. Parole violators-returned to custody, inmates with life terms, second-striker inmates, sex registrants, and persons whose current or prior offenses are serious or violent (as defined in Penal Code, sections 1192.7(c), 1192.8, and 667.5(c)) were considered ineligible for early release.

Several states have released elderly inmates under a program created by George Washington University professor Jonathan Turley. Turley is the founder of the Project for Older Prisoners program, which uses a partnership between law schools and corrections depart-

---

[11] Department of Corrections, "Prison Census Data," December 31, 2003, Table 5.
[12] Legislative Analyst's Office, "Budget Analysis, Fiscal Year 2003-04," p. D-39
[13] *Ibid.*, p. D-40
[14] U.S. Department of Justice, Bureau of Justice Statistics, "Trends in State Parole, 1990-2000."
[15] Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 6," December 16, 2003.

**REFORMING CORRECTIONS**

ments to assess inmates for early release. To date, more than 200 inmates have been released under the program without a single act of recidivism.[16]

The Project for Older Prisoners program is likely to result in fewer early releases than the 657 figure estimated by the department because of its careful risk analysis and assessment of each inmate. This method is recommended, however, because of its conservative approach and excellent track record. Even if only one-quarter of the 657 inmates identified by the department met the more conservative criteria of the Project for Older Prisoners program, savings of $2.75 million could ultimately be realized.

***Contracting with private companies for low-level inmates.*** The Department of Corrections currently contracts with several private corrections companies for about 2,500 beds for lower level inmates. In January 2004 the department discontinued contracts for about 1,000 beds. Privatized beds provide a high degree of flexibility because the department has no long term investment in the infrastructure or the staffing and can renew contracts on an as-needed basis.

Based on the projected Level I male institution population in 2009, the department will need more than 10,000 additional beds in order to house Level I inmates in a safe environment with programming opportunities.[17] Renewing contracts with the existing facilities and reentering into agreements with the previously closed facilities would help to provide the beds needed for this population, with no capital outlay costs to the state.

## Recommendations

The Corrections Independent Review Panel recommends the following actions:

- Begin to create the environment in the prisons that is needed for inmate programs to be effective, which requires the following:

    - Implementation of a Violence Control Program;

    - Opening up program space by reducing prison population through lower returns to custody;

    - Adding staff necessary to implement specific, effective inmate programs;

    - Exploring creative measures for the use of existing resources.

- Develop an interagency agreement with one of the state universities that is active both in corrections education and in research to undertake the responsibility for

---

[16] George Turley, speaking at a sentencing seminar hosted by McGeorge Law School, April 16, 2004; Web-page viewed on March 25, 2004:  www.gwu.edu/~ccommit/law.htm

[17] Table 1: Analysis of Male Institution Bed Capacity, CIRP, June 2004

population projections. Management of this function should be assigned to the new Office of Research and Planning.

- Undertake a project to determine the appropriate standard staffing required for the operation of each type of institution, including management, custody, health care and all other programs.

- Charter a commission with appropriate members from the judicial and corrections fields to develop a presumptive sentencing model. The model would apply only to sentences for offenses that are not subject to "two-strikes," "three-strikes," or other life terms.

- Modify the Penal Code to allow inmates to earn supplemental sentence reduction credits after they complete specified education, vocational, or drug-treatment goals.

- Establish a program to identify older inmates who could be safely released early from prison. The program should be similar to the Project for Older Prisoners program that has successfully released more than 200 inmates in other states without a single instance of recidivism.

- Renew contracts with existing privatized correctional facilities and consider reentering into contract agreements with previously closed facilities to provide the beds needed for the Level I population.

## Fiscal Impact

*For sentencing reform.* The panel expects that once fully implemented, a presumptive sentencing model would generate significant savings as inmates become better prepared for reintegration into society. It is not possible, however, to estimate the fiscal impact at this time. There may be up-front costs to restore vocational and education programs that have been reduced.

*Standardized staffing.* Until a standardized staffing model is developed, it is impossible to predict whether its use would increase or lower current costs. In the long run, however, use of a standardized staffing model will allow greater accountability, which should result in cost savings.

*University-based population projections.* Similar to standardized staffing, better population projections will allow better planning and, in turn, provide greater accountability for the new department's operations.

*For the early release program.* As noted above, estimated savings are $2.75 million. Even greater savings may accrue from savings in health care cost avoidance; however, those savings cannot be estimated.

# Education Reforms

Numerous studies show that prison education programs help inmates reintegrate into society and reduce recidivism rates — the rate at which former inmates return to prison. California's recidivism rate is high compared to those of other states, and many of the state's inmates are ill prepared when they return to their communities.

The Corrections Independent Review Panel identified several areas where the new department can improve its educational system and re-entry programs to improve inmates' chances for success. Specifically, the panel recommends on-going assessment and refinement of the education programs. In addition, recently launched programs such as the bridging program, which provides for education in the reception centers, re-entry services, and other programs aimed at increasing inmate employment opportunities should be expanded. Consideration should also be given to using selected inmates in educational programs for other inmates. Rather than seeking entirely to add staff to effectuate programming goals, the new Department of Correctional Services should explore the expansion of existing projects, such as the health care peer educator, teacher aide, and lead vocational trainer projects that identify and train inmates to be used to teach other inmates in programs. There is evidence in other jurisdictions of success with inmates tutoring other inmates in basic reading.

## Background

Many inmates released from California prisons do not have the skills needed to obtain and maintain employment. More than 65 percent are unable to read, write, communicate in English, and function on a job. Many are unable to find jobs when they return to society— the parolee unemployment rate is 70 to 80 percent.[18] This situation is aggravated by the fact that re-entry programs designed to provide links to employment opportunities for parolees serve only abut 30 percent of all inmates.[19]

*Effective programs reduce recidivism.* There is ample evidence that prison education and substance abuse programs have a positive impact on parolee recidivism, whereas researchers agree that incarceration alone does not have a measurable impact on recidivism. In May 2002, the Urban Institute completed a literature review of the effectiveness of prison-based education and vocational programs and concluded that: "In general, participants in prison-based educational, vocational, and work-related programs are more successful—that is, they commit fewer crimes and are employed more often and for longer periods of time after release—than are non-participants."[20] Similar results have been found in other studies, including a Federal Bureau of Prisons study that showed a 33 percent drop in recidivism among federal inmates who were enrolled in vocational and apprenticeship training." [21]

---

[18] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. vi.
[19] *Ibid.*
[20] The Urban Institute, "The Practice and Promise of Prison Programming Report," May 2002, p 8.
[21] State Correctional Education Programs, State Policy Update by Michelle Tolbert, March 2002, p 1.

General evidence of the benefit of prison education programs is also reflected in specific studies at the state level.  For example, a January 2001 study by the Florida Department of Corrections found that the recidivism rate for inmates who earn a general education degree (GED) was 29.8 percent, whereas the recidivism rate for inmates without a GED was 35.4 percent (a 5.6 percent reduction.)  Even more dramatic reductions in recidivism were observed for inmates who both completed a GED and obtained a vocational certificate.  In that situation, the inmate's recidivism rate was 19.9 percent compared to the 35.4 percent rate for inmates with neither a GED nor a vocational certificate. The recidivism rate in Florida was even smaller for inmates who completed a GED and improved their Test of Adult Basic Education score to a 9th grade level.  The recidivism rate of those inmates was only 12.2 percent.[22]

A three-state study of education programs conducted by the Correctional Education Association and Management & Training Corporation also showed the benefits of education programming in prisons.  Statistics from Maryland, Minnesota, and Ohio showed that their rates of re-incarceration dropped from 31 percent for inmates not participating in education programs to 21 percent when inmates participated in education programs.[23]

The Washington State Institute for Public Policy analyzed numerous evaluations of treatment and education programs in North America conducted over the past 25 years.  Their findings showed that prison programs can reduce crime in a cost-effective manner.  For example, the study showed that prison vocational programs generate savings of up to $12,000 per participant and reduce crime by 13 percent, and that education programs generate savings of up to $9,000 per participant and reduce crime by 11 percent.  The Washington review also found that in-prison therapeutic community substance abuse programs could save $2,365 per participant and reduce crime by 5 percent. (After the cost of the treatment was deducted and including both the direct savings to taxpayers and the benefits to potential crime victims.)  When the type of program was followed through to the community (parole), the savings increased to an estimated $5,230 per participant and the crime reduction increased to 8 percent.  The study showed an even larger savings from cognitive-behavioral programs, which cost about $300 per inmate but generated more than $7,000 in savings per participant and reduced crime by 8 percent.[24]

*Inmates' preparation for release must begin upon entry to the prison.*  Re-entry planning and a risk assessment tool are being developed as part of the new parole model.[25]  However, the current plan is to use these features only during the six- to nine-month period prior to an inmate's release from prison.  The Corrections Independent Review Panel con-

---

[22] Florida Department of Corrections, "Academic, Vocational and Substance Abuse Program Impacts," pp. 3 and 11.
[23] Correction Education Association, Management & Training Corporation, "Education Reduces Crime – Three-State Recidivism Study," February 2003, p.12.
[24] Aos, Steve, *et.al,* Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001, p.8.
[25] Department of Corrections, draft memorandum - New Parole Model, February 2004.

cluded that this is too late.  Instead, risk assessment and re-entry planning should begin when the inmate enters the institution, so that parole and prison staff can plan, along with the inmate, for eventual reentry by offering educational, behavioral, and drug treatment programs from the moment the inmate enters prison.  Using this time constructively will both enhance public safety and save money if it can reduce the offender's future criminal behavior.  It is important to include the parole division in this process because they are familiar with the community resources and what is needed for a successful re-entry.

***The availability of program classes is still limited to a small percentage of inmates.***  At present, only inmates in the general population may participate in academic, vocation, or work programs; participation is not allowed for inmates in administrative segregation, secure housing units, and hospitals.  Inmates in the reception centers participate in the bridging program, but are not considered part of the eligible population for traditional academic programs. The number of inmates participating in academic education programs rose from 7,178 in 1990 to 11,668 in 2004.  During the same time period vocational program participation increased from 7,426 to 15,000.[26]  However, the 2004 enrollment numbers reflect that only 26,668 (23 percent) of the 116,338 eligible inmates are participating.

The number of inmates who can enroll in academic and vocation programs is calculated by a formula used by the department that designates one filled teaching position for every 27 inmates.  The total number of inmates who can receive programming is referred to as the enrollment capacity.  A review of enrollment statistics indicates that the department does not accurately assess a true enrollment capacity number.  As an example, in October 2003 the enrollment capacity was determined to be 33,371, while only 30,288 inmates were actually enrolled.  Factors that affect the enrollment capacity are classroom availability and teacher vacancies for sick leave, vacation, and special assignments. The department should revise the enrollment capacity numbers to project a true number that accounts for site-specific classroom size, availability limits, and projected teacher absences.

***Program participation is voluntary.*** Factors that limit the department from offering programming to a higher number of inmates are further aggravated by the fact that program participation is voluntary. Legislative efforts to mandate programs and incentives that provide day-for-day sentence reduction for class participation have had a limited effect on enrollment numbers.  In 1995, Penal Code Section 2053.1 mandated that literacy classes be offered to 60 percent of the eligible inmate population, yet only 35,136 of the available 80,016 eligible inmates participate.[27]  The presumptive sentence concept described earlier in this chapter could increase enrollment and provide additional incentives for inmates to participate in education programs. If presumptive sentencing is implemented, the department would need to evaluate and adjust the number of education programs, teaching positions, and program hour needs.

---

[26] Vocation enrollment figures obtained verbally from John Jackson, Supervisor of Academic Instruction, Education and Inmate Programs Unit.

[27] Department of Corrections, "Vocational and Academic Program Summary," October 2003.

***Education begins in the reception centers.***  The 2003 Budget Act required the department to implement education programming in reception centers so that inmates could begin earning "day-for-day" sentence-reduction credits pursuant to Penal Code Section 2933.  In January 2004, the department began providing academic programs at the reception centers under its "bridging" program.  The bridging program allows inmates to receive academic education and day-for-day sentence credits during the average three-month reception center period.

To implement these programs, the department uses an assessment through the Test of Adult Basic Education and Comprehensive Adult Student Assessment System, and education programs in anger management, employment options, life skills, and personal life planning.[28]  In April 2004, 215 bridging instructors were in place and another 212 instructor positions were unfilled.[29]  Some of the teaching positions were obtained as a result of shifting instructor positions from eliminated vocational programs. Typical academic programs use classroom settings with 27 students and one instructor. The bridging instructor program is designed to allow inmates to use cell study materials. The elimination of a classroom setting allows an inmate/instructor ratio of 54 to 1. This program is designed to provide academic training, which allows day-for-day credits upon entry into the reception centers. The program is new and not fully implemented. The effectiveness of the program will depend on its ability to be fully implemented and evaluations should be conducted to assess the benefits.

***College education shows a decrease in recidivism.***  A 2003 Little Hoover Commission report on the parole system presented findings that inmates with at least two years of college education have a 10 percent re-arrest rate and a significantly better rate of employment (60 to 75 percent).[30] A 1997 report by Education Works reported findings from the state of Ohio that calculated that the recidivism rate for inmate graduates of college level programs decreased by as much as 72 percent compared to inmates who do not participate in prison education programs.[31]  Correctional studies in Oklahoma found "the rate of recidivism was 8 percent for inmates who participated in college courses in prison and 3 percent for inmates who earned a college degree in prison."[32]

The Ironwood State Prison Community College Program provides an example of the benefits of college courses. The program provides distance learning to approximately 300 inmates.  The estimated cost savings to the institution at $8 million dollars per year, based on lower rates of recidivism and a decrease in disciplinary incidents in the prison.[33]  The

---

[28] California Department of Corrections, Bridging Program Mission Statement.

[29] Department of Corrections, "Instructor Vacancy Report," April 2004.

[30] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p 44.

[31] Mary Ellen Batiuk, "The State of Post-Secondary Education in Ohio," *Journal of Correctional Education,* June 1997, pp.70-72

[32] Davis, Dr. H.C., "Correctional Education: Success and Hope," *Correctional Education Association News and Notes,* October 1999.

[33] Little Hoover Commission, "Back to the Community, Safe & Sound Parole Policies", 2003, p. 45.

program is provided at no cost to the department. The National Institute for Literacy defines distance learning as follows:

> *Distance learning is defined as the delivery of education through electronically mediated instruction such as satellite, video, audio graphic, computer and multimedia technology. Distance education refers to teaching and learning situations in which the instructor and learner or learners are geographically separated and therefore rely on electronic devices and printed materials for instructional delivery.*[34]

Another example of college-level courses available in the prisons is the Incarcerated Youth Offenders Program, which began in 1998. Inmates who are under 26 years of age with five years or less commitment time and who possess a high school diploma are allowed to participate. The program offers three areas of study: continuing coursework, obtainment of postsecondary education degree, and/or vocational certificate. In fiscal year 2002-2003, the program was operating at 12 institutions with 1,040 participants. Approximately 45 percent of the participants complete the program. During the same fiscal year, the 401 Incarcerated Youth Offenders Program participants released from prison showed that 124 (31 percent) were employed and 34 (8 percent) returned to prison within a year.[35] The program is paid for with federal funding through the U.S. Department of Education Office of Vocational and Adult Education.[36] The Incarcerated Youth Offenders Program has had a positive effect on recidivism and employment rates and should be continued and expanded.

In 2004, the possibility of implementing on-line college courses, with the program paid for by grant funding, was presented to the department's Education and Inmate Programs Unit by James Fay of California State University, Hayward. The department concluded that implementation of the program would need approval through the Department of Finance and the department's Information Services Division. Additional barriers include current restrictions that bar inmates from Internet access.[37] Based on its ability to provide postsecondary education using grant funding to reduce cost, this program would be beneficial. The program should be implemented and assessed for its effect on recidivism.

***Department of Corrections technology is inadequate to support education programs.*** The department lacks a computerized system to easily share inmate education program information and promote effectiveness of paper-based programs. Because an inmate's education files are paper-based and are retained at the institution of commitment, it is difficult for the department to share information. For example, it would be helpful for a parole agent to be aware of an inmate's education background, training, and coursework. Even when inmates are transferred between prisons, their education history may not travel with them. This

---

[34] National Institute for Literacy, "State Policy Update," February 2004, p 2.
[35] Gary Green, Ph.D., "Incarcerated Youth Offenders Program, 2002-2003 Annual Report."
[36] Department of Corrections, Education and Inmate Programs, Incarcerated Youth Offenders Program statistics sheet.
[37] Memorandum, Yvette M. Page, Superintendent of Correctional Education, Education and Inmate Programs Unit.

happens so frequently that inmates are simply retested when they are transferred to a new institution. This places both the inmate and those trying to assist the inmate with education programs at a disadvantage.

A larger-scale solution is needed to ensure that education programming information is widely available. This solution should include a computer program at each institution that is linked statewide to other institutions, parole offices, department education program personnel, and others.

***The Department of Corrections lacks statistical data on program effectiveness.*** The department lacks statistical information to show whether its education programs reduce recidivism. The department tracks the number of inmates eligible for vocation and education programs, the number of program participants, inmate levels of achievement, and teaching positions. However, it does not track program statistics to determine whether parolees who recidivate were involved in education programs.

As discussed earlier, various studies have shown that education programs reduce recidivism.  However, it is important that the department collect specific information about how its programs reduce recidivism in California, so that the department can optimize its programs.  One method to accomplish this would be for the department to document education programming for each parolee who recidivates. This information could be used to determine whether education programs or the lack of programs were a factor in the parolee's return to prison.  Similarly, the department should debrief parolees who are about to be discharged from parole so that the department can learn what factors and programs may have contributed to the parolee's success.  This information could then be used to measure the effectiveness of institutions and programs.

***Re-entry programs show success.***  The New Parole Model of the Department of Corrections includes a bridge between prison education programs and parole needs.  The new model has planned for expanded inmate re-entry programs through its Police and Corrections Team program, which establishes a partnership between parole, law enforcement, and service providers in the community. (See Appendix A to this chapter for additional information about the New Parole Model).

During the first two weeks of parole, parolees must attend a mandatory Police and Corrections Team program. The program consist of a 2-1/2 hour orientation meeting where the parolee develops a personal action plan and receives on-site information about housing, food, employment, and substance abuse treatment.  A key component of this program is the link to immediate employment opportunities in the community and on-site job training opportunities.  Important skills, training, and job opportunities could be enhanced for the parolees if these programs were expanded to a full day instead of the current 2-1/2 hours. In a longer format, additional instruction could be offered for social and interpersonal skills, resume writing, job search, financial literacy, and personal management.

***Temporary Assistance for Needy Families.*** Parolees who have been convicted of a drug felony since August 1996 are not eligible for Temporary Assistance for Needy Families or food stamps. Approximately half of the costs of these benefits are paid by the federal government. Although this restriction affects only the adult portion of the grant and not the portion attributable to children, receipt of these benefits may improve the likelihood that parolees will be successful in reintegrating into society. The federal government allows states to pass a waiver to allow drug offenders to receive these benefits, but this has not occurred in California. Full or partial waivers have been passed in 32 other states.[38]

***Police and Corrections Team.*** One example of how employment opportunities are made available to parolees is the Police and Corrections Team program operating in the Sacramento area.  This program provides on-site training through the Skills Center operated by the Sacramento Unified School District. One of the training programs available for parolees is an 18-week, 720-hour training class in truck driving.  Since 1998, the recidivism rate for the 250 parolees who graduated from this training program has been 7 percent.[39]

***Community Re-Entry Bridging Program.*** Another example of a successful re-entry program is the Community Re-Entry Bridging Program in Sacramento. This program supplements the institution re-entry programs by having a teacher assist parolees on an individual basis to identify housing, transportation, health care systems, food, and clothing needs.  Participation in the program is voluntary.  Sixty-one parolees from piloted institutions have participated in the program and all but one (98 percent) have successfully completed training and are now employed.[40]

These programs are examples of the positive impact that re-entry programs can have to reduce recidivism and help parolees integrate back into their communities. Programs such as these, when they produce demonstrable results, should be expanded to other regions of the state.

***The Joint Venture Program shows economic benefit.***  In 1990 a statewide initiative created the Prison Inmate Work Incentive, which mandated the department to recruit private businesses into partnerships using inmate labor. Inmates participating in the joint venture programs are paid a comparable wage with deductions for restitution, room and board, and forced savings.[41]  In return for their participation, the inmates receive day-for-day sentence reduction credits.  According to the department, since its inception 13 years ago, the program has generated the following benefits:

---

[38] National Conference of State Legislatures website:  www.ncsl.org/statefed/welfare/program.htm.

[39] PACT program statistics, e-mail communications with Ward Allen, Program Coordinator, Sacramento City Unified School District.

[40] Education and Inmate Programs Unit, memorandum dated May 7, 2004.

[41] California Department of Corrections Joint Venture Program website: www.cor.ca.gov/institutionsdiv/instdiv/programs/programs-jointventure.asp.

√  $18.7 million wages paid to inmates
√  $3.5 million in restitution for crime victims
√  $2.9 million in taxes paid from inmate wages
√  $2.3 million deducted for support of inmate families
√  $4 million placed in mandatory inmate savings accounts.[42]

In fiscal year 2002-03, the program costs were lowered and revenue of $35,000 was returned to the general fund.  The statistics for 2003 were:

√  $315,066 program budget
√  $350,714 reimbursement to the general fund
√  206 average number of inmates participating
√  10 average number of programs
√  $1,350 administrative cost per inmate
√  $1,700,000 wages paid to inmates
√  $286,944 in restitution for crime victims
√  $235,924 federal taxes paid by inmates
√  $59,000 in inmate earnings withholding orders.
√  $222,855 deducted for support of inmate families
√  $351,034 placed in mandatory inmate savings accounts
√  $383,532 placed in inmate trust accounts

Unfortunately, the joint venture program budget for fiscal year 2003-04 was decreased to $103,709, and the budget does not provide adequate funding for the administrative positions and financial firm contract. According to an analysis by the Joint Venture Program, in fiscal year 2004-05 the budget will have to be increased to $410,542.[43]

Based on the low cost to operate the program and the financial benefits in restitution, tax revenue, inmate wages, and savings the department should provide an adequate budget and consider expanding the program. One possibility would be expanding the program to operate outside of the institutions, such as through joint ventures with community-based businesses that employ parolees.  That arrangement would create a natural employment opportunity as parolees transition into their communities.

***Prison Industry Authority programs increase employment and reduce recidivism.*** Prison Industry Authority programs show success in increasing employment and reducing recidivism. The Prison Industry Authority was established in 1982 to develop and operate manufacturing, agricultural, and service industries within correctional institutions. The Prison Industry Authority operates more than 60 service, manufacturing, and agricultural industries at 22 prisons, employing 5,823 inmates.[44] According to its fiscal year 2002-03 report, the

---

[42] California Department of Corrections, Joint Venture Program document prepared by J. R. Griggs, Program Manager.
[43] Department of Corrections, Joint Venture Program analysis by Susan Jacobson
[44] Prison Industry Authority, fiscal year 2002-03 annual report.

Prison Industry Authority provided an annual net cost avoidance to the department of $14.1 million based on programming costs that the department would otherwise incur."[45]

As part of its Inmate Employability Program, the Prison Industry Authority provides certain inmates with industry-accredited certifications in fields such as welding, optical technician, laundry and linen management, and metalworking. Since 2001, 2,346 inmates have received industry-accredited certifications in 13 different fields. These certifications reduce parolee recidivism — the recidivism rate for parolees who obtained accredited certifications is about 13 percent.[46,47] Similarly, Prison Industry Authority-trained inmates have higher employment rates than inmates not trained in its programs. For example, for former Prison Industry Authority workers on parole who had completed six or more months in the program employment rates were approximately 60 percent compared to typical rates of 20 to 30 percent for other parolees.[48] Because of the success of the accredited certification program, it should be continued and expanded where appropriate.

To further assist inmates in finding employment after parole, the Prison Industry Authority will pilot a new job placement service through the Offender Employment Continuum that will begin in July 2004. The program will operate in five institutions and coordinate employment services between the institution and parole.

## Recommendations

The new Department of Correctional Services should take the following actions to improve results from education, vocational, and re-entry programs:

- Provide inmate planning and re-entry assessment at the time of initial incarceration.

- Revise enrollment capacity numbers to reflect accurate capacity.

- Expand education and vocational programs.

- Promote education program attendance by implementing presumptive sentencing.

- Fully implement the bridging program and evaluate the academic effectiveness and sentence reduction benefits.

---

[45] *Ibid.*

[46] California Department of Corrections, *California Prisoners and Parolees – 2002*, Tables 54 and 54a.

[47] Calculations for recidivism vary depending both on the definition of recidivism and amount of time elapsing between release and the moment recidivism is measured. As a result of these variables, the literature and this report cite various recidivism rates for California depending on the source and the context of the discussion. The panel found universal agreement from those it contacted that California's recidivism rate is high compared to those of other states. [Little Hoover Commission, *Back to the Community, Safe & Sound Parole Policies*, 2003, p. 39].

[48] Prison Industry Authority, Inmate Employability Program report, April 29, 2004.

- Expand college correspondence courses and conduct on going evaluations on their effect on recidivism.

- Continue and expand the Incarcerated Youth Offenders Program.

- Implement on-line college programs.

- Track education program participation against parole success (and recidivism.)

- Debrief successful parolees during their last scheduled parole agent contact to determine whether education programs affected their success.

- Develop a state-wide computer database to track inmate education assessment and classroom achievement.

- Continue mandatory participation in the Police and Corrections Team orientation program and consider expanding it to a full day.

- Provide job training programs at the Police and Corrections Team orientations when possible.

- Expand the Community Re-Entry Bridging Program.

- Expand the in-prison joint venture program and explore creating community-based joint venture programs for parolees.

- Expand the Inmate Employability Program.

### Fiscal Impact

Providing greater access to education and vocational programs for inmates will require an investment in additional teachers and other resources, but this investment will generate cost savings through a lower return to prison rate for parolees. This will occur because inmates will be better prepared for reintegration into society.

# Reforming Parole

It costs almost ten times as much to maintain an offender in prison as it does to supervise a parolee. Therefore, unless the risk to public safety requires returning a parolee to prison, supervising parolees in the community is a wiser use of the state's limited financial resources. To make that possible, California must make the best use of both the prison and parole options. The number of parolees returned to prison can be effectively and efficiently reduced by better preparing inmates for eventual release, beginning from the moment the inmate arrives in prison and continuing through careful re-entry planning before release. Once released into the community, the parolee must receive an appropriate level of supervision that includes a broad spectrum of possible services and sanctions.

The panel reviewed the state's existing parole process and found that the Parole and Community Services Division has partially implemented promising improvements through its "new parole model." The panel recommends that the new parole model be closely monitored and that successful programs be expanded as quickly as possible. In addition, the panel identified other improvement opportunities, including early discharge of low-risk parolees, expansion of eligibility rules for drug-treatment programs, better data collection and analysis of parole programs, and, perhaps a reconsideration of the present policy of placing all offenders released from prison on parole.

## Background

In 2002, the California Department of Corrections released more than 117,000 inmates to parole supervision.[49] These inmates were released with few job skills and with limited treatment for health and drug abuse problems. Ten percent end up homeless and nearly 70 percent return to prison within 18 months.[50] In 2003, 78,056 were returned to prison for either parole violations or new prison terms.[51]

After release from prison, parolees are supervised by parole agents, whose duties include monitoring the parolee's activities, assisting the parolee in obtaining needed services such as drug-treatment or job training, and ensuring that parolees abide by specified conditions of parole. If a parolee threatens public safety by committing a new crime or by violating the parole conditions, the parole agent can arrest the parolee and recommend that the Board of Prison Terms revoke parole and return the parolee to prison. In cases where the parolee is to be returned to prison, the Board of Prison Terms decides the length of time the parolee will serve in prison. In 2001, the Board of Prison Terms revoked the parole of approxi-

---

[49] California Department of Corrections Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1983-2002," Table 8a.

[50] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, pp. i;vi.

[51] California Department of Corrections, Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.

mately 74,400 parolees. Since then, the number of parole revocations has decreased. In 2002 the number dropped to 71,246 and in 2003, it dropped to 62,358.[52]

Not all parolees who violate conditions of parole are returned to prison. In some instances, a parole agent may recommend drug treatment, more intensive supervision, or some other kind of sanction. When appropriate, the use of these types of interventions is preferable to returning a parolee to prison—which is much more costly. However, a large percentage of parolees ultimately return to prison. According to department reports, 41 percent of the 55,321 inmates paroled in 2001 returned to prison within one year of release. After two years, the recidivism rate increased to nearly 55 percent.[53]

In recent years, the Department of Corrections has developed three programs to address these problems. The programs provide opportunities for parolees to make fundamental behavioral changes and also to refocus parole supervision into less punishment-oriented solutions. Specifically, the Preventing Parolee Crime Program offers employment, drug treatment and education; the Office of Substance Abuse Programs provides drug programs both in and out of prison; and the new parole model includes graduated sanctions for minor parole violations and re-entry planning, drug treatment, and program coordination among various community and law enforcement agencies. These programs are described in more detail in Appendix A to this chapter. The new parole model, which the parole division began developing in 2001, consists of the following:

- *Pre-release planning.* Provides for a plan to be developed for the inmate's reintegration into society, based on the inmate's needs and risks. Pre-release planning begins about six months before the end of the prison sentence.
- *Graduated sanctions.* Provides a matrix of sanctions for parole violations, matched to the severity of the violation.
- *Substance abuse treatment control unit*. Provides in-custody drug treatment for low risk parolees who have returned to drug use. Used in lieu of returning the parolee to prison.
- *Halfway back.* Residential treatment facilities that provide life skills, education, and employment assistance for low-risk parolees who have violated the conditions of parole. Used in lieu of returning parolees to custody.
- *Electronic monitoring.*  For low-risk parolees who have committed minor violations of parole. Used in lieu of incarceration.
- *Police and Community Corrections Team.* Establishes partnerships between parole, law enforcement, and community service providers. Requires each newly released parolee to attend an orientation meeting with this team.

---

[52] California Department of Corrections, Data Analysis Unit, Offender Information Services Branch, "Historical Trends 1982-2002" Table 5; California Department of Corrections Population Projection Unit, Offender Information Services Branch, "Actual vs. Spring 2004 Projections," March 17, 2004.

[53] California Department of Corrections, Policy and Evaluation Division "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

*Programs that address parolees' problems help reduce recidivism.* Research indicates that the most effective way to break the costly cycle of parolees returning to prison is to treat the parolees' problems of drug addiction, illiteracy, lack of employability, and criminal thinking. For example, a three-year study of the parole division's Preventing Parolee Crime Program showed that 28,000 parolees who participated in the program were significantly less likely to commit new crimes or abscond from parole supervision. The program has generated $21 million in savings for the department. The study further indicated that participants avoided returning to prison for 54 days longer, on average, than those who did not participate in the program. According to the study, for every dollar invested in the program, the program saved $1.56. [54] In another example, an analysis conducted by the Washington Institute of Public Policy of more than 400 research studies showed that many treatment programs both reduced recidivism and generated savings for every dollar invested.[55] Finally, a study of a 2,000-bed expansion in the department's substance abuse treatment program found that the 12-month return to custody rate was 24 percent for parolees who participated in aftercare and 15 percent for those who received 90 days or more of aftercare services.[56]

*The new organizational structure will support preparing inmates for release*. Chapter 1 of this report describes a new organization structure for the parole division. Under the reorganization, both the parole function and the custody function will operate under the control of the Director of Adult Operations. Regional directors will each manage five or six prisons and related-parole operations. In turn, the wardens of individual prisons and the regional parole managers will report to the regional directors. The Corrections Independent Review Panel believes that placing responsibility for both prison and parole operations under the leadership and management of the regional directors, will properly align the focus of the regional directors onto preparing inmates for release back into society.

*Implementation of the department's new parole model has been slow.* The new parole model of the Department of Corrections will address many past recommendations and represents a good start toward bringing California's parole system in line with current research on how to reduce crime without jeopardizing public safety, but its implementation has been slower than expected. The re-entry portion was scheduled to begin in February 2004, and, according to an official from the parole division in charge of the new model, staff has been hired and was scheduled to begin training in May 2004.  The pre-release program, which was scheduled to begin in the department's 32 institutions on June 1, 2004, has begun.[57]

---

[54] California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program" by Sheldon Zhang, Ph.D., San Marcos, California, 2003, pp. 4,45.

[55] Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," Olympia, Washington, May 2001, p. 8

[56] UCLA Integrated Substance Abuse Programs, "Semi-Annual Report on the UCLA-ISAP Evaluation of the 2,000-Bed Expansion of Therapeutic Community Programs for Prisoners," Michael L. Prendergast, Ph.D. July – December 2003, Appendix C.

[57] Shirley Poe, Parole Administrator, Parole and Community Services Division, interview, May 12, 2004

It is important to visualize the model not simply as an experiment, but as an investment toward making the department a national leader in helping inmates and parolees reintegrate into society. It is too early to judge the new model's impact on recidivism or public safety because most components have yet to be implemented, but there have been some promising signs. For example, the proportion of parolees returned to custody decreased by 7 percent between July-December 2003 compared to the same period one year earlier.[58] The decrease is probably due not to the new parole model, but to a new policy implemented earlier, which requires parole administrators to review each return to custody recommendation and consider alternatives to incarceration. Nonetheless, the new policy will dovetail with the new parole model because both encourage agents and supervisors to consider alternative sanctions instead of returning the parolee to custody.

The cornerstone of the new parole model is a risk assessment instrument, which the department plans to use, but has not yet purchased. The risk assessment instrument uses an actuarial approach to identify the treatment needs of the parolee and the likelihood that the parolee will re-offend. The predictions are made using a computerized system that takes into account specific information about the parolee's background, including criminal and social history, and compares that information to statistical risk scales. A research group assembled by the parole division reviewed several different risk-assessment instruments, recommended one for selection, and has submitted that recommendation to the Youth and Adult Correctional Agency for approval.

The risk assessment tool is critical to formalized, consistent decision-making by parole agents. For the instrument to be accurate, it is imperative that the parole division complete periodic follow-up evaluations of its results and update the instrument to reflect any changing demographics in the population being assessed. It is also important to evaluate the assessment tool to make sure that it has predictive validity and that the classification of parolees is in line with the parolees' actual behavior.

The violation matrix is another important component of the new parole model. Still being developed by the parole division, the violation matrix will guide parole agents in making decisions about what sanctions, including treatment alternatives to re-incarceration, to impose for particular violations. Parole agents will use the violation matrix to match a parolee's violation against a graduated range of increasingly strident sanctions. According to officials, changes to the violation matrix are pending approval by the division's deputy director.[59] It is risky to begin less-restrictive sanctions, such as drug treatment in the place of re-incarceration, without first using risk-assessment to determine who is appropriate for various programs.

---

[58] California Department of Corrections, "Spring Population Projections 2003," p.13; "Spring Population Projections 2004," p.13.
[59] Shirley Poe, Parole Administrator, Parole & Community Services Division, telephone interview, May 13, 2004

Other components of the new model have only recently been implemented or are similarly awaiting purchase, staffing, and approval. The electronic monitoring component has been submitted for bid offerings and should be solidified by June 2004. The halfway back facilities have been open since February 2004, and the Substance Abuse Treatment and Control Unit component became operational in mid-May 2004. The agents for the Police and Community Team had been chosen and were in place by June 2004, as was the staff for the pre-release component.

The new parole model incorporates many of the recommendations made by both the Little Hoover Commission and the 1990 report of the Blue Ribbon Commission on Inmate Population Management. Specifically, the Little Hoover Commission recommended that the department should prepare inmates for parole while they are still in prison, build strong partnerships with community agencies, use structured decision-making to establish clear guidelines for responding to parole violations, and consider less restrictive, treatment-oriented sanctions for parole violations. As described in Appendix A to this chapter, the new model includes a matrix as a guide for graduated dispositions for parole violations; includes a re-entry component; creates a community/law enforcement/parole team to work with parolees; and provides two new treatment programs to be used in lieu of incarceration for parole violations.

The Corrections Independent Review Panel is optimistic that the new parole model will help the parole division improve its operation and will reduce the number of parolees returned to prison each year. The parole division must implement all features of the new model as quickly as possible, however. Also, the new department must view the new model as an investment, rather than an experiment in reforming its much-criticized parole process.

*An inmate's preparation for release must begin upon arrival at prison.* As discussed earlier, re-entry planning and risk assessment are being developed as part of the new parole model, but the current plan is to use these only during the six- to nine-month period before the inmate is released from prison. Instead, risk assessment and re-entry planning should begin when the inmate enters the institution so that parole and prison staff, along with the parolee, can plan for the parolee's reentry with educational, behavioral and drug treatment programs available from the moment the inmate enters the prison. If it can reduce the future criminal behavior of the offender, using incarceration time constructively will both enhance public safety and save money. It is important that the parole division be included in this effort, because the parole staff is familiar with available community resources and what is needed for successful re-entry.

*Substance abuse treatment in prison should be expanded.* Approximately 210,600 prisoners and parolees under custody or supervision by the department need drug treatment. About 132,000 of those needed drug treatment are inmates, yet, according to the Office of Sub-

148

stance Abuse Programs, only 14,800 are being treated.[60] More than 95 percent of all inmates will eventually be released from prison. To reduce recidivism, save money and protect the public, the number of treatment beds should be increased. Participation in and completion of the treatment program could be tied to the offender's release using the presumptive sentencing model discussed earlier.

***Successful parole and re-entry programs should be expanded.*** The Department of Corrections has made efforts to address parolees' needs for drug, vocational, and education intervention with the Preventing Parolee Crime Program, Office of Substance Abuse Programs, and the new parole model. These programs have demonstrated success, but because they have addressed the needs of only a fraction of eligible offenders, the programs should be expanded with more funding. There is a particular need for residential treatment beds for parolees whose problems cannot be resolved in an outpatient setting. One way to accomplish this would be to change the focus of the existing halfway back program to drug treatment. The department could expand the capacity of substance abuse treatment beds by contracting with existing community-based residential treatment programs. These community-based programs also have secure lock-up facilities available for when that type of program is required. In some instances, these community-based facilities may charge a lower fee than the $59 per day rate charged by the local jail-operated programs currently used by the state.

The Office of Substance Abuse Programs estimates that there are 78,000 parolees with drug abuse problems, but fewer than 25,000 of them receive treatment. A study of the Preventing Parolee Crime Program by California State University found that the rate of return to prison of those who completed the drug and education component was 20-percentage points lower than the non-treated population. For the study period, participants' incarceration rate was reduced by an average of 56.6 days per parolee, saving the state over $21 million after the costs of the program were subtracted.[61]

The Legislature has also recognized the value of providing drug treatment. Penal Code Section 3070 directed the Department of Corrections to develop and present a plan by December 31, 2000, that would ensure that all parolees and inmates "receive appropriate treatment, including therapeutic community and academic programs" by January 1, 2005. According to the parole division, this plan was not prepared; instead, a brief letter was sent to the Legislature reporting that it was not feasible to accomplish the plan now because of fiscal problems and changes in sentencing laws. The Legislature indicated that it agreed. Proposition 36, the ballot initiative that provides drug treatment in lieu of incarceration, passed soon after Penal Code Section 3070 went into effect, but the state's subsequent fiscal

---

[60] Merrie Koshell, Correctional Counselor III, Office of Substance Abuse Programs, telephone interview, Sacramento, California, April 15, 2004.
[61]California State University San Marcos Foundation, "An Evaluation of the California Preventing Parolee Crime Program," by Sheldon Zhang, PhD, (San Marcos, CA, 2003), p.5

crisis has resulted in uncertainty about whether any substance abuse treatment programs would continue.[62]

***Global positioning satellite tracking can bolster electronic monitoring.*** Global positioning satellites are an advanced form of electronic monitoring that allows real-time tracking of the location of parolees. The devices can be programmed to alert parole agents and local law enforcement when a parolee enters or leaves a particular area. The technology could be useful for high-risk parolees such as armed robbers or sex offenders. Global positioning satellite systems cost about $10 per day to operate — which is significantly less expensive than placing an offender back in prison.

Florida has used global positioning satellite systems since 1997 to target high-risk sex offenders, and other cases of high public interest. Texas also uses global positioning satellite systems to track the highest risk parolees, primarily sex offenders.

One potential drawback to global positioning satellite technology is that it requires parole agents or local law enforcement to respond quickly if an "alert" is issued by the device when a parolee leaves an authorized area. Failure to respond quickly could be a public safety risk, as well as a political embarrassment, if the parolee committed a crime while in an unauthorized area. Another potential drawback is that the increased surveillance that global positioning satellite systems generate can often lead to increased revocations. This increase may counter the money-saving aspect of global positioning satellite systems, but must be considered a necessary public safety benefit.

***Early discharge of low-risk parolees will reduce costs.*** California's existing parole policy focuses treatment time and money on non-serious, nonviolent parolees, yet it is the high risk, serious offenders who commit the most violent offenses and consequently pose the greatest threat to public safety. In 2001, 21 percent of those paroled had originally been sentenced to prison for possession of a small amount of drugs.[63] These parolees take as much time and effort to supervise as do those convicted of violent offenses. Rather than directing resources toward offenders whose crimes are drug-use related and who have no history of violence, the department's emphasis should be placed on serious, high-risk parolees. Low-risk parolees should be required to participate in self improvement programs throughout their prison stay and should be prepared for parole through a rigorous prison re-entry program. Immediately upon release they should be connected with needed community services. This "hand-off" component is critical because parolees tend to fail during the first few months on parole.

---

[62] Merrie Koshell, Office of Substance Abuse Programs, interview, April 15, 2004
[63] California Department of Corrections, Policy and Evaluation Division, "Recidivism Rates Within One and Two Year Follow-Up Periods – Released From Prison for First Time in 2001," March 2004.

The Corrections Independent Review Panel recommends that parolees who are employed or self supporting, have a stable residence, and have no violations of their parole conditions after three months on parole be discharged from parole supervision. The discharge would require approval from the hearings administration identified in Chapter 1 of this report. In December 2003, the Department of Corrections estimated annual savings of between $150 and $176 million if all non-serious or non-violent parolees were discharged after three months.[64] To enhance public safety, a portion of the savings realized from early discharge should be redirected to more closely supervising high-risk parolees. The panel assumes that about 50 percent of low-risk parolees will qualify for release after three months and that 50 percent of the resulting fiscal savings would be redirected to supervising high-risk parolees. Under these assumptions, according to Department of Corrections calculations, the department would save about $10 million in the first six months of implementation and $39 million and $44 million in the second and third years, respectively.[65]

To accomplish this change, the parolee's risk level should be determined using the evidence-based risk and needs instrument described earlier. Parolees with a history of violent or serious felony conduct (such as those crimes identified in Penal Code Sections 1192.7 and 667.5) and parolees who must register as sex offenders would be excluded.  The goal would be to require that parolees participate in programs in prison, remain crime free and stable upon release, and be rewarded for their participation and success by early discharge from parole supervision. Following these guidelines will improve public safety.

***Should all inmates released from prison be placed on parole?*** In California, 100 percent of those released from prison are placed on parole supervision for three or four years. In contrast, several other states supervise only certain prisoners after release. A few states, including Maine and Virginia, have abolished parole supervision altogether. Michigan supervises parolees for only two years, compared to California's three- or four-year parole supervision period.[66]

Scarce public resources are forcing corrections to make difficult decisions about where to place limited funds. Joe Lehman, Secretary of Washington State Department of Corrections, noted that when both low-risk and high-risk parolees are placed together on a caseload, parole agents don't give enough time to serious offenders. To remedy this, the Washington officials asked the questions: "Why do we (prison/parole) exist? What can the public reasonably expect us to do?" They concluded that the public wants to be protected from dangerous criminals and has tolerance toward treating drug addicts who are not violent.[67] They

---

[64] California Department of Corrections, Legislative Estimates Unit, "Legislative Analyst Request 4&7," December 16, 2003.

[65] Department calculations prepared in December 2003 for the Legislative Analyst.

[66] Petersilia, Joan, Ph.D., *Reforming Probation and Parole,* American Correctional Association, 2002, p.115.

[67] Lehman, Joseph D., "A Forum on Current Issues in the Field of Corrections," presented by the Department of Corrections for the California Performance Review, April 27,2004.

further concluded that focusing on more dangerous offenders and not supervising those on parole for less serious offenses would lower recidivism.[68] That sentiment is echoed by nationally recognized corrections expert Joan Petersilia. Petersilia notes that research indicates that the public is becoming more willing to tolerate treatment for nonviolent offenders, particularly substance abusers, and to focus punishment on those convicted of violent crimes. This is especially so when the public is aware of the high costs of incarceration.[69]

***Participation in drug-treatment programs is presently too restricted.*** Studies show that parolees who complete drug treatment programs are less likely to re-offend.[70] Yet many parolees in California are excluded from participation in drug treatment programs because of their past criminal history. For example, parolees whose crimes are defined under Penal Code Sections 667.5 and 1192.7 as "serious" or "violent," or who are required to register as sex offenders are barred from participating in the Substance Abuse Treatment Control Unit program, which has 30-day inpatient and 90-day outpatient components. This restriction is illogical from a public-safety standpoint because the Substance Abuse Treatment Control Unit program is a "lock-up" program typically located in city or county jails. So long as the normal criteria are met for this jail-based drug program and the violation is for drug use only, these currently excluded parolees would benefit from drug treatment as much as a lower risk offender. If these offenders were allowed to participate in the Substance Abuse Treatment Control Unit program, the department would save money because the cost of that program is cheaper than the cost of returning the offender to prison. Moreover, numerous studies have demonstrated that those who complete substance abuse programs are less likely to be sent back to prison, particularly when they complete both in and out patient components.

***Private contractors can be used to provide specific treatment.*** Exploring the use of private contracted facilities to provide treatment can expand the availability of efficient resources to support the new parole model. Private contractors could be used to provide secure facilities for specific kinds of treatment designed to maintain the parolee in the community. These programs have the promise of success at a cost substantially lower than state prisons, and sometimes lower than county facilities. Programs provided include 90-day treatment for drug and alcohol addiction, which has been shown to have a positive effect on preventing new offenses. These facilities and programs can be found especially in large urban areas.

***Data collection is critical to measuring program effectiveness.*** Collecting data and measuring the results of both new and existing programs is critical to on-going improvement. At

---

[68] Washington State Institute for Public Policy, "Washington's Offender Accountability Act: An Evaluation of the Department of Corrections' Risk Management Identification System," January 2003.

[69] Petersilia, Joan, Ph.D., *Reforming Probation and Parole,* American Correctional Association, 2002, p.180.

[70] Aos, Steve *et al,* Washington State Institute for Public Policy, "The Comparative Costs and Benefits of Programs to Reduce Crime," May 2001.

present, there is no comprehensive, integrated data system in the department to even provide information about trends or the success or failure of policies. This lack of data collection and analysis prevents the department from showing lawmakers and the public the effectiveness of its programs. The lack of data mirrors a similar lack of research to evaluate parole programs nationwide. Petersilia notes,

> It is safe to say that parole programs have received less research attention than any other correctional component in recent years. A congressionally mandated evaluation of state and local crime prevention programs included just one parole evaluation among the hundreds of recent studies that were summarized for that effort.[71]

For years the department has been focused on incarceration over rehabilitation programs, in spite of the research statistics that show rehabilitation programs help offenders and simultaneously reduce the skyrocketing prison populations and costs. As California's new parole programs are implemented, it is important that they be monitored to determine both whether they are affecting return to custody rates and whether they compromise public safety. A measurement component should be built into the programs, and adequate funding should be provided to the department so that decision making and public policy is based on valid analysis of what programs and policies are effective.

The following are suggested outcomes that the new Department of Correctional Services should measure to demonstrate the success of its prison and parole programs. Each of these outcomes should improve as the department becomes more effective at preparing inmates for reintegration back to society.

- Reduction in risk and needs scores, as measured by the risk and needs assessment instrument;
- Rate and duration of parolee employment;
- Program attendance rates;
- Improvements in reading levels;
- Reduction in the number of fugitives from parole; and
- Recidivism rate.

**Effectively supervising parolees requires parole agents to have a balance of skills.** Most agents now working in parole were hired and trained when the department's focus was on surveillance and detection of criminal behavior. This focus was reinforced by department training, which included arrest procedures and use of force. The department provides no training in casework issues, such as patterns of recovery from drug addiction or mental illness and its impact on relapse.

---

[71] Petersilia, Joan, *Reforming Probation and Parole in the 21st Century,* American Correctional Association, 2002., p.190

Furthermore, hiring practices and requirements impede hiring individuals with social services background. Agents are rarely hired from social service disciplines, such as child protection agencies, treatment programs, or even probation, largely because of the lengthy background investigations required of applicants not already employed as peace officers by the department. It can take up to a year to hire an individual from other disciplines such as social services or probation, whereas current department correctional officers can be hired almost immediately. This is because correctional officers seeking parole agent positions have already gone through a Department of Corrections background investigation, so the investigator need only examine the period in the applicant's career subsequent to the original background investigation. To hire an applicant from outside the department, conversely, the investigation must start from scratch—a time-consuming process. Consequently, most new agents are chosen from the prison correctional officer ranks. To develop a more balanced force of parole agents who bring a combination of law enforcement and social work skills to parole operations, the new Department of Correctional Services should remedy these hiring barriers and provide on-going training in social service skills to its parole agents.

## Recommendations

To improve parole operations the new Department of Correctional Services should take the following actions:

- Continue implementation of the Department of Corrections new parole model.

- Consider the use of private contractors to provide specific kinds of treatment in secure facilities designed to maintain the parolee in the community.

- Begin preparation for re-entry when the offender enters prison.

- Increase the number of substance abuse treatment beds in prison.

- Increase the number of substance abuse treatment beds in the community by increasing funding for programs that are proven successful. This could include halfway back, Substance Abuse Treatment Control Unit, or other community-based facilities.

- Use the needs and risk assessment tool when the inmate first enters prison and design a programming plan that addresses those needs.

- Discharge parolees who are determined to be very low risk from parole three months after they are released from prison.

- Consider the use of global positioning satellite tracking for certain high-risk offenders.

154

- Allow both high- and low-risk parolees to participate in treatment and training programs.

- Add a quality control feature to the new parole model programs to measure effectiveness.

- Increase focus on casework skills when recruiting new agents and in agent training.

- Develop a comprehensive data collection and analysis system that measures the effectiveness of the department's parole programs. This system must also link with other department data analysis systems.

## Fiscal Impact

The Little Hoover Commission estimated that changes outlined in the commission's November 2003 report on parole could save the department $151 million by reducing the percentage of parole violators returned to prison. The commission further estimated that an additional $300 million could be saved by reducing the length of revocation sentences for "low end" offenders from an average of 140 days to 100 days.[72] The Department of Corrections has estimated that the new model will reduce the parolee return to prison rate by 5 percent in 2004.[73]  Already, as agents seek alternatives to incarceration, there has been a decrease of 5,765 parolees in prison for violations from January 2003 to January 2004 as compared to the same period a year earlier.

Many of the recommendations of the Corrections Independent Review Panel require an initial investment, but are designed to save money in the future as they increase inmates' chances for success on parole.

The Corrections Independent Review Panel estimates the following savings would occur from implementation of the recommendations presented in this report:

- **Early discharge from parole – after 3 months of successful parole**

  Fiscal Year    2004-05 - $10 million
  Fiscal Year    2005-06 - $39 million
  Fiscal Year    2006-07 - $44 million

---

[72] Little Hoover Commission, "Back to the Community: Safe & Sound Parole Policies," November 2003, p. iii.

[73] Arthur Chung, Chief, Offender Information Services Branch, California Department of Corrections, interview,March 22, 2004

# Appendix A

## Preventing Parolee Crime Program

In 1998 Assembly Bill 2321 provided funding to expand the Department of Corrections pilot program known as the Preventing Parolee Failure program. As codified in Penal Code Section 3068, this program was renamed Preventing Parolee Crime Program and includes the following components.

- Offender Employment Continuum. This is a 40-hour mandatory employment workshop for parolees focusing on identifying and correcting long term barriers to employment. It includes job preparation, resume writing and interviewing skills, as well as employment referral and continued counseling to ensure that the parolee stays on the job.

- Residential Multi-service Centers. These facilities provide a therapeutic environment primarily for homeless parolees to help them transition into independent living. The program offers substance abuse treatment, literacy training, and individual and group counseling. Parolees can live in the program for up to 180 days. There is a 60- to 90-day aftercare period.

- Computerized Literacy Learning Center. This a computer-assisted instructional program staffed by credentialed teachers. The programs are located in parole offices at 21 sites throughout the state. (as of August 2003)

- Substance Abuse Treatment and Recovery. This is a 20-day education-based substance abuse program located in at least 28 parole offices. Parole agents refer parolees who have tested positive for drugs. Approximately 8,060 parolees are using this program.

In its February 1998 analysis of the fiscal year 1998-1999 budget, the Legislative Analyst's Office stated that, according to the department, the Preventing Parolee Failure program resulted in net state savings of $74 million over a four-year period. The Legislative Analyst recommended expanding the Preventing Parolee Failure program, noting that the program would save between $2 and $3 for every $1 invested.[74]

## Office of Substance Abuse Programs

The Office of Substance Abuse Programs estimates that there are 210,000 inmates and parolees with drug abuse problems. The office estimates that approximately 16,500 parolees are receiving treatment in one of its programs. The Office of Substance Abuse Programs coordinates the following prison and community based programs:

---

[74] Legislative Analyst's Office, "Analysis of the 1998-99 Budget Bill," February 1998, pp. D-25, D-33

- Substance Abuse Program. There are 8,500 therapeutic community slots in 35 substance abuse programs in 19 prisons. The length of stay is from six to twenty-four months. Each slot serves an average of 1.33 inmates annually.

- Transitional Treatment Team Program. At Folsom State Prison, 200 inmates participate in this four-month program that includes intensive pre-release planning. Parolees who go back to prison briefly for drug violations and who have completed a substance abuse program in prison are also eligible for this program.

- Parole Services Network. This program is for parolees who have not been in a prison substance abuse program but need drug/alcohol treatment. The average length of stay for a residential program is 30 to 90 days, followed by outpatient services.  The Office of Substance Abuse Programs coordinates with the California Department of Alcohol and Drug Programs to manage the service networks. The Department of Alcohol and Drug Programs transmits funds to the counties, which in turn contract with treatment providers. These programs offer up to 180 days of services, which include assessments, detoxification, and residential and outpatient treatment.

- Drug Treatment Furlough. This is an in-prison substance abuse program for 1500 nonviolent, non-serious offenders. Inmates participate in this residential community aftercare treatment program during their last 120 days in prison.

- Family Foundations Program. A 70-bed program for women with small children who have been convicted of low-level felonies. This program is used in lieu of state prison.

- Community Mother Infant Program: This is also a 70-bed program for low-risk female inmates who are pregnant or give birth in prison. The 70 beds are divided between three facilities.

The Community-Based Aftercare Programs are included under the Office of Substance Abuse Programs. Merrie Koshell of the Office of Substance Abuse Programs indicated that according to a study, (R.J. Donovan In-Prison and Community Substance Abuse Program: Three-Year Return-to-Custody) 24 percent of those who complete both the prison and aftercare drug portions of the R.J. Donovan program return to prison, compared to 78 percent of those who complete only the prison component. The programs are much more successful if the inmate/parolee completes all components.

The Substance Abuse Services Coordination Agency is also included under Office of Substance Abuse Programs.  The Substance Abuse Services Coordination Agency manages the aftercare portion of the drug programs. The agency has offices in each of the four parole regions and purchases services from community-based providers. These are 30- to 90-day residential care programs followed by outpatient drug treatment.

- Female Offender Treatment and Employment Program. This program was estab-lished by Penal Code Section 3054, as enacted by SB 491, Chapter 500 in 1998. Female parolees who graduated from a prison-based substance abuse program are eligible to receive up to 15 months of Female Offender Treatment and Em-ployment Program services. For parolees who choose to use the program, the average length of stay is 135 days. Services include substance abuse treatment, employment/educations programs, and life skills development. Child care and transportation is provided. Some of the residential programs allow children to live with their mothers.

- Enhanced Substance Abuse Treatment Control. This is a 200-bed treatment pro-gram located at Folsom Prison. After completion of this program the parolee is eligible to use the other community-based programs of the Office of Substance Abuse Programs.

### The New Parole Model

In September of 2001 the Parole and Community Services Division created its new parole model to address recidivism issues. The model focuses on non-serious/non-violent offend-ers as they are thought to pose the least risk to the community if they are offered alterna-tive sanctions to incarceration. The basic components of the model are the following:

- Violation matrix. This is a structured system for providing clear guidelines to decision making for parole violations.

- Pre-release planning. Inside prison, a Parole Agent II, social worker and parole service assistant will assess the inmate using a computer-based tool that identifies the inmates' needs and the risk they present to others. Agents will continue to use this tool throughout the parole period and will modify parole conditions and supervision levels accordingly.

- The Police and Corrections Team. The team establishes a partnership between parole, law enforcement, and service providers once the offender is released. Every newly released parolee will be required to attend an orientation meeting with this group of professionals. A Parole Agent II will run this program with the help of a social worker. The department plans to have a team in each of the 24 parole divisions.

- Electronic monitoring will become available for non-violent/non-serious offend-ers. This will allow agents to impose home detention as an alternative sanction for parole violations. It costs $43.00 a day to house an inmate in prison and ap-proximately $5.00 a day to monitor a parolee at home with an electronic device. There will be 1,000 of these devices, which will provide about five per parole unit.

- The Halfway Back program offers residential treatment as an alternative sanction for parolees who have committed a technical violation and who need a more structured setting to both address their problems and monitor their behavior. The Halfway Back units focus on life skills, education, and employment. Statewide there are 18 facilities with a total capacity of 792 beds. These facilities were being used as work furlough beds for inmates during the last six months of their term. As the work furlough inmates parole, the beds are being filled with parolees. This program began in March 2004. Currently it is 74.5 percent full; however inmates are still in the process of transitioning out of the facilities.

- The Substance Abuse Treatment Control Unit will provide a 30-day, in-custody drug treatment program for parolees whose drug addiction is too advanced to be addressed in the community. It is designed to serve up to 1306 parolees. 1770 beds have been contracted in various jails throughout the state —600 beds are now available at the Los Angeles County Detention Center, with another 20 beds at Humboldt County Jail.

**TABLE 1**

| Male Institution Bed Type (Includes Civil Addict Program) | Design Capacity (DC) updated on 6/2/04[1] | Actual Male Institution Population April 2004[2] | Actual Percentage of Design Capacity April 2004 | CDC Defined Maximum % of DC | Male Institution Population Equivalent of CDC Maximum | Bed Changes Req'd to Reach CDC's Maximum Percentages | Warden's Proposed Operable Capacity (OC) as % of DC[3,4] | Male Institution Population Equivalent of Warden's Proposed OC | Projected Male Institution Population on 6/30/09[5] | Population Reductions Needed by 2009 to Meet Warden's OC[6] |
|---|---|---|---|---|---|---|---|---|---|---|
| **CAMP BEDS** | **3,588** | 3,752 | 105% | 100% | 3,588 | 164 | **100%** | 3,588 | | |
| General Population: | | | | | | | | | | |
| Level I - MSFs | 4,759 | | | | | | | | | |
| Level I - old design | 5,091 | | | | | | | | | |
| **LEVEL I TOTAL** | **9,850** | 15,751 | 160% | 190% | 18,715 | -2,964 | **150%** | 14,775 | 29,054 | -10,691 |
| Level II - new design | 6,406 | | | | | | 160% | | | |
| Level II - old design | 9,622 | | | | | | 100% | | | |
| **LEVEL II TOTAL** | **16,028** | 35,306 | 220% | 190% | 30,453 | 4,853 | **150%** | 24,042 | 31,334 | -7,292 |
| Level III - standard | 13,252 | | | | | | 140% | | | |
| Level III - over/under | 2,122 | | | | | | 140% | | | |
| **LEVEL III TOTAL** | **15,374** | 30,912 | 201% | 190% | 29,211 | 1,701 | **152%** | 23,325 | 38,245 | -10,048 |
| Level IV - 180 design | 7,510 | | | | | | 150% | | | |
| Level IV - 270 design | 6,520 | | | | | | 190% | | | |
| **LEVEL IV TOTAL** | **14,030** | 21,293 | 152% | 190% | 26,657 | -5,364 | **140%** | 19,642 | 28,030 | -3,591 |
| Reception Center cells | 5,646 | | | | | | 150% | | | |
| Reception Center over/under | 256 | | | | | | 150% | | | |
| Reception Center dorms | 2,608 | | | | | | 190% | | | |
| **RECEPTION CENTER TOTAL** | **8,510** | 20,055 | 236% | 190% | 16,169 | 3,886 | **162%** | 13,808 | 17,628 | -3,820 |
| Administrative Segregation/III | 2,262 | | | | | | 150% | | | |
| Administrative Segregation/IV | 1,152 | | | | | | 120% | | | |
| **AD SEG TOTAL** | **3,414** | 7,092 | 208% | 150% | 5,121 | 1,971 | **140%** | 4,775 | | |
| **SUBSTANCE ABUSE TX** | **1,056** | 1,467 | 139% | 140% | 1,478 | -11 | **140%** | 1,478 | | |
| **SECURITY HOUSING UNIT** | **2,436** | 2,780 | 114% | 120% | 2,923 | -143 | **100%** | 2,436 | 3,165 | -729 |
| **CONDEMNED** | **604** | 604 | 100% | 100% | 604 | 0 | **100%** | 604 | | |
| **YOUTHFUL OFFENDERS** | **82** | 82 | 100% | 100% | 82 | 0 | **100%** | 82 | | |
| **EOP** | **1,691** | 2,397 | 142% | 150% | 2,537 | -140 | **150%** | 2,537 | | |
| **PSU** | **192** | 248 | 129% | 100% | 192 | 56 | **100%** | 192 | | |
| **PHU** | **24** | 24 | 100% | 100% | 24 | 0 | **100%** | 24 | 25 | -1 |
| **TOTAL SYSTEM** | **76,879** | 141,763 | 184.4% | 179.2% | 137,754 | 4,009 | **144.8%** | 111,309 | 147,481 | -36,172 |

**Notes for Table 1**

[1] "Design Capacity" (DC) is based on the following assumptions:
  (1) one inmate per cell,
  (2) single bunks in dormitories, and
  (3) no inmates housed in spaces that were not designed for housing, such as dayrooms, hallways and gymnasiums.
The numbers used here provide a basis for expressing the actual capacity of the prisons as a percentage of design capacity. Includes new beds at the Delano II facility.

[2] The population reflected here is the male felon and civil addict population housed in CDC institutions and camps. This population does not include (1) women, (2) inmates housed in various community correctional centers, (3) inmates housed in the Department of Mental Health state hospitals, and (4) inmates housed in county jail beds.

[3] "Maximum Operable Capacity" (MOC) is determined through an assessment of experienced Wardens and is expressed as the percentage of design capacity of the various housing units within the institutions wherein the prison can be operated both safely and can provide programming for every inmate, consistent with the inmate's ability. Programming means the provision of education, vocational education, drug and alcohol prevention and other programs especially for inmates serving a determinate sentence or PV-RTCs, which is consistent with a renewed emphasis on preparation for re-entry. For the purposes of the process of determining Operable Capacity, it is assumed that (1) all "bad beds" are closed, thus freeing up program space, and (2) staff with requisite experience are available to manage an effective program.

[4] Ad Seg and Level III maximum operable capacities are a weighted average based on the number of beds and the recommendations by bed type for the different designs.

[5] Based on Table 6 in the the Spring 2004 Population Projections, which has fewer breakdowns for inmate/bed types. Campers, Administrative Segregation, Substance Abuse Treatment, Condemned, Youthful Offenders, EOP, and PSU inmates are included in the projections for Levels I through IV.

[6] Camp beds are included in Level I figures. Ad Seg beds are broken out between Level III and Level IV. Substance Abuse treatment beds are included in Level III. Condemned, Youthful Offenders, EOP and PSU beds are included in Level IV.

**This Page Left Blank**

# Ward / Parolee Population Management

Providing education, training, and treatment to youthful offenders is central to the mission of the California Youth Authority. Forty years ago, California was the undisputed national leader in carrying out that responsibility. But in the 1980s, tougher sentencing for juveniles, subsequent overcrowding of youth correctional facilities, and a societal emphasis on custody over rehabilitation began eating away at the State's programs for helping incarcerated youths.

Today, a new set of forces is at work. In recent years, the number of youthful offenders in California correctional facilities has fallen by almost half, from 10,114 in June 1996 to 4,879 in June 2003, with the number expected to decline to 3,740 by June 2009.  Most of the youths now committed to state custody are proportionately more violent and have significantly greater needs for mental health care and other program services compared to the youths of earlier years.  At the same time, the state is under increasing challenge from the public, from lawmakers, and from the courts for failing to provide humane and constitutionally adequate conditions of confinement for incarcerated youths and for not providing adequate education and treatment services.

In light of those circumstances, the Corrections Independent Review Panel examined what California can do to improve its treatment, education, and parole services for the serious, chronic, and violent youthful offenders committed to its custody. As a result of that study, the panel recommends that the State institute a series of best-practices reforms in its education and treatment programs to more successfully protect society by helping youthful offenders reintegrate back into the community.

## Fiscal Impact

Implementing the panel's recommendations can be expected to result in long-term savings by reducing disciplinary incidents in youth correctional institutions, helping youthful offenders earn earlier release, and reducing the number who commit new crimes and return to custody. The recommendations will also assist the new Department of Correctional Services in complying with the requirements of the consent degree anticipated in a major court action, Farrell v. Harper. A detailed legislative financial analysis involving key stakeholders is needed to more fully determine the fiscal impact of the recommendations.

## Background

The mission of the California Youth Authority is as follows:

> [T]o protect the public from criminal activity by providing education, training, and treatment services for youthful offenders committed by the courts; directing these offenders to participate in community and victim restoration; and assisting local justice agencies with their efforts to control crime and delinquency, and encouraging the development of state and local programs to prevent crime and delinquency.[1]

---

[1] California Youth Authority, Public Affairs Office

The department's historical obligation to provide juvenile offenders with education, training, and treatment services was set forth when the California Youth Authority was created by the Youth Corrections Act of 1941. At the time of its enactment, the law was revolutionary in that it substituted training and treatment for youthful offenders in place of retributive punishment, which had been the national norm. In the years following, the act also made California the national model in juvenile treatment. By the mid-1960s the success of California's training and treatment model became not only accepted practice across the country, but also the formal legal policy of the United States, certified by the U.S. Supreme Court, in *Kent v. United States* (1966). Although the U.S. Supreme Court has since modified the treatment model, allowing juveniles to be tried as adults in cases involving particularly egregious offenses, it has nonetheless preserved the importance of individual assessment of the circumstances of the juvenile before sentencing, and the general policy of rehabilitation for juveniles remains sacrosanct. The U. S. Supreme Court continues to affirm the special developmental status of those under the age of 18 and the State's obligation to provide them with special protection.

Studies have shown that wards who participate in education and vocational training programs have a lower risk of recidivism.[2] Yet, despite those studies, and despite the historical mandate to provide treatment services to youths committed to the California Youth Authority, the State's commitment to providing such services has been eroding since the early 1980s. During the 1980s and 1990s, the department's budget failed to keep pace with rising ward populations resulting from "tough on crime" sentencing laws that made sanctions for juvenile crime comparable to those of adults and from stricter parole policies instituted by the Youthful Offender Parole Board that lengthened incarceration times. Largely because of Youthful Offender Parole Board policies, the average length of stay for wards increased from 21.6 months in 1991-92 to 27.6 months in 2002-03.[3] Between 1987 and 1991, the ward population in California Youth Authority facilities averaged 139 percent of bed capacity and over-crowded living conditions and double bunking became standard.[4]

With the overcrowding came increased violence in youth correctional facilities—group disturbances, suicidal behavior, escape attempts, and other acts of destructive conduct. And, in an escalating cycle, increased violence led to longer stays, still more overcrowding, and still more violence. Research by the California Youth Authority shows that before crowding began in 1987 disciplinary incidents were significantly fewer. In 1987 the disciplinary rate for serious ward misbehavior stood at 102.5 incidents per 100 wards, but as crowding increased between 1987 and 1991, the rate of disciplinary actions increased by 33

---

[2] Stephen J. Steurer, Linda Smith and Alice Tracy, "Three State Recidivism Study, Preliminary Summary Report," September 30, 2001.

[3] Department of Youth Authority, "Population Projections for Fiscal Years 2004-05 through 2007-08," March 9, 2004, pages 1; 7-8.

[4] Department of Youth Authority, "Budget Change Proposal, Institutions and Camps Branch, Fiscal Year 2003-04, Fiscal Year 2004-05," March 9, 2004, pages 1-2.

percent to 136.2 incidents per 100 wards. Under earlier policies, wards were nearly always able to decrease the time they served through a system that deducted time as a reward for positive behavior. But under policies instituted in the 1980s, as the number of disciplinary incidents rose, the Youthful Offender Parole Board increasingly deferred release to the point that it was not unusual for wards to have served all their "available confinement time" — the maximum sentence imposed by the committing court— with no reduction for good behavior by the time they left the institution. At present, approximately 540 wards—14 percent of the current California Youth Authority population—are serving all of their available confinement time as a result of disciplinary actions.

Because of this pattern, several reforms were enacted in January 1, 2004, with the passage of Senate Bill 459. The new law removed authority from the Youthful Offender Parole Board for setting projected parole dates and for making decisions about time adds and time cuts and gave it back to the California Youth Authority, which had that authority until 1980. The bill also includes a provision allowing wards to reverse time adds through sustained positive behavior. In addition, the new law re-named the Youthful Offender Parole Board as the "Youth Authority Board," and required it to report to the Director of the California Youth Authority, who is once again designated chairman of the board.  The board retains its public protection role of making decisions concerning parole release and parole revocation.

In the meantime, the California Youth Authority is under court mandate to improve its programming and treatment of youthful offenders.  A complaint for injunctive and declaratory relief, filed in the Alameda County Superior Court in the case, *Farrell v. Harper* alleges numerous deficiencies in education, treatment, and parole services for youthful offenders.[5]

### Education services
California Welfare and Institution Code Section 1120 requires the California Youth Authority to operate a statewide correctional school district under the direction of the Superintendent of Education.[6] Each of the California Youth Authority's eight institutions provides academic and vocational classes and teaches life survival skills to help wards attain a high school diploma or general education degree (GED) equivalent before they are released. Each institution has a school administered by a principal, one or more assistant principals, teachers, teaching assistants, and specially credentialed supplemental service providers.[7]

---

[5] Complaint for Injunctive and Declaratory Relief, Superior Court For The State Of California, County Of Alameda, Margaret Farrell v. Jerry L. Harper, January 16, 2003.
[6] California Youth Authority, "Report on Education Funding Levels, Submitted in Response to the Supplemental Report of the 2002 Budget Act – Item 5460-011-0001," November 2002, page 2.
[7] California Youth Authority, "Report on Education Funding Levels, Submitted in Response to the Supplemental Report of the 2002 Budget Act – Item 5460-011-0001," November 2002.

All California Youth Authority high schools are accredited through the Western Association of Schools and Colleges.[8]

At the time of commitment, the educational level and abilities of each ward are assessed at a reception center clinic and an individual education plan is developed for those in special education.  The methods by which education services are provided are substantially influenced by the ward's security restrictions and program needs, including the need for substance abuse treatment or mental health services.[9] These factors, in turn, dictate the institutional setting in which education services are provided. Education services at the California Youth Authority are provided through the following primary delivery models:

- *Conventional classrooms.* Wards attend conventional classrooms and vocational shops with up to 15 students.

- *Special management programs.* These programs provide education services to wards with special needs whose behavioral problems prevent them from attending school for significant periods of time. At present, instruction for special management program wards is conducted by teachers either on a one-on-one basis at the room door or in open settings in small groups not exceeding five wards.

- *Temporary detention.* Wards placed in temporary detention for misbehavior receive education through an alternative education plan. This is an ever-changing population, as wards are moved in and out of temporary detention on a continuous basis.

- *Self-contained classrooms.*  These classrooms are an adjunct feature of special program facilities that provide mental health services, and the instructional schedule mirrors that of the conventional classroom.

- *Reception centers/clinics.* At California Youth Authority reception centers and clinics, the focus of the education activities is assessing the ward's education proficiency and determining the appropriate subject and grade level into which he or she should be placed upon arrival at a residential institution. The reception centers also provide a pre-education service to assess how the ward functions with peers in conventional classrooms.

- *Conservation camps*. Wards attend a full-day schedule of classes during afternoons and evenings outside the three- to four-month fire season.

---

[8] Richard Kai and Robert Brown, Deputy Director and Assistant Deputy Director, Education Services Branch, California Youth Authority, interview, April 2004.
[9] California Youth Authority, "Report on Education Funding Levels, Submitted in Response to the Supplemental Report of the 2002 Budget Act – Item 5460-011-0001," November 2002, page 8.

- **Community colleges.** Under cooperative agreements with local community colleges, the California Youth Authority provides coursework toward the Associate of Arts degree to wards who possess a high school diploma or who have earned a GED.[10]

- **Vocational training.** The California Youth Authority's high school curriculum once emphasized "hands-on" vocational education combined with regular course work, but due to the declining ward population and subsequent budget cuts, the number of vocational education instructors was dramatically reduced and the emphasis was shifted to obtaining a high school diploma.

*The California Youth Authority's education programs have received high marks.* In contrast to strong criticisms leveled at the California Youth Authority's custody practices and at the violence in its institutions, the department's education programs have received generally favorable assessments. In September 1999, a department publication noted, "the level of education in CYA is better than three years ago as there has been notable progress in education services provided and also in gaining greater acceptance within the community of educators throughout the state."[11] The authors of an independent review conducted for the California Attorney General in 2002 that assessed whether the department was providing adequate education opportunities to wards, commented: "the CYA is commended for its efforts to provide quality educational programming for the wards committed to its care."[12] The reviewers went on to note: "the overall quality of high school programming offered to general and special education wards by CYA is considered to be adequate. In some cases the programs being provided are exemplary."[13] Those comments contrast sharply with assessments of the general environment in California Youth Authority facilities. One such assessment, an officially commissioned review, noted: "it is abundantly clear from a range of data that I collected as part of this review, the CYA is a very dangerous place, and that neither staff nor wards feel safe in its facilities."[14]

*The department plans to combine education services with custody operations.* Studies have shown that for education services to be effective in youth correctional facilities, they must receive primary focus and they must be administered separately from custody operations. Yet, the California Youth Authority is currently planning to place its Education Services Branch, which is responsible for education services in youth facilities, under the Institution and Camps Branch, which is responsible for custody and treatment programs. That proposal seems particularly ill-advised considering that the Institution and Camps Branch has been severely criticized for its failure to effectively operate treatment and custody pro-

---

[10] Department of Youth Authority, "Draft, Major Capital Outlay Five-Year Plan, FY 2004-09," April 2004, pages C1-C2.
[11] California Youth Authority, Today, Director's Corner, September 1999.
[12] Thomas O'Rourke and Robert Gordon, "Education Program Review of California Youth Authority, Deputy Attorney General, California Department of Justice, 2002, page 3.
[13] Ibid.
[14] Barry Krisberg, Ph.D., "General Corrections Review of the California Youth Authority," December 2003, page 18.

grams. The branch has been successfully sued by the Prison Law Office for failure to provide proper conditions of confinement consistent with public, ward, and staff safety and is under scrutiny and review by the U.S. Department of Justice and the California Attorney General.

*Other reforms in the education program are needed.* Although assessments of the California Youth Authority's education program have been generally positive, a number of improvements are needed. The problems to be addressed include the following:

- *The year-round school year does not allow for teacher training and vacations.* The school year in California Youth Authority facilities runs 248 days compared to 184 days in local public schools. The year-round school session was instituted to address the serious education gaps typical of youthful offenders. The long school year generally allows students to take four courses per day and to complete approximately 60 credits a year toward the 200 credits required for high school graduation.[15] But the long school session does not accommodate teacher vacations, scheduled breaks, and in-service training. As a result, classes are frequently cancelled because of teacher absences.

- *Teacher-student ratios are inadequate for special education.* The teacher-student ratios required under current department policy do not adequately take into account the lower ratios needed for special education programs. The base teacher-student ratio required at the California Youth Authority is 1:15 for regular education students and 1:12 for special education students. The California Attorney General's 2002 review of the California Youth Authority found that the teacher-student ratios do not take into account the different types of programs offered and that the number of regular and special education teachers allocated is not adequate to meet the required ratios. The base ratio formerly included a factor for teacher relief and substitute coverage, but that factor was eliminated in fiscal year 1988 budget reductions. At that time, the California Youth Authority did not provide education to students who were on restriction in program settings (special management program and temporary detention). Subsequent legal challenges in 1989 resulted in the requirement that all students receive education services regardless of program placement. For safety and security reasons, education services are now provided to wards in restricted program settings either individually or in small groups of no more than five students. As many as 1,000 of the wards presently in California Youth Authority facilities have been diagnosed with special education needs and many have two or more learning disabilities. The financial formula used to obtain teaching resources for these wards does not make adjustments for wards with multiple disabilities, but rather pro-

---

[15] California Youth Authority," Report on Education Funding Levels, Submitted in Response to the Supplemental Report of the 2002 Budget Act – Item 5460-011-0001, November 2002, page 10.

vides resources for only one disability. This severely affects the ability of the education program to provide necessary resources for wards with multiple disabilities.

- **Chronic shortages of qualified teachers.** The California Youth Authority has difficulty recruiting and retaining teachers, and as a result suffers from continual vacancies in specialties such as science, math, and English. The vacancies stem in part from the inability of the California Youth Authority to recruit and retain teachers because of competition from public school districts and from other state agencies. Public school districts offer higher salaries, added financial incentives such as sign-on bonuses and forgiveness of school loans as well as a shorter school year compared to the California Youth Authority. Comparable public school district pay scales average 4 to 10 percent higher than the California Youth Authority for a 184-day school year, compared to the 248-day school year at the California Youth Authority.[16] Five of the 32 California Department of Corrections institutions offer a monthly enhancement of $200 per teacher, and state-run schools under the Department of Education, such as the school for the blind and school for the deaf, give teachers monthly enhancements ranging from $200-$700.[17]

Just as low-performing public schools often experience a 15 to 25 percent turnover in teaching staff, the disadvantages of working in a correctional environment also hamper the department's ability to recruit and retain teachers as teachers with high-level skills are recruited to more favorable settings.[18] As a result, the California Youth Authority frequently resorts to hiring part-time teachers, administrators, and school psychologists, who "moonlight" from other jobs.

State fiscal policies also impede the department's ability to maintain an adequate teaching staff. Under present policies, one teacher position is eliminated each time the youthful offender population at a facility is reduced by 15. During fiscal years 2002-03 and 2003-04, 106.8 teacher positions were eliminated because of the reduced youthful offender population. Those staffing reductions disproportionately affected the areas of English, special education, and math.[19]

The continuing vacancies in important classifications impede the ability of the California Youth Authority to meet its obligation to provide quality education

---

[16] Thomas, Robert, O'Rourke and Gordon, "Education Program Review, California Youth Authority," page 5.
[17] Karen Sanders, Staff Personnel Program Analyst, Department of Personnel Administration, telephone conversation, May 2004.
[18] National Governors Association Center, Reaching New Heights - Turning Around Low-Performance Schools, August 2003.
[19] Thomas, Robert, O'Rourke and Gordon, "Education Program Review, California Youth Authority," page 8.

services and make it difficult for students to complete courses needed for graduation.

- ***Security issues and medical appointments interfere with class attendance.*** The California Youth Authority has set a school attendance goal of 90 percent, but classes are frequently cancelled because of teacher absences, facility maintenance activities, and security reasons. A recent six-month review of monthly school attendance at the California Youth Authority found that 20 to 30 percent of the wards were absent from school each day. The authors of the review commented: *"it is evident that education is not the primary focus during the school day".*[20] *The reviewers identified three main reasons for school absences:*

  1. Wards are scheduled to attend medical or counseling appointments, work assignments and hearings mandated by the Youthful Offender Parole Board during scheduled class time.

  2. Wards are removed from school because of correctional incidents resulting in temporary lock downs.

  3. Wards refuse to attend school. The report noted that allowing school to be "optional" appeared to be unofficial practice at California Youth Authority institutions.[21]

## Recommendations

The Corrections Independent Review Panel recommends that the new Department of Correctional Services make education a priority, not an option. Accordingly, the director should develop collaboration and program guidelines designed to enforce school attendance. Specifically, the panel recommends that the department take the following actions:

- Establish a separate unit in the Office of the Director of Youth Operations to develop and implement educational and vocational training programs proven to be effective in the treatment of youthful offenders.

- Develop a "school first policy" to reduce student absenteeism. Measures to be taken should include a master schedule for each institution that plans activities around the school schedule to avoid interruptions in the school day for counseling, medical, board hearings, and work activities. Non-emergency deviations from the master schedule should require supervisory approval.

---

[20] *Ibid.*, page 8.
[21] *Ibid.*, page 9.

- Develop an operational plan to facilitate school re-entry after group disturbances for the use of all institutions and mandate its application.

- Develop a multidisciplinary intervention team to provide assessment, counseling, and incentives to improve school attendance when wards are absent more than three times in any semester.

- Determine the most effective teacher-student ratios for general education, special education, and segregated program settings, including an accurate formula for counting wards with multiple disabilities.

- Determine the most effective substitute teacher relief ratio to cover teacher absences.

- Institute financial incentives to recruit and employ more dual-credentialed teachers in core academic areas who are capable of instructing both regular and special education wards.

- Enhance options for recruiting qualified teachers through a student teacher employment incentive program, such as a 20/20 program providing for 20 hours of work and 20 hours of school per week.

- Establish a regular 220-day school year calendar to be followed by all California Youth Authority schools.

## Fiscal Impact

Enhancing teacher-student ratios and providing financial incentives to recruit and retain qualified teachers are likely to result in additional state expenditures, but effective education is also more likely to reduce recidivism among youthful offenders. The average time wards serve in the California Youth Authority is 29 months, at an annual cost of $66,000 to $80,000 per ward, which equates to as much as $193,000 per ward for the entire commitment term. If improved education services reduce annual recidivism by only 20 wards the State would save $3,860,000. From this cost breakdown, it is easy to see that educational programs have the potential of paying for themselves in a short time.

To fully establish fiscal implications related to this proposal the new Department of Correctional Services should assess the number of teachers required to meet recommended teacher-ward ratios and determine the number of additional teachers required. Following are cost estimates related to given assumptions:

- ***Increase the number of special education segregated program settings teachers.*** The California Youth Authority is currently requesting 85 additional teacher

positions to address deficiencies in general population, special education and segregated program settings.[22] Assuming that 60 percent of the additional teachers would be assigned to segregated program and special education program settings, and the annual cost per teacher (including benefits) is approximately $80,000, this recommendation would cost the state $4,080,000 annually (51 teachers x $80,000).

- *Increase the number of substitute teachers.* A 15 percent relief factor allowing for substitute teachers is based on a total of 215 teachers system wide. This would result in 32 substitute teacher positions, for a total annual cost of $1,920,000 (32 teachers x $60,000, as the average rate of pay for substitute teachers is less than that of full-time teachers.)

- *Improve recruitment of dual-credential teachers.* Assuming an annual turnover of 10 percent and $3,000 per teacher in financial incentives this recommendation would cost the state $63,000 annually (21 teachers x $3,000).

- *Improve teacher retention.* A five percent retention pay per teacher would cost the state $725,625 annually (215 teachers x $3,375).

## Counseling and Treatment Services

The new Department of Correctional Services will continue to have the statutory obligation of protecting public safety by providing training and treatment to youthful offenders. That mission is as valid today as it was when the California Youth Authority was established in 1941. In recent years the department has fallen behind in carrying out those responsibilities. During that time, the department has been repeatedly challenged by the U. S. Department of Justice, the Office of the Inspector General, and youth advocacy organizations such as the Prison Law Office, for failing to meet national standards in providing "best practices" treatment services. In general, it is clear that wards with complex mental health problems are not receiving adequate treatment from trained and licensed professionals and that wards with less severe problems who are housed in the general population are not receiving adequate counseling from the non-professional youth counselor staff.

National standards for juvenile corrections represent the minimum conditions and best practices found to be effective in the rehabilitation of juvenile offenders. In the area of treatment, the standard is to provide activities and interventions that target risk factors by using treatment models demonstrated to be effective in reducing recidivism. The treatment models use cognitive behavioral approaches, family involvement, and structured aftercare.[23]

---

[22] Bill Costa, Assistant Superintendent, Education Services Branch, California Youth Authority, telephone conversation, May 2004.

[23] California Youth Authority, "The New Youth Authority Proposal," National Standards, American Correctional Association, *Standards for Juvenile Training School,* 1991.

The delivery of specialized treatment at the California Youth Authority is based on a continuum of care model with multiple levels of care provided by department staff, but a number of deficiencies have been identified in the department's implementation of the model. As a result of the *Farrell v. Harper* court action filed by the Prison Law Office, a formal review of California Youth Authority treatment services was conducted by a panel of experts under the direction of the California Attorney General as part of a general corrections overview of department practices. The inquiry compared current conditions in the California Youth Authority to accepted standards of service in the field of juvenile corrections. The panel's findings are now being used as the basis for a negotiated settlement (consent decree) to reform California Youth Authority practices. That inquiry and other assessments conducted by experts have identified the following deficiencies in the department's treatment program.

- *Treatment planning.* Treatment planning is the process of identifying reasons a youth needs treatment and developing a plan to address the youth's symptoms and emotional disorders by setting specific treatment goals. The inquiry experts found: "Despite the screening, assessment and specialized assessments being done, treatment planning…is not evident in the clinical records of youth in CYA. Treatment planning requires significant improving."[24]

- *Case management.* Case management entails the coordination and monitoring of rehabilitation needs identified by court documents, as well as the treatment and educational needs assessed through screenings and assessments initially conducted at California Youth Authority reception center/clinics and at subsequent institutional settings. Maintaining consistent communication among clinical, educational, and custody staff is a key component of case management. The review experts found, however, that at the California Youth Authority "case management standards are inconsistently applied from institution to institution and are in need of significant improvement."[25]

- *Crisis management.* Crisis management requires that facilities, consistently and in a well-monitored manner, address, assess, develop and implement programs to prevent youths from engaging in behaviors that place them or others at risk of harm. In reviewing the department's crisis management policies and procedures, the California Attorney General's review experts found the California Youth Authority policies and procedures related to suicide prevention to be inadequate.

   *Suicide prevention.* California Youth Authority wards are at high risk of suicide because of stressful situations related to incarceration. The risk is

---

[24] E.Trubin, and Raymond Patterson, "Report of Findings of Mental Health and Substance Abuse Treatment Services to Youth in California Youth Authority Facilities," December 2003, page 5.

[25] *Ibid,* page 5.

compounded by the background histories of juvenile offenders, which are riddled with violence, physical abuse, emotional instability, substance abuse, mental health disorders and impulsive behavior. It is also important to consider suicide risk in the context of the general youth population. Suicide ranks as the third leading cause of death for adolescents (behind accidents and homicide) and is the most frequent cause of death in youth incarceration facilities in the United States.[26] As with adults, the majority of adolescent suicides are committed by males. Among 15-24 year olds, males commit 73 percent of suicides. The reverse is true of attempted suicides, with females more likely to attempt suicide.

Combined, these factors make suicide prevention in youth correctional institutions a difficult challenge. Most suicide attempts at the California Youth Authority are by hanging, which requires an immediate response to avoid a fatality. Medical evidence shows that brain damage from strangulation can occur within four minutes, and that death can occur within five to six minutes.[27] From May 1996 through January 2004 there were 14 suicides in California Youth Authority institutions, with six suicides occurring in the past five years. Between January 2001 and December 2003, there were also 172 suicide attempts.[28]

In light of these circumstances, the California Attorney General's review experts examined whether the California Youth Authority's suicide watch policies and procedures were adequate and whether they are being properly implemented. The reviewers concluded as follows:

> [The]CYA is currently effectively designing appropriate policies and procedures to address the issue of suicide….and…what remains to be addressed are the implementation and consistent monitoring, supervision, and quality assurance that will sustain the policy in practice at a high level of performance compliance. [29]

In suicide prevention, the consensus of industry experts is that those who are actively suicidal — either threatening or engaging in suicidal behavior—should be put under continuous, uninterrupted observation. Best practice for suicidal wards requires a level of therapeutic programming greater than isolation and watch and calls for reintegration activities for

---

[26] American Association of Suicidology, May 2004.

[27] Department of Youth Authority, "Spring Finance Letter, Institutions and Camps Branch, Fiscal Year 2004-05, Civil Rights for Institutionalized Persons Act Action Plan," page 13. .

[28] Rudy Haapanen, Ph.D., Chief of Research, Department of Youth Authority, May 2004.

[29] E. Trupin Ph.D., and R. Patterson M.D., Mental Health Services and Substance Abuse Treatment Services to Youth in California Youth Authority Facilities, Page 17, December 2003.

wards who may still be at suicidal risk but who will not be made better by simple lock-up and observation. In contrast, California Youth Authority policy has been to isolate suicidal wards in camera rooms where they are observed only at five-minute intervals. As a result of a U.S. Department of Justice finding that the department's isolation of wards is punitive, the department is requesting a budget augmentation to allow a designated staff person to provide continuous direct observation when the ward is not in a suicide-safe room. In assessing the department's suicide prevention measures, the California Attorney General has noted, "the CYA have developed appropriate policies, but …. the application of these policies …. must be assured."[30]

***Violence prevention.*** Several studies have addressed the general issue of violence at California Youth Authority facilities. As noted earlier in this chapter, one such assessment concluded that "the YA is a very dangerous place and that neither staff nor wards feel safe in its facilities." The author of that assessment based the conclusion in part on a 2002 data-driven study of violent incidents at six institutions in which rule violations for ward-on-ward assault and battery had been sustained under the department's disciplinary decision-making system. During that period, more than 4,000 such infractions occurred — at least 10 a day.

The California Attorney General's review experts found that the department lacks an appropriate classification system for security and programming and that fear of violence, especially of gang behavior, dominates the thinking of the living unit staff. As a result of the lack of a structured classification process, the assessment concluded that decisions are made on an *ad hoc* basis.[31] The assessment concluded that there is no conflict between an objectively weighted classification instrument for each ward and the department's primary mission to provide high quality treatment and education within a safe environment. An effective classification system, the assessment concluded, would enable the California Youth Authority to be more effective in determining security and custody needs in housing wards, and would thereby reduce the danger to wards and staff and increase public safety. The reviewers noted that the classification instrument should classify youths into differing levels of risk for escape and serious institutional misconduct, particularly assaults on staff and other wards.

---

[30] *Ibid.*
[31] Barry Krisberg, Ph.D. "General Corrections Review of the California Youth Authority," December 2003, p.18.

- **Youth development and treatment programs.** National standards require juvenile institutions to operate a well-defined, incentive-based behavior management program covering all domains in which juveniles function. The goal is to provide opportunities for juveniles to learn and practice effective behaviors that promote self regulation and pro-social conduct in most aspects of daily living. Toward that end, the standards should cover unit activities, recreation, school, and group programs.

    **The department's behavior management program is deficient.** The California Attorney General's review experts found the department's behavior management program to be inadequate. The California Youth Authority uses a phase system in living unit programs in which wards advance from lower phases to higher phases through positive behavior. But the review experts found that incentives were not consistently applied and that cognitive behavioral principles were not being consistently implemented. The reviewers concluded that the line staff had not been adequately trained by clinicians to help youths handle anger and frustration in the group living environment.

    **Wards do not receive adequate counseling services.** A number of studies have shown that California Youth Authority wards do not receive appropriate counseling services. Management review audits of several California Youth Authority institutions by the Office of the Inspector General between 2000 and 2003 found that youth counselors did not provide basic small group or individual counseling to wards.[32] To address that problem, the department developed a treatment and programming approach called the "Enhanced Casework Pilot Program," which separates the roles of youth correctional officers from those of youth counselors. The change assigns to youth correctional officers the primary responsibility of group supervision and allows youth counselors to conduct more group counseling, have more individual contact with wards, and devote more time to developing and monitoring individual and case plans. The Corrections Independent Review Panel found that the pilot program has shown encouraging results. Wards participating in the program have been involved in four times as many hours of treatment than before, have earned many more time credits for good behavior, and have incurred fewer time adds for serious disciplinary infractions.

    **The department lacks appropriate treatment programs.** Timely access to appropriate care is a critical test of the constitutionality of a medical and mental health care services program. At present, the California Youth Author-

---

[32] Office of the Inspector General, Management Review Audits of: Herman G. Stark Youth Correctional Facility, October 2000, page 24; Ventura Youth Correctional Facility, June 2002, page 4; Fred C. Nelles Youth Correctional Facility, July 2002; pages 6-7; Southern Youth Correctional Reception Center and Clinic, March 2003, pages 4-5.

ity does not have the right blend of programs to consistently provide wards with appropriate care and therefore does not meet this standard. The department's medical and mental health treatment programs provide the following treatment beds:

- Department of Mental Health – 10 beds at state hospitals
- Correctional treatment centers – 33 beds
- Intensive treatment programs – 225 beds
- Special behavior treatment program – 35 beds
- Special counseling program – 300 beds
- Sex offender program – 207 beds
- Substance abuse program –370 residential beds
- Outpatient housing units for general population wards – 61 beds
- General population – 2,000 beds

***Sex offender treatment is inadequate.*** The department measures whether the number of treatment beds is sufficient to accommodate all wards needing services by the number of wards on program waiting lists. By that standard, the number of beds is adequate except in the area of sex offender treatment. Under California Welfare and Institutions Code Sections 727.2 and 6000, the California Youth Authority must provide juvenile offenders committed for sexually violent offenses with sexual offender treatment consistent with specified protocols. At present, however, the majority of sex offenders are housed in the general population with no formalized treatment. A study conducted for the California Attorney General in September 2003 by a nationally recognized expert concluded that the department does not offer adequate sex offender treatment to all of the wards covered by the statutory requirement. The study showed that 207 wards were receiving sex offender treatment, but that an additional 624 wards in need of sex offender treatment were not receiving it. The study noted other deficiencies in the sex offender treatment programs:

> [T]he programs do not meet current standards of practice even minimal ones….programs are understaffed, there is a lot of staff turnover, some of the staff is not appropriate to work with the population and some are not trained to do so….the total treatment environment must be integrated so that 24 hours a day there are constant opportunities to apply therapeutic interventions and newly learned skills….the current therapeutic CYA culture has allowed a counter-productive prison culture to develop, which is reactive rather than proactive and punitive rather than cultural.[33]

---

[33] Jerry Thomas, California Youth Authority, Evaluation of Sex Offender Programs, September 2003.

To address the deficiencies in the sex offender treatment programs, the California Youth Authority has issued a fiscal year 2004-05 budget change proposal that would standardize sex offender treatment in the facilities and ensure that all sex offenders in California Youth Authority institutions receive treatment.

***Other deficiencies in the department's mental health programs.*** A number of other studies have also found deficiencies with the California Youth Authority's mental health treatment programs. A Stanford University study found that the organizational culture of most California Youth Authority facilities is not conducive to mental health treatment and that treatment services throughout the California Youth Authority are fragmented.

An investigation conducted by the U.S. Department of Justice in August 2003 into compliance with the Civil Rights for Institutionalized Persons Act at the California Youth Authority's N.A. Chaderjian Youth Correctional Facility found a number of deficiencies in the area of mental health. The investigation found the following specific problems:

- A lack of registered nurses in the intensive treatment and specialized counseling programs, resulting in the inability to deliver bedtime medications at appropriate times.

- The housing of mentally ill wards in special management programs and in temporary detention (lock-up) units that appeared to lack specialized mental health treatment services.

- Lack of treatment services for developmentally disabled wards.

- The inappropriate placement and isolation of wards on suicide watch into temporary detention and the use of handcuffs and force on wards on suicide watch.

The issues of nursing coverage and care of mentally ill wards are discussed further in *Chapter 6, Risk Management and Health Care*.

***Treatment services for developmentally disabled wards.*** The California Youth Authority defines developmental disabilities as disabilities attributable to a mental or physical impairment, manifested before age 22, likely to continue indefinitely, resulting in substantial limitation in three or more specified areas of functioning, and requiring specific and lifelong extended care. The department has documented that 1,000 wards presently receive special education services. Of that population, seven have been identified as mentally developmentally delayed and six others suffer from a traumatic brain injury that

leaves them developmentally disabled. A lawsuit against the Department of Corrections has established that the Americans with Disabilities Act applies to the developmentally disabled population and that correctional agencies must provide support services for those with physical or mental disabilities.[34]

The U.S. Department of Justice recommended that developmentally disabled wards be programmed in a separate living unit with specialized services. The department does not yet have a specific program to meet the specialized needs of this ward population.

## Recommendations

The Corrections Independent Review Panel recommends that the new Department of Correctional Services take the following actions to improve counseling and treatment services for wards.

- Ensure that treatment services provided to wards conform to national standards and are appropriate for addressing the complex problems of youthful offenders.

- Provide appropriate assessment and placement and programming of wards identified as suicide risks.

- To reduce ward-on-ward violence, develop a research-validated security classification instrument to be used in scoring each ward.

- Establish programming for group living environments that effectively promotes pro-social behavior.

- Institute system-wide a program similar to the "Enhanced Casework Pilot Program" to improve individual and group counseling services for wards.

- Develop treatment services specifically for developmentally disabled wards.

- Ensure that effective treatment services are provided to wards identified as sex offenders.

## Fiscal Impact

Implementing the panel's recommendations would enhance treatment and counseling services for wards and create potential long term savings by reducing disciplinary incidents and helping wards earn earlier releases.  More effective treatment will improve safety for staff and wards and contribute to lowering recidivism. Instituting best practices treatment

---

[34] *Armstrong vs. Wilson*, 1997.

and counseling services will also assist the Department of Correctional Services in comply-ing with the forthcoming consent decree, thereby reducing costs associated with court-ordered monitoring and the potential for future litigation.

Costs associated with implementing the recommendations include the following:

- Costs for developing treatment services for developmentally disabled wards. The panel recommends that the department convert an existing program for this purpose. Approximately 40 hours of training would be needed for the staff.

- Costs to provide continuous direct observation of suicidal wards when they are outside a secured suicide watch room. The annual cost for a designated staff member to provide the additional coverage is estimated to be $19 million. The cost assumes two additional hours of coverage per day for each day after the first day a ward is placed on suicide observation. Coverage is required 12 hours per day for every day after the first day the ward is on suicide observation.

- Costs for providing appropriate treatment to sex offenders is projected to be $3.4 million. The cost assumes that treatment could be provided on an outpatient basis and that 33 staff positions would be needed.

## Parole Services

The purpose of the Parole Services and Community Corrections Branch is to protect the public while helping parolees in returning to the community. The panel reviewed the functional operations of the California Youth Authority Parole Branch and identified several areas that need improvement.

Wards who have been incarcerated in California Youth Authority institutions are generally the most serious and violent offenders in the juvenile justice system. The department currently provides parole services to approximately 4,200 wards through 16 parole offices located throughout California. The parole offices are divided into two regions: the northern region, which supervises approximately 1,880 parolees, and the southern region, which supervises approximately 2,200 parolees. The northern region is comprised of seven field offices encompassing 47 counties, including the Bay Area, the Central Coast, Northern California, and the San Joaquin Valley.  The southern region includes nine field offices covering 11 counties, including Los Angeles, San Luis Obispo, Santa Barbara, Ventura, San Diego, and Imperial counties.[35]

Parole agents assigned to each parole office must work closely with local law enforcement to enforce conditions of parole, protect the community, and broker community resources to promote the ward's successful integration into society. All 16 parole offices provide core parole services.  A detailed description of these services and other programs offered by the California Youth Authority are listed in Appendix A.

At present, the authority to grant or revoke parole rests exclusively with the Youth Authority Board in accordance with California Code of Regulations, Title 15, Section 4966, and California Welfare and Institutions Code Section 1723. The parole hearing process, which includes setting projected parole dates, involves both the Youth Authority Board and the California Youth Authority staff. The projected parole date, also called the "projected board date," is based on the ward's committing offense. Absent from this phase of the process is the committing court and community probation resources. A more coordinated effort and partnership involving the committing courts, local community resources, and the California Youth Authority would improve case management and provide a more effective continuum of treatment services.

***At present, counties do not have the option of supervising non violent wards.*** The California Youth Authority is presently responsible for supervising all wards released from state youth correctional facilities and returned to communities. These wards remain under the jurisdiction of the California Youth Authority rather than the counties. Instead, non violent wards could be returned to counties for probation services upon release from state youth correctional facilities. The California Youth Authority could pay counties a pre-determined

---

[35] California Youth Authority, Parole Services and Community Corrections Branch, document revised, April 2004.

"rebate" for every non-violent ward (presently designated as Categories 5, 6, and 7) for whom the county agrees to provide parole supervision and services. The change would enable the new Department of Correctional Services to re-direct resources and supervision to high-risk parolees in Categories 1, 2, 3, and 4, thereby improving the likelihood of success for these offenders (Appendix B.)

The current parole population of non violent, Category 5, 6, and 7 wards totals approximately 1,740. Field parole agents who provide parole supervision are spread out over a large geographical area, making it difficult for remote areas to be covered. With responsibility for this parole population removed, parole positions could be reduced proportionately and the additional resources could be re-directed to high-risk parolees to lower the ward-to-parole agent ratio.

*Counties are not paying the true cost incurred by the state for supervising wards.* The sliding fee scale outlined in California Welfare and Institutions Code Section 912.5 and in Title 15 of the California Code of Regulations does not reflect the actual cost incurred by the California Youth Authority for treatment, training, and supervision of lower level wards. The sliding fee scale designates specific percentages of a pre-determined per-capita cost incurred by the California Youth Authority to be reimbursed to the state by each county.[36] The base cost in the sliding scale fee is $36,500 yearly and counties pay a flat fee of $175.00/month for all high risk commitments. Counties pay 50 percent, 75 percent, or 100 percent of the per capita cost for non-violent wards classified respectively in Categories 5, 6, and 7. (A new provision to this section, enacted on July 1, 2003, allows for annual review of actual costs incurred and subsequent adjustment of the pre-determined base amount for the sliding scale).[37]

The sliding fee scale was introduced in 1997 to encourage counties to find alternatives to California Youth Authority commitment for non-violent offenders and appears to have had that effect. An estimate of future overall youthful offender population shows a continuing decrease in the California Youth Authority population (See Appendix C, Table 1). Conversely, the more violent ward population continues to rise. That fact, coupled with the development of increased services for more troublesome wards, has increased the true cost incurred by the Youth Authority to house each ward. Current estimates of actual per capita costs range between $66,000 estimated by the California Youth Authority[38] and $80,000[39] estimated by the Juvenile Justice Reform Group and Kevin Carruth, Undersecretary of Youth and Adult Corrections Agency. Both figures far exceed the current $36,500 per capita reimbursement rate (Appendix D.)

---

[36] Welfare and Institutions Code Sections 912, 912.1, 912.5
[37] *Ibid.*
[38] Sheryl Ward, Chief of Financial Services Management, California Youth Authority, telephone interview.
[39] Juvenile Justice Reform Group meeting, April 1 2004, participants' notes.

Given these circumstances, an upward adjustment to the sliding fee scale of 25 percent to $50,000 is warranted. This prudent adjustment will continue to encourage counties to reduce the number of non violent youthful offenders sent to the California Youth Authority without making the cost prohibitive and will encourage local program development. The option of sending the most difficult, unmanageable youth that the county cannot effectively program will remain affordable.

***Judges and probation officers have no role in decisions to continue incarceration.*** The California Youth Authority has not been mandated to involve local courts, judges, and probation officers in the treatment and incarceration of youthful offenders. One superior court judge noted recently in correspondence to Senator Gloria Romero that local juvenile justice systems are not afforded the opportunity to oversee or be involved in decisions affecting wards committed to the California Youth Authority.[40] In most cases, the committing court hears little about wards committed to the California Youth Authority until they are in trouble again. Much to the same extent, county probation departments are also left out of the loop about wards until they receive a notification of additional charges because the ward's stay at the California Youth Authority has been extended. According to Dr. Barry Krisberg of the National Council on Crime and Delinquency in correspondence to G. Kevin Carruth, Undersecretary of Youth and Adult Corrections Agency, most judges would welcome the chance to interact with youthful offenders throughout all stages of the juvenile justice system.[41] Furthermore, the concept of coordinating efforts and increasing community involvement seems to be the resounding theme among youthful offender advocates, employees of the California Youth Authority, and the Department of Finance.

At present, there is no effective partnership between the California Youth Authority, the courts, and county probation departments and communication between these entities is minimal. The cost of this disconnect is the loss of valuable resources and services for youthful offenders paroled from California Youth Authority institutions. The amount of additional time wards serve in California Youth Authority institutions for misbehavior varies. Many receive much more time. At present, 540 California Youth Authority wards will serve all of their available confinement time due to time extensions for disciplinary or treatment reasons.[42] Often, these time extensions are unknown to the counties until they receive a request for payment of services provided.

Partly because of these extensive time adds, Senate Bill 459, which went into effect on January 1, 2004, provided for the new Youth Authority Board to serve as the second and final review level to hear appeals regarding treatment and training and disciplinary time extensions. The Corrections Independent Review Panel has concluded that this appeal process should be retained, but that for wards in Categories 5-7, the decision of the Youth Authority Board will be reviewed by the committing court.

---

[40] Judge Leonard Edwards, Judge, Santa Clara Superior Court, letter to Senator Gloria Romero, March 1, 2004.
[41] Electronic mail from Barry Krisberg to G. Kevin Carruth, re: Juvenile Justice Reform Workgroup, March 29, 2004.
[42] Sue Easterwood, California Youth Authority, electronic mail re: Maxed Out, May 11, 2004.

When wards are referred for return to the county for probation, the California Youth Authority should reimburse the county $5,000 annually for aftercare services provided to each ward.[43] A caveat to this recommendation is that probation officers not be granted the authority to revoke probation and refer wards directly to the California Youth Authority for revocation, but instead may refer the case to the court for review and recommendation. The presiding judge may hold the commitment to the California Youth Authority in abeyance, conditional on successful completion of probation.

Recognizing that some counties are not equipped to provide these services, and that the needs of some wards may be greater than the capacity of county probation services to provide, the state should encourage counties to develop "joint use facility agreements" with adjoining counties to provide aftercare services. Counties also should be allowed to contract with the California Youth Authority for parole services in accordance with a "needs assessment" conducted for the ward.

***The California Youth Authority has lost valuable parole resources to budget cuts.*** In the past four years, the California Youth Authority has lost a number of parole resources as a result of budget cuts. Programs such as the "Transitional Residential Program" and "Fouts Springs" offered pre-release planning and other options in lieu of re-institutionalizing for parolees who violate technical conditions of parole. The programs were similar to the traditional half way houses but offered stronger treatment, educational, counseling and job assistance components.[44] The Transitional Residential Program, established in 1982 in Los Angeles County, provided pre-parole placement in a residential center operated by Volunteers of America, Inc. The program provided employment development services, job referrals, counseling services, and 24-hour supervision for up to 34 wards. Participants were required to seek full-time employment and, upon obtaining employment, were responsible for their transportation costs. After a ward successfully completed the program, the parole agent made a recommendation for parole consideration to the Youth Authority Board. Although the Transitional Residential Program did not formally track participants, the former administrator estimated that 75-80 percent of program graduates had not re-offended within a year of completing the program. Anecdotal evidence indicates that most participants maintained employment and often were promoted to jobs earning a higher wage.[45] The program was discontinued because of budget cuts.

Fouts Springs was developed in 1987 to fulfill a need for drug treatment options for northern California parolees having a substance abuse history. The program offered 90-day drug

---

[43] Zlatco Theodorovic, Department of Finance Budget Analyst and Ms. Sheryl Ward, Chief of Financial Services Management, California Youth Authority, telephone discussions.

[44] Parole Services and Community Corrections Branch, document provided by Mike Cardoff, California Youth Authority parole agent III, May 2004.

[45] According to Allen Breed, former California Youth Authority Director and nationally recognized court monitor, the lack of solid research to support best practices is one of the difficulties in the California Youth Authority. Allen Breed, letter to former Governor George Deukmejian, May 11, 2004.

treatment in a partnership between the California Youth Authority and Fouts Springs Youth Correctional Facility. The program was operated by Solano and Colusa counties as a relapse option in lieu of parole revocation. The cost benefits of this short-term program were significant when compared with the cost of re-incarcerating wards for a period of 6 to 12 months for technical parole violations involving substance abuse. For wards, a return to custody counts as a parole failure, whereas the Fouts Springs program was in lieu of revocation. This program was also discontinued due to budget constraints.

***The California Youth Authority needs more specialized Parole Agent IIs.*** The California Youth Authority presently does not have enough specialized Parole Agent IIs to adequately supervise sex offenders and mentally ill wards on parole**.** Providing treatment, supervision, and critical services to sex offenders paroling from California Youth Authority institutions is critical to the parolee's re-integration into the community, and only Parole Agent IIs receive specialized training for that purpose. Inside the institutions, sex offenders receive treatment and training designed to address the urge to offend. Aftercare treatment, provided to parolees by Parole Agent IIs, who have been trained in the sex offender curriculum, is designed to reinforce the concepts, therapeutic issues, and relapse prevention techniques. As of April 5, 2004, there were 381 sex offenders in the department's parolee population, yet eight parole offices have no specialized Parole Agent IIs to provide sex offender services, thus breaking the continuum of treatment.[46] It is critical this group of offenders be afforded highly individualized parole services and that treatment services be continued.

## Recommendations

The panel recommends that the state take the actions listed below to improve the ability of the California Youth Authority Parole Branch to meet the specialized treatment and mental health needs of the wards under its supervision. The recommendations are intended to create a more effective partnership with county probation and court services to enable wards released from California Youth Authority institutions to be better served in their local communities.

- Adjust the sliding fee scale used to determine how much a county pays the state for housing non-violent wards in the California Youth Authority from $36,500 to $50,000 to more accurately reflect the actual cost of those services.

- Grant committing courts sole authority and final review for revoking parole or probation or for extending length of stay at the California Youth Authority for wards in Categories 5, 6, and 7.

- Encourage counties to develop joint-use facility agreements or to contract with adjoining counties to provide aftercare services for parole services.

---

[46] Parole Services and Community Corrections Branch North and South Regions, January 2004

- Provide funding in each parole region for entry programs, aftercare services, transition programs such as half-way houses, and alternatives to parole revocation. The services should include employment assistance and short-term substance abuse treatment.

- Increase the number of specialized Parole Agent IIs by eight to provide services for sex offenders and wards with mental health problems. Each field parole office should have one specialized parole agent II to supervise and provide training and resources to sex offenders and mentally ill parolees.

- Give counties the option of providing parole supervision for non-violent wards in Categories 5, 6, and 7. The state should subsidize the cost of probation services offered by the counties.

- As a result of allowing counties to provide parole supervision for non-violent wards, cut the number of parole agent positions proportionately and allow some of those positions to be re-directed toward the more violent high-risk offenders (Categories 1, 2, 3, and 4) in order to lower the ward-to-parole agent ratio.

## Fiscal Impact

Although a detailed financial analysis would be necessary to determine the actual costs and savings associated with these recommendations, the Corrections Independent Review Panel estimates that the recommendations would result in an annual savings of approximately $4.5 million. The expected savings can be summarized as follows:

- ***Adjustment to the sliding fee scale.*** Increasing the sliding scale fee that counties pay the state for housing non-violent wards from $36,500 to $50,000 so as to more accurately reflect the actual cost of those services would provide an estimated $9,568,698 in increased annual revenue to the state. The estimate is based on average daily population estimates for the spring of fiscal year 2004-05 (Appendix C). The totals can be broken down as follows:

  Category 5 = $4,651,815 increased revenue to the California Youth Authority
  Category 6 = $4,575,144 increased revenue to the California Youth Authority
  Category 7 = $341,739 increased revenue to the California Youth Authority
  Total = $9,568,698 increased revenue to the California Youth Authority

- ***Funding for entry programs, aftercare services, and transition programs.*** Funding for entry programs, aftercare services, transitional programs, and alternatives to parole revocation could result in significant savings**.** Savings of approximately $45,000 annually ($3,800 per month) could be realized for each available bed in a transition program similar to the Transitional Residential Program. Assuming the availability of 34 beds, annual savings would amount to an estimated $1.55

million. Entry and aftercare service programs would create off-set possibilities to decrease state costs and improve services to parolees. The Transitional Residential Program charged approximately $1,200 per month to provide each ward with food, housing, and personal expenses, whereas the average monthly cost to house wards in a dormitory setting in a California Youth Authority institution is approximately $5,000 per month.[47]

A savings of $27,600 annually ($2,300 per month) would be realized for each available bed in a program similar to the Fouts Springs program, which offered drug treatment as an alternative to parole revocation. Assuming the availability of 44 beds, annual savings would be an estimated $1.2 million.[48] The Fouts Springs program charged approximately $2,700 per month to provide each ward with housing, treatment programming, and medical care, compared to approximately $5,000 to house wards in a California Youth Authority institution dormitory setting.

- *Increasing Parole Agent II positions.* Increasing the number of Parole Agent II positions by eight, to provide sex offender and mental health services is expected to initially increase state expenditures by approximately $528,000 ($5,500/ monthly base salary *x* 12 months *x* 8 positions). Over time, this expenditure would be expected to be offset in the form of reduced criminal acts and recidivism for parolees receiving the services.

- *Subsidizing county probation services*. Assuming that all 1,740 non-violent wards presently under California Youth Authority parole supervision could be served instead through county probation services subsidized by the state, a net rebate of $8.7 million would be returned to the counties. That amount equates to 28 percent of the California Youth Authority's $31 million parole budget and is based on $5,000 per parolee.

- *Cutting and re-directing parole agent positions*. Reducing the number of California Youth Authority parole agent positions by a number proportionate to the number of wards supervised through county probation services instead of through California Youth Authority parole services and re-directing some of the positions to the more violent ward population would result in an estimated savings of $1,440,000. The estimate assumes a 40 percent reduction in the present staff of 120 parole agent positions, for a reduction of 48 positions, and a re-direction of 50 percent of that number (24 positions) toward more violent youthful

[47] The $5,000 per month rate was used as the cost of housing wards for purposes of this fiscal estimate because wards eligible for transitional programs would not have specialized treatment needs, would not be sex offenders, and would have a low violence potential and low escape risk.
[48] Parole Services and Community Corrections Branch, document provided by Mike Cardoff, Parole Agent III, California Youth Authority, May 2004.

offenders in the parole population. The change would result in a net reduction of 24 parole agent positions, with a total of 96 positions remaining. The estimated savings is based on a $5,000/month Parole Agent I base salary. Additional savings would be expected through reduced recidivism resulting from improved services to parolees and a decrease in the parole agent caseload.

# Appendix

This Appendix is divided into four sections;

    A  Parole Services offered at California Youth Authority parole offices.

    B.  California Code of Regulations, Title 15, explanation of California Youth Authority Categories 1-7.

    C.  Tables depicting the California Youth Authority population and administrative staffing.

    D.  Estimates of county sliding fee payments.

## Appendix A

### Parole Services

**Gang Investigation and Apprehension Unit.**  Each parole region operates a gang investigation and apprehension unit. The primary focus of the unit is aggressive investigation and apprehension of missing parolees and institutional escapees. The gang investigation and apprehension unit collaborates with state, federal and local law enforcement, including county probation departments.

**Intensive Re-entry Caseload.**  Intensive re-entry is designed to increase public protection by early detection and prevention of parole violations, and to provide maximum services during the most critical period, e.g., the transition from institutional to community living. Caseload ratios are 1:15.  Each parole unit provides intensive re-entry services, in areas where it is geographically feasible.  This program averages 90 days in duration, and is dependent upon the service needs of the wards released to parole.  Intensive re-entry services include two contacts per week for the first 30 days and weekly contacts for the duration of the re-entry period.  Also included is twice monthly substance abuse testing for parolees with substance issues, employment/education/job training assistance, individual and group counseling, subsidized placement, and other services as needed.

**Specialized Caseload.**  Each parole unit has one or more specialized caseloads, based on local needs.  Parole agents are assigned fewer cases (1:30 budgeted ratio) than those with case management caseloads.  Specialized caseload provides concentrated, intensive services for parolees with special needs, e.g., severe substance abuse, sex offenses, mental health problems, needs for specialized placement, and heavy gang activity.  Specialized caseloads increase the likelihood of offender's successful adjustment as self supporting and contributing members of the community, and enhance the ability of the parole agent to identify potentially dangerous behavior at the earliest possible time.  Parolees typically remain on specialized caseloads until they have exhibited stable behavior for a significant period of time and no longer pose a major threat to public safety or need intensive services.

**Case Management Caseloads.** Parolees are transferred to case management after intensive re-entry or upon transitioning from a specialized caseload. Parolees are seen a minimum of twice per month if classified as maximum supervision/services, and once if classified medium. The purpose of case management is to assist the parolee in maintaining acceptable levels of behavior, job, and at home, and a variety of collateral contacts.

**Parenting Program.** To improve the parenting skills of parolee fathers through an educational parenting course with the intention of helping their children break the inter-generational cycle of learned violence and involvement in the criminal justice system.

**Education Services.** Classes are on site in Parole Offices and Charter Schools located in Sacramento and Watts (Youth Authority operated Parole Schools), Central Valley Stockton, South Coast , Inland , LA Metro, Gang Services (local school district operated Charter Schools), Oakland, San Jose, San Fernando and San Diego.

**Community Service.** Parolees are required to perform 80 hours of community services in order to receive an honorable discharge. Parole offices work with government agencies, non-profit organizations and business to provide parolees with community services projects to do clean-up, landscaping, remodeling and other services.

**Specialized Counseling for Sex Offenders.** Contracted counseling services, which include, but are not limited to, weekly counseling sessions (group and individual).

**Restitution.** From July 1996 through March 2004, Parole has collected $215,047 in Restitution Fines and $295,575 in Victims Restitution for a total of $510,622 from parolees.

**Tattoo Removal.** Parolees can have tattoos removed through a partnership with designated treatment facilities and hospitals in Northern and Southern California.

**Tools for Success.** A partnership with Parole's San Diego Project, Franklin Outreach Center, and community-based organizations is based on a "wrap-around service model"—a collaborative team, which includes parole agents, teachers, Parolees and community based organizations. They ensure the following services are implemented: basic re-entry services, community integration, cognitive restructuring, training, and employability/vocational assistance. The program is for newly-released parolees, with classes scheduled for six weeks, eight hours a day. Activities include employment, parenting and family re-unification.

**Project Choice.** A new collaborative effort between the City of Oakland and various city and state departments including the County Probation Department and a coalition of community partners. With more than 3,000 parolees released to Oakland each year (including Department of Corrections parolees), this project is designed to reduce recidivism by providing additional support to parolees for successful re-entry into the community, while providing for a safer community.

**Mentoring Services.** This mentor program matches volunteer attorneys with parolees. Matches participate in VIP sponsoring events.  The VIP program provides services to the following parole offices; San Diego, Watts, Covina, South Coast, Gang Services, San Fernando, East Los Angeles, Oakland, Fresno and San Jose.  Program activities include job training and placement, education, legal aid, and other services necessary to help parolees become productive and self-sufficient.

**Westside Energy Service Training and Education Center (WESTEC).** Collaboration between the Bakersfield Parole Office, Taft Community College, the Department of Corrections, County Probation and the WESTEC.  The college pays tuition fees with WESTEC developing the training courses in light to heavy general petroleum and mining industries. Parolees may also further their education by attending courses in general education and vocational training.  Employer visits the classes and interview potential employees.  More than 600 parolees have completed the training program with 93 percent of the parolees employed for a minimum of 90 days.

**Appendix B**

California Code of Regulations, Title 15,

Explanation of California Youth Authority Categories 1-7

**California Code of Regulations, Title 15, Section 4951 - Category 1 Offenses**

A parole consideration date interval of seven years shall be established for those cases committed to the Youth Authority for offenses in this category.

Offenses:

1. Murder – First Degree
2. Murder – Second Degree
3. Kidnapping w/death of victim
4. Kidnapping w/substantial injury
5. Torture
6. Conspiracy to commit any Category 1 offense.

**Section 4952 – Category 2 Offenses**

A parole consideration date interval of four years shall be established for those cases committed to the Youth Authority for offenses in this category.

Offenses:

1. Voluntary Manslaughter
2. Rape
3. Sodomy
4. Sexual Assault w/foreign object
5. Oral Copulation
6. Lewd/Lascivious w/child under 14
7. Kidnap for ransom, reward, extortion
8. Kidnap during carjacking
9. Explosion or attempt to ignite device w/intent to commit murder
10. Kidnap for robbery
11. Conspiracy to commit any Category 2 offense
12. Attempt of any Category 1 offense
13. Continuous sexual abuse of a child

**Section 4953 – Category 3 Offenses**

A parole consideration date interval of three years shall be established for those cases committed to the Youth Authority for offenses in this category.

Offenses:

1. Sexual Assault w/foreign object
2. Rape
3. Sodomy
4. Oral Copulation
5. Kidnap
6. Robbery (armed w/dangerous, deadly weapon, w/substantial injury)

7. Robbery of inhabited dwelling
8. Robbery – Operator of transportation of vehicle for hire
9. Assault w/deadly weapon likely to produce great bodily injury on peace officer, fireman, custodial officer, or school personnel.
10. Assault w/firearm on peace officer fireman
11. Grand Theft Person – armed w/dangerous, deadly weapon, w/substantial injury
12. Burglary armed w/dangerous, deadly weapon, w/substantial injury
13. Shooting at inhabited dwelling, occupied building, or vehicle, w/substantial injury
14. Arson causing great bodily injury or during State of Emergency
15. Mayhem
16. Vehicular manslaughter w/gross negligence
17. Gross vehicular manslaughter while intoxicated
18. Carjacking
19. Kidnap w/intent to commit specified sex crimes
20. Discharge firearm from motor vehicle
21. Conspiracy to commit any Category 3 offense

**Section 4954 – Category 4 Offenses**
A parole consideration date interval of two years shall be established for those cases committed to the Youth Authority for offenses in this category.
Offenses:

1. Vehicular Manslaughter
2. Involuntary Manslaughter
3. Robbery (Armed With Dangerous or Deadly Weapon or With Substantial Injury
4. Assault with Caustic Chemicals
5. Assault with a Deadly Weapon or Force Likely to Produce Great Bodily Injury w/ substantial injury
6. Assault with Firearm w/substantial injury
7. Assault with Intent to Commit Rape, etc.
8. Child Cruelty likely to produce great bodily injury death
9. Extortion
10. Grand Theft Person armed with dangerous or deadly weapon or w/substantial injury
11. Burglary armed with dangerous or deadly weapon or w/substantial injury
12. Shooting at Inhabited Dwelling House, Occupied Building or Vehicle
13. Arson
14. Recklessly Causing a Fire of any Structure, Forest Land, or Property (with substantial injury
15. Sale, Possession for Sale, Transportation, or Furnishing of Controlled Substance, Narcotics, Marijuana.
16. Maintaining Place for Selling, Using of Certain Controlled Substances or Specified Narcotics

17. Any other felony including attempted felony not listed in Categories 1 through 3 w/ substantial injury
18. Conspiracy to commit any Category 4 offense
19. Discharging a Firearm from a Motor Vehicle
20. Attempt of any offenses in Categories 2 and 3.
21. Recommitment for any offense listed in Category 5 and 6 w/ a prior commitment for any offense in Categories 1 through 6.

**Section 4955 – Category 5 Offenses**
A parole consideration date interval of eighteen months shall be established for those cases committed to the Youth Authority for offenses in this category.
Offenses:
1. Assault with a deadly weapon or force likely to produce great bodily injury
2. Battery w/substantial bodily injury
3. Battery upon a peace officer, fireman, or custodial officer
4. Recklessly Causing a Fire of Inhabited Structure or Property
5. Robbery
6. Grand Theft Person
7. Burglary, 1st Degree
8. Accessory to Murder
9. Sexual Battery
10. Intimidation of Witness by Force or Fear; in furtherance of a conspiracy; for pecuniary gain; or by a repeat offender
11. Conspiracy to commit any Category 5 offense
12. Attempt of any Category 4 Offense.

**Section 4956 – Category 6 Offenses**
A parole consideration date interval of one year shall be established for those cases committed to the Youth Authority for offenses in this category.
Offenses:
1. Concealable Firearms
2. Possession of Explosives, Flammable Matter or Fire Bomb
3. Recklessly Causing Fire to Uninhabited Structure or Forest Land
4. Burglary, 2nd Degree
5. All felonies not listed
6. Conspiracy to commit any Category 6 offense
7. An attempt of any Category offense

**Section 4957 – Category 7 Offenses**
A parole consideration date of one year or less shall be established for those cases committed to the Youth Authority for offenses not listed in Categories 1 through 6. This provision also applies to a case in which parole has been revoked for technical violation.

WARD/PAROLEE POPULATION MANAGEMENT    **8**

## Appendix C

Tables depicting the California Youth Authority population and administrative staffing

### TABLE 1
### Ward Population- Historical and Projected

| Actual Population As Of June 30 | | Projected Population As Of June 30 | |
|---|---|---|---|
| Year | Wards | Year | Wards |
| 1996 | 10,144 | 2004 | 4,090 |
| 1997 | 8,790 | 2005 | 3,895 |
| 1998 | 8,122 | 2006 | 3,760 |
| 1999 | 7,618 | 2007 | 3,755 |
| 2000 | 7,380 | 2008 | 3,750 |
| 2001 | 6,776 | 2009 | 3,740 |
| 2002 | 5,847 | | |
| 2003 | 4,879 | | |

### TABLE 2
### Administrative Staffing

| Fiscal Year | Auth. Pers. Year (Py) | Conversion To Auth. Positions | Admin. Budget |
|---|---|---|---|
| 2003-04 | 321.4 | 338.3 | $29,850 |
| 2002-03 | 278.7 | 293.4 | $29,569 |
| 2001-02 | 319.2 | 336.0 | $30,200 |
| 2000-01 | 315.4 | 332.0 | $26,403 |
| 1999-00 | 299.9 | 315.7 | $20,993 |
| 1998-99 | TBD * | 0.0 | TBD |
| 1997-98 | TBD | 0.0 | TBD |
| 1996-97 | TBD | 0.0 | TBD |
| 1995-96 | TBD | 0.0 | TBD |

**\***Amounts not yet determined.

195

# Appendix D
## Estimates of county sliding fee payments

**DEPARTMENT OF THE YOUTH AUTHORITY**
**ESTIMATE OF COUNTY PAYMENTS**
**USING SPRING 2004 POPULATION PROJECTIONS**
**2003-04 FISCAL YEAR**

| COUNTY | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | CAT. I - IV MONTHLY COST $176 | CAT. V -VII ANNUAL PER CAPITA $36,504 | TOTAL COST |
|---|---|---|---|---|---|
| ALL COUNTIES | I - IV | 2,393 | $   5,054,016 | | $   5,054,016 |
| | V | 850 | | $   15,514,200 | 15,514,200 |
| | VI | 549 | | 15,030,522 | 15,030,522 |
| | VII | 29 | | 1,058,616 | 1,058,616 |
| TOTALS | | 3,821 | $   5,054,016 | $   31,603,338 | $   36,657,354 |

| | | |
|---|---|---|
| 2004 Spring Projections estimated reimbursements | | $   36,657,000 |
| 2003-04 as adjusted by 1/10/2004 Governors Budget | | 37,483,000 |
| Increase/(Decrease) in estimated reimbursements | | $   (826,000) |

ASSUMPTIONS:
1. Juvenile Court Commitments only.
2. ADP based on current commitment rates.
3. Fee Indexing = $176 per month.
4. Per Capita Cost = $36,504 per year. AB 1758 (CH 158/2003) effective July 1, 2003
5. Fee Indexing cost computation example: Category I-IV = (ADP x ($176 per month x 12 months)).
6. Sliding scale = Category V (50% of per capita cost; Category VI (75% of per capita cost); Category VII (100% of per capita cost).
7. Cost computation example: Category V = (ADP x ($36,504 x 50%));
   Category VI = (ADP x  (36,504 x 75 %); Category VII = (ADP x 36,504).
8. Effective July 1, 2003.

| | SPRING POPULATION PROJECTIONS CURRENT YEAR | | FALL POPULATION PROJECTIONS CURRENT YEAR | | |
|---|---|---|---|---|---|
| COUNTY | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | DIFFERENCE |
| ALL COUNTIES | I - IV | 2,393 | I - IV | 2,494 | -101 |
| | V | 850 | V | 829 | 21 |
| | VI | 549 | VI | 534 | 15 |
| | VII | 29 | VII | 34 | -5 |
| TOTALS | | 3,821 | | 3,891 | -70 |

196

**DEPARTMENT OF THE YOUTH AUTHORITY**
**ESTIMATE OF COUNTY PAYMENTS**
**USING SPRING 2004 POPULATION PROJECTIONS**
**2004-05 FISCAL YEAR**

| COUNTY | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | CAT. I - IV MONTHLY COST $180 | CAT. V -VII ANNUAL PER CAPITA $37,343 | TOTAL COST |
|--------|---------------|------------------------|-------------------------------|---------------------------------------|------------|
| ALL COUNTIES | I - IV | 2,049 | $       4,425,840 | | $       4,425,840 |
| | V | 735 | | $    13,723,553 | 13,723,553 |
| | VI | 482 | | 13,499,495 | 13,499,495 |
| | VII | 27 | | 1,008,261 | 1,008,261 |
| TOTALS | | 3,293 | $       4,425,840 | $    28,231,308 | $      32,657,148 |

| | | |
|---|---|---|
| 2004 Spring Projections estimated reimbursements | | $      32,657,000 |
| 2004-05 Fall Population | | 32,348,000 |
| Increase/(Decrease) in estimated reimbursements | | $          309,000 |

ASSUMPTIONS:
1. Juvenile Court Commitments only.
2. ADP based on current commitment rates.
3. Fee Indexing = $180 per month.
4. Per Capita Cost = $37,343 per year. AB 1758 (CH 158/2003) effective July 1, 2004
5. Fee Indexing cost computation example: Category I-IV = (ADP x ($180 per month x 12 months)).
6. Sliding scale = Category V (50% of per capita cost; Category VI (75% per capita cost); Category VII (100% of per capita cost).
7. Cost computation example: Category V = (ADP x ($37,343 x 50%));
         Category VI = (ADP x  (37,343 x 75 %); Category VII = (ADP x 37,343).
8. Effective July 1, 2003.

| | SPRING POPULATION PROJECTIONS BUDGET YEAR | | FALL POPULATION PROJECTIONS BUDGET YEAR | | |
|--------|--------------|------------------------|--------------|------------------------|------------|
| COUNTY | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | YOPB CATEGORY | AVERAGE NUMBER OF WARDS | DIFFERENCE |
| ALL COUNTIES | I - IV | 2,049 | I - IV | 2,179 | -130 |
| | V | 735 | V | 716 | 19 |
| | VI | 482 | VI | 450 | 32 |
| | VII | 27 | VII | 28 | -1 |
| TOTALS | | 3,293 | | 3,373 | -80 |

**This Page Left Blank**

# Closures

Over the last century and a half since California's first prison opened in 1852, the state's correctional system has grown to become the largest in the nation, rivaling in size and numbers even those of most other countries. Today, California operates 32 adult prisons, 38 fire camps, and eight youth correctional facilities—providing custody for more than 162,000 adult inmates and 4,000 youthful offenders. California's prisons stretch the length and breadth of the state, from Crescent City on the Oregon border to San Diego on the south; east to Blythe in the Mojave Desert, up through the central valley, and all the way to Susanville in the northeast.

Not surprisingly, this massive system shows the strains of both its age and its decades-long growth. Adult prisons are severely overcrowded, imperiling the safety of both correctional employees and inmates. Youth correctional facilities, built decades ago to house truants, runaways, and so-called "incorrigibles," now must accommodate far more violent and disturbed youths. Maintenance costs for aging facilities, meanwhile, consume an ever-greater share of the corrections budget.

Now another fundamental shift is taking place. In the last five years, the number of youthful offenders committed to state custody has fallen by more than half, and recent projections show that the adult inmate population is also now expected to decline.

In that context, the Corrections Independent Review Panel considered what changes could be made to better match correctional facilities to ward and adult inmate populations and whether older institutions with higher repair and maintenance costs could be closed.

The panel concluded that the declining numbers will allow the state to make adult prisons safer by shifting inmate populations to relieve acute overcrowding. At the same time, the dramatic decline underway in the number of youthful offenders committed to state custody will make it possible to close several youth institutions. More important, closing selected youth facilities while retaining the same staffing levels would enable the state to vastly improve treatment and programming for youthful offenders.

## Fiscal Impact

Implementing the panel's recommendations would save the state an estimated $85.7 million between fiscal years 2005-06 and 2008-09 and would eliminate the need for 639 budgeted correctional officer positions. The estimate assumes that the staffing reductions would be achieved through normal attrition, rather than through layoffs.

# Department of Corrections

California's adult prisons are filled to almost double capacity. As a result, some inmates are triple-bunked — stacked three deep in bunk beds — others are living two-to-a-cell in cells designed for one, and beds for both low- and medium-risk inmates are crammed into gyms and dayrooms that were never meant to be used for housing. These "ugly beds," as prison administrators call them—which presently total almost 9,500—create difficult, unsanitary living conditions where ventilation is poor, toilet access is limited, and as many as 200 people might share six showers. The situation makes the prisons dangerous, putting correctional employees and inmates alike at risk of violence, and has made the state vulnerable to lawsuits challenging the constitutional adequacy of inmate conditions of confinement.

Now, though, after decades of escalating inmate population levels, the Department of Corrections expects the number of adult inmates to begin declining, fueled by such factors as better mental health services, day-for-day credit granted earlier in an inmate's sentence, broader availability of drug treatment, and a new parole and reentry program.

But because inmate population figures are influenced by numerous factors outside the department's control, including crime and arrest rates, sentencing laws, and judicial decisions, the downward trend has yet to materialize. As of May 5, 2004, the actual inmate population exceeded projections by more than 1,000 inmates.[1]

The Department of Corrections still expects the inmate population to fall according to projections because of new programs now being instituted. But the Corrections Independent Review Panel found that because of the severe overcrowding in the institutions— and until significant declines are realized—the State cannot close any of its adult prisons. Instead, as declines begin to occur, the department should concentrate its efforts on relieving overcrowding by doing away with "ugly beds" to make the prisons safer, improve living conditions, help to satisfy constitutional standards for conditions of confinement, and save money in the process.

If—and only if—the inmate population falls according to projections, the department could gradually deactivate almost 78 percent of the ugly beds —7,343 beds in triple bunks and gymnasiums. The panel recommends that the state give first priority to deactivating triple bunks. After that, and again only if population declines according to projections, the state should gradually deactivate beds in gymnasiums and dayrooms.

---

[1] California Department of Corrections, Offender Information Services Branch, "Weekly Comparison of Actual and Projected Population," May 10, 2004.

## Recommendations

If the adult inmate population declines according to projections, the new Department of Correctional Services should deactivate prison beds in the following priority:

- All emergency triple bunk beds by June 2005.

- 2,219 gymnasium beds in Level III and IV institutions.

- Up to 4,200 additional gymnasium beds in Level IV, III, and II institutions through 2009.

## Fiscal Summary

Implementing the recommended bed deactivations as the inmate population declines would save the state $45 million between fiscal years 2005-06 and 2008-09 and would eliminate the need for 639 budgeted correctional officer positions.

## Background

The Department of Corrections is constitutionally mandated to provide inmates with acceptable conditions of confinement and access to adequate health care services. Over the past several years, a succession of lawsuits challenging the department's performance in these areas have resulted in numerous court orders and settlements, ongoing court-ordered monitoring, and an evolving definition of minimum standards for inmates. The most important cases defining conditions of confinement are the following:

*Hoptowit v. Ray* (U.S. Court of Appeals, Ninth Circuit, 1980). The case established constitutional minimum standards for correctional entities in providing inmates with food, clothing, shelter, sanitation, medical care, and personal safety.

*Toussaint v. Rushen,* (U.S. Court of Appeals, Ninth Circuit, 1980). The case concerned conditions of confinement and due process requirements for inmates housed in administrative segregation units.

*Madrid v. Wilson* (US District Court, Northern District of California, 1990). The case concerned conditions of confinement, medical care, and mental health services for inmates at the Pelican Bay State Prison security housing unit.

*Coleman v. Wilson* (U.S. District Court, Eastern District of California, 1990). The case concerned mental health care for seriously mentally ill inmates.

*Armstrong v. Wilson* (US District Court, Northern District of California, 1994). The case concerned access to programs, services, and activities for inmates with disabilities.

*Clark v. Davis,* (U.S. District Court, Northern District of California, 1996). The case concerned access to programs, services and activities for inmates with developmental disabilities.

*Plata v. Davis,* (U.S. District Court, Northern District of California, 2001). The case concerned timely access to adequate medical care and treatment.

In most instances, court orders resulting from these cases have required modification of the physical plant and consequent higher costs for prison operations. Changes to make conditions of confinement consistent with constitutional minimum standards, therefore, are not only legally necessary and compelling from a humanitarian standpoint, but also fiscally prudent.

Department of Corrections institutions are presently rated at 197.7 percent occupied,[2] with almost 9,500 inmates housed in so-called "ugly beds" — triple bunks in dorm settings and beds in gyms and dayrooms. Inmate housing units are classified into four security levels, with Level I the least restrictive and Level IV the most secure. Table 1 in the Appendix shows the number of inmate beds by institution, security level, and housing type, including more than 8,500 beds presently in gyms and day rooms.[3] Another 924 "ugly beds," not shown in the table, are represented by triple bunks in Level I and Level II facility dorms.

***Projected population decline.*** The Department of Corrections projects that the inmate population will decline by 3,308 inmates over the next five fiscal years and that the mix of inmates will shift. Table 2 in the Appendix illustrates the projected system-wide inmate population decline by year for the years 2004 to 2009.[4] Specifically, the department projects a decline by 2009 in the lowest custody levels (Level I, II), with a decrease of 4,930 Level I inmates and a decrease of 1,344 Level II inmates. The number of female inmates is also projected to decline by 866. At the same time, the projections reflect an increase of 184 Level III inmates, an increase of 3,608 Level IV and security housing unit inmates, and an increase of 40 reception center inmates by 2009.[5] Table 3 in the Appendix shows the expected change in population by custody level through 2009. Delano II, a new Level IV institution with a potential double-cell capacity of 4,190, scheduled for activation in May 2005, will help house some of the increased Level IV population reflected in Table 3.

***Accuracy of the population projections.*** The population projection model used by the Department of Corrections is generally regarded as the best available, but it is accurate only in the short term, with long-term projections much less reliable.[6] To make the long-term

---

[2] California Department of Corrections, Weekly Report of Population as of March 24, 2004.

[3] California Department of Corrections, Population Projection Unit, "Weekly Population Summary," March 12, 2004."

[4] California Department of Corrections, Population Projection Unit, "Projections Report," Spring 2004.

[5] Ibid.

[6] The model, which takes into account more than 100 variables, was developed by the Department of Corrections and has been adopted by several other states. The U.S. Bureau of Prisons has also used it to develop a similar model.

projections as accurate as possible, the department adjusts the model every six months to reflect changes in sentencing laws, revisions to internal operations and procedures, and analyses of actual incoming inmate population. Yet, projections as long as five years out are still not as accurate as short-term projections. A comparison of the department's projections to actual inmate population over the past nine years shows that first-year projections were an average of .6 percent greater than the actual population and that fifth-year changes were 18 percent greater. The range of difference is presented in Table 4 (See Appendix).[7]

It is also important to note that the population decline projected by the Department of Corrections depends in part on the success of new programs presently in various stages of operation. The difficulty of accurately predicting population declines associated with the new programs is illustrated in Table 3 (See Appendix), which shows the inmate population on February 29, 2004 to be 1,300 greater than the population projected for June 30, 2004.

The Department of Corrections attributes the projected decline in the inmate population to the following programs.[8]

- Granting day-for-day credit to inmates assigned to education and vocational programs beginning with the inmate's arrival at the reception center. That change, which began in February 2004, allows inmates to receive day-for-day credit beginning on the first day of incarceration, in contrast to the previous practice, which provided one-third credit on arrival and day-for-day credit beginning at a later date.

- Expansion of the transitional case management program, which provides mental health services to parolees upon release from prison to ensure continuity of mental health care in the community.

- New pre-release and re-entry programs, which are designed to reduce parole revocations by providing programs and alternatives to incarceration for parolees.

- Substance abuse treatment programs in institutions and the community to provide alternative treatment and sanctions for parole violators instead of returning them to prison. These programs have been operating for several years.

***Population decline provides the opportunity to deactivate "ugly beds."*** As the inmate population declines, the department could gradually deactivate ugly beds while continuing to make maximum use of existing resources and institution physical plants in a safe and

---

[7] California Department of Corrections, Population Projection Unit, "Summary of Projection Errors, Spring 1993 – Fall 2003."

[8] California Department of Corrections, Population Projection Unit, "Spring 2004 Population Projection Report – Assumptions."

reasonable manner. The changes must be undertaken in a manner consistent with inmate custody level, disability designation, mental health care needs, health care status, behavior, safety and security, and physical plant limitations. Deactivation of beds must take into account inmates with specialized needs, such as those with disability placement restrictions, sensitive placement needs, and developmental disabilities. Some of the ugly beds throughout the state may also be relieved by the new Delano II prison, which will accommodate Level IV inmates presently in administrative segregation units, reception centers, and Level III beds in the state's other prisons.

## Recommendations

- To provide a sound foundation for future planning efforts, the new Department of Correctional Services should aggressively pursue improvements to the inmate population projection model.

- If the inmate population declines according to current projections, the department should begin to deactivate prison beds according to the following priority:

  – By June 2005, deactivate the emergency triple-bunk dorm beds at Avenal State Prison, California State Prison-Solano, and Chuckawalla Valley State Prison.

    As shown in Table 5 (See Appendix), the deactivations would eliminate 924 Level I and II beds and approximately 116.5 correctional officer positions. The beds are scheduled to be deactivated as part of the department's May 2004 revised budget.

  – If the inmate population continues to decline, deactivate gymnasium beds at the following 10 Level III and IV institutions:

        California Correctional Institution
        High Desert State Prison
        Pelican Bay State Prison
        Centinela State Prison
        California State Prison, Corcoran
        California State Prison, Los Angeles County
        Mule Creek State Prison
        California State Prison, Sacramento
        Substance Abuse Treatment Facility and State Prison at Corcoran
        Salinas Valley State Prison

    Assuming inmate population declines according to projections, Table 6 shows that those deactivations will eliminate approximately 2,219 Level I and II beds and approximately 187 correctional officer positions.

    − As the inmate population continues to decline, deactivate additional gymnasium beds in the following 12 Level IV, III, and II institutions:

Avenal State Prison
California Correctional Center
California Correctional Institution
Centinela State Prison
Correctional Training Facility
Deuel Vocational Institution
High Desert State Prison
Ironwood State Prison
Pleasant Valley State Prison
Substance Abuse Treatment Facility and State Prison at Corcoran
Sierra Conservation Center
California State Prison, Solano

Depending on the actual decline in inmate population, the deactivations could eliminate approximately 4,200 additional Level I and II beds and 335 correctional officer positions. (See Table 7.)

## Fiscal Impact

- *Elimination of triple bunks.* Deactivation of the emergency triple bunk dorm beds at Avenal State Prison, California State Prison-Solano, and Chuckawalla Valley State Prison by June 2005 would result in full-year savings of $8,155,000 beginning in fiscal year 2005-06.

- *Elimination of gymnasium beds, phase I.* Deactivation of gymnasium beds in 10 Level III and IV institutions by June 2005, assuming the population declines according to projections, would result in a savings of $12,873,000.

- *Elimination of gymnasium beds, phase II.* Deactivation of additional gymnasium beds in twelve Level II, III, and IV institutions as the inmate population continues to decline according to the department's projections would result in a savings of $24,136,000.

## Summary

Implementation of all recommendations would eliminate the need for 639 budgeted correctional officer positions and would result in a savings of $45 million between fiscal years 2005-06 and 2008-09. (See Table 8, Appendix) The estimate is based on an average of $70,000 in salary and benefits per correctional officer position and assumes that the staffing reductions would be achieved through normal attrition, rather than through layoffs.

The implementation by June 2005 of the first two recommendations —as the inmate population declines — would result in the elimination of 303.8 correctional officer positions and cumulative savings of $21,028,000. It should be noted that the deactivation of gymnasiums as inmate housing units would allow reactivation of gymnasiums as inmate recreation areas, which would require re-staffing for supervision of inmate gymnasium activities during second and third watches. The savings estimate includes this factor.

Implementation of the third recommendation depends upon a significant reduction in the inmate population, which may not be achieved according to the estimate time-frame.

# California Youth Authority

While California's adult prisons are overcrowded, the opposite is true at the California Youth Authority. From a high of 10,114 in June 1996, the youth population at the Youth Authority has now fallen by more than half and is expected to continue to drop. In June 2003, the population stood at 4,879, and by June 2009 is projected to fall to 3,740. At the same time, those sent to the Youth Authority now include a much higher percentage of violent offenders and youths who need mental health care, drug treatment, and other specialized services.

As a result of these changes, California Youth Authority facilities are presently a poor fit for the population. About 40 percent of the existing facilities consist of dormitories built in the 1960s, when only a small percentage of the Youth Authority population consisted of violent offenders and many of the rest were "incorrigibles" and status offenders, such as runaways. Living units are also too big. The average living unit size in California Youth Authority institutions is 50 beds—about double the accepted standard of 25-30 beds for juvenile facilities. And the ratio of staff to "wards," as youths committed to the Youth Authority are called, is between 1:16 and 1:25, which is much too large for effective programming and treatment and is also contrary to recent federal case law. The wide age diversity among those in Youth Authority institutions presents an additional challenge. Under present law, Youth Authority wards range from age 11 to age 25, making California one of only four states that incarcerate youths over age 21 in youth facilities. The broad age span makes programming difficult, complicates security, and affects every other aspect of the department's overall facility operations.

California was once the undisputed national leader in juvenile corrections, providing a model for the treatment and training of youthful offenders committed by the courts. Now, with the change in the types of wards sent to the Youth Authority — and in order for the Youth Authority to regain its former excellence in providing services to incarcerated youths — the need is for individual rooms in well-designed facilities with smaller living units, a lower staff-to-ward ratio, good mental health treatment and other program services, and improved surveillance capability.

Because of the drop in the number of youths sent to the California Youth Authority, and partly as the result of legislative mandate, the Youth Authority is presently closing five of its facilities. With these changes underway, and with the needs of the present ward population in mind, the Corrections Independent Review Panel considered how the California Youth Authority could make better use of its facilities by consolidating wards into fewer institutions.

As a result of that study, the panel recommends that the department close several other older facilities with high repair and maintenance costs and move wards into facilities better matched to population size and needs. Programs at the closed facilities would be transferred to other California Youth Authority institutions. Underlying the recommendations is

the fundamental goal of improving services to youthful offenders. Making the change in facilities while retaining the same staffing levels will make it possible for the department to reduce living unit size to 25 beds within five years, bringing California Youth Authority institutions into line with accepted national standards for youth correctional facilities. The recommendations are also aimed at reducing the staff-to-ward ratio to the recognized standard of 1:8. Overall, the changes will reduce the number of Youth Authority beds by 1,985.

## Fiscal Impact

Implementing the recommendations would result in an estimated net savings of $5,991,000 in fiscal year 2005-06; an estimated net savings of $11,627,000 in fiscal year 2006-07; and an estimated net savings of $11,627,000 in each subsequent fiscal year.

## Background

The official mission of the California Youth Authority is to protect the public by providing education, training, and treatment services to youthful offenders. Because of the declining ward population, the department is in the process of closing five of its youth correctional facilities, for a net reduction of 1,763 beds. Four of the closures result from legislative mandates. In 2002, with the enactment of AB 3000 (Chapter 1124, Statutes of 2002), the department was required to develop a consolidation plan and to close three of its facilities by June 2007. Subsequent legislation (AB 1758, Chapter 158, Statutes of 2003) required the department to close one additional facility.

Before the facility closures began in September 2003, the department was operating eleven institutions and four conservation camps, with a total bed capacity of 6,505. Table 9 (See Appendix) shows the distribution of beds by type in Youth Authority facilities as of June 30, 2003. Table 10 (See Appendix) lists the facilities the department has closed or is in the process of closing.

After June 30, 2004, when the planned closures are completed, the Youth Authority will be operating a total of eight institutions and three conservation camps, with a combined design bed capacity of 4,742 beds — a net reduction of 1,763 beds from June 30, 2003. Table 11 illustrates the number and type of beds that will remain at all facilities under the department's plan after June 30, 2004. The change in the number and type of beds remaining at the affected facilities is depicted in bold type.

*Cost of housing female wards has escalated.* In part to alleviate the problems caused by housing female wards in the same facility with more criminally oriented male wards, the Youth Authority's plans have called for moving all male wards from the 750-bed Ventura Youth Correctional Facility and converting the institution to an all-female facility for the State's 218 female wards. But the mismatch between the size of the Ventura facility and the size of the female ward population substantially increased the State's cost for housing female wards. Because of the change, the annual per-ward cost for housing female wards

has increased from approximately $100,000 to $143,000, compared to $80,000 for male wards.[9,10]

***California Youth Authority living unit size conflicts with established standards.*** The number of beds in a typical California Youth Authority living unit is inconsistent with accepted standards for youth correctional facilities. The California Board of Corrections limits living unit size in youth correctional facilities to 30 beds,[11] and American Correctional Association guidelines recommend no more than 25 beds per living unit. Most California Youth Authority living units, in contrast, whether open dormitories or single-room units, are designed to house 50 wards or more — a size that makes effective programming more difficult and impairs the safety of staff and wards.

Numerous studies have shown living unit size, crowding, treatment success, and violence in youth correctional institutions to be inextricably linked. As one study noted:

> *Evidence research indicates that incarcerating young offenders in large, congregate care juvenile institutions does not effectively rehabilitate and may actually harm them…A century of experience with training schools and youth prisons demonstrates that they constitute the one extensively evaluated and clearly ineffective method to treat delinquents.[12]*

Similarly, studies conducted for the California Youth Authority in the 1980s showed that reducing the size of living units and increasing staff resources both significantly reduced violence and improved treatment outcomes for incarcerated youths.[13] Barry Krisberg, Ph.D., president of the National Council on Crime and Delinquency, has reported that the research conducted by the Youth Authority has been influential in the design of youth correctional facilities across the country and in the establishment of national professional standards. Ironically, the standards resulting from that research have not been applied to California Youth Authority facilities.[14]

---

[9] California Youth Authority, "2004 Governor's Budget – Salaries of staff plus average staff benefits and OE&E divided by number of wards."

[10] The difference in annual per-ward costs between female and male wards also reflects the greater need of female wards for mental health services. A recent Stanford University study found that females committed to the California Youth Authority exhibit a significantly greater number of mental health disorders than male wards. (Hans Steiner and Keith Humphreys, "The Assessment of the Mental Health System of the California Youth Authority: Report to Governor Gray Davis," December 2001.

[11] California Board of Corrections, "Minimum Standards for Local Juvenile Facilities," Title 24, Section 460A.1.5.

[12] Barry C. Feld, "Juvenile and Criminal Justice Systems' Responses to Youth Violence," in Tonry, Michael, and Moore (editors), *Youth Violence: Crime and Justice, a Review of Research, Vol. 2* (Chicago, IL:University of Chicago Press, 1998), pp.2-27.

[13] Joe Seckel and James Turner, "Institutional Violence Reduction: The Impact of Changes in Living Unit Size and Staffing," January, 1980; Carolyn Davis, "DeWitt Nelson reduced staff ward Ratio Program: Final Report," April 1981.

[14] Barry Krisberg, Ph.D., President, National Council on Crime and Delinquency, "General Corrections Review of the California Youth Authority, " December 23, 2003.

***Staff-to-ward ratios are also inconsistent with accepted standards.*** California Youth Authority formulas prescribe a staff-to-ward ratio of 1:25 on morning shifts and 1:16 on afternoon shifts. That ratio deviates substantially from the standard of 1:8 used in many other states and with a similar 1:8 ratio specified in a recent federal case involving juvenile facilities in Arizona.[15] Recent federal cases in Nevada, Maryland, and Los Angeles County have defined the same 1:8 standard.

***Ward population projections.*** The California Youth Authority ward population has been dropping since 1996 and is projected to continue to decline. As Table 12 illustrates, the population fell from a high of 10,144 in June 1996 to 4,879 in June 2003 and, according to California Youth Authority projections, is expected to drop to 3,740 by June 2009.[16] Table 13 illustrates the changes in actual and projected ward populations by gender for the same period. As Table 13 shows, the California Youth Authority population will remain predominately male, with the number of female wards remaining at approximately 200 through the year 2009.

***Reasons for the decline in ward population.*** The ward population decline can be attributed to the following: a significant decrease in youth arrests for violent offenses; an increase in county incarceration and treatment options, allowing many youthful offenders to be handled in their own communities; and SB 681 (Chapter 66, Statutes of 1996). SB 681 requires counties to reimburse the State for specified juvenile court commitments to the Youth Authority based on a sliding-scale percentage of per capita costs. The legislation was intended to encourage counties to retain custody of all but the most dangerous wards and appears to have had that effect. In the six years since the enactment of SB 681, ward commitments to the California Youth Authority have decreased by an average of 8 percent a year.

***Accuracy of the population projections.*** A comparison of projected and actual ward populations from June 1990 to June 2003 shows the projections to be accurate at between 5.7 and +9.4 percent over one year, -7.3 to +25 percent over two years, and -10.2 to +61.5 percent over five years.[17] The variation in accuracy can be attributed to a number of factors, including changing commitment laws; lower rates of youth arrests; implementation of release criteria based on a case-by-case review of the wards' education and treatment progress and behavior, as determined by politically appointed Youth Authority Board members; and the impact of the county reimbursement sliding scale.

---

[15] Civil Rights Division, U.S. Department of Justice, "Civil Rights of Institutionalized Persons Act (CRIPA). Investigation of Adobe Mountain School and Black Canyon School in Phoenix Arizona; and Catalina Mountain School in Tucson, Arizona," January 23, 2004.

[16] California Youth Authority, "Male and Female Institution Population, Actual and Projected, 1996-2009."

[17] California Youth Authority, "Comparison of Actual and Projected CYA Institution Population – June 30, 1990 through June 30, 2003."

*Ward characteristics.* California Youth Authority facilities were initially designed as schools for boys and have never been modified to accommodate today's more violent ward population. Many of the facilities were built in the 1960s when the proportion of violent offenders was much smaller. On June 30, 1962, for example, only 14.8 percent of the Youth Authority population was made up of violent offenders. But with the implementation of the sliding-scale county reimbursement, and as more non-violent youthful offenders are retained in community-based programs, the proportion of violent offenders in the California Youth Authority has increased. On December 31, 2003, violent offenders made up 58.9 percent of the Youth Authority population.[18]

Wards committed to the Youth Authority also now tend to have other serious problems, including mental illness, substance abuse, and gang alliances. According to a 2001 Stanford University study, 71 percent of male wards and 82 percent of female wards incarcerated in California Youth Authority institutions have been diagnosed with between three and nine mental disorders, demonstrating a critical need for access to specialized programs.[19]

In a May 2004 report, the California Legislative Analyst's Office noted that the California Youth Authority's building configurations are no longer suited to the ward population:

> *While the declining ward population has reduced the overall need for institutions and facilities, the changed nature of the current ward population and mandates to provide mental health and education programs have resulted in the department having facilities that are in many ways functionally obsolete….*

When the large majority of Youth Authority buildings were designed and constructed, there was significantly less need for many security features. The basic configuration of many buildings reflects the Youth Authority's heritage as reform schools rather than correctional facilities. For instance, the reform school dormitory layout is not secure or efficient for programming and housing a significant portion of the existing population.[20]

The wide age range of California Youth Authority wards also affects institution programming and operations.  California is one of just four states (in addition to Montana, Oregon, and Wisconsin) that handle offenders up to age 25 in the youth justice system. Under Welfare and Institutions Code Section 1769, youths between the ages of 11 and 25 may be committed to the Youth Authority. At present, the average age of a California Youth Authority ward is 19.4 years. Table 14 shows the age breakdown of the Youth Authority institution population as of March 31, 2004.[21]

---

[18] Interview with Sue Pannell, Research Program Specialist II, California Youth Authority, April 2004.

[19] Hans Steiner and Keith Humphreys, "The Assessment of the Mental Health System of the California Youth Authority: Report to Governor Gray Davis," December 2001.

[20] Elizabeth C. Hill, Legislative Analyst, "A Review of the California Youth Authority's Infrastructure," Legislative Analyst's Office, May 2004.

[21] California Youth Authority, "All Wards In Youth Authority Facilities By Current Age ," - March 31, 2004.

## Recommendations

The Corrections Independent Review Panel recommends that the state take the actions listed below. Making these changes while keeping the same staffing levels will enable the state to reduce living unit size to 25 beds within five years and reduce staff-to-ward ratios to the recognized standards of 1:8. The changes will enable California to better meet the programming, education, and treatment needs of the projected ward population consistent with the state's statutory and court-ordered obligations. The recommendations will also produce a safer living environment by enabling staff to interact more effectively with wards and will lower the per-ward cost for female wards from $143,000 to $100,000 — equivalent to the cost of male wards in specialized programs.

- Effective January 1, 2005, amend Welfare and Institutions Code Section 1769 to restrict the California Youth Authority ward population to those under age 21 and provide judges with the option of imposing "blended" sentences — both juvenile and suspended adult sanctions— for certain categories of serious offenders. The change would result in a net decrease of 105 wards by June 2009 as follows: 25 wards by June 2006; 30 wards by June 2007; 90 wards by June 2008 and 105 wards by June 2009.

  The age adjustment will improve the overall treatment environment of the remaining youthful offenders by making it easier to develop age-compatible education, treatment, and training programs. The change will also result in fiscally sound efforts to provide constitutionally mandated services to the remaining wards in accordance with the expected terms of a consent decree presently being negotiated in the Farrell v. Harper lawsuit, which challenged the adequacy of the California Youth Authority's performance in providing training and treatment to wards.

  Blended sentencing is used in 15 states. Under a blended sentence, youthful offenders are conditionally confined in a juvenile facility under the threat of a suspended criminal sentence and transfer to an adult institution in order to encourage cooperation and discourage misconduct. When the youth confinement period or jurisdiction ends, the ward is returned to court for a determination by a judge of whether further confinement in an adult institution is warranted.

  The ward population estimate assumes that the new law would not apply retroactively, but rather would apply only to new sentences. Wards previously sen-

tenced who have already reached age 21 would continue to age out of the California Youth Authority at 25. Wards committed to the California Youth Authority after the new law takes effect would be either released at age 21 or transferred at age 21 to a Department of Corrections facility to complete their sentence.

- By June 30, 2004, close the Fred C. Nelles Youth Correctional Facility and the Mt. Bullion Conservation Camp according to the existing California Youth Authority plan.

- By June 30, 2005, transfer all female wards from the Ventura Youth Correctional Facility to the Karl Holton Youth Correctional Facility and transfer Ventura's intensive treatment program, special counseling program, formalized drug program, and other gender-specific programs to the new facility to serve the female ward population.

  The Karl Holton Youth Correctional Facility, which is presently vacant because of the legislative mandate for the Youth Authority to close institutions in response to the ward population decline, is one of four California Youth Authority institutions comprising the Northern California Youth Correctional Center complex in Stockton. With a design capacity of 388 beds, the institution more closely matches the projected female ward population than the Ventura Youth Correctional Facility, while providing the advantage of shared services, central kitchen, medical support, and access to a new on-site hospital planned for completion in 2005.[22] The female wards would be housed in a separate facility consistent with California Youth Authority gender-separation policy.[23] To accommodate the female population, it would be necessary to convert 122 dry rooms (rooms without sinks or toilets) to wet rooms.

- By June 30, 2005, re-establish the Ventura Youth Correctional Facility as an all-male institution and fill with male wards from the El Paso de Robles Youth Correctional Facility.

  The changes will make Ventura an all-male institution with a population close to its approximate design capacity of 650 beds. Ventura has approximately 82 percent wet rooms and the physical plant is in average condition, with lower pending capital outlay, special repair, and deferred maintenance needs relative to other California Youth Authority institutions.

---

[22] California Youth Authority, "Bed Utilization Plan," March 2004.
[23] Department of Youth Authority, "Consolidation Plan, Report to the Legislature," November 2002

- Close El Paso de Robles Youth Correctional Facility.

  El Paso de Robles Youth Correctional Facility is in a remote location inland from the central coast of California, making it problematic to recruit and retain professional staff and difficult for families of wards to visit, since most of the families reside in Southern California. Living units are a combination of dry rooms and dormitory construction with numerous blind spots where wards can hide undetected, creating safety and security problems. The institution houses a number of programs, including a specialized counseling program, a specialized management program, and two drug treatment programs, all of which could be relocated to other institutions.

- By June 30, 2006, close the Preston Youth Correctional Facility and transfer the wards to the Northern California Women's Facility, a former Department of Corrections institution, which is presently closed.

  Built in 1894, the Preston Youth Correctional Facility is the second-oldest California Youth Authority institution and has unmet capital outlay, special repair, and deferred maintenance needs of $31 million. Approximately 65 percent of the ward housing consists of open dormitory beds. The facility houses a number of specialized programs, including a drug treatment program, special management program, specialized counseling program, a 41-bed intensive treatment program, and a 35-bed specialized behavior treatment program, all of which could be relocated to other institutions.

  Relocating the wards from Preston to the vacant Department of Corrections Northern California Women's Facility in Stockton, which is adjacent to the Northern California Youth Correctional Center, would create a consolidated northern California complex for youthful offenders. The change would allow for centralized support services functions, including administration, food service, plant operations, warehouse, staff training, accounting, personnel, ward transportation, and an on-site hospital. Wards would be housed in single rooms, significantly improving living conditions for the special program population now housed at Preston. As an additional benefit, the reception center clinic now at Preston could be relocated to one of the four institutions in the Northern California Youth Correctional Center complex, thereby reducing ward transportation costs.

  Although not required to do so, the Youth Authority should inform the local community of the conversion of the Northern California Women's Facility from an adult women's institution to a male institution for youthful offenders and address any concerns. It should be noted that the new use of the facility would be consistent with that of the other four facilities at the Northern Youth Correctional

Center complex, and would also provide opportunity for increased employment. The conversion of the facility would require expenditures for alterations, renovations, and other improvements to the Northern California Women's Facility to reduce living unit size, enhance education corridor and special program areas, and construct space for education, treatment, and program support.

Following the closure of Preston and the transfer of wards to the former Northern California Women's Facility, the California Youth Authority would have a total of 4,520 beds, as shown in Table 16.

The recommended changes would leave the Youth Authority with 760 more beds than wards on June 30, 2006. The bed surplus would provide the California Youth Authority with the opportunity to reduce the size of living units closer to the American Correctional Association recommendation and the Board of Corrections standard of 25 to 30 wards. As the ward population declines, 29 single-room living units could be reduced to 35-ward living units, resulting in a net decrease of 435 beds. In addition, the 21 open dormitories at the O.H. Close Youth Correctional Facility, the Karl Holton Youth Correctional Facility, and the DeWitt Nelson Youth Correctional Facility could be reduced to 35 wards each, resulting in an additional decrease of 315 beds and a net decrease of 750 beds.

- Between June 30, 2004 and June 30, 2006, and beginning with open dormitories, reduce the number of wards in living units from 50 to 35.

- By June 30, 2009, reduce the number of wards in living units to 25 and decrease staff-to-ward ratio to 1:8.

After all of the recommendations have been implemented, the total number of beds would remain at 4,520 through June 2009, as shown in Table 18.

It is important to note that after the Fred C. Nelles Youth Correctional Facility closes in June 2004, the families of wards from many Southern California counties will be obliged to travel long distances to visit family members in California Youth Authority institutions. The San Diego area in particular, has no Youth Authority institutions. The panel suggests that any future facilities be sited in that area.

## Fiscal Impact

Implementing these recommendations would result in an estimated net savings of $5,991,000 in fiscal year 2005-06; an estimated net savings of $11,627,000 in fiscal year 2006-07; and an estimated net savings of $11,627,000 in each subsequent fiscal year.

The recommendations are expected to reduce system costs by consolidating wards into institutions with capacities more closely matched to the populations and by closing facilities with significant capital outlay for special repair and deferred maintenance costs. Administrative and overhead costs will also decrease.

Potential one-time costs may offset some of the long-term savings. Those costs include the following:

- Payment of accrued leave to employees who leave the department due to layoff, retirement, and other separations instead of transferring to other facilities.

- Moving and relocation expenses for key employees who the department transfers to other institutions.

- Moving expenses for transfer of records and equipment.

- Physical plant adaptations required to accommodate wards and programs.

These one-time costs may be offset by the sale and ultimate disposition of the Nelles, El Paso de Robles, Preston, and Northern Reception institutions. Neither the potential one-time costs nor the potential revenue from the sale of properties has been included in this fiscal estimate. The estimate reflects only the full-year savings that will begin to accrue in the first full fiscal year after each step of the consolidation is completed.

The Youth Authority completed a consolidation plan in November 2002 as a result of the requirements of Assembly Bill 3000, but the plan did not consider the fiscal impact of closing either El Paso de Robles or Preston, the two institutions proposed for permanent closure in the panel's recommendation.  More recently, in March 2004, the Youth Authority developed a draft bed utilization plan that made a variety of recommendations and estimates of costs and savings for various closure and re-activation scenarios. The Corrections Independent Review Panel has reviewed the Youth Authority estimates and found them to be realistic. The panel has therefore used the Youth Authority estimates to calculate general fund savings resulting from these recommendations. It should be noted, however, that the Youth Authority should achieve budgetary savings as a result of the decline in the ward population regardless of the efficiencies created by the consolidation plan.

Table 19 illustrates the cumulative costs and savings resulting from these recommendations, using fiscal detail from the Youth Authority's 2004 draft bed utilization plan. As the table shows:

- In fiscal year 2005-06, the closures of El Paso de Robles will result in savings of

$19,149,000, and the reopening of Karl Holton will cost $13,158,000, resulting in net savings of $5,991,000 in fiscal year 2006-07 and continuing each year thereafter.

- Additional savings will occur in fiscal year 2006-07 when the closure of Preston will result in savings of $22,922,000, and the reopening of the Northern California Women's Facility will cost $17,286,000, resulting in net savings of $5,636,000 in fiscal year 2006-07 and each year thereafter.

As shown in Table 19, the combined result of these recommendations is a net savings of $5,991,000 in fiscal year 2005-06 and net savings of $11,627,000 in fiscal year 2006-07 and each year thereafter.

**REFORMING CORRECTIONS**

TABLE 1
Department of Corrections Beds by Security Level in All Facilities

| Facility | Beds in Areas Intended for Housing by Security Level | | | | | | Gym & Miscellaneous Beds by Security Level | | | | Total Beds |
|---|---|---|---|---|---|---|---|---|---|---|---|
| | RC | I | II | III | IV | Female | RC | I | II | III | |
| Avenal State Prison | | | 6,378 | | | | | | 700 | | 7,078 |
| Calif. State Prison - Calipatria | | 408 | | | 3,910 | | | | | | 4,318 |
| Calif. Correctional Center | | 3,164 | 1,093 | 935 | | | | | 300 | 150 | 5,642 |
| Calif. Correctional Institution | 760 | 1,062 | 1,303 | | 1,859 | | 266 | 175 | 175 | | 5,600 |
| Central Calif. Women's Facility | | | | | | 3,507 | | | | | 3,507 |
| Calif. State Prison - Centinela | | 408 | | 2,460 | 1,500 | | | | | 480 | 4,848 |
| Calif. Institution for Men | 3,576 | 2,810 | | 279 | | | | | | | 6,665 |
| Calif. Institution for Women | | | | | | 1,806 | | | | | 1,806 |
| Calif. Men's Colony | | 408 | 2,446 | 3,750 | | | | | | | 6,604 |
| Calif. Medical Facility | | 177 | 410 | 2,814 | | | | | | | 3,401 |
| Calif. State Prison - Corcoran | | 876 | 0 | 0 | 4,166 | | | | 121 | 242 | 5,405 |
| Calif. Rehabilitation Center | | | 3,952 | | | 680 | | | | | 4,632 |
| Calif. Training Facility | | 970 | 3,187 | 2,384 | | | | 120 | 280 | | 6,941 |
| Chuckawalla Valley State Prison | | 408 | 3,500 | | | | | | | | 3,908 |
| Deuel Vocational Institution | 2,578 | 231 | 242 | | | | 100 | | 300 | | 3,451 |
| Folsom State Prison | | 753 | 1,852 | 1,440 | | | | | | | 4,045 |
| High Desert State Prison | 380 | 400 | 0 | 570 | 2,820 | | | | 120 | 360 | 4,650 |
| Ironwood State Prison | | 400 | | 3,785 | | | | | | 480 | 4,665 |
| Calif. State Prison - Los Angeles County | | 400 | 0 | 950 | 2,880 | | | | 120 | 240 | 4,590 |
| Mule Creek State Prison | | 392 | | 1,520 | 1,305 | | | | | 480 | 3,697 |
| North Kern State Prison | 3,846 | 408 | | 935 | | | | | | | 5,189 |
| Pelican Bay State Prison | | 296 | 0 | | 3,188 | | | | 160 | | 3,644 |
| Pleasant Valley State Prison | | 408 | | 2,860 | | | | | | 480 | 3,748 |
| RJ Donovan Correctional Facility | 1,000 | 392 | | 2,595 | | | 456 | | | | 4,443 |
| California State Prison - Sacramento | | 384 | 0 | | 2,798 | | | 50 | 140 | | 3,372 |
| Substance Abuse Treatment Facility | | | 1,754 | 2,238 | 2,273 | | | | 480 | 240 | 6,985 |
| Sierra Conservation Center | | 3,258 | 1,334 | 935 | | 320 | | | 300 | 150 | 6,297 |
| California State Prison - San Quentin | 2,941 | 265 | 1,827 | | 730 | | | | | | 5,763 |
| Salinas Valley State Prison | | 400 | 0 | 0 | 3,878 | | | 50 | 120 | 120 | 4,568 |
| California State Prison - Solano | | | 3,239 | 2,265 | | | | | 225 | 225 | 5,954 |
| Valley State Prison | | | | | 3,657 | | | | | | 3,657 |
| Wasco State Prison | 4,606 | 392 | | 840 | | | 120 | | | | 5,958 |
| Contract Jail Beds | | 2,092 | | | | | | | | | 2,092 |
| Contract Community Beds | | 5,018 | | | | | | | | | 5,018 |
| **TOTALS BY BED TYPE** | 19,687 | 26,580 | 32,517 | 33,555 | 31,307 | 9,970 | 942 | 395 | 3,541 | 3,647 | 162,141 |

**Table 1 Explanatory Notes**

a)  Table created from data reported in the California Department of Corrections "Weekly Population Summary," March 12, 2004.

b)  The number of inmates per custody level is based on the staffed capacity of each institution.

c)  Administrative segregation unit and security housing unit inmates were added to the institutions' highest custody level number.

d)  Medical-designed beds, (HIV, EOP, DMH) were added to the institution's highest custody level number.

e)  U.S. Immigration and Naturalization Service inmates at Centinela and RJ Donovan, were added to the institutions' highest custody level number.

f)  Youthful Offender Program inmates at the California Correctional Institution were added to the institution's highest custody level number.

g)  Substance abuse program inmates at the Substance Abuse Treatment Facility were added to the institution's level III custody level number.

h)  Condemned inmates at the Central California Women's Facility and San Quentin were added to the institutions' highest custody level number

i)  Camp inmates (male and female) at the Sierra Conservation Center were added to the institution's Level I beds.

j)  Source documents did not delineate triple bunking. Triple bunk totals will increase gymnasium and miscellaneous beds total s and decrease and regular bed totals.

TABLE 2
**Department of Corrections Spring 2004 Population Projections**

| Date | Inmate Population | Annual Net Change | Annual Percentage Change |
|---|---|---|---|
| 6/30/2003 | 160,931 | | |
| 6/30/2004 | 160,122 | -809 | -0.5% |
| 6/30/2005 | 157,218 | -2,904 | -1.8% |
| 6/30/2006 | 156,952 | -266 | -0.2% |
| 6/30/2007 | 156,889 | -63 | 0.0% |
| 6/30/2008 | 156,884 | -5 | 0.0% |
| 6/30/2009 | 157,623 | 739 | 0.5% |
| **TOTAL NET CHANGE** | | **-3,308** | |

**TABLE 3**
**Projected Inmate Population by Custody Level**
**Including Changes from Previous Year**

| Date | Reception | Male Inmate Custody Levels | | | Level IV & PHU/SHU | Male Subtotal | Female Subtotal | Total Inmates |
|---|---|---|---|---|---|---|---|---|
| | | Level I | Level II | Level III | | | | |
| Actual 6/30/2003 | 19,285 | 33,984 | 31,909 | 38,061 | 27,612 | 150,851 | 10,080 | 160,931 |
| Actual 2/29/2004 | *19,342* | *32,222* | *33,660* | *40,285* | *25,686* | *151,195* | *10,254* | *161,449* |
| 6/30/2004 | 18,580 | 32,057 | 32,625 | 36,405 | 28,942 | 148,609 | 11,513 | 160,122 |
| Changes | -705 | -1,927 | +716 | -1,656 | +1,330 | -2,242 | +1,433 | -809 |
| 6/30/2005 | 19,245 | 30,128 | 31,185 | 36,420 | 29,285 | 146,263 | 10,955 | 157,218 |
| Changes | +665 | -1,929 | -1,440 | +15 | +343 | -2,346 | -558 | -2,904 |
| 6/30/2006 | 17,975 | 29,797 | 31,105 | 37,125 | 29,870 | 145,872 | 11,080 | 156,952 |
| Changes | -1,270 | -331 | -80 | +705 | +585 | -391 | +125 | -266 |
| 6/30/2007 | 17,415 | 29,441 | 30,865 | 37,595 | 30,380 | 145,696 | 11,193 | 156,889 |
| Changes | -560 | -356 | -240 | +470 | +510 | -176 | +113 | -63 |
| 6/30/2008 | 17,450 | 29,054 | 30,550 | 37,895 | 30,800 | 145,749 | 11,135 | 156,884 |
| Changes | +35 | -387 | -315 | +300 | +420 | +53 | -58 | -5 |
| 6/30/2009 | 19,325 | 29,054 | 30,565 | 38,245 | 31,220 | 148,409 | 9,214 | 157,623 |
| Changes | +1,875 | +0 | +15 | +350 | +420 | +2,660 | -1,921 | +739 |
| Net Changes 2003 to 2009 | +40 | -4,930 | -1,344 | +184 | +3,608 | -2,442 | -866 | -3,308 |

**TABLE 4**
**Average Variance Between Projected Population and Actual Population**
**Fall 1996 to Spring 2003 Projections**

| | F 1996 | S 1997 | F 1997 | S 1998 | F 1998 | S 1999 | F 1999 | S 2000 | F 2000 | S 2001 | F 2001 | S 2002 | F 2002 | S 2003 | AVG |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1st year | -1.0% | -1.9% | 2.3% | 2.0% | 2.3% | -0.1% | 1.9% | -0.5% | 1.5% | 0.2% | 1.0% | 0.1% | -0.2% | -0.2% | 0.6% |
| 2nd year | 1.0% | -0.1% | 5.6% | 4.7% | 6.4% | 3.2% | 3.4% | -0.9% | 5.3% | 0.2% | 3.3% | -2.3% | | | 2.4% |
| 3rd year | 4.9% | 2.8% | 10.8% | 9.5% | 11.1% | 6.3% | 6.9% | 1.8% | 5.4% | -1.4% | | | | | 6.5% |
| 4th year | 10.9% | 8.8% | 15.9% | 14.1% | 17.1% | 11.4% | 7.0% | 1.4% | | | | | | | 11.8% |
| 5th year | 16.4% | 14.2% | 22.1% | 19.8% | 19.2% | 13.0% | | | | | | | | | 18.7% |

F= Fall Projection    S= Spring Projection

**TABLE 5**
**Fiscal Year 2005-06**

| Institution | Inmates | Officers | Savings |
|---|---|---|---|
| Avenal State Prison | -300 | -28.4 | $1,988,000 |
| California State Prison - Solano | -192 | -32.9 | $1,365,000 |
| Chuckawalla Valley State Prison | -432 | -55.2 | $3,864,000 |
| **TOTAL** | **-924** | **-116.5** | **$8,155,000** |

**TABLE 6**
**Fiscal Year 2005-06**

| Institution | Inmates | Officers | Savings |
|---|---|---|---|
| Pelican Bay State Prison | -160 | -13.4 | $938,000 |
| California State Prison - Sacramento | -140 | -11.3 | $791,000 |
| Substance Abuse Treatment Facility | -120 | -14.8 | $798,000 |
| California Correctional Institution | -266 | -25.3 | $1,771,000 |
| California State Prison - Centinela | -120 | -7.8 | $546,000 |
| California State Prison - Corcoran | -363 | -25.1 | $1,757,000 |
| High Desert State Prison | -360 | -24.5 | $1,715,000 |
| California State Prison – Los Angeles County | -360 | -36.8 | $2,576,000 |
| Mule Creek State Prison | -160 | -8.2 | $574,000 |
| Salinas Valley State Prison | -170 | -20.1 | $1,407,000 |
| **TOTAL** | **-2,219** | **-187.3** | **$12,873,000** |

**TABLE 7**
**Fiscal Year to be Determined by Actual Population Decline**

| Institution | Inmates | Housing Officers | Savings |
|---|---|---|---|
| Avenal State Prison | -600 | -65.0 | $4,550,000 |
| California Correctional Center | -450 | -20.8 | $1,456,000 |
| California Correctional Institution | -350 | -30.6 | $2,142,000 |
| California State Prison - Centinela | -360 | -23.4 | $1,638,000 |
| California Training Facility | -360 | -50.8 | $3,556,000 |
| Deuel Vocational Institution | -300 | -19.6 | $1,372,000 |
| High Desert State Prison | -120 | -11.2 | $784,000 |
| Ironwood State Prison | -480 | -26.2 | $1,834,000 |
| Pleasant Valley State Prison | -360 | -37.5 | $2,625,000 |
| Substance Abuse Treatment Facility | -240 | -25.3 | $1,771,000 |
| Sierra Conservation Center | -150 | -9.4 | $1,288,000 |
| California State Prison - Solano | -450 | -16.0 | $1,120,000 |
| **TOTAL** | **-4,220** | **-335.8** | **$24,136,000** |

TABLE 8
General Fund Savings
(in thousands)

| Fiscal Year | Savings | Costs | Net Savings | Change in Positions |
|---|---|---|---|---|
| 2004/05 | $0 | $0 | $0 | 0 |
| 2005/06 | -$21,028 | $0 | -$21,028 | -303.8 |
| 2006/07 | -$21,028 | $0 | -$21,028 | -303.8 |
| 2007/08 | -$21,028 | $0 | -$21,028 | -303.8 |
| 2008/09 | -$21,028 | $0 | -$21,028 | -303.8 |
| Future Fiscal Years | -$45,164 | $0 | -$45,164 | -639.4 |

TABLE 9
Youth Authority Beds by Type in All Facilities as of June 30, 2003

| Institutions | Living Units | Number of general units and beds | | | | Special beds | | | | Total Beds |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Dorm Beds | Dry Rooms | Wet Rooms | Sub Total | Detention (b) | Medical | Program | Sub Total | |
| O. H. Close | 8 | 266 | 99 | | 365 | 33 | | 2 | 35 | 400 |
| Karl Holton | 8 | 266 | 122 | | 388 | 28 | | | 28 | 416 |
| N. A. Chaderjian | 12 | | | 550 | 550 | 50 | | | 50 | 600 |
| DeWitt Nelson (a) | 8 | 400 | | | 400 | 8 | 10 | 1 | 19 | 419 |
| Preston | 14 | 500 | | 202 | 702 | 42 | 6 | 20 | 68 | 770 |
| Fred C. Nelles | 14 | 380 | 150 | 110 | 640 | 30 | 23 | 10 | 63 | 703 |
| El Paso De Robles | 12 | 388 | 112 | 158 | 658 | 32 | 11 | | 43 | 701 |
| Ventura (Male) | 7 | 100 | | 250 | 350 | 23 | 8 | 2 | 33 | 383 |
| Ventura (Female) | 7 | | 1 | 299 | 300 | 25 | 8 | 1 | 34 | 334 |
| Heman G. Stark | 12 | | 16 | 1,132 | 1,148 | 84 | 12 | 28 | 124 | 1,272 |
| SYCRCC | 8 | | 2 | 377 | 379 | 23 | 14 | 14 | 51 | 430 |
| NYCRCC | 7 | 12 | | 293 | 305 | 23 | 17 | 1 | 41 | 346 |
| Ben Lomond | 1 | 80 | | | 80 | | | | | 80 |
| Pine Grove | 1 | 80 | | | 80 | | | | | 80 |
| Washington Ridge | 1 | 80 | | | 80 | | | | | 80 |
| Mt. Bullion | 1 | 80 | | | 80 | | | | | 80 |
| TOTALS | 121 | 2,632 | 502 | 3,371 | 6,505 | 401 | 109 | 79 | 589 | 7,094 |

(a) Includes 10 medical beds located as part of the central core facility of the entire complex.
(b) Total number of detention beds includes suicide resistant beds and beds solely dedicated for detention.

**TABLE 10**
**California Youth Authority Facility Closure Plan**

| Institution | Location | Closure Date | Beds |
|---|---|---|---|
| Karl Holton Youth Correctional Facility (Holton) | Stockton | September 28, 2003 | 388 |
| Ventura Youth Correctional Facility (Ventura) – male only | Camarillo | March 1, 2004 | 350 |
| Northern Youth Correctional Reception Center and Clinic (Northern Reception) | Sacramento | March 1, 2004 | 305 |
| Fred C. Nelles Youth Correctional Facility (Nelles) | Whittier | June 30, 2004 | 640 |
| Mt. Bullion Conservation Camp | Mariposa | June 30, 2004 | 80 |
| | | **Total beds closed** | **1,763** |

**TABLE 11**
**Change in Number and Type of Beds by Facility**
**Effective June 30, 2004**

| | 2003 | Bed Change by Type | | | 2004 |
|---|---|---|---|---|---|
| Institutions | Beds | Dorm Beds | Dry Rooms | Wet Rooms | Beds |
| O. H. Close | 365 | 266 | 99 | 0 | 365 |
| **Karl Holton** | **388** | **0** | **0** | **0** | **-388** |
| N. A. Chaderjian | 550 | 0 | 0 | 550 | 550 |
| DeWitt Nelson | 400 | 400 | 0 | 0 | 400 |
| Preston | 702 | 500 | 0 | 202 | 702 |
| **Fred C. Nelles** | **640** | **0** | **0** | **0** | **-640** |
| El Paso De Robles | 658 | 388 | 112 | 158 | 658 |
| **Ventura (Male)** | **350** | **0** | **0** | **0** | **-350** |
| Ventura (Female) | 300 | 0 | 1 | 299 | 300 |
| Heman G. Stark | 1,148 | 0 | 16 | 1,132 | 1,148 |
| SYCRCC | 379 | 0 | 2 | 377 | 379 |
| **NYCRCC** | **305** | **0** | **0** | **0** | **-305** |
| Ben Lomond | 80 | 80 | 0 | 0 | 80 |
| Pine Grove | 80 | 80 | 0 | 0 | 80 |
| Washington Ridge | 80 | 80 | 0 | 0 | 80 |
| **Mt. Bullion** | **80** | **0** | **0** | **0** | **-80** |
| **TOTAL** | **6,505** | **1,794** | **230** | **2,718** | **4,742** |

**TABLE 12**
**Actual and Projected Ward Population**
**June 30, 1996 through June 30, 2009**

| Actual population as of June 30 | | | |
|---|---|---|---|
| Year | Population | Change | % change |
| 1996 | 10,144 | | |
| 1997 | 8,790 | -1,354 | -13.3% |
| 1998 | 8,122 | -668 | -7.6% |
| 1999 | 7,618 | -504 | -6.2% |
| 2000 | 7,380 | -238 | -3.1% |
| 2001 | 6,776 | -604 | -8.2% |
| 2002 | 5,847 | -929 | -13.7% |
| 2003 | 4,879 | -968 | -16.6% |
| Projected population as of June 30 | | | |
| Year | Population | Change | % change |
| 2004 | 4,090 | -789 | -16.2% |
| 2005 | 3,895 | -195 | -4.8% |
| 2006 | 3,760 | -135 | -3.5% |
| 2007 | 3,755 | -5 | -0.1% |
| 2008 | 3,750 | -5 | -0.1% |
| 2009 | 3,740 | -10 | -0.3% |

**TABLE 13**
**Actual and Projected Ward Population by Gender**
**June 30, 2003 through June 30, 2009**

| Date | Male Sub-total | Female Sub-total | Total Wards |
|---|---|---|---|
| 6/30/2003 | 4,644 | 235 | 4,879 |
| 6/30/2004 | 3,870 | 220 | 4,090 |
| 6/30/2005 | 3,685 | 210 | 3,895 |
| 6/30/2006 | 3,555 | 205 | 3,760 |
| 6/30/2007 | 3,555 | 200 | 3,755 |
| 6/30/2008 | 3,555 | 195 | 3,750 |
| 6/30/2009 | 3,550 | 190 | 3,740 |

**TABLE 14**
**Ward Population by Age as of March 31, 2004**

| Age | # of Wards | Age | # of Wards | Age | # of Wards |
|---|---|---|---|---|---|
| 12 | 2 | 17 | 706 | 22 | 192 |
| 13 | 6 | 18 | 953 | 23 | 145 |
| 14 | 31 | 19 | 810 | 24 | 100 |
| 15 | 108 | 20 | 640 | 25 | 1 |
| 16 | 304 | 21 | 222 | 32 | 1 |
| Total | 451 (10.9%) | Total | 3,331 (79%) | Total | 439 (10.4%) |

NOTE:  Under Welfare and Institutions Code Section 1800 the sentencing court may extend a ward's jurisdiction up to two additional years when a ward is shown to be a danger to self and others.  A sex offender in one of the YA institutions has been extended four times using these criteria and is now age 32.

**TABLE 15**
**Number and Type of Beds Eliminated from Youth Authority Facilities as of June 30, 2005**
**Under This Proposal**

| | 2004 | Bed Change by Type | | | 2005 |
|---|---|---|---|---|---|
| Institutions | Beds | Dorm Beds | Dry Rooms | Wet Rooms | Beds |
| O. H. Close | 365 | 266 | 99 | 0 | 365 |
| **Karl         Holton (Female)** | **0** | **+266** | **0** | **+122** | **+388** |
| N. A. Chaderjian | 550 | 0 | 0 | 550 | 550 |
| DeWitt Nelson | 400 | 400 | 0 | 0 | 400 |
| Preston | 702 | 500 | 0 | 202 | 702 |
| Fred C. Nelles | 0 | 0 | 0 | 0 | 0 |
| **El Paso De Robles** | **658** | **0** | **0** | **0** | **-658** |
| **Ventura (Male)** | **0** | **+100** | **0** | **+250** | **+350** |
| Ventura (Male) | 300 | 0 | 1 | 299 | 300 |
| Heman G. Stark | 1,148 | 0 | 16 | 1,132 | 1,148 |
| SYCRCC | 379 | 0 | 2 | 377 | 379 |
| NYCRCC | 0 | 0 | 0 | 0 | 0 |
| Ben Lomond | 80 | 80 | 0 | 0 | 80 |
| Pine Grove | 80 | 80 | 0 | 0 | 80 |
| Washington Ridge | 80 | 80 | 0 | 0 | 80 |
| Mt. Bullion | 0 | 0 | 0 | 0 | 0 |
| **TOTAL** | **4,742** | **1,772** | **118** | **2,932** | **4,822** |

**TABLE 16**
**Number and Types of Beds Eliminated from Youth Authority Facilities**
**As of June 30, 2006**

| Institutions | 2005 Beds | Bed Change by Type | | | 2006 Beds |
|---|---|---|---|---|---|
| | | Dorm Beds | Dry Rooms | Wet Rooms | |
| O. H. Close | 365 | 266 | 99 | 0 | 365 |
| Karl Holton | 388 | 266 | 122 | 0 | 388 |
| N. A. Chaderjian | 550 | 0 | 0 | 550 | 550 |
| DeWitt Nelson | 400 | 400 | 0 | 0 | 400 |
| **Preston** | **702** | **0** | **0** | **0** | **-702** |
| Fred C. Nelles | 0 | 0 | 0 | 0 | 0 |
| El Paso De Robles | 0 | 0 | 0 | 0 | 0 |
| Ventura (Male) | 350 | 100 | 0 | 250 | 350 |
| Ventura (Male) | 300 | 0 | 1 | 299 | 300 |
| Heman G. Stark | 1,148 | 0 | 16 | 1,132 | 1,148 |
| SYCRCC | 379 | 0 | 2 | 377 | 379 |
| NYCRCC | 0 | 0 | 0 | 0 | 0 |
| Ben Lomond | 80 | 80 | 0 | 0 | 80 |
| Pine Grove | 80 | 80 | 0 | 0 | 80 |
| Washington Ridge | 80 | 80 | 0 | 0 | 80 |
| Mt. Bullion | 0 | 0 | 0 | 0 | 0 |
| **NCWF** | **0** | **0** | **0** | **+400** | **+400** |
| **TOTAL** | **4,822** | **1,272** | **240** | **3,008** | **4,520** |

**TABLE 17**
**Number and Types of Beds Eliminated from Youth Authority Facilities**
**Through June 30, 2009**

| Institutions | 2006 Beds | Dorm Beds | Dry Rooms | Wet Rooms | 2009 Beds |
|---|---|---|---|---|---|
| O. H. Close | 365 | 266 | 99 | 0 | 365 |
| Karl Holton | 388 | 266 | 122 | 0 | 388 |
| N. A. Chaderjian | 550 | 0 | 0 | 550 | 550 |
| DeWitt Nelson | 400 | 400 | 0 | 0 | 400 |
| Preston | 0 | 0 | 0 | 0 | 0 |
| Fred C. Nelles | 0 | 0 | 0 | 0 | 0 |
| El Paso De Robles | 0 | 0 | 0 | 0 | 0 |
| Ventura (Male) | 350 | 100 | 0 | 250 | 350 |
| Ventura (Male) | 300 | 0 | 1 | 299 | 300 |
| Heman G. Stark | 1,148 | 0 | 16 | 1,132 | 1,148 |
| SYCRCC | 379 | 0 | 2 | 377 | 379 |
| NYCRCC | 0 | 0 | 0 | 0 | 0 |
| Ben Lomond | 80 | 80 | 0 | 0 | 80 |
| Pine Grove | 80 | 80 | 0 | 0 | 80 |
| Washington Ridge | 80 | 80 | 0 | 0 | 80 |
| Mt. Bullion | 0 | 0 | 0 | 0 | 0 |
| NCWF | 400 | 0 | 0 | 400 | 400 |
| **TOTAL** | **4,520** | **1,272** | **240** | **3,008** | **4,520** |

**TABLE 18**
**Summary of Youth Authority Institution Bed Consolidation Recommendations,**
**2003 through 2009**

| Date | Dorm Beds | Dry Rooms | Wet Rooms | Total | Bed Reduction | Annual Change |
|---|---|---|---|---|---|---|
| 6/30/2003 | 2,632 | 502 | 3,371 | 6,505 | | |
| 6/30/2004 | 1,794 | 230 | 2,718 | 4,742 | -1,763 | -27.1% |
| 6/30/2005 | 1,772 | 118 | 2,932 | 4,822 | 80 | 1.7% |
| 6/30/2006 | 1,272 | 240 | 3,008 | 4,520 | -302 | -6.3% |
| 6/30/2007 | 1,272 | 240 | 3,008 | 4,520 | 0 | 0.0% |
| 6/30/2008 | 1,272 | 240 | 3,008 | 4,520 | 0 | 0.0% |
| 6/30/2009 | 1,272 | 240 | 3,008 | 4,520 | 0 | 0.0% |
| **Net Change** | **-1,360** | **-262** | **-363** | **-1,985** | **-1,985** | **-31.7%** |

TABLE 19
General Fund Savings

| Fiscal Year | Savings | Costs | Net Savings |
|---|---|---|---|
| 2004 - 05 | $0 | $0 | $0 |
| 2005 - 06 | -$19,149,000 | +$13,158,000 | -$5,991,000 |
| 2006 - 07 | -$42,071,000 | +$30,444,000 | -$11,627,000 |
| 2007 - 08 | -$42,071,000 | +$30,444,000 | -$11,627,000 |
| 2008 - 09 | -$42,071,000 | +$30,444,000 | -$11,627,000 |

# Labor Contract

In any organization, there must exist a balance between management's obligation to direct the activities of the department to achieve operational goals and a union's obligation to ensure that its members receive just wages and work in a safe and fair environment.  Historically, influence and power has shifted between these two entities in the California correctional system. The agreement between the state and the California Correctional Peace Officers Association, which is in effect from July 1, 2001 until July 2, 2006, clearly has resulted in an unfair and unworkable tilt toward union influence. The Department of Personnel Administration, which negotiated the contract, did not adequately represent the interests of the Youth and Adult Correctional Agency and its departments.  The Secretary of the Youth and Adult Correctional Agency had little, if any, influence on matters that affect department operations.

The agreement contains numerous provisions that seriously undermine the ability of management to direct and control the activities of existing correctional departments and the new Department of Correctional Services.  It is unclear whether adjustments can be made to the current agreement, but at the very least, the following should be considered in negotiating a new agreement.

## Recommendations

- **The Secretary of the Department of Correctional Services should be responsible for negotiating all matters that involve the management of the department.**

    Wages and benefits are clearly negotiation rights that should be reserved for the Governor and the Legislature. However, the Secretary of the Department of Correctional Services must be involved in any negotiations that affect the efficient operation of the department.  Only management is in a position to ascertain how proposed concessions or agreements in this area could effect long-range planning and goals.

- **Management personnel should have their own bargaining unit.**

    At present management personnel receive no longevity or education bonus. As a result, qualified personnel are reluctant to attempt to promote because by doing so they would lose benefits available at the lower ranks. Giving management personnel their own bargaining unit would also enable them to negotiate increased benefits, which would make it more desirable to join management ranks.

- **The California Correctional Peace Officers Association should not be guaranteed a seat on management committees just because an employee the union represents is on the committee.**

It is management's prerogative to staff a committee as it sees fit. Arbitrary rules that dictate membership on a committee do not serve the best interests of the organization.

- **The California Correctional Peace Officers Association should not be a member of any committee that reviews staff assaults.**

  Management may choose to have peer representation on the committee but it is management's prerogative to review such matters without union participation. The current contract gives the California Correctional Peace Officers Association two bites of the apple. First, it sits on the committee that makes recommendations as to whether or not an assault is within policy, and then it defends officers in punitive actions that result from inappropriate use of force.

- **The Correctional Peace Officer apprenticeship program should be eliminated.**

  The apprenticeship program has not produced qualified candidates in significant numbers. Entry-level cadets should be on probation for one year after their graduation from the academy. Their training, mentoring, and final decision as to permanent employment is a management right. Management should designate a field training officer employment classification, whose members will be specially selected and trained to oversee a probationer's progress. It is management's decision to terminate a probationary employee and that employee should have no appeal rights other than a "liberty" hearing before the Director of Training to ascertain whether the decision to terminate is justified.

- **Training lesson plans should be formulated and implemented by management without prior approval from any outside entity, such as the Correctional Peace Officers Standards and Training Commission.**

  At present, training lesson plans can be delayed for years because of disagreements between the members of the Correctional Peace Officers Standards and Training Commission, on which the California Correctional Peace Officers Association enjoys 50 percent membership. Training is also a management right and is based on organizational needs. Under the reorganization plan proposed by the Corrections Independent Review Panel, an independent Office of Personnel and Training would have the department-wide responsibility for all training.

- **Adverse action and citizen complaint documents should not be purged from an employee's files.**

  Safeguards should be established to ensure that not-sustained complaints cannot be used for the purposes of promotion and transfer, but management must retain a record of all incidents for risk-management purposes.

- **Seniority should not be used for transfers, overtime, and assignments.**

  In order to fulfill its mission, it is crucial that management have the ability to post its best employees in the most critical assignments. The union should have no say in this matter. In addition, granting permission to work overtime based on seniority ensures that the highest paid employees will get that assignment. This does not guarantee that the best employee will be selected, but it does guarantee that it will cost more money. Using seniority for transfers greatly impinges on management's right to assign employees based on need and competency. It is permissible to use seniority for the selection of vacations.

- **Longevity pay should be based on time in the department, and not time in the California Correctional Peace Officers Association.**

  Employees should be rewarded for longevity in the department. The state should neither discourage nor reward union membership.

- **The present 70-30 percent rule for assignments and overtime should be eliminated.**

  Only management should be responsible for the posting of employees, and posting should be based on merit without union participation. A fundamental obligation for management is to deploy the best personnel in the most critical assignments. It is unacceptable to have the union make these decisions.

- **The present sick leave policy should be revisited to ensure that management has the right to inquire and take corrective action relative to sick leave abuse.**

  Present contract provisions make it difficult for management to investigate sick leave abuses, such as chronic use of Friday and Monday sick leave to correspond with a weekend off. The result has been a surge in sick leave use at great expense to the state.

- **The contract section on personnel investigations (9.09 and related side letters) should be revisited.**

  The present contract mandates that management give an employee pertinent information relative to an investigation before the first interview.  It makes no sense to give an employee a copy of the investigation BEFORE the investigation is completed. This practice encourages the "code of silence" afflicting the state correctional system and could contribute to retaliation against "whistle-blowers."

# Information Technology

Information technology at the Department of Corrections has been consistently under-funded, overlooked and neglected. In examining the state correctional system, the Corrections Independent Review Panel found a loosely connected organization that evolved as independent components lacking centralized control. Not surprisingly, the same is true of the correctional system's information technology structure—independent growth resulting in inconsistent systems not supportable by a centralized authority. Consequently, information technology in the state correctional system is inadequate to allow the correctional system to fulfill its current responsibilities or those envisioned by the objectives presented in this report.

A November 2002 report of the Senate Advisory Commission on Cost Control in State Government concluded that the Department of Corrections is technologically antiquated. The report observed that since the late 1980s, the Department of Corrections has invested most of its attention into "providing new prisons, hiring and training the thousands of correctional employees to operate them," but that "one important item was forgotten—a similar commitment to build new information capabilities" and capacity.[1]

Efforts to correct the department's information technology capacity have been thwarted by competing crisis demands and priorities external to corrections, apparently killing the messenger rather then addressing the message. The Senate Advisory Commission report noted:

> [D]epartmental managers directly responsible for the IT systems time and again have requested funds to replace aging equipment, to complete an unfinished infrastructure, and to take advantage of inexpensive prison management software developed by other states. But the requests have been ignored. 'Budgetary Constraints' have been invoked year after year by the state Administration as the reason for failing to provide funds needed to develop an up-to-date CDC information system.[2]

Information is essential in managing an organization the size of the correctional system. The Senate Advisory Commission determined that, "A modern management information system must be a critical goal for CDC in terms of improving efficiency, reducing costs, and supporting the department's mission of public safety."[3] The lack of information relative to inmate care and treatment has been a significant factor in lawsuits against state correctional agencies. The legal cases *Madrid v. Gomez, Clark v. State of California, Coleman v. Davis, Plata v. Wilson,* and *Farrell v. Harper,* all identify poor records systems as indicators of negligent

---

[1] Senate Advisory Commission on Cost Control in State Government, *Utilizing Technology in the Department of Corrections,* Sacramento, California, August 2002, pp.13, 15.

[2] *Ibid.,* pp. 63-64.

[3] *Ibid.,* p.63.

conduct on the part of corrections and demonstrative of the failures to properly care for or protect inmates.[4]

Attorney Donald Specter, Director of the Prison Law Office, the primary legal advocacy group initiating class action suits against the state correctional system, commented about the California Department of Corrections:

> [I]t is too big and much too diverse; without information there is no management.[5]

The Corrections Independent Review Panel reaffirms those observations.

The objective to be pursued is not unknown to the state or to corrections officials. J. Clark Kelso, Chief Information Officer, State of California, in a May 12, 2004 speech to the Government Technology Conference, in Sacramento, set out three major goals:

> [M]y vision for the immediate future of IT in state government is re-establishing effective IT governance within the State, agreeing upon a 5-year strategic plan for IT developments in the areas of back office systems, smart services on the Internet, infrastructure rationalization, and IT security, and establishing and enforcing statewide policies and standards through an enterprise architecture.[6]

Corrections Independent Review Panel concludes that the core technology needs of the Department of Correctional Services parallel this vision. An effective information technology enterprise requires the establishment of a centralized highly placed information technology leadership in corrections; a five-year strategic plan for infrastructure implementation and enforcing corrections-wide policies and standards through an enterprise architecture.

## Fiscal Impact

The costs associated with personnel enhancements and standardization of information technology will increase expenditures for technology over present levels. This budget area has been restrained in past years with the consequence of accumulated maintenance costs and deferred expansion. New personnel costs must be accepted if minimum base levels of support are to be provided.

---

[4] Youth and Adult Correctional Agency, "Transition Document," November 4, 2003, pp. 23-28.

[5] Donald Specter, Director, Prison Law Office, comments to the Corrections Independent Review Panel, Sacramento, California, April 15, 2004.

[6] J. Clark Kelso, Chief Information Officer, State of California, "21st Century Government," Government Technology Conference Sacramento, California May 12, 2004,

## Background

The information technology arena of each entity of the Youth and Adult Correctional Agency has evolved on its own, scaled to its own operation. The two largest components, California Department of Corrections and California Youth Authority, both addressing incarceration and parole issues but on different scales, have mirror-image information technology components, varying only in size. The duty statements of the technology staff, regardless of employing department, authority, or board are identical and validate that similar duties are carried out.

Entities within the Youth and Adult Correctional Agency are capable of supporting different information needs. Indicative of this is that the California Department of Corrections, Information Systems Division has responsibility for both institution and parole support and is presently supporting the Board of Prison Terms in development of a parolee hearing tracking database ordered by the federal courts.[7]

*All technology staff should be accountable to one central authority.* At present, 100 Department of Corrections employees are assigned in 32 institutions for technology purposes, but they are not supervised by the Information Systems Division, which is responsible for technology management. Christy Quinlan, Chief Information Officer, California Department of Corrections, Information Systems Division, advised that during recent 2004 department information technology training in Galt, California on April 6 and 7, the most prominent voiced request was to change the information technology organization to centralized personnel management.[8] Conference attendees who work in institutions provided examples of problems resulting from the absence of centralized personnel management. The problems cited include: the inability to gain local compliance with departmental policy and report non-compliance in accordance with policy; the inability to report or stop security breaches; being assigned tasks out of information technology classification; non-information technology managers over-riding departmental priorities; and the inability of non-information technology managers to grasp information technology-related issues.[9] In an environment of understaffing, the fragmentation of resource control not only compounds the staffing issue, but undermines the morale of those properly and improperly utilized.

*Support of technology has not kept pace with other staffing.* In an agency of 52,000 employees—about one-sixth of all state employees—approximately 250 people are directly accountable for supporting the department's information systems development, communi-

---

[7] Heidi Trimarchi, Manager of Application Development and Maintenance Section, Information Systems Division, California Department of Corrections, interview Folsom, California, June 2, 2004.

[8] Christy Quinlan, Deputy Director and Chief Information Officer, California Department of Corrections, interview, Sacramento, California, May 19,2004.

[9] Dan Marshall, Staff Information System Analyst, California Department of Corrections, San Quentin, California.

cation, and associated storage and service requirements.[10]  The 100 additional technology employees assigned to Department of Corrections institutions are responsible to the institution hiring authority and can be diverted to non-information technology local duties as determined by institution supervisors. Assigned at a specific institution, some of which are quite remote, these employees are not readily available to assist each other or headquarters. Also, institutions operate twenty-four hours a day, seven days a week, 365 days a year. Often these employees have the highest ratio of support to users—as much as 1:600.[11]  The Gartner Group, an industry-recognized expert on information technology personnel ratios, conducted a staffing study for the California Youth Authority, which is similar to California Department of Corrections, and recommended a support ratio of staff to personal computers of 1:45. If all of the technology employees within the agency were used only for computer support, the ratio, at best, would be 1:150. But if that were the case, no other information technology services could be delivered, including application development, network and server support, data communications, database, security, help desk and implementation and control of production systems. [12]  Adequate staffing levels are needed if correctional personnel are to rely upon and trust the technology environment to support their needs.

In addition, the current structure allows for candidates who lack even the most basic required qualifications to be hired into technology positions; indeed, the majority of the institution and field interview panels do not include a member from the information technology classifications. The department must change its hiring practices for information technology personnel.[13]

**Budget.**  Budget centralization is critical to uniformity of applications, prioritization of projects, and accountability.  In the past, wardens had autonomy over institution budgets, which has contributed to overspending the corrections budget by 1.6 billion dollars since 1999.[14]  As has been the case with many agencies, much of the early technology applications in the corrections system occurred from the ground up. In the absence of headquarters capability to provide support that kept pace with correctional growth, local ingenuity was applied. A consequence of self-initiative and local budgeting at institutions resulted in diverse software programs and hardware.  Local institutions used available programmable software to implement local solutions. Standardization was a victim. These numerous

---

[10]  Christy Quinlan, Deputy Director and Chief Information Officer, California Department of Corrections, interview, Sacramento, California, May 19, 2004, and Heidi Trimarchi, Manager of Application Development and Maintenance Section, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

[11]  Dan Marshall, Staff Information System Analyst, California Department of Correction, San Quentin, California.

[12]  California Department of Corrections, Information Systems Division, "Youth and Correctional Agency Information Technology Statement Form," pp. 2-3. (Supplied by Christy Quinlan, Deputy Director and Chief Information Officer, California Department of Corrections, Sacramento, California, January 2003).

[13]  Senate Advisory Commission on Cost Control in State Government, *Utilizing Technology in the Department of Corrections*, Sacramento, California, August 2002, p. 41.

[14]  Associated Press, "Prison spending reforms approved by state assembly," May 27, 2004.

single purpose, stand-alone systems in today's networking environments and information demands, cannot communicate with one another, are too slow, are outmoded, or are no longer supported by the manufacturer. These inherited systems, or legacy systems, dilute technical support resources; can no longer perform the tasks undertaken; cannot be supported; or are antiquated. [15]

This autonomy of expenditure has also resulted in some institutions implementing major technology infrastructure developments on their own and others not.[16]  A consequence is a fragmented level of development and a failure to anticipate the continuing cost of maintaining systems after they are established. The fragmentation is also generated by several major settlements in federal court cases that have mandated specific actions to include databases and the technology to achieve them, [17] some local in nature[18] and others division-wide.[19] These court mandates have re-prioritized projects, often with great administrative expense. One special master received $600,000[20] and another is even more costly.[21]

The methodology of financing is also affected by practices imposed by the Department of Finance. Presently, all technology projects costing over $500,000 must be justified to and approved by the Department of Finance, a generic process applied regardless of risk involved and seen by technology staff as wasteful. The Department of Finance requires that each project include its own infrastructure development and costs, regardless of whether a general infrastructure project alone would be more economical in the long run.[22] This also encourages piecemeal development.

While issues of budget impact all project activity, project development and management determines success or failure. The ghosts of projects failed haunt the state technology departments. Every technology administrator is familiar with the failed Department of Motor Vehicles computer project, the Oracle licensing contract debacle, and other technology-related failures and scandals. These technology graves create suspicions toward all major technology projects proposed for state government. The California Department of Corrections suffers from a failed Correctional Management Information System.[23] Begun in

---

[15]  Heidi Trimarchi, Manager of Application Development and Maintenance, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

[16]  Heidi Trimarchi, Manager of Application Development and Maintenance, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

[17]  Joe Panora, Chief Information Officer, California Youth Authority, interview, Sacramento, California, May 17,2004.

[18]  "*Madrid* Remedial Plan, Pelican Bay State Prison, Use of Force Policy," revised July 2003, pp. 45-46.

[19]  Darrel Ballard, Major, California Youth Authority, interview, March 24, 2004.

[20]  Youth and Adult Correctional Agency, "Transition Document, *Madrid v. Alameida*," November 4, 2003,page 26

[21]  *Ibid., Coleman v. Wilson,* p. 24.

[22]  Heidi Trimarchi, Manager of Application Development and Maintenance, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

[23]  *Ibid.*

1994 with great hopes for propelling the department into an automated inmate information era, the project focus froze all existing older systems it was to replace, until it sputtered to a litigated halt in 1998. In its wake it left even more outdated and under-maintained old systems, a paranoia as to undertaking anything whose beginning and end could not be absolutely guaranteed, and a Legislature skeptical of funding any new projects.[24]

The ability to manage a technology project of the magnitude appropriate for the new De-partment of Correctional Services or a consolidated correctional entity should give rise to cautious deliberation; not only as to the need, but as to selecting the correct resources to initiate and undertake the endeavor. Government technology resources generally can be fully tasked in the maintenance of the existing architecture, service calls, and coordinating the various connectivity of networks. The complexity of project development and the balancing of the responsibilities of the corrections internal units should require corrections administrators to seek competent expert advice and guidance. Technology project manage-ment is a specialized skill not naturally nurtured in the technology domain of state govern-ment or businesses in general. A new project can drain and overwhelm the normal support-ing function provided by technology staff to an agency, harming its core operations and at the same time failing to produce the desired project results. Executive support of a project requires an objective assessment of both program and technical staff capabilities to inter-nally undertake a major project task, or to contract out the task. This is not to diminish the talents of many corrections personnel, but to acknowledge that the size of the agency alone equals and surpasses many other state governments. Other options in technology choices are similarly important, such as using commercial off-the-shelf systems or choosing be-tween purchasing or leasing various types of hardware. No clear formula exists for making these determinations, but the issues must be addressed objectively with each project.

The current budgeting practice requires program technology projects to be funded by the affected institution or program. Institution budgets can be expended for technology pur-poses, but procurement procedures in the Department of Corrections and the California Youth Authority now require sign-off on procurement requests by the chief information officer. The culture of institution autonomy still prevails—an occasional technology argu-ment concludes with "the wardens have to run their institutions, you can't tell them what to do!" [25]

***Standardization.*** Control of technology development is essential. As noted above, fiscal control can provide standardization of systems and hardware. The technology authority must be adequately empowered to do this. Replacing the older antiquated systems not compatible with current technology will require discipline and a long-term strategy. New

---

[24] Senate Advisory Commission on Cost Control in State Government, *Utilizing Technology in the Department of Corrections*, Sacramento, California, August 2002, p. 26.
[25] Heidi Trimarchi, Manager of Application Development and Maintenance, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

Department of Corrections policy applies the industry practice of requiring a written charter between the department technology staff and the program staff in the development of a technology project for operational use. These project management relationships are formally documented with specific responsibilities assigned.[26]  The operational program establishes the business need, and technology determines the process. But not every program person is suited to or, more likely, even trained in the manager role.[27]  Standardization of systems can be maintained by allowing technology to determine the process.

Many projects affecting corrections have been court-imposed, which can undermine standardization. The settlement outcomes are negotiated between program staff and the court-appointed representative and experts. The understanding of the corrections program staff may not realistically encompass technology concerns.[28]  Likewise, the capacity of the technology staff may not be adequate to fulfill the operational need.[29]  In either instance, this can result in settlements that create expensive or inefficient results. Further, executive management must consider the global impact of these settlements on the resulting technology demands and ensure that negotiations do not undermine standardization.

**Executive support.** The executive leadership must support a technology strategy of centralized authority and standardized process.[30]  That support is essential to the effective use of technology capable of supporting the operational program activity of the agency. Information is the key to accountability. The executive must understand that information capture, flow, and use are essential to all aspects of the correctional mission. Adequately implemented, information technology can support the external initiatives foreseen by the proposed Correctional Standards Authority in the coordination of state and local corrections systems. Implementation of technology strategic policy must be aggressively enforced, whether resisted by institution executives, affected by union policy concerning work rules, or infringed upon by proposed settlement agreements.

The chief information officer must have adequate authority to prevent dilution of resources through budget and personnel diversion, to control development of infrastructure and to enforce a focused strategy.[31]  The Department of Corrections has implemented an Information Technology Executive Committee composed of all major division executives.  It is the role of the Technology Executive Committee to consider and prioritize projects and monitor their progress. Greater involvement and representation of wardens is desired and is being

---

[26]  *Ibid.*

[27]  Joe Panora, Chief Information Officer, California Youth Authority, interview, Sacramento, California, May 17,2004.

[28]  *Ibid.*

[29]  Warden Joe McGrath, Pelican Bay State Prison, letter to Special Master John Hagar, in re *Madrid v.Gomez*, April 2, 1999.

[30]  Joe Panora, Chief Information Officer, California Youth Authority, interview, Sacramento, California, May 17, 2004.

[31]  Joe Sogge, Chief Information Officer, Department of General Services, interview, Sacramento, California, May 7,2004.

sought.[32]  This concept is consistent with the proposed Department of Correctional Services elevation of the information technology executive to report directly to the Secretary.

***Infrastructure and database development.***  Robust enterprise-wide systems addressing core matters are essential. A consolidated Department of Correctional Services will require enhanced wide-area networks. A strong regional authority will require reliable connectivity; hence, a robust enterprise wide infrastructure is essential.  In recent years the technology components have worked toward that end within budget restraints, but much still remains. The California Youth Authority is concluding a phasing out of Macintosh hardware and implementing a unified e-mail.[33]  The Department of Corrections just completed the installation of the last local area network in an institution.[34]

In recent years, the Department of Corrections and the California Youth Authority have identified needed new and replacement data collection systems and these are being developed. Several of these major systems are court-ordered.  A business information system, an offender data system, and a global data system encompassing all inmate medical history are some of the major endeavors, and are just a few of many in stages of development or under consideration. As identified and justified elsewhere in this report, the Corrections Independent Review Panel has found the need for developing enterprise-wide data collection applications and for enhancing or consolidating currently developed systems or systems under development, based upon anticipated needs of the new Department of Correctional Services.

In summary the Corrections Independent Review Panel found need for the following:

- An offender data system to consolidate all intake, history, and tracking of all inmates, wards or parolees.
- An inmate education program database accessible by institutions and parole for all needs.
- Data systems that would support "evidence-based" decision making to measure the effectiveness of parole policies and programs to reduce the rate of recidivism.
- A health care data system to capture all individual inmate, ward, and parolee medical activity and records and to allow for global analysis of corrections medical treatment, costs, and impacts.
- The development of a state-wide system for tracking and analysis of inmate/parolee appeals.

---

[32]  *Ibid.*
[33]  Joe Panora, Chief Information Officer, California Youth Authority, interview, Sacramento, California, May 17,2004.
[34]  Heidi Trimarchi, Manager of Application Development and Maintenance, Information Systems Division, California Department of Corrections, interview, Folsom, California, June 2, 2004.

- A business information system to support all management tasks and provide for accountability within the Department of Correctional Services.
- Creation of a personnel information system to track all employee-related matters and issues and to provide employee access to those aspects that facilitate career and training development while maintaining adequate record security.
- Creation of a case management system for managing internal affairs cases state-wide.
- Creation of a data system for gathering and analysis of information regarding use-of-force incidents.

# Recommendations

The Corrections Independent Review Panel recommends that the following actions be taken to improve information technology in the state correctional system:

- Consolidate all correctional information technology into one major organizational structure under the direction of a Deputy Secretary for Information Technology, who will act as the chief information officer of the Department of Correctional Services.

- Establish and incorporate into budget and personnel planning a strategic plan for information technology infrastructure development, maintenance, and replacement.

- The Secretary of the Department of Correctional Services must adequately support the Deputy Secretary for Information Technology in implementing a strategic technology plan through personnel and budgetary discipline.

- The Secretary of the Department of Correctional Services must require a global assessment of all settlement agreements relative to technology strategic plan impact.

- Authorization of new or amended technology projects must identify all costs associated with establishing programs, supporting infrastructure, and maintenance.

- Department of Correctional Services information technology and financial management components should establish criteria for determining the need for contracted expertise in technology projects.

- Require technology project management training for corrections operations staff involved in chartered technology projects.

- All personnel servicing and implementing information technology systems must be hired by and assigned to the Deputy Secretary for Information Technology.

- Establish and maintain proper levels of technology support staffing for both existing and new systems.

- Establish specific core enterprise-wide databases to facilitate the effective operation of the Department of Correctional Services.

## Fiscal Impact

Implementation of the recommendation will increase costs for technology infrastructure and personnel. The dollar cost of the recommendations will be determined by the creation of and compliance with a strategic plan. A strategic plan can minimize the unanticipated consequences that can arise in technology development and implementation that inflate expenses. User acceptance by compliance with standards of input of data, consideration of database content, and management application of data to decision making can reduce the events and incidents that generate crisis costs for the correctional entity. Business information systems allow the executive to control costs consistent with planning and require accountability and consequences for failure. Systems that document the medical treatment of inmates, wards, and parolees professionalize and enhance medical treatment and provide proof of action needed for medical and legal purposes. Failure to provide that proof in the past has led to legal claims alleging mistreatment, followed by subsequent damages and remediation costs.

# Appendices

**A: Implementation**                                                    **2**

**B: Legal Discussion**                                                  **5**

**C: Proposed Statutory and Constitutional Changes**        **8**

**D: Bibliography**                                                     **59**

**E: Individual Contacts**                                              **83**

# Implementation

While the recommendations presented in this report may provide the best opportunity for success in reforming California's correctional system, the scope and volume of the recommendations are such that implementation may appear to be daunting. Accordingly, the Corrections Independent Review Panel offers the following implementation guidelines:

- **Develop a strategic plan.** A strategic plan should be developed that includes a detailed plan for implementation. The strategic plan should also include metrics to track progress. The strategic planning process should begin immediately with a select team that includes all involved entities, led by experienced strategic planners. The panel suggests three principles to guide the development of the strategic plan:

  1. **Vision –values.** This principle seeks to answer the fundamental question, *If all things were possible and there were no financial or resource limits on what could be accomplished, what would you want the future to be like?* This permits planning to an envisioned future and an articulation of values.

  2. **Mission - goals/strategies.** This principle describes a short-term plan of one to three years to attain and measure progress. A clear mission is necessary to guide goals and strategies.

  3. **Objectives –action plan.** This principle describes what will be done and in what order it will be accomplished. The plan should state clearly what is to be accomplished in the very short term and what actions are required to do so. Action plans are needed to align the units of the organization and begin the implementation of the new structure, such as establishing Adult and Youth Operations, Regional Directors, and subordinate parole offices.

  Implementation planning should prioritize objectives based on the vision, values, mission, and goals/strategies of the organization. Steps involved in such a process include organizing the recommendations according to current priorities; identifying recommendations that can be undertaken without changing statutory authority; determining those that require new law; gauging the impact of the Governor's Reorganization plan; and identifying the resources required during the implementation period.

- **Provide continuing strategic management.** A continuing process of strategic management is needed to engage both management and staff in re-creating the organization. This requires establishing a guiding task force responsible for oversight and for taking action to overcome barriers to implementation. Given the magnitude of the current effort, several such groups focused on specific aspects may be appropriate. These entities are also essential to generating the extensive

communications needed and effective collaboration required to carry organizational change forward.

- **Implement certain recommendations immediately.** Implementation can begin immediately on certain recommendations, even under the current Youth and Adult Correctional Agency structure. These include the policy changes recommended for the operation of internal affairs, personnel and training, information technology, risk management, and the code of conduct, as well as continued development of financial management and health care administration. These policy changes should be incorporated into the strategic plan.

- **Give population management recommendations priority.** Recommendations affecting institution and parole population management should be at the forefront of organizational planning. These recommendations deal primarily with the management and programming of wards, inmates, and parolees. Actions critical to the success of the organization are needed now in institutions and parole operations. These include adoption of a violence control program for adult institutions, pursuing legislation to change sentence credit policies and sentencing practices, expanding support for the "new parole model" for adults, and developing community aftercare for youthful offenders.

- **Begin the groundwork for long-term changes as soon as possible**. Many of the panel's recommendations require substantial time and investment in both human capital and technology before their effects can be realized. These investments should be determined and made over successive budget cycles, although some significant and early cost savings can be expected by merging department-wide policy and support functions. Planning for long-term change should begin even before legislative approval is obtained for reorganization.

- **Begin implementing changes in health care administration.** The changes recommended in health care administration involve many areas of the new organization, including risk management, financial and contract management, and legal services. While implementing the changes will require a long-term effort, the changes can be initiated now. The organization should without delay develop a plan to: (1) define and establish its new central administrative organization; (2) enter into collaboration with University of California officials to build an effective partnership; (3) identify and develop the data necessary for understanding correctional health care demands; (4) establish a task force to determine the types of contracts that best support delivery of health care in specific institutions; (5) develop a master set of contracting documents; and (6) establish field contract managers to obtain health care providers and train the contract managers. Internal organizational changes — such as moving the present quality management assessment program to a new risk

management function, and the program support unit, to a new financial management operation—should also be undertaken immediately.

# Legal Discussion

Some of the recommendations in this report can be implemented under existing statutory authority, but others will require new legislation, and two recommendations will require amendments to the California Constitution.

The first proposed constitutional amendment involves providing the new Secretary of Correctional Services with the ability to appoint and remove those in certain key exempt positions within the department. Under current law, the Secretary would be able to make no more than one exempt appointment. Accordingly, in the legislation proposed below, the Secretary would appoint only the Undersecretary. In order to attract the most qualified candidates who are free of outside allegiances, however, the Secretary must be free to appoint and remove exempt Assistant Secretaries, Deputy Secretaries, Directors of Operations, and Regional Directors within the new Department of Correctional Services. This recommendation requires a constitutional amendment permitting the Secretary to make these additional exempt appointments.

The second proposed constitutional amendment involves replacing the State Personnel Board's involvement in the disciplinary appeal process for employees of the new Department of Correctional Services with an internal employee discipline appeal panel and eliminating the appeal process for lower level penalties. The discipline appeal panel would consist of designated departmental managers and one member selected by the Civilian Corrections Commission. At present, the California Constitution requires the State Personnel Board to review disciplinary actions taken against all state civil service employees. *[See California Constitution, Article VII, Section 3, subdivision (a)]* Accordingly, this recommendation requires a constitutional amendment exempting the employees of the new department from the State Personnel Board's appeal process.

In addition to these constitutional amendments, legislation will be required to fully accomplish the proposed reorganization of the Youth and Adult Correctional Agency and its component entities into a single Department of Correctional Services, which will be overseen by the Civilian Corrections Commission. While the California Performance Review may propose a sweeping reorganization of state government through a Governor's reorganization plan that includes a similar reorganization of the correctional system, as permitted by California's Government Code Sections 12080-12081.2, the changes envisioned in this report cannot be adequately accomplished by such a reorganization plan alone. Following are a few of the fundamental reasons that the panel is instead recommending separate legislation:

- In order to create accountability and change the culture of the new correctional organization, this panel recommends that the Civilian Corrections Commission's five members be the only individuals in the new structure whose appointments require Senate confirmation. A Governor's reorganization plan may not abolish

existing Senate confirmation requirements for the positions transferred to the new department (for example, the Inspector General and wardens). Separate legislation, on the other hand, could specifically abolish these requirements.

• The proposed organizational structure includes a Civilian Corrections Commission with five members serving five-year staggered terms. A Governor's reorganization plan would not allow appointments for a term of more than four years. Accommodating this limitation would have a significant impact on the commission. For example, having only three members with staggered, three-year terms would not allow the diversity of opinion envisioned for such an important commission. Similarly, having four members with staggered, four-year terms would create the possibility of tie voting, which makes little sense and would create unnecessary problems. In addition, having more than one member complete a term at the same time would disrupt the continuity of the membership. Separate legislation, on the other hand, could provide for the staggered, five-year terms exactly as proposed.

• There are additional recommendations in this report that require specific legislation (for example, legislation regarding the new term of the Inspector General, inmate and ward health care), which would not be accomplished by a Governor's reorganization plan. Separate legislation, on the other hand, allows all of the Corrections Independent Review Panel's recommendations not otherwise requiring constitutional amendments to be introduced to the legislature at one time.

The proposed legislation outlined in these appendices includes new code sections and revisions to existing code sections. While the new legislation would create some of the legal framework for the new organization and implement a few of the recommendations, these revised code sections reflect the changes necessary to implement additional recommendations and transition all of the functions and responsibilities from the existing organizational structure to the new one. The proposed legislation set forth below is not exhaustive, but it provides the language necessary for specified changes. The Legislative Counsel and the new department will have to spend considerable time reviewing and updating the existing codes.

Other features presented in this report would require additional legal changes. For instance, the report recommends creating a system of blended sentences for some youthful offenders in order to encourage wards sentenced to the Department of Correctional Services –Division of Youth Operations to succeed in that program; otherwise, they would be transferred to the Division of Adult Operations for the remainder of their sentence. These youths would be distinguished from those who are tried in adult court and receive only adult sentences. In order to implement this type of blended sentencing system under the jurisdiction of the juvenile courts, which are arguably better suited than the adult courts to monitor the progress of youth committed in their courtrooms, youthful offenders would have to receive all adult criminal procedural safeguards in the juvenile courts, including the right to a jury

trial. As a practical matter, it would be an unnecessary burden and expense to provide adult criminal procedural safeguards for all youth matters; therefore, the district attorney would have to move to have the youth tried under the blended sentencing system with its adult criminal procedural safeguards at the outset of the prosecution. This system of sentencing would require a task force to propose significant legislation to develop the parameters of the blended sentences— a measure that is not proposed in the appendices below. Furthermore, there would be practical and budgetary considerations with regard to implementation of adult criminal procedural safeguards within the existing juvenile court system.

Similarly, this report recommends a system of presumptive sentencing for adult offenders. In order to accomplish a sentencing system that gives prisoners incentives for improvement for eventual re-entry into society, a task force of sentencing, corrections, and legal experts should be formed to develop the parameters of the new model with all of its nuances and limitations. Additional research will have to be conducted before a plan could be advanced. Eventually, this fully-formulated plan would have to be presented to the Legislature for codification.

Legislative language is included below for the following categories of changes:

   Managing Inmate and Ward Health Care

   Risk Management

   Personnel and Training

   Population Management-Youth

   Population Management-Adult

   Organizational Structure

# Proposed Statutory and Constitutional Changes

### A.     MANAGING INMATE AND WARD HEALTH CARE

**PROPOSED NEW LEGISLATION**

*The Legislature hereby finds and declares that the functions of the Department of Correctional Services includes the provision of legally required, medically necessary health care for wards and inmates. The Legislature further finds and declares that managing and providing for the health care needs of wards and inmates under the jurisdiction of the Department of Correctional Services are not sufficiently met by civil service employees, cannot be performed satisfactorily by civil service employees, and can be of such a highly specialized or technical nature that the necessary expert knowledge, experience, and ability are not available through the civil service system. Commencing January 1, 2005, the Department of Correctional Services is hereby authorized pursuant to Government Code Section 19130(b)(3) to seek personal services contracts to replace its medical care system until such time that these services can be provided by an organization that is constitutionally exempt from civil service, pursuant to Government Code Section 19130(b)(1).*

**AMEND PENAL CODE SECTION 2684-2685**

*The existing language of sections 2684 and 2685 are repealed and replaced with the following:*

*2684. The legislature finds that the Department of Correctional Services has established and operates a mental health services delivery system for the treatment of inmates who have serious mental disorders, and that such inmates are treated in the following levels of care: (1) clinical case management, (2) enhanced outpatient care, (3) crisis care, and (4) long-term and acute inpatient care, with all inpatient care provided in state hospitals or other facilities operated by the Department of Mental Health, or its successor, pursuant to renewable agreements between the Department of Correctional Services and the Department of Mental Health, or its successor.*

*The legislature finds further that the Department of Correctional Services identifies inmates with serious mental disorders through screenings and other methods with diagnoses made by qualified psychologists and psychiatrists in accordance with accepted mental health practices.*

*The legislature declares that it is in the best interests of the state and of inmates with serious mental disorders requiring enhanced outpatient care, crisis care or inpatient care that they be provided such care and treatment by the Department of Mental Health, or its successor, in the most appropriate setting within either state prisons or state hospitals without the need for a renewable agreement between the departments.*

*(a)The Director of the Department of Mental Health, or his/her successor, shall be responsible for and shall accept for treatment any inmate under the jurisdiction of the Department of Correctional*

Services that has been determined by either the Department of Correctional Services or the Department of Mental Health, or its successor, to have a serious mental disorder and who requires enhanced outpatient, crisis or inpatient care and treatment as such levels of care are defined in the Mental Health Program Guides governing the Department of Correctional Services mental health service delivery system.

(b) In order to achieve an effective transition of responsibility for providing the services required by this section, the Department of Correctional Services and the Department of Mental Health shall enter into a collaborative process in which to determine a plan for implementing the requirements of this section.  The plan shall include: (i) the determination of the facilities in which the enhanced outpatient, crisis care and inpatient services are to be provided, (ii) the security required for such facilities, (iii) staff and budget requirements, (iv) and the date upon which the required services will be implemented by the Department of Mental Health, or its successor, which shall not occur later than one year from the effective date of this section.  The Department of Mental Health, or its successor, shall be responsible for all care and treatment required by this section including staffing, medications and materials.  The Department of Correctional Services shall be responsible for providing security for staff and inmates who are in the care of the Department of Mental Health, or its successor, within a state prison, and for providing security for the perimeter of a state hospital in which such care is provided.

(c)When in the opinion of the Department of Mental Health, or its successor, an inmate treated pursuant to the requirements of this section is in remission such that the particular level of care provided by the Department of Mental Health is no longer clinically required as determined by the Department of Mental Health, or its successor, the inmate may be discharged into the care and custody of the Department of Corrections.  Such discharged inmates shall be received by the Department of Correctional Services and retained within the case management level of care until clinically discharged from that care, or until the inmate's release date from prison, whichever date arrives first.

(d)Any inmate whose prison sentence expires while under treatment by the Department of Mental Health, or its successor, pursuant to this section shall be released in accordance with procedures determined by the Department of Correctional Services.

(e)The Department of Mental Health, or its successor, and the Department of Correctional Services shall consult with one another to determine if the treatment of seriously disordered youthful offenders should be included in the provisions of the transition plan described in subsection (b) above and the required treatment for such youthful offenders be provided by the Department of Mental Health, or its successor.

B.    <u>**RISK MANAGEMENT**</u>

**PROPOSED NEW LEGISLATION**

*Commencing January 1, 2005, the Department of Correctional Services and the Office of the Attorney General shall negotiate a binding Memorandum of Understanding no later than March 1st of each calendar year for the succeeding fiscal year.  The Memorandum of Understanding shall include the terms and scope of representation by the Office of the Attorney General of the Department of Correctional Services and its employees.  Included in those terms shall be the mutually agreed upon remedies available to the parties in the event of conflicts arising from the agreement.  In the event that the Attorney General is unable to provide legal services for Department of Correctional Services' legal matters, the department is authorized to employ attorneys at law and such assistant attorneys as are necessary, said attorneys to act as the attorneys and legal advisers of the department on those matters. The department shall report to the Department of Finance, or its successor, an annual summary of resulting expenditures incurred for these services.*

**PROPOSED NEW LEGISLATION AND REVISION OF PENAL CODE SECTION 5058.1[1]**

*The Legislature hereby finds and declares that the Department of Correctional Services is uniquely tasked with serving the interest of public safety.  This service is best provided by the uniform and timely implementation of new and/or revised policies throughout the correctional system.  In the safety and welfare interests of inmates, wards, parolees, employees and the public-at-large, the Department of Correctional Services shall be exempt from the requirements of the Administrative Procedure Act (Chapter 3.5 (commencing with Section 11340), Chapter 4 (commencing with Section 11370), Chapter 4.5 (commencing with Section 11400), and Chapter 5 (commencing with Section 11500)). This section shall apply to actions taken by the department and the Civilian Corrections Commission with respect to the California Code of Regulations, Title XV.   The Civilian Corrections Commission shall hold public meetings  prior to the consideration or adoption of any permanent changes to the California Code of Regulations, Title XV proposed by the Secretary of Correctional Services.*

*5058.1.  (a) For the purposes of this section, "pilot program" means a program implemented on a temporary and limited basis in order to test and evaluate the effectiveness of the program, develop new techniques, or gather information.*

  *(b)* <u>*Commencing January 1, 2005, t*</u>~~*The*~~ *adoption, amendment, or repeal of a regulation by the* ~~*director*~~<u>*Secretary, subject to the oversight of the Civilian Corrections Commission,*</u> *to implement a legislatively mandated or authorized pilot program or a departmentally authorized pilot program, is exempt from Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, if the following conditions are met:*

---

[1]  The revision to Penal Code Section 5058.1 must only be enacted in conjunction with the enactment of the new legislation.

*(1) A pilot program affecting male inmates affects no more than 10 percent of the total state male inmate population; a pilot program affecting female inmates affects no more than 10 percent of the total state female inmate population; and a pilot program affecting male and female inmates affects no more than 10 percent of the total state inmate population.*

*(2) The ~~director~~ Secretary certifies in writing that the regulations apply to a pilot program that qualifies for exemption under this section. The certification shall include a description of the pilot program and of the methods the department will use to evaluate the results of the pilot program.*

*(3) The certification and regulations are filed with the Office of Administrative Law and the regulations are made available to the public by publication pursuant to subparagraph (F) of paragraph (3) of subdivision (b) of Section 6 of Title 1 of the California Code of Regulations.*

*(4) An estimate of fiscal impact is completed pursuant to Sections 6650 to 6670, inclusive, of the State Administrative Manual.*

*(c) The adoption, amendment, or repeal of a regulation pursuant to this section becomes effective immediately upon filing with the Secretary of State.*

*(d) A regulation adopted pursuant to this section is repealed by operation of law, and the amendment or repeal of a regulation pursuant to this section is reversed by operation of law, two years after the commencement of the pilot program being implemented, unless the adoption, amendment, or repeal of the regulation is promulgated by the ~~director~~ Secretary pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code. For the purpose of this subdivision, a pilot program commences on the date the first regulatory change implementing the program is filed with the Secretary of State.*

## C.    PERSONNEL AND TRAINING

### AMEND PENAL CODE SECTIONS 13600-13602 & 6126.2

13600.  (a) The Legislature finds and declares that peace officers of the state correctional system, including youth and adult correctional facilities, fulfill responsibilities that require creation and application of sound selection criteria for applicants and standards for their training prior to assuming their duties.  For the purposes of this section,  correctional peace officers are peace officers as defined in Section 830.5 and employed or designated by, _commencing January 1, 2005,_ the ~~Department of Corrections and the Department of the Youth Authority~~ _Department of Correctional Services_.

  The Legislature further finds that sound applicant selection and training are essential to public safety and in carrying out the missions of the ~~Youth and Adult Correctional Agency~~ _Department of Correctional Services_ in the custody and care of the state's offender population.  The greater degree of professionalism which will result from sound screening criteria and a significant training curriculum will greatly aid the ~~Youth and Adult Correctional Agency~~ _Department of Correctional Services_ in maintaining smooth, efficient, and safe operations and effective programs ~~in the Department of Corrections and the Department of the Youth Authority~~.

  (b) ~~There is within the Youth and Adult Correctional Agency a Commission on Correctional Peace Officer Standards and Training, hereafter referred to as the CPOST.~~ [2] _Commencing January 1, 2005, any reference to the Commission on Correctional Peace Officer Standards and Training, or "CPOST", shall refer to the Corrections Standards Authority._  The Department of Corrections-Department of the Youth Authority Joint Apprenticeship Committee, as referred to in the Memorandum of Understanding for Unit 6, ~~is hereby renamed the~~ _also formerly named the_ Commission on Correctional Peace Officer Standards and Training, _shall refer to the Corrections Standards Authority._  ~~Any reference to the Department of Corrections-Department of the Youth Authority Joint Apprenticeship Committee shall be deemed to refer to the CPOST.~~

  ~~(c) (1) The executive board of the CPOST shall be composed of six voting members.~~

  ~~- (A) Two members from, appointed by, and representing the management of, the Department of Corrections and one member from, appointed by, and representing the Department of the Youth Authority.~~

  ~~- (B) Three members from, and appointed by the Governor upon recommendation by, and representing the membership of, the California Correctional Peace Officers' Association.  Two members shall be rank and file persons from State Bargaining Unit 6 and one member shall be supervisory.~~

  ~~- (C) Appointments shall be for four years.~~

  ~~- (D) Promotion of a member of CPOST shall invalidate the appointment of that member and shall require the recommendation and appointment of a new member if the member was appointed from~~

---

[2] While the statutory change may be made, the contractual obligation remains through July 2, 2006 unless there is mutual assent to the abolition of the Commission of Correctional Peace Officer Standards and Training (CPOST) by the California Correctional Peace Officers Association.

*rank and file or from supervisory personnel and promoted out of his or her respective rank and file or supervisory position during his or her term on CPOST.*

*(2) Each appointing authority shall appoint one alternate member for each regular member who they appoint pursuant to paragraph (1). Every alternate member shall possess the same qualifications as the regular member and shall substitute for, and vote in place of, the regular member whenever he or she is absent.*

*(d) The rules for voting on the executive board of the CPOST shall be as follows:*

*(1) Decisions shall be made by a majority vote.*

*(2) Proxy voting shall not be permitted.*

*(3) Tentative approval of a decision may be taken by a telephone vote. The CPOST members' decision shall be documented in writing and submitted to the CPOST for confirmation at the next scheduled CPOST meeting so as to become a part of the permanent record.*

*(e) The executive board of the CPOST shall adopt rules as it deems necessary for efficient operations, including, but not limited to, the appointment of advisory members for forming whatever committee it deems necessary to conduct its business. These rules shall be in conformance with the State Personnel Board rules and regulations, the Department of Personnel Administration rules and regulations, and the provisions of the State Bargaining Unit 6 Memorandum of Understanding.*

*(f) The CPOST shall appoint an executive director.* <u>*The Governor may appoint a subordinate officer to the secretary, subject to confirmation by the Senate, under this section who shall hold office at the pleasure of the Governor. Commencing January 1, 2005, t*</u>*The* <u>*executive director*</u> <u>*subordinate officer*</u> *shall appoint staff as provided for in the annual Budget Act*<u>*, beginning in fiscal year 1999-2000*</u>*.*

13601. *(a)* ~~*The CPOST*~~ <u>*Commencing January 1, 2005, the Corrections Standards Authority*</u> *shall develop, approve, and monitor standards for the selection and training of state correctional peace officer apprentices. Any standard for selection established under this subdivision shall be subject to approval by the State Personnel Board. Using the psychological and screening standards established by the State Personnel Board,* <u>*or its successor;*</u> *the State Personnel Board or the Department of the Youth Authority*<u>*, or their successors,*</u> *shall ensure that, prior to training, each applicant who has otherwise qualified in all physical and other testing requirements to be a peace officer in either a youth or adult correctional facility, is determined to be free from emotional or mental conditions that might adversely affect the exercise of his or her duties and powers as a peace officer.*

*(b) The* ~~*CPOST*~~ <u>*Corrections Standards Authority*</u> *may approve standards for a course in the carrying and use of firearms for correctional peace officers that* ~~*is*~~ <u>*are*</u> *different from that prescribed pursuant to Section 832. The standards shall take into consideration the different circumstances presented within the institutional setting from that presented to other law enforcement agencies outside the correctional setting.*

*(c) Notwithstanding Section 3078 of the Labor Code, the length of the probationary period for correctional peace officer apprentices shall be determined by the* ~~*CPOST*~~ <u>*Corrections Standards Authority*</u> *subject to approval by the State Personnel Board, pursuant to Section 19170 of the Government Code.*

*(d) The ~~CPOST~~ Corrections Standards Authority shall develop, approve, and monitor standards for advanced rank-and-file and supervisory state correctional peace officer and training programs for the Department of ~~Corrections~~ Correctional Services. When a correctional peace officer is promoted within the ~~Department of Corrections~~ department, he or she shall be provided with and be required to complete these secondary training experiences.*

*(e) The ~~CPOST~~ Corrections Standards Authority shall develop, approve, and monitor standards for the training of state correctional peace officers in the Department of ~~Corrections~~ Correctional Services in the handling of stress associated with their duties.*

*(f) Toward the accomplishment of the objectives of this act, the ~~CPOST~~ Corrections Standards Authority may confer with, and may avail itself of the assistance and recommendations of, other state and local agencies, boards, or commissions.*

*(g) Notwithstanding the authority of the ~~CPOST~~ Corrections Standards Authority, the ~~departments~~ department shall design and deliver training programs, shall conduct validation studies, and shall provide program support. The ~~CPOST~~ Corrections Standards Authority shall monitor program compliance by the departments.*

*(h) The ~~CPOST~~ Corrections Standards Authority may disapprove any training courses created by the ~~departments~~ department pursuant to the standards developed by the commission if it determines that the courses do not meet the prescribed standards.*

*(i) The ~~CPOST~~ Corrections Standards Authority shall annually submit an estimate of costs to conduct those inquiries and audits as may be necessary to determine whether the ~~departments~~ department and each of their institutions and parole regions are adhering to the standards developed by ~~CPOST~~ Corrections Standards Authority, and shall conduct such inquiries and audits consistent with the annual Budget Act.*

*(j) The ~~CPOST~~ Corrections Standards Authority shall establish and implement procedures for reviewing and issuing decisions concerning complaints or recommendations from interested parties regarding ~~CPOST~~ Corrections Standards Authority rules, regulations, standards, or decisions.*

*13602. (a) Commencing January 1, 2005, the ~~The~~ Department of ~~Corrections~~ Correctional Services shall use the training academy at Galt~~.,~~ ~~This academy shall be~~ known as the Richard A. McGee Academy.  ~~The Department of the Youth Authority shall use~~ and the training center at Stockton. The training divisions, in using the funds, shall endeavor to minimize costs of administration so that a maximum amount of the funds will be used for providing training and support to correctional peace officers while being trained by the ~~departments~~ department.*

*(b) Each new cadet who attends an academy shall complete the course of training, pursuant to standards approved by ~~CPOST~~ Corrections Standards Authority before he or she may be assigned to a post or job as a peace officer. Every newly appointed first-line or second-line supervisor in the Department of ~~Corrections~~ Correctional Services shall complete the course of training, pursuant to standards approved by ~~CPOST~~ Corrections Standards Authority for that position.*

*(c) The Department of ~~Corrections and the Department of the Youth Authority~~ Correctional Services shall ~~make every effort to provide training prior to commencement of supervisorialy duties. If this training is not completed within six months of appointment to that position, any first-line or second-line supervisor shall not perform supervisory duties until the training is completed.~~ ensure that peace officers appointed to a first-line or second-line supervisory position shall complete the*

*course of training pursuant to standards approved by the Corrections Standards Authority prior to assuming the responsibilities for that position.*

6126.1. (a) <u>Commencing January 1, 2005, i</u>~~I~~n consultation with the ~~Commission on Correctional Peace Officer Standards and Training~~ <u>Corrections Standards Authority</u> and the Inspector General, the ~~Youth and Adult Correctional Agency~~ <u>Department of Correctional Services</u> shall establish a certification program for investigators under the jurisdiction of the Inspector General, <u>Civilian Corrections Commission,</u> ~~the Youth and Adult Correctional Agency, the Department of the Youth Authority, the Department of Corrections, the Board of Corrections, the Youthful Offender Parole Board,~~ and the ~~Board of Prison Terms~~ <u>Department of Correctional Services.</u> The investigators' training course shall be consistent with the standard courses utilized by other major investigative offices, such as county sheriff and city police departments and the California Highway Patrol.

(b) ~~Beginning January 1, 1999, all~~ <u>All</u> internal affairs investigators conducting investigations for the office of the Inspector General, the <u>Civilian Corrections Commission</u> ~~Youth and Adult Correctional Agency, the Department of the Youth Authority, the Department of Corrections, the Board of Corrections, the Youthful Offender Parole Board,~~ and the ~~Board of Prison Terms~~ <u>Department of Correctional Services</u> shall complete the investigation training and be certified ~~within six months of employment~~ <u>prior to conducting any internal affairs investigations.</u>

(c) ~~Beginning January 1, 1999, all~~ <u>All</u> internal affairs investigators shall successfully pass a psychological screening exam before becoming employed with the office of the Inspector General, <u>the Civilian Corrections Commission</u> ~~the Youth and Adult Correctional Agency, the Department of the Youth Authority, the Department of Corrections, the Board of Corrections, the Youthful Offender Parole Board,~~ or the ~~Board of Prison Terms~~ <u>Department of Correctional Services.</u>

D.        POPULATION MANAGEMENT – YOUTH

**AMEND WELFARE & INSTITUTIONS CODE SECTIONS 912.1, 1176, & 1719**

912.1.  (a) The Department of ~~the Youth Authority~~ Correctional Services – Division of Youth Operations shall present to each county, not more frequently than monthly, a statement of per capita institutional cost.

   (b) As of ~~July 1, 2003~~January 1, 2005, "per capita institutional cost," as used in this section and Section 912.5, means ~~thirty-six thousand five hundred four~~ fifty thousand dollars (~~$36,504~~ 50,000).

   (c) The "per capita institutional cost" set forth in subdivision (b) shall be adjusted annually, on July 1, to reflect any increases in the California Consumer Price Index for All Urban Consumers, as published by the California Department of Industrial Relations, based on regional data from the United States Department of Labor, Bureau of Labor Statistics.


1176.  Commencing January 1, 2005, ~~W~~when, in the opinion of the ~~Youth Authority Board~~ Department of Correctional Services – Division of Youth Operations Hearing Administration any person committed to or confined in any such school deserves parole according to regulations established for the purpose, and it will be to his or her advantage to be paroled, for any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2, the ~~board~~ Hearing Administration may grant parole under conditions it deems best.  A reputable home or place of employment shall be provided for each person so paroled.


1719.  (a) Commencing January 1, 2005, T~~t~~he following powers and duties shall be exercised and performed by the ~~Youth Authority Board~~ Department of Correctional Services –Division of Youth Operations Hearing Administration, ~~as such, or~~ all of which may be delegated to a panel, member, or case hearing representative as provided in Section 1721: discharges of commitment, orders to parole and conditions thereof for any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2, revocation or suspension of parole for any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2, and ~~disciplinary appeals~~ appeals of disciplinary action for any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 resulting in an extension of the ward's parole consideration date or appeals of departmental disciplinary recommendations to extend a ward's parole consideration date for any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2.  Any recommendation by the department to deny parole or probation for any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 will automatically be referred for final determination to the ward's committing court, who will have the authority to discharge the ward's commitment, order or deny probation and conditions thereof within their respective county or order parole by the Department of Correctional Services.  Any recommendation by the department to grant  parole or probation for any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 will automatically be referred to the ward's committing court for placement,

*who will have the authority to discharge the ward's commitment, order or deny probation and conditions thereof within their respective county or order parole by the Department of Correctional Services.  Revocation or suspension of parole or probation for any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 shall be exercised and performed by the ward's committing court.  In those instances where the committing court orders county probation and the conditions thereof in lieu of parole by the Department of Correctional Services, the committing county shall receive from the state a payment of $1,250 on a quarterly basis for as long as the juvenile continues to receive probation services from the county pursuant to annual review and approval of continuation by the Department of Correctional Services.*

*(b) Any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 may appeal an adjustment to his or her parole consideration date to a panel comprised of at least two ~~board~~ hearing administrators.  Any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2 may appeal a recommendation by the department to adjust his or her parole consideration date to a panel comprised of at least two ~~board~~ hearing administrators.*

*(c) The following powers and duties shall be exercised and performed by the Department of ~~the Youth Authority~~ Correctional Services: return of persons to the court of commitment for redisposition by the court, determination of offense category, setting of parole consideration dates, conducting annual reviews, treatment program orders, institution placements, furlough placements, return of nonresident persons to the jurisdiction of the state of legal residence, disciplinary decision-making, and referrals pursuant to Section 1800.*

*(d) The Department of ~~the Youth Authority~~ Correctional Services shall promulgate policies and regulations implementing a department wide system of graduated sanctions for addressing ward disciplinary matters.  The disciplinary decision-making system shall be employed as the disciplinary system in department institutions, and shall provide a framework for handling disciplinary matters in a manner that is consistent, timely, proportionate, and ensures the due process rights of wards. The department shall develop and implement a system of graduated sanctions which distinguishes between minor, intermediate, and serious misconduct.  The department may extend a ward's parole consideration date for any ward categorized pursuant to sections 4951-4954 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2, subject to appeal pursuant to subdivision (b), from one to not more than 12 months, inclusive, for a sustained serious misconduct violation if all other sanctioning options have been considered and determined to be unsuitable in light of the ward's previous case history and the circumstances of the misconduct.  In any case in which a parole consideration date has been extended, the disposition report shall clearly state the reasons for the extension. Commencing January 1, 2005, ~~T~~the department may recommend to the ward's committing court, who has sole jurisdiction  to extend the length of stay an extension of ~~extend~~ a ward's parole consideration date for any ward categorized pursuant to sections 4955-4957 of Title 15 of the California Code of Regulations, Division 4.5, Chapter 2~~, subject to appeal pursuant to subdivision (b)~~, from one to not more than 12 months, inclusive, for a sustained serious misconduct violation if all other sanctioning options have been considered and determined to be unsuitable in light of the ward's previous case history and the circumstances of the misconduct.  ~~In any case in which a parole consideration date has been extended, the disposition report shall clearly state the reasons for the extension.~~  The length of any parole consideration date extension shall be based on the seriousness of*

_the misconduct, the ward's prior disciplinary history, the ward's progress toward treatment_
_objectives, the ward's earned program credits, and any extenuating or mitigating circumstances._ The
department shall promulgate regulations to implement a table of sanctions to be used in determining
parole consideration date extensions.  The department ~~also~~ may promulgate regulations to establish a
process for granting wards who have successfully responded to disciplinary sanctions a reduction of
up to 50 percent of any time acquired for disciplinary matters.

E.    **POPULATION MANAGEMENT – ADULT**

**NEW LEGISLATION**

*The Department of Correctional Services shall identify and implement the use of an objective, actuarial-based risk assessment tool to be used for identification of offenders of low risk to society by no later than July 1, 2005.  Notwithstanding any other provision of law, any person referred to in Penal Code Section 3000 (b)(1), who was not imprisoned for offenses requiring registration as listed in Penal Code Section 290(a)(2), or were not imprisoned for "violent felonies" as defined in Penal Code Sections 667.5, or for "serious felonies" as listed in Penal Code Sections 1192.7(c) and 1192.8 shall be assessed with this objective, actuarial-based risk assessment tool prior to release from prison. Commencing July 1, 2005, the Department of Correctional Services – Division of Adult Operations may recommend as early as 90 days after release from prison the discharge of those parolees objectively identified as low risk.  The division shall otherwise submit to the Hearing Administration a recommendation either justifying discharge or retention on parole no later than 180 days from the parolee's release from prison.  The Hearing Administration shall review the division's recommendations and may elect to either discharge or retain the parolee.  Notwithstanding this early discharge provision, any parolee retained on parole by the Hearing Administration shall still be subject to the provisions of Penal Code Section 3001.*

*The Department of Correctional Services shall develop and implement a program utilizing objective, actuarial-based criteria to periodically identify eligible, low risk prisoners age 60 or older, who were not imprisoned for offenses which are listed in Penal Code Sections 290, 667.5, 1192.7(c) or 1192.8. Commencing January 1, 2006, under regulations prescribed by the department, the Secretary of Correctional Services may recommend, that the previously ordered sentences and commitments of eligible, low risk prisoners age 60 or older, who were not imprisoned for offenses requiring registration as listed in Penal Code Section 290(a)(2), or were not imprisoned for "violent felonies" as defined in Penal Code Sections 667.5, or  for "serious felonies" as listed in Penal Code Sections 1192.7(c) and 1192.8., be recalled and that the prisoners be resentenced by their courts of commitment pursuant to Penal Code Section 1170(d).*

**REVISE PENAL CODE SECTION 2933**

. . .

*(e)  Under regulations prescribed by the Department of Correctional Services by no later than July 1, 2005,  prisoners assigned to a worktime credit qualifying program  may be awarded supplemental worktime credit upon completion of specified educational, vocational, or substance abuse treatment programs.  The department may award up to 90 days of supplemental worktime credit per specified program up to a maximum of 360 days supplemental worktime credit per commitment.  Under no circumstances shall a prisoner's aggregate credit per term of imprisonment result in the prisoner serving less than one-third of his/her total sentence.*

F.    <u>ORGANIZATIONAL STRUCTURE</u>

**NEW LEGISLATION**

*There is hereby created in state government the Department of Correctional Services.*

*The Civilian Corrections Commission is hereby created and will function as the board of directors for the Department of Correctional Services.  It will consist of five (5) members, each to be appointed by the Governor and confirmed by the Senate for staggered 5 year terms. No commissioner shall serve more than two consecutive terms plus no more than 2 years of an un-expired term. A vacancy is filled for the remainder of the term. There shall be at least one commissioner selected on the basis of his or her expertise in the area of youthful offender treatment and rehabilitation serving on the commission at all times.  The Governor may remove any of the five members for incompetence, neglect of duty, or corruption.  No commissioner shall be eligible for appointment if he or she has been affiliated with the California Department of Correctional Services or its predecessor entities prior to his or her appointment.  The salaries for these positions shall be fixed by the legislature.  The annual compensation provided for shall be increased in any fiscal year in which a general salary increase is provided for state employees.  The amount of the increase shall be comparable to, but shall not exceed, the percentage of the general salary increases provided for state employees during that fiscal year.*

*The Commission shall elect a Chairperson from its members who shall serve for a period not to exceed two consecutive years.*

*The Civilian Corrections Commission, or any member of it who is authorized by a resolution of the Civilian Corrections Commission, may make investigations and conduct hearings concerning all matters and subjects under the jurisdiction of Department of Correctional Services, or may request such investigations to be performed by the Inspector General.*

*At the recommendation of the Civilian Corrections Commission, the Governor shall appoint a Secretary of the Department of Correctional Services, to be referred to hereafter as the Secretary of Correctional Services or secretary, who shall serve at the pleasure of the Commission.  An Undersecretary for the Department of Correctional Services shall be appointed by the secretary and shall serve at the pleasure of the secretary.  The salaries for these positions shall be fixed by the legislature.*

*Commencing January 1, 2005, the office of the Inspector General shall be a subdivision of the Civilian Corrections Commission.  The Civilian Corrections Commission shall appoint the Inspector General, who shall serve a five-year term.  The term may be renewed for one additional term of five years at the discretion of the Civilian Corrections Commission.  The Civilian Corrections Commission may otherwise remove the Inspector General for incompetence, neglect of duty, or corruption at any time.*

*The Civilian Corrections Commission will perform the following functions:*

A.   *Adopt integrated plans for the Department of Correctional Services.*
B.   *Adopt policies for the Department of Correctional Services.*
C.   *Conduct departmental performance oversight.*
D.   *Approve the overall department budget.*
E.   *Issue directives to the Secretary of Correctional Services*
F.   *Perform other duties as may be appropriate to a board of directors.*

*The Department of Correctional Services hereby succeeds to, and is vested with, all the powers, duties, responsibilities, obligations, liabilities, and jurisdiction of the following Agency, Boards, Departments, and Commissions which effective January 1, 2005, shall no longer exist:*

A.   *Youth and Adult Correctional Agency;*

B.   *Department of Corrections;*

C.   *Department of the Youth Authority;*

D.   *Prison Industry Authority*

E.   *Prison Industry Board*

F.   *Board of Prison Terms*

G.   *Narcotic Addict Evaluation Authority*

H.   *Commission on Correctional Peace Officer Standards and Training*

I.   *Youth Authority Board*

*For purposes of this article, the above entities shall be known as predecessor entities.*

*The following entities shall, effective January 1, 2005, be organized within the Department of Correctional Services and shall retain existing functions, powers, responsibilities and jurisdiction:*
A.   *Board of Corrections, which shall be known as the Corrections Standards Authority*
B.   *Council on Mentally Ill Offenders*
C.   *California Council for Interstate Adult Offender Supervision*
D.   *State Commission on Juvenile Justice, Crime and Delinquency Prevention*

*The Civilian Corrections Commission may add duties to the Corrections Standards Authority from predecessor entities in Section 5 hereinabove.*

*For purposes of this article, these shall be known as continuing entities.*

*The Secretary of the Department of Correctional Services shall serve as the Chief Executive Officer of the Department of Correctional Services and shall have all of the powers and authority which are conferred upon a head of a state department by Chapter 2 (commencing with Section 11150) of Part 1 of Division 3 of Title 2 of the Government Code.*

*Without limiting any other powers or duties, the secretary shall assure compliance with the terms of any state plans, memoranda of understanding, administrative orders, interagency agreements, assurances, single state agency obligations, federal statutes and regulations, and any other form of agreements or obligations that vital government activities rely upon or are a condition to the continued receipt by the department of state or federal funds or services. This includes, but is not limited to the designation, appointment, and provision of individuals, groups, and resources to fulfill specific obligations of any agency, board or department that is abolished pursuant to Section 4.*

*There shall exist within the Department of Correctional Services, the Division of Youth Operations, to be headed by a subordinate officer who shall be appointed by the Governor upon the recommendation of the secretary and whose salary shall be fixed by the legislature. The annual compensation provided for shall be increased in any fiscal year in which a general salary increase is provided for state employees. The amount of the increase shall be comparable to, but shall not exceed, the percentage of the general salary increases provided for state employees during that fiscal year. This subordinate officer may be removed by the secretary, whose decision shall be final.*

*There shall be within the Department of Correctional Services, the Division of Adult Operations, to be headed by a subordinate officer who shall be appointed by the Governor upon the recommendation of the secretary and whose salary shall be fixed by legislature. The annual compensation provided for shall be increased in any fiscal year in which a general salary increase is provided for state employees. The amount of the increase shall be comparable to, but shall not exceed, the percentage of the general salary increases provided for state employees during that fiscal year. This subordinate officer may be removed by the secretary, whose decision shall be final.*

*The following subordinate positions shall exist within the Office of the Secretary of Correctional Services and shall be appointed by the Governor upon the recommendation of the secretary: General Counsel, Assistant Secretary for External Affairs, Assistant Secretary for Victim Services, Assistant Secretary for Legislative Affairs, Assistant Secretary for Equal Employment Opportunities, and Assistant Secretary for Inspection & Control. The salaries for these positions shall be fixed by the Department of Personnel Administration, or its successor. The annual compensation provided for shall be increased in any fiscal year in which a general salary increase is provided for state employees. The amount of the increase shall be comparable to, but shall not exceed, the percentage of the general salary increases provided for state employees during that fiscal year. These subordinate officers may be removed by the secretary, whose decision shall be final.*

*There shall be within the Department of Correctional Services, the following offices: Fiscal Management, Health Care Administration, Information Technology, Internal Affairs, Labor Relations, Personnel & Training Development, Research & Planning, and Risk Management. Each office shall be headed by a subordinate officer who shall be appointed by the Governor upon the recommendation of the secretary. This subordinate officer may be removed by the secretary, whose decision shall be final. The salaries for these positions shall be fixed by the legislature. In setting these salaries, the Legislature shall consider the salaries of positions comparable to each of these*

*officers in both the public and private sector. The annual compensation provided for shall be increased in any fiscal year in which a general salary increase is provided for state employees. The amount of the increase shall be comparable to, but shall not exceed, the percentage of the general salary increases provided for state employees during that fiscal year.*

*All regulations adopted by the predecessor entities, continuing entities and any of their predecessors are expressly continued in force. Any statute, law, rule, or regulation now in force, or that may hereafter be enacted or adopted with reference to the predecessor entities and any of their predecessors shall mean the Department of Correctional Services. Any action concerning these duties, responsibilities, obligations, liabilities, and functions shall not abate but shall continue in the name of the Department of Correctional Services, and the Department of Correctional Services shall be substituted for the predecessor entities and continuing entities by the court wherein the action is pending. The substitution shall not in any way affect the rights of the parties to the action.*

*No contract, lease, license, or any other agreement to which the predecessor entities, continuing entities and any of their predecessors are a party shall be void or voidable by reason of this act, but shall continue in full force and effect, with the Department of Correctional Services assuming all of the rights, obligations, and duties of the predecessor entities. That assumption by the Department of Correctional Services shall not in any way affect the rights of the parties to the contract, lease, license, or agreement.*

*Bonds issued by the predecessor entities, continuing entities and any of their predecessors on or before January 1, 2005, shall become the indebtedness of any newly created entity. Any on-going obligations or responsibilities of the predecessor entities, continuing entities and any of their predecessors for managing and maintaining bond issuances shall be transferred to the newly created entity without impairment to any security contained in the bond instrument.*

*On and after January 1, 2005, the unencumbered balance of all money available for expenditure by the predecessor entities, continuing entities and any of their predecessors in carrying out any functions transferred to the Department of Correctional Services by this act shall be made available for the support and maintenance of the Department of Correctional Services. All books, documents, records, and property of the predecessor entities shall be transferred to the Department of Correctional Services.*

*On and after January 1, 2005, positions filled by appointment by the Governor in the predecessor entities or continuing entities shall be transferred to the Department of Correctional Services, unless otherwise abolished. Individuals in positions transferred pursuant to this section shall serve at the pleasure of the Governor, unless otherwise provided for. Titles of positions transferred pursuant to this section shall be determined by the secretary with the approval of the Governor. Salaries of positions transferred shall remain at the level established pursuant to law on December 31, 2004.*

*Any officer or employee of the predecessor entities who is engaged in the performance of a function specified in this reorganization and who is serving in the state civil service, other than as a temporary*

*employee, shall be transferred to the Department of Correctional Services pursuant to the provisions of Government Code Section 19050.9.*

*Any officer or employee of the continuing entities who is engaged in the performance of a function specified in this reorganization and who is serving in the state civil service, other than as a temporary employee, shall continue such status with the continuing entity pursuant to the provisions of Government Code Section 19050.9.*

*The status, position, and rights of any officer or employee of the predecessor entities shall not be affected by the transfer and shall be retained by the person as an officer or employee of the Department of Correctional Services, as the case may be, pursuant to the State Civil Service Act (Part 2 [commencing with Section 18500] of Division 5 of Title 2 of the Government Code), except as to a position that is exempt from civil service.*

**PROPOSED REVISIONS TO PENAL CODE**

*2036.  The Deuel Vocational Institution shall be an intermediate security-type institution.  Its primary purpose shall be to provide custody, care, industrial, vocational and other training, guidance and reformatory help for young men, too mature to be benefited by the programs of institutions under the jurisdiction of the ~~Youth Authority~~ Department of Correctional Services – Division of Youth Operations and too immature in crime for confinement in prisons.*[3]

*2038.  Commencing January 1, 2005, t~~The Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of the Deuel Vocational Institution and the management of its affairs, subject to the oversight of the Civilian Corrections Commission.*[4]

*2043.3.  Commencing January 1, 2005, t~~The Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of the California Correctional Center at Susanville and the management of its affairs, subject to the oversight of the Civilian Corrections Commission.*[5]

*2045.3.  Commencing January 1, 2005, t~~The Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of said institution and the management of its affairs, subject to the oversight of the Civilian Corrections Commission.*[6]

---

[3]  This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.

[4]  This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.

[5]  This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.

[6]  This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.

2046.3.  _Commencing January 1, 2005, t_~~The Director of Corrections~~ _Secretary of Correctional Services_ shall make rules and regulations for the government of the said prison and the management of its affairs_, subject to the oversight of the Civilian Corrections Commission._[7]

2048.3.  _Commencing January 1, 2005, t_~~The Director of Corrections~~ _Secretary of Correctional Services_ shall make rules and regulations for the government of the California Correctional Institution at Tehachapi and the management of its affairs_, subject to the oversight of the Civilian Corrections Commission._[8]

2048.7.  Notwithstanding other provisions of the law, _commencing January 1, 2005,_ the ~~Director of Corrections~~ _Secretary of Correctional Services_ shall have the authority to modify the percentage of the inmate population of the Southern Maximum Security Complex to be employed by the Prison Industry Authority_, or its successor,_ or to participate in vocational training commensurate with security requirements in relation to the type of inmates housed therein, provided that the percentage of the inmate population to be employed by the Prison Industry Authority_, or its successor,_ or to participate in vocational training shall be no less than 60 percent of the inmates in the general population. Authority is also vested in the ~~director~~ _Secretary of Correctional Services_ to utilize up to 100 percent of the cells of the facility to house special cases.  The ~~director~~ _Secretary of Correctional Services_ may also choose to double occupy each cell if system wide overcrowding demands that measure.

    The ~~Director of Corrections~~ _Secretary of Correctional Services_ may implement the provisions of this section only if the encumbrance of those funds is authorized by the Department of Finance, _or its successor,_ not sooner than 30 days after notification in writing of the necessity therefore, to the chairman of the committee in each house which considers appropriations and the Chairman of the Joint Legislative Budget Committee.

2052.  (a) The department shall have power to contract for the supply of electricity, gas and water for said prisons, upon such terms as the department shall deem to be for the best interests of the state, or to manufacture gas or electricity, or furnish water itself, at its option.  It shall also have power to erect and construct or cause to be erected and constructed, electrical apparatus or other illuminating works in its discretion with or
without contracting therefore, on such terms as it may deem just.  The department shall have full power to erect any building or structure deemed necessary by it, or to alter or improve the same, and to pay for the same from the fund appropriated for the use or support of the prisons, or from the earnings thereof, without advertising or contracting therefore.
    ~~ (b) With respect to any facility under the jurisdiction of the Prison Industry Authority, or its successor, the Prison Industry Authority , or its successor, shall have the same powers which are vested in the department pursuant to subdivision (a).~~

---

[7] This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.
[8] This section pre-dates the creation of the current Department of Corrections and should be considered for repeal altogether.

2081.5.  *Commencing January 1, 2005, the* ~~The Director of Corrections~~ *Secretary of Correctional Services* shall keep complete case records of all prisoners under custody of the department~~, which records shall be made available to the Board of Prison Terms at such times and in such form as the board may prescribe~~.

   Case records shall include all information received by the ~~Director of Corrections~~ *Secretary of Correctional Services* from the courts, probation officers, sheriffs, police departments, district attorneys, State Department of Justice, Federal Bureau of Investigation, and other interested agencies and persons.  Case records shall also include a record of diagnostic findings, considerations, actions and dispositions with
respect to classification, treatment, employment, training, and discipline as related to the institutional correctional program followed for each prisoner.

   The ~~director~~ *Secretary of Correctional Services* shall appoint, ~~after consultation with the Board of Prison Terms,~~ such employees of the various institutions under his control as may be necessary for the proper performance of the duties of the ~~Board of Prison Terms~~ *Hearing Administration*  and when requested shall also have in attendance at *its* hearings ~~of the Board of Prison Terms~~ psychiatric or medical personnel.  ~~The director shall furnish, after consultation with the Board of Prison Terms and the Director of General Services, such hearing rooms and other physical facilities at such institutions as may be necessary for the proper performance of the duties of the Board of Prison Terms.~~


2400.  *Commencing January 1, 2005, any reference to the Department of Corrections – Parole and Community Services Division or "division" shall refer to the Department of Correctional Services.*  ~~There is in the Department of Corrections, a division known
as the Parole and Community Services Division.~~


~~2401.5.  The head of the Parole and Community Services Division shall be appointed by the director pursuant to the State Civil Service Act.~~


~~2402.  The director shall organize the division.~~


~~2403.  The division shall perform such functions and duties as specified from time to time by the director.~~


2651.  No punishment, except as may be authorized by the ~~Director of  corrections~~ *Secretary of Correctional Services*, shall be inflicted and then only by the order and under the direction of the wardens.  Nothing in this section shall be construed as a limitation or impairment of the authority of the ~~Board of Prison Terms~~ *Hearing Administration* in exercising its functions.


2684.  (a) *Commencing January 1, 2005, if* ~~If~~, in the opinion of the ~~Director of Corrections~~ *Secretary of Correctional Services*, the rehabilitation of any mentally ill, mentally deficient, or insane person confined in a state prison may be expedited by treatment at any one of the state hospitals under the jurisdiction of the State Department of Mental Health or the State Department of Developmental Services, the ~~Director of Corrections~~ *Secretary of Correctional Services*, with the approval of the ~~Board of Prison Terms~~ *Hearing Administration* for persons sentenced pursuant to subdivision (b) of

Section 1168, shall certify that fact to the director of the appropriate department who shall evaluate the prisoner to determine if he or she would benefit from care and treatment in a state hospital. If the director of the appropriate department so determines, the superintendent of the state hospital shall receive the prisoner and keep him or her until in the opinion of the superintendent the person has been treated to the extent that he or she will not benefit from further care and treatment in the state hospital.

   (b) Whenever the ~~Director of Corrections~~ Secretary of Correctional Services receives a recommendation from the court that a defendant convicted of a violation of Section 646.9 and sentenced to confinement in the state prison would benefit from treatment in a state hospital pursuant to subdivision (a), the ~~director~~ Secretary shall consider the recommendation. If appropriate, the ~~director~~ Secretary shall certify that the rehabilitation of the defendant may be expedited by treatment in a state hospital and subdivision (a) shall apply.


2691. No person imprisoned for a felony listed in Section 667.6 shall be removed or released under Section 2690 from the detention institution where he or she is confined for the purpose of attending college classes in any city or county nor shall that person be placed in a community correctional center pursuant to Chapter 9.5 (commencing with Section 6250) of Title 7 of Part 3. No person under the jurisdiction of the adult court and confined under the jurisdiction of the Department of ~~the Youth Authority~~ Correctional Services – Division of Youth Operations for conviction of a felony listed in Section 667.6 shall be removed or released from the place of confinement for attendance at any educational institution in any city or county.


2700. Commencing January 1, 2005, t~~T~~he Department of ~~Corrections~~ Correctional Services shall require of every able-bodied prisoner imprisoned in any state prison as many hours of faithful labor in each day and every day during his or her term of imprisonment as shall be prescribed by the rules and regulations of the ~~Director of Corrections~~ Secretary of Correctional Services, subject to the oversight of the Civilian Corrections Commission.

   Whenever by any statute a price is required to be fixed for any services to be performed in connection with the work program of the Department of ~~Corrections~~ Correctional Services, the compensation paid to prisoners shall be included as an item of cost in fixing the final statutory price.

   Prisoners not engaged on work programs under the jurisdiction of the Prison Industry Authority, or its successor, but who are engaged in productive labor outside of such programs may be compensated in like manner. The compensation of such prisoners shall be paid either out of funds appropriated by the Legislature for that purpose or out of such other funds available to the Department of ~~Corrections~~ Correctional Services for expenditure, as the Director of Finance may direct.

   When any prisoner escapes, the ~~director~~ Secretary shall determine what portion of his or her earnings shall be forfeited and such forfeiture shall be deposited in the State Treasury in a fund known as the Inmate Welfare Fund of the Department of ~~Corrections~~ Correctional Services.


2701. (a) The Department of ~~Corrections~~ Correctional Services is hereby authorized and empowered to cause the prisoners in the state prisons of this state to be employed in the rendering of services as are now, or may hereafter be, needed by the state, or any political subdivision thereof, or that may be

needed for any state, county, district, municipal, school, or other public use, or that may be needed by any public institution of the state or of any political subdivision thereof, or that may be needed for use by the federal government, or any department, agency, or corporation thereof, or that may be needed for use by the government of any other state, or any department, agency, or corporation thereof, except for services provided by enterprises under the jurisdiction of the Prison Industry Authority, ~~or~~ *its successor*. The Department of ~~Corrections~~ *Correctional Services* may enter into contracts for the purposes of this article.

(b) The Department of ~~Corrections~~ *Correctional Services* may cause prisoners in the prisons of this state to be employed in the rendering of emergency services for the preservation of life or property within the state, whether that property is owned by public entities or private citizens, when a county level state of emergency has been declared
due to a natural disaster and the local governing board has requested the assistance of the Department of ~~Corrections~~ *Correctional Services*.

2717.4. (a) *Commencing January 1, 2005, the Joint Venture Policy Advisory Board or "board" is hereby abolished.* ~~There is hereby established within the Department of Corrections the Joint Venture Policy Advisory Board. The Joint Venture Policy Advisory Board shall consist of the Director of Corrections, who shall serve as chair, the Director of the Employment Development Department, and five members, to be appointed by the Governor, three of whom shall be public members, one of whom shall represent organized labor and one of whom shall represent industry. Five members shall constitute a quorum and a vote of the majority of the members in office shall be necessary for the transaction of the business of the board. Appointed members of the board shall be compensated at the rate of two hundred dollars ($200) for each day while on official business of the board and shall be reimbursed for necessary expenses. The initial terms of the members appointed by the Governor shall be for one year (one member), two years (two members), three years (one member), and four years (one member), as determined by the Governor. After the initial term, all members shall serve for four years.~~
~~(b) The board shall advise the Director of Corrections of policies that further the purposes of the Prison Inmate Labor Initiative of 1990 to be considered in the implementation of joint venture programs.~~

2800. *Commencing January 1, 2005, any reference to the Prison Industry Authority, "authority", Prison Industry Board, "board", or Department of Corrections shall refer to the Department of Correctional Services.* ~~There is hereby established the Prison Industry Authority. As used in this article "authority" means the Prison Industry Authority.~~

2801. The purposes of the authority, *or its successor,* are:

(a) To develop and operate industrial, agricultural, and service enterprises employing prisoners in institutions under the jurisdiction of the Department of ~~Corrections~~ *Correctional Services*, which enterprises may be located either within those institutions or elsewhere, all as may be determined by the ~~authority~~ *Department of Correctional Services*.

*(b) To create and maintain working conditions within the enterprises as much like those which prevail in private industry as possible, to assure prisoners employed therein the opportunity to work productively, to earn funds, and to acquire or improve effective work habits and occupational skills.*

*(c) To operate a work program for prisoners which will ultimately be self-supporting by generating sufficient funds from the sale of products and services to pay all the expenses of the program, and one which will provide goods and services which are or will be used by the Department of ~~Corrections~~ Correctional Services, thereby reducing the cost of its operation.*

2802.  *Commencing January 1, 2005, t~~The~~ authority, or its successor, shall be under the policy direction of ~~a board of directors~~ the Civilian Corrections Commission. ~~, to be known as the Prison Industry Board, and to be referred to hereafter as the board.  The board shall consist of eleven members:~~*

~~(a) The Director of Corrections shall be a member.~~

~~(b) The Director of the Department of General Services, or his or her designee, shall be a member.~~

~~(c) The Secretary of the Trade and Commerce Agency, or his or her designee, shall be a member.~~

~~(d) The Speaker of the Assembly shall appoint two members to represent the general public.~~

~~(e) The Senate Rules Committee shall appoint two members to represent the general public.~~

~~(f) The Governor shall appoint four members.  Of these, two shall be representatives of organized labor, and two shall be representatives of industry.  The initial term of one of the members appointed by the Speaker of the Assembly shall be two years, and the initial term of the other shall be three years.  The initial term of one of the members appointed by the Senate Rules Committee shall be two years, and the initial term of the other shall be three years.  The initial terms of the four members appointed by the Governor shall be four years.  All subsequent terms of all members shall be for four years.  Each member's term shall continue until the appointment and qualification of his successor.~~ The Governor may appoint a subordinate officer to the secretary under this section who shall hold office at the pleasure of the Governor.*

2803.  ~~The Director of Corrections shall be the chairman of the board.  The chairman shall be the administrative head of the board and shall exercise all duties and functions necessary to insure that the responsibilities of the board are successfully discharged.  The board shall meet regularly at least four times during each fiscal year, and shall hold extra meetings on the call of the chairman or a majority of the board.  Six members of the board, including the chairman, shall constitute a quorum.  The vote of a majority of the members in office is necessary for the transaction of the business of the board.~~

2804.  ~~The appointed members of the board shall receive a per diem to be determined by the chairman, but not less than the usual per diem rate allowed to the Department of Corrections employees during travel out of state.  All members, including the chairman, shall also receive their actual and necessary expenses of travel incurred in attending meetings of the commission and in making investigations,~~

*either as a board or individually as members of the board at the request of the chairman. All the* *expenses shall be paid from the Prison Industries Revolving Fund.*

2805. The ~~authority~~ <u>Department of Correctional Services</u> shall assume jurisdiction over the operation of all industrial, agricultural, and service operations formerly under the jurisdiction of the Correctional Industries Commission <u>and the Prison Industry Authority</u>. In addition, the ~~authority~~ <u>Department of Correctional Services</u> shall have the power to establish new industrial, agricultural and service enterprises which it deems appropriate, to initiate and develop new vocational training programs, and to assume jurisdiction over existing vocational training programs. The ~~authority~~ <u>Department of Correctional Services</u> shall have control over and the power to buy and sell all equipment, supplies and materials used in the operations over which it assumes control and jurisdiction.

2806. There is hereby constituted a permanent revolving fund in the sum of not less than seven hundred thirty thousand dollars ($730,000), to be known as the Prison Industries Revolving Fund, and to be used to meet the expenses necessary in the purchasing of materials and equipment, salaries, construction and cost of administration of the prison industries program. The fund may also be used to refund deposits either erroneously made or made in cases where delivery of products cannot be consummated. The fund shall at all times contain the amount of at least seven hundred thirty thousand dollars ($730,000), either in cash or in receivables, consisting of raw materials, finished or unfinished products, inventory at cost, equipment, or any combination of the above. Money received from the rendering of services or the sale of products in the prisons and institutions under the jurisdiction of the board shall be paid to the State Treasurer monthly and shall be credited to the fund. At any time that the authority and the Director of Finance jointly determine that the balance in said revolving fund is greater than is necessary to carry out the purposes of the authority, they shall so inform the Controller and request a transfer of the unneeded balance from the revolving fund to the General Fund of the State of California. The Controller is authorized to transfer balances upon request. Funds deposited in the revolving fund are not subject to annual appropriation by the Legislature and may be used without a time limit by the authority<u>, or its successor</u>.

   The Prison Industries Revolving Fund is not subject to the provisions of Articles 2 (commencing with Section 13320) and 3 (commencing with Section 13335) of Chapter 3 of Part 3 of Division 3 of Title 2 of the Government Code.

   The revolving fund created by Section 2714 known as the Correctional Industries Revolving Fund is abolished, and the Controller shall transfer the balance in that revolving fund to the Prison Industries Revolving Fund. Any major capital outlay project undertaken by the authority<u>, or its successor,</u> shall be subject to review by the Public Works Board pursuant to the provisions of Part 10.5 (commencing with Section 15752) of Division 3 of Title 2 of the Government Code.

2807. (a) <u>Commencing January 1, 2005, the</u> ~~The authority~~ <u>Department of Correctional Services</u> is hereby authorized and empowered to operate industrial, agricultural, and service enterprises which will provide products and services needed by the state, or any political subdivision thereof, or by the federal government, or any department, agency, or corporation thereof, or for any other public use.

*Products may be purchased by state agencies to be offered for sale to inmates of the department and to any other person under the care of the state who resides in state-operated institutional facilities. Fresh meat may be purchased by food service operations in state-owned facilities and sold for onsite consumption.*

*(b) All things authorized to be produced under subdivision (a) shall be purchased by the state, or any agency thereof, and may be purchased by any county, city, district, or political subdivision, or any agency thereof, or by any state agency to offer for sale to*

*persons residing in state-operated institutions, at the prices fixed by the board. State agencies shall make maximum utilization of these products, and shall consult with the staff of the authority to develop new products and adapt existing products to meet their needs.*

*2808. <u>Commencing January 1, 2005, t</u>The ~~board~~ <u>Secretary of Correctional Services</u> shall, in the exercise of its duties, have all the powers and do all the things which the board of directors of a private corporation would do, except as specifically limited in this*

*article, including, but not limited to, the following:*

*(a) To enter into contracts and leases, execute leases, pledge the equipment, inventory and supplies under the control of the authority and the anticipated future receipts of any enterprise under the jurisdiction of the authority as collateral for loans, and execute*

*other necessary instruments and documents.*

*(b) To assure that all funds received by the authority are kept in commercial accounts according to standard accounting practices.*

*(c) To arrange for an independent annual audit.*

*(d) To review and approve the annual budget for the authority, in order to assure that the solvency of the Prison Industries Revolving Fund is maintained.*

*(e) To contract to employ a general manager to serve as the chief administrative officer of the authority, or its successor. The person so appointed shall serve at the pleasure of the ~~chairman~~ Secretary of Correctional Services. The general manager shall have wide and successful experience with a productive enterprise and have a demonstrated appreciation of the problems associated with prison management.*

*(f) To apply for and administer grants and contracts of all kinds.*

*(g) To establish, notwithstanding any other provision of law, procedures governing the purchase of raw materials, component parts, and any other goods and services which may be needed by the ~~authority~~ department ~~or~~ in the operation of any enterprise under its jurisdiction. Such procedures shall contain provisions for appeal to the ~~board~~ Secretary of Correctional Services, or a subordinate officer as may be designated by the Secretary, from any action taken in connection with them.*

*(h) To establish, expand, diminish, or discontinue industrial, agricultural and service enterprises under its jurisdiction to enable the authority to operate as a self-supporting organization, to provide as much employment for inmates as is feasible, and to provide*

*diversified work activities to minimize the impact on existing private industry in the state.*

*~~(i) To hold public hearings pursuant to paragraph (h) above to provide an opportunity for persons or organizations who may be affected to appear and present testimony concerning the plans and activities of the authority. The authority shall assure adequate~~*

*public notice of such hearings. No new industrial, agricultural, or service enterprise which involves a gross annual production of more than fifty thousand dollars ($50,000) shall be established unless and until a hearing concerning the enterprise has been held by a committee of persons designated by the board including at least two board members. The board shall take into consideration the effect of a proposed enterprise on California industry and shall not approve the establishment of the enterprise if the board determines it would have a comprehensive and substantial adverse impact on California industry which cannot be mitigated.*

(j̲i) *To periodically determine the prices at which activities, supplies, and services shall be sold.*

(k̲j) *To report to the Legislature in writing, on or before February 1 of each year, regarding:*

(1) *The financial activity and condition of each enterprise under its jurisdiction.*

(2) *The plans of the board regarding any significant changes in existing operations.*

(3) *The plans of the board regarding the development of new enterprises.*

(4) *A breakdown, by institution, of the number of prisoners at each institution, working in enterprises under the jurisdiction of the authority, said number to indicate the number of prisoners which are not working full time.*

*The Civilian Corrections Commission shall hold public hearings pursuant to paragraph (h) above to provide an opportunity for persons or organizations who may be affected to appear and present testimony concerning the plans and activities of the authority, or its successor. The commission shall assure adequate public notice of such hearings. No new industrial, agricultural, or service enterprise which involves a gross annual production of more than fifty thousand dollars ($50,000) shall be established unless and until a hearing concerning the enterprise has been held by a committee of persons designated by the commission including at least two board members. The commission shall take into consideration the effect of a proposed enterprise on California industry and shall not approve the establishment of the enterprise if the board determines it would have a comprehensive and substantial adverse impact on California industry which cannot be mitigated.*

*2809. Commencing January 1, 2005, notwithstanding ~~Notwithstanding~~ any other provision of law, the ~~authority~~ department may recruit and employ such civilian staff as may be necessary to carry out the purposes of this article, and shall establish recruiting, testing, hiring, promotion, disciplinary, and dismissal procedures and practices which will meet the unique personnel needs of the authority, or its successor. The practices may include incentives based on productivity, profit-sharing plans, or other criteria which will encourage civilian employee involvement in ~~the~~ productivity goals ~~of the authority~~. The procedures and practices shall apply to all employees working in enterprises under the jurisdiction of the ~~authority~~ department. The ~~Director of Corrections~~ Secretary of Correctional Services shall be the appointing authority for all personnel of the authority, or its successor ~~other than the general manager~~.*

*2810. Commencing January 1, 2005, t~~The~~ board Secretary of Correctional Services may authorize the borrowing of money by the authority, or its successor, for purposes of:*

(a) *Operating the business affairs ~~of the authority~~.*

(b) *Purchasing new equipment, materials and supplies.*

*(c) Constructing new facilities, or repairing, remodeling, or demolishing old facilities. Funds may be borrowed from private sources, upon such terms as the ~~board~~ Secretary deems appropriate, including but not limited to, the use of equipment under the jurisdiction of the authority, or its successor, and of the future income of an enterprise under the jurisdiction of the authority, or its successor, as collateral to secure any loan.*

*2810.5. Notwithstanding any other provision of law, commencing January 1, 2005, the Pooled Money Investment Board, or its successor, may grant loans to the ~~authority~~ Department of Correctional Services when money is appropriated for that purpose by the Legislature, upon application by the ~~Prison Industry Board~~ Secretary of Correctional Services, in order to finance the establishment of a new industrial, agricultural, or service enterprise. All loans shall bear the same interest rate as the pooled money market investment rate and shall have a maximum repayment period of 20 years from the date of approval of the loan.*

*Prior to making its decision to grant a loan, the Pooled Money Investment Board, or its successor, shall require the ~~authority~~ department to demonstrate all of the following:*

*(a) The proposed industry project cannot be feasibly financed from private sources under Section 2810. The ~~authority~~ department shall present proposed loan conditions from at least two private sources.*

*(b) The proposed industry project cannot feasibly be financed from proceeds from other ~~Prison Industry Authority~~ enterprises.*

*(c) The proceeds from the proposed project provide for a reasonable payback schedule to the General Fund.*

*2811. Commencing January 1, 2005, t~~The board~~ Secretary of Corrections shall adopt and maintain a compensation schedule for prisoner employees. Such compensation schedule shall be based on quantity and quality of work performed and shall be required for its performance, but in no event shall such compensation exceed one-half the minimum wage provided in Section 1182 of the Labor Code, except as otherwise provided in this code. This compensation shall be credited to the account of the prisoner.*

*Such compensation shall be paid from the Prison Industries Revolving Fund.*

*2815. Commencing January 1, 2005, t~~The authority~~ department may, under rules prescribed by the ~~board~~ Secretary of Correctional Services, with oversight by the Civilian Corrections Commission, dispose of products developed from the operations of industrial enterprises in prisons and institutions under the jurisdiction of the authority, or its successor, by sale to foreign governments, corporations for distribution in foreign countries, and private persons or their agents in markets outside the United States and in countries which permit the importation of prison-made goods. All sales made pursuant to this section shall be reported to the Legislature in the board or its successor's annual report pursuant to Section 2808.*

*2816. With the approval of the Department of Finance, there shall be transferred to, or deposited in, the Prison Industries Revolving Fund for purposes authorized by this section, money appropriated from any source including sources other than state appropriations.*

Notwithstanding subdivision (i) of Section 2808, <u>commencing January 1, 2005,</u> ~~the chairman, in consultation with the board,~~ <u>the Secretary of Correctional Services, with oversight by the Civilian Corrections Commission,</u> may order any authorized public works project involving construction, renovation, or repair of prison facilities to be performed by inmate labor when the total expenditure does not exceed the project limit established by Section 10108 of the Public Contract Code. Projects entailing expenditure of greater than the project limit established by Section 10108 of the Public Contract Code shall be reviewed and approved by the ~~board~~ <u>Civilian Corrections Commission</u>.

Money so transferred or deposited shall be available for expenditure by the department for the purposes for which appropriated, contributed or made available, without regard to fiscal years and irrespective of the provisions of Sections 13340 and 16304 of the Government Code. Money transferred or deposited pursuant to this section shall be used only for purposes authorized in this section.

5000. <u>Commencing January 1, 2005, any reference to the Department of Corrections or "department" shall refer to the Department of Correctional Services.</u> ~~There is in the Youth and Adult Correctional Agency the Department of Corrections.~~

5001. ~~The department is composed of the Director of Corrections and the Prison Industry Authority.~~

5002. (a) <u>Commencing January 1, 2005, t</u>~~T~~he department shall succeed to and is hereby vested with all of the powers and duties <u>previously</u> exercised and performed by the following departments, boards, bureaus, commissions, and officers when such powers and duties are not otherwise vested by law:

(1) The Department of Penology.

(2) The State Board of Prison Directors.

(3) The Bureau of Paroles.

(4) The warden and the clerk of the California State Prison at San Quentin.

(5) The warden and the clerk of the California State Prison at Folsom.

(6) The warden of and the clerk of the California Institution for Men.

(7) The California Crime Commission.

(8) <u>The Youth and Adult Correctional Agency</u>

(9) <u>The Department of Corrections</u>

(10) <u>The Prison Industry Authority</u>

(11) <u>The Prison Industry Board</u>

(12) <u>The Narcotic Addict Evaluation Authority</u>

(13) <u>The Commission of Correctional Peace Officer Standards and Training</u> [9]

(14) <u>Department of the Youth Authority</u>

(15) <u>The Youth Authority Board</u>

---

[9]While the statutory change may be made, the contractual obligation remains through July 2, 2006 unless there is mutual assent to the abolition of the Commission of Correctional Peace Officer Standards and Training (CPOST) by the California Correctional Peace Officers Association.

(b) <u>Commencing January 1, 2005,</u> whenever any designation of any of the departments, boards, bureaus, commissions, or officers mentioned in subdivision (a) is contained in any provision of law and this designation is expressly made to refer to the Department of ~~Corrections~~ <u>Correctional Services</u>, ~~the Board of Corrections~~ or the ~~Board of Prison Terms~~ <u>Corrections Standards Authority</u>, then the Department of ~~Corrections~~ <u>Correctional Services</u>, ~~the Board of Corrections~~ or the ~~Board of Prison Terms~~ <u>Corrections Standards Authority</u>, to whichever one the designation is made to refer, shall exercise the power or perform the duty heretofore exercised or performed by the particular departments, boards, bureaus, or officers mentioned in subdivision (a).

(c) The powers and duties of the State Board of Prison Directors, ~~and of~~ the clerks of the state prisons and the California Institution for Men<u>, and the Department of Corrections</u> are transferred to and shall be exercised and performed by the Department of ~~Corrections~~ <u>Correctional Services</u>, except as may be otherwise expressly provided by law.

(d) The powers and duties of <u> </u>wardens of the state prisons and the California Institution for Men, presently or hereafter, expressly vested by law in them shall be exercised by them but such exercise shall be subject to the supervision and control of the ~~Director~~ <u>Secretary</u> of ~~Corrections~~ <u>Correctional Services</u> . All powers and duties not expressly vested in the wardens are transferred to and shall be exercised and performed by the Department of ~~Corrections~~ <u>Correctional Services</u>. When the designation of warden is expressly made to refer to the Department of ~~Corrections~~ <u>Correctional Services</u>, the department shall exercise the power and perform the duty heretofore exercised or performed by the warden.

(e) <u>Commencing January 1, 2005, any reference to the Board of Prison Terms or "board" shall refer to the Department of Correctional Services. Commencing January 1, 2005, t</u>~~T~~he <u>Department of Correctional Services</u> ~~Board of Prison Terms~~ shall succeed to and is hereby vested with all of the powers and duties <u>previously</u> exercised and performed by <u> </u>the following boards when such powers and duties are not otherwise vested by law:

(1) The Board of Prison Terms and Paroles.

(2) The Advisory Pardon Board.

(3) The Adult Authority.

(4) The Women's Board of Terms and Paroles.

(5) The Community Release Board.

(6) The Board of Prison Terms


5003.5. ~~The Board of Prison Terms is empowered to advise and recommend to the Director of Corrections on general and specific policies and procedures relating to the duties and functions of the director. The director is empowered to advise and recommend to the Board of Prison Terms on matters of general and specific policies and procedures, relating to the duties and functions of the board. The director and the board shall meet for purposes of exchange of  information and advice.~~

~~It is the intention of the Legislature that the Board of Prison Terms and the Director of Corrections shall cooperate with each other in the establishment of the classification, transfer, and discipline policies of the Department of Corrections, to the end that the objectives of the State Correctional System can best be attained. The director and the Board of Prison Terms shall, not less than four times each calendar year, meet for the purpose of discussion of classification, transfer, and discipline policies and problems and it is the intent of the Legislature that whenever possible there shall be~~

~~agreement on these subjects.  But for the purpose of maintaining responsibility for the secure and orderly administration of the prison system, the Director of Corrections shall have the final right to determine the policies on classification, transfer and discipline.~~

~~In the event there is no agreement the Board of Prison Terms shall file in writing with the Board of Corrections a statement of its proposals or recommendations to the director, and the director shall answer such statement in writing to the Board of Prison Terms, and a copy of both documents shall be transmitted to the Governor and to the Board of Corrections.~~

5050.  <u>Commencing January 1, 2005, any reference to the Director of Corrections or to the Director of the Youth Authority shall refer to the Secretary of Correctional Services.</u>  ~~The Office of Director of Corrections is hereby created.~~ <u>The office of Director of Corrections is hereby abolished.</u>

5051.  ~~The director shall be appointed by the Governor with the advice and consent of the Senate.  He or she shall hold office at the pleasure of the Governor, but before the director may be removed, charges against him or her, which charges may be preferred by any person, shall be heard by the Board of Corrections.  The Board of Corrections shall make detailed findings with respect to the charges and submit the findings to the Governor.  The Governor may, but need not, abide by the findings of the Board of Corrections, and may retain or remove the director.  If the Governor removes the director his or her action shall be final.  He or she shall receive an annual salary provided for by Chapter 6 (commencing with Section 11550) of Part 1 of Division 3 of Title 2 of the Government Code, and shall devote his or her entire time to the duties of his or her office.~~

5051.5.  <u>Commencing January 1, 2005, the</u> ~~The Governor~~ <u>Civilian Corrections Commission</u> may request the State Personnel Board to use extensive recruitment and merit selection techniques and procedures to provide a list of persons qualified for appointment as ~~Director of Corrections~~ <u>Secretary of Correctional Services</u>.  The Governor<u>, with the recommendation of the Commission,</u> may appoint any person from such list of qualified persons or may reject all names and appoint another person who meets the requirements of this chapter.

5052.  ~~The Director of Corrections and any other officer or employee of the Department of Corrections designated in writing by the director, shall have the power of a head of a department pursuant to Article 2 (commencing at Section 11180) of Chapter 2, Part 1, Division 3, Title 2, of the Government Code.~~

5053.  ~~The Director of Corrections is the chief administrative officer of the Department of Corrections.~~

5054.  <u>Commencing January 1, 2005, t</u>~~T~~he supervision, management and control of the State prisons, and the responsibility for the care, custody, treatment, training, discipline and employment of persons confined therein are vested in the ~~director~~ <u>Secretary of Correctional Services, subject to the oversight of the Civilian Corrections Commission.</u>

5055.  <u>Commencing January 1, 2005, A</u>~~a~~ll powers and duties granted to and imposed upon the Department of Corrections <u>and the Board of Prison Terms</u> shall be exercised by the ~~Director~~ <u>Secretary</u>

of ~~Corrections~~ Correctional Services, except where such powers and duties are expressly vested by law in the ~~Board of Prison Terms~~ the Civilian Corrections Commission.

Whenever a power is granted to the ~~Director of Corrections~~ Secretary of Correctional Services or a duty is imposed upon the ~~director~~ Secretary, the power may be exercised or the duty performed by a deputy ~~of the director~~ or by a person authorized pursuant to law by the ~~director~~ secretary.

5057.  Subject to the powers of the Department of Finance, or its successor, under Section 13300 of the Government Code, the ~~director~~ secretary must establish an accounting and auditing system for all of the agencies and institutions including the prisons which comprise the department, except the ~~Youth Authority~~ Division of Youth Operations  in such form as will best facilitate their operation, and may modify the system from time to time.

Its accounting and auditing system must include such accounts and records as are found necessary to properly account for all money and property of the prisoners and the inmates.

Except where other disposition is provided by law, all money belonging to the state received by the department, shall be reported to the Controller and deposited in the State Treasury monthly.

5058.  (a) Commencing January 1, 2005, t~~The~~ director Secretary of Correctional Services may prescribe and amend rules and regulations, subject to oversight by the Civilian Corrections Commission, for the administration of the prisons and for the administration of the parole of persons sentenced under Section 1170 except those persons who meet the criteria set forth in Section 2962. ~~The rules and regulations shall be promulgated and filed pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, except as otherwise provided in this section and Sections 5058.1 to 5058.3, inclusive.~~ All rules and regulations shall, to the extent practical, be stated in language
that is easily understood by the general public.

For any rule or regulation filed as regular rulemaking as defined in paragraph (5) of subdivision (a) of Section 1 of Title 1 of the California Code of Regulations, copies of the rule or regulation shall be posted in conspicuous places throughout each institution and
shall be mailed to all persons or organizations who request them no less than 20 days prior to its effective date.

(b) The ~~director~~ Secretary shall maintain, publish and make available to the general public, a compendium of the rules and regulations promulgated by the ~~director~~ Secretary pursuant to this section and Sections 5058.1 to 5058.3, inclusive.

(c) The following are deemed not to be "regulations" as defined in Section 11342.600 of the Government Code:

(1) Rules issued by the director applying solely to a particular prison or other correctional facility, provided that the following conditions are met:

(A) All rules that apply to prisons or other correctional facilities throughout the state are adopted by the ~~director~~ Secretary pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code.

(B) All rules except those that are excluded from disclosure to the public pursuant to subdivision (f) of Section 6254 of the Government Code are made available to all inmates confined in the particular prison or other correctional facility to which the rules

*apply and to all members of the general public.*

*(2) Short-term criteria for the placement of inmates in a new prison or other correctional facility, or subunit thereof, during its first six months of operation, or in a prison or other correctional facility, or subunit thereof, planned for closing during its last six months of operation, provided that the criteria are made available to the public and that an estimate of fiscal impact is completed pursuant to Sections 6650 to 6670, inclusive, of the State Administrative Manual.*

*(3) Rules issued by the director that are excluded from disclosure to the public pursuant to subdivision (f) of Section 6254 of the Government Code.*

*5067.* ~~*There is, in the Department of Corrections, a Correctional Conservation Camp Services Division, which shall be headed by a Deputy Director of Corrections, appointed by the Governor, on the recommendation of the Director of Corrections to serve at the pleasure of the Governor.*~~ *Commencing January 1, 2005, t~~he~~The Department of Correctional Services shall operate the conservation centers, branches thereof, and permanent, temporary and mobile camps operating therefrom, and shall have charge, subject to the general direction of the ~~Director~~ Secretary of ~~Corrections~~ Correctional Services, of all other institutions in the department and activities of persons in the custody of the ~~director~~ secretary relating to conservation work. The ~~director~~ secretary shall appoint such personnel as are necessary to enable the division to carry out its functions.*

*5069. (a) Commencing January 1, 2005, t~~he~~ ~~administrative director of the Division of Industrial Accidents~~ Department of Correctional Services shall formulate procedures for the selection and orderly referral of injured inmates of state penal or correctional institutions who may be benefited by rehabilitation services and retrained for other positions upon release from incarceration. The State Department of Rehabilitation, or its successors, shall cooperate in both designing and monitoring results of rehabilitation programs for the disabled inmates. The primary purpose of this section is to rehabilitate injured inmates in order that they might engage in suitable and gainful employment upon their release.*

*(b) The ~~director~~ Secretary shall notify the injured inmate of the availability of rehabilitation services in those cases where there is continuing disability of 28 days and beyond. A copy of such notification shall be forwarded to the State Department of Rehabilitation, or its successors.*

*(c) The initiation of a rehabilitation plan shall be the responsibility of the ~~director~~ Secretary.*

*(d) Upon establishment of a rehabilitation plan, the injured inmate shall cooperate in carrying it out.*

*(e) The injured inmate shall receive such medical and vocational rehabilitative services as may be reasonably necessary to restore him to suitable employment.*

*(f) The injured inmate's rehabilitation benefit is an additional benefit and shall not be converted to or replace any workmen's compensation benefit available to him.*

*5075. Commencing January 1, 2005, any reference to the Board of Prison Terms or the "board" shall refer to the Department of Correctional Services. There shall be a Hearing Administration within the Department of Correctional Services – Division of Adult Operations.*

a) ~~The Board of Prison Terms shall be composed of nine commissioners, each of whom shall be appointed by the Governor, with the advice and consent of the Senate, for a term of four years and until the appointment and qualification of his or her successor.~~
~~Commissioners shall be eligible for reappointment.~~

~~(b) The chair of the board shall be designated by the Governor from time to time.  The chair shall be the administrative head of the board and shall exercise all duties and functions necessary to insure that the responsibilities of the board are successfully~~
~~discharged.  He or she shall be the appointing authority for all civil service positions of employment in the board.~~

~~(c) The terms of the commissioners shall expire as follows:  two on March 15, 1978, two on March 15, 1979, two on March 15, 1980, and three on March 15, 1981.  Successor commissioners shall hold office for terms of four years, each term to commence on the expiration date of the term of the predecessor.  The Governor shall fill every vacancy for the balance of the unexpired term.  The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial, sexual, economic, and geographic features of the population of the state.~~ <u>The Governor may appoint a subordinate officer to the secretary under this section who shall hold office at the pleasure of the Governor.</u>

It is the further intent of this section that the ~~board~~ <u>Civilian Corrections Commission</u> shall adopt policies and practices as will permit continuing operations and improvements ~~without any further increase in the number of its commissioners.~~

(d) ~~Each commissioner shall participate in hearings on each workday, except when it is necessary for a commissioner to attend training, en banc hearings or full board meetings, or other administrative business requiring the participation of the commissioner.  For purposes of this subdivision, these hearings shall include parole documentation hearings, parole consideration hearings, parole rescission hearings, parole progress hearings,~~
~~mentally disordered offender hearings, and sexually violent predator hearings.~~


5075.5.  All ~~commissioners and deputy commissioners~~ <u>hearing administrators</u> who conduct hearings for the purpose of considering the parole suitability of prisoners or the setting of a parole release date for prisoners, shall receive initial training on domestic violence cases and battered women's syndrome.


~~5076.  Each commissioner of the board shall devote his entire time to the duties of his office and shall receive an annual salary provided for by Chapter 6 (commencing with Section 11550) of Part 1 of Division 3 of Title 2 of the Government Code.~~


5076.1.  The ~~board~~ <u>hearing administrators</u> shall meet at each of the state prisons at such times as may be necessary for a full and complete study of the cases of all prisoners whose applications for parole come before ~~it~~ <u>them</u>.  Other times and places of meeting may also be fixed by the ~~board~~ <u>Hearing Administration</u>.  ~~Each commissioner of the board shall receive his actual necessary traveling expenses incurred in the performance of his official duties.  Where the board performs its functions by meeting en banc in either public or executive sessions to decide matters of general policy, at least five members~~

~~shall be present, and no such action shall be valid unless it is concurred in by a majority vote of those present.~~

The ~~board~~ Hearing Administration may meet and transact business in panels.  Each panel shall consist of at least three persons.  No action shall be valid unless concurred in by a majority vote of the persons present.

Consideration of parole release for persons sentenced to life imprisonment pursuant to subdivision (b) of Section 1168 shall be heard by a panel of hearing administrators, ~~a majority of whose commissioners are commissioners of the Board of Prison Terms~~.  A recommendation for recall of a sentence under subdivisions (d) and (f) of Section 1170 shall be made by a panel of hearing administrators, ~~a majority of whose commissioners are commissioners of the Board of Prison Terms~~.

The ~~board~~ Secretary of Correctional Services may employ ~~deputy commissioners~~ subordinate officers to whom ~~it~~ (s)he may assign appropriate duties, including that of hearing cases and making decisions.  Such decisions shall be made in accordance with policies approved by ~~a majority of the total membership of the board~~ the Civilian Corrections Commission.


5076.2.  (a) Any rules and regulations regarding the Hearing Administration within the Department of Correctional Services – Division of Adult Operations, including any resolutions and policy statements, promulgated by the Civilian Corrections Commission ~~Board of Prison Terms, shall be promulgated and filed pursuant to Chapter  (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, and~~ shall, to the extent practical, be stated in language that is easily understood by the general public.

(b) The ~~Board of Prison Terms~~ Secretary shall maintain, publish and make available to the general public, a compendium of its rules and regulations, including any resolutions and policy statements, promulgated pursuant to this section.

~~(c) The exception specified in this subdivision to the procedures specified in this section shall apply to the Board of Prison Terms. The chairperson may specify an effective date that is any time more than 30 days after the rule or regulation is filed with the Secretary of State.  However, no less than 20 days prior to that effective date, copies of the rule or regulation shall be posted in conspicuous places throughout each institution and shall be mailed to all persons or organizations who request them.~~


5076.3.  ~~The Chairman of the Board of Prison Terms shall have the authority of a head of a department set forth in subdivision (e) of Section 11181 of the Government Code to issue subpoenas as provided in Article 2 (commencing with Section 11180) of Chapter 2 of Division 3 of Title 2 of the Government Code.  The board shall adopt regulations on the policies and guidelines for the issuance of subpoenas.~~


5077.  Commencing January 1, 2005, the ~~The Board of Prison Terms~~ Hearing Administration shall review the prisoners' requests for reconsideration of denial of good-time credit, and setting of parole length or conditions, and shall have the authority to modify the previously made decisions of the ~~Department of Corrections~~ department as to these matters.  The revocation of parole shall be determined by the ~~Board of Prison Terms~~ Hearing Administration.

*5078. (a) Commencing January 1, 2005, t~~The Board of Prison Terms~~ Department of Correctional Services shall succeed to and shall exercise and perform all powers and duties granted to, exercised by, and imposed upon the Board of Prison Terms, Adult Authority, the California Women's Board of Terms and Paroles, and the Community Release Board.*

*(b) The Board of Prison Terms, Adult Authority and California Women's Board of Terms and Paroles are abolished.*

*5080. Commencing January 1, 2005, the ~~The Director~~ Secretary of ~~Corrections~~ Correctional Services may transfer persons confined in one state prison institution or facility of the Department of ~~Corrections~~ Correctional Services – Division of Adult Operations to another. The ~~Board of Prison Terms~~ Hearing Administration may request the ~~Director~~ Department of ~~Corrections~~ Correctional Services – Division of Adult Operations to transfer an inmate who is under its parole-granting jurisdiction if, after review of the case history in the course of routine procedures, such transfer is deemed advisable for the further diagnosis, and treatment of the inmate. The ~~director~~ Secretary shall as soon as practicable comply with such request, provided that, if facilities are not available he shall report that fact to the ~~Board of Prison Terms~~ Hearing Administration and shall make the transfer as soon as facilities become available; provided further, that if in the opinion of the ~~Director of Corrections~~ Division of Adult Operations such transfer would endanger security, it ~~he~~ may report that fact to the ~~Board of Prison Terms,~~ Hearing Administration and refuse to make such transfer.*

*When transferring an inmate from one state prison, institution, or facility of the Department of ~~Corrections~~ Correctional Services – Division of Adult Operations to another, the ~~director~~ secretary may, as necessary or convenient, authorize transportation via a route that lies partly outside this state.*

*~~5081. The Governor may remove any member of the Board of Prison Terms for misconduct, incompetency or neglect of duty after a full hearing by the Board of Corrections.~~*

*5082. (a) Any number of employees of the ~~Board of Prison Terms~~ Hearing Administration as are needed to carry out its functions shall be selected and appointed pursuant to the State Civil Service Act. Nothing shall prohibit the ~~Board of Prison Terms~~ Hearing Administration from employing any person employed formerly by the Adult Authority, or Women's Board of Terms and Paroles, or Board of Prison Terms.*

*(b) ~~The provisions of Chapter 6 (commencing with Section 6050) of Title 7 of Part 3, relating to the employment of personnel by the department, do not apply to the employees of the Board of Prison Terms.~~*

*6001. The establishment, organization, jurisdiction, powers, duties, responsibilities, and functions of the ~~Youth Authority~~ Department of Correctional Services - Division of Youth Operations are continued as provided in the Youth Authority Act (Chapter 1 (commencing with Section 1700) of Division 2.5 of the Welfare and Institutions Code).*

*6003. The ~~Youth Authority~~ Department of Correctional Services – Division of Youth Operations and the ~~Director of Corrections~~ Division of Adult Operations may, pursuant to Section 11253 and Sections 11256 to 11259, inclusive, of the Government Code, provide for the performance of any of*

the duties or the exercise of any of the powers of the ~~Youth Authority~~ Division of Youth Operations by the ~~Department of Corrections~~ Division of Adult Operations subject to the direction and control of the ~~Youth Authority~~ Division of Youth Operations except that the power of classification and segregation of persons committed to the ~~authority~~ Division of Youth Operations shall be exercised by the ~~authority~~ Division of Youth Operations and shall not be exercised by any other agency.

6004.  Whenever the ~~Director of Corrections~~ Division of Adult Operations ~~or the Department of Corrections~~ exercises any power or performs any duty of the ~~Youth Authority~~ Division of Youth Operations pursuant to the authorization in Section 6003:

   (a) The exercise of the power or the performance of the duty by the ~~Director of Corrections or the Department of Corrections~~ Division of Adult Operations shall constitute an exercise of the power or a performance of the duty by the ~~Youth Authority~~ Division of Youth Operations for the purposes of the Youth Authority Act (Chapter 1 (commencing with Section 1700) of Division 2.  5 of the Welfare and Institutions Code).

   (b) The operation of any service, place, institution, hospital, agency, or facility by the Department of ~~Corrections~~ Correctional Services under the authorization in Section 6003 shall be deemed operation by the ~~Youth Authority~~ Division of Youth Operations.

   (c) All public officers and other persons under a duty to make any reports or provide any information, access, or assistance to the ~~Youth Authority~~ Division of Youth Operations in respect to the power or duty so exercised shall make the reports, or provide the information, access, or assistance to the ~~Director of Corrections or the Department of Corrections~~ Division of Adult Operations.

6005.  Whenever a person confined to a correctional institution under the supervision of the Department of ~~the Youth Authority~~ Correctional Services - Division of Youth Operations is charged with a public offense committed within the confines of that institution and is tried for that public offense, the appropriate financial officer or other designated official of a county or the city finance officer of a city incurring any costs in connection with that matter must make out a statement of all the costs incurred by the county or city for the investigation, and the preparation of the trial, and the actual trial of the case, and of all guarding and keeping of the person, and of the execution of the sentence of the person, properly certified to by a judge of the superior court of the county.  The statement shall be sent to the department for its approval.  After the approval the department must cause the amount of the costs to be paid out of the money appropriated for the support of the department to the county treasurer of the county or the city finance officer of the city incurring those costs.

6024.  Commencing January 1, 2005, any reference to the Board of Corrections or "board" shall refer to the Corrections Standards Authority. ~~There is in the Youth and Adult Correctional Agency a Board of Corrections.~~  There is in the Department of Correctional Services, a Corrections Standards Authority.

6025.  (a) Commencing January 1, 2005, t~~The~~ ~~Board of Corrections~~ Corrections Standards Authority shall be composed of 15 members, one of whom shall be the Secretary of the ~~Youth and Adult Correctional Agency~~ Correctional Services who shall be designated as the chairperson, one of whom

shall be the _subordinate officer of the Secretary of Correctional Services, who is responsible for the Division of Adult Operations_ ~~Director of Corrections~~, one of whom shall be the ~~Director of the Youth Authority~~ _subordinate officer of the Secretary of Correctional Services, who is responsible for the Division of Youth Operations_, and 12 of whom shall be appointed by the Governor after consultation with, and with the advice of, the Secretary of ~~the Youth and Adult Correctional Agency~~ _Correctional Services_, and with the advice and consent of the Senate. The gubernatorial appointments shall include all of the following:

(1) A county sheriff in charge of a local detention facility which has a ~~Board of Corrections~~ _Corrections Standards Authority_ rated capacity of 200 or less inmates.

(2) A county sheriff in charge of a local detention facility which has a ~~Board of Corrections~~ _Corrections Standards Authority_ rated capacity of over 200 inmates.

(3) A county supervisor or county administrative officer.

(4) A chief probation officer from a county with a population over 200,000.

(5) A chief probation officer from a county with a population under 200,000.

(6) A manager or administrator of a county local detention facility.

(7) An administrator of a local community-based correctional program.

(8) Two public members.

(9) Two rank and file representatives from one or more local corrections facilities, as described in Section 6035. One representative shall be a juvenile probation officer at the level of the first line supervisor or below, with a minimum of five years of experience in a juvenile facility, and one representative shall be a deputy sheriff with the rank of sergeant or below, with a minimum of five years experience in an adult facility.

(10) A representative of a community-based youth service organization.

(b) Of the members first appointed by the Governor, two shall be appointed for a term of two years, three for a term of three years, and three for a term of four years. The length of the original term to be served by each member first appointed shall be determined by lot. Their successors shall serve for a term of three years and until appointment and qualification of their successors, each term to commence on the expiration date of the term of the predecessor.

(c) The ~~board~~ _Authority_ shall select a vice chairperson from among its members. Seven members of the board shall constitute a quorum.

(d) When the ~~board~~ _Authority_ is hearing charges against any member, the individual concerned shall not sit as a member of the board for the period of hearing of charges and the determination of recommendations to the Governor.

(e) If any appointed member is not in attendance for three consecutive meetings the ~~board~~ _Authority_ shall recommend to the Governor that the member be removed and the Governor shall make a new appointment, with the advice and consent of the Senate, for the remainder of the term.


6025.5. The ~~Director of Corrections, Board of Prison Terms, the Youthful Offender Parole Board, and the Director of the Youth Authority~~ _Secretary of Correctional Services_ shall file with the ~~Board of Corrections~~ _Standards Authority_ for information of the ~~board~~ _Authority_ or for review and advice to the respective agency as the ~~board~~ _Authority_ may determine, all rules, regulations and manuals relating to or in implementation of policies, procedures, or enabling laws.

6026.  The ~~Board of~~ Corrections _Standards Authority_ shall be the means whereby the Department of ~~Corrections and the Department of the Youth Authority~~ _Correctional Services_ may correlate ~~their~~ individual programs for the adults and youths under ~~the~~ _its_ jurisdiction ~~of each~~.


6028.2.  _Commencing January 1, 2005, t_~~T~~he Secretary of ~~the Youth and Adult Correctional Agency~~ _Correctional Services_ may furnish  for the use of any such commission such facilities, supplies, and personnel as may be available therefore.


6030.  (a) The ~~Board of~~ Corrections _Standards Authority_ shall establish minimum standards for local detention facilities by July 1, 1972.  The ~~Board of~~ Corrections _Standards Authority_ shall review such standards biennially and make any appropriate revisions.

   (b) The standards shall include, but not be limited to, the following:  health and sanitary conditions, fire and life safety, security, rehabilitation programs, recreation, treatment of persons confined in local detention facilities, and personnel training.

   (c) Such standards shall require that at least one person on duty at the facility is knowledgeable in the area of fire and life safety procedures.

   (d) The standards shall also include requirements relating to the acquisition, storage, labeling, packaging, and dispensing of drugs.

   (e) In establishing minimum standards, the ~~Board of~~ Corrections _Standards Authority_ shall seek the advice of the following:

   (1) For health and sanitary conditions:

   The State Department of Health Services, physicians, psychiatrists, local public health officials, and other interested persons.

   (2) For fire and life safety:

   The State Fire Marshal, local fire officials, and other interested persons.

   (3) For security, rehabilitation programs, recreation, and treatment of persons confined in local detention facilities:

   The Department of ~~Corrections, the Department of the Youth  Authority~~ _Correctional Services_, local juvenile justice commissions, local correctional officials, experts in criminology and penology, and other interested persons.

   (4) For personnel training:

   ~~The Commission on Peace Officer Standards and Training, Pp~~sychiatrists, experts in criminology and penology, the Department of ~~Corrections, the Department of the Youth Authority~~ _Correctional Services_, local correctional officials, and other interested persons.


6050.  (a) ~~Commencing January 1, 2005~~, the Governor, upon recommendation of the ~~director~~ _Secretary of Correctional Services_, ~~and with the advice and consent of the Senate,~~ shall appoint the wardens of the various state prisons.  Each warden shall be subject to removal by the _Secretary of Correctional Services_ ~~director~~.  If the ~~director~~ _Secretary of Correctional Services_ removes the warden, his or her action shall be final.  The wardens shall be exempt from civil service.

   (b) The Department of Personnel Administration_, or its successor,_ shall fix the compensation of the wardens and superintendents of the state prisons.

*6104. The ~~Director~~ Secretary of ~~Corrections~~ Correctional Services shall make rules and regulations for the government of the Medical Facility and the management of its affairs, subject to the oversight of the Civilian  Corrections Commission.*

*6125. Commencing January 1, 2005, ~~There is hereby created the~~ ~~independent~~ there shall be within the Civilian Corrections Commission an office of the Inspector General~~, which shall not be a subdivision of any other governmental entity~~. The ~~Governor~~ Civilian Corrections Commission shall appoint the Inspector General ~~subject to Senate confirmation of that appointment~~, who shall serve a five-year term. The term may be renewed for one additional term of five years at the discretion of the Civilian Corrections Commission. The Civilian Corrections Commission may otherwise remove the Inspector General for incompetence, neglect of duty, or corruption. If the Civilian Corrections Commission removes the Inspector General, its action shall be final. The Inspector General shall be exempt from civil service.*

*6126. (a) Commencing January 1, 2005, t~~T~~he Inspector General shall be responsible for reviewing departmental policy and procedures for conducting audits of investigatory practices and other audits, as well as conducting investigations of the ~~Department of Corrections, the Department of the Youth Authority, the Board of Prison Terms, the Youthful Offender Parole Board, the Board of Corrections, the Narcotic Addict Evaluation Authority, the Prison Industry Authority, and the Youth and Adult Correctional Agency~~ Department of Correctional Services, as requested by either ~~the Secretary of the Youth and Adult Correctional Agency or~~ (1) a Member of the Legislature, pursuant to the approval of the Inspector General under policies to be developed by the Inspector General, or (2) as directed by the Civilian Corrections Commission. The Inspector General may, under policies developed by the Inspector General, initiate an investigation or an audit on his or her own accord. The Civilian Corrections Commission shall not prevent or prohibit the Inspector General from initiating, carrying out, or completing any audit or investigation.*

 *(b) Upon completion of an investigation or audit, the Inspector General shall provide a response to the requester.*

 *(c) The Inspector General shall, during the course of an investigatory audit, identify areas of full and partial compliance, or noncompliance, with departmental investigatory policies and procedures, specify deficiencies in the completion and documentation*
*of investigatory processes, and recommend corrective actions, including, but not limited to, additional training with respect to investigative policies, additional policies, or changes in policy, as well as any other findings or recommendations that the Inspector*
*General deems appropriate.*

*6126.2. Commencing January 1, 2005, t~~T~~he Inspector General, ~~the Youth and Adult Correctional Agency, the Department of the Youth Authority, the Department of Corrections, the Board of Corrections, the Youthful Offender Parole Board,~~ the Civilian Corrections Commission, and the ~~Board of Prison Terms~~ Department of Correctional Services shall not hire as an internal affairs investigator any person known to be directly or indirectly involved in an open internal affairs investigation being conducted by any federal, state, or local law enforcement agency or the Inspector General.*

*6128.  (a) The office of the Inspector General may receive communications from any individual, including those employed by any department, board, or authority who believes he or she may have information that may describe a variance from departmental*

*investigatory policies and procedures.  The identity of the person providing the information as well as the information provided shall be held as confidential by the Inspector General and may be disclosed, in confidence, only to the secretary, the Governor, the appropriate director or chair, or a law enforcement agency in the*

*furtherance of their duties.  It is not the purpose of these communications to redress any single disciplinary action or grievance that may routinely occur.*

*(b) <u>Commencing January 1, 2005, i</u>~~I~~n order to properly respond to any allegation of improper governmental activity, the Inspector General shall establish a toll-free public telephone number for the purpose of identifying any alleged wrongdoing by an employee of the Department of <u>Correctional Services</u> ~~Corrections, the Department of the Youth Authority, the Board of Prison Terms, the Youthful Offender Parole Board, the Board of Corrections, the Narcotic Addict Evaluation Authority, the Prison Industry Authority, or the Youth and Adult Correctional Agency~~.  This telephone number shall be posted by the above-named departments, and their respective subdivisions, in clear view of all employees and the public.  When appropriate, the Inspector General shall initiate an investigation or audit of any alleged wrongdoing.  However, any request to conduct an investigation shall be in writing.  The request shall be confidential and is not subject to disclosure under the Public Records Act (Chapter 3.5 (commencing with Section 6250) of Division 7 of Title 1 of the Government Code).*

*(c) The identity of the person providing the information that initiated the investigation shall not be disclosed without the person's written permission, except to a law enforcement agency in the furtherance of its duties.*

*6129.  (a) (1) <u>Commencing January 1, 2005, f</u>~~F~~or purposes of this section, "employee" means any person employed by the <u>Department of Correctional Services, Civilian Corrections Commission</u> ~~Youth and Adult Correctional Agency, the Department of Corrections, the Department of the Youth Authority, the Board of Corrections, the Board of Prison Terms, the Youthful Offender Parole Board~~, or the Inspector General.*

*(2) For purposes of this section, "retaliation" means intentionally engaging in acts of reprisal, retaliation, threats, coercion, or similar acts against another employee who has done either of the following:*

*(A) Has disclosed or is disclosing to any employee at a supervisory or managerial level, what the employee, in good faith, believes to be improper governmental activities.*

*(B) Has cooperated or is cooperating with any investigation of improper governmental activities.*

*(b) (1) Upon receiving a complaint of retaliation from an employee, the Inspector General may commence an investigation.  All investigations conducted pursuant to this section shall be performed, where applicable, in accordance with the requirements of Chapter 9.7 (commencing with Section 3300) of Title 1 of Division 4 of the Government Code.*

*(2) When investigating a complaint, in determining whether retaliation has occurred, the Inspector General shall consider, among other things, whether any of the following either actually occurred or were threatened:*

*(A) Unwarranted or unjustified staff changes.*

*(B) Unwarranted or unjustified letters of reprimand or other disciplinary actions, or unsatisfactory evaluations.*

*(C) Unwarranted or unjustified formal or informal investigations.*

*(D) Engaging in acts, or encouraging or permitting other employees to engage in acts, that are unprofessional, or foster a hostile work environment.*

*(E) Engaging in acts, or encouraging or permitting other employees to engage in acts, that are contrary to the rules, regulations, or policies of the workplace.*

*(3) Upon authorization of the complainant employee, the Inspector General may release the findings of the investigation of alleged retaliation to the State Personnel Board for appropriate action.*

*(c) Any employee at any rank and file, supervisory, or managerial level, who intentionally engages in acts of reprisal, retaliation, threats, coercion, or similar acts against another employee, pursuant to paragraph (2) of subdivision (a), shall be disciplined by adverse action as provided in Section 19572 of the Government Code. If no adverse action is taken, the State Personnel Board shall invoke adverse action proceedings as provided in Section 19583.5 of the Government Code.*

*(d) (1) In addition to all other penalties provided by law, including Section 8547.8 of the Government Code or any other penalties that the sanctioning authority may determine to be appropriate, any state employee at any rank and file, supervisory, or managerial level found by the State Personnel Board to have intentionally engaged in acts of reprisal, retaliation, threats, or coercion shall be suspended for not less than 30 days without pay, and shall be liable in an action for damages brought against him or her by the injured party. If the State Personnel Board determines that a lesser period of suspension is warranted, the reasons for that determination must be justified in writing in the decision.*

*(2) Punitive damages may be awarded by the court if the acts of the offending party are proven to be malicious. If liability has been established, the injured party also shall be entitled to reasonable attorney's fees as provided by law.*

*(e) Nothing in this section shall prohibit the employing entity from exercising its authority to terminate, suspend, or discipline an employee who engages in conduct prohibited by this section.*

*(f) The Inspector General, the ~~Youth and Adult Correctional Agency, the Department of the Youth Authority, the Department of Corrections, the Board of Corrections, the Youthful Offender Parole Board,~~ <u>Civilian Corrections Commission</u> and the <u>Department of Correctional Services</u> ~~Board of Prison Terms~~ shall refer matters involving criminal conduct to the proper law enforcement authorities in the appropriate jurisdiction for further action. The entity making a referral to the local district attorney shall also notify the Attorney General of the action. If the local district attorney refuses to accept the case, he or she shall notify the referring entity who shall subsequently refer the matter to the Attorney General. If the local district attorney has not acted on the matter, the referring entity shall notify the Attorney General. It is the intent of the Legislature that the Department of Justice avoid any conflict of interest in representing the State of California in any civil litigation that may arise in a case in which an investigation has been or is currently being conducted by the Bureau of Investigation by contracting when necessary for private counsel.*

*(g) Upon the completion of any investigation, the Inspector General shall prepare a written report, which shall be held as confidential and disclosed in confidence, only to the Secretary of the ~~Youth and Adult Correctional Agency~~ <u>Department of Correctional Services</u>, the Governor, and the appropriate*

*director or law enforcement agency.  A summary of the report's findings and conclusions shall be made available, upon*
*request, to the person who requested the investigation, the person or persons who were the subjects of the investigation, and to any Member of the Legislature.*
*(h) Nothing in this section shall preclude the office of the Inspector General from following all applicable laws regarding confidentiality, including, but not limited to, the California Public Records Act, the Public Safety Officers Procedural Bill of Rights,*
*the Information Practices Act of 1977, the Confidentiality of Medical Information Act, and the provisions of Section 832.7 relating to the disposition notification for complaints against peace officers.*

*6204.  The ~~Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of the conservation centers in the management of*
*their affairs, subject to the oversight of the Civilian Corrections Commission.*

*6252.  The ~~Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of the community correctional centers in the*
*management of their affairs, subject to the oversight of the Civilian Corrections Commission*

## REVISIONS TO THE WELFARE AND INSTITUTIONS CODE

*1000.  Commencing January 1, 2005, any references to the ~~The~~ Department of the Youth Authority shall refer to the Department of Correctional Services, which has jurisdiction over all educational training and treatment institutions now or hereafter established and maintained in the State as correctional schools for the reception of wards of the juvenile court and other persons committed to the department.*

*1703.  Commencing January 1, 2005, as ~~As~~ used in this chapter*
*(a) "Public offenses" means public offenses as that term is defined in the Penal Code;*
*(b) "Court" includes any official authorized to impose sentence for a public offense;*
*(c) "Youth Authority", "Authority", "authority", ~~or~~ "department", "Board" or "board" means the Department of Correctional Services ~~the Youth Authority~~;*
*(d) ~~"Board" or "board" means the Youth Authority Board.~~*
*(e) The masculine pronoun includes the feminine.*

*1710.  Commencing January 1, 2005, any reference to ~~There is in~~ the Youth and Adult Correctional Agency, ~~a~~ the Department of the Youth Authority, and the Youth Authority Board shall refer to the Department of Correctional Services.*

*1711.  ~~The Director of the Youth Authority shall be appointed by the Governor with the advice and consent of the Senate.  He or she shall hold office at the pleasure of the Governor but before the director may be removed, the procedures set forth in Section 5051 of the Penal Code shall be followed. He or she shall receive an annual salary~~*

*provided for by Chapter 6 (commencing with Section 11550) of Part 1 of Division 3 of Title 2 of the* *Government Code, and shall devote his or her entire time to the duties of his or her office.* *Commencing January 1, 2005, any reference in this division to the Director of the Youth Authority* *shall refer to the Secretary of Correctional Services.  The office of the Director of the Youth Authority* *is hereby abolished.*

1712.  (a) *All powers, duties, and functions pertaining to the care and treatment of wards provided by* *any provision of law* ~~and not specifically and expressly assigned to the Youth Authority Board~~ *shall* *be exercised and performed by the* ~~director~~ *Secretary of Correctional Services.  The* ~~director~~ *Secretary* *of Correctional Services shall be the appointing authority for all civil service positions of employment* *in the department.  The* ~~director~~ *Secretary of Correctional Services may delegate the powers and* *duties vested in him or her by law, in accordance with Section 7.*

   (b) *Commencing January 1, 2005, t*~~The director~~ *Secretary of Correctional Services is authorized to* *make and enforce all rules appropriate to the proper accomplishment of the functions of the* *Department of* ~~the Youth Authority~~ *Correctional Services, subject to the oversight of the Civilian* *Corrections Commission.  The rules shall* ~~be promulgated and filed pursuant to Chapter 4.5~~ ~~(commencing with Section 11371) of Part 1 of Division 3 of Title 2 of the Government Code, and~~ ~~shall~~*, to the extent practical, be stated in language that is easily understood by the general public.*

   (c) *The* ~~Department of the Youth Authority~~ *Secretary* *shall maintain, publish, and make available to* *the general public, a compendium of rules and regulations promulgated by the department pursuant* *to this section.*

   ~~(d) The following exceptions to the procedures specified in this section shall apply to the~~ ~~Department of the Youth Authority:~~

   ~~(1) The department may specify an effective date that is any time more than 30 days after the rule or~~ ~~regulation is filed with the Secretary of State; provided that no less than 20 days prior to that effective~~ ~~date, copies of the rule or regulation shall be posted in~~ ~~conspicuous places throughout each institution and shall be mailed to all persons or organizations~~ ~~who request them.~~

   ~~(2)~~ *(d)* *The department may rely upon a summary of the information compiled by a hearing officer;* *provided that the summary and the testimony taken regarding the proposed action shall be retained as* *part of the public record for at least one year after the adoption, amendment, or repeal.*

1713.  (a) *The* ~~Director of the Youth Authority~~ *Secretary of Correctional Services shall have wide and* *successful administrative experience in youth or adult correctional programs embodying* *rehabilitative or delinquency prevention concepts.*

   (b) ~~The Governor may request the State Personnel Board to use extensive recruitment and merit~~ ~~selection techniques and procedures to provide a list of persons qualified for appointment as Director~~ ~~of the Youth Authority.  The Governor may appoint any person from such list of qualified persons or~~ ~~may reject all names and appoint another person who meets the requirements of this section.~~

1714.  *The* ~~Director of the Youth Authority~~ *Secretary of Correctional Services may transfer persons* *confined in one institution or facility of the Department of* ~~the Youth Authority~~ *Correctional Services* *– Division of Youth Operations* *to another.*

*1716.  (a)* Commencing January 1, 2005, the Youth Authority Board is hereby abolished.  There is a Hearing Administration in the Department of Correctional Services – Division of Youth Operations. ~~There is in the Department of the Youth Authority a Youth Authority Board, which shall be composed of six members, one of whom shall be the Director of the Youth Authority who shall serve as the ex officio nonvoting chair of the board.  Other than the chair, who is subject to appointment pursuant to Section 1711, the members shall be appointed by the Governor, with the advice and consent of the Senate, for a term of four years, and shall devote their entire time to its work.~~ The Governor may appoint a subordinate officer to the secretary under this section who shall hold office at the pleasure of the Governor.

*(b)* ~~The individuals who were members of the Youthful Offender Parole Board immediately prior to the effective date of this section shall continue in their respective terms of office as members of the Youth Authority Board as provided in this section.  The positions held by one of the members whose term ends on March 15, 2007, and by one of the members whose term ends on March 15, 2006, shall be eliminated on the effective date of this section, reducing the composition of the board to five members, not including the position held by the Director of the Youth Authority.  All other members shall continue to serve out their respective terms.  Their successors shall hold office for terms of four years.  The members shall be eligible for reappointment and shall hold office until the appointment and qualification of their successors, with the term of each new appointee to commence on the expiration date of the term of his or her predecessor.~~

*(c)* ~~All appointments to a vacancy occurring by reason of any cause other than the expiration of a term shall be for the unexpired term.~~

*(d)* ~~If the Senate, in lieu of failing to confirm, finds that it cannot consider all or any of the appointments to the Youth Authority Board adequately because the amount of legislative business and the probable duration of the session does not permit, it may adopt a single house resolution by a majority vote of all members elected to the Senate to that effect and requesting the resubmission of the unconfirmed appointment or appointments at a succeeding session of the Legislature, whether regular or extraordinary, convening on or after a date fixed in the resolution.  This resolution shall be filed immediately after its adoption in the office of the Secretary of State and the appointee or appointees affected shall serve subject to later confirmation or rejection by the Senate.~~

*1717.  (a)* ~~Persons~~ The subordinate officer appointed to the Department of Correctional Services pursuant to section 1716 above ~~Youth Authority Board~~ shall have a broad background in and ability for appraisal of youthful law offenders and delinquents, the circumstances of delinquency for which those persons are committed, and the evaluation of the individual's progress toward reformation. Insofar as practicable, ~~members~~ hearing administrators shall be selected who have a varied and sympathetic interest in youth correction work including persons widely experienced in the fields of corrections, sociology, law, law enforcement, mental health, and education.

*(b)* ~~The selection of persons and their appointment by the Governor and confirmation by the Senate shall reflect as nearly as possible a cross section of the racial, sexual, economic, and geographic features of the state.~~

*(c) ~~The Director of the Youth Authority shall serve as the ex officio nonvoting chair of the board.~~* ~~*The chair shall be the administrative head of the board and shall exercise all duties and functions*~~ ~~*necessary to ensure that the responsibilities of the board are successfully discharged.*~~

*(d) Within 60 days of appointment and annually thereafter, ~~persons appointed to the Youth~~* ~~*Authority Board,*~~ the subordinate officer *shall undergo a minimum of 40 hours of training in the following areas:  treatment and training programs provided to wards at* Department of Correctional Services – Division of Youth Operations ~~*Authority*~~ *institutions, including, but not limited to, educational, vocational, mental health, medical, substance abuse, psychotherapeutic counseling, and sex offender treatment programs; a review of current national research on effective interventions with juvenile offenders and how they compare to department program and treatment services; parole services; board member duties and responsibilities; and a review of factors influencing ward lengths of stay and ward recidivism rates and their relationship to one another.*

~~*1718.  (a) The members of the board shall receive an annual salary as provided for by Chapter 6*~~ ~~*(commencing with Section 11550) of Part 1 of Division 3 of Title 2 of the Government Code and their*~~ ~~*actual necessary traveling expenses to the same extent as is provided for other state offices.*~~ ~~*– (b) The Governor may remove any member of the board for misconduct, incompetency or neglect of*~~ ~~*duty after a full hearing by the Board of Corrections.*~~

*1720.  (a) The case of each ward shall be reviewed by the Department of ~~the Youth Authority~~* Correctional Services *within 45 days of arrival at the department, and at other times as is necessary to meet the powers or duties of the ~~board~~* Hearing Administration.

*(b) The department shall periodically review the case of each ward for the purpose of determining whether existing orders and dispositions in individual cases should be modified or continued in force. These reviews shall be made as frequently as the department considers desirable and shall be made with respect to each ward at intervals not exceeding one year.*

*(c) The ward shall be entitled to notice if his or her annual review is delayed beyond one year after the previous annual review hearing.  The ward shall be informed of the reason for the delay and of the date the review hearing is to be held.*

*(d) Failure of the department to review the case of a ward within 15 months of a previous review shall not of itself entitle the ward to discharge from the control of the ~~Youth Authority~~* Department of Correctional Services *but shall entitle him or her to petition the superior court of the county from which he or she was committed for an order of discharge, and the court shall discharge him or her unless the court is satisfied as to the need for further control.*

*(e) Reviews conducted by the department pursuant to this section shall be written and shall include, but not be limited to, the following:  verification of the treatment or program goals and orders for the ward to ensure the ward is receiving treatment and programming that is narrowly tailored to address the correctional treatment needs of the ward and is being provided in a timely manner that is designed to meet the parole consideration date set for the ward; an assessment of the ward's adjustment and responsiveness to treatment, programming, and custody; a review of the ward's disciplinary history and response to disciplinary sanctions; an updated individualized treatment plan for the ward that makes adjustments based on the review required by this subdivision; an estimated*

*timeframe for the ward's commencement and completion of the treatment programs or services; and a review of any additional information relevant to the ward's progress.*

  *(f) The department shall provide copies of the reviews prepared pursuant to this section to the court and the probation department of the committing county.*

*1721.  (a) The ~~Youth Authority Board~~ Civilian Corrections Commission shall adopt policies governing the performance of ~~its~~ the functions by the ~~full board~~ Hearing Administration~~, or, pursuant to delegation, by panels, or referees.  Whenever the board performs its functions meeting en banc in either public or executive sessions to decide matters of policy, four members shall be present and no action shall be valid unless it is concurred in by a majority vote of those present.~~*

  ~~*(b) Case hearing representatives from the Department of the Youth Authority may be employed to participate with the board in the hearing of cases and authority may be delegated to those persons as provided in this section.*~~

  ~~*(c) The board may delegate its authority to hear, consider, and act upon cases to members or case hearing representatives, sitting either on a panel or as a referee.  A panel may consist of two or more members, a member and a case hearing representative, or two case hearing representatives.  Two members of a panel shall constitute a quorum, and no action of the panel shall be valid unless concurred in by a majority vote of those present.*~~

  ~~*(d) When delegating its authority, the board may condition finality of the decision of the panel or referee to whom authority is delegated on concurrence of a member or members of the board.  In determining whether, in any case, it shall delegate its authority and the extent of such delegation, the board shall take into account the degree of complexity of the issues presented by the case.*~~

  ~~*(e)*~~ *(b)The ~~board~~ Secretary shall adopt rules, with oversight by the Civilian Corrections Commission, under which a person under the jurisdiction of the ~~Youth Authority~~ Department of Correctional Services –Division of Youth Operations or other persons, as specified in those rules, may appeal any decision of a ~~case hearing representative~~ hearing administrator.  Any departmental decision resulting in the extension of a parole consideration date or recommendation to the ward's committing court seeking the extension of a parole consideration date, as the case may be, shall entitle a ward to appeal the decision to a panel of at least ~~two board~~ three hearing administrators.  The ~~board~~ panel shall consider and act upon the appeal in accordance with those rules.*

*1722.  (a) Any rules and regulations, including any resolutions and policy statements, promulgated by the ~~Youth Authority Board~~ Civilian Corrections Commission, ~~shall be promulgated and filed pursuant to Chapter 3.5 (commencing with Section 11340) of Part 1 of Division 3 of Title 2 of the Government Code, and~~ shall, to the extent practical, be stated in language that is easily understood by the general public.*

  *(b) The ~~board~~ Secretary shall maintain, publish, and make available to the general public, a compendium of its rules and regulations, including any resolutions and policy statements, promulgated pursuant to this section.*

  ~~*(c) The following exception to the procedures specified in this section shall apply to the board:  The chairperson may specify an effective date that is any time more than 30 days after the rule or regulation is filed with the Secretary of State; provided that no less than 20 days prior to that effective*~~

~~date, copies of the rule or regulation shall be posted in conspicuous places throughout each institution and shall be mailed to all persons or organizations who request them.~~

*1723. (a) Except as provided in Sections 1716 and 1721, every order granting and revoking parole and issuing final discharges to any person under the jurisdiction of the* ~~Youth Authority~~ Department of Correctional Services –Division of Youth Operations *shall be made by the* ~~Youth Authority Board~~ Hearing Administration of the Department of Correctional Services –Division of Youth Operations *or its designee, as authorized by this article.*

~~(b) All other powers conferred to the Youth Authority Board may be exercised through subordinates or delegated to the Department of the Youth Authority under rules established by the board. Any person subjected to an order of those subordinates or of the department pursuant to that delegation may petition the board for review. The board may review those orders under appropriate rules and regulations.~~

*(c) All board* Hearing Administration *designees shall be subject to the training required pursuant* ~~to subdivision (d) of Section 1717.~~

*1725.* The Department of Correctional Services ~~The Youth Authority Board~~ *shall succeed to and shall exercise and perform all powers and duties granted to, exercised by, and imposed upon the Youthful Offender Parole Board* and Youth Authority Board, *as authorized by this article. The Youthful Offender Parole Board is abolished.*

*3150. (a)* Commencing January 1, 2005, any reference to the Narcotic Addict Evaluation Authority or "authority" shall refer to the Department of Correctional Services. ~~There is in the Youth and Adult Correctional Agency a Narcotic Addict Evaluation Authority, hereafter referred to in this article as the "authority." The authority shall be composed of seven members, each of whom shall be appointed by the Governor, for a term of four years and until the appointment and qualification of his successor. Members shall be eligible for reappointment. The chairman of the authority shall be designated by the Governor from time to time. The terms of the members first appointed to the authority shall expire as follows: one on January 15, 1965, one on January 15, 1966, one on January 15, 1967, and one on January 15, 1968. The terms of the three members first appointed to the authority pursuant to amendments to this section enacted at the 1979~~

~~80 Regular Session of the Legislature shall expire as follows: one on January 15, 1983, one on January 15, 1984, and one on January 15, 1985. Their successors shall hold office for terms of four years, each term to commence on the expiration date of the term of the predecessor. The Governor shall fill every vacancy for the balance of the unexpired term.~~ The Governor may appoint a subordinate officer to the secretary under this section who shall hold office at the pleasure of the Governor. *Insofar as practicable, persons appointed to the* ~~authority~~ subordinate office *shall have a broad background in law, sociology, law enforcement, medicine, or education, and shall have a deep interest in the rehabilitation of narcotic addicts.*

*(b)* ~~Each member of the authority shall devote such time to the duties of his or her office as required for performance of his or her duties and shall be entitled to an annual salary of nine thousand five hundred dollars ($9,500) for attendance upon business of the~~

*authority. The chairman shall be entitled to an annual salary of ten thousand dollars ($10,000). In addition, each member shall be allowed actual expenses incurred in the discharge of his duties, including travel expenses.*

*(c) The authority, or its successor, shall maintain its headquarters at the California Rehabilitation Center and shall be provided with necessary office space, equipment and services from funds appropriated to the California Rehabilitation Center.*

*(d) The ~~authority~~ Hearing Administration of the Department of Correctional Services – Division of Adult Operations shall ~~meet at the center or its branches at such times as may be necessary for~~ conduct a full and ~~complete study~~ fair hearing of the cases of all patients who are certified by the ~~Director of Corrections~~ subordinate officer previously identified in subsection (a) ~~to the authority~~ as having recovered from addiction or imminent danger of addiction to such an extent that release in an outpatient status is warranted. ~~Other times and places of meetings may also be fixed by the authority. Where the authority performs its functions by meeting en banc in either public or executive sessions to decide matters of general policy at least three members shall be present, and no such action shall be valid unless it is concurred in by a majority vote of those present. The authority may meet and transact business in panels. Each authority panel shall consist of at least two members of the authority. Two members of the authority shall constitute a quorum for the transaction of business of a panel. No action shall be valid unless concurred in by a majority of the members present.~~*

*(e) Members of other similar boards may be assigned to hear cases and make recommendations to the ~~authority~~ Hearing Administration. Such recommendations shall be made in accordance with policies established by ~~a majority of the total membership of the authority~~ the Secretary of Correctional Services, with oversight by the Civilian Corrections Commission.*

*3151. Commencing January 1, 2005,~~After~~ after an initial period of observation and treatment, and subject to the rules and policies established by the ~~Director of Corrections~~ Secretary of Correctional Services, with oversight by the Civilian Corrections Commission, whenever a person committed under Article 2 or Article 3 of this chapter has recovered from his addiction or imminent danger of addiction to such an extent that, in the opinion of the ~~Director of Corrections~~ subordinate officer, release in an outpatient status is warranted, the ~~director~~ subordinate officer shall certify such fact to the ~~authority~~ Hearing Administration. If the ~~director~~ subordinate officer has not so certified within the preceding 12 months, in the anniversary month of the commitment of any person committed under this chapter his case shall automatically be referred to the ~~authority~~ Hearing Administration for consideration of the advisability of release in outpatient status. Upon any such certification by the ~~director~~ subordinate officer or such automatic certification, the ~~authority~~ Hearing Administration may release such person in an outpatient status subject to all rules and regulations adopted by the ~~authority~~ Civilian Corrections Commission, and subject to all conditions imposed by the Hearing Administration, whether of general applicability or restricted to the particular person released in outpatient status, and subject to being retaken and returned to inpatient status as prescribed in such rules, regulations, or conditions. The supervision of such persons while in an outpatient status shall be administered by the Department of ~~Corrections~~ Correctional Services . Such persons are not subject to the provisions of Penal Code Section 2600.*

~~A single member of the authority~~ A hearing administrator may by written or oral order suspend the release in outpatient status of such a person and cause him to be retaken, ~~until the next meeting of the authority~~.  The written order ~~of any member of the authority~~ shall be a sufficient warrant for any peace officer to return such persons to physical custody.

It is hereby made the duty of all peace officers to execute any such order in like manner as ordinary criminal process.

3154.  A person released in an outpatient status from the California Rehabilitation Center may, with the approval of the ~~Director of Corrections~~ Secretary of Correctional Services and the ~~Narcotic Addict Evaluation Authority~~ subordinate officer identified in Section 3150 above, voluntarily participate in a narcotic treatment program approved under Section 11876 of the Health and Safety Code. Participation in a narcotic treatment program shall not be construed to break the abstention from the use of narcotics for the purpose of Section 3200.

3157.  Commencing January 1, 2005, t~~The~~ ~~Chairman of the Narcotic Addict Evaluation Authority~~ Secretary of Correctional Services shall have the authority of a head of a department set forth in subdivision (e) of Section 11181 of the Government Code to issue subpoenas as provided in Article 2 (commencing with Section 11180) of Chapter 2 of Division 3 of Title 2 of the Government Code.  The ~~authority~~ secretary, with oversight by the Civilian Corrections Commission, shall adopt regulations on the policies and guidelines for the issuance of ~~regulations~~ subpoenas.

3158.  Notwithstanding Section 11425.10 of the Government Code, Chapter 4.5 (commencing with Section 11400) of Part 1 of Division 3 of Title 2 of the Government Code does not apply to a release hearing or other adjudication concerning rights of a person civilly committed as narcotic addicts to the custody of the ~~Director of Corrections~~ Secretary of Correctional Services conducted by the ~~Narcotic Addiction Evaluation Authority~~ Hearing Administration as discussed in this chapter.

3200.  (a) If at any time the ~~Director of Corrections~~ subordinate officer identified in Section 3150 above  is of the opinion that a person committed pursuant to Article 3 (commencing with Section 3100) while in outpatient status has abstained from the use of narcotics, other than as medically prescribed in a narcotic treatment program pursuant to Section 3154, for at least six consecutive months and has otherwise complied with the conditions of his or her release, the ~~director~~ subordinate officer shall recommend to the ~~Narcotic Addict Evaluation Authority~~ Hearing Administration that the person be discharged from the program.  If the ~~authority~~ Hearing Administration concurs in the opinion of the ~~director~~ subordinate officer, it shall discharge the person from the program.

(b) If at any time the ~~director~~ subordinate officer  is of the opinion that a person committed for a period of 24 months, or less, pursuant to Article 2 (commencing with Section 3050) while in outpatient status has abstained from the use of narcotics, other than as medically prescribed in a narcotic treatment program pursuant to Section 3154, for at least 12 consecutive months and has otherwise complied with the conditions of his or her release, or if at any time the ~~director~~ subordinate officer  is of the opinion that a person committed for a period of more than 24 months pursuant to Article 2 (commencing with Section 3050) while in outpatient status has abstained from the use of narcotics, other than as medically prescribed in a narcotic treatment program pursuant to Section 3154, for at least 16 consecutive months and has otherwise complied with the conditions of his or her

*release, the ~~director~~ subordinate officer shall so advise the ~~Narcotic Addict Evaluation Authority~~ Hearing Administration.  If the ~~authority~~ Hearing Administration concurs in the opinion of the ~~director~~ subordinate officer, it shall file with the superior court of the county in which the person was committed a certificate alleging those facts and recommending to the court the discharge of the person from the program.  The ~~authority~~ subordinate officer shall serve a copy of the certificate upon the district attorney of the county.  Upon the filing of the certificate, the court shall discharge the person from the program.  The court may, unless otherwise prohibited by law, modify the sentence, dismiss the criminal charges of which the person was convicted, or suspend further proceedings, as it deems warranted in the interests of justice.  Where the person was certified to the superior court pursuant to Section 3050 the person shall be returned to the court that certified the person, which may dismiss the original charges.  In any case where the criminal charges are not dismissed and the person is sentenced thereon, time served in custody while under commitment pursuant to Article 2 (commencing with Section 3050) shall be credited on the sentence.  The dismissal shall have the same force and effect as a dismissal under Section 1203.4 of the Penal Code, except the conviction is a prior conviction for purposes of Division 10 (commencing with Section 11000) of the Health and Safety Code.*

*3201.  (a) Except as otherwise provided in subdivisions (b) and (c) of this section, if a person committed pursuant to this chapter has not been discharged from the program prior to expiration of 16 months, the ~~Director of Corrections~~ Secretary of Correctional Services shall, on the expiration of such period, return him or her to the court from which he or she was committed, which court shall discharge him or her from the program and order him or her returned to the court in which criminal proceedings were adjourned, or the imposition of sentence suspended, prior to his or her commitment or certification to the superior court.*

*(b) Any other provision of this chapter notwithstanding, in any case in which a person was committed pursuant to Article 3 (commencing with Section 3100), such person shall be discharged no later than 12 months after his or her commitment.*

*(c) Any person committed pursuant to Article 2 (commencing with Section 3050), whose execution of sentence in accordance with the provisions of Section 1170 of the Penal Code was suspended pending a commitment pursuant to Section 3051, who has spent, pursuant to this chapter, a period of time in confinement or in custody, excluding any time spent on outpatient status, equal to that which he or she would have otherwise spent in state prison had sentence been executed, including application of good behavior and participation credit provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of the Penal Code, shall, upon reaching such accumulation of time, be released on parole under the jurisdiction of the ~~Narcotic Addict Evaluation Authority~~ department, subject to all of the conditions imposed by the ~~authority~~ Hearing Administration, and subject to the provisions of Article 1 (commencing with Section 3000) of Chapter 8 of Title 1 of Part 3 of the Penal Code.  A person on parole who violates the rules, regulations or conditions imposed by the ~~authority~~ Hearing Administration shall be subject to being retaken and returned to the California Rehabilitation Center as prescribed in such rules, regulations, or conditions and in accordance with the provisions of Sections 3151 and 3152.  At the termination of this period of parole supervision or of custody in the California Rehabilitation Center, the person shall be returned by the ~~Director~~ Secretary of ~~Corrections~~ Correctional Services to the court from which*

*such person was committed, which court shall discharge him or her from the program and order him or her returned to the court which suspended execution of such person's sentence to state prison. Such court, notwithstanding any other provision of law, shall suspend or terminate further proceedings in the interest of justice, modify the sentence in the same manner as if the commitment had been recalled pursuant to subdivision (d) of Section 1170 of the Penal Code, or order execution of the suspended sentence.  Upon the ordering of the execution of such sentence, the term imposed shall be deemed to have been served in full.*

*Except as otherwise provided in the preceding paragraph, or as otherwise provided in Section 3200, the period of commitment, including outpatient status, for persons committed pursuant to Section 3051, which commitment is subsequent to a criminal conviction for which execution of sentence to state prison is suspended, shall equal the term imposed under Section 1170 of the Penal Code, notwithstanding good time and participation credit provisions of Article 2.5 (commencing with Section 2930) of Chapter 7 of Title 1 of Part 3 of such code.  Upon reaching such period of time, such person shall be released on parole under the jurisdiction of the ~~Narcotic Addict Evaluation Authority~~ <u>department,</u> subject to all of the conditions imposed by the ~~authority~~ <u>Hearing Administration</u> and subject to the provisions of Article 1 (commencing with Section 3000) of Chapter 8 of Title 1 of Part 3 of the Penal Code.  A person on parole who violates the rules, regulations, or conditions imposed by the ~~authority~~ <u>Hearing Administration</u> shall be subject to being retaken and returned to the California Rehabilitation Center as prescribed in such rules, regulations, or conditions and in accordance with the provisions of Sections 3151 and 3152.  At the termination of this period of parole supervision or of custody in the California Rehabilitation Center the person shall be returned by the ~~Director of Corrections~~ <u>Secretary of Correctional Services</u> to the court from which he or she was committed, which court shall discharge such person from the program and order him or her returned to the court which suspended execution of the person's sentence to state prison. Such court, notwithstanding any other provision of law, shall suspend or terminate further proceedings in the interest of justice, modify the sentence in the same manner as if the commitment had been recalled pursuant to subdivision (d) of Section 1170 of the Penal Code, or order execution of the suspended sentence. Upon the ordering of the execution of such sentence, the term imposed shall be deemed to have been served in full.*

*Nothing in this section shall preclude a person who has been discharged from the program from being recommitted under the program, irrespective of the periods of time of any previous commitments.*

*3300.  There is hereby established an institution and branches, under the jurisdiction of the Department of ~~Corrections~~ <u>Correctional Services</u>, to be known as the California Rehabilitation Center.  Branches may be established in existing institutions of the ~~Department of Corrections or of the Department of the Youth Authority~~ <u>Department of Correctional Services</u>, in halfway houses as described in Section 3153, in such other facilities as may be made available on the grounds of other state institutions, and in city and county correctional facilities where treatment facilities are available. Branches shall not be established on the grounds of such other institutions in any manner which will result in the placement of patients of such institutions into inferior facilities.  Branches placed in a facility of the State Department of Mental Health<u>, or its successor,</u> shall have prior approval of the Director of Mental Health, <u>or his/her successor,</u> and branches placed in a facility of the*

State Department of Developmental Services, or its successor, shall have the prior approval of the Director of Developmental Services, or his/her successor. Commencing January 1, 2005, t~~The~~ branches in the ~~Department of the Youth Authority~~ Division of Youth Operations shall be established on order of the Secretary of ~~the Youth and Adult Correctional Agency~~ Correctional Services and shall be subject to the ~~administrative~~ policy direction of the ~~Director of the Youth Authority~~ Civilian Corrections Commission. Branches placed in city or county facilities shall have prior approval of the legislative body of the city or county. Persons confined pursuant to this section in branches established in city and county correctional facilities shall be housed separately from the prisoners therein, and shall be entitled to receive treatment substantially equal to that which would be afforded such persons if confined in the main institution of the California Rehabilitation Center.

3309. Commencing January 1, 2005, t~~The~~ ~~Director of Corrections~~ Secretary of Correctional Services shall make rules and regulations for the government of the community correctional centers in the management of their affairs, subject to the oversight of the Civilian Corrections Commission.

## C.     REVISIONS TO THE BUSINESS AND PROFESSIONS CODE

23.9. Notwithstanding any other provision of this code, commencing January 1, 2005, any individual who, while imprisoned in a state prison or other correctional institution, is trained, in the course of a rehabilitation program approved by the particular licensing agency concerned and provided by the prison or other correctional institution, in a particular skill, occupation, or profession for which a state license, certificate, or other evidence of proficiency is required by this code shall not, when released from the prison or institution, be denied the right to take the next regularly scheduled state examination or any examination thereafter required to obtain the license, certificate, or other evidence of proficiency and shall not be denied such license, certificate, or other evidence of proficiency, because of his imprisonment or the conviction from which the imprisonment resulted, or because he obtained his training in prison or in the correctional institution, if the licensing agency, upon recommendation of the ~~Adult Authority or the Department of the Youth Authority, as the case may be,~~ Department of Correctional Services finds that he is a fit person to be licensed.

# Bibliography

"2000 Standards Supplement." *American Correctional Association.* January 2000.

Alarcon, Francisco "Frank" J. "Speak Out, Myth Versus Reality on the Impact of Size in Juvenile Correctional Facilities."

Allen, Ward, Coordinating Instructor, Sacramento Unified School District. E-Mail to California Performance Review, Re: Police and Corrections Team Program Statistics. June 6, 2004.

American Association of Suicidology. *Some Facts About Suicide In The USA.* May 2004.

American College of Healthcare Executives (2003). *Hospital Executive Pay, Median Base Salary and Total Cash Compensation Table.* Hay Hospital Compensation Survey retrieved from www.ache.org. (Last visited June 4, 2004).

*Armstrong v. Wilson.* Case No. C-94-02307, United States District Court For The Northern District Of California, Permanent Injunction, Judge Claudia Wilken. December 22, 1999.

Batiuk, Mary Ellen. "The State of Post-Secondary Education in Ohio." *Journal of Correctional Education,* June 1997.

Bloomington Police Department. *Field Training Manual.* Retrieved from http://www.in-nafto.org/ftomanual.pdf. (Last visited June 4, 2004).

Blue Ribbon Commission. *CDC: Inmate Population Management.* January 1990.

Bucklen, Kristofer, Gary Zajac, and Kathleen Gnall. "Understanding and Responding to the needs of Parole Violators." *American Correctional Association,* April 2004.

California Assembly Bill. *AB 1758.* 2003.

California Assembly Bill. *AB 3000.* 2002.

California Board of Corrections. *Assessment of Regulations - Title 15.* March 2001.

California Board of Corrections. *Organizational Chart.* February 2003.

California Board of Corrections. *Technical Assistance Plan - Institutions Operational Assurance Project for the California Youth Authority.* October 2000.

California Board of Prison Terms. *Board of Prison Terms Initial Strategic Plan 1997.*

California Code of Regulation. *Title 22.*

California Code of Regulations. *Title 15*.

California Code of Regulations. *Title 2*.

California Commission on Peace Officer Standards and Training. (General Information). www.post.ca.gov/catalog/2476.htm. (Last visited June 4, 2004).

California Commission on Peace Officer's Standards and Training. *A Glimpse of the Past A Look to the Future*. 1999-2000.

California Community Colleges Chancellor's Office. (General Information). <www.ccccc.edu> (Last visited May 16, 2004).

California Correctional Peace Officers Association. (General Information). www.ccpoa.org. (Last visited May 17, 2004).

California Correctional Peace Officers Association. *Bargaining Unit 6 Contract Information - Agreement Between the State of California and CCPOA.* July 2001-2006.

California Correctional Peace Officers Association. *Peacekeeper Magazines.* Fall 2003, February 2004.

California Department of Corrections, Information Systems Division. *Youth and Correctional Agency Information Technology Statement Form from C. Quinlan, CIO*. January 2003.

California Department of Corrections, Information Technology Executive Committee. *Charter and By-laws.* April 19, 2002.

California Department of Corrections, Legal Affairs Division. *Pending Employment Litigation Cases.* 2003-2004.

California Department of Corrections, Legal Affairs Division. *Status and Nature of State Personnel Board Cases.* Fiscal Years 2000-2003.

California Department of Corrections, Offender Information Services Branch. *Projections Process Presentation.*

California Department of Corrections, Offender Information Services Branch. *Population Projections.* Spring 2004.

California Department of Corrections. (General Information). http://www.corr.ca.gov. (Last visited April 20, 2004).

California Department of Corrections. *Actual vs. Spring 2004 Projections.* March 17, 2004.

California Department of Corrections. *Annual Evaluation Report Fiscal Year 2002-2003. Grants to States for Workplace and Community Transition Training for Incarcerated Youth Offenders Program.*

California Department of Corrections. *Annual Report of Citizen's Complaints Against Peace Officers.* 2002.

California Department of Corrections. Basic Correctional Officers Academy Lesson Plan. *Use-of-Force Policy.* (Confidential, not for public distribution).

California Department of Corrections. *Bridging Program Mission Statement.* January 2004.

California Department of Corrections. *Budget Change Proposal for Fiscal Year 2003-04, Violence Control Program.*

California Department of Corrections. *California Correctional Facility Growth.* March 2004.

California Department of Corrections. *California Prisoners and Parolees 2002.*

California Department of Corrections. *California Rehabilitation Center Closure Analysis.* January 2004.

California Department of Corrections. *Characteristics of the Inmate Population.* February 2004.

California Department of Corrections. *Coleman Order.* September 1995.

California Department of Corrections. *Comparison of Management Strategies-Reducing Unnecessary Inmate Litigation.* California Department of Corrections Executive Symposium. October 1999.

California Department of Corrections. *Corrections and Law Enforcement Governor's Budget "A" proposed, 2004-2005.*

California Department of Corrections. *Departmental Overview Guide.*

California Department of Corrections. *Facts and Figures, Second Quarter 2004.* <www.corr.ca.gov/CommunicationsOffice/facts_figures.asp>. (Last visited June 2, 2004).

California Department of Corrections. *Felon Releases to Parole by Sex: Calendar Years 1983-2003 (Draft).* March 2004.

California Department of Corrections. *General Corrections Review of the California Youth Authority.* December 2003.

California Department of Corrections. *Governor's Action Request, Spring 2004 Inmate and Parolee Population Projections.* March 2004.

California Department of Corrections. *Headquarters Directory*. August 2003.

California Department of Corrections. *Historical Trends: 1982-2002*. May 2002.

California Department of Corrections. *Ideas on Improving California's Parole System*. Speakers: G. Kevin Carruth - Agency Undersecretary, Richard Rimmer - Deputy Director, Parole & Community Services Division, Sharon Jackson - Regional Parole Administrator, Steve Goya - Regional Parole Administrator, Dr. Sheldon Zhang - California State University, San Marcos. March 16, 2004.

California Department of Corrections. *Information About Community Re-Entry Bridging Program. (*Memorandum dated May 7, 2004, from Education and Inmate Programs Unit).

California Department of Corrections. *Inmate Appeals Activity for CDC Institutions.* Fiscal Year 2002 -2003.

California Department of Corrections. *Institutions Telephone Manual.*

California Department of Corrections. *Instructor Vacancy Report.* April 2004.

California Department of Corrections. *Joint Venture Program* (Analysis prepared by Susan Jacobsen).

California Department of Corrections. *Joint Venture Program* (Document prepared by J.R. Griggs).

California Department of Corrections. *Legislative Analyst Requests 4 & 7: Direct Discharge From Prison or Early Release from Parole for Non-Serious, Non-Violent and Non-Sex Registrant Offenders Who Have Specified "Clean Time on Parole."* December 16, 2003.

California Department of Corrections. *Legislative Analyst Requests 6: Release Specified Non-Serious, Non-Violent Offenders, Age 60 and Older, to Parole.* December 16, 2003.

California Department of Corrections. *Mental Health Service Delivery System Study*. February 1993.

California Department of Corrections. *Monthly Report of Population as of Midnight April 30, 2004.* May 2004.

California Department of Corrections. *New Parole Model/Recidivism Reduction Initiative. (Briefing document)*. February 2004.

California Department of Corrections. *Operations Manual, Draft, Article 25, Section 52100.21. Use-of-Force*. 2004.

California Department of Corrections. *Operations Manual, Draft, Chapter 8, Article 45. Parole Use-of-Force Policy*. 2004.

California Department of Corrections. *Operations Manual*.

California Department of Corrections. *Organizational Chart*.

California Department of Corrections. *Parole Counts for Parole Statuses by Region and Unit,* May 5, 2004. <www.corr.ca.gov/OffenderInfoServices/Reports/WeeklyWed/PAROLE/PAROLEd040505.pdf>

California Department of Corrections. *Peer Interactive Management Training Manual*. 1994.

California Department of Corrections. Pelican Bay State Prison. *Use of Force Policy (Remedial Plan)*. Revised July 2003.

California Department of Corrections. *Policies and Procedures for the New Parole Model (Draft)*. January 2004.

California Department of Corrections. *Population Projection Briefing*. April 9, 2004.

California Department of Corrections. *Prison Bed Deactivation Report*. March 2004.

California Department of Corrections. *Prison Census Data*. December 2003.

California Department of Corrections. *Projection Report*. Spring 2004.

California Department of Corrections. *Rate of Felon Parolees Returned to California Prisons: Calendar Year 2002*. May 2003.

California Department of Corrections. *Recidivism Rates Within One and Two Year Follow-Up Periods - Released From Prison for First Time in 2001*. March 2001.

California Department of Corrections. *Spring 2004 Population Projection Report-Assumptions*.

California Department of Corrections. *Spring 2004 Population Projections: 2004-2009*. March 2004.

California Department of Corrections. *Statewide Offender Management System Overview Information*.

California Department of Corrections. *Summary of Projection Errors, Spring 1993-2003*.

California Department of Corrections. *Vocational and Academic Program Summary*. October 2003.

California Department of Corrections. *Weekly Comparison of Actual and Projected Population*. May 10, 2004.

California Department of Corrections. *Weekly Report of Population*. March 24, 2004.

California Department of Finance. *2004/05 Governor's Budget*. January 2004.

California Department of Finance. *2004/05 Salaries and Wages Supplement*. February 2004.

California Department of Personnel Administration. *51st Edition of the California State Civil Service Pay Scales.* <http://www.dpa.ca.gov> (Last visited May 14, 2004).

California Department of Youth Authority, Institutions & Camps Branch. *Spring Finance Letter.* "Civil Rights for Institutionalized Persons Act Action Plan." Fiscal Year 2004-05.

California Department of Youth Authority. *Budget Change Proposal Institutions and Camps Branch Fiscal Year 2003-04, Fiscal Year 2004-05*. March 9, 2004.

California Government Code.

California Highway Patrol. (General Information). http://www.chp.net/stoappl.htm. (Last visited April 20, 2004).

California Highway Patrol. *Command Management Manual*.

California Performance Review. Conference: *Performance Review and Management.* Speakers: Chon Gutierrez - Co-Executive Director of California Performance Review, Henry Olson - Executive Director, Manhattan Institute for Policy Research, Donna Arduin - Director California Department of Finance, Carl DeMaio - President of The Performance Institute. May 20, 2004.

California Performance Review. Forum: *Day to Day Operations at Institutions. Scope of Responsibility of Wardens.* Speakers: California Department of Corrections Wardens John Dovey - California Institution for Women, Scott Kernan - Mule Creek State Prison, Lori DiCarlo - California Institution for Men, Gail Lewis - Retired, Anthony Newland – Retired, Robert Ayers – Retired. April 1, 2004.

California Performance Review. Forum: *Employee and Inmate Litigation Management and Disciplinary Structure*. Speakers: Kathleen Keeshen - Chief Counsel, Legal Affairs California Department of Corrections, Debra Ashbrook - Chief Counsel, California Youth Authority, Terry Farmer - Chief Counsel, Board of Prison Terms, David Beales - Chief Counsel, Prison Industry Authority. April 20, 2004.

California Performance Review. Forum: *Recommendations to Improve California Department of Corrections.* Speaker: Donald Specter, Director Prison Law Office. April 15, 2004.

California Performance Review. Seminar: *Being an Agent of Change in Transforming Organizations.* Speaker:  Francis Hesselbein, CEO of Leader to Leader Institute. March 2003.

California Senate Advisory Commission on Cost Control in State Government. *Utilizing Technology in the Department of Corrections.* August 2002.

California Senate Select Committees on Government Oversight and the California Correctional System. *Briefing Paper.*  January 16, 2004.

California Senate Select Committees on Government Oversight. *State Employee Discipline and the Personnel Board: Is Justice Served?* March 22, 2004.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  Its Plans to Build a New Condemned Inmate Complex at San Quentin Are Proceeding, but Its Analysis of Alternative Locations and Costs Was Incomplete.* March 2004.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  A Shortage of Correctional Officers, Along With Costly Labor Agreement Provision, Raises Both Fiscal and Safety Concerns and Limits Management's Control.* July 2002.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  Its Fiscal Practices and Internal Controls Are Inadequate to Ensure Fiscal Responsibility.* November 2001.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  Poor Management Practices Have Resulted in Excessive Personnel Costs.* January 2000.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  The Cost of Incarcerating Inmates in State-run Prisons is Higher Than the Department Published Cost.* September 1998.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  Though Improving, the Department Still Does Not Identify and Serve All Parolees Needing Outpatient Clinic Program Services, but Increased Caseloads Might Strain Clinic Resources.* August 2001.

California State Auditor, Bureau of State Audits. *California Department of Corrections:  It Needs to Ensure That All Medical Service Contracts It Enters Are in the State's Best Interest and All Medical Claims It Pays Are Valid.* April 2004.

California State Auditor, Bureau of State Audits. *California Law Enforcement And Correctional Agencies:  With Increased Efforts, They Could Improve the Accuracy and Completeness of Public Information on Sex Offenders.* August 2003.

California State Auditor, Bureau of State Audits. *Early Intervention Program:  Flaws Found in the 1997 Report on the Benefits of Early Intervention.* April 1998.

California State Auditor, Bureau of State Audits. *Investigations of Improper Activities by State employees*. July 2003 through December 2003.

California State Auditor, Bureau of State Audits. *Prison Industry Authority:  Has failed to Take Significant Corrective Action on Many State Auditor Recommendations*. August 1997.

California State Auditor, Bureau of State Audits. *Prison Industry Authority:  Its Outside Purchase of Goods and Services is Neither Well Planned nor Cost Effective*. September 1998.

California State Auditor, Bureau of State Audits. *Prison Industry Authority:  Statutory and Cost Control Problems Adversely Affect the State*. April 1996.

California State Auditor, Bureau of State Audits. *State of California:  Its Containment of Drug Costs and Management of Medications for Adult Inmates Continues to Require Significant Improvements*. January 2002.

California State Auditor, Bureau of State Audits. *Wasco State Prison:  Failure to Proactively Address Problems in Critical Equipment, Emergency Procedures, and Staff Vigilance Raises Concerns About Institutional Safety and Security*. October 1999.

California State University, Sacramento. *Correctional Peace Officer Training – California Department of Corrections and California Youth Authorit*y. By Miki Vohryzek-Bolden, Ph.D., Sue Cote, Ph.D., and Peggy Giannoni, Ph.D. October 2001.

California State University, San Marcos Foundation. *An Evaluation of The California Preventing Parolee Crime Program.* Sheldon Zhang Ph.D, Principal Investigator. December 2003.

California Welfare and Institutions Code.

California Youth and Adult Correctional Agency. *Informational Forum.* Speakers: Morris Thigpen - Director, National Institute of Corrections in Mississippi and Alabama, Richard Stalder - Secretary of Public Safety & Corrections, Gary Johnson - Executive Director of the Texas Department of Criminal Justice, Joe Lehman - Secretary of Washington State Department of Corrections, James Gomez - Former Director of the California Department of Corrections, John Vanyur - Senior Deputy Assistant Director of the Federal Bureau of Prisons.  April 27, 2004.

California Youth and Adult Correctional Agency. *Transition Document.* November 4, 2003.

California Youth Authority, Parole Services and Community Corrections Branch. *Branch Overview Revision April 2004.*

California Youth Authority. (General Information). http://www.cya.ca.gov/ (Last visited April 20, 2004).

California Youth Authority. *California Department of the Youth Authority, Strike Team Report*. May 2000.

California Youth Authority. *Description of Pending Litigation*. 2002.

California Youth Authority. *Draft Major Capital Outlay Five Year Plan FY 2004/09*. Vol. I of IV.

California Youth Authority. *Institutions and Camps Manual*. "Use of Force Draft Policy." May 2004.

California Youth Authority. *Mental Health Treatment Program Plan*. 2003.

California Youth Authority. *Parolee Rights Handbook* (Rewrite). Reggie Sears, PA III. October 2003.

California Youth Authority. *Population Movement Summary*. February 2004.

California Youth Authority. *Population Movement Summary*. February 2002-03.

California Youth Authority. *Recidivism Reaches Lowest Level in Two Decades*. (Resource Library). 1986.

California Youth Authority. *Report on Education Funding Levels Submitted in Response to the Supplemental Report of the 2002 Budget Act – Item 5460-011-0001*. November 2002.

California Youth Authority. Reports & Materials. *A Review of Gang Programs in the CYA*. July 2003.

California Youth Authority. Reports & Materials. *Comparison of CYA Institution and Parole Populations, Yearly*. 1994-2003.

California Youth Authority. Reports & Materials. *Consolidation Guide*. April 25, 2003.

California Youth Authority. Reports & Materials. *Consolidation Plan Report to the Legislature*. November 2002.

California Youth Authority. Reports & Materials. *CYA Administrative Manual*. December 2003.

California Youth Authority. Reports & Materials. *CYA Basic Academy Course Catalog*. March 2004.

California Youth Authority. Reports & Materials. *CYA Education Manual*. December 2003.

California Youth Authority. Reports & Materials. *CYA Institutions and Camps Manual*. December 2003.

California Youth Authority. Reports & Materials. *CYA Organizational Charts.* March 2004.

California Youth Authority. Reports & Materials. *CYA Supervisors Training Course Catalog.* March 2004.

California Youth Authority. Reports & Materials. *Facility Closure Advisory Commission Member List.* March 1, 2004.

California Youth Authority. Reports & Materials. *Facility Profiles.* February 1, 2004.

California Youth Authority. Reports & Materials. *Institutions and Camps Staffing.* Fiscal Years 2003 - 2005.

California Youth Authority. Reports & Materials. *Parole Services Manual.* December 2003.

California Youth Authority. Reports & Materials. *Population Movement Summary.* December 2003.

California Youth Authority. Reports & Materials. *Spring 2004 Population Projections through 2013 - Proposal to Lower Jurisdiction to Age 22 effective January 1, 2005.* March 2004.

California Youth Authority. Reports & Materials. *Ward Information and Parole Research Bureau, Characteristics of CYA Population.* December 2003.

California Youth Authority. *The Impact of Living Unit Size in Youth Training Schools.* April 1971.

California Youth Authority. *The Youth Authority Sex Offender Program.* April 2003.

California Youth Authority. *Today.* "Director's Corner." September 1999.

California Youth Authority. *Updated Population Projections for Fiscal Years 2003-04 through 2004-05.*

California Youth Authority. *Ward Grievances, Heman G. Stark.* 2002.

California Youth Authority. *Ward Grievances, N.A. Chaderjian.* 2002.

California, Juvenile Justice Reform Workgroup. *Department of the Youth Authority Detention Information by Year of Admission.* 2003.

California, Juvenile Justice Reform Workgroup. *Department of the Youth Authority Population Projections.* 2004

California, Juvenile Justice Reform Workgroup. *Detention Information, Age of Admission by Sex, Court, Year of Admission.* March 2004.

California, Juvenile Justice Reform Workgroup. *Detention Information, County of Commitment by Sex, Court, Year*. March 2004.

California, Juvenile Justice Reform Workgroup. *Juvenile Arrest and Disposition Information*. 2002.

California, Juvenile Justice Reform Workgroup. *Juvenile Arrest/Disposition Information*. 2002.

California, Juvenile Justice Reform Workgroup. *Participant's Notes*. April 1 2004.

California, Juvenile Justice Reform Workgroup. *Participant's Notes*. March 2004.

California, Juvenile Justice Reform Workgroup. *Population Projections*. March 2004.

California, Juvenile Justice Reform Workgroup. *Reform Information*. March 2004.

California, Juvenile Justice Reform Workgroup. *Spring 2004 Population Projection Highlight*. Fiscal Years 2003 - 2008.

California, Juvenile Justice Reform Workgroup. *State Prison Population by Juveniles*. 1989 - 2003.

California, Office of the Inspector General. *Administrative Review into Allegations of Inappropriate Use of Inmates at the Konocti Conservation Camp No. 27*. April 2001.

California, Office of the Inspector General. *Audit of the Folsom Community Correctional Facility*. January 2002.

California, Office of the Inspector General. *Audit of the Prison Industry Authority Optical Program at the Richard J. Donovan Correctional Facility*. May 2000.

California, Office of the Inspector General. *Audit of the Salinas Valley State Prison Inmate Appeal and Inmate Disciplinary Processes*. March 2000.

California, Office of the Inspector General. *Audit of the Sierra Conservation Center Inmate Day Labor Program*. May 2000.

California, Office of the Inspector General. *Central California Women's Facility Chowchilla, Warden Teena Farmon*. February 2000.

California, Office of the Inspector General. *Follow-up Review of the Inmate Appeal and Inmate Disciplinary Processes, Salinas Valley State Prison*. September 2003.

California, Office of the Inspector General. *Follow-up Review of the Board of Prison Terms*. April 2002.

California, Office of the Inspector General. *Investigation of the Richard A. McGee Correctional Training Center and Basic Correctional Officer Academy*. May 2000.

California, Office of the Inspector General. *Management Review Audit - <u>Heman G. Stark Youth Correctional Facility, Follow-up Review - Superintendent Xavier Ruiz</u>*. July 2002.

California, Office of the Inspector General. *Management Review Audit - <u>Fred C. Nelles Youth Correctional Facility - Superintendent Vivian Crawford</u>*. January 2001.

California, Office of the Inspector General. *Management Review Audit - <u>High Desert State Prison - Acting Warden David Runnels</u>*. November 2001.

California, Office of the Inspector General. *Management Review Audit - Office of Internal Audits, California Youth Authority*, July 2003.

California, Office of the Inspector General. *Management Review Audit - California Substance Abuse Treatment Facility and State Prison - Warden Derral G. Adams*. January 2003.

California, Office of the Inspector General. *Management Review Audit - <u>California State Prison, Solano - Warden Thomas L. Carey</u>*. March 2003.

California, Office of the Inspector General. *Management Review Audit - <u>Fred C. Nelles Youth Correctional Facility, Follow-up Review - Superintendent Vivian Crawford</u>,* July 2002.

California, Office of the Inspector General. *Management Review Audit - <u>Leo Chesney Community Correctional Facility, Live Oak - Facility Director Susan Hickey</u>*. October 2001.

California, Office of the Inspector General. *Management Review Audit - <u>California Institute for Men, Chino - Warden Larry Witek</u>*. February 2000.

California, Office of the Inspector General. *Management Review Audit - <u>Valley State Prison for Women, Chowchilla - Warden Raymond Middleton</u>*. January 2001.

California, Office of the Inspector General. *Management Review Audit - Superintendent Allison Nicholson, Preston Youth Correctional Facility*. February 2000.

California, Office of the Inspector General. *Management Review Audit - Superintendent Eugenia Ortega*. June 2002.

California, Office of the Inspector General. *Management Review Audit - Superintendent Perry Brooks, Southern Youth Correctional Reception Center and Clinic*. June 2003.

California, Office of the Inspector General. *Management Review Audit - Superintendent Xavier Ruiz, Heman G. Stark Correctional Facility*. October 2000.

California, Office of the Inspector General. *Management Review Audit - Warden Cheryl Pliler, California State Prison Sacramento*. September 2000.

California, Office of the Inspector General. _Management Review of the Audit Functions of the California Department of Corrections Office of Compliance_. October 2002.

California, Office of the Inspector General. _Program Review of CYA Facilities Paso, Nelles, Stark, Chaderjian, Preston and Southern Youth Corrections Reception Center and Clinic_. December 2000.

California, Office of the Inspector General. _Review of Correctional Facility Mail Processing, California Department of Corrections_. July 2002.

California, Office of the Inspector General. _Review of Inmate Dental Care at High Desert State Prison_. June 2000.

California, Office of the Inspector General. _Review of the Board of Prison Terms_. January 2003.

California, Office of the Inspector General. _Review of the Board of Prison Terms_. March 2000.

California, Office of the Inspector General. _Review of the CDC Identix Touchlock Fingerprint Identification System_. July 2001.

California, Office of the Inspector General. _Review of the Employee Disciplinary Process, California Department of Corrections_. March 2002.

California, Office of the Inspector General. _Review of the Implementation of Welfare and Institutions Code Section 1732.8 Providing for Housing California Youth Authority Wards in Department of Corrections Facilities_. February 2003.

California, Office of the Inspector General. _Review of the Inmate Appeals Branch, California Department of Corrections Office of Compliance_. February 2001.

California, Office of the Inspector General. _Review of the Inmate Appeal Process - California Rehabilitation Center_. August 2000.

California, Office of the Inspector General. _Review of the Inmate Appeal Process - California Substance Abuse Treatment Facility and State Prison, Corcoran_. February 2001.

California, Office of the Inspector General. _Review of the Inmate Appeal Process Deuel Vocational Institution_. September 2000.

California, Office of the Inspector General. _Review of the Intensive Treatment Program, California Youth Authority_. November 2002.

California, Office of the Inspector General. _Review of the Process Used by the California Youth Authority and the Youthful Offender Parole Board to Establish Ward Program Requirements_. December 2002.

California, Office of the Inspector General. _Special Review of the Medical Contracting Process, Health Care Services Division, California Department of Corrections_. October 2002.

California, Office of the Inspector General. _Special Review of the Local Assistance Program, Parole and Community Services Division, California Department of Corrections_. January 2002.

California, Office of the Inspector General. _Special Review of the Office of Investigative Services - California Department of Corrections._ October 2001.

California, Office of the Inspector General. _Survey of CDC Pharmaceutical Expenditures._ July 2003.

California, Office of the Inspector General. _Survey of Education Programs at Level IV Institutions._ July 2003.

California, Office of the Inspector General. _Youthful Offender Program_. September 2003.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Challenges of Prisoner Re-Entry and Parole in California." By Joan Petersilia, Ph.D. June 2000.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "A Crime Control Rationale for Reinvesting in Community Corrections." By Joan Petersilia, Ph.D. December 1995.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Crime and Justice, Intensive Probation and Parole." By Joan Petersilia, Ph.D. 1993.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Diverting Non-Violent Prisoners to Intermediate Sanctions." By Joan Petersilia, Ph.D.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Hard Time: Ex-Convicts Returning Home After Prison." By Joan Petersilia, Ph.D. September 2003.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Intermediate Sanction Program." By Joan Petersilia, Ph.D.

California, Policy Research Center, University of California & University of Chicago. _Prison and Parole Reform_: "Minimizing Harm as a Goal for Crime Policy in California." By Joan Petersilia, Ph.D. February 1997.

California, Policy Research Center, University of California & University of Chicago. *Prison and Parole Reform*: "Prison Crime and Justice, Parole Re-Entry in the U.S." By Joan Petersilia, Ph.D. 1997 & 1999.

California, Policy Research Center, University of California & University of Chicago. *Prison and Parole Reform*: "Probation and Parole." By Joan Petersilia, Ph.D.

California, Policy Research Center, University of California & University of Chicago. *Prison and Parole Reform*: "Work Release: Recidivism and Corrections Costs in Washington." By Joan Petersilia, Ph.D. December 1996.

California, Prison Industry Authority. *Fiscal Year 2002-2003 Annual Report*. November 2003.

California, Prison Industry Authority. *Inmate Employability Program Report*. April 29, 2004.

Capital Center for Government Law and Policy. (March 2000). "Proposition 21." Retrieved from www.mcgeorge.edu, (Last visited June 4, 2004).

Center on Juvenile and Criminal Justice. *Aftercare as Afterthought Reentry and the CYA*. By M. Byrnes, D. Macallair, and D. Shorter. August 2002.

Center on Juvenile and Criminal Justice. *Cutting Correctly: New Prison Policies for Times of Fiscal Crisis*. 2001.

*Coleman v. Wilson.* Case No. S-90-0520 United States District Court for the Eastern District of California, Findings and Recommendations, Magistrate Judge John Moulds. June 6, 1994.

Correctional Education Association, Management & Training Corporation Institute. *Education Reduces Crime, Three-State Recidivism Study*. February 2003.

Correctional Educational Association News and Notes. "Correctional Education: Success and Hope." By Dr. H.C. Davis. October 1999.

Correctional Service of Canada. *Mission of the Correctional Service of Canada*. Ottawa, Ontario. March 2001.

Criminal Justice Institute. *South Salem New York Study of the Connecticut Department of Corrections Final Report*. December 14, 1990.

Criminal Justice Institute. *Study of the Connecticut Department of Corrections Final Report*. December 1990.

Criminal Justice Institute. *The Corrections Yearbook Adult Corrections 2002*. Middletown, Connecticut. 2002.

Deloitte Research and the Ash Institute for Democratic Governance and Innovation at the John F. Kennedy School of Government at Harvard University, "*Government by Network - The New Public Management Imperative.*" April 2004.

Department of New York Corrections. "Field Training Program." http://www.cpdny.org/Administration/field.html. (Last visited June 4, 2004).

Federal Bureau of Prisons. *About the Federal Bureau of Prisons.* July 2001.

Federal Bureau of Prisons. *Correction Trends for the 21st Century.* By Peter Carlson.

Federal Bureau of Prisons. *Cultural Anchors / Core Values.* < http://www.bop.gov/> (Last visited June 4, 2004).

Federal Bureau of Prisons. *Inmate Health Care Manual.* October 1997.

Federal Bureau of Prisons. *Mission Statement.* <http://www.bop.gov/> (Last visited June 04, 2004).

Federal Bureau of Prisons. *Organizational Chart.* December 12, 2003.

Federal Bureau of Prisons. *Program Statement.* August 21, 2002.

Federal Bureau of Prisons. *Recidivism Among Federal Prisoners Released in 1987.* August 4, 1994.

Federal Bureau of Prisons. *Salary Table 2004-LA.* Facsimile received May 27, 2004.

Federal Bureau of Prisons. *Vision Statement.* <http://www.bop.gov/> (Last visited June 4, 2004).

Federal Special Master. *Draft Report - CDC Investigation and Employee Discipline.* January 2004.

Florida Department of Corrections. *Analysis of the Impact of Inmate Programs on Recidivism.* January 2001.

Fox Systems Incorporated. CDC – HCSD. *Alternatives for Improvement.* December 2001.

Fox Systems Incorporated. CDC – HCSD. *Current Pharmacy Services Processes.* November 2001.

Fox Systems Incorporated. CDC – HCSD. *Plan for Delivering Pharmaceutical Services.* June 2002.

Fox Systems Incorporated. CDC – HCSD. *Summary of Prior Reviews and Data Collections on Pharmacy Services.* October 2001.

Fox, Kelly and Lyons, Donna. Legislative Brief: *Confinement Conditions and Services*; Vol. 11, No. 5, ncsl.org. January 2003.

Galt Training Academy. Field Lieutenants In-Service Training. *7K Replacement Training Strategy Forum.* March 26, 2004.

Georgia Department of Juvenile Justice. *Education Program Review of CYA.* December 2003.

Gordon, Robert and O'Rourke, Thomas. "Education Program Review of California Youth Authority, Deputy Attorney General, California Department of Justice." 2002.

Governors Budget Summary. *2004-2005, Personnel Years and Salary costs.* <www.dof.ca.gov/HTML/BudgetSummary04/schds_04.pdf.> (Last visited June 4, 2004).

*Hudson v. McMillian.* 112 S. Ct. (1992).

Institute on Crime, Justice and Corrections at The George Washington University. *Reliability and Validity Study of the LSI-R Risk Assessment Instrument.* January 2003.

International Organization for Standardization. "*Quality Management Principles"* <www.iso.ch/iso/en/iso9000-14000/iso9000/qmp.html> (Last visited May 4, 2004)

Jennings, Stephen A., Assistant Chief Counsel (Acting), Employment Law Unit, Legal Affairs Division, California Department of Corrections. Memorandum to Joyce Hayhoe, Deputy Secretary (Acting), Legislation, Youth and Adult Correctional Agency. December 18, 2003.

Jerry Thomas Consulting. *CYA - Evaluation of Sex Offender Programs.* September 2003.

Juvenile Forensic Evaluation Resource Center. *States' New Blended Sentencing.* By Richard Redding, PhD. 2000. <http://www.ilppp.virginia.edu>

Juvenile Justice Update. *Word From Washington.* By Marion Mattingly. December/January 2003.

Kalb, L. "Trained to Supervise; Many companies stress in-house programs," *Sacramento Bee.* March 16, 2004.

Kelso, J. Clark, Chief Information Officer, State of California. *Government, Technology Conference Sacramento.* "21st Century Government." May 12, 2004. <http://www.cio.ca.gov/PDFs/SCIO_GTC-04_Keynote.pdf> (Last visited June 23, 2004).

Krisberg, Barry Ph.D. *General Correctional Review of California Youth Authority.* December 2003.

La Marre, Madie and Puisis, Michael, D.O. *Review of Health Care Services in the CYA.* August 2003.

Legislative Analyst Office. *1999 ~ 2000 Budget Analysis.*

Legislative Analyst Office. *2000 ~ 2001 Budget Analysis.*

Legislative Analyst Office. *2001 ~ 2002 Budget Analysis.*

Legislative Analyst Office. *2002 ~ 2003 Budget Analysis.*

Legislative Analyst Office. *2003 ~ 2004 Budget Analysis.*

Legislative Analyst Office. *2004 ~ 2005 Budget Analysis.*

Legislative Analyst Office. *A Review of the California Youth Authority's Infrastructure.* By Chris Guyer. May 2004.

Leonard, Lee. *Sentencing Bill On Youth Crime Awaits Action.* The Columbus Dispatch. May 2000.

Little Hoover Commission. *Back to the Community: Safe & Sound Parole Policies.* November 2003.

Little Hoover Commission. *Beyond Bars, Correctional Reforms to Lower Prison Cost and Reduce Crime.* January 1998.

Little Hoover Commission. *Boot Camps: An Evolving Alternative to Traditional Prisons.* January 1995.

Little Hoover Commission. *Public Hearing. "Women in Parole."* Speaker: Barbara Bloom MD.

Little Hoover Commission. *Putting Violence Behind Bars: Redefining the Role of California Prisons.* January 1994.

Los Angeles Police Department. *Dr. Greene Lessons Learned Training Material.* May 2004.

Los Angeles Sheriff's Office. *Risk Management Bureau Manual.* October 1999.

Macpherson, Sherry, PhD. "Clinicians and Custody Staff." *American Correctional Association.* April 2004.

*Madrid v. Gomez.* Case C90-3094 TEH, U.S. District Court of California, Findings of Fact, Chief Judge Thelton E. Henderson. January 10, 1995.

Marin County. "Marin County Juvenile Drug Court Participant Handbook." (no date).

McGeorge School of Law, Conference, *Sentencing Practices and Policy*, Speakers: Michael Vitiello - McGeorge School of Law, Frank Zimring - Hastings School of Law, Jonathan Turley - George Washington School of Law, Erwin Chemerinsky - USC School of Law, Kevin Reitz - University of Colorado, Jerome McGuire - Senate Public Safety Committee, Clark Kelso - California Performance Review. April 16, 2004.

Memorandum of Understanding by and Between the United States and the State of Nevada. February 26, 2004.

Michigan, Bureau of Forensic Mental Health Services. *Michigan Corrections Mental Health Program*. May 2002.

Milton Marks Commission on State Government Organization and Economy. *Parole Realignment Model*. April 2004.

Missouri Department of Corrections. (General Information). <http://www.corrections.state.mo.us/division/hservice/inservice> (Last visited June 4, 2004).

Missouri, Department of Social Services, Division of Youth Services. *Programs and Services/Aftercare*. January 2001.

Missouri, Department of Social Services, Division of Youth Services. *Programs and Services/Overview*. October 2003.

Montana Department of Corrections. *Field Training Officer Program*. http://www.cor.state.mt.us/resources/training.asp. (Last visited June 4, 2004).

Mullen, Rod, et.al., *California's First Prison Therapeutic Community: A 10-Year Review*. March/April 2001.

National Center for Juvenile Justice. *National Overview*. Bozynski & Griffin. April 2004.

National Center for Juvenile Justice. *Organization of Juvenile Delinquency Services*. April 2003.

National Center for Juvenile Justice. *Technical Assistance to the Juvenile Court Special Project Bulletin*. By Patrick Griffin. October 2003.

National Criminal Justice Reference Service. "In the Spotlight Drug Courts-Summary." http://www.ncjrs.org/drug_courts/summary.html. (Last visited June 4, 2004).

National Criminal Justice Reference Service. *From Prison Safety to Public Safety: Innovations in Offender Reentry*. By Faye Taxman, Ph.D., Douglas Young, M.S., James M. Byrne, Ph.D., Alexander Holsinger, Ph.D., and Donald Anspach, Ph.D. March 25, 2002.

National Criminal Justice Reference Service. *Reentry Courts process Evaluation (Phase 1), Final Report*. By Christine Lindquist, Jennifer Hardison and Pamela K. Lattimore. October 2003.

National Governors Association Center. *Reaching New Heights - Turning Around Low-Performance Schools*. August 2003.

National Institute for Literacy. *State Correctional Education Programs - State Policy Update*. February 2004.

National Institute for Literacy. *State Correctional Education Programs - State Policy Update.* March 2002.

National Institute of Corrections, Information Training Center. *Risk Management Organization.* May 2004.

National Institute of Corrections. (General Information). <http://nicic.org/Services/TrainingServices.aspx>. (Last visited June 4, 2004).

National Institute of Corrections. *Prisoner Intake Systems: Assessing Needs and Classifying Prisoners.* February 2004.

National Institute of Ethics. *Police Code of Silence Facts Revealed.* By Neal Trautman. <http://www.aele.org/loscode2000.html> (Last visited March 24, 2004),

National Institutes of Health (National Institute on Drug Abuse). *Therapeutic Community:  What is a Therapeutic Community?*  August, 2002.

"New Prisons Chief Says Corrosive 'Code of Silence' Must End." *Associated Press*. Retrieved March 23, 2004 from <http://www.nbc4.tv/news/2919779/detail.html>

Office of Justice Programs. *Second Reentry Courts Initiative Cluster Meeting.* September 28, 2000. http://www.ojp.usdoj.gov/nij/reentrycourtstrans/reentry. (Last visited June 4, 2004).

Office of Juvenile Justice and Delinquency Prevention. *Juvenile Justice Reform Initiatives in the States 1994-1996.*

Oklahoma Department of Corrections. (General Information). <www.doc.state.ok.us/Training>. (Last visited June 4, 2004).

Pace Law School. *Prison Reform-Offender Reentry: Partnership Between Courts and Corrections.* Paper by Symposium. October 2003.

Parkinson, Anne F., and Stephen J. Steurer. "Overcoming Obstacles in Effective Correctional Instruction." *American Correctional Association.* April 2004.

Parole Services and Community Corrections Branch North and South Region Telephone Contact List Dated January 2004.

Parole Services and Community Corrections Branch. Document provided by Mike Cardoff, CYA P.A. III. May 2004.

Peele, Thomas. "Judge Losing Patience on Guards." *Contra Costa Times.* March 10, 2004.

Pennsylvania Department of Corrections, Division of Planning, Research, Statistics, & Grants. *Finding a Balance: Quality, Cost Effective Treatment Programs*. May 2003.

Perez, Margarita, Chairwoman, Board of Prison Terms.  Letter to Ron Frantz, California Performance Review, April 5, 2004. "Revocation Proceedings Information for Calendar Year 2002 and FY 2002/2003," "Life Prisoner Hearing and Decision Information for FY 2002/2003," and "Life Prisoner Hearing and Decision Information for Calendar Year 2003."

Petersilia, Joan, Ph.D., "Reforming Probation and Parole in the 21st Century." *American Correctional Association*, 2002.

Police Executive Research Forum. *Repeat Offenders*. By W. Spelman. Washington D.C. 1990.

Policy Research Associates Inc. *Designing an Intensive Aftercare Program for High Risk Juveniles*. Altschuler, D. and T. Armstrong. 1990.

Policy Research Associates Inc. *Intensive Aftercare for High-Risk Juveniles: A Community Care Model*, Altschuler, D. and T. Armstrong. 1994.

Policy Research Associates Inc. *Intensive Juvenile Aftercare as a Public Safety Approach.* Altschuler, D. and T. Armstrong. 1998.

Policy Research Associates Inc. *Juvenile Corrections and Continuity of Care in a Community Context:  The Evidence and Promising Directions.* Altschuler, D. and T. Armstrong. 2002.

Policy Research Associates Inc. *Reintegration, Supervised Release, and Intensive Aftercare*, Altschuler, D. and T. Armstrong. 1999.

Policy Research Associates Inc. *The Community Transition of Incarcerated Mentally Ill Youth: An Outcome Study*. By P. Wood, E. Trupin, A. Turner, A. Vander Stoep, and D. Stewart. 1999.

Prison Spending Reforms Approved by State Assembly." *Associated Press.* May 27, 2004.

Rampart Independent Review Panel. *Report of the City of Los Angeles Police Department.* November 2000.

RAND. Research Report. *Training 21st Century Police Officer*. 2003.

"Re-entry/Reintegration." *Corrections Compendium*. March/April 2004.

Research Division Ward Information and Parole Research Bureau. *Characteristics of California Youth Authority Population*. December 2003.

Roush, David W., PhD. "The Relationship Between Group Size and Outcomes in Juvenile Corrections, a Partial Review of the Literature." *Journal for Juvenile Justice and Detention Services*.

Sacramento County Sheriff. (General Information) <http://www.sacsheriff.com>. (Last visited April 22, 2004).

Senate Advisory Commission. *CDC: Controlling the Costs of California's Prison Pharmacy Operations*. July 2002.

Senate Select Committees on Government Oversight Hearing. Senator Jackie Speier, Chair: State Employee Discipline and the Personnel Board: Is Justice Served? The State Personnel Board (SPB), Wlliam Elkins, President, SPB, Ronald Alvarado, Vice President, SPB, Laura M. Aguilera, Interim Executive Officer, SPB, Elise Rose, Chief Counsel, SPB, II. Youth and Adult Corrections Agency, Jeanne Woodford, Director, California Department of Corrections (CDC), Walter Allen, Director California Youth Authority (CYA), Kathy Keeshan, Chief Counsel CDC, Debra L. Ashbrook, Chief Counsel CYA, III. Whistleblowers and Retaliation; Sexual Harassment , Bruce Monfross, SPB and former Counsel, Office of the Inspector General, Richard Krupp, CDC employee, John Scott, Private Attorney, Amy Hinchee, CDC employee, Richard Burton, Private Attorney, IV. The Department of Personnel Administration , Linda Buzzini, Legal Counsel, DPA, Bill Curtis, Legal Counsel, DPA. March 22, 2004.

"Show and Tell, Saying No to Training Schools." By Dick Mendel. February 2004.

Siggins, Elizabeth. Correspondence to Robin Dezember. Re: *Some Examples of Evidence and Best Practices Regarding the Treatment of Youthful Offenders*. April 12, 2004.

*Skelly v. State Personnel Board* (1975) 15 Cal. Rptr.

Skonovd, Norm, Research Manager. *California Youth Authority, Looking Back. Looking Ahead.*

Skonovd, Norm. Research Manager. *California Youth Authority, From Corporal Punishment to Classification.*

"Standards for Juvenile Training School:  The New Youth Authority Proposal, National Standards." *American Correctional Association*. 1991.

Stanford University, Department of Psychology. *Interpersonal Dynamics in a Simulated Prison.* 1973.

State Justice Institute. *University of Kentucky Center on Drug and Alcohol Research SJI-01-007.* "Kentucky Reentry Courts: Evaluation of the Pilot Programs."

Strategic Futures Consulting Group, Inc. *Cross Functional Teams.* <http://www.strategicfutures.com/crossfun.htm> (Last visited May 4, 2004).

Thompson, Don. (Associated Press). "Prison System Blasted by Lawmakers, New Administration." *North County Times (San Diego).* January 20, 2004. <http://www.nctimes.com/articles/2004/01/21/news/state/1_20_0422_21_25.txt> (Last visited May 28, 2004).

Trupin, Eric, Ph.D. & Patterson, Raymond, M.D. Consultants. *Report of Findings: Mental Health and Substance Abuse Treatment Services in the CYA.* December 2003.

U.S. Department of Justice, Bureau of Justice Statistics. *Trends in State Parole, 1990-2000.* October 2001.

U.S. Department of Justice, National Institute of Corrections, *CDC: Corrections Agency Collaborations With Public Health.* September 2003.

U.S. Department of Justice, National Institute of Corrections. *Prison Health Care Survey: An Analysis of Factors Influencing Per Capita Costs.* February 2001.

U.S. Department of Justice, National Institute of Corrections. *Provision of Mental Health case in Prisons.* February 2001.

U.S. Department of Justice, National Institute of Corrections. *Workshop Materials: Promoting Public Safety Using Effective Interventions With Offenders.*

U.S. Department of Justice, Office of Justice Programs, Bureau of Justice Statistics. *Re-Entry as a Transient State Between Liberty and Recommitment.* By Alfred Blumstein & Allan J. Beck.

U.S. Department of Justice, Office of Justice Programs, Planning of New Institutions. *Workshops for Juvenile Facilities.* By Dennis Barron and Shelly Zavlek. January 2001.

United States Army. *CALL Research Division Action Review Process (unclassified document).* John Goodloe. May 2004.

University of California Los Angeles, Integrated Substance Abuse Programs. *Semi-Annual Report on the UCLA-ISAP Evaluation of the 2000-Bed Expansion of Therapeutic Community Programs for Prisoners.* By Michael L. Prendergast, Ph.D. December 2003.

Urban Institute. *The Practice and Promise of Prison Programming.* May 2002.

Vera Institute of Justice. *Changing Fortunes or Changing Attitudes? Sentencing and Corrections Reforms in 2003.* March 2003.

Washington State Institute for Public Policy. *The Comparative Costs and Benefits of Programs to Reduce Crime, Version 4.0.* May 2001.

Washington State Institute for Public Policy. *Washington's Offender Accountability Act: An Evaluation of the Department of Corrections' Risk Management Identification System.* January 2003.

Wiebush R., McNully, B., and Le, T. *Implementation of the Intensive Community-Based Aftercare Program.* Policy Research Associates. 2000.

Wilkinson, Reginald A. "Prison Reform Through Offender Reentry: A Partnership Between Courts and Corrections." October 2003. http://www.drc.state.oh.us/web/articles/article93.htm. (Last visited June 4, 2004).

Women's league of Voters, CYA Research Division. *Probation/Parole.* September 1996.

# Individual Contacts

## Alphabetical Listing

| Name (Last, First), Title | Organization |
|---|---|
| Acosta, Lucille, Chief, Division of Apprenticeship Services | Department of Industrial Relations |
| Adame, Louie, Rank & File Vice President CYA | California Correctional Peace Officers Association |
| Addington, Mike, Director | Alaska Department of Correctional Institutions |
| Alexander, Chuck, Rank & File Vice President CDC | California Correctional Peace Officers Association |
| Allen, Calleen, Personnel Technician | California Youth Authority |
| Allen, Vivian | Citizen Correspondence |
| Allen, Walter III, Director | California Youth Authority |
| Allen, Ward, Coordinating Instructor | Sacramento Unified School District |
| Alvarado, Yan Sum, Parole District Administrator | California Department of Corrections |
| Alvarez, Laurel, Manager | Commission on Correctional Peace Officer Standards & Training |
| Ambrocelli, Robert, Parole Administrator | California Department of Corrections |
| Anderson, Capril, Administrative Assistant | California Department of Corrections |
| Antenen, Thomas, Deputy Commissioner | New York Department of Corrections |
| Antista, Janice | Citizen Correspondence |
| Aoyagi, Naomi, Assistant Secretary, Admin. & Oversight | Youth and Adult Correctional Agency |
| Applesmith, Jacob, Deputy Attorney General | Office of the Attorney General |
| Aros, Michael, Parole District Administrator | California Department of Corrections |
| Ashbrook, Debra, Assistant Chief Counsel, Legal Affairs Division | California Department of Corrections |
| Ater, Mark, Correctional Counselor II | California Department of Corrections |
| Atkinson, Jay, Chief, Estimates & Statistical Analysis Section | California Department of Corrections |
| Autrey, Mandy, Sergeant, Emergency Operations Unit | California Department of Corrections |
| Ayers, Robert, Retired Warden | California Department of Corrections |
| Babich, Pam, Senior Information System Analyst | California Youth Authority |
| Bacigalupo, Dave, Assistant Superintendent | California Youth Authority |
| Baldo, Jeffrey, Chief Information Officer | Youth and Adult Correctional Agency |

Baldwin, Nancy, Assistant Deputy Director .................................... California Youth Authority
Ballard, Daryl, Assistant Superintendent ......................................... California Youth Authority
Barbara, Joe, Senior Staff Counsel III .................................................. California Department of
Corrections
Barnet, Mary, Training Officer ............................................................. California Department of
Corrections
Barretta, Judith, Community Liaison .................................................. California Department of
Corrections
Bazar, Edmond, Director of Professional Standards ...................... Georgia Department of Corrections
Beales, David, Chief Counsel ................................................................ Prison Industry Authority
Beauregard, Charles, Director, Internal Affairs ............................... Tennessee Department of
Corrections
Belnas, Jenny, Student Assistant ......................................................... California Youth Authority
Bernstein, Catherine, Assistant Chief Counsel,
    Legal Affairs Division ................................................................. California Department of
Corrections
Bestolarides, Paul, Academy Administrator ..................................... California Department of
Corrections
Beverage, Julie ........................................................................................ Citizen E-Mail Suggestion
Bikowski, Mary ....................................................................................... Citizen E-Mail Suggestion
Birotte, Andre, Inspector General ....................................................... Los Angeles Police Department
Bishoff, Marshall M.D., Surveyor ....................................................... National Commission on
Correctional Healthcare
Blalock, Jan, Asst. Superintendent of Correctional Education ...... California Department of
Corrections
Block-Brown, Robert, Assistant Deputy Director,
    Education Services Branch ......................................................... California Youth Authority
Blonien, Rodney J., Attorney ............................................................... Government Relations
Borg, Bob, Retired Warden .................................................................. California Department of
Corrections
Boyle, Diana, Use of Force Coordinator ........................................... California Department of
Corrections
Boynton, Ann, Managing Consultant ................................................ IBM
Braswell, Milton, Assistant Deputy Director ................................... California Youth Authority
Breed, Allen F. ........................................................................................ Criminal Justice Consultant
Bromberg, Martha .................................................................................. Citizen E-Mail Suggestion
Brooks, Murray, Program Administrator ........................................... Florida Department of Corrections
Brown, Jim ............................................................................................... Citizen E-Mail Suggestion
Brown, Peter, Director, Labor Relations ............................................ New York Department of
Corrections
Brown, Shellvina, Use of Force Coordinator .................................... California Department of
Corrections
Brown, William, Chief, Lompoc Police Department ....................... California Police Chiefs Association
Burkhart, Toni ........................................................................................ Citizen Correspondence
Burrell, Sue, Attorney ............................................................................ Youth Law Center
Burrows, Richard L., Deputy Regional Parole Administrator ....... California Department of
Corrections

Butler, Kristina, Staff Services Manager II .........................................California Department of
Corrections

Calabreese, Wayne H., President  ...................................................The GEO Group Inc.

Caldwell jr., Floyd .........................................................................Citizen E-Mail Suggestion

Cambra, Steven, Retired Director.....................................................California Department of
Corrections

Campbell, John, Chief, Program Support Unit...................................California Department of
Corrections

Campbell, Rosanne, Deputy Director,
    Health Care Services Division ....................................................California Department of
Corrections

Canutt, Ford, Field Services Representative .....................................California Correctional Supervisors
Organization

Cardiff, Mike, Parole Agent III .........................................................California Youth Authority

Cardoza, Sandy, Equal Employment Officer......................................California Department of
Corrections

Carruth, Kevin, Agency Undersecretary............................................Youth and Adult Correctional
Agency

Carter, Sharon, Personnel Operations ...............................................California Department of
Corrections

Carver, Doug, Chief Probation Officer ...............................................Nevada County Probation
Department

Cate, Matt, Inspector General ...........................................................Office of the Inspector General

Cevola, Michael, Recruitment Manager .............................................California Department of
Corrections

Chantal, Gibbs...............................................................................Citizen E-Mail Suggestion

Chavez, Frank ................................................................................Citizen Correspondence

Chen Jr., Arthur, Director of Facilities Programs...............................Foundation for Community
Colleges

Chung, Arthur, Chief, Offender Information Services Branch .......California Department of
Corrections

Churchill, Rob, Supervisor of Correctional Education Programs...California Department of
Corrections

Clanton, Daniel, Associate Governmental Program Analyst ..........California Department of
Corrections

Coder, Jacqui, Research Manager II,
    Population Projections Unit ........................................................California Department of
Corrections

Colwell, Mike, Inmate Employability..................................................Prison Industry Authority

Commander Maislin .......................................................................Los Angeles Police Department

Conover, Robin, Staff Services Analyst ..............................................California Department of
Corrections

Cooper, Gary, Legislative Advocate ...................................................Criminal Justice Consultant

Corcoran, Lance, Executive Vice President.........................................California Correctional Peace
Officers Association

Cornelius, May, Supervisor of Education Programs ........................California Department of
Corrections

Cornwell-Spencer, Sharon..................................................................Citizen E-Mail Suggestion

Costa, Bill, Assistant Superintendent, Business Operations ........... California Youth Authority
Couzens, Richard, Judge .................................................................. Placer County Superior Court
Covington, Carole, Associate Governmental Program Analyst ..... Board of Prison Terms
Cox, Diane, Sergeant, Internal Affairs ............................................. California Highway Patrol
Crumpton, Art, Assistant Director, Intelligence & Investigations . Alabama Department of Corrections
Currier, Lisa, Human Resources Administrator ............................. New Hampshire Department of Corrections
Curtis, Richard, RN, Selections & Standards .................................. California Department of Corrections
Daley, Robert ................................................................................... Citizen E-Mail Suggestion
Datig, Creg, Chief Deputy District Attorney ................................... Riverside County District Attorney's Office
Davis, Arlan, Risk Management Specialist ....................................... Florida Department of Corrections
Davis, Paul, Lieutenant .................................................................... California Highway Patrol
Dean, Robert, Supervising Vice President ....................................... California Correctional Peace Officers Association
DeGrood, Phil, Asst. Superintendent of Correctional Education . California Department of Corrections
DeJesus, Robert, Probation Manager .............................................. Santa Clara County Probation Department
DeMaio, Carl, President .................................................................... The Performance Institute
DiCarlo, Lori, Warden ...................................................................... California Department of Corrections
Dillard, Paul J., Associate Warden .................................................. California Department of Corrections
DiMiceli, Michael C., Assistant Executive Director ........................ California Commission on Peace Officer Standards & Training
Dixon, Sam, Sergeant, Internal Affairs ............................................ California Highway Patrol
Doke, Darryl, Deputy Attorney General ........................................... Office of the Attorney General
Domen, Patricia, Supervisor of Education Programs ...................... California Department of Corrections
Dovey, John, Chief Deputy Director, Field Operations ................... California Department of Corrections
Drake, Michael V. M.D., Vice President, Health Affairs ................. University of California
Drews, Paul, Western Sales Manger ................................................ General Dynamics/Veritirecks
Dulay, Dennis, Retired Parole Agent III ........................................... California Youth Authority
Dunkin, John, Special Agent-In-Charge, Internal Affairs .............. California Youth Authority
Duque, Kathy, Deputy Chief .............................................................. Santa Clara County Probation Department
Easterwood, Sue, Research Program Specialist I ............................. California Youth Authority
Edwards, Leonard ............................................................................. Citizen Correspondence
Ehar, Sandra, Public Affairs Officer ................................................ Federal Bureau of Prisons
Elmer Jr., E.D., Deputy Regional Parole Administrator ................. California Department of Corrections
English, Sharon, Crime Victim Coordinator .................................... Youth and Adult Correctional Agency
Escoto, David ..................................................................................... Citizen Correspondence
Everett, Randy, Investigative Administrator .................................... Oregon Department of Corrections

Facha, Cindy, Case Records Manager ................................................California Department of Corrections
Fackler, Martie ......................................................................................Citizen E-Mail Suggestion
Fagot, Jeff, Deputy Regional Parole Administrator ..........................California Department of Corrections
Farmer, Terry, Chief Counsel ...............................................................Board of Prison Terms
Farris, Jim, Retired Annuitant, Youth Authority Board ...................California Youth Authority
Fedullo, Dave, Sergeant ........................................................................California Highway Patrol
Fernandez, David, Parole Agent I .........................................................California Department of Corrections
Fetzer, Sheila ........................................................................................Citizen Correspondence
Fincel, Ed, Assistant Chief ....................................................................California Highway Patrol
Fitzgerald, Pat, Assistant General Manager ......................................Prison Industry Authority
Flores, Loida, Associate Personnel Analyst .......................................California Youth Authority
Florez-Delyon, Cynthia, Assistant Deputy Director ..........................California Youth Authority
Ford, Anita, Personnel Director ...........................................................Los Angeles Unified School District
Ford, Bob ...............................................................................................Employment Background Investigations Inc.
Ford, Dave, Parole Agent I ....................................................................California Youth Authority
Forren, John R., President & Chief Executive Officer ......................Correctional Systems Inc.
Franco, Patricia, Parole Agent III ........................................................California Youth Authority
Frazier, Valerie, Bureau Chief, Training Services Division .............California Youth Authority
Free, Max, Supervisor of Correctional Education Programs ...........California Department of Corrections
Funkhouser, Linda ................................................................................Citizen Correspondence
Gallagher, Pete, Associate Warden .....................................................California Department of Corrections
Gallegos, Mike, Retired Deputy Director, Institutions & Camps ...California Youth Authority
Gantt, Mark, Asst. Director, Office of Professional Standards ........California Youth Authority
Garcia, Carolina, Parole Agent III ........................................................California Youth Authority
Garcia, Sylvia, Chief Deputy Director .................................................California Youth Authority
Gastreich, Kathy ...................................................................................Washington Department of Corrections
Gieda, Deb, Manager, Office of Professional Responsibility ...........Pennsylvania Department of Corrections
Gillen, Richard, Parole Agent I ............................................................California Department of Corrections
Giurbino, George J., Warden ................................................................California Department of Corrections
Godown, Jeff, Detective, Computer Statistics ...................................Los Angeles Police Department
Gomez, James, Former Director ..........................................................California Department of Corrections
Gonzalez, Melissa, Use of Force Coordinator ...................................California Department of Corrections
Goodloe, John, Research Division .......................................................U.S. Army
Gordon, JoAnn, Warden ........................................................................California Department of Corrections

Gotivich, Erin, Internal Affairs ......................................................... Massachusetts Department of Corrections

Goya, Steve, Regional Parole Administrator ..................................... California Department of Corrections

Grannis, Nola, Chief, Inmate Appeals .............................................. California Department of Corrections

Grater, Lindsay, Staff Services Manager ........................................... California Department of Corrections

Graves, Bob, Co-Founder.................................................................. E-Republic

Green, Robin Ph.D., Former Chief of Training ................................. Los Angeles Police Department

Grenz, Rick, Chief, Regulation & Policy Management Branch ...... California Department of Corrections

Griggs, J.R., Program Support Analyst, Joint Venture Program .... California Department of Corrections

Grunder, Frances, Senior Assistant Attorney General ................... Office of the Attorney General

Gusman, Shane, Legislative Representative ..................................... California Public Defenders Association

Haapanen, Rudy, Chief, Research Division ...................................... California Youth Authority

Hahn, Donna, Juvenile Justice Specialist.......................................... Wisconsin Department of Corrections

Hale, Arzell......................................................................................... Citizen Correspondence

Halford, Jamie, Executive Secretary I, Prison Industry Board ....... Prison Industry Authority

Hamilton, Kris, Associate Governmental Program Analyst........... California Department of Corrections

Hampton, Diane, Training Officer II................................................... California Department of Corrections

Hansen, Doug...................................................................................... Citizen Correspondence

Harding, Doug, Internal Affairs ........................................................ Maryland Department of Corrections

Hargrove, M., Sergeant ..................................................................... California Department of Corrections

Harper, Judith, Assistant Chief Counsel, Legal Affairs.................. California Department of Corrections

Harrison, Michael, Parole Agent II.................................................... California Department of Corrections

Hartwig, Jack T., Director .................................................................. Management & Training Corporation

Hayhoe, Joyce, Deputy Secretary, Legislative ................................. Youth and Adult Correctional Agency

Haywood, Fred, Parole Administrator .............................................. California Department of Corrections

Hazelton, Mark .................................................................................. Citizen E-Mail Suggestion

Henry, Haunani, Retired Warden ...................................................... California Department of Corrections

Hensley, Candice, Officer .................................................................. Los Angeles Police Department

Hernandez, Susan, Associate Governmental Program Analyst..... California Department of Corrections

Herrera, David .................................................................................. Citizen Correspondence

Herron, Ronald, Vice Chairman, Youth Authority Board ...............California Youth Authority

Hickman, Roderick Q., Agency Secretary ..........................................Youth and Adult Correctional Agency

Hikcernell, Douglas..................................................................................Citizen Correspondence

Hill, Curtis, Sheriff, San Benito County...............................................California State Sheriffs' Association

Holman, Lana, Juvenile Justice Specialist ..........................................Oregon Department of Corrections

Holt, Nikki.................................................................................................Citizen E-Mail Suggestion

Horel, Robert A., Chief of Fiscal Programs.......................................Youth and Adult Correctional Agency

Hoshino, Martin, Assistant Director,
    Office of Investigative Services.......................................................California Department of Corrections

Hotto, Bill, Chief, Inmate Transportation Unit.................................California Department of Corrections

Howard, Elizabeth, Legislative Representative ................................California State Association of Counties

Hubbard, Suzan, Assistant Deputy Director .....................................California Department of Corrections

Huegen, Gena, Internal Affairs..............................................................Missouri Department of Corrections

Hutchison, Kacy, Deputy Cabinet Secretary .....................................Office of Governor Arnold Schwarzenegger

Inge, Peter, Background Investigator ..................................................California Youth Authority

Ingram, Kevin, Personnel Operations Manager...............................Nevada Department of Corrections

Jackson, Gwen, Administrator I ............................................................California Youth Authority

Jackson, Otis, Staff Services Manager .................................................California Department of Corrections

Jackson, Sharon, Regional Parole Administrator .............................California Department of Corrections

Jacobson, Susan, Joint Venture Program ............................................California Department of Corrections

Jarue, Todd, Budget Analyst..................................................................Department of Finance

Jenkins, Ron, Facilitator .........................................................................Board of Corrections

Jimenez, Mike, State President...............................................................California Correctional Peace Officers Association

Johnson, Deborah, Supervising Casework Specialist I....................California Youth Authority

Johnson, Gary L., Executive Director...................................................Texas Department of Corrections

Johnson, Ken, Program Administrator................................................Florida Department of Corrections

Johnson, Mary, Director, Programs & Treatment ............................Connecticut Department of Corrections

Johnson, Scott, Lieutenant, Risk Management Bureau....................Los Angeles Sheriff's Department

Johnston-Brito, Anne, Sergeant, Departmental Training Division.California Highway Patrol

Jones, Georgia, Use of Force Coordinator ..........................................California Department of Corrections

Jones, Martin, Retired Chief, Office of Departmental Training.......California Department of Corrections

Kai, Richard, Deputy Director, Education Services Branch.............California Youth Authority

Kalvelage, Marilyn, Chief, Institution Operations............................California Department of Corrections

Kamberian, Van, Staff Counsel...........................................................California Youth Authority
Kanan, Rene M.D., Assistant Deputy Director ................................California Department of
Corrections
Kane, Cindy, Parole Agent I................................................................California Department of
Corrections
Kearns, Lura, Internal Affairs .............................................................Federal Bureau of Prisons
Keeshen, Kathleen M., Deputy Director, Legal Affairs Division ...California Department of
Corrections
Kemp, Mark.............................................................................................Citizen Correspondence
Kennedy, Phillip, Jr. ............................................................................Citizen Correspondence
Kernan, Scott, Warden ........................................................................California Department of
Corrections
Kicker, Lee, Regional Sales Manager ................................................Pro Tech Monitoring Inc.
Kim, Amy, Parole Outpatient Clinic ..................................................California Department of
Corrections
Kim, Paul, Commander, Training Office............................................Los Angeles Police Department
Kindred, Richard ..................................................................................Citizen Correspondence
King, Don, Regional Administrator ...................................................California Youth Authority
Kirkland, Richard, Chief Deputy Warden........................................California Department of
Corrections
Kopf, Paul, Staff Counsel.....................................................................California Youth Authority
Koshell, Merrie, Correctional Counselor III ....................................California Department of
Corrections
Kramer, Matthew C., Warden.............................................................California Department of
Corrections
Kravitz, Joe, Health Program Coordinator.......................................California Department of
Corrections
Krisberg, Dr. Barry, President.............................................................National Council on Crime &
Delinquency
Krolowsky, Lorraine, Sergeant, Internal Affairs .............................California Highway Patrol
Kuhns, Ann-Lousie, Associate Director
of Governmental Affairs .................................................................Bristol-Meyers Squibb Co.
Kuty, Paula, Chief Assistant District Attorney ................................Santa Clara County District
Attorney's Office
Kwong, Tina, Hiring & Selections .....................................................California Highway Patrol
LaBahn, Dave, Executive Director......................................................California District Attorneys
Association
Lackner, Heidi, Facility Captain ........................................................California Department of
Corrections
Langlois, Renauld, Chief Inspector, Special Investigations Unit ...Rhode Island Department of
Corrections
Larson, Carl, Retired Assistant Deputy Director.............................California Department of
Corrections
Leber, Jon ...............................................................................................Citizen E-Mail Suggestion
Lediju, Tonia, Staff Management Auditor ........................................California Highway Patrol
Lee, Joey, Departmental Budget Officer............................................California Youth Authority
Lehman, Joseph D., Secretary ............................................................Washington Department of
Corrections

Lemke, Tom, Captain.............................................................California Department of Corrections

LeSage, Pat, Chief Financial Officer .....................................California Correctional Supervisors Organization

L'Etoile, Jim, Chief, Office of Substance Abuse Programs ...............California Department of Corrections

Levine, Robin, Retired Deputy Public Defender..............................San Francisco Public Defenders Office

Lewis, Beth, Assistant Chief, Labor Relations ...................................Ohio Department of Corrections

Lewis, Donald, Assistant Director, Labor Relations........................New Jersey Department of Corrections

Lewis, Gail, Retired Warden ..................................................California Department of Corrections

Lewis, Terry, Captain, Background Investigations Bureau .............California Youth Authority

Losco, Frank, Chief, Office of Public Affairs......................................Prison Industry Authority

Loustalot, Sue, Deputy Secretary, Fiscal and Programs...................Youth and Adult Correctional Agency

Ludeman, Sarah, Information Officer, Public Affairs......................California Youth Authority

Lungren, Nancy, Assistant Director, Public Affairs .........................California Youth Authority

Lupineti, Jim, Director, Internal Affairs ............................................Delaware Department of Corrections

Lynch, Therese, Parole Agent ................................................Illinois Department of Corrections

Lyons, Nancy, Deputy Executive Director.........................................Little Hoover Commission

Macallair, Dan...................................................................Center on Juvenile and Criminal Justice

Mack, Larry A., Retired Annuitant .....................................California Department of Corrections

MacMurray-Muzquiz, Rebecca .............................................Citizen E-Mail Suggestion

Maislin, Stuart, Commander.................................................Los Angeles Police Department

Mak, Ken, Chief, Internal Audits ........................................California Youth Authority

Maltbie, John, County Manager, San Mateo County.......................California State Association of Counties

Mandella, Rick, Executive Officer .......................................Council on Mentally Ill Offenders

Manual, Rick, Assistant Chief, Inmate Appeals...............................California Department of Corrections

Marc-Aurele, Yvette, Deputy Director (A), Institutions & Camps ..........................................................California Youth Authority

Mariscal, Linda ....................................................................Citizen Correspondence

Martin, Christine, Chief, Telemedicine Services .............................California Department of Corrections

Maurino, Jaquelyn, Pharmacy Manager.............................................California Department of Corrections

Mayer, James P., Executive Director .....................................Little Hoover Commission

McAtee, Gail, Director of Administration.........................................Texas, State Office of Risk Management

McCarthy, Thomas, Editorial Director ...............................New York Department of Corrections

McCarty, Bert, Parole Agent II............................................................ California Department of Corrections
McConnell, Thomas E., Executive Director...................................... Board of Corrections
McCracken, W., Lieutenant.................................................................. California Department of Corrections
McDaniel, Roger ..................................................................................... Florida Department of Corrections
McGill, Leslie, Executive Director ...................................................... California Police Chiefs Association
McGrath, Joe, Warden............................................................................ California Department of Corrections
McIntyre, Barbara, Assistant Manager, Human Resources ............ Nebraska Department of Corrections
Mechling, Jerry, President .................................................................... E-Government and Public Policy
Medina, Rene, Lieutenant, Backgrounds & Investigations............. California Department of Corrections
Meisner, Gary, Detective, Risk Management Unit........................... Los Angeles Police Department
Micu, Mike, Internal Affairs................................................................. Montana Department of Corrections
Miller, Art, Lieutenant, Public Information Office........................... Los Angeles Police Department
Milliken, James, Retired Judge............................................................. San Diego County Superior Court
Minor, Michael, Major............................................................................ California Youth Authority
Miraglio, Valeta, Parole Agent III....................................................... California Department of Corrections
Mitchell, Don............................................................................................ Citizen Correspondence
Modena, P., Use of Force Coordinator................................................ California Department of Corrections
Molina, Sergio, Information Officer .................................................... Illinois Department of Corrections
Moore, Bob, Major ................................................................................... California Youth Authority
Morgan, Brett ........................................................................................... Citizen Correspondence
Morris, B., Lieutenant............................................................................. California Department of Corrections
Mraz, Cassie, Training Officer ............................................................. California Department of Corrections
Nave Mayberry, Lucibeth, Sr. Director .............................................. Corrections Corporation of America
Newland, Anthony Ph.D., Retired Warden ....................................... California Department of Corrections
Niedermann, Nathalie.............................................................................. Citizen E-Mail Suggestion
Nielson, Jim, Deputy Commissioner (Former State Senator) ......... Board of Prison Terms
Nobili, Mark, President,
    Public Relations & Government Affairs ...................................... MN & Associates
Norris, Randall Ph.D., Chief Psychologist ....................................... California Department of Corrections
Norris, Steve, Lieutenant ...................................................................... California Department of Corrections
Northrup, Kay, Deputy Director, Health Care ................................. Ohio Department of Corrections
O'Brien, Ken, Executive Director........................................................ California Commission on Peace Officer Standards & Training
O'Brine, Jillian ....................................................................................... Citizen Correspondence
Olson, Henry, Executive Director......................................................... Manhattan Institute for Policy Research

O'Neal, Marty, District Parole Administrator ....................................California Department of Corrections

O'Niell, Barry, Associate Warden........................................................California Department of Corrections

Ottolini, Pat, Director, Health Care.....................................................Connecticut Department of Corrections

Overman, R., Lieutenant.......................................................................California Department of Corrections

Owen, Brook..........................................................................................Citizen E-Mail Suggestion

Ozawa, Naomi, Casework Specialist ...................................................California Department of Corrections

Page, Yvette, Superintendent of Correctional Education.................California Department of Corrections

Pank, Karen, Deputy Legislative Secretary.......................................Office of Governor Arnold Schwarzenegger

Pannel, Sue, Research Specialist .........................................................California Youth Authority

Panora, Joe, Chief Information Officer ...............................................California Youth Authority

Parks, Gary ...........................................................................................Citizen E-Mail Suggestion

Patterson, R., Sergeant ........................................................................California Department of Corrections

Patterson, Robert .................................................................................Citizen E-Mail Suggestion

Pederson, Jere, President......................................................................University of Texas Medical Branch

Pena, Zeke, Program Administrator ...................................................Texas Department of Corrections

Penland, Beverly, Supervisor of Vocational Instruction .................California Department of Corrections

Perez, Margarita E., Chairwoman .......................................................Board of Prison Terms

Perez, Steve, Lieutenant.......................................................................California Department of Corrections

Perrin, Cecilia, Associate Personnel Analyst ....................................California Youth Authority

Peters, Winston, Bureau Chief ...........................................................Los Angeles County Public Defenders Office

Pinkert, Michael, President ..................................................................MHM Correctional Services Inc.

Pinto, Alvaro & Adozinda....................................................................Citizen Correspondence

Pipes,Susan............................................................................................Citizen E-Mail Suggestion

Pliler, Cheryl, Deputy Director, Institutions Division.....................California Department of Corrections

Poe, Shirley, Regional Parole Administrator .....................................California Department of Corrections

Pope, Kathy, Staff Counsel...................................................................Department of Personnel Administration

Powers, Matt, Assistant Professor.......................................................California State University, Long Beach

Presley, Robert, Former Agency Secretary
   (Former State Senator) ......................................................................Youth and Adult Correctional Agency

Proby, Lee...............................................................................................Citizen Correspondence

Prosper, Kathleen, Warden ..................................................................California Department of Corrections

Quinlan, Christy, Deputy Director, Information Systems Div........ California Department of Corrections

Quintar, Al, Executive Assistant........................................................ U.S. Medical Center for Federal Prisons

Rackley, Ron, Lieutenant ..................................................................... California Department of Corrections

Ramos, P., Sergeant .............................................................................. California Department of Corrections

Reed, Dick, Assistant Executive Director ......................................... California Commission on Peace Officer Standards & Training

Remington, Calvin, Chief .................................................................... Ventura County Probation Department

Renwick, Frank E., Deputy Director,
    Administrative Services Division ................................................ California Department of Corrections

Richman, Keith S., Assembly Member ............................................. Legislature

Rimmer, Richard, Deputy Director,
    Parole & Community Services Division ..................................... California Department of Corrections

Ritchie, Peggy ....................................................................................... National Institute of Corrections

Rives, Larry, Special Agent, Office of Internal Affairs .................. California Department of Corrections

Robbins, De Ahn, Use of Force Coordinator.................................... California Department of Corrections

Roberts, Anthony, Director ................................................................ U.S. Medical Center for Federal Prisons

Robinson, Cil, Juvenile Justice Specialist.......................................... Montana Department of Corrections

Robinson, Ken, President...................................................................... Correctional Counseling Inc.

Rodarte, Steve........................................................................................ Citizen E-Mail Suggestion

Rodriguez, Gil, Deputy Parole Administrator................................. California Department of Corrections

Rodriguez, John, Deputy Director...................................................... Department of Mental Health

Rogers, Debra, Use of Force Coordinator.......................................... California Department of Corrections

Romero, Gloria, Senator....................................................................... Legislature

Romero, Raul, Asst. Superintendent of Correctional Education.... California Department of Corrections

Roos, Robert Ph.D., Deputy Commissioner...................................... Board of Prison Terms

Rosenthal, Matthew, Executive Director ........................................... Institute for the Study and Prevention of Hate Crimes

Rosko, Thomas M.D., Consultation Psychiatry ............................... Cedars-Sanai Medical Center

Runnels, David, Warden....................................................................... California Department of Corrections

Saito, Brady, Parole Agent III Supervisor......................................... California Department of Corrections

Sanchez, Carlos, Chief, Office of Departmental Training ............... California Department of Corrections

Sanchez, H.G., Chief Psychologist ........................................................ California Department of Corrections

Sanders, Karen, Personnel Program Analyst .................................... Department of Personnel Administration

Santana, Tony, Attorney ......................................................................... California Association of Highway Patrolmen

Schick, Walt, Captain ............................................................................... Los Angeles Police Department

Schmidt, William ...................................................................................... Citizen Correspondence

Seaborn, Marguerite, Chief Counsel .................................................... Department of Personnel Administration

Sears, Reggie, Parole Agent III ............................................................. California Youth Authority

Sevesind, Donald, Detective .................................................................. Pomona Police Department

Shansky, Ronald M.D. .............................................................................. Correctional Health Care Consultant

Short, Caroline, Staff Services Manager I ........................................... California Department of Corrections

Shumsky, Richard, Chief Probation Officer ....................................... Los Angeles County Probation Department

Sida, Jim, Deputy Director,
   Standards & Training for Corrections ............................................ Board of Corrections

Siefert, Donna, Supervisor of Correctional Education Programs ... California Department of Corrections

Sifuentes, George, Deputy Director (A), Facilities Mgmt. Div. ....... California Department of Corrections

Siggins, Elizabeth, Executive Director ................................................. Volunteer Auxiliary of Youth Guidance Center

Siggins, Peter, Legal Affairs Secretary ................................................ Office of Governor Arnold Schwarzenegger

Silva, John, Supervisor, Solano County ............................................... California State Association of Counties

Simpson, Debbie, Administrative Assistant ...................................... California Youth Authority

Sims, Clayton, Internal Affairs Investigator ...................................... Arizona Department of Corrections

Singh, Harinder, Executive Officer, Technology Transfer .............. California Department of Corrections

Sivula, Eric, Internal Affairs ................................................................. Louisiana Department of Corrections

Skonovd, Norman, Research Manager ................................................ California Youth Authority

Slavin, Bruce, General Counsel ............................................................. Youth and Adult Correctional Agency

Sliney, Pat, Staff Services Manager, Policy Development ................ California Highway Patrol

Smail, Mike, Staff Services Manager .................................................... California Department of Corrections

Smelosky, Mark, Captain ........................................................................ California Department of Corrections

Smith, Chris, Deputy Superintendent ................................................. California Youth Authority

Smith, Dave, Chief Inspector of Special Operations ........................ Colorado Department of Corrections

Smith, Greg, Detective, Risk Management Unit ............................... Los Angeles Police Department

Smith, Kelly, Use of Force Coordinator ............................................ California Department of
Corrections
Smith, Larry, Data Processing Manager ............................................ California Youth Authority
Snow, Hal, Assistant Executive Director ........................................... California Commission on Peace
Officer Standards & Training
Sogge, Joe, Chief Information Officer ............................................... Department of General Services
Soriano, Bernard, Chief Information Officer .................................... Secretary of State Office
Spar, Wayne, Population Management Specialist ............................ California Youth Authority
Specter, Donald, Director .................................................................... Prison Law Office
Speed, Marvin E. II, Executive Officer .............................................. Board of Prison Terms
Speier, Jackie, Senator ........................................................................ Legislature
Sreeninvasan, Shoba Ph.D. ................................................................. University of Southern California,
Keck School of Medicine
Stafford, Kay, Parole Agent III .......................................................... California Department of
Corrections
Stahl, Kim, Manager, Human Resources ........................................... South Dakota Department of
Corrections
Stalder, Richard L., Secretary ............................................................ Louisiana Department of
Corrections
Steel, Tina, Staff Counsel .................................................................... California Youth Authority
Steffen, Richard, Staff Director .......................................................... Legislature
Steinhart, David, Juvenile Justice Program Director ...................... Commonweal
Stenoski, Stephen M., Assistant Superintendent ............................ California Youth Authority
Stephens, Regina, Former Deputy Director,
Parole & Community Services Division ....................................... California Department of
Corrections
Stevens, Doug, Chief of Investigations ............................................. Florida Department of Corrections
Stewart, Joann, Personnel Operations Specialist ............................ California Department of
Corrections
Stoller, Nancy Ph.D., Professor .......................................................... University of California, Santa Cruz
Stresak, Bob, Retired Assistant Director, Internal Affairs .............. California Youth Authority
Stubblefield, Lynn, Human Resources Specialist ............................ Texas Department of Corrections
Sturtevant, Beverlee ........................................................................... Citizen Correspondence
Sullivan, Jacqueline, Administrative Assistant ............................... Center on Juvenile and Criminal
Justice
Surbeck, John F., Judge ....................................................................... Indiana Superior Court
Suzuki, Norma, Executive Director .................................................... Chief Probation Officers Association
of California
Swig, Julian .......................................................................................... Citizen Correspondence
Tatum, Richard L., State President ..................................................... California Correctional Supervisors
Organization
Theodorovic, Zlatco, Budget Analyst ................................................ Department of Finance
Thomas, Matthew B., Staff Services Manager II .............................. California Department of
Corrections
Thompsen, Neil, Staff Services Manager II ....................................... California Department of
Corrections
Thompson, Mark, Vice President ....................................................... Cornell Companies Inc.

Thornton, Kim, Use of Force Coordinator .........................................California Department of Corrections

Tien, Ivan, Officer, Recruitment Division ..........................................California Highway Patrol

Tilton, James, Program Budget Manager .........................................Department of Finance

Tinstman, Tom M.D., Associate Director of Clinical Information ..University of California, Davis

Toni, Craig, Parole Agent III ...............................................................California Department of Corrections

Toombs, Christine, Parole Agent III....................................................California Department of Corrections

Tremblay, J.P., Assistant Director, Communications ......................California Department of Corrections

Trexler, Larry, Captain, Institutions Division....................................California Department of Corrections

Trimarchi, Heidi, Manager, Information Services Division ............California Department of Corrections

Tristan, David, Retired Chief Deputy Director ................................California Department of Corrections

Tristan, Irma M. ...................................................................................Citizen E-Mail Suggestion

Valdez, Dan, Major...............................................................................California Youth Authority

Vanyur, John M., Senior Deputy Assistant Director........................Federal Bureau of Prisons

Vasquez, Alfredo, Sergeant, Departmental Training Division........California Highway Patrol

Veach, Bob ...........................................................................................Citizen E-Mail Suggestion

Veri, Cynthia Z......................................................................................XEROX

VeVea, George, Lieutenant..................................................................California Department of Corrections

Vilches, Ronald, Internal Affairs Investigator ..................................Arkansas Department of Corrections

Vohryzek-Bolden, Miki Ph.D., Criminal Justice Division...............California State University, Sacramento

Walker, Christine, Research Division .................................................U.S. Army

Wallace, Jack, Retired Administrator I ...............................................California Youth Authority

Ward, Sheryl, Chief, Financial Management Division ....................California Youth Authority

Warner, Nick, Governmental Affairs Representative .....................California State Sheriffs' Association

Webb, Wendy........................................................................................Illinois, Marion County Probation Department

Wehe, Dick, Assistant Chief Counsel ...............................................California Department of Transportation

Weibe, Marvin.......................................................................................Correctional Counseling Inc.

Weiss, Jean, Use of Force Coordinator..............................................California Department of Corrections

Weiss, Judy, Retired Assistant Deputy Director ..............................California Youth Authority

White, Gary, President...........................................................................Alternative Programs Inc.

Wilder, Nancy, Chief, Employee Relations.......................................North Carolina Department of Corrections

Williams, Debbie...................................................................................Citizen Correspondence

Williams, Martha, Deputy Compact Administrator........................California Department of Corrections

Williams, Roxanna, Associate Budget Analyst.................................California Youth Authority

Willner, Nei ........................................................................... Citizen E-Mail Suggestion
Wilson, Jeff............................................................................ Citizen E-Mail Suggestion
Winistorfer, Rick, Chief, Divisional Training Unit........................... California Department of
Corrections
Winters, Linda....................................................................... Illinois Department of Corrections
Wise, Sharie, Chief, Personnel Services Division ........................... California Youth Authority
Wolf, Steve, Chief Investigator, Professional Standards ................ Idaho Department of Corrections
Woodford, J. S., Director ....................................................... California Department of
Corrections
Woodyard, Mark..................................................................... Citizen E-Mail Suggestion
Woolever, R., Lieutenant ....................................................... California Department of
Corrections
Wright, Sandra, Camp Superintendent ............................................ California Youth Authority
Ylst, Eddie, Former General Manager .............................................. Prison Industry Authority
Zamora, Lori, Manager .......................................................... California Department of
Corrections
Zehringer, Beverly, Parole Agent II .................................................. California Department of
Corrections
16 Anonymous Citizens........................................................ Citizen E-Mail Suggestions

# Listing by Organization

**California Correctional Agencies**

### Board of Corrections

Jenkins, Ron, Facilitator

McConnell, Thomas E., Executive Director

Sida, Jim, Deputy Director, Standards & Training for Corrections

### Board of Prison Terms

Covington, Carole, Associate Governmental Program Analyst

Farmer, Terry, Chief Counsel

Nielson, Jim, Deputy Commissioner (Former State Senator)

Perez, Margarita E., Chairwoman

Roos, Robert Ph.D., Deputy Commissioner

Speed, Marvin E. II, Executive Officer

### California Department of Corrections

Alvarado, Yan Sum, Parole District Administrator

Ambrocelli, Robert, Parole Administrator

Anderson, Capril, Administrative Assistant

Aros, Michael, Parole District Administrator

Ashbrook, Debra, Assistant Chief Counsel, Legal Affairs Division

Ater, Mark, Correctional Counselor II

Atkinson, Jay, Chief, Estimates & Statistical Analysis Section

Autrey, Mandy, Sergeant, Emergency Operations Unit

Ayers, Robert, Retired Warden

Barbara, Joe, Senior Staff Counsel III

Barnet, Mary, Training Officer

Barretta, Judith, Community Liaison

Bernstein, Catherine, Assistant Chief Counsel, Legal Affairs Division

Bestolarides, Paul, Academy Administrator

Blalock, Jan, Assistant Superintendent of Correctional Education

Borg, Bob, Retired Warden

Boyle, Diana, Use of Force Coordinator

Brown, Shellvina, Use of Force Coordinator

Burrows, Richard L., Deputy Regional Parole Administrator

Butler, Kristina, Staff Services Manager II

Cambra, Steven, Retired Director

Campbell, John, Chief, Program Support Unit

Campbell, Rosanne, Deputy Director, Health Care Services Division

Cardoza, Sandy, Equal Employment Officer

Carter, Sharon, Personnel Operations

Cevola, Michael, Recruitment Manager

Chung, Arthur, Chief, Offender Information Services Branch

Churchill, Rob, Supervisor of Correctional Education Programs

Clanton, Daniel, Associate Governmental Program Analyst

Coder, Jacqui, Research Manager II, Population Projections Unit

Conover, Robin, Staff Services Analyst
Cornelius, May, Supervisor of Education Programs
Curtis, Richard, RN, Selections & Standards
DeGrood, Phil, Assistant Superintendent of Correctional Education
DiCarlo, Lori, Warden
Dillard, Paul J., Associate Warden
Domen, Patricia, Supervisor of Education Programs
Dovey, John, Chief Deputy Director, Field Operations
Elmer Jr., E.D., Deputy Regional Parole Administrator
Facha, Cindy, Case Records Manager
Fagot, Jeff, Deputy Regional Parole Administrator
Fernandez, David, Parole Agent I
Free, Max, Supervisor of Correctional Education Programs
Gallagher, Pete, Associate Warden
Gillen, Richard, Parole Agent I
Giurbino, George J., Warden
Gomez, James, Former Director
Gonzalez, Melissa, Use of Force Coordinator
Gordon, JoAnn, Warden
Goya, Steve, Regional Parole Administrator
Grannis, Nola, Chief, Inmate Appeals
Grater, Lindsay, Staff Services Manager
Grenz, Rick, Chief, Regulation & Policy Management Branch
Griggs, J.R., Program Support Analyst, Joint Venture Program
Hamilton, Kris, Associate Governmental Program Analyst
Hampton, Diane, Training Officer II
Hargrove, M., Sergeant
Harper, Judith, Assistant Chief Counsel, Legal Affairs
Harrison, Michael, Parole Agent II
Haywood, Fred, Parole Administrator
Henry, Haunani, Retired Warden
Hernandez, Susan, Associate Governmental Program Analyst
Hoshino, Martin, Assistant Director, Office of Investigative Services
Hotto, Bill, Chief, Inmate Transportation Unit
Hubbard, Suzan, Assistant Deputy Director
Jackson, Otis, Staff Services Manager
Jackson, Sharon, Regional Parole Administrator
Jacobson, Susan, Joint Venture Program
Jones, Georgia, Use of Force Coordinator
Jones, Martin, Retired Chief, Office of Departmental Training
Kalvelage, Marilyn, Chief, Institution Operations
Kanan, Rene M.D., Assistant Deputy Director
Kane, Cindy, Parole Agent I
Keeshen, Kathleen M., Deputy Director, Legal Affairs Division
Kernan, Scott, Warden
Kim, Amy, Parole Outpatient Clinic
Kirkland, Richard, Chief Deputy Warden
Koshell, Merrie, Correctional Counselor III

Kramer, Matthew C., Warden

Kravitz, Joe, Health Program Coordinator

Lackner, Heidi, Facility Captain

Larson, Carl, Retired Assistant Deputy Director

Lemke, Tom, Captain

L'Etoile, Jim, Chief, Office of Substance Abuse Programs

Lewis, Gail, Retired Warden

Mack, Larry A., Retired Annuitant

Manual, Rick, Assistant Chief, Inmate Appeals

Martin, Christine, Chief, Telemedicine Services

Maurino, Jaquelyn, Pharmacy Manager

McCarty, Bert, Parole Agent II

McCracken, W., Lieutenant

McGrath, Joe, Warden

Medina, Rene, Lieutenant, Backgrounds & Investigations

Miraglio, Valeta, Parole Agent III

Modena, P., Use of Force Coordinator

Morris, B., Lieutenant

Mraz, Cassie, Training Officer

Newland, Anthony Ph.D., Retired Warden

Norris, Randall Ph.D., Chief Psychologist

Norris, Steve, Lieutenant

O'Neal, Marty, District Parole Administrator

O'Niell, Barry, Associate Warden

Overman, R., Lieutenant

Ozawa, Naomi, Casework Specialist

Page, Yvette, Superintendent of Correctional Education

Patterson, R., Sergeant

Penland, Beverly, Supervisor of Vocational Instruction

Perez, Steve, Lieutenant

Pliler, Cheryl, Deputy Director, Institutions Division

Poe, Shirley, Regional Parole Administrator

Prosper, Kathleen, Warden

Quinlan, Christy, Deputy Director, Information Systems Division

Rackley, Ron, Lieutenant

Ramos, P., Sergeant

Renwick, Frank E., Deputy Director, Administrative Services Division

Rimmer, Richard, Deputy Director, Parole & Community Services Division

Rives, Larry, Special Agent, Office of Internal Affairs

Robbins, De Ahn, Use of Force Coordinator

Rodriguez, Gil, Deputy Parole Administrator

Rogers, Debra, Use of Force Coordinator

Romero, Raul, Assistant Superintendent of Correctional Education

Runnels, David, Warden

Saito, Brady, Parole Agent III Supervisor

Sanchez, Carlos, Chief, Office of Departmental Training

Sanchez, H.G., Chief Psychologist

Short, Caroline, Staff Services Manager I

Siefert, Donna, Supervisor of Correctional Education Programs
Sifuentes, George, Deputy Director (A), Facilities Management Division
Singh, Harinder, Executive Officer, Technology Transfer
Smail, Mike, Staff Services Manager
Smelosky, Mark, Captain
Smith, Kelly, Use of Force Coordinator
Stafford, Kay, Parole Agent III
Stephens, Regina, Former Deputy Director, Parole & Community Services Division
Stewart, Joann, Personnel Operations Specialist
Thomas, Matthew B., Staff Services Manager II
Thompsen, Neil, Staff Services Manager II
Thornton, Kim, Use of Force Coordinator
Toni, Craig, Parole Agent III
Toombs, Christine, Parole Agent III
Tremblay, J.P., Assistant Director, Communications
Trexler, Larry, Captain, Institutions Division
Trimarchi, Heidi, Manager, Information Services Division
Tristan, David, Retired Chief Deputy Director
VeVea, George, Lieutenant
Weiss, Jean, Use of Force Coordinator
Williams, Martha, Deputy Compact Administrator
Winistorfer, Rick, Chief, Divisional Training Unit
Woodford, J. S., Director
Woolever, R., Lieutenant
Zamora, Lori, Manager
Zehringer, Beverly, Parole Agent II

### California Youth Authority

Allen, Calleen, Personnel Technician
Allen, Walter III, Director
Babich, Pam, Senior Information System Analyst
Bacigalupo, Dave, Assistant Superintendent
Baldwin, Nancy, Assistant Deputy Director
Ballard, Daryl, Assistant Superintendent
Belnas, Jenny, Student Assistant
Block-Brown, Robert, Assistant Deputy Director, Education Services Branch
Braswell, Milton, Assistant Deputy Director
Cardiff, Mike, Parole Agent III
Costa, Bill, Assistant Superintendent, Business Operations
Dulay, Dennis, Retired Parole Agent III
Dunkin, John, Special Agent-In-Charge, Internal Affairs
Easterwood, Sue, Research Program Specialist I
Farris, Jim, Retired Annuitant, Youth Authority Board
Flores, Loida, Associate Personnel Analyst
Florez-Delyon, Cynthia, Assistant Deputy Director
Ford, Dave, Parole Agent I
Franco, Patricia, Parole Agent III
Frazier, Valerie, Bureau Chief, Training Services Division

Gallegos, Mike, Retired Deputy Director, Institutions & Camps
Gantt, Mark, Assistant Director, Office of Professional Standards
Garcia, Carolina, Parole Agent III
Garcia, Sylvia, Chief Deputy Director
Haapanen, Rudy, Chief, Research Division
Herron, Ronald, Vice Chairman, Youth Authority Board
Inge, Peter, Background Investigator
Jackson, Gwen, Administrator I
Johnson, Deborah, Supervising Casework Specialist I
Kai, Richard, Deputy Director, Education Services Branch
Kamberian, Van, Staff Counsel
King, Don, Regional Administrator
Kopf, Paul, Staff Counsel
Lee, Joey, Departmental Budget Officer
Lewis, Terry, Captain, Background Investigations Bureau
Ludeman, Sarah, Information Officer, Public Affairs
Lungren, Nancy, Assistant Director, Public Affairs
Mak, Ken, Chief, Internal Audits
Marc-Aurele, Yvette, Deputy Director (A), Institutions & Camps
Minor, Michael, Major
Moore, Bob, Major
Pannel, Sue, Research Specialist
Panora, Joe, Chief Information Officer
Perrin, Cecilia, Associate Personnel Analyst
Sears, Reggie, Parole Agent III
Simpson, Debbie, Administrative Assistant
Skonovd, Norman, Research Manager
Smith, Chris, Deputy Superintendent
Smith, Larry, Data Processing Manager
Spar, Wayne, Population Management Specialist
Steel, Tina, Staff Counsel
Stenoski, Stephen M., Assistant Superintendent
Stresak, Bob, Retired Assistant Director, Internal Affairs
Valdez, Dan, Major
Wallace, Jack, Retired Administrator I
Ward, Sheryl, Chief, Financial Management Division
Weiss, Judy, Retired Assistant Deputy Director
Williams, Roxanna, Associate Budget Analyst
Wise, Sharie, Chief, Personnel Services Division
Wright, Sandra, Camp Superintendent

### Commission on Correctional Peace Officer Standards and Training

Alvarez, Laurel, Manager

### Council on Mentally Ill Offenders

Mandella, Rick, Executive Officer

### Prison Industry Authority

Beales, David, Chief Counsel
Colwell, Mike, Inmate Employability
Fitzgerald, Pat, Assistant General Manager
Halford, Jamie, Executive Secretary I, Prison Industry Board
Losco, Frank, Chief, Office of Public Affairs
Ylst, Eddie, Former General Manager

### Youth and Adult Correctional Agency

Aoyagi, Naomi, Assistant Secretary, Administration & Oversight
Baldo, Jeffrey, Chief Information Officer
Carruth, Kevin, Agency Undersecretary
English, Sharon, Crime Victim Coordinator
Hayhoe, Joyce, Deputy Secretary, Legislative
Hickman, Roderick Q., Agency Secretary
Horel, Robert A., Chief of Fiscal Programs
Loustalot, Sue, Deputy Secretary, Fiscal and Programs
Presley, Robert, Former Agency Secretary (Former State Senator)
Slavin, Bruce, General Counsel

## California Educational Organizations

### California State University, Long Beach

Powers, Matt, Assistant Professor

### California State University, Sacramento

Vohryzek-Bolden, Miki Ph.D., Criminal Justice Division

### Sacramento Unified School District

Allen, Ward, Coordinating Instructor

### University of California

Drake, Michael V. M.D., Vice President, Health Affairs

### University of California, Davis

Tinstman, Tom M.D., Associate Director of Clinical Information

### University of California, Santa Cruz

Stoller, Nancy Ph.D., Professor

### University of Southern California, Keck School of Medicine

Sreeninvasan, Shoba Ph.D.

**California Governor's Office**

### Office of Governor Arnold Schwarzenegger

Hutchison, Kacy, Deputy Cabinet Secretary
Pank, Karen, Deputy Legislative Secretary
Siggins, Peter, Legal Affairs Secretary

**California Labor Organizations**

### California Association of Highway Patrolmen

Santana, Tony, Attorney

### California Correctional Peace Officers Association

Adame, Louie, Rank & File Vice President CYA
Alexander, Chuck, Rank & File Vice President CDC
Corcoran, Lance, Executive Vice President
Dean, Robert, Supervising Vice President
Jimenez, Mike, State President

### California Correctional Supervisors Organization

Canutt, Ford, Field Services Representative
LeSage, Pat, Chief Financial Officer
Tatum, Richard L., State President

**California Oversight Agencies**

### Little Hoover Commission

Lyons, Nancy, Deputy Executive Director
Mayer, James, Executive Director

### Office of the Inspector General

Cate, Matt, Inspector General

**California Public Safety Organizations**

### California Highway Patrol

Cox, Diane, Sergeant, Internal Affairs
Dixon, Sam, Sergeant, Internal Affairs
Davis, Paul, Lieutenant
Fedullo, Dave, Sergeant
Fincel, Ed, Assistant Chief
Johnston-Brito, Anne, Sergeant, Departmental Training Division
Krolowsky, Lorraine, Sergeant, Internal Affairs
Kwong, Tina, Hiring & Selections
Lediju, Tonia, Staff Management Auditor
Sliney, Pat, Staff Services Manager, Policy Development
Tien, Ivan, Officer, Recruitment Division

Vasquez, Alfredo, Sergeant, Departmental Training Division

***Los Angeles County Probation Department***

Shumsky, Richard, Chief Probation Officer

***Los Angeles County Public Defenders Office***

Peters, Winston, Bureau Chief

***Los Angeles Police Department***

Birotte, Andre, Inspector General
Commander Maislin
Godown, Jeff, Detective, Computer Statistics
Green, Robin Ph.D., Former Chief of Training
Hensley, Candice, Officer
Kim, Paul, Commander, Training Office
Meisner, Gary, Detective, Risk Management Unit
Miller, Art, Lieutenant, Public Information Office
Schick, Walt, Captain
Smith, Greg, Detective, Risk Management Unit

***Los Angeles Sheriff's Department***

Johnson, Scott, Lieutenant, Risk Management Bureau

***Los Angeles Unified School District***

Ford, Anita, Personnel Director

***Nevada County Probation Department***

Carver, Doug, Chief Probation Officer

***Nevada Department of Corrections***

Ingram, Kevin, Personnel Operations Manager

***Placer County Superior Court***

Couzens, Richard, Judge

***Pomona Police Department***

Sevesind, Donald, Detective

***Riverside County District Attorney's Office***

Datig, Creg, Chief Deputy District Attorney

***San Diego County Superior Court***

Milliken, James, Retired Judge

***San Francisco Public Defenders Office***

Levine, Robin, Retired Deputy Public Defender

***Santa Clara County District Attorney's Office***

Kuty, Paula, Chief Assistant District Attorney

***Santa Clara County Probation Department***

>DeJesus, Robert, Probation Manager
>Duque, Kathy, Deputy Chief

***Ventura County Probation Department***

>Remington, Calvin, Chief


**California State Agencies (other)**

***Commission on Peace Officer Standards & Training***

>DiMiceli, Michael C., Assistant Executive Director
>O'Brien, Ken, Executive Director
>Reed, Dick, Assistant Executive Director
>Snow, Hal, Assistant Executive Director

***Department of Transportation***

>Wehe, Dick, Assistant Chief Counsel

***Department of Finance***

>Jarue, Todd, Budget Analyst
>Theodorovic, Zlatco, Budget Analyst
>Tilton, James, Program Budget Manager

***Department of General Services***

>Sogge, Joe, Chief Information Officer

***Department of Industrial Relations***

>Acosta, Lucille, Chief, Division of Apprenticeship Services

***Department of Mental Health***

>Rodriguez, John, Deputy Director

***Department of Personnel Administration***

>Pope, Kathy, Staff Counsel
>Sanders, Karen, Personnel Program Analyst
>Seaborn, Marguerite, Chief Counsel

***Office of the Attorney General***

>Applesmith, Jacob, Deputy Attorney General
>Doke, Darryl, Deputy Attorney General
>Grunder, Frances, Senior Assistant Attorney General

***Secretary of State Office***

>Soriano, Bernard, Chief Information Officer

**California State Legislature**

>Richman, Keith S., Assembly Member
>Romero, Gloria, Senator
>Speier, Jackie, Senator
>Steffen, Richard, Staff Director

**Citizen Correspondence**

>Allen, Vivian
>Antista, Janice
>Burkhart, Toni
>Chavez, Frank
>Edwards, Leonard
>Escoto, David
>Fetzer, Sheila
>Funkhouser, Linda
>Hale, Arzell
>Hansen, Doug
>Herrera, David
>Hikcernell, Douglas
>Kemp, Mark
>Kennedy, Phillip, Jr.
>Kindred, Richard
>Mariscal, Linda
>Mitchell, Don
>Morgan, Brett
>O'Brine, Jillian
>Pinto, Alvaro & Adozinda
>Proby, Lee
>Schmidt, William
>Sturtevant, Beverlee
>Swig, Julian
>Williams, Debbie

**Citizen E-Mail Suggestions**

>Beverage, Julie
>Bikowski, Mary
>Bromberg, Martha
>Brown, Jim
>Caldwell jr., Floyd
>Chantal, Gibbs
>Cornwell-Spencer, Sharon
>Daley, Robert
>Fackler, Martie
>Hazelton, Mark
>Holt, Nikki

Leber, Jon
MacMurray-Muzquiz, Rebecca
Niedermann, Nathalie
Owen, Brook
Parks, Gary
Patterson, Robert
Pipes,Susan
Rodarte, Steve
Tristan, Irma M.
Veach, Bob
Willner, Nei
Wilson, Jeff
Woodyard, Mark
16 Anonymous Citizens

## Departments of Corrections of Other States

### Alabama Department of Corrections

Crumpton, Art, Assistant Director, Intelligence & Investigations

### Alaska Department of Correctional Institutions

Addington, Mike, Director

### Arizona Department of Corrections

Sims, Clayton, Internal Affairs Investigator

### Arkansas Department of Corrections

Vilches, Ronald, Internal Affairs Investigator

### Colorado Department of Corrections

Smith, Dave, Chief Inspector of Special Operations

### Connecticut Department of Corrections

Johnson, Mary, Director, Programs & Treatment
Ottolini, Pat, Director, Health Care

### Delaware Department of Corrections

Lupineti, Jim, Director, Internal Affairs

### Florida Department of Corrections

Brooks, Murray, Program Administrator
Davis, Arlan, Risk Management Specialist
Johnson, Ken, Program Administrator
McDaniel, Roger
Stevens, Doug, Chief of Investigations

### Georgia Department of Corrections

Bazar, Edmond, Director of Professional Standards

### Idaho Department of Corrections

Wolf, Steve, Chief Investigator, Professional Standards

### Illinois Department of Corrections

Lynch, Therese, Parole Agent
Molina, Sergio, Information Officer
Winters, Linda

### Louisiana Department of Corrections

Sivula, Eric, Internal Affairs
Stalder, Richard L., Secretary

### Maryland Department of Corrections

Harding, Doug, Internal Affairs

### Massachusetts Department of Corrections

Gotivich, Erin, Internal Affairs

### Missouri Department of Corrections

Huegen, Gena, Internal Affairs

### Montana Department of Corrections

Micu, Mike, Internal Affairs
Robinson, Cil, Juvenile Justice Specialist

### Nebraska Department of Corrections

McIntyre, Barbara, Assistant Manager, Human Resources

### New Hampshire Department of Corrections

Currier, Lisa, Human Resources Administrator

### New Jersey Department of Corrections

Lewis, Donald, Assistant Director, Labor Relations

### New York Department of Corrections

Antenen, Thomas, Deputy Commissioner
Brown, Peter, Director, Labor Relations
McCarthy, Thomas, Editorial Director

### North Carolina Department of Corrections

Wilder, Nancy, Chief, Employee Relations

### Ohio Department of Corrections

Lewis, Beth, Assistant Chief, Labor Relations
Northrup, Kay, Deputy Director, Health Care

### Oregon Department of Corrections

Everett, Randy, Investigative Administrator
Holman, Lana, Juvenile Justice Specialist

### Pennsylvania Department of Corrections

Gieda, Deb, Manager, Office of Professional Responsibility

### Rhode Island Department of Corrections

Langlois, Renauld, Chief Inspector, Special Investigations Unit

### South Dakota Department of Corrections

Stahl, Kim, Manager, Human Resources

### Tennessee Department of Corrections

Beauregard, Charles, Director, Internal Affairs

### Texas Department of Corrections

Johnson, Gary L., Executive Director
Pena, Zeke, Program Administrator
Stubblefield, Lynn, Human Resources Specialist

### Washington Department of Corrections

Gastreich, Kathy
Lehman, Joseph D., Secretary

### Wisconsin Department of Corrections

Hahn, Donna, Juvenile Justice Specialist


## Federal Organizations

### Federal Bureau of Prisons

Ehar, Sandra, Public Affairs Officer
Kearns, Lura, Internal Affairs
Vanyur, John M., Senior Deputy Assistant Director

### National Institute of Corrections

Ritchie, Peggy

### U.S. Army

Goodloe, John, Research Division
Walker, Christine, Research Division

### U.S. Medical Center for Federal Prisoners

Quintar, Al, Executive Assistant
Roberts, Anthony, Director


## Governmental Agencies of Other States

### Illinois, Marion County Probation Department

Webb, Wendy

**Appendix E**

*Indiana Superior Court*

    Surbeck, John F., Judge

*Texas, State Office of Risk Management*

    McAtee, Gail, Director of Administration

*University of Texas Medical Branch*

    Pederson, Jere, President


**Other - Consultants, Non-Profits, and Private Organizations**

*Alternative Programs Inc.*

    White, Gary, President

*Bristol-Meyers Squibb Co.*

    Kuhns, Ann-Lousie, Associate Director of Governmental Affairs

*California District Attorneys Association*

    LaBahn, Dave, Executive Director

*California Police Chiefs Association*

    Brown, William, Chief, Lompoc Police Department
    McGill, Leslie, Executive Director

*California Public Defenders Association*

    Gusman, Shane, Legislative Representative

*California State Association of Counties*

    Howard, Elizabeth, Legislative Representative
    Maltbie, John, County Manager, San Mateo County
    Silva, John, Supervisor, Solano County

*California State Sheriffs' Association*

    Hill, Curtis, Sheriff, San Benito County
    Warner, Nick, Governmental Affairs Representative

*Cedars-Sanai Medical Center*

    Rosko, Thomas M.D., Consultation Psychiatry

*Center on Juvenile and Criminal Justice*

    Macallair, Dan
    Sullivan, Jacqueline, Administrative Assistant

*Chief Probation Officers Association of California*

    Suzuki, Norma, Executive Director

*Commonweal*

    Steinhart, David, Juvenile Justice Program Director

**Cornell Companies Inc.**

      Thompson, Mark, Vice President

**Correctional Counseling Inc.**

      Robinson, Ken, President
      Weibe, Marvin

**Correctional Health Care Consultant**

      Shansky, Ronald M.D.

**Correctional Systems Inc.**

      Forren, John R., President & Chief Executive Officer

**Corrections Corporation of America**

      Nave Mayberry, Lucibeth, Sr. Director

**Criminal Justice Consultant**

      Breed, Allen F.
      Cooper, Gary, Legislative Advocate

**E-Government and Public Policy**

      Mechling, Jerry, President

**Employment Background Investigations Inc.**

      Ford, Bob

**E-Republic**

      Graves, Bob, Co-Founder

**Foundation for Community Colleges**

      Chen Jr., Arthur, Director of Facilities Programs

**General Dynamics/Veritirecks**

      Drews, Paul, Western Sales Manger

**Government Relations**

      Blonien, Rodney J., Attorney at Law

**IBM**

      Boynton, Ann, Managing Consultant

**Institute for the Study and Prevention of Hate Crimes**

      Rosenthal, Matthew, Executive Director

**Management & Training Corporation**

      Hartwig, Jack T., Director

**Manhattan Institute for Policy Research**

      Olson, Henry, Executive Director

**MHM Correctional Services Inc.**

    Pinkert, Michael, President

**MN & Associates**

    Nobili, Mark, President, Public Relations & Government Affairs

**National Commission on Correctional Healthcare**

    Bishoff, Marshall M.D., Surveyor

**National Council on Crime & Delinquency**

    Krisberg, Dr. Barry, President

**Prison Law Office**

    Specter, Donald, Director

**Pro Tech Monitoring Inc.**

    Calabreese, Wayne H., President

**The GEO Group Inc.**

    Calabreese, Wayne H., President

**The Performance Institute**

    DeMaio, Carl, President

**Volunteer Auxiliary of Youth Guidance Center**

    Siggins, Elizabeth, Executive Director

**XEROX**

    Veri, Cynthia Z.

**Youth Law Center**

    Burrell, Sue, Attorney

# EXHIBIT R

**California State Auditor**

BUREAU OF STATE AUDITS

# High Risk:

*The California State Auditor's Initial Assessment of High-Risk Issues the State and Select State Agencies Face*



May 2007
2006-601

The first five copies of each California State Auditor report are free.
Additional copies are $3 each, payable by check or money order.
You can obtain reports by contacting the Bureau of State Audits
at the following address:

**California State Auditor**
**Bureau of State Audits**
**555 Capitol Mall, Suite 300**
**Sacramento, California  95814**
**(916) 445-0255 or TTY (916) 445-0033**

OR

**This report is also available**
**on the World Wide Web**
**http://www.bsa.ca.gov**

The California State Auditor is pleased to announce
the availability of an on-line subscription service.
For information on how to subscribe, please contact
the Information Technology Unit at (916) 445-0255, ext. 456,
or visit our Web site at www.bsa.ca.gov

**Alternate format reports available upon request.**

Permission is granted to reproduce reports.

# CALIFORNIA STATE AUDITOR

**ELAINE M. HOWLE**
STATE AUDITOR

**DOUG CORDINER**
CHIEF DEPUTY STATE AUDITOR

May 31, 2007

2006-601

The Governor of California
President pro Tempore of the Senate
Speaker of the Assembly
State Capitol
Sacramento, California  95814

Dear Governor and Legislative Leaders:

As authorized by Chapter 251, Statutes of 2004, the Bureau of State Audits presents its report concerning its initial assessment of high-risk issues the State and select state agencies face. Providing the leadership, programs, and services the State needs is a complex business; the use of significant resources and the provision of critical services to the people of California are accompanied by risks. Systematically identifying and addressing high-risk areas can contribute to enhanced efficiency and effectiveness by focusing the State's resources on improving the delivery of services related to important programs or functions.

We believe the State is currently faced with at least five significant statewide risk areas: emergency preparedness, maintaining and improving infrastructure, information technology, management of human resources, and other post-employment benefits of retiring state employees. We further believe that two state agencies meet our criteria for high risk as they face challenges in their day-to-day and long-term operations: the Department of Corrections and Rehabilitation and the Department of Health Services.

We will continue to monitor the risks we have identified in this report and the actions state agencies take to address them. In addition, we plan to periodically evaluate the quality and effectiveness of the State's mitigation efforts by conducting audits and making recommendations for improvement. When the State's actions, including those in response to our recommendations, result in significant progress toward resolving or mitigating these risks, we will remove the high-risk designation based on our professional judgment.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE
State Auditor

# CONTENTS

***Summary***                                                                    1

***Introduction***                                                               5

***High-Risk Issues the State and Select State Agencies Face***

Broad Areas of High Risk                                                          7

Removal of Broad Areas of Risk From the High-Risk List                          21

State Agencies Facing Risks and Challenges                                      21

***Appendix***

Considerations for Determining High Risk                                        33

# SUMMARY

## Report Highlights . . .

*Effective January 2005, Government Code, Section 8546.5, authorizes the Bureau of State Audits (bureau) to develop a risk assessment process for the State. Through this process, the bureau will identify, audit, and issue reports with recommendations for improvement in areas it identifies as high risk.*

*For this inaugural high-risk list, we have identified both risks that encompass multiple state agencies and those that are agency-specific. The following are the significant statewide risk areas:*

☑ **Emergency preparedness**

☑ **Maintaining and improving infrastructure**

☑ **Information technology**

☑ **Management of human resources**

☑ **Other post-employment benefits of retiring state employees**

*The following two state agencies meet our criteria for high risk:*

☑ **Department of Corrections and Rehabilitation**

☑ **Department of Health Services**

## RESULTS IN BRIEF

Providing the leadership, programs, and services the State needs is a complex business; the use of significant resources and the provision of critical services to the people of California are accompanied by risks. Systematically identifying and addressing high-risk areas can contribute to enhanced efficiency and effectiveness by focusing the State's resources on improving the delivery of services related to important programs or functions. Legislation effective in January 2005 authorizes the Bureau of State Audits (bureau) to develop a risk assessment process for the State. In particular, Government Code, Section 8546.5, authorizes the bureau to establish a high-risk audit program to identify, audit, and issue reports with recommendations for improvement in areas it identifies as high risk. The bureau's authority includes initiating audits of areas identified as high risk and requiring the responsible state agencies to periodically report on the status of their progress in mitigating or resolving identified risks.

In some instances risks related to leadership, programs, or services cut across all or multiple state agencies; in other instances one or more of these risks are concentrated in one state agency. For this inaugural high-risk list, we have identified both risks that encompass multiple state agencies and those that are agency-specific. In particular, we believe the State is currently faced with at least five significant statewide risk areas: emergency preparedness, maintaining and improving infrastructure, information technology (IT), management of human resources, and other post-employment benefits of retiring state employees. We further believe that two state agencies meet our criteria for high risk as they face challenges in their day-to-day and long-term operations: the Department of Corrections and Rehabilitation (Corrections) and the Department of Health Services (Health Services).

California's emergency preparedness system must address a wide range of potential emergencies, some of which can be catastrophic in their effect on public health, safety, and economic well-being. Multiple state agencies play a role in ensuring the State is prepared to respond to emergencies including the Governor's Office of Homeland Security, the Governor's Office of

Emergency Services, and Health Services. Despite the heightened awareness of the potential for a catastrophic emergency arising from events such as Hurricane Katrina and the terrorist attacks on the United States in 2001, the State is not as well prepared for emergencies as it should be. The bureau's most recent report on emergency preparedness supports this concern. Among the key concerns the bureau noted in that report were that the State's organizational structure for ensuring emergency preparedness is neither streamlined nor well-defined and its annual response exercises have not sufficiently tested the medical and health response systems.

Infrastructure is the underlying foundation or basic framework of a system or organization. The State's infrastructure covers a myriad of assets including roads, bridges, and levees, much of which was constructed in the 1950s and 1960s. Maintenance and improvement needs for these critical State assets have increased as they have aged but have not always been met. Similarly, as the State's population has grown, it is widely acknowledged that we have not always added the infrastructure necessary to accommodate that growth. Until recently, significant financing has not been available to meet infrastructure demands. However, in November 2006 the voters approved an unprecedented bond package totaling $42.7 billion to begin addressing the State's infrastructure needs. The authorization of these bond funds introduces a number of risks that must be addressed. The State must properly plan for the use of these bonds, coordinate the projects the funds will finance, take on debt responsibly, and ensure it meets its fiduciary responsibility to the taxpayers by monitoring and overseeing how these dollars are spent.

Information technology (IT) systems are increasingly important for efficient and effective business practices. Strong IT oversight is critical at a time when the State has IT projects in process which, according to the Department of Finance, currently total nearly $6 billion. However, despite efforts to establish statewide governance over IT, the State's prior models had limited success and did not provide the statewide vision needed to ensure the State invests in IT projects promising the greatest possible benefit. As a result, the State has suffered past IT failures costing taxpayers hundreds of millions of dollars. The State is beginning to implement a new governance model, but the functions of and full level of responsibility for the current model are not

yet clear. Without strong statewide oversight and a clear vision of IT needs, the State is at risk for ineffective and improper IT investment and use.

Human resources management is another statewide high-risk area. The State will soon face the consequences of a significant portion of its current workforce retiring. According to the Department of Personnel Administration, 44 percent of the State's current workforce is over the age of 45, and up to 35 percent of these employees are eligible to retire between 2006 and 2010. Staffing shortfalls may reduce the ability of state agencies to perform their missions efficiently and effectively, and significant vacancies could threaten the ability of state programs to deliver critical services. Large numbers of retirements and filling vacancies with quality staff present challenges that are strongly entrenched and far-reaching. These challenges are not limited to any one agency; they have the potential to negatively impact every state agency. As more and more top managers and key staff reach retirement age, this challenge will become more acute.

Another effect of these retirements is the increased cost to the State of other post-employment benefits—those benefits the State pays individuals in addition to a pension, such as health care. The State pays 100 percent of the health insurance cost for retirees, as well as certain other costs, out of annual appropriations on a pay-as-you-go basis. The cost of providing these insurance benefits to retirees for the year ended June 30, 2006, was $888 million. With the required implementation of a new federal reporting standard, the State's financial statements for fiscal year 2007–08 will for the first time need to reflect its estimated liability for these future other post-employment benefits. In early May 2007 the State Controller's Office issued a report from its actuary estimating the liability at $48 billion as of July 1, 2007. The State's risk here is twofold: whether it can afford to provide the level of benefits promised to its employees while protecting its credit rating. Bond rating agencies have already made it clear they will look with disfavor on governments that do not adequately plan for managing this liability.

Although we do not intend them as a complete list of all the risks state agencies face, Corrections and Health Services presently face significant challenges that warrant inclusion on our inaugural high-risk list. Corrections reports that many of its adult institutions are exceeding their capacity to safely house

and rehabilitate inmates and the United States District Court for the Northern District of California placed Corrections' inmate health care system in receivership. Corrections also faces the challenge of continuing to implement a reorganization it began in 2005, a reorganization designed to address many of the problems it faced then and continues to face today. Corrections' reorganization efforts are also at risk because of inconsistent leadership at many management levels.

On July 1, 2007, Health Services is slated to split into two separate departments: the Department of Public Health and the Department of Health Care Services. The primary goal for the split is to provide stronger, more focused leadership over public health and to give the State's role in public health a significantly higher priority. The Legislature has also expressed its expectation for increased accountability and program effectiveness for both the public health and health care purchasing functions the State provides. California faces risks related to program continuity from creating two departments where just one existed before, and the two new departments face challenges of enhancing accountability and program effectiveness to meet the Legislature's expectations.

We will continue to monitor the risks we have identified in this report and the actions state agencies take to address them. To successfully mitigate these risks, we believe the State needs to take certain actions. For example, in the case of the broad areas of risk involving multiple agencies a responsible person, group, or entity must be charged to address the risks. Those responsible parties and the specific state agencies we have designated as being at high risk must demonstrate a commitment to address the risks and have sufficient resources to resolve them. They must develop detailed and definitive action plans along with a process for independently monitoring and measuring the effectiveness of the steps taken. In addition to monitoring these actions, we plan to periodically evaluate the quality and effectiveness of the State's mitigation efforts by conducting audits and making recommendations for improvement. When state actions, including those in response to our recommendations, result in significant progress toward resolving or mitigating these risks, we will remove the high-risk designation based on our professional judgment. ∎

# INTRODUCTION

## BACKGROUND

Identifying and addressing high-risk areas in California's government can lead to the assessment and resolution of serious weaknesses in the State's use of significant resources and provision of critical services to its citizens. The process of systematically identifying and addressing high-risk areas can also contribute to enhanced efficiency and effectiveness, focusing the State's resources on improving the delivery of services related to important programs and functions. High-risk programs and functions include not only those particularly vulnerable to fraud, waste, abuse, and mismanagement or that present major challenges associated with their economy, efficiency, or effectiveness, but also those of particular interest to the citizens of the State and those that have potentially significant impacts on public health, safety, and economic well-being.

## FEDERAL AND STATE RISK ASSESSMENT PROGRAMS

Since 1990 the U.S. Government Accountability Office has periodically reported on federal government operations that it has designated as high risk, identifying general and specific areas of concern, making recommendations to address weaknesses, and performing follow-up assessments of progress made in resolving issues. Some of the areas of concern it has identified—management of contracts and human resources, for example—are responsibilities all governments share. Others, such as the functions of the Federal Aviation Administration or the Department of Defense, relate primarily to federal responsibilities.

Legislation effective in January 2005 authorizes the Bureau of State Audits (bureau) to develop a similar risk assessment process for the State. In particular, Senate Bill 1437 of the 2003–04 Regular Session of the Legislature added Section 8546.5 to the Government Code. It authorizes the bureau to establish a high-risk audit program, to issue reports with recommendations for improvement in areas it identifies as high risk, and to require state agencies responsible for these identified programs or functions to report periodically to the bureau on the status of recommendations for improvement made by the bureau.

## THE BUREAU'S CRITERIA FOR IDENTIFYING AREAS OF HIGH RISK

Our first task was to formulate considerations for developing an initial list of statewide issues and state agencies that we believe are at high risk for the potential of waste, fraud, abuse, and mismanagement or that have major challenges associated with their economy, efficiency, or effectiveness. In the Appendix we describe the factors we considered including: an agency's mission or key function and how it contributes to the State's overall performance, qualitative and quantitative factors, an agency's responsiveness to recommendations, and the quality of corrective measures. We also outline in the Appendix the factors we will consider in determining whether it is appropriate to remove a statewide issue or state agency from our high-risk list.

## SCOPE AND METHODOLOGY

Government Code, Section 8546.5, authorizes the bureau to establish an audit program for identifying state agencies that are at high risk for potential waste, fraud, abuse, and mismanagement or that have major challenges associated with their economy, efficiency, or effectiveness. The law also authorizes the bureau to audit any state agency that it identifies as high risk and to issue related audit reports at least once every two years. This report provides an initial list of high-risk areas the bureau identified, which may be the subject of audits we perform in the future.

To identify high-risk areas in state government, we established criteria for identifying areas of high risk, as previously described. We reviewed audit and investigative reports we have issued to identify issues of significant concern and reviewed reports of other audit or oversight entities. In addition, we consulted with legislative budget and fiscal committees, the Legislative Analyst's Office, the Milton Marks "Little Hoover" Commission on California State Government Organization and Economy, the Department of Finance, and other control agencies that have oversight responsibilities in the State.

For those areas we concluded on a preliminary basis to be high risk, we interviewed agencies with significant related responsibilities to assess their perspectives on the extent of risk the State faces and to identify any efforts underway to mitigate the risks. We also reviewed reports and other documentation they provided to us.

# HIGH-RISK ISSUES THE STATE AND SELECT STATE AGENCIES FACE

## BROAD AREAS OF HIGH RISK

California has a large and diverse economy and is home to more than 37 million people. Providing the leadership, programs, and services the State needs is a complex business with risks related to the use of significant resources and the provision of critical services to the people of California. In some instances risks concerning leadership, programs, or services cut across all or multiple state agencies; in other instances, one or more of these risks are concentrated in one agency. In this inaugural high-risk list we have identified risks that cut across multiple state agencies and those that are agency-specific as the Appendix describes in greater detail. We believe the State is currently faced with at least five significant statewide risk areas: emergency preparedness, maintaining and improving infrastructure, information technology, management of human resources, and other post-employment benefits of retiring state employees.

### Emergency Preparedness

California's emergency preparedness system, which links the State in mutual-assistance agreements with local governments and federal emergency preparedness agencies, must address a wide range of potential emergencies, some of which can be catastrophic in their effect on public health, safety, and economic well-being. Potential emergencies range from single, short-term events, such as the major earthquakes and fires in densely populated areas California has experienced in the past, to prolonged emergencies like a pandemic that the medical community has warned could sweep the State, last for months, and challenge the capacity of hospitals and clinics to accommodate the sick. In addition to natural disasters, the State must be prepared for man-made events—like the terrorist attacks in September 2001 or the riots that caused extensive damage in Los Angeles in 1992.

In California, although about 40 state entities may be involved when the State responds to emergencies, the following three are very heavily involved in preparedness: the Governor's Office of

Homeland Security (State Homeland Security), the Governor's Office of Emergency Services (Emergency Services), and the Department of Health Services (Health Services). State Homeland Security serves as the lead state contact with Federal Homeland Security on matters relating to terrorism and state security and develops, implements, and maintains a statewide homeland security strategy. Emergency Services is the lead agency for emergency management in California and coordinates the State's response to major emergencies in support of local entities. Health Services coordinates the State's overall public health preparedness and response efforts and maintains California's public health emergency plans.

Despite the heightened awareness of the potential for a catastrophic emergency such as the devastation caused from Hurricane Katrina and the terrorist attacks on the United States in 2001, the State is not as well-prepared for emergencies as it should be. Since 2002 the bureau has issued five reports related to emergency preparedness. Each report concludes that the State is weak in one or more of the four elements of emergency preparedness: planning, training, corrective action, and equipment and resources.

The planning phase of emergency preparedness is to *prepare* or undertake activities in advance of an emergency to be ready should an emergency occur. However, in four of the five reports we have issued since 2002 on this subject, the bureau expressed concerns with the State's planning. For example, in a July 2003 report (report 2002-113), the bureau noted that Emergency Services lacked a formal process to regularly review and update the State Emergency Plan and its annexes including the Earthquake Advisory Plan and Emergency Resources Management Plan. Also, three of our reports noted issues regarding training. For instance, in a report focused on terrorism readiness (report 2002-117) the bureau concluded that the California National Guard had not provided all of the training its Joint Operations Center needed to adequately respond to terrorism missions.

The bureau issued its most recent report on emergency preparedness in September 2006. In this report, the bureau noted four principal concerns: The State's organizational structure for ensuring

---

The bureau's five reports on emergency preparedness since 2002 highlight the State's weakness in one or more of the four elements of emergency preparedness: planning, training, corrective action, and equipment and resources. The bureau's five reports are titled as follows:

- *Emergency Preparedness: California's Administration of Federal Grants for Homeland Security and Bioterrorism Preparedness Is Hampered by Inefficiencies and Ambiguity* (Report 2005-118, September 2006)

- *Emergency Preparedness: More Needs to Be Done to Improve California's Preparedness for Responding to Infectious Disease Emergencies* (Report 2004-133, August 2005)

- *Governor's Office of Emergency Services: Its Oversight of the State's Emergency Plans and Procedures Needs Improvement While Its Future Ability to Respond to Emergencies May Be Hampered by Aging Equipment and Funding Concerns* (Report 2002-113, July 2003)

- *Terrorism Readiness: The Office of Homeland Security, Governor's Office of Emergency Services, and California National Guard Need to Improve Their Readiness to Address Terrorism* (Report 2002-117, July 2003)

- *California National Guard: To Better Respond to State Emergencies and Disasters, It Can Improve Its Aviation Maintenance and Its Processes of Preparing for and Assessing State Missions* (Report 2001-111.2, February 2002)

emergency preparedness is neither streamlined nor well-defined; its annual response exercises have not sufficiently tested the medical and health response systems; Emergency Services and State Homeland Security have been slow in spending federal grant awards for improving homeland security; and Emergency Services is behind schedule in its receipt and review of county and state agency emergency operations plans.

When we solicited their perspectives on emergency preparedness, Emergency Services and Health Services both pointed to their respective strengths and weaknesses in preparing for emergencies that require their response. Positive trends Emergency Services noted included the State's efforts to implement systems to foster better-integrated communications among emergency responders and to address the concerns of populations with special needs by including representatives of these communities in Standardized Emergency Management Systems (SEMS) committees. SEMS is the system California uses to manage its responses to emergencies. In contrast, Emergency Services also listed numerous areas of concern, including inadequate salaries for the emergency management workforce, limited resources for equipment, and insufficient efforts to make the public aware of the risks posed by emergencies.

Health Services pointed out that the evolution of its Emergency Preparedness Office from a small unit several years ago to an equal partner with the other major divisions of the department underscores the increased attention and recognition it has given to emergency preparedness. However, Health Services also believes that there is currently a lack of agreement on goals between the federal and state governments, accompanied by a shift in focus from terrorism to natural disasters prompted by Hurricane Katrina.

An official we contacted at State Homeland Security spoke extensively on preparedness in terms of its *metrics project*. According to State Homeland Security, the federal National Response Plan poses 15 scenarios that the State wants to be prepared for. State Homeland Security is working with Emergency Services and local working groups to determine from the ground up what capabilities exist and to set a metric for a minimum level of preparedness for each type of emergency scenario.

**Maintaining and Improving Infrastructure**

Infrastructure is the underlying foundation, or basic framework of a system or organization. The State's infrastructure covers a myriad of assets including roads, bridges, levees, housing, schools, government buildings, prisons, parks, and health facilities. Much of the State's infrastructure was constructed in the 1950s and 1960s. As these critical assets have aged, maintenance needs have increased but have not always been met. For example, the State estimated that $2 billion would be needed to preserve the existing state highway system for the fiscal year ending June 30, 2006, but only $1.5 billion was actually spent during that year. In addition, the number of state highway lane miles in fair to poor condition has been increasing in recent years, with the total reaching more than 13,800 miles as of June 2006. Similarly, it is widely acknowledged that we have not always added the infrastructure necessary to accommodate the State's population growth. As a result, significant investments will be needed to upgrade and expand the State's infrastructure.

Until recently, significant financing has not been available to meet infrastructure needs. However, in November 2006 the voters approved an unprecedented bond package totaling $42.7 billion to begin addressing the State's infrastructure needs. The authorization of these bond funds introduces a number of risks that the State will need to address. In particular, the State must properly plan its use of these bond funds and coordinate the projects the funds will finance so that it follows the voters' intent and the bond funds are effectively and efficiently used. In addition, taking on debt creates its own risk, and the State must do so responsibly. Finally, the State has a fiduciary responsibility to the taxpayers to monitor and oversee how these dollars are spent.

The following bureau reports highlight the importance of timely and cost-effective project delivery:

- *California Department of Transportation: Low Cash Balances Threaten the Department's Ability to Promptly Deliver Planned Transportation Projects* (Report 2002-126, July 2003)

- *California Department of Transportation: Seismic Retrofit Costs of State-Owned Toll Bridges Have Significantly Exceeded the Department's Original Estimates and May Go Even Higher* (Report 2001-122, August 2002)

### Planning and Coordination

In January 2007 the governor released the California Strategic Growth Plan, which indicates that California requires over $500 billion in infrastructure investment to meet the demands of its growing population over the next 20 years. The 2006 bond package represents a portion of the money with which the State can begin to address its infrastructure needs. However, addressing these needs will take large-scale planning and coordination. For example, one

of the bond measures voters approved was the Safe Drinking Water, Water Quality and Supply, Flood Control, River and Coastal Protection Bond Act of 2006. This measure authorized $5.4 billion in bond funds to be distributed to or administered by 20 different state departments and boards and local conservancies, including the Departments of Water Resources and Parks and Recreation, the State Water Resources Control Board, and a variety of coastal, mountain, and river conservancies.

According to an analysis the Legislative Analyst's Office (Analyst's Office) performed, there are 67 pots of money included in the 2006 bond package, each with its own purpose and administering agency. The bonds also fund 21 new state programs. In the 2007 California Five-Year Infrastructure Plan (infrastructure plan), the Department of Finance (Finance) describes the 2006 bonds as the first installment in the governor's 20-year plan to rebuild California. The infrastructure plan acknowledges the importance of planning and prioritizing. However, considering the breadth of the State's needs, the numerous categories of infrastructure the 2006 bond package is authorized to fund, and the number of administering agencies, the State faces risks. Such risks include ensuring that it properly prioritizes its infrastructure projects, then selects and executes those most likely to meet existing and future needs. The State also faces risks in ensuring that the various agencies with a role in expending the bond funds coordinate as needed and that redundancy and confusion do not result in wasted time and money and needless delays in completing critical projects.

### Managing Debt

The 2006 bond package authorized the State to issue $42.7 billion in general obligation bonds. The State, in planning to finance a large part of its infrastructure with bond funds, faces the challenge of financing the right projects and balancing this debt with other potentially necessary debt. Bonds are generally paid back over a long period of time. It is appropriate to use bond proceeds for financing infrastructure because the long repayment period often mirrors the life of the infrastructure and spreads the financing costs to the many people who benefit from the projects. However, the State must be vigilant to ensure that the terms of future bond issuances responsibly spread costs over the life of the infrastructure projects they are used to create or improve.

Another challenge with funding infrastructure with bond funds is balancing additional debt with existing or other potentially necessary debt. The State issues bonds for a variety of reasons and at any point in time has a number of bonds outstanding. However, it must be sensitive to its debt burden. As the infrastructure plan notes, the bond markets and bond rating agencies are watchful of the reasonableness of a state's debt level. A common measure of a state's debt burden is the ratio of General Fund debt service payments to state revenues referred to as the debt-service ratio. According to the Analyst's Office, some in the investment community look to the debt-service ratio as a useful general indicator of the State's debt burden, and some have expressed concerns when the ratio starts to exceed 6 percent. The Analyst's Office also indicated that the debt-service ratio for fiscal year 2005–06 amounted to 5.4 percent. It will be important for the State to continue monitoring its debt burden to ensure it can arrange future borrowings at reasonable interest rates.

Although the voters approved a significant investment in the State's infrastructure through the 2006 bond package, the State will need to be efficient to ensure all the spending authority is put to good use. For example, the Highway Safety, Traffic Reduction, Air Quality and Port Security Bond Act of 2006 provides for $4.5 billion in bond funds for performance improvements on California's highly congested travel corridors. The act also specifies that a project can only be included in the program if construction or implementation commences no later than December 31, 2012. In commenting on the risks the State faces related to infrastructure, an official from the Department of Water Resources told us that for the work needed on the State's levees and water systems, it will be challenging to meet certain time requirements because of the lengthy efforts currently underway that are necessary to measure where the needs are greatest. However, he also noted that there are a number of local projects that are ready to get underway and that the bond funds will allow them to start soon.

### Oversight

Infrastructure may be planned and built by the State, but it is funded with taxpayer money. Therefore, the State has a fiduciary responsibility to monitor and oversee how these dollars are spent. The 2006 bond package offers a mixed bag in terms of its requirements to report on or audit the use of the funds. For example, according to the Analyst's Office, transportation

The following bureau reports highlight weaknesses in oversight of state and local infrastructure projects:

- *Department of Parks and Recreation: It Needs to Improve Its Monitoring of Local Grants and Better Justify Its Administrative Charges* (Report 2004-138, April 2005)

- *Department of Transportation: Various Factors Increased Its Cost Estimates for Toll Bridge Retrofits, and Its Program Management Needs Improving* (Report 2004-140, December 2004)

represents the largest segment of the bond funding at $19.9 billion, and this money will fund 15 different programs. However, only nine of the programs require oversight reports or audits.

In January 2007 the governor issued an executive order laying a framework for bond accountability. The order states that "departments shall be accountable for ensuring that bond proceeds are spent efficiently, effectively and in the best interests of the people of the State of California." The order requires each department to establish a *three part accountability structure* for the bond proceeds they may receive. The first part of the accountability structure requires departments to follow existing criteria for bond expenditures including state or federal law, regulations, implementation plans, or a capital outlay program. The second part of the structure requires these departments to document ongoing actions to ensure projects funded with the bonds stay within their scopes and budgeted costs and for each administering department to report about its actions semi-annually to Finance. The third point of accountability makes department expenditures funded with bond proceeds subject to audit by Finance.

We discussed infrastructure with staff from the California Transportation Commission (Transportation Commission). According to the Transportation Commission's executive director, a challenge the State faces is ensuring that the projects undertaken are delivered, especially at the local level. Projects must be completed and opened to users in a timely manner to offer the intended benefits. Because construction costs can rise rapidly, timely project completion also helps to ensure available funding is maximized. The Transportation Commission told us it is planning to provide stronger oversight on transportation projects undertaken as part of the 2006 bond package to ensure that once funds are committed, the projects move forward rapidly to completion. Given the size, complexity, and cost of the State's infrastructure needs and the public funds made available to address them, oversight will be critical to ensuring the programs are run efficiently and effectively and provide maximum benefit.

## Information Technology

Information technology (IT) systems are increasingly important for efficient and effective business practices. The State has an ongoing need for its IT to keep pace with technology changes and to develop and use IT where it has not existed in the past. However, despite efforts to establish statewide governance, the State has lacked strong IT oversight for many years. Its prior governance models have had limited success and have not provided the statewide vision needed to ensure the State invests in IT projects with the greatest possible benefit. Moreover, the functions of and full level of responsibility for the current governance model are not yet clear. Without strong statewide oversight and a clear vision of its IT needs, the State is at risk for ineffective and improper IT investment and use. Strong oversight is critical at a time when the State has IT projects planned or in process that, according to Finance, total nearly $6 billion.

In 1995 Senate Bill 1 (Chapter 508, Statutes of 1995) established the Department of Information Technology (DOIT). The Legislature created DOIT largely in response to a number of costly and embarrassing problems with implementing various IT projects—most notably, the Department of Motor Vehicles database redevelopment project that cost the State $49 million, but did not result in a working system. DOIT was created to improve the State's ability to apply IT effectively by providing leadership, guidance, and oversight for projects initiated by state agencies. However, DOIT was not successful in its mission, and on July 1, 2002, the Legislature disbanded it.

The bureau's 2003 report, titled *Information Technology: Control Structures Are Only Part of Successful Governance* (Report 2002-111), highlighted DOIT's challenges.

The bureau has also reported on IT leadership and contracting issues in these two reports:

- *Enterprise Licensing Agreement: The State Failed to Exercise Due Diligence When Contracting With Oracle, Potentially Costing Taxpayers Millions of Dollars* (Report 2001-128, April 2002)

- *Information Technology: The State Needs to Improve the Leadership and Management of Its Information Technology Efforts* (Report 2000-118, June 2001)

A 2003 report by the bureau provided insight into several of DOIT's struggles. For example, DOIT's ability to plan IT projects was hampered by its need to balance advocacy and control and build trust with agency staff. In addition, the bureau reported that DOIT had no clearly defined approval role or responsibilities. Both DOIT and Finance had a role in the approval process, but their individual roles were not clear. In principle, DOIT would review the merit of the technology of a proposed IT project; Finance would review the business case and approve funding, relying on DOIT's technical expertise. In practice, however, DOIT became primarily a *rubber-stamp* department, while Finance made the final decisions about IT projects because it had control over funding approval. State agencies

saw Finance's and DOIT's roles as overlapping, and this ambiguity and the imbalance of power eroded the agencies' trust and confidence in these two control entities.

Following DOIT's closure, the former governor appointed a new chief information officer.[1] However, the chief information officer had limited staff support and no statutory authority or budget. At the same time the former governor used an executive order to restructure the State's IT governance, giving Finance and the Department of General Services collective responsibility for issuing management memoranda to provide continuity and clarity with respect to statewide IT policies, procedures, approvals, and oversight. In addition, state agencies were charged with the prudent oversight of ongoing IT projects and procurements within their jurisdictions.

There have been failed projects costing taxpayers hundreds of millions of dollars under these past governing structures. In 1997, after spending more than $111 million, the State abandoned development of a system to establish a statewide automated network for tracking child support payments. A new statewide system is being implemented in two phases. According to the chief information officer, phase one is operational and phase two, which was started in 2006, is scheduled for full implementation by September 2008. The delays in implementing this system have cost the State hundreds of millions of dollars in federal penalties. Other major project failures, including those at the Department of Motor Vehicles and the Department of Corrections and Rehabilitation, have cost the State and taxpayers about $400 million. More recently, in November 2006, the State abandoned a $10 million investment in the California Developmental Disabilities Information System. This IT system was intended to improve the statewide tracking of expenditures and services for the developmentally disabled. According to the chief information officer, the project was abandoned when it became clear that the State could not satisfy all the requirements for project continuation and the decision to abandon it likely avoided an additional $30 million to $50 million in costs.

In 2006 the Legislature passed and the governor signed into law Senate Bill 834 (Chapter 533, Statutes of 2006), creating the Office of the State Chief Information Officer (State CIO), to be headed by a chief information officer, a cabinet-level position. As of May 25, 2007, no one has been appointed to fill the

---

[1] This individual is continuing to work in this capacity under the current administration.

position. Among its key duties, this office is charged with advising the governor on the strategic management and direction of the State's IT resources and promoting effective and efficient use of IT systems by minimizing overlap, redundancy, and cost. According to the chief information officer this statute largely codified his existing responsibilities.

The *2007–08 Governor's Budget* lays out an aggressive agenda for the State CIO and proposes to expand this office's role. However, the State may be poised to repeat past mistakes in adopting the proposal. According to the Analyst's Office in its *Analysis of the 2007–08 Governor's Budget*, the State CIO would have no authority to fund projects; this authority would remain with Finance. The Analyst's Office noted that a state agency could end up with a State CIO-approved project and still be denied funding by Finance. In fact, the Analyst's Office further noted this was one of the problems that contributed to DOIT's failure. Finance often funded projects below the level recommended by DOIT, which over time diminished DOIT's role because it had no financial clout to support its decisions.

The Analyst's Office's budget analysis also noted that the budget lists 15 major IT goals but has not prioritized them. The Analyst's Office is concerned that such an aggressive agenda will result in reduced effectiveness, the same problem that plagued DOIT during its existence. According to the bureau's previously referenced IT report, one of the reasons for DOIT's lack of success was that it attempted to tackle too many challenges at once rather than establish a set of priorities and take on only the most important issues, as time and resources permitted.

In light of these continuing concerns and with several costly and complex projects planned or currently underway, the State has a critical need for strong IT governance. For example, the Franchise Tax Board's California Child Support Automated System is projected to cost $1.6 billion through fiscal year 2008–09, and the Department of Corrections and Rehabilitation's Strategic Offender Management System is projected to cost $416 million through fiscal year 2012–13. The most extensive and long-term project the administration has recently proposed is the Financial Information System for California (FI$Cal), which Finance has projected to cost $1.3 billion through fiscal year 2014–15. The California State Information Technology Annual Report for 2006 notes that the resources necessary to design and implement the project still need to be obtained through the

budget process. According to the chief information officer (if the Legislature approves the project by funding it) FI$Cal will be an enterprise-wide business management system that will become the mandatory standard for all state agencies for performing basic business functions, such as budgeting, accounting, procurement, cash management, financial management, and financial reporting. Because the proposed scope and cost of this and other previously discussed projects are significant, effective governance over development and implementation of these projects is critical.

### Human Resources Management

The State will soon face the consequences resulting from the retirement of a significant portion of its current workforce, including many of its top managers and key staff. As a result, human resources management is another statewide high-risk area because any large exodus of experienced employees could reduce the ability of state agencies to perform their core missions efficiently and effectively, and could threaten the ability of state programs to deliver critical services. As large numbers of its workforce reach retirement age, the State will be further challenged by its ability to recruit and train enough employees to fill the vacated positions.

According to the Department of Personnel Administration's (Personnel Administration) Workforce Planning Model, dated February 2006, 44 percent of the State's current workforce is over the age of 45 and up to 35 percent of this segment are eligible to retire between 2006 and 2010. The loss of experienced, long-term employees is often keenly felt because they take with them their accumulated institutional knowledge and expertise. However, the sheer number of retirement-aged staff who now occupy supervisory and management-level positions but who will soon be leaving the workforce poses a grave risk that the State will not be ready to replace them when the time comes. The large number of experienced employees who will retire soon and the urgent need to quickly recruit and train new employees having the appropriate skill sets to take their place is a problem that faces virtually all state agencies. As more and more high-level managers reach retirement age, it exposes those agencies that have failed to adequately plan for succession, as they have no ready means for replacing the loss in leadership with trained high-quality employees—creating a serious risk in terms of delivering key services.

Part of the challenge state agencies face in recruiting is caused by the State's rules for hiring employees. It is very difficult for individuals who do not already work for the State to get into entry-level positions, such as those in the staff services analyst series, and it is virtually impossible at the managerial level. These were two conclusions the Milton Marks "Little Hoover" Commission on California State Government Organization and Economy (Little Hoover Commission) reached in its June 2005 report on managing the state workforce, which was primarily focused on recruiting and retaining top talent at the managerial level. When compared with the private sector, the State's capacity to recruit, train, and retain certain staff is limited due to its lengthy hiring process and noncompetitive salaries. These difficulties limit the State's ability to attract top talent from colleges and universities, as well as to lure employees from the private sector.

Although each state agency typically screens, interviews, and hires its own employees, two agencies within the state structure are responsible for setting policies and overseeing a variety of broad personnel issues: the State Personnel Board (Personnel Board), and Personnel Administration. The Personnel Board is responsible for California's civil service system; it ensures that the system is free from political patronage and that employment decisions are based on merit. State agencies can obtain a variety of services from the Personnel Board, including assistance with recruitment, candidate selection, classification, and training and consultation services. Personnel Administration creates and administers compensation levels, benefit packages, training programs, and the State's classification plan; it also represents the State in negotiating labor contracts with various state employee labor unions.

California has recently taken initial, yet important, steps to address employee recruitment, hiring, and retention. In February 2006 the director of Personnel Administration announced the creation of a workforce planning model for the State based on models the federal government and other states and jurisdictions have developed. For example, the U.S. Government Accountability Office has created a human capital resource self-assessment checklist to help agency leaders understand the strengths and weaknesses of the human resources information they have and has created a model for strategic management of human capital. In addition, the Personnel Board periodically offers state agencies an introductory, one-day class in workforce planning. Among other

subjects, the class focuses on understanding the basic principles of workforce planning, identifying common deterrents to effective planning, introducing several different planning models and helping agencies determine which model best suits their particular needs, and identifying and using the resources to create and maintain a successful workforce plan.

Managing ongoing programs faced with a large number of staff retirements will require the State to adequately prepare for leadership continuity and engage in succession planning. Beyond its model on workforce planning, Personnel Administration has provided little direction to state agencies in terms of succession planning. Personnel Administration defines succession planning as a subset of workforce planning that focuses on having the right leadership in place at every level of an organization. This definition appears reasonable, yet in its workforce planning model, Personnel Administration simply refers the user to a report on the Internet for additional information. We believe this falls far short of what is needed to attract, train, and retain tomorrow's government leaders.

### Other Post-Employment Benefits of Retiring State Employees

Another effect of the large number of retiring employees will be the increased cost to the State of providing them other post-employment benefits. Other post-employment benefits refer to benefits in addition to a pension, such as health care. The State generally pays 100 percent of the health insurance cost for retirees, as well as 90 percent of premiums required for the enrollment of retirees' family members, and generally pays all or a portion of the dental insurance costs for retirees. The State has not set aside reserves for these costs, instead paying for them out of annual appropriations on a pay-as-you-go basis. The cost of these insurance benefits for the year ended June 30, 2006, was $888 million for 131,000 individuals enrolled to receive health benefits and 106,400 individuals enrolled to receive dental benefits. These numbers are up from $409 million as of June 2001, when 110,000 received health benefits and 89,000 received dental benefits.

With the expected increase in the number of state retirees and continuing escalation of health care costs, the State can anticipate a related increase in these annual costs. In addition, with the required implementation of a new financial reporting standard, Statement 45 of the Governmental Accounting Standards Board (GASB 45), beginning with its financial

statements for the year ended June 30, 2008, the State will need to reflect its estimated liability for these future payments of other post-employment benefits. In a February 2006 report the Analyst's Office estimated that these liabilities are likely to be in the range of $40 billion to $70 billion. In early May 2007 the State Controller's Office (Controller's Office) published the results of the first actuarial study to estimate this liability. According to the actuary, the State's liability for its other post-employment benefits under the pay-as-you-go policy is about $48 billion as of July 1, 2007. Based on this liability, California has an *annual required contribution* of about $3.6 billion, the amount the State would need to pay yearly to fund these estimated future benefits.

According to the Controller's Office, the State plans to include an actuarial computation of its liability for other post-employment benefits in the fiscal year 2007–08 financial statements. The Controller's Office also indicated that it has been meeting with various agencies to help educate them about the State's liability. The governor, too, has taken steps towards understanding the magnitude of the State's liability by creating the Public Employee Post-Employment Benefits Commission to examine what is owed in unfunded retirement benefits, both pension and nonpension benefits like health care, and to recommend how best to meet those obligations as they come due.

With California's other post-employment benefits liability estimated at $48 billion on an actuarial basis, the risk to the State is at least twofold: determining whether it can afford the level of benefits promised to its employees while at the same time protecting its credit rating. Reporting other post-employment benefits information in accordance with GASB 45 will, among other things, provide financial statement users with information useful in assessing potential demands on the State's future cash flows. Bond rating agencies have already made it clear that they will look with disfavor on governments that do not adequately plan for managing this liability. To protect its credit rating and ensure that it can borrow at the lowest available interest rates, the State will need to demonstrate that it is adequately managing the long-term costs of its other post-employment benefits.

## REMOVAL OF BROAD AREAS OF RISK FROM THE HIGH-RISK LIST

As the State moves forward to address and mitigate the broad areas of risk the bureau has identified, we will be monitoring to determine if certain actions have been taken as outlined in our criteria in the Appendix. For example, the bureau will determine if a responsible person, group, or entity has been charged with monitoring these risks and has demonstrated a commitment to address them by devoting sufficient resources to mitigate or resolve each identified risk. Another key step the responsible party must take for the bureau to remove a high-risk designation is to develop detailed and definitive action plans along with a process for independently monitoring and measuring the effectiveness of the actions taken. In addition to reviewing these actions, we plan to periodically evaluate the quality and effectiveness of the State's mitigation efforts by conducting audits and making recommendations for improvement. When state actions, including those in response to our recommendations, result in significant progress toward resolving or mitigating these risks, we will remove the high-risk designation based on our professional judgment.

## STATE AGENCIES FACING RISKS AND CHALLENGES

Although this inaugural report is not intended to be a complete list of all the risks and challenges state agencies face, we believe two state entities, the Department of Corrections and Rehabilitation (Corrections) and the Department of Health Services (Health Services), presently face significant challenges that warrant inclusion on our inaugural high-risk list. In particular, Corrections faces a myriad of challenges. Currently, many of its adult institutions exceed their capacity to safely house and rehabilitate inmates and its inmate health care system is under federal receivership. In addition, Corrections continues to implement a reorganization it began in 2005, a reorganization designed to address many of the problems it faced then and still faces today. Corrections' reorganization efforts are also at risk because of inconsistent leadership at many levels of management.

Health Services is the other department we have included on our inaugural list. On July 1, 2007, it is slated to split into two separate departments, the Department of Public Health and the Department of Health Care Services, to provide stronger, more focused leadership in public health and to give the State's role in public health a significantly higher priority. The Legislature has

also expressed its expectation for increased accountability and program effectiveness for both public health and the health care purchasing functions of government. The State faces risk related to program continuity from creating two departments where just one existed before in addition to the challenges of operating the two departments while increasing accountability and program effectiveness to meet the Legislature's expectations.

### Department of Corrections and Rehabilitation

Corrections is one of the largest state departments in California. Headquartered in Sacramento, its operations stretch statewide with 33 adult institutions and 38 adult conservation camps. Corrections is responsible for the care and rehabilitation of the men and women inmates in its custody. For fiscal year 2007–08 the governor proposed a budget of $10 billion and 66,000 positions for Corrections. In May 2007 we met with several Corrections' staff and discussed the challenges that Corrections faces. Staff agreed that Corrections faces the challenges we have identified.

#### *Overcrowding*

With overcrowding, it is important for Corrections to have sound projections of its inmate population. Yet, since 2005, the bureau has twice reported that Corrections struggles to properly project its inmate population:

- *California Department of Corrections and Rehabilitation: Inmate Population Projections Remain Questionable* (Report 2007-503, March 2007)

- *Department of Corrections: It Needs to Better Ensure Against Conflicts of Interest and to Improve Its Inmate Population Projections* (Report 2005-105, September 2005)

Although a recent follow-up review we conducted confirmed that Corrections still has problems with its inmate population projections, the current overcrowding situation is severe. Based on Corrections' data from February 28, 2007, it has more than 171,000 male and female adult inmates in its custody. Of these, 94 percent (160,830) are housed in institutions; the remaining 6 percent are housed in camps, community correctional centers, state hospitals, and at institutions in other states. Corrections' data also show that its institutions are at more than 200 percent overall capacity; the individual institution's occupancy rates range from a low of 130 percent at the California Medical Facility to a high of 257 percent at Avenal State Prison.

Prison overcrowding presents numerous problems. The obvious challenges are protecting the health and safety of prison staff and inmates. However, additional issues emerge, including the following:

- Limited opportunities for inmates to participate in education, substance abuse treatment, and other programs when such program space is used for housing.

- Stresses on a prison's infrastructure such as sewage and water systems to safely and effectively service a large population.

- Meeting the constitutional rights of inmates to receive minimum standards of treatment.

Solutions to prison overcrowding have been slow in coming. One solution that has received a great deal of recent attention is to expand existing facilities. Although adding space to existing facilities may occur more quickly than constructing a new prison, construction is not an immediate solution because it sometimes takes years to design, contract for, and construct new space, and to bring that new space online. In the summer of 2006 the governor sought more immediate solutions to overcrowding by calling a special legislative session, but the session ended with no apparent resolution. Then in October 2006 the governor declared a state of emergency and used this declaration to, among other things, transport inmates to out-of-state prisons. Since that time, a small number of inmates have been transferred to other states' facilities; however, the ability to continue these transfers is in doubt. A lawsuit against the State was filed to block the transfers, and the lower court sided with the plaintiffs. The State appealed that ruling on April 5, 2007, and as of May 23, 2007, the court's ruling is pending.

Also, in April 2007, the governor and certain legislative leaders announced an agreement that they believe will reform California's correctional system and resolve overcrowding. Assembly Bill 900 (Chapter 7, Statutes of 2007) is a complex plan that is designed to do the following:

- Add new prison beds at state facilities in two phases and increase the number of beds in county jails.

- Provide inmates with rehabilitation services, such as education, vocational programs, and substance abuse treatment programs.

- Continue the voluntary and involuntary transfer of inmates to out-of-state facilities for the next four years.

The law authorized funding the prison construction with a mix of bond funds and General Fund money. To proceed with the second phase of construction, Corrections must meet specific construction and programmatic benchmarks, including successfully completing construction of one-half of the phase one

prison beds, averaging 75 percent participation in available drug treatment programs, and properly assessing and placing inmates in rehabilitation programs both when they enter the correctional system and when they are within one year of parole.

In spite of these recent efforts, overcrowding in the State's prisons persists. In addition, much of the current proposal may take a considerable amount of time because prison construction or expansion can take years to complete. Meanwhile, Corrections has estimated that it will run out of bed space as early as June 2007. Promptly achieving a successful resolution to prison overcrowding is especially critical because, as of May 23, 2007, a federal judge is considering motions regarding the overcrowding issue that could result in federal intervention relating to inmate population.

### Health Care Receivership

In June 2005 the United States District Court for the Northern District of California ruled that it would establish a receivership to take control of the State's prison health care system. This action came three years after Corrections agreed to meet various conditions related to inmate medical care as part of a settlement agreement in the *Plata v. Davis* lawsuit. In court documents, the judge stated that the State's prison medical care system is broken beyond repair, that the harm already done to the prison population could not be more grave, and that the threat of future injury and death is virtually guaranteed in the absence of drastic action. Additionally, the judge noted that it is an uncontested fact that, on average, one California prison inmate needlessly dies every six to seven days due to constitutional deficiencies in Corrections' medical delivery system.

In February 2006 the federal judge appointed a receiver to oversee the State's prison health care system and ordered the receivership to remain in place until the court is satisfied that the State has the will, capacity, and leadership to maintain a system of providing constitutionally adequate medical health care services to inmates. The receiver testified before a legislative budget subcommittee in early February 2007. He told the subcommittee that he was unable to provide a dollar amount for what the needs will be to correct the system. He added that every aspect of the prison medical system was broken and that fixing it would cost what it was going to cost. The receiver retains complete discretion over spending to meet the prison system's current medical needs and to devise a plan and implement a system that will bring prison

medical care up to federal constitutional standards. For fiscal year 2007–08, the governor proposed a medical budget for Corrections of roughly $1.8 billion.

In March 2007 the receiver issued his fourth bimonthly report describing the following successes in establishing a constitutionally adequate health care service system for inmates:

- Established appropriate salaries for specific clinicians and support classifications as well as physicians in the prison medical care system.

- Drafted a comprehensive workforce development plan to recruit and retain clinicians.

- Entered into an agreement with a private pharmacy management consulting service to develop a constitutionally adequate pharmacy system.

- Planned for additional medical beds, including an initial assessment of the impacts of chronic disease and physical impairment on the prison population.

In two reports the bureau has recommended needed reforms for aspects of Corrections' medical care system:

- *California Department of Corrections and Rehabilitation: It Needs to Improve Its Processes for Contracting and Paying Medical Service Providers as Well as for Complying With the Political Reform Act and Verifying the Credentials of Contract Medical Service Providers* (Report 2006-501, April 2007)

- *California Department of Corrections: More Expensive Hospital Services and Greater Use of Hospital Facilities Have Driven the Rapid Rise in Contract Payments for Inpatient and Outpatient Care* (Report 2003-125, July 2004)

The receiver has been in place for one year as of April 2007 and still faces many challenges. In a press release dated March 20, 2007, the receiver indicated that five to 10 years are needed for Corrections' medical delivery system to reach constitutional levels with possibly an additional equal amount of time to transition the management of the medical system back to the State. According to the receiver, "Nearly every aspect of medical care delivery in the State's prison system requires substantial reform. The tasks involved in the system's repair are numerous and complex, and following decades of neglect and mismanagement, all of the existing problems cannot begin to be completed in the next one to two years."

On May 14, 2007, the receiver issued a report on overcrowding in response to the court's order. In his report the receiver makes it clear that overcrowding in Corrections' facilities is having a real effect on his ability to implement necessary health care reforms. According to the receiver, overcrowding will result in

necessary health care reforms costing more and taking longer. Restoring the prison health care delivery system is clearly a long-term risk to the State.

### Reorganization

In a letter to the governor and Legislature dated February 2005, the Little Hoover Commission stated that the correctional system's organizational structure contributes to persistent and serious problems, including egregious cost overruns, inmate abuse, and parolee failure. Several bureau reports also highlight practices at Corrections that contribute to its cost overruns, including frequent use of sick leave by custody staff, spending plans that do not correspond to its spending authority, a shortage of custody staff that results in increased overtime, and the lack of an infrastructure for inmate health care similar to a managed care organization. The Little Hoover Commission's letter summarized its review of the governor's plan to reorganize the Youth and Adult Correctional Agency. The letter concluded that the proposed reorganization, although not perfect, was a good place to start. Effective July 2005 the departments of Corrections and the Youth Authority, the boards of Prison Terms and Corrections, the Youthful Offender Parole Board, and the Commission on Correctional Peace Officers' Standards and Training combined into a single agency, the Department of Corrections and Rehabilitation.

> These bureau reports highlight issues that have historically contributed to cost overruns as the Little Hoover Commission noted:
>
> - *California Department of Corrections: A Shortage of Correctional Officers, Along With Costly Labor Agreement Provisions, Raises Both Fiscal and Safety Concerns and Limits Management's Control* (Report 2002-101, July 2002)
>
> - *California Department of Corrections: Its Fiscal Practices and Internal Controls Are Inadequate to Ensure Fiscal Responsibility* (Report 2001-108, November 2001)
>
> - *California Department of Corrections: Poor Management Practices Have Resulted in Excessive Personnel Costs* (Report 99026, January 2000)
>
> - *California Department of Corrections: Utilizing Managed Care Practices Could Ensure More Cost-Effective and Standardized Health Care* (Report 99027, January 2000)

Shortly after the reorganization, in January 2006, Corrections published its strategic plan. The document is meant to guide the agency in its newly organized form and "build the foundation for lasting change." The plan includes seven goals and attendant strategies as well as time frames for completing key actions. Corrections' goals include developing a well-trained, quality workforce; developing information technology strategies and implementing systems for current and future needs; achieving organizational excellence in operations and systems; developing preventative strategies related to risk management and legal compliance; developing a comprehensive crime prevention program to promote community safety; and establishing a managed health care system. In its strategic plan, Corrections notes that some components of its goals have been met; other short- and long-term goals are still in development. Given the

challenges represented by overcrowding and the health care receivership, it will be important for Corrections to continue measuring and realigning itself with its goals to ensure that it implements its strategic plan and achieves the changes intended by its reorganization.

### Leadership

During 2006 two individuals that served as the secretary of Corrections—the agency's top post—abruptly resigned and a third individual was appointed. Corrections provided us an organizational chart as of March 2007 generally listing positions down to the deputy director level at its headquarters. The organization chart shows that 34 percent of Corrections' management positions are either vacant or have staff working in an *acting* capacity. A similar analysis as of April 2007 revealed that 34 percent of the wardens that oversee individual adult institutions are also working in an acting capacity.

Lack of consistent leadership at the top and in its upper and mid-level management hampers an organization's ability to succeed. Corrections' turnover in its secretary position came at a time when it had just implemented its reorganization and was planning to launch its strategic plan. With a large number of vacancies and employees in an acting capacity in key upper and middle management positions, Corrections is at risk because management cannot provide the continuity in leadership needed for it to maintain stability or to move forward. Without permanent leadership, the organization cannot effect the changes embodied in its reorganization and strategic plan. Additionally, without consistency in leadership it is difficult to hold staff accountable for solving problems.

In accordance with the criteria we describe in detail in the Appendix, we will look for Corrections to take steps to mitigate its risks in the four areas described: overcrowding, improving its health care delivery system, implementing its reorganization, and establishing consistent leadership. Corrections will need to demonstrate that it has the necessary resources to mitigate the risks we have identified and that it is implementing corrective actions recommended by the bureau or other state oversight agencies. We will use our professional judgment to assess whether the risks have been sufficiently mitigated. At that time, we will remove Corrections' high-risk designation.

**Department of Health Services**

Health Services is another large department that we consider to be at high risk. For fiscal year 2006–07, the department had 6,000 authorized positions and a budget of more than $38 billion. In its current form, Health Services' mission is to protect and improve the health of all Californians. It administers a broad range of public and environmental health programs, including those targeting obesity, communicable diseases, and food-borne illness. Health Services also administers the California Medical Assistance Program (Medi-Cal), which provides health care services to eligible low-income persons and families.

In July 2007 Health Services will split into two new departments: the Department of Health Care Services (Health Care Services) and the Department of Public Health (Public Health). Senate Bill 162 (SB 162) (Chapter 241, Statutes of 2006), established the requirements for the split. As early as April 2003, in a report titled *To Protect & Prevent: Rebuilding California's Public Health System*, the Little Hoover Commission recommended that the governor and the Legislature create a public health department, one separate from Medi-Cal, to focus on emerging health threats. Its recommendation resulted from a finding that "the State's public health leadership and organizational structure is ill-prepared to fulfill the primary obligation of reducing injury and death from threats that individuals cannot control, such as environmental hazards, bioterrorism and emerging infectious diseases." The Little Hoover Commission also found that the public safety functions of public health have not been given priority and public health resources are not adequately managed and tracked.

In staff analysis of SB 162, the stated intent for the bill is to provide stronger, more focused leadership in public health and to give the State's role in public health a significantly higher priority. Further, its author noted that public health programs and goals are constantly overlooked and overshadowed by the Medi-Cal program. Through SB 162, the Legislature established the following expectations for the two new departments:

• Elevate the visibility and importance of public health issues in the policy arena.

• Increase accountability and require program effectiveness for the public health and health care purchasing functions of state government.

An additional expectation the Legislature expressed was for the reorganization to be *budget neutral;* that is, it did not intend to provide state funding for the two separate departments, Public Health and Health Care Services, in excess of the total state funding previously appropriated to the former Department of Health Services, with possible exceptions for caseload and inflation adjustments.

The bureau has issued these reports recommending needed reforms for certain aspects of Health Services' Medi-Cal program:

- *Department of Health Services: It Needs to Improve Its Application and Referral Processes When Enrolling Medi-Cal Providers* (Report 2006-110, April 2007)

- *Department of Health Services: It Needs to Better Plan and Coordinate Its Medi-Cal Antifraud Activities* (Report 2003-112, December 2003)

- *Department of Health Services: It Needs to Significantly Improve Its Management of the Medi-Cal Provider Enrollment Process* (Report 2001-129, May 2002)

As a new department, Health Care Services will have responsibility for administering the Medi-Cal program and will be challenged to meet the Legislature's expectations of *increased accountability* and *program effectiveness*. In several reports the bureau has identified deficiencies in Health Services' Medi-Cal program. For example, in a report dated April 2007 the bureau concluded that the Provider Enrollment Branch (branch) within the Medi-Cal program—established to review applications and prevent providers with fraudulent intent from participating in Medi-Cal—does not always process provider enrollment applications within statutory time periods. The bureau's report also concluded that the branch does not adequately track applications referred to other units within the department for secondary review, limiting the branch's contribution to preventing Medi-Cal fraud. The bureau also repeated concerns raised in a May 2002 report regarding branch staff making data-entry errors, which decreases the branch's ability to effectively track the status of provider enrollment applications.

The State's new Department of Public Health will perhaps face even greater challenges than Health Care Services. According to the Little Hoover Commission, the State's public health system has lacked focused leadership, coordination of efforts, and an informed public process. In addition, public health epidemics already exist, and certain diseases are poised to become epidemics. As a result, California faces significant risks related to various public health issues, including the following:

- **Obesity**. Adults and children are being diagnosed as obese in alarming numbers, especially children. Obesity has a multitude of health issues related to it, including high blood pressure, heart disease, stroke, and diabetes. (Source: Department of Health Services.)

- **Communicable diseases**. Avian flu and tuberculosis are two diseases that could reach epidemic proportions. Up to now no confirmed cases of avian flu have been reported in the continental United States. However, with the relative ease with which air travel and other modes of transportation can physically connect communities, the spread of disease is a serious threat. With regard to tuberculosis, although the number of cases in California have been declining, they continue to rise worldwide, and more significantly, drug-resistant strains have evolved. (Sources: Department of Health Services and the World Health Organization.)

- **Food-borne illness**. The September 2006 outbreaks of Escherichia coli (E.coli) in fresh spinach represents a threat in the form of a food-borne illness that was ultimately traced back to spinach harvested in California. (Source: Department of Health Services.)

We met with Health Services' staff to discuss the risks inherent in its division into two departments. As Health Services undertakes splitting into two departments it will need to be careful to avoid waste through duplication of effort and ensure that all required programs continue without interruption. Health Services' staff told us that the department was currently engaged in a great deal of planning surrounding program and staff placement and that Health Services was communicating continually with the public and its staff so that each group has the information they need leading up to and following the split. In addition, the staff indicated that the two new departments would continue engaging in strategic and business planning following the split.

In accordance with the criteria we describe in detail in the Appendix, we will look for the departments of Public Health and Health Care Services to take steps to mitigate the risks we have described. Each department will need to demonstrate that it has the necessary resources to mitigate the risks and that it is implementing corrective actions recommended by the bureau or other state oversight agencies. Using our professional judgment, we will determine whether the risks have been sufficiently mitigated to warrant removing our high-risk designations.

We prepared this report under the authority vested in the California State Auditor by Section 8546.5 of the California Government Code.

Respectfully submitted,

*Elaine M. Howle*

ELAINE M. HOWLE
State Auditor

Date:    May 31, 2007

Staff:    John F. Collins II, CPA, Deputy State Auditor
Sharon L. Fuller, CPA
Lois Benson, CPA
Ly Huynh
Tim Jones
Tina Kobler
Jessica Oliva

Blank page inserted for reproduction purposes only.

# APPENDIX

## *Considerations for Determining High Risk*

### INTRODUCTION

Senate Bill 1437 of the 2003–04 Regular Session of the Legislature (Chapter 251, Statutes of 2004) added Section 8546.5 to the Government Code to provide the Bureau of State Audits (bureau) with the following authority:

- To establish a high-risk government agency audit program for the purpose of identifying, auditing, and issuing reports on any agency of the State, whether created by the Constitution or otherwise (state agency), that the bureau identifies as at high risk for the potential of waste, fraud, abuse, or mismanagement or that has major challenges associated with its economy, efficiency, or effectiveness. This includes challenges that cut across programs or management functions at all state agencies or multiple state agencies; we refer to these as *statewide issues*.

- When identifying state agencies or statewide issues that are at high risk, in addition to reviewing the work of the bureau, to consult with the Legislative Analyst's Office (Analyst's Office), the Milton Marks "Little Hoover" Commission on California State Government Organization and Economy (Little Hoover Commission), the Office of Inspector General, the Department of Finance (Finance), and other state agencies with oversight responsibilities.

- To issue audit reports with recommendations for improvements in state agencies or with regard to statewide issues identified as at high risk not less than once every two years.

- To require state agencies identified as at high risk, including state agencies with responsibility for a statewide issue, to periodically report to the bureau on the status of recommendations for improvement made by the bureau or other state oversight agencies.

In addition, Section 8546.5 requires the bureau to notify the Joint Legislative Audit Committee whenever it identifies a state agency or statewide issue as at high risk.

To establish our inaugural list, we focused on defining and applying the criteria to identify state agencies and statewide issues that present a high risk to California. For our inaugural high-risk list, we used the criteria described in this appendix to do the following:

- Identify major program areas within state government and assess performance.

- Assess and determine how agencies' management functions contribute to program performance, achieve results, and ensure accountability.

- Determine state agency and statewide issues and whether they merit a high-risk designation.

- Assess what level of risk mitigation warrants the removal of a high-risk designation.

## METHODOLOGY AND CRITERIA

Based on our experience in examining a wide range of government programs, we identified major program and mission areas administered by one or more state agencies that might warrant consideration as high risk because they:

- Are at the center of legislative and executive branch attention.

- Command high public interest and/or involve large dollar outlays.

- Figure prominently in various oversight agencies' reports.

- Have known performance and accountability or high-risk issues.

In assessing state agencies and major statewide issues and making high-risk determinations, we drew from information available through a number of sources, the primary source being the bureau's performance, financial, compliance, and investigative reports, and testimonies. Other sources of information included the following:

- The governor's budgets.

- Reports or studies from various state control or oversight agencies.

- Reports by federal entities such as the U.S. Government Accountability Office, the Inspectors General, or cognizant agencies.

- Reviews or white papers by outside study panels, commissions, and work groups.

- Reports by legislative committees.

In accordance with Section 8546.5, we consulted with various state control agencies—Finance, the Analyst's Office, the Little Hoover Commission, and the State Controller's Office. In addition, we met with legislative budget and fiscal committees to obtain their perspectives on the challenges and high risks facing the State. Finally, we met with staff at state agencies having a key role in a high-risk area or those designated in this report as at high risk to ascertain their perspective on the risks they face.

### Criteria for Determining if State Agencies and Major Issues the State Faces Merit High-Risk Designations

To determine whether a state agency's performance and accountability challenges are of high risk to the State, we first considered the significance of an agency's mission or functions and the extent to which the agency's management and program function is key to the State's overall performance and accountability. We then determined whether risk was involved and if it stemmed from one of the following:

- A risk that could be detrimental to the health and safety of Californians.

- The nature of a program could create susceptibility to fraud, waste, and abuse. For example, a program involving payments to claimants for services provided to third parties involves risk due to the difficulty in verifying claims.

- A systemic problem that has created inefficiencies and ineffectiveness.

To identify a high-risk statewide issue we considered the following:

- Is it evident in several state agencies?

- Does it affect the State's total resources?

- Does it stem from some deficiency or challenge that warrants monitoring and attention by the Legislature through the Joint Legislative Audit Committee, the Joint Legislative Budget Committee, other legislative committees, or other legislative action?

For both state agencies and statewide issues, we also considered a number of qualitative and quantitative factors as well as whether or not an agency has taken corrective measures for deficiencies previously identified or whether the State is taking measures to reduce the risk a statewide issue may pose. In all cases, the ultimate determination of high risk is based on the independent and objective judgment of the bureau's professional staff.

### Qualitative and Quantitative Factors

In determining whether a state agency or statewide issue should be identified as at high risk, we considered a number of qualitative and quantitative factors. Although we considered many qualitative factors, in particular we focused on whether the risk could result in significantly impaired service; program failure; significantly reduced efficiency and/or effectiveness; public injury or loss of life; reduced confidence in government; or unauthorized disclosure, manipulation, or misuse of sensitive information.

To the extent possible, we took into account the risk to the State in terms of monetary or other quantitative aspects. For this inaugural list, we considered that a $1 billion investment by the State for a program would be an indicator of potential material loss. Further, we looked at the changes in assets—additions and deletions—as an indicator of potential risk to major agency assets being lost, stolen, or damaged. We further considered risks that revenue sources may not be realized or improper payments may be made. Finally, we considered the number of employees each state agency is authorized to hire in determining the magnitude of human capital.

*Responsiveness to Recommendations and Corrective Measures*

State law requires the bureau to follow the Government Auditing Standards issued by the Comptroller General of the United States (California Government Code, Section 8546). In accordance with those standards, it has been the long-standing practice of the bureau to request auditees to report back at 60-day, six-month, and one-year intervals on progress they have made in implementing recommendations we have made to them in our audit reports (agency responses). Recently enacted legislation, Senate Bill 1452 of the 2005–06 Regular Session of the Legislature (Chapter 452, Statutes 2006), explicitly requires that state agencies provide the bureau with updates on the implementation of those recommendations in the form and intervals prescribed by the bureau. Moreover, Senate Bill 1452 places additional reporting requirements on state agencies that have not implemented audit recommendations that are over one year old.

The bureau also receives whistleblower complaints about improper governmental activities under the California Whistleblower Protection Act and regularly issues public reports on substantiated complaints. That act requires state agencies to either take corrective action on substantiated complaints and report to us what action is taken, or if no action is taken, the reason for not doing so.

For subsequent high-risk designations, we will consider whether each state agency audited or investigated demonstrated commitment in implementing audit recommendations or taking corrective measures for any substantiated complaints or issues noted in our reports. Although agencies' responses were considered in this high-risk list and will be in future lists, the final determination on how committed agencies are about making changes to address audit recommendations or taking corrective measures stemming from investigations may include additional follow-up reviews by the bureau and ultimately is based on our professional judgment.

## Ongoing Reporting and Future Audits

Once the bureau identifies as at high risk a state agency or statewide issue, the bureau may require the affected agencies to report on the status of recommendations for improvement made by the bureau or other state oversight agencies. Related to that, the bureau may require affected agencies to periodically report their efforts to mitigate or resolve the risks identified

by the bureau or other state oversight agencies. In addition, the bureau may initiate audits and issue audit reports with recommendations for improvement in the affected agencies.

### Removal of High-Risk Designations

When we designate agencies or statewide issues as at high risk and place them on our high-risk list, removing the designation takes a demonstrated commitment by the leadership of the state agency or agencies responsible for addressing the risk. The agency or agencies should appoint a person, group, or entity responsible to address the risk, and those responsible must devote sufficient resources to mitigate or resolve it. Further, those responsible must develop detailed and definitive action plans, including, when necessary, plans to seek legislative action. Those plans should define the root cause of the risk, identify cost-effective solutions, and provide a timetable for completion. Moreover, the responsible party must have a process for independently monitoring and measuring the effectiveness of steps taken and for periodic reporting regarding progress.

When legislative and agency actions, including those in response to our recommendations, result in significant progress toward resolving or mitigating a high-risk area, we will remove the high-risk designation. The agency or agencies must also demonstrate progress in implementing corrective measures. However, we will continue to closely monitor these areas. If risks again arise, we will consider reapplying the high-risk designation. The final determination of whether to remove a high-risk designation will be based on our professional judgment.

cc:   Members of the Legislature
      Office of the Lieutenant Governor
      Milton Marks Commission on California State
        Government Organization and Economy
      Department of Finance
      Attorney General
      State Controller
      State Treasurer
      Legislative Analyst
      Senate Office of Research
      California Research Bureau
      Capitol Press

# EXHIBIT S

*Matthew L. Cate, Inspector General*                                    *Office of the Inspector General*

April 18, 2006

Jeanne S. Woodford, Secretary (A)
California Department of Corrections and Rehabilitation
1515 S Street, Room 502 South
Sacramento, California 95814

Dear Secretary Woodford:

The enclosed report presents the results of the Office of the Inspector General's 2006 accountability audit of the California Department of Corrections and Rehabilitation's adult operations and programs. The audit assessed the department's progress in implementing recommendations resulting from 22 past audits conducted by the Office of the Inspector General between 2000 and 2004.

The accountability audit determined that individual institutions have taken numerous steps to improve operations and security, with wardens and staff at state prisons fully or substantially implementing 84 percent of past recommendations. The department itself, however, has fully or substantially implemented only 69 percent of recommendations directed to non-medical department administrators and only 48 percent of recommendations directed to department medical administrators. Overall, 75 percent of the 394 recommendations resulting from the 22 past audits have been fully or substantially implemented.

The Office of the Inspector General found that although the department has markedly improved its internal affairs operation, it has not addressed three of its most significant and long-standing problems: the need to overhaul its antiquated information technology; the need to provide inmates with adequate medical care in a fiscally sound manner, and the need to fulfill its broader public safety mission by better preparing inmates for release.

The report presents 91 new recommendations to address deficiencies identified in the course of the audit. The department's response appears as an attachment to the report.

Thank you for the courtesy and cooperation extended to my staff during the accountability audit.

Sincerely,

MATTHEW L. CATE
Inspector General

cc:  Bernard Warner, Undersecretary (A), California Department of Corrections and Rehabilitation
     Joe McGrath, Chief Deputy Secretary, Adult Operations, California Department of
     Corrections and Rehabilitation
     Del Sayles-Owen, Chief Deputy Secretary (A), Adult Programs, California Department of
     Corrections and Rehabilitation

Enclosures

*Arnold Schwarzenegger, Governor*

(Blank page)

# OFFICE OF THE INSPECTOR GENERAL

## MATTHEW L. CATE, INSPECTOR GENERAL



## ACCOUNTABILITY AUDIT

## REVIEW OF AUDITS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION ADULT OPERATIONS AND ADULT PROGRAMS

## 2000 – 2004

## VOLUME I

### APRIL 2006

### STATE OF CALIFORNIA

(Blank page)

# CONTENTS

## VOLUME I

PAGE

EXECUTIVE SUMMARY ------------------------------------------------------------------------------ ES-1

SUMMARY OF FINDINGS AND RECOMMENDATIONS ----------------------------- ES-9

INDEX TO FINDING SUMMARIES---------------------------------------------------- ES-55

INTRODUCTION ---------------------------------------------------------------------------------------1

BACKGROUND --------------------------------------------------------------------------------1

OBJECTIVES, SCOPE, AND METHODOLOGY ------------------------------------------2

FINDINGS AND RECOMMENDATIONS -------------------------------------------------------------5

CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY
AND STATE PRISON, CORCORAN ----------------------------------------------7

PHARMACEUTICAL EXPENDITURES------------------------------------------------ 53

OFFICE OF INVESTIGATIVE SERVICES-------------------------------------------- 65

EMPLOYEE DISCIPLINARY PROCESS ----------------------------------------------- 89

OFFICE OF COMPLIANCE, AUDIT FUNCTIONS------------------------------------ 99

MEDICAL CONTRACTING PROCESS------------------------------------------------111

EDUCATION PROGRAMS AT LEVEL IV INSTITUTIONS ---------------------------121

RICHARD A. MCGEE CORRECTIONAL TRAINING CENTER ----------------------133

CALIFORNIA STATE PRISON, SOLANO-----------------------------------------------143

CALIFORNIA STATE PRISON, SACRAMENTO-------------------------------------------165

# VOLUME II

**FINDINGS AND RECOMMENDATIONS, CONTINUED**

HIGH DESERT STATE PRISON------------------------------------------------------------183

VALLEY STATE PRISON FOR WOMEN ---------------------------------------------209

SIERRA CONSERVATION CENTER ---------------------------------------------------237

LEO CHESNEY COMMUNITY CORRECTIONAL FACILITY -------------------------267

LOCAL ASSISTANCE PROGRAM------------------------------------------------------293

INMATE APPEALS BRANCH-----------------------------------------------------------301

SALINAS VALLEY STATE PRISON, INMATE APPEALS AND DISCIPLINARY PROCESSES ---305

CALIFORNIA REHABILITATION CENTER, INMATE APPEALS PROCESS --------------------315

DEUEL VOCATIONAL INSTITUTION, INMATE APPEALS PROCESS ----------------------323

CORRECTIONAL FACILITY MAIL PROCESSING ---------------------------------------329

PRISON INDUSTRY AUTHORITY, OPTICAL PROGRAM AT RICHARD J. DONOVAN --------349

KONOCTI CONSERVATION CAMP NO. 27 -----------------------------------------------355

RESPONSE FROM THE CALIFORNIA DEPARTMENT OF CORRECTIONS
    AND REHABILITATION ----------------------------------------------------- ATTACHMENT

# EXECUTIVE SUMMARY

This report presents an assessment of the progress made by the California Department of Corrections and Rehabilitation in implementing past recommendations affecting the department's adult operations and programs. The recommendations resulted from 22 audits and reviews conducted by the Office of the Inspector General between 2000 and 2004. The report represents the third and final component of a comprehensive follow-up review — an accountability audit — of 33 previous reviews and audits of entities comprising the former Youth and Adult Correctional Agency (now the California Department of Corrections and Rehabilitation). In addition to the 22 audits and reviews conducted by the Office of the Inspector General between May 2000 and September 2004 represented here, the original audits in the accountability audit included nine audits and reviews of the former California Youth Authority (now the Division of Juvenile Justice) and two reviews of the Board of Prison Terms (now the Board of Parole Hearings). The two previous follow-up reviews in the accountability audit were released in January and July 2005, respectively.

The follow-up review of the California Department of Corrections and Rehabilitation's adult operations and programs determined that of 394 recommendations issued in the 22 previous audits and reviews, 241 (61 percent) have been fully implemented; 53 (14 percent) have been substantially implemented; 45 (11 percent) have been partially implemented; 39 (10 percent) have not been implemented; and 16 (4 percent) are no longer applicable. The Office of the Inspector General has issued 91 new recommendations, listed in the body of this report, to address remaining deficiencies.

The review revealed two broad findings. The first is that the staff and management of individual institutions have been highly responsive to recommendations resulting from past audits and reviews and have taken numerous steps to improve operations and security at the state's prisons. The second is that the department itself has been less responsive to past recommendations and, although it has markedly improved its internal affairs operation, has yet to address three of its other most troubling and long-standing problems — the need to overhaul its antiquated information technology system; the need to provide inmates with adequate medical care in a fiscally sound manner; and the need to fulfill its broader public safety mission by better preparing inmates for release. Achieving these goals is the responsibility of department administrators. At the same time, it must be recognized that efforts to address the problems in these areas are severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff resources thin and leaving little facility space available for programming and other purposes. Developing sustainable solutions will require the department, state policymakers, and the public to collectively address the available options: increasing prison capacity; examining sentencing and parole policies; investing additional resources in reducing recidivism; or a combination of all three.

## IMPROVEMENTS BY THE INSTITUTIONS

Overall, the 2006 follow-up review determined that recommendations directed to prison wardens and chief medical officers at individual institutions were more often implemented than those directed toward department administrators, even though in some instances, the department has had as long as five years to take action. Of 175 recommendations directed to wardens, 84 percent (148) have been fully or substantially implemented. In contrast, only 69 percent (98) of the 143 recommendations directed to non-medical administrators in the department have been fully or substantially implemented. Worst of all, of the 31 recommendations directed to headquarters medical administrators, only 15 (48 percent) have been fully or substantially implemented. The table shown below illustrates these results.

| | | TABLE 1 IMPLEMENTATION STATISTICS BY RESPONSIBLE ENTITY | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Responsible Entity | Totals | Fully Implemented | | Substantially Implemented | | Partially Implemented | | Not Implemented | | Not Applicable | |
| | | Number | Percent | Number | Percent | Number | Percent | Number | Percent | Number | Percent |
| Department Non-medical | 143 | 78 | 55% | 20 | 14% | 22 | 15% | 15 | 10% | 8 | 6% |
| Department Medical | 31 | 10 | 32% | 5 | 16% | 7 | 23% | 9 | 29% | | 0% |
| Warden | 175 | 128 | 73% | 20 | 11% | 10 | 6% | 9 | 5% | 8 | 5% |
| Chief Medical Officer | 43 | 23 | 53% | 8 | 19% | 6 | 14% | 6 | 14% | | 0% |
| Department of Forestry and Fire Protection | 2 | 2 | 100% | | 0% | | 0% | | 0% | | 0% |
| Totals | 394 | 241 | 61% | 53 | 14% | 45 | 11% | 39 | 10% | 16 | 4% |

Institutions have implemented improvements in a wide range of operations, including security requirements, employee disciplinary actions, staff training, and the inmate appeals process. For example:

- *Sierra Conservation Center.* A May 2001 audit of the Sierra Conservation Center resulted in 53 recommendations to address a range of deficiencies in safety and security, the inmate disciplinary process, staff training, employee grievances, equal employment opportunity complaints, adverse personnel actions, and the reporting of inmate deaths. The follow-up review determined that the institution has fully or substantially implemented 92 percent of the recommendations, making important improvements in its physical plant and operational procedures.

- *California State Prison, Solano.* A March 2003 audit of California State Prison, Solano, resulted in 24 recommendations relating to deficiencies in such areas as the tracking of inmates with tuberculosis; the awarding of sentence reduction credits for classes that

were not held; the reporting of inmate deaths; the retention of inmates in administrative segregation units for periods longer than justified; documentation of employee disciplinary proceedings; and prompt implementation of medical modification orders. The follow-up review determined that the institution has fully or substantially implemented 88 percent of the recommendations.

- ***Leo Chesney Community Correctional Facility.*** An audit of the Leo Chesney Community Correctional Facility, released in October 2001, found deficiencies related to the use of monies from inmate telephone revenues and the inmate welfare fund, as well as deficiencies in staff training, the inmate adult education program, and the processing of inmate appeals. The follow-up review determined that the facility has fully or substantially implemented 73 percent of the 22 recommendations resulting from the audit.

- ***California State Prison, Sacramento.*** A September 2000 audit of California State Prison, Sacramento resulted in 17 recommendations to address deficiencies related to financial management; internal control weaknesses in the handling of inmate trust funds; failure to process inmate appeal forms in a timely manner; the failure to comply with a mandate to remove underground storage tanks; inconsistent handling of inmate rules violation reports; and the failure to complete employee probation and performance reports on time. The follow-up review determined that the institution has fully or substantially implemented 82 percent of the recommendations.

## IMPROVEMENTS BY THE DEPARTMENT

The follow-up review determined that the most important improvements affecting the department have occurred in the internal affairs and employee disciplinary process as a result of earlier reviews and the *Madrid v. Woodford* litigation. Reviews by the Office of the Inspector General in October 2001 and March 2002 had found significant deficiencies that prevented internal affairs investigations from being completed within the statutory one-year time limit, which in turn prevented the department from disciplining peace officers found to have engaged in misconduct. The March 2002 review found, for example, that 43 percent of a sample of investigations completed during fiscal years 1999-2000 and 2000-01 in which misconduct allegations were sustained were not completed within one year and therefore did not result in disciplinary action. The department also has been criticized in the past for alleged failure to sufficiently investigate misconduct and to impose discipline in a fair and consistent manner. Under reforms developed through the Madrid Remedial Plan, however, a central intake panel made up of representatives from the Office of Internal Affairs, Office of Legal Affairs, and other department staff now reviews all requests for investigation and either accepts the request as an internal affairs investigation or sends it back to the hiring authority for disposition. The Office of the Inspector General's Bureau of Independent Review monitors the central intake and internal affairs process, and also monitors the investigations. A new electronic case management system tracks the entire employee discipline continuum from the request for investigation to the final hearing and disposition of action. Although deficiencies remain, such as the inability to use the system to identify trends and pervasive problems, the Office of the Inspector General found that as a result of these and other changes, only two percent of 94 investigations with sustained findings conducted by the Office of Internal Affairs for the period December 1, 2004 through May 31, 2005 exceeded the one-year statutory limit.

**CONTINUING DEPARTMENT FAILURES**

Where institutions have not fully or substantially implemented recommendations, often the reason has been the failure of the department to implement department-level solutions by establishing the necessary statewide policies and procedures or investing in needed resources. The department also has not effectively used its internal audit function and other tools to identify systemic problems. Again, the most significant deficiencies are seen in information technology, medical care, and inmate programming.

*Information technology.* The department's outdated information technology, with its antiquated mainframes and stand-alone databases lacking integration with other system components, impedes processes at every level. The absence of efficient modern technology — to automate routine procedures, to organize records and make them readily available to designated staff — echoes through programs and institutions and causes inefficiency and waste. Worse, the deficiencies reduce critical procedures to the manual handling of paper documents and sometimes leaves the custody and medical staff at risk of making important decisions based on paper records in files that may not be up-to-date. These deficiencies have been fueled by a long history on the part of the department of poor information technology planning, poor project implementation, and failure to fund needed improvements. Only 42 percent of the Office of the Inspector General's past recommendations relating to information technology covered in this follow-up review, for example, have been fully or substantially implemented. To bring about solutions, the administration, policymakers, the courts, labor representatives, inmate advocates, and other corrections stakeholders should work together to invest in needed improvements and resolve these long-standing problems.

Examples of areas affected by the failures in information technology include the following:

- *Pharmaceutical expenditures.* The department continues to waste millions of dollars annually by not implementing recommendations that it replace its outdated, inefficient, 20-year-old pharmacy management system. A July 2003 survey by the Office of the Inspector General found the department's pharmaceutical expenditures were projected to increase 111 percent between 1999-2000 and 2002-03, even though the inmate population decreased two percent and the national consumer price index for pharmaceutical drugs increased only 22 percent during that time.[1] To remedy the problems, the Office of the Inspector General's survey and four comprehensive audits and studies by other entities identified the need for the department to replace the pharmacy management system with an automated health care management system capable of performing essential functions to control costs and prevent waste, fraud, and abuse. Following the July 2003 survey, the Office of the Inspector General estimated that by replacing the system and implementing other management controls, the department could reduce its annual pharmaceutical expenditures— which totaled $122.4 million in fiscal year 2002-03 — by as much as $26 million. In response to the 2006 follow-up review, the department reported that it has made progress toward launching a new automated health care management system, but that statewide implementation has not yet

---

[1] The actual increase in the department's pharmaceutical expenditures was later reported to have been 94 percent.

been accomplished. The department reported, however, that it nonetheless achieved "cost avoidance" between 2002-03 and 2003-04 because its pharmaceutical expenditures increased only 6 percent, compared to the 18 percent average annual increase over the three preceding fiscal years. Yet, Bureau of Labor Statistics data show that between July 2003 and June 2004, pharmacy prices nationwide increased only 3.3 percent. Meanwhile, the department's pharmaceutical expenditures in fiscal year 2003-04 rose to $129.7 million —an increase of $7.3 million over the previous year. Because of these problems, in March 2006, the U. S. District Court ordered a comprehensive financial and operational audit of the department's pharmaceutical services. That audit will be conducted by a private specialty firm with expertise in correctional pharmaceutical operations.

- *Inmate appeals.* The department's Inmate Appeals Branch still has not obtained the information technology needed to enable it to efficiently analyze information from all levels of the inmate appeals process in order to identify systemic problems in the department's operations and practices. The inmate appeals process provides inmates with a means of resolving grievances concerning a range of issues, including requests for reasonable accommodation under the Americans with Disabilities Act and the alleged failure to obtain medical services. The Office of the Inspector General found from a February 2001 review that the department had no automated process for analyzing the appeals to identify deficiencies in policies, procedures, or practices even though the department's operations manual identifies the inmate appeals process as a vehicle for that purpose. In a September 2004 follow-up review, the Inmate Appeals Branch reported that it had developed a new inmate appeals tracking system for use at the institutions and was in the planning stages to extend the reporting capability of the new system to include data that could be used as a tool for identifying systemic problems. In the 2006 follow-up review, however, the Inmate Appeals Branch reported that enhancements scheduled to take place in November 2004 had been delayed because of other department priorities. In December 2005, the Inmate Appeals Branch reported that it was working on a feasibility study for the enhancements, which was scheduled to be completed by December 21, 2005. But the department had not completed the study when the Office of the Inspector General's fieldwork on this issue ended in December 2005.

- *Local assistance.* The department's Local Assistance Program, which reimburses local jurisdictions for the costs of detaining state parolees in local facilities, lacks the information technology needed to efficiently verify information on the invoices submitted for those costs. The department reports that its parole revocation scheduling and tracking system cannot be programmed to allow continuous tracking of the movements of individual parolees. As a result, the parole staff cannot confirm that a parolee was detained in the local jurisdiction on an active parole hold during the period claimed. The department reports that it is using a tracking system developed only for Parole Region III, which encompasses Los Angeles County, but has not estimated when such a system might be available statewide. The 2005 state budget for local assistance payments totaled $81.5 million.

*Medical services for inmates.* Because of the department's long-standing failings in providing inmate medical services, a federal receiver appointed by the U. S. District Court will take over the department's health care operations on April 17, 2006 to create a sustainable health care

system capable of providing constitutionally adequate medical care to inmates. Under the terms of the court's action, the receiver will have broad powers to restructure day-to-day operations and to direct the department's medical administrative, personnel, financial, accounting, contractual, legal, and other operational functions. In working with the receiver, the department should endeavor to address the following long-term deficiencies:

- **The California Substance Abuse Treatment Facility.** The second-largest prison in the state system, the California Substance Abuse Treatment Facility and State Prison at Corcoran, reports that a critical shortage of staff physicians to treat its more than 7,300 inmates has prevented the institution from implementing many of the Office of the Inspector General's past recommendations affecting medical services. The institution continues to fail to ensure that inmates see physicians promptly after requesting medical services, and inmates with chronic medical conditions are not adequately monitored. Because of the physician shortage, inmate appeals concerning medical services at the institution are backlogged, creating a domino effect as new appeals are filed to complain that earlier appeals have not been answered. Repeated turnover in other key medical positions also contributes to the deficiencies. The institution reports that six different individuals filled its chief medical officer position between September 2002 and June 2005 when the present incumbent was hired and that since September 2002 its chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have all resigned, retired, or transferred. The use of outside medical specialists at the institution also has not been brought under control. In fiscal year 2001-02, the institution exceeded its budget for contracted medical services by more than $5 million — an 81 percent overage. The Office of the Inspector General recommended in January 2003 that the institution establish a process to review all referrals to outside providers, and the institution reports that it did establish an authorization committee to review specialist referrals, but that the physician shortage has limited the review to a cursory examination by the chief medical officer.

- **Contracting for outside medical services.** An October 2002 special review by the Office of the Inspector General found the department lacked a comprehensive statewide policy for managing medical services contracts and, because of deficiencies in its medical contracting process, had paid for services not performed and for services with an outside physician that had not been authorized. In response to the Office of the Inspector General's review, the department established a health contract services unit to assist institutions with all medical services contracts. In addition, the department required institutions to solicit medical providers and to prepare market surveys before initiating a contract. Meanwhile, expenditures for medical contracts rose 58 percent between fiscal years 2000-01 and 2004-05 from $200 million to more than $315 million, largely because of medical staff vacancies requiring contracted personnel to fill the void.

In response to two subsequent audits issued by the California State Auditor in 2004, the Department of General Services tightened the procedures used by the department to contract with outside community hospitals, physicians, nurses, pharmacists and other medical professionals to provide needed services and fill temporary medical staff vacancies and required the department to obtain competitive bids on clinical contracts. According to a correctional expert appointed by the U. S. District Court, however, due in part to insufficient staffing and training necessary to properly implement the new

contracting procedures as well as to the complexity of the procedures, the department has fallen $58 million behind in paying provider claims. The new bidding process instituted to replace single-source contracting also has resulted in a shortage of specialty providers. Because of these developments, on March 30, 2006 the court ordered the department to pay all valid outstanding department-approved claims within 60 days and to establish new medical contracting procedures within 180 days.

*Preparing inmates for release.* California's prison population grew by 8,245 inmates between 2000 and 2006, tracking almost exactly with the state's annual population growth rate. In February 2000, the total inmate population stood at 160,846 and by March 2006 it had increased to 169,091, making California's prison system among the largest in the world and filling the state's prisons to nearly double design capacity. The department's adult operations budget grew over the same period from $4.4 billion in fiscal year 2000-01 to $5.3 billion in 2003-04 and to a proposed $7.5 billion for fiscal year 2006-07. As the inmate population increases, the department's problems — controlling violence, offering education, delivering health care, managing overcrowding, and controlling costs — become more difficult. While numerous factors are driving the numbers, the department has done little to control recidivism.

Examples of the deficiencies in rehabilitation efforts:

- *Substance abuse treatment.* According to the department, 21 percent of the state's more than 169,000 inmates are presently serving prison terms for drug offenses and the one-year recidivism rate for drug offenders is 37 percent. Yet, the effectiveness of the department's largest substance abuse treatment program is still unproven. A September 2002 study by the University of California, Los Angeles of the California Substance Abuse Treatment Facility's 1,478-bed substance abuse treatment program — the largest custody-based substance abuse treatment program, not only in the state correctional system, but also in the United States — showed no difference in recidivism rates between program participants and a control group of inmates from another prison who did not receive treatment. No comprehensive effectiveness studies comparable to the September 2002 study have been conducted. A January 2003 audit by the Office of the Inspector General of the program found numerous problems that impaired the program's effectiveness. The program is administered by the department's Office of Substance Abuse Programs, which screens inmates for the program, and is run by two private contractors. From January 2002 through June 2006, the Office of Substance Abuse Programs contracted to pay each private contractor approximately $29 million for substance abuse program services, for a total of $58 million. Key among the deficiencies identified was the placement of large numbers of inmates into the program who were not suited to the treatment model, including sex offenders and inmates suffering from mental illness. Other deficiencies included a shortage of trained counselors to run the interactive therapeutic community — a proven treatment modality for substance abusers — and the fact that treatment group sizes exceeded contract limits. The department has made improvements since the January 2003 audit by reducing the number of sex offenders and mental health patients in the program, yet the problems of large group size and the shortage of counselors remain. The 2006 follow-up review found that more than 400 general population inmates had been moved into the substance abuse housing units in response to a department-wide bed shortage, causing the substance abuse treatment group

clusters to increase to up to 100 inmates —exceeding the professionally recommended standard for therapeutic communities of 50 to 75 participants per cluster. The follow-up review also found that program staffing was 19 percent short of contract requirements, with only 59 counselors, instead of the 73 entry-level and journey-level counselors provided for under the contracts. The deficiencies appear to result from the continuing failure of the department to adequately monitor program contractors or to include provisions in the contracts that would allow the state to impose sanctions for noncompliance.

- *Education.* To its credit, the department has taken steps to institute new education methods for inmates at Level IV institutions, where classroom education models have proven to be unworkable, but the effectiveness of the new programs has not yet been evaluated. A July 2003 survey by the Office of the Inspector General found that delivering academic and vocational classes through a classroom model was ineffective and expensive for Level IV maximum security inmates because frequent institution lockdowns caused classes to be cancelled more than 60 percent of the time. The Office of the Inspector General also found that even if the classes were held 100 percent of the time, they would be able to accommodate only a small percentage of inmates eligible for the programs, in part because of the small number of budgeted teaching positions at Level IV institutions. State law requires the department to make literacy programs available to at least 60 percent of eligible inmates with the goal of ensuring that inmates achieve a ninth-grade reading level by the time they parole, and a survey by the Department of Corrections in November 1996 found that 68 percent of the inmate population scored below the ninth grade level in reading. Yet, at the time of the Office of the Inspector General's July 2003 survey, only 21 percent of eligible inmates at the five Level IV institutions covered in the survey were assigned to education classes. Since the survey, the department reports that it has developed new program models incorporating self-paced independent study, distance education, and other education services to increase inmate participation. It is too early to assess the effectiveness of the new education programs, however, and the department has not developed an effective monitoring system to ensure that institutions are complying with its education policies and procedures. Prison reform advocates have also suggested that the new programs may be too shallow to be effective, but again, population pressures appear to make it difficult to provide more comprehensive educational opportunities, at least in a classroom setting.

***Failure to use internal auditing tools.*** The Department of Corrections and Rehabilitation has failed to make effective use of its own internal auditing function to identify systemic deficiencies and effect needed changes in programs and institutions. An October 2002 audit by the Office of the Inspector General of the Office of Compliance, which is the entity responsible for the department's internal auditing activity, found numerous weaknesses. For example, the office did not target internal audits toward areas of the highest risk; did not monitor audit projects to make sure they were completed in a proper and timely manner; and used a rigid checklist auditing approach that had the potential to miss important issues. The Office of Compliance reports that it has taken preliminary steps toward correcting deficiencies. But, more than three years after the October 2002 audit, the Office of Compliance still has not addressed most of the audit findings and has still not appointed a chief of internal audits with the training and experience to manage an internal auditing unit.

## SUMMARY OF FINDINGS AND RECOMMENDATIONS

Following is a summary of the findings from each of the 22 follow-up reviews comprising this accountability audit of the California Department of Corrections and Rehabilitation's adult operations and programs. An index to the summaries is included following that section.

(blank page)

**CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN**

**The California Substance Abuse Treatment Facility and State Prison at Corcoran has developed needed improvements to policies and procedures affecting medical services, but the institution has not implemented numerous recommendations from a January 2003 audit, citing a shortage of medical personnel and turnovers in its management ranks as major impediments. In addition, the Office of Substance Abuse Programs has not significantly improved its processes for monitoring contracts with private providers of in-prison substance abuse treatment programs, and drug treatment providers continue to fail to provide the number of counselors required under the contracts. Independent evaluations of the effectiveness of the facility's in-prison substance abuse treatment program are inconclusive.**

| IMPLEMENTATION REPORT CARD |
| --- |
| Previous recommendations: 72 |
| Fully implemented: 38 (53%) |
| Substantially implemented: 11 (15%) |
| Partially implemented: 10 (14%) |
| Not implemented: 12 (17%) |
| Not applicable: 1 (1%) |

The Office of the Inspector General issued a management review audit of the California Substance Abuse Treatment Facility and State Prison at Corcoran in January 2003. The audit identified numerous problems at the institution, including inadequate management of medical, dental, and pharmacy services; deficiencies in the substance abuse treatment program that prevented the institution from reducing recidivism by helping inmates overcome drug dependency; and the failure of a significant number of staff and managers to fulfill annual training requirements.

The January 2003 management review audit identified numerous problems that impaired the effectiveness of the institution's substance abuse treatment program. Key among these was the placement into the program of large numbers of inmates not suited to the treatment model, including sex offenders and inmates suffering from mental illness. Other deficiencies included a shortage of trained counselors to run the interactive therapeutic community — a proven treatment modality for modifying the behavior of substance abusers — and the fact that treatment group sizes for the therapeutic community exceeded contract limits.

A September 2002 study of the institution's substance abuse treatment program by the University of California, Los Angeles, showed no difference in recidivism rates between program participants and a control group of inmates at another prison who received no treatment. The study raised questions about the advisability of paying contractors millions of dollars for in-prison substance abuse programs not demonstrated to be effective.

As a result of the January 2003 management review audit, the Office of the Inspector General made 72 recommendations to the Department of Corrections, the Health Care Services Division, and the California Substance Abuse Training Facility and State Prison at Corcoran.

## BACKGROUND

The California Substance Abuse Treatment Facility and State Prison at Corcoran, which opened in August 1997, houses approximately 7,300 male inmates and has a staff of about 1,700 employees, making it one of the largest prisons in the western world. It is designed for inmates ranging from Level II (low medium security) through Level IV (maximum security), and also includes a small number of Level I (minimum security) inmates. The institution includes a correctional treatment center, which provides medical treatment and recovery, mental health assessment and care, and clinical services. Clinics affiliated with the correctional treatment center provide medical and dental services inside each of the prison's seven facilities. Pharmaceuticals are provided by a pharmacy located in the correctional treatment center. Medical services for the California Department of Corrections and Rehabilitation inmates are the responsibility of the department's Division of Correctional Health Care Services. The health care manager at the Substance Abuse Treatment Facility and State Prison at Corcoran acts as the on-site administrator of health care services for the institution and is responsible for overall management of the institution's medical, mental health, and dental programs.

In addition to its mission of providing custody for state prison inmates remanded to the custody of the Department of Corrections and Rehabilitation, the institution includes a 1,478-bed substance abuse treatment program — the largest custody-based substance abuse treatment facility in the United States. The Department of Corrections and Rehabilitation's Office of Substance Abuse Programs is responsible for administering the substance abuse program, which is run by two private contractors. The Office of Substance Abuse Programs has employees on site to monitor daily program operations and to screen inmates eligible for the substance abuse program to ensure that the program operates at full capacity. The office is also responsible for monitoring the private contractors for compliance with the terms of the contracts to provide treatment services. The institution staff provides custody, security, drug testing, classification reviews, and administrative support to the Office of Substance Abuse Programs and the contractors. From January 2002 through June 2006, the Office of Substance Abuse Programs contracted to pay each private contractor approximately $29 million for substance abuse program services.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In the 2006 follow-up review, the Office of the Inspector General found that although there have been some improvements, the California Substance Abuse Treatment Facility has made generally disappointing progress in implementing needed changes in the three years since the January 2003 management review audit. The institution has been successful in identifying and recruiting a higher proportion of program-eligible inmates into the program, while reducing the proportion of sex offenders and mental health patients. Of the 1,456 inmates assigned to the program on October 20, 2005, less than seven percent were mental health patients and less than one percent of those who were mental health patients were also sex offenders. In comparison, the January 2003 audit found the proportion of sex offenders and mental health patients in the program to be as high as 50 percent.

The Office of the Inspector General also found, however, that the Office of Substance Abuse Programs continues to fail at effectively monitoring its contracts with the private providers of substance abuse program services at the prison. In reviewing the on-site monitoring reports for each provider in the substance abuse program for the 11-month period from December 2004 to October 2005, the Office of the Inspector General found that the monitoring reports continued to lack detail, did not focus on the contractors' compliance with contractual expectations, and did not reflect evidence of substantive review of the providers' records and operations.

The Office of the Inspector General noted in addition that the program providers continue to supply an inadequate number of counselors. During an October 2005 site visit, the Office of the Inspector General found that program staffing was 14 counselors short of the 73 entry-level and journey-level counselors required under the state contracts — a 19 percent shortfall. Moreover, the Office of Substance Abuse Programs still has no language in its provider contracts permitting the state to withhold payment or to exercise other sanctions short of contract cancellation for instances of non-compliance.

The Office of the Inspector General also found that an influx of more than 400 general population inmates into the substance abuse housing units in response to a department-wide bed shortage caused the treatment group cluster sizes to increase from 62 inmates to up to 100 inmates —levels that exceed the professionally recommended standard of 50 to 75 participants for therapeutic community programs and further detract from program effectiveness.

Treatment also appears to be frequently interrupted. On two separate visits in October and November 2005, the Office of the Inspector General attempted without success to observe therapeutic community groups and evaluate group sizes at the institution. On the first visit, all counseling had been suspended for the programs' annual "Sports Week," and on the second visit nearly all group sessions had been suspended to accommodate population movements among the housing units. This inactivity, coupled with recent lockdowns reported by counselors, raises concerns about the continuity of therapeutic community treatment at the institution. It is noteworthy that, with the exception of the lockdowns, none of the monitoring reports by the Office of Substance Abuse Programs discussed the continuing problems found by the Office of the Inspector General during its six days of fieldwork.

The Office of the Inspector General reviewed three subsequent evaluations by the University of California, Los Angeles, of the institution's substance abuse treatment program conducted since the September 2002 evaluation. Although the more recent evaluations, which were issued in September 2003, September 2004, and January 2006, made positive assessments of the effectiveness of post-prison aftercare, none were bona-fide effectiveness studies like the 2002 evaluation because they did not compare the recidivism rates of in-prison program participants against those of inmates from another prison who had not received treatment. Without a comparison of the subject group to a control group, it is not possible to conclude that the institution's program is successful in lowering recidivism.

***Medical care.*** The Office of the Inspector General found that although the institution has made efforts to implement recommendations affecting the institution's medical services and operations, many of the problems identified in the January 2003 management review audit have

not been adequately addressed. The remaining deficiencies include a continuing backlog of inmate medical appeals; lack of an effective means of ensuring that physicians work a full 40-hour-a-week schedule; failure to ensure that inmates see a physician in a timely manner; lack of review of the need for inmate treatment by specialists; and inadequate monitoring of chronic care patients. The institution points to repeated turnover in the chief medical officer position as one cause of the continuing deficiencies. Six different individuals served in the position between September 2002 and June 2005, when the present incumbent was hired. The institution also reports that since September 2002 its chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have all resigned, retired, or transferred. The institution further cites a critical shortage of physicians and other medical staff as a barrier to full implementation of the Office of the Inspector General's recommendations. For example:

- The institution reports that it has established an expectation that physicians complete all administrative duties, including notifying the chief medical officer of medical appeals approaching delinquent status, but maintains that the physician shortage precludes aggressive focus on appeals.

- The institution reports it established a medical authorization review committee to review the medical necessity for procedures referred to outside medical providers, but that the committee process has fallen victim to the physician shortage and reviews are limited to a cursory examination by the chief medical officer.

- While physicians' hours and workloads have been adjusted to permit doctors to see more patients, the requirement that inmates see doctors within 14 days after a request for contact as mandated by the *Plata v. Schwarzenegger* court decision is not being met because the institution does not have enough physicians to meet that workload.

In addition, the Office of the Inspector General found that despite establishing a system of accountability for medical personnel, the institution's medical management team has been lax in enforcing a directive that medical personnel log in and out of the correctional treatment center each day by signing the log and recording the actual times of arrival and departure. Instead of recording the time of day, physicians simply sign the log and indicate a status of "in" or "out."

***Pharmacy operations.*** The Office of the Inspector General noted significant improvements in the institution's pharmacy operations. The institution developed improved policies and procedures for control of medications and quality control over prescriptions, as well as for intra-facility transfers of inmate medications. Spending for pharmaceuticals also decreased. As the Office of the Inspector General reported in the January 2003 management review audit, the institution spent $5.4 million in fiscal year 2001-02 for drugs and pharmaceutical supplies, but in fiscal year 2004-05, the institution's reported spending decreased to $3.7 million — a 31 percent reduction. The Department of Corrections and Rehabilitation, however, has still has not made a significant effort to develop an automated pharmaceuticals inventory system for the institutions.

The Office of the Inspector General also found that the Substance Abuse Treatment Facility has made significant progress in staffing its pharmacy with permanent state employees. At the time of the Office of the Inspector General's January 2003 audit, the institution's pharmacy was

staffed entirely by contract employees, but now the pharmacy employs only two contract employees among its full-time staff of nine. The positions currently filled by the two contract employees have been advertised as state civil service job openings since October 30, 2002, and the institution says the current state salary for pharmacists is lower than that offered in the industry, making recruitment difficult.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of the 2006 follow-up review, the Office of the Inspector General is providing 23 recommendations to the Office of Substance Abuse Programs. The main recommendations are listed below, and the remainder are presented in the full report.**

- **Conduct systematic, in-depth monitoring of treatment providers for compliance with contract terms. Monitoring reports should reflect all substantive details of the provider's records and operations. The reports should also include the Office of Substance Abuse Programs' analysis and evaluation of the provider's operations.**

- **When drafting contracts for substance abuse treatment services, include provisions for fiscal sanctions to address instances of non-compliance with contract terms, including failure to provide the required number of counselors.**

- **Whether performed by UCLA or by another contractor, ensure that future studies of the effectiveness of the substance abuse program at the institution include a comparison of the treatment group to a control group of similar inmates who did not receive treatment.**

- **Return to using smaller clusters of inmates to conform to the Office of National Drug Control Policy's recommendation that therapeutic community program clusters consist of no more than 50 to 75 inmates.**

**The Office of the Inspector General recommends that the Substance Abuse Treatment Facility and State Prison at Corcoran continue to work with the Division of Correctional Health Care Services' department-wide efforts to address the shortage of physicians and other medical staff.**

## PHARMACEUTICAL EXPENDITURES

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in reducing its pharmaceutical expenditures. The department, however, has accomplished only the preliminary steps required to replace its outdated management information system.**

In July 2003, the Office of the Inspector General conducted a survey to examine the Department of Corrections pharmaceutical expenditure trends over the four preceding fiscal years and to evaluate the department's efforts to implement changes recommended by previous audits and studies. The survey revealed that the department's pharmaceutical expenditures increased 94 percent, from $63 million in fiscal year 1999-2000 to $122.4 million in 2002-03 despite a slight decrease in inmate population and in stark contrast to a 22 percent increase in the national consumer price index for pharmaceutical drugs during the same period. The department's per-inmate pharmaceutical expenditures also increased, more than quadrupling from $142 in 1997 to $642 in 2002. The survey further identified four comprehensive audits and studies that had previously identified problems in the department's pharmacy program and included specific recommendations to remedy the deficiencies. Particularly critical was the indicated need for the department to replace its Pharmacy Prescription Tracking System, a badly outdated 20-year-old information system that lacked essential functions to control costs and prevent pharmaceutical waste, fraud, and abuse. In its July 2003 survey, the Office of the Inspector General recommended that the department act promptly to implement the recommendations of previous audits and studies of its pharmacy program, noting the department could reduce its annual pharmaceutical expenditures by up to $26 million by doing so. The Office of the Inspector General also recommended that if it appeared that the department would be unable to carry out the implementation on its own, that it consider contracting with a private vendor to institute the necessary improvements.

### IMPLEMENTATION REPORT CARD

Previous recommendations: 7

Fully implemented: 0 (0%)

Substantially implemented: 1 (14%)

Partially implemented: 2 (29%)

Not implemented: 3 (43%)

Not applicable: 1 (14%)

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In the 2006 follow-up review, the Office of the Inspector General found that the department has failed to fully implement the recommendations from the 2003 survey. Until it implements past recommendations in this area, the department continues to waste millions of dollars annually in pharmaceutical expenditures.

The department reported it has developed a strategic plan incorporating recommendations from private consulting, regulatory, and oversight agencies. It also reported that it has revised its statewide procedures for medication administration and distribution; trained personnel on formulary rules; and organized management workgroups. The department rejected recommendations to contract with a private firm to manage pharmacy operations and to centralize its pharmacy distribution system.

Although the department reported it has made progress in launching a project to replace its outdated and inefficient pharmacy management system with an automated health care management system, statewide implementation of that system has not been accomplished. The department reported, however, that it achieved a "cost avoidance" of $14.3 million between *projected* pharmaceutical expenditures for fiscal year 2003-04 ($144 million) and *actual* expenditures for that period. The department's actual pharmaceutical expenditures for fiscal year 2003-04 were $129.7 million — a $7.3 million (6 percent) increase over the previous year, compared to an 18 percent average increase experienced in the three preceding fiscal years. Yet, Bureau of Labor Statistics data show that between July 2003 and June 2004, pharmaceutical prices nationwide increased only 3.3 percent.

Because of these problems, in March 2006, the U. S. District Court ordered a comprehensive financial and operational audit of the department's pharmaceutical services, to be conducted by a private specialty firm with expertise in correctional pharmaceutical operations. In addition, the U. S. District Court-appointed receiver scheduled to take over all aspects of the department's health care system on April 17, 2006, will have authority to acquire and modernize information technology.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Continue the project to replace the outdated and inefficient Pharmacy Prescription Tracking System with the automated Health Care Management System and implement the new system statewide as soon as practicable.**

- **In light of the flexible options likely to be available under the February 2006 federal court order appointing a receiver over the department's medical health care delivery system, reconsider the option of contracting with a private pharmacy services management firm to implement the recommendations submitted in the reports and studies conducted since 2000.**

**OFFICE OF INVESTIGATIVE SERVICES**

**The Department of Corrections and Rehabilitation has reorganized and significantly improved its internal affairs operation since an October 2001 special review. The Office of Investigative Services—renamed the Office of Internal Affairs[1]—is now responsible for all of the department's internal affairs investigative functions. Many of the Office of the Inspector General's previous recommendations were implemented in the course of the reorganization and as a result of a federal court-ordered remedial plan. Other recommendations are no longer applicable in the wake of these changes. Yet, several deficiencies identified in the Office of the Inspector General's 2001 review remain, including the lack of a system for prioritizing investigations; inadequacies in completing employee background investigation; and failure to use the department's internal audits function to help identify pervasive problems.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 37**
>
> **Fully implemented: 19 (52%)**
>
> **Substantially implemented: 2 (5%)**
>
> **Partially implemented: 8 (22%)**
>
> **Not implemented: 6 (16%)**
>
> **Not applicable: 2 (5%)**

In October 2001 the Office of the Inspector General issued a special review of the management practices and administrative operations of the Office of Investigative Services, which is responsible for all of the department's internal affairs investigative functions. The special review centered on the Office of Investigative Services' effectiveness, its compliance with required procedures, and the quality of its operational practices, identifying numerous deficiencies that impaired the ability of the office to meet its responsibilities. In particular, the review found that a rapidly expanding caseload, coupled with deficient management practices, prevented the Office of Investigative Services from completing investigations within required time limits. That deficiency limited the ability of the department to take appropriate administrative action against employees when misconduct allegations were sustained. The Office of the Inspector General presented 37 recommendations to remedy the deficiencies identified in the October 2001 special review.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that the Office of Internal Affairs has significantly improved its investigative process through creation of a central intake panel that brings consistency to the process of determining whether to accept or reject cases for investigation. In another improvement, the investigative classification system has been streamlined, allowing cases involving minor supervisory issues requiring no additional investigation to be addressed directly by the hiring authorities, while those requiring investigation are conducted or closely supervised by the Office of Internal Affairs. In addition, the former case management information system has been replaced by a new system providing not only for tracking and monitoring active cases, but also for tracking the entire employee discipline continuum from the initial request for investigation to its final disposition. The system

---

[1] Depending on the context and time-frame discussed, both names — Office of Investigative Services and Office of Internal Affairs — are used in this report.

is being installed at California Department of Corrections and Rehabilitation investigative offices, legal offices, and hiring authorities throughout the state.

Many of the Office of the Inspector General's recommendations from the October 2001 special review were implemented in the course of reorganizing the entities now under the Department of Corrections and Rehabilitation, and also as a result of a federal court-ordered remedial plan. Other recommendations are no longer applicable in the wake of these changes. However, several deficiencies identified in the Office of the Inspector General's 2001 review remain. These include a lack of a system for prioritizing investigations; inadequate management of overtime use; inadequacies in completing background investigations of employees and borrowed investigators; inadequate control over access to the case management information system; deficiencies in evidence handling; and failure to use the department's internal audits function to help identify pervasive problems.

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General's 2006 follow-up review makes ten additional recommendations to the Office of Internal Affairs, including the following:**

- **Develop policies and procedures for prioritizing investigative cases.**

- **Assign each region a monthly allocation of budgeted overtime and prepare a monthly log for each regional office that begins with monthly allotted hours and is adjusted for each usage. When overtime is granted, the supervisor should immediately e-mail the agent and the overtime timekeeper for the purpose of adjusting monthly balances and providing evidence of previous overtime approval. In order to provide regional supervisors flexibility in managing cases, the Office of Internal Affairs should consider rolling over unused office balances from one month to the next.**

- **Refrain from using investigative services unit investigators until their supplemental background investigations are complete.**

- **Formalize the process for verifying that case management information system access is limited to only authorized users. The process should define the frequency of reviews, require a reconciliation of beginning and ending authorized users for the period, and specify the date when users are added or deleted. Included in this process should be a requirement that an exit document be prepared by the departing staff's supervisor that instructs the information technology staff to remove the user's access.**

- **Prepare a supervisory quality control review sheet that ensures that the investigative package is complete, the investigative plan was followed, all key witnesses were interviewed, required notices were performed, and the final report represents a clear, fair, and unbiased representation of the facts.**

- **Use the Department of Corrections and Rehabilitation internal audit staff to perform field audits to identify trends in complaints against staff so that resources can be focused on the most pervasive problems.**

**EMPLOYEE DISCIPLINARY PROCESS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has improved its employee disciplinary process and has fully or substantially implemented all previous recommendations.**

In March 2002, the Office of the Inspector General conducted a review of the Department of Corrections employee disciplinary process. The purpose of the review was to identify any administrative or procedural weaknesses in the disciplinary process that might affect the department's ability to take appropriate adverse action against employees found to have engaged in misconduct.

| IMPLEMENTATION REPORT CARD |
|---|
| **Previous recommendations: 9** |
| **Fully implemented: 6 (67 %)** |
| **Substantially implemented: 3 (33%)** |
| **Partially implemented: 0 (0%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

The review found that needless complexity sometimes delayed or even impaired disciplinary actions against employees. In addition, there were no clear guidelines defining the one-year period for investigating misconduct and imposing disciplinary action against peace officers. The review found that 43 percent of a sample of investigations completed during fiscal years 1999-00 and 2000-01 in which misconduct allegations were sustained were not completed within one year and therefore did not result in disciplinary action. Further, employee relations officers at institutions were not adequately trained, departmental legal staff were often uninvolved in disciplinary actions, and the department lacked policies and procedures governing settlements with employees. The Office of the Inspector General made nine recommendations to the department to address these findings. Subsequent to the March 2002 review, a special master appointed by the U. S. District Court, Northern District of California has been monitoring efforts to reform the disciplinary process through what is known as the Madrid Remedial Plan. Many of the plan's provisions are consistent with the Office of the Inspector General's March 2002 recommendations.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has significantly improved its administration of the employee disciplinary process. The department has developed a case management system to monitor and track disciplinary cases from start to finish to ensure that cases meet statutory deadlines. It has also implemented a new central intake process that provides for representatives from the Office of Internal Affairs, office of Legal Affairs, and other department staff to review requests for investigations and determine appropriate action. The Office of the Inspector General's Bureau of Independent Review monitors the central intake and internal affairs process and also monitors the investigations. The department has also updated its policies and procedures for employee discipline and has provided formal training to its employee relations officers statewide. As a result of these and other changes, only two percent of 94 investigations with sustained findings conducted by the Office of Internal Affairs for the period December 1, 2004 through May 31, 2005 exceeded the one-year statutory limit. No follow-up recommendations are made.

**OFFICE OF COMPLIANCE, AUDIT FUNCTIONS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has consolidated its audit functions into a single unit and elevated the chief of the unit to report directly to the undersecretary. Yet, more than three years after an October 2002 review by the Office of the Inspector General, the department still has not corrected most of the deficiencies identified in that review.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 4** |
| **Fully implemented: 2 (50 %)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 2 (50%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

In October 2002, the Office of the Inspector General issued a report resulting from a review of the audit functions of the Department of Corrections Office of Compliance. The Office of the Inspector General found that the Office of Compliance did not adhere to appropriate professional standards in performing its internal audit work. The Office of the Inspector General identified several specific weaknesses in the department's management of the Office of Compliance, all of which resulted from the failure of the office to comply with internal auditing standards. The deficiencies included poor communication with executive staff and unresponsiveness to executive requests for audits. As a result of the deficiencies, the Office of the Inspector General questioned the ability of the Office of Compliance to accomplish its objectives and meet its assigned responsibilities. As a result of the October 2002 review, the Office of the Inspector General recommended that the Department of Corrections consolidate all of its auditing activities into a professional internal auditing unit consistent with standards prescribed in *Standards for the Professional Practice of Internal Auditing*. The Office of the Inspector General recommendations specified that the chief of internal audits should possess the training, knowledge, and experience necessary to manage an internal auditing unit and should report to the chief deputy director for Support Services.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its 2006 follow-up review, the Office of the Inspector General found that more than three years after the initial audit in October 2002, the department has not addressed most of the audit findings. The department has consolidated its internal audit activities into the Office of Audits and Compliance, which reports directly to the department's undersecretary. That change should allow the department to better coordinate its varied audit activities and provide the appropriate level of organizational independence, as prescribed by the Institute of Internal Auditors. According to the department, once the Office of Audits and Compliance is fully operational, it will address most of the remaining issues raised in the October 2002 review.

Because the Office of Audits and Compliance is not yet fully operational, however, the department has not yet addressed several issues and recommendations raised in the review including:

- The department stated that it has not yet begun to adhere to *Standards for the Professional Practice of Internal Auditing*.

- The department reported that it has not yet developed a quality assurance and improvement program for its internal auditing activity.

- The department stated that it is currently not using a risk-based plan to determine the priorities of its internal audit activity.

- The department acknowledged that the two units that perform audits of internal operations are still not receiving substantive input from senior management in developing their audit plans.

- The department has not yet appointed a permanent assistant secretary as the chief of internal audits who possesses the training, knowledge, and experience to manage an internal auditing unit.

Not only appropriate auditing standards, but also sound business principles require the department to incorporate the features described above into its audit operations. By not adequately addressing the findings of the Office of the Inspector General's October 2002 report, the department has limited the value of its internal audit unit as a tool for identifying department operations needing improvement.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes six recommendations, including:**

- **The department should continue its efforts to recruit a permanent assistant secretary for the Office of Audits and Compliance, ensuring that the person selected possesses the training, knowledge, and experience to manage an internal auditing unit.**

- **The department should ensure that the Office of Audits and Compliance continues to develop operating policies and procedures that will ensure that its audit activity is consistent with the standards prescribed in the *Standards for the Professional Practice of Internal Auditing*.**

- **The policies and procedures should include a process for effective communication with the department's executive staff in planning annual audit activities and reporting audit performance, and a process by which to develop a risk-based comprehensive annual plan for identifying the priorities of the internal audit activity.**

**MEDICAL CONTRACTING PROCESS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has implemented several of the recommendations resulting from an October 2002 special review, but because of continuing problems with its medical contracting procedures, is under court order to develop new procedures within 180 days.**

In October 2002, the Office of the Inspector General conducted a special review of the processes and controls used by the department's Health Care Services Division to procure and pay for contract medical services to inmates. In order to provide adequate medical services to the growing inmate population, the department contracts with outside community hospitals, physicians, nurses, pharmacists, and other medical professionals to obtain specialized services its staff and facilities cannot provide. In some instances, the department also contracts with medical professionals to fill temporary staff vacancies in medical classifications where recruitment is difficult. The review determined that the division did not effectively manage its medical services to inmates and that it should adopt statewide policies and procedures to ensure cost-effective contracts, quality case management, and continuity of care.

The October 2002 review found the department lacked a comprehensive statewide policy for managing medical services contracts and had paid for services not performed and for services with an outside physician that had not been authorized because of deficiencies in its medical contracting process. The review found that the process was vulnerable to potentially serious conflicts of interest because the person selecting the contractor was also authorized to approve invoices and payments under the contract, and that these deficiencies in the process may have led to problems in the quality and continuity of inmate medical care.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has made a number of changes to its medical contracting process. In response to the Office of the Inspector General's review, the department established a health contract services unit to assist institutions with all medical services contracts. In addition, the department required institutions to solicit medical providers and to prepare market surveys before initiating a contract. Meanwhile, expenditures for medical contracts rose 58 percent between fiscal years 2000-01 and 2004-05 from $200 million to more than $315 million, largely because of medical staff vacancies requiring contracted personnel to fill the void.

In response to two subsequent audits issued by the California State Auditor in 2004, the Department of General Services tightened the procedures used by the department to contract with outside community hospitals, physicians, nurses, pharmacists and other medical professionals to provide needed services and fill temporary medical staff vacancies and required

**IMPLEMENTATION REPORT CARD**

**Previous recommendations: 7**

**Fully implemented: 5 (72 %)**

**Substantially implemented: 1 (14%)**

**Partially implemented: 1 (14%)**

**Not implemented: 0 (0%)**

**Not applicable: 0 (0%)**

the department to obtain competitive bids on clinical contracts. According to a correctional expert appointed by the U. S. District Court, however, due in part to insufficient staffing and training necessary to properly implement the new contracting procedures as well as to the complexity of the procedures, the department has fallen $58 million behind in paying provider claims. The new bidding process instituted to replace single-source contracting also has resulted in a shortage of specialty providers. Because of these developments, on March 30, 2006 the court ordered the department to pay all valid outstanding department-approved claims within 60 days and to establish new medical contracting procedures within 180 days.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation develop a more effective and efficient system for processing and monitoring medical service invoices, including validation that contractors have performed all services invoiced prior to issuing payment.**

**EDUCATION PROGRAMS AT LEVEL IV INSTITUTIONS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made progress in developing alternative education programs for Level IV inmates, but the effectiveness of the new programs has not yet been evaluated.**

In July 2003, the Office of the Inspector General conducted a survey of education programs at the Department of Corrections Level IV institutions. The survey was prompted by management review audits conducted by the Office of the Inspector General showing that inmates in state correctional institutions received only limited classroom instruction because classrooms were closed for significant periods of time due to lockdowns, teacher vacancies, and other program disruptions.

| IMPLEMENTATION REPORT CARD |
|---|
| **Previous recommendations: 6** |
| **Fully implemented: 1 (17%)** |
| **Substantially implemented: 2 (33%)** |
| **Partially implemented: 3 (50%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

The survey revealed the classroom education model to be an inefficient and expensive means of delivering education to Level IV inmates because frequent lockdowns cause academic and vocational classes to be closed down more than 60 percent of the time. At the five Level IV institutions locked down for the largest percentages of time, education programs operated an average of only 25 percent of the time. And even with the classes closed for long periods, the survey found that inmates continued to receive day-for-day sentence reduction credits as though they had attended class, and teachers continued to be paid as though they had provided instruction. Meanwhile, the survey also found that institutions had no systematic means of accounting for teachers' activities during lockdown periods or of temporarily assigning them to other duties, and labor agreements hampered the redirection of teachers to other functions during those periods. When lockdowns and other program disruptions were taken into account, the annual per-inmate cost of the education programs at Level IV institutions greatly exceeded the annual per-inmate cost budgeted.

The Office of the Inspector General also found despite the statutory requirement that the Department of Corrections and Rehabilitation make literacy programs available to at least 60 percent of eligible inmates — and even though a statewide survey conducted by the Department of Corrections in November 1996 found that 68 percent of the inmate population scored below the ninth grade level in reading — only 20.8 percent of eligible inmates at the level IV institutions surveyed were assigned to education classes at the time of the survey. Lastly, the Office of the Inspector General found that even if the classes were held 100 percent of the time, they would have been able to accommodate only a small percentage of inmates eligible for the programs, in part because of the small number of budgeted teaching positions at Level IV institutions. The Office of the Inspector General recommended that the Department of Corrections re-evaluate education programs at Level IV institutions to determine whether they warrant continued operation and investigate other methods of delivering academic and vocational instruction. Among the options considered should be eliminating formal classroom instruction and retaining a small educational staff to coordinate in-cell study courses for inmates.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in developing alternative education programs for its Level IV inmates. In response to a $34.8 million reduction to its education budget, the department evaluated its existing programs and prioritized them to determine those that warranted continued operation. Upon completion of the evaluation, the department eliminated 129 education positions, including many of the Level IV vocational programs, due to their ineffectiveness. The department has since developed alternative education program models designed to increase overall inmate participation through non-traditional methods. The new programs include more self-paced independent study, such as the new Bridging Education Program recently implemented in the reception centers and general population facilities. This new program allows inmates to begin participating in self-paced education programs when they arrive at a reception center. Other programs include short-term vocational certification classes, half-day assignments with a homework component, delivery of educational services via distance education methodologies, and delivery of educational services in the living units. The department recently implemented the majority of the new alternative delivery education models. Therefore, only minimal data is available at this time to evaluate the effectiveness of these programs. Prison reform advocates have suggested that the new programs may be ineffective, but inmate population pressures appear to make it difficult to provide more comprehensive educational opportunities, at least in a classroom setting.

Although the department has made progress in developing new education programs, it still has not developed an effective monitoring system to ensure that institutions are complying with its education policies and procedures.

### FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General recommended that the Department of Corrections and Rehabilitation take the following actions:**

- **Systematically evaluate the effectiveness of the new alternative education delivery models. The evaluation should include inmate participation rates, progress in achieving educational goals, and the impact of the programs on recidivism.**

- **The new Office of Correctional Education should dedicate staff to perform periodic on-site reviews to ensure compliance with department policies and procedures. The on-site reviews should include, but not be limited to, verification of educational representatives participating in classification committees, verification of class closures for teacher vacancies beyond 30 days, and the verification of the accuracy of timekeeping for inmate program participation.**

## RICHARD A. MCGEE CORRECTIONAL TRAINING CENTER

**The Office of the Inspector General found that the Richard A. McGee Correctional Training Center has significantly improved its cadet training program. The academy instituted guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training program approval. Lesson plans for the now-expanded academy are complete and were approved by the commission. Cadet testing protocols are also complete, as are operational procedures governing test results retention.**

| IMPLEMENTATION REPORT CARD |
| --- |
| Previous recommendations: 12 |
| Fully implemented: 11 (92%) |
| Substantially implemented: 0 (0%) |
| Partially implemented: 0 (0%) |
| Not implemented: 1 (8%) |
| Not applicable: 0 (0%) |

In April 2000 the Office of the Inspector General conducted an unannounced special review audit of the Richard A. McGee Correctional Training Center (now known as the Richard A. McGee Academy), which conducts the basic correctional officer academy program for all correctional officers training in California. The review was prompted by numerous serious allegations that were reported to the Office of the Inspector General in late March 2000. The allegations called into question the integrity of test results for recent graduates of the basic correctional officer academy located at the center and the overall preparedness of correctional officers graduating from the academy.

As a result of the May 2000 review, the Office of the Inspector General made eight specific findings, including:

- Cadets being trained under the expanded ten-week curriculum even though a significant number of the lesson plans had not been completed.

- Many of the 46 lesson plans, including those for highly essential courses, had not received provisional approval from the Commission on Correctional Peace Officer Standards and Training.

- The department's Staff Development Center and the training center staff failed to coordinate efforts in developing the lesson plans.

- The training center did not maintain the instructor-to-cadet ratios specified in the lesson plans approved by the Commission on Correctional Peace Officer Standards and Training.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Richard A. McGee Correctional Training Center has significantly improved its cadet training program. The academy implemented guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training approval. Lesson plans for the now-expanded academy are complete and have been approved by the

Commission on Correctional Peace Officer Standards and Training (now the Corrections Standards Authority). Cadet testing protocols and test retention policy also have been completed. The Office of the Inspector General makes no follow-up recommendations.

## CALIFORNIA STATE PRISON, SOLANO

**The Office of the Inspector General found that the California State Prison, Solano has improved certain of its operations since a March 2003 management review audit. The facility more closely monitors inmates' tuberculosis status, better manages sentence reduction credits granted to inmates, and has improved its management of both inmates placed in administrative segregation and those taking psychotropic medications. Although it has made significant progress, the facility has only partially implemented recommendations to properly house inmates taking anticonvulsant medications and has not taken steps to monitor its pharmacy inventory.**

---

**IMPLEMENTATION REPORT CARD**

Previous recommendations: 24

Fully implemented: 19 (79%)

Substantially implemented: 2 (9%)

Partially implemented: 2 (8%)

Not implemented: 1 (4%)

Not applicable: 0 (0%)

---

In March 2003, the Office of the Inspector General conducted a management review audit of California State Prison, Solano to assess the essential functions of the facility. As a result of the review, the Office of the Inspector General found that California State Prison, Solano was not adequately tracking inmates with tuberculosis, creating the potential of exposing inmates throughout the state to the disease and presenting a risk to the correctional staff and the general public. In addition, the institution allowed inmates to earn sentence reduction credit through education and training classes even when classes were not actually held, and maintained inadequate pharmacy record keeping and physical controls over prescription medications stored in the infirmary and clinics to prevent unauthorized access and theft. The Office of the Inspector General also found that a significant number of inmates taking psychotropic medications were inappropriately housed in buildings lacking air conditioning and some inmates who were taking anticonvulsant medications were not assigned to lower bunks to lessen the possibility of injury in the event of a seizure, and makeshift partitions in the institution's administrative segregation unit buildings created blind spots that limited the view of the control booth officers, compromising the safety and security of correctional staff and inmates. Furthermore, when inmate deaths occurred, the institution did not examine the cause and circumstances surrounding the deaths in a timely manner and the people the institution assigned to conduct the reviews may have had a direct interest in the results. The Office of the Inspector General presented 24 recommendations in its March 2003 report to remedy the findings.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the California State Prison, Solano has made significant progress in implementing the recommendations made in the March 2003 report. Specifically, the Office of the Inspector General made the following findings:

- The facility has improved its monitoring of inmates who have tested positive for tuberculosis by adding staff and increasing follow-up assessments of those inmates.

- In closing classes with no assigned instructors, the facility has reduced the rate at which it grants sentence-reduction credits to inmates who otherwise did not attend classes.

- The facility installed mirrors that improved visibility in its administrative segregation units.

- The facility has implemented procedures to ensure that inmates taking psychotropic medications—which increase inmates' susceptibility to heat-related illnesses—are appropriately housed and monitored when temperatures are higher than 90 degrees. The facility should, however, improve its monitoring of inmates taking anti-seizure medications to ensure that those inmates are assigned to lower bunks to protect their safety.

- The department implemented new procedures in December 2005 relative to reporting inmate deaths and submitting specific documents related to each death to headquarters for analysis.

- The pharmacy at California State Prison, Solano has improved its security over non-narcotic medications, but still does not have a method to monitor their inventory.

- The department obtained additional resources to improve statewide dental care.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the California State Prison, Solano take the following actions:**

- **Conduct periodic evaluations of the housing assignments of inmates who have been prescribed seizure medications to ensure that those inmates are housed appropriately.**

- **Develop a method to reconcile the types and quantities of pharmaceuticals shipped from its pharmacy to its clinics and the correctional treatment center with the types and quantities of medications prescribed to inmates.**

**In addition, the Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation assess whether additional dental staffing and equipment have improved the availability of dental examinations to inmates across all institutions.**

## CALIFORNIA STATE PRISON, SACRAMENTO

**The Office of the Inspector General found that California State Prison, Sacramento has corrected various deficiencies identified in a September 2000 management review audit. Financial management has improved, in that actual expenditures are closer to budget allotments; underground storage tanks have been removed, thus avoiding fines and penalties; and internal control weaknesses in the handling of inmate trust funds have been corrected.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 17** |
| **Fully implemented: 12 (70%)** |
| **Substantially implemented: 2 (12%)** |
| **Partially implemented: 1 (6%)** |
| **Not implemented: 2 (12%)** |
| **Not applicable: 0 (0%)** |

In September 2000, the Office of the Inspector General issued a management review audit report of California State Prison, Sacramento focusing on personnel, training, communications, inmate programming, security, and finances. The audit found deficiencies in financial management and internal control weaknesses in the handling of inmate trust funds. Other areas found to be deficient included the institution's electronic security clearance system designed to track the arrival and departure of employees and visitors, inmate dental examinations, the failure to process inmate appeal forms in a timely manner, failure to comply with a mandate to remove underground storage tanks in a timely manner, inconsistent handling of inmate rules violation reports, and the failure to complete employee probation and performance reports on time. The Office of the Inspector General presented 17 recommendations to remedy the deficiencies identified in the September 2000 review.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the California State Prison, Sacramento has substantially improved its financial management, keeping expenditures aligned with budget allotments and resolving internal control weaknesses relative to inmate trust funds. The institution has also implemented processes improving monitoring of the following: inmate and parolee appeals, the correctional peace officer apprenticeship program, equal employment opportunity case files, and inmate rules violation reports. The institution still needs improvement in tracking institution staff and visitors, providing timely inmate dental examinations, and completing staff performance evaluations.

### FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General makes five recommendations to the department and California State Prison, Sacramento, including:**

- **Explore options for a cost-effective electronic system that effectively tracks the entry and departure of staff and visitors at the institution.**

- **Barring a change in Title 15, California Code of Regulations, comply with the requirement to provide dental examinations to inmates within 14 days of their arrival at the institution.**

- **Ensure that employee performance and probationary reports are completed in a timely manner.**

## HIGH DESERT STATE PRISON

**The Office of the Inspector General found that High Desert State Prison has addressed most of the recommendations from a November 2001 audit that were under its control, but the Department of Corrections and Rehabilitation has not implemented several recommendations to provide the institution with needed resources or to take other actions affecting both High Desert State Prison and other institutions.**

```
IMPLEMENTATION REPORT CARD

Previous recommendations: 31

Fully implemented: 18 (58%)

Substantially implemented: 4 (13%)

Partially implemented: 3 (10%)

Not implemented: 5 (16%)

Not applicable: 1 (3%)
```

In November 2001, the Office of the Inspector General conducted a management review audit of High Desert State Prison. The audit determined that the institution was generally well run, but identified a number of deficiencies affecting safety and security, the inmate appeals process, the inmate disciplinary system, employee performance reports, and inmate medical and dental care. The audit also identified issues affecting safety and security and inmate dental care that required action from the Department of Corrections.

Specifically, the Office of the Inspector General noted a number of health care deficiencies, including poor documentation of chronically ill inmates, inmates taking psychotropic medications not being properly managed for heat risks, a risk that inmate medications could be tampered with before administration and were not adequately documented in the medical files, that inmates were not receiving required dental services, and poor controls over prescription drugs. Additionally, problems were found in institutional programs, such as the inmate appeals process, administrative segregation housing units, and inmate discipline process. As a result of the November 2001 audit, the Office of the Inspector General made 31 recommendations to the management of High Desert State Prison and to the Department of Corrections.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General found in its follow-up audit that High Desert State Prison has made significant progress in implementing recommendations affecting areas under the warden's control, but a number of issues requiring additional funding and policy direction from the Department of Corrections and Rehabilitation central office have not been addressed. The institution has addressed the timeliness of the inmate appeals process, monitoring of inmate modification orders, and ensuring that inmates comply with administrative segregation policies. The institution has also made improvements in the inmate disciplinary process, in documenting services provided during lockdowns, in completing staff performance reports, and in completing mandated training requirements. In contrast, the Department of Corrections and Rehabilitation has made minimal progress in performing security modifications, including installing security cameras on the main yards, and in pursuing additional release allowance funding for inmates paroling from rural areas.

A number of the recommendations affecting the health care program, which is under the direction of the health care manager, have also been addressed. In particular, the institution has

made progress in documenting inmate medical histories before issuing medications; in providing additional escorts for dental services; and in implementing policies and procedures to improve distribution and tracking of inmate medications. But the institution's medical department still has not developed a system to ensure that inmates on psychotropic medications are included in the mental health care delivery system. Also, the department has not eliminated inconsistencies in regulations concerning minimum dental service requirements and has not developed an automated system to schedule and track dental services.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General made six recommendations, including the following:**

- **The High Desert State Prison medical department develop a system to ensure that inmates requiring psychotropic medications are included in the mental health delivery system before they receive the medications.**

- **The Department of Corrections and Rehabilitation eliminate inconsistencies between California Code of Regulations, Title 15 and the *Department of Corrections and Rehabilitation Operations Manual* concerning inmate dental care.**

- **The Department of Corrections and Rehabilitation implement an automated inventory system to track and monitor prescription drugs.**

**VALLEY STATE PRISON FOR WOMEN**

**The Office of the Inspector General found that Valley State Prison for Women has improved employee morale and the timeliness and completion of important administrative processes, such as Category I investigations, inmate appeals, and rules violation reports. The institution remains deficient in areas involving employee performance and probation reports, weapons qualification for armed staff, drug disposal, and drug interdiction training.**

| IMPLEMENTATION REPORT CARD |
| :--- |
| **Previous recommendations: 35** |
| **Fully implemented: 24 (68%)** |
| **Substantially implemented: 2 (6%)** |
| **Partially implemented: 5 (14%)** |
| **Not implemented: 1 (3%)** |
| **Not applicable: 3 (9%)** |

The Office of the Inspector General conducted a January 2001 management review audit of Valley State Prison for Women focused on institutional processes relating to communications, personnel, investigations, training, security, and financial matters. As a result of the review, the Office of the Inspector General found that poor morale among the institution staff was pervasive. The Office of the Inspector General also found a number of administrative deficiencies, such as incomplete and untimely investigations of employee misconduct and rules violation reports involving inmate conduct, untimely completion of inmate appeals and employee performance and probation reports, and inadequate control over drug disposal.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that Valley State Prison for Women has taken measures to improve employee morale and various important administrative procedures, including investigations of employee misconduct, rules violation reports, inmate appeals, adverse personnel actions, and equal employment opportunity complaints. The institution has improved its tracking systems for these administrative processes and has established bi-monthly employee advisory council meetings. However, the institution remains deficient in preparing timely employee performance and probation reports; ensuring that staff assigned to armed posts meet quarterly weapons qualification requirements; providing drug interdiction training; and complying with Department of Corrections and Rehabilitation drug disposal guidelines.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes seven additional recommendations to Valley State Prison for Women, including:**

- **Hold staff members with responsibility for preparing performance and probation reports accountable for completing and submitting the reports on the required date and use progressive discipline to ensure compliance.**

- **Follow the updated evidence control procedure for the destruction of drugs.**

- **Conduct a quarterly audit of staff members assigned to armed posts to ensure compliance with the quarterly range qualifications.**

## SIERRA CONSERVATION CENTER

**The Office of the Inspector General found that the Sierra Conservation Center has successfully addressed nearly all of the deficiencies identified in a May 2001 management review audit. The institution has enhanced the safety and security of its physical plant and has improved procedures relating to inmate appeals, the inmate disciplinary process, staff training, adverse personnel actions, employee grievances, equal employment opportunity complaints, and the reporting of inmate deaths.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 53** |
| **Fully implemented: 38 (71%)** |
| **Substantially implemented: 11 (21%)** |
| **Partially implemented: 1 (2%)** |
| **Not implemented: 1 (2%)** |
| **Not applicable: 2 (4%)** |

The Office of the Inspector General issued a May 2001 management review audit report of Sierra Conservation Center, which is situated on 420 acres near Jamestown, California, and one of only two institutions in the state responsible for the training and placement of inmates into the conservation camp program. While the institution's principal mission is to provide housing, programs, and services for minimum and medium custody inmates, it also administers 22 conservation camps — 19 camps for male inmates and three camps for female inmates — located in rural and wilderness areas. The audit identified safety and security deficiencies focused on physical conditions of the institution such as the use of privacy curtains by inmates in their living areas, gun coverage on a recreational yard, physical deterioration of prison dormitories, the need for an additional strip search facility, and the need to secure utility closets in the administrative segregation unit. The audit also found deficiencies related to the institution's inmate appeals process, inmate disciplinary system, employee grievance process, equal employment opportunity complaints, inmate death reporting, staff training, and the tracking of adverse personnel actions. As a result of its May 2001 management review audit, the Office of the Inspector General made 53 recommendations to the management of the Sierra Conservation Center.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that the Sierra Conservation Center made improvements in its physical plant and operational procedures, thereby limiting the use of privacy curtains in inmate living areas, enhancing gun coverage of the recreational yard, constructing a strip search area, securing utility closets in the administrative segregation unit; and making needed repairs to inmate dormitories. The institution has also developed monitoring tools to ensure that inmate appeals and inmate disciplinary actions are processed in a timely fashion, taken steps to ensure that staff training requirements are fulfilled, improved monitoring and tracking of adverse personnel actions and employee grievances, improved organization of equal employment opportunity complaints, and improved reporting of inmate deaths.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General's 2006 follow-up review makes five recommendations to the Sierra Conservation Center, including:**

- **Continue to enforce the order that the staff remove all sheets and makeshift privacy curtains in housing units that would obstruct the view of officers.**

- **Hold managers and supervisors accountable for failure to follow through with their responsibilities.**

- **Ensure that letters of instruction are issued when merited.**

- **Maintain a tracking log with complete and up-to-date information on the disposition of letters of instruction.**

## LEO CHESNEY COMMUNITY CORRECTIONAL FACILITY

**The Office of the Inspector General found that most of the recommendations from a 2001 audit of the Leo Chesney Community Correctional Facility have been fully implemented, but that the Department of Corrections and Rehabilitation has not addressed deficiencies identified in the audit relating to the need for written policies governing investigations into alleged misconduct at community correctional facilities by non-department employees.**

| IMPLEMENTATION REPORT CARD |
| :--- |
| Previous recommendations: 22 |
| Fully implemented: 15 (68%) |
| Substantially implemented: 1 (5%) |
| Partially implemented: 2 (9%) |
| Not implemented: 1 (5%) |
| Not applicable: 3 (13%) |

In October 2001, the Office of the Inspector General issued an audit report of the Leo Chesney Community Correctional Facility, operated by Cornell Corrections of California, Inc. under a contract with the Department of Corrections and Rehabilitation. The California Penal Code authorizes the California Department of Corrections and Rehabilitation to establish, operate, and contract for "community correctional centers" for the housing, supervision, and counseling of inmates. The Leo Chesney Community Correctional Facility, the only facility for female inmates in the community correctional facility program, is located in the community of Live Oak, approximately 50 miles north of Sacramento.

The audit identified problems with the facility's operations and with the department's management of the facility, the most significant of which included an absence of formal policies and procedures for investigating inmate and staff misconduct; failure by the department's Office of Investigative Services to adequately respond to allegations of sexual misconduct; and a lack of clear guidelines governing the use of revenues generated from inmate telephone calls.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that Cornell Corrections has improved the investigative process by developing procedures for investigating allegations of inmate or employee misconduct. These improved procedures provide for investigations of inmate misconduct to be conducted jointly by Cornell Corrections and the Department of Corrections and Rehabilitation's Office of Internal Affairs. But the department still does not have clear policies to guide the investigative process in cases of misconduct involving the contractor's employees.

The Office of the Inspector General's follow-up review also found that the Community Correctional Facility Administration provided for better approval and control of inmate telephone revenues earned by the contractor by negotiating an amendment to its contract. The amendment addresses how revenues may be spent, but does not address the ownership of any unspent balance that may remain at the end of the contract period. The department reported that this important issue will be addressed in an arrangement that will cover all future contracts. Under that arrangement, inmate telephone services will be provided through a statewide contract that will result in the state general fund being paid the telephone revenues generated under the contracts.

**FOLLOW-UP RECOMMENDATIONS**

**As a result of its 2006 follow-up review, the Office of the Inspector General makes three recommendations to the Department of Corrections and Rehabilitation which include the following:**

- **Develop and implement clear policies to guide the investigative process for investigations of misconduct at community correctional facilities by individuals who are not department employees.**

- **Continue to use the new statewide Inmate Telephone System agreement to provide inmate telephone services for all future community correctional facility contracts.**

## LOCAL ASSISTANCE PROGRAM

**The Office of the Inspector General found that the Parole and Community Services Division has made significant improvements in its oversight of the Local Assistance Program, but still lacks the information technology needed to efficiently verify information on invoices submitted to reimburse local jurisdictions for services provided to state parolees.**

In January 2002, the Office of the Inspector General conducted a special review of the Parole and Community Services Division's Local Assistance Program, which reimburses local jurisdictions for the costs of detaining state parolees in local facilities. The review determined that the program had overpaid local jurisdictions $8.2 million in the previous two fiscal years by reimbursing for services at rates exceeding the maximum daily rate allowed under the State Budget Act. The review also found that the program did not adequately monitor non-routine medical services provided to state parolees in Los Angeles County and that the department's procedures for processing invoices from local jurisdictions were deficient. The Office of the Inspector General made six recommendations to the Department of Corrections to address these findings.

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 6** |
| **Fully implemented: 4 (66 %)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 0 (0%)** |
| **Not implemented: 1 (17%)** |
| **Not applicable: 1 (17%)** |

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that the Parole and Community Services Division has improved its monitoring of the Local Assistance Program. The Department of Corrections cooperated with the Department of Finance and the California Sheriffs' Association to revise the method for calculating the daily jail rate and to amend the state budget act language for reimbursement to local jurisdictions. The resulting agreement excludes non-routine medical costs from the daily jail rate calculation, while the amended budget language resolves previous confusion over interpretation of California Penal Code requirements for calculating reimbursements to local jurisdictions. The Parole and Community Services Division has also improved its procedures and monitoring efforts to reduce associated non-routine medical costs. The Parole and Community Services Division's information system, however, needs further improvement to efficiently verify and process invoices from local jurisdictions. The State Budget Act of 2005 provides for expenditures of up to $81.5 million in payments for local assistance. The department reports that its parole revocation scheduling and tracking system cannot be programmed to allow continuous tracking of the movements of individual parolees. As a result, the parole staff cannot confirm that a parolee was detained in the local jurisdiction on an active parole hold during the period claimed. The department reports that it is using a tracking system developed only for Parole Region III, which encompasses Los Angeles County, but has not estimated when such a system might be available statewide.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation continue to pursue development of an information system to improve the Local Assistance Program's invoice verification process.**

**INMATE APPEALS BRANCH**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation Inmate Appeals Branch has made efforts to enhance its inmate appeals tracking system to integrate appeals at the third-level review but other department priorities have hampered its efforts.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 1** |
| **Fully implemented: 0 (0 %)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 0 (0%)** |
| **Not implemented: 1 (100%)** |
| **Not applicable: 0 (0%)** |

A special review of the Department of Corrections Inmate Appeals Branch, issued by the Office of the Inspector General in February 2001, identified serious deficiencies in the third-level inmate appeals process. The problems had caused unacceptable delays in the processing of inmate appeals and had created a significant and growing backlog of appeals that had not been completed within the 60-day time frame required by California Code of Regulations, Title 15, which provides inmates with a system and process for filing complaints.

The process usually begins with an informal attempt to resolve the issue but can escalate to a three-step formal appeal process beginning with the institution's appeals office, which logs appeals into a database before assigning the appeal to a staff member for action. Second level appeals are typically decided by the warden or chief medical officer and third level appeals are decided by the Inmate Appeals Branch in Sacramento. In addition, the inmate appeals process is intended to serve as a vehicle for improving department policies and procedures. *The California Department of Corrections and Rehabilitation Operations Manual* specifies that the appeals process is designed to audit the internal practices and operation of the Department of Corrections and Rehabilitation to "identify, modify, or eliminate practices which may not be necessary or may impede the accomplishment of correctional goals."

In September 2004, the Office of the Inspector General conducted a follow-up review that determined the Inmate Appeals Branch had made significant progress in addressing the deficiencies identified in the February 2001 review. In particular, the follow-up review found that the Inmate Appeals Branch was meeting required deadlines in responding to third-level appeals; had virtually eliminated its former backlog of overdue appeals; and had developed a formal training manual and written guidelines for new appeals examiners. The Inmate Appeals Branch also had developed a system for tracking inmate appeals for use at all institutions, but at the time of the follow-up review, online interconnectivity between the prisons and the Inmate Appeals Branch was still in the planning stage. After its 2004 review, the Office of the Inspector General recommended that the Inmate Appeals Branch continue to work with the Information Systems Division to develop and enhance the new inmate appeals tracking system to include third-level appeals and statewide reporting of first- and second-level appeals. These enhancements are also needed to provide for a review of institution appeals and elevation of granted and partially granted appeals as a vehicle for identifying department policies and procedures needing revision.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General completed a follow-up review in 2006 and found that the Inmate Appeals Branch has made continuous efforts to enhance its inmate appeals tracking system. As recently as December 2005, the Inmate Appeals Branch reported that it was working on a feasibility study for the enhancements, which was scheduled to be completed by December 21, 2005.  But the department had not completed the study when the Office of the Inspector General's fieldwork ended in December 2005.  Notwithstanding the passage of six years, the Information Systems Division continues to assign a low priority to this project.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation require the Information Systems Division to either integrate the inmate appeals tracking system with the third-level appeals or contract with a private firm to do so.**

SALINAS VALLEY STATE PRISON, INMATE APPEALS AND
DISCIPLINARY PROCESSES

**The Office of the Inspector General found that the number
of overdue inmate appeals at Salinas Valley State Prison
has increased since a September 2003 review, primarily
because of a significantly higher volume of appeals from
inmates. In addition, although the institution has improved
its inmate disciplinary process, it has not developed a
corrective action plan to address deficiencies in the process
identified in the September 2003 review.**

┌─────────────────────────────────────┐
│  **IMPLEMENTATION REPORT CARD**      │
│                                      │
│  **Previous recommendations: 7**     │
│                                      │
│  **Fully implemented: 3 (44%)**      │
│                                      │
│  **Substantially implemented: 1 (14%)** │
│                                      │
│  **Partially implemented: 1 (14%)**  │
│                                      │
│  **Not implemented: 1 (14%)**        │
│                                      │
│  **Not applicable: 1 (14%)**         │
└─────────────────────────────────────┘

In September 2003, the Office of the Inspector General
conducted a follow-up review of the inmate appeals and disciplinary processes at Salinas Valley
State Prison. Since its opening, the institution has had problems with staff turnover and inmate
unrest. Problems with inmates have led to a significant number of total or partial lockdowns,
impairing the institution's ability to provide academic and vocational programs. In response to
the problems, the Office of the Inspector General conducted an audit of the inmate appeals and
inmate disciplinary processes at the institution in March 2000. The audit found significant
deficiencies in both processes and made recommendations to correct the problems. In response to
an inmate's complaint, the Office of the Inspector General returned to Salinas Valley State
Prison during January 2003 to initiate an investigation of certain aspects of the inmate
disciplinary process. As a result of that investigation, the Office of the Inspector General found
that the prison had violated the rights of more than 80 inmates in administering the inmate
disciplinary process following an inmate work stoppage in October 2002. The Office of the
Inspector General subsequently conducted a follow-up review of the March 2000 audit to assess
the institution's progress in addressing the earlier findings. The results of the follow-up review
were published in September 2003.

The September 2003 review found that the institution had significantly improved the inmate
appeals process since the earlier audit, but that problems remained in the inmate disciplinary
process. Specifically, the Office of the Inspector General found that the inmate appeals process
had significantly improved but the Salinas Valley State Prison had made little progress in
improving its inmate disciplinary process. The Office of the Inspector General made seven
recommendations to the management of Salinas Valley State Prison for improving the inmate
disciplinary process.

SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that Salinas Valley State
Prison has improved its inmate disciplinary process by requiring chief disciplinary officers to
maintain independent registry logs and to regularly audit the logs for compliance. However, the
institution has not developed a corrective action plan to address the deficiencies in the
disciplinary process identified in the September 2003 follow-up review, and the disciplinary
system procedures developed by the institution still fail to hold staff members accountable for
the quality of their work. Moreover, the Office of the Inspector General found that the number of

overdue appeals has increased since the March 2000 follow-up review. The rise in the number of overdue appeals is attributable to a significantly higher volume of appeals from inmates, the process of logging informal appeals, and a lack of staffing to handle the increase in appeals.

**FOLLOW-UP RECOMMENDATIONS**

**As a result if the 2006 follow-up review, the Office of the Inspector General recommended that Salinas Valley State Prison take the following actions:**

- **Develop an alternative method of tracking informal inmate appeals instead of logging each informal appeal in the appeals tracking system.**

- **Provide for staff accountability in the inmate disciplinary system procedures.**

- **Prepare and execute a corrective action plan to address deficiencies in the inmate disciplinary process.**

**CALIFORNIA REHABILITATION CENTER,
INMATE APPEALS PROCESS**

**The Office of the Inspector General found that the
California Rehabilitation Center has improved its process
for handling inmate appeals by maintaining adequate
staffing in the inmate appeals office, providing orientation
on the appeals process to new inmates, and having
management monitor inmate complaints against staff. The
institution continues to experience problems with
transferring inmate property.**

<table>
<tr><td colspan="1" align="center"><b>IMPLEMENTATION REPORT CARD</b></td></tr>
</table>

| |
|---|
| **IMPLEMENTATION REPORT CARD** |
| **Previous recommendations: 5** |
| **Fully implemented: 4 (80 %)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 1 (20%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

In August 2000, the Office of the Inspector General
completed its review of the inmate appeals process at the
California Rehabilitation Center. The inmate appeals process is prescribed under Title 15 of the
California Code of Regulations to provide inmates with a system and process for filing
complaints. The process usually begins with an informal attempt to resolve the issue but can
escalate to a three-step formal appeal process beginning with the institution's appeals office,
which logs appeals into a database before assigning the appeal to a staff member for action.
Second level appeals are typically decided by the warden or chief medical officer and third level
appeals are decided by the Inmate Appeals Branch in Sacramento.

As a result of the August 2000 review, which was prompted by a letter from an inmate reporting
a backlog in the inmate appeals process, the Office of the Inspector General found that the
institution had taken action to significantly reduce the number of overdue appeals and that the
backlog was manageable. The review also found that a high percentage of inmate appeals at the
institution concerned the forwarding of inmate property and trust funds to other institutions. The
Office of the Inspector General made five recommendations to the California Rehabilitation
Center, including that it review and analyze a representative sample of appeals categorized as
complaints against staff to determine the cause of their frequency and implement corrective
action. In addition, the Office of the Inspector General recommended that the institution
discontinue its practice of waiting for an inmate appeal from a transferred inmate before sending
property to the new institution.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

In its February 2006 follow-up review, the Office of the Inspector General found that the
California Rehabilitation Center has fully implemented the recommendations to adequately staff
the inmate appeals office, incorporate inmate appeals information in its orientation process,
investigate increased staffing for the inmate trust fund office, and review and analyze staff
complaints to identify systemic problems. The Office of the Inspector General found, however,
that the California Rehabilitation Center has not adequately addressed the timely transfer of
inmate property when an inmate is transferred to another institution.

**FOLLOW-UP RECOMMENDATION**

**As a result of its 2006 follow-up review, the Office of the Inspector General recommends that the California Rehabilitation Center consider initiating procedures to transfer inmate property at the time of the inmate's relocation rather than waiting for the inmate to return a form once he or she is permanently housed at another institution.**

**DEUEL VOCATIONAL INSTITUTION, INMATE APPEALS PROCESS**

**The Office of the Inspector General found that Deuel Vocational Institution has improved its inmate appeals process by implementing both of the Office of the Inspector General's recommendations from a September 2000 review. Specifically, the institution upgraded the software used for the inmate appeals tracking system and began including informal level inmate appeals in the tracking system.**

```
┌─────────────────────────────────────────┐
│      IMPLEMENTATION REPORT CARD          │
│                                          │
│  Previous recommendations: 2             │
│                                          │
│  Fully implemented: 2 (100 %)            │
│                                          │
│  Substantially implemented:0 (0%)        │
│                                          │
│  Partially implemented:0 (0%)            │
│                                          │
│  Not implemented: 0 (0%)                 │
│                                          │
│  Not applicable: 0 (0%)                  │
└─────────────────────────────────────────┘
```

The September 2000 review of the inmate appeals process at Deuel Vocational Institution by the Office of the Inspector General determined that the process was generally efficient and well-run, but that the computer system in the inmate appeals office needed to be upgraded with the most recent version of the inmate appeals tracking system software. The Office of the Inspector General also noted that the institution was not tracking informal inmate appeals. The inmate appeals process is prescribed under Title 15 of the California Code of Regulations to provide inmates with a system and process for filing complaints. The process usually begins with an informal attempt to resolve the issue but can escalate to a three-step formal appeal process beginning with the institution's appeals office, which logs appeals into a database before assigning the appeal to a staff member for action. Second level appeals are typically decided by the warden or chief medical officer and third level appeals are decided by the Inmate Appeals Branch in Sacramento.

The Office of the Inspector General made the following two recommendations as a result of the September 2000 findings:

- The California Department of Corrections should consider upgrading the computer system used by the institution's inmate appeals office with the most recent version of the inmate appeals tracking system software. The inmate appeals office staff also should be provided with training and manuals for the new version of the software.

- Although the institution had strong management controls that mitigated the need for a tracking system for informal appeals, the inmate appeals staff and the warden should continue to diligently monitor all informal appeals to ensure that the informal process works as designed and that a tracking system remains unnecessary.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

The Office of the Inspector General's 2006 follow-up review found that both recommendations issued by the Office of the Inspector General in September 2000 concerning the Deuel Vocational Institution's inmate appeals process have been fully implemented, with the institution upgrading the inmate appeals tracking system software to the current version, and instituting tracking of informal inmate appeals. Accordingly, the Office of the Inspector General makes no follow-up recommendations.

## CORRECTIONAL FACILITY MAIL PROCESSING

**The Office of the Inspector General found that the California Department of Corrections and Rehabilitation has reported making significant progress in implementing the recommendations from the July 2002 review of correctional facility mail processing. Eighty-eight percent of the recommendations have been reported as either fully or substantially implemented.**

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 27** |
| **Fully implemented: 14 (51%)** |
| **Substantially implemented: 10 (37%)** |
| **Partially implemented: 1 (4%)** |
| **Not implemented: 1 (4%)** |
| **Not applicable: 1 (4%)** |

In July 2002, the Office of the Inspector General conducted a review to determine whether mail handling procedures and processes could be changed to improve efficiency and reduce costs while maintaining mandated service levels and institution security. Department of Corrections and Rehabilitation inmates and staff send and receive millions of pieces of mail through the U.S. Postal Service each year. Inmates consider mail a vital link to family, friends, and the outside world, as well as a vehicle for communicating with legal advisers, government officials, and clergy.

The Office of the Inspector General reviewed the California Code of Regulations, Title 15 and the correctional facility plans of operations for mail handling for nine institutions, and conducted in-depth site visits to the California State Prison, Solano; the California Institution for Men; and the California Institution for Women. As a result of its July 2002 review, the Office of the Inspector General found a number of problems, including that institutions were not taking advantage of services provided by U.S. Postal Service, some prisons were inefficient in searching incoming mail, and standard mail was often delayed by mail requiring special processing. The Office of the Inspector General estimated that implementing the recommendations at all of the department's institutions could generate $1.3 million in operational savings and provide timelier mail delivery.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In January 2006, the Office of the Inspector General completed a follow-up audit of the 27 recommendations issued in July 2002. The Office of the Inspector General found that implementation of the recommendations had been delayed because the previous departmental administration neglected to provide direction to the institutions on implementing the needed improvements. It was only after the Office of the Inspector General's follow-up audit that instructions and guidelines were issued to the institutions.

### FOLLOW-UP RECOMMENDATIONS

**As a result of its 2006 follow-up review, the Office of the Inspector General makes eight recommendations, including the following:**

- **The Department of Corrections and Rehabilitation ensure that California State Prison, Sacramento use automatic letter openers and that the California Institution for Men**

**and Salinas Valley State Prison develop a list of acceptable publications that can be immediately placed in housing unit mailbags.**

PRISON INDUSTRY AUTHORITY OPTICAL PROGRAM AT THE
RICHARD J. DONOVAN CORRECTIONAL FACILITY

**The Office of the Inspector General found that the optical program laboratory at the Richard J. Donovan Correctional Facility resumed operations during August 2000. The Prison Industry Authority also implemented a process to confirm that inmates applying for jobs in the optical laboratory meet the eligibility requirements set forth in Penal Code section 5071.**

| IMPLEMENTATION REPORT CARD |
| :--- |
| **Previous recommendations: 2** |
| **Fully implemented: 2 (100 %)** |
| **Substantially implemented: 0 (0%)** |
| **Partially implemented: 0 (0%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

The Office of the Inspector General's May 2000 audit of the Prison Industry Authority optical program at the Richard J. Donovan Correctional Facility found that in May 1999, the California Department of Corrections closed the optical laboratory operation at the Richard J. Donovan Correctional Facility because inmate workers had gained access to the personal information of Medi-Cal beneficiaries. The department also closed the remaining optical laboratories until corrective action was taken and then authorized the re-opening of each optical laboratory, except the Richard J. Donovan optical laboratory, soon after the Prison Industry Authority developed new policies and procedures to prevent inmate access to sensitive information. The Office of the Inspector General evaluated the corrective action taken by the Prison Industry Authority and found that it developed new policies and procedures that could effectively prevent inmate access to Medi-Cal beneficiary information in all areas of the optical program. The Office of the Inspector General recommended that the optical laboratory at the Richard J. Donovan Correctional Facility resume full operations and that inmate workers should be screened to ensure they meet eligibility requirements.

SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The Office of the Inspector General's 2006 follow-up review found that both of the recommendations made in May 2000 have been fully implemented and that the optical laboratory program at the Richard J. Donovan Correctional Facility re-opened during August 2000. No follow-up recommendations are made.

## KONOCTI CONSERVATION CAMP NUMBER 27

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has clarified rules and procedures governing the use of inmate labor for conservation camp work projects; has improved accountability over reimbursements for work projects; and has instituted limits on reimbursement amounts.**

In April 2001, the Office of the Inspector General conducted a special review into allegations of misappropriation of state funds and inappropriate use of inmates on work projects and in the vocational auto body program at the Konocti Conservation Camp, which was operated by the former Department of Corrections. The

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 8 |
| Fully implemented: 5 (63%) |
| Substantially implemented: 0 (0%) |
| Partially implemented: 2 (25%) |
| Not implemented: 0 (0%) |
| Not applicable: 1 (12%) |

department jointly operates 31 fire-fighting conservation camps with the California Department of Forestry and Fire Protection. Sixteen of the camps, including Konocti, are under the direct supervision of the California Correctional Center in Susanville, which receives, houses, and trains minimum-custody inmates for placement into one of the Northern California conservation camps. As a result of the 2001 review, the Office of the Inspector General found that some of the work projects conducted by the Konocti Conservation Camp violated state laws, regulations, and department policy and that the camp had received inappropriate reimbursements for those projects. The review also determined that the management of the Konocti Conservation Camp circumvented fiscal controls, failed to maintain proper accounting for reimbursements obtained through inmate labor, and failed to observe requirements governing the vocational auto body program. The Office of the Inspector General made eight recommendations to the Department of Corrections and the Department of Forestry and Fire Protection.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

In its 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has clarified rules and procedures governing the use of inmate labor for conservation camp work projects; has improved accountability over reimbursements for work projects; and has instituted limits on reimbursement amounts. No follow-up recommendations are made.

# INDEX TO FINDING SUMMARIES

California Rehabilitation Center, Inmate Appeals Process ----------------------------------ES-48

California State Prison, Sacramento ----------------------------------------------------------ES-32

California State Prison, Solano---------------------------------------------------------------ES-30

California Substance Abuse Treatment Facility and State Prison, Corcoran-------------ES-11

Correctional Facility Mail Processing--------------------------------------------------------ES-51

Deuel Vocational Institution, Inmate Appeals Process --------------------------------------ES-50

Education Programs at Level IV Institutions------------------------------------------------ES-26

Employee Disciplinary Process --------------------------------------------------------------ES-21

High Desert State Prison --------------------------------------------------------------------ES-34

Inmate Appeals Branch ----------------------------------------------------------------------ES-44

Konocti Conservation Camp Number 27 ----------------------------------------------------ES-54

Leo Chesney Community Correctional Facility ----------------------------------------------ES-40

Local Assistance Program --------------------------------------------------------------------ES-42

Medical Contracting Process -----------------------------------------------------------------ES-24

Office of Compliance, Audit Functions-------------------------------------------------------ES-22

Office of Investigative Services--------------------------------------------------------------ES-18

Pharmaceutical Expenditures-----------------------------------------------------------------ES-16

Prison Industry Authority Optical Program at the Richard J. Donovan

     Correctional Facility --------------------------------------------------------------------ES-53

Richard A. McGee Correctional Training Center---------------------------------------------ES-28

Salinas Valley State Prison, Inmate Appeals and Disciplinary Process ------------------ES-46

Sierra Conservation Center -------------------------------------------------------------------ES-38

Valley State Prison for Women --------------------------------------------------------------ES-36

(Blank page)

# INTRODUCTION

This report presents the results of a comprehensive follow-up audit of 22 previous audits and reviews conducted by the Office of the Inspector General of the former California Department of Corrections (now Adult Operations and Adult Programs of the California Department of Corrections and Rehabilitation) between 2000 and 2004. The purpose of the audit was to assess the progress of the California Department of Corrections and Rehabilitation in implementing the Office of the Inspector General's previous recommendations. The audit was performed pursuant to California Penal Code section 6126, which assigns the Office of the Inspector General responsibility for oversight of the California Department of Corrections and Rehabilitation.

## BACKGROUND

The stated mission of the California Department of Corrections and Rehabilitation is to "improve public safety through evidence-based crime prevention and recidivism reduction strategies." The department operates 33 prisons for adult offenders, oversees 12 community correctional facilities, and supervises state parolees in local communities. In February 2000, the state prison inmate population totaled 160,846; by February 2004, the population had increased to 161,449; and as of March 2006, the population stood at 169,091— an increase of 8,245 over the February 2000 total. At present, the institutions are filled to nearly twice design capacity. Department staff consists of 55,050 employees, including 46,759 employees assigned to institutions, 3,126 assigned to parole, and 4,513 assigned to department administration. The department's budget for adult operations and programs increased from $4.4 billion in fiscal year 2000-01 to $5.3 billion in 2003-04, and the governor's proposed budget for adult operations and programs for fiscal year 2006-07 is approximately $7.5 billion.

Effective July 1, 2005, the Youth and Adult Correctional Agency was dissolved and its former entities were reorganized under the new Department of Corrections and Rehabilitation. The department now consists of Adult Operations and Programs (formerly the Department of Corrections); the Division of Juvenile Justice (formerly the California Youth Authority); the Corrections Standards Authority (formerly the Board of Corrections and the Commission on Correctional Peace Officer Standards and Training); the Board of Parole Hearings (formerly the Youthful Offender Parole board, the Board of Prison Terms, and the Narcotic Addict Evaluation Authority); the State Commission on Juvenile Justice; the Prison Industry Authority; the Prison Industry Board; and the California Council on Mentally Ill Offenders.

The Department of Corrections and Rehabilitation has come under consistent criticism for its prison overcrowding; in-prison violence; failure to provide constitutionally adequate medical care and mental health services to inmates; failures in employee discipline; and for a recidivism rate that is one of the highest in the country. A series of

class-action lawsuits have been filed against the department as a result of some of those problems, addressing in particular, health care services and employee discipline.

The department's failure to provide adequate medical services to inmates was the subject of the class-action lawsuit, *Plata v. Schwarzenegger.* The case resulted in a settlement agreement that required the department to implement specified changes in inmate medical services over an eight-year period beginning in 2003. In February 2006, dissatisfied with the department's progress in implementing improvements, the U. S. District Court appointed a receiver over the department's health care operations. Under the terms of the court's action, the receiver, who is scheduled to assume duties on April 17, 2006, will have broad powers for "restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable." The receiver's powers include the duty to control and direct "all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component of the department."

A federal civil rights lawsuit, *Madrid v. Hickman,* filed by inmates at Pelican Bay State Prison, alleging misconduct by correctional officers and corruption in internal affairs investigations, has resulted in the court-ordered Madrid Remedial Plan to correct deficiencies in the internal affairs process. The Office of the Inspector General's Bureau of Independent Review was established in 2004 as part of that plan to monitor the department's internal affairs investigations.

## OBJECTIVES, SCOPE AND METHODOLOGY

To conduct the follow-up review, the Office of the Inspector General performed the following procedures:

- Reviewed 22 audits and reviews conducted by the Office of the Inspector General of California Department of Corrections programs and institutions between 2000 and 2004.[1]

- Reviewed statutes, regulations, lawsuits, and other documents pertinent to the California Department of Corrections and Rehabilitation's current operating environment.

- Contacted the California Department of Corrections and Rehabilitation and requested information and documentation on the department's progress in implementing the Office of the Inspector General's recommendations.

---

[1] Audits of discontinued programs were not included in the follow-up review.

- Based on its assessment of the information and documents received, the Office of the Inspector General either conducted site visits to conduct interviews, make observations, and review records—performing tests as necessary using audit sampling techniques — or relied on the documents and other information provided by the department to assess the department's progress in implementing the Office of the Inspector General's recommendations.

- Evaluated the information developed from the audit procedures and classified the progress of the department and the institutions in implementing each recommendation into one of the following five categories:

  ➢ **Fully implemented:** The recommendation has been implemented and no further corrective action is necessary.

  ➢ **Substantially implemented:** More than half of the corrective actions necessary to fulfill the recommendation have been implemented.

  ➢ **Partially implemented:** Half or less than half of the corrective actions necessary to fulfill the recommendation have been implemented.

  ➢ **Not implemented:** The recommendation has not been implemented.

  ➢ **Not applicable:** The recommendation is no longer applicable.

In some instances, the department has successfully addressed the problems by implementing alternative solutions, and wherever that has occurred, those achievements are acknowledged in the report. The original 22 reports covered in this follow-up accountability audit had dates of issue ranging from May 2000 through September 2004. The California Department of Corrections and Rehabilitation, therefore, had a significant amount of time to implement the Office of the Inspector General's recommendations before the follow-up audit was conducted. The large number of audits and recommendations that required follow-up for the accountability audit caused the fieldwork completion dates for this follow-up audit to range from August 2005 through March 2006. (The specific completion date for fieldwork is indicated in each chapter.) It is therefore possible that in some cases the California Department of Corrections and Rehabilitation took action to address some of the Office of the Inspector General's recommendations after completion of the follow-up audit fieldwork. In such cases, the corrective action would not be reflected in this report.

(blank page)

# FINDINGS AND RECOMMENDATIONS

(blank page)

## CALIFORNIA SUBSTANCE ABUSE TREATMENT FACILITY AND STATE PRISON AT CORCORAN

| IMPLEMENTATION REPORT CARD |
| --- |
| **Previous recommendations: 72** |
| **Fully implemented: 38 (53%)** |
| **Substantially implemented: 11 (15%)** |
| **Partially implemented: 10 (14%)** |
| **Not implemented: 12 (17%)** |
| **Not applicable: 1 (1%)** |

**The California Substance Abuse Facility and State Prison at Corcoran has developed needed improvements to policies and procedures affecting medical services, but the institution has not implemented numerous recommendations from a January 2003 audit, citing a shortage of medical personnel and turnovers in its management ranks as major impediments. In addition, the Office of Substance Abuse Programs has not significantly improved its processes for monitoring contracts with private providers of in-prison substance abuse treatment programs, and drug treatment providers continue to fail to provide the number of counselors required under the contracts. Independent evaluations of the effectiveness of the facility's in-prison substance abuse treatment program are inconclusive.**

The Office of the Inspector General issued a management review audit of the California Substance Abuse Treatment Facility and State Prison at Corcoran in January 2003. The audit identified numerous problems at the institution, including inadequate management of medical, dental, and pharmacy services; deficiencies in the substance abuse treatment program that prevented the institution from reducing recidivism by helping inmates overcome drug dependency; and the failure of a significant number of staff and managers to fulfill annual training requirements.

### BACKGROUND

The California Substance Abuse Treatment Facility and State Prison at Corcoran, which opened in August 1997, houses approximately 7,300 male inmates and has a staff of about 1,700 employees, making it one of the largest prisons in the western world. It is designed for inmates ranging from Level II (low medium security) through Level IV (maximum security), but houses a small number of Level I (minimum security) inmates as well.

***Medical, dental, mental health, and pharmacy services***. The institution's correctional treatment center is the hub of medical, dental, and mental health services. Located inside the institution's secured perimeter, the correctional treatment center is responsible for medical treatment and recovery, mental health assessment and care, and clinical services. The correctional treatment center is used for providing in-patient care, treating respiratory illnesses, and providing care to inmates with mental health problems. Clinics affiliated with the correctional treatment center provide medical and dental services within each of the prison's seven facilities. Pharmaceuticals are provided by a pharmacy located in the correctional treatment center.

Medical services for the California Department of Corrections and Rehabilitation's inmates are the responsibility of the department's Division of Correctional Health Care Services. The health care manager at the Substance Abuse Treatment Facility and State Prison at Corcoran reports to the regional health care administrator of the Division of Correctional Health Care Services and acts as the on-site administrator of health care services for the institution, with responsibility for overall management of the institution's medical, mental health, and dental programs. Division personnel, along with various contract employees, operate the correctional treatment center.

In addition to the health care manager, the medical management team consists of a chief physician and surgeon, a chief psychiatrist, a chief dental officer, and the director of nursing, who collectively supervise a staff of physicians, dentists, psychiatrists, psychologists and other medical employees.

***Substance abuse program***. In addition to its mission of providing custody for state prison inmates remanded to the custody of the Department of Corrections and Rehabilitation, the institution includes a 1,478-bed substance abuse treatment program — the largest custody-based substance abuse treatment facility in the United States. The Department of Corrections and Rehabilitations' Office of Substance Abuse Programs is responsible for administering the substance abuse program, which is run by two private contractors. The Office of Substance Abuse Programs has employees on site to monitor daily program operations and to screen inmates eligible for the substance abuse program to ensure that the program operates at full capacity. The office is also responsible for monitoring the private contractors for compliance with the terms of the contracts to provide treatment services. The institution staff provides custody, security, drug testing, classification reviews, and administrative support to the Office of Substance Abuse Programs and the contractors. From January 2002 through June 2006, the Office of Substance Abuse Programs contracted to pay each private contractor approximately $29 million for substance abuse program services.

In recent years, providing adequate health care to inmates has been increasingly problematic for the Department of Corrections and Rehabilitation. In February 2006, the U.S. District Court for the Northern District of California appointed a receiver over the department's health care operations in connection with a class action suit, *Plata v. Schwarzenegger*. Under the terms of the court's action, the receiver has broad powers to achieve the goal of "restructuring day-to-day operations and developing, implementing, and validating a new, sustainable system that provides constitutionally adequate medical care to all class members as soon as practicable." The receiver's powers include the duty to control and direct "all administrative, personnel, financial, accounting, contractual, legal, and other operational functions of the medical delivery component" of the department.

### SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

As a result of the January 2003 management review audit, the Office of the Inspector General identified 10 findings encompassing a wide array of the institution's operations. The findings included observations of deficiencies in the substance abuse treatment

program, medical and dental care, pharmacy operations, staff training, safety and security, and hiring procedures. Among the most significant findings from the January 2003 management review audit were the following:

- Deficiencies in the substance abuse treatment program were preventing the institution from reducing recidivism by helping inmates overcome drug dependency.

- Inadequate management of the institution's medical, dental, and pharmacy services placed the health of inmates and safety of staff at risk and exposed the state to possible legal liability.

- A significant number of staff and managers were not fulfilling annual training requirements.

As a result of the January 2003 management review audit, the Office of the Inspector General made 72 recommendations to the Department of Corrections, the Health Care Services Division, and the California Substance Abuse Training Facility and State Prison at Corcoran to address these and other findings.

**OBJECTIVES, SCOPE, AND METHODOLOGY**

The purpose of the 2006 follow-up review was to determine the extent to which the Department of Corrections and Rehabilitation, the Division of Correctional Health Care Services, and the California Substance Abuse Training Facility and State Prison at Corcoran had implemented the recommendations from the Office of the Inspector General's January 2003 management review audit. To conduct the follow-up review, the Office of the Inspector General provided the department, the institution, and the Division of Correctional Health Care Services with a table listing the January 2003 findings and recommendations and asked management to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with supplementary documentation provided, and evaluated the degree of compliance or noncompliance with the recommendations. The Office of the Inspector General completed follow-up field work at the institution in November 2005. The results are presented in the tables following this narrative.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

Of the 72 recommendations issued by the Office of the Inspector General in January 2003 concerning the California Substance Abuse Treatment Facility and State Prison at Corcoran, 38 have been fully implemented, 11 have been substantially implemented, 10 have been partially implemented, 12 have not been implemented, and one is no longer applicable.

***Substance abuse treatment program.*** The Office of the Inspector General's January 2003 management review audit identified numerous problems that impaired the effectiveness of the institution's substance abuse treatment program. Key among these was the placement into the program of large numbers of inmates not suited to the treatment

model, including sex offenders and inmates suffering from mental illness. Other deficiencies included a shortage of trained counselors to run the interactive therapeutic community — a proven treatment modality for modifying the behavior of substance abusers — and the fact that group sizes for the therapeutic community exceeded contract limits.

A September 2002 UCLA study of the institution's substance abuse treatment program, cited in the Office of the Inspector General's audit report, showed no difference in recidivism rates between program participants and a control group of inmates at another prison who received no treatment. The study raised questions about the advisability of paying contractors millions of dollars for in-prison substance abuse programs not demonstrated to be effective.

In the 2006 follow-up review, the Office of the Inspector General found that the California Substance Abuse Treatment Facility has made generally disappointing progress in implementing needed changes in the three years since the January 2003 management review audit, although there have been some improvements. The institution has been successful in identifying and recruiting a higher proportion of program-eligible inmates into the program, while reducing the proportion of sex offenders and mental health patients. Of the 1,456 inmates assigned to the program on October 20, 2005, fewer than seven percent were mental health patients and fewer than one percent of those who were mental health patients were also sex offenders. In comparison, the January 2003 audit found the proportion of sex offenders and mental health patients in the program to be as high as 50 percent.

The Office of the Inspector General also found, however, that the Office of Substance Abuse Programs continues to fail at effectively monitoring its contracts with the private providers of substance abuse program services at the prison. In reviewing the on-site monitoring reports for each provider in the substance abuse program for the 11-month period from December 2004 to October 2005, the Office of the Inspector General found that the monitoring reports continued to lack detail, did not focus on the contractors' compliance with contractual expectations, and did not reflect evidence of substantive review of the providers' records and operations.

The Office of the Inspector General noted in addition that the program providers continue to supply an inadequate number of counselors. During an October 2005 site visit, the Office of the Inspector General found that program staffing was 14 counselors short of the 73 entry- and journey-level counselors required under the state contracts —a 19 percent shortfall. Contributing to this condition, the Office of Substance Abuse Programs still has no language in its contracts with the providers permitting the state to withhold payment or exercise other sanctions short of contract cancellation for such instances of non-compliance.

The Office of the Inspector General also found that an influx of more than 400 general population inmates into the substance abuse housing units in response to a department-wide bed shortage caused the treatment "cluster" sizes to increase from 62 inmates to up to 100 inmates. The higher population clusters exceed the professionally recommended

standard of 50 to 75 participants for therapeutic community programs and further detract from program effectiveness.

Treatment also appears to be frequently interrupted. On two separate visits in October and November 2005, the Office of the Inspector General attempted without success to observe therapeutic community groups and evaluate group sizes at the institution. On the first visit, all counseling had been suspended for the programs' annual "Sports Week," and on the second visit nearly all group sessions had been suspended to accommodate population movements among the housing units. This inactivity, coupled with recent lockdowns reported by counselors, raises concerns about the continuity of therapeutic community treatment at the institution. It is noteworthy that, with the exception of the lockdowns, none of the monitoring reports by the Office of Substance Abuse Programs discussed the continuing problems found by the Office of the Inspector General during its six days of fieldwork.

The Office of the Inspector General reviewed three subsequent evaluations by UCLA of the institution's substance abuse treatment program conducted since the September 2002 evaluation. Although the more recent evaluations, which were issued in September 2003, September 2004, and January 2006, made positive assessments of the effectiveness of post-prison aftercare, none were bona-fide effectiveness studies like the 2002 evaluation because they did not compare the recidivism rates of in-prison program participants against those of inmates from another prison who had not received treatment. Without a comparison of the subject group to a control group, it is not possible to conclude that the institution's program is successful in lowering recidivism.

***Medical care.*** The Office of the Inspector General found that although the institution has made efforts to implement recommendations affecting the institution's medical services and operations, many of the problems identified in the January 2003 management review audit have not been adequately addressed. The remaining deficiencies include a continuing backlog of inmate medical appeals; lack of an effective means of ensuring that physicians work a full 40-hour-a-week schedule; failure to ensure that inmates see a physician in a timely manner; lack of review of the need for inmate treatment by specialists; and inadequate monitoring of chronic care patients. The institution points to repeated turnover in the chief medical officer position as one cause of the continuing deficiencies. Six different individuals served in the position between September 2002 and June 2005, when the present incumbent was hired. The institution also reports that since September 2002, its chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have all resigned, retired, or transferred. The institution also cites a critical shortage of physicians and other medical staff as a barrier to full implementation of the Office of the Inspector General's recommendations. For example:

- The institution reports that it has established an expectation that physicians complete all administrative duties, including notifying the chief medical officer of medical appeals approaching delinquent status, but maintains that the physician shortage precludes aggressive focus on appeals.

- The institution reports it established a medical authorization review committee to review the medical necessity for procedures referred to outside medical providers, but that the committee process has fallen victim to the physician shortage and reviews are limited to a cursory examination by the chief medical officer.

- While physicians' hours and workloads have been adjusted to permit doctors to see more patients, the requirement that inmates see doctors within 14 days after a request for contact as mandated by the *Plata v. Schwarzenegger* court decision is not being met because the institution does not have enough physicians to meet that workload.

In addition, the Office of the Inspector General found that despite establishing a system of accountability for medical personnel, the institution's medical management team has been lax in enforcing a directive that medical personnel log in and out of the correctional treatment center each day by signing the log and recording the actual times of arrival and departure. Instead of recording the time of day, physicians simply sign the log and indicate a status of "in" or "out."

***Pharmacy operations.*** The Office of the Inspector General noted significant improvements in the institution's pharmacy operations. The institution developed improved policies and procedures for control of medications and quality control over prescriptions, as well as for intra-facility transfers of inmate medications. Spending for pharmaceuticals also decreased. As the Office of the Inspector General reported in the January 2003 management review audit, the institution spent $5.4 million in fiscal year 2001-02 for drugs and pharmaceutical supplies, but in fiscal year 2004-05, the institution's reported spending decreased to $3.7 million — a 31 percent reduction. The Department of Corrections and Rehabilitation, however, has still has not made a significant effort to develop an automated pharmaceuticals inventory system for the institutions.

The Office of the Inspector General also found that the Substance Abuse Treatment Facility has made significant progress in staffing its pharmacy with permanent state employees. At the time of the Office of the Inspector General's January 2003 audit, the institution's pharmacy was staffed entirely by contract employees, but now the pharmacy employs only two contract employees among its full-time staff of nine. The positions currently filled by the two contract employees have been advertised as state civil service job openings since October 30, 2002, and the institution says the current state salary for pharmacists is lower than that offered in the industry, making recruitment difficult.

***Dental services.*** The institution's dental management has instituted systems for tracking dentists' productivity and for monitoring patient backlog, showing improvements in both areas, but has still not updated the chief dental officer's duty statement or provided formal management training. In addition, while the Office of the Inspector General found improvement in the institution's local management of dental operations, it found no evidence of regular site inspections by the Division of Correctional Health Care Services.

***Administration and custody.*** The Office of the Inspector General found improvement in the institution's procedures and controls over evidence storage, as well as in its system for administering and monitoring mandatory employee training. But the institution still had not implemented the Office of the Inspector General's recommendations to conform to departmental regulations concerning recording inmate movements and other significant events in the administrative segregation units.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the Office of Substance Abuse Programs take the following actions:**

- **Conduct systematic, in-depth monitoring of treatment providers for compliance with contract terms. Monitoring reports should reflect all substantive details of the provider's records and operations. The reports should also include the Office of Substance Abuse Programs' analysis and evaluation of the provider's operations.**

- **When drafting contracts for substance abuse treatment services, include provisions for fiscal sanctions to address instances of non-compliance with contract terms, including failure to provide the required number of counselors.**

- **Whether performed by UCLA or by another contractor, ensure that future studies of the effectiveness of the substance abuse program at the institution include a comparison of the treatment group to a control group of similar inmates who did not receive treatment.**

- **Return to using smaller clusters of inmates to conform to the Office of National Drug Control Policy's recommendation that therapeutic community program clusters consist of no more than 50 to 75 inmates.**

**The Office of the Inspector General recommends that the Substance Abuse Treatment Facility and State Prison at Corcoran continue to work with the Division of Correctional Health Care Services' department-wide efforts to address the shortage of physicians and other medical staff.**

**Within the framework of that limitation the Office of the Inspector General recommends that the Substance Abuse Treatment Facility and State Prison at Corcoran take the following actions:**

- **Develop methods to reduce or eliminate inmate medical appeal backlogs without placing inmates at risk.**

- **Hold medical staff responsible for completing administrative activities, including responding to inmate medical appeals in a timely manner.**

- **Review all medical procedures currently referred to contracted specialist clinics or outside providers to identify those that could be performed by institution doctors.**

- **Establish procedures and systems to ensure that all inmate requests for reasonable accommodation and medical verification of disabilities under the Americans with Disabilities Act are processed in a timely manner and that all appropriate accommodations or modifications are implemented without delay.**

- **Track pending actions on Americans with Disabilities Act requests to ensure completion within established time limits and ensure that medical chronologies or modifications are implemented without delay.**

- **Systematically identify inmates with chronic medical conditions and ensure that those inmates are monitored through regular appointments with institution doctors.**

- **Establish policies and procedures to require periodic laboratory work and measurement of vital signs for chronic care inmates. Ensure that this information is available to doctors at the time of examinations so they may adequately assess chronic medical conditions.**

**The Office of the Inspector General further recommends that the California Substance Abuse Treatment Facility and State Prison at Corcoran take the following actions:**

- **Enforce the August 2004 memorandum from the health care manager instructing medical personnel to sign in and out of the institution and record actual times of arrival and departure.**

- **Establish procedures to comply with Title 15 of the California Code of Regulations, requiring that dentists examine inmates within 14 days of the date inmates arrive at the assigned institution from the reception center, and develop a reporting and monitoring system to track compliance.**

- **Review the chief dental officer's duty statement and either require the chief dental officer to devote 40 percent of his or her time to clinic work as described in the current duty statement, or revise the duty statement as necessary.**

- **Provide management training to on-site dental management staff, including training on planning and goal setting; performance measurement; interpersonal communication; and principles of supervision.**

- **Continue efforts to reduce the dental backlog.**

- **Have the health care manager and the chief dental officer establish policies and procedures for local operation of dental services.**

- **The Office of the Inspector General recommends that the California Substance Abuse Treatment Facility and State Prison at Corcoran record inmate movements, unusual incidents, and other noteworthy conditions in the administrative segregation isolation log (CDC-Form 114) as they occur.**

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Continue to develop an automated system combining individual patient medical records with pharmacy tracking information.**

- **Develop a barcode system for tracking the inventory and movement of pharmaceutical products within the institutions.**

- **Work with the receiver recently appointed by the federal court to develop a competitive salary structure for pharmacy professionals, while continuing efforts to hire full-time pharmacy staff at present salary levels.**

- **Improve support of the dental function at the California Substance Abuse Treatment Facility and State Prison at Corcoran by conducting site visits, both scheduled and unannounced, to inspect dental operations, provide guidance, and meet with the institution's dental management to discuss areas of concern.**

The following table summarizes the results of the follow-up review.

ORIGINAL FINDING NUMBER 1

**The Office of the Inspector General found that deficiencies in the substance abuse treatment program were preventing the institution from reducing recidivism by helping inmates overcome drug dependency.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections take the actions listed below to improve the substance abuse treatment program at the Substance Abuse Treatment Facility and State Prison at Corcoran. | | |
| Develop a process for recruiting eligible inmates from other institutions into the program, including those who may be receiving fire camp, facilities maintenance, and similar assignments in lieu of substance abuse treatment program assignments. | FULLY IMPLEMENTED | The Office of Substance Abuse Programs reported that it has developed a number of strategies to recruit eligible inmates into the program. For example, contracts that began April 1, 2005 enable the Office of Substance Abuse Programs to screen, assess, and orient inmates with a history of substance abuse at intake. Program staff members then recommend participants to the most appropriate treatment option. Center Point, Inc., was the successful competitor for the in-reception-center substance abuse programs at North Kern State Prison (200 slots) and Wasco State Prison (300 slots).<br><br>The Office of the Inspector General contacted the Office of Substance Abuse Programs staff member assigned to the reception center substance abuse programs at North Kern and Wasco State Prisons and requested information on inmates the representatives have endorsed to the substance abuse program at the Substance Abuse Treatment Facility and State Prison at Corcoran.<br><br>The Office of the Inspector General verified that between May 3, and October 9, 2005, the staff endorsed 89 participants to the program at the Substance Abuse Treatment Facility and State Prison at Corcoran. The Office of the Inspector General also verified that 61 of the 89 participants (69 percent) were actually participating in the substance abuse program as of October 9, 2005. |

| | | The Office of Substance Abuse Programs reported that as of January 2004, the substance abuse treatment program at the Substance Abuse Treatment Facility and State Prison in Corcoran also serves as the alternate placement site for disabled in-custody drug treatment program parolees who volunteer for treatment in lieu of parole revocation.<br><br>The Office of Substance Abuse Programs reported that as of May 22, 2003, inmates eligible for work-furlough are also eligible for placement in substance abuse treatment programs and for subsequent transition into community treatment. Previously, such inmates were ineligible, and were assigned to fire camps, facilities maintenance, and similar assignments.<br><br>The Office of the Inspector General verified that 314 work furlough inmates (22 percent of the 1,456 inmates assigned to the program) were participating in the institution's substance abuse treatment program as of October 20, 2005. |
| Cease the policy of requiring inmates to participate in the substance abuse treatment program involuntarily. | NOT IMPLEMENTED | The Office of Substance Abuse Programs informed the Office of the Inspector General that it does not agree with this recommendation and will not pursue a policy change, citing clinical research supporting the effectiveness of involuntary program participation. |
| Develop alternative methods of providing substance abuse treatment to sex offenders, perhaps by grouping them into specially designated clusters. | PARTIALLY IMPLEMENTED | The Office of Substance Abuse Programs reported that it is exploring funding options for establishing in-prison programs for sex offenders and correctional clinical case management system inmates in fiscal year 2007-08.<br><br>The Office of Substance Abuse Programs also reported that since May 14, 2004, inmates convicted of Penal Code section 288 sex offenses are excluded from placement in substance abuse treatment programs. According to the Office of Substance Abuse Programs, the deputy director of institutions implemented the exclusion because there are virtually no continuing care facilities in the state for individuals convicted of such offenses.<br><br>The Office of the Inspector General determined that 87 inmates identified as sex offenders were assigned to the substance abuse treatment program at the |

|  |  | Substance Abuse Treatment Facility and State Prison at Corcoran as of October 20, 2005. The Office of the Inspector General also reviewed the commitment and controlling offenses of each of these 87 inmates and found that eight of the 87 inmates had received a Penal Code section 288 conviction. According to the May 14, 2004 exclusionary policy, only inmates assigned to the substance abuse treatment program before that date could remain in the program. The Office of the Inspector General verified that two of the eight inmates were assigned to the program before May 14, 2004. Six of the eight inmates were assigned to the program after May 14, 2004, and therefore should not have been included in the program. |
|---|---|---|
| Limit the percentage of correctional clinical case management system inmates and sex offenders that contractors must accept into the substance abuse treatment program. | **FULLY IMPLEMENTED** | The Office of Substance Abuse Programs reported that the percentage of correctional clinical case management system (mental health) inmates continues to average eight percent of the substance abuse treatment program participants at the Substance Abuse Treatment Facility and State Prison at Corcoran. The Office of Substance Abuse Programs also reported that it will move these special groups to the aforementioned new programs if they are implemented, thus minimizing the need to include these groups in existing substance abuse treatment programs.<br><br>The Office of the Inspector General obtained a list of the correctional clinical case management system inmates assigned to the substance abuse treatment program at the California Substance Abuse Treatment Facility and State Prison at Corcoran as of October 20, 2005 and found 93 of these inmates, including 12 who were also "R" suffix inmates. Of the 1,456 inmates assigned to the program on October 20, 2005; therefore, 6.4 percent were correctional clinical case management system inmates and fewer than one percent were also "R" suffix inmates. In comparison, the Office of the Inspector General's January 2003 audit found the proportion of sex offenders and correctional clinical case management system inmates to be as high as 50 percent, demonstrating that the Office of Substance Abuse Programs has been successful in reducing the number of such inmates assigned to the program. |

| Conduct systematic, in-depth monitoring of providers for contract compliance. Deficiencies noted should require corrective action plans with deadlines and include follow-up monitoring to verify that satisfactory corrective action has been taken. | NOT IMPLEMENTED | The Office of Substance Abuse Programs reported that it has a number of in-depth tracking and technical assistance efforts in place to monitor contract compliance. These efforts include the development of a monitoring handbook to address standards for program services; a monitoring instrument for the drug treatment furlough program; an audit tool to assess classification, security, and contractual compliance of substance abuse program sites; and a Continuing Quality Improvement Subcommittee comprised of Office of Substance Abuse Programs and treatment provider executives.

The Office of Substance Abuse Programs also reported that it conducts a minimum of one site visit per month at the Substance Abuse Treatment Facility and State Prison at Corcoran's substance abuse treatment program to evaluate program operations and provider compliance with contract terms. The staff member conducting the site visit prepares a report on observations as well as on areas of concern and accomplishments. The Office of Substance Abuse Programs allows each provider sufficient time to correct any deficiencies noted in the report and develops a corrective action plan if the provider does not resolve deficiencies within the timeframes allowed. The Office of Substance Abuse Programs monitors the corrective action plan and conducts monthly meetings until the providers resolve all areas of concern.

The Office of the Inspector General obtained and reviewed the on-site monitoring reports of each of the substance abuse treatment program providers at the Substance Abuse Treatment Facility and State Prison at Corcoran for the period December 2004 to October 2005. During the period, Phoenix House had site visit reports prepared for visits during December 2004 and January, June, July, August, and October 2005. Walden House, had site visit reports completed for visits during December 2004 and March, April, May, and September 2005. The Office of the Inspector General concluded that monitoring by the Office of Substance Abuse Programs of providers for contract compliance continues to lack evidence of systematic, in-depth analysis of contract compliance. The reports the Office of the Inspector General reviewed continued to lack detail and did not reflect substantive review of provider records and operations. |
|---|---|---|

| | | |
|---|---|---|
| Investigate methods of helping providers retain counselors and other staff members. | **PARTIALLY IMPLEMENTED** | The Office of Substance Abuse Programs reported that it has taken steps to ensure higher minimum pay for entry-level counselors by specifying a minimum and maximum bid amount in the competitive request for proposal. Career paths are built into contractors' budgets so that entry-level counseling staff with the requisite education and experience can progress to journey-level counselors and into management positions.<br><br>The Office of Substance Abuse Programs reported in addition that its Continuing Quality Improvement Subcommittee studied staff retention strategies as an example of 'best practices" during a visit to the substance abuse treatment program at the Substance Abuse Treatment Facility and State Prison at Corcoran and intended to share its findings with other treatment providers. The Office of Substance Abuse Programs also reported that it provides workforce development training and cross-training for treatment, institution, and headquarters staff and enables contractors to budget for on-going staff training.<br><br>Despite these steps by the Office of Substance Abuse Programs, the Office of the Inspector General found there continues to be an inadequate number of counselors working for the providers of the substance abuse treatment program at the Substance Abuse Treatment Facility and State Prison at Corcoran. The Walden House contract stipulates that Walden House should have 19 entry-level counselors, nine journey-level I counselors, and 13 journey-level II counselors. As of November 15, 2005, Walden House employed the required number of journey-level I and II counselors, but three entry level counselor positions were vacant. Similarly, the Phoenix House contract requires Phoenix House to employ 12 entry-level counselors and 20 journey-level counselors. As of October 21, 2005, Phoenix House employed three entry-level counselors and 18 journey-level counselors —11 counselors fewer than the required number. Executives from both providers informed the Office of the Inspector General that a number of counselors transferred to the substance abuse treatment program at the newly opened Kern Valley State Prison and they have not yet been able to fill the open positions at the Substance Abuse Treatment Facility and State Prison at Corcoran. The Office of the Inspector General interviewed various Walden House counselors and learned that while the counselors generally liked their jobs, they were dissatisfied with the low pay. |

| Evaluate all possible means of increasing aftercare participation, including possible legislation to mandate aftercare as a condition of parole for substance abuse treatment program inmates. | FULLY IMPLEMENTED | The Office of Substance Abuse Programs reported that it met with the new Board of Parole Hearings to open discussions about moving civil addicts into drug treatment furlough programs 120 days before the end of their commitment terms. In the drug furlough program, inmates serve the final days of their commitment term in a residential-type setting where substance abuse treatment is provided. The Office of Substance Abuse Programs noted that the furlough program is less restrictive than an institution and therefore more closely resembles the aftercare experience. According to the Office of Substance Abuse Programs, the discussions included requiring mandatory aftercare for those in the drug treatment furlough programs as well as mandating aftercare as a condition of parole for in-prison substance abuse treatment program participants.

The Office of Substance Abuse Programs reported that the drug treatment furlough program for non-serious, non-violent substance abuse treatment program inmates was activated on January 26, 2004. The program opened up 1,500 slots in community-based residential treatment facilities, enabling inmates to volunteer to transition from the in-prison substance abuse treatment program to the drug treatment furlough program 120 days before their release on parole. Fifty percent of the participants are budgeted to receive up to 150 days of aftercare following parole from the drug treatment furlough program.

The Office of Substance Abuse Programs reported in addition that it has collaborated with the Parole and Community Services Division on a program in which parolees volunteer to participate in a 30-day jail-based drug education program in lieu of parole revocation. Participating parolees must agree to complete 90 days of non-residential aftercare upon release from the jail program. |
| In future contracts with providers, include withholding of payments or other fiscal sanctions as alternatives to contract termination in the event of non-compliance. | NOT IMPLEMENTED | The Office of Substance Abuse Programs reported that the contract monitoring handbook under development will include graduated sanctions for contractor non-compliance. |
| Review and evaluate the recommendations of the UCLA evaluation of the substance abuse | PARTIALLY IMPLEMENTED | The Office of Substance Abuse Programs reported that it will be working jointly with UCLA on controlled studies of the program participants at the Substance |

| | | |
|---|---|---|
| treatment program. | | Abuse Treatment Facility and State Prison at Corcoran. The Office of Substance Abuse Programs has a formal process for reviewing contracted evaluations and recommendations and adopts those recommendations that are based on sound findings and appropriate for implementation in a correctional facility. According to the office, UCLA studies have identified significant reductions in return-to-custody rates for substance abuse treatment program parolees who complete at least 90 days of aftercare, preferably in residential treatment. As a result, on June 25, 2003, the chief of the Office of Substance Abuse Programs directed substance abuse treatment providers to take the steps necessary to place program graduates in residential treatment within 90 days of release from prison.

The Office of Substance Abuse Programs provided studies of the substance abuse treatment program performed by UCLA in September 2003, September 2004, and January 2006 for review by the Office of the Inspector General. The Office of the Inspector General's review determined, however, that unlike the September 2002 evaluation described in the original audit report, the more recent studies did not compare recidivism rates of parolees who completed the substance abuse treatment program with those of inmates from another prison who did not receive substance abuse treatment. While the more recent evaluations did report lower recidivism rates than those reported in the September 2002 evaluation, without such a comparison, it is not possible to conclude that the substance abuse treatment program at the Substance Abuse Treatment Facility and State Prison at Corcoran has succeeded in lowering recidivism rates.

The Office of Substance Abuse Programs also reported that it disagrees with a conclusion by the UCLA study authors that the treatment clusters at the Substance Abuse Treatment Facility and State Prison at Corcoran are too large. The Office of Substance Abuse Programs reported that the two contract substance abuse treatment program providers each have three housing units consisting of 246 inmates divided into four treatment clusters of approximately 62 inmates each. That cluster size would be consistent with the Office of National Drug Control Policy's suggestion that large therapeutic community programs be subdivided into clusters no larger than 50 to 75 inmates. |

The Office of the Inspector General determined, however, that some of the treatment clusters at the institution exceed the recommended limits because general population inmates not participating in the program have been placed in the substance abuse treatment housing units in response to a department-wide bed shortage. As of mid-June 2005, 431 general population inmates were occupying five of the substance abuse treatment program's 24 treatment clusters. As of October 20, 2005, 1,456 inmates were participating in the substance abuse treatment program and were occupying the remaining 19 treatment clusters. In site visits to the substance abuse treatment program housing units on October 24, 2005 and November 14, 2005, the Office of the Inspector General verified that instead of the 62 inmates per treatment cluster reported by the Office of Substance Abuse Programs, some clusters had between 84 to 100 inmates.

The Office of Substance Abuse Programs also reported that it disagrees with findings by UCLA researchers that there was no significant difference in return-to-custody rates between Substance Abuse Treatment Facility treatment subjects and Avenal State Prison subjects who did not receive treatment. According to the Office of Substance Abuse Programs, further analysis by its staff determined that the population of non-treatment subjects was over-represented by drug traffickers compared to the treatment subjects' higher population of drug possession offenders, arguing that drug traffickers generally return to prison at a lesser rate than drug possession offenders.

The Office of the Inspector General discussed this argument with the principal investigator who worked on the September 2002 UCLA evaluation. According to the principal investigator, the Office of Substance Abuse Programs raised this argument during the drafting of the UCLA report. Accordingly, the final UCLA report specifically addressed the issue, finding that while the control group of non-treatment inmates convicted of drug offenses did have a higher percentage of drug traffickers than the treatment group, the one-year return-to-custody percentages between the treatment and control groups, sorted by type of offense, was not statistically significant. UCLA, therefore, stands by its findings.

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Office of Substance Abuse Programs take the following actions:**

- **Conduct systematic, in-depth monitoring of treatment providers for compliance with contract terms. Monitoring reports should reflect all substantive details of the provider's records and operations. The reports should also include the Office of Substance Abuse Programs' analysis and evaluation of the provider's operations.**

- **When drafting contracts for substance abuse treatment services, include provisions for fiscal sanctions to address instances of non-compliance with contract terms, including failure to provide the required number of counselors.**

- **Whether performed by UCLA or by another contractor, ensure that future studies of the effectiveness of the substance abuse program at the institution include a comparison of the treatment group to a control group of similar inmates who did not receive treatment.**

- **Return to using smaller clusters of inmates to conform to the Office of National Drug Control Policy's recommendation that therapeutic community program clusters consist of no more than 50 to 75 inmates.**

**ORIGINAL FINDING NUMBER 2**

**The Office of the Inspector General found serious deficiencies in the medical care provided to inmates at the Substance Abuse Treatment Facility and State Prison at Corcoran, placing the health of inmates and staff at risk and exposing the State to possible legal action.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections and the medical management of the California Substance Abuse Treatment Facility and State Prison at Corcoran take the actions listed below to improve medical services and operations. | | |

| | | |
|---|---|---|
| Develop a plan for re-activating medical operations at the institution. The plan should include the following: a component for recruiting, training, and retaining adequate professional staff; written department and institution-specific policies and procedures covering all areas of operation, including nursing; and provisions for regular on-site monitoring and assistance by the Health Care Services Division. | PARTIALLY IMPLEMENTED | The institution noted that since September 2002 its chief medical officer, chief dental officer, chief psychologist, chief psychiatrist, director of nurses, and medical records supervisor have resigned, retired, or transferred. Health care management remains problematic, with the institution experiencing a succession of six different chief medical officers since September 2002 until the present incumbent was hired in June 2005. The institution reports hiring a chief dental officer in July 2005. Meanwhile, according to the institution, recruitment for all health care classifications has been assigned to the Selections and Standards Branch.<br><br>The institution reported that policies and procedures for its correctional treatment center have been revised; the inmate medical services program (known informally as the *"Plata"* decision) has been activated; appropriate local operating procedures have been implemented; and staff training has been completed.<br><br>As part of its overall quality management program, the institution says it has established an inmate medical services subcommittee that meets monthly to advise the quality management committee regarding ongoing medical issues. Issues that cannot be resolved locally are addressed through the local governing body meeting (institution staff and headquarters staff are members).<br><br>The institution reported a continuing critical shortage of physicians at the institution. |
| Develop a plan to bring the institution's correctional treatment center into compliance with all licensing requirements. The institution medical management team should establish and staff all required committees and ensure that the committees meet as required. The | SUBSTANTIALLY IMPLEMENTED | The institution reports that its correctional treatment center underwent a full licensing survey by the Department of Health Services in February 2003, which resulted in a corrective action plan being submitted to the Department of Health Services. This process was repeated in April 2005.<br><br>The Office of the Inspector General confirmed that the Department of Health |

| | | |
|---|---|---|
| medical management team should also ensure that the functions of the pharmacist-in-charge and the radiology physician are being performed. | | Services April 2005 survey shows fewer corrective action items than the February 2003 survey. The correctional treatment center remains licensed, subject to renewal in June 2006.<br><br>Required licensing committees are being held as required and records maintained. The duties of both the pharmacist-in-charge and radiology physician are being performed through contractual agreements. |
| Obtain the resources to establish a management information system by which to track and monitor backlogs in pharmacy, radiology, medical records, specialist clinics, and medical appeals. The system should prioritize backlogged items according to urgency. | **FULLY IMPLEMENTED** | The institution reported that it put a system in place in May 2003 to track and monitor backlogs for laboratory, radiology, medical records, medical appeals and specialty clinics. The system generates a monthly backlog report that is reviewed by health care management. Areas identified as problematic or showing a significant increase in backlogs are addressed with health care management and additional resources are directed to the problem. |
| Develop methods to reduce or eliminate backlogs without placing inmates at risk. | **PARTIALLY IMPLEMENTED** | The institution reported that its expectation is that physicians see 25 scheduled patients and five additional sick call patients per day, with daily statistics recorded and maintained. Due to a critical shortage of physicians, however, the institution reported that it has been unable to meet the timeframes for seeing patients required by the *Plata* decision, and that medical appeals have fallen behind. The Office of the Inspector General noted that the institution's physicians averaged 16 patients per day in September 2005. The institution asserted that it has nonetheless resolved backlogs in x-ray, labs, pharmacy, and specialty clinics. |
| Ensure that doctors work required hours and are fully productive during working hours. | **PARTIALLY IMPLEMENTED** | According to the institution, the current work schedule for physicians is eight hours per day, five days per week, and a sign-in/sign-out log has been implemented for accountability. In addition, the institution reported that it compiles daily statistics to provide productivity information to the chief medical officer. |

| | | The Office of the Inspector General's examination of the sign-in log for February through October 2005 revealed minimal compliance by the institution's doctors in adhering to the health care manager's August 2004 memorandum instructing medical personnel to sign in and out of the institution. Instead of recording their actual times of arrival and departure as instructed, doctors were simply signing the log and indicating a status of "in" or "out." |
|---|---|---|
| Review the number of hours scheduled for doctors' lines to ensure that enough time is scheduled to address inmate medical needs. | **SUBSTANTIALLY IMPLEMENTED** | The institution reports that it changed physicians' work schedules from four 10-hour days to five eight-hour days to allow more consistent coverage and provide an extra day on which physicians see patients. The chief medical officer used to hold a weekly physicians' meeting in an open forum as an avenue for communication and problem resolution, but the critical shortage of physicians currently precludes these meetings. |
| Establish a quality control procedure to ensure that entries into inmate medical files are complete, accurate, and timely. | **FULLY IMPLEMENTED** | The institution reported that it stresses the importance of timely, complete, and accurate documentation through physician's meetings, monthly nursing meetings, pharmacy meetings, and health record reviews, with relevant findings reported to health care management. |
| Hold the medical staff responsible for completing administrative activities, including responding to inmate medical appeals, in a complete and timely manner. | **NOT IMPLEMENTED** | While the institution reports having established an expectation that physicians complete all administrative duties in a timely manner and that procedures for notifying the chief medical officer of medical appeals that will become delinquent at the end of each week, the physician shortage precludes aggressive focus on appeals and contributes to a continuing backlog of appeals. |
| Foster effective communication and coordination of medical activities between medical and custody staff. | **FULLY IMPLEMENTED** | The institution reported that implementation of a quality management program provides an avenue for ongoing communication, problem identification, and resolution of common issues between medical staff and custody staff. |

| Actively manage the medical function by establishing goals, setting priorities, defining expectations, and communicating these to the medical staff. | SUBSTANTIALLY IMPLEMENTED | With the January 2004 implementation of the inmate medical services program, the institution reports that policies and procedures for delivery of health care are in place, with audits performed to ensure compliance with the program and Title 22 requirements. Audit findings are reported to health care management at supervisor meetings, held twice per month, and at monthly nursing meetings. |
|---|---|---|
| Perform periodic audits and reviews of all medical activities, including nursing, to monitor compliance with policies, procedures, and regulations. | FULLY IMPLEMENTED | The institution reports that nursing audits are performed to ensure compliance with medication management policy and procedures (Operating Procedure 430). Other nursing audits performed include evaluation of physician orders, nursing assessment, and charting content. |
| Ensure that all staff members, including temporary nursing registry staff, are thoroughly trained in delivering health care in a custody environment. | FULLY IMPLEMENTED | According to the institution, all staff members, including registry nursing staff, are required to attend orientation classes on institutional safety and security as well as an overview of correctional health care. Training is documented and records maintained. |
| Provide resources to allow clinics to remain open for more hours per day and more days per week for sick call and doctors' lines to allow more inmates to receive care. | FULLY IMPLEMENTED | According to the institution, physicians' work schedules changed from four 10-hour days to five eight-hour days per week, allowing for more consistent coverage and an extra day on which to see additional patients. Physicians are expected to see 25 scheduled patients, leaving time to see at least five sick call patients each day. The Office of the Inspector General confirmed the improvement to physicians' work schedules, but noted that the physicians averaged 16 patients per day during September 2005. |
| Ensure that treatment in the emergency room meets minimum standards of care before inmates are released to housing facilities with instructions to return to facility doctor's lines. | FULLY IMPLEMENTED | According to the institution, a tracking procedure has been implemented to ensure that all inmates returning from outside medical facilities receive appropriate follow-up care pursuant to the inmate medical services program ("Plata") guidelines and the correctional treatment center policies and procedures. Because the June 2004 Plata review identified this as an area of concern, the institution notes that follow-up care is closely monitored and additional staff training has been conducted. |

| | | |
|---|---|---|
| Establish an automated on-line medical records system to allow the medical staff access to inmate pharmaceutical records and medical histories. The system should also record and track follow-up appointments to ensure that these appointments occur. | NOT IMPLEMENTED | Although an automated on-line medical record system incorporating pharmaceutical data has not been established, the institution reported that medical staff can obtain inmate pharmaceutical records by contacting the pharmacy and that patient medication profiles are provided to staff before all scheduled appointments. A computer-based appointment scheduling and tracking system is in place, and the institution reports that the Department of Corrections and Rehabilitation is developing an automated system that will incorporate each patient's medical records and pharmacy tracking information. |
| Review all medical procedures currently referred to contracted specialist clinics or outside providers in order to evaluate which of those procedures can be performed by institution doctors. | NOT IMPLEMENTED | The institution reported that a medical authorization review committee was implemented in April 2004 to review the medical necessity of procedures referred to contracted specialists or outside providers of medical treatment. With the current critical shortage of physicians at the institution, however, such review is limited to a cursory examination by the chief medical officer, who does not formally document the decision process. |
| Review current backlogs of cases referred to specialist clinics to assess the appropriateness of providing specialist clinics more often. | FULLY IMPLEMENTED | According to the institution, the chief medical officer is provided with a monthly report of the number of inmates awaiting specialty services appointments (optometry, orthotics, surgery, urology, etc.), allowing management to request additional clinics or provide other resources to prevent excessive treatment delays. |
| Establish procedures and systems to ensure that all inmate requests for reasonable accommodation and medical verification of disabilities under the Americans with Disabilities Act are processed in a timely manner and that all appropriate accommodations or modifications are implemented without delay. | SUBSTANTIALLY IMPLEMENTED | The institution reported that its administrative staff closely monitors appeals to ensure compliance with requirements for timely responses to appeals filed under the Americans with Disabilities Act. The institution further reported that it has assigned an appeals coordinator to work with medical appeals and to complete all of the institution's second-level appeals filed under the Americans with Disabilities Act. As a result, according to the institution, the improvement has caused third-party monitoring groups *("Armstrong"* monitors) to put the institution on "paper tour" status for the next scheduled review, although the recent critical shortage of physicians has made it difficult to meet the response deadlines required by the *Armstrong* litigation. |

| | | |
|---|---|---|
| Track pending actions on Americans with Disabilities Act requests to ensure completion within established time limits and follow up on medical chronologies or modifications to ensure that these are implemented without delay. | **SUBSTANTIALLY IMPLEMENTED** | (See above) |
| Systematically identify inmates with chronic medical conditions and ensure that these inmates are monitored through regular appointments with institution doctors. | **PARTIALLY IMPLEMENTED** | The institution reported that its chronic care program was established as part of the inmate medical services program in September 2004, and that its "SATSLITE" scheduling and tracking system tracks and monitors chronic care appointments. However, the institution advised the Office of the Inspector General that the critical shortage of physicians has impaired the institution's ability to meet program time frames for care of inmates with chronic medical issues. |
| Establish policies and procedures to require periodic laboratory work and measurement of vital signs for chronic care inmates. Ensure that this information is available to doctors at the time of examinations so they may adequately assess chronic medical conditions. | **PARTIALLY IMPLEMENTED** | (See above). |

**FOLLOW-UP RECOMMENDATIONS**

   The Office of the Inspector General recommends that the institution continue to work with the Division of Correctional Health Care Services' department-wide efforts to address the shortage of medical staff as cited by a federal court monitor.

   The Office of the Inspector General also reiterates the following recommendations to the institution:

- **Develop methods to reduce or eliminate inmate medical appeal backlogs without placing inmates at risk.**

- **Hold medical staff responsible for completing administrative activities, including responding to inmate medical appeals in a timely manner.**

- **Review all medical procedures currently referred to contracted specialist clinics or outside providers to identify those that could be performed by institution doctors.**

- **Establish procedures and systems to ensure that all inmate requests for reasonable accommodation and medical verification of disabilities under the Americans with Disabilities Act are processed in a timely manner and that all appropriate accommodations or modifications are implemented without delay.**

- **Track pending actions on Americans with Disabilities Act requests to ensure completion within established time limits and ensure that medical chronologies or modifications are implemented without delay.**

- **Systematically identify inmates with chronic medical conditions and ensure that those inmates are monitored through regular appointments with institution doctors.**

- **Establish policies and procedures to require periodic laboratory work and measurement of vital signs for chronic care inmates. Ensure that this information is available to doctors at the time of examinations so they may adequately assess chronic medical conditions.**

- **Enforce the August 2004 memorandum from the health care manager instructing medical personnel to sign in and out of the institution and record actual times of arrival and departure.**

**Finally, the Office of the Inspector General recommends that the Department of Corrections and Rehabilitation continue to develop an automated system combining individual patient's medical record with pharmacy tracking information.**

**ORIGINAL FINDING NUMBER 3**

**The Office of the Inspector General found that pharmacy operations at the Substance Abuse Treatment Facility and State Prison at Corcoran were seriously deficient.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the medical management Team at the institution take the actions listed below to improve administrative controls over pharmacy operations. | | |
| Develop written institution policies and procedures, consistent with Title 22 of the California Code of Regulations, governing the institution's pharmacy operations and comply with existing department policies and procedures. The institution policies and procedures should include the physical controls and accounting controls necessary to correct the problems identified by this audit. | FULLY IMPLEMENTED | The institution reported, and the Office of the Inspector General confirmed, that policies and procedures consistent with Title 22 of the California Code of Regulations for pharmacy services are in place and that the institution's pharmacy services committee meets quarterly to address pharmacy issues and review the quarterly pharmacy report. |
| Consider implementing an automated barcode system for tracking the inventory and movement of pharmaceutical products within the institution. Bar-coding improves accuracy in identifying items and in determining quantities on hand, thus increasing efficiency by reducing the staff time required to prepare replenishment orders. | NOT IMPLEMENTED | The institution reported that the Division of Correctional Health Care Services is working to obtain a more sophisticated automated pharmacy system for implementation statewide, but that no such system presently exists. |
| Develop a systematic means of transferring inmate medications when inmates change housing assignments at the institution. | FULLY IMPLEMENTED | The institution reported that Operating Procedure 418 concerning intra-facility inmate medication transfer was implemented in October 2003. The policy governs the method for transferring medications with inmates between yards within the facility, and has contributed to a reduction in the institution's pharmacy expenditures of more $1 million from fiscal year 2002-03 to fiscal |

| | | year 2004-05. Audits are performed to ensure compliance. |
|---|---|---|
| Staff the pharmacy with full-time employees hired by the Department of Corrections in order to minimize the turnover in those positions and enhance the quality of service. | SUBSTANTIALLY IMPLEMENTED | The institution reported that it currently employs two state pharmacists, five pharmacy technicians, two contract pharmacists, and a contracted pharmacist-in-charge. This represents an improvement over conditions found in the January 2003 audit when the pharmacy was staffed entirely by contract employees.<br><br>While recruitment of pharmacists has proven difficult throughout the state's correctional institutions, the Substance Abuse Treatment Facility and State Prison at Corcoran has two pharmacist vacancies that have been advertised for more than 40 months. The institution said the current salary levels offered by the state are not competitive with those of private industry. |
| Ensure that the current pharmacist-in-charge is present at the pharmacy as required until a permanent pharmacist-in-charge can be hired. | FULLY IMPLEMENTED | According to the institution, the current pharmacist-in-charge works a 40-hour-per-week schedule under contract with a private agency, while recruitment efforts to hire a permanent state employee continue. |
| Develop management information systems, on-site monitoring methods, and management reports to more directly monitor pharmacy operations. | SUBSTANTIALLY IMPLEMENTED | The institution reports that it has established a pharmacy services committee to be responsible for overall direction of pharmacy services, along with a standards compliance coordinator to audit pharmacy services for compliance with Title 22 regulations. Deficiencies noted by the audits are brought to the attention of the pharmacy services committee and health care management for resolution.  The institution reports that these actions have resulted in improvements noted by a recent *Plata* monitoring tour. The improvements depend primarily on manual processes, however. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Division of Correctional Health Care Services take the following actions:**

- **Continue to develop and implement an automated barcode system for tracking the inventory and movement of pharmaceutical products within the institutions.**

- **Work with the court-appointed federal receiver to develop a competitive salary structure for pharmacy professionals, while continuing efforts to hire full-time pharmacy staff at present salary levels.**

ORIGINAL FINDING NUMBER 4

**The Office of the Inspector General found that the dental care program at the Substance Abuse Treatment Facility and State Prison at Corcoran was seriously deficient and that inmates were not receiving dental services required under state regulations.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Division of Correctional Health Care Services take the actions listed below to improve dental services at the California Substance Abuse Treatment Facility and State Prison at Corcoran. | | |
| Develop a plan for "re-activating" the dental operation at the institution. The plan should provide the dental function with the number of dental professionals necessary to provide a minimum standard of care consistent with Title 15 of the California Code of Regulations. The plan should also include detailed policies and procedures for the efficient delivery of dental services. To this end, the policies and procedures should include methods for ensuring that dentists examine inmates within 14 days of arrival at the institution and for | PARTIALLY IMPLEMENTED | The institution reported that policies and procedures for dental services have been developed and approved.<br><br>According to the institution, dental management has been a problem because the chief dental officer position was vacant from September 2002 until July 2005. The institution reported that meanwhile, dental department meetings are held monthly, and a dental program subcommittee reports its significant findings to the Quality Management Committee for resolution.<br><br>The institution reported that its dentists continue to make an effort to examine inmates within 14 days of arrival by using a process that notifies dentists of new |

| | | |
|---|---|---|
| developing individual treatment plans, based on regular examinations, within the framework of preventative dentistry. | | arrivals, but the institution also asserted its belief that the 14-day requirement in Title 15 pertains to reception centers only and not to other institutions. The Office of the Inspector General notes, however, that Title 15 of the California Code of Regulations clearly states, in section 3355.1(b), "Each newly committed inmate shall within 14 days following transfer from a reception center to a program facility receive a complete examination by a dentist who shall develop an individualized treatment plan for the inmate."<br><br>The Office of the Inspector General noted that the institution had six dentists and six dental assistants at the time of the audit fieldwork — only one fewer in each category than the institution's staffing allotment for these positions. |
| Improve communication with and support of the institution's dental function by conducting scheduled as well as unannounced site visits to monitor and inspect dental operations, and by holding regular meetings with on-site managers to discuss issues of concern to both headquarters and on-site staff. | PARTIALLY IMPLEMENTED | As noted above, the institution reports that it has established a dental program subcommittee as part of its quality management program, and that the subcommittee meets monthly and forwards any concerns to the quality management committee for resolution. Issues that cannot be resolved by institution personnel alone are addressed through the local governing body, which is comprised of institution staff and headquarters staff.<br><br>Although the institution has internal communication and monitoring processes for its dental operations, the Office of the Inspector General found no evidence of regular site visits by the Division of Correctional Health Care Services to inspect dental operations. |
| Address and resolve the issue of institution dentists not reviewing or using the dental assessments completed by reception center dentists. Institution dentists should either use the screening as part of the continuum of care or the Health Care Services Division should eliminate the screening and its attendant costs. | FULLY IMPLEMENTED | According to the institution, dental assessments performed during the reception center screening process are reviewed if they are in the unit health record at the time dental services are performed. |
| Obtain the resources to develop a management | SUBSTANTIALLY | The institution reported that a monthly report on dental services is provided to |

| information and reporting system to monitor key indicators of the efficiency and effectiveness of the dental function. These indicators should include, but not be limited to, the following: backlogs in inmate requests for dental services at the various clinics; number of patients seen by dentists; number of patients examined (and not examined) within the 14-day limit established by Title 15; number of individual treatment plans developed; number of fillings and other preventive procedures compared to the number of extractions and denture procedures. | IMPLEMENTED | institution and headquarters management. The report provides statistics on the number of patients to whom services were provided, the percentage of the total inmate population seen, and details about the types of services provided, such as restorative procedures, extractions, periodontal, prosthodontics, and endodontics, in relation to the total number of patients scheduled for appointments. According to the institution, sick call is held each morning in all clinics to handle dental emergencies. |
| --- | --- | --- |
| Develop a strategy to eliminate the backlog within a reasonable period based on the urgency of each request. | SUBSTANTIALLY IMPLEMENTED | The Office of the Inspector General noted that the institution maintains weekly statistics for dental workload, including patient backlog, and found that the backlog during September and October 2005 was approximately three months, compared to the five-month backlogs the Office of the Inspector General observed in the January 2003 audit. In addition, the institution has taken steps to enhance the productivity of its dental operations, as discussed below. |
| Hold the health care manager and the chief dental officer accountable for managing dental operations at the correctional treatment center, including the following: ensuring that dentists work appropriate hours and are fully productive during scheduled working hours; reviewing the number of hours scheduled for dental sick call and clinics to ensure sufficient time is allotted to address inmate dental problems; establishing a quality control procedure to ensure that entries into inmate medical files are complete and accurate; | SUBSTANTIALLY IMPLEMENTED | The institution reports that its dentists, who work five days per week, are required to sign in and out daily, that management reviews their productivity using the monthly dental report and daily appointment lists, and that any problems are discussed at monthly dental department meetings. The institution noted again that it has formed a dental program subcommittee that reports to the institution's quality management committee, and that dental appeals are handled in a timely manner under the monitoring of the Correctional Health Services Administrator II.<br><br>The Office of the Inspector General noted a slight improvement in the productivity of the institution's dentists since the January 2003 audit. Dentists saw an average of 11 patients per day during February and March 2005, |

| | | |
|---|---|---|
| ensuring that staff respond to inmate medical appeals in a complete and timely manner. | | compared to only eight patients per day for the same months in 2002. |
| Review the chief dental officer's duty statement and either require him to devote 40% of his time to clinic work or change the duty statement. | NOT IMPLEMENTED | The institution advised the Office of the Inspector General that since the chief dental officer was hired in July 2005, the duty statement for that position has not been revised since the January 2003 management review audit. |
| Provide management training to the on-site dental management staff. The training should include: planning and goal setting; performance measurement; interpersonal communication; and principles of supervision. | NOT IMPLEMENTED | According to the institution, the chief dental officer has not been scheduled to attend management training since being hired in July 2005. |
| Require the health care manager and the chief dental officer to develop policies and procedures for local operation of dental services. These policies and procedures should include the following:<br><br>• Longer and more frequent hours of clinic operations, and the posting of these hours in the facilities.<br><br>• A system of accountability for the time worked by dentists, dental assistants, and other dental staff.<br><br>• Alignment of the work schedules of dentists and dental assistants to maximize the efficiency of clinic operations. | NOT IMPLEMENTED | The institution reported that formal policies and procedures are being developed at department headquarters and have not been officially released, although final approval and distribution is expected soon. According to the institution, the institution's chief dental officer, meanwhile, is working on local policies and procedures. |

|  |  |  |
|---|---|---|
| • Use of benchmarking and minimum standards of productivity for dental staff, including number of patients seen daily, weekly, and monthly by dentists.<br><br>• Use of progressive discipline for employees who fail to comply with policies, procedures, and minimum productivity standards. |  |  |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the California Substance Abuse Treatment Facility and State Prison at Corcoran take the following actions:**

- **Establish procedures to comply with Title 15 of the California Code of Regulations, requiring that dentists examine inmates within 14 days of the date inmates arrive at the assigned institution from the reception center, and develop a reporting and monitoring system to track compliance.**

- **Review the chief dental officer's duty statement and either require the chief dental officer to devote 40 percent of his or her time to clinic work as described in the current duty statement, or revise the duty statement as necessary.**

- **Provide management training to on-site dental management staff, including training on planning and goal setting; performance measurement; interpersonal communication; and principles of supervision.**

- **Continue efforts to reduce the dental backlog.**

- **Have the health care manager and the chief dental officer finalize the policies and procedures for local operation of dental services.**

In addition, the Office of the Inspector General recommends that the Division of Correctional Health Care Services improve its support of the dental function at the institution by conducting site visits, both scheduled and unannounced, to inspect dental operations, provide guidance, and meet with the institution's dental management to discuss areas of concern.

ORIGINAL FINDING NUMBER 5

The Office of the Inspector General found that a projected deficit of $8.4 million in the 2002-03 budget for the Substance Abuse Treatment Facility and State Prison, Corcoran could significantly affect institution operations.

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections take the actions listed below to better manage the operating budgets of the institutions. | | |
| Continue to request resources to address the issues driving deficits in the institutions. | FULLY IMPLEMENTED | The department reported that it has been aggressively pursuing additional resources to address structural deficiencies and was successful in receiving additional funding for the following:<br><br>*Sick leave for posted positions.* In fiscal year 2003-04, the department received $4.8 million in funding to increase its posted sick leave relief factor. The sick leave relief factor is now funded at the employee's accrual rate. In fiscal year 2004-05, additional funding was received to fully fund absences under the Family Medical Leave Act /California Family Rights Act.<br><br>*Workers' compensation.* The department reported that it has received base budget augmentations of $158.3 million over the last three fiscal years to cover its annual workers' compensation deficits. |

*Medical guarding and transportation*. The department reported that it received approval for a fiscal year 2004-05 budget augmentation of 114.9 positions and $18.1 million to meet increased costs of medical guarding and transportation, increasing the base overtime funding for medical guarding and transportation costs to $9.9 million.

*Overtime for posted positions*. The department reported that it received an augmentation of $36.6 million in overtime funding for fiscal year 2001-02 and that provisions were included in the budget bill specifying that the funding is available only for expenditures for overtime and temporary help to reduce holiday and vacation leave credits and for costs associated with filling authorized positions. The funding can be converted to 504 permanent positions when excess vacancies are filled. The initial allocation of 124.28 positions was distributed to the various institutions in July 2003 and the remaining 379.61 positions were allocated in August 2004 to reduce overtime use. An approved budget change proposal for fiscal year 2004-05 addressed the unfunded relief needed to cover posted positions.

*Administrative segregation overflow*. For fiscal year 2004-05, the department reported receiving an augmentation of 195.6 positions and $16.8 million in funding to provide additional staffing for administrative segregation unit overflow. The augmentation was based on the minimum overflow levels experienced during calendar year 2003, and future adjustments were expected to be addressed after the fall population projection and May 2006 budget revision.

*Utilities costs*. For fiscal year 2002-03, the department reported that it received additional funding of $13.1 million through various policy proposals and population related adjustments. For fiscal year 2003-04, the department's utilities base was increased, with permanent funding of $27.8 million and one-time population-related adjustments.

*Population increases*. The department reports that it uses data from its Offender Information Services Branch in conjunction with any legislative changes to estimate the fiscal impact of population changes. Through the fall

| | | |
|---|---|---|
| | | population projection and the May budget revision process, the department adjusts its projections of funding required to accommodate population changes.<br><br>***New base budget methodology***. The department reports that its Financial Services Division, in conjunction with the Department of Finance, developed a new budget allotment methodology to align funding with expenditure levels more realistically and continues to work on refinements. While budgets are tight, the department reports that it continues to submit requests addressing the need for additional resources. |
| Prepare cost estimates of all changes to employee bargaining unit contracts before committing to changes in the contracts. | **FULLY IMPLEMENTED** | The department reports that its budget management branch is instructed to estimate the impact of labor agreements that have been negotiated by the department in consultation with the Department of Finance and the Department of Personnel Administration. In addition, the department director issued a memorandum in July 2002, requiring that any labor agreements having a fiscal impact on either local operations or the department's budget must have the prior approval of the budget management branch. |
| Request additional funding to mitigate the effect of increased sick leave usage in future fiscal years. | **FULLY IMPLEMENTED** | For fiscal year 2004-05, the department reports that it received approval for $99.5 million and 1,238.8 positions to address insufficient funding for relief coverage for absences caused by training, bereavement leave, military leave, jury duty, the Family Medical Leave Act, and the Family-School Partnership Act. |
| Provide institutions with adequate resources before initiating policy changes, such as designating an institution for dialysis treatment. | **FULLY IMPLEMENTED** | The department notes that its existing policies prohibit implementation of any new program before appropriate funding is secured.  In the specific case of hemodialysis, the department reports that it has budgeted, funded, and constructed an on-site hemodialysis unit at the California Substance Abuse Treatment Facility and State Prison at Corcoran, which is pending activation, The unit will involve a contract with a private vendor to operate dialysis chairs. |

| Assist the institution in improving the control and monitoring of pharmaceuticals. | **FULLY IMPLEMENTED** | The department reported that its Division of Correctional Health Care Services has provided the following services to institutions to assist in managing pharmacy and pharmaceutical operations: |
|---|---|---|

**Management Systems**
- Imposed a quality management structure to facilitate continuous improvement, information management and analysis, and corrective action. The quality management structure involves institutional and departmental pharmacy improvement teams, pharmacy and therapeutics subcommittees, quality management committees, governing bodies, and associated reporting systems.

- Developed a process to monitor the utilization and costs of certain drug categories that produces both institution-specific and aggregate management reports. The reports were disseminated for use in the quality management process, with quarterly reports, including an executive summary and analysis available.

- Procured the Health Care Management System to replace the outdated Pharmacy Prescription Tracking System. The Health Care Management System was piloted at the California Medical Facility in September 2004 with statewide implementation anticipated to occur over the next two to three years. The system includes a comprehensive modern pharmacy prescription information management capability and is designed to assist institutions with tracking and managing pharmacy operations more easily and rapidly. The department will provide field training to staff at its institutions as the system is implemented statewide over the next two to three years.

**Contract and Formulary Management**
- Developed and distributed formularies and updates to guide appropriate drug purchases and prescriptions. Non-formulary drug requests are reviewed for appropriateness and policy compliance by the institution; and in certain cases, department management. The Division of Correctional Health Care Services generates, reviews, and

distributes a monthly formulary compliance report through the quality management process.

- Developed and distributed monthly contract compliance reports that facilitate cost-effective purchasing by identifying non-contract purchases that are generally more expensive than items purchased through a contract. The Division of Correctional Health Care Services produces and analyzes these reports and provides them to the institutions through the quality management process.

- Developed and distributed periodic discount and rebate reports to ensure that institutions are taking advantage of available pharmaceutical discounts and rebates. The Division of Correctional Health Care Services provides information regarding available discounts and rebates and advises institution on corrective measures as necessary through informational e-mail bulletins and the quality management process.

**Medication Utilization and Disease Management**
- Developed and implemented the Hepatitis C Virus Clinical Management Program to assist the institution in improving control and monitoring of related antiviral drug costs. The program includes a utilization management database to assist with monitoring hepatitis-C treatment and tracking.

- Developed protocols and provided training to appropriate health care staff in March 2004 on the utilization and management of the five high-volume/high-cost drug categories that are responsible for more than 50 percent of the department's pharmaceutical expenses.

**Pharmacy Operations and Medication Management**
- Developed and completed the first turn-rate report in 2003 to determine how frequently pharmacies replace their stock, with a high turn-rate generally reflective of efficient inventory management. The department requested that institution pharmacies measure turn rates

|  |  | while the department conducts annual turn-rate reviews. |
|  |  | • Facilitated inventory management training for pharmacy field staff in August and September of 2004, and scheduled annual inventories of institution pharmacies. |
|  |  | • Implemented comprehensive transfer and medication management policies in 2003 that improved continuity of care and reduced waste. |
|  |  | According to the department, as a result of the initiatives noted above, the rate of increase in the department's pharmaceutical expenditures slowed to six percent during fiscal year 2003-04 from a 17.7 percent average over the previous three years. The department interprets this declining trend as a "cost avoidance" in excess of $14 million, noting that it is 50 percent less than the industry standard rate of increase of 12 percent.[1] The Office of the Inspector General did not audit these figures, but, if they are accurate, recognizes them as a commendable trend. The Office of the Inspector General believes the department can achieve further savings if it fully implements past recommendations to replace outdated information technology systems that lack the capacity to control costs and manage waste. |
|  |  | [1] The 12 percent industry standard rate is stated in Hoffman, Nilay, et al. "Projecting Future Drug Expenditures-2004." *American Journal of Health-System Pharmacy* (2004): 61:145-157. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 6**

**The Office of the Inspector General found that a significant percentage of employees and managers of the Substance Abuse Treatment Facility and State Prison at Corcoran were not fulfilling annual training requirements.**

---

[1]

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the management of the California Substance Abuse Treatment Facility and State Prison at Corcoran take the actions listed below to ensure that employees receive required training. | | |
| The in-service training unit should periodically review each employee's training records to ensure that all employees meet departmental training requirements and should notify appropriate supervisors of instances of non-compliance. For those employees consistently not attending "7k" training, the in-service training unit should determine the cause of the employee's inability to attend and make training schedule adjustments if necessary. | FULLY IMPLEMENTED | The Office of the Inspector General confirmed a statement from the institution that a block training program was implemented for all department employees in September 2004, with training months designated for every employee two months before the employee's birth month. A 40-hour block of required and site-specific training is offered weekly during that month. In addition, employees receive a 12-hour self-study packet, which they are required to complete to supplement the 40 hours of block training. The in-service training unit automatically provides each employee with a training audit during the employee's birth month, and the personnel department sends the audit results to the employee's supervisor for evaluation and follow up. |
| As a part of the annual performance evaluation process, supervisors should work with employees to include specific plans to meet training requirements for the following year. | NOT APPLICABLE | Under the annual block training process, it is no longer necessary for supervisors to meet with employees to plan training. Each employee's training evaluation is provided to the employee's supervisor upon completion of training. |
| Develop a systematic means of acquiring the training records of newly arrived employees from the sending institution or agency. | FULLY IMPLEMENTED | According to the institution, the in-service training unit and the personnel office implemented a process in August 2003 in which a listing of all new employees is sent to the in service training office weekly to assist in tracking and obtaining new employees' training files. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 7**

**The Office of the Inspector General found that the Investigative Services Unit was not following proper procedures for the temporary storage of evidence.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the management of the California Substance Abuse Treatment Facility and State Prison at Corcoran take the actions listed below to improve the integrity of temporary evidence storage at the institution. | | |
| Re-locate the sub-evidence area to a separate room, unexposed to extraneous pedestrian traffic. All persons entering the room should be required to sign the logbook documenting the date, time, and purpose of their visit. The storage refrigerator should be fitted with a lock if it cannot be moved to a secured and locked room. | **FULLY IMPLEMENTED** | The Office of the Inspector General verified that the sub-evidence lockers and the refrigerator have been relocated to the central services building. Anyone entering the room is required to sign the logbook documenting the date, time, and purpose of the visit. |
| Replace the current loose-leaf evidence log with hardbound logbooks with pre-numbered pages. The logbook for urinalysis samples should be separate from the logbook used for | **FULLY IMPLEMENTED** | The Office of the Inspector General noted during a follow-up tour that the logbooks are now manufactured by the investigative services unit staff using a durable plastic spiral binding, with sequentially-numbered pages, allowing for individual books unique to an incident number. Separate urinalysis logbooks are |

| | | |
|---|---|---|
| other evidence. Information recorded in the logs should include date and time of access, the badge number (or other identification), name of the person submitting the evidence, the subject's name and identifying number, a description of the evidence, and the locker number in which it is stored. When an evidence officer retrieves the evidence, the log entry should include the date and time evidence was removed from the sub-evidence locker, the name of the evidence officer, and the final disposition of the evidence. | | being used and information recorded in the logs includes date and time of access, the badge number (or other identification) and name of the person submitting the evidence, the subject's name and identifying number, a description of the evidence, and the locker number in which it is stored. When an evidence officer retrieves the evidence, the log entry includes the date and time evidence was removed from the sub-evidence locker, the name of the evidence officer, and the final disposition of the evidence. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 8**

**The Office of the Inspector General found that the institution was not properly documenting inmate activity in the administrative segregation units.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the management of the California Substance Abuse Treatment Facility and State Prison at Corcoran require the administrative segregation unit staff to take the actions listed below to comply with regulations and policies governing inmate activity in the administrative segregation unit. | | |

| | | |
|---|---|---|
| Record inmate movements and other activities in the CDC-114 as they occur, rather than waiting for the first watch administrative segregation floor officer to update the log.<br><br>. | **NOT IMPLEMENTED** | The institution reported that training has been provided to all staff in the administrative segregation units and that all unusual incidents and inmate movements are documented contemporaneously on the inmate's individual CDC- 114D, as well as in the administrative segregation isolation log . In discussing the matter with institutional management, however, the Office of the Inspector General learned that supervisors responsible for implementing the original recommendation misinterpreted it, believing that the recommendation focused on the CDC-Form 114A, which is the record of activity for an individual inmate (used for recording such events as feeding, showers, and medical treatment). Accordingly, the institution's training was directed toward improving records in the individual inmate files rather than toward the isolation log (Form CDC-Form 114). |
| Record unusual incidents and other noteworthy conditions in the CDC-114 instead of exclusively in the sergeant's log. | **NOT IMPLEMENTED** | Institution management acknowledged that inmate movement is not consistently being recorded in the isolation log as it occurs and that this will become a subject of training. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the California Substance Abuse Treatment Facility and State Prison at Corcoran record inmate movement in the administrative segregation isolation log (CDC-Form 114) as it occurs and that this document also be used to record unusual incidents and other noteworthy conditions.**

**ORIGINAL FINDING NUMBER 9**

**The Office of the Inspector General found that the institution had not consistently followed required state hiring procedures.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the institution management take the actions listed below to improve employee hiring. | | |
| In consultation with the department's Office of Personnel Management, develop a policies and procedures manual for the hiring process. The manual should incorporate the applicable provisions of the California Department of Corrections Operations Manual, department policy memoranda, and state laws and regulations. | FULLY IMPLEMENTED | The institution reports that it has in place a recruitment and hiring process that will ensure that all State Personnel Board rules and regulations are observed. The Office of the Inspector General examined records at the institution and noted evidence of improved compliance with each of the elements discussed below. |
| Advertise all vacancies for at least 14 days in accordance with the Department Operations Manual and other department policy memoranda. | FULLY IMPLEMENTED | The institution advised the Office of the Inspector General that all vacancies are advertised for the required 14 days and that the advertisement bulletin is maintained as part of the recruitment file. |
| Provide training to appropriate managerial personnel on the hiring process and on the responsibilities and duties of interview panel members. | FULLY IMPLEMENTED | According to the institution, an orientation is provided to panel members and the panelists' acknowledgment forms are maintained in the recruitment file. |
| For each examination, have all members of interview panels document the candidates' interview performance and rate each candidate using a pre-determined scoring system and a standardized scoring sheet. | FULLY IMPLEMENTED | According to the institution, a standardized rating format is used for all interviews, and the ratings are reflected on the interview questions sheet. |

| | | |
|---|---|---|
| Use interview panels consisting of at least three members whenever possible. | **FULLY IMPLEMENTED** | The institution reported that interview panels consist of at least three members approved by the staff services manager I when feasible, and a note is made to the file if there is a deviation from this requirement. |
| Interview a minimum of three candidates for each vacancy whenever possible. | **FULLY IMPLEMENTED** | According to the institution all interviews consist of at least three candidates unless fewer than three candidates respond to the notice. |
| Have the warden date all documents at the time of signature. | **FULLY IMPLEMENTED** | The institution reports that the warden's executive assistant and the staff services manager I confirm that documents are dated when the signature is obtained. |
| In addition, the Office of the Inspector General recommended that the Department of Corrections conduct periodic reviews of institution hiring policies and procedures to ensure they are used consistently. | **FULLY IMPLEMENTED** | The department reported that the institution's delegated testing office conducts monitoring reviews of all interview packets for evidence that all requirements of the hiring process are met. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 10**

**The Office of the Inspector General found while institution employees generally regarded the warden's communication and management skills to be satisfactory, some described his management style as "reactive," and said that he does not communicate adequately with managers and line staff.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| To improve communication among the warden, his executive staff, employees, and inmates, the Office of the Inspector General recommended that the warden take the actions listed below. | | |
| Conduct regularly scheduled staff meetings with employees, permitting them to identify and define important issues. | FULLY IMPLEMENTED | According to the institution, the warden hosts informal open forums scheduled at various times throughout the day to allow all interested staff members an opportunity to attend and ask questions or voice concerns. In addition, the institution reports that monthly meetings are scheduled with collective bargaining unit representatives to address issues and concerns. |
| Within the framework of institution security and existing policy, respond promptly to as many employee and inmate concerns as practicable. When the warden's commitment to an action is made, ensure that a "tickler system" is used to monitor implementation of the commitment. | FULLY IMPLEMENTED | According to the institution, all assignments are currently tracked by an office technician, and pending issues are continuously monitored for follow-up, with the office technician generating weekly due lists and overdue reports for use by the warden during morning briefings. The warden's administrative assistant tracks issues resulting from inmate council meetings. |
| Form a committee of representatives from various employee areas (administration, custody, facilities, programming, etc.) to provide a forum for identifying factors relating to employee morale, recommending solutions, and monitoring the effectiveness of the solutions implemented. | FULLY implemented | The institution reported that several committees comprised of managerial staff, union representatives, and non-custody personnel are in place to address employee concerns. According to the institution, the warden has an "open door" policy, allowing an employee to communicate concerns directly to the warden after exhausting remedies available through the appropriate chain-of-command. |
| Conduct regular walking tours of the institution, visiting all work sites to talk with | FULLY IMPLEMENTED | According to the institution, the warden or chief deputy wardens conduct weekly tours as time and schedules permit. |

| | | |
|---|---|---|
| employees about the institution's mission and to receive feedback directly from employees responsible for carrying out that mission. | | |
| Meet with the inmate advisory councils at least once a month. | **FULLY IMPLEMENTED** | The institution reports that the associate wardens meet with the inmate advisory councils monthly, while the warden meets with the councils quarterly. Issues raised during these meetings are followed-up through the appropriate facility captain. The warden's administrative assistant routinely monitors unresolved issues. |
| In addition, the Office of the Inspector General recommended that the warden take the actions listed below. | | |
| Arrange with facility captains to provide the inmate advisory councils access to dedicated office space and the necessary office equipment and supplies to conduct approved council activities and business. | **SUBSTANTIALLY IMPLEMENTED** | The institution reported that although there is no permanent workspace dedicated exclusively for the purpose, office space, supplies. and equipment are provided to the inmate advisory councils as available. |
| Have an appropriate staff person appointed as the institution's inmate advisory council coordinator. | **FULLY IMPLEMENTED** | According to the institution the associate warden of each complex has been designated to serve as the inmate advisory council coordinator. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

## PHARMACEUTICAL EXPENDITURES

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in reducing its pharmaceutical expenditures. The department, however, has accomplished only the preliminary steps required to replace its outdated management information system.**

> **IMPLEMENTATION REPORT CARD**
>
> **Previous recommendations: 7**
>
> **Fully implemented: 0 (0%)**
>
> **Substantially implemented: 1 (14%)**
>
> **Partially implemented: 2 (29%)**
>
> **Not implemented: 3 (43%)**
>
> **Not applicable: 1 (14%)**

In July 2003, the Office of the Inspector General conducted a survey to examine the department's pharmaceutical expenditure trends over the four preceding fiscal years to analyze practices contributing to those trends and to evaluate the department's efforts to implement changes recommended by previous audits and studies.

The survey revealed that despite a two percent decrease in inmate population between fiscal years 1999-2000 and 2002-03, the department's pharmaceutical expenditures increased 94 percent, from $63 million in 1999-00 to $122.4 million in 2002-03. During the same period, the national consumer price index for pharmaceutical drugs increased only 22 percent. The Office of the Inspector General found that the department's pharmaceutical expenditures were also significantly higher than those of two comparably sized prison systems—the U.S. Bureau of Prisons and the Texas state prison system—and had increased at a much faster rate.

Problems contributing to the department's high pharmaceutical expenditures had been well-documented in four comprehensive audits and studies conducted by the Bureau of State Audits, by the California State Senate Advisory Commission on Cost Control in State Government, and by a private consulting firm, FOX Systems, Inc., under a contract with the department. All of these audits and studies identified similar problems in the department's pharmacy program and included specific recommendations to remedy the deficiencies. Particularly critical was the indicated need for the department to replace its Pharmacy Prescription Tracking System, a badly outdated 20-year-old information system without the capacity to perform essential functions to control costs and prevent pharmaceutical waste, fraud, and abuse.

Although the Legislature mandated in July 2001 that the department implement the recommendations contained in the 117-page FOX Systems, Inc. report, the Office of the Inspector General found that, as of July 2003, the department had made only minimal progress in carrying out the implementation.

The Office of the Inspector General recommended that the department act promptly to implement the recommendations of previous audits and studies of its pharmacy program and, if it appeared that the department would be unable to carry out the implementation on its own, that it consider contracting with a private vendor to institute the necessary improvements.

## BACKGROUND

The California Department of Corrections and Rehabilitation is required to provide health care services, including pharmaceutical services, to inmates incarcerated in state correctional institutions. Each institution operates its own pharmacy under the direction of the department's Division of Correctional Health Care Services (formerly the Health Care Services Division), which is responsible for administering health care services to inmates. Until January 2003, however, when the division hired three pharmacy service managers, no individual at the department level was assigned to actively manage the pharmacy program. As a result, pharmacy operations at the institutions lacked standardization because purchasing, dispensing, and administrative processes varied significantly. Each institution also maintained an independent pharmacy database using the Pharmacy Prescription Tracking System, a severely outdated information system with limited capabilities.

In February 2006, the U.S. District Court for the Northern District of California appointed a receiver over the department's health care operations in connection with a class action suit, *Plata v. Schwarzenegger*. Under the terms of the court's action, the receiver has broad powers of "administration, control, management, operation, and financing" over all aspects of the department's health care system, including the power to acquire and modernize information technology.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

The Office of the Inspector General's survey indicated that, although the department could have reduced its annual pharmaceutical expenditures by up to $26 million by implementing such management controls as those recommended in the four previous audits and studies, it had, in fact, made only minimal progress in implementing the recommendations.

As a result, despite a decrease in inmate population during the period covered by the Office of the Inspector General's survey, the department's pharmaceutical expenditures continued to grow dramatically. Between fiscal years 1999-2000 and 2002-03, the department's pharmaceutical expenditures increased 94 percent, from $63 million to $122.4 million, while inmate population declined two percent, from 162,000 to 159,000, and the national consumer price index for prescription drugs increased only 22 percent.[1] Similarly, between fiscal years 1996-97 and 1998-99, pharmaceutical expenditures increased from $24 million to $51 million — an annual growth rate of 28 percent — while the inmate population grew by about six percent and the cost of prescription drugs increased only 13 percent. The department's per-inmate pharmaceutical expenditures also increased, more than quadrupling from $142 in 1997 to $642 in 2002.

---

[1] At the time of the July 2003 survey, the department's pharmaceutical expenditures were projected to increase 111 percent between 1999-2000 and 2002-03.

The Office of the Inspector General issued seven recommendations to the department in its July 2003 survey addressing these and other findings.

### OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the Department of Corrections and Rehabilitation, through its Division of Correctional Health Care Services, has implemented the seven recommendations from the Office of the Inspector General's July 2003 survey of pharmaceutical expenses. To conduct the follow-up review, the Office of the Inspector General provided the department and the Division of Correctional Health Care Services with a table listing the July 2003 findings and recommendations and asked management to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the department's responses, along with documentation provided by the department, and evaluated the degree of compliance or noncompliance with the recommendations. The results are presented in the tables following this narrative and reflect the department's responses as of September 2005, when the Office of the Inspector General completed its fieldwork.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the seven recommendations issued by the Office of the Inspector General in July 2003 concerning the department's pharmaceutical expenditures, one recommendation has been substantially implemented; two recommendations have been partially implemented; three recommendations have not been implemented; and one is no longer applicable.

The Department of Corrections and Rehabilitation reported it has developed a strategic plan that incorporates recommendations from private consulting, regulatory, and oversight agencies. The department also reported that it has revised its statewide procedures for medication administration and distribution; trained personnel on formulary rules; and organized management workgroups. The department rejected recommendations to contract with a private firm to manage pharmacy operations and centralize its pharmacy distribution system.

Although the department reported it has made progress in launching a project to replace its outdated and inefficient pharmacy management system with an automated health care management system, statewide implementation of that system has not been accomplished. The department reported, however, that it achieved a "cost avoidance" of $14.3 million between *projected* pharmaceutical expenditures for fiscal year 2003-04 ($144 million) and *actual* expenditures for that period. The department's actual pharmaceutical expenditures for fiscal year 2003-04 were $129.7 million — a $7.3 million (6 percent) increase over the previous year, compared to an 18 percent average increase experienced in the three preceding fiscal years. Yet, Bureau of Labor Statistics data show that between July 2003 and June 2004, pharmaceutical prices nationwide increased only 3.3 percent.

Until the department implements past recommendations in this area, it continues to waste millions of dollars annually in pharmaceutical expenditures. Because of these problems,

in March 2006, the U. S. District Court ordered a comprehensive financial and operational audit of the department's pharmaceutical services, to be conducted by a private specialty firm with expertise in correctional pharmaceutical operations. In addition, the U. S. District Court-appointed receiver scheduled to take over all aspects of the department's health care system on April 17, 2006, will have authority to acquire and modernize information technology.

FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Continue the project to replace the outdated and inefficient Pharmacy Prescription Tracking System with the automated Health Care Management System and implement the new system statewide as soon as practicable.**

- **In light of the flexible options likely to be available under the February 2006 federal court order appointing a receiver over the department's medical health care delivery system, reconsider the option of contracting with a private pharmacy services management firm to implement the recommendations submitted in the reports and studies conducted since 2000.**

The following table summarizes the results of the follow-up review.

**ORIGINAL OBSERVATION NUMBER 1**

**The Office of the Inspector General found that the Department of Corrections has failed to implement recommendations from four recent audits and studies at a cost of millions in potential pharmaceutical expenditure savings.**

**ORIGINAL OBSERVATION NUMBER 2**

**The Office of the Inspector General estimates that the Department of Corrections could reduce its annual pharmaceutical costs by at least 20 percent—saving upwards of $26 million a year—by implementing effective management controls such as those recommended in recent audits and studies.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections begin immediate implementation of the recommendations made by FOX Systems, Inc. To accomplish the implementation, the department was to select one of the following two options. | | |
| **Option 1**<br><br>Direct the Health Care Services Division to begin implementing the FOX Systems, Inc. recommendations. | SUBSTANTIALLY IMPLEMENTED | The California Department of Corrections and Rehabilitation reported that it has developed a strategic plan incorporating audit recommendations advocated by the Bureau of State Audits, the Senate Advisory Commission on Cost Control in State Government, FOX Systems Inc., and recent legislative mandates to improve pharmacy management. The department reported that it had completed the following FOX Systems, Inc. recommendations:<br><br>• Appointed three pharmacy services managers. |

| | | |
|---|---|---|
| | | • Reorganized the Division of Correctional Health Care Services. |
| | | • Revised and distributed the department's formulary. |
| | | • Established pharmacy and therapeutics subcommittees. |
| | | • Participates in the inter-agency Common Drug Formulary Committee and Pharmacy Advisory Board. |
| | | • Secured a rebate for a high-cost atypical antipsychotic medication. |
| | | • Implemented a tier structure for atypical antipsychotic medications. |
| | | • Implemented a Hepatitis C Clinical Management Program. |
| | | • Revised and distributed medication management and intra-system medication transfer policies. |
| | | • Completed e-mail and Internet connectivity in all pharmacies. |
| | | • Completed local area network and wide-area network connectivity in all institution administration buildings. |
| | | • Acquired the Veterans Affairs Information System and Technology Architecture (VISTA) system from the U. S. Department of Veterans Affairs to improve pharmacy and clinical management operations. Designated as the Health Care Management System, it will be integrated with the Clinical Management System (a system developed by staff at the California Medical Facility) and the Parole Division's Transitional Case Management Program-Mentally Ill (TCMP-MI) to provide comprehensive pharmaceutical information management and ancillary functions. |
| | | • Initiated implementation of the Health Care Management System by linking the Division of Correctional Health Care Services and all |

| | | institutional pharmacies, including those at Division of Juvenile Justice facilities, through a central file server. |
|---|---|---|
| Reduce the fiscal year 2003-04 budget of the Health Care Services Division by an amount equal to 20 percent of its annual pharmaceutical expenses. | **NOT IMPLEMENTED** | The department reported that it did not reduce the Division of Correctional Health Care Services budget by an amount equal to 20 percent of its annual pharmaceutical expenses because the reduction could not be achieved without jeopardizing statutory- and court-mandated inmate health care services. The department reported, however, that it had completed several initiatives to accomplish the Office of the Inspector General's recommendation. According to the department, these achievements include over $14 million in "pharmaceutical cost avoidance" for fiscal year 2003-04.

The department reported that its pharmaceutical expenditures exhibited significant cost avoidance between fiscal years 2002-03 and 2003-04. Total expenditures reportedly increased by only six percent, considerably less than both the 17.7 percent average increases over the three previous years and the industry standard increase of 12 percent. As a result, the department maintains that it has avoided over $14 million in pharmaceutical expenses by slowing the rate of increase from 17.7 percent to six percent.

Moreover, despite court-mandated levels of patient care, a high concentration of such diseases as the hepatitis C virus, and mental illnesses that require expensive treatments, the department asserted that this cost avoidance trend will continue to be evidenced through the following managed care initiatives: monitoring, review, and quality management of the drug formulary; prescription protocols for high-volume/high-cost pharmaceuticals; utilization management reporting; health transfer processes; chronic care programs; and compliance auditing. |
| Reallocate a sufficient portion of the budgetary reduction to pay for specific information technology improvements. | **NOT IMPLEMENTED** | The department reported that its pharmacy program's budget was reduced by $8 million in fiscal year 2002-03 and by a subsequent $4.8 million in fiscal year 2003-2004 because of negative-impact budget change proposals directed at reducing pharmaceutical expenditures through more efficient prescription procedures.
The department reported that it is currently requesting funding to implement the two-phase pilot of the Health Care Management System. The department acquired |

| | | the program technology at no cost from the U.S. Department of Veteran's Affairs and will allocate the funding to staff time, system consultants, program adaptation, and hardware. The department reported that it is also requesting funding to complete statewide implementation of the Health Care Management System. |
|---|---|---|
| Provide appropriate support to the Health Care Services Division to expedite the required technology procurement. | PARTIALLY IMPLEMENTED | The department reported that it continues to pursue a modern information technology infrastructure for its pharmacy operations and that it is aggressively implementing the Health Care Management System — which combines integral elements of existing software applications obtained from the U.S. Department of Veteran's Affairs, the California Medical Facility, and the Parole and Community Services Division — to meet the department's needs in a cost-effective manner. The department reported that it had launched the Health Care Management System at the California Medical Facility and that it intends to complete statewide system implementation.<br><br>The department also reported that, to meet pressing needs within the budgetary constraints, the Division of Correctional Health Care Services has proactively developed several interim data applications, completed e-mail and Internet connectivity for all institutional pharmacies, and linked all 33 institutions on a wide area network or local area network in May 2004. Although the interim data applications enable tracking, monitoring, and reporting of medication errors; of physician prescribing practices; and of targeted high-cost and high-risk drugs, the applications are presently dependent on data that emanates from the problematic Pharmacy Prescription Tracking System, which the new Health Care Management System is designed to replace.<br><br>The department reported that it will achieve central file server connectivity between prison pharmacies and the Division of Correctional Health Care Services with implementation of the Health Care Management System. |

| Ensure that the Health Care Services Division establishes specific goals and objectives to implement the FOX Systems, Inc. recommendations, and that the Health Care Services Division management adequately monitors the implementation. | PARTIALLY IMPLEMENTED | The department reported that it has improved overall pharmacy management by using a matrix management structure to implement its strategic plan. The plan's purpose is to enhance operations through more effective and efficient pharmaceutical procurement and delivery. The department reported that it has used a systematic approach to achieve the following five goals:<br><br>1. Secure a fully integrated medication management information system.<br>2. Improve pharmacy operations by instituting centralized pharmacy management and maintaining a community standard.<br>3. Improve negotiated discounts for high-cost, high-volume pharmaceuticals.<br>4. Optimize prescribing targeted high-cost medications.<br>5. Reduce medication waste through improved distribution and inventory controls.<br><br>The department reported that it has implemented several mechanisms to monitor overall initiative progress, including a project management matrix, management reports to track drug utilization, and contract and inventory management. |
| **Option 2 (preferred)**<br><br>Contract with a private pharmacy services management firm to implement the FOX Systems, Inc. recommendations. The contractor would perform the following functions:<br><br>• Assume management of the day-to-day operations of the Health Care Services Division pharmacy operations. | NOT APPLICABLE[2] | The department reported that it reviewed this option and determined that the most effective course of action was to permit the Division of Correctional Health Care Services to implement a managed care model, drug use controls, and a quality management structure to replicate the recommendations of FOX Systems, Inc. |

---

[2] Because the Division of Correctional Health Care Services elected to implement Option 1, the Office of the Inspector General has listed this recommendation as "Not Applicable." As noted in the follow-up recommendations, however, the Office of the Inspector General recommends that the Division of Correctional Health Care Services reconsider implementing Option 2.

| | | |
|---|---|---|
| • Assume responsibility for promptly implementing the information technology improvements recommended by FOX Systems, Inc.<br><br>• Begin the business process re-engineering activities recommended by FOX Systems, Inc. | | According to the department, three Division of Correctional Health Care Services pharmacy services managers, supported by the quality management structure, control day-to-day pharmacy operations. A multidisciplinary Pharmacy Focus Improvement Team provides issue-targeted analysis and planning, concurrent with multidisciplinary and administrative review from the Pharmacy and Therapeutics Subcommittee. A parallel quality management structure exists at each correctional institution. |
| Regardless of the option chosen, the department should also change the pharmacy program structure from a decentralized system with pharmacies in each prison to a system with two or three regional pharmacies or one large central pharmacy, consistent with the model used in other states. That change would provide the following benefits:<br><br>• Allow more efficient operations, using automated dispensing machines.<br><br>• Reduce inventory shrinkage and spoilage.<br><br>• Increase standardization of operations and prescribing practices.<br><br>• Reduce the impact of staff turnover and vacancies in hard-to-recruit pharmacist positions located in | NOT IMPLEMENTED | The department reported that it had reviewed options that included mail-order pharmacy services and regional pharmacies serving several prisons. The department maintained that it had found these options impractical, given the remote locations of some institutions and the specific pharmacy service requirements set by the state Department of Health Services for licensed health care facilities within most corrections institutions. The department reported, however, that it was still reviewing other alternatives.<br><br>The department reported that it has made progress through other methods and cited as an example its participation since April 2003 in activities of the Pharmaceutical Prime Vendor Technology Committee, a subcommittee of the California Pharmacy Advisory Board, through which it has worked with the Department of General Services to improve prime vendor contract specifications, mail-order prescription services, automated dispensing systems, and operations consolidation.<br><br>The department reported that it installed an automated dispensing system in one of its prisons in October 2000 to increase efficiency and reduce waste. The department has determined that automated dispensing systems should be tailored to the needs of individual institutions and to permissible medication packaging for the inmate populations served.<br><br>The department reported that it had implemented a second automated dispensing system in 2002 in another institution to evaluate the project's effectiveness. |

| | | |
|---|---|---|
| remote geographic areas.<br><br>• Reduce prescription errors. | | The department reported that it had distributed a revised statewide pharmacy services policy and procedures for medication administration and distribution, prescribing practices, intra-system transfers, and inventory control in August 2003.<br><br>The department reported that it had also developed a lesson plan and audit tool in May 2004 to train pharmacy staff in pharmacy operations.<br><br>The department reported that it has developed formulary and drug use guidelines, forms, and protocols and has:<br><br>    Implemented an ongoing training program for the updated formulary and formulary compliance in April 2003.<br><br>    Provided policy training on videoconference pharmacy services to field medical staff in February 2004.<br><br>    Developed a lesson plan and audit tool to train pharmacy staff in pharmacy operations in May 2004.<br><br>The department reported that, in November 2003, it had implemented the Hepatitis C Clinical Management Program, which standardizes hepatitis C virus (HCV) medication management through a court-approved protocol to ensure effective and efficient application of costly HCV drug therapies. By using a scientifically based, data-driven approach to identify those individuals likely to benefit from testing and treatment, the department maintains that it has reduced the margin for unnecessary and potentially dangerous therapies, while at the same time providing quality care where such testing and treatment are appropriate.<br><br>The department reported that it initiated a pharmacist recruitment mailer program in February 2003, prepared a salary adjustment package for the appropriate control agencies in February 2004, and continues to actively recruit to fill full-time pharmacy positions. |

| | | The department reported that it began implementation of its Department of Health Services-approved medication error reduction plan on July 17, 2003 to comply with California Health and Safety Code section 1339.63, which mandates medication error reduction plans at general acute care hospitals. The plan includes processes for collecting and reviewing data on medication errors and corrective actions to eliminate or substantially reduce medication errors.

In addition, the department has reported implementation of the new clinical management software at the California Medical Facility. This Clinical Management System enables physicians to write orders on-line, monitors appropriate dosage rates, and averts duplicate therapies and potential drug reactions—resulting in more efficient patient care and fewer prescription errors. It will eventually be used by correctional institutions statewide. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Continue the project to replace the outdated and inefficient Pharmacy Prescription Tracking System with the automated Health Care Management System and implement the new system statewide as soon as practicable.**

- **In light of the flexible options likely to be available under the February 2006 federal court order appointing a receiver over the department's medical health care delivery system, reconsider the option of contracting with a private pharmacy services management firm to implement the recommendations submitted in the reports and studies conducted since 2000.**

## OFFICE OF INVESTIGATIVE SERVICES

<div style="border:1px solid; background:gray;">

### IMPLEMENTATION REPORT CARD

**Previous recommendations: 37**

**Fully implemented: 19 (52%)**

**Substantially implemented: 2 (5%)**

**Partially implemented: 8 (22%)**

**Not implemented: 6 (16%)**

**Not applicable: 2 (5%)**

</div>

**The Department of Corrections and Rehabilitation has reorganized and significantly improved its internal affairs operation since an October 2001 special review. The Office of Investigative Services—renamed the Office of Internal Affairs[1]—is now responsible for all of the department's internal affairs investigative functions. Many of the Office of the Inspector General's previous recommendations were implemented in the course of the reorganization and as a result of a federal court-ordered remedial plan. Other recommendations are no longer applicable in the wake of these changes. Yet, several deficiencies identified in the Office of the Inspector General's 2001 review remain. These include a lack of a system for prioritizing investigations; inadequate management of overtime use; inadequacies in completing background investigations of employees and borrowed investigators; inadequate control over access to the case management information system; deficiencies in evidence handling; and failure to use the department's internal audits function to help identify pervasive problems.**

In October 2001 the Office of the Inspector General issued a special review of the management practices and administrative operations of the Office of Investigative Services. At the time of the special review, the Office of Investigative Services was responsible for investigating allegations of serious employee misconduct only within the Department of Corrections. Since renamed the Office of Internal Affairs, the office is now responsible for conducting employee misconduct investigations for all entities within the new Department of Corrections and Rehabilitation. The October 2001 review, which centered on the effectiveness of the office, compliance with required procedures, and the quality of operational practices, identified numerous deficiencies that impaired the ability of the Office of Investigative Services to meet its responsibilities. In particular, the review found that a rapidly expanding caseload and deficient management practices prevented the Office of Investigative Services from completing investigations within required time limits. That deficiency limited the ability of the department to take appropriate administrative action when misconduct allegations were sustained. The Office of the Inspector General noted that some of the issues raised in the review were beyond the control of the Office of Investigative Services and required action by the Department of Corrections management.

---

[1] Depending on the context and time-frame discussed, both names — Office of Investigative Services and Office of Internal Affairs — are used in this report.

## BACKGROUND

The Office of Investigative Services was established in July 1997 by the California Department of Corrections for the purpose of investigating allegations of serious employee misconduct within the department. Until that time, local hiring authorities — prisons and parole regions — conducted most internal investigations. That arrangement raised questions from the Legislature and the public about the appropriateness of hiring authorities investigating their own employees. The Office of Investigative Services was therefore created to fulfill the following responsibilities:

- Perform fair and impartial investigations;

- Ensure the consistent application of policies and procedures throughout the Department of Corrections;

- Provide highly trained staff with specialized skills to perform administrative and criminal investigations, particularly those related to incidents involving the use of force, officer-involved shootings, and sexual assaults; and

- Provide oversight for investigations of less serious misconduct performed by the institutions.

With the July 2005 reorganization of the former Youth and Adult Correctional Agency into the newly created Department of Corrections and Rehabilitation, the Office of Investigative Services was renamed the Office of Internal Affairs and assigned responsibility for internal affairs investigative functions for all organizations inside the new department. Additional organizational and operational changes have resulted in the implementation of some of the Office of the Inspector General's October 2001 recommendations, or have altered operations so significantly that other recommendations are no longer applicable. The department has made additional changes under a remedial plan developed to address deficiencies in the employee disciplinary process identified by a U. S. District Court special master in connection with the *Madrid v. Schwarzenegger* case. The Madrid Remedial Plan presently forms the basis for significant changes affecting employee discipline in the Department of Corrections and Rehabilitation.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

The Office of the Inspector General made the following specific findings as a result of the October 2001 special review:

- The Office of Investigative Services could not effectively manage its caseload with its existing staffing levels without significant changes to its management practices.

- The management information system for the Office of Investigative Services was inaccurate and unreliable and did not contain information needed for the agency to effectively manage its resources and caseload.

- The Office of Investigative Services lacked adequate controls to prevent overtime abuse.

- Background checks of Office of Investigative Services agents were inadequate because of a departmentally imposed 11-hour limit on conducting background investigations.

- The Office of Investigative Services did not conduct background checks of staff borrowed to conduct internal affairs investigations.

- The Office of Investigative Services did not have a formalized plan for training special agents.

- The Office of Investigative Services case tracking system did not have adequate controls to prevent unauthorized access.

- The Office of Investigative Services investigations lacked sufficient documentation to show that investigations were conducted in accordance with established guidelines.

- The Office of Investigative Services did not have procedures to ensure that the regional offices processed Category II case rejections consistently and properly.

- The Office of Investigative Services was not adequately fulfilling its responsibility for overseeing Category I investigations.

- Procedures used by the Office of Investigative Services for handling evidence did not comply with regulatory requirements or the agency's own guidelines.

- The Office of Investigative Services was not in compliance with prescribed armory policies and procedures.

The Office of the Inspector General presented 37 recommendations to remedy the deficiencies identified in the October 2001 special review.

### OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the Office of Internal Affairs has implemented the 37 recommendations from the Office of the Inspector General's October 2001 special review. To conduct the follow-up review, the Office of the Inspector General provided the Office of Internal Affairs with a table listing the October 2001 findings and recommendations and requested the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the Office of Internal Affairs, and evaluated the degree of compliance or noncompliance with the recommendations. Fieldwork for the follow-up review concluded in March 2006. The results are presented in the tables following this narrative.

SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the 37 recommendations issued by the Office of the Inspector General in October 2001, 19 recommendations have been fully implemented; two have been substantially implemented; eight have been partially implemented; six have not been implemented; and two recommendations are no longer applicable.

The Office of the Inspector General found that the Office of Internal Affairs has significantly improved its investigative process. No longer are requests for investigations considered at each regional office; instead, nearly all requests are forwarded to a central intake panel for review. Before creation of the central intake panel, each of the Office of Internal Affairs regions decided which cases were accepted and which were rejected. Establishment of the central intake panel brings consistency to the decision. In another improvement, the investigative classification system, which formerly designated minor offenses as Category I investigations and allegations of serious offenses as Category II investigations, has been eliminated. Instead, cases involving minor supervisory issues requiring no additional investigation are addressed directly by the hiring authorities, while those that require investigation are conducted or closely supervised by the Office of Internal Affairs. In addition, the former case management information system has been replaced by a new system that provides not only for the tracking and monitoring of active cases, but also for tracking the entire employee discipline continuum from the request for investigation to the final hearing and disposition of action. The system is being installed at California Department of Corrections and Rehabilitation investigative offices, legal offices, and hiring authorities throughout the state.

Despite these important improvements, several deficiencies identified in the Office of the Inspector General's October 2001 special review remain. The deficiencies include the lack of a system for prioritizing investigations, inadequate management of overtime use; inadequacies in completing employee background investigations and background investigations of borrowed investigators; inadequate control over access to the case management information system; inadequate documentation of supervisory review of investigations; failure to ensure that case rejection letters are issued in a timely manner; deficiencies in policies and procedures for the handling of evidence; physical deficiencies in the evidence room; and failure to use the department's internal audits function to assist in identifying systemic and pervasive problems and in focusing resources accordingly.

FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the Office of Internal Affairs take the following additional actions:**

- **Develop policies and procedures for prioritizing investigative cases.**

- **Assign each region a monthly allocation of budgeted overtime and prepare a monthly log for each regional office that begins with monthly allotted hours and is adjusted for each usage. When overtime**

is granted, the supervisor should immediately e-mail the agent and the overtime timekeeper for the purpose of adjusting monthly balances and providing evidence of previous overtime approval. In order to provide regional supervisors flexibility in managing cases, the Office of Internal Affairs should consider rolling over unused office balances from one month to the next.

- **Reevaluate whether the proposed budget increase to 40 hours per background investigation for potential employees of the Office of Internal Affairs is justified, given that investigators are obtaining 75 percent of the required information using only 11 hours per investigation.**

- **Ensure that background investigation files contain evidence that potential employees of the Office of Internal Affairs have not been the subject of past or pending adverse actions, as mandated by California Penal Code sections 6065(b)(1) and 6126.2.**

- **Refrain from using investigative services unit investigators until their supplemental background investigations are complete.**

- **Formalize the process for verifying that case management information system access is limited to only authorized users. The process should define the frequency of reviews, require a reconciliation of beginning and ending authorized users for the period, and specify the date when users are added or deleted. Included in this process should be a requirement that an exit document be prepared by the departing staff's supervisor that instructs the information technology staff to remove the user's access.**

- **Prepare a supervisory quality control review sheet that ensures that the investigative package is complete, the investigative plan was followed, all key witnesses were interviewed, required notices were performed, and the final report represents a clear, fair, and unbiased representation of the facts.**

- **Establish procedures to ensure that case rejection letters are issued within the prescribed 10-day time-frame.**

- **Use the Department of Corrections and Rehabilitation internal audit staff to perform field audits to identify trends in complaints against staff so that resources can be focused on the most pervasive problems.**

- **Install a dedicated alarm system for the southern regional office evidence room.**

**The Office of the Inspector General also recommends that the California Department of Corrections and Rehabilitation standardize evidence policy and procedures throughout the department  and include the standards in the Office of Internal Affairs' Investigation Policy and Procedures Manual, and train staff to ensure that the policies and procedures are properly implemented and followed.**

The following table summarizes the results of the follow-up review.

## ORIGINAL FINDING NUMBER 1

**The Office of the Inspector General found that the Office of Investigative Services could not effectively manage its caseload with its existing staffing levels without significant changes in its management practices.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order for the agency/department to take appropriate administrative action when allegations are sustained and effectively fulfill its responsibilities, the Office of the Inspector General recommended that the California Department of Corrections and the Office of Investigative Services take the actions listed below. | | |
| Address the present inability of the Office of Investigative Services to fulfill its responsibilities. As part of this effort, reassess the mission and responsibilities of the Office of Investigative Services and, from that reassessment, allocate sufficient resources to the Office of Investigative Services to allow it to meet its mandate. | FULLY IMPLEMENTED | The Office of Internal Affairs reported that it has undergone several changes in leadership since the October 2001 special review and that the employee disciplinary process has been the focus of legislative hearings, audits by external parties, recommendations by the California Independent Review Panel, and scrutiny by the U. S. District Court special master. To respond to the deficiencies reported by these entities, the department was required by the federal court to develop a corrective action plan, known as the "Madrid Remedial Plan" to rectify problems in the department's disciplinary continuum – including the investigative process. The Office of the Inspector General's recommendation to reassess the mission and responsibilities of the Office of Internal Affairs is incorporated in the Madrid Remedial Plan. Many of the Madrid Remedial Plan objectives provide for the reassessment of the roles and responsibilities of the Office of Internal Affairs and for specific processes by which to meet those objectives.<br><br>To fulfill its revised mission, the Office of Internal Affairs hired seven additional special agents, two information technology employees, and two office technicians. It also reported that a budget change proposal was submitted for fiscal year 2006-07 to align staffing levels with proposed structural and functional changes resulting from the California Department of Corrections and Rehabilitation's reorganization plan and consolidation of investigative functions. |

| | | The Office of the Inspector General reviewed the remedial plan and concluded that the department has initiated a significant reassessment of the Office of Internal Affairs. |
|---|---|---|
| Review the Office of Investigative Services' organizational structure and administrative processes to ensure standardization in the operation of the regional offices. As a part of the process, develop a formalized system for prioritizing cases. | SUBSTANTIALLY IMPLEMENTED | The Office of Internal Affairs reported that it has established a central intake process that alleviates the former disparities among accepted and rejected cases when the regional offices acted autonomously in vetting investigation requests. The new system also ensures consistency in the type and severity of allegations accepted for investigation and ensures the sufficiency of the evidence used to determine whether or not to proceed.<br><br>The Office of Internal Affairs also reported that its new case management system promotes case prioritization by including a classification field that identifies a case as "high" or "normal" priority. The case management system also allows case activity to be monitored by Office of Internal Affairs administrators in headquarters and identifies specific categories of cases for monitoring. Implementation of the new case management system also contributes to the standardization of operations throughout the regional offices.<br><br>The Office of the Inspector General noted that while the new case management system allows for case prioritization, and the central intake process has improved the organizational structure, the Office of Internal Affairs has not developed policies and procedures to provide for consistency in the prioritization process. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Office of Internal Affairs develop policies and procedures for prioritizing investigative cases.**

**ORIGINAL FINDING NUMBER 2**
**The Office of the Inspector General found that the management information system of the Office of Investigative Services was inaccurate and unreliable and did not contain the information needed for the agency to effectively manage its resources and caseload.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| In order to ensure that the system fully meets management information needs and department requirements, the Office of the Inspector General recommended that the Office of Investigative Services, in concert with the Information Systems Division, review and modify the case-tracking system. The recommendation specified that if system modification was not feasible, the Office of Investigative Services should replace the system. | FULLY IMPLEMENTED | The Office of Internal Affairs reported and the Office of the Inspector General verified that, as of July 2004, the Office of Internal Affairs had implemented a new case management system in each of its regional offices, headquarters, and various institutions. Implementation of the case management system will provide needed information for all stakeholders in the employee disciplinary process to facilitate tracking of cases from start to finish. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 3**

**The Office of the Inspector General found that the Office of Investigative Services lacked adequate controls to prevent overtime abuse.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| In order to prevent overtime abuse, the Office of the Inspector General recommended that the Office of Investigative Services implement appropriate control measures governing overtime payments. The process should require prior authorization of overtime, supervisor approval before payment, and management oversight through review of payment trends and patterns. Management should also investigate discrepancies and take appropriate action to rectify problems. | PARTIALLY IMPLEMENTED | According to the Office of Internal Affairs, overtime is approved by supervisors in the regional offices. The Office of the Inspector General confirmed that these approvals are largely in place, but the approvals are granted and documented after the overtime is incurred. The Office of the Inspector General also observed a variety of processes for authorizing overtime at the various regional offices. For example, one regional office used standard state overtime authorization forms and maintained the highest level of compliance of all regions — 43 percent.  Another regional office, where none of the overtime hours met the "prior authorization standard," used the employee timesheet for overtime authorization.

Oversight monitoring at regional offices also varied.  One regional office |

|  |  | prepared a monthly tracking schedule that allocated 100 hours of overtime for the entire office, with the 100 hours based upon earlier budget-based overtime estimates. The tracking log was adjusted for overtime incurred and provided a method for monitoring overtime on a daily basis.  No other regional office used such a tool.

In lieu of individual regional offices reporting monthly overtime, the budget officer monitors monthly overtime reports prepared by the California Department of Corrections and Rehabilitation personnel office. Any unusual trends or usages are reported to Office of Internal Affairs management. This provides for centralized oversight of overtime usage. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Office of Internal Affairs assign each region a monthly allocation of budgeted overtime and prepare a monthly log for each regional office that begins with monthly allotted hours and is adjusted for each usage. When overtime is granted, the supervisor should immediately e-mail the agent and the overtime timekeeper for the purpose of adjusting monthly balances and providing evidence of previous overtime approval. In order to provide regional supervisors flexibility in managing cases, the Office of Internal Affairs should consider rolling over unused office balances from one month to the next.**


**ORIGINAL FINDING NUMBER 4**

**The Office of the Inspector General found that background checks of Office of Investigative Services agents were inadequate because of a departmentally imposed 11-hour limit on conducting background investigations.**


| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
| --- | --- | --- |
| In order to improve the quality of the background checks, the Office of the Inspector General recommended that the California Department of Corrections take the actions listed below. |  |  |

| | | |
|---|---|---|
| Remove the 11-hour limit on performing background investigations. | NOT IMPLEMENTED | According to the Office of Internal Affairs, the Department of Corrections and Rehabilitation is considering preparing a budget change proposal to increase the background investigation time-frame to 40 hours for all peace officer staff; but no increase in the allotted time for background checks has been implemented.<br><br>The Office of the Inspector General's testing of background investigations concluded that 75 percent of the required investigation elements were fulfilled within the 11-hour budget. Consequently, the Office of Internal Affairs should be able to conduct complete and thorough background investigations with budgets of between 11 and 40 hours per candidate. |
| Require background investigations to be conducted in accordance with Commission on Peace Officer Standards and Training guidelines. | SUBSTANTIALLY IMPLEMENTED | The Office of Internal Affairs reported that to the extent possible within the 11 hour limit, the background investigations are conducted in accordance with the guidelines set by the Commission on Peace Officer Standards and Training. If funding for this activity is provided in the future, the department will be able to spend 40 hours for each background investigation, increasing compliance with the guidelines.<br><br>The Office of the Inspector General reviewed the six most recent background investigations for Office of Internal Affairs hires and found deficiencies similar to those reported in the 2001 special review. The investigations reviewed still failed to include credit checks and face-to-face contacts with personal references, neighbors, or landlords. Despite those deficiencies, however, two background investigations contained 95 percent of the investigative elements required by the Commission on Peace Officer Standards and Training guidelines. The six background investigations collectively contained 75 percent of the applicable elements from the Commission on Peace Officer Standards and Training guidelines. Improvements were noted in preparation of background reports and evidence of medical and psychological examinations. |

| | | |
|---|---|---|
| Require background investigation files to contain evidence to verify that candidates have not been the subject of past or pending serious adverse actions as mandated by California Penal Code sections 6065(b)(1) and 6126.2. | **PARTIALLY IMPLEMENTED** | Review by the Office of the Inspector General of hiring packages for six recent special agent hires determined that four files did not contain evidence of testing for compliance with California Penal Code section 6126.2 and that three files lacked evidence of testing for compliance with California Penal Code section 6065(a)(1).  California Penal Code section 6126.2 prohibits the hiring of any internal affairs investigator candidate who is indirectly or directly involved in an open internal affairs investigation, and California Penal Code section 6065 (a) (1) prohibits the hiring of an internal affairs investigator candidate who has ever had allegations sustained pertaining to a serious disciplinary action. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Office of Internal Affairs take the following additional actions:**

- **Reevaluate whether the proposed budget increase to 40 hours per background investigation for potential employees of the Office of Internal Affairs is justified, given that investigators are obtaining 75 percent of the required information using only 11 hours per investigation.**

- **Ensure that background investigation files contain evidence that potential employees of the Office of Internal Affairs have not been the subject of past or pending adverse actions, as mandated by California Penal Code sections 6065(b)(1) and 6126.2.**

**ORIGINAL FINDING NUMBER 5**

**The Office of the Inspector General found that the Office of Investigative Services did not conduct background checks of staff borrowed to conduct internal affairs investigations.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| To comply with statutory requirements and improve the integrity of investigations, the Office of the Inspector General recommended that the California Department of Corrections conduct background checks on employees borrowed to conduct internal affairs investigations. The recommendation noted that because of the time and cost associated with background investigations, the Office of Investigative Services could identify a pool of employees borrowed for internal affairs investigations and perform background checks for those employees. | NOT IMPLEMENTED | In July 2005, the Office of Internal Affairs reported that the recommendation is no longer applicable because it no longer uses borrowed staff to perform internal affairs investigations.<br><br>The Office of the Inspector General determined, however, that in September 2005, the Office of Internal Affairs began delegating case assignments to prison investigative services units. Of 10 investigative services unit investigators reviewed by the Office of the Inspector General, none had had a supplemental background investigation completed, although nine were reportedly in the process of receiving such an investigation. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Office of Internal Affairs refrain from using investigative services unit investigators until their supplemental background investigations are complete.**

**ORIGINAL FINDING NUMBER 6**

**The Office of the Inspector General found that the Office of Investigative Services did not have a formalized plan for training special agents or sufficient means to monitor and track the training progress of special agents to ensure compliance with prescribed training policies.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order to improve the training program for Office of Investigative Services special agents and ensure compliance with prescribed training policies, the Office of the Inspector General recommended that the California Department of Corrections and the Office of Investigative Services take the actions listed below. | | |

| Allow the Office of Investigative Services to develop and manage its own training budget. | FULLY IMPLEMENTED | According to the California Department of Corrections and Rehabilitation, the Office of Internal Affairs now has its own training budget. The Budget Management Branch reported that the training budget for the Office of Internal Affairs in fiscal year 2005-06 totaled $84,573.<br><br>The Office of the Inspector General confirmed that the Office of Internal Affairs now maintains it own training budget. |
|---|---|---|
| Allow Office of Investigative Services staff members to comply with the 40-hour training requirement on a calendar year or fiscal year basis instead of basing compliance on each staff member's performance appraisal period. | NOT APPLICABLE | The Office of Internal Affairs reported that although it may seem easier to track employee training on a calendar year basis, the *California Department of Corrections and Rehabilitation Operations Manual* requires that training plans be created and updated during an employee's annual appraisal period, which coincides with the employee's birthday. The Office of Internal Affairs reported that further discussion is planned to determine whether the policy should be changed or an exception provided for Office of Internal Affairs employees. Upon further review, the Office of the Inspector General concluded that the training review cycle based on the employee's birth date is adequate. |
| Establish minimum training requirements for each job classification to ensure that employees possess the minimum skills needed to perform assigned duties and to ensure comparability in the proficiency of staff members among various offices. | FULLY IMPLEMENTED | The Office of Internal Affairs issued a memorandum in November 2001 that outlines the recommended training requirements for sworn and non-sworn staff and prescribes the frequencies with which courses must be repeated. The Office of Internal Affairs management also developed a training program in accordance with the Madrid Remedial Plan.<br><br>The Office of the Inspector General reviewed the draft training plan submitted to the federal court in October 2005 and noted that it provides detailed training requirements by classification, time-frames for completion of training, and an organizational structure to monitor and direct training requirements. |
| Prepare an annual training plan that identifies and summarizes training needs by employee, office, and topical area. | FULLY IMPLEMENTED | As part of the Madrid Remedial Plan, the Office of Internal Affairs has completed a training assessment to align its training with the "industry standard." The training plan was completed and submitted to the federal court in October 2005. |
| Establish a separate training database for Office of Investigative Services staff members | FULLY IMPLEMENTED | According to the Office of Internal Affairs, each regional office implemented a staff training database in January 2002. The Office of the Inspector General |

| | | |
|---|---|---|
| and maintain the training database at the Office of Investigative Services headquarters. | | confirmed that each regional office maintains a training database and that these databases can be merged at Office of Internal Affairs headquarters as needed. In accordance with the proposed training plan, the Office of Internal Affairs will select a training advisory committee, a training manager, and regional training coordinators. The regional coordinators maintain training records and are responsible for ensuring that training mandates are fulfilled at the local level. Each year regional coordinators will prepare a training needs assessment for development of the annual training plan. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 7**

**The Office of the Inspector General found that the internal affairs case tracking system did not have adequate controls to prevent unauthorized access.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order to reduce the inherent risk associated with unauthorized access and improve controls over access to the internal affairs case tracking system, the Office of the Inspector General recommended that the California Department of Corrections and the Office of Investigative Services take the actions listed below. | | |
| Purge log-on identifications for employees no longer working for the Office of Investigative Services or not otherwise required to have access to the office network and systems. Once the system is purged of unauthorized log-on identifications, the office should formalize a process for purging log-on identifications as | PARTIALLY IMPLEMENTED | According to the Office of Internal Affairs, log-on identifications were purged in response to the Office of the Inspector General's report. The Office of Internal Affairs also reported that when employees leave the Office of Internal Affairs, their network accounts are deleted. Yet the Office of Internal Affairs does not have a formalized process for the elimination of unauthorized users. In particular, there is no checkout process to eliminate system user identifications when an employee departs the Office of Internal Affairs. Instead the network |

| | | |
|---|---|---|
| part of the standard separation process when employees leave. | | administrators access the user list as part of their daily activities, and in so doing, according to the Office of Internal Affairs, would recognize the name of an unauthorized user. The process assumes that the system administrator is immediately aware of any employees, including regional staff, who leave Office of Internal Affairs. It was the failure to remove former staff members from user lists that resulted in the initial finding and recommendation. Because the process is not formalized, the potential for failures continues. |
| Require the Office of Investigative Services system administrator to meet monthly or quarterly with the network manager from the Information Services Division to reconcile the list of authorized users maintained by the Information Services Division to the list of authorized users maintained by the Office of Investigative Services. | PARTIALLY IMPLEMENTED | While the case information system has changed since the 2001 recommendation, the need for reconciliation of authorized users still exists. The Office of Internal Affairs reported in July 2004 that the system administrator was working with the network management team for the Information Systems Division to develop a quarterly reconciliation process for all authorized users. The first reconciliation was anticipated to be complete by September 30, 2004. The Office of Internal Affairs reported, however, that the Information Services Division had not prepared a listing of authorized users by July 2004 and that, consequently, the Office of Internal Affairs had not completed a user reconciliation. In January 2006, the Office of Internal Affairs claimed that audits of users accessing their domain, servers, and computers were conducted several times a month. A log of monthly reconciliations provided by the Office of Internal Affairs dated back to September 2005. The Office of the Inspector General learned, however, that staff from the Department of Corrections and Rehabilitation's Information Services Division monitors user accounts that have no activity and coordinate with the Office of Internal Affairs only when unusual activity is observed.<br><br>In summary, the Office of Internal Affairs took no action to implement the Office of the Inspector General's recommendation to conduct access reconciliations until four years had passed. Furthermore, the Office of Internal Affairs still has no formal policy specifying frequency, procedures, or reporting to keep unauthorized users from accessing confidential information assets. |
| Require separate passwords for the network and the case tracking system. | FULLY IMPLEMENTED | Since the October 2001 special review, the Office of Internal Affairs has undergone numerous changes and revisions to its case management systems and |

| | | in security measures to protect information assets. Initially the Office of Internal Affairs disagreed with the recommendation, stating that Microsoft did not recommend dual passwords (one for the network and another for the case management system) for its Windows authentication software. As technology, computer security software and the complexity of the case management system evolved, however, the Office of Internal Affairs chose to abandon Microsoft Windows authentication software for SQL authentication software.  With the deployment of SQL authentication software, the dual password format is now in place. |
|---|---|---|
| Establish expiration dates for both network and case tracking system passwords. | **FULLY IMPLEMENTED** | According to the Office of Internal Affairs, its network now requires staff to change computer passwords on a quarterly basis. |
| Retain at least a 30-day history of user access to the system. | **FULLY IMPLEMENTED** | With the implementation of the new case management system, the Office of Investigative Service now has the capability of permanently tracking and archiving all users who access the system. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Office of Internal Affairs formalize the process for verifying that case management information system access is limited to only authorized users. The process should define the frequency of reviews, require a reconciliation of beginning and ending authorized users for the period, and specify the date when users are added or deleted.  Included in this process should be a requirement that an exit document be prepared by the departing staff's supervisor that instructs the information technology staff to remove the user's access.**

**ORIGINAL FINDING NUMBER 8**

**The Office of the Inspector General found that a significant number of investigation files lack sufficient documentation to show that the investigation was conducted in accordance with established guidelines.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| In order to ensure uniformity in the maintenance and documentation of | **PARTIALLY IMPLEMENTED** | The Office of Internal Affairs reported it did not conclude that a checklist is the best method to ensure that investigations are conducted in accordance with |

| | | |
|---|---|---|
| investigative case files, the Office of the Inspector General recommended that the Office of Investigative Services establish a managerial review checklist. The recommendation specified that the checklist should be signed and dated by the senior special agent responsible for reviewing the case files. | | established guidelines and instead will develop a policy and procedure manual and an investigator's manual and review adherence to these standard practices.<br><br>The Office of the Inspector General disagrees with that position. While a policy and procedure manual and supervisory review are important, a methodical and carefully prepared quality control guide for case file reviews would provide a helpful tool for the reviewer, thus ensuring a level of consistency among all investigation files. Further, a checklist would create a record that the case file was reviewed for key attributes required by the policy and procedure manual.<br><br>A review by the Office of the Inspector General of case files in the Office of Internal Affairs southern region office determined that a checklist is being used in that office. The checklist delineates standard investigative documents with a date completed and a line for agent initials. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Office of Internal Affairs prepare a supervisory quality control review sheet that ensures that the investigative package is complete, the investigative plan was followed, all witnesses were interviewed, required notices were performed, and the final report represents a clear, fair, and unbiased representation of the facts.**

**ORIGINAL FINDING NUMBER 9**

**The Office of the Inspector General found that the Office of Investigative Services did not have procedures in place to ensure that the regional offices process Category II case rejections consistently and properly.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order to ensure consistency in accepting and rejecting Category II cases and to improve the processing of Category II investigation requests, the Office of the Inspector General recommended that the California Department of Corrections and the Office of Investigative | | |

| | | |
|---|---|---|
| Services take the actions listed below. | | |
| Amend the *California Department of Corrections Operations Manual* to provide for centralized review and acceptance or rejection of investigation requests. | **FULLY IMPLEMENTED** | The Department of Corrections and Rehabilitation has instituted a central intake process in which all requests for investigations are directed to the Office of Internal Affairs headquarters and presented before a panel of agents, attorneys, management representatives, and the Office of the Inspector General's Bureau of Independent Review. |
| Adopt a policy and procedures for assigning priority for case acceptance or rejection. | **PARTIALLY IMPLEMENTED** | The new case management system does provide for identifying cases as "normal" or "high" priority once the case is accepted by central intake. The criteria for determining priority include whether a subject is on administrative time off, the subject is high profile, or the statute completion time-frame is short. The case management system allows monitoring of high priority cases through specialized management reports. The Office of the Inspector General notes, however, that while the Office of Internal Affairs has developed a case management system that allows for prioritizing cases, it has not developed policies and procedures to provide for consistency in the prioritization process. |
| Provide refresher training for special agents in-charge and senior special agents on the definitions of Category I and Category II misconduct. | **NOT APPLICABLE** | The Office of Internal Affairs has eliminated the Category I and Category II case distinctions. Consequently, the recommendation no longer is relevant. All requests for investigations are handled through the central intake process, which provides a thorough assessment of the allegations and specific violations of policy or law. Because the process eliminated the subjectivity of Category I and II determination, the need for definition training is no longer applicable. |
| Establish procedures to ensure that case rejection letters are issued within the prescribed 10-day timeframe. | **NOT IMPLEMENTED** | According to the Office of Internal Affair, no procedures have been implemented that would ensure compliance with the California *Department of Corrections and Rehabilitation Operations Manual* required 10-day time-frame. Rather, the Office of Internal Affairs will consider adding audit procedures to periodically monitor compliance.<br><br>The Office of the Inspector General conducted a test of the turn-around time-frames for 36 rejection letter and found that 47 percent of the responses did not meet the 10-day criterion. The late rejection letters averaged 19 days between receipt and response. |

| | | |
|---|---|---|
| Implement a review process providing for independent review of the rejection letters to ensure that the letters adequately explain why the case was rejected. | **FULLY IMPLEMENTED** | The Office of the Inspector General reviewed nine rejection memoranda and found they were thorough in presenting specific details about the reasons the case was rejected.  Rejection letters are now prepared by the central intake unit — a change that contributes to a more consistent level of detail in the rejection letters. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Office of Internal Affairs establish procedures to ensure that case rejection letters are issued within the prescribed 10-day time-frame.**

**ORIGINAL FINDING NUMBER 10**

**The Office of the Inspector General found that the Office of Investigative Services was not adequately fulfilling its responsibility for overseeing Category I investigations.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order to effectively oversee Category I investigations, the Office of the Inspector General recommended that the Office of Investigative Services take the actions listed below. | | |
| Perform an analysis of the workload and resources necessary to implement an effective tracking system, perform data analysis, and conduct audits of the Category I investigations. The office should also develop a work plan to identify the initial objectives and timelines for implementing a legitimate oversight process. | **FULLY IMPLEMENTED** | The Office of Internal Affairs no longer classifies investigations as Category I and Category II. All requests for investigations are reviewed by a panel in the central intake unit at the Office of Internal Affairs headquarters. Accepted requests are assigned to an Office of Internal Affairs regional office. As with the former Category I cases, the regional office can assign investigations to an Office of Internal Affairs special agent or delegate them to an institution's investigative services unit. Cases assigned to the institution's investigative services unit are supervised by a senior special agent at the Office of Internal Affairs and are monitored on the new case management system. |

| | | The case management system also provides a periodic case aging report that allows the senior special agent to monitor the age of a case. This feature prevents cases from exceeding statutory completion time-frames without sufficient warning to management. |
|---|---|---|
| If additional resources cannot be obtained, the Office of Investigative Services should use the information developed to determine the best way to provide at least minimal oversight of Category I investigations using existing resources. Potential improvements include the following: | **FULLY IMPLEMENTED** | The Office of Internal Affairs has obtained additional manpower and electronic data processing resources. The new case management system is a database system that provides a single source for monitoring requests for investigations, investigations, and employee disciplinary actions. The system incorporates hiring authorities, employee relations officers, institutional investigative services units, the Office of Internal Affairs, legal affairs staff, and the Office of the Inspector General's Bureau of Independent Review. |
| Develop an improved management information system to track and monitor investigations and identify trends so as to focus resources on the most pervasive problems. | **FULLY IMPLEMENTED** | The case management system classifies approximately 43 different types of offenses for the purpose of stratifying and trending allegations. The system can sort by allegation, providing such information as the case region, institution, subject, statutory completion date, and case conclusion. As of February 2006, all requests for investigation and all direct employee actions for the California Department of Corrections and Rehabilitation are reviewed by the central intake panel. These requests are posted into the case management system, which provides a mechanism for monitoring the decisions to investigate allegations or to proceed with direct corrective or adverse actions. All hiring authorities post their activities to the case management system, which allows for proper monitoring of employee actions imposed. |
| Centralize the oversight function and redirect staff to perform oversight. | **FULLY IMPLEMENTED** | According to the Office of Internal Affairs, the case management system will be expanded to all California Department of Corrections and Rehabilitation hiring authorities to provide proper monitoring of investigations and employee disciplinary processes. |
| Perform reviews on a sample basis. Perform both desk reviews and field reviews. | **FULLY IMPLEMENTED** | The Office of Internal Affairs reported that it established an administrative support unit to help monitor and track investigations and identify trends. The administrative support unit will also develop a self-audit process and perform reviews. |
| Use Department of Corrections internal audit | **NOT** | The Office of Internal Affairs reported that it will consider using the |

| | | |
|---|---|---|
| staff to perform field audits. | IMPLEMENTED | department's internal audit staff in conjunction with the reorganization proposed by the Corrections Independent Review Panel to evaluate the merits of this recommendation. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Office of Internal Affairs Use the Department of Corrections and Rehabilitation internal audit staff to perform field audits to identify trends in complaints against staff so that resources can be focused on the most pervasive problems.**

**ORIGINAL FINDING NUMBER 11**

**The Office of the Inspector General found that the procedures used by the Office of Investigative Services for handling evidence did not comply with regulatory requirements or the agency's own guidelines.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| In order to ensure compliance with regulatory and agency requirements, the Office of the Inspector General recommended that the Office of Investigative Services, at a minimum take the actions listed below. | | |
| Provide training to all staff on general evidence-handling policies and procedures. | NOT IMPLEMENTED | In response to this recommendation, the Office of Internal Affairs reported that the evidence handling problem identified by the Office of the Inspector General was isolated at one regional office and was rectified immediately. The Office of Internal Affairs also reported that as part of the Madrid Remedial Plan, it would rewrite the Policy and Procedures Manual and Investigator's Guide (tasks 2.5.2 and 2.5.3), which will also clarify evidence handling policies and procedures. A review by the Office of the Inspector General of the original policy and procedures manual, however, failed to identify any reference to evidence handling. Furthermore, the proposed training plan drafted for the U. S. District Court failed to cite any courses specifically addressing evidence handling. A |

| | | review of numerous staff in-service training reports from all regional offices revealed that 24 special agents at one regional office received preservation of evidence training consisting of a 30-minute in-house training session. |
|---|---|---|
| Provide specialized training for evidence custodians and alternates. | NOT IMPLEMENTED | The Office of the Inspector General reviewed the training records of the evidence officers for the office referred to in the Office of Internal Affairs' response, the southern regional office. While these special agents participated in training for some general investigation topics, the Office of the Inspector General could not locate training records that satisfy the recommendation for specialized training for evidence custodians and alternates. Furthermore, documents show that repeated requests for formal evidence handling training dating back to 1999 have been denied. |
| Make physical modifications, as necessary, to the regional evidence rooms to ensure that they meet all requirements. | PARTIALLY IMPLEMENTED | The Office of Internal Affairs stated that the evidence handling procedures were isolated to one regional office and were rectified. The Office of the Inspector General confirmed that, while some minor physical modifications were made, the southern regional office has not installed an alarm system dedicated to the evidence room. |
| Re-key evidence rooms to limit access to the evidence custodian, the alternate, and the regional special agent-in-charge. | FULLY IMPLEMENTED | The Office of Internal Affairs reported, and the Office of the Inspector General confirmed, that the deficiency reported existed in only one regional office and was corrected at that location. |
| Use bound evidence logs that provide space for all mandatory information. | FULLY IMPLEMENTED | The Office of Internal Affairs reported, and the Office of the Inspector General confirmed, that the deficiency reported existed in only one regional office and was corrected at that location. |
| Perform periodic audits at each of the regions to ensure compliance with policies and procedures. | PARTIALLY IMPLEMENTED | The Office of Internal Affairs had not conducted any internal audits at the time the Office of the Inspector General conducted its fieldwork, but had assembled a self-audit program. This recommendation has also been incorporated into the federal court remedial plan. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation standardize evidence policy and procedures throughout the department  and include the standards in the Office of Internal Affairs' Investigation Policy and Procedures Manual, and train staff to ensure that the policies and procedures are properly implemented and followed.**

**The Office of the Inspector General also recommends that the Office of Internal Affairs install a dedicated alarm system for southern regional office evidence room.**

**ORIGINAL FINDING NUMBER 12**

**The Office of the Inspector General found that the Office of Investigative Services was not in compliance with prescribed armory policies and procedures.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| In order to ensure compliance with armory policies and procedures, the Office of the Inspector General recommended that the Office of Investigative Services review the operations of the armories at all of its regional offices and address all areas of non-compliance, including those related to physical design, fire safety, and record maintenance and retention. | FULLY IMPLEMENTED | The Office of the Inspector General conducted a follow-up site review of the regional office that was responsible for the October 2001 finding and found that the areas of non-compliance previously identified have been corrected. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

## EMPLOYEE DISCIPLINARY PROCESS

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has improved its employee disciplinary process and has fully or substantially implemented all previous recommendations.**

| IMPLEMENTATION REPORT CARD |
| --- |
| Previous recommendations: 9 |
| Fully implemented: 6 (67 %) |
| Substantially implemented: 3 (33%) |
| Partially implemented: 0 (0%) |
| Not implemented: 0 (0%) |
| Not applicable: 0 (0%) |

In March 2002, the Office of the Inspector General conducted a review of the Department of Corrections employee disciplinary process. The purpose of the review was to identify any administrative or procedural weaknesses in the disciplinary process that might affect the department's ability to take appropriate adverse action against employees found to have engaged in misconduct. The review found a number of systemic deficiencies in the department's disciplinary process that jeopardized the department's ability to administer appropriate adverse action against peace officers within the one-year statutory deadline.

### BACKGROUND

The Department of Corrections and Rehabilitation employs a workforce of approximately 50,000 to fulfill its responsibility for more than 165,000 state prison inmates and 114,000 parolees. Ensuring appropriate conduct of employees and taking disciplinary action against those found to have engaged in misconduct is one of the department's essential functions.

The department's employee disciplinary process has been the subject of a lawsuit, *Madrid v. Woodford,* and as a result, a special master appointed by the U. S. District Court, Northern District of California has been monitoring efforts to reform the disciplinary process through the Madrid Remedial Plan. Many of the plan's provisions are consistent with the Office of the Inspector General's March 2002 recommendations.

### SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

As a result of the March 2002 review, the Office of the Inspector General made the following specific findings:

- The needless complexity of the employee disciplinary process caused delays that impaired the ability of the Department of Corrections to take appropriate action against employees found to have engaged in misconduct.

- Forty-three percent of a sample of investigations completed during fiscal years 1999-2000 and 2000-01 in which misconduct allegations were sustained were not completed within one year and therefore did not result in disciplinary action.

- There were no clear guidelines for defining the prescribed one-year period for investigating alleged misconduct and imposing disciplinary action against peace officers or for identifying the required 30-day notification period.

- Employee relations officers at institutions did not receive adequate training and often lacked the experience necessary to properly handle employee disciplinary actions.

- Most of the employee disciplinary actions proceeded all the way through settlement and hearing before the State Personnel Board without advice or assistance from the department's legal staff.

- There were no established policies or procedures governing settlement of employee disciplinary actions and the department had no means of monitoring or evaluating the settlement process.

The Office of the Inspector General issued nine recommendations as a result of the March 2002 review.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the California Department of Corrections has implemented the nine recommendations from the Office of the Inspector General's March 2002 review of the employee disciplinary process. To conduct the follow-up review, the Office of the Inspector General provided the Department of Corrections and Rehabilitation with a table listing the March 2002 findings and recommendations and asked the department to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the department, and evaluated the degree of compliance or noncompliance with the recommendations. Review fieldwork was completed on January 30, 2006. The results are summarized in the table that follows this section.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the nine recommendations issued by the Office of the Inspector General in March 2002 concerning the employee disciplinary process, six recommendations have been fully implemented and three have been substantially implemented.

The Office of the Inspector General found that the Department of Corrections and Rehabilitation has significantly improved its administration of the employee disciplinary process. The department has developed a case management system to monitor and track disciplinary cases from start to finish to ensure that cases meet statutory deadlines. It has also implemented a new central intake process that provides for representatives from the Office of Internal Affairs, Office of Legal Affairs, and other department staff to review requests for investigations and determine appropriate action. The Office of the Inspector General's Bureau of Independent Review monitors the central intake and internal affairs process and also monitors the investigations. The department has also updated its policies and procedures for employee discipline and has provided formal training to its employee

relations officers statewide. As a result of these and other changes, only two percent of 94 investigations with sustained findings conducted by the Office of Internal Affairs in the period December 1, 2004 through May 31, 2005 exceeded the one-year statutory limit. The Office of the Inspector General makes no follow-up recommendations.

## Original Finding Number 1

**The Office of the Inspector General found that the needless complexity of the employee disciplinary process caused delays that impaired the ability of the Department of Corrections to take appropriate action against employees found to have engaged in misconduct.**

| Original Recommendations | Status | Comments |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections establish a centralized system to monitor and track the status of employee disciplinary cases. The Office of the Inspector General recommended that the department consider modifying either the personnel operations information management system or the Employment Law Unit information management system to include this tracking capability and that the system include an early warning mechanism for cases in danger of exceeding statutory time limits. | Substantially Implemented | The California Department of Corrections and Rehabilitation has developed a centralized case management system that monitors and tracks the status of employee disciplinary cases. When the system is fully implemented, it will incorporate information from the information management systems of both the Employment Law Unit and department personnel operations. The system will include an early warning mechanism for cases in danger of exceeding statutory time limits. <br><br> Most of the department's hiring authorities, including the Office of Internal Affairs and the Employment Advocacy and Prosecution Team, now have access to the case management system. Efforts to give all hiring authorities access are continuing. Under the Madrid Remedial Plan, full rollout of the case management system is scheduled for June 2006. <br><br> The Office of the Inspector General reviewed the timeliness of investigations conducted by the Office of Internal Affairs for the period December 1, 2004 through May 31, 2005 and found that only two (2 percent) of the 94 sustained cases reviewed exceeded the one-year statute, preventing the hiring authority from taking disciplinary action against the employee. By comparison, the original Office of the Inspector General review found 43 percent of the sustained cases reviewed exceeded the one-year statute. |

## Follow-up Recommendations

**None.**

## ORIGINAL FINDING NUMBER 2

**The Office of the Inspector General found that the California Department of Corrections had no clear guidelines for defining the prescribed one-year period for investigating alleged misconduct and imposing disciplinary action against peace officers or for identifying the required 30-day notification period.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections issue clear guidelines defining what constitutes the date of discovery, who is "authorized to initiate an investigation," and the date the department makes its decision to impose discipline. | SUBSTANTIALLY IMPLEMENTED | *The Department of Corrections and Rehabilitation Operations Manual,* section 3, article 22, covering employee discipline, has been revised and was accepted by the federal district court on December 22, 2005. Article 22 outlines sections relating to employee misconduct investigations and employee discipline.<br><br>The department has implemented a central intake process that includes representatives from the Office of the Inspector General's Bureau of Independent Review and the department's Legal Affairs Division and Office of Internal Affairs to review requests for investigations and determine whether to authorize internal affairs investigations. More than half of the department's hiring authorities use the central intake process, and the department achieved statewide implementation on January 30, 2006. Auditors from the Office of the Inspector General observed and participated in the central intake process during the follow-up review. Under the new process, central intake examines requests for investigations and reviews the supporting documentation provided by the requestor. Central intake then either accepts the request as an internal affairs investigation or returns the request for direct disciplinary or corrective action at the hiring authority level. Central intake can also return the request if it identifies no misconduct. The process allows the department to concentrate investigative resources on cases that have merit while requiring the hiring authorities to take direct corrective action in matters that do not warrant a formal investigation.<br><br>According to the department, specific guidelines governing the date of discovery and internal affairs investigations will be included in the *Department of Corrections and Rehabilitation Operations Manual,* article 14 – *Employee Misconduct Investigations/Inquiries.* Revisions to article 14 have been completed and are part of the Madrid Remedial Plan. The department consulted with the |

| | | Office of the Inspector General Bureau of Independent Review to develop the following mutually agreed-upon definition of investigatory timeframes: "The CDC shall normally conclude all of its investigations of peace officer misconduct and provide notice of its proposed disciplinary action within one year. This time period shall begin on the date that an uninvolved supervisor learns facts, which if true, would constitute employee misconduct." At the end of the fieldwork, October 18, 2005, the Department of Corrections and Rehabilitation had received an extension from the court to have article 14 completed by December 9, 2005. |

**FOLLOW-UP RECOMMENDATIONS**

None.

**ORIGINAL FINDING NUMBER 3**

**The Office of the Inspector General found that employee relations officers at institutions did not receive adequate training and often lacked the experience necessary to properly handle employee disciplinary actions.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections establish a formalized training program for employee relations officers at the institutions. | FULLY IMPLEMENTED | The Department of Corrections and Rehabilitation has developed a formalized training program for employee relations officers that consists of fourteen lesson plans covering the following topics:<br><br>Overview of employee relations officer advocacy curriculum<br>Analysis of investigations<br>Drafting adverse actions<br>Rejection during probation and non-punitive actions<br>Serving adverse actions<br>*Skelly* hearings and due process<br>Settlements<br>Administrative time off<br>Subpoenas and witness preparation<br>Evidence<br>Order of evidence at SPB hearings, discovery, and pre-hearing motions<br>Examination of witnesses<br>Argument |

| | | |
|---|---|---|
| | | Case preparation<br><br>The Office of the Inspector General reviewed training records and confirmed that as of July 27, 2005, 54 employees had completed formal training. The total included at least one employee from each of the 33 institutions, one from each of the four parole regions, and seven from the central office. The department reported it will continue to provide formal training to ensure that newly hired employee relations officers receive the required training. The department is also developing a computer-based training program for employee relations officers and anticipates the new training to be available to employees by April 2006. The Office of Internal Affairs, the Employment Advocacy and Prosecution Team, and the Bureau of Independent Review also provided training to employee relations officers and investigative services unit staff in September and October 2005. The training covered the following topics:<br><br>    New central intake process<br>    Investigator training plans<br>    Providing assistance to outside agencies<br>    Peace Officers Bill of Rights<br>    Overview of the Bureau of Independent Review<br>    Overview of the vertical advocate program<br>    Investigative review and initiation of discipline<br>    Hiring authority review of investigation<br>    Justification of penalty |
| The Office of the Inspector General recommended that the department convert the employee relations officer positions from temporary training assignments to permanent positions. | SUBSTANTIALLY IMPLEMENTED | The Department of Corrections and Rehabilitation received approval through the budget process to establish 20 correctional sergeant positions for four-year rotations as disciplinary officers (formerly referred to as employee relations officers). The department reported to the court monitor in October 2005, however, that it had reached agreement with the Department of Personnel Administration to use the staff services manager I classification for the disciplinary officer positions in order to establish permanent assignments. The department informed the court it may continue to use the training and development process as necessary to hire a correctional sergeant or to extend an existing assignment for up to four years in cases where using a staff services manager I candidate is not feasible. |

**Follow-up Recommendations**

**None.**

**Original Finding Number 4**

**The Office of the Inspector General found that most of the employee disciplinary actions at the Department of Corrections proceeded all the way through settlement and hearings before the State Personnel Board without advice or assistance from the department legal staff.**

| Original Recommendations | Status | Comments |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections establish formalized policies and procedures to expand the role and responsibility of the Employment Law Unit in the preparation of employee disciplinary actions. | **Fully Implemented** | *The Department of Corrections and Rehabilitation Operations Manual,* section 3, article 22, *Employee Discipline,* now implemented statewide, has been revised to include the vertical advocacy model. The vertical advocacy model establishes formalized policies and procedures to expand the role and responsibility of the Employment Advocacy and Prosecution Team in the preparation of employee disciplinary actions. Vertical advocates will assist with disciplinary actions, draft the adverse action, and prosecute most cases involving staff integrity or dishonesty, abuse of authority, sexual misconduct, use of force in which an inmate suffers death or serious injury, use of deadly force, serious allegations against supervisors, high-profile cases, and any case for which the penalty is dismissal. Vertical advocates were assigned and attended training concurrently with the respective hiring authorities on the vertical advocacy model and disciplinary procedures. |
| The Office of the Inspector General recommended that as part of that effort, the department implement a process for monitoring court decisions and State Personnel Board rulings affecting employee disciplinary actions. | **Fully Implemented** | According to the department, court decisions, State Personnel Board rulings, and employee disciplinary actions are monitored using the following systems and processes:<br><br>• Case management system<br>• Vertical advocacy policy<br>• PROLAW database<br><br>Vertical advocates use the PROLAW database to monitor disciplinary actions and State Personnel Board decisions. The PROLAW database has been installed |

| | | statewide and all vertical advocates have been trained on its use. |
|---|---|---|
| The Office of the Inspector General also recommended that the department provide Internet access to employee relations officers and conform to standard management practices by instituting a comprehensive e-mail system to improve communication between headquarters staff and institution employees. | **FULLY IMPLEMENTED** | According to the department, all employee relations officers at the adult institutions have been provided with Internet access and have e-mail capability to communicate with headquarters employees. |
| In addition, the Office of the Inspector General recommended that the department review its policies and procedures for evaluating and appealing cases to ensure that it vigorously defends its right to discipline employees guilty of serious misconduct. | **FULLY IMPLEMENTED** | The revised *Department of Corrections and Rehabilitation Operations Manual,* section 3, article 22, *Employee Discipline*, outlines the procedure for appealing State Personnel Board decisions to the Superior Court. Employees from the Office of the Inspector General's Bureau of Independent Review participate in the new process. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 5**

**The Department of Corrections had not established policies and procedures governing settlement of employee disciplinary actions and had no means of monitoring or evaluating the settlement process.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections establish policies and procedures governing employee disciplinary action settlements and require that the necessary documentation be maintained for monitoring and evaluating the settlement process. | **FULLY IMPLEMENTED** | The revised *Department of Corrections and Rehabilitation Operations Manual,* section 3, article 22, *Employee Discipline*, now includes a settlement policy that requires documentation, monitoring, and evaluation throughout the process. The case management systems and PROLAW database will be used to document and monitor the settlement process. |

**Follow-up Recommendations**

**None.**

## OFFICE OF COMPLIANCE, AUDIT FUNCTIONS

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has consolidated its audit functions into a single unit and elevated the chief of the unit to report directly to the undersecretary. Yet, more than three years after the Office of the Inspector General issued its initial report, the internal audit organization still does not adhere to appropriate internal auditing standards in performing its work.**

---

**IMPLEMENTATION REPORT CARD**

**Previous recommendations: 4**

**Fully implemented: 2 (50 %)**

**Substantially implemented: 0 (0%)**

**Partially implemented: 2 (50%)**

**Not implemented: 0 (0%)**

**Not applicable: 0 (0%)**

---

In October 2002, the Office of the Inspector General issued a report resulting from a review of the audit functions of the Department of Corrections' Office of Compliance. The Office of the Inspector General found that the Office of Compliance did not adhere to appropriate professional standards in performing its internal audit work. The Office of the Inspector General identified several specific weaknesses in the department's management of the Office of Compliance, all of which resulted from the failure of the office to comply with internal auditing standards. The deficiencies included poor communication with executive staff, unresponsiveness to executive requests for audits, and inadequate monitoring of the audit status. As a result of the deficiencies, the Office of the Inspector General questioned the ability of the Office of Compliance to accomplish its objectives and meet its assigned responsibilities.

### BACKGROUND

When the Office of the Inspector General issued its October 2002 report, the Office of Compliance was comprised of three organizational units: The Program and Fiscal Audits Branch, the Inmate Appeals Branch, and the Information Security Unit. The primary audit functions of the department were established within the Program and Fiscal Audits Branch. The department established these audit activities to fulfill the requirements of California Penal Code, section 5057, which provides:

> Subject to the powers of the Department of Finance under Section 13300 of the Government Code, the director must establish an accounting and auditing system for all of the agencies and institutions including the prisons which comprise the department, except the Youth Authority, in such form as will best facilitate their operation, and may modify the system from time to time.

In addition, *California Department of Corrections and Rehabilitation Operations Manual*, section 11010.26.1 provides as follows:

> The Program and Fiscal Audits Branch exists to independently audit program contracts for compliance to terms and conditions of the contract. And review, evaluate, and better assure that institutions, parole regions, and headquarters are operated in accordance with department standards, state and federal law, and court mandates.

The Department of Corrections and Rehabilitation reorganized its audit functions into the Office of Audits and Compliance in July 2005

State law requires all state agencies having their own internal auditors to adhere to the *Standards for the Professional Practice of Internal Auditing* of the Institute of Internal Auditors. The Institute of Internal Auditors promulgates these standards to provide guidance for conducting internal auditing. It divides the standards into two groups: attribute standards, which address the characteristics of organizations and parties performing internal audit activities; and performance standards, which describe the nature of internal audit activities and provide criteria against which the performance of these services can be evaluated. In addition, the Institute of Internal Auditors maintains a third set of standards–implementation standards—which apply only to specific types of audit activity.

In response to the Office of the Inspector General's October 2002 report, the department disagreed with the Office of the Inspector General's conclusion that the activities of the department's Program and Fiscal Services Branch were internal audit activities, and were therefore subject to the state law that requires it to adhere to the *Standards for the Professional Practice of Internal Auditing*. Rather, the department asserted that alternate auditing standards promulgated for external auditors were the appropriate auditing standards for it to follow.

The Institute of Internal Auditors describes internal auditing as follows:

> *Internal auditing is an independent, objective assurance and consulting activity designed to add value and improve an organization's operations. It helps an organization accomplish its objectives by bringing a systematic, disciplined approach to evaluate and improve the effectiveness of risk management, control, and governance processes.*

The Office of the Inspector General continues to maintain that the department's audit activities are consistent with the Institute of Internal Auditors' description of internal auditing, and that the department therefore should ensure that its audits are conducted in accordance with the *Standards for the Professional Practice of Internal Auditing*.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

The Office of the Inspector General made the following specific findings as a result of the October 2002 review:

- The Office of Compliance did not adhere to appropriate professional standards, calling into question its ability to accomplish its objectives and meet its assigned responsibilities.

- Audit planning and communication with the department executive staff was inadequate.

- The management of the Program and Fiscal Audits Branch did not target internal audit activity toward issues posing the highest risk.

- The Program and Fiscal Audits Branch of the Office of Compliance was not responsive to executive management requests for special audits.

- The Office of Compliance did not adequately monitor the status of audit projects.

- The Program Compliance Unit of the Program and Fiscal Audits Branch used a highly structured auditing approach that could fail to reveal important issues relating to the entities under audit.

- The audit functions of the California Department of Corrections were fragmented, with a lack of coordination of audit activities and incomplete coverage of areas requiring audit, resulting in a failure to comply with state law governing financial accountability.

As a result of the October 2002 review, the Office of the Inspector General recommended that the Department of Corrections consolidate all of its auditing activities into a professional internal auditing unit consistent with standards prescribed in *Standards for the Professional Practice of Internal Auditin*g. The recommendations specified that the chief of internal audits should possess the training, knowledge, and experience necessary to manage an internal auditing unit and should report to the chief deputy director for Support Services.

### OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the California Department of Corrections and Rehabilitation has implemented the recommendations from the Office of the Inspector General's October 2002 review. To conduct the follow-up review, the Office of the Inspector General provided the Department of Corrections and Rehabilitation with a table listing the October 2002 findings and recommendations and asked the department to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the department, and evaluated the degree of compliance or noncompliance with the recommendation. The fieldwork for the follow-up review was completed in August 2005. The results are presented in the tables following this narrative.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

The department has fully implemented two of the four recommendations issued by the Office of the Inspector General in October 2002 concerning the audit functions of the Office of Compliance, and has only partially implemented the two remaining recommendations.

The Office of the Inspector General found that more than three years after the initial audit in October 2002, the department has not addressed most of the audit findings. The department has consolidated its internal audit activities into the Office of Audits and Compliance, which reports directly to the department's undersecretary. That change should allow the department to better coordinate its varied audit activities and provide the appropriate level of organizational independence, as prescribed by the Institute of Internal Auditors. According to the department, once the Office of Audits and Compliance is fully operational, it will address most of the remaining issues raised in the October 2002 review. Because the Office of Audits and Compliance is not yet fully operational, however, the department has not yet addressed several issues and recommendations raised in the review. Specifically:

- The department stated that it has not yet begun to adhere to *Standards for the Professional Practice of Internal Auditing*, but asserts that where applicable, the new office will be operated consistent with these standards.

- The department reported that it has not yet developed a quality assurance and improvement program for its internal auditing activity. However, it also reports that the Office of Audits and Compliance will include a quality assurance and improvement function that will evaluate the effectiveness of the internal audit activity.

- The department stated that it is currently not using a risk-based plan to determine the priorities of its internal audit activity, but asserts that its new Office of Audits and Compliance will develop a comprehensive annual work plan based on input from senior management. The department adds that it plans to assign the Office of Risk Management responsibility for developing a risk analysis plan for the department, which senior management will use in determining the priorities of the internal audit activity.

- The department acknowledged that the two units that perform audits of internal operations — the Correctional Business Audit Unit and the Program Compliance Unit — are still not receiving substantive input from senior management in developing their audit plans. However, the department stated that the deputy director of the Risk Management Division does provide a semi-annual report of auditing activities to the executive staff. The department reported that its new Office of Audits and Compliance will develop a comprehensive annual work plan that will be based on substantive input from senior management through a process it has yet to develop, and will provide reports of auditing activities to a new executive management team.

- Although the department reported completing 19 audits as part of its biennial internal control certification as required by the State Administrative Manual, it did not conduct these audits in accordance with appropriate internal auditing standards, as required by state law.

- The department has not yet appointed a permanent assistant secretary as the chief of internal audits who possesses the training, knowledge, and experience to manage an internal auditing unit. It has assigned an acting chief of internal audits who has some narrowly focused auditing experience. The acting chief does not have experience in

applying internal auditing standards, procedures and techniques, however, and has not demonstrated such proficiency by obtaining an appropriate professional certification, such as the Certified Internal Auditor designation. Therefore, the Office of the Inspector General questions whether that person is qualified for the position of chief of internal audits.

Not only appropriate auditing standards, but also sound business principles require the department to incorporate the features described above into its audit operations. By not adequately addressing the findings of the Office of the Inspector General's October 2002 report, the department has limited the value of its internal audit unit as a tool for identifying department operations needing improvement.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation continue its efforts to recruit a permanent assistant secretary for the Office of Audits and Compliance, ensuring that the person selected possesses the training, knowledge, and experience to manage an internal auditing unit.**

**In addition, the department should ensure that the Office of Audits and Compliance continues to develop operating policies and procedures that will ensure that its audit activity is consistent with the standards prescribed in the *Standards for the Professional Practice of Internal Auditing*. The policies and procedures should include the following:**

- **A process for effective communication with the department's executive staff in planning annual audit activities and reporting audit performance.**

- **A process by which to develop a risk-based comprehensive annual plan for identifying the priorities of the internal audit activity.**

- **A process for entering into the audit monitoring system the data necessary to adequately monitor the status of audits.**

- **A system to monitor the amount of time the staff spends on audits.**

The following table summarizes the results of the follow-up review.

**ORIGINAL FINDING NUMBER 1:**
**The Office of the Inspector General found that the Program and Fiscal Audits Branch did not adhere to professional standards for internal auditing.**

**ORIGINAL FINDING NUMBER 2:**
**The Office of the Inspector General found that the Program and Fiscal Audits Branch, which performed most of the department's audit work, was not effectively communicating with the department's executive staff in planning annual audit activities and in reporting audit performance.**

**ORIGINAL FINDING NUMBER 3:**
**The Office of the Inspector General found that the management of the Program and Fiscal Audits Branch did not target internal audit activity toward issues posing the highest risk.**

**ORIGINAL FINDING NUMBER 4:**
**The Office of the Inspector General found that the Program and Fiscal Audits Branch was not responsive to executive management requests for special audits.**

**ORIGINAL FINDING NUMBER 5:**
**The Office of the Inspector General found that the Office of Compliance did not monitor the status of audit projects.**

**ORIGINAL FINDING NUMBER 6:**
**The Office of the Inspector General found that the Program Compliance Unit of the Program and Fiscal Audits Branch used a highly structured auditing approach that could fail to reveal important issues relating to the entities under audit.**

**ORIGINAL FINDING NUMBER 7:**
**The Office of the Inspector General found that the audit functions of the California Department of Corrections were fragmented, with a lack of coordination of audit activities and incomplete coverage of areas requiring audit, resulting in a failure to comply with state law governing financial accountability.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections take the actions listed below. | | |
| Consolidate all department auditing activities into a professional internal auditing unit. | FULLY IMPLEMENTED | As part of its recent restructuring, the department created an Office of Audits and Compliance. According to the department, the coordination and performance of all department audits, reviews, and quality assurance functions have been consolidated into this office. |
| The audit unit should be operated consistent with standards prescribed in *Standards for the Professional Practice of Internal Auditing*. | PARTIALLY IMPLEMENTED | The department reported that it has not yet begun to adhere to *Standards for the Professional Practice of Internal Auditing*, but stated that as the new Office of Audits and Compliance is developed, it will be operated consistent with these standards where applicable. <br><br> The Office of the Inspector General's original report addressed a number of specific standards with which the Program and Fiscal Audits Branch of the Office of Compliance was not complying. A discussion of each of the specific standards addressed in the Office of the Inspector General's October 2002 report follows. <br><br> *Organizational Independence* — This standard requires that the chief audit executive report to a level within the organization that allows the internal audit activity to fulfill its responsibilities. As discussed below, the department has reorganized its audit activities to provide the appropriate level of organizational independence. <br><br> *Proficiency* — This standard states that internal auditors, including the chief audit executive, should possess the knowledge, skills, and other competencies needed to perform their individual responsibilities. As discussed later in this matrix, the department has not yet appointed a permanent assistant secretary as chief of its internal audits. <br><br> *Quality Assurance and Improvement Program* — This standard requires the chief audit executive to develop and maintain a quality assurance and |

improvement program that covers all aspects of internal audit activity and continuously monitors its effectiveness.

The department reported that a quality assurance and improvement program has not yet been developed and implemented. However, the department stated that the Office of Audits and Compliance will include a quality assurance and improvement function that will evaluate the effectiveness of the internal audit activity.

*Managing the Internal Audit Activity* — This standard requires the chief audit executive to effectively manage the internal audit activity to ensure it adds value to the organization. As part of these responsibilities, the standards require the chief audit executive to establish risk-based plans to determine the priorities of the internal audit activity, consistent with the organization's goals.

The department stated that it is currently not using a risk-based plan to determine the priorities of its internal audit activity. The department added, however, that its new Office of Audits and Compliance will develop a comprehensive annual work plan based on input from senior management. The department plans to assign its Office of Risk Management the task of developing a risk analysis plan for the department, which senior management will use in determining the priorities of the internal audit activity.

*Resource Management* — This standard requires the chief audit executive to ensure that internal audit resources are appropriate, sufficient, and effectively deployed to achieve the audit plan. The Office of the Inspector General found in its October 2002 report that the Program and Fiscal Audits Branch lacked an adequate audit tracking system.

The department reported that it has developed and implemented an audit tracking system called the Standardized Correspondence Control System. It describes the system as one that tracks each audit, including various milestone dates, and provides a weekly report for audit management.

The Office of the Inspector General reviewed a sample management report produced by the tracking system and found that with some modification, the system would provide information the department could use to monitor the status of audits. However, the sample report reviewed revealed that key information had not been entered into the tracking system's data fields and that there was no field for time spent on each audit. For example, several audits listed on the sample report did not have a date in the "Date Assigned" field, even though the report showed that the audit had been completed— signified by a date in the "Date Approved" field. According to the deputy director, the "Date Assigned" field reports the date the audit was commenced and the "Date Approved" field is the date the final audit report was signed by the chief of the audits branch. Therefore, several audits on the sample report showed that even though the audit had not been commenced, the audit had been completed and the final report signed by the chief of the audits branch. In addition, the department acknowledged that the system does not track the time spent on audits by staff. As a result, the department is still unable to determine whether assignments are completed within designated budgetary timeframes. Unless and until all key data is entered into the system and the system tracks time spent on audits, the report's usefulness to department management is limited.

*Reporting to the Board and Senior Management* — This standard requires the chief audit executive to report periodically to senior management on the internal audit activity's purpose, authority, responsibility, and performance relative to its plan.

According to the department, the two units that perform audits of internal department operations are not receiving substantive input from senior management in developing their audit plans. The department also reported that the deputy director of the Risk Management Division provides a semi-annual report of auditing activities to the department's executive staff. The department added that the new Office of Audits and Compliance will develop a comprehensive annual work plan that will be based on substantive input from senior management through a process it has yet to develop and will provide reports of auditing activities to a new executive management team.

| The chief of internal audits should possess the training, knowledge, and experience to manage an internal auditing unit. | PARTIALLY IMPLEMENTED | The department reported that it has not yet appointed a permanent chief of internal audits, adding that when it selects a chief, the person will possess the training, knowledge, and experience to manage an internal auditing unit. It has assigned an acting chief of internal audits who has some narrowly focused auditing experience. However, the acting chief does not have experience in applying internal auditing standards, procedures, and techniques, and has not demonstrated such proficiency by obtaining an appropriate professional certification, such as the Certified Internal Auditor designation. Therefore, the Office of the Inspector General questions whether that person is qualified for the position of chief of internal audits. |
| The chief of internal audits should report to the chief deputy director for Support Services. | FULLY IMPLEMENTED | As part of its recent restructuring, the department created an Office of Audits and Compliance. According to the department's July 2005 organization chart, this office reports directly to the department's undersecretary. That reporting relationship should provide the appropriate level of organizational independence, as prescribed by the Institute of Internal Auditors. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation continue its efforts to recruit a permanent assistant secretary for the Office of Audits and Compliance, ensuring that the person selected possesses the training, knowledge, and experience to manage an internal auditing unit.**

**In addition, the department should ensure that the Office of Audits and Compliance continues to develop operating policies and procedures that will ensure that its audit activity is consistent with the standards prescribed in the *Standards for the Professional Practice of Internal Auditing*. The policies and procedures should include the following:**

- **A process for effective communication with the department's executive staff in planning annual audit activities and reporting audit performance.**

- **A process by which to develop a risk-based comprehensive annual plan for identifying the priorities of the internal audit activity.**

- **A process for entering into the audit monitoring system the data necessary to adequately monitor the status of audits.**

- **A system to monitor the amount of time the staff spends on audits.**

(Blank page)

# MEDICAL CONTRACTING PROCESS

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has remedied nearly all of the deficiencies in its medical contracting process but must continue to take steps to control its medical contract expenditures.**

In October 2002, the Office of the Inspector General conducted a special review of the processes and controls used by the department's Health Care Services Division to procure and pay for contract medical services to inmates. The review determined that the division did not effectively manage its medical services to inmates and that it should adopt statewide policies and procedures to ensure cost-effective contracts, quality case management, and continuity of care.

| IMPLEMENTATION REPORT CARD |
| :--- |
| **Previous recommendations: 7** |
| **Fully implemented: 5 (72 %)** |
| **Substantially implemented: 1 (14%)** |
| **Partially implemented: 1 (14%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

## BACKGROUND

The Department of Corrections and Rehabilitation established the Health Care Services Division in 1992 to manage and oversee the delivery of health care services to inmates. In order to provide adequate medical services to the growing inmate population, the department contracts with outside community hospitals, physicians, nurses, pharmacists, and other medical professionals to obtain specialized services its staff and facilities cannot provide. In some instances, the department also contracts with medical professionals to fill temporary staff vacancies in medical classifications where recruitment is difficult.

As shown in the chart below, the total cost for contracted medical services continues to rise annually, from $200 million in fiscal year 2000-01 to more than $315 million in fiscal year 2004-05—an increase of 58 percent.

**Contract Medical Expenditures ($ millions)**

The Health Care Services Division has oversight responsibility for all medical contracts. In response to external audits, the division established the Health Contract Services Unit to establish new contract policies, assist with contract negotiations, and provide support

to institutions for all medical service contracts. Until recently, the Department of Corrections and Rehabilitation was not required to competitively bid the majority of its medical service contracts and often it contracted with a sole provider. Prompted by the Bureau of State Audits, the Department of General Services issued Management Memorandum 05-04 on January 26, 2005, which requires competitive bids for all medical services except those in which departments can justify the need for an exemption.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

As a result of the October 2002 review, the Office of the Inspector General made the following specific findings:

- The Department of Corrections lacked a comprehensive statewide policy for managing its medical services contracts.

- Lack of sound contract management by the Department of Corrections resulted in payments of more than $77,000 for clinical services not performed and of more than $1 million for services not authorized under a California Medical Facility contract with an outside physician.

- The contracting process of the Department of Corrections was vulnerable to potentially serious conflicts of interest because the person selecting the contractor was also authorized to approve invoices and payments under the contract.

- The deficiencies identified in the department's contracting process may have led to problems in the quality and continuity of inmate medical care.

As a result of the October 2002 review, the Office of the Inspector General made the following seven recommendations:

- The Office of the Inspector General recommended that the Department of Corrections adopt statewide policies and procedures for contract management, including but not limited to advertising and soliciting proposals; and awarding, monitoring, and enforcing contracts to provide cost-effective medical services to inmates. The recommendation specified that the policies and procedures should include the following:

  ➢ A requirement that institutions advertise the need for medical service providers and solicit proposals from their local communities.

  ➢ A requirement that institutions document their efforts to advertise and solicit proposals before approving any contract.

  ➢ Implementation of a statewide survey every three to four years to determine what constitutes a reasonable hourly fee for various medical specialties in selected regions of the state. The results of this survey can be used to develop reasonable contract expenditures for specific services in various geographical regions.

> ➢ A requirement that the cost of custody and support staff be included in calculations of the cost of providing medical care to inmates outside an institution, and that the cost be applied in developing a "reasonable" rate for care inside the institution.

- The Department of Corrections establish tight controls to ensure compliance with contract provisions, including monitoring and authorizing payment. The controls should be effectively communicated to staff through special training in contract language and the proper procedures for authorizing payments. The department should also strengthen its procedures for amending existing contracts to avoid confusion and misunderstanding.

- The Department of Corrections include provisions in its contracting policies to ensure that the individual who selects and approves a contractor does not also authorize payment by approving invoices under that contract.

- Pending resolution of contract issues, the Department of Corrections take any necessary interim steps to ensure that inmates receive good-quality medical care that is uninterrupted by contract problems.

**OBJECTIVES, SCOPE, AND METHODOLOGY**

The purpose of the 2006 follow-up review was to determine the extent to which the California Department of Corrections and Rehabilitation has implemented the seven recommendations from the Office of the Inspector General's October 2002 special review of the medical contracting process. To conduct the follow-up review, the Office of the Inspector General provided the Department of Corrections and Rehabilitation with a table listing the October 2002 findings and recommendations and asked the department to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the department, and evaluated the degree of compliance or noncompliance with the recommendations. Review fieldwork was completed on November 7, 2005. The results are summarized in the table that follows this section.

**SUMMARY OF THE 2006 FOLLOW-UP RESULTS**

Of the seven recommendations issued by the Office of the Inspector General in October 2002 concerning the medical contracting process, five recommendations have been fully implemented; one has been substantially implemented; and one has been partially implemented.

As a result of the 2006 follow-up review, the Office of the Inspector General found that the Department of Corrections and Rehabilitation has made a number of changes to its medical contracting process. In response to the Office of the Inspector General's 2002 review, the department established a health contract services unit to assist institutions with all medical services contracts. In addition, the department required institutions to solicit medical providers and to prepare market surveys before initiating a contract.

Meanwhile, expenditures for medical contracts rose 58 percent between fiscal years 2000-01 and 2004-05 from $200 million to more than $315 million, largely because of medical staff vacancies requiring contracted personnel to fill the void.

In response to two subsequent audits issued by the California State Auditor in 2004, the Department of General Services tightened the procedures used by the department to contract with outside community hospitals, physicians, nurses, pharmacists and other medical professionals to provide needed services and fill temporary medical staff vacancies and required the department to obtain competitive bids on clinical contracts. According to a correctional expert appointed by the U. S. District Court, however, due in part to insufficient staffing and training necessary to properly implement the new contracting procedures as well as to the complexity of the procedures, the department has fallen $58 million behind in paying provider claims. The new bidding process instituted to replace single-source contracting also has resulted in a shortage of specialty providers. Because of these developments, on March 30, 2006 the court ordered the department to pay all valid outstanding department-approved claims within 60 days and to establish new medical contracting procedures within 180 days.

### FOLLOW-UP RECOMMENDATION

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation develop a more effective and efficient system for processing and monitoring medical service invoices, including validation that contractors have performed all services invoiced prior to issuing payment.**

The following table summarizes the results of the follow-up review.

ORIGINAL FINDING NUMBER 1

**The Department of Corrections lacked a comprehensive statewide policy for managing its medical services contracts.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections adopt statewide policies and procedures for contract management, including but not limited to advertising and soliciting proposals and awarding, monitoring, and enforcing contracts to provide cost-effective medical services to inmates. The policies and procedures should include the following: | | |
| A requirement that institutions advertise the need for medical service providers and solicit proposals from their local medical communities. | SUBSTANTIALLY IMPLEMENTED | According to the department, the Health Care Services Division has implemented new procedures that require completing market surveys for the majority of its medical services contracts. The division conducted meetings with all institutions except Pelican Bay State Prison, California State Prison, Corcoran, and the California Substance Abuse Treatment Facility and State Prison at Corcoran to discuss the new contract procedures. Institution contract analysts, health care cost and utilization program analysts, and health care managers attended the meetings for an understanding of how to complete market surveys for medical contracts. The department reported that the remaining three institutions will receive contract training as part of the new statewide contract negotiation training to be completed by May 2006.<br><br>Under the January 2005 Management Memorandum 05-04 issued by the Department of General Services, all departments are now required to bid for medical services, with the exception of emergency hospital and ambulance provider services. When it is difficult to obtain services, such as in rural locations or for specific medical specialties, departments can submit a special |

| | | category request/non-competitive bid exemption request to the Department of General Services. The Department of Corrections and Rehabilitation has prepared 16 special category requests and had received approval for 14 at the time review fieldwork was completed on November 7, 2005.<br><br>According to the department, the Health Contract Services Unit also uses the following as benchmarks for determining the reasonableness of potential contract provisions:<br><br>    ➢ Department sector rates for Relative Value for Physicians<br>    ➢ Medicare Diagnostic Related Group code information<br>    ➢ Data reflecting cost-to-change ratios obtained from the Office of Statewide Health Planning and Development<br><br>The department provided the Office of the Inspector General with draft procedures addressing hospital negotiations, completion of physician contracts, contract renewal requests, and contract approval. The Health Contract Services Unit had not presented the procedures for approval at the time fieldwork was completed. |
| A requirement that institutions document their efforts to advertise and solicit proposals before approving any contract. | **FULLY IMPLEMENTED** | The department reported that it implemented a process effective July 1, 2004 requiring all non-bid contract requests to be submitted to the Health Contract Services Unit for approval. The Health Contract Services Unit maintains all documentation relating to solicitation and now-mandatory market surveys. The unit also prepares solicitation letters targeting areas in which preferred provider master contracts are desirable and performs cost analyses, including such factors as medical guarding and inmate transportation, for each proposal received under preferred provider master contracts. All negotiation efforts are documented in Health Contract Services Unit contract files. The department continues to develop policies and procedures to address contract issues.<br><br>The Office of the Inspector General reviewed eight contract requests that institutions had submitted to the Health Contract Services Unit to verify completion of market surveys; all eight were in compliance with this requirement. |

| | | |
|---|---|---|
| Implementation of a statewide survey every three to four years to determine what constitutes a reasonable hourly fee for a range of medical specialties in selected regions of the state. The results of the survey could be used to develop equitable contract expenditures for specific services in various geographical regions. | **FULLY IMPLEMENTED** | According to the department, the Health Contract Services Unit has completed a survey of four specialty services the department frequently uses—cardiology, neurology, orthopedics, and gastroenterology—to determine the current rates for these services and identify whether patients can be directed to providers with favorable rates. The Health Contract Services Unit reported that it will employ the surveys to determine the reasonableness of proposed rates.<br><br>The department provided the Office of the Inspector General with documentation of its neurology survey. |
| A requirement that the cost of custody and support staff be included in calculations of the cost of providing medical care to inmates outside an institution and that the cost be applied in developing a reasonable rate for care inside the institution. | **FULLY IMPLEMENTED** | The Health Contract Services Unit provided the Office of the Inspector General with a medical guarding cost analysis worksheet it had prepared with input from the Institutions Division. The analysis identifies the costs associated with medical guarding in both medical-guarded and non-medical-guarded hospital units. Medical-guarded units have correctional officers permanently assigned to provide ongoing security coverage for inmates receiving medical care, while non-medical-guarded facilities must temporarily assign correctional staff to the hospital while an inmate receives treatment. The Health Contract Services Unit completed the project in December 2003 but continued to work with the Institutions Division in updating the worksheet to include necessary revisions. According to the department, the unit employees use the worksheet routinely to establish appropriate rates. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 2**

**Lack of sound contract management by the Department of Corrections resulted in payments of more than $77,000 for clinical services not performed and of more than $1 million for services not authorized under a California Medical Facility contract with an outside physician.**

| Original Recommendation | Status | Comments |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections establish stringent controls for monitoring and authorizing payments for contract health care services. The controls should be effectively communicated to staff through special training on contract language and the proper procedures to be followed when authorizing and processing invoices for payment. The department should also improve the procedures for amending existing contracts to avoid confusion and misunderstanding. | Partially Implemented | At the time the Office of the Inspector General conducted its original review, the Health Care Services Division had disbanded the contract unit due to budget reductions. After audits by the Office of the Inspector General and the Bureau of State Audits revealed deficiencies in the department's medical contracting procedures, however, the department received additional funding to re-establish the unit, now known as the Health Contract Services Unit. The unit assists institutions with medical contract negotiations, develops contracting policies and procedures specific to health care contracts, and performs contract-monitoring services for the department. The unit is comprised of 15 positions, including three managers and 12 analysts. Most of the analysts in the unit have attended training related to cost benefit analysis and analytical skills development, and those new to the unit will attend training in the near future. According to the department, in April 2005 it awarded Managed Care Consulting Inc. a contract to provide contract negotiation skills training to the Health Contract Services Unit. The contractor is currently reviewing staff skill levels to determine training needs.

The Health Care Services Division distributed a memorandum to all institutions on June 29, 2004 outlining the new contract procedures for institutional health care services. The memorandum covers procedures for contract requests, renewal of exiting contracts, and the new "medical and return" process (when an inmate must be transferred to another facility to receive appropriate medical services). According to the Health Contract Services Unit, the staff meets with institutions and medical contractors on a regular basis to monitor the quality of services and resolve any contractual issues.

The department reported that it has contacted various providers and is considering contracting out the medical invoice review. Currently, the health care cost and utilization analysts at the institutions perform medical invoice reviews, but they are able to perform detailed audits only on a limited sample due to the high volume of medical invoices and the absence of an automated system. The department stated that it is still in the early planning stages of transferring the invoice review function to an automated system and the costs of doing so have not yet been determined. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 3**

**The contracting process of the Department of Corrections was vulnerable to potentially serious conflicts of interest because the person selecting the contractor was also authorized to approve invoices and payments under the contract.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended the department include provisions in its contracting policies to ensure that the individual who selects and approves a contractor does not also authorize payment by approving invoices under that contract. | FULLY IMPLEMENTED | The new procedures provided on June 29, 2005 to all institution health care managers require that initial and renewal contract requests be submitted to the Health Contract Services Unit for approval.  In addition, the unit reviews market surveys and utilization data before recommending approval of a specific contractor.  The new medical contract procedures have eliminated the previous potential for conflicts of interest. |

**FOLLOW-UP RECOMMENDATIONS**

**None**.

**ORIGINAL FINDING NUMBER 4**

**The current deficiencies in the department's contracting process may lead to problems in the quality and continuity of inmate medical care.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| Pending resolution of contract issues, the Office of the Inspector General recommended that the Department of Corrections take any necessary interim steps to ensure that inmates receive good-quality, fundamental medical care that is uninterrupted by contract issues. | FULLY IMPLEMENTED | The department reported that it instructed all institutions to transfer patients to other facilities if services were not readily available because of contract issues.  In addition, the Health Contract Services Unit has developed a network of service providers and affirms that it provides ongoing assistance to the institutions in determining the availability of medical services.

The memorandum submitted on June 29, 2004 advises all department health care |

| | | managers to contact the Health Contract Services Unit for assistance if there is no existing local or regional contract for a particular medical service. Through its network, the unit can determine if services are available at another institution. The department can then transfer the inmate to the appropriate location for medical services ("medical and return process"). |
|---|---|---|

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation develop a more effective and efficient system for processing and monitoring medical service invoices, including validation that contractors have performed all services invoiced prior to issuing payment.**

**EDUCATION PROGRAMS AT LEVEL IV INSTITUTIONS**

**The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made progress in developing alternative education programs for Level IV inmates.**

| IMPLEMENTATION REPORT CARD |
|---|
| **Previous recommendations: 6** |
| **Fully implemented: 1 (17%)** |
| **Substantially implemented: 2 (33%)** |
| **Partially implemented: 3 (50%)** |
| **Not implemented: 0 (0%)** |
| **Not applicable: 0 (0%)** |

In July 2003, the Office of the Inspector General conducted a survey of education programs at the Department of Corrections Level IV institutions. The survey was prompted by management review audits conducted by the Office of the Inspector General showing that inmates in state correctional institutions received only limited classroom instruction because classrooms are closed for significant periods of time due to lockdowns, teacher vacancies, and other program disruptions. The survey revealed the classroom education model to be an inefficient and expensive means of delivering education to Level IV inmates because frequent lockdowns cause academic and vocational classes to be closed down more than 60 percent of the time. At the five Level IV institutions locked down for the largest percentages of time, education programs operated an average of only 25 percent of the time. And even with the classes closed for long periods, the survey found that inmates continued to receive day-for-day sentence reduction credits as though they had attended class, and teachers continued to be paid as though they had provided instruction. The Office of the Inspector General also found that even if the classes were held 100 percent of the time, they would be able to accommodate only a small percentage of inmates eligible for the programs, in part because of the small number of budgeted teaching positions at Level IV institutions. The survey found in addition that institutions had no systematic means of accounting for teachers' activities during lockdown periods or of temporarily assigning them to other duties.

**BACKGROUND**

Declaring that "there is a correlation between prisoners who are functionally literate and those who successfully reintegrate into society upon release," the Legislature in 1987 enacted the Prisoner Literacy Act, which required the Department of Corrections to provide literacy programs at every state prison. Codified as California Penal Code section 2053 *et seq.*, the act required the department to make the programs available to at least 60 percent of eligible inmates in the state prison system by January 1, 1996, with the goal of ensuring that inmates achieve a ninth-grade reading level by the time they parole. Accordingly, the Department of Corrections provides an education program consisting of both academic classes and vocational training for inmates at state correctional institutions. A November 1996 survey by the Department of Corrections found that 68 percent of the inmate population scored below the ninth grade level in reading.

The budget for the Department of Corrections for fiscal year 2004-05 included $12.3 million for academic and vocational education for the five Level IV institutions that were

part of the Office of the Inspector General's original survey. As of April 30, 2005, there were 20,059 inmates, 18 percent of the eligible population, enrolled in academic and vocational education programs statewide.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

The Office of the Inspector General made the following specific observations as a result of the July 2003 survey:

- Only 21 percent of eligible inmates at the five Level IV institutions covered in the survey were enrolled in education classes and the classes were closed a large percentage of the time because of lockdowns and other disruptions.

- The low level of inmate participation is explained partly by budget constraints. In fiscal year 2002-03, the number of academic teaching positions budgeted at the five Level IV institutions surveyed averaged 16, with an average of only 13 of those positions actually filled. At a ratio of one teacher for every 27 students, therefore, the academic program were able to accommodate an average of only 351 inmates at each of the institutions — 11.8 percent of the eligible inmate population (with "eligible" defined as those able to participate in a classroom setting).

- The Department of Corrections and the institutions had no means of accounting for the activities of teachers during lockdowns, and labor agreements hampered the redirection of teachers to other functions during those periods.

- When lockdowns and other program disruptions were taken into account, the annual per-inmate cost of the education programs at Level IV institutions greatly exceeded the annual per-inmate costs budgeted.

As a result of the July 2003 survey, the Office of the Inspector General recommended that the Department of Corrections re-evaluate education programs at Level IV institutions to determine whether they warrant continued operation and investigate other methods of delivering academic and vocational instruction. Among the options considered should be eliminating formal classroom instruction and retaining a small educational staff to coordinate in-cell study courses for inmates. Instruction through cable television and correspondence courses could also be developed to assist inmates in achieving educational goals.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the Department of Corrections and Rehabilitation has implemented the six recommendations from the Office of the Inspector General's July 2003 survey of education programs at Level IV institutions. To conduct the follow-up review, the Office of the Inspector General provided the Department of Corrections and Rehabilitation with a table listing the July 2003 findings and recommendations and asked the department to provide the implementation status of each recommendation. The Office of the Inspector General

reviewed the responses, along with documentation provided by the department, and evaluated the degree of compliance or noncompliance with the recommendations.

Fieldwork for the review was completed in September 2005. The results are presented in the tables following this narrative.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the six recommendations issued by the Office of the Inspector General in July 2003 concerning the education programs at Level IV institutions, one recommendation has been fully implemented; two recommendations have been substantially implemented; and three recommendations have been partially implemented.

The Office of the Inspector General found that the Department of Corrections and Rehabilitation has made some progress in developing new education methods for Level IV inmates, but the effectiveness of the new programs has not yet been evaluated. In response to a $34.8 million reduction to its education budget, the department evaluated its existing programs and prioritized them to determine those that warranted continued operation. Upon completion of the evaluation, the department eliminated 129 education positions, including many of the Level IV vocational programs, due to their ineffectiveness. The department has since developed alternative education program models designed to increase overall inmate participation through non-traditional methods. The new programs include more self-paced independent study, such as the new Bridging Education Program recently implemented in the reception centers and general population facilities. This new program allows inmates to begin participating in self-paced education programs when they arrive at a reception center. Other programs include short-term vocational certification classes, half-day assignments with a homework component, delivery of educational services via distance education methodologies, and delivery of educational services in the living units. The majority of the new alternative education delivery models have only recently been implemented; therefore, only minimal data is available at this time to evaluate the programs' effectiveness. The department also has not developed an effective monitoring system to ensure that institutions are complying with its education policies and procedures. Prison reform advocates have also suggested that the new programs may be too shallow to be effective, but inmate population pressures appear to make it difficult to provide more comprehensive educational opportunities, at least in a classroom setting.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Systematically evaluate the effectiveness of the new alternative education delivery models. The evaluation should include inmate participation rates, progress in achieving educational goals, and the impact of the programs on recidivism.**

- **The new Office of Correctional Education should dedicate staff to perform periodic on-site reviews to ensure compliance with department policies and procedures. The on-site reviews should include, but not be limited to, verification of educational representatives participating in classification committees, verification of class closures for teacher vacancies beyond 30 days, and the verification of the accuracy of timekeeping for inmate program participation.**

The following table summarizes the results of the follow-up review.

**ORIGINAL OBSERVATION NUMBER 1**

**The Office of the Inspector General found that only a small percentage of inmates at Level IV institutions were enrolled in education classes and that the classes were closed a large percentage of the time because of lockdowns and other disruptions.**

**ORIGINAL OBSERVATION NUMBER 2**

**The Office of the Inspector General found that the department and institutions had no means of accounting for the activities of teachers during lockdowns and that labor agreements hampered the redirection of teachers to other functions during those periods.**

**ORIGINAL OBSERVATION NUMBER 3**

**The Office of the Inspector General found that when lockdowns and other program disruptions were taken into account, the annual per-inmate cost of the education programs at Level IV institutions greatly exceeded the annual per-inmate cost budgeted.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections re-evaluate education programs at Level IV institutions to determine whether they warrant continued operation and investigate other methods of delivering academic and vocational instruction. | FULLY IMPLEMENTED | According to the department, the Education and Inmate Programs Unit evaluated all Level IV institutions as part of a $34.8 million reduction to the department's education budget. The evaluation included inmate program participation, program viability, teacher assignments, inmate assignments, and waiting lists.  In addition, the department looked at the *Ten-Year Employability Outlook* published by the Employment Development Department to determine the projected employment growth for vocational programs.  The evaluation completed by the department noted that Level IV institutions of 180- design[1] and Level IV institutions of 270-design[2] evidenced the following:<br><br>• Excessive class closures averaging 77 percent<br>• Low enrollment of approximately 20 percent<br>• Fifteen percent of the teachers assigned to programs other than those for which they were hired to teach |

---

[1] High Desert State Prison, Pelican Bay State Prison, California State Prison, Sacramento, and Salinas Valley State Prison.
[2] California State Prison, Los Angeles County and Salinas Valley State Prison.

| | | |
|---|---|---|
| | | • Seventeen vocational programs deemed as low growth by the *Ten-Year Employability Outlook*<br>• Programs not well suited as correctional education vocational programs<br><br>Upon completion of the evaluation, the Education and Inmate Programs Unit recommended that the department eliminate 129 education positions at the Level IV institutions. The department approved the recommendations and eliminated the positions and programs effective March 1, 2004. |
| The Office of the Inspector General recommended that among the options considered should be eliminating formal classroom instruction and retaining a small educational staff to coordinate in-cell study courses for inmates. | **SUBSTANTIALLY IMPLEMENTED** | Along with the recommended position cuts noted above, the Education and Inmate Programs Unit, now renamed the Office of Correctional Education, also reported that it had developed alternative means of delivering educational services. These alternatives include short-term vocational certification, half-day assignments with homework, delivery of educational services during lockdowns via distance education methodologies, and delivery of educational services in living units. The Office of Correctional Education had expected to fully implement these new programs by October 2005. The department was still negotiating with labor union representatives on the implementation of the new alternative education delivery models during the Office of the Inspector General's fieldwork. The new alternative delivery models include both distance education and independent study. According to the department, these models are appropriate for higher-level learners, and teachers will be assigned 90 to 120 students, thereby greatly expanding educational services.<br><br>In response to the ongoing security measures under lockdown and modified program conditions, the alternative education delivery model has a component that includes providing educational services during lockdowns and modified programs. According to the department, each institution has developed a plan for how it will deliver services during lockdowns and modified programs.<br><br>The Office of Correctional Education reported that it has recently implemented industry certification in all of the vocational construction trade programs, using the *National Center of Construction Education and Research* text and instructional materials. This curriculum addresses short-term vocational certification and is delivered in modules that run from three to six weeks. Completion of the program results in industry certification. The program |

complements the aforementioned half-time educational programs that are part of the alternative education and delivery model. The Office of Correctional Education continues to support traditional classroom instruction as a viable method of instructional delivery when it is feasible.

The Office of the Inspector General reviewed the inmate participation statistics provided by the Department of Corrections and Rehabilitation for fiscal year 2004-05 and found the following:

| Institution | Inmate Participation[3] | Total Hours Possible[4] | Percentage of Participation |
|---|---|---|---|
| California State Prison, Sacramento | 159,174 | 260,022 | 61% |
| Calipatria State Prison | 221,697 | 527,355 | 42% |
| High Desert State Prison | 266,784 | 673,539 | 40% |
| Pelican Bay State Prison | 113,568 | 237,273 | 48% |
| Salinas Valley State Prison | 139,677 | 483,811 | 29% |
| Totals/average percentage | 900,900 | 2,182,000 | 41% |

The original survey of the above institutions indicated an average participation rate of 25 percent. Although the department has improved, the 41 percent participation rate ultimately results in the closure of education programs 59 percent of the time. It is too early to evaluate the effectiveness of the new alternative delivery models because the department only recently implemented these programs. Nevertheless, the data clearly demonstrates that the department must continue to improve its delivery of education services to the Level IV inmate population.

| | | |
|---|---|---|
| The Office of the Inspector General recommended that instruction through cable television and correspondence courses could also be developed to assist inmates in achieving educational goals. | **SUBSTANTIALLY IMPLEMENTED** | According to the department, every institution is connected to the corrections learning network. The corrections learning network is a distance learning initiative, administered by Educational District 101 and funded through the United States Department of Education. The network provides free interactive instructional programming for the nation's correctional facilities. Educational programming is available through satellite/television downlink for the offender population (youth and adult) and to correctional employees. The department reported that it uses the corrections learning network to supplement curricula in the traditional classroom programs and in its Bridging Education Program. The institutions distribute the network programming to the housing units, where inmates can directly connect with the correctional learning network. Each institution has been permitted program flexibility in its distribution.<br><br>The department stated that it has obtained more traditional and distance college courses. The department considered budget change proposals to improve the infrastructure for reception centers in order to accommodate additional electrical and cable connections and thereby make available more television units in housing units/cells to receive educational and self-help information through distance learning models. The department reported, however, that the excessive cost of providing the additional cable connections became evident. As an alternative, the department decided to concentrate on purchasing television sets and video cassette recorders for use in the reception center dayrooms to facilitate the distance learning efforts. The department stated that it is currently ordering television carts to enable staff to secure the equipment when not in use and provide mobility to different locations as needed.<br><br>The department affirmed that it has significantly increased the availability of college programs to the inmate population, including some Level IV institutions, without additional allocations from the state general fund. The department stated that it has cooperated fully with the California community colleges to expand the availability of college programs.<br><br>The department also provided the following examples of new educational programs now being offered at level IV institutions:<br><br>   • Pelican Bay State Prison operates a small television studio that records teacher classroom lectures for distribution across the institutional |

television network, allowing inmates who are unable to attend school to continue their studies. The network also provides other programs, including general educational development, community college courses, and self-help programming.

- Salinas Valley State Prison provides re-entry information through educational packets, which include anger management and substance abuse videos. In addition, the adjunct teacher coordinates general education development and the corrections learning network programming. The institution recently installed computer labs with educational software in all four yards.

- California State Prison, Sacramento uses an adjunct teacher who coordinates general education development and corrections learning network programming for inmates who cannot attend traditional classrooms. In addition, the institution gives inmates access to re-entry and general education development materials through educational packets.

- High Desert State Prison coordinates with the work of its television specialist and two academic teachers, who manage coursework offered through the corrections learning network. Inmates who complete the course receive completion certificates.

- Calipatria State Prison uses the corrections learning network to offer general education development coursework to all institution inmates. After completing the course, inmates may sign up through the education department to take the general education development exam.

| | | |
|---|---|---|
| If the department decides to continue formal classroom instruction, the Office of the Inspector General recommended that the department take the following actions:<br><br>Ensure that classification committees include an education representative for the purpose of evaluating appropriate education placement for inmates. | **PARTIALLY IMPLEMENTED** | The Department of Corrections and Rehabilitation provided the Office of the Inspector General with a memorandum entitled "Student Class Assignment Policy," dated February 7, 2003 and signed by W. A. Duncan, former Deputy Director, Institutions Division. The purpose of the memorandum, which was sent to all institutions, was to reiterate departmental policy and to ensure that an education representative was present at initial classification committee and unit classification committee hearings. The memorandum also provided guidelines for appropriate inmate education placement, assessment, and equal access to inmates with special needs. The Office of Correctional Education affirmed that it has never deviated from its position — that inmates receive an education appropriate to their individual needs. In addition, the new Bridging Education Program mandates that an educational representative be part of the classification committee to directly interview participants and ensure their appropriate placement.<br><br>The Office of the Inspector General recognizes that the Department of Corrections and Rehabilitation has officially notified the institutions of the policy requiring educational representatives to participate in classification committee hearings. The department, however, could not provide evidence to indicate that it has monitored whether educational representatives actively participate in classification committee hearings, as required. Moreover, the department stated in its response that, because of budget cuts, it no longer retains staff to perform on-site compliance reviews. |

| | | |
|---|---|---|
| Develop a more efficient process for removing from classes inmates who are disruptive or who fail to attend class and for removing inmates from classes that are closed because of teacher vacancies and other reasons. | **PARTIALLY IMPLEMENTED** | According to the department, it has convened with the teachers' and vocational instructors' union pursuant to an understanding of the existing sections of the California Code of Regulations, Title 15 and the *Department of Corrections and Rehabilitation Operations Manual,* which delineate the discipline process and define education staff authority to effectively handle classroom discipline problems. The department also states that it will continue training supervisors of correctional education programs to ensure that education staff members are aware of the disciplinary process. Recommended changes to the California Code of Regulations are being sought relative to the section that reads, "A classification committee action shall not be required to remove inmates from Bridging Education Programs if no other changes in work/training group, privilege group, custody designation or work waiting list is required." <br><br> The department stated that the Title 15 revisions encompass new classification and disciplinary processes with the implementation of the Bridging Education Program. The Office of the Inspector General reviewed the revisions to Title 15 and found no significant changes that constitute a more efficient process for teachers to remove disruptive inmates from education programs. <br><br> The department also stated that it notified wardens and supervisors of correctional education programs in writing of the policy regarding class closures. The policy requires that inmates be temporarily unassigned from classes in which the teacher or instructor is unavailable beyond 30 days. |
| Institute quality-control measures to ensure that inmate class attendance is accurately reported. | **PARTIALLY IMPLEMENTED** | The Department of Corrections and Rehabilitation stated that each instructor is required to keep a permanent class record on inmate attendance. In addition, the department stated that all instructors are required to follow timekeeping policies as articulated in the California Code of Regulations, Title 15, Crime Prevention and Corrections, Article 3.5. The supervisors of academic instruction and vocational instruction at each institution review the permanent class record for accuracy and apply proper corrective action procedures if an inmate fails to attend. The supervisor of correctional education program maintains all permanent class records in the education office. The assignment office is provided copies to maintain accountability under the department's new timekeeping system. |

| | | According to the department, the new education strategic plan it has adopted includes a mandated accountability model.  In addition, the department will hire an associate governmental program analyst at each institution for education data collection and reporting needs.  The department states that it is also developing a new monthly report that will provide better enrollment accountability. |
| | | The Office of the Inspector General recognizes that the Department of Corrections and Rehabilitation has made efforts to officially notify institutions of the policy requirements. Nevertheless, without performing periodic on-site institution audits, the department cannot ensure compliance with its policies. |

**FOLLOW-UP RECOMMENDATIONS**

**The Office of the Inspector General recommends that the Department of Corrections and Rehabilitation take the following actions:**

- **Systematically evaluate the effectiveness of the new alternative education delivery models. The evaluation should include inmate participation rates, progress in achieving educational goals, and the impact of the programs on recidivism.**

- **The new Office of Correctional Education should dedicate staff to perform periodic on-site reviews to ensure compliance with department policies and procedures.  The on-site reviews should include, but not be limited to, verification of educational representatives participating in classification committees, verification of class closures for teacher vacancies beyond 30 days, and verification of the accuracy of timekeeping for inmate program participation.**

## Richard A. McGee Correctional Training Center

**The Office of the Inspector General found that the Richard A. McGee Correctional Training Center has significantly improved its cadet training program. The academy instituted guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training program approval. Lesson plans for the now-expanded academy are complete and were approved by the commission. Cadet testing protocols are also complete, as are operational procedures governing test results retention.**

| IMPLEMENTATION REPORT CARD |
|---|
| Previous recommendations: 12 |
| Fully implemented: 11 (92%) |
| Substantially implemented: 0 (0%) |
| Partially implemented: 0 (0%) |
| Not implemented: 1(8%) |
| Not applicable: 0 (0%) |

In April 2000 the Office of the Inspector General conducted an unannounced special review audit of the Richard A. McGee Correctional Training Center. The review was prompted by numerous serious allegations that were reported to the Office of the Inspector General in late March 2000. The allegations called into question the integrity of test results for recent graduates of the basic correctional officer academy located at the center and the overall preparedness of correctional officers graduating from the academy.

### Background

Established in the early 1970s, the Richard A. McGee Correctional Training Center (now known as the Richard A. McGee Academy) conducts the basic correctional officer academy program for all correctional officers training in California. Cadets who complete the training are credentialed by the academy as certified correctional peace officers. In addition to basic correctional officer training, the center provides advanced peace officer and correctional officer training, parole agent training, management training, and a leadership institute.

Before the Office of the Inspector General's 2000 audit, the basic correctional officer certification training program consisted of a six-week course given at the academy in Galt, California. In fiscal year 1999-00, the Department of Corrections obtained a $5 million budget increase to expand the program to a ten-week course. The ten-week curriculum required developing 77 new lesson plans, all of which were to have been launched in January 2000. (Effective September 30, 2000, legislation further expanded the ten-week course to 16 weeks.)

The Office of the Inspector General's May 2000 audit reported a range of deficiencies in the implementation of the new ten-week academy. Among other findings, it revealed incomplete lesson plans, lesson plans that failed to receive Commission on Correctional Peace Officer Standards and Training approval, academy courses that did not adhere to specified lesson plan instructor-to-cadet ratios, testing and cadet evaluations that lacked strict controls, and academy instructors who were insufficiently qualified.

Effective July 1, 2005, the Commission on Correctional Peace Officer Standards and Training was dissolved and responsibility for academy oversight was transferred to the Corrections Standards Authority. Legislated by Senate Bill 737, this transfer of authority included the oversight to "develop, approve, and monitor standards for the selection and training of state correctional peace officers." The bill also renamed the training center the Richard A. McGee Academy.

Although the Corrections Standards Authority is accountable for oversight of the academy, the Department of Corrections and Rehabilitation is still required to design and deliver training programs, conduct validation studies, and provide program support—areas in which critical deficiencies were found in the May 2000 audit. These deficiencies are the focus of this follow-up review.

### SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

As a result of the May 2000 review, the Office of the Inspector General made the following specific findings:

- Cadets were being trained under the expanded ten-week curriculum even though a significant number of the lesson plans had not been completed. The Department of Corrections was able to completely develop only 46 of the required 77 new lesson plans before January 2000, the start of the ten-week curriculum.

- Many of the 46 lesson plans, including those for highly essential courses, had not received provisional approval from the Commission on Correctional Peace Officer Standards and Training. At the start of the January 2000 academy, only 23 completed lesson plans had been submitted to the commission for approval, and only a portion of the 23 had received provisional approval.

- The Department of Corrections Staff Development Center and the training center staff failed to coordinate efforts in developing the lesson plans. The training center staff members informed the Office of the Inspector General that their suggestions for lesson plans were consistently ignored. Consequently, the training staff found some of the commission-approved training plans to be unacceptable and significantly modified the plans without the knowledge of either the Staff Development Center or the commission.

- The training center did not maintain the instructor-to-cadet ratios specified in the lesson plans approved by the Commission on Correctional Peace Officer Standards and Training.

- Guidelines for presenting lesson plans and administering tests were not prepared. No written guidelines were developed for administering the lesson plans, presenting them to a class, or evaluating their effectiveness. Likewise there were no written guidelines for administering and securing the tests associated with each lesson plan.

- The academy's process for testing and certifying cadets under the ten-week curriculum was seriously flawed. For example, the overall passing score for cadets was, without justification, arbitrarily lowered from 85 percent to 80 percent; cadets were permitted to retake tests more than once to increase scores; cadets were not administered comprehensive examinations required by the *California Department of Corrections Operations Manual*; the training center nullified a particular quiz because the failure rate was too high; test questions were altered without commission approval; students who failed firearms testing were allowed to graduate; written evaluations of cadets by company commanders were not specific to individual cadets, as intended; and cadets received disparate treatment relative to opportunities to improve performance and to disciplinary actions for similar offenses.

- Except for the quiz on radio communications, test results had not been destroyed. The staff at the training center's examination unit initially informed the Office of the Inspector General that all test and quiz results had been destroyed at the completion of the first ten-week course. However, other training center staff members later produced test and quiz results, except for those pertaining to the radio communications class. According to the training center staff, the radio communications quiz was destroyed because the quiz was nullified.

- Instructor qualifications and class preparation time were deficient. Because certification of many of the instructors at the academy had not been evaluated by an objective certifying agency, some may not have been qualified in the subjects they taught. Also, they were required to teach eight to 12 hours a day on a variety of subjects, and the Staff Development Center was often tardy in supplying lesson plans. As a result, instructors had inadequate time for class preparation. These factors were further exacerbated by the academy's overall instructor shortage. The training center estimated that nine additional instructors were needed to effectively institute the lesson plans.

As a result of the May 2000 review, the Office of the Inspector General recommended that the Richard A. McGee Correctional Training Center, in consultation with the Staff Development Center and the Commission on Correctional Peace Officer Standards and Training, take the following actions:

- Complete all lesson plans.

- Obtain lesson plan approval from the Commission on Correctional Peace Officer Standards and Training.

- Develop lesson plans in a collaborative effort between the Staff Development Center and the Correctional Training Center.

- Adhere to lesson plan staff-to-cadet ratios.

- Prepare guidelines for presenting lesson plans and administering tests.

- Establish a clearly defined testing protocol that measures cadet performance.

- Handle and dispose of test results appropriately.

- Develop an action plan.

- Provide instructors with approved lesson plans and written guidelines.

- Follow prescribed guidelines in administering tests.

- Ensure that instructors are fully qualified.

- Determine the need for remedial training of cadets who had recently completed the new ten-week curriculum.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which the Richard A. McGee Academy has implemented the 12 recommendations from the Office of the Inspector General's May 2000 review. To conduct the follow-up review, the Office of the Inspector General provided the California Department of Corrections and Rehabilitation Office of Departmental Training and the Richard A. McGee Academy with a table listing the May 2000 findings and recommendations and requested the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the academy, and evaluated the degree of compliance or noncompliance with the recommendations. Review fieldwork was completed in November 2005. The results are presented in the table that follows this section.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the 12 recommendations issued by the Office of the Inspector General in May 2000 concerning the academy's administration of its correctional cadet training program, 11 recommendations have been fully implemented and one recommendation, relating to the possible need for remedial training of cadets who had recently completed the ten-week curriculum, has not been implemented.

The Office of the Inspector General found that the Richard A. McGee Academy has significantly improved its cadet training program. The academy implemented guidelines for course development that include instructor input, cadet feedback, and Commission on Correctional Peace Officer Standards and Training approval. Lesson plans for the now-expanded academy are complete and have been approved by the Commission on Correctional Peace Officer Standards and Training (now the Corrections Standards Authority). Cadet testing protocols and test retention policy also have been completed.

### FOLLOW-UP RECOMMENDATIONS

**None.**

The following table summarizes the results of the follow-up review.

ORIGINAL FINDING NUMBER 1

**The Office of the Inspector General found that cadets were being trained under the expanded ten-week curriculum even though a significant number of the lesson plans had not been completed.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center complete all lesson plans. | FULLY IMPLEMENTED | According to the Department of Corrections and Rehabilitation Office of Training and Professional Development, the ten-week curriculum was expanded to 16 weeks and all lesson plans were completed as of June 11, 2003. |

FOLLOW-UP RECOMMENDATIONS

**None.**

ORIGINAL FINDING NUMBER 2

**The Office of the Inspector General found that many of the lesson plans, including those for highly essential courses, had not received provisional approval from the Commission on Correctional Peace Officer Standards and Training.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center, in consultation with the training center, obtain Commission on Correctional Peace Officer Standards and Training approval of lesson plans. | FULLY IMPLEMENTED | The Department of Corrections and Rehabilitation Office of Training and Professional Development reported that all lesson plans comprising the 16-week Basic Correctional Officer Academy curriculum were approved by the Commission on Correctional Peace Officer Standards and Training as of June 11, 2003. The approval is still valid under the new Corrections Standards Authority. |

FOLLOW-UP RECOMMENDATIONS

**None.**

**ORIGINAL FINDING NUMBER 3**

**The Office of the Inspector General found that the Department of Corrections Staff Development Center and the training center staff failed to coordinate efforts in developing the lesson plans.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center and the Correctional Training Center develop lesson plans in a collaborative effort. | FULLY IMPLEMENTED | With the July 1, 2005 reorganization of the Department of Corrections and Rehabilitation, instructional designers have been relocated to the Basic Peace Officer Institute at the Richard A. McGee Academy. According to the Office of Training and Professional Development, as lesson plans are developed and revised, designers will rely on instructor and cadet evaluations, classroom visitation, and pilot testing to coordinate materials used in the lesson plans. Academy instructors have been apprised of this process and have been encouraged to provide input. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 4**

**The Office of the Inspector General found that the training center did not maintain the instructor-to-cadet ratios specified in the approved lesson plans.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center ensure adherence to lesson plans and written guidelines including maintaining specified lesson plan ratios. | FULLY IMPLEMENTED | According to the Office of Training and Professional Development, one of the chief priorities of the basic academy's scheduling office is to ensure that courses are in compliance with required staff-to-cadet ratios specified by approved lesson plans. |

**FOLLOW-UP RECOMMENDATIONS**
None.

**ORIGINAL FINDING NUMBER 5**

**The Office of the Inspector General found that guidelines for presenting lesson plans and administering tests were not prepared.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center prepare guidelines for presenting lesson plans and administering tests. | FULLY IMPLEMENTED | The Department of Corrections Staff Development Center informed the Office of the Inspector General that guidelines for presenting lesson plans are complete and were approved by the Commission on Correctional Peace Officer Standards and Training.<br><br>All academy instructors receive a *Correctional Sergeant/Instructor Handbook* containing instructional guidelines that include the following:<br><br>• Course length<br>• Prerequisites<br>• Recommended maximum number of students<br>• Related courses<br>• Required resources<br>• Instructional goal<br>• Core tasks<br>• Learning objectives<br>• Learning activities<br>• Evaluation methodology<br>• Outline of the course presentation<br>• PowerPoint slides used, if applicable<br><br>In addition, guidelines were established for administering basic academy tests. Testing falls into two categories: written objective testing and skills demonstration testing. The Curriculum Testing and Evaluation Section at the academy administers all written examinations; skills testing is predicated on individual lesson plans. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 6**

**The Office of the Inspector General found that the academy's process for testing and certifying cadets under the ten-week curriculum was seriously flawed.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections Staff Development Center establish and clearly define a testing protocol that measures cadet performance. | FULLY IMPLEMENTED | According to the Office of Training and Professional Development, the basic academy uses five separate instruments to gauge cadet performance:  practice exercises, major exams, performance tests, the California Penal Code 832 test, and on-the-job observation. The protocol sets guidelines for the development of each of these measuring instruments, including establishing pass points, continuous improvement, test administration procedures, and test security. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 7**

**The Office of the Inspector General found that except for the quiz on radio communications, test results had not been destroyed.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Richard A. McGee Correctional Training Center handle and dispose of test results appropriately. | FULLY IMPLEMENTED | On August 22, 2005 the academy approved Operational Procedure #B-038, which mandates that all hard copies of cadet tests and scantrons be destroyed upon graduation, unless a cadet is involved in any administrative action relative to poor academics or testing irregularities, whereupon those tests and scantrons will be |

| | | |
|---|---|---|
| | | maintained on-site for two years. The records will then be archived off-site for three years. Cadet academic scores, range scores, participation logs, and related class materials are securely maintained on-site for two years in the testing office and three years at the off-site archives location. After five years' storage, the documents are confidentially shredded. At the conclusion of each academy, a password-protected copy of the testing files for each class is created and archived. A chronological electronic history of academy classes is maintained indefinitely in the testing office. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 8**

**The Office of the Inspector General found that instructor qualifications and class preparation time were deficient.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended the actions listed below. | | |
| The California Department of Corrections Staff Development Center, in consultation with the training center and the Commission on Correctional Peace Officer Standards and Training develop an action plan. | FULLY IMPLEMENTED | The academy developed an action plan following the Office of the Inspector General's May 2000 report. The latest version of the action plan submitted to the Office of the Inspector General, dated September 16, 2000, indicated that 35 of the 37 action items had been completed. The remaining two action items were not related to the Office of the Inspector General's recommendations. |
| The California Department of Corrections Staff Development Center should provide approved lesson plans and written guidelines to academy instructors. | FULLY IMPLEMENTED | The Office of the Inspector General was informed that copies of approved lesson plans have been provided to basic correctional academy instructors. Further, in March 2005 the academy revised its *Correctional Sergeant/Instructor Handbook* to include guidelines for training cadets. |

| The Richard A. McGee Correctional Training Center follow prescribed guidelines in administering tests. | **FULLY IMPLEMENTED** | Operational procedures applying to major exam administration and scoring instructions were approved in March 2005. According to the academy, the center administration will review these procedures annually for any necessary amendments. |
|---|---|---|
| The Richard A. McGee Correctional Training Center ensure that instructors are fully qualified. | **FULLY IMPLEMENTED** | The academy reported that it maintains training files for all instructors. According to the academy, every basic academy instructor's in-service training file has been analyzed and a complete accounting of instructor certification training has been made. A certification spreadsheet has been created and the academy's scheduling office uses the spreadsheet to ensure that instructors are assigned to teach only courses for which they have the necessary certificates. |
| The California Department of Corrections should determine the need for remedial training of cadets recently completing the new ten-week curriculum. | **NOT IMPLEMENTED** | The academy observed that several years have elapsed since the last class of the Basic Correctional Officer Academy graduated under the circumstances identified by the May 2000 audit. There is no documentation of follow-up work to determine the need for remedial training. Further, the academy suggests that any deficiencies in the training of cadets in the original ten-week academy would likely have been addressed by corrective action tied to performance problems or by ongoing service training. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

CALIFORNIA STATE PRISON, SOLANO

> | IMPLEMENTATION REPORT CARD |
> | --- |
> | **Previous recommendations: 24** |
> | **Fully implemented: 19 (79%)** |
> | **Substantially implemented: 2 (9%)** |
> | **Partially implemented: 2 (8%)** |
> | **Not implemented: 1 (4%)** |
> | **Not applicable: 0 (0%)** |

**The Office of the Inspector General found that the California State Prison, Solano has improved certain of its operations since a March 2003 management review audit. The facility more closely monitors inmates' tuberculosis status, better manages sentence reduction credits granted to inmates, and has improved its management of both inmates placed in administrative segregation and those taking psychotropic medications. Although it has made significant progress, the facility has only partially implemented recommendations to properly house inmates taking anticonvulsant medications and has not taken steps to monitor its pharmacy inventory.**

In March 2003, the Office of the Inspector General conducted a management review audit of California State Prison, Solano pursuant to its authority under California Penal Code, section 6051. The review was conducted to assess the essential functions of the facility. As a result of the review, the Office of the Inspector General found deficiencies in tracking inmate tuberculosis status, improper assignment of sentence reduction credits, ineffective monitoring of the length of time inmates spend in administrative segregation, unsafe modifications to the administrative segregation buildings, and inappropriate housing for inmates taking psychotropic and anticonvulsant medications.

### BACKGROUND

California State Prison, Solano opened in August 1984 and is a medium-security institution covering 146 acres in Vacaville, California. The prison was initially administered by the warden of the California Medical Facility, the adjacent institution, but beginning in January 1992 it was administered as a separate institution under its own warden. California State Prison, Solano was designed to house 2,658 inmates, but it currently houses about 5,800 Level II and Level III inmates. The prison provides a comprehensive work/training program that offers academic and vocational training as well as industry assignments.

### SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

As a result of the March 2003 review, the Office of the Inspector General made the following specific findings:

- California State Prison, Solano was not adequately tracking inmates with tuberculosis, creating the potential of exposing inmates throughout the state to the disease and presenting a risk to the correctional staff and the general public.

- California State Prison, Solano inmates were allowed to earn sentence reduction credit through education and training classes even when classes were not actually held.

- Makeshift partitions in the institution's administrative segregation unit buildings created blind spots that limited the view of the control booth officers, compromising the safety and security of correctional staff and inmates.

- A significant number of inmates taking psychotropic medications were inappropriately housed in buildings lacking air conditioning and some inmates who were taking anticonvulsant medications were not assigned to lower bunks to lessen the possibility of injury in the event of a seizure.

- When inmate deaths occurred, the cause and circumstances surrounding the deaths were not examined in a timely manner and those assigned to conduct the reviews may have had a direct interest in the results.

- California State Prison, Solano retained inmates in administrative segregation units longer than justified.

- California State Prison, Solano was not complying with state regulations governing inmate dental care and as a result may have been exposed to the risk of litigation.

- California State Prison, Solano did not adequately document employee disciplinary proceedings, and the warden inappropriately served as the Skelly hearing officer in appeals of adverse action decisions.

- Pharmacy record keeping and physical controls over prescription medications stored in the infirmary and clinics were inadequate to prevent unauthorized access and theft.

- California State Prison, Solano did not promptly implement medical modification orders and many were significantly overdue at the time of the audit.

- The institution was not properly documenting inmate activity in the administrative segregation units and in some instances events were logged before they occurred.

- California State Prison, Solano prepared an excessive number of daily meals for inmates, resulting in unnecessary added costs for food and related services.

The Office of the Inspector General presented 24 recommendations to remedy the deficiencies identified in the March 2003 review.

**OBJECTIVES, SCOPE, AND METHODOLOGY**

The purpose of the 2006 follow-up review was to determine the extent to which the California State Prison, Solano has implemented the 24 recommendations from the Office of the Inspector General's March 2003 management review audit. To conduct the follow-

up review, the Office of the Inspector General provided the California State Prison, Solano with a table listing the March 2003 findings and recommendations and asked management to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the facility, and evaluated the degree of compliance or noncompliance with the recommendations. In addition, the Office of the Inspector General visited the facility in October 2005 to conduct on-site verification and interviews with staff members. The fieldwork for the follow-up review was completed during February 2006. The results are presented in the table following this narrative.

### SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the 24 recommendations issued by the Office of the Inspector General in March 2003 concerning the California State Prison, Solano, 19 recommendations have been fully implemented; two have been substantially implemented; two have been partially implemented; and one has not been implemented.

The Office of the Inspector General found that the California State Prison, Solano has made significant progress in implementing the recommendations made in the March 2003 report. Specifically, the Office of the Inspector General made the following findings:

- The facility has improved its monitoring of inmates who have tested positive for tuberculosis by adding staff and increasing follow-up assessments of those inmates.

- In closing classes with no assigned instructors, the facility has reduced the rate at which it grants sentence-reduction credits to inmates who otherwise did not attend classes.

- The facility installed mirrors that improved visibility in its administrative segregation units.

- The facility has implemented procedures to ensure that inmates taking psychotropic medications—which increase inmates' susceptibility to heat-related illnesses—are appropriately housed and monitored when temperatures are higher than 90 degrees. The facility should, however, improve its monitoring of inmates taking anti-seizure medications to ensure that those inmates are assigned to lower bunks to protect their safety.

- The department implemented new procedures in December 2005 relative to reporting inmate deaths and submitting specific documents related to each death to headquarters for analysis.

- In July 2005, the department obtained additional resources to improve statewide dental care. It is too early, however, for the Office of the Inspector General to determine whether those additional resources will improve inmate dental care.

- The pharmacy at California State Prison, Solano has improved its security over non-narcotic medications, but still does not have a method to monitor their inventory.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the California State Prison, Solano take the following additional actions:**

- **Conduct periodic evaluations of the housing assignments of inmates who have been prescribed seizure medications to ensure that those inmates are housed appropriately.**

- **Develop a method to reconcile the types and quantities of pharmaceuticals shipped from its pharmacy to its clinics and the correctional treatment center with the types and quantities of medications prescribed to inmates.**

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation take the following additional actions:**

- **Assess whether the increased dental staffing and equipment have improved the availability of dental examinations to inmates across all institutions.**

The following table summarizes the results of the follow-up review.

**ORIGINAL FINDING NUMBER 1**

**The Office of the Inspector General found evidence that California State Prison, Solano was not adequately tracking inmates with tuberculosis, creating the potential of exposing inmates throughout the state to the disease and presenting a risk to the correctional staff and the general public.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Solano take the actions listed below to improve the identification and tracking of inmate tuberculosis status. | | |
| Allocate additional personnel resources to the task of monitoring and recording inmate tuberculosis status. | FULLY IMPLEMENTED | California State Prison, Solano reported that the medical department has provided additional resources to assist the public health nurse and infection control nurse in monitoring inmates' tuberculosis (TB) status. Specifically, it assigned a TB manager to oversee the project, updated its TB policies and procedures, and assigned additional clerical staff to medical records. It also assigned a staff physician to oversee auditing of the TB alert program. The facility also reports that nursing supervisors daily review TB testing of incoming inmates. <br><br> The Office of the Inspector General interviewed the chief medical officer and verified that additional staff members have been assigned to oversee the facility's TB alert program. According to the chief medical officer, a physician oversees the TB alert program and two public health nurses work nearly full-time monitoring TB alert program information in inmate medical records. Additionally, an infection control nurse and a health program coordinator work part-time on the TB alert program. |

| Require the public health nurse to collect all records for inmates who have completed a tuberculosis treatment regimen to ensure that those inmates receive a post-treatment evaluation by a physician. | SUBSTANTIALLY IMPLEMENTED | The facility reported that the public health nurse is required to monitor and ensure that all inmates, including new arrivals, are processed, evaluated, and receive a post-treatment physician evaluation and follow-up. This process is audited by a staff physician and nursing supervisors.

The Office of the Inspector General interviewed the chief medical officer, who stated that the institution is closely monitoring 186 inmates who previously tested positive for the TB skin test. In addition, the physician who monitors the TB alert program stated that, beginning in March 2006, all inmates previously testing positive, but who refused to take or stopped taking medication, will be counseled and strongly advised to begin or complete the prophylactic medication series. According to the chief medical officer, inmates who test positive for the TB skin test have a 50 percent chance of developing infectious TB within two years. The physician further informed the Office of the Inspector General that inmates receive evaluations over the course of treatment to ensure that there is no adverse reaction to the medication, although post-treatment evaluation is not administered in all cases. Alternatively, post-treatment evaluation typically occurs in light of a separate clinical need, such as if the inmate has other medical issues that require follow-up.

The chief medical officer also affirmed that the facility will shortly initiate new procedures to assess the clinical need for a chest x-ray for new inmates who had previously tested positive for TB but who had either refused to take or had not completed taking the prophylactic medication series. For these inmates, a chest x-ray would be considered if the inmate's previous chest x-ray had been taken more than three months earlier and if such clinical symptoms as night sweats, coughing, fever, or recent weight loss were evident. |

| Require the public health nurse to ensure that tuberculosis codes are properly updated in inmate medical records and in the department's system-wide database and that a CDC Form 128-C (medical chrono) is forwarded to the central records staff for inclusion in the inmate's central file. | FULLY IMPLEMENTED | The facility reported that the department's Division of Correctional Health Care Services developed a standardized statewide inmate TB alert system. The facility's public health nurse monitors the system daily for compliance and ensures that a completed CDC Form 128-C (medical chrono) is forwarded to the records office for inclusion in the inmate's central file.<br><br>The physician who oversees the TB alert system at the facility also affirmed to the Office of the Inspector General that, between January and June 2005, she audited medical records monthly to ensure that inmates' TB status (coding) and TB-related documents concur with their medical records. She reported further that she had observed a substantial improvement in record-keeping monitored by the public health nurses. In addition, the chief medical officer reported that the public health nurse has fully reconciled the TB codes recorded in inmate medical records with those in the system-wide database. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**


**ORIGINAL FINDING NUMBER 2**

**The Office of the Inspector General found that California State Prison, Solano inmates were allowed to earn sentence-reduction credit through education and training classes even when classes were not actually held.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Solano refer all inmates currently assigned to programs without instructors to the classification committee for reassignment in accordance with the May 16, 2002 memorandum from the Department of Corrections Institutions Division and discontinue awarding "S" time to these inmates. | **FULLY IMPLEMENTED** | California State Prison, Solano reported that the education supervisor is monitoring these issues. When long-term class closures are anticipated, they are communicated to the inmate assignment lieutenant for temporary deactivation. Additionally, monthly education reports itemize specific reasons for "S" time to guide supervisors in rectifying deficiencies.<br><br>The Office of the Inspector General found that the facility closed eight classes in 2005. The facility also reduced the percentage of inmate "S" time credits. (Regulations authorize the department to award inmates sentence-reduction credit under certain circumstances, such as when instructors are absent and no relief instructor is available. These time credits are referred to as "S" time credits.) In fiscal year 2001-02, 62 percent of the time credits granted for education were "S" time hours, whereas in fiscal year 2004-05, the percentage of "S" time hours decreased to 46 percent. |
| The Office of the Inspector General also recommended that California State Prison, Solano immediately identify which classes should be closed and take formal steps to do so. | **FULLY IMPLEMENTED** | California State Prison, Solano reported that inmates assigned to education classes identified as permanently closed are referred to the work incentive coordinator for reassignment as appropriate. The classes are then documented as closed and inmates are no longer assigned to those classes.<br><br>The Office of the Inspector General found that the facility closed eight classes in 2005. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

## ORIGINAL FINDING NUMBER 3

**The Office of the Inspector General found that makeshift partitions in the institution's administrative segregation unit buildings created blind spots that limited the view of the control booth officers, compromising the safety and security of correctional staff and inmates.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Solano remove the makeshift barriers in the administrative segregation unit and develop alternatives for creating meeting space. | SUBSTANTIALLY IMPLEMENTED | California State Prison, Solano reported that the floors have been painted with a red line, convex mirrors have been installed, partitions are currently secured to the floor, and obstructions have been removed from cabinet tops. In addition, the facility reported that the institutional staff reviewed the Office of the Inspector General's recommendation to remove the partitions and decided to retain them because they furnish privacy for inmate mental health and medical evaluation interviews.<br><br>Although the partitions still present blind spots to the control booth officer, the Office of the Inspector General believes that the facility's modifications have improved control booth officers' visibility and are the most feasible solution to the original recommendation. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

## ORIGINAL FINDING NUMBER 4

**The Office of the Inspector General found that a significant number of inmates taking psychotropic medications were inappropriately housed in buildings lacking air conditioning and that some inmates who were taking anticonvulsant medications were not assigned to lower bunks to lessen the possibility of injury in the event of a seizure.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the institution conduct periodic evaluations of the housing assignments of inmates who have been prescribed psychotropic medications or whose medical conditions indicate particular housing needs. When a housing assignment is found to be incompatible with an inmate's medical condition, the institution should take immediate measures to reassign the inmate to appropriate housing. | PARTIALLY IMPLEMENTED | California State Prison, Solano reported that its extreme weather plan (institutional operations plan CSPS-CS/AD-04-015) requires specific staff procedures to minimize health risks to inmates who could be adversely affected if exposed to high ambient temperatures. In addition, the facility reported that inmates who suffer from seizure disorders are required to be identified by unit staff to ensure compliance with lower bunk requirements.

The Office of the Inspector General reviewed the extreme weather plan and related documents. The Office of the Inspector General found that the facility medical staff generates a daily list of heat-risk inmates, and that custody staff monitors inside and outside air temperatures hourly. Further, the facility extreme weather plan outlines specific steps to be followed when temperatures exceed 90 and 95 degrees. When inside temperatures exceed 95 degrees, medical staff members visually monitor heat-risk inmates every two hours and must contact the chief medical officer for a diagnosis when a heat-risk inmate appears to be suffering from heat exposure.

The Office of the Inspector General also analyzed pharmacy records for September 2005 and identified eight inmates who had been prescribed seizure medications, yet records indicated that the inmates were not assigned to lower bunks, putting them at risk of a fall-related injury in the event of a seizure. The Office of the Inspector General requested that the chief medical officer assess whether these inmates had health conditions that required placement in lower bunks; according to the chief medical officer, five of the eight did require lower bunks. In response, the Office of the Inspector General alerted the warden's office, which determined that two of the five were currently housed in lower bunks, leaving three remaining inmates in upper bunks. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the institution conduct periodic evaluations of the housing assignments of inmates who have been prescribed seizure medications to ensure that these inmates are housed appropriately.**

## ORIGINAL FINDING NUMBER 5

**The Office of the Inspector General found that when inmate deaths occurred, the cause and circumstances surrounding the deaths were not examined in a timely manner and that those assigned to conduct the reviews may have had a direct interest in the results.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections develop procedures to require the Health Care Services Division to take the steps listed below to improve review of inmate deaths. | | |
| Coordinate review of inmate deaths with the warden and the institution's chief medical officer. The procedures should provide for communication throughout the review process to coordinate the assignment of staff and collection of evidence by the investigative staff when necessary. | FULLY IMPLEMENTED | On December 30, 2005, the department's director over the Division of Correctional Health Care Services issued a directive requiring that all inmate death-related documents be submitted to the division within seven calendar days following the date of death. Division staff also told the Office of the Inspector General that, beginning January 2006, all inmate deaths are reviewed by a headquarters-based death review committee comprised of division staff, medical professionals, and representatives from the Office of Internal Affairs. At present, the death review committee is monitored by the Office of the Inspector General's Bureau of Independent Review. The committee meets every two weeks and can issue referrals for peer reviews and/or internal affairs investigations. Referrals for internal affairs investigations related to inmate deaths can also be initiated by the institution's chief medical officer or the warden.

Because the death review process and peer review process are new, the Office of the Inspector General did not assess their effectiveness during this audit. It, anticipates, however, that it will provide comments to the division and |

| | | |
|---|---|---|
| | | appropriate departmental officials as part of its ongoing monitoring of the death review process. |
| Forward pertinent information gathered by the investigations unit of the institution to the morbidity and mortality review committee. | **FULLY IMPLEMENTED** | According to the director of the division's medical program implementation, the morbidity and mortality review committee has been replaced. Inmate deaths are now reviewed by the death review committee described above, and inmate suicides are reviewed by staff members who have clinical, psychological, and custodial expertise. The December 30, 2005 directive provides that all information related to inmate deaths is forwarded to the division. As noted above, the death review committee includes representatives from the Office of Internal Affairs and is presently monitored by the Office of the Inspector General's Bureau of Independent Review. |
| Ensure that those conducting peer reviews are independent of the incident and the individuals involved. | **FULLY IMPLEMENTED** | According to the division's director of medical program implementation, peer reviews are now coordinated through the regional medical directors and the professional practice executive committee. These peer reviews can be initiated by the death review committee or health care managers, and are conducted either by regional staff or external University of California experts. |
| Ensure that peer reviews are completed in a timely manner. | **FULLY IMPLEMENTED** | The division reported to the Office of the Inspector General that, because they are now coordinated through headquarters division staff, peer reviews are monitored for timely completion by headquarters staff. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 6**

**The Office of the Inspector General found that California State Prison, Solano retained inmates in administrative segregation units longer than justified.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden take the actions listed below. | | |
| Develop a standard tracking system for use by all of the housing facilities to monitor inmates retained in administrative segregation. The tracking system should record all critical actions, including communication with employees and other units within the institution, to ensure that casework is completed in a timely manner. | **FULLY IMPLEMENTED** | The institution reported that its inmate classification information system is currently being used to monitor inmates retained in administrative segregation. This local information system tracks all critical actions, including communication with employees and other units, to ensure that casework is completed in a timely manner. |
| Emphasize the importance of completing casework before presenting cases at the institution classification committee hearing or submitting cases to the classification services representative for review and approval. | **FULLY IMPLEMENTED** | The institution reported that caseworkers can now prepare the appropriate documentation before presenting cases to the institutional classification committee by using the inmate classification information system. The Office of the Inspector General's review of institutional classification committee actions relative to administrative segregation inmates confirmed that casework is completed before cases are presented to the institution classification committee. |
| Provide training to correctional counselors and other members of the institution staff to ensure that all actions required in administrative segregation cases are completed and the results documented and communicated to the appropriate staff. | **FULLY IMPLEMENTED** | The institution reported that it provides training to correctional counselors and other institutional staff weekly or monthly. It furnished the Office of the Inspector General with copies of weekly agenda meeting topics supported by sign-in sheets for training conducted in 2004 and 2005, indicating that the topic of administrative segregation had been included. |
| Identify all cases that have been deferred pending action or returned by the classification services representative for completion of additional casework and monitor these cases | **FULLY IMPLEMENTED** | The institution generates a deferral list of administrative segregation inmates whose institution classification committee hearings have been deferred pending results from investigations, parole hearings, district attorney requests, rules violation reports, or other administrative issues. This list is provided to |

| closely to ensure that tasks are completed by the institution staff in a timely manner. | | the chief deputy warden for review and forwarded to division heads to ensure that the pending circumstances are monitored. |
|---|---|---|
| The Office of the Inspector General further recommended that the Department of Corrections follow the procedural requirements for amending regulations as required by the *California Government Code*. | **FULLY IMPLEMENTED** | The Department reported that it follows the procedural requirements for amending regulations as required by the *California Government Code*. The Office of the Inspector General originally found that the department's Institutions Division disseminated a department-wide memo in November 2001, directing institutions to re-evaluate an inmate's retention in administrative segregation every 90 to 180 days, depending on the reason for the retention, instead of the mandate of at least every 30 days. Since the Office of the Inspector General's original audit, the department's Regulation and Policy Management Branch processed the formal regulation change, and effective December 15, 2005, the regulation change became permanent. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 7**

**The Office of the Inspector General found that California State Prison, Solano was not complying with state regulations governing inmate dental care and as a result may have been exposed to the risk of litigation.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the California Department of Corrections examine policies and regulatory requirements governing inmate dental care and consider revising requirements to a level achievable under present conditions. | PARTIALLY IMPLEMENTED | The department reported that it is examining its policies and regulatory requirements in the course of drafting a dental policy and procedure manual. The department also reported its submission of a fiscal year 2005-06 finance letter to secure additional positions and equipment specifically for department-wide dental care.<br><br>The Office of the Inspector General found that inmates did not receive the required dental examinations under California Code of Regulations, Title 15, which requires that inmates receive an initial dental examination within 14 days of arrival from the reception center. Further, inmates under age 50 are to receive a dental examination every two years; all other inmates are to receive a dental examination annually.<br><br>The Office of the Inspector General also found that the drafted dental policy and procedure manual does not address the inmate dental care issues identified in the audit. Also, the department does not offer any proposed or pending changes to Title 15 that would alter the frequency of inmate dental examinations.<br><br>The finance letter to increase department-wide dental care was approved in July 2005, adding 63 positions and $13.3 million. It is too early, however, for the Office of the Inspector General to determine whether these additional resources will improve the availability of inmate dental care examinations. |

**FOLLOW-UP RECOMMENDATION**

**The California Department of Corrections and Rehabilitation should assess whether the increased dental staffing and equipment have improved the availability of dental examinations to inmates across all institutions.**

## ORIGINAL FINDING NUMBER 8

**The Office of the Inspector General found that California State Prison, Solano did not adequately document employee disciplinary proceedings and that the warden inappropriately served as the Skelly hearing officer in appeals of adverse action decisions.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Solano take the actions listed below. | | |
| Take steps to ensure that the employee relations officer and all others involved in possible employee disciplinary proceedings document their actions thoroughly and completely in the adverse action files to provide a complete and accurate history of critical steps in the disciplinary process and assist the employee relations officer in developing consistent disciplinary recommendations in future cases. | **FULLY IMPLEMENTED** | California State Prison, Solano reported that the employee relations officer uses a checklist contained within each adverse action file for an overview of the critical steps taken in employee disciplinary proceedings, ranging from a review of circumstances for possible adverse action to taking adverse action through the appeal process. The completed adverse action files also contain supporting documentation.

As part of its follow-up review, the Office of the Inspector General examined samples of adverse action files and found that they were supported by documentation of the disciplinary steps taken. |

| Discontinue the practice of the warden acting as the Skelly hearing officer in personnel matters involving California State Prison, Solano. | FULLY IMPLEMENTED | California State Prison, Solano reported that it no longer engages the warden or chief deputy warden to conduct Skelly hearings. Alternatively, associate wardens who are not within the chain of command of the affected employee conduct these hearings.<br><br>As part of its follow-up review, the Office of the Inspector General reviewed samples of adverse action files and found that the hearing officer was a non-involved manager.<br><br>In addition, as discussed in the chapter of this audit which relates to the employee disciplinary process, the Office of the Inspector General's follow-up review to its initial March 2002 review of the department's employee disciplinary process found that the Department of Corrections and Rehabilitation has made significant improvements in administering the employee disciplinary process by updating its policies and procedures for employee discipline, providing formalized training to its statewide employee relations officers, and developing a case management system to monitor the comprehensive stages of disciplinary cases. It has also implemented a new central intake process that includes legal representatives from both the Department of Corrections and Rehabilitation and the Office of the Inspector General's Bureau of Independent Review to review requests for investigations and determine appropriate action. |
|---|---|---|

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 9**

**The Office of the Inspector General found that pharmacy record keeping and physical controls over prescription medications stored in the infirmary and clinics were inadequate to prevent unauthorized access and theft.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the health care manager at California State Prison, Solano take the actions listed below to improve control over pharmaceuticals. | | |
| Institute measures to ensure that medications are securely stored at all times consistent with their value and potential for misuse. Medications in the infirmary and clinics should be stored in secured areas under a supervisor's control. | FULLY IMPLEMENTED | California State Prison, Solano reported that narcotic medications are stored in secured containers in the pharmacy, clinics, and the correctional treatment center. In addition, licensed pharmacists monitor the handling and storage of narcotics and perform routine audits of these functions.

During its follow up review, the Office of the Inspector General observed that both narcotic and non-narcotic medications are stored in secured containers and that medications in the correctional treatment center and clinics are secured under a supervisor's control. |
| Record the quantity of pharmaceuticals shipped to the infirmary and clinics and periodically compare these records to the quantities prescribed by doctors. Investigate any material variations between the two amounts. Physical inventories of drugs should be conducted periodically and compared to perpetual inventory records maintained by the health care manager. | NOT IMPLEMENTED | California State Prison, Solano reported that the pharmacy maintains both individual binders with accountability log sheets for each medication and a controlled medication log for narcotics. For narcotics secured in locked cabinets, a running inventory log is also updated whenever medications are added or removed and an inventory of each cabinet is conducted at every shift change.

The Office of the Inspector General verified that the pharmacy maintains a medication log for narcotics, but that a similar perpetual inventory system is not maintained for non-narcotic medications. According to the pharmacy manager, the current pharmacy computer system is incapable of generating inventory records, making a reconciliation between physical inventory amounts and perpetual inventory records unfeasible. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the California State Prison, Solano develop a method to reconcile the types and quantities of pharmaceuticals shipped from its pharmacy to its clinics and the correctional treatment center with the types and quantities of medications prescribed to inmates.**

**ORIGINAL FINDING NUMBER 10**

**The Office of the Inspector General found that California State Prison, Solano did not promptly implement medical modification orders and that many were significantly overdue at the time of the audit.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the chief medical officer at California State Prison, Solano assign a staff member to monitor the timely completion of medical modification orders, with priority on resolving the oldest orders first. That staff member should also periodically reconcile the information on the overdue modification orders list with information in the inmate appeals office records to ensure accuracy of the list. | FULLY IMPLEMENTED | California State Prison, Solano reported that a medical appeals coordinator is assigned to monitor the timely completion of medical modification orders. The medical appeals coordinator reconciles this information monthly with the inmate appeals office, which prepares a weekly overdue list that is distributed to the warden, chief deputy warden, and division heads.<br><br>In its October 2005 follow-up review, the Office of the Inspector General examined a list of medical modification orders and found that the facility had no overdue orders. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

ORIGINAL FINDING NUMBER 11

**The Office of the Inspector General found that the institution was not properly documenting inmate activity in the administrative segregation units and that in some instances events were logged before they occurred.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that administrative segregation custody personnel institute a practice of recording inmate movements in CDC Form 114 and CDC Form 114-A as they occur, rather than waiting for the first watch administrative segregation floor officer to update the movements after the fact or recording events before they take place. | FULLY IMPLEMENTED | California State Prison, Solano reported that it had trained all administrative segregation custody personnel to record inmate movements as they occur on the CDC Form 114, Disciplinary Detention Log, and the CDC Form 114-A, Detention/Segregation Record. The administrative segregation lieutenant additionally monitors this practice. |

FOLLOW-UP RECOMMENDATIONS

**None.**

ORIGINAL FINDING NUMBER 12

**The Office of the Inspector General found that California State Prison, Solano prepared an excessive number of daily meals for inmates, resulting in unnecessary added costs for food and related services.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden and the food manager review the food service process at the institution to identify areas in which controls should be established or strengthened. Controls should include an accurate cost accounting system to record actual meals served, re-cycled, and wasted to assist in estimating future daily meal requirements and in controlling associated costs. The institution should also strengthen custody controls over food service operations to lessen opportunities for inmates to obtain more than one meal. | FULLY IMPLEMENTED | California State Prison, Solano reported that it is difficult to predict exactly how many inmates will be participating in each meal because such factors as the menu, weather conditions, sports events, and inmate incidents can affect meal participation. The facility further reported that its food services department developed a tracking system reflecting daily meals prepared versus wasted; this data—including dates, menus, and events suspected to have contributed to food waste fluctuations—is submitted monthly to management and is also evaluated in food services supervisory and staff meetings. The facility also took measures to reduce inmates' ability to "double back" through food lines to receive more than one meal and in addition modified the feeding system to minimize inmates' opportunities to request extra portions of food.<br><br>The Office of the Inspector General reviewed monthly monitoring sheets prepared by the food services manager for January through August 2005. During this period, the monthly food waste ranged between 2 and 5.4 percent and averaged 3.1 percent—a significant improvement over the 7.5 percent average noted by the Office of the Inspector General in its 2003 audit. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

(Blank page)

CALIFORNIA STATE PRISON, SACRAMENTO

**The Office of the Inspector General found that California State Prison, Sacramento has corrected various deficiencies identified in a September 2000 management review audit. Financial management has improved in that actual expenditures are closer to budget allotments; underground storage tanks have been removed, thus avoiding fines and penalties; and internal control weaknesses in the handling of inmate trust funds have been corrected.**

---

**IMPLEMENTATION REPORT CARD**

**Previous recommendations: 17**

**Fully implemented: 12 (70%)**

**Substantially implemented: 2 (12%)**

**Partially implemented: 1 (6%)**

**Not implemented: 2 (12%)**

**Not applicable: 0 (0%)**

---

In September 2000, the Office of the Inspector General issued a report presenting the results of a management review audit of California State Prison, Sacramento. The audit focused on personnel, training, communications, inmate programming, security, and finances. The review found several deficiencies in financial management, including budgeting and staffing issues. Other areas found to be deficient included security, inmate dental examinations, and tracking and filing systems pertaining to various operational areas.

BACKGROUND

California State Prison, Sacramento, which opened in 1986, covers 1,200 acres adjacent to Folsom State Prison. When it first opened, the institution was administered by the Folsom warden and was called New Folsom. In October 1992, the institution's name was changed to the California State Prison, Sacramento and it began operating as a separate institution with its own warden.

California State Prison, Sacramento is a multi-mission institution that houses maximum security inmates serving long-term sentences and other inmates who have proved to be management problems at other institutions. The institution also serves as a medical hub for northern California institutions, with a psychiatric services unit, an enhanced outpatient unit, and an enhanced outpatient administrative segregation unit. The institution currently operates an outpatient housing unit and a correctional treatment center, the latter of which was licensed in February 2003. The institution also provides Prison Industry Authority inmate work programs, inmate academic and vocational education programs, and other inmate programs.

At present, the institution houses approximately 2,900 Level IV (high-security) inmates and 400 Level I (low-security) inmates. For fiscal year 2005-06, the institution has an operating budget of approximately $161 million and 1,420 staff positions.

## SUMMARY OF PREVIOUS FINDINGS AND RECOMMENDATIONS

The Office of the Inspector General made the following specific findings as a result of the September 2000 review:

- The institution's budget deficit continued to increase. This trend was expected to continue unless the institution's budget was adjusted to reflect its realistic needs.

- Inmate and parolee appeal forms were not processed in a timely manner.

- There was inadequate documentation to demonstrate that the apprentices in the Correctional Peace Officer Standards and Training apprentice program fully complied with prescribed standards.

- The warden's busy schedule limited time spent in custody areas.

- The Identix Touchlock II System did not work properly and, apparently, some of the institution staff members did not use it.

- The institution faced potentially highly significant fiscal liability for failing to remove underground storage tanks in a timely manner.

- The institution was not in compliance with the regulatory requirement for providing dental examinations to inmates.

- The equal employment opportunity complaint and investigation case files contained inadequate documentation.

- Employee probation and performance reports were not completed in a timely manner.

- The emergency operations plan was not submitted in a timely manner.

- The various facilities did not manage and process the inmate rules violation reports in a consistent manner.

- California State Prison, Sacramento incurred high costs in workers' compensation expenditures and related service fees paid to the State Compensation Insurance Fund.

- There were internal control weaknesses in accounting for the inmate trust funds.

The Office of the Inspector General presented 17 recommendations to remedy the deficiencies identified in the September 2000 review.

## OBJECTIVES, SCOPE, AND METHODOLOGY

The purpose of the 2006 follow-up review was to determine the extent to which California State Prison, Sacramento has implemented the 17 recommendations from the Office of the Inspector General's September 2000 audit.  To conduct the follow-up review, the Office of the Inspector General provided the California State Prison, Sacramento with a table listing the September 2000 findings and recommendations and asked the institution to provide the implementation status of each recommendation. The Office of the Inspector General reviewed the responses, along with documentation provided by the institution, and evaluated the degree of compliance or noncompliance with the recommendations. Additional field work was completed in September 2005. The results are presented in the table following this narrative.

## SUMMARY OF THE 2006 FOLLOW-UP RESULTS

Of the 17 recommendations issued by the Office of the Inspector General in the September 2000 management review audit, 12 recommendations have been fully implemented; two have been substantially implemented; one has been partially implemented; and two have not been implemented.

The Office of the Inspector General found that the California State Prison, Sacramento has substantially improved its financial management. The institution has kept expenditures aligned with budget allotments; avoided fines and penalties by removing underground storage tanks in a timely manner; and resolved internal control weaknesses relative to inmate trust funds. The institution has also benefited from departmental changes that have increased funding and staff levels to address high workers' compensation expenditures. The institution has implemented processes that have improved timely monitoring of the following: inmate and parolee appeals, the correctional peace officer apprenticeship program, equal employment opportunity case files, and inmate rules violation reports. In addition, the institution has improved custody operations by providing the appropriate level of warden involvement and updating its emergency operations plan. The institution still needs improvement in the following areas: tracking institution staff and visitors, providing timely inmate dental examinations, and completing staff performance evaluations.

### FOLLOW-UP RECOMMENDATIONS

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation take the following additional action:**

- **In conjunction with the institution wardens, implement measures to lower workers' compensation costs through enhanced case monitoring, thereby minimizing service fees paid to the State Compensation Insurance Fund.**

**The Office of the Inspector General recommends that the warden of California State Prison, Sacramento take the following additional actions:**

- **Explore options for a cost-effective electronic system that effectively tracks the entry and departure of staff and visitors at the institution.**

- **Barring a change in Title 15, California Code of Regulations, comply with the requirement to provide dental examinations to inmates within 14 days of their arrival at the institution.**

- **Ensure that performance and probationary reports are completed in a timely manner.**

- **In conjunction with the California Department of Corrections and Rehabilitation, implement measures to lower workers' compensation costs through enhanced case monitoring, thereby minimizing service fees paid to the State Compensation Insurance Fund.**

The following table summarizes the results of the follow-up review.

ORIGINAL FINDING NUMBER 1

**The Office of the Inspector General found that the institution's budget deficit continued to increase. The trend was expected to continue unless the institution's budget was adjusted to reflect its realistic needs.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections perform a custody staffing audit to determine the appropriate level of staffing required to maintain the safety and security of the institution and the programming needs of the institution's specialized population.<br><br>It was further recommended that the Department of Finance and the Legislature should participate in the audit to ensure that the institution's budget is balanced permanently and safely. Until this is accomplished, it is difficult to hold the warden solely accountable for the budget deficit. | SUBSTANTIALLY IMPLEMENTED | The Office of the Inspector General reviewed budgetary and expenditure reports to determine whether the institution has continued to incur a budget deficit. The reports concentrated on the program 21 budget, which is the portion of the institution's budget controlled by the warden.  Review of the last fiscal year (2004-05) expenditures indicated that the institution exceeded its mid-year projected expenditures of $118.4 million by only $289,000, which amounts to one-quarter of a percent, a deficit that was incurred after the mid-year fiscal review adjustment had reduced the budget allotment by $453,000.<br><br>The California Department of Corrections and Rehabilitation administration reported that staff from the department's headquarters worked with staff from the Department of Finance to develop a new base budget methodology to fund institutions based on their individual missions and functions. The goal was to develop an achievable budget for each institution and to hold institution management accountable for operating within that budget. The department also reported that it would continue to seek additional funding for inmate population-related issues and operating cost adjustments.<br><br>The department administration reported that it received $450,000 during fiscal year 2003-04 to initiate a standardized institutional staffing study. It affirmed, however, that due to contractual freezes, the project was delayed and the funding was subsequently re-appropriated in fiscal year 2004-05 when the Standardization Review Unit was established. It also reported that the Standardization Review Unit has gathered preliminary data to complete the staffing and operations reviews and contracted with the California State University, Sacramento for consultation services. According to the administration, department need dictates that the reviews begin in the |

| | | institution case records office and mailrooms statewide and that project funding has been extended through fiscal year 2006-07, although it is anticipated that project funding and completion will continue through fiscal year 2007-08. <br><br> The Office of the Inspector General reviewed the Standardization Review Unit's work plan, which identified that preliminary data collection for the custody review was to take place January 2006 through May 2006. The custody review site visits are scheduled to begin June 2006, with findings and recommendations to be completed by October 2006. The review of those areas in the custody operations not included in the initial review is scheduled to begin November 2006. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 2**

**The Office of the Inspector General found that inmate and parolee appeal forms were not processed in a timely manner.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden take the actions listed below. | | |
| Implement effective monitoring processes to ensure that inmate/parolee appeals are processed promptly. The warden should review the status of the appeal reports weekly until the appeal backlog is eliminated. Once the appeal backlog is eliminated, the warden should continue to periodically review the | SUBSTANTIALLY IMPLEMENTED | California State Prison, Sacramento reported that the inmate appeals process is monitored and reviewed weekly by the warden and that an updated overdue appeals list is prepared and distributed weekly to each division head, the chief deputy warden, and the warden. The appeals status or backlog is addressed by the warden during the Monday executive staff meeting with managers. The institution also reported that a correctional sergeant's position had been reclassified to a correctional counselor II specialist to better address the |

| status of appeals and ensure timely resolution. If additional resources are necessary, the warden should address this issue either through redirection of staff or through the budgetary process. | | appeals workload and that the appeals office has added a second appeals coordinator to the staff.<br><br>The Office of the Inspector General reviewed an overdue appeals report dated, August 4, 2005. The report identified 50 overdue appeals, with 39 at the first level and 11 at the second level. Eleven of the overdue appeals, however, were medically related, cases in which ultimate oversight responsibility lies with the chief medical officer. Nine of the overdue appeals had been generated by other institutions from which inmates had transferred. Nonetheless, 50 overdue appeals demonstrate a clear improvement over the 108 overdue inmate appeals found in the original audit. |
|---|---|---|
| Ensure that a standard informal appeals log book is developed to define information required to be used consistently by all facilities. | **FULLY IMPLEMENTED** | California State Prison, Sacramento reported that a designated staff member in each facility collects daily appeals and maintains the informal appeals logbook, after which the appeals are either forwarded to the appeals coordinator or logged and assigned to the appropriate staff member with an expected due date. Informal appeals are returned through the designated staff member to document the response date in the logbook and are also returned to the inmate. The standard logbooks are used to maintain the informal logs.<br><br>The institution further reported that the informal appeals logbooks are not required by department procedures or law; that notwithstanding, staff continues to collect and track informal appeals to ensure their appropriate and timely management. Essential information is maintained in the logs by all facilities. Although the logs themselves are not identical across all facilities, the information gathered is the same. |
| Provide additional training, if necessary, in California State Prison, Sacramento's policies and procedures for processing inmate appeals. | **FULLY IMPLEMENTED** | California State Prison, Sacramento reported that inmate appeals training had been provided annually to all staff during the 7K training schedule. The 7K training has now been eliminated and the inmate appeals training is conducted on the job by the supervisors. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

Original Finding Number 3

**The Office of the Inspector General found there was inadequate documentation to demonstrate that the apprentices in the Correctional Peace Officer Standards and Training apprentice program fully complied with prescribed standards.**

| Original Recommendation | Status | Comments |
|---|---|---|
| To mitigate the potential for exposing the institution and the department to civil liability, the Office of the Inspector General recommended that the institution's in-service training unit develop policies, procedures, and controls to monitor apprentices' progress and completion of the Correctional Peace Officer Standards and Training apprenticeship program.<br><br>The procedures should provide for the reconciliation of apprentice time sheets with total reported program hours. The procedures should also ensure that documentation of all required program milestones (probation reports, for example) is included in the apprentice files in accordance with statute and with the terms of the memorandum of understanding for Bargaining Unit 6. | Fully Implemented | California State Prison, Sacramento reported that the apprenticeship program and all participant information is tracked by an apprenticeship tracking and maintenance computer program used by the department and the institutions. Apprentice progress is monitored through data in the computer program as well as through hard copies of monthly reports in apprentice files. In the capacity of the Local Apprenticeship Subcommittee chairperson, the in-service training manager maintains the apprenticeship program. The subcommittee secretary documents the monthly meetings.<br><br>The Office of the Inspector General reviewed a copy of a monthly meeting report, which includes the status of enrollees by classification and the activity of each classification. It also provides current information on individuals who have completed, been terminated from, or resigned from the program since the last meeting. The report identified one correctional officer who had completed the mandatory hours in the following categories: (a) maintaining security, (b) supervising inmates, (c) escorting/transporting inmates, (d) report writing/record keeping, and (e) additional experience. It also identified an individual who had resigned because of a disability.<br><br>The institution reported that the reconciliation of apprentice time sheets occurs monthly and that the generated reports reflect current work hours. Apprentice files and related information are housed in the in-service training manager's office.<br><br>Although the original finding identified deficiencies in the verification of training hours and documentation of probation reports, reconciling apprentice |

| | | time sheets and maintaining apprentice training documentation should resolve those issues. |
|---|---|---|

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 4**

**The Office of the Inspector General found that the warden's busy schedule limited time spent in custody areas.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden prioritize the workload to allow for greater involvement in custody matters. | FULLY IMPLEMENTED | California State Prison, Sacramento reported that the warden is intimately involved in all of the institution's custody operations. The warden participates in two weekly executive staff meetings and two weekly lockdown meetings; chairs weekly institutional classification committees; attends most major program meetings; and regularly tours the institution and communicates with staff. The warden has made active involvement in custody operations a top priority. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 5**

**The Office of the Inspector General found that the Identix Touchlock II System did not work properly and, apparently, some of the institution staff members did not use it.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden continue to | FULLY IMPLEMENTED | California State Prison, Sacramento reported in its initial response to the audit that it was working with department headquarters to resolve the problem. |

| work cooperatively with the Department of Corrections to make the necessary corrective changes to the Identix Touchlock II system to ensure that it is fully operational at California State Prison, Sacramento. | | Trans Tech was commissioned to address the software and equipment failures. The software was subsequently sent to Oregon but the problem could not be remedied. Since that time, the institution reported that the Identix Touchlock II system has been discontinued.<br><br>Although the institution worked with the department in attempting to resolve the problem, the ultimate resolution was to terminate the system's operation. Nevertheless, an electronic system to track the entry and departure of staff and visitors remains critical to enhance the institution's safety and security operations. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that California State Prison, Sacramento explore options for a cost-effective electronic system that effectively tracks the entry and departure of staff and visitors at the institution.**

**ORIGINAL FINDING NUMBER 6**

**The Office of the Inspector General found that the institution faced potentially highly significant fiscal liability for failing to remove underground storage tanks in a timely manner.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Sacramento continue to expedite the underground fuel storage tank filling and removal process. At the same time, the institution should negotiate with Sacramento County to either extend the final deadline by approximately one month or waive all fines and penalties to mitigate their impact on an already significant budget deficit. | FULLY IMPLEMENTED | In its initial response to the audit, California State Prison, Sacramento reported that its ability to comply with the mandates for removing the underground fuel storage tanks was limited. It also reported that the process would be completed by November 2000 and that its compliance with Sacramento County requirements appeared to preclude the imposition of any fines or penalties. Since that time, the institution reported that the underground storage tank filling and removal process was completed. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 7**

**The Office of the Inspector General found that the institution was not in compliance with the regulatory requirement for providing dental examinations to inmates.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that California State Prison, Sacramento comply with the requirement to examine inmates within 14 days of their transfer from the reception center to the institution. Although the chief medical officer would be directly responsible for implementing this finding, the warden should monitor progress in resolving the problem. | NOT IMPLEMENTED | The California Department of Corrections and Rehabilitation reported that the Division of Correctional Health Care Services has developed dental policies and procedures to standardize dental services at all correctional facilities. The proposed dental policies and procedures will require the dental examinations to be completed within 90 days of the inmate's arrival at the assigned institution, which will necessitate a revision to the 14-day mandate in the California Code of Regulations, Title 15.

The Office of the Inspector General reviewed the draft dental policies and procedures dated October 2003. It determined that the chapters related to dental issues retain the 14-day requirement for dental examinations. Specifically, chapter nine, which covers inmate dental care, requires that a comprehensive dental examination be completed within 14 days of assignment to a given facility.

The Office of the Inspector General reviewed the California Code of Regulations, Title 15, section 3355.1 regarding dental examinations and determined that, as of February 10, 2006, the institution is still required to provide a complete dental examination to inmates within 14 days of their transfer from a reception center. The California State Prison, Sacramento provided no evidence to indicate that it is complying with this requirement.

The California Department of Corrections and Rehabilitation also reported that additional resources to augment staffing of the statewide dental program |

| | | had been acquired through a fiscal year 2005-06 finance letter.

The Office of the Inspector General reviewed the fiscal year 2005-06 finance letter, wherein the department had requested a total of 88.5 positions and $17.3 million to correct the base dental staffing deficiencies, assess the dental staffing and operational deficiencies, and begin the planning activities to implement major policy changes in the dental program. Review of the Final Change Book for fiscal year 2005-06 showed that the Legislature had reduced the finance letter amount by $4 million to accommodate the purchase of equipment over a two-year period. Given that 50.0 of the positions authorized by the Legislature were to have been instituted January 1, 2006, an assessment of the benefits afforded by these additional resources would be premature, as would assessment of the potential effects of the protracted delay in equipment funding.  The California State Prison, Sacramento was scheduled to acquire three office technicians and one dental assistant. |
|---|---|---|

**FOLLOW-UP RECOMMENDATION**

**Barring a change in Title 15, California Code of Regulations, the Office of the Inspector General recommends that California State Prison, Sacramento comply with the requirement to provide dental examinations to inmates within 14 days of their arrival at the institution.**

**ORIGINAL FINDING NUMBER 8**

**The Office of the Inspector General found that the equal employment opportunity complaint and investigation case files contained inadequate documentation.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the institution's equal employment opportunity coordinator develop a system to track and monitor equal employment opportunity cases to assure that cases are resolved in a timely fashion, and that all | FULLY IMPLEMENTED | California State Prison, Sacramento reported that the equal employment opportunity coordinator deploys a system for tracking equal employment opportunity cases to assure that cases are resolved in a timely manner and that critical information is complete. The coordinator regularly monitors the caseload to identify and apprise the warden of those cases requiring immediate attention. |

| | | |
|---|---|---|
| critical documentation is complete. | | The Office of the Inspector General reviewed an excerpt from an equal employment opportunity log and found the information documented to be appropriate for case monitoring. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 9**

**The Office of the Inspector General found that employee probation and performance reports were not completed in a timely manner.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden should take steps to ensure that performance and probationary reports are completed on time. | NOT IMPLEMENTED | California State Prison, Sacramento reported that the completion of performance evaluations outside of overtime remains a challenge. The current overdue list is unacceptable and the process for tracking performance evaluations is flawed. The personnel officer has been instructed to prepare a plan that ensures timely tracking and completion of performance evaluations. The personnel section generates the report notices, which the in-service training and personnel assignment sections forward through the division heads to the appropriate supervisors.  The personnel officer has implemented a tracking system report to monitor the progress and completion of performance and probationary reports.<br><br>The Office of the Inspector General reviewed a current report of outstanding performance evaluations. The list identified 668 employees whose performance evaluations were delinquent. With a budget for approximately 1,420 positions, this amounts to a delinquency rate of 47 percent. |

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the warden take steps to ensure that performance and probationary reports are completed in a timely manner.**

## ORIGINAL FINDING NUMBER 10

**The Office of the Inspector General found that the institution's emergency operations plan was not submitted in a timely manner.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden should implement procedures to ensure that the emergency operations plan is updated and ready to be submitted to the Department of Corrections for review each January. | FULLY IMPLEMENTED | California State Prison, Sacramento reported that the emergency operations plan is current. A report from the Emergency Operations Unit of department headquarters indicates that the plan had been submitted and contained all the required resource supplements. The headquarters report also identified specific areas that require further clarification. The administration reported that the follow-up work was being completed and that its plan had been approved by headquarters. The Office of the Inspector General reviewed a copy of the report from headquarters and found that California State Prison, Sacramento's emergency operations plan was consistent with the requirements set forth in the *California Department of Corrections and Rehabilitation Operations Manual* and encompassed all required resource supplements. The headquarters report did not indicate that the institution's emergency operations plan was delinquent. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

## ORIGINAL FINDING NUMBER 11

**The Office of the Inspector General found that the various facilities did not manage and process the inmate rules violation reports in a consistent manner.**

| ORIGINAL RECOMMENDATIONS | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the warden's office implement a monitoring system to ensure that CDC-115 forms are processed promptly and uniformly among the facilities.<br><br>Specifically, the Office of the Inspector General recommended that the warden take the actions listed below. | | |
| The inmate disciplinary process requires due process and consistency in disposition. On a weekly basis, either the warden or the chief deputy warden should review the status of the reports with Facilities A, B, and C, taking appropriate action when necessary to ensure prompt resolution of inmate disciplinary cases. | FULLY IMPLEMENTED | California State Prison, Sacramento reported that the chief disciplinary officers—the associate wardens assigned to each facility—are responsible for the disciplinary systems within those facilities. Under the supervision of the facility lieutenants, the chief disciplinary officers track and maintain disciplinary processes.  Staff utilizes the standardized facility logbooks to monitor the progress of each CDC-115, Rules Violation Report.  Facility captains review and approve all rules violation reports and also monitor, review, and approve the logbooks.<br><br>The institution reported that the warden and chief deputy warden conduct spot reviews of the logbooks during institution tours, classification committee hearings, and inmate appeals reviews. The institution also reported that the warden, chief deputy warden, and associate wardens are complying with the current mandates relative to disciplinary process. |
| A written explanation should be required of any official authorizing the voiding of a CDC-115 form. Furthermore, for proper monitoring and auditing purposes, copies of all voided CDC-115 forms must be forwarded to the chief disciplinary officer for the institution register and files. | FULLY IMPLEMENTED | California State Prison, Sacramento reported that a written explanation is required of any official who voids a rules violation report. All rules violation reports are forwarded to the appropriate chief disciplinary officer for the institution register files. |

| | | |
|---|---|---|
| Copies of completed CDC-115 and 115-A forms should be delivered to inmates within five working days of the chief disciplinary officer's review. | **FULLY IMPLEMENTED** | California State Prison, Sacramento reported that copies of the completed rules violation reports are delivered to inmates within five working days of the chief disciplinary officer's review. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

**ORIGINAL FINDING NUMBER 12**

**The Office of the Inspector General found that California State Prison, Sacramento incurred high costs in workers' compensation expenditures and related service fees paid to the State Compensation Insurance Fund.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that the Department of Corrections should increase the workers' compensation staff at California State Prison, Sacramento. | **PARTIALLY IMPLEMENTED** | The warden had submitted a budget concept statement to department headquarters requesting additional staff to manage the workers' compensation caseload. The California State Prison, Sacramento reported that the request was denied but that it continued to explore options to manage its workers' compensation caseload, including requesting additional staff through the budget process.  The department indicated that its budget for fiscal year 2004-05 had been fully funded for workers' compensation costs.<br><br>The institution also reported that, as a result of the department's reorganization and consequent departmental assumption of responsibility for workers' compensation cases, the need for additional institution staff to manage the caseload no longer exists. It reported that the workers' compensation costs for the institution were to have been $5.3 million in fiscal year 2002-03, $6.0 million in fiscal year 2003-04, and $5.2 million in fiscal year 2004-05.<br><br>The Office of the Inspector General reviewed information obtained from the |

|  |  | department's fiscal services unit and verified that the department had received a $115.8 million increase to its base budget in fiscal year 2003-04 to fund additional workers' compensation expenses unrelated to any employee population adjustments that might have altered the base budget's level of workers' compensation funding. The fiscal services unit reported that, although the institution is not allocated a specific increase in its base allotment, its annual needs are based initially on personnel year expenditures, which may be reassessed periodically and at year-end. It also reported that the department had redirected two positions to start addressing cost containment and that legislative action subsequently added six positions to implement the workers' compensation suspicious activity program. The fraud investigation program assists the department in managing claims through a fraud referral program. The department has also developed a workers' compensation cost containment strategy action plan to more effectively manage workers' compensation processes.

While the specific recommendation to increase institution staff was not implemented, the department reported that it has increased staff at the department level to address workers' compensation expenditures issues. Although funding for workers' compensation costs has increased, it is not evident that the department has either decreased or stabilized workers' compensation expenditures. It is also not apparent that the changes made by the department have reduced service fees levied by the State Insurance Compensation Fund. |
|--|--|--|

**FOLLOW-UP RECOMMENDATION**

**The Office of the Inspector General recommends that the California Department of Corrections and Rehabilitation and the warden implement measures to lower workers' compensation costs through enhanced case monitoring, thereby minimizing service fees paid to the State Compensation Insurance Fund.**

**ORIGINAL FINDING NUMBER 13**

**The Office of the Inspector General found that there were internal control weaknesses in accounting for the inmate trust funds.**

| ORIGINAL RECOMMENDATION | STATUS | COMMENTS |
|---|---|---|
| The Office of the Inspector General recommended that in the future, if vacancies occur in the trust accounting office and internal controls are compromised, the warden should take action to redirect resources to this area.<br><br>If necessary, staff from other accounting units in the California Department of Corrections should be used to assist with the inmate trust accounting system. | FULLY IMPLEMENTED | California State Prison, Sacramento reported that, given its current staffing level, internal controls are not compromised. The institution reported that the warden would continue to redirect resources to comply with department mandates. |

**FOLLOW-UP RECOMMENDATIONS**

**None.**

# EXHIBIT T

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

      Plaintiffs,

vs.                CIV S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

      Defendants.

_____/

MARCIANO PLATA, et al.,

      Plaintiffs,

vs.                No. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

      Defendants.

_____/

Deposition of

PABLO STEWART, M.D.

Tuesday, December 11, 2007

Reported by:

SHARON CABELLO, RPR

CSR No. 3080

Job No. 58268

Esquire Deposition Services

520 Capitol Mall, Ste. 250, Sacramento, CA  95814  916-448-0505

f080ab1a-924c-4ab1-917f-1bf9dae05662

Page 22

1 employment with the City and County of San Francisco?

2 A.      Yes.

3 Q.      And in what scope or in what place?

4 A.      After I left San Francisco General Hospital --

5 just take a second to answer your question -- is that I

6 worked for University of California San Francisco

7 School of Medicine which manages San Francisco General

8 Hospital, and also manages the University Hospital and

9 the Veterans Hospital in San Francisco.

10         So when I left the County Hospital I took a

11 lateral move to the Veterans Hospital, so I stayed

12 within the UC system.  And that was in September of

13 1990.  And the San Francisco Veterans Administration

14 also had a similar program or policy where

15 psychiatrists were primary care physicians for their

16 patients.  So I continued to be the primary care

17 physician for my patients at the Veterans Hospital up

18 until I left there in November 1996.

19 Q.      And when you left there in November 1996 did

20 you provide medical care in any other position of

21 employment?

22 A.      Yes.

23 Q.      And where was that?

24 A.      Throughout my entire time -- well, not the

25 entire time of being a physician.  During my second

f080ab1a-924c-4ab1-917f-1bf9dae05662

1    year of my psychiatric residency I started working at

2    the Haight Ashbury Free Medical Clinic in San Francisco

3    and I stayed there until February of 2006.  During my

4    entire tenure at the Haight Ashbury Free Clinic I

5    continued to provide both medical and psychiatric care

6    for my patients.

7    Q.        Is the Haight Ashbury Free Clinic licensed by

8    any particular entity?

9    A.        Yes.

10    Q.        And who is it licensed by?

11    A.        By the State of California.

12    Q.        As?

13    A.        There are several sections of the clinic, so I

14    can't speak to all of them.  I was working -- during my

15    tenure at the Haight Ashbury Free Clinic I was working

16    at the drug rehabilitation and -- Drug Detoxification

17    and Rehabilitation Center, commonly referred to as

18    Detox.

19            And we were licensed by the State as an

20    outpatient drug and alcohol, and I believe we were also

21    a primary care health clinic for the City.

22    Q.        When you say for the City, was there a

23    contract with the City or you were licensed by the

24    City?

25    A.        The Haight Ashbury Free Clinic had numerous

f080ab1a-924c-4ab1-917f-1bf9dae05662

1    contracts to provide care, and one of those I know a

2    major one was with the City and County of San

3    Francisco.

4    Q.        I noticed in your expert report that you

5    indicated various consultation work with correctional

6    systems located in other states.  I think Michigan,

7    Ohio -- is that correct?

8    A.        Michigan, Georgia, New Mexico.

9    Q.        Aside from your work with the City and County

10    of San Francisco and with San Francisco General

11    Hospital located at UCSF, have you worked within a

12    correctional system as a provider of psychiatric

13    services?

14    A.        No.  Well, if I could amplify my answer to

15    that question about providing psychiatric services to I

16    believe your question was incarcerated population or

17    within a jail or prison?

18    Q.        Have you been employed by a correctional

19    system to provide such services to inmates?

20    A.        Yes, for a number of years.  And I would have

21    to refer to my CV.  I was the psychiatric consultant

22    for the San Francisco drug courts.  And in that

23    capacity we would often have drug court clients who

24    were incarcerated.  And in that capacity I would be the

25    treating physicians for those people during the time

f080ab1a-924c-4ab1-917f-1bf9dae05662

Page 41

1    Q.        Have you been to Napa State Hospital?

2    A.        Yes, I have.

3    Q.        And that would be in the course of your work

4    for San Francisco General?

5    A.        I had a very long relationship with Napa State

6    Hospital where I was a consultant for them for a number

7    of years.  The exact relationship was that they

8    contracted through the Haight Ashbury Free Clinic for

9    us to provide free training to the staff at Napa State

10   Hospital.  And I would only guess when it was, I would

11   imagine it was in the late '90's, early 2000, maybe

12   even earlier than that.  And I would go there once a

13   month, maybe once every two months and provide training

14   and consult on particularly difficult patients.

15          I have also been in the Napa State Hospital

16   more recently in the context of some of my forensic

17   work where I have one person who I have worked with who

18   is deemed incompetent by Superior Court in San Mateo

19   County who is currently at the Napa State Hospital

20   return to competency unit, for lack of a better term.

21   So I have visited in that context.

22   Q.        Have you been to the Salinas Valley

23   Psychiatric Program run by DMH?

24   A.        I have been to Salinas.  I did not tour, as I

25   said earlier, the DMH unit at Salinas Valley on my

f080ab1a-924c-4ab1-917f-1bf9dae05662

```
 1    STATE OF CALIFORNIA      )

 2    COUNTY OF PLACER         )

 3

 4          I, the undersigned, a Certified Shorthand

 5    Reporter of the State of California, do hereby certify:

 6          That the foregoing proceedings were taken before

 7    me at the time and place herein set forth; that any

 8    witnesses in the foregoing proceedings, prior to

 9    testifying, were placed under oath; that a verbatim

10    record of the proceedings was made by me using machine

11    shorthand which was thereafter transcribed under my

12    direction; further, that the foregoing is an accurate

13    transcription thereof.

14          I further certify that I am neither financially

15    interested in the action nor a relative or employee of

16    any attorney of any of the parties.

17          IN WITNESS WHEREOF, I have this date subscribed

18    my name.

19

20    DATED: June 16, 2002

21

22

23    _____

24            SHARON CABELLO
              CSR #3080
25
```

# EXHIBIT U

## Confidential Transcript

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE  28 UNITED STATES CODE


RALPH COLEMAN, et al.,

      Plaintiffs,

vs.                No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

      Defendants.

_____/

MARCIANO PLATA, et al.

      Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.

      Defendants.

_____/


Deposition of VICTOR F. BREWER

MARKED CONFIDENTIAL (Pages 1 through 197)


DATE:          SEPTEMBER 4, 2008

TIME:          9:34 A.M.

LOCATION:     ROSEN, BIEN & GALVAN
               315 Montgomery Street, 10th Floor
               San Francisco, California 94104

REPORTED BY:    Cari L. Waters-Drewry
               Certified Shorthand Reporter
               License Number 12401

b0a80d3f-d1ac-4469-9b29-af39bf30c85a

Confidential Transcript

1          Q.    Okay.   Thank you.

2                Do you recall -- again, I want to be careful

3     about using patient names, so I'll just ask for your

4     patience.   Cooperating with me, so I'm going to try and

5     avoid using patient names.

6                But do you recall that there was a suicide in

7     an acute unit back in January of 2007?

8          A.    I recall having two suicides within 72 hours

9     in 2007.

10         Q.    Okay.   Did one of those suicides occur in the

11    Q-Wing of CMF?

12         A.    They both occurred in the Q-wing of CMF.

13         Q.    Can you tell me where the two suicides

14    occurred?

15         A.    In their cell.

16         Q.    In which Q unit did those suicides occur?

17         A.    I don't recall particularly which of the three

18    units.

19         Q.    Did both of those suicides occur by hanging?

20         A.    Yes.

21         Q.    Did both of the men hang themselves from holes

22    in the window mesh coverings?

23         A.    No.

24         Q.    Can you explain where each of the patients

25    hanged themselves from?

b0a80d3f-d1ac-4469-9b29-af39bf30c85a

Confidential Transcript

Page 162

1      A.    The first patient hung himself from the desk

2   by placing a noose around the desk, tying it to his

3   neck, put his feet against the seat as a brace and

4   strangled himself.  The second patient hung from the

5   window, from the screen material.

6      Q.    Since those suicides occurred in January of

7   2007; is that correct?

8      A.    (Witness nods affirmatively.)  Uh-huh.

9      Q.    Have the desks and the windows -- window mesh

10  screens been fixed in those units?

11     A.    No.

12     Q.    Is there a time frame within which those desks

13  and the window mesh screens will be fixed?

14     A.    Our plan of correction was to replace the

15  beds, remove the desk, remove the stools, replace the

16  screen, and cover the beds, and to place new doors, as

17  approved by the Coleman Court.

18          Three months ago, I asked the Coleman Court to

19  allow me to take four beds offline and start the

20  retrofit, and I was denied that, so the beds are sitting

21  in the warehouse, the screen is sitting in the

22  warehouse, and we cannot do the retrofit at this time.

23     Q.    When you say that you requested to the Coleman

24  Court to do the retrofit, how did you do that?

25     A.    Sent a memo to Cindy Radavsky, who established

b0a80d3f-d1ac-4469-9b29-af39bf30c85a

Confidential Transcript

Page 163

1    a meeting with Lisa Tillman and the Court Master.

2        Q.    Are you referring to Manny Lopes?

3        A.    Yes, I am.

4        Q.    Did you receive a response directly from

5    Manny Lopes about that issue?

6        A.    We received a verbal response at the

7    conclusion of the meeting that pending a 19-patient

8    waiting list, he was unwilling to take the risk of not

9    having 100 percent of the beds online.

10       Q.    So, in other words, it was the Special

11   Master's position that because there's a waiting list

12   for those beds, he couldn't afford to take any of them

13   offline to make these adjustments so that there aren't

14   hanging dangers; is that correct?

15       A.    At that time, he said, you may come back and

16   request it in the future, but as of today, I will not

17   allow you to take four beds offline.  It will take

18   repeatedly taking a series of four beds offline for a

19   year to retrofit all acute units.

20       Q.    So in order to do the full three units, it

21   would take a year period taking four offline at a time?

22       A.    Five units.

23       Q.    Sorry.

24       A.    150 beds.

25       Q.    So the whole process is anticipated to take

Golden Gate Reporting
(415) 499-DEPO

b0a80d3f-d1ac-4469-9b29-af39bf30c85a

Confidential Transcript

Page 164

1    about a year to retrofit these cells and remove the

2    dangerous furniture and the vent mesh screens with four

3    cells at a time coming down; is that correct?

4         A.    That's correct.

5         Q.    Is it accurate to say that in the interim,

6    there are mesh vents and furniture in these cells that

7    makes it easier for someone to commit suicide?

8         A.    That is accurate.

9         Q.    Do you have an opinion about whether or not

10   the cells should be retrofitted immediately?

11        A.    We had a serious suicide attempt last week,

12   and I sent another request to Cindy Radavsky, to

13   Lisa Tillman, to Matt Lopes to allow us to retrofit the

14   facility.

15        Q.    Did you receive a response to that memo?

16        A.    Not yet.

17        Q.    So it sounds like it's your position that the

18   retrofit needs to be done, and that it should be done as

19   soon as possible; is that correct?

20        A.    That's accurate.

21             MS. WHELAN:  Do you guys need a break?

22             MS. O'BANNON:  Hum-um.

23             MS. WHELAN:  Q.  Were you involved, at all, in

24   the unidentified needs study that was conducted back in

25   and around 2003 and 2004?

b0a80d3f-d1ac-4469-9b29-af39bf30c85a

CERTIFICATION OF DEPOSITION OFFICER

I, CARI L. WATERS-DREWRY, duly authorized to administer oaths pursuant to Section 2093 (b) of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was thereafter transcribed by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of this cause named in said caption.

CARI L. WATERS-DREWRY, CSR 12401