**EXHIBIT A**

## COUNTY OF SANTA CLARA ("COUNTY")
## PROPOSED FACTS

Coleman v. Schwarzenegger CIV S-90-0520 LKK JFM P
Plata v. Schwarzenegger C01-1351 TEH

1. The County Mental Health Department's Recommended Budget for fiscal year 2009 as of May 2008 includes more than $250 million of county, state and federal funds.
2. The Mental Health Department serves 17,000-19,000 clients each year through an extensive network of County operated and contracted providers.
3. Approximately 25% of mental health clients are under 18 years of age, 65% are between 18 and 59 and 10% are 60 or older.
4. The State of California contracts with the County to act as the Medi-Cal Mental Health Managed Care provider for Medi-Cal beneficiaries who are Santa Clara County residents.
5. The County administers services to Medi-Cal eligible individuals through contracted and county-operated programs.
6. Medi-Cal eligible services are claimed and reimbursed through the State Department of Mental Health, who in turn bills the federal Medicaid program through the State Department of Mental Health, who in turn bills the federal Medicaid program through the State Department of Health Services.
7. Counties are reimbursed by federal Medicaid pass through by the State at approximately 50% on the dollar. For children with Medi-Cal under the age of 22 years, counties receive federal and state reimbursement up to 95% on the dollar.
8. As the Medi-Cal provider, the County is mandated to provide the required match of funds (i.e. the difference between the cost of the services provided by the County and the federal and state reimbursement) from the County's Mental Health Realignment funds or local discretionary funds.
9. The County serves mentally ill adults and children that are uninsured, meaning that they are not eligible for Medi-Cal and do not have private insurance or financial resources to cover the cost of mental health service ("Unsponsored Clients").
10. The County expends significant general fund dollars to provide services to Unsponsored Clients.
11. The Mental Health Department's FY09 Recommended Budget shows approximately $72 million dollars in County general fund budgeted for mental health services, including the Medi-Cal match.
12. The County is one of only a few counties in the state that invests substantial general discretionary fund dollars for mental health care to Unsponsored Clients and to Medi-Cal beneficiaries beyond state and required local matching funds.
13. During the past 5 years, the Mental Health Department has sustained general fund budget cuts of nearly $45 million dollars.
14. These budget cuts have resulted in the loss of discretionary general fund dollars that are used to provide mental health services to Unsponsored Clients. Over the years,

the Mental Health Department has lost the ability to serve at least 4,000 Unsponsored Clients.
15. Most individuals needing mental health services seek those services through the Mental Health Department's Call Center, which screens individuals for County mental health services.
16. The Call Center accepts approximately 30% of these individuals. The remaining individuals are turned away or referred to other community resources.
17. Generally, the only people who are able to receive mental health services from the County are Medi-Cal eligible beneficiaries who have significant impairment in their functioning, are unable to work, and have had recent psychiatric crisis, hospitalizations or suicide attempts.
18. Unsponsored Clients usually receive services only if they are directly referred from an inpatient hospitalization or psychiatric emergency room.
19. In fiscal year 2008, the Mental Health Department had a waiting list of nearly 500 Unsponsored Clients.
20. The majority of adult mental health clients receive outpatient services.
21. Outpatient mental health services generally consist of one hour per month of case management services and individual, group and family therapy, and medication monitoring.
22. It costs the Mental Health Department an average of $4,337 per year to provide outpatient services to an adult client.
23. The County is one of few counties in California that has an inpatient psychiatric facility for emergency care.
24. The County has seen a large spike in emergency psychiatric services.
25. The Mental Health Department is currently $8 million dollars over budget for inpatient hospitalization.
26. It costs the County approximately $1200 a day for inpatient services if the services are rendered by the County facility, and approximately $900 a day if the County contracts for services in the private sector.
27. The County's Mental Health Services Act ("MHSA") plan requires the County to use a majority of MHSA funds for Full Service Partnerships ("FSP").
28. The FSP model is a comprehensive multidisciplinary approach involving psychiatrists, clinicians, and case management staff to address all aspects of a client's life and to provide treatment and support services such as permanent housing, 24 hour access to treatment, support and case management, and flexible funds that can be used for any purpose, including employment, benefits or housing.
29. The FSP model is designed for people who have complex needs that cannot be served in an outpatient model of care. FSP candidates often have no support system in the community. They may have compliance issues in that they do not take their medications or have difficulty cooperating with their mental health treatment plan. Many are homeless or have problems maintaining housing. Many lack employment and education, and have repeated crises and use of emergency rooms; and many have substance abuse issues and criminal histories.
30. FSP services cost an average of $19,380 per year, per client.
31. Approximately 175 of the County's 300-350 FSP slots are reserved for individuals who are part of the criminal justice system and are coming out of County jail.

32. The County is currently in the process of contracting with the State of California for the State to pay for a small number of FSP slots for parolees.
33. Approximately 20 percent of inmates in the County jail are taking psychotropic medications and receiving mental health services in the jail.
34. Approximately 2000-2500 individuals leaving the County jail each year are in need of ongoing psychiatric service upon release.
35. The Mental Health Department serves an estimated 700 individuals leaving County jail, or less than 30 percent.
36. Mentally ill offenders who are released into the community from the court system with conditions of obtaining community mental health and substance abuse treatment are waiting 7 to 90 days because of the backlog of available treatment beds in the County.
37. County residents consist of approximately 3.6% of the state prison population.
38. During the past 5 years (FY 2003-2008), the County has solved budget deficits exceeding $1 billion.
39. During FY2009, the County faced a general fund deficit of $172 million.
40. The County has forecasted budget deficits through at least 2012.
41. The estimated impact of the State Budget for Fiscal Year 2008-2009 on the County is approximately $13 million, including $7.8 million in health services.
42. The County Board of Supervisors approved a $4.1 million in target amounts for the County departments to address after finalization of the State Budget.
43. The County Executive is proposing millions of dollars in additional budget cuts from the FY2009 Recommended Budget to certain departments, including the Mental Health Department, the Drug and Alcohol Department, and the Santa Clara Valley Medical Center.
44. The County jail system has a state Board of Corrections rated capacity of 3,810 incarcerated individuals.
45. The County identifies its jail capacity as 5,380 incarcerated individuals.
46. The County requires a 15% vacancy rate in the jails in order to physically segregate incarcerated individuals as dictated by their security level and individual circumstance.
47. The FY09 average daily population in the County jails as of October 1, 2008 was 4,737 incarcerated individuals.
48. The County currently exceeds its Board rated capacity by 24%.
49. The County houses over 400 state, federal and other county inmates that contribute $15 million in revenue to the operation of the County's jail system.
50. In 2007, the County estimated there were more than 7,000 homeless individuals in the County.
51. The County has provided more than $100 million in general fund dollars for medical care to uninsured residents over the last three years.
52. The FY09 County Department of Alcohol and Drug Services Recommended Budget contains more than $50 million of combined federal, state and County general fund dollars.
53. Approximately $24 million of the FY09 Recommended Budget for the County Department of Alcohol and Drug Services comes from the County's general fund dollars.

54. In fiscal year 2008, the Department of Alcohol and Drug Services served approximately 8,130 adult clients.
55. In fiscal year 2006, the Department of Alcohol and Drug Services served approximately 8,566 adult clients.
56. The Department of Alcohol and Drug Services provides a broad array of treatment services to adult clients through a combination of County and community based treatment providers. These services include outpatient counseling, transitional short-term (1-3 months) housing for clients who are in the outpatient program but do not have adequate housing, residential programs, detoxification services, perinatal program, and methadone treatment (drug replacement for heroin and other opium addicts).
57. The estimated cost to the County to provide drug and alcohol services to an adult is $4,369.00 per client, per year.
58. The County is required by law to provide services to individuals eligible for treatment through the Substance Abuse and Crime Prevention Act of 2000 ("SACPA"), which is a voter approved initiative providing state funding for drug treatment in lieu of incarceration for certain non-violent adult drug offenders.
59. Because the state does not fully fund the services that the County is required to provide under SACPA, the County must supplement one-half to two-thirds of the state SACPA allocation with state and federal discretionary funds, and County general funds.
60. The Department of Alcohol and Drug Services maintains a waiting list for services, which ranges from an average of 33 days for outpatient services, 28 days for methadone treatment, 9 days for residential drug abuse treatment, 12 days for detoxification, and 7-14 days for residential treatment.
61. The waiting list does not include everybody who needs or wants drug and alcohol services because many people do not put their names on the list when they discover they cannot get immediate access to treatment.

**EXHIBIT B**

JOINT PRE-TRIAL CONFERENCE STATEMENT
EXHIBIT  B

SONOMA COUNTY INTERVENORS' PROPOSED LIST OF STIPULATED FACTS

A. **JAIL CAPACITY AND HOUSING**

1. Thirty-two counties in California have jails with Population caps; in 2005, 155,000 sentenced jail inmates were released early in California due to jail overcrowding, and jail bookings that year were at a 10-year high.

2. Sonoma County's two detention facilities have a "rated capacity" that consists of the number of beds currently installed and approved by the Corrections Standards Authority for housing in each facility, consistent with security and classification requirements. As of June 1, 2008, the total rated capacities of Sonoma County detention facilities are as follows: the rated capacity of the Main Adult Detention Facility is 894; the rated capacity of the North County Detention Facility is 561.

3. The rated capacity of the Sonoma County detention facilities do not reflect classification, gender and security requirements that require certain segments of the inmate population to be separately housed from each other; accordingly, to ensure proper housing is available based on classification factors, the Sonoma County jails aim for a jail population of less than 85% of total rated capacity.

4. For several years, the Sonoma County jails were required to house a population that was close to or exceeded 85% of their total rated capacity; during the time period January 28, 2004 through October 18, 2006, the Sonoma County Sheriff's

1

Department sought and obtained orders from the Sonoma County Superior Court on a monthly basis to release inmates early pursuant to the provisions of Penal Code section 4024.1.

5.  Since approximately October 18, 2006, Sonoma County jails have been able to maintain jail populations at or less than 85% of total rated capacity due to increasing the number of beds through double-bunking (thereby increasing total rated capacity), as well as other factors, such as:

   a.  Certain criminal justice reforms recommended by Sonoma County's Consultant David Bennett have been instituted which have resulted in efficiencies of time management in the court processes, resulting in swifter justice;

   b.  Sonoma County has increased its cite and release program, such that individuals who had previously been housed in jail are now being released based on a promise to appear (due to lack of available space in the jail); and

   c.  Increased immigration enforcement by the Department of Homeland Security, Immigration and Customs Enforcement, has resulted in deportation of individuals previously housed in Sonoma County jails on a consistent basis (recidivism).

6.  As of July 29, 2008, there were 653 individuals incarcerated in the Sonoma County Main Adult Detention Facility, and 352 individuals incarcerated in the Sonoma County North County Detention Facility, for a combined total of 1005 inmates as of that date; as of October 2008, total population has reached approximately 1055.

7. Approximately 39% of Sonoma County jail inmates are on "hold" status, including holds for warrants issued by other counties, holds for probation violation processing, immigration holds, holds for the California Department of Corrections and Rehabilitation, and other state holds.

8. In 2007, approximately 1,200 offenders were held in Sonoma County jails en route to California prison custody.

9. Sonoma County is currently facing a back-up of inmates who have been ordered by the Court to go to a State psychiatric hospital under Penal Code Section 1370 to restore their competency.

10. State psychiatric hospitals refuse to accept such inmates upon commitment due to unavailable bed space; the time the jail must continue to house these inmates before they are accepted into the state hospital has increased dramatically in the last two fiscal years, from an average wait of 60 days in fiscal year 2006/2007, to an average wait of 95 days in fiscal year 2007-2008.

## B. RE-ARREST AND RECIDIVISM

11. Sonoma County's jail citation release program (used to manage the jail population) showed a 43 percent failure-to-appear rate for both misdemeanors and felonies – a figure that is more than twice the national average.

12. Sonoma County's re-arrest rate for the population released by the jail on its citation release program – meaning an arrest for a new crime prior to the disposition of

3

the case for which the person had been released from jail – is approximately 29% for misdemeanors and 50% for felonies; the average number of such re-arrests is 1.6 for both misdemeanors and felonies.

13. The number of prior arrests for each person who is ultimately re-arrested in Sonoma County averages 4.8 arrests.

14. The average time inmates spend in custody in the Sonoma County jails is 10.1 days for misdemeanants, and 37.8 days for felons.

15. Of the prison inmates released each year in California, about 70% are re-incarcerated within 3 years – a figure almost two times the national average; many such individuals end up back in the Sonoma County jails after previously being sent to State prison, either on parole violations or on new charges.

## C. SERVICES AND PROGRAMS UNAVAILABLE

16. Out of the total number of inmates released from California state prisons each year, approximately 20% of them have mental health needs, 65% have substance abuse problems, 70% are unemployed, 22% are gang members, and a significant number are in need of stable housing.

17. Mental health needs are significantly under-met in Sonoma County. For example, in June of 2007, the County was forced to close its only inpatient psychiatric emergency hospital, due to budget cuts and lack of adequate funding.

18. Because the County's only inpatient emergency psychiatric hospital closed

4

in June of 2007, the Sonoma County jails must now continue to house misdemeanor defendants who have been declared incompetent to stand trial, but who have been ordered to be treated for the purpose of rendering them competent under the provisions of Penal Code Section 1370.

19. Sonoma County law enforcement agencies and Sonoma County jail officials transport persons in need of inpatient psychiatric hospitalization to a facility in Fairfield, Solano County, pursuant to an agreement between the counties.

20. Sonoma County has substantial waiting lists for residential drug abuse and alcohol treatment programs, and this limitation of resources causes a back-up in the jail; inmates who are ordered to residential treatment programs are often required to stay in jail either in the absence of jail sentences or well past their jail terms – in 2005, the average wait in jail for inmates enrolled in TASC (Treatment Accountability for Safer Communities Program) for residential treatment programs was 9 weeks.

21. Data shows that as of the year 2002, on any given day, approximately 412 Sonoma County residents were seeking publicly-funded alcohol and drug treatment that was not available; such number has only increased over time.

### D. INADEQUATE PROBATION SUPERVISION

22. Sonoma County's current probation caseload is too large for its probation officers to effectively supervise: 25-30 probation officers presently supervise approximately 3,074 probationers (the number of individual probationers supervised per

probation officer ranges from 50 to 380).

23. Due to insufficient treatment, education and supervision resources, probation officers do not have adequate tools to properly supervise probationers and lower recidivism rates.

### E. COUNTY RESOURCES UNAVAILABLE

24. Sonoma County tax revenues have decreased in the last two years, requiring that both the Sheriff's Department and Probation Department scale back on their budgets – resulting in fewer available resources.

25. The Sonoma County Administrative Office has informed the Sheriff's Department that it will be required to reduce its budget for the 2009/2010 fiscal year by 12 % – an amount of $8,598,862; the Probation Department and other county departments are facing similar cuts.

### F. SONOMA COUNTY'S CRIMINAL JUSTICE SYSTEM REFORM

26. The Sonoma County Board of Supervisors has authorized county departments to proceed to effectuate the reforms described in the Sonoma County Corrections Master Plan, dated December 11, 2007, prepared by expert consultant David M. Bennett.

27. Sonoma County is committed to this reform effort, and has already invested a tremendous amount of time, energy, funds and other resources to effectuate the Master Plan.

28. As a general matter, the Master Plan demonstrates a commitment to addressing issues via "upstream intervention" – starting at the booking phase, which is intended to shorten the time for completing criminal proceedings, shorten the time in jail, effectively address rehabilitation and treatment issues at an early stage, and provide a continuum of effective supervision to reduce recidivism.

29. A prison population cap would prevent Sonoma County from effecting its Master Plan, as such a cap would require Sonoma County to expend its finite resources in addressing the consequences of the cap rather than its Master Plan.

30. The citizens of Sonoma County would be dis-served – in both the short-term and the long-term – by the County's inability to reform its criminal justice system through the Master Plan, as the cycle of recidivism and the ineffective/inefficient use of public resources would continue.

END OF DOCUMENT