JONES & MAYER
Martin J. Mayer (SB # 73890)
Michael R. Capizzi (SB # 35864)
Kimberly Hall Barlow (SB # 149902)
Ivy M. Tsai (SB # 223168)
3777 North Harbor Boulevard
Fullerton, California 92835
(714) 446-1400; Fax (714) 446-1448
e-mail: mjm@jones-mayer.com
e-mail: mrc@jones-mayer.com
e-mail: khb@jones-mayer.com
e-mail: imt@jones-mayer.com

Attorneys for Intervenor-Defendants
SAN DIEGO COUNTY SHERIFF WILLIAM B.
KOLENDER, ORANGE COUNTY SHERIFF-
CORONER SANDRA HUTCHENS, PLACER
COUNTY SHERIFF EDWARD N. BONNER,
BUTTE COUNTY SHERIFF-CORONER PERRY
L. RENIFF, CALAVERAS COUNTY SHERIFF
DENNIS DOWNUM, LOS ANGELES COUNTY
SHERIFF LEE BACA, SANTA CLARA COUNTY
SHERIFF LAURIE SMITH, SAN BENITO COUNTY
SHERIFF CURTIS HILL, STANISLAUS COUNTY
SHERIFF ADAM CHRISTIANSON, MENDOCINO
COUNTY SHERIFF TOM ALLMAN, TEHAMA
COUNTY SHERIFF CLAY PARKER, LASSEN
COUNTY SHERIFF STEVE WARREN, YOLO
COUNTY SHERIFF ED PRIETO, SANTA BARBARA
COUNTY SHERIFF BILL BROWN, KERN COUNTY
SHERIFF DONNY YOUNGBLOOD, SAN MATEO
COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
SHERIFF STEVE DURFOR, CONTRA COSTA
COUNTY SHERIFF WARREN RUPF,
SHASTA COUNTY SHERIFF TOM BOSENKO,
RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
VENTURA COUNTY SHERIFF BOB BROOKS,
SOLANO COUNTY SHERIFF GARY R. STANTON,
SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
SUTTER COUNTY SHERIFF JIM DENNEY,
LAKE COUNTY SHERIFF ROD MITCHELL,
GLENN COUNTY SHERIFF LARRY JONES,
TUOLUMNE COUNTY SHERIFF JIM MELE,
FRESNO COUNTY SHERIFF MARGARET MIMS,
MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
MONO COUNTY SHERIFF RICHARD SCHOLL,
HUMBOLDT COUNTY SHERIFF GARY PHILP,
EL DORADO COUNTY SHERIFF JEFF NEVES,
MERCED COUNTY SHERIFF MARK PAZIN,
DEL NORTE COUNTY SHERIFF DEAN WILSON,
SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
AMADOR COUNTY SHERIFF MARTIN RYAN,
INYO COUNTY SHERIFF WILLIAM LUTZE,
STANISLAUS COUNTY CHIEF PROBATION OFFICER
JERRY POWERS, VENTURA COUNTY CHIEF

DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON

1  PROBATION OFFICER KAREN STAPLES,
   SOLANO COUNTY CHIEF PROBATION OFFICER
2  ISABELLE VOIT, SANTA BARBARA COUNTY
   CHIEF PROBATION OFFICER PATRICIA STEWART,
3  BUTTE COUNTY CHIEF PROBATION OFFICER JOHN
   WARDELL, SAN LUIS OBISPO COUNTY CHIEF
4  PROBATION OFFICER KIM BARRETT, CONTRA
   COSTA COUNTY CHIEF PROBATION OFFICER
5  LIONEL CHATMAN, INYO COUNTY CHIEF
   PROBATION OFFICER JIM MOFFETT,
6  SHASTA COUNTY CHIEF PROBATION
   OFFICER BRIAN RICHART, YOLO COUNTY
7  CHIEF PROBATION OFFICER DON MEYER,
   FRESNO COUNTY CHIEF PROBATION OFFICER
8  LINDA PENNER, MARIPOSA COUNTY CHIEF
   PROBATION OFFICER GAIL NEAL, CITY OF
9  WHITTIER POLICE CHIEF DAVE SINGER,
   CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES,
10 CITY OF PASADENA POLICE CHIEF BARNEY
   MELEKIAN, CITY OF ALHAMBRA POLICE
11 CHIEF JIM HUDSON, CITY OF FREMONT
   POLICE CHIEF CRAIG STECKLER, CITY OF
12 GROVER BEACH POLICE CHIEF JIM COPSEY,
   CITY OF SANTA CLARA POLICE CHIEF STEVE
13 LODGE, CITY OF VACAVILLE POLICE CHIEF
   RICH WORD, CITY OF WOODLAND POLICE CHIEF
14 CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF
   MACE McINTOSH, CITY OF PASO ROBLES POLICE
15 CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO
   POLICE CHIEF MICHAEL BILLDT, CITY OF
16 ATWATER POLICE CHIEF RICHARD HAWTHORNE,
   NATIONAL CITY POLICE CHIEF ADOLFO GONZALES,
17 CITY OF DELANO POLICE CHIEF MARK DeROSIA,
   CITY OF MODESTO POLICE CHIEF ROY WASDEN,
18 CITY OF FRESNO POLICE CHIEF JERRY DYER, AND
   CITY OF DELANO CHIEF OF CORRECTIONS GEORGE
19 GALAZA

20

21          IN THE UNITED STATES DISTRICT COURTS

22       FOR THE EASTERN DISTRICT OF CALIFORNIA

23       AND THE NORTHERN DISTRICT OF CALIFORNIA

24  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

25   PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

26

27  RALPH COLEMAN, et al.,          Case No: CIV S-90-0520 LKK JFM P

       Plaintiffs,                  **THREE-JUDGE COURT**
28

                              -2-

| | |
|---|---|
| vs. | [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)] |
| ARNOLD SCHWARZENEGGER, et al., | **DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON** |
| Defendants. | |
| MARCIANO PLATA, et al., | Case No.:  C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |

I, ADAM CHRISTIANSON, hereby declare as follows:

     1.     I am the Sheriff-Coroner for Stanislaus County.  I was appointed as Sheriff in July of 2006.

     2.     Prior to being elected as Sheriff-Coroner, I served as a Lieutenant with the Stanislaus County Sheriff's Department as the Northwest Area Commander of the Salida Substation, K9 Unit Commander, and Air Support Unit Commander from May 2005 to July 2006.

     3.     Prior to that, I served as a Lieutenant of Administrative Services with the Stanislaus County Sheriff's Department from July 2004 to May 2005.  As such, I oversaw and managed Internal Affairs and Personnel and supervised the Background Unit, Recruitment, and Training.   I also served as Injury Management Coordinator and Air Support Unit Commander.

     4.     Prior to serving as Lieutenant of Administrative Services, I served for approximately 6 months as a Lieutenant with the Stanislaus County Sheriff's Department working in the Homeland Security/ Office of Emergency Services, participating in the California Anti-Terrorism Task Force, assisting with the development of Emergency

1   Response Plans, working with Stanislaus County Area Emergency Managers, and

2   assisting with the development of a Food & Water Safety Plan.

3       5.      Prior to my promotion to Lieutenant, I was a Detective Sergeant with the

4   Stanislaus County Sheriff's Department from November 2002 to February 2004. I was

5   assigned to the Sacramento Valley Hi-Tech Crimes Task Force. I supervised ten

6   investigators from six different agencies, including a vertical prosecutor. I developed

7   partnerships with federal, state and local agencies, promoting effective working

8   relationships. I was responsible for the Satellite operation of the Task Force, including

9   the preparation of reports and statistics, and evidence processing. I managed and directed

10  the Internet Crimes Against Children grant, including reporting to the Office of Juvenile

11  Justice and Delinquency Prevention.

12      6.      Prior to serving as Detective Sergeant, I was a Sergeant with the Stanislaus

13  County Sheriff's Department. For approximately six months, I was assigned to Patrol

14  Operations, I supervised K9 Unit, and I was assigned to a special project supervising the

15  Information Technology Unit.

16      7.      Prior to that, I served for approximately one year as a Detective with the

17  Stanislaus County Sheriff's Department. I was assigned to the Sacramento Valley Hi-

18  Tech Crimes Task Force and I was specially trained in the recovery and presentation of

19  digital evidence. I also investigated traditional crimes as well as High-Tech Crimes and

20  investigated Internet Crimes Against Children.

21      8.      Prior to that, I was a Field Training Officer with the Stanislaus County

22  Sheriff's Department for approximately three months. In that capacity, I directed and

23  coordinated the activities of Deputy Sheriff/Coroner Trainees assigned to the Field

24  Training Operations program.

25      9.      Prior to being a Field Training Officer, I was a Bailiff with the Stanislaus

26  County Sheriff's Department from July 1999 to December 2000. I was assigned to the

27  Court Services Division and Judge Wray Ladine. I was responsible for the Court

28  calendar and the organization of pre-trial cases. I developed and organized a new

DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON

1  program to more efficiently and effectively manage the felony arraignment calendar. I

2  was also responsible for Court security.

3      10.    Prior to that, I was a Deputy Sheriff/Coroner with the Stanislaus County

4  Sheriff's Department for approximately three years. I was assigned to the Boating

5  Enforcement Team as a Reserve Deputy Sheriff from January to August 1996. I was

6  later assigned to the Patrol Operations Division and to the Sheriff's K9 Unit as a K9

7  handler.

8      11.    I have a BA in Criminal Justice Management from Union Institute &

9  University. I have the following certificates: Peace Officer Standards and Training

10  (POST) Basic Certificate, POST Intermediate Certificate, POST Advanced Certificate,

11  POST Supervisory Certificate and POST Management Certificate. I also received a

12  certificate in paramedicine from San Joaquin Delta College.

13      12.    I worked as a paramedic in Stanislaus County for several years, including

14  work as a flight paramedic for Medi-Flight of Northern California. Prior to joining the

15  Stanislaus County Sheriff's department in 1996, I was a police officer with the Ceres

16  Police Department from 1988 to 1994 and a police officer with the Modesto Police

17  department from 1994 to 1995.

18      13.    As Sheriff-Coroner of the Stanislaus County Sheriff's Department, I

19  manage and oversee the Adult Detention Division, including the hiring of personnel,

20  review of operations, and establishment of specific policies, procedures, and practices.

21  Upon being elected Sheriff-Coroner, I performed a complete review of all policies,

22  procedures, and practices throughout the Sheriff's Department, including the Adult

23  Detention Division, and implemented changes based on my assessment of opportunities

24  for continued improvement in the provision of services.

25      14.    Currently, I keep a daily population count of the number of inmates

26  incarcerated in the county jails. We operate under a federally mandated cap of 1,492,

27  which is result of the lawsuit of Rodriguez v. County of Stanislaus, filed in the Eastern

28  District of the United States District Court, case number CIV F-90-0601 REC JFM P.

DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON

We also maintain a ten percent buffer in order to accept local bookings, remands from the Court, surrenders, new arrests, and other instances where we accept back into custody people in various programs who commit new offenses.   Because of this cap and buffer, our daily inmate population does not greatly vary.   The average range for our daily population counts is 1325-1350, so we are often near or over our buffer limit.   At my deposition taken by Plaintiffs on August 25, 2008, I provided a document compiled by one of my sergeants by my request of data relating to our adult detention facilities as of August 22, 2008.  The figures contained in this document are typical of what we see on a daily basis and provide a picture of the different factors we consider in managing our daily jail population.  This document was attached to my deposition transcript as Exhibit 5 and is attached hereto as Exhibit 1 (LEIStCSD0001).

15.    In order to mitigate our daily inmate population, we utilize as part of an early release program a classification system that has a very specific matrix or criteria that determines whether or not we house or release.  This criteria includes the type of offense, whether or not a person has previously been in our custody, whether a person was out on bail when she or he reoffended, and whether a person is a known or documented gang member.  It is a risk assessment tool that we use to determine whether releasing someone is going to pose a public safety risk or flight risk.

16.    Additionally, in order to manage our jail population, my department utilizes jail alternatives programs.   Since 2006, our facility counts have reached capacity, leaving us with no other choice but to release.  Our jail alternatives programs provide alternatives to incarceration in a number of different ways in order to stay under our population cap and also to deal with the limited number of service beds that we have in our aging facilities.  These programs include vocational training, life-skills programs, drug rehabilitation, and mental ill offender programs.  We have partnerships with education providers and the faith-based community, and charitable and service or civic clubs and organizations, all in an effort to provide resources and tools for people to successfully conquer drug addiction and to provide them skills to get back into the work force.

17.     We have specific requirements for placement in jail alternatives programs. Once an individual's case is adjudicated and he or she has been sentenced, we review a list of criteria for participation in these programs. We look at who we consider to be low-level or nonviolent offenders or low-risk offenders based on our matrix, which is very specific because we want people to be successful. Our focus is on program success, rather than "shoving" people into programs to try to show that our recidivism rates are low. We go through a very specific interview with people and an analysis of their skills, their background, their education, their family, and their interests, so that we can try to fit people with the right programs to give them the skills they need to successfully integrate into society rather than recidivating, reoffending and coming back into custody. We work with employers throughout the county to try to find employment for participants of these programs. However, since 2006, there have been at least forty-eight occasions in which we have been required to release a total over 658 inmates from our jails into alternatives programs because of the population cap on our jails.

18.     One of our most popular programs is our welding program, which is part of the vocational training program, a partnership between my department and Modesto City Schools to teach skills which will hopefully lead to employment and prevent individuals from reoffending or coming back into our custody on a new offense. There are also vocational programs available in horticulture, landscaping and agriculture. The life-skills jail alternative training program is in partnership with the Stanislaus County Office of Education and its focus is on issues such as family, parenting, and education. Our jail alternatives program for the mentally ill was previously a partnership with the local Behavioral Health Center to focus on the people who were coming into our system with identifiable mental health issues. We established this program for the mentally ill because we discovered that if we focused on very specific care intervention, medication and treatment, participants did much better outside of our custody and were less likely to come back into custody. Because of the lack of local funding, this program ceased to exist, and we saw an increase in the number of people coming into our custody.

DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON

19.    For the fiscal year 2006-2007, my department applied for and received a grant from the Mentally Ill Offender Crime Reduction Grant Program, which was established to support locally developed efforts to reduce recidivism and promote long-term stability among mentally ill offenders. The administering agency of MIOCR is the Corrections Standards Authority (CSA). We received a grant of one million dollars, which went towards a multidisciplinary partnership between my department, the local courts, the District Attorney's office, and the Behavioral Health Center. As of today, I have seventy-five people in custody who have been identified as having either a mental health history or mental health issues and we are focused on providing the right treatment for each one of them to be a productive member of society and not recidivate. My experience with the alternative program treatment of these mentally ill offenders is if they are properly cared for, they do very well and have a reduced tendency to reoffend. There is a demonstrated factual basis for proper care for integrating these people back into the community. From what I have seen, if these people receive the proper care they need, there is a very large percentage that I believe are more successful and less likely to reoffend.

20.    My department's jail alternative faith-based programs partner with local churches to work directly with our community's homeless population, which includes people with mental health issues, some form of addiction, or both. These individuals often commit misdemeanor crimes that result in them coming into, or back into, our custody. The largest percentages are usually alcohol related crimes. There is a very specific need for law enforcement to partner with community organizations, including faith-based organizations, to help provide resources for people to deal with alcohol addiction and to get them into homeless shelters, which are often run by faith-based organizations, to reduce crime. It is more productive and less costly for people to be placed in homeless shelters rather than end up in the jails I run. Our jail alternatives programs also involve collaboration with charitable and service or civic clubs and organizations in the local community as part of the effort to keep people out of jail.

21.    Stanislaus County is known for being the county with the highest number of automobile thefts. This is attributable in part to methamphetamine and narcotic addition, and gang activity. The biggest challenge we have is getting people off methamphetamine, and that is the largest contributing factor to property crimes, violent crimes and gang-related crimes. If we could get people off methamphetamine, I believe we would have a larger success rate in successfully integrating people into the community. While there are great local programs and partnerships available to try to mitigate people or help people with the mitigation of narcotics-related offenses, they are greatly limited by lack of funding. Locally, we have an outstanding partnership with the courts, law enforcement, the Probation Department, and the District Attorney's office, for what we call a drug court treatment. In those programs, we hold people accountable and we supervise them very closely and monitor them and help prevent them from committing new crimes.

22.    In 2007, the total number of bookings for my jails was approximately 26,000. Out of this number, 1,810 were state prison parolees who either violated the terms of their parole or committed new offenses, and who we sent back to state prison. This figure increased each year from 2004 to 2007. In 2004, the number of parolees sent back to state prison was 1,434; in 2005, the number was 1,587; and in 2006, the number was 1,680. My understanding is that the increase in numbers is related to the increase in general population in the county and the corresponding increases in the number of crimes committed. The total number of bookings for each year increased as well. The California Department of Corrections and Rehabilitation (CDCR) reports a recidivism rate of seventy percent.

23.    A prisoner release order would impact public safety and recidivism, but precisely how would have to be assessed by knowing the nature of the order, including the types of offenders released, what rehabilitative services they have been offered, what programming they have been offered, and their record of offenses. Should there be a prisoner release order, I would estimate that anywhere from 200 to as many as 400

DECLARATION OF EXPERT WITNESS ADAM CHRISTIANSON

1    inmates would come back to Stanislaus County. Working within those numbers, my
2    concern is the potential impact of those inmates reoffending and coming back into
3    custody on the daily inmate population cap, and the impacts to funding as it relates to the
4    provision of services, programming, and staffing.  There would be public safety impacts
5    as well as impacts on my jails.  Regardless of the number of released inmates, without
6    proper risk assessment and rehabilitation efforts, there will be some impact on our
7    community.

8        24.    My concern with a prisoner release order, although the specifics have not
9    been made available, is that, regardless of the nature of the order, it will result in the
10   release in the community of people who have committed multiple and serious offenses in
11   order to have been sentenced to state prison.  They are people who have been through the
12   local criminal justice system multiple times before being sentenced to state prison.  These
13   people have already demonstrated many times that they will commit crimes.  Without
14   having a risk assessment, without having rehabilitative services to offer, and knowing
15   that there is a high recidivism rate, we must assume and prepare for the fact that they are
16   going to reoffend.  However, we have limited resources to try to prepare for this.

17       25.    Based upon my law enforcement experience, I believe that any general
18   release order is going to have a negative impact on the community economically because
19   it will increase the number of crimes committed.   It is going to impact public safety by
20   placing additional demands on my officers and placing them at risk if they have to go out
21   and mitigate offenses that are potentially violent because of narcotics abuse.  Even
22   "nonviolent" offenders can be violent when on narcotics.  Further, the impacts to my
23   facility and my daily population cap, the impact on my ability to either get people into
24   jail alternatives all have a negative impact on public safety.  Any prisoner release order
25   will have a negative impact on my jails because I am already faced with issues such as
26   aging facilities that are not cost-effective to run, and lack of funding for expansion,
27   staffing, and programming.

28       26.    I have attempted to quantify the impact of a prisoner release order to

1  funding for the purposes of assessing the impact to our current services. We thought an

2  average daily population increase of 100 to 200 inmates would require, at minimum, we

3  would need at least four deputy sheriffs to track the home detention program, another

4  deputy to administer the increase in the alternative work program and probably another

5  community service officer to assist in the administrative tasks of both programs. I have

6  tried to take just a broad overview of the program and identify specific impacts to the

7  program itself and we projected that if 10,000 inmates were released early from state

8  prison, 200 would return to this county alone. I have created with the help of one of my

9  captains and one of my lieutenants a summary impact report dated July 18, 2008, which

10  was attached as Exhibit 7 to my deposition taken by Plaintiffs, and which is attached

11  hereto as Exhibit 2 (LEIStSD0002).

12      27.    As a sheriff, I am absolutely opposed to any prisoner release order, but that

13  being said, I want to be able to provide input and recommendations to try to help mitigate

14  the effect. I believe that in order to mitigate the negative impact of a prisoner release

15  order, there would have to be collaboration and partnership between the state and local

16  agencies to manage this release in an effective manner, with programs in place to help

17  prevent recidivism. My opinion is that sheriffs do a better job of programming and

18  managing jail alternatives programs and that this knowledge and expertise should be

19  utilized to help prevent released inmates from committing new crimes, being sent to jail,

20  being released from jail because of our overburdened and capped facilities, reoffending,

21  and being ultimately sent to state prison and increasing its population.

22      28.    If there is a prisoner release order, the health care system for the inmates in

23  my jails may suffer. I spend 6.3 million dollars a year on my vendor contract with the

24  California Forensic Medical Group. That is the amount of money that I have to invest or

25  the County invests in health care, dental care, and mental health care, to provide services

26  to our daily inmate population. If I get released inmates back into my custody, I will be

27  required to provide medical and mental healthcare for them through my medical vendor

28  contract. Without knowing the needs of released inmates, I cannot predict the exact

-11-

1  additional cost to do so, but there will be an additional cost that will affect my ability to

2  provide such services.  One alternative I would suggest to help deal with this impact is a

3  partnership with the state to establish reentry facilities.  Such facilities might include part-

4  medical facility, part-reentry facility where we can mitigate some of these costs and

5  provide services.

6      29.    Another alternative would be to have day reporting centers, which would

7  directly reduce our daily inmate population, focusing solely upon low-risk offenders. If

8  we cannot house people who are sentenced by the court because of our inadequate

9  facilities or our population cap, the thought was for them to report at jails and assign

10  them to programs similar to our jail alternative programs.  I have also considered and

11  would suggest community correctional facilities as an alternative to incarceration.  For

12  this lawsuit, my staff and I put together alternative recommendations to a prisoner release

13  order, which was attached to my deposition taken by Plaintiffs on August 25, 2008 as

14  Exhibit 8, and which is attached hereto as Exhibit 3 (LEIStCSD0003).

15      30.    As I have mentioned previously, funding plays a large role in our ability to

16  ensure public safety and provide for our current inmate populations, and it would play a

17  large role in the local community's ability to address the release of state inmates through

18  a prisoner release order.  There would be an impact on public safety in Stanislaus County

19  if there was a prisoner release order.  It is unrealistic to think that at least some of these

20  released inmates will not reoffend.  We know that a certain percentage will reoffend,

21  which results in a public safety impact and an impact to the crime rate.  Based upon the

22  number of inmates or the number of prisoners we send back to state prison each year, a

23  prisoner release order will result in released inmates reoffending and being sent back to

24  state prison.

25      31.    I am not completely confident that, even given sufficient funding from the

26  state, whether the rate of recidivism could be reduced.  At the county level, we deal with

27  our own failure rate. We see the same people coming back through the system and

28  unfortunately, until people decide to make that conscious choice to take advantage of the

-12-

1  services we offer to get off of methamphetamine, they are going to continue to offend,

2  because they are going to commit crimes to support their drug habit. You can look at the

3  number of people who are addicted to methamphetamine that we deal with who are

4  repeat offenders because they either get arrested for narcotics-related offenses, property

5  crimes, domestic violence, and child abuse.  There is always a percentage that reoffends.

6        32.    In order to address the existing local inmate population, without even

7  considering a prisoner release order, my department has completed a Master

8  Plan/Needs/Assessment update for our local needs for Stanislaus County.  I need 420

9  more medium to maximum security beds for 2010.  I currently need more staffing and

10  program expansion, and more funding to accomplish this.  The MIOCR grant for which

11  we applied and were approved for fiscal year 2007-2008 was eliminated for lack of

12  funds, and therefore, my jail alternative program for mentally ill inmates has effectively

13  been eliminated as well, which in turn creates a concern in maintaining our inmate

14  population within the court-ordered cap and the limitations of my facilities.  Given the

15  problems my department currently faces, a prisoner release order would only serve to

16  further burden our local system, causing congestion that would spill out into the

17  community and negatively impact public safety.

18        I declare under penalty of perjury under the laws of the State of California that the

19  foregoing is true and correct.  Executed this 30th day of October at Modesto, California.

20

21

22        ADAM CHRISTIANSON

23

24

25

26

27

28

**EXHIBIT 1 – LEIStCSD0001**
**DECLARATION OF EXPERT WITNESS CHRISTIANSON**

## <u>Currently in the Stanislaus County Adult Detention Facilities</u>

As of **8/22/08** there are **1,363** Inmates in the **(3)** facilities. These inmates are in custody for various types of crimes. Some forms of these crimes are Drug charges, weapon charges, violent crimes, sex crimes, theft burglary robbery, parole violations, vehicle code violations and illegal aliens.

Between the **1,363** Inmates in custody today there are approximately **(819)** Drug related offenses, **(134)** Weapon charges, **(699)** Violent crimes, **(270)** Sex crimes, **(772)** Theft, burglary, & robbery crimes, **(638)** Vehicle code violations, (which includes vehicle theft and DUI'S). **(148)** Parole violators, and **(86)** Illegal aliens. (This of course does not include all possible charges).

Between the Downtown jail and the Public Safety Center we currently have
 **(53)** Inmates for 187 PC (murder)
 **(70)** Mental inmates
 **(27)** 3 strike inmates
 **(63)** Maximum security inmates
 **(120)** Documented gang members
 **(111)** Gang dropouts

The current average length of stay for these inmates is **121** days.

Out of the **1,363** Inmates we currently house **(537)** are sentenced and **(826)** are unsentenced.

The Honor Farm is a minimum-security facility that houses only men.

The Downtown jail is a medium to maximum facility that houses only men.

The Public Safety Center is a minimum to maximum facility that house men and women.

All three facilities hold inmates that have been arrested and are waiting for arraignment, waiting for transportation to an out of county facility or state prison, Convicted and waiting for sentencing or inmates who have been convicted of a felony or misdemeanor with **365** days or less.

The downtown jail and the Public Safety Center house all inmates regardless of their charges, parole violators, inmates sentenced to state prison, mental hospitals and gang members. The Honor Farm houses men sentenced and unsentenced on non-violent charges and no parole violators.


Exhibit No. _____
Date: _____
Witness: _____
Susan Thomas, CSR 3214

**EXHIBIT 2 – LEIStCSD0002**
**DECLARATION OF EXPERT WITNESS CHRISTIANSON**

**Stanislaus County Sheriff's Department**
**Adult Detention Division**
**Impact Report regarding Coleman/Plata v Schwarzenegger**
**July 18, 2008**

Recently, discussions ensued in a concerted but unsuccessful effort to reach a settlement agreement between the plaintiffs, defendants and intervenors in the Coleman and Plata v Schwarzenegger lawsuits. Basically, these lawsuits pertain to inmate access to medical and mental health care in the California Department of Corrections and Rehabilitation (CDCR) and the perception of a causal relationship between inmate access to adequate health care and the seriously over-crowded housing conditions in existence at all of the CDCR prisons. The critical concern for every county in the state of California is the very real threat of the federal court imposing a capacity limit on the number of inmates housed at each of the thirty-three state prisons and ultimately system wide. CDCR currently houses over 170,000 inmates at near 200% of design capacity. Most discussions involving a reduction of the inmate population to an acceptable level to deliver reasonable health care appear fixated at or near 130,000, or a reduction of 40,000 inmates. The statewide District Attorneys and Sheriffs understand any reduction of inmate population in CDCR, particularly in the significant numbers under discussion; poses a very real threat to public safety and the respective counties' ability to accommodate the influx of prospective inmates in an already over-taxed jail system. In Stanislaus County, we endeavored to assess the impact locally to our department of any significant release of CDCR inmates as follows:

- If a significant number of inmates are released early from the CDCR, it is a safe assumption many will require ongoing medical and mental health care and may, in fact, be members of the class represented by this litigation. Our county, as we are sure most of the others, is not in a position to provide adequate health care to an expanded population of former state inmates, whether the issue is sufficient resources, adequate facilities or funding levels. Additionally, this litigation could easily follow the class and place the counties in the same predicament as CDCR, thereby raising the bar for potential law suits and substantial cost increases. Currently, we only provide mental health services under the Mentally Ill Offender Crime Reduction (MIOCR)

Exhibit No. 7
Date: _____
Witness: _____
Susan Thomas, CSR 3214

grant, which includes a Mental Health Treatment Court and treatment plans to determine the appropriate level of care needed. This grant program has allowed us to expand the treatment, recreation and programs offered to the mentally ill in our custody. A collaborative effort has been made with Behavioral Health and Recovery Services and the Stanislaus County Probation Department. Ironically, funding to support this grant is in jeopardy as part of the current stalemate over the state budget.

- In Stanislaus County, we have three separate and distinct detention facilities with a maximum housing capacity of 1,492 inmates. The downtown Men's Jail houses a maximum of 396 inmates in an aged, linear design facility in need of replacement. In fact, this facility has a federal court-ordered capacity limit due in part to the conditions of confinement and access to programs and medical care. The Honor Farm houses a maximum of 370 inmates in an aged wooden barracks structure with a seriously deteriorating infrastructure. The Public Safety Center (PSC) houses a maximum of 726 inmates in a relatively new facility but facing over-crowded conditions at near 200 % of design capacity. The county recently completed a "Needs Assessment" as part of a planned expansion of the PSC, and it was determined 420 beds must be added by the year 2010 to minimally meet the detention needs of the county. It is important to note this expansion did not include necessary replacement beds for the Men's Jail or the Honor Farm and most certainly did not consider the potential mass releases of hundreds of inmates from state prisons throughout California. Today, the jails operate at a daily average population capacity of 90%, with 10% held in abeyance for the rash of daily bookings, inmate transportation and turnover. Each of the facilities is clearly understaffed, and we are in the midst of initiating an independent staff audit to establish a proper base staffing level. The staffing shortages will become more pronounced if we are required to house an influx of former state inmates.

- The Sheriff also operates a Jail Alternatives Program as a traditional relief for jail overcrowding. This program includes the Alternative Work Program, where participants provide services to public and non-profit employers, and Electronic Monitoring (Home Detention). Currently, the vast majority of inmates who meet the criteria for these programs, based largely on severity of the crime and criminal history,

are in the program. An increase in our daily jail population by even 100 inmates would require an equal number be transferred to the Jail Alternative Programs. This increase will consist primarily of individuals who do not meet the current criteria and will require increased monitoring to ensure public safety. This increase in monitoring can only be achieved through the use of GPS technology and would require additional staffing to track participants in the program on a 24/7 basis. We estimate that an average daily population increase of 100-200 inmates will require, at a minimum, the addition of four deputies to properly track the Home Detention Program, one additional deputy to administer the increase in the Alternative Work Program and one additional Community Service Officer to assist with the increase in administrative tasks for both programs. As it currently stands, the Jail Alternatives Program maintains an average daily census of 440 participants, with conservatively half still in need of detention but released early due to jail population pressures.

- During calendar years 2004 through 2006, Stanislaus County sentenced an average of 1106 inmates to state prison. For the same time period, an annual average of 1,567 parolees were released from state prison to this county. By utilizing a recidivism rate of 70%, an average of 1,097 parolees were recycled through the jails and prisons. We project that for every 10,000 inmates released early from state prison, approximately 200 will return to this county alone. The bottom line is the increase in inmates/discharges/parolees returned to this county, as well as all other counties, will result in a substantial increase in law enforcement and judicial contact and workload. Inevitably, the county jails will house a disproportionate number of inmates sentenced to state prison but retained in the jails due to a lack of available bed space in CDCR or parolees who violate the conditions of their parole but with nowhere to go but county jail. Only the most significant criminal offenders will actually face retention in jail and local law enforcement resources and the District Attorney's Office will be unable to cope with the serious and heightened threat posed to public safety.

- Gang membership and violence is another top priority for law enforcement intervention in this and all other counties in California. Their impact is clearly evidenced by escalating media reports of gang-related shootings, drug activity and auto thefts. Our jails currently

house 1, 492 inmates. We have 80 inmates charged with 187PC
(murder), 44 three-strike enhancements, a significant number of state
prison parolees and over 200 documented gang members of all races.
The majority of these gang members maintain close ties both in the
community and prison system. We have documented and identified as
active gang members 120 Nortenos, 35 Surenos, 91 Norteno dropouts
24 Sureno dropouts, 25 White gang members, 19 Black gang
members and 15 Asian gang members as of this writing. There are
untold numbers of inmate gang members who are as yet un-
documented. Our current Classification Unit is not able to effectively
deal with and fully identify this criminal element. Since 2004, our
jails have seen an increase of 45% in assaults, most of which involve
gang-on-gang attacks founded upon competition for control of drug
trafficking and other contraband within the facilities. Gang members
are responsible for 80% of all contraband smuggled into the jails. It is
safe to say that any inmates/parolees released from CDCR back into
our communities will significantly exacerbate our current jail
population problem and bring an even higher level of criminal
sophistication and gang activity into our facilities, which were not
constructed to meet the same security requirements needed at the state
prisons to manage this type of inmate population. In this county, we
would clearly need to expand staffing levels just to develop a Gang
Unit, which specializes in gang culture and monitoring of gang
activities, and sufficient Classification Officers to meet the individual
case needs of such an inmate population. We would need to develop
specialized training relating to state prison gang culture and
management to educate personnel for the safety and security of both
staff and inmates. Currently, there is no STC approved Classification
Officer School to properly train staff.  We rely on our seasoned
officers for training, as well as the limited number of training
opportunities offered through independent seminars.

- If this county had been fully informed of the potential impact of the
  Coleman/Plata litigation, there exists a strong likelihood the Sheriff's
  Department would have been more aggressive in pursuing an
  arrangement with the state to provide additional re-entry beds under
  the provisions of AB 900. The state and CDCR did not appear to
  adequately disseminate information or plan for the implementation of
  this bill in an effective and responsible manner, particularly as the
  impact of this litigation becomes ever more apparent. One could argue

AB 900 should be recycled or even expanded as a means to lessen the impact of this litigation both locally and at the state level.

This report is limited to the potential impact the early release of significant numbers of inmates currently incarcerated in the CDCR poses on the Adult Detention Division of the Stanislaus Sheriff's Department. It is certainly not all-inclusive, nor does it speak to the impact on community law enforcement, the District Attorney's Office or the Courts in this county. It is entirely conceivable over the course of several years, the local jails will be limited primarily to service as "holding" facilities for state prisoners either awaiting vacant beds after their commitment to the CDCR by the local courts, state discharges who re-offend or parolees who violate the conditions of their parole with no available prison bed to return to. The county detention facilities are not built and designed from a security standpoint to house large numbers of state prisoners, who pose not only a security threat but also an enhanced threat to the safety of the staff assigned to these facilities. This situation further exacerbates our already tenuous ability to detain potential criminals in need of detention locally, thereby posing a more significant threat to public safety. The county will face major cost increases to identify and implement alternatives to incarceration, enhanced health care needs for this population of inmates and the likelihood of increased litigation relating to the very issues leading to this predicament. This is the prototypical "no win" situation. Rather than resolving a legitimate problem, it actually contaminates the issue and spreads it beyond the walls of the state prisons.

**EXHIBIT 3 – LEIStCSD0003**
**DECLARATION OF EXPERT WITNESS CHRISTIANSON**

# Stanislaus County Sheriff's Department
## Alternative Recommendations in the Coleman/Plata v Schwarzenegger Litigation

As the Coleman and Plata v Schwarzenegger lawsuits move forward to trial, the Stanislaus Sheriff's Department poses the following alternatives to the potential early release from prison of thousands of inmates to reduce inmate overcrowding and enhance the delivery of adequate inmate health care:

1) The court-appointed Receiver in the Coleman/Plata litigation has recommended the funding and construction of 10,000 additional health care beds to relieve the health care crisis in the California Department of Corrections and Rehabilitation (CDCR). We propose not only funding these beds at the state level but additional beds as needed to alleviate the crisis and bring CDCR into compliance with constitutional standards. Though expensive, it certainly pales in comparison to the costs and impact to each of the counties and the serious threat posed to public safety.

2) Enhance viable outpatient mental health treatment and substance abuse treatment/aftercare for parolees through a partnership between CDCR and the respective County Mental Health professionals.

3) The state can assist in funding regional health care facilities in identified counties to treat both county inmates and parolees who require sub-acute medical care or mental health care. The base county can generate revenue by charging per diem rates to other participating counties or the state. Operations can be maintained through a contractual arrangement with a private vendor or partnership with county health services.

4) The state can assist in funding Day Reporting Centers in the counties with stringent occupational/educational training and substance abuse programming to reduce recidivism and serve as an alternative to incarceration for both county inmates and state parolees.

5) Expand the use of private or public Community Correctional Facilities as an alternative to incarceration in CDCR prisons, particularly for the lower security level inmates.

6) Re-visit the provisions of AB 900 to expand funding for county jail expansions an/or re-entry facilities.

7) Eliminate the state parole program and utilize that funding to enhance programs cited previously. Inmates would be direct discharges and repeat offenders would follow the process at the county level with enhanced support from the state. With a 70% recidivism rate, one could argue the parole system is not functional. Those inmates considered high control cases due to violence or other related factors could be discharged but retained under the supervision of county probation officers.

8) The legislature can change sentencing laws and return to the pre-1977 indeterminate sentencing structure. In this way, the state Board of Prison Terms can determine the suitable release of inmates based on their participation in viable programs and their in-prison conduct. In effect, establish a contractual arrangement with the inmate whereby he or she is motivated for early release through this mechanism. If truly viable training, substance abuse treatment, health care, etc. are provided, it may be reasonable to assume the recidivism rate may drop. This would be particularly feasible if suitable aftercare treatment and programs similar to those cited previously are made available.