1   JONES & MAYER
    Martin J. Mayer (SB # 73890)
2   Michael R. Capizzi (SB # 35864)
    Kimberly Hall Barlow (SB # 149902)
3   Ivy M. Tsai (SB # 223168)
    3777 North Harbor Boulevard
4   Fullerton, California 92835
    (714) 446-1400; Fax (714) 446-1448
5   e-mail: mjm@jones-mayer.com
    e-mail: mrc@jones-mayer.com
6   e-mail: khb@jones-mayer.com
    e-mail: imt@jones-mayer.com
7
    Attorneys for Intervenor-Defendants
8   SAN DIEGO COUNTY SHERIFF WILLIAM B.
    KOLENDER, ORANGE COUNTY SHERIFF-
9   CORONER SANDRA HUTCHENS, PLACER
    COUNTY SHERIFF EDWARD N. BONNER,
10  BUTTE COUNTY SHERIFF-CORONER PERRY
    L. RENIFF, CALAVERAS COUNTY SHERIFF
11  DENNIS DOWNUM, LOS ANGELES COUNTY
    SHERIFF LEE BACA, SANTA CLARA COUNTY
12  SHERIFF LAURIE SMITH, SAN BENITO COUNTY
    SHERIFF CURTIS HILL, STANISLAUS COUNTY
13  SHERIFF ADAM CHRISTIANSON, MENDOCINO
    COUNTY SHERIFF TOM ALLMAN, TEHAMA
14  COUNTY SHERIFF CLAY PARKER, LASSEN
    COUNTY SHERIFF STEVE WARREN, YOLO
15  COUNTY SHERIFF ED PRIETO, SANTA BARBARA
    COUNTY SHERIFF BILL BROWN, KERN COUNTY
16  SHERIFF DONNY YOUNGBLOOD, SAN MATEO
    COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
17  SHERIFF STEVE DURFOR, CONTRA COSTA
    COUNTY SHERIFF WARREN RUPF,
18  SHASTA COUNTY SHERIFF TOM BOSENKO,
    RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
19  VENTURA COUNTY SHERIFF BOB BROOKS,
    SOLANO COUNTY SHERIFF GARY R. STANTON,
20  SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
    SUTTER COUNTY SHERIFF JIM DENNEY,
21  LAKE COUNTY SHERIFF ROD MITCHELL,
    GLENN COUNTY SHERIFF LARRY JONES,
22  TUOLUMNE COUNTY SHERIFF JIM MELE,
    FRESNO COUNTY SHERIFF MARGARET MIMS,
23  MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
    MONO COUNTY SHERIFF RICHARD SCHOLL,
24  HUMBOLDT COUNTY SHERIFF GARY PHILP,
    EL DORADO COUNTY SHERIFF JEFF NEVES,
25  MERCED COUNTY SHERIFF MARK PAZIN,
    DEL NORTE COUNTY SHERIFF DEAN WILSON,
26  SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
    AMADOR COUNTY SHERIFF MARTIN RYAN,
27  INYO COUNTY SHERIFF WILLIAM LUTZE,
    STANISLAUS COUNTY CHIEF PROBATION OFFICER
28  JERRY POWERS, VENTURA COUNTY CHIEF

DECLARATION OF EXPERT WITNESS  MICHAEL JAMES

1  PROBATION OFFICER KAREN STAPLES,
   SOLANO COUNTY CHIEF PROBATION OFFICER
2  ISABELLE VOIT, SANTA BARBARA COUNTY
   CHIEF PROBATION OFFICER PATRICIA STEWART,
3  BUTTE COUNTY CHIEF PROBATION OFFICER JOHN
   WARDELL, SAN LUIS OBISPO COUNTY CHIEF
4  PROBATION OFFICER KIM BARRETT, CONTRA
   COSTA COUNTY CHIEF PROBATION OFFICER
5  LIONEL CHATMAN, INYO COUNTY CHIEF
   PROBATION OFFICER JIM MOFFETT,
6  SHASTA COUNTY CHIEF PROBATION
   OFFICER BRIAN RICHART, YOLO COUNTY
7  CHIEF PROBATION OFFICER DON MEYER,
   FRESNO COUNTY CHIEF PROBATION OFFICER
8  LINDA PENNER, MARIPOSA COUNTY CHIEF
   PROBATION OFFICER GAIL NEAL, CITY OF
9  WHITTIER POLICE CHIEF DAVE SINGER,
   CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES,
10 CITY OF PASADENA POLICE CHIEF BARNEY
   MELEKIAN, CITY OF ALHAMBRA POLICE
11 CHIEF JIM HUDSON, CITY OF FREMONT
   POLICE CHIEF CRAIG STECKLER, CITY OF
12 GROVER BEACH POLICE CHIEF JIM COPSEY,
   CITY OF SANTA CLARA POLICE CHIEF STEVE
13 LODGE, CITY OF VACAVILLE POLICE CHIEF
   RICH WORD, CITY OF WOODLAND POLICE CHIEF
14 CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF
   MACE McINTOSH, CITY OF PASO ROBLES POLICE
15 CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO
   POLICE CHIEF MICHAEL BILLDT, CITY OF
16 ATWATER POLICE CHIEF RICHARD HAWTHORNE,
   NATIONAL CITY POLICE CHIEF ADOLFO GONZALES,
17 CITY OF DELANO POLICE CHIEF MARK DeROSIA,
   CITY OF MODESTO POLICE CHIEF ROY WASDEN,
18 CITY OF FRESNO POLICE CHIEF JERRY DYER, AND
   CITY OF DELANO CHIEF OF CORRECTIONS GEORGE
19 GALAZA

20

21                IN THE UNITED STATES DISTRICT COURTS

22           FOR THE EASTERN DISTRICT OF CALIFORNIA

23            AND THE NORTHERN DISTRICT OF CALIFORNIA

24   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

25      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

26  RALPH COLEMAN, et al.,          Case No: CIV S-90-0520 LKK JFM P

27        Plaintiffs,               **THREE-JUDGE COURT**

28

DECLARATION OF EXPERT WITNESS  MICHAEL JAMES

| | |
|---|---|
| vs. | [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)] |
| ARNOLD SCHWARZENEGGER, et al., | **DECLARATION OF EXPERT WITNESS MICHAEL JAMES** |
| Defendants. | |

| | |
|---|---|
| MARCIANO PLATA, et al., | Case No.: C01-1351 TEH |
| Plaintiffs, | **THREE-JUDGE COURT** |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al., | |
| Defendants. | |

I, MICHAEL JAMES, hereby declare as follows:

1.      I am the Assistant Sheriff for the County of Orange in charge of custody operations. I am in charge of all five Sheriff's Department correctional facilities, inmate services and food services.

2.      In the five facilities there is a division commander assigned to each of these divisions. We oversee budget, staffing, training for all those facilities, inmate services and the level of service provided to the inmates. I also monitor the population.

3.      I have a Bachelor's Degree in Organizational Management from Vanguard University.

4.      I am a 23-year veteran of the Sheriff's office and I have worked in all of the jail facilities with the exception of the James Musick jail. I have worked in South Operations (covering the Southern part of Orange County), North Operations (covering the Northern part of Orange County), Internal Affairs and I have worked in these different divisions in all levels of rank. I also, most recently, served as chief information officer for the Sheriff's Department. My expertise comes from the fact that I have worked in all the facilities, I currently manage all the facilities, deal with the personnel

1   there and deal with the costs associated with housing and caring for the inmates that are

2   currently in our custody.

3       5.    I am supportive of a type of program under which state prisoners would be

4   housed in secure re-entry facilities, run by the State or by the host communities' county,

5   and receive services for mental health care needs, drug and alcohol abuse, domestic

6   violence counseling, vocational and other necessary training and be partnered with

7   community resources on release to improve their chances of successfully reintegrating

8   back into the community and reducing their risk to reoffend.  Orange County was

9   applying for AB 900 funds to site a re-entry facility at its James A. Musick facility.

10  Although that particular project does not appear to be moving forward currently, we are

11  implementing a successful programming effort for County prisoners in our custody to

12  provide this same type of assistance to them.   Despite the apparent discontinuance of

13  AB 900, the County will likely be moving forward with building replacement beds for

14  1000 existing "temporary" or barracks beds at Musick.  This buildout is expected to take

    some time, as it is currently in the planning stage.

15      6.   In my opinion, all jails are overcrowded, including ours.  We have

16  implemented programs in Orange County to try to avoid overcrowding and particularly in

17  the Theo Lacy facility which is subject to a population cap.   There are alternatives to

18  incarceration which Orange County employs to try to maintain jail populations at an

19  acceptable level.   Cite and release, early "sober" release of DUI arrestees, work furlough

20  programs, etc., can be an effective way of reducing the levels of very low risk offenders

21  to leave room in the jail for higher risk pre-trial detainees and post-sentence offenders

22  who are awaiting transfer to state prison or who will serve out their sentences in our

    facility.

23      7.  We have a program in Orange County under the Mentally Ill Offender Crime

24  Reduction Act (MIOCR) which diverts those with mental illness from the jail into

25  appropriate mental health treatment facilities.   This program does not and cannot serve

26  all of those in our jails with mental health needs.  A determination whether a person

27  should be diverted to the MIOCR program is made by the mental health professionals,

28  not by the Sheriff's Department.  We have mental health treatment facilities inside the

DECLARATION OF EXPERT WITNESS  MICHAEL JAMES

jail. The mental health professionals make a recommendation that a particular person should be removed and we generally go along with that after a security assessment of that person. I support and agree with the purposes of the MIOCR program. The Department also supports and agrees with the purposes of the MIOCR program. There are simply not enough resources available to provide the program to all who might be able to benefit from it.

8.    In addition, the Orange County jails have a model mental health treatment program, for which we have recently won an award, in the facility. But there are more inmates in our custody that have mental illness than we provide treatment for. The reason for this is insufficient staffing, funding, and timing – that is some of the county jail prisoners do not spend enough time in our facility to obtain any benefit from this program.

9.    Before the MIOCR grant was in place we would use the mentally ill offender court program. The mentally ill offender court program would take mental health into account in sentencing these people. These people could be in custody a while waiting for the court date, but then the court takes their mental illness into consideration.

10.    We have our own recognizance program or O.R., which is a pretrial program. Cite and release can be done by an officer in the field. O.R. is done by an officer of the court, detention release officer, who makes that determination. It is not a judge it is a court officer. It is not bail, bail requires you to pay a fee, get a bond posted. O.R. says you get released on your own recognizance to reappear at a hearing. These actually happen inside the jail prior to the time the individual goes to court; at pre-arraignment, basically at booking. This process is used without regard to crowding conditions and is available for all who are eligible for it. If the charges, history and character of the arrestee justify O.R. release pre-trial, thedetention release court officer basically makes that determination. An early release is entirely different and occurs on the back end of the sentence.

11.    We use our field and cite release policy for Orange County in mostly misdemeanor crimes. The misdemeanor crimes are cited and released in the field, so they are never actually booked in the jail. They are issued a citation, a summons to appear at a

DECLARATION OF EXPERT WITNESS  MICHAEL JAMES

later date. This would depend on the crime and history. The one that is a primary difference would be a DUI. We bring them into jail and hold them until they are sober and then release them. We do not just release them in the field. Both of these tools deal with low risk offenders, usually with insignificant or no criminal history and are useful tools to reduce overcrowding.   These tools would not be appropriate for parolees rearrested for new crimes or for persons with a significant conviction history, history of violence or arrest for a serious crime.

12.    Proposition 36 is a drug offender alternative to incarceration for a fairly large percentage of first-time drug offenders.   Orange County also has a drug court, which is for repeat offenders, to try to give them treatment options instead of jail/ incarceration time. The County operates an ITT court.   The ITT court is the intensive P.C. 1210 program; it is essentially a more intensive Proposition 36 proposition.  The County Court system also operates a juvenile delinquent court, in which the court deals with juveniles who have delinquency problems in school, to try and correct the behavior early before the juvenile moves into more serious problems and crime.   The County has several other specialty courts and programs designed to provide specific and tailored treatment and supportive services to those arrested in various risk categories.  For example, we have a driving under the influence court, which deals specifically with drunk drivers to try to focus on the causes of the crime, appropriate treatment and penalties, to reduce recidivism.

13.   We have a domestic violence court that deals with both sides of the domestic violence issue. There is also a specialized court called "Whatever It Takes." It takes a hard core look at the lives of juveniles and younger offenders, who are going into the criminal system, to try to stop that behavior before it escalates into habitual crime. And for these specialty court programs, there are often follow-up programs that go with them out of the courts. There are graduations. A whole variety of treatment goes with the program, that the judges monitor and follow.

14.   We also have a homeless court that deals with homeless issues, Sentinel, which is electronic monitoring. For the homeless, if someone is on the streets, they are not typically arrested and taken to that court. Usually it is another crime that has been

-6-

committed and then they are dealing with that crime. The program offers jobs, clothes, bus tickets, food tickets, some meals, things that they can do, and services they can utilize. We have the biggest population of homeless people that live right near the main jail in the Santa Ana Civic Center. There are 40,000 homeless people in the county.

15. We have a community work program, a co-occurring disorders court, a diversified monitoring services court, and an alternative community treatment program for chronically mentally disordered misdemeanants. We have a dependency drug court, which is a family reunification program that is designed to keep parents off of illegal drugs. We also have a military court that deals with military folks that are returned from service and are having issues. So if they have issues, they can go to a military court. It is a brand new one that was just started. For example, if someone comes back from the military and they have posttraumatic stress syndrome and they get into a domestic violence situation or something like that and they might have gone otherwise into one of the courts I already mentioned, but because they might have just gotten back from Iraq or discharged, they go to the military court. It is a civilian judge that deals with that.

16. The Orange County criminal justice system has developed a very sophisticated array of tools for specialized courts to address specific needs of those committing crimes and attempting to help them adjust their behavior appropriately and reduce recidivism. In each of the courts identified, in addition to being a specialized court, it is a court in which the punishment is likely to be either an alternative to incarceration or less incarceration than might have been imposed had the defendant not been eligible for that court.

17. The arrest rate in Orange County is 65,000 bookings a year. The jail population at any given moment is 6,000 to 6,500, 6,800, somewhere in there. The bookings are a pretty steady number for several years.

18. Thus, even though this vast array of specialized courts, specialized services in the jail, facilities expansion and population reduction measures has occurred, the County's jail needs in the future are still not going to be met by currently planned facilities. While I certainly will not give up on creating and implementing new plans to address the needs of our incarcerated populace, Orange County has risen dramatically to

-7-

the challenges of prison overcrowding, mentally ill offenders, substance abuse, and the need for specialized programs and interventions to deal with particular types of criminal and related activity.

19. A total of slightly under 600,000 people have been early released from the County jail facilities, as that term is quantified by the Sheriff in Orange County, from 1986 to 2004. Most of the jail prisoners who are early released from the sentences in Orange County Jail are released three days early pursuant to Penal Code section 4018. Basically the three-day early releases in Orange County are the bulk of all the early out releases.

20. I believe that the use of some of these programs and policies that I have identified above contribute positively to public safety in the sense that they provide focus, specialized attention and specialized services to those who are arrested for particular types of crimes. I also believe that similar programs provided at the local level could provide a viable alternative to a prisoner release order because they typically target offenders before they find their way into the State prison system, when they are easier to program, treat, and before they have been exposed to (and potentially trained by) more hardened and experienced criminals in the state prison system. Moreover, similar programs could be offered through both the courts and the prisons to address the more violent and hardened inmates in the prison.

21. The Sheriff's Department and our partners which include all the public safety agencies and the treatment programs we deal with in Orange County, have made an analysis of the impact that an order of prisoner release of state prisoners might have on Orange County. We are trying to make contingency plans as to how we might deal with the impacts of such an order. The process of assessing what the impacts may be and how the county may deal with them is something that has not been completed. At this point, without knowing the precise characteristics, numbers and timing of prisoners who would be released, we cannot determine what the precise impacts will be or finalize plans on how to deal with a proposed release order.

22. What we do know is that Orange County previously suffered serious negative impacts on public safety from the early releases that have been compelled by the

-8-

population cap under which the county was previously operating. An influx of new parolees early into our community could lead to exactly the same result by requiring us to release "county" offenders early to accommodate state prisoners awaiting transfer to prison and re-arrested parolees. The negative impact of the county inmate releases would be compounded by the expected crime and victim/societal costs caused by the additional parolees.

23.    Based on my expertise I believe the average length of stay in Orange County Jails has been trending up since 2001. I believe the citizens and taxpayers of this county expect inmates to serve their full sentences. Citizens and taxpayers want inmates to spend their time in custody. Orange County has more people spend more time in custody than any other county around us, which has been proven by an independent report. I believe that it is important that inmates stay in custody to serve their sentences and I believe it is important we provide them programming while they are in custody which is something that is done as well, and can help them avoid future incarceration.

24.    Alternative programs as opposed to early release programs have a dual purpose in providing specialized attention for particular types of offenses as well as helping to manage the jail population. Due to overcrowding in Orange County's jails, the county has had to adopt a pattern of releasing inmates early due to a lack of housing capacity. Over the years, a significant number of inmates have been released for no reason other than there was no room for them in the jails.

25.    A statewide early release of prisoners (whether to parole or at large) would infuse another large number of inmates convicted of felony crimes into a system that is already taxed and inhibit our ability to provide those programs that we already do today. Orange County inmates are approximately 10% of the state prison population. Thus approximately 10% of releases will come back to Orange County. Thus if the Court were to order 30,000 prisoners released early, approximately 3,000 of them would come to Orange County, without programming, services or likely proper supervision available in the community. Applying the State's 70% recidivist rate, that would amount to 2,100 parolees coming back through Orange County's jails, or one third of our current inmate population. We simply do not have room for these inmates unless we eliminate

DECLARATION OF EXPERT WITNESS  MICHAEL JAMES

programming space for the County programs that are proving to be so promising, and unless we revert to regular and substantial early releases, already demonstrated to have a disastrous effect on Orange County in the past.

26.     The impact of an early release order of prisoners from state prison in part is a question of the timing of the impact of those individuals who would return to Orange County. My understanding is that Plaintiffs' experts propose that those nearing their parole date get returned to Orange County sooner that they otherwise would. This would definitely cause an increase or spike in crime and arrests when the initial wave of releases puts demands on the Orange County systems. People that commit multiple crimes get arrested for some or one ultimately. So we are dealing with more months of crimes they could commit before they are ultimately arrested for the one at end. These are plain and simply crimes that the victims would not have to deal with, the community would not have to deal with, and the entire criminal justice system would not have to deal with if these inmates remained incarcerated.

27.     The initial impact on Orange County of an early release order of state prisoners will be severe but I also believe that the extra impact will continue because that pool of inmates are the population that is in prison today. We also know that the 18 to 25 year old population is an expanding population that is beginning to engage in or escalate criminal activity. Thus, it is likely in my view that this population of offenders will actually increase the pressure for additional early release, which if pursued would lead to even greater risk to the community from this group. Men in this age group are not only likely to offend more regularly, but more brazenly, and they are not as inhibited, mature or responsible as men past the age of 25.

28.     In Orange County part of the recidivism problem is the lack of funding, and hence inadequacy of resources, to provide the extent of programs that the county would like to provide to assist people in not committing new crimes. An increase in jail population could lead us to focus on more officers on the streets, more custody officers, and space needs, reducing space, personnel and funds available to provide the very programming which could end this viscious cycle.

29.     If there were a state prison release order it would certainly be in the interest

DECLARATION OF EXPERT WITNESS MICHAEL JAMES

of public safety to expand the available programs to assist new arrestees in trying to get

the greatest number to avoid committing new crimes. Part of the analysis and assessment

that we are doing with our partners is analyzing what needs there would be to expand

such programs.   But there will be failures of those who are released from prison and

cannot benefit from the County programs because of their higher risk and more serious

crimes; there will be those who cannot receive programming because the only alternative

is to release them early; and there will be those who will fail even with the best

programming.

30.    While we are still tracking data on the various programs we have initiated

over the past few years, it is my opinion that these programs do contribute to a reduction

in recidivism.   In my opinion, several things contribute to this reduction.   It is a

combination of the punishment of being incarcerated, the programs that they may take

advantage of within the period of incarceration, and the assistance that they may receive

from the county to reintegrate them successfully into society. The likelihood that they

will not commit new crimes is increased through the operation of those three factors

among others.   Based on the experience I have had with success from the County's

programs, it is my opinion that if similar programs were implemented in state prison, I

believe it could have a similar effect in reducing recidivism for state prison inmates.

31.    Orange County does not currently have available space in county facilities

to provide treatment to mentally ill prisoners released early;  there are not enough mental

health beds existing to house the mentally ill currently living in the community, and thus

I believe there would be a negative impact on the County's mental health system, both in

terms of space and money.  Untreated mentally ill people or inadequately treated

mentally ill people are an enormous source of crime in our community.  Thus releasing

mentally ill prisoners into a community lacking in mental health care facilities and

professionals will also have a negative impact on public safety.  There are not enough

mental health care professionals in the county to provide services to all the currently

present mentally ill population. If there were more mentally ill persons in the County, it is

my opinion that there would be nobody to treat them.

32.    The current jail population in Orange County is between 6,000 and 6,800.

-11-

70 percent of those in custody in Orange County facilities right now are felony arrestees as opposed to misdemeanants. If 3,000 prisoners were to be released to Orange County from state prisons as a result of an early release order 2,000 people would be in the system which is already over the capacity that we have today. State prison inmates are all felons and we have the combination of misdemeanants and felons

33.    Assuming we get 2,000 rearrested and assuming we cannot build any new beds other than the ones that are already in the pipeline to deal with those 2,000 felons I would let out misdemeanants that are in custody out first. If we have 6,000 people in jail and we let out 30 percent, it would be 1,000 misdemeanants. We would pretty much be releasing all misdemeanants.    If there is a cap of the state prison population, we will have other state prisoners in custody here that cannot be moved out, causing additional releases.

34.    Assuming 3,000 inmates were released early in Orange County, I do not believe there are adequate programs such as drug treatment, housing, educational, vocational, counseling, and so on to deal with those 3,000 people coming back in the community. In my experience, if people are simply released from jail without programming they do worse than if they had programming.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 30 day of _October_ at _Trabuco Canyon_ California.

_Michael James_
MICHAEL JAMES

DECLARATION OF EXPERT WITNESS MICHAEL JAMES