| | |
|---|---|
| PRISON LAW OFFICE | ROSEN BIEN & GALVAN, LLP |
| DONALD SPECTER, Bar No. 83925 | MICHAEL W. BIEN, Bar No. 96891 |
| STEVEN FAMA, Bar No. 99461 | JANE E. KAHN, Bar No. 112239 |
| ALISON HARDY, Bar No. 135966 | AMY WHELAN, Bar No. 215675 |
| SARA NORMAN, Bar No. 189536 | LISA ELLS, Bar No. 243657 |
| REBEKAH EVENSON, Bar No. 207825 | MARIA V. MORRIS, Bar No. 223903 |
| 1917 Fifth Street | 315 Montgomery Street, 10th Floor |
| Berkeley, CA 94710 | San Francisco, CA 94104 |
| Telephone: (510) 280-2621 | Telephone: (415) 433-6830 |

K & L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

THE LEGAL AID SOCIETY -
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>     Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.<br>     Defendants | No. Civ S 90-0520 LKK-JFM P<br>**THREE-JUDGE COURT**<br><br>No. C01-1351 THE<br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>     Plaintiffs,<br>vs.<br>ARNOLD SCHWARZENEGGER, et al.<br>     Defendants | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MIL NO. 1 (TO EXCLUDE EVIDENCE RE: HOUSING AND OTHER ENVIRONMENTAL CONDITIONS, SAFETY CONCERNS, AND PROGRAMMATIC CONCERNS)** |

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351                                   1

I. **Introduction**

Defendants seek to exclude plaintiffs' experts' testimony about "housing and other environmental conditions, safety concerns, and programmatic concerns" in California prisons. Defs' Mtn in Limine No. 1 to Exclude Evidence Re: Housing and Other Environmental Conditions, Safety Concerns, and Programmatic Concerns (Defs' MIL No. 1) at 2.  They argue that such evidence is irrelevant or, if relevant, is "inflammatory" and a wasteful distraction from "the real issues." *Ibid.*  They are wrong: the testimony at issue regarding actual prison conditions is evidence that supports plaintiffs' experts' opinions that overcrowding is the primary cause of the constitutional violations and no relief other than a prisoner release order will remedy the violations.  Housing prisoners in conditions that are unsafe and promote violence interferes with the delivery of health care and puts prisoners at risk for disease, mental illness and injury, thereby increasing the demand for scarce health care services, which in turn exacerbates the existing constitutional violations.  Moreover, the testimony defendants seek to exclude also demonstrates how current conditions constitute a serious risk to public safety, which is relevant to the statutory requirement that the Court consider public safety concerns in issuing any relief.  18 U.S.C. § 3626(a)(2).  The Court should therefore deny the motion.

II. **Plaintiffs' experts' testimony regarding the detrimental effects of drastic overcrowding on the medical and mental health of prisoners as well as on the impossibility of remedying the constitutional violations under such conditions is directly relevant to the fundamental issues in this proceeding**

Defendants' first argument is that testimony of plaintiffs' correctional management experts regarding actual prison conditions should be excluded because it is not relevant to the central issues in this proceeding: whether overcrowding is the primary cause of the constitutional health care violations and whether any relief short of reducing the population will be effective. Defendants are wrong.

The testimony defendants seek to exclude describes the ways in which overcrowding affects living conditions for plaintiff class members: it yields living units dangerously packed

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351                                     2

1  with overwhelming numbers of prisoners (Report of Doyle Wayne Scott, November 9, 2007
2  [Scott Report] at ¶¶ 12-13; Supplemental Report of Jeanne Woodford, August 15, 2008
3  [Woodford Supplemental Report] at ¶¶7- 8, 10); it increases the risk of violence, which leads to
4  fear and mistrust on the part of staff, as well as frequent lockdowns, which deprive prisoners of
5  access to treatment, recreation, and programming (Scott Report at ¶¶ 31-37, 63-66; Report of
6  Joseph Lehman, August 15, 2008 [Lehman Report] at ¶¶ 9-10; Report of Jeanne Woodford,
7  November 9, 2007 [Woodford Report] at ¶¶ 8, 24-27); it causes shortages of toilets and showers
8  and other sanitary facilities (Scott Report at ¶¶ 19-22); it leads to filthy living conditions (Scott
9  Report at ¶¶ 14, 18, 23; Woodford Supplemental Report at ¶¶ 10, 15); and it overloads prison
10 infrastructure capacity in dealing with drinking water and wastewater disposal (Scott Report at
11 ¶¶ 17-18 ).

12    The experts do not simply describe prison living conditions in isolation, however.  They
13 make direct links between such conditions and medical and mental health care delivery.  They do
14 this in two ways: first, they explain how the overcrowded conditions interfere with health care
15 delivery, and second, they discuss how the overcrowded conditions are themselves detrimental to
16 prisoners' medical and mental health, causing further strains on the unconstitutional health care
17 delivery systems and making remedies more difficult.

18    The first link between the overcrowded conditions, as described by the experts, and
19 prison health care delivery is that the overcrowded conditions interfere with care.  Much of the
20 testimony at issue in this motion – descriptions of masses of bodies in close proximity,
21 inadequate sanitary conditions, inadequate toilets and showers, inadequate programming space –
22 addresses how overcrowding leads to increased violence.[1]  Scott Report at ¶¶ 32 ("[d]ecades of

---

[1] These observations echo Scott Kernan, one of defendants' trial witnesses, who opined before this Court that "[t]he overcrowding of CDCR facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide." Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order,

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351                                3

1 experience have demonstrated to me that close physical proximity, lack of adequate supervision,
2 noise, and competition for scarce resources are a recipe for violence in high-pressure prison
3 settings.  The lack of adequate toilets and sinks can also lead to long lines and anger at not
4 getting basic needs met, which in turn can lead to violence"), 33 (inadequate programming due
5 to nonexistent programming space leads to violence) (quoting Governor's blue-ribbon panel and
6 *Coleman* Special Master), 36 (housing idle prisoners in overcrowded gyms and hallways with
7 short-staffed and overworked officers having inadequate control over the population leads to an
8 increased risk of violence); Lehman Report at ¶¶ 8, 10; Woodford Supplemental Report at ¶ 8.
9 Violence interferes with health care delivery.  Scott Report at ¶¶ 36 (in violent and unsafe
10 conditions, "officers make poor decisions, nearly invariably disbelieving prisoners and denying
11 permission for movement, based on their concerns about controlling a population they perceiver
12 to be barely contained.  Such decisions can have the effect of denying essential medical and
13 mental health care. . . .), 54 (violence interferes with care because it deflects prison resources
14 away from medical escorts and other essential support tasks for health care delivery) (quoting
15 CDCR's head of adult institutions Scott Kernan); *see also id.* at ¶¶ 58-61 (same).

16    The overcrowded, unsafe, crisis level conditions described by the experts in the testimony
17 at issue in this motion also cause lockdowns, drastically restricting prisoner movement.  Scott
18 Report at ¶¶ 63-66; Lehman Report at ¶ 10.  Lockdowns impair delivery of medical and mental
19 health services.  *See, e.g.,* Scott Report at ¶ 65 ("[t]he Coleman Special Master has documented
20 extensively the ways in which lockdowns. . . injure prisoners with mental illness by denying
21 them needed mental health care"); Woodford Report at ¶¶ 4, 24-27 ("[l]ockdowns increase the
22 risk that a prisoner will not get treatment in an emergency" and "adversely affect some
23 prisoners' mental health"); Lehman Report at ¶ 10.

24    The second link between overcrowding and health care delivery is that the overcrowded

26 May 16, 2007, at ¶ 3.

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351

4

conditions plaintiffs' experts describe and defendants contest in this motion – extremely dense living units, inadequate sanitary facilities, forced idleness and lack of programming opportunities – lead to deterioration of prisoners' physical and mental health.  Expert Report of Ronald Shansky, November 9, 2007, at ¶ 135 ("[t]he housing conditions I observed and, in particular the converted gymnasiums at ASP, VSP and San Quentin, create textbook breeding grounds for infectious diseases. . . . Until CDCR reduces its population, it will remain highly vulnerable to outbreaks of communicable diseases, including staph infections, tuberculosis and influenza"); Expert Report of Pablo Stewart, August 15, 2008, at  ¶ 117 ("[t]he causal link between overcrowding and unconstitutional mental health care is clear and direct in the many CDCR housing units where space shortages from overcrowding directly result in long-term living arrangements that are harmful to the mental health of Coleman class members"); *see also* *ibid* ("[t]hese same harsh conditions. . . also increase the demand for mental health services in the general population who, in a properly operated, not overcrowded system, would not need mental health services. . . . . Isolation, seclusion, idleness, violence, fear and stress plague the prisoners in the CDCR as a direct result of overcrowding.  These conditions exacerbate mental illness. . ."); Expert Report of Craig Haney, November 9, 2007, at ¶¶ 185 ("these makeshift dormitories. . . especially the huge 'triple bunk' dormitories located inside gymnasiums. . . are likely to take an especially severe toll on prisoners who have pre-existing mental health and medical problems"), 186 ("the increased frustration [generated by frequent and long-term lockdowns] often increases rather than decreases the very tensions and conflicts they are supposed to help alleviate. . . In the meantime, prisoners – especially those with pre-existing psychiatric conditions – suffer emotionally and psychologically"), 45 ("[e]xposure to 'long-term, intense, inescapable crowding' of the sort that now characterizes California prisons results in high levels of stress that 'can lead to physical and psychological impairment'") (internal citations omitted), 50 ("[i]n addition to the lack of adequate numbers of treatment staff proportionate to the sheer numbers of mentally ill prisoners, these prisoners are themselves especially sensitive to

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351

5

the harsh realities of overcrowded prisons. They are more likely to decompensate from exposure to such pressurized, overcrowded environments, and they are vulnerable to victimization from the overcrowding-related conflicts that occur with increased frequency"), 58 ("the kind of widespread idleness and lack of purposeful activity that pervades overcrowded prisons have been identified as a major cause of self-harm and suicide among prisoners") (internal citations omitted), 67 ("prisoners who are traumatized by severely overcrowded prison conditions or the violence they can generate may leave prison with psychiatric disorders they did not have or manifest as clearly at the outset of their prison sentences").

Thus, the observations of plaintiffs' correctional management experts that defendants contest as irrelevant are in fact directly relevant to the findings of plaintiffs' experts, including the clinical experts, regarding the detrimental effects of overcrowding on prisoners' physical and mental health. *See also* Scott Report at ¶¶16 (program deprivation, particularly in "non-traditional" spaces, harms health and well–being of prisoners, particularly mentally ill prisoners) (quoting *Coleman* Special Master), 20-21 (inadequate numbers of toilets and showers in extremely dense populations breed violence and lead to spread of disease) (quoting CDCR head of adult institutions Scott Kernan and *Plata* Receiver), 21 ("lockdowns and limited programming also reduce access to exercise and fresh air, and increase idleness and frustration, with consequent negative effects on physical and mental health"), 65 (in lockdown conditions, "'a subset of sick inmates got sicker'") (quoting *Coleman* Special Master); Scott Supplemental Report at ¶ 4 (quoting former CDCR Secretary James Tilton that "'[t]here is widespread agreement among correctional experts that chronic idleness produces negative psychological and behavioral effects in prison'"); Lehman Report at ¶ 8 (CDCR overcrowding has led to increased infectious disease outbreaks) (quoting CDCR Expert Panel on Adult Offender and Recidivism Reduction Programming, A Roadmap for Effective Offender Programming in California, June 2007). Such deterioration places more strains on an already failed system, making remedies more difficult.

The conclusions that Mr. Scott, Ms. Woodford, and Mr. Lehman draw from their direct observations of prison living conditions – that overcrowding interferes with health care and increases the strain on the delivery system – support their conclusions that overcrowding is the primary cause of the constitutional violations, and that it must be addressed before those violations can be remedied. Scott Report at ¶ 80 ("'Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system'" (quoting *Plata* Receiver's First Bi-Monthly Report, July 5, 2006); Woodford Supplemental Report at ¶ 31 ("[o]vercrowding in the CDCR is extreme, its effects are pervasive and it is preventing the Department from providing adequate mental and medical health care to prisoners"); Lehman Report at ¶¶ 6, 8 (California's prison overcrowding "calls for drastic and immediate action" and "places intolerable burdens on the staff and the facilities, with significant negative impacts on the CDCR's ability to provide prisoners with all the necessary services, including health care"). Their testimony regarding living conditions is thus relevant to two of the central questions before this Court.

**III. Direct factual evidence of current prison conditions is not inflammatory and is clearly relevant to the questions before the Court**

Defendants' argument that plaintiffs' expert witnesses' evidence of actual prison conditions should be excluded because it is "inflammatory" and "distracts from the real issues" in the case is patently absurd. Defendants do not contend that the experts' descriptions are inaccurate. Instead, their claim is, in essence, that the Court should not know the full extent of the brutal living conditions found in California's overcrowded prisons and the ways in which those conditions interfere with the delivery of health care to *Plata* and *Coleman* class members.

The argument is based on Federal Rules of Evidence 403: "evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues. . . or by considerations of undue delay, waste of time, or needless presentation of

Pltfs' Opp to Defs' MIL No. 1 (Evidence of Housing Conditions, Safety and Programmatic Concerns) Case Nos. 90-00520; 01-1351

7

cumulative evidence." As a preliminary matter, Rule 403 is less relevant here, in a bench trial, since the purpose of the rule is to prevent juries from being swayed by inflammatory facts. *Gulf States Utilities Co. v. Ecodyne Corp.*, 635 F.2d 517, 519 (5th Cir. 1981) ("excluding relevant evidence on the basis of 'unfair prejudice' is a useless procedure" in a bench trial) (footnote excluded); *see also Matthews v. Transamerica Transportation Services*, 945 F.2d 269, 273 (9th Cir. 1991) ("[t]he burden of showing prejudice is particularly heavy in a bench trial") (citation omitted); *U.S. Caudle*, 48 F.3d 433, 435 (9th Cir. 1995) (allegedly prejudicial evidence would not likely have "any significance in a bench trial").

Further, Rule 403 does not apply because the testimony at issue in the expert reports of Doyle Wayne Scott, Jeanne Woodford, and Joseph Lehman is factual, personal observation; the harsh terms are merely accurate descriptions of the conditions. All three witnesses toured multiple prisons. Scott Report at ¶ 6 n.1; Scott Supplemental Report at ¶ 3; Woodford Supplemental Report at ¶¶ 3, 4; Lehman Report at ¶ 4. All three witnesses have run large state prison systems. Scott Report at ¶ 1 (Texas); Woodford Report at ¶ 1 (California); Lehman Report at ¶ 1 (Washington, Maine, and Pennsylvania). Thus, all three have extensive experience to draw on in rendering comparisons and judgments regarding California's prisons. The opinions they rendered regarding conditions of California prisons are carefully chosen, factual terms. As Mr. Scott testified, "I was prepared to witness troubling conditions at the state prisons I toured in California, but was unprepared for the sheer magnitude of the crisis." Scott Report at ¶ 29. Ms. Woodford noted similarly that "[o]vercrowding of the magnitude currently existing in the CDCR is unprecedented in my experience." Woodford Report at ¶ 10.

These witnesses' observations might be extreme, but that is because the conditions themselves are shocking. Defendants' outrage rings hollow in the face of the profoundly unsettling conditions. For example, defendants complain that Mr. Scott called it "appalling" to force prisoners to spend the night in hallway cages only a few feet wide with no mattresses or toilets. Defs' MIL No. 1 at 4; Scott Report at ¶ 11. Defendants cannot comprehend why it is

Pltfs' Opp to Defs' MIL No. 1 (Evidence of Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351         8

relevant to prisoners' physical or mental health to be forced to live in "filthy conditions" with "permanent unidentified liquid dripping from upper tiers into busy passageways," and conclude that such testimony is offered merely "to inflame and distract from the actual issues in this case." Defs' MIL No. 1 at 4-5; Scott Report at ¶¶ 17-18.

Defendants' argument that these witnesses' language is "inflammatory" rings hollow when defendant Arnold Schwarzenegger himself used much the same language to describe the state of California's prisons. Defendants complain that Mr. Scott's description of safety deficits in a housing unit is offered "clearly to scare the triers of fact," Defs' MIL No. 1 at 5, but the Governor himself has stated "the current severe overcrowding in 29 CDCR prisons has caused substantial risk to the health and safety of the men and women who work inside these prisons and the inmates housed in them," citing "an increased, substantial risk of violence," as well as "an increased, substantial risk for transmission of infections illnesses" and "increased, substantial security risk." Prison Overcrowding State of Emergency Proclamation, Exhibit A to Declaration of Sara Norman in Support of Plaintiffs' Opposition to Defendants' Motion in Limine No. 1, at 1. He described how "the current severe overcrowding. . . has overwhelmed the electrical systems and/or wastewater/sewer systems" and caused "power failures and blackouts" and "thousands of gallons of sewage spills and environmental contamination" which "can contaminate the drinking water supply, putting the public's health at an increased, substantial risk." *Ibid.* In sum, "overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism. . . ." *Id.* at 2. Defendant Schwarzenegger can hardly complain that plaintiffs' witnesses agree with his unflinching description of the profound crisis in the prison system.

**IV. Evidence regarding living conditions in California's overcrowded prisons is relevant to the Court's consideration of public safety**

The Prison Litigation Reform Act requires that the Court consider whether any prisoner release order would have an "adverse impact on public safety." 18 U.S.C. § 3626(a)(2). In order

Pltfs' Opp to Defs' MIL No. 1 (Evidence of
Housing Conditions, Safety and Programmatic Concerns)
Case Nos. 90-00520; 01-1351                        9

to fully weigh the impact of any proposed relief on public safety, it is important for the Court to consider any *benefits* to public safety from the reduction in overcrowding brought about by that relief.  Much of the testimony at issue in this motion is directly relevant to such a consideration. Overcrowding impacts public safety because disease spreads with dangerous speed in extremely dense populations with limited sanitation facilities.  Scott Report at ¶¶ 20 (lack of appropriate sanitation facilities serves as a "dangerous vector for the spread of disease"), 21 (citing CDCR institutions chief regarding how overcrowding of CDCR facilities has led to increased numbers of infectious disease outbreaks and *Plata* Receiver's documentation of similar serious overcrowding caused outbreaks, supporting his opinion that overcrowding has an impact on public health in the community); Woodford Supplemental Report at ¶ 9 (agreeing with defendant Governor Schwarzenegger that overcrowding increases risk of the transmission of infectious disease).  Overcrowding also overburdens basic infrastructure, which results in environmental hazards.  Scott Report at ¶ 17.  Furthermore, overcrowding makes it impossible to provide rehabilitative programs, and without such programs, prisoners are more likely to recidivate. Lehman Report at ¶¶ 9, 11; Woodford Supplemental Report at ¶ 3.  Thus, the testimony at issue in this motion is relevant to the crucial point that overcrowding itself has an adverse impact on public safety.

## CONCLUSION

For the foregoing reasons, Defendants' Motion in Limine No. 1 should be denied.

DATED: October 30, 2008

                              Respectfully submitted,

                              */s/ Sara Norman*

                              Sara Norman
                              Prison Law Office
                              Attorney for Plaintiffs in
                              *Plata v. Schwarzenegger* and
                              *Coleman v. Schwarzenegger*