PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99461
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 433-6830

K & L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY -
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants | No. Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT**<br><br>No. C01-1351 THE<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants | **PLAINTIFFS' OPPOSITION TO DEFENDANTS' MIL NO. 8 (RE EXPERT TESTIMONY OF WOODFORD, SCOTT, LEHMAN, AUSTIN AND BEARD)** |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ii

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II. ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    A.    The Court Should Deny Defendants' Motion Because the Experts Are Extraordinarily Qualified to Opine About the Matters in Their Reports, and All Opinions Are Based on Appropriate Information and Methodology . . . . . . . . . . 3

        1.    Jeanne Woodford . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        2.    Doyle Wayne Scott . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        3.    Joseph Lehman . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        4.    Dr. James Austin . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

        5.    Dr. Jeffrey Beard . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

    B.    The Testimony of These Experts Is Not Cumulative . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

III. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351      i

# TABLE OF AUTHORITIES

## CASES

Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S.579 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

Jones 'El v. Berge, 164 F. Supp. 2d 1096 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Kumho Tire Co. v. Carmichael, 528 U.S. 137 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3-4

Ruiz v. Johnson, 37 F. Supp. 2d 855 (S.D. Texas 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

U.S. v. Hankey, 203 F.3d 1160 (9th Cir. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. 14.38 Acres of Land Situated in Leflore County, Mississippi,
    80 F.3d 1074 (5th Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

## STATUTES

18 United States Code

    § 3626(a)(3)(E) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

## RULES

Federal Rules of Evidence

    403 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
    702 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3
    703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                ii

# I. INTRODUCTION

The Court should deny defendants' Motion in Limine No. 8 (Defs' MIL 8), which seeks to exclude opinion evidence from Jeanne Woodford, Doyle Wayne Scott, Joseph Lehman, James Austin, and Jeffrey Beard. Defendants assert that these experts' opinion testimony should be excluded because they are not correctional health care experts and because their opinions are not based on sufficient facts or a reliable method. *Id*. at 1:20-2:23. Defendants also assert all this evidence should be excluded as cumulative. *Id*. at 2:24-3:2. Defendants are wrong on both counts.

As explained below, the experts whose opinions defendants seek to exclude are extraordinarily experienced in administering, managing and analyzing correctional systems; they in fact include some of the most experienced prison administrators in the country, and one of the foremost national experts on prison crowding. One, Ms. Woodford, ran California's prison system just a few years ago and was in fact a defendant in this litigation. Three others, Mr. Beard, Mr. Austin, and Mr. Lehman, were chosen by defendants last year to advise the state of California on how to reduce overcrowding, as members of the Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs (CDCR Expert Panel). According to defendants themselves,

> The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs is comprised of some of the best and brightest minds on corrections and rehabilitation from across the country. Members were chosen for their broad experience in rehabilitation, education, correctional administration, psychology, and organizational development. The panel's recommendations are based on scientific research and evidence and reflect the best practices used by correctional agencies in other states.

"Expert Panel on Corrections Reform Offers California a Roadmap for Reducing Recidivism and Overcrowding," http://www.cdcr.ca.gov/News/2007_Press_Releases/ Press20070629.html, Exhibit A to the Declaration of Steven Fama in Support of Plaintiffs' Opposition to Defendants' Motion in Limine Number 8 (Fama MIL 8 Oppo Dec). Defendants dismiss the experts' participation in the CDCR Expert Panel as irrelevant because they claim the Expert Panel only addressed rehabilitative programming, but defendants are dead wrong. The Expert Panel explicitly explored the problems caused by overcrowding. It found that "[n]ot only does overcrowding have a negative impact on

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                    1

[rehabilitative] programming but, according to documents provided to the court by CDCR Chief Deputy Secretary Scott Kernan (2007), 'housing inmates in non-traditional quarters presents serious safety concerns for both inmates and correctional staff. The overcrowding of CDCR facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide.'" Expert Panel Report at 9 (the Expert Panel Report can be found at http://www.cdcr.ca.gov/news/ExpertPanel.html (site last visited 10/27/08)).

It is hard to imagine more qualified experts than defendants' own hand-picked "best and brightest minds" who have previously studied – at CDCR's behest – problems caused by overcrowding in California's prisons. Their experience superbly qualifies them, within the meaning of Rule 702 of the Federal Rules of Evidence, to provide opinion testimony in this action. Further, defendants' claims that these experts used inadequate methodologies to develop opinions is simply false, as set forth below.

Defendants' motion rests on the erroneous assumption that one needs to be a medical doctor to give an opinion about the impacts that crowding has on a prison or prison system's ability to provide health care. This is simply false. Plaintiffs' experts, with their substantial expertise in prison administration and prison crowding, are amply qualified to analyze the impacts of crowding on health care delivery systems without a medical degree.   Health care in prison is, obviously, delivered in a prison setting. A witness need not be a doctor or clinician to be an expert regarding barriers to providing health care in the prison system. Those who manage and work closely with prisons and prison systems know well about providing such care too, since it is their responsibility to do so, and they have actually done it.[1] *See, e.g.,* Plaintiffs' Opposition to Def MIL No. 1 (To Exclude Evidence Re: Housing and Other Environmental Conditions, Safety Concerns, and Programmatic Concerns).

---

[1] Defendants' argument in part also recycles their assertion that the experts did not prepare their reports, and thus that the opinions expressed therein are not their own. Defs' MIL 8 at 4:17-5:3 and 10:11-15. The spurious assertion that the opinions are not the experts' own is addressed in plaintiffs' opposition to Defendants' Motion In Limine Number 9, filed herewith.

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    2

Moreover, the methodology that plaintiffs' experts used in developing their opinions is reliable. Each of the experts reviewed numerous documents, including, among others, reports from the *Plata* Receiver and the *Coleman* Special Master, the state's Little Hoover Commission, CDCR's Expert Panel report, and other documents. All of the experts visited California state prisons either as part of their duties as expert panel members or as an employee of defendants, or as an expert in this case. Based on their review of pertinent documents and data, their on-site visits and their vast experience, plaintiffs' experts developed competent, reliable theories on the primary cause of the constitutionally inadequate medical and mental health care and whether any relief other than a prisoner release order would remedy the care.

## II. ARGUMENT

**A.  The Court Should Deny Defendants' Motion Because the Experts Are Extraordinarily Qualified to Opine About the Matters in Their Reports, and All Opinions Are Based on Appropriate Information and Methodology**

Defendants' motion in limine is based on two main assertions: (1) that the specified experts are not qualified to provide opinion testimony on primary cause and related issues; and (2) that the experts did not base their opinions on sufficient facts or a reliable method. As we demonstrate below, defendants are incorrect on both accounts.

"[A] witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case." Fed.R.Evid. 702. "The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence in order for the opinion or inference to be admitted." Fed.R.Evid. 703.

With regard to qualifications, "no one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience." *Kumho Tire Co. v. Carmichael*, 528

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                               3

1  U.S. 137, 156 (1999). Prisons, as archetypal "closed" institutions, are particularly apt for experts to

2  gain this expertise based on experience alone. As one court writes, "in evaluating the condition of a

3  prison system, having extensive experience in and around the cellbocks of this country is a paramount

4  qualification." *Ruiz v. Johnson*, 37 F.Supp.2d 855, 891 (S.D. Texas 1999) (rejecting challenge to

5  expert Allen Breed given his decades of experience evaluating prisons). Opinion testimony from

6  experienced prison administrators or experienced prison monitors can be properly admitted regarding

7  matters involving a mix of correctional and health care matters, including when a licensed clinician

8  with correctional experience also provides expert testimony on the issue. See, e.g., *Jones 'El v. Berge*,

9  164 F.Supp.2d 1096, 1102-1104 (expert opinions regarding adequacy of "Supermax" cellblock for

10  placement of mentally ill inmates heard from a 30-year corrections employee, a board-certified

11  psychiatrist, and a prison special monitor/consultant).

12       Courts must "construe liberally" the requirements of Rule 702 where, as here, the expert

13  testimony is not scientific but is based on "other specialized knowledge." *U.S. v. Hankey*, 203 F.3d

14  1160, 1168 (9th Cir. 2000). *Hankey* involved the opinion testimony of a police officer who, based on

15  years of training and work experience, became an expert on gang members and activities. The Court

16  rejected the argument that such evidence was inadmissible and that the district court should have

17  reviewed the expert's scientific methodology. *Id.* at 1168-69. The Ninth Circuit held that "[t]he

18  *Daubert* factors (peer review, publication, potential error rate, etc.) simply are not applicable to this

19  kind of testimony, whose reliability depends heavily on the knowledge and experience of the expert,

20  rather than the methodology or theory behind it." *Id.* at 1169. When an expert has decades of

21  experience in and around the nation's prisons, that experience is "paramount" and his opinions "cannot

22  be disregarded based on quibbles over . . . methodology." *Ruiz*, 37 F.Supp.2d at 890-891.

23       Finally, "the trial court's role as gatekeeper [regarding expert testimony] is not intended to serve

24  as a replacement for the adversary system." *United States v. 14.38 Acres of Land Situated in Leflore*

25  *County, Mississippi*, 80 F.3d 1074, 1078 (5th Cir. 1996). The Court should not exclude the evidence

26  challenged by defendants, but should instead hear it and permit defendants to raise any concerns they

27

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351     4

28

1    believe warranted via cross-examination and the presentation of contrary evidence, if they have any.

2    *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 US 579, 595-96 (1993).

3            **1.    Jeanne Woodford**

4            Incredibly, defendants challenge the expertise of their own former prison chief and longtime

5    employee, Jeanne Woodford. Ms. Woodford is uniquely qualified to testify about overcrowding and its

6    impacts on health care in the system that she herself oversaw and worked in for nearly three decades,

7    and her methodology clearly supports the opinions she expressed in her expert reports.

8            a. Expert Qualifications

9            Jeanne Woodford is the former Warden at San Quentin and former Director, Undersecretary,

10    and acting Secretary for the California Department of Corrections and Rehabilitation (CDCR) (formerly

11    California Department of Corrections). Report of Jeanne Woodford, November 7, 2007 (Woodford

12    Report), at ¶ 1 and Appendix A. Ms. Woodford worked for almost 30 years in corrections, including

13    various custody and management positions. *Ibid.* She served as Warden at San Quentin for five years,

14    ending in 2004. *Ibid.* Between 2004 and 2006, Ms. Woodford was the CDCR Director,

15    Undersecretary, or acting Secretary. *Ibid.*

16            All of Ms. Woodford's CDCR work involved health care related tasks. This included, as a

17    correctional officer and housing unit supervisor, escorting prisoners to health care appointments,

18    supervising such escorts, advocating for prisoners to be seen by physicians, and delivering medications.

19    Woodford Report at ¶ 2; Deposition of Jeanne Woodford, December 18, 2007, attached as Exhibit B to

20    Fama MIL 8 Oppo Dec, at 14:4-16.

21            In her many years as San Quentin Warden and then top-level CDCR manager, Ms. Woodford

22    worked with health care staff and others to improve the health care delivery system at San Quentin and

23    at all state prisons, including attempts at compliance in the two instant actions. Woodford Report at ¶

24    2. As Director of the CDCR, Ms. Woodford was in charge of health care for all the state's prisons.

25    Exhibit B to Fama MIL 8 Oppo Dec at 27:4-5. The head of the prison system's health care services – to

26    whom all the individual prisons' chief medical officers reported – reported to her and they worked

27

28    Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    5

1  closely together. *Id.* at 26:1-28:3. During her tenure as Director she was also responsible for the

2  CDCR's efforts to comply with the *Plata* lawsuit requirements. *Id.* at 29:4-20. Her efforts involved

3  working with CDCR health care services to achieve that goal, and to work with other parts of the

4  department if physical plant changes or construction were needed to achieve it. *Id.* She had a similar

5  role as Director regarding the requirements of the *Coleman* lawsuit, including working with other state

6  agencies to try to bring CDCR into compliance. *Id.* at 29:21-30:1. When she left the CDCR in 2006,

7  the delivery of medical care was one of her concerns. *Id.* at 37:19-22.

8       In her nearly 30 years of work at CDCR, Ms. Woodford learned a great deal about judicial

9  standards for the treatment of prisoners, which has resulted in her strong understanding of what

10  constitutes a constitutional level of treatment. Exhibit B to Fama MIL 8 Oppo Dec at 34:1-35:4. Ms.

11  Woodford has articulated many aspects of constitutionally adequate health care, including the need for

12  appropriate space. *Id.* at 36:2-37:18. As a CDCR employee, Ms. Woodford also received training

13  regarding various aspects of health care in the prisons, as it pertained to matters related to the

14  requirements of class actions (including the instant ones) regarding health care in the prisons. *Id.* at

15  10:3-12; 10:16-11:13. She has also studied correctional systems other than California's; she is an avid

16  reader of correctional programs and policies and has read widely about other states. *Id.* at 14:23-15:2.

17       Her experience and expertise thus overwhelmingly qualify Ms. Woodford to render opinions

18  regarding the operational effects of overcrowding on access to health care in CDCR and the efficacy of

19  various remedial options.

20            b. Facts and Methodology Underlying Testimony

21       Defendants challenge Ms. Woodford's opinion because, they allege, it is not based on sufficient

22  facts and methodology. This argument has no merit.

23       Defendants first claim that Ms. Woodford did not draft her own opinions. Defs' MIL 8 at 4-5.

24  This characterization twists her testimony. Ms. Woodford testified that plaintiffs' counsel typed the

25  first version of her reports after lengthy interviews; she then made the appropriate changes to the

26  written document. Exhibit B to Fama MIL 8 Oppo Dec at 46:15-47:7, 48:23-50:17; Deposition of

27

28

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                          6

Jeanne Woodford, September 15, 2008, attached as Exhibit C to Fama MIL 8 Oppo Dec, at 26:20-30:3.

Defendants then claim that her opinions are "not based on any actual data." Defs' MIL 8 at 5. Defendants resort to factually false mud-slinging. Ms. Woodford was abundantly clear that her reports were based not only on her extensive, directly relevant experience, but on a review of numerous key documents, mostly generated by defendants and the *Plata* Receiver, regarding the CDCR overcrowding emergency, the prison population, various aspects of prison operations, and individual prisoners. Woodford Report at ¶ 4; Supplemental Report of Jeanne Woodford (Woodford Supplemental Report), August 15, 2008, at ¶¶ 2, 3, 5 and Appendix A (list of documents reviewed). Ms. Woodford also reviewed recent reports of the *Plata* Receiver and his TurnAround Plan. *Id.* at Appendix A. Ms. Woodford also inspected three California prisons in July and August, 2008. Woodford Supplemental Report at ¶ 4 and Appendix A. At those prisons, Ms. Woodford was able to inspect all areas and have questions answered by staff, health care and custody. *Id.; see also, e.g.*, ¶¶ 10-15.

Defendants complain that Ms. Woodford has not reviewed certain documents or undertaken prison tours before her first deposition, but they fail to mention that she has in fact done so since that time. Defs' MIL 8 at 5; Woodford Supplemental Report at ¶ 4, Appendix A. Her opinions regarding overcrowding did not change. Woodford Supplemental Report at ¶ 3.

Defendants attack Ms. Woodford's facts and methodology because she did not opine regarding clinical sufficiency of health care in CDCR currently, and did not have exact facts on figures on staffing and clinical space. Defs' MIL 8 at 5-6. They attack Ms. Woodford's ability to express an opinion in an area – clinical aspects of prison health care in California – in which she offered no opinion.[2] She is not a clinician, and thus did not evaluate the clinical sufficiency of health care delivery. The fact that she

---

[2] Defendants rely on Ms. Woodford's statement at her 2007 deposition that she did know the current status of medical care delivery in the prisons. Ds' MIL 8 at 5. The question was vague as to "status" and easily interpreted to refer to clinical care alone. Ms. Woodford was clear in both her reports and at her deposition that medical care delivery is deficient. Woodford Supplemental Report at ¶ 31; Woodford Report at ¶ 46; Exhibit C to Fama MIL 8 Oppo Dec at 31:15-32:23.

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                          7

1    did not offer opinions, or have knowledge, outside of her area of expertise is irrelevant to the expert

2    opinions she did offer regarding how overcrowding creates operational barriers to health care delivery

3    in California prisons, an area she is well qualified to discuss. Furthermore, she very properly reviewed

4    and relied on the facts, analyses, and conclusions of the *Plata* Receiver and the clinical experts in the

5    case. Exhibit B to Fama MIL 8 Oppo Dec at 92:23-93:4; Exhibit C to Fama MIL 8 Oppo Dec at

6    31:15-32:23; Woodford Supplemental Report at Appendix A.

7           Defendants attempt to discredit Ms. Woodford's testimony, claiming that information in her

8    first report, drafted one year after her retirement as the CDCR Secretary, was stale. Defs' MIL 8 at 6.

9    Defendants complain that Ms. Woodford testified that crowding causes delays in moving prisoners, but

10   did not have specific information about delays since leaving the department. *Id.* However, Ms.

11   Woodford's conclusion, based upon her nearly 30 years in corrections, that crowding causes delays,

12   remains valid whether or not she can provide precise data about the degree of the delays since her

13   departure from the Department. Similarly, Ms. Woodford's observation, based on her extensive

14   experience in the Department, that tired officers suffer from low morale, are less productive and do not

15   fulfill their responsibilities to the prisoners and that such circumstances can be detrimental to the

16   provision of health care, is no less valid because Ms. Woodford was unable to identify a prisoner who

17   had died as a consequence during 2006. *See id.* at 6.

18          Defendants attempt to discredit Ms. Woodford by taking her testimony out of context and

19   disregarding key elements. For example, defendants criticize Ms. Woodford for stating that the CDCR

20   lacks sufficient custodial staff to provide prisoners with timely access to care, because she admitted that

21   she did not know the specific number of correctional officer vacancies at a specific prison in the last

22   year. Defs' MIL 8 at 6. However, Ms. Woodford *did* provide specific data about such shortages – she

23   testified that, in the previous six months, there were between 3000 and 4500 such vacancies. Exhibit B

24   to Fama MIL 8 Oppo Dec at 77:24-78:4.

25          Ms. Woodford testified that she agreed with the Governor's own strike team's recommendation

26   that California not exceed 130% of design capacity in its prisons. Supplemental Woodford Report at ¶

27

28
Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                        8

3. This opinion is based on her extensive knowledge and expertise regarding the administration of California prisons. Defendants' attempt to undercut this opinion based on her inability to remember, on the spot at her deposition, the names of documents she had reviewed in the course of her nearly 30-year career as a corrections professional that address appropriate housing capacity (Defs' MIL 8 at 7), is irrelevant. Depositions are not a memory test; Ms. Woodford's opinion in this area rests on solid ground and is made in good company.

Inexplicably, defendants attack Ms. Woodford's reliance on other expert reports in the case for their observations regarding current prison conditions. Defs' MIL 8 at 7-15. It is entirely appropriate for Ms. Woodford to consider the observations of other experts in the case, as it is for her to consider the reports of the *Plata* Receiver, the California Independent Review Panel, the Governor's AB 900 strike team, the Little Hoover Commission, the Inspector General, and the CDCR's Expert Panel on overcrowding. Woodford Report at ¶ 4; Woodford Supplemental Report at Appendix A. Her methodology does not suffer from a review of reliable sources that are directly on point; in fact that is exactly what experts do.

Based upon her extensive experience working in and running the California prison system, and based upon her review of the relevant documents in this case, Ms. Woodford is eminently qualified to offer an opinion on the impacts of overcrowding on the operational aspects of health care delivery in California prisons. Nor can be there any quibble with the methodology Ms. Woodford employed. Like the other experts in this case, she has reviewed extensive relevant documents generated by defendants, the *Plata* Receiver, and reliable experts in the field, and called on her considerable wealth of knowledge and expertise regarding the California prison system, before coming to the conclusions set forth in her report. Defendants' accusations that their own former prison chief has engaged in "naked speculation and self-serving rhetoric" (Defs' MIL 8 at 8), describes their own attacks and not Ms. Woodford's reports.

## 2.    Doyle Wayne Scott

### a. Expert Qualifications

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                                                 9

Defendants argue that Mr. Scott is not qualified to opine on whether overcrowding is the primary cause of the constitutional violations and whether any relief short of population reduction will remediate those violations because he is not a medical or mental health clinician. Defs MIL 8 at 8-9. As discussed in Section II.A above, this argument fails in face of the Federal Rules of Evidence and applicable case law, which clearly allow expert testimony from people such as Mr. Scott, with vast experience in the administration of prison systems, including medical and mental health care, as well as in the remediation of severe overcrowding and health care constitutional violations.

Mr. Scott has run one of the world's largest prison systems. Report of Doyle Wayne Scott, November 9, 2007 (Scott Report), filed herewith, at ¶¶ 1, 4. For more than 30 years, Mr. Scott worked for the Texas Department of Criminal Justice (TDCJ), the agency that runs that state's prisons, and the Texas Board of Pardons and Paroles, culminating in an appointment as the Executive Director of TDCJ from 1996-2001. Scott Report at ¶ 1. He has also been hired as an expert correctional consultant by multiple state systems, a federal district judge, and the National Institute of Corrections, and in that capacity has conducted independent reviews and analyses regarding prison-related matters in more than a half-dozen jurisdictions. *Id.*, and Appendix A thereto (curriculum vitae). He has served as chair or vice-chair of national correctional committees, including the standard-setting arm of the American Correctional Association. *Id.*

During the approximately five years Mr. Scott served as the TDCJ Executive Director, Mr. Scott reported directly to the state's Governor and its Board of Corrections. Deposition of Doyle Wayne Scott, December 14, 2007, attached as Exhibit D to Fama MIL 8 Oppo Dec, at 21:21-22:2. Texas has approximately 150,000 prisoners. *Id.* at 24:13-15. Mr. Scott was in charge of all matters, including medical and mental healthcare, concerning the Texas prisons. *Id.* at 37:4-10. Mr. Scott has also served as warden of a Texas prison in which half the facility was acute or intermediate mental health beds. *Id.* at 37:14-38:2.

During the time Mr. Scott was in charge, that TDCJ was in the remedial phase of the sweeping *Ruiz v. Estelle* prison reform litigation, working to accomplish specific tasks with respect to prisoner

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                    10

1  health care to end that lawsuit, including timelines in stipulated agreements regarding prisoners

2  receiving medical and mental health care. Exhibit D to Fama MIL 8 Oppo Dec at 16:21-17:19; Scott

3  Report at ¶¶ 4-5. Under Mr. Scott, the TDCJ undertook efforts to find clinicians for its institutions,

4  including associating with the state university teaching hospital and redesignating beds so that certain

5  prisoners would be housed closer to areas where larger pools of clinicians were available. Exhibit D to

6  Fama MIL 8 Oppo Dec at 19:2-16. Mr. Scott's prison system also used temporary space like modules

7  or trailers for clinical care. *Id.* at 89:1-8. In the management structure of the TDCJ, the medical

8  director reported to Mr. Scott's immediate deputy. *Id.* at 20:22-22:23.

9         The *Ruiz* case also involved severe overcrowding, and Mr. Scott played a role in the reform

10  efforts, including both population reduction and prison construction. Exhibit D to Fama MIL 8 Oppo

11  Dec at 14:12-15:6, 101:18-23; Deposition of Doyle Wayne Scott, October 1, 2008, attached as Exhibit

12  E to Fama MIL 8 Oppo Dec, at 44:23-45:6 and 77:8-13; Scott Report at ¶¶ 4-5.

13         Moreover, Mr. Scott's independent studies and analyses have involved the impact on medical

14  and mental health care of prison staffing patterns, including in-prison escorts for health care and off-site

15  transportation for the same purpose. Exhibit D to Fama MIL 8 Oppo Dec at 27:13-24. Mr. Scott has

16  done analyses of correctional officer staffing and medical escort and transportation needs in Florida,

17  Oklahoma, Kentucky, Indiana, New Mexico, and Puerto Rico. *Id.* at 28:10-15.

18         Through his experience running a prison system similar in size to California's undergoing

19  sweeping court-ordered reforms involving overcrowding and medical and mental health care, and his

20  experience as a corrections consultant for a federal court and various state systems, Mr. Scott is

21  uniquely qualified to opine regarding the obstacles facing California in the current crisis. Indeed, given

22  that Texas employed significant population reduction strategies as well as building additional capacity

23  to address its overcrowding problems, Mr. Scott has an extraordinary level of expertise to analyze

24  CDCR's systemic failure to provide adequate health care and the role played by overcrowding in this

25  failure.

26                     b. Facts and Methodolgy Underlying Testimony

27

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
28  Case Nos. 90-00520; 01-1351                          11

1    Defendants challenge Mr. Scott's opinion because, they allege, it is not based on sufficient facts

2    and methodology. This argument has no merit.

3    Defendants' allegation that Mr. Scott failed to review current, relevant information regarding

4    medical and mental health care in California (Defendants' MIL 8 at 9), is difficult to fathom in the face

5    of the wealth of documentation and personal observation that underlie his opinions. In addition to his

6    experience, detailed above, Mr. Scott's testimony is based on review of numerous key documents,

7    mostly generated by or for defendants and the *Plata* Receiver, regarding the CDCR overcrowding

8    emergency, the prison population, various aspects of prison operations, and medical care.[3] Scott Report

9    at ¶ 6 n.1 and Appendix B thereto (list of documents reviewed); Supplemental Report of Doyle Wayne

10   Scott, August 15, 2008 (Scott Supplemental Report), filed herewith, at ¶ 3 and Appendix A thereto

11   (listing additional documents reviewed).

12   Mr. Scott also toured four California prisons in October 2007 and four additional California

13   prisons in June 2008. Scott Report at ¶ 6, fn 1, Scott Supplemental Report at ¶ 3. At those prisons, Mr.

14   Scott had open access to staff, prisoners, medical and custody records and information, and all his

15   questions were answered. Scott Supplemental Report at ¶ 3. His methodology – review of extensive

16   documentation and analyses from defendants, their experts, and the Court's *Receiver*, among others,

17   along with numerous prison tours with interviews of staff and prisoners – is thus reliable.[4]

18   Defendants appear concerned that Mr. Scott was asked to opine regarding operational and not

19

20   [3]Contrary to defendants' assertion (Def's MIL 8 at 10), Mr. Scott did in fact review the
     Receiver's November 15, 2007 Plan of Action. Supplemental Report of Doyle Wayne Scott, August 15,

21   2008 (Scott Supplemental Report), filed herewith, at ¶ 11. He can hardly be faulted for not reviewing

22   the May 2007 preliminary plan, when it was never accepted by the Court and superseded by the
     November 2007 plan. Order Re: Receiver's May 2007 Preliminary Plan of Action [etc.], September 6,

23   2007, at 4:3-5:20.

24   [4]Oddly enough, the only documents defendants point out that Mr. Scott did not review (with the

25   exception of the Receiver's May 2007 and November 2007 plans, addressed in the above footnote, are
     plaintiffs' own monitoring reports. Defendants' MIL 8 at 10. Defendants thus appear to argue that Mr.

26   Scott is biased because he has read only documents generated by the state and not documents generated

27   by plaintiffs.

     Pltfs' Opp to Def's MIL No. 8
     Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
28   Case Nos. 90-00520; 01-1351          12

clinical aspects of prison health care in California, and did not evaluate the clinical sufficiency of health care delivery. Defendants' MIL 8 at 9. However, as noted above, he is superbly qualified to render an opinion on the obstacles overcrowding presents to the operational aspects of health care delivery. As defendants point out, he is not a clinician; he appropriately left clinical matters to Drs. Shansky and others. *See, e.g.,* Exhibit E to Fama MIL 8 Oppo Dec at 85:12-86:2.

Defendants criticize Mr. Scott for spending only four to seven hours at each California prison he visited, based on the fact that he spent longer at Florida prisons. Defendants' MIL 8 at 9-10. However, these tours were for different purposes: the Florida review was part of "an agency-wide operational analysis with recommendations for retooling specific areas that might not have been operating effectively, efficiently, in compliance with procedures or within the bounds of the law." Appendix A to Scott Report. In Florida, he calculated specific numbers of staff required for particular purposes. Exhibit D to Fama MIL 8 Oppo Dec at 29:12-30:8. He did not do so in California, since his focus was on the broader question of how overcrowding impacts health care delivery from an operational perspective.

Given Mr. Scott's extraordinary qualifications, extensive reviews of documentary evidence, numerous tours, and carefully sourced reports, defendants' accusations that his opinion lacks "intellectual rigor" and that its conclusions are "unsupported" and "engineered to match the positions of Plaintiffs' counsel" are grossly improper and must be rejected.

### 3.    Joseph Lehman

#### a.  Expert Qualifications

Joseph Lehman's experience and expertise in correctional management, including experience in a large and overcrowded prison system, make him highly qualified to analyze and opine on the effects of overcrowding on the delivery of medical and mental health care in California's prison system. Indeed, the state of California recognized his expertise by appointing him in 2006 to serve on the state's Expert Panel on Adult Offender and Recidivism Reduction Programming. Report of Joseph Lehman, August 2008 (Lehman Report), filed herewith, at ¶ 4.

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                        13

Mr. Lehman has 35 years of experience in corrections, parole, and probation, including managing adult prison systems and adult probation programs. Lehman Report at ¶ 1. He has 15 years experience running three state correctional systems in Washington State (1997-2005), Maine (1995-1997) and Pennsylvania (1990-1995). *Id.* He has received awards for his correctional work, including one for excellence from the Association of State Correctional Administrators. *Id.* at ¶ 2. He has been a member of the sentencing commission in two states, and was a Commissioner on the Pennsylvania Commission on Crime and Delinquency. *Id.*

When Mr. Lehman was in charge of the prison system in Washington, he created the prison health department for both medical and mental health care for inmates, and hired the physician who ran that unit. Deposition of Joseph Lehman, September 16, 2008, attached as Exhibit F to Fama MIL 8 Oppo Dec, at 12:3-19. Mr. Lehman worked closely with that physician. *Id.* at 13:1-3. He was the physician's boss and reviewed department wide policies promulgated and proposed by the healthcare unit. *Id.* at 13:7-18.

In Maine, Mr. Lehman was Commissioner of the state's prisons, with equivalent responsibilities as when he was Secretary of Corrections in Washington. Exhibit F to Fama MIL 8 Oppo Dec at 20:19-21:5. In Maine, local healthcare staff reported to the prison superintendents and wardens who in turn reported to a deputy commissioner supervised by Mr. Lehman. *Id.* at 21:23-22:11. Mr. Lehman also created and promulgated policy relating to medical and mental health care. *Id.* at 22:12-24. He worked with input from staff, including the person who drafted medical and mental health policies, which Mr. Lehman would then review and approve. *Id.* That policy person reported directly to Mr. Lehman. *Id.* at 24:3-6.

Mr. Lehman was hired to run the overcrowded Pennsylvania prisons soon after there had been serious riots. Exhibit F to Fama MIL 8 Oppo Dec at 28:5-16. Shortly after starting work, he was notified that a class action lawsuit regarding conditions of confinement would be filed against the state. *Id.* Mr. Lehman hired outside experts, including in the field of health care, to review the Pennsylvania prison system, and they concluded the system's most significant problem was overcrowding. *Id.* at

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    14

1    28:18 -29:6. Subsequently, the Pennsylvania prisons were sued, including regarding inadequate

2    medical and mental health care, insufficient medical staff and inadequate medical facilities. *Id.* at 29:7-

3    30:19. The same allegations of deficiencies were made regarding mental health care in the prisons. *Id.*

4    at 30:20-31:2. The case settled. *Id.* at 29:7-22. Mr. Lehman created an administrative division for

5    inmate medical and mental health care; there had not been such a division when he began. *Id.* at 26:7-

6    27:2. In Pennsylvania, Mr. Lehman's experience included creating the policy, procedural and

7    structural capacity to provide medical services in the state prisons. *Id.* at 57:11-22.

8            Mr. Lehman's experience with prison healthcare included determining whether policies and

9    procedures were adequate, including measuring whether they provided for adequate assessments and

10   screening for medical and mental health care, timely access to healthcare services for inmates,

11   classification systems sensitive to health care needs, documentation of healthcare activities, including

12   the provision of treatment and medication, and the infrastructure necessary for that task, and the

13   capacity to provide continuity of care. Exhibit F to Fama MIL 8 Oppo Dec at 34:22-35:18. When he

14   was the top manager of the state prison systems, Mr. Lehman would conduct site visits, including of the

15   healthcare program, and reviewed incident reports, some of which involved health care matters. *Id.* at

16   35:19-36:13 and 37:10-18.

17           Appointed to the CDCR Expert Panel on Adult Offender and Recidivism Reduction

18   Programming in December 2006, Mr. Lehman also served as the Chair of the Model Program

19   Subcommittee. Lehman Report at ¶ 4, 11. After Panel members including Mr. Lehman toured CDCR

20   prisons, heard from many CDCR officials and reviewed numerous documents, they produced a report to

21   the legislature entitled *A Roadmap For Effective Offender Programming In California. Id.* at ¶ 4. Mr.

22   Lehman was also a member of a CDCR strike team which in 2007 reviewed matters related to

23   population and crowding, which included site visits to three California prisons. Exhibit F to Fama MIL

24   8 Oppo Dec at 17:6-11 and 67:6-20.

25                              b. Facts and Methodolgy Underlying Testimony

26           Mr. Lehman's methodology for conducting his analysis in this action is set forth below, and is

27

28

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                    15

1    entirely sound. Mr. Lehman reviewed key documents regarding California's prison population and

2    attempts by the State to redress its emergency crowding, most of which were prepared by or on behalf

3    of defendants. Lehman Report, Appendix B (list of documents reviewed). Mr. Lehman also relied on

4    the documents he reviewed, matters he heard, and observations he made in December 2006 and the first

5    half of 2007 as a State-appointed member of the CDCR Expert Panel, and during his service on the

6    California strike team in 2007, including his tours of California prisons. *Id.* at ¶ 4; Exhibit F to Fama

7    MIL 8 Oppo Dec at 17:6-11 and 67:6-23. Of course, Mr. Lehman's findings and opinions are also

8    based upon his 35 years of correctional experience, with fifteen years experience directing correctional

9    systems in three states including a total of nine years directing overcrowded correctional systems in

10    Pennsylvania and Washington. Lehman Report at ¶ 1.

11        Based upon his experience as an Expert Panel member, as a director of multiple departments of

12    corrections, his review of documents and his tours of California prisons, Mr. Lehman determined: 1)

13    that the type of severe overcrowding found in California affects the entire operation of a prison and the

14    prison system as whole, 2) that the crowding has led to increased numbers of infections disease

15    outbreaks, riots and disturbances system-wide, 3) that the crowding places intolerable burdens on staff

16    and facilities, negatively impacting CDCR's capacity to provide health care and other services, and 4)

17    that the crowding makes the prisons' classification system meaningless. *Id.* at ¶ 8. Additionally, Mr.

18    Lehman concluded that severe overcrowding, such as exists in California, results in a lack of treatment

19    space, decreased access to health care services, the cancellation of health care services during

20    lockdowns, and increased idleness, which fuels tension, frustration and increased violence in the

21    prisons. *Id.* at ¶ 10.

22        Defendants claim that Mr. Lehman's opinions are not based on facts or reliable methods, but are

23    instead based on his experiences in corrections in Maine, Washington and Pennsylvania. Defs' MIL 8

24    at 12. Defendants are mistaken as to their first assertion as demonstrated above. As to the second, Mr.

25    Lehman's experiences in other prison systems, and specifically in two overcrowded systems (one of

26    which was sued based on claims that the overcrowding resulted in constitutionally inadequate medical

27

28

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                    16

and mental health care), are an appropriate basis for developing an expert opinion regarding conditions in California's overcrowded prisons. The insight Mr. Lehman derived from running an overcrowded prison system with unconstitutional medical care and mental health care is undeniably relevant to his observations of California's overcrowded system.

Defendants also criticize Mr. Lehman's opinion because he has no experience as a corrections official in California. Defs' MIL 8 at 11. Surely defendants recognize that employment by the CDCR is not a prerequisite to forming opinions about the CDCR's operations. Indeed, neither of defendants' experts, Drs. David Thomas or Ira Packer, have ever worked for the CDCR.

Mr. Lehman found that overcrowding places an intolerable burden on CDCR's staff and facilities. Lehman Report, at ¶ 8. Defendants claim that Mr. Lehman testified that no correctional officer had described a specific difficulty or burden. Defs' MIL 8 at 12. However, defendants' cite to Mr. Lehman's deposition is incomplete and misleading. In fact, Mr. Lehman testified that correctional officers he spoke to reported they were concerned about the amount of overcrowding and "expressed the difficulties of managing units of those size." Exhibit F to Fama MIL 8 Oppo Dec at 70:15-20. Mr. Lehman's deposition testimony is entirely consistent with the opinions in his report.[5]

Defendants complain that Mr. Lehman had not read the reports of the Special Master or the Receiver. Defs' MIL 8 at 11. They fail to identify, however, how information in those reports undermine his opinions that overcrowding affects the entire operation of the prison system. And in fact, they do not.

_____

[5]/ In the context of commenting on the burdens overcrowding place on staff and facilities, Mr. Lehman stated at his deposition that California's staffing ratio was below the national average. Exhibit F to Fama MIL 8 Oppo Dec at 66:16-18 and 67:21-68:19. He testified that he had looked at CDCR's staffing ratio, and it was below the national average. *Id.* at 69:2-4. Defendants insinuated that because Mr. Lehman did not recall what the CDCR's staffing ratio is, and did not know of any studies showing that a system must maintain the national staffing average to maintain care, his opinion is suspect. Defs' MIL 8 at 12. They are wrong. Mr. Lehman's correctional experience and observations of staffing in CDCR prisons provide him with a sufficient basis to opine that California's custodial staffing is thin relative to other prison systems. Exhibit F to Fama MIL 8 Oppo Dec at 67:8-9. In any case, Mr. Lehman was not asked to, and did not offer, an opinion on staffing levels in his expert report.

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    17

1    Mr. Lehman stated that overcrowding results in increased outbreaks of infectious diseases,

2    based on the findings of the Expert Panel, of which he was a member. Lehman Report at ¶ 8.

3    Defendants point out that Mr. Lehman could not quantify the degree to which overcrowding had

4    increased the number of infectious disease outbreaks. Defs' MIL 8 at 11-12. The fact that Mr. Lehman

5    has not performed epidemiological studies does not undermine his opinion, as a highly experienced

6    correctional administrator, that overcrowded living conditions result in outbreaks of disease. Moreover,

7    his opinion is echoed by Scott Kernan, defendants' top correctional offfical, who declared in May, 2007

8    that "overcrowding of CDCR facilities has led to increased numbers of infectious disease outbreaks"

9    and set forth specifics of the outbreask. Declaration of Scott Kernan In Support Of Defendants' Report

10   To The Court's February 15, 2007 Order, May 16, 2007 (*Plata* Docket # 668), at ¶¶ 1 and 3.

11   Finally, Mr. Lehman opined that overcrowding makes the prison classification system

12   meaningless, because the system's overriding interest is in finding an empty bed, rather than meeting

13   the prisoners' needs. Lehman Report at ¶ 8. Defendants suggest that because Mr. Lehman would not

14   opine on the level of population at which prisoners could be properly classified, his opinion is suspect.

15   This is nonsense. With his extensive correctional experience, Mr. Lehman is plainly qualified to judge

16   whether a classification system is functioning properly. Mr. Lehman was not asked to develop an

17   opinion about the level of population reduction necessary to achieve a functioning classification system,

18   and forming such an opinion is not a necessary precedent to the well-researched opinions he reached.

19   The opinions Mr. Lehman expressed in his deposition and Expert Report are well within his

20   expertise and experience, and are based on reliable information and methodology. They should not be

21   excluded.

22       **4.    Dr. James Austin**

23           a. Expert Qualifications

24   Dr. James Austin is well qualified to testify about the matters set forth in all of his reports,

25   including the November, 2007 report challenged here. Dr. Austin received his Ph.D. in sociology from

26   the University of California at Davis in 1980. Expert Report of James Austin, November, 2007 (Austin

27

28   Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    18

1    Report), filed herewith, at 1 and Appendix A thereto (his resume), filed herewith. He has done

2    correctional planning and research for more than thirty years, in both an academic capacity and as a

3    contractor or consultant to states. Austin Report at 2-7. As president of JFA Institute, a non-profit

4    corrections consulting firm, Dr. Austin regularly works with state legislatures and prison agencies to

5    analyze correctional policies and practices, and to make recommendations for methods to safely reduce

6    crowding in state prison facilities. *Id.*; Deposition of James Austin, September 19, 2008, attached as

7    Exhibit G to Fama MIL 8 Oppo Dec, at 10:4-23:4. Indeed, Dr. Austin performed such work for a dozen

8    states in the last two years alone, and he has performed other work -including designing prison

9    classification systems and medical and mental health screening systems - in most of the state prisons

10   and large jail systems throughout the country.  Exhibit G to Fama MIL 8 Oppo Dec at 32:12-17.

11          Part of Dr. Austin's analysis of crowding in correctional systems involves looking at

12   institutional processes that can interfere with the delivery of medical and mental health care services.

13   Exhibit G to Fama MIL 8 Oppo Dec at 25:24-26:17. He has particular experience analyzing prison

14   reception centers, and how delays in processing inmates impacts the screening and delivery of medical

15   and mental health care. *Id.* at 25:10-26:18.

16          In addition to his work as a consultant to states wishing to reduce their prison populations, Dr.

17   Austin was also chosen by the US. Department of Justice and the states of Georgia and Louisiana to

18   serve as a special monitor overseeing the states' juvenile justice systems. Austin Report at 7; Exhibit

19   G to Fama MIL 8 Oppo Dec at 26:21-28:5. Dr. Austin's role in those cases was to oversee

20   implementation of comprehensive settlements addressing, among other topics overcrowding and the

21   delivery of medical and mental health care. *Id.*

22          Dr. Austin also has extensive experience with California's prison system. CDCR asked him to

23   be a member of their "Expert Panel on Adult Offender Reentry and Recidivism Reduction" ("Expert

24   Panel"). Austin Report at 10. In this capacity, he reviewed extensive materials regarding the operation

25   of California's prisons, conducted a site visit to the Lancaster prison, and conducted a thorough analysis

26   of the impacts of overcrowding on California's prison system. *Id.* at 10-13.

27

28

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                           19

1

b. Facts and Methodolgy Underlying Testimony

2      As part of his information-gathering regarding the role of crowding on the delivery of medical

3  and mental health care services in CDCR, Dr. Austin reviewed the key documents in this case,

4  including but not limited to Governor Schwarzenegger's Emergency Proclamation Regarding Prison

5  Overcrowding (October 2006); The Receiver's reports regarding overcrowding as well as other

6  Receiver reports; and Coleman Special Master reports. Austin Report at 17 and Appendix B thereto

7  (list of documents). In addition, as a member of the Expert Panel, Dr. Austin had full access to CDCR

8  documents and data, including information about the CDCR population and crowding. *Id.* at 18.

9      Using these reports and data and his extensive experience of crowding in multiple states'

10  correctional systems (Austin Report 16; Exhibit G to Fama MIL 8 Oppo Dec at 101:16-21), Dr. Austin

11  formed specific conclusions about particular deficiencies he observed in medical and mental health care

12  that were caused by crowding: 1) excessive inter-facility transfers, which make it difficult for medical

13  and mental health patients to receive adequate services (Austin Report 30 ); 2) inadequate staff and

14  program space for mental health programs (Austin Report 31, 33); 3) excessive stays and mis-housing

15  of EOP prisoners in Reception Centers (Austin Report 35-37); and 4) safety problems that interfere

16  with medical and mental health treatment (Austin Report 38-41). Based upon these findings, he

17  reached the opinion that overcrowding makes it so that California "cannot manage any kind of medical

18  and mental health care system or other functions of a … prison system." Exhibit G to Fama MIL 8

19  Oppo Dec at 96:11-14.

20      Defendants contend that Dr. Austin should not be allowed to offer an opinion because he was

21  unable to identify *all* the deficiencies in medical and mental health care. Defs' MIL 8 at 13-14. But Dr.

22  Austin is not offered to exhaustively list all of the medical or mental health care deficiencies; he is

23  offered because he has expertise in prison systems generally, and overcrowded systems in particular,

24  and he identified - both in his deposition and his report - particular problems that he observed that were

25  caused primarily by overcrowding. Exhibit G to Fama MIL 8 Oppo Dec at 79:9-22.

26      Defendants take one sentence from Dr. Austin's deposition out of context, and then make the

27

Pltfs' Opp to Def's MIL No. 8
28  Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    20

spurious claim that "Dr. Austin did not employ any methodology whatsoever to determine which factors contributing to the alleged inadequacies in medical care were the most important." Defs' MIL 8 at 14:13-15. Dr. Austin's report exhaustively lists the reports and documents he reviewed, and the prison he toured, which led him to reach his opinion in this case. He also testified in his deposition that he reviewed the source materials, identified specific problems caused by overcrowding that resulted in deficiencies in prison medical and mental health care, considered other possible causes and "rate[d]" them, before he came to the conclusions set forth in his report.   Exhibit G to Fama MIL 8 Oppo Dec at 99:4-100:12. Dr. Austin's extensive experience in corrections, and with overcrowded systems in particular, makes him highly qualified to perform such an analysis.

Defendants also contend that Dr. Austin "did not do any statistical analysis himself to determine primary cause and he could not identify any statistical analysis or individual study done regarding primary cause that he relied upon." Defs' MIL 8 at 14:22-24. It is unclear what precise type of statistical analysis defendants are referring to - this is a report about the impact of crowding on health care, which required no statistical analysis. Dr. Austin did all that was necessary, including reviewing all relevant data and information regarding provision of health care, such as information contained in Plata Receiver's reports, the Coleman Special Master's reports, the Expert Panel report, and other documents.   Exhibit G to Fama MIL 8 Oppo Dec at 102:16-22; 105:5-22.  No statistical analysis was required to reach the conclusions set forth in Dr. Austin's November 2007 report.

Dr. Austin cited the Expert Panel as one of the bases of his opinions about the impacts of overcrowding on deficiencies in medical and mental health care. Defendants argue that this somehow undercuts his testimony, because the Expert Panel addressed only rehabilitative programming, not medical or mental health care. Defs' MIL 8 at 15:1-2. But defendants are simply wrong about their own expert panel. CDCR's Expert Panel explicitly found that "[n]ot only does overcrowding have a negative impact on [rehabilitative] programming but, according to documents provided to the court by CDCR Chief Deputy Secretary Scott Kernan (2007), 'housing inmates in non-traditional quarters presents serious safety concerns for both inmates and correctional staff. The overcrowding of CDCR

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                    21

1    facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances

2    system-wide.'" Expert Panel Report at 9 (the Expert Panel Report can be found at

3    http://www.cdcr.ca.gov/news/ExpertPanel.html (site last visited 10/27/08)).

4          Finally, Defendants suggest that Dr. Austin is not qualified to opine on administrative failures

5    caused by overcrowding because he could not identify which of California's prisons was more

6    dangerous than the others without conducting more tours, or give examples of dangerous conditions

7    within a particular prison during his deposition. Defs' MIL 8 at 15 (citing deposition transcript). This

8    is a red herring. It is undisputed in this action that overcrowding causes dangerous prison conditions.

9    Documents reviewed by Dr. Austin, including CDCR admissions contained in the Expert Panel Report

10   and the Governor's Emergency Proclamation, are uncontroverted in their assertion that overcrowded

11   conditions in the CDCR have created an environment within the prisons that is dangerous, violent, and

12   prone to lockdown. *See* Emergency Proclamation (the Emergency Proclamation can be found at

13   http://gov.ca.gov/proclamation/4278/ (site last visited 10/27/08)); Expert Panel Report at 9 (the Expert

14   Panel Report can be found at http://www.cdcr.ca.gov/news/ExpertPanel.html (site last visited

15   10/27/08)).

16         In short, Dr. Austin's testimony regarding the deficiencies caused by overcrowding is well

17   within his expertise, and is based upon reliable information and methodology. It should not be

18   excluded.

19         **4.    Dr. Jeffrey Beard**

20         Jeffrey Beard, PhD., is the head of Pennsylvania's correctional system and is a non-retained

21   expert in this case. As such, he did not produce a report, but expressed his opinions during a deposition

22   taken by both plaintiffs' counsel and defense counsel. Defendants do not identify a *single deficiency in*

23   *any opinions* Dr. Beard expressed during the deposition. Instead, they make only the most general

24   claim that Dr. Beard is unqualified to offer an opinion about the "primary cause" and "no other relief"

25   issues in this case. Defs' MIL 8 at 15-16. Defendants' contention is simply wrong.

26               a. Expert Qualifications

27

28   Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                                  22

Dr. Beard, who has a doctorate in counseling and has more than 35 years experience in managing and working in prisons. Deposition of Jeff Beard, September 26, 2008, attached as Exhibit H to Fama MIL 8 Oppo Dec, at 7:16-9:19. He is currently the Secretary of the Pennsylvania Department of Corrections, a position he has held for almost eight years. *Id.* As Secretary, he is responsible for running 27 prisons and almost 47,000 prisoners. *Id.* at 8:24-9:19 and 11:1-10. Before becoming Secretary, Dr. Beard had worked his entire career in the Pennsylvania prison system, starting in 1972 as a prison psychologist/correctional counselor, working his way up through the ranks to become deputy superintendent at that prison, then superintendent at two other facilities, followed by executive level regional and central office responsibilities. *Id.* at 7:16- 9:19. His work as a superintendent included, among other things, putting a particular prison "basically back together" after two very bad riots. *Id.* at 8:18-20, 8:24-9:19.

Dr. Beard is well aware of the challenge of providing healthcare in prisons, since he is responsible for that in Pennsylvania. Prisoners are transferred between prisons for healthcare reasons. Exhibit H to Fama MIL 8 Oppo Dec at 124:12-125:5. His prison system contracts for physicians and psyciatrists and hires nurses and psychologists. *Id.* at 144:6-146:14. While not himself a medical doctor, Dr. Beard is aware of many components of a constitutionally adequate medical care system, including the need for clinical (doctors and nurses) and other staffing, places with suitable privacy and sanitation for staff to provide care, equipment, a pharmacy operation, a location to assess and treat more acute problems, contracts with specialists and places for those providers to work, and a process to send prisoners to different levels of hospital care, chronic care clinics, central office oversight functions, and a set of operational policies and procedures. *Id.* at 153:4-158:13.

Dr. Beard learned about prison medical care delivery issues via his work in prison and as a prison manager over the years, such that he now knows what is done regarding medical care in the prisons. Exhibit H to Fama MIL 8 Oppo Dec at 153:4-158:3-7. Dr. Beard testified that he considers himself an expert in running a medical care system in a correctional setting because, among other things, he has run such a system in prisons for years. *Id.* at 191:11-192:9. That expertise includes how

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                    23

to provide medical care in a correctional environment and the kinds of things that would interfere with it or promote access to care. *Id*. at 192:10-17. He further confirmed that he is an expert in mental health care. *Id*. at 159:3-14.

Defendants do not contest that Dr. Beard is an expert in *running* a prison health care system, or that he is an expert in mental health care. Instead they contend, based solely on one out-of-context quote, that Dr. Beard is not an expert in medical care *delivery* because he is not a medical doctor. Defs' MIL 8 at 15 (citing Exhibit H to Fama MIL 8 Oppo Dec at 153:4-19). But one does not need to be a medical doctor to testify about the matters that Dr. Beard discussed in his deposition, which relate to the ability to run an adequate prison health care system when the institutions are overcrowded. That is a matter about which Dr. Beard has extensive experience. Indeed, after disclaiming that he is not a medical doctor, Dr. Beard went on to describe in detail (five full pages of deposition testimony), essential components of a constitutionally adequate prison medical care system, based upon his extensive experience overseeing prisons: adequate medical and administrative staff, sufficient space for medical professionals to work, privacy, sanitation, medical equipment, adequately operating pharmacy and dispensary, infirmary for acute medical problems, clinics for chronic care, access to specialist care, availability of correctional escorts for outpatient medical care, an organization structure that provides for central office oversight and monitoring, and adequate policies and procedures. Exhibit H to Fama MIL 8 Oppo Dec at 153:20-158:2.

After providing this extensive narrative on the key issues involved in running a prison health care system, Dr. Beard further opined about deficiencies in these areas in the California prison system. Exhibit H to Fama MIL 8 Oppo Dec at 157:13-158:2. Defense counsel found Dr. Beard's analysis so impressive he gushed, "You have a vast amount of experience in these subjects and you're in charge of a very large system. I am in no way trying to diminish that." *Id*. at 158:14-18 (statement of Mr. Mello).

Defendants claim that Dr. Beard "lacks any factual foundation" to opine about the matters in California prisons. Defs' MIL 8 at 16:19. But Dr. Beard is very familiar with the California prison system and the challenges it faces as a result of overcrowding. He was recruited by the State of

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                                24

1    California to be a member of CDCR's Expert Panel. Exhibit H to Fama MIL 8 Oppo Dec at 107:2-24.

2    While on the Expert Panel, Dr. Beard interacted with CDCR staff, received presentations from various

3    state officials about the California prison system, and he and other members of the panel sought and

4    received a panoply of information about the impacts of overcrowding in California's prisons, including

5    information and data on lockdowns and assaults. *Id*. at 107:20-110:22. Dr. Beard also reviewed the

6    reports of the Receiver and Coleman Special Master, the Little Hoover Commission report of 2007, the

7    2004 Deukmejian Report, the Governor's Emergency Proclamation, and numerous reports regarding

8    population obtained from the CDCR website, as well as the expert reports of Mr. Scott, Ms. Woodford,

9    Dr. Stewart, and Dr. Shanksy. *Id*. at 129:15-131:16. Dr. Beard has also recently toured a California

10   prison. *Id*. at 132:16-133:3.

11        Defendants contend that Dr. Beard is not qualified to offer *any* opinions because he did not

12   personally evaluate what deficiencies exist in the medical and mental care systems in California

13   prisons. Defs' MIL 8 at 16:4-7. But no one expects Dr. Beard's expert testimony to involve

14   identification of the panoply of deficiencies in medical and mental health care in this case – that matter

15   has already been established in earlier proceedings, and will be covered by medical and mental health

16   experts. Instead, Dr. Beard reached well-supported conclusions about the impact of overcrowding on

17   all aspects of prison administration, including running the prison health care system.

18        Dr. Beard reviewed the reliable information contained in reports of the Receiver and Special

19   Master, as well as the wealth of information he learned as a member of CDCR's Expert Panel, among

20   others, and reached conclusions – based upon his review of the information and his experience running

21   a large prison system – that "[e]verything is affected when you have a — when you overcrowd the

22   infrastructure in a facility." Exhibit H to Fama MIL 8 Oppo Dec at 41:15-17. He elaborated further

23   that "[e]verything from feeding inmates, to being able to do programs with inmates, to being able to

24   provide health care to inmates, to being able to identify and properly treat mentally ill inmates, all of

25   those things are impacted if the infrastructure of the institution is inadequate to handle . . . the

26   situation." *Id*. at 41:19-42:4; 79:19-80:10 (same); 81:4-19. He found that, as a result of overcrowding,

27

28
Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                               25

California's prison reception centers have too many prisoners, and as a result cannot properly identify and classify mentally-ill prisoners. *Id.* at 49:24-51:2.

Dr. Beard provided further well-supported testimony that if California reduced its prison population, it "would allow them to better handle and manage the inmates that are remaining their care. And that management is across the board . . . [and] would include health care. It would include mental health. It would include feeding people three meals a day. It would include programming. It would include everything that you do to manage an inmate when they're in the system." Exhibit H to Fama MIL 8 Oppo Dec at 73:11-74:3. As a result, he testified that "there's no question in my mind that for California to be able to deal with all of these problems that they're faced with . . . whether it's the programming, food service, sanitation, health care, mental health, there's no question in my mind, from everything that I've learned over the years in corrections, that overcrowding must be addressed and it must be addressed rapidly if you want to deal with and try to start moving that system in the right direction." *Id.* at 84:5-20.[6]

Defendants do not contend that *any* of the opinions quoted above are faulty, methodologically unsound, or lack factual basis. Their general argument that Dr. Beard is "not qualified" to testify in this matter – without identifying any of the specific testimony they contend is unsupported – should be rejected.

---

[6]Dr. Beard also provided testimony about matters relevant to defendants' defense in this matter that other relief – such as building more prison beds or implementing rehabilitative programs – will resolve the overcrowding crisis. Dr. Beard opined, based on his extensive analysis as part of CDCR's Expert Panel (Exhibit H to Fama MIL 8 Oppo Dec at 33:4-35:3) that CDCR cannot address its overcrowding crisis by implementing rehabilitative programming because the programs cannot be effectively rolled out until overcrowding is reduced.Exhibit H to Fama MIL 8 Oppo Dec at 35:5-11. He also concluded, based on his experience in Pennsylvania and the information he learned through participating in CDCR's Expert Panel, that CDCR cannot solve the problem through prison construction because building will be costly and mired in delays, and building new beds in existing prisons does not solve problem because it does not eliminate he massive infrastructure problems faced by California's prisons. *Id.* at 35:16-40:8, 43:3-46:15. Furthermore, he testified about appropriate measures to reduce the prison population without impacting public safety, all of which had been studied and adopted by CDCR's Expert Panel. *Id.* at 46:19-56:18, 61:3-64:23; 71:1-72:8; 84:21-25. Defendants do not make any challenge to this testimony.

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351                                                    26

**B. The Testimony of These Experts Is Not Cumulative**

Defendants assert that the testimony of the specified witnesses should be excluded as cumulative. In support, defendants cite the applicable rule (Fed.R.Evid. 403) and a single case that annunciates the well-known standard that evidence is cumulative if its contribution to the length of the trial outweighs its probative force. Defs' MIL 8 at 16:23-17:21. But plaintiffs have the burden in this motion for a population reduction order, and must prove the necessary facts by "clear and convincing evidence" 18 U.S.C. section 3626(a)(3)(E). And while evidence presented by plaintiffs' experts concerns the same or similar *legal* issues, it differs significantly in substance, analysis and approach. Each of plaintiffs' experts brings a unique set of kills and experiences to bear upon the matters for which opinions are offered. Each has different points of reference, and can make different comparisons. Moreover, the testimony will not contribute unduly to the length of the trial because the Court has imposed strict limits on the direct testimony of expert witnesses (*see* 7/2/08 Order for Pretrial Preparation, *Plata* Docket No. 1294). Accordingly, the probative force of each expert's testimony far outweighs any minimal contribution to the length of the trial.

### III. CONCLUSION

For the foregoing reasons, Defendants' Motion in Limine No. 8 should be denied.

DATED: October 30, 2008

Respectfully submitted,

By: */s/ Steven Fama*

Steven Fama
Prison Law Office
Attorney for Plaintiffs in
*Plata v. Schwarzenegger*
and
*Coleman v. Schwarzenegger*

Pltfs' Opp to Def's MIL No. 8
Re Expert Testimony of Woodford, Scott, Lehman, Austin and Beard
Case Nos. 90-00520; 01-1351

27