# EXHIBIT A

Case 2:90-cv-00520-KJM-SCR    Document 3242-1    Filed 10/30/08    Page 2 of 88









Home ∘» News ∘» 2007 Press releases ∘» Press20070629

**NEWS**

∘» Communications Home Page
∘» Press Releases
∘» Press Office Contacts
∘» List of Public Information Officers
∘» Resources for Media
∘» Multi-Media
∘» Links Archive

∘» Recent RFI

For Immediate Release
Friday, June 29, 2007
Contact: Seth Unger
(916) 445-4950

## Expert Panel on Corrections Reform Offers California a Roadmap for Reducing Recidivism and Overcrowding

## Panel's Recommendations Could Reduce Population Significantly

SACRAMENTO - As part of the state's commitment to comprehensive prison reform, a panel of national experts advising the California Department of Corrections and Rehabilitation (CDCR) has released a report titled *"A Roadmap for Effective Offender Programming in California."* The report was commissioned by the California State Legislature, and provides recommendations for improving the state's rehabilitation model, as well as strategies to significantly reduce recidivism and overcrowding.

"The expert panel's report will serve as a tool for implementing the historic corrections reforms that were signed into law by Governor Schwarzenegger this year," said CDCR Secretary James Tilton. "The panel's innovative work provides a cutting edge roadmap to reduce overcrowding and bring California up to speed with other states."

The report recommends new models for in-prison rehabilitation programs, risk assessment tools for analyzing parole revocation decisions, and other methods to reduce recidivism and end the perpetual overcrowding crisis the state has faced in recent years. The report suggests that if all of the panel's recommendations were adopted, California could significantly impact overcrowding and reduce its inmate population. The population reductions could result in estimated annual savings of $561 to $684 million after considering the additional investment costs for rehabilitation facilities and programs.

"The key to reducing the number of inmates who return to prison lies in matching the needs of individual inmates to evidence-based rehabilitation programs," said expert panel co-chair, and rehabilitation strike team member Dr. Joan Petersilia. "Preparing offenders for a crime-free and successful life upon release will ultimately improve public safety."

"The expert panel's report will be an invaluable tool for the strike teams and CDCR policy implementers," said expert panel chair and Chief Deputy Secretary of Adult Programs Marisela Montes. "The roadmap will allow the state to accelerate plans to carry out the department's renewed mission of rehabilitation."

The *CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs* is comprised of some of the best and brightest minds on corrections and rehabilitation from across the country. Members were chosen for their broad experience in rehabilitation, education, correctional administration, psychology, and organizational development. The panel's recommendations are based on scientific research and evidence and reflect the best practices used by correctional agencies in other states.

The expert panel made 11 key recommendations. Some relate to areas that are being addressed through AB 900, the comprehensive reform package signed into law in May 2007. Others seek additional legislation, while some suggestions may be accomplished administratively.

**Summary of Key Expert Panel Recommendations:**

**Recommendation 1 – Reduce overcrowding in prison facilities.**

**Recommendation 2 – Enact legislation to expand positive reinforcements for offenders who complete rehabilitation programs and follow the rules.** CDCR must improve on matching offender needs with program objectives.

**Recommendation 3 – Select and utilize a risk assessment tool to assess an offender's risk to reoffend.** Risk assessments tools have been utilized for parolees, and should be expanded to assess all offenders.

**Recommendation 4 – Determine offender rehabilitation programming based on the results of assessment tools that identify and measure risks and needs.** CDCR should develop and utilize a risk-needs matrix to assign offenders to programming.

**Recommendation 5 – Create and monitor a behavior management (or case) plan for each offender.** Case plans are critical to assigning offenders to the right programs.

Conditions of Use | Privacy Policy | Compatibility Statement

Copyright © 2007 State of California

**Recommendation 6 – Select and deliver a core set of programs for offenders that cover major offender areas.** These include: academic, vocational and financial; alcohol and drugs; anger management; criminal thinking; family; and sex offenses.

**Recommendation 7 – Develop systems and procedures to collect and utilize programming process and outcome measures.** This will allow CDCR to determine the effectiveness of programs, reasons for outcomes, and ways to improve.

**Recommendation 8 – Continue to develop and strengthen formal partnerships with community stakeholders.** This will improve coordination of transition services for offenders moving from prison to their home communities.

**Recommendation 9 – Modify community based programs to ensure they target the crime patterns of offenders, meet their basic needs upon return, and identify risk factors in their home community.**

**Recommendation 10 – Engage the community to help reduce likelihood offenders will return to a life of crime.** Critical thinking, positive relationships, and healthy behaviors are critical to offenders' success upon release.

**Recommendation 11 – Develop structured guidelines to respond to technical parole violations, based on risk and seriousness.** Sanctions and incentives are important tools.

A list of panel members and the panel's full report, A Roadmap for Effective Offender Programming In California, is available on CDCR's website, www.cdcr.ca.gov

CDCR Expert Panel Final Report

# EXHIBIT B

00001

```
              UNITED STATES DISTRICT COURT
        FOR THE EASTERN DISTRICT OF CALIFORNIA
        AND THE NORTHERN DISTRICT OF CALIFORNIA
     UNITED STATES DISTRICT COURT COMPOSED OF THREE
   PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
```

RALPH COLEMAN, et al.,              )
                                    )
                Plaintiffs,         )
                                    )
        vs.                         )  NO. 2:90-cv-00520 LKK JFM P
                                    )
ARNOLD SCHWARZENEGGER, et           )
al.,                                )
                                    )
                Defendants.         )
_____)
MARCIANO PLATA, et al.,             )
                                    )
                Plaintiffs,         )
                                    )
        vs.                         )
                                    )
ARNOLD SCHWARZENEGGER, et           )
al.,                                )
                                    )
_____Defendants._____) 

---o0o---

```
        DEPOSITION OF JEANNE S. WOODFORD
            Tuesday, December 18, 2007
                    ---O0O---
```

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

00010

1    medical or mental healthcare?

2        A.    No, I do not.

3        Q.    Have you ever received any training beyond

4    basic first-aid in medical care?

5        A.    Well, I have received training as a result of

6    litigation against the department so I've received

7    training as it pertained to the Coleman lawsuit,

8    training as it pertained to the Marin lawsuit when that

9    was a case -- a medical case at San Quentin State

10   Prison.  I received training on Plata.  And other

11   lawsuits that I can't even remember the name of at this

12   point in time so, yes, in that way I have.

13       Q.    Do you hold any degrees with respect to

14   medical or mental healthcare?

15       A.    No, I do not.

16       Q.    Can you tell me generally speaking what type

17   of training you've received with respect to the Coleman

18   lawsuit?

19       A.    There was training that was put on by the

20   Department of Health Services that covered the various

21   aspects of the Coleman lawsuit and our responsibility as

22   it pertained to the Coleman lawsuit.

23       Q.    When you say various aspects of that lawsuit,

24   do you mean actually -- or what do you mean?  To the

25   extent you remember.

00011

1       A.    There's provisions within the Coleman lawsuit

2    as to how much yard, time inmates are supposed to be in

3    treatment programs.  What else is included in that?

4    There's just -- many requirements that we were trained

5    on as to our responsibility.

6       Q.    You mentioned the Marin lawsuit.  Was that a

7    lawsuit relating to various issues at San Quentin

8    prison?

9       A.    Healthcare issues at San Quentin State Prison,

10   yes.

11      Q.    Did it relate to issues besides healthcare

12   issues?

13      A.    It also covered mental health.

14      Q.    And you were formerly the warden at

15   San Quentin, correct?

16      A.    Yes, I was the warden.

17      Q.    When were you the warden at San Quentin?

18      A.    I was the warden from 1999 until February of

19   2004.

20      Q.    Do you know what period of time -- or strike

21   that.

22            Do you know when the Marin lawsuit ended?

23      A.    I don't remember the year because I can't

24   remember if it ended when I was the chief deputy warden

25   or the warden.  But I would estimate it was 2003 or

00014

```
 1       A.    No, I did not.

 2       Q.    Did you ever provide somebody a band-aid?

 3       A.    Yes.

 4       Q.    Did you ever perform CPR?

 5       A.    No.  But I did during those -- in those years

 6    when I was a correctional officer, we did deliver

 7    medication to inmates' cells.

 8             MR. SPECTER:  I didn't know that.

 9       Q    (By Mr. Mello) So --

10             MR. SPECTER:  Thanks, Paul.

11       Q    (By Mr. Mello) So when you were a

12    correctional officer correctional officers delivered

13    medications to inmates?

14       A.    Yes.  We also gave out what they referred to

15    as cold packs.  If you had a cold, there was a set of

16    pills that you would hand to inmates.

17       Q.    Have you ever worked in any other state's

18    correctional system?

19       A.    No, I have not.

20       Q.    Have you ever worked in any county or city

21    jails?

22       A.    No, I have not.

23       Q.    Have you studied any correctional systems

24    other than California's?

25       A.    Yes.  I am an avid reader of correctional
```

00015

1    programs and policies so I read a lot about other

2    states, yes.

3         Q.    Have you ever visited other states and toured

4    other states' facilities or other jurisdiction's

5    facilities?

6         A.    Yes, I have.

7         Q.    Which ones?

8         A.    I have toured a prison in Oregon, I don't

9    remember the name of it, it's their reception center,

10   half of it's a reception center and the other half is a

11   women's facility, right outside of Portland.  And then I

12   toured The Walls in Texas.

13        Q.    Any others?

14        A.    I think that's it.

15        Q.    Do you know when you toured this reception

16   center/women's facility in Oregon?

17        A.    I did that when I was the director of the

18   California Department of Corrections and so that would

19   have been somewhere between February, 2004, and July of

20   2005.

21        Q.    What was the reason that you toured that

22   facility?

23        A.    There's an association of prison directors, I

24   was attending a meeting of that in Oregon and we were

25   offered a tour and so I took that opportunity to tour

00026

1    Q.   And am I correct that there was not a medical

2    officer above those facility chief medical officers

3    until just a couple of months before you became

4    undersecretary?

5    A.   No.  There was a chief medical officer in

6    Sacramento or the head of healthcare services, I'm not

7    sure what the titles were as we've changed titles, so

8    it's very difficult for me to remember what we were

9    calling people at that point in time.

10   Q.   Let's for purposes of this discussion just

11   refer to him as head of healthcare services.

12   A.   That's correct.

13   Q.   Okay.  At the time that you were the director

14   of the Department of Corrections how many heads of

15   healthcare services were there?

16   A.   At what location?

17   Q.   In Sacramento.

18   A.   There was one.  Until the last few months and

19   then there was another position added at the secretary

20   level.

21   Q.   And who was that one person?

22   A.   The one before the position added?

23   Q.   Yes.

24   A.   That would be Dr. Rene Kanan.

25   Q.   And Dr. Kanan.  Did the chief medical officers

00027

1    at the institutions report to Dr. Kanan?

2        A.    Yes, they did.

3        Q.    And who did Dr. Kanan report to?

4        A.    Dr. Kanan reported to the director of

5    corrections, that would be me during that time.  And

6    also because we were in transition she was reporting to

7    the secretary of the agency.

8        Q.    Did she report to anybody below the -- was she

9    a direct report to anybody below you during that time?

10       A.    She reported a direct report to the deputy

11   director of administration.

12       Q.    How many deputy directors did you have below

13   you at the time Dr. Kanan was reporting to the deputy

14   director of administration?

15       A.    Let me restate.  The title of that one was

16   chief deputy director and I had two.

17       Q.    What was the other chief deputy?

18       A.    Operations.

19       Q.    And who is the chief -- strike that.

20             How many chief deputy directors of

21   administration did Dr. Kanan report to, to your

22   knowledge?

23       A.    One.

24       Q.    Who was that?

25       A.    Ernie Van Sant.  But I do need to say that

00029

1   recall.

2       Q.   Was she a physician?

3       A.   I don't think so.

4       Q.   When you were the director of the Department

5   of Corrections, what, if any, role did you have with

6   respect to the Plata lawsuit, generally speaking?

7       A.   Well, my role -- that's a very complicated

8   question.  My role was to make sure that we were in

9   compliance with the Plata lawsuit and to work with

10  healthcare services to achieve that goal and work with

11  other parts of the department if achieving that goal

12  required physical plant changes or construction.

13          It was also to make sure that the custody side

14  of the house was working well with healthcare at their

15  facilities and at headquarters to come into compliance

16  with the provisions of the Plata lawsuit.  And, I mean,

17  that's everything from soup to nuts, I mean, trying to

18  attract more doctors.  I was involved in discussions in

19  just about every aspect of compliance with that lawsuit

20  I would say.

21      Q.   Was your role with respect to the Coleman

22  lawsuit similar when you were the director of the

23  Department of Corrections?

24      A.   Yes.  With the Coleman lawsuit I also worked

25  with other state agencies to try to bring us into

00030

1    compliance with the provisions of Coleman.

2         Q.    And, again, on your resume it appears that you

3    were subsequently appointed the undersecretary of the

4    CDCR, correct?

5         A.    That is correct.

6         Q.    And it was in about July of 2005?

7         A.    That is correct.

8         Q.    And at that time was there somebody below you

9    who oversaw the medical care system at CDCR?

10        A.    No, there wasn't anyone below me.

11        Q.    Was there somebody at the same level as you

12   who directly oversaw medical care?

13        A.    Yes.

14        Q.    Who?

15        A.    Peter S.

16        Q.    Dr. Szekrenyi.

17        A.    Yes, that is correct.

18        Q.    I like to say Dr. Peter.  So when Dr. Peter --

19   it drove me nuts.  So Dr. Szekrenyi, he was the head of

20   medical when you were the undersecretary?

21        A.    That is correct.

22        Q.    The entire time?

23        A.    Yes.  Let me say I believe it was the entire

24   time.  I can't remember exactly when he was appointed.

25        Q.    Okay.  Was Dr. Szekrenyi also the head of

00034

1      A.    Well, I don't know that I can answer that in

2    technical terms.  But I can tell you having been

3    involved with the Department of Corrections for 27 years

4    and the variety of litigation cases that I have been

5    involved in and the standards that have been set by the

6    courts as to number of hours inmates need to be out of

7    their cell or be in yards or be involved in mental

8    health treatment or receive recreational activity or

9    double celling, all of that litigation has led me to

10    have an understanding of what the courts believe is a

11    constitutional level of treatment of incarcerated

12    individuals.

13            And then becoming the director and going

14    around the state and seeing some of the prisons and the

15    conditions and the overcrowding and our inability to

16    meet the ten hours of yard time, for example, that's

17    involved under the Toussaint, T-o-u-s-s-a-i-n-t, case or

18    the fact that we weren't giving inmates who were in the

19    EOP level of care for Coleman or CCCMS level of care to

20    the number of hours of group therapy or group counseling

21    or whatever the requirements were.  We weren't meeting

22    those standards.

23            After seeing all of that, I knew that we were

24    in big, big trouble and it was just a matter of time

25    before we would be facing all those similar lawsuits all

00035

1    over again that I saw in the late '70s and '80s,

2    Toussaint, Wilson, names I've forgotten, Pepperwood, all

3    of those cases, we were headed there again and fast.  So

4    I hope that I've answered your question.

5        Q.   I think you've answered my question.  Can you

6    tell me what constitutionally adequate medical care is?

7             MR. SPECTER:  Well, Paul, I'm going to object

8    to that.  A, it calls for a legal conclusion and, B,

9    it's vague.

10            MR. MELLO:  You can answer.

11            MR. SPECTER:  No, she can't answer if it calls

12   for a legal conclusion and there's no --

13            MR. MELLO:  She's opined that it's the primary

14   cause of the unconstitutional delivery of medical and

15   mental healthcare and I can probe as to why she thinks

16   that's right.

17            MR. SPECTER:  That's right.

18            MR. MELLO:  And without having at least an

19   understanding -- okay, I'll ask it this way.

20       Q.   What's your understanding as to what

21   constitutionally adequate medical care is?

22       A.   My understanding would be that inmates would

23   have appropriate access to healthcare to address their

24   healthcare issues.  It would be the reasonable access to

25   healthcare that anyone would expect for people who have

00036

```
 1   healthcare problems.
 2       Q.   And what is your understanding what is
 3   constitutionally adequate mental healthcare?
 4       A.   That, again, inmates have access to mental
 5   health treatment to address their diagnoses of mental
 6   health concerns.
 7       Q.   Do you believe that qualified, competent
 8   medical and mental health providers is an aspect of
 9   delivering constitutionally adequate medical or mental
10   healthcare?
11       A.   I believe it is an aspect, yes.
12       Q.   Are you aware of any other aspects to the
13   constitutional delivery of medical or mental healthcare
14   other than qualified, competent clinicians?
15       A.   Yes.
16       Q.   What are they?
17       A.   Well, you have to have appropriate space to
18   provide treatment or recreational activities in case of
19   mental -- the mentally ill, appropriate space for group
20   therapy or whatever is required to provide treatment for
21   people who suffer from mental illness.  You also have to
22   have appropriate housing for inmates to live in so that
23   they don't decompensate.  And there's probably other
24   aspects that just aren't coming to mind at this time.
25       Q.   Are correctional officers an aspect to the
```

00037

1    constitutional delivery of healthcare and mental

2    healthcare, in your opinion?

3        A.    Yes, I believe correctional officers and other

4    prison staff are an aspect in order to deliver

5    appropriate healthcare in a safe and appropriate way.

6        Q.    Do you believe that equipment are an aspect to

7    a constitutionally adequate medical care and mental

8    healthcare delivery system?

9        A.    Yes, I believe equipment is an aspect of

10   delivering appropriate healthcare and mental healthcare

11   to inmates.

12       Q.    Do you believe that access to specialty care

13   is an aspect to the constitutional delivery of medical

14   and/or mental healthcare?

15       A.    I'm sorry, say that again.

16            MR. MELLO:    Can you read that one back for me?

17       (Whereupon the reporter read back as requested.)

18            THE WITNESS:    Yes, I do.

19       Q    (By Mr. Mello) Was your principal concern

20   when you left the department, CDCR, the delivery of

21   medical care?

22       A.    It was one of my concerns, yes.

23       Q.    You're currently the chief adult probation

24   officer in San Francisco, correct?

25       A.    Yes.

00046

1   there, either.

2       Q.   Did you provide either a handwritten or draft

3   copy of your report to the Prison Law Office?

4       A.   No, I did not.

5       Q.   Did the Prison Law Office provide either a

6   handwritten or written or electronic copy of your report

7   ·to you?

8       A.   I was interviewed.  I mean, I sat down and had

9   an interview.

10          MR. SPECTER:  He just asked you about whether

11  we provided you an electronic copy, which to you meaning

12  her possession?

13          MR. MELLO:  Let me just ask the question again

14  and I'll try to be clear.

15      Q.   Was the first draft of your expert report

16  provided to you either in handwriting, in a hard paper

17  copy or electronically by the Prison Law Office?

18      A.   It was provided to me electronically.

19      Q.   And do you believe that first draft of your

20  expert report is being produced today?

21      A.   Well, I don't know that -- it wasn't really a

22  draft.  I'm not a computer person so it was, as I

23  understand it, a web based, so sent to me web based and

24  I may have to ask Don how this worked.  I didn't receive

25  a draft, per se.

00047

1        Q.    The first time you saw the writing, the words,

2    which ultimately was your report was by way of the

3    internet?

4        A.    I accessed it using the internet, yes.

5        Q.    And just so I'm clear, you didn't actually

6    type up the first draft of your expert report, correct?

7        A.    No, I did not.

8        Q.    That's correct?

9        A.    That's correct.

10       Q.    And the first draft of your report was

11   available via the internet, correct?

12       A.    Via a program utilizing the internet.

13       Q.    And I believe -- did you provide any

14   handwritten notes or writings to the Prison Law Office

15   or to any of the plaintiffs' counsel prior to the

16   drafting of your first report?

17       A.    Oh, yes, actually I did provide some typed

18   notes, that's correct.  I recall that now.

19       Q.    Did you produce those typed notes that you

20   provided to the Prison Law Office today?

21       A.    Yes.

22            MR. MELLO:  I have in front of me five pages

23   of typed up notes and the title on the first page is

24   Conversations with the Governor.  I'm going to ask that

25   this portion of the documents that you produced today be

00048

1    marked as exhibit next to this deposition.

2              (Marked Deposition Exhibit No. 9.)

3         Q    (By Mr. Mello) I'll ask you to look at

4    Exhibit 9 and let me know when you're done.

5         A.    I'm done.

6         Q.    Do you believe these are the handwritten notes

7    that were provided to the Prison Law Office before the

8    drafting of your first report?

9         A.    Actually, I typed these, these are my typed

10   notes.

11        Q.    Pardon me.  Do you believe those are the typed

12   notes that you provided to the Prison Law Office prior

13   to the drafting of your report?

14        A.    Yes.

15        Q.    And those are actual words that were typed by

16   you?

17        A.    Yes.

18        Q.    Can I see it for a second?  I'm sorry.  Thank

19   you.

20              I believe you started to testify that you were

21   interviewed by the Prison Law Office prior to -- or

22   strike that.

23              Were you interviewed by the Prison Law Office

24   prior to receiving the first draft of your report?

25        A.    I was interviewed, yes, by the Prison Law

00049

1    Office.

2        Q.    By whom?

3        A.    By Don Specter.

4        Q.    Do you know when that occurred?

5        A.    I'm sorry, I don't.  I don't remember the

6    date.

7        Q.    Do you know whether it was within a month of

8    the November 9th date that you've signed the

9    declaration?

10       A.    It was probably within 30 days of that, yes.

11       Q.    Was anybody else present during that, for lack

12   of a better term, interview with Mr. Specter?

13       A.    No.

14       Q.    And was that interview in person?

15       A.    Yes.

16       Q.    And where did that occur?

17       A.    That occurred at the Prison Law Office I

18   believe.

19       Q.    How soon after that interview do you believe

20   you saw the first draft of your report on this web based

21   program?

22       A.    It was within four or five days.

23       Q.    After you accessed -- strike that.

24             When you accessed this web based draft of your

25   report for the first time, were you able to print it

00050

1    out?

2         A.    I'm not sure.

3         Q.    Did you print it out?

4         A.    No.

5         Q.    Did you make any notes in writing while you

6    were reviewing this initial draft report?

7         A.    I made -- no, I did not.

8         Q.    As you reviewed this first draft report did

9    you speak to anybody at that time right then and there

10   as you were looking at it about proposed changes or

11   revisions to the report?

12        A.    I -- well, I didn't speak to anybody about

13   proposed changes.  I did have my husband help me make

14   changes on the computer.

15        Q.    So you accessed the document and actually made

16   changes to it?

17        A.    Yes.

18        Q.    And, as you sit here today, can you tell me

19   the difference between the first draft report that you

20   saw on the internet and the final draft that you signed

21   on or about November 9th, 2007?  Do you know what

22   changes you made with the help of your husband who is

23   apparently more computer savvy?

24        A.    Right.  That was his help.  Generally I do

25   know but not specific word changes.

00077

1    correctional staff to provide prisoners with timely

2    access to care and still perform other essential

3    functions."  Do you see that?

4        A.    Yes.

5        Q.    Are you referring to medical care or mental

6    healthcare or both in this sentence?

7        A.    I'm referring to both.

8        Q.    Is it your testimony that this statement is

9    true at all 32 prisons?

10        A.    I don't have specific knowledge of all 32

11    prisons but I generally believe that's true of all 32

12    prisons.

13        Q.    Are you aware of whether or not that is true

14    at any of the prisons, specific prisons?

15        A.    Are you referring to now?

16        Q.    Today.

17        A.    Today.  I know that it's true at many prisons

18    today but I cannot specifically tell you that.  I know

19    that it's true because of the number of correctional

20    officer vacancies.

21        Q.    Do you know what the number of correctional

22    officer vacancies is today?

23        A.    As of today, I do not.

24        Q.    Do you know what it was in the last six

25    months?

00078

1       A.    Yes, I believe I do.

2       Q.    What's that number, to the best of your

3    understanding or recollection?

4       A.    I've heard numbers from 3,000 to 4,500.

5       Q.    Do you know the number of correctional officer

6    vacancies, a specific number, that there are at any

7    specific institution in the system today?

8       A.    No, I do not.

9       Q.    Do you know the number of -- the specific

10   number of correctional officer vacancies at any of the

11   institutions in the last six months?

12      A.    No, I do not.

13      Q.    In the last year?

14      A.    No, I do not.

15      Q.    On page seven of your report, paragraph 19, it

16   reads that "Some staff work back-to-back double shifts

17   and would sleep in their cars in the prison parking lot

18   instead of making a long commute home."  Do you see

19   that?

20      A.    Yes.

21      Q.    Do you know how many correctional officers

22   have done this in the last year?

23      A.    No, I do not.

24      Q.    What do you base this opinion on or statement

25   on?

00092

```
 1      (Whereupon a discussion was held off the record.)
 2              MR. MELLO:  Back on the record.
 3      Q.   Ms. Woodford, can you look at this letter and
 4   let me know when you've had an opportunity to review it.
 5   Because I want to know whether or not the substance of
 6   this letter will in any way impact your opinions in this
 7   case.
 8      A.   Okay.
 9              MR. SPECTER:  Do you have more than one copy
10   of that?
11              MR. MELLO:  I do.
12              MR. SPECTER:  Thank you.
13                      (Short break.)
14              MR. MELLO:  Back on the record.
15      Q.   Have you had an opportunity to review what's
16   been marked as Exhibit 5?
17      A.   Yes, I have.
18      Q.   And you've never seen that before today's
19   date, correct?
20      A.   That's correct.
21      Q.   As an aside, Ms. Woodford, did you review the
22   expert reports of any of the other experts in this case?
23      A.   Yes, I did.
24      Q.   Which ones?
25      A.   I -- hmm.  I'm probably not going to remember
```

00093

1    their names.

2        Q.    Okay, let me ask you, then.  Did you review

3    Dr. Shansky's report?

4        A.    I scanned Dr. Shansky's report.

5        Q.    Did that affect any of your opinions in this

6    case?

7        A.    No.

8        Q.    Did you review a Dr. Thomas' report?  He's the

9    defendants' medical expert.

10            MR. SPECTER:  I don't know if I sent it to

11   you.

12            THE WITNESS:  I think I did review that but

13   I'm not positive.

14       Q    (By Mr. Mello) Did it affect your opinions

15   in any way in this case?

16       A.    No.

17       Q.    Did any of the expert reports that you

18   reviewed in this case impact your opinions at all?

19       A.    No.

20       Q.    Back to Exhibit 5.  Exhibit 5 references many

21   things including some improvements, like compliance with

22   the Plata policies, clinical hires, space, access to

23   care and access to specialty care improvements.  Do any

24   of those circumstances change your opinion regarding --

25   change your opinions in this case?

```
 1                   STATE OF CALIFORNIA   )    ss.

 2            I, the undersigned, a Certified Shorthand

 3     Reporter of the State of California, hereby certify that

 4     the witness in the foregoing deposition was by me duly

 5     sworn to testify to the truth, the whole truth, and

 6     nothing but the truth in the within-entitled cause; the

 7     said deposition was taken at the time and place therein

 8     stated; that the testimony of said witness was reported

 9     by me, a Certified Shorthand Reporter and a

10     disinterested person, and was thereafter transcribed

11     under my direction into typewriting; that the foregoing

12     is a full, complete and true record of said testimony;

13     and that the witness was given an opportunity to read

14     and, if necessary, correct said deposition and to

15     subscribe the same.

16            I further certify that I am not of counsel or

17     attorney for either or any of the parties in the

18     foregoing deposition and caption named, nor in any way

19     interested in the outcome of the cause named in said

20     action.

21            IN WITNESS WHEREOF, I have hereunto set my

22     hand this 3rd day of January, 2007.

23

24                           _____
                                CERTIFIED SHORTHAND REPORTER
25
```

# EXHIBIT C

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE TO
PURSUANT SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

     vs.                 CASE NO. 2:90-cv-00520
                              LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,

                        THREE-JUDGE COURT
        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,

        Plaintiffs,

     vs.                 CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JEANNE WOODFORD

SEPTEMBER 15, 2008
10:00 a.m.

425 Market Street, 25th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

Jeanne Woodford

26

 1 | listed, this Item No. 7?

 2 |     A    I learned about it in discussions with

 3 | Mr. Specter.

 4 |     Q    Do you recall what Mr. Specter told you with

 5 | respect to Item No. 7?

 6 |     A    Specifically, no.

 7 |     Q    Going back to Exhibit 1 quickly, you've

 8 | identified that you forwarded one e-mail to the Prison

 9 | Law Office with respect to drug programs, I believe, and

10 | you sent a copy of your handwritten notes to the Prison

11 | Law Office.

12 |          Did you provide the prison law office with any

13 | other documents that you used or relied upon in arriving

14 | at your opinions in this case?

15 |     A    I don't believe so.

16 |     Q    Okay.  So it's true that you did not provide

17 | any copies of draft reports or handwritten reports to

18 | the Prison Law Office other than your notes, correct?

19 |     A    That's correct, mm-hm.

20 |     Q    Can you tell me who prepared the first draft

21 | of your supplemental report?

22 |     A    Well, I -- when you mean prepare, tell me what

23 | you mean by that.

24 |     Q    Okay, did you write out a copy of the report

25 | that's been marked as Exhibit 2?

1       A   No, I did not.

2       Q   Did you type out what has been marked as

3  Exhibit 2?

4       A   No, I did not.

5       Q   Did you dictate Exhibit 2 into a dictaphone or

6  some other machine?

7       A   No, I did not.

8       Q   Did you dictate Exhibit 2 to Mr. Specter?

9       A   Well, I don't know that I would use the word

10  dictate, but we certainly had lots of conversations

11  about what I would want to put into my supplemental

12  report based on my observations in touring the prisons

13  and based on what I had read.

14      Q   Did you dictate your supplemental report to

15  anybody else at the Prison Law Office, like Miss Norman

16  or somebody else?

17      A   I did not dictate it, but I had conversations

18  with Miss Norman about what I wanted to see in the

19  supplemental report.

20      Q   Okay. And can you tell me what you told

21  Miss Norman about what you wanted to see in the

22  supplemental report?

23      A   Well, I talked about what I had -- my

24  observations of the different prisons, what I saw in

25  terms of the overcrowded situations in each of the

28

1     prisons.  I talked about it -- at -- probably have to go

2     through this, like, paragraph by paragraph to -- to

3     answer your question fully.  But I talked about examples

4     of issues like at Soledad, when we were in Central,

5     seeing inmates who had canes, trying to maneuver the

6     stairs to get to their second-floor cells.

7          I talked about the case I saw at Corcoran with

8     the inmate in the standalone SHU unit, who appeared to

9     be having some distress.  What else did I talk about?  I

10    talked about the 114A's and -- and the lack of

11    documentation about inmate participation.  What else?

12         I know that I had a conversation with her

13    about Soledad CTF, in particular in discussing North,

14    CTF North, and at North, while they had managed to get

15    better control of the inmates since I had last been

16    there making observation, that they had to do that by

17    keeping more inmates in their cell for longer periods of

18    time, which is, while it's safer for the inmates to be

19    out, it was causing much more in-cell time, and they

20    were barely getting more time out of their cell than

21    inmates in SHU or AdSeg.  SHU is S-H-U, and AdSeg is

22    administrative segregation.  The -- about idleness of

23    inmates, that there was very little going on for inmates

24    at -- at CTF North and even at South.

25         At Corcoran, I made observations about the

1    cleanliness of the units, because it was -- the --

2    Corcoran was much cleaner than it had been in the past,

3    but at the same time, it was really clear that they were

4    struggling to comply with the provisions of providing

5    health care to those inmates there.  Talked about --

6    there's different terms used for this, but chronic care

7    inmates at Corcoran.  The -- they used to call them

8    boarders.  There's different names that have been given

9    to them, that there still wasn't a plan for how to

10   address that population, that they were still being held

11   within the medical facility there but without a program.

12   There was no program designed for those individuals.  I

13   talked about -- what else did I talk about?

14        Q    I see you reviewing to your -- reviewing

15   your -- or referring to your supplemental report.  Is

16   that refreshing your recollection with respect to what

17   you discussed with Miss Norman?

18        A    Yes.  When I'm -- I mean, I'm not reading it

19   word for word, but seeing keywords reminds me to talk

20   about something that I saw or observed while on my

21   tours.

22        Q    Okay.  I didn't mean to cut you off, if you

23   want to continue you can, or I can try to speed it up.

24   It's up to you.

25        A    It's really up to you.

```
 1        Q    Okay.

 2        A    I mean, we talked about a lot of things.  I

 3   just wanted to make sure I was being very clear about --

 4        Q    Right.  Do you plan on reviewing any

 5   additional documents between now and trial to prepare

 6   for your testimony?

 7        A    I really don't know the answer to that. I'm

 8   sure it would depend on what occurs during the many

 9   tours and depositions and things that happen between now

10   and the time of trial.

11        Q    Okay.  Do you plan to interview any people

12   between now and trial regarding the subjects of your

13   expert testimony?

14        A    I don't have any plans at this point.

15        Q    Do you plan to supplement your report in

16   writing any time between now and trial?

17        A    I have no plans to do that.

18        Q    In your opinion, what are the specific

19   deficiencies in the delivery of medical care at

20   California's prisons that presently result in the care

21   being unconstitutional?

22            MR. SPECTER:  Object.  It's overbroad.  It's

23   too general.  It's vague.

24            And you can answer, if you can answer it.

25            THE WITNESS:  Could you repeat the question?
```

1    BY MR. MELLO:

2        Q    Sure.  In your opinion, what are the specific

3    deficiencies in the delivery of medical care at

4    California's prisons that presently result in the care

5    being unconstitutional?

6        A    That is a very broad question.

7            MR. SPECTER:  So you don't have to answer it

8    if you can't.  I mean, it's -- if you understand it, you

9    can answer.  If it's too broad, you don't have to

10   answer, so ...

11           THE WITNESS:  Okay.

12   BY MR. MELLO:

13       Q    Do you understand the question?

14       A    Not really.

15       Q    Okay.  What deficiencies in medical care do

16   you base your opinions on in this case?

17       A    I have read some of the expert reports,

18   including the Receiver's reports, and in reading those,

19   there's different elements of health care services that

20   the department's quite deficient in, and it -- that are

21   caused by lack of systems and lack of personnel and by

22   overcrowding of our prison system, and those things

23   include the ability to see inmates in a timely fashion.

24   It includes medication delivery.  It includes lack of

25   information systems.  It includes inability to obtain

32

1   medical records on inmates and to keep them current.  It

2   includes inability to transport inmates from their cells

3   to health care, the -- the provisions of health care on

4   the medical side and the psychiatric side.  It includes

5   lockdowns that interfere with health care delivery.  It

6   includes lack of transportation to be able to get

7   inmates to outside services.  It includes a lack of

8   outside services due to the quantity of inmates who

9   require those services in many of the communities where

10  inmates are housed.

11          It -- all -- all that you read from both the

12  Receiver and the experts in this case is that the

13  California Department of Corrections has a very broken

14  health care and mental health system that it has been

15  attempting to remedy for 10-plus years without much

16  success, and primary cause of that is the number of

17  inmates in the system and the growing number of inmates

18  and an inability of the state to be able to keep up with

19  that kind of population growth both from a physical

20  plant standpoint and from our inability to hire and

21  maintain the kind of staff that you need to provide

22  constitutionally appropriate health care for inmates

23  inside our prison system.

24      Q    Okay.  Can you tell me what a constitutionally

25  adequate medical care system looks like?

119

## REPORTER'S CERTIFICATION

1
2
3      I, Quyen N. Do, Certified Shorthand Reporter, in

4  and for the State of California, do hereby certify:

5
6      That the foregoing witness was by me duly sworn;

7  that the deposition was then taken before me at the time

8  and place herein set forth; that the testimony and

9  proceedings were reported stenographically by me and

10  later transcribed into typewriting under my direction;

11  that the foregoing is a true record of the testimony and

12  proceedings taken at that time.

13      IN WITNESS WHEREOF, I have subscribed my name

14  this 22nd day of September 2008.

15
16
17           /s/ Quyen N. Do
           Quyen N. Do, RPR, CSR No. 12447

18
19
20
21
22
23
24
25

Telephone: 415.591.3333
Facsimile: 415.591.3335

PAULSON
REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT D

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE

PURSUANT TO SECTION 2284, 28 UNITED STATES CODE

RALPH COLEMAN, et al.,              )
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )  NO. 2:90-cv-00520 LKK JFM P
                                    )
ARNOLD SCHWARZENEGGER, et           )
al.,                                )
                                    )
            Defendants.             )
_____)
MARCIANO PLATA, et al.,             )
                                    )
            Plaintiffs,             )
                                    )
      vs.                           )
                                    )
ARNOLD SCHWARZENEGGER, et           )
al.,                                )
                                    )  *Certified Copy*
            Defendants.             )
_____)

---o0o---

DEPOSITION OF DOYLE W. SCOTT

Friday, December 14, 2007

---O0O---

REPORTED BY:  KRISTIE L. HUBKA, CSR NO. 5974

1      Q.   Did you stay there continuously until your
2   retirement?

3      A.   Correct.

4      Q.   You obviously rose the ranks all of the way to
5   the top.

6      A.   Correct.

7      Q.   How long did it take you to go from
8   correctional officer after you came back to get back to
9   at least major?

10     A.   A year and two weeks.

11     Q.   So if I understand -- strike that.

12          In approximately 1980 the department was sued
13   in a class action lawsuit, correct?

14     A.   Correct.

15     Q.   And that lawsuit is Ruiz?

16     A.   Actually the department was sued much earlier
17   than that.  The trial was held in the '80 to '81 time
18   period.  And it was the Ruiz case.

19     Q.   And, to the best of your understanding, a
20   judgment was entered in favor of plaintiffs in the Ruiz
21   case?

22     A.   Yes.

23     Q.   And was there -- what were the terms of that
24   judgment generally?  Did it involve crowding or mental
25   healthcare, medical?  Do you understand my bad question?

1   was at about 200 percent of design capacity?

2        A.   Is my understanding, yes.  You need to

3   remember I was at a much lower level at that time.

4        Q.   Absolutely.  Do you know what -- or strike

5   that.

6             Was design capacity, to your knowledge, based

7   upon single or double celling?

8        A.   No.  Number of the cells that were designed

9   were double cells.

10       Q.   They were double cells?

11       A.   Yes.  They were designed as double cells

12  originally.

13       Q.   Have you heard the term "design capacity" with

14  respect to California's prisons?

15       A.   I've seen the term in a number of the

16  documents that I've looked at, yes.

17       Q.   Do you know whether California uses the term

18  "design capacity" as single or double cells?

19       A.   I think it depends on the original design of

20  each facility.

21       Q.   Do you know when that Ruiz case wrapped up?

22       A.   It wrapped up shortly after I left in 2001.

23  There were a few outstanding issues that were wrapped up

24  right after that.

25       Q.   When I say, "wrapped up," I mean it ended.

1        A.    Right.

2        Q.    There's a concept.  Do you know what the

3   issues were during your time as the executive director

4   of that department with respect to medical care in the

5   Ruiz lawsuit?

6        A.    Could you be a little more specific?

7        Q.    Yes.  I assume you were in a remedial phase

8   with respect to Ruiz when you were the executive

9   director, correct?

10       A.    Yes.

11       Q.    And what things with respect to medical care

12  were you as the department trying to remedy?  Was it

13  staffing?  Was it medical records?  Were there specific

14  things that you needed to accomplish with respect to

15  medical care to end that lawsuit?

16       A.    Yes.  It was mostly meeting the timelines that

17  were called for in the stipulated agreements for

18  offenders to receive medical care in both medical and

19  mental health.

20       Q.    Was that timelines with respect to primary

21  care as well as specialty care?

22       A.    Mostly primary care.

23       Q.    Do you recall what any of those timelines

24  were, as you sit here today?

25       A.    I do not.

17

DEPOSITION OF DOYLE W. SCOTT

1          THE WITNESS:  Okay.

2          Q     (By Mr. Mello) During the period of time
3     that you were executive director what programs or
4     efforts did the department take to find clinicians
5     for those difficult to place institutions?

6          A.    First we outsourced our medical treatment to
7     our university teaching hospitals in the state and that
8     would be the University of Texas Tech Health Science
9     Center and the University of Texas Medical Branch. UTMB
10    had about 70 percent of our inmate population to care
11    for medically, Texas Tech had about 30 percent of our
12    population to care for.

13          We redesignated some beds to facilities that
14    were close to major metropolitan areas so we would have
15    an available labor pool of classes of medical
16    professionals to work at our institutions.

17          Q.    And when did the relationships with Texas Tech
18    and UTMB start?

19          A.    I don't recall the exact year.

20          Q.    Do you know if it was before you became the
21    executive director?

22          A.    It was.  It was, yes.

23          Q.    Do you think if California were to enter into
24    agreements with its U.C. system that that might help
25    with some of the problems in California's prisons?

DEPOSITION OF DOYLE W. SCOTT                    19

1          MS. NORMAN:  I'm going to object as to

2    speculation.

3          You can answer if you can speculate.

4     Q    (By Mr. Mello) Let me reask the question.

5    Based upon your experience in Texas -- strike that.

6          Was it a positive development when these two

7    institutions took over medical delivery?

8     A.   That and the relocation of our medical beds to

9    major metropolitan areas.

10    Q.   Based upon that experience and the success

11   that you had do you believe that CDCR entering into a

12   similar agreement with, for example, the University of

13   California system would help improve medical delivery in

14   CDCR institutions?

15    A.   Possibly.  I think -- again, I think it's

16   going to take more than just that.

17    Q.   Is it your opinion that such an arrangement

18   would negatively impact medical care in California's

19   prisons?

20    A.   I wouldn't say that it would negatively impair

21   it, no.

22    Q.   When you were the executive director who was

23   responsible for the medical branch?  Was there a medical

24   director?

25    A.   Yes.

1        Q.    And who was that?

2        A.    The medical director that worked for the

3     Department of Corrections?

4        Q.    Yes.

5        A.    Yes, Lynette Linthicum.  Don't ask me how to

6     spell that, either one.

7        Q.    She was in charge of medical?

8        A.    Yes.

9        Q.    Was there a similar person in charge of mental

10     health?

11       A.    She was.  She oversaw all of the medical

12     services.

13       Q.    Do you know if she was a physician?

14       A.    She is, yes.

15       Q.    Do you know if she's still employed by the

16     department?

17       A.    She was as of last week.

18       Q.    Was she a direct report to you when you were

19     executive director?

20       A.    She reported to my deputy.

21       Q.    Just so I understand the structure of the

22     system, when you were executive director, I assume you

23     were top.

24       A.    Correct.

25       Q.    And I assume you reported to the executive

1    branch State of Texas, right?

2       A.   The Governor and the Board of Corrections.

3       Q.   And you had a deputy?

4       A.   I did.

5       Q.   And he was the deputy executive director?

6       A.   He was.

7       Q.   And you refer to him as a he.  What's his

8    name?

9       A.   Art Mosley, M-o-s-l-e-y.

10      Q.   Is he still employed by the department?

11      A.   No.

12      Q.   He's retired?

13      A.   He is.

14      Q.   Was Art Mosley the deputy executive director

15   during your entire tenure as executive director?

16      A.   Yes, he was.

17      Q.   And then Dr. Linthicum --

18      A.   I think it's L-i-n-t-h-i-c-u-m, I believe.  It

19   doesn't make sense.  That's the phonetic spelling at

20   least.

21      Q.   That's phonetic, I like it.  So Dr. Linthicum

22   reported to Mr. Mosley?

23      A.   That's correct.

24      Q.   And what was her title?

25      A.   Director of medical services I think but I'm

1      Q.    That's good enough.  Thank you.  Approximately

2    how many director level folks were there that reported

3    up to Mr. Mosley?

4      A.    Well, it changed at various times.  But

5    usually around 15.

6      Q.    Are you familiar with the Texas system today?

7      A.    Somewhat.

8      Q.    Do you know the size of that system?

9      A.    It's approximately 150,000.

10         MS. NORMAN:   Just again a clarification, the

11   size referring to?

12         MR. MELLO:   Exactly.

13     Q.    Do you know what the approximate current

14   population of adult inmates is in the Texas system?

15     A.    It's about 150,000.

16     Q.    Do you know if they are currently under any

17   class action -- strike that.

18         Do you know if they're currently subject to

19   any class action litigation or judgments with respect to

20   the delivery of medical or mental healthcare?

21     A.    Not that I'm aware.

22     Q.    I've pre-marked some exhibits.  The first is

23   your final report and you can grab it.

24     A.    All right.

25     Q.    On page one of your report you refer to -- you

1    Q.    Right.

2    A.    And Plata is the medical portion of it.

3    Q.    Do you believe you'll be providing expert

4    testimony with respect to mental healthcare in this

5    case?

6    A.    I think I will, yes.

7    Q.    On the same page of your report you indicate

8    that you have done independent reviews and expert

9    analyses on staffing patterns, institutional response to

10   violent disturbances, general operations, and security

11   controls.  Do you see that?

12   A.    Uh-huh.  Yes.

13   Q.    Any of those items that you've just discussed,

14   did they relate to either medical care or mental

15   healthcare?

16   A.    Staffing patterns impacted medical care in the

17   number of staff, correctional staff, that were used as

18   escorts to escort people to and from medical

19   appointments.  Also the number of staff that was

20   designated to transfer offenders off site for specialty

21   appointments.  The one on violent disturbances, the only

22   impact on healthcare there was the treatment of the

23   offenders that were injured and the staff that were

24   injured.

25   Q.    Were you asked to provide any analysis of the

1    staffing patterns of medical or mental health

2    clinicians?

3        A.    Clinicians?

4        Q.    Yes.

5        A.    No.

6        Q.    Do you have any experience analyzing staffing

7    or staffing ratios as it relates to medical clinicians

8    or mental health clinicians?

9        A.    No, I've never done that.

10       Q.    And when you say correctional officers needed

11   for medical escorts and correctional officers needed to

12   transfer inmates off site, on what locations have you

13   done such analysis?

14       A.    Florida, Oklahoma, Kentucky, Indiana,

15   New Mexico, and Puerto Rico.

16       Q.    Have you ever heard Texas referred to as Baja,

17   Oklahoma?

18       A.    No.

19       Q.    Somebody used that term to me in the last six

20   months, somebody from Oklahoma obviously.

21       A.    Don't you think it should be the other way

22   around?

23       Q.    That was very funny.  It was before the

24   Texas/Oklahoma or whatever.  Maybe it was a year ago.

25   Time flies when you're having fun.

1      A.   I never heard of that.

2      Q.   It obviously made an impression on me.   When

3    did you conduct such an analysis in Florida?

4      A.   I was there in the summer of 2006.

5      Q.   And who did you conduct that analysis for?

6      A.   The director of the department.

7      Q.   And what conclusions did you reach with

8    respect to this subject matter in Florida?

9      A.   That's a pretty broad question.

10     Q.   It is.  Did you write a report?

11     A.   I wrote my section of the report.

12     Q.   And do you recall what your conclusions were

13   in the section of the report that you wrote for the

14   director of the department of Florida?

15     A.   In regards to what in particular?

16     Q.   Staffing for correctional officers for escorts

17   and off site transfer.

18     A.   Right.  In some areas they were short and

19   needed to have additional staff in those areas.

20     Q.   And how did you go about determining whether

21   they were short staffed for Florida?

22     A.   For Florida?

23     Q.   Uh-huh.

24     A.   By observing on site for a number of hours at

25   the institutions that I was assigned to and by

1   interviewing staff, by interviewing offenders, looking

2   at how many medical appointments were missed, the

3   frequency of those misses, and then it's pretty easy to

4   extrapolate from there to determine the number of staff

5   needed.

6       Q.   Did you come up with hard numbers of

7   additional staff they needed at each institution?

8       A.   Correct.

9       Q.   Did you come up with ratios that were needed

10  at those institutions?

11      A.   In respect to what?

12      Q.   Inmate to correctional officers.

13      A.   Well, one ratio doesn't really apply because

14  each institution is designed and operated very

15  differently so you have to actually be on site and

16  observe the operation to determine the proper ratio of

17  officers to inmates.

18      Q.   And would that be the same with respect to the

19  institutions in California?

20      A.   Yes.

21      Q.   To do a proper analysis would you need to

22  spend time at each institution to come up with the

23  appropriate staffing levels?

24           MS. NORMAN:   Objection.   Clarification, to do

25  a proper analysis of?

1     A.   Have I ever served in that capacity?

2     Q.   Right.

3     A.   No, I have not.

4     Q.   Clearly when you were the executive director
5 it all stopped with you and you were responsible for
6 everything, correct?

7     A.   Yes.

8     Q.   So in that respect you were in charge of
9 medical and mental healthcare, correct?

0     A.   I was.

1     Q.   And that's obvious.  I don't dispute that.  Is
2 it true to say that your experience is really in custody
3 as opposed to medical or mental health delivery?

4     A.   Mostly, yes.  Now, I will say that when I was
5 warden at the -- now the Estelle unit, half of my
6 facility was mental health, acute and intermediate beds.

7     Q.   How long did you hold that warden position at
8 that Estelle unit now?

9     A.   I started in June of -- it's in my -- let me
0 look.  Too much water under the bridge.  From February
1 of 1984 until June of 1984.

2     Q.   February of '94 to June of '94?

3     A.   No, '84.  I'm sorry, I misspoke.

4     Q.   February of '84, to June of '84?

5     A.   That's right.

1       Q.    So four months, four to five months?

2       A.    Yes.

3       Q.    Is that the last time that you had any sort of

4   direct responsibility for medical and mental care?

5       A.    That's been the most direct experience I've

6   had.

7       Q.    I assume, though, even in that position that

8   you had an intermediate level supervisor who was more

9   responsible for the delivery of medical and mental

10   healthcare, correct?

11      A.    Yes, I did.

12      Q.    Do you recall when you were first contacted

13   about being an expert in this case?

14      A.    August or September of this year.  I don't

15   recall the exact date.

16      Q.    Do you know how you were contacted?

17      A.    Mr. Specter called me.

18      Q.    I'm guessing but is this the first time you've

19   been retained as an expert for plaintiffs in a prison

20   case?

21      A.    Yes.

22      Q.    And you indicated on the first -- you were

23   first contacted by Mr. Specter by phone, correct?

24      A.    Yes.

25      Q.    And do you recall approximately how long you

1    Q.   Did you ever use temporary space like modules
2    or trailers in Texas?

3         A.   For what purpose?

4         Q.   For clinical.

5         A.   Yes.

6         Q.   And was that -- did that help?

7         A.   It alleviated somewhat the problem until we
8    got permanent office space built.

9         Q.   Do you know whether or not the CDCR, the
10   receiver and/or the special master in Coleman is trying
11   to use such temporary space or develop such temporary
12   space to add clinical space?

13        A.   I do not.

14        Q.   Do you believe that similar to your experience
15   in Texas that the adding of temporary space would help
16   in California?

17        A.   Well, there's a critical difference.  We were
18   not overcrowded at the time.  We were still operating at
19   that facility within the design capacity and that's not
20   the case here.

21        Q.   The adding of temporary space at the four
22   institutions that you visited, do you think that would
23   impact one way or the other the delivery of medical or
24   mental healthcare at those institutions?

25        A.   It's possible.  But, again, I think you're --

1  design capacity."

2      A.   Yes.

3      Q.   Have you worked with any system that did not

4  maintain its population within design capacity?

5      A.   Yes.

6      Q.   Which systems?

7      A.   Puerto Rico.

8      Q.   Any others?

9      A.   No.

10     Q.   Are you aware of any other systems, besides

11 California and Puerto -- well, strike that.

12          Is California operating within its design

13 capacity?

14     A.   No.  In my opinion, no.

15     Q.   Are you aware of any other systems in the U.S.

16 that are operating above their design capacity?

17     A.   No, I'm not.

18     Q.   During your time with the Texas department

19 either as executive director or beforehand did the Texas

20 department add approximately 50,000 beds?

21     A.   Yes.

22     Q.   When was that?

23     A.   In the early to mid '90s.

24     Q.   And how long did it take for Texas to add

25 approximately 50,000 beds to its system?

DEPOSITION OF DOYLE W. SCOTT          101

1            STATE OF CALIFORNIA   )   ss.

2           I, the undersigned, a Certified Shorthand

3 Reporter of the State of California, hereby certify that

4 the witness in the foregoing deposition was by me duly

5 sworn to testify to the truth, the whole truth, and

6 nothing but the truth in the within-entitled cause; the

7 said deposition was taken at the time and place therein

8 stated; that the testimony of said witness was reported

9 by me, a Certified Shorthand Reporter and a

10 disinterested person, and was thereafter transcribed

11 under my direction into typewriting; that the foregoing

12 is a full, complete and true record of said testimony;

13 and that the witness was given an opportunity to read

14 and, if necessary, correct said deposition and to

15 subscribe the same.

16          I further certify that I am not of counsel or

17 attorney for either or any of the parties in the

18 foregoing deposition and caption named, nor in any way

19 interested in the outcome of the cause named in said

20 action.

21          IN WITNESS WHEREOF, I have hereunto set my

22 hand this 18th day of December, 2007.

23

24                               CERTIFIED SHORTHAND REPORTER

25

EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

        Plaintiffs,

    vs.                CASE NO. 2:90-cv-00520
                         LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,

                    THREE-JUDGE COURT
        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,


        Plaintiffs,

    vs.                CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

        Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~


DEPOSITION OF

DOYLE WAYNE SCOTT

OCTOBER 1, 2008

10:12 a.m.



425 Market Street, 26th Floor

San Francisco, California


Reported by Quyen N. Do, RPR, CSR No. 12447

44

1          A       They're steel.   They're bar doors, steel bar

2     doors.

3          Q       Steel bar doors.

4          A       Mm-hm.   [Nodding.]

5          Q       And are they open steel bar doors, like -- and

6     I'm going to try to describe as best I can for the

7     record -- where it looks like something out of, like, I

8     don't know, like your old western movie, where there's

9     just bars running straight up and down and cross-wise,

10    or are they solid steel with a barred window?

11         A       No.   They're -- they're open steel doors.   The

12    bars are running horizontal to the floor with open

13    space --

14         Q       Okay.

15         A       -- and there's a -- a food chute.

16         Q       Okay.   Did you review a document entitled "Do

17    the Crime, Do the Time?  Maybe Not, in California:   Jail

18    cell shortage is upsetting the balance."   This is a

19    document that was done by the California State

20    Association of Sheriffs in June of 2008 [sic].   Do you

21    recall reviewing a document titled that?

22         A       No, I don't.

23         Q       Have you formed any opinions regarding the

24    possible impact of a prisoner release order on public

25    safety in California?

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

45

1      A    Well, I know from experience in Texas, when we

2    did population reduction, we did it -- we did it

3    cautiously, but we were able to release low-risk

4    offenders back to the general public ahead of time when

5    they were scheduled to be released without any adverse

6    effect.

7      Q    Now, when you say without any adverse effect,

8    what does that mean?

9      A    It means the crime rate -- there were no

10   extraordinary spikes in the crime rate.  There were no

11   egregious events that occurred from one of those

12   offenders.

13     Q    And then so, based on that, have you formed an

14   opinion about the possible impact on public safety of a

15   prisoner release order in California?

16     A    It's my experience, if you do it correctly,

17   you can release a number of offenders early that are not

18   a lot of risk to the general public.

19          MS. NORMAN:  I'm going to object to this

20   line of questioning.  It's going beyond the scope of his

21   report, both reports, in this case.

22   BY MR. LEWIS:

23     Q    Have you formed any opinions regarding the

24   possible impact of a prisoner release order on the local

25   criminal justice systems in California?

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

Doyle Wayne Scott

October 1, 2008

77

1    A    That would be, actually, a little bit less

2    than your designed bed capacity to allow for

3    classification movements.

4    Q    Is that the 95 percent you're talking about?

5    A    Yes, sir.

6    Q    What is that opinion based on?  What studies

7    is that based on, if any?

8    A    Well, it's -- for one, it's my experience in

9    Texas.  When we had to drastically reduce our population

10   there to get to down to the 95 percent capacity, we

11   found we were able to function and integrate all of our

12   operations much more efficiently when we were at that

13   level.

14   Q    Can you --

15   A    We struggled at anything above that, frankly.

16   Q    Do you know of any studies or anything that

17   you could rely on for that other than your experience?

18   A    No, sir.

19   Q    On page 10 of your report, in the last

20   paragraph, you wrote that you believe medical care is

21   among the basic needs that cannot be supplied under

22   current conditions.

23        Is it your opinion that no matter what

24   resources the Receiver's office has or may not have, the

25   receivership for the California prison system, that they

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

85

1    adequate medical care that was needed?

2         A    Not that I've observed personally.  Only what

3    I have read in the Receiver's reports.

4         Q    So aside from what you read in the Receiver's

5    reports, you know of no instances?

6         A    And other sources.

7         Q    And what are some of those other sources?

8         A    Some of the -- possibly some of the expert

9    reports if they have referred to those.  And I don't

10   recall specifically any that have, but I don't want to

11   exclude those.

12        Q    And are you aware of any instances where there

13   wasn't adequate medical facilities or medical staff at

14   California prison systems that -- whereby a prisoner was

15   not able to get needed medical care?

16        A    Well, again I take you back to the reception

17   center that we talked about earlier when the inmates had

18   a general complaint that they couldn't get in to see

19   their -- at their appointed times to see their medical

20   professionals because of competition with the reception

21   inmates being processed.

22        Q    But you can't recall if there were any

23   specific medical needs that weren't met in any of those

24   inmates other than their general comments?

25        A    Again that was something that I didn't

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

1    explore, because I left that to Dr. Shansky to explore

2    the quality issues.

3        Q    But as it stands now, other than that IRC

4    thing at Deuel vocational Institute, the inmate

5    reception center, conversation you had or the

6    conversations you had with inmates in general

7    population, you know of no instances where there was a

8    lack of an -- or where a prisoner didn't receive medical

9    care because of a lack of space or medical staff?

10        A    No.

11        Q    You testified earlier that -- that regarding

12    what inhumane conditions were and stuff like that.

13    Would you consider overcrowding inhumane?

14        A    Yes.

15        Q    So is --

16        A    To the degree that it is in California, yes.

17        Q    You also testified that one person over design

18    capacity is considered overcrowding?

19        A    Yes.

20        Q    So then is one person over design capacity

21    inhumane?

22        A    Not necessarily.  I qualified my previous

23    answer to the degree that it is in California.

24        Q    All right.  Is there a point at which

25    overcrowding is not inhumane?

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

108

## REPORTER'S CERTIFICATION

I, Quyen N. Do, Certified Shorthand Reporter, in and for the State of California, do hereby certify:

That the foregoing witness was by me duly sworn; that the deposition was then taken before me at the time and place herein set forth; that the testimony and proceedings were reported stenographically by me and later transcribed into typewriting under my direction; that the foregoing is a true record of the testimony and proceedings taken at that time.

IN WITNESS WHEREOF, I have subscribed my name this 7th day of October 2008.

|S| *(signature)*

Quyen N. Do, RPR, CSR No. 12447

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

       Plaintiffs,

    vs.                                 CASE NO. 2:90-cv-00520
                                            LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,
          THREE-JUDGE COURT

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~
MARCIANO PLATA, et al.,

       Plaintiffs,

    vs.                                 CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

       Defendants.
~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JOSEPH DENNIS LEHMAN

SEPTEMBER 16, 2008
10:05 p.m.

425 Market Street, 26th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

P A U L S O N
REPORTING & LITIGATION SERVICES
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

1    probation, parole, community residence programs,

2    treatment programs in prisons.

3          Q    With respect to prisons, was there someone

4    under you who was in charge of the medical care in the

5    prisons?

6          A    Yes, there was.

7          Q    Who was that?

8          A    I can't remember the name.  It was a doctor.

9          Q    Did that person --

10         A    That was -- he headed up the health

11   department.

12         Q    And was that true for all the years that you

13   were at the department -- Washington State Department of

14   Corrections?

15         A    There wasn't a physician when I got there.  I

16   hired him and created the unit after I got there.

17         Q    Did the health department include mental

18   health care, as well, or was that its own department?

19         A    It included mental health.

20         Q    Was this person who headed up the health

21   department there when you left in 2005?

22         A    Yes, he was.

23         Q    But you're having a hard time remembering his

24   name today?

25         A    Yes.  Yes.

Page 13

1    Q    Did you not work closely with him when you

2  were in Washington?

3    A    I did.

4    Q    You did work closely with him.  Have you kept

5  in touch with him since you left Washington State?

6    A    No, I have not.

7    Q    What was the function of the physician who

8  headed up the health department for the prisons -- for

9  the Washington State Department of Corrections when you

10  were secretary there?

11    A    He was responsible for creating the policies

12  and procedures dealing with health care, for setting up

13  a -- a system in terms of monitoring compliance with

14  those as well as for hiring, overseeing and

15  participating in the hiring of health care staff.

16    Q    And what was your role in being his boss?

17    A    To review the department-wide policies

18  promulgated and proposed by his unit.

19    Q    Did the Washington State Department of

20  Corrections face any legal challenge as to the adequacy

21  of the medical or mental health care system when you

22  were there?

23    A    No.

24    Q    So is it your understanding that the medical

25  and mental health care system, when you were the

1          A     Lakewood, Washington.

2          Q     Are you performing -- besides being an expert

3    in this lawsuit, are you performing any functions in

4    corrections these days?

5          A     Not these days.

6          Q     And when was the last time that you were

7    involved in any correctional activities?

8          A     2007.

9          Q     And what was that?

10         A     I was involved in the expert panel in state of

11   California and then subsequently the strike team.

12         Q     When you were the secretary of the Washington

13   State Department of Corrections, what was the largest

14   prison population?

15         A     Probably around 2,000.

16         Q     For the whole state?

17         A     No, no, no.   Just for one prison unit.

18         Q     Okay.   For the entire state.   I'm sorry.   I

19   might have been misunderstood.   What was --

20         A     In Washington state?

21         Q     Mm-hm.

22         A     Oh, it would be under 14,000.   Close to

23   14,000, I believe.

24         Q     And how many prisons were operated in

25   Washington State on average, adult prisons --

1    Q    Is there something that would refresh your

2    recollection about that?

3    A    Data.  I don't have it.

4        MR. SPECTER:  And, in those answers, Anne, you

5    were referring to Washington State, correct?

6        MS. JOHNSON:  That's correct.

7        THE WITNESS:  That's right.

8        MS. JOHNSON:  Mm-hm.

9    Q    (By Ms. Johnson)  At the times that the prisons

10   were above even operational capacity when you were

11   secretary of the Washington State Department of

12   Corrections, is it your opinion that the system was

13   still providing adequate medical and mental health care?

14   A    Yes, it is.

15   Q    So it's possible for a system that's above

16   operational capacity to provide adequate medical and

17   mental health care?

18   A    That's correct.

19   Q    Before you were secretary of the Washington

20   State Department of Corrections, you were the

21   commissioner of the Maine Department of Corrections from

22   1995 to 1997; is that right?

23   A    No.  That's -- actually, it's after

24   Washington -- oh, no, you're right.  Before I was

25   secretary, right.  That's correct.

1      Q    So, is the position of commissioner of the

2   Maine Department of Corrections the equivalent position

3   as secretary of the Washington State Department of

4   Corrections?

5      A    Yes, it is.

6      Q    They're just called -- the secretary is just

7   called the commissioner in Maine?

8      A    East Coast phenomenon.

9      Q    So you were commissioner of Maine Department

10  of Corrections for two years?

11     A    Yes.

12     Q    And what departments or divisions were under

13  you when you were commissioner of the Maine Department

14  of Corrections?

15     A    The Maine Department of Corrections had the

16  parole system and the prison system.

17     Q    Anything else?

18     A    No.

19     Q    With respect to the prison system, was there

20  someone who was in charge of the medical and/or mental

21  health care?

22     A    No.  Not at the headquarters level.

23     Q    Does that mean that -- well, what are the

24  levels below headquarters level?

25     A    There were health care staff at each of the

1    prisons.

2        Q    And who did those health care staff at the

3    prisons report to?

4        A    The -- the superintendents, the wardens.

5        Q    And did the wardens report to someone under

6    you?

7        A    To a deputy commissioner.

8        Q    And so it was you, a deputy commissioner, and

9    then there was -- and then the wardens at the various

10   prisons?

11       A    That's correct.

12       Q    Did you have any role in connection with the

13   provision of medical or mental health care in the

14   prisons while you were commissioner of the Maine

15   Department of Corrections?

16       A    Creating and promulgating policy.

17       Q    You yourself did that?

18       A    No.  With staff's input.

19       Q    You received staff input for the health and

20   mental health care --

21       A    Actually --

22       Q    -- policies?

23       A    -- they would -- they would draft the

24   policies.  I would review and approve.

25       Q    So which staff would -- drafted the medical

1    answer.

2        A    Okay.

3        Q    Okay.  Did the person who was drafting the

4    medical and mental health policies report to you or

5    report to the deputy commissioner?

6        A    Reported to me.

7        Q    While you were commissioner of the Maine

8    Department of Corrections, did the Maine Department of

9    Corrections face any legal challenges to the adequacy of

10   the medical or mental health care?

11       A    No, they did not.

12       Q    What was the largest overall prison population

13   while you were secretary -- while you were commissioner

14   in Maine?

15       A    1400.

16       Q    In a prison or the whole system?

17       A    Whole system.

18       Q    So the whole system in Maine was smaller than

19   your largest prison in Washington State; is that right?

20       A    That's right.

21       Q    What was your -- how many prisons were there

22   in Maine?

23       A    I think there was around 10.

24       Q    So the prisons held less than 200 people a

25   piece?

1    questioning, I'm not really going to distinguish between
2    those two functions unless you believe that there is
3    some type of important distinction between being the
4    acting secretary and then the secretary.

5        A    The only distinction was a period of between
6    my appointment and confirmation by the Senate.

7        Q    Okay.  So, I'm just going to -- for purposes
8    of the question, I'm just going to refer to it as the
9    period when you were secretary of the Pennsylvania
10   Department of Corrections just for ease.  Is that
11   acceptable?

12       A    That's fine.

13       Q    Okay.  So, during the period of time that you
14   were the secretary of the Pennsylvania Department of
15   Corrections, what departments or divisions were under
16   you?

17       A    The prisons themselves and some prerelease
18   programs.

19       Q    With respect to the prisons, was there a
20   division for medical and/or mental health care?

21       A    Not initially, but I created one.

22       Q    So you created one department or division for
23   medical and mental health together?

24       A    For health department.

25       Q    And just to be clear, that health department

1          Q    Did Pennsylvania Department of Corrections

2     face any legal challenges to the adequacy of medical or

3     mental health care when you were the secretary?

4          A    Yes.

5          Q    Can you explain to me what type of challenge

6     occurred to the -- regarding the medical or mental

7     health care while you were secretary of the Pennsylvania

8     Department of Corrections?

9               MR. SPECTER:  Objection.  That's vague.

10              THE WITNESS:  When I -- I was hired as the

11     secretary of the Department of Corrections subsequent to

12     some serious riots within the system.  Two weeks after I

13     got to the Department of Corrections, I had a --

14     received a letter from Al Bronstein, welcoming me to the

15     department and indicating it was their intent to sue a

16     class action.

17     BY MS. JOHNSON:

18          Q    And what were the particular complaints they

19     were going to -- or did they sue?

20          A    Al Bronstein and I agreed that we would sit

21     down and talk about that lawsuit prior to filing.  In

22     the meantime, having been given notice, I hired some

23     outside experts in the fields of health care and other

24     programs, and they came in and reviewed the system,

25     identified what the shortfalls were, where we had

78bca7c9-42c7-467e-a22b-74646c29c03c

1    problems.

2         Over -- the most significant problem was in --
3    the overriding problem of -- of overcrowding.  We
4    subsequently took that information, went to the
5    legislature and got some significant funding relative to
6    a construction program.

7         Q    Your -- I'm sorry.  I couldn't hear what you
8    said.

9         A    Significant funding relative to a construction
10   program.  We had -- it had been discussed in legislature
11   and subsequently agreed that we would do a lease
12   purchase of prisons.  They gave us $12 million to do a
13   design for a maximum custody and medium custody
14   facility.  We subsequently put it out to bid for lease
15   purchase and built five prisons within three years.

16              (Sotto voce discussion had between

17              Mr. Specter and the witness)

18         THE WITNESS:  Subsequently, we were sued.  We
19   went to trial.  Two weeks into the trial, there was a --
20   an agreement made between, at that point in time, the
21   ACLU and the Department of Corrections relative to the
22   actions it would take, and the suit was dropped.

23   BY MS. JOHNSON:

24         Q    What were the allegations that were made in
25   connection with medical or mental health care?

1        A        Inadequate mental health and health care, not

2    sufficient policy and procedures relative to that or

3    oversight.

4        Q        Were there any particular concerns regarding

5    the -- strike that.

6                 Were there any particular inadequacies alleged

7    regarding medical care that you can recall sitting here

8    today?

9        A        Insufficient staff.

10       Q        Anything else?

11       A        Inadequate facilities.

12       Q        Any other specific inadequacies that you can

13   recall?

14       A        No.

15       Q        So insufficient staff and inadequate

16   facilities with respect to medical care --

17       A        Mm-hm.

18       Q        -- were alleged.

19       A        Yes.

20       Q        Were there the same inadequacies alleged with

21   respect to mental health care, or were there different

22   inadequacies?

23       A        Similar.

24       Q        I'm going to be a real lawyer here and say

25   similar is not the same.  So I would need to know were

1    the same ones alleged or different ones?

2         A    The same.

3         Q    Do you recall what the particular remedies

4    were that were implemented to address the inadequacies

5    in the medical and mental health care?

6         A    The creation of that health department within

7    the -- in other words, the separate administration

8    relative to that within the Department of Corrections

9    and certainly the construction of new facilities with

10   adequate health care.

11        Q    Anything else that you can recall as you sit

12   here today?

13        A    No.

14        Q    So prisoners weren't released in response to

15   those alleged inadequacies in the medical or mental

16   health care?

17        A    No.    We -- immediate step we actually sent 800

18   inmates to the federal system.    That was the first step.

19        Q    What was the largest overall prison population

20   while you were secretary of the Pennsylvania Department

21   of Corrections?

22        A    It was under 20,000, but it was close to

23   20,000.

24        Q    And what was your largest single prison

25   population?

Page 34

1   to a hundred percent design capacity, or were they still

2   operated over design capacity?

3        A    Not while I was there.  I do not believe they

4   were operating over design capacity.

5        Q    Have you personally had any direct

6   responsibility for the administration of medical care in

7   prisons?

8        A    I'm not sure what you mean by direct.

9        Q    Where it was your job to oversee the delivery

10  of the medical care in the prison system?

11            MR. SPECTER:  That's still vague.

12  BY MS. JOHNSON:

13       Q    Have you ever held a position such as a health

14  care manager at a prison?

15       A    No, I have not.

16       Q    Have you ever held a position such as head of

17  the health department for a prison system?

18       A    No, I have not.

19       Q    Would you consider yourself to have experience

20  in the administration of health care systems in prison?

21       A    At a policy level.

22       Q    What does your experience, at a policy level,

23  regarding the administration of medical and mental

24  health care in prisons consist of?

25       A    Ensuring that the policies and procedures

1    developed for those programs adequately address the

2    issues of inmate health care, both in health and mental

3    health.

4         Q    And what measures would you use to determine

5    what adequately address mean when you were reviewing

6    these policies and procedures?

7         A    An adequate capacity to, in fact, screen and

8    assess inmate health and adequate provision of actual

9    medical and/or mental health services; timely access to

10   those services on the part of the inmate population;

11   development of classification system that would be

12   sensitive to those needs; the provision of an

13   infrastructure in terms of documenting the activities of

14   the health care system in terms of assessing inmate

15   health and provision of programs and treatment and

16   medication; and in capacity to, in fact, ensure

17   continuity of care relative to those services as inmates

18   move throughout the system.

19        Q    So I guess my question was, Did you use any

20   measures?  How did you determine whether the policies

21   that were being recommended to you by the people in

22   charge of the health policies were adequately addressing

23   the medical or mental health care?

24        A    The person, for example, in Washington or

25   Pennsylvania will have responsibility to -- in terms of

1   to be indicating that you did that in connection with

2   medical and mental health care), I'm trying to

3   understand what kind of incidents would be reported.

4       A    Well, let's -- let's say -- actually, the

5   incident reports were not limited to health care and

6   mental health, but for any incident within an

7   institution --

8       Q    I understand that --

9       A    -- I would be informed.

10      Q    -- but what I'm trying to understand is, with

11  respect to medical and mental health care, were there

12  incident reports that you reviewed?

13      A    There might be a incident report relative to a

14  inmate not being transferred to an institution within an

15  appropriate time.  We had a special -- specialized

16  facilities.  I would -- I might get an incident report

17  regarding that, and then I would ask people to follow up

18  on it.

19      Q    How were questions of quality of care dealt

20  with?

21      A    If there were significant quality care --

22  quality of care issues, which I'm not remembering, but

23  the director of the health care would be responsible for

24  addressing that.

25      Q    You served on the CDCR Expert Panel on Adult

1    infrastructure relative to documentation of medical

2    care, including diagnosis, treatment and follow-up;

3    certainly, adequate provision of access to appropriate

4    medicines; certainly, an adequate infrastructure

5    relative to data that collects information relative to

6    all the medical services that -- that is a critical

7    insurer of the continuity of care with any -- any prison

8    system.

9         Q    Anything else?

10        A    I've probably forgotten some, but ...

11        Q    What is the basis of your opinion about the

12   key elements of adequate prison medical care system?

13        A    I'm sorry.  I'm not sure what that question

14   is.

15        Q    Well, how did you form this opinion?

16        A    Experience.

17        Q    Any particular experience?

18        A    Certainly, within the systems that -- such as

19   Pennsylvania, where there were difficulties in -- in --

20   in terms of providing those services and creating --

21   creating both the policy, procedural and structural

22   capacity to do so.

23        Q    Anything besides your experience in

24   Pennsylvania?

25        A    Well, certainly, I didn't mean to limit it

Joseph Dennis Lehman                                    September 16, 2008

 1    sentence:

 2                  "... overcrowding places intolerable

 3            burdens on the staff and the facilities, with

 4            significant negative impacts on the CDCR's

 5            ability to provide prisoners with all

 6            necessary services, including health care."

 7            You see that?

 8         A    Yes.

 9         Q    What specific intolerable burdens have been

10    placed on staff that it resulted in negative impacts on

11    CDCR's ability to provide health care?

12         A    I think the -- the first responders or first

13    indicators of inmate problems, both in terms of their

14    behavior and health care status, are correctional

15    officers.  Those individuals who actually work on the

16    blocks, in the yards and interact -- California's

17    staffing ratio, in terms of custody staff, is very low

18    compared to the national average.  At least one of those

19    is committed in each of the cell blocks to gun walks.

20    There is a -- because of the fewer staff, little --

21    little -- little opportunity, in overcrowded conditions,

22    for correctional officers to get to know the inmates and

23    to be actually aware of the problems they have or their

24    difficulties.

25                  In those circumstances, I -- I -- I think

1    they -- they are stressed out.  That creates an

2    environment where staff become, because they are

3    overwhelmed, reluctant to interact with inmates at a

4    level that would ensure better identification of

5    problems.

6         Q    And what is the basis for that opinion of

7    yours?

8         A    Experience, 35 years of experience.  Walking

9    through the cell blocks.

10        Q    In California?

11        A    Yes.

12        Q    And when did you do that?

13        A    That was when I was with the strike team.

14        Q    How many cell blocks did you visit?

15        A    Actually, I think it was about three

16   institutions, but Cathy with -- would have that

17   information.

18        Q    You walked through the cell blocks in three

19   institutions when you were on the strike team?

20        A    Mm-hm.

21        Q    And that's the basis for your opinion that

22   system-wide first --

23        A    And what --

24        Q    -- responders are so stressed out that they

25   don't get to know the inmates --

1      A    And --

2      Q    -- and become reluctant to interact with them?

3           MR. SPECTER:  That mischaracterizes his

4      answer.

5           THE WITNESS:  I said because of the sheer

6      numbers within the cell blocks and the crowding.

7           MR. SPECTER:  And it's also argumentative.

8           I'd appreciate if you'd just ask him the

9      question.

10          MS. JOHNSON:  Argumentative is a proper

11     objection to the form of the question, and we'll let the

12     court sort that out.

13     Q    (By Ms. Johnson)  Okay, so because of the sheer

14     numbers, you said -- I'm not sure what you meant by

15     that.  The sheer numbers is one of the basis of your

16     opinion?

17     A    The sheer numbers of the inmates within the

18     housing units and the limited staff, by national

19     standards, in terms of the staff-to-inmate ratio.

20     Q    Okay.  And where is -- and the sheer numbers

21     that you're relying on, what report did you find that

22     in?

23     A    I -- that was from my observations in walking

24     the units.

25     Q    So, do you know what the staffing ratio is

1    system-wide?

2        A    I -- I've looked at the staffing ratio.  I

3    can't tell you what is, but I know it's below the

4    national average.

5        Q    Is there some study or report that you've read

6    that says the national average is the average that one

7    has to maintain in order to --

8        A    No, but it's --

9        Q    -- meet quality of care?

10       A    It's a barometer in terms of ...

11       Q    So, if you were to just say in one or two

12   words identify what the intolerable burdens are

13   specifically that are placed on the staff, could you do

14   that?

15       A    Well, if you were two officers in a huge

16   cellblock that is triple or double bunked with the sheer

17   numbers of inmates, you -- I think those staff become

18   overwhelmed by the -- the responsibilities and the

19   interaction with inmates that are in systems where

20   they're overcrowded.

21       Q    When you were touring these cell blocks at the

22   three institutions when you were on the strike team, did

23   you speak with correctional officers?

24       A    Yes.

25       Q    Did they tell you they felt overwhelmed?

1        A        Well, they were -- they -- they certainly were
2    recognizing the overcrowding and expressed that.

3        Q        What exactly did they say to you?

4        A        Well, they were concerned about the -- the
5    amount of inmates within -- for example, many of the
6    gyms that are in -- in -- in program space is full of
7    bunks, triple bunked.  I mean, you walk through them,
8    and I think, if you were a correctional officer, any
9    correctional officer, they would tell you that this is
10   overwhelming.  How do we respond?

11       Q        What I'm asking you is, though, did the
12   correctional officers you spoke with on your cellblock
13   tours at the three institutions that you toured when you
14   were on the strike team say that to you?

15       A        I had individual correctional officers say
16   they were concerned with the amount of overcrowding.

17       Q        But they didn't say that they were
18   overwhelmed?

19       A        Well, they -- they expressed the difficulties
20   of managing units of those size.

21       Q        Did they say that they faced an intolerable
22   burden?

23       A        I don't think they used those specific words.

24       Q        Can you identify any specific negative impacts
25   on the ability to provide health care that have been

160

REPORTER'S CERTIFICATION

1

2

3      I, Quyen N. Do, Certified Shorthand Reporter, in

4  and for the State of California, do hereby certify:

5

6      That the foregoing witness was by me duly sworn;

7  that the deposition was then taken before me at the time

8  and place herein set forth; that the testimony and

9  proceedings were reported stenographically by me and

10 later transcribed into typewriting under my direction;

11 that the foregoing is a true record of the testimony and

12 proceedings taken at that time.

13      IN WITNESS WHEREOF, I have subscribed my name

14 this 23rd day of September 2008.

15

16      [S]

17

       Quyen N. Do, RPR, CSR No. 12447

18

19

20

21

22

23

24

25

# PAULSON
REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104