EXHIBIT G

Case 2:90-cv-00520-KJM-SCR    Document 3242-2    Filed 10/30/08    Page 2 of 92

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

     vs.              CASE NO. 2:90-cv-00520
                          LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,
                      THREE-JUDGE COURT
        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA, et al.,

        Plaintiffs,

     vs.              CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,  THREE-JUDGE COURT

        Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

JAMES AUSTIN

VOLUME I

SEPTEMBER 19, 2008

10:06 a.m.

425 Market Street, 26th Floor

San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

f1716972-181b-4fba-a74f-b616a3f1d987

Case 2:90-cv-00520-KJM-SCR    Document 3242-2    Filed 10/30/08    Page 3 of 92

1          So, are you still working for all of those

2    states to reduce their prison populations?

3          A    No.

4          Q    Okay.  Can you tell me which states you are

5    still currently working for?

6          A    On that list?

7          Q    Mm-hm.

8          A    Maryland, Nevada, Texas, Rhode Island, Arizona

9    and Louisiana.

10         Q    Maryland, Nevada, Texas, Rhode Island, and I

11   think I lost you.  I got Louisiana.  There was another

12   one in the middle?

13         A    Arizona.

14         Q    Arizona.  So you are no longer working for

15   Connecticut and Pennsylvania; is that correct?

16         A    Correct.

17         Q    From your answer, am I to understand that

18   there are some other states you are working for instead

19   of Connecticut and Pennsylvania now?

20         A    Yes.

21         Q    Okay, which states are those?

22         A    Mississippi, Michigan and Ohio.  And the

23   District of Columbia and the U.S. Parole Commission.

24         Q    So, with respect to Maryland, how long have

25   you been working for Maryland?

1       A    I would estimate about four years.

2       Q    And what's your exact function with respect to

3    Maryland?

4       A    Maryland, I've been helping the state with

5    respect to prison population reductions and working with

6    the Parole Commission, which is also part of the

7    Department of Public Safety and Corrections, to

8    implement new parole guidelines which are designed to

9    increase the parole grant rates for serving classes of

10   inmates based on their suitability for release.

11      Q    Okay.  With respect to Nevada, what are your

12   specific functions in connection with Nevada?  Let me

13   step back.

14           How long have you been working for Nevada?

15      A    That goes back to 19 -- the 1980s, but the

16   current assignment, really, started about two years ago.

17      Q    And what is, as specifically as you can

18   describe it, your current assignment for Nevada?

19      A    The assignment is to review their current

20   sentencing and correctional practices and to make

21   recommendations to decrease the prison population by

22   implementing new laws and new practices.

23      Q    With respect to Texas, how many years have you

24   been working with Texas on your current assignment?

25      A    My current assignment goes back approximately

1    two years, and that involves working with the Texas

2    Board of Pardons and Parole, their release criteria and

3    parole guidelines.  Actually, that goes back about four

4    years, I'm sorry, about four years.

5        Q    With respect to Rhode Island, how long have you

6    you been working on your current assignment?

7        A    I've been working Rhode Island again

8    approximately three to four years.  That work has

9    entailed working with the legislature and the governor

10   to adopt new laws that would reduce the prison

11   population and also working with the Rhode Island parole

12   board to adopt new criteria for release that would

13   reduce the prison population.

14       Q    With respect to Arizona, how long has your

15   current assignment for Arizona been going on?

16       A    Approximately two years.  That work has

17   entailed working with the state legislature, the

18   governor's office and then Department of Corrections to

19   identify new laws and policies that would reduce their

20   prison population.

21       Q    And Louisiana, how long has your current

22   assignment with Louisiana been going on for?

23       A    Approximately five years.

24       Q    And what is your current assignment?

25       A    Current assignment is -- is evaluating the

1    impact of new laws and policies that were adopted by the

2    state legislature and the governor approximately two

3    years ago that were designed to lower the prison

4    population.

5         Q    With respect to any of these six states that

6    we just talked about, are any of the states -- all of

7    them, it sounds like, are attempting to reduce their

8    prison populations; is that correct?

9         A    Either reduce the prison population or stop

10   the growth.

11        Q    Okay.

12        A    One of those two things.  It depends on the

13   state.

14        Q    Are any of the six states doing that in

15   response to some type of a lawsuit, to your knowledge?

16   Just the six ones we've been talking about.

17        A    Right, right.  I'm just trying to recall.

18             No.

19        Q    With respect to any of those six states, did

20   you have an understanding of what's motivated those

21   states to attempt to reduce or, sounds like, stabilize

22   their prison population?

23             MS. EVENSON:  Objection.  Lacks foundation.

24             MS. JOHNSON:  I think I asked him if he knows.

25             THE WITNESS:  Do I know?

1    BY MS. JOHNSON:

2        Q    Yeah, do you know what motivated them?  If you

3    don't, "no" is a perfectly fine answer.  I'm just trying

4    to get the foundation if you might know.

5        A    I can just tell you in general terms, you

6    know, it varies from state to state, but the basic

7    reasons would be budget issues, concerns about equity

8    and fairness in their sentencing laws, and a desire to

9    reduce crime rates, improve public safety and to reduce

10   recidivism rates.  Those are kind of like the general

11   themes that come up in those states, from time to time.

12       Q    Are you aware of any specific event in

13   connection with any of these six states that spurred

14   that particular state to implement new measures with

15   respect to prison population policies?

16       A    No.

17       Q    Okay.  So, how long did you work for

18   Connecticut on your last assignment for it?

19       A    Well, to further explain, most of these states

20   or some of these states are part of a national program

21   that's sponsored by the U.S. Department of Justice and

22   several foundations.  It's orchestrated by the Council

23   of State Governments, which is a state legislative

24   membership group, and they've created a -- a program

25   called justice reinvestment, and states are invited to

Case 2:90-cv-00520-KJM-SCR   Document 3242-2   Filed 10/30/08   Page 8 of 92

Page 15

1  participate in that program.  And the Council of State

2  Government hires my firm to go into each state and

3  evaluate the prison population, what's causing it to go

4  up and down, analyze, you know, recidivism rates, things

5  like that.  And then the recommendations come forward,

6  basically, from that analysis and also based on the

7  interest of the legislature and the governor's office.

8       So my point is that I'm working for the

9  Council of State Government in most of these states, not

10  all, but most of these states, and they have me come and

11  go as they see fit in that state.

12       Q    I see.

13       A    So, on Connecticut, we did the analysis, and

14  the work was done.  So I'm no longer actively involved

15  in that state, but I might get called in again because

16  they're still participating -- they're a participant

17  state in this larger program.

18       Q    Okay.  With respect to the last assignment

19  that you did for Connecticut now have been completed,

20  how long did that last?

21       A    It lasted approximately 12 months.

22       Q    And what was the purpose of that assignment?

23       A    Purpose was to do an assessment of the

24  correctional system: looking at admissions and releases,

25  crime rate data, evaluating sentencing practices.

f1716972-181b-4fba-a74f-b616a3f1d987

1    Basically, a complete -- I'd called checkup of their

2    correctional practices in the system, and we do a lot of

3    analysis, and then we present the data back to the

4    policy makers, and then they start developing policy

5    recommendations based on the analysis.

6         Q    With Pennsylvania, was your assignment that

7    ended sometime after November 2007 related to this

8    justice reinvestment program?

9         A    Pennsylvania -- my work in Pennsylvania was

10   not tied to that program.

11        Q    It was not, okay.

12        A    [Nodding.]  That's in a state that was not --

13   Council of State Government is involved in that state,

14   but I'm not part of that work.

15        Q    So, your last assignment in Pennsylvania, how

16   long did that last?

17        A    That lasted approximately two years, I

18   believe, and it ended -- let me see.  Probably ended, I

19   think, about March or April of this year.

20        Q    And what were you doing for Pennsylvania?

21        A    I was reevaluating their parole guidelines and

22   risk instruments.

23        Q    Anything else?

24        A    No.

25        Q    With respect to Connecticut, is there any

Case 2:90-cv-00520-KJM-SCR    Document 3242-2    Filed 10/30/08    Page 10 of 92
September 19, 2008

1    particular event that occurred, to your knowledge, that

2    caused Connecticut to be interested in getting a checkup

3    on its correctional practices and systems?

4        A    No.

5        Q    With respect to Pennsylvania, is there any

6    particular event that occurred, to your knowledge, that

7    motivated it to have you reevaluate the parole

8    guidelines and risk instruments?

9        A    No.

10       Q    So, to your knowledge, neither of those states

11   was involved in a lawsuit that caused you to -- that

12   caused them to want to hire you?

13       A    To my knowledge, there may be lawsuits going

14   on, but it wasn't the cause of me being involved.

15       Q    Okay.  Of the six states (Maryland, Nevada,

16   Texas, Rhode Island, Arizona and Louisiana), which, if

17   any, of those were involved in this government -- I'm

18   sorry, the justice reinvestment program?

19       A    Could you just give them again and --

20       Q    Sure.

21       A    -- and I'll give them to you?

22       Q    Maryland?

23       A    No.

24       Q    Nevada?

25       A    Yes.

f1716972-181b-4fba-a74f-b616a3f1d987

1       Q    Texas?

2       A    Texas, yes, but I'm not involved.

3       Q    So your involvement in Texas was not part of

4   the justice reinvestment program?

5       A    Correct.

6       Q    Okay.  Rhode Island?

7       A    Yes.

8       Q    Arizona?

9       A    Yes.

10      Q    And Louisiana?

11      A    Louisiana initially, yes, but currently, no.

12      Q    And, let's see, the other states you said

13  you're now working for, let's start with Mississippi.

14  How long have you been working for Mississippi?

15      A    I've been working in Mississippi -- let me

16  clarify.  My firm has been working in Mississippi for

17  several years, but on this issue of prison population

18  reductions, approximately -- I'd say approximately 12 to

19  18 months, something like that.

20      Q    And is that part of the justice reinvestment

21  program?

22      A    No.

23      Q    And what's your current assignment in

24  Mississippi?

25      A    Prison population reduction --

1    Q    Yes.

2    A    -- is to work with the parole board to put in

3    place a risk instrument.  They recently passed

4    legislation that accelerated significantly the inmates

5    that are eligible for parole, so they need a risk

6    instrument to assess these candidates before they

7    consider their release.

8    Q    And, to your knowledge, was there a particular

9    event that motivated Mississippi to accelerate the

10   number of offenders eligible for parole?

11   A    Not that I'm specifically aware of.  I -- I

12   know it had to do in part because of budget issues and

13   the population projection, which showed it's going to

14   keep on increasing.

15        Can I add, in Mississippi, there is a lawsuit

16   or a settlement that I'm involved in, but it's not part

17   of the population reduction effort.

18   Q    What is the lawsuit that you're involved in

19   Mississippi?

20   A    I don't know the name of it, but it was a --

21   it involves -- the Plaintiffs' attorneys are the ACLU

22   and Hollands Knight, and it's a long -- I don't know all

23   the details of the lawsuit, but it's been going on for

24   quite a while, and they reached a settlement, and part

25   of the settlement was to bring in two correctional

1    experts to help them depopulate their -- what they call

2    their supermax facility.  So I was one of the two

3    consultants that were hired -- both parties had to agree

4    to this (the state and the Plaintiffs).  So, I didn't

5    want to mislead you.  There's litigation there, but it's

6    not related, you know, to the other matter I'm doing in

7    Mississippi.

8        Q    What's a supermax facility?

9        A    Be like Pelican Bay, California.  Does that

10   help?  I'm --

11       Q    Sure.  I mean -- now, when you say depopulate

12   it, do you mean shut it down or just reduce its

13   population?

14       A    Reduce its population.

15       Q    Okay, with respect to Michigan, how long have

16   you been working on your current assignment in Michigan?

17       A    Michigan's work began maybe the very latter

18   part of 2007.  Most of the work has been in this year.

19       Q    And what are you doing for Michigan?

20       A    Similar to the other states.  They send us a

21   lot of information about prison admissions, prison

22   releases, probation, parole.  We put together a report

23   that summarizes all this information and present it to

24   the governor's office and the legislature, and so they

25   had done -- they received that report, and now they're

¹    moving ahead with some specific recommendations that

²    would help effect their prison population.  I also

³    received a new contract with the Department of

⁴    Corrections to evaluate their boot camp program, which

⁵    is separate somewhat from the Council of State

⁶    Governments' work in Michigan.

⁷         Q    So the work you're doing in Michigan regarding

⁸    population analysis and recommendations is part of the

⁹    justice reinvestment --

¹⁰        A    Correct.

¹¹        Q    -- program?

¹²             Okay, you are also working for Ohio.

¹³        A    Yes.

¹⁴        Q    How long have you been working on your current

¹⁵    assignment for Ohio?

¹⁶        A    I have two assignments in Ohio.  One is in the

¹⁷    juvenile area.  It's unrelated to prison populations,

¹⁸    but just to give you full disclosure, it's a settlement

¹⁹    agreement to implement changes in the juvenile

²⁰    correctional system.  They were putting in place a

²¹    classification risk assessment system, and Plaintiffs

²²    and the state wanted an objective assessment of that

²³    system before it went forward.  So, I was under contract

²⁴    with -- am under contract with Ohio to do that work.

²⁵             And the other assignment, which is part of the

Case 2:90-cv-00520-KJM-SCR    Document 3242-2    Filed 10/30/08    Page 15 of 92

1    Council of State Governments' work, that has just begun.

2    The legislature has sent a request to Council of State

3    Government to participate in this program, and our

4    initial site visit will be on October 9th in Columbus,

5    Ohio, to begin that work.

6        Q    So Ohio was also part of the justice

7    reinvestment program?

8        A    Yes.

9        Q    Okay.  And District of Columbia.

10       A    Yes.

11       Q    What are you doing for the District of

12   Columbia?  Well, how long have you been working for it

13   in your current assignment?

14       A    My current assignment, I've been working for

15   the District of Columbia since 2007.  But the related

16   partner is the U.S. Parole Commission.

17       Q    Okay.

18       A    And I've been working with them about the same

19   time.  The focus of that work was to evaluate their risk

20   instrument that they used to determine suitability for

21   parole.  I completed that.  We made recommendations to

22   change that instrument.  So we're now in the process of

23   redesigning that instrument and getting that

24   implemented.

25            We're also in the process of developing

1    criteria for determining when a parole violator should

2    be revoked and returned to the bureau prisons and, if

3    they are revoked, how long they'll spend in custody

4    before they get released.

5         Q    Do you know if there is any particular event

6    that motivated DC to work with U.S. Parole Commission on

7    these issues?

8         A    No.

9         Q    Have you ever worked as a consultant or an

10   expert in any other lawsuit involving prison condition

11   issues?

12        A    Yes.

13        Q    Okay.  What lawsuits?  Are those listed in

14   your CV?

15        A    I believe so.

16        Q    My copy doesn't actually have the CV on it.

17             MS. EVENSON:   The CV is attached to the

18   original that we served.

19             MS. JOHNSON:   Hm.  I don't know what happened

20   to that.  Did you guys reattach it in any of your later

21   reports?

22             MS. EVENSON:   No.

23             MS. JOHNSON:   Hm.  That's very interesting.

24   I'll deal with that on a break sometime.

25        Q    (By Ms. Johnson)   Do you know if any of the

```
 1   paragraph 15, you've been retained as an expert in
 2   prison administration.  Do you see that?
 3        A    Yes.
 4        Q    Have you ever been a prison administrator?
 5        A    No.
 6        Q    You also state that you've been retained as an
 7   expert in the impact of overcrowding on prisoners'
 8   medical care.  Do you see that?
 9        A    Yes.
10        Q    Do you have any medical training, education or
11   experience?
12        A    No.
13             MS. EVENSON:  Objection.  Compound.
14   BY MS. JOHNSON:
15        Q    Do you have any experience in health care
16   management or systems of any sort?
17             MS. EVENSON:  Objection.  Compound.
18             THE WITNESS:  What do you mean by systems of
19   any sort?
20   BY MS. JOHNSON:
21        Q    Health care systems.  Do you have any
22   experience in the operation of any health care systems?
23             MS. EVENSON:  Objection.  Vague.
24             THE WITNESS:  Well, I have experience in terms
25   of looking at the reception centers.
```

Case 2:90-cv-00520-KJM-SCR   Document 3242-2   Filed 10/30/08   Page 18 of 92

1           MS. JOHNSON:   Okay.

2           THE WITNESS:   And how inmates are processed

3    and what kinds of procedures need to be completed, and

4    that does get into the area of medical and mental health

5    procedures that need to be in place.

6    BY MS. JOHNSON:

7       Q   Can you explain to me how the work involving

8    reception centers gets into medical and mental health

9    procedures?

10          MS. EVENSON:   Objection.   Vague.

11          THE WITNESS:   When an inmate is admitted to a

12   correctional center, they are expected to undergo some

13   level of medical and mental health care screening in a

14   timely manner.   We look at issues about how long they're

15   spending in those reception centers and the extent to

16   which, you know, that is interfering with either the

17   screening or the delivery of those services.

18   BY MS. JOHNSON:

19      Q   When you say you look at that, as a

20   consultant, I'm assuming, or --

21      A   Well, yeah, let me also clarify, which you

22   haven't raised, but I've also been a special monitor in

23   two juvenile systems, which would be the state of

24   Georgia and the state of Louisiana.   And part of my work

25   there was reviewing compliance with medical and mental

1    health care requirements.

2        Q    Okay, when were you a special monitor for the

3    juvenile system in Georgia?

4        A    It's in my résumé, so I don't have the exact

5    time period, but it was in, I believe, the -- maybe 1996

6    to about the year 2000.  I'm just estimating.

7        Q    And you were special monitor appointed by a

8    court, I'm assuming?

9        A    No.

10       Q    No.

11       A    It was a memorandum agreement between the U.S.

12   Department of Justice civil rights division and the

13   state of Georgia, and then both parties hired myself and

14   another gentleman to serve as the monitors/masters of

15   that MOA.

16       Q    So in the issues that particularly involved --

17   strike that.

18            The issues that were particularly addressed by

19   that memorandum of agreement related to medical and

20   mental health care?

21            MS. EVENSON:  Objection.  Vague.

22            THE WITNESS:  I'm sorry.

23   BY MS. JOHNSON:

24       Q    You said this memorandum of agreement between

25   the U.S. Department of Justice and the state of Georgia

1  under which you were selected as a special monitor, I'm

2  trying to find out if that memorandum of agreement

3  specifically addressed issues of medical and mental

4  health care in that juvenile system.

5      A    Yes, it does.

6      Q    Were there any other issues involved in that

7  memorandum of agreement besides medical and mental

8  health care?

9      A    Yes.

10     Q    What were those issues?

11     A    Education, protection from harm, quality

12  assurance, medical/mental health, I think those are the

13  primary ones.  There may have been some others, but

14  those are the major ones.

15     Q    Did you work on those other issues, as well,

16  or just the medical and mental health care side?

17     A    I oversaw the whole MOA.

18     Q    Okay, with respect to the Louisiana juvenile

19  justice system, can you estimate for me approximately

20  when you worked as a special monitor for that system?

21     A    That would be approximately, just estimating,

22  2001 or -2 to about 2004 or -5.

23     Q    And how did you become a special monitor for

24  the Louisiana juvenile justice system during those

25  years?

Case 2:90-cv-00520-KJM-SCR    Document 3242-2    Filed 10/30/08    Page 21 of 92

1    Q    Well, I'm going for broadest definition.  I'm

2    trying to get your best understanding of any work that

3    you've done in connection with a correction system that

4    relates to medical and mental health care or medical

5    or --

6    A    That's --

7    Q    -- mental health care.

8    A    That's a lot.

9    Q    That's a lot?

10    A    That's a lot.

11    Q    Okay.  Can you be more specific?

12    A    Well, I basically have designed and

13    implemented most of the state prison classification

14    systems and many of the large jail systems, and all of

15    those systems have medical and mental health screening

16    components that are built into it.  So, in the broadest

17    definition, I've been, you know, involved in that kind

18    of enterprise, you know, in a lot of places over a long

19    period of time.

20    Q    Other than screening as part of the

21    classification system and other than the work as a

22    special monitor in Georgia and Louisiana for their

23    juvenile systems, have you done any other work that

24    relates to medical and mental health care in prisons?

25    A    I would say no.

Case 2:90-cv-00520-KJM-SCR   Document 3242-2   Filed 10/30/08   Page 23 of 93   September 19, 2008

1   you have some opinion about what those inadequacies

2   themselves are.

3          MS. EVENSON:  Why don't you ask him about what

4   he's actually opined about.

5          MS. JOHNSON:  I am asking him about what he's

6   opined about, and I'm entitled to ask him the questions

7   I want to ask him, not the questions you want me to ask

8   him.

9          THE WITNESS:  Well, in the report -- let me

10  try and do it this way:  In the report, I list several

11  things that crowding is producing that's related to the

12  delivery of adequate medical and mental health care.

13  BY MS. JOHNSON:

14       Q    Can you tell me what those are?

15       A    Significant delays in processing and

16  classifying prisoners, excessive interfacility

17  transfers, lack of access to mental health and medical

18  treatment programs, mis-housing of inmates, serious

19  incidents in safety, inability to conduct valid

20  individual needs and risk assessment.  Seven, really, is

21  not direct -- seven has to do with the failure of the

22  work incentive program.

23       Q    Are there other inadequacies in the prison

24  medical care system in California that aren't related to

25  overcrowding?

1      THE WITNESS:  I'm answering your question.

2  You shouldn't interrupt me either.

3      I'm saying I don't know if he ever stated

4  that.  Without looking at the documents.

5  BY MS. JOHNSON:

6      Q    Were there any factors related to the

7  deficiencies in medical care in California's prisons

8  that you were directed not to consider by Plaintiffs'

9  counsel?

10      MS. EVENSON:  Objection.  Vague and ambiguous.

11      THE WITNESS:  My opinion is that the

12  California prison system is so overcrowded that it

13  cannot manage any kind of medical and mental health care

14  system or other functions of a -- of a prison system,

15  and until that crowding is reduced, which is the primary

16  cause of all these deficiencies, you will not be able

17  to, you know, solve the problems that have been

18  identified by the courts, by the Receiver, by the

19  monitors.  So that's my testimony.  That's what you have

20  to do; you have to reduce the crowding.  The crowding is

21  so severe, it's impacting all aspects of the operations

22  of the prison system.

23  BY MS. JOHNSON:

24      Q    That was clear that that was your opinion in

25  the report, but that's completely not responsive to my

1    believe it's significant?

2         MS. EVENSON:  Objection.  Mischaracterizes

3    testimony.  Lacks foundation.  Argumentative.

4         THE WITNESS:  No.  What I -- what I'm saying

5    is that overcrowding -- I mean, that's all I say is that

6    the crowding conditions to me are the number-one primary

7    major cause in the lack of adequate provision of medical

8    and mental health services.

9    BY MS. JOHNSON:

10        Q    Well, in reaching that conclusion, did you

11   make a comprehensive list of what all the deficiencies

12   were and then attempt to assign causes to all of each of

13   those deficiencies?

14        A    In my intellectual process, I look at

15   everything, yes, and I rate them, and I make an -- an

16   opinion --

17        Q    Okay.

18        A    -- you know, in terms of how they're affecting

19   the delivery of medical and mental health services.

20        Q    So what are all the deficiencies, in the

21   delivery of medical care in California's prisons, that

22   you considered in this intellectual process you just

23   described?

24        A    I guess I'm missing you, but they're here,

25   Section B.

1      Q    These are all of them; you didn't consider any

2    deficiencies other than the ones that are identified in

3    Section B?

4      A    Oh, I see.  These are the ones that I've

5    identified as the major things that crowding is causing,

6    which -- which affects the delivery of adequate medical

7    and mental health services.  I guess are you asking, are

8    there -- anything else I looked at or considered?

9      Q    That's correct.

10     A    I'm sure I did.  In reading all the reports,

11   you know, I'm sure I looked at a lot of things that were

12   being stated.

13     Q    Can you identify to me today all of the

14   deficiencies in medical care in California's prisons

15   that you considered when attempting to determine whether

16   overcrowding was the primary cause of the

17   constitutionally adequate care overall?

18     A    No, I can't tell you today without looking at

19   all the documents that I reviewed.

20     Q    So, in reaching the conclusion that

21   overcrowding was the primary cause of the -- the

22   unconstitutional opinions conditions for the Plata class

23   members, you did not make an exhaustive list of what you

24   thought all the deficiencies in medical care were and

25   attempt to assign some type of cause to each of those

1  deficiencies; is that correct?

2            MS. EVENSON:  Objection.  Vague and ambiguous.

3            THE WITNESS:  The way you're phrasing it,

4  it -- it is not accurate.  So I can't -- it's hard for

5  me to respond to your question.  Did I list -- put a

6  list of all the factors and then assign a weight to

7  them?

8            MS. JOHNSON:  Yes.

9            THE WITNESS:  Okay.  I don't think I put

10 weights on them, but I just listed the ones that I

11 thought were the most important ones.

12 BY MS. JOHNSON:

13     Q     And how did you come to the conclusion that

14 those were the most important ones if you didn't put a

15 weight on them?

16     A     Well, that's based on my opinion and my

17 experience in working with other states and the work

18 that I do.  People ask me all the time, you know, "What

19 do you think are the most important things here?"  And

20 that's what I do for a living.  You know, people ask me

21 to do that.  I do that.  That's what I did here.

22     Q     Well, sometimes you actually do statistical

23 analyses as well, correct?

24     A     Mm-hm.  Yes.

25     Q     But you didn't do any form of statistical or

1    empirical analysis here, correct?

2         MS. EVENSON:  Objection.  Vague as to "here."

3    There are three reports.

4         MS. JOHNSON:  Well, we're only talking about

5    the first report, so we can clear that up.

6         Q    (By Ms. Johnson)  And, with respect to your

7    opinion regarding whether overcrowding is the primary

8    cause of the unconstitutional conditions for the Plata

9    class members, you did not do any statistical or

10   empirical analysis; is that correct?

11        A    No, that's not correct.

12        Q    Okay.  What statistical or empirical analysis

13   did you do to determine that overcrowding is the primary

14   cause of the unconstitutional conditions for Plata class

15   members?

16        A    Well, what I was looking at, in these various

17   reports, there's a lot of documentation that's

18   statistical in nature about the state's ability to meet

19   the requirements set forth in the agreements.  So

20   there's bunch of statistical analysis there, so I'm

21   looking at that data.  Did I do any statistical analysis

22   myself?  No.  I was reviewing other people's analysis.

23        Q    Who's people -- what analysis -- specific data

24   analysis did you review --

25        A    It's --

Case 2:90-cv-00520-KJM-SCR   Document 3242-2   Filed 10/30/08   Page 28 of 92

September 19, 2008

1    wasn't available from the Department of Corrections or

2    from other documents.  In order to reach my conclusions

3    in the other documents, I had to perform analysis that

4    had never been done.

5         Q    And what statistical analyses had been done

6    regarding whether overcrowding is the primary cause of

7    the unconstitutional conditions facing the Plata class

8    members?

9         A    Well, I can give you some examples, but, you

10   know, there was examples of proportion of cases where

11   services were not being provided, screenings, delays in

12   screening.  There was a number of statistical reports

13   that are in the various progress reports that present

14   measures of whether or not the state's in compliance

15   with Plata and Coleman.  And so those that's -- those

16   are data that's in those reports, and again if I had the

17   reports, I could go by and show you this is the report,

18   this is the data, et cetera.

19        Q    Well, what the --

20        A    But I'm not doing that analysis.  That's being

21   done by other people, and they're presenting it in

22   reports.

23        Q    And that has to do with the deficiencies in

24   providing care itself, correct?  There's data about

25   whether care is being provided correctly.

303

REPORTER'S CERTIFICATION

1
2
3       I, Quyen N. Do, Certified Shorthand Reporter, in
4   and for the State of California, do hereby certify:
5
6       That the foregoing witness was by me duly sworn;
7   that the deposition was then taken before me at the time
8   and place herein set forth; that the testimony and
9   proceedings were reported stenographically by me and
10  later transcribed into typewriting under my direction;
11  that the foregoing is a true record of the testimony and
12  proceedings taken at that time.
13          IN WITNESS WHEREOF, I have subscribed my name
14  this 26th day of September 2008.
15
16
17          /s/ Quyen M. Do
            Quyen N. Do, RPR, CSR No. 12447
18
19
20
21
22
23
24
25

PAULSON

REPORTING & LITIGATION SERVICES, LLC

www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104

# EXHIBIT H

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT

OF CALIFORNIA

\* \* \* \* \* \* \* \*

RALPH COLEMAN,          \*

et al.,                 \*

    Plaintiffs     \*   Case No.

      vs.         \*   Civ S90-0520-

ARNOLD                  \*   LKK-JFM-P

SCHWARZENEGGER,         \*

et al.,                 \*

    Defendants      \*

        \* \* \* \* \* \* \* \*

DEPOSITION OF

JEFFREY BEARD, Ph.D.

September 26, 2008

Any reproduction of this transcript

is prohibited without authorization

by the certifying agency.

a0246461-06f4-4276-8d8f-ecb99736a1f6

```
 1         P R O C E E D I N G S
 2    ------------------------------------
 3    JEFFREY BEARD, Ph.D., HAVING BEEN
 4    DULY SWORN, TESTIFIED AS FOLLOWS:
 5    ------------------------------------
 6    EXAMINATION
 7    BY ATTORNEY SPECTER:
 8    Q. Please state your name and
 9    spell your last name.
10    A. Jeffrey A. Beard, B-E-A-R-D.
11    Q. And you are a --- you have a
12    doctorate in psychology, do you not?
13    A. Actually I have a Ph.D. in
14    counseling from Penn State
15    University that I got in 1980.
16    Q. Right.  Okay.  And you are
17    currently the Secretary of the
18    Pennsylvania Department of
19    Corrections?
20    A. That's correct.
21    Q. And you've had that position
22    for how long?
23    A. Well, I took over on an acting
24    basis in December of 2000 and it
25    was --- and I was confirmed by the
```

1    Senate in February of 2001.  And then

2    when Governor Rendell came in I was

3    reconfirmed by the Senate in February

4    of 2003.  And so I've been in for

5    what, just about --- coming up on

6    eight years.

7    Q. And prior to that time you

8    spent your whole career in the

9    Pennsylvania Department of

10   Corrections?

11   A. Yes.  I started as a

12   corrections counselor, actually

13   working as a psychologist, but my

14   title was a corrections counselor,

15   back in July of 1972 at one our

16   facilities here in Pennsylvania and

17   worked my way up through the system

18   to a deputy superintendent.  I was a

19   superintendent in two facilities,

20   including the one here at Camp Hill

21   and then eventually came up in the

22   central office and into the current

23   position I hold today.

24   Q. So you're run a couple of

25   prisons and you run the whole system

1    now?

2    A. Yes.  I ran the State

3    Correctional Institution at Cresson.

4    I opened that in 1986 and was there

5    for about four years.  And then after

6    we had two very bad riots here at the

7    Camp Hill prison I was reassigned to

8    this prison and had to put this

9    prison basically back together.  And

10    I ran this prison for about three and

11    a half years until I became a

12    regional deputy commissioner.  I did

13    that for about three years and then I

14    became the Executive Deputy

15    Secretary, is what we called it at

16    that time, and then became the

17    Secretary of Corrections and am now

18    responsible for all 27 facilities in

19    our community correction system.

20    Q. Okay.  And I'm supposed to ask

21    you before I did all this other

22    stuff, whether you've had your

23    deposition taken before so you

24    know --- so you're familiar with the

25    procedure.

1   Q. So how many prisons are there

2   in Pennsylvania?

3   A. There are 27 prisons ---

4   correctional institutions and a boot

5   camp.

6   Q. And how many prisoners are

7   there?

8   A. We're approaching 47,000.

9   We're a few hundred short of 47,000

10   inmates.

11   Q. And does Pennsylvania have a

12   parole system?

13   A. Yes, we do.

14   Q. And so how many prisoners are

15   on --- or how many people are on

16   parole?

17   A. There's probably about 30-some

18   thousand at any given time on parole

19   in Pennsylvania.  But I will point

20   out that parole in Pennsylvania is

21   separate from corrections, so it's a

22   separate agency.

23   Q. I see.

24   A. The Board actually runs the

25   supervision and the agents, so once

1       out on parole, parole re-administers

2       that LSIR every six months.

3       Q. I see.

4       A. Because there are some dynamic

5       elements in the LSIR and particularly

6       when people are out in the community

7       you can get shifts in those risk

8       things and obviously you're hoping

9       that they look better over time.

10      Q. Right.  Right.  And so does

11      that risk assessment factor into the

12      decision-making process if they're

13      charged with a parole violation?

14      A. Absolutely.  Our parole system

15      has a matrix that they use that is

16      based on the type of violation as

17      well as the risk level.

18      Q. And in your opinion has that

19      risk assessment matrix --- well, the

20      matrix involves a set of graduated

21      sanctions?

22      A. Yes.

23      Q. Right.  So you try to match

24      the ---?

25      A. Well, Parole does.

1        And then that should accelerate any

2        things that they do to help reduce

3        the population.

4     But you know, you're

5        really --- I can't see California

6        getting anything positive out of

7        programs as far as recidivism

8        reduction that would affect

9        population until you're out at least

10        five, six years.  You might start

11        starting to some of the thing and you

12        wouldn't fully get it in place, I

13        don't believe, for probably eight

14        years or more.

15     Q. And the five or six years,

16        given the size of the Department of

17        Corrections and the fact that they

18        would have to pilot some programs in

19        the first place is relatively

20        optimistic it seems to me.  Do you

21        agree?

22     A. Well, I think --- it could be.

23        I mean, like I said, I think if you

24        really wanted to do it you could

25        start seeing some impact in five or

1    six years.  You wouldn't see your

2    full impact ---

3    Q. Right.

4    A. --- until you had everything

5    implemented.

6    Q. Right.  Right.

7    A. And it would be a graduated

8    thing, but you might start seeing

9    some minor impact in five or six

10    years.

11    Q. Okay.

12    A. But again, even doing the best

13    programs, I mean, you're not going to

14    eliminate recidivism.

15    Q. Right.

16    A. You know, you're going to get

17    a certain percentage reduction, five

18    percent, ten percent, and that's

19    going to have --- that's going to

20    really help.  But it in and of itself

21    isn't going to solve the problem

22    either.

23    Q. Right.

24    A. And it's the chicken or the

25    egg kind of thing.  I mean, it's

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    like, how do you start getting the

2    impact from this when you can't start

3    this?

4    Q. Right.

5    A. You know, I mean, that's the

6    dilemma that they're in.  You know,

7    somewhere they have to get to the

8    point where they get that population

9    down, deal with the safety issues so

10   they can really begin rolling these

11   things out.

12   Q. So your --- the expert panel

13   made recommendations on how to reduce

14   overcrowding.  Do you recall those

15   recommendations?

16   A. There were some

17   recommendations in the expert panel.

18   The basic way that you deal with a

19   crowding problem in a system is

20   either through construction of new

21   facilities or through somehow

22   reducing your population.

23   Q. Right.

24   A. The problem with construction

25   is it takes so long to get facilities

1    A. So I think --- you know, I
2    would have preferred in AB-900 to see
3    new prisons being built of between
4    2,000 and 3,000 inmates in size ---
5    Q. Right.
6    A. --- rather than this infill
7    beds, because that is not going to
8    deal with the safety problems and the
9    severe overcrowding problems they
10   have.
11   Q. It also has --- would you
12   agree that it also has an effect, for
13   example, on health care services
14   because you still need ---?
15   A. Everything is affected when
16   you have a --- when you overcrowd the
17   infrastructure in a facility.
18   Q. Right.
19   A. Everything from feeding
20   inmates, to being able to do programs
21   with inmates, to being able to
22   provide health care to inmates, to
23   being able to identify and properly
24   treat mentally ill inmates, all of
25   those things are impacted if the

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    infrastructure of the institution is

2    inadequate to handle ---

3    Q. Right.

4    A. --- the situation.  So yes.  I

5    mean, obviously they would be

6    affected along with everything else.

7  I mean, one of the things I

8    was surprised, when I go out to the

9    one prison I visited, I see inmates

10   carrying around bagged lunches.  And

11   I said, oh, you let them carry bagged

12   lunches to the education program

13   here?  And he said, oh, no, they all

14   get bagged lunches in the morning.  I

15   said, well, you don't feed them three

16   meals a day?  Well, we can't do that.

17   We don't have the ability.  We can

18   only feed them twice and we have to

19   give them bagged lunches.  That's an

20   example of the facility not having

21   the infrastructure.  They can't feed

22   their inmates ---

23   Q. Right.

24   A. --- the way most prisons do.

25   So you know, that's ---.  So anyway,

1        the infill beds I think is a

2        defective plan.

3      The other thing is re-entry

4        beds.

5        Q. Right.

6        A. That's --- I think they're

7        great.  I think these small 500-man

8        reentry facilities are nice things.

9        The problem is that most of those

10       facilities need to be built near the

11       major metropolitan centers because

12       that's where most of the inmates are

13       going back to.

14       Q. Right.

15       A. And from my experience in

16       Pennsylvania, and I don't know why it

17       would be any different in California,

18       when you try to site ---

19       Q. Right.

20       A. --- correctional facilities

21       near metropolitan centers, they don't

22       want you.

23       Q. Right.

24       A. And so you have huge siting

25       issues.  Example here in Pennsylvania

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    is we had a facility, SCI-Fayette,

2    which we built a few years ago, it

3    was supposed to be a replacement for

4    the prison at Pittsburgh.  Pittsburgh

5    is one of our major metropolitan

6    areas.  So we looked within --- like

7    we wanted to put a prison within

8    about 20 miles --- you know, really

9    ten miles of the current prison.  We

10   found a lot of nice sites.

11   Q. Right.

12   A. We got run out of town.  No.

13   We're too near a school.  We're too

14   near this.  We're too near that.  We

15   weren't able to do it.  We ended up

16   building that prison over 50 miles

17   away in another county, a rural

18   county that was really depressed and

19   wanted us.

20   Q. Right.

21   A. But it wasn't where we wanted

22   to put it.

23   Q. Right.

24   A. And it caused a lot of --- and

25   I suspect that California would have

1      a lot of problems with that.

2    Two other problems with the

3      construction is, number one, I've

4      seen a lot in the various reports

5      from the Receiver and the Special

6      Master and some of these experts and

7      stuff, and we saw it in the expert

8      panel, that there's staffing issues.

9      I mean, there's staffing issues in

10     current institutions.  You can't

11     staff them.  So okay, so we build a

12     whole bunch more institutions.  Who

13     are we going to run them with ---

14     Q. Right.

15     A. --- if you're understaffed and

16     you can't possibly staff them?  So

17     that's another problem with

18     construction.

19   And then the final thing is

20     that I don't see any focus on the

21     existing infrastructure.  So even if

22     you build enough beds today to

23     supposedly deal with your deficit

24     that you have today, I've seen in

25     some of the expert reports, Wayne

1       Scott's report particularly, about

2       the decay in infrastructure in San

3       Quentin and some of these other older

4       facilities.  You know, I'm not sure

5       that, you know, that's being focused

6       on.  And really, how many inmates can

7       those facilities even hold, you know.

8       Q. Right.

9       A. So that's why while you can

10      certainly do some construction to do

11      it, you have to focus on --- I'm

12      getting to your question here.  You

13      have to focus on the second issue,

14      which is doing something to reduce

15      the population.

16      Q. Right.

17      A. Okay?

18      Q. Uh-huh (yes).

19      A. And that's something that can

20      be done quicker and can deal with

21      some of these other problems, the

22      staffing issues, and everything else

23      that we're talking about.  And if you

24      want to reduce the population, you

25      can do two things to reduce the

1      population.  And they were pointed

2      out, I believe, in the expert panel

3      report.  Number one, you can reduce

4      the people coming into the system.

5      Q. Right.

6      A. Or you can reduce the time

7      that the people in the system are

8      staying in the system.  Those are the

9      two ways to reduce your population.

10     Q. Right.

11     A. If you look at the first

12     thing, as we pointed out in the

13     expert panel report, I think we

14     focused on parol, and the huge amount

15     of technical parole violators that

16     are coming back into the system.  You

17     have some 70,000 violators that are

18     coming back without new charges.

19     Q. Right.

20     A. Because you have some 20-some

21     thousand that are coming with new

22     charges.

23     Q. Right.

24     A. So 50 percent of the

25     receptions into the system ---

1     Q. Right.

2     A. --- are these parole

3     violators.  It's the highest rate, I

4     think, around the country.

5     Q. Right.

6     A. It far exceeds our technical

7     rate, which we think is too high in

8     Pennsylvania, our own rate.

9     Q. Right.

10    A. And those people are only

11    coming back for four months.

12    Q. Right.

13    A. And then since you can't do

14    any programming with them, they just

15    turn in and they just chew up your

16    resources.

17    Q. Right.

18    A. So if you could find some way

19    through --- we talked about a matrix

20    and graduated sanctions ---

21    Q. Right.

22    A. --- and maybe using their

23    community corrections system like we

24    do to divert people into that rather

25    than back into the prisons.

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    Q. Right.

2    A. We thought --- I think in the

3    expert panel we talked about the

4    possibility of reducing the number by

5    maybe as much as 20,000 ---

6    Q. Right.

7    A. --- which would reduce the ---

8    since they stay for four days it

9    would reduce ---.

10    Q. Four months.

11    A. Four months, excuse me, for

12    four months, it would reduce the

13    length of stay --- I mean, it would

14    reduce the actual population between

15    six and nine thousand inmates or

16    somewhere in that range.

17    Q. Right.

18    A. You know, that would be one

19    way.  You're diverting those people

20    in the rear end.  And another huge

21    benefit you get from that ---

22    Q. Right.

23    A. --- is you also reduce the

24    receptions you're getting in.  I

25    mean, you get in 140,000 receptions,

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    which is like nine times what we get

2    here in Pennsylvania, nine or ten

3    times what we get in a year.

4    Q. And you're about a quarter of

5    the ---?

6    A. We're about 27 percent of

7    the --- our population's about 27

8    percent of the California population.

9    So it's about, what, close to a

10   third.

11   Q. Right.

12   A. But yet, they get ten times as

13   many receptions as we do.

14   Q. Right.

15   A. I mean, it's just a huge

16   number of people and it's no

17   wonder ---

18   Q. Right.

19   A. --- that they can't properly

20   identify, you know, mentally ill

21   people.  They can't properly identify

22   medical problems.  They can't

23   properly classify inmates, you know,

24   high, medium, low and get them

25   segregated and sorted right.  I mean,

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    it's huge to try to deal with those

2    numbers.

3  Well, you can imagine, if you

4    could reduce 20,000 from that

5    number ---

6    Q. Right.

7    A. ---  just by reducing your

8    technical parole violators, it would

9    make a huge difference in the

10   reception centers.

11   Q. Right.

12   A. So that's one area of

13   diversion.  The other area of

14   diversion would be on the front end.

15   And they get, I think, somewhere

16   around 16,000 inmates a year that are

17   less serious inmates.  They're not

18   strikers, lifers, sex offenders or

19   serious or violent offenders.

20   Q. Right.

21   A. There's about 16,000 of these,

22   you know, lower level offenders that

23   come into the system and spend less

24   than ten months ---

25   Q. Right.

1    A. --- or spend less than 12

2    months, less than a year.

3  Now, again, by the time they

4    come into these overcrowded

5    assessment centers or reception

6    centers, get assessed and then sent

7    out to a facility where they can't do

8    any programming ---

9    Q. Right.

10   A. --- all they're doing is

11   sitting in jail ---

12   Q. Right.

13   A. --- and nothing's happening to

14   them.  It's like the parole violators

15   on the back end.

16  The research is very, very

17   clear that just confining people

18   alone, confinement alone ---

19   Q. Right.

20   A. --- is not going to reduce

21   recidivism.  That if you want to

22   reduce recidivism, if you want to

23   make any impact, you have to deal

24   with what we call the criminogenic

25   factors that brought them to

1       prison.

2       Q. Right.

3       A. Those criminogenic factors are

4       like their anger issues, their

5       thinking issues, their substance

6       abuse issues.  Those are the

7       criminogenic factors.  If you don't

8       address those factors you're going to

9       go out and you're going to come back

10      again, which is why they have such a

11      huge recidivism rate out there.

12      Q. Right.

13      A. So the other thing they could

14      do is take that 16,000 --- and we

15      have a program here in Pennsylvania

16      called restrictive intermediate

17      punishment, where we will pay

18      counties so that they can take people

19      who would have normally come to us in

20      the state and put them into treatment

21      programs in the community.

22      Q. I see.

23      A. It has been an effective

24      program.  It's much cheaper ---

25      Q. Right.

1    A. --- than putting them in
2    prison.  I think --- it's like --- it
3    cost between $10,000 and $15,000
4    whereas if you put them in our prison
5    it's going to be $32,000.
6    Q. Wow.  And would you say
7    they're easier to get started or they
8    can get started quicker than an
9    overcrowded prison?
10   A. Well, what happened is the
11   county would take them and instead of
12   sending them to the overcrowded
13   prison where nothing happens to
14   them ---
15   Q. Right.
16   A. --- they would take them and
17   put them into a substance abuse
18   program or some program out there
19   that then the state reimburses them,
20   which is what we do.  I mean, that's
21   what we do.
22   Q. Right.
23   A. So I think there's a
24   number --- now, that whole 16,000
25   can't be diverted, but let's say you

1    diverted 8,000.

2    Q. Right.

3    A. Okay?  That's another 8,000

4    that's not coming into your reception

5    center ---

6    Q. Right.

7    A. --- on top of the ones from

8    the back end that you've diverted ---

9    Q. Right.

10   A. --- and you've now reduced

11   your population by almost 8,000

12   inmates.

13   Q. Right.

14   A. So right there by diverting

15   those people, you're not hurting

16   public safety.  You're helping public

17   safety ---

18   Q. Right.

19   A. --- because you're seeing that

20   these people are getting the programs

21   that they need and you're not also

22   then overburdening your system.

23   Q. Right.

24   A. So in my mind it's like it's a

25   no-brainer.

1    Q. Right.

2    A. That, you know, it's something

3    that --- you know, if they did that

4    they could start getting on the road

5    and probably between those two

6    initiatives could lower their

7    population over the course of three

8    years or so between 15,000 and 20,000

9    inmates ---

10    Q. Right.

11    A. --- and reduce their

12    receptions by close to 30,000.

13    Q. Right.

14    A. Now, that would get them well

15    on the way to closing the gap that

16    they need to close.  I mean, you have

17    to decide what level you want to

18    bring the system down to.

19    Q. Right.

20    A. You know, I think I looked

21    just recently on their web site and

22    they're just under 200 percent.

23    Q. Right.

24    A. Well, it had been over 200

25    percent.

1        people coming into the system.

2        Q. Right.

3        A. The other thing that could be

4        done that I don't think would hurt

5        pubic safety at all, that was

6        mentioned in the expert panel

7        report ---

8        Q. Right.

9        A. --- that could help make

10       prisons safer ---

11       Q. Right.

12       A. ---  and could help

13       incentivize inmates to get involved

14       in programs ---

15       Q. Right.

16       A. --- would be to do something

17       with the credits that's given to the

18       inmates ---

19       Q. Right.

20       A. --- and only focus on those

21       inmates who get the 50 percent

22       credit.  Again, these less serious

23       offenders.  We're not talking about

24       the violent offenders.  But if you

25       made that 50-percent credit statutory

1    rather than something where they're

2    supposed to sit in a cell and read a

3    book and earn it, which is absolutely

4    of no value at all as far as

5    recidivism reduction ---.

6    Q. You're talking about what they

7    call the Bridging Program?

8    A. The Bridging Program.

9    Q. Right.

10    A. I mean, I heard that. I

11    couldn't believe it, that, you know,

12    to qualify for this credit you have

13    to sit in a cell and you do self

14    study.

15    Q. Which nobody does.

16    A. Which probably --- well, but

17    even if they do it they're not going

18    to get anything out of it.

19    Q. Right.

20    A. That's not evidence-based

21    programming.

22    Q. Right.

23    A. That's not going to reduce

24    recidivism.

25    Q. Right.

1     A. So it's a sham.

2     Q. Right.

3     A. And then the inmates don't

4     know if they're really going to get

5     this 50-percent credit or not.  What

6     I say is give it to them up front.

7     Q. Right.

8     A. Everybody gets it and it's

9     theirs to lose ---

10    Q. Right.

11    A. --- if they misbehave.  That's

12    going to give them an incentive to be

13    better.  It's going to help move

14    those prisons to be safer.

15  And then take and come up with

16    an additional credit for these less

17    serious offenders ---

18    Q. Right.

19    A. --- that they would earn only

20    if they completed the programs that

21    they were required to complete.

22    Q. But there aren't any programs

23    for them to complete.

24    A. Well, today you might not be

25    able to get that part of it running.

1    That's something that may have to
2    wait until you did get the programs
3    out there.
4    Q. Right.
5    A. But I believe in the expert
6    panel report, when we were looking at
7    making that change on that 50 percent
8    stuff statutory ---
9    Q. Right.
10    A. --- I believe the number was
11    like a 14,000 reduction ---
12    Q. Right.
13    A. --- just on that change alone,
14    without any extra credit. So even if
15    you just took and made the 50 percent
16    statutory ---
17    Q. Right.
18    A. --- you would make safer
19    prisons. You could reduce the
20    population by up to another 14,000.
21    If you take that 14,000 and the about
22    15,000 to 20,000 from the other
23    initiatives ---
24    Q. Right.
25    A. --- you've now pretty much

1    A. Things that we're suggesting

2    are things that would enhance the

3    public safety.  Because like even

4    diverting parole violators on the

5    back end, what we found in

6    Pennsylvania, and I can't imagine

7    that it would be much different in

8    California, is that once a person

9    violates and comes back to prison ---

10   Q. Right.

11   A. --- they're more likely to

12   violate the second time and even more

13   likely to violate the third time.

14   Q. So the fact of the violation

15   itself is something that ---?

16   A. It actually increases their

17   likelihood to recidivate.

18   Q. So you're actually ---?

19   A. So that's why, if you can

20   divert them into proper programs to

21   deal with what their problems are,

22   and not send them back, maintain

23   their contacts in the community,

24   maybe maintain their job if they have

25   it.

1    Q. Right.

2    A. If you can do that kind of

3    stuff rather than breaking those

4    community linkages for four months

5    and then throwing them back out

6    again, you're going to be further

7    ahead from a public safety

8    perspective.

9    Q. Right.

10   A. And I think when we were

11   looking at this, that's what we were

12   looking at.  We wanted to stay away

13   from the violent offenders.

14   Q. Right.

15   A. We wanted to focus on these

16   less serious offenders that are

17   really churning and driving the

18   population ---

19   Q. Right.

20   A. --- and saying, how can we

21   deal with them better so that we're

22   going to have a better outcome with

23   those people?

24   Q. Right.  So if I understand you

25   correctly, you believe that you could

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    reduce the population, which would

2    thereby enhance the ability of the

3    Department to provide health care

4    services, and at the same time it

5    would improve public safety.  Is that

6    a fair summary of your ---?

7  ATTORNEY MELLO:

8  I think that misstates

9    his testimony.  Objection,

10    misstates testimony.

11    A.  I think what I would say is

12    that if we did the things that are

13    being suggested in the expert panel

14    report we could reduce --- greatly

15    reduce the population and we could

16    allow them to better handle and

17    manager the inmates that are

18    remaining in their care.  And that

19    management is across the board.

20    BY ATTORNEY SPECTER:

21    Q.  And includes health care.

22    A.  It would include health care.

23    It would include mental health.  It

24    would include feeding people three

25    meals a day.  It would include

1    programming.  It would include
2    everything that you do to manage an
3    inmate when they're in the system.
4    Q. All right.  So overcrowding,
5    sort of --- you have overcrowding in
6    Pennsylvania, some ---?
7    A. We have some degree of
8    overcrowding.  But, you know, I have
9    47,000 inmates and I have about 5,000
10   more than what I would like to have.
11   It's a far, far cry from what the
12   crowding problem that they have.  You
13   know, I don't have any facility ---.
14   Q. The kind of problem they have
15   in California?
16   A. Yeah, in California.  I don't
17   have any facility that anywhere
18   approaches 200 percent or even 150
19   percent of capacity.
20   Q. Right.  And even at the level
21   of crowding that you have, you are
22   concerned about; are you not?
23   A. Well, certainly I'm concerned
24   about it, even at the low level of
25   crowding.  Because, you know, what

1    A. Right.  And I think I

2    mentioned that a little bit, that I

3    think those size of facilities are

4    unmanageable.  And while they may not

5    be able to totally eliminate them,

6    they certainly need to reduce the

7    population in those larger

8    facilities.  And in the future I ---

9    if I was them I would be focusing on

10   building facilities that were in the

11   2,000 --- 2,000 to 3,000 range rather

12   than these mega facilities that

13   they're building out there.

14   Q. So when you have a facility

15   which is in the 4,000 designed

16   capacity range and you double that

17   population, it really becomes

18   unmanageable?

19   A. It becomes very unmanageable.

20   And the other thing that it is is,

21   you know, you built your

22   infrastructure for 4,000 inmates, now

23   you have 8,000 inmates ---

24   Q. Right.

25   A. --- or 7,000 inmates, you

1    know, it wears out the facility much

2    quicker ---

3    Q. Right.

4    A. --- and you don't have the

5    ability to manage the things you need

6    to manage, again, the medical care,

7    the mental health care, the food

8    service, because that facility was

9    built with facilities to manage 4,000

10   inmates, not to manage 7,000.

11   Q. Right.

12   A. You might get away with 5,000

13   inmates.

14   Q. Right.

15   A. You know, some degree of

16   overcrowding ---

17   Q. Right.

18   A. --- but you can't overcrowd it

19   to the extent that they have out

20   there.

21   Q. Right. And you've seen some

22   of the expert reports from the

23   doctors and --- the ones you've

24   mentioned, Wayne Scott's ---?

25   A. Yeah. I saw Wayne Scott's. I

1       saw Jeannie Woodford's (phonetic).  I

2       saw Dr. Stuart's and Dr. Shansky's

3       (phonetic) expert reports.

4       Q. And so knowing what you know

5       about corrections and having been out

6       in California with the expert panel

7       and having reviewed those reports, is

8       there any doubt that overcrowding is

9       having an effect on the health care

10      system?

11      A. I had no doubt --- and I know

12      this lawsuit is about health care.

13      Q. Right.

14      A. And there's also the one about

15      mental health care.  I have no doubt

16      that overcrowding is impacting on all

17      of those things, just like it impacts

18      on everything else.  I came from it

19      from a different perspective.

20      Q. Right.

21      A. Because I was looking at it

22      from a programming perspective on the

23      expert panel ---

24      Q. Right.

25      A. --- and became aware from a

1       A. But there's --- everything

2           else is a part of that, too, you

3           know.

4       Q. Right.

5       A. And so there's no question in

6           my mind that for California to be

7           able to deal with all of these

8           problems that they're faced with ---

9       Q. Right.

10      A. --- whether it's the

11          programming, food service,

12          sanitation, health care, mental

13          health, there's no question in my

14          mind, from everything that I've

15          learned over the years in

16          corrections, that overcrowding must

17          be addressed and it must be addressed

18          rapidly if you want to deal with and

19          try to start moving that system in

20          the right direction.

21      And I think we on the expert

22          panel gave them recommendations to

23          address that overcrowding in a way

24          that would not harm public safety,

25          but would enhance public safety.

1        that people age out of crime ---

2        Q. Right.

3        A. --- so the fact that these

4        younger people from the boot camp are

5        showing a better recidivism rate than

6        people who go through the system

7        normally ---

8        Q. Right.

9        A. --- is saying that our boot

10       camp's working.  But it's only

11       working because we put the programs

12       in place and it's a good case for

13       evidence-based programs that shows

14       you the differences that you can make

15       if you get proper evidence-based

16       programs in place.

17       Q. Right.  So I have just one ---

18       I think I'm mostly done.  I just have

19       a few sort of technical questions.

20       One is to talk about the expert panel

21       for a  minute.  The State of

22       California recruited you to be on the

23       expert panel; correct?

24       A. Yes.

25       Q. And when you were out working

1      on this subject, you met with the

2      other members of the Commission, but

3      you had a lot of interaction, as I

4      understand it, from California prison

5      officials and administrators; is that

6      right?

7      A. There was interaction.  One of

8      their deputies was there, Mara ---

9      Q. Marcella.

10     A. --- Marcella, was there and

11     some other people from their system

12     were there.  Yes.

13     Q. And they provided you with

14     whatever ---?

15     A. They provided us with all the

16     information, anything we asked for.

17     Like I think some of us started

18     becoming concerned about lockdowns ---

19     Q. Right.

20     A. --- so they provided us with

21     the lockdowns.  That's why I'm

22     familiar with the statistics.  And

23     we, of course, put that in the group

24     thing.  We were looking at assault

25     rates, because we became concerned

1    about the safety in the system and

2    how people could do programs if they

3    don't feel safe.  And so they

4    provided those statistics.  A guy

5    named Atkinson, I think.

6    Q. Jay Atkinson.

7    A. Jay was there.  And you know,

8    pretty much anything we asked for

9    they provided the data to us.  Yes.

10   Q. And you had presentations from

11   various state officials about the

12   prison system ---

13   A. Yes.

14   Q. --- is that correct?

15   A. That's correct.

16   Q. So you felt confident that you

17   knew enough about the prison

18   system --- you and your other members

19   of the panel --- well, speaking for

20   yourself anyway, you felt confident

21   that you had enough information to

22   make these decisions ---

23   A. Yes.

24   Q. --- or recommendations I

25   should say?

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    A. Yes.  I mean, by reviewing,

2    you know, all of these reports,

3    talking to people, seeing the

4    statistics and the numbers. and you

5    know, the percentage of overcrowding

6    and you know --- because we have a

7    chart about the various institutions.

8    Some of them were even well over 200

9    percent overcrowded.

10    Q. Right.  Some of the units are

11    300.

12    A. Right.  And so you know,

13    seeing all that --- the statistical

14    information we were provided with,

15    the presentations, as you said, that

16    were made, our conversations with

17    people from CDCR, you know, that ---

18    as I said, that's what was causing me

19    to become increasingly concerned ---

20    Q. Right.

21    A. --- that we were doing an

22    exercise in futility.  Because, you

23    know, if I was running an institution

24    or running a system that was so

25    massively overcrowded and wasn't

1    on ---- was so unsafe ---

2    Q. Right.

3    A. --- that I had to use all of

4    these unusual measures, I would be

5    focusing on dealing with that problem

6    first.

7    Q. Right.

8    A. And anything as far as

9    programming would be on the back

10    burner ---

11    Q. Until you got that ---.

12    A. --- until I got control of the

13    system.

14    I mean, that's essentially

15    what happened here in Pennsylvania.

16    You know, we had these riots.  We

17    were overcrowded.

18    Q. Right.

19    A. Joe Layman came in as

20    commissioner ---

21    Q. Right.

22    A. --- here.  And you know, Joe

23    really, I think, was more interested

24    in sentencing reform and things like

25    that, but he had an unsafe system.

1    is that right?

2    A. That's correct.  Because you

3    don't have the places to do it.  In

4    my case, if I have a need to separate

5    people, I can do that.

6    Q. Right.

7    A. And you know, even though I'm

8    overcrowded all my facilities have at

9    least few beds, so I can move

10   somebody pretty much anywhere in the

11   state if I have to.

12   Q. Right.

13   A. If I have somebody that has a

14   mental health problem in this

15   institution --- we have also special

16   needs units within all of our

17   facilities for people who have mental

18   health and physical disabilities to

19   protect them from the rest of the

20   population.  But like, if we're

21   overcrowded somewhere else I can move

22   them to another institution that has

23   an opening in one of their special

24   needs units, because I'm not maxed

25   out in that.

1    Q. Right.

2    A. You know, and if I need to

3    commit somebody to an inpatient

4    unit --- like I said, I only run 80

5    percent of capacity.

6    Q. Right.

7    A. My forensic hospital is never

8    full, you know.

9    Q. Right.  And the

10   correctional --- as a correctional

11   administrator essentially you need

12   some vacancy rate?  You need some ---

13   A. Right.

14   Q. --- you need some open beds in

15   order to function properly?

16   A. Well, it's what I tell them.

17   It's like, you know, if I look out at

18   my system today I might have a

19   thousand available beds out there.

20   Q. Right.

21   A. So that might seem like a lot

22   of beds.

23   Q. Right.

24   A. But practically speaking, if I

25   don't have around 300 to 500 beds at

a0246461-06f4-4276-8d8f-ecb99736a1f6

1      clarification.  I also want to ask

2      you some questions that I don't think

3      Mr. Specter touched upon.  And I very

4      much thank you for your time and

5      fitting us into your schedule.

6   First of all, you referenced

7      reviewing some documents, some

8      reports.  Were you provided reports

9      to review in preparation for your

10     deposition?

11     A. Yes.

12     Q. Okay.  And who provided you

13     those reports?

14     A. Mr. Specter.

15     Q. And do you recall what reports

16     or documents you reviewed in

17     preparation for your deposition?

18     A. I reviewed the reports by

19     Wayne Scott, Jeannie Woodford, Dr.

20     Stuart and Dr. Shansky.  Those were

21     the reports that were provided to me

22     by Mr. Specter.

23   I also went to the CDCR web

24     site on my own and reviewed various

25     reports, population reports,

1      projection reports, assault rate

2      reports from that web site.  I also

3      have previously seen copies of the

4      Receiver's reports.  It's been some

5      time since I've read them, but I read

6      those reports.  I think there was a

7      report by the Coleman master that

8      I've read.

9  I've seen the little Hoover

10     Commission report of 2007.  There was

11     another report done by a group in

12     2004 that ---

13  ATTORNEY SPECTER:

14  Deukmejian.

15     A. --- Deukmejian report.  So

16     I've seen that report.  I might say

17     by --- way of saying that that report

18     was one of the things that helped

19     when I was looking at the 150

20     percent.  I think there was a group

21     of wardens there who had talked about

22     145 percent, so that was one of the

23     things that --- it seemed that they

24     felt comfortable with that out there

25     as well.

1    And you know, I've seen

2        various news articles.  I saw the

3        proclamation by the Governor in ---

4        October of 2006 where he declared the

5        emergency because of overcrowding and

6        all the unsafe and unsanitary

7        conditions that he felt was in the

8        system.

9    Let me see.  And then, you

10       know, as part of the expert panel

11       stuff, I reviewed, you know, a lot of

12       information from CDCR and ---.  Those

13       are the things that just pop out

14       right off hand.  There may have been

15       others, but those were primarily the

16       ones that I've seen.

17       BY ATTORNEY MELLO:

18       Q. Have you ever spoken to

19       anybody from the Receiver's office?

20       A. I have not.

21       Q. Have you ever spoken to

22       anybody from --- and the Receiver is

23       over the Quada (phonetic) case,

24       medical case, just so we're clear.

25       A. Yes. I'm aware of that.

1    Q. And the Coleman case relates

2    to mental health care.  Have you ever

3    spoken to anybody who works for the

4    Special Master?

5    A. No.

6    Q. Okay.  So Mr. Scott and Ms.

7    Woodford, Drs. Stuart and Shansky are

8    all experts for Plaintiffs in this

9    litigation.  Have you reviewed any of

10   the expert reports by Defense's

11   experts?

12   A. Nobody has ever provided me

13   with any of those reports.

14   Q. So you have not?

15   A. I have not.

16   Q. How many California prisons

17   have you toured in the last two

18   years?

19   A. One.

20   Q. And which facility is that?

21   A. Old Folsom.

22   Q. And when did you do that?

23   A. Oh, a year or so ago.  I'd

24   have to look to be exact.  I mean, I

25   can find the date, but I don't

Page 133

1        remember right off hand exactly.

2        Q. But in the last 18 months?

3        A. Oh, yes.

4        Q. Okay.  And was that as part of

5        your work with the expert panel or

6        something else?

7        A. I'm trying to remember.  I

8        think that was something else.

9        Q. Okay.  Do you recall what it

10       was for, why you toured that

11       institution?

12       A. I was out there doing ---

13       working on something and just --- we

14       toured that institution.

15       Q. Did Mr. Specter or anybody

16       else explain to you the legal issues

17       in this three-judge panel proceeding?

18       A. To ---.

19       Q. The legal issue before the

20       court is whether overcrowding is the

21       primary cause of the unconstitutional

22       delivery of medical care and mental

23       health care.  That's one of the

24       issues.  Has somebody explained that

25       to you?

a0246461-06f4-4276-8d8f-ecb99736a1f6

1         the vacancy rate isn't that high.

2         Q. When you say not that high, is

3         it ten percent vacancies?

4         A. I think it would be less than

5         that.

6         Q. Okay.  How about for

7         physicians?

8         A. Physicians, we contract for

9         physicians through our medical

10        provider.  And occasionally in some

11        institutions they have problems

12        recruiting both psychiatrists and

13        physicians, but it's rare and they

14        usually get people to fill in.  They

15        have these locum tenens that they

16        will come in, which aren't an ideal

17        situation, but at least to get

18        somebody there.  But it's few and far

19        between.

20     Most of our physicians --- and

21        we also rely a lot on physicians'

22        assistants and they're able to

23        recruit and fill those positions.  So

24        again, except for an isolated

25        institution here or there and

1    occasionally, we have very little

2    problems with the physicians as well.

3    Q. And that's right, you folks

4    contract out the physicians primarily

5    in your state; correct?

6    A. Yeah.  The nurses work for us,

7    but the physicians and the

8    physicians' assistants work for the

9    medical provider.

10    Q. Do psychologists and

11    psychiatrists also work for the

12    medical provider?

13    A. The psychologists work for me.

14    Q. Okay.

15    A. The psychiatrists work for

16    another provider.  I've split the

17    contracts.  I find it works better to

18    have separate pharmaceutical, mental

19    health and medical contracts rather

20    than having one vendor do all three.

21    And so actually THS is my

22    medical vendor.  MHM is my provider

23    for mental health care.  They would

24    provide some psychologists, but only

25    the ones that work in the licensed

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    inpatient units that we have.  And

2    they provide the psychiatrists.  The

3    other psychologists are mine.  In

4    other words, each institution has,

5    you know, four or five, whatever,

6    psychologists that take care of the

7    things that they take care of in the

8    institution.  They work for me.  It's

9    only the specialized units where

10   there's contract staff, including

11   psychologists.  Maybe even nurses

12   that are on some of those mental

13   health units, you know, are provided

14   by the contractor.

15   Q. All right.  What I think you

16   testified to, is Pennsylvania's state

17   population about 27 percent of

18   California's population?

19   A. No, not the state population.

20   We're 27 percent of our --- our

21   47,000 is about 27 percent of the

22   160,000, 170,000 they have out there

23   in California.

24   Q. Do you know what the

25   comparison is in the state

1     problem's getting worse and nobody

2     seems to be moving to deal with the

3     problem.

4     Q. Can you tell me the components

5     of a constitutionally adequate

6     medical care system?

7  ATTORNEY SPECTER:

8  It calls for a legal

9     conclusion.

10   BY ATTORNEY MELLO:

11   Q. Well, let me back up.  Do you

12   consider yourself an expert in

13   medical care delivery in prisons?

14   A. I don't consider myself an

15   expert, but I'm certainly aware of

16   what some of the components are that

17   you need.  Whether I know all the

18   components, I can't tell you.  I'm

19   not a physician.

20  But obviously you need

21   doctors.  You need nurses.  You need

22   physicians' assistants.  You need

23   people to take care of it.  You need

24   a place for them to work.  There

25   should be suitable privacy in those

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    locations.  There should be suitable
2    sanitation in those locations.  You
3    need, you know, equipment for them to
4    work with.  You need a pharmacy
5    that --- where you can keep pills so
6    that when they get medication they
7    have a place to go to get their
8    medication dispensed.
9  You --- in most facilities, if
10    you don't have another facility
11    nearby, you need some kind of an
12    infirmary to take care of acute
13    medical problems, you know.  And I'm
14    sure there's a whole bunch of other
15    things within the facility.
16  And then you need to have the
17    availability or contracts with
18    specialists, because the doctors that
19    you have typically aren't
20    specialists, so if you have an
21    orthopedic problem or a
22    dermatological problem or whatever
23    problem or, you know, an eye problem,
24    you need to be able to have
25    specialists that are either coming in

1          to the facility to do the specialty

2          reviews.  And then they need a place

3          to do that review and they need the

4          equipment.  If it's an eye doctor, he

5          needs the equipment, obviously, to do

6          the --- whatever they do.

7      And then you also need the

8          ability to send people to hospitals.

9          And you need different levels of

10         hospital care.  Some people might

11         just be able to go to a regular

12         hospital.  Some may need to go to

13         tertiary care hospitals because they

14         have more serious medical problems.

15     And so that pretty much ---

16         you know, that's the kinds of things,

17         you know, from medication delivery,

18         to specialists, to hospital care, to

19         the infirmary, to the on-site doctors

20         and everything else.  I mean, those

21         are the things that basically make

22         up.

23     And then you need, of course,

24         a whole set of policies and

25         procedures and everything else as

1          well, about how this is all going to
2          work and operate and how you're going
3          to do and what you do with certain
4          people.
5      And you need chronic care
6          clinics for people who have chronic
7          care situations.  And then, in our
8          state, at least, we have a central
9          office that provides oversight to the
10         facilities and what's going on and
11         monitors various indicators out in
12         the facilities to make sure that
13         you're meeting certain needs, that if
14         you have chronic care clinics that
15         they're meeting on a regular basis
16         and the people are being taken care
17         of.  So it's a whole structure that
18         even goes beyond the facility that
19         you need oversight to --- the system
20         should have some kind of oversight.
21     Because while  we have a
22         contacted vendor, I have three
23         physicians that work for me.  I have
24         two medical physicians and a
25         psychiatrist.  And their job is to

1    provide oversight so that if we have

2    a concern about the medical care

3    being delivered by --- to somebody at

4    a particular facility, my physician

5    will review it and then my contractor

6    knows that my physician has the

7    absolute sign off.  So if we need

8    something done, if my physician says

9    it, it gets done.  Because these

10   facilities and the contractors, if

11   you're not careful, you know, look to

12   try to keep costs down.

13   So you need all of those

14   things to have a proper system.  And

15   from what I've seen in California, in

16   addition to staffing shortages that

17   have been mentioned in various

18   reports, what seems to be as I was

19   reading in these other reports is

20   lack of space, a lack of privacy, a

21   lack of sanitation, cleanliness,

22   those kinds of things are the things

23   that I see reported that would make

24   it difficult even with full staffing,

25   I would think, for them to provide

1    constitutionally adequate medical

2    care.

3    Q. Okay.  So you mentioned ---.

4    A. And again I'm not a lawyer and

5    I'm not a doctor, but those ---.

6    Q. Lucky for you you're not a

7    lawyer.

8    A. Right.  Those are just my

9    observations from being involved in

10   contracting with things and walking

11   through institutions and over the

12   years knowing what we do in the

13   institutions.

14   Q. You have a vast amount of

15   experience in these subjects and

16   you're in charge of a very large

17   system.  I am in no way trying to

18   diminish that.  I am just asking you

19   to identify the components of a

20   constitutionally adequate medical

21   care system and you started off by

22   saying I believe that you're not an

23   expert with respect to medical care.

24   So let me ask you this question.  Are

25   you an expert with respect to mental

1    health care in light of your

2    training?

3    A. I would probably consider

4    myself to be more of an expert in

5    mental health care because I am a

6    licensed psychologist in

7    Pennsylvania.  I haven't practiced

8    for many years since I started off,

9    you know, in the system years ago.

10   But I do have a Ph.D.  I do have a

11   license to practice psychology.  And

12   so I would consider myself more of an

13   expert in that area than in the

14   medical area.

15   Q. And you identified various

16   subjects, people, place, privacy,

17   sanitation, equipment, pharmacy,

18   infirmary, contracts of specialties,

19   the ability to send to hospitals and

20   specific hospitals, policies and

21   procedures, chronic care and central

22   office oversight as components to a

23   constitutionally-adequate medical

24   care system.  Are there additional

25   items other than those with respect

1    Sure.

2       SHORT BREAK TAKEN

3       EXAMINATION

4       BY ATTORNEY SPECTER:

5       Q. So first A question on your

6       expertise.  Like I recognize you're

7       not a physician, so you're not an

8       expert in providing clinical care to

9       people.

10      A. That's correct.

11      Q. And Paul's question was I'm

12      sure unintentionally somewhat vague

13      about being an expert in medical

14      care.  But it seems to me that you

15      are an expert in running a medical

16      care system in a correctional

17      setting?

18      A. Yeah.  I guess you're correct.

19      If you would make that distinction

20      that we're not talking about actually

21      clinical care for individuals ---

22      Q. Right.

23      A. --- but for the kinds of

24      things that you need to provide and

25      the kinds of oversight that you need

a0246461-06f4-4276-8d8f-ecb99736a1f6

1    to do, the kind of contracts you need

2    to have, certainly I've been involved

3    in that, you know, for years and done

4    those kinds of things and I'm

5    familiar with that.  And I'd feel

6    more comfortable saying I'm an expert

7    in that area rather than in, you

8    know, the actual provision of the

9    medical care.

10   Q. Right.  So you're --- and that

11   would include how to provide medical

12   care in a correctional environment

13   and the kind of things that would

14   interfere with it or promote access

15   to care, all those kinds of things;

16   correct?

17   A. Yes.  That's correct.

18   Q. Okay.  So the other point I

19   wanted to talk about was Paul asked

20   you some questions about putting

21   staff in place.  And I think I'm just

22   going to reiterate what you said when

23   I was questioning you in the first

24   place, but I just want to nail it

25   down a little bit.  You said that it

COMMONWEALTH OF PENNSYLVANIA )

COUNTY OF DAUPHIN            )


                C E R T I F I C A T E


        I, Jennifer T. Alves, a Notary Public in and

for the Commonwealth of Pennsylvania, do hereby

certify:

        That the witness whose testimony appears in

the foregoing deposition, was duly sworn by me on

said date and that the transcribed deposition of

said witness is a true record of the testimony

given by said witness;

        That the proceeding is herein recorded fully

and accurately;

        That I am neither attorney nor counsel for,

nor related to any of the parties to the action in

which these depositions were taken, and further

that I am not a relative of any attorney or

counsel employed by the parties hereto, or

financially interested in this action.

NOTARIAL SEAL
JENNIFER T. ALVES, Notary Public
Harrisburg, Dauphin County, PA
My Commission Expires April 15, 2012

_____
Jennifer T. Alves, Reporter

· PITTSBURGH, PA

· CLEARFIELD, PA          · ERIE, PA

· STATE COLLEGE, PA       · OIL CITY, PA

· HOLLIDAYSBURG, PA       · HARRISBURG, PA

SARGENT'S
COURT REPORTING
SERVICE, INC.
210 Main Street
Johnstown, PA  15901

· INDIANA, PA

· GREENSBURG, PA

· PHILADELPHIA, PA

· SOMERSET, PA

· WILKES-BARRE, PA

· CHARLESTON, WV