1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA  94063
   Telephone: (650) 363-4746
4  Facsimile: (650) 363-4034
   E-mail: cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenor
6  COUNTY OF SAN MATEO

7

8
                    UNITED STATES DISTRICT COURT
9
                  EASTERN DISTRICT OF CALIFORNIA
10
             AND THE NORTHERN DISTRICT OF CALIFORNIA
11
        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
12
           PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
13

14  RALPH COLEMAN, et al.                  Case No. CIV S-90-0520 LKK JFM P

15              Plaintiffs,               THREE-JUDGE COURT

16       vs.

17  ARNOLD SCHWARZENEGGER, et al.

18              Defendants.

19
    MARCIANO PLATA, et al.                 Case No. C01-1351 THE
20
                Plaintiffs,                THREE-JUDGE COURT
21
         vs.
22                                         DECLARATION OF DAVID S. BOESCH,
    ARNOLD SCHWARZENEGGER, et al.          JR. FOR TRIAL
23
                Defendants.                TRIAL:  NOVEMBER 17, 2008
24

25       DAVID S. BOESCH, JR. declares as follows:
26
    I am the Assistant County Manager for the County of San Mateo. The following is within my personal
27
    knowledge.  I submit this declaration in lieu of direct live testimony for the trial of these cases.
28

In preparing the following remarks, I rely on my over 29 years of experience in local government, the last 20 months in my capacity as the Assistant County Manager for San Mateo County, my education including a Master of Public Administration degree from Harvard University, and a reasonably in depth knowledge of the criminal justice system in California learned in part from having read and considered the following publications.

- Detention Facilities Needs Assessment & Master Plan, County of San Mateo and Huskey & Associates, February 25, 2008

- California Corrections Reform: State/Local Partnerships, Stanford Law School, June 8, 2007

- The Role of the Judiciary in Shaping Sentencing Law and Policy, Stanford Law School, November 2007

- San Mateo County Housing Needs Study, Economic & Planning Systems, Inc., July 2007

- Strategic Directions 2010, County of San Mateo Human Services Agency Alcohol and Other Drug Services, June 2006

- Roadmap for Alcohol, Tobacco and Other Drug Prevention: A Guide for Community Action, San Mateo County Board of Supervisors

- The Challenge of Treating Forensic Dual Diagnosis Clients: Comment on "Integrated Treatment for Jail Recidivists with Co-occurring Psychiatric and Substance Use Disorders, Robert E. Drake, Ph.D., Joseph P. Morrissey Ph.D. and Kim T. Mueser, Ph.D., Community Mental Health Journal, August 2006

- Coordination at the Front-End of Sentencing: The Judiciary, Probation, and the Pre-Sentence Report, Stanford Law School, March 7, 2008

- From Cellblocks to Classrooms: Reforming Inmate Education to Improve Public Safety, Legislative Analyst's Office, February 2008

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

- Addressing Addiction: Improving & Integrating California's Substance Abuse Treatment System, Little Hoover Commission, March 2008

- Crime, Corrections, and California: What Does Immigration Have to Do with It?, Kristin F. Butcher and Anne Morrison Piehl, California Counties, February 2008

- Changing the Focus of Corrections, California Counties, September/October 2007

- Prison Reforms: Achieving Results, State of California, Department of Corrections and Rehabilitation, April 2008

- Criminal Justice Information Sharing: Enhancing Early Intervention, Measuring Results, Stanford Law School, December 2007

- Adult Correctional System Master Plan-Phase I, Napa County, November 13, 2007

- Inmates Services & Case Management for Re-Entry, San Mateo County Sheriff's Office, June 6, 2006

- San Mateo County Crime and Justice System Indicators Comparison with Six Bay Area Counties and Statewide, San Mateo County Jail Crowding Task Force, October 14, 2004

- San Mateo County Sheriff's Facilities Master Plan, Hellmuth, Obata & Kassabaum, Inc.; Omni Group, Inc.; Williams-Kuebelbeck & Associates, Inc., September 19, 1991

- A Roadmap for Effective Offender Programming in California, California Department of Corrections and Rehabilitation, June 29, 2007

- Attitudes of US Voters toward Prisoner Rehabilitation and Reentry Policies, Barry Krisberg, Ph.D., Susan Marchionna, National Council on Crime and Delinquency, April 2006

- Task Force on California Prison Crowding, National Council on Crime and Delinquency, August 2006

- Reconsidering Incarceration: New Directions for Reducing Crime, Don Stemen, Director, Center on Sentencing and Corrections, January 2007

- Understanding California Corrections, Joan Petersilia, California Policy Research Center, May 2006

- Who's in Prison? The Changing Demographics of Incarceration, Amanda Bailey and Joseph M. Hayes, August 2006

- Governor's Prison Overcrowding Package Is More Balanced But Too Big, Legislative Analyst's Office, April 12, 2007

- California's Criminal Justice System, Elizabeth G. Hill, Legislative Analyst's Office, January 2007

- Analyzing U.S. Prison Growth, Mike Males, Ph.D., Center on Juvenile & Criminal Justice, July 2007

- California Juvenile Justice Reentry Partnership Aims to Improve Outcomes for Youth, California Juvenile Justice Reentry Partnership, May 21, 2007

- California Corrections Reform: State/Local Partnerships, Stanford Law School, June 8, 2007

- Phase I: Survey of Interventions and Programs, Juvenile Justice Data Project, April 2007

- Helping Mentally Ill Criminals, Donna Lyons, April 2007

- Mentally Ill Offender Crime Reduction Grant Program, Department of Corrections and Rehabilitation Corrections Standards Authority, November 6, 2006

- The State Has Inadequately Maintained Its Major Investment in Prison Infrastructure, Legislative Analyst's Office, February 21, 2007

- Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates, Washington State Institute for Public Policy, October 2006

- Gender-Responsive Strategies for Women Offenders, U.S. Department of Justice, May 2006

- Reforming Corrections and Promoting Reentry Policy Statement, Volunteers of America, November 9, 2007

- Forecasting: Fiction and Utility In Jail Construction Planning, Allen R. Beck, Ph.D., 1996

- Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, Roger K. Warren, June 5, 2007

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

- Community Reentry Programs: Their Impacts on Offenders and Recidivism Rates, Tony M. Wilkes, Site Administrator, Davidson County Sheriff's Office, Nashville Tennessee, 2007

- Controlling Inmate Population Size: A Case Study of 20 Years of Success, Marily Chandler Ford, Assistant Director, Volusia County Department of Corrections, Daytona Beach, Florida, March 2007

- An Overview of NIC's Transition from Prison to the Community Initiative, Peggy B. Burke, Center for Effective Public Policy, Silver Spring, Maryland, 2007

- Avoiding The Expense of Constructing Unnecessary Jail Capacity, Allen R. Beck, Ph.D., 1999

- Corrections reform, Sonoma County style, Jennifer M. Murray, Sonoma County Deputy Administrator, California Counties, September 2007

- One in 100: Behind Bars in America, The Pew Center on the States, February 2008

- Sedgwick County Day Reporting Center Helps Alleviate Jail Overcrowding and Targets Recidivism, Behavioral Interventions, October 2007

- San Mateo County Human Services Agency Strategic Plan 2008-1013, San Mateo County Human Services Agency, February 27, 2008

- Assessment of the Impact of Prison Population Reductions on Counties and Public Safety, James Austin, Ph.D., The JFA Institute, Jeff Beard, Ph.D., Pennsylvania Department of Corrections

- Solving California's Corrections Crisis: Time Is Running Out, Executive Summary, Little Hoover Commission, January 2007

- Governor Unveils Comprehensive Prison Reform, Office of the Governor, December 21, 2006

- San Diego Community Prison to Reentry Program: A State County Collaborative, University of California San Diego

- Dispelling the Myths about Information Sharing Between the Mental Health and Criminal Justice Systems, John Petrila, JD, U.M., February 2007

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

- From Words to Deeds: Changing the Paradigm for Criminal Justice and Mental Health, California State Sheriff's Association Education Foundation, June 29, 2007

- Recommended Budget, San Mateo County, July 1, 2008-June 30, 2009

- 2008 Community Assessment: Health and Quality of Life in San Mateo County, Health Department, March 2008

- Interoffice memorandum, Ross Nakasone

- Research on the Community Reintegration Of Formerly Incarcerated Adults and Juveniles: Implications for County Human Servces Agencies, BASSC, September 19, 2008

- Mental Health- A critical partner in corrections reform, Patricia Ryan, Executive Director, California Mental Health Directors Association, California County, September/October 2007

In addition, I served as the Counties' Intervenor representative to the Settlement Discussion Group that worked with the Settlement Referee and Consultant for six months to craft a consensus document to be presented to the Panel. These efforts were a significant and substantial effort to avoid a Court-ordered prisoner release. The last working draft version of the memorandum of understanding (MOU) that was provided to the Court reflects a set of alternative solutions that would address the pervasive overcrowding and result in a transformation of the criminal justice and corrections system. The MOU was structured to cover the essential elements in terms of startup and continuing appropriations and necessary State legislation, and included a combination of local diversion strategies, improved parole capacity and changes to the credits system for inmates. Moreover and importantly, rather than continue the dysfunctional relationship between State and county corrections, the draft MOU incorporated the Community-Based Punishment Act of 1994 that received broad legislative and criminal justice community support but was never funded and implemented.

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

Finally, a number of the comments that follow are a reflection of and embody the policy positions that the California State Association of Counties (CSAC) and affiliated local government associations have consistently expressed to the Governor and Legislature.

Following are my opinions about the above-captioned matters pending before the Three-Judge Panel in Federal Court.

OPENING REMARKS

Preserving public safety is of paramount importance to communities and officials throughout the state. The State and its counties must work more collaboratively as partners in the criminal justice and corrections system to address the inextricably linked challenges of recidivism and facility overcrowding. We know from experience and inmate profiles that treatment programs and rehabilitative services must be adequately funded to enable the State and counties to accomplish their shared criminal justice functions and to ensure successful outcomes for offenders. An historic lack of funding for pre- and post-release services has resulted in extraordinarily high recidivism rates, with 70% returning to prison within 24 months of release. It is abundantly and increasingly clear that additional financial support is a prerequisite and must be in the form of a new, dedicated and sustained funding source rather than a redirection of existing resources or a downward shifting of responsibilities.

The County of San Mateo joined as an Intervenor to participate in the lawsuits with the express purpose of avoiding a massive prisoner release order that would have dire consequences for all of California's counties. We expect that such an order would result in increased crime, an overwhelmed probation and parole service, an exacerbation of our already overcrowded jails, increased rates of recidivism, overloaded court dockets and significant adverse impacts on our ability to provide health, mental health and alcohol and drug addiction services. Effectively, such an action by the Court would serve to give the

State carte blanche to devolve its problem to the counties without a corresponding obligation to compensate or the ability of counties to absorb the financial consequences.

BUDGET CHALLENGES

Many California cities and counties are on the verge of financial calamity as they struggle to balance budgets in the face of existing demands and increasing pressure to provide more services with less revenue. Counties are especially challenged in light of the State's structural budget imbalance, the likelihood of further State funding takeaways and the nature of the safety net services they are both committed and often mandated to provide to our most vulnerable residents. An influx of released prisoners with complex and expensive needs will force further difficult decisions regarding which population to serve: those residents who have service needs prior to any release or recently released parolees who have either not received treatment while incarcerated or will otherwise face a lapse in treatment. Any reasonable discussion about early release or a prison population cap cannot be undertaken without also acknowledging and addressing the likely release of elderly and sick inmates who require two or three times greater costs to incarcerate and treat. Moreover, looking beyond the potential of a release order and to the prospect of a population cap into the future, estimates are that the number of elderly inmates released will increase commensurately by 80% by 2012, and those who are sick and need medical services will return to impact the health of communities with illnesses including tuberculosis (16%), HIV/AIDS (4%)and hepatitis (33%) (Public Policy Institute of California). With a significant influx of inmates to counties, more local resources would be diverted to accommodating these former inmates into our communities and safety nets—rather than positive efforts currently directed toward committing resources at the front end of corrections reform in prevention-oriented services.

San Mateo County has been dealing with a structural budget deficit, wherein costs of operations continue

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

to outstrip and outpace revenues, for several years. The Board of Supervisors has adopted a five-year plan to restore the County Budget to balance, in order to close a projected $92 million shortfall. All departments, including criminal justice and health, are fully engaged in the process of improving flagging revenues and decreasing expenditures. And, this is occurring both during this time of great fiscal uncertainty with respect to the ongoing State Budget conundrum and in light of the potential for further cutbacks in funding and increased demand for services in a soft economy. In all probability the County will suffer additional substantial cuts in State funding.

Any actions that require local governments to divert, house, incarcerate, or treat State prisoners must be accompanied by sufficient and sustained appropriations. Initially, upfront funding is required to create the community capacity necessary to provide the services required, not just within the criminal justice system but in safety net health, social and vocational (44% of inmates have high school diplomas) services and housing. The reality is that counties are not adequately prepared to provide the services that will be needed and this potential influx of released prisoners will have a serious, significant and unavoidable adverse ripple effect upon this County's service delivery system.

COUNTY SERVICES IMPACTED

Given the current overcrowding circumstances in prison, inmates clearly may not have had sufficient access to needed services. If significant numbers of prison inmates are released into our communities—communities that in many cases are already ill equipped to deal with existing service demands—numerous counties' programs and services will be stretched beyond the breaking point.

Past research has suggested the correlation between poverty and crime (*Who's in Prison? The Changing Demographics of Incarceration*. Public Policy Institute of California, August 2006). It is also well

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

documented that 70-80% of inmates suffer from some degree of alcohol and/or drug addiction and that 16-20% suffer from mental illness (according to studies done by the California Mental Health Directors Association as a part of reviewing AB900 legislation). It is natural to assume, that if the Three-Judge Panel orders a prison population cap, the State has not been able to provide the needed treatment and mental health services to all inmates. So, how many parolees (assuming all inmates released early would be placed on some level of parole supervision) do we suspect might require mental health treatment, at what cost and borne by whom? Furthermore, many county jails like San Mateo's are structured such that county mental health departments fund and provide mental health services to inmates in county jails. A release with a population cap will presumably impose a freeze on the transfer of county inmates to state prison, requiring county mental health departments to provide care to a growing number of inmates who are awaiting transfer to state prison as well as their routine county jail patient population.

Another point that should not be overlooked is the importance of providing a continuum of care to individuals in need of mental health treatment. A prison population cap would create an obstacle to providing that continuum by having an influx of additional residents into a county system already challenged to meet the needs of its current residents. Some, if not all, of these inmates and parolees would undoubtedly have a lapse in treatment. There already exists a lack of services and treatment capacity for parolees, with 30-50% homeless at any given point in time. If parolees are unable to maintain and sustain themselves, they will be unable to maintain housing and unable to contribute to their family's livelihood; thus, some will seek aid from the counties' general funds for financial assistance and social services. To prevent adverse impacts on critical services for non-criminal justice clients, treatment capacity must be increased and separately funded in advance of any increased demand.

The Panel must be cognizant of the impact on local communities' existing treatment capacity (e.g.,

health, mental health, drug and alcohol treatment, vocational services, sex offender treatment, probation, courts, public defender) if major new demands for services result. Specialized, community-based and county provided services are likely to be quickly overtaxed. Counties throughout California provide numerous essential services to many underserved residents. Currently, however, demand for such county services exceeds available capacity. There are substantial waiting lists for services—services that many state prison inmates will require were they to return to our communities.

San Mateo County has estimated, based on a 2-3% share of the potential release of 40,000 State prisoners, that the annual cost of services for this hypothetical population of 1,000 former inmates would be $21 million, not including costs associated with either job/vocational training or housing. Increased crime, due to the early (premature, in some cases) release of State prisoners and/or the inability of parole or probation to effectively monitor significantly increased numbers will seriously affect a number of services within and in support of the criminal justice system of San Mateo County. For example, the County conducts several evidence-based programs as alternatives to jail incarceration or prison sentences. These programs are already oversubscribed. If additional persons with similar needs for substance abuse and mental health treatment were released into the San Mateo County community, we believe these programs would be overwhelmed and unable to function successfully; ultimately, and ironically, causing an increase in the number of persons going to State prison from this County.

The California Department of Corrections and Rehabilitation itself recognizes the importance of comprehensive reentry services, including substance abuse treatment programs, job training and placement, anger management, family counseling and housing placement, as it attempts to implement AB900 funding. And, the Little Hoover Commission wrote that: "Inmates who are willing to improve their education, learn a job skill or kick a drug habit find that programs are few and far between, a result of budget choices and overcrowding. Consequently, offenders are released into California communities

with criminal tendencies and addictions that first led to their incarceration. They are ill-prepared to do more than commit new crimes and create new victims."

JAIL OVERCROWDING

Without a doubt, a prisoner release order will increase local crime due, in part, to the inability of parole and probation officers to effectively monitor increased numbers of parolees. An increased number of inmates being booked into the County's jail, combined with a refusal to accept inmates sentenced to State prison because of a population cap, will exacerbate San Mateo County's well-documented overcrowded jail condition (currently at approximately 140% of rated capacity); thereby, further inhibiting efforts to provide services and treatment to those while incarcerated, with resultant increases in recidivism and reentry or recycling back into the criminal justice system, and corresponding workload impacts on the courts, district attorneys, public defenders, correctional health and probation.

While San Mateo County does not currently face a population cap like 33 other counties, it does have a serious problem with jails that are crowded and lack space for effective reentry programs. (The County unsuccessfully applied for State funding under AB900 to construct a 648-bed, $140 million medium security facility.) Even if the State funds an expanded and improved parole capability, the likelihood is that some significant percentage of former prisoners will reoffend or violate parole/probation and add to the overcrowding of local jails. In addition, much of the effort currently invested in addressing local jail and reentry challenges and systemic reform will be diverted to dealing with this imminent crisis.

SUMMARY

San Mateo County has invested its time and resources in an effort to assist the State and the Three-Judge Panel in finding an acceptable solution to the State's prison overcrowding problem that will not adversely

12

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

impact public safety in our community. I personally have spent countless hours as the Counties' Intervenor representative on the Settlement Discussion Group exploring ways to effectively reduce the prison population by applying proven, evidence-based approaches. I remained hopeful up until the end that a consensus document was possible: A comprehensive package of systemic reforms with sufficient funding that included improved prerelease risk and needs assessment, treatment and life skills planning, increased mental health services and parole oversight, a continuum of community-based treatment, stable housing and work readiness programs, and the other required services that can be better provided in a community rather than an institutional setting.

The threat of a prison release order forced the various and oft-competing interests to the table. Turning tens of thousands of inmates loose into our communities without sufficient resources to support the multiple service delivery systems that will be impacted will have a disastrous result. Whereas, the alternative approach of investing in proven rehabilitation programs and graduated sanctions earlier in the process can staunch the flow through the revolving door to state prison and contribute positively to safer communities.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 29, 2008.

DAVID S. BOESCH, JR.
Assistant County Manager
County of San Mateo

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. David Boesch for trial.doc

DECLARATION OF DAVID S. BOESCH, JR. FOR TRIAL

1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA  94063
   Telephone: (650) 363-4746
4  Facsimile:  (650) 363-4034
   E-mail:  cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenor
6  COUNTY OF SAN MATEO

7

8                    UNITED STATES DISTRICT COURT

9                 EASTERN DISTRICT OF CALIFORNIA

10            AND THE NORTHERN DISTRICT OF CALIFORNIA

11    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

14  RALPH COLEMAN, et al.                    Case No. CIV S-90-0520 LKK JFM P

15         Plaintiffs,                       THREE-JUDGE COURT

16      vs.

17  ARNOLD SCHWARZENEGGER, et al.

18         Defendants.

19  ───────────────────────────

20  MARCIANO PLATA, et al.                   Case No. C01-1351 THE

           Plaintiffs,                       THREE-JUDGE COURT
21
        vs.
22                                           **DECLARATION OF LOREN BUDDRESS
    ARNOLD SCHWARZENEGGER, et al.            FOR TRIAL**
23
           Defendants.                       **TRIAL:  NOVEMBER 17, 2008**
24

25       I, LOREN BUDDRESS, declares as follows:

26       I am the Chief Probation Officer for the County of San Mateo. The following is within my

27  personal knowledge. I submit this declaration in lieu of direct live testimony for the trial of these cases.

28  In preparing the following remarks, I rely on my over 30 years of combined experience as a parole

officer, probation officer—both federal and county government, and as a Chief Probation Officer—both federal and county government as well.

       1.     If a "mass parole release" is used to reduce the CDCR population, and probation is not charged with supervision duties, such a release would have a very negative impact on counties and Probation departments.  This is due to the fact that with a 70% recidivism rate, many of these parolees will commit new offenses.  Parolees who commit new offenses negatively affect local law enforcement agencies, Sheriff's Departments and their overcrowded jails. These arrests also would have a negative impact on the Court, the District Attorney, and the Private Defender, Health/Mental Health Departments, Human Services Agencies, and a number of community based treatment providers.  When these parolees are referred to the Probation Department, we must complete a pre-sentence investigation and a pre-sentence report, and then the department provides new supervision services for those placed on probation.

       2.     Probation resources in San Mateo County are already stretched to their maximum capacity.  The Probation Department and the other County agencies and the Court are unable to absorb new parolee recidivism cases without additional resources.  Without new resources, we would be forced to cut services elsewhere. This would have a very negative impact on the County and our local communities.

       3.     Prison overcrowding could be addressed in a very positive manner and without the State having to "build their way out of the problem" by using the recommendations contained in the document prepared by Dr. Barry Krisberg (President of the National Council on Crime and Delinquency, [NCCD]) for the Legislature during their special summer session in 2006. (See San Mateo County Exhibit SMC-C.)  Dr Krisberg's report focused upon:

      a.   Reducing women's imprisonment;

      b.   Improving parole practices;

      c.   Focusing on successful community reentry;

      d.   Adopting evidence-based assessment and supervision practices;

      e.   Implementing a comprehensive Intermediate Sanctions Program;

      f.   Implementing a structured mandatory decision making process;

      g.   Reallocating resources to fund necessary programs and services for parolees;

DECLARATION OF LOREN BUDDRESS FOR TRIAL

h.   Creating a new State-local corrections partnership; and

i.   Creating a California Sentencing Policy Commission

The report opens stating:

"For three decades, most California elected officials and the voters have radically transformed the penal system by enacting tough new sentencing laws, building 22 new prisons, and until recently, making punishment the sole purpose of the penal system.  For almost 30 years there has been scant attention paid to adequate funding for rehabilitation services or successful programming to permit inmates to successfully return home.  The fiscal and social costs of these policies were neither examined nor sufficiently shared with the electorate.  And so, we are close to a boiling point which most observers believe could lead to a prison catastrophe."

Dr. Krisberg's report concludes noting:

"A smart reform program must balance emergency steps, short-term measures, and a longer-term strategic vision.  The NCCD believes that the proposals in this report represent a start in that direction.  Fundamental to viable solutions is a continued movement toward a corrections system that combines effective rehabilitation and reentry programs that reduce recidivism with appropriate public protection considerations and sensitivity to the plight of victims.

There are evidence-based pathways out of the deep prison crisis that we have created.  A comprehensive approach is needed that includes realistic forecasts of the impact of policy and law changes on state and local corrections.  We need to understand the true financial implications to fixing the corrections imbroglio.  Reforms must include a new alliance of state and local justice officials, and an exploration of proven safe alternatives to state confinement.  California must expand its commitment to employ research and rigorous evaluation to determine if the taxpayers are getting value for their massive investments in the corrections system.  A clear plan that achieves bipartisan support and includes all three branches of government is the standard we should uphold."

4.   The CDCR parole system could be improved, thus reducing the parole recidivism rate by looking at implementing the PEW Charitable Trusts recent document entitled, "When Offenders

Break the Rules—Smart Responses to Parole and Probation Violations." (Please San Mateo County Exhibit SMC-D.)  The PEW Report notes that:

> "Innovative judges and correctional administrators believe that many individuals who have violated the conditions of their release can be managed safely and cost-effectively in the community rather than returned to expensive prison cells.  They increasingly are relying upon a strategic approach that includes incarceration of high risk offenders who present an imminent danger of reoffending and a problem-solving combination of penalties, rewards and services to those who pose less risk to public safety.  The strategy seeks to protect the community, to hold violators accountable with interventions that address the reasons for the violations, and to reduce reincarceration and the resulting costs to taxpayers."

5.    Dr. Krisberg's literature review regarding the "Effect of Early Release from Prison on Public Safety"(See San Mateo County Exhibit SMC-E) notes  in his review of studies from nine states and Canada that:

> "Most of the cited studies and reports found: No significant difference in rates of recidivism among early release and full-term offenders.  Some studies found lower recidivism rates among early releases that those who served a full-term in prison. NCCD reviewed annual crime rates throughout the different regions reported in the studies during the same time the studies took place.  Crime data in the states where studies took place show decreases even as early release was being implemented."

> "What worked?" showed that selecting non-violent offenders for early release, designing ER as an incentive for non-violent behavior in prisons, allocating probation officers to maintain contact with ER groups (accountability), and linking ER groups to community-based services and programs (e.g., employment, housing, substance abuse and mental health treatment") all worked.

> The State could release parolees 6 months before their release date, which would reduce the CDCR population, but it would be done in a manner that would not increase recidivism. (Also from Exhibit SMC-E.)

6.    When the Legislative Analyst's Office (LAO) recently proposed releasing somewhere between 50,700 and 71,000 "low risk" parolees, to be supervised by county Probation Departments, San Mateo County did an analysis of the fiscal and personnel impact such a release would

have on San Mateo County in order to provide the needed services for these parolees, which for the most part had not been provided to parolees for decades. This is why California parolees have the highest recidivism rate of any state in the United States. (70% of California's parolees become recidivists within a two year period.)

7.    In order to provide needed services for approximately 1,000 parolees, the Probation Department would need approximately $7,600,000 intended for new probation and support staff to provide the parole supervision. In addition to the personnel costs, other needs would be office space rental, office furniture for new parole staff, computers, cell phones, training, vehicles for field supervision, electronic monitoring equipment, drug testing equipment, and office supplies. (Please see San Mateo County Exhibit SMC-F.)

In addition to the costs to probation to supervise these 1,000 parolees, San Mateo County determined that it would also cost "Behavioral Health" to provide mental health and substance abuse services, approximately $9 million dollars, and it would cost the Sheriff's Office approximately $4.3 million dollars for re-incarceration expenses. Therefore, for Probation, Mental Health, Substance Abuse, and Jail services, it would cost San Mateo County $20.9 million dollars to provide services for 1,000 parolees. (See Exhibit SMC-F.) This does not count the additional costs to the Court, the District Attorney, the Private Defender's Office, to the Human Services Division, and to community based treatment organizations.

8.    In my judgment, local Probation departments could supervise State parolees and create far better recidivism rates as well as other more positive outcome results, however, the success of such a "realignment" process would absolutely hinge upon the fact of whether the State would be willing to compensate counties properly for their new parole responsibilities.

Criminal justice research clearly shows that "treatment" is what changes criminal, delinquent, and recidivist behavior, and reduces crime and community victimization. The research also shows that if you merely lock people up and "warehouse" them and provide NO treatment, recidivism actually increases by approximately 7%.

9.    San Mateo County is a unique county, in that all of the key stakeholders in the county (the Court, the Board of Supervisors, the County Manager, the Sheriff, the District Attorney, the

Probation Department, the Health/Mental Health Department, and Human Services) understand that what changes criminal behavior and recidivism and reduces community victimization is "treatment."

10.    One very effective way to reduce prison overcrowding is to invest in probation resources that have already proven to be not only effective, but cost effective. (Between 1992 and 2002, juvenile felony crime was reduced 48% according to a Rand Corporation three year study.) (See San Mateo County Exhibit SMC-G.)

Similarly, juvenile misdemeanor offenses declined 26%, when the juvenile population for the state increased 26% over the same time frame, according to the same Rand study. These significant reductions in juvenile crime, according to the Rand report was due to the treatment programs implemented by Probation departments throughout California using TANF funding.

11.    If given appropriate funding, Probation departments throughout the State could provide similar services for youthful adult offenders, ages 18 to 25, in addition to older offenders. Using treatment programs on the "front end of the criminal justice system," similar to the ones we use to reduce juvenile crime would have a significant impact in reducing the number of adult probation violators who are sent to state prison on probation violations (approximately 17,000 per year, according to the Chief Probation Officers of California (CPOC) organization.)

Additionally, on the "back end of the criminal justice system," for those probation violations that did occur, if Probation departments and counties were given additional resources, and sufficient funding for treatment, many of these probation violators could be kept locally and not sent to prison.

As was noted above, I believe that Probation departments could provide much more effective parole supervision services if counties were provided appropriate fiscal resources by the state. However, if parole services remain with the State, one key change in how parole violations are handled could have a substantial impact on prison overcrowding. According to the CDCR, approximately 70,000 to 80,000 parole violators are returned to prison each year, and approximately one-half of those parole violations are for "technical" violations. (A "technical" violation is for a violation of their conditions of parole, e.g., missing an appointment with a therapist or their parole officer; however, the "technical" violation does NOT entail a new law violation.)

12.    Sending most parole violators to prison, in my judgment is an enormous waste of

state prison resources. Professor Joan Petersilia has done research that showed that "technical" parole/probation violators were no more likely to commit new offenses than non-technical violators. Additionally, these technical violators serve an average of approximately four months. The processing of these violations through the CDCR's "Reception Centers" costs the state approximately $2 billion dollars per year, according to Jeanne Woodford, a long term CDCR administrator. Such "technical" violators (35,000 to 40,000 per year) should be kept locally in treatment programs or "Day Reporting Centers" (please see attachment 6) instead of unnecessarily clogging up the State's prison system. However, this process could only work if the state used a good portion of the savings that would accrue by having these violators kept locally, to compensate counties and Probation departments who would be keeping violators locally and providing them with treatment resources so they do not have to go back into the state prison system.

13.    In summary, if the State wishes to reduce the prison overcrowding problem without having to pay an enormous amount to "build their way out of the problem" and even FAR more to run the newly built prisons, they should strongly consider the roadmap for such a reduction provided by Dr. Krisberg and the NCCD. They should also use the information provided by the PEW Trust to see how to improve parole outcomes and reduce parole violations. Finally, if the state were to provide counties and Probation departments with funding for both "front end" and " back end" criminal justice services, departments could employ treatment services which have already proven to be both effective (in terms of reducing crime and community victimization) and cost effective. In so doing, many more offenders would be kept locally, instead of being sent to State prison, which would be another means of reducing the state prison population without building new prisons. This approach would save the state millions, if not billions of dollars, and such a process would reduce crime throughout the state.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 30, 2008.

Loren Buddress /s/
**LOREN BUDDRESS**

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. of Loren Buddress.doc

DECLARATION OF LOREN BUDDRESS FOR TRIAL

MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA  94063
Telephone:  (650) 363-4746
Facsimile:  (650) 363-4034
E-mail:  cwoodward@co.sanmateo.ca.us

Attorneys for Intervenor
COUNTY OF SAN MATEO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al. | Case No. CIV S-90-0520 LKK JFM P |
| Plaintiffs, | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al. | |
| Defendants. | |
| MARCIANO PLATA, et al. | Case No. C01-1351 THE |
| Plaintiffs, | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al. | **DECLARATION OF BEVERLY BEASLEY JOHNSON FOR TRIAL** |
| Defendants. | **TRIAL:  NOVEMBER 17, 2008** |

I, BEVERLY BEASLEY JOHNSON, declares as follows:

1.     I am the Director of the Human Services Agency for the County of San Mateo.  Please see San Mateo County Exhibit SMC-H for my qualifications.  The following is within my personal knowledge and, if called as a witness, I could and would testify competently thereto.

1.       The following is a brief overview of the Human Services Delivery System: the San Mateo
County Human Services Agency administers public social services to benefit low-income and at-risk
residents of San Mateo County. The largest programs administered by the Human Services Agency are
funded through federal, state and local sources and include public assistance programs such as
CalWORKS, Food Stamps, Medi-Cal; emergency assistance programs including Shelter Services and
Safety Net Services; as well as ongoing Workforce Development and Child Welfare Programs.
Eligibility for each program is set by federal, state and local law, regulation and policy.  The programs
which are believed to have the most obvious nexus to the plaintiffs would be General Assistance, Shelter
Services, Workforce Development Services, Food Stamp and Food Assistance Programs, Child Welfare
Services, Indigent Medical Care and lastly, the CalWORKS program.

        The potential impacts to the CalWORKS program are significant, but difficult to measure since it
is unclear how many returning parolees will be able to establish a household with their children in their
first year of re-entry.  Once the parental/guardian relationship is established, those families will be
eligible for financial assistance and social services through the CalWORKS program. The potential
impact to the Medi-Cal program may also be significant, but again it is unclear how many returning
parolees will be meet eligibility requirements (i.e. aged, disabled).

2.       I have performed a programmatic and fiscal impact assessment based on the effects of an
early prisoner release order on the delivery of human services in San Mateo County assuming that 1,000
parolees re-enter San Mateo County and that approximately 800 will require services administered by the
Human Services Agency (HSA). Some of these services will be fundamentally altered by the magnitude
of change in service population and by the need for specialized, intensive services. For example, in this
county's extremely limited housing and labor market, these individuals will encounter extreme barriers to
finding work and housing.  The current apartment vacancy rate is 3.5% and potential renters need to
provide a credit history and a verifiable source of income to landlords in order to secure rental housing.
San Mateo County's current unemployment rate is 4.3%. However, we anticipate that a significant
percentage of parolees will return to the communities of East Palo Alto and North Fair Oaks where the
unemployment rates are 200%-300% higher. As a consequence, they will rely on social services longer.
They will also need more intensive services than the general population due to re-entry issues, lack of a
work history, untreated substance abuse and mental illness, family stabilization needs, and the absence of

social supports and resources.

3.    This assessment does not include all services provided by the Human Services Agency, but rather, only those services that would experience a significant programmatic or fiscal impact ($1 million or greater per annum). It also includes the services provided indirectly through contractors of the Human Services Agency when the service affected would have a significant county-wide programmatic impact, such as Shelter Services, Emergency Food Services, Safety Net Services and Employment Training Services and/or has a significant annual fiscal impact of $1 million or greater per annum.

4.    The conservative estimated county cost for the delivery of the applicable Human Services Agency services to the plaintiff population of 1,000 is believed to exceed $26 million annually and would result in a fundamental shift in the overall human service delivery system within the County of San Mateo due to two factors: the substantial increase in participation in entitlement programs and the reallocation of resources from other programs. The indirect costs of reallocation from preventative programs are not included in this assessment, but are also significant.  Non-mandated preventative and early intervention programs are almost entirely funded through county dollars, which is also the sole source of General Assistance funding.

In addition, we foresee a dramatic impact on the social resiliency of individual communities.  An influx of parolees will affect San Mateo County's most under-resourced communities, those already affected by fewer social and financial resources, high levels of untreated co-occurring disorders, as well as high concentrations of drug abuse, interpersonal violence, unemployment, and gang involvement. These communities are already isolated by socio-economic factors and neglect.  Increasing the parolee population in these communities will contribute to the criminal justice system's revolving door, further destabilize families and, for some at-risk populations, increase exposure and participation in gang culture.

5.    Programmatic Impact and Fiscal Impact by Program are as follows:

a.    General Assistance: The General Assistance (GA) program provides financial assistance to low income childless adults who fall below the established property and income limits. Service recipients fall in one of two categories, those who are employable and those who are disabled, including those who have a medical exemption due to substance abuse. The maximum monthly payment is $319 per individual. This program is funded entirely through

3

county funds.

Program impact:

The annual grant amount for 800 clients:                    $3,062,400

($319 monthly benefit x 12 months x 800 clients)

Staffing impact:

14.5 FTE (full-time equivalents) to administer grants, intake, screen, and case management:

$1,788,556

      b.     Food Stamp Program: Low-income households who meet federal eligibility requirements may participate in the Food Stamp Program. A household of one individual can receive a maximum monthly food stamp allotment of $162.

Program impact:

The annual grant amount for 800 anticipated clients in this program:     $1,555,200

($162 monthly benefit x 12 months x 800 clients)

Staffing impact:

6.5 FTE to determine eligibility, administer grants, and case management: $795,541

      c.     The Work Fare Program: In order to receive either GA or Food Stamp benefits, employable GA clients are required to participate in an employment skills building Work Fare Program. Due to the downturn in the economy, this program has already experienced increased participation and additional program expansion would require increased staffing and operational resources. The Work Fare program can accommodate 100 additional clients, at most.

Staffing impact:

3.0 FTE to support an additional 100 clients:                    $410,634

      d.     Emergency Assistance Services:

          (1)     Shelter Services: HSA's Center on Homelessness provides shelter services on a temporary basis to individuals and families. There are 71 shelter beds available to single individual adults through three contracted shelters. The existing shelter capacity has a consistent 100% occupancy rate. Other beds are available through a motel voucher program. Motel operators participate in this program on a limited basis due to the modest compensation rate of $75 per night.

DECLARATION OF BEVERLY BEASLEY JOHNSON FOR TRIAL

HSA utilizes a ten-year strategic plan to end homelessness in San Mateo County. The HOPE (Housing Our People Effectively) Plan is built around two key strategies: increasing the supply of permanent, affordable housing and preventing individuals and families from becoming homeless by helping them maintain their housing. (See San Mateo County Exhibit SMC-L, HOPE Annual Report.) Emergency or temporary shelters are not viewed as an effective solution to homelessness. The entire human services delivery system in San Mateo County, including contracted and non-profit services, does not have the physical capacity to accommodate 800 additional clients who are at-risk for homelessness.

Program impact:

The annual cost of serving 800 clients in the Motel Voucher Program would be $24 million. However, due to the limited motel bed inventory, it is assumed that the annual cost for temporary shelter through this program would be: $12,045,000

(400 beds x $75 room rate x 10% program administration costs x 365 nights

| | |
|---|---|
| The cost to build an 80-bed shelter: | $2,500,000 |
| Annual operating costs of an 80-bed shelter: | $480,000 |

(2)    Safety Net Services: In addition, safety net services are provided by contract through a network of seven community based organizations which provide information, referrals and access to emergency food and housing. This is an example of a county-wide service that would be significantly affected by an early release order. Currently, six of the seven providers in this system do not have the training, program knowledge or specialization of services needed to assist this population. It can be assumed that they will serve the same 800 service recipients several times over the course of the year; however we are not including that factor in this analysis.

Program impact:

| | |
|---|---|
| Increase contracted operating costs by 4%: | $30,503 |

Staffing impact:

| | |
|---|---|
| 3.0 FTE to monitor additional shelter *and* safety net contracts: | $417,536 |

DECLARATION OF BEVERLY BEASLEY JOHNSON FOR TRIAL

e.    Children and Family Services: This program is a continuum of services to children and families who come into contact with the Child Welfare System. Services include intake, referral and investigation of child abuse, emergency sheltering of children, supports for family maintenance and reunification, youth independent living services, as well as foster care and adoptions.

While Children and Family Services will not experience the most significant fiscal impact, these programs will likely experience the most profound long-term programmatic impacts. Children and families can experience long-term developmental impacts when families are destabilized due to a change in the family structure, exposure to uncertainty, changes in guardianship, relocation and court involvement. Currently, 14% of our caseloads include children with incarcerated parents. We anticipate that an early release order would more than double that high-risk caseload. These children and families require intensive case management services, including safety and risk assessments, psycho-social and socio-economic assessments, mental health services, alcohol and other drug treatment, co-occurring disorders treatment, anger management classes, domestic violence treatment, parenting classes and additional support for basic life needs such as housing, food, transportation, clothing, child care and health care. These parents will need supervised visits with their children, monitoring, ongoing assessment and service planning. In addition, permanency planning for children in our care is subject to the Adoptions and Safe Families Act of 1997 which establishes guidelines for permanency planning for children in our care.

In order to reunify with a child, a parent needs to meet parole requirements, establish self-sufficiency, and successfully demonstrate the ability to provide a safe and stable home environment to a child. These requirements, all of which are necessary and justified, delay the permanent placement of the child. (See San Mateo County Exhibit SMC-K.)

Program impact:

Contracted therapeutic services:                                        $310,000

Staffing impact:

15.25 FTE to locate parents, provide assessments including psycho-social assessments, provide information and referrals, targeted treatment of mental and behavioral health issues, supervised

visits, adoptions and social workers:                                  $1,967,237

      f.      Workforce Development Services: County employment services are delivered through Career Centers and Workforce Investment Act (WIA) related services delivered at those centers. Those services include a broad range of employment related activities, and contracted employment-related training and education.

      It is assumed that 680 parolees will seek employment services. Of these, 47% or 332 will require intensive employment training services. This general estimate is from the needs of employment services clients overall and not any type of special population.

Program impact:

Annual cost of employment training services for 322 clients:            $901,000

(Average employment training cost per client $2,798 x 322 clients)

Staffing impact:

5.0 FTE in caseworkers with 64 clients each:                            $342,380

      g.      Medi-Cal:This program seeks to provide essential medical care and services to preserve health, alleviate sickness, and mitigate handicapping conditions for individuals or families on public assistance, or whose income is not sufficient to meet their individual needs. There are hundreds of sub-programs within Medi-Cal with varying eligibility requirements and program funding sources. Unless aged or disabled, most parolees will not qualify for Medi-Cal. However, they will need to be screened by Medi-Cal staff and referred to county medical programs.

Staffing impact:

2.5 FTE to provide screening and referral services:                    $310,035


6.      The human services delivery system is a network of public and nonprofit services that seek to aid those in need, prevent crises, and build stability in households and communities. These services are regulated by federal, state and local law or are administered as part of the local budgeting process. Our non-mandated programs and services are provided by resources made available through county government and, on a more limited basis, special grants. We already fully utilize and leverage available funding sources. Any reallocation of resources will result in a reduction in services to other

DECLARATION OF BEVERLY BEASLEY JOHNSON FOR TRIAL

available funding sources. Any reallocation of resources will result in a reduction in services to other programs and services. For example, to support this service population, the General Assistance Program would require an additional $4.8 million. However, that reallocation would necessarily involve a reduction in services, including safety net services, school-based services, and even, community-based services that seek to prevent involvement in criminal activity. In addition to funding limitations, we also have program capacity limitations. Our shelters have a 100% occupancy rate and for every motel bed provided to an individual who cannot enter a shelter due to the nature of his/her prior offense, an individual or a family will go un-housed.

If the adage that "desperate people do desperate things" is true then the reality of 1,000 early release parolees arriving in San Mateo County without housing, employment, food, medical coverage, or other supports is a recipe for recidivism. When considering the impacts of an early release order, we also assessed the social and family impacts. Our high-risk communities, children and families will be disproportionately affected by an early release order. Under-resourced communities will be severely tested by the rapid influx of unemployed and un-housed individuals. These individuals may rely on their families for financial support which will have a dramatic impact on low-income families, multigenerational families and families in subsidized housing. They will have untreated therapeutic needs including mental health and substance abuse treatment and will require extended employment services. Their families, along with the children in our care who are awaiting permanent homes, will likely experience the greatest lifelong and destabilizing impacts of inadequate re-entry planning and resources.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 30, 2008.

*Beverly Beasley Johnson*

**BEVERLY BEASLEY JOHNSON**

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. of Beverly Johnson.doc

8

DECLARATION OF BEVERLY BEASLEY JOHNSON FOR TRIAL

1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA 94063
   Telephone: (650) 363-4746
4  Facsimile: (650) 363-4034
   E-mail: cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenor
6  COUNTY OF SAN MATEO

7

8

9                    UNITED STATES DISTRICT COURT

                  EASTERN DISTRICT OF CALIFORNIA
10
              AND THE NORTHERN DISTRICT OF CALIFORNIA
11
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
12
          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
13

14  RALPH COLEMAN, et al.                 Case No. CIV S-90-0520 LKK JFM P

15        Plaintiffs,                     THREE-JUDGE COURT

16        vs.

17  ARNOLD SCHWARZENEGGER, et al.

18        Defendants.

19
    MARCIANO PLATA, et al.                Case No. C01-1351 THE
20
          Plaintiffs,                     THREE-JUDGE COURT
21
          vs.
22                                        **DECLARATION OF SAN MATEO**
    ARNOLD SCHWARZENEGGER, et al.         **COUNTY SHERIFF GREG MUNKS FOR**
23                                        **TRIAL**
          Defendants.
24                                        **TRIAL:  NOVEMBER 17, 2008**

25

26        GREG MUNKS declares as follows:

27        1.      I am the duly-elected Sheriff of San Mateo County.  The following is within my personal

28  knowledge and, if called as a witness, I could and would testify competently thereto.  My

experience and training as the Sheriff of the County are as follows:

| | |
|---|---|
| January 8, 2007 to Present | **Sheriff of San Mateo County** |
| | Chief Law Enforcement Officer for County of San Mateo, elected June 6, 2006. As Sheriff, I oversee a large, full-service organization that provides law enforcement services to the unincorporated county areas as well as contract law enforcement services to municipalities and a three-county transit system. Beyond this, I provide security to county buildings and to the court system. In addition, as with most Sheriffs in the state, I operate all of the adult correctional facilities within the County. |
| 1993 to 2007 | **Undersheriff, San Mateo County Sheriff's Office** |
| | Second-in-Command of 600-person law enforcement agency. Assist in planning, organizing, directing, and reviewing the activities of the Sheriff's Office including patrol, investigations, corrections, civil and records management, search and rescue, bomb detection and disposal, narcotics enforcement, internal affairs, personnel and training, and fiscal management. Assist in the preparation and oversight of a $100 million annual operating budget. Act as Sheriff in his absence. |
| 1990 to 1993 | **Human Resources Manager, City of Palo Alto** |
| | Responsible for various human resources functions including Training and Development, Recruitment, Labor Relations, etc. |
| 1981 to 1990 | **Promoted through the ranks to Lieutenant, Palo Alto Police Department** |
| | Assignments included: Patrol Officer, Field Training Officer, Burglary Suppression Detective, Robbery/Homicide Investigator, Manager of Crime Prevention Division, Patrol Watch Commander, Manager of Personnel and Training Division, Commander of Field Training Officer Program, Commander of Hostage Negotiations Team, Commander of Public Information Officer Unit, Liaison to Human Relations Commission, Member of Management Negotiations Team during contract negotiations with both Police and Fire Unions. |
| 1977 to 1981 | **Deputy Sheriff, San Mateo County Sheriff's Office** |
| | Assignments included Main Jail, Honor Camp, and Manpower Pool |
| 1975 to 1977 | **Reserve Police Officer, Palo Alto Police Department** |

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

2.    San Mateo County Sheriff's Office and the County's criminal justice system, and ultimately local public safety would be adversely impacted by a prisoner release order. The following are facts, opinions, assumptions, and conclusions related to the impact and effect a prisoner release order would have on the San Mateo County Sheriff's Office, the County's criminal justice system, including our overcrowded detention system, and public safety.

3.    Releasing prison inmates before their sentences have been completed will negatively impact our overall criminal justice system in San Mateo County. Currently, California's recidivism rate is at 70 percent, the nation's highest. In San Mateo County, we do not have an information management system that calculates local recidivism. However, based on a snapshot of those inmates re-booked with old identification numbers from our database system between March 2008 and May 2008, we calculated a local recidivism rate of 68.3 % (Intervenor San Mateo County (hereinafter referred to as "SMC") Exhibit A).

4.    Recent parole realignment discussions assumed 70,000 early releases from the state's incarceration population. Using the figure of 1.5% of California prison inmates that come from San Mateo County, approximately 1,050 of the 70,000 would return to San Mateo County. Based on a conservative recidivism rate of 65% for my county, I can make an approximation that 682 of those 1,050 state early released prisoners would re-offend in a short period of time. It is my opinion, based on my law enforcement experience, that this potential and significant number of felons recommitting crimes in my community would strain the Sheriff's Office limited resources in protecting the public from serious law violators and thus create an adverse impact on public safety.

5.    The last three years, San Mateo County law enforcement agencies arrested and booked into the county jail more than 450 state parolees yearly (SMC Exhibit B). Adding another potential 682 parolees that can be expected to re-offend in our communities is not only a public safety threat, but also it will severely strain all functions of our local criminal justice systems.

6.    San Mateo County currently has a chronic and severe overcrowding crisis in its correctional system. It is strained beyond its functional and state rated capacity. If the state releases inmates early, the inmate population at my detention facilities will increase, further exacerbating our overcrowded jail crisis. The San Mateo County Sheriff's Office currently operates two Type II detention facilities – the Maguire Correctional Facility (MCF) and the Women's Correctional Center (WCC)). The Sheriff's Office also operates two Type III facilities – the male Minimum Security Facility (MSTF) and

the Men's Weekender Facility (MSTF). The rated capacity as established by the California Standards Authority (CSA) of the California Department of Corrections and Rehabilitation (CDCR) is 834 beds for all facilities. In 2007, the San Mateo County detention system had an average daily population (ADP) of approximately 1,200 inmates. This means that on an average, San Mateo County detention facilities were operating at 143% of rated capacity in total. The male facilities operated at 141% of CSA rated capacity and the female facility operated at 171% of CSA rated capacity.

7.      The San Mateo County detention facilities operational capacity will also be adversely impacted by a prisoner release order. Best practices recommend that an allowance be made within the facilities rated capacity for inmate classification, population peaking, and maintenance. If a conservative allowance for these factors of 5% for males and 10% for females is applied to the rated capacity, the total population was 152% of the recommended operational capacity and the male and female factors were 148% and 180% respectively of recommended operational capacity. Any further inmate population increase will only exacerbate the County's jail-overcrowding crisis and exponentially increase the risk of assaults and serious injuries to the incarcerated inmates and to my staff that work within these detention facilities.

8.      The San Mateo County Sheriff's Office has an inmate classification system for its detention population to insure inmates are lawfully housed in a safe environment. For example, state sentenced inmates are separated from inmates awaiting prosecution; mentally ill inmates are separated from gang members; inmates charged with crimes against children are separated from the general inmate population, etc. With overcrowding and additional increases in the detention population, the potential for misclassifying an inmate increases and those mistakes could cause serious unsafe situations for inmates and staff.

9.      As a result of the severe overcrowding, the County's detention facilities are very limited as to areas where we can house additional inmates that need special housing arrangements. The increasing gang population in our County has compounded this issue. If the Court were to order state prisoners released into our community, we would expect some of these released inmates that re-offend to be gang members. If rival gang members are incarcerated in the same housing unit, they have the tendency to fight and attack each other. Therefore, rival gang members need to be in separate housing units within the facility. However, we also cannot allow a concentrated number of gang members from the same gang in the same housing unit because they have a tendency to take over, attempt to control and/or influence other inmates, causing unsafe conditions for inmates and staff. The overcrowding of the detention facilities makes this task of separating gang members more difficult and potentially

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

compromises my abilities and obligation to provide a safe correctional environment for inmates, staff, and the community.

10.    As stated in this declaration, a prisoner release order would increase inmate population at all my detention facilities. Even with an overcrowding crisis in my detention facilities, as Sheriff of San Mateo County, it is my duty to protect public safety by finding any available space in my jails to insure inmates that are too dangerous to be in the communities awaiting their trials are not released until ordered by the courts. Therefore, I must convert any available jail space to housing units, even though the space was not intended for that use. The past few years, MCF's housing unit program rooms that were originally designed as classrooms have been modified with beds and converted into temporary housing units. These program rooms where we are forced to set up overflow beds do not have toilets and sinks. By state mandates and laws, these spaces cannot be locked which compromises the safety and security concern, especially when there are too many gang members in the facility. Additionally, by converting these program rooms to housing units, it limits our ability to conduct rehabilitation and re-entry programs, such as Choices, Project Read, GED, Alcoholics Anonymous, Domestic Violence Program, Narcotics Anonymous, etc., that are so vital and effective in preventing recidivism.

11.    San Mateo County is continually designing and supporting programs that can serve as alternatives to incarceration. Alternative sentencing can relieve overcrowding in our detention facilities and assist in lower the recidivism rate.. Approximately 50% of the criminal offenders in this county, who are sentenced to county jail, will serve their time outside MCF in an alternative and/or reentry program. A prisoner release order could adversely impact these programs that are limited in the number of sentenced inmates they can serve. The following is a list and brief description of our alternative sentencing programs:

- The "First Chance" Program – In 2007, 3,261 offenders were arrested for non-violent public intoxication offenses and driving under the influence are taken to an alternative facility and not booked into MCF.
- Cite and Release Program – Local law enforcement agencies' polices to issue field citations to appear in court and allow immediate release to offenders for minor offenses. These offenders are not booked into MCF,
- Sheriff's "Release Own Recognizance" Program – Arrested and booked offenders who qualified can be release on a promise to appear citation, prior to their arraignment and without posting bail.
- "Bridges" Intensive Day Treatment Program – Inmates' sentences are modified to

an intensive day treatment program where they receive education and treatment for chemical addictions, employment, and cognitive training.

- "Pathways" Mental Health Program – Program for inmates with a history of mental illnesses who are eligible for release on probation. The treatment program is designed to reintroduce inmates back into society with treatment for their mental illnesses, along with intensive supervision.

- Electronic Monitoring Program - In appropriate cases, judicial officers have discretion to order electronic monitoring at the pretrial stages and as an alternative to incarceration for sentenced inmates.

- Sheriff's Work Program (SWP) – Approximately 450 inmates report to SWP each day in lieu of being incarcerated. These inmates report to the alternative sentencing bureau to perform community work for municipal and private non-profit agencies. At the end of the day, the inmate return home to sleep, thus freeing up jail beds.

- Sheriff's Work Furlough Program – This program allows sentenced inmates who have employment to continue with their jobs during the day and then come back into custody at night. This program is also allows qualified inmates to receive off-site vocational training during business hours and then return to a detention facility at night.

- Re-entry Programs – San Mateo County provides re-entry planning and rehabilitation programs to jail inmates prior to the end of their incarceration. It is a collaborative approach, involving rehabilitation service providers and the Probation Department, to identify and arrange for qualified sentenced inmates into community based rehabilitation services.

Most CDCR early released inmates would not be eligible for the current County alternative sentences, due to their criminal history, classification, and status. However, in order to control further overcrowding in our detention facilities, the Sheriff's Office will be placed in a position to consider other county inmates for alternative sentencing that would not normally qualify because of their risk to public safety. In other words, a prisoner release order will increase our detention population and the measures we employ to reduce overcrowding in our detention facilities may adversely impact public safety.

12.    Conversely, our current and highly successful re-entry program would be adversely impacted by a prisoner release order. For example, CDCR's parolees would be the first to get the community based treatment beds before county inmates, because they are funded at a higher rate by the State. This will result in fewer community based treatment bed for county inmates. Our county inmates

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

1  will remain in custody longer, causing further clogging in our rehabilitation efforts.

2      13.    If the state separately places a cap on its incarcerated population and would not allow any
3  new intakes at the state CDCR's facilities, our jail population would be further backlogged, and we
4  would incur further classification risks for our inmate population.  In fact, any slowdown in the intake of
5  inmates from the county to the state system would create a backlog in my jails, anywhere from 30-35
6  inmates compounded weekly.  Each week San Mateo County sends approximately 15-17 new
   commitments to CDCR.  In addition, we have approximately the same number (15-17) of parole
7  violators, which are picked-up by CDCR transportation (SMC Exhibit C).  Earlier this year, CDC San
8  Quentin was placed on a lock down due to an illness breakout.  Within less than two weeks, we had a
9  backlog list of 40 inmates waiting to be transported to San Quentin, approximately 50% were new
10 commitments, and the other half was parole violators.  While we waited for CDCR's reception center to
   reopen, my detention facilities had to house those inmates, which only worsened the overcrowded
11 conditions.

12     14.    If the Court orders CDCR to stop taking parole violators, the San Mateo County Sheriff's
13 Office detention facilities would potentially experience more assaults on staff and the necessity for more
14 keep away orders, thus giving even us less flexibility in housing additional inmates.  CDCR inmates have
15 been convicted of felonies, which often are related to violence.  These inmates have higher risk factors in
16 their classification and having them serve their parole violation time in county jails posses an undue
   threat to staff, visitors, and other inmates.

17     15.    A prisoner release order would adversely impact the County and Sheriff's Office budgets.
18 Currently, the San Mateo County Sheriff's Office annual budget is approximately $150 million.
19 Approximately 60 percent of the annual budget is allocated to operating our jails and re-entry programs.
20 Our local average cost per inmate, per day is $110.00.  Because of our housing arrangements, the cost for
21 staff is based on a fixed ratio of staff to inmate.  Meals and medical care are averaged, as some inmates
22 require more medical treatment while others do not.

23     16.    If San Mateo County were forced to rent additional bed space to house our jail population,
   it would cost us $110 per day, per inmate, not including transportation that would be necessary for court
24 and other appointments and appearances, or transportation back to San Mateo County for release.  Thus,
25 adding an additional 200 inmates into our local correctional system ($110 per day per inmate) would cost
26 San Mateo County approximately $9 million annually.

27     17.    A long-term increase to our overall jail population, due to a prisoner release order, would
28 require San Mateo County to construct a new correctional facility to accommodate the increase.  We are

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

currently in the process of planning and designing to construct a new 648 bed correctional facility to handle our current overcrowded jail population. This new facility has not planned any significant increases in jail population due to a state prisoner release order or state caps on its incarcerated population. It is estimated that a new correctional facility to meet San Mateo County's current jail population needs will cost approximately $130 million to construct and approximately $40 million annually to operate (SMC Exhibit D). Even with a new facility, an additional increase in the current jail population will once again cause overcrowding conditions. The overcrowding will continue to pose an undue threat to the safety of staff, visitors, and inmates, as well as a financial burden to our County budget.

18.    I have personally discussed the state's prisoner release proposal with the San Mateo County police chiefs and the San Mateo County District Attorney. I believe there is a consensus with this law enforcement group that a release of a significant number of inmates from the state's correctional system would have an adverse impact on police safety in San Mateo County.

19.    My staff strives to perform at their highest level of efficiency and professionalism at all times, even as the burden of overcrowding threatens us daily. However, as I have declared in this document, my detention facilities do not have room for additional inmates that would likely come from a prisoner release order. Our daily detention population is already stretching our operational limits, which endangers my staff and the safety of the inmates. Moreover, I believe it is my responsibility to offer programming and opportunities that have proven successful in reducing recidivism and in assisting inmates to make a better life for them upon release from custody. Overcrowding decreases and sometimes precludes my ability to offer these programs and opportunities.

20.    The county's jail system is an integral part of the criminal justice system that provides an element of public safety to our local communities. A well-functioning criminal justice system is critical to public safety, and if any part of that system is not working properly, it will have a negative impact on public safety. Jail is one of the necessary options for judges to consider when sentencing people for the crimes they have committed. Jail is also a necessary function for law enforcement when it comes to taking dangerous criminals off the street. If the jail is at or over its rate capacity, it limits those options for both law enforcement and the judiciary when making decisions about those aspects of the criminal justice system. If our county detention facilities reach maximum inmate capacity, then I would have to, as the Sheriff of San Mateo County, start releasing sentenced inmates before they have completed their court ordered sentence. County inmates released early will not be given the opportunity to finish one of the rehabilitation programs our detention system offers and/or enter into a reentry program. Without

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

these opportunities to better oneself and learn important life skills, I believe it is almost a certainty that the early released inmate will commit a new crime.

21.    As Sheriff of San Mateo County and based on my more than thirty years of law enforcement experience, it is my professional opinion that releasing inmates into the community prior to completing their sentences would only shift the problems the CDCR is currently experiencing to the local level, which will adversely impact the County's criminal justice systems and public safety.  I conclude with my opinion that any significant release of state prisoners, due to a prisoner release order, will have an adverse impact on my Sheriff's Office detention system, which will in turn have and adverse impact on the entire San Mateo County's criminal justice system, ultimately adversely affecting public safety.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 29, 2008.

GREG MUNKS

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. Sheriff for trial.doc

9

DECLARATION OF SAN MATEO COUNTY SHERIFF GREG MUNKS FOR TRIAL

1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA  94063
   Telephone: (650) 363-4746
4  Facsimile:  (650) 363-4034
   E-mail:  cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenor
6  COUNTY OF SAN MATEO

7

8

9                    UNITED STATES DISTRICT COURT

                   EASTERN DISTRICT OF CALIFORNIA
10
                AND THE NORTHERN DISTRICT OF CALIFORNIA
11
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
12
          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
13

14  RALPH COLEMAN, et al.                    Case No. CIV S-90-0520 LKK JFM P

15             Plaintiffs,                   THREE-JUDGE COURT

16      vs.

17  ARNOLD SCHWARZENEGGER, et al.

18             Defendants.

19
    MARCIANO PLATA, et al.                   Case No. C01-1351 THE
20
               Plaintiffs,                   THREE-JUDGE COURT
21
        vs.
22                                           **DECLARATION OF CHARLENE SILVA**
    ARNOLD SCHWARZENEGGER, et al.            **FOR TRIAL**
23
               Defendants.                   **TRIAL:  NOVEMBER 17, 2008**
24

25      I, CHARLENE SILVA, declares as follows:

26      1.     I am the Director of the Health Department and Interim Chief of the Health System for the

27  County of San Mateo.  The following is within my personal knowledge and, if called as a witness, I

28  could and would testify competently thereto.  My experience and responsibilities are as follows:

    Case No. CIV S-90-0520 LKK JFM P
    DECLARATION OF CHARLENE SILVA FOR TRIAL

I have served as the San Mateo County Health Director for four years. Prior to this, I served as Director of Aging and Adult Services for San Mateo County for fourteen years. Prior positions include senior management roles within the Sacramento Department of Social Services and a wide range of professional and community advisory boards in the health and social services fields. I began my career as a social worker in Child Protective Services in 1971.

As the Director of San Mateo County's Health Department, I have responsibility for our broad mission to build a healthy community. Within this arena, we have services aimed at caring for vulnerable populations, such as behavioral health and recovery services that comprise a system of care for persons with serious mental illness, alcohol and other drug addiction, and co-occurring mental health and substance abuse issues, aging and adult services that protect and promote the health and well-being of older adults and persons with disabilities, as well as correctional health services that address the medical and behavioral health needs of clients in our local criminal justice system. In addition, as part of a County initiative to look across all of the County's healthcare delivery system assets, I have responsibility working with colleagues leading the San Mateo Medical Center and the Health Plan of San Mateo (our local Medi-Cal and public coverage managed care plan) to leverage our joint resources to serve the needs of the underserved. Through this work, we have platforms to build on in serving the needs of parolees released to our community. However, our existing systems are stretched in meeting the needs of current residents as the number of those without health insurance has grown, as state and federal funding for many of our services has been reduced, the pressures on the safety net have increased, and the supports that keep communities and individuals healthy have frayed. It is in this context that we consider the potential impact of the early release of segments of the State correctional facility population back to our community.

2.      As we aim to carry out existing health responsibilities entrusted to us, we know the following:

- There are an estimated 40,000 adults in our community who lack health insurance and have incomes below 400% of the Federal Poverty Level.[1]

---

[1] 400% FPL represents the estimated income required to live "self-sufficiently" in our high cost-of-living area.

- We have persistent health disparities in our community, disproportionately affecting populations of color and low-income populations, whose health outcomes are influenced by social and environmental factors that reflect poverty, inequities in health access and the toll of discrimination and stigma.

- We have inadequate primary care capacity within our public delivery system; the waits for a primary care appointment are currently between two and four months.

- State budget cuts to the Medi-Cal program, which is the financial platform for safety net medical care and mental health care systems to sustain services, will likely result in reductions in current capacity.

- Our County has determined that it must achieve reductions in the level of County General Fund subsidy of our public medical care delivery system to maintain our ability to carry out our broad range of responsibilities. The Board of Supervisors has established a target reduction of General Fund subsidy for indigent healthcare from $72 million in FY 08-09 to $50 million by 2013.

- We have waits for every level of long-term care (home and community-based services, skilled nursing facility services) for low-income populations, and currently do not have any affordable assisted living capacity. Given our age profile, the aging of the baby boomer population will affect San Mateo County earlier than the State as a whole, resulting in greater stresses to an already stretched system for current County residents.

- We have had to prioritize the segments of our population with substance abuse addiction that we will serve with the limited treatment resources we have, resulting in four priority populations and an ability to serve an estimated one in five of our current residents in need of substance abuse treatment.

- As we face a local structural budget deficit, we are maintaining a 9% staff vacancy rate within our Behavioral Health and Recovery Services system to live within the local resources directed to those programs.

- We have long-standing vacancies in some critical, hard-to-fill positions, such as psychiatry, and bi-lingual/bi-cultural clinicians, mirroring statewide workforce capacity shortages that constrain our ability to meet existing clients' needs.

- The demands on the medical care and behavioral health and recovery systems have not enabled adequate attention to the "upstream" opportunities for prevention and early intervention. We have embarked on a plan to build our prevention approach, but this will be a generation-long endeavor.

3.     In projecting the impact of the release of parolees, and the demographic composition of that population, it is clear that there are health needs that we would have to be prepared to address. Given that the criminal justice system is a "lens that magnifies inequities – socio-economic, gender, race, culture and class differences"[2], we can conservatively estimate the following health needs:

- A sizable proportion of released inmates will lack health insurance, and, likely be low-income, requiring additional capacity in our safety net medical care system. An 18-month planning process targeting the health needs of uninsured adults included an actuarial analysis of per member per month healthcare costs for the low-income, uninsured population. We estimate a cost of $300 per client per month for medical care for the uninsured.

- We would expect that the aging of the population that we are preparing for exists among the State inmate population as well, and would require additional resources within our continuum of services for older adults. In order to support residents in the least restrictive setting possible, our Aging and Adult Services division would need additional capacity to address the long-term care needs that the released population will have over the next several years.

- We recognize that our criminal justice system has been a backstop for underlying issues of mental illness and substance abuse, and, therefore would expect to see a sizable prevalence of these needs among the population proposed to be returned. The California Mental Health Directors' Association estimates a prevalence of 15-50% of released parolees will have mental health needs, and at least 75% of this incarcerated mentally ill population also has co-occurring drug and alcohol use.[3] We would also estimate at least 75% of released parolees will have a substance

---

[2, 3] California Mental Health Directors Association Forensics Committee White Paper, 8/12/08. (See San Mateo County Exhibit SMC-R.)

DECLARATION OF CHARLENE SILVA FOR TRIAL

abuse problem.[4]  We estimate a cost in excess of $12 million annually to provide the appropriate mental health and substance abuse treatment services for this population.

• While we will make every effort to support all residents in our community to be productive and contributing members, supported by systems that keep them out of jail, we would expect that some proportion of this population will return to our local jail and require health services in this setting.  Our average cost/day for correctional health services ranges from $23-$25, translating to annual costs/ inmate/day to between $8,300 and $9,000  These costs have been rising even more steeply than other costs within the Health Department's purview, given the increased complexity of healthcare needs faced by inmates and underlying drivers of healthcare inflation.

4.     We were hopeful to have pursued a constructive dialogue about these issues through the settlement discussions.  It is unfortunate that we must now pursue these critical issues within the legal dispute in which we are engaged to ensure that the State's actions do not prevent us from carrying out the mandates and mission that we have without adequate resources to address the parolees' projected healthcare needs.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 30, 2008.

Charlene Silva /s/
**CHARLENE SILVA**

---
[4] Report of the Re-Entry Policy Council, 2008 (See San Mateo County Exhibit SMC-S.)

DECLARATION OF CHARLENE SILVA FOR TRIAL

1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 83887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA 94063
   Telephone: (650) 363-4746
4  Facsimile: (650) 363-4034
   E-mail: cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenors
6  COUNTY OF SAN MATEO

7

8              UNITED STATES DISTRICT COURT

9            EASTERN DISTRICT OF CALIFORNIA

10        AND THE NORTHERN DISTRICT OF CALIFORNIA

11    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13
   RALPH COLEMAN, et al.                    Case No. CIV S-90-0520 LKK JFM P
14
                Plaintiffs,                 THREE-JUDGE COURT
15
16         vs.

17 ARNOLD SCHWARZENEGGER, et al.

18              Defendants.
   _____
19 MARCIANO PLATA, et al.                   Case No. C01-1351 THE

20              Plaintiffs,                 THREE-JUDGE COURT

21         vs.
                                            **DECLARATION OF DUANE BAY FOR**
22 ARNOLD SCHWARZENEGGER, et al.            **TRIAL**

23              Defendants.

24

25 DUANE BAY declares as follows:

26    1.  I am and have been since September, 2005 the Director of County of San Mateo Department of

27        Housing.  As Director of the Department of Housing, I have actively participated in the

28        development and implementation of the County of San Mateo's Plan to End Homelessness

(known as Housing Our People Effectively) for three years from 2006 through the present. Following is an assessment of the probable substantial public safety impact of an early prisoner release order. This assessment is based on my experience as Director of County of San Mateo Department of Housing. coincident to my active participation in the development of the County of San Mateo Plan to End Homelessness I engaged in formal and informal, written and oral communications with housing and criminal justice professionals, and reviewed numerous reports, among them: the 2007 San Mateo County Homeless Census and Survey, the San Mateo County Roadmap for Alcohol and Drug Prevention, Housing Our People Effectively—Ending Homelessness in San Mateo County (2006), and meeting packets for the San Mateo County Community Re-entry [from County jail] Planning Committee (2008).

2.  I believe the early release of prisoner, absent commitment of adequate funding to provide housing subsidies, would increase crime and decrease public safety. My reasoning is as follows, step by step:

- I believe that most early release prisoners will not be able to compete effectively for housing in the open housing market due to low income, lack of positive credit history, and the tendency of most landlords to discriminate against prospective tenants with criminal records.

- Released prisoners who do not compete effectively for open-market housing will find shelter with relatives or acquaintances, in transitional treatment facilities, in homeless shelters, or will remain unsheltered.

- Because transitional treatment facilities and emergency shelters for the homeless are chronically overbooked in our County, many, perhaps most, early release prisoners will remain unsheltered. According to 2007 San Mateo County Homeless Census and Survey, average demand for approximately 2,064 beds nightly exceeded average supply of less than 1,094 beds by a factor of almost 2:1. The supply to demand ratio is even less favorable for treatment facilities.

- Lack of stable housing is among factors that are positively correlated to recidivism. Most of the criminal acts leading to recidivism are threats to public safety directly or indirectly.

- This effect—lack of stable housing contributing to recidivism—is likely to be even more pronounced for persons with one of more of the additional challenges of serious ill-health,

DECLARATION OF DUANE BAY FOR TRIAL

physical disability, illiteracy or drug/alcohol addiction. As a point of reference, County staff estimates 10% to 20% of parolees will qualify for social services related to mental health and 70% will qualify for social services related to drug or alcohol problems.

Based on research and anecdotal evidence reported during meetings of the County Jail Re-Entry Task Force, and the direct recent empirical evidence from a pilot prisoner release program in San Mateo County, I would estimate that at least 40% of early release prisoners would be homeless the majority of their first year our of prison. Applying a recidivism rate of 65%, the San Mateo County Sheriff's estimate of general recidivism among parolees, which is therefore a conservative figure for unsheltered parolees, and assuming only one crime per recidivist (again a very conservative assumption) suggests that at least 260 crimes would be committed by homeless parolees during the first year after parolee release. These crimes would probably be concentrated in certain communities (e.g., East Palo Alto) that have historically received parolees disproportionately, which would render the local crime rate (i.e., crimes per thousand residents) even higher.

I declare under penalty of perjury that the foregoing is true and correct, and that this declaration was executed at Redwood City , California, on October 29, 2008.



_____
DUANE BAY

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. of Duane Bay for Trial.doc

DECLARATION OF DUANE BAY FOR TRIAL