# EXHIBIT "SMC-A"

# MEMORANDUM

### SAN MATEO COUNTY
### COUNTY MANAGER'S OFFICE

**DATE:**       April 30, 2008

**TO:**         Legislative Committee (Supervisors Jacobs Gibson and Tissier)

**FROM:**       Ross Nakasone, Legislative Coordinator (xt. 1345)

**SUBJECT:**    Response to UCC Survey on Parole Realignment

---

The Urban Counties Caucus asked member counties to estimate costs associated with the LAO's Parole Realignment proposal.

For the assessment below, San Mateo County staff has estimated the annual cost for an assumed 1,000 realigned parolees.

Total Year-one costs (annual as well as startup costs):

| | |
|---|---|
| Probation (supervision costs): | $7.6 million |
| Behavioral Health and Recovery Services (mental health and AOD costs): | $9 million |
| Sheriff (re-incarceration costs): | $4.3 million |
| **TOTAL YEAR-ONE COSTS:** | **$20.9 million** |

The below assessment is preliminary and draft. It does not include a number of significant costs such as housing and work readiness program needs for returning realigned parolees.

#### Significant and unanswered questions
- Does the estimated 71,000 statewide realigned parolee figure represent a one-time or an annual ongoing shift of such parolees? If it is ongoing, the number of the County's realigned parolees could grow at a factor similar to the average realigned parolee's duration of supervision. For example, should the average supervision period be three years and the annual release of realigned parolees remain constant; San Mateo County's realigned parolee population could grow to three times the initial amount.
- How (and how long) will San Mateo County build capacity to serve the County's estimated 1,000 realigned parolees who have generally not been served under the current parole system? Building capacity in mental health and AOD services—especially residential treatment services—will be a tremendous challenge to do and if possible, will take significant time when neighborhood concerns are considered. The sheer number of AOD and mental

health facilities (to house services/slots/beds) that would need to be created is daunting. Without such additional capacity, realigned parolees could compete and crowed out others needing services.

- While the Sheriff has estimated reincarceration costs, the County's jail system is over capacity. How will realignment parole violators be reincarcerated if both the County jail and state prison system cannot accommodate them?

**Cost detail requested by UCC follows below.**

1) Estimated impact on the **Probation Department** assuming the optimal level of services is provided.  Please share with us how you define optimal services and what formula you used to determine cost.

| Annual costs: | $6,873,144 |
|---|---|
| Startup, one-time and periodic costs: | $694,871 |
| **Year 1 Probation TOTAL:** | **$7,568,015** |

What is the caseload size that your county assumes for these offenders?

    1,000 realigned parolees

What is the average length of supervision for these clients that your estimate assumes?

    One year

What number of peace officer staff does your estimate assume will be required to supervise this population?

| Deputy Probation Officer III | 20 |
|---|---|

What number of support staff does your estimate assume?

| Probation Services Manager I | 2 |
|---|---|
| Legal Office Specialist | 5 |
| Legal Office Services Supervisor | 1 |

Are you assuming that additional contract providers will be required for things such as drug testing, etc.?  If so, please explain.

    Yes.  All clients would be subject to random drug testing, with an average of 3 tests per client per month per year.  1,000 clients X 3 tests per month X 12 months per year = 36,000 tests per year.  The frequency of tests per client will likely be higher during the initial months of realignment parole and lower with predicted compliance.  Assumed 15 percent of drug test kit results will be contested resulting in 5,400 lab test confirmations.

    In addition, all clients would be subject to electronic monitoring through a continuous RF + GPS system.

2) Estimated impact on the **Sheriff/Department of Corrections**
Given that the revocation process is as yet unspecified, what local law enforcement impacts can be anticipated and/or articulated, with dollar amounts if feasible?

    **$4.3 million annually for reincarceration costs**

p. 3

3) Estimated impact on the **District Attorney**

> Not estimated.

4) Estimated impact on the **Public Defender and Alternate Public Defender**

> Not estimated.

5) Estimated impact on **Mental Health Department** (including pharmacy)
Please observe the sample methodology suggested by Santa Clara County included below.

(a) Estimated impact on the Mental Health Department (including pharmacy) based on number of parole clients per LAO estimates.

Assume 10% of parolees (1,000 X 10% = 100) for intensive treatment (FSP):

| Cost of full Service Partnership level slots needed: | $3 million per year |
|---|---|
| Methodology: Estimated $30,000 per patient per year for Full Service Partnership level of care. Per-patient rate ($30,000) X number of patients (100)=$3,000,000 | |

Assume 10% of parolees (1,000 X 10% = 100) for outpatient treatment:

| Cost of lower level (Core) SMI slots needed: | $2 million per year |
|---|---|
| Methodology: Estimated $20,000 per patient per year for Core level of care. Per-patient rate ($20,000) X number of patients (100)=$2,000,000 | |

Pharmacy Cost estimate:

> Included.

Total costs (Low to high range) including both intensive and outpatient treatment and pharmacy.

> **$5 million annually for mental health services**

(b) What new/expanded service capacity is required to treat adult probation (parolees) with mental illness? Use your county's Mental Health Services Act CSS program costs as basis: Full Service Partnership slots & outpatient slots.

> San Mateo County would need an estimated:
> - 100 additional intensive services (FSP) slots.
> - 100 additional slots in outpatient services

p. 4

6) Estimated impact on **County Alcohol and Drug Treatment**

Assume that 70 percent of the parolee population will need services of some sort. Use a "per episode" cost and multiply it by the number of parolees in your county that will need alcohol and drug treatment services (70 percent of the total number of parolees expected to be returned your county). An episode includes the course of treatment from entrance to treatment to discharge and can include various modalities. Santa Clara provided the example below.

### $4 million annually for alcohol and other drug services

| | |
|---|---|
| Cost of residential service days needed annually: | $2.4 million per year |
| Methodology: Estimated $85 per day for residential services. Daily rate ($85) X number of days needed (28,350) = $2,409,750 | |

| | |
|---|---|
| Cost of intensive outpatient service days needed annually: | $578,340 per year |
| Methodology: Estimated $85 per day for intensive outpatient services. Daily rate ($85) X number of days needed (6,804) = $578,340 | |

| | |
|---|---|
| Cost of outpatient service hours needed annually: | $226,800 per year |
| Methodology: Estimated $50 per hour for outpatient services. Hourly rate ($50) X number of hours needed (4,536)=$226,800 | |

| | |
|---|---|
| Cost of intensive outpatient service days needed annually for clients stepping down from residential treatment: | $627,300 per year |
| Methodology: Estimated $85 per day for intensive outpatient services. Daily rate ($85) X number of days needed (7,380) = $627,300 | |

| | |
|---|---|
| Cost of outpatient service hours needed annually for clients stepping down from intensive outpatient services: | $171,000 per year |
| Methodology: Estimated $50 per hour for outpatient services. Hourly rate ($50) X number of hours needed (3,420)=$171,000 | |

**UCC Parole Realignment Survey Response Detail**
**San Mateo County**
**Revised: April 23, 2008**

## POPULATION ASSUMPTIONS/ESTIMATES

| | |
|---|---|
| Number of "new" Realigned Parolees per year: | 1,000 |
| Methodology: | According to CSAC, San Mateo County's percent of statewide parole population applied to the estimated 71,000 realigned parolees is 934. And the County's percent realigned parolees based on percentage of statewide population is 1,381. 1,000 is an easy round number between the two. |

**Supervision**

| | |
|---|---|
| Ratio of Clients to Parole Realignment peace officer: | 50:1 |
| Methodology: | San Mateo County's probation officers have a caseload ratio between 50:1 to 70:1. The 50:1 ratio represents an intensive supervision level which is appropriate for realigned parolees that have typically failed or deemed to be unsuitable for probation. |

| | |
|---|---|
| Number of Realigned Parolee agents needed: | 20 |
| Methodology: | 1,000/50=20 Deputy Probation Officer III's |

| | |
|---|---|
| Number of support staff needed: | 8 |
| Methodology: | Support staff includes 2 Probation Services Manager I's, 5 Legal Office Specialists, and 1 Legal Office Services Supervisor. |

**Other monitoring needs:**

| | |
|---|---|
| Drug testing: | 36,000 4-panel drug testing kits and related equipment annually and 5,400 test confirmations |
| Methodology: | All clients would be subject to random drug testing, with an average of 3 tests per client per month per year. 1,000 clients X 3 tests per month X 12 months per year = 36,000 tests per year. The frequency of tests per client will likely be higher during the initial months of realignment parole and lower with predicted compliance. Assumed 15 percent of drug test kit |

|  | results will be contested resulting in 5,400 lab test confirmations. |
|---|---|

| Electronic monitoring | 1,000 electronic monitors and related services annually. |
|---|---|
| Methodology: | All clients would be subject to electronic monitoring through a continuous RF + GPS system. |

## Services

Number of Alcohol and Other Drug (AOD) slots needed (Assumes 70 percent of realigned parolees will need AOD services of varying levels)

| Residential service days needed annually: | 28,350 days |
|---|---|
| Methodology: | Assume 35 percent of realigned parolees will need residential treatment for an average of 90 days with a 90 percent retention rate. 1,000 X 35%= 350 clients X 90% retention rate=315 clients X 90 days of service=28,350 residential service days. |

| Intensive outpatient service days needed annually: | 6,804 days |
|---|---|
| Methodology: | Assume 21 percent of realigned parolees will need intensive outpatient treatment for an average of 36 days per client with a 90 percent retention rate. Service would likely be provided 3 days per week for 12 weeks. 1,000 X 21%=210 clients X 90% retention rate= 189 clients X 36 days per client=6,804 outpatient days. |

| Outpatient service hours needed annually: | 4,536 hours |
|---|---|
| Methodology: | Assume 14 percent of realigned parolees will need outpatient treatment for an average of 36 hours per year per client with a 90 percent retention rate. Service would likely be provided 3 hours per week for 12 weeks. 1,000 X 14%=140 clients X 90% retention rate= 126 clients X 36 hours per client=4,536 outpatient service hours. |

| Intensive outpatient service days needed annually for clients stepping down from residential treatment: | 7,380 days |
|---|---|
| Methodology: | Assume 23 percent of realigned parolees (65% of the 35% that receive residential treatment) will need intensive outpatient treatment for an average of 36 days per client with a 90 percent retention rate. Service would likely be provided 3 days per week for 12 weeks. 1,000 X 35% X65%=228 clients |

| | X 90% retention rate= 205 clients X 36 days per client=7,380 outpatient days. |
|---|---|
| Outpatient service hours needed annually for clients stepping down from intensive outpatient services: | 3,420 hours |
| Methodology: | Assume 11 percent of realigned parolees (50% of the 21% that received intensive outpatient services) will need outpatient treatment for an average of 36 hours per year per client with a 90 percent retention rate.  Service would likely be provided 3 hours per week for 12 weeks.  1,000 X 21%X50%=105 clients X 90% retention rate=95 clients X 36 hours per client=3,420 outpatient service hours. |

Number of Mental Health slots needed (Assumes 20 percent of realigned parolees will need mental health services of varying levels)

| Full Service Partnership level slots needed: | 100 |
|---|---|
| Methodology: | Assume 10 percent of all realigned parolees have serious mental illness that require Full Service Partnership level of service as scoped in MHSA.  This includes intensive case management, wrap around services and Rx management.  1,000 realigned parolees X 10%=100. |

| Lower level (Core) SMI slots needed: | 100 |
|---|---|
| Methodology: | Assume 10 percent of all realigned parolees have serious mental illness that a lower level of service (Core service).  1,000 realigned parolees X 10%=100. |

Other service needs:
Other service needs identified but not assessed include:
1. Housing needs
2. Work readiness needs, and
3. Potential uptake in General Assistance.
Other considerations include day-reporting reentry programs that could provide case management services.


**Realignment Parole Violations Process**
No estimates or methodology here

**Re-incarceration Population Estimates**

| Number of realigned parolee technical violations: | 600 violations |
|---|---|
| Methodology: | Considers recidivism rates and technical violation rates. |
| | This does not include realigned parolees that commit new crimes. |

| Average length of stay in the county jail for realignment parole violations: | 60 days |
|---|---|
| Methodology: | A median point for technical violation sanctions assumed between 30-90 days. |

| Number of jail-bed days: | 36,000 jail-bed days |
|---|---|
| Methodology: | Number of reincarcerated parolees X average length of stay. 600 X 60 = 36,000 jail-bed days. |

## COST ASSUMPTIONS/ESTIMATES

**Supervision**

| Cost of a Parole Realignment peace officer: | $140,318.26 |
|---|---|
| Methodology: | This includes annual costs: salary and benefits for a DPO III (127,820), various administrative and technology costs (4,359.86) and vehicle costs (8,138.40) on a per officer basis. |

| Average cost per support staff: | $109,934.86 |
|---|---|
| Methodology: | This includes the average annual cost per support staff: salary and benefits (105,575) and various administrative and technology costs (4,359.86) on a per staff basis. |

| Total supervision cost: | $3,685,844 per year |
|---|---|
| Methodology: | (peace officer cost (140,318.26) X number of peace officers needed (20)) + (Support staff cost (109,934.86) X number of support staff needed (8)) =$3,685,844. |

| Supervision cost per client: | $3,685 per client per year |
|---|---|
| Methodology: | Total supervision cost/number of realigned parolees (3,685,844 /1,000=3,685 per client per year. |

| One-time and periodic costs: | $694,871 |
|---|---|
| Methodology: | Initial vehicle purchase, office needs, intoximeters, staff |

| | training (minimum 40 hours of backfill costs), backfill costs for CORE training, training costs, background investigation costs. Assume arming officers and training. |
|---|---|

**Other monitoring needs:**

| Drug testing | $267,300 per year |
|---|---|
| Methodology: | Estimated cost per drug test kit and related equipment ($4.50) X number of tests (36,000) = $162,000. Estimated cost per drug test confirmation at testing lab ($19.50) X number of lab test confirmations needed (5,400) = 105,300. |

| Total electronic monitoring cost: | $2.9 million per year |
|---|---|
| Methodology: | Staff estimates an $8 per client per day cost based on a brief survey of some electronic survey systems. Per client per day cost ($8) X 365 days X number of clients (1,000) = $2.92 million. |

**Services**

Number of Alcohol and Other Drug (AOD) slots needed (Assumes 70 percent of realigned parolees will need AOD services of varying levels)

| Cost of residential service days needed annually: | $2.4 million per year |
|---|---|
| Methodology: | Estimated $85 per day for residential services. Daily rate ($85) X number of days needed (28,350) = $2,409,750 |

| Cost of intensive outpatient service days needed annually: | $578,340 per year |
|---|---|
| Methodology: | Estimated $85 per day for intensive outpatient services. Daily rate ($85) X number of days needed (6,804) = $578,340 |

| Cost of outpatient service hours needed annually: | $226,800 per year |
|---|---|
| Methodology: | Estimated $50 per hour for outpatient services. Hourly rate ($50) X number of hours needed (4,536)=$226,800 |

| Cost of intensive outpatient service days needed annually for clients stepping down from residential treatment: | $627,300 per year |
|---|---|
| Methodology: | Estimated $85 per day for intensive outpatient services. Daily rate ($85) X number of days needed (7,380) = $627,300 |

| Cost of outpatient service hours needed annually for clients stepping down from intensive outpatient services: | $171,000 per year |
|---|---|
| Methodology: | Estimated $50 per hour for outpatient services. Hourly rate ($50) X number of hours needed (3,420)=$171,000 |

Number of Mental Health slots needed (Assumes 20 percent of realigned parolees will need mental health services of varying levels)

| Cost of full Service Partnership level slots needed: | $3 million per year |
|---|---|
| Methodology: | Estimated $30,000 per patient per year for Full Service Partnership level of care. Per-patient rate ($30,000) X number of patients (100)=$3,000,000 |

| Cost of lower level (Core) SMI slots needed: | $2 million per year |
|---|---|
| Methodology: | Estimated $20,000 per patient per year for Core level of care. Per-patient rate ($20,000) X number of patients (100)=$2,000,000 |

| Administrative costs: | $1.35 million |
|---|---|
| Methodology: | Assume 15 percent cost to administer contracts, performance measures and reporting of providers. $9 million X 15% = $1.35 million |

**Realignment Parole Violations Process**
No estimates or methodology here

**Re-incarceration Population Estimates**

| Daily cost for a jail bed: | $120 per day |
|---|---|
| Methodology: | This number is the cost of detention facilities divided by the number of jail-bed days. |

| Estimated total cost for reincarceration: | $4.32 million |
|---|---|
| Methodology: | $120/day X 36,000 jail-bed days = $4.32 million |

# EXHIBIT "SMC-B"

Public Policy Institute *of* California

# *California Counts*

## POPULATION TRENDS AND PROFILES

*Hans P. Johnson, editor*

**Volume 8  Number 1 • August 2006**

# Who's in Prison?

## *The Changing Demographics of Incarceration*

*By Amanda Bailey and Joseph M. Hayes*



For issues of crime and punishment, California has experienced a dynamic period over the past 15 years. Voters and legislators have chosen to impose harsher criminal penalties but also to experiment with alternatives to incarceration. The federal courts have taken management of the entire prison health care system away from the state itself; they have also ruled that California's racial segregation policy in prisons is unconstitutional. And as a larger number of Californians are confined to prison, concern has mounted about the effects of incarceration policies on all Californians, in particular on the families and communities that prisoners leave behind and to whom many eventually return.

The state prison population has grown three times faster than the general adult population since 1990 and at year-end 2005 stood at 167,698. African Americans have the highest incarceration rates of any group (5,125 per 100,000 adults in the population for men and 346 per 100,000 for women, compared to 1,159 and 62, respectively, for all adults), although Latinos now constitute the largest ethnic group in the prison system, at 38 percent of the total.

The prison population is aging, with adults under age 25 representing a steadily declining share while the number of prisoners in older age groups continues to grow. Currently, the share of prisoners age 50 and older is 11 percent, up from 4 percent in 1990, whereas the share of prisoners under age 25 has declined from 20 percent to 14 percent. This trend bears on the health care problem, as the cost of housing, transporting, and caring for elderly inmates is estimated to be two or three times higher than for other inmates (Brown and Jolivette, 2005).

The San Joaquin Valley and the Inland Empire contribute somewhat disproportionately to the prison population, and the highest incarceration rates are found in rural Central Valley counties. Women constitute 7 percent of prisoners, and they differ significantly from men by

Public Policy Institute *of* California

## *California Counts*                                    Who's in Prison?

> **The state prison population has grown three times faster than the general adult population since 1990 and at year-end 2005 stood at 167,698.**

a few important measures, most notably racial/ethnic representation and offense type.

Prisoners serving time for violent crimes are a majority (just over 50%) of the prison population, and their share is growing. More serious sentencing laws have increased the penalties for this group, contributing to its growth as well as to the aging of the overall prison population.

By contrast, drug offenders now represent a diminished share of the prison population, having fallen from 28 to 21 percent in the past 15 years; admissions for drug crimes have also declined in recent years, following the introduction of alternatives to prison for some offenders. Together, these trends contribute to a population composed of older prisoners serving longer terms for serious or violent offenses.

*Amanda Bailey and Joseph M. Hayes are research associates at the Public Policy Institute of California. Views expressed here do not necessarily reflect those of PPIC. The authors acknowledge the helpful comments of Richard Greene, Hans P. Johnson, Greg Jolivette, Deborah Reed, Lorien Rice, Darren Urada, and Franklin Zimring. They would also like to extend their thanks to those who provided data: Christopher Shores and Lori Asuncion at the California Department of Corrections and Rehabilitation (CDCR), Offender Information Services Branch; Allen Beck and Timothy Hughes at the U.S. Department of Justice, Bureau of Justice Statistics; and Tom Zelenock at the Interuniversity Consortium for Political and Social Research.*

Public Policy Institute *of* California

## California Counts

Who's in Prison?

## Introduction

On February 23, 2005, the U.S. Supreme Court ruled that California's policy of segregating new prison arrivals according to race was unconstitutional. The state had argued that the practice was necessary to prevent interracial violence. On June 30, 2005, U.S. District Judge Thelton Henderson ordered that a federal receiver take control of California's $1.1 billion-per-year prison health care system, citing deplorable conditions and preventable deaths. In 2004, voters elected not to restrict the application of the ten-year-old Three Strikes and You're Out law.

Who are the people at the center of these recent policy interventions? To what extent does the prison population resemble the wider state population, and in what ways does it differ? What is its racial and ethnic profile? What health problems prevail in the prison system, and how might the population's changing age structure affect health care costs? How do changes in sentencing policy alter the composition of the prison population?

In this issue of *California Counts*, we begin by providing a demographic profile of the state prison population as of December 31, 2005. We compare California's prison population to the general population by several demographic measures and then examine some

incarceration-specific characteristics, including offense and sentence type.

Next, we explore how these characteristics have changed over the past 15 years, paying particular attention to the substantial growth of the prison population and the sizable yearly flows of prisoners into and out of the system. Finally, we examine some of the likely reasons for these changes.

In particular, we document changes in California's prison population subsequent to three contemporary policy interventions that have affected its size and composition: the passage of the Three Strikes and You're Out law (in Assembly Bill 971 in March 1994 and Proposition 184 in November 1994), California's adoption and enactment of Truth in Sentencing (September 1994), and the passage of the Substance Abuse and Crime Prevention Act (Proposition 36 in 2000).

## Who Are California's Prisoners?

At year-end 2005, California housed 167,698 men and women in 33 prisons, 40 camps, and 12 community correctional centers throughout the state,[1] giving it the largest state prison population in the United States (see the textbox, "Focus and Data

Sources").[2] California incarcerates 616 prisoners per 100,000 adults in the population, 17th of the 50 states.[3] Most prisoners are men (93%) but women represent a growing share.

The prison population includes a few teenagers, many adults in midlife, and a small number of elderly inmates (Figure 1). Imprisoned men are slightly younger than imprisoned women. The average age at year-end 2004 was 36 for men and 37 for women (California Department of Corrections and Rehabilitation, 2005). Fifteen percent of men and 11 percent of women were younger than age 25 at the end of 2005. Three-quarters of adult prisoners were between ages 25 and 49 at year-end 2005. Eleven percent of the prison population is age 50 or older.

As Figure 1 illustrates, people ages 25 to 44 are overrepresented

> **California incarcerates 616 prisoners per 100,000 adults in the population, 17th of the 50 states.**

3

Public Policy Institute *of* California

## *California Counts*                                    **Who's in Prison?**

**Adult African American men are seven times as likely as white men and 4.5 times as likely as Latino men to be incarcerated.**

among prisoners compared to their share in the general adult population; older people are under-represented among prisoners. Criminological research tells us that young people are the most likely group to commit crimes (Blumstein, Farrington, and Moitra, 1985; Gottfredson and Hirschi, 1990). As people age, they tend to commit fewer crimes. The age distribution among prisoners at year-end 2005 is consistent with this pattern—younger prisoners represent a high share of the prison population.

Three of every four men in prison are nonwhite (38% are Latino, 29% are African American, and 6% are of another race or ethnicity[4]—see Figure 2), although just over one-half of the general adult male population is nonwhite.

White men constitute 27 percent of the prison population but 44 percent of the general adult male population. Among women prisoners, 28 percent are Latina, 29 percent are African American, 39 percent are white, and 5 percent report some other race or ethnicity. Compared to their numbers in the general population, however, African Americans are disproportionately represented in prisons.

Race-specific incarceration rates (i.e., the number of prisoners per 100,000 adults in the population) illustrate the disproportionate number of African Americans in prison. We calculate these incarceration rates separately for adult men and women (Figure 2). African American men and women have a dramatically higher probability than other groups of being imprisoned. Adult African American men are seven times as likely as white men and 4.5 times as likely as Latino men to be incarcerated. Among adult men, 5,125 per 100,000 African Americans were imprisoned in 2005, compared to 770 per 100,000 whites, 1,141 per 100,000 Latinos, and 474 per 100,000 for those classified as "other." One out of every 12 African American men ages 25 to 29 in California is currently in state prison.[5]

Furthermore, although adult women overall have much lower incarceration rates than men, African American women have a higher incarceration rate than



**Figure 1. Percentage Distribution of Prisoners and Adults, by Age and Gender, 2005**

Legend: ■ Men prisoners  ■ Women prisoners  ■ California adults

Source: Authors' calculations of 2005 CDCR data and 2005 California Department of Finance (DOF) data.
Notes: The 18–24 age category includes a small number of prisoners under age 18 who are held in adult CDCR state facilities. The number of prisoners under age 18 ranges from 1 to 156, depending on the year, with only one or two prisoners under age 18 in the most recent years.

Public Policy Institute *of* California

## *California Counts*                    Who's in Prison?



**Figure 2. Percentage Distribution of Prisoners, by Race and Ethnicity, and Race-Gender-Specific Incarceration Rates, 2005**

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Race-specific incarceration rates have been age-standardized (using DOF population data, 2005) to control for the age differences by race and ethnicity that occur in the general adult population.

other women. African American women are four times as likely to be imprisoned as whites and Latinas. Among African American women, 346 per 100,000 in the population are incarcerated, whereas fewer than 80 women per 100,000 are incarcerated among whites, Latinas, and other groups.

Prior research shows that higher arrest rates for African Americans, particularly for crimes that result in imprisonment, partially explain the black-white differentials in incarceration rates (Blumstein, 1982, 1993). In California in 2004, African Americans were about three times as likely as whites to be arrested for any offense and four times as likely to be arrested for a felony offense.[6] Contextual factors such as unemployment, poverty, and lower educational attainment are associated with crime and arrests. African Americans have the highest poverty rate (17%) of any native-born racial or ethnic group in California (Reed, 2006) and among the lowest high school completion rates (77% for African Americans compared to 89% for whites) (Reed, 2005). Even when controlling for education and birth cohort (and thus, business cycles), Pettit and Western (2004) show that among high

Public Policy Institute *of* California

# *California Counts*

**Incarceration rates are much lower for foreign-born adults (297 per 100,000) than for U.S.-born adults (813 per 100,000).**

school dropouts, African American men are seven times as likely as white men to be imprisoned. Finally, some research suggests that the American history of slavery (Wacquant, 2002) and racial bias in various stages of the criminal justice system, including policing, prosecution, and sentencing (Free, 2002; Beckett, Nyrop, and Pfingst, 2006; Taxman, Byrne, and Pattavina, 2005; Alpert, MacDonald, and Dunham, 2005), also partially explain higher rates of incarceration for African Americans.

Reflecting California's diverse population, a sizable share of prisoners was born outside the United States.[7] Approximately 17 percent of all prisoners (28,279) were born abroad, with a higher share of men (17%) than women (8%) born in another country.[8] Sixty percent of all foreign-born prisoners were

born in Mexico, 4 percent were born in El Salvador, and 3 percent were born in Vietnam.[9] Incarceration rates are much lower for foreign-born adults (297 per 100,000) than for U.S.-born adults (813 per 100,000).

Highly populated regions of the state send more people to prison than do less populated areas. Approximately three of every five prisoners (62%) at year-end 2005 were sentenced and committed to prison from Southern California. Los Angeles County is home to 32 percent of the state adult population and commits about that share of prisoners (33%). The share of prisoners committed from the San Joaquin Valley and the Inland Empire[10] is higher than those regions' representation in the general adult population. The Bay Area and South Coast regions send fewer people than are represented by their general adult population.

Figure 3 shows incarceration rates at the county level (controlling for county population size) and gives a more detailed view of variation in prison commitments across California. Shasta, Tehama, Yuba, and Lake Counties, relatively small northern inland counties with majority white adult populations, have the highest incarceration rates. Incarceration rates are elevated for all racial and ethnic groups living in these areas. Incarceration rates for white men are especially noteworthy, at

2.5 times higher in these counties than in the state overall. Latino men in Yuba and Lake Counties also have twice the incarceration rate of Latino men in California overall. Men who have been categorized as an "other" race also have noticeably higher rates of incarceration in these counties, ranging from 1.8 times higher in Yuba County to 6.7 times higher in Lake County than in the state overall. Kern and Kings Counties in the Central Valley, with roughly equal shares of white and Latino residents (47% and 39%, respectively, in Kern, and 42% each in Kings), also have high incarceration rates. Both white and Latino men in these Central Valley counties have incarceration rates that are nearly double the state rates.

Each of these six counties incarcerates more than 1,000 people per 100,000 adults; the state rate is 616 per 100,000. These rates may result from either genuinely higher crime rates in these counties, or tougher enforcement and prosecution, or both. The oft-observed link between poverty and incarceration is reflected here, as the highest incarceration counties all have higher poverty rates than the state as a whole. At the other end of the spectrum, the Bay Area and the South Coast counties, relatively wealthy areas, have the lowest incarceration rates in the state (fewer than 400 per 100,000 adults).

Public Policy Institute *of* California

## *California Counts* — Who's in Prison?



**Figure 3. California Incarceration Rates per 100,000 Adults, by County, 2005**

Legend:
- < 400
- 400–699
- 700–999
- 1,000+

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Incarceration rates by county are not age-adjusted.

**Forty-four percent of California prisoners do not have a high school diploma or GED.**

Research shows that completing a general equivalency diploma (GED) or postsecondary degree or participating in vocational classes while in prison reduces recidivism (Nuttall, Hollmen, and Staley, 2003; Vacca, 2004) and provides prisoners with basic skills that may lead to postrelease employment. Educational investments in prison are particularly important because most prisoners in California have completed little formal education (Figure 4). Forty-four percent of California prisoners do not have a high school diploma or GED; the comparable number for the general California adult population is 21 percent.[11] Educational attainment differs by race and ethnicity. Nearly two-thirds of Latinos (63%) in prison have not completed high school. Prisoners of all racial and ethnic groups, including Latinos, have earned a GED in prison in roughly equal shares (14% to 17%).

The effects of incarceration extend far beyond prison walls to touch the lives of thousands of children and family members of prisoners. Two-thirds of women in California's prisons are mothers of children under age 18; more than half of these mothers were living with their children at the

Public Policy Institute *of* California

# *California Counts*

**Who's in Prison?**

> **More than half of women in California prisons (58%) have an immediate family member (e.g., mother, father, brother, spouse, or child) who has also been imprisoned.**

time of their arrest.[12] About half of men in prison are fathers of minor children and 42 percent of fathers lived with their children at the time of their arrest.[13] Prior research suggests that children of incarcerated parents are more likely to serve time in prison themselves (Petersilia, 2000; Greene, Haney, and Hurtado, 2000). Our findings seem to corroborate this connection—more than half of women in California prisons (58%) have an immediate family member (e.g., mother, father, brother, spouse, or child) who has also been imprisoned. Forty-two percent of male prisoners report that an immediate family member has been imprisoned. This varies greatly by race and ethnicity. Two-thirds each of Afri-

can American, Latina, and "other" women have an immediate family member who has been incarcerated, compared to 44 percent of white women. Half of African American men in California prisons said they had an immediate family member who had been imprisoned, with a lower share of white, Latino, and "other" men reporting this connection.

## What Crimes Did Prisoners Commit?

One-half of all prisoners at year-end 2005 were serving time for violent crimes (including homicide, robbery, assault and battery, sex offenses, and kidnapping); approximately 20 percent were serving time for property crimes (such as burglary, theft, vehicle theft, or forgery/fraud), 20 percent for drug offenses, and 10 percent were locked up for other types of crimes (such as escape from custody, felony driving under the influence, arson, or possession of a weapon). Men and women differ sharply in the types of crimes for which they are incarcerated (Figure 5). A majority of men are imprisoned for violence (52%) whereas women most often serve time for property crimes (36%) and drugs (30%).

Type of offense varies by other characteristics as well. Only 14 percent of those under age 25 were imprisoned for drug crimes, whereas



**Figure 4. Percentage Distribution of California Prisoners, by Education, 1997**

Legend:
- Bachelor's degree or more
- Some college
- GED in prison
- High school diploma
- < High school

(Percentage axis 0–100; categories: Latino, African American, White, Other)

Source: Authors' calculations of 1997 Survey of Inmates in State and Federal Correctional Facilities data.

Public Policy Institute *of* California

## California Counts

Who's in Prison?



**Figure 5. Percentage Distribution of Types of Offense, by Gender, 2005**

Men

Other 8%
Drug 20%
Violent 52%

Women

Other 5%
Violent 29%
Drug 30%

Source: Authors' calculations of 2005 CDCR data.

**Twenty-six percent of prisoners were sentenced under the Three Strikes and You're Out law, which enhances the sentences of felons with one or more prior serious or violent felonies.**

52 percent were sentenced for violent crimes and 25 percent for property crimes. A lower share of white prisoners was committed for violent offenses (44%), compared to other groups (52% for Hispanics and African Americans, and 63% for "other"). A higher share of foreign-born prisoners than of U.S.-born prisoners was serving time for violence (60% compared to 50% for men and 38% compared to 28% for women).

## Sentencing and Overcrowding

Six of every ten prisoners are serving a determinate sentence (a sentence of a specified length) and could be paroled before serving the specified time. By contrast, 14 percent of state prisoners are serving sentences that make them potentially permanent residents of the system (Figure 6). Most of these long-term prisoners are serving an indeterminate life sentence (20,487 "lifers" constitute 12% of the prison population) and will be released only on parole board approval. Another 2 percent (3,300) are serving a life sentence without the possibility of parole. Fourteen women and 638 men are on death row.

Twenty-six percent of prisoners were sentenced under the Three Strikes and You're Out law (see Greenwood et al., 1996; Schichor and Sechrest, 1996; Austin et al., 1999; Zimring, Hawkins, and Kamin, 2001), which enhances the sentences of felons with one or more prior serious or violent felonies. Second-strikers serve double the normal sentence following their second conviction and constitute 21 percent (35,412) of those currently imprisoned. Third-strikers serve 25 years to life and make up 5 percent (7,815) of the prison population.[14]

At year-end 2005, California penal institutions were operating at nearly double their design capacity. That meant they were 186 percent occupied, judging by the maximum number of beds a facility was designed to contain. (CDCR *Monthly Report of Population*, December 31, 2005). Crowding beyond design capacity varies by security level. Higher security prisons, where inmates live in cells, are less crowded (but demand

9

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

**California state prisons held 96,794 people in 1990; by year-end 2005, the California prison population had increased by 73 percent, to 167,698.**

more staff) than lower security, dormitory-style prisons and camps; reception centers are particularly overcrowded, averaging 245 percent of design capacity. Although design capacity can be an imprecise measure of overcrowded conditions, the nearly double-capacity figure does suggest that CDCR is struggling to effectively house all prisoners. CDCR reports that the overall maximum capacity for the institutional population (i.e., the "real" maximum or use of all possible space) is 176,500[15] and that, as of May 31, 2006, there were 170,713 prisoners in CDCR custody.[16] Crowded conditions can adversely affect rehabilitative services. Using classrooms and dayrooms as dormitories reduces the possibility that rehabilitative and

vocational programs and services, which are keys to reducing recidivism, will be available or effective (Marquart et al., 1994).

## How Is California's Prison Population Changing?

California has seen substantial growth and dramatic compositional change in its prison population over the past 15 years. California state prisons held 96,794 people in 1990; by year-end 2005, the California prison population had increased by 73 percent, to 167,698.[17] During the same period, Latinos became the largest ethnic group in the prison population (while whites became the largest racial group among women prisoners), and the age structure shifted toward older prisoners. From 1990 to 2005, the prison population expanded three times faster than the general population—73 percent compared to 25 percent (Figure 7).

Incarceration rates, the number of persons in prison per 100,000 in the general adult population, demonstrate imprisonment trends independent of population change (Figure 8). Incarceration rates have increased over the past 15 years in California, jumping from 443 in 1990, peaking at 673 in 1998, and declining in recent years to 616. Compared to the rest of the



**Figure 6. Percentage Distribution of Sentence Type**

Life without parole 2%
Death row 0.4%
Life 12%
Third-striker 5%
Second-striker
Determinate sentence 59%

Source: Authors' calculations of 2005 CDCR data.
Note: Percentages do not sum to 100 because of rounding.

Public Policy Institute *of* California

## *California Counts*

**Who's in Prison?**



**Figure 7. Changes in Prison and Adult Population, 1990–2005**

Source: Authors' calculations of 2005 CDCR data and 2005 DOF data.
Note: Population changes have been indexed to 100 for the 1990 population.

**Since 1998, California incarceration rates have declined while rates in the rest of the United States have continued to increase slightly.**



**Figure 8. Incarceration Rates per 100,000 Adults, 1990–2005**

Sources: Authors' calculations of data from Harrison and Beck (2005) (for rest of U.S. rates) and CDCR data (for California rates); U.S. Census Bureau population estimates; and California DOF population data.
Notes: To maintain consistency with rates reported elsewhere in this study, we show California incarceration rates based on CDCR data. California's incarceration rates using BJS data are nearly identical to our results using CDCR data in all available years (e.g., 615 compared to 609 in 2004).

United States, California had especially high incarceration rates in the mid to late 1990s. Since 1998, however, California incarceration rates have declined while rates in the rest of the United States have continued to increase slightly. California rates have leveled off at 616 while rates in the rest of the United States stand at 573. California ranks 17th among all states for incarceration rates.

The dropoff in the late 1990s coincides with an economic boom and lower poverty in California. Criminological research suggests a correlation between poverty and crime (Blau and Blau, 1982). As poverty declined in the late 1990s (Reed, 2006), there could have been a genuine decrease in the amount of crime and, thus, fewer

Public Policy Institute *of* California

**The vast majority of admissions every year consists of prisoners being returned from parole, either for a new crime or for a technical violation of their parole terms.**

prisoners entering the system. The peak of admissions in 1998 (Figure 9) and subsequent decline is consistent with this explanation. Additionally, California enacted treatment instead of incarceration for some drug offenders in 2001, which slowed prison growth.

The California prison population is far more dynamic than is commonly understood. This population constantly changes, with new admissions arriving in the system, prisoners being released from custody on parole or outright, other prisoners returning for parole violations or new offenses, and inmates dying while in custody.

At year-end 1990, the system held 96,794 prisoners in custody. During the next year, 97,769 pris-

oners were admitted to the system, either arriving on new sentences or having had their parole revoked (Figure 9). Meanwhile, 93,354 prisoners left the system, resulting in a net population gain of 4,415 prisoners from the previous year, pushing the prison population to over 101,200.

Through most of the 1990s, admissions slightly outpaced releases; the prison population grew between 4.5 percent and 9.5 percent each year until 1998. Admissions peaked in 1998 at 135,812, but releases kept growing, peaking in 2000 at 131,832. By that time, releases outnumbered admissions by almost 4,000 and the prison population began to decline slightly, a pattern that continued until 2002, when it reversed again.[18]

The vast majority of admissions every year consists of prisoners being returned from parole, either for a new crime or for a technical violation of their parole terms. In 2004, only 33 percent of admissions were new admissions; in 1990, 41 percent were new admissions.[19] These numbers are consistent with the 70 percent recidivism rate found by Fischer (2005). But as Fischer notes, California has a unique parole process—nearly every prisoner is released to parole and placed under supervision for a period of time. This practice inevitably boosts the number of technical violators and perhaps explains why California



**Figure 9. Admissions, Releases, and Net Change in Prison Population, 1990–2002**

Source: Authors' calculations of National Corrections Reporting Program (NCRP) data, 1990–2002.

Public Policy Institute *of* California

has such a high rate of recidivism compared to other states.

## Demographic Changes
Women constitute 7 percent of the overall state prison population, and their numbers have been increasing slightly faster than those of men. Since 1990, the number of women in state prison in California has expanded 77 percent (from 6,440 to 11,418); the comparable number for men is 73 percent. Because women are typically imprisoned for property and drug offenses, the "war on drugs" of the 1980s and 1990s may have increased arrest and imprisonment among women (Simpson, 1991). Thirteen percent of women prisoners were serving time for drug offenses in 1980 but by 1990, that share had increased to 40 percent, peaked at 44 percent in 1999, and stood at 30 percent in 2005. The declining share in the last few years at least partly reflects the drug treatment alternatives created by Proposition 36.

Thirty percent of male prisoners were Latino in 1990; by 2005, Latinos constituted the largest ethnic group, at 37 percent. The share of African American and white men in prison decreased during this time period, from 36 to 29 percent and from 29 to 27 percent, respectively. A slightly different pattern emerges among women prisoners. Both Latina and white women increased their shares in prison between 1990 and

2005, Latinas growing from 23 to 28 percent and the white share from 35 to 39 percent. African American women experienced a pattern identical to that of African American men, decreasing from 36 to 29 percent of the prison population.

## Regional Representation
Between 1990 and 2002, Los Angeles County's share of prison admissions dropped from 39 percent to 26 percent. The difference was made up chiefly by the San Joaquin Valley and the Inland Empire, whose shares of admissions during the same time rose from 11 to 14 percent and 8 to 15 percent, respectively. In absolute terms, these regions' contribution to prison admissions is considerable. The San Joaquin Valley moved from 10,806 admissions in 1990 to 17,145 in 2002, whereas the Inland Empire's admissions increased from 7,459 in 1990 to 17,897 in 2002.

The cumulative effect of this growth in admissions is echoed in the disproportionate numbers of prisoners committed from these regions. The San Joaquin Valley and the Inland Empire both experienced significant adult population growth between 1990 and 2005, but the growth in the number of prisoners from these regions was far greater. The population of prisoners from the San Joaquin Valley grew twice as fast as the region's general adult population

> **The San Joaquin Valley and the Inland Empire both experienced significant adult population growth between 1990 and 2005, but the growth in the number of prisoners from these regions was far greater.**

(87% compared to 39%); for the Inland Empire, the prison population grew four times as fast as the adult population (221% compared to 48%).

## Age Structure
The prison population is becoming older for at least three reasons: The state's overall population is aging, prisoners are aging in place because they are serving longer sentences, and older adults are increasingly likely to be admitted into prison. Table 1 shows that young adults represent a declining share of the prison population and older prisoners a greater share. In 1990, 20 percent of prisoners were younger than age 25; in 2005, only 14 percent of prisoners were under age 25. Across this same time period, the share of prison-

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

| | Stock Population, % | | Admissions, % | | Incarceration Rates per 100,000 Adults | |
|---|---|---|---|---|---|---|
| Year | 18–24 | 50+ | 18–24 | 50+ | 18–24 | 50+ |
| 1990 | 20 | 4 | 19 | 3 | 550 | 59 |
| 1991 | 20 | 4 | 18 | 3 | 582 | 62 |
| 1992 | 20 | 4 | 19 | 3 | 649 | 67 |
| 1993 | 20 | 4 | 19 | 3 | 706 | 73 |
| 1994 | 19 | 4 | 17 | 3 | 708 | 80 |
| 1995 | 17 | 5 | 16 | 4 | 722 | 89 |
| 1996 | 17 | 5 | 15 | 4 | 763 | 102 |
| 1997 | 16 | 6 | 15 | 4 | 772 | 118 |
| 1998 | 16 | 6 | 14 | 5 | 767 | 130 |
| 1999 | 15 | 7 | 14 | 5 | 733 | 140 |
| 2000 | 15 | 8 | 15 | 6 | 708 | 147 |
| 2001 | 15 | 8 | 15 | 6 | 680 | 149 |
| 2002 | 15 | 9 | 16 | 7 | 681 | 155 |
| 2003 | 15 | 9 | — | — | 677 | 163 |
| 2004 | 15 | 10 | — | — | 655 | 172 |
| 2005 | 14 | 11 | — | — | 646 | 185 |

**Table 1. Changing Age Distribution of the Prison Population and Admissions, 1990–2005**

Source: Authors' calculations of CDCR, NCRP, and California DOF data, 1990–2005.
Note: Incarceration rates are age-specific per 100,000 under age 25 and ages 50+.

ers age 50 and older has nearly tripled—from 4 percent in 1990 to 11 percent in 2005. Admissions records echo this trend.

Age-specific incarceration rates are included in Table 1 to account for age trends in the general population. Rates for the youngest group rose swiftly during the first part of the decade, peaking at 772, then fell back to 646 per 100,000. But for those age 50 and older, incarceration rates more than tripled during the period, from 59 to 185 per 100,000.

Changes in the age structure of admissions help to illustrate this aging trend. Between 1990 and 2002, the median age of prison admissions rose from age 31 to 34. Figure 10 displays age-specific admissions rates, to separate these trends from the overall aging of the state's population. The rates for each age group under age 40 show moderate overall fluctuation throughout the decade, whereas the rates for each age group age 40 and over increase dramatically. Particularly notable is the rate for the 40–49 age group, nearly doubling from 304 per 100,000 in the population in 1990 to 576 in 2002, and in the process surpassing the admissions rate for the under age 25 group.

The aging of the prison population could exacerbate the health care problem as the population in need expands (see the textbox "Prisoner Health"). Responsibility for the California prison health care system has already been wrested from state authorities by the federal courts and given to a receiver because of the state's failure to provide adequate health care to prisoners. Furthermore, some researchers question the cost-effectiveness of incarcerating older people who are beyond their prime offending years (Schmertmann, Amankwaa, and Long, 1998; Brown and Jolivette, 2005).

## Why Is the California Prison Populaton Changing?

Many factors contributed to the demographic changes highlighted in the last section, including state-level economic and demographic trends and criminal justice strategies concerning law enforcement, prosecution, and sentencing. We do not attempt to account for all these factors or to draw a direct causal link to the outcomes we observe, but we do pay particular attention to the policy interventions implemented from 1990 to 2005 with an eye toward identifying their likely effects.

Three recent policy interventions merit particular consider-

Public Policy Institute *of* California

# California Counts

**Who's in Prison?**



Figure 10. Age-Specific Admissions Rates, 1990–2002

Source: Authors' calculations of NCRP data, 1990–2002.

> **California is unique among states with three strikes laws in that the triggering felony need not be serious or violent—any felony conviction can be the second or third strike.**

ation. First, the Three Strikes and You're Out law, as discussed above, enhances the sentences of offenders with one or more prior serious or violent felonies. Second, Truth in Sentencing, a federal program initiated in 1994, provided financial incentives to states requiring that violent offenders serve at least 85 percent of their sentences without the possibility of earlier parole (Sabol et al., 2002). California met the Truth in Sentencing criteria in 1994. Third, Proposition 36, known formally as the Substance Abuse and Crime Prevention Act of 2000, diverts nonviolent drug offenders from prison to probation and community-based treatment centers.

Tougher sentencing policies (including three strikes and

truth in sentencing legislation) explain much—although by no means all—of the demographic change that we see in the general prison population over the 15-year period. Most clearly, the three strikes law established a new sentencing dimension in California, creating a determinate sentence category for second-strikers (with double the penalty) and an indeterminate sentence category (25 years to life) for third-strikers. California is unique among states with three strikes laws in that the triggering felony need not be serious or violent—any felony conviction can be the second or third strike. Beyond sentencing, three strikes legislation also affects the actual time served by strikers. Prisoners sentenced under three

strikes can reduce their sentences by only one-fifth, rather than one-half, as nonstriker prisoners can, through credits for good behavior. The innovative drug treatment policy (Proposition 36) partially explains the more recent slowdown in prison population growth and the shift to a higher share of prisoners serving time for violent crimes.

## New Sentencing Structure

In 1990, 90 percent of California state prison inmates were serving a sentence of determinate length, and 10 percent were serving either a term of life (8.4%), life without parole (0.9%), or death (0.3%). Beginning in 1994, with the passage of the three strikes legislation, new felony admissions who had

Public Policy Institute *of* California

## *California Counts* — Who's in Prison?

**Three strikes legislation has affected African Americans disproportionately. Thirty-eight percent of strikers are African American, compared to 29 percent in the overall prison population.**

previously been convicted of serious or violent felonies began to be classified as second-strikers or third-strikers.

Figure 11 shows the changes in composition of inmates by sentence type that resulted. At year-end 1995, after the first full year of implementation of three strikes, 11.4 percent of prisoners were serving sentences handed down by the courts under this law, and 10.6 percent were serving a term of life or more. The striker group continued to grow throughout the 1990s in both absolute and percentage terms. In recent years, the number of second-strikers has begun to stabilize around the year-end 2005 level of 35,412, whereas the number of third-strikers has continued to climb,

reaching 7,815 by that time. Collectively, strikers account for 26 percent of the prison population, and those serving life or more constitute 15 percent.

In addition, an undetermined number of second-strikers currently live in the broader community and if arrested and convicted of a felony—even a nonserious, nonviolent felony—can be imprisoned for 25 years to life.[20] The longer sentences imposed on both second- and third-strikers under this law will likely continue to increase the prison population (Greenwood et al., 1996; Sorensen and Stemen, 2002).

Three strikes legislation has affected African Americans disproportionately. Thirty-eight percent of strikers are African



**Figure 11. Distribution of Sentence Type, 1990–2005**

Source: Authors' calculations of CDCR data, 1990–2005.

Public Policy Institute *of* California

American, compared to 29 percent in the overall prison population. White and Latino shares of strikers (26% and 33%, respectively) are similar to their representation in the overall prison population. Although the striker population tripled in size between 1995 and 2005, its racial/ethnic representation remained exactly the same.

## The Nexus of Tougher Sentencing and Aging

As noted above, the prison population is aging. Age-specific incarceration rates for people ages 50 and older (Table 1), which control for population size and growth, have tripled from 59 per 100,000 population in 1990 to 185 in 2005. This growth, in rate as well as in share, shows that the aging phenomenon is not driven entirely by demographic changes, but it is at least partly the consequence of the enactment of three strikes and truth in sentencing legislation in 1994. At the end of 1995, the year after three strikes went into effect, California prisons held 15,308 second- and third-strikers. Of these, most (61%) were younger than age 35 (Figure 12). The largest group was between ages 30 and 34 (26%) and the next largest, between ages 25 and 29 (22%).

Ten years later, the picture of strikers had changed substantially. At year-end 2005, the total number had almost tripled (to 43,227) and the age distribution had shifted considerably—the largest

group of strikers was those ages 40 to 44, and a clear majority (65%) was age 35 or older. This aging of the striker population is consistent with other research on longer sentencing and the resulting older prison population (Brown and Jolivette, 2005; Aday, 2003; Schmertmann, Amankwaa, and Long, 1998).

Very similar patterns emerge in the age distribution of prisoners serving sentences of life, life without parole, or death. This category comprises nearly 25,000 inmates and is aging rapidly. Between 1995 and 2005, the median age rose from 34 to 39, and the proportion of prisoners age 50 and over grew from 10 percent to 20 percent.

## Drug Treatment in Lieu of Incarceration

The enactment of Proposition 36 in 2001 has dramatically diminished the number of prisoners serving time for drug offenses—the period from 2000 to 2005 saw a decrease of more than 10,000 prisoners. This was to be expected, as the law's intent was to provide rehabilitative alternatives for drug addicts outside the prison system. The decrease in prisoners with drug convictions meant an increase in the share of prisoners serving time for all other types of offenses.

Prisoners serving time for violent crimes constituted the largest offense type throughout the time interval, and as of year-end 2005, that group represents a majority of

> . . . incarceration rates for people ages 50 and older, which control for population size and growth, tripled from 59 per 100,000 population in 1990 to 185 in 2005.

the population, at just over 50 percent (Figure 13). (This category of prisoners has also grown steadily in absolute terms throughout this interval, from 40,000 in 1990 to over 83,000 in 2005.) During the 1990s, property crimes and drug-related crimes alternated as the second- and third-most-common offense types. Between 1995 and 2000, drug crimes outpaced property crimes, peaking at 28 percent in 1999. But following the implementation of Proposition 36, the share (and absolute number) of prisoners serving time for drug crimes declined, slowly at first, then more rapidly, and recently settling around 21 percent of the total.

17

Public Policy Institute *of* California

# California Counts

**Who's in Prison?**

**The enactment of Proposition 36 in 2001 has dramatically diminished the number of prisoners serving time for drug offenses— the period from 2000 to 2005 saw a decrease of more than 10,000 prisoners.**



Figure 12. Age Distribution of Strikers, 1995, 2000, and 2005

Source: Authors' calculations of CDCR data, 1995–2005.

As noted above, the offenses for which men and women are committed to prison differ. Drug charges drove the largest movements of women into and out of the prison system over the past decade, peaking in 1999 with over 50 percent of women admitted to the system for this type of crime (Figure 14). Drug crime admissions dropped (in share and in absolute numbers) after 1999. The pattern for releases (not shown) is very similar but with a delayed decline in releases for drug crimes. Drug charges figure in most prominently among releases, peaking in 2001, when more than half of women released from prison had been serving time on drug charges; releases from prison for property crimes remain at about 33 percent of the total.

For men, drug crime admissions show a very similar pattern (Figure 15), peaking in 2000 at



Figure 13. Change in Composition of Prisoners, by Offense Type, 1990–2005

Source: Authors' calculations of CDCR data, 1990–2005.

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**



**Figure 14. Change in Composition of Admissions of Women, by Offense Type, 1990–2002**

Source: Authors' calculations of NCRP data, 1990–2002.



**Figure 15. Change in Composition of Admissions of Men, by Offense Type, 1990–2002**

Source: Authors' calculations of NCRP data, 1990–2002.

35 percent of the total and declining thereafter, whereas violent and property crimes remain at around 26 and 30 percent, respectively. As of 2002, drug crimes were still the most common type of admission among men, but the emerging trend was toward nearly equal proportions of violent, property, and drug crimes.

These patterns show that Proposition 36 has reduced admissions to California state prisons. However, drug crimes remain an important source of admissions. The only offenders who would be serving prison time for drug charges after Proposition 36 are those with offenses for sale or manufacturing of drugs or those who were ineligible because of a history of violent or serious crimes, a concurrent non-drug offense, or repeated violations following Proposition 36–mandated treatment. The remaining drug offenders would be getting treatment in lieu of incarceration. This diversion into treatment rather than incarceration means that a higher share of prisoners will be serving time for violent and other offenses.

## Conclusion

All Californians have a stake in the state's prison system. Per capita spending on adult corrections has increased by 78 percent in the past 16 years, from $109 in 1990 to $194 (inflation-

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

> **Large numbers of prisoners flow into and out of the system each year. Many of these prisoners are parents, and thus the effects of incarceration reach far beyond the prisons themselves.**

adjusted) in 2006. The governor's 2006–2007 budget proposes to spend more than $7.2 billion on adult corrections. The California Department of Corrections and Rehabilitation consumes 6 percent of the overall budget and is the fourth-largest general fund expenditure. Moreover, serious problems have been identified in the state's prison system, with the federal government placing prison health care in the hands of a receiver and the U.S. Supreme Court requiring that the state desegregate its prisons. Large numbers of prisoners flow into and out of the system

each year. Many of these prisoners are parents, and thus the effects of incarceration reach far beyond the prisons themselves.

The current size of the California state prison system, whose growth since 1990 has outpaced that of the state's overall adult population by three times, presents the obvious problems of overcrowded prison facilities and increased health care costs. A detailed examination of this population's recent changes in composition puts a finer point on these emerging concerns and suggests some results of recent policy interventions in the corrections system.

Because crime and the potential responses to it continue to rank high among public policy concerns, it may be instructive to observe the effects of recent legislation on the prison population. The three strikes and truth in sentencing laws have produced longer sentences and increased time served, respectively. Together with Proposition 36, they are helping to transform the prison population into one composed of more serious or violent offenders, although drug

crimes still constitute a major cause of imprisonment. Most clearly, the population is getting older.

The aging of the prison population, accelerated by the passage of stricter sentencing laws in the previous decade, presages greater health care needs and costs for the near future, especially given already high rates of infectious disease among prisoners. Because of high turnover in the system every year, these health issues could have a significant effect on the entire California population, especially on the communities from which these prisoners come and to which many eventually return. It remains to be seen whether the management of state prison health services by a receiver accountable to a federal court will bring any relief.

The impetus behind the three strikes and truth in sentencing legislation was to reduce crime, not to change the prison population. However, given the continued growth and shifting composition we have identified in this population, it will be important to consider such effects when formulating any future policy interventions. ◆

Public Policy Institute *of* California

## California Counts

**Who's in Prison?**

### Text Box 1. Focus and Data Sources

**Focus on prisoners**

In this *California Counts*, we describe California prisoners housed in state-run adult facilities. We do not address the approximately 15 federal prisons in California, which held 18,154 prisoners as of February 2006, nor do we consider those persons held in local or county jails throughout the state.

Readers should note that imprisonment represents one of the end stages of the criminal justice system. Many processes, institutional actors, and practices precede incarceration. We are not accounting for the differences, demographic and otherwise, that may exist in the commission of crimes, policing activities, arrests, prosecution, legal counsel, or sentencing. Likewise, we are not explicitly examining prisoner reentry, recidivism, substance abuse, poverty, or employment—all factors that may influence imprisonment. Our goal is to describe California prisoners today and how this population has changed over the past 15 years.

**California Department of Corrections and Rehabilitation data**

We obtained annual data on state prisoners from the California Department of Corrections and Rehabilitation, Offender Information Services Branch, for 1980 and 1990 through 2005. Specifically, CDCR provided us with tabulated data for county of commitment, offense category, admission and return status, sentence status, and commitment type. We received each of these substantive pieces of information by age (categorical), race and ethnicity, sex, and nativity. In this report, we focus only on adult prisoners who are incarcerated in the state-run adult facilities, including institutions, camps, community correctional centers, and mental health hospitals. Our numbers may differ from published CDCR reports because of differing dates for population counts or different base populations (e.g., we do not have information on temporary releases, interstate cooperatives, or interstate parole units).

**Survey of Inmates in State and Federal Correctional Facilities data**

The Interuniversity Consortium for Political and Social Research provided us with the California state sample (confidential data) from the 1997 Survey of Inmates in State and Federal Correctional Facilities (SISFCF). The survey provides nationally representative data on state prison inmates and, because of the large California subsample, is representative of the California state prison population (n = 151,496). The data collectors used personal interviews to get information about prisoners' current offense and sentence, criminal history, family background, prior drug and alcohol use and treatment programs, and much more. The survey was conducted by the Bureau of the Census for the Bureau of Justice Statistics and Bureau of Prisons in five- to six-year intervals from 1974 to 1997 and has not been administered since that time.

21

Public Policy Institute *of* California

*California Counts*                                                    **Who's in Prison?**

**Text Box 1. continued**

**National Corrections Reporting Program data**

The National Corrections Reporting Program, a project of the Bureau of Justice Statistics, collects yearly comprehensive data on convicted persons' entrance into and departure from correctional custody and supervision. California has reported every year since 1983, providing a full set of records for each year through 2002.

Beginning in 1983, the NCRP included inmates with sentences of a year or less—prisoners sentenced to state prison but admitted to or released from a local jail, for instance, were included in the accounting. Multiple admissions or releases during the year, including those entering parole or having had their parole revoked, were recorded as separate records. For these reasons, a simple tallying of admissions less releases does not give the net growth in the prison population as measured by CDCR data.

Since our interests lay solely with those persons in physical custody, we used the information on admissions to and releases from California state institutions and ignored the portion concerned with release from parole. Data collected include race, gender, and age of inmates; type of offense; type of admission and release; prior time served; maximum and minimum sentence length; and, for persons being released, time served on the current conviction. Unfortunately, we found the race/ethnicity data to be fraught with missing values and suspiciously low numbers for Latino prisoners for selected years, so we were not able to use these data for determining the racial/ethnic composition of the yearly flow of prisoners into and out of the system.

Public Policy Institute *of* California

## *California Counts*                                        **Who's in Prison?**

### Text Box 2. Prisoner Health

We have shown that California's prison population is aging and now has a sizable share of people older than age 50 (11%). As this population ages and as current policies incarcerate people for longer periods of time, greater demands will be placed on the prison health care system. Currently, that system is in crisis and in federal receivership, and conditions may worsen as older prisoners require more health care. Additionally, the lack of adequate health care for prisoners may heighten the prevalence and spread of infectious diseases in prisons.

As with any institutionalized group, prisoners are at high risk for contraction and spread of tuberculosis (TB). Many prisoners, especially those with a history of IV drug use, are also considered high risk for HIV and hepatitis B and C. The prevalence of these diseases among prisoners varies according to the specific year and data source, but prisoners generally have a higher infection rate than the general population. According to self-reports, 16 percent of prisoners in California have TB.[21] Tuberculosis infection varies by race and ethnicity. One of every four prisoners classified as "other" race (including Asians and Pacific Islanders) report a positive TB test. Twenty-two percent of Latinos are positive for TB whereas a lower share of African Americans and whites report TB infection (15% and 8%, respectively).

HIV infection rate estimates vary by data source (from 1% to 4% of the prison population), but all sources confirm that rates differ by race and ethnicity. Three percent of African American prisoners and 1 percent of white prisoners self-report HIV positive status.[22] Other groups' rates are significantly lower. A cross-sectional study of new admissions to California prisons in 1999 found that 1.4 percent tested positive for HIV, 3.5 percent had current/chronic hepatitis B, and 33 percent had current hepatitis C (Ruiz et al., 2001). HIV rates were higher for women prisoners than for men. African American women and men, however, had the highest rates of HIV infection, with 2.8 and 2.3 percent positive, respectively. Hepatitis C, common among IV drug users, was prevalent in the prison population, with an astonishing one in three men and one in four women testing positive in the 1999 new admissions study.

In addition to physical problems, many prisoners experience mental and emotional difficulties. Nearly one-third of women prisoners in California report taking medication for emotional or mental problems; 18 percent of men say that they have taken prescription medicine for emotional and mental health reasons.[23] Emotional problems may be related to other traumas in prisoners' backgrounds and their current situation. Forty-five percent of women prisoners in California report physical abuse in their pasts; 39 percent report sexual abuse. These shares are much lower for imprisoned men.

Public Policy Institute *of* California

# Notes

[1] According to the CDCR website, the 33 prisons range from minimum to maximum custody and are located in 19 counties. Several cities within these counties house at least two prison facilities (http://www.cya.ca.gov/ReportsResearch/OffenderInfoServices/OffenderInformation.html).

[2] On May 31, 2006, the total CDCR population was 310,949—170,713 in institutions, 116,530 on parole, and 23,706 classified as "non-CDCR jurisdiction," which includes people under other state or federal jurisdiction, out of state parole, inmates out to court, escapees, and so forth.

[3] The U.S. incarceration rate was 578 per 100,000 adults in 2004 (authors' calculations using the U.S. Bureau of Justice Statistics (BJS) data). The national ranking reported here is based on year-end 2004 data from BJS.

[4] The other race group reported here comprises Asian, Pacific Islander, Native Hawaiian, American Indian, Alaska Native, and a catch-all "other race" category.

[5] California is not unique in the high share of young African American men behind bars. Harrison and Beck (2005) report that 8.4 percent of African American males between ages 25 and 29 in the nation were in state or federal prison at year-end 2004. For further discussion of race, imprisonment, and inequality see Pettit and Western (2004).

[6] Authors' calculations using arrest data from California Department of Justice (2004, Table 30) and population data from the California Department of Finance.

[7] Authors' calculations using the 2005 *Current Population Survey* show that 35 percent of California's adult population is foreign-born.

[8] A foreign-born person who is convicted of a crime in a California court and receives a prison sentence will serve that sentence in a California state prison, regardless of immigration status. After serving the sentence, immigrants with U.S. Immigration and Customs Enforcement (USICE) "holds" will be paroled to the federal immigration authorities for deportation. Approximately three-quarters of current foreign-born prisoners in state custody have a USICE hold (54%) or potential hold (22%) (Authors' calculations of CDCR data, March 2006.) Further, the Legislative Analyst's Office shows that California budgeted approximately $700 million in 2005–2006 to incarcerate illegal immigrants who committed crimes in California. The state anticipated about $78.5 million from the federal government to partially offset this cost.

[9] Data on the place of birth for foreign-born residents are from CDCR and are current as of March 31, 2006. The share of foreign-born as of this date was the same as our share at year-end 2005 (17%).

[10] We define the San Joaquin Valley as Fresno, Kern, Kings, Madera, Merced, San Joaquin, Stanislaus, and Tulare Counties. The Inland Empire consists of Riverside and San Bernardino Counties. Alameda, Contra Costa, Marin, Napa, San Francisco, San Mateo, Santa Clara, and Solano Counties form the Bay Area. We define the South Coast as Orange and Ventura Counties.

[11] Information about prisoners' educational attainment comes from the authors' calculations of data from the 1997 Survey of Inmates in State and Federal Correctional Facilities (SISFCF), except where otherwise noted. Unfortunately, more recent data are not available. For comparison, the educational attainment of the general California adult population is based on 1997 *Current Population Survey* data.

[12] Information about parental status and living arrangements before incarceration is based on the California sample of the 1997 SISFCF data.

[13] For more information on the effects of incarceration on children, see Powell and Nolan (2003).

[14] Third-strikers who receive a life sentence are not part of the group we refer to as "lifers"—those serving a life sentence with or without the possibility of parole. These sentence types are mutually exclusive categories.

[15] http://www.corr.ca.gov/DivisionsBoards/AOAP/FactsFigures.html.

[16] http://www.cdcr.ca.gov/ReportsResearch/OffenderInfoServices/Monthly/TPOP1A/TPOP1Ad0605.pdf.

[17] Moreover, this 15-year period itself followed a decade of unprecedented—and since unmatched—growth in the prison population, attributed in large part to increased arrests and sentencing for violation of new drug laws, as well as to the use of determinate sentencing, which California adopted in 1977. Between 1980 and 1990, the California prison population quadrupled, from 24,165 to 96,794.

[18] Data for admissions and releases from the NCRP are currently available only through 2002.

[19] Authors' calculations using admissions data from California Department of Corrections and Rehabilitation (2005).

[20] The Legislative Analyst's Office estimates that, as of December 31, 2004, about 80,000 second-strikers have been sent to state prison since 1994 and approximately half of these have served their time and have been released. District attorneys have discretion to use three strikes sentence enhancements.

[21] Authors' calculations using 1997 SISFCF data.

[22] Authors' calculations using 1997 SISFCF data.

[23] Authors' calculations using 1997 SISFCF data.

Public Policy Institute of California

*California Counts*                                                    **Who's in Prison?**

# References

Aday, Ronald H., *Aging Prisoners: Crisis in American Corrections*, Praeger, Westport, Connecticut, 2003.

Alpert, G. P., J. M. MacDonald, and R. G. Dunham, "Police Suspicion and Discretionary Decision Making During Citizen Stops," *Criminology*, Vol. 43, No. 2, May 2005, pp. 407–434.

Austin, James, John Clark, Patricia Hardyman, and D. Alan Henry, "The Impact of 'Three Strikes and You're Out,'" *Punishment & Society*, Vol. 1, No. 2, October 1999, pp. 131–162.

Beckett, K., K. Nyrop, and L. Pfingst, "Race, Drugs, and Policing: Understanding Disparities in Drug Delivery Arrests," *Criminology*, Vol. 44, No. 1, February 2006, pp. 105–137.

Blau, Judith, and Peter Blau, "The Cost of Inequality: Metropolitan Structure and Violent Crime," *American Sociological Review*, Vol. 47, No. 1, February 1982.

Blumstein, Alfred, "On the Racial Disproportionality of United States' Prison Populations," *Journal of Criminal Law and Criminology*, Vol. 73, No. 3, Autumn 1982, pp. 1259–1281.

Blumstein, Alfred, "Racial Disproportionality of U.S. Prison Populations Revisited," *University of Colorado Law Review*, Vol. 64, 1993.

Blumstein, Alfred, Jacqueline Cohen, and David P. Farrington, "Criminal Career Research: Its Value for Criminology," *Criminology*, Vol. 26, 1988, pp. 1–35.

Blumstein, Alfred, Jacqueline Cohen, Jeffrey Roth, and Christy Visher, eds., *Criminal Careers and Career Criminals*, National Academy Press, Washington, D.C., 1986.

Blumstein, A., D. P. Farrington, and S. Moitra, "Delinquency Careers: Innocents, Desisters, and Persisters," *Crime and Justice*, Vol. 6, 1985, pp. 187–219.

Brown, Brian, and Greg Jolivette, *A Primer: Three Strikes—The Impact After More Than a Decade*, Legislative Analyst's Office, Sacramento, California, October 2005.

California Department of Corrections and Rehabilitation, Data Analysis Unit, Estimates and Statistical Analysis Section, Offender Information Services Branch, *Monthly Report of Population*, Sacramento, California, December 31, 2005.

California Department of Corrections and Rehabilitation, Offender Information Services, Estimates and Statistical Analysis Section, Data Analysis Unit, *California Prisoners and Parolees 2004*, Sacramento, California, 2005.

California Department of Justice et al., *Crime in California 2004*, 2004, available at http://ag.ca.gov/cjsc/publications/candd/cd04/cdintro.htm.

Federal Bureau of Investigation, "Age-Specific Arrest Rates and Race-Specific Arrest Rates for Selected Offenses, 1993–2001," Uniform Crime Reporting Program, Washington, D.C., 2003.

Fischer, Ryan, "Are California's Recidivism Rates Really the Highest in the Nation?" *UC Irvine Center for Evidence-Based Corrections Bulletin*, Vol. 1, No. 1, September 2005.

Free, Marvin D., "Race and Presentencing Decisions in the United States: A Summary and Critique of the Research," *Criminal Justice Review*, Vol. 27, No. 2, 2002.

Gottfredson, Michael R., and Travis Hirschi, *A General Theory of Crime*, Stanford University Press, Palo Alto, California, 1990.

Governor's Budget, 2006–2007, available at http://www.ebudget.ca.gov/BudgetSummary/ImagePages/SUM-06.html.

Greene, Susan, Craig Haney, and Aida Hurtado, "Cycles of Pain: Risk Factors in the Lives of Incarcerated Mothers and Their Children," *The Prison Journal*, Vol. 80, No. 1, March 2000, pp. 3–23.

Greenwood, P. W., et al., "Estimating Benefits and Costs of Calculating New Mandatory-Minimum-Sentencing Law," in David Schichor and Dale K. Sechrest, eds., *Three Strikes and You're Out: Vengeance as Public Policy*, Sage, Thousand Oaks, California, 1996.

Harrison, Paige, and Allen Beck, "Prisoners in 2004," *Bureau of Justice Statistics Bulletin*, October 2005.

Longshore, Douglas, Angela Hawken, Darren Urada, and M. Douglas Anglin, *SACPA Cost Analysis Report (First and Second Years)*, prepared by UCLA Integrated Substance Abuse Programs, Los Angeles, California, March 2006.

Marquart, James W., et al., "A Limited Capacity to Treat: Examining the Effects of Prison Population Control Strategies on Prison Education Programs," *Crime & Delinquency*, Vol. 40, No. 4, October 1994, pp. 516–531.

Marvell, Thomas B., and Carlisle E. Moody, "The Lethal Effects of Three-Strikes Laws," *The Journal of Legal Studies*, Vol. 30, No. 1, January 2001, pp. 89–106.

Nuttall, John, Linda Hollmen, and E. Michele Staley, "The Effect of Earning a GED on Recidivism Rates," *The Journal of Correctional Education*, Vol. 54, No. 3, September 2003, pp. 90–94.

Petersilia, Joan, "Challenges of Prisoner Reentry and Parole in California," *California Policy Research Center Brief*, Vol. 12, No. 3, June 2000.

Pettit, Becky, and Bruce Western, "Mass Imprisonment and the Life Course: Race and Class Inequality in U.S. Incarceration," *American Sociological Review*, Vol. 69, April 2004, pp. 151–169.

Powell, Anne, and Clare Nolan, *California State Prisoners with Children: Findings from the 1997 Survey of Inmates in State and Federal Correctional Facilities*, California Research Bureau, Sacramento, California, November 2003.

Reed, Deborah, "Educational Resources and Outcomes in California, by Race and Ethnicity," *California Counts*, Vol. 6, No. 3, February 2005.

Reed, Deborah, "Poverty in California: Moving Beyond the Federal Measure," *California Counts*, Vol. 7, No. 4, May 2006.

Public Policy Institute *of* California

## *California Counts*

Who's in Prison?

Ruiz, Juan D., et al., "Prevalence of HIV Infection, Sexually Transmitted Diseases, Hepatitis, and Risk Behaviors Among Inmates Entering Prison at the California Department of Corrections, 1999," California Department of Health Services, Prevention Services, Office of AIDS, HIV/AIDS Epidemiology Branch, Sacramento, California, 2001.

Sabol, William J., Katherine Rosich, Kamala Mallik Kane, David P. Kirk, and Glenn Dubin, *The Influences of Truth-in-Sentencing Reforms on Changes in States' Sentencing Practices and Prison Populations*, Report to the National Institute of Justice, Urban Institute, Justice Policy Center, Research Report, Washington, D.C., April 2002.

Schichor, David, and Dale K. Sechrest, eds., *Three Strikes and You're Out: Vengeance as Public Policy*, Sage, Thousand Oaks, California, 1996.

Schmertmann, Carl P., Adansi A. Amankwaa, and Robert D. Long, "Three Strikes and You're Out: Demographic Analysis of Mandatory Prison Sentencing," *Demography*, Vol. 35, No. 4, November 1998, pp. 445–463.

Simpson, S. S., "Caste, Class, and Violent Crime—Explaining Difference in Female Offending," *Criminology*, Vol. 29, No. 1, February 1991, pp. 115–135.

Sorensen, Jon, and Don Stemen, "The Effect of State Sentencing Policies on Incarceration Rates," *Crime & Delinquency*, Vol. 48, No. 3, July 2002, pp. 456–475.

Taxman, F., J. M. Byrne, and A. Pattavina, "Racial Disparity and the Legitimacy of the Criminal Justice System: Exploring Consequences for Deterrence," *Journal of Health Care for the Poor and Underserved*, Vol. 16, No. 4, Suppl. B, November 2005, pp. 57–77.

Vacca, James, "Educated Prisoners Are Less Likely to Return to Prison," *The Journal of Correctional Education*, Vol. 55, No. 4, December 2004, pp. 297–305.

Wacquant, Loic, "From Slavery to Mass Incarceration," *New Left Review*, Vol. 13, January–February 2002.

Zimring, Franklin, Gordon Hawkins, and Sam Kamin, *Punishment and Democracy: Three Strikes and You're Out in California*, Oxford University Press, New York, New York, 2001.

Public Policy Institute *of* California

# California Counts

**Who's in Prison?**

## Board of Directors

**Thomas C. Sutton, Chair**
Chairman and Chief Executive Officer
Pacific Life Insurance Company

**Linda Griego**
President and Chief Executive Officer
Griego Enterprises, Inc.

**Edward K. Hamilton**
Chairman
Hamilton, Rabinovitz & Alschuler, Inc.

**Gary K. Hart**
Founder
Institute for Education Reform
California State University, Sacramento

**Walter B. Hewlett**
Director
Center for Computer Assisted
Research in the Humanities

**David W. Lyon**
President and Chief Executive Officer
Public Policy Institute of California

**Cheryl White Mason**
Vice-President Litigation
Legal Department
Hospital Corporation of America

**Ki Suh Park**
Design and Managing Partner
Gruen Associates

**Constance L. Rice**
Co-Director
The Advancement Project

**Raymond L. Watson**
Vice Chairman of the Board Emeritus
The Irvine Company

**Carol Whiteside**
President
Great Valley Center

ISSN #1554-401X

The Public Policy Institute of California is a private, nonprofit research organization established in 1994 with an endowment from William R. Hewlett. The Institute conducts independent, objective, nonpartisan research on the economic, social, and political issues affecting Californians. The Institute's goal is to raise public awareness of these issues and give elected representatives and other public officials in California a more informed basis for developing policies and programs. PPIC does not take or support positions on any ballot measure or on any local, state, or federal legislation, nor does it endorse, support, or oppose any political parties or candidates for public office.

PUBLIC POLICY INSTITUTE OF CALIFORNIA
500 Washington Street, Suite 800 • San Francisco, California 94111
Telephone: (415) 291-4400 • Fax: (415) 291-4401 • www.ppic.org

27