EXHIBIT "SMC-C"

*Centennial*

# NCCD

*Continuing the
Struggle for Justice*

# Task Force on California Prison Crowding

**Christopher Baird**
*Executive Vice President
Children's Research Center*

**Barbara Bloom**
*Professor
Sonoma State University*

**Allen Breed**
*Criminal Justice Consultant*

**Loren Buddress**
*Chief Probation Officer
San Mateo County*

**James P. Fox**
*District Attorney
San Mateo County*

**Joe Gunn**
*Former Executive Director
Corrections Independent Review Panel*

**Craig Haney**
*Professor
Univeristy of California, Santa Cruz*

**Vincent Iaria**
*Regional Representative
American Probation and Parole
Association*

**Barry Krisberg**
*President
National Council on Crime and
Delinquency*

**Mary Lou Leary**
*Former U.S. Attorney
Executive Director
National Center for Victims of Crime*

**Calvin Remington**
*Chief Probation Officer
Ventura County*

**Laurie Robinson**
*Former U.S. Assistant
Attorney General*

**Rick Roney**
*Roney Family Foundation*

**Don Specter**
*Prison Law Office*

**Robert Weisberg**
*Professor
Stanford University*

**Carl Wicklund**
*Executive Director
American Probation and Parole
Association*

**John Van de Kamp**
*Former California Attorney General*

**Frank Zimring**
*Professor of Law
University of California, Berkeley*

## Responding to California's Prison Crisis

The purpose of this report is to offer some policy and program options to be considered in the Special Session of the Legislature on the severe problems in California prisons. Although the challenges confronting the state's corrections system cannot be solved simply, cheaply, or immediately, there is no alternative but for all of our top elected officials to engage this crisis with honesty, a spirit of cooperation, and a genuine commitment to advancing public safety.

For three decades, most California elected officials and the voters have radically transformed the penal system by enacting tough new sentencing laws, building 22 new prisons, and, until recently, making punishment the sole purpose of the penal system. For almost 30 years there has been scant attention paid to adequate funding for rehabilitation services or successful programming to permit inmates to successfully return home. The fiscal and social costs of these policies were neither examined nor sufficiently shared with the electorate. And so, we are close to a boiling point which most observers believe could lead to a prison catastrophe.

The National Council on Crime and Delinquency (NCCD) has been part of the debate over correctional and sentencing policy in California for years. The NCCD is the nation's oldest criminal justice research and policy group, often called upon by policy makers, practitioners, the media, and private foundations for objective, evidence-based responses to crime and justice issues. The following recommendations represent the Council's views on needed next steps to alleviate the prison crisis. We have drawn extensively on analysis and suggestions put forth by the California Department of Corrections and Rehabilitation (CDCR), the Office of Inspector General, key legislators and their staff members, and prestigious independent groups such the Little Hoover Commission, the Legislative Analyst, and the Independent Review Panel, which was appointed by Governor Schwarzenegger and led by former Governor George Deukmejian.

We also wanted to include the views of nationally renowned experts in criminal justice. To that end, the NCCD recruited an impressive group to serve on a special Task Force on Prison Crowding (listed in the sidebar at left). Some members of that group provided drafts of the recommendations, and these were reviewed by every member of the Task Force. Editorial and substantive changes to the draft proposals

## Contents

| | |
|---|---|
| Reducing Women's Imprisonment in California | 3 |
| The California Parole System | 7 |
| Creating A New State-Local Partnership | 10 |
| The Need for A California Sentencing Commission | 12 |

were made, and each member of the Task Force was asked to endorse these proposals. **The members of the Task Force were asked to reflect their own views, and we did not require them to achieve the endorsement of the organizations that they represent.** Ultimately, NCCD takes full responsibility for these proposals and any errors or omissions. The NCCD stands ready to work with concerned Californians to commence meaningful and needed reforms in the penal system.

*"We Face an Insurmountable Opportunity"*

Beloved humorist Al Capp reminded us via his cartoon character Pogo that enormous challenges also present great possibilities for positive change. The depth of the crisis in our prisons may well pose such an "insurmountable opportunity."

There is an undeniable consensus among elected officials, the courts, advocates, prison administrators, criminologists, and service providers that severe crowding has led to an untenable state of danger and inhumane conditions within the prisons. Dayrooms, gyms, outside yards, and TV rooms have been converted into makeshift dormitories to house over twice as many prisoners as these facilities were intended to hold. The CDCR is under receivership for medical care of its inmates and for internal investigations. Many other aspects of the operations of the CDCR are governed by consent decrees based on federal and state court litigation. Current projections of the inmate population into the future indicate this situation will only get worse. According to a recent statement by Secretary Tilton, the CDCR will be completely out of bed space by June of 2007.

We know that adverse prison conditions can have a negative effect on prisoners, an effect that can carry over to their post-prison adjustment, increasing the chances that they will reoffend and, in the long run, contribute to prison crowding. Conversely, improved prison conditions, ones that are well managed, safe, and provide prisoners with badly needed services can enhance their chances of making a successful adjustment to free society (Haney, 2006, Liebling and Maruna, 2005).

It is important to keep in mind that the prison population is only part of the story. Besides nearly 170,000 state prisoners, more than 115,000 offenders are supervised in the community on parole. At the county level, there are nearly 80,000 jail inmates and more than 350,000 adult offenders under probation supervision. Local correctional resources are also strained to the breaking point. Many jails have been ordered by the court to expedite the release of inmates, and probation departments are handling thousands of offenders on "banked caseloads"— meaning that these probationers are rarely seen by their probation officers. The crowding and budget problems faced by county sheriffs and chief probation officers sometimes requires them to implement local policies to ship more offenders to state facilities. High rates of recidivism of both local and state inmates further fuels the inmate population crisis confronting California.

Over the past 30 years, the state and the counties have attempted to increase the number of prison and jail beds, but the expansion of incarceration capacity has been overwhelmed by the growth in inmates. Indeed, as the CDCR tripled its bed capacity, the number of inmates grew by over 800 percent. Jails experienced a more modest increase in bed capacity, but inmate populations exceeded this increase in jail space. In large measure, the corrections population increases were a function of sentencing and parole policies.

All of this came at an enormous cost to the taxpayers. The CDCR budget is over $8.9 billion dollars for 2005-2006. California taxpayers may even be willing to spend this much on corrections, but it is doubtful that they realize or accept the current high level of recidivism or the budget-driven policies that compromise public safety.

Clearly, this crisis did not develop overnight; Californians have a now long history of choosing a punitive versus rehabilitative approach, although that view is changing (NCCD, 2004). Continued media and political focus on crime, despite decreased violent crime over the past decade, have inflamed and distorted the public discourse about crime and its

2

rational consequences. Ironically, the policies that led to prison crowding have not increased public safety. The recommendations put forward in this paper are designed to achieve exactly that goal. Although this problem will not be solved in just a few weeks or months, there are short- and medium-term measures that are consistent with protecting the public that could well relieve some of the pressures on correctional infrastructure, staff, inmates, and the courts. We also know that evidence-based corrections policies help crime victims and prevent future victimization from occurring.

There is also consensus that the problem must be dealt with as a genuine emergency, not as "business as usual." The Governor and his opponent in the upcoming election have put forth their plans. The Legislature is considering a number of policies directed at improving the situation. In response to the crisis, the National Council on Crime and Delinquency reached out to a national panel of experts representing a variety of views and expertise. In its role as convener, NCCD holds to the conviction that the prison crisis is of such a magnitude that it

warrants a consideration of all the options, not just those that seem politically safe. A creative, collaborative, and intelligent process is needed now more than ever before.

One of our main proposals that speaks to reforming how the state deals with women offenders is essentially in agreement with the Governor's plan. Other proposals about revamping parole and creating a new state-county correctional partnership, built on realistic cost sharing, represent immediate steps that would reduce prison crowding in the near term. The final recommendation is much longer term, but the NCCD firmly believes that a comprehensive and thoughtful review of sentencing laws and policies must begin if we are ever to resolve the crisis in our penal system.

### References

Haney, C. (2006). *Reforming punishment: Psychological limits to the pains of imprisonment.* Washington, DC: American Psychological Association Books.

Liebling, A., & Maruna, S. (Eds.) (2005). *The effects of imprisonment.* Cullompton:Willan Publishing.

# Reducing Women's Imprisonment in California: A Blueprint for Reform

In July, 2005, the former California Department of Corrections changed its name and mission to address the rehabilitative and reentry needs of incarcerated men and women. As part of this reorganization, the California Department of Corrections and Rehabilitation (CDCR) established a new unit, Female Offender Programs and Services, to implement standards for the management, rehabilitation, and community reintegration of more than 11,000 women incarcerated in California state prisons (CDCR, 2006).

The CDCR has embarked on an unprecedented women offender reform effort that recognizes the importance of developing gender-responsive strat-

egies to specifically address the issues pertaining to women offenders. This endeavor includes the creation of a Strategic Plan for Female Offender Reform, the establishment of gender-responsive policies and operational practices that are designed to promote safe and productive institutional and community environments, a review and development of gender-appropriate classification and risk/needs/case management tools, as well as the establishment of community rehabilitative correctional centers and programs for non-serious, nonviolent women offenders.

There are currently four state prisons housing approximately 11,600 women offenders. Of those, only seven percent (867) are housed in community-based facilities. As of February 28, 2006, nearly 5,900 women that are also eligible for community placement were incarcerated in existing state prisons for nonviolent property and drug offenses and are

classified as Level I or Level II. According to the CDCR Spring 2006 Population Projections, the female prison population will increase by an additional 1,550 by June 30, 2009.

To facilitate the women offender reform efforts, the CDCR created a strategic plan for improving outcomes for female offenders. As a part of this plan, CDCR is proposing to move approximately 4,500 Level I and Level II female offenders from "mega-prisons" located far from urban centers to smaller community facilities located in the areas from which women are committed and to which they will return upon parole. The NCCD strongly endorses this plan. We believe this should be a key component of any reform package.

The Senate Concurrent Resolution (SCR) 33 Commission on Female and Parolee Issues was established to study issues that affect female inmates and parolees. During its study, the Commission assessed such issues as work, education, sentencing, classification, substance abuse, alternative treatment programs, and parental status and reviewed programs and services available to female inmates and parolees. The Commission's final report as published in 1994 presents an analysis of these issues and the Commission's findings and recommendations, which revolve around three central concepts:

- Female inmates differ significantly from male inmates in terms of their needs while incarcerated and upon their release to the community.

- Female inmates and parolees generally have a lower rate of commitment to prison for violent offenses and exhibit significantly less violent behavior in prison than males.

- Upon release to parole, over 95 percent of all female inmates are returned to the communities from which they were sentenced. The successful reintegration of these women into their communities is, to a large degree, dependent on those communities sharing responsibility with the CDCR and its Parole & Community Services Division for supervision, care, and treatment.

As described in the 2004 Little Hoover Commission (LHC) report, a significant number of California women inmates do not represent a serious threat to public safety. The LHC recommended a greater reliance on community corrections rather than large remote prisons for women. It proposed that the State should use evidence-based practices and develop "a robust system of community correctional facilities focused on preparing women offenders for success on parole." It urged the CDCR to develop a continuum of facilities for female inmates to cost effectively match inmates with the facility that best achieves the goals of public protection and successful reentry. The continuum should include community correctional facilities to house women offenders closer to their communities and to support their reintegration process.

The LHC further proposed that the CDCR should use a competitive process to develop contracts for community correctional facilities to deliver an array of services shown to reduce recidivism of women offenders. Private companies, public agencies, or partnerships among them should be encouraged to bid on the contracts. Moreover, measuring and reporting performance is essential. Other recommendations from the LHC included revising classifications procedures, developing community partnerships, establishing an Inter-agency Council on Reentry, providing technical assistance, and shifting parole supervision to the county level.

In 2003, the National Institute of Corrections (NIC) published the report, *Gender-Responsive Strategies: Research, Practice and Guiding Principles* (Bloom, Owen, and Covington, 2003). This report has been incorporated into strategic plans and state and national standards in multiple jurisdictions. NIC has also made these strategies and their supporting principles the foundation of their national training efforts.

Bloom, Owen, and Covington describe the differences in male and female pathways into criminality and their differential response to custody and supervision and provide a theoretical foundation that could lead to better outcomes for women offenders in both institutional and community settings.

Bloom, Owen, and Covington define gender-responsiveness as:

> Gender-responsive means creating an environment through site selection, staff selection, program development, content, and material that reflects an understanding of the realities of women's lives and addresses the issues of the participants. Gender-responsive approaches are multidimensional and are based on theoretical perspectives that acknowledge women's pathways into the criminal justice system. These approaches address social (e.g., poverty, race, class, and gender inequality) and cultural factors, as well as therapeutic interventions. These interventions address issues such as abuse, violence, family relationships, substance abuse, and co-occurring disorders. They provide a strength-based approach to treatment and skill building. The emphasis is on self-efficacy.

The guiding principles are:

1. *Gender:*  Acknowledge that gender makes a difference.

2. *Environment:*  Create an environment based on safety, respect, and dignity.

3. *Relationships:*  Develop policies, practices and programs that are relational and promote healthy connections to children, family, significant others, and the community.

4. *Services and Supervision:*  Address substance abuse, trauma, and mental health issues through comprehensive, integrated, culturally-relevant services, and appropriate supervision.

5. *Socioeconomic Status:*  Provide women with opportunities to improve their socioeconomic conditions.

6. *Community:*  Establish a system of community supervision and reentry with comprehensive, collaborative services.

There is significant evidence that the response of women to incarceration, treatment, and rehabilitation differs from that of men in the following areas:

- Levels of violence and threats to community safety in their offense patterns.

- Responsibilities for children and other family members.

- Relationships with staff and other offenders.

- Vulnerability to staff misconduct and revictimization.

- Needs for programming and services while under supervision and in custody, especially in health and mental health, substance abuse, recovery from trauma, and economic/vocational skills.

- Challenges in reentry and community integration.

Incarceration affects more than just the individual, especially in the case of women. Although difficult to measure, the impact on children of having a mother in prison is pervasive and disruptive. The majority of women in California prisons are the primary caretakers of dependent children. Our estimates indicate that around 19,000 children have mothers who are incarcerated in state facilities. In California, incarcerated women are more likely to be parents, to have multiple children, and to have been living with their children before arrest than incarcerated men (Powell & Nolan, 2003). Furthermore, their incarceration has very immediate consequences for their children. While the vast majority of children of incarcerated men continue to live with their mothers, children of incarcerated women are more likely to end up living with other relatives, particularly grandparents, and more likely to end up in foster care (Powell & Nolan, 2003).

Because many incarcerated mothers return home with an expectation that they will reunite with their children, it is important to prepare them for that reunion. There is also a need to provide support to their children. To the extent that the State of California fails to do so, it is a missed opportunity for intervention.

Given the nonviolent nature of most women's crimes and their low level of risk to public safety, increasing the availability of community-based placements is the primary objective of needed reform. Community-based placements offer a number of advantages for a system that has a stated goal of "reforming" and reintegrating women from prison into society to contribute positively to their families and communities. Women in community-based, family-focused settings face fewer obstacles to visitation and maintaining family connections. Community-based settings can emphasize treatment, service provision, and community reentry.

There is a critical need to develop a system of supervision and support in communities to better assist women in reuniting with their families and communities. Assistance is needed in the areas of housing, education, job training, employment, family counseling, child care, drug and alcohol treatment, health and mental health care, peer support, and aftercare. Wraparound services and other integrated approaches can also be very effective because they address multiple goals and needs in a coordinated way and facilitate access to services.

## A Blueprint for Reform

In an historic move, the CDCR has identified 4,500 non-serious, nonviolent women offenders currently confined in prison that could be eligible for community placement. The CDCR recently released a Request for Proposal for community beds and plans to phase in over 4,000 Female Rehabilitative Community Correctional Center (FRCCC) beds over two years beginning in 2007. The CDCR anticipates that the first FRCCCs could open in April, 2008.

The following recommendations are based on a recent survey of community-based programs conducted by NCCD. They suggest a blueprint for a gender-responsive, community-based system of programs and services for women offenders.

- Community-based alternatives to incarceration and reentry programs that are gender-responsive are more likely to be successful than prison.

- Community-based programs should focus on reducing recidivism and breaking the intergenerational cycle of incarceration though family-focused programming.

- The community-based service delivery model should include a gender-responsive risk and needs assessment.

- Community-based settings should offer an array of services including housing, job training and placement, parenting, education, health care, drug treatment, mental health services, and basic life skills.

- Programs should be flexible and include individualized treatment plans and coordinated case management.

- A process and outcome evaluation component should be included in program planning.

- A public awareness campaign should be conducted to encourage community ownership of programming for female offenders.

## References

Bloom, B., Owen, B., & Covington, S. (2003). *Gender-responsive strategies: Research, practice and guiding principles for women offenders.* Washington, DC: National Institute of Corrections.

California Department of Corrections and Rehabilitation (2006). *Strategic plan: Population placement and programming for female offenders sentenced to state prison, July 17, 2006.* Sacramento, CA: Author.

California Senate Concurrent Resolution 33 Commission on Female Inmate and Parolee Issues (1994, June). *Final report.* Sacramento, CA.

Little Hoover Commission (2004, December). *Breaking barriers for women on parole.* Sacramento, CA: Author.

Powell, M.A. & Nolan, C. (2003). *California state prisoners with children: Findings from the 1997 survey of inmates in state and federal correctional facilities.* California Research Bureau.

# The California Parole System: Improving Supervision and Public Safety

Every year, approximately 115,000 prisoners are released. Once returned to the community, ex-prisoners fail at an alarming rate. Recent data show that over two-thirds of California's parolees are returned to prison within two years. This recidivism rate is twice as high as the national average (Petersilia, 2006).

High rates of return to prison not only compromise public safety, but add significantly to the prison crowding problem. Due to their high failure rate, parolees account for the bulk of prison admissions. Between January 1 and May 31, 2006, parolees constituted 64 percent of the 57,000 people who were admitted to California prisons (CDCR, 2006b). At the end of 2005, one-third of the prison beds were filled by revoked parolees. Some of these parolees had been convicted of a new offense while on parole, but many—in fact 8 percent of the prison population—were there for technical violations of parole[1] (CDCR, 2006a).

Because the parole system contributes so heavily to prison crowding, improved parole practices could have an immediate and lasting impact on the need for prison beds in California. The following five-point program would reduce the parole recidivism rate, ease pressure on correctional institutions, reduce the overall cost of the correctional system, and most significantly, enhance public safety:

- Commit the State of California to a focus on successful community reentry.

- Adopt evidence-based assessment and supervision practices.

- Institute a program of intermediate sanctions to deal with parole violations.

- Implement a structured decision making process that ensures department policy is reflected in individual decisions.

- Reallocate resources to fund programs needed to assist offender's success in the community.

## Commit to a Focus on Successful Community Reentry

Spurred by the U. S. Department of Justice's Serious and Violent Offender Reentry Initiative, scores of jurisdictions across the country are shifting their correctional mission and philosophy from pure incapacitation to one that focuses on enhancing offenders' chances for successful reentry.

The rationale is clear: the better prepared offenders are for reentry, the greater their likelihood of success. Success translates into lower recidivism rates and therefore greater public safety. In addition, lower recidivism means fewer returns to prison and, therefore, less crowding.

The reentry model consists of multiple phases (prison, transition, parole) that are treated as a continuum of preparation and support for reintegration. The model emphasizes: 1) linking offenders with the types of programs and services that will address their criminogenic needs during all three phases, 2) the assessment tools to target the use of limited resources where they can have the greatest impact, 3) the use of transition facilities as a "step-down" process that serves as a bridge between the institution and the community[2], and 4) the use of a collaborative approach between the correctional system and community agencies, organizations, and individuals in developing and implementing the reentry model.

---

1 In some counties, these technical parole violations may be based on new criminal conduct.

2 Unfortunately, the newly proposed CDCR "Reentry Facilities have only a few characteristics of most transitional facilities. Although the proposed facilities will offer a wide range of important transition-related services, and will be located in the offender's home community, the proposed size and character of the facilities is likely to undermine their effectiveness. CDCR wants these facilities to be 500 bed maximum security institutions. They would be "community-based" only in the most narrow definition of that term and would negate any opportunity for the offenders to be tested in a less restrictive environment and the type of offender-community interaction typically associated with step down facilities. States such as Illinois, Georgia, and Texas all operate transitional facilities that are 200 beds or less.

7

California should adopt the central components of the reentry model, and commit to implementing it through necessary legislation, policy development, procedural changes, and engagement of California's communities.

## Adopt Evidence-Based Assessment and Supervision Practices

At a minimum, this must include the use of standardized risk and need assessment tools to drive the development of case plans.

Empirically-based risk instruments have repeatedly demonstrated their ability to sort the offender population into sub-groups that have very different probabilities of recidivism. It is possible to identify a group of high-risk offenders who are four to five times more likely to recidivate than low-risk offenders. This knowledge can be used to allocate resources to offenders who present the greatest risk to public safety.

Ideally, these assessments would be augmented by systems that assist parole officers with supervision strategies. For example, the widely used Client Management Classification system (CMC) has proven very successful in reducing revocations. A massive five-year study of CMC in Florida found that, "all else being equal, CMC offenders are 44 percent less likely to fail than non-CMC offenders," (Leininger, 1998). If California cut its recidivism rate even by half this amount using a strong case management model, it would reduce the need for prison beds significantly.

Supervision requirements can be tailored to each offender as follows:

- Parole officer time can be focused on those at the highest level of risk by seeing them more frequently (e.g., once per week), while seeing low-risk offenders less frequently (e.g., once every other month).

- Currently all parolees receive parole terms that are fairly similar in duration. This results in needlessly high caseloads, which prevent parole officers from paying sufficient attention to higher-risk parolees. It would be a far more efficient use of resources to tie the length of stay on parole to an offender's risk level or accomplishment of individual benchmarks. Low-risk offenders who adjust well could be released after three to six months of supervision. Moderate-risk offenders might be expected to serve a year on parole, while high-risk offenders would serve two years or more.

- Further risk assessment, used in conjunction with needs assessment, can be used to "match" offenders to the type of programs and services most appropriate for them. Very intensive (and expensive) programs should be reserved for the high-risk offenders they were designed to serve. Specific program assignments for high-risk offenders should be driven by assessed needs and/or a process such as CMC.

## Implement a Comprehensive Intermediate Sanctions Program

Offenders will violate the conditions of their parole. Long standing patterns of behavior are not changed overnight, especially without strong, consistent intervention. The question is, how can parole respond in such a way that violators are held accountable and concerns for public safety upheld, without consistently resorting to revocation?

Many jurisdictions have developed a range of intermediate sanctions for parole that can provide a meaningful, graduated, and proportionate response to violations. Such sanctions can include community service orders, electronic monitoring, increased drug testing, mandated participation in out-patient or in-patient drug treatment, short-term stays in local jails, attending a structured day-reported program,

8

and a host of other measures. Graduated sanctions, if used appropriately, can be more effective than revocation, because it is the certainty and the swiftness of a sanction—rather than its severity—that determine its impact.

CDCR's previous, limited experience with intermediate sanctions should not deter the Department from vigorously pursuing this strategy.[3] There has been considerable success in states that have made concentrated efforts to implement intermediate sanctions programs. For example, Georgia saw its revocation rate drop by 11 percent during the first year after it began using intermediate sanctions. New Jersey's revocations dropped by 27 percent in the two-year period following implementation (Burke, 2004).

## Implement a Structured Decision Making Process

The best graduated sanction programs are guided by a formal, structured decision making process (e.g., a violation/sanctions matrix) that takes into account the severity of the violation—as well as the offender's risk level—when determining the severity of the sanction. The system's response to a low-risk offender who violates parole can and should be very different from its response to a high-risk parole violator who represents a greater threat to the community.

The use of a structured decision making model will enhance consistency throughout California. It represents the most direct method for ensuring that state policy is reflected in practice. It ensures that equity in decision making is maintained and protects the State against egregious error.

## Reallocate Resources to Fund Necessary Programs and Services for Parolees

Offenders returning to their communities bring with them a host of problems including physical and mental health and substance abuse issues, illiteracy, few job skills, and minimal work history. These deficits contribute directly to continuing patterns of crime. And unless they are addressed in a comprehensive and consistent fashion—both in the institutions and in the community—parolees will continue to fail.

There is now a strong body of evidence that well-designed programs that target the right offenders for participation can have a substantial impact on recidivism rates. Several rigorous reviews of the research have shown that educational and vocational programs, substance abuse treatment, cognitive behavioral therapies, and reentry programming can reduce recidivism by 5-30 percent (Burke and Tonry, 2006).

Program selection and development should be based on prior evidence of success in helping offenders succeed in the community.

## Potential Impact

Improving the system of parole in California could have a substantial impact on prison crowding. There is strong evidence available from other states with large correctional populations that improved case management and expanded use of intermediate sanctions can reduce the need for prison beds. And, in no state is the potential as great as it is in California. This year, approximately 67,000 parolees will be administratively returned to prison, in other words, without a conviction for a new offense. About

---

3 CDCR implemented three alternative sanctions programs in 2004. All the programs were plagued with implementation problems and, amid fears that they weren't working, the CDCR terminated the programs after less than a year of operation.

44,000 of these will be for drug usage, drug posses-sion and minor traffic violations, or for parole viola-tions not based on new criminal conduct. If parole violations were reduced by 20 percent through the use of CMC, and the State were to use intermediate sanctions for even half of the remaining minor vio-lations, it could find alternatives to prison for more than 30,000 offenders. Returnees serve an average of 4.5 months in prison after revocation. This trans-lates to a savings of more than 11,000 beds annually.

It must be emphasized that an intermediate sanc-tions program would not jeopardize public safety and, in fact, would bring California's parole revo-cation rate in line with rates experienced in other states. Furthermore, the savings in bed space could provide the dollars needed to fund sorely needed programs.

## References

Burke, P. (2004). *Parole violations revisited.* Washington, D. C.: U. S. De-partment of Justice, National Institute of Corrections.

Burke, P., and M. Tonry (2006). *Successful transition and reentry for safer communities: A call to action for parole.* Silver Spring, MD: Center for Ef-fective Public Policy.

California Department of Corrections and Rehabilitation, Data Analy-sis Unit (2006a). *Monthly programs: Table 1. Prison census data, total institu-tion population, offenders by admission/return status and gender as of December 31, 2005.* Sacramento CA: CDCR. (February).

California Department of Corrections and Rehabilitation (2006b). *Inmate population, rehabilitation and housing management plan.* Sacramento, CA: CDCR (July).

Leininger, K. (1998, December). *Effectiveness of client management clas-sification.* Tampa, FL: Florida Department of Corrections, Research and Data Analysis.

Petersilia, J. (2006). *Understanding California corrections,* University of California, Irvine: Center for Evidence-Based Corrections. Report at: http://www.seweb.uci.edu/users/joan/Images/CPRC.pdf

# Creating A New State-Local Corrections Partnership

California must create joint state-local planning and programming that expands the quality and quantity of community corrections sentencing options and enhances reentry services for released inmates. Such a program could be modeled after the highly suc-cessful Juvenile Challenge Grant Program, which expanded proven community alternatives for serious juvenile offenders and helped reduce the crowding crisis in state juvenile facilities (California Board of Corrections, 2004). The critical components of that program are described below.

In most instances, prisoners return to the same com-munities they came from. State prison inmates often have done time in local county jails or have been supervised on probation. The state and local cor-rectional enterprises are inextricably linked despite a bifurcated funding system. Local corrections depart-ments are primarily supported through county bud-gets, and state facilities receive appropriations from the Legislature and the Governor's budget. These two correctional systems exert significant influence on one another. For example, excellent local county programs such as drug courts can avert later state prison commitments. Funding for better care of mentally ill offenders in jail can relieve pressure on prison admissions. Parole revocation rates have ma-jor implications for county jail space if parolees are awaiting their parole revocation hearings in county jails. If the CDCR added community corrections beds or reentry facilities in urban areas, it would require the support and assistance of local elected officials and law enforcement leadership. Also, there are sections of the penal code that give discretion to local prosecutors and judges to handle cases as either misdemeanors or felonies (so-called *wobblers*). This means that district attorneys can greatly impact prison admissions based on their legitimate prosecu-torial discretion. Furthermore, working at the local level would give victims their best chance at having a voice in appropriate sanctions and reentry planning.

There has been funding in the recent past through the Corrections Standards Authority (formerly the Board of Corrections) to support training of local corrections personnel and to defray some costs for local correctional facility construction. Unfortunately, these legislative subsidies of local corrections have diminished due to large state budget deficits.

Ultimately, California needs to find a structure and method of maximizing the appropriate investment in local and state correctional resources. Some states such as Minnesota, Kansas, and Oregon have established Community Corrections Acts that permit state funds to support programs that keep minor offenders in local correctional programs. Research on the effectiveness of these Community Corrections Acts has been positive (Shilton, 1992).

It is abundantly clear that communities are key to the successful reentry of state prisoners. The CDCR Parole Division by itself cannot ensure the success of released inmates. To paraphrase former Speaker of the U.S. House of Representatives, Tip O'Neill, "All reentry is local." As Petersilia (2003) and Travis (2005) have noted, the key ingredients to successful reentry include 1) finding safe housing, 2) obtaining employment, 3) reestablishing positive family and community ties, 4) having access to needed mental health, substance abuse, and other medical care services, 5) having a mentor or sponsor, or 6) completing a cognitive skills training program. All of these key areas of support must be obtained at the community level, with funding support from municipal and county budgets.

Growing recognition of the important community role in reentry has led a number of California counties, including San Diego, Santa Barbara, San Mateo, and San Francisco, to establish county-wide reentry planning groups to work with CDCR officials to enhance and, in some cases, redesign reentry support systems. The current CDCR budget sets aside modest funding to encourage these community partnerships with local government and community-based organizations.

## An Adult Corrections Challenge Grant Program

The Division of Community Partnerships (DCP) of the CDCR should begin the process of alliance building by making available modest planning grants to counties that wish to participate. These grants would support local consultation and planning activities. Funding of planning grants would take into account the prisoner commitment rates of each county. The participating counties could form multi-agency task forces chaired by the Sheriff or Chief Probation Officer. These planning bodies would include all pertinent county justice agencies, representatives from agencies covering housing, employment, adult education, mental and physical health care, and substance abuse treatment. There should also be participation from the faith community, ex-offender self-help groups, and other voluntary community agencies.

The DCP should provide a planning protocol and offer technical assistance to counties that need this help. Within six months, the participating counties would be required to submit a data-driven analysis of local correctional needs for offenders returning home from prisons, people released from local jails, and enhanced local correctional programming. Based on these plans, each participating county would propose its top priorities for additional funding from the DCP. These proposed programs must be evidence-based and be justified by the local plan. There would need to be strict evaluation standards, and each county would have to demonstrate how the potential new projects would reduce crowding in CDCR facilities by averting initial prison commitments or reducing parole revocation rates.

The DCP would review these plans and proposals and provide up to four years of funding for selected programs. Funding would be based on a competitive review of all proposals. The DCP would define an evaluation and monitoring process to be followed by the counties. Successful grantees would be required to explain plans for ongoing financial support of effective programming at the end of the initial grant period.

Financial support for this Adult Offender Challenge Grant Program could increase over time, based on proven results. The DCP would offer ongoing monitoring and consultation of local efforts. Although it is difficult to predict in advance how many counties would want to participate in this program, or what would be the immediate impact on prison crowding, this Adult Offender Challenge Grant program would create a viable structure to encourage communication and collaboration between CDCR and local corrections officials.

## References

California Board of Corrections (2004). *Challenge Grant II Program: Final report to the Legislature, March, 2004*. Sacramento, CA: Author.

Petersilia, J. (2003). *When prisoners come home: Parole and prisoner reentry*. New York: Oxford University Press.

Shilton, M.K. (1992). *Community Corrections Acts for state and local partnerships*. Laurel, MD: American Correctional Association.

Travis, J. (2005). *But they all come back*. Washington, DC: The Urban Institute Press.

# The Need for a California Sentencing Policy Commission

California's Determinate Sentencing Law (DSL) was enacted in 1976, with bipartisan political support, to replace the old indeterminate sentencing system. That system was denounced by some as permitting overly lenient sentences and by others for allowing arbitrary and discriminatory sentences. Superficially, the DSL achieved its goal of greater uniformity of sentencing. In most cases, judges have discretion whether to commit an offender to prison. If they decide a commitment is warranted, they have very little flexibility to sentence below (or above) the statutorily-mandated terms. After 30 years of implementation, the DSL has turned into more of a problem than a solution. "Uniformity" has meant highly rigid sentences that make it impossible for judges to engage in the rational individualization necessary to ensure that the sentence truly reflects the culpability and harmfulness of the individual offender's act or imposes the degree of incapacitation necessary to prevent future serious criminality. The DSL's rigidity has also led to severe overcrowding, excessive costs, and dangerous and unconstitutional prison conditions. The DSL has, in fact, made the Legislature the sole sentencing authority in California. Those who are unhappy with legislative actions have resorted to ballot measures that amend the state constitution.

This has resulted in law changes piled onto older law changes. By many accounts, the current provisions of the DSL are a mélange of conflicting and, often, inconsistent provisions.

Worse yet, one of the DSL's key professed goals—eliminating the abuses of the old discretionary parole system—has remained unmet. For one thing, the DSL never really eliminated parole. Not only did parole remain in its old form as a system of deciding on the release of inmates who were convicted for the most serious violent crimes—most obviously homicide—but parole was retained, albeit in a different guise, for other crimes. Now all prisoners are released onto a fixed parole term of 1 to 3 years, set according to a formula. Therefore, all prisoners use up expensive parole supervision resources. Though parole conditions are somewhat individualized by parole officers, the system lacks the flexibility needed for sensible allocation of resources to prevent recidivism and enhance reentry. Some prisoners who pose no danger to public safety receive unnecessarily long terms of supervision and face being reincarcerated for minor technical violations. Other prisoners who pose greater community danger get released on parole at the end of their determinate sentences, whether they are ready for community reentry or not. The current concern about releasing dangerous sex offenders is an example of this dilemma.

With guaranteed parole release, convicts have little or no incentive to prepare for release by enrolling in reentry programs in prison, even those who wish to benefit from these programs. While Californians generally want to have minimum graduation standards from our high schools, there are no minimum life skills that inmates must have before they are released from prison, hence our crisis of dangerously crowded prisons, one of the highest parole recidivism rates in the nation, and no governmental infrastructure to comprehend, much less solve, these problems.

A legislative solution is necessary, but the key to sentencing reform is for the Legislature to realize that it cannot solve these problems by business as usual. Rather, the dramatically positive lesson from other states such as North Carolina and Virginia is that a new governmental mechanism is necessary: a sentencing policy commission. A sentencing policy commission is an administrative body authorized by the legislature to translate the broad design of sentencing statutes into a workable system that achieves the optimal mix of uniformity and flexibility.

## Functions of a Sentencing Policy Commission

What would a commission do? There are many possibilities. First, a commission could carefully review the current DSL and pinpoint major problems and inconsistencies. Next, it could issue sentencing guidelines to carry out the appropriate goals of sentencing legislation. Third, the commission could conduct research to assess the impact of the guidelines on public safety, prison and parole populations, and disparity in the statewide implementation of the guidelines. Statutes necessarily speak in large generalities. But effective sentencing rules to guide judges, promote reasonable state-wide uniformity and predictability, and allow for a necessary degree of individualization, cannot be drawn by the Legislature itself.

Under the DSL, judges are left with only a narrow set of choices called a "triad," a high, medium, and low sentence for the crime of conviction, but then may add on to those an array of automatic enhancements for certain factors. A commission can issue guidelines that, of course, operate within the range dictated by the Legislature but allow for more careful calibration of the sentence that balances principles of just deserts, deterrence, incapacitation, and restorative justice demand. These tasks require fine-grained rule making and identification of all relevant aggravating and mitigating factors, based on updated information and analysis provided by research staff. Second, sentencing guidelines rely on research-based expert information on the most efficient allocation of prisoners to state and county correctional options. No legislature has the time or the logistical ability to engage in this continuing readjustment. But a commission, acting as the eyes and ears for the Legislature, always subject to the ultimate control of the Legislature, can do just that.

Equally important, a sentencing policy commission can help resolve some of the problems of the parole system. Just as guidelines can ensure the proper mix of uniformity and individualized flexibility in actual sentences, they are a crucial tool in guiding parole officials in rationally allocating the use of parole resources to the most dangerous offenders, and in setting the most efficient parole conditions for released prisoners. Right now, parole officials, while no doubt acting in good faith, must make ad hoc decisions about the reentry needs and sensible supervisory conditions for released inmates without any overall guidance. They do this without receiving updated information about state-wide parole resources and without benefiting from timely and systematic data about the availability and effectiveness of various reentry programs. Again, a legislature can hardly perform this task, but a sentencing commission, with an expert staff, can do the job. We now have persistent criticism of decisions made by parole staff. A sentencing policy commission can provide statewide

*13*

guidelines to direct and assist the decisions of parole officials, while also supplying those officials with the crucial information they now lack.

## Success in Other States

This concept of a modern sentencing policy commission hardly requires much imagination, because superb models are readily available. Many states now have such commissions, and some, notably North Carolina, Virginia, Oregon, Washington, and Minnesota, are uniformly acknowledged by policymakers and academics to be very successful. With the help of their commissions, these states have drastically reduced prison costs and reallocated resources towards incapacitation of the truly dangerous convicts while providing alternative and less expensive sanctions for those who are not major threats to public safety. These commissions have done their work with a remarkable degree of bipartisan political consensus and a virtual absence of public controversy. For example, both North Carolina and Virginia employed sentencing guidelines to end court-ordered policies of accelerated release of inmates. These state commissions permitted longer terms for the most violent offenders and moved nonviolent and low-risk inmates to effective intermediate sanctions. Prison crowding was reduced in both states without massive new prison building. Both North Carolina and Virginia enjoyed at least as much of a decline in serious crime rates as the rest of the nation in the past decade.

Commission models vary among these states, and no one model fits California perfectly. If California takes the crucial next step in creating a sentencing policy commission, the Legislature will have the opportunity to make a number of choices about the design of that system: Should the commission be a direct delegate of the Legislature? Should it be placed within the Judiciary? Should it be an independent agency? How will its political accountability be ensured? What will be its size? Who will select its members? Will they be full or part-time? What mix of public officials and private citizens will it contain? Will the commission's sentencing guidelines be binding on judges or will the commission issue "presumptive guidelines" from which judges can diverge if they offer reasons on the record? California needs to designate a body, chaired by the Chief Justice, with members appointed by the Chair, the Governor, the Legislature, and the Attorney General, to propose answers to these questions about the structure and operations of the commission.

## A Time To Take Action

The successes of other states have been striking. They have shown that a sentencing policy commission can insulate the elected officials from the pressures to follow high visibility crimes with political sloganeering that, too often, produces laws that actually undermine the effectiveness of the criminal justice system. A sentencing policy commission can be a well-oiled machine to monitor the successes and failures of various sentencing initiatives while keeping prison populations within manageable capacities. It can enable government officials to benefit from the most thoroughly tested research from criminologists and other policy experts.

The commission concept has been fitfully considered by California legislators and other officials over the past 50 years, but our leaders have never resolved to utilize this well-tested tool of public administration. The Independent Review Panel led by former Governor George Deukmejian strongly endorsed this concept. Given our bulging and dangerous state prisons and county jails, no state needs this sort of reform more.

## *Does the Political Will Exist To Respond to the Prison Crisis?*

The Governor and the Legislature face a daunting task to effectively respond to the prison crisis. California is at a crossroads and must face up to the deep problems in its state and local corrections systems. This is no time for "sound bite" policies and politically popular quick fixes. Whatever solutions are adopted, there will be an urgent need to pay careful attention to the details of implementation. We also need to enlist the best thinkers and practitioners from across the nation to assist us.

A smart reform program must balance emergency steps, short-term measures, and a longer-term strategic vision. The NCCD believes that the proposals in this report represent a start in that direction. Fundamental to viable solutions is a continued movement toward a corrections system that combines effective rehabilitation and reentry programs that reduce recidivism with appropriate public protection considerations and sensitivity to the plight of victims.

There are evidence-based pathways out of the deep prison crisis that we have created. A comprehensive approach is needed that includes realistic forecasts of the impact of policy and law changes on state and local corrections. We need to understand the true financial implications to fixing the corrections imbroglio. Reforms must include a new alliance of state and local justice officials, and an exploration of proven safe alternatives to state confinement. California must expand its commitment to employ research and rigorous evaluations to determine if the taxpayers are getting value for their massive investments in the corrections system. A clear plan that achieves bipartisan support and includes all three branches of government is the standard we should uphold.

This is a time for honesty about what is working and what needs major reforms. The public debate on sentencing and corrections has too often been misinformed by myths rather than empirical data. Interest group politics must be replaced by a search for the best ways to make our communities safer. Finally, California must respond to the urgent plight of the estimated 500,000 children whose parents are incarcerated. To ignore the needs of these children is to perpetuate an inter-generational cycle of crime and violence that is diminishing our communities and extending the current prison crisis long into the future.

*15*

## *Summary*

As we attempt to move California's prisons and jails away from their current disastrous crowding, we acknowledge that this effort is driven by the initiative to create a humane, safe, and effective system of crime control and prevention that reflects the ideals of our society. Essential services, procedures, and structures designed to reduce recidivism, break the intergenerational cycle of violence, and save taxpayer dollars for more positive expenditures will serve the larger end of reducing crime in our communities and enhancing public safety.

## *Recommendations*

**Move 4,500 non-serious, low-risk women to community-based facilities.** The vast majority of women prisoners are nonviolent, pose a low threat to society, and need better access to their children and to rehabilitative services.

**Reform the parole system.** The state must commit to a focus on reentry, adopt evidence-based supervision and assessment procedures, institute intermediate sanctions, and use a structured decision making system.

**Create an Adult Corrections Challenge Grant Program.** Establishing a viable partnership between state and local corrections would expand sentencing options, enhance rehabilitative services, and strengthen local reentry systems. We must find creative ways to make the most of our expenditures.

**Establish a Sentencing Policy Commission.** This Commission model, already in use in many states, is an administrative body authorized by the legislature to translate the broad design of sentencing statutes into a workable system that balances uniformity of sentencing with flexibility for individualization. This body would ensure that sentencing reflects the culpability and harmfulness of a convicted individual. A Commission would also allow for an evaluation of the use of parole and a rational allocation of state and local correctional resources.

## *Principles*

**Implement evidence-based practices.** These will reduce recidivism and increase public safety.

**Standardize risk and needs assessments.** These must be a integral part of a coherent plan to match resources with needs and determine appropriate placements.

**Coordinate case management.** This is essential to ensuring continuity of care, reducing failure rates and returns to prison, maintaining morale of parole and probation officers.

**Provide essential services to reentering prisoners.** These include housing, employment, mental and physical health care, substance abuse treatment, education, family reunification, mentoring, and cognitive skills.

**Evaluate programs.** This is critical to knowing what works and what doesn't.

**Promote public awareness.** The public should be well informed; they should know how their tax dollars are being spent and what they are getting for their public safety investment.