# EXHIBIT "SMC-D"



THE
# PEW
CENTER ON THE STATES

# When Offenders Break the Rules

## Smart Responses to Parole and Probation Violations

**Public Safety Policy Brief**                          No. 3 | November 2007



# Executive Summary

The incarceration of offenders who break the rules of their probation or parole is one of the chief reasons for the rapid growth of prison and jail populations and costs. Over 230,000 parole violators were admitted to prison in 2005, accounting for more than one-third of all admissions.[1] Half the U.S. jail population is the consequence of failure under community supervision.[2]

Some of these offenders are returning to lock-ups for committing new criminal acts. Others are revoked to prison for violations of their parole and probation conditions, non-criminal offenses such as missing appointments or failing drug tests. A growing body of analysis and experience suggests a strategy that can boost the success of people on parole and probation, keeping them crime- and drug-free and thereby saving more prison beds for violent, serious and chronic offenders.

Some states return a high percentage of probationers and parolees to prison for breaking the rules of their release; others do not. The decision to seek revocation of community supervision can be inconsistent, the result of wide variability in staff members' interpretation of when revocation is appropriate. Revocation rates also vary widely within a single state—high in one region, much lower in another—and even among judges and parole officers in the same district. This raises questions about even-handedness and fundamental fairness. It also suggests a significant opportunity to be more strategic in using the power to revoke release.

**A Shifting Perspective.** Most offenders occasionally violate some condition of their community supervision. A common violation involves the use of illicit drugs or alcohol, since the standard conditions of parole or probation usually require addicted offenders to stay clean and sober, or to participate in treatment that may be unavailable or difficult to access. Unskilled and uneducated offenders must be continually employed, seeking

## In this brief

◗ Condition violation
   or new crime? ...................3

◗ Revocation rates
   vary widely ......................4

◗ Elements of a
   strategic approach................5

◗ Action steps
   for policy makers................7

# Executive Summary continued from page 1



**The Pew Charitable Trusts**
**1025 F Street, NW Suite 900**
**Washington, DC 20004-1409**
**www.pewtrusts.org**

### ABOUT THE PROJECT

Launched in 2006 as a project of Pew's Center on the States, the Public Safety Performance Project seeks to help states advance fiscally sound, data-driven policies and practices in sentencing and corrections that protect public safety, hold offenders accountable, and control corrections costs.

The Pew Charitable Trusts applies the power of knowledge to solve today's most challenging problems. Our Pew Center on the States identifies and advances effective policy approaches to critical issues facing states.

### ABOUT THIS BRIEF

This document is part of a series of primers for policy makers about the critical choices they face in developing strategies to improve the public safety return on taxpayer dollars. For more on this topic, see our companion publications—key questions for policy makers and a case study of parole violator reforms in Texas—and visit our website at www.pewpublicsafety.org.

### ABOUT THE AUTHORS

This document was written by Peggy Burke in collaboration with Adam Gelb and Jake Horowitz. Ms. Burke is a Principal with the Center for Effective Public Policy where she directs projects in the areas of offender transition and reentry, responses to parole and probation violations, court innovation, offender classification, sentencing policy, and strategic planning. Mr. Gelb is Director of, and Mr. Horowitz is a Senior Associate on, the Public Safety Performance Project.

### ABOUT THE REVIEWERS

This document was peer reviewed by Judith Sachwald and Dale Parent. Ms. Sachwald was most recently the Director of the Maryland Division of Probation and Parole. Mr. Parent recently retired from Abt Associates, Inc., where for the past 20 years he conducted research and planning on sentencing alternatives, performance-based standards in criminal justice, and prisoner reentry.

While these experts have screened the report for methodology and accuracy, neither they nor their current or former organizations necessarily endorse its findings or conclusions.

employment or attending school. Indigent offenders must have a stable residence, pay court fees, fines and restitution, and support all dependents.

Innovative judges and correctional administrators believe that many individuals who have violated the conditions of their release can be managed safely and cost-effectively in the community rather than returned to expensive prison cells. They increasingly are relying on a strategic approach that includes incarceration of high-risk offenders who present an imminent danger of reoffending and a problem-solving combination of penalties, rewards and services to those who pose less risk to public safety. The strategy seeks to protect the community, to hold violators accountable with interventions that address the reasons for the violations, and to reduce reincarceration and the resulting costs to taxpayers.

## Defining the Issue

Federal and state governments over recent years have invested significant and growing funds in expanding corrections systems. From 1977 to 2003, state and local expenditures for corrections increased by 1,173 percent, far outstripping growth rates for education (505 percent), hospital and health care (572 percent), interest on debt (577 percent), and public welfare (766 percent).[3] Between 1982 and 2003, state correctional expenditures increased 550 percent from $6 billion to $39 billion, far above the 184 percent increase that would have been expected from inflation alone.[4] In 2005, the average annual operating cost per inmate nationwide was estimated to be $23,876, although costs varied greatly by state, region, and security level of inmates.[5] Some states have been able to reduce per capita costs in the very recent past while other states have experienced increases. In general, most analysts expect continuing increases in per capita corrections costs as the inmate population ages and as corrections administrators find it harder to

squeeze additional efficiencies out of their budgets.

Increasing costs primarily reflect the growth in prison and jail populations nationwide. Between 1980 and 2006, the prison population of the U.S. more than quadrupled to 1.55 million.[6] Not only have the absolute numbers of inmates increased, but the rate of incarceration has risen dramatically as well. Between 1995 and 2006, the incarceration rate grew from 601 to 750 jail or prison inmates per 100,000 citizens— a 25 percent increase. At mid-year 2006, one in every 133 U.S. residents was in prison or jail.[7]

The population of individuals who are at risk of violating the terms of their release—and being sent to prison or jail—is large and growing. At year-end 2001, there were 312 state parolees per 100,000 adult U.S. residents, up from 271 in 1990 and 123 in 1980. In absolute terms, 656,320 releases from state and federal prison were reported in 2003.[8] For state prison releases, this was a 50 percent increase since 1990.[9] The probation population is even larger, and growing. In 2005, there were 4.2 million people on probation in the community, up from 3 million in 1995.[10]



# Violators: A Leading Driver of Prison Population Growth

The chief cause of the growth in incarceration has not been higher crime rates, but rather stricter sentencing and release policies put in place by all three branches of government. Judges are more likely to sentence felons to prison for longer terms. Legislatures have passed more mandatory minimum sentences, especially for drug offenders. And parole boards have held inmates in prison longer before deciding to release them. They also are more likely than in the past to revoke individuals on parole and return them to prison.[11]

An analysis of data over the past 25 years finds an important shift in the source of population growth. From 1980 to 1992, crime trends and the number of commitments to prison per arrest were most significant in driving prison populations. In contrast, data from 1992 to 2001 show a significantly greater influence from longer time served in prison, including time served as a result of recommitment for

parole violations.[12] In fact, leading criminal justice scholars observe that shifts in practices with respect to parole release and reincarceration for parole violations accounted for 60 percent of the increase in the nation's prison population between 1992 and 2001.[13] The number of parolees revoked and sent to prison in 2005 was 232,000, up from 133,900 in 1990.[14] The same is true among probationers: in 2004, 330,000 probationers were revoked and sent to jail, up from 222,000 in 1990.[15]

Many of those revoked to prison have been convicted of new crimes, either misdemeanors or felonies. And some cases that could have been handled as new criminal prosecutions are, instead, processed administratively as parole violations, often to avoid the delays and costs that attend new criminal court cases. A significant number of returns, however, are solely for violations of the conditions of probation or parole— acts, such as missing treatment sessions, which otherwise are not crimes. In some states, these so-called "technical" or "condition" violators account for more than half of all those returned to prison.[16]

# Condition Violation or New Crime?

Sometimes the criminal justice system processes new arrests of people on probation or parole as condition violations rather than new crimes. By revoking an offender's release through the administrative violations process, prosecutors and judges avoid further clogging the courts with new criminal cases, while also achieving the goal of removing the offender from the community.

Some analysts suggest that if there is new criminal behavior it should be charged and prosecuted in all cases. Anything less holds the determination of guilt to a lower burden of proof, and could result in more time served for revocations than would result from prosecution and sentencing by a court. Others argue that revocation is a quicker and more appropriate way to sanction lower-level offenses without burdening court dockets.

Available statistics do not paint a clear picture of the degree to which returns to prison for probation and parole violations involve solely breaking the rules of supervision or also involve significant new criminal behavior. Many analysts believe that about half of the condition violators sent to prison were revoked for new criminal acts. But the actual figures can be determined only by studies within individual states.

## Parole vs. Probation

Probation and parole are very similar in that they both involve supervision of offenders in the community and require them to comply with a set of rules or face incarceration. The key differences between the two are in how they are ordered and when they typically occur. Probation is ordered by a judge in court at the time of sentencing instead of a prison term. Parole, on the other hand, involves supervision in the community after serving time in prison. The timing of release is, in most cases, determined by the offender's original sentence and sometimes credit for satisfactory behavior ("good time credit"). In a small percentage of cases, parole boards determine the timing of release. Once on parole, however, parole boards set conditions and make decisions as to revocation of parole.

In some states, judges may order "split sentences," a period of probation supervision to be served after release from prison or jail.

Much of this briefing is based on parole research because more is known nationally about this population than about probationers. There is only one parole board in each state, making parole data collection much more simple than gathering probation data, which in many states is kept by local courts. Although the impact of probation violators on prison populations is hard to quantify, these violations have some of the same effects on prison growth and public safety as do parole violations. Several jurisdictions across the nation have focused on developing a more structured and strategic approach to probation violations. Most of the analysis and many of the recommendations in this briefing can be applied to both populations.



## Types of Violations

Offenders placed on probation by a court or on parole by a paroling authority must abide by a set of rules, or conditions of supervision, while they are in the community. There are two types of conditions:

□ **General conditions** that apply to all offenders, such as obeying all laws, abstaining from alcohol and drug use, maintaining employment, and reporting regularly to the probation or parole officer. While these are common requirements, general conditions of supervision vary among the states and can differ among court districts within a state.

□ **Special conditions** that are directed toward individual offenders and the risks they pose, such as requirements to attend treatment, submit to drug testing, avoid certain places such as bars or areas where children congregate, or stay away from certain people such as prior victims. Courts and parole boards often add up to a dozen special conditions to an offender's list of requirements.

Taken together, the general and special conditions are intended to help monitor offenders, keep them away from risky situations, and link them with resources that will reduce the chances of recidivism. They also define a range of expectations that, should offenders fail to comply, can result in punishment in the community or return to prison. When an offender breaks the rules, it is often called a "technical" or condition violation.

If current trends continue, states are likely to see increasing numbers of parole and probation violators admitted to prison. Those violators who could be managed in the community tie up prison beds that could be used for more dangerous offenders, which risks public safety and hikes correctional costs.

## Revocation Rates Vary Widely Among States

Research on releases and recommitments to prison in California and Illinois shows that different policies and practices result in radically different rates at which violators are returned to prison.[17]

Based on a study of all prisoners in those states released in 1995 and tracked through 2001, the percent of released prisoners reincarcerated for new crimes ranges from 30 in California to 52 in Illinois. *(See chart.)* The percent of released prisoners who are reincarcerated for violations of parole during that same time period ranges from 2.5 percent in Illinois to 35.8 percent in California. Recommitments for parole violations per 100 releases reached a high of 209

> **"...the choices states make in responding to violations of parole vary widely and those choices have enormous implications for prison populations, costs and public safety."**

in California, where more than half of all released prisoners are recommitted more than once during their parole period. Remember that paroling authorities have discretion about whether to reincarcerate an offender guilty of a technical violation, or to impose an intermediate sanction in the community. These statistics demonstrate that the choices states make in responding to violations of parole vary widely and those choices have enormous implications for prison populations, costs and public safety.



**California**
Prisoners released in 1995: **92,997**

Number returned by 2001 66%

for a new offense 30.2%

for a technical violation 35.8%



**Illinois**
Prisoners released in 1995: **21,598**

Number returned by 2001 54.1%

for a new offense 51.6%

for a technical violation 2.5%



## Current Practice: Three Approaches

Experience from work on violations by the National Institute of Corrections (NIC), an agency of the U.S. Department of Justice, indicates that it is typical for 75 to 80 percent of parolees to be, at one time or another, in violation of some condition of their supervision.[18] But the prevalence of violations should not hide the fact that they vary widely in terms of severity and risk to the community.

States have developed three broad approaches to handling these violations. They can be characterized as unstructured, prescriptive and strategic.

**❍ Unstructured.** When NIC began studying probation and parole violation practices in the late 1980s,[19] it became clear that there was very little policy, clear sense of purpose, or specific criteria that guided staff in decisions about how to respond to rule violations. Revocation rates varied dramatically among line officers, supervisors, and regions within the same state—the consequence of a diffuse network of unstructured decisions. While there has been no comprehensive research that catalogs the details of states' approaches to violations, experience on a range of national technical assistance efforts supported by NIC indicates that while a number of states are attempting to be more strategic in responding to violations, most practice remains relatively unstructured in this regard.

**❍ Prescriptive.** At the other extreme is an approach that prescribes in law or regulation which violators must or cannot be brought to revocation

hearings or actually revoked to prison. There is discussion in some states about prohibiting recommitment to prison as a result of a probation or parole violation. Such an approach can limit the ability to quickly remove offenders from the street when they present an imminent risk, in effect telling supervision agencies to wait until a crime is committed to take action to protect the community.

Overly-prescriptive limits on revocations also remove the ability to incarcerate violators who repeatedly and blatantly refuse to comply with requirements for treatment or other conditions designed to reduce their risk of reoffending. For example, an offender might be revoked if he had a history of domestic violence and is found contacting a victim he was prohibited from contacting as a condition of supervision. An offender who has been assessed as high risk, particularly because of his criminal associates, could be revoked for being in the company of gang members who were his former co-defendants.

**❍ Strategic.** As early as 1997, NIC-sponsored work found that revocation rates could be reduced without increases in new crime.[20] NIC's recent work in three states helped cut the percentage of total caseloads revoked to prison for parole violations and decreased the percentage of admissions to prison as a result of violations with no corresponding increase in new criminal behavior among those supervised.[21] Encouraged by such results, parole and probation agencies are beginning to adopt similar strategies, developing tools and policies that help determine which violators should be taken off the street and which can be held accountable

through sanctions in the community.

This third approach to parole violations may be characterized as strategic because it includes a clear definition of desired outcomes, corresponding policies and tools, and measurement of performance. This approach has its roots in the work NIC conducted for many years on "structured decision making" for parole release and supervision.[22]

The implications for public safety are promising. If violators are judged according to their risk of reoffending, with priority placed on quick reimprisonment in high-risk cases, then safety can be enhanced. At the same time, if violations by offenders having difficulty with substance abuse, mental health, and similar issues can be identified for problem-solving interventions that prevent future criminal behavior, then community safety can be even more effectively enhanced, and at lower cost than revocation and reincarceration.

## Elements of a Strategic Approach

The critical first step for states interested in better handling of violations is a careful analysis of current policies and practices. These policies and practices can be designed to enhance the likelihood of successful completion of supervision, with violations becoming used as an opportunity to intervene with offenders and redirect their behavior.

Key elements of this strategic approach include the following:


Case 2:90-cv-00520-KJM-SCR    Document 3247-3    Filed 10/31/08    Page 7 of 24
Smart Responses to Parole and Probation Violations
NO. 3 ● November 2007

## Collaboration Between Releasing Authority and Supervision Agency.

Typically, the decision-maker with authority over release or revocation—the judge or the parole board—is separate from the agency responsible for actually supervising offenders on probation or parole. Yet because their responsibilities are so intertwined, it is difficult to conceive of a "strategic" approach to violations without the close collaboration of these two entities. In those states where such strategic approaches have been developed, there has been a conscious effort to involve the court or releasing authority and the supervision agency in defining and implementing changes.

## Clarifying the Goals of Supervision.

Correctional policy over the past decade has increasingly recognized that the successful completion of community supervision—with no new offenses and no new victims—is in the best interests of public safety. The three most important goals of supervision are protecting the public, holding offenders accountable for their actions, and helping them become productive, law-abiding citizens. This balanced mission differs markedly from the notion that the job of probation and parole officers is to monitor and revoke individuals who are not in compliance with the conditions of their release. Identifying agency goals, establishing clear policies, communicating expectations to staff, and providing options short of revocation to prison are the important elements of this strategy.

## Good Risk Assessment Tools.

Supervision agencies need to understand offender risk to make strategic decisions about how to respond to specific violations. States that develop, implement, maintain and evaluate research-based risk assessment tools improve their ability to make sound decisions in individual cases and at the policy level. These tools should be so-called "third generation" instruments that include both "static" factors—things about the offender that can't be changed, such as their prior criminal records and age at first arrest, and "dynamic" factors—characteristics that can be changed and that research has identified as chief drivers of criminal behavior, such as low self-control and substance abuse.

## Structured Discretion.

Parole and probation supervision staff need discretion so they can respond appropriately to different situations. On the other hand, clear policies that guide staff, particularly as to when revocation should be pursued, help agencies pursue their public safety and fiscal goals. Many agencies are requiring higher levels of approval to issue a warrant or begin the revocation process. These include supervisory approval and the use of centralized "warrant units" that review requests and assure consistency and adherence to policy.

## Graduated Responses.

Violations vary in terms of severity and the risk they represent to the community. Supervision agencies are beginning to craft policy and garner resources that support front-line officers with a continuum of practical, community-based sanctions. Missing a meeting with the probation officer might result in imposition of community service hours, and repeated failures to comply with rules could lead to placement of the offender in a day reporting center.

## Swiftness and Certainty.

In addition to being scaled according to the severity of the offense and the risk of the offender, sanctions for probation and parole violations should be delivered as certainly and swiftly as possible. Sanctions lose their deterrent impact if they happen arbitrarily or too long after the violation has occurred. Courts and parole boards need to construct procedures that minimize paperwork and speed the imposition of

> "Agencies without a continuum of sanctions and services to address these situations will deliver either a slap on the wrist or revocation to prison, neither of which provides a level of accountability proportionate to the violation."



sanctions. Some mechanisms, such as granting sanctioning authority to agency officials or hearing officers, require legislative permission.

**Positive Reinforcement.** One of the critical lessons emerging from research is that the motivation of offenders to change is a critically important factor in their likelihood of avoiding return to crime. Parole and probation staff have many opportunities to affect motivation, and one of the significant tools that staff have is positive feedback.[23] Agencies have focused on the use of incentives for positive behavior, such as certificates of completion when offenders complete programs, reductions in restrictions, and early termination of supervision.

**Condition and Supervision Strategies.** A violation may be an indication of substantial risk and trigger a decision to remove an offender quickly from the community. Or it may be an opportunity to reinforce expectations, hold offenders accountable through community-based sanctions, and to connect offenders with needed services and treatment. Supervision should be targeted by risk, reserving interventions and monitoring for higher risk offenders. Lower risk offenders can be managed with a limited set of conditions and considered for early discharge. The alignment of judicial and parole board practices on setting conditions with this overall strategic approach to violations also is critical. The supervision of higher risk offenders must incorporate treatment programs that have been demonstrated to reduce recidivism.[24]

**Community Resources.** Many violations of parole and probation involve relapses into drug abuse,

difficulties finding or keeping a job, and the like. Agencies without a continuum of sanctions and services to address these situations will deliver either a slap on the wrist or revocation to prison, neither of which provides a level of accountability proportionate to the violation.

## Action Steps for Policymakers

As growing numbers of probation and parole failures push prison populations beyond capacity, communities and policy makers are beginning to explore remedies. Research and experience suggest some key steps that policy makers in all three branches of government can take to ensure their state's parole and probation violations process is working effectively.

First, they can determine if their state has adopted an unstructured, prescriptive, or strategic approach to violations. If it is not a strategic approach, diagnose the statutory, funding or managerial obstacles that stand in the way of reform. A strategic framework will:

- Promote tailored responses to violations that improve public safety, offender accountability, and prudent use of resources.

- Mandate and fund sound, research-based assessments of risk that inform decision making; and

- Mandate, fund and organize community-based sanctions and resources that ensure a continuum of sanctions short of incarceration.

Policymakers should expect correctional agencies to:

- Articulate successful completion of supervision as a goal in service of community safety;

- Advance an agency culture that supports a strategic approach to parole violations;

- Routinely measure and report rates of successful completion of supervision; and

- Design and implement a policy framework for revocations that includes graduated responses based on offender risk and violation severity and allows probation and parole agencies to impose those responses as quickly as possible.

By adopting more strategic approaches to probation and parole violations, states will better protect public safety by reducing recidivism, hold offenders accountable to the victims and communities they have harmed, and control the costs of their corrections systems. 🏛

*Additional information and guidance on these issues can be found at www.parolesviolationsrevisited.org, a resource developed by the Center for Effective Public Policy with the support of the National Institute of Corrections. This web site guides policy makers through a process of assessing and reshaping their approach to violations in collaboration with other key stakeholders.*


# Notes

[1] William J. Sabol, Todd D. Minton, and Paige M. Harrison, *Prison and Jail Inmates at Midyear 2006*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2007), 4.

[2] Allen J. Beck, "The Importance of Successful Reentry to Jail Population Growth," presented at the Corrections Statistics Program, Bureau of Justice Statistics, U.S. Department of Justice, June 27, 2006, Washington, D.C.

[3] Kristen A. Hughes, *Justice Expenditure and Employment in the United States, 2003*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2006), 4.

[4] Ibid., 2.

[5] Public Safety Performance Project, The Pew Charitable Trusts, *Public Safety, Public Spending: Forecasting America's Prison Population, 2007-2011* (Washington, D.C.: The Pew Charitable Trusts, 2007), 33.

[6] Sabol, Minton, and Harrison, 1.

[7] Sabol, Minton, and Harrison, 8.

[8] Paige M. Harrison and Allen J. Beck, *Prison and Jail Prisoners at Midyear 2004*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2005).

[9] Timothy A. Hughes, Doris James Wilson, and Allen J. Beck, *Trends in State Parole, 1990-2000*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2001).

[10] Lauren E. Glaze and Thomas P. Bonczar, *Probation and Parole in the United States, 2005*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2006), 1.

[11] Alfred Blumstein and Allen J. Beck, "Reentry as a Transient State between Liberty and Recommitment," in *Prisoner Reentry and Crime in America*, Jeremy Travis and Christy Visher, eds., (New York, New York: Cambridge University Press, 2005), 56.

[12] Ibid.

[13] Ibid., 59.

[14] Page M. Harrison and Allen J. Beck, *Prison and Jail Prisoners at Midyear 2006*, U.S. Department of Justice, Bureau of Justice Statistics (Washington, D.C.: U.S. Department of Justice, 2007).

[15] Allen J. Beck, "The Importance of Successful Reentry to Jail Population Growth."

[16] Hughes, Wilson, Beck, 13.

[17] Blumstein and Beck, 73.

[18] Peggy B. Burke, *Parole Violations Revisited: A Handbook on Strengthening Parole Practices for Public Safety and Successful Transition to the Community* (Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 2004), 4.

[19] Peggy B. Burke, *Policy-Driven Responses to Probation and Parole Violations* (Washington, D.C.: U.S. Department of Justice, National Institute of Corrections, 1997).

[20] Ibid., 27-33.

[21] Burke, *Parole Violations Revisited*, 31. The three states are Georgia, Kansas and New Jersey.

[22] Peggy Burke, Linda Adams, and Becki Ney, *Policy for Parole Release and Revocation: The National Institute of Corrections 1988-1989 Technical Assistance Project* (Washington, D.C.: National Institute of Corrections, 1990); *The Intermediate Sanctions Handbook: Experience and Tools for Policymakers*, eds. Peggy McGarry and Madeline Carter (Washington, D.C.: National Institute of Corrections, 1993); Burke, *Policy-Driven Responses to Probation and Parole Violations*; Madeline Carter, *Responding to Parole and Probation Violations: A Handbook to Guide Local Policy Development* (Washington, D.C.: National Institute of Corrections, 2001).

[23] Scott Walters, Michael D. Clark, Ray Gingerich, and Melissa Meltzer, *A Guide for Probation and Parole: Motivating Offenders to Change* (Washington, D.C.: National Institute of Corrections, 2007), 31.

[24] Steve Aos, Marna Miller, and Elizabeth Drake, *Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates*

# EXHIBIT "SMC-E"

# Effect of Early Release from Prison on Public Safety:
## A Review of the Literature

### National Council on Crime and Delinquency
April, 2007

## Significance

Prison crowding is the most critical problem facing the criminal justice system in the US. Several approaches have been undertaken to alleviate this problem, ranging from "front-door" solutions such as reducing prison admissions or reducing the sentence lengths of those admitted, "back-door" solutions of increasing the number of releases from prison through parole release, and finally, through "capacity expansion" or by building more prison. However, the rate of incarceration continues to pose a burden to the prisons and jails.

## Methods

The National Council on Crime and Delinquency (NCCD) conducted an extensive review of published literature on "early release" and "public safety" in March, 2007, for this report. The literature reviewed included approximately 15 peer-reviewed articles, dissertations, state reports, and policy-related and national data reports. The reports used data from 1981 to 2004. This review examines the issue of early release from prison in different geographical settings and at different times and looks at its impact on public safety over the span of 22 years.

## Highlights

No attempt has been made to compare the methods and validity of the studies reviewed. However, these studies contribute to the discourse around early release as an effective strategy to address prison overcrowding and its effect on prisoners and prison staff. In most cases early release is evaluated in terms of its impact on recidivism and public safety.

The cited literature shows:

- The recidivism rates among early release prisoners and those serving full term are comparable.
- In some cases the recidivism rate among the early release groups was *lower* than that of the full-term groups.
- Early release programs are most effective when they are targeted to specific types of offenders: substance abusers or property-related offenses.

# Literature Review on Effect of Early Release from Prison on Public of Safety

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 1. Sims, B., O'Connell, J., *Early Release; Prison Overcrowding and Public Safety Implications.* Washington (State) Office of Financial Management, 1985. | **Setting:** Olympia, **Washington** **Summary:** First early release programs to attempt to control inmate population started in 1979. During early release efforts, inmates were paroled early at the discretion of the state Board of Prison Terms and Paroles. Starting in 1982, legislation prohibited early release of inmates convicted of treason, any class A felony, or inmates found to be sexual psychopaths. In 1983 the law was amended to prohibit the early release of inmates legally defined as violent offenders. The study groups was a total of 1,674 inmates released an average of six months earlier than their expected released dates (starting in 1979). | Longitudinal comparison assessment of six different cohorts participating in a court-mandated Prison Overcrowding Reform. The early release cohorts were compared to a historical comparison group. The comparison group includes 1,867 inmates released between July, 1978 and July, 1979. This period is the 12 months immediately preceding the first early release program. **Outcomes:** Effect of early release on public safety, as measured by recidivism rates of early release inmates, is measured at one, two and three years following release and compared with a historical comparison group. | Similar rates of recidivism were found among the early release group when compared to the historical comparison group: Combined recidivism rate (y1-y5) for early release: 12.3% vs. 12.1% for comparison group. The types of offenses committed by early release prisoners were not substantially different than those committed by the comparison group. For example, 28.7% of the offenses committed by early release prisoners who refunded were classified as property offenses, vs. 27.2% of the comparison group. The crime rates in Washington state remained constant from the 1981-1984 periods, thus showing the early release program had no net effect on these rates. |

2

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 2. Berecochea, J.E., Jaman, D.R., *Time Served in Prison and Parole Outcome: An Experimental Study.* California Department of Corrections, Research Unit, No. 2, 1981. | **Setting: California** Summary: All male felons who received a parole date during the period from March through August, 1970. Using this list, the authors generated a random assignment of inmates to have their parole advanced by six months. The groups were divided as follows: Total: 1,310 n=637 experimental who had their terms reduced by six months; and n=673 controls who did not. | Randomized study design, where the experimental group (early release) served an average of 31.3 months, while the control group served 37.9, for a difference of 6.6 months. Outcomes: most serious disposition at two different time periods: first twelve months following release and the first 24 months. | "A reduction of six months in prison terms has *no statistically significant effect* upon recidivism on parole within the first two years following release". This means that the experimental group (early release) did not differ from the controls in their likelihood of returning to prison (by a court conviction, for a new felony, or as a result of a parole violation short of a new conviction.) In California, the periods from 1981-1984 experienced a reduction and then plateau in the crime rates. (Source: CA Criminal Justice Center's Website: http://ag.ca.gov/cjsc/keyfacts.php, accessed, April 5, 2007). |
| 3. Malak, P.A., *Early Release.* Colorado Division of Criminal Justice, 1984. | **Setting: Colorado** Summary: 126 early release cases after Supreme Court Ruling People vs. Chavez. In this case, the supreme court ruled that the Department of Corrections must be granted good time credit for pre-sentence confinement in local jails. | Case comparison analysis of recidivism rate as measured by re-arrest between early release prisoners and determinate sentence release prisoners during February and March, 1983. Re-arrests were measured within eight months of the date of release. Measures: demographics, offenses for which they were sentenced to prison, and prior criminal history. | A comparison of re-arrest rates for those released early as a result of the Chavez ruling shows that those released early were *no* more likely to be arrested for another crime than those offenders not in early release. In fact, only 39% of those released early were arrested as compared to 36% of those serving a full term. In Colorado, total index crimes decreased from a peak of 7,773.5 per 100,000 state residents in 1980 to 4,281.5 in 1998. (Source: Crime in Colorado, from the Colorado Legislative Council website: http://www.state.co.us/gov_dir/leg_dir/lcsstaff/ accessed April 5, 2007) |

3

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 4. Leonardson, G., *Results of Early Release: Study Prompted by Passage of HB 685 (1993)*, Montana Board of Crime Control, 1997. | Setting: **Montana** Summary: In 1993 the Montana State Legislature enacted HB 685, which was designed to cap the prison population, in part, by decreasing the average time spent in prison. | Historical information on 667 inmates from 1990-1993. This list contained persons who were in early release program (accelerated good time); regular paroles or sentenced to one of the community-based parole programs. All were surveyed after one year of supervision. | Overall, less than 1/3 of the persons in the study were arrested for a new crime during the one year follow-up period. This percent is close to the historical Montana average of 33.3%. That is, early release did not result in more offenses.<br><br>Crime rates in Montana showed a decrease from a rate of 177 per 100,000 populations in 1994 to 132 per 100,000 in 1997, according to the FBI UCR reports. |
| 5. Eisenberg, M., *Release Outcome Study: Early Mandatory Release*, State of Texas Board of Pardons and Paroles, Division of Budget and Planning, 1985. | Setting: **Texas** Summary: A sample of 2,072 cases released from the Texas Department of corrections. 55% of the sample consisted of parolees, 16% were mandatory supervision cases, and 29% were early mandatory release (EMR) cases (EMR utilizes the Board's authority to release selected inmates up to 180 days prior to their mandatory release date). | Systematic review of a sample of cases released from the Texas Department of Corrections between January and June, 1983, and followed for one year. Outcome: no reports of violations, no arrests, convictions or incarceration during the one year follow-up period | The return rate to the department of corrections was similar among the mandatory and early mandatory release cases.<br><br>Crime rates: During the year of this early mandatory release period (1983), Texas reported one of the most significant *decreases* in offenses in the 20 years prior. |

4

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 6. Wisconsin Department of Health and Social Services, *Identifying Parole Candidates among Mandatory Release Inmates*. Wisconsin Parole Board, 1984. | Setting: **Wisconsin** correctional facilities Summary: 1,886 inmates who received mandatory release (MR) after being rejected for parole The MR group emerged as part of an effort to identify groups of inmates rejected for parole who, because they exhibit low rates of post release criminal behavior, may warrant more favorable consideration in future parole decisions. | Quasi-experimental cohort design with a one-year follow up. **Outcome:** criminal activity rates of parole and mandatory releases. | This study found that inmates who received the discretionary parole (those in MR but initially rejected for parole, n=1886) were much less likely to be returned to prison for criminal activity than inmates who received a mandatory release (15% vs. 23% respectively) during the one year follow up period. Crime rates decreased from 3975 per 100,000 populations in 1984 to 3757 per 100,000 in 1988. FBI, Uniform Crime Report Statistics. |
| 7. Wisconsin Department of Health and Social Services, *Special Action Release: Three Year Follow up*. Wisconsin Division of Corrections, 1985. | Setting: **Wisconsin** Summary: The Special Action Release (SAR) program started in 1981 to reduce crowding in adult penal institution by releasing carefully selected offenders three or more months prior to their scheduled prison discharge. During its initial phase, SAR inmates received a 90-day early discharge. A total of 892 SAR participants with 90-135 days of early release were reviewed. | Case comparison among two different SAR groups: 90-day early release (n=606) and 135-day early release (n=286) Post-release behavior was observed over a 6- and 12-month follow up period as follows: New sentence: Conviction of new felony offense, criminal parole violation, and technical parole violation. | At 6-month follow up, only 7% of the 135-day SAR group and 6% of the 90-day SAR group had committed felony offenses for which they were convicted and sentenced. In this study, *no evidence* was found that early release extension from 90 to 135 days resulted in a disproportionate increase in criminal activity. Crime rates decreased from 3975 per 100,000 populations in 1984 to 3757 per 100,000 in 1988. FBI, Uniform Crime Report Statistics. |

5

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 8. Austin, J., Using Early Release to Relieve Prison Crowding: A Dilemma in Public Policy. *Crime and Delinquency*, Vol. 32, No. 4, October 1986: 404-502. | Setting: **Illinois**, 1980-1983 Summary: Inmates released early (before end of sentence period) and inmates completing term. Population Size: Over 21,000 prisoners, representing over 2/3 of all prison releases were early release. | Longitudinal (30 months), random sample panel design of prison inmates in early release programs and those completing terms (n=1,600). Comparisons: Inmate's prior criminal history, institutional conduct, time served, method of prison release, social and persona; characteristics and criminal behavior after release from prison. | Prisoners who were released early did not have higher probability of being arrested or returned to prison than those prisoners serving their full prison term (42% vs. 49% respectively), although the criminality characteristics of the prisoners were different. By 1983 the Illinois prison population had been reduced by approximately 2,500 inmates as a direct result of early release. Crime rates in Illinois during this period decreased from 800 per 100,000 populations in 1986 to 796 per 100,000 in 1987. FBI Uniform Crime Reports. |
| 9. Austin, J., Boylard, M., *The Effectiveness of Reduced Prison Terms on Public Safety and Cost: Evaluation of the Illinois Supplemental Meritorious Good Time Program*. National Council on Crime and Delinquency, 1993. | Setting: **Illinois** Summary: The 1990 HB3838, Public Act 86-1090, which took effect in Illinois on July, 1990, made selected inmates eligible for a 180-day early prison release (Supplemental Meritorious Good Time [SGMT]), instead of the 90-day early release. This study reviewed 4,640 cases of inmates who were awarded an average of 61.7 days of SGMT. | Random review of cases of inmates awarded SMGT by December 1990. Two main measures of recidivism were used: Follow-up arrest—those arrested, at least once during the year after release from prison; Return to prison rate—the proportion of released inmates who were returned to prison including both new sentences and parole violations. | Inmates released via the Supplemental Meritorious Good Time (SMGT) had the *same* recidivism rates as those inmates not released via the SMGT. Inmates released under the SMGT had lower recidivism rates than those released under regular meritorious good-time (out 180 days earlier vs. 90 days earlier). The vast majority of the re-arrests were for nonviolent misdemeanor crimes. Crime rates in Illinois during this period decreased from 959 per 100,000 population in 1993 to 886 per 100,000 in 1996. FBI Uniform Crime Reports. |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 10. Michigan Task Force in Jail and Prison Overcrowding. *Final Report.* March, 2005. | Setting: **Michigan** Summary: Review of Michigan's prison population growth, early release programs and crime trends to propose strategies to effectively address and alleviate prison overcrowding. | Review of statewide crime reports. | County jails have been releasing offenders early since 1982.<br><br>According to the 2003 Michigan Uniform Crime Reports, crime has decreased by 123,897 from 1988 (1,186,140) to 2003 (1,062,407); and the number of arrests have decreased by 85,648 from 1988 (43,148) to 2003 (352,500).<br><br>Crime rates: The *number* of index crime offenses in Michigan generally has been dropping for the last decade: down 29 percent from 1991 to 2004. The concurrent decline in the Michigan crime *rate* (the number of crimes per 100,000 residents—6,138 in 1991 and 4,144 in 2000) closely parallels that of the nation as whole, for which the rate of serious crime declined every year from 1991 to 2000. (Source: National Institute of Corrections, website: http://www.nicic.org/Features/StateStats/?State=MI# accessed April 7, 2007) |

7

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 11. Wagner, D., Baird, C., *Evaluation of the Florida Community Control Program.* National Institute of Justice, 1993. | Setting: **Florida** Summary: The Florida Community Control Program (FCCP) is an intensive supervision, house arrest program that seeks to reduce prison and jail crowding while ensuring public safety. | Case review of 630 Florida Community Control Program (FCCP) offenders in 1985. | During an 18-month follow up, the Florida Community Control Program (FCCP) had *lower* rates of new convictions. Only 19.7% of the FCCP group had a new offence, compared to 24.3% of new offenses among those offenders who spent 9-months in prison. In Florida, the crime rates reduced from 1188 per 100,000 population in 1993 to 1137 per 100,000 population in 1994. (SOURCE: Florida Statistical Analysis Center: FDLE, (1989-2005). Crime in Florida, Florida uniform crime report [Computer program]. Tallahassee, FL.) |
| 12. Florida Office of the Auditor General. *Performance Audit of the Implementation of Control Release Supervision Administered by the Florida Parole Commission and the Department of Corrections.* Tallahassee, FL, 1994. | Setting: **Florida** Summary: 7,481 inmates released to a term of a court-imposed supervision (probation or community control). As part of the early release decision, the Authority determines whether to impose a term of control release supervision. | Audit review of offender release data from fiscal year 1987-88 through 1992-93. | For the 1991-92 fiscal years, offenders in the Control Release Supervision served an average of 7.7 months in jail and prison prior to release, and were placed on an average term of supervision of 17.6 months. 60% of these offenders returned to jail or prison as the result of violation of specific conditions of supervisions not because of *new crimes.* |

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 13. Zanis, D., Mulvaney, F., Coviello, D., Alterman, A.I., Savitz, B., Thompson, W., The Effectiveness of Early Parole to Substance Abuse Treatment Facilities on 24-month Criminal Recidivism. *Journal of Drug Issues*, Vol 03, No 1, 2003: 223-236. | Setting: Urban jails in **Northeastern United States** (Funded by City of Philadelphia). Summary: 569 offenders who met criteria for substance abuse or dependence; had no other psychiatric disorders; and served at least half of their minimum sentence (for full criteria see article attached). | Self-select case study design. 87% of offenders were paroled to a community-based substance abuse treatment program; and 13% who were early paroled were not enrolled into a substance abuse program. Measures: Time in substance abuse program; age, gender, race, number of prior convictions, type of substance abuse/dependence, and 2 year follow-up on new criminal convictions. | 78% of the offenders released to the community-based substance abuse treatment program reported *no new convictions* in comparison to 66% of those early release offenders that did not participate in treatment. Furthermore, of those offenders who participated in and completed treatment, only 11.8% were convicted of a new crime vs. 29% who did not complete treatment (e.g. <6mos in treatment). |
| 14. Verbugge, P., Nunes, K., Johnson, S., Taylor, K., *Predictors of Conditional Release among Substance Abusing Women Offenders.* Correctional Service Canada, 2002. | Setting: **Canada** Summary: The sample under study consisted of federally sentenced women who were granted a conditional release between 1995 and 2000 and identified at intake as having substance abuse problems. In this study, conditional release included day parole (halfway homes), full parole and statutory release. | Case review of 483 women offenders who were serving, or had recently served federal sentences under the supervision of Correctional Services Canada (CSC). 73% of the women were released on day parole; 9% were released on full parole and 18% were released at their statutory release date. Outcome: Revocation was defined as a woman having been admitted to federal custody after conditional release and before reaching a warrant expiry. | Approximately one half of the offenders, or 52% successfully completed their sentences in the community or had been successfully living in the community for at least one year post-release when the follow up period ended. Within those who had had their conditional release revoked, most returned with a miscellaneous, nonviolent offense (these included offenses related to breaches of parole). Crime rates: In 2001, Canada posted its lowest crime rate in 25 years with 7,655 incidents per 100,000 people. Source: Statistics Canada, 2001, released by the Canadian Centre for Justice Statistics (CCJS). |

9

| Authors and Publication Name | Brief Study Description | Methods Overview | Key Findings |
|---|---|---|---|
| 15. Grant, B.A., *Day Parole: Effects of Corrections and Conditional Release Act* (1992). Ottawa, Correctional Services of Canada, 1996. | Setting: **Canada:** Data comes from the National Parole Board and from the Correctional Service of Canada. Summary: A total of 1,087 cases of male offenders who completed day parole in 1990-91 were reviewed. Day parole, for purposes of this setting is defined as release from prison to a halfway house where offenders reside, participate in treatment programs, attend school, work, and look for work and accommodation that will be needed for further full release. These halfway houses may be operated by the Correctional Service of Canada or a Community Residential Centre operated privately on a fee-for-service basis. | Systematic case review of 1,087 male offenders in day parole. **Outcomes:** New offenses by day parole sample. | Overall, the results of this study indicate that the offenders released prior to their full parole eligibility are less likely to fail than those released after this date. The failure of the day parole sample, as measured by new offenses was about 10% for the one year time period. |

10

**EXHIBIT "SMC-F"**

**Probation Adult Parolee Supervision Unit -- Estimated start up and ongoing expenses, Year 1**

I:DJJ Restructure/Parolees @ 1000/ Parolees 71 thousand.xls (Morrill)      Revised 4.22.08 3:30 p.m.

| Assumptions | |
|---|---|
| | 1) Approximately 1,000 State parolees to be released to San Mateo County  (Note: SMCO is usually approx. 2% of State totals which would be roughly 1,420 (71,000 x 2%) |
| | 2) Caseload standard for intensive supervision of approximately 50 parolees per officer |
| | 3) Staffing pattern as follows:  20 DPO IIIs,  2 Prob. Svcs Mgr. Is, 5 Legal Office Specialists, one Legal Office Specialist Supervisor = 28 positions |
| | 4) Continuous Electronic Monitoring for all 1,000 parolees |
| | 5) County office space rental for 3,640 sq feet |
| | 6) In accord with an intensive supervision unit, all officers armed and fully firearms trained |
| | 7) Office furniture/workstation (standard Pleion type for each staff member) |
| | 8) Laptop needed for each officer; Desktop for each support.  4 printers. |
| | 9) Land line handsets and lines for all staff, and cell phones for sworn staff |
| | 10) 8 vehicles purchased year 1 for pool use (potential for additionally needed in year 2) |
| | 11) Drug testing kits and equipment.  Twice monthly testing.  24,000 kits + confirmation |
| | 12) Training for staff, min. of 40 hrs, to include Core training |
| | 13) Backfill new staff requiring Background Investigations (20) |

| Expenditure Frequency | Expenditure Item | | | | | TOTAL Costs |
|---|---|---|---|---|---|---|
| Recurring | A] Staffing | | | | | |
| | | | | | | |
| | Positions | FTE | Annual S&B | Total | | |
| | Deputy Probation Officer III | 20.00 | $ 127,820 | $ 2,556,400 | | |
| | Probation Services Manager I | 2.00 | $ 145,226 | $ 290,452 | | |
| | Legal Office Specialist | 5.00 | $ 90,158 | $ 450,790 | | |
| | Legal Office Services Supv | 1.00 | $ 103,361 | $ 103,361 | | |
| | | 28.00 | $ 466,565 | $ 3,401,003 | | $ 3,401,003 |
| | | | | | | |
| | | | Items | Cost per Item | | |
| Recurring | B] Facility rental assuming 3,650 s.f. | | 3,640 | $ 17.97 | | $ 65,411 |
| One time, then as needed | C] Office furniture (Workstation + Chair) | | 28 | $ 4,900 | | $ 137,200 |
| 3-year replacement cycle | D] 20 Laptops, 8 desktops, software and 4 printers & ISD monthly node charges per device | | | | | $ 63,908 $ 23,040 |
| 3-year on cells | E] Communications (Cell and land lines phones & land line handset cost) | | 28 | $ 1,136 | | $ 29,455 |
| One time; annual training | F] Officer arming and firearms certification (100 hrs) range time, ammo and protective vests | | 20 | $ 5,048 | | $ 100,960 |
| One-time, then 7-year replacement cycle | G] 8 vehicles @ $26,500 purchase (then $3,786 annual replacement) + mileage @ .46 per mile assuming 1,200 miles per officer each month | | 8 20 | $ 30,286 $ 6,624 | | $ 242,288 $ 132,480 |
| Recurring | H] Electronic Monitoring for all parolees. Continuous RF+GPS (Avg of $8 per day) | | 1,000 | $ 2,920 | | $ 2,920,000 |
| Recurring | I] Drug testing kits and equipment (4-panel) | | 36,000 | $ 4.50 | | $ 162,000 |
| Recurring | J] Drug test confirmation at testing lab | | 5,400 | $ 19.50 | | $ 105,300 |
| One time+recur. | K] Intoximeters, mouthpieces @ .17 X10,000 | | | | | $ 4,583 |
| Recurring | L] Office supplies, copying, miscellaneous supplies | | 28 | $ 620.00 | | $ 17,360 |
| Year 1+ as needed | M] Staff training-minimum 40hrs backfill cost. | | 20 | $ 1,634 | | $ 32,688 |
| | Backfill for CORE training for backfill staff 20 x 200 hr | | 20 | $ 8,172 | | $ 163,440 |
| | Trainers @ $1600 per day x 5 days | | 5 | $ 1,600 | | $ 8,000 |
| One time | Background investigation cost per 20 backfill staff | | 20 | $ 1,800 | | $ 36,000 |
| One time | | | | | | |
| | **Probation Parolee Supervision Unit Start Up TOTAL costs:** | | | | | **$ 7,845,116** |

# MEMORANDUM

## SAN MATEO COUNTY
## COUNTY MANAGER'S OFFICE

**DATE:**      April 30, 2008

**TO:**        Legislative Committee (Supervisors Jacobs Gibson and Tissier)

**FROM:**      Ross Nakasone, Legislative Coordinator (xt. 1345)

**SUBJECT:**   Response to UCC Survey on Parole Realignment

The Urban Counties Caucus asked member counties to estimate costs associated with the LAO's Parole Realignment proposal.

For the assessment below, San Mateo County staff has estimated the annual cost for an assumed 1,000 realigned parolees.

Total Year-one costs (annual as well as startup costs):

| | |
|---|---|
| Probation (supervision costs): | $7.6 million |
| Behavioral Health and Recovery Services (mental health and AOD costs): | $9 million |
| Sheriff (re-incarceration costs): | $4.3 million |
| **TOTAL YEAR-ONE COSTS:** | **$20.9 million** |

The below assessment is preliminary and draft. It does not include a number of significant costs such as housing and work readiness program needs for returning realigned parolees.

**Significant and unanswered questions**

- Does the estimated 71,000 statewide realigned parolee figure represent a one-time or an annual ongoing shift of such parolees? If it is ongoing, the number of the County's realigned parolees could grow at a factor similar to the average realigned parolee's duration of supervision. For example, should the average supervision period be three years and the annual release of realigned parolees remain constant; San Mateo County's realigned parolee population could grow to three times the initial amount.
- How (and how long) will San Mateo County build capacity to serve the County's estimated 1,000 realigned parolees who have generally not been served under the current parole system? Building capacity in mental health and AOD services—especially residential treatment services—will be a tremendous challenge to do and if possible, will take significant time when neighborhood concerns are considered. The sheer number of AOD and mental

p. 1

health facilities (to house services/slots/beds) that would need to be created is daunting. Without such additional capacity, realigned parolees could compete and crowed out others needing services.

- While the Sheriff has estimated reincarceration costs, the County's jail system is over capacity. How will realignment parole violators be reincarcerated if both the County jail and state prison system cannot accommodate them?

p. 2