**EXHIBIT "SMC-S"
PART 2 OF 2**

# Maximize value of existing funding



**CHALLENGES**

- Extremely tight budgets that greatly limit the flexibility of corrections, community corrections, police, and social services administrators to experiment with strategies that would make their agencies more efficient
- Reluctance among some social or health service organization officials to prioritize, or appear to prioritize, people with criminal records ahead of their general client population
- Inability of a corrections agency to demonstrate actual savings to a state or county, short of shuttering institutions or portions of facilities and reducing personnel due to the contraction of the agency
- Political allies of programs or organizations who are determined to maintain funding for particular initiatives, even when research demonstrates these programs' ineffectiveness
- Complex federal and state regulations that preclude or impede the bundling of funds administered by distinct agencies
- Time and resources required of corrections administrators to train, coordinate, and supervise volunteers who know little about prison and jail populations or operations

**SECTION HIGHLIGHTS**

- Focus resources on the periods immediately preceding and following a person's release to the community;
- Coordinate resources intended for the same populations and communities;
- Manage growth of the corrections population by making smart use of release decision policies and graduated sanctions for violators of probation and parole and then reinvesting the savings generated through such measures in the communities to which people return after prison;
- Tap sources of funding not traditionally used for re-entry programs, such as Temporary Aid to Needy Families (TANF) and Workforce Investment Act (WIA) funds, and leverage these dollars to attract additional resources;
- Cultivate volunteers from community and faith-based groups to increase staffing and program capacity.

### inspiration from the field

The **Oklahoma Marriage Initiative (OMI)** uses TANF funds to provide programming to strengthen both married and unmarried couples, especially those with low income. Because many people in prison and jail fall into this target population, OMI partnered with the state Department of Corrections (DOC) to train DOC staff chaplains to teach the evidence-based Prevention and Relationship Enhancement Program curriculum. OMI provides the training and workshop materials for inmate participants and evaluates the programs while DOC covers the cost of staff time and expenses incurred around training.

**RELEVANT POLICY STATEMENT**
**4:** Funding a Re-Entry Initiative

# Integrate systems



### CHALLENGES

- Different, and sometimes conflicting, definitions of client population and performance measures used by the various agencies and organizations serving people released from prison or jail
- Concern among agencies and organizations that the integration of the operations (and, especially, the funding) of distinct agencies and organizations will blur lines of accountability and responsibility
- Lack of compatibility among databases and information systems managed by agencies within the criminal justice system as well as with health and social service information systems
- Absence of an authority, structure, or forum to monitor—and address obstacles to—the effective integration of two or more systems

### SECTION HIGHLIGHTS

- Expand opportunities for inter-system and inter-disciplinary education and training;
- Link information systems so data for criminal justice, health, labor, and social service populations can be effectively shared and analyzed as appropriate;
- Assign staff to be responsible for "boundary spanning" among organizations serving people during—and following—their incarceration;
- Establish policy goals and benchmarks common to all parties and agencies involved in re-entry and devise methods for system-wide evaluation;
- Create ongoing forums for project oversight, information-sharing, communication, and problem-solving across agencies and organizations.

### inspiration from the field

The **Maryland Re-Entry Partnership** brings together participants from public and private agencies and systems, including criminal justice, health, and housing, to support the re-entry of prisoners in Baltimore. Community-based case managers (CCMs) meet with people incarcerated in state facilities before they are released to develop individualized re-entry plans. After those people return to Baltimore, the CCMs continue to meet with them. The CCMs act as "boundary spanners," connecting released individuals to services in different systems.

**RELEVANT POLICY STATEMENT**
5: Promoting Systems Integration and Coordination

# Measure performance

### CHALLENGES

- Insufficient resources to commission an independent evaluation that employs a methodology which meets research community standards
- Pressure to demonstrate a program's results shortly after its implementation, before much can be known about its impact on the target population
- Difficulty of demonstrating unequivocal results, particularly regarding real cost savings, that are typically of greatest interest to policymakers
- Laws, such as the Health Information Protection and Privacy Act, that protect confidentiality but impede data-sharing for research purposes
- Need to collect and analyze data on an ongoing basis—not just for a one-time evaluation

### SECTION HIGHLIGHTS

- Develop a logic model—a visual representation of how the program works—that includes resources, activities, outputs, and outcomes;
- Establish performance measures for staff and program components;
- Conduct process evaluations to identify problems with the program strategy or service delivery;
- Evaluate outcomes to identify the reasons behind a program's success or failure and its cost-effectiveness.

**RELEVANT POLICY STATEMENT**
6:   Measuring Outcomes and Evaluating the Impact of a Re-Entry Initiative

# Inform and reassure the public

### CHALLENGES

- Public's lack of familiarity with (and general misconceptions about) prisons and jails, the people released from these institutions, and the issue of re-entry generally[28]
- Stories in the media that sometimes over-simplify criminal justice issues and sensationalize exceptional cases illustrating system failures
- Risk that information about prisoner re-entry—or about the development of a new program or service targeting incarcerated populations—might actually galvanize community or political opposition to a re-entry initiative

### SECTION HIGHLIGHTS

- Reassure the public about governments' efforts to ensure that people who present a risk to the community are carefully supervised upon their release and re-incarcerated, when appropriate, for failures to comply with their conditions of release;
- Make clear that governments do not have the resources to prolong the incarceration of every prisoner or to automatically return every violator of probation or parole to prison or jail;
- Inform the public about the extraordinary number of people in the community with criminal records and the barriers that they face to moving on with their lives when they re-enter the community;
- Help the public appreciate that preparing people in prison or jail for their release and providing support to them upon their return makes families and communities stronger, safer, and healthier;
- Leverage community networks to enhance community supervision and to inform re-entry policies and programs.

**RELEVANT POLICY STATEMENT**
7:   Educating the Public About the Re-Entry Population

# Make smart release and community supervision decisions

## CHALLENGES

- Laws that limit the ability to ensure post-release supervision or to impose terms and conditions of release that compel participation in programs designed to reduce criminal behavior
- Dearth of validated, evidence-based instruments or complete criminal histories to guide decisions about release and insufficient information about what terms and conditions of release are most likely to keep a person from returning to prison or jail
- Overwhelming caseloads for community corrections officers
- Limited options (other than reincarceration or ignoring the violation) available to respond to violations of conditions of release
- Uniform allocation of resources that disregards the differing risks and needs that each individual returning from prison or jail presents and is not concentrated in the period of time immediately before and after release
- Need for coordination and information-sharing between local law enforcement, community supervision agencies, and service providers

### inspiration from the field

The **Missouri Department of Corrections (DOC)** assesses and re-assesses individuals in prison and after release to allocate supervision resources efficiently. Institutional staff develop individualized Transition Accountability Plans and provide the parole board with varying release and community supervision options designed to achieve successful reintegration of prisoners back into society. Community corrections officers then match varying degrees of intervention, control, and treatment with the individual needs of the offender and his or her environment and progress.

## REPORT HIGHLIGHTS



**PRISON AND JAIL**
- Inform the releasing authority about the extent to which the prisoner is prepared to return to the community (and the community is prepared to receive the individual).



**TRANSITION**
- Ensure that people exiting prison or jail who it is determined pose a threat to public safety are released to some form of community supervision; use a validated risk assessment instrument, in addition to other information, to inform the level and duration of supervision, and, for those states that have maintained some discretion in the release process, to determine when release would be most appropriate.
- Review and prioritize the terms and conditions of release and develop a supervision plan that corresponds to available resources, reflects the likelihood of recidivism, incorporates recommended transition plans, and provides incentives to encourage compliance with the conditions of release.



**COMMUNITY**
- Concentrate community supervision resources on period immediately following person's release from prison or jail, and adjust supervision strategies as the needs of the person released, the victim, the community, and the family change.
- Establish a matrix of graduated responses to ensure community corrections officers have a range of options available to them to reinforce positive behavior and to address, swiftly and certainly, failures to comply with conditions of release.

**RELEVANT POLICY STATEMENTS**
- **17:** Advising the Releasing Authority
- **18:** Release Decision
- **25:** Design of Supervision Strategy
- **26:** Implementation of Supervision Strategy
- **29:** Graduated Responses

# Ensure support for victims



**CHALLENGES**

- Criminal justice system officials' lack of familiarity with state law affording victims particular rights and services upon a person's re-entry
- Contact information for crime victims is often missing or unavailable
- Failure to assess restitution, or, when restitution is ordered, failure to implement a reasonable payment schedule
- Understanding the particularly complex needs of crime victims who have or have had a personal relationship with the offender
- Incorrect perception among some criminal justice officials that victims are too grief-stricken or vengeful to participate in the re-entry process
- Overburdened corrections and community corrections agencies that, given their limited resources, may not prioritize victims' needs
- Understaffed victim advocacy organizations

**inspiration from the field**

Three to six months prior to the release of an offender, Community Victim Liaison Managers at the **Washington Department of Corrections** contact individuals (including prior victims) who they believe may be at risk because of the release. Individuals who choose to participate are engaged in a multi-system "victim wrap-around" process that allows them to choose which community resources they want.

**REPORT HIGHLIGHTS**


**INTAKE**
- Ensure that information about victim or victims' interest in notification and, if applicable, victim contact information, are included in the institutional file.
- Provide opportunities for crime victims and victim advocates to inform inmates' individualized plans for programming during incarceration.


**PRISON AND JAIL**
- Provide (and encourage inmates to attend) victim impact panels, impact of crime classes, and other educational programs involving victims and/or victim advocates which are designed to convey the harm resulting from crime.
- Notify victims that the releasing authority is considering release of a particular person and invite victims to provide input into the release decision and the terms and conditions of release.


**TRANSITION**
- Prepare victims for offenders' return to the community, and provide victims with protection, counsel, services, and support, as needed and appropriate.
- Include victims or victim advocates on a team charged with implementing the recommendations of the releasing authority and developing a supervision strategy.


**COMMUNITY**
- Concentrate community supervision resources on the period immediately following release from prison or jail, and adjust supervision strategies as victims' needs change.
- Provide the victim with an opportunity to inform responses to violations of release conditions.

**RELEVANT POLICY STATEMENTS**

**8:** Development of Intake Procedure
**9:** Development of Programming Plan
**14:** Behaviors and Attitudes
**17:** Advising the Releasing Authority
**23:** Victims, Families, and Communities
**25:** Design of Supervision Strategy
**26:** Implementation of Supervision Strategy
**29:** Graduated Responses

# Offer safe places to live



## CHALLENGES

- Complex family situations, which may include a history of domestic violence or ambivalence about a family member's release from prison or jail
- Acute shortage of affordable housing
- Exclusion of those with criminal records – and sometimes their families – from available public and low-income housing
- Unwillingness of community members to accept housing units developed for people with criminal records
- Dearth of transitional and supportive housing

### inspiration from the field

The **Illinois State Department of Corrections** pays St. Leonard's Ministries, a local supportive housing provider, just under what it costs the Department to supervise a given number of parolees. St. Leonard's then not only provides housing and other social services for the parolees but also assumes a large share of the responsibility for their supervision.

## REPORT HIGHLIGHTS


**INTAKE**
- Include, as part of the intake procedure, questions regarding the type and appropriateness of housing, if any, that may be available to individuals upon their release, as well as any lease or rental obligations they may have during their incarceration.


**TRANSITION**
- Facilitate access to stable housing upon people's re-entry to the community.
- Adopt balanced admission and eviction policies for public housing that consider individual circumstances.


**COMMUNITY**
- Help releasees to maintain stable housing.


**SERVICE SYSTEMS**
- Preserve existing housing resources and develop new housing to increase housing affordability and availability.

**RELEVANT POLICY STATEMENTS**

- 8: Development of an Intake Procedure
- 19: Housing
- 24: Identification and Benefits
- 27: Maintaining Continuity of Care
- 30: Housing Systems

# Break the bonds of addiction



### CHALLENGES

- Proliferation of outdated or non-validated instruments that do not measure addiction treatment needs accurately
- Number of people incarcerated who have a history of substance abuse that far exceeds availability of treatment
- Treatment programs that frequently do not adhere to evidence-based treatment modalities
- Difficulty recruiting and retaining qualified, culturally-competent treatment professionals
- Lack of coordinated service delivery and aftercare to prevent and respond to relapse

### inspiration from the field

**Delaware's KEY-Crest program** is a three-stage process that includes an in-prison therapeutic community, work release, and community-based aftercare. Among KEY-Crest participants, 77 percent were arrest-free 18 months after their release, compared to only 46 percent of a control group. Further, 47 percent of program participants were drug-free after 18 months, compared to only 16 percent of a control group.

### REPORT HIGHLIGHTS

**INTAKE**
- Screen people upon their admission to a correctional facility for substance abuse and dependency using standardized, validated instruments, and determine which individuals require further assessments and programming.
- Include substance abuse specialists on a team charged with developing individualized programming plans for people admitted to a correctional facility and ensure that the plan addresses any substance abuse issues identified during intake.

**PRISON AND JAIL**
- Provide effective substance abuse treatment to anyone in prison or jail who is chemically dependent.

**TRANSITION**
- Prepare community-based health and treatment providers, prior to the release of an individual, to receive that person and to ensure that he or she receives uninterrupted services and supports upon his or her return community.
- Ensure that people who are eligible for public benefits receive them immediately upon their release from incarceration.

**COMMUNITY**
- Facilitate releasees' sustained engagement in substance abuse treatment.

**SERVICE SYSTEMS**
- Ensure that individualized, accessible, integrated, and effective community-based substance abuse treatment services are available.

### RELEVANT POLICY STATEMENTS

- **8:** Development of Intake Procedure
- **9:** Development of Programming Plan
- **12:** Substance Abuse Treatment
- **20:** Planning Continuity of Care
- **24:** Identification and Benefits
- **27:** Maintaining Continuity of Care
- **32:** Establishing Effective Substance Abuse Treatment

# Treat physical and mental illness



## CHALLENGES

- Inconsistent and ineffective screening and identification of prisoners for health and/or mental health disorders
- Narrow focus on emergency treatment needs of people who are incarcerated rather than their long-term health and public health generally
- Compartmentalized, uncoordinated treatment of co-occurring disorders, particularly substance abuse and mental illness
- Inadequate communication and cooperation between correctional health officials and community service providers
- Limited capacity of existing community-based services and general reluctance of providers to serve people with criminal records
- Delivery of services and use of medications that do not reflect the most current, evidence-based practices
- Shortages of qualified health care professionals in prison and jail, and high cost of medications

### inspiration from the field

**Project Bridge** in Rhode Island offers a holistic social support model for HIV-infected inmates. The collaborative program provides continuous treatment and other services for people during incarceration and after release. Of 134 Project Bridge participants, 83 percent completed the entire 18-month program, 90 percent stayed engaged in medical care after program completion, and only three percent were re-sentenced.

## REPORT HIGHLIGHTS

**INTAKE**
- Screen people upon their admission to a correctional facility for mental illness using standardized, validated instruments, and determine which individuals require further assessments and programming.
- Include healthcare specialists on a team charged with developing individualized programming plans for people admitted to a correctional facility, and ensure that the plan addresses any physical or mental health issues identified during intake.

**PRISON AND JAIL**
- Facilitate community-based mental and physical health care providers' access to prisons and jails and promote delivery of services consistent with standards of the public health model.

**TRANSITION**
- Prepare community-based health and treatment providers, prior to the release of an individual, to receive that person and to ensure that he or she receives uninterrupted services and supports upon his or her return community.
- Ensure that people who are eligible for public benefits receive them immediately upon their release from incarceration.

**COMMUNITY**
- Facilitate releasees' sustained engagement in treatment and mental health and supportive health services.

**SERVICE SYSTEMS**
- Ensure that individualized, accessible, integrated, and effective community-based mental health treatment services are available.

### RELEVANT POLICY STATEMENTS

- 8: Development of Intake Procedure
- 9: Development of Programming Plan
- 10: Physical Health Care
- 11: Mental Health Care
- 20: Planning Continuity of Care
- 24: Identification and Benefits
- 27: Maintaining Continuity of Care
- 33: Availability of Effective Mental Health Services

# Foster meaningful relationships



## CHALLENGES

- Absence of useful information about a prisoner's family ties; constantly changing dynamics of family relationships; and risk of re-establishing relationships fractured by domestic violence, substance abuse, or other traumatic events
- Lack of attention to family's needs for support during a family member's incarceration and following release
- Inflexible child support policies and accumulated child support debts
- Limited parenting skills programs
- Distance between correctional facilities and home communities and difficulty of expanding visitation policies given institutional safety constraints
- Inadequate mobilization of peer support and faith-based groups

### inspiration from the field

New York's **La Bodega de la Familia's** family case management model brings together a parolee, a family case manager, a supervision officer, and family members of the parolee. Together, they work to identify the family's resources and to build a supportive network of healthy relationships. Among other positive results, informal encouragement and support—even without increased drug treatment—led to a 36 percent decline in substance abuse for program participants, compared to a five percent drop for a comparison group. Re-arrest was cut nearly in half, with 11 percent of participants arrested during the six months following their involvement in the program, compared to 18 percent of the comparison group.

## REPORT HIGHLIGHTS

**INTAKE**
- Assess each inmate's family strengths and needs upon admission to a correctional facility, including dependent care responsibilities, child support debt, domestic violence history, and family relationships.

**PRISON AND JAIL**
- Make available services and supports for family members and children of prisoners, and, when appropriate, strengthen relationships between prisoners and their families.
- Ensure that family members have opportunities to provide input into the conditions of release and gauge their willingness and capacity to receive their relative upon release.



**TRANSITION**
- Prepare family and relevant community members for offenders' return to the community, and provide them with protection, counsel, services, and support, as needed and appropriate.



**COMMUNITY**
- Consult family and community members regularly to determine their assessment of the re-entering person's adjustment and modify supervision strategies accordingly.



**SERVICE SYSTEMS**
- Support interagency efforts to enhance systems supporting children and families, identify populations with special needs, provide staff cross-training, and address permanency and service planning challenges.

- Provide opportunities for family and community members to provide input into individualized plans for programming during incarceration.

- Facilitate efforts of faith-based institutions, peer support groups, and other service providers to engage prisoners and to improve their trust and confidence in treatment and services.

- Ensure that people who are eligible for public benefits receive them immediately upon release from prison or jail.
- Include family members on a transition team charged with developing and implementing a supervision strategy.

- Consult family members about graduated sanctions and incentives most likely to effect a change in behavior.

## RELEVANT POLICY STATEMENTS

- **8:** Development of Intake Procedure
- **9:** Development of Programming Plan
- **13:** Children and Families
- **14:** Behaviors and Attitudes
- **17:** Advising the Releasing Authority
- **23:** Victims, Families, and Communities
- **24:** Identification and Benefits
- **25:** Design of Supervision Strategy
- **26:** Implementation of Supervision Strategy
- **29:** Graduated Responses
- **34:** Children and Family Systems

# Provide training, education, and jobs



## CHALLENGES

- Poor basic education and marketable skills among people who are incarcerated
- Insufficient opportunities for people in prison and jail to participate in vocational or educational programs
- Work assignments or training provided during incarceration that do not always correspond to jobs available in the community
- Inadequate job opportunities, especially for people with few skills, in the communities to which prisoners return
- Statutory and regulatory barriers, in addition to employer concerns generally, regarding the employment of people with criminal records
- Lack of coordination between otherwise effective workforce systems and departments of correction

### inspiration from the field

Working with people from the time of their incarceration until their community supervision ends, the **Texas Department of Corrections' Project RIO** helps offenders seek, find, and maintain employment in their home communities. An evaluation found that 69 percent of RIO clients found employment versus 36 percent of non-clients. Further, RIO clients recidivated less often: 23 percent of RIO clients were re-incarcerated versus 38 percent of the comparison group.

## REPORT HIGHLIGHTS


**INTAKE**
- Assess employment situation, education level, literacy, and vocational interests and aptitudes of people admitted to prison or jail, using objective, validated instruments.


**PRISON AND JAIL**
- Teach inmates functional, educational, and vocational competencies based on employment market demand and public safety requirements.


**TRANSITION**
- Promote, where appropriate, the employment of people released from prison and jail and facilitate the creation of job opportunities for this population.


**COMMUNITY**
- Recognize and address the obstacles that make it difficult for someone who has been incarcerated to obtain and retain viable employment while under community supervision.

**SERVICE SYSTEMS**
- Create a comprehensive workforce system that is integrated, market-driven, accountable, universal, and portable.

- Include workforce specialists on a team charged with developing individualized programming plans for people admitted to a correctional facility and ensure that the plan addresses any educational, training, or employment issues revealed during intake.

- Provide inmates with opportunities to participate in work assignments and skill-building programs that build toward successful careers in the community.

- Connect inmates to employment, including supportive employment and employment services, before their release to the community.

### RELEVANT POLICY STATEMENTS

- **8:** Development of Intake Procedure
- **9:** Development of Programming Plan
- **15:** Education and Vocational Training
- **16:** Work Experience
- **21:** Creation of Employment Opportunities
- **22:** Workforce Development and Transition Plan
- **28:** Job Development and Supportive Employment
- **31:** Workforce Development Systems

# 9 WAYS TO USE THE RPC REPORT

1. **ENGAGE A POLICYMAKER OR OTHER OFFICIAL KEY TO A PRISONER RE-ENTRY INITIATIVE**

   Often there has been at least one person key to a jurisdiction's re-entry effort whose investment in the initiative has been tenuous at best. The RPC Report was guided by 100 leading policymakers and practitioners – Republicans and Democrats from around the country – and can be used to demonstrate to a state or local government official that a counterpart in another jurisdiction has been actively involved in thinking about, and addressing, the issue of prisoner re-entry.

2. **FOCUS INTEREST IN RE-ENTRY ON A PARTICULAR ASPECT OF THE PROBLEM**

   Coalitions or task forces formed to tackle prisoner re-entry are often overwhelmed by the enormity of the problem. Constant analysis of the issue can become paralyzing. The dozens of policy statements in the RPC Report present a menu of options for such groups, helping them to translate their commitment into tangible action steps.

3. **DETERMINE HOW TO ADDRESS A PARTICULAR OBSTACLE THAT HAS IMPEDED PEOPLE'S SAFE AND SUCCESSFUL TRANSITION FROM PRISON OR JAIL TO THE COMMUNITY**

   Whether it is connecting people in prison to housing before their release or prioritizing the use of limited drug treatment slots, the RPC Report provides detailed recommendations that can inform efforts to address longstanding roadblocks to successful re-entry.

4. **ASSESS COMPREHENSIVENESS OF AN EXISTING RE-ENTRY EFFORT**

   Officials in a state or county interested in identifying any shortcomings of current re-entry efforts can use the RPC Report as a checklist to inventory their existing programs, policies, and practices.

5. **FIND OUT WHAT OTHER JURISDICTIONS ARE DOING**

   Elected or appointed officials presented with a proposal for a new or modified program or policy can learn about other jurisdictions that have successfully implemented the proposed approach.

6. **LEARN ABOUT RELEVANT RESEARCH**

   Although many key research questions regarding prisoner re-entry remain unanswered, studies and reports analyzing different aspects of re-entry abound. With research condensed into easy-to-use highlights, the RPC Report is an ideal resource for readers wondering what the evidence says about a particular aspect of re-entry.

7. **ADVOCATE FOR CHANGE**

   The RPC Report provides a bipartisan platform which can be invaluable to advocates who are unanimous in their commitment to make prisoner re-entry safe and successful in their jurisdiction, but divided about how best to accomplish that goal. Furthermore, the Report provides specificity and pragmatism to advocates whose efforts may otherwise be undermined by an agenda that is ambiguous or unrealistic.

8. **RESPOND TO PUBLIC PRESSURE GENERATED BY A RECENT TRAGEDY**

   Too often, public policy is shaped in the immediate aftermath of a tragedy that has been reported widely in the media. The atmosphere in such situations is typically not conducive to the development of thoughtful policy. The RPC Report is an ideal resource in such situations, as it provides hundreds of carefully-considered recommendations, each of which has bipartisan support and the backing of public safety officials and service providers alike.

9. **EDUCATE THE MEDIA**

   Journalists faced with re-entry related stories can use the RPC Report to contextualize a particular event or issue for their audience.

## REFERENCES

1. James P. Lynch, and William J. Sabol, *Prisoner Reentry in Perspective*, Washington, D.C.: The Urban Institute, September 2001.
2. Serious and Violent Offender Re-Entry Initative web site, Office of Justice Programs, U.S. Department of Justice, http://www.ojp.usdoj.gov/reentry/learn.html. Accessed May 13, 2004.
3. Theodore M. Hammett, "Health-Related Issues in Prisoner Reentry to the Community," (paper presented at the Reentry Roundtable on Public Health Dimensions of Prisoner Reentry of the Urban Institute, Washington, D.C., October 2000).
4. Bureau of Justice Statistics Correctional Surveys (The Annual Probation Survey, National Prisoner Statistics, Survey of Jails, and The Annual Parole Survey) as presented in *Correctional Populations in the United States, Annual; Prisoners in 2002*; and *Probation and Parole in the United States, 2002*.
5. Patrick A. Langan and David J. Levin, National Recidivism Study of Released Prisoners: Recidivism of Prisoners Released in 1994, Washington, D.C., U.S. Department of Justice, Bureau of Justice Statistics, NCJ 193427, June 2002.
6. Lynn Bauer, *Justice Expenditure and Employment in the United States, 2001*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 202792, May 2004.
7. C. J. Mumola, *Substance Abuse and Treatment, State and Federal Prisoners, 1997*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 172871, 1999.
8. C. W. Harlow, *Profile of Jail Inmates 1996*. Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 164620, 1998.
9. Jeremy Travis, Elizabeth Cincotta, and Amy L. Solomon, *Families Left Behind: The Hidden Costs of Incarceration and Reentry*, Washington, D.C.: The Urban Institute, October 2003.
10. C. W. Harlow, *Education and Correctional Populations*, Washington, DC: US Department of Justice, Bureau of Justice Statistics, NCJ 195670, 2003.
11. C. W. Harlow, *Profile of Jail Inmates, 1996: Bureau of Justice Statistics Special Report*, Washington, D.C.: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 164620, 1998.
12. Ibid.
13. T. Hughes, A. Beck, and D. Wilson, *Trends in State Parole, 1990-2000*, Washington, DC: U.S. Department of Justice, Bureau of Justice Statistics, NCJ 184735, 2001.
14. Council of State Governments, *Building Bridges: From Conviction to Employment, A Proposal to Reinvest Corrections Savings in an Employment Initiative*, January 2003. Available at: www.csgeast.org/crimpub.asp.
15. Nancy La Vigne, Cynthia A. Mamalian, Jeremy Travis, and Christy Visher, *A Portrait of Prisoner Reentry in Illinois*, Washington, D.C.: The Urban Institute, April 2003.
16. Jeremy Travis, Amy L. Solomon, and Michelle Waul, *From Prison to Home: The Dimensions and Consequences of Prisoner Reentry*, Washington, D.C.: The Urban Institute, June 2001.
17. Oregon Department of Corrections web site, http://www.doc.state.or.us/research/PROFILE.pdf, accessed May 2004.
18. Nancy G. La Vigne, Vera Kachnowski, Jeremy Travis, Rebecca Naser, and Christy Visher, *A Portrait of Prisoner Reentry in Maryland*, Washington, D.C.: The Urban Institute, March 2003.
19. Analysis by Eric Cadora and Charles Swartz for the Community Justice Project at the Center for Alternative Sentencing and Employment Services (CASES), 1999, cited in Jeremy Travis, Amy L. Solomon, and Michelle Waul, *From Prison to Home: The Dimensions and Consequences of Prisoner Reentry*, Washington, D.C.: The Urban Institute, June 2001.
20. Margie Phelps, Director of Release Planning, Kansas Department of Corrections, interview, November 2003.
21. Nancy G. La Vigne and Gillian L. Thompson, *A Portrait of Prisoner Reentry in Ohio*, Washington, D.C.: The Urban Institute, November 2003.
22. Jamie Watson, Amy L. Solomon, Nancy G. La Vigne, Jeremy Travis, Meagan Funches, and Barbara Parthasarathy, *A Portrait of Prisoner Reentry in Texas*, Washington D.C.: The Urban Institute, March 2004.
23. Anne Piehl, *From Cell To Street: A Plan to Supervise Inmates After Release*, Massachusetts Institute for a New Commonwealth, January 2002.
24. Bureau of Justice Statistics, *Prisoners in 1998*, Washington D.C.: U.S. Department of Justice, Bureau of Justice Statistics, National Prisoner Statistics Data Series (NPS 1), August 2000.
25. Jeremy Travis and Sarah Lawrence. *Beyond the Prison Gates: The State of Parole in America*, Washington, D.C.: The Urban Institute, November 2002.
26. Jeremy Travis and Sarah Lawrence, *California's Parole Experiment*, Washington, D.C.: The Urban Institute, August 2002.
27. Bureau of Justice Statistics, *Prisoners in 1998*, Washington D.C.: U.S. Department of Justice, Bureau of Justice Statistics, National Prisoner Statistics Data Series (NPS 1), August 2000.
28. Eagleton Institute of Politics Center for Public Interest Polling at Rutgers University, *Prisoner Reentry: The State of Public Opinion*, New Brunswick, NJ: Eagleton Institute of Politics Center for Public Interest Polling at Rutgers University, November 2002.

"As 97 percent of those now in prisons will eventually be released, the solutions we develop today will determine the safety and security of our communities tomorrow. The Department of Justice established the Serious and Violent Offender Re-Entry Initiative, and we're pleased the Re-Entry Policy Council has been part of that initiative. We appreciate the leadership from the Council on re-entry issues and look forward to the release of its report on this critical public safety issue."
— JOHN ASHCROFT
UNITED STATES ATTORNEY GENERAL

"When people get out of prison, they have so many strikes against them, they feel doomed to failure. The *Report of the Re-Entry Policy Council* details the kinds of services—drug treatment, job training, and family counseling—that can keep people from returning to prison, help them to take care of their families, and allow them to become productive members of society."
— DAVID LEWIS
PRESIDENT AND CO-FOUNDER, FREE-AT-LAST AND FORMERLY INCARCERATED PERSON (CA)

"This report should be required reading not just for jail administrators but for any policymaker concerned about public safety and saving money."
— TIMOTHY RYAN
PRESIDENT OF AMERICAN JAIL ASSOCIATION AND CHIEF, ORANGE COUNTY (FL) CORRECTIONS DEPARTMENT

"Successfully integrating people released from prison and jail into the workforce is critical to the economy. The *Report of the Re-Entry Policy Council* will go a long way toward helping workforce boards and practitioners collaborate with the correctional system and establish agendas that insure this population gets the workforce services it needs and deserves."
— SALLIE A. GLICKMAN
EXECUTIVE DIRECTOR, PHILADELPHIA WORKFORCE INVESTMENT BOARD (PA)

"Current policies on incarceration and prisoner release are far from effective. Too many former prisoners return to lives of crime. To break the vicious cycle of crime, punishment, and recidivism, we need a more coordinated effort to provide the helping hand that so many ex-offenders need in order to become productive members of society. The *Report of the Re-Entry Policy Council* is a wake-up call for Congress, states, and cities to deal more effectively with this festering problem. The proven and cost-effective solutions highlighted in the report will enable communities across the country to move forward in improving public safety."
— SENATOR EDWARD M. KENNEDY (D-MA)

"Efforts to achieve successful re-entry must focus not only on offenders, but also on those whose lives are affected by their actions. By inviting victims to the table, along with so many others, the Re-Entry Policy Council is creating a truly collaborative document that accounts for everyone involved in the re-entry process and paves the way to solutions for entire communities."
— PAT TUTHILL
VICTIMS' REPRESENTATIVE, INTERSTATE COMPACT FOR ADULT OFFENDER SUPERVISION, AND MOTHER OF PEYTON TUTHILL, 1999 HOMICIDE VICTIM (FL)

"The *Report of the Re-Entry Policy Council* is encyclopedic; corrections administrators and others involved with re-entry should have a copy at their fingertips. It is a wonderful tool to facilitate collaborative efforts between community-based organizations, correctional facilities, law enforcement, and other stakeholder groups."
— REGINALD A. WILKINSON
DIRECTOR, OHIO DEPARTMENT OF REHABILITATION AND CORRECTION, AND PRESIDENT, ASSOCIATION OF STATE CORRECTIONAL ADMINISTRATORS AND INTERNATIONAL ASSOCIATION OF REENTRY

"We've got a broken corrections system. Recidivism rates are too high and create too much of a financial burden on states without protecting public safety. The efforts of the Re-Entry Policy Council will be of great value to those of us in Congress seeking to highlight and facilitate the development of innovative programs and policies in state and local government to reduce recidivism drastically, which will transform not only lives but our nation as a whole."
— SENATOR SAM BROWNBACK (R-KS)

"This timely and comprehensive report provides inspiration and guidance to the thousands of practitioners and community leaders who are committed to improving outcomes for returning prisoners, their families, and the broader society. This report will stand as a guidepost for new ways of thinking about one of the most important challenges facing our country."
— JEREMY TRAVIS
SENIOR FELLOW, THE URBAN INSTITUTE (DC)

"The demand for services that prisoner re-entry generates overwhelms the meager resources that corrections administrators and local government leaders have available to them. Meanwhile, leaders of churches and other faith-based institutions want to meet this demand but are unsure how best to marshal the resources available to them. The RPC Report is an unprecedented tool for leaders looking to bridge this divide."
— CHUCK COLSON
FOUNDER, PRISON FELLOWSHIP (VA)

"We are pleased that through the Re-Entry Policy Council, the Council of State Governments continues to build on its commitment to finding a new future for people with mental illness who stand at the intersection of the criminal justice and mental health systems."
— CHARLES CURIE
ADMINISTRATOR, SUBSTANCE ABUSE AND MENTAL HEALTH SERVICES ADMINISTRATION, US DEPARTMENT OF HEALTH AND HUMAN SERVICES

## PROJECT PARTNERS

American Probation and Parole Association ▪ Association of State Correctional Administrators ▪ Corporation for Supportive Housing ▪ National Association of Housing and Redevelopment Officials ▪ National Association of State Alcohol/Drug Abuse Directors ▪ National Association of State Mental Health Program Directors ▪ National Association of Workforce Boards ▪ National Center for State Courts ▪ Police Executive Research Forum ▪ Urban Institute

*Coordinated by the Council of State Governments*                        WWW.REENTRYPOLICY.ORG