MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA 94063
Telephone: (650) 363-4746
Facsimile: (650) 363-4034
E-mail: cwoodward@co.sanmateo.ca.us

Attorneys for Intervenor
COUNTY OF SAN MATEO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al. | Case No. CIV S-90-0520 LKK JFM P |
| Plaintiffs, | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al. | |
| Defendants. | |
| MARCIANO PLATA, et al. | Case No. C01-1351 THE |
| Plaintiffs, | THREE-JUDGE COURT |
| vs. | |
| ARNOLD SCHWARZENEGGER, et al. | **INTERVENOR SAN MATEO COUNTY'S DISCLOSURE OF NON-RETAINED EXPERT WITNESSES FOR TRIAL** |
| Defendants. | |

TO ALL PARTIES AND TO THEIR ATTORNEYS OF RECORD:

Pursuant to the Three-Judge Court's Order dated July 2, 2008, the Intervenor County of San Mateo ("County Intervenor") discloses the following witnesses who are expected to present evidence at trial. Each of the following witnesses is a non-retained percipient expert witness, whose testimony will

pertain to matters within the scope of his or her employment with County Intervenor.  None of the
disclosed witnesses herein is retained or specially employed to provide expert testimony in this case, and
none of these witnesses' duties as County employees regularly involves giving expert testimony.  None
of the disclosed witnesses is being paid additional amounts above his or her regular County salary for his
or her work on this case, or for preparation or testimony at trial.  Accordingly, County Intervenor
contends the provisions of Federal Rules of Civil Procedure, Rule 26(a)(2) do not apply to these
witnesses.

However, in a recent e-mail message, plaintiffs herein have stated:

> "Our position is as follows:  If you exert control over your "non-retained experts," (e.g.
> if the "non retained experts" are parties, or are employees of or contractors of parties)
> they must submit reports by the August 15, 2008 deadline.  To the extent your non-
> retained experts plan to testify about matters outside their personal knowledge or outside
> the scope of their employment (e.g. the effects a prisoner release order might have), they
> also must submit Rule 26(a)(2)(B) disclosures. *See, e.g.,* Funai Elec. Co. v. Daewoo
> Electronics Corp., 2007 WL 1089702, *6 (N.D. Cal. 2007).  If your witnesses do not
> submit reports, we will move to exclude their testimony in its entirety."

(E-mail received by counsel for County Intervenor from plaintiffs' counsel Amy Whelan, sent
August 05, 2008 4:35pm., a true and correct copy of which is attached as Exhibit A to the Declaration of
Carol L. Woodward, filed herewith.)

On August 14, 2008, Defendants and other Intervenors filed a Motion for Clarification of Order
for Pre-Trial Preparation.  If this Court rules that expert witness reports under Federal Rules of Civil
Procedure, Rule 26(a)(2)(B) need *not* be submitted by non-retained percipient County employee experts,
such as those disclosed herein, then County Intervenor respectfully reserves the right to withdraw,
develop, supplement, and/or exchange the attached reports.

By disclosing the witnesses herein, County Intervenor further does not waive any privilege,
including the attorney-client privilege, that would apply if the witnesses disclosed herein were testifying
as percipient witnesses and not as expert witnesses.

Pursuant to the Court's July 2, 2008 Order, these disclosures do not include witnesses who may be
called only for impeachment or rebuttal, and County Intervenor reserves the right to supplement this
disclosure regarding such witnesses, if any, at a later date.

**Disclosure of Expert Witnesses:**

The non-retained percipient County-employed expert witnesses whom County Intervenor may call to testify at trial and the subject of the testimony each is expected to give are as follows:

**Duane Bay, Director of Housing.** Mr. Bay is expected to testify about the impact of a prisoner release order on the County's provision of housing assistance. Mr. Bay has not prepared a report at this time.

**David Boesch, Assistant County Manager.** Mr. Boesch is expected to testify about impacts of a prisoner release order on the County budget and the services it provides to the community and County efforts to relieve jail overcrowding. Mr. Boesch's report is attached hereto, marked as Exhibit A.

**Loren Buddress, Probation Chief.** Mr. Buddress is expected to testify about the impact of a prisoner release order on Probation Services, on current programs that act as alternatives to incarceration, and on the County criminal justice system. Mr. Buddress' report is attached hereto, marked as Exhibit B.

**Beverly Beasley Johnson**, **Director, Human Services Agency.** Ms. Johnson is expected to testify about the impact of a prisoner release order on human services provided by the County, including children and family services, employment and financial assistance services, and health insurance eligibility services. Ms. Johnson's report is attached hereto, marked as Exhibit C.

**Greg Munks, San Mateo County Sheriff.** Sheriff Munks is expected to testify about the San Mateo County jail overcrowding crisis, the impacts of a prisoner release order on the County criminal justice system, and criminal justice reform measures undertaken by the County. Sheriff Munks' report is attached hereto, marked as Exhibit D.

**Charlene A. Silva, County Health Director.** Ms. Silva is expected to testify about the impact of a prisoner release order on the County's health services, including aging and adult services, behavioral health and recovery services, correctional health services, emergency medical services, environmental health services, family health and public health, and publicly funded medical services. Ms. Silva's report is attached hereto, marked as Exhibit E.

///

///

///

3

1    All of the above disclosed witnesses may be reached through San Mateo County, Deputy County

2    Counsel Carol L. Woodward.

3                                                          Respectfully submitted,

4

5    Dated:  August 15, 2008.                             MICHAEL P. MURPHY, COUNTY COUNSEL

6

7                                                          By: _____

8                                                               Carol L. Woodward, Deputy County Counsel

9                                                          Attorneys for Intervenor
10                                                         COUNTY OF SAN MATEO

11

12   L:\LITIGATE\C_CASES\Coleman\Pleadings\Disclosure of non-retained expert witnesses for trial_final.doc

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

INTERVENOR SAN MATEO COUNTY'S DISCLOSURE OF NON-RETAINED EXPERT WITNESSES
FOR TRIAL

**EXHIBIT A**

# County Manager's Office



## COUNTY OF SAN MATEO

COUNTY GOVERNMENT CENTER • REDWOOD CITY • CALIFORNIA 94063-1662
WEB PAGE ADDRESS:http://www.co.sanmateo.ca.us

**BOARD OF SUPERVISORS
MARK CHURCH
JERRY HILL
RICHARD S. GORDON
ROSE JACOBS GIBSON
ADRIENNE TISSIER**

**JOHN L. MALTBIE
COUNTY MANAGER
CLERK OF THE BOARD**

(650) 363-4123
FAX: (650) 363-1916

August 15, 2008

Ms. Carol Woodward
Deputy County Counsel
County of San Mateo
Hall of Justice
400 County Center
Redwood City, CA 94063

Re: Coleman-Plata Federal Lawsuit

Dear Ms. Woodward:

I write to provide you with my opinions about the above-captioned matters pending before the Three-Judge Panel in Federal Court. In preparing the following remarks, I rely on my over 29 years of experience in local government, the last 18 months in my capacity as the Assistant County Manager for San Mateo County, my education including a Master of Public Administration degree from Harvard University, and a reasonably in depth knowledge of the criminal justice system in California learned in part from having read and considered the following publications.

- Detention Facilities Needs Assessment & Master Plan, County of San Mateo and Huskey & Associates, February 25, 2008
- California Corrections Reform: State/Local Partnerships, Stanford Law School, June 8, 2007
- The Role of the Judiciary in Shaping Sentencing Law and Policy, Stanford Law School, November 2007
- San Mateo County Housing Needs Study, Economic & Planning Systems, Inc., July 2007
- Strategic Directions 2010, County of San Mateo Human Services Agency Alcohol and Other Drug Services, June 2006
- Roadmap for Alcohol, Tobacco and Other Drug Prevention: A Guide for Community Action, San Mateo County Board of Supervisors
- The Challenge of Treating Forensic Dual Diagnosis Clients: Comment on "Integrated Treatment for Jail Recidivists with Co-occurring Psychiatric and Substance Use Disorders, Robert E. Drake, Ph.D., Joseph P. Morrissey Ph.D. and Kim T. Mueser, Ph.D., Community Mental Health Journal, August 2006

- Coordination at the Front-End of Sentencing: The Judiciary, Probation, and the Pre-Sentence Report, Stanford Law School, March 7, 2008
- From Cellblocks to Classrooms: Reforming Inmate Education to Improve Public Safety, Legislative Analyst's Office, February 2008
- Addressing Addiction: Improving & Integrating California's Substance Abuse Treatment System, Little Hoover Commission, March 2008
- Crime, Corrections, and California: What Does Immigration Have to Do with It?, Kristin F. Butcher and Anne Morrison Piehl, California Counties, February 2008
- Changing the Focus of Corrections, California Counties, September/October 2007
- Prison Reforms: Achieving Results, State of California, Department of Corrections and Rehabilitation, April 2008
- Criminal Justice Information Sharing: Enhancing Early Intervention, Measuring Results, Stanford Law School, December 2007
- Adult Correctional System Master Plan-Phase I, Napa County, November 13, 2007
- Inmates Services & Case Management for Re-Entry, San Mateo County Sheriff's Office, June 6, 2006
- San Mateo County Crime and Justice System Indicators Comparison with Six Bay Area Counties and Statewide, San Mateo County Jail Crowding Task Force, October 14, 2004
- San Mateo County Sheriff's Facilities Master Plan, Hellmuth, Obata & Kassabaum, Inc.; Omni Group, Inc.; Williams-Kuebelbeck & Associates, Inc., September 19, 1991
- A Roadmap for Effective Offender Programming in California, California Department of Corrections and Rehabilitation, June 29, 2007
- Attitudes of US Voters toward Prisoner Rehabilitation and Reentry Policies, Barry Krisberg, Ph.D., Susan Marchionna, National Council on Crime and Delinquency, April 2006
- Task Force on California Prison Crowding, National Council on Crime and Delinquency, August 2006
- Reconsidering Incarceration: New Directions for Reducing Crime, Don Stemen, Director, Center on Sentencing and Corrections, January 2007
- Understanding California Corrections, Joan Petersilia, California Policy Research Center, May 2006
- Who's in Prison? The Changing Demographics of Incarceration, Amanda Bailey and Joseph M. Hayes, August 2006
- Governor's Prison Overcrowding Package Is More Balanced But Too Big, Legislative Analyst's Office, April 12, 2007
- California's Criminal Justice System, Elizabeth G. Hill, Legislative Analyst's Office, January 2007
- Analyzing U.S. Prison Growth, Mike Males, Ph.D., Center on Juvenile & Criminal Justice, July 2007
- California Juvenile Justice Reentry Partnership Aims to Improve Outcomes for Youth, California Juvenile Justice Reentry Partnership, May 21, 2007
- California Corrections Reform: State/Local Partnerships, Stanford Law School, June 8, 2007

2

- Phase I: Survey of Interventions and Programs, Juvenile Justice Data Project, April 2007
- Helping Mentally Ill Criminals, Donna Lyons, April 2007
- Mentally Ill Offender Crime Reduction Grant Program, Department of Corrections and Rehabilitation Corrections Standards Authority, November 6, 2006
- The State Has Inadequately Maintained Its Major Investment in Prison Infrastructure, Legislative Analyst's Office, February 21, 2007
- Evidence-Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates, Washington State Institute for Public Policy, October 2006
- Gender-Responsive Strategies for Women Offenders, U.S. Department of Justice, May 2006
- Reforming Corrections and Promoting Reentry Policy Statement, Volunteers of America, November 9, 2007
- Forecasting: Fiction and Utility In Jail Construction Planning, Allen R. Beck, Ph.D., 1996
- Evidence-Based Practice to Reduce Recidivism: Implications for State Judiciaries, Roger K. Warren, June 5, 2007
- Community Reentry Programs: Their Impacts on Offenders and Recidivism Rates, Tony M. Wilkes, Site Administrator, Davidson County Sheriff's Office, Nashville Tennessee, 2007
- Controlling Inmate Population Size: A Case Study of 20 Years of Success, Marily Chandler Ford, Assistant Director, Volusia County Department of Corrections, Daytona Beach, Florida, March 2007
- An Overview of NIC's Transition from Prison to the Community Initiative, Peggy B. Burke, Center for Effective Public Policy, Silver Spring, Maryland, 2007
- Avoiding The Expense of Constructing Unnecessary Jail Capacity, Allen R. Beck, Ph.D., 1999
- Corrections reform, Sonoma County style, Jennifer M. Murray, Sonoma County Deputy Administrator, California Counties, September 2007
- One in 100: Behind Bars in America, The Pew Center on the States, February 2008
- Sedgwick County Day Reporting Center Helps Alleviate Jail Overcrowding and Targets Recidivism, Behavioral Interventions, October 2007
- San Mateo County Human Services Agency Strategic Plan 2008-1013, San Mateo County Human Services Agency, February 27, 2008
- Assessment of the Impact of Prison Population Reductions on Counties and Public Safety, James Austin, Ph.D., The JFA Institute, Jeff Beard, Ph.D., Pennsylvania Department of Corrections
- Solving California's Corrections Crisis: Time Is Running Out, Executive Summary, Little Hoover Commission, January 2007
- Governor Unveils Comprehensive Prison Reform, Office of the Governor, December 21, 2006
- San Diego Community Prison to Reentry Program: A State County Collaborative, University of California San Diego
- Dispelling the Myths about Information Sharing Between the Mental Health and Criminal Justice Systems, John Petrila, JD, U.M., February 2007

- From Words to Deeds: Changing the Paradigm for Criminal Justice and Mental Health, California State Sheriff's Association Education Foundation, June 29, 2007
- Recommended Budget, San Mateo County, July 1, 2008-June 30, 2009
- 2008 Community Assessment: Health and Quality of Life in San Mateo County, Health Department, March 2008

In addition, I served as the Counties' Intervenor representative to the Settlement Discussion Group that worked with the Settlement Referee and Consultant for six months to craft a consensus document to be presented to the Panel. These efforts were a significant and substantial effort to avoid a Court-ordered prisoner release. The last working draft version of the memorandum of understanding (MOU) that was provided to the Court reflects a set of alternative solutions that would address the pervasive overcrowding and result in a transformation of the criminal justice and corrections system. The MOU was structured to cover the essential elements in terms of startup and continuing appropriations and necessary State legislation, and included a combination of local diversion strategies, improved parole capacity and changes to the credits system for inmates. Moreover and importantly, rather than continue the dysfunctional relationship between State and county corrections, the draft MOU incorporated the Community-Based Punishment Act of 1994 that received broad legislative and criminal justice community support but was never funded and implemented.

Finally, a number of the comments that follow are a reflection of and embody the policy positions that the California State Association of Counties (CSAC) and affiliated local government associations have consistently expressed to the Governor and Legislature.

OPENING REMARKS
Preserving public safety is of paramount importance to communities and officials throughout the state. The State and its counties must work more collaboratively as partners in the criminal justice and corrections system to address the inextricably linked challenges of recidivism and facility overcrowding. Treatment programs and rehabilitative services must be adequately funded to enable the State and counties to accomplish their shared criminal justice functions and to ensure successful outcomes for offenders. It is abundantly and increasingly clear that additional financial support is a prerequisite and must be in the form of a new, dedicated and sustained funding source rather than a redirection of existing resources or a downward shifting of responsibilities.

The County of San Mateo joined as an Intervenor to participate in the lawsuits with the express purpose of avoiding a massive prisoner release order that would have dire consequences for all of California's counties. We expect that such an order would result in increased crime, an overwhelmed probation and parole service, an exacerbation of our already overcrowded jails, increased rates of recidivism, overloaded court dockets and significant adverse impacts on our ability to provide health, mental health and alcohol and drug addiction services. Effectively, such an action by the Court would serve to give the State carte blanche to devolve its problem to the counties without a corresponding obligation to compensate or the ability of counties to absorb the financial consequences.

4

BUDGET CHALLENGES

Many California cities and counties are on the verge of financial calamity as they struggle to balance budgets in the face of existing demands and increasing pressure to provide more services with less revenue. Counties are especially challenged in light of the State's budget impasse, the likelihood of further State funding takeaways and the nature of the safety net services they are committed to provide to our most vulnerable residents. An influx of released prisoners with complex and expensive needs will force further difficult decisions regarding which population to serve: those residents who have service needs prior to any release or recently released parolees who have either not received treatment while incarcerated or will otherwise face a lapse in treatment. Any reasonable discussion about early release or a prison population cap cannot be undertaken without also acknowledging and addressing the likely release of elderly and sick inmates who require two or three times greater costs to incarcerate and treat. With a significant influx of inmates to counties, more resources would be diverted to accommodating these former inmates into our communities and safety nets—rather than positive efforts directed toward committing resources at the front end of corrections reform in prevention-oriented services.

San Mateo County has been dealing with a structural budget deficit, wherein costs of operations continue to outstrip and outpace revenues, for several years. The Board of Supervisors has adopted a five-year plan to restore the County Budget to balance, in order to close a projected $92 million shortfall. All departments, including criminal justice and health, are fully engaged in the process of improving revenues and decreasing expenditures. And, this is occurring both during this time of great fiscal uncertainty with respect to the State Budget and in light of the potential for further cutbacks in funding and increased demand for services in a soft economy. The latest estimate is that the County could suffer an additional cut of $23 million in State funding.

Any actions that require local governments to divert, house, incarcerate, or treat State prisoners must be accompanied by sufficient and sustained appropriations. Initially, upfront funding is required to create the community capacity necessary to provide the services required. The reality is that counties are not adequately prepared to provide the services that will be needed and this potential influx of released prisoners will have a serious, significant and unavoidable adverse ripple effect upon this County's service delivery system.

COUNTY SERVICES IMPACTED

Given the current overcrowding circumstances in prison, inmates clearly may not have had sufficient access to needed services. If significant numbers of prison inmates are released into our communities—communities that in many cases are already ill equipped to deal with existing service demands—numerous counties' programs and services will be stretched beyond the breaking point.

Past research has suggested the correlation between poverty and crime (*Who's in Prison? The Changing Demographics of Incarceration.* Public Policy Institute of California, August 2006). It is also well documented that 80% of inmates suffer from some degree of alcohol and/or drug addiction and that 16% suffer from mental illness. It is natural to assume, that if the Three-Judge Panel orders a prison population cap, the State has not

5

been able to provide the needed treatment and mental health services to all inmates. So, how many parolees (assuming all inmates released early would be placed on some level of parole supervision) do we suspect might require mental health treatment, at what cost and borne by whom? Furthermore, many county jails like San Mateo's are structured such that county mental health departments fund and provide mental health services to inmates in county jails. A release with a population cap will presumably impose a freeze on the transfer of county inmates to state prison, requiring county mental health departments to provide care to a growing number of inmates who are awaiting transfer to state prison as well as their routine county jail patient population.

Another point that should not be overlooked is the importance of providing a continuum of care to individuals in need of mental health treatment. A prison population cap would create an obstacle to providing that continuum by having an influx of additional residents into a county system already challenged to meet the needs of its current residents. Some, if not all, of these inmates and parolees would undoubtedly have a lapse in treatment. If parolees are unable to maintain and sustain themselves, they will be unable to maintain housing and unable to contribute to their family's livelihood; thus, some will seek aid from the counties' general funds for financial assistance and social services. To prevent adverse impacts on critical services for non-criminal justice clients, treatment capacity must be increased and separately funded in advance of any increased demand.

The Panel must be cognizant of the impact on local communities' existing treatment capacity (e.g., health, mental health, drug and alcohol treatment, vocational services, sex offender treatment, probation, courts, public defender) if major new demands for services result. Specialized, community-based and county provided services are likely to be quickly overtaxed. Counties throughout California provide numerous essential services to many underserved residents. Currently, however, demand for such county services exceeds available capacity. There are substantial waiting lists for services—services that many state prison inmates will require were they to return to our communities.

San Mateo County has estimated, based on a 2-3% share of the potential release of 40,000 State prisoners, that the annual cost of services for this hypothetical population of 1,000 former inmates would be $21 million, not including costs associated with either job/vocational training or housing. Increased crime, due to the early (premature, in some cases) release of State prisoners and/or the inability of parole or probation to effectively monitor significantly increased numbers will seriously affect a number of services within and in support of the criminal justice system of San Mateo County. For example, the County conducts several evidence-based programs as alternatives to jail incarceration or prison sentences. These programs are already oversubscribed. If additional persons with similar needs for substance abuse and mental health treatment were released into the San Mateo County community, we believe these programs would be overwhelmed and unable to function successfully; ultimately, and ironically, causing an increase in the number of persons going to State prison from this County.

JAIL OVERCROWDING
Without a doubt, a prisoner release order will increase local crime due, in part, to the inability of parole and probation officers to effectively monitor increased numbers of parolees. An increased number of inmates being booked into the County's jail, combined

6

with a refusal to accept inmates sentenced to State prison because of a population cap, will exacerbate San Mateo County's well-documented overcrowded jail condition; thereby, further inhibiting efforts to provide services and treatment to those while incarcerated, with resultant increases in recidivism and reentry or recycling back into the criminal justice system, and corresponding workload impacts on the courts, district attorneys, public defenders, correctional health and probation.

While San Mateo County does not currently face a population cap like 33 other counties, it does have a serious problem with jails that are crowded and lack space for effective reentry programs. (The County unsuccessfully applied for State funding under AB900 to construct a 648-bed, $140 million medium security facility.) Even if the State funds an expanded and improved parole capability, the likelihood is that some significant percentage of former prisoners will reoffend and add to the overcrowding local jails. In addition, much of the effort currently invested in addressing local jail and reentry challenges and systemic reform will be diverted to dealing with this imminent crisis.

SUMMARY
San Mateo County has invested its time and resources in an effort to assist the State and the Three-Judge Panel in finding an acceptable solution to the State's prison overcrowding problem that will not adversely impact public safety in our community. I personally have spent countless hours as the Counties' Intervenor representative on the Settlement Discussion Group exploring ways to effectively reduce the prison population by applying proven, evidence-based approaches. I remained hopeful up until the end that a consensus document was possible: A comprehensive package of systemic reforms with sufficient funding that included improved prerelease risk and needs assessment, treatment and life skills planning, increased mental health services and parole oversight, a continuum of community-based treatment, stable housing and work readiness programs, and the other required services that can be better provided in a community rather than an institutional setting.

The threat of a prison release order forced the various and oft-competing interests to the table. Turning tens of thousands of inmates loose into our communities without sufficient resources to support the multiple service delivery systems that will be impacted will have a disastrous result. Whereas, the alternative approach of investing in proven rehabilitation programs and graduated sanctions earlier in the process can staunch the flow through the revolving door to state prison and contribute positively to safer communities.

Respectfully,

David S. Boesch Jr.
Assistant County Manager
San Mateo County

7

**EXHIBIT B**

**PROBATION DEPARTMENT**

Loren Buddress, Chief Probation Officer



*Making A Difference*

**COUNTY OF SAN MATEO**

Email: Lbuddress@co.sanmateo.ca.us

Prison Overcrowding in the
California Department of Corrections and Rehabilitation (CDCR)

I    <u>Consequences of a "Mass Release" to Lower the CDCR Prison Population:</u>

- If a "mass parole release" is used to reduce the CDCR population, and probation is not charged with supervision duties, such a release would have a very negative impact on counties and Probation departments. This is due to the fact that with a 70% recidivism rate, many of these parolees will commit new offenses. Parolees who commit new offenses negatively affect local law enforcement agencies, Sheriff's Departments and their overcrowded jails. These arrests also would have a negative impact on the Court, the District Attorney, and the Private Defender, Health/Mental Health Departments, Human Services Agencies, and a number of community based treatment providers. When these parolees are referred to the Probation Department, the department must complete a pre-sentence investigation and a pre-sentence report, and then the department provides new supervision services for those placed on probation.
- Probation resources in San Mateo County are already stretched to their maximum capacity. The Probation Department, the Court, and other County agencies are unable to absorb new parolee recidivism cases without additional resources. Without new resources, we would be forced to cut services elsewhere. This would have a very negative impact on the County and our local communities.
- A mass release would have a very dire impact on a broad array of County agencies, the Court, and community based organizations; however, a carefully planned partnership between the State and counties, using evidence based programs that have proven to reduce crime would be a very positive means of reducing the State's prison overcrowding problem.

II    <u>Other Possible Solutions to the Prison Overcrowding Problem:</u>

- Prison overcrowding could be addressed in a very positive manner and without the State having to "build their way out of the problem" by using the recommendations contained in the document prepared by Dr. Barry Krisberg (President of the National Council on Crime and Delinquency,

**Prison Overcrowding**
     **Page 2**

___

- [NCCD]) for the Legislature during their special summer session in 2006. The document is entitled "Task Force on California Prison Crowding, August 2006." (Please see attachment 1.)

    Dr Krisberg's report focused upon:
    - Reducing women's imprisonment;
    - Improving parole practices;
    - Focusing on successful community reentry;
    - Adopting evidence-based assessment and supervision practices;
    - Implementing a comprehensive Intermediate Sanctions Program;
    - Implementing a structured mandatory decision making process;
    - Reallocating resources to fund necessary programs and services for parolees;
    - Creating a new State-local corrections partnership; and
    - Creating a California Sentencing Policy Commission
    - The report opens stating:
        "For three decades, most California elected officials and the voters have radically transformed the penal system by enacting tough new sentencing laws, building 22 new prisons, and until recently, making punishment the sole purpose of the penal system. For almost 30 years there has been scant attention paid to adequate funding for rehabilitation services or successful programming to permit inmates to successfully return home. The fiscal and social costs of these policies were neither examined nor sufficiently shared with the electorate. And so, we are close to a boiling point which most observers believe could lead to a prison catastrophe."
    - Dr. Krisberg's report concludes noting:
        "A smart reform program must balance emergency steps, short-term measures, and a longer-term strategic vision. The NCCD believes that the proposals in this report represent a start in that direction. Fundamental to viable solutions is a continued movement toward a corrections system that combines effective rehabilitation and reentry programs that reduce recidivism with appropriate public protection considerations and sensitivity to the plight of victims.

        There are evidence-based pathways out of the deep prison crisis that we have created. A comprehensive approach is needed that includes realistic forecasts of the impact of policy and law changes on state and local corrections. We need to understand the true financial implications to fixing the

**Prison Overcrowding**
**Page 3**

corrections imbroglio.  Reforms must include a new alliance of state and local justice officials, and an exploration of proven safe alternatives to state confinement.  California must expand its commitment to employ research and rigorous evaluation to determine if the taxpayers are getting value for their massive investments in the corrections system.  A clear plan that achieves bipartisan support and includes all three branches of government is the standard we should uphold."

- The CDCR parole system could be improved, thus reducing the parole recidivism rate by looking at implementing the PEW Charitable Trusts recent document entitled, "When Offenders Break the Rules—Smart Responses to Parole and Probation Violations."  (Please see attachment 2.)
- The PEW Report notes that:
  "Innovative judges and correctional administrators believe that many individuals who have violated the conditions of their release can be managed safely and cost-effectively in the community rather than returned to expensive prison cells.  They increasingly are relying upon a strategic approach that includes incarceration of high risk offenders who present an imminent danger of reoffending and a problem-solving combination of penalties, rewards and services to those who pose less risk to public safety.  The strategy seeks to protect the community, to hold violators accountable with interventions that address the reasons for the violations, and to reduce reincarceration and the resulting costs to taxpayers."
- Dr. Krisberg's literature review regarding the "Effect of Early Release from Prison on Public Safety"(Please see attachment 3) notes in his review of studies from nine states and Canada that:
  "Most of the cited studies and reports found: No significant difference in rates of recidivism among early release and full-term offenders.  Some studies found lower recidivism rates among early releases that those who served a full-term in prison. NCCD reviewed annual crime rates throughout the different regions reported in the studies during the same time the studies took place.  Crime data in the states where studies took place show decreases even as early release was being implemented."

"What worked?" showed that "selecting non-violent offenders for early release, designing ER as an incentive for non-violent behavior in prisons, allocating probation officers to maintain contact with ER groups (accountability), and linking ER groups to community-based services and programs (e.g., employment, housing, substance abuse and mental health treatment") all worked.

Prison Overcrowding
Page 4

---

- The State could release parolees 6 months before their release date, which would reduce the CDCR population, but it would be done in a manner that would not increase recidivism. (Also from attachment, attachment 3.)

- When the Legislative Analyst's Office (LAO) recently proposed releasing somewhere between 50,700 and 71,000 "low risk" parolees, to be supervised by county Probation Departments, San Mateo County did an analysis of the fiscal and personnel impact such a release would have on San Mateo County in order to provide the needed services for these parolees, which for the most part had not been provided to parolees for decades. This is why California parolees have the highest recidivism rate of any state in the United States. (70% of California's parolees become recidivists within a two year period, according the CDCR and the California Rehabilitation Oversight Board.)

  In order to provide needed services for approximately 1,000 parolees, the Probation Department would need approximately $7,600,000 intended for new probation and support staff to provide the parole supervision. In addition to the personnel costs, other needs would be office space rental, office furniture for new parole staff, computers, cell phones, training, vehicles for field supervision, electronic monitoring equipment, drug testing equipment, and office supplies. (Please see attachment 4.)

  In addition to the costs to probation to supervise these 1,000 parolees, San Mateo County determined that it would also cost "Behavioral Health" to provide mental health and substance abuse services, approximately $9 million dollars, and it would cost the Sheriff[s Office approximately $4.3 million dollars for re-incarceration expenses. Therefore, for Probation, Mental Health, Substance Abuse, and Jail services, it would cost San Mateo County at least minimally $20.9 million dollars to provide services for 1,000 parolees. (Please see attachment 5.) This does not count the additional costs to the Court, the District Attorney, the Private Defender's Office, to the Human Services Division, and to community based treatment organizations.

  In my judgment, local Probation departments could supervise State parolees and create far better recidivism rates as well as other more positive outcome results, however, the success of such a "realignment" process would absolutely hinge upon the fact of whether the State would

Prison Overcrowding
Page 5

be willing to compensate counties properly for their new parole
responsibilities.

- Criminal justice research clearly shows that "treatment" is what changes
criminal, delinquent, and recidivist behavior, and reduces crime and
community victimization.  The research also shows that if you merely lock
people up and "warehouse" them and provide NO treatment, recidivism
actually increases by approximately 7% (according to Professor Don
Andrews, Carlton University, Ottawa, Canada, and "Supervising Offenders
in Minnesota, Facts and Solutions.)
- San Mateo County is a unique county, in that all of the key stakeholders in
the county (the Court, the Board of Supervisors, the County Manager, the
Sheriff, the District Attorney, the Probation Department, the Health/Mental
Health Department, and Human Services), understand that what changes
criminal behavior and recidivism and reduces community victimization is
"treatment."

III    <u>Another Potential Contributing Solution to Prison Overcrowding Problem</u>

- Probation Departments have demonstrated for a number of years that
given proper resources, they can implement programs that will reduce
crime and populations for both State and county institutions.

    Probation could replicate for young adults (18 to 25 years of age) the same
    type of evidence based successful programs we have implemented for
    juveniles.

    Between 1992 and 2002, juvenile felony crime was reduced 48% according
    to a Rand Corporation three year study. (Please see attachment 5.)
    Similarly, juvenile misdemeanor offenses declined 26%, when the juvenile
    population for the state increased 26% over the same time frame,
    according to the same Rand study.  These significant reductions in
    juvenile crime, according to the Rand report was due to the treatment
    programs implemented by Probation departments throughout California
    using TANF funding.

    Using treatment programs on the "front end of the criminal justice system,"
    similar to the ones we use to reduce juvenile crime would have a
    significant impact in reducing the number of adult probation violators who
    are sent to state prison on probation violations (approximately 17, 000 per

Prison Overcrowding
Page 6

---

year, according to the Chief Probation Officers of California [CPOC] organization.)

Additionally, on the "back end of the criminal justice system," for those probation violations that did occur, if Probation departments and counties were given additional resources, and sufficient funding for treatment, many of these probation violators could be kept locally and not sent to prison.

- As was noted above, I believe that Probation departments could provide much more effective parole supervision services if counties were provided appropriate fiscal resources by the state. However, if parole services remain with the State, one key change in how parole violations are handled could have a substantial impact on prison overcrowding. According to the CDCR, approximately 70,000 to 80,000 parole violators are returned to prison each year, and approximately one-half of those parole violations are for "technical" violations. (A "technical" violation is for a violation of their conditions of parole, e.g., missing an appointment with a therapist or their parole officer; however, the "technical" violation does NOT entail a new law violation.)

Sending most parole violators to prison, in my judgment is an enormous waste of state prison resources. Professor Joan Petersilia has done research that showed that "technical" parole/probation violators were no more likely to commit new offenses than anyone else on probation or parole. Additionally, these technical violators serve an average of approximately four months, according to CDCR. The processing of these violations through the CDCR's "Reception Centers" costs the state approximately $2 billion dollars per year, according to Jeanne Woodford, a long term CDCR administrator. Such "technical" violators (35,000 to 40,000 per year) should be kept locally in treatment programs or "Day Reporting Centers" (please see attachment 6) instead of unnecessarily clogging up the State's prison system. However, this process could only work if the state used a good portion of the savings (that would accrue by having these violators kept locally) to compensate counties and Probation departments who would be keeping violators locally and providing them with treatment resources so they do not have to go back into the state prison system.

**Prison Overcrowding**
**Page 7**

---

In summary, in my judgment a "mass release" would have extremely negative impacts on counties and communities throughout the state.

However, I believe it would be helpful for the Court to be aware that there are a variety of options, suggested by criminal justice experts, which would allow the state to reduce the prison populations by a variety of means that would not necessitate "building" their way out of the overcrowding problem. Using these expert suggestions also would not negatively impact recidivism. I believe that it would be important for the Court to be aware of the information provided by the PEW Trust to see how to improve parole outcomes and reduce parole violations. Finally, if the state were to provide counties and Probation departments with funding for both "front end" and "back end" criminal justice services, departments could employ treatment services which have already proven to be both successful (in terms of reducing crime and community victimization) and cost effective. In so doing, many more offenders would be kept locally, instead of being sent to State prison, which would be another means of reducing the state prison population without building new prisons. This approach would save the state millions, if not billions of dollars, and such a process would reduce crime throughout the state.

Signed: _____

Chief Probation Officer, San Mateo County
and
Regional Chair, Chief Probation Officers of California, Bay Region
August 15, 2008

# EXHIBIT C

Beverly Beasley Johnson
Agency Director
Human Services Agency
San Mateo County
400 Harbor Boulevard, Building C
Belmont, CA 94002

August 13, 2008

Carol Woodward
Deputy County Counsel
Office of County Counsel, San Mateo County
Hall of Justice and Records
400 County Center
Redwood City, California 94063-1662

Re:    Coleman vs. Schwarzenegger
       Plata vs. Schwarzenegger

Dear Ms. Woodward:

Pursuant to your request, I have performed a programmatic and fiscal impact
assessment based on the effects of an early prisoner release order on the delivery of
human services in San Mateo County. Assuming that 1,000 parolees reenter San Mateo
County, approximately 800 will require services administered by the Human Services
Agency (HSA). Some of these services will be fundamentally altered by the magnitude
of change in service population and by the need for specialized, intensive services. For
example, in this county's extremely limited housing and labor market, these individuals
will encounter extreme barriers to finding work and housing.  The current apartment
vacancy rate is 3.5% and potential renters need to provide a credit history and a
verifiable source of income to landlords in order to secure rental housing.  San Mateo
County's current unemployment rate is 4.3%. However, we anticipate that a significant
percentage of parolees will return to the communities of East Palo Alto and North Fair
Oaks where the unemployment rates are 200%-300% higher. As a consequence, they
will rely on social services longer. They will also need more intensive services than the
general population due to reentry issues, lack of a work history, untreated substance
abuse and mental illness, family stabilization needs, and the absence of social supports
and resources.

This assessment does not include all services provided by the Human Services Agency,
but rather, only those services that would experience a significant programmatic or
fiscal impact ($1 million or greater per annum). It also includes the services provided
indirectly through contractors of the Human Services Agency when the service affected
would have a significant county-wide programmatic impact, such as Shelter Services,
Emergency Food Services, Safety Net Services and Employment Training Services
and/or has a significant annual fiscal impact of $1 million or greater per annum.

Reference documents and data sources used to develop this assessment include:

1. Food Stamps Eligibility Regulations (California Department of Social Services, Food Stamp Regulation, Division 63)
2. Medi-Cal Regulations (California Code of Regulations, Division 2, Chapter 1)
3. General Assistance Eligibility Manual (County of San Mateo, 1994)
4. California Child Welfare Services Regulations, Division 31
5. California Welfare and Institutions Codes, Title 22, Division 6, Chapter 9.5
6. Labor Market Information (State of California, Employment Development Department, June 20, 2008)
7. Adoptions and Safe Families Act, 1997
8. Housing Management Information System (County of San Mateo, 2008)
9. Child Welfare Services Case Management System (California Department of Social Services)
10. Human Services Agency Budget, FY 2008-2009 (County of San Mateo, 2008)
11. Contracts with individual service providers, FY 2008-2009
12. Shared Vision 2010 (County of San Mateo, 2001)
13. Housing Our People Effectively, Strategic Plan (County of San Mateo, 2006)
14. Human Services Agency Strategic Plan, 2008-2013 (County of San Mateo, 2008)

## Overview of the Human Services Delivery System

The San Mateo County Human Services Agency administers public social services to benefit low-income and at-risk residents of San Mateo County. The largest programs administered by the Human Services Agency are funded through federal, state and local sources and include public assistance programs such as CalWORKS, Food Stamps, Medi-Cal; emergency assistance programs including Shelter Services and Safety Net Services; as well as ongoing Workforce Development and Child Welfare Programs.

Eligibility for each program is set by federal, state and local law, regulation and policy. The programs which are believed to have the most obvious nexus to the plaintiffs would be General Assistance, Shelter Services, Workforce Development Services, Food Stamp and Food Assistance Programs, Child Welfare Services, Indigent Medical Care and lastly, the CalWORKS program. The potential impacts to the CalWORKS program are significant, but difficult to measure since it is unclear how many returning parolees will be able to establish a household with their children in their first year of reentry. Once the parental/guardian relationship is established, those families will be eligible for financial assistance and social services through the CalWORKS program. The potential impact to the Medi-Cal program may also be significant, but again it is unclear how many returning parolees will be meet eligibility requirements (i.e. aged, disabled).

The conservative estimated county cost for the delivery of the applicable Human Services Agency services to the plaintiff population of 1,000 is believed to exceed $26

million annually and would result in a fundamental shift in the overall human service delivery system within the County of San Mateo due to two factors: the substantial increase in participation in entitlement programs and the reallocation of resources from other programs. The indirect costs of reallocation from preventative programs are not included in this assessment, but are also significant. Non-mandated preventative and early intervention programs are almost entirely funded through county dollars, which is also the sole source of General Assistance funding.

In addition, we foresee a dramatic impact on the social resiliency of individual communities. An influx of parolees will affect San Mateo County's most under-resourced communities, those already affected by fewer social and financial resources, high levels of untreated co-occurring disorders, as well as high concentrations of drug abuse, interpersonal violence, unemployment and gang involvement. These communities are already isolated by socio-economic factors and neglect. Increasing the parolee population in these communities will contribute to the criminal justice system's revolving door, further destabilize families and, for some at-risk populations, increase exposure and participation in gang culture.

## Programmatic and Fiscal Impact by Program

### General Assistance
The General Assistance (GA) program provides financial assistance to low income childless adults who fall below the established property and income limits. Service recipients fall in one of two categories, those who are employable and those who are disabled, including those who have a medical exemption due to substance abuse. The maximum monthly payment is $319 per individual. This program is funded entirely through county funds.

> Program impact:
> The annual grant amount for 800 clients:                               **$3,062,400**
> ($319 monthly benefit x 12 months x 800 clients)
>
> Staffing impact:
> 14.5 FTE (full-time equivalents) to administer grants, intake, screen, and case
> manage                                                                 **$1,788,556**

### Food Stamp Program
Low-income households who meet federal eligibility requirements may participate in the Food Stamp Program. A household of one individual can receive a maximum monthly food stamp allotment of $162.

> Program impact:
> The annual grant amount for 800 anticipated clients in this program: **$1,555,200**
> ($162 monthly benefit x 12 months x 800 clients)

Staffing impact:
6.5 FTE to determine eligibility, administer grants, and case manage   **$795,541**

## The Work Fare Program

In order to receive either GA or Food Stamp benefits, employable GA clients are required to participate in an employment skills building Work Fare Program. Due to the downturn in the economy, this program has already experienced increased participation and additional program expansion would require increased staffing and operational resources. The Work Fare program can accommodate 100 additional clients, at most.

Staffing impact:
3.0 FTE to support an additional 100 clients                **$410,634**

## Emergency Assistance Services

Shelter Services

HSA's Center on Homelessness provides shelter services on a temporary basis to individuals and families.  There are 71 shelter beds available to single individual adults through three contracted shelters. The existing shelter capacity has a consistent 100% occupancy rate.  Other beds are available through a motel voucher program.  Motel operators participate in this program on a limited basis due to the modest compensation rate of $75 per night.

HSA utilizes a ten-year strategic plan to end homelessness in San Mateo County. The HOPE (Housing Our People Effectively) Plan is built around two key strategies: increasing the supply of permanent, affordable housing and preventing individuals and families from becoming homeless by helping them maintain their housing.  Emergency or temporary shelters are not viewed as an effective solution to homelessness. The entire human services delivery system in San Mateo County, including contracted and non-profit services, does not have the physical capacity to accommodate 800 additional clients who are at-risk for homelessness.

Program impact:
The annual cost of serving 800 clients in the Motel Voucher Program would be $24 million. However, due to the limited motel bed inventory, it is assumed that the annual cost for temporary shelter through this program
                                                          **$12,045,000**
(400 beds x $75 room rate x 10% program administration costs x 365 nights)

The cost to build an 80-bed shelter                      **$2,500,000**
Annual operating costs of an 80-bed shelter:             **$480,000**

Safety Net Services

In addition, safety net services are provided by contract through a network of seven community based organizations which provide information, referrals and access to emergency food and housing. This is an example of a county-wide service that would

be significantly affected by an early release order. Currently, six of the seven providers in this system do not have the training, program knowledge or specialization of services needed to assist this population. It can be assumed that they will serve the same 800 service recipients several times over the course of the year; however we are not including that factor in this analysis.

Program impact:
Increase contracted operating costs by 4%                              $30,503

Staffing impact:
3.0 FTE to monitor additional shelter *and* safety net contracts       $417,536

## Children and Family Services

Children and Family Services is a continuum of services to children and families who come into contact with the Child Welfare System. Services include intake, referral and investigation of child abuse, emergency sheltering of children, supports for family maintenance and reunification, youth independent living services, as well as foster care and adoptions.

While Children and Family Services will not experience the most significant fiscal impact, these programs will likely experience the most profound long-term programmatic impacts. Children and families can experience long-term developmental impacts when families are destabilized due to a change in the family structure, exposure to uncertainty, changes in guardianship, relocation and court involvement.  Currently, 14% of our caseloads include children with incarcerated parents.  We anticipate that an early release order would more than double that high-risk caseload.  These children and families require intensive case management services, including safety and risk assessments, psycho-social and socio-economic assessments, mental health services, alcohol and other drug treatment, co-ocurring disorders treatment, anger management classes, domestic violence treatment, parenting classes and additional support for basic life needs such as housing, food, transportation, clothing, child care and health care. These parents will need supervised visits with their children, monitoring, ongoing assessment and service planning.  In addition, permanency planning for children in our care is subject to the Adoptions and Safe Families Act of 1997 which establishes guidelines for permanency planning for children in our care.  When a parent enters and exits a child's life, the permanency planning.  In order to reunify with a child, a parent needs to meet parole requirements, establish self-sufficiency, and successfully demonstrate the ability to provide a safe and stable home environment to a child. These requirements, all of which are necessary and justified, delay the permanent placement of the child.

Program impact:
Contracted therapeutic services                                        $310,000

Staffing impact:

15.25 FTE to locate parents, provide assessments including psycho-social assessments, provide information and referrals, targeted treatment of mental and behavioral health issues, supervised visits, adoptions and social workers

**$1,967,237**

## Workforce Development Services

County employment services are delivered through Career Centers and Workforce Investment Act (WIA) related services delivered at those centers. Those services include a broad range of employment related activities, and contracted employment-related training and education.

It is assumed that 680 parolees will seek employment services. Of these, 47% or 332 will require intensive employment training services. This estimate is generalized from the needs of employment services clients overall and not any type of special population.

Program impact:
Annual cost of employment training services for 322 clients      **$901,000**
(Average employment training cost per client $2,798 x 322 clients)

Staffing impact:
5.0 FTE in caseworkers with 64 clients each      **$342,380**

## Medi-Cal

The Medi-Cal Program seeks to provide essential medical care and services to preserve health, alleviate sickness, and mitigate handicapping conditions for individuals or families on public assistance, or whose income is not sufficient to meet their individual needs. There are hundreds of sub-programs within Medi-Cal with varying eligibility requirements and program funding sources. Unless aged or disabled, most parolees will not qualify for Medi-Cal. However, they will need to be screened by Medi-Cal staff and referred to county medical programs.

Staffing impact:
2.5 FTE to provide screening and referral services      **$310,035**

## Summary and Opinion

The human services delivery system is a network of public and nonprofit services that seeks to aid those in need, prevent crises, and build stability in households and communities. These services are regulated by federal, state and local law or are administered as part of the local budgeting process. Our non-mandated programs and services are provided by resources made available through county government and, on a more limited basis, special grants. We already fully utilize and leverage available funding sources. Any reallocation of resources will result in a reduction in services to other programs and services. For example, to support this service population, the General Assistance Program would require an additional $4.8 million. However, that reallocation would necessarily involve a reduction in services, including safety net services, school-based services, and even, community-based services that seek to

prevent involvement in criminal activity. In addition to funding limitations, we also have program capacity limitations.  Our shelters have a 100% occupancy rate and for every motel bed provided to an individual who cannot enter a shelter due to the nature of his/her prior offense, an individual or a family will go unhoused.

If the adage that  "desperate people do desperate things" is true then the reality of 1,000 early release parolees arriving in San Mateo County without housing, employment, food, medical coverage, or other supports is a recipe for recidivism.  When considering the impacts of an early release order, we also assessed the social and family impacts. Our high-risk communities, children and families will be disproportionately affected by an early release order.  Under-resourced communities will be severely tested by the rapid influx of unemployed and unhoused individuals. These individuals may rely on their families for financial support which will have a dramatic impact on low-income families, multigenerational families and families in subsidized housing. They will have untreated therapeutic needs including mental health and substance abuse treatment and will require extended employment services. Their families, along with the children in our care who are awaiting permanent homes, will likely experience the greatest lifelong and destabilizing impacts of inadequate reentry planning and resources.

**Qualifications**
Please refer to attached resume.

**Expert Testimony**
I have not testified as an expert in any cases, State of Federal, during the last four years, nor am I receiving any additional compensation for this testimony.

Sincerely,

Beverly Beasley Johnson
Agency Director

L:\LITIGATE\C_CASES\Coleman\Discovery\HSA Expert Witness Report_final.doc

15 Shorebreeze Court                    Phone 650-561-3939
East Palo Alto, California 93312     E-mail: BBKSPACE@aol.com

# Beverly Beasley Johnson

## Work Experience

November 2006 – Present: San Mateo County Human Services
Agency, Belmont, CA.

Agency Director
- Leadership
- Budget
- Management
- Initiatives
- Community

May 2002 – November 2002 Kern County Human Services
- Provide leadership to a large full service Public Human
  Services Department
- Fourteen Hundred Staff and Three Hundred Million dollar
  annual budget
- Effectively managed Departments budget and
  implemented Revenue Maximizing strategy in
  collaboration with Mental Health, First Five and Probation
  Departments
- Led our successful implementation of the Kern Citizens
  Review Panel, Family-to-Family Program, The Linkages
  Project, and the Permanency Youth Projects in Kern
  County
- Extensive experience with Community Partnerships,
  Community Collaboration and Service

September, 1999-May, 2002 Michigan Department of Civil Rights
Lansing, Michigan

**Chief Deputy Director**
- Restructured Departments Legal Case Review Division to successfully eliminate Case load backlog eliminating three years of overdo legal opinions while ensuring that current legal opinions were completed within 90 days of the Commission rendering its ruling.
- Led the Departments Automation efforts by proactively identifying and contracting with outside Project management to get previously installed automation project on track. Served as liaison and Executive sponsor for the project The Department was successfully automated prior to my departure.
- Executive Sponsor of Departments Y2K planning efforts resulting in no disruption in client service.
- Served as Chief Operations Officer for the Departments day-to-day internal operations.

January, 1976 – September, 1999
Michigan Department of Social Services
Lansing, Michigan (Now the Michigan Department of Human Services)
**Social Worker, Supervisor, District Manager, Zone Manager**
- Twenty three years of progressive Social Services experience in Child Welfare, Child Care, Adult Services, Community Placement, Public Assistance, Welfare Reform and Michigan's TANF Program, the Family Independence Program, welfare to work program.
- Co-chaired the Statewide Food Stamp Payment Accuracy Initiative which addressed ways to get a handle on the food stamp error rate and avoid fiscal sanctions.
- Provided leadership to one-third, (26) of Michigan's county Social Services operations as the Zone 4 Manager
- Served on the executive leadership team for Out State Operations.
- In partnership with County Social Services Boards

Recruited, Developed, Coached, Mentored and conducted performance appraisal on ten new County Directors appointed in my Zone.

- Delivered Direct Services to Families making up my Child Welfare Caseload including, counseling, coaching, mentoring, and case managing.

## Education

September, 1988-1992 Detroit College of Law Detroit Michigan
**Juris Doctorate**

- Member of the Michigan State bar Association (P46157)
- Served on the Open Justice Commission of the Michigan State Bar Association
- Moot Court Teams for three years

September, 1969-1973 Wayne County Community College, Wayne State University, Oakland University Rochester Michigan Bachelors of Arts Degree, Psychology Major

## Community

Mothers Against Senseless Killing (MASK)

Bethany Homeless Shelter Board First

Five Commissioner

California State University at Bakersfield Social Work Advisory Committee

California Welfare Directors Association National Association for the Advancement of Colored People

Child Welfare League of America

National Eligibility Workers Association

Kern County Network for Children

References Available Upon Request

**EXHIBIT D**

# COUNTY OF SAN MATEO

# Office of the Sheriff

**GREG MUNKS**
SHERIFF

**CARLOS G. BOLANOS**
UNDERSHERIFF

400 COUNTY CENTER    •    REDWOOD CITY    •    CALIFORNIA 94063-1662    TELEPHONE (650) 599-1664    www.smcsheriff.com

ADDRESS ALL COMMUNICATIONS TO THE SHERIFF

August 15, 2008

Carol L. Woodward
Deputy County Counsel
San Mateo County Counsel's Office
400 County Center
Redwood City, CA 94063

Dear Ms. Woodward;

You have asked me to determine the impact that a prisoner release order would have on the San Mateo County Sheriff's Office and the County's criminal justice system. I am confident that the areas under the control of my organization, including our already overcrowded jail system, would be significantly negatively impacted by such an order.

In preparing this report, I considered the following reference materials:

      1. The California recidivism rate from the Governors website for January 2008
      http://gov.ca.gov/index.php?/fact-sheet/1084/
      2. Facility recidivism rate (chart) from the Sheriff's Own Recognizance Program.
      3. Legislative Analyst Office website regarding parole re-alignment.

In addition, several senior staff members provided information for this response.

My experience and training as the Sheriff of the County are as follows:

January 8, 2007      **Sheriff of San Mateo County**
                Chief Law Enforcement Officer for County of San Mateo.
                Elected June 6, 2006.

                As Sheriff, I oversee a large, full-service organization that provides Law Enforcement services to the unincorporated county areas as well as contract law enforcement services to municipalities and a three-county transit system. Beyond this, I provide security to County buildings and to the court system. And as with most Sheriffs in the state I operate all of the adult correctional facilities within the county.

1

| 1993 to 2007 | **Undersheriff, San Mateo County Sheriff's Office** |
|---|---|
| | Second-in-Command of 600 person law enforcement agency. Assist in planning, organizing, directing and reviewing the activities of the Sheriff's Office including patrol, investigations, corrections, civil and records management, search and rescue, bomb detection and disposal, narcotics enforcement, internal affairs, personnel and training, and fiscal management. Assist in the preparation and oversight of a $100 million annual operating budget. Act as Sheriff in his absence. |
| 1990 to 1993 | **Human Resources Manager, City of Palo Alto** |
| | Responsible for various human resources functions including Training and Development, Recruitment, Labor Relations, etc. |
| 1981 to 1990 | **Promoted through the ranks to Lieutenant, Palo Alto Police Department** |
| | Assignments included: Patrol Officer, Field Training Officer, Burglary Suppression Detective, Robbery/Homicide Investigator, Manager of Crime Prevention Division, Patrol Watch Commander, Manager of Personnel and Training Division, Commander of Field Training Officer Program, Commander of Hostage Negotiations Team, Commander of Public Information Officer Unit, Liaison to Human Relations Commission, Member of Management Negotiations Team during contract negotiations with both Police and Fire Unions. |
| 1977 to 1981 | **Deputy Sheriff, San Mateo County Sheriff's Office** |
| | Assignments included Main Jail, Honor Camp, and Manpower Pool |
| 1975 to 1977 | **Reserve Police Officer, Palo Alto Police Department** |

The following are my conclusions related to your inquiry:

1) *We know releasing prison inmates before their sentences have been completed, will negatively impact our overall criminal justice system in San Mateo County.*

California's recidivism rate is, at 70 percent, the nation's highest. In San Mateo County we do not have an information management system that calculates recidivism. However, if we look at a snapshot of those inmates re-booked with old ID numbers from our database system we come up with a recidivism rate of 68.3 %.

| March-08 | | |
|---|---|---|
| Total Reported Bookings for March = | 1647 | |
| New ID #s Issued = | 570 | 34.6% |
| Old ID #s Returning = | 1077 | 65.4% |

| April-08 | | |
|---|---|---|
| Total Reported Bookings for April = | 1582 | |
| New ID #s Issued = | 478 | 30.2% |
| Old ID #s Returning = | 1104 | 69.8% |

| May-08 | | |
|---|---|---|
| Total Reported Bookings for May = | 1741 | |
| New ID #s Issued = | 528 | 30.3% |
| Old ID #s Returning = | 1213 | 69.7% |

**2)** *We are using the figure of approximately 1000 inmates being released into SMC based on the percentage of total inmates in the state prison population that come from our county.*

Recent parole realignment discussions assumed 70,000 early releases from the state population. Using the figure of 1.5% of California prison inmates that come from San Mateo County, approximately 1,050 of the 70,000 would come to San Mateo County. We rounded that estimate to 1,000. If we use the settlement discussion figure of 40,000 releasees, and use 1.5% for San Mateo County's share, we are looking at 600 inmates that would come into our county.

**3.** *Of those 1000 inmates, we estimate 65%, or 650, would re-offend in a short period of time.*

We would keep in mind that not everyone would re-offend at the same time. We have limited information about who would be booked into our facility and which cases would or would not be filed. We assume some inmates would be going back to state prison, and some would go to other counties where they may re-offend.

**4.** *There would be an increase in population that would exacerbate our currently overcrowded jails.*

San Mateo County's rated capacity in the men's main jail is 688 inmates. Currently, our Average Daily Population (ADP) is 981 in the men's main jail. On a daily basis, we are now very close to reaching our maximum bed capacity, which is far above the rated capacity of 688 inmates.

3

The Women's Jail is rated for 84 inmates while our current ADP is 129.

We are opening and closing a temporary emergency overflow housing unit (OHU) almost every weekend in an effort to provide safe and secure beds based on classification concerns. The emergency facility has only 29 beds.

As a result of the severe overcrowding, we are very limited as to areas where we can house additional inmates. The increased gang population in our County has compounded this issue. If the Court were to order state prisoners released into our community as described above, we would expect some of these released inmates would re- offend. Adding the new category of inmates to our already strained jail system likely would put us over our _actual_ bed count. In addition, such an order would further decrease the already limited options we have when housing inmates. The CDCR released inmates would likely not be eligible for County alternative sentences, such Sheriff's Work Program (SWP), Electronic Monitoring (EMP) or the Work Furlough Facility (WFF) due to their criminal history and status.

Currently most of our jail housing units (PODS) program rooms are already unusable for programs, because they have been modified to contain additional beds. With any more inmates the few remaining program spaces too would be converted to housing units, and we would no longer be able to offer the programming that has been proven effective in preventing recidivism.

These program rooms and common areas where we are forced to set up overflow beds do not have toilets, sinks, or showers so the doors must be left unlocked so the inmates have access to the facilities in the POD day room. This arrangement compromises the safety and security of the facility, as rival gang members have consistently behaved in a violent manner around their adversaries.

Our current and highly successful re-entry program would be impacted in the following manner: CDCR Parolees would be the first to get the community based treatment beds before county inmates, because they are funded at a higher rate by the State. This will result in fewer spaces for county inmates. Our county inmates will remain in custody longer, causing further clogging in our rehabilitation efforts.

**5.** *If the state separately places a cap on its incarcerated population and would not allow any new intakes at the state CDC facilities, our jail population would be further backlogged, and we would incur further classification risks for our inmate population. We would expect to see more assaults on staff and the necessity for more keep away orders, and that would give even us less flexibility in housing additional inmates.*

Earlier this year, CDC San Quentin was placed on a lock down due to an illness breakout. Each week our County sends approx. 12-15 new commitments to CDCR. In addition we have approx. the same number (12-15) of parole violators which are picked up by CDCR transportation. It is reasonable to conclude that a cap on the CDCR population would increase our backlog quickly. When San Quentin was closed to new commitments it only took a couple of weeks before we had a list of 40 inmates waiting to be transported.

4

While we waited to transport those inmates, our facility had to house those inmates, and the jails were further overcrowded.

Inmates in CDCR have been convicted of felonies which often are related to violence. These inmates have higher risk factors in their classification and keeping them in our jails posses an undue threat to staff, visitors, and other inmates as well as a financial burden to our County budget.  If the Court orders CDCR to stop taking parole violators, the risks are exacerbated.

**Fiscal Issues:**

*A prisoner release order would adversely impact the County Sheriff's budget.*

Our local average cost per inmate, per day is $110.00. Because of our housing arrangements the cost for staff is based on a fixed ratio of staff to inmate. Meals and medical care are averaged as some inmates require more medical treatment while others do not.

If San Mateo County is forced to rent additional bed space to house our jail population, it would cost us $110 per day, per inmate, not including transportation that would be necessary for court and other appointments and appearances, or transportation back to San Mateo County for release.

**Conclusion**
 Thank you for the interesting and intriguing questions regarding our agency as it relates to this pressing issue. Opportunities such as this allow me to evaluate our system and make necessary adjustments. I insist my staff perform at their highest level of efficiency and professionalism at all times, even as the burdens of overcrowding threatens us daily. But as you can see, we do not have room for additional inmates that would likely come from a prisoner release order.  Our daily population is already stretching our operation, which endangers our staff and the safety of the inmates. Moreover, I believe it is my responsibility to offer programming and opportunities that have proven successful in reducing recidivism and in assisting inmates to make a better life for themselves upon release from custody.  Overcrowding decreases and sometimes precludes my ability to offer these programs and opportunities.

In summary, I believe that releasing inmates into our community prior to their completing their sentences would only shift the problems the CDCR is experiencing to the local level, which will effect public safety at all levels.

Please feel free to contact me if you have any further questions.

Sincerely,

Greg Munks
Sheriff

5

**EXHIBIT E**

Written Report

**Charlene A. Silva**
Health Director

As the Director of San Mateo County's Health Department, I have responsibility for our broad mission to build a healthy community.  Within this arena, we have services aimed at caring for vulnerable populations, such as behavioral health and recovery services that comprise a system of care for persons with serious mental illness, alcohol and other drug addiction, and co-occurring mental health and substance abuse issues, aging and adult services that protect and promote the health and well-being of older adults and persons with disabilities, as well as correctional health services that address the medical and behavioral health needs of clients in our local criminal justice system.  In addition, as part of a County initiative to look across all of the County's healthcare delivery system assets, I have responsibility working with colleagues leading the San Mateo Medical Center and the Health Plan of San Mateo (our local Medi-Cal and public coverage managed care plan) to leverage our joint resources to serve the needs of the underserved.  Through this work, we have platforms to build on in serving the needs of parolees released to our community.  However, our existing systems are stretched in meeting the needs of current residents as the number of those without health insurance has grown, as state and federal funding for many of our services has been reduced, the pressures on the safety net have increased, and the supports that keep communities and individuals healthy have frayed.  It is in this context that we consider the potential impact of the early release of segments of the State correctional facility population back to our community.

As we aim to carry out existing health responsibilities entrusted to us, we know the following:
- There are an estimated 40,000 adults in our community who lack health insurance and have incomes below 400% of the Federal Poverty Level.[1]
- We have persistent health disparities in our community, disproportionately affecting populations of color and low-income populations, whose health outcomes are influenced by social and environmental factors that reflect poverty, inequities in health access and the toll of discrimination and stigma.
- We have inadequate primary care capacity within our public delivery system; the waits for a primary care appointment are currently between two and four months.

---

[1] 400% FPL represents the estimated income required to live "self-sufficiently" in our high cost-of-living area

- State budget cuts to the Medi-Cal program, which is the financial platform for safety net medical care and mental health care systems to sustain services, will likely result in reductions in current capacity.
- Our County has determined that it must achieve reductions in the level of County General Fund subsidy of our public medical care delivery system to maintain our ability to carry out our broad range of responsibilities. The Board of Supervisors has established a target reduction of General Fund subsidy for indigent healthcare from $72 million in FY 08-09 to $50 million by 2013.
- We have waits for every level of long-term care (home and community-based services, skilled nursing facility services) for low-income populations, and currently do not have any affordable assisted living capacity. Given our age profile, the aging of the baby boomer population will affect San Mateo County earlier than the State as a whole, resulting in greater stresses to an already stretched system for current County residents.
- We have had to prioritize the segments of our population with substance abuse addiction that we will serve with the limited treatment resources we have, resulting in four priority populations and an ability to serve an estimated one in five of our current residents in need of substance abuse treatment.
- As we face a local structural budget deficit, we are maintaining a 9% staff vacancy rate within our Behavioral Health and Recovery Services system to live within the local resources directed to those programs.
- We have long-standing vacancies in some critical, hard-to-fill positions, such as psychiatry, and bi-lingual/bi-cultural clinicians, mirroring statewide workforce capacity shortages that constrain our ability to meet existing clients' needs.
- The demands on the medical care and behavioral health and recovery systems have not enabled adequate attention to the "upstream" opportunities for prevention and early intervention. We have embarked on a plan to build our prevention approach, but this will be a generation-long endeavor.

In projecting the impact of the release of parolees, and the demographic composition of that population, it is clear that there are health needs that we would have to be prepared to address. Given that the criminal justice system is a "lens that magnifies inequities – socio-economic, gender, race, culture and class differences"[2], we can conservatively estimate the following health needs:

- A sizable proportion of released inmates will lack health insurance, and, likely be low-income, requiring additional capacity in our safety net medical care system. An 18-month planning process targeting the health needs of uninsured adults included an actuarial analysis of per member per month healthcare costs for the low-income, uninsured population. We

---

[2] California Mental Health Directors Association Forensics Committee White Paper, 8/12/08

estimate a cost of $300 per client per month for medical care for the uninsured.

- We would expect that the aging of the population that we are preparing for exists among the State inmate population as well, and would require additional resources within our continuum of services for older adults. In order to support residents in the least restrictive setting possible, our Aging and Adult Services division would need additional capacity to address the long-term care needs that the released population will have over the next several years.
- We recognize that our criminal justice system has been a backstop for underlying issues of mental illness and substance abuse, and, therefore would expect to see a sizable prevalence of these needs among the population proposed to be returned. The California Mental Health Directors' Association estimates a prevalence of 15-50% of released parolees will have mental health needs, and at least 75% of this incarcerated mentally ill population also has co-occurring drug and alcohol use.[3] We would also estimate at least 75% of released parolees will have a substance abuse problem.[4] We estimate a cost in excess of $12 million annually to provide the appropriate mental health and substance abuse treatment services for this population.
- While we will make every effort to support all residents in our community to be productive and contributing members, supported by systems that keep them out of jail, we would expect that some proportion of this population will return to our local jail and require health services in this setting. Our average cost/day for correctional health services ranges from $23-$25, translating to annual costs/ inmate/day to between $8,300 and $9,000  These costs have been rising even more steeply than other costs within the Health Department's purview, given the increased complexity of healthcare needs faced by inmates and underlying drivers of healthcare inflation.

We were hopeful to have pursued a constructive dialogue about these issues through the settlement discussions. It is unfortunate that we must now pursue these critical issues within the legal dispute in which we are engaged to ensure that the State's actions do not prevent us from carrying out the mandates and mission that we have without adequate resources to address the parolees' projected healthcare needs.

## Qualifications

I have served as the San Mateo County Health Director for four years. Prior to this, I served as Director of Aging and Adult Services for San Mateo County for fourteen years. Prior positions include senior management roles within the

[3] California Mental Health Directors Association Forensics Committee White Paper, 8/12/08
[4] Report of the Reentry Policy Council, 2008

Sacramento Department of Social Services and a wide range of professional and community advisory boards in the health and social services fields. I began my career as a social worker in Child Protective Services in 1971.

*Charlene A. Silva*

Charlene A. Silva
Director
San Mateo County Health Department

C:\DOCUME~1\CWOODW~1\LOCALS~1\Temp\XPgrpwise\HSA RULE 26 REPORT-FINAL2.doc

1  MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
   By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
2  Hall of Justice and Records
   400 County Center, 6th Floor
3  Redwood City, CA  94063
   Telephone: (650) 363-4746
4  Facsimile:  (650) 363-4034
   E-mail:  cwoodward@co.sanmateo.ca.us
5
   Attorneys for Intervenor
6  COUNTY OF SAN MATEO

7

8                    UNITED STATES DISTRICT COURT

9                   EASTERN DISTRICT OF CALIFORNIA

10           AND THE NORTHERN DISTRICT OF CALIFORNIA

11       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

12           PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

13

14  RALPH COLEMAN, et al.              Case No. CIV S-90-0520 LKK JFM P

15           Plaintiffs,               THREE-JUDGE COURT

16       vs.

17  ARNOLD SCHWARZENEGGER, et al.

18           Defendants.

19
    MARCIANO PLATA, et al.            Case No. C01-1351 THE
20
             Plaintiffs,              THREE-JUDGE COURT
21
         vs.
22                                     **DECLARATION OF CAROL L.**
    ARNOLD SCHWARZENEGGER, et al.     **WOODWARD IN SUPPORT OF**
23                                     **INTERVENOR SAN MATEO COUNTY'S**
             Defendants.              **DISCLOSURE OF NON-RETAINED**
24                                     **EXPERT WITNESSES FOR TRIAL**

25

26       CAROL L. WOODWARD declares as follows:

27  I am employed as Deputy County Counsel for the County of San Mateo.  I am one of the attorneys

28  assigned to defend the instant case on behalf of Intervenor County of San Mateo.  The following is within

Case No. CIV S-90-0520 LKK JFM P

DECLARATION OF CAROL L. WOODWARD IN SUPPORT OF INTERVENOR SAN MATEO
COUNTY'S DISCLOSURE OF NON-RETAINED EXPERT WITNESSES FOR TRIAL

my personal knowledge and, if called as a witness, I could and would testify competently thereto.

On August 5, 2008, I received an e-mail from plaintiffs' counsel Amy Whelan stating the following:

> Dear All,
>
> We have now received all of the intervenors' trial witness lists with the exception of the District Attorneys, who have informed us that they are only designating non-retained experts. Several of the intervenors have disclosed county or other witnesses as both percipient witnesses and "non-retained experts" or "non-retained testifying experts." Theresa Fuentes, counsel for Santa Clara County, contacted plaintiffs' counsel yesterday to determine our position on these designations. Rather than respond only to Ms. Fuentes, we are providing our response to counsel for all parties. In particular, Ms. Fuentes asked whether we agree that non-retained, testifying experts are exempt from providing expert reports. Our position is as follows: If you exert control over your "non-retained experts," (e.g. if the "non retained experts" are parties, or are employees of or contractors of parties) they must submit reports by the August 15, 2008 deadline. To the extent your non-retained experts plan to testify about matters outside their personal knowledge or outside the scope of their employment (e.g. the effects a prisoner release order might have), they also must submit Rule 26(a)(2)(B) disclosures. *See, e.g., Funai Elec. Co. v. Daewoo Electronics Corp.*, 2007 WL 1089702, *6 (N.D. Cal. 2007). If your witnesses do not submit reports, we will move to exclude their testimony in its entirety.
>
> We hope this clarifies plaintiffs' position.
>
>
> Sincerely,
>
> Amy Whelan, Esq.
>
> Rosen, Bien & Galvan LLP
>
> 315 Montgomery Street, 10th Floor
>
> San Francisco, CA 94104
>
> T: 415/433-6830
>
> awhelan@rbg-law.com
>
> www.rbg-law.com

DECLARATION OF CAROL L. WOODWARD IN SUPPORT OF INTERVENOR SAN MATEO COUNTY'S DISCLOSURE OF NON-RETAINED EXPERT WITNESSES FOR TRIAL

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on August 15, 2008.

CAROL L. WOODWARD

L:\LITIGATE\C_CASES\Coleman\Pleadings\Decl. CLW re expert disclosure 8-15-08.doc

3

DECLARATION OF CAROL L. WOODWARD IN SUPPORT OF INTERVENOR SAN MATEO
COUNTY'S DISCLOSURE OF NON-RETAINED EXPERT WITNESSES FOR TRIAL