1   JONES & MAYER
    Martin J. Mayer (SB # 73890)
2   Michael R. Capizzi (SB # 35864)
    Kimberly Hall Barlow (SB # 149902)
3   Ivy M. Tsai (SB # 223168)
    3777 North Harbor Boulevard
4   Fullerton, California 92835
    (714) 446-1400; Fax (714) 446-1448
5   e-mail: mjm@jones-mayer.com
    e-mail: mrc@jones-mayer.com
6   e-mail: khb@jones-mayer.com
    e-mail: imt@jones-mayer.com
7
    Attorneys for Intervenor-Defendants
8   SAN DIEGO COUNTY SHERIFF WILLIAM B.
    KOLENDER, ORANGE COUNTY SHERIFF-
9   CORONER SANDRA HUTCHENS, PLACER
    COUNTY SHERIFF EDWARD N. BONNER,
10  BUTTE COUNTY SHERIFF-CORONER PERRY
    L. RENIFF, CALAVERAS COUNTY SHERIFF
11  DENNIS DOWNUM, LOS ANGELES COUNTY
    SHERIFF LEE BACA, SANTA CLARA COUNTY
12  SHERIFF LAURIE SMITH, SAN BENITO COUNTY
    SHERIFF CURTIS HILL, STANISLAUS COUNTY
13  SHERIFF ADAM CHRISTIANSON, MENDOCINO
    COUNTY SHERIFF TOM ALLMAN, TEHAMA
14  COUNTY SHERIFF CLAY PARKER, LASSEN
    COUNTY SHERIFF STEVE WARREN, YOLO
15  COUNTY SHERIFF ED PRIETO, SANTA BARBARA
    COUNTY SHERIFF BILL BROWN, KERN COUNTY
16  SHERIFF DONNY YOUNGBLOOD, SAN MATEO
    COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
17  SHERIFF STEVE DURFOR, CONTRA COSTA
    COUNTY SHERIFF WARREN RUPF,
18  SHASTA COUNTY SHERIFF TOM BOSENKO,
    RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
19  VENTURA COUNTY SHERIFF BOB BROOKS,
    SOLANO COUNTY SHERIFF GARY R. STANTON,
20  SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
    SUTTER COUNTY SHERIFF JIM DENNEY,
21  LAKE COUNTY SHERIFF ROD MITCHELL,
    GLENN COUNTY SHERIFF LARRY JONES,
22  TUOLUMNE COUNTY SHERIFF JIM MELE,
    FRESNO COUNTY SHERIFF MARGARET MIMS,
23  MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
    MONO COUNTY SHERIFF RICHARD SCHOLL,
24  HUMBOLDT COUNTY SHERIFF GARY PHILP,
    EL DORADO COUNTY SHERIFF JEFF NEVES,
25  MERCED COUNTY SHERIFF MARK PAZIN,
    DEL NORTE COUNTY SHERIFF DEAN WILSON,
26  SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
    AMADOR COUNTY SHERIFF MARTIN RYAN,
27  INYO COUNTY SHERIFF WILLIAM LUTZE,
    STANISLAUS COUNTY CHIEF PROBATION OFFICER
28  JERRY POWERS, VENTURA COUNTY CHIEF

-1-

AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON

| | |
|---|---|
| 1 | PROBATION OFFICER KAREN STAPLES, SOLANO COUNTY CHIEF PROBATION OFFICER |
| 2 | ISABELLE VOIT, SANTA BARBARA COUNTY CHIEF PROBATION OFFICER PATRICIA STEWART, |
| 3 | BUTTE COUNTY CHIEF PROBATION OFFICER JOHN WARDELL, SAN LUIS OBISPO COUNTY CHIEF |
| 4 | PROBATION OFFICER KIM BARRETT, CONTRA COSTA COUNTY CHIEF PROBATION OFFICER |
| 5 | LIONEL CHATMAN, INYO COUNTY CHIEF PROBATION OFFICER JIM MOFFETT, |
| 6 | SHASTA COUNTY CHIEF PROBATION OFFICER BRIAN RICHART, YOLO COUNTY |
| 7 | CHIEF PROBATION OFFICER DON MEYER, FRESNO COUNTY CHIEF PROBATION OFFICER |
| 8 | LINDA PENNER, MARIPOSA COUNTY CHIEF PROBATION OFFICER GAIL NEAL, CITY OF |
| 9 | WHITTIER POLICE CHIEF DAVE SINGER, CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES, |
| 10 | CITY OF PASADENA POLICE CHIEF BARNEY MELEKIAN, CITY OF ALHAMBRA POLICE |
| 11 | CHIEF JIM HUDSON, CITY OF FREMONT POLICE CHIEF CRAIG STECKLER, CITY OF |
| 12 | GROVER BEACH POLICE CHIEF JIM COPSEY, CITY OF SANTA CLARA POLICE CHIEF STEVE |
| 13 | LODGE, CITY OF VACAVILLE POLICE CHIEF RICH WORD, CITY OF WOODLAND POLICE CHIEF |
| 14 | CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF MACE McINTOSH, CITY OF PASO ROBLES POLICE |
| 15 | CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO POLICE CHIEF MICHAEL BILLDT, CITY OF |
| 16 | ATWATER POLICE CHIEF RICHARD HAWTHORNE, NATIONAL CITY POLICE CHIEF ADOLFO GONZALES, |
| 17 | CITY OF DELANO POLICE CHIEF MARK DeROSIA, CITY OF MODESTO POLICE CHIEF ROY WASDEN, |
| 18 | CITY OF FRESNO POLICE CHIEF JERRY DYER, AND CITY OF DELANO CHIEF OF CORRECTIONS GEORGE |
| 19 | GALAZA |

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | Case No: CIVS90-0520 LKK-JFMP |
| Plaintiffs, | **THREE-JUDGE COURT** |

-2-
AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON

|   |   |   |
|---|---|---|
| 1 | vs. | [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)] |
| 2 | ARNOLD SCHWARZENEGGER, et al., | **AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON** |
| 3 | Defendants. | |
| 7 | MARCIANO PLATA, et al., | Case No.: C01-1351 TEH |
| 8 | Plaintiffs, | **THREE-JUDGE COURT** |
| 9 | vs. | |
| 10 | ARNOLD SCHWARZENEGGER, et al., | |
| 12 | Defendants. | |

I, KAREN DALTON, hereby declare as follows:

1. I obtained a Bachelor of Science degree in Health Science from California State University, Chico. I obtained my Master of Arts degree in social science from California State University, Chico. While obtaining my Masters I did my thesis on Perinatal Substance Abuse: What U.S. Hospitals are doing to detect the problem. I received my Doctor of Public Health, DrPH, degree from Loma Linda University in 1998.

3. I am currently the Director of Bureau Operations for the Bureau of Offender Programs and Services, serving under the Correctional Services Division of the Los Angeles County Sheriff's Department. I have been the Director of Bureau Operations since 2000. This includes education and services for 20,000 inmates incarcerated in the Los Angeles County Jails. The bureau is responsible for creating, implementing and studying the outcome of various offender programs. These programs range from academic, ESL, ABE, GED, to vocational, print shop, dog grooming, industrial sewing, etc., to life skills such as parenting, substance abuse and anger management.

4. From 1998 to 2000 I was the Executive Director at Southeast Area Social Services Funding Authority. I oversaw the Workforce Investment Act and Senior Services non-profit agency. I was responsible for innovative services for those unemployed individuals and senior individuals within a 5-city area. I also managed an annual budget of eight million dollars.

5. From 1999 to present I have been the President of the Heath Education Innovations in La Habra Heights. I am responsible for all aspects of this consulting company dedicated to program planning, implementation and training in the public health and corrections industry, focusing on Healthy People 2010 goals and objectives.

6. I have been involved for corrections for 14 years. From 1993 to 1999 I worked as a correctional educator and programs and services manager with the San Bernardino County Sheriff's Department. It is during this tenure that I was pursuing my DrPH degree, conducting my dissertation research on "Factors Predicting Recidivism among Adult Offenders in the San Bernardino County Jail." During this time I received a $1.2 million dollar grant from the U.S. Department of Education, Life Skills for state and Local Prisoner's Project, where a program designed to transition inmates from custody to the community through the development of case plans. I have been with the Los Angeles County Sheriff's Department since 2000.

7. In my current position the bureau is responsible for the creation, implementation, evaluation and day to day operations of all inmate programs. Programs are offered throughout the seven-jail system to nearly all 20,000 inmates. Additionally, management of the Inmate Welfare Fund, nearly $45 million annually, is undertaken by the bureau. The Bureau is comprised of several units, each with a specific charge. The Inmate Service Unit is primarily responsible for revenue generating contracts, service contracts, and all volunteer programs managed by the bureau.

8. The Community Transition Unit, dedicated to reentry, works collaboratively with the bureau by creating partnerships with parole, probation, Department of Mental Health, Department of Public Health, Department of Health Services, Alcohol and Drug Programs, Public Defenders, as well as Department of Public Social Services, Department of Children & Family Services, and the county's Service

Integration Branch.

9. The Community Transition Unit (CTU) has successfully been awarded three grants; an Intergovernmental Partnership Grant used to develop county-wide procedure and policies around reentry issues. Another was receiving a grant from the Paul Newman Foundation to be utilized for structure for homeless women and their children exiting the criminal justice system. Finally, the Los Angeles County Board of Supervisors approved a $100 million dollar allocation for homeless services.

10. The CTU was instrumental in securing $1.5 million to be utilized for jail "in reach" services. Using the outcome of several recidivism studies, where findings note lack of employment as a strong predictor of recidivism, the Jail Enterprise Unit is dedicated to creating jail industries designed to provide labor market skills to offenders and increasing their likelihood of securing gainful employment upon their release from custody.

11. The Jail HIV & AIDS Services Unit has created a streamlined process for those offenders at high risk for contracting HIV to receive education, counseling, testing, risk reduction and treatment and care if they are HIV positive.

12. I am a Certified Jail Manager (CJM) through the American Jail Association. This certification is documented evidence to the public that the individual possesses current competency in his and her field. It substantiates the mastery of a strong level of knowledge in the area of jail management.

13. I have served as an expert consultant on various projects within corrections. I assisted on the development of Medical and Mental Health Standards to be included as part of the Prison Rape Elimination Act Standards and Guidelines. Additionally, I have participated in the Development of a Curriculum (DACUM) for the National Correctional Industries Association (NCIA) on the bridging of jail and prison industries and reentry. I was a subject matter expert on homelessness for the Peace Officers Standards and Training (POST), where a distance learning project for law enforcement was created.

14. In previous assignments I have worked as a Health Educator, hired to develop and implement a countrywide substance abuse education program. Additionally, I have worked as a Research Associate where data were collected, maintained, and

-5-
AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON

evaluated for state and locally funded projects.

15. Over the years I have testified on several topics related to corrections and alternative sanctions. I testified before the National Senate Committee on Drug Policy regarding the successes of Drug Courts. I testified before the Little Hoover Commission on Drug and Alcohol Treatment Programs and the Implementation of Prop 36. I am published in AJA Magazine, Corrections Today periodical, and have provided input on chapters for book publications.

16. In 2007 I was invited to participate on a Governor's Strike Team related to Secure Reentry Facilities. The focus of the Strike Team was to develop a Continuum of Care Model of Rehabilitation. I also participate in the USC's Justice & Journalism Reentry Roundtable, where several high level executives from across the county join together to discuss reentry issues. The result of this group has been a one day conference on crime and media as well as the successful submission of a Women's Reentry Grant.

17. There are current criminal and Penal Justice Reform Efforts that could help reduce prison population without an early release. Some of these measures could help reduce recidivism at the local level, ultimately reducing the number of offenders who recidivate from the local system to the state system.

18. These efforts include SB 718 which allows for county sheriffs to authorize money from the Inmate Welfare Fund be used for the purpose of assisting indigent inmates, after release, with the reentry process. The Inmate Welfare fund, pursuant to Penal Code section 4025, gives certain mandates on how inmate programs and services are supplied to the inmates. Los Angeles County recognized that there was a gap in how those funds could be used because as soon as an offender was released from custody, they were no longer an "offender" and hence could not qualify for funds. Thus, we took steps to have the statute modified to allow us 14 days of "gap funding" for offenders once they are released. We have continued to provide services to them now that the Penal Code has

been amended. For example, for someone who is eligible for SSI, their benefits do not begin for 14 days, so we would provide that funding from the Inmate Welfare Fund to assist them until their benefits begin. However, because the inmate welfare fund has not received adequate funding, we have not implemented it yet. We believe that implementing this program will help people stay out of trouble, especially in that critical time upon first release.

19. Another alternative would be Funding the Community Based Corrections Act of 1994. The Community Corrections Act was enacted in 1994 to create a framework for community corrections in California. Implementation was contingent upon funding. The Community Corrections Act provides many communities with local punishment options as an alternative to prison or jail. These sanction-type programs are lower cost alternatives to increased prison and jail construction. They provide courts, parole, probation, etc. with a wide range of correctional options. The goal is to right fit people into programs and services.

20. CCA seeks to punish and hold the offender accountable through a therapeutic process and opposed to a punitive process. It also seeks to increase public safety by providing these services rather than putting the individual out on the streets with a blanket set of terms and conditions. Some examples of CCAs include an integrated criminal justice system that supports a network of decentralized or centralized correctional programs for target offenders. These usually include restitution programs for nonviolent offenders.

21. Adequately funding the Community Corrections Act would allow criminal

justice systems to be tailored according to need. Furthermore, capacity could be built because funding is available. If funding is available and capacity can be built, people in need can receive services.

22. Sentencing reform is a viable option to reduce the number of non-violent drug offenders going to prison. 25% of the increase in the U.S. prison population has been for nonviolent drug convictions. In November 2000, Californians voted for the Substance Abuse and Crime Prevention Act of 2000, also known as Proposition 36. This proposed that individuals convicted of nonviolent drug possession offenses receive probation and a court-ordered drug treatment in lieu of prison. The program has not been very effective either at reducing overall conviction rates, or in addressing drug abuse. More than 1,000 individuals in the last year have been diverted from custody through the Prop 36 program. Prop 36 was never set up for our overcrowding issues, but it is fair to say that the effect of it is to assist in that area as well.

23. Prop 36 is specially outpatient treatment, it is a blanket-type program where everybody gets the same level of treatment. A much better and more effective alternative for substance abusers are drug courts. Drug courts are very specific, and they have elements within the drug courts that bring together the public defender, the district attorney, probation and the judge. It is a team approach to this individual's care. Drug courts are more of an intensive evaluation of what is appropriate for the individual. Literature has indicated that these type of substance abuse intervention/diversion programs have a markedly higher success rate than Proposition 36 diversion, reportedly in the high 70% to the low 80% range.

24. There are mental health court programs that essentially do the same for offenders that come in deemed mentally ill as the drug court. This is done through the Department of Mental Health; they work in the courts. These programs likewise can prove very beneficial in both reducing population and improving success rates. The capacity to treat the mentally ill in the community is certainly a big hurdle to successful diversion. Funding is also a big part. If there was capacity and funding then individuals who are in jail rather than receiving mental health care treatment, or in jail rather than an appropriate facility, would be better served in a different form of treatment.

25. Another penal justice reform option that could dramatically impact success rates, reducing prison population and recidivism rates would be the utilization of a Risk & Needs Instrument to determine initial and ongoing level of supervision and severity of needs. Offenders must be accurately and objectively assessed for risk and needs to have an effective correctional program. We have utilized a canned approach to offender behavior, through a generic adoption of terms and conditions of probation and parole. Further, any assessments that may be done in one criminal justice arena is rarely shared with other arenas in the criminal justice system. A Risk and Needs Assessment is designed to seek out the offender needs to become a model citizen, and risks associated to reoffending. The results of the assessment prove to be a working model with efforts placed on increasing awareness, changing behaviors, and sustaining success. Offenders must be reevaluated regularly to ensure that there is sufficient progress being made on the initial resulting information, as well as ensuring that risks have not increased or needs changed. If they have, the outcome goals and objectives must be modified accordingly.

26. In my opinion, there are two clogs in the current State Prison system. First, are the technical violators. Reformation in this area that leads to a uniform response on how technical violators are handled, with the last resort being jail or prison time (as opposed to the first option), could dramatically reduce overcrowding. Providing services to technical violators or higher levels of treatment, interaction and supervision would be a vast improvement for these inmates, reduce overall recidivism, and reduce overcrowding simultaneously.

27. The second clog in my view is the time offenders are spending in the reception centers. The state prison system has a set number of beds as does the local jail systems. An increase in the population can cause major backlogs and overcrowding as is seen in many jails and prisons today. In Los Angeles County, moving people through the Inmate Reception Center and into housing, thus programs is critical to beginning the interventions and behavior change needed to ensure the greatest likelihood of success once released. Inmates booked into the Los Angeles County jail system spend only hours getting classified, assessed, and assigned.

28. A recent visit to a California State Prison with a reception center confirmed what a lot of the correspondence with former programmed inmates in Los Angeles County state. Our Community Transition Unit regularly receives letters from offenders asking for help in the state reception centers, by way of referring them to programs, etc. On our visit we were informed that inmates stay upwards of 45-days in the reception centers, without access to telephones, commissary, or education. When questioned on this, the corrections officer stated they were short staffed. Forty-five days could be a

turning point for many of these offenders in their desire and capability to engage in cognitive-behavioral interventions. Several noted that they spent a month or so in the reception center and were released from there, never entering the prison area where programs and services might be available to them.

29. The impacts that the above reforms would have on public safety or operation of the County's criminal justice system would be as follows. In 2007 the Los Angeles Sheriff's Department made 46,488 felony arrests. Misdemeanor arrests were 65,586, with an additional 58,726 arrests from other law enforcement agencies throughout the county, totaling 170,800 arrests in Los Angeles County. Approximately 41% of all arrests throughout the County of Los Angeles were felony arrests. Coupled with misdemeanor arrests, there are a high number of arrests currently and if a prisoner release order is put into place, even if the releases are done incrementally, we stand to increase our arrests by 41% of the 70% that are likely to recidivate (based on the state's own admission of a 69%-plus recidivism rate).

30. On the other hand, the impacts of a prisoner release order on public safety would be significant and negative. Most inmates fall into low income categories and they typically have a low and unsteady rate of employment in their history. Upon their return to the community, ex-offenders can either find a job, remain unemployed, or go back to crime. If they are able to find a job, it is often for very few hours and low paying; because of the low hours they are unable to qualify for employment benefits. Many continue accruing child support responsibilities because, if employed, the income is too low to support their basic living needs and other expenditures. The inability to sustain

AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON

themselves financial leads to reoffense.

31. In addition, parole and probation do not offer treatment for mental health, substance abuse, and similar high risk needs. Instead, they refer clients to the services. However, lack of capacity already exists in the areas of documented inmate needs such as residential substance abuse treatment, housing, employment, etc. Lastly, the mental health system would be severely impacted. There's no doubt that if a prisoner release order is put into place, many mentally ill offenders will be released. Community Mental Health Centers do not have the necessary tools or capacity to meet the needs of these individuals coming out of jail and prison now, an increase in releases would only compound the problem. The Mental Health Services Act (Prop 63), passed by the voters in 2004 ensured a revamping of the mental health system. While there have been many modifications to the system, the ability to meet the needs of the individuals coming out of the criminal justice system is sorely lacking. In addition, there are many other angles to study here. If the direction of the state is to revert these individuals from parole to probation, the likelihood to receive mental health services through MHSA is diminished because probationers don't have access to these services, while parolees do. Further, rarely is there an instance where mental health services are the single need of the offender. Usually, housing and substance abuse issues need to be addressed as well. These services are above and beyond the mental health service needs, and capacity is lacking in these areas as well.

32. The impacts of a prisoner release order on the county's criminal justice system would also be profound. The current caseload of probation officers is upwards of 1000:1,

when the recommended caseload is between 30 and 50:1. In addition, the court system would be heavily impacted and additional courtrooms would be necessary to handle the increase in arrests. Probation executives have made several statements in meetings speaking to the impact of a state prison release order. Unsure of whether the order will require the reverting of current parolees to probation or placing all new releasees or a percentage of them on probation directly, the system as we know it today is not equipped to handle the influx. Caseloads are already bursting at the seams, building them with the inability to fund new probation officers is a recipe for disaster. It's hard to hold people accountable when you are responsible for hundreds of them.

33.  Diversion Programs can be very useful in reducing recidivism and jail population, if used correctly. As noted above, Proposition 36 has not been particularly successful. There are other options. For example, using the Crisis Intervention Team model created in Memphis, Los Angeles County Sheriff's Department officials put together a proposal to establish "Stabilization Centers." These centers were designed to accommodate individuals committing "quality of life" crimes. Law enforcement officials would have the opportunity to transport individuals to the "Stabilization Center" as opposed to jail or the local emergency rooms. Cost avoidance could be realized in the implementation of "Stabilization Centers" through decreases in police officer time spent at Emergency Rooms, or jails, offender processing time and court costs, jail or prison incarceration time, and the frequency of arrests.

34.  Successful jail diversion programs have been shown to have positive impacts on decreasing incarceration time. Diversion programs can also increase the

-13-

likelihood of offenders receiving the services they need to remain out of custody. The primary purpose of diversion programs should be to "right fit" offenders into appropriate community based services, focusing on the mentally ill, substance abusers, and homeless. Services must be coordinated and collaborative, and be inclusionary.

35. Electronic Monitoring Programs (EMP) are a form of diversion. Utilized properly, that is coupled with needs and risk-based programming, EMP can be a successful diversion program.

36. In my opinion, a prisoner release order is a short term, band-aid solution at reducing the number of offenders who are actually incarcerated. The mass, or even stratified release of offenders, who are not prepared to be released, to communities that are unwilling to accept them, will lead to an increase in crime and a threat to public and community safety. Much advance planning, work and funding has to go into the communities to make the prisoner release order succeed without harming the community and those released. Partnerships with employers willing to hire ex-offenders must be secured prior to a prisoner release order.

37. Housing laws must change to accommodate the needs of the ex-offenders as they exit the criminal justice system, and in my opinion, other federal policies that deny welfare benefits to convicted felons should be studied and amended. Increased supervision by parole and or probation must occur, coupled with prisoners having access to the necessary services for needs which are documented through a validated risk and needs assessment.

38. The reality is that there are far more people under criminal justice

supervision than those housed in jails and prisons. Yet, jails and prisons receive much more attention than do probation or parole. Additionally, prisons and jails receive far greater funding. The sheer numbers of individuals placed on probation and parole warrants attention, both in the funding and policy arenas. We can no longer run away from the problem. In my considered opinion, simply opening the doors and releasing prisoners without addressing these underlying problems is just an alternative way of running away from the problem. It will neither reduce recidivism nor the population of prisoners in the long run.

39. We must be prepared, and the preparation includes time, money, and people willing to do the right thing for the people, not doing something to get to the right number of inmates. Without a sustained community investment and revitalization strategy to create an infrastructure of opportunity and alternatives, those communities most impacted by violence, incarceration and reentry may not be able to survive. Public health models of care that include the simultaneous attention to needs, risk, and surveillance are noted to be most effective. Individuals who receive intervention based on their needs have less likelihood to recidivate than individuals who receive no intervention at all.

39. My assumptions are as follows: That a prisoner release order would also impose a cap, over which there are to be no new commitments to CDCR. CDCR's documented recidivism rate 67.5%. Assuming a current total CDCR population of 158,931 and a target population of 132,500, leading to 26,431 to be released. CDCR is comprised of 33% inmates from Los Angeles County. 52,447 (158,931 x .33) are Los Angeles County Commitments. The approximate parole count in Los Angeles County

-15-
AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON

was 48,586 as reported by CDCR in July 2008. Los Angeles County Sheriff's Department makes felony arrests of 46,488 (approx) annually; misdemeanor arrests 65,586 for a total of 112,074 annual arrests. Other Los Angeles County law enforcement agencies make an additional 58,726 arrests (approx) annually, for a total of 170,800 arrests in Los Angeles County.

40. My recidivism assumptions are as follows: If .675 of current parolees (32,795) and gap releases (5,887) recidivate, law enforcement agencies in Los Angeles County may realize an additional 38,682 arrests. Even using a much lower recidivism rate of 53%, would result in 25,751 current parolee and 4,623 gap releases recidivating, with law enforcement agencies in Los Angeles County may realize an additional 30,384 arrests. The latter would be an increase of 18% in annual bookings at the Los Angeles County Inmate Reception Center. This would further increase overcrowding in the County Jail. ADIP is 19,600 in Los Angeles County. An 18% increase in the jail population would require an additional 3,528 beds. Using CSS data that a general population bed (not factoring in medical or mental health needs) of $33,408/annually, the additional financial burden to the County of Los Angeles at this very conservative rate would be $6,013,440.00.

41. If a person is released into Los Angeles County today, the County does not have all the programs necessary and appropriate to provide services to such individuals at a level and at a quality that will keep recidivism to its lowest possible rate because of capacity limitations. Generally services in Los Angeles County are provided by slots. So they may have X amount of residential treatment slots, X amount of outpatient substance

abuse treatment slots. And the County slots across the board are maxed out. Currently the county's capacity to even take additional unincarcerated people is limited.

42. When we talk about successful reintegration there are a number of needs that these individuals have, in particular housing. Many of them are leaving custody homeless. And there are laws on the books and definitions that prevent folks who are on parole or on probation from getting Section 8 housing or, into any type of housing. Also Los Angeles County lacks available, affordable units. Even if the money was there I do not know if they could build the units fast enough to accommodate the individuals proposed to be released. If the prisoner release order goes out there is not going to be any ramp-up period. In other words, while releasing people from prison and/or jail is a process that can occur rather quickly and with little strategizing, ramping up to service these individuals in the community will require modifications to enormous systems within the county. Personnel in each service arena would have to be increased to account for the necessary capacity. Finding, hiring, and training qualified individuals takes time. It is critical to find the right people to serve the offenders; it is critical to find the right services for the right offenders. We are not there yet.

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct. Executed this 31 day of OCTOBER at LOS ANGELES, California.

KAREN DALTON

-17-
AMENDED DECLARATION OF EXPERT WITNESS KAREN DALTON