1 | JONES & MAYER
  | Martin J. Mayer (SB # 73890)
2 | Michael R. Capizzi (SB # 35864)
  | Kimberly Hall Barlow (SB # 149902)
3 | Ivy M. Tsai (SB # 223168)
  | 3777 North Harbor Boulevard
4 | Fullerton, California 92835
  | (714) 446-1400; Fax (714) 446-1448
5 | e-mail: mjm@jones-mayer.com
  | e-mail: mrc@jones-mayer.com
6 | e-mail: khb@jones-mayer.com
  | e-mail: imt@jones-mayer.com
7 |
  | Attorneys for Intervenor-Defendants
8 | SAN DIEGO COUNTY SHERIFF WILLIAM B.
  | KOLENDER, ORANGE COUNTY SHERIFF-
9 | CORONER SANDRA HUTCHENS, PLACER
  | COUNTY SHERIFF EDWARD N. BONNER,
10 | BUTTE COUNTY SHERIFF-CORONER PERRY
  | L. RENIFF, CALAVERAS COUNTY SHERIFF
11 | DENNIS DOWNUM, LOS ANGELES COUNTY
  | SHERIFF LEE BACA, SANTA CLARA COUNTY
12 | SHERIFF LAURIE SMITH, SAN BENITO COUNTY
  | SHERIFF CURTIS HILL, STANISLAUS COUNTY
13 | SHERIFF ADAM CHRISTIANSON, MENDOCINO
  | COUNTY SHERIFF TOM ALLMAN, TEHAMA
14 | COUNTY SHERIFF CLAY PARKER, LASSEN
  | COUNTY SHERIFF STEVE WARREN, YOLO
15 | COUNTY SHERIFF ED PRIETO, SANTA BARBARA
  | COUNTY SHERIFF BILL BROWN, KERN COUNTY
16 | SHERIFF DONNY YOUNGBLOOD, SAN MATEO
  | COUNTY SHERIFF GREG MUNKS, YUBA COUNTY
17 | SHERIFF STEVE DURFOR, CONTRA COSTA
  | COUNTY SHERIFF WARREN RUPF,
18 | SHASTA COUNTY SHERIFF TOM BOSENKO,
  | RIVERSIDE COUNTY SHERIFF STANLEY SNIFF JR.,
19 | VENTURA COUNTY SHERIFF BOB BROOKS,
  | SOLANO COUNTY SHERIFF GARY R. STANTON,
20 | SAN LUIS OBISPO COUNTY SHERIFF PAT HEDGES,
  | SUTTER COUNTY SHERIFF JIM DENNEY,
21 | LAKE COUNTY SHERIFF ROD MITCHELL,
  | GLENN COUNTY SHERIFF LARRY JONES,
22 | TUOLUMNE COUNTY SHERIFF JIM MELE,
  | FRESNO COUNTY SHERIFF MARGARET MIMS,
23 | MONTEREY COUNTY SHERIFF MIKE KANALAKIS,
  | MONO COUNTY SHERIFF RICHARD SCHOLL,
24 | HUMBOLDT COUNTY SHERIFF GARY PHILP,
  | EL DORADO COUNTY SHERIFF JEFF NEVES,
25 | MERCED COUNTY SHERIFF MARK PAZIN,
  | DEL NORTE COUNTY SHERIFF DEAN WILSON,
26 | SAN JOAQUIN COUNTY SHERIFF STEVE MOORE,
  | AMADOR COUNTY SHERIFF MARTIN RYAN,
27 | INYO COUNTY SHERIFF WILLIAM LUTZE,
  | STANISLAUS COUNTY CHIEF PROBATION OFFICER
28 | JERRY POWERS, VENTURA COUNTY CHIEF

-1-

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

1  PROBATION OFFICER KAREN STAPLES,
   SOLANO COUNTY CHIEF PROBATION OFFICER
2  ISABELLE VOIT, SANTA BARBARA COUNTY
   CHIEF PROBATION OFFICER PATRICIA STEWART,
3  BUTTE COUNTY CHIEF PROBATION OFFICER JOHN
   WARDELL, SAN LUIS OBISPO COUNTY CHIEF
4  PROBATION OFFICER KIM BARRETT, CONTRA
   COSTA COUNTY CHIEF PROBATION OFFICER
5  LIONEL CHATMAN, INYO COUNTY CHIEF
   PROBATION OFFICER JIM MOFFETT,
6  SHASTA COUNTY CHIEF PROBATION
   OFFICER BRIAN RICHART, YOLO COUNTY
7  CHIEF PROBATION OFFICER DON MEYER,
   FRESNO COUNTY CHIEF PROBATION OFFICER
8  LINDA PENNER, MARIPOSA COUNTY CHIEF
   PROBATION OFFICER GAIL NEAL, CITY OF
9  WHITTIER POLICE CHIEF DAVE SINGER,
   CITY OF ROSEVILLE POLICE CHIEF JOEL NEVES,
10 CITY OF PASADENA POLICE CHIEF BARNEY
   MELEKIAN, CITY OF ALHAMBRA POLICE
11 CHIEF JIM HUDSON, CITY OF FREMONT
   POLICE CHIEF CRAIG STECKLER, CITY OF
12 GROVER BEACH POLICE CHIEF JIM COPSEY,
   CITY OF SANTA CLARA POLICE CHIEF STEVE
13 LODGE, CITY OF VACAVILLE POLICE CHIEF
   RICH WORD, CITY OF WOODLAND POLICE CHIEF
14 CAREY SULLIVAN, CITY OF SONORA POLICE CHIEF
   MACE McINTOSH, CITY OF PASO ROBLES POLICE
15 CHIEF LISA SOLOMON, CITY OF SAN BERNARDINO
   POLICE CHIEF MICHAEL BILLDT, CITY OF
16 ATWATER POLICE CHIEF RICHARD HAWTHORNE,
   NATIONAL CITY POLICE CHIEF ADOLFO GONZALES,
17 CITY OF DELANO POLICE CHIEF MARK DeROSIA,
   CITY OF MODESTO POLICE CHIEF ROY WASDEN,
18 CITY OF FRESNO POLICE CHIEF JERRY DYER, AND
   CITY OF DELANO CHIEF OF CORRECTIONS GEORGE
19 GALAZA

20

21              IN THE UNITED STATES DISTRICT COURTS

22          FOR THE EASTERN DISTRICT OF CALIFORNIA

23          AND THE NORTHERN DISTRICT OF CALIFORNIA

24   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

25    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

26
   RALPH COLEMAN, et al.,          Case No:  CIV S-90-0520 LKK JFM P
27
              Plaintiffs,          **THREE-JUDGE COURT**
28

vs.

ARNOLD SCHWARZENEGGER, et al.,

                    Defendants.

[F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)]

**AMENDED DECLARATION OF EXPERT WITNESS DON MEYER**

---

MARCIANO PLATA, et al.,

                    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.,

                    Defendants.

Case No.:  C01-1351 TEH

**THREE-JUDGE COURT**

I, DON MEYER, hereby declare as follows:

1.      I am the Chief Probation Officer of the Yolo County Probation Department. I was appointed to this position in 2005. In my capacity as Chief, I oversee management of juvenile hall, the juvenile work program, adult work program, adult and juvenile field supervision, and adult and juvenile court investigations.

2.      Prior to my appointment as Chief Probation Officer of Yolo County, I served for approximately 2 years as Chief Probation Officer of Calaveras County Probation Department. My duties included management of adult and juvenile court investigations, as well as adult and juvenile field supervision.

3.      Prior to my appointment as Chief Probation Officer of Calaveras County, I served for approximately 3 years as Chief Deputy Probation Officer of the Sacramento County Probation Department. My primary responsibility was managing the Adult Court Division.

4.      Prior to my appointment as Chief Deputy Probation Officer of the Sacramento County, I served for approximately 2 years as Chief Deputy Probation Officer of the

-3-

1  same department as Division Manager responsible for directing the Juvenile Hall and

2  Juvenile Work Program, and the home supervision program.

3  5.      Prior to my appointment as Chief Deputy Probation Officer of the Sacramento

4  County Probation Department, I served for approximately 3 years as Chief Deputy

5  Probation Officer of the same department as Division Manager responsible for directing

6  the Boys Ranch, a 100-bed camp.

7  6.      Prior to my appointment as Chief Deputy Probation Officer of Sacramento

8  County Probation Department, I served for approximately 3 years as Assistant Chief

9  Deputy Probation Officer of the same department as Assistant Division Manager

10  responsible for the Boys Ranch, supervisor of the treatment program, management of

11  supervisors, training and handling personnel issues.

12  7.      Prior to my appointment as Assistant Chief Deputy Probation Officer of

13  Sacramento County Probation Department, I served for approximately 13 years as a

14  Supervising Probation Officer responsible for the supervision and management of

15  assigned probation officers in the drug intensive unit, an armed unit responsible for

16  supervision of high risk drug offenders and Juvenile Court investigations.  I was assigned

17  as administrative assistant to the Chief Probation Officer.   In this staff position, I

18  reported directly to the Chief Probation Officer.

19  8.      I was a Supervising Probation Officer responsible for Juvenile Hall, the Warren

20  E. Thornton Youth Center and the Juvenile Work Program.

21  9.      Prior to my assignment as a Supervising Probation Officer, I served, from 1972  -

22  1979 as Senior Deputy Probation Officer assigned to the victim-witness program,

23  alternative sentencing program, police-probation program and 601 diversion program.

24  10.     Prior to my assignment as Senior Deputy Probation Officer, I was a Deputy

25  Probation Officer assigned to Juvenile Field supervision, Adult Field supervision,

26  Juvenile Court investigation and Adult Court investigations.

27  11.     I received a Bachelor of Science degree in Business Administration with a

28  concentration in accounting in 1970 from California State University, Sacramento and a

-4-

1 Master of Arts in Correctional Counseling from Chapman University in Orange,

2 California in 1972.

3 12.    My professional affiliations include the California Probation, Parole and

4 Corrections Association, California Association of Probation Institutional Administrators

5 (prior member) and the Chief Probation Officers of California of which I am the

6 President-Elect.

7 13.    I hold a Junior College Teaching Credential. I currently continue to teach PC 832,

8 arrest, search and seizure the POST certified basic core course for peace officer

9 certification  and have taught courses in management of assaultive behavior, juvenile law,

10 emergencies in institutions, juvenile corrections core for the Standards Training for

11 Corrections ("STC").

12 14.    I toured CIM and CIW with other law enforcement intervenors on December 17,

13 2007.  In my career, I have toured jails in Sacramento, San Diego, Woodland, San

14 Bernardino, San Andreas, Humboldt County I have toured prisons in Tehachapi, San Luis

15 Obispo, Corona, Folsom, Atascadero, Solano and San Quentin.  I have toured juvenile

16 institutions in Ione, Nevada County, El Dorado, Stockton, San Joaquin, San Diego,

17 Contra Costa, San Mateo, San Francisco, Santa Clara, Lake, Placer, Sonoma, Napa,

18 Marin, Stanislaus, Tulare, Yuba and Humboldt County.

19 15.    As a practicing probation officer for over 42 years, I have seen the funding of

20 adult community corrections diminish to a point that limited to no rehabilitation takes

21 place at the local level.  The July, 2008 statistical summary from the Yolo County

22 Probation Department reveals the following:

23 16.    In the Yolo County Probation Department Budget of $2.5 million for adults, July

24 statistics indicate there are 3728 adult cases assigned or $670 per adult probationer.  The

25 California Probation Services Survey, prepared by the Administrative Office of the courts

26 in November, 2006, essentially says that adult probation is a mess. For instance, 77% of

27 the probation officer's time is allocated to juvenile services, even though there are four to

28 five times as many adults on probation as juveniles.

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

17.     In Yolo County Juvenile Probation has a $2.5 million budget, 874 cases assigned or $2,870 per juvenile probationer. Implementation of evidence based programs has resulted in a 50% reduction of the juvenile hall population, and a 30% reduction in out of home placements.

18.     There are 1100 cases assigned to 10 deputy probation officers (mainly domestic violence, sex offenders, proposition 36, and mentally ill offender crime reduction grant). An average of 6.73 contacts are made per day, of which 16% were home contacts, 9.5% were field contacts, on a scheduled or unscheduled basis to see how they are doing, and 74.4% were office contacts.

19.     In July, 2008, a total of nine arrests for that month were made by probation field staff and resulted in nine violations. None were arrests for new crimes. For the adult division, 224 drug tests were conducted that month.

20.     The Bank loads, Warrants, Case control report shows that for 2,589 cases, only one deputy probation officer is assigned. The average number of daily contacts was 8.87. Those are people out in the community somewhere. Some come into the office. Others have to be tracked down if there is a warrant out on them.

21.     Of the 310 adult placement cases (placed at residential facilities) usually for drugs, one deputy probation officer is assigned, and made 5.05 contacts per day (all office) in addition to assisting other probationers that come in, typically those that have come out of placement, but are still on probation. Risk assessments (Wisconsin model, 1970's) are conducted on most adult cases, but the results have never been validated for our population. No need assessments were conducted, as there are few and limited services available for treatment at the local level. The most recent crime committed determines who is selected for the most supervision. That means a higher percentage of probationers who are not seen at all.

22.     Almost all of the adult placement cases are in jail when assigned to the Probation Department for placement in an adult residential facility. We lose track of about a third of them, because there is no additional follow up. We may learn about them if they have

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

1    been rearrested or come back to town. The facilities don't always inform us. The other

2    two-thirds of the probationers have stayed in contact with the office or the office staff has

3    called to find out who is still at the facility.

4    23.    Subsequent to July, 2008, we have targeted follow ups on these, because of the

5    frustration of not knowing where they are. A person from the Work Investment Act is

6    being used to follow up and inform the probation officer so that the officer can file a

7    violation of probation declaration for issuance of a warrant.

8    24.    The probation office workload has changed in the last year in that fewer cases

9    have been supervised, because we wanted to focus on the cases that required the most

10   intense supervision. Most of the adult division is reactionary; in that we respond to

11   emergencies and have little ability to provide treatment to adult offenders.

12   25.    There are approximately 65 probation officers in Yolo County. Of those, 11 are

13   adult positions, one of whom is not working due to extended medical leave. There are

14   also 6 deputy probation officers assigned to the court unit and about the same number in

15   the juvenile division. Adult field positions are those assigned to cases placed on formal

16   felony probation by the court. These are the probation officers assigned to the 1100

17   people under direct supervision and the one probation officer  does all the rest. The six

18   deputy probation officers assigned to the court write reports.

19   26.    In 2007, 404 people went to state prison out of Yolo County. There were 627

20   technical violations of probation ("VOP") in the Yolo County Probation Office. This

21   means that the person is out of compliance with their probation conditions. Of that

22   number, 168 or 41% went to prison. Therefore, slightly over one in (three) people went to

23   prison because of a technical violation, not a new crime.

24   27.    Calendar year 2007 total felon admissions to CDCR was 14,311, of which 37%

25   were for drug and property crimes or 5,295 offenders.  Assuming that the prison

26   commitment percentage of Yolo County is an average commitment rate (41% as a result

27   of Violation of Probation) this would equate to 5,867 felons being committed to CDCR

28   from Probation Departments, statewide.  We expect that if Probation is funded properly

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

1  that we can reduce prison commitments of the lower risk by at least 30%, of 5,867, which

2  equates to 1,760 fewer commitments to CDCR annually. Yolo County is ranked 27th in

3  population and 26th in total felon admissions to CDCR.

4  28.    Yolo County accounts for .6 of the total commitments to CDCR (according to

5  CDCR statistics), thus an early release of 30,000 inmates would mean an additional 180

6  felons paroled to Yolo County.  Because we don't have enough services for the existing

7  probation offender population, this additional number will impact the community in the

8  following ways:

9  29.    According to CDCR recidivism statistics (offenders returned to custody), drug

10  and property offenders have some of the higher recidivism rates, and average between

11  36% to 37% for felony parole violators returned with a new term (during calendar year

12  2006).  The recidivism rate increases over a 3 year period to as much as 70% for some

13  offenders (auto theft).

14  30.    We can expect an additional 65 paroled felons will be arrested for a new offense

15  in the first year of parole.  Previous research indicates that offenders are not apprehended

16  for every crime they commit, so we can assume the crime rate will be significantly higher

17  as a result of an active parole population.

18  31.    This will require more law enforcement responses and investigations, more

19  referrals to the District Attorney, more jail bed days for this group further exacerbating

20  the crowding problems at the jail (Federal consent decree, population cap) more Court

21  time hearing cases, more Court trials, more Public Defender time for parolee cases, and

22  more Pre-sentence reports prepared by the Probation Officer.  A number of the new

23  crimes, may end up on a grant of felony probation (depending on plea bargains), thus

24  further impacting minimal probation resources.

25  32.    Researchers seem to agree that appropriate correctional treatment adheres to the

26  following three principles:

27  33.    Risk Principle: To maximize effect on recidivism, treatment should be targeted

28  toward higher risk, rather than lower risk offenders, and the population of treatment

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

1  groups should not be aggregated by risk. Specifically, low risk offenders should not be

2  mixed with high risk offenders because this significantly reduces treatment effect in the

3  low risk population. At best, treatment delivered in this way is ineffective, and at worst,

4  it may increase the likelihood of re-offense (Research from WSIPP contains the same

5  findings).

6  34.      Need Principle: Treatment should be targeted toward dynamic risk factors, also

7  know as criminogenic needs. These are risk factors that can be changed (e.g. substance

8  abuse) as opposed to those that are static (e.g. criminal history).

9  35.      Responsivity Principle: Treatment should use behavioral/structured social

10  learning/cognitive behavioral strategies rather than unstructured, nondirective or "getting

11  in touch" approaches.

12  36.      There are 8 criminogenic factors that are found in high risk and moderate high

13  risk offenders:

14        Anti-social attitudes

15        Antisocial Personality (Impulsive, weak socialization, egocentric, no problem

16        solving skills, etc)

17        Anti-social associates

18        History of anti-social behavior

19        Family and/or marital factors (family factors that include criminality and

20        psychological problems)

21        Low levels of personal, education or vocation achievement

22        Low levels of involvement in pro-social leisure activities (unproductive free time)

23  37.      I would recommend not implementing a population cap that would release

24  parolees to local communities for the following reasons: Parolees, according to CDCR

25  records have high recidivism rates, many have multiple needs, as evidenced by the

26  COMPAS report prepared by CDCR.

27  38.      At a very minimum, Yolo County could expect 60 additional parolees for each

28  10,000 early releases. 21% of the offenders will be under the age of 26, 69% under the

AMENDED DECLARATION OF EXPERT WITNESS DON MEYER

1   age of 40.

2   39.    A review of the Yolo County Inmate Statistics prepared by CDCR for the

3   calendar year 2008 (AB 900, Re-entry Facility data),  projected recidivism rates, absent

4   any treatment or programming, would within two years result in  crimes against persons

5   and crimes of violence for 47 parolees;  Property crimes, two year projected recidivism

6   would result in recidivism of  44 parolees; Drug Crimes two year projected recidivism

7   would result in recidivism of 45 parolees; Other crimes two year projected recidivism

8   would result in recidivism of 24 parolees.    The two year total for parolee recidivism

9   would be 160 parolees or nearly 50% of the projected 331 parolees for Yolo County in

10   2008.

11   40.    The recidivism rate does not include crimes for which parolees were not arrested,

12   but committed and went undetected.  It is clear from past research that higher risk

13   offenders commit multiple crimes before being arrested.

14   41.    The  criminal justice system, treatment providers, community based

15   organizations, Courts, District Attorney, and Probation do not have adequate resources to

16   address the current adult felon probation population, as evidenced by Yolo County

17   Probation Department's inability to provide supervision or treatment to 78% of adult

18   felons currently on probation.  We actively supervise only sex offenders, domestic

19   violence and adult placements.  The total of probationers for July 2008, was 3720, with

20   2900 not being supervised.

21   42.    During 2007, 168 felons were committed to state prison, on a violation of

22   probation.  With resources and effective programming this total can be dramatically

23   reduced.  Assuming that Yolo County has an average commitment rate, then one can

24   project that nearly 6,000 probationers state-wide are sent to prison for technical

25   violations. Having 160 people return to prison over two years means about six and a half

26   additional per month. Since it is not their first time to prison, there are a lot of

27   enhancements and aggravators, so they typically would not plead out. They would go to

28   trial and thus have a greater impact on the resources of the court, the DA, the public

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

1  defender and, ultimately, our department has to write reports on every one of them. That

2  is six and a half additional reports per month on the assumed 50% re-offense rate.

3  43.    The Court system in Yolo County is severely clogged with cases and is several

4  years behind on trials. In addition, the County Jail has a population cap pursuant to a

5  Federal Consent Decree.

6  44.    Research as provided in the Washington State Institute of Public Policy reports

7  clearly outlines that use of evidence based programs (and programs that work) in local

8  communities  as well as in prisons, results in reduction of recidivism, decrease in prison

9  populations, parole and probation caseloads, and jail populations. My experience in

10  delivery of evidence based programs in the juvenile probation services division demands

11  that an offender needs to be properly assessed at the front end of the system, deciding

12  what programs they need to go into, then, making sure it happens. Evidence-based

13  programs must be used. There has been a 50% reduction in custody and at least a

14  significant reduction in out-of-home placements. Kids that we used to have locked up are

15  now staying home and in programs, going to school and not using drugs. This reduction

16  is because of the funding that's enabled the department to provide the programs.

17  45.    It is clear that one of the major reasons for prison crowding and the resulting

18  problems brought forth in the Coleman/Plata litigation has and is the lack of resources for

19  local community corrections.  For instance, as noted previously, Yolo County spends

20  approximately $670 per adult offender and $2500 on juvenile offenders. We have

21  programs for juveniles that simply do not exist for adults.

22  46.    Of interest, is that juvenile crime rates and recidivism are at all time 50-year lows.

23  An alternative to a prisoner release order in Coleman and Plata is the implementation of a

24  statewide evidence-based programming, which would take two to five years, assuming

25  there was funding. Proper funding of the adult system using evidence-based approach

26  programs is the only rational approach to assisting the State in correcting the "prison

27  problem." This approach should include: outcome-based performance, rigorous

28  evaluation, and a positive return on taxpayer involvement.

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

47.    The Washington State Institution of Public Policy documents evidence-based programs that are based upon research over 30 years. It shows that programs delivered with cognitive behavior components, provided with fidelity and measured to make sure that they stay on task, do a tremendous job in reducing recidivism. Institutional populations, parole population and probation populations are reduced as a result.

48.    "Provided with fidelity" means doing it the way you're trained. If you start lecturing instead of using cognitive behavior skills and require that the probationer puts forth some effort to change the way they think, the program will drift and you end up with nothing or they get worse.

49.    The difference between faith based and evidence based programs is that faith based programs are provided by organized religion or a non-religious organization that deals with Christian principles or of the Koran or the Ten Commandments or prayer. Some of these programs may be effective, however there is no data supporting that conclusion.

50.    Evidence-based programs look at the components of the program and the data on outcomes and recidivism. Some programs don't work, some make people worse and some make people better. The evidence has a strong correlation to data as opposed to anecdotal information.

51.    The Washington State Institute for Public Policy report prepared in March 2004 entitled "Sentences for Adult Felons in Washington: Options to Address Prison Overcrowding – Part I (Historical Trends)" provides evidence that if you want to reduce prison populations, evidence-based programming is needed. It's better to deal with offenders first in the community. Then, if you send them off, evidence-based programs need to be in prisons.

52.    We are not able to provide anything to adults when 78% of them are handled by just one person. The impact on recidivism rates in every state that has gone to evidence-based programming has seen a dramatic and positive reduction in recidivism and fewer people to prison. There is more compliance, they are employed and their education level

1   rises. It is clear, that with the right programs, funding and resources, prison commitments

2   could be reduced by up to 30%.

3   53.    I had a list prepared of adult residential facilities that Yolo County uses as

4   referrals, including the location by city and a synopsis of their services. Adults that need

5   to be in such a facility could stay there from 30 days to a year. Of the 108 facilities listed,

6   only 11 are in Yolo County. Most are faith based 12 Step programs. Very few are

7   evidence based.

8   54.    Most probation departments statewide receive about 50% of their funding from

9   the county. However, Yolo County only provides 21% - 22% to our department. The

10  remainder is from outside categorical funding, which is mainly juvenile. There are two

11  mentally ill offender crime reduction grants for adults. The grant for the mentally ill is

12  administered by the Sheriff. The Probation Department has one position for alcohol, drug

13  and mental health.   All of the County's mentally ill offender grants were cut in the last

14  State budget.  Although we currently have a probation officer for Project AIM, it ends in

15  September.

16  55.    Returning to the dismal state of adult probation, California is one of only two

17  states that is funded locally and not at the state level. Resources for adult supervision and

18  programs went away, decades ago. The biggest impact was Proposition 13. If there is a

19  budget crisis at the state level, when it affects the county, adult probation gets cut,

20  because everything else is categorical. Even if juvenile monies are cut there is Title IV-E

21  funding revenue, which cannot be utilized for adults.

22  56.    Additionally, that would impact the jail, because those people tend to spend

23  prolonged periods of time in court pending trial. That also means that anyone else in there

24  serving a sentence would be released due to these extra inmates.  Capital crimes in Yolo

25  is not a big percentage, but the juvenile data shows that there are 8 minors pending adult

26  court.  Five of them have been in there at least a year and 98% of them probably get adult

27  probation.

28  57.    The point is, if there are six and a half more recidivist parolees per month in jail,

-13-

1  that would impact the capacity of the jail. According to the consent decree, when they

2  reach 95% of the 450 people, they have to start releasing people. Sometimes, that is

3  happening on a daily basis.

4  58.      A release of prisoners would adversely impact public safety. Looking at the

5  recidivism rates, for instance, upwards of 70% of people who steal cars re-offend in a two

6  to three-year period. That means they are going to steal multiple cars, affecting multiple

7  victims. That's a public safety issue. People can't get to work, there are high speed

8  chases, because they know they are on parole and they don't want to go back to prison.

9  59.      All of the people who are going to be released back to Yolo County are going to

10  be released at some point anyway, but early release creates an infusion of them on a short

11  time frame, instead of spreading them out, and we don't have the resources to cope with

12  that infusion.

13  60.      It's not just that it would temporarily overload things. If they get the services,

14  then that means probation does not have access for local probationers. Working with

15  them after they have gone through the entire system is not the right or smart thing to do.

16  If you work with them before they get there, a sizeable number are rehabilitated.  The

17  ones that end up in prison deserve to be there. They do recidivate, some at a high level.

18  Absent any resources for probationers, it makes no sense to give resources to parolees

19  and deny them to probationers.

20  61.      Other ways in which a prisoner release order would impact public safety would

21  be the domestic violence, the drug and the alcohol problems, which creates a lot more

22  victims, many parolees have families that are adversely impacted by erratic behavior of

23  the offender.  Armed robbers have a high recidivism rate, which terrifies victims of these

24  violent crimes; first-degree burglars in particular, when they invade your house and take

25  your property.   Property and drug offenders are some of the highest recidivists.

26  62.      When you look at recidivism rates, each arrestee generally has committed more

27  than one crime   As an example, DUI offenders often drive under the influence upwards

28  to 200 times before being arrested.

-14-

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER

62.    Another report from Washington State Institute for Public Police called, "Evidence-Based Adult Corrections Programs: What Works and What Does Not Work" is a review of evidence-based programs for adult offenders to lower the recidivism rates. They reviewed 291 evaluations conducted throughout the U. S. and other countries for the last 35 years and concluded what the specific recidivism rate reduction is. For instance, in the case of county adult drug courts, if you put people in programs, there is an expected 10.7% improvement in the recidivism rate.

63.    I reviewed a California Department of Corrections and Rehabilitation report entitled, "Division of Adult Parole Operation, Mentally Ill Parolee Population," dated March 28, 2008 from the CDCR website. Surprisingly, the number of people with mental health issues was greater than I thought. That is important, because that large number would have a huge impact on our mental health department –alcohol, drug, mental health and community based agencies. It called attention to the significant issue of the need for treatment, medication and supervision. Otherwise, they return to prison, because there are only a couple of thousand mental health beds in the entire state.

64.    The impact of the release of 10,000 parolees statewide would impact mental health services in Yolo County. In the last budget cycle, 30 people were laid off.

65.    There often are long waiting lists for clients of mental health departments, with few resources available to assist the mentally ill offenders.

66.    If there is a prison early release, unless there are resources apart from the county resources that deal specifically with their needs, they are going to end up in the in the criminal justice system.

67.    According to a CDCR report "Total Felons Paroled and Reparoled from an Adult Institution by County of Parole, Calendar Year 2007," during 2007 in Yolo County, 295 were first paroled and 641 were reparoled for a total of 936. Reparole means the parole agent wrote a violation or there was a plea bargain on a new arrest and their parole is revoked and they go back to jail.

68.    This data does not account for the people currently on parole. It may be 800 or

-15-

1  more. It is difficult to calculate, because the caseload is active. People come in and go

2  out. At the end of the month, there's a static number, but it is not reflective of all the

3  parolees who have come and gone during that month period.

4  69.      The state could do some things to mitigate the impacts of a prisoner release order.

5  It could fund community corrections and not send as many people to prison.  The

6  Community Corrections Act as chaptered in Penal Code section 6050 has never been

7  funded.  Community corrections can keep people out of prison and from recidivating,

8  resulting in a reduction in the prison population. The state can do a better job by helping

9  local agencies to work more effectively.  There are, in short, many viable alternatives to a

10  prisoner release order, all of which are likely to have a more positive impact on the

11  community and on the criminals themselves.

12  I declare under penalty of perjury under the laws of the State of California that the

13  foregoing is true and correct. Executed this 30th day of October, 2008  at

14  Woodland, California.

15

16                                                DON MEYER

17

18

19

20

21

22

23

24

25

26

27

28

AMENDED DECLARATION OF EXPERT WITNESS  DON MEYER