1    JONES & MAYER
     Martin J. Mayer (SB # 73890)
2    Michael R. Capizzi (SB # 35864)
     Kimberly Hall Barlow (SB # 149902)
3    Ivy M. Tsai (SB # 223168)
     3777 North Harbor Boulevard
4    Fullerton, California 92835
     (714) 446-1400; Fax (714) 446-1448
5    e-mail: mjm@jones-mayer.com
     e-mail: mrc@jones-mayer.com
6    e-mail: khb@jones-mayer.com
     e-mail: imt@jones-mayer.com
7
     Attorneys for Law Enforcement
8    Intervenor-Defendants

9

10              IN THE UNITED STATES DISTRICT COURTS

11              FOR THE EASTERN DISTRICT OF CALIFORNIA

12              AND THE NORTHERN DISTRICT OF CALIFORNIA

13       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

14          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

15

16   RALPH COLEMAN, et al.,               Case No:  CIV S-90-0520 LKK JFM P

17              Plaintiffs,               **THREE-JUDGE COURT**

18       vs.                              [F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)]

19   ARNOLD SCHWARZENEGGER, et
     al.,

20              Defendants.

21

22   ─────────────────────────           Case No.:  C01-1351 TEH

23   MARCIANO PLATA, et al.,              **THREE-JUDGE COURT**

24              Plaintiffs,               **DECLARATION OF IVY M. TSAI
                                          REGARDING SUBMISSION OF LAW
25       vs.                              ENFORCEMENT INTERVENORS'
                                          EXPERT REPORTS**
26   ARNOLD SCHWARZENEGGER, et
     al.,

27              Defendants.

28

1  I, IVY M. TSAI, declare as follows:

2      1.    I am an attorney licensed to practice before the courts of the State of

3  California.  I admitted to practice before the United States District Courts for the Eastern

4  and Northern Districts of California.  I am employed by the law firm of Jones & Mayer,

5  which represents the Sheriff, Police Chief, Chief Probation, and Chief Corrections

6  Intervener-Defendants (collectively, the "Law Enforcement Intervenors") in this action.  I

7  have personal knowledge of the facts stated in this declaration and could and would

8  competently testify thereto.

9      2.    Attached hereto as Exhibit A is a true and correct copy of Chief Jerry

10  Dyer's expert witness report dated September 15, 2008.

11      3.    Attached hereto as Exhibit B is a true and correct copy of Chief Jerry

12  Power's expert witness report, dated September 15, 2008.

13      I declare under penalty of perjury that the foregoing is true and correct.  Executed

14  this 31[th] of October, 2008 in Fullerton, California.

15

16                              _____
                                IVY M. TSAI
17

18

19

20

21

22

23

24

25

26

27

28

TSAI DECL. RE: SUBMISSION OF LAW ENFORCEMENT INTERVENORS' EXPERT REPORTS

# EXPERT WITNESS REPORT OF JERRY POWERS CHIEF PROBATION OFFICER, STANISLAUS COUNTY, CALIFORNIA

*Colemanv. Schwarzenegger, et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger, et al.*

No. C01-1351 T.E.H.

September 15, 2008

Expert Report of Jerry Powers, Chief Probation Officer

I.     Expert Qualifications

1.  I am the Chief Probation Officer for Stanislaus County. I was appointed as the Chief Probation Officer in November of 2002. As such I have been in a policy and administrative leadership oversight role of a department responsible for the community supervision of approximately 8,000 adult and juvenile felons in both Stanislaus County and other counties within the State of California. Additionally, I am also responsible for the operations of a 158 bed detention facility for minors and younger adults to the age of 19. Department personnel also provide sentencing reports and recommendations to the superior court on adult and juvenile defendants. My department is also involved in collaborative relationships with both public and private providers of rehabilitative programs for offenders. These programs are both voluntary in nature as well as court mandated.

2.  Prior to my appointment as a Chief Probation Officer, I served for approximately 1 year as the Chief Deputy Probation Officer for the department. My area of responsibility was oversight of all adult and juvenile field operations for the department.

3.  Prior to my appointment as a Chief Deputy, I was the Superintendent for the Juvenile Hall detention facility operated by the department. This included oversight of all aspects of the 158 bed facility as well as supervision of the alternatives to custody program which included electronic monitoring, house arrest and a work program.

4.  Prior to my assignment as Superintendent, I was a Supervising Probation Officer for the San Diego County Probation Department. During my term as a supervisor, I spent 3 years as a supervisor in the 500 bed Juvenile Hall. I also supervised the department's grants and special operations division which included community based counseling programs. My final assignment prior to leaving San Diego County was as the supervisor of the adult and juvenile electronic monitoring program for the county.

5.  Prior to my appointment as a supervisor, I was a Senior Probation Officer. My assignments included services to a local school district as a school based probation officer. My area of responsibility included school safety and intervention with high risk students displaying truant behaviors. I also held an assignment providing pre-sentence investigative reports to the adult superior court.

6. Prior to my appointment as a senior probation officer, I was a Deputy Probation Officer. My duties included assignment to a juvenile transitional custody facility as well as preparing juvenile dispositional sentencing reports to the court, and the previously mentioned school based probation officer assignment.

7. Prior to my appointment as a Deputy Probation Officer, I was a Corrections Deputy Probation Officer. My assignments included working in a juvenile commitment facility and also an assignment to an adult detention facility/camp.

8. I hold state certifications in Adult/Juvenile Corrections Officer, Deputy Probation Officer, Corrections Supervisor, and Corrections Manager/Administrator.

9. I have a BA in Psychology from the University of California at San Diego.

10. I am a member of the following professional associations: American Probation and Parole Association, California Probation Parole Correctional Association, Stanislaus County Law Enforcement Executives Association, Chief Probation Officers of California. I have served one term as the president of the Stanislaus County Law Enforcement Executives Association, and am currently serving my second term as the president of the Chief Probation Officers of California.

11. I am a Governor's appointee to the California Council on Criminal Justice and The California Sex Offender Management Board

II. Expert Opinions on the impact of a Prisoner Release Order (PRO):

A Prisoner Release Order will have a significant negative impact on local public safety, and is not the only method available to address the issues being litigated.

The release of prisoners from the state prison system regardless of the method of obtaining a population cap will significantly impact all aspects of the local public safety system and the communities into which the individuals are released.

For purposes of demonstration, if the release order were to require the drawing down of the population by 30,000 offenders, these individuals would return to the communities with little or no rehabilitative programs and virtually no prospect of remaining out of the local system.

Plaintiffs' expert report filed by James Austin acknowledges that only 21% of the institutional population was involved in any proven recidivism reduction programs. Mr. Austin also opines that virtually no classification or assessment is accomplished within the facilities, and those that are assessed were most likely invalid because they are administered in a common area where other inmates are present. Given the above, the chance that the 21% who are in rehabilitative programs are in programs appropriate to their needs is not known and probably less than the 21%.

Using CDCR statistics, over a 3 year period the general return rate of offenders to prison is reported at 54%. For some categories of crime such as auto theft, the return rate is over 70%. Burglary and robbery return rates are over 60%.

Plaintiffs have suggested that the public safety impact of a prison release order can be mitigated by releasing those "low risk", or sometimes referred to as "low level" offenders. In fact reviewing CDCR recidivism rates reveals that those individuals that are typically lumped into this classification generally have the highest recidivism rates. These are typically property related offenses such as auto theft (71.36 %) and other property offenses (60.62%). In fact, those with the lowest recidivism rates tend to be those who have paroled for the most serious offenses including Murder, Second Degree (6.38%) -- although a small number and probably not statistically significant -- or vehicular manslaughter (22.7%).

Lastly, research has revealed that placing low risk offenders into high risk environments and programs essentially increases their risk to high. The lack of classification and segregation as well as programming in the CDCR facilities essentially ensures that most offenders are in fact high risk of reoffending as demonstrated by the recidivism rates.

Using the reported 54% general recidivism rate and a hypothetical 30,000 released offenders, would result in 16,200 of them reoffending and being recommitted over a 3 year period. It is not unreasonable to also expect that these individuals will have committed significantly more offenses that do not result in arrest, thereby multiplying the actual crime impact to communities by several orders of magnitude. Additionally, it is also not unreasonable to expect that some of the remaining 13,200 will also reoffend but not result in arrest, further exacerbating the public safety impact to the communities.

Plaintiffs' experts have stated that the impact of the release would be short lived as the system adjusted to the cap with respect to intake at the state end of the system. The statement is probably accurate from the state perspective, but again will result in a negative public safety impact locally.

Given that the average length of stay is 11.4 months as reported by CDCR and Mr. Austin, and the last reported number of admissions of over 140,000 a court imposed cap will result in the continued diversion of prisoners, who lacking the cap would have been committed and confined in CDCR institutions, one would expect that in years going forward significant diversion of offenders to local resources will be required. Currently those local resources do not exist from a custody or community supervision and treatment perspective. Due to the nature of the risk posed by these offenders, they will simply back up into the local system and force more offenders out of custody, treatment and supervision programs resulting in a further degradation of local public safety.

Given that the initial wave of releases will work their way through the system as per the Plaintiffs' expert's report, the inability to send new commitments to the CDCR because of a lower population cap will result in approximately **30,000 per year (based on the average term of 11.4 months at CDCR)** additional offenders per year requiring local services. This will be in the form of either state prison commitments completing time in already overcrowded local jails because of reduced intake at the state level, or a forced restructuring of local sentencing practices that results in more individuals being sentenced to local custodial time and probation terms. This in turn will result in a shifting of the current local custodial population to accommodate this population. Given the current population caps at the local level this will result in a significant increase in early releases from local custodial facilities and further erosion of local custodial consequences and public safety. Additionally, this will result in a significant increase in local probation grants and increased demands on the county operated probation programs that already average over 200 offenders per probation officer in many counties. Statewide currently there are over 300,000 offenders on probation grants. There are approximately 1400 officers statewide to supervise them. This results in many offenders going entirely unsupervised and receiving little to no services during their probationary term. An addition of 20-30,000 new offenders annually will exacerbate an already overwhelmed local probation system.

III.    Proposed Alternatives

Current scenarios presented by plaintiffs and their experts center around population caps and prisoner release orders. All of the proposals are centered around alternatives that happen after a commitment to CDCR. These proposals fail to acknowledge the true "driver" of the state CDCR population, that is, the local criminal justice system. For example, in excess of 90% of all offenders who are committed to CDCR are "graduates" of the county probation system. These probationers feed the state system either by virtue of new arrests which result in commitments,

probation revocations, or they were prior probationers who in some instances are ineligible for probation, or simply result in a prison commitment. Ten percent (14,000+) of CDCR commitments annually are the result of technical probation violations that result in a commitment to CDCR.

Certainly there have been significant plans put forth to increase capacity of the state system through AB900 and even the court appointed medical receiver's efforts at building additional medical facility beds. Given the best of environments these measures will take several years to bring on line.

A more effective and responsible approach to dealing with overcrowding than a prison release order or population cap would be to address the feeder system that drives the population numbers from the local to the state. By taking a comprehensive view of the criminal justice system, a much more effective and responsible approach to population reduction in the CDCR system is to address the probation population. There are several compelling reasons to target this population:

- The population generally is lower risk, and thus much less a threat to public safety as they are generally already in the community.
- Given the lower risk profile of the population they also tend to be a lower need population in terms of services.
- Services to the population can be provided in most instances on an "outpatient" or out of custody basis.
- These services tend to be less costly when provided at the local level. In many instances they can be provided by local groups at much less cost to government.
- The reported cost to incarcerate in state prison is $40,000 annually per offender, with very little treatment and high recidivism. The cost for community supervision and treatment is less than half that amount, and using evidenced based programming can reduce recidivism significantly below CDCR rates.

In essence, a properly funded community corrections program consisting of community probation supervision, evidence based programs provided to offenders while in local custody and post custody in the community, supported by probation supervision will result in the desired population reduction at the CDCR institutions.

Most successful models from around the country of this type of program have used an incentive based funding system. That is as counties and programs reduce their commitments to CDCR they are incentivized to fund their local programs in a manner that further allows them to reduce

their reliance on state level custodial options. Based on best practice results as well as results from other states, it is not unreasonable to expect a conservative reduction of 20-25,000 offenders going forward per year. Given the significant parole revocation problems in the CDCR system this reduction would actually result in significantly fewer admissions than the 20-25,000 figure cited above. This would ultimately result in the desired population reduction at much less risk to public safety and at significant cost savings to the State of California in reduced custodial costs which can be used to fund the programs required to achieve the reduction.

Dated: September 15, 2008

_____
JERRY POWERS

# PROOF OF SERVICE
## (§ 1013a, 2015.5 C.C.P.)

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

I am employed in the aforesaid county; I am over the age of eighteen years and not a party to the within entitled action; my business address is: 3777 N. Harbor Boulevard, Fullerton, California 92835.

On **September 15, 2008**, I served the within **EXPERT REPORT OF JERRY POWERS**, on the interested parties in said action by placing [X] a true and correct copy or [ ] the delivered by one or more of the means set forth below:

**SEE ATTACHED SERVICE LIST**

[x ]    [*Via Mail*]  By depositing said envelope with postage thereon fully prepaid in the United States mail at La Habra, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Fullerton, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit of mailing in affidavit.

[ ]    [*Personal Delivery*]   I cause the above referenced document(s) to be delivered to the addressee set forth above.

[ ]    [*Overnight Courier*]   I caused the above referenced document(s) to be delivered to an overnight delivery service, for delivery to the addressee(s) on the attached service list.

[ ]    [*Via Facsimile Transmission*]   I caused the above referenced document(s) to be transmitted to the named person(s) to the fax number(s) set forth on the attached Service List.

[x]    [*Federal*]   I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **September 15, 2008**, at Fullerton, California.

Marilyn L. Tallef

## SERVICE LIST

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Prison Law Office
Donald Specter
Steven Fama
E. Ivan Trujillo
Sara Norman
Alison Hardy
Rebekah Evenson
1917 Fifth Street
Berkeley, CA 94710

The Legal Aid Society–
Employment Law Center
Claudia Center
600 Harrison Street, Suite 120
San Francisco, CA 94107

Bingham, McCutchen, LLP
Warren E. George
Three Embarcadero Center
San Francisco, CA 94111

Lisa A. Tillman
Deputy Attorney General
P. O. Box 944255
Sacramento, CA 94244-2550

Steven S. Kaufhold
Teresa Wang
Akin Gump Strauss Hauer & Feld, LLP
580 California, Suite 1500
San Francisco, CA 94104-1036

Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403-2815

Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
County of Santa Clara
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

K&L Gates LLP
Jeffrey L. Bornstein
Edward P. Sangster
Raymond E. Loughrey
55 Second Street, Suite 1700
San Francisco, CA 94105-3493

Rosen, Bien & Galvan, LLP
Michael W. Bien
Jane E. Kahn
Amy Whelan
Lori Rifkin
Lisa Ells
315 Montgomery Street, 10th Floor
San Francisco, CA 94104

Natalie Leonard
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

Paul B. Mello, Esq.
Hanson Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

William E. Mitchell
Assistant District Attorney
Riverside County District Attorney's Office
4075 Main Street, First Floor
Riverside, CA 92501

Rochelle East
Office of Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004

California Department of Corrections and Rehabilitation
Adult Research Branch

June 2008

**One, Two, Three Year Follow-up Recidivism Rates**
**For All Paroled Felons Released from Prison for the First Time in 2004[1]**
**Under the Supervision of the California Department of Corrections and Rehabilitation**

| Principal Commitment Offense | Number Paroled[5] | Returned to Prison Within:[2] | | | | | |
|---|---|---|---|---|---|---|---|
| | | One Year | | Two Years[3] | | Three Years[4] | |
| | | Number[5] | Percent[6] | Number[5] | Percent[6] | Number | Percent[6] |
| Murder First (old law) | 5 | 0 | | 0 | | 0 | |
| Murder First (new law) | 11 | 0 | | 0 | | 0 | |
| Murder Second (old law) | 2 | 0 | | 0 | | 0 | |
| Murder Second (new law) | 47 | 1 | 2.13% | 2 | 4.26% | 3 | 6.38% |
| Manslaughter | 323 | 59 | 18.27% | 106 | 32.82% | 124 | 38.39% |
| Vehicular Manslaughter | 163 | 19 | 11.66% | 31 | 19.02% | 37 | 22.70% |
| Robbery | 2,659 | 942 | 35.43% | 1,421 | 53.44% | 1,630 | 61.30% |
| Assault/Deadly WP | 2,912 | 969 | 33.28% | 1,427 | 49.00% | 1,617 | 55.53% |
| Attempted Murder First | 7 | 0 | | 0 | | 1 | |
| Attempted Murder Second | 192 | 34 | 17.71% | 58 | 30.21% | 72 | 37.50% |
| Other Assault/Battery | 4,820 | 1,830 | 37.97% | 2,579 | 53.51% | 2,858 | 59.29% |
| Rape | 224 | 45 | 20.09% | 77 | 34.38% | 94 | 41.96% |
| Lewd Act With Child | 1,098 | 213 | 19.40% | 319 | 29.05% | 389 | 35.43% |
| Oral Copulation | 108 | 29 | 26.85% | 55 | 50.93% | 62 | 57.41% |
| Sodomy | 31 | 7 | 22.58% | 7 | 22.58% | 10 | 32.26% |
| Sexual Penetration with Object | 62 | 20 | 32.26% | 27 | 43.55% | 31 | 50.00% |
| Other Sex | 1,083 | 486 | 44.88% | 647 | 59.74% | 709 | 65.47% |
| Kidnapping | 124 | 27 | 21.77% | 45 | 36.29% | 51 | 41.13% |
| Burglary First | 1,928 | 751 | 38.95% | 1,079 | 55.96% | 1,174 | 60.89% |
| Burglary Second | 4,232 | 1,899 | 44.87% | 2,475 | 58.48% | 2,653 | 62.69% |
| Grand Theft | 2,055 | 757 | 36.84% | 1,038 | 50.51% | 1,114 | 54.21% |
| Petty Theft With Prior | 3,701 | 1,699 | 45.91% | 2,223 | 60.06% | 2,361 | 63.79% |
| Receiving Stolen Property | 2,675 | 1,300 | 48.60% | 1,677 | 62.69% | 1,756 | 65.64% |
| Vehicle Theft | 3,942 | 2,176 | 55.20% | 2,688 | 68.19% | 2,813 | 71.36% |
| Forgery/Fraud | 2,318 | 774 | 33.39% | 1,101 | 47.50% | 1,188 | 51.25% |
| Other Property | 546 | 225 | 41.21% | 313 | 57.33% | 331 | 60.62% |
| CS Possession | 9,223 | 4,061 | 44.03% | 5,543 | 60.10% | 5,958 | 64.60% |
| CS Possession for Sale | 6,113 | 1,697 | 27.76% | 2,515 | 41.14% | 2,776 | 45.41% |
| CS Sales | 1,709 | 482 | 28.20% | 683 | 39.96% | 759 | 44.41% |
| CS Manufacturing | 1,074 | 184 | 17.13% | 303 | 28.21% | 337 | 31.38% |
| CS Other | 402 | 164 | 40.80% | 216 | 53.73% | 234 | 58.21% |
| Hashish Possession | 26 | 13 | 50.00% | 15 | 57.69% | 16 | 61.54% |
| Marijuana Possession for Sale | 632 | 182 | 28.80% | 259 | 40.98% | 283 | 44.78% |
| Marijuana Sale | 252 | 83 | 32.94% | 108 | 42.86% | 118 | 46.83% |
| Marijuana Other | 107 | 30 | 28.04% | 46 | 42.99% | 49 | 45.79% |
| Escape | 90 | 43 | 47.78% | 55 | 61.11% | 58 | 64.44% |
| Driving Under Influence | 1,759 | 367 | 20.86% | 578 | 32.86% | 674 | 38.32% |
| Arson | 175 | 60 | 34.29% | 84 | 48.00% | 92 | 52.57% |
| Possession Weapon | 3,009 | 1,361 | 45.23% | 1,824 | 60.62% | 1,989 | 66.10% |
| Other Offenses | 2,170 | 776 | 35.76% | 1,072 | 49.40% | 1,194 | 55.02% |
| **TOTAL** | **62,009** | **23,765** | **38.33%** | **32,696** | **52.73%** | **35,615** | **57.44%** |

* See back page for definitions and formula
[1] First releases to parole include those paroled for the first time from prison on a new admission to prison and paroled for the first time following return to prison with a new court commitment. Returns to prison on new court commitments following discharge on this parole are not included.
[2] Returns to prison on new court commitments following discharge on this parole are not included.
[3] Returns within two years include returns within one year.
[4] Returns within three years include returns within one and two years.
[5] Numbers may have changed from prior version of report based on updated data.
[6] Percentages not computed for less than 20 releases to parole.



California Department of Corrections and Rehabilitation
Adult Research Branch

June 2008

**One, Two, Three Year Follow-up Recidivism Rates**
**For Paroled Female Felons Released from Prison for the First Time in 2004[1]**
**Under the Supervision of the California Department of Corrections and Rehabilitation**

| Principal Commitment Offense | Number Paroled [5] | Returned to Prison Within:[2] | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | | One Year | | Two Years [3] | | Three Years [4] | |
| | | Number [6] | Percent [6] | Number [6] | Percent [6] | Number | Percent [6] |
| Murder First (old law) | 1 | 0 | | 0 | | 0 | |
| Murder First (new law) | 1 | 0 | | 0 | | 0 | |
| Murder Second (old law) | 0 | 0 | | 0 | | 0 | |
| Murder Second (new law) | 5 | 0 | | 0 | | 0 | |
| Manslaughter | 25 | 3 | 12.00% | 4 | 16.00% | 6 | 24.00% |
| Vehicular Manslaughter | 27 | 1 | 3.70% | 2 | 7.41% | 3 | 11.11% |
| Robbery | 163 | 47 | 28.83% | 69 | 42.33% | 82 | 50.31% |
| Assault/Deadly WP | 169 | 51 | 30.18% | 82 | 48.52% | 96 | 56.80% |
| Attempted Murder First | 1 | 0 | | 0 | | 0 | |
| Attempted Murder Second | 8 | 1 | | 1 | | 1 | |
| Other Assault/Battery | 286 | 74 | 25.87% | 114 | 39.86% | 128 | 44.76% |
| Rape | 1 | 0 | | 0 | | 0 | |
| Lewd Act With Child | 11 | 2 | | 3 | | 4 | |
| Oral Copulation | 6 | 2 | | 4 | | 4 | |
| Sodomy | 0 | 0 | | 0 | | 0 | |
| Sexual Penetration With Object | 0 | 0 | | 0 | | 0 | |
| Other Sex | 24 | 6 | 25.00% | 11 | 45.83% | 13 | 54.17% |
| Kidnapping | 18 | 3 | | 4 | | 6 | |
| Burglary First | 130 | 35 | 26.92% | 50 | 38.46% | 54 | 41.54% |
| Burglary Second | 574 | 171 | 29.79% | 261 | 45.47% | 286 | 49.83% |
| Grand Theft | 379 | 79 | 20.84% | 119 | 31.40% | 131 | 34.56% |
| Petty Theft With Prior | 701 | 228 | 32.52% | 314 | 44.79% | 345 | 49.22% |
| Receiving Stolen Property | 352 | 129 | 36.65% | 182 | 51.70% | 193 | 54.83% |
| Vehicle Theft | 339 | 154 | 45.43% | 202 | 59.59% | 216 | 63.72% |
| Forgery/Fraud | 748 | 192 | 25.67% | 296 | 39.57% | 321 | 42.91% |
| Other Property | 75 | 16 | 21.33% | 26 | 34.67% | 28 | 37.33% |
| CS Possession | 1,253 | 440 | 35.12% | 633 | 50.52% | 696 | 55.55% |
| CS Possession for Sale | 711 | 140 | 19.69% | 242 | 34.04% | 273 | 38.40% |
| CS Sales | 183 | 45 | 24.59% | 63 | 34.43% | 71 | 38.80% |
| CS Manufacturing | 117 | 17 | 14.53% | 28 | 23.93% | 30 | 25.64% |
| CS Other | 85 | 20 | 23.53% | 23 | 27.06% | 26 | 30.59% |
| Hashish Possession | 2 | 1 | | 1 | | 1 | |
| Marijuana Possession for Sale | 32 | 7 | 21.88% | 11 | 34.38% | 11 | 34.38% |
| Marijuana Sale | 13 | 2 | | 3 | | 4 | |
| Marijuana Other | 3 | 0 | | 1 | | 2 | |
| Escape | 15 | 2 | | 4 | | 6 | |
| Driving Under Influence | 105 | 23 | 21.90% | 36 | 34.29% | 41 | 39.05% |
| Arson | 21 | 8 | 38.10% | 12 | 57.14% | 12 | 57.14% |
| Possession Weapon | 77 | 25 | 32.47% | 35 | 45.45% | 42 | 54.55% |
| Other Offenses | 183 | 54 | 29.51% | 74 | 40.44% | 85 | 46.45% |
| TOTAL | 6,844 | 1,978 | 28.90% | 2,910 | 42.52% | 3,217 | 47.00% |

* See back page for definitions and formula

[1] First releases to parole include those paroled for the first time from prison on a new admission to prison and paroled for the first time following return to prison with a new court commitment. Returns to prison on new court commitments following discharge on this parole are not included.

[2] Returns to prison on new court commitments following discharge on this parole are not included.

[3] Returns within two years include returns within one year.

[4] Returns within three years include returns within one and two years.

[5] Numbers may have changed from prior version of report based on updated data.

[6] Percentages not computed for less than 20 releases to parole.

California Department of Corrections and Rehabilitation
Adult Research Branch

June 2008

**One, Two, Three Year Follow-up Recidivism Rates**
**For Paroled Male Felons Released from Prison for the First Time in 2004[1]**
**Under the Supervision of the California Department of Corrections and Rehabilitation**

| Principal Commitment Offense | Number Paroled [5] | Returned to Prison Within:[2] | | | | | |
|---|---|---|---|---|---|---|---|
| | | One Year | | Two Years [3] | | Three Years [4] | |
| | | Number [5] | Percent [6] | Number [5] | Percent [6] | Number | Percent [6] |
| Murder First (old law) | 4 | 0 | | 0 | | 0 | |
| Murder First (new law) | 10 | 0 | | 0 | | 0 | |
| Murder Second (old law) | 2 | 0 | | 0 | | 0 | |
| Murder Second (new law) | 42 | 1 | 2.38% | 2 | 4.76% | 3 | 7.14% |
| Manslaughter | 298 | 56 | 18.79% | 102 | 34.23% | 118 | 39.60% |
| Vehicular Manslaughter | 136 | 18 | 13.24% | 29 | 21.32% | 34 | 25.00% |
| Robbery | 2,496 | 895 | 35.86% | 1,352 | 54.17% | 1,548 | 62.02% |
| Assault/Deadly WP | 2,743 | 918 | 33.47% | 1,345 | 49.03% | 1,521 | 55.45% |
| Attempted Murder First | 6 | 0 | | 0 | | 1 | |
| Attempted Murder Second | 184 | 33 | 17.93% | 57 | 30.98% | 71 | 38.59% |
| Other Assault/Battery | 4,534 | 1,756 | 38.73% | 2,465 | 54.37% | 2,730 | 60.21% |
| Rape | 223 | 45 | 20.18% | 77 | 34.53% | 94 | 42.15% |
| Lewd Act With Child | 1,087 | 211 | 19.41% | 316 | 29.07% | 385 | 35.42% |
| Oral Copulation | 102 | 27 | 26.47% | 51 | 50.00% | 58 | 56.86% |
| Sodomy | 31 | 7 | 22.58% | 7 | 22.58% | 10 | 32.26% |
| Sexual Penetration with Object | 62 | 20 | 32.26% | 27 | 43.55% | 31 | 50.00% |
| Other Sex | 1,059 | 480 | 45.33% | 636 | 60.06% | 696 | 65.72% |
| Kidnapping | 106 | 24 | 22.64% | 41 | 38.68% | 45 | 42.45% |
| Burglary First | 1,798 | 716 | 39.82% | 1,029 | 57.23% | 1,120 | 62.29% |
| Burglary Second | 3,658 | 1,728 | 47.24% | 2,214 | 60.52% | 2,367 | 64.71% |
| Grand Theft | 1,676 | 678 | 40.45% | 919 | 54.83% | 983 | 58.65% |
| Petty Theft With Prior | 3,000 | 1,471 | 49.03% | 1,909 | 63.63% | 2,016 | 67.20% |
| Receiving Stolen Property | 2,323 | 1,171 | 50.41% | 1,495 | 64.36% | 1,563 | 67.28% |
| Vehicle Theft | 3,603 | 2,022 | 56.12% | 2,486 | 69.00% | 2,597 | 72.08% |
| Forgery/Fraud | 1,570 | 582 | 37.07% | 805 | 51.27% | 867 | 55.22% |
| Other Property | 471 | 209 | 44.37% | 287 | 60.93% | 303 | 64.33% |
| CS Possession | 7,970 | 3,621 | 45.43% | 4,910 | 61.61% | 5,262 | 66.02% |
| CS Possession for Sale | 5,402 | 1,557 | 28.82% | 2,273 | 42.08% | 2,503 | 46.33% |
| CS Sales | 1,526 | 437 | 28.64% | 620 | 40.63% | 688 | 45.09% |
| CS Manufacturing | 957 | 167 | 17.45% | 275 | 28.74% | 307 | 32.08% |
| CS Other | 317 | 144 | 45.43% | 193 | 60.88% | 208 | 65.62% |
| Hashish Possession | 24 | 12 | 50.00% | 14 | 58.33% | 15 | 62.50% |
| Marijuana Possession for Sale | 600 | 175 | 29.17% | 248 | 41.33% | 272 | 45.33% |
| Marijuana Sale | 239 | 81 | 33.89% | 105 | 43.93% | 114 | 47.70% |
| Marijuana Other | 104 | 30 | 28.85% | 45 | 43.27% | 47 | 45.19% |
| Escape | 75 | 41 | 54.67% | 51 | 68.00% | 52 | 69.33% |
| Driving Under Influence | 1,654 | 344 | 20.80% | 542 | 32.77% | 633 | 38.27% |
| Arson | 154 | 52 | 33.77% | 72 | 46.75% | 80 | 51.95% |
| Possession Weapon | 2,932 | 1,336 | 45.57% | 1,789 | 61.02% | 1,947 | 66.41% |
| Other Offenses | 1,987 | 722 | 36.34% | 998 | 50.23% | 1,109 | 55.81% |
| **TOTAL** | 55,165 | 21,787 | 39.49% | 29,786 | 53.99% | 32,398 | 58.73% |

* See back page for definitions and formula

[1] First releases to parole include those paroled for the first time from prison on a new admission to prison and paroled for the first time following return to prison with a new court commitment. Returns to prison on new court commitments following discharge on this parole are not included.

[2] Returns to prison on new court commitments following discharge on this parole are not included.

[3] Returns within two years include returns within one year.

[4] Returns within three years include returns within one and two years.

[5] Numbers may have changed from prior version of report based on updated data.

[6] Percentages not computed for less than 20 releases to parole.

California Department of Corrections and Rehabilitation
Adult Research Branch
June 13, 2008

# DEFINITIONS AND FORMULA

**Recidivist:**  A felon who returns to prison for any reason during a specified follow-up period.

**Return to prison:**  Includes felons who are returned to Substance-Abuse Treatment-Control Units in correctional facilities; returned pending a revocation hearing by the Board of Prison Terms on charges of violating the conditions of parole; returned to custody for parole violations to serve revocation time; or returned to prison by a court for a new felony conviction.

**First release to parole:**  The first release to parole for felon with new admissions and parole violators returned with a new term (PV-WNT) during a calendar year.

**Recidivism rate:**  The ratio of the number of recidivists (number returned) to the number of felons at risk of recidivating (number paroled) during the specified period, times one hundred.

**How California Department of Corrections and Rehabilitation (CDCR) calculates recidivism:** The recidivism rate starts with a cohort of felon offenders who are released to parole in a given year. They are tracked for a period of three years to determine if they return to prison. The release cohort includes only offenders, who are paroled for the first time from prison on a new admission to prison or paroled for the first time following return to prison with a new court commitment. The recidivism rate does not include parole violators who are re-released.

For more information on <u>recidivism</u> please contact:

Paula Agostini, Chief
CDCR Adult Research Branch
P.O. Box 942883, Rm 508-S
Sacramento, CA 95811-7243

E-Mail: OAR@cdcr.ca.gov

# EXPERT WITNESS REPORT OF JERRY DYER
# CITY OF FRESNO CHIEF OF POLICE

*Coleman v. Schwarzenegger, et al.,*

## No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger, et al.*

## No. C01-1351 T.E.H.

## September 15, 2008

I.    QUALIFICATIONS

1.    I am the Chief of Police of the Fresno Police Department. I have served as the Chief for seven years, having been appointed Chief on August 1, 2001. The City of Fresno is the sixth largest municipality in California with nearly a half million residents. The Fresno Police department has 843 authorized sworn officer positions and 476 authorized civilian positions for a workforce of 1,319 people. The Fresno Police Department is a nationally accredited law enforcement agency. On July 30, 2005 the Fresno Police Department earned its accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), becoming the largest municipality in California to receive national accreditation. On July 30, 2008, the Fresno Police Department earned re-accreditation from CALEA. Fewer than four percent of law enforcement agencies nation wide have been able to earn accreditation.

2.    I currently serve as the President of the California Chiefs of Police Association, having been appointed to the position March 5, 2008. Prior to my position as President of the Association I served as First Vice-President, Second Vice-President and Third Vice-President. This position has caused me to become involved in a number of statewide concerns, including the issues of prison reform and the early release of prisoners.

3.    I currently serve as the Chair for the California Central Valley "High Intensity Drug Trafficking Area" Board. This position has given me broader insight into the workings of drug trafficking organizations operating in California and those that work for them to include illegal immigrants and former state prisoners.

4.    I currently serve as an Advisory Board member of Governor Schwarzenegger's California Gang Reduction Intervention Program. I also serve as a voting member of the Sacramento Regional Threat Assessment Center Governance Board.

5.    I have earned a Bachelor of Science Degree in Criminology from California State University Fresno; a Master's Degree in Management from California Polytechnic University at Pomona: and I am a graduate of the California Command College, a graduate level program for law enforcement leadership.

6.    In my nearly thirty years as a police officer I have worked a variety of assignments that have allowed me to much better understand the impact of parolees in a community. During my first five years as a police officer I worked the streets as a patrol officer. Much of that time was spent in the central part of Fresno where we have historically had a high concentration of parolees. I therefore had many contacts with parolees, generally on a daily basis. I had the opportunity to see some parolees succeed in their efforts to reintegrate themselves back into the community. Unfortunately however, I saw a great many more fail, especially if they were poorly supervised or did not have adequate community resources in place to help them turn away from their life of crime.

7.    During my eight years as a police sergeant I worked a variety of assignments, including supervising a patrol tactical team, supervising street level narcotics officers and then later major narcotics enforcement teams. This lead me to deal frequently with career criminals,

many of whom were parolees or former state prisoners. I also served as a SWAT sergeant and often had to confront dangerous career criminals who had once again resumed their criminal lifestyle upon release from prison.

8.      During the next four years I served as police lieutenant. One of my duties included being an Area Commander in the Central Policing District where I had management control over teams working street crime issues. As mentioned previously this district has a high concentration of parolees.

9.      Later when I was promoted to police captain I was assigned as the Commander of the Southeast Policing District. It was at this time that I had an opportunity to extensively analyze crime trends and data for a large portion of the city. This research made it very clear that gang members and parolees, while a small percentage of the overall community, were responsible for a large percentage of crime occurring in Fresno.

10.     On March 13, 1999 I was promoted to Deputy Chief where I was in charge of the Field Operations Division, which includes our patrol officers. I was later promoted to Assistant Chief of Police.

11.     Upon being promoted to Chief of Police, knowing that parolees were involving themselves in a proportionally large percentage of crimes I put in place a Parolee Apprehension Team. This team was designed to locate and arrest parolees who were absconding from parole, knowing that getting them off the street sooner would help reduce crime in the community. This program has proven to be very successful. However it was also important to partner with various community based organizations and other government service providers to help gather the resources that a recently released prisoner would need to help mainstream them back into our community. These efforts have also proven successful and prevention and intervention are an integral part of our efforts in dealing with parolees.

12.     As Chief I also caused the development and implementation of "Crime View." "Crime View" was adopted as part of our agency's Smart Policing philosophy. The goal of Crime View is to rapidly identify and respond to criminal activity, using near real time data to allow us to quickly identify emerging crime trends, develop strategies and to deploy our resources more effectively and efficiently. Much of the data and intelligence gathered from this department wide crime view effort supports our conclusions about parolees being responsible for a significant percentage of crime.

13.     As an intervener for the City of Fresno on this issue I have visited various state prisons, to include Wasco, Corcoran and San Quentin. This has allowed me to take a close look at these facilities and some of the issues involved in our corrections system. I was also one of the six individuals selected by Justice Elwood Lui to participate in a working group to develop alternatives to prisoner release as part of the attempted settlement agreement in this case.

It is difficult to predict the exact impact the release of forty thousand criminals released from prison would have on our communities; however, it is safe to say that in the City of Fresno, it would have an extremely detrimental effect on public safety. If the release of forty thousand prisoners occurs, it is estimated that 4.8% or 1,920 would be released to the County of Fresno with the vast majority to reside in the City of Fresno.

At this time, we do not know the specifics on the prisoners that are to be released; however, it can be expected that they will have similar criminal histories as those persons being released on parole. Currently, there are approximately six thousand parolees residing within the County of Fresno, with five thousand of those residing in the City of Fresno. Each month, approximately 120 prisoners are paroled to Fresno County, with 80% residing in the city of Fresno. Commitment offenses for parolees in the County of Fresno include:

| | | |
|---|---|---|
| 1. | 16.6% | Use and Possession of Narcotics |
| 2. | 12.5% | Auto Theft |
| 3. | 12.5% | Burglary |
| 4. | 12.5% | Receiving Stolen Property |
| 5. | 8.3% | Grand Theft |
| 6. | 8.3% | Spousal Abuse |
| 7. | 8.3 | Firearms Offenses |
| 8. | 5% | Sale of Narcotics |
| 9. | 5% | Petty Theft with Priors |
| 10. | 4% | Sex Offenses |
| 11. | 2.5% | Child Abuse |
| 12. | 4.5% | Financial Crimes (fraud, identity theft) |

According to Parole Agent, Daniel Renteria, the majority of these commitments are not the result of a first time conviction. Most of these offenders have multiple arrests preceding their commitment to prison. In most cases, the first two or three convictions result in diversion or probation commitments.

Those offenders who are convicted and sentenced to prison can clearly be described as career criminals. Conviction data alone does not describe the harm these offenders do in a community. They are responsible for committing scores of crimes, in addition to the one they are arrested for. Statistics bear out that 10% of these offenders commit over 80% of all crime. Studies indicate the average inmate has committed twelve crimes before being arrested for their commitment offense.

Of those released from prison, approximately 70% will reoffend within 3 years. However, those convicted of property crimes, to include auto theft, drug offenses, burglary and larcenies, have even higher rates of recidivism.

The two major obstacles to maintaining a crime-free life style for inmates being released from prison are drug addiction and unemployment. When inmates are released from prison, most do not receive adequate support in these areas and as a result, become

immersed in a continuing cycle of crime. Fresno is a uniquely poor environment for a released prisoner because of the high unemployment rate and the ready supply of methamphetamine.

Fresno has often been referred to as the "Meth Capital of the Nation" and because of vast agricultural lands, is one of the most active methamphetamine manufacturing regions in the United States. Despite continuous aggressive seizures of large super labs, methamphetamine continues to be plentiful and affordable in the Fresno area. As efforts increase at the borders to stem the flow of methamphetamine, we have experienced an increase in manufacturing in the San Joaquin Valley.

The majority of methamphetamine users support their habit by committing crime. Identity theft is one of the fastest growing crimes in America, and a favorite of methamphetamine addicts because of the ease with which it can be committed. There is little chance of detection or arrest, and if arrested, sentences are light when compared with that of robbery. Our detectives conservatively estimate that 65% of all identity theft cases involve suspects who are addicted to methamphetamine. These cases can easily involve tens of thousands of dollars in loss. Methamphetamine addicts are involved in approximately 90% of our auto thefts, and 15% of the suspects in domestic violence cases are addicted to methamphetamine.

Currently the availability of low or no-cost methamphetamine treatment is almost non-existent. There are approximately 530 beds for residential drug treatment in the Fresno metropolitan area to serve a population of over half a million. The majority of those receiving treatment at these facilities are there pursuant to a condition of probation. Most do not attend on their own volition.

Fresno has the greatest concentration of urban poverty in the nation. Unemployment is 2.5 times greater in Fresno than any other city of comparable size in California. Our current unemployment hovers around 10 percent. This high unemployment rate severely reduces the chance of a released prisoner obtaining employment, making it likely released prisoners will be involved in criminal activity to support their lifestyle.

Without employment and with continued drug addiction, released prisoners will quickly return to a life of crime. Property crimes, including auto theft, identity theft, burglary and larceny are the most likely crimes these released prisoners will be involved in.

It is expected that crimes rates in Fresno will increase dramatically if 1,920 prisoners are released into the community. When considering recidivism rates, numbers of crimes committed by offenders, and the fact that these prisoners represent the 10% of the offenders who are committing 80 % of the crime, the results are alarming. Within three years, we can expect that 1,344 released prisoners will commit a crime for which they will be arrested, and that each one of these offenders will have committed at least 12 crimes preceding their re-arrest. These 1,920 released prisoners can be expected to commit over 16,000 felony crimes, the majority of which they will never be held responsible.

All parts of the criminal justice system expect to be seriously challenged by the release of these prisoners.

Police officers will be hindered in their investigation of these crimes, especially as to those released prisoners who will not be on parole, and therefore not open to parole searches. In the majority of property crimes, there are no witnesses; therefore, the physical evidence yielded in parole searches often provides the vital evidence for prosecution. Losing the ability to conduct parole searches will be a serious impediment to investigating the crimes we expect these released prisoners to commit.

The Fresno County District Attorney's Office faces serious resource challenges. Their ability to process cases this year is reduced from last year and they are overwhelmed. The District Attorney's Office would be unable to accept an increased work load and would be faced with the difficult task of prioritizing cases, with the knowledge they will not be able to pursue many serious cases. Priority would be given to violent crimes, and those cases with the most sentencing exposure, thus, it is doubtful that the property crimes that we expect these released prisoners to commit, will receive aggressive prosecution.

The Fresno County Jail currently must comply with a federal court consent decree that limits the jail population. The jail's maximum population must not exceed 3,478 prisoners. Currently, the population hovers around 3,300 inmates. Due to budget cuts this fiscal year, the Sheriff has been forced to cut 32 correctional officer positions, which resulted in the closure of a 300 bed satellite jail facility. The closure of this facility has aggravated jail over crowding issues at the main jail. Pursuant to the consent decree, the Sheriff may release or refuse to take additional prisoners when they reach 90% capacity, and they must release and refuse prisoners when they reach 100% capacity. Any increased levels of arrests requiring booking would pose a severe challenge for the jail, and property offenders would be the first to be released or refused in the face of over-crowding.

The Fresno Superior Court will face challenges similar to those of the jail and the District Attorney's Office. Superior Court Judge Gary Hoff, who oversees the felony courts, said the release of 1,920 inmates would burden the courts because of the high recidivism rates of property offenders and that each case would require multiple appearances and court dates. The court services manager conservatively estimates that the workload would increase by 10% and put a drain on court services.

With little or no accountability, due to the over burdening of the criminal justice system, crime rates will increase. As crime rates increase, so does the fear in the community. When people become fearful, the tendency is for them to stay in their homes and limit visits to shopping and entertainment venues to avoid being a crime victim. This will have a negative impact on sales tax revenues and businesses already struggling with the lagging economy. Additionally, new businesses will be hesitant to open in Fresno if crime increases. This will exacerbate the already high unemployment rates in our city.

Currently, parolees in Fresno receive very little supervision. There is one parole agent assigned to one hundred parolees, with the exception of "third strikers" who are supervised at a ratio of one to 40 and sex offenders who are supervised at a ratio of one to 20. This is an overwhelming caseload, and as a result, a great deal of the crime committed in Fresno is committed by offenders on parole. It is not an understatement to say that everyday the Fresno Police Department arrests paroles for serious crimes. During 2007, the Fresno Police Department arrested 6,453 parolees. Several examples of the types of crimes these parolees are involved in are listed below.

Incident #1

On June 9, 2008, "Help Eliminate Auto Theft" task force officers located a stolen vehicle being driven by Mua Thao. Thao had been released on parole in September 2007 for PC 496, possession of stolen property, PC 459 burglary, and PC 12021 (a) felon in possession of a firearm. He was living in a motel room rented by a parolee by the name of Nina Her. Inside the room, officers located paper work in the name of Linda Fang, as well as methamphetamine paraphernalia. On June 18, 2007 "Help Eliminate Auto Theft" task force officers arrested Linda Fang in a stolen vehicle. Fang was on parole for PC 470, forgery, and was released on parole in October of 2007. Inside her motel room was another parolee, Nina Her. Her was on parole for PC 496, possession of stolen property, and HS 11377, possession of methamphetamine. Both parolees admitted to knowing the vehicle was stolen. Methamphetamine paraphernalia and multiple stolen checks and credit cards indicative of identity theft were found in the room. All three parolees, Her, Fang, and Thao are methamphetamine users.

Incident #2

On April 18, 2008, Martina Duarte was released on parole for auto theft. That same day she stole a purse from a victim who briefly walked away from her shopping cart while shopping. Over the next several weeks, Martina, her boyfriend, Daniel Maldonado, and her sister, Marcy Duarte, used the victim's credit cards and checks to defraud at least nine businesses in and around Fresno. Marcy Duarte was released on parole March 23, 2007, for PC 459, burglary, and PC 470 check forgery. Daniel Maldonado was discharged from parole on February 7, 2008. His commitment offence was PC 422, making terrorist threats. On May 6, 2008, Thomas Garcia committed a vehicle burglary in Merced County, stealing checks credit card and identification from the vehicle. Garcia was on parole for PC 459, burglary. These checks cards and identification were passed on to Martina Duarte, who along with her boyfriend, Daniel Maldonado and her sister Marcy Duarte, used them to defraud additional multiple business in Fresno and surrounding areas. During this investigation and subsequent search warrant, evidence was obtained to implicate these three suspects in numerous additional identity theft and fraud cases. Due to the complexity of the cases, and the potential of numerous unreported victims, this case is still under investigation. These three suspects have been arrested for multiple felony charges and likely face additional charges.

Incident #3

On January 20, 2006, Police officers observed Renard Brooks Jr. driving a vehicle that had been taken in an armed residential robbery. Brooks was not identified as being the suspect who committed the residential robbery, but it was learned that he had been driving the vehicle taken in the robbery for approximately one week. Brooks was arrested for driving the stolen vehicle and on March 29, 2006, Brooks was sentenced to 3 years in State Prison after being convicted of auto theft.

On October 23, 2006, Brooks was released on parole to the Fresno Parole Office. His scheduled discharge date from parole was October 23, 2009. On October 25, 2006, two days later, a home in northeast Fresno was burglarized. The property taken during this burglary included a .40 caliber semi-automatic handgun with two 10 round magazines, an AR-15 assault rifle with four 30 round magazines, and a .22 caliber pistol. The victim arrived home and observed an African-American male suspect walking out of her home with the above property. The next day, October 26, 2006, Brooks was observed by police officers walking in a neighborhood armed with a handgun. After his arrest, the handgun was determined to be the .22 caliber pistol taken in the residential burglary the previous day. Brooks was also in possession of a .40 caliber handgun magazine taken in the same burglary.

Brooks could not be identified as the burglary suspect who was seen walking out of the victim's residence with the property. As a result, he was charged with possession of stolen property, being a convicted felon in possession of a handgun, and violating his parole. On March, 20, 2007, Brooks was convicted of being a felon in possession of a firearm and sentenced to 3 years in state prison.

On June 18, 2008, Brooks was again paroled to the Fresno Parole Office. On June 20, 2008, two days after being released on parole, Brooks was detained by officers after he was observed knocking on several doors of residences. The officers believed he was in the process of looking for a residence to burglarize. During his detention, he provided a false name to officers and denied being on parole. Brooks was arrested for providing a false name to officers during a detention and violating his parole. Brooks was released by his parole agent on June 23, 2008.

July 1, 2008, Brooks forced his way into a car occupied by two elderly females in the parking lot at a shopping center. Brooks physically forced the females out of the vehicle then fled in their vehicle. Brooks was located by officers driving the vehicle and a vehicle pursuit ensued. During the pursuit, Brooks was involved in three separate traffic collisions. One of the collisions resulted in the driver being injured. Brooks fled from the vehicle on foot and shortly thereafter, he was taken into custody. Brooks was found to be in possession of property belonging to the victims.

In summarizing the impact the premature release of these prisoners will have in the City of Fresno, it is safe to say, the impact will be extremely detrimental to public safety. The relationship between, property crimes offenders, methamphetamine use, and unemployment can not be overstated. These inmates will certainly continue to pose a

hazard to the public safety unless they are able to kick their drug addiction and find employment.

Based on my knowledge of cities within the central valley and their demographics, as well as conversations I have had with police chiefs from these cities, it is my belief that central valley cities such as Stockton, Modesto, Merced, Visalia, etc. will experience the same impact as Fresno in terms of crime should the premature release of inmates occur. These cities have officer to population ratios that are very similar to that of the Fresno Police department, similar unemployment rates to that of the city of Fresno, and a population ratio of methamphetamine addicts that is also similar to ours.

Date: September 15, 2008

Jerry Dyer

## PROOF OF SERVICE
### (§ 1013a, 2015.5 C.C.P.)

**STATE OF CALIFORNIA, COUNTY OF ORANGE**

    I am employed in the aforesaid county; I am over the age of eighteen years and not a party to the within entitled action; my business address is: 3777 N. Harbor Boulevard, Fullerton, California 92835.

    On **September 16, 2008**, I served the within **EXPERT WITNESS REPORT OF JERRY DYER, CITY OF FRESNO CHIEF OF POLICE**, on the interested parties in said action by placing [X] a true and correct copy or [ ] the delivered by one or more of the means set forth below:

**SEE ATTACHED SERVICE LIST**

[x ]   *[**Via Mail**]*  By depositing said envelope with postage thereon fully prepaid in the United States mail at La Habra, California. I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Fullerton, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit of mailing in affidavit.

[ ]   *[**Personal Delivery**]*  I cause the above referenced document(s) to be delivered to the addressee set forth above.

[ ]   *[**Overnight Courier**]*  I caused the above referenced document(s) to be delivered to an overnight delivery service, for delivery to the addressee(s) on the attached service list.

[ ]   *[**Via Facsimile Transmission**]*  I caused the above referenced document(s) to be transmitted to the named person(s) to the fax number(s) set forth on the attached Service List.

[x]   *[**Federal**]*  I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on **September 16, 2008**, at Fullerton, California.

Rita J. Alger

## SERVICE LIST

1

2  Prison Law Office                          K&L Gates LLP
   Donald Specter                             Jeffrey L. Bornstein
3  Steven Fama                                Edward P. Sangster
   E. Ivan Trujillo                           Raymond E. Loughrey
4  Sara Norman                                55 Second Street, Suite 1700
   Alison Hardy                               San Francisco, CA 94105-3493
5  Rebekah Evenson
   1917 Fifth Street
6  Berkeley, CA 94710

7  The Legal Aid Society–                     Rosen, Bien & Galvan, LLP
   Employment Law Center                      Michael W. Bien
8  Claudia Center                             Jane E. Kahn
   600 Harrison Street, Suite 120             Amy Whelan
9  San Francisco, CA 94107                    Lori Rifkin
                                              Lisa Ells
10                                            315 Montgomery Street, 10th Floor
                                              San Francisco, CA 94104
11
   Bingham, McCutchen, LLP                    Natalie Leonard
12 Warren E. George                           Gregg MacClean Adam
   Three Embarcadero Center                   Carroll, Burdick & McDonough, LLP
13 San Francisco, CA 94111                    44 Montgomery Street, Suite 400
                                              San Francisco, CA 94104
14
   Lisa A. Tillman                            Paul B. Mello, Esq.
15 Deputy Attorney General                    Hanson Bridgett LLP
   P. O. Box 944255                           425 Market Street, 26th Floor
16 Sacramento, CA 94244-2550                  San Francisco, CA 94105

17 Steven S. Kaufhold                         William E. Mitchell
   Teresa Wang                                Assistant District Attorney
18 Akin Gump Strauss Hauer & Feld, LLP        Riverside County District Attorney's Office
   580 California, Suite 1500                 4075 Main Street, First Floor
19 San Francisco, CA 94104-1036               Riverside, CA 92501

20 Anne L. Keck, Deputy County Counsel        Rochelle East
   Steven Woodside                            Office of Attorney General
21 575 Administration Drive, Room 105A        455 Golden Gate, Suite 11000
   Santa Rosa, CA 95403-2815                  San Francisco, CA 94102-7004

22 Ann Miller Ravel
   Theresa Fuentes
23 Office of the County Counsel
   County of Santa Clara
24 70 West Hedding, East Wing, 9th Floor
   San Jose, CA 95110

25

26

27

28