STEVEN S. KAUFHOLD (SBN 157195) skaufhold@akingump.com
CHAD A. STEGEMAN (SBN 225745) cstegeman@akingump.com
TERESA WANG (SBN 252961) twang@akingump.com
GALIT A. KNOTZ (SBN 252962) gknotz@akingump.com
Akin Gump Strauss Hauer & Feld LLP
580 California, 15th Floor
San Francisco, California 94104-1036
Telephone:    415-765-9500
Facsimile:     415-765-9501

Attorneys for Republican Assembly and Senate Intervenors

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　　　Defendants. | Case No.: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>　　　　　　Plaintiffs,<br><br>　vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　　　Defendants. | Case No.:  C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**LEGISLATOR INTERVENORS' TRIAL BRIEF** |

## I. INTRODUCTION

The issuance of a prisoner release order is an extremely important public issue, as it is indeed a "radical step," in view of the size of the California prison system. *Plata* Order Granting Plaintiffs' Motion to Convene Three-Judge Court at 10-11 (July 23, 2007). The United States Congress clearly recognizes this fact, given the attention Congress has given this issue with its enactment of the Prison Litigation Reform Act ("PLRA"). 18 U.S.C. § 3626 (1997). Congress recognized the danger of prisoner release orders and enacted the PLRA to ensure that they would be issued only as a last resort, when no alternatives existed, and only in a manner consistent with public safety.

Congress set a very high bar for issuance of prisoner release orders, and Plaintiffs have shown no sign that they will be able to meet this standard. On the contrary, the evidence in this case indicates that a prisoner release order is inappropriate because a lack of resources and operational failures, rather than overcrowding, are the cause of any current conditions that fail to meet constitutional standards. Moreover, the uncontested facts indicate that improvements are being made to the California prison system (and that a prisoner release order would accordingly be premature), and that alternatives exist to the issuance of a prisoner release order. Finally, Plaintiffs have never demonstrated that a prisoner release order would cure alleged constitutional deficiencies in a manner consistent with public safety.

## II. FACTS AND PROCEDURAL HISTORY

### A. Procedural Background

The Three-Judge Court was convened pursuant to orders entered on July 23, 2007, by Judge Thelton Henderson of the United States District Court for the Northern District of California, and Judge Lawrence Karlton of the United States District Court for the Eastern District of California, who preside over *Marciano Plata, et al. v. Arnold Schwarzenegger, et. al.*, Case No. C01-1351 TEH (N.D.C.A.), and *Ralph Coleman, et al. v. Arnold Schwarzenegger, et. al.*, Case No. S-90-0520 LKK JFM (E.D.C.A.), respectively. For convenience and judicial economy, the same panel presides over the *Plata/Coleman* consolidated action (hereinafter, the "Action"), which centers on the effect of overcrowding on provision of medical and mental health care in California's prisons. Former Chief Judge of the Ninth Circuit Court of Appeals, Mary Schroeder, subsequently appointed Judge

Henderson, Judge Karlton and Ninth Circuit Judge Stephen Reinhardt to the three-judge panel (the "Three-Judge Court") presiding over the Action.

In granting the Plaintiffs' Motion to Convene Three-Judge Court, the *Plata* Court recognized that it "[did] not consider, for example, whether overcrowding is the primary cause of the unconstitutional nature of the delivery of medical health care in prisons," nor had it determined "the type of relief that a three-judge court might impose if it finds that a prisoner release order is warranted." *Plata* Order Granting Plaintiffs' Motion to Convene Three-Judge Court at 2. Central to the *Plata* Court's finding that convening a three-judge court was appropriate was its finding that overcrowded conditions were having a "serious impact on the Receiver's ability to complete the job for which he was appointed." *Id*. at 7-8. The *Plata* Court recognized that a prisoner release order "would, indeed, be a *radical step*, particularly given the size of California's prison system." *Id*. at 10-11 (emphasis added).

On August 13, 2007 and September 14, 2007, the Republican State Assembly and Senator Intervenors (collectively, "Legislator Intervenors")[1] filed motions to intervene in this Action pursuant to Rule 24 of the Federal Rules of Civil Procedure and the PLRA. 18 U.S.C. § 3626 (a)(3)(F) (granting standing to intervene to, *inter alia*, state legislators whose function includes appropriation of funds for the construction, operation, or maintenance of prison facilities). The Legislator Intervenors intervened in this action in order to oppose issuance by the Three-Judge Court of an order calling for early release of prisoners or the imposition of a cap on the population of California Department of Corrections and Rehabilitation ("CDCR") prisons. Such early release and population limits are

---

[1] The California Senator and Assembly Intervenors (collectively the "Legislator Intervenors"), include the following California State Senators: Senators Samuel Aanestad, Dick Ackerman, Roy Ashburn, James F. Battin, Jr., Dave Cogdill, Dave Cox, Jeff Denham, Robert Dutton, Dennis Hollingsworth, Abel Maldonado, Bob Margett, George Runner and Mark Wyland; and the following California Assemblymembers: Todd Spitzer, Chairman, Assembly Select Committee on Prison Construction and Operations, Michael N. Villines, Assembly Republican Leader Anthony Adams, Greg Aghazarian, Joes Anderson, John J. Benoit, Tom Berryhill, Sam Blakeslee, Paul Cook, Chuck DeVore, Michael D. Duvall, Bill Emmerson, Jean Fuller, Ted Gaines, Martin Garrick, Shirley Horton, Guy S. Houston, Bob Huff, Kevin Jeffries, Rick Keene, Doug La Malfa, Bill Maze, Alan Nakanishi, Roger Niello, George A. Plescia, Sharon Runner, Jim Silva, Cameron Smyth, Audra Strickland, Van Tran, and Mimi Walters. In its November 9, 2007 order, the Three-Judge Court consolidated the Assembly Member Intervenors and Republican Senator Intervenors into one party.

contrary to public safety and are unnecessary to achieve the goal of providing constitutional levels of medical and mental health care to California prisoners. Specifically, it is the Legislator Intervenors position that: 1) a prisoner release order is premature, as prior orders addressing the underlying rights violations at issue have not yet been fully implemented; 2) Plaintiffs have not demonstrated if constitutional violations to prison medical and mental health care currently exist; 3) overcrowding is not the primary cause of any allegedly inadequate medical and mental health care provided to California prisoners; 4) less intrusive means exist to solve the overcrowding issues of CDCR facilities; and 5) any prisoner release measure would be contrary to public safety.

The Legislator Intervenors have been active participants in all stages of this Action. The Legislator Intervenors attended and contributed to the settlement negotiations facilitated by settlement referees Justice Elwood Lui (ret.) and Justice Peter Siggins in the spring of 2008; they have sought discovery and responded to all discovery requests; they have toured CDCR facilities; and they stand ready to defend against the issuance of a prisoner release order at trial.

**B. The *Plata* Receivership**

On February 14, 2006, the *Plata* Court appointed a Receiver, and the Court conferred upon the Receiver complete control of the CDCR's medical care delivery system. *Plata* Order Appointing Receiver, Feb. 14, 2006. In fact, in addition to developing plans that address the provision of medical health care in CDCR facilities (*Plata*), the Receiver's plans also address mental health care (*Coleman*), dental health care (*Perez v. Schwarzenegger*, No. 05-05241 JSW (N.D.Cal.)), and compliance with Americans with Disabilities Act (*Armstrong v. Schwarzenegger*, No. C 94-2307 CW (N.D.Cal.)) in CDCR institutions.

The first *Plata* Receiver, Robert Sillen, commenced his duties in April 2006 and filed his Plan of Action last fall, in November 2007. The current Receiver, J. Clark Kelso, was appointed on January 23, 2008, and his Turnaround Plan of Action was approved by the *Plata* court less than five months ago, on June 16, 2008.

On August 13, 2008, Receiver Kelso brought a motion for contempt against the State Defendants in *Plata*, to seek an order compelling the State to fund the Receiver's projects at an estimated cost of roughly $8 billion, including $250 million by December 31, 2008, and an additional

$7.8 billion over the next five years, or face an order of contempt of court. On October 27, 2008, the *Plata* Court ordered the State Defendants to transfer $250 million to the Receiver by November 5, 2008, or face a contempt hearing regarding their failure to do so.[2]

The $8 billion sought by the Receiver is in addition to the approximately $1.8 billion allocated to the Receivership in the State's 2008-2009 budget, which is the majority of the $2.3 billion allocated to prison health care in the 2008-2009 budget.

**C. Assembly Bill 900**

Prior to the convening of the Three-Judge Court, the California Legislature passed Assembly Bill 900 ("AB 900") on April 26, 2007. Governor Schwarzenegger signed AB 900 into law on May 3, 2007.

AB 900 is a bipartisan bill that aims to address the overcrowded conditions in California's prisons by authorizing funding to build thousands of prison and jail beds and facilitate out-of-state transfer of inmates. AB 900 aims to reduce overcrowding by providing funds to remove the so-called "bad beds" in CDCR facilities' gyms and dayrooms and free up these spaces for valuable rehabilitative programming. It provides funding for this rehabilitative programming, including vocational, educational, and substance abuse treatment programs. AB 900 also provides for transfer of California inmates to out-of-state facilities; the legislation authorizes transfer of up to 8,000 inmates to out-of-state facilities to ease the overcrowding in California prisons. To date, roughly 5,000 inmates have been transferred to out-of-state facilities.

Moreover, AB 900 funds the construction of CDCR secure community reentry facilities that will house offenders in their last eighteen months of incarceration in facilities closer to their communities. Reentry facilities will provide county-based services and rehabilitative programs to facilitate offenders' reintegration into their communities.

---

[2] On October 31, 2008, the State Defendants filed a Motion to Stay the *Plata* Court's October 27, 2008 Order, pending appeal. As of the date of this filing, this Motion to Stay has not yet been decided.

Finally, AB 900 strengthens inmate health care delivery by providing funds to CDCR and the court-appointed *Plata* Receiver for medical, mental, and dental health care beds to improve the health care provided in CDCR facilities.

The Legislator Intervenors have strongly urged the State Legislature and the Governor's Office to take all steps necessary to enable the full implementation of AB 900.  *See* Trial Declaration of Assemblyman Spitzer ¶ 17 ("Spitzer Decl."); Trial Declaration of Senator George Runner ¶ 16-18 ("Runner Decl.").  To that end, Senator George Runner, one of the Legislator Intervenors, introduced Senate Bill No. 1705 (last amended on August 13, 2008) ("SB 1705").  Runner Decl. ¶ 16.  SB 1705 sought to clarify the statutory language in AB 900 in order to expedite issuance of a clean bond opinion for the sale of bonds to fund initiatives outlined in AB 900.  *Id.*  Senator Runner has requested that Governor Schwarzenegger take all legal, administrative, and legislative steps necessary to ensure the issuance of bonds to fund the facilities and objectives set forth by AB 900.  *Id.* ¶ 18.

The Legislator Intervenors are confident that AB 900 presents viable solutions to the problems facing overcrowded California prisons.  To that end, the Legislator Intervenors will continue to advocate for the prompt implementation of AB 900.

### D. CDCR's Illegal Immigrant Population

One often overlooked factor contributing to the overcrowding in California's prisons is the presence of 30,200 illegal alien prisoners housed in CDCR facilities.  This number of illegal alien inmates is greater than the number of illegal alien inmates in the next four largest states (Arizona, Florida, New York and Texas) combined.  In housing these prisoners, who should be held in federal prisons, CDCR experiences strains on its facilities and resources.  CDCR spends approximately $50,000 per year to house each adult inmate; if these illegal alien prisoners were housed in federal prisons, California would save over $1 billion a year, and considerable space would free up in CDCR institutions.  *See* Runner Decl. ¶¶ 6, 19 (citing Runner Decl. Exhibit B).

### III. SUMMARY OF LEGAL ARGUMENTS

#### A. Legal Standard

As the language of the PLRA makes clear, Plaintiffs must meet a very high standard before the Three-Judge Court may issue a prisoner release order.  In fact, Congress passed the PLRA with the

intent to "limit[] judicial remedies in prison cases and . . . frivolous prisoner litigation." 141 Cong. Rec. S14,414 (daily ed. Sep. 26, 1995) (statement of Sen. Abraham). Therefore, "the legislation forbids courts from entering release orders except under very limited circumstances." *Id*.

The language of the PLRA reflects Congress' intent to establish strict standards for issuance of prisoner release orders. The PLRA provides that no court can enter a prisoner release order unless (1) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the constitutional rights sought to be remedied through the prisoner release order; and (2) the defendant has had a reasonable amount of time to comply with the previous court orders. 18 U.S.C. § 3626(a)(3)(A). Moreover, a court can enter a prisoner release order *only* if the Plaintiffs can prove by *clear and convincing evidence* that (1) crowding is the primary cause of the constitutional violation, and (2) no other relief will remedy this violation. 18 U.S.C. § 3626(a)(3)(E)(i-ii).

Finally, a court considering a prisoner release order must give "substantial weight to any adverse impact on public safety" resulting from a prisoner release order. 18 U.S.C. 3626(a)(1).

### B. A Prisoner Release Order Should Not Issue Because Plaintiffs Have Failed to Meet the High Standard Required for This Extreme Remedy.

#### 1. Issuance of a Prisoner Release Order Would Be Premature, as Court Orders for Less Intrusive Relief Have Not Yet Failed.

A prisoner release order should not issue because it is premature to conclude that the orders appointing the Receiver, approving his Turnaround Plan of Action (TPA) and ordering funding for his TPA have failed to remedy the any constitutional violations of medical and mental health care. *See* 18 U.S.C. § 3626(a)(3)(A). The current *Plata* Receiver was appointed only this year, on January 23, 2008. The Receiver must have more time to implement his TPA, which Judge Henderson approved on June 16, 2008. Indeed, Judge Henderson has recognized that the Receiver's court-approved construction program has not yet failed; to the contrary, the Receiver's phased plan will "address the major treatment and housing concerns" in the four class actions involving prison medical health care (*Plata*), prison mental health care (*Coleman*), prison dental care (*Perez*), and prison disability access issues (*Armstrong*). Spitzer Decl. Exhibit C. As these court orders seeking to improve health care have not yet failed, and in fact, are still being implemented, a prisoner release order is premature.

### 2. A Prisoner Release Order Should Not Issue Because Plaintiffs Cannot Demonstrate Current Constitutional Violations.

Plaintiffs have not demonstrated current constitutional violations and will not be able to do so, due to the improvements achieved by the *Plata* Receiver and *Coleman* Special Master. For example, the death rate of California prisoners has dropped almost 30% since the beginning of 2006, when inmate health care was seized from state control by the Receiver. This drop is due to the Receivership's success in reducing the number of preventable deaths in state prisons caused by inadequate access to care. *See* Runner Decl. ¶ 20 (citing Runner Decl. Exhibit G). Moreover, California spends more on inmate health care than most other states—over $12,000 per inmate per year. *Id*. ¶ 10 (citing Runner Decl. Exhibit C). CDCR's health care expenditures have increased significantly in the past 8 years from just under $700 million in 2000, to approximately $2.4 billion in 2007. Indeed, the Legislature has allocated approximately $2.3 billion to prison health care in the 2008-2009 budget. Unsurprisingly, California has one of the lowest prisoner mortality rates within the United States, although its inmates are among the oldest in the country. *Id*. ¶ 13 (citing Runner Decl. Exhibit E). A system like CDCR's, which provides prisoners with greater access to medical and mental health care than that afforded to the average Californian, likely meets and even surpasses minimum constitutional standards.

### 3. A Prisoner Release Order Is Not Appropriate Because Overcrowding Is Not the Primary Cause of Any Constitutional Violations That Exist.

Even if certain current conditions were unconstitutional, plaintiffs have not and will not be able to demonstrate that overcrowding is the statutory "primary cause" of such violations. In an August 13, 2008 press briefing at the Sacramento Press Club, *Plata* Receiver Clark Kelso stated that CDCR's provision of health care delivery is not contingent upon the population level. *See* Spitzer Decl. ¶¶ 26-27. Specifically, Mr. Kelso stated, in response to a question regarding the effects of overcrowding on health care provision, "I'm just not seeing difficulty in providing medical services no matter what the population is." *Id*. ¶ 28 (citing Spitzer Decl. Exhibit D at 30:00 minutes). These positions are far different from the previous Receiver's suggestion that overcrowding and its consequences could "render adequate medical care impossible," *see* Receiver's Suppl. Report Re: Overcrowding at 10 (cited by *Plata* Order Granting Plaintiffs' Motion to Convene Three-Judge Court, at 7). To the

contrary, the current Receiver has stated that the opposite is true. Provision of adequate medical health care does not hinge upon population size; rather, "it's a question of how much you're willing to spend for it." Spitzer Decl.. ¶ 28 (citing Spitzer Decl. Exhibit D at 30:00 minutes). According to the Receiver, the Receivership can provide constitutional health care in CDCR institutions, regardless of the size of the inmate population. Consequently, the size of the population is not the primary factor in the CDCR's ability to ensure health care delivery.

### 4. A Prisoner Release Order Is Inappropriate Because Less Intrusive Alternatives Exist.

A prisoner release order should not issue because several alternatives to this extreme remedy exist. The Receiver's Turnaround Plan of Action, approved by Judge Henderson earlier this year, calls for construction of beds and hiring more health care staff. Both of these measures are remedies other than a prisoner release order that are far better suited to addressing the underlying violations at issue in *Coleman* and *Plata* than a population-reducing remedy. The Receiver himself has expressed his confidence that, in due time, his Plan will improve conditions in CDCR: "I think we've discovered that you actually can provide care and certainly our Plan and Turnaround Plan—we believe we can provide constitutional levels of care no matter what the population is." Spitzer Decl. ¶ 28 (citing Spitzer Decl. Exhibit D at 31:20 minutes). The allocation of approximately $1.8 billion in the State's 2008-2009 budget, of a total of $2.3 billion allocated to prison health care, will equip the Receiver to carry out his TPA. *Id*. ¶ 29. Thus, as an alternative to a prisoner release order, this Court should allow the Receiver to continue the work he is doing in improving the delivery of health care in CDCR institutions.

Another alternative to a prisoner release order is the full implementation of AB 900. As discussed above, AB 900 seeks to ease the overcrowded conditions in California's prisons by authorizing funding to build thousands of prison and jail beds. AB 900 also funds the construction of CDCR secure community reentry facilities that will house offenders in their last eighteen months of incarceration in order to facilitate offenders' reintegration into their communities. These reentry facilities will ease overcrowding while also providing inmates with county services and rehabilitation programs. The Legislator Intervenors are committed to the prompt and successful implementation of

AB 900 and will continue to urge the State Legislature and the Governor's Office to take all steps necessary to enable its full implementation.

Moreover, one aspect of AB 900, the transfer of California inmates to out-of-state facilities, is an alternative to a prisoner release order that is presently easing overcrowding. Thousands of inmates have already been transferred, thereby reducing the number of "bad beds" needed by CDCR. Used in conjunction with the other alternatives discussed here, out-of-state transfers are a viable alternative to a prisoner release order.

Finally, if the Court remanded the thousands of illegal alien prisoners in the California State prison system to federal custody, CDCR would save facility space and money that can be used to improve delivery of constitutional medical and mental health care to inmates. CDCR currently supports more than 30,200 illegal alien prisoners who should be in federal prisons. If these illegal alien prisoners were housed in federal prisons, California would save over $1 billion a year that could be spent on improving CDCR facilities and programming. In addition, such a remand would free up considerable space for inmate housing and programming. *See* Runner Decl. ¶¶ 6, 19.

**C. The Court Must Consider Public Safety Before Issuing a Prisoner Release Order**

Plaintiffs have yet to present evidence that would support a prisoner release order under the PLRA. However, even if they do, the Court must consider the likely adverse affect a prisoner release order will have on public safety. Past experience has shown that early release endangers public safety. For example, early release of prisoners in Los Angeles County jails has led to tragic and dangerous consequences. Since 2002, when Los Angeles County jails closed their doors to prisoners due to budget shortages, nearly 16,000 inmates were rearrested and charged with new crimes while they were supposed to be in jail. Sixteen of those inmates were charged with murder; a quarter were charged with violent or life-endangering crimes, including robberies, sex offenses, weapons violations, drunk driving incidents, assaults and kidnappings. All of these crimes were committed while the inmates should have been serving time in prison. *See* Runner Decl. ¶ 22.

These are the effects of a population cap in one county jail system. County jails generally house lower level offenders than state prisons. Imposing a population cap statewide, at the state prison level, would likely have far more drastic consequences. *See* Spitzer Decl. ¶ 32. Moreover, the

1  inmates who would be released early have not had the opportunity to spend time in reentry facilities or
2  rehabilitative programming, because AB 900 has not yet been fully implemented, and because of
3  overcrowding.  Therefore, there is a high likelihood that they will reenter their communities and
4  commit new crimes.  *Id*. ¶ 33.  Thus, even were the Court convinced that current violations existed,
5  with overcrowding as a primary cause, and that none of the alternatives above nor any suggested by
6  other parties would remedy them, the Court should not issue a prisoner release order.

Respectfully submitted,

DATED:  November 3, 2008                    AKIN GUMP STRAUSS HAUER & FELD LLP

                                            By:      /s/
                                               Steven S. Kaufhold
                                               Attorney for Republican Assembly and Senator
                                               Defendant-Intervenors

11
**LEGISLATOR INTERVENORS' TRIAL BRIEF**