1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99461
   SARA NORMAN, Bar No. 189536
3  ALISON HARDY, Bar No. 135966
   REBEKAH EVENSON, Bar No. 207825
4  1917 Fifth Street
   Berkeley, CA 94710
5  Telephone: (510) 280-2621

6  K & L GATES LLP
   JEFFREY L. BORNSTEIN, Bar No. 99358
7  EDWARD P. SANGSTER, Bar No. 121041
   RAYMOND E. LOUGHREY, Bar No. 194363
8  55 Second Street, Suite 1700
   San Francisco, CA 94105-3493
9  Telephone: (415) 882-8200

10 THE LEGAL AID SOCIETY -
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA 94107
   Telephone: (415) 864-8848
13
   Attorneys for Plaintiffs
14

ROSEN BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, CA 94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, CA 94111
Telephone: (415) 393-2000

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br>  Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br>  Defendants | No. Civ S 90-0520 LKK-JFM P <br><br> **THREE-JUDGE COURT** <br><br> No. C01-1351 TEH <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br>  Plaintiffs, <br><br> vs. <br><br> ARNOLD SCHWARZENEGGER, et al., <br>  Defendants | **PLAINTIFFS' TRIAL BRIEF** <br> **(E.D. Local Rule 16-285)** |

1

## I.  SCOPE OF PROCEEDINGS

2

3      This trial is solely about determining the appropriate remedy for the constitutional violations that

4 the *Plata* and *Coleman* courts have found to exist.  Given this procedural posture, this proceeding does

5 not involve proof of the existence of the constitutional violations, whether the *Plata* and *Coleman* courts

6 have issued prior orders directed at remedying the violations, or whether defendants had a reasonable

7 amount of time to comply with such orders.  Those are all conditions precedent to convening a three

8 judge court.  18 U.S.C. § 3626(a)(3)(A).  The three judge court does not have jurisdiction to make

9 determinations that must be made in the first instance by the presiding court in the underlying matters.

10 Now that the three judge court has been convened, it would be inappropriate to re-litigate these matters.

11      At issue in these proceedings are three questions: 1) whether crowding is the primary cause of the

12 constitutional violations; 2) whether "no other relief" will remedy the constitutional violations; and 3) if

13 plaintiffs have established these elements, what is the appropriate scope of the remedy (including giving

14 substantial weight to whether any remedy would adversely impact public safety or the administration of

15 a criminal justice system).  18 U.S.C. §§ 3626(a)(3)(A), (a)(1)(A).

16

## II.  POINTS OF LAW

17      The PLRA requires plaintiffs seeking a "prisoner release order" to make two showings.

18 Plaintiffs must demonstrate by clear and convincing evidence that 1) "crowding is the primary cause" of

19 the constitutional violations (in this case, the rights to constitutionally adequate medical and mental

20 health care), and 2) that "no other relief" will remedy the violations.  18 U.S.C. § 3626(a)(3)(E).  At trial

21 in this matter, plaintiffs will demonstrate that these elements are met through the overwhelming

22 evidence from the *Plata* Receiver and the *Coleman* Special Master, the experts (including defense

23 experts), and voluminous documents created by defendants themselves.  We do not recount the items of

24 proof here, as this matter has been extensively briefed, most recently in plaintiffs' opposition to

25 defendants' motion for summary judgment. (*Plata* Docket No. 1522).

26      Following a finding that crowding is the primary cause of the violations and that no other relief

27 will remedy the violations, the three judge court's next step will be to fashion a "prisoner release order"

28 to remedy the violations.

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                          1

1     The PLRA requires the court to take several factors into consideration in crafting the remedy. 18

2 U.S.C. §3626(a)(1)(A).  First, the relief must be "narrowly drawn," "extend[] no further than necessary

3 to correct" the constitutional violations, and be "the least intrusive means necessary to correct the

4 violation of the Federal right."  *Id.*  Second, the court crafting the relief "shall give substantial weight to

5 any adverse impact on public safety or the operation of a criminal justice system caused by the relief."

6 *Id.*

## III.  RELIEF SOUGHT

8     The remedy plaintiffs seek is a court order that (1) requires defendants to reduce the population

9 of CDCR institutions to 130% of the design capacity over a 2-year period; and (2) orders defendants to

10 develop a population reduction plan within 30 days of the court's order to achieve that population level.

11 The Population reduction plan should include the following:

12 1.    Defendants should develop the population reduction plan in consultation with the parties.

13 2.    The population reduction plan should include a plan for establishing, within 6 months of the

14       court's order, maximum population levels for each CDCR institution such that the overall

15       population across all CDCR institutions will not exceed 130% of design capacity at the end of

16       the 2-year implementation period.

17 3.    The population reduction plan should establish 6-month benchmarks for achieving progress

18       toward reducing the prison population to 130% of design capacity over the two-year

19       implementation period.

20 4.    The population reduction plan should be designed to minimize any adverse impacts on public

21       safety or the operation of a criminal justice system

22 5.    The population reduction plan should not discriminate against mentally ill inmates.  The

23       population reduction plan should include targeted policies and programs directed to the risks and

24       needs of *Coleman* class members with special needs who may require additional services and

25       programs to be successfully diverted from incarceration or to reenter their communities on

26       parole.

27 6.    If the parties are unable to reach an agreement on the population reduction plan, the court should

28       hold a hearing to rule on any objections.

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                    2

1    This remedy meets the constitutional and statutory mandates because it provides defendants

2   themselves the opportunity to craft the relief.  And as we discuss further below, the evidence will show

3   that defendants can reduce their prison population without any adverse impact on public safety or

4   criminal justice system operations.

5                        **IV.  SAFE REDUCTION OF PRISON POPULATION**

6    While plaintiffs propose that defendants be provided the first opportunity to craft a plan for

7   reducing the prison population, plaintiffs' experts have demonstrated that it is possible to do so in a way

8   that is responsible, gradual, and will improve public safety and have no adverse impact on the

9   administration of a criminal justice system.  Expert Reports of Dr. James Austin dated September 25,

10   2008 ("Austin 9/25/08 Report"), August 27, 2008 ("Austin 8/27/08 Report"), and August 15, 2008

11   ("Austin 8/15/08 Report"); Expert Report of Dr. Barry Krisberg ("Krisberg Report"); Expert Report of

12   Dr. James Gilligan, M.D. ("Gilligan Report"); Expert Report of Joseph Lehman; Supplemental Expert

13   Report of Jeanne Woodford dated August 15, 2008.[1]

14    Defendants' and defendant-intervenors' primary contention is that a plan that simply "opens the

15   prison doors" and releases tens of thousands of inmate at once would be overwhelming and

16   irresponsible.  But there is no need for the population be reduced in such an abrupt and careless way.

17    Instead, plaintiffs' experts will demonstrate that defendants can safely reduce their prison

18   population by 1) diverting from prison those parolees who are returned to prison for a short term because

19   they violated technical parole rules; 2) diverting from prison certain low-risk offenders, and 3) reducing

20   length of stay in prison by a few months by increasing "good time" credits for good behavior and/or

21   participation in rehabilitative programs.  Austin 8/15/08 Report at 20-35.  These methods of reducing the

22   prison population would only impact prisoners *who were about to be released*.  In other words,

23   defendants can reduce the prison population solely by diverting or shortening the length of stay for

24   prisoners whom defendants would otherwise release shortly under current circumstances.

25    All of the methods for reducing the prison population that are described in Dr. Austin's report are

26   also measures recommended by CDCR's own hand-picked "Expert Panel." Austin 8/15/08 Report at 21.

27   Moreover, each of these methods has been proven to have no impact on recidivism.  Reducing length of

28

[1] Copies of all expert reports cited herein were filed with the court on October 30, 2008.

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                3

1  stay in prison has no impact on recidivism rates, and persons who are diverted away from prison do not

2  have higher recidivism rates than persons who are incarcerated.  Austin 8/15/08 Report at 26-28;

3  Krisberg Report at 4-11.

4  　　　　Furthermore, each of these population reduction methods has been *implemented successfully in*

5  *other jurisdictions*.  They have been effective in reducing the prison population without having any

6  impact on crime rates. Krisberg Report at 4-18; Austin 8/15/08 Report at 11-20.  Dr. Barry Krisberg

7  surveyed early release programs in Canada, nine states (including some of the largest states), and

8  numerous jurisdictions within California.  Every jurisdiction studied implemented early release programs

9  and experienced no increase in recidivism or crime rates – indeed, both recidivism rates and crime rates

10 *declined* in some of the jurisdictions.  Krisberg Report at 4-11.

11 　　　　Defendants and intervenors do not contest these facts, but they argue (incorrectly) that reducing

12 the prison population would increase crime rates because California has a high recidivism rate, and so a

13 large number of prisoners who are released will commit new crimes.  But no additional crimes would be

14 committed as a result of a responsible population reduction.  Austin Report 8/15/08 Report at 36-45;

15 Austin 8/27/08 Report at 1-5.  California releases about 140,000 prisoners every year.  Defendants can

16 reduce their prison population without releasing anyone who would not otherwise be released within a

17 few months.  And it is uncontested that diversion programs and short reductions in length of time served

18 have no impact on recidivism.  Thus, the likelihood of parolees committing crime remains the same

19 whether they are released as expected, or a few months earlier than expected.  Reducing the prison

20 population will not result in any additional crimes.  At most, it might affect the timing or circumstances

21 of crimes that are statistically likely to occur under the current system.  But reducing the prison

22 population will not change the likelihood that any individual will be a victim of a crime.

23 　　　　Defendants and certain intervenors also vastly overstate the proportion of crime committed by

24 parolees.  There is no data demonstrating the numbers of crimes committed by parolees (and no party

25 purports to present such data).  However, there is data regarding the numbers of parolees who are

26 arrested, and the proportion of all arrests that are arrests of parolees.  That data shows that parolees make

27 up less than 5% of all arrests.  Austin 9/25/08 Report at 2.  (Contrary to popular belief, only a tiny

28 fraction of offenders are "career criminals;" most commit very few offenses.  *Id.* at 1-2.)  Thus, if all new

1   parolees have the same arrest rate as the current parolees, a small, short-term increase in the overall

2   number of parolees will not have any noticeable impact on arrests.  Austin 8/15/08 Report at 36-44.

3          Because there will not be a measurable impact on crime or arrests, there will be no impact on the

4   administration of local criminal justice systems.  Certain intervenor-defendants express concern that

5   reducing the prison population will overwhelm local police, prosecutors or courts.  But that would only

6   occur if there were an increase in crime.  If crime rates remain the same, these impacts will not occur.

7          Defendants  make inflamatory arguments about releasing mentally ill inmates.  But mental illness

8   by itself is not a significant predictor of violent recidivism.  Gilligan Report at 18-26, ¶¶34-49.  And in

9   any event, mentally ill inmates are released every day under the current system, and there is no reason to

10  suspect their recidivism rates would be different if they were diverted or released several months earlier.

11  Moreover, under the current system, mentally ill prisoners are regularly "churned" through short-term

12  incarcerations, which exacerbates mental illness.  Gilligan Report at 6, ¶16(a).  Diversion programs

13  (which reduce the prison population) also reduce churning, and could therefore improve outcomes for

14  mentally ill prisoners.  Interrupting this destructive cycle of churning would not just be good for

15  parolees, it is also essential for improving public safety, as recognized by defendants' own trial

16  witnesses.  *See* Trial Affidavit of Thomas Hoffman (*Coleman* Docket No. 3148) ¶ 6.

17         Several of the intervenors have taken the position that any adverse impacts from a prison

18  population reduction could be mitigated by funding rehabilitative programs at the local level.  They

19  complain (and defendants echo this complaint) that currently there are insufficient resources in the

20  communities to address the needs of parolees – too few programs providing job placement, housing,

21  drug and alcohol addition treatment, mental health treatment, etc.  According to both groups, the lack of

22  such programs endangers public safety.  But it is the state's responsibility to provide funding for such

23  programs, and it is the state's failure to do so that has caused this dearth of programs.  To the extent that

24  the intervenors control the availability of funding as legislators, or its allocation as county officials, they

25  share the  responsibility for any dearth of programs.  CDCR currently releases more than a hundred and

26  thirty thousand people every year, including individuals who are drug addicted, mentally ill, or have

27

28

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                         5

1  other needs, despite this dearth of resources.[2]  The Governor, as well as numerous other public officials,

2  has proclaimed that protecting public safety is of paramount importance to the state.  Either the

3  Governor does not believe that the rehabilitative programs actually protect the public safety, or he does

4  not think that it is important.  Either way, it is a policy decision that the state has made, and that reflects

5  the current state of affairs.

6  　　　While creating and funding rehabilitative programs would *improve* outcomes, reducing the

7  prison population without such programs in place will not *worsen* public safety.  It will merely

8  perpetuate the status quo.

9  　　　Nonetheless, reducing the prison population could generate a billion dollars in savings, which

10 could be applied to create the needed programs both within prisons and in the communities.  For every

11 reduction of ten thousand prisoners, the state will save more than $200,000,000.  Austin 9/25/08 Report

12 at 3.  Defendants and intervenors can craft a population reduction plan that redirects these savings

13 toward funding the programs that defendants and intervenors claim are necessary in order to protect the

14 public from parolees.  Defendants' own hand-picked expert panel has provided them with a roadmap of

15 programs and policies that could receive such diverted funding.  Austin 8/15/08 Report at 21.

16 Defendants' own experts have presented additional program alternatives that could receive such support

17 if the funds were freed up by a reduction in the prison population.  *See* Declaration of Paul Mello

18 Regarding Submission of Defendants' Expert Reports (*Coleman* Docket No. 3139), Exhibit A,

19 Preliminary Report of Gale Bataille, MSW at 16-18, Exhibit B, Rebuttal Report of Gale Bataille at 10-

20 11.

21 //

22 //

23 //

24 //

25 //

26

27

28 　　　[2] No one argues that the necessary resources exist *inside* the prisons.  Indeed, the mental health care in prisons is unconstitutional, and the evidence will show that CDCR has no ability to provide the right rehabilitative programs to the right prisoners.

Plaintiffs' Trial Brief
Case Nos. 90-00520; 01-1351                    6

1    Thus, while plaintiffs will demonstrate that defendants can reduce the prison population without

2  any impact on crime rates or the administration of a criminal justice system, plaintiffs will also show that

3  if defendants devote the money they save to creating recidivism-reducing programs, a population

4  reduction order could *improve* public safety and the administration of criminal justice systems

5  throughout the state.

6

7    DATED: November 5, 2008

8                                     Respectfully submitted,

9                                     By: */s/ Rebekah Evenson*

10                                     Rebekah Evenson
                                      Prison Law Office
11                                     Attorney for Plaintiffs in
                                      *Plata v. Schwarzenegger*
12                                     and
                                      *Coleman v. Schwarzenegger*

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28