1  EDMUND G. BROWN JR.
   Attorney General of the State of California
2  DAVID S. CHANEY
   Chief Assistant Attorney General
3  ROCHELLE C. EAST
   Senior Assistant Attorney General
4  JONATHAN L. WOLFF
   Senior Assistant Attorney General
5  LISA A. TILLMAN – State Bar No. 126424
   Deputy Attorney General
6  KYLE A. LEWIS – State Bar No. 201041
   Deputy Attorney General
7  455 Golden Gate Avenue, Suite 11000
   San Francisco, CA 94102-7004
8  Telephone: (415) 703-5708
   Facsimile:  (415) 703-5843
9  lisa.tillman@doj.ca.gov
   kyle.lewis@doj.ca.gov
10
   Attorneys for Defendants
11

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12              UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14          AND THE NORTHERN DISTRICT OF CALIFORNIA

15      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

| | |
|---|---|
| 18  RALPH COLEMAN, et al.,<br><br>19          Plaintiffs,<br>         v.<br>20  ARNOLD SCHWARZENEGGER, et al.,<br>21          Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| 22  MARCIANO PLATA, et al.,<br><br>23          Plaintiffs,<br>         v.<br>24  ARNOLD SCHWARZENEGGER, et al.,<br>25          Defendants.<br>26<br>27 | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DOYLE WAYNE SCOTT PLAINTIFFS IDENTIFIED FOR ADMISSION IN PHASE I**<br><br>**To:  Three-Judge Panel** |

28

- 1 -

1        The following is a listing of Defendants' objections to the statements in the expert

2   reports of Doyle Wayne Scott, which Plaintiffs' identified for admission in Phase I of the

3   trial of Plaintiffs' request for a prisoner release order under the Prisoner Litigation Reform

4   Act.   Defendants did not receive Plaintiffs' confirmation of their intent to call Mr. Scott to

5   testify on November 18, 2008, until 12:30 p.m. on November 11, 2008.  Defendants

6   forwarded their objections to Plaintiffs, requesting their responses, which, to the extent

7   provided, are set forth below.

8   **A.    November 9, 2007 Report of Doyle Wayne Scott**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 1. November 9, 2007 Report, p. 2, TOC, Heading I "California's severely overcrowded prison population far outstrips the ability of the system to safely or appropriately house its prisoners" | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 2. "The overcrowding crisis in California is, in my experience, unprecedented in scope and in the dangers and deprivations of day-today life in the prisons." (November 9, 2007 Report, p. 2, ¶3.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 3. "My extensive experience in running the Texas prison system and evaluating management, staffing, and security needs in multiple state and local jail systems, as well as my review of numerous reports regarding California's prisons from diverse and credible sources, and my tours of four California prisons, lead me to the conclusion that without substantially reducing its prisoner population, California will never be able to generate the custodial support services necessary to provide prisoners with basic medical and mental health care." (November 9, 2007 Report, p. 2, ¶3.) | Objection: Phase II issue - irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 4. November 9, 2007 Report, pp. 2-4, Heading A "The Texas experience demonstrates the | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| impossibility for systemic reform in these areas under current overcrowded conditions" and ¶¶4 -6 in their entirety.  **See attached**.) | | constitutional violations. |
| 5. "Not only are California's prisons operating under a state of emergency, it is clear to me that unless the population is reduced, the state will remain in crisis verging on catastrophe and will remain utterly unable to provide adequate medical and mental health care to the prisoners in its custody." (November 9, 2007 Report, p. 4, ¶6.) | Objection: Phase II issue - irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 6.  "California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it     The last few decades have seen extraordinary growth in California's prison population.  The population has grown more than 500 percent in less than 30 years, and the number of prisons has nearly tripled.  Plata Pls. Trial Ex. 1 at 4 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver).  Today, California houses 171,285 prisoners; its prisons are at 203.7 percent of design capacity.  Joint Pls' Trial ex. 25 at 1 (Weekly report of Population, October 31, 2007)." (November 9, 2007 Report, p. 4-5 Heading B and ¶7.) | Objection - Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 7. "As the population has grown, the state's prison infrastructure, staff, and management have stretched beyond the breaking point, resulting in the current state of acute crises."  (November 9, 2007 Report, p. 5, ¶8.) | Objection - Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 8. "Ugly Beds.  It is impossible to grasp the scope of California's crisis without understanding the plight of the thousands of prisoners confined to "ugly beds."  Before I describe the specific strains on infrastructure, staffing, and management, I would | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 3 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| like to paint a picture of some of the stark realities of life in today's California prisons.      As the prison population has grown, it has outstripped the available space for safely housing prisoners.  As a result, California has started in recent years to house more and more prisoners in so-called "ugly beds."  According to the Governor, as of October 2006, "the CDCR is required to house more than 15,000 inmates in conditions that pose substantial safety risks, namely, prison areas never designed or intended for inmate housing, including, but not limited to, common areas such as prison gymnasiums, dayrooms, and program rooms.'.  Joint Pls' Trial Ex. 1 at 1 (Governor's Emergency Proclamation)."  (November 9, 2007 Report, p. 5, Heading 1 "Ugly Beds" and ¶¶9-10.) | | |
| 9. "Six months later, that number had risen to more than 16,000, which 'means that about 10 percent of the prison population is currently housed in "bad" beds.'  Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007).  'Ugly beds' are not merely uncomfortable, they are actually dangerous: they make it harder for staff to prevent violence and breed anger and frustration among prisoners by sharply curtailing the space available for anything but the warehousing of bodies.  *See, e.g., id* at 2."  (November 9, 2007 Report, pp. 5-6, ¶9.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 10.     November 9, 2007 Report, pp. 6-8, ¶¶11-14 in their entirety.  **See attached**. | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 11.     "The space inadequacies extend to treatment **as well as living spaces**."  (November 9, 2007 | Objection to highlighted portion: | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 4 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Report, p. 8, ¶15) | Irrelevant | |
| 12. "As the *Coleman* Special Master has noted, the 'ugly beds' harm prisoners." (November 9, 2007 Report, p. 8, ¶16.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 13. "'None of this is conducive to the health and well-being of *any inmate, much less* a seriously mentally disordered inmate/patient;…" (November 9, 2007 Report, p. 9, ¶16.) | Objection to highlighted portion: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 14. "Infrastructure. Overcrowding affects all prisoners, not just those who are triple-bunked in gymnasiums or forced to live in hallways and dayrooms." (November 9, 2007 Report, p. 9, Heading 2 "Infrastructure," ¶17.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 15. "'[T]he overcrowding of the prison facilities has overburdened the basic infrastructure of the institutions resulting in sewage spills and shortages of safe drinking water.' Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). '[C]ritical deficiencies in…existing infrastructure' are found at most prisons; 20 prisons have critical drinking water system deficiencies; 18 have critical deficiencies in waste water treatment, 20 in electrical systems, and 14 in other areas.' *Id.* at 9." (November 9, 2007 Report, p. 9, ¶17." | Objection: Irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1.<br><br>Admissible under Federal Rules of Evidence 703, 803(8). |
| 16. "My tours demonstrated the truth of these findings. In my opinion, CIM is an incredibly old, poorly maintained, unsanitary facility with inadequate staffing and overburdened, crumbling infrastructure that must be vacated and provided significant maintenance and renovations or else simply abandoned. In its current state, it is not fit for housing human beings. Similarly, San Quentin needs a substantial | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| infrastructure overhaul before it should house people: I saw bars rusted almost completely through, filthy conditions that staff say cannot be made clean, and what was described to me as permanent unidentified liquid dripping from upper tiers onto busy passageways. It might well cost less to build an entirely new facility than to rehabilitate San Quentin to an acceptable level, the infrastructure damage and deterioration are so severe."  (November 9, 2007 Report, p. 9, ¶18.) | | |
| 17.    "On my tours, I saw housing units with serious deficits of toilets, sinks, and urinals by contemporary correctional standards."  (November 9, 2007 Report, p. 10, ¶19.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 18.    "The American Correctional Association states that toilets should be 'provided at a minimum ratio of 1 for every 12 inmates in male facilities and 1 for every 8 inmates in female facilities.' Joint Pls' Trial ex. 51 at 38 (American Correctional Association, Standards for Adult Correctional Institutions, 4th ed.). Further, one sink should be provided for every 12 prisoners, and one shower for every eight prisoners.  *Id.* at 38-39." (November 9, 2007 Report, p. 10, ¶19.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 19.    "California far exceeds these minimum ratios.  For example, at CIM, Sycamore Hall had 54 prisoners for one toilet and East Gym had 202 prisoners for seven showers and 11 working toilets.  Avenal 410 had 344 prisoners with 14 toilets.  As a correctional administrator, I find that such deprivations are not only inhumane, they breed violence, as I discuss in greater detail below, and serve as a dangerous vector for the spread of disease." (November 9, 2007 Report, p. 10, ¶20.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 6 -

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 20.    "My understanding is that the established standards for toilets and showers in correctional settings are based on infectious disease prevention requirements.  Such precautions are necessary because disease spreads with dangerous speed in extremely dense populations with limited sanitation facilities.  According to the CDCR institutions chief, '[t]he overcrowding of CDCR facilities has led to increased numbers of infectious disease outbreaks…system-wide.'  Joint Pls' Trial Ex. 11 at ¶3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007).  The *Plata* Receiver has documented similar serious overcrowding-caused outbreaks, supporting his opinion that '[t]he serious levels of crowding in CDCR prisons and the unconstitutional levels of medical services' make it necessary to be alert to 'the ever present danger of a serious infectious disease outbreak in California's prisons, a problem that not only jeopardizes inmates and staff, but also has an impact on public health in the community.'  Joint Pls' Trial Ex. 30 at 70-71 (Receiver's Fourth Bi-Monthly Report, March 19, 2007)." (November 9, 2007 Report, p. 10-11, ¶21.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 21.    "As a correctional administrator, I am extremely concerned that lockdowns and limited programming also reduce access to exercise and fresh air, and increase idleness and frustration, with consequent negative effects on physical and mental health."  (November 9, 2007 Report, 11, ¶21.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 22.    "One result of having too many people and too few sanitary facilities are that toilets, lavatories, | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 7 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| and showers will be used much more than originally contemplated and wear out faster.  Prisoners complained of lack of hot water for weeks at a time at Avenal (on 5 Facility and Building 410, where prisoners complained that there had been no hot water for months) and for days at a time in CIM's West Facility.  At San Quentin, staff noted that they could submit work order after work order to repair basic living unit functions, but the repairs were simply not done.  As a result, staff expressed hopelessness and cynicism.  At all three of these facilities, maintenance was inadequate and work orders were not addressed in a timely manner." (November 9, 2007 Report, pp. 11-12, ¶22.) | | |
| 23.    "I saw everywhere evidence of crumbling infrastructure.  Ventilation appeared to be inadequate at CIM, where I saw filters and screens that had clearly not been cleaned in quite some time.  In Elm Hall, a housing unit that houses many paraplegics and other prisoners who use wheelchairs, all windows had been broken and were covered with plastic sheeting.  Prisoners also complained that that roofs leak.  At Avenal, I saw large amounts of mold in almost every shower that I inspected, demonstrating inadequate sanitation practices over a significant length of time." (November 9, 2007 Report, p. 12, ¶33.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 24.    "One of the most dangerous effects of overcrowding on infrastructure lies in safety deficits.  I saw a frightening range of fire hazards in the housing areas, where the very high population density exacerbates the risk of deadly fires. I saw few efforts to minimize this risk, but instead saw hazards such as flammable | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 8 -

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | blankets and cardboard on cell doors and other flammable material in cells and living areas. At San Quentin, the risk of fire disaster is unacceptable - there is no automatic cell unlock system, so in a fire emergency, each one of hundreds of cells, spread over fire tiers in many living units, would have to be unlocked individually. It is simply impossible. On my tour of West Block, I smelled at two separate cell locations something burning. Clearly, prisoners are able to light flammable material in their cells, and are doing so. If there were a fire in San Quentin's cell blocks, many would die in their cells." (November 9, 2007 Report, p. 12, ¶28.) | | |
| | 25.    "Staffing. Staffing as well as infrastructure is strained to the breaking point." (November 9, 2007 Report, p. 13, Heading 3 "Staffing," ¶25.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| | 26.    "At the same time as it experienced extraordinary inmate growth, the CDCR has substantially reduced the number of prison staff, eliminating more than 5,000 workforce positions in the last 15 year alone. Joint Pls Trial Ex. 4 at 125 (Reforming Corrections: Report of the Corrections Independent Review Panel, June 30, 2004)." (November 9, 2007 Report, p. 13, ¶25. | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations.<br><br>Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| | 27.    "And the system has not even been able to fill the positions that remain: 'CDCR projects current officer vacancies, statewide, at approximately 4, 130….[I]t will take about 5 years to fill all of the vacancies under the current academy structure.'" (November 9, 2007 Report, p. 13, ¶25.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| | 28.    "CDCR staffing rates are already extremely low by national standards." (November 9, 2007 | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Report, p. 13, ¶26.) | | |
| 29.    "According to Dr. Joan Petersilia, who has headed numerous CDCR reform research efforts, '[w]hile the nation's prisons average one correctional officer to every 4.5 inmates, the average California officer is responsible for 6.5 inmates.  Although officer salaries are higher than average, their ranks are spread dangerously thin and there is a severe vacancy rate.'  Joint Pls' Trial Ex. 5 at 2 (Dr. Joan Petersilia, *Understanding California Corrections* (May 2006))."  (November 9, 2007 Report, p. 13-14, ¶26.) | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations.  Admissible under Federal Rule of Evidence 703. |
| 30.    "***I agree with Dr. Petersilia and Mr. Sillen that*** the paucity of correctional officers in California, due to the low staffing rate and high number of vacancies, ***is dangerous***."  (November 9, 2007 Report, p. 14, ¶26.) | Objection to highlighted portion: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 31.    "Several prisons I visited - notably CIM and Avenal - reported that they had no vacancies, ***but the staffing patterns I observed were clearly inadequate to maintain security within an acceptable risk level and to address the needs of the prisoner population, especially in the housing units with 'ugly beds.***'  In fact, every institution I toured had inadequate custodial staff on the ground to address ***the needs of the prisoner population***, including ensuring that health care services are provided."  (November 9, 2007 Report, pp. 14-15, fn 3.) | Objection to highlighted portions: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 32.    Pls' Trial Ex. 4 at 1 (Deukmajian Report) ("the system's organizational structure has not kept pace with the massive growth in inmate population or with the vast geographical spread of the institutions.")  (November 9, 2007 Report, p. 15, ¶22.) | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations.  Admissible under Federal Rules of Evidence 703, 801(d)(2), |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| | | 803(8). |
| 33.    "As I related above, I was prepared to witness troubling conditions at the prisons I toured in California, but was unprepared for the sheer magnitude of the crisis.  I was even more appalled when I learned that California corrections and other state officials have known for many years that the problem was approaching emergency proportions.  I have relied on the Governor's own State of Emergency Proclamation as an extraordinary admission of serious risk of harm for prisoners, staff, and the public, but I continue to be astounded that he issued it more than one year ago, and conditions have not improved."  (November 9, 2007 Report, p. 16, ¶29.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 34.    "It is indicative of the poor management that is apparent in this crisis that the Governor refused to see at least one of his corrections chiefs, Jeanne Woodford, when she attempted to meet with him regarding sentencing reform.  Joint Pls' Trial Ex. 42 at 14:1-16 (Transcript of Proceedings, December 20, 2006, *Madrid v. Woodford*, No. C90-3094 TEH.) She was trying to see him because 'our population pressures were just going to continue to become critical, and I felt that the only path to success had to include sentencing reform....'  *Id.* at 11:10-15."  (November 9, 2007 Report, p. 16-17, ¶30.) | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations.  Admissible under Federal Rule of Evidence 703. |
| 35.    "In Texas, where we took prison population control very seriously, I had the governor's telephone number and met with him routinely every month.  The personal contact with the highest level of management in state government was crucial to my ability to run a humane system."  (November 9, 2007 Report, p. 17, ¶30.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |

- 11 -

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 36.    "According to the CDCR, 'overcrowding in CDCR prisons has…led to increased riots and disturbances.'  Joint Pls' Trial Ex. 11 at ¶3 (Declaration of Scott Kernan in Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007.)"  (November 9, 2007 Report, p. 17, ¶31.) | Objection:  Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 37.    "Overcrowding breeds violence in a number of ways.  First, people are simply bumping up against each other far more often, especially those housed in triple bunks and dayrooms and hallways. They are also competing for extremely limited toilet, shower, and sink facilities and generate far more noise and smell in close quarters. Decades of experience have demonstrated to me that close physical proximity, lack of adequate supervision, noise, and competition for scarce resources are a recipe for violence in high-pressure prison settings.  The lack of adequate toilets and sinks can also lead to long lines and anger at not getting basic needs met, which in turn can lead to violence."  (November 9, 2007 Report, p. 17, ¶32.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 38.    "Second, California prisoners have seen drastic cut-backs in the programming available to them due to the fact that programming space is used for warehousing bodies and because of the lockdowns due to staff limitations or violent outbursts. Joint Pls' Trial Ex. 6 at 22 (California State Auditor Report); Sections II.B and II.C, below." (November 9, 2007 Report, p. 18, ¶33.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.<br><br>Admissible under Federal Rules of Evidence 703, 803(8). |
| 39.    "I observed on my tours that prisoners have inadequate out-of-cell time (or time spent outside of overcrowded dorms, gyms, dayrooms, and hallways) to compensate for the density of the population, especially at CIM, | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| where prisoners living under extremely overcrowded, triple-bunked conditions had only a few hours per week of recreation in an exercise yard and few opportunities to obtain scarce prison jobs.  The idleness and hopelessness that accompany extremely limited programming in overcrowded living units breed frustration, anger, and violence."  (November 9, 2007 Report, p. 18, ¶33.) | | |
| 40.     "I agree with the governor's blue-ribbon panel that 'combined with the reductions in security and non-security staff, the crowded conditions and lack of programming have elevated security risks and increased the probability of violent confrontations.'  Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report)." (November 9, 2007 Report, p. 18, ¶33.) | Objection:  Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.

Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 41.     "I also agree with the *Coleman* Special Master that under overcrowded conditions, '[d]isturbances occur more frequently, with resulting increases in the number and duration of lockdowns.'  Joint Pls' Trial Ex. 35 at 7 (Coleman Special Master's Report Regarding Overcrowding, May 31, 2007)."  (November 9, 2007 Report, p. 18, ¶33.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 42.     "Third, short-staffing and the use of 'ugly beds' means that staff has far less control over prisoners. It is far more difficult to supervise a gym densely populated with triple-bunked minimum to maximum security prisoners, as at CIM East Facility, or a housing unit with people sleeping in bunk-beds in a hallway or dayroom, as at CIM and Valley State, than it is to supervise a unit where all prisoners are locked in cells.  It is also far more difficult to get to know the prisoners in your unit when there are twice as many of them.  These situations are very much a reality in CDCR.  In CIM's | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

- 13 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| West Facility, at Cleveland Hall, I saw 198 prisoners with only two officers to keep order, one in an office, with the other roving.  Half of the dorm was in another building connected by the shower/bathroom area, and one room in the back was completely out of sight.  It is impossible to provide any type of security or proper services under these circumstances. The housing unit was a serious disturbance waiting to happen.  If the prisoners wanted to take over the dorm they could do so in a second and no one would know. In the East Facility gymnasium at CIM that I toured, there were only two officers on duty at night and three during daytime watches, plus a gunner, to supervise 202 prisoners." (November 9, 2007 Report, p. 18-19, ¶34.) | | |
| 43.    "Visibility in these units was poor and sometimes sightlines were non-existent.  The physical structure simply could not allow an acceptable level of security.  Illicit activities would go on unnoticed and correctional officers are very much at risk.  Further, these closed gyms and dormitories provide no opportunity for backup if radio communication is not available in an emergency, and the CDCR lacks adequate supervisory personnel and cameras that would augment the staffing. My review of the written materials and conversations with staff on the tours gives me confidence that these conditions are replicated around the system - indeed, in many places, they are the norm."  (November 9, 2007 Report, p. 119-20, ¶35.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 44.    "With short-staffed and overworked officers, and angry, idle prisoners spilling out into common areas, experience tells me that not only is increased violence more likely, but crisis decision-making | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| based on the inadequate controls over the inmate population is guaranteed." Fn. 4: "Increased violence may not be reflected in statistics or in self-reports by prisoners, since, as I mentioned above, many illicit activities will take place out of the sign and knowledge of staff. It is impossible to measure fully the degree of violence, including sexual assaults, taking place among the prison population because there is inadequate staff supervision." (November 9, 2007 Report, p. 36, ¶36 and fn. 4.) | | |
| 45.    "Not only does overcrowding cause violence, but violence also leads to even more overcrowding. California punishes prisoners who are found to have committed acts of violence in prisons with the removal of work-time credits, which results in longer terms, or by referring them to the district attorney for prosecution. See Cal. Code of Regs., tit. 15, §§ 1315, 1316, and 1323. Either way, the result is likely to be extended lengths of stay, which increases the population and ensures further deterioration of the system." (November 9, 2007 Report, p. 120, ¶33.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 46.    "The overcrowding is getting worse." (November 9, 2007 Report, p. 20, Heading 6.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 47.    "'The overcrowded conditions are projected to worsen over the next several years as the population continues to grow. Over the past 20 years, the state inmate population has grown at an average annual rate of 5 percent. If this trend continues, the LAO indicates that the state prison system will be deficient 152,900 beds by the year 2022.' Joint Pls Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007)." (November 9, 2007 Report, p. 21, | Objection: Phase II issue - irrelevant, hearsay | Relevant to Phase I.

Admissible under Federal Rules of Evidence 703, 803(8). |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| ¶38.) | | |
| 48.    "CDCR itself projects steady population increases, to 175,418 by June 30, 2008: 179,105 by June 30, 2009; 183,171 by June 30, 2010; 186,137 by June 30, 2011; 189,226 by June 30, 2012, and 191, 886 by June 30, 2013.  Joint Pls' Trial Ex. 19 at 2, 6 (CDCR Fall 2007 Adult Population Projections.)." (November 9, 2007 Report, p. 21, ¶38.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 49.    "No relief is in sight.  The CDCR itself projects that even if its population reduction strategies are implemented successfully, California's prisons will still hold 162,674 male prisoners in 2009 (compared with 159,605 male prisoners today).  Plata Pls' Trial Ex. 2 at 12 (*Plata* Defendants' Report in Response to the Court's February 15 Order, May 16, 2007; Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007)."  (November 9, 2007 Report, p. 21, ¶39.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 50.    "The state has no plans to lift the State of Emergency before 2009.  Plata Pls' Trial Ex. 2 at 12.  Under the recently passed prison-building law, Assembly Bill 900, not a single 'in-fill' bed will be activated before 2009, assuming that defendants can meet their schedule.  Id. at 9."  (November 9, 2007 Report, p. 21, ¶39.) | Objection: Phase II issue - irrelevant, hearsay | Relevant to Phase I. Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 51.    "There are already indications that they cannot, however.  AB 900 also fails to include any plans for staffing.  Joint Pls' Trial Ex. 13 at 8."  Fn. 5: "According to legislative experts, 'the department's timeline for constructing the infill beds depends on its core business services functioning in a timely manner…[and] the majority of these functions within the department are not operating in a timely manner,' | Objection: Phase II issue - irrelevant, hearsay | Relevant to Phase I. Admissible under Federal Rules of Evidence 703, 803(8). |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| and 'the remote location of many of the construction sites means that the department will likely have difficulty finding contractors willing to bid for the contract.'  Joint Pls' Trial Ex 13 at 7."  (November 9, 2007 Report, p. 21-22, ¶39 and fn. 5.) | | |
| 52.    "Given how short-staffed the CDCR currently is, they will simply have no ability to open new beds because there will not be adequate staff to run the new housing units." (November 9, 2007 Report, p. 22, ¶39.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 53.    "In summary, the overcrowding is pervasive and severe and, barring court intervention, conditions will continue to deteriorate."  (November 9, 2007 Report, p. 22, ¶40.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 54.    November 9, 2007 Report, p. 22, Heading C "By any definition, California's prison population exceeds its capacity to safely house prisoners and provide for their needs" | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 55.    "This system ensures that the facilities and service areas - such as plumbing, kitchen space, electricity, laundry, education, etc.-- are sized to the actual population, and not some anticipated or hoped-for number of prisoners." (November 9, 2007 Report, p. 23, ¶41.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 56.    "**Such a system is a distant dream in California, where by any measure, population vastly outstrips capacity.  California's prisons are currently at 203.7 percent of** 'design' capacity, the termination by the prison architect as to how many prisoners an institution can hold, including how many toilets, lavatories, and showers are needed.  **Joint Pls' Trial Ex. 25 at 1 (Weekly Report of Population, October 31, 2007). In my experience, prison systems** | Objection to highlighted portion: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |

- 17 -

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| *generally maintain their populations within design capacity. California's vast overflow, then, places it very far outside the range of accepted practice.*" (November 9, 2007 Report, p. 23, ¶42.) | | |
| 57.    "The design of some prisons makes them even more susceptible to overcrowding. For example, dorms are easier to overcrowd than cells." (November 9, 2007 Report, p. 24, ¶43.) | Objection - Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 58.    "Another way of looking at prison capacity addresses the number of prisoners that can be held consistent with basic safety and security principles." (November 9, 2007 Report, p. 24, ¶44.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 59.    "California's population surpasses by 15,000 the 'safe and reasonable' capacity, defined as 'the maximum number of inmates who can safely and reasonably be housed in the prison system…. [The CDCR] has determined that the maximum safe and reasonable capacity of the state's male prisons is 137,764 -- 179 percent of design capacity.' Joint Pls' Trial Ex. 4 at 124 (Deukmajian Report)." (November 9, 2007 Report, p. 24, ¶44.) | Objection: Phase II issue - irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1.  Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 60.    "According to a 'group of experienced California prison wardens,' CDCR's 'operable' capacity 'to support full inmate programming in a safe and security environment is 111,309 inmates, or 145 percent of design capacity.' *Id.* at 124." (November 9, 2007 Report, p. 24-25, ¶45.) | Objection: Irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1.  Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 61.    "CDCR currently houses 171,285 prisoners in California, *exceeding 'operable' capacity by nearly 60,000.*" (November 9, 2007 Report, p. 25, ¶45.) | Objection to highlighted portion: Irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1.  Admissible under Federal Rules of Evidence 703, 801(d)(2), |

- 18 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| | | 803(8). |
| 62.    "Those definitions, however, still fail to look at the capability of a system or individual facility to adequately **and legally** care for the medical and mental health needs of its population…"  (November 9, 2007 Report, p. 25, ¶46.) | Objection to highlighted portion: Irrelevant, impermissible legal conclusion/opinion | Relevant.\n\nWithin the scope of expertise. |
| 63.    "This limiting factor further reduces the CDCR's capacity to house prisoners legally." (November 9, 2007 Report, p. 26, ¶47.) | Objection: Legal conclusion | Within the scope of expertise. |
| 64.    "The prisoners **cannot be fed or safely allowed out of their cells without adequate staff to supervise them, and** cannot be provided appropriate medical and mental health care without clinical staff to care for them…" | Objection to highlighted portion: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 65.    "Thus, any measure of California's prison capacity that includes a reasonable expectation of providing constitutional levels of medical and mental health must account for the severely limiting building design and staffing needs." (November 9, 2007 Report, p. 27, ¶50.) | Objection: Phase II issue - irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 66.    "The Governor's blue-ribbon panel declared more than three years ago that 'California's prisons are presently filled to the breaking point, with populations exceeding both design capacity and "safe and reasonable capacity," and far exceeding operable capacity.'  Joint Pls' Trial ex. 4 at 124 (Deukmajian Report)."  (November 9, 2007 Report, p. 28, ¶51.) | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 67.    "The situation looks even more dire when…California's severe deficits in building design and staffing capabilities are factored into the equation."  (November 9, 2007 Report, p. 28, ¶51.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 68.    "…all of the factors that we in Texas consider essential components of capacity are considered, and…"(November 9, | Objection: Irrelevant | Defendants cannot object to sentence fragment that does not stand alone.  In any |

- 19 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 2007 Report, p. 28, ¶51.) | | event, the fragment is part of Mr. Scott's opinion that is relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 69.    "I wholeheartedly agree with the statement the governor made more than a year ago: California's prison population 'exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state,' causing 'extreme peril.'  Joint Pls' Trial Ex. 1 at 8 (Governor's Emergency Proclamation).  The 'extreme peril' in the potential for violence is easy to see." (November 9, 2007 Report, p. 28, ¶51.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. See also Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 70.    "Less obvious is the 'extreme peril' of teeming populations of prisoners, *at risk for deadly disease outbreaks* …." (November 9, 2007 Report, p. 28, ¶51.) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 71.    "Overcrowding engenders a state of perpetual crisis that shuts down non-emergency prison functions."  (November 9, 2007 Report, p. 35, ¶63.) | Objection: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 72.    "I agree with the Governor's expert panel: 'Staffing reductions, overcrowding, and attendant violence have eroded the ability of the prisons to operate effectively for any purpose other than security.' Joint Pls' Trial Ex. 4 at 125 (Deukmajian Report)."  (November 9, 2007 Report, p. 35, ¶63.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.<br><br>Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 73.    "Riots and disturbances at Avenal, the California Correctional Center, Calipatria, and Wasco alone account for thousands of days on lockdown or modified programs.  Joint Pls' Trial Ex. 11 at ¶3 (Declaration of Scott Kernan in | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Support of Defendants' Report in Response to the Court's February 15, 2007 Order, May 16, 2007). The Governor noted more than a year ago that overcrowding has 'substantially limited or restricted inmate movement…'  Joint Pls' Trial Ex. 1 at 6 (Emergency Proclamation)."  (November 9, 2007 Report, p. 35, ¶63.) | | |
| 74.    "As a result of lockdowns, many prisoners spend extreme amounts of time in their cells or crowded dorms or gyms, with drastically limited time in beneficial programs or basic living needs." (November 9, 2007 Report, p. 36, ¶65.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 75.    "Overcrowding has pernicious effects on classification, the central organizing principal that **keeps modern prisons as safe as possible for prisoners and staff by separating more dangerous inmates from more vulnerable prisoners** and …"  (November 9, 2007 Report, p. 37, ¶67.) | Objection to highlighted portion: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 76.    "Overcrowding has wreaked havoc with CDCR's classification systems intended to **maintain safe conditions and** ensure appropriate specialized health care placement." (November 9, 2007 Report, p. 38, ¶67.) | Objection to highlighted portion: Irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violations. |
| 77.    "In California's overcrowded prisons, an estimated 25% of prisoners are housed outside of their security levels, many in higher security housing. Joint Pls' Trial Ex. 5 at 14 (Dr. Joan Petersilia, *Understanding California Corrections*).  The most common reason to override classification scores in California is called a 'population override,' which 'occurs when no bed is available at the type of facility that would normally be used for an inmate with a given score.  Under those circumstances, the classification staff | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.

Admissible under Federal Rule of Evidence 703. |

- 21 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| representative has total discretion over prisoner placement.  This override has become increasingly common as California prisons have filled up beyond their designed capacity [], and this shuffling of inmates to areas that were not designed to hold them has adverse consequences for both the facilities and the individuals they house.' *Id.* (footnote omitted).  In fact, this is not an override at all - this is the rejection of any classification scheme at all for these estimated 25% of prisoners.  In any event, it is two and a half times greater than the accepted norm for variations from the classification scheme, and presents an unacceptable risk of violence and harm.  As Dr. Petersilia notes,<br><br>    'There are significant implications of these frequent reassignments to more heavily fortified facilities, where inmate violence is higher, [citation omitted] the housing cost per prisoner is higher, and a lower level of programming is available to inmates.  In other words, the pressures of overcrowding frequently lead to housing assignments that are more expensive and dangerous than necessary and less likely to encourage rehabilitation….<br>    [¶]…Prisoners in a maximum-security prison or unit spend a good part of the day in their cell, have strictly regulated movement, and are surrounded by a secure perimeter with extensive gun coverage.  At the | | |

- 22 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| other extreme, in a minimum-security conservation camp, prisoners spend a large part of the day out of their dorm and have few restrictions on movement within an unfenced security or work area. [citation omitted]  These variations in inmates' level of movement translate into tremendous differences in their ability to participate in rehabilitation programs.' *Id.*"<br><br>(November 9, 2007 Report, p. 38, ¶69.) | | |
| 78.    "I saw these problems in practice at Avenal, where Building 510 houses 300 prisoners; the population overflow goes to segregation units intended for punitive purposes, where they are treated like segregation prisoners." (November 9, 2007 Report, p. 39, ¶70.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 79.    "In addition, prisoners are subject to increased degrees of danger and potential for violence because they are placed with more dangerous and violent prisoners than their classification scores would warrant."  (November 9, 2007 Report, p. 40, ¶71.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 80.    "Mixing prisoners of different security levels and different needs is also extremely dangerous." (November 9, 2007 Report, p. 40, ¶72.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 81.    "That is why, for example, in Texas we have defined 'capacity' to include enough space to ensure 'proper inmate classification and housing within the unit that is consistent with the classification system' as well as 'housing | Objection: irrelevant, unqualified legal opinion | Relevant to whether overcrowding is the primary cause of the constitutional violations.<br><br>Within the scope of expertise. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| flexibility to allow necessary repairs and routine and preventive maintenance to be performed without compromising the classification system….' Texas Gov't Code ¶ 499.102(a)(1)-(2) (Appendix C)." (November 9, 2007 Report, p. 41, ¶73) | | |
| 82.    "According to CDCR's Director of CDCR Division of Correctional Health Care Services, this action would result in 'thousands of inmate moves over a 13-week period scheduled to begin in September 2006.'  Joint Pls' Trial Ex. 54 at 1 (Dr. Peter Farber Szekrenyi, letter to Plata Receiver Robert Sillen and Coleman Special Master J. Michael Keating, Jr., September 1, 2006)."  (November 9, 2007 Report, p. 41, ¶74.) | Objection: Hearsay, document speaks for itself | Admissible under Federal Rules of Evidence 703, 801(d)(2). |
| 83.    "CDCR simply did not have the capacity to deal with this event in an appropriate way and instead was forced to resort to cutting *legally required* corners." (November 9, 2007 Report, p. 42, ¶75.) | Objection: Legal conclusion/opinion | Within the scope of expertise. |
| 84.    "The head of medical services admitted that during the resulting transfers, CDCR would be unable to comply with legal requirements such as transferring prisoners with a 30-day supply of prescribed medications, performing intake assessments and tuberculosis tests on new arrivals, and completing medical summary forms for transferring prisoners.  *Id.* at 2-3.  Other 'necessary medical services' would suffer 'increased delay': outside specialty service appointments would be cancelled for prisoners scheduled to transfer. *Id.* at 3.  Further, in order to conduct 'required [mental health] evaluations, the existing mental health staff w[ould] have to be redirected from their primary responsibility of direct patient care.' *Id.* at 2." (November 9, 2007 | Objection: Hearsay, document speaks for itself | Admissible under Federal Rules of Evidence 703, 801(d)(2). |

- 24 -

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Report, p. 42, ¶75.) | | |
| 85.    "Administrators spend their time doing damage control, rather than making sure the prison is operating properly and prisoners are getting the services that they need.  I was the warden of a prison with 3,000 prisoners and that was almost unmanageable.  A population of 7,000 or more, as is found in some California prisons, is not manageable at all. The sheer size and complexities of managing a prison that size would be overwhelming for one manager especially with the limited resources in the areas of staffing and inadequate space for services to the offenders that I observed at all of the prisons I toured in California. One warden simply cannot know what he/she needs to know on a daily basis to make good informed managements decisions." (November 9, 2007 Report, pp. 42-43, ¶76.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 86.    "I was told at CIM that 98% of parole violators do not have their files when they arrive, which leads to security problems because staff are unable to properly classify prisoners."  (November 9, 2007 Report, p. 43, ¶78.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 87.    "Adequate record-keeping is a basic component of correctional systems management, but at Avenal, a prison *I was told was built for 2900 prisoners with a current population of 7500.  I was told that there was four feet of loose filing waiting to be placed in prisoners' health records*." (November 9, 2007 Report, pp. 43-44, ¶78.) | Objection to highlighted portion: Hearsay | Admissible under Federal Rules of Evidence 703, 801(d)(2). |
| 88.    "Staff told me they had 54 inches several days earlier and has been much higher at other times." (November 9, 2007 Report, p. 44, ¶78.) | Objection: Hearsay | Admissible under Federal Rules of Evidence 703, 801(d)(2). |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 89.   "Based on the above, my opinion is that overcrowding *is the primary cause of the medical and mental health constitutional violations caused by deficiencies in the support role played by non-health care staff*."  (November 9, 2007 Report, p. 44, Heading "Overcrowding is the primary cause of the constitutional violations," ¶80.) | Objection to highlighted portion: Legal conclusion, ultimate issue | Admissible under Federal Rules of Evidence 704.  See Plaintiffs' Response to Defendants' Objections to Evidence Submitted in Opposition to Motions for Dismissal or, Alternatively, Summary Judgment or Adjudication, October 13, 2008. Within the scope of expertise. |
| 90.   "In rendering this opinion, I agree with the Governor's blue-ribbon panel of experts that '[t]he key to reforming the system lies in reducing the numbers.'  Joint Pls' Trial Ex. 4 at 3 (Deukmajian Report)."  (November 9, 2007 Report, p. 44, ¶80.) | Objection: Irrelevant, hearsay | Relevant to whether overcrowding is the primary cause of the constitutional violations.

Admissible under Federal Rules of Evidence 703, 801(d)(2), 803(8). |
| 91.   "I also agree with the *Plata* Receiver, when he reports that '[m]ost California prisons operate at 200% of capacity, with no effective relief in sight.  Unless and until the living conditions of some prisons and the overpopulation experienced system-wide is effectively addressed, the Receiver will be impeded in applying systemic and even some ad hoc remedies to the medical care system'  Joint Pls' Trial Ex. 53 at 3  (Receiver's First Bi-Monthly Report, July 5, 2006)."  (November 9, 2007 Report, pp. 44-45, ¶80.) | Objection: Phase II issue - irrelevant | Relevant to Phase I. |
| 92.   "I further agree with the California State Auditor that '[m]eeting the constitutional rights of inmates to receive minimum standards of treatment' is a problem that 'emerge[s]' from overcrowding. Joint Pls' Trial Ex. 6 at 22-23 (California State Auditor's Report."  (November 9, 2007 Report, p. 45, ¶80.) | Objection: Hearsay, document speaks for itself | Admissible under Federal Rules of Evidence 703, 803(8). |
| 93.   "I also agree with the Office | Objection: Phase II | Relevant to whether |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| of the Inspector General that efforts to solve the medical care failures 'are severely hampered by inmate population pressures that have prisons straining at nearly twice design capacity, spreading staff recourses thin and leaving little facility space available for programming and other purposes. Developing sustainable solutions will require the [CDCR], state policy makers, and the public to collectively address the available options to reduce overcrowding. Joint Pls' Trial Ex. 46 at ES-1 (Office of the Inspector General, Accountability Audit, Review of the Audits of the California Department of Corrections and Rehabilitation Adult Operations and Adult Programs, 2000-2004, April 2006)." (November 9, 2007 Report, p. 45, ¶80.) | issue - irrelevant; irrelevant, hearsay | overcrowding is the primary cause of the constitutional violations.  Admissible under Federal Rules of Evidence 703, 803(8). |

**B.    August 2008 Supplemental Report of Doyle Wayne Scott**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 1. August 2008 Suppl. Report, p. 1, Heading 1: "Overcrowded conditions continue to endanger health and safety of California's prisoners." | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 2. "…California's prisons remain drastically overcrowded, which makes the state unable to **keep prisoners and staff safe and** to provide for the health care needs of prisoners."  (August 2008 Suppl. Report, p. 1, ¶4.) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 3. "I agree with former CDCR Secretary Jim Tilton, that the overcrowding - and use of dayrooms, gymnasiums, hallways, and other inappropriate places for housing prisoners - 'has reduced the availability of program and recreation space that is essential for positive inmate programming. | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.  Admissible under Federal Rules of Evidence 703, 801(d)(2). |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| There is widespread agreement among correctional experts that chronic idleness produces negative psychological and behavioral effects in prison.' Joint Pls' Trial ex. 72 at 15 (CDCR Presentation to the Senate Select Committee on Prison Population Management and Capacity, August 15, 2006). I further agree with Mr. Tilton that<br><br>    [i]dleness-related frustration increases the probability of interpersonal conflict and assaults in prison. Overcrowding simultaneously reduces the opportunities for staff to effectively monitor inmate behavior and drastically limits the options to reduce animosities between inmates by separating them or sending them to different facilities. Thus, there is less for inmates to do, fewer outlets to release the resulting tension, a decreased staff capacity to identify inmate problems, and fewer options to solve them if and when they do.<br><br>*Ibid.* Moreover, my assessment of the present situation in California's prisons comports with Mr. Tilton's in 2006: 'the risk of catastrophic failure in a system strained from severe overcrowding is a constant threat…[I]t is my professional opinion this level of overcrowding is unsafe and we are operating on borrowed time.' Ibid." (August 2008 Suppl. Report, pp. 1-2, ¶4.) | | |
| 4. "Prisoners continue to be housed in unacceptable conditions that endanger their health and safety. Prisoners in Folsom (in Building | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Two) were double-celled in six-by-eight foot cells, with two bunks, a toilet and sink, and a desk crowded into the cells with the two prisoners. There was hardly any unencumbered space in those cells, and they were extremely narrow. Prisoners in these units spent very little time outside these cells. There were no dayrooms in the units. Although there was a large hard, they spent little time on it and what time they spent was in groups of several hundred with very few staff. (I saw only one staff on the yard on my tour.) It is inhumane to warehouse prisoners two to a cell under such conditions." (August 2008 Suppl. Report, pp. 2-3, ¶5.) | | |
| 5. "Inadequate out-of-cell or out-of-gym time was a common complaint on these recent tours, as on my first round of tours. Staff at Solano told me that administrative segregation prisoners do not receive even the required 10 hours per week of outdoor recreation, because there is simply not enough space available to provide them access to safe exercise." (August 2008 Suppl. Report, p. 3, ¶6.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 6. "Nontraditional or 'ugly' beds are still very much a common practice in California's prisons. A converted gymnasium at Solano (H Building) contained 225 triple bunks - a wall of sound and bodies and noise. As was often the case in areas with significant numbers of people housed where people were never intended to be housed, many of the over-used toilets and showers were broken. Z Dorm at DVI was a similar mass of people." (August 2008 Suppl. Report, pp. 3-4, ¶9.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 7. "DVI, a reception center for the San Francisco Bay Area, is extraordinarily overcrowded. The design capacity is 1700 and the count, the day I was there, was just short of 4000. All but approximately | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |

1670883.2

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 640 prisoners were there for reception processing. The prison is so overcrowded that prisoners being released are carefully timed with new arrivals so that beds are immediately swapped. Every available space was in use for offender housing: most dayrooms at DVI are used for offender housing. I saw dayrooms with 40 inmates in double and triple bunks, using showers in the bottom tier of the associated cellblock. There were beds along all the outer walls and in the central area, leaving just enough space to walk, but not enough to do anything else. There was no recreation space at all." (August 2008 Suppl. Report, p. 4, ¶10.) | | |
| 8. "By placing prisoners in such settings, and requiring staff to work under these conditions, California is placing itself at serious risk, as the Governor noted in his State of Emergency Proclamation, from increased violence from enforced idleness, deteriorating mental and physical health from inadequate access to exercise and the outdoors." (August 2008 Suppl. Report, p. 6 ¶12.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 9. Heading "California has no meaningful plan to fix its overcrowding problems," and ¶¶14-21 in their entirety. **See attached**. | Objection: Phase II issue - irrelevant. | Relevant to Phase I. |

- 30 -

1    DATED:  November 13, 2008                HANSON BRIDGETT LLP

2

3                                             By: /s/ Paul B. Mello
                                              PAUL B. MELLO
4                                             Attorneys for Defendants
                                              Arnold Schwarzenegger, et al.
5
     DATED:  November 13, 2008                EDMUND G. BROWN JR.
6                                             Attorney General of the State of California

7

8                                             By: /s/ Kyle A. Lewis
                                              KYLE LEWIS
9                                             Deputy Attorney General
                                              Attorneys for Defendants
10                                            Arnold Schwarzenegger, et al.

11

12   DATED: November 13, 2008                 PRISON LAW OFFICE

13

14                                            By: /s/ Sara Norman
                                              SARA NORMAN
15                                            Attorneys for *Plata* and *Coleman* Plaintiffs.

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF DOYLE
WAYNE SCOTT PLTFS IDENTIFIED FOR PHASE I ADMISSION                1670883.2

Report of Doyle Wayne Scott

November 9, 2007

I.    California's severely overcrowded prison population far outstrips the ability
of the system to safely or appropriately house its prisoners

3.  The overcrowding crisis in California is, in my experience, unprecedented in scope
and in the dangers and deprivations of day-to-day life in the prisons.  My extensive
experience in running the Texas prison system and evaluating management, staffing, and
security needs in multiple state and local jail systems, as well as my review of numerous
reports regarding California's prisons from diverse and credible sources, and my tours of
four California prisons, lead me to the conclusion that without substantially reducing its
prisoner population, California will never be able to generate the custodial support
services necessary to provide prisoners with basic medical and mental health care.

Obj #4    A. The Texas experience demonstrates the impossibility for systemic reform
in these areas under current overcrowded conditions

4.  Next to California, Texas is the largest penal system in the United States and one
of the largest in the world.  When I started as a correctional officer in 1972, the system
was severely overcrowded, reaching "over 200 percent of . . . original design capacity" by
1980, the year the overcrowding, health care, and many other aspects of the system were
declared unconstitutional. *Ruiz v. Estelle*, 503 F. Supp. 1265, 1285 (S.D. Texas 1980).
As Judge Justice found 27 years ago, the Texas Department of Corrections

> has been, by the admissions of its own officials, severely overcrowded since at
> least March of 1977.  The problem has reached crisis proportions.  When Director
> Estelle testified in August 1979, he reported that approximately 1,000 of the
> system's 26,000 inmates were sleeping on the floors of TDC institutions.  These
> supernumerary inmates are housed in cells and dormitories already holding almost
> double the number of persons for which they were designed.

2

*Id.* at 1277. The judge described the situation as "intolerable" and, in particular, noted that "[t]he population density of inmates confined in dormitories is shocking," *id.* at 1278, with "sanitary and recreational facilities" that were "wholly inadequate…" *Id.* at 1279.

5. Judge Justice issued population controls as part of the relief in *Ruiz*. *See, e.g., id.* at 1387. As a corrections manager and later the system's executive director, I firmly believe that population control was absolutely necessary in our decades-long efforts to correct the systemic violations. We were able to remedy the serious harms by reducing our offender population to reasonable capacity limits agreed to by the parties that allowed the Texas Department of Corrections to properly classify and manage its inmates and their attendant needs. These limits or "caps" were calculated at five percent less than the original design capacity of each institution. Those "caps" were later memorialized in legislation passed by the State of Texas that made those limitations permanent.

6. California today is far more overcrowded than Texas ever was. It is the worst overcrowding I have ever seen, in my decades of work in the severely overcrowded Texas system and in subsequent expert consultant reviews of staffing, security, and management functions in prison systems in Oklahoma, Indiana, Florida, New Mexico, Kentucky, Cook County, and Puerto Rico. Based on my experience, I was prepared to see crowded conditions, fraying infrastructure, and management failures in California's prisons. As the head of a similarly huge and complex penal system, and as an employee of that system as it struggled with severe overcrowding, I know that it is impossible to run such an

3

operation properly under such circumstances. However, I was shocked by what I saw in the four California prisons I toured. These tours confirmed the profoundly disturbing accounts that I have read from the Court, the Governor, California Department of Corrections and Rehabilitation (CDCR) officials, the *Plata* Receiver, the Legislature, and the Office of the Inspector General.[1] Not only are California's prisons operating under a state of emergency, it is clear to me that unless the population is reduced, the state will remain in crisis verging on catastrophe and will remain utterly unable to provide adequate medical and mental health care to the prisoners in its custody.

**B. California's prison population has expanded tremendously in the last 30 years without the infrastructure, staff, or management capabilities to support it**

7.   The last few decades have seen extraordinary growth in California's prison population. The population has grown more than 500 percent in less than 30 years, and the number of prisons has nearly tripled. Plata Pls. Trial Ex. 1 at 4 (*Plata* Findings of Fact and Conclusions of Law Re Appointment of Receiver).   Today, California houses

---

[1] I personally toured four of California's 33 state prisons in October 2007: Avenal State Prison (Avenal), California Institution for Men (CIM), Valley State Prison for Women (VSPW), and California State Prison at San Quentin (San Quentin). These prisons represent a range of the most important variations in the system: men's and women's facilities; Reception Centers, general population units, specialized mental health units, condemned housing, and administrative segregation housing; dormitory, gymnasium, dayroom, hallway, and celled housing; high, medium, and low security; and old and more recently built structures. In addition, I have reviewed reports as noted in Appendix B from a wide range of credible and impressive sources, describing and analyzing individual prisons as well as systemic issues. My review of these written materials gives me confidence that my observations at the four prisons I toured are truly

4

"means that about 10 percent of the prison population is currently housed in 'bad' beds." Joint Pls' Trial Ex. 13 at 2 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007). "Ugly beds" are not merely uncomfortable, they are actually dangerous: they make it harder for staff to prevent violence and breed anger and frustration among prisoners by sharply curtailing the space available for anything but the warehousing of bodies. *See, e.g., id.* at 2.

Obj. 10

11. These "ugly beds" are truly appalling. I saw cages at the California Institution for Men (CIM) where, as staff freely admitted, prisoners have sometimes had to spend the night because there were no beds for them. In more than 35 years of prison work experience, I have never seen anything like it. These cages are in wide hallways with busy foot-traffic. They are only a few feet wide, and there is no room for a mattress, so prisoners have to sleep sitting on a bench. There are no toilets, and staff shortages would lead prisoners to wait lengthy periods to be escorted to bathrooms. It is difficult to properly hydrate prisoners in such a setting. These cages are an inhumane and unacceptable result of severe overcrowding.

12. At the same prison, I saw 54 prisoners in Sycamore Hall double-bunked and stuffed into a dayroom intended for recreational purposes. They had only one toilet. Also at CIM, I saw a shockingly overcrowded gymnasium at the East Facility. Such facilities are supposed to be temporary housing, but staff told me that some prisoners are there up to a year. It was a sea of people: 202 prisoners, with only seven showers and 11 working

6

toilets. These numbers violate contemporary correctional standards for safe and hygienic

facilities, as discussed in Section I.B.2, below.

13.   At the California State Prison at San Quentin (San Quentin), I saw a gymnasium

converted to inmate housing with 328 double bunk beds. There were only nine working

toilets to service this entire population. Similarly, Dorm 410 at Avenal State Prison

(Avenal) was designed for 172 prisoners but has a current population of 344, some

housed in triple bunks.

14.   My observations are entirely consistent with the findings of the *Coleman* Special

Master, who found shocking living conditions for many mentally ill prisoners. For

example, Deuel Vocational Institution (DVI) "was old and overcrowded. . . . A large

room around the perimeter housed 38 [mentally ill] inmates in a triple-bunk arrangement.

They reported that the room had a single toilet, urinal, and shower. Inmates were

observed dumping water into a drain from a 30-gallon garbage can which they used as a

shower supplement. Many windows were broken. Inmates reported that they used

blankets to cover windows but that custody officer removed the blankets without

replacing them, leaving the area cold and the beds unblanketed. An area of the

[administrative segregation] building housing caseload inmates was referred to as 'deep

seg' or 'the dungeon.' Its four cells were designed for the apparent purpose of isolation.

They had almost no outside light and were illuminated by a single light controlled by an

outside switch and turned off at night. Cells were malodorous, in disrepair, and out of

officers' ready view. Inmates in these cells likely had no more contact with custody staff than inmates housed in [punitive segregation] or stand-along administrative segregation cells and were in much worse condition. Time out of the dorm was limited to approximately 20 minutes twice per day for meals." Joint Pls' Trial Ex. 36 at 101 (18th Special Master's Report).

15.  The space inadequacies extend to treatment as well as living spaces. The *Coleman* Special Master has noted that "[e]xcessive population, thus, results in a reduction of programming space now occupied by inmate bunks[;] greater competition for use of the diminishing available space; fewer correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide treatment." Joint Pls' Trial Ex. 35 at 7 (*Coleman* Special Master's Report Regarding Overcrowding, May 31, 2007). He has documented mental health treatment taking place in closets (Joint Pls' Trial Ex. 36 at 73 (California Medical Facility)), in the middle of dayrooms (*id.* at 42 (High Desert State Prison), 55 (Mule Creek State Prison)), and on outdoor benches (*id.* at 304 (Valley State)). At the California Correctional Institution, suicidal prisoners have been held in holding cells; some "remained in the most frequently used holding cells for as long as three days." *Id.* at 225.

16.  As the *Coleman* Special Master has noted, the "ugly beds" harm prisoners. In California's severely overcrowded system, "[a]ll inmates must spend increasingly larger

# SUPPLEMENTAL REPORT OF DOYLE WAYNE SCOTT

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST 2008

access to care and provide the security necessary to deliver health care safely in a prison

setting are inadequate, lacking both the personnel and structure to ensure timely access to

health care services." Joint Pls Trial Ex. 67 at 5 (Receiver's Seventh Quarterly Report).

*Suppl. obj 9*

California has no meaningful plan to fix its overcrowding problems

14.    The CDCR's "Integrated Strategy to Address Overcrowding in CDCR's

Adult Institutions" (Integrated Strategy) is an inadequate plan to address this crisis for

several reasons. Joint Pls Trial Ex. 73. First, even if CDCR were to build the "infill" and

"secure reentry facilities" they note in the plan, these spaces will not be available for

prisoners to move in for years. CDCR predicts building 4,800 infill beds and 3,000

reentry beds in Phase 1, and "up to" 3,800 additional infill beds and 8,000 additional

reentry beds to follow. *Id.* at 3. CDCR predicts that the first 1000 infill beds will not be

ready for occupancy until FY 2010/11, with the next 3,800 not available until FY

2011/12. *See* Integrated Strategy at Chart 1A, Priority Projects, May Revision Pop. Only

500 reentry beds will be available in FY 2009/10, with 500 more the next year, and an

additional thousand added for each of the next several years. *Id.* Some of the beds

intended to provide relief for this emergency will not be available until 2013. *Id.*

CDCR's building projects will provide prisoners with minimal relief from the emergency

conditions for many years to come, an unacceptable state of affairs.

15.    Second, I have serious doubts as to whether CDCR is capable of

accomplishing what they set out to do in this strategic plan. The plan itself admits that

7

"CDCR has yet to build any of the infill beds authorized by AB 900" at its passage in May 2007 because they have not been able to find sites and because of "unforeseen limitations of infrastructure, community concerns with prison expansion, staffing difficulties, and scope of construction." *Id.* at 2. These should not have been "unforeseen" problems – these are exactly the problems faced in siting and building prison facilities. CDCR's current facilities have been severely understaffed and have a severely decaying infrastructure, as I point out in my original report; local communities are always concerned with prison expansion. These problems are nothing new. This plan admits CDCR's planning shortcomings for the last several years but provides no assurances that CDCR now has the capacity to accomplish what it promises.

16.    Further, the plan states that "the projects have been on hold" because of recent population projections, a budget crisis, and "settlement deliberations" in this case. *Id.* at 2-3. If the state were serious about building new facilities, and were committed to this as a meaningful solution to the crisis, it would not make such excuses.

17.    Third, the infill bed numbers – 4,800 beds in Phase I, 3,800 more in Phase II — are based on *overcrowded* housing – denoted on these charts as "HOC," or "housing overcrowding capacity," instead of "DBC," or "design build capacity." Prisoners in the new facilities, then, might not initially be living in gymnasiums or hallways, as they are now, but they will still be overcrowded. California will be in the same position with the new beds as with the old, replicating the same conditions that led to inadequate staffing

8

and treatment space, inadequate out-of-cell time, and overworked and overstressed staff and violent, frustrated prisoners.

18. The state's AB 900 Strike team concluded that housing should be at no more than 130% of design bed capacity in the long term, based on national standards. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike team Issue Memo No. 1, August 13, 2007). That is a realistic and appropriate place for CDCR to be, to ensure that its prisons are safe and provide legally required services. I caution, however, that while this number might be appropriate for new construction, it should be used carefully in CDCR's old, decaying facilities, with their failing infrastructure. Crowding prisoners at 130% is an appropriate goal for CDCR, speaking broadly, but some facilities might only be able to support and provide appropriate health care for smaller numbers.

19. Fourth, the Integrated Strategy is extremely vague on reform provisions. The document states that CDCR's strategy "relies upon a reform component" to "effectively reduce overcrowding consistent with CDCR's mission to reduce recidivism." but does not say what that reform component is. Joint Pls Trial Ex. 73 at 5 (CDCR's Integrated Strategy). In fact, CDCR has not even decided what this "reform component" will look like: "our integrated approach incorporates summary parole *or an alternative reform measure* that would safely reduce average daily population by approximately 8,000 inmates when fully implemented." *Ibid.* (emphasis added). This aspiration is a far

9

cry from an actual strategic plan.

20.     Fifth, the plan says nothing about funding sources for any of the building or reform components. Although AB 900 does provide some funding, it is not clear to me that it would cover all of the building proposed in this plan and, in particular, the undefined reform components. California's current budget crisis shows that unfunded promises are very risky propositions.

21.     The bottom line was stated properly by Mr. Tilton, in a statement currently on the CDCR's website; I would simply add medical care to his list of mental health care, education, and other basic needs that cannot be supplied under current conditions: "[t]he Department of Corrections owns the responsibility to assist inmates who are willing to change their ways with basic tools, of education, life skills, drug treatment and mental health, so they can get better when they leave Corrections -- not worse. But until I get overcrowding reduced -- then I don't have the opportunity to provide the program that I believe is my charge." (Viewed on the CDCR website on August 6, 2008, at http://www.cdcr.ca.gov/News/ Background_Info.html.)

Date: August 13, 2008                    _____
                                          Doyle Wayne Scott