PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>   Plaintiffs,<br><br>  v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>  Defendants | No.  Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al.,<br><br>   Plaintiffs,<br>  v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>  v.<br><br>   Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART** |

[253418-1]

**Plaintiffs' Statement**

At approximately 1:00 p.m. on November 13, 2008, Defendants provided Plaintiffs with the following chart of objections to the Expert Reports of Dr. Pablo Stewart. Declaration of Amy E. Whelan in Support of Plaintiffs' Responses to Defendants' Objections to the Expert Reports of Pablo Stewart, ¶ 3. This chart was 108 pages long and contains a great number of what can only be considered frivolous objections. Defendants object to many of the statements made by persons working for Defendants, about their employment, in the presence of Defendants' counsel, as hearsay. Defendants object to statements about suicide, problems with the provision of medication, and overflow housing for mentally ill inmate/patients, among other things, on the grounds of relevance. Defendants also object to the statements required by Fed. R. Civ. P. 26 (a)(2)(B) on the grounds of relevance. Such objections are not made in good faith and are a waste of Court and party resources.

Nonetheless, to ensure a complete record on the objections, Plaintiffs have responded below to all the objections raised by Defendants.

Because Defendants' delayed in providing the objections, and then filed without providing a reasonable amount of time to either respond or to meet and confer about specific objections, Plaintiffs are filing this Response without Defendants.

## I.

## DEFENDANTS' GENERAL OBJECTIONS

Dr. Stewart is not qualified to make the opinions and assertions as outlined in his supplement and expert report, in violation of Federal Rules of Evidence 702.

## II.

## PLAINTIFFS' RESPONSE TO DEFENDANTS GENERAL OBJECTIONS

Defendants state that Dr. Stewart is not qualified to make the opinions and assertions in his expert declarations. Defendants do not explain what the basis for this assertion is.

However, as discussed in ¶¶ 1-19 of his November 9, 2007 Declaration, and in the Resume attached thereto, Dr. Stewart is a very experienced clinical and forensic psychiatrist. He has worked in many correctional facilities, including numerous facilities dealing with the effects of overcrowding and has published and presented a large number of papers relating to mental health care, particularly relating to substance abuse issues and issues of detention.

Dr. Stewart is a highly qualified expert on issues relating to mental health care, the care of individuals in correctional facilities and the impact of overcrowding on mental health care systems.

## III.

## SPECIFIC OBJECTIONS

**A.    Expert Report of Pablo Stewart Dated November 9, 2007**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 5. Between August 1988 and December 1989, I served as the Director of Forensic Psychiatric Services for the City and County of San Francisco. In that capacity, I had administrative and clinical oversight responsibility for the psychiatric care provided to the inmate population in San Francisco at both the county jails and in the 12-bed locked inpatient treatment unit at the San Francisco General Hospital. At the time, mental health care in the San Francisco's jails was subject to a consent decree in the case *Stone v. City and County of San Francisco*, 968 F.2d 850 (9th Cir. 1992). In the 1980s, San Francisco's jails were overcrowded, and the *Stone* consent decree included remedies designed to limit vercrowding. While I was working as the Director of Forensic Services in San Francisco, the plaintiffs in the *Stone* case brought contempt proceedings against the City because of ongoing | Inadmissible Hearsay. Fed. R. Evid. 802 - *Stone* consent decree, contempt proceedings. | Not for the truth; public record |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowding that they asserted violated the consent decree. | | |
| 6. I have also served as a psychiatric expert or consultant to various federal courts or other organizations implementing remedial decrees covering the provision of mental health care in correctional institutions. For ten years, between April 1990 and February of 2000, I served as both a medical and a psychiatric expert for the United States District Court for the Eastern District of California in the consent decree case *Gates v. Deukmejian*, E.D. Cal. Case No. CIV S-87-1636. Among other things, that case involved the provision of adequate psychiatric care to mentally ill inmates at the California Medical Facility (CMF) in Vacaville, California. The *Gates* Consent Decree included various restrictions on overcrowding, and at times the parties in the case agreed to limitations on the size of the population of mentally ill inmates at CMF in order to prevent the mental health programs there from being overwhelmed and undermined by excessive transfers of mentally ill prisoners from other prisons. During my time monitoring CMF, California introduced its new state-wide Mental Health Services Delivery System (MHSDS) as part of the implementation of the remedy in the *Coleman* case. Given the requirements of the new MHSDS being implemented at CMF, the California Department of Corrections and Rehabilitation (CDCR) limited the number of inmates allowed to transfer to CMF in order to give the new MHSDS programs the ability to provide adequate psychiatric care. | Inadmissible Hearsay. Fed. R. Evid. 802 – *Gates* consent decree. | Not for the truth; public record |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 7. My experiences working on the *Gates* case also informed me about the difficulty of providing mental health services in locked, high security units. As part of the *Gates* case, CMF was forbidden from housing mentally ill inmates in its Willis Unit, a three-tier administrative segregation unit, because of the severity of conditions and the acknowledged difficulty of providing adequate mental health services in this type of setting. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 - Willis unit. | Not for the truth; public record<br><br>Relevant to development of expertise |
| 8. Between October 1996 and July 1997, I served as a psychiatric expert for the United States District Court for the Northern District of California in the case of *Madrid v. Gomez*, 889 F. Supp. 1 146 (N.D. Ca. 1993), an omnibus case involving psychiatric care and other issues at Pelican Bay State Prison in Crescent City, California. In my work on that case, I gained first-hand knowledge concerning the severe impact of prolonged isolation in segregation units on mentally ill inmates, as well as a concrete understanding of the need for constant monitoring of both non-mentally ill and mentally ill inmates in lock up units in order to prevent any further decompensation, since housing in these units by itself contributes to psychiatric instability. | Relevance. Fed. R. Evid. 402 - SHU | Relevant to development of expertise |
| 9. Between July of 1998 and February of 2004, I served as a psychiatric consultant to the National Council on Crime and Delinquency (NCCD) and subsequently for the Institute on Crime, Justice and Corrections at Washington University (when it took over monitoring responsibilities from NCCD) in their efforts to monitor juvenile detention and | Relevance. Fed. R. Evid. 402 Georgia case. | Relevant to development of expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| treatment facilities operated by the State of Georgia. In that case, I monitored an Agreement between the United States Department of Justice and the State of Georgia designed to improve the quality of care in its juvenile detention facilities. The Agreement encompassed mental health care, medical care, educational services, and treatment programs. Overcrowding was a major issue in the Georgia case. It was clear from the outset of the monitoring that overcrowding severely limited the ability of staff in the Georgia youth facilities to meet the medical and mental health needs of the youths in their charge. As part of the Agreement to address overcrowding, Georgia was required to limit the intake of youths from the counties into their state juvenile system in order to prevent the fragile mental health system from being overwhelmed. Also as part of the monitoring in that case, Georgia created significant new mental health treatment programs with dedicated staffing and capacity limitations, including most significantly a new inpatient treatment facility for boys and a second new inpatient treatment facility for girls. The Agreement also included a provision forbidding the prior practice of housing suicidal youths in administrative segregation units, and required "mainstream" housing and suicide watch monitoring of such youths. The youths would go to school and work during the day, and would continue their suicide watch in their housing units overnight. This provision was introduced because it had become clear under the prior practices that suicidal youths frequently | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| would not come forward with their suicidal feelings because they did not want to be locked down in administrative segregation for suicide watch. This demonstrated to me the dangerous and damaging nature of isolation in locked units for suicidal individuals. It also demonstrated to me the dangerous nature of punitive suicide watch conditions when they discourage suicidal individuals from coming forward and seeking treatment. | | |
| 10. Between June of 2003 and December of 2004, I was hired by the State of New Mexico as a defense expert for the implementation phase of the psychiatric sections of the "Ayer's Agreement" covering the New Mexico Corrections Department (NMCD). The Agreement was a settlement between attorneys representing New Mexico prisoners and the NMCD concerning the provision of adequate psychiatric care for inmates in New Mexico's highest security facility. The Ayers Agreement concerned a mental health treatment program in a disciplinary detention unit similar to the Security Housing Unit (SHU) at Pelican Bay State Prison. The treatment program implemented in the unit was based in part on the treatment standards for the Psychiatric Security Unit (PSU) mental health care programs in California. New Mexico implemented the new treatment program with an acknowledgement that they needed to maintain minimum clinical staff-to-inmate ratios given the severe nature of the housing conditions in the locked-down unit, and the potential for mental | Inadmissible Hearsay. Fed. R. Evid. 802 – Ayers agreement. | Not for the truth; public record |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| decompensation. | | |
| 11. I have also worked as an expert consultant for the United States Department of Justice (USDOJ) on inspections and remedial work in connection with youth facilities in California and Michigan. In August and September of 2003, I was retained as a medical and psychiatric expert for the USDOJ in connection with an inspection of the N.A. Chaderjian Youth Correction Facility in Stockton, California. In that inspection, we looked at overcrowding and whether the level of psychiatric care being provided met constitutional minimums, based on the number of wards and the limited number of staff. We concluded that the facility was badly overcrowded and understaffed. At the time, the facility consisted entirely of locked units, and the inspection found that the staff failed to provide minimally adequate medical and mental health services, that the facility locked down its wards excessively, that medication delivery was faulty, that the level of ward access to yard and recreation was insufficient, and that the institution's suicide prevention efforts were underdeveloped, overwhelmed, and ineffective. All of these problems were, in my opinion, closely correlated with the extensive overcrowding that existed at that time at that institution. Moreover, these types of problems are typical in the overcrowded systems with which I have been involved in one capacity or another. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. – California Juvenile facilities. | Not for the truth; public record<br><br>Relevant to development of expertise |
| 12. Between March of 2003 and the summer of 2006, I worked as an expert for the USDOJ in connection with inspections to identify and remedy | Relevance. Fed. R. Evid. 402 – Maxey. | Relevant to development of expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| various problems at the Maxey Training School, a youth facility with large medical and mental health treatment programs in Whitmore Lake, Michigan. The case involved the adequacy of medical and mental health care provided at the facility. It did not involve overcrowding. The case did involve issues around excessive lock-downs of suicidal youths. One of the remedies implemented as a result of the proceedings was a requirement that the institution handle all cases of suicidal wards on an "outpatient basis" in the regular housing units, and that any suicidal behavior that could not be handled in this manner would result in a transfer to an outside psychiatric hospital. The case also involved general medical and psychiatric conditions. | | |
| 13. I have presented numerous papers before mental health professionals, prosecuting and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including prison mental health services, dual diagnosis, mental illness, alcohol and drug abuse, and the treatment of substance abuse. These presentations and publications include: "Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices" (2004); "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Managing People of Different | Inadmissible Hearsay. Fed. R. Evid. 802 – papers. | Not for the truth; Required by Fed. R. Civ. P. 26 |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Pathologies in Mental Health Courts" (2000); "Model for Health Appraisal for Minors Entering Detention" (2000); "Co-Occurring Disorders: Substance Abuse and Mental Health" (2000); "The Dual-Diagnosed Client" (2000); "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering" (1999); "Working With the Substance Abuser in the Criminal Justice System" (1999); "Mental Illness and Drug Abuse" (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Criminal Justice and Substance Abuse" (1 999); "Impulse Control Disorders" (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major. Depressive Disorder" (1999); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment and Treatment of the High Risk Offender" (1999); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychiatry, Homelessness, and Serious Mental Illness" (1994). | | |
| 20. I have been retained by plaintiffs' attorneys in the *Coleman* and *Plata* cases as an expert on prison medical care and prison psychiatry and the impact of overcrowding on prisoners' medical and mental health, including how prison overcrowding detrimentally affects prisoners' mental health and interferes with the ability of prison officials to meet the existing and increased medical and mental health needs of the prisoners in an | Relevance. Fed. R. Evid. 402 – Other relief and remedies. | Required by Fed. R. Civ. P. 26 |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowded system. I have also been asked to render my opinion with respect to whether overcrowding within the California Department of Corrections and Rehabilitation (CDCR) is the primary cause of the current unconstitutional conditions experienced by members of the *Coleman/Plata* class. Finally, I have been asked to address whether other relief -that does not address overcrowding -will remedy the ongoing constitutional violations in a timely and effective manner. My opinions, based upon the evidence that I have reviewed to date documenting current conditions within the CDCR, on my tours of Deuel Vocational Institute (DVI), California State Prison Solano (Solano), and Salinas Valley State Prison (SVSP), and on my professional knowledge and my experiences working in similarly overcrowded correctional settings, are set forth below. | | |
| 21. Prior to rendering any opinions, I reviewed a variety of reports, documents and other materials relevant to the current condition of the CDCR. A complete list of the materials I have reviewed is attached hereto as Appendix B. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. – Appendix B. | Not for the truth; public record  Relevant because required by Fed. R. Civ. P. 26 |
| 23. My opinion that overcrowding within the CDCR is the primary cause of the ongoing constitutional violations is based on my experience with other overcrowded correctional systems and mental health programs, on my knowledge of the psychiatric and social science literature regarding the effects of overcrowded jail and prison conditions on the mental health of inmates, on the documents I have reviewed as part of my | Relevance. Fed. R. Evid. 402, Lack of Foundation – basis of opinion. | Relevant because required by Fed. R. Civ. P. 26; the report as a whole is the basis |

-11-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| preparation of my opinion in this case, on the prison tours conducted in this case, and on my personal experiences assessing and treating individual inmates within the context of overcrowded correctional systems. In particular, my opinion is based on my experiences managing psychiatric care in the San Francisco County jail system in the 1980s, when it was overcrowded. It is also based on my experiences with the overcrowded youth corrections system in Georgia. Overcrowding was also an important factor in the failure of the California Youth Authority to provide adequate medical and mental health care to its wards that was revealed in my inspection of the N.A. Chaderjian Youth Corrections Facility in 2003 for the USDOJ. In addition, while the psychiatric programs at the California Medical Facility were not typically overcrowded during the time that I served as an expert on the *Gates v. Deukmejian* case, there were times when the quality of care in the Outpatient Psychiatric Program (which became the Enhanced Outpatient Program (EOP) when the institution transitioned to *Coleman* programs) was undermined by a combination of insufficient staffing to meet the severity of the mental health problems presented in the EOP setting, along with insufficient treatment space, insufficient custodial staff, and a lack of back-up coverage when clinicians were out sick or on vacation. As discussed below, I encountered similar conditions on my recent prison tours of Deuel Vocational Institute, California State | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Prison Solano, and Salinas Valley State Prison. | | |
| 24. In addition, I am familiar with the manner in which housing conditions that tend to worsen mental illness among chronic mentally ill patients become more common in an overcrowded system. For example, it is well established that prolonged isolation and lack of stimulus of the sort that is commonly experienced when inmates are housed in administrative segregation and other high security housing units for long periods of time tend to exacerbate both the symptoms of mental illness and the underlying pathologies themselves. Indeed, these conditions are known to even cause symptoms of mental illness in individuals with no psychiatric history prior to being confined in this manner for long periods of time. Similarly, it is well established among psychiatrists that environmental and social stress of the type experienced in crowded dormitories tends to aggravate mental illness. In addition to finding these conditions at CDCR prisons with full mental health treatment programs, they are also common in reception centers that screen, assess, and process inmates when they first enter a prison system. Reception-centers typically confine inmates to their cells for much of the day either for security reasons or because they do not have much out-of-cell programming available. In overcrowded systems such as the CDCR today, inmates tend to spend significantly longer periods of time in reception centers. | Lack of Foundation – mental illness. | Based upon his expertise |
| 25. In my professional opinion, | Lack of Foundation – | Based upon his |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowded prison systems are characterized by several types of endemic correctional and care delivery problems which tend to reinforce and exacerbate each other. Two closely intertwined problems endemic to overcrowded systems are the shortages of staff and treatment space. In addition to the fact that there are simply more inmates for correctional officers to monitor, for mental health workers to treat, and for medical staff to treat, there is also frequently less treatment space in which to provide services to these inmates, and fewer correctional officers to provide escorts to medical and psychiatric appointments. | regarding endemic problems. | expertise |
| 26. A third endemic problem in overcrowded systems is that there are increased population pressures on administrative segregation and other locked units, and inmates tend to stay in these units for longer periods of time. In crowded systems, there are pressures to double-cell psychiatrically-impaired inmates in administrative segregation. In addition, overflow administrative segregation units are often created in overcrowded systems, which stretches limited staffing resources and yard space and results in the institution being less able to provide inmates with access to basic privileges like yard, and showers. Because of this, the inmates in these units spend more and more time locked in their cells, and have fewer interactions with other individuals. | Lack of Foundation – regarding endemic problems. | Based upon his expertise |
| 27. A fourth endemic problem is that the number of inmates experiencing psychiatric crisis, medical problems, and/or psychiatric decompensation tends | Lack of Foundation – regarding endemic problems. | Based upon his expertise |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| to soar,' causing overcrowding in mental health care units responsible for providing suicide watch and other forms of crisis psychiatric care. This often results in the creation of "overflow" crisis units, which are ill equipped to provide the level of psychiatric care required by-this population. | | |
| 28. A fifth common problem is that access to inmate work, exercise, vocations, counseling, and education programs tends to be reduced and/or in many cases eliminated, leading to greater idleness on the part of inmates. | Lack of Foundation – regarding endemic problems. | Based upon his expertise |
| 29. A sixth endemic problem is the overcrowded, dangerous, and chaotic housing environments themselves. Given the shortage of space to house inmates, more vulnerable mentally ill inmates are housed in crowded gyms, dayrooms, and other make- shift environments where the stress of living in close quarters and the threat of violence exacerbate their mental illness. Due to their overwhelmingly overcrowded nature, these make-shift housing units threaten both the health of the inmates confined within them and the public health. ' *See* P. Paulus, G. McCain, V. Cox, "The Relationship Between Illness Complaints and Degree of Crowding in a Prison Environment," Environment and Behavior 8 (1976) at 283,288; P. Paulus, G. Mc*Cain, V. Cox,* "Death Rates, Psychiatric Commitments, Blood Pressure, and Perceived Crowding as a Function of Institutional Crowding," Environmental Psychology and Nonverbal Behavior 3 (1978) at 107, 115; V. Cox, P. Paulus, G. McCain, "Prison Crowding Research," American | Lack of Foundation – regarding endemic problems. | Based upon his expertise |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | Psychologist 39 (1984) at 1148, 1159; E. Sieh, "Prison Overcrowding: The Case of New Jersey," Federal Probation 53 (1989) at 41; B Walker and T. Gordon, "Health Risks and High Density Confinement in Jail and Prisons," Federal Probation 44 (1980) at 53. See also Joint Pls' Trial Ex. 27 (*Plata* Receiver's June 11,2007 Supplemental Report on Overcrowding) at 3 (discussing increasing risk of "communicable disease outbreaks" in overcrowded CDCR units). | | |
| | 30. As discussed in greater detail below, all of these features appear to be present in the CDCR at this time. | Lack of Foundation – regarding endemic problems. | Based upon his expertise and rest of the report |
| | 35. The Governor's October 4, 2006 Proclamation of a State of Emergency contains several very frank admissions about the effects of overcrowding in the CDCR. The Proclamation declares that "conditions of extreme peril to the safety of persons and property exist in the 29 CDCR prisons identified [in the proclamation], due to severe overcrowding, and that the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state."  Joint Pls' Trial Ex. 1 at 7 2. In his Proclamation, the Governor also correctly listed some of the commonly recognized effects of overcrowding, noting that overcrowding causes harm to people and property, leads to inmate unrest and misconduct, reduces or eliminates programs, and increases recidivism as shown within this state." *Id.* | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.  Relevance. Fed. R. Evid. 402. | Admission of party opponent; relevant to existence of overcrowding and problems caused thereby |
| | 36. In his June 11,2007 Supplemental | Inadmissible Hearsay. | Public Record - Fed. |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Report on Overcrowding, the *Plata* Receiver notes several characteristics of overcrowded systems are present currently in the CDCR. See Joint Pls' Trial Ex. 27 (6111/07 Receiver's Supplemental Report on Overcrowding). First, he notes the increased violence between prisoners: "Overcrowding has resulted in increasing numbers of prisoner disturbances and 'lockdowns' by prison authorities in response. Because of the heightened security measures associated with lockdowns, medical care to the inmates is delayed and made substantially more time-consuming and cumbersome." *Id.* at 3. Second, he documents the increased medical needs of inmates in the overcrowded CDCR: "The risk of communicable disease outbreaks in the prisons, as well as their transference to local communities is increased substantially by overcrowding and the attendant rapid movement of prisoners between prisons." *Id.* Third, he notes the severe and detrimental effects of the staffing shortages caused by overcrowding on medical and mental health care: "The extent of overcrowding in the prisons means that the entire health care system medical, dental and mental health is increasingly burdened. Because of staffing shortages and the overwhelming number of prisoners needing care, prison staff often must decide with which set of class action remedial orders they will comply at the expense of others." *Id.* Fourth, he notes that overcrowding has led to shortages of space and beds, which in turn causes "competition between the various providers over resources, space, | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | R. Evid. 803(8); see Plfs' Response to Defs' MIL 3

Receiver is knowledgeable, Court appointed

Relevant to impact & existence of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| beds, and the like." *Id*. at 4. <u>Fifth</u>, the Receiver explains that the lack of adequate space makes it more difficult to hire clinical staff, noting that "existing staff shortages and inadequate clinical space" are among the factors that "make developing a competent medical staff a daunting challenge." *Id*. at 2. Receiver's 511 5/07 Report on Overcrowding. | | |
| 38. The Receiver's First Report on Overcrowding begins with an overall assessment of current overcrowding, explaining that "[T]he specifics of prison crowding are far worse than previously explained by State officials." Joint Pls' Trial Ex. 26 (5/15/07 Receiver's Report Re: overcrowding) at 1. The Receiver goes on to explain that the institutional problems which led to his appointment in 2005 also contribute to the severity of the overcrowding crisis: "The State's response to decades of overcrowding is similar; despite various task forces, numerous studies and reports and Special Sessions, California has not instituted any effective response to the worsening overcrowding crisis." *Id*. at 2. Moreover, the "degree of operational chaos within the CDCR, the institutional paralysis in many State agencies, and trained incompetence are even worse than indicated by the Court's findings [in connection with the appointment of the Receiver in October 20051 ." *Id*. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed<br><br>Relevant to impact & existence of overcrowding |
| 39. Next, the Receiver looks at the history of the current crisis. The Receiver finds that the current crisis is an inevitable consequence of decades of CDCR policies and decisions that tolerate overcrowding: "[O]vercrowding is ingrained in the CDCR style of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| constructing and managing prisons. Crowding-related policies that do not provide adequate clinical and program space are now an accepted practice of CDCR prison planning, as is California's practice of offering inadequate salaries and failing to provide adequate hiring programs which have created crisis levels of shortages of clinical personnel and correctional officers." *Id.* at 8. In fact, "despite massive waves of construction [over the last ten years], prison overcrowding has grown worse in California." I*d.* at 9. The Receiver also found that the CDCR has an "institutionalized acceptance of overcrowding" and a consequent "lowering of correctional standards to accommodate overcrowding," as seen in its facilities master plans, which call for up to nearly 200 percent crowding rates. *Id.* at 10. | opinion. Fed. R. Evid. 703. Lack of Foundation. | Court appointed<br><br>Relevant to impact & existence of overcrowding |
| 40. The Receiver also found widespread staffing problems of the type that I witnessed first hand during my tours of DVI, Solano, and Salinas Valley State Prison. He notes that overcrowding "is accompanied by serious staffing shortfalls for both clinical providers and correctional officers." *Id.* at 11. The shortages impact almost every category of clinical, custodial, and managerial staff, and the staffing shortages are worse now than they were five years ago in every category except for registered nurses. *Id.* at 11-13. The Receiver also points out staffing and recruitment problems are exacerbated by the State's decision to house prisoners in "mega-prisons" in remote locations. *Id.* at 14. The Receiver also found that in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. Mischaracterization of receiver's report. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed<br><br>Relevant to impact & existence of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| some of the communities where prisons are located, "there may not be enough competent clinicians to both provide medical care for an unlimited number of State prisoners and for the public also," and that continuing to raise salaries for prison doctors in these areas might have "a resulting disruptive impact on the availability of clinicians for county and private health care programs." *Id.* at 46, 26. | | |
| 42. The custody side of these staffing problems was illustrated by comments from DVI staff during my tour there to the effect that even though DVI, which is centrally located in a relatively inexpensive area, can recruit as many staff members as they need, the CDCR intentionally maintains a custody vacancy rate of seven percent (7%) at DVI to allow the CDCR to reduce custody vacancies at more remote, undesirable prisons. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to existence of overcrowding |
| 43. The Receiver also found that the extraordinary number of prisoner intakes and transfers in the overcrowded system increases the stress of various parts of the CDCR's medical and mental health delivery systems. *Id.* at 14-18. The "constant churning of parolees into and out of the CDCR (and between CDCR institutions) requires special clinical and correctional support staff at reception centers and in the 'receiving and release units at each-state prison." *Id.* at 13. "[C]rowding driven movement," as prison officials search for open beds, "adversely impacts. . . health care | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed<br><br>Relevant to impact of overcrowding |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| delivery" by overburdening intake screening, out-going screening, records update and transfer, medication delivery, and special transport during the process, and by disrupting of patient-clinician relationships and clinical programs. Id. at 16. "Movement into and out of the CDCR, as well as between CDCR prisons has now reached crisis proportions." *Id.* at 17. | | |
| 44. These movement-related problems were evident during my tour of DVI, where staff members told me that they process approximately 500 new arrivals a week in their Receiving and Release department, with roughly 25 percent of the new arrivals being identified as mentally ill. Even after significant expansions of its Receiving and Release areas, there was not enough space at DVI at the time of my tour to allow for confidential psychiatric screenings, to permit confidential clinical contacts, or to allow same-day psychiatric screening of new arrivals. | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate Expert Opinion. Fed. R. Evid. 702. Lack of Foundation. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding |
| 45. The Receiver found that overcrowding is also particularly felt "not only in the overall numbers, but also in the population pressures created by a lack of beds for specific classifications of prisoners," such as maximum security beds. Id. at 17-1 8 (emphasis removed). | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed<br><br>Relevant to impact of overcrowding |
| 46. Similarly, during my tour of the DVI reception center, it was clear that mentally ill prisoners with protective custody needs spent significantly longer periods in the reception center waiting | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402.  As to wait-time for SNY yard - | Admission of party opponent – staff interviewed by expert were generally chosen by |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| for transfer to a more complete mental health program. Staff at SVSP also confirmed during my tour there that its similar population of protective custody inmates -known as "SNY" (for Special Needs Yard) inmates -who were also in need of EOP level of care would typically wait for extremely long periods in administrative segregation for a placement to open up at MCSP in the only EOP SNY program in the whole CDCR, unless they were willing to waive their SNY status. | Overbroad. Calls for speculation. Lack of Foundation. | defendants to speak with expert about matters within their employment, attorneys for defendants were present;<br><br>Personal observation<br><br>Relevant to impact of overcrowding |
| 47. The Receiver also notes that one category particularly affected by overcrowding is reception centers. All prisoners entering the CDCR must be processed through a reception center, but "none of the CDCR's designated reception centers were designed or constructed with adequate clinical space. To make matters worse, as the original prisons designated for reception became overwhelmed by the influx of parole violators, the CDCR was forced to 'convert' general population prisons into reception centers," but did so without providing "adequate additions to clinical staff or clinical space." Id. at 19. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703.. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed<br><br>Relevant to impact of overcrowding |
| 48. These reception center space problems were evident in my tour of DVI, which was a general population prison until it was converted to a reception center a few years ago. Staff explained during my tour that DVI's extensive vocational programs (hence the name of the institution) were all shut down when DVI converted into a reception center institution. In addition, because it was not designed as a reception center, it has been difficult to | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| find space for various reception center functions. For example, during the DVI tour I saw a small classroom where at any given time six psychologists simultaneously conduct reception center mental health assessments for new arrivals. These assessments are mandated to be confidential by the *Coleman* Program Guide. See Joint Pls' Trial Ex. 9 (September 2006 *Coleman* Program Guide) at 12-2-4 and 12-2-5. In my experience, conducting screenings in non-confidential settings results in under-identification of mental illness. | | Relevant to impact of overcrowding |
| 49. One of the most disturbing findings in the Receiver's report is that even the CDCR's "newest and most modern prisons" were "designed with clinic space which is only one half that necessary for the real life capacity of the prisons." Joint Plfs' Trial Ex. 26 (Receiver's Report Re: Overcrowding) at 19 (emphasis removed). Indeed, the Receiver found that CDCR building projects often go astray: "while millions of dollars have been allocated for prison health care space projects during the past five years, the great majority of the project[s] were never completed; indeed, some projects do not appear to exist." Id. at 20. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |
| 50. The Receiver also reports that overcrowding causes lockdowns which "call for a radically different form of medical delivery than the services provided under normal general population conditions" because "clinical staff must go from cell to cell to see the prisoner patient, or small groups of individual prisoners must be escorted by correctional officers to and from clinic | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |

-23-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| areas," so that lockdowns "inhibit the delivery of medical care and increase the staffing necessary for such care." Id. at 29-30. | | |
| 51. The difficulty of providing clinical treatment in an administrative segregation unit was clear to me in the administrative segregation unit known as "K-Wing" at DVI. The clinical leadership at DVI reported that although they have the necessary clinical staffing available, they are unable to hold any groups for their EOP inmates in the administrative segregation unit because of the absence of space. In addition, I witnessed a case manager contact occurring in administrative segregation while touring the unit. The meeting took place in the front office of the unit, and there were two custody officers at the table with the inmate-patient. In addition, other custody staff members were going in and out of the room during the clinical interview. Such an environment affords zero privacy and is clinically inappropriate. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding |
| 52. The problem of delivering care in a locked down environment was also evident in the CCCMS program on C-Facility at Salinas Valley State Prison when I visited that institution on November 1, 2007. Staff and inmates alike reported during the tour that the Facility has been locked-down almost continually for the last two to three years. I spoke with a Dr. Williams on C-Facility who told me that due to the frequency of lock-downs on the yard, a group consisting of 8 sessions would typically take between ten months and a full year to complete. In addition, the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Lack of Foundation as to level of acuity. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| level of acuity exhibited by the CCCMS inmates I interviewed on the yard was quite high, often exceeding the minimum requirements for EOP level of care. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-3 (EOP treatment criteria). In addition, I noted that the inmates were not psychiatrically stable and required more mental health treatment than they were receiving to control their illness. | | Personal observation |
| 53. The Receiver also reports that "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care. Every day, many California prison wardens and health care managers make the difficult decision as to which of the class actions, *Coleman, Perez, Armstrong* or *Plata* they will fail to comply with because of staff shortages and patient loads." *Id* at 30. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate Expert Opinion. Fed. R. Evid. 702. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |
| 54. This problem was also evident on my tours. For example, at DVI, staff reported that the 26 Outpatient Housing Unit (OHU) cells used to be divided equally between medical cases and mental health cases. However, DVI staff reported that in the last year, generally only 4 of these OHU beds are available to mental health patients because the remaining beds in the unit are occupied by medical placements. Similarly, at SVSP, the number of MHCB beds generally available to psychiatric cases has been reduced from 10 in the past to 8 and sometimes fewer due to the use of these CTC beds by medical patients. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 55. The Receiver's report also documents the related problem of CTC bed shortages. "[B]ecause of the failure, for more than fifteen years, to provide an adequate number of inpatient beds for prisoners with very serious mental illnesses, prison CTC beds confined many patients in a mental health 'crisis' creating shortages of CTC beds for medical needs which, at times, pits medical staff against mental health staff. In similar fashion, the failure by the CDCR to plan for and construct beds for aged and disabled prisoners has lead to a practice of using the CTC beds for sheltered living housing, creating similar tensions." *Id.* at 31. As noted above, this problem was evident at DVI (in competition for OHU beds) and in the CTC units at SVSP. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |
| 56. The Receiver reaches a number of critical conclusions based on these findings. First, he points out that "[o]vercrowding interferes with the Receiver's ability to successfully remedy the constitutional violations at issue ..." *Id.* at 24. Second, he finds that overcrowding has created a "culture of cynicism, fear, and despair which makes hiring and retaining competent clinicians extremely difficult." Id. at 25. Third, he finds that overcrowding also makes it difficult to hire staff because of the sheer numbers required to support the population, the frequent movement of inmates and the remote locations where California has placed its mega-prisons. Id. at 25-26. Fourth, he finds that the cost and duration of the Receiver's remedial efforts are adversely affected by overcrowding because it creates severe | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART**, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| barriers to the recruitment and hiring of new clinical and support staff and competent health care managers and executives, leads to an extraordinarily high "velocity of prisoner movement in the CDCR," which necessitates the construction of thousands of medical beds and extensive clinical and support space, and places a heavy burden on contracts with outside providers for medical support services. *Id*. at 26-28. Fifth, he concludes that overcrowding "has increased the number and seriousness of infectious and communicable diseases, jeopardizing prisoners, staff, and the public"; the risk of an outbreak of infectious and communicable diseases "cannot be underestimated." *Id.* at 30. | | |
| 57. In short, because of overcrowding, the Receiver reports, many prisons simply cannot provide adequate medical, mental health, and dental services. Id. at 30. | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of Foundation. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3<br><br>Receiver is knowledgeable, Court appointed |
| 59. The Special Master's report is very stark in underscoring the impact of overcrowding on access to higher levels of care, particularly access to MHCB crisis units and DMH inpatient care units: "The inadequacy of beds appropriate to the treatment needs of inmates, particularly at the highest level of treatment needs, is compounded by severe overcrowding. The back-up of inmate/patients awaiting transfer to inpatient DMH programs fill MHCB units, which, in turn, cannot provide crisis intervention to other | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care system, Court appointed |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| inmate/patients who need to be stabilized." Joint Pls' Trial Ex. 35 (Special Masters' 5/31/07 Report on Overcrowding) at 9. The Special Master also explains that in the face of these limitations on referrals, eventually, clinicians no longer even try to refer appropriate cases to higher levels of care: "Not surprisingly, harassed clinicians often choose not to undertake the frustrating struggle for a referral that will not bring movement for weeks or months, and increasing numbers of truly psychotic inmate/patients are trapped in EOPs that cannot meet their needs." *Id.* at 10. Despite this evidence of a widespread failure to refer all appropriate cases to higher levels of care, during my visit to SVSP, Department of Mental Health staff reported that the waiting list for their inpatient program has risen from 80 inmates six months ago to 110 inmates at the time of my tour on November 1, 2007. | | |
| 61. The Special Master also explains that additional mental health beds will take a long time to construct: "Sadly, construction of the beds identified as needed to meet defendants' projected needs for acute and intermediate inpatient care will not be completed until FY2011/12." *Id.* at 9. Since the Special Master wrote this report in May, defendants have amended their beds expansion plans and further delayed many projects for new inpatient and MHCB projects. According to the new plans, if all goes according to plan, defendants will finally have built sufficient beds to meet the needs of the *Coleman* class by January 2014, at the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)

Special Master is knowledgeable about mental health care system, Court appointed |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| earliest. See *Coleman* Pls' Trial Ex. 12 (*Coleman* Special Master's 9/24/07 Report) | | |
| 62. The Special Master's Report explains that "[over the past three years, however, the number of inmate patients referred to a MHCB level of care has regularly and significantly exceeded the number of MHCBs available in CDCR, resulting in the placement of inmate patients in need of a MHCB level of care in a variety of temporary housing alternatives, which often lacked the heightened monitoring and treatment essential to the MHCB level of care." I*d*. at 3. According to the Special Master, these alternative placements have included Outpatient Housing Units (OHUs), which are unlicensed infirmaries for temporary housing of inmates for up to 72 hours, mental health outpatient housing units (MH-OHUs) and other temporary holding cells, including, frequently, administrative segregation cells. *Id.* "Between MHCBs, OHUs, MH OHUs and other alternative placements, some 300 to 350 seriously mentally ill inmate/patients are confined in one or another of these facilities on any given day." *Id.* at 4. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.  Relevance. Fed. R. Evid. 402 | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)

Special Master is knowledgeable about mental health care system, Court appointed |
| 63. This shortage of MHCB beds was confirmed in the oversubscribed MHCB unit that I visited at SVSP during my tour on November 1, 2007, where psychiatrically decompensating suicidal inmates are frequently housed in makeshift holding cells for long periods of time. Several of these "holding cells" are small upright cages that are completely inadequate for inmates with serious mental health problems. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402.  As to length of stay – Calls for speculation. Vague.  "holding cells" are small up right cages – Argumentative, Mischaracterization. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were |

-29-

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Similarly, at DVI, staff reported during my October 29, 2007 tour that transfers to MHCB beds at other institutions are virtually impossible, and that its own OHU, which essentially is acting as an overflow MHCB unit, does not have enough space, resulting in the creation of an overflow unit to the overflow unit. Due to the lack of space in the OHU, DVI often houses suicidal inmates in its administrative segregation unit. | | present<br><br>Relevant to impact & existence of overcrowding<br><br>Court will have pictures of holding cells, can determine if argumentative or mischaracterization; Further the Special Master uses the same term in his report on overcrowding, (Coleman Docket # 2253 at 6) |
| 66. Moreover, the Special Master notes that this discussion of vacancies and their impact, "does not even address the endemic shortages of escort correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians." *Id*. at 12. | Lack of Foundation – regarding endemic problems. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care system, Court appointed |
| 68. This lack of space has a particularly severe impact upon mental health programming in restrictive locked units: "Each succeeding compliance report over the past two years, for example, has documented the decline in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program inmate/patients in administrative segregation units, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| repeatedly attributed to the acute absence of adequate space." *Id.* at 6. | | mental health care system, Court appointed |
| 71. The Special Master also notes that "the inevitable result of severe overcrowding is that everyone also spends more and more time in their cells. General yards are more crowded, less well supervised and increasingly dangerous. . . . Work or vocational opportunities shrink in the expanding population." *Id.* at 7. The Master also explains that these conditions lead to more conflict between inmates: "Disturbances occur more frequently, with resulting increases in the number and duration of lock- downs." *Id.* This in turn means that "inmates must spend increasingly larger chunks of their days in their cells, or much more dangerously, in one of those triple-bunked 'non-traditional' spaces." The Master concludes that such conditions "inevitably escalates the incidence of mental illness and exacerbates the condition of those already mentally fragile and vulnerable." *Id.* at 7-8. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care system, Court appointed |
| 73. I toured Deuel Vocational Institute (DVI) on October 29, 2007. As part of my tour, I spoke with a number of staff members and inmates at the institution. At the time of my visit, DVI was severely overcrowded -staff reported during the tour that DVI has a design capacity of 1,861 and a current population of 3,748, meaning that the current population is 201 percent of design capacity. (However, these numbers do not comport with the most recently CDCR population report posted on the CDCR website, dated October | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "design capacity" and "capacity" – Vague. Lack of Foundation. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to existence |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 29,2007, which states that DVI's population as of midnight on October 24, 2007 was 3,855 with a capacity of 1,627, meaning that the current population is actually 236.9 percent of capacity. See Joint Pls' Trial Ex. 24 (October 24, 2007 CDCR Weekly Population Report) at 2. | | of overcrowding<br><br>Further clarification is appropriate subject for cross-examination |
| 74. Recently, the population of DVI's mental health programs has been growing rapidly. In a September 19, 2007 report provided to the *Coleman* monitors in connection with an October 2, 2007 tour of the institution, DVI staff members report that while at the beginning of the year, 22 percent of DVI's population consisted of mentally ill individuals, by September the inclusion rate had risen by three percentage points to 25%. *Coleman* PIS' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 1. The report also notes that "DVI remains a busy and at times chaotic reception center process receiving as much as 150 inmates daily." *Id.* One sign that overcrowding may be creating a more acutely ill population in need of greater mental health services is the fact that in places like DVI, the number of mentally ill prisoners is growing faster than the number of prisoners overall. Between January of 2007 and October 24, 2007, the overall population at DVI actually fell from 3,954 to 3,855. See Joint Plfs' Trial Ex. 22 and 24 (CDCR weekly population reports from January 10, 2007 and October 24, 2007). | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "overcrowding is cause of growth of mental health caseload at DVI" – Lack of Foundation, Speculative. | Admissions of party opponent<br><br>Relevant to existence and impact of overcrowding<br><br>Opinion based upon data and expertise |
| 75. During my tour of DVI on October | Inadmissible Hearsay. | Admission of party |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 29, 2007, staff reported that as of the day of the tour, the mental health population at DVI was 933, or 25% of the overall population of 3,748. Staff also broke down the placements of mental health cases at DVI as follows: there were 879 CCCMS inmates (including 364 in reception center general population, 101 in administrative segregation, 425 in the reception center protective custody or SPU unit, and 11 in the infirmary); there were 54 EOP inmates (including 14 in reception center general population, 20 in administrative segregation, 17 in the reception center protective custody unit, and 3 in the infirmary). | Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to existence and impact of overcrowding |
| 76. During the tour of DVI, I interviewed 9 inmates in the visiting room of the institution. I also interviewed two EOP administrative segregation inmates during my tour of the K-wing administrative segregation unit. As discussed in greater detail below, my clinical impression of this group of inmates as a whole was that both the EOPs and the CCCMS patients that I met were more acutely ill than the EOP and CCCMS patients I encountered in the late 1990s while working at CMF. Clinical staff at DVI also indicated that they believe the clinical acuity of the patients they are treating at EOP level of care frequently makes them appropriate for referrals to higher levels of care -MHCB and DMH inpatient programs -that are simply unavailable. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "clinical impression of inmates' acuity levels" - Lack of foundation. re. clinical impression of inmates' "working at CMF" - Mischaracterization. | Personal observation, based upon expertise<br><br>Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |
| 77. In both my October 29, 2007 tour of DVI and in the documents I reviewed in preparing for the tour, there was substantial evidence of serious problems at the institution related to endemic | Lack of Foundation – regarding endemic problems. | Personal observation based upon expertise and review of data |

-33-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowding in the CDCR. These problems were the same problems highlighted in the system-wide reports of the *Coleman* Special Master and the *Plata* Receiver discussed above. | | |
| 78. The September 2007 report from DVI staff to the *Coleman* monitors notes that one "of DVI's biggest challenges in terms of the Mental Health Department remains treatment space access and utilization." See *Coleman* Pls Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 10/2/07 expert tour) at 2. The report also explains that despite a 65% increase in staffing, DVI has had very little increase in office and treatment space. Id. "Unfortunately, this has meant long wait times for inmates receiving treatment and overcrowded offices, as there are at times 8-10 doctors sharing offices in our ever increasing and growing mental health staff." Id. Moreover, "at the present time there is no group therapy occurring in Ad Seg for EOP inmates given space limitations." *Id.* | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Admissions of party opponent<br><br>Relevant to impact and existence of overcrowding |
| 80. During the tour of the unit, the Chief Psychiatrist and Chief Psychologist also explained that due to space limitations, much of the treatment provided to caseload inmates in administrative segregation is provided at cell-front, through the cell door, which is both non-confidential and not conducive to meaningful clinical assessments or meaningful therapy. They also confirmed that although DVI now has enough clinicians to hold groups for EOP inmates in its administrative segregation unit, no effort has been made to conduct such groups because there is no suitable | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| treatment space available. *Coleman* Class Member A, one of the two mentally ill inmates I spoke with in the K-Wing administrative segregation unit, told me that he had been at DVI in administrative segregation as an EOP inmate since his arrival at DVI on August 17,2007 (73 days as of the date of the tour) and that he had not received any group treatment and only sporadic cell-front case manager contacts. The court-approved *Coleman* Program Guide requires the CDCR to transfer inmates to an EOP administrative segregation hub within 30 days of placement in an administrative segregation unit, and requires that all reception center EOP inmates be transferred to a mainline EOP program within 60 days. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-7-7 (EOP Ad Seg) and 12-1 -13 (Timeline Chart). | | Relevant to impact and existence of overcrowding |
| 81. My tour of DVI also revealed that there is currently a severe office space shortage for clinical staff. During the tour, I visited a clinician office on the L-2 area which houses the desks of 8 clinicians. The clinicians I spoke with during the tour reported that even with 8 desks crammed into the office, they frequently have to share individual desks with other clinicians. I also observed that 3-5 mental health staff members working in the OHU must share a small office in a covered cell. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact and existence of overcrowding |
| 83. In addition, during the tour of DVI, the mental health leadership indicated that they had hoped to have space in the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. | Admission of party opponent – staff interviewed by |

-35-

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | new Receiving and Release area to conduct these psychological assessments on the same day that inmates arrive, but that due to lack of sufficient space they are forced to screen inmates in a different part of the prison, which requires them to conduct the screening on the next day after arrival. | Evid. 402 | expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact and existence of overcrowding |
| | 84. A serious overcrowding-related problem acknowledged by DVI in the September 19, 2007 Institutional - Summary report to the *Coleman* monitors has to do with the use of administrative segregation cells instead of the infirmary for suicide-watch patients. The report states that: Another significant problem at DVI has to do with the increased use of medical beds in the OHU [or "outpatient housing unit," a name given to unlicensed CDCR infirmaries], most likely driven by ongoing *Plata* requirements. While the number of inmates referred to the OHU for acute mental health treatment has not increased, the number of beds that the mental health inmates have access to continues to decrease. As a result, we are frequently forced to overflow inmates to areas other than the OHU given the paucity of treatment space in our OHU. This has resulted in a significant increase of inmates being housed in Administrative Segregation, specifically K-wing pending a bed opening up in the OHU. *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.  Relevance. Fed. R. Evid. 402 | Admissions of party opponent<br><br>Relevant to impact and existence of overcrowding |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Tour Binder for 1012107 expert tour) at 2. | | |
| 85. During my tour of DVI on October 29, 2007, staff confirmed this problem, reporting that although the 26-bed OHU used to be one-half designated for mental health cases, in recent months, only 4 of the 26 OHU beds are generally available to mental health cases. At the time of my tour, there were 3 mental health inmates in the holding cells in the OHU, another 5 mental health patients in the OHU beds that are typically occupied by medical cases, and one inmate on suicide watch in the L-Wing administrative segregation unit. Staff stated it was very unusual that so many beds were available in the OHU for mental health patients. DVI staff reported that they have 11 cells in the L-Wing unit for OHU-overflow/suicide watch and that these cells are frequently used. This is remarkable because, in effect, the OHU is itself an overflow unit to the fully licensed MHCB units. The administrative segregation overflow OHU is essentially an overflow unit to an overflow unit. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact and existence of overcrowding |
| 86. In my opinion, housing suicidal inmates in administrative segregation units, particularly ones as harsh, dirty and noisy as K-Wing and L-Wing at DVI, is a very dangerous practice, both because of its potential to exacerbate suicidal behavior, and because of its potential to discourage inmates from reporting their true feelings for fear of being housed in such a unit. Indeed, the dangerousness of these units is evident from the *Coleman* Court's Order that defendants undertake extensive | Inappropriate expert opinion. Fed. R. Evid. 702. Mischaracterization of the *Coleman* court order. | Personal observation, based on expertise<br><br>Court can determine whether statement is mischaracterization |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| modifications to their administrative segregation programs to increase monitoring of all inmates in these units to address the increased risks of suicide. See 6/8/06 Order at paragraph 1 (noting "escalating percentage of suicides occurring in administrative segregation units"). Although DVI is now using L-Wing in lieu of K-Wing, and L-Wing does in fact represent a slight improvement over the extremely harsh conditions of K-Wing, it is still an administrative segregation unit. Moreover, the cells in L-1 appeared to have been hastily retrofitted to be suicide-proof. They are also small and dirty, and the paint on the walls of the cells I observed was peeling badly. | | |
| 87. In its *Coleman* Corrective Action Plan for the October 2, 2007 tour by the *Coleman* Special Master's experts, DVI acknowledges some ancillary problems with using administrative segregation in this manner (at the time of the report, only K-Wing was being used in this manner). See *Coleman* Pls' Trial Ex. 30 (DVI 10/2/07 CAP, item 14) at 26. "This overflow into K-wing, however, has caused other problems with regards to access to inmates given the low number of custody escort officers to both meet the needs of the OHU and their overflow inmates in K-wing, as well as the large number of mental health clinicians currently working in Ad Seg and their access to their CCC[MS] and EOP inmate's living in this housing unit. Although additional [escort] officers have been added to the mix, it is still inadequate to meet the ever increasing mental health need." *Id.* at 26-27. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.  Relevance. Fed. R. Evid. 402. | Admissions of party opponent

Relevant to impact and existence of overcrowding |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| 88. | Another problem underscored by DVI mental health staff during my tour of the institution on October 29, 2007 is their inability to access licensed Mental Health Crisis Bed (MHCB) units at other prisons for DVI's suicidal inmates. During the tour, the Chief Psychiatrist, the Health Care Manager, and the Chief Psychologist all expressed to me that they are almost never able to transfer inmates needing higher levels of care to an MHCB unit or to one of the DMH inpatient programs. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present

Relevant to impact and existence of overcrowding |
| 89. | In their September 2007 Report to the *Coleman* experts, DVI staff likewise noted that although the institution has hired more treatment staff for its OHU units, "our effectiveness to actually move inmates to crisis facilities is limited as CTC's are not actively discharging inmates. As a result, additional beds for DVI mental health emergencies are never available." *Coleman* Pls' Trial Ex. 31 (DVI Institution Program Status from *Coleman* Tour Binder for 1012107) at 2. A more detailed review of the issue as part of DVI's Corrective Action Plan (CAP) item 10 noted that 97 percent of the cases transferred from DVI's OHU to an MHCB unit were not compliant with *Coleman* court-ordered time-frames for such transfers and noted that "DVI continues to experience significant problems with the transfer of inmates from the OHU to crisis beds or other higher levels of care." *Coleman* Pls' Trial Ex. 30 (DVI 1013107 Tour Documents, CAP item 10) at 15. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Admissions of party opponent

Relevant to impact and existence of overcrowding |

-39-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 90. Another crowding-related problem discussed by DVI staff during my tour, and also documented in detail in the Special Master's Eighteenth Monitoring Report, is medication management. During my tour of DVI, Dr. Coppola, the Chief Psychiatrist, acknowledged serious problems with medication continuity and medication practices generally and stated that medication is a "major area where we need to make changes" to improve the delivery of care. During my tour, DVI staff also reported that due to large processing volumes of new inmates coming into the reception center, which typically number 100 new inmates a day, they are unable to check with counties when an inmate arrives reporting that he was on a medication that does not match documentation in the records from the sending county. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care system, Court appointed<br><br>Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact and existence of overcrowding |
| 91. According to the Special Master's most recent 18th monitoring report, DVI's medication practices suffer in the following respects:<br>        Medication on intra-institutional transfers was timely in only 40 percent of cases;<br>        Medication renewals were timely in 89 percent of the cases, but this was achieved through the use of 90-day bridging orders, and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care |

-40-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| follow-up appointments were often delayed for periods of up to six weeks;<br>　Poor tracking of follow-up on medication non-compliance;<br>　Inaccurate recordings of MARS in 47 percent of cases;<br>　Timely follow-up appointments with psychiatrists in only 40 percent of cases;<br>　Problems with lab testing;<br>Low medication compliance rates, at 40 to 57 percent for patients on anti-depressant medication, 37 to 40 percent for those on antipsychotic medication, and 73 percent for patients on Valproic acid. See Joint Pls" Trial Ex. 36 (Special Master's Eighteenth Monitoring Report) at 96-97. | | system, Court appointed |
| 92. In my experience, these types of medication management problems are very typical in overcrowded systems. In overcrowded systems, medical staff becomes stretched thin and there is not enough time for clinical staff to consult closely with each inmate when administering medication to check for side effects, to ensure that the medication is being taken, and to ensure the efficacy of the particular medication prescribed. Of note, no effort is currently being made on the part of the medication dispensers to monitor to any degree the clinical efficacy of a given medication. This contributes to medication non-compliance and results in inadequate feedback to treating clinicians concerning instances of medication non-compliance and/or lack of medication efficacy. | Relevance.  Fed. R. Evid. 402. | Relevant to impact of overcrowding on care |
| 96. During my tour of DVI, the institution's new Chief Medical Officer | Inadmissible Hearsay. Fed. R. Evid. 802. | Admission of party opponent – staff |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | candidly admitted that he believes that DVI is running 40% over capacity in terms of its ability to deliver medical care. | Relevance. Fed. R. Evid. 402. "capacity for medical care" - Vague, Lack of Foundation. | interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present Further clarification is appropriate subject for cross-examination |
| | 97. During my tour of DVI, I was surprised by the high level of acuity of many of the EOP and CCCMS inmate/patients I met, both during the tour of the institution and during the interview with class members at the end of the tour. DVI's Chief Psychiatrist, Dr. Coppola, stated during the tour that he thinks that one effect of overcrowding on his caseload population is that his patients are very sick, and that it is difficult to move these sick patients to higher levels of care. He said that he sees an increase in illness "in terms of both incidence and severity." I agree with Dr. Coppola that the level of acuity among patients at DVI was very high. He also agreed with my assertion that the current mental illness incidence rate of approximately 25% of the institution's population is higher than that seen in other correctional settings. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Lack of foundation – "Level of acuity of patients he met. " Vague – "incidence of mental health illness." | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present Further clarification is appropriate subject for cross-examination |
| | 100. While at DVI on October 29, 2007, I interviewed *Coleman* Class Member B, an EOP inmate, and reviewed his Unit Health Records ("UHR"). According to his UHR, *Coleman* Class Member B has | Inadmissible Hearsay. Fed. R. Evid. 802. Improper Expert Opinion. Fed. R. Evid. 702. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about |

-42-

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| a "history of cutting and burning" himself and is diagnosed with Major Depressive Disorder. *Coleman* Class Member B is currently housed in the reception center EOP program for protective custody inmates. He had been in the reception center at DVI waiting for a transfer to an EOP program for more than six months, since April 17, 2007. He is taking very serious psychotropic medications including Seroquel, Depakote, Remeron and Effexor. *Coleman* Class Member B told me that medication has been a big problem for him at DVI. He indicated that DVI staff members "don't give it to you all the time" and that when medication has lapsed, it takes a long time to see a psychiatrist and get a renewal. *Coleman* Class Member B indicated that he is very frustrated because he was sexually assaulted as a child and would like to get treatment around this issue, but he has been unable to access individual therapy for this problem. He indicated that he goes to a one-hour group five days a week, but that it is mostly just a "check-in" group and that he does not believe he is receiving meaningful treatment from the group. Thus, he is getting five hours a week of the same group, rather than the 10 hours a week of EOP care mandated by the Program Guide. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-4-8 (10 hours of treatment per week requirement for EOP inmates). In addition, because he is in a reception center, he is confined to his cell most of the time. Once he is transferred to an EOP program at a mainline institution, *Coleman* Class Member B will hopefully | | the basis of the opinions formed

Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807

Personal observation, based upon expertise

Small number of members of the plaintiff class, examples of the problems faced by class members |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART**, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| receive much more out-of-cell time and be able to participate in significantly greater programming. *Coleman* Class Member B has a history of suicide attempts and self-mutilation. Although my interview with *Coleman* Class Member B was time limited, in my opinion, a stay of more than six months in the reception center under these conditions is clinically deleterious to an inmate like *Coleman* Class Member B with serious, chronic mental illness and a history of suicidal ideation and self-mutilation. | | |
| 101. *Coleman* Class Member C is a reception center CCCMS inmate who arrived at DVI on March 30, 2006, roughly 18 months ago. He reported to me that he is diagnosed as "paranoid and bipolar;" his medical record reflects a diagnosis of "Mood A Disorder NOS." In general, an NOS diagnosis is an appropriate provisional diagnosis while a clinician is completing a thorough diagnostic workup. In my professional opinion, a diagnosis of Mood Disorder NOS is inappropriate when a patient has been in the same institution for 18 months. *Coleman* Class Member C is taking Seroquel, Neurontin, and Celexa. *Coleman* Class Member C was agitated when I interviewed him because he has recently been taken off of Wellbutrin, which he indicated was helping him. When I asked him how his long stay in reception center is affecting him, he stated "it's making me real mad ... and then when I get mad I start threatening them and I get written up." Apparently, he has received a number of pills during his stay at DVI, which may be one | Inadmissible Hearsay. Fed. R. Evid. 802. Improper Expert Opinion. Fed. R. Evid. 702. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed\n\nPublic record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807\n\nPersonal observation, based upon expertise\n\nSmall number of members of the plaintiff class, examples of the problems faced by |

-44-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| reason for the delay in transferring him to a mainline institution. In my opinion, *Coleman* Class Member C is inappropriately diagnosed and is not receiving adequate treatment. His inadequate treatment is contributing to his agitation and disciplinary problems. | | class members |
| 102. I also interviewed *Coleman* Class Member D during the tour of DVI. *Coleman* Class Member D is an EOP inmate currently housed in the K-Wing administrative segregation unit. He has been at DVI since March 14, 2006. He has been in administrative segregation since February of 2007. The *Coleman* Program Guide requires that EOP inmates be moved from reception centers to a mainline EOP program within 60 days, or 30 days if clinically indicated. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1 -1 3. *Coleman* Class Member D stated that on September 2, 2007 he battered an officer after missing his morning medications. His medical record reflects a current diagnosis of Schizoaffective Disorder. He is on a variety of medications including Zyprexa, Seroquel, and Prozac. He indicated that he hears voices if he does not take his medications. In my opinion, *Coleman* Class Member D has a serious mental illness and is decompensating under the pressures of his prolonged stay in administrative segregation, where he getting very little treatment except for his medication. | Inadmissible Hearsay. Fed. R. Evid. 802. Improper expert opinion. Fed. R. Evid. 702. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807<br><br>Personal observation, based upon expertise<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members |
| 103. *Coleman* Class Member E is a reception center EOP inmate who has been housed in DVI's administrative segregation unit since his arrival at DVI | Inadmissible Hearsay. Fed. R. Evid. 802. Cumulative. | Not offered for the truth of the statement, but to provide information |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| 3–18 | on August 7, 2007. *Coleman* Class Member E is currently serving a term for a parole violation. He is on a number of serious psychotropic medications including Zyprexa, Depakote, and Risperdal. He is currently housed in the K-Wing administrative segregation unit on the second floor. He said he gets his medications every day, but he has not received any group therapy. According to his medical record, he is diagnosed with Schizoaffective Disorder. My clinical assessment of *Coleman* Class Member E is that he remains very psychotic and that he is decompensating in administrative segregation and requires access to a higher level of care. Some of his mental health clinicians appear to be concerned about the same symptoms I noticed in my interview with him. An October 2, 2007 psychiatric technician note in his medical record states: "look for symptoms of decompensation." | | to the Court about the basis of the opinions formed<br><br>Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807<br><br>Personal observation, based upon expertise<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members |
| 19–28 | 104. *Coleman* Class Member F is a CCCMS administrative segregation inmate. He arrived at DVI on August 29, 2007 from the Sacramento County jail. According to his medical record, he is diagnosed with Schizophrenia, Paranoid Type. My clinical assessment of *Coleman* Class Member F is that he is severely psychotic and requires a higher level of care than he is currently receiving. | Inadmissible Hearsay. Fed. R. Evid. 802. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | | | or residual exception – 807<br><br>Personal observation, based upon expertise<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members |
| | 105. *Coleman* Class Member G is a general population reception center E inmate who has been at DVI since August 14,2007. The current diagnosis listed in his health record is "Psychotic Disorder, NOS." The Medication Administration Record (MAR) in his medical file shows that *Coleman* Class Member G refused to take his medications on 5 of the last 7 days. In my clinical opinion, *Coleman* Class Member G is very severely mentally ill. He is acutely psychotic. It is unclear whether his recent refusal of medication represents a worsening of his psychiatric disability or his informed decision to refuse medication. Regardless, he clearly needs close monitoring and supervision, which in my estimation based on the tour of DVI will be difficult for him to obtain in the overcrowded reception center. | Inadmissible Hearsay. Fed. R. Evid. 802. Improper expert opinion. Fed. R. Evid. 702. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807<br><br>Personal observation, based upon expertise<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 106. Several of DVI's overcrowding-related problems appear to have played a role in a successful suicide at DVI in the spring of 2007. In preparing this report, I reviewed the suicide report for *Coleman* Class Member H, who died on March 9, 2007. See *Coleman* Pls' Trial Ex. 26 (September 18, 2007 Suicide Report *Coleman* Class Member H and June 18, 2007 Executive Summary) at 5. *Coleman* Class Member H, a "severely mentally ill" schizophrenic, spent four days in CDCR custody prior to his death by hanging on Friday March 9, 2007 in the protective custody unit on West Hall. Id. at 2. Although *Coleman* Class Member H reported to staff that he was taking psychiatric medications when he arrived at DVI on March 4, 2007, he was not seen for an initial assessment by psychiatric staff or referred for an urgent medication evaluation by a psychiatrist as required by the *Coleman* Program Guide. Id. at 3,5. He reportedly asked nurses and other staff members for his medications and told officers on several occasions that he needed to leave his cell. Id. at Suicide Report at 11. | Inadmissible Hearsay. Fed. R. Evid. 802. Improper expert opinion. Fed. R. Evid. 702. Relevance. Fed. R. Evid. 402. Mischaracterization of the evidence. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Admission of party opponent;<br><br>Suicide report is public record (required by law to be reported)<br><br>Relevant to impact of overcrowding on quality of care<br><br>Unclear what mischaracterization defendants believe there is – can be explored on cross-examination |
| 107. The CDCR Suicide Report for *Coleman* Class Member H identified four serious failures that may have played a role in *Coleman* Class Member H's suicide. First, the Suicide Report notes that CPR was not initiated at the scene when custody staff discovered the inmate hanging in his cell. *Id.* at Executive Summary of Suicide Report at 5. In the course of the investigation into the death, it was revealed the Chief Medical Officer at DVI, who has since been suspended, | Relevance. Fed. R. Evid. 402. Mischaracterization of the evidence. | Relevant to impact of overcrowding on quality of care<br><br>Unclear what mischaracterization defendants believe there is – can be explored on cross-examination |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| personally countermanded CDCR policy by directing that custody officers should not conduct CPR at the scene when discovering a suicidal inmate, but should instead bring the individual to the institution's infirmary. *Id.* In my view, this serious problem is probably not related to overcrowding. | | |
| 115. The H-Dorm at Solano has been a source of great anxiety and stress for *Coleman* class members housed there. One CCCMS inmate who I interviewed during the tour (*Coleman* Class Member I) told me that he came "unwound" in the H-Dorm. He said he could not sleep, in part because of the dense population and in part because of the "constant, roaring engine of noise." His sleep deprivation became so severe that he began to hear voices in the fans. Another class member, *Coleman* Class Member J, did not become a *Coleman* class member until he was housed in the H-Dorm. *Coleman* Class Member J also described severe sleep deprivation, which then caused him to become depressed and paranoid. He described the desperation he felt living in a very overcrowded dorm with no hope of moving out. Mental health staff recorded *Coleman* Class Member J's problems as "adjustment disorder" secondary to his housing unit. The housing conditions in places like the H-Dorm, where there is constant activity, sensory overload, extreme sleep deprivation and loss of control, have been shown to cause or exacerbate mental illness. "Intensive Care Unit" (ICU) psychosis, a well-established clinical condition, for instance, is also caused by these | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Improper expert opinion. Fed. R. Evid. 702. Lack of Foundation. | Then existing condition – 803(3)<br><br>Relevant to impact of overcrowding on quality of care |

[253418-1]

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| 3<br>4<br>5<br>6 | conditions. As *Coleman* Class Member I and *Coleman* Class Member J demonstrate, people become extremely agitated, depressed, psychotic and potentially violent when living in these conditions. | | |
| 7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22 | 116. I interviewed eight *Coleman* class members during my tour of Solano. Of the eight class members, two (*Coleman* Class Member K and *Coleman* Class Member L) had serious staph infections that Solano was treating with heavy doses of antibiotics. *Coleman* Class Member K, who was housed in the H-Dorm, told me that his staph infection caused an abscess on his arm, which medical staff drained earlier in the day. *Coleman* Class Member L was housed in Building 11. Another class member, *Coleman* Class Member M, told me that his cellmate also had a staph infection. Staph infections are a sign of poor hygiene, and they are a serious consequence of overcrowding that could grow more serious over time if these dorms and cells continue to be crowded with ill patients in the current manner. They can also become a threat to public health more generally, as antibiotics used to control these infections select for more treatment- resistant strains of the staph bacteria. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Improper expert opinion. Fed. R. Evid. 702. Lack of Foundation. Cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Then existing condition – 803(3)<br><br>Relevant to impact of overcrowding on quality of care<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members |
| 23<br>24<br>25<br>26<br>27<br>28 | 118. The Special Master was concerned about Solano's significant mental health population during the 18th round of monitoring, noting that, "[t]he size of the mental health caseload, 1,555, exceeded its capacity of 1,199 by 30 percent," and recording that 111 out of 378 inmates in administrative segregation were on the mental | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Admission of party |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| health caseload. Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 76. The day that I visited Solano, the population was very similar. Staff reported that there were 1,517 CCCMS and 10 EOP class members. They also reported that 105 of the 328 inmates housed in administrative segregation were on the mental health caseload (2 EOPs and 103 CCCMS). This means that while *Coleman* class members constitute approximately 20% of the total CDCR population, they represent 32% of the population in administrative segregation at Solano. | | opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present

Personal observation |
| 119. In my opinion, housing inmates with serious mental health issues in administrative segregation units is a very dangerous practice given the lack of stimulation in those units and the nearly constant seclusion in cells. This is particularly true in light of the Special Master's observation in his 18th monitoring report that, "[I]n [Solano's] administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 85. During my tour of Building 10, which is an administrative segregation unit, I observed a psychiatric technician administering the 3 1-question mental health survey for new intakes into the unit. Although the Program Guide requires that these types of interviews occur in a confidential setting, the psychiatric technician was asking the questions at cell-front. See Joint Pls' Trial Ex. 9 (Program Guide) at 12-7-12 ("Interviews of inmates will be held in a | Improper expert opinion. Fed. R. Evid. 702. Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Based upon expertise and observation

Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)

Special Master is knowledgeable about mental health care system, Court appointed

Relevant to impact of overcrowding on quality of care provided |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| private setting unless the security of the institution or the safety of staff will be compromised. Screening and evaluation interviews and treatment activities are accomplished in existing interview rooms and exercise areas within current ASU units."). In my opinion, this is a dangerous practice that relates to overcrowding; staff members do not have the office and treatment space that they need to administer clinically appropriate evaluations in a confidential setting (or there are insufficient custody staff to escort the patients to an appropriate setting). | | |
| 120. I also observed several problems with the medication administration process at Solano. This is consistent with the Special Master's observations during the 18th round of monitoring: "During the monitoring period, medication management [at Solano] remained a collection of haphazard practices without oversight or standardized practices and procedures" and "non-compliance with medication did not reliably trigger referrals to prescribers." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 79. These problems were also apparent to me during my tour. In light of the infrequent appointments with psychiatrists and the very brief interactions between patients and staff in the pill lines, Solano cannot adequately monitor the efficacy of medications, medication side effects, or patient compliance with medications as effectively as necessary. I discussed medication distribution with several staff members, including Dr. Kumar, the Chief Psychiatrist, Ms. Bibby, a | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | Public Record - Fed. R. Evid. 803(8); see Plfs' Response to Defs' MIL 3 (same reasoning applies with regard to Special Master)<br><br>Special Master is knowledgeable about mental health care system, Court appointed<br><br>Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |

-52-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Psychiatric Technician in the administrative segregation unit, Dr. Naku, the Pharmacist in Charge (PIC), Joel Williams, a supervising Registered Nurse and several class members. Mr. Williams explained that medical staff members at the pill windows are not in a position to monitor medications since they do not have patient records with them when they distribute the medications. He also explained that staff is supposed to report patient non-compliance only when a patient misses his medications for three days in a row. Even when medical staff does report non-compliance, however, Nurse Williams explained that the information only flows one way–the pill line staff never knows if anything is done in response to their reports. | | |
| 121. In addition, several class members I spoke with raised medication concerns that I found quite disturbing. An EOP class member housed in administrative segregation, for instance, told me that he is currently taking Zyprexa. When I asked him whether medical staff took his blood when he was first prescribed Zyprexa, he said that he did not think they had. He also could not remember any medical staff drawing his blood anytime since that initial prescription. Atypical antipsychotics such as Zyprexa carry with them certain metabolic risks that can only be addressed by regular monitoring of certain blood parameters. These metabolic risks include Type II diabetes, as well as significantly elevated cholesterol and triglyceride levels. Several other class members also confirmed problems with | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed

Public record (state-employed medical doctors, required by law to report medical treatment contacts in UHR) 803(8); Then-existing mental condition 803(3); or residual exception – 807

Personal observation, based upon expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| medications as noted by the Special Master. They complained, for instance, that the pill lines were very long and that they sometimes had to choose between taking their medications or going to the chow hall before it closed. If they chose to go to the chow hall, they were not allowed to go back to the pill line later and therefore were forced to skip doses. Other class members were taking medications too early in the day. *Coleman* Class Member N is currently taking 30 mg. of Remeron, which he receives at 4:30 or 5:00 p.m. This is a very high dose of Rerneron to be taking so early in the day, which results in his becoming extremely sedated for several hours in the late afternoon and evening, thus further disrupting his sleep/wake cycle. Still other class members reported that their prescriptions sometimes lapsed, including *Coleman* Class Member 0 and *Coleman* Class Member K. *Coleman* Class Member 0 is currently taking Prozac (60 mg.), Remeron (15 mg.) and Risperdal (2 mg. twice per day). *Coleman* Class Member 0's medical file reflected that he was initially prescribed his medications on July 6, 2007. When they expired on October 6, 2007, however, the clinicians at the medication window renewed them without a doctor's order *Coleman* Class Member did not see a doctor until 10//25/07). This is a very dangerous and illegal practice because it precludes the patient from having adequate assessment of the efficacy and safety of his medication. *Coleman* Class Member K, who has been prescribed Lexapro for Post Traumatic Stress Disorder, did not | | Relevant to impact of overcrowding on care

Small number of members of the plaintiff class, examples of the problems faced by class members |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| receive his medications for several days when he was transferred to administrative segregation. | | |
| 124. Nevertheless, there were significant overcrowding-related problems present in our tour of SVSP. During an initial meeting with the SVSP Warden and SVSP's clinical leadership for medical and mental health at the beginning of the tour, staff reported a number of relevant facts. Staff indicated that roughly 38 percent of the population at SVSP is mentally ill. Staff also indicated that 80 percent of the cases of suicidal ideation admitted to "holding cells" at SVSP do not result in an admission to the MHCB unit. Clinical and Custody Staff Vacancies Are Impacting Clinical Care at SVSP | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "admission to MHCBs" – Speculation, Mischaracterization of evidence. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding on mental health care |
| 125. There was also significant information reported concerning staffing levels. During the morning meeting, Department of Mental Health (DMH) staff members present, including Victor Brewer, the director of the Salinas Valley Psychiatric Program, an inpatient treatment program at SVSP run by DMH, stated that D is still having staffing problems in some categories due to salary competition from the CDCR. SVSP staff reported that in the medical staff area, roughly 50 percent of the medical providers are full-time staff and the other 50 percent are contract employees. In the mental health department, Dr. Kalie, the Chief Psychologist, reported that 14.5 of 29 psychologist positions are vacant and that there are no registry employees | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to existence and impact of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| available to cover the vacancies. | | |
| 126. The Warden reported that although custody staffing levels have improved lately, at one point in the last year, SVSP was 200 custody officers short out of 840 total positions. The Warden reported a current custody staff vacancy rate of 97 out of 795 positions, or 12.5 percent. He also indicated that the biggest area where SVSP has problems recruiting custody staff is in recruiting and retaining Sergeants. He stated that SVSP currently has a vacancy rate for Sergeants of 27 percent. Clinical staff answered "yes" during the morning meeting when I asked if the high vacancy rate among custody staff has a negative impact on medical and mental health care. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present

Relevant to impact of overcrowding on mental health care |
| 127. Dr. Lee, the Chief Medical Officer and Health Care Manager at SVSP, acknowledged during the opening meeting that there are serious drawbacks associated with the use of contract and registry staff at SVSP. He indicated that reliance on such staff was not ideal because (a) such staff members come and go frequently, causing continuity problems, (b) such staff members do not have the same commitment to care as full-time correctional staff, and (c) such staff members have to be trained over and over again, draining the amount of time available for health care managers to take care of other business. He also indicated that he believes that the use of contractors "has had an impact on the delivery of care." | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present

Relevant to impact of overcrowding on mental health care |
| 129. During the morning meeting, staff acknowledged that there have been numerous and frequent lockdowns at | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. | Admission of party opponent – staff interviewed by |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| SVSP during recent years. They indicated that at the present time, all four Facilities at SVSP are locked down. During the tour, I was able to observe the impact of excessive lock-downs in two areas, CCCMS treatment programs on C-Facility, and EOP treatment programs on D-Facility. CCCMS Care on C-Facility: | Evid. 402. | expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding on mental health care |
| 130. During the morning meeting, staff reported that C-Facility, a Level IV CCCMS yard, has been locked down almost continuously for the last two years. When I visited C-Facility, I spoke with Dr. Williams, who indicated that there are three groups for CCCMS inmates on C-Facility. I also personally reviewed the waiting list for these groups. Each of the three groups had a long waiting list: The waiting list for the life prisoner process group was 46 inmates, with the longest wait person on the waiting list since 2/10/06; the waiting list for the anger management group was 27 inmates, with the longest wait person on the waiting list since 9/11/06; and the waiting list for the coping skills group was 33 inmates, with the longest wait person on the waiting list since 7/10/06. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding on mental health care |
| 131. These delays are not surprising given the near constant lock-downs on the yard. Dr. Williams stated that a typical 8-meeting group held on the yard would generally take 10 months to a year to complete due to the frequent lockdowns. She also said that in some | Inadmissible Hearsay. Fed. R. Evid. 802. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| years the mental health staff only completes two or three groups in the entire year. In my opinion, disrupting group therapy for this long a time period would make the group ineffective. This is because there is a complete lack of continuity between the sessions and the group basically has to restart every time it meets. | | matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding on mental health care |
| 132. Dr. Williams also stated that in her estimation roughly five of every seven inmates she treats are in the CCCMS treatment program on the basis of "medical necessity." Under the Program Guide, "medical necessity" is a treatment category for inmates who do not have a qualifying serious mental illness, but who require treatment for short term mental health episodes involving less severe mental illness. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-5. In my opinion, this is an extraordinarily high percentage of cases to be medical necessity, and it either reflects under-diagnosis and treatment, or else a high level of acuity on the part of inmates who would not normally qualify for the MHSDS. Either explanation is bothersome and is likely a reflection of the impact of overcrowding on mental health care. | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate Expert Opinion. Fed. R. Evid. 702. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to impact of overcrowding on mental health care<br><br>Based on expertise. |
| 133. Dr. Williams also provided me with a print-out listing the diagnosis and medications for these CCCMS inmates on her caseload. See *Coleman* Pls' Trial Ex. 32 (SVSP Current Mental Health Listing-Case Manager, from SVSP tour of C-Facility). A review of these CCCMS medical necessity patients revealed that they were being treated with multiple psychotropic medications | Relevance. Fed. R. Evid. 402. Inadmissible Hearsay. Fed. R. Evid. 802. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| including anti-psychotics and anti-depressants.<br>Of note, their stated diagnoses did not "match the severity of the psychotropic medications being given. When I mentioned this issue to Dr. Gregory, a new psychiatrist working on C-Facility, she expressed this same concerns about incorrect diagnoses, as well as about medication mismanagement issues among the patients she was seeing. | | defendants were present<br><br>Relevant to impact of overcrowding on mental health care |
| 135. In my opinion, *Coleman* Class Member P appears to have been extremely mentally ill for someone in the CCCMS program based on medical necessity receiving treatment, and there appear to have been severe problems with access to psychiatrists and appropriate medication in his case. In May and June of 2006, he was treated at the CCCMS level of care while in the CCCMS administrative segregation program. *Id.* at 6. He was continued on CCCMS status through October of 2006. *Id.* at 7. On October 11, 2006, he apparently requested that he be removed from the caseload; and he was removed from the CCCMS program in a treatment team meeting on October 18,2006. *Id.* On October 17, 2006, however, *Coleman* Class Member P was prescribed Effexor, a drug commonly used to treat depression and anxiety, although it is unclear whether he ever received this medication and it appears that the medication order may have been cancelled when he was removed from the caseload on October 18, 2006. *Id.* Inmates on psychotropic medications cannot be removed from the caseload pursuant to the Program Guide. | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate Expert Opinion. Fed. R. Evid. 702. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Cumulative. Mischaracterization of the evidence. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Admission of party opponent;<br><br>Suicide report is public record<br><br>based upon expertise<br><br>Relevant to impact of overcrowding on care<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members<br><br>Court can determine whether evidence is mischaracterized |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-3-13 (standards for removal from CCCMS caseload requires inmates not be on psychiatric medication). Nevertheless, he was removed from CCCMS care and placed in the stand-alone administrative segregation unit at SVSP on October 26, 2006. *Coleman* Pls' Trial Exhibit 24 (Suicide Report of *Coleman* Class Member P) at Executive Summary at 5. A court order in the *Coleman* case forbids the housing of caseload inmates in the stand-alone administrative segregation units used in the CDCR because of the harsh conditions there. See 10/10/02 Order. | | |
| 136. In my opinion, this suicide reflects serious problems with the adequacy of diagnosis and treatment of chronically mentally ill inmates with serious mental health histories at SVSP. The case also reflects the serious consequences of some of the medication delivery problems I witnessed at SVSP, and the serious consequences of the over-use of medical necessity diagnoses. If *Coleman* Class Member P had been maintained in the CCCMS program, he would have been seen more frequently and could not have been placed in the stand-alone administrative segregation unit. Other overcrowding-related problems that have played a role in this suicide include the severe shortage of psychiatrists at SVSP, the medication distribution problems at SVSP, and improper removals of patients from the MHSDS program. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. Cumulative. Mischaracterization of the evidence. Speculative. | There is no hearsay listed.<br><br>Based upon expertise<br><br>Relevant to impact of overcrowding on care<br><br>Small number of members of the plaintiff class, examples of the problems faced by class members<br><br>Court can determine whether evidence is mischaracterized |
| 137. I also interviewed and reviewed the medical records of several inmates on C-yard, the unit that staff stated had been | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. | Admission of party opponent – staff interviewed by |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| on nearly continuous lockdown for the last two and a half years. The first two inmates I randomly selected appeared to be cases where inmates who might not normally be mentally ill were being treated as if they had serious mental illnesses. These cases reflect the impact of prolonged lockdowns on individuals whose mental illness would otherwise not require formal intervention. The third inmate I selected randomly off of Dr. Williams' caseload on C-Yard and interviewed was *Coleman* Class Member Q. *Coleman* Class Member Q's medical record reflects a diagnosis of "Schizoaffective Disorder." *Coleman* Class Member Q complained to me that his medications are changed every time he sees his psychiatrist. He also stated that he is very stressed out due to the fact that he never gets out of his cell due to a pending appeal. He indicated that he hears voices and that when he is not on his medications he can become violent, depressed and suicidal. He said that he is trying to hold it together, is having difficulty sleeping, and indicated that he feels like he might "fall out." In my view, *Coleman* Class Member Q is severely mentally ill and needs at least an EOP level of care. I believe he would have been classified as EOP when I worked as an expert at CMF and Pelican Bay in the late 1990s. | Evid. 402. Inappropriate expert opinion. Fed. R. Evid. 702. Cumulative. | expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present

Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed

Based upon expertise and personal observation

Relevant to impact of overcrowding on care

Small number of members of the plaintiff class, examples of the problems faced by class members |
| 138. During the morning meeting at the outset of my tour of SVSP, clinical staff members stated that they believe the frequent lockdowns have the biggest impact on EOP programs on D-Facility, because a number of the groups offered to EOP inmates on D-yard take place | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about |

-61-

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART**, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| across the yard, and when the yard is closed, inmates cannot access these treatment spaces. I interviewed four inmates in the D-3 EOP program during my tour. All four inmates indicated that D-Facility has been frequently locked down in recent months. Based on these interviews, it appears that helpful groups are provided to these inmates when the yard is not locked down. However, when the yard is locked down, these inmates all appear to struggle with the stress of confinement to their cells for extended periods of time and experience mental health difficulties. | Speculative. | matters within their employment, attorneys for defendants were present<br><br>Based upon expertise and personal observation<br><br>Relevant to impact of overcrowding on care |
| 139. DMH staff reported during the morning meeting on the tour that the waiting list for access to DMH inpatient care programs at SVSP is currently 111 cases. Staff reported that after the new DMH intermediate inpatient care programs opened last year in D-5 and D-6 at Salinas Valley and in P-2 and P-3 at CMF, the waiting list for SVPP intermediate inpatient care program dropped from about 120 down to 80. However, now the waiting list has gone back up to over 110 inmates. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Relevant to existence of overcrowding |
| 140. I observed serious problems with crisis care for suicidal inmates while touring SVSP. It is clear that SVSP has a severe shortage of MHCB beds for its patients and that SVSP routinely employs a variety of make-shift "overflow" housing environments for such inmates. Dr. Chase, the CTC psychologist in charge of the MHCB unit, stated that the MHCB beds are | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "refusal" as opposed to rejection of referrals - Mischaracterization of evidence, Argumentative. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for |

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| 3 4 5 6 7 8 9 10 11 12 13 14 | always full. She indicated that inmates frequently stay in the MHCB unit for longer than the ten-day maximum mandated in the *Coleman* Program Guide, especially if they are waiting for a placement in DMH. Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-5-1 (mandating maximum MHCB length of stay of 10 days). She also indicated that DMH can refuse referrals and sometimes does refuse referrals. She stated that generally the census is 5-8 MHCB patients and that in her Experience working in the unit since May of 2007, up to 3 of the 8 MHCB beds are sometimes used by medical patients. She indicated that the unit refers cases to an outside MHCB unit at least once a week. | | defendants were present Based upon expertise and personal observation Relevant to existence and impact of overcrowding Court can determine whether this is mischaracterization or argumentative |
| 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | 141. Dr. Chase also indicated that the institution uses a variety of overflow holding cells due to the MHCB shortage. She indicated that three "dry cells," which are tiny freestanding upright cages with mesh wiring surrounding them (and no toilet) are routinely used during the day to house suicidal Inmates. I observed these small holding cages on the tour of SVSP and they are extremely confined and are clinically inappropriate locations to assess suicidality and to have confidential psychiatric interviews with suicidal inmates. At night, these inmates are transferred into one of four holding cells outside the entrance to the CTC which are known as "wet cells" because they have toilets. SVSP also routinely uses "BPT cells" located on each yard for overflow suicide watch. This report was consistent with the findings of the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present Based upon expertise and personal observation Relevant to existence and impact of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Special Master in the most recent progress report. See Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 153 (noting that holding cells "were in use daily and frequently housed inmates overnight. The holding cells in daily use were stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses. . . . Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells. The MHSDS system never intended to permit the use of holding cells, particularly one where a patient is required to sit in a wire mesh holding cell without access to minimum health and safety standards. The use of these non-authorized, unlicensed "treatment settings" results in an exacerbation of the underlying mental illness which led to the mental health crisis. | | |
| 142. While in the MHCB unit, I spoke with *Coleman* Class Member R, a seriously mentally ill patient who has been waiting for referral to the Department of Mental Health acute inpatient program since August 30, 2007. The Program Guide standard for transfer of an inmate to the acute DMH program at CMF is within 10 days of referral. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide) at 12-1 -13. Staff on the unit explained that *Coleman* Class Member R has chronic self-injurious behavior. He had been in a small safety cell near the front of the CTC unit since October 7, 2007, more than three weeks at the time of my | Inappropriate expert opinion. Fed. R. Evid. 702.  Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion.  Fed. R. Evid. 703. cumulative. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed

Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| November 1, 2007 tour, because he is too psychotic and paranoid to return to his cell -he believes that CDCR staff makes the floor vibrate in his MHCB cell and so he refuses to return to it. *Coleman* Class Member R is taking Depakote and Thorazine. He is alternately diagnosed as having Bipolar and Schizoaffective Disorders. His transfer has been delayed in part because he has 500 custody points, and must undergo a special review process before being sent to the acute DMH program at CMF. In my opinion, it is clinically inappropriate to keep this actively psychotic, paranoid inmate in a safety cell for such a long period of time. It is also inappropriate for him to remain in the MHCB unit for several months. He requires an expedited transfer to a higher level of care in DMH. | | attorneys for defendants were present

Based upon expertise and personal observation

Relevant to existence and impact of overcrowding

Examples of experience of small number of plaintiff class is not cumulative |
| 143. The difficulty of accessing higher levels of care was evident from my conversation with Dr. Chase, who stated that at one point during the summer the MHCB unit had a very sick homicidal inmate waiting for more than 100 days for a transfer to a higher level of care. She also expressed that in her opinion the general acuity level of her MHCB patients is extremely high, in part because of the difficulty of transferring cases to DMH care. | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculative. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |
| 144. During my tour of SVSP, I spoke with staff members in various areas of the institution about medication management practices. The most | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission of party opponent – staff interviewed by expert were |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| significant interviews I conducted on this topic were with two psychiatric technicians on C-Facility who distribute medications. According to these individuals, because of the high security level on the yard, medication delivery is always done at cell-front through the open food port. These individuals stated that their interaction with each inmate includes giving the inmate the pill, doing a mouth check through the cell door, and moving on. In my opinion, this is a seriously deficient medication distribution practice, because the individuals dispensing the medication are not taking the time to speak with patients about possible side effects they are having, and about whether or not their medication is working. Also, it is difficult to observe inmates taking their medications through food ports in cell doors. In a fully functional medication distribution system, these staff members would provide feedback to treating Psychiatrists about medication compliance, whether the medications were having the desired clinical effect and about whether inmates are experiencing side effects. This kind of feedback is critical to basic psychiatric care. | | generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present<br><br>Based upon expertise and personal observation<br><br>Relevant to impact of overcrowding on care |
| 145. I encountered one medication problem that better medication practices at SVSP should have caught when interviewing inmates in the D-3 EOP program. At the end of the SVSP tour I interviewed inmate *Coleman* Class Member S. *Coleman* Class Member S recently had his dosage of his medications raised by his psychiatrist. During his interview, *Coleman* Class | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Then existing mental or physical condition – 803(3)<br><br>Relevant to impact of overcrowding on care.<br><br>Based upon personal observation and |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Member S told me that he thinks his medications are making him worse, and resulting in severe daytime sedation, and that he is experiencing other side effects. He went on to state that he was required to wait for his next regularly scheduled psychiatrist appointment to address the issues. An effective medication delivery system would provide timely information to clinicians about these kinds of side effects and would result in improved medication compliance at SVSP. | | expertise |
| 146. In his most recent 18th Monitoring Report, Special Master Keating noted that SVSP has significant medication management issues. See Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 148 (noting that "SVSP did not appear to have a functioning mechanism to manage medication . . . Medication continuity remained problematic when inmates were relocated between yards, were released from the MHCB, or arrived from other prisons."). In my experience, these medication management problems are closely associated with both staffing shortages and an oversubscribed system. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Inappropriate expert opinion. Fed. R. Evid. 702. | Public Report – see supra;<br><br>Relevant to impact of overcrowding on care<br><br>Based upon expertise |
| 147. During my SVSP tour, I was told that although the institution had all four gyms filled and triple-bunked a month before my visit, these housing units had been emptied in the month before the tour. At the time of my tour, the only remaining gym in operation was on A-yard, and that gym was in the process of being emptied out. During the tour, I visited the A-gym and spoke to inmates about conditions there. Although it was no longer crowded, several inmates said | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion.  Fed. R. Evid. 703. | Admission of party opponent – staff interviewed by expert were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| living in the gym had been extremely stressful when the gym was full. I spoke with one inmate, *Coleman* Class Member T, who is CCCMS. He stated that he takes anti-psychotics and an anti-depressant and that he has found it extremely stressful to be housed in the gym. He stated that he was very stressed out and felt that he could "lose it" at any time. In my opinion, the stress of being housed in a gym is clinically harmful to this CCCMS inmate. | | Then existing mental condition – 803(3)<br><br>Based upon expertise and personal observation |
| 150. *Coleman* Class Member V is a CCMCS inmate who is refusing medications. He has a history of EOP treatment. He indicated that he used to take Wellbutrin, Neurontin, Paxil and Seroquel. He told me that he is able to communicate telepathically with his fiancé, who is out on the street. He appears to be very mentally ill. He may be appropriate for CCCMS treatment, but he needs to be watched closely for signs of decompensation, and he should be encouraged to take medication. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Not offered for the truth of the statement, but to provide information to the Court about the basis of the opinions formed<br><br>Then existing mental condition – 803(3)<br><br>Relevant to impact of overcrowding on quality of care<br><br>Based upon expertise and personal observation |
| 151. In conclusion, my impression of the level of clinical acuity of the majority of the inmates I encountered at SVSP was that they exceeded the stated treatment criteria for the current MHSDS treatment program to which they were assigned. See Joint Pls' Trial Ex. 9 (September 2006 Program Guide). In addition, they were not receiving appropriate psychiatric care. | Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Relevant to impact of overcrowding on quality of care<br><br>Based upon expertise and personal observation |
| 163. The 1 8th Monitoring Report of the | Lack of Foundation – | Based upon review |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Special Master documents severe, endemic problems with access to MHCB beds and with the use of inadequate alternative sites for housing suicidal inmates who need MHCB care but are unable to access it. See generally, Joint Pls' Trial Ex. 36 (I 8h Monitoring Report of the Special Master). The Eighteenth Report confirmed what I saw at DVI, reporting that "DVI had difficulty transferring inmates to MHCB beds at other prisons." Id. at 98. At Mule Creek, the institution was forced to open a 5-bed overflow wing to its MHCB unit in its administrative segregation unit. Id. at 53. At San Quentin State Prison, the Special Master's monitors noted that "there were 78 to 101" mental health placements in its unlicensed OHU each month, some of whom were so severely mentally ill that waiting for placement in the DMH acute inpatient unit. Id. at 92. At Wasco State Prison, overflow cases from the MHCB unit were frequently housed in "[h]olding cells in the CTC, the B Facility chapel, or in administrative segregation.. ." Id. at 184. Although I did not see any specific cases of failure to refer to the MHCB unit during my tour of Solano, the 18th Report of the Special Master documents "[t]wo cases in which referrals to the MHCB unit should have been made but were not, indicated that more improvement was needed (see Exhibit E, Case Reviews 3, 1 I)." Id. at 82. | regarding endemic problems. | of Monitoring Report, expertise, personal observation |
| 164. The Eighteenth Report also documents the severe problems CDCR institutions are having with accessing DMH care at every level, noting that "approximately one third of DMH referrals did not result in transfers" and | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | Public record (see supra re Special Master reports)  Relevant to impact of overcrowding on |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| noting that poor access to DMH "was attributed principally to lack of bed availability." *Id.* at 321. After years of plans to address this lack of sufficient MHCB and DMH beds, defendants' latest August 2007 plan to address these bed shortages will not be completed until 2014 at the earliest. See *Coleman* Pls' Trial Ex. 12 (*Coleman* Special Master's Report and Recommendations on Defendants' August Bed Plan) at 11. | | quality of care |
| 166. This is an area where I witnessed first hand the impact of delays in reception center treatment programs when I toured DVI. My clinical impression of the inmates I encountered at DVI in the administrative segregation program and in the EOP and CCCMS program is that they exceed the stated treatment for the MHSDS programs to which they were assigned. See Joint Pls7 Trial Ex. 9 (Program Guide). This impression was confirmed by the clinical leadership at DVI, who candidly stated that they are routinely treating inmates in their EOP program that should be treated at a higher level of care that is not accessible to them because of bed shortages. The Special Master also highlighted the severity of this problem in the recommendations section at the end of the 18th Monitoring report, his most recent: Over time, insufficient mental health staffing has exacted a particularly high toll on the care of the growing EOP population entering CDCR institutions. It has led to ever longer waiting periods for EOP inmates in reception. Inmates languished there without care, leading to an increase in cases of decompensation. Joint Pls' Trial | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for opinion. Fed. R. Evid. 703. | Admissions

Program Guide is public record

Relevant to impact of overcrowding on quality of care

Based upon expertise and personal observation |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Ex. 36 (18th Monitoring Report of the Special Master) at 330. The Special Master goes on to explain that, despite the May 1, 2006 Court Order requiring limited treatment for EOP inmates in reception centers, "EOP inmates continued to wait for transfers in reception center for excessively longer periods of time." *Id*. at 33. Mr. Keating also noted the need for "vigilance" in monitoring the adequacy of care during these long waits. *Id*. There are numerous system-wide examples of this failure to refer inmates in a timely fashion out of reception centers in the Special Master's Eighteenth Monitoring Report. Id. In my opinion, this type of back-up in the reception center caseload is typical of overcrowded systems. | | |
| 168. The many problems with medication distribution that I observed on my tours are also problems which appear to be widespread. In the summary section of the Eighteenth Progress Report, the Special Master explains that in the area of medication distribution and continuity "fewer than half of institutions were compliant with medication continuity on intra-institutional transfers," and that "[r]esponsiveness to medication non-compliance was another area in which most institutions failed to comply with guidelines." Joint Pls' Trial Ex. 36 (18" Monitoring Report of the Special Master) at 3 15-16. In my opinion, medication issues of this type are typical in overcrowded systems. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | Public record (see supra re Special Master reports)<br><br>Relevant to impact of overcrowding on quality of care |
| 175. In my opinion, another serious question raised by the suicide is the decision to place an inmate with a very high risk of suicide and a history of | Relevance. Fed. R. Evid. 402. Inappropriate expert opinion. Fed. R. Evid. | Relevant to impact of overcrowding on quality of care |

-71-

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| serious suicide attempts into an unlicensed outpatient housing unit rather than admitting him to an MHCB unit. This inmate's level of dysfunction and his mental health history were such that staff should have recognized his need for crisis stabilization using medication changes and closely monitoring both his suicidality and his response to medication. This suicide also appears to raise serious questions about medication management and the response to the inmates' medication side-effects. | 702. Inappropriate basis for opinion. Fed. R. Evid. 703. | Based upon review of report and expertise |
| 188. In my opinion, this case illustrates a number of the problems and risks that a mentally ill patient faces in the CDCR today. First, the inmate was not properly screened for mental illness. Second, when he exhibited signs of psychiatric distress and suicidality, he was not appropriately responded to, was not given a suicide risk assessment, and in fact was placed into an administrative segregation unit, a dangerous place for suicidal inmates. Third, when he complained about medication side effects, and when, according to his MAR, he stopped taking his medication for a month, he was not referred to a psychiatrist for an assessment. Fourth, his suicidal gestures were discounted, and his behavior was not reported to mental health staff members in administrative segregation who should have monitored him. Fifth, he was not appropriately assessed for placement in the mental health treatment program. These are the types of problems that take place in an overburdened, overcrowded system when staff does not have enough time with each | Relevance. Fed. R. Evid. 402. Inappropriate expert opinion. Fed. R. Evid. 702. Inappropriate basis for opinion. Fed. R. Evid. 703. | Relevant to impact of overcrowding<br><br>Based upon expertise and review of required report of suicide |

-72-

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| patient and systems break down. | | |
| 189. It is also clear that staffing shortages are currently endemic in the CDC's mental health system. In the 18th Monitoring Report, the Special Master found that "The vacancy rates in mental health staffing continued throughout CDCR institutions," and that vacancy rates were a "significant obstacle to compliance with the *Coleman* Program Guide." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 330. He also found the staffing problem to be particularly damaging to EOP inmates entering reception centers. *Id.* | Relevance. Fed. R. Evid. 402. Inadmissible Hearsay. Fed. R. Evid. 802. Lack of Foundation – regarding endemic problems. | Public record (see supra re Special Master reports)<br><br>Based upon review of findings of special master<br><br>Relevant to existence and impact of overcrowding |
| 190. It is also clear that the problem of adequate office and treatment space is endemic in the CDCR. The 18th Report explains that during the review period, "[c]ompetition for mental health treatment and clinical office space sharpened with growth in the overall healthcare infrastructure against the backdrop of already overcrowded prisons." Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 2. | Relevance. Fed. R. Evid. 402. Inadmissible Hearsay. Fed. R. Evid. 802. Lack of Foundation – regarding endemic problems. | Public record (see supra re Special Master reports)<br><br>Based upon review of findings of special master<br><br>Relevant to existence and impact of overcrowding |
| 191. The Special Master's Report contains numerous concrete examples of individual institutions that are unable to provide adequate care because of space shortages. In many institutions and housing units, including Mule Creek State Prison, Solano, and Sierra Conservation Camp, group therapy is impossible because of lack of space. See Joint Pls' Trial Ex. 36 (Special Master's 18th Monitoring Report) at 55-56 (in MCSP's EOP Administrative Segregation program "eight holding cells used for | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate expert opinion. Fed. R. Evid. 702. | Public record (see supra re Special Master reports)<br><br>Based upon personal observation and expertise |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| group treatment were unable to accommodate the unit's census of 40 to 60 inmates" and group sessions and case manager contacts took place on the dayroom floor); 55 (MCSP Level IV EOP program had "insufficient group treatment space"); 61 (at SCC, treatment space in administrative segregation "remained insufficient"); 84 (at Solano four CCCMS groups were formed "but did not meet for lack of suitable space."); 85 (Solano: "In administrative segregation, mental health treatment and mandated outdoor recreation were stymied by inadequate space."); 178 (at CMC: "Lack of sufficient clinical staff caused [group treatment] options to be limited. Lack of space exacerbated CMC's difficulties with meeting Program Guide group requirements."); 204 (at NKSP: space limitations caused cancellation of groups administrative segregation). | | |
| 198. The *Coleman* Special Master has observed that, although there was a period of time when it seemed that defendants might be making progress in terms of their bed plan and the provision of treatment, the overcrowding crisis has overwhelmed this hope. In his April 12, 2007 Report to the Court, he concluded: "By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was | Inadmissible Hearsay. Fed. R. Evid. 802. | Public record (see supra) |

[253418-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| CDCR's mental health plan." See 4/12/07 Special Master's Report on Defendants' Establishment of Interim Inpatient Intermediate DMH Beds at 8. | | |
| 209.  Similarly, the alternative remedy proposed by defendants for beds at the MHCB and inpatient level will not be finished until 2014 -seven years from now at the earliest, even assuming there are no bureaucratic delays or construction delays. See *Coleman* Plfs. Trial Ex. 12 (9/24/07 Special Master's Report on Defendants' August 2007 Bed Plan). That plan is unacceptable. Mentally ill *Coleman* class members are daily suffering dangerous denials of mental health care and medical care that place them, their fellow inmates, the officers who supervise them, and the public at risk. In the interim, the only way to correct the endemic denials of appropriate mental health care that currently exist in the CDCR is to significantly reduce the population. No other remedy will result in a constitutional mental health care system in the CDCR. | Lack of Foundation – regarding endemic problems. Relevance. Fed. R. Evid. 402 – other remedies. | Based upon observation, review of reports, and expertise

Members of the class suffering is relevant to the impact of overcrowding.

Plaintiffs acknowledge that statements regarding other remedies are not relevant to Phase I. |

**B.      Supplemental Expert Report of Pablo Stewart dated August 15, 2008.**

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 17. Similar to my last tour at SVSP, I observed significant overcrowding-related problems at SVSP, including serious problems with access to higher levels of care, poor medication distribution and compliance, staffing shortages, and inadequate treatment and | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Lack of Foundation. Vague – "capacity". | Admissions

Relevant to impact and existence of overcrowding

Foundations are the |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| office space. 11/9/07 Report at pp. 51-63. According to the data provided by staff during the tour, there were 1,537 total *Coleman* class members housed at SVSP, with 1,152 at the 3CMS level of care and 232 at the EOP level of care as of July 28, 2008. *Coleman* Pls' Trial Ex. 136. This means that SVSP was operating at 115 percent capacity of its 3CMS program and 121 percent capacity of its EOP program. *Coleman* Pls' Trial Ex. 57 at p. 3 (showing SVSP's capacities of 999 for 3CMS patients and 192 for its EOP program). The data provided during the tour also showed that between April 29, 2008 and July 28, 2008, SVSP admitted 50 patients into mental health crisis beds and housed 79 patients in various "overflow" placements because crisis beds were unavailable. *Coleman* Pls' Trial Ex. 136. | | admissions.<br><br>Further clarification is an appropriate subject for cross-examination. |
| 20. The extremely long waiting list for ICF beds has a ripple effect throughout the system[2] Sterling Price, the Acting Executive Director of DMH who attended both my Salinas Valley State Prison and my California Medical Facility tours, acknowledged that some of the inmates on the SVPP waiting list for ICF beds have been on the list since 2005. This is consistent with the reports from psychologists at both SVSP and CMF who said that it can take up to a year for a patient to come off of the waiting list. Dr. Kittimongcolporn, the Clinical Director of the MHCB unit at SVSP, reported that it takes a year or longer to get her patients to an ICF bed and that she does not typically refer patients to those beds for that reason. Dr. Burkhardt, a psychologist at SVSP who | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of overcrowding |

-76-

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART**, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| previously worked as the Clinical Director of the CTC, also reported a 9-12 month wait for ICE beds. When I asked Dr. Burkhardt whether she continues to refer patients to that list, she said that she really only refers lifers who are at the EOP level of care since those patients will be around long enough to wait for a bed. The *Coleman* Court also recognized the problem of under-referrals in its June 28, 2007 Order: SVSP staff reported that construction of another 64-bed ICF unit is on schedule for completion later this year. These beds, while badly needed, will still fail to address the serious shortfall of beds. "Indeed, from other sources the court has learned that at least some CDCR clinicians have stopped referring patients to DMH because of its refusal to accept referrals." 6/28/07 Order (Docket 2301) at 3, fn. 2. | | |
| 23. Sterling Price reported that the waiting list for the acute psychiatric hospital at CMF was 15 as of July 29, 2008 but that it was up to 45 patients as recently as July 1, 2008. I heard reports from staff members at SVSP and CMF that it takes anywhere from about two to eight weeks to get a patient into an acute bed. SVSP also listed access to acute beds as a problem in its *Coleman* 21" Round Corrective Action Plan, dated May 23, 2008: "We continue to experience difficulty with the continual wait list for our referral to DMH acute for any referral reason. Length of wait has also been longer for self injurious behaviors and suicidal ideation. We had one inmate who was referred for grave disability reason at an acute level that we | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of overcrowding |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| decided to send U back to EOP to wait for intermediate level of referral so that he at least could program there while waiting." *Coleman* Pls' Ex. 138 at p. 7. | | |
| 24. This backlog is particularly significant in an overcrowded system like the CDCR's. Dr. Kittimongcolporn, the Clinical Director of the CTC at SVSP, told me that if she refers a patient to an acute bed from a mental health crisis bed (MHCB), that patient stays in the MHCB until he is transferred. While it may be clinically appropriate (and even necessary) for a patient to remain in an MHCB while he awaits transfer, it also means that that patient is occupying a bed that is in high demand for other acutely ill and suicidal patients. This puts clinicians in the dangerous position of having to triage the mental health acuity of their patients because they simply do not have enough options for adequate treatment | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of overcrowding |
| 26. My prior report documented the serious problems I saw at SVSP with respect to suicidal inmates' impeded access to mental health crisis beds and consequent placements in wholly inadequate alternative settings. See 11/19/07 Report at pp. 58-60. These problems, including a shortage of sufficient mental health crisis beds and the use of make-shift cages to hold patients waiting for crisis beds, existed during my July 29, 2008 tour as well. Dr. Kittimongcolporn, the Clinical Director of the CTC at SVSP, reported that the MHCBs are almost always full. The Chief Psychiatrist, Dr. Wilson, explained that he has to "fight" to maintain the 6-8 MHCBs so that medical patients are not | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "cages" – Mischaracterization of the evidence, Argumentative. | Admissions<br><br>Relevant to impact and existence of overcrowding<br><br>Cages is the term used by the Special Master in Overcrowding Report at p. 6 (see supra)<br>Plaintiffs will submit photos, and the Court can determine whether this is a mischaracterization or argumentative |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| placed in those beds. While the MHCB unit at SVSP is theoretically open to other institutions, staff reported that only "very rarely" is anyone outside of SVSP admitted to the unit, although it did happen the week before the tour. | | |
| 27. During my tour on July 29, 2008, I observed again the dry holding cages that SVSP must use when there are no available mental health crisis beds. I described these cages and the wet cells used for overnight stays in the CTC in my prior report: Dr. Chase also indicated that the institution uses a variety of overflow holding cells due to the MHCB shortage. She indicated that three "dry cells," which are tiny freestanding upright cages with mesh wiring surrounding them (and no toilet) are routinely used during the day to house suicidal inmates. I observed these small holding cages on the tour of SVSP and they are extremely confined and are clinically inappropriate locations to assess suicidality and to have confidential psychiatric interviews with suicidal inmates. At night, these inmates are transferred into one of four holding cells outside the entrance to the CTC which are known as "wet cells" because they have toilets. SVSP also routinely uses "BPT cells" located on each yard for overflow suicide watch. This report was consistent with the findings of the Special Master in the most recent progress report. See Joint Pls' Trial Ex. 36 (18th Monitoring Report of the Special Master) at 153 (noting that holding cells were in use daily and frequently housed inmates overnight. The holding cells in daily use were | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "cages" – Mischaracterization of the evidence, Argumentative. "exacerbates mental health issues" - Lack of foundation, Inappropriate basis for expert opinion. Fed. R. Evid. 703. | Admissions<br><br>Relevant to impact and existence of overcrowding<br><br>Cages is the term used by the Special Master in Overcrowding Report at p. 6 (see supra) Plaintiffs will submit photos, and the Court can determine whether this is a mischaracterization or argumentative<br><br>Based on observation and expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| stand-up mesh cells. Holding cells used overnight were large group waiting rooms that had plumbing and that could be furnished with mattresses.. .Standard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells."). The MHSDS system never intended to permit the use of holding cells, particularly one where a patient is required to sit in a wire mesh holding cell without access to minimum health and safety standards. The use of these non-authorized, unlicensed "treatment settings" results in an exacerbation of the underlying mental illness which led to the mental health crisis. 11/9/07 Report at pp. 59-60. | | |
| 29. The stand-up, mesh holding cages are not clinically appropriate places to house patients who are having mental health crises. Pictures of the cages from my tour are attached to this report as Appendix C. Staff informed me during the tour that they cannot utilize wet holding cells for those patients during the day, however, because they have to use those cells to hold inmates awaiting medical appointments. This is another example of medical and mental health staff competing for very limited space in medical and mental health systems that simply cannot accommodate the large volume of patients. To treat a patient in crisis as if he was a dangerous animal, subjecting him to public degradation and humiliation, is, by definition, inappropriate mental health care. The routine use of these cages throughout the system for mental health interventions is itself a tragic symptom of an overcrowded and dangerous system | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. "cages" and "animals", "inhumane" – Mischaracterization, Argumentative. | Admissions

Relevant to impact and existence of overcrowding

Characterization based upon observation and expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| where mental health staff are taught to be fearful of their patients and inhumane practices are not only tolerated, but institutionalized within the medical and mental health systems. | | |
| 30. During the morning meeting of my July 29, 2008 tour, Dr. Kahle, the Chief Psychologist, reported that SVSP has 12 vacant psychologist positions (of about 24) which it is able to fill with contract staff. She reported that there is one vacant psychiatrist position and two positions filled by contract staff. The Director of Nursing said that the nurse and psychiatric technician positions are almost full, but that there are not enough LVN positions allocated for the institution. With respect to staffing in general, SVSP reported to the Special Master in May of 2008 that, "hiring of support staff remains a conflicting demand with no Recruitment and Retention to offer potential employees." *Coleman* Pls' Trial Ex. 138 at p. 2. SVSP also reported that "[s]taff turnover continues to be a problem" and that "Loss of Recruitment and Retention (R&R) pay differential causing continued difficulty in successful recruitment of state employees. With the loss of R&R comes loss of incentive to live in a remote isolated, non-urban small-town environment." Id. CDCR chose to end the practice of paying extra bonuses to recruit clinicians to undesirable locations when the *Coleman* court raised salaries across the board. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Public Record (see supra re Special Master's reports)<br><br>Relevant to impact and existence of overcrowding |
| 31. My prior report also documented extensive lockdowns at SVSP that interfered with programming and mental health care. 11/9/07 Report at pp. 53-54. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Staff reported during the morning meeting on my July 29, 2008 tour that some of those lockdowns improved in recent months, particularly on the C1 side of C-Yard, which houses 3CMS class members. On the day of tour, however, the entire yard was on modified program. I understand that there are eight housing units on C-Yard, which are split evenly between the C1 and C2 sides. Chief Deputy Warden Liotta and Associate Warden Trexler explained that the C1 side was programming fairly well until an incident occurred the week before the tour. They both confirmed that the C2 side of the yard, however, continued to struggle with modified program status (meaning that inmates cannot go to their jobs, school, the library, yard, etc.). This was also confirmed when I spoke with Dr. Burkhardt on C-Yard. She reported that C-yard's lockdowns interfere so much with programming that clinicians at SVSP are afraid to change classifications of class members from EOP to 3CMS. She explained that the programming would be so restrictive on the 3CMS C-Yard, that clinicians would opt to keep the patient at the EOP level so that he could at least continue to have some program. | | overcrowding |
| 32. Dr. Burkhardt also talked generally about tensions she experienced with custody staff, including incidents whereby custody officers refused to escort patients out of their cells for her. The Special Master has also documented disturbing tensions between custody and mental health staff A pervasive and disturbing pattern of custodial | Relevance. Fed. R. Evid. 402. | Relevant to impact and existence of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| dysfunction was apparent at SVSP. Line officers and custodial supervisors assigned to 3CMS and EOP buildings reportedly taunted inmates about mental disabilities, enforced rules arbitrarily, restricted utilization of space set aside for mental health programs in an inexplicable manner, and failed to properly manage the priority ducat system. This dysfunction created tension and animosity between custody and mental health staffs and discouraged inmate participation in treatment, thereby thwarting access to mental health programs. ..The dysfunction reported in October 2007 had grown more widespread, pronounced, and destructive to SVSP's substantial and expanding mental health mission [by the June 2008 monitoring tour]. Joint Pls' Trial Ex. 57 at pp. 188-198. These problems are disturbing and, in my opinion, may be another symptom of the extremely stressful working conditions in the overcrowded system. | | |
| 33. My prior tour report also documented my conversation with Dr. Williams, a clinician on C-Yard who told me that it typically took 10 months or a year to complete an 8-meeting group due to the extensive lockdowns on the yard. 11/9/07 Report at p. 22. I asked Dr. Burkhardt if this was still the case and she said that it was. Dr. Burkhardt also reported that she had recently gathered monthly data about mental health groups provided on C-Yard which showed that those groups were cancelled 2 out of every 4 weeks. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of overcrowding |
| 34. SVSP continues to struggle with adequate treatment and office space for | Inadmissible Hearsay. Fed. R. Evid. 802. | Admissions |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| mental and medical health services. Dr. Kahle explained during the tour that clinicians are forced to run 40-50 percent of all EOP therapy groups outside on the yard due to space shortages. While the institution converted three rooms on the yard for group treatment, they are still not enough. Because 40-50 percent of the groups are held on the yard, SVSP loses all of those groups when there are custodial lockdowns or modified programs. Inclement weather is also presumably a factor. | | |
| 36. The Chief Deputy Warden told me during the morning meeting that the institution submitted a plan for additional treatment space on A, B and C yards two years ago, but has not heard anything back from headquarters' staff about that plan. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact and existence of overcrowding |
| 44. My interview with *Coleman* Class Member TTT illustrates some of these problems. I interviewed Class Member TTT in the S1 unit at CMF, which houses men with mental illness. Although Class Member TTT had been housed in acute unit for nearly six months at the time I saw him, he was floridly psychotic, with unintelligible thought process.  According to the file, he was prescribed  a 300 mg. Daily dose of Clozaril, which I refer to as the "atomic bomb" of anti-psychosis even after 6 months of acute care, including treatment with very powerful anti-psychotic medication. It was also apparent to me that he will require an acute level of acute level of care for a long period of time, thereby consuming a very valuable resource within CDCR's overcrowded system.  According to the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for expert opinion. Fed. R. Evid. 703. | Not offered for the truth, but to provide information about the basis for the opinions<br><br>Medical files created by state employees are public records, as they are required reports<br><br>Bed report is Admission and public record<br><br>Relevant to impact of overcrowding on care<br><br>Based on expertise, |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| DMH Monthly Bed Utilization report, he also waited as MCSP for nearly month (between 1/8/08 and 2/6/08) for an acute bed. *Coleman* Pls' Trial Ex. 118, Patient 127. | | personal observation, review of records |
| 45. I also interviewed another class member in an acute unit at CMF who, in my opinion, is also going to require a significant stay at that level of care. Class Member UUU was admitted into the acute unit on July 11, 2008 from administrative segregation, according to his medical file, although the file also showed another admission into the acute unit from administrative segregation on June 23, 2008. The file said he was diagnosed with Schizophrenia and Personality Disorder NOS, however his June 3, 2008 "Mental Health Treatment Plan" lists the following diagnoses: Schizophrenia, Paranoid Type; Major Depressive Disorder, Severe with Psychotic Features; and Schizotypal Personality Disorder. His medical file also showed a significant history of bizarre behavior, including pouring water over cell mates for "sacrificial purposes." His "Mental Health Treatment Plan" reflects a history of suicide attempts, cutting, violence and sexual victimization from childhood. *Coleman* Pls' Trial Ex. 140 at p. 1. The chart also notes that he has difficulty with female staff and that he has catatonic periods. *Id.* A clinician on the unit told me that Class Member UUU had a significant history of inpatient placements at DMH and Atascadero State Hospital. His file reflected that he was prescribed the following medications: Haldol Decanoate (150 mg. every 4 weeks); | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for expert opinion. Fed. R. Evid. 703. | Not offered for the truth, but to provide information about the basis for the opinions<br><br>Medical files created by state employees are public records, as they are required reports<br><br>Relevant to impact of overcrowding on care<br><br>Based on expertise, personal observation, review of records |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Abilify (30 mg. daily dose); Prozac (60 mg. daily dose); Cogentin (2 mg. daily dose); Benadryl (50 mg. daily dose) and Valproic Acid (2000 mg. daily dose). In my opinion and based on Class Member UUU's clinical presentation and mental health history, he was probably prematurely discharged back to administrative segregation in late June to early July of 2008, which lead to his readmission into the unit on July 1lLh. It is also my opinion that he will require an acute level of care for a significant amount of time in light of the severity of his mental illness. | | |
| 47. Every class member I spoke with about medications, including class members at CMF, reported that medications were distributed very quickly by line staff who never asked about either the efficacy of the medication or potential side effects. The Special Master also documented significant failures with CMF's ability to manage patient medications: CMF staff at all levels reported that medication management was a broken system. Problems included continuity of medication when inmates were moved between housing units, handling medication non-compliance, medication errors, implementation of DOT orders and considerable variation in the quality of documentation on MARS. Many inmates who were interviewed reported that they frequently received the wrong medication. Some inmates reported that they had to choose whether to go to yard or stay inside in order to receive medication, while others had difficulty getting medication during scheduled | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Not offered for the truth, but to provide information about the basis for the opinions<br><br>Medical files created by state employees are public records, as they are required reports<br><br>Relevant to impact of overcrowding on care<br><br>Based on expertise, personal observation, review of records |

[253418-1]

| | Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| 3<br>4<br>5 | work assignments. Staff confirmed that medication errors included wrong medication, wrong recipient and wrong time of administration. Joint Pls' Trial Ex. 57 at p.78. | | |
| 6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20 | 50. The treatment and office space limitations are also severe for the CDCR mental health programs at CMF. I spoke with a clinician who works in the M2 unit (an EOP unit), for instance, who reported that there was no interview space available for staff and that the one available room must be shared with 4 or 5 other clinicians who frequently walk in and out of the room. In fact, the defendants recently submitted a plan to the *Coleman* court admitting significant treatment and office space shortages in the L, M, and N-wings for EOP patients and proposing to build 16 group therapy rooms, 28 interview rooms, 4 recreational therapy rooms, 6 education classrooms and "appropriate support space for staff." *Coleman* Pls' Trial Ex. 59 at p. 4. CMF does not propose to start construction of these spaces until 2010, however, and does not anticipate completion until 2012 at the earliest. *Id.* | Relevance. Fed. R. Evid. 402. | Relevant to impact of overcrowding on care |
| 21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 55. Because MCSP does not have ICF or acute beds, its biggest issue is providing adequate MHCB access to men who are suicidal or otherwise in crisis. During the morning meeting, both the Warden and the head registered nurse reported that the institution's MHCBs are almost always full and that while they are theoretically available to prisoners from other institutions, they did not know of even one admission from an outside prison. Staff also reported that the overflow units to the MHCBs are also almost always full, including the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to existence and impact of overcrowding on care |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| cells set aside as the Mental Health Outpatient Housing Unit (MHOHU) and five administrative segregation cells on C-yard. | | |
| 56. The Chief Psychiatrist, Dr. Fowler, candidly talked about problems getting men into crisis beds and inpatient beds run by DMH. He said that it takes a lot of paperwork to do a DMH referral and significant staff time, which he estimated as 5-7 hours. I asked him if these problems resulted in fewer referrals to DMH and he said that they do. He said that staff sometimes opt to initiate the Keyhea process (to involuntarily medicate patients) rather than refer them to an inpatient bed. Dr. Fowler also told me that he prefers to keep some men at MCSP rather than refer them to DMH beds for "continuity" of care purposes. He admitted that this means he sometimes uses the MHCB unit to provide acute care. The data provided by MCSP shows that the institution admitted 42 patients into crisis beds during the three month period between April 1 and June 30, 2008. Five of the admitted patients stayed a combined 13 extra days due to administrative reasons, which were described as "medical quarantine, institutional emergency, cell unavailability due to overcrowding or custody unavailable to complete transport." Joint Pls. Trial Ex. 141 at p. 2. When Dr. Fowler does not have open beds in the MHCB unit, he uses six cells designated as the MHOHU and then 5 administrative segregation cells if the MHOHU cells are full. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to existence and impact of overcrowding on care |
| 57. The Special Master has grave concerns about the systemic use of | Inadmissible Hearsay. Fed. R. Evid. 802. | Public Record (see supra re Special |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| alternative placements due to shortages of mental health crisis beds. In his 201h monitoring report, he wrote: Fourteen institutions that did not have adequate access to licensed crisis beds resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care. Despite having 26 CTC beds and a 20-bed MHOHU, CSP Sac referred inmates in holding cells for up to eight hours, held half of all MHOHU admissions for longer than 72 hours, and transferred 33 inmates to MHCB units in other prisons. MCSP used six MHOHU beds and five observation cells in administrative segregation to monitor inmates it was not able to admit to its eight-bed MHCB unit. CSPILAC, KVSP, NKSP, SVSP, and WSP, all with licensed CTCs, routinely used holding cells and tanks to monitor inmates for whom MHCBs were not available. CCI, CIM, and DVI used alternative sites to monitor inmates for whom OHU beds were unavailable. OHU admissions at ASP, CRC, CTF, SCC, and SQ routinely exceeded 72 hours because inmates were not timely referred and/or transferred to MHCB units. Joint Pls' Trial Ex. 57 at p. 352-353. The Program Guide specifies that patients should not be housed in OHUs for longer than 72 hours except in limited circumstances. Joint Pls' Trial Ex. 9 at p. 12-5-28. | Relevance. Fed. R. Evid. 402. | Master reports)<br><br>Relevant to existence and impact of overcrowding |
| 58. The Mental Health Outpatient Housing Unit ("MHOHU") at MCSP is a disturbing example of one of the overflow units to which the Special Master refers. The MHOHU is in a fenced-off area within an administrative | Inadmissible Hearsay. Fed. R. Evid. 802. | Admissions<br><br>Statements of inmate/patients not offered for the truth, but as explanation of |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| segregation unit at MCSP. Staff reported during the morning meeting at MCSP that the MHOHU cells are usually full. Data provided during the tour showed that there were 125 patients admitted to the MHOHU between April 1st and June 30th of 2008, 33.6 percent of whom stayed in the MHOHU for longer than 72 hours. Joint Pls' Trial Ex. 142 at p. 4. During my tour on August 1, 2008, four of the six cells were occupied by men who had been housed there, according to notes on their doors, for between one and eight days. The cells themselves are small, concrete rooms that are often completely bare aside from a small toilet and sink. In fact, two of the men I saw in these cells were wearing nothing but suicide smocks and had no mattress or blanket. They told me that they do not get a mattress or a blanket even during the night while they are sleeping, forcing them to sleep on the cold, concrete floor wearing only a suicide smock. The man who had been in the MHOHU for 8 days was lucky enough to have a one inch plastic-coated mattress, but reported that he slept on the bare concrete floor in a suicide smock and without a blanket for the first 7 days he was there. |  | basis of opinion

Then existing physical condition – 803(3) |
| 59. The MHOHU cells at MCSP do not constitute anything even approaching an acute level of care. Attached to this report as Appendix D are pictures of a MHOHU cell that I saw during my tour. To the contrary, the conditions found in the MHOHU are likely to exacerbate many patients' clinical conditions and will ultimately dissuade people from communicating candidly with their doctors about their mental health | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Statements of inmate/patients not offered for the truth, but as explanation of basis of opinion

Then existing physical condition – 803(3)

Relevant to impact |

[253418-1]

| | Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| 3<br>4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13 | conditions. My interviews with two men who were currently in the MHCB unit, but who had spent time in the MHOHU support these opinions. One of those men (Class Member VW) was wearing a suicide smock when I interviewed him and told me that he became so upset about being placed in the MHOHU without a mattress or a blanket that he smeared feces in his cell. The paperwork in his file confirmed this account. Class Member WWW, the other patient I interviewed in the MHCB unit, told me that he did not like the MHOHU, primarily because he was forced to sleep on a concrete floor without a blanket or a mattress. See Appendix D. | | of overcrowding on quality of care |
| 14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | 61. Yet the MHOHU placements are not the only overflow beds for the MHCB unit at MCSP. Mule Creek also sets aside 5 administrative segregation cells in the same cordoned off area where the MHOHU cells are located. They are therefore overflow cells in that they house people who have been referred for mental health crisis care but who cannot be housed in either a MHCB or a MHOHU bed. The Special Master found the following problems with respect to the five administrative segregation cells: "The institution did not track the number or duration of placements in these cells. Inmates placed in the holding cells were reportedly monitored by custody staff on a one-to-one basis until they were either admitted to an MHCB or then persons with mental illness smear feces, it is most likely due to acute, untreated psychosis. It can also be associated with people who are psychotic because of a serious mood | Relevance. Fed. R. Evid. 402. | Relevant to existence and impact of overcrowding |

[253418-1]

| | Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| | disorder such as Bipolar Disorder, Manic and Schizoaffective Disorder, Manic. This behavior is also seen in individuals who have severe cognitive impairments such as mental retardation and dementia due to medical conditions returned to their cell in administrative segregation. Inmates placed in holding cells in administrative segregation reportedly received daily clinical contacts, most of which occurred cell-front. Contacts routinely occurred without the inmate's UHR, as the medical records for inmates retained in the observation cells were stored in the TTA of the CTC." Joint Pls' Trial Ex. 57 at p. 62. | | |
| | 62. Again, these overflow units are a direct result of overcrowding and represent the system's desperate and inadequate attempt to deal with a significant deficiency of inpatient beds. In fact, MCSP notified the Director of Mental Health for the Division of Correctional Health Care Services back in October of 2006 that 8 crisis beds were wholly inadequate for the October 2006 census of 265 EOP patients and that increasing the EOP population would seriously impede the provision of mental healthcare: "By doubling our population without increasing acute care capacity the department would be taking an acute care program that is already too small for our current census and further overloading it ...Failure to have adequate acute care capacity increases the risk of suicide and medical (mental health) negligence for our entire facility." Joint Pltfs' Trial Ex. 143 at p. 1. Despite these warnings, MCSP's EOP population as of July 29,2008 was 526 patients (261 | Inadmissible Hearsay. Fed. R. Evid. 802. | Admission |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| patients more than MCSP had when it issued the memorandum to headquarters staff warning that eight MHCBs were wholly inadequate). | | |
| 63. In addition to the disturbing MHOHU and administrative segregation placements of acutely ill class members, MCSP also generally houses many inmates in temporary "E-bed" placements in either converted gymnasiums or dayroom floors of housing buildings. As of July 1, 2008, MCSP had 729 of these "non-traditional," bad beds. Joint Pls' Trial Ex. 68 at p. 7. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admission<br><br>Relevant to the existence and impact of overcrowding |
| 64. For instance, I toured the gyms on the A and B yards of the facility. I understand that these buildings at one time acted as real gymnasiums, but that they have been used for housing in recent years due to overcrowding. Staff members in the gym on B-yard informed me that they have a capacity of 160 men, and that the gym was full on the day of my tour. The data MCSP provided to us in the morning showed that 80 *Coleman* class members were housed in this gym as of July 29, 2008, all at the 3CMS level of care. *Coleman* Pls' Trial Ex. 62. The large room consists of multiple rows of triple bunks, although staff informed me that they had been able to empty out some of the middle bunks in recent weeks or months. Pictures of the B-yard gym are attached to this report as Appendix E. I spoke with a *Coleman* class member at the 3CMS level of care and asked him what it was like to live in the gym. He said that conditions can be very stressful, which breeds anger among the men and tends to worsen one's mental | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate basis for expert opinion. Fed. R. Evid. 703. | Admissions<br><br>Relevant to the existence and impact of overcrowding<br><br>Based upon observation, review of records and expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health symptoms. | | |
| 65. 1 also toured the gym on A-yard during my visit to MCSP. Pictures of the A-yard dorm are attached to this report at Appendix F. The A-yard gym is the worst living space I have seen in any correctional system, including even the H-dorm at Solano. There were nearly 200 men housed in rows of triple bunks, including on all of the middle bunks as far as I could tell. According to the MCSP data, 73 *Coleman* class members were housed in the gym as of July 29, 2008, all of whom were at the 3CMS level of care. *Coleman* Pls' Trial Ex. 62. One row of beds was placed at an angle and there was virtually no visibility for staff or other inmates to see around corners or down the rows of beds. I talked to several men in this gym who reported that they were often unable to sleep at all in the gym and that the living conditions are made even worse by the fact that they have no privacy at all. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Information from inmate/patients is not offered for the truth but as an explanation of the basis of opinions.<br><br>Then existing mental, emotional or physical conditions<br><br>Relevant to the existence and impact of overcrowding |
| 67. The Special Master found the following with respect to MCSP's medication management system during the 2oU'round: "[Continuity [of] medications] during intra-facility transfers worsened during the monitoring period, with audits yielding a compliance rate of 75 percent...recorded noncompliance prompted referral to mental health only 59 percent of the time and less than half of referrals submitted for noncompliance generated contact within seven calendar days." Joint Pls' Trial Ex. 57 at p. 59. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Public record (see supra, re Special Master Reports)<br><br>Relevant to the impact of overcrowding |
| 70. The Special Master also documented significant problems with MCSP's EOP program during his 20" round of tours: | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. | Public record (see supra, re Special Master Reports) |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "Internal audits yielded 60 percent compliance rates for bi-weekly case manager contacts during the second and third quarters of 2007. Noncompliance was attributed to the extra intake work for case managers associated with the program's rapid expansion, excessive case manager caseloads, inadequate clinical supervision and an overall lack of cooperation from custody officers. Case manager contacts continued to occur in cubicle spaces on the day room floor, which afforded inadequate auditory and visual privacy." Joint Pls' Trial Ex. 57 at p. 65. In my opinion, the expansion of MCSP's EOP program is directly related to overcrowding and the system-wide shortage of EOP beds. | Evid. 402. | Relevant to the impact of overcrowding |
| 76. The Special Master found that there were substantial problems with access to higher levels of care at DVI, leading to use of overflow beds that were "isolated and poorly suited for acute psychiatric patients." Joint Pls' Trial Ex. 57 at p. 11 5. As I noted in my report, housing suicidal patients in harsh, dirty, and noisy overflow units is a very dangerous practice. There were also delays in psychiatric responses to referrals. Joint Pls' Trial Ex. 57 at p. 122-123. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Public record (see supra, re Special Master Reports)<br><br>Relevant to the impact of overcrowding |
| 77. The Special Master also reported on the serious problems with medication management that I observed Problems persisted in all areas of medication management, although methodologically flawed audits rendered it impossible, in most cases, to ascertain the magnitude of noncompliance or to identify the underlying causes. Medication continuity upon arrivals and transfers within the | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Public record (see supra, re Special Master Reports)<br><br>Relevant to the impact of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| institution remained poor, as did the institution's response to medication noncompliance. The institution had not taken steps to remedy deficiencies noted during the preceding site visit relative to ordering DOT in response to medication checking, hoarding, and overdose. An audit of distribution of parole medications was too small to produce meaningful results. Joint Pls' Trial Ex. 57 a1 p.112-113. The Special Master also reported that "protocols for monitoring blood levels of inmates prescribed mood-stabilizing medications were not working. From July 20 to September 19, 2007, more than half, or 75 of 134 ordered labs were not drawn for unknown reasons. In addition, UHRs reviewed by the monitor and chief psychiatrist during the site visit indicated that blood work was not always ordered when indicated. None of the reviewed UHRs belonging to EOP inmates contained required lab reports for currently prescribed medications." Joint Pls' Trial Ex. 57 at p. 113. | | |
| 81. The Special Master's report on this 20th round tour, which occurred on December 4-6, 2007, confirmed the observations I made during my tour. There were serious problems with medication administration, symptomatic of severe overcrowding and understaffing. The Special Master reported that, "[f]aced with chronic psychiatric vacancies, CSP Solano continued to rely on contract psychiatrists. Treatment continuity was poor in that many inmates rarely saw the same psychiatrist from one visit to the next. The institution did not audit | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Public record (see supra, re Special Master Reports)<br><br>Relevant to the impact of overcrowding |

| | Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| | unexplained and unwarranted medication changes, the subject of a CAP item, and lacked the permanent staff to perform psychiatric peer review. Consequently, it could not be determined if poor treatment continuity continued to be associated with unexplained, unjustified, and unwarranted changes in medications." *Coleman* Pls' Trial Ex. 57 at p. 95. | | |
| | 85. In his 7th Quarterly report, the Receiver documented ongoing and serious problems with the medical care systems. With respect to the system as a whole, he wrote: Accomplishing the mission [of the Receivership], however, is a huge challenge only because of the current chaotic state of CDCR's medical delivery system. Timely access is not assured. The number of medical personnel has been inadequate, and competence has not been assured. Accurate and complete patient records are often not available when needed. Adequate housing for the disabled and aged does not exist. The medical facilities, when they exist at all, are in an abysmal state of disrepair. Basic medical equipment is often not available or used. Medications and other treatment options are too often not available when needed. Custody resources needed to facilitate access to care and provide the security necessary to deliver health care safely in a prison setting are inadequate, lacking both the personnel and structure to ensure timely access to health care services. Thus the remedial actions necessary to fix these problems are far from simple. Indeed, it is a misnomer to call the existing chaos a "medical delivery system"-it is more an act of | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402 | Public record (see supra, re Receiver Reports)<br><br>Relevant to the impact of overcrowding |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| desperation than a system. Joint Pls' Trial Ex. 67 at p. 5. The Receiver and the Special aster also documented numerous other systemic problems, including medication management issues, problems with medical records, serious delays in access to higher levels of care, staffing shortages, and lack of adequate office and treatment space. | | |
| 87. The *Coleman* Special Master also documented serious problems with access to higher levels of care during his 19th and 20th round monitoring tours: Access to higher levels of mental health care at the DMH level remained slow. In addition, the ongoing need for sufficient MHCBs continued to challenge the institutional capacity to provide crisis care. Inmates' overly long stays in institutional OHUs and MHOHUs and their placements in holding areas reflect not only the continuing need for more MHCBs, but also the deferred access to inpatient levels of care needed by the more severely mentally inmates. For several years the defendants have been struggling with assessing their mental health bed needs, particularly at the most intensive levels of care, and developing a responsive long-term plan. Undoubtedly, the task has been challenging, for no less reason than the shifting nature of many conditions that affect CDCR and its mental health care. These challenges have included unprecedented growth in the prison population and resulting changes to population projections; understaffing of personnel at CDCR's own headquarters to execute the many parts of the planning task; and coordination with the California Prison | Relevance. Fed. R. Evid. 402. | Relevant to the impact of overcrowding |

-98-

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Receivership, which has become engaged in the redesign of medical care, and to some extent mental health care, within CDCR institutions. Joint Pls' Trial Ex. 69 at p. 13 1-132. In the draft 20Ih report, he noted, "Timely access to appropriate levels of care, essential to the efficacy of a mental health delivery service, continued to elude CDCR." Joint Pls' Trial Ex. 57 at p. 349. | | |
| 89. The following are examples of class members from my recent tours who I believe require a higher level of mental healthcare than was currently being provided:<br><br>I interviewed *Coleman* Class Member VVV in the MHCB unit at MCSP a) on August 1, 2008. He was designated at the EOP level of care. The medical file reflected that Class Member VVV is diagnosed with Schizophrenia or Schizoaffective Disorder. His "Inmate Profile" shows that he is also diagnosed with Dementia due to HIV disease or Cognitive Disorder NOS, although I did not see these diagnoses in his medical file. *Coleman* Pls' Trial Ex. 145. He was prescribed the following medications: Risperdal (37 % mg. shot every 2 weeks); Lexapro (20 mg. daily dose) and Trazodone (unknown daily dose). The "Inmate Profile" sheet shows a significant suicide attempt history and also shows that while he was referred for acute inpatient care at DMH on February 20, 2008, he was not placed in an acute bed until June 6,2008. The MHCB 2nd Quarter Chart shows that he was housed in an MHCB for 37 days between April 30 and June 6, 2008. *Coleman* Pls' Trial | Inadmissible Hearsay. Fed. R. Evid. 802. Inappropriate expert opinion. Fed. R. Evid. 702. Inappropriate basis for expert opinion. Fed. R. Evid. 703. Lack of Foundation. Cumulative. | Inmate/patient statements not offered for the truth, but as explanation of the basis of the opinions<br><br>Inmate Profiles are admissions of party opponents<br><br>Opinions relating to mental health are within this expert's expertise; his observation and interviews, and review of records are appropriate basis<br><br>Examples of treatment of small number of members of plaintiff class is appropriate and not cumulative |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Ex. 145. Class Member VVV reported that he was in the MHOHU previously, where he smeared feces in his cell because staff would not provide him with a mattress or blanket. Pictures of a MHOHU cell are attached to this report as Appendix D. The Patient Activity Report-Inhouse" log shows that he was admitted to the MHOHU three times between June 24 and July 22, 2008 (4124-4130; 714- 717 and 7/22 for one day). *Coleman* Pls' Trial Ex. 146 at p. 13. In my opinion and based on Class Member VVV's clinical presentation and his significant suicide history, he exceeds the EOP level of care and should be housed in an inpatient setting.<br>b) I interviewed *Coleman* Class Member XXX at SVSP on July 29, 2008. Class Member XXX was floridly psychotic when I spoke with him, was also manic and was religiously preoccupied. His file reflected that he was not taking medications despite documented assaults on staff due to untreated mental health issues. He is also not listed on the Keyhea "active cases" log from SVSP dated July 20, 2008. *Coleman* Pls' Trial Ex. 147 at p. 4. Despite his condition, Class Member XXX was housed in an administrative segregation unit with active mental health issues that were not being treated. He is designated at an EOP level of care, but in my opinion, requires inpatient psychiatric care.<br>c) I interviewed *Coleman* Class Member YYY at SVSP on July 29,2008. Class Member YYY was very paranoid, could not maintain eye contact, and was responding to internal stimuli. He also had significant cognitive impairment. | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| The "inmate history" sheet provided by the institution shows that he has a diagnosis of Schizoaffective Disorder and is at the EOP level of care. He was prescribed Zyprexa (daily dose of 10mg) and Cyrnbalta (daily dose of 60 mg). Although Class Member YYY was being housed at the EOP level of care, I believe he requires inpatient care based on his clinical presentation and his active psychosis. Clinicians at the institution agree that Class Member YYY needs an inpatient level of care as he has been waiting for an inpatient bed since his 11/8/07 referral (or for nearly 9 months as of the date I saw him). *Coleman* Pls' Trial Ex. 118, Patient 622.<br><br>d) I interviewed *Coleman* Class Member 227, at SVSP on July 29,2008 Class Member ZZZ reported, and his file confirmed, that he made a serious suicide attempt more than a year before and had been waiting for an intermediate care facility bed ever since that time. The "Inmate History" sheet provided by the institution shows that he has a diagnosis of Bipolar I disorder, severe with psychotic features. *Coleman* Pls' Trial Ex. 148 at p. 1. He was psychotic and labile when we spoke and had low frustration tolerance. He was also on very high doses of medications as follows: Buspar (60 mg. daily dose); Zyprexa (30 mg, daily dose); Inderal (60 mg. daily dose); Visteril(150 mg. daily dose, and; Lithium (900 mg. daily dose). While CDCR clinicians agreed that Class Member ZZZ needs inpatient care, he has been housed at the EOP level for nearly a year awaiting that placement. The SVPP waiting list reflects that he has | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| been waiting for an inpatient bed since his September 6,2007 referral (or nearly a year as of the date I saw him). *Coleman* Pls' Trial Ex. 118, Patient 607. | | |

e) I interviewed Class Member LL at SVSP on July 29,2008. Class Member LL was floridly psychotic during our interview and had strange ideas of reference. He believed that the FBI was sending lasers into his cell through wires and he also believed that his wife worked on the *Coleman* lawsuit in San Francisco. He had been admitted for mental health crisis care five times in 2007 and once already in 2008 according to his "Inmate History" print-out. *Coleman* Pls' Trial Ex. 149 at p. 28. His file reflected that he was on Keyhea and that he was currently taking the following medications: Risperdal Consta (37 % mg. every 2 weeks) and Risperdal (2 mg. daily dose). He was diagnosed with Schizoaffective Disorder. It appears from a DMH log that clinicians referred Class Member LL to an ICF bed on September 27,2007 and that he was "accepted" for the bed on January 22,2008. He then sat on the waiting list until May 4,2008, when someone rescinded his referral. Class Member LL needs a higher level of care than EOP as evidenced by his clinical presentation and his multiple mental health crisis bed placements since 2007. *Coleman* Pls' Trial Ex. 117, Patient 570. In my opinion, he should not have been removed from the ICF waitlist.

f) I interviewed Class Member AAAA at SVSP on July 29,2008. Class Member AAAA was being treated at the EOP level of care and was diagnosed with Schizophrenia. According to his file and

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| my conversation with him, Class Member AAAA had a significant violent history, which included decapitating his father with a machete. His "Inmate History" shows that he was on Keyhea since November 2, 2007 (order expires November 1, 2008). *Coleman* Pls' Trial Ex. 150 at p. 38. He was also on a very significant amount of medications, including the following: Haldol Decanoate (100 mg. shot every two weeks); Cogentin (2 mg. daily dose); Zyprexa (20 mg, daily dose). Despite being prescribed a significant amount of medication, including four times the normal dose of Haldol Decanoate, Class Member AAAA was still very ill and requires inpatient care. In my opinion, he should have been promptly transferred to an inpatient psychiatric hospital. According to the DMH referral log, clinicians referred Class Member AAAA to an inpatient bed on February 20, 2008, but he was sent back to the EOP unit to wait for that bed. *Coleman* Pls' Trial Ex. 151 at pp. 1-2. It also appears that staff lost his referral package at one point, which required SVSP to send a replacement. His Inmate History also shows that Class Member AAAA saw seven different psychiatrists for psychotropic medications between June of 2007 and June of 2008. I interviewed Class Member BBBB at CMF on July 30, 2008.<br><br>g) Although Class Member BBBB was in an intermediate care facility placement when I interviewed him, there was a July 29, 2008 physician note discharging him back to the EOP level of care. Class Member BBBB was diagnosed with | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Schizophrenia, Paranoid Type, Depressive Disorder, NOS, and Polysubstance Dependence and was prescribed the following medications: Abilify (30 mg. daily dose), and; Remeron (30 mg. daily dose). I saw paperwork for two different people in Class Member BBBB's file and when I asked him about it, he said that he was both men. I told him that the men were born five years apart based on the paperwork and he confirmed again that he is both men. In my opinion, Class Member BBBB was not appropriate for discharge to an EOP level of care and requires inpatient mental health treatment. Unless Class Member BBBB has an alias, it also appears that his medical file may contain documents about a different *Coleman* class member. h) I interviewed Class Member CCCC at MCSP on August 1, 2008. Class Member CCCC was housed in administrative segregation at the EOP level of care and appeared to have been there for a very long time. His file showed that he was diagnosed with "Psychosis NOS,"' but his "Inmate History" lists his diagnosis as Schizophrenia, Paranoid Type. *Coleman* Pls' Trial Ex. 152 at p. 1. His file showed that he was diabetic and that he was being treated for his mental health issues, as of July 25, 2008, with a 20 mg. daily dose of Abilify. His "Inmate History," however, which is dated August 1, 2008, shows that all medications were stopped on January 27,2008. He reported that he was previously housed in inpatient beds at both CMF and SVSP. At the time of our interview, Class Member CCCC was | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| floridly psychotic and was responding to multiple internal stimuli. The "Patient Activity Summary" shows that he had three admissions to the MHOHU between April 19 and June 25, 2008 for a total of 27 days in the MHOHU. *Coleman* Pls' Trial Ex. 146 at p. 15. Based on the information in Class Member CCCC's file and his clinical presentation, he very clearly needs inpatient care and is not appropriately housed at the EOP level of care.<br><br>i) I interviewed Class Member FFFF at CMF on July 30, 2008. His case manager progress note, dated 7/25/08 shows that he has a diagnosis of Schizophrenia, Paranoid Type, and Polysubstance Dependence. *Coleman* Pls' Trial Ex. 153 at p. 1. His file showed that he was prescribed Risperdal Consta (50 mg. every 2 weeks); Risperdal (4 mg. daily dose) and Thorazine (200 mg. daily dose). His "Case Manager Progress Note" shows that he is on a Keyhea as a "DTO" (Danger to Others). According to the medical file, staff referred Class Member FFFF to an intermediate care placement on January 28, 2008, but he was waiting at the EOP level of care until a bed opened up for him. I agree that Class Member FFFF requires inpatient care. Because there are no beds, however, he has been forced to stay in a clinically inappropriate placement for nearly six months. The severity of his mental illness is demonstrated by numerous assaults on staff and other prisoners, his history of inpatient admissions and his suicidal history. Intermediate Care Facility Patients Who Require Acute | | |

-105-

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Care<br>a) I interviewed Class Member DDDD at SVSP on July 29, 2008. Class Member DDDD was very psychotic and displayed prominent negative symptoms. He was paranoid and had a history of staff assaults. He was also prescribed significant medications, including two anti-psychotics and one mood stabilizer as follows: Risperdal (8 mg. daily dose); Seroquel (400 mg. daily dose), and; Depakote (1000 mg. daily dose). In my opinion, Class Member DDDD was inappropriate for ICF care due to his excessive psychosis and paranoia and his history of staff assaults. He requires placement in a locked hospital setting that provides acute care.<br>b) I interviewed Class Member EEEE at CMF on July 20, 2008. He had been housed in an intermediate care facility bed since December 3, 2007 and had a significant violent history. Class member EEEE was diagnosed with Schizoaffective Disorder (depressive type) with Polysubstance Dependence in remission. His October 24, 2007 "Mental Health Treatment Plan," however, listed his diagnosis as Schizophrenia, Paranoid Type, and Polysubstance Dependence in remission. *Coleman* Pls' Trial Ex. 153 at p. 3. He was prescribed the following medications: Depakote (1750 mg. daily dose); Prozac (40 mg. daily dose); Propranalol (20 mg. daily dose); Zyprexa (25 mg. daily dose), and; Benadryl (100 mg, daily dose). Class Member EEEE is in my opinion too sick to be at an intermediate level of care and requires placement in an acute hospital setting. He continued to display extensive | | |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| thought blocking by competing stimuli despite being housed at the ICF level of care for more than seven month span despite being prescribed large doses of anti-psychotic and mood stabilizing medications. | | |
| 94. The *Coleman* Special Master also found major medication problems in both his 19th and his draft 20th reports. He found, for instance, significant variance with institutions' abilities to fill medication orders: "CSP Corcoran complied with timelines for filling medication orders in 95 percent of cases. NKSP, however, filled and delivered ordered medications within one day in only50 percent of cases, and at CSPILAC there were delays of up to one week before ordered medications reached carts." *Coleman* Pls' Trial Ex. 69 at pp. 121-122. When it came to patient non-compliance with medications, the Special Master's audits showed significant problems: "Predominantly, institutions did not meet timelines in responding to instances of medication non-compliance." Joint Pls' Trial Ex. 69 at p. 122. The Special Master also found that referrals to psychiatry for non-compliance issues were lacking, as was the documentation and follow-up regarding those referrals: At CSP Sac, referrals to psychiatry for noncompliance fell below 80 percent, and staff failed to document cases of no-shows or medication refusals. At KVSP, medication refusals were documented in MARS 89 percent of the time, but refusing inmates were seen within seven days in only 17 percent of cases. The rate of documentation of medication | Relevance. Fed. R. Evid. 402, Insufficient basis for expert opinion. Fed. R. Evid. 703. | Relevant to impact of overcrowding on quality of care<br><br>Based upon fact finding by court-appointed and knowledgeable Special Master<br><br>Corroborated by personal observation (see infra, re ¶¶ 98-100) |

-107-

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| noncompliance at CIM was high at 97 percent, but referrals for follow-up were documented in only 62 percent of cases. Of those, follow up occurred within seven days in 51 percent of cases. Follow-up on noncompliance was timely in only 48 percent of cases at ASP, which chartered a QIT although its audit was methodologically unsound. Documentation of noncompliance was deficient at CSPILAC and at VSPW, which showed no improvement in this area during the monitoring period. Compliance was probably hindered by inconsistency in psychiatric coverage which led to delays in follow-up contacts, with only half of referrals seen within one week. Joint Pls' Trial Ex. 69 at pp. 122-123. | | |
| 98. During my tour at SVSP on July 29, 2008, Dr. Neill, the Program Director for DMH, talked about these serious medication non-compliance issues. In particular, she reported that most patients are not compliant with their medications when they are admitted to DMH units and also are not subject to Keyhea orders, which would permit involuntary medication. As a result, DMH must stabilize the patients on medications and also initiate Keyhea orders where necessary. Dr. Neill reported that 60 percent of the men housed in the SVPP, an intermediate care facility unit, are subject to Keyhea orders. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to impact of overcrowding on quality of care |
| 99. Dr. Gandhi, the Director of DMH programs at CMF also talked about the serious medication compliance issues throughout the CDCR. As I mentioned, when I told Dr. Gandhi that two of the patients I interviewed in the DMH unit | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. | Admissions<br><br>Relevant to existence and impact of overcrowding |

-108-

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| were some of the sickest people I have seen, she agreed that the acuity of patients is severe. She very candidly told me that the patients coming into DMH units are getting sicker and sicker in all of her programs, including the Day Treatment Unit. She said that "quite a lot" of the increased acuity levels has to do with poor medication compliance upon admission, which presents a "very big challenge." Dr. Gandhi also said that poor medication compliance means that it takes much longer to stabilize patients and get them to the point where they can productively participate in groups. This in turn means that the draft memorandum directs psychiatrists to order and monitor reference psychotropic blood levels immediately when patients show signs of decompensation and also specifies that "results are to be returned to the ordering psychiatrist within seven or less [sic] working days for review." *Coleman* Pls' Trial Ex. 80 at p. 1-2. It is unclear, however, whether the CDCR's overburdened medical and mental health care systems can even absorb the additional laboratory testing required to effectively monitor medication compliance. Several clinicians told me that they do not do this kind of lab testing, including the Director of the new 50-bed MHCB unit at CMF who had been in the unit for five weeks and had not ordered even one such test patients must stay in DMH units longer than they otherwise might require, which further contributes to the backlog of significantly ill patients unable to access higher levels of care. | | |
| 100. These medication management | Inadmissible Hearsay. | Admissions |

-109-

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| problems are typical in overcrowded systems. The consequences are just as Dr. Gandhi described-patients are coming into DMH units with very acute mental health problems, are taking longer to stabilize on medications and are then returned to the same system that fails to adequately monitor medication compliance, thereby starting the cycle all over again. A disturbing suicide that happened in the C-12 administrative segregation building at MCSP on January 22, 2008 illustrates this dangerous cycle, as well as the consequences of having too few crisis placements. Class Member GGG had a history of inpatient placements due to the severity of his underlying psychotic process, and a history of suicidal ideation and medication non-compliance. *Coleman* Pls' Trial Ex. 144 at p. 3-5. On September 19,2007, he was admitted into an acute bed at CMF, where staff were able to stabilize him and get him to take his medications. *Id*, at p. 5. He was discharged to the EOP level of care and arrived at MCSP on 11/2/07 with a recommendation that he continue to take his medications. *Id*. at pp. 5-6. Although a psychiatrist at MCSP continued the prescription initially, he discontinued the medication on 11/13/07. Id. at p. 6. Class Member GGG then apparently decompensated over a period of two months. There were no progress notes in his medical file from a psychiatrist between November 13, 2007 (the day he was removed from medications) and January 22,2008, the day he killed himself. *Id* at p. 7. Meanwhile, his case manager realized that he was | Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. Cumulative. "Cause of Suicide" – Speculation. | Public Record<br><br>Relevant to impact of overcrowding<br><br>Basis is Review of required report<br><br>Examples of treatment of small number of members of plaintiff class is appropriate and not cumulative |

[253418-1]

| | Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| | decompensating, particularly after receiving news that he received few additional years added to his sentence for pushing a food tray out of his cell back in June of 2007, which apparently hit a correctional officer. Id at p. 6. On January 10, 2008, the case manager talked to the psychiatrist about initiating Keyhea, but apparently did not do so. Id. at p. 7. She noted the same plan on January 17th but an order still was not initiated. On January 22nd, the case manager saw Class Member GGG for a crisis evaluation after he pushed his cell door into correctional officers when they were trying to close it. *Id*. at p. 7. Staff planned to admit him into the crisis unit at that point and initiate the Keyhea process. Id. After learning that the restraint room was not available and that there were no crisis beds open, staff moved Class Member GGG back to his administrative segregation cell without any prescribed observation. *Id*. at p. 11. He hanged himself that night in his cell. This suicide is a disturbing example of an institution's failure to maintain the clinical gains achieved at a higher level of care, its failure to appropriately monitor and prescribe necessary psychotropic medications and its failure (in this case fatal) to provide a mental health crisis bed to an acutely ill patient. | | |
| | 101. The *Coleman* Special Master found significant problems with medical records during his 20th round of tours. See Joint Pls' Trial Ex. 57 at p. 68 (MCSP's records sometimes had "years of paperwork [I stuffed into heavy UHRs held together with duct tape); p. 120 (weekly summaries of psychiatric | Relevance. Fed. R. Evid. 402. | Relevant to the existence of overcrowding and its impact on care |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| technician rounds "were not timely placed in UHRs due to substantial filing backlogs in [DVI's] medical records"). The Receiver has also noted that the "management and maintenance of health records continues to be an area of great concern." Joint Pls' Trial Ex. 67 at p. 39. | | |
| 105. Another example of harsh living conditions are the administrative segregation units, which often act as overflow placements for *Coleman* class members who are unable to get into crisis beds, EOP units and even acute or intermediate facility placement beds. The "Transitional Placement Unit" at Salinas Valley State Prison is an example of an overflow unit that was created because of population pressures in the system. Although I did not tour the unit, staff explained that it was created as a transitional unit for men who require a "Sensitive Needs Yard" (SNY) placement, but for whom there are no SNY beds. An Associate Warden explained that while *Coleman* class members at the 3CMS level of care can be housed in the TPU, EOP class members cannot. The Associate Warden explained that if a person housed in the TPU becomes EOP, he would have to waive his SNY status to remain in the building or, if he refused to waive that status, he would be housed in administrative segregation. This account conflicts with the Special Master's 20th round report which found that inmates "identified as requiring EOP treatment typically waited two to three weeks in the transitional program unit for a bed to become available." Joint Pls' Trial Ex. 57 at p. 183 (emphasis added). | Relevance. Fed. R. Evid. 402. Inadmissible Hearsay. Fed. R. Evid. 802. | Relevant to the existence of overcrowding and its impact on care

Admissions

Special Master's statement is public record (see supra) |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Whether EOP prisoners remain in the TPU or are moved to administrative segregation units, however, these delays show inadequate access to the EOP level of care. | | |
| 107. I discussed the impact overcrowding has on suicide rates in my prior report. 11/9/07 Report at pp. 75-81. In particular, I noted that the suicide rate in the CDCR has significantly exceeded the national average of 14 per 100,000 during both 2005 (21.9 per 100,000) and 2006 (at least 25 per 100,000 prisoners). *Id.* at p. 76. The CDCR had at least 43 suicides in 2006 and I am informed by plaintiffs' counsel that there have been 35 suicides reported by defendants already this year. The Special Master's draft report about 2006 suicides found that 72 percent of the completed suicides in 2006 "involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable." Joint Pls' Trial Ex. 58 at p. 8. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. | Public record<br><br>Level of suicides is relevant to the impact of overcrowding on care<br><br>Based upon review of reports and knowledge of field |
| 109. The Special Master's finding that more than 70 percent of the 2006 suicides were preventable is extremely disturbing. In my opinion, much of the suicide risk in the CDCR is related to overcrowding. One recent suicide in particular illustrates the consequences of an overburdened system. Class Member HHH hanged himself in an unlicensed infirmary at Correctional Training Facility (CTF) on March 18, 2008 and died two days later when he was removed from life support. A few days prior to his admission into the infirmary, a staff member found Class Member HHH unresponsive in his administrative | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. Cumulative. | Public report (see supra re Special Master Reports)<br><br>Suicide report is admission of party and public record<br><br>Relevant to impact of overcrowding on care<br><br>Based upon review of records, observation, interviews and |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| segregation cell due to a suspected drug overdose; he also had dried blood on his wrist. He was transported to an outside hospital and then returned to the infirmary. A March 16, 2008, clinical note shows that staff recommended placement in a mental health crisis bed, but did not pursue that placement. A psychiatrist interviewed him on March 17, 2008 and noted that he was a "high suicide risk," but then reduced the observation to one hour rounding rather than the 15-minute watches. The next day, Class Member HHH hanged himself with a noose that he made out of tour towel pieces. *Coleman* Pls' Trial Ex. 155. The report also reflects that staff were confused about the correct suicide precaution and watch standards that should have been followed. | | expertise |
| 114. Another factor that demonstrates that overcrowding is the primary cause of the constitutional violations is the fact that the percentage of persons with serious mental illness in the CDCR is increasing faster than the overall CDCR population. Between January of 2003 and July of 2007, the population of the CDCR's prisons and camps grew from 152,396 to 165,932, an increase of 8.9 percent. *Coleman* Pls' Trial Ex. 34 and 35 (Monthly population figures downloaded from the CDCR website for January 2003 and July 2007). During the same period, the MHSDS caseload of EOP and CCMS inmates grew from 24,599 to 32,039, an increase of 30.2 percent. *Coleman* Pls' Trial Ex. 36 (CDCR MHSDS Prevalence Data for January 2003 and July 2007 from CDCR Monthly Reports). Thus, during this | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. Lack of Foundation. | Admissions of party opponent<br><br>Relevant to existence and impact of overcrowding<br><br>Based upon defendants' own reports of population and caseload |

**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO THE EXPERT REPORTS OF DR. PABLO STEWART**, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| period of roughly four and one-half years, the mental health caseload grew at four times the rate of increase for the overall population. | | |
| 115. Since my last report, the overall CDCR population has decreased while the MHSDS population continues to increase. From July 2007 to June 2008, the overall population went from 165,932 to 160,169, a decrease of 5,763 inmates. Joint Pls' Trial Ex. 63. At the same time, the MHSDS has increased from 32,039 to 34,035, or by 6.2 percent. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. Lack of Foundation. | Admissions of party opponent<br><br>Relevant to existence and impact of overcrowding<br><br>Based upon defendants' own reports of population and caseload |
| 125.  Even if the Receiver's construction plan had funding, however, the Receiver anticipates building only one of the five hospitals by 2011 in the best case scenario. The fact that the plan is currently unfunded means that the 2011 and all other deadlines are in jeopardy. It is also significant that the Receiver's plan does not address all of the required shortfall of EOP, MHCB and ICF beds. The CDCR, which has a very poor track record of completing construction projects on time, is still tasked with a series of construction projects, including, for example: the 64-bed ICF unit at SVSP; the 64-bed ICF unit at CMF; the 50 bed MHCB unit at CMC; the 32 MHCB unit at San Quentin and; the 67 EOP unit at CMF. *Coleman* Pls' Trial Ex. 55 at p. 7. Meanwhile, the *Coleman* and *Plata* class members are daily suffering dangerous denials of mental health care and medical care that place them, their fellow inmates, the officers who supervise them, and the public at risk. The only way to timely correct the | Lack of Foundation – endemic problems. | Based upon review of records, reports, observation, interviews and expertise |

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| endemic denials of appropriate mental health care that currently exist in the CDCR is to significantly reduce the population. No other remedy will result in a constitutional medical and mental health care system in the CDCR. | | |
| 126. I conclude that the prison population must be substantially reduced in order to provide adequate mental health care in a timely manner to the prisoners with mental illness who are suffering every day in the California prisons. In 2004, the Corrections Independent Review Panel appointed by Governor Schwarzenegger worked with experienced wardens to determine the "Maximum Operable Capacity" (MOC) of the prisons system. The Panel defined MOC as "the percentage of design capacity of the various housing units within the institutions wherein the prison can be operated both safely and can provide programming for ever inmate, consistent with the inmate's ability." Joint Pls' Trial Ex. 4 at p. 161. The MOC incorporated educational, vocational, substance abuse, and other rehabilitation programming, but did not account for programming associated with mental health or medical treatment. *Coleman* Pls' Trial Ex. 108 at p. 113: 15-17. The Panel concluded that the MOC for male prisons statewide was 145 percent of design capacity.' Joint Pls' Trial Ex. 4 at p. 124. The MOC made two assumptions: first, all "bad beds" would be closed so that program space would be available, and second, there would be sufficient "staff with requisite experience" available to manage an effective program. *Id* at p. 161. | Inadmissible Hearsay. Fed. R. Evid. 802. Relevance. Fed. R. Evid. 402. Inappropriate expert opinion. Fed. R. Evid. 702. Insufficient basis for expert opinion. Fed. R. Evid. 703. Lack of Foundation. | Admission (direct and adoptive)<br><br>Public record<br><br>Relevant to existence and impact of overcrowding<br><br>Based upon review of records, reports, observation, interviews and expertise |

-116-

[253418-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 127. When mental health treatment needs are taken into account, the maximum operable capacity will be lower. The *Coleman* Special Master reported to the Court on May 31, 2007 that "[g]iven the inadequacies of programming space, program beds and mental health staffing...defendants cannot meet at least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs ..." Joint Pls' Trial Ex: 35 at pp. 12-14. | Relevance. Fed. R. Evid. 402. Insufficient basis for expert opinion. Fed. R. Evid. 703. Lack of Foundation. | Relevant to existence and impact of overcrowding<br><br>Based upon review of records, reports, observation, interviews and expertise |

DATED: November 13, 2008                ROSEN BIEN & GAVLAN

By: /s/ Maria V. Morris
     MARIA V. MORRIS
     Attorneys for *Coleman* Plaintiffs and on behalf
     of *Plata* Plaintiffs

-117-

[253418-1]