1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DAVID S. CHANEY
    Chief Assistant Attorney General
3   ROCHELLE C. EAST
    Senior Assistant Attorney General
4   JONATHAN L. WOLFF
    Senior Assistant Attorney General
5   LISA A. TILLMAN – State Bar No. 126424
    Deputy Attorney General
6   KYLE A. LEWIS – State Bar No. 201041
    Deputy Attorney General
7   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
8   Telephone: (415) 703-5708
    Facsimile: (415) 703-5843
9   lisa.tillman@doj.ca.gov
    kyle.lewis@doj.ca.gov
10
11  Attorneys for Defendants

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

12              UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14         AND THE NORTHERN DISTRICT OF CALIFORNIA

15    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

18  RALPH COLEMAN, et al.,                  No. 2:90-cv-00520 LKK JFM P

19            Plaintiffs,                    **THREE-JUDGE COURT**
         v.
20
    ARNOLD SCHWARZENEGGER, et al.,
21            Defendants.

22  MARCIANO PLATA, et al.,                  No. C01-1351 TEH

23            Plaintiffs,                    **THREE-JUDGE COURT**
         v.
24                                           **DEFENDANTS' OBJECTIONS TO THE
    ARNOLD SCHWARZENEGGER, et al.,           EXPERT REPORTS OF JOSEPH
25            Defendants.                    LEHMAN AND JEANNE WOODFORD
                                             PLAINTIFFS IDENTIFIED FOR
26                                           ADMISSION IN PHASE I**

27                                           **To: Three-Judge Panel**

28
                                - 1 -

## I.    INTRODUCTION

The following is a listing of Defendants' objections to the statements in the expert reports of Joseph Lehman and Jeanne Woodford Plaintiffs' identified for admission in Phase I of the trial of Plaintiffs' request for a prisoner release order under the Prisoner Litigation Reform Act.  Defendants forwarded their objections to Plaintiffs, requesting their responses, which, to the extent provided, are set forth below.

## A.    August 2008 Report of Joseph Lehman

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 1. "I also have been asked to express an opinion about whether a meaningful reduction of the prison population can be accomplished without any significant risk to public safety." (August 2008 Report, p. 2, ¶5.) | Objection: Phase II issue - irrelevant | Agree |
| 2. "The kind of severe overcrowding that is present in California's prisons affects the entire operation of a prison and a prison system.  First, it is very dangerous for prisoners and staff." (August 2008 Report, p. 2, ¶8.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 3. "'The overcrowding of CDCR facilities has led to increased numbers [of] infectious disease outbreaks and riots and disturbances system-wide.' (Expert Panel Report at 9.)" (August 2008 Report, p. 2, ¶8.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 4. "Second, overcrowding places intolerable burdens on the staff and the facilities, with significant negative impacts on the CDCR's ability to provide prisoners with **all the necessary services, including** health care." (August 2008 Report, p. 3, ¶8.) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1. |
| 5. "This results in **a greater risk of violence and** the inappropriate housing of prisoners who need health care services." (August 2008 Report, | Objection to highlighted portion: Irrelevant | |

- 2 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| p. 3, ¶8.) | | |
| 6. "The conclusion the Expert Panel reached with respect to rehabilitation is equally applicable to health care: '[The] incidences of violence and other negative consequences of overcrowding degrade the CDCR's ability to consistently operate rehabilitation programs in the prison environment. While lockdowns and controlled movements allow the CDCR to increase the safety of its correctional officers and prisoners, when wardens enact these security measures, they cancel all programming in the affected prison areas.' (Expert Panel Report at 9.)" (August 2008 Report, p. 3, ¶9.) | Objection: Irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1<br><br>Admissible under Federal Rules of Evidence 703, 803(8). |
| 7. "Overcrowding affects virtually every aspect of a prison's operation." (August 2008 Report, p. 4, ¶10.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 8. "I found during my tours that significant portions of program space were being used to house prisoners. Overcrowding thus reduces the opportunity for prisoners to program, which causes the obvious idleness I observed in a large segment of the population. That in turn leads to frustration, tension and increased violence among the prison population." (August 2008 Report, p. 4, ¶10.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 9. pp. 4-9, Heading C. "The California Prison Population Can Be Reduced Safely," and ¶¶11-18 in their entirety. **See Attachment 1.** | Objection: Phase II issue - irrelevant | Agree |
| 10.    "In my opinion, California must act quickly and decisively to reduce its prison population so that prisoners receive the health care services to which they are constitutionally entitled." (August 2008 Report, p. 9, ¶19.) | Objection: Phase II issue- irrelevant; irrelevant, legal conclusion, unqualified legal opinion | Relevant to whether overcrowding is the primary cause. Order denying Summary Judgment Motion permitted experts to |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| | | provide opinion on ultimate legal question |
| 11.    "I have no doubt that the overcrowding crisis in California's prisons can be resolved without having a significant adverse impact on public safety." (August 2008 Report, p. 9, ¶19.) | Objection: Phase II issue - irrelevant | Agree |
| 12.    "I have reviewed a memo authored by Deborah Hysen, the head of the CDCR's Facilities Strike Team, appointed by the Governor to implement the extensive AB 900 building plans.  Joint Pls Trial Ex. 74 (Validation of In-Fill Bed Plan.  AB 900 Strike Team Issue Memo No. 1, August 13, 2007).  In that memo, Ms. Hysen states (on pages five through six) that AB 900 infill bed construction should not exceed 145% design capacity, and that in its Master Planning process, the CDCR should ensure that prisoners not be housed at higher than 130% design capacity in the future, a number based on national stands.  I agree with Ms. Hysen.  In my opinion and in my experience, housing California prisoners at 130% design capacity will give prison officials and staff the ability to provide the necessary programs and services for California's prisoners." (August 2008 Report, p. 9, ¶20.) | Objection: Phase II issue - irrelevant | Relevant to whether overcrowding is the primary cause of the constitutional violation.  What level of overcrowding is acceptable is relevant to that question. |
| 13.    "I have reviewed the report submitted by James Austin, Ph.D., which discusses the effects of various prison population reducing measures on public safety.  I agree with his conclusion that if such measures are properly implemented, the prison population can be reduced, and the community as well as the prison system will be safer.  This does not mean that some offenders released from prison 'early' will not commit crimes.  That happens now with offenders streaming back | Objection: Phase II issue- irrelevant | Agree |

- 4 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| into the community no better and often worse off than then they went to prison.  There is no need to choose between dangerously overcrowded prisons, on the one hand, and less crowded prisons but more crime, on the other; the question instead is whether California can maintain or reduce crime levels and at the same time run a less crowded prison system.  Experience and research in other states throughout the country says that it can."  (August 2008 Report, p. 10, ¶21.) | | |

**B.    November 9, 2007 Report of Jeanne Woodford**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 1. "…and, if so, whether other orders would effectively address the severe problems that plague the CDCR." (November 9, 2007 Report, p. 2, ¶3.) | Objection: Phase II issue - irrelevant | Agree |
| 2. "My opinion is that overcrowding is the primary cause of the constitutional violations, …" (November 9, 2007 Report, p. 2, ¶6.) | Objection: Legal conclusion, ultimate issue | Relevant.  See Order Denying Summary Judgment |
| 3. "…and nothing short of a reduction in the prison population will effectively address these issues." (November 9, 2007 Report, pp. 2-3, ¶6.) | Objection: Phase II issue - irrelevant | Relevant to primary cause. |
| 4. "When I began employment as a correctional officer there were fewer than 30,000 prisoners in 12 state prisons.  In the early 1980's, the prison population began to grow, and as a result the then existing prisons, including San Quentin, began to increase the use of double celling, to house prisoners.  I saw first hand the effects of overcrowding on prisoners, staff and the prison's infrastructure." (November 9, 2007 Report, p. 3, Heading B "Causes and Effects of Overcrowding" and ¶7.) | Objection: Irrelevant | Relevant to causes and effects of overcrowding |
| 5. "The increase in the prison | Objection: Irrelevant | Relevant.  See |

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| population created problems in virtually all areas. Overcrowding caused the prison to be more dangerous for both prisoners and staff. The environmental conditions deteriorated to the point where they posed health and safety risks to everyone living and working in some housing units. Violence increased among prisoners, putting prisoners and staff at a greater risk of harm." (November 9, 2007 Report, p. 3, ¶8) | | Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 6. "Crowding also put a tremendous strain on the prison's ability to deliver **adequate services, particularly** medical and mental health care to prisoners." (November 9, 2007 Report, p. 3, ¶8) | Objection to highlighted portion: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 7. "It was not long before lawsuits were filed, challenging these terrible conditions. Two cases, *Wilson v. Deukmejian* and *Toussaint v. McCarthy*, resulted in orders not to double cell prisoners. Another case, *Marin v. Rushen*, was settled with an agreement to provide enhanced medical and mental health services to prisoners. In the *Toussaint* case, the Court found that overcrowding 'strains all environmental systems within the institution, and makes it difficult to provide decent conditions of confinement to lockup inmates.' *Toussaint v. McCarthy*, 597 F.Supp. at 1045. I agree, although I believe the Court understated the challenges posed by severe overcrowding, perhaps because the lockup units at that time were only 140% overcrowded. (November 9, 2007 Report, pp. 3-4, ¶9) | Objection: Irrelevant | Relevant to the causes of overcrowding and the determination of whether it is the primary cause |
| 8. "Overcrowding of the magnitude currently existing in the CDCR is unprecedented in my experience. I do not know of another state prison system that approaches this level of crowding. In my opinion, it is all but impossible to safely and humanely incarcerate this many prisoners within the existing facilities." (November 9, | Objection: Irrelevant | Relevant to primary cause |

- 6 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 2007 Report, p. 4, ¶10) | | |
| 9. "Management. The CDCR lacks an effective management structure, it has insufficient management information systems to provide accurate data to managers, and it lacks sufficient number of personnel who have the necessary skill and training to manage such a large and complex organization." (November 9, 2007 Report, p. 4, ¶11) | Objection: Irrelevant | Relevant to primary cause |
| 10. "When I visited the Correctional Training Facility at Soledad, for example, I found a lone correctional officer in a housing unit who told me that he could not search cells (a basic safety requirement) while prisoners were in the housing unit." (November 9, 2007 Report, p. 6, ¶16) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 11. "When I asked what his supervising sergeant thought about this, he responded that there was no sergeant because it was the least desirable of the units at CTF." (November 9, 2007 Report, p. 6, ¶16) | Objection: Irrelevant, hearsay | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1. Basis of Expert opinion. Rule 703. Non-Hearsay -- admission of defendants' agent. Rule 801(d)(2)(D) |
| 12. "The number of authorized positions is grossly inadequate to provide sufficient staff to meet all of the prisoners' basic needs." (November 9, 2007 Report, p. 6, ¶17) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 13. "***This is extremely dangerous for both the prisoners and the staff because*** line of sight supervision is impossible under these circumstances and…" (November 9, 2007 Report, p. 6, ¶17) | Objection to highlighted portion: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 14. "…and it does not permit the staff the time to recognize that prisoners are in trouble from ***any number of causes, including*** medical or mental illness." | Objection to highlighted portion: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| (November 9, 2007 Report, p. 6, ¶17) | | |
| 15.  "Inadequate staff has created dangerous conditions for both the staff and prisoners." (November 9, 2007 Report, p. 6, ¶18) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 16.  "This communication *reduces tension and violence in the unit, and*…"  (November 9, 2007 Report, p. 7, ¶18) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 17.  "*The danger to prisoners is enhanced because* the correctional staff frequently is forced to work mandatory overtime."  (November 9, 2007 Report, p. 7, ¶19) | Objection to highlighted portion: Irrelevant | Relevant.  See also Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 18.  "Officers who are tired and suffer from low morale *are often less productive and do not fulfill all their responsibilities to provide for the basic needs of prisoners. Such officers*…" (November 9, 2007 Report, p. 7, ¶19) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 19.  "At Corcoran and SATF two tragic cases illustrated the problem. One prisoner literally starved to death and another bled to death. Many officers were in the unit at the time these events occurred.  It is inconceivable to me that officers who were properly supervising the prisoners in their care would not notice such obvious events." (November 9, 2007 Report, p. 7, ¶20) | Objection: Hearsay, lacks foundation | Relevant.  Non-hearsay.  Rule 703 |
| 20.  "The tragic effects of overcrowding reach into the community. The case of Scott Thomas exemplifies the unreasonable demonstrated on staff when the prisons are so overcrowded.  Scott Thomas was mistakenly released on parole on May 18, 2007 and allegedly entered a San Francisco bakery and stabbed a 15 year-old girl and a man who came to her aid. | Objection: Phase II issue - irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| San Quentin staff made three fundamental errors when processing this case. First, they confused Scott Thomas with another prisoner, Steve Thomas, who was a different race, 16 years younger and 40 pounds lighter. Second, in 2002 the CDCR designated Thomas as 'high control', which requires the Department to take additional precautions, such as close supervision, when releasing such prisoners on parole. No such precautions were taken despite prominent documents to that effect in his prison file. Third staff violated clear CDCR policy that required the release of a prisoner serving a term in the security housing unit directly to a parole agent.<br><br>    Although it is clear that individuals did not comply with CDCR policy, the inappropriate release of Thomas is really a system failure because the people doing the work have an impossible mission. Having been a correctional counselor with similar responsibilities, I know from first hand experience that there is not enough time for the Correctional Counselor III to review 150 to 200 cases per week and do their job properly. Nor is there sufficient trained records staff to complete adequate review of cases for parole or other legal releases." (November 9, 2007 Report, pp. 7-8, ¶¶21-23) | | |
| 21.    "A recent state-sponsored study of lockdowns recognized the direct relationship between overcrowding and lockdowns: the 'other side of the overcrowding coin is that when wardens implement security lockdowns, they usually shut down all programming in the affected areas. Not only is this disruptive to programming but, the Panel believes the number and duration of lockdowns in California prisons is excessive.' Expert panel, A Roadmap for effective Offender Programming in California, at viii." (November 9, 2007 Report, p. 8-9, | Objection: Hearsay, irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1<br><br>Hearsay exceptions public record, business record. Rule 803(6),(8) |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| ¶24) | | |
| 22.    "Old and Deteriorating Prisons. Many of the existing facilities are too old and decrepit to provide humane housing.  Among those include parts of the Correctional Training Facility, Deuel Vocational Institution, San Quentin, the California Mens Colony, Folsom, the California Rehabilitation Center and the Correctional Conservation Center."  (November 9, 2007 Report, p. 10, ¶29) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 23.    November 9, 2007 Report, pp. 10-13, Heading C "The State's Inadequate Response to Overcrowding: AB 900," and ¶¶31-39 in their entirety. **See attachment 2.** | Objection: Phase II issue - irrelevant, hearsay, lacks foundation | Agree as to section C, paragraphs 31-39 |
| 24.    (November 9, 2007 Report, pp. 13-15 Heading D "Communications with the Governor and His Staff on Overcrowding," and ¶¶40-45 in their entirety.  **See attachment 2.** | Objection: Phase II issue - irrelevant | Relevant to effects and causes of overcrowding |
| 25.    "E. Conclusion.  The Governor's October 4, 2006 emergency proclamation recognized that California's prisons are severely overcrowded, creating 'extreme peril' to the health and safety of prisoners and that 'the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities….'  I agree.  Until the population is reduced substantially there is no realistic hope that the unconstitutional conditions will be eliminated."  (November 9, 2007 Report, p. 15, ¶46 | Objection: Phase II issue - irrelevant | Relevant. |

**C.    August 2008 Supplemental Report of Jeanne Woodford**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 1. "At that time I concluded that overcrowding is *the primary cause of the constitutional violations in these two cases*…"  (August 2008 | Objection to highlighted portion: Legal conclusion, ultimate | Relevant. Admissible as expert opinion.  See Order |

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Suppl. Report, p. 1, ¶1.) | issue | Denying Summary Judgment |
| 2. "…that a prison construction program will not alleviate the unconstitutional conditions and that the prison population must be substantially reduced for there to be any realistic hope that the unconstitutional conditions will be eliminated." (August 2008 Suppl. Report, p. 1, ¶1.) | Objection: Phase II issue - irrelevant | Relevant to primary cause |
| 3. "…that this overcrowding *is the primary cause of the constitutional violations*…" (August 2008 Suppl. Report, p. 1, ¶3.) | Objection to highlighted portion: Legal conclusion, ultimate issue | Admissible as expert opinion. See Order Denying Summary Judgment |
| 4. "…and that the prison population must be substantially reduced to alleviate the unconstitutional conditions. In my opinion, the state can and should safely reduce the prison population to an appropriate level that allows prisoners to receive, and staff to provide, the health care to which they are entitled and the programming that will keep all of us safe." (August 2008 Suppl. Report, pp. 1-2, ¶3.) | Objection: Phase II issue - irrelevant | Relevant to primary cause. |
| 5. "I have read that the strike team appointed by the Governor to implement AB 900 has concluded that CDCR should not exceed 130% of design bed capacity in the long term, and should establish measures to ensure that this crowding level is not exceeded in the future. Joint Pls Trial Ex. 74 at 6 (Validation of In-Fill Bed Plan, AB 900 Strike Team Issue Memo No. 1, August 13, 2007). I agree with this position, with the caveat that different (and particularly older) facilities might require slightly lower population limitations based on the quality of infrastructure and availability of treatment space, for example." (August 2008 Suppl. Report, p. 2, ¶3.) | Objection: Phase II issue - irrelevant | Relevant to primary cause because it demonstrates how far the population is above an acceptable and manageable level |
| 6. "The three prisons I visited confirmed my opinion that | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowding negatively affects the entire operation of a prison. Although this is manifested in different ways, it is obvious that the overcrowding itself is very dangerous and is preventing the state from providing the necessary services to prisoners." (August 2008 Suppl. Report, p. 3, ¶5.) | | to Defendants' MIL No. 1 |
| 7. "Housing Units. All three prisons were housing prisoners in areas not designed for that purpose. At Lancaster, all three of the gymnasiums were filled with triple bunks and each housed between 150 and 200 prisoners. Other housing units had 40 double bunks on the dayroom floor. CTF is using three units as dormitories filled with 200 prisoners in double-bunks. And at Corcoran a gym was converted into a triple bunked dormitory, and inmates in a housing unit in the sensitive needs yard were overflowing on to the dayroom floor." (August 2008 Suppl. Report, p. 3, ¶7.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 8. "These overcrowded housing units are neither safe nor secure. The custodial staffing in each of these units is not sufficient to provide adequate supervision, especially because the bunks obstruct lines of sight and there are not enough officers to patrol the units." (August 2008 Suppl. Report, pp. 3-4, ¶8.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 9. "Adding to the risk of harm is the fact that these units are very hot, with the outside temperature between 95-102 degrees. Further, the prisoners had virtually nothing to do for months and sometimes years on end. The staff in these units confirmed that with the exception of the 'E' Dorm at South at CTF there was little program or activity for these prisoners except exercise, and that was often cancelled because of the lack of officers or security lockdowns. At CTF North, for example, the size of the housing units, coupled with the | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| lack of recreational space, has resulted in a yard program that divides the yard between three housing units on one yard and two on the other yard. Limiting the number of inmates on the yard has reduced the potential for violence on the yard but has dramatically reduced the number of hours general population inmates are out of their cell." (August 2008 Suppl. Report, p. 4, ¶9.) | | |
| 10.    "I was told over 50% of the inmates did not have education or work assignments." (August 2008 Suppl. Report, p. 4, ¶9.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 11.    "For these inmates the amount of out of cell time was slightly more than an inmate in administrative segregation or a security housing unit. As a former correctional officer and Warden, I have observed that prolonged periods of idleness under cramped conditions breeds anger and frustration.  I also observed a growing number of elderly inmates at CTF central utilizing assistive devices such as a cane climbing grated stairs to get to their cell.  These inmates were having some difficulty.  This appeared dangerous under normal conditions.  It is hard to imagine how they would accomplish this task in an emergency evacuation. There appears to be an insufficient number of first floor cells to meet the needs of the growing number of elder inmates. Inmates are often left with the choice of staying at a prison that ha mobility challenges but offers some programs, such as CTF Central, or transferring to a prison that can meet their physical needs but has no or limited program availability. I agree with Governor Schwarzenegger that this level of overcrowding constitutes an emergency because it increases the risk of violence, riot and the transmission of infectious disease." (August 2008 Suppl. Report, p. 4-5, | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| ¶9.) | | |
| 12.    "It is also apparent that the sheer numbers of prisoners are straining the prison operations beyond the breaking point.  This is especially apparent in reception centers."  (August 2008 Suppl. Report, p. 5, ¶10.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 13.    "Several Mangers, including the Warden at Lancaster, remarked on the difficulty that they had keeping up with the flow of 1,000 newly arriving prisoners each month, each of whom must undergo a medical, dental and mental health examination."  (August 2008 Suppl. Report, p. 5, ¶10.) | Objection: Lacks foundation, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1.  Admissible. See Rule 801(d)(C) (D) |
| 14.    "The reception center was also taxed by he need to keep inmates moving through the reception center until transferring to other prisons to complete their sentence.  It was also clear from touring this facility that staff had difficulty keeping up with sanitation and cleanliness."  (August 2008 Suppl. Report, pp. 5-6, ¶10.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 15.    "*Much of the prison*, *including* medical examining rooms…"  (August 2008 Suppl. Report, p. 6, ¶10.) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 16.    "Another manifestation of crowding is the length of time it takes to transfer prisoners from the reception center to other prisons. Prisoners should be processed through a reception center in 60 days."  (August 2008 Suppl. Report, p. 6, ¶11.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 17.    "At Lancaster, the Warden initially told us that the average length of stay was 113 days.  During the tour, I was told by correctional staff that the average reception stay was about 120 days. I was later informed by the associate warden that the average length of stay was about 61 days, a figure which appears suspect."  (August 2008 | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 Hearsay Exception Rule 801(d)(C) (D) |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Suppl. Report, p. 6, ¶11) | | |
| 18.    "The Warden acknowledged that some reception prisoners stayed at Lancaster for up to two years because there was no other place to put them." (August 2008 Suppl. Report, p. 6, ¶12.) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1<br>Hearsay Exception Rule 801(d)(C) (D) |
| 19.    "I spoke with one such prisoner in the most restrictive and harsh unit at the prison, the new free-standing administrative segregation unit. He had been in ASU for two years because there was no room for him at the security housing unit, and in the year since his disciplinary term had expired seven proposed transfers had failed." (August 2008 Suppl. Report, p. 6, ¶12) | Objection: Irrelevant, hearsay | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1<br>Hearsay Exception Rule 801(d)(C) (D) |
| 20.    "Since I only talked with a few randomly-selected prisoners in this unit, I am confident that a full examination of the 175 prisoners in that unit would have revealed similar cases." (August 2008 Suppl. Report, p. 6, ¶12.) | Objection: irrelevant, hearsay, lacks foundation, speculation | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1<br>Hearsay Exception Rule 801(d)(C) (D), Rule 703 |
| 21.    "The situation was similar at CTF with at least one prisoner spending two years in administrative segregation because there was no place else to put him." (August 2008 Suppl. Report, p. 6, ¶12.) | Objection: Irrelevant, lacks foundation | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1<br>Rule 703 |
| 22.    "The Health Care Manager and Director of Nursing at Lancaster both remarked that prisoners coming into the prison from the county jails were sicker and had more medical and mental health problems than general population prisoners.  The chief medical records offer stated that the prison was two months behind in filing certain medical documents because files had not arrived from the *Plata* central medical records storage facility." (August 2008 Suppl. Report, p. 7, ¶13.) | Objection: Hearsay | Hearsay Exception Rule 801(d)(C) (D) |
| 23.    "This was particularly serious | Objection: Lacks | Rule 703 |

- 15 -

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| because virtually none of the prisoners from the Los Angeles county jails arrived with any health related information." (August 2008 Suppl. Report, p. 7, ¶13.) | foundation | |
| 24. "Not only were the absolute number (900) of outpatient (CCCMS) prisoners stretching their resources beyond their capability, but many CCCMS prisoners were present at the prison for only a short time, thus requiring staff to use their resources on the time intensive intake process." (August 2008 Suppl. Report, p. 7, ¶14.) | Objection: Lacks foundation | Rule 703 |
| 25. "Mental health staff reported that they have had up to 200 new arrivals in a week, preventing them from completing the initial evaluations within the timelines, even with staff working overtime." (August 2008 Suppl. Report, p. 7, ¶14.) | Objection: Hearsay | Hearsay Exception Rule 801(d)(C) (D) |
| 26. "The Warden of Lancaster remarked that the reception center Enhanced Outpatient Program (EOP) prisoners were 'really hurting us.'" (August 2008 Suppl. Report, p. 7, ¶15.) | Objection: Hearsay | Hearsay Exception Rule 801(d)(C) (D |
| 27. "Sixty percent of the EOP prisoners at Lancaster were from the reception center. Many of those were housed in an EOP administrative segregation unit. The unit was supposed to house only 54 prisoners, but had housed up to 90." (August 2008 Suppl. Report, p. 7, ¶15.) | Objection: Lacks foundation | Rule 703 |
| 28. "The sheer number of reception center prisoners caused prisoners to be housed in places that were completely inappropriate. In the recently built free-standing administrative segregation unit at Lancaster, I talked to two minimum security prisoners who were in that unit only because there was no space anywhere else in the facility. The rules of the unit require all prisoners housed there to be treated | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| the same. As a consequence, they remained in the cells for all but 10 hours a week, during which they could exercise in a small cage outside." (August 2008 Suppl. Report, p. 9, ¶18.) | | |
| 29. "Another prisoner was housed in this unit only because he had a relative who worked at the prison. When I brought they cases to the attention of staff, they told me arrangements had been made to have the minimum custody inmates moved out of the unit and they would explore the possibility of moving the inmate who had a relative working at the facility to another reception center." (August 2008 Suppl. Report, p. 9, ¶18.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1<br>Hearsay Exception Rule 801(d)(C) (D |
| 30. "These examples are significant because it shows that this degree of overcrowding causes staff to make housing decisions solely on the basis of available beds and not according to the prisoners' or the prison's needs." (August 2008 Suppl. Report, p. 9, ¶18.) | Objection: Irrelevant | Relevant. See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 31. "This atypical behavior strongly suggests that the prisoner is mentally or emotionally at risk. However, this condition apparently went unnoticed. A review of the 114-Ds for this prisoner revealed that psych tech rounds were done daily, yet no one had referred this man for a psychiatric evaluation despite the behavior and lack of program participation noted on the CDC 114A until I pointed out his condition to the chief psychologist who accompanied me during the tour." (August 2008 Suppl. Report, p. 9, ¶19.) | Objection: Unqualified clinical opinion | Rule 703 permits such opinion. Goes to weight rather than admissibility |
| 32. "This was not an isolated incident. The Chief Psychologist noted that there were a lot of others like him in the SHU at Corcoran." (August 2008 Suppl. Report, p. 10, ¶20.) | Objection: Hearsay | Hearsay Exception Rule 801(d)(C) (D |
| 33. "At Lancaster, I spoke with | Objection: Unqualified | Rule 703 permits |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| several of the prisoners in an EOP unit who appeared to be losing touch with reality.  They had difficulty expressing their thought and appeared somewhat disorientated to time and space." (August 2008 Suppl. Report, p. 10, ¶21.) | clinical opinion | such opinion.  Goes to weight rather than admissibility |
| 34.    "At Lancaster, although the Warden said the prison had few lockdowns, it appeared much of the prison was on some form of lockdown when we visited.  There were few prisoners on the yards, and many prisoners and staff reported that prisoners had gone weeks or months without access to the exercise yard." (August 2008 Suppl. Report, p. 11, ¶24.) | Objection: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 |
| 35.    "Overcrowding in the CDCR is extreme, *its effects are pervasive* and…" (August 2008 Suppl. Report, p. 14, ¶31.) | Objection to highlighted portion: Irrelevant | Relevant.  See Plaintiffs' Opposition to Defendants' MIL No. 1 Hearsay Exception Rule 801(d)(C) (D |
| 36.    "The prison population can be reduced safely. As the former Chief Probation Officer of San Francisco, Warden of San Quentin and acting Secretary of the CDCR, it ha been my experience that California incarcerates many more prisoners than is necessary for the safety of the public. This is not to say that offenders should not be held accountable for their actions. Sanctions other tan incarceration are effective in punishing many prisoners and at the same time reducing the risk of recidivism.  If California used these sanctions it would have not only a prison system that is capable of providing essential services, but safer communities." (August 2008 Suppl. Report, p. 14-15, ¶32.) | Objection: Phase II issue - irrelevant | Agree |

/ / /

/ / /

- 18 -

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND
JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION

1668948.1

1    DATED:  November 14, 2008                HANSON BRIDGETT LLP

2

3                                            By: /s/ Paul B. Mello
                                                 PAUL B. MELLO
4                                                Attorneys for Defendants
                                                 Arnold Schwarzenegger, et al.
5
     DATED:  November 14, 2008                EDMUND G. BROWN JR.
6                                             Attorney General of the State of California

7

8                                            By: /s/ Kyle A. Lewis
                                                 KYLE LEWIS
9                                                Deputy Attorney General
                                                 Attorneys for Defendants
10                                               Arnold Schwarzenegger, et al.

11

12   DATED: November 14, 2008                 PRISON LAW OFFICE

13

14                                           By: /s/ Donald Specter
                                                 DONALD SPECTER
15                                               Attorneys for *Plata* and *Coleman* Plaintiffs.

16

17

18

19

20

21

22

23

24

25

26

27

28

DEFENDANTS' OBJECTIONS TO EXPERT REPORTS OF JOSEPH LEHMAN AND
JEANNE WOODFORD PLTFS IDENTIFIED FOR PHASE I ADMISSION                    1668948.1

## Attachment 1

# REPORT OF JOSEPH LEHMAN

*Coleman v. Schwarzenegger et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger et al.,*

No. C01-1351 T.E.H.

AUGUST 2008

10. Overcrowding affects virtually every aspect of a prison's operation. Severe overcrowding, like that affecting California's prisons, results in a lack of treatment and office space, decreased access to health care services, and the cancellation of such services during lockdowns. In lockdown situations staff often have to escort prisoners to their appointments or activity, which makes the strain on the staff even more acute. Because of the strain on the staff, they must then choose between conflicting needs of the prisoner. I found during my tours that significant portions of program space were being used to house prisoners. Overcrowding thus reduces the opportunity for prisoners to program, which causes the obvious idleness I observed in a large segment of the population. That in turn leads to frustration, tension and increased violence among the prison population.

## C. The California Prison Population Can Be Reduced Safely

Obj #9    11. The first recommendation of the Expert Panel is to reduce overcrowding. (Expert Panel Report at viii.) The panel included as members James Gomez, former Director of the California Department of Corrections, Reginald Wilkinson, former head of the Ohio prison system, Steven Ickes, Deputy Director of the Arizona Department of Corrections, Jeffrey Beard, Secretary of the Pennsylvania Department of Corrections, Mark Carey, President of the American Probation and Parole Association, Joan Petersilia, Ph.D., an expert retained by Defendants, and Marisela Montes, then Chief Deputy Secretary for Adult Programs for the CDCR. (Expert Panel Report at ii.) As Chair of the Model Program Sub-Committee, I proposed that recommendation, and continue to

4

believe that a reduction in the population is a necessary condition for providing rehabilitation in the California prison system. The Expert Panel concurred in that recommendation. The same recommendation holds true for providing other services, especially medical and mental health care.

12. The Expert Panel, mainly through the work of Dr. Petersilia, reviewed fifteen reports that had been written since 1990 on the subject of the crisis in California's prison system. Dr. Petersilia found that all of the reports made the same ten recommendations, which we endorsed:

    a.    Stop sending non-violent, non-serious offenders to prison. This particularly pertains to technical parole violators, who could better be served in community based, intermediate facilities.

    b.    Once in prison, use a standardized risk and needs assessment tool to match resources with needs and determinate appropriate placements for evidence-based rehabilitation programs.

    c.    Develop and implement more and better work, education, and substance abuse treatment programs for prisoners and parolees.

    d.    Reform California's determinate sentencing system to reward prisoners for participating in rehabilitation programs and

allow the system to retain prisoners who represent a continued public safety risk.

c.    Move low risk prisoners to community based facilities toward the later part of their sentences to foster successful reintegration and save more expensive prison-based resources. Sub-populations, such as women, the elderly and the sick, are ideal candidates.

f.    Create a sentencing policy commission or some other administrative body that is authorized to design new sentencing statutes into a workable system that balances uniformity of sentencing with flexibility of individualization.

g.    Reform California's parole system so that non-serious parole violators are handled in community-based intermediate facilities and more violent parole violators are prosecuted for new crimes.

h.    Create viable partnerships between state and local corrections agencies that would expand sentencing options, enhance rehabilitation services, and strengthen local reentry systems. Suggestions have been made that include Community Corrections Acts (to get greater funding for local criminal justice initiatives) and a Community Corrections Division of the CDCR charged with developing alternatives.

6

    i.     Evaluate all programs and require that existing and newly funded programs are based on solid research evidence.

    j.     Promote public awareness so that taxpayers know what they are getting for their public safety investment and become smarter and more engaged about California's prison system.

(Expert Panel Report, Appendix A.)

13. The Expert Panel Report also recommended that the prison population be reduced through the more aggressive use of in-prison credits, the early discharge of some parolees and the selective use of parole for only certain offenders. (Expert Panel Report at 11-13, 41-43.) The panel found, and I concur, that if implemented properly these measures would reduce the prison population without any significant adverse affect on crime in the community. As the panel found, "it has been widely established by a number of studies, including those conducted by the US Department of Justice and the CDCR, there is no relationship between time served and recidivism (US Department of Justice, 2006). Therefore, releasing prisoners early as a result of earning program credits will not increase their recidivism rates." (Expert Panel Report at 92.)

14. Indeed, in Washington State parole was abolished in 1984 and the law was changed so that offenders could not be sent to prison for probation violations. From 1984 to 1986, the court made certain changes to the sentencing laws retroactive and increased the amount of credits that prisoners were entitled to, creating a situation that caused prisoners to be released "early" in a relatively short

period of time. This early release did not have any significant impact on the crime rate or the rate of recidivism.

15. While I was Secretary we were directed by the Legislature to institute a system for parolees that allocated parole resources based on risk that an offender would commit a new crime, as measured by a risk instrument. In this system, low risk parolees and probationers were not supervised at all. This allowed the Department of Corrections to concentrate its resources on those parolees most likely to commit serious crimes in the future. In my experience, only a handful of the low risk offenders who were not supervised were subsequently convicted of violent crimes, and those were for assaults without a major injury.

16. Washington State also had a number of laws that prevented parole violators and certain felons from clogging up the prisons. Technical parole violators were not sent back to prison at all, but were placed county facilities. In addition, another law diverted certain categories of low risk felons to the county by prohibiting the courts from sentencing them to prison. In my opinion, both of these measures controlled the prison population while not having any significant adverse effect on public safety.

17. Washington State has a legislatively created Institute for Public Policy, which conducts research on criminal justice issues, among many other things. In a report entitled *Evidence-based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs, and Crime Rates* (October 2006), the Institute noted many programs that can be instituted in the community and in

8

prison that effectively reduce recidivism (some by as much as 18-20%), thereby

lowering the prison population and the cost of the punishment. I believe that

many of these programs could be instituted safely by California.

18. In Pennsylvania the state made changes to sentencing guidelines to

allow for restorative and intermediate sanctions, such as fines, restitution,

probation, residential treatment programs and house arrest. Part of the intent of

these changes was to reduce the number of offenders who were sent to state

prison. In my opinion and experience, these changes did not result in any

increased harm to the public; in fact, in general they benefited both the community

and the offender.

D. **Conclusions**

19. In my opinion, California must act quickly and decisively to reduce its

prison population so that prisoners receive the health care services to which they

are constitutionally entitled. I have no doubt that the overcrowding crisis in

California's prisons can be resolved without having a significant adverse impact

on public safety.

20. I have reviewed a memo authored by Deborah Hysen, the head of the

CDCR's Facilities Strike Team, appointed by the Governor to implement the

extensive AB 900 building plans. Joint Pls Trial Ex. 74 (Validation of In-Fill Bed

Plan, AB 900 Strike Team Issue Memo No. 1, August 13, 2007). In that memo,

Ms. Hysen states (on pages five through six) that AB 900 infill bed construction

should not exceed 145% design capacity, and that in its Master Planning process,

9

**<u>Attachment 2</u>**

# REPORT OF JEANNE WOODFORD

COLEMAN v. SCHWARZENEGGER et. al.,
No. CIV S-90-0520 LKK JFM P

PLATA v. SCHWARZENEGGER et. al.,
No. C01-1351 THE

THREE-JUDGE COURT

NOVEMBER 9, 2007

facilities into areas that were not designed for such activities.   Not only did this make an imperfect fit for the space, but it also resulted in the loss of space for other programs.

29. **Old and Deteriorating Prisons**. Many of the existing facilities are too old and decrepit to provide humane housing.  Among those include parts of the Correctional Training Facility, Deuel Vocational Institution, San Quentin, the California Mens Colony, Folsom, the California Rehabilitation Center and the Correctional Conservation Center.

30. When I visited prisons during my tenure as Director at times the noise levels were so bad that it was enough to drive a sane person crazy.  In some units, like Palm Hall for example, staff found it unbearable to remain inside the unit for more than a few minutes.

### C. The State's Inadequate Response to Overcrowding: AB 900.

Obj #23   31. Assembly Bill 900 is not the right solution for the overcrowding crisis.  AB 900 essentially is a prison expansion measure which increases the number of prison cells without addressing the fundamental structural issues that have caused the crisis and that have created unconstitutional conditions within the prisons.  It is not consistent with the recommendations of the report of the Expert Panel on Corrections Reform as well as other similar reports.  See Expert Panel Report at 77 (summarizing recommendations of previous reports).

32. AB 900 does nothing to limit the growth of the prison population.  According to the CDCR's latest projections, the population will increase by another 10,000 prisoners

by 2010. This confirms my belief that California cannot build its way out of this crisis.

33. AB 900 relies heavily on the assumption that there will be a reduction in recidivism through rehabilitative programs in the planned reentry facilities. That assumption is wrong. CDCR paroles 10,000 prisoners per month. Sixty percent of those parolees serve an average of 4.5 months, and 69% of first time parolees serve less than a year. Not only is this precious little time to promote effective rehabilitation, but I agree with the Little Hoover Commission that these "short prison stints" have no effect on public safety. "[T]hey . . . disrupt families and communities where these offenders come from and return to, and diminish the potential for offenders to get and keep jobs, maintain housing and become law-abiding citizens." Little Hoover Commission, *Solving California's Corrections Crisis*, at 27.

34. Effective rehabilitation assumes that the Legislature and Governor will appropriate enough money for effective programs. This fiscal year the legislature enhanced the budget for programs by only approximately $50 million. By any measure, this paltry figure demonstrates a lack of commitment to rehabilitation in a system this large with an annual budget of almost $10 billion. In my experience, in tight fiscal times the first thing to go in corrections is money for rehabilitative programs.

35. I witnessed the destruction of most rehabilitation programs during the early 1990s, from which the department has never recovered. With a California budget deficit expected to reach over $8 billion next year, I do not believe that the state legislature's monetary commitment will be any greater and probably much less.

11

36.  AB 900 relies heavily on the construction of 32 reentry facilities located in urban areas to provide rehabilitation.  Since many, if not most, of the prisoners will spend only a short time in these facilities, I doubt it will be very effective in reducing recidivism.  In addition, it is extremely unlikely that the CDCR will be able to site 32 of these facilities in local communities, especially in urban centers.

37.  In the unlikely event that these facilities are built, I question whether they will ever be adequately staffed or managed.  Since the CDCR cannot effectively manage or staff its existing 33 prisons, doubling the number of prisons will only aggravate the problems.

38.  The Inspector General recently audited the substance abuse treatment provided by the CDCR.  He concluded that the effort was a "$1 billion failure—failure to provide an environment that would allow the programs to work; failure to provide an effective treatment model; failure to ensure that the best contractors are chosen to do the job at the lowest possible price; failure to oversee the contractors to make sure they provide the services they agree to provide; failure to exert the fiscal controls necessary to protect public funds; failure to learn from and correct mistakes—and most tragically, failure to help California inmates change their lives and, in so doing, make our streets safer." Office of the Inspector General, *Special Review into In-Prison Substance Abuse Programs Managed by the California Department of Corrections and Rehabilitation*, at 5.  Nothing that I now know suggests that the CDCR is any more capable of reducing recidivism through these or any other programs.  In fact my experience with the

leadership of the CDCR suggests the opposite. When I was the Acting Secretary of the CDCR, I adopted a goal of reducing the recidivism rate by 10% by 2010. When I stepped down from this position that goal was rescinded. The Secretary informed me that he had rescinded that goal because he believed it was risky to set such a goal. Throughout my career I have found the leadership unwilling to be accountable for the outcome of prisoner programs.

39. The so-called "in-fill" beds will cause more problems than they will solve. Many of California's prisons are so big that they are effectively unmanageable. Wardens and other administrators spend much of their time responding to crises, rather than fulfilling their responsibilities to provide adequate medical and mental health care. Unless these in-fill beds stand alone with their own administrative and support facilities, adding thousands of additional prisoners to already overburdened facilities will only compound the burdens imposed on prison administrators and line staff.

Obj #24   **D. Communications with the Governor and His Staff on Overcrowding**

40. When the Governor offered to appoint me as acting Secretary of the CDCR, I asked him whether we could meet to discuss the direction that I wanted to pursue for the Department. He agreed to meet the next week, but despite several attempts, I never met with him again until the day I resigned.

41. I wanted to meet with the Governor to make sure that I would have his support for the initiatives I believed were necessary. I particularly wanted to talk to him about sentencing reform because I believed that the population pressures were going to

13

continue and that the state could not build its way out of this problem.

42.  I did subsequently meet with Ms. Kennedy, the Governor's Chief of Staff, and Fred Aguiar, the Governor's Cabinet Secretary, and informed them that I could not accept the position as Secretary until I had an opportunity to discuss my plans with the Governor.  I told them about the population pressures and my position on sentencing reform.  Ms. Kennedy said that she wanted to give the issue some thought, but never discussed this issue with me again until the day I resigned.

43.  I finally met with the Governor in his smoking tent after I told Mr. Aguiar that I planned to resign.  I told the Governor that the state did not have a plan to address the population pressures.  In a prior meeting with the Governor as the Undersecretary of the CDCR the Governor asked me if I thought we needed more prison beds.  I replied no, unless it is to replace existing capacity.  I explained that California has more prisoners than Texas, yet Texas has over one hundred prisons and California has only 33.  I informed the Governor that California had built very large prisons that were designed to warehouse inmates.  These large prisons are very difficult to manage and do not provide enough space for programs and services.

44.  During my meeting with him on the day I stepped down as acting Secretary of the CDCR I explained that we could not build our way out of the overcrowding problem and that we needed sentencing reform.  I also explained to him that we parole about 70,000 parole violators per year who serve twelve months or less and that this revolving door created population pressures.  I also told him that dangerous offenders were being

14

released without any treatment or program, and that this crisis was jeopardizing public safety. In addition, I explained that low level offenders could receive programs in the community that would cost less and be more effective than the prison programs. Governor Schwarzenegger said that this all sounded reasonable, but Ms. Kennedy reminded him that it was an election year and the meeting ended shortly thereafter.

45. It was obvious to me at that time that in order to run an organization this large with such complex, high profile problems, the CDCR Secretary must have meaningful access to and the support of the Chief Executive. He is the only one who can make the tough, politically sensitive decisions that are necessary to alleviate the crisis. Since it was obvious that I was not going to have this necessary access and it was evident to me the Governor was not going to address the issues in a way I thought would address the prison overcrowding problem, I resigned my position as acting Secretary.

**E. Conclusion**

46. The Governor's October 4, 2006 emergency proclamation recognized that California's prisons are severely overcrowded, creating "extreme peril" to the health and safety of prisoners and that "the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities. . . ." I agree. Until the population is reduced substantially there is no realistic hope that the unconstitutional conditions will be eliminated.

Dated: November 9, 2007

Jeanne Woodford

15