PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA  94710
Telephone:  (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA  94105-3493
Telephone:  (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA  94107
Telephone:  (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.  Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY** |

1    Plaintiffs submit their responses to Defendants' objections to the Expert Report of Craig

2    Haney dated August 15, 2008.

**PLAINTIFFS' STATEMENT**

4    At approximately 1:53 p.m. on November 14, 2008, Defendants provided Plaintiffs with

5    the following chart of voluminous objections to the Expert Report of Dr. Craig Haney.

6    Defendants were provided with Dr. Haney's Report on August 15, 2008, approximately 60

7    days ago.  In the transmittal email, Defendants required Plaintiffs to meet and confer and

8    respond to their over 350-page long chart within two and one half hours – an impossible task.

9    Declaration of Jane E. Kahn in Support of Plaintiffs' Response to Defendants' Objections to

10   August 15, 2008 Report of Dr. Craig Haney, ¶¶ 3-14.

11   The chart contains a great number of what can only be considered frivolous objections.

12   Defendants object to many of the statements made by persons working for Defendants, about

13   their employment, in the presence of Defendants' counsel, as hearsay.[1]  Defendants object to

14   statements about suicide, unsafe prison conditions, problems with the provision of medication,

15   lack of programming, and overflow housing for mentally ill inmate/patients, among other

---

[1]   Such statements are clearly party admissions under FRE 801(d)(2)(D).  Defendants need not
authorize or ratify the statements in question for the statements to be admissible against Defendants.
*See In re Sunset Bay Assocs.*, 944 F.2d 1503, 1519 (9th Cir. 1991).  Nor does it matter that, in some
cases, the staff members in question hold relatively low level positions.  Robert E. Jones et al., Federal
Civil Trials and Evidence § 8:2143 (2008) ("No matter how menial the level of employment, any
employee's statement may be a vicarious admission by the employer [under FRE 801(d)(2)(D)] if made
in the course of employment and concerning matters related to the employment."); *Wilkinson v.
Carnival Cruise Lines, Inc.*, 920 F.2d 1560, 1565 (11th Cir. 1991); *cf. Sana v. Hawaiian Cruises, Ltd.*,
181 F.3d 1041, 1045-46 (9th Cir. 1999) (statements from low-level staff admissible against company).
Finally, staff members need not be identified by name, so long as they were Defendants' agents and
were speaking on topics related to their employment.  *Sea-Land Srvs., Inc. v. Lozen Int'l, LLC*, 285
F.3d 808, 821 (9th Cir. 2002); *Ryder v. Westinghouse Elec. Corp.*, 128 F.3d 128, 134 (3d Cir. 1997).

[253560-1]

things, on the grounds of relevance.[2]  Defendants also object to the statements required by Fed. R. Civ. P. 26 (a)(2)(B)  on the grounds of relevance.  Other objections ignore the very nature and purpose of expert testimony and include such tedium as objecting to the words "prison overcrowding" as "vague and ambiguous" and to terms such as "representative sample" as argumentative.  *See, e.g.*, Objection No. 13.  Similarly, Defendants repeatedly object to Dr. Haney's reliance on scientific and scholarly literature as not the appropriate basis for expert opinion.  In fact, however, Rule 703 expressly allows experts to rely on such literature. Such objections are not made in good faith and are a waste of Court and party resources.

Nonetheless, to ensure a complete record on the objections, Plaintiffs have responded below to all the objections raised by Defendants.

Defendants delayed in providing the objections, and then filed their Trial Objections at 5:55 p.m. without providing a reasonable amount of time for Plaintiffs to either respond or to meet and confer about specific objections.  Plaintiffs hereby submit these Responses to the objections.

## I.

## GENERAL OBJECTION

Defendants assert that Dr. Haney is not qualified to make the opinions and assertions as outlined in his supplement and expert report, in violation of Federal Rules of Evidence 702.

## II.

## PLAINTIFFS' RESPONSE TO DEFENDANTS' GENERAL OBJECTIONS

Defendants do not explain what the basis for their assertion is.

---

[2]   Defendants' arguments on this point are patently frivolous, as this Court has already rejected their motions in limine numbers 1 and 10, which sought to exclude evidence on these and similar matters on relevance grounds.  *See* Transcript of 11/10/08 Pretrial Conference at 7:24 (denying, inter alia, Defendants' Motions in Limine 1 and 10); *see also* Pls' Opp. to Defs.' Mot. in Limine 1 (*Coleman* Docket # 3239) (discussing why evidence re: prison housing, environmental conditions, safety concerns, and programmatic concerns is relevant and admissible);  Pls' Opp. to Defs.' Mot. in Limine 10 (*Coleman* Docket # 3223) (discussing why evidence re: prison suicide rates is relevant and admissible).

[253560-1]

1  However, as discussed in ¶¶ 1-11 of his August 15, 2008  Expert Report and in the

2  Resume attached thereto, Dr. Haney is a Professor of Psychology at the University of

3  California at Santa Cruz, who received his Ph.D in Social Psychology from Stanford

4  University and a J.D. degree from the Stanford Law School.  Dr. Haney has studied the

5  psychological effects of living and working in institutional environments for 35 years, and has

6  written extensively on the psychological effects of imprisonment.  He has statistically analyzed

7  aggregate correctional data to examine the effects of overcrowding, segregation, and other

8  conditions of confinement on prison life, and has toured, inspected and analyzed conditions in

9  twenty (20) state prison systems and federal and international prison systems.  Dr. Haney has

10  worked as an expert on various California prison cases involving conditions of confinement

11  and has great familiarity with the California prison system.  Dr. Haney is a highly qualified

12  expert on the nature of prison overcrowding, the effects of overcrowding on prisoners and

13  prison systems and the chronic and severe level of overcrowding within the California

14  Department of Corrections and Rehabilitation.  The General Objection should be overruled.

### III.

### SPECIFIC OBJECTIONS

Plaintiffs request that the specific objections be overruled as well:

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 12.  I was retained by attorneys for Plaintiffs in *Coleman* v. *Schwarzenegger* and *Plata* v. *Schwarzenegger* to complete several inter-related tasks.  Those tasks included reviewing and summarizing the existing psychological and social science literature on the effects of overcrowding in prison settings. They also included reviewing an extensive | Vague and ambiguous re: "overcrowding." Lack of foundation. | Required by FRCP 26; Further clarification is available through cross-examination. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| number of documents provided by Plaintiffs' counsel that pertain to the current nature and quality of medical and mental health care in the California Department of Corrections and Rehabilitation (CDCR), the conditions of confinement that prevail throughout the state's prison system and, especially, the ways in which these things may be affected by the chronic and severe overcrowding that continues to plague CDCR facilities. An updated list of the documents I was provided by Plaintiffs' counsel and reviewed in advance of preparing this report is appended as Appendix B. A list of prior cases in which I have testified at trial or deposition in the past four years and a statement of compensation is attached as Appendix C. I submit the present report to update and replace my report dated November 9, 2007. | | |
| 13.  In addition to the documents reviewed, as listed in Appendix B, I also conducted tours and interviews in numerous housing units located in eight prisons where *Coleman* class members reside.  The prisons were: California Institution for Men (CIM), in | Lack of foundation. Vague and ambiguous. Mischaracterization/ Argumentative re: "representative sample" and "harsh regimes." | Statement of what he did to prepare; Required by FRCP 26; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Chino, California; Valley State Prison for Women (VSPW), in Chowchilla, California; Salinas Valley State Prison (SVSP), in Soledad, California; Mule Creek State Prison (MCSP), in Ione, California; California Substance Abuse and Treatment Facility (SATF), in Corcoran, California; California Correctional Institution (CCI), in Tehachapi, California; North Kern State Prison (NKSP), in Delano, California; and Wasco State Prison (Wasco), in Wasco, California. In the course of these tours, I made a point of visiting a representative sample of mainline housing units, including those that had been impacted by the severe overcrowding in CDCR *(e.g.,* housing units that had been converted into makeshift dayroom and gymnasium dormitories). I also toured areas that contained specialized mental health and crisis beds. Because of the special sensitivity and vulnerability of mentally ill prisoners to the harsh regimes that exist in Administrative Segregation Units (ASUs), I also made a point of touring and speaking to a number of the mentally ill | | through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners housed in the ASUs at each of the prisons. In the cases of VSPW and CCI, I also toured and spoke to men and women housed in the Security Housing Units (SHU), where prisoners also are housed under severe locked down conditions. In addition, in the course of touring the last four CDCR facilities that I visited, we photographed a number of different areas inside the prisons themselves. I have reviewed and relied on those photographs, as well as photographs and videos materials obtained from the CDCR's own publicly accessible website depicting conditions inside CDCR institutions. | | |
| 14.  In addition to the tours themselves, and my conversations with correctional administrators, clinical staff, and line correctional officers, I was able to converse with numerous prisoners who were participants in the CDCR's mental health delivery system, including many who were in the Correctional Clinical Case Management System (CCCMS) as well as those in the Enhanced Outpatient Program (EOP).  I also conducted private, one-on-one interviews with individual | Lack of foundation. Mischaracterization of the evidence. | Statement of what he did to prepare; Required by FRCP 26; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners who were selected by Plaintiffs' counsel from the various lists of CCCMS and EOP prisoners at each facility and from correspondence. | | |
| 16.  The relevant psychological and social scientific literature on prison overcrowding underscores its negative impact on virtually every aspect of prison life, from the pains of imprisonment suffered by prisoners, to the performance and well-being of correctional officers and other prison employees, to the way in which individual institutions and prison systems discharge their constitutionally mandated duties and functions. In my experience as a scholar and researcher who has studied prisons in the United States for more than 35 years, no other single aspect or condition of confinement has had a more significant impact on the prisons of this country or prisons in the State of California. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. Specualtion. | Defendants have withdrawn all objections except speculation; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |
| 17.  Because of the tremendous importance of overcrowding and its impact on virtually every aspect of prison life, it is my opinion that it is the primary cause of the continuing constitutional violations that plague the | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| California prison system, including the CDCR's inability to provide medical and mental health care for state prisoners that meets the relevant constitutional minimum standards. | Speculation. | thereby. |
| 18. It is my opinion that a prisoner release order that results in a significant and expeditious reduction in the number of prisoners housed in the CDCR is the only appropriate remedy to the continuing overcrowding-related constitutional violations. I base this opinion on my knowledge of and experience with court-ordered institutional change in this state and others, as well as my knowledge of the depth and magnitude of the overcrowding problem in the CDCR--a problem that reached crisis--level proportions many years ago and has been allowed to continue to worsen. I also base this opinion on my knowledge of the history of prison overcrowding in California and the CDCR's decades-long record of failing to anticipate the magnitude of this problem, failing to recognize the urgency of the continuing overcrowding crisis it faced, and failing to fully appreciate the harm | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. Speculation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| inflicted on prisoners, staff members, and California communities by levels of prison overcrowding it came to regard as "acceptable" or "tolerable." The gap between the urgency of the problem and the insufficiency of CDCR's response is evident in their projected "best case scenario" date for a solution--the year 2014--which underscores why a prisoner release order is necessary. Even the active involvement of the *Plata* Receiver in addressing the shortfall of mental health beds in the system will not appreciably advance this date. Thus, although it is my understanding Receiver does not intend to build all of the outstanding mental health beds that will be required by the CDCR, the construction of the new mental health/medical facilities that the Receiver does plan to build are projected to be completed in July 2013.  However, even the Receiver has acknowledged that there is uncertainty of this completion date. Thus, he has said "[t]he key to hitting our 2013 target date for completing this objective is the commencement of construction at the first site no later than February 2009, | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| with construction completed at that site no later than February 2011." | | |
| 19.  In its July 23, 2007 Order referring consideration of a prisoner release order to the three-judge panel, the *Coleman* Court concluded that CDCR's mental health care delivery system has not come into compliance with the Eighth Amendment, despite twelve years of remedial work in this case.  The Court cited significant delays in access to care at the highest levels of need, alarming rates of staffing vacancies, and a severe lack of programming space, among other problems, as evidence that the current level of unmet mental health need in the CDCR-estimated by the *Coleman* Special Master to be one-third of the *Coleman* class- "is unconscionable."  The Court noted that although it has issued at least seventy-seven orders over more than eleven years directed at bringing California's prison mental health care system into constitutional compliance, "the system still falls woefully short of meeting the requirements of the Eighth Amendment." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Mischaracterizes the evidence. Argumentative. | FRE 803(8) (public record); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 20.  The *Coleman* Special Master, in a Report filed with the Court on May 31, 2007 regarding the effects of overcrowding on mental health treatment, concluded that a lack of treatment and programming space, beds, and staff was still pervasive throughout the CDCR system. He provided a number of examples, including a consistent decline over the past two years "in the number of hours of therapeutic activities offered in most institutions to Enhanced Outpatient Program prisoner/patients in administrative segregation units, repeatedly attributed to the acute absence of adequate space."  The Special Master also reported a functional vacancy rate among clinicians of 19.86 percent, and concluded that there was sufficient staff to provide full mental health services to roughly two-thirds of the mental health caseload.  He noted that this analysis "does not even address the endemic shortages of escort  correctional officers, nursing staff, clerical and records keeping personnel, pharmacy staff and lab technicians." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Mischaracterizes the evidence. Argumentative. | FRE 803(8) (public record); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 21.  Some of the standards for measuring whether constitutional requirements are | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | Defendants have withdrawn all objections to this |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| being met are set forth in the Revised Program Guide approved by the *Coleman* Court ("Program Guide"). On March 2, 2006, the *Coleman* Court ordered defendants to immediately implement the Program Guide, which provides the protocol for the provision of mental health care in the CDCR. I have reviewed the standards in the Program Guide relevant to this declaration. | Hearsay. Fed. R. Evid. 805. Mischaracterizes the evidence. | paragraph. |
| 22. One of the key elements of the Program Guide is the transfer timeline chart that sets forth the required timeframes for transferring prisoners to appropriate levels of care. For obvious reasons, the ability of a mental health delivery system to meet these timeframes is indispensable to the provision of adequate mental health care. They are, in essence, the limits placed on the amount of time a prisoner/patient must wait before receiving the care that clinicians have determined he or she needs. In relevant part, these timeframes are: Reception Centers: EOP transfers should occur within 60 days, or 30 days if clinically indicated. CCCMS transfers should occur within 90 | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Argumentative. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| days, or 60 days if clinically indicated. MHCB: MHCB transfers should occur within 24 hours of referral. DMH: Transfers to DMH acute placements should occur within 10 days of referral, if accepted to DMH. Referral must be completed within 2 working days of identification. Transfers to DMH intermediate care placements should occur within 30 days of referral, if accepted to DMH. Referral must be completed within 5-10 working days. EOP: Transfers to general population ("GP") EOP programs should occur within 60 days, or 30 days if clinically indicated. EOP Administrative Segregation Unit ("ASU") Hub: EOP prisoners housed in the regular ASU should transfer to an EOP ASU Hub within 30 days of placement in the regular ASU or within 30 days of referral to EOP level of care. PSU: EOP prisoners housed in the ASU who are endorsed for the PSU must be transferred within 60 days of endorsement. | | |
| 23.  In the Court's July 23, 2007 | Inadmissible Hearsay. | FRE 803(8) (public |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Order referring this matter to the three-judge panel, the Court found, based upon information documented by the Special Master, that these transfer timelines are not being met. The Special Master reported that "[d]elays in transfers, especially to the most intensive treatment programs for prisoners at the highest custody levels [have become] "endemic." | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | record); FRE 201 (judicially noticeable); Relevant to existence of overcrowding and problems caused thereby; Special Master is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); Court can determine whether statement is mischaracterization, speculative, or argumentative |
| 24.  Housing at the appropriate level of care, the ability to transfer prisoner-patients to appropriate levels of care, and the resources to provide treatment at each level of care are key elements in the provision of mental health care. The State does not have enough beds at nearly every level of care right now (Fiscal Year 2007/2008). | Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 25.  Additionally, the *Coleman* Special Master recently reported in his Report and Recommendations on Defendants' August 2007 Supplemental Bed Plan that "[f1inding available beds in either of these programs [MHCB and inpatient DMH] remains a daily challenge that | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Special Master is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); FRE 803(4) (statement for purpose of medical diagnosis or |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| still exceeds CDCR's capability..."  In June 2007, the Court found that "Defendants are providing to class members only twenty-six percent of the beds at ASH [DMH inpatient psychiatric program] called for by their plan. That is unacceptable." The Special Master also concluded that recent events, including the population crisis, implementation of the *Plata* Receivership, and defendants' newest bed plan, "have caused widespread confusion and uncertainty, which now threaten to stall the allocation of construction and operational funding critically needed to meet the increasingly desperate need for acute and intermediate inpatient and mental health crisis beds in CDCR."  In May 2006, the Court described the effect of the shortage of intermediate care facility beds and mental health crisis beds in the CDCR: "It is undisputed that the shortage is leaving critically mentally ill prisoners languishing in horrific conditions without access to immediately necessary mental health care."  Even in his 15th Report, the Special Master warned that the long waiting lists for the special MHCB, PSU, and DMH beds meant that | | treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "suicidal and other seriously mentally ill and violent inmates lack access to clinically necessary levels of monitoring and treatment."  In a Report issued in the summer of 2008, the *Coleman* Special Master found that the shortage of MHCBs remained a barrier to clinically adequate care.  Specifically: "[t]imely access to appropriate levels of care, essential to the efficacy of a mental health delivery service continued to elude CDCR."   In addition, the Special Master documented the continued use of alternative sites for prisoners who required MHCB level of care, a practice that was a direct result of the MHCB shortages. Moreover, he described these sites as "uniformly inappropriate for acute care."  In fact, as the Special Master noted, "[f]ourteen institutions that did not have adequate access to licensed crisis beds resorted to using a variety of temporary monitoring arrangements, most of which were grossly inappropriate alternatives to acute care." | | |
| 26.  In the Special Master's most recent draft report on suicides within the CDCR, he found that "[c]ontinuing use of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Special Master is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| ZZ cells and other holding cells for inmates awaiting transfers to *bonafide* CTCs with MHCBs, and placements in OHUs that exceeded the 72-hour time limitations, were ongoing obstacles to the care of inmates in need of constant or close monitoring or timely transfer to higher levels of care. | 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | knowledgeable, Court appointed; *see also* FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Facts in this paragraph come from the documents reviewed by the Expert and submitted to this Court in evidence. |
| 27.  The documents that I reviewed clearly indicate that, as I noted earlier, defendants do not anticipate being able to meet the need for mental health beds at every level of care until 2014, at best. For example, the *Coleman* Special Master concluded in his Report filed September 24,2007 that full implementation of defendants' latest proposed bed plan "will stretch out" to January 2014. He also noted that "objections to defendants' present and preceding bed plans on the part of plaintiffs, experts, special master and the Court all reflect a decade of accumulated experience and frustration that justifies fully concerns about CDCR's ability to generate and implement this latest plan effectively."  The Special Master further suggested that the actual implementation of the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Special Master is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Facts in this paragraph come from the documents reviewed by the Expert and submitted to this Court in evidence. |

-17-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| defendants' bed plan may be unlikely to occur within a decade. | | |
| 28.  Similarly, the Receiver has acknowledged the many serious obstacles he has faced in his efforts to construct adequate health care facilities, which will include mental health beds.  In his most recent quarterly report to the *Plata* Court, the Receiver stated: "before constitutionally adequate health care can be delivered in California's prisons, there needs to be *constitutionally adequate treatment/acilities to provide such care.* Unless and until these facilities are constructed, the major health care class action cases will continue indefinitely.  Likewise, prisoners will continue to die unnecessarily."  Nevertheless, despite "avoidable prisoner deaths" that "illustrate the human cost of the State's failure to provide adequate funding for needed health care treatment facilities," the Receiver concluded that the "State's failure to make this necessary financial commitment puts the Receiver's entire remedial program at risk."  A significant part of the *Coleman* mental | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 803(8) (public record); Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health bed plan may be folded into the Receiver's plan to construct medical and mental health treatment facilities for 10,000 prisoner-patients. | | |
| 29.  Meanwhile, some of the beds that CDCR is routinely operating at higher levels of care are, in fact, overflow 'jury-rigged" or makeshift units that do not meet appropriate standards for mental health treatment, according to CDCR and DMH guidelines. One example of this is occurring in the Reception Center EOP Program. This program appears to be a "stopgap" response to the overwhelming population pressures in CDCR. EOP patients are not being transferred out of Reception Centers in a timely manner, and some serve their entire terms there. However, the guideline for the Reception Center EOP Program approved as an emergency stopgap by the Court is not equal to the care mandated by the Program Guide for EOP patients. For example, the Reception Center EOP program provides for only five hours of treatment per week, while EOPs housed in mainline EOP or EOP administrative segregation programs must be provided with | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 803(8) (public record); Required by FRCP 26; FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-19-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| a minimum often hours of treatment per week. Furthermore, due to overcrowding within CDCR, Reception Center EOPs were not congregated in designated housing units despite the fact that EOP program is "characterized by a separate housing unit ... for mentally ill inmate-patients who, because of their illness, experience adjustment difficulties in a General Population (GP) setting." Yet, in July 2007, the *Coleman* Special Master reported to the Court that this is the level care that is and will be provided to a significant number ofprisoners who require an EOP level of care: "Apart from EOP prisoners in administrative segregation, mental health crisis beds, or alternative housing pending admission to mental health crisis beds, on May 25, 2007, there were 463 EOP inmates in the seven reception centers surveyed in this report, representing over ten percent of all EOP inmates in CDCR institutions." The number of such prisoners continues to grow. Thus, by June 2008, the number of EOP patients housed in the same seven reception centers had reached 707--all patients waiting transfer to a mainline EOP program. An | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| additional 79 EOP patients were housed in other reception centers around the CDCR.  In addition, however, as I learned in my most recent tours and will detail below, even these "reduced" level of care Reception Center EOP programs are makeshift programs operated out of makeshift spaces under circumstances and staffing levels that compromise the quality of care provided. | | |
| 30.  Similarly, some of the units currently operating as intermediate care facilities at SVPP and CMF do not meet the criteria for DMH intermediate care facilities. The D-5 and D-6 units at SVPP and the P-2 and P-3 units at CMF are operating as "interim" intermediate care programs, and the Court waived the state licensing requirements for inpatient facilities so that defendants could meet this overflow need in the short term, given the current emergency the CDCR faces.  However, these units do not have the appropriate treatment space for mental health patients at this level of acuity, nor do they have the resources to provide yard and out-of-cell time in the appropriate manner. For example, in the SVPP D-5 | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | No hearsay cited; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-21-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and D-6 units, all mental health treatment occurs on the dayroom floor.  On October 18, 2007, the Court ordered defendants to develop and submit proposals for developing "adequate mental health treatment and counseling space" at these SVSP and CMF units. Defendants have created construction proposals for SVSP and CMF in response to the October 2007 Coleman order, but these are long-term projects that, under the best case scenario, will take years to complete. Thus, the SVSP proposal includes treatment space for both the EOP and the DMH units, but has a projected completion date of January 2011 that is contingent on being funded by the Legislature.  The CMF treatment space proposal covers only the EOP program, but it projects a completion date of 2012, and only if funding is approved.  In the meantime-a period of several years at best-the existing mental health treatment programs will be forced to "make do" with the existing inadequate treatment space. | | |
| 31.  The tours that I have completed, discussions I have had with numerous mental | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 703 (not offered for the truth, but to provide information |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health and custody staff, and the extensive documents I have reviewed all confirm that institutions throughout the California prison system are using a variety of different types of "overflow" housing to scramble to meet their pressing need for MHCB beds. These include housing such as OHU beds, "Mental Health" OHU ("MOHU") beds, and "ZZ" cells. In his May 31, 2007 Report to the Court, the *Coleman* Special Master found that: "Over the past three years, however, the number of inmate/patients referred to a MHCB level of care has regularly and significantly exceeded the number ofMHCBs available in CDCR, resulting in the placement of inmate/patients in need of a MHCB level of care in a variety of temporary housing alternatives, which often lack the heightened monitoring and treatment essential to the MHCB level of care.... Most of these alternative placements lack suitable staffing and/or the physical configuration needed for the continuous monitoring or intensive treatment provided in a MHCB unit. While strict time limits on their use are prescribed in both department and local policies, they are not | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | about the basis of the opinions); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-23-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| consistently observed."  The problem persists. Thus, the continued use of alternative sites to house prisoner requiring MHCB placement was documented overall by the Special Master in his draft 20th Report and by individual institutions during the 21 st round monitoring tours. | | |
| 32.  The situation at the California Men's Colony (CMC) provides just one illustrative example of the chronic nature of this problem. In 2006, the *Coleman* Court ordered that a locked observation unit (LOU) at CMC be re-opened despite its failure to meet state law licensing requirements. The Court found that although "State licensing requirements serve an important function ... It is essential to provide immediately mental health crisis beds to critically ill inmates in the CDCR...Under present circumstances, state licensing requirements must temporarily give way to measures necessary to remedy the Eighth Amendment violations that remain unresolved in this action."  The unlicensed facility at CMC provides crisis bed care at a prison that has a large mental | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-24-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health population, including more than 500 EOP patients. On March 27,2007, the Coleman court ordered defendants to complete and occupy a 50 bed MHCB at CMC "as soon as possible." However, this project remains stalled.  On February 26, 2008, the *Coleman* court, in an order regarding the construction agreement in *Plata, Perez, Armstrong,* and *Coleman,* addressed plaintiffs' concerns about the 50-bed MHCB at CMC, stated that "[a]pproval of the construction agreement does not relieve defendants of their obligation to comply with this court's March 27,2007 order." The start of this critically needed MHCB project has nonetheless been delayed by at least a year.  No patients will benefit from this yet unfunded project for many years. | | |
| 33.  I have been informed that two years after construction began in May 2006, CDCR opened the new CMF 50-bed MHCB facility to its first patients.  It is unclear how much this overdue resource will affect the massive backlog ofpatients waiting for higher levels of care. In my opinion, due to the effects of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to |

-25-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overcrowding on the delivery of mental health care, any reduction in the waitlists for higher levels of care will be temporary due to the pentup demands in the system. During my site inspection at Wasco Reception center on August 1, 2008, the clinical staff in the CTC reported that they experienced difficulty referring their overflow crisis bed patients to the new CMF unit because their reception center prisoners do not have the medical work-up that CMF is requiring prior to transfer. | Mischaracterizes the evidence. Assumes facts not in evidence. | speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 34.  As problematic as the widespread use of these overflow beds is, CDCR is so overcrowded that it has not been able to create enough of them. Thus, there continue to be waiting lists to get prisoner/patients into these beds. For example, the State reported that as of November 1,2007, there was a 108 person waiting list for beds at SVPP, even with the overflow D-5 and D-6 units operating.  The waitlist for the SVPP intermediate care DMH beds has continued to expand since November 1,2007 with the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| most recent waiting list data for July 31, 2008, listing 173 patients currently accepted and waiting for transfer to Svpp.61 Recent documents from CSP-Sacramento show that ZZ beds, which are "contraband watch cells" were used as alternate sites for crisis beds patients after CTC beds, OHU beds, and MOHU beds were already full. These documents show that these cells are used regularly, with 62 admissions to ZZ cells and approximately 900 admissions to the MOHU in seven months. | | argumentative. |
| 35.  Similarly, at CIM during the 19th round of monitoring, the Special Master found that "there were 106 admissions to the Del Norte overflow MHCBs."  By the 20th round of monitoring, the number of admissions to the overflow MHCBs had increased to 384 and the Special Master noted: "[t]here were no physical plant modifications, and cells in Del Norte were inadequate for potentially suicidal or agitated inmates. Large grate vents, unsafe bunk beds, and blind spots were not addressed." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Assumes facts not in evidence. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 36.  It also appears that some | Inadmissible Hearsay. | FRE 801(d)(2) |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisons are operating EOP units that are explicitly intended to be "temporary" because they are not appropriate for provision of this level of care.  However, it seems inevitable that these units will continue to operate for years to come because of the current, overcrowding-driven bed shortage. This, in turn, has led to more interim measures being implemented to attempt to make these supposedly-temporary beds workable over the long term. For example, there is a "temporary" EOP mental health program operating at MCSP, and in March 2007, the Court approved defendants' *ex parte* request that they be permitted "to install adequate temporary treatment and office space to accommodate the existing and newly-opened Enhanced Outpatient Program mental health programs until replacement programs have been completed and occupied elsewhere in CDCR." However, even here, there have been delays in trying to make "temporary" space more adequate. Thus, to date, the temporary treatment space at Mule Creek State Prison has not yet been completed. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-28-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 37.  In summary, as the *Coleman* Court noted throughout its July 23, 2007 Order, although some progress had been made over the years in the provision of mental health care in California prisons, this trend has been dramatically reversed by the overcrowding crisis. Prisoners throughout the CDCR are living in harsh and extreme conditions of confinement.  As detailed throughout this declaration, and based on my observations and review of documents, I have concluded that overcrowding is now interfering with the ability of the CDCR to meet timelines for transfers to treatment programs at every level of care in its mental health system; it has resulted in an insurmountable shortage of clinical and custody staff; it has overrun all available treatment, office, and programming space; and combined with the environmental effects of overcrowding itself, these delays, shortages, and inadequacies in mental health care are exacerbating existing mental illness, and creating negative psychological consequences for prisoners who, but for overcrowding, would likely not exhibit these | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-29-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| problems and symptoms. | | |
| 38.  Overcrowding impacts every aspect of prison life.  In addition to its direct, adverse effects on prisoners and correctional officers, chronic and severe overcrowding can precipitate reactions and adaptations that actually exacerbate its harm, leading to even more dramatic, even tragic consequences. That is, extreme and persistent levels of prison overcrowding force individuals and institutions to adapt in ways that are often counterproductive, and produce even more serious harm. Exposure to chronic and severe overcrowding has especially harmful effects on mentally ill and other vulnerable prisoners. | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise);Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 39.  It is important to note that "overcrowding" is measured or understood as a function of more than just the ratio of prisoners to the rated capacity of a particular facility; it also includes the extent to which a prison, or prison system, houses more prisoners than it has adequate resources and infrastructure to humanely accommodate. Indeed, when prison systems increase their rated capacity without commensurate increases | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| in programming, medical, and mental health resources, they are still "overcrowded" even though, technically, they do not house greater numbers ofprisoners than they are designed to hold. Thus, a correctional facility "could be operating at fewer prisoners than its rated capacity, yet be overcrowded." California prisons are chronically and severely overcrowded both in the sense that they house far more people than they were designed to hold, and because they do not have remotely enough programming, medical, and mental health resources-staff, space, and other infrastructure-- to humanely house the unprecedented numbers of prisoners who are confined in them. | | speculative, or argumentative. |
| 40.  It is also important to note that the negative consequences of overcrowding go beyond the failure to provide essential services to prisoners. Overcrowded prisons are dangerous for staff and prisoners alike because they create a variety of security-related problems and risks. Of course, these security-related problems and risks, in turn, create | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| enormous and often insurmountable obstacles to effective treatment and constitutionally mandated care for mentally ill prisoners. | Speculative. | statement is mischaracterization, speculative, or argumentative. |
| 41. The risks and dangers of overcrowding have been well understood and acknowledged by corrections officials and experts for decades. Indeed, when I first began to study the psychology of imprisonment in the 1970s, it was widely understood among corrections officials that whenever their prisons were nearing 90-95% of their capacity, they were becoming dangerously overcrowded. This was because of the recognition that in order to safely maintain a closed environment like prison, where people are involuntarily housed, staff and administrators must have sufficient options to readily move and separate prisoners, both for security and treatment-related classification reasons. As prisons become full, tensions mount and deprivations begin to multiply; administrators must have sufficient degrees of freedom to respond to the special needs and conflicts that inevitably result. As a prison closes in on having every one of | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| its cells filled, those degrees of freedom are correspondingly reduced and serious problems begin to go unaddressed and eventually worsen. | | |
| 42. Of course, we have traveled a very, very long distance in California from that original concept of what constitutes an "overcrowded" prison. Prison officials have come to expect, make do, and manage in the face of levels of overcrowding that are unprecedented and have lasted for an astounding length of time. The quality of life inside CDCR facilities has profoundly deteriorated and the physical safety and the mental health of the people who live and work there have been jeopardized as a result. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded" and "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 43. To provide a sense of exactly how far standards of acceptable overcrowding have deteriorated in California, consider that as recently as the late 1970s there was a widespread consensus among the state's correctional officials about the evils of "double-celling"—the practice of housing two prisoners in a single cell usually designed to hold one person. High level | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross- |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prison administrators in California (and virtually everywhere else in the country) understood that double-celling was problematic, dysfunctional, and potentially damaging, even if they were forced to resort to it from time to time. Thus, here is how 1979 correctional task force that included a number of high-ranking California prison officials explained the state's official policy: According to legislative and departmental policy, the Department of Corrections does not sanction double-celling prisoners. This task force agrees with the basic premise that double-celling violates basic standards of decent housing, health, and institutional security; however, at present, there is no viable alternative to double-celling prisoners as population projections are realized. Thus, while concurring that double-ceiling is totally undesirable, the task force must recommend this, and has attempted to propose gradual population increments and associated staffing to lessen the impact of overpopulation. | Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 44.  I know of no conceptual development or theoretical breakthrough—in psychology or | Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| penology or any other discipline--over the last several decades that alters or challenges the fundamental validity of these observations. Yet, in the intervening decades, we have come to accept double-ceIling and much, much worse as a matter of course. Instead of sound penological or psychological theory, this new-found acceptance of unprecedented levels of overcrowding appears to derive purely from necessity.  To be sure, nothing more than necessity could account not only for the CDCR's acceptance of double-ceIling (which is nearly universal, even in the state's least overcrowded prisons), but also its "creative" definitions and redefinitions of "tolerable overcrowding." Indeed, the "acceptable" percentage of prisoners housed at different kinds of facilities beyond those facilities' design capacity has continued to inexplicably but inexorably rise. As a result, increasingly intolerable levels of overcrowding can be "accommodated" and made to appear less drastic than they are. | Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 45.  The court-appointed Receiver in *Plata* v. *Schwarzenegger* clearly | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | Receiver is knowledgeable, Court appointed; see also FRE |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| documented these shifting standards in his May 15,2007, Overcrowding Report. As he noted, CDCR has repeatedly redefined "tolerable overcrowding" by continuing to increase the acceptable percentages above design capacity so that "crowding limits were steadily lowered." To illustrate, below is a summary of some of the shifting limits from the relevant CDCR Master Plans, depicting changes in allowable prisoner populations above the design capacities of the different types of housing units:<br>Master Plan<br>1995-1998<br>1995-2000<br>1998-2003<br>Dormitory<br>120%<br>[not available]<br>190% (including gym housing)<br>Celled Housing<br>130%<br>170% (for Level IV)<br>190%<br>I can think of no possible reason-other than necessity and expediency--why a maximum allowable capacity of 120% or 130% over design capacity set for the years 1995-1998 would be increased to 190% by 1998-2003. | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-36-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 46.  In addition, as the Receiver also noted: "During these same years various CDCR housing definitions were repeatedly modified, and new terms were instituted such as 'crisis' and 'nontraditional' (the CDCR's designation for prisoners housed in classrooms, hallways, etc.). Prison staff refer to such beds as 'ugly' beds." Unfortunately, overcrowding cannot simply be defined away, especially in a prison setting. Definitional gymnastics notwithstanding, the basic concept of overcrowding-housing more people than space, resources, or infrastructure can humanely accommodate-remains valid. Moreover, in a legal context, there is a constitutional line that cannot be crossed. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. Improper legal conclusion. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 704. |
| 47.  There are a number of basic facts of life in overcrowded prison settings that generate a wide range of unpleasant, harmful, and potentially very dangerous and damaging effects, especially when the overcrowding is chronic and severe. Crowding intensifies or amplifies the basic pains of imprisonment. Prisoners in overcrowded correctional settings are | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| forced to interact with more unfamiliar people, under extremely close quarters that afford little or no privacy or respite, where their basic needs are less likely to be addressed or met. The frequency of interactions, the sheer numbers of violations of personal space that occur, the forced closeness of the contact, and the reduction or elimination of respite from one another all expose prisoners to greater levels ofpsychological stress. Prisoners in overcrowded prisons are more idle and on edge. | Speculative. | statement is mischaracterization, speculative, or argumentative. |
| 48. Indeed, overcrowding operates at an individual level to worsen the experience of imprisonment by literally changing the nature of the context or situation to which prisoners must adapt on a day-to-day basis. The longer someone is exposed to overcrowded conditions, the greater the length of time during which problematic coping mechanisms can evolve in response. Thus, all other things being equal, short-term overcrowding is less problematic than exposure to long-term or chronically crowded prison conditions. In addition to these | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| direct, individual-level effects, which I will discuss in a subsequent section, overcrowding changes the way the prison itself functions. | | |
| 49. Not surprisingly, a large literature on overcrowding has documented a range of adverse effects that occur when prisons have been filled to capacity and beyond. In the 1980s, when prisons in different parts of the United States were beginning to receive unprecedented numbers of incoming prisoners, a group of prison researchers concluded that "crowding in prisons is a major source of administrative problems and adversely affects prisoner health, behavior, and morale."  Two other early commentators concluded their review of the literature in much the same way, namely, that "[w]ith few exceptions, the empirical studies indicate that prison overcrowding has a number of serious negative consequences."  Although other variables may mediate or reduce the negative effects of crowding, its psychological toll can be substantial. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); 803(18); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 50.  Thus, despite an occasional | Inadmissible Hearsay. | FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| study that yields an inconclusive finding,77 there is little reason to doubt that crowding significantly worsens the quality of institutional life and increases the destructive potential of imprisonment. Among other things, we know that prison overcrowding increases negative affect among prisoners, elevates their blood pressure, and leads to greater numbers of prisoner illness complaints.  Not surprisingly, exposure to "longterm, intense, inescapable crowding" of the sort that now characterizes California prisons results in high levels of stress that "can lead to physical and psychological impairment."  In addition, a number of studies have found that overcrowding is associated with higher rates of disciplinary infractions, especially among younger prisoners.  For example, one study concluded that in prisons "where crowded conditions are chronic rather than temporary and where people prone to antisocial behavior are gathered together, there is a clear association between restrictions on personal space and the occurrence of disciplinary violations."  And there is also evidence to suggest that psychiatric patients are | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-40-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| more likely to become aggressive in housing units that lack adequate bed space and are overcrowded. | | |
| 51. Among other things, crowded prisons generally experience increased noise levels and temperatures that can be elevated to intolerable levels during summer months, which in turn increase irritability.  In addition, effective surveillance becomes more difficult because of the sheer number of people who must be monitored. Overcrowded housing units are more difficult to keep clean, more likely to fall into disrepair and suffer breakdowns in plumbing and other basic services more frequently. Unintentional violations of personal space are not only more likely in overcrowded prisons but also, in turn, are more often perceived as provocations (and responded to accordingly). In fact, perhaps in part because the subjective experience of prison crowding is so stressful, it actually leads prisoners to perceive others in their surrounding environment as more hostile and intentionally malevolent, increasing their | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "crowded." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| readiness to react to those others as threatening. | | |
| 52. Prison overcrowding also affects prisoners' mental and physical health by increasing the level of uncertainty with which they regularly must cope. Thus, crowded conditions heighten the level of cognitive strain that persons experience by introducing social complexity, turnover, and interpersonal instability into already dangerous prison environments in which interpersonal mistakes or errors in social judgments can be fatal. Of course, overcrowding also raises collective frustration levels inside prisons by generally decreasing the resources, programming, and other activities that are available to the prisoners confined in them. The sheer number of things prisoners can do or accomplish on a day-to-day basis is compromised by the increasingly scarce resources and the multiplicity of people in between them and their goals and destinations. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 53. One widely cited literature review concluded that although prisons in general were not necessarily harmful to prisoners, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | FRE 703 (based upon personal observation)l FRE 703 (based upon review of data and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overcrowded prisons certainly were. It included the following empirically documented observations: that "physiological and psychological stress responses ... were very likely [to occur] under crowded prison conditions"; that "a correlation [has been found] between population density and misconduct [when age is used as a moderator variable]"; that there is "a significant relationship between crowding and post-release recidivism"; and that "high prisoner turnover [in some prisons has been found to predict] prisoner disruptions." These reviewers also acknowledged that "as sentence length or exposure to crowded situations increase so does the risk for misconduct"; and that "[w]hen threats to health come from suicide and self-mutilation, then prisoners are clearly at risk." . | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 54. Prisoners confined to severely and chronically overcrowded prisons commonly live in more rapidly deteriorating and dilapidated housing units. Obviously, overcrowded prisons are dirtier and their infrastructure is in greater disrepair because of the | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded." Lack of foundation. Argumentative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overuse they receive.  In extreme cases, prisoners may be herded into makeshift housing that clearly was intended for some other purpose and affords them even less privacy than the already minimal amounts they receive in standard prison environments.  The degraded conditions under which prisoners live serve as constant reminders of their compromised and stigmatized social status and role.  A diminished sense of self-worth and personal value may result from this. That is, like the rest of us, prisoners derive and internalize symbolic meaning from the way they are treated. When they are treated in harsh and humiliating ways, and are confined in abysmal housing units, many come to think of themselves as deserving no more than the degradation and stigma to which they are being subjected.  This degraded identity may be difficult or impossible to relinquish when they are released from prison. | Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 55.  Of course, there are many prisoners who enter overcrowded prison systems with pre-existing psychological problems and psychiatric disorders. For obvious reasons, chronically and severely | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | No hearsay cited; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overcrowded prison systems are challenged to obtain and retain adequate numbers of clinical staff and to implement treatment programs that address the needs of this special population. In addition to the lack of adequate numbers of treatment staff proportionate to the sheer numbers of mentally ill prisoners, these prisoners are themselves especially sensitive to the harsh realities of overcrowded prisons.  Mentally ill prisoners are more likely to be adversely affected by the forced intimate contact that overcrowded housing units require because, depending on the nature of their illness, they may be far less adept at reading social cues, controlling their impulses, or regulating their emotional states than the prisoners with whom they must so closely and constantly interact.  The decreased opportunities for normal, non-pressured social interaction may undermine already impaired reality testing.  And the sheer stress of severely overcrowded confinement may overwhelm their already fragile coping mechanisms, creating fear and anxiety in what these prisoners experience as an increasingly unpredictable | Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| world. Thus, mentally ill prisoners are more likely to decompensate from exposure to such pressurized, overcrowded environments, and they are vulnerable to victimization from the overcrowding-related conflicts that occur with increased frequency. | | |
| 56. Whether or not they enter prison with pre-existing psychiatric disorders, some prisoners find the severe conditions of confinement in badly overcrowded systems to be traumatic. Others are exposed to violence and other emotionally wrenching events that will have long-lasting psychological consequences. As a result, some develop "post-traumatic stress disorder" (PTSD)-a range of long-term trauma-related symptoms, including depression, emotional numbing, anxiety, isolation, hypervigilance, and related reactions-in response to prison trauma. In this regard, psychiatrist Judith Herman and others have proposed that the diagnostic category of post-traumatic stress disorder be restructured to include what she has termed "complex PTSD," a disorder created by "prolonged, | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowded." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-46-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| repeated trauma or the profound deformations of personality that occur in captivity." Complex PTSD can result in protracted depression, apathy, and the development of a profound sense of hopelessness. For some prisoners, it represents the long-term psychological cost of adapting to oppressive forms of prison confinement. | | |
| 57. In any event, many prisoners adapt to the pains of extreme forms of imprisonment in severely overcrowded prisons by developing overt psychological symptoms or experiencing an exacerbation of ones that already exist-including clinical depression, paranoia, and psychosis. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 58. Prison systems, administrators, and staff also respond to overcrowding in a variety of ways that, in turn, impact prisoner behavior. In an important sense, of course, overcrowding is a systemic problem, and prison systems "behave" differently in the face of it. Because overcrowding is | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Relevant |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| such a pernicious problem, however, few if any of these adaptations have long-term positive consequences. | evidence. Assumes facts not in evidence. Speculative. | to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 59.  For one, overcrowded prison systems often respond to the influx of unprecedented numbers of prisoners by reducing the amount of screening, monitoring, and managing that they perform. This typically includes compromises that are made in the assessment and treatment of vulnerable or special needs prisoners. As one group of clinicians acknowledged: "Unfortunately, the prospect of screening prisoners for mental disorder and treating those in need of mental health services has become a daunting and nearly impossible task in the present explosion of prison growth."  Unidentified and untreated mentally ill prisoners in mainline prison populations not only are more likely to deteriorate themselves, but also to have a significant adverse effect on the prisoners with whom they must live and interact-sometimes incurring their wrath and mistreatment. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | Further clarification is available through cross-examination; FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 60.  Overcrowding also means | Inappropriate basis for | FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| that prison systems experience pressures to reallocate already limited programming and other resources to create bed space and maintain basic security. Thus, in addition to significant reductions in correctional services, activities, programming, and treatment for prisoners, of course, overcrowded prisons are correspondingly plagued by higher levels of idleness. The prison overcrowding crisis in the United States in general and California in particular coincided with the advent of a correctional philosophy that saw punishment rather than rehabilitation become the stated goal and primary purpose of imprisonment. Unprecedented amounts of unproductive inactivity have resulted from the confluence of these trends. Put simply, a severely and chronically overcrowded prison system like the one that now exists in California cannot keep the majority of its prisoners meaningfully or productively engaged in activities and programs. | opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous re: "overcrowding." Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination. |
| 61. Moreover, chronic idleness produces more than mere boredom. There is | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 703 (based upon personal observation); FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| widespread agreement among correctional experts that empty, idle time in prison produces negative psychological and behavioral effects.  As far back as the 1980s, when the trends toward overcrowding and the lack of prison programming had just begun, the U.S. Government Accounting Office noted: "Corrections officials believe that extensive prisoner idleness can lead to destructive behavior and increase violence within institutions. Moreover, idleness does little to prepare prisoners for re-entry into society." | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination. |
| 62.  Idleness-related frustration also increases the probability of interpersonal conflict and assaults in prison. Unfortunately, as I noted earlier, overcrowding simultaneously reduces the opportunities for staff to effectively monitor prisoner behavior and drastically limits their options to reduce animosities between prisoners by separating them or sending them to different facilities. Thus, there is greater stress and more opportunity for interpersonal conflict, less for prisoners to do, fewer positive or productive outlets to release the resulting tension, | I Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| decreased staff capacity to identify prisoner problems, and fewer options to solve them once they do. | | |
| 63.  Moreover, the kind of widespread idleness and lack of purposeful activity that pervades overcrowded prisons has been identified as a major cause of self-harm and suicide among prisoners.  Indeed, a 2005 nationwide study of prison suicides found that the "the probability of suicide increases dramatically as overcrowding increases ..."   These researchers found that suicide rates were lower in minimum security facilities overall-presumably because of the greater levels of program participation-but that overcrowding actually produced the greatest effect on the suicide rate at these facilities.  That is, at high levels of overcrowding, minimum security prisons were as likely to experience suicide as their medium and maximum security counterparts.  In fact, some prison researchers have concluded that one of the best ways to decrease the rate (not just the absolute number) of prison suicides would be to reduce the total number of incarcerated persons. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 64.  Another negative behavioral effect of overcrowding that stems from the changes it produces at both individual and institutional levels is the increased risk of sexual victimization.  For example, one prison researcher has noted that "[i]n less well-regulated institutions in which prisoners have little recourse to protection or in which there may be collusion between dominant prisoners and staff to maintain the peace, sexual violence tends to be greater."  Others have suggested that overcrowded conditions in which prisoners have much idle time may contribute to higher numbers of prison rapes. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 65.  Researchers also have documented greater amounts of illicit drug use among prisoners who are incarcerated in overcrowded prison settings, leading one of them to conclude that "reducing drug-related behaviors inside prison may require alleviating prison crowding..."  There are several plausible explanations for this relationship, including the fact that illicit drug use is more difficult to monitor and prevent in overcrowded prisons and the likelihood that prisoners will attempt to cope with the stress | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of overcrowded living conditions through increased drug use. | | |
| 66.  As I noted earlier, overcrowding appears to have especially adverse effects on the institutional behavior of younger prisoners.  Thus, one study of the Texas prison system found that: The greater the proportion of young prisoners housed in the institution, the greater the infraction and assault rates. There is some evidence for an interaction effect between age and prison size. Younger prisoners may be more susceptible to the problems and control structures in large prisons than older prisoners. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. Speculative. | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 67.  Another study obtained similar results, with overall correlations that revealed "a significant association between density and total assaults and assaults on prisoners" such that the greater the density the more frequent the assaults. But the relationship between crowding and violence was "strongest in the institutions housing young offenders." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. Speculative. | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| | | argumentative. |
| 68.  These age-related crowding effects are not difficult to understand. Younger prisoners tend to be more volatile, sensitive to their surroundings and, in general, more likely to react aggressively to the tensions and conflicts that crowded conditions of confinement generate. However, prison officials and staff members often respond to these crowding-related infractions by punishing prisoners, frequently by placing them in disciplinary segregation units. The heightened reactivity of younger prisoners to the context of crowded living conditions means that greater numbers of them will be exposed to even harsher conditions in the segregated or isolated housing units where they will be confined. | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 69.   A number of adverse and presumably unintended long-term consequences are likely to follow from this scenario.  Prison officials typically use a prisoner's disciplinary segregation status to bar him from participation in any form of educational or vocational programming. Moreover, time spent in | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| segregation simultaneously places prisoners at risk of developing a host of adverse psychological reactions that are associated with long-term isolation (that I will discuss in a subsequent section of this report). The absence of even minimal forms of programming and exposure to potentially disabling solitary confinement jeopardize subsequent adjustment in the mainline prison population as well as in the freeworld. And, once these prisoners do return to prison, they may well find that their prior disciplinary status leads more readily (or even automatically) to their classification as a present security risk, making them prime candidates for assignment to a segregation unit once again. | Speculative. | clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 70. In light of the panoply of negative individual and institutional effects ofprison overcrowding that I have summarized in the preceding paragraphs, it is perhaps not surprising that several studies have suggested that crowded prisons are associated with increased recidivism. For example, at the start of the 1980s, several British researchers found a strong relationship between | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overcrowding and prison ineffectiveness in England-prisoners released from overcrowded prisons were more likely to be recommitted for subsequent criminal infractions. The relationship could not be explained away by other variables, leading the researchers to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime. By sending fewer people to prison or by reducing the effective lengths of prison sentences, they argued, the effectiveness of prison might be enhanced. | evidence. Speculative. | Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 71. Similarly, several years after this English study, Canadian researchers concluded that placing low-risk offenders in often-overcrowded high security facilities resulted in high rates of re-incarceration. The rates were significantly higher than those of comparable lowrisk offenders who had been placed in halfway houses. The researchers concluded that the failure to properly divert low-risk offenders from high to low security facilities-something that overcrowded prison systems often lack the capacity to do--"may actually increase | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is |

-56-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the risk of future recidivism." | | mischaracterization, speculative, or argumentative. |
| 72. Long-term "criminogenic" or crime-producing overcrowding effects can occur in other ways as well. Indeed, severely overcrowded prison systems can generate a wide variety of problems that may reverberate back into the community and eventually back into the prison system itself. For example, because prisoners lack sufficient programming and treatment in overcrowded systems, they are more likely to re-enter the free society no better and often much worse-than they left. This is especially true for mentally ill prisoners whose psychiatric conditions are likely to worsen in the face of the harsh and punitive conditions they face in overcrowded prisons. If mentally ill prisoners do not receive proper, effective treatment in prison, they will return home with mental health needs that local communities with already limited treatment resources will be called upon to address. Mentally ill prisoners who worsen or decompensate in prison will need even higher levels of care and, in extreme cases, they may become chronically or even | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| permanently disabled. Untreated or worsened mental health conditions also may render some prisoners more dangerous when they return from prison than when they left. | | |
| 73.  In addition, prisoners who are traumatized by severely overcrowded prison conditions or exposure to the extreme forms of violence that can occur within them may leave prison with psychiatric disorders that they did not have or manifest as clearly at the outset of their prison sentences. That is, some number of prisoners will enter prison without a documented history of mental illness but, because of the severe deprivations, profound indignities, and dangerous conditions they confront, develop serious trauma-related disorders that may require mental health treatment both in prison and later in free society. In the absence of such treatment, these prisoners are prime candidates to re-offend. | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 74.  Thus, overcrowded prisons tend to beget overcrowded prisons.  In fact, California is a perfect example of the way in which a chronically and severely overcrowded prison system | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Vague and ambiguous | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); overcroweded defined in report; Further |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| sends prisoners back into the community ill-prepared to successfully reintegrate there. Increasing numbers of them re-offend or violate the conditions of their parole quickly and repeatedly, which in turn continues to generate greater numbers of prisoners and exacerbates the prison overcrowding problem. | re: "overcrowded." Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 75.  As I already have noted, an unprecedented influx of prisoners compromises the meaningful evaluation and classification of incoming prisoners. In a severely overcrowded prison system like California's, a prisoner's security level and available bed space largely determine housing assignments.  This means that many fewer new prisoners pass through an intake process that includes a comprehensive diagnostic evaluation and what-in the days of rehabilitation-was referred to as a "needs assessment." Thus, even chronic deficits in educational or vocational skills are overlooked or ignored in initial classification and subsequent housing assignments. Indeed, a chronically and severely overcrowded prison system for the most part lacks | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the resources with which to address the broad range of prisoner needs and problems anyway. | | |
| 76.   Among other things, this means that prison administrators have few incentives or positive rewards at their disposal with which to manage and control prisoner behavior.  That is, overcrowded prisons lose their programming orientation and options. They are rarely in a position to offer well-behaved prisoners meaningful opportunities for personal growth or skill development, or participation in engaging activities or thriving organizations as "carrots" to reinforce and shape prisoner behavior.  Lacking carrots, overcrowded prisons and prison systems rely increasingly on "sticks."  Thus, overcrowding leads to increasingly negative forms of institutional control and, as population pressures mount, the use of harsh discipline and punishment tends to escalate. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 77.  The use of harsher and more punitive policies and procedures to maintain order and control means that custody staff increasingly rely on security hardware and | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| surveillance technology to control prisoner behavior. The extent of their dependence on the technology and implements of control has concerned some penologists, who worry about the "de-skilling" of correctional officers-the fact that interpersonal skills atrophy in prison systems where problems are solved and conflict defused increasingly by a reflexive tendency to lock up or lock down problematic or challenging prisoners (or the entire housing units in which they reside).  Indeed, overcrowded prisons may engage in the more frequent use of "lockdowns" and forms of disciplinary sanctions and segregation that further restrict prisoner movement and keep them separated from staff as well as one another. In California, as I will document in a subsequent section of this report, this includes the placement of troubled and troublesome prisoners--many ofwhom are mentally ill--in ASUs and SHUs. | Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 78.  Presumably designed to limit and control violence by keeping prisoners isolated from one another, segregated housing confines prisoners in | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| especially harsh and deprived conditions for very long periods of time.  Especially for mentally ill prisoners, this kind of confinement comes with a significant risk of psychological harm. As a general matter, psychologists know from studies of behavior and adjustment in free society that social isolation is generally bad for people's psychological well being.  Its effects are no more positive in prison. Thus, there is substantial evidence of the negative psychological effects of isolated confinement that comes from a variety of sources, including personal accounts, descriptive studies, and systematic research on solitary and supermax-type units.  The data that establish these harmful effects have been collected in studies conducted over a period of several decades, by researchers from several different continents who had diverse backgrounds and a wide range of professional expertise. | Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 79.  For example, mental health and correctional staff who have worked in disciplinary segregation and isolation units have reported observing a range of problematic symptoms | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| manifested by the prisoners confined in these places.  The authors of one of the early studies of solitary confinement summarized their findings by concluding that "[e]xcessive deprivation of liberty, here defined as near complete confinement to the cell, results in deep emotional disturbances."  A decade later, Professor Hans Toch's large-scale psychological study ofprisoners "in crisis" in New York State correctional facilities included important observations about the effects of isolation. After hundreds of in-depth interviews with such prisoners, he concluded that "isolation panic" was a serious problem among prisoners in solitary confinement.  Symptoms reported included rage, panic, loss of control and breakdowns, psychological regression, a build-up of physiological and psychic tension that led to incidents of self-mutilation. | Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 80.  More recent studies have identified other symptoms that appear to be produced by these conditions.  Those symptoms include: appetite and sleep disturbances, anxiety, panic, rage, loss of control, paranoia, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| hallucinations, and self-mutilations. Moreover, direct studies of prison isolation have documented an extremely broad range of harmful psychological reactions. These effects include increases in the following potentially damaging symptoms and problematic behaviors: negative attitudes and affect, anxiety, withdrawal, hypersensitivity, ruminations, cognitive dysfunction, hallucinations, loss of control, irritability, aggression, and rage, paranoia, hopelessness, a sense of impending emotional breakdown, self-mutilation, and suicidal ideation and behavior. | Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 81.  In addition, there are correlational studies of the relationship between housing type and various kinds of incident reports in prison. They show that self-mutilation and suicide are more prevalent in isolated, punitive housing units like ASUs and SHUs.  So, too, are signs of deteriorating mental and physical health (beyond self-injury), other-directed violence, such as stabbings, attacks on staff, and property destruction, and collective violence.  Indeed, within CDCR, suicides are much more likely to occur inside the segregated housing | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| units. | | mischaracterization, speculative, or argumentative. |
| 82.  The use of extreme forms of solitary confinement in so-called "brainwashing" and methods of torture also underscores its painful, damaging potential. In fact, many of the negative effects of solitary confinement are analogous to the acute reactions suffered by torture and trauma victims, including post-traumatic stress disorder ("PTSD") and the kind of psychiatric sequelae that plague victims of what are called "deprivation and constraint" torture. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 83.  The prevalence of psychological symptoms (that is, the extent to which prisoners who are placed in these units suffer from these and related symptoms) is very high. In my own study of a representative sample of prisoners in the Pelican Bay SHU, for example, every symptom of psychological distress that I measured but one (fainting spells) was suffered by more than half of the prisoners. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in | Relevant to development of expertise; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Many of the symptoms were reported by two-thirds or more of the prisoners in this isolated housing unit, and some were suffered by nearly everyone. Well over half of the SHU prisoners reported a constellation of symptoms-headaches, trembling, sweaty palms, and heart palpitations-that is commonly associated with hypertension. I also found that almost all of the prisoners evaluated reported ruminations or intrusive thoughts, an oversensitivity to external stimuli, irrational anger and irritability, difficulties with attention and often with memory, and a tendency to socially withdraw. Almost as many prisoners reported a constellation of symptoms indicative of mood or emotional disorders-eoncerns over emotional flatness or losing the ability to feel, swings in emotional responding, and feelings of depression or sadness that did not go away. Finally, sizable minorities of the prisoners reported symptoms that are typically only associated with more extreme forms of psychopathology-hallucinations, perceptual distortions, and thoughts of suicide. | evidence. | argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 84.  Unless a prison system steadfastly guards against it-and few overcrowded prison system are able to-eertain categories of vulnerable prisoners are likely to be placed disproportionately in these units where, precisely because of their vulnerabilities, they are at greater risk of suffering serious harm.  For example, one commentator has described the "vicious cycle" into which mentally ill and developmentally disabled l22 prisoners can fall when they commit disciplinary violations and are placed in segregated housing.  A lack of appropriate treatment and care in general population may worsen their condition, "[c]ausing hostile and aggressive behavior to the point that they break prison rules and end up in segregation units as management problems." Because of highly stressful conditions in segregation and the fact that mental health care is usually sporadic and of uneven quality there, "this regression can go undetected for considerable periods of time before they again receive more closely monitored mental health care." Unfortunately, this is a cycle that "can, and often does, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| repeat." | | |
| 85.  Indeed, in my own research, I found a higher percentage of prisoners who suffer from serious forms of mental illness residing in isolated or segregated housing, as compared to their numbers in the general prison population. Other researchers have found the same kind of high prevalence rates. For example, a Canadian study estimated that approximately 29 percent of prisoners in special handling and long-term segregation units suffered from "severe mental disorders."  A more recent study conducted by a group of Washington state researchers also found that 29 percent of intensive management prisoners in the state's correctional system manifested at least one pre-defined indication of serious mental disorder (such as multiple admissions to an acute care mental care facility, or having been in one of the prison system's residential mental health units).  California's segregated housing units also contain a disproportionately high concentration of mentally prisoner/patients.  Thus, in the CDCR, although mentally ill | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners comprise less than 25 percent of the overall prison population, by August 2007,46 percent of the prisoners housed in the administrative segregation units were on the mental health caseload. | | |
| 86. Unfortunately, as I have already suggested, the overrepresentation of mentally ill prisoners in isolation units like ASUs and SHUs is potentially dangerous and damaging. All other things being equal, it also is a problem that is more likely to plague overcrowded prison systems than others. There are several reasons why this is so. For one, these systems typically lack adequate treatment resources and programs to effectively monitor and manage mentally ill prisoners in the general population. The mental health of those prisoners is likely to worsen in the absence of appropriate treatment, and their problems are likely to become more serious before they are detected and addressed. In addition, the severe conditions of confinement that accompany overcrowding place special stressors on mentally ill prisoners that may worsen | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-69-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| their conditions and lead to decompensation.  Moreover, overcrowded prison systems are more likely to resort to punitive forms of social control than others, so that if and when mentally ill prisoners do violate prison rules in an overcrowded prison, those violations are more likely to occur in prisons that are more prone to punishment. | | |
| 87.  Yet, as I have suggested, the placement of mentally ill prisoners in ASUs and SHUs places them at risk. It represents one of the critically important ways in which mentally ill prisoners can be damaged and harmed by overcrowded conditions of confinement-not just by the overcrowding to which they are directly exposed, but by the practices and reactions that the larger prison system has developed in response to the overall pressure and dysfunction that overcrowding brings about. As I will discuss in greater detail below, during my site inspections of the administrative segregation units, staff reported and I observed inadequate treatment space, insufficient staffing resources, inadequate access to exercise and yard, lack | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-70-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of programming and poor access to higher levels of care when these prisoners decompensated in these harsh environments. | | |
| 88. In summary, I know of no reputable prison expert who doubts that prison overcrowding-especially when it is chronic and severe-significantly impacts the broadest and most fundamental aspects of prison life in negative ways that have adverse consequences for prisoners. For all of the reasons I have outlined above, overcrowding certainly undermines the quality of medical and mental health care in prison. As a representative of the World Health Organization summarized it: "Overcrowding is an obvious cause or contributory factor to many of the health problems in prison, most notably communicable diseases and mental health, including the use of psychoactive substances." Not surprisingly, correctional administrators and law enforcement officials also acknowledge the wide-ranging negative effects of overcrowding on incarcerated populations and penal | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 201 (judicially noticeable). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| institutions.  For example, between 80-90% of a sample of county sheriffs in the United States perceived overcrowding to have resulted in increased acts of violence between prisoners, increased violence between prisoners and staff, and increased facility maintenance expenses, and nearly one half or more of the total surveyed reported that overcrowding increased medical and mental health problems among prisoners. | | |
| 89.  As someone who has studied the California prison system for more than 30 years, I have been a witness to the growth of the prison population in the state to its current unprecedented and intolerable levels of overcrowding.  I systematically evaluated prison conditions in the early 1980s, in what were then among the state's largest prisons, as a very sizable influx of new prisoners began to enter the Department of Corrections.  The problems that I and other experts identified in those early years were ones that a number of courts attempted to address through court orders limiting crowding-related practices such as doubleceiling, | Inappropriate basis for opinion. Fed. R. Evid. 703.<br>Relevance. Fed. R. Evid. 402.<br>Lack of foundation.<br>Argumentative.<br>Mischaracterizes the evidence.<br>Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and that other courts deferred intervening to solve because of assurances from the CDC that they were making progress in limiting population growth and ameliorating its adverse effects. But those levels of overcrowding and the problems they engendered-as serious, dangerous, and destructive as they were-pale in comparison to the depth and magnitude of the current crisis. | | |
| 90. Of course, I am not the only person who has examined the overcrowding crisis in the CDCR in recent years who has come to this same sobering conclusion. Indeed, virtually every expert and group of distinguished analysts with whom I am familiar has voiced a nearly identical opinion. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination. |
| 91. Thus, the recent panel of distinguished experts convened by defendants, the CDCR's Expert Panel on Adult Offender and Recidivism Reduction Programming, concluded that the first action that the State must take to address the crisis in the prisons and provide for meaningful rehabilitation is to "[r]educe overcrowding in its prison facilities and parole | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Argumentative. Mischaracterizes the evidence. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, |

-73-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| offices." The Expert Panel further noted that for almost two decades, various other respected experts and expert panels-many convened by the State itself-have provided thoughtful recommendations for population reduction strategies for California prisons. I have reviewed many of these recommendations, including reports by the Little Hoover Commission, the Corrections Independent Review Panel, and the CDCR Expert Panel. They have all concluded that the population crisis is beyond urgent. For example, in a January 25, 2007 cover letter to the Governor and Legislature accompanying its report titled "Solving California's Corrections Crisis: Time Is Running Out," the Little Hoover Commission underscored this conclusion: "California's prisons are out of space and running out of time....The problem does not need further study. The State knows what the answers are, thanks to nearly two decades of work....The bare facts have earned California's Department of Corrections and Rehabilitation an ignoble distinction for systemic failure. Inmates have swelled prisons far past capacity. With cells | | speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| already full, new inmates camp out in hallways, gyms and classrooms....The ranks of correctional officers have not kept pace with the rising prison population.  The department has thousands of openings, resulting in huge overtime bills and mounting stress for correctional officers.... The status quo is not acceptable...The choices are stark.  The price of failure is unimaginable." | | |
| 92.  The recommendations made by these experts to address the overcrowding crisis have often been similar in nature, and have commonly emphasized policy reforms that are aimed directly at significant population reductions.  They include the establishment of a sentencing commission, parole reform, and implementation of alternatives to incarceration for parole violators.  The CDCR Expert Panel concluded, "We agree with the Little Hoover Commission (2007) in that California doesn't need another report outlining correctional reform measures.  What California needs to do is implement some of the proposals that have already been presented to it. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent). |

-75-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Since 1990, there have been more than a dozen reports published that deal with the crisis in California's adult prison system. The major recommendations made in all of these reports are entirely consistent with the recommendations contained in our report." | | |
| 93.  In addition, according to documents I have reviewed, in a *Madrid-related* hearing, the attorney representing the Governor personally stated that "it is [the Governor's] belief that overcrowding affects virtually all of the issues that the Court is concerned about... [It] affects prisoners throughout the State ..." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 94.   Indeed, the Overcrowding Proclamation issued by the Governor on October 4, 2006 reflects many of these very same conclusions about the absolute centrality of prison overcrowding and its serious, pernicious consequences: "[C]onditions of extreme peril | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 201 (judicially noticeable); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon review of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| to the safety of persons and property exist in [the CDCR prisons], due to severe overcrowding, and... the magnitude of the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities of any geographical area in this state. The *Coleman* Special Master observed that "[0]ver the past II-plus years, much has been achieved, and many of the achievements have succumbed to the inexorably rising tide of population, leaving behind growing frustration and despair." | Lack of foundation. Mischaracterizes the evidence. | data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 95.  As I noted repeatedly above, prison overcrowding is a systemic problem that affects all aspects of prison life. Thus, although many of my comments have been directed primarily at the mental health care delivery system, and effects of overcrowding on the *Coleman* class members, there is every reason to believe that the severe and chronic conditions that plague CDCR negatively impact its medical care as well. In this regard, as the *Plata* Receiver's Report on Overcrowding noted: "[T]he size, scope, pervasiveness and specifics of overcrowding in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 201 (judicially noticeable). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
| --- | --- | --- |
| California's prisons have special negative consequences" to the provision of medical services. The Receiver also found that, beyond overcrowding itself, "CDCR's efforts to manage the overcrowding problem" have created more and more "ugly beds," and "exacerbate existing inadequacies in the health care delivery system, while threatening to cause still others." | | |
| 96.  Of course, these deficiencies in providing proper care and treatment for mentally ill and medically ill prisoners can interact with and compound one another's harmful consequences. Mentally ill prisoners who are receiving substandard care are likely to deteriorate psychologically and, as a result, be less likely to proactively pursue medical care and more likely to have their medical conditions worsen. They may require a higher level of medical care once their physical condition finally comes to the attention of medical staff. Mentally ill prisoners in a system that provides substandard medical care may find that their psychiatric conditions are aggravated by the anxiety and vulnerability they feel at having | Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| their physical health-related problems and concerns neglected. Medical prisoner/patients who receive poor quality care may find that their emotional health is placed in jeopardy by virtue of the same kinds of anxieties and sense of vulnerability-suffering a worsening medical condition and experiencing fear and frustration over their inability to receive proper treatment. They may seek (or, at least, be in increasing need of) mental health care as a result. Precisely because prison is run as a largely closed system, serious deficiencies in one part of the system can adversely affect many others. | | |
| 97.  In any event, as these experts have concluded and I agree, the California prison system is in crisis and operating in a dysfunctional and dangerous manner. Whole institutions-including the mentally ill prisoners housed inside-are chronically locked down.  Mentally ill prisoners are being housed in ASU and SHU cells virtually around the clock, and are subjected to harsh treatment and severe deprivations that place them at greater risk of harm. California is suffering what | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 201 (judicially noticeable). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| appear to be escalating suicide rates and rates of recidivism in the state-rates that in any event are among the worst in the entire United States. State prison suicide rates dropped sharply nationwide from 34 per 100,000 in 1980 to 14 per 100,000 in 2002.  However, despite specific orders of the *Coleman* court and the ongoing intervention of the *Coleman* Special Master, California's prison suicide rate has not seen a similar drop; in fact, in 2006, despite focused attention on suicide prevention, there were 43 suicides in California's prisons, a rate of 25.1 per 100,000.140 In 2007, defendants reported 35 "uncontested" suicides and 7 overdose deaths, resulting in a suicide rate (only using the 35 suicides) of 21.18. 141 In 2008, there have already been 24 suicides reported by defendants between January 1,2008 and August 5, 2008. Equally disturbing, the Special Master found that 72 percent of the completed suicides in 2006 "involved some measure of inadequate treatment or intervention and were, therefore, most probably foreseeable and/or preventable ...."   In addition, | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| although most states do not report any prisoner homicides in a single year, CDCR is a clear exception. 144 In 2006, for example, CDCR reported 14 homicides.  Although CDCR has not yet provided 2007 data, defendants have provided the *Coleman* Special Master and plaintiffs' counsel with email notifications of at least 12 homicides ofMHSDS prisoners that occurred in 2007. However, even these disturbing numerical measures of systemic dysfunction are in some ways dwarfed by the day-to-day realities that exist inside CDCR facilities and the way in which they impact the lives and mental health of the *Coleman* class members. I tum to some of these issues in the paragraphs below. | | |
| 98.  As I mentioned at the outset of this report, in order to gain a firsthand understanding of some of the consequences of overcrowding in the CDCR, I conducted tours and interviews in numerous housing units located in eight prisons where *Coleman* class members reside. I spent a full day at each of the eight prisons, and visited a representative sample of mainline housing units.  During my tours I had open access to medical, custody | Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is |

-81-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and mental health staff, prisoners, medical and custody records, staffing and construction information, logs of delayed access to care and any additional information that I requested. Custody and clinical staff responded openly and honestly to my questions and no one tried to block me from reviewing any files or documents or from speaking with anyone in the prison. The housing units I visited included ones most affected by the severe overcrowding in CDCR (*e.g.,* housing units that had been converted into makeshift dayroom and gymnasium dormitories), ones that contained specialized mental health and crisis beds, and segregated housing (including the SHUs at Valley State and CCI). I also spoke with prisoners in each of the housing units and interviewed a sample of prisoners at each facility selected from lists of CCCMS and EOP prisoners at the prison and from correspondence with Plaintiffs' counsel. | | mischaracterization, speculative, or argumentative. |
| 99. I should say at the outset of this section of my report that virtually every one of the overcrowding-related | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. | FRE 703 (based upon personal observation); FRE 703 (based upon review of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| harmful conditions, negative consequences, and dysfunctional adaptations that I described in general terms earlier in this report-at least the ones that could be seen in the course of a prison tour-was in evidence at the eight prisons I visited. The nexus between severe and chronic overcrowding as the primary cause of the continuing constitutional violations was clearly apparent and disturbing. Specifically: | Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 100.  CIM is a large, sprawling, prison complex consisting of four separate facilities under the administration of one warden. CIM serves as a Reception Center for parolees returning to custody and new commitments to the CDCR. According to the CDCR population report as of midnight on October 31, 2007, CIM had a population of 6,315 and a design capacity of 3,033, for a population at 208 percent of capacity. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Vague and ambiguous re: "sprawling." Argumentative. | FRE 201 (judicially noticeable); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 102.  On the day I toured CIM (October 29, 2007), Warden Poulous reported that the count was approximately 6,900 prisoners, well over 200 percent | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party |

-83-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of its rated capacity of 3,160. I should note that the level of overcrowding has not significantly subsided since then. Thus, on July 30, 2008, CDCR's website listed CIM's population as 6,057 prisoners-still 203 percent o f its rated capacity of 2,976. Ninety percent (90%) of the prisoners housed in the reception center were parole violators. Prior to touring the facilities, Warden Poulous and some of his staff met with me and the other experts and attorneys on the tour. Dr. Norris, the Chief Psychologist, reported that the mental health count was approximately 1,400 CCCMS and 130 EOP patients, which is 25 percent of the population. Among those caseload prisoners, Dr. Norris indicated that nearly 100 CCCMS/EOP patients were currently housed in their ASUs. He noted that until quite recently, the census of EOP patients in the ASUs was even higher, but they had recently transferred 15 to 20 EOPs out of their ASU to RJ. Donovan prison. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 103.   Because parole violators are "short timers," many of them spend their entire terms at CIM. The prison administrators with whom I spoke were very | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| clear about the fact that the Department's transfer policy was driven almost entirely by "space availability and custody level"-in other words, all other things being equal, prisoners typically were sent to whatever facility at the appropriate security level that had the bed space to receive them. | for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |
| 104.  The prison continues to experience backlogs in the flow of pertinent information needed to classify and house incoming prisoners. Thus, for example, although prisoners typically receive mental health and medical screening within a week of arriving at the prison, this is done without access to medical records, which may not arrive for another several weeks. This is consistent with medical record problems identified in the Special Master's 18th Monitoring report, which noted a daily filing backlog of medical records of "three to four days' worth although staff reported higher figures."  During the 21 st round monitoring tour on May 14-16, 2008, CIM staff reported that "[m]edical records continue to be a challenging | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 201 (judicially noticeable); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, |

| | Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| 1 2 3 | | | |
| 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 | area at CIM. As the Plata and Perez cases increase, the demand for services, requests for medical records and filing demands also increase.  Along with these demands there has been little additional staffing, resources or space allocated for this critical area."  Although I was told that an initial mental health screening is done within one business day after arrival, and that the clinics were "pretty good at catching mental health problems," I was also told that a "data glitch" in the mental health tracking system makes it difficult for the mental health staff to get access to an incoming prisoner's records. The mental health tracking system, used to schedule and track treatment and follow up, was frequently dysfunctional and lost track of patients in reception each time they were transferred between the various Units at CIM during the Reception process.  In fact, during the 21 st round tour, staff reported, "[a] representative from the Plata information technology division visited the institution in January, reviewed the system and stated that it was dysfunctional and beyond repair." | | speculative, or argumentative; Special Master is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); FRE 803(8) (public record). |
| 28 | 105.  During my tour of the | Inadmissible Hearsay. | FRE 801(d)(2)(4) -- |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOP reception center program, the Supervising Clinical Social Worker, in charge of pre-release planning for the EOP reception center prisoners, reported that the majority of the EOP RC prisoners will serve their entire term in the reception center at CIM. This is consistent with problems the Special Master identified in his 18th Monitoring report, including that it was taking CIM an average of 86 days to transfer EOP prisoners out of the reception center and that "[t]ransfer impediments included transportation difficulties and bed unavailability and population caps at receiving institutions." In both the 19th and the draft 20th Report, the Special Master noted CIM's continued difficulty transferring EOP prisoners out of the reception center to EOP treatment programs. These problems are especially problematic in light of CIM's staffing shortages for the EOP RC program. During the 20th round of monitoring, for instance, CIM identified the need for additional administrative staffing in order to meet the increased workloads that come with the reception center EOP program. As noted by CIM, the EOP reception center program and other | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 803(8) (public record); FRE 201 (judicially noticeable); Special Master is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-87-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| increased workload requirements have added "over 800 more tracking forms that must be entered weekly, additional reports and other duties for a staff that has increased by almost 25%. In addition, scheduling demands have increased along with the services. No additional clerical positions were added as part of the RC EOP expansion." Although the Special Master found that some elements of the EOP RC program were implemented at CIM during the 20th round review, he noted a number of obstacles including staffing vacancies, information technology shortcomings and workspace deficits. Finally, lockdowns impacted programming throughout the reception center during the 20th round monitoring. | | |
| 106.  At CIM-East, a staff psychiatrist who sees about 25-30 prisoners a day-all of whom are on psychotropic medications-told me that when the CIM MHCB, located in a different part of the prison, to which he typically admits patients is full, they are transferred to "temporary" and "overflow" housing. This happened as recently as ten days ago. He also told | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| me that although he has the patient's records most of the time, "sometimes I don't," and when this happens he is forced to make treatment decisions without them. Moreover, he often experiences a delay in getting suicidal patients transferred-"either the custody staff is tied up or, now that we take them in an ambulance, the ambulance is otherwise occupied and they have to wait." While the patients wait for transfer to the CTC or the overflow unit, they are kept in five small holding tanks---cages---in a room in the administrative building. There were five single man "dry" cages (no toilet or sink) and two were occupied. The psychiatrist told me that suicidal prisoners are placed there about four to five times a day and custody officers confirmed that the cages are used for suicidal patients. | evidence. Assumes facts not in evidence. | to existence of overcrowding and problems caused thereby Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 107.  Later in the day I visited the "temporary" and "overflow" beds in Del Norte that are used when the MHCB is full. The IO-bed unit is called the TBH (Temporary Bed Housing). The TBH unit that is regularly used in Del Norte was under construction and closed. I was shown another 5-bed unit | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| on the other side of the dayroom, which I was told was identical to the old "temporary" overflow unit. These "temporary" beds for housing suicidal prisoners had bunk beds, stools under the sink and large, mesh ventilation screens, all of which could be easily used to attach a ligature for hanging. I asked staff if the construction on the older "temporary" overflow beds was going to include suicide-proofing the cells (removing the bunks, replacing the large mesh ventilation screens, removing the stools), but I was told "no." | Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 108. The Special Master has also identified serious problems with CIM's MHCB units, including overcrowding in the unit (the "average daily census [in the MHCB] increased from 31 to 34.6, or 16 above licensed capacity") and staffing shortages: "MHCB staffing was allocated for 18 beds, while the unit served 36 prisoners within several different areas, including overflow areas on East yard and Cypress, and sometimes an area of the CTC. The 18 unlicensed beds plus the overflow beds were covered by diverting other staff,,,157 In the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Required by FRCP 26; FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 19th Report, the Special Master noted that overflow MHCB areas were operational in two of the reception center units, in Del Norte and in Birch Hall, with 106 admissions to the Del Norte overflow MHCBs in March 2007 alone. 158 This overflow unit in Del Norte was "inadequate for potentially suicidal or agitated inmates ... The cells had large-grate vents, unsafe beds and blind spots." 159 Similar problems were noted in the Draft 20th Report; CIM clinicians admitted 384 patients to the two overflow MHCB areas during the monitoring period. 160 Despite the frequent use of this overflow unit, no physical plant modifications were made to the unsafe overflow cells located in the Del Norte MHCB overflow unit. | | |
| 109.  At the time I visited the facility, CIM had recently hired a number of new clinicians, and there had been a large influx of new psychologists. However, many of them now did not have offices. In | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| addition, social workers also shared offices, and I was told that psych techs have no offices at all. The counseling or therapy groups were being held in "card rooms" adjacent to the day rooms. In fact, I was told that one of the key problems with the groups themselves was what one staff member termed "scheduling gymnastics"-the fact that "we don't have enough escorts to bring people to groups." The Special Master noted much the same thing. Thus, he observed that although mental health staffing had been increased due to caseload demands in administrative segregation, "[0]ffice space problems were exacerbated by the additional staff, and ten clinicians shared two small offices during the monitoring period."162 During the May 2008 21 st round monitoring tour, staff reported that "[t]his institution has been operating at or above 200% of capacity for some time. This is particularly evident in the limited mental health clinical space available. Most offices are shared and in some cases as many as four clinicians share a single small | Evid. 402. Lack of foundation. | employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions) |

-92-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| office. Increases in medical and dental staffs have created a situation where we often are competing for the same space.,,163 The Receiver's Eight Quarterly Report, filed June 7, 2008, describes the master plan developed for CIM, which will include renovations and additions to existing buildings for more clinical space. 164 The Master Plan for CIM has not been implemented, and in fact, the Receiver states that the cost and timeframe for the Master Plan is not yet known, "but will be provided in the Receiver's next quarterly report to the Court.,,165 The Receiver's next quarterly report should be provided to the court in mid September 2008, since his Eighth Report was filed on June 17, 2008. | | |
| 110. Many of the housing units that have been devised at CIM to accommodate the severe overcrowding that plagues the facility are shocking to see. For example, the units I saw at CIM where bunks have been installed in the dayrooms are very troubling-in terms of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the inadequate space afforded the prisoners, the degrading and degraded nature of a number of the housing units themselves, and the way that the prisoners are "enclosed" inside the dayrooms of some of them. In fact, the dayroom dormitories in the Colusa unit are unlike anything I have seen in any other prison system I have visited. The makeshift dayroom dormitory holds some 38 beds and houses CCCMS and EOP prisoners together. However, the dayroom itself is actually fenced in, giving the very distinct impression that the entire dormitory is in a large cage-a caged-in dormitory within a prison housing unit. During the tour, we were told that the unit was caged because of a riot that occurred several years ago at CIM that resulted in injuries to staff and prisoners. The unit, which is a general population unit within the reception center, felt very much like an administrative segregation unit. | Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. | for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 111. The bunks are also arranged very close together, and there was a dank feel and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| odor to the unit. There were only four toilets for the 38 men in the dormitory, and they were largely out in the open, affording no privacy. The prisoners had draped a sheet around the sides of one of the toilets so that they could sit on it partially shielded from the others. Although there was a dispute about how much yard time the prisoners got-a correctional officer said about 10 hours a week, while a number ofprisoners indicated that they only went to yard every four to five days for an hour or two -there was no question that these prisoners did not have jobs, and were not being afforded educational or vocational training of any kind. They got out of their caged dormitory for yard, showers, and chow, but nothing else on a regular basis. Indeed, at approximately 11 a.m., when I visited the dormitory, I counted nearly half the prisoners lying or sitting idly on their bunks, engaged in no meaningful activity at all. | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 112. CIM also houses prisoners inside two large, makeshift gym dormitories. I toured both of these units, each of which houses approximately | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 200 prisoners. The living conditions are degraded and degrading. All of the prisoners sleep on double bunk beds, arranged in tight -1] rows. None of the prisoners are provided with lockers, so they store all of their possessions in paper grocery bags. The prisoners housed in these dormitories have little or no privacy, and virtually nothing to do. Just as with the prisoners in the dayroom dormitories, they are confined in open areas that allow them to do little more than exist. In the gym dorms, obviously, there are many more men living this way. The officer in charge of one of the gym dorm housing units on the day I was there told me that that "program" in the dormitory consisted of "laundry exchange, chow, and showers; when I say 'open the dayroom,' I just mean 'turn on the TV.'" | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 113. The housing units themselves are extraordinary, difficult to adequately capture in words. The bunks are laid out in an area that is cavernous -the size of a full gymnasium-so the double bunks are stretched out as far as the eye can see. I think it is fair to say that the safety and security of the | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether |

-96-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners in these units is entrusted in large part to the prisoners themselves. Because of the physical layout of the housing units, effective monitoring and surveillance by correctional officers is a virtual impossibility. There are three officers assigned to the unit, plus a gunner. | | statement is mischaracterization, speculative, or argumentative. |
| 114. One of the gym dorms I toured had ten toilets and seven showers, all arranged in the open, in full view of one another. Thus, here, too, there is no privacy afforded to prisoners. When a counselor or case manager comes to this particular gym dorm to see a prisoner, the meeting takes place inside an office with large glass windows that adjoins and looks out on the shower and toilet area, and also is in plain view of it. The gym dorm housed a small number of EOP prisoners and a significant number ofCCCMS prisoners. | I Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 115. The other gym dorm unit I visited also housed a small number ofEOPs and a significantly larger number ofCCCMS prisoners. It was in a state of significant disrepair. The officers indicated that they make an attempt to remove EOP | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners when and if they discover that they have been placed in this unit. When we toured this particular dorm, all of the prisoners had been temporarily moved outside because an "incident" had occurred and the unit was being searched. The shower and toilet areas were filthy and slippery, with water collected on the floor, and broken pieces oftile. The walls were dirty, and the doors and windows were rusted in places. | Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | for defendants were present; FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 116. As I suggested above, both ofthe dormitories appeared to be extremely dangerous places in which to live and work. There were blind spots throughout, and even the dorm officer who sits or stands on a raised officer's station peering out over the bunks cannot see what is taking place just a few yards away, let alone at the far corner of the gymnasium. In the case of the second gym dorm I toured, the windows on the ceiling had been painted some time ago-a remnant of the days when the gym was once used to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is |

-98-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| show movies. Now that it had been converted to a housing unit, however, no one had bothered to remove the paint, so there was barely any natural light coming into the gym from above. In addition, three of the ten overhead lights were out-the officer told me that they had been for some time-so the housing unit was very dimly lit. | | mischaracterization, speculative, or argumentative. |
| 117. Despite these cramped and claustrophobic conditions and severe restrictions, I was told that there are a number of EOP prisoners housed in these crowded units throughout CIM. The mixing of EOP prisoners with general population and CCCMS prisoners in the same housing units, either in dorms or cells, was of serious concern. As I pointed out in my earlier discussion of the general consequences of overcrowding, prison staff in prisons like CIM operating at over 200% of capacity-have little wiggle-room in making decisions about where to house prisoners. Thus, custody staff at CIM are often forced to place vulnerable prisoners in settings that are dangerous and inappropriate. I was told that | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

-99-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOP prisoners were afforded the opportunity to attend "groups" that were held in the offices that were adjacent to the dormitories, in plain view of the other prisoners. This turned out to be a common problem in the CDCR-EOP and CCCMS prisoners being housed in units where their "treatment" was arranged in plain view of general population prisoners- although no one in CDCR seemed particularly concerned about it. In any event, on the day I visited CIM, the particular groups that were being run in the unit I saw were devoted to "leisure skill development"-the prisoners came out to play checkers and other board games for an hour. | | |
| 118. I have reviewed the monitoring documents provided to plaintiffs' counsel during the 20th Round Monitoring tour of CIM, which occurred on October 10-12, 2007, a few weeks before my visit. In the Corrective Action Plan prepared by the institution to address access to appropriate care in the administrative segregation units, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the monitors and institution found: "The mental health population in ASU continues to be high with an average ASU population of 113, the same as reported the last audit period. In addition, the EOP population in ASU remains high with an average of 30 - up 10% from last site visit. Access to EOP hub beds continues to be the main reason for delay, driving up this census. During past site visits the monitors reviewed performance audits and determined that due to physical limitations unique to the facility, the optimal number of mentally ill prisoners that CIM could effectively house and treat was 62. The accuracy of this capacity estimate appears to be confirmed by this past monitoring period's statistics.,,166 The total administrative segregation population for CIM, in June 2007, was 356. 167 In fact, during my tour of the prison, there were at least 100 mentally ill prisoners housed in the administrative segregation units at CIM. Furthermore, during the tour, staff reported that the prison continues to experience on-going delays in transferring EOP | evidence. Assumes facts not in evidence. | Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

-101-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners who are confined to Ad Seg units to EOP Hubs where they will receive EOP level of care within thirty (30) days, as mandated by the *Coleman* Program Guide. 168 In the monitoring documents that I have reviewed that were provided to plaintiffs' counsel during the 21 st round monitoring tour of CIM, held on May 14-16, 2008, the prison staff reported that the "mental health population in ASU continues to be high with an average ASU population of 120, up from the last audit period. In addition, the EOP population in ASU remains high with an average of 35 also up from the last visit. | | |
| 119. I also toured the administrative segregation unit in Palm Hall and Cypress Hall. There were approximately 100 prisoners on the mental health caseload housed in the administrative segregation units, both EOPs and CCCMS. After touring these units, which are dark, noisy and include a section referred to as "deep seg"- three or four cells recessed into a dark space with another set of door coverings-I agree with the institution and the *Coleman* | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| monitors that providing appropriate mental health care in these units to the large numbers of mentally ill prisoners currently housed in these units is impossible. In the draft 20th Report, the Special Master discussed some of the obstacles to care that were observed in the ASUs at CIM. They included office space deficits, non-compliance with suicide prevention policies, custody practices that resulted in non-confidential clinical contacts, excessive waiting times in holding cells prior to and after clinical contacts, and the failure to provide minimum Title 15 required outdoor yard time. | | mischaracterization, speculative, or argumentative; Relevant to existence of overcrowding and problems caused thereby. |
| 120. As part of the CDCR's Suicide Prevention plan filed with the court and required to be implemented system-wide, prisons are obligated to provide 30-minute welfare checks on all prisoners housed in their administrative segregation units during the first three weeks of their stay.171 In the 20th Monitoring Round documents provided to the *Coleman* monitors and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 201 (judicially noticeable); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon review of data and expertise); Special Master is knowledgeable, Court |

-103-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| plaintiffs' counsel, CIM custody staff acknowledged their inability to provide 30 minute welfare checks because of insufficient custody staffing resources. l72 In fact, CIM acknowledges that "Walking time to complete Ad Seg and Ad Seg overflow wellness checks is 54 minutes ...Acknowledging this is inadequate time lines it must be stated it is the best we can do without additional resources ...Additionally when the renovation begins late '07 in Cypress and the Ad Seg prisoners are moved to Birch Hall walking time will be increased by 15-20 minutes.,,173 This non-compliance was confirmed by the Special Master in the Draft 20th Report: "CIM was noncompliant with pre-placement screenings and the 30-minute welfare checks in administrative segregation." | | appointed; see also FRE 803(8) (public record); Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 121. One of the officers in the Ad Seg unit showed us additional walk-alone yards under construction outside the unit. The officer referred to these yards as "dog runs." He reported to us that currently the men in the Ad Seg units are | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| provided with approximately 3 to 4 hours of yard per week, but that would be increased once the new yards were completed. The men that we spoke to on the tiers and in interviews told us that they currently receive much less yard time than the officer reported to us. One said that he understood that he did not get yard "because he was EOP." Another, Prisoner II said he was afraid to leave his cell for any reason. I reviewed portions of Prisoner II's unit health record. It indicated that he had originally been placed in administrative segregation for safety concerns and because "appropriate housing is currently unavailable at this facility."175 He had several crisis bed admissions in 2007 because of psychotic symptoms, including an admission on November 713,2007, after I saw him during my site visit. In fact, he never transferred to a mainline EOP program, but rather paroled out of CIM on January 25,2008. Three days after paroling out, he was rearrested by the Upland Police Department because he reported feeling suicidal, and was | Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| placed in the Mental Health ward of the Arrowhead Regional Hospital on a Welfare and Institutions Code Section 5150 hold. His records indicate that he was released on February 5, 2008, but was admitted to the Royale Health Care Center psychiatric unit the next day for additional mental health care, and was released again on February 7, 2008. His parole was revoked a few days later for a technical violation (that was apparently related to his mental illness) for "failing to report" and he was returned to CIM reception center on February 11, 2008, where he was admitted to the crisis unit for 10 days. On April 2, 2008 (the date of the last record that I have reviewed) he was expressing concern for parole because "I don't want to be left at the bus stop again." | | |
| 122. Mental health clinicians, who had recently begun implementation of the EOP Reception Center groups in cages set up in Cypress, confirmed that there was a very high refusal rate for the caged groups and that they would try to visit these men cell-front. In order to enter the Ad Seg tier, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterization/ Argumentative re: "cages." | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| however, everyone is required to wear not only a protective vest but also a plastic face mask. | | (based upon personal observation); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 123.  Based upon my tour of the Ad Seg units, and discussions with clinical and custody staff and prisoners housed in these units, it is my opinion that these housing units are dangerous places to house prisoners with serious mental health concerns. I agree with Dr. Jordan, the Senior Psychologist Supervisor, who attended a meeting of the Suicide Prevention Committee at CIM on May 10, 2007 and reportedly: "expressed concerns about the possibility of another suicide occurring in administrative segregation due to the number of inmates, their acuity level, and the lack of clerical support, offices, and the limited escort availability." One suicide occurred in Palm Hall, one of the Ad Seg units in August 2006. 177 More recently, a suicide occurred in the administrative segregation unit at CIM on March 30, 2008. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 124. Ofcourse, I am aware that approximately 9 months have passed since I toured CIM and interviewed staff and prisoners there. One of the overall conclusions that I have reached in the course ofmy analysis of the magnitude and centrality of the overcrowding problem that plagues the CDCR is that it cannot and will not be remedied by implementing a series ofpiecemeal solutions that ignore the essence of the problem itself-the fact that the CDCR houses significantly more prisoners than it can provide constitutionally adequate mental health care for. In addition to the sheer magnitude of the problem, CDCR's track record in attempting to remedy the effects of the overcrowding crisis is entirely consistent with the judgment I have reached. However, to underscore that fact, I believe it is instructive to note the lack ofprogress that has been made by CDCR in solving the profound, pervasive, and welldocumented problems that described above at CIM, as reflected in the institution's own "Corrective Action Plan' (dated | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| May 14-16,2008). Aside from citing in passing to more recent reports (such as the Special Master's draft 20th Report) with respect to the other institutions that I have visited, I will not repeat this exercise of separately citing at length to the Corrective Action Plans. But, like CIM's, they vividly underscore the endemic and intractable nature of the overcrowding problems CDCR confronts. | | |
| 125. CIM's Corrective Action Plan," dated May 14-16,2008, conceded that there were a number of continuing overcrowding-related problems that continued to plague the institution. Potential solutions for many of these problems were significantly hampered by inadequate staffing (*i.e.,* too few correctional personnel for the numbers of prisoners whose mental health needs had to be addressed). Thus, in response to the fact that "[i]nmates on the psychiatric ward of the hospital, at the time of the August monitoring visit, were locked in their cells most of the time and received little programming," CIM sought to increase the number of group therapy sessions | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Assumes facts not in evidence. | FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

-109-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| available. However, CIM acknowledged that this effort was impeded by what officials admitted was a "lack of adequate numbers of custody personnel to insure safety and security needs related to inmate movement required for group therapy.,,179 Even with augmentation of their clinical staff within the MHCB, CIM reported that "obstacles to full utilization for this increased clinical staffing are: insufficient clinical programming space for group and recreational therapy activities, insufficient office/one to one clinical interview space, insufficient custody escort staff, and inadequate allocation of counselors to cover the treatment teams. | | |
| 126. CIM's Corrective Action Plan acknowledged an increase in the overall EOP population at the institution, growing from about 145 for the first four months of this period then rising gradually up to "around 180 currently,,181, and a corresponding increase in the use of Transitional Bed Housing, "with 28 inmates overflowed in March and 47 for the first 28 days in April.,,182 CIM | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. Assumes facts not in | FRE 801(d)(2) (admission of party opponent); Relevant to impact of overcrowding; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative; See Plfs.' Response to Defs.' MIL 1 (re: prison |

-110-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| acknowledged another continuing, overcrowding-related problem-the fact that "[w]eekly clinical contacts continued to be held at cell-front due both to shortages in custody staffing and lack ofprogram space.,,183 In fact, officials at the facility admitted that attempts to resolve this particular problem were impeded by these three additional overcrowding-related issues: "Lack of custody staff allocated to Administrative Segregation to provide inmate movement and security necessary to meet program guideline mandates"; "Lack of clinical staff allowed to Administrative Segregation to provide clinical contacts necessary to meet Program Guides"; and "Lack of clinical office space". | evidence. | conditions). |
| 127. Indeed, throughout the entire CIM May, 2008 Corrective Action Plan, correctional officials identified a daunting number of continuing, serious problems that, in various ways, are directly connected to the serious overcrowding that continues to plague CIM, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Relevant to existence of overcrowding and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and the CDCR in general. That is, CIM officials are continuing to operate a prison that, in a number of fundamental ways, lacks the capacity to manage and respond to the extraordinary number ofprisoners it contains, perhaps especially those prisoners who are mentally ill. The additional overcrowding-related problems included but were not limited to: a Mental Health Tracking System that is "inadequate to perform [the] task" of tracking and properly accounting for prisoners, and the use of an "ASU environment [that] is difficult for mental health inmates," so that "they quickly decompensate when returned from the MHCB, only to return to the MHCB after a few days or a week." This problem is said to have contributed to "many severely acute cases and unfortunate patient outcomes." | Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 128. Indeed, the ASU environment at CIM is one where the "mental health population... continues to be high" and the EOP population is increasing. Despite these increases, the prison staff admitted that EOP prisoners have "[i]nadequate access to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOP hub beds" because EOP Hub facilities continue to operate "at capacity which makes it difficult to transfer these inmate/patients to the facilities designed to provide adequate treatment.,,186The reason? Again, overcrowding-related problems: "[D]ue to physical limitations unique to the facility, the optimal number of mentally ill inmates at CIM could effectively house and treat in ASU was 62 which puts our current census at over 200% of capacity" 187 Similarly, CIM staff reported that the DMH referral times increased during this monitoring period "from 9 to 25 total days" and "[w]aiting lists prioritized by acuity wave [sic] been an ongoing reality with CMF acute referrals, SVPP ICF referrals and recently, also for ASH ICF." | Lack of foundation. | |
| 129.  Further, during the 21 st round monitoring period, in the reception center the "average length of stay for inmates at the EOP level of care was 106 days" and "[a]s a result of transfer delays and short parole sentences many EOP inmates | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| parole from CIM.,,189 The ASU, where RC EOP prisoners are housed "does not have the space and resources needed to meet compliance in this [EOP group treatment hours] area.,,190 Moreover, despite these prolonged stays in reception, 3CMS prisoners "received no treatment other than medication management and crisis intervention," were "not assigned case managers and no treatment plans were prepared for these inmates,,191 Here, too, the reasons were directly related to the fact that CIM houses more prisoners than it has staff and space to accommodate. Thus, officials acknowledged that three things were preventing them from solving these serious problems: "Insufficient staffing for EOP treatment in Reception Center" and "Physical plant limitations and need for adequate custody staff.,,192 Further: "CIM is not staffed to provide complete CCCMS services for mental health inmates upon arrival, transfer or discharge" and is plagued by "[p]hysical plant restrictions (lack of adequate office space and group room facilities) and lack of custody staff to assist | Lack of foundation. | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| with inmate movement and security." | | |
| 130. Another major area of concern was the "significant backlog of unfiled materials" making prisoners' medical files "relatively useless to clinicians seeing inmates," in part because the "case manager and psychiatric notes were lost or filed late or in a disorganized fashion" or were "often difficult to read.,,194 Not surprisingly, the major obstacle to solving this problem was the dearth of "[m]edical records staffing resources." 195 During the March 2008 monitoring tour, staff continued to describe medical records as a "challenging area at CIM." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding. |
| 131. Beyond the lack of key badly needed mental health staff, CIM continues to lack appropriate treatment space. Thus, for example, fewer than half (42%) of clinical visits in ASU were "held in a confidential setting.,,197 Not only was there little adequate treatment space, but even once prisoners had been seen by clinical staff, "there was a problem with timely followup for inmates in reception," attributed to "[p]sychiatric staff | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| vacancies" and "[o]ffice technician vacancies." | | |
| 132. CIM staff noted that the "increase in admissions [to the MHCB] appears to be coinciding with an increase in the overall EOP population at CIM, growing from about 145 for the first four months of this period then rising gradually up to around 180 currently.,,199 As a result of the increased admissions, the prison was forced to use its overflow MHCB beds, with "28 inmates overflowed in March and 47 for the first 28 days in April.,,20o Some of the MHCB beds were unavailable because they were used by "inmate/patients awaiting DMH LaC." 201 The problem of "repeated admissions in the MHCB" by individual prisoners was similarly attributed to "[l]imited staff' available "to process and expedite transfers," a "[l]ack of bed availability for EOP and DMH placement," and the "[l]ack of adequate number of clinical staff allocated to provide follow up | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402 | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

-116-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| services in the Reception Center." | | |
| 133. As I say, the persistence of these profound, pervasive, and well-documented problems suggests to me that they can only be adequately solved by implementing a set of new and decisive policies that go to the heart of the phenomenon that virtually everyone agrees is causing them-overcrowding itself. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 134.  Valley State Prison for Women is one of three CDCR prisons housing women in the state. VSPW has a reception center, mainline, SHU and Ad Seg units, and an OHU. It does not have a licensed CTC, but rather has an unlicensed infirmary (OHU). CCCMS prisoners are mixed throughout the reception center and on other yards. VSPW has no regular EOP program, but has an Ad Seg EOP Hub. The Special Master Reported in the 18th Monitoring Report that in January 2007,26 percent of VSPW's prisoners were participants in MHSDS, with 1,004 MHSDS participants and 3,806 total prisoners,z03 These numbers have increased. Thus, according to the most | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| recent data provided by defendants, VSPW had 1143 participants in the MHSDS on June 20, 2008, including 1129 3CMS (151 percent of their 3CMS capacity) and 14 EOPs (156 percent of their EOP capacity). | | |
| 135. When I visited Valley State Prison for Women (on October 30,2007), it housed 3,810 women in a facility designed for approximately 2,000. On the CDCR website, VSPW's population was listed as 4,022 women as of July 30, 2008, which was 203.7 percent of its design capacity of *1,980,z05* Although some of the VSPW staff talked proudly about their compliance with the requirements of *Coleman,* my observations of the prison and conversations with staff and prisoners revealed much at the prison to be concerned about. There are many problems there that stem from the severe overcrowding and the corresponding lack of treatment space that characterizes the facility. Among other things, their medical and mental health treatment areas are cramped and inadequate. I | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or |

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was told that they have had as many as 90 prisoners in the waiting room area which, as the Chief Medical Officer noted, is a direct result of overcrowding at the prison. She also noted that the prison lacked appropriate long-term treatment options for women with very serious mental health problems. | | argumentative. |
| 136.  During my visit, I was told by the Acting Chief of Mental Health that VSPW recently has been able to hire significant numbers of new mental health staff due to salary increases, but that the institution does not have the office and treatment space to appropriately accommodate these new employees. Months after my tour, this problem continues to plague the institution. Thus, on April 21-23, 2008, nearly six months after my visit, the prison staff stated that "[t]he primary challenge facing the mental health as well as the entire healthcare department remains the severe lack of space. Dental, Mental Health and Medical must compete for space in areas that were never intended to house and treat the current inmatepatient population.,,206 Despite having | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-119-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| requested "immediate relief for the lack of space at VSPW," the prison reported "[n]o progress has been made with this to date.,,207 This general problem applied more specifically to the Reception Center, where "[t]here are ongoing and serious problems related to office space for treatment/evaluation." | | |
| 137. During my tour I routinely heard from staff that space is the "number one challenge" at VSPW. One senior clinician told me that they were "crawling all over each other"-and documents drafted by the institution for the *Coleman* monitoring team that I reviewed confirmed these comments. All clinical staff members were sharing offices, including some senior staff members who had tripled up on offices. The institution was so short of treatment space that I was told storage rooms were being converted to this use. Although the institution did offer some groups, mental health staff reported that the groups were virtually always full and always had long waiting lists. I | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was told that VSPW has had to shorten the number of weeks that each group cycle lasts in order to be able to get more prisoners through them. Worse, still, some prisoners I interviewed reported that sometimes a group session or "hour" lasts for only five to ten minutes. When prisoners complain, they are told that groups cannot be scheduled for different times or longer periods because the space is being used for something else. One prisoner in B-yard reported that there had been no groups except a lifer group in more than three months. | | argumentative; Further clarification is available through cross-examination. |
| 138. When I met with one of the clinicians who directs the reception center mental health program, she explained that staff members in this area also do not have enough office space. Screening of many of the prisoners who arrive without urgent issues actually took place in the dining hall-obviously non-confidential-but she explained that there is no other space to go into because prisoners are housed in dayrooms in the reception center. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| | | through cross-examination. |
| 139. Staffing vacancies and the reliance on contractors remains a problem at VSPW.<br>In the April 2008 monitoring documents, the prison reported 18.88 clinical vacancies, with contractors covering a small percentage of those vacancies.209 In June 2008, the prison reported similar vacancy rates of 18.05 clinical positions, with 2.4 of those vacancies covered by contractors.210 The majority of the vacancies were psychologists and social workers who provide case management services to the reception center and mainline mental health caseload prisoners. | Inappropriate basis for opinion.  Fed. R. Evid. 703.<br>Relevance. Fed. R. Evid. 402.<br>Lack of foundation.<br>Argumentative. Mischaracterizes the evidence. | FRE 801(d)(2) -- Admission of party opponent (Defendants' June 8, 2008 staffing documents); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 140. The Corrective Action Plan also acknowledged a continuing "[l]ack of individualized treatment plans with coherence between diagnosis, plan and treatment provided," an area where improvement was reflected in the previous audit but not in the current one. The identified obstacles included "[l]ack of group treatment space," "[l]ack of ideas for time-limited | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703.<br>Relevance. Fed. R. Evid. 402.<br>Lack of foundation. | FRE 801(d)(2) -- Admission of party opponent; FRE 703 (based upon data reviewed and expertise); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions) |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| treatment," and "[l]ack of staff to provide therapy as dictated by program guide." 212 In this area VSPW noted "compliance rates appear to have fallen from the review done on 9/107." 213 Among the reasons given for decreased compliance were possible audit problems, the number of newly hired clinicians who required additional training, and the increased volume of evaluations required for the reception center prisoners. | | |
| 141. As was true of all of the prisons I visited, the overcrowding at VSPW has necessitated use of housing arrangements and configurations that are extremely troublesome and that subject the prisoners to conditions of confinement that are potentially dangerous and psychologically damaging. These kinds of housing arrangements are especially problematic for prisoners who suffer from pre-existing mental illness or possess special psychological vulnerabilities. For example, a number of the housing units at VSPW now use their dayrooms as makeshift dormitories where prisoners are double-bunked. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby Further clarification is available through cross-examination. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 142. In the standard VSPW housing unit, 40 such bunks (housing 80 prisoners) have been placed in the dayroom, significantly increasing the number of prisoners living in the unit and, at the same time, significantly degrading the overall living conditions there (both for the women in the makeshift dorms and those in other parts of the unit). In addition to subjecting the prisoners who are housed on these open bunks to marginal and degraded living conditions, the presence of the bunks deprives the other women in the housing units of the opportunity to use the dayrooms for their intended purpose. Indeed, officers told me that, prior to the introduction of the dayroom dorms, prisoners were allowed to use the dayrooms for recreation and a number of constructive activities throughout the day; now they get about 4 hours of recreation time, which must all be spent in the yard outside the unit. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 143. As problematic as the dayroom dorm housing appeared, the 8-person rooms in which many of the VSPW | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners lived were equally if not more cramped. In fact, many of the women said that they actually preferred the dayroom dorms to the 8-person cells for safety reasons-they told me that when the doors were closed and the women were locked in the close quarters of the cells, there was little or no opportunity for staff to monitor what went on inside. With four double bunks, one toilet, one shower, and two sinks crammed into each cell, it could be likened to living in a steamy shower stall. | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | provide information about the basis of the opinions); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 144. A number of the women at VSPW told me that they felt closed in and claustrophobic in these cramped and crowded quarters. One CCCMS prisoner told me: "I have a hard time around people-in the housing unit, yard, everything is so crowded here-I don't do anything but sit in my cell. I used to go to yard or dayroom but not now. I just want to be away from people." Staff at VSPW reported that they do not consider CCCMS status in their housing decisions in these units, so CCCMS prisoners are spread throughout both dayrooms and cells. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| | | problems caused thereby; Further clarification is available through cross-examination. |
| 145. Out of three reception center housing units, two of them were configured with the 8-person dorms rooms mentioned above plus the double bunks in the dayroom. The other reception center housing unit had double cells along with the double-bunks in the dayroom. However, at the time of my visit, these were unoccupied (although the prisoners I talked to reported that this was not always the case). They also reported that some of the cells in this unit are used as overflow Ad Seg housing, and that they had been used for this purpose as recently as two weeks prior to my visit. When Ad Seg prisoners are housed in this unit, then the reception center prisoners do not receive dayroom, and must choose between taking showers or going to yard. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 146. Just as many other CDCR facilities have, VSPW resorted to housing prisoners in makeshift gym dormitories. The | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and |

-126-

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| gym that I observed currently houses 200 prisoners in doublebunks. The atmosphere is very much like that in the men's prisons where the gymnasiums have been converted into housing units. The women in the gym dormitories at VSPW were at least afforded metal lockers in which to keep their property (an improvement over the paper bags provided to the men in CIM gym dorms). However, they still had no real privacy in this huge dorm. The women live on open bunks that also stretch out across a huge area that is impossible to monitor. Women must use the shower stalls and toilets in plain view of one another, and the ventilation ducts and cross beams on the ceiling of the gym appeared to be filthy with some kind of material that resembled insulation; many of the women complained to me about it and said that pieces or particles of it dropped on them from time to time. At the time of my visit, 5 out of the 17 toilets had "out of order" signs on them. | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

230542-1J

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 147. The Security Housing and Administrative Segregation Units at VSPW were severe and especially problematic for *Coleman* class members, a fairly large number of whom were housed there. In fact, we were told that out of the 63 prisoners housed in the SHU, more than half were on the mental health caseload, with 34 CCCMS and 2 EOP. In Ad Seg, roughly 25 percent were on the mental health caseload, with 28 CCCMS and 2 EOP out of 129 total prisoners. Unfortunately, the population of mentally ill prisoners in the SHU and Ad Seg units has not been reduced since my visit in October 2008.215 The Ad Seg unit sergeant was unclear about how often mental health staff members actually came into the unit. He also indicated that "groups run all day" and that both CCCMS and EOP prisoners have access to groups. However, the prisoners told me a different story. For example, I learned that the group that was taking place on the unit on the day of my visit-which consisted | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of several women standing in treatment cages that were arrayed in a semi-circle in a separate room off the unit dayroomwas the only one that they knew about that was available to CCCMS prisoners. Moreover, they told me that this was its first meeting. The women reported more generally that access to groups for EOP prisoners was sporadic at best. In addition, I learned from staff as well that, when one-to-one clinician contact occurred, it took place on the open dayroom floor. On the day ofmy visit, the prisoners in the Ad Seg unit did not receive any yard, apparently due to a faulty gate lock. However, we received mixed reports about whether yard was regularly provided for prisoners in the Ad Seg unit. | | |
| 148. Here, too, there were concerns expressed by prisoners about whether and how they were being prepared for their release from prison. One VSPW prisoner who has been diagnosed as psychotic and is on the EOP caseload told me: "I am scared about my fate when I get out. Am I going to be a zombie who has to be on big | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to impact of overcrowding; Further clarification is available through cross- |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| doses of medicine to function at all?"<br>She complained about the fact that groups are sometimes cancelled-"sometimes we have only one group for the whole week"- and also about the lack of meaningful content in the groups themselves, which she said often consisted of nothing more than watching Animal Planet or Disney Channel television shows. | Argumentative. Mischaracterizes the evidence. | examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 149.  Prisoner JJ, another VSPW prisoner on the EOP caseload told me that she had been either in SHU or Ad Seg for virtually her entire prison term-a total of approximately 6 years. She said that she had been kept in these segregated units despite that fact that she was diagnosed as schizophrenic, had serious enough mental health problems in the free society to have been sent to Patton State Hospital, and was taking Haldol at the time I interviewed her. More troubling still, she felt that she had received little or no help during her incarceration (in part because she had been kept segregated for virtually her entire time in prison) and yet she | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2) (admission of party opponent); FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was scheduled for release in less than a month. She voiced complaints both about the content of the groups she had attended as well as the circumstances under which they were held: "They have groups for EOP-we stand or sit in cages and watch TV. It doesn't help me and so I don't come out." In light of her imminent release from prison, and the fact that "nobody has helped me with my release," she was extremely concerned about what was going to happen to her. I reviewed portions of Prisoner JJ's records and confirmed that she did have a history of treatment at Patton State Hospital and at EOP level of care.216 She had been housed in administrative segregation or SHU for most of her prison time, with some periods in the crisis unit or in EOP programs. She also had a history of suicide attempts. She was placed in administrative segregation when she returned to VSPW on a parole revocation in March 2007 and was housed there when I saw her. She had multiple crisis bed admissions for suicidal ideation and was treated at the | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOP level of care until she paroled out on January 4, 2008. Her records reflect that she returned to VSPW on a parole violation on February 27,2008 and was placed on EOP level of care in the reception center. 217 On March 4, 2008, she was reviewed in her treatment team and was retained at EOP level of care. Less than a week later, on March 10, 2008, she was recommended by her clinicians for removal from EOP despite clinical notes that described her with: "affect was blunted," and as "less compliant with groups" and complaining of "intermittent fearfulness and paranoia."218 A chrono in her file showed that she was at an EOP level of care on March 9, 2008, and 3CMS on March 10,2008. Despite the reduction in her level ofcare, she was followed weekly by her case manager but was no longer provided with the ten hours of group therapy available to EOP prisoners. Her medications were changed several times and she was described as having a "childlike disposition."219 On June 16, 2008, she was involved in an incident in her housing unit, which the officer writing | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| up the rules violation described as a mixed housing unit for reception center and administrative segregation overflow prisoners. She ignored an order to stop walking toward the door, and the officer used physical force on her. I could not tell from the records whether this rule violation resulted in a DA referral or other sanctions. | | |
| 151. I toured Salinas Valley State Prison (SVSP) on November 1,2007. During the initial meeting with the SVSP Warden and other SVSP staff, including key clinical and custodial leadership, staff reported on some significant challenges, population moves and factors affecting the prison's ability to provide adequate health care to the prisoner population. Although the prison administration informed us that they had recently ended the use of most of their "non-traditional" housing-makeshift gymnasium and dayroom.dorms, the facility still housed close to twice the number ofprisoners it was | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| designed to hold. Staff reported that the mental health population included approximately 1200 CCCMS, 240-250 EOP, 96 DMH, and 5-8 MHCB patients, for a total of approximately 1554 mentally ill prisoners at SVSP, or 38 percent of the total prison population. The Warden reported that 150 of the CCCMS prisoners were housed in Ad Seg. In the 18th Monitoring Report, the Special Master found that "[t]he level of mental health treatment provided to 3CMS inmates in administrative segregation was similar to that reported in the preceding three monitoring periods. Each week a large number of prisoners were seen out of cell, but effort alone could not overcome structural impediments to meeting Program Guide requirements.. .. Staff reported that 80 3CMS prisoners at most could be seen out of cell in one week due to limits imposed by schedules and space constraints.,,223 The 3CMS population in Ad Seg at the time of my visit was almost twice the number that SVSP's own staff determined could be seen weekly out-of-cell | | Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| in Ad Seg as required by the Program Guide.224 Overcrowding in SVSP's Ad Seg has worsened since my tour: in June 2008, defendants reported that there were 208 3CMS prisoners housed in the Ad. Seg units, an increase of more than one-third.225 In the draft 20th Report, the Special Master found that "[c]linical staffing, space, scheduling, and the arrangements of holding cells used for group treatment [in ASU] were among the factors that thwarted the delivery of adequate mental health treatment ... Refusal rates were high. In one of the two rooms containing holding cells for group treatment, cells were arranged in a straight line. In the other group room, noise from nearby machinery was problematic." | | |
| 152.  During my tour staff explained how staffing levels affected clinical care. For example, many of the clinical positions in both medical and mental health were covered by contractors. In addition, Dr. Kalie, the Chief Psychologist reported that 14.5 of 29 psychologist positions are vacant and cannot be covered by | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were |

-135-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| registry employees. She also volunteered that "we work until 7 or 8 PM each night to get the job done, working 60 hours a week" (and also acknowledged that this meant they were being paid for a 60 hour week as well). Dr. Lee, the CMO, reported that medical vacancies have been filled by both full-time state employees (50%) and by contract employees (50%). He discussed the problems associated with the use of contract and registry staff at SVSP, noting that reliance on 230542-1] contractors and registry impacted quality and continuity of care because these staff left frequently, did not have the same commitment level as state employees, and retraining replacement registry staff drained other staff resources. In recent mental health staffing data provided by defendants reporting June 2008 data, SVSP reported 117.25 mental health positions and 35.5 vacancies, including 12.37 of the 28 psychologist positions.227 Only 3.54 of these 12.37 open positions were covered by registry hours in June 2008.228 Even when adjusted for registry coverage, | | present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; *see* Plaintiffs' Response to Defendants' MIL 1 (re: prison conditions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the overall vacancy rate for clinical staffing was 21%. | | |
| 153. The Warden also reported to us during the meeting that SVSP had experienced significant custody staffing shortages recently, with as many as 200 of 840 custody positions vacant. He noted that among the current 100 custody vacancies, 27% are Sergeant positions. The staffing shortages were so dire at the prison that SVSP has 21 custody officers on loan from other prisons. Despite this, the prison was still short somewhere in the neighborhood of 100 custody officers, requiring the prison to run "hundreds of overtime shifts per week." The Warden reported that he also has vacancies in many support positions, including clerical, plant operations, and food service. The clinical staff confirmed that the high vacancy rate among custody officers has a negative impact on the delivery of medical and mental health care. This was later confirmed by custody officers during my tour of the prison. In the draft 20th Report, the Special Master discussed disturbing findings regarding "custodial dysfunction" at | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| SVSP, which impacted on the delivery of mental health care to 3CMS, EOP and DMH patients.23o Among the problems cited was the taunting of prisoners about their mental health disabilities, the arbitrary enforcement of rules, the restriction of spaces set aside for mental health programs, and the "fail[ure] to properly manage the priority ducat system.,ml Similar obstacles to care existed within the DMH units at SVSP. | | |
| 154. The Warden reported to us that all four facilities at the prison were on lockdown status during our visit, including the EOP housing units. During the tour of the prison I was able to observe the impact of the lockdowns on prisoners housed in the EOP treatment programs in D-Facility and in C-Facility. A number of the individual clinical staff, at least in some ofthe units (especially in BYard, the SNY Level III facility), were very positive about recent changes at SVSP, such as the deactivation of one of the large gyms, and were proud of the fact that they were now able to run a number of treatment groups. However, their experiences were by no means | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| uniformly shared and the facility suffered from many obvious overcrowding-related problems. One of the facilities, C Facility, a Level IV CCCMS yard, has been on lock-down status for almost two years. The Special Master recently confirmed that as a result of the lockdowns and modified programming on C Facility, "no group treatment was provided on C Yard." | | thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 155. During the morning meeting, Dr. Lee reported that although there are 8 MHCB beds in the Correctional Treatment Center, some of these beds are routinely filled by medical patients. As a result, the prison has been forced to continue its use of "overflow" MHCB beds. The Special Master has found that "[s]tandard CTC procedures resulted in heavy use of both types of cells and many overnight stays in large holding cells. Logs of holding cell use maintained by custody and nursing staff were incomplete ... Staff reported that holding cells located in the yards were rarely used after September 2006, but those in the treatment and triage area of the CTC were in use | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| daily and frequently housed prisoner overnight. The holding cells in daily use were stand-up mesh cells." | | Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination. |
| 156.  When I toured the CTC, I spoke with Dr. Chase, the CTC psychologist in charge of the unit. She reported that the MHCBs are always full, sometimes necessitating the use of "overflow" beds, as well as "holding arrangements" consisting of wet cells, dry cells, and holding cages for prisoners who are awaiting admission into the unit. According to Dr. Chase, although the prison houses over 1500 mentally ill prisoners, not all of the 8 MHCB beds are available for mental health prisoners because they are occupied by medical patients. As a result, the prison must sometimes place prisoners in the holding cells for several days or refer them to an outside MHCB unit. Dr. Chase reported that the "dry cells," which are tiny, freestanding upright cages with mesh wiring surrounding them (and no toilet), are used during the day to house suicidal | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners until an MHCB bed becomes available. During the tour of the CTC, there were three men housed in these tiny "dry cells," all of whom were waiting for administrative hearings for involuntary medication orders. At night, those prisoners not already transferred into an MHCB bed are transferred into a "wet cell," one of the four holding cells outside the entrance of the CTC which have toilets. The longest stays that Dr. Chase recalled were from Thursday evening to a Monday morning. Clinical staff also reported that they routinely use "BPT cells" located on each yard for overflow suicide watch. | | |
| 157. In addition, the shortage of DMH beds in the system means that prisoners who should be prioritized for transfer to inpatient care wait for inordinate periods of time. A tragic example was the paraplegic prisoner I saw in the CTC who had been on a hunger strike since July and had been awaiting transfer to an acute DMH bed for several weeks. | Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Argumentative. Mischaracterizes the evidence. Assumes facts not in evidence. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 158. During the morning | Inadmissible Hearsay. | FRE 801(d)(2)(4) -- |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| meeting with the Warden and other staff, I spoke with Vic Brewer of DMH, Executive Director of the DMH operated Salinas Valley Psychiatric Program (SVPP) and Vacaville Psychiatric Program (VPP). SVPP has been expanded by Court order to include two temporary ICF units, D5 and D6, located in Facility D. Mr. Brewer reported on the size of the current waiting list for the DMH Level IV ICF programs which remains high at 111 men, despite the opening of the Court-ordered temporary ICF units at SVSP and two others at CMF (P2 and P3). According to Mr. Brewer, mainline EOP patients can wait up to a year for an ICF Level IV bed. Unfortunately, this problem, too, has gotten worse rather than better since my tour. Thus, in the past nine months since I visited SVSP, the waitlist for the DMH Level IV ICF programs has grown to 173 patients. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. | Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 703 (based upon personal observation). |
| 159. Later in the day I visited SVPP and the temporary D6 unit. SVPP, which is a 64-bed ICF unit, has dedicated treatment space, including group rooms, a dining room, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| recreational therapy spaces, yard areas and some dorm housing. I observed some of the patients walking to their evening meal in a group dining hall area. I also visited D-6, one of the two temporary ICF units that have been placed on Facility D in the prison. Facility D also includes the EOP units and several Ad Seg units. In D-6 the men live in a regular two-tiered housing unit, with a dayroom floor modified to look less like a traditional prison dayroom floor. When I walked into the unit I saw an armed correctional officer stationed in the second floor control room, overlooking the dayroom. Ms. Neil, the Executive Director of the Program, pointed out the armed officer to me and stated that the visible presence of the gunner understandably created problems for a number of the patients in the unit, "many ofwhom are quite paranoid." | opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. Mischaracterizes the evidence. Speculative. | speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination. |
| 160. There are no group rooms or any other treatment space provided for the patients housed in D-6 or in the identical unit, D-5. Staff reported that all treatment occurred on the dayroom floor in a non-confidential setting, which | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

-143-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| creates problems for the patients who can overhear group sessions. Staff showed us an empty room next to the housing unit, which they reported to us had been promised to them when D-5 opened more than a year earlier, space that CDCR would retrofit into several group rooms for the ICF units. To date, no modifications to this room have occurred and all treatment still happens on the dayroom floor. Clinical staff informed me that these units are likely to remain operational until all of CDCR's new hospital beds are constructed; a project which is not slated for completion until 2013 by the Receiver's estimate, and which does not include additional mental health beds that are to be built by CDCR. I found the differences between these two treatment environments stark, and although the clinical staff undoubtedly have attempted to do their best to "make do" with the situation, it was quite appalling that in-patient care was being provided in the D-6 ICF setting. | Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. | employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 161.  During my tour of Facility D where the EOP programs are | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (not offered for the truth, but to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| located, I walked into Building D3 to interview a group of EOP patients. I briefly spoke with some EOP prisoners who were preparing to serve dinner.  These men told me that the EOP program has been locked down quite frequently in the past year and half. The program was on lockdown that day and for several days earlier because the prisoners told me that a piece of a hair clipper was missing.  The prisoners also told me that they are regularly locked down if two EOP patients fight, even if the men resolve their dispute. The men told me that recently the EOP program had been locked down for several weeks because of a fight. When the EOP program is locked down, they said that they do not get yard or group therapy. | Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | provide information about the basis of the opinions); FRE 703 (based upon personal observation). |
| 162.  The problem is apparently a chronic one. Although it has been identified and addressed by others, it has yet to be solved. Thus, the *Coleman* Special Master also found that cancellation of group activities in the EOP interfered with the availability of meaningful structured therapeutic activities and addressed this issue in his Draft 20th Report.  In part in response to this concern, the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| SVSP staff audited this issue and "found during the summer of 2007, most cancellations were for custody or security reasons. In their 21[st] round monitoring documents, SVSP staff listed a number of obstacles to the provision of mental health treatment to EOP patients: (1) insufficient group rooms to see all of the patients ducated for groups; (2) 40% of the structured therapeutic activities are run outside on the yard and when the yard is "down", the program is adversely affected; and (3) significant deficit in available office space for EOP clinical staff (as the EOP Mental Health Building was designed for 25 staff members and currently supports 51). It is noteworthy that SVSP staff reported planning continues for the development of additional treatment space, but "there has been no new construction." Hence, there does not appear to be a solution in sight. | | |
| 163.  In any event, I had an occasion to discuss the magnitude of the lockdown problem with a CDCR staff member later in my tour of another EOP unit. This especially candid sergeant who worked in the EOP program told | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| me that, even in the EOP housing units, the lockdowns had increased over time and were being implemented with the same frequency and based on the same rationale as for the general population of prisoners. She said, "we are locking down a lot more now-its like we aren't analyzing the real threat level-we just lock down." And she pointed to another overcrowding-related dynamic: "The doctors are less frequently in the building now than in the past, so we don't communicate with them enough."  She also believed that the management style at the prison had changed (in a way that also could stem from the overcrowding problems that existed there). Specifically, as she said: Now there is an emphasis on security-we used to be aiming toward programs-it took a while but we did it. But now, over the last years, things have deteriorated.... We had dayrooms, doctors would come over here, they would have "community meetings" and organize activities, TV events, and the guys would really get into it. It stopped a year or so ago. Then the "cave dwellers" emerged-guys who just stay in their cells all the time. | | employment, attorneys for defendants were present; FRE 703 (based upon personal observation). |

-147-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 164.  The lockdowns at SVSP are psychologically costly and directly impact both the *Coleman* class members and the CDCR mental health delivery system itself. For example, I spoke to Prisoner KK, a prisoner housed on suicide watch in the CTC who told me that he was a former EOP prisoner who was sent to SVSP from CSP-Sacramento several months ago, and housed in C Facility. However, he told me he "couldn't handle the stress of lockdown" and tried to kill himself. He spent 8 days at an outside hospital and now was back in the CTC on suicide watch. He had been there for days, sitting in a barren room with only a few books to read, sleeping on a mattress on the floor of the cell. He was adamant about not returning to C Facility but fearful that he would end up there again. I subsequently reviewed portions of Prisoner KK's records which confirmed that he transferred to SVSP Facility C from CSP Sacramento on May 2, 2007.240 Prior to his transfer from CSP-SAC, he had been placed on involuntary medications - through a Keyhea Order - because he was found to be psychotic and a danger to himself and others unless he | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise). |

-148-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was involuntary medicated. In the petition in support of the Keyhea Order, his significant psychiatric history, including psychiatric hospitalizations, beginning at the age of 13, were noted, as well as previous suicide attempts. Despite the involuntary medication order and his significant mental health and suicide attempt history, he was not referred to a higher level of care level and transferred to SVSP Facility C as a CCCMS. His records indicate that he found the lockdown conditions at SVSP very difficult and, on July 16, 2007, he told his case manager that "I feel like I'm going to do something to myself." He asked to be transferred to the EOP in August because "I've been locked down since I've been here." On October 22, 2007, he was brought to the crisis unit because of a suicide attempt. | | |
| 165.  I saw Prisoner KK a few days after his suicide attempt. His medical records show that when he was discharged on November 5, 2007, he was returned to Facility C. By December 2007, he was again expressing problems coping with the lockdowns, and finally on February 13, 2008, his case manager recommended him for | Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2) (admission of party opponent); Relevant to development of expertise; FRE 703 (based upon review of data and expertise). |

-149-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOP level of care. However, he was not transferred to the EOP GP unit, but was rather placed in the EOP ASU, where he remained from February 13, 2008 until April 3, 2008, because no bed was available. During this wait for an EOP bed in the ASU, he was repeatedly reassured "he is not in trouble only waiting for bed space." He told his case manager on April 21, 2008, after transferring out of ASU, that "being on lockdown all the time made me go crazy.," | | |
| 166.  In fact, this case clearly illustrates the interconnected and long-term consequences of prison overcrowding, especially for mentally ill prisoners. Overcrowding helps to precipitate lockdowns at the prison which, in turn, have negative consequences on mentally ill prisoners in particular, some of whom cannot handle the severe stress of locked-down confinement. They may decompensate or become suicidal as a result. The increased suffering of the prisoners notwithstanding, this is another way that overcrowding puts mentally ill prisoners at greater risk and requires the clinical staff to devote more time and scarce | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 703 (based upon review of data and expertise); No hearsay cited. |

-150-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| crisis beds to stabilize them. | | |
| 167. The frequent lockdowns at SVSP also interfere with programming and mental health groups. As one psychiatric technician at SVSP told me, "I'll be running the groups for 2-3 weeks, then, bang, we are on lockdown." Chronic idleness becomes a way of life in the housing units with frequent lockdowns. One C Facility prisoner I interviewed on the tier told me: "My program is to read, watch TV, sit in my cell-I get shower every other day-we haven't even got our packages from our family." Like a number of the C Facility prisoners I spoke to, he was frustrated by the lockdowns and felt that they were taking a toll on him: "I can't handle the stress of being locked up all the time, it's getting to me. I was OK before, but not now." This prisoner, who was on the mental health caseload, had transferred to Facility C four months ago from CSP-Sacramento Facility B where he was programming. He had been locked down since he arrived at SVSP. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Speculation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 803(3) (then existing mental, emotional, or physical condition); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |
| 168. During these extended lockdowns on Facility C, prisoners on the mental health caseload are not provided with | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and |

-151-
PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| increased mental health monitoring, which is required by the Program Guide standards for mental health and non-mental health prisoners in Ad Seg units. Yet the conditions and daily life of these locked down prisoners are no different than Ad Seg. There have been a number of suicides at SVSP by prisoners who were housed on Facility C on lockdown conditions. I have reviewed a number of these CDCR Suicide Reports, and some of them are summarized below. | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Cumulative. | expertise); FRE 801(d)(2) (admission of party opponent); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate. |
| 169. *Coleman* Class Member BB, committed suicide on January 20,2006 at SVSP. He was housed on Facility C and was receiving mental health services at CCCMS level of care. Mr. BB had a history of suicidal ideation and the Suicide Report noted that "[h]e seemed to find lock-down conditions difficult, as he tended to utilize mental health services primarily when he was in ASU, SHU and the modified program." The Report also found that "SVSP-C Facility was under lock-down the entire time that Prisoner BB was there." Mr. BB was seen once when he first arrived at the prison for an initial case manager contact, and once more | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Cumulative. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| a week later for his treatment team. He was not seen again by any mental health staff nor does the existing Program Guide require increased monitoring of mental health prisoners during extended lockdowns. The Suicide Report made no recommendations. | | and are therefore appropriate. |
| 170.  Coleman Class Member GG, committed suicide on August 6, 2005 at SVSP. Mr. GG was housed on Facility C and was not on the mental health caseload at the time of his suicide. He was 20 years old. He arrived at SVSP on June 8, 2004, and was housed in Facility C. The Suicide Report noted that "[h]is facility was in frequent [sic] and prolonged modified lockdowns during his time at SVSP, had been on hard lockdown since July 14, 2005, and no telephone calls or visits were permitted to any prisoners during this time." In fact, the Report noted that: "During the fourteen months that Prisoner GG had been at SVSP, Facility C had been on modified program (i.e., partial lockdown status) for the majority of time. While the total lockdown time was not readily available by record, research did indicate that during May 2005 and until July 14, 2005, there were only | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Cumulative. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| approximately four days (June 17-21) that Facility C was not on modified program." Just prior to his suicide, Mr. GG received bad news about his criminal appeals, and faced life without possibility of parole until he was about 75 years of age. The Suicide Report noted that: "this lockdown situation was difficult for Prisoner GG, who had a lot of family support and contact." | | |
| 171. *Coleman* Class Member FF, committed suicide on January 3, 2005, at SVSP. Mr. FF was housed on Facility C and was on the mental health caseload at CCCMS level of care. He had a history of crisis bed admission and significant mental health symptoms prior to his transfer to SVSP on November 29, 2004. Due to an absent case manager, Mr. FF was not seen during the first month that he was housed on Facility C, which was on lockdown as indicated in the Suicide Report of Mr. FF. On December 27, 2004, Mr. FF set his cell on fire and he was taken to a clinic for a mental health evaluation, which he first refused, but later agreed to. The psychologist noted that he sounded paranoid and set the fire to keep out someone who | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

-154-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was trying to kill him. Mr. FF remained in a holding cell in a clinic on the yard for two days and was eventually moved to a bed in the Ad Seg unit. He was moved back to C-Yard the next day and was seen for the first time by his case manager on December 31, 2004. He committed suicide four days later. | | |
| 172.  Unlike administrative segregation units, where prisoners are guaranteed out-of-cell time (although not necessarily provided all of it) by regulation and are provided with psych tech rounding and enhanced case manager contacts for mental health prisoners, those prisoners housed on facilities like Facility C endure months on end of locked down conditions. My interviews with staff, prisoners and my reviews of these suicide reports confirm that the excessive lockdowns at SVSP are produced by the extraordinary levels of overcrowding at the facility and limited degrees of freedom the staff believes it has in reducing conflict and managing the prisoner population in other less drastic ways. Obviously, these excessive lockdowns undermine the delivery of mental health | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| services and adversely affect the mental health of all prisoners housed in those units. | | |
| 173.  I was taken aback generally at how little the custody staff in the various CDCR institutions I toured appeared to know about which prisoners in their units were on the mental health caseloads- something that would be extremely useful in helping them place the prisoners' behavior in context and watch for signs of decompensation. But this was especially troublesome in the Behavioral Modification Unit (BMU), a pilot program developed by CDCR at several prisons, including SVSP. The BMU at SVSP is located in a housing unit on Facility C-8. The Warden told us in the morning meeting that this unit was not locked down when the rest of the yard was on lockdown status. When we visited the BMU, the officers told us that the unit was created for managing disruptive prisoners and teaching them to program more productively through a step program. The officers said that the men in the program are not provided with any outside yard time until they | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 803(8) (public record); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| have reached Step 3. The Special Master has monitored the BMU and found that "[t]he BMU was locked down, as was the yard on which it was located, which undermined the use of graduated privilege levels ... Inmates were cuffed during mental health sessions." During our tour of the BMU, custody staff reported that it was currently on lockdown status and had been so for several weeks (apparently without the Warden's approval). The *Coleman* monitors who reviewed Central Files during the 18th round tour, "found no factors that distinguished inmates placed in the BMU from those who were not selected." In the draft 20th Report, the Special Master noted that the BMU was not placed on lockdown or modified program status unless an incident occurred within the program. Notably, all of the 3CMS prisoners in the program at the time of the Coleman monitors' site visit were at Step 1. | | |
| 174.  The officers we spoke to in the BMU were unable to identify the prisoners who were receiving mental health services by looking at photos and lists of prisoners. I asked | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| one of the officers to identify several prisoners who had been at Level I for the longest time in the BMU and he provided me with three names. I looked up these prisoner names on a list of SVSP prisoners on the mental health caseload provided to me by staff, and two of the prisoners were CCCMS; they had been Level I (without any outside yard and limited phone privileges) since the summer of 2007. Needless to say, any meaningful, effective, and humane prison behavior modification program depends on a prisoner being able to comprehend the contingencies that are being imposed on him and also assumes that the prisoner possess the capacity to control his behavior enough to meet them. It was unclear to me whether the BMU program that is being applied to some Coleman class members is one that they are able to function productively in. | Evid. 703. Lack of foundation. Mischaracterization/Argumentative re: "caged group therapy session." | speak with expert about matters within their employment, attorneys for defendants were present, FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); no cages mentioned. |
| 175. One of the psychologists who accompanied us for part of my tour of SVSP told me that his ASU caseload was about 50-a figure that he characterized as "too many" because it made it impossible to see them all on schedule. He also told me that "we want to hold CCCMS | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Mischaracterization/Ar | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys |

-158-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| groups but we have no staff, no space, and no escorts." Prisoners in a caged "group therapy" session taking place in the D Yard ASU told me that they were given a choice each day whether they wanted to go to group or to yard, but not to both. They also complained about a lack of mental health training and responsiveness on the part of the custody staff: "Sometimes we feel depressed in our cells. We tell the officers, but they ignore us. They tell you they want to see blood, or they tell you, 'we'll give you the rope.'" Prison staff reported during the 21st round monitoring tour that only 50 to 60 percent of the prisoners in administrative segregation were provided with confidential out-of-cell case manager meetings. The obstacles to providing these confidential out-of-cell clinical meetings included "limited space available for confidential out of cell interviews," staff coverage during vacations and absences, and tight scheduling in the Ad Seg units. | gumentative re: "caged group therapy session." | for defendants were present; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self. |
| 176. One of the rooms that I saw at SVSP that was set aside for the caged "group therapy" that takes place in the ASU was truly degrading. The | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis | FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to provide information |

-159-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| room in which some 10 or so therapy cages were located appeared to be a laundry room, with huge trays of laundry in the background and large storage shelves-a large, dirty industrial or factory-like setting that the caged prisoners looked out on during their sessions. In addition, the cages themselves were filthy, with rusted metal and graffiti on the sides of the cages and the tops of the small tables inside. A prisoner who was being held in one of the cages, presumably waiting for the rest of his "group," told me: "I'm just in a cage back here [in ASU]-I've been kept here for several weeks but had no yard, no group, no nothing." The Special Master noted the EOP high refusal rates for group therapy and described the group therapy rooms where "[i]n one of the two rooms ... cells were arranged in a straight line ... [i]n the other room, noise from nearby machinery was problematic." | for opinion.  Fed. R. Evid. 703. Lack of foundation. Mischaracterization/Argumentative re: "caged group therapy session." | about the basis of the opinions); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self. |
| 177.  In another similar unit, a custody staff member told me that he could not run the yards for prisoners on the appropriate schedule because he simply lacked the manpower with which to do it: "I don't have single escorts to run the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| psych, doctor, CTC escorts. I don't have the staff. I am short at least 2 officers." This unit also lacked appropriate treatment space for *Coleman* class members to receive their mandated clinical contacts. They had only two holding cages near the entrance to the housing unit, and an individual office that contained another cage inside it. | Mischaracterization/Argumentative re: "exercise cages," "individual cages." | employment, attorneys for defendants were present; FRE 703 (based upon personal observation); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self. |
| 178.  I visited D-8, an Ad Seg housing unit where the majority of prisoners are CCCMS. I spoke with the Sergeant, who discussed some of the problems that he faces in the unit because of staffing shortages and the inadequate number of walk-alone yards for Ad Seg prisoners. This Sergeant described how the majority of prisoners in his unit were on walkalone status, but there were no walk-alone yards on his yard. (The "walk-alone yards" are actually outdoor exercise cages.) He explained that in order for the men on walk-alone status in his unit to receive outside exercise, they have to be placed in restraints and waist chains, escorted out of their cells and out of their housing unit, and taken by correctional officers all the way to another yard on Facility D, where they | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

-161-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are put in individual cages and allowed to exercise. When their exercise time is over, they are chained up again and escorted back to their unit and into their cells. He stated that he needed additional correctional staff in order to run the yard, medical, mental health and the regular Ad Seg program. | | |
| 179.  A disturbing suicide occurred in the Ad Seg unit, D2, on January 10, 2008, when a 3CMS prisoner hung himself from the top bunk of his cell.268 This prisoner was housed for a long period of time in the harsh conditions of Ad Seg and had "become more isolative and withdrawn, refused out-of-cell contacts" as the months passed and his promised transfer from Ad Seg to SATF general population did not materialize. He refused to come out of his cell for treatment and other activities. Progress notes documenting the last two cellfront visits with his case manager were missing from his medical records. When he was discovered by custody officers, CPR was not initiated immediately and according to the records, when the watch commander requested medical assistance via radio from medical staff in Facility D, the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Speculation as to time frame. | FRE 801(d)(2) (party admission); FRE 703 (based upon data reviewed and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| records note: "Be advised, medical staff are refusing to respond." Other problems were identified in the Suicide Report, including the fact that this prisoner was transferred in error from Lancaster back to SVSP where he had been charged with attempted murder of an officer and remained there until his death. Overcrowding contributed to the problems identified in this tragic case: his transfer to his endorsed prison was delayed; classification mistakes were made when he was returned to SVSP; this decompensating prisoner was retained in Ad Seg with little intervention by clinical staff; and, custody and medical staff failed to appropriately and timely respond to the emergency. | | |
| 180. I requested to interview approximately ten randomly selected mental health prisoners housed at SVSP. Due to some difficulty scheduling the interviews around the prisonwide lockdown and mealtimes, I was able to only interview one of the prisoners on my list, Prisoner LL. It is my understanding that some of the prisoners on the list were interviewed by plaintiffs' expert, Dr. Pablo Stewart. This EOP | Inappropriate basis for opinion. Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoner I interviewed was floridly psychotic and appeared to be in a considerable amount of psychological pain. He had an elaborate delusional system that he shared with a great sense of urgency. He appeared genuinely convinced that his life was in danger at the prison, from both staff and other prisoners, and he urged me to help save him. When I asked the Senior Psychologist in charge of the EOP program about his status, however, he seemed relatively unconcerned. "He's on a DMH referral list," he told me, "and he's stable, we're watching him, we will have gone through the motions, we're covering ourselves, and we don't know what else anyone could do." He knew of no treatment plan or course of therapy that was being implemented in the case, just "manage symptoms, keep him safe, that's all we can do, he's fending for himself adequately." Based upon the information provided in the morning from Dr. Brewer, Director of the DMH inpatient program, SVPP, it is clear that this floridly psychotic EOP mainline patient will be required to wait for many months to a year before he transfers to an appropriate in-patient level of care. I also understand that Dr. Pablo | | |

[253560-1]

| | Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| 4 5 6 7 8 9 10 11 12 13 14 15 16 17 18 19 20 21 22 23 24 25 26 27 28 | Stewart recently interviewed Prisoner LL him during the site inspection that he undertook on July 29, 2008. Dr. Stewart concluded that Mr. LL was floridly psychotic and had strange ideas of reference. Dr. Stewart concluded that Mr. LL needs inpatient level of care as evidenced by his clinical presentation and his multiple crisis bed admissions since 2007. I have also reviewed the DMH Report on Monthly Bed Utilization for June 16,2008, which lists Prisoner LL on the report - he was referred to SVPP on September 27,2007, his referral was received on December 3, 2007, he was accepted and placed on the waitlist on January 22,2008 and his referral was finally rescinded on May 4, 2008. Since his acceptance in the DMH program, this EOP patient has requested that he alternatively not transfer to DMH and to be placed on the mainline at 3CMS level of care. He was on a modified EOP program receiving one group a week; but appears to have a full EOP group schedule in the past two months. His long wait for an ICF bed - more than six months before the prison rescinded his referral- was similar to the timeframe | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| suggested by Vic Brewer, Director of SVPP, when discussing the transfer delays for GP EOP patients accepted into the program. The current waitlist of 173 patients for the existing 176 beds at SVPP makes it unlikely that a floridly psychotic patient such as this EOP patient would ever transfer to the ICF program. | | |
| 181. I toured Mule Creek State Prison on November 2, 2007. The facility was operating at over 200% of capacity the day I was there, with some 3800 prisoners confined in a prison built for 1700. Nonetheless, the warden was adamant the prison was not crippled by the overcrowding-"it is what it is, and we do a great job at this prison," he said. When pressed to explain when and how he would know if he had too many prisoners at his facility, he replied that "I've never gotten a bus where I didn't have space somewhere and I had to leave them [the prisoners] on the bus" and talked about being able to "sandwich them in" at the prison somehow. The prison houses Level III and IV prisoners, close custody Sensitive Needs Yard (SNY) prisoners all with special vulnerabilities of some kind, and a large number ofEOP and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 703 (based upon personal observation);FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| CCCMS prisoners. The Special Master reported that as of January 2007, MCSP's overall census was 3,966, of whom 1,530, or 39 percent were part of the mental health caseload. Mule Creek's prisoner population also has not decreased appreciably since my tour of the facility. On July 30, 2008, its population was 3,681 prisoners, still over 200 percent capacity of its design capacity of 1,700 prisoners.271 The June 20, 2008 monthly data provided by defendants listed the MHSDS population at 1694 (1161 3CMS, 525 EOP and 8 MHCB). Thus, although the prison census was reduced by several hundred prisoners between January and June, 2008, the MHSDS caseload grew by 164 prisoners. | | |
| 182.  Given the large numbers of prisoners on the EOP and CCCMS caseloads, the inadequate amount of appropriate treatment space at the facility was especially troubling. For example, the area that served as the A Facility OHU (which also serves the B Facility EOP population, which does not have an OHU of its own) was wholly inadequate, consisting of a row of cells behind a chain link fence on one | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Speculation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether |

-167-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of the cellblocks. The nurse on duty in the unit informed me that the OHU is often filled, although on the day I was there it held only two prisoners. The inside of the OHU cells was filthy, depressing, and bare-converted Level IV cells that were dimly lit, and afforded prisoners only a thin mattress on the floor. | | statement is mischaracterization, speculative, or argumentative. |
| 183.  One of the prisoners I interviewed, Prisoner MM, later told me what it was like to be housed in this facility: "I went on suicide watch to the OHU. They threw me in the cell, they strip you, put you in a blue gown, mattress on the floor. I stayed there for several days like that.  Nobody was watching me or helping me ... I was behind a cage, nobody was watching me-the room was cold, then they sent me to the CTC, and I didn't get anything but the cold cell there either." I reviewed portions of Prisoner MM's records after I nterviewed him on the tour. He had transferred to MCSP on April 18, 2007 after treatment at DMH-Vacaville for a serious suicide attempt. He had several OHU and crisis bed admissions at MCSP, primarily related to forced double-ceIling at MCSP. During his first admission, he | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 801(d)(2) (admission of party opponent); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was placed in the OHU from June 19 until June 22, 2007, at which time he was transferred to the MHCB.  During the four days he was housed in the OHU, he was observed on suicide precautions, and after his transfer to the MHCB on June 26, 2007, he remained on precautions until he was discharged with a recommendation that he be provided with a 2 week temporary single cell chrono. On July 3, 2007, nine days later, custody staff tried to force him to take a cellmate despite the chrono, and when he refused, he was placed in segregation. Again, on July 18, 2007, he was issued a rules violation for refusing to double cell. According to the report, "11M said that he would just go back to Ad-Seg because he couldn't deal with all of this. I again ordered 11M to move and again he refused. At this time I placed 11M in mechanical restraints (handcuffs).,m9 There is a clinical summary for the Ad Seg classification committee that notes that "11M's claim at single cell status is correct. There is a note in UHR dated 6/26/08 signed by Dr. Riley, "single status x 2 wks." His clinician wrote several chronos on his behalf recommending | | |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| single-cell status, yet custody staff was unwilling or unable to honor these chronos. On October 12,2007, he filed an administrative appeal requesting single cell status and attached a chrono from an EOP clinician describing why he required single cell status, but his appeal was denied. On January 17,2008, his case manager wrote: "Mood anxious, agitated, tearful affect; it seems in the best interest of patient and peers that he be placed in a single cell ...He continues to consider requested Ad Seg placement in order to be alone as he does not want to harm others while struggling with overwhelming emotions and memories." On January 31, 2008, he met with his case manager and told him that another prisoner had been moved into his cell the night before. He was.quite agitated and his case manager referred him for admission to the OHU.," He reported to clinical staff that he was not suicidal, but that "I need a single cell or 1might hurt someone.," He was transferred from the OHU to the CTC where he remained for two weeks until he was transferred to CMF Vacaville's acute program on February 16, 2007. | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Custody staff at Mule Creek repeatedly over-rode clinical recommendations that this fragile EOP patient have a single cell which was likely a contributing factor in his decompensation and resulting referral and transfer back to the DMH acute program, which has a waiting list for these scarce beds. | | |
| 184.  The EOP treatment area in A Facility was short on space. Staff told me that they would hold more groups if they had the space to do so. I was told that the clinical staff shares offices and handle large caseloads. Even so, general population prisoners are not given opportunities to participate in groups. A prisoner in one the groups that I spoke with said "we are packed-people aren't getting the help they need. There's just not enough programs, and there are a lot of guys here who can't function but aren't getting any help." Another one told me that many CCCMS prisoners are concerned that, if they appear to function too well, they will be pushed out of the groups, because there are so few of them and the spaces are reserved for the least functioning prisoners. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 185.  At the CTC staff told me that "we are always full here." When there are overflow prisoners, they are sent to the A Facility OHU that I described above. The staff indicated that there have been times when there were so many prisoners in crisis that they not only filled the OHU but had to look for additional alternative space to house them. The longest delays in transferring prisoners from the CTC occur for those who are awaiting DMH transfers (for which the wait has been as long as 45 days). | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Argumentative re: Attorney General statement. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); no attorney general statement cited. |
| 187.  In fact, the psychologist who accompanied me on the tour spoke candidly as we left this area. She told me that her clinical staff is very concerned about their ethical and legal and professional standards being compromised, "the staff is doing its best, but... as a clinician, this is a very, very serious situation- you know what I mean." When I asked her if she would elaborate, and tell me how overcrowding was affecting the staffs ability to "ethically, legally, and professionally" do their job, the assistant attorney general on the tour informed me that I was not allowed to ask such a question. "If you want | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Specualtion. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| her opinion on that, depose her," as she put it. | | |
| 188. It was obvious that one of the overriding concerns among the clinicians was the quality of treatment that they could provide under the conditions that prevailed at the prison, given the lack of usable and appropriate treatment and office space, staff vacancies, and the overwhelming numbers of prisoners. Many of the treatment areas I saw at Mule Creek lacked even a modicum of privacy and, even when there were cubicles and partitions, it was possible to overhear what was being said. For example, two groups were underway when I entered the B Annex and the prisoners were talking in hushed tones, presumably in an unsuccessful attempt to keep the content of the group confidential. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. | FRE 703 (based upon personal observation); No hearsay cited. |
| 189. Prisoners on the MHSDS caseload are housed in the "non-traditional" beds, which include dayroom and gyms with triple bunks. The makeshift gymnasium dormitory on B Facility is similar to those at the other prisons I visited, except that there are triple bunks, and all levels are filled with prisoners. Staff reported that | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| there are three gyms filled with these bunks at MCSP. The correctional officer on duty in the B Facility gym told me that they tried to insure that only about a third of the prisoners were in the dorm at anyone time, except for count and when everyone returned to the dorm in the evening. Prisoners who feel they are unable to tolerate dormitory housing like this can request an exemption; however the correctional staff member and the clinician who accompanied me on the tour both agreed that it was rare that such an exemption would be granted, in part because there were too few alternative housing spaces to accommodate them. | | for defendants were present; Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 190.  Just as with the other gymnasium dormitories, there were obvious security concerns and blind spots throughout the unit. Prisoners have clothing and towels draped down the sides of their bunks in an attempt to create minimal amounts of privacy, but this also means that it is impossible to see what is taking place almost anywhere in the unit. The correctional officer overseeing the dormitory from the raised guard station told me, "we can't see very well from up here. We | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present Relevant to existence of overcrowding and problems caused |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| have to rely on informants" to know what is going on in the unit. He also told me that there are too many people for correctional staff to monitor or be sensitive to: "we have to rely on other prisoners to tell us that their bunk mate is not handling it well." | | thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 191.  In another of the makeshift gymnasium dormitories, a female staff member told me that "the biggest problem is too many people and not enough space. There's a guy in here who has been in 23 years. He has lots of stuff, but where will he keep it? There are blind spots all over here. It is dangerous for staff and prisoners. Triple bunking has made a difference. You just can't see any place. When you go back there [pointing to the far corner of the gym] even the gunman can't see us. It gets really, really hot [in the summer] and the swamp coolers are ineffective." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 192.  A number of the housing units had makeshift dayroom dormitories in them, with rows of triple bunks where several dozen "extra" prisoners were housed in the unit. Among the many indignities that this kind of housing imposes, prisoners complained that there was only | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Relevant to existence of overcrowding and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| one toilet for some 20 prisoners (located in cells that were set aside to serve as bathrooms for the prisoners on the dayroom bunks). They told me that the line after breakfast was especially long, and prisoners who have to urinate badly or have problems with bladder control have a difficult time managing the wait. Prisoners also explained that, although they are allowed to use the dayroom tables until 9 PM, they are not allowed to be on the dayroom floor after that. Essentially this means that they are confined to their beds from 9 PM until the morning. Not surprisingly, prisoners on the bottom and middle bunks had an especially difficult time with this. | Lack of foundation. | problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 193.  A prisoner in one of these makeshift dayroom dorm beds told me that he was a Level IV CCCMS prisoner who could not handle the stress of this kind of housing: "Because I can't take the pressure I have gone off on people-living in a gym or dayroom, having to deal with all these people-I told them that I was being placed at risk." After living in one of the gym dorms, he was attacked by another prisoner. He told prison officials that "if you put me back in the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| gym, I'm not going to handle it." In response, he was sent to a triple-bunked dayroom dormitory instead. | | |
| 194. One of the prisoners I interviewed spoke eloquently about the problems prisoners at Mule Creek confronted: "Since it's gotten crowded, you can't get the help you need. They tell you they don't have enough staff-so you get so frustrated, you don't think anybody cares, so you feel even more hopeless." He also told me that the groups that are being run there are predominately recreation time. "We get 4 hours of core group a week. The rest of the group is just recreation. You just go out to the yard with your group and shoot baskets." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation). |
| 195. Building 13 was one of the most bizarre housing units I have ever seen in a maximum or medium security prison. A tall, chain link fence divides both floors of one section of the unit, ostensibly into Ad Seg cells on one side and reception cells on the other. However, the Ad Seg population in the unit continues to grow, so MCSP has had to "convert" some of the standard cells for Ad Seg use. As the Sergeant in charge of the unit explained: "We are really | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| struggling here with the layout. We have people in Ad Seg cells that don't have food ports, we don't have grill gates on some of the showers, so these guys have to be escorted when we take them out of the unit. .. We have huge problems with suicide prevention because we don't have enough officers." The officer shortage is intensified because the Ad Seg prisoners in the cells without the food ports require an entirely separate and elaborate procedure in order to be fed, one that ties up at least two officers for a considerable period of time, simply because of the shortage of appropriate cells. | | problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 196.  The Receiver's staff observed problems in conjunction with the anomalous arrangement in Building 13, as described in its MCSP Operational Assessment, conducted after my tour of MCSP:<br>In the ASU Overflow, LVN's distribute medication by sliding pills under the door because there is no designated custody officer to open the food/handcuff port. . .. The doors in Building 13 have not been retrofitted to prevent "fishing," which has allowed GP inmates who are housed in the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. Mischaracterization/Argumentative re: "treatment cages." | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon review of data and expertise); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| building to introduce serious contraband by throwing razor blades over the chain link fence which are then "fished" into one of the cells. The Receiver's staff rightly noted that "[t]his practice places the nursing license at risk and creates a serious security concern because of the potential for hoarding controlled medication. | | mischaracterization, speculative, or argumentative. |
| 197.  The configuration of Building 12 was almost as problematic, but for different reasons. Clinicians have "offices" that sit completely out in the open on the dayroom floor of the housing unit, and a semi-circle of treatment cages stands against the wall behind them. Even though there are cubicle panels that create what appear to be semi "private" offices, much of what goes on in the treatment area is completely visible to the prisoners in the unit, especially to the prisoners on the second tier of the unit. Indeed, the treatment cages actually face the cells. There is a large EOP and CCCMS population in the unit and it is very noisy, with prisoners yelling across the unit. The noise and shouting (and sometimes the taunts) of the other prisoners are pervasive | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and distracting. The psychologist who accompanied me acknowledged that the atmosphere is utterly incompatible with effective treatment, but stated that the staff was doing the best they could under the circumstances. | | |
| 198. Prisoners noted that there were a lot of lockdowns at the facility, and that they appeared to be increasing. Despite being a prison that houses predominately SNY prisoners, there were a total of five emergency alarms on the day I was there (either prison-wide alarms or alarms within the individual unit that I was touring). During these alarms, all prisoners are required to get down on the ground until the emergency is cleared. In addition, the interviews I had scheduled at the end of the day were interrupted by a medical emergency in which a prisoner had to be evacuated to a hospital by helicopter. When I asked a correctional officer involved what had happened, he said, "hanger-guy threw himself off a second floor tier." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 199. Here, too, the observations of another independent observer-in this instance, the Plata Receivership-are worth | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); |

-180-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| quoting at some length, in part because of the high level of corroboration his assessment provides about the many overcrowding-related problems I described above, and also because the observations and related concessions by institutional staff actually post-date my visit to the institution. Thus, the Receiver's MSCP Operational Assessment and Facility Master Plan Report, conducted December 18-20,2007, documented many of the same serious overcrowding-related problems that I identified when I toured the prison a few months earlier. Despite describing MCSP as "one of the most manageable institutions to be found anywhere within the State of California," and having a staff that "obviously[takes] great pride...in the institution,"the Receiver identified a number of serious overcrowding-related "barriers to care" for the prisoner/patients housed there. The facility was operating at well over 200% of capacity (designed for 1700, it housed 3644 at the time the Receiver inspected it). In addition to the overall level of overcrowding, the Receiver noted that Mule Creek was tasked to "provide mental health services for an | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| ever increasing caseload of seriously ill inmate/patients," in programs that had "expanded exponentially over the last year to include 560 EOP level of care inmate/patients, and 1093 inmate/patients at the Correctional Clinical Case Management Services (CCCMS) level of care. A 6-page portion of the Receiver's report (pages 10-15) was devoted to the mental health program at Mule Creek and it documented numerous, continuing overcrowding-related problems. | | |
| 200.  The initial portion of the Receiver's assessment of mental health treatment needs was based on observations provided to the team by the Chief of Mental Health Services, who told them that there was "an immediate need to expand services" to EOP inmate/patients at Mule Creek "in order to provide 10 hours of therapeutic services as required under the Coleman Program Guides." He noted several instances in which custody staff shortages prevented needed mental health services from being delivered, including the lack of escorts to bring prisoners to the new group therapy modules that were being opened | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and the need to expand the mental health services offered to Coleman class members (to bring them up to the Program Guide-mandated amounts). Indeed, he emphasized that "the only barrier to initiating these programs was the lack of custody coverage. | | Response to Defs.' MIL 1 (re: prison conditions). |
| 201. The Receiver expressed a number of overcrowding-related concerns with respect to the Ad Seg (ASU) at Mule Creek, concluding that "[t]he ASU at MCSP, like health care access points in many institutions, has not been resourced sufficiently with custody escort personnel to meet operational requirements," and recommended additional officers be assigned as "Health Care Access Escort Officers." These were not the only personnel-related shortages. For example, the Receiver also noted that "[t]here were similar custody shortages noted in the ASU Overflow." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 202. The Receiver also noted that the "high volume of inmate/patient health care access contacts" in the Central Health Building at Mule Creek was not supported by sufficient correctional officer staffing and supervision, and the Review team "was surprised to discover | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| that there is currently no dedicated custody staff assigned to provide supervision and escort of inmate/patients to and from the housing units. | Lack of foundation. | problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 203. The Receiver's conclusions and recommendations about access to the proper levels of care addressed several overcrowding-related problems, including what were described as "serious space deficiencies for clinical staff, and the insufficient correctional staffing levels in the mental health program at the prison. Thus, despite having a mental health program that was "extremely well established," it was compromised by staff shortages-so severe that they necessitated the use of so-called "inmate aides" (prisoners who were given the responsibility of providing "prompting and support for inmate/patients" by determining if they are present in their cells and want to attend scheduled EOP clinical services). As the Receiver concluded, "the current system appears to create significant barriers to care. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 204. The January 25, 2008 Facility Master Plan Report developed in response to the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | Receiver is knowledgeable, Court appointed; see also FRE |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| assessment repeated many of these overcrowding-related themes. The Report recommended that, "[i]n order to adequately service the needs of the inmate populations at the yard clinics and reduce the overcrowded conditions that currently exist... Facility Clinics in Yards A, B, and C need to be enlarged. The Administrative Segregation Unit received special attention. It noted that "[h]ealth services staff are currently operating out of a small kitchen space," and that "[t]here are no designated medical exam or mental health treatment rooms," so that "custody staff must escort restrained Ad Seg. Inmates out of the Ad Seg housing unit" through the C Yard to the general population clinic where, because "[i]t is necessary to isolate the Ad Seg Inmate during the entire exam process, in essence closing down both the access path and the Clinic" while the Ad Seg Prisoner receives treatment, "in order to avoid any possibility for an altercation to occur. A timeline was provided in the MCSP Facility Assessment and Plan for the overall project, which included Legal Approval for the project by May 3, 2008. If this had occurred by May 3rd and all | Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | 803(8) (public record); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of the component projects are completed on schedule, overall completion of the Plan upgrades is projected by March 2009. However, in the Receiver's Eighth Quarterly Report, on July 17,2008, he noted that there is a motion pending regarding the upgrade proposal for Mule Creek State Prison. Thus, it appears that the timeframe for this project has been delayed. | | |
| 205. Mule Creek's own "Space Needs Survey," compiled by prison staff and signed by the Warden more than two years ago, on March 22,2006, acknowledged that "[d]etermining space and staffing needs is very difficult to speculate as our inmate Mental Health population is constantly changing, creating immediate staffing and space deficiencies. The Warden expressed two additional, interrelated overcrowding concerns: that the "[c]urrent overcrowding packages provide temporary relief' that may evaporate "due to population fluctuations," and the fact that, given continuing operation at over 200 percent of capacity, "our existing infrastructure is unable to support proposed growth projections." Apparently, the concerns with respect to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Vague/ambiguous re: "capacity." | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| adequate water, waste, and electricity were identified years earlier in previous proposals from the prison "but have not been funded or scheduled. | | |
| 206.  I toured SATF on July 28, 2008. SATF is located in the Central Valley of California, south of Fresno. During the morning meeting, staff reported the prison census for July 28,2008 at 7,193 prisoners, which was well over 200% capacity for this prison built for 3,424.301 The population on the CDCR website for the week was listed at 7,156, or 209% of capacity.302 SATF is a large, sprawling prison. In fact, we were told that it is physically the largest prison in the world, with buildings that stretch out some 1.5 miles long-and that it is the world's most populous. It also may have the dubious distinction of holding the greatest number of prisoners beyond its design capacity; on the day we visited it, SATF housed some 3700 more prisoners than it was built for. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 201 (judicially noticeable). |
| 207.  SATF is comprised of seven separate facilities, a Correctional Treatment Center with 16 licensed mental health crisis beds, and two administrative segregation units, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff |

-187-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| including a stand-alone Ad Seg, where mentally ill prisoners cannot be housed. The prison houses several different custody levels and its housing types range from cells to large dormitories. On the day of our tour, prison staff also provided us with a packet of documents that included: an MHSDS census by yard and level of care, treatment space schedule by day of week and yard, MHCB admission/discharge report for April 1 to July 25, 2008, MHCB log for July 28, 2008 and a list of EOPs at SATF, including their length of stay, endorsement status and comment field. I have reviewed these documents. Prison staff reported to us during our tour that there were a total of 157 prisoners housed in the stand-alone Administrative Segregation unit and 136 prisoners housed in the regular Ad Seg unit, which is located in EI (the vast majority of which were on the mental health caseload). SATF does not have an EOP program, which means it is not staffed for EOP patients and does not have treatment space allocated for EOP programming. Prior to the day of the tour, the prison staff provided us with MHSDS data reporting that approximately | Evid. 703. Lack of foundation. | interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 1380 3CMS and 35 EOP prisoners were housed at SATF on July 21,2008. On July 28,2008, eight of the 35 EOPs at SATF had been waiting at least 100 days to transfer to an EOP program. Almost half of the EOPs had been waiting more than 60 days, including a significant number of EOPs housed in Ad Seg (who should have been transferred to an EOP HUB within 30 days). According to SATF's own EOP List, the reason for these delays in transfers was the lack of EOP beds system-wide. | | |
| 208. In the draft 20th Report, the Special Master noted that the EOP population at SATF had rapidly expanded at SATF by October 2007 "[t]he number of EOP inmates awaiting transfer continued to increase, growing from eight in September 2006 to 16 in April 2007 and then reaching 23bytheend of October2007. During the 20th round of monitoring,SATF also experienced difficulty transferring EOPs within transfer requirements and "[t]ransfer delays were attributed by staff to the system-wide shortage of Level III and Level IV EOP beds, and in particular the lack of SNY beds | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| at MCSP and EOP hub beds at CSP/Corcoran. According to the Special Master (and confirmed by SATF staff on the day I toured), SATF follows a practice of dispersing EOPs throughout the immense prison. (We were driven in golf carts from unit to unit at SATF during the tour.) As the Special Master noted, this negatively impacts the ability of mental health clinicians to provide EOPs with a weekly case manager contact. Yet the practice persists. | | |
| 209. During our orientation meeting, SATF administrators reported that their mental health program was fully staffed, although they still made some use of clinicians from the registry (several psychologists and 3.5 psychiatrist positions). However, the increase in staffing has created corresponding shortages in space; we were told "we don't have enough space for all the new folks we've hired." In the staffing data for June 2008 provided by Division of Correctional Health Care Services, SATF reported 6 clinical vacancies, with only 2 of their vacancies covered by registry clinicians. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 210.  We were also told at the orientation that there were treatment spaces in all of the various interconnected facilities that comprise the SATF complex. In addition, however, the institution submitted plans about a year ago that would have authorized fairly significant additional mental health treatment space to be constructed on each of the yards and in the Ad Seg. Unit located in E_l. The acting chief psychologist acknowledged that they have not heard a word back about the fate of the proposal since it was submitted. Obviously, there has been no additional construction. He told us that "we need to be doing more groups, and the proposed treatment modules would allow us to do this." In fact, despite its enormous size, the institution is pressed for space. Chief Deputy Warden Allison said that they were "looking at our two vacant gyms"-not for use as gyms but rather as "interim treatment spaces to be converted." In fact, SATF already utilizes chapel areas and some space designed for hobby craft in the prison for mental health treatment. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent). |
| 211.  Acting Chief Psychologist Coffin told me that "because we are making use of spaces not | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| originally designed for treatment, we are limited even more in the summer months." That is in part because some of the areas that they have converted for use as treatment spaces are too hot in the summer, and also because they cannot effectively utilize the yard areas for everyone because a number of prisoner/patients are on heat sensitive medications. | Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Argumentative. | interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 212. The space limitations have resulted in a dispersal of clinical offices and treatment spaces to less than ideal areas of the prison. Thus, rather than intelligently and efficiently planning the creation of appropriate clinical offices and treatment spaces, the staff has been forced to utilize wherever space it can convert for clinical use. Among other things, for example, I was told that the Ad Seg clinicians have their offices in A Yard, at another part of the prison, even though they are supposed to service prisoners in the Ad Seg unit. Obviously, this limits their access to prisoner/patients in their housing units. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present FRE 703 (based upon personal observation). |
| 213. Dr. Jesus Juarez, the CTC supervising psychiatrist, told me | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 801(d)(2)(4) -- Admission of party |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| that the prison actually does have staff shortages, and needs more staff personnel in order to function properly. Some of the staff shortages impact little things. For example, he mentioned that he had recently been provided with a computer to use at SATF but there were no technical staff available to connect it. Other staff shortages pose more serious problems. Dr. Juarez told me that "we are short of psychiatrists. We need more. The six we have are not enough." Dr. Juarez went on to explain that his staff is always very busy in the CTC. He said that the MHCBs at SATF are always full. If they aren't filled with SATF prisoners, "then Sacramento sends us people to fill up." They need more clinical staff to meet these needs. | Hearsay within Hearsay. Fed. R. Evid. 805. | opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon review of data and expertise). |
| 214. Dr. Juarez was also emphatic that office and treatment space are "at a premium here. I am sharing an office with three other doctors, plus I have to see patients there. I have to do dictation when the other doctors are working there. If I get another psychiatrist I'll have to put him in there too. And we run a group in there. We don't have enough space here..." In addition, he told me, the same room "multi-purpose" | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Mischaracterization/argumentative re: "treatment cages." | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Relevant to existence of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| room-is used for IDTT in the CTC. | | overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); no reference to "treatment cages" cited. |
| 215. The issues of appropriate space and available staffing came up again and again. The Triage and Treatment Area ("TTA") is outside of the CTC. I was told that prisoners who appear to be in a mental health crisis are first brought to the TTA, where they are put in a treatment cage-referred to here as a "safety cell"-that sits in the corner of the room. The prisoner stays in the cage until a psychiatrist can assess his condition. However, the TTA nurse told me that, when there is no psychiatrist on site, a suicidal prisoner could stay in the cage overnight, with a custody staff member sitting in front of the cage, observing the prisoner throughout. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Vague and ambiguous. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative; Further clarification is available through cross-examination. |
| 216. At the SATF orientation we heard about a chronic problem that continues to plague CDCR facilities-EOPs who have been endorsed for transfer to more appropriate programs and levels of care but cannot be moved because of the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| shortage of bed space. Thus, we were told: "the hubs are always full. We call every week-CMF, Corcoran, Salinas Valley-they are all full. We try to get them out, but there is no room anywhere and it takes months sometime." The Acting Chief Psychologist told us that their program for the EOPs is to have them seen once a week by a case manager, once a month by a psychiatrist, and daily by the psych techs, if they are in Ad Seg. However, they are unable to provide their EOPs with group therapy or other enhanced services during their prolonged stays at the prison. The prison staff acknowledged to us in the morning meeting and during the tour of the prison, that they made no effort to house the EOP prisoners in a single building on a yard in order to enhance the monitoring, safety or clinical care provided to these patients. In face, we observed EOP prisoners scattered in many yards throughout the prison. As a result of the extended stays at SATF and the limited mental health treatment provided to these EOPs while they waited for transfer, many of them were being admitted to the MHCBs for stabilization, often more than once.310 In fact, 15 of the 35 EOPs who | Argumentative. | employment, attorneys for defendants were present; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-195-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| were at the prison when we toured, had been admitted to the MHCB at least once, and 9 had multiple admissions. | | |
| 217.  SATF has a CTC that is licensed for 14 mental health crisis beds that they have expanded to 18, although four of the beds still require retrofitting to ensure that they are safe for suicidal patients. The Chief Psychiatrist noted that all of the beds in the CTC are "flex" beds that can be converted to an MHCB. The staff reported that during a shortage of MHCBs, they are able to send medical patients out to nearby hospitals to open up bed space for mentally ill patients when they are determined to be in crisis. As I noted above, the CTC is "always full." In fact, on the day of our tour, the majority of the MHCBs were filled with patients from other prisons, including prisoners from DVI (4), Centinela (2), and CSP-Sacramento (3). Once again, the staff acknowledged that "DMH beds are very, very scarce," and suggested that the wait to transfer typically lasts a minimum of 30 days. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Speculative. Argumentative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 218.  In addition to the impacted space and treatment resources in | Inadmissible Hearsay. Fed. R. Evid. 802. | Special Master is knowledgeable, Court |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the CTC, and the chronic problems with effectuating DMH transfers, SATF appeared to be running a very limited program for its 3CMS prisoners. The Special Master described SATF's inability to provide an adequate 3CMS program to be related to the prison's limited "success at recruiting and retaining clinical staff." During the 20th round monitoring period, "[c]hronic staff turnover clearly compromised 3CMS services. The Acting Chief Psychologist acknowledged to me problems with staff retention but stated that he hoped they would be more successful with the new staff hired. Another staff person during the morning meeting reported that staff retention problems were related to their hiring of unlicensed psychologists who would leave after they completed their necessary hours for licensing. When I asked whether new hires were licensed, I was informed that they were not. | Hearsay within Hearsay. Fed. R. Evid. 805. | appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present FRE 703 (based upon personal observation). |
| 219. During our tour of Facility A, I visited the Chapel space that we were told was used for group therapy on this yard. The schedule on the door indicated that the Chapel was available for mental health programming only four hours a week, on | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Cumulative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Tuesdays from 12:00 until 4 p.m. Facility A houses approximately 188 3CMS prisoners.314 Perhaps not surprisingly, the Special Master found that although group therapy offerings increased on five of the seven yards, "inmate demand for groups outpaced CSATF's ability to provide them and wait lists for groups were lengthy." | Lack of foundation. Speculative. | employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 220. I interviewed several prisoners in A Facility, which houses both EOP and 3CMS prisoners in dormitories as well as cells. When we arrived on the yard and asked whether the EOP prisoners were placed in anyone particular housing unit, the sergeant told us that they were not. The stories told to me by several A Facility prisoners illustrated some of the ways in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculation. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (not offered for the truth, but |

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| which overcrowding at SATF limits the staffs options in dealing with mentally ill prisoners and the level of care that is provided. The first prisoner that I interviewed, Prisoner NN had a significant history of DMH inpatient hospitalization that immediately pre-dated his arrival at SATF four weeks earlier. He had come from the DMH psychiatric Hospital at Coalinga, where he had been for 10 months and, before that, he spent some 8-9 months at DMH's Atascadero hospital. Before going to Atascadero, he was a 3CMS prisoner at SATF. Yet Prisoner NN was    returned to SATF at his former level of care -3CMS -six weeks before he was scheduled for parole, apparently with no parole discharge planning provided. He told me he was diagnosed with PTSD (the result of extensive child abuse) and bi-polar disorder, and currently takes Thorazine, Effexor, and Depakote. He said that "there's a lot in my case file," but that for some reason "the psychs have overlooked it." Prisoner NN has been in and out of prison several times since 1996, most of the time returning because he said that he "self medicates" when he experiences mental health | | to provide information about the basis of the opinions); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-199-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| problems and psychological stress on the street. He told me that his psychological problems are greatly exacerbated when he is forced to live in open dormitory settings. He feels vulnerable and crowded and his PTSD symptoms are aggravated. He elaborated that "I'm very sensitive to lights, noise, crowds-people make me anxious when they are all around, and it's so crowded here." When he feels crowded in this way, "I become paranoid, sure that other prisoners are against me, trying to harass me,[that] people are talking about me. So I tried to kill myself." Prisoner NN showed me long cuts on his arms from this suicide attempt, and said that he had received 110 stitches as a result of this. He also said that he is an active participant in programs when they are available and that, for example, the mental health program at Coalinga was a good one in which he had been actively involved. Indeed, he said his psychiatric condition began to noticeably improve when he was at Coalinga. However, it deteriorated when he was sent back to SATF. He told me: "I started getting suicidal again." He told staff that he was feeling suicidal and he was admitted to | | |

-200-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the CTC on July 3, 2008 for suicide precautions and was kept for fourteen days.316 He told me: "I preferred being naked on a bed in CTC to being in a dorm. But they moved me back to the dorm anyway." After this crisis bed admission, his level of care was raised to EOP. | | |
| 221.  Prisoner NN was most upset about the unresponsiveness of custody and clinical staff to the difficult time he had coping with the overcrowded conditions in the dorm and the way those conditions exacerbated his mental health symptoms since he returned to prison from   the DMH hospital. He said that staff "feel its our own fault and don't do much for us, unless they are forced to." In fact, he said, "how we are housed, in the face of the overcrowding, isn't something that they bother with. They can't." He insisted that he had tried to talk with staff about the way that he was panicked by the dorm housing and the fact that it was adversely affecting his mental health, but to no avail: "Before I tried to kill myself, I told them what was happening," but "they said the dorm housing was not something they could change." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Speculation. Lack of foundation. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2) (admission of party opponent); Court can determine whether statement is mischaracterization, speculative, or argumentative |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Even after he told them, directly, "something is going to happen," they "shrugged and said, '[we] can't help you.'" Prisoner NN said that he was forced to live in the crowded dormitory even though he had a "cell-living only" chrono (that SATF refused to honor). He also said that, since coming back to SATF from the state mental hospital about a month ago, the only EOP program that was available in his unit was a once a week meeting with a psychologist. He has had no groups at all over this one month period. Remarkably, this prisoner is scheduled to parole from prison in about two weeks- on August 15, 2008. | | |
| 222.  I interviewed a second prisoner from A Facility who also had a significant mental health history but was receiving very little treatment for it. Prisoner OO has had several prior CDCR prison terms and is now at SATF for a parole violation. He has been on the mental health caseload off and on, and has taken psychotropic medications for depression. The last time he entered prison, around April, 2008, he went through the Reception Center at the Duel Vocation Institution (DVI), where he sought mental | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculation/mischaracterization of evidence. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health help and even requested placement in solitary confinement to try to ward off a deepening depression that he felt was brought about by a number of deaths that had recently occurred in his family. He told me that staff there said "everybody has deaths, learn to get over it." When he came to SATF about a month later, at the end of May, 2008, he felt his depression just got worse, I was getting more desperate." Prisoner OO sent clinical staff here a chrono asking for help for the depression, but got no response. After a few days, he was frustrated and angry and received a CDCR 115 for his disruptive behavior. He was put in a holding cell and eventually taken to the CTC, where he spent 7 days. He said they "gave me meds, [put me] on a bare mattress, in a wrap around garment." | | |
| 223.  After about 7 days in the CTC, Prisoner 00 was placed on the mental health caseload as 3CMS and was sent to the gym. Since being released from the CTC, several months ago, he told me: "I've had no groups, seen my case manager only twice, and the psychiatrist who does meds review once-that's it." Prisoner 00 said he | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Speculative. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Not inappropriately cumulative – in systemic case, examples of treatment |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| doesn't' know if there are any groups he can participate in-"no one told me anything"-hasn't discussed a treatment plan with the IDTT, and says that his case manager "just asks me, 'how are you doing?' and doesn't seem concerned about providing me treatment." | | of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 224. The third A Facility prisoner, Prisoner PP is a 37 year-old man who said although he had made several suicide attempts when he was younger, and had suffered extensive sexual and other kinds of abuse in his life, this was the first time he had been in any type of mental health program while in prison. When he came into the prison system, through the Reception Center at DVI, he could not sleep and was hearing voices. At DVI "I got to see the psychologist right away, they gave me meds to calm me down." But then he was sent to SATF. He was 3CMS when he got here but told me that his clinician felt he should be placed on EOP status because he was not coping well at the prison. In fact, he is listed on SATF's EOP Log as EOP since April 17, 2008.317 He is taking Remeron, Vistaril, and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculative. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-204-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Depakote. He told me that "A-2 is a hard place to live... [there is] constant movement, noise, fast paced, shadows." Prisoner PP said he had a much easier time handling cell housing than the dormitory unit he is in. He feels that he has been given very little mental health help to cope with his problems or the situation that he is facing. Thus, he said that despite being at SATF since May, 2007, he had been in no groups at all and had to ask for contact with his psychologist rather than being in a program where regular contact was provided as a matter of course. | | |
| 225. In fact, Prisoner PP said that he has no real program of any kind here. Because he already has his GED he is not eligible for educational classes and, because he is required to complete fully 85% of his sentence, is not eligible for work assignments. Not only is it difficult to absorb the day-to-day idleness and lack of mental health treatment but, he told me, "we are locked down whenever our yard or B Yard has problems." He went on to explain that because the prison is short of custody staff, whenever one yard is locked down, the adjoining one is too because the correctional staff | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculative. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); Not |

-205-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are called to that other yard. (This practice was later confirmed to me by custody staff.) Prisoner PP said that it was not uncommon for this to happen a couple of times a week, and that some of the lockdowns lasted as long as a week or two. He told me that he had been endorsed for transfer and is on the wait list for an EOP/SNY program. However, his clinician told him that "the only reason I'm not moving is that there aren't enough beds," and he had no idea whether or when he would go. Prisoner PP should have transferred to an EOP program by June 16, 2008, but his log entry states "no beds" as the reason for his delayed transfer. | | inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 226. Finally, I interviewed Prisoner QQ, who is a 35-year old man who explained that he first came into the prison system when he was in his 20s, and began receiving his first mental health care the last time he entered prison. He said that he began hearing voices and seeing things in the Orange County Jail and that he continues to do so. He is taking Resperidol and Zoloft now. Prisoner QQ was 3CMS until May 15,2008, when he was placed on EOP status.319 He told me that he | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculation. Lack of foundation. Mischaracterization/Argumentative re: "treatment cages." | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| had never learned to read or write, and also that he was developmentally disabled. Like the other prisoners I spoke with, he was very concerned because he is not getting enough mental health care while he waits for his transfer to an EOP program. He said he sees his case manager once a week, in the chapel, and the case manager just asks him about the voices. This brief contact and the medications he takes are the full extent of the treatment that he receives. "I am just waiting to be transferred to an EOP program. I heard it takes a long time." In the meantime, he is living in the dormitory in A Yard. He told me: "It's hard over in the dorm. I'm trying to learn how to live there. The noise in the dorm makes the voices louder." He, too, confirmed that the unit is plagued by numerous lockdowns that can go on for days at a time. Prisoner QQ is listed on SATF's EOP Chart with a notation that his transfer is delayed because of "no beds. | | |
| 227. I toured the stand alone Ad Seg unit at SATF, where we were told that there were no 3CMS or EOP's currently housed. There are offices in the Ad Seg unit with individual | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| cages in them that the clinical staff uses for assessments and also one-to-one treatment. We were shown a holding cell where a suicidal prisoner could be placed pending evaluation and transfer to the CTC. It was totally barren with no bed, toilet or sink, although there was a grate in the floor. The Ad Seg program consists of 10 hours of yard per week, in outside yards that are monitored over television screens and a gunner. The prisoners in Ad Seg also get access to law library and recreational books, which are brought to their cells. They can choose to have a radio or a television but, if the get a 115 disciplinary write up (for example, for refusing to double cell with another prisoner), their television can be taken away. The Ad Seg is configured as a straight row of cells-the 180 degree design, only one tier high. The cells are totally barren inside. There is a television, in the cells that have them, sitting on a makeshift stand. There are no shelves in the cells. The cells themselves are all concrete, including the bunks. The "yards" are completely caged-in, about the size of the cells in dimension. As our correctional escort acknowledged as we toured the unit: "These units are | Evid. 703. Speculation. Lack of foundation. Mischaracterization/Argumentative re: "treatment cages," "holding cages," and "new cages." | Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| not good for the mental health of inmates, there is nothing for them to do or see." | | |
| 228. I also toured the E-l Ad Seg unit, which has a "capacity" of 200 - if all of the prisoners are double-celled - but currently holds 136. The unit sergeant explained that the unit has a heavy concentration of Coleman class members. He estimated that there were as many as 100 3CMS and 6 Eaps in the unit that day. The Eap prisoners are mixed in with the others, and none of the prisoners on the mental health caseload are housed in a special area or concentrated in any particular part of the unit. The unit roster indicated that some of the EOP prisoners had been in the Ad Seg unit since December, 2007, and others since February, 2008. I looked into the case of one of them in particular, Prisoner RR, who had been in the unit since December, 2007. He was described as having many mental health issues, suicide attempts, and behavior problems. Prisoner RR appears on the EOP Log with EOP level of care as of July 25, 2008. However, the MHCB admission log noted that he was admitted to the MHCB on March 27, 2008 from Ad Seg and was EOP level | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent) |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of care.321 During his four admissions to the MHCB listed on this log over the past few months, his level of care bounced back and forth between EOP and 3CMS, and during the seven months he has lived in the unit, he remained in this regular Ad Seg, rather than an EOP Hub where he would have received increased mental health care.322 Yet, as the unit sergeant explained, "these EOPs have been endorsed for hubs and they are just sitting here waiting for a bed somewhere in the system." There were holding cages along the side of the unit floor that the sergeant told us were used for individual clinical appointments as well as for other purposes (that included disciplinary cases). The sergeant explained that there had been treatment cages recently placed on the dayroom floor but then removed; he did not know whether new cages would be placed there later. In fact, if treatment cages are placed on the dayroom floor of this housing unit for group therapy sessions, they would not provide adequate sound or visual privacy to the prisoners participating in group therapy. | | |
| 229.  As I noted earlier, despite the enormous size of the | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (based upon personal observation); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| institution, SATF is plagued by overcrowding. It has more prisoners than it can properly house and, among other things, has had to convert gyms into dormitories just to hold them. In the makeshift gym dorm that I toured in A Yard, I saw what has become an all too familiar scene inside California prisons more than a hundred men sitting in or milling around their open bunks, with little or nothing to do. The floor officer in this makeshift gym dorm did not know how many prisoners in the unit were on the mental health caseload or who they might be. I noted that the unit was relatively clean and quieter than some other gym dorms I have seen. The officer explained that this is because the unit is reserved largely for short-termer prisoners who are about to parole. He said, "we don't want any problems, so [we tell them] keep your bed clean, do your classes or whatever, and don't make waves." A prisoner in the gym, Prisoner SS told me that he has been diagnosed with bi-polar disorder and is 3CMS. He has made three requests within the last month to have his medication changed, but nothing has happened. He said that he is feeling very depressed. Although he sees a | Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| psychologist once a month, he has not seen her yet this month. In any event, he said, that is the full extent of the treatment he receives. | | |
| 230.  In another makeshift gym dorm that I saw at SATF-this one in B Facility-the prisoners are triple bunked. There are 140 men in this gym dorm, which is a little less clean and not as quiet as the previous one. The officer on the floor explained that this dorm, too, is intended for short-termers although "we sometimes end up with guys on long-term." One of the sergeants in the unit, told me: "I don't like the housing here, I don't like to keep people in the humidity. The environment is bad here. I'd like to see the day when we can use a gym as a gym. But I guess that's just me." He noted that, in addition to complicating the supervision of the unit, it strains the infrastructure (toilets, etc.) and, the increased number ofpeople in the unit means that it gets much hotter during the summer months. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703.  Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 231.  While in the B Facility gym dorm, I interviewed Prisoner TT who told me that he had had serious mental health problems on the street, where he took Seroquel, Prozac, and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Elavil, and had been an EOP prisoner in his prior term of incarceration. He said that he was having mental health problems at SATF, but that the staff was unresponsive and unhelpful to his many requests: "I'm not getting any help. I'm a Level I, I have only 6 points-I need help before I get out next year. If I get out with these problems, I'm going to be in trouble." He reported to me that when he arrived at SATF he was placed in the Substance Abuse Program on Facility For G, but he was praying out loud and officers sent him to the mental health crisis unit. When he left the crisis unit, he was sent to the B Facility gym dorm. Prisoner TT became agitated during the interview and expressed concerns about custody procedures in the gym dorm, including the fact that he is placed in handcuffs when he sees his case manager during clinical appointments. He reported that he was refusing clinical care because of the way he was being mistreated. I spoke to the Acting Chief Psychologist about my concerns regarding this prisoner's level of care and his continued housing in the overcrowded gym dorm setting. | Evid. 703. Lack of foundation. | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 232.  In addition to makeshift gym dorms, SATF has makeshift dayroom housing on a number of units. I toured housing unit E-4, which has 20 extra bunks arranged on each side of the unit dayroom. I was told the same arrangement exists in E 2, 3, and 5. Prisoners live out in the open, with little or no privacy, in cramped quarters that are in full view of the others in the unit. One of the floor officers told me "this is bad. I never thought I'd see the day. I've been in the system 16 years, and I never thought it could happen." The added number of prisoners in the unit made it more difficult to supervise, taxed the infrastructure (due to overuse of toilets and the like), and made the unit hotter in the summer months "with so many extra bodies in here." Although all of the prisoners who have been placed in the dayroom bunks are lower custody, The floor officer explained that "3CMS inmates are all over the place. Their mental health status is not part of the decision about whether to house them in the dayrooms." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 233.  I interviewed one of the prisoners housed in the unit, who has been endorsed for | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 703 (not offered for the truth, but to provide information |

-214-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| transfer to an EOP program since April 2008 but has been delayed due to "no beds", and will be released from prison in a few months - November 20, 2008. Prisoner UU, who is currently at EOP level of care, has been in the CDCR for the last three years and has been waiting more than three months to transfer to an EOP program. The reason provided by the prison for his delayed transfer is "no beds." He reported a history of suicide attempts, including a suicide attempt by hanging at Soledad, another where he attempted to cut his neck at Wasco, and one at SATF where he cut his arm. He was previously treated at the California Men's Colony at San Luis Obispo as an EOP and recalled that he got one-to-one counseling, groups, and participated in a much better program. But now, he said, "I'm getting nothing in here-a social worker who does nothing sees me once a week, I get no groups, no nothing." He indicated that he has been asking to go to Mule Creek, to take advantage of the programming there, but "they won't send me." He has been admitted to SATF's CTC for suicidal ideation three times since March 29, 2008. He | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | about the basis of the opinions); Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| explained that his last crisis bed admission occurred when "they forced me into the triple bunked gym, no matter what. I had a 'no triple bunk' order which they ignored. I've also been forced into double-bunked dayroom housing, even though I'm an EOP. Each time I've been forced into these dorms, I start to lose it." | | |
| 234. I also toured C Facility at SATF, which had been on lockdown status since Friday (three days before the tour). Apparently, there was conflict on the yard and a large group of prisoners began fighting. The sergeant accompanying us indicated that this was regarded as a very serious incident and "we'll be down a while, much more than a week." He indicated that the 3CMS prisoners in this Facility "are all over the place, wherever there are beds." He also explained that, when a unit is in lockdown here, prisoners may be placed in restraints and taken to the clinic for the clinical contacts, assuming that there are enough custody staff to provide the needed escorts. Otherwise, there will be little or no movement anywhere. I toured several of the specific housing units that were on lockdown and, indeed, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| there was literally no movement occurring at all. As I passed through the units to observe the conditions, the prisoners who were locked down in their cells complained about the heat, the lights, and the inactivity. | | |
| 235. The severe overcrowding-related problems that plague the CDCR adversely affect and undermine the quality of care that is afforded to *Coleman* class members in a variety of ways and can accumulate to worsen a mentally ill prisoner's condition over time. This was illustrated in the case of Prisoner VV whom I happened to interview at Mule Creek when I toured there on November 2,2007, and saw again at SATF during my tour of the eTC. I have reviewed portions of Prisoner VV's central and medical records, including records that I reviewed during the tour at SATF. At the time I saw him at Mule Creek, his level of care was EOP and he had been identified with a development disability, hearing and vision impairment.327 Prisoner VV had been transferred to Mule Creek from CMF-Vacaville's acute DMH program on June 28,2007. His DMH Discharge summary, dated the same day, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Lack of foundation. Mischaracterization/Argumentative re: "cage." | FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| indicated that his level of care was EOP, he was hearing and vision impaired, and had a developmental disability (DD2), as well as a diagnosis of Major Depression with psychotic features. 328 When he arrived at Mule Creek he was placed in Ad Seg and he remained there for many months for safety concerns. I interviewed him in early November in the Ad Seg unit. He continued to receive EOP level of care, and was evaluated by his treatment team on November 20, 2007 and retained in EOP. However, by December 20,2007, his level of care had been reduced to 3CMS. Clinical notes after that period indicate that he appeared to have some difficulty coping with this reduced level of care, especially because he had been told he would be transferring to SATF, which was located far from his grandmother, who was a source of emotional support to him. On March 27, 2008, he was issued a Rules Violation for mutual combat, but during the report, he told the officer that he "wrote a suicide note stating that I was going to create an incident on the yard that would cause the yard-gun C/O to shoot and kill me.,,329 He was evaluated for suicide risk and found to have a "high risk" and | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was admitted to the OHU and kept there for six days, until he discharged on April 1,2008.330 He was never transferred to one of the licensed crisis beds at Mule Creek during that period of time. When he was discharged, he was observed on five day suicide follow-up, and three days later, he was transferred to SATF on April 9, 2008. Upon his arrival at SATF, Prisoner VV was immediately placed in E-l, Ad Seg "due to lack of available bed space on Facility D."  He has experienced serious difficulties coping at SATF and had been admitted to the crisis unit at least three times when I encountered him in the CTC on suicide watch on July 28, 2008. He was brought out for an interview in a full-length blue suicide smock and seemed very disoriented and upset as he sat down in the treatment cage where I was required to interview him. He began by telling me that he had been harassed by custody staff at SATF-"there are a lot of people who are mean to me." He also said that when he came here from the EOP program at Mule Creek he stayed in the hole, in Ad Seg, "because they didn't have a bed" for him elsewhere. Then he went to D Yard, in a DDP | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| (developmentally disabled) program that he described as "nasty, unclean." He said he was doubled celled there and that he began to be targeted by other prisoners who learned of his child molestation conviction some 15 years ago. He told me "there were no groups in D Yard, every so often I'd see a clinician, but not every week." He explained that his mental condition had deteriorated at SATF: "since I've gotten here I've gotten much worse. I am really afraid for my life. I'm hearing voices, I want to die." Prisoner VV is hearing impaired, but he said that the prison has ignored this disability and failed to replace his lost hearing aid despite multiple requests. As a result, he explained, "I sometimes miss announcements, so it gets me in trouble." This apparently led to his latest disciplinary write-up, when instructions were given over the loudspeaker and he did not hear them. "They put me in the hole for nothing. In the hold I wanted to kill myself because I knew the staff would continue to harass me. They put me in a cage and left me there for a long time." | | |
| 236.  Prisoner VV told me that he ended up in the CTC | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (not offered for the truth, but to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "because I was losing it. I thought they were going to kill me. I wanted to kill myself." He said that he has been in the CTC at SATF several times before. This time, it has been for 14 days. He expressed a great deal of concern about his future: "I have no idea what I'm going to do to take care of myself. I have no skills, I'm really scared. I don't want to be homeless, sleep out in the rain, eat out of garbage cans like the last time I was out." After I finish talking with Prisoner VV, I went to look at his crisis bed cell. It was barren, a mattress pressed to the back corner of the cell, with nothing else in it. Nonetheless, although he says the staff wants to return him to D Yard, "I won't go." I also spoke with his clinician in the CTC, Dr. Jesus Juarez, who told me "today I made him Eap. He is having serious problems." Dr. Juarez confirmed that Prisoner VV has hearing problems but noted also that, because of his serious mental health problems, he "doesn't process information well" and "he also gets agitated when he misunderstands things." In addition to his developmental disability, Prisoner VV is diagnosed with schizo-affective disorder, has hepatitis, and is | Hearsay within Hearsay. Fed. R. Evid. 805.. Lack of foundation. Vague and ambiguous re: "capacity." | provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Further clarification is available through cross-examination. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| suffering from a staph infection that requires him to be on quarantine. Dr. Juarez explained that Prisoner VV "will be hard to transfer. He's a Level IV SNYlEap" who will take "90 days or more" to transfer from SATF. Prisoner VV will eventually transfer back to Mule Creek's Eap program where I first interviewed him back in November 2007. I reviewed Prisoner·VV's medical records at the end of the day, and the clinical notes confirmed his high level of suicidality. I also discovered during my review of his records notes for at least ten other prisoners misfiled inside his medical record. I notified prison staff of this filing error. | | |
| 237.  I toured and inspected and interviewed staff and prisoners at CCI on July 29, 2008. CCI is located south of Bakersfield, near the Mojave Desert. The Warden reported that the count on the day we were there was 5,625, and this included a total of 1499 prisoners who were on the mental health caseload, 1,402 ofwhom were 3CMS and 95 Eaps. (The Eap population at the prison appears to have increased significantly this year; during the 20th round of monitoring, as of January 1,2008, the total number of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.. Lack of foundation. Speculative. Argumentative. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 201 (judicially noticeable); FRE 801(d)(2) (admission of party opponent); Court can |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| EOPs at the prison was 68.)332 On the CDCR official website, CCI's population was reported as 5,652, or 203 percent of its design capacity of 2,783.333 CCI has a reception center, a Security Housing Unit (SHU), administrative segregation, Level I and II gym housing, and an unlicensed Outpatient Housing Unit (OHU). The prison staff provided me with documents showing OHU admission data from January 1,2008 through July 26,2008, an EOP log for July 29,2008, a housing report for MHSDS prisoners, an RC EOP transfer log, and a DMH referral log. | | determine whether statement is mischaracterization, speculative, or argumentative. |
| 238.  The high vacancy rates among mental health clinicians at CCI and the use of registry staff to fill these vacancies has been a persistent problem at CCI,334 apparently the result of very significant and chronic clinical staff recruitment and retention problems. These issues surfaced at the very outset of our tour, and were repeatedly mentioned by administrators and supervisory staff throughout the day. In fact, the problem was so serious that there seemed to be an air of resignation about the problem-"we simply can't get remotely the number of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| professional people we need to come work here" was the way many of the staff with whom I discussed the issue characterized it. For example, the Chief of Psychology, Dr. Walsh addressed the issue during our orientation meeting with the prison administration this way: "Recruitment and retention? I suppose the word 'nightmare' is appropriate. We do everything we can but we just can't get them here." More than half of their allocated psychiatrist positions (5.5 of 8) are filled by contract psychiatrists, and 40% of the psychology positions are open. Also at this initial meeting, Dr. McDill, the reception center Senior Psychologist, indicated that the prison had utilized some 25,000 contractor hours over the last 8 months to service the mental health needs of the prisoner population there. In his words, "that gives you a feel for how much we depend on it." The June 2008 staffing data provided by CDCR to the Coleman Special Master, confirmed CCI's report of their use of significant contractor hours to fill its significant vacancies (28 vacancies, with 21 of them filled by contractors). | | problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

-224-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 239.  The Senior Psychiatrist who runs the OHU, Dr. Pouyon, explained that CCI relies so heavily on contract mental health personnel like him for a variety of reasons that make Tehachapi a difficult place to attract and retain professionals-"the weather, terrain, distance from LA-we can't get physicians here." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Mischaracterization/Argumentative re: "cage." | FRE 801(d)(2) (admission of party opponent); no reference to cage. |
| 240.  The severe staffing problem was perhaps most acute among the clinicians, but it affected custody staffing levels as well. Some of the severe overcrowding and understaffing issues were addressed later by the Associate Warden who accompanied us during several parts of the tour. He said that CCI was still significantly understaffed, and that "we have put in for 96 additional custody staff so we can do what we need, to deliver the basics properly." In fact, the lack of adequate numbers of custody for mental health and medical escorts came up several times at CCI. For example, the clinicians in the 4A OHU overflow unit told me that they could not run weekday groups in the treatment cages that they had "because there aren't enough custody staff-there are too many things for them to do-so they | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| have to run the groups on weekends, with whatever clinical staff are there, when the custody staff has less to do. | | |
| 241.  The overcrowding crisis has profoundly affected prisoner housing at CCI. At our initial meeting with Warden Gonzalez at CCI, he acknowledged that the facility had "gyms in every yard being used for housing." The makeshift gym dormitories were "de-activated for about a month and a half, but then [population] went back up," so the prison was forced to reactivate them. In addition, there is dayroom housing in the intake area of the prison. All of these overcrowding-related problems were evident as I toured the facility. The institution has been operating at 200% of capacity for a considerable period of time, with no end-or help- in sight. In fact, the Associate Warden noted that despite facing these very serious space shortages, CCI has not yet seen one single "in-fill bed. No ground broken on anything, even though CCI is supposed to be one of the first four facilities" to receive these new beds in the system. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Mischaracterization/Argumentative re: "floor sleepers." | FRE 801(d)(2) (admission of party opponent); Court can determine whether statement is mischaracterization, speculative, or argumentative; Relevant to impact of overcrowding; Relevant to existence of overcrowding and problems caused thereby. |
| 242.  As the Warden | Inadmissible Hearsay. | FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| acknowledged at the outset of our tour, there are a number of prisoners at CCI who are living in non-traditional housing settings, becoming what the Sergeant escorting us for part of our tour at CCI, called "floor sleepers." Many of the "floor sleepers" were in the gym makeshift dormitory that we visited that was being used for Reception Center prisoners. The full count inside the gym was 136 prisoners-the entire room pretty much filled with open double-bunks on which the prisoners lived. The floor officer, who said he had been there five years "so I pretty much know what's going on," at first indicated that he did not think there were any mental health caseload prisoners housed there. He did not have a list of any kind to readily consult. When we checked the housing report for MHSDS, however, we found that there were 15 CCCMS prisoners dispersed throughout the makeshift dormitory. Conditions inside this housing unit were frankly no better or worse than the others I saw throughout CDCR-open, unsafe, lacking in privacy, and providing the prisoners with little or nothing to do during the day to pass the time. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | review of data and expertise); Relevant to impact of overcrowding; Relevant to existence of overcrowding and problems caused thereby FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 243. We toured another, slightly larger makeshift gym dormitory that is in use in Housing Unit 4B, where some 142 prisoners are currently confined. The substandard environmental conditions were evident here as well. Here, too, mental health caseload prisoners were housed without custody staff being certain of how many or who, exactly, they were. One of the floor officers indicated that there were "some" 3CMS prisoners currently assigned to this unit and, although there did not appear to be any EOPs there now, they had had them there before. Although this type of housing is intended as short term, for Reception prisoners, the officer indicated that some prisoners have stayed in the gym dorm for six months or more. In addition to the terrible environmental conditions in the unit, it was also apparent that the prisoners really have no programming opportunities. As the officer put it, "they have the dayroom, play games, that's it. And they eat in here." The "dayroom" consists of a series of 14 tables, which also serve as the "dining hall" for the gym residents, and 1 television set in the dorm (used by 140 | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2) (admission of party opponent); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prisoners). A prisoner confirmed for me that there was "nothing else to do... no program at all." He was resigned to the fact that this was all he would have access to until he paroled from the prison in January, 2009. He said he had been told he would have to stay in this unit for another six months or so "because there are no beds anywhere in the system to put me." | | |
| 244.  CCI is plagued with very severe clinical office and treatment space shortages. At the outset of our tour I asked CCI administrators about the four proposed treatment modules that had been requested and were mentioned in documents that I reviewed before my visit. The Warden told me that they had in fact submitted the proposal for these badly needed new treatment modules but that, unfortunately, they were not approved. The additions would have provided two new mental health and two new medical treatment modules at the prison, ones that the administrators at the orientation meeting acknowledged were very badly needed. The staff indicated that, instead, they were now "hoping to convert" a visiting area at the prison for | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| clinical use, but that this "is a work-in-progress" and little more than an idea at this point. We were also told that, in part because of the lack of treatment space and in part because of the lack of available custody staff to serve as escorts (addressed further below), it is "a challenge on a daily basis to make sure prisoners in SHU/ASU are getting their one hour out-of-cell time." The Chief of Psychology, Dr. Walsh, indicated candidly at the orientation meeting and throughout the rest of the day that space was a continuing, critical problem at the facility. He told me simply that a great deal of additional space was "badly needed" so that the clinical staff could do its job properly. | | |
| 245. The Deputy Warden who accompanied us during much of the tour, further explained that there were inherent design problems at CCI that compromised their overall programming capacity. He said that there was no treatment space on the units because "treatment" was not something that CCI was originally designed to do. Now that it has been made a more central part of CCI's mission, he said, there is little that can be done to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2) (admission of party opponent). |

-230-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overcome the physical limitations that were initially built into the design of the facility. | | |
| 246.  The first area of the prison we visited was R & R, where we were escorted by a Sergeant who told us that most of the prisoners who come into CCI are from San Bernardino and Los Angeles counties. It takes them about 6 hours to fully process incoming prisoners into the facility through R & R. Even here, however, the lack of appropriate space was a concern. Thus, one of the psychologists assigned to this unit explained that the psychological assessments that are done in R & R must be completed on one the several open tables out on the dayroom floor, which "is not very good but we have no other room." Obviously, the area is not very private and "if someone is nervous or uncomfortable, it's not very effective" to ask them about their mental health concerns in such an open, public area. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Mischaracterization/Argumentative re: "cage." | FRE 801(d)(2) (admission of party opponent); no reference to "cage;" Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 247.  Space shortages were evident in other areas of R & R as well. For example, the clinic that services the R & R | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Fed. R. Evid. | Court can determine whether statement is mischaracterization, speculative, or |

-231-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| facility has a holding cell that is used to hold suicidal, homicidal, or decompensating prisoners until they can be admitted to the infirmary (OHU) or referred to a mental health crisis bed. The mental health staff informed me that a prisoner could be routinely held in this cell for as long as four hours but, also, that it has been the case that some were kept there for a full day. The delay is caused by the fact that the people who are in charge ofthe OHU are the only ones who can admit prisoners there. One of the psychologists who runs the EOP programming for Reception Center prisoners, Dr. Maden, explained that the OHU is "so short staffed, and it's also a very small OHU, so they are always having to triage." As a result, R & R prisoners in crisis have to wait for the OHU staff to get to them. In a nearby office area, there is another holding room, this one containing three holding cages, which a unit sergeant explained were originally intended to hold disciplinary cases but now have been converted to mental health use. Dr. Maden indicated that it is not uncommon to have all three of them occupied, so that the prisoners have to be | 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Mischaracterization/Argumentative re: "rats." | argumentative; FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| interviewed-often about very sensitive issues-in each other's presence. Although no prisoner is supposed to be held in the cages awaiting transfer for longer than 4 hours, and most were not, the log book in the unit indicated that some were, for as long as 5 or 6 hours on occasion. | | |
| 248.  Dr. Maden also said that they try to run as many EOP groups as they can, to at least get the mentally ill prisoners out of their cells, and also to provide some face-to-face contacts for them. Dr. Maden told me she felt that she had adequate staffing with which to run these particular EOP programs, in part because their staff allocations were "ratio driven" and staffing levels had been set according to the number ofprisoners who were being serviced. However, she immediately added: "But space? Are you kidding? We don't have anywhere near enough!" Dr. Maden said that the clinical space shortage at CCI included the lack of office space-"we have no real office space for most ofthe staff," as | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| well as severely restricted space for groups-"we have to use the chapel and the housing units for groups-it's terrible-the chapel doesn't want us there and the groups in housing are bad-right out in the open where everyone can see them." Dr. Walsh added, "You know the studies about how many rats can you put in one small space without them losing it? That's about where we are with space and my staff." | | |
| 249.  The OHU at CCI is a standard clinic area, but it is very crowded. Dr. Pouyon, the contract Chief Psychiatrist who runs the OHU, told me that space is a very significant problem. "I had to give up my desk to other staff. I'm 'working out ofmy car,' so to speak, I walk all over the place" in order to do the job. In fact, the OHU staff have had "space utilization" meetings and proposed significant modifications but, unless and until the expansions are implemented, as Dr. Pouyon put it: "we're packed in, have no space to do anything." Moreover, "we don't even have internet access, our books are old-we can't get online. We | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703 | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are an archaic system and I am trying my best to bring it into the modern era." | | |
| 250.  In another part of the OHU we were shown a converted bathroom that now holds a desk and a treatment cage, where patients in the OHU can be seen by clinicians. As Dr. Price put it, "we've gotten better at doing more with less." Indeed, they are learning to do more with less in many parts of CCI. In 4A, where the OHU overflow is housed, for example, one psychologist, Dr. Gendalman, showed me her office, which consisted of a cramped broom closet that she actually shares with another clinician. The OHU is a very busy unit with 244 admissions between January 1 and July 26, 2008.337 CCI has attempted to transfer patients from the OHU using the Health Care Placement Unit in CDCR headquarters, but system-wide shortages have impacted on their ability to move patients to the appropriate level of care. In March 2008, CCI referred for transfer 8 MHSDS prisoners for MHCB placement, but only one transferred after waiting 7 days, and the other 7 returned to their | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703;. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise) |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| housing units after waiting from 2 to 16 days for an MHCB transfer.338 In April 2008, CCI referred 5 prisoners for MHCB placement, with 1 placed after waiting 12 days and the remaining 4 returned to their housing unit at CCI after waiting from 3 to 20 days for an MHCB transfer.339 In May 2008, CCI referred 5 prisoners for MHCB placement, with 1 placed after 7 days, and 4 returned to their housing unit after waiting from 4 to 14 days for MHCB placement. Finally, in June 2008, CCI referred 10 prisoners for MHCB placement, with 4 placed after waiting 9 to 14 days, and 6 returned to their housing unit or parole after waiting from 2 to 43 days for MHCB placement. | | |
| 251.  As has been true for all of the CDCR facilities that I have toured, CCI is plagued by not being able to transfer mentally ill and other special needs prisoners to the appropriate locations elsewhere in the system-the beds the prisoners have been deemed clinically in need of. It is a chronic problem here as elsewhere in the system. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703; | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Thus, Dr. Eppler, one of the psychologists working in the Reception Center, told me that CCI is forced to hold EOP prisoners who are also SNY for many months, because the only appropriate placement for them-the program at Mule Creek State Prison- does not have any space for them: "We have to keep EOP/SNYs for 6 or 7 months because they can't get transferred to Mule Creek." Obviously, this creates special challenges for the CCI clinical staff. As Eppler put it: "I've got to program them somehow-how can I? They are told they should be moved but they aren't. They don't get what they know they are entitled to-phone, visits, packages, but don't [get these things] because they are awaiting their transfer, waiting for a bed, for 6 or 7 months!" The Special Master was aware of this problem as well, noting during the 20th round of monitoring that "[a]dherence to EOP transfer deadlines notably declined during the reporting period." On the MHSDS List for EOPs dated July 29,2008, showing transfer deadline dates, there are a total of 102 EOPs listed and 46 of them (45%) are beyond the transfer deadline date.342 The primary reasons provided for the delays | | employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are "lack of EOP beds" and "no vacancies at endorsed institutions." | | |
| 252. In addition to the problem of EOP transfers, CCI suffers from an inability to provide appropriate levels of care at the facility itself. Thus, at the initial orientation meeting, Dr. Alavarez, Senior Psychologist, explained that the OHU currently has 8 beds that are used as MHCBs and another four "flex" beds that can be converted from medical to mental health use. If mental health needs more beds, medical patients are supposed to be transferred to community hospital beds. But the Chief Medical Officer reported to us that the community hospitals were unwilling or unable to accommodate CCI medical transfers so the system did not work as planned. Dr. Pouyon, the OHU director who took us on a tour of the unit, introduced us to Dr. Price, an OHU psychologist who told me he was working to simplify the OHU admission process for mental health patient/prisoners. But he addressed what he thought | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703; | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| was a major problem at the CCI OHU: "Our patients are staying too long here-[we're] running this like a CTC, but we don't have a license to function like that-it's not good practice." He elaborated that, in terms of staffing ratios, space, and equipment, and facility infrastructure, the OHU falls far short of the professional standards it should meet for a CTC operation. | | |
| 253.  The problem ofprisoner/patients backing up in the OHU because of a lack of bed space elsewhere-one that was a chronic issue in all of the other prisons I toured-was clearly present at CCI as well. Dr. Pouyon noted that there were "people who we release from OHU status but [who] stay here because we don't have beds." It is also the case that prisoners remain in the OHU for long periods after being accepted for a DMH transfer, where they "languish on a waiting list" for months. Indeed, CCI has several prisoners who have been waiting this way since February, 2008. Dr. Walsh added that "EOP transfers are | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703; | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| not pretty. They are staying here longer and longer. We are getting more EOPs coming into the system on parole violations who were EOPs when they left-the lack of bed availability is what is killing us." | | |
| 254.  Another clinician talked about the OHU "overflow" and the fact that they have had to leave mentally ill prisoners in the 4A holding cells for a day or two (and, in the past, it was not uncommon to leave them there for as many as three days). The Special Master noted this use of "alternative sites" during the 20th round when "seven percent of inmates referred to the OHU were placed in 'alternative' holding cells pending admission to OHU beds.,,344 Dr. Price described some of the consequences of this back-up, which results in people being kept long-term under conditions that were intended for short-term confinement: "We have people who may stay here for quite a long time-they don't get any yard, no group-they need resocialization. So we have psych techs who come in periodically and read | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703; | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| newspapers to them and so on to make sure they don't lose sociability completely." | | |
| 255.  Being kept in such a place for a long period of time, awaiting transfer to a more appropriate facility, would likely affect a person's "sociability" and a great deal more. Indeed, the cells reserved for mentally ill patient/prisoners in the OHU that I saw were barren, desolate, and depressing. In fact, the Special Master reported a "recurring shortage of safety mattresses and suicide smocks" during the 20th round of monitoring at CCI.345 Many of the mentally ill inmates housed in these cells on the day I toured were lying down on the bare floor, with blankets pulled up over their heads. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Speculative. | ; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable) |
| 256.  I visited the 4A treatment area located between Housing Units 5 and 6 to see some of the prisoner/patients who were housed there, including two prisoners who had been referred to DMH some six months ago (in February) but had yet to be transferred. In fact, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703; | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| I was told by a senior psychologist who works in this unit, that DMH had actually dropped these two prisoners from their list at the start of July. Thus, he said, both prisoners are now "in limbo," with few alternatives that could be pursued for them. For example, he said, if CCI wanted to send them to the EOP program at SVSP, "they'd be 160th on the list. .. [and] the EOP hub at Lancaster is even harder" to get a prisoner into. He told me that they offered the prisoners as much in the way ofEOP services as they could-which amounted to seeing them once a week-"but these guys are needier than that." | | chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 257.  Dr. Gendalman, a clinician on the unit, told me that one of the prisoners I wanted to interview, Prisoner WW, was very paranoid and rarely came out of his cell. He will not take his medications and does not appear to be eating. She was aware of an incident I, too, saw reflected in his records in which he had urinated on his food tray. "We regard [this] as gassing, so he had to be in Ad Seg." Yet she felt strongly that "he doesn't appear to be decompensating | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Cumulative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); Not inappropriately cumulative – in |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| enough to be referred [because] they wouldn't take him. Bizarre behavior doesn't get you very far up on the list" for DMH transfers. This prisoner appears on the CCI DMH referral log provided to me on the day of the tour as accepted to ASH APP on February 29,2008 and remains on the waitlist. | | systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate. |
| 258.  When I went to Prisoner WW's cell to speak with him, he appeared very frail and very afraid. He told me he saw his clinician once or so a week and agreed that she was helpful. But he told me that he does not like to come out of his cell or be around people at all. He said, "I don't like groups. I only go to yard by myself," and repeated that he was too afraid to come out of his cell. Indeed, even as he spoke to me, his eyes were darting around and he was nervously looking behind me to the tier, to see who was out there and what was happening. He told me that he is very afraid of being placed on EOP because he is sure that it would result in his transfer to another prison where he would be killed. Prisoner WW told me that he gets out of prison November 23rd ofthis month but that he feels he | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Mischaracterization/Argumentative re: "cage." | No reference to "cage;" Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| doesn't need any more help. "I'll be OK," he told me. | | |
| 259. I saw Prisoner:XX one of the Building 5 prisoners who had been awaiting DMH transfer for many months. He was brought out to one of the treatment cages in the hallway outside the unit, where I interviewed him. He was so floridly psychotic that it was almost impossible to converse with him. In the midst of his disorientation, he did manage to tell me: "Prison is a certain level of suffering. I don't know why people want to torture one another." Prisoner XX did manage to tell me that he had been in prison for about 14 years, including some time spent at Parton State Hospital, where he said he had been "many times." His mind wandered throughout our interview. He was often unable to respond cogently and he could not remember exactly when he had last seen his clinician. He told me he was currently taking Resperidol and he thought that it helped him. Prisoner XX said: "I've been told that I should be going somewhere else, but I don't know where or when. I | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Mischaracterization/Argumentative re: "cage." | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| can't predict the future." He also is listed on the DMH Referral list as accepted to APP on February 8, 2008, but currently on the waitlist. | | |
| 260.  The last prisoner I interviewed, Prisoner YY was also seen in one of the treatment cages in the hallway outside 4A. He told me he had been diagnosed with bi-polar and obsessive compulsive disorders, and that he continued to see and hear things that others did not. He said that when he is in close confinement he "can't take it, the walls close in on me." Prisoner YY said that he was once taking a variety of psychotropic medications simultaneously, including Remeron, Zoloft, Depakote, and Geodon, and that, because of the serious side effects they produced, he now takes only Geodon. He said that he first came into the prison system in 1999, at age 17, to serve a sentence of life with parole. At that time, he said, he was guarded about what he perceived to be his "mental health problems" because he did not want "to let people take advantage of it." But his problems worsened by the time | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative re: nexus of suicides to overcrowding. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions);Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 703 (based upon review of data and expertise); See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); no speculation re nexus of suicides to overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| he got to CCI and he began to have visual hallucinations and to hear voices. "They took me to the infirmary, to a bare cell, on the floor, where you sleep. It didn't help me." Prisoner YY was placed on the EOP caseload in November, 2007, but was taken off a few months ago. Although he said he still hears the voices all the time, he is getting very little treatment at CCI. There is "no helping, no groups-not any help at all ... I have no program at all, since April. We haven't even been to yard. I just stay in my cell and watch the walls close in on me." He appeared to be doing poorly at 3CMS level of care. Staff later confirmed that this unit has been on complete lockdown (no yard whatsoever) since April 3, 2008, when several staff members were the victims of a serious attack by two prisoners. | | |
| 261.  The lack of adequate programming and treatment in the segregation units at CCI was apparent from the last several interviews described above. In addition, the Special Master observed that "limited program space [in the administrative segregation units at CCI] often | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); see Plaintiffs' response to Defendants' MIL 10 (re: suicide rates); FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| forced clinicians to interview inmates in non-confidential settings." 348 Very severely mentally ill prisoners are being housed under extremely harsh conditions with very little out-of-cell time or meaningful treatment being provided to them. Some of them appear to be so ill that they cannot utilize even the limited clinical contact they are afforded. I have reviewed documents indicating that there were two suicides in the CCI SHU in 2007. There was another suicide in the Ad Seg unit in March 2008 not long before we toured the prison.349 Remarkably, however, no one with whom we discussed the problem of suicides at the institution saw fit to inform us that another suicide had taken place just a few days before our visit. | Speculative re: nexus of suicides to overcrowding. | personal observation); FRE 703 (based upon review of data and expertise). |
| 263. I interviewed a SHU prisoner, Prisoner ZZ in a treatment cage just outside the housing unit. He told me that he had been in prison most of his life-only five years spent on the street since 1970. Prisoner ZZ had been in the SHU at Pelican Bay three different times | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Mischaracterization/Argumentative re: "cage." | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Court can determine whether statement is mischaracterization, speculative, or argumentative; The |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| over this period and came to the CCI SHU about four and a half years ago. This is where he decided to "de-brief," and relinquish his prior gang affiliation He explained that he was placed on 3CMS status at CCI about three years ago and he was hoping that the debriefing process would be finished by now. In fact, he turned in his "autobiography" some 30 months ago and has become very concerned that he has not been transferred to another facility. The stress of the long wait and the uncertainty about his fate has made his psychological condition much worse: "I'm under a lot of stress now-things are stacking up on me. I was asking repeatedly to see a psychiatrist-it took two weeks before he came to see me. Prisoner ZZ is an active participant in a group that is held in the treatment cages-he and two other prisoners participate in a "how to survive the SHU" group together, which he finds beneficial. But the mental health contact is far too limited. He complained that he received only one group per week, and had only one regular psych tech contact per week, but | | Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Relevant to existence of overcrowding and problems caused thereby. |

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| he added that "they don't really do anything." He reported that the frequency of psych tech rounding was cut back a year ago from daily rounding to a psych tech round only once a week. | | |
| 264.  A second SHU prisoner, Prisoner AAA, appeared to be significantly impaired. He told me that he had been in the CDCR for 12 years, serving a sentence of 385 years to life. Although he was on 3CMS status early in his prison term, he is now on Eap status. Prisoner AAA has had one brief stint in Patton State Hospital, which occurred in 1996, when he was committed there for 72 hours from the streets. He said that he has moved from prison to prison for the last 12 years. Prisoner AAA is both hearing and visually impaired, a member of the *Clark* class of developmentally disabled prisoners, and is an Eap prisoner. He told me that he has been hearing voices since he was a teenager, and has taken a number of anti-psychotic medications (including Thorazine and Haldol). He understands that he may represent a threat to others: "When I get upset, I | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| want to hurt people who are bugging me. I've had lots of problems with cellies." He has also attempted suicide on a number of occasions. He told me: "I'm psychotic. They make you psychotic in here." Prisoner AAA was concerned over the level of care he was being provided at CCI. He told me: "I kept telling them I wasn't getting any help. As 3CMS you get nothing. I've had two groups- they both ended when the clinician left, after I opened up to her. [We had] only a couple of sessions, but it stopped." He told me that the psych techs visit the prisoners on the caseload only once a week, "to give you a puzzle." He told me that he had been made an Eap three or four months ago and has been awaiting a transfer ever since. Prisoner AAA was referred for Eap transfer on March 20, 2008, but has remained at CCI well beyond the 60 day transfer timeline because of a "lack of beds." Prisoner AAA said that the EOP program at CCI does not differ much from the minimal program he had been getting as a 3CMS, except that he gets group once a week, | | |

-250-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| when they bring him out to one of the cages. But he also said that the COs are always rushing his clinician, asking her if she is finished yet. | | |
| 265.  I toured and inspected and interviewed staff and prisoners at NKSP on July 31, 2008. According to CDCR data, the facility was operating at 200% capacity on July 30, 2008, with 5,404 prisoners confined in a prison designed for 2,694.352 Staff reported to us during the tour that the prisoner census on that day was 5,381 prisoners. They also reported that there were 917 3CMS, 66 EOP and 10 MHCB patients in their census. NKSP has a large reception center population spread over four yards. Yard A has five 270 housing units, with two for general population, one gym and three for reception center prisoners. Yard B has six "wingnut" units all for reception center prisoners. Yard C has four "wingnut" units and two dorms, all for reception center prisoners. Yard D has six wingnut units, five for reception center and one for Ad. Seg. Yard E is a minimum security facility. A Yard also has a makeshift OHU in building 4, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703; | FRE 803(8) (public record); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| which is a mixed housing unit ofRC Ad Seg Overflow and the OHU. The prison is located approximately four miles north ofKem Valley State Prison and is an exact replica of a neighboring prison, Wasco State Prison. | | |
| 266.   At the initial orientation meeting, the prison staff provided me with a log of all MHCB admissions for May-July 2008, a NKSP EOP transfer log, a list of all NKSP MHSDS prisoners, and a log of Mental Health Temporary Housing with lengths of stay and re-housing locations. Warden Hense began the meeting by acknowledging that the North Kern facility was not built with any real programming or treatment space, yet is now required to provide it. She noted that they recently created a temporary "OHU" by modifying a number of cells, but the unit is unlicensed and they did not get any additional staffing allocations associated with the OHU beds. So, as she said, "it's not an actual OHU." However, because of the reported waitlist of six to ten days for an MHCB, the staff reported that | | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the OHU is regularly used for prisoners waiting for a crisis bed. | | |
| 267. Previously the Special Master noted about North Kern that "[a]ccess to MHCBs also remained problematic. As a result, holding cell usage continued.,,354 Among the documents provided to me at the onset of the site inspection was a nine page log of prisoners who had been placed in temporary housing during May-July 2008 pending review for possible placement in an MHCB.355 Among those prisoners who were ultimately placed in an MHCB, the lengths of stay in the "mental health temporary housing" ranged from 1.5 hours to 208.8 hours (or 8.7 days). Many on this list were held for several days while they waited placement in an MHCB. 356 In addition, in June 2008, NKSP referred 97 prisoners to the Health Care Placement Unit in Sacramento for assistance in placing them in an MHCB because their own local crisis beds were ful1. 357 However, only one of the referrals was actually placed in a crisis | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Speculative. Mischaracterization/Argumentative re: "slim to none." | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); FRE 801(d)(2) (admission of party opponent); no use of "slim to none" in this paragraph. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| bed; the remaining 97 referrals were rescinded because they were either returned to their housing unit or eventually were placed in one of North Kern's crisis beds (*e.g.* only eight of the twenty-one EOPs referred were eventually placed in NKSP's MHCB unit, with the remaining thirteen returned back to their housing unit from the alternative placements.). | | |
| 268.  There was a request that the prison had made for a more substantial increase in space-specifically, three additional trailers that would have housed three to five additional offices each, with space for group and individual treatment and prisoner assessments. However, we were informed that the request was not approved. The staff agreed that this was unfortunate because the increased space would have provided what Dr. Hirakawa, Chief Psychologist, indicated was "what we need, minimally," to meet *Coleman* requirements. When I talked later with Dr. Hirakawa about the request for the new trailers, and asked him what he thought the odds were that | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| North Kern eventually would get the requested additional clinical space, he said: "Our chances of getting those trailers funded is slim to none. We'll just have to continue to make do, I'm sure." | | |
| 269. One of the ways they were "making do" was apparent at the first area of the prison I toured after the orientation meeting-a converted prisoner visiting room (complete with a row of phones and glass partitions) that now serves as clinical office space. The desks are aligned lengthwise, in the long narrow room, where approximately twenty staff members share just two computers, none of which have internet access. There is just one phone for all of the staff who work in this area. One of the psychiatrists who accompanied us on much of the tour, Dr. Pitts, Senior Supervising Psychiatrist, noted that these facilities were "terrible," and he lamented the fact that, among other things, the mental health staff could not rely on internet resources to supplement their knowledge. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Vague and ambiguous. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding; Further clarification is available through cross-examination. |
| 270. The severe space shortage | Inadmissible Hearsay. | FRE 801(d)(2)(4) -- |

-255-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| has impacted their delivery of mental health services in a variety of ways. For example, because North Kern lacks adequate programming space, they had devised a plan to conduct a number of treatment groups for mentally ill prisoners in the prison chapel. Dr. McNarren, explained to me that they had obtained permission to use the chapel for treatment space and, even though they knew it would be a makeshift arrangement, there was no other space available for them to use. However, even this plan had to be placed on hold due to the summer heat and lack of air-conditioning in the unit. To date, they have been unable to get this problem fixed. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. | Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; FRE 703 (based upon personal observation); Relevant to impact of overcrowding; FRE 703 (based upon review of data and expertise). |
| 271. Among other things, the shortage of space has prevented the clinical staff from doing all of the confidential interviews that they need to do in their offices, and some of them have to be conducted at a desk in a hallway, despite the lack ofprivacy. They also try to have at least one group a day for EOPs in each yard but, as Dr. McNarren told me, "it's hard, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Mischaracterization/Argumentative re: "makeshift OHU," "hole," "cage," and "J-Cats." | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| with everyone competing for space, not enough space to have them." | | (based upon review of data and expertise); no use of "makeshift OHU, "hole," "cage," and "J-CATS" in paragraph. |
| 272.  We toured the A-4 housing unit at North Kern, where there were Reception Center prisoners housed, some Ad Seg, and a makeshift OHU. The floor officer stated that this unit handles MHCB overflow and Ad Seg overflow as well, something it was presently being used for. At first we were told that there were no EOPs presently housed there, but then the officer checked a unit roster and determined that there were actually two. (Indeed, one was yelling to us that he was EOP and had been in this unit since mid-June.) Dr. Hirakawa did not know that there were any EOPs in the unit or why the ones we found were there. Prisoner BBB, the one yelling to us, is an SNY prisoner who came into North Kern in October of last year, and was placed on EOP status in December. He told me he has been diagnosed with schizophrenia and is bi-polar. Prisoner BBB reported that he has been awaiting a transfer to Mule Creek but he was accused | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon personal observation); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of indecent exposure and said he was placed back here, in "the hole," about three weeks ago. Indeed, he is listed on a NKSP EOP transfer log dated May 22, 2008, as arriving at NKSP on October 29,2007, with EOP level of care noted on December 12, 2007. At that time, he was endorsed for transfer to MCSP with his length of stay noted as 162 days at NKSp.359 However, on the July 29,2008, EOP Transfer Log, after he was placed in Ad Seg, his arrival date was noted as June 16, 2008, and his length of stay listed as **only 38** days.360 It appears from this log that his referral for transfer to Mule Creek was rescinded due to the rules violation issued to him and his transfer timeline was restarted. He had been getting groups five times a week and seeing his doctor until he was placed in this unit, but now "there is no programming... You sit in group in the dayroom, where you can't hear sometimes, or other prisoners are at their door listening to you." Prisoner BBB indicated that he had to stand at his cell door and yell to his doctor that he wanted to see | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| him. He said that his clinician did come on a regular basis, but that he was having a hard time getting a review or change in his medications. In addition, "when I do see my doc, I have to get pulled out to the cage. You don't feel comfortable talking, especially if there are others around." He reported further that the Ad Seg unit was taking a toll on him: The COs here all call us 'J-Cats." I am pacing, I haven't slept all night, trying to hold it together, not losing it. There are quite a few people in here with mental health problems like me." The "Category J Program" was a *pre-Coleman* mental health unit at California Medical Facility (CMF). | | |
| 273.  I toured housing unit D-4 (B side), and spoke to one of the EOP officers on the unit. She explained that their EOP population is increasing; when she came there about a year ago, there were only five EOPs here, and now there are twenty-six of them in the unit. They try to hold one or two groups a day for EOPs. Today, for example, a recreational therapy group will be held and a so-called | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "outlier" group for people who cannot be with others. Recreational therapy consists of playing games, socializing and, as she put it, 'just getting out of the cell for an hour." The groups "would have 20-24 prisoners, out on benches, in the middle of the unit," in the dayroom area. Indeed, the "group space" consisted of a row of a few secured wooden benches in the middle of the dayroom floor. There is no privacy, either from the other prisoners or staff in the unit, or from anyone else who happens to be out in the dayroom at the time. | | |
| 274.  Like virtually all of the prisons in the overcrowded California system, North Kern is also plagued by serious staffing shortages. Although the facility had an additional 20 psychologist positions allocated to them about six months ago to meet their growing need, they found it was simply "impossible to fill them." Thus, they now have a total of 39 psychologist positions allocated to them, but only 19 are filled by regular CDCR employees. Some 10 psychologist positions (of the total shortfall of 19) have been | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Speculative. Lack of foundation. Argumentative re: nexus of suicides to overcrowding. | FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| filled through the registry. In the CDCR June 2008 staffmg data provided to the Special Master, NKSP reported that nearly a quarter-21.59 of 89.59-of its clinical positions were vacant, including 18 psychologist positions.361 Only 8 of the 18 psychologist positions were covered by registry clinicians. | | present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); no mention of "nexus of suicides to overcrowding." |
| 275.  I learned from Dr. Hirakawa that they have someone in a temporary or "overflow" MHCB every day at North Kern. Dr. Pitts, Senior Supervising Psychiatrist at the prison, told me that the combination of staffing and space shortages affected many aspects of mental health care at the facility. For example, he indicated that he had to "steal a psychiatrist to staffR & R," even though "they should be seeing patients but can't." He noted that, "when you see how many obstacles we face, it's a miracle there aren't more suicides." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |
| 276.  James McNarren, Mental Health Supervisor, was also candid about the ways in which overcrowding has compromised the delivery of mental health services at North Kern. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| For example, he told me: "[We have] huge space problems. This place was never designed for what we are having to do. We are too crowded to do the things we are supposed to do. [We] don't have the space to do treatment, but we try to do the best we can." He told me later that he thought the problem of excessively long waits for transfers to DMH was getting worse rather than better: "It takes forever. There are not enough beds. [We] just can't get gravely disabled prisoners in there." In addition, he felt that space limitations had forced them to create makeshift treatment areas. "We've been having groups on benches in the dayrooms of housing units," for example. | | matters within their employment, attorneys for defendants were present. |
| 277.  Dr. McNarren also addressed the very limited level of care that is being provided for 3CMS prisoners due to the significant overcrowded-related problem that plague North Kern. He explained that these prisoners "are just getting an initial evaluation and then only 90-day follow ups-no groups or clinical contact on a | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative re: nexus of suicides to | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| regular basis after that. We don't have the staffing or the space to see them. I wish we could, but the Reception Centers, 3CMS prisoners are not getting anything. If they make a request, of course, we try to see them, but [we] can't be proactive at all." | overcrowding. Mischaracterization/Argumentative re: "cage." | observation); FRE 703 (based upon review of data and expertise); no mention of "cage." |
| 278.  The various ways in which both space and staffing shortages interact with one another to compromise mental health programming for *Coleman* class members was underscored in the interviews I conducted with several prisoners at North Kern. The first, Prisoner CCC told me he has been at North Kern since January, 2008, approximately 7 months. He seemed somewhat disoriented at times, and had difficulties with memory. Prisoner CCC told me that he had only completed the 6th grade in school. With respect to his mental health status, he told me he is a 3CMS prisoner who hears voices and has long taken psychotropic medications. Prisoner CCC said he took Seroquel and Wellbutrin in the past but the doctors will not prescribe these | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative re: nexus of suicides to overcrowding. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; response to Defendants' MIL 10 (suicide rate). |

[253560-1]

| | Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|

medications here. He said that he had problems getting seen by mental health and medical staff in a timely fashion. For example, he told me that he had finally seen a doctor yesterday, after requesting a visit for 88 days. The longer we talked, the clearer it became that Prisoner CCC was very impaired, and that he had a hard time expressing himself. He indicated that, while at North Kern, he "had a seizure and officers left me on the floor." He also said that he believed the nurse and the COs were trying to kill him and, "I am afraid for my life in here but they don't care." Prisoner CCC has about 10 more months before he completes the prison term for his parole violation and will be released. He said that he was told he would do this entire prison term at North Kern, although he was supposed to transfer to CMC. He explained that he had been "locked up" and eventually brought to this unit about a week ago because "I was suffering and I was thinking about killing myself." When the staff became aware of this, he said, "they put me in a cage, in

-264-

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| front of the medical [unit]-they didn't give me any food-I just sat in the cage for 5 or 6 hours before someone came to see me. Then they brought me here. Then, just yesterday, a psychologist came to see me." | | |
| 279. North Kern serves as a Reception Center for several Southern California counties. The Receiving and Reception area of the prison is struggling under the press of the numbers of people who must be processed, with limited space and staffing, on a daily basis. I was told that the paperwork that new prisoners come with, off the bus from the county jails and into R & R, is minimal. Dr. Hirakawa told me: "We have to try to figure it out-a hundred a day-who is mentally ill, who isn't. We don't get the information we need from county and there are just too many of them." In addition, because many of the inmates are short-termer prisoners, coming in on parole violations and about to be released relatively soon, it is difficult to stabilize them before they leave the prison: "We have a guy in a MHCB right now who | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| is suicidal. He is paroling today. Our job is to try to stay on top of it with parole." | | |
| 280. A floor officer at the R & R, explained that, as with all of the Reception Centers, "the county is supposed to let us know that a guy has mental health problems. If they don't, we try to pick it up here," through the brief psychological screening they do. The R & R area at North Kern is a large open room, with a semi-circular counter, forming a kind of rotunda area in the center, with several large cells or holding tanks arranged along the perimeter. One of the psychologists, Dr. Murphy, acknowledged the space problems with which the unit is plagued. In fact, the psychiatrist and psychologist who work in the R & R unit must share a converted cell that serves as their office. The area is cramped-there can be two clinicians and two prisoners in it on occasion-so Dr. Murphy prefers to do his interviews at the large counter area in the center of R & R, even though there is a fair amount of traffic and not a great deal of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

-266-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| privacy afforded there. He told me that the facility typically receives somewhere between 70150 new prisoners, five days a week, and that mental health staff does more extensive screening with about 20% ofthem. When they do, typically "we are blind to detailed medical information [and] just have what county tells us or what the nurse picks up" from the earlier brief screening that has been done. | | |
| 281.  At the end of the day, I entered C West Building, a regular dormitory housing unit that housed 200 reception center prisoners in 100 bunk beds. C West dorm is a mirror image of C East dorm. I was also informed that C Yard has two-story dorms in buildings C14, which I did not visit at NKSP (but did see the same type of structure the next day during my tour of Wasco Reception Center). I had an opportunity to interview several recently arrived prisoners who had a perspective on what it was like to be recently processed through R & R. (These were prisoners whose | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative/Speculative re: "wanting to be dead," nexus of suicides to overcrowding. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate ; Court can |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| names the state's expert randomly drew from the roster in the housing unit.) Because there was no available treatment or office space on the unit, the prisoners agreed to be interviewed at the dining tables in the center of the dormitory, as the other prisoners in the unit looked on. Also, because dinner was about to be served and the tables we were using were needed to feed the prisoners, we were able to interview only a few prisoners. | | determine whether statement is mischaracterization, speculative, or argumentative. |
| 282.  Prisoner DDD told me he had recently arrived at North Kern and been there for a little over a month. Because he once worked for a sheriffs department in California, he has protective custody concerns. He also suffers from a generalized anxiety disorder for which he was taking Zoloft and Trazadone for 10 years on the streets. This was his first prison term and he said that he was traumatized by what happened to him at the North Kern R & R-the "worst experience I've had in my life." He described being stripped naked at R & R when he arrived, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Cumulative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; FRE 703 (based upon review of data and expertise). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and then being moved to a holding cell where he was finally provided with boxers and left by himself for six to eight hours. Prisoner DDD said he was then placed in a larger holding tank with ten to fifteen other prisoners who were all given mats to sleep on, on the floor of the large cell. He believes he was held in R & R for a total of about 36 hours before being moved into an actual housing unit. "They said they were waiting for beds to open up." It was approximately seven days before he was allowed to take his first shower. Other than showers every several days after that, he said there was no program whatsoever-not even dayroom-in the housing unit where he was kept. Prisoner DDD was dismayed to learn that the medications he had been taking on the street would not be administered to him in prison. The prison psychiatrist told him that it simply wasn't possible. He complained about the lack of mental health care overall: "There is no one-to-one therapy of any kind, just a meds consultation where they tell you | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| that you can't have what you need." As we ended the interview, he told me, "Aside from wanting to be dead, I'm doing OK." | | |
| 283. Prisoner EEE arrived on May 9,2008, and is also a first termer. He told me that he has only a short sentence to do and should be released in about six months. He said it was a shock to come to North Kern, in part because there were so many people, and so many fights in the dorms. (In fact, he said, we had just missed one that occurred in this dorm before we got there.) Prisoner EEE had mental health problems on the streets, where his physician had prescribed anxiety medication for him. He also said he was taking Wellbutrin at the country jail, before coming to North Kern. At North Kern, however, he was taken offWellbutrin and put on Prozac, which was then changed to Effexor (which he told me he finds more effective). However, he, too, acknowledged that, aside from the brief clinical contact he had with a psychiatrist to review his medications, he has had "no | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Cumulative. Speculative. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise; Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| other contact with clinicians," even though, as he said, he "would like to very much." He told me he felt that his anxiety disorder was aggravated by living in the dormitory setting, which has disturbed his sleep and made him feel nervous and unsafe. As he put it, the experience at North Kern is tearing him down without giving him an opportunity to build himself back up. | | |
| 284.  Very little activity and programming appeared to be taking place at North Kern. Of course, such widespread idleness is likely taking a toll on prisoners in general and mentally ill prisoners in particular. As Dr. Hirakawa acknowledged to me: "The Reception Center is locked down most of the time. That's why there's so much acuity-no jobs, they don't know where they are going, and only get yard two times a week." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |
| 285.  Not surprisingly, the lack ofprogramming and activity was especially evident in the Ad Seg unit at North Kern. I toured the D-6 Ad Seg unit, where the total count in the unit was 157, and there were | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overflow Ad Seg prisoners on the other side of the unit. The supervising sergeant explained that their EOPs are supposed to be moved out of this unit and into a hub EOP. Instead, they "often aren't and wait for a while in this unit." According to NKSP's EOP Transfer Log, three of the nine EOPs listed as EOP Ad Seg, were not transferred to an EOP Hub within the transfer timeline of 30 days and have remained in the Ad Seg, for 50 days, 226 days, and 363 days.363 The cell assignment board in the unit indicated that this side of the unit held a total of 6 EOP prisoners and about 30 who were 3CMS. Although the sergeant did not know offhand exactly who the EOP prisoners in the unit were, or how long any particular one had been here, he did know that the EOPs in Ad Seg were treated a bit differently from the other Ad Seg prisoners (who essentially had no program at all). The sergeant indicated that their policy was to double cell everyone in Ad Seg because of space shortages and the difficulty of finding single cells. However, he said that single cell | Relevance. Fed. R. Evid. 402. Cumulative. | matters within their employment, attorneys for defendants were present; FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| assignments could be made when there were obvious gang or safety issues involved or, on occasion, when mental health staff intervened. | | |
| 286.  Prisoners throughout the CDCR have talked about the pressures that are put on them to double cell, even if they feel they cannot handle it, or have a history of having had cell fights in the past. This is true of *Coleman* class members as well as others, despite the fact that their mental health conditions may render them singularly ill-suited to have a cell mate. As it turned out, this issue was underscored by the two prisoners whom I happened to interview next. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative/Speculative re: nexus of suicides and fights to overcrowding. | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions);FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; Relevant to impact of overcrowding; no mention re "suicides." |
| 287.   I interviewed Prisoner | Inadmissible Hearsay. | FRE 703 (not offered |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| FFF who told me that he is 28 years old, and has been to prison several times before. However, he had never been on the mental health caseload until he came into the system this last time, having been returned to custody for a parole violation. He said that he has been given a diagnosis of bi-polar disorder, and is now taking Depakote and Effexor. His level of care is 3CMS. Although he did not ask for mental health help when he was first processed into North Kern, he ended up getting into a fight and was put on suicide watch after that. He told me that he has always had a problem with his anger, and that he had a tendency to "black out" in fights. After his initial fight at North Kern, he served a couple month term in the prison Ad Seg. He was then double-celled and got into another fight-a very serious fight-with his cellmate in which he (Prisoner FFF) was sent to the hospital. After this hospitalization, he was sent to Ad Seg a second time, because of the cell fight, and served an II-month term. He told me that he was fortunate enough to receive some badly needed | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative/Speculative re: nexus of suicides and fights to overcrowding. | for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; Relevant to existence of overcrowding and problems caused thereby; Court can determine whether statement is mischaracterization, speculative, or argumentative; see: Plaintiffs' response to Defendants' MIL 10 (re: suicide rate). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| mental health contact from the clinician who was assigned to the unit, Dr. Roberts. Unfortunately, this clinical contact terminated when Prisoner FFF was released from Ad Seg. He said that now "I only see my psych every 90 days-I've only seen her once. Also, they insisted on having a CO in the room with us, and I'm not comfortable doing that." In fact, he said, he keeps putting in requests about his mental health status but they keep being ignored. He, too, complained about the overall lack of programming and treatment. Prisoner FFF told me he gets yard twice a week, dayroom on the non-yard days, and has a porter job. Besides this limited time-yard and job-the only time he gets out of his cell is to eat in the dayroom. There is no other formal programming available. "We don't even get phone calls here. Visits last one hour, behind glass." He believes "they are handling people by medicating them, 'here, take this, go to sleep.'" | | |
| 288. I interviewed an Ad Seg prisoner, Prisoner GGG who | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (not offered for the truth, but to |

-275-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| told me he re-entered CDCR in January, 2007, after one prior prison term. He once had been an active gang member and had served more than six years in the Security Housing Units at Corcoran and Pelican Bay. However, he dropped out of the gang in 1998, while he was at PBSP SHU. He explained that he knew that he had mental health problems for a long time but, because receiving mental health treatment was not looked on favorably by his fellow gang members, he did not seek any help. When he got out of prison in 2000, he said "I had a really hard time adjusting on the streets." When Prisoner GGG arrived at North Kern in 2007, he got into a very serious fight with his cellmate. He ended up in Ad Seg and that's where he first asked for help with his mental health problems. However, Prisoner GGG complained about the lack of treatment or programming for 3CMS prisoners at North Kern: "We are lucky if we get 10 minutes of clinical time or contact. I got put on 3CMS but nothing much changed-no change in meds they bring you to a cage-you either stand up or sit down, but | Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative/Speculative re: nexus of suicides and fights to overcrowding. | provide information about the basis of the opinions); FRE 803(3) (then existing mental, emotional, or physical condition); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-276-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| nothing much happens there." Prisoner GGG acknowledged that 3CMS prisoners also could receive "group" in Ad Seg: "We go into the little room next door, stand in those cramped cages, and watch a movie for an hour. That's our 'group.'" | | |
| 289.  I was later able to determine that Prisoner GGG and Prisoner FFF had been mutual combatants in the cell fight that resulted in Prisoner FFF's hospitalization and that led to both of them being sent to Ad Seg. Prisoner GGG explained the dilemma for people who are having mental health problems, who may have a history of having cell fights and who, because they are not be getting along with their present cellmate or feel that they need to be singlecelled, are at risk of subsequent conflicts: "You get a write-up if you won't double cell. It will hold up your transfer for at least 90 days. They force you to take a cellie, even if you've had multiple instances of cell violence like I have." In fact, both Prisoner GGG and Prisoner FFF were not only on 3CMS status but both said that they have had | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Cumulative. Mischaracterization/Argumentative re: "cages." | FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate; "cages" not mentioned in ¶ 289. |

-277-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| anger problems in the past. Yet they were celled together, got into a very serious fight where one of them was very badly injured, and they both did Ad Seg time. | | |
| 290.  While I was at the Ad Seg unit, I went into the "treatment" room at the end of the unit. It consists of a small, cramped room, with three cages arranged inside. None of the cages has seats. Dr. McNarren told me that they had ordered new cages, ones with seats, a while ago but that "we don't know what happened to them." I was told that individual mental health contacts typically took place out on the unit dayroom floor, also in treatment cages. There were three cages arranged in a row on the dayroom floor, with "privacy screens" or partitions between them that supposedly protected the individual prisoners from being watched by other prisoners in the unit during their counseling session. The unit sergeant told me that he made a point of moving the privacy screens back reasonably far from the treatment cages themselves, to maximize the distance at which the clinician could stand, "in case the prisoner | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

-278-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| wants to spit on [them] through the cage." One of the prisoners (Prisoner GGG) told me that he felt that the "privacy screens" were superfluous, given the public nature of the sessions themselves. He said: "I have no idea why they use the screens. Everybody can still hear you, everybody knows who is going behind the screen, so it makes no sense." | | |
| 291.  As I noted above, North Kern was operating at 200% of capacity the day I toured there. Not surprisingly, this level of overcrowding translated into the extensive use of "nontraditional" or "bad" beds-housing prisoners under inappropriate conditions, especially inappropriate for the confinement of mentally ill prisoners. For example, I toured a mainline housing unit at North Kern, A-2, which has makeshift dayroom housing. The floor officer initially indicated that he did not believe there were any mental health caseload prisoners housed there, or perhaps there were just a few. If there were any, he did not know who they were specifically. In fact, when the prisoner roster was checked, we learned that there were | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| some forty-five 3CMS prisoners in this unit alone. There was no program being run for the 3CMS prisoners in the unit itself; instead, the officer indicated that they would be given ducats to go to the clinic, where he thought they could participate in groups. The floor officer also told me that it was definitely harder to supervise a unit with dayroom housing like this. There are "too many people, too much movement on the floor, [and it] also gets hotter because of so many people. Things like showers take longer and so on." | | |
| 292.  I also toured the A Yard gym, a large makeshift gym dormitory that holds some 140 prisoners. This is a unit comprised entirely of working prisoners, including one who is on the mental health caseload. A floor officer told me that he typically did not know whether there were mental health caseload prisoners in the unit or, if so, who they were: "I overhear them talking to a nurse about meds, and then I know." But, otherwise, he would not. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| However, he also acknowledged that, although it is rare, he does remember that there have been mental health caseload prisoners housed in the gym, sometimes for months. | | |
| 293.  From the very start of our tour at North Kern-from the morning orientation meeting and for much of the rest of the day-we heard about the crisis bed shortages at the facility. Chief Psychologist, Dr. Hirakawa told us that the North Kern gets about 100 new prisoners each day, and that nowadays it seems many more of them are coming into prison who need crisis beds. But the crisis beds simply are not available. On any particular day, he said, "we have a census of 6-1 0 people waiting for a crisis bed... We had to become creative. [You'll] see EOPs, and CCCMSs, Ad Segs in hallways. The reality is that we have no place to see patients. It's a serious problem." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 294.  In this regard, I toured the CTC trailer at North Kern. It has holding cells in the front that are used for prisoners with special needs, and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| overflow from the CTC itself. The cells are not suicide proof. The North Kern CTC has 10 licensed MHCBs. Although there were exactly 10 prisoners in the crisis beds on the day we visited, Dr. Schmidt, a psychologist who works in the unit, told me that "I've been here for 10 years. This is the second time I've seen no one in our overflow." He went on to tell me that it was a "big problem" to house the CTC overflow "all the way over in A4," because it limited staff access to them. | for opinion. Fed. R. Evid. 703. Cumulative. Lack of foundation. | 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Not inappropriately cumulative – in systemic case, examples of treatment of small number of class members at different prisons are necessary to provide a representative sample and are therefore appropriate. |
| 295.   This general issue-the lack of beds at the appropriate level of care at North Kern-was underscored and illustrated in some of the interviews I conducted with prisoners. For example, while in the D-4 housing unit, I interviewed Prisoner HHH. Prisoner HHH told me: "I need help. I'm 3CMS, have been since 1998, diagnosed as a paranoid schizophrenic." He said that he had been sent to Patton State Hospital in the past, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and had two prior suicide attempts. He also was in an outpatient mental health program the last time he was on the streets. Prisoner HHH was returned to CDCR about a year ago and has requested EOP level of care to address increased mental health symptoms. However, the request has been refused. He is currently taking Geodon, although he has taken Remeron, Zoloft, and Seroquel in the past. Prisoner HHH went on to explain that the staff at North Kern "tried to put me in dorms" but that he "got suicidal-I hated it." He is especially concerned about being sent to a dormitory at Corcoran State Prison, which he believes is what is in store for him. But, because he is SNY, he does not want to go there. In fact, he says, he very much wants to participate in groups, to receive some form of counseling or treatment, but feels he is getting nothing but medication here. Because he gets out of prison in November, 2009, he says, "I want to get the help I need." But it does not appear to be available at North Kern. He | | |

-283-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| indicated that he is still hearing voices, gets paranoid, and "I worry that people are out to get me." Yet, even after he has requested help and explained his problems, "still nothing happens." His "program" at North Kern, as he described it to me, is that, in addition to twice weekly dayroom: "I stay in the cell all the time, except for yard. I go a couple of times a week. That, and TV, and showers, is it." | | |
| 296. North Kern has also found it impossible to meet EOP transfer deadlines. At the general orientation meeting, staff informed us that they continued to be concerned about the length of time that EOP prisoners were staying at their facility, one that they conceded was not designed to house EOPs on a long-term basis. The mental health staff indicated that the problem was not so much getting the EOPs endorsed for placement elsewhere but rather finding the beds once they were endorsed. The Warden also acknowledged that "we have a lot of them, and it's hard to place | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| [these] inmates." In fact, the prison's own data indicate that 25 of the 66 EOP prisoners (or 38%) at NKSP on July 29, 2008 were there beyond the *Coleman* transfer timelines.364 More problematic, however, was the fact, that EOPs represented 21 percent of the admissions to the MHCB between May and July 2008, although they are only a small percentage of the overall MHSDS population (on July 29,2008, only 7 percent of the overall MHSDS).365 It seems that EOP prisoners who are housed at NKSP without EOP level of care do not fair well. The Special Master found that NKSP's failure to transfer their EOP prisoners in a timely fashion was not due to institutional delays, but rather "attributed to lack of beds around the state." | | |
| 297.  In addition to problems transferring EOPs, the Special Master found that "[a]ccess to DMH acute care was inadequate over the monitoring period." 367 Indeed, Dr. Hirakawa told me something that was echoed everywhere I went, namely that "DMH transfers | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are a real problem. Unless your guy is suicidal, you can't get him in. [He] sits on the waiting list." Dr. Pitts agreed, saying that the backlog for transfer of gravely disabled prisoners was "a real problem. Our gravely disabled patients stay 90 days or so often in the CTC." Dr. Hirakawa said that they have found it very difficult to find any crisis beds elsewhere in the state, and that it is rare for their CTC to have an empty bed: "We often have 10 or even 15, which means we need to go elsewhere." | | chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable). |
| 298.  At the CTC, Dr. Schmidt noted that their DMH referrals "used to languish here for 45-60 days," and that this had "gotten somewhat better in recent months." But the referrals were still staying too long-he could not estimate how long- and if they were not suicidal they still "languish a very long time." Staff told us about one patient in the CTC who had been in the unit for a month since he had been referred and accepted in DMH on June 23, 2008, 38 days ago. He was currently number 16 on the DMH waitlist for an acute bed. There were several other patients in the unit | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| who had either been referred to DMH or had extended stays and were being evaluated for an acute referral. Dr. Schmidt noted that "when we put people on the DMH referral list for grave disability, they just don't go, even if they are profoundly disabled or dangerous." | | |
| 300.  . Wasco is faced with a number of serious overcrowding-related problems. As we were leaving the Administration Building, the Chief Medical Officer (CMO), Dr. Michael Songer told me that "we are coming apart at the seems. We don't have enough space to put people, don't have enough space to see them. Plus, we can't hire psychiatrists. We just can't.  We can hire psychologists but not psychiatrists. It's a big problem." These serious overcrowding-related issues- lack of clinical staff (in particular, psychiatrists), lack of treatment and programming space, and far too many prisoners-jointly undermine the treatment of Coleman class members at this facility. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation), FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 301.  The Acting Chief Psychologist, Troy Newton told me that he and his staff did | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| not have "anywhere near" enough space to do the things they are required to do for the overwhelming numbers of prisoners for whom they are responsible. The space shortages required all sorts of improvised, makeshift approaches that, in turn, often had unintended consequences or compromised the delivery of services in other ways. For example, the lack of space required them to convert a prisoner holding area into clinical office space. However, the resulting lack of a holding area precluded clinicians from seeing patients in these offices, as they originally had intended. | Hearsay. Fed. R. Evid. 805. | interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 302. When Dr. Newton took me to one of the areas where the clinicians are housed, he showed me the converted space, which he said staff referred to as "the homeless shelter." In the individual offices that were located in the same building, several psychologists shared each one of the desks. Each office had only one phone and no computers. Apparently, some computers had been purchased but not hooked up because "we don't have the tech staff' to do it. The space for clerical staff in the clinical office area was also | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| extremely overcrowded. Six staff members worked inside a very small area, including in a storage closet that had been converted into clerical office space. In Dr. Newton's opinion, mental health staff at Wasco need "2 or 3 more buildings" equivalent in size to the two trailers they now occupy. | | overcrowding. |
| 303. I toured the RC EOP "mental health clinic." The room is reasonably large and certainly appropriate to accommodate group therapy or counseling. However, the psychiatric technician in the clinic at the time, Ms. Bell, explained that "this is the only room we have for group." With over 90 EOPs, "there can be 20 guys in here at a time-it's not unusual for the room to be jammed." She also said that the staff tries to run an active EOP group program but that sometimes the groups have to be cancelled because of workload issues. Although "group is a priority," she has a number of other responsibilities that prevent her from doing more groups, and sometimes interfering with those that are scheduled. For example, she noted that she had to cancel some of her groups the week before-"I didn't have enough | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-289-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| time and had too much [else] to do"-and that no one had been able to cover them. There are only two psychiatric technicians "for 90+ EOPs-we have to walk all over the place because they are all over the facility. It takes forever to see them." The psychiatric technician supervisor who came into the clinic as we were leaving confirmed that "it's really hard to do rounds with 91 EOPs." | | |
| 304. Wasco's CMO, Dr. Songer, discussed another overcrowding-related problem with me. He told me "at times it's overwhelming in these suicide watches- 12 outside the CTC-we can't oversee them. There are too few places in the state where we can find crisis beds. The [local] hospitals won't accept a non-acute medical patient anymore, we don't have any way to create space." He indicated that there have been times in the past when every bed in the CTC was filled with MHCB prisoners. Moreover, he talked about tensions with custody staff and their inability or unwillingness to provide escorts for prisoners with mental illness and medical needs who must be transported throughout the prison to receive proper care: | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "People are ducated and they just don't get there. It's frustrating as hell." He indicated further that this was a "huge" problem for the EOPs at Wasco. He acknowledged, as Dr. Newton had earlier, that space continues to be a serious problem at the prison. Mental health staff does not have enough space for clinicians to see their clients. They have to go on the units to do so, but even this is cumbersome, with custody staff not necessarily always willing to facilitate their contact in the units. | | |
| 305. I toured the A Gym, a large three-level bunked makeshift dormitory housing unit that, according to the floor officer, currently housed 107 men. It suffered from the same kind of degraded environmental conditions and potential security problems as the other makeshift gym housing units I have seen in different CDCR facilities. The floor officer noted that, although she was not sure whether there were any 3CMS prisoners currently housed in this unit, some certainly had been in the past. She told me that even though an effort is made not to retain prisoners in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| this housing unit any longer than necessary, at least one prisoner had been housed there since February-a period of some six months. When I asked about the challenges she faced working in this unit, she told me "it is a hard place to oversee. We have a gunner, but it's hard to see everything and it gets hot in here a lot," so prisoners sometimes have a difficult time. When she or other officers notice that a prisoner "can't handle it," they call mental health to arrange a visit. | | |
| 306.  I toured one of the Reception Center housing units, B-2(B). One of the floor officers in the unit, explained that this unit housed "a little bit of everything, including EOPs, SNYs, Armstrong class members, DDPs, and Suicide Watch overflows." There were 13 men living in makeshift triple and double bunks, set out on the dayroom floor, directly in front of the unit television on the wall. He acknowledged that EOP prisoners could be housed in these open bunks, depending on their circumstances-"I have done it lots of times." As I found was true of most of the units in the various prisons I toured, however, the officer did | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| not know offhand how many EOPs he presently had in his unit, and he was not at all certain of exactly who any of them were: "We don't have an open list and I don't know." He indicated that a number of groups were held in the housing unit. However, they were conducted at the fixed metal tables on the dayroom floor, ones that he said were open to everyone in the unit, regardless of their mental health status. | | |
| 307. I asked the Unit Sergeant about the suicide watch cells in the unit. He told me: "I don't think it is a good idea to have suicide watch cells in here. This is not set up for it. But the prison wrote the procedure and we have to follow it. On a bad day, we have had as many as ten suicide watch inmates here; we've had them for several days at a time. After three or four days, they take them to CTC." Dr. Newton added at this juncture that: "We are in desperate need of more CTC beds. This suicide watch procedure is dangerous. It's only a matter of time before someone kills [him]self." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 308. Wasco officials indicated that they regularly contact the Health Care Placement Unit in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 703 (based upon personal observation); FRE 801(d)(2) |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Sacramento for assistance.in placing prisoners in a mental health crisis bed when their CTC is full. For example in April 2008, the prison referred eight prisoners for MHCB placement because their MHCBs were full. However, none of these referred patients were transferred.  The four EOPs who were referred for MHCB placement were eventually returned to their housing unit after waits of up to seven days.  Similarly, in May 2008, the prison referred seven EOP and one 3CMS prisoner for MHCB placement system-wide, but none were transferred.  Four of the EOPs were eventually admitted to the crisis unit at Wasco.  In June 2008, it appears that neither of the EOPs referred to HCPU were transferred to an MHCB system-wide during their waits of 9 and 19 days before they were admitted to the NKSP MHCB.  The CTC Overflow table provided to me on the day of my site inspection lists 18 prisoners, including 13 EOPs, with lengths of stay ranging from 2 to 24 days. | Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Lack of foundation. | (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 309.  The Special Master confirmed that the use of holding cells pending MHCB admission was problematic at | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Wasco: "Lengths of stay often exceeded four hours ...[a]lternative holding cells were utilized frequently, and for prolonged periods of time in many different settings throughout the institution. There was no indication that the CTC was used as the priority setting. Documentation revealed suicide watches conducted in the CTC, holding cells, administrative segregation, and R & R. Records showed at least 134 uses of alternative cell placement in a six-month period, including several prisoners with multiple admissions.  One quarter of the prisoners in the alternative settings were held on suicide watch for three to nine days." | 805. | FRE 201 (judicially noticeable). |
| 310.  In the D-6 Ad Seg unit, the housing officer showed me the modifications in the cells where prisoners on suicide watch were placed. The cells have solid doors (unlike the standard Ad Seg doors in this unit, which have perforated cell coverings with Plexiglas placed over them), and concrete bottom bunks, to prevent prisoners from getting under them. All of the windows were painted over ("to prevent communication" | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Mischaracterization/ Argumentative re: "cages." | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| but also precluding any view of the outside world). One of the offices in this part of the Ad Seg unit is used for "groups" and three treatment cages had been placed inside the room. The officer indicated that he had about 13 or so EOP prisoners in his unit and "a lot of 3CMSs." Although the EOPs were getting groups, in the cages mentioned above, the 3CMS prisoners were limited to psych tech rounding contact. | | statement is mischaracterization, speculative, or argumentative. |
| 311.  Dr. Newton also noted that, because of the shortage of appropriate beds where prisoners with similar needs could be housed in one centralized location, "EOPs are being put in with SNY's and PCs, which put stress on all the groups." In addition, he noted, "we get people here who really should be in mental hospitals." Wasco has six licensed MHCBs and they convert other beds in the CTC to MHCBs as needed. As Dr. Newton noted, however, the problem is that they only "have staffing for the six licensed beds," without any  additional staff allocated for the "overflow," which can be substantial at Wasco. In fact, I was told that it was not uncommon at Wasco for | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |

-296-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| them to have as many as 12 or 13 overflow crisis beds in use, and "we have had as many as 20-21," despite not having the staff "to cover that the way we should." All of the MHCBs in the CTC were full the day I visited Wasco, and there were at least six mentally ill prisoners in "overflow" beds located throughout the facility. | | |
| 312.  Inside the CTC itself, there were complaints from staff that that the delays in obtaining DMH beds continued to back up the use ofMHCBs at the facility. As one of clinicians put it, "I've heard it before that the DMH referrals have been improved but nothing changes." In fact, there were a number of prisoners in the CTC who had been there for a considerable period. One prisoner had been in the CTC for 102 days, awaiting a transfer to the appropriate DMH facility. Despite this long-term retention of mentally-ill prisoners, the CTC is not able to offer them regular therapeutic or treatment groups. In fact, the first group that staff could remember being conducted there in a long time had been held the week before. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 313.  We encountered one particular tragic case as we | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (based upon personal observation); |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| passed through the Wasco CTC. I saw a prisoner lying down in one of the cells near the entrance to the unit. We were told that he had been in the CTC for a very long time. I asked to interview him. Inmate III was brought to an area in the CTC that is used for IDTT and that doubles as clinician office space, and talked with me. Mr. III, is a 49 year-old prisoner who has had one leg amputated just below his knee (the result of being shot by prison staff at Tehachapi) and he requires a wheelchair for mobility. He confirmed that he had come to the CTC at Wasco approximately 102 days ago. He told me that he was picked up on the streets for soliciting a prostitute and, because the prospect of returning to prison for a parole violation was so overwhelming, he attempted suicide by slashing his wrists and throat. By all accounts, it was a very serious suicide attempt. After a few days of hospitalization, Mr. III was transported to Wasco as a parole violator. | Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Speculative. Argumentative. Mischaracterization of evidence. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 314. The severity of his suicide attempt resulted in his immediate placement in the CTC, some 102 days ago. Although obviously in need of a | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| higher level of care than could be provided in the CTC, Mr. III was held there in part because he had "appealed his parole violation" (and DMH would not consider him for transfer until that issue had been resolved). However, his hearing date was postponed because the Wasco clinical staff had determined that Mr. Ill's precarious mental health status required that a nurse accompany him on the trip to Fresno (where his parole violation hearing was to be held). Unfortunately, the prison lacked any available staff for this purpose. Because his hearing was delayed, his transfer to DMH or another more appropriate facility was postponed indefinitely and he remained in his MHCB cell in the CTC. I later learned that the hearing was apparently held on July 18th, and Mr. Ill's transfer is now imminent. | for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. | interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 315. The conditions of Inmate Ill's confinement during this 102-day waiting period were abysmal. The MHCBs lack furniture so, for more than three months, Inmate III lived his life-slept, ate, and otherwise just sat-literally on the floor of his barren cell. In addition to his amputation, Inmate III indicated that he has four artificial disks | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to existence of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| in his spine, so that being forced to live on the floor was physically very painful as well as degrading. As he put it, "I'm a wreck, physically and mentally." He told me that about three weeks ago a correctional officer took pity on him and provided him with a thin mattress to sleep on; he asked for a pillow too but this request was denied. During his hundred days in MHCB, Inmate III was clothed for this time in a standard smock and was required to eat from a paper plate, without any utensils, even plastic ones. He told me that he tore off a piece of the paper plate to use as a makeshift spoon because he did not want to be forced to eat with his hands. Because his amputation made it impossible for him to walk, he was forced to "scuttle" when he wanted to move around in his cell and he showed me the calluses on his knees from this practice. | | overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 316.  Other than routine cell front check-ups from mental health staff, and an occasional visit from the recreational therapist who comes by the unit to see all of the patients there, Inmate III received no regular individual | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| or group therapy while he was confined in the CTC. He said that he had never been taken out of his cell for mental health treatment of any kind; the staff "tell me that's not their job-just [do it] through the door." Because of his MHCB status, he also could not have social visits from outside the prison or receive canteen. A brief review of Inmate Ill's records in the CTC confirmed the basic facts that he relayed to me about his. | Evid. 402. Cumulative. Argumentative. | (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 317.  Wasco State Prison serves as one of the Reception Centers for intake into the CDCR for prisoners from a number of areas in Southern California. I toured the Receiving and Reception ("R & R") area of the prison, which is laid out virtually identically to the North Kern facility visited the day before. However, I was told that the Wasco R & R receives a larger percentage of parole violators compared to North Kern. I talked to a contract psychiatrist, Dr. Christina Golden, who was assigned to R & R at Wasco. She told me that she shared office space on the unit with a nurse, so typically tried to conduct more or less confidential psychiatric evaluations with prisoners by sitting outside the bars of the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Cumulative. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| large holding cells where they were kept. She was very candid about the consequences of overcrowding and the lack of appropriate bed space at the prison, in particular at the CTC: "We do the best we can, but we put people in overflow all the time. We're desperate for beds." | | argumentative. |
| 318.  In her view, the situation certainly had not improved recently: "In the last two weeks, custody has been pulling its hair out because they do not have beds anywhere." Dr. Golden was equally candid about the challenges faced by clinicians who are doing screening in the R & R: "We don't really catch all the people who need 3CMS and EOP that come in--the psych screening is so brief. I don't really have records. [I] never have them before I see [a prisoner]. I've never seen a doctor's note or history on the courts' record—never--I just have a medication record-the rest is my clinical judgment." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present. |
| 319.  Dr. Golden also told me about a prisoner, Inmate JJJ, who entered the facility the day before, and whose case she thought illustrated some of these problems. Inmate JJJ had come in the day before acting strangely and was identified by | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| custody staff as needing immediate psychiatric attention. She interviewed him, without any paperwork that might have indicated his medication needs or prior mental health history. She immediately determined that he needed to be put on suicide watch in an appropriate MHCB. However, she also knew that this might be difficult to arrange. He was moved to a "dry cell," on the floor of the R &R unit, to await transfer to an MHCB. However, instead of being moved to an MHCB that day, where they could care for him, as he should have been, she said, Inmate JJJ remained in the holding cell in the R & R today. She told me, with much concern: "I just saw him. He shouldn't be here. A custody person has had to watch him." Then she added: "We are struggling here, trying to provide decent psychiatric care in a place like this, but it is really hard." | | speak with expert about matters within their employment, attorneys for defendants were present. |
| 320.  When I went to look for Inmate JJJ, I found that he was being kept in a separate cell off the main rotunda area ofR & R. There was blanket on the floor, but no bunk, mattress, toilet, or sink in the cell. Inmate JJJ was standing straight up in the middle of the cell, almost at | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Cumulative. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| attention, dressed in a suicide gown; he had urinated on the floor. A nurse's assistant, who was sitting outside his cell, holding suicide watch, confirmed that he had been like this for quite a while. Inmate JJJ had a fixed gaze and he would not make eye contact. He appeared to be completely unresponsive, virtually catatonic. The nurse told that he had been standing more or less motionless for hours and that, in fact, he had been in exactly this state when she had left him the day before: "his behavior hasn't changed." He clearly had not eaten-the food tray that sat on the bench behind him did not appear to have been touched. As I was trying (unsuccessfully) to talk with Inmate JJJ, and asking the nurse about his case, the mental health staff members who handle the CTC overflow showed up for the first time. When they arrived, Dr. Newton indicated to me that the "overflow staff should have been in to see him last night." The psychiatrist explained that, unfortunately, they currently had "no place to put him; we'll have to move someone" in order to make room for him. | | matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 311. Dr. Newton also noted that, because of the shortage of | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (based upon personal observation); |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| appropriate beds where prisoners with similar needs could be housed in one centralized location, "EOPs are being put in with SNY's and PCs, which put stress on all the groups." In addition, he noted, "we get people here who really should be in mental hospitals." Wasco has six licensed MHCBs and they convert other beds in the CTC to MHCBs as needed. As Dr. Newton noted, however, the problem is that they only "have staffing for the six licensed beds," without any additional staff allocated for the "overflow," which can be substantial at Wasco. In fact, I was told that it was not uncommon at Wasco for them to have as many as 12 or 13 overflow crisis beds in use, and "we have had as many as 20-21," despite not having the staff "to cover that the way we should." All of the MHCBs in the CTC were full the day I visited Wasco, and there were at least six mentally ill prisoners in "overflow" beds located throughout the facility. | Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Cumulative. | FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 321. When I discussed Inmate JJJ's case with the Lieutenant, who oversees R & R, he acknowledged the serious challenges his staff regularly | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent); FRE |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| faces in R & R. For one, he told me, they do not often have much information about individual incoming prisoners when they come off the bus. "When parole violators come in, there is no information with them. [The paperwork] says, 'parole hold,' with a picture of the guy and where he's from." So the prison staff has to do their mental health and other assessments essentially from scratch in most cases.  In Inmate JJJ's case, the Lieutenant recalled that "he was basically catatonic when he came in." We determined from examining the unit logs that Inmate JJJ had been processed in at 1330 hours the day before. Thus, he remained in a catatonic state, standing in a bare holding cell, awaiting a transfer to an MHCB, for nearly 24 hours. He was still there when we left the unit. | Lack of foundation. Cumulative. Argumentative. | 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 322.  One of the most unsettling consequences of the profound level of overcrowding that plagues the CDCR facilities that I have inspected is the frequency with which seriously mentally ill prisoners are being consigned to "back ward" type housing units where they are subjected to extremely harsh conditions of confinement and | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| receive little or no genuine mental health care. Despite the good intentions of many of the clinical and custody staff, there are simply too many of these prisoners to be cared for properly under these conditions and they end up figuratively lost and hopeless in the system. I interviewed several of these prisoners at Wasco. | | statement is mischaracterization, speculative, or argumentative. |
| 323.  I conducted interviews with several prisoners in the D-6 Ad Seg unit, in an office space on the other side of the housing unit that also contained treatment cages and was used for EOP "groups." The first prisoner, Prisoner KKK appeared to be profoundly psychotic.  He was extremely confused and disoriented, and answered each of my questions with a stream of consciousness that was mostly impossible to follow. Prisoner KKK was able to focus only momentarily, but then his answer dissolved into a floridly psychotic speech that included the assertion that he was a member of the CIA, an "Alpha Omega," and that he was being asked "to prosecute the state of France." Among other things he was able to tell me that he thought he had been at the prison for about two | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Cumulative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| months, knew that he currently had a cellmate, and had been to Patton State Hospital in the past. He said he was not presently taking medications, and did not know when he would be getting out of prison or Ad Seg. | | |
| 324. Dr. Newton later told me that he was troubled to hear about Prisoner KKK's serious psychosis and the fact that he'd been in Ad Seg for many months. He indicated that, given the seriousness of his mental health problems, he "should be treated." When I inquired further about Prisoner KKK's status, the unit staff said they thought he was in a situation similar to Prisoner III -that is, that he could not be transferred to DMH until his parole status was resolved. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Cumulative. | FRE 703 (based upon personal observation); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 325. The next prisoner, Prisoner LLL also appeared to be psychotic, but not as floridly as the previous prisoner. Prisoner LLL told me that he was 34 years old, an EOP prisoner who had been in Ad Seg for about 5 months, and was currently taking Risperdol and Depakote. He said that he had been to a number of state hospitals, including Patton, Metropolitan, and Atascadero, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion. Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative. Speculative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information to provide the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and believed that he was on the waiting list for DMH or Salinas Valley. He told me what his life consists of in Ad Seg: "I masturbate, draw, and read..." He acknowledged that "it's hard in here because I have no money, [and] can't get canteen. I got a bag of chips last month. It was great, delicious," he said, wistfully. Because of "problems with cellies in the past," he said, he is single celled now, and also goes to the yard by himself. Prisoner LLL said that he has a history of multiple self mutilations and three or four suicide attempts. He still thinks about suicide. | | speculative, or argumentative. |
| 326.  I interviewed another Ad Seg prisoner in D-6, Prisoner MMM. Prisoner MMM is an EOP prisoner who has been waiting at least six months at Wasco Reception center to transfer to an EOP program.  He originally was returned to custody on a parole violation, but because of a cell fight, he was now facing more serious charges and did not know when he would be released. He said that his mental health problems began in 2004, during an earlier term of incarceration, after he had been beaten up by a group of several other prisoners and rendered unconscious. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent); (waiting list for transfer); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Apparently, he began to have delusions after that and, as he put it, "just lost it." When he returned to prison the last time, he was placed on EOP status as well, diagnosed as suffering from schizo-affective disorder, but was housed with another prisoner who was not on the mental health caseload. They did not get along and it precipitated the cell fight for which Prisoner MMM now faces new charges. He acknowledged that the EOP program had improved some since he had been placed on it many years ago, when there literally "was nothing." Nonetheless, this EOP prisoner has been delayed in his transfer to an EOP program well beyond the required 60 days. | | |
| 327.  I attempted to interview another Ad Seg EOP prisoner, Prisoner NNN. Because he refused to be escorted out of his cell by officers, I tried to speak with him cell front. It was impossible to do so. Prisoner NNN is an older prisoner who was disheveled, unkempt, and very troubled on the day I tried to interview him. He spoke a constant stream of words, as he sat on the top bunk in his cell and, although it was extremely | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. | FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| difficult to hear him through the Plexiglas covering on his cell door, he seemed very upset and totally incoherent. One of the floor officers on the unit told me that he does this all the time-that is, he sits atop his bunk and talks constantly but incoherently to anyone who comes by. The officer said Prisoner NNN never comes out of his cell, does not go to yard, and he was not sure whether he ever showered. I was told that Prisoner NNN had refused to sign the conditions of his parole when he was last released from prison, which resulted in his parole being immediately violated. This EOP prisoner arrived at the reception center on November 28, 2007, but no explanation was provided on the prison's EOP log for his transfer delay of more than seven months. | | for defendants were present. |
| 328. At the end of the day, I conducted interviews with three additional prisoners, outside of the Ad Seg unit. Prisoner 000 paroled out of Wasco Reception Center on June 24, 2008, while he was waiting to transfer to the DMH program at Svpp.378 He returned to Wasco RC on July 3, 2008, as a parole violator, only 9 days later. He is currently an EOP who said he was taking Effexor and two | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805.. Lack of foundation. Cumulative. Speculative. Argumentative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| other medications whose names he could not remember. Prisoner OOO seemed very well oriented and coherent at first, expressing his desire to be taken off the mental health caseload and to no longer be given medications. However, as our conversation proceeded, an elaborate set of delusional beliefs eventually emerged. He told me he had become suspicious and "paranoid of the COs in here, as well as the other inmates." As he continued, he described a set of personal concerns that involved underdeveloped genitals, other inmates and people on the streets who threatened and berated him because of this anatomical problem, and voices that told him to engage in homosexual acts and threatened him with gang rape. He said that when he tells the voices that they are not making any sense and that he wants them to stop, they simply get louder. Prisoner 000 was adamant that these experiences were objectively true, and was so frustrated by mental health staff member's suggestions that they might not be true, that he no longer wanted to see any clinicians. Prisoner 000 remains housed at Wasco State Prison without access to EOP or DMH level of care for which he was | | speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| referred and accepted months ago. | | |
| 329.  Prisoner PPP told me that he had come into CDCR in 1996 and subsequently had a number of short recommitments, due primarily to parole violations. He had been hospitalized in state mental hospitals in the past, including Atascadero for five months (during which time he was declared an MDO), and several others in Oregon, Washington, and California. He said that he was diagnosed with schizophrenia, and bi-polar, schizo-affective type. He takes Abilify and another medication for his anxiety. Prisoner PPP was placed on EOP status several years ago, and was an EOP prisoner when he returned to Wasco about 21 months ago. He was referred and accepted at DMH's program at SVPP on February 11,2008, and is listed as #43 on the waiting list for a bed.379 He has had many problems with his cellmates in the past, and gotten into fights with them. As a result, he has been on single cell status for approximately 14 months. However, he believes the social isolation is having an adverse effect on him: "I am finding it hard to talk to people- | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Cumulative. Argumentative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| I feel like a vegetable." Although he tries to go to groups, he finds that he sometimes does not feel comfortable around others and has to return to his cell. Prisoner PPP said that he hears a single voice talking to him frequently; he acknowledged that it was talking to him in the course of our interview. He told me that he was referred to DMH about four months ago, but has continued to wait for his transfer to occur. He has been to the CTC here several times, for suicide attempts, and is eager to receive the treatment he hopes will be provided at a DMH facility. He said: "I got a lot out of Atascadero. I'm a program guy. I did a ton of programs there." But there are very few useful programs at Wasco. Prisoner PPP told me: "I've been here almost two years, getting stagnant. EOP 'program' here is only an hour and a half a day, at best. What do you do the rest of the time?" Although the groups here do serve the purpose of getting you out of your cell, he said, they mostly consist of watching movies. "I am just losing my mind here. I know I'm mentally ill, but I'm not getting better in here. I am becoming a vegetable in here." In Ad Seg, he noted, the | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| situation was much worse. Despite being a "program guy," he had a hard time with the cages: "I couldn't handle the cages. I never got my head right in there." | | |
| 330. Prisoner PPP told me that he had come into CDCR in 1996 and subsequently had a number of short recommitments, due primarily to parole violations. He had been hospitalized in state mental hospitals in the past, including Atascadero for five months (during which time he was declared an MDO), and several others in Oregon, Washington, and California. He said that he was diagnosed with schizophrenia, and bi-polar, schizo-affective type. He takes Abilify and another medication for his anxiety. Prisoner PPP was placed on EOP status several years ago, and was an EOP prisoner when he returned to Wasco about 21 months ago. He was referred and accepted at DMH's program at SVPP on February 11,2008, and is listed as #43 on the waiting list for a bed.379 He has had many problems with his cellmates in the past, and gotten into fights with them. As a result, he has been on single cell status for approximately 14 months. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Cumulative. Argumentative. | See response to No. 329 above; this is an exact duplication of that paragraph and objection. |

-315-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| However, he believes the social isolation is having an adverse effect on him: "I am finding it hard to talk to people-I feel like a vegetable." Although he tries to go to groups, he finds that he sometimes does not feel comfortable around others and has to return to his cell. Prisoner PPP said that he hears a single voice talking to him frequently; he acknowledged that it was talking to him in the course of our interview. He told me that he was referred to DMH about four months ago, but has continued to wait for his transfer to occur. He has been to the CTC here several times, for suicide attempts, and is eager to receive the treatment he hopes will be provided at a DMH facility. He said: "I got a lot out of Atascadero. I'm a program guy. I did a ton of programs there." But there are very few useful programs at Wasco. Prisoner PPP told me: "I've been here almost two years, getting stagnant. EOP 'program' here is only an hour and a haIf a day, at best. What do you do the rest of the time?" Although the groups here do serve the purpose of getting you out of your cell, he said, they mostly consist of watching movies. "I am just losing my mind here. I know I'm mentally ill, but I'm not | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| getting better in here. I am becoming a vegetable in here." In Ad Seg, he noted, the situation was much worse. Despite being a "program guy," he had a hard time with the cages: "I couldn't handle the cages. I never got my head right in there." | | |
| 331. Finally, 1 interviewed Prisoner RRR, who was very concerned about being placed in jeopardy for talking with me. He was convinced that some of the staff at Wasco were out to get him and that he was at risk. Prisoner RRR is a long-term prisoner in the California system, having done some 18 years in prison, and a total of about eight years in the SHU (at Tehachapi and New Folsom). He has been taking sychotropic medications for 25 years, and currently suffers from Hepatitis C, and is an SNY prisoner. He has heard voices in the past and, although he is classified as a 3CMS prisoner now (taking Zoloft and Zyprexa), has been on EOP status a number of times in the past, including being subjected to Keyhea orders. Prisoner RRR reported mental health problems because "I get no treatment in here-just meds-the psych tech doesn't even come by my door. They | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

-317-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| haven't offered me any groups ... 1 get out in two months. They haven't helped me at all. 1 asked and was told that they don't have the resources here. But I've been in prison almost 15 years straight and 1am going to have a hard time back on the streets." Prisoner RRR is due to be released from prison at the end of September. | | |
| 332.  Below 1 summarize some of the numerous overcrowding-related problems that 1 encountered on these tours and interviews, ones that 1either saw directly, heard staff members describe, or about which prisoners repeatedly and consistently complained. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |
| 333.  There are troublesome and potentially dangerous backlogs at virtually every critical juncture in the mental health delivery system, whether they involve the flow of critical information (such as the forwarding of medical and mental health records), delays in the time it takes to make appropriate referrals and to transfer prisoners to their proper destinations (where they would receive badly needed care and treatment), or the speed at which mentally ill prisoners are removed from inappropriate housing and units (whether they | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Relevant to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| are Ad Seg, "bad beds," or holding cages). For example, a correctional counselor at CIM told me candidly that "the transfer process is not working as well as it should" and estimated that it was taking as many as 120 days for EOPs to move through the classification process and be sent to their proper destination. Other professional staff told me that they have "had EOPs in Ad Seg on my caseload for months. I know I'm not supposed to but I do." The same person later told me that "I've had EOP guys in Ad Seg for 6 months or more." | | existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 334. These comments and my observations are representative of a system in overall crisis, one that cannot meet the court-mandated and agreed upon mental health transfer timelines. For example, in CDCR's monthly summary of mental health crisis bed referrals and transfers from the Chief of the Health Care Placement Oversight Program, Rick Johnson, for June 2008, there were a total of 355 MHCB referrals of which only 52 were actually placed. A large number (303, or 85%) of referrals were "rescinded" by the referring clinician before Health Care Placement Oversight Program | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| staff could locate an empty mental health crisis bed within CDCR. Approximately one-third of those rescinded were ultimately placed in a crisis bed at the prison where they were housed. However, over a third of the prisoners referred to an MHCB (114/303) waited an average of more than a week (8.46 days) before their referral was rescinded. Those 52 prisoner/patients who were successfully transferred to an MHCB in another prison spent an average of nearly 10 days (9.33) awaiting transfer; with 40 days as the outer range for days waiting to transfer. Only 5 prisoners, less than 2% of those referred, were transferred to an MHCB within the required 24 hours. | | |
| 335. Every facility I visited suffered significant staff shortages of some kind-ranging from significant shortages of custody staff to a drastic shortage ofpsychologists, to the overuse of contract psychiatrists. In various ways, serious staffing shortages all translate into inadequacies in the mental health delivery system and, in some instances, an outright denial of needed and mandated mental health services. In many of the units | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon personal observation)l FRE 703 (based upon review of data and expertise);FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| this means that professional staff are doubling up on duties, performing more tasks than they should be called upon to handle, and managing far larger caseloads than is appropriate or effective. One psychologist at CIM told me "I can't keep up with everything. I've been doing too much. We hired new staff, but that hasn't helped." He also told me "in my opinion, we are doing about 50% of what we should be doing." |  | present. |
| 336.  The CDCR June 2008 system-wide staffing data corroborates what I saw and heard at the individual prisons I toured. With 440 mental health vacancies system-wide, representing 24% of the overall positions, more than 206 psychologist and 88 psychiatrist positions were vacant in June 2008. A total of 80 of the psychologist and 38 of the psychiatrist vacancies were covered by registry, leaving significant missing staff in these critical positions.  Of perhaps greater concern is the revelation in the Special Master's review of the long-awaited workload study that CDCR's 2008-09 staffing requests (based on the workload study numbers) significantly underestimated the staffing needed to implement | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Mischaracterization of the evidence. | FRE 801(d)(2) (admission of party opponent); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| critical portions of the Coleman Program Guide requirements (for example, the EOP Ad Seg program, the RC EOP program, the RC EOP pre-release planning component and so on). Furthermore, key tasks were omitted when determining staffing workloads, including central file reviews, frequency of case manager contacts, psychiatric review of the medical records and so on. Finally, there were concerns expressed about key assumptions provided to the researchers upon which they based their calculations (including, for example, that only 30 percent of the 3CMS population were taking medication, although the actual percentage is approximately 80 percent.). CDCR has now been tasked with revising the workload study calculations with the Special Master's critique in mind, to conduct reviews of the staffing needs twice a year, and to involve the Coleman experts in the process. Once the more accurate staffing needs have been calculated that provide for the implementation ofthe Coleman Program Guide, a more valid staffing augmentation can be determined for each prison, along with a calculation of the additional | | |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| treatment and office space that will be needed to accommodate the much expanded clinical teams. In short, however, the actual clinical and custody staffing necessary to provide the mental health care required by the Coleman Program Guide is significantly greater than the existing budgeted levels; yet defendants have been unable to recruit and retain staff even to meet the budgeted levels. In my opinion, the serious deficiencies in office and treatment spaces I observed throughout the system are themselves an obstacle to ever achieving appropriate clinical staffing. The working conditions are terrible and there is no space, in any event, for more clinicians. | | |
| 337.  Although the specific kinds of staff shortages varied from place to place, and some facilities reported having nearly all of their budgeted positions filled (at least in one or another clinical category), shortages in space were widespread, generic, and severe. Each one of the facilities I toured was short of significant amounts of space needed to perform otherwise critical tasks and responsibilities. The shortages of offices were perhaps most obvious at (but certainly not | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Mischaracterization of the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2)(4) -- Admission of party opponent; prison staff interviewed by Dr. Haney were generally chosen by defendants to speak with expert about matters within their employment, attorneys for defendants were present; Court can |

-323-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| | Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| | | | |

| | | | |
|---|---|---|---|
| 4<br>5<br>6<br>7<br>8<br>9<br>10<br>11<br>12<br>13<br>14<br>15<br>16<br>17<br>18<br>19<br>20<br>21<br>22<br>23<br>24<br>25<br>26<br>27<br>28 | restricted to) those facilities fortunate enough to have even near their allotted number of filled staff positions. And every prison had inadequate space in which to conduct treatment. In some units, prisoners had to be transported to other parts of the prison for treatment-a time consuming and custody-staff intensive practice-because, as clinician after clinician told me, "we don't have any program space here at all." Even in facilities that had added new clinical staff to handle the mental health caseloads, space was at a premium. For example, the chief psychologist at VSPW told me that they expected their newly hired staff to increase the number of groups they could offer and reduce the long waiting lists but, "as far as space, we are literally crawling all over each other... We've been going through the prison inch by inch, looking at storage rooms, anything that is possible to use for mental health space." Indeed, clinicians and mental health clerical staff were literally operating out of converted visiting rooms, closets, and storage rooms. Storage spaces, benches sitting out in the middle of open dayroom floors, and chapels were being used as clinical | | determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "treatment" areas. Another clinician told me, "we don't have space to have the confidential contacts we need,"and that fact was clearly and repeatedly evident in every facility I toured. These kinds of complaints were echoed again and again by staff members at every prison I visited. | | |
| 338. In many of the units I toured, the critical shortage of treatment space meant that prisoners were forced to draw unwanted, embarrassing, and potentially problematic attention to their mental health status, as they were taken out of their cells or from their housing units, sometimes to participate in group or individual counseling in full view of the rest of the prisoners on the unit. As one mental health staffmember told me, many of the groups were being underutilized because "prisoners don't like the stigma." | Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 339. Idleness has increased at all of the prisons, presumably due to overcrowding and the fact that there are too few programming activities, jobs, escorts, and treatment opportunities for the number of prisoners at each prison. In some VSPW units, for example, women told me that they used to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterization/ Argumentative re: | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| get out of their cells twice a day for programming, but that has now been cut to just once per day. Everywhere I went in the prisons I visited, most of the prisoners were in their cells during most of the day I was at the prison. The one exception to this was Mule Creek, where several of the large outdoor yards were being put to good use. But even there, prisoners complained widely about the lack of adequate programs (as opposed to recreation) and the content of the programs they were provided. And, in any event, the prisoners at the other facilities did not fare nearly as well. In literally every prison I visited, large numbers of prisoners, many ofwhom were on the mental health caseload, were sitting or milling about, with no programs or activities in which to participate. This was most striking in the makeshift dorm or dayroom housing units- or the bizarre "caged-in" dayroom dorms at CIM-where a hundred men or women at a time were sitting atop or standing around their double or triple bunks. But it was true of the celled housing units as well, where there was typically little or no inmate movement or meaningful activity in progress. | "caged in." | to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 340.  And the enforced idleness is even more profound-almost total-for the mentally ill prisoners who have been placed in the Ad Seg and SHU units. One CIM prisoner's comment was typical of what I saw and heard. He told me: "I just lay on my bunk all day long. That's all I do. I have group on Wednesday and Fridays-about how not to be depressed. Nobody else goes. You have to sit in a cage, with your handcuffs on. But I go for something to do. I am the only member of my 'group' sitting there in the cage." The numbers of such Coleman class members living under these severe conditions is substantial and periods of time that they spend there quite substantial. For example, the Health Care Placement Unit Information Report (dated June 20, 2008) shows that at SATF alone there are approximately 50 CCCMS prisoners who have been housed in Ad Seg for more than 200 days, several for over 1000 days. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterization/ Argumentative re: "cage." | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 341.  In addition, the content of the therapy groups I observed or learned about in many of the units was frankly questionable. Many of the groups appeared to serve little more purpose than to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. | FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| get the prisoners out oftheir cells (not an insignificant goal, but hardly psychotherapy for seriously mentally ill prisoners). Thus, I watched two Ad Seg EOP prisoners at CIM stand side-by-side in their treatment cages for "group"-which consisted of watching the film "Mission Impossible." At another prison, Coleman class members told me they had recently watched "The Mummy" in one of the "group therapy" sessions. In fact, numerous prisoners told me that their groups consisted of little more than watching movies, and that they participated largely because this was one of the only ways that they could get out of their cells, however briefly and infrequently. | Evid. 402. Lack of foundation. | impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 342.  Indeed, many of the prisoners I interviewed complained about the lack of real treatment at the prisons where they were housed. Although some said that they were getting contacts with the clinical staff (a number did not), they nonetheless felt that little was being done to truly help them with their mental health problems. In addition, however, a uniformly expressed complaint on the part ofprisoners who were nearing | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| release dates was that they had been given little or no preparation for their return to free society. One told me, "it's difficult to come into prison to begin with. But my mind has been off, and I haven't been thinking about reality, and still I got no real help here. So I'm trying to help myself, and I am proud of myself for doing that." | | overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 343.  Numerous prisoners complained about waiting to be transferred out of the reception center or waiting to go to another more appropriate program than they had been cleared for, and never being told why they were forced to continue to wait or when they would get the help they needed. And a very large number voiced complaints about their medicationfor example; being abruptly taken off medication that they felt was effective, or being given heavy doses of medication that had such adverse effects that they stopped taking it. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Argumentative. | FRE 803(4) (statement for purpose of medical diagnosis or treatment); FRE 703 (not offered for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 344.  The use of holding cages is rampant throughout the CDCR. Prisoners are kept in holding cages when they are awaiting transport or escorts, when they are waiting to see medical or mental health staff | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. | FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and, for some of them, when they are supposed to be receiving individual counseling (even in cages that sit inside a clinician's office) or participating in "group therapy" sessions (inside cages that are arranged in semi-circles). Some of the cages are small, many are in disrepair (with paint peeling in them), and most of them are dirty. Many of them lack seats, so that prisoners must engage in "group therapy" standing up, or a prisoner who may be in crisis and awaiting transport must manage to remain upright until his escort arrives. In the hallway outside the infinnary at CIM an officer told me that they try to keep the prisoners who are waiting to see a nurse or doctor- and who, therefore, presumably have some sort of medical problem-"in the small cages no more than 4 hours." Inside the infinnary at CIM, a large group of about 10 Sensitive Need Yard prisoners or "SNY" (those who need to be separated from other prisoners because of special vulnerabilities or for other reasons) were sitting and standing together in a much larger cage-but still clearly a cage-waiting to receive medical help. | Lack of foundation. Mischaracterization/ Argumentative re: the evidence. | overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); The Special Master uses the word "cages" in his report on overcrowding (Coleman Docket # 2253 at 6); the Court will have pictures of the structures in question to view for self; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 345. As I mentioned earlier, | Inadmissible Hearsay. | FRE 703 (not offered |

-330-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| many of the housing units in the prisons I visited almost defied description, and ranged from uncomfortable to uninhabitable. It should be noted that the so-called "bad beds" are pervasive in the CDCR; I myself literally saw many hundreds of them in my tours of just eight prisons. Even the prisoners who are housed in traditional cells have been double bunked in cells designed for one. One CIM prisoner told me that he has to lift his legs up whenever his cellmate uses the toilet in their small cell, because his legs otherwise hang over it. As inconvenient and uncomfortable as this arrangement is, this prisoner is more fortunate than most because he is in a cell. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | for the truth, but to provide information about the basis of the opinions); FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |
| 346.  In discussing the dormitory housing units I saw on these tours, I have often referred to them as "makeshift" dormitories, to underscore the way in which they represent an exigent response to the prison overcrowding crisis. The dormitory housing units I saw were in spaces that were originally intended for other uses-first built as gymnasiums and dayrooms.  They are not appropriate spaces for housing prisoners and, unlike other fonns of donnitory housing in | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| some other prison systems, they were not constructed with this purpose in mind.  The converted spaces are highly problematic in a number of ways, including the sheer density of the housing; the impossibility of monitoring prisoner behavior (especially in the larger makeshift gymnasium donns, but also on the dayroom floors where officer stations and sight lines that were designed for cellblocks are obstructed by the bunks); the inadequacy of the toilet and other hygiene-related facilities, ventilation, and heating and cooling systems (all of which entail converting and supplementing existing infrastructure in ways that cannot possibly meet the extraordinary levels of use to which they are subjected); the lack of sufficient, dedicated recreational and programming space, accommodations for basic prisoner privacy needs, appropriate storage for prisoners' personal possessions, and so on. | | |
| 347.  Despite the impermanent and makeshift "feel" of the units, large numbers of prisoners are spending many months and years housed inside the barely habitable spaces. Not only are many of these makeshift dormitories shocking | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| to see-especially the huge "triple bunk" dormitories located inside gymnasiums-but such housing units are dangerous and degrading, and they are likely to take an especially severe toll on prisoners who have preexisting mental health and medical problems. | Mischaracterization/ Argumentative re: the evidence. | speculative, or argumentative. |
| 348.  Lockdowns appear to me to be used in California prisons far more than I have seen (or heard of) being used in any other prison system in the country. They are particularly problematic when used on such a frequent or long-term basis. Prisoners in CDCR facilities are being confined to their cells, denied programming and recreational activity, and must eat all of their meals in their cells. Elsewhere in the country lockdowns are used as a last resort by prison systems that cannot control their prisoner populations any other way; in some California prisons (C Facility at SVSP, for example), they have become routine, a way of life. When lockdowns and similar modified programs are overused, as they are in California, in my opinion, they represent another clear indication that the prison system is in crisis. This is true in part because lockdowns usually | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. | No hearsay cited; FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; *See* Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative |

-333-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| prove to be highly counter-productive.  That is, the increased frustration they generate often increases rather than decreases the very tensions and conflicts they are supposed to help alleviate, and they deepen antagonisms between groups (who blame one another for the especially harsh and deprived conditions under which they are forced to live).  In the meantime, prisoners-especially those with pre-existing psychiatric conditionssuffer emotionally and psychologically. | | |
| 349.  In fact, the former CDCR Chief Deputy Secretary of Adult Institutions, Scott Kernan, has attributed the extraordinary number of lockdowns and "modified programs"-as much as 1,435 days at one prison-directly to overcrowding.  Crowded conditions lead to riots, which produce long lockdowns that, in addition to subjecting prisoners to especially harsh conditions of confinement that raise tensions, also: ... deflect prison resources so that while correctional officers now must respond to the increased security concerns and maintain watch over an increasingly dangerous prison population, they are not able to | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| assist [prison officials in] addressing the inmates' mental health concerns by escorting prisoners to appointments and providing access to yard. | | |
| 350.  I could not agree more. Yet I saw little evidence in the prisons I visited that this enlightened perspective had altered CDCR's overall sense of urgency about the magnitude of the overcrowding crisis it faces or decreased the willingness of individual wardens to continue to rely on lockdowns as an ill-advised strategy for managing prisoner conflict. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | No hearsay cited; FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; *See* Plfs.' Response to Defs.' MIL 1 (re: prison conditions); |
| 351.  Because of the subjective nature of the experience of mental illness, it is sometimes difficult to precisely measure whether and how the quality of mental health care in a prison system has improved the overall mental health ofprisoner/patients. This is one of the reasons that indirect but objective measures-staffing, program and contact hours, waiting times to receive appropriate levels of care, and so on-are typically relied on to estimate or monitor progress (or deterioration) in the quality of care provided. One obvious exception to this occurs when | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. | No hearsay cited; FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; *See* Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the subjective suffering associated with mental illness results in someone taking his or her life. Moreover, because of the extreme and tragic nature of suicide, it is regarded as a basic measure of whether and how well a mental health care delivery system is functioning. That is, whatever else such a system does, it should be reasonably effective at preventing its patients from taking their own lives. And, when it does not, it is possible to analyze the events that led up to the suicide, which may help to account for it having happened, and to learn what could have or should have been done to prevent it. | | |
| 352.  This is the logic by which the Special Master's annual "Report on Suicides" is conducted. The information that it contains is revealing, and identifies some of the ways that the overcrowding-related problems that plague the CDCR continue to severely undermine the quality of mental health care provided. For example, the "Report on Suicides Completed in California Department of Corrections and Rehabilitation in Calendar Year 2005"-the seventh such annual report that has been written-was forwarded | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. | FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| by the Coleman Special Master on November 26,2007. The Special Master calculated the number of suicides in CDCR to be 43, 17 more than in calendar year 2004. Nearly three-quarters (72.1 %) had a history of suicidal behavior, fully 86% had a history of past mental health treatment. In addition, about a third (32.6%) were housed in an ASU or SHU, and two-thirds (67.4%) were on the Mental Health Services Delivery System caseload at the time of their death. | | |
| 353.  Indications of "inadequate treatment" (including "canceled appointments not rescheduled, referrals not responded to, past medical records not reviewed, unsupported diagnoses, non-compliance with treatment without reassessment, assignment to inappropriate LOC, failure to provide five-day clinical follow-up, [and] failure to provide immediate CPR") were present in three-quarters (74.4%) of the cases. Based on the longitudinal data provided in the Report, it appears that the most recently calculated suicide rate-for 2005-is higher than any previous year. Between 1998 and 2005, the suicide rate has varied somewhat, from a low | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Inappropriate basis for opinion.  Fed. R. Evid. 703. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. | FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of 9.3 per 100,000 in 2000 to a high of 26.2 per 100,000 in 2005. | | |
| 354.  A number of the inadequacies in treatment that the Special Master identified appear to be the direct result of the severe overcrowding-related problems from which the CDCR continues to suffer. Thus, the failure to reschedule appointments, respond to referrals, review medical records, reassess treatment compliance, employ appropriate levels of care, and conduct required five-day clinical follow-ups all represent the kind of poor quality of care that comes about in understaffed, overpopulated prison systems. In addition, the Special Master identified a host of other overcrowding-related problems that were likely to have directly impacted suicide rates. These included: the continuing failure of CDCR clinicians "to utilize infonnation available in unit health records (UHRs) or central files (C-Files) or through custody referrals," which would have "alerted mental health staff. .. to inmates' relative potential for suicide;" "[t]ailure to screen inmates in confidential settings" which "limit[ed] the adequacy of infonnation that | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| clinicians were able to elicit when completing SRACs [Suicide Risk Assessment Checklist] and intake assessments of inmates on admissions or transfers to (particular) facilities; the "[u]ntimely administration and inadequate completion of SRACs... ;" inadequate staff training "on procedures for the initiation and supervision of Keyhea orders and guardianships or conservatorships for inmates in need of such support;" and the failure of "clinicians to monitor suicidal inmates more closely and, where appropriate, aggressively refer decompensating suicidal inmates, especially those at Level III and IV custody levels, to DMH programs" and to provide "appropriate crisis-level care until such transfers to DMH programs can be achieved." | | |
| 355.  Finally, the Special Master identified another overcrowding-related problem that he concluded was directly implicated in a number of suicides in 2005. Specifically: The crisis in the availability ofMHCBs [Mental Health Crisis Beds], which became evident in early 2005, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Special Master is |

-339-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| led to the spreading use of "alternative" and supposedly "temporary" housing in Mental Health Outpatient Housing Units (MHOHUs), Outpatient Housing Units (OHUs), and a variety of other holding cells for suicidal inmates for whom no bed was available in an MHCB unit. Defendants' dependence on these alternative placements emerged as a factor in a number of suicides in 2005. In addition, an increasing failure by clinicians to refer inmates who were clearly decompensating and in need of treatment at more intensive LOCs contributed to several successful suicides in 2005. | Argumentative re: the evidence. | knowledgeable, Court appointed; see also FRE 803(8) (public record); See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 356.  Although the Special Master's Suicide Report was based on data that were collected in 2005, I have reviewed the 2006 suicide report and more recent suicide data which indicate that the overall number of suicides in the CDCR has remained high. Moreover, and perhaps more importantly, many of the very problems to which the Special Master has pointed to in his Report as playing an instrumental role in these suicides in 2005 persist in 2008. In fact, the last one mentioned | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); Further clarification is available through cross-examination; FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or |

[253560-1]

| | Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|---|
| | above-the crisis in available MHCBs-has become increasingly problematic, as I will discuss at greater length near the end of this report. In any event, the Special Master's analysis illustrates a clear nexus between overcrowding-related dysfunction, decreased quality of overall mental health care, and an extreme and tragic set of mental health outcomes. | | argumentative. |
| | 357. Because they are among the most vulnerable *Coleman* class members, and are so significantly affected by the State's inability to manage the population, I would like to briefly but separately address the group of mentally ill prisoners who cycle back and forth from CDCR prisons to parole, serving short revocation terms for violations of parole. I am informed that these terms cannot exceed twelve months without a revocation extension, and generally average between three and four months. This means that this group of prisoners generally serves their entire revocation terms in reception centers. Documents drafted by the State that I reviewed estimate that more than 10,000 parolees with | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. Assumes facts not in evidence. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions) Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| mental illness were returned to custody in 2005, and more than 6,000 of them are returned for minor or technical violations related to unmet mental health need. The documents I reviewed also show that at anyone time, out of the approximately 500 EOP prisoners backlogged in reception centers, some 200 of them are serving parole revocation terms likely related to their mental illness. | | |
| 358.  Based on interviews I conducted with prisoners who were in precisely this situation at CIM and VSPW, and what I have learned about the parole system more generally in California, I understand that mentally ill parolees often do not receive meaningful mental health treatment when they are on parole. More specifically, these parolees often do not have access to appropriate psychiatric medications, or stop taking them as a result of lack of clinical supervision, and then often decompensate. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. Assumes facts not in evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 359.  Frequently as a result of their decompensation, many are returned to prison, often for | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within | FRE 703 (based upon review of data and expertise); FRE |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| technical or minor violations. Thus, many of the parole violations that return them to prison are directly related to their unmet mental health needs. When they return to prison, these vulnerable prisoners are then packed into overcrowded reception centers. There they find that their out-of-cell time is severely limited and, even with the beginning of the EOP RC program implementation, they receive little individual or group treatment. One of CDCR's senior clinicians stated in a declaration before the *Coleman* Court that: "In the overall inmate population, approximately 18% of inmates are in the mental health caseload. In the Reception Center population, an even higher percentage of inmates are in need of immediate mental health services at the time of arrival. Upon entry, inmates with mental health needs are often severely decompensated because they have not had access to mental health care resources, particularly medication management, in the community." | Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. Assumes facts not in evidence. | 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 360. Based on my observations | Inadmissible Hearsay. | FRE 703 (based upon |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and my review of documents provided by Plaintiffs' counsel, I have concluded that mentally ill prisoners in reception centers are generally not receiving adequate mental health treatment. In addition, none ofthe prisoners I interviewed had received meaningful pre-release planning before they paroled. Especially for this group of vulnerable mentally-ill prisoners, the lack of meaningful pre-release planning virtually guarantees their return to prison. Indeed, it was typical for the prisoners in this population whom I interviewed to have multiple releases and revocations in a single year. Moreover, the time that they actually spent on parole between release and revocation tended to be short, sometimes as brief as one day. | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. Assumes facts not in evidence. | personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 361.  In addition to being revoked for violations related to their unmet mental health needs, this group ofprisoners also appear to receive extensions of their revocation terms for actions related to their mental illness, adding to the cycle of punishment without treatment for mentally ill prisoners in this overcrowded system. In these inter-related ways, they are | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the | FRE 703 (based upon review of data and expertise); FRE 703 (based upon personal observation); FRE 801(d)(2) (admission of party opponent); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| doubly or triply affected by the overcrowding that plagues the CDCR and the adverse conditions and policies it generates. | evidence. Assumes facts not in evidence. | |
| 362.  Indeed, these prisoners seem to be lost in a "population shuffle" or cycle of "catch and release" that is tremendously destabilizing and life-altering for them. Each time cycle through this dysfunctional system in this way, the probability is increased that they will become sicker, and that their illness will become harder to stabilize and manage. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues, *Valdivia* case). Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 363.  Finally, as I have tried to show throughout this report, chronic overcrowding has such pernicious consequences in correctional settings in large part because it can impact so many levels and aspects of the prison environment. The closed nature of a prison environment means that its different parts are unusually interconnected, and problems that remain unsolved in part of the environment have a way of reverberating throughout the institution and even the larger prison system. Thus, even though my discussion of the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance. Fed. R. Evid. 402. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| eight institutions I visited focused on specific aspects of the overcrowding-related crises that each facility faced, I continued to be struck by how deficiencies in one part of the institution impacted the services that could be delivered in another area of the prison. The tours and interviews I conducted and the voluminous documents I reviewed all underscore the degree to which the chronic and severe problem of overcrowding in the CDCR is so widespread and its harmful consequences so interconnected that it does not translate to a piecemeal solution, despite the best efforts of the many individual custody and clinical staff members I encountered who were laboring mightily to overcome this insurmountable obstacle. | | |
| 364.  In the *Plata* Receiver's recent report on overcrowding, he noted: "[O]vercrowding has been a way of life in the CDCR for twenty years." I have been a direct witness to that fact. The overcrowding crisis that now consumes the CDCR and prevents it from discharging its constitutional responsibilities began decades ago. It was largely ignored by the Department of Corrections until a number of courts forced prison | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon review of data and expertise); Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); Further clarification is available through cross-examination; Court can determine whether statement is mischaracterization, speculative, or argumentative. |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| officials to at least acknowledge its presence. But the Department never fully addressed the magnitude of the problem or treated it with the urgency it deserved. CDCR continues to refuse to take decisive actions reasonably designed to bring about a solution or even "instituted any effective response to the worsening overcrowding crisis." Instead, a culture of overcrowding has emerged in the system in which CDCR officials have gotten used to a certain level of "tolerable" overcrowding (that is, of course, intolerable to the prisoners and line staff who live within it). The CDCR has become accustomed to questionable practices (many of which I have detailed above) and to redefining the overcrowding problem in ways designed to normalize rather than solve it. | | |
| 365.  Now, however, the problem has reached truly crisis-level proportions. It has reached this point despite the Herculean efforts of courts and litigators and monitors and receivers and their associated staffs to require the CDCR to alleviate and resolve it. As the *Coleman* Court noted, although | Lack of foundation. Speculative. Mischaracterization/ Argumentative re: the evidence. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; Court can determine whether statement is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| it has issued at least seventy-seven orders over more than eleven years directed at bringing California's prison mental health care system into constitutional compliance, "the system still falls woefully short of meeting the requirements of the Eighth Amendment." | | mischaracterization, speculative, or argumentative. |
| 366. Obviously, prison overcrowding is not a self-correcting problem. To the contrary, as I have tried to show, because of its wide ranging and profoundly negative effects, and the destructive dynamics they set in motion, overcrowding is a self-exacerbating problem that gets much worse if it is not aggressively made better. All of the judicial tools and administrative techniques of which I am aware to effect institutional change have been tried and failed with this intransigent system save one-to force the direct solution of the problem by meeting it head on and in a comprehensive way. There are several reasons why no other solution, including ones proposed by the CDCR itself, are inadequate to the task of resolving this crisis. | Lack of foundation. Argumentative. Speculative. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 367. The first is the urgency of the problem itself, and the | Lack of foundation. Argumentative. | FRE 703 (based upon review of data and |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| unacceptably timeconsuming nature of alternative solutions. The Defendants' own projection for providing adequate mental health care beds is 2013 without including the construction projects outside the responsibility of the Receiver. As I will point out below, even this seems unrealistic, given their inability to address the wide range of glaring inadequacies in this system over the last decade. In this context, however, it is fair to note that mentally ill prisoners in California have been subjected to inadequate or non-existent mental health care since long before the Court's order in *Coleman* and the attempts to remedy these problems began in 1995. It has been more than 10 years since these efforts began, and the CDCR is still not in compliance with constitutional standards. Now, under the best case scenario-one that does not necessarily have any better chance of succeeding than prior, similar projections-the class of mentally ill prisoners is being asked to wait many more years before the system can deliver the care to which they are constitutionally entitled. Institutional change in response to problems this massive and | Speculative. | expertise); FRE 703 (based upon personal observation); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| endemic cannot occur on such an incremental basis. In my opinion, this is not only an unreasonable response but also a dangerous one. | | |
| 368.  The second reason that any remedy short of a prisoner release order is unlikely to succeed pertains to the track record and capacity of the CDCR to solve this problem through its preferred methods and in its preferred manner. The severe and chronic overcrowding that plagues the California prison system is so profound and systemic that it appears to have overwhelmed CDCR officials in charge of all administrative functions, undermining their ability to plan, initiate, and implement overcrowding-related program initiatives. The CDCR and its institutions are so beset by the magnitude and multiplicity of the overcrowding-related challenges and crises that they confront on a daily basis that all they appear to be able to do is manage the prisoner population and respond to emergencies. Constitutional and professional standards and goals have fallen by the wayside, and so too has the capacity to anticipate the next round of overcrowding- | Lack of foundation. Argumentative. Speculative. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); FRE 703 (based upon personal observation). |

-350-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| related set of problems and plan to address it, let alone to effectively resolve the panoply of pre-existing overcrowding-related issues with which the Department is struggling. | | |
| 369. On October 29, 2007, for example, CDCR officials filed their final plan to address the serious shortfall of small management yards ("SMYs") that are necessary for defendants to be able to provide even the basic minimum of 10 hours a week of yard time for prisoners housed in administrative segregation units. The plan was in response to a *Coleman* Court order to implement various measures, including the construction of these yards, in an effort to reduce the high rate of suicides in CDCR's administrative segregation units. The Court ordered that CDCR construct all of the necessary yards no later than the end of fiscal year 08/09. However, CDCR's plan lists a series of reasons and excuses why they cannot comply with the Court order and, thus, will not be able to provide prisoners in administrative segregation with even 10 hours a week of yard for several years. In response to the Court's order to also | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); FRE 703 (based upon personal observation). |

-351-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| maximize the existing SMYs while the shortfall is addressed, CDCR's plan stated that: "[t]he institutions do not currently have sufficient escort and security staff to expand the Administrative Segregation Unit Yard Program beyond the hours currently offered." | | |
| 370.  Moreover, I have reviewed documents indicating that, on the very day that the defendants filed their plan, they also submitted a request to the Legislature to reduce the scope of their small management yard (SMY) project to construct 80 (SMYs) for prisoners housed in administrative segregation units at Mule Creek, Solano State Prison, Wasco State Prison and RJ Donovan. The request informed the Legislature that the change in scope would postpone the construction of 20 SMYs at Solano State Prison and revert $395,000 dollars to the budget. This kind of delay-here for construction of 20 small management yards-when the CDCR has been ordered to build a total of 1,162 additional such yards does not bode well for its ability to comply with the *Coleman* court's order to complete the construction by the end of Fiscal Year 2008/2009." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 801(d)(2) (admission of party opponent); Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (based upon review of data and expertise). |

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 371. Finally, the CDCR's proposed solution of incrementally increasing the system's capacity by adding new facilities and additional staff, and doing very little else, not only is expected to take far more time than this urgent problem permits, with much uncertainty surrounding the CDCR's capacity to deliver on even its own distant projections, but the very nature of approach is inadequately conceived. As jail and prison construction began in earnest in the late 1980s and early 1990s, most scholars understood that correctional systems could not build their way out of the overcrowding problems they faced. For example, as two well-known experts noted, "projections show that such construction will not alleviate crowding if past trends in incarcerative policies and crime rates continue." They were right. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 372. Indeed, if the last two decades of experience in California have proven anything, it is that the overcrowding crisis cannot be remedied through prison construction programs. The *Plata* Receiver is correct when | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Court can determine whether statement is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| he argues that: "[D]espite spending billions of dollars on construction, the level of overcrowding in California's prison system has not decreased; despite waves of prison expansion overcrowding has now reached crisis levels ... By 2007, 19 institutions were at or above 200 percent of [capacity]. To summarize, despite massive waves of construction, prison overcrowding has grown worse in California." | Mischaracterization of the evidence. | mischaracterization, speculative, or argumentative; FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise). |
| 373. Perhaps even more pointedly, there is evidence that the worsening prison overcrowding crisis has had a corresponding effect on the quality of mental health care afforded *Coleman* class members. In his May 31, 2007 Report to the Court, the Coleman Special Master concluded that "nearly 12 years after the determination that mental health service in CDCR were egregiously unconstitutional, hundreds certainly, possibly thousands, of CDCR inmates/patients, all members of the Coleman class certified in the early 1990s, are still looking for beds at the level of treatment their mental health requires." More than a year later, that still appears to be the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); FRE 201 (judicially noticeable); Court can determine whether statement is mischaracterization, speculative, or argumentative. |

-354-

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| case. In fact, the situation appears to be worsening, not improving, in a number of respects. | | |
| 374. Several charts prepared at my request and under my supervision illustrate some of the important dimensions along which the treatment of *Coleman* class members has deteriorated in recent years. For example, as Chart I illustrates below, the average number of days that inmate/patients must wait before being transferred to a mental health crisis bed (MHCB) has actually increased, from 1.67 days waiting in ovember, 2006, to an average of 9.33 days waiting in June, 2008. The maximum number of days an inmate/patient spent waiting reflects a similar deterioration in the standard of care. Thus, the longest wait that an inmate/patient experienced in November, 2006 was 6 days; by June, 2008, that waiting time had increased to 40 days. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); FRE 1006; Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 375. Chart 2 illustrates a similar worsening pattem in the access to mental health care over time. Thus, the total number of persons referred to an outside MHCB has increased very significantly over time, from 85 inmate/patient referrals | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. | FRE 1006; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (based upon review of data and expertise); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| in November, 2006, to a total of 355 in June, 2008 (suggesting, among other things, a deterioration of the quality of care afforded to inmate/patients at a lower level of acuity). Nonetheless, despite this significant rise in the number of total referrals (from 85 to 355 over a less than 2-year period), there was no consistently corresponding or proportionate increase in the number of inmate/patients actually transferred. For example, in April, 2007, when "only" 101 inmate/patients were referred for MHCB placement, a total of 50 were actually transferred. In June, 2008, nearly the same number of transfers occurred (52), despite a much larger number of referrals-355. | Mischaracterization of the evidence. | FRE 801(d)(2) (admission of party opponent); accurate compilation of data provided by CDCR; underlying. |
| 376.  Chart 3 illustrates, there has been no corresponding improvement in the number of prisoner/patients on the Acute Psychiatric Program waiting list. After a low of 14 inmate/patients on the waiting list for admission to the Acute Psychiatric Care Program, that number has risen to 52 inmate/prisoners-those who are presumably the most psychiatrically disturbed in the system-waiting for the appropriate level of care. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 1006; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Further clarification is available through cross-examination. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 377. Chart 4 illustrates the explosive growth in the waitlist for the OMH operated Salinas Valley Psychiatric Program (SVPP) from September 2007 to July 31, 2008. The number of inpatient OMH beds available in SVPP is 176; the number of patients on the June 2008 waiting list now approaches this same number. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. Speculative. Argumentative. Mischaracterization of the evidence. | FRE 1006; Court can determine whether statement is mischaracterization, speculative, or argumentative; FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination; FRE 801(d)(2) (admission of party opponent). |
| 378. Thus, as I say, as the overcrowding problem in general has intensified in the COCR, the quality of mental health care afforded *Coleman* class members has been correspondingly and negatively affected. It appears to have worsened rather than improved. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Lack of foundation. | FRE 703 (based upon review of data and expertise); Further clarification is available through cross-examination. |
| 379. Because COCR is an enonllOUS and enormously complex system, there is no simple formulaic method for determining the precise reductions in the size of its prisoner population that will eliminate the continuing constitutional violations that are primarily caused by overcrowding. Instead, I believe that a range of reasonable goals can be established, ones based on the most intelligent and informed | Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. | Reserved for consideration in Phase 2 of trial. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| estimates, reliable data, and appropriate, meaningful parameters. These goals can and should be adjusted as the nature and magnitude of the constitutional violations are continually monitored and assessed. | | |
| 380.  As a starting point for establishing the range of reasonable goals, let me begin with what was once understood to be collective correctional wisdom (rather than an expedient approach to a largely politics-driven problem). As I mentioned earlier in this report, until the massive overcrowding crises that befell correctional systems in the United States beginning in the mid-1970s, most correctional scholars, experts, and administrators viewed prisons as dangerously overcrowded when they began to approximate 100% of their design capacity. The wisdom in this view was based on several commonsense assumptions. The first was that prisons were virtually always designed sparsely, from very basic and minimalist perspectives and premises, so that a prison that was reaching 100% of its capacity really was pushing against the limits of the number of prisoners that it could safely | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and humanely hold. In a related way, prison design traditionally maximized housing capacities and minimized space allocated to programming needs, opportunities, and demands. Thus, when a prison began to operate at near its rated capacity, there was typically little or no space available to pursue all but the most basic programming options. A prison administration that wanted to preserve at least some of its programming possibilities knew that those options would be all but foreclosed as its institutions neared 100% of capacity. In addition, correctional administrators, especially, knew that they were likely to face a number of unexpected contingencies and challenges, and that they would need at least some flexibility-to move or separate prisoners in response to conflict or confrontation, to accommodate to the special needs of a changing inmate population, or to address anyone of a number of other unforeseeable but inevitable demands that had not been factored into an original design capacity. | | |
| 381.  Aside from the way that the overcrowding crises of the | Inadmissible Hearsay. Fed. R. Evid. 802. | FRE 703 (based upon personal observation); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| last several decades has forced administrators to accept the unthinkable, nothing has changed to undermine that earlier view-namely, that a prison that is approximating 100% of its design capacity is beginning to place its staff and inmates at risk. With this in mind, I see no reason why a proposed range of goal-based remedies for what are significant and chronic constitutional violations should not at least begin with what once was regarded as the outer limit of acceptability, albeit, in this instance, as a concession to exactly how dire a situation has been allowed to come about, set as its most ambitious goal. | Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon review of data and expertise); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 382.  How then to set the maximum allowable population? Fortunately, there is an existing estimate that has been proffered by informed analysts that I believe provides a useful (albeit very conservative) outer limit. The Corrections Independent Review Panel that was appointed by Governor Schwarzenegger undertook an analysis of the various ways that an acceptable CDCR "capacity" could and should be defined and established. Entirely consistent with the observations that I have made throughout this report, the | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. | Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 801(d)(2) (admission of party opponent); FRE 803(8) (public record). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| panel concluded in 2004 that the overall population of male prisons in the state "exceeds a safe maximum, and individual housing units in some prisons are so severely over-crowded as to be at a crisis stage.,, As part of its work, the panel convened a group of experienced wardens to determine what they termed the "Maximum Operable Capacity" (MOC) of the prisons system-the percent of design capacity at which a "prison can be operated both safely and can provide programming for every inmate, consistent with the inmate's ability." The "programming" that was contemplated in calculating the MOC included educational, vocational, substance abuse, and other rehabilitation programming. It explicitly did not take into account the kind of programming that would be required to provide constitutionally adequate mental health and medical treatment. Nonetheless, the Panel concluded that the statewide MOC for male prisons was 145% of design capacity. | | |
| 383. The Corrections Independent Review Panel's estimate assumed several other things. Thus, the use of all "bad beds" would have to be ended, | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. | FRE 801(d)(2) (admission of party opponent); FRE 703 (based upon review of data and expertise); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| so that adequate program space would be available. Ofcourse, it also assumed that, in addition to available space, there would be "staff with requisite experience" provided to manage effective programming. Indeed, the Panel noted that the CDCR estimates of appropriate staffing "packages" that were operative at that time needed to be updated "to reflect position reductions, redirections, accommodations for' overcrowding,' court decisions and other mandates that have affected staffing allocations.,, Moreover, as I noted above, the Panel's estimate of an MOC did not specifically contemplate, take into account, or attempt to calculate the additional space and staffing levels that would be required to provide constitutionally adequate mental health and medical care. | Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | Relevant to existence of overcrowding and problems caused thereby; See Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative |
| 384. In fact, of course, there is every reason to believe that the necessary space and staffing levels needed to provide constitutionally adequate mental and medical are truly substantial. That is certainly my own judgment; it is the very clear conclusion reached on the basis of the observations and analysis I have detailed in much | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. | FRE 703 (based upon personal observation); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 703 (based upon review of data and expertise); Special Master is |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| of this report. It also reflects the judgment of numerous other independent experts who have evaluated, analyzed, and monitored the CDCR. In fact, of course, there is every reason to believe that the necessary space and staffing levels needed to provide constitutionally adequate mental and medical are truly substantial. That is certainly my own judgment; it is the very clear conclusion reached on the basis of the observations and analysis I have detailed in much of this report. It also reflects the judgment of numerous other independent experts who have evaluated, analyzed, and monitored the CDCR. In fact, although I have not attempted to provide a quantitative estimate of the extent of the shortcomings-in space and personnel-that plagues the CDCR in this regard, the *Coleman* Special Master has done so. Specifically, he reported to the Court on May 31, 2007 that: "Given the inadequacies ofprogramming space, program beds and mental health staffing, it is clear that a significant portion of the MHSDS caseload is not receiving the necessary mental health services ...defendants cannot meet at | | knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable); Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record). |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| least a substantial portion, amounting in some loose amalgam to about 33 percent, of acknowledged mental health needs with current staffing resources. Insufficient intensive mental health treatment beds and a chronic lack of programming space for mental health treatment contribute further to defendants' inability to meet required mental health services.,, This quantitative estimate of the current shortfall brought about by inadequacies in space, beds, and housing-fully a third of mental health needs unmet-suggests that the magnitude of the incremental needs ignored in the Panel's estimate of maximum operable capacity is substantial. | | |
| 385.  When these crucial mental health and medical treatment needs are taken into account-as they must be in any calculation aimed at addressing the primary cause of these continuing constitutional violations-then the appropriate percentage for maximum operable capacity would certainly be lower than the Panel's and wardens' estimate of 145%. Thus, in this important sense, a limit of 145% of design capacity can only be regarded as a very conservative estimate of | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; *See* Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or |

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the MOC, and seems an appropriate figure to establish as the outer limit or maximum capacity in a range that is intended to eliminate the constitutional violations that are at issue here. | | argumentative |
| 386.  There is another reason to regard the Independent Review Panel's estimate of a viable MOC as a very conservative outside limit. Specifically, it is based on the judgments of a group of experienced California wardens, many of whose own perspectives on "Maximum Operable Capacity" were likely forged in a system in which a certain amount of institutionalized acceptance of overcrowding has occurred. I note, for example, that the *Plata* Receiver described what he called "CDCR's institutionalized acceptance of overcrowding and the lowering of correctional standards to accommodate overcrowding.,, In fact, the Receiver documented not only the decades of prison overcrowding in California but also the parallel evolution of "a correctional mindset that allows *overcrowding* rather than *sound correctional management* to drive crucial construction and prisoner management policy." | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise); Receiver is knowledgeable, Court appointed; *see also* FRE 803(8) (public record); FRE 801(d)(2) (admission of party opponent); Relevant to existence of overcrowding and problems caused thereby; *See* Plfs.' Response to Defs.' MIL 1 (re: prison conditions); Court can determine whether statement is mischaracterization, speculative, or argumentative |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| 387.  Moreover, the Receiver identified the same failure to take medical, mental health, and dental care programming needs into account in the CDCR's Facility Master Plans (spanning 1993-2003) as was reflected in the Corrections Independent Review Panel's report. As he put it: "All the plans focus on corrections, as if medical, mental health, and dental care have no place in prison design, prison construction, or prison management.,, In fact, the Receiver found that the acceptance of overcrowding was institutionalized to such a degree in CDCR management that it knowingly planned construction of even its newest prisons to provide at most fifty percent of all health care related space needs, "ignoring pre-existing plans to double-cell the prison up to 200 percent of capacity.,, These facts  suggest that the Maximum Operable Capacity would actually have been quite a bit lower than 145% if the Corrections Independent Review Panel had taken these critically important needs into account. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 803(8) (public record); Court can determine whether statement is mischaracterization, speculative, or argumentative; Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding. |
| 388.  At a minimum, then, using | Inadmissible Hearsay. | FRE 801(d)(2) |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the Panel's estimate of 145% as a very conservative outside limit, remedial steps should be taken to reduce CDCR's prison population to its viable, defensible maximum operable capacity. This would mean that all bad beds must be eliminated, sufficient program space must be identified and made available, and the number of inmates not to exceed appropriate numbers of available, qualified staff to provide necessary programming. Necessary staffing must be calculated in such a way as to provide programming opportunities and sufficient custody/escort staff to enable that programming to occur. Indeed, it is not clear that, given the "serious staffing shortfalls" that continue to plague CDCR, its prisons can possibly safely and humanely accommodate even 145% of capacity (much less the near-double capacity they now face). | Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | (admission of party opponent); FRE 803(8) (public record); Relevant to existence of overcrowding and problems caused thereby; Relevant to impact of overcrowding; FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, speculative, or argumentative. |
| 389.  Moreover, as I have suggested, a "maximum operable capacity" that provides for the constitutional delivery of mental health care must incorporate and take centrally into account the mental health treatment standards established | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. | FRE 703 (based upon personal observation); FRE 703 (based upon review of data and expertise); Court can determine whether statement is mischaracterization, |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| by the *Coleman* Court. To parallel the Corrections Independent Review Panel's assumptions in this context, then, all "bad" mental health beds must be eliminated. For example, this includes reducing the population to eliminate the use of alternative crisis beds, EOP "overflow" housing that does not have appropriate space for individual or group mental health contacts, RC EOP housing for EOP stays greater than 60 days, and DMH units such as those currently run in SVSP D-5 and D-6 and CMF P-2 and P-3, which are not set up to provide care consistent with inpatient standards. | Lack of foundation. Mischaracterizes the evidence. | speculative, or argumentative; Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); FRE 201 (judicially noticeable). |
| 390. Furthermore, the programming considerations of the Independent Review Panel must be expanded to reflect the requisite mental health "program" that is set forth in the *Coleman* remedy. Thus, adequate mental health programming space must be afforded under any defensible definition of the MOC. Moreover, whatever operable capacity is finally implemented must also be related to the number of mental health and custody staff in the prison system who are tasked with providing mental health care. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | Court can determine whether statement is mischaracterization, speculative, or argumentative; Receiver is knowledgeable, Court appointed; see also FRE 803(8) (public record); Special Master is knowledgeable, Court appointed; see also FRE 803(8) (public record); Relevant to existence of overcrowding and problems caused thereby; FRE 201 (judicially noticeable); |

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| For example, as I noted above, the Special Master found that current staffing cannot provide for roughly one-third of the prisoners with identified mental illness. Finally, the maximum operable capacity must also account for the intersection of space availability and staffing levels. This means, as the Receiver noted, California's long-standing policy of building "only to base staffing levels"-a policy that "has left the CDCR in crisis regarding the clinical space needed to provide constitutional levels of access to health care"-must be correspondingly changed. | | FRE 703 (based upon review of data and expertise); Relevant to impact of overcrowding. |
| 391.  Numerous previous court orders-most of which were issued a considerable period of time ago-and virtually every other approach to judicially-mandated institutional change of which I am aware have been tried and failed to solve this chronic (and in many ways, worsening) problem. In my opinion, a carefully crafted prisoner release order is the only remedy that is capable of addressing this severe overcrowding crisis and beginning the process of finally solving the wide range of dangerous and debilitating problems it has brought about. | Inadmissible Hearsay. Fed. R. Evid. 802. Hearsay within Hearsay. Fed. R. Evid. 805. Relevance (Phase II issues). Fed. R. Evid. 402. Lack of foundation. Mischaracterizes the evidence. | Reserved for consideration of Phase 2 of trial. |

-369-

[253560-1]

| Statement (Paragraph Number) | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| | | |

Dated: November 14, 2008

Respectfully submitted,

ROSEN, BIEN & GALVAN, LLP

By: _____ /s/ Lisa Ells _____
       Lisa Ells
       Attorney for *Coleman* Plaintiffs and on
       Behalf of *Plata* Plaintiffs

PLAINTIFFS' RESPONSE TO DEFENDANTS' OBJECTIONS TO AUGUST 15, 2008 REPORT OF DR. CRAIG HANEY, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[253560-1]