# ATTACHMENT A

1   EDMUND G. BROWN JR.                    HANSON BRIDGETT LLP
    Attorney General of the State of California   JERROLD C. SCHAEFER - 39374
2   DAVID S. CHANEY                        PAUL B. MELLO – 179755
    Chief Assistant Attorney General       S. ANNE JOHNSON – 197415
3   ROCHELLE C. EAST                       SAMANTHA D. TAMA – 240280
    Senior Assistant Attorney General      RENJU P. JACOB - 242388
4   JONATHAN L. WOLFF                      425 Market Street, 26th Floor
    Senior Assistant Attorney General      San Francisco, CA  94105
5   LISA A. TILLMAN – State Bar No. 126424  Telephone: (415) 777-3200
    Deputy Attorney General                Facsimile:  (415) 541-9366
6   KYLE A. LEWIS – State Bar No. 201041   jschaefer@hansonbridgett.com
    Deputy Attorney General                pmello@hansonbridgett.com
7   455 Golden Gate Avenue, Suite 11000    ajohnson@hansonbridgett.com
    San Francisco, CA 94102-7004           stama@hansonbridgett.com
8   Telephone: (415) 703-5708              rjacob@hansonbridgett.com
    Facsimile:  (415) 703-5843
9   lisa.tillman@doj.ca.gov
    kyle.lewis@doj.ca.gov
10
    Attorneys for Defendants
11

12              UNITED STATES DISTRICT COURT

13          FOR THE EASTERN DISTRICT OF CALIFORNIA

14         AND THE NORTHERN DISTRICT OF CALIFORNIA

15     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

| | |
|---|---|
| 18   RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| 19           Plaintiffs, | **THREE-JUDGE COURT** |
|           v. | |
| 20 | |
| 21   ARNOLD SCHWARZENEGGER, et al., | |
|           Defendants. | |
| 22 | |
|    MARCIANO PLATA, et al., | No. C01-1351 TEH |
| 23           Plaintiffs, | **THREE-JUDGE COURT** |
| 24           v. | **DEFENDANTS' OBJECTIONS AND** |
| 25   ARNOLD SCHWARZENEGGER, et al., | **COUNTER DESIGNATIONS TO PLAINTIFFS' DESIGNATIONS FOR** |
| 26           Defendants. | **NON TRIAL WITNESSES** |
| 27 | **To:  Three-Judge Panel** |
| 28 | |

- 1 -

1  **Deposition of Victor Brewer, September 4, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 10:17 - 13:16 | | |
| 14:25 - 19:11 | | |
| 49:22- 53:21 | **Hearsay, 53:14-21:**<br>Q.  So DMH headquarters concurred with your opinion that those two 64-bed units should be built; is that correct?<br>A.  Yes.<br>Q.  But the CDCR headquarter staff disagreed and removed those projects from the planning phase; is that correct?<br>A.  Correct. | |
| 54:18 - 55:17 | | |
| 56:4 - 60:11 | **Hearsay, 57:11-21:**<br>Q.  And according to the memorandum, you state, "As Delta-6 was being activated, it became apparent that the continued use of each Pod for the provision of patient group activities became increasingly problematic because of the potential for patients who are not participating in therapeutic group but had the ability to hear confidential patient information by their cell location being in the immediate proximity."<br>        Is that still a problem in the D-5 and D-6 units?<br>A.  Yes.<br><br>**Hearsay, 58:2-13:**<br>Q.  The memo states, "On or around June 12th, 2006, a conversation was held between George Sifuentes, you," meaning Doug McKeever, "and myself regarding the construction of the requested temporary group and interview rooms.  At this time, Mr. Sifuentes opposed the addition of the group rooms; however, was willing to re-discuss the issue at a future date."<br>        Do you recall why Mr. Sifuentes opposed construction of the group rooms at that time?<br>        MS. O'BANNON:  Calls for speculation.<br>        THE WITNESS:  I don't accurately recall him stating his opinion why.<br><br>**Objection As Noted In Transcript - Speculation, 58:9-21:**<br>Q.  Do you recall why Mr. Sifuentes opposed construction of the group rooms at that time? | |

DEFENDANTS' OBJECTIONS AND COUNTER DESIGNATIONS
(2:90-CV-00520 LKK JFM )(C01-1351 TEH)

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | MS. O'BANNON:  Calls for speculation.<br>    THE WITNESS:  I don't accurately recall him stating his opinion why.<br>    MS. WHELAN:<br>Q.   Do you have a general recollection of why he opposed building those group rooms at that time?<br>A.   Lack of funding.<br>Q.   Was it also a workload issue with his department?<br>    MS. O'BANNON:  Same objection.<br>    THE WITNESS:  I don't recall.<br><br>**Hearsay, 58:22 - 59:7:**<br>Q.   The memo goes on to state, "Of major concern to SVPP staff is the lack of confidentiality because interviews are currently conducted in the dining room between Delta-5 and Delta-6, which is open to Salinas Valley State Prison nonclinical staff."<br>    And then you go on to note that, "This is a direct violation of acceptable patient care and is clearly a violation of the HIPPA and State statutes."<br>    Is that still true for today?<br>A.   Yes.<br><br>**Hearsay 59:8-15:**<br>Q.   At the very end of this memo, you state that you're again requesting that the group rooms and interview rooms be constructed in the best interest of patient care, compliance with Federal and State statutes and regulations, and expectations set by the Coleman Federal Court.<br>    Is that correct, based on this memo?<br>A.   Yes. | |
| 79:8 - 82:16 | **Privilege, 74:11-20:**<br>    MS. WHELAN:  Mark as Exhibit 6 an April 6, 2007, memorandum from Char Schulz on behalf of Victor Brewer to Special Master Michael Keating regarding Special Master Keating request for information.  This is Bates number E_PRIV_183396 through 183399.<br>    (Whereupon, Plaintiffs'<br>    Exhibit No. 6 was marked for<br>    identification.)<br>    MS. O'BANNON:  Propose an objection to this particular document.  This document was previously privileged by defendants.  I'd | |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | like to assert the same privileges we asserted previously to the entire document, from 183396 through 183399.<br><br>**Hearsay, Lacks Foundation, Irrelevant, 79:8 - 80:14:**<br>Q.  Ms. Schulz then talks about what she refers to as an operational dilemma within the CDCR and DMH at this time, and she writes, "If it is determined that the appropriate level of care is to transfer the patient from MHCB to an APP bed, the question arises, is the MHCB patient to take priority over the current patients on the APP wait list?  If this is the direction the Special Master elects to take, then the negative aspect is that any patient in the MHCB within VPP will take priority over the current wait list, which will result in additional days before the non-VPP MHCB patients will be admitted to the APP."<br>    Can you explain what this --<br>A.  Where are you, specifically?<br>    MS. O'BANNON:  I'm sorry.  We're lost --<br>    THE WITNESS:  I have no idea where you are.<br>    MS. O'BANNON:  -- because you talked about the current operation dilemma, which is the last sentence of a different paragraph, and then I think you moved on to a completely different section after that.<br>    THE WITNESS:  Where are you reading?<br>    MS. WHELAN:  Sorry.  I was reading from the first big paragraph.<br>    MS. O'BANNON:  Do you know how many sentences down?<br>    MS. WHELAN:  Yeah, it's beginning with the sixth line, starting with, "However, if it is..."<br>    MS. O'BANNON:  If we can just read it for a second.<br>    MS. WHELAN:  Sure.  Yes.<br>    THE WITNESS:  (Witness reviewing document.) Okay.<br><br>**Hearsay, 81:12 - 82:1:**<br>Q.  In the last paragraph, let me direct you -- I'm reading from the last three sentences.  She says, "However, the simple fact is that the previous bed plan approved by the court demonstrated the need for additional APP and Level IV ICF beds.  The current delay in | |

- 4 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | completing the plans that included 350 APP and 128 Level IV ICF beds and initiating the construction is a major factor that drives the current and continued bed shortage.  The simple fact is that the bed shortage places both CDCR and VPP in the current operational dilemma."<br>          Do agree with that characterization as it applies to the situation today?<br>A.   Yes; otherwise, you wouldn't have a waiting list.<br><br>**Objection As Noted In Transcript - Speculation, 82:2-16:**<br>Q.   Do you know what the CDCR and DMH's plans are to resolve this dilemma?<br>A.   To my knowledge, the only plans currently on the drawing board is the 64 beds for maximum custody ICF patients at VPP.<br>Q.   So the 64 beds that will be built at the CMF VPP; is that correct?<br>A.   To be operational in 2011.<br>Q.   So is it safe to say this dilemma will continue until at least 2011?<br>          MS. O'BANNON:  Calls for speculation, but if you have an opinion...<br>          THE WITNESS:  It's safe to say that until such time as there's an adequate number of beds, the wait list will continue. | |
| 82:17 - 85:21 | **Hearsay, 84:22 - 85:4:**<br>Q.   "In June 2008, CDCR and the DMH reached agreement that the DMH would continue to provide all inpatient acute and intermediate mental health services instead of transferring responsibilities to provide those services to the CDCR."<br>          Does that refer, at least in part, to your concerns about the mentoring aspect?<br>A.   Yes, it does. | |
| 100:16 - 101:15 | | |
| 120:23 - 123:20 | **Hearsay, 120:23 - 121:8:**<br>Q.   Under No. 2 on that same page, it states --<br>I'm skipping a sentence or two.  "With the recent expansions, sixty six Level IV ICF beds at the Vacaville Psychiatric Program and the Delta Yard Expansion, the wait list predictably dropped to approximately 80 patients," and that's from 120 patients? | |

- 5 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | A.  Um-hum.<br>Q.  "As predicted, the wait list is continuing to grow and has increased to 96 within the current wait list and referrals received as of this date."<br>A.  Um-hum.<br><br>**Hearsay, 122:6-18:**<br>Q.  No. 3 also states, "Considering with each expansion the SVPP wait list has only temporarily decreased with a continued increase approaching the previous levels. SVPP management believes that due to the nature of a relatively long wait time between referral and admission, the referring institutions are reluctant to send referrals.  Only after they experience a bed increase do they again submit appropriate referral packages with the expectation of admission into the program due to the additional operational beds."<br>         Do you still agree with the statements in that paragraph?<br>A.  Yes.<br><br>**Hearsay, 123:6-17:**<br>Q.  Under No. 4 -- and, again, this memo was written on August 22nd, 2007, or dated August 22nd, 2007 -- you state, "Now that the plan submitted to the Coleman Court eliminates the permanent structures for the 128 beds, it becomes imperative that CDCR construct appropriate group rooms within the Delta Yard to provide appropriate patient care and confidentiality according to HIPPA statutes."<br>         Does that refer to the group rooms that you spoke about a couple of minutes ago that are scheduled to be constructed by 2011?<br>A.  Yes. | |
| 126:5 - 129:4 | | 186:12 - 187:4<br>188:20 - 189:6 |
| 135:5 - 138:21 | **Lacks Foundation, 135:15:27:**<br>MS. WHELAN:  Q.  Have you seen this memorandum before?<br>A.  No.<br><br>**Hearsay, 135:28 - 136:9:**<br>Q.  I'll just ask you questions about information in it, since it contains information from DMH, and see if you agree with the way it's | 186:12 - 187:4<br>188:20 - 189:6 |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | characterized.  In the first paragraph, there's a reference, and it states, "In ongoing samplings of patients transferred to the Department of Mental Health facility for inpatient care, data indicates that a significant number of CDCR Inmate-Patients have sub-referenced blood levels of their prescribed medications when measured on admission.  From July 2005 to January 2008, there was a finding of 222 samples from a total of 279 blood draw samples returned at the range of no level detected to at the minimum level of the laboratory reference for the psychotropic medication."  Are you aware of the blood samples that this refers to between July of 2005 and January 2008?<br>     A.   It came off our report.<br><br>**Hearsay, 136:24 - 137:12:**<br>Q.   On the second page of the memorandum, there are directions to psychiatrists and then directions about better medication adherence that you and I have been talking about, including, "Discussing with patient possible barriers and solutions to effect better compliance, conferring with the case manager and other IDTT members to better ensure compliance, discuss ordering liquid or IM formulations with the patient, consider crushing or direct observation medication, assess if Keyhea is warranted and transfer to a higher level of care if the mental health condition warrants that."<br><br>Do you see that?<br><br>     A.   Yes.<br>**Objection As Noted In Transcript - Speculation, 138:11-15:**<br>Q.   Do you have any knowledge as to whether part of the problem in terms of medication compliance within the CDCR has to do with staffing shortages?<br>     MS. O'BANNON:  Calls for speculation.<br>     THE WITNESS:  I have no direct knowledge. | |
| 147:25 - 149:11 | | |
| 161:1 - 164:20 | **Privilege, 161:1-164:20**  See transcript | **157:10-16:**<br>MS. |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | | O'BANNON: Exhibit 11 is a Bates number document E_PRIV_092150 through 092153, those previously published by the defendants. We'd like to assert the same privilege as we asserted to this document previously. MS. WHELAN: Q. Are you familiar with this memorandum? |
| 165:20 - 166:14 | | |
| 190:18 - 193:1 | | 189:10 - 190:14 |

**Deposition of Shama Chaiken, August 29, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 6:9-13 | | |
| 41:1 - 44:19 | **Improper Expert Opinion, 41:1 - 44:19, see Ex. A, Tab 1**<br><br>**Objection as Noted in Transcript, 42:4 - 14:**<br>Q.  Were you trained to interview patients, as a psychologist, in public settings?<br>        MR. ANTONEN:  Objection as to "public."  If you can provide some parameters. BY MR. BIEN:<br>Q.   You can answer, if you understand.<br>        MR. ANTONEN:  To the extent you understand the question.<br>        THE WITNESS:  I was trained to provide certain types of services in confidential settings and other types of services in nonconfidential settings. | 40:6- 25<br>49:17 -52:22 |
| 54:15 - 54:23 | | 49:17 - 52:22<br>54:5 -8<br>54:24- 55:11 |
| 56:6 - 56:24 | **Lacks Foundation, 56:6 - 24:** | 49:19-50:11 |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Q.  Okay.  And do you know the circumstances under which D5 and D6 were established?<br>A.  Yes.<br>Q.  Okay.  And when was that?<br>A.  When was that?<br>Q.  What was that?  What were the circumstances?<br>A.  The circumstances were that the Salinas Valley psychiatric program, which operates under DMH at the same -- on the same grounds as Salinas Valley State Prison, had a significant wait list, and additional space was needed to provide intermediate care at that time.  And so these -- we call them 180 design buildings – were designated as housing and treatment space for intermediate care.<br>Q.  So the department took a -- what was otherwise a regular custodial housing unit and converted it to an inpatient psychiatric facility to deal with this shortage of beds?<br>A.  Correct. | Okay.  I've asked the court reporter to mark as the first exhibit, Exhibit 1, a letter from Lisa Tillman to Matt Lopes, dated February 14th, 2008.  It is one, two -- four pages in length.  I've got copies.  A couple copies at least.  Take a moment and take a look at that.<br>It's pretty short.<br>    Do you understand this to be a copy of a proposal for the department to go ahead with building additional mental health treatment and counseling space at Salinas Valley State Prison?<br>    A.  I just got through the cover letters.  Can I look at that?<br>    Q.  Sure.  Please, take as much time as you like.<br>    A.  Okay.  Can you repeat the question.<br>    Q.  Do you know what this is, this document is?<br>    A.  Do I know what it is?  I've just read it.<br>    Q.  Okay.  Have you seen it |

- 9 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | | before?<br>    A.   No. |
| 70:23 - 71:9 | **Lacks Foundation, 70:23 - 71:9:**<br>Q.   Okay.  Has anyone ever complained to you that they didn't want to work -- had difficulty doing their job at a CDC prison, a clinician, because they didn't have appropriate office space?<br>A.   I can't recall anyone complaining to me particularly about that.<br>Q.   But you've heard that complaint?<br>A.   There was a survey done recently in a different part of the organization, related to staff satisfaction, and I heard the results of that study were clinicians stated that they were not afforded sufficient office space in some locations. | |
| 92:21 - 94:13 | | |
| 94:14 - 97:22 | | 97:23 - 98:21 |
| 98:22 - 99:16 | | |
| 104:19 - 105:22 | | 105:24 - 106:2<br>106:17 - 107:5<br>107:19 - 108:5 |
| 114:20 - 116:16 | | 116:17-19 |
| 116:20 - 117:15 | **Lacks Foundation, 116:20- 117:15:**<br>Q.   Okay.  So when you are looking at the census number here the staff capacity is based on, if I understand you correctly, based on the original program guide ratios for general population for a particular program, in addition to an augmentation by the court order in 2006, and there's probably other court orders added for ad seg and stuff, but, basically, is there a capacity for each prison of mental health staff that you're aware of right now?<br>A.   The capacity refers to the number of inmates. So there's a different grid that has every CCCMS program and the staffed capacity of that program --<br>Q.   Right.<br>A.   -- that drove the original staffing, plus the augmented staffing decisions, about how many staff are allocated at that prison.<br>Q.   Okay.  And is it correct that there's a similar kind of analysis that went into the EOP programs; in other words, there was an original staffing allocation that has been augmented?<br>A.   Yes | 108:13 - 109:15<br>MR. BIEN:  Can you mark this as the next.<br>    (Plaintiffs' Exhibit No. 4 was marked<br>    for identification.)<br>BY MR. BIEN:<br>    Q.   Dr. Chaiken, I've marked, as the next exhibit in order, a two-page document that bears a production number DSU -- it's hard to read -- PP002775 and 2776. It is the MHSDS weekly MIS summary report, dated |

- 10 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | | August 6, 2008, that was produced to us by defendants in the last couple days.<br><br>Is this a report that you see from time to time?<br>A. Yes.<br>Q. Okay. And can you explain what this report shows?<br>A. Under "Program," it shows the different mental health services delivery system levels of care, and the column on capacity, it shows the -- I'm familiar with the ones from CDCR, the staffed capacity of those programs.<br>Q. Okay.<br>A. The census is how many inmate-patients are in those programs. The wait list shows how many inmate-patients are endorsed to those programs or in programs that you are not -- that don't require endorsement, how many are on the wait list. And then the |

- 11 -

| | DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|---|
| | | | source shows where the information is from. |
| | | | Q.   Okay. And what does DDPS stand for, under source? |
| | | | A.   I don't know. |
| | 118:17 - 119:8 | **Lacks Foundation, 118:17 - 119:8:** Q.   Okay.  And what do you understand the wait list column to be?  Let's just look at the CCCMS column.  How would someone be on a wait list for CCCMS? A.   So they may be in a reception center awaiting transfer to a program that has a specific staff capacity for CCCMS level of care. Q.   That's fine.  So, in other words, they've arrived in a reception center, they've been screened, they've been identified by clinicians as needing a CCCMS level of care and they're awaiting transfer to that level? A.   Correct. Q.   Okay.  And would the same apply for -- well, what do you understand about the EOP wait list? A.   I -- I understand the same thing about the EOP wait list, that they're waiting to be transferred to a program that has a staff capacity for providing EOP level of care. | 108:13 - 109:15. *See* quote above. |
| | 121:4 - 124:20 | **Lacks Foundation, 121:4 - 124:20, see Ex. A, Tab 2** | 120:7 -14   Q.   And let me just show you a -- let's mark as the next exhibit in order, No. 5, a copy of a different staffing report, which is still called HCPU, H-C-P-U.  It was provided to us on or about July 31, 2008, by Dennis Beaty.  It's one, two, three, four, |

DEFENDANTS' OBJECTIONS AND COUNTER DESIGNATIONS
(2:90-CV-00520 LKK JFM )(C01-1351 TEH)                                    1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | | five, six, seven, eight -- nine pages long.<br>        (Plaintiffs' Exhibit No. 5 was marked for identification.)<br><br>120:20 - 121:3<br><br>Q.  Dr. Chaiken, are you familiar with this -- this report, Enclosure 3?  It's called the HCPU information report, health care placement unit report.<br>        A.  So I'm not familiar with this cover sheet.  I haven't seen this piece of it before, the first three pages, or the cover, Enclosure 3, and I may not have seen the June 20th, 2008, version of this report, but I used this report that's released on various dates for various reasons. |
| 137:15 - 140:24 | **Lacks Foundation, 137:15 - 140:24, see Ex. A, Tab 3** | 134:13 - 135:8 |
| 142:16 - 143:1 | **Lacks Foundation, Hearsay, 142:16 - 143:1:** Q.  Okay.  If you turn to the next page, under "Justification," second paragraph from the bottom says, (Reading) After 13 years of implementing the court's orders and mandated services, the implementation of the MHSDS revised program guide and the development of and in concurrence with the mental health staffing workload study, the DCHCS has | 140:25 - 141:21<br><br>MR. BIEN:  Okay. Let me mark as Exhibit 8 the finance letter requesting approval of the workload study. |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | determined that current resources are insufficient to comply with required levels of care for mentally ill inmates.<br>　　Do you agree with that, Dr. Chaiken?<br>A.　Yes. | It's dated April 1, '08.<br>　　(Plaintiffs' Exhibit No. 8 was marked<br>　　for identification.)<br>BY MR. BIEN:<br>　Q.　You mentioned that there was some -- a change of leadership that had some effect on the department's use of workload study or timing.  What was that?<br>　A.　Yes. Doug McKeever left, and Peter Farber-Szekrenyi left, and Robin Dezember came in as the deputy secretary, and we were missing -- the position of director was vacant for a period of time. And during the budget cycle where this had to be submitted, I think that there was some problems with transmission of information about the actual numbers that were coming out of the workload study and what they meant.<br>　Q.　Okay. |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | | The court order had required that the department submit the results of the workload study to the legislature a year earlier than it did. Are you aware of that? A. No. |
| 143:21 - 144:23 | | 143:2 -20 |
| 146:20 - 149:13 | | |
| 163:18 - 164:7 | | |
| 165:24 - 166:19 | **Objection as Noted in Transcript - Calls for Speculation, 165:24 - 166:19:** Q. Okay. Is it correct that many of the ad seg EOP programs are unable to provide 10 hours a week of out-of-yard time currently, due to shortages of small management yards? A. Yes. Q. So that means that the men in those ad seg units are getting less than 10 hours a week of outside exercise? A. Yes. Q. Would you agree that that is -- that small amount of outdoor exercise can be detrimental to a mentally ill patient's functioning and health? MR. ANTONEN: Objection. Calls for speculation as each, probably, individual is different. But to the extent you can provide a generalization, Dr. Chaiken, please go ahead. THE WITNESS: The question is whether lack of access to outdoor yard time can be detrimental? BY MR. BIEN: Q. That's correct. A. -- to -- I think it can -- could be detrimental to anyone. Yes. | |
| 167:7 - 168:1 | **Objection as Noted in Transcript - Argumentative, Calls for Speculation, Vague, 167:7 - 168:1** Q. Okay. Are you aware that there are programs in CDCR that, due to lockdowns, or other modifications, give no yard whatsoever to the inmates for extended periods of time that can last months? A. That there are programs -- there are places | |

- 15 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | within CDCR that inmates don't get yard for long periods of time, yes.<br>Q. Okay.<br>A. Yes.<br>Q. Would you agree that that is -- violates basic human standards of decency?<br>   MR. ANTONEN: Objection. Argumentative. And calls for speculation, and is vague as to "basic human standards of decency." To the extent you feel comfortable responding, or counsel can further clarify, please feel free.<br>   THE WITNESS: I agree that it violates basic correctional standards for care that has been agreed upon that is -- that correctional environments are responsible to provide. | |
| 169:12 - 170:24 | **Hearsay, 169:12-22**<br>Q. Okay. And then the next sentence says, "From December 2007 to March 2008, the number of ASU EOP inmate-patients in the hub institution for more than 90 days decreased more than 22%."<br>   Is it correct that -- what were you saying there? That's not the -- just the rounding. You're saying there actually was an improvement in conditions?<br>A. I'm saying that between -- from December 2007 to March 2008, the number of ASU EOP inmate-patients in the hub institutions who were there for more than 90 days decreased more than 22 percent. | |
| 196:11 - 197:23 | | |

**Deposition of Robert Gore, October 1, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 8:5-16 | | |
| 63:2-10 | **Objection as Noted in Transcript; Vagueness; Hearsay 63:2-10:**<br>Q. So, was part of the reason why you were writing to the governor because you saw this as a immediate crisis that needed to be resolved?<br>A. Saw what?<br>Q. The overcrowding.<br>   MR. MELLO: Objection. Vague as to "crisis." Vague as to "immediate need." | 59:16-25 |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | THE WITNESS: Overcrowding needed to be resolved, yes. And it was, and remains, serious. | |

**Deposition of Rick Johnson, September 3, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 9:18-19 | | |
| 77:19 - 81:15 | | |
| 83:5 - 83:11 | | |
| 92:23 - 93:17 | **Hearsay, 92:23 - 93:11:** Q. So, let's go back to the MHSDS Weekly MIS Report, which was Exhibit 2. So, I'd like you to look at line 6, which is EOP. Again, there's a footnote there that -- which says, "The EOP Wait List is a subset of EOP census" -- A. Okay. Q. -- "as all EOPs are coded EOP and DDPS." But let's first look at the "Capacity" number. And it says, "3,667." Can you tell me your understanding of what that number represents? A. That number represents the -- once again, the allocated staff capacities that was given to the specific EOP institutions for their EOP mission. | |
| 94:6 - 94:9 | | |
| 96:4 - 97:12 | **Hearsay, 96:4-9:** So, then I'd like you to look at "Census" for the EOP, and that number is "4,639." What does that number represent? A. That is the actual number of EOP inmates statewide that we have the IMIS DDPS. They're identified on DDPS as "EOP." | |
| 139:15 - 139:20 | **Relevance – Not a Phase I Issue, 139:15-20:** Q. Are there any new MHCB beds that will be opening in the next year or two? A. Not that -- not Mental Health Crisis Beds that I'm aware of -- new beds. Q. And the 50-bed unit at CMF is already opened? A. Yes. | |
| 163:16 - 163:23 | **Relevance – Not a Phase I Issue, 163:16-23:** Q. Exhibit 11 is addressed at better utilization of hub beds; correct? A. Yes. Number 11 was to better utilize the beds that we do have. Q. Okay. | |

- 17 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Does is it address in any way the existing shortfall of Ad Seg beds?<br>A.  No. | |
| 164:2 - 165:14 | **Relevance – Not a Phase I Issue, 164:20-165:5:**<br>Q.  Okay.<br>        Are there any plans for new Ad Seg beds?<br>A.  Um, I don't know of any immediate plans to build any new beds.<br>Q.  Okay.<br>        I just want to direct you to fiscal year 09/10 and the bed deficit there for those beds.<br>        And that number is 171; correct?<br>        MS. FRITZ:  The document speaks for itself.<br>        THE WITNESS:  Correct.<br>        MS. KAHN:  Okay.<br><br>**Hearsay – Objection as Noted in Transcript, Document Speaks for Itself, 164:24-165:5:**<br>Q.  Okay.<br>        I just want to direct you to fiscal year 09/10 and the bed deficit there for those beds.<br>        And that number is 171; correct?<br>        MS. FRITZ:  The document speaks for itself.<br>        THE WITNESS:  Correct.<br>        MS. KAHN:  Okay. | |
| 210:18 - 211:14 | **Relevance – Not a Phase I Issue, 211:7-15:**<br>Q.  Apparently so.<br>        Are there any new PSU beds under construction?<br>A.  Not that I'm aware of.<br>Q.  Okay.<br>        Any new PSU beds slated for -- what's the word I want to use?<br>        Any new PSU beds coming online in the next year or two?<br>A.  Not that I'm aware of. | |

**Deposition of John Misener, January 29, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 16:5 - 17:1 | | |
| 22:19 - 24:25 | **Relevance, Lacks Foundation, Hearsay, 24:3 -11:** | |

- 18 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Q.   So on page 4, the first deliverable is a five-year mental health bed forecast using Navigant's methodology.  And the contract sets forth that that will be accomplished twice a year with due dates 30 days after the contractor's receipt of CDCR's general population projections, which come out in the fall and the spring; is that correct? A.   That's what it says. Correct **Relevance, Hearsay, 24:23 -25:**       MS. TILLMAN: 5. Is that correct? The note 5 on page 4 gives an outline of the time.       THE WITNESS: Oh, yeah. Yes, that's correct. | |
| 49:6 - 49:18 | **Relevance, 49:8 - 13:** Q.   But the other piece of data that you have recommended to CDCR to create is a periodic update of the UNA study so that you can also capture information about unmet need based on clinician reviews of files and patients; is that correct? A.   I think that's a fair statement, yes. **Relevance, 49:14 -24:** Q.   In the absence of periodic UNA type studies, is it accurate to say that you have no way of incorporating into your data unmet need, other than through the wait list data? A.   I would say that's correct.   But during a forecast, we identify a particular program that's going south or decreasing in volume, and we bring it to the attention of the -- either the department or DMH as to why this is occurring.  Because there may be reasons other than need involved. | |
| 53:5 - 53:25 | | |
| 116:12 - 118:8 | **Lacks Foundation, 116:12 - 20:** Q.   So it's your understanding that OHUs are not counted as existing MHCB supply beds; correct? A.   Right. That's correct. Q.   But are inmates housed in the OHUs counted as being on the wait list for MHCB beds? | |

- 19 -

| | DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|---|
| 1 2 | | | |
| 3 4 5 | | A.   If they're on the wait list. They are – I mean, I have no way of knowing which ones are, which ones aren't. But some of them will be on the wait list. Right. | |
| 6 7 8 9 10 | | **Lacks Foundation, 117:13 - 17:** Q.   So if an inmate is in an OHU, and a clinician places them, that inmate on the MHCB wait list, you count the person as being on the wait list; correct? A.   That's my understanding of how it's reported. I don't have access to that data, so I don't know. | |
| 11 12 13 14 15 16 17 | | **Lacks Foundation, 117:25 - 118:8:** Q.   So as far as you know, anybody housed in an OHU is counted on the MHCB wait list only if a clinician has referred that person to an MHCB? A.   That's my understanding, correct. Q.   And is that also true for the MHOHUs, of which I think there's only one at SAC right now? A.   Yeah. I -- my own knowledge of the differences is sort of -- sort of sketchy. But yeah, that's correct. | |
| 18 19 20 21 22 23 24 25 26 27 28 | 123:21 - 124:20 | **Hearsay, Lacks Foundation, 124:4 - 20:** Q.   And as far as you know, your data is not tracking zz cells, and in fact, you've never even heard that term; correct? A.   To my knowledge, nobody's ever mentioned that from within the department. And generally the way these things work is if I can identify, through the data or through conversations with the court experts, that I'm missing something, we'll circle around and ask the department. I'll say, what about, you know, the MHOHUs or the OHUs  or the LOUs, or whatever the places that may be where they're putting overflow of people, and try to identify to what extent that amount is and is it being tracked.  And in some cases, like I said, they have come up with estimates of how to make those adjustments. But I've never heard of zz. So I don't feel qualified to answer that. | |

- 20 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 131:19 - 132:21 | | |
| 154:7 - 155:7 | **Lacks Foundation, 154:7 -18:** Q.   Would there be a situation -- are you afraid of the situation whereby the wait list information wouldn't be enough, because, for instance, if clinicians know a program is full, why bother to put somebody on a wait list for it? A.   I guess my response to that statement would be that, like we discussed earlier, we're dependent on the wait list information to be accurate and complete, but that it's appropriate for the department to audit occasionally to make sure that the clinicians are adequately measuring and referring pathology to the appropriate levels. | |
| 162:22 - 163:22 | | |
| 182:21 - 184:1 | **Hearsay, Document Speaks for Itself, 182:21 - 183:2:** Q.   So footnote 4 deals with the lower level ICF available beds, which include a total of 363 beds, 231 of which are at ASH, 50 of which are at Coalinga, 40 are at CMF, five at Napa State hospital, five at Metropolitan State Hospital, and 32 at the Salinas Valley State Prison stand-alone dorms; correct? A.   Yeah. That's what it says, uh-huh.  **Hearsay, 183:14 - 20:** Q.   Has anyone ever told you that there have never been 231 beds available at ASH for intermediate care facility inmates? A.   You mean before this point? Q.   I mean ever. A.   I guess, you know, what I've dealt with was the supplies that was given to me. | |
| 187:5 - 188:18 | **Relevance, Objections as Noted in Transcript - Lacks Foundation, Incomplete Hypothetical, 187:5 - 188:8** Q.   So my question is, if I, for instance, said to you that an inmate housed in the D-6 unit at Salinas Valley State Prison, which is an ICF unit, never receives yard and also never receives confidential clinician contacts, whereas if that same inmate were housed in the stand-alone cell in Salinas Valley State | |

DEFENDANTS' OBJECTIONS AND COUNTER DESIGNATIONS
(2:90-CV-00520 LKK JFM )(C01-1351 TEH)

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Prison, he would receive yard and he would receive confidential client contacts, would that situation have any impact on your forecast of available ICF beds?<br>    MS. TILLMAN: Lacks foundation. Incomplete hypothetical.<br>  I state those objections for the record.  You're free to answer, if you understand the question.<br>    THE WITNESS: Well, as I understand the question, that you -- there may be somebody that has -- has issues with the quality received, but it wouldn't necessarily mean that that person -- either those two populations that reside in those respective units don't require intermediate care.<br>BY MS. WHELAN<br>Q.  Correct. But would it be appropriate to count the D-6 bed as an intermediate bed?<br>    MS. TILLMAN: Same objections.<br>BY MS. WHELAN<br>Q.  On par with the bed that you're counting in the stand-alone unit?<br>    MS. TILLMAN: Same objections.<br>    THE WITNESS: I'm not counting any beds. The department provides me the beds. | |
| 191:17 - 194:9 | | |
| 202:20 - 205:21 | **Objection as Noted in Transcript - Vague and Ambiguous, 202:20 - 204:5:**<br>Q.  Yeah. I'm not trying to make an argument one way or the other. I'm just trying to understand whether something like staffing shortages is an issue that can be mathematically captured in data as opposed to something that is not appropriate for a mathematical model.<br>    MS. TILLMAN: I'm going to object vague and ambiguous.  But I also think he's answered that question a couple of different ways already. He's already said something along the lines of doing a new contract, a new model, and getting a different set of data from CDCR to create that sort of look at how staffing impacts available beds.  Is that correct?<br>    THE WITNESS:  I guess I would just reiterate that if short-term adjustments -- and | |

- 22 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | when I say short-term, I mean we're looking at current capacity numbers, they don't seem accurate because of staffing shortages, then they need to be footnoted and/or adjusted to reflect-- <br><br> Or actually, what some people do is they'll have built supply number, and then hospital agencies that deal with -- you know, state agencies, still have certificate of need, will have another column that says built but not operational.  It means it's a potential capacity, which apparently from what you're saying -- <br><br> And I assume this is true, that you're arguing that these are built or available but not staffed.  Then that can just be a separate line put in the tables to say, okay, since they're not operational, the deficit goes up.  That's what I'd do. <br><br> It's not my purview to create that or do I have the ability or context to refine what Michael Barks and company have pulled together for me for these previous studies.  But that would change your -- <br><br> **Relevance, Hearsay, 204:17-22** <br> Q.   And is that something that the CDCR has asked you to do at this point? <br> A.   No. <br> Q.   Which is adjust your model at all for staffing vacancies? <br> A.   As far as I'm concerned, it's not my model, that part of it. | |
| 212:18 - 215:20 | **Lacks Foundation, and Objection as Noted in Transcript, Improper Lay Testimony, 212: 24 - 213:17:** <br> Q.   What are the possible explanations for why need would increase as supply increases? <br> A.   Well -- <br><br>      MS. TILLMAN: If you know within the realm of your expertise, although I do object to the question. <br><br>      THE WITNESS:  There's a -- there's a situation called supply-based demand, supply-based growth, which has more to do with the | |

DEFENDANTS' OBJECTIONS AND COUNTER DESIGNATIONS
(2:90-CV-00520 LKK JFM )(C01-1351 TEH)

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | propensity of physicians to utilize resources if they're easy to use and out there. Sometimes in the private sector, they aren't always coincident with need. Sometimes they're -- they have other -- other motivations to -- than maybe the need of the patient.<br><br>   I don't know about this situation. That tends to be what happens in situations where physicians have different financial incentives, and we see in markets where the supply is higher and all of a sudden they're doing more work on patients than maybe the need or compared to other markets.<br><br>**Lacks Foundation, Improper Lay Testimony, Objection as Noted in Transcript - To the Question, 214:7-12:**<br>Q.   Are there any other possible explanations you can think of as to why the data showed an increasing need for MHCB beds as the supply was increasing?<br>MS. TILLMAN: Same objections.<br>THE WITNESS:  I would have to look at the older study of the three. Not the Tucker Alan.<br><br>**Lacks Foundation, Improper Lay Testimony, 215:14 -18:**<br>Q.   And would one possible explanation for this phenomenon of need increasing while bed supply is increasing be that clinicians may be more likely to refer patients to open beds as opposed to referring patients to a wait list? | |
| 220:7 - 221:2 | | |

**Deposition of George Sifuentes, December 15, 2007**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| 14:16 - 18:8 | | 14:16 - 18:8 |
| 23:8 - 26:20 | **Relevance - Not Relevant to Phase I, 25:11 - 16:**<br>Q.   And before you left the Office of Facilities Management, were you involved in any capital outlay projects related to the Plata lawsuit? | 23:8 - 26:20 |

- 24 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | A.  No -- wait a minute, I take that back, that's not correct.<br>      Yes, I did.<br><br>**Relevance - Not Relevant to Phase I issues and Lacks Foundation, 26:8 -13:**<br>Q.  And what is the status of that project?<br>A.  That project, last I understood, it was authorized by the legislature, and the receiver's office has selected a constructor or design builder.  And I'm not sure what -- I'm not sure the status of their schedule, but that's the last I recall.<br><br>**Objection as Noted in Transcript - Lacks Foundation, Not Relevant to Phase I, 26:14 - 26:20:**<br>Q.  So they are still in the preconstruction phase?<br>A.  I'm not sure.<br>      MR. McCLAIN:  Objection, lacks foundation.<br>      BY MS. WHELAN:<br>Q.  You can go ahead and answer.<br>A.  I'm not sure. | |
| 41:7 - 42:10 | | 41:7 - 42:10 |
| 43:23 - 50:14 | **Hearsay, and Lacks Foundation, 45:1 -25:**<br>      MS. WHELAN:  The Navigant report.<br>Q.  And it shows deficits of EOP male beds as of 2007.  As of July 13th, 2007 there's a deficit of 270 beds, fiscal year 2007-2008 there's a deficit of 370 beds?<br>A.  Uh-hmm.<br>Q.  Fiscal year 2008-2009 there's deficit of 454 beds and fiscal year 2009 to 2010 there's a deficit of 520 beds.  And then this document shows surplus beds.<br>      Do you see that?<br>A.  Yes, I do.<br>Q.  Referring back to the 6-26-07 mental health major capital outlay project document, is it correct that on that document there are no EOP construction projects for men under the currently under construction category?<br>A.  That's not correct, the very first one says EOP treatment space for 384 inmates.<br>Q.  I'm under the "currently under construction"?<br>A.  Oh, I apologize.<br>Q.  That's okay. | 43:23 - 50:14<br>46:20 - 47:16 |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | A.   That's correct, 50 mental crisis beds and 64 intermediate care facility beds.<br><br>**Objection as Noted in Transcript -Lacks Foundation, 46:7 - 13:**<br>Q.   Moving down to the second project under "currently under design," CSP Los Angeles County, EOP treatment space for 150 inmates. Do you agree that that will not add any EOP beds for male inmates?<br>     MR. McCLAIN:  Just a minute.  Object as to lacks foundation and vague. | |
| 54:1 - 54:8 | **Lacks Foundation, 54:1 -8:**<br>Q.   And do you have any knowledge whether taking the Lancaster 150 treatment space project first, whether that project is moving forward?<br>A.   To my knowledge, it is not moving forward.<br>Q.   And as to the 384 EOP treatment space project at Sacramento?<br>A.   To my knowledge, that one's not – that one's not moving forward either. | 54:1 - 54:8 |
| 54:15 - 55:20 | **Foundation, Improper Lay Testimony, 55:1-10:**<br>Q.   And do you understand that one issue he raised in that report was his finding that the reception center EOP programs were not meeting required standards in large part because of the lack of treatment and staffing space available in those units?<br>A.   I'm not sure what the reasons were, but I understand that he did have criticism of the EOP programming reception centers.  I did not personally read the report. | 54:15 - 55:20 |
| 70:20 - 73:12 | **Lay Testimony, 71:11 -16**<br>Q.   Do you agree with the statement that the most urgent concern facing the CDCR is overcrowding?<br>     MR. McCLAIN:  Objection, lacks foundation, calls for speculation.<br>     THE WITNESS:  I agree that overcrowding is a serious concern facing the department.<br><br>**Objection as Noted in Transcript - Lacks Foundation, 71:18-22:**<br>Q.   Do you agree, based on your experience with the Office of Facilities Management that there was severe overcrowding in the CDCR | 70:20 - 73:12 |

- 26 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | when you were working with the OFM?<br>　　　MR. McCLAIN:  Objection, lacks foundation.<br><br>THE WITNESS:  CDCR is facing overcrowding in<br>its adult inmate population.  It is also facing a staff shortage, and I think those two things are the<br><br>most critical issues for the department.<br><br>**Hearsay, 72:11-13:**<br>Q.　And do you agree with the statement here that severe overcrowding significantly impacts the CDCR's ability to provide mandated treatment?<br><br>(Ms. Richardson re-enters proceedings.)<br>　　　MR. McCLAIN:  Objection, lacks foundation.<br>　　　THE WITNESS:  I believe that overcrowding impacts the department's ability to provide treatment programming for two reasons, one, it takes<br>staff to get people to the program, and two, if they<br>are being housed in spaces that were designed for<br>treatment, then that is -- then that is taking space<br><br>away from the treatment.<br><br>**Objection as Noted in Transcript - Lacks Foundation, 72:11 -22:**<br>Q.　And do you agree with the statement here that severe overcrowding significantly impacts the CDCR's ability to provide mandated treatment?<br>　　　(Ms. Richardson re-enters proceedings.)<br>　　　MR. McCLAIN:  Objection, lacks foundation<br><br>THE WITNESS:  I believe that overcrowding impacts the department's ability to provide treatment programming for two reasons, one, it takes<br>staff to get people to the program, and two, if they<br>are being housed in spaces that were designed for | |

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | treatment, then that is -- then that is taking space<br><br>away from the treatment.<br>**Objection as Noted in Transcript - Lacks Foundation , Calls for Speculation, 72:24 - 73:6:**<br>Q.   And do you agree that severe overcrowding has also resulted in the CDCR being forced to use a great number of nontraditional beds?<br>        MR. McCLAIN:  Objection, lacks foundation, calls for speculation.<br><br>THE WITNESS:  Well, the overcrowding has required the department to use what we call<br><br>nontraditional areas for housing.<br>**Lacks Foundation, Relevance - Not Phase I Issue, 73:8-12:**<br>Q.   And at the time that you left the OFM in October of this year, do you recall approximately how many nontraditional beds were being used for that purpose?<br>A.   My recollection is -- was 25,000 beds. | |
| 86:16 - 92:12 | **Relevance - Not Phase I Issue, Lacks Foundation, 86:22 - 87:15**<br>Q.   And in the solution column it says, "Construct 341 statewide small management exercise yards to replace large group exercise yards in administrative segregation housing units at 15 Level II and III/reception centers. This phase will build small management yards at various institutions."<br>        Are you familiar with this project?<br>A.   Yes.<br>Q.   At the time that you left the Office of Facilities Management do you recall how many of these small management yards were built?<br>A.   These particular ones?<br>Q.   Yes. Of the 341.<br>A.   I'm not aware of -- of any of the 341 being built, these particular ones.<br>Q.   And at the time that you left the Office of Facilities Management, do you know how many small<br>management yards existed within the CDCR?<br>A.   Approximately 200 or so.<br><br>**Relevance, Lacks Foundation, 89:1- 9:**<br>Q. Okay. | 86:16 - 92:12 |

- 28 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | If you'd turn to page 2, the very last partial paragraph, it says: "At present, defendants have only 719 of the 1,480 small management yards required to give necessary out of cell exercise time to inmates in administrative segregation." Does that sound accurate to you, on a statewide level? A. Yeah. I was off by 500, we had many more. **Relevance, Lacks Foundation, 90:1-91:1:** Q. Do you understand where this 1,480 number comes from? A. Yes. They -- as I mentioned earlier, the department had a plan to replace all ad seg -- not to replace, excuse me, but to add all small management yards to all the administrative segregation units throughout the state. We started with Level IVs, and we were moving through doing Level IIIs and Level IIs. And there is a listing of the -- there was one big list that had ad segs, it had some other projects like SHU, and it had, if I recall correctly, PSU. And it was on one listing that -- one -- the person that was a lead for that project had, and -- and that's where the number, about 1,400, came from, in terms of, you know, point in time, here's how many we would need based upon what we know, you know, what's our ad seg population; where are the ad segs being run from; and how many we have. And so we used that as our -- as that's where we need to be. We're at 719 -- this is June, we're at 719. We had a certain number under construction, we had asked for, if I recall, it was design funds for the 179, because that's how many we | |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | thought we would do in a year.<br>        And the plan, I believe -- the plan that was turned into the court was, we were going to get 179<br>in '07-'08, and then we were going to get another<br>group in '08-'09, another group in '09-'10, another<br>group in '10-'11.  When it was all said and done they would all be finished, the entire 1480, would -- would be completed by 2012.  But I'm not<br>sure when in 2012.<br><br>**Relevance, Lacks Foundation, 91:17-21:**<br>Q.   And so did you have an estimate about how many you could build in a year?<br><br>A. About 100 -- within a 12-month period, we would -- I think it's fairer to say that we could<br><br>have completed the 179 within a 24-month period.<br><br>**Relevance, Lacks Foundation, 91:22-92:1:**<br>Q. Okay.<br>        And you testified that the 1480 number included small management yards for SHUs and PSUs?<br>        A. Yeah.  My recollection of the listing is<br><br>yes, it did.<br><br>**Relevance, Lacks Foundation, 92:2 -4:**<br>Q.   And are you aware that defendant's most recent plan excludes small management yards for SHUs and PSUs?<br><br>        A. I'm not aware of the current plan<br><br>**Relevance, Lacks Foundation, 92:6-12:**<br>Q.   Do you know who would make the decision to exclude SHUs and PSUs from the small management plan?<br>        MR. McCLAIN:  Objection, calls for speculation.<br>        THE WITNESS:  No, I -- I -- I wasn't involved in that process.<br>        MS. WHELAN:  Okay.<br><br>**Objection as Noted in Transcript - Calls for** | |

- 30 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | **Speculation, 92:6-12:**<br>Q.   Do you know who would make the decision to exclude SHUs and PSUs from the small management plan?<br>     MR. McCLAIN:  Objection, calls for speculation.<br>     THE WITNESS:  No, I -- I -- I wasn't involved in that process.<br>     MS. WHELAN:  Okay. | |
| 94:7 - 99:22 | **Hearsay, 95:2-5:**<br>Q.   And this is stating that that is an unlicensed or it's a licensed on a temporary emergency basis; is that correct?<br>A.  That's correct.<br><br>**Calls for Speculation, Lack Foundation, 95:23 - 25:**<br>Q.   And is it your understanding that Judge Karlton ordered that due to a severe shortage of these beds statewide?<br><br>**Calls for Speculation, Lacks Foundation, 97:4 - 15:**<br>Q.   And it's your understanding that the judge ordered that swap of acute for MHCB beds due to Coleman class member bed shortages; is that correct?<br>A.   I believe -- I believe the judge approved that, I believe the department came forward -- the Department of -- the CDCR and the Department of Mental Health came forward with this plan as a way to address the shortage of mental healthcare crisis beds.  And I believe Special Master Keating reviewed the recommendation and made a recommendation to the court to approve that.  And I believe Karlton then approved that.<br><br>**Cumulative, 97:17-22:**<br>Q.   But it's your understanding that the department volunteered that swap of beds due to bed shortages in the CDCR?<br>A.   Well, the department offered it as -- as a plan to address the mental health crisis bed shortage. | 94:7 - 99:22 |
| 101:17 - 106:15 | **Hearsay, Lacks Foundation, 103:6 -9:**<br>Q.   Earlier in the report it refers to 18,200 overcrowding cells; is that correct?<br>A.   I think it refers to -- I think they were referring to nontraditional beds. | 101:17 - 106:15 |

- 31 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | **Objection as Noted in Transcript - Lacks Foundation, Vague, 103:23 - 104:5:**<br>Q.   So just to clarify, the 18,200 nontraditional beds are beyond the CDCR's 'manageable level of overcrowding'; is that correct?<br>        MR. McCLAIN:  Objection, lacks foundation, vague.<br>        THE WITNESS:  As it applies to housing, it doesn't -- it doesn't apply to nontraditional beds.  This concept was applied to housing.<br><br>**Lacks Foundation, 104:8-9:**<br>Q.   Will you describe for me what the phrase "manageable level of overcrowding" means?<br><br>**Lacks Foundation, Relevance, 105:8 -9:**<br>Q.   But it's your experience that there are now triple bunks in dorms; is that correct?<br><br>**Relevance, 105:18 - 25:**<br>Q.   Have you been to reception center dorms?<br>A.   Yes, I have.<br>Q.   Which ones have you been to?<br>A.   Wasco, North Kern, CIM, for example.<br>Q.   And were they double bunked at the time?<br>A.   Yes, they were double bunked, all within the dormitory -- all within the footprint for housing.<br>Q.   Okay.<br><br>**Cumulative and Lacks Foundation, 106:11 - 15:**<br>Q.   So again, the paragraph states that 18,200 inmates are in nontraditional overcrowding, so that means beyond the "manageable level of overcrowding" that the CDCR standard assumes; is that correct?<br>A.   That's correct. | |
| 203:13 - 208:18 | **Lacks Foundation, Not Relevant to Phase I, 204:11 - 14:**<br>Q.   And of the 300 staff members who were required to do this work, were those positions still required after AB 900 was passed?<br>A.   That depends.<br><br>**Lacks Foundation, 207:9 -14:**<br>Q.   And you stated at that time, which was December 18th, 2006, that the institutions were overcrowded by nearly 200 percent; is that | 203:13 - 208:18 |

- 32 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEPOSITION DESIGNATIONS |
|---|---|---|
| | correct?<br>A.   That's correct.<br>Q.   And do you know if that's -- that level of overcrowding exists today?<br><br>**Objection as Noted in Transcript - Lacks Foundation, Calls for Speculation, 207:19 - 23:**<br>Q.   And do you have an understanding of why bed capacity and population growth was also the top priority of the CDCR?<br>        MR. McCLAIN:  Objection, lacks foundation, calls for speculation.<br><br>**Relevance - Not Relevant to Phase I, 208:10 -12:**<br>Q.   And do you think that the population was also taking over other space besides housing, such as programming space? | |

**Deposition of David Bennett, September 9, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 5:13-15 | | |
| 11:15 - 12:7 | **Lacks Foundation, 12:4-6**<br>Q.   Okay.  Do you agree with the basic premises that California's prisons are overcrowded?<br>A.   I do. | |
| 12:12-24 | **Objection As Noted In Transcript - Vague and Ambiguous, Lacks Foundation 12:7-16**<br>Q.   How serious do you think that is?<br>        MS. KECK:  Objection.  It's vague and ambiguous as to the word "serious."<br>Q.        BY MR. BORNSTEIN:  Go ahead.<br>A.   From the reports that I've read -- I have not toured the facilities.  From the reports that I have read of the plaintiffs' experts and the various commissions that have been convened over the years, my opinion is that the overcrowding in the California prison system is as severe as it could possibly be.<br><br>**Lacks Foundation, 12:17-20:**<br>Q.   In your report you said there is no doubt that dramatic action needs to be taken to deal | |

- 33 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | with that situation; is that right?<br>A.  Correct.<br><br>**Lacks Foundation, 12:21-24:**<br>Q.  What kind of dramatic action do you envision that needs to be taken?<br>A.  Well, as I've recommended in my report, a restructuring of the system. | |
| 75:10-17 | **Objection As Noted In Transcript - Calls for Legal Conclusion, and Calls for Expert Opinion,**<br>**75:18-22:**<br>        MS. KECK:  I'm going to object that this calls not only for a legal conclusion, but something that is outside the scope of this witness's testimony and his expected testimony.  He's not been engaged to render an expert opinion in this regard. | |
| 75:24 - 76:19 | **Objection As Noted In Transcript - Outside the Scope, Calls for Legal Conclusion, and Calls for Expert Opinion, 76:22:**<br>        MS. KECK:  Same objection.  Outside the scope. | |
| 76:21 - 77:5 | **Strike, No Answer to Designated Question, 76:22 - 77:5:**<br>        BY MR. BORNSTEIN:  And would you agree that reducing the number of prisoners is at least one of the first steps that needs to be taken while you're doing -- while you're kind of working on the infrastructure of risk and needs and subsequent identification and referral and in the facility and out of the facility?  Basically you've got to bring the population down to a more manageable size so that you can implement those things. | |

**Deposition of Deborah Hysen, September 3, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Defendants object to the admission of any of Ms. Hysen's testimony in Phase I because if relevant, it is only relevant to Phase II. | |
| 12:8-10 | | |
| 12:15-17 | | |
| 14:11-23 | | |

- 34 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 17:2-18:1 | | |
| 157:2-7<br><br>157:10 - 158:24 | **Hearsay (Incomplete Unauthorized Draft) Lacks Foundation, 158:10-20:**<br><br>(Whereupon, Deposition Exhibit No. 16 was marked for identification.)<br>    MS. NORMAN:  Q.  Have you seen this document before?<br>    A.  Yeah.  I started to write it and didn't finish it. . .<br>Q.  Okay.  And when was it that you started it?<br>A.  Oh, man; I couldn't say with any certainty.<br>Q.  Do you remember if it was this year or last year?<br>A.  I would say it was last year.<br>Q.  And I'm guessing it was probably after at least you started on the strike team.  So before May?<br>A.  Given that I'm using that title, as Chief Deputy Secretary.<br>Q.  So it would be not before June, at the least?<br>A.  Yeah.  I would assume so.<br>Q.  What did you start to write this document for?<br>A.  That's a good question.  You know, at some point I wanted to create a, what's called a SharePoint site, which is a technology tool that Microsoft uses to have kind of a virtual space for collaboration.  And I sort of envisioned this blogging, if you will, to engage the stakeholders in the process; to communicate progress to the community.  To educate, inform, engage, collaborate.<br>    And I think that this was my first attempt, and clearly I stopped to kind of look at how I could continue to communicate what we're doing and why it's so important that there was more than just CDCR engaged in this effort.<br>Q.  Could you read from the first page, second paragraph.  Could you read starting with the word "Currently" and going to the end of the paragraph.<br>A.  "Currently, there is simply not enough space in the prisons to meet the basic medical, mental health, and dental needs of prisoners, and spaces that were designed for rehabilitation and vocational purposes now house either temporary beds or, in some | 157:8-9<br>**(In Support of Objections)**<br>A.  Yeah.  I started to write it and didn't finish it.<br><br>158:24 - 159:6<br>**(In Support of Objections)**<br>I think partly the reason why I stopped is clearly there were pretty important gaps here that I needed to research further.  I needed to make sure that I was not overreaching my expertise, my involvement. And so I think part of the reason I stopped is I wasn't certain where this was going to head; what role I should play in communicating some of these conditions; and really starting to understand this more. |

DEFENDANTS' OBJECTIONS AND COUNTER DESIGNATIONS
(2:90-CV-00520 LKK JFM )(C01-1351 TEH)

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | cases, are actually abandoned because there is simply not enough staff, resources, or modernization funds available to restore them to their intended purpose."<br>Q.   Was that true at the time you wrote it?<br>A.   I think it was my understanding at the time that the information that I started to write was accurate.  I think partly the reason why I stopped is . . . | |

**Deposition of James Tilton, September 3, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 10:20 - 11:23 | | |
| 15:1 - 17:12 | | |
| 56:14 - 57:21 | | |
| 60:10 - 62:22 | **Irrelevant, 61:23 - 62:22:**<br>Q.   Okay.  And for certain programs, it might be lower if they have special needs?<br>A.   Well, I don't mean to fill in answers, but there were assumptions being made, when we built the prisons, that we would overcrowd. And when we did that, based on the knowledge of what the program definition was, and the staffing related to that, we made accommodations to fully program -- it was part of our process to make sure every inmate had a job program to be in place.<br>        Now, definitions of what it takes to staff programs has changed, and, so, it may have moved from that, but, clearly, there was an understanding that we would put more than design beds, number of inmates in the prisons. And when we did that, we would provide appropriate program space, as defined at that time.<br>Q.   You would agree that at some point when the population exceeded, in general, 140 percent, and got to be 150, 160, 170, at some point, certain facilities lost the ability, in terms of space, to deliver adequate programs to the inmates?<br>A.   Yes. | |

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | Q.   And it varied from facility to facility, is what that point was?<br>A.   That's true. | |
| 68:5 - 69:2 | **Irrelevant, 62:23 - 65:18, See Ex. B, Tab 1** | |
| 69:14 - 71:17 | **Irrelevant, 69:14- 71:17**<br>        MR. BIEN:  Q.  Okay.  Did you understand, based on your evaluation at that time, that the level of overcrowding was dangerous for both inmates and correctional staff?<br>        MS. TILLMAN:  Vague and ambiguous. But you can answer the question.<br>        THE WITNESS:  I wouldn't use the word dangerous, because the statistics I looked at, I found the Department was able to minimize incidents, but not in a fashion that I thought was productive to our mission.<br>        MR. BIEN:  Q. What do you mean by that?<br>A.   Lockdown inmates, the fact that if you shut down inmates and keep them in their cells, you're not going to have incidents, but that was counter to what I thought, both the role of the Department, as well as the instructions that I had in terms of what the policies should be in the Department to provide the inmates an opportunity for a program.<br>        MR. BIEN:  Q.  Did you understand that the administration had established a mission for the Department of Corrections, which included a rehabilitation of prisoners?<br>A.   Yes.<br>Q.   Okay.  Did you understand that the need to lock down an overcrowded prison to maintain safety and security was inconsistent with that mission?<br>A.   Yes.<br>Q.   And why was that? | |
| 73:15 - 74:1 | **Irrelevant, 73:15 -74:1**<br>Q.   Is it correct that to run programs in a lockdown environment requires additional custody staff?<br>        MS. TILLMAN:  I'll object as vague and ambiguous and overbroad.<br>        If you understand...<br>        THE WITNESS:  Well, I'm hesitating because I know a warden who had a lockdown and provided all the programs and everything, had less staff.  But, by and large, if your -- lock | |

- 37 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | down inmates, it takes more resources to move services to that population than if they get to have preview. So, generally, I would say the answer is, yes. | |
| 74:19 - 76:16 | **Irrelevant, 74:19 - 76:16; See Ex. B, Tab 2**<br><br>**Hearsay, 74:19-22:**<br>Q. In the first paragraph, this report refers to CDCR having insufficient cells and dormitory housing, and CDCR had been required to activate non-traditional temporary housing. | |
| 76:17 - 77:23 | **Irrelevant, 76:17 - 77:23**<br>Q. You talked about flexibility. Could you -- I just want to ask some more about that. When an inmate comes into the system, is it correct that the Department attempts to -- goes through a process of -- to understand the inmates' security needs and other needs to determine where they should be placed?<br>  A. Yes.<br>Q. And the more I've been involved in this process, the more complex I realize it must be for CDCR to appropriately find a place for an inmate that might have, for example, multiple needs. He might have an enemy at a particular prison, certain security needs, certain medical needs, and, therefore, CDCR has to take care of -- or attempt to take care of all of those different requirements?<br>A. True.<br>Q. That becomes -- does that process of appropriately placing inmates in housing that was consistent with their classification requirements become more complex as overcrowding increased?<br>A. Yes.<br>Q. And why was that?<br>A. Well, you have less choices, that if I need a bed that has the following dynamics or characteristics, do I have that bed that meets all this? And, so, therefore, decisions may have to be made, well, gee, I can't address that issue. I'll have to address the following issues.<br>  And the more overcrowded, the less flexibility there is, the less chance you have to take in all of the inmates' needs, not just security or those kinds of things in terms of program, et cetera. | |
| 77:24 - 79:21 | **Irrelevant, 77:24 - 79:21, See Ex. B, Tab 3** | |

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | **Hearsay, 77:24 - 78:2:** Q.  Farther down on that same paragraph, the report mentions increased security concerns based upon severe overcrowding and the housing of inmates in less secure areas. | |
| 79:22 - 80:25 | **Hearsay, 79:22 - 80:4** Q.  Farther down that same paragraph, it states, "In addition, the overcrowding and lack of treatment space to service the additional populations has been a major contributor to court intervention regarding CDCR's healthcare services delivery.  The CDCR is currently operating under stipulated court agreements for medical, mental health, and dental services, and is under receivership for medical services." **Objection As Noted In Transcript -  It misstates the evidence in the document, 80:8 -15:**      MS. TILLMAN:  I'll object.  It misstates the evidence in the document.           If you can answer, go ahead.           THE WITNESS:  Well, I think what we were raising here is the issue that the lack of space is not only a housing issue, but it's impacting the other factors, like delivery healthcare service, the lack of offices, and clinical space. **Objection As Noted In Transcript - Misstates the evidence, 80:16-21:**      MR. BIEN:  Q.  Did you believe, in the summer of 2006, that that was a contributing factor to CDCR's difficulty in complying with, for example, the Coleman Court inmates for treatment?           MS. TILLMAN:  Misstates the evidence.  Assumes facts not in evidence.           You can answer.           THE WITNESS:  It was clear to me that the lack of program space was not just education, vocational.  It also is the ability to provide the mental health and... | |
| 81:6 - 81:24 | **Hearsay, 81:11-13:** Q.  Was this -- here, it says, "By October 2006, we project the shortage will be 2,481 positions, 11 percent of authorized positions." **Irrelevant, 81:6 - 81:24:** MR. BIEN:  Q.  The next paragraph refers to | |

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | something that you testified about already, which was that CDCR was experiencing custodial staff shortages; is that correct? A.   That's correct. Q.   Was this -- here, it says, "By October 2006, we project the shortage will be 2,481 positions, 11 percent of authorized positions."        Was that an unusual -- in your mind, was that an unusual level of vacancies for CDCR? MS. TILLMAN:  Objection.  Vague and ambiguous. MR. BIEN:  Q.  As of 2006? A.   I don't know what to -- how you would define unusual, but it was certainly an issue for me that I needed to close the gap in terms of filling positions. Q.   As secretary, did you believe that the shortages of custody officers were limiting your ability to deliver a program in the CDCR prisons in 2006? A.   Yes, in certain facilities, especially. | |
| 124:11 - 126:4 | | |
| 131:25 - 132:7 | **Irrelevant, Objection As Noted In Transcript – Vague and Ambiguous, 131:225 - 132:7:** Do you agree, Mr. Tilton, that severe overcrowding can lead to increased violence in prisons? MS. TILLMAN:  Objection.  Vague and ambiguous as to severe. If you can answer, go ahead. THE WITNESS:  I would think it's a factor, but, again, I would re-emphasize, the lack of program is as big a factor to this issue, but, yes. | |
| 193:1-7 | | |
| 193:21 - 195:22 | **Hearsay, lacks foundation, improper use of document to purportedly "refresh" recollection, objections as noted in transcript. 194:23-13** MR. BIEN:  Let me mark as the next in order, which I think this is 21, a Population Management Plan dated March 24th, 2006, E-CDCR_023431 through 436. (Whereupon, Plaintiffs' Exhibit No. 21 was marked for identification.) MR. BIEN:  Q.  I'm only going to ask you about -- there's a reference to Coalinga on Page 6. | |

- 40 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | My question is, does that refresh your recollection that CDCR, in 2006, was advocating to increase its use of Coalinga State Hospital beds for mentally ill prisoners?<br>        MS. TILLMAN:  Objection.  Misstates the evidence.<br>        THE WITNESS:  Well, two points.  This document was prepared before I got to the agency. | |
| 220:14 - 222:1 | **Irrelevant, 220:14 - 222:1**<br><br>Q.   Do you recall the issue, I think you talked about earlier, about CCR had already done some infill bed planning before AB 900 was passed, and then AB 900 included the requirement programming for infill beds that had not been anticipated?<br>A.   That's true.<br>Q.   Is it correct that the strike team that CDCR worked on was how to address that requirement, AB 900 and the infill beds?<br>A.   Yes.<br>Q.   Do you recall that one of the issues that was presented for decision was to what level of design bed capacity would the infill beds be designed in terms of, were you going to design them for 100 percent design bed capacity, as we discussed earlier, the one inmate per cell and standard basic dorm, or were you going to design them for a certain level above design bed capacity?  Do you recall that issue being discussed?<br>A.   Yes.<br>Q.   And if you look at Page 11, there's a discussion titled Level of Overcrowding.  And there's some presentations of alternatives.  And you may want to look at Pages 11 and 12.  I'm just going to ask if you recall this discussion and what decision was made.<br>A.   (Witness reviewing document.)  Yes, I do.<br>Q.   Okay.  What do you recall about the discussion about this issue?<br>A.   That I supported a level of overcrowding that we couldn't do design.  Single cell was not efficient, and we proved that if we provide program, we could do more than that, but I was not comfortable doing 190 and, those numbers, and asked for an analysis, not just a fixed percentage, but analysis by program and type of inmate.<br>        Are the institutions to give me what they | |

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | considered an operational goal that I would be willing to champion? So the numbers are somewhere in these ranges, but not these numbers. | |
| 222:2 - 225:22 | **Hearsay, 222:2-6:**<br>Q. Okay. And do you know what -- there's a reference in Point B here on Page 11, "Operate the infill facilities at the independent review panel. IRP suggested overcrowding standard of 145 percent of DBC and built programming space to support this number."<br><br>**Hearsay, lacks foundation, 222:16 - 22:**<br>Q. And do you recall that in that report, there was a suggestion made that CDCR attempt to reach an overcrowding standard of 145 percent of design bed capacity?<br>A. I'm assuming that's the number. I didn't recall from the report that that was the source of that number, but this is what that says. | |
| 226:12 - 228:15 | | |

**Deposition of Christopher Mumola, August 25, 2008**

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 59:18-22 | **Objection As Noted In Transcript - Vague and Ambiguous, Calls For Speculation, Incomplete, Hypothetical, 59:18 -60:3:**<br>Q. A state prison system's mortality rate will be highly dependent on the composition of the prison population, including the age, gender, race and length of time served of the state prisoners in a given state's prison system, correct?<br>    DEFENSE COUNSEL: Objection. Vague and ambiguous, calls for speculation, incomplete hypothetical. | |
| 60:4-62:5 | **Objection As Noted In Transcript - Vague and Ambiguous, Calls For Speculation, Incomplete, Hypothetical, , 59:18 -60:3:**<br>Q. A state prison system's mortality rate will be highly dependent on the composition of the prison population, including the age, gender, race and length of time served of the state prisoners in a given<br>state's prison system, correct?<br>    DEFENSE COUNSEL: Objection. Vague and ambiguous, calls for | |

- 42 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | speculation, incomplete hypothetical. | |
| 62:14-17 | **Objection As Noted In Transcript - The phrase "do not take into account' is vague and ambiguous, 62:14-19:** Q. The yearly and five-year mortality rates on this chart do not take into account the proportion of state prisoners in different age cohorts in the different state prisons, correct?     DEFENSE COUNSEL: Objection. The phrase "do not take into account" is vague and ambiguous. | |
| 62:20 - 63:5 | **Objection As Noted In Transcript - The phrase "do not take into account' is vague and ambiguous, 62:14-19:** Q. The yearly and five-year mortality rates on this chart do not take into account the proportion of state prisoners in different age cohorts in the different state prisons, correct?     DEFENSE COUNSEL: Objection. The phrase "do not take into account" is vague and ambiguous. | |
| 63:8-15 | **Objection As Noted In Transcript - The phrase "do not take into account' is vague and ambiguous, 63:2-17:** Q. The yearly and five-year mortality rates on this chart do not take into account the proportion of male to female prisoners in the different state prisons, correct?     DEFENSE COUNSEL: Objection. The phrase "do not take into account" is vague and ambiguous. | |
| 63:18 - 64:5 | **Objection As Noted In Transcript - The phrase "do not take into account' is vague and ambiguous, 63:2-17:** Q. The yearly and five-year mortality rates on this chart do not take into account the proportion of male to female prisoners in the different state prisons, correct?     DEFENSE COUNSEL: Objection. The phrase "do not take into account" is vague and ambiguous. | |
| 64:8-10 | **Objection As Noted In Transcript - The phrase "do not take into account' is vague and ambiguous, 63:2-17:** Q. The yearly and five-year mortality rates on this chart do not take into account the proportion of male to female prisoners in the different state prisons, correct?     DEFENSE COUNSEL: Objection. The phrase "do not take into account" is | |

- 43 -

1672667.1

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | vague and ambiguous. | |
| 72:5-9 | **Objection As Noted In Transcript - lacks foundation, document speaks for itself, document not properly authenticated, the term "very significant" is vague and ambiguous, 71:2-9**<br>Q.   So for people in the U.S. aged 15 to 64 unintentional injury is a very significant contributing factor to the overall mortality rate, correct?<br>       DEFENSE COUNSEL:  Objection. Lacks foundation, document speaks for itself, document not properly authenticated, the term "very significant" is vague and ambiguous. | 71:2 - 72:4 |
| 72:18-22 | **Objection As Noted In Transcript - Lacks foundation, calls for speculation, incomplete hypothetical, and the term "likely related" is vague and ambiguous, 72:18 - 73:4:**<br>Q.   The fact that the mortality rate for 2001 to 2004 is lower in state prisons than in the U.S. resident population is likely related to the very low rate of death from unintentional injury for state prisoners aged 15 to 64 years old, correct?<br>       DEFENSE COUNSEL:  Objection. Lacks foundation, calls for speculation, incomplete hypothetical, and the term "likely related" is vague and ambiguous. | |
| 73:5 - 77:15 | **Objection As Noted In Transcript - Lacks foundation, calls for speculation, incomplete hypothetical, and the term "likely related" is vague and ambiguous, 72:18 - 73:4:**<br>Q.   The fact that the mortality rate for 2001 to 2004 is lower in state prisons than in the U.S. resident population is likely related to the very low rate of death from unintentional injury for state prisoners aged 15 to 64 years old, correct?<br>       DEFENSE COUNSEL:  Objection. Lacks    foundation, calls for speculation, incomplete hypothetical, and the term "likely related" is    vague and ambiguous.. | |
| 82:10-13 | | |
| 82:22 - 83:3 | **Objection As Noted In Transcript - Overbroad, not relevant to subject matter,** | 83:7-11 |

- 44 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| | **82:22 - 83:4-5:**<br>Q. Have you performed any studies to determine, on a state-by-state basis, the relationship between each state's overall mortality rate and the mortality rate for that state's state prisoner population?<br>    DEFENSE COUNSEL: Objection. Overbroad, not relevant to subject matter. | |
| 83:6 | **Objection As Noted In Transcript - Overbroad, not relevant to subject matter, 82:22 - 83:4-5:**<br>Q. Have you performed any studies to determine, on a state-by-state basis, the relationship between each state's overall mortality rate and the mortality rate for that state's state prisoner population?<br>    DEFENSE COUNSEL: Objection. Overbroad, not relevant to subject matter. | 83:7-11 |
| 83:19 - 84:1 | | |
| 84:4 | | |
| 90:15-22 | **Objection As Noted In Transcript - Irrelevant, misstates the facts, 90:15 - 91:1:**<br>Q. Is it correct that attachment 2 to Defendants' Exhibit B shows that the suicide death rate for California prisons was equal to or above the average rate for all other states in each year, averaging 17 percent higher for the entire five-year period (18 suicide deaths per 100,000 inmates versus 15 suicide deaths per 100,000 inmates)?<br>    DEFENSE COUNSEL: Objection. Irrelevant, misstates the facts | |
| 91:2-11 | **Objection As Noted In Transcript - Irrelevant, misstates the facts, 90:15 - 91:1:**<br>Q. Is it correct that attachment 2 to Defendants' Exhibit B shows that the suicide death rate for California prisons was equal to or above the average rate for all other states in each year, averaging 17 percent higher for the entire five-year period (18 suicide deaths per 100,000 inmates versus 15 suicide deaths per 100,000 inmates)?<br>    DEFENSE COUNSEL: Objection. Irrelevant, misstates the facts | |
| 92:10-16 | **Objection As Noted In Transcript - Irrelevant, 92:10 -17**<br>Q. Is it correct that attachment 2 to Defendants' Exhibit B shows that the homicide | 92:20-21<br>93:2 - 94:3 |

- 45 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
|  | death rate for California prisons was above the average rate for all other states in each year, averaging more than double the average rate for the other states for the entire five-year period (8 homicide deaths per 100,000 inmates versus 3 homicide deaths per 100,000 inmates)?<br>        DEFENSE COUNSEL:  Objection.  Irrelevant |  |
| 92:18 | **Objection As Noted In Transcript - Irrelevant, 92:10- 17**<br>Q.   Is it correct that attachment 2 to Defendants' Exhibit B shows that the homicide death rate for California prisons was above the average rate for all other states in each year, averaging more than double the average rate for the other states for the entire five-year period (8 homicide deaths per 100,000 inmates versus 3 homicide deaths per 100,000 inmates)?<br>        DEFENSE COUNSEL:  Objection.  Irrelevant | 92:20-21<br>93:2 - 94:3 |
| 94:5-12 | **Objection As Noted In Transcript - Irrelevant, 94:5 -13:**<br>Q.   Is it correct that attachment 2 to Defendants' Exhibit B shows that the drug/alcohol intoxication death rate for California prisons was above the rate for all other states in each year, averaging triple the average rate for all other states for the entire five-year period (6 drug/alcohol intoxication death per 100,000 inmates versus 2 drug/alcohol intoxication deaths per 100,000 inmates)?<br>        DEFENSE COUNSEL:  Objection.  Irrelevant | 94:6-17<br>94:20- 95:7 |
| 94:14 | **Objection As Noted In Transcript - Irrelevant, 94: 5-13:**<br>Q.   Is it correct that attachment 2 to Defendants' Exhibit B shows that the drug/alcohol intoxication death rate for California prisons was above the rate for all other states in each year, averaging triple the average rate for all other states for the entire five-year period (6 drug/alcohol intoxication death per 100,000 inmates versus 2 drug/alcohol intoxication deaths per 100,000 inmates)?<br>        DEFENSE COUNSEL:  Objection.  Irrelevant | 94:6-17<br>94:20- 95:7 |

- 46 -

| DEPOSITION DESIGNATIONS | DEFENDANTS' OBJECTIONS | DEFENDANTS' COUNTER DESIGNATIONS |
|---|---|---|
| 95:9-13 | **Objection As Noted In Transcript - Irrelevant, 95: 9-14:**<br>Q.  Is it correct that attachment 2 to Defendants' Exhibit B shows that California prisons mortality rate from all causes has increased from 2001 (178 per 100,000 inmates) to 2005 (223 per 100,000 inmates) and increased of about 25 percent?<br>        DEFENSE COUNSEL:  Objection. Irrelevant | 95:17-18<br>95:21- 97:3 |
| 95:15 | **Objection As Noted In Transcript - Irrelevant, 95: 9- 14:**<br>Q.   Is it correct that attachment 2 to Defendants' Exhibit B shows that California prisons mortality rate from all causes has increased from 2001 (178 per 100,000 inmates) to 2005 (223 per 100,000 inmates) and increased of about 25 percent?<br>        DEFENSE COUNSEL:  Objection. Irrelevant | 95:17-18<br>95:21- 97:3 |
| 97:5-9 | | 97:15-16<br>97:19- 98:20 |
| 97:13 | | |
| 102:10-14 | | |
| 102:17 - 103:16 | | |
| 104:21 - 105:1 | | |

- 47 -

1    DATED:  November __, 2008                HANSON BRIDGETT LLP

2

3

4                                    By: /s/ Paul B. Mello
                                     PAUL B. MELLO
5                                    Attorneys for Defendants
                                     Arnold Schwarzenegger, et al.

6    DATED:  November __, 2008                EDMUND G. BROWN JR.
                                     Attorney General of the State of California
7

8

9                                    By: /s/ Kyle A. Lewis
                                     KYLE A. LEWIS
10                                   Deputy Attorney General
                                     Attorneys for Defendants
11                                   Arnold Schwarzenegger, et al.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28
                                       - 48 -