# EXHIBIT A

```
 1           IN THE UNITED STATES DISTRICT COURTS
            FOR THE EASTERN DISTRICT OF CALIFORNIA
 2           AND THE NORTHERN DISTRICT OF CALIFORNIA
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 3       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
 4

 5   RALPH COLEMAN, et al.,
 6       Plaintiffs,
 7   vs.             No. Civ S 90-0520 LKK-JFM P
 8   ARNOLD SCHWARZENEGGER,
     et al.,
 9
         Defendants.
10   _____/
     MARCIANO PLATA, et al.,
11
         Plaintiffs,
12
     vs.             No. C01-1351 TEH
13
     ARNOLD SCHWARZENEGGER,
14   et al.,
15       Defendants.
     _____/
16
17         DEPOSITION OF SHAMA CHAIKEN
18   DATE:       August 29, 2008
19   TIME:       9:28 a.m.
20
21   LOCATION:   ROSEN, BIEN & GALVAN, LLP
                 315 Montgomery Street, Tenth Floor
22               San Francisco, California
23
     REPORTED BY:   Brenda L. Marshall
24                  Certified Shorthand Reporter
                    License Number 6939
25
```

# TAB 1

1  Q. Okay. What about just as a psychologist in
2  terms of a treatment relationship? Move away from prison
3  for a second. If you were a treating psychologist and you
4  were meeting with a patient, do you think it -- would it
5  be important to you, as a professional, to be able to talk
6  to the patient in a confidential setting?
7  A. In a confidential setting?
8  Q. Yes.
9     MR. ANTONEN: Again, that's -- I object as to
10 vague, but from your personal perspective, go ahead.
11    THE WITNESS: It depends on the situation.
12 Sometimes you engage in family therapy with other people
13 in the room, or group therapy, which is not confidential,
14 which can be beneficial.
15    But, in certain circumstances, you establish a
16 situation where you can talk to an individual alone, in a
17 confidential setting, with limits, and it's important for
18 them to understand the limits of what you can and will
19 keep confidential.
20 BY MR. BIEN:
21 Q. Okay. Is it -- what are you trying -- is there
22 some information that you might elicit in a psychological
23 interview with a patient that they might be more willing
24 to share if they were in a confidential setting?
25    MR. ANTONEN: Objection. Calls for speculation

1  and appears to be an incomplete hypothetical. Please

2  don't speculate, but based on your experience.

3  BY MR. BIEN:

4  Q. Were you trained to interview patients, as a

5  psychologist, in public settings?

6       MR. ANTONEN: Objection as to "public." If you

7  can provide some parameters.

8  BY MR. BIEN:

9  Q. You can answer, if you understand.

10      MR. ANTONEN: To the extent you understand the

11 question.

12      THE WITNESS: I was trained to provide certain

13 types of services in confidential settings and other types

14 of services in nonconfidential settings.

15 BY MR. BIEN:

16 Q. Okay. What services were you trying to provide

17 in confidential settings?

18 A. Individual psychotherapy.

19 Q. Okay. Do you understand why it was good

20 practice, in psychology, to provide individual therapy in

21 confidential settings?

22 A. Yes.

23 Q. Okay. And why was that? Why is that? Do you

24 believe that to be the case?

25 A. Yes. Because it facilitates a therapeutic

1    relationship where the rules of our society apply that

2    people can disclose information without worrying that it

3    could be later used against them in a harmful way.

4        Q.  Okay.  May it also result in -- would a

5    confidential setting -- were you ever trained that a

6    confidential setting might make it more likely the person

7    would share things that they would be embarrassed to share

8    in a public setting?

9        A.  I was trained that there are different

10   conditions that facilitate disclosure.  Sometimes, in

11   group therapy, having others disclose would help people

12   overcome shame or embarrassment, and sometimes, being

13   alone in a room could facilitate that.  Sure.

14       Q.  Okay.  Are you aware that -- any other reasons

15   why you'd want to be in a confidential setting for

16   individual therapy that you can think of?

17       A.  I think it helps people be able to concentrate

18   and have a thread of conversation without interruption.

19       Q.  In a prison setting, a correctional setting, are

20   you aware of any reasons why individual clinical contact

21   should be held in a confidential setting?

22       A.  Yes.

23       Q.  And what are those?

24       A.  For the same reasons as in the community.

25       Q.  Which are what?

1   A. You can have a conversation that's
2   uninterrupted, that the rules of confidentiality and
3   disclosure of information apply when the information is
4   disclosed within a patient-psychotherapist communication
5   that's not intended to be overheard by other people, that
6   individuals may disclose information in a confidential
7   setting that they would worry about could be harmful to
8   them if other people had that information.
9   Q. Okay. Are you aware that there is a -- can be a
10  stigma associated with seeking mental health services for
11  people in society?
12  A. My -- your question is am I aware that --
13  Q. Some people are embarrassed about seeking mental
14  health care.
15  A. Am I aware that some people are embarrassed by
16  seeking mental health care? Yes, I have heard people say
17  they are embarrassed about seeking mental health care.
18  Q. Are you also aware that is true in prison?
19  A. Yes.
20  Q. Okay. Have you ever heard that certain -- have
21  you ever heard clinicians say that certain members of
22  certain ethnic groups are more or less likely to seek
23  mental health care than others, in prison?
24  A. Have I heard clinicians say that? I'm going to
25  take that broadly. We've had conversations. Clinicians

# TAB 2

1  the June 20th, 2008, version of this report, but I used

2  this report that's released on various dates for various

3  reasons.

4      Q. You use this kind of report showing this

5  information in your work?

6      A. Yes.

7      Q. Okay. And is this -- if you'd look at the page

8  that has "Confidential" stamped on the top, Mental Health

9  Population, Placement Per Institution, Download Date June

10 20th, 2008, does that show -- let's just go over -- what's

11 the columns on the left?  Those -- are those prisons?

12     A. Those are names of institutions, and they're

13 broken down by administrative segregation, reception

14 center, security housing unit, and, in some cases, male

15 and female.

16     Q. Okay. And going across, let's just look at the

17 first institution there, ASP.  Is that Avenal State

18 Prison?

19     A. Yes.

20     Q. So it has a capacity, CCCMS capacity, of 1,099?

21     A. Yes.

22     Q. Do you understand that to be the staffed

23 capacity?

24     A. Yes.

25     Q. And we just talked about what that was; right?

1    A.  We did.

2    Q.  Okay.  And the current population, would that be

3  the actual number of CCCs at that institution?

4    A.  Yes.

5    Q.  And is it correct that Avenal, as of this date,

6  according to this report, has 108 percent of its staff

7  CCCMS capacity?

8    A.  Yes.

9    Q.  So that they've been sent more CCCMS patients

10  than they're staffed to handle?

11    A.  Correct.

12        MR. ANTONEN:  Objection.  The document speaks

13  for itself.

14  BY MR. BIEN:

15    Q.  And if you go across, the next -- the next data

16  is about EOP patients.  There's a zero capacity for EOP;

17  is that correct?

18        MR. ANTONEN:  Again, the document speaks for

19  itself, Counsel.

20        THE WITNESS:  Correct.  Where there's no number,

21  it means zero.

22  BY MR. BIEN:

23    Q.  And does that mean that there's no particular

24  allocation of mental health staff for EOP at that

25  institution?

1   A.  Yes.

2   Q.  And there's a current population of 22.  Did you

3   understand that means there were 22 EOP inmates at Avenal

4   State Prison as of this time?

5   A.  There were 22 individuals who are identified by

6   the treatment team as requiring the EOP level of care.

7   Q.  If you would just jump down to CIM, if you

8   would, is it correct there's a staffed capacity for CCCMS

9   that -- there's three entries for CIM; is that correct?

10  CIM, CIM reception center, and CIM reception center ad

11  seg.  Do you see those?

12  A.  Yes.

13  Q.  Looking at the first entry, you understand that

14  would be CIM other than the reception center?

15  A.  Yes.

16  Q.  Okay.  There's a staff capacity of 366 for the

17  CCCMS; is that correct?

18  A.  That's what it says.

19  Q.  And there's a current population of 540?

20  A.  That's what it says.

21  Q.  Okay.  That's 148 percent of the staffed

22  capacity.

23      Now, just going down to CIW for a moment, is

24  that California Institute For Women?

25  A.  Yes.

1   Q.  Okay.  And on the EOP side, there's a staff

2   capacity of 75; is that correct?

3   A.  That's what it says.

4   Q.  And 103 EOP patients; is that correct?

5   A.  That's what it says.

6   Q.  Okay.  That's 137 percent of the staff capacity.

7       Were you ever involved in any discussions of how

8   far above 100 percent of capacity is appropriate to run a

9   CCCMS program?

10  A.  At one time, and this was at the point when

11  Dr. Fishback and Dr. McAloon were working at headquarters

12  with me before Doug McKeever was our director, there was a

13  weekly meeting which Dr. McAloon was responsible for

14  attending, but I occasionally attended as her backup,

15  where decisions were made about opening and closing

16  programs for intake, and decisions were made based on

17  input from the chief of mental health about how many and

18  how quickly inmate-patients could be transferred there.

19  But I have not been involved in those meetings for more

20  than a year.

21  Q.  You're aware that a decision was made that it

22  was permissible to send patients to a CCCMS program beyond

23  a hundred percent of the staff capacity?

24      MR. ANTONEN:  Object.  Assumes facts not in

25  evidence.

# TAB 3

1   A. Yes.

2   Q. Okay. And they allocated -- they recommended,

3   according to this chart, 532 -- it's not just clinicians,

4   but 532 additional physicians; is that correct?

5       MR. ANTONEN: Objection. The document speaks

6   for itself.

7       THE WITNESS: I don't know if that -- I see the

8   column where you're reading 532 under "Indirect Proposed

9   Staffing," and I don't believe that that means that that's

10  the total number of staff that are recommended by the

11  workload study.

12  BY MR. BIEN:

13  Q. Okay. What did you understand their conclusion

14  to be?

15  A. So, I can answer that question, but it requires

16  a clarification and a little bit of background.

17      MR. ANTONEN: Remember, also, please be careful

18  about speculation because to the extent you've been

19  actively involved in this or not, that may --

20      THE WITNESS: Okay.

21  BY MR. BIEN:

22  Q. Go ahead.

23  A. So I have been actively involved in this

24  process. The -- what the contractors did is they created

25  a mathematical model, and the mathematical model can be

1  easily modified, based on population drivers and based on

2  different assumptions.

3       There was a change in leadership, during which

4  there was a part of the budget cycle that occurred when

5  the workload study was submitted with specific numbers. I

6  do not believe that these specific numbers are -- are

7  fixed in the mind of department of finance or the

8  legislature or CDCR.

9       I believe that this is an example of given the

10 assumptions and given the population drivers, the kinds of

11 numbers that came out, and you have to read and

12 understand -- it's a complicated mathematical model. You

13 have to read and understand all of those factors that can

14 be changed, based on the population and based on the

15 different assumptions, and come to a conclusion about what

16 those appropriate numbers are to put the data in, to know

17 what is recommended when it comes out.

18       And the contractors were very careful to say

19 that they were recommending a certain mathematical model,

20 not specific numbers to go into that model, although this

21 was submitted through the budget system, it was submitted

22 so that the model could be reviewed and so that we could

23 start to familiarize the department of finance and the

24 legislature with the model.

25       And so I don't think that too much -- I don't

1  think that a lot of attention should be paid to exact

2  numbers coming out because they can be modified based on

3  assumptions and population drivers. And I don't think

4  that they can be compared directly to current staffing

5  because the current staffing was based on population

6  drivers from a much earlier time, which was before 2006.

7  The 2006 budget change proposal was based on 2003

8  population because it was written in 2004, and then it was

9  court ordered, just that number, not the rationale behind

10 it, remember.

11     So we have a system right now, and it's partly

12 because of the court order, for that work -- for that

13 budget change proposal to be implemented with those

14 positions. And then the workload study to be conducted,

15 that has stopped us from being able to catch up and apply

16 our new population numbers to provided staffing.

17     So I think that what is at hand is a

18 mathematical model, and if the mathematical model is

19 approved by everybody, then we can put the right numbers

20 in and get to the correct staffing.

21   Q.  Okay. You are aware that the workload study was

22 submitted to legislature for approval?

23   A.  Correct.

24   Q.  Okay. And along with that was a request for

25 some reallocated positions?

1   A.   Correct.

2   Q.   Okay. And that's 400 additional positions; is

3   that correct?

4   A.   Correct.

5   Q.   Okay. So the department has asked the

6   legislature, based on the workload study to date, to do

7   two things. One is to accept the workload study as a

8   process and move forward; is that correct?

9   A.   Correct.

10   Q.   And then also to now allocate 400 additional

11   positions?

12   A.   Correct.

13   Q.   Okay. And you agree that's a reasonable

14   request, based on your knowledge of the workload study?

15       MR. ANTONEN: Objection. Calls for speculation.

16   But -- and vague as to "reasonable." But --

17       THE WITNESS: The request is based on numbers

18   that came out of the workload study without necessarily

19   clarifying all of the assumptions and making great

20   decisions about the data that was going in from my

21   opinion, but my opinion is that that can be fixed and that

22   it will -- fixing numbers will only increase the number

23   and, therefore, it was reasonable to request that starting

24   number.

25       MR. BIEN: Okay. Let me mark as Exhibit 8 the