# EXHIBIT B

```
 1              UNITED STATES DISTRICT COURT
 2              EASTERN DISTRICT OF CALIFORNIA
 3           AND THE NORTHERN DISTRICT OF CALIFORNIA
 4   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
 6
 7   RALPH COLEMAN, et al.,
 8        Plaintiffs,
 9   vs.              No. CIV S-90-0520 LKK JFM P
10   ARNOLD SCHWARZENEGGER, et al.
11        Defendants.
                                        /
12
     MARCIANO PLATA, et al.
13
          Plaintiffs,
14   vs.
15   ARNOLD SCHWARZENEGGER, et al.
16        Defendants.
                                        /
17
18           Deposition of JAMES EDWIN TILTON
19
20   DATE:      SEPTEMBER 3, 2008
21   TIME:      9:41 A.M.
22   LOCATION:  ROSEN, BIEN & GALVAN
                315 Montgomery Street, 10th Floor
23              San Francisco, California 94104
24   REPORTED BY:   Cari L. Waters-Drewry
                    Certified Shorthand Reporter
25              License Number 12401
```

# TAB 1

1    there were assumptions being made, when we built the

2    prisons, that we would overcrowd. And when we did that,

3    based on the knowledge of what the program definition

4    was, and the staffing related to that, we made

5    accommodations to fully program -- it was part of our

6    process to make sure every inmate had a job program to

7    be in place.

8         Now, definitions of what it takes to staff

9    programs has changed, and, so, it may have moved from

10   that, but, clearly, there was an understanding that we

11   would put more than design beds, number of inmates in

12   the prisons. And when we did that, we would provide

13   appropriate program space, as defined at that time.

14   Q.  You would agree that at some point when the

15   population exceeded, in general, 140 percent, and got to

16   be 150, 160, 170, at some point, certain facilities lost

17   the ability, in terms of space, to deliver adequate

18   programs to the inmates?

19   A.  Yes.

20   Q.  And it varied from facility to facility, is

21   what that point was?

22   A.  That's true.

23   Q.  Is that something that you were -- you became

24   aware of when you became secretary of CDCR, that there

25   were limits in terms of delivery of programs based on

1   overcrowding?

2   A.  It would be before that.

3   Q.  When did you first become aware of that?

4   A.  When I was at finance.

5   Q.  Do you recall any particular discussions of

6   that issue, limitations on programs based on

7   overcrowding?

8   A.  Well, I mean, it was in combination with the

9   level of overcrowding, and I was an advocate for

10  building more facilities.  It was North Kern, to be

11  honest, came out of my initiative to go do that.

12      So I knew you've got too many inmates, more

13  inmates than we anticipated, both in terms of housing,

14  as well as programs, and knew that we were taxing the

15  facilities beyond their expectation, and, therefore, we

16  needed to do something to accommodate the population

17  growth.

18  Q.  When you say you were an advocate for Kern

19  Valley, that was a project that was -- came up through

20  the BCP process that you described earlier during your

21  tenure at the Department of Finance?

22  A.  Generally, yes.

23  Q.  When you say, generally, what do you mean?

24  Did it start at an earlier date, or did it -- I don't

25  really understand.

1   A.  I asked for, where's your request for -- so,

2   at finance, I said, wait, where are you? Where is your

3   request? There was not one.

4   Q.  So you were someone who was responsible for

5   reviewing CDCR budgetary requests and capital requests,

6   saw that the population was increasing, and, yet, the

7   request for additional capacity, which would take

8   several years to build, wasn't coming through?

9   A.  Correct.

10      MS. TILLMAN: Is that correct?

11      THE WITNESS: Yes.

12      MR. BIEN: Q.  When you say you advocated for

13  it, what process did you undertake to advocate for the

14  project?

15  A.  I met with the secretary of the agency and the

16  Governor's office.

17  Q.  And who was the secretary at that time?

18  A.  Senator Presley.

19  Q.  Did you advocate for a construction of more

20  than one new prison at that time?

21  A.  Yes.

22  Q.  And why did you advocate for more than one?

23  A.  At the time, I felt, let's get started on two,

24  and we'll see where it goes, but we need to get going on

25  reestablishing a capital outlay program.

1       Q.   When you say reestablishing a capital outlay

2   program, had there been a major capital outlay program

3   for CDCR in your tenure that had been approved and moved

4   forward?

5       A.   Yes, I was there when we built 20 prisons.

6       Q.   Okay. And do you recall what time frame that

7   was done?

8       A.   Well, I got there in '85. They had started a

9   couple, and we activated -- I think all of them were

10  activated under my watch when I was there, most of them.

11  I think there may have been existing prisons, two or

12  three, that got activated after I left in '98, but, by

13  and large, they were all done prior to that.

14      Q.   Is it correct that upon completion of that

15  very major prison construction project, that the

16  long-term capital planning and construction process for

17  CDCR stopped for a while?

18      A.   True.

19      Q.   Okay.

20           MR. BIEN: I've asked the court reporter to

21  mark several exhibits during the break to kind of speed

22  things up a little bit.

23      Q.   Let me show you, the first document was marked

24  as Exhibit 1. It is called Inmate Population

25  Rehabilitation, and Housing Management Plan dated July

# TAB 2

1    the answer is, yes.

2         MR. BIEN: Q. Would you turn to Page -- I

3    guess it's the third page of the document, Page 1 of the

4    report. It says, "Overview" at the top?

5    A. (Witness complying).

6    Q. The first -- I guess the first statement, at

7    the top there, in the box, says, "Based upon the current

8    population and projected growth, the California

9    Department of Corrections and Rehabilitation will run

10   out of beds for its adult male population by June 2007."

11        Is that a statement that you believed at that

12   time, in July of 2006?

13   A. Yes.

14   Q. And is that what we were talking about

15   earlier, that you literally felt that the Department may

16   have to actually close its doors to new admissions

17   unless something was done?

18   A. Yes.

19   Q. In the first paragraph, this report refers to

20   CDCR having insufficient cells and dormitory housing,

21   and CDCR had been required to activate non-traditional

22   temporary housing.

23        Can you explain what non-traditional temporary

24   housing is?

25   A. These are areas not designed to house inmates,

1  but the reality is, many of them had been converted to

2  housing units, gyms, for example. For years, the

3  Department had placed inmates in those conditions. I

4  made a policy call that the goal was to get out of all

5  of those facilities.

6      Q. It says here, gyms, day rooms, and TV rooms

7  had been converted to non-traditional temporary housing.

8      A. Right.

9      Q. Have you ever heard the term bad beds?

10     A. Yes.

11     Q. What does that refer to?

12     A. Well, it may -- sometimes it's interchangeable

13  with non-traditional beds.

14     Q. Have you ever used the term bad beds?

15     A. Probably.

16     Q. When you were secretary, did you advocate for

17  the goal that CDCR would no longer have to house inmates

18  in these non-traditional beds?

19     A. Yes.

20     Q. Was that goal accepted by the administration

21  as a goal for CDCR?

22     A. Yes.

23     Q. What are the reasons that you advocated for

24  eliminating the use of non-traditional beds?

25     A. Well, a whole series of assumptions I had, or

1   conclusions I came to: One is that to properly manage

2   the prison environment, I felt it needed to reduce the

3   overcrowding to a situation where we weren't in those

4   beds, as well as less -- more flexibility in placing

5   inmates.

6       In other words, we needed more flexibility in

7   terms of, how do you accommodate one inmate based on

8   background, program needs, gang affiliation in an

9   environment that maintains that safe environment, and we

10  had gotten so overcrowded that we were making not

11  prudent decisions in terms of the housing center

12  population.

13      And in an environment where you say you're

14  going to do a program and reform, not to have the use of

15  these facilities for the purpose, as designed, was

16  inappropriate.

17      Q.  You talked about flexibility. Could you -- I

18  just want to ask some more about that. When an inmate

19  comes into the system, is it correct that the Department

20  attempts to -- goes through a process of -- to

21  understand the inmates' security needs and other needs

22  to determine where they should be placed?

23      A.  Yes.

24      Q.  And the more I've been involved in this

25  process, the more complex I realize it must be for CDCR

# TAB 3

1  to appropriately find a place for an inmate that might

2  have, for example, multiple needs. He might have an

3  enemy at a particular prison, certain security needs,

4  certain medical needs, and, therefore, CDCR has to take

5  care of -- or attempt to take care of all of those

6  different requirements?

7     A. True.

8     Q. That becomes -- does that process of

9  appropriately placing inmates in housing that was

10 consistent with their classification requirements become

11 more complex as overcrowding increased?

12    A. Yes.

13    Q. And why was that?

14    A. Well, you have less choices, that if I need a

15 bed that has the following dynamics or characteristics,

16 do I have that bed that meets all this? And, so,

17 therefore, decisions may have to be made, well, gee, I

18 can't address that issue. I'll have to address the

19 following issues.

20       And the more overcrowded, the less flexibility

21 there is, the less chance you have to take in all of the

22 inmates' needs, not just security or those kinds of

23 things in terms of program, et cetera.

24    Q. Farther down on that same paragraph, the

25 report mentions increased security concerns based upon

Tilton, James - Vol. I  9/3/2008 12:00:00 PM

1   severe overcrowding and the housing of inmates in less

2   secure areas.

3           Is it your understanding, Mr. Tilton, that

4   some security concerns had arisen in terms of the use of

5   these spaces that were not initially designed for inmate

6   housing?

7       A.  Yes.

8       Q.  Can you explain what those were?

9       A.  Well, as you make decisions to put more and

10  more people into dorm environments, which most of these

11  are, you have less flexibility to manage and control if

12  there are issues.

13          And, so, the observation I had, and many

14  others had had, is that you have people in a dorm

15  setting who, in many cases, you'd rather have them in

16  cell settings, so it was a dorm cell analysis.

17      Q.  Was there also an issue of how many people

18  could be safely managed in a particular space?

19      A.  Well, I think it's that, but it's also the

20  philosophy that I had that if you had full program, you

21  could manage safer.  In other words, part of this

22  environment was that if you don't have opportunities for

23  inmates to get out of that living environment into a

24  full program space, it impacts their ability to behave

25  in that environment.

1    So we -- the fact that we had overcrowding and

2    the lack of opportunities for program made it worse.

3    Q. So if you're living in a gym, but you have --

4    you're on the main line and working and going to classes

5    all day long, it might be less of a problem than if you

6    are living in a gym and you have no programming?

7    MS. TILLMAN: Objection. Vague and ambiguous.

8    Incomplete hypothetical.

9    Go ahead.

10    THE WITNESS: Yes, that's my point.

11    MR. BIEN: Q. Is it correct that, at times,

12    CDCR has used these gyms and day rooms for housing but

13    had greater access to programs for the inmates living in

14    those housing?

15    A. Yes.

16    Q. So that the situation, as you just explained,

17    it's not merely the lack of just the use of gyms, but

18    also the fact that a situation happened where there were

19    also not opportunities for programming at the same time

20    people were being housed in the gyms?

21    A. True.

22    Q. Farther down that same paragraph, it states,

23    "In addition, the overcrowding and lack of treatment

24    space to service the additional populations has been a

25    major contributor to court intervention regarding CDCR's