EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
ROCHELLE C. EAST
JONATHAN L. WOLFF
Senior Assistant Attorney General
LISA A. TILLMAN – 126424
Deputy Attorney General
KYLE A. LEWIS – 201041
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile:  (415) 703-5843
lisa.tillman@doj.ca.gov
kyle.lewis@doj.ca.gov

HANSON BRIDGETT LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO – 179755
S. ANNE JOHNSON – 197415
SAMANTHA D. TAMA – 240280
RENJU P. JACOB - 242388
425 Market Street, 26th Floor
San Francisco, CA  94105
Telephone: (415) 777-3200
Facsimile:  (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com
ajohnson@hansonbridgett.com
stama@hansonbridgett.com
rjacob@hansonbridgett.com

Attorneys for Defendants

# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND THE NORTHERN DISTRICT OF CALIFORNIA

## UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

## PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | No. 2:90-cv-00520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>　　　　Plaintiffs,<br><br>　　v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>　　　　Defendants. | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DEFENDANTS' PHASE II TRIAL OBJECTIONS TO EXPERT REPORTS OF JAMES GILLIGAN AND PLAINTIFFS' RESPONSES TO DEFENDANTS OBJECTIONS.**<br><br>**To:  Three-Judge Panel** |

[256990-1]

1    Defendants submit their objections and Plaintiffs submit their responses to

2    Defendants Phase II objections to the Expert Report of James Gilligan dated August 15,

3    2008, and the Rebuttal Expert Report of James Gilligan dated August 27, 2008.

4    **I.**

5    **DEFENDANTS' GENERAL OBJECTIONS**

6    Dr. Stewart is not qualified to make the opinions and assertions as outlined in his

7    supplement and expert report, in violation of Federal Rules of Evidence 702.

8    **II.**

9    **PLAINTIFFS' STATEMENT**

10    The "general objection" asserted above is unfounded.  Dr. Gilligan is a nationally

11    recognized expert on treating the mentally ill in correctional settings, on the causes and

12    preventions of violence, and on the relationship between mental illness and violence.

13    Defendants cannot reasonably dispute Dr. Gilligan's expertise gained in over 40

14    years of experience in the treatment of criminal-justice involved persons with mental

15    illness, the establishment and operation of a statewide psychiatric prison hospital

16    system, the authorship of leading publications and studies on violence reduction, and his

17    experience in numerous initiatives aimed at reducing violence among persons with

18    mental illness in the criminal justice system, including major projects in California

19    involving large county jail systems and the former California Department of Corrections.

20    See Expert Report of James Gilligan, M.D., Aug. 15, 2008 (*Coleman* Docket No. 3170)

21    at ¶¶ 1-15.

22    Dr. Gilligan is clearly qualified to assist this Court regarding any possible adverse

23    impact on public safety that would result from any incremental release or diversion of

24    prisoners with mental illness.  *See also*, Plaintiffs' Opposition to Defendants' Motion in

25    Limine No. 12 Regarding Evidence from Plaintiffs' Experts Drs. Stewart and Gilligan

26    (*Coleman* Docket No. 3227.)

27    **III.**

28    **SPECIFIC OBJECTIONS**

[256990-1]

**A.    Expert Report of James Gilligan Dated August 15, 2008**

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| 18. A properly implemented prisoner release order that included an incremental decrease in length of stay and or diversion of mentally ill offenders would not adversely impact public safety. In fact, it would improve public safety by ending current churning of such persons through short-term incarcerations from which they are released sicker than when they went in. In the larger context, detailed studies of the relationship between incarceration levels and crime rates have shown that mass incarceration does not reduce rates of violent crime. The same is true regarding incarceration of the mentally ill. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Assumes facts not in evidence. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>Dr. Gilligan is entitled to credit Defendants' own consultants who have documented the harmful effects of "churning" on numerous occasions.  (See Expert Report of James Gilligan, M.D., Aug. 15, 2008 (*Coleman* Docket No. 3170) at page 11, note 6, page 12, notes 7-9.<br><br>Assumptions and their bases are clearly stated in the report. |
| 19. The status quo is characterized by frequent cycling of offenders through a prison system that is not equipped to provide the level of services and programming necessary to prevent future crimes and victimization. These points seem hardly to be in dispute. Even the primary defendant named in *Coleman,* Governor Schwarzenegger, not only agrees that the prisons are overcrowded, but that they are dangerously overcrowded, to such an inordinate degree that the | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Vague and ambiguous. Assumes facts not in evidence. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>Dr. Gilligan is entitled to credit Defendant Schwarzenegger's own Emergency Proclamation.<br><br>Further clarification is available through cross-examination. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| overcrowding itself poses an acute and dangerous emergency not only to all those in the prisons but also to all those outside the prisons, *i. e.,* the community, the State, as a whole. As is clear from reading his "Prison Overcrowding State of Emergency Proclamation," the prisons are overcrowded in terms not only of their "design capacity," *i.e.,* the number of beds and the amount of programming capacity (medical and mental health offices, school rooms, workshops, gymnasia, etc.) they were originally designed for, but also of their "operational capacity," *i. e.,* the number of additional inmates they can accommodate by double- or triple-celling, transforming programming spaces into bed-spaces, etc. That this overcrowding is so severe as to create severe medical, psychiatric and security problems is stated clearly and repeatedly with abundant supporting documentation and examples. There are confirmations of that conclusion in almost every other report I have cited above and in Appendix B. | | Assumptions and their bases are clearly stated in the report. |
| 20. Rates of recidivism have increased substantially between 1977, following the passage of the DSL in 1976, followed by 80 additional laws whose cumulative effect was an explosive increase in incarceration rates (culminating in passage of the "three-strikes and you're out" law in 1994), and 2004, as measured by number of offenders returned to prison, with one-year recidivism rates increasing from 20% to 55%, two-year recidivism rates from 26% to 72%, and annual return | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Vague and ambiguous. | FRE 703 (based upon review of data and expertise). The figures cited here come from Defendants' own "Expert Panel Report," P-002, as to which Defendants have already stipulated to Foundation and Authenticity. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| rates from 10% to 60%. | | |
| 21. The links between overcrowded prisons and recidivism are well established. David Farrington and his colleagues at the Institute of Criminology at Cambridge University' found a strong relationship between overcrowding and increased rates of recidivism, a relationship that could not be explained away by other variables, leading them to recommend a reduction in prison overcrowding in order to improve the ability of prisons to reduce crime. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).

Further clarification is available through cross-examination. |
| 23. Figure 1, below, is a chart derived from a summary of releases to parole in 2006 from the discovery documents in this case. The blue bars in the chart represent the numbers of persons released to parole based on identified mental health status. "No mental health code," is self-explanatory, and reflects no identification of mental illness. CCCMS stands for Correctional Clinical Case Management System, the lowest level of diagnosis in the California correctional system. According to the CDCR Mental Health Services Delivery System Program Guide, patients are to be designated for the CCCMS level of care based on stable functioning in the general population, exhibiting symptom control, or being in partial remission as a result of treatment, and with a Global Assessment of Functioning (GAF)5 scores of 50 and above. EOP stands for Enhanced Outpatient Program, the California correctional designation for a higher and more intensive level of treatment, usually resulting in a GAF of | Lack of foundation. (Fed. R. Evid. 901.) | The chart is cited to the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity.

The description is cited to CDCR Mental Health Services Delivery System Program Guide, which Defendants have offered as D-1147. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| less than 50. "Crisis Bed and DMH" signify persons at the two crisis levels of care provided by the program guide- the Mental Health Crisis Bed (MCHB) level of care for prisoners during the first 10 days of a major crisis, and the Department of Mental Health (DMH) level of care for the most acute cases. | | |
| 24. The distribution of persons by mental health status in Figure 1, below, is typically pyramidal, with a very broad base of persons with no diagnosis (80%) or with a very low acuity diagnosis (17.65% CCCMS), narrowing rapidly to population of higher-acuity individuals that is a full order of magnitude smaller (1.82% EOP), followed by a very small population of individuals with a history of needing crisis-level care (0.48% Crisis Bed and DMH). | Lack of foundation. (Fed. R. Evid. 901.) | The chart is cited to the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity. |
| 25. What are the current public safety outcomes for California's released parolees, both mentally ill and non-mentally ill? Measured by California's recidivism rates, the outcomes are not good. California's recidivism rate has been measured variously. A recent estimate based on 1994 releases found 70% rearrested within three years of release. Counting only returns to prison, the rate was 66% within three years of release.[6] These high rates of recidivism make California an outlier in the United States, particularly in the numbers of people returned to prison not for new crimes but for technical parole violations. It is important to understand that part of this high recidivism rate is | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Argumentative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). Recidivism figures are sourced to Defendants' own consultant, Dr. Petersilia. "Churning" |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| a group of offenders who continually cycle in and out of the prisons on parole violations. This has been referred to as California's "catch-and-release" policy.  California leads the nation in the practice of "churning" parolees into and out of prison for short-term parole violations that average about 4 months in prison.[8] As discussed in more detail below, while persons with mental illness do not have higher rates of violent recidivism, they do have higher rates of recidivism for technical parole violations, and thus are more likely to "churn" into and out of prison for short periods. Individuals who "churn" through repeated short-term revocations are predictably released to parole without having received appropriate treatment or programming in the prison, and without adequate plans for treatment or supportive services in the community. Thus, the current public safety baseline is that large numbers of individuals are already recidivating, already being released to the community, coming back to prison, and being released again. For those individuals with mental illness, a California parole department management report from the discovery in this case estimated that thousands of individuals are being returned to prison for parole violations directly resulting from unmet mental health needs: Each year over 6,000 parolees suffering from serious mental illness are returned to prison for periods ranging from a few months up to one full year or longer if they receive a new term. This is primarily | | discussion is sourced to scientific literature of a type reasonably relied upon in the field (FRE 703) and extensively relied upon by Defendants' own consultant, Dr. Petersilia.

Higher levels of technical, non-criminal violations among mentally ill sourced to scientific literature of a type reasonably relied upon in the field (FRE 703), and in this instance developed by Defendants' own consultant, the Center for Effective Public Policy at UC Irvine.

Return of over 6,000 parolees with mental illness due to behavior resulting from mental illness is from documents Defendants' produced in discovery, confirmed by Defendants' witness Thomas Hoffman in deposition. (Hoffman Depo at pages 211-12.) |

[256990-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| due to technical violations or other criminal behavior that can result from their mental illness. Many of the problems exhibited by these individuals when noncompliant with their parole conditions are related to the disorganization produced by their mental illness. | | FRE 801(d)(2) (admissions of party opponent).<br><br>FRE 803(6), (8) (business records, and public records as to documents used in the CEPP studies).<br><br>FRE 803(18) (learned treatises as to scientific literature). |
| 27. The evidence I reviewed establishes that the levels of mental health treatment provided to individuals in Reception Centers are inadequate to meet the needs of persons with mental illness, especially those facing the stresses of re incarceration. The *Coleman* Special Master has reported that transfers to housing at appropriate levels of care for the EOP and CCCMS populations in Reception Centers are extremely delayed. 14 Thus, for short-term parole violators the limited mental health treatment provided in the Reception Centers is all they are likely to receive before they are released to parole. Moreover, it is my understanding that identification of individuals with mental illness who would then be referred for this limited treatment may be significantly delayed upon their arrival at the Reception Centers because screening clinicians do not have timely access to prisoner files. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 201 (Special Master reports subject to judicial notice).<br><br>FRE 801(d)(2) (admissions of party opponent in representations made to special master).<br><br>FRE 803(6), (8) (business records, and public records as to documents review by special master).<br><br>Further clarification is available through cross-examination. |
| 28. Top CDCR administrators have | Inappropriate basis | FRE 703 (based |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| admitted that programming in the Reception Centers is minimal or non-existent. During a hearing before the California State Senate Budget Subcommittee on Government Administration on March 12,2008, in response to the question, "Can you talk about what the Department currently does to deal with the terms of parole violators in reception centers, whether or not there's any rehabilitative services being provided in the short stay that they have there?" Scott Kernan, CDCR Chief Deputy Secretary of Adult Operations, testified, "I would say as to your question are they getting services ... in prisons, I would say no, sir. They're being sanctioned for their behavior and we are sitting them on bunks. The California Rehabilitation Oversight Board found in its July 15,2008 Biannual Report that "CDCR is still primarily in the planning stages of rehabilitation programming reform. The department needs to move more into the implementation phases to demonstrate true progress." In this regard, I agree with the written statement of one of CDCR's to parole administrators in Southern California, who reported to the director of state parole that the state needs to "break the cycle of mentally ill parolees filling up expensive prison beds," as well as with the statement of a top Los Angeles parole administrator that under the current system parolees are "punished for their illness by being locked Up." | for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Argumentative. | upon review of data and expertise).<br><br>Defendants have not previously objected to foundation and authenticity of the video record of this hearing, (*See Coleman* Docket No. 3314, Joint Submission of Exhibit Lists, Plaintiffs' Exhibit P-360.)<br><br>FRE 801(d)(2) (admissions of party opponent).<br><br>FRE 803(8) (public records and reports). |
| 29. Overcrowding the prisons and reception centers impairs California's ability to start to provide rehabilitative programming to anyone in the prisons. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible | FRE 703 (based upon review of data and expertise). |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| The CDCR Expert Panel on Adult Offender Reentry and Recidivism Reduction Programs issued a report on June 29, 2007 that concluded that California must reduce overcrowding in its correctional facilities in order to give its adult offenders the ability to access rehabilitation programming: The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding. CDCR facilities were built to hold 100,000 offenders; however, at the time of this report, the CDCR was currently housing 172,385 offenders in its prisons. Because of this overcrowding situation, there is simply not enough space to conduct effective programming-this applies to both the male and female offender populations. | Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | The citation is to the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity.<br><br>FRE 801(d)(2) (admissions of party opponent).<br><br>FRE 803(8) (public records and reports).<br><br>Further clarification is available through cross-examination. |
| 32. When overcrowding impairs the ability of a prison system to deliver treatment, rehabilitative programming, and pre-release planning, the already inherently harmful effects of "churning" are multiplied, and present clear and present risks to public safety: "By definition, churners' correctional histories are characterized by frequent short spells in prison interspersed with frequent short spells on parole.,,23 Churning is particularly harmful for persons with mental illness, for whom frequent returns to prison interrupt their access to treatment, medication, and community ties needed to function productively in society. In my opinion, California's pattern of incarcerating mentally ill parolees is a tragically misguided decision which seriously harms public safety by increasing the criminogenic factors in the lives of such parolees, and cutting them off from the | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(6), (8) (business records, and public records as to documents used in the cited studies).<br><br>FRE 803(18) (learned treatises as to scientific literature). |

| | Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|---|
| | very sources of stable treatment and community connection that have been shown to prevent crime and victimization. | | |
| | 33. Recent studies of the California parole system define parole revocation "churners" as persons who enter prison six or more times over a seven-year span. The mechanisms by which such churning of the mentally ill adversely affects public safety are clear. An overcrowded prison medical system cannot reliably identify the treatment needs of such persons as their rapid arrivals and transfers overwhelm medical records systems. Thus, they are likely to go without adequate treatment at one of the most de-stabilizing times a person is likely to face. Churners tend to stay in for short-periods and are released back to the community not only without adequate treatment, but without adequate transition plans to ensure that they continue on medication regimes, and reconnect with housing, public benefits, and other stabilizing influences. Churning overwhelms the systems that parole departments use to address the needs of the few high-need parolees in the system, including simple procedures such as identifying which releasees need to be met by a parole agent at the gate, and which can be sent into the community with less supervision. In my opinion and experience, the ability of prison mental health and administrative systems to perform such public-safety advancing functions properly is compromised when the volume of the inmate population being serviced overwhelms the staff and support infrastructure | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(6), (8) (business records, and public records as to documents used in the cited studies).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>Further clarification is available through cross-examination. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| who are supposed to provide the services. | | |
| 34. The scientific evidence is clear that the vast majority of mentally ill offenders are no more dangerous as a group than non-mentally ill offenders. Mental illness by itself is not a significant predictor of violent recidivism. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). Further clarification is available through cross-examination. |
| 36. A recent study of California parolees confirms the results of national and international studies (discussed in more detail below) that mentally ill offenders as a group are no more likely to commit violent crimes after release than are non-mentally ill offenders. Among the discovery documents that I have reviewed in this case is a recent manuscript of a study by researchers Jennifer Eno Louden, Eric Dickinger, & Jennifer L. Skeem at the University of California at Irvine, Center for Evidence Based Corrections, titled "Parolees with Mental Disorder: Toward Evidence-Based Practice.,,The researchers report their findings on a cohort of 105,430 persons released to adult parole in California for one calendar year, 2004. The researchers sought to determine, among other things, whether there was an association between violent recidivism and mental illness in this cohort of releasees. The compared the | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). FRE 801(d)(2) (admissions of party opponent). FRE 803(6), (8) (business records, and public records as to documents used in the CEPP studies). |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| paroolees with an identified mental disorder (PMDs) with those without identified mental disorders. Their conclusion is in keeping with the general consensus of the scientific literature: "Our data indicate that PMDs were not significantly more likely to have a determination involving violence than their nondisordered counterparts. Relative to other characteristics that PMDs share with non-disordered parolees (e.g., past violence, antagonistic personality features, criminogenic peers), mental illness is a modest risk factor for both violence (Elbogen et al., 2007) and violent recidivism. (Bonta et al., 1998)." They note that this conclusion is contrary to common perceptions: "Members of the public grossly overestimate the relationship between mental illness and violence (Watson, Corrigan, & Angell, 2005)." | | |
| 37. The above-cited Center for Evidence Based Corrections study also examined the overall recidivism rate among the 2004 California cohort of persons released to adult parole, and confirmed the common perception that persons with mental illness tend to return to prison for parole violations at a higher rate. They went further, however, and "drilled down" into the reasons that persons with mental illness return to prison on parole violations. They found that the parolees with mental illness are far more likely to be returned to prison on technical violations and not for new crimes, as compared with the non-mentally ill population. "The results | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). FRE 801(d)(2) (admissions of party opponent). FRE 803(6), (8) (business records, |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| indicate that PMDs who recidivated are much less likely to be charged with a new offense than non-disordered parolees who are returned to custody (19.9% vs. 34.2%; $x2(1)$= 448.3, p.001). PMDs, then, are much more likely than non-disordered parolees to return to custody for a technical violation of parole." | | and public records as to documents used in the CEPP studies). |
| 38. This recent California research is consistent with the great body of scientific evidence that mental illness itself is not a useful predictor of violent recidivism. In my opinion, the most comprehensive source of evidence on this point is a meta-analysis of 58 research studies on 64 separate samples of subjects that compared violent (as well as nonviolent) recidivism rates of mentally ill and non-mentally ill prisoners over a post-release period that averaged 4.8 years. The studies included all those that the authors were able to locate that met rigorous standards of scientific design and evaluation and had been published in edited journals or books, reported in academic theses, or recorded in the working papers of ongoing research projects, during the 37 calendar years 1959-1995. | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system. FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). FRE 803(18) (learned treatises as to scientific literature). The statement includes no speculation about the results of these published scientific findings, which are relied upon as well by Defendants' |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| | | experts Dr. Packer and Ms. Bataille. |
| 39. Their main finding (p. 136) was that "In studies that compared the recidivism of mentally disordered offenders with nondisordered offenders, the mentally disordered offenders were less likely to recidivate." These differences between the two groups were statistically significant (p.001). When they sub-divided the mentally ill ex-prisoners into different diagnostic groups, they found that "Severe mental disorders (e.g., psychosis and schizophrenia) were inversely related to [both] general and violent recidivism," *i.e.,* they were less likely than non-mentally ill offenders to reoffend with either violent or non-violent crimes. The mentally ill group diagnosed as suffering from "disorders of mood (e.g., depression) showed no relationship to recidivism" (p. 136), *i. e.,* they were neither more nor less likely than the nonmentally ill to reoffend. That was also the consensus in studies comparing individuals found "not guilty by reason of insanity" with those who were convicted of comparable offenses, *i. e.,* neither group was more or less likely than the other to reoffend after release back into the community (p. 134). They concluded that "those with mental illnesses are not as dangerous, at least as compared with nondisordered offenders, as the public perceives" | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system.

FRE 703 (based upon review of data and expertise).

FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).

FRE 803(18) (learned treatises as to scientific literature). |
| 40. Another major finding of this meta-analysis was that "The major predictors of general and violent recidivism appear comparable" for | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis | Risk of violence is relevant to the court's consideration of alleged adverse |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| both mentally disordered and nonmentally disordered offenders. "Criminal history, antisocial personality, substance abuse, and family dysfunction" turned out to be the most powerful predictors or risk factors for both groups of offenders, and to be equally important for both. (p. 139). For example, mentally ill individuals who drink to excess or who have an established history of committing violent crimes are more likely to commit acts of violence after release from prison than are those who do not; but the same is true for people who are not mentally ill. To sum up, "the results support the theoretical perspective that the major correlates of crime are the same, regardless of race, gender, class, and the presence or absence of a mental illness. Clinical or psychopathological variables," on the other hand, such as mental illness, "were either unrelated to recidivism or negatively related" (p. 139). And "In general, indicators of ... psychological disturbance were among the least important predictors of general and violent recidivism. In contrast, the best predictors were those associated with an established pattern o prior criminal behavior" (p. 139), whether or not the individuals involved were mentally ill. | for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | impacts on public safety and operation of a criminal justice system.<br><br>FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature). |
| 41. Those conclusions are completely consistent with my own clinical experience in evaluating and treating both mentally ill and non-mentally ill violent prisoners since 1967. In my published books and articles on the causes and prevention of violence, I have not found it useful to differentiate | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| between the mentally ill (as major mental illness is defined by law and by psychiatry) and those who are not, since I had repeatedly observed in working with both populations that the same etiological and motivational factors appeared to be responsible for the violence committed by the members of both groups. I observed that one factor distinguished the mentally ill who committed serious acts of violence and were committed to the prison mental hospital from equally mentally ill but non-violent individuals whom I had diagnosed and treated in civil mental hospitals. That factor was that when the acute psychotic symptoms had resolved, there emerged in the violent mentally ill individuals a character or personality disorder that met the diagnostic criteria for antisocial personality disorder or such closely related, somewhat overlapping medical classifications as borderline or narcissistic personality disorder - exactly the types of personality disorders that are modal in the population of non-mentally ill prisoners. In the non-violent mentally ill patients I have treated, I have found no such pattern. Thus I have concluded that the main risk factor or etiological element in the violent mentally ill is not their mental illness as such, but rather, the same type of underlying personality disorder that is found in people without mental illness who commit violent crimes. | Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Assumes facts not in evidence. Argumentative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). FRE 803(18) (learned treatises as to scientific literature). Assumptions and their bases are clearly stated in the report. |
| 42. The only exception to that that I would mention is the brief psychiatric emergency that can occur when | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) | Risk of violence is relevant to the court's consideration |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| mentally ill individuals become or threaten to become violent in response to paranoid delusions of persecution or command hallucinations (e.g., hearing voices telling them to kill someone). In that situation, the most rapid and effective way to diminish the risk of violence is to treat the psychosis (by means of psychotherapy, psychopharmacology, and changing their social and physical environment, such as by having the individual moved to a different location, or placed temporarily in a more secure environment) so as to give them some relief from those symptoms. But that is no different in principle from what one does with non-mentally ill prisoners who are acutely emotionally disturbed, many of whom actually request to be moved to a different cell block or institution or to be placed in a locked cell until they feel in control of their own behavior again. Again, this is consistent with the meta-analysis on which I have been commenting, in which the authors observe that "Hallucinations and delusions may trigger antisocial acts in the immediate situation and have high predictive validity in the short term. However, as indicated by the present findings, such symptoms may have little predictive validity in the long term". | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | of alleged adverse impacts on public safety and operation of a criminal justice system.<br><br>FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>There is nothing speculative about this summary of scientific findings. |
| 43. A more detailed analysis of some of the 54 studies synthesized in the meta analysis just referred to may make some of these issues clearer. One study examined the behavior of 120 male prisoners divided between those with psychotic disorders and those with non-psychotic (personality | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system. |

[256990-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| disorders who had been released from incarceration in a maximum-security inpatient psychiatric unit of a federal penitentiary in Ontario into an "at risk" situation, *i.e.,* community, halfway house, or psychiatric institution other than maximum security, for an average of 92 months. Participants in the study had a mean of 24 prior criminal convictions including two for violent crimes, of which the average most serious conviction was for aggravated assault causing bodily harm. (p.402). Their rearrest rates were measured at six, 12,24,36 and 92 months. The most relevant finding was that while there was no difference between the two groups in rearrest rates for non-violent crimes, the men who were diagnosed with major (psychotic) mental illnesses actually *had fewer* rearrests at all of the follow-up periods both for any violent crime, and for severe violent crimes (everything more serious than simple or common assault), than did the non-psychotic ex-prisoners. | Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>There is nothing speculative about this summary of scientific findings. |
| 44. In another study from Ontario,28 96 men from a maximum security prison psychiatric hospital who had been found not guilty by reason of insanity and were diagnosed as schizophrenic were compared with a matched comparison group of 96 men who had undergone brief pretrial psychiatric assessments at the same hospital, found not to have schizophrenia or any other psychotic illness (19 received no diagnosis, 42 had personality disorders, 18 had a history of drug or alcohol abuse, and the remainder had a variety of nonpsychotic diagnoses of insufficient | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system.<br><br>FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| severity to warrant further hospitalization) and transferred to prison. Following their release into "at risk" situations (the community or open, unlocked psychiatric hospitals) the men with schizophrenia had lower rates of recidivism both for any crime (35% vs. 53%) and for any violent crime (16% vs. 24%).29 While only the former difference was large enough to be statistically significant (p.02), when they examined the seriousness of the offense, they found that the mentally ill population committed less severe offenses than the non-psychotic. Of their total of 15 violent charges, the most serious were three for assault causing bodily harm, as compared with 23 rearrests among the non-mentally ill group including one murder, one attempted murder, one wounding, six assaults with bodily harm, and four sexual assaults. (p.403). This study, like many others, found that the best predictors of recidivism are the same for the mentally ill as for those who are not, and that among those is alcohol abuse. (p. 405). In this population, unlike those in some other studies, the mentally ill group had a lower overall rate of alcohol abuse than the non-mentally ill, and "when alcohol abuse was statistically controlled the two groups no longer exhibited statistically significant differences in recidivism" (p. 405). The more relevant point for this report, however, is precisely the fact that there was no significant difference in recidivism between the two groups; that is, they did not find the mentally ill group to be at greater risk of reoffending than the non-mentally ill, even when they examined only that minority among the | | the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>There is nothing speculative about this summary of scientific findings. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| mentally ill who also used alcohol to excess. | | |
| 45. In many other studies of recidivism, personality disorders (including antisocial, psychopathic, borderline and narcissistic disorders, which are the modal diagnoses among nonmentally ill prisoners)30 have been found to be stronger predictors of reoffending than major mental illness is. | Irrelevant to Phase II issues. (Fed. R. Evid. 401, 402.) Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system.<br><br>FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>There is nothing speculative about this summary of scientific findings. |
| 46. There is one "natural experiment" that bears on the question being asked here concerning the relative risk of danger to the public from suddenly releasing a large group of mentally ill offenders from prison. Exactly that event occurred in the state of New York following the decision of the U.S. Supreme Court on February 23, 1966 (Baxstrom v. Herold,383 U.S. 107).32 As a result of that decision, New York | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Assumes an incomplete | Risk of violence is relevant to the court's consideration of alleged adverse impacts on public safety and operation of a criminal justice system.<br><br>FRE 703 (based upon review of data |

[256990-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| State correctional authorities had to remove some 969 persons from its maximum-security prison mental hospitals for "insane criminals" in a very short period. Published studies of these releases showed that predictions of violence and mayhem were unfounded, both during the phase in which the patients were transitioned to civil mental hospitals, and later in community releases. | hypothetical. Assumes facts not in evidence. Argumentative. | and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>Assumptions and their bases are clearly stated in the report. |
| 47. My conclusion is that mentally ill prisoners as a group are either less likely, or at least no more likely, than non-mentally ill prisoners as a group to increase the risk of danger to the public upon release by committing violent crimes, and that before we can reject that conclusion we will need more evidence to the contrary than is currently available. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>Further clarification is available through cross-examination. |
| 48. However, it has been found that the mentally ill are far more likely to be victims of violent crime than perpetrators of it.[34] That is, they are likelier to be injured by someone else than they are to injure someone | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| else. The research regarding mental illness and violence "does not support the stereotype that persons with severe mental illness are typically violent" toward others, but instead should raise more concerns regarding the vulnerability of the mentally ill to victimization. | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>Further clarification is available through cross-examination. |
| 49. The conclusion that should be drawn is that mental health status is not a useful, appropriate, or valid predictor of violence among people released from prison. While social prejudices perpetuate the assumption that "mentally ill" prisoners are more dangerous when released into society than non-mentally ill prisoners are, the mental health status of exprisoners is not in fact correlated with increased dangerousness to others. To the extent that release of inmates is based on assessment of risk factors, these should be individualized and consider each particular individual's history of violence, substance abuse, etc., in order to assess each individual's dangerousness, or lack of it. This risk assessment should be no different for individuals who are mentally ill. To the extent that release of inmates is based on a generalized release that, for example, simply accelerates release dates for a group of inmates already scheduled for release, it would not be useful from a | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>Further clarification is available through cross-examination. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| public safety perspective to differentiate between inmates in this group solely on the basis of mental illness. | | |
| 52. Building on this framework to accommodate a prisoner release order that includes the mentally ill does not require an unrealistic level of investment. In this regard it is critical to remember that not all mentally ill persons are the same. Most have modest needs for treatment. Some have moderate needs. A very few have needs for the highest levels of treatment. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). Further clarification is available through cross-examination. Further clarification is available through cross-examination. . |
| 53. In this area, it is important to differentiate between the large majority of mentally ill offenders who have modest reintegration needs (approximated by the CCCMS population in California, estimated at approximately 18,900 parolees as of June 2007. the smaller group at the margins (the EOP population in California estimated at approximately 4,000 parolees as of June 2007) who may have somewhat greater needs for services, and the even smaller minority who may need high levels of care up to and including inpatient hospitalization. As I stated above in Paragraph 24, above, in any population of mentally ill offenders, | Lack of foundation. (Fed. R. Evid. 901.) | The figures cited here come from Defendants' own "Expert Panel Report," P-002, as to which Defendants have already stipulated to Foundation and Authenticity. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| these levels of severity are arranged in a pyramidal distribution, with a broad base of low-acuity, low-need patients, and a very narrow tip of high-acuity, high need patients. For reference, I present the same chart again as Figure 2, showing the distribution of mental health status among persons released to parole in California in 2006, with 80% having no mental health diagnosis, 17.65% at the CCCMS level, 1.82% at the EOP level, and 0.48% at one of the "crisis" levels. | | |
| 54. In implementing any prisoner release order, whether the order is targeted based on an assessment of risk and need, or whether it includes a wholesale short-term release or diversion, there is no public-safety based reason to exclude or disfavor the mentally ill as a group. Even examining the numbers based on the assumption of a wholesale short-term incremental increase in persons released and/or diverted, with no risk and needs assessment, the numbers show that local communities would not be overwhelmed with large numbers of high-need mentally ill offenders. Assume a prisoner release order that required the short-term removal of 30,000 people from the pool of convicted offenders held in (or to be sent back to) prison. Assume that this prisoner release order included no bias against the mentally ill, which is appropriate based on my findings that mental illness itself presents no greater risk to public safety, and that public safety would in fact be enhanced if California desisted from | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Assumes facts not in evidence. Argumentative. | The figures cited here come from Defendants' own "Expert Panel Report," P-002, as to which Defendants have already stipulated to Foundation and Authenticity.<br><br>FRE 703 (based upon review of data and expertise).<br><br>Further clarification is available through cross-examination.<br><br>Assumptions and their bases are clearly stated in the report. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| churning the mentally ill through the parole revocation process. Again, assuming no bias against the mentally ill, this group of 30,000 would be distributed in the same pyramidal manner described above, with 80% having no diagnosis, 17.65% CCCMS, 1.84% EOP, and 0.48% "crisis level" care. Figure 3, below, shows the breakdown of 30,000 releases by mental health status. The significant fact here is that the numbers of persons at the high-acuity levels are very small143 persons with a history of crisis care, and 546 persons at the EOP level of care to be released into state with a population of over 36,000,000. | | |
| 57. Pre-release and benefits planning must especially target the smaller group at the margins with the highest needs. The larger group of persons with modest needs can generally be managed with access to medications, and with the same types of reintegration programs such as education, access to employment, and reintegration with family that all parolees need, regardless of mental illness. | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise). |
| 62. As discussed above, mental illness is not a critical factor in predicting which released prisoners are at highest risk of violent crimes after release. Other factors, such as age at release, predominate. A factor that does affect new crime outcomes is untreated drug addiction. Drug addition hurts the chances of any released prisoner. For persons with both drug addiction and mental illness, specially targeted programs are useful | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| and can improve public safety.49 California has begun to put a framework in place to target parolees with concuring mental illness and drug addiction. First, the literature shows that California has a long experience with correctional drug addiction program based on the therapeutic community model.50 Second, in recent years, California has begun to identify certain community-based drug treatment programs that specialize in serving persons with co-occurring mental illness and drug addiction. | | |
| 63. Successful post-release programs should be based on strong links to community resources. For releasees with mental illness this should include access to the local systems of mental health care. The safety of the parolee with mental illness and the public is enhanced by access to the community mental health system (which includes the additional services provided to parolees by the Parole Outpatient Clinics and parole programs such as Day Reporting Centers and Assertive Community Treatment programs.) Leaving a person with mental illness in need of treatment to fend for him or herself on the street and then returning him or her to an overcrowded and dangerous prison reception center environment for several months could be dangerous for the patient and public safety. Appropriate access to mental health treatment and pre-release planning is generally not available in these reception centers, especially for patients requiring higher levels of care | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |

[256990-1]

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| to stabilize their mental illness. This cycle leads to further decompensation, and release of a patient who is as sick as or sicker than when he or she came into prison. | | |
| 64. A very small percentage of persons with mental illness will require access to higher levels of care, up to and including inpatient psychiatric hospitalization. As noted in Figure 2, above, releases at the highest levels of care in the California system numbered approximately 600 for all of 2006. If a prisoner release order resulting in the release or diversion of a total of 30,000 people immediately, this group would include only 143 persons with a history of crisis care, spread over an entire state. The size of this group that may need in-patient hospitalization in the community are likely to be even smaller. One proxy for this smaller group may be the group of persons who are returned by their parole agents due to mental illness alone. Documents that I have reviewed for this case estimate this need in the range of several hundred patients per year. [52] The historical strategy of California corrections has been to arrest such parolees solely because of their mental illness under a procedure known as "psych and return" or "return to custody for psychiatric treatment." In my opinion, returning such person to a prison environment is harmful to public safety, as they are likely to return as sick as or sicker than when they went into prison, and with no progress having been made at reintegration into the community. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | FRE 703 (based upon review of data and expertise). FRE 801(d)(2) (admissions of party opponent). The information regarding the former "psychiatric return" population are from Defendants' own documents. Defendants' witnesses Thomas Hoffman and James Tilton have confirmed the nature of the former psychiatric return process. |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| Instead, prompt access to crisis care should include rapid and intensive treatment to address episodes of decompensation for this small minority of the population. For the small minority of prisoners who require continued access to higher levels of care, discharge planning to less restrictive (and less expensive) community placements such as board and care facilities, drug treatment programs, day treatment and other alternatives, should begin upon admission. | | |
| 65. Because the need for the highest levels of care exists at the margins of the continuum of mentally ill offenders, in my opinion it should not be an overwhelming or overly costly project to secure the necessary levels of community-based care in settings such as county mental health facilities or private board and care facilities. 53 The few hundred most serious cases that would need these levels of care will be scattered over a very large state, so that no one county would have to absorb an overly burdensome number of such high-need mentally ill parolees. In my opinion, providing for appropriate levels of care for this small group is better for public safety than is the currently implemented alternative of repeated returns to the community after short-term stints of re-incarceration without adequate treatment or pre-release planning. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | FRE 703 (based upon review of data and expertise). |
| 66. It is my opinion that by building on this framework, California could significantly improve public safety outcomes by breaking the dysfunctional cycle of churning  mentally ill offenders through destabilizing short-term | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and | FRE 703 (based upon review of data and expertise). |

| Statement | Defendants' Objections | Plaintiffs' Responses |
|---|---|---|
| revocation stints. | ambiguous. | |

**B.    Rebuttal Expert Report of James Gilligan dated August 27, 2008.**

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| **Opinion 1:** The recommendation that a prisoner release order must be limited only to the lowest acuity individuals with mental illness is based on false assumptions about the levels of care required by the population currently on CDCR's mental health caseload, and on unsupported speculative fears about the dangerousness of individuals with mental illness.<br>**A.** The population of individuals defined as "mentally ill" by CDCR consists of a spectrum of severity and acuity of mental illness, and their treatment needs vary accordingly. | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise). |
| 1. Ms. Bataille begins her report by describing the population likely to be released as part of a prisoner release order as consisting of 19-20% of individuals with "serious mental illness as assessed by CDCR" (p.2) and proceeds to make assumptions about the "mentally ill offender" population, their characteristics and service needs, and the effects of their release. Rather than starting from the premise of a single group of mentally ill offenders, it is crucial to recognize this "mentally ill" population in fact consists of a very broad spectrum of severity and acuteness of psychopathology, and wide variation with respect to the intensity of their treatment needs. These can be divided into three broad categories, from least to most seriously | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | Foundation for statements about Bataille's Report is her report itself.<br><br>Foundation for the CDCR mental health categories is CDCR Mental Health Services Delivery System Program Guide, which Defendants have offered as D-1147. |

[256990-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| psychiatrically impaired: 1) Parolees eligible for the Correctional Clinical Case Management System (CCCMS), who demonstrate stable functioning in the community and had a Global Assessment of Functioning Score (GAF) above 50; 2) Those requiring the Enhanced Outpatient Program (EOP), because they manifest acute onset or significant deterioration of psychotic symptoms, such as delusions or hallucinations; dysfunctional or disruptive social interaction (withdrawal, bizarre or disruptive behavior, or provocative behavior toward others as a consequence of a serious mental disorder; and impairment of activities of daily living, such as eating, hygiene, and maintenance of their dwelling; 3) Those who need inpatient and/or acute care, including the subcategories of a) those who need a Mental Health Crisis Bed (MHCB), for inpatient treatment and stabilization, for up to 10 days (or longer, if deemed necessary by treating clinicians), until they demonstrate ability to function in a less restrictive environment, i.e., EOP or CCCMS; and b) those who require inpatient hospitalization on a longer-term basis, currently provided by the Department of Mental Health through its intermediate and acute care inpatient programs. | | |
| 2. As I documented in detail in my Expert Report of August 15,2008, pp. 11-12, out of some 134,000 prisoners released to parole by CDCR in 2006, only 0.48%, or 642, could be classified in the third, most acute category (MHCB/DMH). And only 1.82% required EOP services. By far the largest group of parolees with one degree or another of psychiatric impairment, 17.65%, or 23,735, were classified as being at the | Lack of foundation. (Fed. R. Evid. 901.) Argumentative. | The figures are cited to the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity. |

[256990-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| CCCMS level of functioning, or to put it another way, at the minimal end of the spectrum of severity of mental illness. To state, as Ms. Bataille does, that up to 20% of this population would be suffering from "severe mental illness" fails to acknowledge that fully 17.65% are at the lowest level of severity, and only 0.48% at the level of severity that would require a temporary crisis bed or DMH inpatient treatment. Furthermore, Ms. Bataille assumes that all individuals classified at the EOP level of care will need inpatient care if released to the community as part of a prisoner release order. Not only is this assumption clinically inaccurate, in that being given an EOP classification does not signify that a prisoner is in "the most seriously mentally ill" group, nor does it mean that he or she needs in-patient treatment; but it also ignores the reality that CDCR currently paroles numerous individuals at the EOP and higher levels of care each year to the community and rarely if ever places them into inpatient care, or even into lesser day treatment programs. | | |
| 3. As I stated in my Report (pp. 28-29), if a prisoner release order required the diversion of 30,000 persons to parole and the community, it is reasonable to assume that they will be distributed in approximately the same proportions as those persons California paroled in 2006. Assuming that that is the case, the number of persons needing the highest level of care (MHCB/DMH) would be 143, with only an additional 546 needing the EOP level of care, in a state with a population of over 36,000,000. Even the larger group of stable, well functioning persons with a minimal need for intensive mental health | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Mischaracterizes the evidence. Argumentative. | The figures are cited to the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity.<br><br>FRE 703 (based upon review of data and expertise). |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| services would amount to approximately 5,296. These individuals, consistent with State law and practice returning parolees to their home counties, would be distributed throughout the State, and over a period of time. There is no basis for the assumption that the full incremental population would arrive all at once or overwhelm anyone county's resources. | | |
| 4. One of the suggestions pervasive throughout Ms. Bataille's report is that any additional release of mentally ill prisoners would disproportionately decrease public safety. For example, on page three, Ms. Bataille raises the question as "to what extent members of the mentally ill released parolee population might be at greater risk for recidivism" – presumably implying greater than the risk among non-mentally ill parolees. Raising the question in this way, without reviewing the evidence that would provide the answer suggests that, in fact, the mentally ill parolee population *is* at greater risk for recidivism. Ms. Bataille also suggests that because California is currently understaffing its Parole Outpatient Clinic system, the POC system will not be effective for any additional parolees with mental illness who are released (pages 7-9), and concludes that one consequence of this failure is that these parolees will recidivate. These suggestions about the increased recidivism rates for individuals with mental illness, without more analysis, also imply a corollary increase in risk to public safety. However, for this to be true, the rate of violent recidivism would have to be higher among mentally ill parolees than it is among those who are not mentally ill. This is not | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). Appropriately based on facts and evidence cited in expert report. |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| the reality, as my review of substantial empirical data in my Report of August 15 illustrates. As I explained, mentally ill parolees and persons discharged from prison have been found in study after study (and with no major exceptions) to be either at lesser risk, or at no higher risk, of committing either a violent or a non-violent crime, than non-mentally ill prisoners are. | | |
| 5. Moreover, cites to the general "recidivism" rates of mentally ill offenders in California are not reflective of actual dangerousness of these individuals and should not be used to promote speculative fears of mentally ill individuals as dangerous. Recidivism rates generally in California are not reliable indicators of violent crimes being committed; instead, the extremely high recidivism rates in California actually reflect the enactment of "tough on crime" legislation and policies resulting in the imprisonment of large numbers of individuals for technical or minor violations of parole that do not involve serious or violent crimes.2 Joan Petersilia has stated that California's "blanket imposition of parole on all ex-prisoners, and California's unusual reliance on parole revocation as a quick-fix response to parolee problems" drives up recidivism rates in California.3 | Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | Parole study cited was performed for Defendants by their consultant, Dr. Petersilia.<br><br>FRE 801(d)(2) (admissions of party opponent).<br><br>FRE 803(6), (8) (business records, and public records as to documents used in the Petersilia studies).<br><br>FRE 803(18) (learned treatises as to published Petersilia study). |
| 6. Based on the materials I have reviewed, it is evident that California's parole revocation system not only results in extremely high recidivism rates generally, but also disproportionately affects individuals with mental illness. This is not because of their disproportionate dangerousness, but rather because the parole system encourages-in manycases, mandates-imprisonment as punishment for | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| technical and minor infractions to which individuals with mental illness are more susceptible. This pattern is sometimes confused with a higher rate of criminal recidivism, or re-offending, whereas in fact it is primarily a symptom of their mental impairment and disorganization. One study of California parolees concluded that "[t]hree interacting factors probably contribute to PMDs' disproportionate rate of return purely for technical violations. First, parole agents may have lower thresholds for violating PMDs than non-disordered parolees... Second, PMDs have symptoms and functional impairments that may prevent them from adhering to some rules of parole...Third, PMDs often must adhere to more technical rules of parole than their non-disordered counterparts, including the special condition of treatment adherence. For example, California literally revokes mentally ill parolees-sends them back to prison-for failing to attend scheduled appointments with their clinicians at the Parole Outpatient Clinics, and this "violation" can result in a prison term of 12 months.[6] While it is important to encourage psychiatric patients to understand their illness and take personal responsibility for treatment, it is appropriate to use case management services and education to achieve this function in a mental health system, not criminal sanctions and incarceration. | | subject). |
| 7. Ms. Bataille herself recognizes the disconnect between the sentences individuals with mental illness serve and their actual dangerousness, observing that "[w]hen mentally ill individuals commit crimes, even relatively low level crimes, they cycle through the local | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Mischaracterizes the | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| criminal justice system," and they "serve sentences that are disproportionately long in relation to their offense" (p.2l). Once again, the far more accurate and valid measure of dangerousness is the commission of violent crimes, as I explained in my August 15 Report. | evidence. Argumentative. | upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>Assumptions and their bases are clearly stated in the report. |
| 8. The recommendation that individuals with only the very lowest levels of severity or acuity of mental illness be included in any kind of release order also implies that more severely or acutely ill individuals represent an increased danger to society. This fear, based on public stigma and myth, must be rejected. The evidence does not support such a conclusion; in fact, the evidence suggests the opposite.[7] The important point here is that the presence and severity of mental illness, and the acuity level of such illness, are not valid predictors of dangerousness. To suggest that they are, without offering evidence of any kind, is to mobilize precisely "[t]he general public's fear of individual with mental illness and discriminatory practices related to this fear" that Ms. Bataille describes at the end of her report (p.22). For example, the most comprehensive meta-analysis of 58 studies involving 64 unique groups of comparisons between more severely and acutely mentally ill individuals with those who were less severely or acutely ill or did not meet the criteria for any diagnosis of mental illness found that people with the most severe illnesses (schizophrenia and other psychotic conditions) were less likely than those who were not mentally ill to | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>FRE 803(18) (learned treatises as to scientific literature).<br><br>Appropriately based on facts and evidence cited in expert report. |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| commit violent crimes after returning to the community, while those with less severe psychiatric impairments, such as depressed mood, were as likely (but not more likely) than those with no mental illness to do so. | | |
| 9. Other studies II have found that an increase in the acuity or severity of the symptoms of schizophrenia (the most severe form of mental illness) is not a predictor of violence. Rather, the most powerful predictors of violent behavior are the same for both the mentally ill and those who are not mentally ill, such as age, sex, substance abuse, socioeconomic status, and past criminal history. These predictors differentiate between the violent and the non-violent in both the mentally ill and the non-mentally ill groups much more powerfully than the presence, absence, or severity and acuity of mental illness. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). FRE 803(18) (learned treatises as to scientific literature). |
| 10. On page two of her report, Ms. Bataille makes the unsupported assertion that if there were a prisoner release program on even the small scale of 15,000 prisoners, "it should be assumed that a substantial portion of these individuals who have received psychiatric treatment while incarcerated have a significant risk of exacerbation of their psychiatric symptoms when released to community settings." Based upon my own experience in prisons, this statement is totally unsupportable, for it assumes that the social and physical environment of the prison is more salubrious, more conducive to mental health, than community settings are. In saying that, I do not mean to imply that community settings are always supportive of mental health; on the contrary, they all too frequently are not. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise). Appropriately based on facts and evidence cited in expert report. |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| Nor do I mean that all prisons are equally pathogenic, for prisons do vary in that regard among each other. But in my opinion if one wanted to design an institutional setting that would be maximally pathogenic, or likely to provoke or exacerbate psychopathology of all kinds, one could hardly do better than to design the typical modem prison as I have known it over the past 40 years. To begin with, prisons stimulate paranoia more powerfully than any other type of institution in which I have ever worked, for prisons really are dangerous, which is presumably why the ratio of "police" (correction officers) to residents is higher than in any other residential setting in our society. Prisons are more dangerous than any other institution in our society not because most of the people in them are violent-an increasingly large proportion of the prison population over the past few decades has been made up of people who were sentenced to prison for non-violent offenses-but because among their residents is a small minority of individuals who really are among the most dangerous (i.e., violent) people in our society, and while they are there, they are indeed a threat and a danger to the less-violent or non-violent majority. Thus, the less- or non-violent prisoners need to become effectively "paranoid" in order to survive. Among the prisoners with whom I have worked over the years, a high level of distrust was almost universal. Needless to say, this is not the kind of atmosphere in which to foster mental health. To say that we should leave mentally ill prisoners inside our prisons - for the sake of their mental health! -- rather than allow them to return to the community, since the | | |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| community might be more likely to precipitate mental illness than prisons are, is not a conclusion in which I can place much credibility. | | |
| 11. On the contrary, if it is the mental health of our prisoners which we are concerned about, the best thing we could do for most of them is to get them out of the prisons and back into the community as soon as possible. That there are exceptions to this generalization is of course true, depending on how disordered or pathogenic a particular community is relative to a particular prison. However, the assumption that prisons on the whole are healthier psychological environments than peoples' home communities are-such that returning mentally ill prisoners to the community places them at higher risk for decompensating than leaving them in prison would-is highly dubious. That mentally ill people need and can benefit from mental health treatment (provided it is competent treatment) is true, of course, whether or not they are or ever have been prisoners, and whether or not they are living in the community. I would suggest, however, that mental health treatment in the community is more likely to be successful and effective than similar treatment would be in the social environment of the prison. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise). |
| 12. Given the unprecedented level of overcrowding in California prisons today and the uncontested findings of ongoing serious deficiencies in the delivery of mental health care in the prisons, the argument that individuals with mental illness may be "better off' in prison than in the community cannot be taken seriously.  It is the ongoing violation of the minimum required level of mental | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise). As to hearsay, no statement is offered here other than that of Dr. Gilligan. Appropriately based |

[256990-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| health care in California's prisons today that drives our present consideration of a prisoner release order and the question of diversion of mentally ill prisoners to parole and the community. | Speculative. Mischaracterizes the evidence. Argumentative. | on facts and evidence cited in expert report. |
| 13. From a public health standpoint, we must reject the implication that people should remain in prison because community mental health resources are too taxed. To do otherwise, would be to accept the premise that the prison system, rather than the public mental health system, should have primary responsibility for the mental health care of mentally ill individuals who would otherwise be eligible for release or diversion from prison. This "solution" of criminalizing rather than treating mental illness is a clinically and morally unacceptable conclusion. Similarly unacceptable is the proposition that prisons may be utilized as warehouses for holding individuals with mental illness until we have remedied the failures of the public mental health system. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Argumentative. | FRE 703 (based upon review of data and expertise). |
| 14. Throughout her report, Ms. Bataille speculates as to the time it will take to bring the public mental health system into the condition in which it would need to be in order to provide treatment for mentally ill individuals released from prison. However, the release of mentally ill individuals into the community is not something that will only happen in the future; rather, it already constantly happens. A prisoner release order that includes the release and diversion of individuals with mental illness from prison would help close the "revolving door" through which mentally ill prisoners/parolees repeatedly cycle back and forth between the prisons and the community. It is that process, more | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise).

Appropriately based on facts and evidence cited in expert report. |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| than the lack of capacity on the part of the public mental health system, that is making it impossible for these individuals to receive adequate and effective treatment. | | |
| 15. The State itself has estimated that more than 6,000 parolees are returned to prison each year for technical or minor parole violations resulting from unmet mental health needs. This is not indicative of their dangerousness, but rather of the failure of the State to adequately fund its parole mental health services. The State's failure in this regard does not provide justification for keeping high numbers of individuals with mental illness in prison, where the mental health system is also a failure. The appropriate response to the lack of resources is to increase resources, not to give up and return people to prison. In this respect, I agree with Ms. Bataille when she concludes that the "criminalization of the mentally ill individuals" is a "tragic consequence" of California's failure to adequately maintain its public mental health system. | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Speculative. Argumentative. | FRE 703 (based upon review of data and expertise). |
| 16. Non-mentally ill parolees, by contrast, are more likely than those who are mentally ill to commit a new crime, both violent and non-violent. The fact that mentally ill parolees oscillate more frequently between the prison and the community, spending relatively short times in each, makes it difficult if not impossible for them to receive any effective mental health treatment in either environment. While it would be valuable to interrupt their constant cycling in and out of prison by providing adequate mental health care in both environments, they do not represent a greater danger to public safety than non- | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | FRE 703 (based upon review of data and expertise). FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| mentally ill parolees, and by most measures they represent a lesser danger. | | |
| 17. Ms. Bataille refers to the staffing shortages that exist within the public mental health system. (p.12). Staffing shortages, however, in California's prison mental health system are severe, chronic and well-documented. Based on my forty years of psychiatric experience as a clinician, an educator, an administrator and a policy planner in prison mental hospitals and mental health clinics, and in civil mental hospitals and community mental health centers, it is my firm and unambiguous opinion that it is much more difficult to recruit and hire qualified mental health professionals to work in prison settings than it is to recruit and hire them to work in civil hospital and clinic settings. Thus, I fail to see how it can make sense to say that we should refuse to reduce the overcrowding in California's prisons because there are too few clinicians available in the civil mental health system - when the problem of staffing shortages in the prison mental health system is even greater and more difficult (if not impossible) to solve than it is in the civil mental health system. | Lack of foundation. (Fed. R. Evid. 901.) Speculative. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |
| 18. Ms. Bataille and the intervenor experts who opine about community mental health all acknowledge that California is at a funding impasse regarding what level of government (state or local) is responsible for paying for mental health care for parolees, and in what proportion. I agree with Ms. Bataille when she concludes that clarification of funding and service provision responsibility would improve the provision of adequate mental health | Inappropriate basis for opinion. (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Mischaracterizes the evidence. Argumentative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |

[256990-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| care to parolees and the public mental health system generally. It is indeed tragic that California has allowed its public health system to deteriorate at the expense of the individuals who suffer from mental illness. However, as the reports submitted by Ms. Bataille and the intervenor experts illustrate, many experts in California have identified the evidence-based methods of improving this public health system, and the resources that, if funded, could be mobilized to support this system. In my opinion, the State's and counties' refusals to fund such a system[16] does not justify the continued criminalization of persons with mental illness. Indeed, the current overcrowding crisis makes evident that the State, both ethically and financially, can no longer afford to do so. | | Appropriately based on facts and evidence cited in expert report. |
| 19. Moreover, it is my experience mental health treatment in the community, even when it involves in-patient mental hospitalization, is much less expensive than incarceration in prison. Thus the implementation of the programs being proposed for California would be likely to result in cost-savings that could be passed on to the public mental health system. That is, the cost savings to the prison system from the changes being proposed would be more than adequate to pay for whatever additional resources the public mental health system would require. | Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject). |
| 20. Ms. Bataille and the intervenor experts who opine on community mental health describe severe consequences for community mental health resources if a prisoner release order is entered. For example, Ms. Bataille predicts that an "accelerated release" of prisoners in the Coleman class will have "adverse- | Vague and ambiguous. Speculative. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| and potentially serious consequences for the released prisoners; community mental health systems and the (nonoffender status) mentally ill children, adults and older adults they serve," as well as "potentially long-term negative consequences to the development of public mental health services in the future." (p.1 & p.18). These types of dramatic and far-reaching statements overstate the potential effects of a prisoner release order because they do not accurately tie their conclusions to the actual numbers and populations being considered. | | the particular field in forming opinions or inferences upon the subject).<br><br>Appropriately based on facts and evidence cited in expert report. |
| 21. Ms. Bataille's predictions of "adverse consequences" to the whole state mental health system are based on a projected figure of half that number, i.e., "a release of even 15,000 offenders including all classes of mentally ill (Coleman class) prisoners." (p.1). In my opinion, based on the 2006 data discussed above, a more appropriate prediction, given the premise of releasing 15,000 individuals, is that 72 individuals statewide would require an inpatient or crisis level of care, 273 individuals statewide would require an BOP level of care, and 2,648 individuals statewide would require a CCCMS level of care. The conclusions drawn that suggest the collapse of the current mental health system based on the transfer of this relatively small number of mentally ill persons out of the prison system and into the mental health system of the most populous state in the nation thus appear overstated. | Lack of foundation. (Fed. R. Evid. 901.) Speculative. Assumes facts not in evidence. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise).<br><br>FRE 703 (scientific literature is of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject).<br><br>The figures cited here come from Defendants' own "Expert Panel Report," P-002, as to which Defendants have already stipulated to Foundation and Authenticity.<br><br>Assumptions are clearly stated in the report.<br><br>Appropriately based |

[256990-1]

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| | | on facts and evidence cited in expert report. |
| 22. While I agree that the public mental health system in California is under appreciable pressure given the resources allocated to it and as a society, we would do well to increase the funding for these resources, I do not agree with Ms. Bataille's and the other experts' conclusions about the effects of the limited increase in population being considered. As I discussed above, the assumptions made about the intensive levels of care this population would need are incorrect. For example, Ms. Bataille assumes that all BOP individuals released to parole would need inpatient care, and the experts from Santa Clara County assume that half of all individuals with mental illness released to parole would need inpatient care. These assumptions are not supported by the evidence I have reviewed and appear to greatly overstate the level of mental health services that are likely to be required for this population. Moreover, they ignore the realities of the numbers of individuals with mental illness currently being released to parole every year. In 2006, 26,824 individuals with mental illness were released to parole, including 2,447 individuals at the BOP level of care. None of these experts make the claim that the services they describe as so crucial to the public safety that without them, we dare not release mentally ill individuals, are now provided to these tens of thousands of individuals with mental illness now released to the communities. In fact, one of the experts from Santa Clara County estimates that in the "best case," | Vague and ambiguous. Speculative. Mischaracterizes the evidence. | FRE 703 (based upon review of data and expertise).

Further clarification is available through cross-examination.

Appropriately based on facts and evidence cited in expert report. |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| "significantly less than 30% of those in need are able to access service.,,18 | | |
| 23. Although the public health system in California is under funded, it is important to recognize that there are public mental health systems in place and that large numbers of peopleare being served. For example, a report presented by the California Department of Mental Health, California Mental Health Directors Association, and Mental Health Services Oversight & Accountability Commission in July 2008 identify over $6 billion dollars funding public mental health in the state of California for fiscal year 200'8-09. 19 Data from the California Department of Mental Health shows that 658,314 persons were served by county mental health programs in fiscal year 2005-06.20 43,435 persons received some type of 24-hour service, 69,063 received some type of day treatment service, and 633,884 received some type of outpatient service. | Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. | FRE 703 (based upon review of data and expertise). FRE 801(d)(2) (admissions of party opponent). FRE 803(6), (8) (business records, and public records). Further clarification is available through cross-examination. |
| 24. The scale on which public mental health services are already being provided renders highly unlikely Ms. Bataille's prediction that the release or diversion of a relatively small number of mentally ill offenders21 will result in the deprivation of care from mentally ill children and nonoffender adults. | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Lack of foundation. (Fed. R. Evid. 901.) Vague and ambiguous. Speculative. Argumentative. | FRE 703 (based upon review of data and expertise). Further clarification is available through cross-examination. |
| 25. Rather than endorsing a prisoner release order, Ms. Bataille suggests implementing the recommendations of the CDCR Expert Panel Report on Adult Offender and Recidivism Reduction (2007) "including establishing community diversion programs ... , community re-entry facilities ... , community supervision for low-risk | Inappropriate basis for opinion.  (Fed. R. Evid. 703.) Inadmissible Hearsay. (Fed. R. Evid. 802, 805.) Lack of foundation. (Fed. R. Evid. 901.) | FRE 703 (based upon review of data and expertise). FRE 801(d)(2) (admissions of party opponent). FRE 803(6), (8) |

| Statement | Defendants' Objections | Plaintiff's Responses |
|---|---|---|
| offenders," etc. (p.19). I agree completely with those ecommendations, as far as they go. But what Ms. Bataille fails to include in that reference to the: Expert Panel Report is that its first and most central recommendation, to which it returned again and again, was that before it could hope to improve the effectiveness of any of its rehabilitation programs and practices, the CDCR must "Reduce overcrowding in its prison facilities and parole offices" (p. viii). They also stated, as I quoted in my Report of August 15,2008, that "The largest barrier that the Panel identified to delivering effective programming in CDCR prison facilities is its current state of overcrowding." (pp. viii, 9-10) They continue, "Unless California reduces overcrowding, offenders will not have the space or safe environments they need to participate in the rehabilitation programs" (p. 51). Therefore the highest and most urgent priority facing anyone who would like to decrease violent recidivism and increase public safety is to reduce prison overcrowding - first and foremost. | | (business records, and public records)

The recommendations cited are from the Expert Panel Report, P-002, as to which Defendants have already stipulated to Foundation and Authenticity. |

1  DATED:  November 26, 2008          HANSON BRIDGETT LLP

2

3                                     By: /s/ Paul B. Mello
                                          PAUL B. MELLO
4                                         Attorneys for Defendants
                                          Arnold Schwarzenegger, et al.
5
   DATED:  November 26, 2008          EDMUND G. BROWN JR.
6                                     Attorney General of the State of California

7

8                                     By: /s/ Kyle A. Lewis
                                          KYLE LEWIS
9                                         Deputy Attorney General
                                          Attorneys for Defendants
10                                        Arnold Schwarzenegger, et al.

11 DATED: November ___, 2008           ROSEN BIEN & GAVLAN

12

13

14                                    By: _____
                                          MICHAEL BIEN
15                                        Attorneys for *Coleman* Plaintiffs

16 DATED: November ___, 2008           PRISON LAW OFFICE

17

18                                    By: _____
                                          DONALD SPECTER
19                                        Attorneys for *Plata* Plaintiffs

20

21

22

23

24

25

26

27

28

[256990-1]

## DECLARATION OF SERVICE BY OVERNIGHT COURIER & DOJ MESSENGER

Case Name:     **Three-Judge Panel Proceeding Pursuant to 28 U.S.C. § 2284**
                **Coleman, et al. v. Schwarzenegger, et al.**
                **USDC, Eastern District of California, Case No. 2:90-cv-00520 LKK JFM**
                **Plata, et al. v. Schwarzenegger, et al.**
                **USDC, Northern District of California, Case No. C-01-1351 TEH**

No.:     **C 90-0520 LKK / C 01-01351 TEH**

I declare:

I am employed in the Office of the Attorney General, which is the office of a member of the California State Bar, at which member's direction this service is made.  I am 18 years of age or older and not a party to this matter; my business address is: 455 Golden Gate Avenue, Suite 11000, San Francisco, CA  94102-7004.

On December 1, 2008, I served the attached

### DEFENDANTS' PHASE II TRIAL OBJECTIONS TO EXPERT REPORTS OF JAMES GILLIGAN AND PLAINTIFFS' RESPONSES TO DEFENDANTS OBJECTIONS

by placing a true copy thereof enclosed in a sealed envelope with the **OnTrac Overnight** courier service, addressed as follows:

**Honorable Stephen Reinhardt**          **Honorable Thelton E. Henderson**
**United States Courthouse**             **United States Courthouse**
**450 Golden Gate Avenue, Room 19-5398** **450 Golden Gate Avenue**
**San Francisco, CA 94102**              **San Francisco, CA 94102**
*via DOJ Messenger*                      *via DOJ Messenger*

**Honorable Lawrence K. Karlton**
**Robert T. Matsui**
**United States Courthouse**
**501 I Street**
**Sacramento, CA 95814**

I declare under penalty of perjury under the laws of the State of California the foregoing is true and correct and that this declaration was executed on December 1, 2008, at San Francisco, California.

| T. Oakes | */s/ T. Oakes* |
|----------|----------------|
| Declarant | Signature |

POS 3 judge.wpd