URL098~2
IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,                )
                                      )
                  Plaintiffs,         )
                                      )
       vs.                            )  Case No.
                                      )  CIV S-90-0520 LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,        )
                                      )
                  Defendants.         )
_____  )
                                      )
MARCIANO PLATA, et al.,               )
                                      )
                  Plaintiffs,         )
                                      )
       vs.                            )  Case No.
                                      )  C01-1351 TEH
ARNOLD SCHWARZENEGGER, et al.,        )
                                      )
                  Defendants.         )
_____  )

DEPOSITION OF LISA RODRIGUEZ

San Diego, California

Monday, October 6, 2008

Reported by:

Candice Guerra
CSR No. 13086

Job No.:
URL0987B

1            IN THE UNITED STATES DISTRICT COURTS
             FOR THE EASTERN DISTRICT OF CALIFORNIA
2            AND THE NORTHERN DISTRICT OF CALIFORNIA
       UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
3       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

4

5

6      RALPH COLEMAN, et al.,           )
                                        )
7                    Plaintiffs,        )
                              Page 1

URL098~2

```
 8              vs.                    ) Case No.
                                       ) CIV S-90-0520 LKK JFM P
 9    ARNOLD SCHWARZENEGGER, et al.,   )
                                       )
10                 Defendants.         )
      ─────────────────────────────────)
11                                     )
      MARCIANO PLATA, et al.,          )
12                                     )
                   Plaintiffs,         )
13                                     )
               vs.                     ) Case No.
14                                     ) C01-1351 TEH
      ARNOLD SCHWARZENEGGER, et al.,   )
15                                     )
                   Defendants.         )
16    ─────────────────────────────────)
```

17

18              DEPOSITION OF LISA RODRIGUEZ, taken on

19          behalf of the Plaintiff, at Hall of Justice

20          located at 333 West Broadway, Suite 1300,

21          San Diego, California, commencing at 12:00

22          p.m., on Monday, October 6, 2008, reported by

23          CANDICE GUERRA, CSR No. 13086, a Certified

24          Shorthand Reporter for the State of California,

25          pursuant to Notice.


                                                            2


              LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
 1    APPEARANCES:

 2

 3    For the Plaintiff:          K&L GATES, LLP
                                  Attorneys at Law
 4                                BY:   FRED D. HEATHER
                                  10100 Santa Monica Blvd.
 5                                Seventh Floor
                                  Los Angeles, California
 6                                              90067

 7
      For the District           WILLIAM E. MITCHELL
 8    Attorney Defendant          Assistant District Attorney
      Intervenors:                4075 Main Street
 9                                Riverside, California 92501

10
```

URL098~2

```
             Also present:                SYLVIE SNYDER
     11                                    Department of Justice
                                           Office of the Attorney
     12                                    General
                                           110 West A Street
     13                                    Suite 1100
                                           San Diego, California 92101
     14

     15

     16

     17

     18

     19

     20

     21

     22

     23

     24

     25
```

3

              LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
D      1                       I N D E X

       2

       3    EXAMINATION BY:                                  PAGE

       4      Mr. Heather                                      5

       5      Mr. Mitchell                                    73

       6

       7

       8                    E X H I B I T S

       9    PLAINTIFF'S:                                      PAGE

      10    1 - Booklet entitled "Improving Reentry for       11
                Ex-Offenders in San Diego County: SB 618
      11        First Annual Evaluation Report, March 2008"
                with SANDAG logo at the bottom of the cover
      12
            2 - Booklet entitled "Symposium: SB 618           24
      13        Community Reentry Program" from the County
                               Page 3

URL098~2
of San Diego District Attorney's Office
14      dated March 13, 2008

15

16

17

18

19

20

21

22

23

24

25

4

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1      San Diego, California, Monday, October 6, 2008

2                          12:00 p.m.

3

4                        LISA RODRIGUEZ,

5      produced as a witness by and on behalf of the Plaintiff,

6      and having been first duly sworn, was examined and

7      testified as follows:

8

9                          EXAMINATION

10     BY MR. HEATHER:

11        Q    would you say your name for the record, please?

12        A    Sure.  Lisa Rodriguez.

13        Q    And your position?

14        A    I'm a deputy district attorney.

15       .Q    In San Diego County?

16        A    Yes.
                          Page 4

URL098~2

17     Q    And how long have you been in this office?

18     A    With the district attorney's office, over 10

19     years.

20     Q    Okay.  Would you briefly summarize what your

21     education is past high school and then your work

22     experience?

23     A    Certainly.  I went to college at the University

24     of California San Diego 1986 to 1991, went to University

25     of San Diego Law School, graduated from there in 1995.

5

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      while I was in law school I worked for the 4th

2      District Court as an intern for Justin Huffman and I

3      interned with the public defender's office and interned

4      with a private defense attorney.  Upon graduation I was

5      employed by the San Diego City Attorney's office as a

6      deputy city attorney, did that for two years, a little

7      over two years.

8      Q    Doing what?

9      A    Deputy city attorney prosecuting misdemeanors,

10     mostly domestic violence, then came to the DA's office in

11     1998 and I'm now, by the way, getting my LLM in

12     prosecutorial science.

13     Q    There is a science to that?

14     A    There seems to be.

15     Q    Okay.

16     A    Not just an art.

17     Q    Actually, I was a prosecutor many years ago in

18     LA.

19          MR. HEATHER:  I understand -- in fact, Counsel, do

URL098~2

20    you want to put on the record what you told me off the

21    record about the scope of what her expected testimony is?

22        MR. MITCHELL:  Yes.  Deputy DA Rodriguez has been

23    noticed as a witness in this action to testify in regards

24    to the SB 618 program, its implementation, and the goals

25    of that program as an alternative to a prisoner release

6

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    order to reduce recidivism and thereby lower the prison

2    population.  Her testimony is limited to that extent, and

3    that's what she's going to be giving testimony on.  To

4    the extent that any opinions would be offered it would

5    only be in the context of that program.

6        MR. HEATHER:  Okay.  Thank you.  Now, usually when I

7    use the word "prison" in one of these depositions, and I

8    learned early, everybody yells at me.  And you actually

9    meant to say "jails," correct?

10        MR. MITCHELL:  I did not.  This SB 618 program deals

11    with the state prison population coming out of San Diego

12    County.  Right now San Diego County is the only county in

13    the state that has an SB 618 program up and working right

14    now.  But it is a prison program, state prison, so we

15    have to shift gears a little bit.

16        MR. HEATHER:  Thank you.  So I can use the word

17    "prison" and not get yelled at during the deposition?

18        MR. MITCHELL:  During this one.

19        MR. HEATHER:  Okay.  Thank you.

20    BY MR. HEATHER:

21        Q    Have you had your deposition taken before?

22        A    No.

Page 6

URL098~2

23        Q    I don't know if this will turn out to be a

24   model for that process, but I will ask you if you -- if

25   I've asked you something you don't understand, I'm sure

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    you will tell me, and I'll try to clarify it.  We have a

2    little bit of a difficulty with documents today because,

3    apparently, the documents you all produced were produced

4    late at the end of last week and produced to our San

5    Francisco office, I was in LA.

6        So I don't -- I don't think I printed them all

7    out because, as I mentioned, I got a disk Saturday at my

8    home, so those are still on the disk, and I don't have

9    copies of everything I want to refer to.  So that if in

10   asking you questions about something you want to see the

11   copy of the document I will give it to you and if we need

12   to maybe we can make additional copies.  But part of that

13   is just the logistics that I didn't get these things

14   until Friday, late, if at all.

15       But with that caveat, let me start out by

16   asking you if you have heard of an organization called

17   SANDAG, S-A-N-D-A-G?

18       A    Yes.

19       Q    And what is SANDAG?

20       A    Well, in general I think that they are a

21   research facility, and I know they're involved -- it's

22   the San Diego Association of Government, so they have

23   their hands in lots of different projects.  I know what

24   their relation is specifically to SB 618, though.

25       Q    Okay.  Will you tell me what that is?

URL098~2

8

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    They actually have been following SB 618 almost

2   since the beginning.  They send a member of their

3   research team to every one of our operations meetings,

4   they get most of the data that we collect because they

5   are following the SB 618 program and conducting an

6   independent research and statistical analysis of how well

7   it performs, so they have been there since the inception

8   and they continue to be there.

9            We actually have -- they're not just following

10  the participants in the SB 618 program to see how well

11  they do, they are also tracking a control group of

12  similarly situated group of people who are not in the SB

13  618.

14       Q    And I'm going to get to 618 and ask you to go

15  through all that.

16            Before I do, let me ask you whether or not you

17  think this research project there is being done

18  competently?

19       A    I would assume so.

20       Q    Okay.  You have no reason to believe that it

21  isn't?

22       A    Not that I'm aware of.

23       Q    Okay.  There are probably five pages of this

24  document that I'm going to want to ask her about.  What

25  do you suggest we do?  Do you think somebody could copy

9

URL098~2

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    these pages?  Then I'll mark the whole thing as an

2    exhibit for the record.  It is -- let me ask you this:  I

3    have, which you produced, I believe you produced, a

4    document called -- for March 2008 -- "Improving Re-entry

5    For Ex-Offenders in San Diego County: SB 618 First Annual

6    Evaluation Report."

7            You have a copy of it?

8        MR. MITCHELL:  There's a full bound copy of it.

9        MR. HEATHER:  Why don't we mark it as Exhibit 2.

10   Can I mark your copy when we're done questioning about

11   it?

12       MR. MITCHELL:  You can use it.

13       MR. HEATHER:  Okay.  And what I'd like you to do, I

14   mean, this is an example.  If I ask you questions about

15   documents and you want to take whatever time to read it,

16   please do.  I'm going to direct your attention to

17   specific pages and --

18       MS. SNYDER:  Can we go off the record just one

19   moment?

20           (Pause in the proceedings)

21       MR. HEATHER:  The exhibit should be marked as

22   Exhibit 1 to your deposition.  I'm sorry, I misspoke.

23   The 2008 SANDAG study Improving Reentry for Ex-Offenders

24   in San Diego County, the First Annual Evaluation Report

25   for SB 618 should be marked Exhibit 1.

10

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1           (Plaintiff's Exhibit 1 was marked for

2       identification, the original of which is attached

URLO98~2
3        hereto.)

4    BY MR. HEATHER:

5        Q    I'm going to direct your attention to the pages

6    beginning on page nine, particularly the paragraph

7    beginning "Literature Review" and I'm going to sort of go

8    through each of these paragraphs briefly and then ask

9    about SB 618.

10            would you like to take the time to look at

11    those few pages now or I can ask the questions and you

12    can follow along with me, whichever you prefer.  I'd like

13    you to read -- I'm going to ask you through the top of

14    page 16.

15        A    Sure.  I'd prefer to just read it so I --

16        Q    why don't you do that and let me know when

17    you've finished.

18            What page are you on right now?

19        A    15.

20        Q    I was going to say, I'm probably not going to

21    ask you a lot about that page.

22        A    You want me to just read through to 15,

23    correct?

24        Q    Yes.  You done that?

25        A    Uh-huh.

11

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1        Q    Have you read that before?

2        A    Yes.  I've perused it before.

3        Q    Okay.  Let me ask you this before I get into

4    what SB 618 is.  I want to ask you about some of the

5    statements in here and see if you agree with them.

Page 10

URL098~2

6   Do you agree that there's been a significant increase in

7   the prison population in California over the past number

8   of years?

9        A    Can you be more specific as to --

10       Q    Well, if you look on page nine it states that

11  between 1984 and 2005 the rate of sentenced prisoners

12  under the jurisdiction of state and federal correctional

13  authorities across the U.S. increased 161 percent, and in

14  California the rate was 188 percent higher than the

15  national increase.

16       Would you consider those figures as

17  demonstrating a significant increase in the prison

18  population not only in California but generally? You're

19  looking at the wrong page. Prior page. I'm sorry.

20  Nine. The bottom paragraph.

21       MR. MITCHELL:  I'm going to object to the question

22  as vague unless she understands what you're asking.

23       THE WITNESS:  I'm a little confused by your

24  question.

25

12

0        1   BY MR. HEATHER:

2        Q    States there's been 188 percent increase in the

3   prison population -- strike that. I'll withdraw it.

4        The first sentence of the paragraph says over

5   the past two decades there's been a considerable growth

6   in the number of individuals under the supervision of the

7   criminal justice system.

8        Do you agree with that statement?

URL098~2

9      A    I don't really have any specific information to

10     base that on other than this saying so as to what the

11     actual prison population or criminal justice population,

12     how it has grown, so I don't feel I'm really in a

13     position to answer that with any kind of gravitas.

14     Q    All right.  And you are aware that for a number

15     of years now the San Diego County jail system has been

16     operating under a court ordered population cap, correct?

17     A    I have heard that, yes.

18     Q    Okay.  Do you agree with the statements in this

19     article, and I'm just testing your background knowledge

20     of these issues so I can put your comments about SB 618

21     in context, that -- or I shouldn't say article, with the

22     study that has been marked as Exhibit 1 that the two

23     principal underlying factors for recidivism are the

24     deemphasis on rehabilitative programs within places of

25     incarceration as a result, in part, of the increase in

13

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1      prison population coupled with determinate sentencing?

2      MS. SNYDER:  Objection, calls for speculation, lacks

3      foundation.

4      BY MR. HEATHER:

5      Q    Are the principal reasons why the recidivism

6      rate has gone up?

7      MS. SNYDER:  Same objections.

8      THE WITNESS:  I think you're mixing apples and

9      oranges there.  I think there has been a deemphasis on

10     rehabilitation, and that effects recidivism.  I'm not

11     sure that the deemphasis on rehabilitation has to do with

URLO98~2

12    the increased population.

13    BY MR. HEATHER:

14        Q    Fair enough.  Okay.  Regardless of why there

15    has been -- well, let's put it this way.

16            If the population of a prison or a jail

17    facility increases significantly is it fair to say that

18    you would have to increase the resources that are

19    available to provide rehabilitative treatment and

20    programs in order to keep pace with the increased

21    population?

22        MS. SNYDER:  Objection, lacks foundation.

23        MR. MITCHELL:  I'm also going to object as it being

24    irrelevant.  I don't know how this goes to a basis for

25    her testimony or opinion.  I know you wanted to get in

14

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    some general areas, but I have to object on relevance

2    grounds here.

3        MR. HEATHER:  You can answer.

4        THE WITNESS:  Well, again, I think you're mixing

5    apples and oranges here because we're talking about how

6    there has been a deemphasis on rehabilitation in the

7    prison system.  Prison programming, and I think everyone

8    will agree, has been virtually eliminated.

9            There's very little vocational programming left

10    and that's one of the things SB 618 has been very

11    successful at getting, but I don't think that that

12    necessarily relates specifically to how many prisoners

13    are there, I think it goes to more of a policy shift.

14    BY MR. HEATHER:

URL098~2

15       Q    Okay.  Fair enough.  You said that it affects

16    recidivism.

17            How does it, in your view, affect recidivism?

18       A    Based on my experience and what I have learned

19    working on the SB 618 program is when you don't have

20    tools when you get out of prison you are more likely to

21    reoffend.

22       Q    There is a statement quote on page 12 that

23    cites to a Little Hoover Commissioner report in 2003

24    stating the California parole system is a billion-dollar

25    failure and saying the real problem is that a growing

15

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    percentage of those who are released from prison, I'm

2    looking at the quote in the middle of the page, are

3    unprepared to get a job, steer clear of drugs and

4    alcohol, and find a home.  Not surprisingly, before long

5    most of these parolees are back on a bus to prison.

6            Do you have an opinion of whether or not the

7    act of someone who comes out of jail or prison to get a

8    job affects the likelihood that they will recidivate?

9       A    Well, I think it certainly can play a role.

10    People who are unemployed may be more apt to commit a

11    crime.  If they're not given the tools in terms of

12    rehabilitation, not just for employment but for their

13    alcohol or drug problems, those are people that we see

14    returning to jails and prisons.

15       Q    Okay.  And in your opinion has the reduction in

16    rehabilitation programs that you cited earlier, as a

17    matter of policy, affected the ability of jails and

URL098~2

18    prisons to prepare people to find jobs when they are

19    released?  Is that one aspect of what's been reduced?

20        A    I'm not sure I can answer that.

21        Q    Let me rephrase it.  What specifically has been

22    reduced or eliminated when you refer to the reduction in

23    rehabilitation?  What kinds of things have been

24    eliminated or reduced?

25        A    Well, my understanding is that there have been

16

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    less vocational programs for people who are

2    short-termers.

3        Q    By "vocational programs" do you mean job skills

4    training or something else?

5        A    Not more general job skills training, but

6    specific types of jobs.

7        Q    Okay.  So that would affect, presumably, their

8    ability to find employment when they get out because they

9    can cite to the fact when they were in they were given a

10   skill or refined a skill; is that fair to say?

11       A    Or they earned a skill, yes.

12       Q    Okay.  Those have been reduced or eliminated?

13       A    To some degree that's my understanding, yes.

14       Q    Okay.  And what else?

15       A    I think there are still some substance abuse

16   treatments within the prisons, but I would wager a guess,

17   and I don't have any statistical data on this, that those

18   have been decreased or not as effectively handled.  Part

19   of what we try to do is find out what the individual

20   needs.

Page 15

URL098~2

21          Do they need the substance abuse programs that

22    are available, would a vocational program work for them,

23    do they need more education, where is it that we as SB

24    618 can assist them to find the tools so that when they

25    get out of prison they can transition back into the

17

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376
0        1    community more successfully?

2          Q    Okay. So underlying the -- is it fair to say

3    that underlying the SB 618 program is a sense that absent

4    identifying what vocational training or drug or alcohol

5    treatment may be the most appropriate for individual --

6    individuals who are incarcerated will affect the

7    likelihood that they'll successfully reintegrate into the

8    community? Did that make sense?

9          A    It did and I think it's -- it's kind of a

10    return to what I believe the prison and parole system was

11    intended to be, which was to try to rehabilitate people

12    so they didn't come back through the system. We can all

13    agree that there's a high degree of recidivism. I don't

14    think anybody will dispute that. We're trying to find

15    something that is going to change that.

16          Q    And I agree and I'm going to get to that

17    momentarily. I'm just trying to lay a foundation, which

18    I think you're doing, to the fact that the SANDAG March

19    2008 study and your testimony I think supports the notion

20    that the failure to provide the type of rehabilitation

21    that you've described contributes to the high level of

22    recidivism.

23          A'   I don't think that's an unfair statement.

Page 16

URL098~2
24        Q    Okay.  Do you have or are you aware of any
25    evidence -- well, strike that.


18


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1         I'm not going to ask you about it because I
2    don't think it's within your noticed area of expertise,
3    if I'm wrong about that please tell me, but there are
4    also statements in here that shift from indeterminate to
5    determinate sentencing has affected recidivism because
6    under -- just give me a moment here.

7              If you look at the top of page 11, the second
8    full paragraph, the study states, "According to experts
9    in the field, under indeterminate sentencing, prisoners
10   were more motivated to obey prison rules and participate
11   in rehabilitative programs," et cetera.

12             And it goes on to state "With the change to
13   determine the sentencing in many states, including
14   California, there was less incentive for good behavior
15   and as" -- and this goes to your point of our earlier
16   discussion about population -- "as a greater number of
17   individuals were incarcerated for longer periods of time,
18   the increased cost of housing of these individuals also
19   resulted in a drastic paring down of rehabilitative
20   programs."  Two questions.

21             Do you agree that the change from indeterminate
22   to determinate sentencing has had an effect on the
23   recidivism rate?

24        MS. SNYDER:  Objection, lacks foundation.

25        MR. MITCHELL:  You can go ahead and answer.

URL098~2

19

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1       THE WITNESS:  Well, once again, I think that's kind

2    of a too general of a statement to answer because we can

3    talk about how recidivism has -- or the number of people

4    that are committing violent crimes has gone down as

5    opposed to these nonviolent crimes because of three

6    strikes and determinate sentencing.  So I think it's hard

7    to give a very specific answer to that question.

8    BY MR. HEATHER:

9        Q    Okay.  You see the reference in here we were

10    discussing earlier that at least this study contributes

11    some of the reduction in rehabilitation programs to not

12    just policy shift but to population shift?

13        MS. SNYDER:  You're asking her if she sees that?

14        MR. HEATHER:  Yes.

15        THE WITNESS:  You'll have to be more clear.

16    BY MR. HEATHER:

17        Q    The last sentence in paragraph two, "the

18    increased cost of housing of these individuals also

19    resulted in a drastic paring down of rehabilitation

20    programs."

21            We were discussing earlier whether the increase

22    in population affected rehabilitation programs and you

23    thought it wasn't population, it was policy?

24        A    I would just need to see if there were other

25    studies that came out differently.  I can't really answer

20

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    that question.

URL098~2

2      Q      All right.

3      A      Since we're just basing it on what we have

4      here.

5      Q      There's nothing in this discussion of

6      recidivism that I see that says early release, per se,

7      has any effect on recidivism.

8              Do you have any expertise or knowledge which

9      would demonstrate, in your view, that early release in

10     and of itself as opposed to the factors discussed in

11     Exhibit 1 contribute to a higher rate of recidivism than

12     would otherwise occur?

13     A      Well, first I'd like to say that was not

14     addressed in this report.

15     Q      I understand.

16     A      So there's -- I wouldn't expect there to be any

17     evidence or statistics or analysis of whether early

18     release effects recidivism.  Secondly, I can only answer,

19     one, with anecdotal evidence and, two, with my opinion as

20     to how it would effect our SB 618 participants.

21             Obviously, if people are getting out of prison

22     earlier then there's certainly the chance they could

23     commit new crimes earlier, so we have new victims being

24     victimized.

25             But as to the SB 618 population, should they be

21

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      released early, one, we don't have the resources to

2      provide for them because we have it set up so that they

3      would be getting out in certain amounts of time so we

4      have the case managers ready for them, we have the

URL098~2

5     community getting ready for them.  We would be cutting

6     short those programs and we would not have the resources

7     within the community:  The housing for them, the

8     treatment for them, the work, the -- any kind of

9     vocational program.

10         All those things would be certainly affected

11    because this is the population under a prison release

12    that would be affected and released early.  So I think it

13    could certainly affect SB 618 participants in a very

14    negative fashion.

15         Q    Okay.  Let me take those two points that you

16    made separately.

17         First, you say somebody that's released earlier

18    could commit a crime earlier?

19         A    Correct.

20         Q    But obviously -- well, let me rephrase that.

21         Do you know of any statistics which show

22    whether there is any difference in the recidivism rate

23    for those that are released early as opposed to those who

24    served -- as opposed to those who are not released early?

25         A    I don't know.  I think that would be a

22

D      1    dispositive.  I'm not sure there's been a study done on

2     something like that because you would have to release

3     people early in order to compare them.

4         Q    Well, there's been people released early since

5     the population cap went into effect in San Diego County,

6     correct, many years ago?

7         MS. SNYDER:  Object as vague.
                    Page 20

URL098~2

8        THE WITNESS:  On what level?

9        MR. HEATHER:  How is it vague?

10       MS. SNYDER:  As opposed to veil cap or prison cap.

11       MR. HEATHER:  I'm not mixing anything.  I'm asking

12   the question.

13   BY MR. HEATHER:

14       Q    Any of the above, any statistics whatsoever to

15   show whether it's at the prison level, the jail level,

16   violent crime, misdemeanor, anything.  Any statistics

17   whatsoever that show whether the recidivism rate for

18   those who were released early is higher, lower, or the

19   same as the recidivism rate for those who are not

20   released early, are you aware of any such statistics?

21       A    I am not aware of an analysis like that.  I

22   thought you were speaking specifically to the probation

23   and to the local fed kicks.  I'm not aware of that

24   applying to the prisons, but that may just be me not

25   knowing.

23

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Q    Okay.  Limiting it to the LA County jail system

2   -- I'm sorry, the San Diego County jail system, are you

3   aware of any such statistics?

4        A    I'm not aware if there's been an analysis done,

5   no.

6        Q    Okay.  Now we'll get to the easy part and ask

7   you about SB 618.  And I think I should probably mark as

8   Exhibit 2, if I may, the March -- let me ask you this:

9   Your counsel graciously provided me with a bound copy of

10   a document called the "SB 618 Community Reentry Program,

Page 21

URL098~2

11  March 2008."

12       Are you familiar with this document?

13    A    I am.

14    Q    Is this the most up-to-date description of the

15  program?

16    A    It would be up-to-date in terms of the general

17  framework of the program, but it may not be up-to-date in

18  all of the data. I'm not sure how much data we gave to

19  -- I think that was the one we gave to the superior court

20  bench, if memory serves correctly.

21    MR. HEATHER:   Okay. Can we mark this when we're

22  done as Exhibit 2?

23    MR. MITCHELL:   It's yours. That's fine.

24       (Plaintiff's Exhibit 2 was marked for

25       identification, the original of which is attached

24

 1       LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
          hereto.)

 2    MR. HEATHER:   Do you have one for her to refer to

 3  while I ask questions?

 4  BY MR. HEATHER:

 5    Q    And taking a clue from what's on page one, what

 6  is SB 618?

 7    A    What is SB 618? It is a multi-agency

 8  comprehensive program that starts at the time of the

 9  stipulated plea bargain until 18 months after release.

10  It's designed to transition more successfully our

11  parolees back into the community.

12    Q    How long has 618 been in effect in San Diego

13  County or in operation?

Page 22

URL098~2

14      A    Do you mean the operations committee or do you

15    mean actually the program taking in participants?

16      Q    The latter.

17      A    We had our first -- we had a kind of dry

18    run-through, if you will, in February of 2007.  Took two

19    people in, two more early in March to make sure we had

20    all the kinks out, and then we started up full swing in

21    March -- I believe March 17th of 2007.  So about 18

22    months now.

23      Q    Okay.  And now currently how many people

24    participate in the program?

25      A    We have 361 active participants in the program

25

LYNOEN J. ANO ASSOCIATES, INC.  (800) 972-3376

1    as of this morning.

2      Q    Okay.  And how long do they stay in the

3    program?

4      A    Well, it kind of depends upon the individual.

5    These are individuals who are nonviolent felony offenders

6    who are going to prison, so it depends upon the length of

7    their stay in prison.  The terms that we have set is that

8    it must be somebody who's getting no less than eight

9    months sentence and no more than a six year sentence with

10    time to serve of no less than four months and no more

11    than 36 months, so taking into account good time credits.

12          So it will last during the course of their time

13    in prison as well as 18 months after release from prison,

14    and we have five people who have actually completed and

15    discharged parole who will still get the services of SB

16    618 for that full 18 months.
                    Page 23

URL098~2

17      Q      Okay.  And are the individuals that are

18  participating in this program in San Diego County those

19  that are paroled from the state prison that exist in this

20  county?

21      A      They are -- there's two prisons, actually, that

22  participate in this.  For men it's Richard J. Donovan

23  Correctional Facility, which is here in San Diego, and

24  then the other prison that's participating is California

25  Institute for Women, which is up in Corona.

26

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      And that's, obviously, for our women

2  participants, it's the closest female prison to San

3  Diego.  That was something that was very important for

4  people who are going to parole back to San Diego, we

5  wanted to keep them as closely tied to  San Diego as we

6  could.

7      Q      Okay.  What percentage -- you know, you gave

8  the parameters of those people who are eligible for the

9  program.

10          Is the program taking into -- taking in all

11  those individuals who meet those criteria, in other

12  words, is everyone who gets a sentence of four to eight

13  months or --

14      A      No.  We have many other eligibility criteria

15  and exclusionary criteria.  There are other things we

16  have to take into account.  Secondly, we only have the

17  finances for six people per week countywide to enter the

18  program.  Our hope is that anybody who meets all the

19  eligibility criteria at some point will be able to

URLO98~2

20    participate in the program.

21          That just depends upon funding, obviously.  But

22    for right now there are other eligibility and

23    exclusionary factors that come in besides the sentence.

24          That's just the first thing we have to look at.

25       Q    Okay.  So right now you have all these


27


LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
 1    eligibility requirements and on top of it you have kind

 2    of a cap that in any event you can only take six parolees

 3    per week?

 4       A    They're not parolees yet, they are going to

 5    prison.

 6       Q    Okay.  So they're going to prison, and we'll

 7    get to that in a minute.

 8          Six people per week can enter the program right

 9    now, assuming at least six people qualify for the

10    eligibility requirements?

11       A    We never have a problem with that.  I actually

12    went back and looked and with the exception of about a

13    week ago where we had four, which was kind of an anomaly,

14    it's all the way back to May that we didn't fill up

15    completely each week.

16          We have people begging us to get into the

17    program and we have to turn them away.  We take the first

18    six that meet the criteria every week so that way we're

19    not cherry picking who gets in the program, it's just the

20    first six.

21       Q    You don't run like a college admissions

22    program?

Page 25

URL098~2

23    A    Exactly.

24    Q    Okay.  So if there are 20 people that meet the

25    eligibility requirement six are going to get in?

28

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     A    The first six.

2     Q    The first six.  Okay.  Now, is there any

3     funding that is in place now, at least in terms of the

4     commitment, that will increase this six people per week?

5          In other words, do you know now that as of

6     January 1 2009, for example, you'll be able to take in 12

7     people per week?

8     A    It's interesting you should mention that

9     because we had applied for additional funding through the

10    budget so that we could actually ramp up to at least 12

11    per week.  We're just waiting now because, as you know,

12    the budget just got signed so we're waiting to hear how

13    it will all play out.

14    Q    So nobody told you whether the budget included

15    any money for you for this program?

16    A    Not that I'm aware of.  But we have a meeting

17    tomorrow.

18    Q    Are you saying nobody's informed you or you're

19    not aware of any money?

20    A    I'm saying nobody's informed me if there is

21    such money.  But we are fully funded for the ones we do

22    have in the program.

23    Q    Okay.  How many people would you say on average

24    are eligible for the program?  In other words, how many

25    people do you have to turn away each week on average, if

URL098~2

                LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
0        1    you know?

         2         A    You know, I don't have a specific number, but I

         3    can tell you that my ITD Department and I sat down and --

         4         Q    What's "ITD"?

         5         A    I'm sorry.  Information Technology Division.

         6    And we sat down and we tried to figure out, just

         7    statistically based, about how many people we think

         8    San Diego County as a whole, including all of our

         9    different branches, could put into the program if we had

        10    the funding for it, and I think we came up with about 20

        11    per week that would probably meet all the eligibility

        12    requirements.

        13         Q    So maybe three-fold increase?

        14         A    Yeah.  A little more.

        15         Q    A little more than a three-fold increase.  Do

        16    you know how many people in the county each week are

        17    en route to prison?  In other words, you take six people

        18    out of the population of people who are eligible, which

        19    is a subset of the population that is heading off to

        20    prison from San Diego County, correct?

        21         A    Correct.

        22         Q    Do you know what the approximate average prison

        23    population entry group is per week?

        24         A    Gosh.  I got to tell you, I don't.

        25         Q    Okay.

URL098~2

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    You know, I'm in there every day, but I'm only
2    in one department and I don't know what happens overall.
3       Q    Obviously, it's somewhat higher, but you don't
4    know exactly how much?
5       A    It's definitely higher because we have people
6    that don't qualify for the program because their
7    sentences are too long, violent felonies, any number of
8    reasons.  Not local residents, all sorts of things that
9    get taken into account.
10      Q    Now, before I get into this in detail I want to
11   go through some more -- give you the opportunity to talk
12   a little bit more about what the program is and how it
13   works.  But before I do that, let me just say it strikes
14   me, at least mathematically, when you say if individuals
15   were released from state prison early as a result of an
16   overcrowding problem in state prisons that would have an
17   impact on SB 618.
18           And I don't -- I'm not trying to play word
19   games, but let me see if it's fair to at least limit that
20   impact in this sense.  First of all, anybody that's in
21   state prison now that's early released wouldn't be a
22   participant in 618 anyway because you said it starts from
23   the time they go into prison, right?  So somebody that's
24   coming up to the end of their prison right now isn't an
25   SB 618 person anyway; isn't that correct?

31

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    No.  We have people that are at all sorts of
2    stages in the prison system.  We have 361, only 80 of

URL098~2

3       them are out on parole right now.  So that means 320 --

4       I'm sorry -- 280 are actually in either county jail on

5       their way to prison or some part of their prison

6       sentence.

7           Q    What I meant to say is I thought I heard you

8       say, and maybe I misheard you, that the -- that people

9       are taken into SB 618 on the way into the prison system?

10          A    Yes.

11          Q    In other words, following their sentencing or

12      is it even before that?

13          A    It's before that.

14          Q    Okay.  My question to you is I understand there

15      are many people in prison right now who are participating

16      in the SB 618 program, what I meant to say is if someone

17      is coming up today toward the end of their sentence in

18      state prison, and today is not already in SB 618, they

19      won't go into SB 618 when they come out today, correct?

20          A    No.  But that person who gets out early will

21      have other people who are in SB 618 who also get out

22      early, and they will be competing for the same very small

23      resources that already exist in the community and our

24      community case managers and parole agents that we already

25      have assigned will have to deal with all of those new

32

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

D       1       people that get out that they weren't anticipating and

        2       hadn't planned for.

        3               So the resources will be strained even further

        4       and we don't -- we have not hired additional community

        5       case managers, there are not additional parole agents

URL098~2

6    assigned to this case load.  It will affect the services

7    that we can provide to the people who get out.

8        Q    Okay.  So what you're saying is depending on

9    the number, if the prison overcrowding were cured by the

10   release of one person, you could live with that, right?

11   If the number of people early released was one, the

12   county could make do, correct?

13       A    I assume, yes, if one extra person was released

14   early.

15       Q    You would find a way to deal with it.

16            So the impact and consequences to the services

17   you talk about are going to depend on the number of

18   people that are released back to San Diego County?

19       A    well, it's not just the number of people who

20   are released.  Part of the reason that we chose the

21   sentences we did was because we wanted the people in SB

22   618 to get an amount of services while they were there in

23   prison.  We want them to be working on their rehab, if

24   that's what they need to be working on, get their GED, do

25   the vocational program, which we have three new

33

1    vocational programs at RJD that weren't there.

2            So if they were released early they're not

3    prepared in the way we intended them to be prepared, so

4    it's a negative effect not just for the resources on the

5    outside but for those individuals.

6        Q    I'm assuming for purposes of the questions that

7    you get what you want and all the SB 618 participants are

8    not released early?

URL098~2

 9    A    I think you're going to have a little due
10   process issue there.

11    Q    well, maybe, maybe not, but the issue is the
12   impact on services if you do assume for purposes of this
13   question that there will not be anybody participating in
14   SB 618 released early, the impact on the services will
15   depend on the numbers in part, correct?

16          In other words, if one -- you could live with
17   it, if it's a thousand per week it creates a different
18   strain on the system, its impact on services is a
19   question in part of the numbers of additional people who
20   come back to the community in a given time period,
21   correct?

22    A    I think it affects more than just the services,
23   it affects our community who are now open to more people
24   coming out of prison who are unprepared.  I'm not talking
25   about SB 618 but you're getting a greater number of

34

 1   people that are low-level offenders who typically do
 2   reoffend and we're putting them out to the community.

 3          So I think it affects the community, I think it
 4   effects law enforcement, and I think it affects my
 5   office.  Of course, this is all just based on my time as
 6   a prosecutor, but in my opinion it doesn't just affect
 7   the services I think it affects the community as a whole.

 8    Q    And that effect on the community as a whole is
 9   dependent on part of the numbers, right?  The greater
10   number the people who come out, the greater the impact.

11          Is that fair to say or not fair to say?

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

URL098~2

12      A      I think you can say that.

13      Q      Now, if people come out early and they are

14  going to recidivate then your testimony is they're more

15  likely to recidivate earlier than they would have had

16  they stayed in prison?

17      A      I think that's a given.  If you are not due out

18  until September but you get out in June you have an

19  opportunity to recidivate for three months that you would

20  not have had.

21      Q      I agree with you completely.  But it doesn't

22  say whether if you had stayed in until September then you

23  would have had the same likelihood based on everything

24  you know to recidivate in October or November, correct?

25  Sooner or later you'll recidivate if you're going to

35

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1  recidivate?

2      A      Well, I have my own theory on that as a parent

3  and the terms of consequences and if you tell people

4  they're going to get a certain consequence and then you

5  give them less of a consequence I think that affects

6  whether they feel like they can reoffend or not, too, but

7  that's just a theory of mine.

8      Q      Right.  And -- but the study, the study SB 618

9  that we referred to actually found that having the

10  opportunity to get in credit in the indeterminate

11  sentence as opposed to the determinate sentence made

12  people less likely to recidivate.

13          Do you recall that?

14      A      Well, I think that was talking about

URL098~2

15    determinate versus indeterminate and not just giving a

16    wholesale your time is less, you're getting out early.

17    There they talked about earning credits as opposed to

18    somebody giving them to you to get you out of prison

19    early, so I don't think that really compares.

20         Q    well, you talked about the people that were

21    eligible for SB 618, and this was people that would get

22    an eight-month sentence at a minimum?

23         A    Up to six years.

24         Q    But who would serve at least four months.  So

25    isn't it true now, putting aside whatever early release

36

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    may or may not be imposed in this case, that people who

2    get eight-month sentences, generally speaking, aren't

3    going to do eight months?

4         A    That's true.

5         Q    They know that going in?

6         A    That's true.  And, actually, they're very savvy

7    to -- based on my experience, very savvy to the type of

8    credits they're going to get, so they take a plea knowing

9    when they're going to get out, having an expectation of

10   how much they're going to serve, not thinking "I'm

11   getting an eight months' sentence hopefully I'll get

12   lucky and get out in two months."

13        Q    Right.  Now --

14        A    And, by the way, we only have two people, I

15   believe, out of these 361 that got an eight-month

16   sentence.

17        Q    Okay.  But the others are within the range.

URL098~2

18    So, again, it comes back to the fact, however, that you

19    are not aware of any -- so right now when somebody tells

20    someone in the system "you're getting eight months" they

21    know they're not getting eight months, fair?

22         A    True.

23         Q    Okay.  Let me ask you this as a matter of your

24    opinion having been deeply involved in 618.  If you had

25    to choose for the California state prison system right

37

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     now between a system in which everybody did all the time

2     they are sentenced to:  You get eight months, you do

3     eight months; you're a model prisoner, you do eight

4     months; you're not a model, you get eight months; you

5     have a family crisis, you do eight months, and no

6     rehabilitative programs, no help in preparing the

7     individual for reentry, no treatment for any kind of

8     mental problems, drugs or alcohol, that's plan A.

9          Plan B is you get out early if you're a model

10    prisoner and you get all these programs, that's plan B.

11    What I mean by "get out early," take eight months and

12    four months.  You get eight months, you don't do eight

13    months, you get four months, and you get the -- or maybe

14    because you need more time, time for your program, let's

15    say you do two years and do 18 months, you get all the

16    things that SB 618 provides, but you get out early.

17         Do you understand the difference in the

18    hypothetical?

19         A    I do understand the difference in the

20    hypothetical.

Page 34

URL098~2

21      Q    Okay.  So my question to you is this:  If you

22   had to choose based on everything you know, all your

23   experience as a parent and prosecutor and someone

24   involved in 618 and is an expert on 618, if the powers

25   that could make it happen said to you it's all up to you,

38

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   do you want the California system to operate under plan A

2   or plan B?  And we want you to pick the program that you

3   believe in the long run will result in the lower rate of

4   recidivism, which program would you recommend?

5      MS. SNYDER:  I'll object it's argumentative,

6   improper hypothetical, and not within this witness'

7   expertise.

8      MR. HEATHER:  Okay.  I disagree with all of that,

9   but you can answer.

10      MS. SNYDER:  It is argumentative given the choices

11   you've given.

12      MR. HEATHER:  It goes to the heart of this case.

13   BY MR. HEATHER:

14      Q    If you had to choose between A and B which

15   would you choose?  Or say "I can't tell you."

16      A    I don't think either of those are a remotely

17   perfect population system.

18      Q    I'm not saying that.

19      A    I'm obviously not for plan A, given that

20   rehabilitation and programming is necessary to prevent

21   crime on the back end.

22      Q    But if you had to choose between them -- in

23   other words, I'll let you comment on the choices later,

Page 35

URL098~2
24    the question right now is if you had to choose, which

25    would you choose, and then I'll give you the opportunity

39

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    to comment however you want.

2         A    I don't think it's a fair question because I

3    don't think those are two equitable choices since neither

4    of them operates in the realm of reality, but if I had to

5    choose one I probably would choose plan B, although I

6    will tell you the flaws with plan B.

7         Q    Okay.  Tell me.

8         A    I think that you need to be very clear on what

9    your sentence is going to be.  We don't have a system in

10   place that permits you to decide, oh, you're doing well,

11   but you're not, so you get extra bonus credits and get to

12   get out early.  That's not the way the system is planned.

13   So if you're going to have a system where you can get

14   programming, that's excellent, and that's what I would

15   recommend.

16        When somebody gets their prison sentence they

17   have agreed to, that they have signed up for, or has been

18   imposed by a judge and then services indeed be provided

19   to them in prison and upon release, because the best way

20   is not to release people wholesale but give them tools so

21   that they can choose not to commit crimes in the future.

22   But it is a personal choice and there will always, always

23   with 100 percent certainty be recidivism.

24        There's no way we're ever going to stop

25   recidivism, but we can try to decrease it by providing

Page 36

URL098~2

40

1    people with some sort of tools in order to have them make

2    choices not to commit crimes.

3        Q    Right. Because the -- I think we've

4    established this is a different way of saying it.

5    Is it fair to say it's your opinion that the less

6    assistance you give an individual, for example, in the

7    area of vocational training, job hunting, drug or alcohol

8    treatment, whatever may be appropriate for that

9    individual, the less those forms of assistance are

10   available to the prison population and to those that are

11   paroled, the more likely it is that those individuals

12   will get in trouble upon release?

13       A    I think that is true, yes. If you can provide

14   people with tools and you cannot do it for them, they

15   have to make the choice to want to participate and want

16   to make a change in their life, and some people don't

17   want to do that.

18           There are some people with criminal thinking

19   that that is the way they will make their living, but for

20   those who truly do not want to lead that lifestyle, if

21   you provide them with tools and they choose to take

22   advantage of them there is a significant, I believe,

23   decrease in recidivism.

24       Q    And having worked closely with the SB 618

25   program I take it that you deal sometimes face-to-face

41

1    with people who are in the program in prison?

URL098~2

2       A     Absolutely.

3       Q     And you -- sorry.

4       MS. SNYDER:  Break when you get a chance.

5       MR. HEATHER:  That's all right.  I know where I am.

6    Let's stop for five minutes.

7              (Pause in the proceedings)

8              (Record read)

9    BY MR. HEATHER:

10       Q     I know where I was but I wanted to go back to

11   one of my questions.  When I asked you if there was

12   anything in Exhibit -- is this Exhibit 1?  When I asked

13   you if there was anything in Exhibit 1 dealing with early

14   release, per se, as being a significant causes of

15   recidivism you said that wasn't the cause of this study.

16              Do you recall saying that?

17       A     Uh-huh.

18       Q     The fact is that when this report describes

19   what it believes are the causes of recidivism they

20   weren't instructed to exclude what they considered

21   significant factors, were they?  In other words, they

22   were free to write what they believed were the cause of

23   recidivism, as you know?

24       MR. MITCHELL:  Objection, speculation on her part.

25       MS. SNYDER:  Lacks foundation.

42

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1       MR. HEATHER:  That's a very interesting set of

2    objections.  Let me explore those.

3    BY MR. HEATHER:

4       Q     So when you said they were not asked to write

URL098~2

5    about the effects of early release on recidivism the fact
6    is you don't know what they were asked or not asked or
7    told or not told to write about, do you?

8         A    Well, I know in general because they come to
9    our meetings and I know that they're generally to write
10   about the program and to write about how they think it's
11   working out and do their comparison study, but I don't
12   believe that at any time anyone said to them "Please
13   investigate whether early release on determinate
14   sentencing, not on a theory or comparison of the prior
15   way of doing business, how it will affect it." So I
16   don't think that that was a task that they were given,
17   but I can certainly inquire for you.

18         Q    Well, no, I really -- I appreciate that, and
19   that's okay. I don't need you to do that. If you want
20   to do that then I would appreciate knowing what the
21   answer is if it's going to affect your testimony, but
22   what I'm really asking you is when they give the overview
23   of their opinions about recidivism, which is the first
24   section here, and reviewing the expert literature in the
25   field about recidivism, to your knowledge no one told

43

O        1    them that if in that review they believed that early
2    release was a significant factor in contributing to
3    recidivism, that they should exclude any mention of it?
4              Nobody throttled them like that, isn't that
5    true?
6         MS. SNYDER: Objection. Compound, vague.
7         BY MR. HEATHER:

Page 39

URL098~2

8       Q      Do you understand the question?

9       A      I understand your question, and not that I'm

10   aware of.  You have to understand they are an independent

11   group.  They are hired to objectively give their opinion,

12   not the DA's opinion, not the SB 618 program's opinion,

13   but their opinion.

14       Q      And to your knowledge nobody tried to limit how

15   they could express their opinion to the extent it was

16   honestly their opinion, correct?

17       A      I don't believe that they were told to limit or

18   to expand.

19       Q      Okay.

20       A      That I'm aware of on that particular topic.

21       Q      Okay.  So all I was trying to do was get you to

22   acknowledge that there is no reference in here to early

23   release, per se, being a factor that they have described

24   in terms of its effect on recidivism?

25       A      I think that's true.

44

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       Q      Okay.  Now back to your work on SB 618.

2   Would you say it's fair in the process of relating to

3   individuals who are in the program and still in state

4   prison that you've gotten to know some of these

5   participants as individuals?

6       A      Yes.  If I can go back for a minute regarding

7   your questions about SANDAG, you know, you asked if they

8   were asked to look into the effect of recidivism on early

9   release, but we also didn't ask them to look on the

10   effect of SB 618 participants if there was early release,

URL098~2

11    either.

12         Q    Fair enough.  Fair enough.  And let me just

13    clarify what I was asking.  I wasn't really -- I was

14    simply noting that in their description of what they

15    believe is contributing to recidivism, and they talked

16    about increased population, decrease in rehabilitation

17    programs, and change in sentencing from increased

18    population indeterminate to determinate, they did not add

19    and say early release, per se, was a factor.  That's all

20    I'm saying.  Fair enough?

21              That's, in fact, what the report says and

22    doesn't say?

23         A    I think --

24    MS. SNYDER:  Objection.  Compound.

25    THE WITNESS:  I'm not sure there was a question as

45

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
□         1    much as your belief.

2    BY MR. HEATHER:

3         Q    Okay.  Let's break it down because I love the

4    assistance I get from objections.  So let's simplify it.

5    Number one, they conclude that the elimination or

6    decrease in rehabilitative programs contributes to

7    recidivism, correct?

8         A    Yes.

9         Q    They conclude, whether incorrectly or

10    correctly, the change from indeterminate to determinate

11    sentences contribute, correct?

12         A    I forget what they say on that.

13         Q    I'm going to spare you because the report says

URL098~2

14    what it says.

15          Is it fair to say you've gotten to know some of

16    these participants in state prison in the SB 618 program

17    as individuals to some extent?

18    A    To some extent, yes.

19    Q    Okay.  I mean, have you talked to them or any

20    of them about their hopes and plans and desires for the

21    future?

22    A    Yes.

23    Q    Have you found that some of them genuinely --

24    well, strike that.

25          Some of them have families, i.e., spouses and

46

1    children, correct?

2    A    Yes.

3    Q    And many of them care deeply about those

4    relationships, correct?

5    MS. SNYDER:  Objection, calls for speculation.

6    BY MR. HEATHER:

7    Q    Do they stress to you the fact they want to be

8    there as a parent for their children in the future rather

9    than being in jail?

10    A    I can't say they've expressed that to me.  In

11    fact, I would say that the people I have spoken to about

12    their families and children have expressed to me how

13    grateful they are that they had that time in prison and

14    that they came to realize that their actions were

15    affecting their family and children.

16          And they looked forward to going back to them,

Page 42

URL098~2

17    but going back to them as a different person. So I don't

18    recall anybody saying to me, you know what, I wish I was

19    getting out of here so I can get back to my family.

20        Q    Well, I didn't mean it that way. I meant it

21    exactly as you said it. That they -- I'm not really

22    trying to trick a question into providing testimony about

23    early release at all.

24            I'm trying to ask exactly what you responded,

25    which is these people have a genuine concern about being

47

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    a good parent and seeing their family being taken care of

2    properly, regardless of when they get out, and being a

3    part of that process when they get out, whether it's

4    early or not?

5        A    I think there are certainly people that feel

6    that way. I cannot speak for the entire population.

7        Q    Okay. And there are people in the program who

8    speak to you sincerely about the desire to not

9    recidivate?

10       A    Yes.

11       Q    And the desire to maybe increase their

12    education as you are attempting to provide it, right?

13       A    Yes.

14       Q    And the desire to learn a skill to the extent

15    you're providing it, and to get a job?

16       A    Yes.

17       Q    And do you believe when you talk with the

18    people that you've selected for the program and they

19    express those views that they sincerely believe those

URL098~2

20    things?

21        A    I believe that -- and it's not that I've

22    selected for the program, that has been selected for the

23    program.

24        Q    Fair enough.

25        A    That at the time they say that that, indeed,

48

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    they do believe they will not recidivate.

2        Q    And you believe that -- let me withdraw that.

3    Before I go through what the program is let me just ask

4    you one other question, another hypothetical.  Plan A and

5    plan B.  You have to make a choice.  Plan A you continue

6    unconstitutional provisions of overcrowding in the state

7    prisons and, B, you reduce the overcrowding to eliminate

8    the constitutional violation even though that reduction

9    will have an impact on local services.

10            If you had to make a choice would you

11    perpetuate the constitutional violations or eliminate

12    them even though it would have an impact on local

13    services?

14        MR. MITCHELL:   I would object to that as improper

15    hypothetical and improper relevance.

16        MS. SNYDER:  Also argumentative.

17        THE WITNESS:  And I have to say it's also outside my

18    scope of expertise.

19    BY MR. HEATHER:

20        Q    So you don't feel comfortable answering that

21    question because you don't know really how to make that

22    choice responsibly?  Is that fair?  I'm not trying to
                              Page 44

URL098~2

23      trick or demean you, I'm just trying to make sure you

24      can't answer it.

25          MR. MITCHELL:  Also lacking foundation and imposing

49

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1       a fact not in evidence.  Lack of evidence as to what

2       constitutional violations, if there are any, you're

3       referring to.

4           MS. SNYDER:  I think your last question is also

5       argumentative towards this witness.

6           MR. HEATHER:  No.  I'm asking whether you can answer

7       it or not and I think you said it's outside your area of

8       expertise, but I don't think you told me whether you can

9       answer it or not.

10          THE WITNESS:  I don't think I can answer because I

11      don't -- you ask about unconstitutional violations.  I

12      don't have any information that there's unconstitutional

13      violations going on and I don't feel comfortable giving

14      an answer without all the information.

15      BY MR. HEATHER:

16          Q    Okay.  The population cap that was imposed in

17      San Diego County, that was a federal cap?

18          A    As far as I know, and I just know about that

19      just in passing.

20          Q    Okay.  You never read the opinion which

21      established the cap?

22          A    No, I have not.

23          Q    You never read any opinions in this case?

24          A    In this particular case any of the opinions --

25          Q    By the court.
                        Page 45

50

1       A    I might have.  I know I've gotten some of the

2    stuff, but I couldn't tell you what I've read.

3       Q    Okay.  You can't recall reading anything about

4    whether or not there are any conditions in the California

5    prison system which rise to the level of a constitutional

6    violation?

7       A    No.  Everything that I've dealt with on this

8    particular case really I've kind of just focused it on my

9    area of expertise.

10       Q    Okay.  Let's go back to that.  And now talk

11    about, if you can, why you think SB -- is SB 618 being --

12    has it been adopted in San Diego County as the first

13    county in the State of California to use the program?

14       A    We are, indeed, the first county.

15       Q    Okay.  Was it a program that was developed by

16    people in San Diego County or how did San Diego County

17    get to be the test county?

18       A    Actually, Bonnie Dumanis and Von Jeffery who

19    works for the DA's office here, they wrote the

20    legislation, took it to Jackie Speier who sponsored it,

21    and hence we were involved in it from the very beginning.

22       Q    Okay.  And do you believe that this is a good

23    program?

24       A    Yes.  I think it's the best of its kind out

25    there right now.

51

Page 46

URL098~2

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          Q    Do you think the continuation of this program

2     will have an impact on public safety?

3          A    Absolutely.

4          Q    And what would that impact be as best -- you

5     know, without precision, because that would be

6     speculation, but how would you characterize what you

7     believe the impact will be?

8          A    Well, I think the impact will be less crime,

9     less cost to the county for housing people who commit

10    crimes, less cost to the state for people who are housing

11    people who commit crimes, less cost to the county in

12    terms of prosecution of people who commit crimes, so I

13    think it's a win/win situation.

14              If you put people back in the community who can

15    participate actively in a positive way in the community,

16    aside from them not committing crimes, they are bettering

17    their own communities.

18         Q    There is a program overview that begins on page

19    11.  By the way, I don't mean to be ignoring your answers

20    when I'm looking ahead, I'm just trying to keep you from

21    being here all day.

22         MR. MITCHELL:  You're in Exhibit 2 now?

23         MR. HEATHER:  Yes.

24    BY MR. HEATHER:

25         Q    You've read this before?

52

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          A    Uh-huh.  Yes.

2          Q    There's a statement in the first paragraph,

URL098~2

3       "The current structure of the California penal system has

4       not effectively stemmed the tide of recidivism plaguing

5       our communities." Do you see that statement? It is the

6       -- it begins the end of the fifth line down on the

7       introduction. "The current structure of the California

8       penal system has not effectively stemmed the tide of

9       recidivism plaguing our communities."

10             That is a statement of which you would agree?

11      A    Yes.

12      Q    Are the grounds for that failure what you've

13      already testified about, namely principally the lack of

14      the kind of rehabilitation and training and reentry

15      preparation that SB 618 is designed to provide?

16             MS. SNYDER: Objection. Misstates prior testimony,

17      calls for speculation, lacks foundation.

18             THE WITNESS: Based on what I'm aware of it's not

19      just the lack of preparation within the system, it's the

20      lack of continuity outside the system, also.

21      BY MR. HEATHER:

22      Q    Including that.

23      A    But I think that's very important.

24      Q    Would you describe what that is?

25      A    Because when you have people released to parole

53

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       agents, because they are so taxed and have such big case

2       loads, they are not able to give the kind of services

3       that would contribute to rehabilitation, and that's part

4       of the reason why we instituted the community case

5       manager to provide that conduit so that there are more

Page 48

URL098~2

6    services on the outside as well.

7         So it's not just the failure of the CDCR within

8    the prison, it's once people get out as well, which kind

9    of goes to the lawsuit in the sense that we already have

10   trouble dealing with the people who are out on parole.

11   If you put more people out on the parole, that's less

12   services that are available to everybody when they are

13   already taxed.

14        When you release somebody at the gate of a

15   prison and you give them $200 and say check in with your

16   parole agent in 48 hours the likelihood is that that $200

17   is going to get spent on things they don't necessarily

18   need, and they may or may not make it to their parole

19   agent.  So part of it is the services once they get out

20   of prison that'contributes to recidivism as well.  So

21   releasing more people with small services is not going to

22   help the problem of recidivism.

23        Q    Okay.  So to understand the sort of -- the

24   social policy underpinnings of SB 618 as reflected in

25   this introduction are that currently, as you just stated,

54

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    there is insufficient programming within the prison

2    system and following release to assist individuals to not

3    recidivate?

4         MS. SNYDER:  Okay.  Lacks --

5    BY MR. HEATHER:

6         Q    Is that your opinion?

7         MS. SNYDER:  Objection, lacks foundation.

8    BY MR. HEATHER:

URL098~2
```
 9      Q    That there are insufficient programs both
10  within the prison system and following the release?
11      A    That is my opinion based on anecdotal evidence,
12  not based on any statistical analysis.
13      Q    Okay.  And is that your understanding of why
14  the -- this document states that the structure of the
15  California penal system has not effectively stemmed the
16  tide of recidivism?
17      A    I did not write this, but I would wager a guess
18  that that is the basis for it.
19      Q    Okay.  And should an early release order be put
20  into effect by the court, in this case that puts more
21  people back into the county sooner than otherwise
22  expected, it would exacerbate the inability of the system
23  to deal with recidivism; is that a fair statement?
24      A    I would agree with that, that you will
25  exacerbate an already difficult situation.
```

55

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
```
 1      Q    Okay.  Has the program been in effect long
 2  enough -- how many graduates have you had?
 3      A    We don't have any graduates yet.  Our first
 4  person got out in November of 2007, which means they will
 5  not graduate until May of 2009 -- no.  2009.  My math is
 6  bad.
 7      Q    And since that first person that was -- was
 8  released in 2007 how many additional individuals have
 9  been released?
10      A    As of today we have 80 parolees.
11      Q    Okay.  Of various sort of -- approximately six
```
Page 50

URL098~2

12    a week have come out; is that fair to say?

13        A    No.  That isn't fair to say.

14        Q    Because their sentences vary?

15        A    Yes.

16        Q    How many of those individuals, to your

17    knowledge, have been sent back to prison because they've

18    committed a new crime?

19        A    Because of committing a new crime there are two

20    that have gone back to prison for new felony prison

21    terms.

22        Q    Out of 80?

23        A    Yes.

24        Q    So that's a percentage of -- very well

25    percentage compared with the general recidivism rate?

56

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1        A    I believe so.

2        Q    Are you aware that currently if you're on

3    parole, I'm not talking about SB 618, and you don't find

4    a full-time job and your parole officer wants to violate

5    you, the failure for not working full-time can constitute

6    a parole violation?

7        A    I'm not aware of that.

8        Q    Are you aware it's a felony?

9        A    It's a felony to not get a job.

10        Q    To be violated on that ground.

11        A    I don't think that could be a felony.  A felony

12    would be a new crime and I don't think we've ever charged

13    anybody with not getting a new job.

14        Q    I will tell you in good faith that's the

Page 51

URL098~2

15    testimony of the representative and he had two stars on

16    his collar, generally speaking two stars means you're

17    pretty well ranking to me.  That's what he stated is the

18    treatment in Orange County, it's a no-bail violation --

19        A    It might be a violation of your parole terms,

20    but I don't believe it's a new felony conviction.

21        Q    Well, it's not a conviction.

22        A    Well, it can't be a felony charge.

23        MR. MITCHELL:  Parole violations aren't felonies or

24    misdemeanors, they're just --

25        THE WITNESS:  Violation of your terms of parole.


57


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    BY MR. HEATHER:

2        Q    Okay.  If I'm correct that that's what his

3    testimony was, that's just not right?

4        A    I don't know.  Based on 12 years as a

5    prosecutor I've never been able to charge somebody with

6    failure to get a job.

7        Q    Okay.  Have you been aware, though, that

8    individuals are returned to prison because of a failure

9    to work full-time, that that can be grounds to terminate

10   parole?

11       A    I'm personally not aware.

12       Q    Actually, I represent people, innocent people,

13   in the federal court, and I had one person return for

14   that ground several months ago and another individual the

15   judge said, "You got to be kidding me.  Can't get a job

16   if you're a convicted felon out there, how can I send

17   somebody to prison?"

URL098~2

18          But you're not aware of somebody being sent
19    back to prison for not getting a job on parole violation?
20          A    I'm not aware of that.  But I'm in state
21    courts, I know nothing about federal system.
22          Q    Well, I was asking by analogy to state prison.
23    That was the testimony, which I'll be happy to provide to
24    you.
25          MR. MITCHELL:  Do you have a name?


58

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1          MR. HEATHER:  I forget the name.  But I'll be happy
2    to provide it to you.  I don't have the record yet.  But
3    one of the individuals, in fact, the person designated
4    most knowledgeable about -- I'll provide it to you.
5          MR. MITCHELL:  Thank you.
6    BY MR. HEATHER:
7          Q    There are many people returned to custody,
8    however, for violations of parole that don't involve the
9    commission of a new crime, correct?
10          A    I can speculate, yes.  I don't know what all of
11    the reasons for returns to custody for parole violations
12    are.  But I do know they have -- there are lists of what
13    parole violations are.
14          Q    Okay.  Do you know whether among the
15    individuals who have been released through the SB 618
16    program, whether they're in addition to the two you
17    identified who were returned to prison for committing new
18    crimes, there have been any that have returned to prison
19    for parole violations?
20          A    Yes, there have.

Page 53

URL098~2
21      Q      How many individuals, approximately?

22      A      I think it's four.  I can personally think of

23      four names in my head, so there may be more, but I know

24      of at least four, and only one of those has not been

25      retained in SB 618.  We work very hard to keep them

59

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1      within the program.

2      Q      What were their violations?  Do you recall?

3      A      I believe one was for having a knife in his

4      car.

5      Q      That will do it.

6      A      One was for somebody being with members of a

7      gang who had a gun in their car, but he was not in the

8      car and he did not have the gun on him.

9      Q      And undoubtedly there was no proof that he knew

10      the gun was there?

11      A      This I do not know.  I don't get the actual

12      physical reports of it.  I know there's only been one

13      woman that's been a return to custody, and I don't recall

14      what her violation was.  And we have one very recently

15      where a report came in, but it was not filed or submitted

16      to our office, actually, for filing, and he's been

17      returned to custody and I think that involved theft of

18      some sort, but I don't know any more about it because no

19      report was ever submitted to our office by the police

20      department.

21      Q      Okay.  Do you know which of these individuals

22      was discharged from the program as a result of the new

23      violation?

Page 54

URL098~2
24        A    Oh, that was the other person, I'm sorry.  I
25    recall one other person who did not -- was not retained

60

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    in the program, but he was not able to actively
2    participate in the program in any kind of fashion that
3    was assisting him any longer, so he was excluded from the
4    program and I cannot recall what his violation was.
5        Q    Why couldn't he continue to participate in the
6    program?
7        A    He was not able to comply with the parole
8    conditions.  There was a variety of things he was not
9    complying with.
10        Q    He just was deemed unsuitable?
11        A    At some point there's not much more you can do.
12        Q    Okay.  Now, by the way, the recidivism rate
13    that everybody talks about, whatever it is, for whatever
14    jurisdiction, it combines those who return to prison
15    because they convicted a new crime with those who
16    returned for parole violations?
17        A    Yes, it does.
18        Q    So just so we're clear, recidivism, without
19    knowing more, you can't tell what percentage of the
20    recidivist statistic is part of a new crime or parole
21    violation?
22        A    Actually, I think CDCR does keep statistics
23    whether it's a new term or parole violation.
24        Q    Right.  What I meant is if somebody gives you
25    the recidivism for a particular jurisdiction, like

Page 55

URL098~2

61

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    San Diego County or California or any jurisdiction,

2    unless you knew what the breakdown was, you don't know

3    what percentage of that figure is made up of individuals

4    who commit new crimes?

5        A    Well, I think that's like any statistic,

6    though.  You can get more information and have the

7    breakdown.

8        Q    The point is this -- I will just disclose this

9    to you.  It's not really a -- simply, so you know where

10   I'm coming from.  Where I'm coming from is that people

11   refer to the recidivism rate often as an indicator of the

12   individuals who were released from prison who commit new

13   crimes and don't distinguish or recognize in those

14   statements that the recidivism rate combines those who

15   commit new crimes with those who were returned to custody

16   for parole violations and not for committing new crimes.

17            That's all I meant, and that you've

18   acknowledged that, that it's a combined statistic, and

19   unless you know what the difference is, in other words,

20   if you said -- if I told you Arkansas had a recidivism

21   rate of 42 percent you would not be able to distinguish

22   without more information how much of that is new crime as

23   opposed to parole violations, right?  You couldn't?

24   Never mind.  I'll withdraw it.

25            Do you understand?

62

URL098~2

    2    BY MR. HEATHER:

    3        Q    Do you understand that the recidivism rate for

    4    the State of California doesn't tell you what the

    5    percentage of those are put back into prison because they

    6    committed new crimes?

    7        MR. MITCHELL:  I think that misstates the statistics

    8    coming out of CDCR, which has recidivism rates for

    9    specific parolees with new terms, and that's what

   10    everybody's been citing with 70 percent, and are you

   11    referring to that one or are you citing --

   12        MR. HEATHER:  I'm asking her what she knows.  Let's

   13    stick with San Diego County.

   14        MS. SNYDER:  At this point it's more a speech than

   15    getting testimony from this witness.  I don't know

   16    that --

   17        MR. HEATHER:  Well, I'll rephrase it.

   18        MS. SNYDER:  I mean, we're not here to decide the

   19    case.

   20        MR. HEATHER:  I understand that.  I'm trying to give

   21    her the context.

   22    BY MR. HEATHER:

   23        Q    So let me ask a question, then, which is, in

   24    San Diego County do you know what the recidivism rate is

   25    from county jails?


                                                            63

    1        A    No.

    2        Q    No idea?

    3        A    No idea.

    4        Q    Okay.  Do you know whether or not the
                                Page 57

URL098~2

5      recidivism rate in San Diego County is higher or lower

6      than the national average?

7              A      No.

8              Q      If you look at page 14 of this study.

9              A      Of the SANDAG study or --

10             Q      I'm sorry.  The Exhibit 2, the summary of the

11     reentry program of SB 618.  It says, "The recidivism

12     problem in San Diego county exceeds both the national and

13     statewide numbers."

14             And my question to you, really, is do you have

15     any understanding why the rate in San Diego County is

16     higher than it is in the rest of California or

17     nationally, assuming this statement is correct?

18             A      Well, I don't know that it's higher than

19     everywhere within the state.

20             Q      Okay.  Fair enough.  The statewide -- let's

21     assume it's a statewide average, in other words, have you

22     had -- let me rephrase it.

23             Have you discussed with anybody the statement

24     or assumption or allegation or however you want to phrase

25     it that the recidivism rate in San Diego County is higher

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      than average nationally or the rest of California?

2              A      I have not discussed that.  The focus of what I

3      have done is try to lower that recidivism rate, not

4      talking about what it is.

5              Q      Okay.  Is there anything else about SB 618 that

6      you believe is pertinent to recidivism that we haven't

7      yet discussed that you would like to either give an

URL098~2

8    opinion of when you testify in court or state for the

9    completeness of this record?

10       In other words, I've asked you particular

11   questions but I want to give you the opportunity to

12   describe what you think the benefits of the SB 618

13   program are or detriments to the extent you haven't

14   already testified about them.

15   A    Well, I can tell you that some of the positive

16   things about SB 618 that I think will have a positive

17   effect on recidivism is the fact that all these different

18   agencies that never spoke before, the sheriff's

19   department, the probation department, CDCR, the

20   department of parole, the DA's office that we're all

21   talking now, and there is no longer a silo effect where

22   you move an inmate from one location to the next to the

23   next throughout the system and they are lost within the

24   system and then released back into the community.

25       All of these different agencies work together

65

1    from the time somebody takes a plea bargain and agrees to

2    go to prison and volunteers to participate in the SB 618

3    program they are working together on this individual.

4        And I can tell you that I have seen the

5    difference in the 30 days between the time somebody takes

6    a plea bargain and the time they come back for their

7    sentencing.

8        I've seen a physical difference in some of

9    these defendants because they have hope, they're excited

10   about the program that something might change for them.

URL098~2

11          So you can see that and then as they go through
12     the program we are all interacting and talking about
13     these individuals and keeping tabs on them and the
14     different agencies, and so when they get released on
15     parole I'm aware if somebody commits an offense and I
16     work with the parole and with the community case
17     managers, and we keep track of what's going on.  So not
18     only are they getting better services but they have
19     increased supervision in a way that parolees don't if
20     they are just released back onto the street.

21     Q    And I take it that you believe this sort of
22     coordinated individual attention, in your opinion, will
23     make it more likely that that individual or those
24     individuals who received that attention will reenter
25     successfully into the community and not recidivate?

66

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     A    I think they have a better chance.  And I will
2     tell you some other things that were unintended
3     consequences.  I've talked to the parolees, we just had a
4     meeting with, like, 18 of the parolees that are actually  ·
5     out on SB 618, and they have come together as a group.
6     They think about each other in terms of whether or not to
7     recidivate.

8          I talked to one gentleman who said, "I didn't
9     get the job I applied for and in the past first thing I
10     would have done was get high because that would be the
11     only thing that would make me feel better because I was
12     so mad about it, but I thought to myself, Joe from SB 618
13     isn't getting high, I don't have to get high."  So
                                    Page 60

URL098~2

14    there's this community that's being built amongst them.

15            There's also unintended effects, well, maybe

16    intended effects for the prison at large, too.  Because

17    of SB 618 we have three vocational programs in Donovan

18    that didn't exist before.

19        Q    And what are those?

20        A    C tech.

21        Q    What is that?

22        A    It's -- I don't know, like kind of an

23    electrical engineering sort of thing, I think it's for

24    cable, cable technician, I believe, so that they can go

25    out and get a job.  Electronics and welding, and the

67

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    cabinetry should be up sometime this week.  At CIW we are

2    planning to get cosmetology they had built up from the

3    ground, but there's programs not just for SB 618

4    participants but for anybody who is in prison that can

5    enroll in them as well.

6            We have people getting their GEDs in prison

7    because they're encouraged to do so.  We've actually

8    bought college books for Donovan and CIW so people can

9    further their education.  So it's not just affecting them

10    in a small way, it's affecting the community in prison,

11    outside of prison, and then their general community that

12    they live with.

13        Q    There is a statement on page 17, just to follow

14    up, it says "Many inmates serve their time with minimal

15    or no rehabilitative program geared toward their

16    successful reentry into the community."

URL098~2

17          You agree with that?

18          MS. SNYDER:  Objection, lacks foundation.

19          MR. HEATHER:  Do you agree with that?  What's the

20     lack of foundation?

21          MS. SNYDER:  I don't know if she knows what these

22     people do.

23          MR. HEATHER:  That's not a fair objection because

24     I'm asking whether she agrees with the statement or not,

25     not whether it's true.

68

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
 1     BY MR. HEATHER:

 2          Q    Do you agree with that statement?

 3          MS. SNYDER:  Well, then, it's argumentative because

 4     what's the difference whether she agrees with that

 5     statement or not?

 6          MR. HEATHER:  Because she is an expert on 618 which

 7     involves rehabilitative programs for reentry.

 8          MS. SNYDER:  I don't want to argue with you.  I'm

 9     not instructing her not to answer, I'm just stating my

10     objection for the record.

11          MR. HEATHER:  Fair enough.

12          THE WITNESS:  I only know specifically about what

13     Donovan had prior to this time, and I know that they did

14     not have many vocational rehabilitative programs.

15     BY MR. HEATHER:

16          Q    Okay.  So as to Donovan prior to 618 would you

17     agree that many of the inmates there served their time

18     with minimal or no rehabilitative programming geared

19     toward their successful return to the community?

URL098~2

20    MS. SNYDER:  Lacks foundation.

21    THE WITNESS:  I would say based on my personal

22    experience there was minimal rehabilitative efforts.

23    BY MR. HEATHER:

24    Q    okay.  And you have opined on what you believe

25    the effects of SB 618 will be in the future on

69

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    recidivism, correct?

2    A    Yes.

3    Q    I want to ask you whether you agree with the

4    last sentence of this paragraph which states "This lack

5    of effective coordination is a major contributor to the

6    high rate of recidivism and the concomitant impact on the

7    crime rate"?

8    A    well, I agree with that in theory.  This was a

9    multi-agency plan in order for our budget, so this was, I

10   think, more theoretical.  But, yes, in theory I agree

11   that in order to lower rates of recidivism we need to act

12   in a coordinated effort.

13   Q    okay.  And I take it from what you've said

14   about 618, I don't mean to overly compartmentalize its

15   benefits, but two of the principal positives of the

16   program I think you have stated are, one, that it does

17   have meaningful rehabilitative programs and, two, that

18   individuals in the program are dealt from the plea stage

19   through reentry and continuing after reentry in a

20   coordinated and interagency fashion, that those two

21   aspects of the program are two important parts of the

22   program, correct?

URL098~2

23        A     Those are two important parts, but I would

24    throw in also it's voluntary and people who have chosen

25    to take that on.


                                                              70


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1         Q     Okay.  You talked a little bit about -- and as

2    far as you know this Exhibit 2 fairly summarizes the

3    program.

4               Do you want to take a minute to look it over

5    and make sure something doesn't jump out at you as being

6    significantly changed, and I'll let the document speak

7    for itself if you don't see everything -- I'm not going

8    to ask you to read every word, but looking at the major

9    components whether you believe it fairly summarizes the

10   program?

11        A     It does except for the expanse plans because,

12   again, our expanse plans have been tempered by the lack

13   of a budget.

14        Q     Speaking of the budget, if I may ask a

15   question.  If you're not comfortable with multi-tasking

16   I'll wait until you finish.

17        A     Go ahead.

18        Q     Did San Diego County anticipate that AB 900,

19   the implementation and full implementation of AB 900,

20   would have any impact on the county's ability to expand

21   SB 618 or are they separate issues?

22        A     Separate issues.

23        Q     So AB 900, in your view, was not going to

24   provide additional reentry facilities or resources that

25   would impact 618?

URL098~2

71

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A     There could potentially have been a positive

2   impact from it.  But we haven't really talked about them

3   in conjunction.  We were aware of AB 900, but not

4   something we were planning on.

5       Q     Okay.  Are you aware that AB 900 -- that not an

6   additional new cent of moneys was provided for in the new

7   budget?

8       A     Yes, I am aware of that.

9       Q     Are you aware that many individuals have stated

10  AB 900 was going to provide the cure for the prison

11  overcrowding in the State of California?

12      A     I have not heard of that.

13      Q     I can't remember whether or not you said

14  Exhibit 2 fairly characterizes the SB 618.

15      A     I think it does, as I pointed out, with the

16  exception of the expansion plan.

17      MR. HEATHER:  I think I'm done.

18      MR. MITCHELL:  You're done?

19      MR. HEATHER:  I think so.  Just give me a second.

20  I'm looking at the Donovan thing and see if there's

21  anything I want to ask.  I don't have any further

22  questions at this time.  If you discover any statistics

23  or anything else that relates to the questions to be

24  asked that may effect the testimony you might give in

25  this case I would appreciate receiving copies of those.

72

Page 65

URL098~2

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    MR. MITCHELL:  We'll do that.  A couple quick

2    questions.

3

4                          EXAMINATION

5    BY MR. MITCHELL:

6        Q    Is SB 618 functioning as designed currently or

7    as it was intended?

8        A    Almost as it was intended.  We intended to have

9    the medical assessments done locally so they could spend

10   less time in reception, but because of the medical

11   receiver we do not have the ability to do that, so the

12   participants do have to go through the reception center

13   and have their medical chronos done at their prison.  So

14   that would be the one thing that isn't functioning the

15   way we intended.

16       Q    Now, was the purpose of having the medical

17   screening done at the local level before they get to

18   prison, was that designed to help unclog reception

19   centers or advance the quick replacement into

20   programming?

21       A    Quicker placement into programming for one

22   reason, and the second is as we all probably know time in

23   reception is downtime you're not doing anything, not

24   programming, just getting into trouble, so we want to

25   make sure it's done as soon as possible.

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        Q    What is being done with the receiver in order

2    to speed that up for participants in SB 618?

URL098~2
3       A    I think that's a constant process.

4       Q    A constant process, and that's because the

5    receiver is in charge of all medical screening?

6       A    Exactly.

7       Q    And have they been able to accommodate SB 618

8    to do anything to speed up the assessments or medical

9    reviews of these participants?

10      A    Not yet.  But we are not giving up.

11      Q    And any other problems with the implementation

12   of SB 618 either from the receiver or CDCR?

13      A    There has certainly been some bumps along the

14   way and some constant fine tuning and making the program

15   better.  One of the problems that we had initially was

16   that we didn't have social workers involved in the prison

17   case management system in Donovan while we did at CIW.

18          That's something we worked on as a committee

19   and were able to change because social workers have a

20   better ability to assist and work with our participants,

21   so little things like that.  We're riding in a very big

22   ship and it takes a while.

23      Q    I think you mentioned a term previously a case

24   management worker.

25          Is that the social worker?


74

D    1       A    We have prison case managers who work with an

2    inmate while in prison and a conduit or advocate between

3    the prison system and the participant and make sure

4    they're following their life plan and going along with

5    the programming, and then six months prior to release we

URL098~2

6    have community case managers who start coming to meet

7    with the participant and planning for their release.

8            Where you're going live, who you're going to

9    live with, do you need to be in treatment, do you need to

10    get a driver's license for you, what kind of things do we

11    need to set up your time when you get out on parole, and

12    that's the same person that will work with them for 18

13    months after release.

14        Q    And for the SB 618 program in San Diego County

15    how many of these positions were created and what's the

16    case load of the typical case management worker?

17        A    You know, I didn't write down the number.  I

18    believe we're trying to keep it around I want to say

19    about 30 for our case managers, but I'm not a hundred

20    percent on that.  I'll have to get you the numbers on

21    that.

22        Q    And these are new positions not connected to

23    CDCR?

24        A    They are paid through CDCR, but new positions

25    created specifically for SB 618 both within the prison

75

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    and then the community case managers.  The community case

2    managers are actually hired by UCSD and paid through the

3    contract to UCSD.

4        Q    Have there been any estimates regarding the

5    lowering recidivism rates among SB 618 as to a goal or

6    what it could achieve?

7        A    That is certainly our goal.  We have not

8    actually speculated on the dollar amount that we would

Page 68

URL098~2

9    save, but if we keep one or two or three people, I mean,

10    every person that we keep from going back we've saved,

11    what is it, $48,000 now that it costs to house a person.

12    So you figure exponentially on economy of scale as we get

13    more people successful we're saving more money on the

14    back end.

15        MR. MITCHELL:  Nothing further.

16        MR. HEATHER:  Nothing further.

17        MS. SNYDER:  I have no questions.

18        MR. HEATHER:  Thank you very much for your

19    cooperation and appearing here today.

20            (Deposition concluded at 2:00 p.m.)

21

22

23

24

25


76


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    STATE OF CALIFORNIA    )

2                           )

3    COUNTY OF ORANGE       )

4

5        I am the WITNESS in the foregoing deposition.  I

6    have read the foregoing deposition and having made such

7    changes and corrections as I desire, I certify that the

8    same is true of my own knowledge, except as to those

9    matters which are therein stated upon my information or

10    belief, and as to those matters, I believe it to be true.

11        I declare under penalty of perjury that the

Page 69

URL098~2

12    foregoing is true and correct.

13        Executed on_____

14    at_____, California.

15

16

17

18

19                                    _____

20                                    LISA RODRIGUEZ

21

22

23

24

25

77

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

The following changes and corrections have been made in the transcript of the deposition of Deputy District Attorney Lisa Rodriguez:

| Page | Line | |
|------|------|---|
| 16 | 1 | Change: end with "?" |
| | | Reason: |
| 33 | 7 | Change: "to" to "too" |
| | | Reason: |
| 46 | .18 | Change: "Von" to "Vaughn" |
| | | Reason: |
| 51 | 9 | Change: End with "?" |
| | | Reason: |
| 64 | 11-12 | Change: "expanse" to "expansion" |
| | | Reason: |
| 66 | 21 | Change: "riding" to "righting" |
| | | Reason: |
| 67 | 2 | Change: "and" to "as" |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |
| | | Change: |
| | | Reason: |

1  STATE OF CALIFORNIA
2
3  COUNTY OF SAN DIEGO
4

5      I am the WITNESS in the foregoing deposition. I

6  have read the foregoing deposition and having made such

7  changes and corrections as I desire, I certify that the

8  same is true of my own knowledge, except as to those

9  matters which are therein stated upon my information or

10  belief, and as to those matters, I believe it to be true.

11      I declare under penalty of perjury that the

12  foregoing is true and correct.

13      Executed on _October 23, 2008_

14  at _La Mesa_ , California.

15
16
17
18
19

20      LISA RODRIGUEZ
21
22
23
24

25


77


LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376