URL098~1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,            )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       ) Case No.
                                  ) CIV S-90-0520 LKK JFM P
ARNOLD SCHWARZENEGGER, et al.,    )
                                  )
                Defendants.       )
                                  )
_____)
                                  )
MARCIANO PLATA, et al.,           )
                                  )
                Plaintiffs,       )
                                  )
        vs.                       ) Case No.
                                  ) C01-1351 TEH
ARNOLD SCHWARZENEGGER, et al.,    )
                                  )
                Defendants.       )
_____)

DEPOSITION OF BONNIE DUMANIS

San Diego, California

Monday, October 6, 2008

Reported by:

Candice Guerra
CSR No. 13086

Job No.:
URL0987A

D       1            IN THE UNITED STATES DISTRICT COURTS
                FOR THE EASTERN DISTRICT OF CALIFORNIA
        2            AND THE NORTHERN DISTRICT OF CALIFORNIA
                UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
        3       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

        4

        5

        6       RALPH COLEMAN, et al.,            )
                                                  )

                            Page 1

```
                              URL098~1
  7                         Plaintiffs,        )
                                               )
  8              vs.                            )  Case No.
                                               )  CIV S-90-0520 LKK JFM P
  9    ARNOLD SCHWARZENEGGER, et al.,           )
                                               )
 10                         Defendants.         )
       _____)
 11                                            )
       MARCIANO PLATA, et al.,                  )
 12                                            )
                            Plaintiffs,         )
 13                                            )
                 vs.                            )  Case No.
 14                                            )  C01-1351 TEH
       ARNOLD SCHWARZENEGGER, et al.,           )
 15                                            )
                            Defendants.         )
 16    _____)

 17

 18                 DEPOSITION OF BONNIE DUMANIS, taken on

 19            behalf of the Plaintiff, at Hall of Justice

 20            located at 333 West Broadway, Suite 1300,

 21            San Diego, California, commencing at 11:05

 22            a.m., on Monday, October 6, 2008, reported by

 23            CANDICE GUERRA, CSR No. 13086, a Certified

 24            Shorthand Reporter for the State of California,

 25            pursuant to Notice.
```

2

```
                 LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
  1    APPEARANCES:

  2

  3    For the Plaintiff:          K&L GATES, LLP
                                   Attorneys at Law
  4                                BY:   FRED D. HEATHER
                                   10100 Santa Monica Blvd.
  5                                Seventh Floor
                                   Los Angeles, California
  6                                               90067

  7
       For the District           WILLIAM E. MITCHELL
  8    Attorney Defendant          Assistant District Attorney
       Intervenors:               4075 Main Street
  9                                Riverside, California 92501
```

Page 2

URL098~1

10
11          Also present:                  SYLVIE SNYDER
12                          .              Department of Justice
                                           Office of the Attorney
13                                         General
                                           110 West A Street
14                                         Suite 1100
                                           San Diego, California 92101
15
16
17
18
19
20
21
22
23
24
25

3

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1                    I N D E X

2

3    EXAMINATION BY:                              PAGE

4      Mr. Heather                                  5

5      Mr. Mitchell                                93

6    FURTHER EXAMINATION BY:                      PAGE

7      Mr. Heather                                103

8

9

10

11

12                  E X H I B I T S

Page 3

URL098~1

13    PLAINTIFF'S:                                    PAGE

14    1 - Two-page document listing programs            15

         currently in place in San Diego County
15
      2 - One-page document with statistics            51
16

17

18

19

20

21

22

23

24

25

                                                              4

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
 1    San Diego, California, Monday, October 6, 2008

 2                      11:05 a.m.

 3

 4                    BONNIE DUMANIS,

 5    produced as a witness by and on behalf of the Plaintiff,

 6    and having been first duly sworn, was examined and

 7    testified as follows:

 8

 9                     EXAMINATION

10    BY MR. HEATHER:

11        Q    Would you state your name and title for the

12    record, please?

13        A    Bonnie M. Dumanis, D-u-m-a-n-i-s, and that's

14    Bonnie i-e.

15        Q    And you are currently the District Attorney for
                        Page 4

URL098~1

16    San Diego County?

17        A    I am.

18        Q    And how long have you held that position?

19        A    I was sworn in January of '03.

20        Q    And could you briefly summarize your education

21    past high school and your work experience up until the

22    time you took your current position?

23        A    High school, too?

24        Q    You can skip high school.

25        A    Okay.  Let's see.  I graduated undergraduate

5

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    University of Massachusetts in Amherst, Massachusetts in

2    1973 with a degree in sociology, minor in French and

3    education.  Got my student teaching credentials, did a

4    university year for Action Vista Volunteer Program for

5    one year and a year abroad in France my junior year.

6        In the Vista Volunteer Program I worked in the

7    Legal Aid Society of Pittsburgh representing -- in a

8    Community Action Center representing welfare fraud

9    recipients at their fair hearings.  This 1973 went -- did

10    you have a question?

11        Q    When you say "welfare fraud recipients" that

12    means people who were on welfare who were accused of

13    fraud?

14        A    Yeah.  I should have said welfare recipients at

15    their fair hearings.  I misspoke.

16        Q    Okay.

17        A    When they were accused of an overpayment, which

18    most of the time was in accusation of fraud, they would

Page 5

URL098~1

19    have an administrative procedure whereby they could

20    contest that.

21        Q    Okay.

22        A    With an administrative judge and that sort of

23    thing, and I represented them in those proceedings.

24        Q    Okay.

25        A    Then in '73 I came to San Diego and went to

6

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Thomas Jefferson School of Law.  It was then known as

2    Western State University.  Graduated in --

3        Q    When did the name change?

4        A    I don't know.

5        Q    A few years ago?

6        A    A few years ago.

7        Q    Okay.

8        A    Graduated in December of 1976, passed the Bar

9    in June of '77, while going to law school worked in the

10    district attorney's office as a junior clerk typist,

11    intermediary clerk typist, investigative assistant, and

12    then became a deputy district attorney.

13        Q    Okay.

14        A    I was a deputy district attorney for 12 years,

15    spent a year doing the -- heading the Metropolitan

16    Homicide Task Force, did virtually every job in the

17    office from issuing to rapes, robberies, murders, then

18    became a referee in 1990 in the Superior Court in the

19    Juvenile Division of the Superior Court for four years,

20    handling two years of dependency for those cases where

21    children are taken from their homes or the parents are

22    involved in the juvenile court system for child abuse or

23    neglect, and then two years of delinquency which involves

24    those kids under the age of 18 who are alleged to have

25    committed crimes.

.

7

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1         Then in 1994 I ran for the Municipal Court and

2    won and was sworn in in '95 as a Municipal Court judge,

3    handled during my Municipal Court days the first drug·

4    court here in the Central Division of San Diego County,

5    handled that for, I think, close to two years.

6         That program became a model nationwide, and

7    then in 1998 ran for Superior Court, won the position of

8    Superior Court and was sworn in just before the courts

9    unified, so I was -- I ran for election, I also was

10   appointed because the person vacated it early, and then

11   the courts unified.

12        In the Superior Court I was one of the judges

13   that handled the domestic -- I was a lead judge in the

14   domestic violence court where we did all domestic

15   violence cases for the entire Central Division of

16   San Diego County and also did all the civil restraining

17   orders and domestic issues that related to domestic

18   violence cases, and we were recognized statewide for that

19   program as well because we reduced recidivism by 26

20   percent.

21        Let's see.  I stayed on the bench until I ran

22   for district attorney in 2002, which required that I take

23   about a year and a half leave without pay from the bench

24   to do that.

Page 7

URL098~1

25      Q      I'm sorry.  Do what?


8


LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1       A      To run for district attorney.

2       Q      Okay.

3       A      And was elected in 2002 and sworn in in January

4       of 2003.  While a lawyer I was on San Diego County Bar

5       Association Board of Directors, I was on the California

6       Women Lawyer's Board of Directors, I was president of the

7       Lawyer's Club of San Diego, served two years as a member

8       of the General Commission Judicial Nominee's Evaluations

9       Commission, taught at various law schools, and as a

10      Superior Court judge was an instructor at the California

11      Judge's College, National Judge's College, taught for The

12      Drug Court Institute, University of San Diego Thomas

13      Jefferson.

14             Oh, also taught for the Center for Addiction

15      Studies here for UCSD Center of Psychology has the Center

16      for Addiction and participated while I was on leave from

17      the bench in teaching within the prison system --

18      Q      When was that?

19      A      -- therapeutic communities.  It would have been

20      2002, probably.

21      Q      Was that on leave from Superior Court?

22      A      Yes.  Superior Court.

23      Q      Shortly after you got on?

24      A      Well, I got on in '98.

25      Q      Oh, you got on in '98?

URL098~1

9

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      A    So --

2      Q    Okay.  And tell me -- summarize what you did in

3   teaching within the prison system.

4      A    It was based on therapeutic communities and it

5   was teaching the inmates as well as the correctional

6   officers how to participate -- we actually taught the

7   correctional officers, in addition, how to work with the

8   program for substance abusers in developing therapeutic

9   communities and programs within the prison.

10      Q    Okay.  This was in a state prison system?

11      A    Yes.

12      Q    And was there a particular prison you worked

13   with?

14      A    There were two, I believe, but I don't remember

15   which ones they were.  One was a woman's facility.

16      Q    And what is a therapeutic community, briefly?

17      A    It is, in essence, it has a treatment program

18   and people working together to get clean, sober, and

19   productive.  So they have group therapy, individual

20   therapy, AA meetings, NA meetings, you know, educational

21   programs, but it's more based on therapy.

22      Q    And you were doing this full-time for a while?

23      A    No.  No, I was campaigning full-time.  That was

24   part-time.

25      Q    Okay.  But you were doing this during the

10

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   campaign?

URL098~1

2      A      Yes.

3      Q      Okay.  Now, did I interrupt you or had you

4   completed sort of a summary what you were doing in the

5   district attorney's office?  I can't remember whether I

6   interrupted you just before I forgot this, or whether you

7   had finished.

8      A      Well, I got up to being a district attorney, I

9   think.

10      Q      And you've been that since?

11      A      Yes.  Since 2003.  And I'm now currently on

12   California State Bar Board of Governors, California Post

13   Commission.

14      Q      So I have to be good at this deposition?

15      A      Indeed.  And I'm president of the California

16   District Attorney's Association.

17      Q      There you go.  All right.  So are we

18   up-to-date, more or less?

19      A      More or less, I think so.  Yeah.  Started the

20   SB 618 program, too, while we were here.

21      Q      Okay.  I'll ask you something about that.

22   First of all, have you been deposed before?

23      A      A few times, yes.

24      Q      Okay.  And I'm sure you know the rules, but the

25   only thing I want to emphasize is if I say something that

11

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

0      1   you don't understand I'll try to clarify it if you let me

2   know.  And I'm entitled, obviously, to your best

3   recollection even though you may not be certain, and if

4   you want to consult any documents we have something of a

URL098~1

 5    logistics problem here today because the documents that

 6    were produced were produced at the last minute.

 7          In fact, the point being if you do look at

 8    something today and I direct your attention to a

 9    particular area, please feel free to take the time you

10    need to read anything else in the document before

11    answering.  I was called on Friday to say that the San

12    Francisco office of our firm had received some documents,

13    I guess that you had produced, and there were a lot of

14    documents.

15          They didn't want to e-mail them to me in

16    Los Angeles, so they said they can send them to my house

17    on Saturday, I said fine, and what I got was one disk.

18    And being, maybe it's generational, but I have no clue to

19    how to download a disk from my house, so the disk is

20    still in the back of my car.

21      A    I understand.

22      Q    So I don't know that I have all the documents

23    you produced, and sort of as a clean up near the end I

24    may ask you some questions about that.  Did you --

25          MR. MITCHELL:  Can I interrupt one moment, and say a


12


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

 1    lot of the same materials you had for Pacheco's

 2    deposition would be the same one that Bonnie reviewed

 3    and, essentially, the same documents.

 4          MR. HEATHER:  What I may do, with your permission,

 5    is to say I'll, obviously, download it when I get back to

 6    my office and if there was something earth shattering

 7    maybe if we could ask about that over the phone.

URL098~1

8      MR. MITCHELL:  Either that or in writing.

9      MR. HEATHER:  All right.  Are you here as a

10   percipient witness or as an expert?

11      THE WITNESS:  Percipient witness.

12      MR. MITCHELL:  She's designated as both, a

13   percipient and expert.

14      MR. HEATHER:  Because I don't have her expert -- do

15   you have her expert designation?  Because I was going to

16   ask what areas she's been designated in.  She might not

17   know that off the top of her head.

18      MR. MITCHELL:  Per the court's order she is one of

19   the percipient expert witnesses who's not required to

20   issue an expert report because she's testifying to

21   opinions that are formed based upon her position as the

22   district attorney of San Diego.

23      MR. HEATHER:  But there aren't any particular areas

24   in which she's been designated.

25      MR. MITCHELL:  Particular areas?

13

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      MR. HEATHER:  For example, I took a sheriff's

2   deposition up in Orange County and he was an expert

3   witness and they identified what particular subjects he

4   was going to give expert testimony on.

5      MR. MITCHELL:  No.  She is an actual Defendant

6   intervener in these proceedings.

7      MR. HEATHER:  Okay.  All right.  I just want to make

8   sure I didn't miss a document and fail to ask and get

9   into waiver issues and things like that.  The only thing

10   I have is the amended notice.

URL098~1

11       MR. MITCHELL:  The deposition notice?

12       MR. HEATHER:  Yes.  I don't have any specific

13  designation that identifies the areas of expertise to

14  which she is expected to testify.

15       MR. MITCHELL:  Correct.  We had our initial

16  disclosures.

17       MR. HEATHER:  I understand that.

18       MR. MITCHELL:  Okay.

19  BY MR. HEATHER:

20       Q    San Diego, is it fair to say, has been

21  relatively creative in finding alternatives to

22  reincarceration; is that fair to say in your opinion?

23       A    Yes.

24       Q    Okay.  And I'm not going to overly test your

25  recollection.

                                                    14

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    That's good.  I'm over 50, so it's not very

2  good.

3       MR. HEATHER:  Okay.  I understand.  So let me do

4  this.  I've only got one extra copy of this, so I'm going

5  to show you a copy that's previously been marked as

6  Exhibit 4, and I forget the name of the witness, but it

7  was one of the sheriff's officials in this county, so why

8  don't I mark it as the first exhibit in your deposition.

9       THE WITNESS:  Okay.

10           (Plaintiff's Exhibit 1 was marked for

11           identification, the original of which is attached

12           hereto.)

13       MR. HEATHER:  And it lists some of the alternatives

                        Page 13

URL098~1

14    or some of the devices which are used to provide

15    alternatives to detention.

16    BY MR. HEATHER:

17        Q    Why don't you take a moment to review that.

18    The first question I want to ask you is whether you've

19    seen that before, but otherwise I'll ask you about the

20    substance and the contents.

21        A    I don't recall if I've seen this particular

22    exhibit.  I'm aware of the various programs and have seen

23    something that summarizes them, but I'm not sure if this

24    is the particular document.  And for the most part

25    they're alternatives to detention, which is different

15

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    than alternative sentences to incarceration.

2        Q    Okay.  Many of the things that are on Exhibit 1

3    are policies which allow the sheriff's department or

4    other law enforcement authorities to putting someone

5    under arrest in the first place; cite and release.

6        A    That's correct, as a result of a court ordered

7    cap.

8        Q    So San Diego is currently operating under a

9    population cap?

10        A    Yes.

11        Q    And to maintain legal compliance with that cap

12    the county employs various means, some of which are

13    listed on Exhibit 1; is that correct?

14        A    Yes.

15        Q    Okay.  Now, by the way, I don't mean by any of

16    my questions today to restrict your ability to say what

URL098~1

17  you think is responsive generally, so if my questions are

18  too narrow and you want to volunteer something, please do

19  that.  And I will get to what the other -- I will get to

20  what some of the other alternatives are, and if I forget

21  you remind me because I know they're important to your

22  sense of the administration of justice here.

23          Now, my recollection is when the

24  representatives from the sheriff's department testified

25  about these particular programs the testimony was that,

16

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1  at least in the view of the sheriff's department, these

2  programs had not had a negative impact on public safety.

3          Let me ask you, as the district attorney for

4  San Diego county, is it your view that these programs

5  have or have not had a negative impact on public safety?

6      A    These programs, for the most part, have had an

7  impact on public safety.  And with respect to the

8  sheriffs I believe it was Commander --

9      Q    Ingrassia?

10     A    Yeah.  Yes.  Excuse me.

11     Q    Have you reviewed his testimony?

12     A    I have.

13     Q    Did I fairly summarize the fact that he did

14  state --

15     A    He said he was not aware of any public safety

16  issues as a result of it.  His background is in, of

17  course, detentions, and my background, of course, is in

18  prosecution, and as a former judge having observed the

19  actual public safety impacts of these programs.  So I do

Page 15

URL098~1
20    believe that they have had a significant public safety

21    impact.

22        Q    And what has that impact been?

23        A    Number of things.  Number one, those that --

24    for felons, those that are released oftentimes don't

25    appear for their hearings, which then has the impact of

17

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    clogging up the court system, also they are out in the

2    community able to commit other crimes, and then when they

3    finally do get back in then it takes the resources,

4    additional resources, to process them through the system.

5        Q    I don't understand that.  Let me stop with that

6    first impact and explore it.

7             Someone is released and what hearing is it that

8    they fail to appear for?

9        A    Oftentimes the arraignment hearing.

10       Q    Okay.  These are individuals who may be

11    released and never arrested, in other words, cited and

12    released, for example?

13       A    Yes.

14       Q    Okay.

15       A    Most cited and released, though, would be

16    misdemeanors, but on felonies at the arraignment date

17    they would be issued an OR release.

18       Q    Okay.  But -- and I don't want to be overly

19    technical, and I don't have a clock.  I know that your

20    schedule is such that --

21       A    It's 11:25.

22       Q    You got to leave here a little bit before noon?
                         Page 16

URL098~1

23      A    Yes.  And then I'll be back.

24      Q    Are you willing to reconvene -- we're going to

25   start at noon with your deputy, I guess, would you be

18

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1   willing to continue with the deposition this afternoon?

2      A    Yes.

3      Q    Okay.  Because it will give us a chance to get

4   into these things in a little more depth than if I knew I

5   only had 20 minutes to finish the whole thing.

6           Let me go back and see if I can recall where I

7   was trying to focus, which is I thought you had said that

8   the arraignment was the procedure at which you were

9   concerned people who were released would not appear, but

10   if I heard you correctly just now you said it would be

11   the arraignment at which they would be given an OR.  So

12   those are inconsistent.

13      A    I think you're right.  I think I meant the

14   misdemeanor cite and release is where they wouldn't

15   appear, and in the felony --

16      Q    Because you said felons.

17      A    I did say felons.  Because the felonies,

18   generally the reason why they don't appear is because the

19   bail is set at a low amount and able to bail out from the

20   jail in which case they don't appear at the arraignment.

21           But, generally, if they're in custody felons go

22   to arraignment and receive either an OR release or a

23   pretrial supervised OR release, then they oftentimes do

24   not appear at the next hearing, which would be, in most

25   cases, the readiness conference or the preliminary

URL098~1

19

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1    hearing.

2        Q    Now, failure to appear, generally speaking, is

3    something which is true throughout the criminal justice

4    system, for example, people get parking tickets and don't

5    pay them?

6        A    Yes.

7        Q    And people are given traffic violations and

8    told to appear unless they pay their ticket.

9            In many cases and they don't appear, correct?

10       A    I don't know if it's many, but I know that

11   there are some that do that, yes.

12       Q    So it's not surprising in some cases that you

13   would have people with a misdemeanor who are not

14   appearing for a hearing?

15       A    Well, I wouldn't put infractions like speeding

16   in the same category as a misdemeanor.

17       Q    Okay.  Let me explore this.  What percentage of

18   persons cited and released with misdemeanors fail to

19   appear?  Can you give me statistics?

20       A    I can't give you statistics.  I'm not sure we

21   could retrieve them, either.  I don't know that.  The

22   court system might have them, but I don't know that we

23   would have them.

24       Q    I'm just trying to discover what information --

25   and I would ask your counsel should you prepare for trial

20

Page 18

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    testimony, if you're going to testify at trial and you do

2    learn this information, I would ask that you let me know

3    what it is.

4        A    Certainly.

5        Q    And if you can.  If you find there are such --

6    do you know how many misdemeanor citations there are in

7    San Diego County in a year, say, in 2007?

8        A    No, I don't.  But I do know --

9        Q    Ballpark.

10       A    I know judicial counsel prepares reports, I

11   think, that reflect the numbers, so that is achievable, I

12   think.

13       Q    Okay.

14       A    But a lot of my testimony is based on my

15   experience as, you know, being on the bench.  Part of

16   what I handled were traffic DUIs, for instance, so I saw

17   those people come and go frequently.  Not just DUIs but

18   driving with a suspended license, those are two big areas

19   where people are cited and released, and I have the

20   experience of having seen them over and over again.

21       Q    Okay.  And that goes back to how far?

22       A    1994 or '95.

23       Q    When did the population cap go into effect, do

24   you recall?

25       A    I believe it was 1980.


21


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1        Q    Okay.  Now, in addition to the impacts that you

2    just talked about are there any other negative impacts

3    from these programs that you can think of?

URL098~1

4       A    Well, recidivism.  That's the key issue.

5       Q    Okay.  Before I get that let me just finish

6    with the felon OR release statistics and ask you the same

7    questions.

8            Do you know how many felons have failed to

9    appear following an OR release in any given time frame or

10   would your answer be the same as it was for cite and

11   release misdemeanors?

12      A    I think it would just be based on my experience

13   that there were great numbers of them that failed to

14   appear.

15      Q    Okay.

16      A    Especially if they were drug users.

17      Q    Okay.  But you don't know the facts?

18      A    Well --

19   MS. SNYDER:  Objection, argumentative.

20       THE WITNESS:  I do know the facts, but I don't know

21   the statistics.

22   BY MR. HEATHER:

23      Q    And your facts are based on something that is

24   now 14 years old?

25       MR. MITCHELL:  Misstates her testimony.

22

1            MR. HEATHER:  Let me rephrase it.

2    BY MR. HEATHER:

3       Q    Your sense of the facts -- and I didn't mean to

4    be argumentative about the facts.  The number of the

5    felons that are OR'd, the number that failed to further

6    appear, those precise facts are facts you can't tell me?

URL098~1

7      Like there are approximately 10,000 ORs per year in

8      San Diego County and there are approximately X amount of

9      failures to further appear, that's what I want to

10     establish on the record.

11             You can't say?

12         MS. SNYDER:  Objection, compound.

13     BY MR. HEATHER:

14     Q      Do you understand?

15     A      Well, no --

16     Q      I'll break it down.

17     A      That would be good.

18     Q      How many felons were OR'd at arraignment last

19     year?

20     A      I don't know that, but we could probably get a

21     number.

22     Q      And I don't want to --

23     A      I don't know if it's available.

24     Q      I don't want to prolong this process by saying

25     do you know how many yesterday, last month, for whatever

23

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      period of time I would give you, your answer would be the

2      same; is that fair to say?  Whether I asked you

3      five-month period or one-month period or last week or

4      last month your answer would be, "I don't know that but I

5      might be able to get it"?

6      A      Well, I don't want to speculate on what you're

7      going to ask me.

8      Q      Well, last month do you know how many OR --

9      A      Well, if the question is OR releases within

Page 21

URL098~1

10    that period of time I would not be able to tell you the

11    exact number without checking the computer programming

12    or --

13         Q    That's all I'm asking.

14         A    -- with the various entities.

15         Q    And I take it you couldn't comfortably

16    approximate the number?  In other words, you wouldn't

17    feel comfortable, because if you can approximate the

18    number, please do.

19         A    I don't feel comfortable approximating.

20         Q    Okay.  And is it true that you wouldn't feel

21    comfortable approximating and you don't know how many of

22    those felons who were OR released failed to further

23    appear in whatever time period I would give you, the same

24    ones we've just talked about, last month, last week, last

25    year?

24

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

 1         A    No.  But I do have a sense based on my

 2    experience that it is often that OR felons don't appear.

 3         Q    Okay.  I don't question that that's your sense.

 4    I have the obligation to test the underlying facts on

 5    which that sense is based, and I take it it's from your

 6    experience as a judge and whatever else you may have

 7    learned in discussions, but you haven't seen -- you don't

 8    recall seeing papers which provide the specific precise

 9    information in that regard?

10         MR. MITCHELL:  Object to that as vague.  By "papers"

11    you mean studies of recidivism?

12         MR. HEATHER:  Anything.  Any document.  Any concrete

URL098~1

13    piece of evidence that is producible.

14         THE WITNESS:  I don't believe any reports are

15    currently developed that show how many felons received OR

16    and then failed to appear.  Although, there may be some

17    tracking, and I tried to get it but was not able to

18    today, with the pretrial services, which is an arm of the

19    court that does qualification for supervised OR, and they

20    may study those that they give the OR, supervised OR and

21    those that returned or violated the terms of their OR.

22    BY MR. HEATHER:

23         Q    Okay.  And I want to move onto the key issue,

24    which you identified, but let me just ask this:  I

25    believe you said that these failures to appear clog the

25

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    court system and, again, I don't mean to play word games,

2    but if someone isn't in the court system because they

3    failed to appear how does that clog the system?

4         A    Anytime you don't do a case in a timely manner

5    it has an impact on the system.  That's why the judicial

6    counsel has developed for misdemeanors a certain length

7    of time that disposition should occur in, and with

8    felonies the same thing.  And when somebody fails to

9    appear witnesses are then oftentimes left hanging,

10    officers, cases change, you know, all those things.

11         So it has -- and then when that person appears

12    then it adds to because usually how they appear is by way

13    -- they're arrested and then brought into court and,

14    therefore, they are like an add-on to the court, which is

15    an unexpected event.

Page 23

URL098~1

16      Q    Okay.  Now, I think you said that the biggest
17  negative impact from the programs that are on Exhibit 1
18  is recidivism.
19          That's the key issue?
20      A    Yes.
21      Q    Okay.  Let me ask you this:  Do you know what
22  the recidivism rate is -- has been in the State of
23  California?
24      A    For what?  The prison system?
25      Q    Let's take that.

26

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1       A    I believe currently it's 70 percent reoffend
2   within the first three years.
3       Q    Okay.  What about for the LA County jail system
4   -- I'm sorry -- San Diego County jail system?
5       A    They don't have I don't think currently
6   anything that shows statistics, although I did try and
7   look at our statistics with respect to cases that came
8   in, and I only did this from 2003 to date, where somebody
9   came in with a case and then subsequently had additional
10  cases, and that rate was 26 percent.
11      Q    Okay.  Let me make sure I understand.
12          You tried to look at individuals who have
13  records in San Diego County and then are rearrested on
14  new crimes?
15      A    Yes.
16      Q    Okay.
17      A    So someone comes in after 2003 -- this is the
18  period since I've been the district attorney.  Someone

URL098~1

19    comes in with a case, it's time stamped, they have a

20    case, and it goes through the system.

21        Q    So they're in for burglary January 1, 2004,

22    okay?

23        A    And then I ask them to look at those cases that

24    came after that with respect to each --

25        Q    That same person?

27

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1        A    Yes.  Although I'm not sure if it's -- yes.  It

2    is that -- I'm pretty sure it's that same person.  So as

3    a result of those over the period of time from 2003 to

4    the current it was 26 percent.

5        Q    Okay.  So if I understand you correctly, of

6    those individuals who had cases commencing on or after

7    approximately January 1, 2003, whatever the day is, the

8    percentage of those individuals who were found to have

9    had a subsequent case against them, a second --

10        A    Or third.

11        Q    -- or third case was approximately 20 --

12        A    Six percent.

13        Q    26 percent.  Now, of that 26 percent -- well,

14    let me rephrase this.

15            Since 2003, in light of the population cap in

16    San Diego County, regardless of whether someone is

17    eligible for OR release or cite and release or one of the

18    means to avoid detention and the impact on the population

19    cap, of those individuals who are ultimately convicted of

20    crimes and sentenced, has there been a necessity to give

21    early release to all such sentenced individuals in

Page 25

URL098~1

22    San Diego County in order to comply with the population

23    cap?

24         MS. SNYDER:  Objection, calls for speculation.

25         THE WITNESS:  I'm not sure I understand that

28

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

D

1    question.  Can you break it down a little bit for me?

2         MS. SNYDER:  I was also confused as to which cap

3    you're referring to.

4         THE WITNESS:  Can I explain some of these programs

5    and how they impact the cap and that sort of thing or --

6    BY MR. HEATHER:

7         Q    Yeah.  But, you know, since we're going to

8    reconvene why don't I defer that, because you said the

9    key issue is recidivism.  So I'm trying to deal with that

10   first and then you absolutely before we conclude can take

11   · whatever time you want and go through that list and say

12   whatever you want.  But I'd like to try to get some sense

13   of your position on recidivism, and I'm doing it in an

14   indirect way.  I'll try one more time and if not I'll

15   give a better hint at what I'm trying to get at.

16        A    Okay.

17        Q    In San Diego County following conviction and

18   sentencing is there a percentage of time, generally, that

19   people serve as opposed to a hundred percent of the

20   sentence time so as to comply with the population cap?

21        A    Yes.

22        Q    Okay.

23        MR. HEATHER:  were you going to put an objection?

24        MR. MITCHELL:  I just want to object because it's

Page 26

URL098~1

25    not clear right here if you're applying both to felonies

29

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
 1    or misdemeanors or one or the other, and if you could

 2    clarify.

 3        MR. HEATHER:  I'm not going to clarify that.  It's

 4    not -- if I meant to be precise I would make it precise.

 5    I don't have to make it precise, and she understands the

 6    question.

 7        MR. MITCHELL:  Yes, she does.

 8        THE WITNESS:  I do.  So there is a formula that has

 9    been developed by the courts, as well as through

10    legislation, for credits for each person that is in local

11    custody as well as in state custody.  But locally for

12    misdemeanors and felons one of the things that was

13    developed was the 10 percent sheriff kick-out, basically.

14    BY MR. HEATHER:

15        Q    That's on Exhibit 1?

16        A    That's on Exhibit --

17        Q    Exhibit 1.

18        A    Yes.  Exhibit 1.  And there's also 4019

19    credits, and I'm not sure what other credits.  But the

20    court has, and from my experience I've seen this and I

21    know it still exists, the court can look at a formula

22    that will say if somebody gets 90 days this is what they

23    actually spend in custody.

24        Q    Okay.

25        A    And that is based on some of these programs,

Page 27

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    some of the legislative programs, which were a result of,

2    I think, overcrowding as well that were developed.

3         Q    Okay.  Now, to put this in perspective and,

4    again, if I recall correctly, I think the testimony in LA

5    County was that men serve approximately 70 percent of

6    their time in the LA county jails, this is on an average,

7    women 10 percent.

8            Do you know approximately what percent -- can

9    you give me whatever the appropriate percentages are for

10   San Diego County?

11        A    No.

12        Q    Okay.

13        A    I hope to have the formula for you after lunch,

14   though.

15        Q    Okay.

16        A    But it, you know, it's significant.  I know

17   that as a judge one of the things we looked at was that

18   sometimes it didn't make sense to sentence somebody to 90

19   days, for instance, because they wouldn't do very much of

20   the 90 days.

21        Q    Okay.  Now, when did those -- when did those

22   programs go into effect?  What I'm really asking is --

23            (Discussion off the record)

24        THE WITNESS:  I think you were asking since when

25   did --

31

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    BY MR. HEATHER:

URL098~1

2        Q    Yeah.  Did these credits, these means by which

3    people serve only a portion of their sentence, do you

4    know whether or not they were developed in response to

5    the population cap issues?

6        MS. SNYDER:  That's for jails?

7        MR. HEATHER:  I'm only here talking about San Diego

8    County jails.  I'm not talking about the state prison

9    system.  So can I stipulate unless otherwise specified my

10   questions relate solely to the jail system in San Diego

11   County?

12       MR. MITCHELL:  That's fine.

13       THE WITNESS:  Okay.

14       MS. SNYDER:  That's fine.

15       THE WITNESS:  At any rate, I don't know -- I know

16   that our -- the lawsuit, I think, was around 1980, and

17   some of those things are a result of that, but I think

18   legislation --

19   BY MR. HEATHER:

20       Q    Some of it may have preexisted?

21       A    It may or it may have come after.  I think some

22   of these programs were developed after 1980, but not

23   necessarily 1980 -- I couldn't tell you the dates within

24   the time frame up to today's date when they were each

25   implemented.

32

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Q    Okay.  Now, the reason it -- I know what does

2    this have to do with recidivism, but here's my question:

3    Do you know what the recidivism rate for San Diego County

4    was prior to 1980, prior to the issuance of the

URL098~1

5    population cap?

6        A    I do not.

7        Q    Do you have any basis on which to state or

8    opine whether the recidivism rate in San Diego County was

9    greater prior to 1980 than it has been after?

10       A    No.

11       Q    Okay.  Now, I assure you, by the way, there are

12   two things I would like to get to today.  I will get to

13   these alternative programs that you mentioned early and I

14   will get to your opinion about these programs, so I

15   wanted to put your mind at ease while I continue.  With

16   regard to recidivism if someone -- I'm sorry?

17       MR. MITCHELL:  It's okay.

18       THE WITNESS:  I was --

19   BY MR. HEATHER:

20       Q    With regard to recidivism, it's fair to say

21   whether someone is early released or not that a good

22   number of people who are arrested for crimes are going to

23   recidivate, is that a term?  Is that the right word?  Or

24   commit new crimes.  Let me rephrase it.

25            Do you have any statistics to show whether

33

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    there is a difference in the recidivism rate between

2    those who serve out a full sentence for a particular

3    crime as opposed to those who commit the same crime and

4    are released early?

5        A    I'm still not sure I understand.  I do know

6    from my experience that those that are released early

7    oftentimes recidivate.

Page 30

URL098~1

8      Q     Okay.  Do you have any evidence that shows that
9   those who were not released early do not recidivate?
10      A     I think there are studies that show that
11   incarceration is an effective tool for deterrents as well
12   as punishment and that it does have an impact.  For
13   instance, there are studies, I think, that show in DUIs
14   that just a short period of time in custody for most DUI
15   first time offenders is effective because it is that
16   wake-up call that makes them not reoffend.

17          And then there are those who come back again
18   who tend to have a substance abuse problem, an alcohol
19   problem, and those are the people that will tend to come
20   back again if not treated properly.

21      Q     Okay.  Other than that do you have any other
22   basis to -- see, but that didn't answer my question
23   because you're talking about a short period of
24   incarceration for DUI, so my question really was not
25   comparing those who may be incarcerated to those who were

34

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1   not incarcerated, but do you have any statistics which
2   tell you what the difference in recidivism rate is, if
3   any, between individuals who serve the full-time that
4   they are sentenced to as opposed to individuals who
5   commit the same crime but who are subsequently released
6   early?

7          In other words, can you say in San Diego County
8   those who serve out their full sentence for burglary have
9   a recidivism rate of 14 percent and those who are
10   released early have a recidivism rate of two percent and

URL098~1

11    that's why we end up with the average of 22 percent, but

12    there's a demonstrated track difference in recidivism

13    rate that compares doing all the time with being released

14    early?  I'm just asking if you know of any such --

15         MR. MITCHELL:  I'm going to object as compound.

16    That was two or three questions.

17         MR. HEATHER:  Do you understand what I'm asking?

18         THE WITNESS:  I think, but I don't think that I can

19    answer that question because even though there may not be

20    studies it certainly is the case that when you set

21    parameters for anyone to hold them accountable if, in

22    fact, you say it's going to be 60 days and they don't get

23    that 60 days then they know that they can get away with

24    it and it's not an effective tool to change their

25    behavior.

35

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1         I saw in the juvenile court there was a

2    tendency in the juvenile court to be very lenient on the

3    first offense and then progressively stronger as the

4    juvenile came back.  I reversed it and those that came in

5    the time period that I was there we reversed that to give

6    them a stronger sentence up front and as a result of that

7    it stopped the behavior or lessoned the behavior because

8    they took it seriously.

9         It's like parenting.  If you set the parameters

10    and you don't follow through with them then kids know

11    they can get away with it and they're going to continue

12    to do things that are going to, you know, push the

13    envelope, so to speak.

URL098~1

14          So when you ask about these studies, and I've
15     seen it, in my experience in the courts as well, and in
16     the drug court is the best indicator of how holding
17     people accountable and giving them the actual time as
18     opposed to setting a time and getting released early.
19          The drug courts are about 70 percent successful
20     and part of that success is because they actually do the
21     time by agreement that you give them.  They don't get
22     those credits.  So if you -- if they test positive and
23     you give them a weekend they actually serve the whole
24     weekend.  If you give them 10 days they actually serve
25     the whole 10 days.  And it has been very effective at

36

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1      getting them clean and sober and productive.

2          On the other hand, I have been on the bench
3     where you give somebody a sentence that doesn't come
4     through drug court, for instance, and you give them 90
5     days and it's not really 90 days and they choose to do
6     that because they know that they can go without drugs for
7     that very short window of time that really isn't 90 days
8     and they continue to use drugs and come back through the
9     system.

10     Q     Okay.  So if you have such statistics I would
11     appreciate you providing them to me.

12          And other than in the drug court situation do
13     you know of whether or not there are comparative studies
14     of the recidivism rate between those who do all the time
15     and those who are released early?

16     A     I think there are some studies that show that
                          Page 33

URL098~1

17    incarceration is an effective deterrent.  I would have to

18    look to see.

19        Q    Just so I'm clear, I'm not asking for studies

20    about the value of incarceration, I'm not asking for

21    generalized studies, and I don't mean to demean what you

22    said, but I'm not asking you about whether it's effective

23    with juveniles to give a harsh sentence early or lenient

24    sentence early.  I'm not interested in that policy

25    debate.

37

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        what I'm asking you is whether or not whatever

2    sentence is given for any particular crime, and you have

3    mentioned the drug situation, for any other crimes can

4    you tell me if there's a difference in the recidivism

5    rate for those who serve all of their time as opposed to

6    those who were released early?  That's all I'm trying to

7    get at.

8            Not whether or not releasing early is a good

9    idea, but whether there are hard and fast statistics that

10    say people who are convicted of burglary, for example, in

11    San Diego County, if they give 90 days and do 90 days the

12    recidivism rate is 10 percent and we did a study and

13    found that those convicted of burglary during the same

14    time period, if they were given 90 days but knew they

15    only had to do 60 their recidivism rate was much higher.

16            That's what I'm asking, whether there are any

17    such statistics.  Now, I suspect there aren't, obviously,

18    if there are I would like to see them.  That's all I'm

19    asking.

URL098~1

20       A    I would disagree with your policy question,

21   though, that those studies that show that incarceration

22   is a deterrent and punishment do go to the heart of what

23   you're asking because if you don't follow through on the

24   incarceration I think it waters down the effort, sends

25   the wrong message, and does, in fact, change the dynamic

38

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   of how much you give and how much you get less of.

2       But if -- and there are, I do believe, some

3   studies, and I don't know if it's recidivism but LA, in

4   their release periods, I think showed a significant

5   increase in those that came back through the system, but

6   I would have to look at the study that I looked at.  But

7   I don't know of any statistics or any study that anyone

8   has undergone to determine that.

9       But I think it's fair to say that even with

10   these lower level crimes that are local custody we have

11   seen that people come back several times over and over,

12   which is why they end up in prison to begin with.

13       Q    Right.  And, again, I'm not trying to deprive

14   you of the ability to testify about what you just said or

15   for purposes of this question try to disagree with you,

16   all I'm simply saying is assuming for the purpose of

17   these questions that what you say is true, what I want to

18   know is are there any measurements specifically and

19   precisely to tell me what that difference is.  That's all

20   I'm really asking.

21       In other words, my position is if you do all

22   the time you have a lower recidivism rate than if you

Page 35

URL098~1

23    know you can get out early, and I understand that's your

24    position.  I'm not arguing with that.

25              I'm saying do you know a hard and fast

39

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    statistic other than anecdotal evidence to show me what

2    these differences are?

3         MR. MITCHELL:  And I object as asked and answered.

4    She had mentioned an LA study that she would have to look

5    at to make sure that that's what she's talking about.

6         MR. HEATHER:  Counsel, you stipulated all my

7    questions, unless otherwise specified, were San Diego

8    jails.  I don't care about LA right now.

9         MR. MITCHELL:  She said she had a study that looked

10   at recidivism rates.

11        MR. HEATHER:  There is no such LA --

12        THE WITNESS:  Counsel, can we stop arguing so I can

13   go to lunch?

14        MR. HEATHER:  Thank you.  Off the record.

15              (Lunch recess)

16

17

18

19

20

21

22

23

24

25

Page 36

URL098~1

40

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
San Diego, California, Monday, October 6, 2008

1

2          (Afternoon session)

3

4   BY MR. HEATHER:

5       Q    I'm going to sort of transition now,

6   Ms. Dumonis.

7            That is the correct pronunciation?

8       A    Yes.

9       Q    To discussing SB 318 with you.

10      A    618.

11      Q    618, I'm sorry.  And in doing that can we use

12   what we marked as -- why don't I identify as having been

13   marked, it's Rodriguez?

14      A    Lisa Rodriguez.

15      MS. SNYDER:  You could just say Exhibit 1 from the

16   Rodriguez.

17   BY MR. HEATHER:

18      Q    What's been marked as Exhibit 1 from the

19   Rodriguez deposition and Exhibit 2, but I'm going to

20   start with Exhibit 1.  And, you know, I don't -- I want

21   you to take whatever time you need to in this exhibit to

22   look at it, if I ask you some questions, but I just want

23   to ask you some background questions that I know, as

24   usual, will sound overphilosophic, but I won't belabor

25   it.  And what I'm going to ask you about are some things

41

URL098~1

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    that appear on the bottom half of page 9 through page 13.

2         would you like to take a moment just to review

3    that so it's fresh in your mind?

4         A    How far over are we going?

5         Q    The last thing would be at the bottom of page

6    13.

7         A    Okay.

8         Q    You don't have to read it, but I can take it

9    sort of paragraph by paragraph.

10        A    well, let me just take a glance at it, anyway.

11   I've looked at nine and 10, so let's start there and --

12        Q    Do you want to start there and if you like I

13   can ask you some specific things and if you want to take

14   more time -- I'm not going to -- hopefully I won't be too

15   long on this, but first question I'm going to ask you is

16   that this -- first of all, I understand I'm talking with

17   the person who is responsible for having conceived,

18   really, and contributed significantly to implementing SB

19   618, correct?

20        A    It was a team effort.

21        Q    But you played an important role in the

22   process?

23        A    Yes.

24        Q    And you believed in the program?

25        A    And I still believe in the program.

42

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1         Q    And you still believe in the program.  And

2    before I ask you to describe however you feel most

URL098~1

3   comfortable what you believe the benefits and purposes

4   and progress of the program is, which I will do and let

5   you describe in your own words, I do want to explore a

6   little bit of the background that's at least in this

7   particular study and ask you first, what is SANDAG?

8        A   San Diego Association -- I can't give you the

9   -- does it say on the book?

10       Q   I'm not trying to trick you, so I will tell you

11   I don't know.  Putting aside what the acronym stands for,

12   is it a group of agencies that work together or --

13       A   Yes.  It is a group of agencies that is like a

14   clearing house for information on various things, one of

15   which is criminal justice statistics, studies, they have

16   PhDs, and people that do studies.  I can't think of the

17   word right now.  And they have --

18       Q   Research analysis?

19       A   Research analysts, that's it.  A function of it

20   is transportation of the population, those sorts of

21   things, and then there's another system that falls under

22   SANDAG is Argis, A-r-g-i-s, System, which is a system

23   where all 10 law enforcement agencies in the community

24   input their criminal justice statistics.

25       Q   Okay.  From the face of this report it appears


43

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   that what's been marked as Exhibit 1 to the Rodriguez

2   deposition, and I'll just refer to it from now on as

3   Exhibit 1 and 2 because I'm not going to talk anymore

4   right now, unless we identify it, to Exhibit 1 to your

5   deposition.

URL098~1

6     A    Okay.

7     Q    So is an evaluation report on the SB 618

8    program; is that correct?

9     A    Yes.

10     Q    Who asked them to do this?

11     MS. SNYDER:  Objection.  Calls for speculation,

12    lacks foundation.

13     THE WITNESS:  It was part of the design of SB 618 to

14    have an evaluation component, and we can -- I'm not sure

15    if we contract it, but we're the ones that requested

16    SANDAG be the one because they have a research and

17    evaluation component.

18    BY MR. HEATHER:

19     Q    Okay.  Now, when you said "we" in that answer

20    you mean the district attorney's office or the group of

21    agencies that are involved in implementing 618?

22     A    It was a consensus.

23     Q    Okay.  And have you reviewed this report

24    before?

25     A    When it originally came out, yes.

44

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     Q    Okay.  Part of the background in the pages that

2    I asked you to look at, as I understand it, the report

3    addresses first the sense that the prison population has

4    increased significantly in California over the years for

5    whatever reasons.

6          Do you agree with that?

7     A    Yes.

8     Q    Okay.  Now, the increase in population has been

Page 40

URL098~1

9     coupled, at least according to the report, with certain

10    policy shifts within the criminal justice system, and

11    they identify, as I read the report, two such policy

12    shifts.  The first of which appears at the bottom of page

13    10 where they say that policy shifts that occurred as a

14    result were the implementation of stiffer penalties as

15    punishment rather than rehabilitation.

16          Do you agree that over the years there has been

17    more of a focus on punishment and less of a focus on

18    rehabilitation in part because of increased population

19    and its strain on rehabilitative resources?

20    A     Well, I think what has happened is there was a

21    shift in the pendulum in the criminal justice system.

22    There was a focus on rehabilitation prior to this shift

23    that was not successful, and as it wasn't successful and

24    people offended and offended violently and more

25    frequently then I think the political will, if you will,

45

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     of the people of the State of California was to get

2     tougher on those crimes that were being committed, as

3     well as concern that people were being let out of prison

4     too early, because part of that shift early on was to

5     give so many credits that people were getting out early

6     for good time credits, which, in essence, was breathing

7     in the prisons, and so the pendulum began to swing the

8     other way.

9           And as it did penalties, primarily in the areas

10    of violent crimes, began to get stiffer along the way.

11          And to include the three strikes, which was two

Page 41

URL098~1
12    strikes serious and violent and the final one none

13    serious. And so I think that that -- that the

14    punishments did get tougher, but I don't think that the

15    population increase in California is really much more

16    than the increase in the population as a whole in

17    California, and I think as you look at all the other

18    states you see that California does not have a

19    significantly higher population for the population that

20    it reflects than anyone else in the other states.

21        Q    You meant to say not as significantly higher

22    prison population, right? You said it doesn't have a

23    significantly higher population than the population in

24    higher states.

25            Did you mean to say it didn't have a

46

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376
1    significantly higher prison population?

2        A    When you compare the population to the

3    population at large in each state it reflects, roughly,

4    California's is no higher than most states.

5        Q    Okay. The report on the top of page 11, the

6    second paragraph, it begins "According to experts" --

7    well, it actually begins in the first paragraph. The

8    second shift, which this report identifies, is that there

9    was a change from indeterminate sentencing to determinate

10    sentencing, and in the second paragraph it states that

11    according to experts in the field under indeterminate

12    sentencing --

13        A    De-emphasizing rehabilitation.

14        Q    Correct. And in the third paragraph it

Page 42

URL098~1

15    concludes that these two related policy shifts,

16    de-emphasizing rehabilitation and determinate sentencing,

17    themselves contributed to the rise in prison population

18    because of the rise in the number of individuals

19    returning to prison either after not successfully

20    reintegrating into society and committing a new offense

21    or because of a technical violation while under parole

22    supervision.

23        Do you agree with that statement?

24    A    That was too many statements in there.

25    Q    Let me just ask you, then, the first sentence

47

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    on paragraph three that begins "These two related policy

2    shifts also led to a third factor that increased prison

3    population," namely recidivism.

4        Do you agree with the sentence?

5    A    Yes and no.

6    Q    Okay.  How do you agree with that?

7    A    Yes, I believe that de-emphasizing

8    rehabilitation and determinate sentencing added to the

9    prison population for a period of time, but because we

10   ended up locking up the most violent and serious

11   criminals then what I believe happened is that the

12   numbers were more reflective of the population at large.

13       So, in other words, I think with the three

14   strikes in particular we saw a significant drop in the

15   crime rate and so we had for a period of time, as three

16   strikes was implemented, an increase in the number of

17   violent criminals, but because they're being sentenced

Page 43

URL098~1

18    for a longer period of time there was no additional

19    increase.

20         In fact, now three strikes cases are sort of on

21    the decline because I think we've got many of those who

22    -- repeat offenders in prison right now.  I do think,

23    though, that in addition rehabilitation and the lack

24    thereof within the prison system, although there is some

25    treatment available, it's very limited, and there has

48

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    been a decline in the use of those programs because of

2    the budget issues and the reflection of the change.  I do

3    think that that also --

4         Q    The change you're referring to is just --

5    it's --

6         A    The policy shift.

7         Q    Punished, not rehabilitated, coupled with

8    budget constraints?

9         A    Right.  And because of that those that are

10   coming out of prison do not have any tools and there is

11   very little ability for parole to monitor them because of

12   budget issues, as well, and so, therefore, they're not

13   getting much support in their reintegration into the

14   community and, therefore, they are ending up --

15        Q    Recidivating?

16        A    Recidivating.

17        Q    Recidivating, by the way, can be through one of

18   two general means:  Committing a new crime or parole

19   violation, which may not get the commission of the new

20   crime; is that correct?

URL098~1

21      A     Well, that's one -- part of the problem with

22   defining recidivism, I think, is many people use

23   different terms and there are different ways when we're

24   talking about studies for recidivism.

25            It would be difficult because you have whether

49

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   or not it's committing a new crime, being arrested for a

2   new crime, violating a term of probation, whether it's

3   the police agency data, the prosecution data, you know,

4   there's a lot of different variations as to what people

5   use in terms of recidivate, and so it's difficult, but if

6   you could go back to the question let's not use

7   "recidivate" but define what you mean and --

8      Q     Well, I was simply -- I guess to pick up on

9   your point I think all I need to ask is if someone says

10   that the recidivism rate for a particular jurisdiction is

11   X, that number alone, unless you know how they define

12   recidivism, won't tell you what percentage of that

13   recidivist population is from the commission of new

14   crimes because the figure may include other violations.

15            Is that correct?

16      A     No.  Our records, a copy of which just the --

17   we pulled out some statistics for you, they do not

18   reflect violations of parole.

19      Q     Okay.

20      A     That would be a function -- so, in other words,

21   those that you are saying are technical would not be

22   reflected for --

23      Q     In your statistics?

Page 45

URL098~1

24    A    -- for parole statistics in these statistics.

25    And, in fact, it's broken out here.


50


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Q    Should we mark this?  Because I notice you're

2    looking at this now.

3    MR. HEATHER:  So why don't we mark this for the

4    record as Exhibit 2 to your deposition.

5         (Plaintiff's Exhibit 2 was marked for

6         identification, the original of which is attached

7         hereto.)

8    THE WITNESS:  Okay.

9    MR. HEATHER:  Off the record.

10        (Pause in the proceedings)

11   MR. HEATHER:  Back on the record.

12   THE WITNESS:  Here it says total number of

13   defendants -- total defendants timestamped since 2003.

14   That's an offense that occurred sometime, you know, they

15   were in -- had an offense in 2003.  Total distinct

16   defendant timestamped since then, so they had another

17   conviction since then or were considered -- not a

18   conviction, were considered since then would be 209,386.

19   Total defendants issued since 2003 would be 264,000 --

20   BY MR. HEATHER:

21   Q    What does that mean, "issued"?

22   A    That would be the beginning process of the

23   criminal procedure, a document either a complaint or

24   indictment.

25   Q    You know what, I'm sorry.  The "timestamped"

URL098~1

51

1    means arrested or what does that --

2        A    It's just a term that's used so that it's

3    saying that they were in the system with a conviction.

4        Q    With a conviction?

5        A    Yes.

6        Q    Okay.

7        A    And along -- after that -- so after that they

8    had more committed.

9        Q    So the 209 is the number of individuals since

10   2003, and those 209,000 individuals committed a total of

11   331,000 crimes.  Is that what it means?  In other words,

12   there's some repeat offenders in that first -- otherwise

13   I don't know what "distinct defendants" means.

14       A    Distinct defendants timestamped since then

15   means repeat offenders.

16       Q    Okay.  So 209,000 people have been charged for

17   a total of 331,000 crimes?

18       A    I know.  It's confusing.

19       Q    I'm not trying to be difficult.

20       A    I know.  I had to have it explained to me, too.

21       Q    Just take it from the time again.  Total

22   defendants timestamped, people came in with convictions,

23   since 2003.  I get that.  Total number of people

24   convicted since 2003.

25            Now, total distinct defendants since 2003, 209,

52

1    what's the difference?

URL098~1

```
 2     A    You know what, I think it would be easier,
 3   don't pay attention to that for a moment.
 4     Q    Okay.  I'll disregard that.
 5     A    Total distinct defendants issued since 2003.
 6   So the total defendant to number of cases that we filed a
 7   criminal complaint on was 264,453.
 8     Q    Okay.
 9     A    And of those cases by distinct defendant,
10   sometimes there are codefendants involved, that sort of
11   thing.
12     Q    Okay.
13     A    So individual defendants would be 175,655.
14     Q    Now I know why I didn't become a mathematician.
15   Okay.
16     A    Well, I think if you just looked at the
17   recidivism rates it might be helpful a little bit.
18     Q    That's where we need to go.  So take me down
19   there.
20     A    Booking recidivism rate was 33 percent.  What
21   that means is they were booked in subsequently to the
22   original case.
23     Q    After they were first convicted?
24     A    Yes.
25     Q    That's definitely understandable.
```

53

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
```
 1     A    Issuing recidivism rate means 26 percent of
 2   those 33 percent of the overall we actually filed
 3   criminal charges on.
 4     Q    Okay.  The booking arrest, the other is being
```

URL098~1

5    filings?

6        A    Yes.

7        Q    Okay.

8        A    And then --

9        Q    Case issuing recidivism rate 52 percent, what

10   does that mean?

11       A    I'm not sure, to tell you the truth.

12       Q    All right.  I get the basic picture that I

13   think what you told me this morning was you thought that

14   the local recidivism rate was about 26 percent, this

15   reflects that.  If you take it from charging -- and the

16   conviction rate in your office is what?

17       A    94 percent.

18       Q    Okay.  Then this substantiates that.  And the

19   precise meaning of all that?

20       A    I'll have to --

21       Q    we'll leave that alone.

22       A    I confused you more than it was -- I was trying

23   ·  to help.

24       Q    The effort was important, and we at least got

25   the substantiation of the figure.  So fair enough.  Let

54

1   me go back to this report.  And thank you for taking the

2   time to provide that.

3        If you look at page 12 it begins to sort of

4   build a bridge between the way things have been and where

5   you hope to go in SB 618, at least that's how I read it,

6   and it cites a quote from a 2003 report by the Little

7   Hoover Commission that states that "California's parole

URL098~1

8      system is a billion-dollar failure."

9              Now, putting aside what you're trying to do

10     with SB 618, do you agree with that statement?  I know

11     you can't qualify the figure, but do you think the parole

12     system has been broken up in your efforts to sort of work

13     with SB 618?

14     A      No.  I can't say that it's broken.  There are

15     certainly flaws in the system.

16     Q      And what are the flaws?

17     A      The lack of programs within the prisons.

18     Q      What about the parole side, post release?

19     A      Post release?

20     Q      Flaws.

21     A      The lack of ability of each parole agent to be

22     able to supervise because their case loads are too high

23     to actually supervise.  The lack of funding to provide

24     the programming that is necessary, and the follow-up

25     services that I think is necessary.  But in terms of the

55

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1      system as a whole, though, when Governor Schwarzenegger

2      came in, one of the things that he brought to the table

3      was to refocus the Department of Corrections and

4      Rehabilitation.

5              And when we began SB 618 we began with the then

6      secretary Rod Hickman in working with him at his

7      direction from Governor Schwarzenegger to do strategic

8      planning and thinking and we were -- one of our

9      discussions, as I recall, was that we were basically with

10     SB 618 and what they were doing at the prisons were in

URL098~1

11    alignment.  And that is bringing stake holders to the

12    table, reidentifying rehabilitation as a core part, which

13    is why it's CDCR now, the rehabilitation part was added

14    in.

15          Additionally, the efforts with AB 900 were

16    designed to address -- and the governor tried for some

17    time since he came into office to work on and rectify the

18    flaws that I think we can all agree to, and overcrowding

19    is part of that -- the problem that needs to be

20    addressed.  But release is not the way we believe in

21    public safety is the way to do it.  So Department of

22    Corrections Rehabilitation then restructured, then worked

23    on the idea of trying to get some more programs in the

24    prison.

25          But it's a process, just as Lisa was saying

56

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    about SB 618 and steering the ship, it's a ship that, you

2    know, turns slowly, and I think that efforts have been

3    and continue to be made to steer the ship of CDCR in the

4    right direction, and that direction is to provide more

5    programming within the jails, to build more jails so that

6    the population is not overcrowded and that these programs

7    can be effective, and to provide step down reentry

8    facilities in order to do some of that reintegration

9    process, and then to continue that process even after

10    people that are being released from prison are released

11    from the reentry facilities, to have more programming.

12          And to -- it was with the cooperation and

13    partnership with the state prison system that we were

URL098~1

14    able to do SB 618, and it was the Secretary Hickman's

15    buy-in at the beginning and then continued into Secretary

16    Tilton's, and continues to Secretary Cate who are all

17    very much in favor and get it that we need to do

18    programming, not just rehabilitation, but educational,

19    vocational, literacy, you know, GED, all those things

20    need to be made available in order·to give the people the

21    tools so that they are able to change.

22        Q    And, you know, your Deputy Ms. Rodriguez

23    describes that in some detail and it is clearly an

24    extraordinary program in today's world and something you

25    obviously are very proud of?

57

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        A    Very passionate about.  It is an offshoot of

2    the drug court and the drug court movement.  I think that

3    these kinds of -- because drug court has in some states

4    begun for the local area reentry courts where people

5    coming out of jails report back to the courts and,

6    actually, originally we contemplated in our reentry

7    program trying to have a program for parolees to have a

8    reentry court, but because of the budgetary concerns for

9    the court that was not possible, at least at this time.

10            But I think in the long run it would certainly

11    be helpful because drug court has found that the judge's

12    participation has been a very successful component of

13    drug court to provide the oversight, the parental figure,

14    and the accountability that's required with those that

15    violate the law.

16        Q    Let me contrast that with, if I may refer you

URL098~1

17    back to that same quote we looked at a moment ago, and I

18    realize this is from 2003 so the statistic right then may

19    not be correct today, but it says that the number of

20    felons who serve the time and are given a bus ticket home

21    has increased to -- at least in 2003 they said it was

22    about 125,000 a year.

23         Do you know how many felons from state prison

24    are released statewide each year?  Do you know whether or

25    not this figure is roughly correct?

58

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    A    I don't know.  I know you could obtain that

2    from the department's statistical analysis.

3    Q    Okay.  And it goes on to say, "But the real

4    problem is that a growing percentage of those 125,000

5    parolees are unprepared to get a job, steer clear of

6    drugs and alcohol, and find a home."

7         Do you agree with that statement?

8    A    Yes.  Which is why part of our component is

9    picking them up at the gate, taking them directly to

10   where they need to go, and helping them with those

11   wraparound services to give them the opportunities.

12   Q    By the way, it does say on page 13 under

13   "Sentencing," at the end of the first sentence that

14   "community-based services are more effective in reducing

15   recidivism than programs in institutional settings."

16        Do you agree?

17   A    I'm not with you.

18   Q    If you look on page 13 under the paragraph

19   that's called "Sentencing."

Page 53

URL098~1

20     A     Oh, I see.  I wasn't following.

21     Q     It says, "According to best practices,

22  offenders should be maintained in the community whenever

23  possible because community-based services are more

24  effective in reducing recidivism than programs in

25  institutional settings."


59


LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376
1                Do you agree with that?

2      A     I do, but I think that's the current practice.

3      Q     Okay.

4      A     I think as a former judge I know that people

5  are not sent to prison until they have three, four, five

6  felony convictions and every attempt is made to keep them

7  within the community in programs within the community,

8  but, again, though, there are not enough treatment

9  facilities, there's not enough follow-through in terms of

10  probation because of the overload of probation, and so,

11  you know, those programs are not really effective because

12  of budgetary issues as well.

13     Q     By the way, I'm listening to everything you say

14  even though I'm looking down, I'm doing that to make sure

15  I'm as efficient as possible, and not being rude.

16     A     I do agree with the next sentence,

17  distinguishing between high- and low-risk offenders

18  requires a valid tool, and I know that we are

19  participating in a pilot project with three or four

20  counties here in California with the Department of

21  Corrections to use an assessment tool that is designed to

22  look at those kinds of things, and that is certainly what
                         Page 54

URL098~1

23    we do here in San Diego with SB 618.

24          I think it's critical, the assessment tool that

25    you use, because I think that whether or not somebody has

60

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    a low level quote/unquote, "offense," whether it be drugs

2    or petty theft with a prior, is not determinative. I

3    think that what we found through the studies have been

4    that those people who are criminals first and happen to

5    take drugs and those that are drug addicts first and

6    happen to commit crimes to support their habits.

7          So we need to determine who are the criminals.

8    Who has the high risk of really breaking the law for

9    purposes of breaking the law.  The violent crimes, you

10   know, the rapists, the property crimes, and then those

11   who are the ones that have an addiction problem, that are

12   committing low-level felonies to support their habit,

13   like, you know, the petty theft with a prior or

14   theft-related offenses, you know, car theft, those kinds

15   of things.

16          Those are the people I think that you can

17   rehabilitate, the other people I don't think you can.

18   And that tool will help us determine what they call the

19   criminogenic feature that each individual has.

20    Q    Before I get to discussing SB 618 and, again,

21   if I appear to not go into it in great depths it's

22   because your deputy did go into it very well, but I don't

23   think I will go into it as great a depth with you because

24   I went with her.

25    A    She would be the one who knows the most.  I'm

Page 55

URL098~1

61

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1   the idea person and she's the follow-through person.

2       Q    Why don't you take a look at what was marked in

3   Ms. Rodriguez's deposition as Exhibit 2 and ask you to --

4   have you seen this document before?

5       A    Yes.  We did a training related to this

6   document early on in the process.

7       Q    And I think with one exception, which now

8   escapes me, Ms. Rodriguez thought this document fairly

9   describes generally what the program is.  Forget what she

10   added.

11       MR. MITCHELL:  Expansion plans.

12       MR. HEATHER:  Oh, yes.  Expansion plans.

13   BY MR. HEATHER:

14       Q    Do you agree with that?

15       A    Without reading the whole thing.

16       Q    Okay.

17       A    But, as I said, she really knows the details of

18   the program.

19       Q    Okay.  This does, by the way, acknowledge your

20   leadership involved with this program.  There's a couple

21   things I want to ask you about this.  Just give me a

22   moment to find, if I can, would you turn to page 14,

23   please, which is entitled -- the paragraph I want you to

24   look at is the first section under the paragraph titled

25   "Scope and Nature of the Local Recidivism Problem."  And

62

URL098~1

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    really just the first sentence it says, "The recidivism

2    problem in San Diego County exceeds both the national and

3    statewide numbers."

4            By the way, this document was prepared by your

5    office?

6        A    I believe so, yes.

7        Q    Because it's entitled "County of San Diego

8    District Attorney" also on the front?

9        A    And it looks like they came up with these

10   numbers based on the statistics provided by the CDCR in

11   2006.

12       Q    Okay.

13       A    So my guess is they looked at those felons that

14   were released and those that recidivated, got a new case

15   within the first year, within the second year, and third

16   year.  I'm not sure how they identified that.

17       Q    Do you have any -- first of all, I may have

18   just asked you this, if I did I have forgotten.

19            Do you agree with that statement that you have

20   a higher rate of recidivism in the San Diego County than

21   nationally and the rest of California?

22       A    I couldn't answer that.

23       Q    Okay.

24       A    I would assume that they did some research for

25   this.

63

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        Q    All right.  Without tying it to this statement

2    have you been aware in your own mind that you have a

URL098~1

3    particularly high recidivism rate or just something you
4    haven't been aware of, hasn't been part of your frame of
5    reference?

6        A    I think as I said earlier, my anecdotal
7    experience as a judge as well as the district attorney
8    tells me that we have many repeat offenders because, you
9    know, being on the bench they recycle in front of you.  I
10   often did the arraignment courts, I often did the felony
11   disposition calendar, which is where many of those people
12   plead guilty, and so I would see the entire background of
13   each one of these people.

14           As well as, you know, as the district attorney
15   I do get reports that reflect, you know, how each
16   division is doing and what many of those prior records
17   are and that sort of thing.  So I'm not surprised that we
18   have a high recidivism rate and we do, of course, have a
19   state prison here in San Diego County.

20       Q    Okay.

21       A    Which means they do parole many people here to
22   San Diego County.

23       Q    Okay.  Now, before I get to the -- just
24   generally, the positives of the program without the
25   detail that Deputy Rodriguez testified to, I wrote down

64

1    that one of the -- one of the things which you
2    anticipated would contribute to rehabilitation in
3    San Diego County would be the funding that would be
4    implemented through AB 900, correct?

5        A    Yes.  For the reentry program?

URL098~1

6       Q    Yes.

7       A    Yes.  San Diego was designated, they had

8    property designated for a reentry facility and were

9    counting -- was counting on that money and, of course, as

10   you know, it was not included.

11      Q    It was not included in the budget?

12      A    It was not included in the budget.

13      Q    Do you know how much money was designated for

14   San Diego County, approximately?

15      A    No.  Because that facility and those

16   negotiations have to do with the sheriff, not with our

17   office, really.

18      Q    Okay.  But what it assisted overall in

19   providing the kind of reentry support that you believe

20   would have contributed to hopefully reducing the

21   recidivism rate?

22      A    Yes.

23      Q    Okay.  Now, let me just see if I understand

24   some of the statistics I have.  And, unfortunately, as I

25   said, I received -- I received some statistics that

65

1    people have put in this very organized fashion, but I

2    haven't had a chance to discuss it with you.

3            Some of the documents were produced Thursday

4    and Friday in San Francisco and I just got these and

5    haven't had a chance to really understand, so I'm going

6    to show you two documents and ask whether or not you

7    recognize, whether these relate to San Diego, because

8    they don't on their face tell me the answer to that, and

URL098~1

9      let me show you this one.  I won't mark it if you don't

10     recognize it.

11        A     I would say that these do not relate to

12     San Diego.

13        Q     Okay.

14        A     Because it says "fed kick numbers" and --

15        Q     Well, sometimes what other people -- what other

16     statistics have said that means is that's the cap kick.

17              Is the San Diego cap a federal cap or state?

18        A     State.

19        Q     Oh, it's a state cap?  Then this isn't yours.

20     In other words, it's not federal release, it's releases

21     pursuant to a federal court order, that's what they mean

22     by "fed kick"?

23        A     Right.  But ours is a state court.

24        Q     You got a state cap so these aren't yours.

25        MR. MITCHELL:  Counsel, just to interrupt, there's a

66

D       1      note at the bottom of that relating to Riverside County,

2      CDC detainers, fourth from the bottom line.

3         MR. HEATHER:  Oh, okay.  Riv County.  All right.

4      Thank you.

5      BY MR. HEATHER:

6         Q     Let's go then to the -- by the way -- never

7      mind.  The document speaks for itself.  Let's go to SB

8      618.  As I understand it, and let me ask if you agree

9      with this, and then tell me in your own words what you

10     think the benefits of the program have been and are going

11     to be, but as I understand it 618 combines three

URL098~1

12    fundamental components.

13          One is the coordinated individual attention on

14    an offender from the very earliest stages of the criminal

15    process so that instead of being treated, as Rodriguez

16    said, a silo effect, you're handed off and no continuity

17    of the treatment of the individual, there's a coordinated

18    treatment that lasts throughout his participation or her

19    participation in the program, that's one.

20          Two is the rehabilitation programs within the

21    prison systems, and the third major component is the

22    attention and assistance that the individual is given

23    after release.

24    A    Yes.

25    Q    I mean, is that a fair, kind of in broad stroke

67

1    summary of the program?

2    A    Yes.  I believe it is.  And you touched on this

3    at the beginning, but it is the coordination of all the

4    stake holders including the community, the faith

5    community, working together in more or less of a

6    nonadversarial way to assist the offender to get tools

7    necessary to become clean, sober, productive again.

8    Q    Right.  And as I understand it, again I'm

9    trying to fairly represent to you what I recall Deputy

10    Rodriguez saying, of the 80 some people that have been

11    released through the program since November 2007 when I

12    think the first person was released, there have only

13    been, I think she said, two individuals who have been

14    returned to prison for committing a new crime, and

URL098~1
15    approximately four that had parole violation issues.

16         Is that your understanding of the statistics?

17    A    Yes.

18    Q    So I know it's a limited sample, but the

19    recidivism rate of that population is much less than the

20    general recidivism rate in the county, it's less than 10

21    percent, and way less if you only count the two that

22    committed new crimes?

23    A    Well, that's the general idea of the program.

24    Q    All right.  Now, some of the program results

25    may reflect the screening process, correct, and not just

68

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    the value of the program?  In other words, you're not

2    just randomly picking people?

3    A    Yes.

4    Q    You're selecting the best candidates, correct?

5    A    Yes.

6    Q    But that does go to what you said you're also

7    trying to do is identify and differentiate and assess

8    through objective standards those more likely to commit

9    crimes and those more likely to be amenable to

10   rehabilitation?

11   A    Yes.  Although I have to say this is the

12   beginning of the process.  As I'm sure Deputy Rodriguez

13   said, we're extending, you know, offering into more and

14   more people, and as we see how effective it is then I

15   think we move on to other populations that we may be able

16   to succeed in as well.  It's not -- right now it's

17   limited because of the sentence time because you need

URL098~1

18    enough time within the prison in order to get the
19    treatment that you need as well as the types of offenses
20    that you cannot have to get into the program.
21           So it's a beginning part of a process, I think,
22    that, first of all, we are taking those with the very
23    least risk in order to determine whether or not we can
24    have an impact there and, of course, those are the ones,
25    you know, that we hopefully can turn around, but there

69

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    are, you know, differing levels of risk and some of that
2    will, you know, be determined by baby steps.
3         Q    Had you heard -- by the way, you don't have any
4    obligations other than to answer the questions, but I
5    know you did want to speak about the programs that are
6    listed on your Exhibit 1 and if I forget to ask --
7         A    Good memory.
8         Q    If I forget to ask you that and you still want
9    to talk about them, please near the end do that because I
10   don't mean -- I told you I would ask about that and if I
11   don't it's only because I forgot.
12          But let me ask you this:  Have you heard that
13   people in the legislature and the governor -- I can't get
14   out of this deposition without mentioning the governor --
15   have said that AB 900 is going to be the answer to prison
16   overcrowding, the prison overcrowding crisis, that AB 900
17   .was designed in part to fund new construction to relieve
18   the prison overcrowding problem?  Are you aware of that?
19        A    I am aware that the purpose for sitting down
20   with all the legislature was to address the issues that

Page 63

URL098~1

21    related to prison overcrowding.

22        Q    Okay.

23        A    But that began -- that process, as I understand

24    it, began a long time ago.  My being in office, I think

25    the governor came in sometime thereafter, and ever since

70

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    he's been in office and I've been involved we've been

2    working towards solutions to overcrowding since that

3    time.  So --

4        Q    Fair enough.  I didn't mean to imply anything

5    to the contrary.

6        A    I didn't take it as anything differently.  I

7    just don't know what they're saying about it.

8        Q    Right.  Do you know how much money was included

9    in the current budget to fund and implement AB 900?

10        A    I knew in the past, but I can't recall right

11    now.

12        Q    If I represented to you in good faith that it

13    was nothing that would surprise you?  Not a single dollar

14    of additional money for AB 900 was included in the

15    current budget, did anybody tell you that?

16        A    Well, I understood that the legislatures took

17    out the trailer bill that had to do with the funding for

18    AB 900, at least for the reentry facilities.  My

19    understanding was that the bond, and I don't understand a

20    whole lot about bonds, that the bond sales were going to

21    be what was needed for I think the --

22        Q    The construction?

23        A    The construction, yes.

Page 64

URL098~1

24     Q    That wasn't funded, either.  Have you had any

25     discussions in the county about what the county is going

71

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     to do in light of the failure to fund AB 900 to provide

2     the money that was designated for San Diego County?

3          MR. MITCHELL:  I'm going to object as calling for

4     speculation on her part at this time.

5          MR. HEATHER:  It wasn't speculation.  I asked her

6     about having discussions.

7          MR. MITCHELL:  I didn't hear you.

8              (Record read)

9          MR. MITCHELL:  Withdrawn.

10         MR. HEATHER:  Accepted.

11         THE WITNESS:  I am not the county, but I personally

12    have not been involved in discussions.

13    BY MR. HEATHER:

14         Q    All right.  Let me ask you this before we move

15    on to anything you would like to add about the

16    alternatives to the detention.  I believe you made a

17    distinction this morning about the programs or policies

18    or procedures that are listed on Exhibit 1 as being

19    alternatives to detention, and if I recall correctly you

20    had said that San Diego County has been -- in response to

21    a question I phrased -- has San Diego County been

22    creative in devising alternatives to incarceration, you

23    said yes.

24         A    They're two different things.

25         Q    They're two different things, and I take it SB

URL098~1

72

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    618 is one of the alternatives to incarceration.

2           Is there any other or others -- other programs

3    we haven't discussed today that you would consider

4    alternatives to incarceration, not alternatives to

5    detention?

6       A    Well, we are required by law under proposition

7    36 to divert drug users and place them on probation

8    without the ability to incarcerate, so that's one such

9    program.

10      Q    Okay.

11      A    PC 1000 is another program.  That's first

12   offenders can divert out of the system for drug offenses.

13      Q    Okay.

14      A    You know, we have treatment programs, we have

15   drug court, we are working on a mental health court.  But

16   generally San Diego has been very proactive in trying to

17   find approaches that will be effective.  It's not

18   necessarily to find an alternative but to find

19   appropriate placement for those who are on probation.

20      Q    Yeah.  I'm not sure I understand the courts,

21   and I don't want to spend a lot of time on it, but if

22   it's relatively easy to explain, can you tell me, when

23   you describe these specialized courts, are these

24   designated courtrooms for those problems or are they

25   designated judges for the problem or are they both?

73

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    Both.  At least -- but different places do it

Page 66

URL098~1

2    differently, but here in downtown San Diego we have,

3    actually, it is a commissioner who handles the drug court

4    calendar and also the prop 36 calendar and may very well

5    -- if we do a mental health calendar court -- would do

6    that as well.

7         The purpose is to have -- and it's a prosecutor

8    that's designated and a defense attorney that's

9    designated, and there is a contracted treatment provider

10   to -- that work together on nonadversarial approach to

11   each individual offender.

12       Q    Okay.

13       A    So by having the consistency of the same

14   players it is in the same courtroom and it is the same

15   judge and in each one of the courthouses they have

16   designated -- South Bay, El Cajon, and North County -- a

17   judge in a specific courtroom to handle those specific

18   calendars.

19       Q    Now, do they have other calendars as well?

20       A    Yes, they do.

21       Q    If one of these types of cases does arise they

22   handle it?

23       A    That's correct.

24       Q    And do you think that sort of specialized and

25   individual treatment has been effective?

74

1        A    Yes.

2        Q    And, therefore, has had, in your view, a

3    positive effect on public safety?

4        A    It already has had a positive effect on public

Page 67

URL098~1

5    safety.

6        Q    And my understanding is that not every county

7    has been able to implement this type of specialization;

8    is that correct?

9        A    Yes.

10        Q    Some, I think based simply on what I've been

11    doing in this case, may have gone even further because

12    for whatever reason I think Orange County may have, if I

13    remember correctly, even a few more, they may have one

14    for domestic violence, they may have even a third drug

15    related court for repeat offenders, I forget what the

16    name is, something like the tough love court, that's the

17    wrong term.

18            But it seems to me that that approach to the

19    judicial system is similar to the approach in SB 618,

20    that to maximize the likelihood of an individual's

21    ability to successfully go through the criminal system

22    and not reoffend they need individual specialized

23    attention.

24            Is that correct?

25        A    Yes.  And in addition one of the things I found

1    when I was on the bench is it's not just that specialized

2    attention, it's a judge that fully knows all the

3    information about a defendant.  Because what they do,

4    particularly substance abusers, is use the same excuse

5    over and over again, like the same grandma that dies at

6    least five times, the same wife, those kind of things.

7            And how I discover that was in a court that I

URL098~1

8    handled what we call a volume calendar, so I did like a

9    hundred cases a day, and I would read the cases and I

10    began taking them and keeping jurisdiction over them

11    because I saw as I flipped through the file, you know,

12    not because it's a fast paced calendar, most judges don't

13    have the time to read that, so the offenders are able to

14    play on that and have no consistency.

15        And so it's good for the individual attention

16    but it's also good for the consistency so you can hold

17    them accountable to what they've said in the past.  And

18    all of that is very much sort of the same, I think, but,

19    as I said, in the drug court and the domestic violence

20    court that we have in San Diego County the judge plays an

21    important role because the judge is the authority

22    parental figure, and many of the people that come through

23    the courts that are involved with these problems never

24    had a parental figure that was active or caring enough to

25    discipline and limit them in their behavior.

76

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        And that's how they feel they're cared for is

2    when you give them limitations, you keep to those

3    limitations, and they feel that you care and so,

4    therefore, they want to succeed.

5    Q    All right.  I've got two remaining questions

6    after the following question.  I understand that -- the

7    position of various district attorneys has been discussed

8    among the district attorneys, correct?  File a joint

9    statement regarding settlement, et cetera.  And I

10    understand from my limited experience and Mr. Mitchell

URL098~1

11    that district attorneys tend to say the same thing.

12    Other opinions don't tend to say the same thing, but they

13    are consistent in saying that the recidivism rate is high

14    because of early releases.

15         In other words, there's early releases are bad

16    and early releases cause problems and I'm not sure how

17    I'm going to unravel on that when I release you in a

18    minute. My question, so I don't get the speech

19    objection, my question is: Can you find anywhere in this

20    document put out -- I'm sorry. Wrong one. In the SANDAG

21    evaluation, Exhibit 1.

22         A    Exhibit 1 of Rodriguez.

23         Q    where it discusses the literature on recidivism

24    where it identifies early release as being a significant

25    contributor to recidivism?

77

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1         MS. SNYDER: Do you want her to read through the

2    whole document?

3         MR. HEATHER: NO.

4    BY MR. HEATHER:

5         Q    I'm going to rephrase that to say are you aware

6    -- these are documents which you need to see because they

7    address your program, correct?

8         A    Yes.

9         Q    Do you recall seeing any reference in any study

10    that you've seen on SB 618 -- let me go into these two

11    documents.

12         Any reference to the position that early

13    release, per se, has contributed to the high rate of

URL098~1

14    recidivism in California?

15         A    Well, that wasn't the purpose of the evaluation

16    so it went to address early release issues.

17         Q    Fair enough.  Before I ask you the last

18    question, which is to say anything else you want about

19    the programs on Exhibit 1, is there anything else about

20    SB 618 for which you have been so responsible that you

21    would like to add to the record?

22         A    Well, this is sort of a general philosophical

23    approach, that I believe SB 618, which was embraced and

24    endorsed by the then Board of Directors of the California

25    District Attorney's Association as well as the then judge

78

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    of the juvenile court presiding, is the way that

2    prosecutors and law enforcement are looking at how we

3    deal with the criminal justice system now with the

4    successes of the drug court, and I hope with the

5    successes of SB 618, what we have seen, like you just

6    categorized the DAs, and they all have a certain way of

7    looking at things.

8              I think that the way the DAs look at things has

9    changed over the years, recognizing that rehabilitation

10    and treatment with accountability is successful, can be

11    successful, and are very supportive of that, but they are

12    also mindful of the public safety risks which, again, we

13    address in SB 618 by taking a very small population to

14    begin with, recognizes that there is recidivism, and when

15    you release people early they have the opportunity when

16    not given the tools to change, they will then reoffend.

URL098~1

17          And there haven't been many studies as a whole

18     that really do, and I'm not sure you can really identify

19     early release in conjunction with recidivism other than

20     to say that people have reoffended and unless you went

21     back and figured out how much they should have spent in

22     custody, whether it happened while they would have been

23     in custody it will be an incredibly difficult task, but

24     you have collectively as interveners, 20 plus district

25     attorneys, many of them with far more experience than I

79

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     have, but I have Orange County Tony Rackauckas was also

2     on the bench for many years, now up in Santa Clara,

3     Dolores Carr was on the bench for many years as well.

4          The experience, it's not just that we are

5     saying that recidivism will result, and I hate to use

6     "recidivism" because we've talked about some of the

7     issues, but it is clear to me from my 30 years or plus,

8     because I might be a little older, in the system that

9     when you release people early, when you don't stick to

10     your limitations or the sentence, when they don't get

11     what's reflected as the sentence, they will reoffend,

12     they will revictimize, and it will result in a public

13     safety -- tremendous risk.

14          Q    I may have asked you this.  The recidivism rate

15     in California, has it remained constant through your

16     professional career generally or have you perceived it to

17     have increased or decreased over the course of the last

18     15 or 20 years, if you have a view?

19          A    I don't.  I really don't know.

Page 72

URL098~1

20        Q    Because the reason I ask this is there really

21    hasn't been -- and this really is my last question

22    because I keep saying it's going to be and you've been

23    very generous with your time.

24        A    It's okay.

25        Q    There really hasn't been a test of early

80

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    release as compared with the alternative in recent years

2    because the system, the way it is, as you have explained

3    from the population cap, goes back decades.  So, you

4    know, there's no baseline of nonearly release to compare

5    it to.  Isn't that fair to say?

6             I mean, in other words, what I'm asking you in

7    all fairness is what you're really talking about is

8    recidivism, but you're not comparing an early release

9    period that was put into effect, say, two years ago and

10   say now before we did that it was very different.

11            In other words, we've been in an early release

12   posture to some extent at least in this county for many

13   years?

14        A    Let me just say this about that.  First of all,

15   there -- I made reference to a survey or some kind of

16   study out of Los Angeles that actually did implement an

17   early release because of budgetary concerns, Sheriff Baca

18   has done it in the LA Times, I wrote down the date of

19   that article somewhere.  LA Times releasing inmates early

20   has a costly human toll, which is May 14 of '06.

21            It does actually reflect that there was

22   tremendous recidivism as a result of early releases out

Page 73

URL098~1

23  of the LA jails, which is San Diego and, you know, most

24  urban or metro -- large metropolitan areas are

25  microcosms.  LA is two thirds of the population,

81

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1  San Diego County is the second highest prison population.

2      But the problem I have with your proposition is

3  that you are trying to make a comparison between those

4  who are serving local custody and being released early in

5  local custody and then making the leap to that, even if

6  there were studies, to what will happen to the prison

7  population.

8      And they are apples and oranges, and they are

9  because those that are in the probation population are,

10  for the most part, first, second, third, fourth offenders

11  that are low level, that people are willing to take a

12  risk on because the types of crimes that they have done

13  are not necessarily of the violent nature, which is why

14  they're in local custody to begin with, and for all

15  intents and purposes many judges don't even put them in

16  custody when they know that 90 days may really be a book

17  and release.

18      But they may also in the alternative give them

19  a longer sentence because they figure out 365 days

20  sentence, which is the most you can do locally, is six

21  months, so we'll give you 365 days because we want you to

22  serve six months.  So as a practical -- in practical

23  materials you can't say those people who you are early

24  releasing and will reoffend, generally speaking, are

25  still low level people.

URL098~1

82

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    And then those that go to prison, again, are

2    the people that we have tried everything at the local

3    level over and over and over and over again that we then

4    have to throw up our hands and say "you must go to

5    prison, we must punish you, because we have to get you

6    out of the population because you're revictimizing

7    everybody."

8    And so that population is a much more serious

9    population, and I think about 85 percent of the people in

10    prison are violent and serious criminals anyway, so we're

11    talking about a smaller population, but the answer to the

12    problem is not early release.

13    The answer to the problem is some of the

14    programs that we've talked about with the SB 618, drug

15    court, programming within the prison system, and that

16    can't be said enough, I don't think.  I think that we

17    need to put a lot more programming in the prison because

18    what we found in terms of what really works is the longer

19    you can keep somebody in treatment the more likely they

20    will be to succeed.  And so to begin the process, and not

21    too soon because, you know, they are going to get out,

22    but you want to get it close in time so you give them the

23    foundation.

24    But in order to succeed they need to stay in

25    that inside custody for a period of time, and we do that

83

URL098~1

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   in our local custody as well, we try and keep them in,

2   and sometimes we'll assign them to residential treatment

3   and confine them to residential treatment for that

4   purpose.

5           And then you have to keep them in a treatment

6   program once they get out of prison for a period of time,

7   which is why we chose 18 months with the SB 618, and then

8   you have to have a step-down process so that they will be

9   able to reintegrate into the system.

10          If you release the 3,000 plus prisoners to

11  San Diego County they're going to go back to the same

12  communities, which are by and large minority communities

13  where the lack of resources are tremendous, they are

14  going to revictimize the people in those communities

15  again, and you are setting them up for failure.  I'm not

16  even sure what the question was.

17      Q    That's all right.  It was an appropriate answer

18  and as a sign of good faith I'm closing my books, but I

19  will stipulate she's correct because that answer prompted

20  me for two thoughts.  One is that I think you would

21  agree, and I ask you whether you agree that those who go

22  to state prison, you haven't, not you individually, the

23  state and the county, have not done everything they can

24  for them and SB 618 is proof of that.

25          In other words, you haven't put these repeat

84

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   offenders earlier through the type of rehabilitation and

2   assistance programs which may, and some of those

URL098~1

3  individuals have, turned them around.  Fair enough?

4      A    We have tried at the local level with anyone

5  that has a drug problem to put them into drug treatment

6  and require they go to drug treatment.  We haven't had

7  the oversight of S8 618, but you can see what the cost of

8  that is going to be if we were to do it to everyone that

9  was available.

10     Q    I agree with you about that, it's going to be

11  costly.  I'm just reflecting on what the SANDAG study

12  noted is without rehabilitation in the system and

13  assistance in jobs and housing after release and all the

14  other components that are part of 618, there is a higher

15  likelihood of recidivism.

16          And so I think given that there haven't been

17  the resources to provide that to people you haven't

18  really done everything that could be done for these

19  people who did recidivate at this point, not because of

20  lack of desire, but because of the lack of wherewithal?

21     A    But the answer to that problem is not to open

22  the prison doors and let everybody out to the same lack

23  of resources that are in the local communities to

24  revictimize the local people who don't have the resources

25  to absorb those that we're trying at the local level to

85

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1  deal with.

2      Q    And that sparked my second and last thought,

3  which is that while you say the answer to the problem may

4  not be early release, the cause of the problem, I think

5  your own studies substantiate are not early release,

URL098~1

6    they're the lack of these programs and you and I will not

7    resolve that difference here today, fair enough?

8        A    Well, it's a policy shift that has occurred by

9    the willing of the people, and so for many years the

10    people said all we feel is appropriate is to punish, and

11    by punishment deter, and now there has been a change, I

12    think, in the will of the people somewhat because we all

13    have had contact with people with our extended family,

14    friends, those in our lives that have had substance abuse

15    issues, because it is a cruel type of thing that

16    devastates whoever is sucked into it.

17        So I think to blame anyone for not having done

18    some of these things I think is really faulty reasoning

19    because --

20        Q    I'm not blaming anyone, I'm just saying

21    factually the kinds of programs which you think are

22    appropriate and helpful to many people haven't been

23    available in the past for whatever reason, whether it's

24    policy or resources or money, they just haven't been

25    there, that's what makes SB 618 unique?

86

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        A    And so the answer, though, is to put the money

2    into the resources within the prison for programs that

3    are necessary within the prison and within the parole to

4    give you those things that we have found, because we

5    don't have to do any more studies about what is

6    successful.

7        We have all the -- there has been study after

8    study after study right now about what will work, which

Page 78

URL098~1

9   is we could come to SB 618 by using best practices

10   because those are the best practices.

11          we know what we are, what we need is the money.

12   And, as you know, we have a budget deficit this year and

13   anticipate I think it's 1.5 billion next year so the

14   problem is one of resources, and as we face these

15   problems thank heavens it's not my job to make those

16   priority decisions.

17          Q    All right.  And, remember, I have never

18   suggested that it's our position in this questioning that

19   the cure for recidivism is early release.  The case is

20   about whether or not -- the case may be about what the

21   appropriate remedy is for unconstitutional violations?

22          A    But what I understand those unconstitutional

23   provisions are, the medical, dental, and mental health

24   issues, which to me there's no nexus between the lack of

25   medical care, the lack of psychiatric or mental health

87

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   care, or the lack of dental care, what we're talking

2   about, what we've been talking about, is totally

3   unrelated to that.

4          I don't disagree with that we need what we're

5   talking about today, but I don't think there's anything

6   that we've talked about today that reflects on the kind

7   of mental health services, the kind of medical services,

8   and the kind of dental services that are given to those

9   that are in prison.

10          Q    well, you're not an expert on that, are you?

11          A    well, give me some time.

URL098~1

12     Q    The point being that --

13     A    I understand.

14     Q    Well, my last question, I promise you, there

15  was never a promise, there was a hope.  Which do you

16  think is more important if you had to make the choice,

17  allowing -- if you had to make the choice, allowing the

18  number of persons incarcerated in state prison to be

19  released so that a constitutional level of population

20  could be achieved or for the reasons you've stated not

21  allowing people to be early released and perpetuating the

22  unconstitutional violations assuming that the

23  constitutional violations exist?

24     A    I don't think that's an answer I want to get

25  into.


                                                        88


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          MR. MITCHELL:  There's no such thing as an

2   unconstitutional level of prosecution, of health care,

3   mental health care.

4          THE WITNESS:  Let me just end with this.  I think

5   the primary duty of government is to protect the

6   citizens, public safety.  That is the number one priority

7   of government.

8   BY MR. HEATHER:

9      Q    Isn't the number one priority of government

10  officials to uphold and defend the constitution?

11     A    Yes, and we do that every day.

12     Q    And to uphold it in this case should be the

13  number one priority.

14         MS. SNYDER:  Objection.

                    Page 80

URL098~1

15          MR. HEATHER:  I'll withdraw it.  I am actually out

16     of questions.  I am out of questions unless you would

17     like to further discuss Exhibit 1, because I think this

18     morning you asked whether you should go through the list.

19     I'm not going to ask you to go through the list, I got

20     your general position on this, but I don't want to cut

21     the record off.

22               So if there's something else you want to add

23     about those, please go ahead.

24          THE WITNESS:  Let me just take a look at them and

25     I'll tell you.


                                                              89


                 LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1          MR. MITCHELL:  If I could just interrupt.  You

2      indicated previously you wanted to explain how the

3      programs there impacted jail cap?

4          THE WITNESS:  Yes.  Some of these were designed, I

5      believe, for -- to keep the jail underneath the --

6          MR. HEATHER:  Right.

7          THE WITNESS:  -- jail population.  I'm not sure that

8      all of them relate to that.

9          MR. HEATHER:  And I don't -- I'm not presuming that

10     they do, I'm not going to draw an inference that they're

11     all designed for that.  The sheriff testified and did

12     talk about the relationship between that and sort of

13     their monitoring of the population, but by your silence

14     I'm not going to say that you said any particular one or

15     ones were or weren't designed for cap purposes as opposed

16     to some other policy.

17               (Discussion off the record)

URL098~1

18          THE WITNESS:  I think probably what I wanted to talk

19     about, and who can remember this morning right now, but

20     is that some of these programs actually have some court

21     oversight to them.  For instance, county parole, which is

22     to release those sentenced inmates who have applied for a

23     parole and demonstrated an acceptance of responsibility,

24     et cetera, et cetera.

25               Those come to a judge by way of a sheet that

90

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      comes to the judge so that we can look at the file and

2      agree or disagree, they don't always honor the judge, but

3      it's a recommendation, i.e., but we state our reasons if

4      we feel that that person is a danger for some reason.  So

5      the point being that there is some oversight to that

6      population.  Work release is an alternative program but,

7      again, usually screened, but the judge makes the ultimate

8      decision.

9               Electric monitoring also relates to a judge

10  .  making that recommendation, honor camps, those are all

11     post sentence kind of programs.  That's what the sentence

12     would be, the ones that come before that it looks like.

13     DUI quick release program would be jail book and release.

14          MR. HEATHER:  And I think, by the way, I think what

15     she may have left open this morning, and it's not a

16     question, but I think you were telling me why you thought

17     some of these impacted public safety, and so in fairness

18     if there's anything else you want to say about that with

19     regard to any other programs please go ahead, but I'm not

20     asking.

URL098~1

21        THE WITNESS:  I think I've covered that caveat, I

22    think, I understand.  I think I've covered most of what I

23    wanted to say.  I mean, each one of these programs,

24    number one, are very low level.  The DUI numbers are very

25    high, but I think statistically those that actually do

91

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     not get rearrested as a result of their first DUI is much

2    higher than most other crimes because what that is is,

3    you know, like somebody here at the table who drank a

4    little bit too much and got arrested and all they needed

5    was the shock of the system to turn them around.

6           But, again, those programs take away your

7    license, there are other ramifications to -- so that

8    public safety is not jeopardized as much.  Jail book and

9    release program is a process also that relates to

10    qualified misdemeanors, and then we're talking very low

11    level.  Petty theft, urinating in public, those kind of

12    things, shoplifting -- well, that is petty theft, but

13    those kind of things, and then field cite and release is

14    also those same kind of things.

15           Inebriate center is for people drunk in public.

16    Again, those people don't usually even get charged many

17    times so it's just basically to give them time to sober

18    up.  The drug diversion is a post -- for the most part,

19    post sentence kind of thing, but the key ones I think are

20    the sheriff's work release, that's when we see people

21    that may be due out monitoring, you know, being monitored

22    by probation who later reoffend while they're out as well

23    as the accelerated release and the 10 percent release.

Page 83

URL098~1

24          when you have the combination of the 10 percent

25     release, the accelerated release, and the 4019 credits,

92

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      then you have substantial reduction in what they do, and

2      that's when the public risk comes in because those

3      people, I do believe, if they were out of the segment of

4      the population for that period of time which they should

5      have been sentenced, then they would not be rearrested

6      for committing new crimes and revictimizing people.

7               Can I go off the record?

8               (Pause in the proceedings)

9          MR. MITCHELL:  Couple of questions.

10

11                          EXAMINATION

12     BY MR. MITCHELL:

13          Q     You had mentioned previously in distinguishing

14     the people that are kept at the local level and the

15     people that are sent to prison, the people who go to

16     prison, are the repeat, repeat offenders, the ones who

17     have three, four, and five prior felony convictions and

18     opportunities on probation at the local level, those are

19     the ones that if they reoffend again at some point in

20     time enough is enough and they're getting sentenced to

21     prison.

22          A     Yes.

23          Q     Correct?  Is it safe to say that those people

24     that reoffend to the point of going to prison, these low

25     level offenders, property crimes, are the individuals

URL098~1

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    that have partaken or been the beneficiaries of the early

2    release programs listed in Exhibit 1 at some point or

3    another?

4        A    Yes.  All of them would have been involved in

5    at the very least the sentence inmate reduction

6    provisions.  They would have been, you know, recipients

7    of that as well as they could have been recipients of

8    some of those other programs.

9        Q    And those programs in Exhibit 1, they deal

10   mainly and applied to the misdemeanors, the low-level

11   offenders and the property crime people, correct, not the

12   high level offenders?

13       A    That's right.

14       Q    And these people that reoffend to the point of

15   going to prison, failed on probation two or three times

16   or more, these are the people in SB 16, correct, the

17   repeat offenders?

18       A    Yes, they are.

19       Q    And this is the population we're targeting, the

20   ones who have proven they're going to recidivate

21   repeatedly, that SB 16 is designed and has a goal of

22   turning around and taking off that revolving door of

23   recidivism, correct?

24       A    Yes.  But I need to correct one thing I said

25   earlier, and that is that there is some level of violence

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    that could find themselves on probation, you could have a

URL098~1

2    bar fight, you could have an assault with a deadly weapon
3    where the damages weren't serious that you could -- if
4    somebody has no prior criminal record they could wind up
5    on probation and would be subject to this early release.
6         And I am fairly certain that there are those
7    that have recidivated or -- I hate to use "recidivated"
8    -- rearrested so that there is domestic violence, you
9    know, spousal abuse, there may be those that are also,
10   you know, in local custody that could very well have
11   participated in these programs, been the recipient of
12   reductions as well that have been rearrested and
13   prosecuted again.  The other thing I wanted to mention
14   while my thought processes are like yours --
15        MR. HEATHER:  Well, you know, it's overtime now.  I
16   get another bite of the apple.
17        THE WITNESS:  It's my experience both with the
18   juvenile court and also as the district attorney with the
19   juvenile court was, as I was thinking about this, what
20   was interesting to me was that as the local programs had
21   to be cut back because of the budgetary concerns here
22   locally, probation had what's called a breaking cycles
23   program, which was in the detention facility where they
24   program people and kept them in for a certain length of
25   time, I think it was six months to a year it could be,

95

1    they've cut back substantially on that.
2         They've also cut back because of capping
3    problems in the juvenile hall on keeping kids in juvenile
4    hall.  And it was alarming what we saw with some of the

URL098~1

5    kids that were coming back and committing robberies and

6    serious crimes and we had to address it through the

7    probation department to be -- and, you know, through the

8    courts to be more cautious about the people that we were

9    letting out because there was this high increase of those

10   that were committing new offenses.

11   BY MR. MITCHELL:

12        Q    Do you attribute that to the reduction and the

13   deterrent effect of the incarceration?

14        A    Some -- part of it, yes.  Part of it, yes,

15   because they were in custody for a period of time so,

16   therefore, they couldn't create new crimes, but also

17   because they had some programming within the department

18   as well that would help them when they came out, but

19   certainly with the detention aspects releasing those kids

20   in detention, which is the same as, you know, an adult,

21   instead of being in custody you would release them, in

22   essence, on their own recognizance, there were a lot of

23   returns on that as well.

24        Q    The CDCR states show that San Diego County

25   has --

96

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        A    7,627.  Was I close?

2        Q    Well, released back into parole in San Diego

3    County in 2007 there was 9,089 felons released on parole,

4    basically about seven percent of the state total.

5    Hypothetically, if there is a prison release order that's

6    issued that has a number of, say, 30,000 inmates, seven

7    percent of that would be 2,100 released to San Diego

Page 87

URL098~1

8    County.

9                    Do you see a negative impact in your opinion,

10   on the criminal justice system both in terms of new crime

11   and in impact on the courts that would result from that?

12        A    Yes, I do.  I think it's 7.6 percent, though,

13   so it would make it more than 21.

14        Q    I think you have 7.6 percent in the prison

15   population, but seven percent were released back on

16   parole.

17        A    Yes, I certainly do for the reasons that I've

18   said.  If those people come back to the community they,

19   as required by law, have to come back to the commitment

20   community, they would go back to the very same

21   neighborhoods and environment that they came from, which

22   has a lack of resources to begin with.

23                    And, again, it will be like a bubble effect

24   with all of them coming out at once and the inability of

25   the county to handle all of these people all at once will

97

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    most certainly result in a large portion of these people

2    reoffending and creating more crimes and more victims.

3         Q    Now, if these people coming out are the same

4    type of offenders that we've previously been speaking of

5    that are getting into the SB 618 program, if they don't

6    have violent crimes in their past, would a few of them,

7    say six per week you're allowed to put into the SB 618,

8    still be qualified to go into SB 618?  The people coming

9    out of prison, if they reoffend, are they still eligible

10   for SB 618?

URL098~1

11      A    Well, each case will be screened on their own,

12      but the problem is all these people coming out, it has a

13      domino effect.  If they reoffend and end up in local

14      custody they push out people that are being detained in

15      local custody to bring down the cap, so we then have more

16      failures to appear, we have more court clogging, and more

17      expenses to the local.

18             And if we don't have sentencing that is

19      structured so you serve your time you have less people

20      interested in doing the programming like SB 618 or drug

21      court or any of the other programs available because they

22      know if they do their time they really only do a small

23      portion of that time and it's much easier for them to do

24      their time and then get out and do what they want than it

25      is to do a program like drug court or SB 618, which is

98

1       highly structured and disciplined and requires a lot of

2       work on their behalf.

3              In fact, in drug court many times even when I

4       had a misdemeanor offender who was facing a mandatory 90

5       days in custody would say I could do -- even if they

6       thought they were doing the real 90 days, I could do that

7       standing on my head, I would rather do that than the drug

8       court because that's going to take more of my time.

9              But when you're facing state prison where it's

10      162 and three and they're only doing, what, half of that

11      time or whatever the current number is as it is, but then

12      you're going to be releasing more and more people, it has

13      that domino effect which is going to cost and clog the

URL098~1

14    courts, add more cost to the prosecutors, the defense
15    attorneys, and the system as a whole, the sheriff's
16    department and the local jails.

17        Q    You mentioned drug court.  Is there a
18    difference between Prop 36 and drug court in regard to
19    sanctions and is there an impact that you see regarding
20    recidivism in Prop 36 versus drug court because of the
21    distinction and sanctions there?

22        A    Yes.  I think Prop 36 is a good example for
23    you, Counsel, of what happens when you don't have
24    consequences for behavior.  Prop 36 was, according to the
25    UCLA report, was a disappointment because what they found

99

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    was that of all those that entered, at least -- I think
2    it was 25 percent never even showed up to the programs
3    and Prop 36 takes away the ability of the judge to
4    incarcerate even for short term as they do in the drug
5    court.

6            And so, therefore, when they know that there is
7    no consequences, number one, they don't show up because
8    they know that they can't go to jail if they don't show
9    up, they have to be placed back on probation, and, number
10    two -- which I just totally lost my train of thought.

11        MR. HEATHER:  He asked you if there was a difference
12    between the two courts in terms of --

13        THE WITNESS:  Not only are there differences in the
14    failure to appear rate, but also in the success rate with
15    respect to Prop 36, it's much lower than it is with drug
16    court.  In fact, those that successfully complete only a

URL098~1

17    very small portion, and I can't remember the portion.  I

18    want to say probably less than a third actually succeeded

19    in the program, and in drug court it's about a 70 percent

20    success rate.

21         And I think it's directly attributable to the

22    ability of the judge to give consequences and those

23    consequences are only short term jail sentences for the

24    most part for testing positive for violating the terms

25    and conditions of treatment or some of the program

100

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    requirements.

2         MR. MITCHELL:  Okay.  My last question.

3         MR. HEATHER:  I won't hold you to it.

4    BY MR. MITCHELL:

5    Q    The pretrial release procedures, not pretrial

6    by early release procedures as they've been described in

7    Exhibit Number 1, you've indicated are generally applied

8    to misdemeanors and low-level felony nonviolent type

9    offenders, correct?

10   A    Yes.

11   Q    One of the likely effects, if there is a

12   prisoner release order, is a cap on the prison

13   population, and if there is a cap on the prison

14   population it could likely result in a back-up or

15   inability of the county jails, San Diego County jail

16   included, to be able to send their sentenced state prison

17   inmates off to state prison until there is bed space

18   available in the prison resulting in an increase or

19   back-up increase in the county jail.

Page 91

URL098~1

20          Would it be your opinion that early release

21     procedures would then have to be applied to a gradually

22     more and more serious type of offender and would that

23     have an impact on public safety in the community?

24          A     Some of those that are mandatory certainly

25     would apply to those, and in addition it would wind up

101

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      actually being a paper state prison commitment because

2      they would spend more time in the local jail and use up

3      all their custody credits, so they never would get to

4      prison.

5          But as they used up their custody credits they

6      would use up their custody credits than they would be

7      entitled to in the prison, so it certainly would release

8      greater and greater populations which could include the

9      more serious offenders that are released into the

10     San Diego jails and, therefore, also bumping out more

11     serious offenders from the probation group that would be

12     in the local jail.

13         Q     What about pretrial detainers, people awaiting

14     trial on serious felony charges, would that be kicked out

15     also?

16         A     It would be a process, but I think some of them

17     could be kicked out because of the jail caps.  They would

18     have to draw the line somewhere and I'm not sure how they

19     would be able to do that without beginning to impact also

20     the people that are there detained for serious crimes as

21     well.

22         MR. MITCHELL:   I think that covers everything I

URL098~1

23    wanted to touch upon.  Are you aware -- have you heard of

24    any -- one final question.

25        MR. HEATHER:  I feel better now.


                                                            102


                LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     BY MR. MITCHELL:

2         Q    AB 900, that there was going to be an add-on

3     for the AB 900 or bond fix after the budget was signed,

4     have you had any discussions with anybody about that?

5         A    I have heard that, I think I've read it, too,

6     and I don't know enough about the detail, but I have

7     heard there is supposed to be clean-up legislation that

8     would impact and revisit that SB 900 -- AB 900 funding

9     issue that counsel eluded to earlier.

10        MR. HEATHER:  Ms. Snyder, any questions?

11        MS. SNYDER:  I have no questions.

12        MR. HEATHER:  I have a couple extra, prompted by

13    him.

14

15                       FURTHER EXAMINATION

16    BY MR. HEATHER:

17        Q    You haven't heard a single legislature state

18    that there will be any funding for AB 900, for example,

19    in this year, have you?  Can you name one senator or

20    assembly member who has said that there will be funding

21    for AB 900 this year?

22        A    I haven't heard one say that there would not

23    be, either.

24        Q    You can read the transcripts of two people I

25    deposed last week who said -- well, never mind.
                            Page 93

URL098~1

103

0           1           Do you know of any pending legislation or

2    proposal that is intended to actually fund AB 900 in the

3    foreseeable future given the failure of the budget?

4           A    I only know what I've heard is it's the

5    governor's plan to propose or in some way assist in the

6    process of implementing funding for AB 900.

7           Q    Okay.  Are you aware that the programs that are

8    listed on Exhibit 1 for San Diego County are more

9    extensive than those that exist in some other counties?

10           A    No, I'm not aware.

11           Q    Okay.  Mr. Mitchell asked you about some of the

12    individuals who have been and or will be rearrested for

13    DUI, for example, are they those who would have been

14    early released under these programs, and I think you said

15    yes.

16           Do you recall that?

17           MR. MITCHELL:  Object as misstating.

18           THE WITNESS:  We didn't talk about DUI at all with

19    Mr. Mitchell.  He said more serious crimes.

20    BY MR. HEATHER:

21           Q    I thought early on he said DUI.  I was going to

22    ask you do you know what the statewide recidivism is for

23    DUI?

24           A    No, I don't.

25           Q    Do these programs cover the early release of

104

Page 94

URL098~1

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1    people convicted for DUI?

2        A    Yes, they would.

3        Q    Okay.  The record will be what it is.  I

4    recalled that, if I'm wrong, I'm wrong, but it is what it

5    is.

6        A    But violations, to say that the -- there has

7    been research done on DUIs in particular because of, as I

8    said, the -- if you will, for lack of a better term,

9    regular people, Main Street America gets DUIs, that

10    incarceration has not been a proven tool, you know,

11    length of time has not been a proven tool to stop someone

12    from reoffending.  What really stops them is the

13    overnight spending, just the wake-up call, for the most

14    part.

15        Q    So early release for DUI is positive in terms

16    of public safety because the longer you keep them in, the

17    more likely they recidivate?

18        A    No, not the more likely they recidivate.

19        Q    I thought you said one night works better

20    than --

21        MS. SNYDER:  That's all they need, she said.

22        THE WITNESS:  That's all they need, that's right.

23    For those that are repeat offenders on DUIs, most of them

24    have had many DUIs before they get caught for their

25    second DUI, and they have a problem, and for those people

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1    that are a danger to the community.  But I think counsel,

2    you know, was interpreting it the way I meant it, unless

URL098~1

3    if I misstated it, that they don't need a long period of

4    time to be impacted by the sentence in order to stop the

5    behavior. It is only those people that really have a

6    problem with alcohol.

7         MR. HEATHER: Okay.

8         THE WITNESS: That need to have a longer sentence,

9    and they also need treatment as well because, obviously,

10   it's a substance abuse issue.

11   BY MR. HEATHER:

12        Q    And it's the overnight shock, DUI -- people who

13   commit DUIs get that on the arrest night, right? Because

14   if they're too drunk to get themselves home they're going

15   to be in jail until they sober up; is that correct? In

16   other words --

17        A    Well, in the quick release program I think they

18   do release them -- they keep them for a while, but they

19   release them to family members if they can find one.

20        Q    And someone is available. Okay. Now, my last

21   question on the second round is -- and you went two over.

22        A    Wait a minute. I'm going to keep track.

23        Q    Yeah. Is the early release proposal that we

24   have been debating in various aspects -- and I think even

25   Mr. Mitchell will ask you in the form -- if such a remedy

106

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376
1    were adopted or proposal were adopted, what is your

2    understanding in this case of what that remedy is being

3    proposed to remedy?

4         A    My understanding in this case is that the issue

5    is the unconstitutional treatment of prisoners as it

URL098~1

6    relates to medical, dental, and mental health issues.

7    And I don't know what the connection is, I see no

8    connection between that and a prison release program.

9    What the problem that I think we all have with the prison

10   release idea is that nobody knows what that would entail.

11        Q    Okay.  Let me refine the question and ask it

12   this way.

13             Would your answer change if you assumed that

14   the unconstitutional levels of medical care, dental care,

15   health care, mental and health care, were the result of

16   prison overcrowding primarily?

17        A    I don't think you could ever say that.

18        Q    Well, that's a fact question and the question

19   is if you assume that fact will your answer change about

20   the wisdom of an earlier release order?

21        A    That assumes facts not in evidence.  I'm

22   objecting to the question myself.

23        Q    If you can't answer that question tell me you

24   can't answer that question or you're not comfortable or

25   you don't want to answer it.  I need a response on the

107

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    record and I'll respect the fact you say you don't want

2    to answer it.

3         A    My response is I see no connection between

4    overcrowding and those alleged constitutional violations.

5         Q    But if I ask you to assume that overcrowding is

6    the cause of those violations would your position on

7    early release as a remedy to alleviate those problems,

8    would your position change?

URL098~1

9       A     I will not make any assumptions.

10      Q     Fair enough.

11      MR. HEATHER:  No further questions.

12      MR. MITCHELL:  I'll get the original, have her

13 correct it, we'll send it to you.

14              (Deposition concluded at 4:00 p.m.)

15              (Whereupon it was stipulated by and between

16      counsel that the provisions of 2025(q)(1) and 2025

17      (s)(1) were waived.)

18

19                            .

20

21              .

22

23

24                                              .

25

                                                        108

        LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1       STATE OF CALIFORNIA     )

2                               )

3       COUNTY OF ORANGE        )

4

5           I am the WITNESS in the foregoing deposition.  I

6       have read the foregoing deposition and having made such

7       changes and corrections as I desire, I certify that the

8       same is true of my own knowledge, except as to those

9       matters which are therein stated upon my information or

10      belief, and as to those matters, I believe it to be true.

11              I declare under penalty of perjury that the
                            Page 98

URL098~1

12    foregoing is true and correct.

13        Executed on_____

14    at_____, California.

15

16

17

18

19                              _____

20                              BONNIE DUMANIS

21

22

23

24

25

109

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

The following changes and corrections have been made in the transcript of the deposition of District Attorney Bonnie Dumanis:

| Page | Line | |
|------|------|--|
| 9 | 8 | Change: General Commission Judicial Nominee's Evaluations<br>To: Judicial Nominees Evaluation Commission |
| 9 | 9 | Change: Delete the first word, "commission" |
| 10 | 21 | Add at the end of the existing sentence: It's a peer-oriented group process that deals with behavioral concerns by addressing issues through one-on-one contact and group therapy. Usually, the facilitator is a person who went through the process. He/she would have completed the program and been a graduate of a therapeutic community. |
| 21 | 8 | Change: We prosecuted over 28,000 misdemeanors in 2007. |
| 22 | 20 | Change: We had over 1600 felons FTA on their arraignment, readiness conference, or prelim hearings in 2007. |
| 26 | 6 | Change: counsel<br>To: council |
| 27 | 15 | Change: We looked at individuals that entered our office/system multiple times since 2003, they may have been arrested but the case not submitted to us for a variety of reasons so we cannot look at all arrests, only submitted cases to our office. |
| 34 | 11 | Change: deterrents<br>To: deterence |
| 36 | 7 | Change: lessoned<br>To: lessened |
| 43 | 8 | Change: San Diego Association --<br>To: San Diego Association of Governments |
| 46 | 12 | Change: none<br>To: not |
| 49 | 21-24 | Change: Recidivism has different interpretations and hence populations to be measured. It may be defined as re-arrested, re-prosecuted, re-convicted, or re-incarcerated (either new charge or parole violation). |
| 51 | Starting line 12-19 | Change:      We are able to look at re-prosecuted data. Since 2003, we issued on 264,453 defendants. Of those, there were 175,655 different individuals. Of the 175,655 defendants, 46,417 were issued subsequently on 1 or more cases (through September 2008). Using this definition, 26.4% of all defendants recidivated (aka were re-prosecuted) within the 5 ½ year time frame that was examined.<br><br>If we look at re-submitted (aka timestamped by us) data, the percent is higher – 32.3% of defendants that we prosecuted between January 2003 and September 2008 were subsequently submitted one or more times after the initial prosecution. *Keeping in mind for both timestamped and prosecuted that we are missing all defendants whose subsequent arrest went to the City Attorney's Office. So the percentage is actually higher Countywide.* |

| 69 | 13 | Change: into<br>To: it to |
|----|----|---------------------------|
| 71 | 16 | Change: legislatures<br>To: legislature |
| 76 | 5 | Change: grandma<br>To: grandmother |
| 76 | 7 | Change: discover<br>To: discovered |
| 76 | 12 | Change: Delete first word "not" |
| 78 | 16 | Change: went to<br>To: did not |
| 81 | 23 | Change: ...which is San Diego and,...<br>To: ...which is similar to San Diego and,... |
| 86 | 9 | Change: willing<br>To: will |
| 99 | 10 | Change: 162 and three and<br>To: 16-2-3 years |

1    STATE OF CALIFORNIA     )

2                            )

3    COUNTY OF ORANGE        )

4

5        I am the WITNESS in the foregoing deposition.  I

6    have read the foregoing deposition and having made such

7    changes and corrections as I desire, I certify that the

8    same is true of my own knowledge, except as to those

9    matters which are therein stated upon my information or

10   belief, and as to those matters, I believe it to be true.

11       I declare under penalty of perjury that the

12   foregoing is true and correct.

13       Executed on_____

14   at_____, California.

15

16

17

18

19                        _____

20                                BONNIE DUMANIS

21

22

23

24

25

                                                            109

URL098~1

12    foregoing is true and correct.

13    Executed on ___10/90/08_____

14    at __SAN DiEGO_____, California.

15

16

17

18

19

20                                    BONNIE DUMANIS

21

22

23

24

25

109