depo of Rod Pacheco

· IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. |
| | ) CIV S-90-0520 LKK JFM P |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |
| | ) |
| MARCIANO PLATA, et al., | ) |
| | ) |
| Plaintiffs, | ) |
| | ) |
| vs. | ) Case No. |
| | ) C01-1351 TEH |
| ARNOLD SCHWARZENEGGER, et al., | ) |
| | ) |
| Defendants. | ) |
| ———————————————— | ) |

DEPOSITION OF RODRIC PACHECO

Irvine, California

Monday, September 22, 2008

Reported by:

Lynden J. Glover
CSR No. 5510

Job No.
URL0971

1           IN THE UNITED STATES DISTRICT COURTS
            FOR THE EASTERN DISTRICT OF CALIFORNIA
2           AND THE NORTHERN DISTRICT OF CALIFORNIA
    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
3     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

4

5

6    RALPH COLEMAN, et al.,            )
                                       )

Page 1

depo of Rod Pacheco

```
 7                    Plaintiffs,    )
                                     )
 8           vs.                     )  Case No.
                                     )  CIV S-90-0520 LKK JFM P
 9    ARNOLD SCHWARZENEGGER, et al., )
                                     )
10               Defendants.         )
                                     )
11    _____)
                                     )
      MARCIANO PLATA, et al.,        )    .
12                                   )
                     Plaintiffs,     )
13                                   )
             vs.                     )  Case No.
14                                   )  C01-1351 TEH
      ARNOLD SCHWARZENEGGER, et al., )
15                                   )
                 Defendants.         )
16    _____)

17

18            DEPOSITION OF RODRIC PACHECO, taken on

19       behalf of the Plaintiffs, at 1900 Main Street,

20       Suite 600, Irvine, California, commencing at

21       11:00 a.m., on Monday, September 22, 2008,

22       reported by LYNDEN J. GLOVER, CSR No. 5510, a

23       Certified Shorthand Reporter for the State of

24       California, pursuant to Notice.

25
```

2

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

```
 1    APPEARANCES:

 2

 3    For the Plaintiffs:         K&L GATES, LLP
                                  Attorneys at Law
 4                                BY:  FRED D. HEATHER
                                  10100 Santa Monica Blvd.
 5                                Seventh Floor
                                  Los Angeles, California
 6                                            90067

 7

      For the District           WILLIAM E. MITCHELL
 8    Attorney Defendant         Assistant District Attorney
      Intervenors:               4075 Main Street
 9                               Riverside, California 92501
```

Page 2

depo of Rod Pacheco

```
10
11    For the Defendants        HANSON BRIDGETT LLP
      State of California,      Attorneys at Law
12    et al.:                   BY:   PAUL MELLO
                                425 Market Street
13                              26th Floor
                                San Francisco, California
14                                             94105
15
16
17
18
19
20
21
22
23
24
25
```

                                                        3

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

```
1                    I N D E X
2
      EXAMINATION BY:                        PAGE
3
         Mr. Heather                          5
4
         Mr. Mitchell                        170
5
      FURTHER EXAMINATION BY:                 PAGE
6
         Mr. Heather                         171
7
8
9
                  E X H I B I T S
10
11    PLAINTIFFS':                           PAGE
12    1 - Document entitled "The following is a synopsis   27
          of programs currently in place in San Diego
                        Page 3
```

depo of Rod Pacheco

13    County that provide alternatives to detention
      and the relative effectiveness of these
14    programs, where available"

15    2 - District Attorney Intervenors Objections and        84
         Responses to Plaintiffs' First Set of
16       Interrogatories, signed by William E. Mitchell,
         dated July 2008
17
      3 - Document entitled "Probation can reduce prison      132
18       overcrowding, By Vincent J. Iaria, October 13,
         2006"
19
      4 - Document entitled "Position Statement of the        139
20       District Attorney Intervenors Regarding "Draft
         Settlement Referee Proposal Dated May 27,
21       2008""

22    5 - Document entitled "2007 Countywide Priority         143
         Federal Release Statistics"
23
      6 - Riverside County Sheriff's Department,              145
24       Headcount Management Unit, Federal Release
         Recidivism Rate, Sampling Period:
25       01/01/08 - 08/31/08"

4

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Irvine, California, Monday, September 22, 2008

2                    11:00 a.m.

3

4                    RODRIC PACHECO,

5    produced as a witness by and on behalf of the Plaintiffs,

6    and having been first duly sworn, was examined and

7    testified as follows:

8

9                    EXAMINATION

10   BY MR. HEATHER:

11       Q    Would you state your name for the record?

12       A    Rodric, R-o-d-r-i-c, Anthony, common spelling,

13   Pacheco, P-a-c-h-e-c-o.

14       Q    And you're appearing here today pursuant to a

15   Notice in the Coleman versus Schwarzenegger case?

depo of Rod Pacheco

16      A     Yes.

17      Q     Your current position?

18      A     I'm the elected district attorney for the County

19      of Riverside.

20      Q     How long have you held that position?

21      A     I was elected in June of '06 and sworn in

22      January 1st, '07.

23      Q     Would you briefly describe your educational

24      background and professional experience, however most

25      comfortable for you?

5

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

☐           1      A     Starting college?

2      Q     Yes.

3      A     Went to college at the University of California

4      at Riverside 1976 to 1980.  It's kind of a long way back.

5      I've almost forgotten.

6             Graduated in 1980 and went to University of

7      San Diego School of Law till 1983, graduated, passed the

8      bar in July of 1983, and started work in the District

9      Attorney's office of Riverside County May 21st, 1984,

10      worked there till December 2nd, 1996, left and came back

11      December 2nd, 2002, and have been there since.

12      Q     And between '96 and 2002?

13      A     I served in the California State Legislature as

14      an elected representative in the State Assembly.  It was

15      the 64th Assembly District covering western Riverside

16      County, served there three terms at two years apiece.

17      Q     And in your service in the Riverside County

18      District Attorney's office, have you always served as a

depo of Rod Pacheco
19    prosecutor as opposed to --

20        A    Yes.

21        Q    -- A civil lawyer?

22        A    Yes.

23        Q    And you prosecute, I take it, the full range of

24    crimes that the Riverside County D.A.'s office

25    prosecutes?

6

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        A    I probably had a more varied experience than

2    almost anyone I can think of.

3        Q    And can you characterize by sort of a

4    predominance of percentage of crimes, the most frequently

5    prosecuted crimes in that office in the last few years?

6        A    I don't understand the question.

7        Q    Well, I mean, in other words, if you go to some

8    places like San Diego, at least the word is that they

9    have a ton of immigration cases because they're close to

10   the border, a ton of drug cases.

11           Does the Riverside County's District Attorney

12   office say have any particular one or two or three types

13   of crimes that you would say constitute the majority of

14   crimes that are prosecuted by that office?

15       A    No.  The majority of crimes?  No.

16       Q    Okay.  Can you tell me what the five most

17   frequently prosecuted crimes are by that office say in

18   the last few years?

19       A    Drugs, gangs, sexual predators, sex crimes.

20   Five?  I don't think I can get to five.  There are --

21   grand theft autos is a heavily -- heavily committed crime

Page 6

depo of Rod Pacheco

22   in our county.

23      Q    And the rest are an assortment of petty thefts,

24   burglaries --

25      A    Yeah.

7

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      Q    -- that kind of thing, street crimes?

2      A    We have the gamut.

3      Q    Okay.

4      A    I mean it's fair to say we have the gamut of

5   crimes in Riverside County, with no one having a

6   majority.

7      Q    Okay.  Are there any population caps to which

8   the county is subject for its jail facilities?

9      A    Yes.  Consent decree in the 1990s.  I think it

10   was '91 or '92.

11      Q    Okay.

12      A    Federal Consent Decree.

13      Q    Okay.  And do you have any responsibilities with

14   regard to ensuring that the county is in compliance with

15   those caps?

16      A    I don't, no.  The sheriff does.

17      Q    Okay.  Are you aware of whether or not say in

18   the last several years the county has been able to

19   maintain its compliance with that population cap?

20      A    I'm very aware.

21      Q    And have they been able to do so?

22      A    No.

23      Q    And say in the last three years -- I'm trying to

24   use approximations.  I should probably stop here and not

Page 7

depo of Rod Pacheco
25    be as presumptive as I've been by not asking you whether

8

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

☐         1    you've ever been deposed before.

2         A    I have not been deposed.

3         Q    Okay.  Then --

4         A    I am assuming you mean training post?  Is that

5    what you mean?

6         Q    No.  Have you ever had your deposition taken

7    before?

8         A    Oh, yeah.  Absolutely.  Oh, you said "deposed."

9    I thought you meant post.  Sorry.  I have been deposed

10    before.

11         MR. MITCHELL:  Paul Mello.

12              (Mr. Mellow entered the deposition

13         proceedings.)

14         MR. MELLO:  Hi.  I'm Paul Mello.  I'll give you a

15    card.

16              (Discussion off the record)

17         MR. HEATHER:  Okay.  We're going to keep going if

18    that's okay, Paul.

19         MR. MELLO:  Please.  Please.  Sorry.

20    BY MR. HEATHER:

21         Q    Okay.

22         A    Yes, I have been deposed before.  And I've

23    testified in court before.

24         Q    You know, obviously being the experienced

25    attorney you are and having had your deposition taken,

9

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    I'm going to presume that you're generally aware of the
2    rules and that your counsel has reinforced those.
3          But let me just say, obviously, everything is on
4    the record.  If I ask you something you don't understand,
5    please ask me to clarify.
6          For the sake of not unduly imposing on
7    everyone's time, I will ask you questions that have sort
8    of a general approach to a subject to allow you to answer
9    them as best you can.  If that's insufficient, let me
10   know and I'll try to sharpen the question.
11         If I show you documents, I may want to draw your
12   attention to a particular portion of the document.
13   However, you should take whatever time you need to review
14   the document in order to feel comfortable answering the
15   question.
16         I forgot what the last question was.  Can you
17   read it back?
18   A    Have you been deposed before.
19   Q    No, prior to that.
20        (Record read)
21   BY MR. HEATHER:
22   Q    Okay.  In the last several years -- and this is
23   an example of the sort of general question I'm asking.
24   If it's not something you can answer, I'll narrow it.
25         But in the last several years when the county

10

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    has fallen into noncompliance with the population cap,
2    what has happened?  In other words, has there been court

depo of Rod Pacheco

```
3    action --
4        A    Well, that's pretty -- when they've fallen into
5    noncompliance?
6        Q    Well, you say they haven't been able to maintain
7    compliance.
8        A    They haven't -- let me back up.  Let me explain
9    if I can.  They have a cap, and they have exceeded that
10   cap.
11       Q    Right.
12       A    They have taken actions to prevent that from
13   occurring and violating the consent decree, and those
14   actions that they have taken involve early release.  The
15   manifestations of that early release are many and varied.
16       Q    Okay.  So let me just --
17       A    So --
18       Q    -- go through that answer.
19       A    -- clarify.
20       Q    That provides the information I was looking for
21   in a more cumbersome question, so I appreciate your
22   saying that.  Let me just make sure I understand the
23   mechanics, though, of what happens in this sense.
24            I believe you testified that there have been
25   periods during the last several years in which they have
```

11

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

```
1    failed to comply with the population cap numbers.  Is
2    that correct?  In other words, they've reached --
3        A    I indicated that, but that would've been in some
4    sense a misunderstanding of the question.  Have they
5    exceeded the population cap?  Yes.  They have taken steps
```

depo of Rod Pacheco

6      to remedy that.

7             So in a legal sense, a technical sense, it's

8      probably fairer to say or more fair to say that they have

9      not -- they have not been -- they have complied, but

10     they've taken steps to comply.

11     Q    Okay.

12     A    That's a better way to put it.

13     Q    All right.  So -- and, again, I'm just trying to

14     understand the facts.  I'm not trying in any way to

15     create facts here.

16            Is what you're saying that there have been

17     occasions in which the jail population has exceeded the

18     population cap and --

19     A    No.

20     Q    Okay.  It has not?

21     A    No.

22     Q    All right.  Is what you're saying that there are

23     occasions in which there was a concern that the jail

24     population would exceed the population cap and, as a

25     result, steps were taken involving early release to

12

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      ensure that the population cap was not exceeded?

2      A    Yes.

3      Q    Okay.  And but for those steps, such as early

4      release, the expectation would've been that they would've

5      gone over the limit.  Is that fair to say?

6      A    Could you repeat the question?

7      Q    The early release measures that were adopted

8      were adopted because there was a perception that absent
                              Page 11

depo of Rod Pacheco

9    those measures the population cap would or might well be

10   exceeded.  Is that fair to say?

11        A    Fair to say.

12        Q    Okay.  Now, the date of the opinion that you

13   mentioned which established the population cap, what year

14   was that again?

15        A    I want to say '91 or '92.

16        Q    All right.

17        A    It might have been '93, but I don't think so.

18   It was the early nineties.

19        Q    Okay.  And how soon after that opinion were the

20   first early release measures employed in order to see

21   that the county remained in compliance with that

22   decision, approximately?

23        A -  Early release measures?

24        Q    I believe you testified that in order to

25   maintain compliance with the population caps in Riverside

13

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    County, steps have been taken to ensure that compliance

2    and those steps involved early release measures.  I

3    believe that's what you said.

4         A    That's fair.  There were other measures as well.

5    Increasing jail capacity, for example.

6         Q    Okay.  I'm going to focus right now initially

7    just on the early release measures.  How soon after that

8    decision, if you recall?

9         A    I couldn't accurately tell you.

10        Q    Okay.

11        A    I was gone for six years from -- in effect from

Page 12

depo of Rod Pacheco

12    the office.

13        Q    All right.

14        A    And so I don't know during that six-year absence

15    if they took early release measures during that time.

16        Q    Okay.  You came back again when?

17        A    In 2002, December 2nd, 2002.

18        Q    And at that time were early release measures in

19    effect?

20        A    I think they were just starting.  Somewhere

21    around there.  And when I say "around there," I mean

22    within the first two or three years of me coming back.

23            So anywhere from December 2nd of '02 to '04, '05

24    they started early releasing.  I shouldn't say "started."

25    I became aware of.  That's a better way to describe it.

14

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    I don't know if they had done it before then.

2        Q    Okay.  Can you tell me what early release

3    measures since the time you returned in 2002 have been

4    employed by Riverside County in order to maintain

5    compliance with its population cap?

6        A    They release prisoners from jail or not book

7    them into jail.

8        Q    Okay.  Let me start with the releasing prisoners

9    from jail.  What is the criteria for giving early release

10    to a particular inmate?

11        A    You'll have to speak to the sheriff's

12    department.

13        Q    Okay.

14        A    I think generally speaking I could characterize
                        Page 13

depo of Rod Pacheco

15    it if you'd like.

16        Q    Sure.  Whatever your best understanding is.

17        A    Yeah.  You know, from afar it appears that they

18    look for the less dangerous inmate.  It's not a question

19    between this one is dangerous and that one isn't; it's a

20    question of degree.

21            This one is more dangerous than that one.

22    They're both equally dangerous, but then this one is more

23    dangerous than that one.  And so they make a choice, and

24    they make that choice daily.

25        Q    Do you know what the population cap number is

15

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    for Riverside County?

2        A    I believe it's 3,640, thereabouts.

3        Q    That's men and women?

4        A    Yes, total.

5        Q    What percentage of --

6        A    I have no idea of percentages between men and

7    women.

8        Q    Okay.  Do you have any idea what the

9    population -- the actual population is today, the

10    actual --

11        A    The jail?

12        Q    Yes.

13        A    It's full.  It's been full for several years

14    now.

15        Q    All right.  So it runs at about 3,640?

16        A    Yeah.

17        Q    And so there are -- really on a daily basis

Page 14

depo of Rod Pacheco

18    these early release measures have to be considered and

19    frequently employed.  Is that fair to say?

20         A    Yeah.

21         Q    Okay.

22         A    Not frequently.  I believe it's daily.

23         Q    Okay.

24         A    Routinely.

25         Q    All right.  Now, is one of the early release

16

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     measures a percentage reduction in the time in which an

2     inmate will serve?

3              As opposed to making an election that prisoner A

4     is less dangerous than prisoner B, is there in effect an

5     across-the-board reduction in the amount of time that

6     someone would serve but for the early release programs?

7         A    It's not as opposed to, as you put it.  It is

8     always a calculation, in my understanding, between this

9     one is less dangerous than the one we keep in.

10             The population that is considered in that

11    calculation is everyone in custody pending trial,

12    everyone in custody as a sentenced prisoner, everyone

13    coming into the facility, and anyone that I've forgotten,

14    anyone there, you know, pending some evaluation for some

15    purpose.

16             The only ones that I believe they don't fed kick

17    are the ones that are on their way to prison.  But other

18    than that, everyone is considered.

19             There isn't a body in the jail that is not

20    considered for a fed kick other than the ones that are
                              Page 15

depo of Rod Pacheco

21    being transported to corrections. And it is always a

22    calculation between less dangerous and more dangerous.

23    It's not convenience.

24        Q    My understanding -- and I represent this to you

25    just as that, as my understanding as a way of putting a

                                   ʻ

                                                          17

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

 1    context to this next question -- is that having taken the

 2    depositions of individuals from the L.A. County Sheriff's

 3    Department, I believe their testimony was that male

 4    inmates serve approximately 70 percent of their time as a

 5    result of their need to meet their population caps and

 6    female prisoners serve approximately 10 percent of their

 7    time.

 8        Do you know whether or not there is a percentage

 9    of time on average that people serve in Riverside County

10    as a result of these early release measures?

11        A    It's harder to fix on felonies, but I'll attempt

12    to do that. Misdemeanors serve little, if any, time on

13    their sentences.

14        Q    And misdemeanors can be sentenced to up to a

15    year; is that correct?

16        A    Yes. 365 days. And so they serve little, if

17    any, time. Felons that are on probation and given local

18    time my understanding is anywhere from 10 to 20 percent.

19        Q    They serve 10 to 20 percent or they --

20        A    Yes, they serve 10 to 20 percent. But it's

21    variable because they don't decide at the beginning of

22    their term how much time they're going to serve. They're

23    just sitting there, and they make the determination

                              Page 16

depo of Rod Pacheco

24    daily.

25            There's a guy sitting there for 10851, grand

18

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    theft auto.  A robber comes into the facility.  He's been

2    arrested, person arrested for robbery.  And there's a

3    choice.  And they look through the facility and say,

4    "Who's less dangerous?"  And they make that choice.

5        Q    Okay?

6        A    And that's how they do it.  So that person may

7    serve 10 percent of his time, the next person may serve

8    15, the next person may serve 30.  It's variable.

9        Q    Okay.  So on an individual basis, you can't

10   predict, it's not absolute, you're coming in here, you

11   know you're going to get out after 10 percent of your

12   time.

13       A    Right.

14       Q    But if you average it out, your best --

15       A    10 to 20 percent.

16       Q    -- is that individuals who were convicted of a

17   felony served 10 to 20 percent of their times, which

18   means that they on average in terms of the population are

19   having 80 to 90 percent of their sentences reduced.

20            Is that correct?

21       A    Yes.

22       Q    Now --

23       A    Thereabouts.

24       Q    Have you studied the rate of recidivism in

25   Riverside County on an historical basis?  By "an

depo of Rod Pacheco

19

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    historical basis," say going back say to 1970 or '80 or

2    for the last 25 years or done any kind of systematic

3    study of the rate of recidivism?

4        A    Not as you have described it.

5        Q    Okay.  Have you done some study in a different

6    fashion?

7        A    We've looked at recidivist rates in the jail

8    population, correctional population, state correctional

9    population, in preparation for this particular lawsuit.

10       Q    Okay.  Putting aside anything other than

11   Riverside County, have you looked at those rates as they

12   apply solely to Riverside County?

13       A    I've seen a lot of things, so I'm trying to

14   recall.  I'm sure that I have.  I would make the

15   assumption that I have.

16       Q    Do you recall, as you sit here today, what the

17   recidivism rate has been in Riverside County for the past

18   year?

19       A    I have seen that.  I don't recall.

20       Q    Okay.  Do you know whether or not that

21   recidivism rate for the past year is higher or lower or

22   approximately the same as the recidivism rate in

23   Riverside County say in 1980?

24       A    No, I don't know that.

25       Q    And if I used any other date in comparison, your

20

depo of Rod Pacheco

1    answer would be the same?

2        A    It depends on the date, but --

3        Q    1985?

4        A    Yeah, it depends on the date.

5        Q    Is there a date on which you could say I do know

6    what the comparative rate of recidivism is?

7        A    Intuitively in working in the system as long as

8    I have, it appears to be higher as we started having

9    trouble with our jail system.

10        We have seen increases in our filings and things

11    of that nature.  And we see a lot of turnaround of folks

12    that we have prosecuted in the past that had prior

13    convictions.  And that appears to be going up, if that's

14    to a larger point of your question.

15        As it relates to individual years, this year was

16    53.2 percent and this year was 45 percent?  No, I'm not

17    capable of doing that today.

18        Q    Okay.  Is the crime rate in Riverside County

19    different than it was 25 years ago?

20        A    Crime rate has gone down over the last decade.

21    Since 1994 the crime rate has gone down dramatically.

22        Q    And what do you attribute that to?

23        A    And continues to go down.

24        A variety of factors, one of which was Three

25    Strikes Law which passed first by the legislature in

21

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    March of '94 and then by the electorate November of '94.

2    And our violent crimes have been -- were almost

3    immediately cut in half.

Page 19

depo of Rod Pacheco

4      Q    As a result of three strikes?

5      A    Yes, and remain almost 50 percent, maybe a
6    little more than 50 percent. Our property crimes have
7    gone up, but even they will reduce over time. They're
8    starting to go back up.

9           Our office is a very aggressive district
10    attorney's office. And over the last 20 years it -- the
11    former district attorney took it and professionalized it,
12    became very innovative and created an aggressive culture,
13    I guess, in prosecution of crimes, tough on violent
14    crimes particularly, created new units, things like that.

15           Also law enforcement evolved and innovated in
16    our county. The board of supervisors became very
17    committed to the support of law enforcement agencies
18    within the county.

19           A number of other factors I would point to. But
20    it's a -- it's a county that's fairly I think unique in
21    its dedication to public safety which is represented
22    through its elected officials.

23      Q    Do you know how the crime rate in Riverside
24    County compares with the crime rate in surrounding
25    counties?

22

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      A    Yeah. Riverside County has -- the last time I
2    checked, the fourth lowest violent crime rate. Orange
3    County is number one. And I want to say Santa Clara is
4    number two, Contra Costa is number three, Riverside is
5    four. San Diego is in there somewhere. It's pretty
6    close.

Page 20

"depo of Rod Pacheco

7    Q    well, what about for nonviolent crime?

8    A    our property crimes are high, and I would not

9    say that we are that low.  I don't recall --

10    Q    And why do you attribute property crime as being

11    higher?

12    A    The attention to violent crimes and the

13    explosion of identity theft, and I think we've lagged

14    behind in our approaches to that.

15         I think also, quite frankly, the congestion of

16    the courts, which has been going on for some time, has

17    caused people to make choices between bad and worse

18    crimes.

19         And so if you have to choose between a murder

20    and an identity theft case, the identity thefts tend to

21    get pushed out of the system, the drug cases and things

22    like that.

23         And then we had a guy the other day that was

24    brought to my attention who committed nine commercial

25    burglaries.  And a judge gave him probation and credit

23

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    for time served, which was literally nothing.

2         And that was the judge's decision, not ours.  We

3    didn't create that plea bargain; the judge did.

4         And that's I think a perfect example of what's

5    gone on in our system over the last probably decade.

6    When I first got back in 2002, that's when we started --

7    that's when I became aware of the congestion.  When I

8    left in '96, it wasn't there.

9    Q    All right.  So you think that judge's decision

Page 21

depo of Rod Pacheco

10    you attribute more to be overcrowding in jails or the

11    risk of overcrowding in jails and the backlog of cases in

12    the courts as opposed to that particular judge's penchant

13    for just not giving jail time?

14        A    I think that is an example of the systemic

15    congestion in the jail and the courts, and there are many

16    examples of that.

17        Q    Okay.  Let me go back, if I can, to these early

18    release measures.  I think so far we've talked about two

19    aspects of that.

20             One is that people who are convicted of

21    misdemeanors spend little, if any, time in jail.

22             And those who are convicted of felonies spend on

23    an average 80 to 90 percent -- I'm sorry, 10 to

24    20 percent of their time, although some individuals may

25    spend a lot longer than that if they're considered

24

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    particularly dangerous.

2        A    It depends.

3        Q    Are there other aspects of the early release

4    measures that are used in Riverside County in order to

5    ensure compliance with its population cap?

6        A    I'm not sure what you mean.

7        Q    Well, let me ask you -- I think you testified

8    earlier that compliance with a population cap -- and I'm

9    doing this simply to see if I'm correctly refreshing your

10    recollection.  And if I'm not, I'll ask the questions in

11    a different way.

12             But I thought you suggested earlier that

Page 22

depo of Rod Pacheco

13   compliance with a population cap is achieved in two

14   different ways.  One is through reductions in the jail

15   population which we've just talked about.

16        A    Yes.

17        Q    And the other is not putting people in jail in

18   the first place.

19        A    Right.

20        Q    And so other than the fact that if you're

21   convicted of a misdemeanor you may spend little, if any,

22   time in jail, are there other procedures or policies or

23   programs which divert people from going into jail in the

24   first place which are programs that are designed at least

25   in part to ensure that the county maintains compliance

25

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1   with its population cap?

2        A    I know of no programs external to the jail that

3   are designed to keep the cap -- to keep the jail in

4   compliance.

5        Q    All right.

6        A    With the federal cap.

7        Q    All right.

8        A    There may be -- there may be practices in the

9   jail that allow them on a daily basis to maintain that

10   number, 3,640.  And that might be moving prisoners here

11   and there and, you know, housing them in various

12   locations.

13        MR. HEATHER:  I apologize.  My phone went off.  I'm

14   going to stop just for a second to make sure I turn it

15   off.

Page 23

depo of Rod Pacheco
16          (Discussion off the record)

17    BY MR. HEATHER:

18         Q    Let me suggest a couple of procedures that have

19    been used in other counties, I will represent to you have

20    been used in other counties, and see if you're aware of

21    any similar programs in Riverside County.

22              And in fact, to make it easy, I will mark, I

23    guess, as -- is Pacheco the correct pronunciation?

24         A    It is.

25         Q    -- as Pacheco Exhibit 1 a document that's

                                                                26

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1     previously been marked in the deposition of one of the

2     San Diego County Sheriff's Department officials.

3          MR. MITCHELL:   Is that Colonder?

4          MR. HEATHER:   I don't recall.

5     BY MR. HEATHER:

6          Q    And I'll ask you to review that and represent to

7     you that these are some of the things that are done in

8     San Diego County to ensure that they comply with the

9     population cap.

10              May I have that one back when you're ready?

11              (Pacheco's Exhibit 1 was marked for

12         identification, the original of which is

13         attached hereto.)

14         THE WITNESS:   I have reviewed it.

15    BY MR. HEATHER:

16         Q    All right.  Having reviewed Exhibit 1, what has

17    been marked as Exhibit 1, do you recognize any programs

18    that are used in San Diego that are similar to those that

                              Page 24

depo of Rod Pacheco

19    are used in Riverside County other than what we've

20    already discussed?

21        A    Yes.

22        Q    Okay.  Could you explain what those are?  And if

23    you want to do it by reference to the exhibit, that's

24    fine.  However you feel most comfortable.

25        A    Thank you.  There are versions of some of these

27

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     and then some of these I'm not aware of, but that should

2     not mean that they don't exist, so if I fail to mention

3     one.  It may exist.  I may just not be aware of it.

4         Court Felony OR is something that I believe that

5     we do.  Jail Book and Release Program.  Field Cite and

6     Release.  That actually -- let me clarify if I can.

7         Some of these things have been done for a long

8     time, some of them are recent manifestations, and they're

9     not necessarily actions done by the sheriff's department

10    which runs the jail.  We have a number of police

11    departments in Riverside County, for example, Murrieta

12    Police Department.

13        Q    Okay.

14        A    They can field cite and release based on their

15    belief that the jail is full, and so there's no reason to

16    drive two hours and book somebody in who's not going to

17    get booked.  So they start citing people and releasing

18    them at the scene so that they can keep their officers on

19    the street.

20        Q    Okay.

21        A    So it's not necessarily -- your question --

Page 25

depo of Rod Pacheco

22  questions have been, you know, designed to ensure

23  compliance. Those aren't actions designed to ensure

24  compliance; those are reactions to the jail being full.

25      Q    They nonetheless have the effect of assisting

28

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   the county in maintaining compliance?

2       A    They have a lot of effects.

3       Q    But one of them is to assist the county in

4   maintaining its compliance with the cap because if the

5   people who are not put in jail as a result of the

6   programs you identified were put in jail and the jails,

7   as you say, are always full, you would exceed the cap

8   unless you accelerated the early release for other

9   people.

10      A    Taking the field cite and release as an example,

11  if Murrieta P.D., instead of citing that person for the

12  petty theft that they investigated, arrested them, took

13  them down to the jail, the jail would not accept them.

14  The jail would book and release them.

15      Q    Okay.

16      A    And so the departments have made determinations

17  that that's pointless for their officers to waste two to

18  three hours to drive all the way down to the jail and all

19  the way back -- we have a pretty big county -- for

20  someone who is not even going to get booked in.

21           So they start reacting to that and by release --

22  they start citing and releasing people, which is

23  different than the way you're describing it.

24           Central Intake Program, I believe that's now

Page 26

depo of Rod Pacheco
25    currently being done, as I've heard.  And that involves

29

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

□          1    all of the jails in our county.  There are different

2    sites.

3            Supervised Release may be something that we do

4    about -- do something similar to, but we don't have

5    anybody to supervise people so I'm not sure what that

6    refers to.

7            Drug diversion has been done for -- since I

8    started in 1984, so --

9            Work release, again, since I got there as a

10   prosecutor in 1984 we've been doing that.  Work release

11   and we have I believe some work furlough.  And we've also

12   done weekends, but we've been doing that for a long time.

13      Q    Okay.  What about electronic monitoring, home

14   detention?

15      A    Well, we've tried to stay away from that.  It's

16   done every now and then, but it's something that's not

17   done commonly.

18      Q    Why is that?

19      A    Probably because there's a lack of

20   accountability.  If someone could sit at home and watch

21   TV and watch the Cowboys play, there's not a lot of

22   accountability there for somebody who's violating the

23   law.

24            And so it's probably based more on principle

25   than practicality.  And those are many of the decisions

30

Page 27

depo of Rod Pacheco

1    we make in Riverside County, which are different than

2    other counties.

3        Q    Now, have you ever been a criminal defense

4    lawyer?

5        A    I worked for a criminal defense firm, yes, as a

6    young lawyer and as a law clerk.

7        Q    Okay.  I missed that in your -- you didn't -- I

8    don't recall your mentioning that in your history.  Can

9    you tell me when and where you did that?

10       A    Sure.  Let's see.  Let me remember the exact

11   year.  The summer of my -- after my second year in law

12   school I worked as a law clerk for Sprigg, Milligan &

13   Beswick.  They're no longer Sprigg, Milligan & Beswick.

14   I think they're just Milligan & Beswick, but Mr. Beswick

15   passed away earlier this year.

16            I worked as law clerk for them.  I did criminal

17   work.  I wrote motions and 1538.5s and 995s and assisted

18   in other ways that a law clerk can assist.

19            And then when I finished the bar exam, I went

20   back to work for them as a law clerk to earn some extra

21   money and then passed the bar and worked for them as an

22   attorney.

23            I had always wanted to be a prosecutor, so --

24   and they knew that, so it was just a question of me

25   getting hired in the interviewing.  So I did work for

31

1    them as a defense attorney I guess you might call it.

2        Q    For how long after you --

depo of Rod Pacheco

3      A     I got hired May 21st, 1984.  So between
4    December 13th when I sworn in of 1983 I worked as a
5    lawyer for them.
6      Q     For essentially six months?
7      A     It would be fair to describe it as contract
8    work.  I didn't have an employment agreement or
9    retirement or health benefits.  It was, you know, hey, we
10   need your -- some research on this project.
11           I did a federal appeal, for example, that was a
12   big project.  But it was project-driven.  I didn't show
13   up and sit around and wait for a salary, so to speak.
14     Q     Okay.  Did you actually meet the clients?
15     A     Oh, yeah.
16     Q     And work directly with the clients?
17     A     Well, kind of.  I don't want --
18     Q     I mean I realize you're a young lawyer and so --
19     A     Yeah, and, you know, I was a kid.  I was 25
20   years old and I was working for some very seasoned
21   lawyers.  And, yes, I would be in on the meetings.  Yes,
22   I would from time to time speak to the clients, but --
23     Q     Were these mostly white-collar cases?
24     A     They were all kinds.
25     Q     All kinds of cases?

32

1      A     There was a juvenile murder case that I worked
2    on I recall.  There was a federal drug conspiracy case
3    that I worked on.  That was the federal appeal I did.  I
4    actually didn't work on the trial, but I worked on the
5    appeal.

depo of Rod Pacheco

6      Q      Did you meet the client?

7      A      Yeah, I remember meeting the client.  I wouldn't

8    call those interactions between myself and the client

9    substantive, that is where I sat down and they explained

10   their story.

11     Q      Right.  Now, I'm asking for a slightly different

12   reason, which is did you have enough interaction with

13   these defendants or people who were concerned they might

14   be defendants in the criminal process to understand that

15   while they may or may not ultimately have been convicted

16   of crimes, there was an element of humanity in them that

17   you could see in terms of their desire to be,

18   notwithstanding what mistakes they may have made,

19   contributing members of society, take care of their

20   family, that there was decency in them even though they

21   may have been subject to the criminal system.

22     A      That's an interesting question you ask.  I have

23   to expand a little bit.  It's a philosophical question

24   and hopefully a philosophical answer.

25            I don't know that we can say any human is devoid

33

1    of any humanity.  And so that being said, that there's

2    always some bit of humanity that every human has

3    regardless of how lacking in humanity they may exhibit in

4    other contexts.

5            I think of the worst people in history, and they

6    exhibited humanity, real or imagined, in some way or

7    another to their loved ones, their friends, strangers.

8    So, you know, I don't know if that answers your question.

Page 30

depo of Rod Pacheco

9       Q    It does answer my question.  When someone makes
10   a mistake and gets convicted of a crime in Riverside
11   County and comes out of jail, let's assume it was a crime
12   for which they had to do some jail time, are there
13   programs in place which you believe are sufficient to
14   allow the county to do the best possible job in assisting
15   that individual to avoid becoming a recidivist?
16      A    I don't know how many questions are in that
17   question because I lost track at three --
18      Q    I don't either.
19      A    -- but I think I know what you're asking, so
20   I'll try to answer all the parts of it.
21           I do not believe that the county or the state
22   provides sufficient rehabilitation programs, resources,
23   whatever is necessary for the implementation of those
24   things, for sufficiently helping people redeem
25   themselves, which is what you're asking.

34

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1            They don't provide those resources.  They don't
2    in Riverside County and they don't in any other county in
3    the state, and they don't statewide either.
4            That's a problem, and it needs to be remedied.
5    There are some efforts to do that, but they haven't been
6    sufficient to my take.  And the recidivism is high, and
7    redemption is low.
8       Q    Now, look, I appreciate the effort that you're
9    making to answer my questions.  And I know they're broad
10   and maybe even, as you say, somewhat philosophical.
11           As I said, if I can -- if I need to ask them

depo of Rod Pacheco

12    differently, I will.  But I appreciate the effort you're

13    making.  And I'm trying to ask these questions in a

14    fashion that will allow you to answer them the way you

15    are so we're not here all day.

16        A    But I've set aside all day if we need to.

17        Q    Well, you're going to get early released.

18        A    Only if I deserve it.

19        Q    I want to assume for purposes of the question

20    that individuals have the individual responsibility, once

21    they've committed a crime and done their time, to try to

22    go straight, to avoid committing another crime.

23        A    They have responsibility?

24        Q    They have individual responsibility to try to

25    avoid committing another crime.


35

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1            I'd like to, for purposes of this question, set

2    aside but assume that that individual responsibility

3    exists and focus to some extent on what the state or

4    counties might do to assist that individual if they had

5    sufficient resources and ask you, therefore, the

6    following questions.

7            Do you believe that assisting individuals in

8    finding employment would assist in reducing the

9    recidivism rate?

10        A    Well, I'm going to answer the question with the

11    proviso when you say "responsibility," what that means to

12    me -- just so that you know what context I am responding

13    and why I am responding -- individual responsibility

14    tells me that's an expectation not by the individual but

depo of Rod Pacheco

15    by society or others in society.

16        Q    Fair enough.

17        A    It is incumbent upon the individual who has

18    committed the crime and is now released to resolve their

19    situation, to make a choice.

20            I served on the board of directors for an

21    alcohol rehabilitation center, and I was the president at

22    one opportunity and learning -- I don't have much -- I

23    didn't have much familiarity with alcohol and its effects

24    and rehabilitation efforts until I got on that board, but

25    learned a valuable lesson about that and that it's up to

36

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    the individual, regardless of the resources that are

2    provided.

3            So a county, a state, a community, a society can

4    provide as many resources as they would like.  If the

5    person doesn't avail themselves of those opportunities,

6    then they're never going to redeem themselves.

7            And they're making a choice.  It may be for a

8    whole host of reasons within or without their control,

9    but they're still making a choice.

10            So -- but employment, is it a good thing for

11    society to provide help for people who have gone to jail

12    and prison and been released and are now looking for

13    employment?  Yeah, that's a good thing.  There are lots

14    of efforts that could be done that are not being done.

15        Q    Okay.

16        A    And the resources, for some reason, are not

17    being placed there.

Page 33

depo of Rod Pacheco

18    Q    All right.  The availability of sufficient jobs
19    is one of them.  Wouldn't you say that that's true?
20    A    I don't know -- that's a different question.
21    The availability of sufficient jobs or the availability
22    of someone to help them find a job?  Those are two
23    different things.
24    Q    Let's start with the availability of someone to
25    help them find a job.

                                    37

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    A    I think that would be helpful.  That would be an
2    important part of the rehabilitative process for jail or
3    prison.
4    Q    And currently is it fair to say there are not
5    sufficient resources to carry out that role?
6    A    Yeah, I think statewide or countywide.
7    Q    Okay.  You agree with that?
8    A    I do.
9    Q    And would the same be true of housing?
10    A    Absolutely.  No -- federal authorities provide
11    some assistance in that, Section 8 housing, some.
12    Q    But overall you would say it's another area
13    which is insufficient at present?
14    A    Yes.  Uh-huh.
15    Q    Are there other things -- when you said it's one
16    of many, are there other things you can think of as you
17    sit here that would help individuals to go straight?
18         I mean, again, assuming their responsibility to
19    make individual choices, but assuming they want to, are
20    there other things that could assist them?
                        Page 34

depo of Rod Pacheco

21      A     Alcohol rehabilitation, controlled substance

22   rehabilitation, treatment centers, you know, all kinds of

23   things.  Job training, you name it.

24      Q .   And in all these areas you've mentioned, is it

25   fair to say at present the resources just aren't

38

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   sufficient, whether we're talking about Riverside County

2   or statewide?

3      A     The resources haven't been provided.

4      Q     Okay.

5      A     The resources are available, but they have not

6   been provided.

7      Q     And is funding a -- is it your understanding

8   it's a question of funding or is it a question of

9   philosophy?

10      A     Oh, I think it's a question of choices.  You

11   know, the budget that was just signed or is about to be

12   signed by the governor I believe this week is a

13   hundred -- close to 150 billion dollars.

14           Clearly, there's enough resources to provide

15   these things.  But it's a choice between rehabilitation

16   efforts and the things that are necessary to help people

17   redeem themselves or, you know, a new reservoir in the

18   central valley or, you know, more money for schools or,

19   you know, any number of things.

20           And I think those are the choices that are being

21   made.  And they're being made very poorly, in my opinion.

22   And I think the receivers run into that with dealing with

23   the legislature, which I know very well.

                           Page 35

depo of Rod Pacheco

24    Q    Are you aware of any facts or studies or have a

25    personal opinion as to whether an individual who is

39

LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

1    released early is more likely to commit another crime,

2    become a recidivist, because that individual has been

3    released early?

4         I'm not talking about the question of timing.

5    I'm talking about whether they'll -- in other words,

6    obviously, if they're out and they commit a crime, it's

7    going to be sooner than they would've committed it had

8    they stayed in.

9         I'm talking about regardless of when they get

10   out, are you aware of any studies which show that if you

11   get out a week early the recidivism rate is one percent,

12   if you stay in a week longer the recidivism rate for that

13   group is lower?

14   A    Is that a specific question or is that an

15   example?

16   Q    I've done the best I can. Yeah, it's an

17   example.

18   A    That's an example?

19   Q    Of what I'm trying to get at.

20        In other words, do recidivist rates change

21   depending on the percentage of time from the original

22   sentence that people serve?

23        Are you aware of any such facts?

24   A    Yes. And you asked for personal opinion as

25   well, and that personal opinion is based on my experience

Page 36

depo of Rod Pacheco

40

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    in the criminal justice system.

2            And not only from the perspective as a

3    prosecutor, a line prosecutor for 12 and a half years,

4    but also in the perspective as a manager and now as the

5    district attorney and also in my perspective as a former

6    legislator and watching it from a different angle and

7    observing the system.

8            From the dawn of time, not to be -- not to

9    provide too much exaggeration, but from early man we've

10   learned that punishment provides some deterrence.

11           Any diminution of that effort I think encourages

12   folks and increases recidivism.

13           When someone who is violating the law, on a

14   fairly consistent basis especially, sees that the system

15   is incapable of providing accountability, that encourages

16   them.

17           It's a pretty obvious thing.  I've got four

18   kids.  If I fail to discipline them in some fashion, they

19   will increase their behavior.  It's human nature.

20           And that's why we have punishment in society, to

21   deter people from committing more crimes than they have

22   already committed.

23           Sometimes it's very effective.  Sometimes it's

24   not.  There are varying degrees, depending on the

25   individual, who gets the message and who doesn't.

41

depo of Rod Pacheco

1      Some people don't commit crimes because of the

2    ·deterrence.  Some people do it based on morality and

3    their familial teachings.  It depends.

4        Q    You know, I know I'm being very philosophical

5    today.  And, again, I appreciate your discussing this

6    with me.

7             I think this case raises some very important

8    questions for society.  I think your answers today have

9    shown they're important questions in where we elect to

10   put resources and how we elect to try and solve the

11   problem.

12            The problem is people committing crimes in the

13   first place, and another aspect of that problem is

14   whether they're going to continue to commit crimes.

15   That's a problem for society that you see in your

16   professional position.  Fair to say?

17       A    Yes.

18       Q    And in your last answer, you used the example of

19   someone who commits a series of crimes and sees there's

20   no accountability.  And I understand that it sounds -- I

21   don't mean to say common sense, because that would demean

22   the fact that you're bringing a lot of your experience to

23   it, but --

24       A    It's intuitive.

25       Q    It's kind of intuitive.  I'm not sure you

42

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    intended to say the same thing might be true for someone

2    who's made one mistake.

3        A    It depends.  It depends.

Page 38

depo of Rod Pacheco

4      Q     And here's what I'm trying to ask.

5      A     Who is that person?  What's their background?

6    What have they learned?  How is it -- for some people one

7    exposure to the criminal justice system changes their

8    life entirely and they never come back and we never see

9    them.  And that number may be pretty big or that number

10   may be fairly small.

11          It depends on how the system interacts with them

12   too.  If the system is permissive and looks at their

13   violation of society's law or laws as no big deal, as,

14   well, it's not that significant to us, that sends a

15   subconscious and conscious message to the person who's

16   standing in front of the judge.

17          If the judge is quite the opposite, if the judge

18   is assertive in the violation and the meaning of that

19   violation, that has a different impact.

20     Q     Well, I'm going to approach this issue from two

21   additional perspectives.  And it's not to argue with

22   anything you've said.

23          But given what you've said, if you take a

24   particular individual and you don't know anything more

25   about that individual, but let's say it's a first-time

43

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    offender, whatever, not a violent crime, and they're

2    sentenced to whatever they're sentenced to, a period of

3    months, or they're going to serve a period of months

4    under the current system, let's say they're going to be

5    in jail for somewhere between three and six to nine

6    months, somewhere in that range, is it fair to say that

Page 39

depo of Rod Pacheco

7    there are no statistics or studies that show that if you

8    take a day off that time it's going to have an impact on

9    whether they'll become a recidivist?

10        A    That's an incomplete question in the sense that,

11   one, it's not the experience that we have, number one.

12   Number two, is it a day off or is it 10 days?  What's

13   the -- how long is the sentence?  Is the sentence 15 days

14   and you're taking 10 days off?

15        Q    I'm saying let's make it concrete.

16        A    Is the sentence two days and you're taking one

17   day off?

18        Q    Let's make it six months and take off a day.

19             Do you know any studies that say if you take one

20   day off a six-month sentence, that the recidivism rate

21   for the class of people who are sentenced to that time

22   changes?

23        A    Not in that limited hypothetical, no.

24        Q .  Okay.  And at what point does it change?

25             Say on a six-month sentence, how much time do

44

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    you have to take off a six-month sentence before you will

2    be able to answer my follow-up questions to show me a

3    study that says we found that with that much time off the

4    recidivism rate goes from "X" to "Y"?

5             And if there are no such studies, that's what

6    I'm asking.

7        A    If only it were that simple to identify a hard

8    and fast number.  Then we wouldn't be here.  But it's not

9    that simple because every individual and every situation

depo of Rod Pacheco

10    is different.

11        Some people you could theoretically, I think,

12    give them a day off their sentence and it would have a

13    negative impact on them such that it might influence them

14    to commit another crime. Depending on the sentence,

15    depending on the circumstances, depending on the

16    individual.

17        Some person you don't need to give them a day

18    off and they're going to repeat their offense. You could

19    give them a very tough sentence, and they're still going

20    to repeat it.

21        I've seen it day in and day out in my profession

22    as a prosecutor. It doesn't matter what the sentence is.

23        But it's fair to say that when a society

24    identifies a punishment and then diminishes that

25    punishment, in some significant way -- and I don't think

45

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    it can be quantified -- in some significant way there is

2    a problem with public safety. And that encourages

3    recidivism and repeat offenses within that community.

4        And there are anecdotal stories, studies if you

5    will -- you can put it in quotations or not -- from

6    around the country that -- where we have seen that.

7        It also increases failures to appear. Why would

8    a person appear in court if the court is meaningless, if

9    there's no sentence that they will serve that it really

10    exacts any punishment or creates any deterrence in them?

11    And so their failures to appear go up.

12        That's what's happened in Riverside County, for

depo of Rod Pacheco

13  example, and we've seen that in other communities as

14  well.

15      Q   I forgot whether I have asked you and you've

16  answered whether the rate of recidivism generally in

17  Riverside County has changed over any measurable period

18  of time that you can recall, like whether it's gotten

19  higher in the last five years or higher in the last 20

20  years or --

21      A   It's hard to quantify because we have many other

22  variables in Riverside County.  It is not a static

23  environment.

24          If that were the only variable, we might be able

25  to identify that.  But it's not.  The county has grown

46

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   from -- I started in 1984.  It was 500,000 people.  Today

2   it's 2.1 million.

3           We have a court system that has diminished in

4   many respects and not grown to the size of the community.

5   You know, our office has grown.  There's this situation,

6   this variable, so on and so forth.

7           So selecting this one variable out, it's hard to

8   say.  It is intuitive, however, in my, you know, working

9   in the office that it appears to be increasing.

10      Q   The recidivism rate generally, even though there

11  are a lot of explanations for it.  And I'm not trying to

12  pin the explanation.

13      A   There may be a lot of explanations, but it

14  appears to be a fairly recent occurrence.  The court

15  congestion over the last decade has been a fairly

Page 42

depo of Rod Pacheco

16    recent occurrence.  A lot of things have been fairly

17    recent.

18         But that's what happens in a community like

19    ours.  One of which is the fairly extreme number of

20    releases that have occurred in our county over the last

21    few years.  6,001 in 2007.

22         Q    I'm sorry.  You had your hand up.  I thought you

23    were going to interject.

24         MR. MITCHELL:  If it was, it was just a big yawn.

25         MR. HEATHER:  Okay.  Sorry.


47


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    BY MR. HEATHER:

2         Q    Let me explore -- I'm really trying to get your

3    views on this.  I'm not trying to circle the wagons and

4    put you in someplace you don't want to go.

5         I don't know where you're going to go, and I

6    think your answers have been -- you know, have shown the

7    experience you've had and your thought about these

8    things.  Let me give you a background to this next

9    question.

10         You know, like you, I have served -- not as long

11    but for four years as a prosecutor.  And for the last 20

12    or 25 years, I've volunteered to take cases as a member

13    of the Federal Indigent Defense Panel.  I think I'm one

14    of only two big firm lawyers that does that now, and so I

15    always carry two or three cases that I do pro bono.

16         But I can recall as a young law clerk, like you,

17    when I was going to law school in New York, I had the

18    pleasure of working for one of the top lawyers in the

Page 43

depo of Rod Pacheco

19    country.  His name is Arthur Lyman.  I don't know if you

20    know the name, but --

21    A    I've heard it.

22    Q    And I remember him coming back to a litigation

23    lunch -- which shows you how small the law firms were,

24    but in the entire litigation department of that big firm

25    could fit around two of these table.

48

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    But he came back and he said -- and I remember

2    this to this day.  He said, "You know, the judges in the

3    southern district of New York, the word is they're going

4    to start giving jail time in white-collar cases."  And it

5    was like shocking news.

6    And then when I became a prosecutor in the early

7    eighties, there were no sentencing guidelines.  And I

8    remember I used to go down -- on Monday morning

9    calendars, you'd have to go down to court and take

10   whatever small matters there were.

11   And you handled it for that judge, but it was an

12   important matter.  Then the prosecutor had that case and

13   would handle it.  And so I watched many sentences.

14   The prosecutor would get up there and talk about

15   what a bad case it was.  The defense lawyer would get up

16   there.  The judge would say, "You've been punished

17   enough.  Straight probation."  First time offense

18   white-collar case.

19   And then the sentencing guidelines came in.

20   They didn't have that latitude.

21   And what I've seen during my lifetime from the

Page 44

depo of Rod Pacheco

22    time when Arthur Lyman reported that they're going to

23    start giving jail time is -- and I'm not a student of

24    this in a sophisticated sense -- is that we've now

25    become -- with maybe one exception -- we have the highest

49

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1    percentage of people incarcerated of anybody in the

2    world.

3        A    When you say "we," who do you mean?

4        Q    The United States.  That now we're number one or

5    number two in the world.

6            And the perception I get -- and, again, this is

7    in part from interacting with people I've had to

8    represent who are now facing these incredibly long

9    mandatory minimums, particularly in federal courts or

10   even the sentencing lawyers are now saying this is

11   unfair -- the difference between crack and powder and

12   whatever -- is that, while everything you say is true,

13   you can also get to a point where the sentence is so long

14   that the length of the sentence destroys the ability of

15   the person to ever rehabilitate, that they become so

16   bitter and so without hope that too long a sentence can

17   have as negative of an effect on some individuals as too

18   short a sentence.

19           That's my personal perception, and I'm sorry for

20   the philosophy.  But do you agree with that?

21   MR. MITCHELL:  I'm going to interpose an objection as

22   vague unless you understand the question.

23   THE WITNESS:  I kind of understand the question, and

24   I'll deal with it as I perceive it.

Page 45

depo of Rod Pacheco
25        It depends on what you value.  Has this person

50

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    murdered five people?  Do we as a society have the right
2    to destroy their hope to rehabilitate themselves?  Of
3    course we do.  They've murdered five people.

4            It's a balancing act.  And any judge knows that.
5    Any prosecutor knows that.  And any defense attorney
6    knows that.  Today the guy that walks in on the murder of
7    five people and they're sentenced knows that, as well as
8    the guy who walks in with a robbery.

9            It depends.  It depends on what the facts are.
10   It depends on what their crime is.  But your point --
11   overgeneralized point, no offense, is where is that line.
12   And that's the question of this lawsuit.  where is the
13   line?

14           The line is in different places depending on
15   what it is.  For a guy who's been -- who's murdered five
16   people, he should be in prison for the rest of his life
17   at the very least, if not receiving an execution through
18   the death penalty.

19           Has he committed five commercial burglaries?
20   Well, that's a different thing.  Should we destroy that
21   person's hope?  Well, it depends.

22           What has he done in his life?  Is he responsible
23   for the murder of other people?  Is he a gang member?  Is
24   he a priest?  Has he helped people?  Has he hurt people?
25   It depends.

51

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          And so, therefore, we invest to some degree, at
2    least in California, our state judges with some
3    discretion.  That's appropriate.

4          Not unfettered discretion, because in the past
5    people of color like myself were treated differently in
6    the system.  And, quite frankly, I've seen it myself in
7    the court system.

8          It's abhorrent that any court system would treat
9    people differently based on their racial or ethnic
10    background.

11          But that's why we have determinate sentences,
12    because some judges -- not most, thankfully -- could not
13    control their own biases against people that look
14    differently than themselves.

15    BY MR. HEATHER:

16    Q    Well, you know, I'm wondering whether or not the
17    increase of recidivism might be a factor that reflects
18    the increase in the harshness of penalties coupled with
19    the absence of any of these programs that we've talked
20    about that can assist people when they get out.

21    A    I'm sorry.

22    Q    I worry genuinely -- I mean you smile.  Let me
23    rephrase it.  You smile.  And I don't mean any of this to
24    be funny.  And I don't know the answers.

25          I'm asking the questions from somebody like you

52

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    who has spent a lifetime really studying, whether you
2    realized you were studying or not, the system.

depo of Rod Pacheco

3      But I wonder if we really know what the cause of

4      increased recidivism is and whether or not it may be in

5      part a combination -- and I'm asking this as a question

6      in your opinion -- whether it may be in part a

7      combination of the tremendous increase in sentences for

8      even nonviolent crimes together with a really wholesale

9      failure to provide the kinds of programs that you talked

10     about here today that will assist people in reintegrating

11     themselves into society in a manner that doesn't lead to

12     their committing new crimes.

13          Do you believe that or not believe that?

14     A    Well, you know --

15     Q    Or can you not answer?

16     A    Well, I can't answer it because I'm not sure --

17     Q    Then I'll withdraw it.

18     A    Well, wait a minute.  I could provide an answer

19     to the general theme of your question.

20     Q    Okay.

21     A    And I don't smile because it's funny.  I smile

22     because it's an overgeneralization that I've heard on

23     many occasions.  And it's a belief that --

24     Q    It's a question, not a fact.  I state it as a

25     question.


53


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

D        1      A    Yeah.  However you couch it.  It's the belief

2      that if we just let people out of jail either on the

3      front end and never send them there to begin with or we,

4      as you describe it, not be so harsh, that they'll redeem

5      themselves.

Page 48

depo of Rod Pacheco

6          It's not that simple.  And -- I'm sorry.  I

7     waited for you.

8          It's not that simple.  And it's not so simple

9     that if we give people enough time they'll redeem

10    themselves.  It's not that simple on the other end of it

11    either.

12         Punishment works as a deterrence for some.  It

13    doesn't for others.  But punishment doesn't just involve

14    deterrence.  It also involves society saying we think

15    this act is abhorrent, and we want you to stop it.  And

16    if you don't stop it, we're going to punish you for doing

17    it.

18         And you decide, once you get out, whether you're

19    going to do it again.  But at the very least we're going

20    to exact some toll on you for violating one of our laws.

21         And sometimes those are small laws, like driving

22    too fast on the freeways, and sometimes they're very

23    significant, like murdering another human being.  And it

24    depends.  It depends in every situation.

25         But letting people out early or not sending

54

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     people at all for what you might describe as nonviolent

2     offenses is a failed view and has been a failed view

3     since the dawn of time.

4          What do you do with these people?  You put them

5     in college?  What if they don't want to go to college?

6     What if they don't want to study?  What if they don't

7     want job training?

8          Q    Well, you know, look, I'm not here to argue, but

Page 49

depo of Rod Pacheco

9   I don't think you answered my question.  I think what you
10  did was take my question and rephrase it in a way that
11  made it easy for you to give the speech you just made.
12          My question wasn't let's take people and not
13  give them jail time at all, let's take people who have
14  done really bad things and just whack their sentences.
15          My question was frankly more sophisticated even
16  if it was general.  So I'd like to have it read back so I
17  know what I asked you and then I'll try to refine it.
18          (Record read)
19      MR. MITCHELL:  I'm going to interpose an objection as
20  the question as being asked and answered.  I think he was
21  responsive to your question, and I'm going to ask you to
22  please refrain from the argumentative comments about his
23  answers you just went into.
24      MR. HEATHER:  All right.  Well, I don't think it was
25  asked and answered because what he left out was the fact

55

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   that the question asked for the impact of a combination
2   of two factors, and he addressed one.
3           And I don't want to conduct this deposition in
4   an argumentative way, but --
5   BY MR. HEATHER:
6       Q    My question wasn't intended to suggest, as I
7   think your answer implied, that some kind of wholesale
8   cutting of sentences or avoiding sentences is going to be
9   a positive.
10          It was really a question of whether or not the
11  combination of increased time that people have to serve

depo of Rod Pacheco

12    for crimes which previously carried lesser sentences,

13    coupled with the -- in California, the state and county's

14    inability to provide services that we've discussed, if

15    that combination may have contributed to recidivism.

16          And let me put it in this context and -- because

17    I'm not trying to put you in a corner and have you say

18    something that you don't want to say or don't believe.

19          So I'll use one example.  And I know this is

20    unorthodox for a deposition but, the issues here are

21    important.

22          I had an individual who's violated parole in

23    front of a federal judge who used to be the U.S. Attorney

24    for that district and is a serious law and order judge.

25    And the person was parole violated because they hadn't

56

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    found full-time employment.

2          And the judge commented that he had just been

3    reading an article of what are we supposed to do if we're

4    going to throw people back in jail because they can't

5    find full-time employment and we don't have the programs

6    to provide it?

7          He did not return that individual to jail

8    because it was clear from his history, having been out,

9    that he was making a real effort in his life.

10          So what I also know to a certainty, which I

11    tried to allude to from my own personal history, is that

12    if you compare many, many crimes and the sentences for

13    those crimes to what they were 20 or 25 years ago,

14    they've gone up dramatically because every five years,

Page 51

depo of Rod Pacheco

15    for a while, the sentence changed.

16           And I know that from having been a prosecutor

17    and having been a defense lawyer.

18           The fact of the matter is despite the fact we

19    have done what you have suggested, I believe, which is

20    punish people for crimes and punish them increasingly,

21    our recidivism rate has gone up.

22           And so my question to you is, is it possible

23    that a portion of that recidivism is from the combination

24    of punishing people very harshly for crimes coupled with

25    the fact that when they get out they have almost no

57

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    assistance available to help them reintegrate, even if

2    what they want to do is reintegrate and take care of

3    their family.

4      A    Well, I can't really answer that series of

5    questions that you asked because to say that that

6    question is compound is obvious.  It's a very compound

7    question.

8           In addition to that, it makes various

9    assumptions, one of which is that the sentences have

10    increased over the past few years or the past decade or

11    even longer and that they continue to increase at a

12    great -- as you describe it, more harsh penalties.

13           Now, that hasn't been the case.  It has been for

14    some offenses and not for others.

15           Drug crimes are a perfect example of where the

16    sentencing for drug crimes, whether you're possessing

17    them for personal use or possessing them for sale,

depo of Rod Pacheco

18    continue to drop, that there are numerous diversion
19    programs.

20          Proposition 36 is a perfect example.  Medicinal
21    marijuana has provided sort of a cover for those people
22    that would possess, cultivate or use those, use that
23    substance.

24          So the law on some occasions has gotten more
25    significant, and the law on other occasions has gotten

58

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     less significant.  And there are ramifications for both.
2           You know, in terms of the recidivism rate,
3     that's another assumption that you made.  I haven't seen
4     that the recidivism rate has increased.  It's been fairly
5     static.  The reasons for that I think are varied.  One of
6     which --

7     Q     I thought you just testified earlier that your
8     perception was that it had increased.

9     A     In our county over the last few years, which has
10    been coincidental or not coincidental -- let's say
11    concurrent is a better word -- concurrent with the
12    extreme releases that we've had out of our local jail.

13          So -- but there are many variables, like I said.
14    In any case, you know, on a statewide level, I wouldn't
15    say that recidivism has increased.

16          Now, if your question is more philosophical than
17    that, should we make more of an effort to do that?  Are
18    there ways to do that?  Should we use rehabilitation to
19    do that?  Absolutely.  I agree with those -- if those
20    were your questions, I agree with that.
                    Page 53

depo of Rod Pacheco

21        We should rehabilitate more folks, and we should

22    make more of an effort.  A life saved is important.  And

23    the funds that we use and the resources that we use to

24    make that effort are important.

25        Casting people out as in your example of the

59

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    federal judge, casting people out and expecting them to

2    fix it on their own doesn't really work.  For some it

3    does because of the person they are, but for most it

4    doesn't.

5        Kind of like education.  We provide education in

6    our society, and it's free, as opposed to letting

7    everybody figure it out for themselves.

8        Q    Okay.  I think from this series of interactions,

9    is it fair to say that you would agree that providing

10    more assistance to people who are released from jail,

11    generally speaking -- while each person is an individual,

12    the crime they've committed has to be individually

13    considered.

14        But, generally speaking, providing more

15    resources to assist them when they return, in terms of

16    housing and employment and treatment if they have a

17    dependency or had a dependency, if that could be done in

18    a more extensive and sophisticated way, that would

19    contribute to those individuals reintegrating into

20    society successfully generally.

21        A    That would help them, yes.  And that's only a

22    part of it.  It would have to start in the custodial

23    facility in which they're housed, whether that be a

Page 54

depo of Rod Pacheco

24    prison or a jail that would assist them.

25        Q    And, in your view, are there sufficient

60

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    resources to provide those programs in places of

2    incarceration at the present time?

3        A    Not in the county or the state.

4        Q    And I take it -- is it fair to say from the

5    other aspect of our debate, namely the amount of time

6    that individuals serve --

7        A    I'm sorry.  Did you say "debate"?

8        Q    Our questions and answers.

9             -- that the line at which an individual's time

10   will both sufficiently punish them and incentivize them

11   not to commit another crime, putting aside whether they

12   have sufficient resources to assist, is an individual

13   line that varies depending on the type of crime they may

14   have committed and who they are and their own personal

15   history?

16       A    Individuals respond individually to

17   circumstances.

18       Q    And when Riverside County -- I think you said

19   contemporaneously with your going back to that job from

20   the legislature -- started to release individuals early,

21   it was putting in a given period of time more individuals

22   back into society than would've gone in in a particular

23   time frame, let's say, in a month or a six-month period

24   or whatever.

25       A    Yes.

Page 55

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Q    Okay.  So have you done any studies to determine
2    whether or not your perception that the recidivism rate
3    increased once the early release program started was the
4    result of anything other than the fact that there were
5    simply more people all of a sudden within a given time
6    frame back on the streets?
7    A    Well, I'm not sure how you quantify or define
8    "study."  We look at trends, and we look at anecdotal
9    evidence that we receive in our office through, you know,
10   computer programs and the like.
11        And we saw that when people were released early,
12   they tended to commit more crimes that they would not
13   have committed if they were in custody.
14        One guy, for example, was released, early
15   released, on a first degree burglary charge, went in --
16   at any other point in time prior to the Federal Consent
17   Decree, he would've never been released.
18        He was released.  He went to San Bernardino, a
19   neighboring county, and with a cohort committed the
20   murder of a I believe 74-year-old woman.  That would've
21   never occurred, she'd probably be alive today, if he had
22   never been early released.
23        That is an extreme example, but there are many
24   other examples as well, gang members, et cetera, violent
25   people that were released because the sheriff's

depo of Rod Pacheco

1    department had to make a choice between bad or worse.

2         So those early releases have come fast and

3    furious in the last year or so, and we have seen those

4    individuals commit more crimes.

5         Does that constitute a study?  Well, I'm not a

6    member of a -- you know, a university, so it wouldn't be

7    in that context.

8         It would be more in terms of a practical

9    application of my knowledge of the system, of the

10   community, and of the trends that are occurring.  What

11   I've given you are trends that are occurring in Riverside

12   County.

13   Q    The individual who committed the murder, is it

14   your testimony if he had stayed in jail another week he

15   would've never committed that crime?

16   A    If he had stayed in jail long enough past the

17   date of the murder that he committed shortly after he was

18   released, of course he wouldn't have committed that

19   murder.

20   Q    But how do you know he wouldn't have committed

21   another murder?

22   A    He would've been in jail, and he wouldn't have

23   committed that --

24   Q    I understand, but he would've been released at

25   one point.

63

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    A    Well, maybe that extra time in jail and allowing

2    the system to work and to provide some deterrence to him

3    might have taken affect on that first degree burglary.

depo of Rod Pacheco

4    Maybe he would've been transferred to prison.

5         Maybe he would've received some training, might

6    have taken affect on him so that the first degree murder

7    wouldn't have been committed.

8         Whatever -- look, the bottom line is some people

9    are deterred. However high the numbers are for

10   recidivism, there is a group of people that don't

11   re-offend.

12        He might have been one of those if the system

13   had been allowed to work. The system was not allowed to

14   work because there was an early release.

15        That's one of the problems with early release.

16   A dead signal, so to speak, that this system cannot

17   function. There is system failure.

18        We cannot hold you accountable. We told you

19   that you if you committed a first degree burglary, that

20   you were in trouble and you would go into custody. We're

21   not going to keep you in custody.

22        That's a signal to him, and that was a signal to

23   him. That combined with other factors I think

24   contributed to the commission of that murder, as well as

25   the other individuals who are early released.

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Of course within them internally they have the

2    impulses that caused them to commit those crimes and the

3    background, et cetera, whatever has caused them to reach

4    that point in time. But that early release sent the

5    wrong signal to the wrong person at the wrong time.

6    Q   Well, you said if he had stayed in longer he

depo of Rod Pacheco
```
 7   might not have committed the murder.  And generally

 8   speaking, the word "might," if you characterized it, you

 9   used the word "speculation."

10          I mean you're speculating as to what he would or

11   wouldn't have done had he stayed in jail for another

12   week, correct?

13      MR. MITCHELL:  Object to that as mischaracterizing

14   his testimony.

15   BY MR. HEATHER:

16      Q    Do you know what he would've done or not done

17   had he stayed in jail another week?

18      A    I know if he had stayed long enough in that jail

19   such that it exceeded the date of the murder that he

20   committed, that the murder would not have occurred.

21      Q    Well, that's self-evident.  But how do you know

22   he wouldn't have committed a different murder when he got

23   out?

24      A    Well, it's self-evident to me.  As it relates to

25   what he would've done when he got out, it depends on when
```

65

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
```
 1   he got out.  It depends on when the system dealt with him

 2   and how the system dealt with him.

 3          That's what we've been discussing today, how the

 4   system dealt with him.  Does he stay in until he's

 5   provided some sentence?  Is the sentence meaningful?

 6   What impact does that have on him?  Does he go to state

 7   prison?  Is he dealt with locally?

 8          If he's dealt with in whatever environment he

 9   goes to, what kind of training/rehabilitation efforts are
```
Page 59

depo of Rod Pacheco

10    there?  As insufficient as I believe they are today, both

11    locally and on the statewide basis, there are still

12    efforts in that regard.

13          I know that there is Alcoholics Anonymous and

14    Narcotics Anonymous in our state prison system, for

15    example.  I know there are also efforts, mental health

16    efforts, in our local jail and other things.

17          You know, would those efforts have taken?  I

18    don't know.  But we never found that out, did we, because

19    he was early released.

20          And when he was early released, he took it upon

21    himself, given his background, his situation, and I

22    believe the signal that was sent to him by a failed

23    system, to go and commit the murder of a 74-year-old

24    woman with a cohort.

25          And I think that signal continues to be sent.

66

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Now, you call that speculation.  It's not.  It's based on

2    my experience.  It's based on the training I have

3    received and the observations I have made and the

4    discussions I have had with people that know what they're

5    doing and know how the system works.

6          It's also based on my own knowledge of the

7    system both up close and from a distance and from

8    different angles.

9          And I predict he wouldn't have committed another

10    murder.  I don't know because we never got to that point.

11    We never found out.  But we did find out he murdered a

12    74-year-old woman.

Page 60

depo of Rod Pacheco

13    Q    You're a trial lawyer, aren't you?

14    A    Not anymore.  I used to be.

15    Q    Used to be?  Do you remember that when somebody

16    gets up and they start to say, "now, in his head," and

17    starts to testify about what another person's state of

18    mind is, you would stand up, when someone did that, and

19    object and say, "Objection."  Correct?

20    A    No, I wouldn't do that depending on the

21    circumstances.  If it was an expert witness, well,

22    that --

23    Q    A fact witness.

24    A    I'm sorry.  I wasn't finished with my answer.

25         If it was an expert witness, I knew the Evidence

67

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Code well enough to know that an expert witness could

2    testify to those things.  It wasn't, as you might call

3    it, speculation.  It was expert testimony.

4         And that's what I've been providing today based

5    on my experience and my training.  I wouldn't make that

6    objection for an expert witness.

7    Q    The fact of the matter is you don't have a clue

8    what that person's state of mind was when he committed

9    that murder, do you?

10    MR. MITCHELL:  Objection, argumentative and calls for

11    speculation.

12    BY MR. HEATHER:

13    Q    Do you have a clue for a fact, other than your

14    speculation based on your experience, what the actual

15    state of mind of that individual was when he committed

Page 61

depo of Rod Pacheco

16    the murder?

17        A    I'm not aware one way or the other.

18        Q    Fair enough.  Now, let me ask you this:  How

19    many individuals have been released in Riverside County

20    since the population cap -- let me rephrase that.

21            How many individuals have been early released in

22    Riverside County since the population cap went into

23    effect?

24        A    The federal cap went into effect in the early

25    nineties.  I'm not familiar of whether there were

68

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    releases between the early nineties and the time I came

2    back in 2002.  So for a period of about a decade I

3    wouldn't know.

4        Q    Okay.  Since you came back.

5        A    I'm sorry.  I hadn't finished.

6            Since I came back in 2002, as I've testified

7    earlier, there appeared to be some releases that were

8    occurring with greater frequency.

9            In 2007 there were 6,001.  Prior to that I

10    believe it was 2,000, and the year prior to that it was

11    about 400.  So it's been 8,000 plus, approximately, in

12    the last three years.

13            This year they're not quite on pace for 6,000,

14    but they are releasing.  They have released several

15    thousand, I believe.  I think they're up to two or 3,000

16    right now.  So 10,000 people.

17        Q    10,000 people in the last three plus years?

18        A    Yeah.  That I am aware of.

Page 62

depo of Rod Pacheco

19    Q    That you're aware of.  And out of those 10,000

20    plus releases, you're aware of one case where the person

21    who had been early released from a first degree burglary

22    had committed a murder, correct?

23       A    Well, no.  If you mean by that that I'm not

24    aware of any others, well, then the answer is no.  I am

25    aware of many others.  There's a list of others.  And

69

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    it's not just murder.  It's attempted murders.

2    Q    I'm talking about actual murder.

3    A    I'm trying to recall another one.  I believe

4    there was a domestic violence one.  And I can't recall

5    that case but I believe where a man was early released

6    and got out and killed his wife or girlfriend.  I know

7    that there was one in Los Angeles.

8    Q    I'm talking about Riverside County.

9    A    Oh, okay.  I believe there was that one, yes, a

10   domestic violence one.

11   Q    All right.  But you're not sure?

12   A    I'm pretty sure.  I'll check on it.

13   Q    Would you check on it --

14   A    Sure.

15   Q    -- and provide it to me?

16   A    If I can find it, yeah.

17   Q    If you can find it, as to whether or not it was

18   during the early release period.

19   A    Oh, I know it was during the early release

20   period.  The only question is whether or not it resulted

21   in a murder or an attempted murder.  But there was an

Page 63

depo of Rod Pacheco

22    assault that I at this moment believe led to a murder,

23    but it might have been less than that. But it was an

24    early release.

25        Q    Do you know how many assaults there are on

70

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    average approximately in Riverside County a year?

2        A    Gosh. We had 60,000 filed cases, misdemeanors

3    and felonies, last year. I couldn't tell you.

4        Q    And how many murders?

5        A    It's over a hundred probably. I don't know the

6    number.

7        Q    On an annual basis approximately?

8        A    Roughly. It depends. They go up, they go down,

9    but it depends.

10       Q    Okay. Roughly a hundred murders a year?

11       A    The city of Riverside, which is the largest city

12   in the county, has I believe close to 20 this year so

13   far, so --

14   MR. MITCHELL: We've been going for almost an hour

15   and a half, an hour and 25 minutes. Want to take a

16   break?

17   THE WITNESS: I'm fine.

18   MR. HEATHER: Let's go off the record.

19       (Recess)

20   MR. HEATHER: All right. Are we ready to go back on

21   the record?

22   BY MR. HEATHER:

23       Q    Let me ask you this: Do you have a copy of the

24   Interrogatory Answers?

Page 64

depo of Rod Pacheco
25        A    I think I was provided them, yes.


                                                                        71


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Q     I'm going to ask some questions about that.  Let
2     me mark this as Exhibit -- I'm going to mark mine as
3     Exhibit 2.  You know, I don't have another set.  I can
4     take a moment and get a copy for you.
5             MR. MELLO:  Can you do that?
6             MR. HEATHER:  Yeah.  Do you mind if I go off the
7     record for just a minute?  And I'll make a copy.
8                  (Recess)
9             MR. HEATHER:  All right.  Let's go back on the
10    record.
11    BY MR. HEATHER:
12       Q     Before I go over these Interrogatories, let me
13    just ask a few more follow-up questions.  And then I'll
14    tell you I'm going to go over these Interrogatories
15    Answers and the documents produced.  And unless I think
16    of other things, that's sort of what I'm going to do
17    today.
18            But before I do that, let me just ask you a few
19    more follow-up questions and ask you a series of succinct
20    questions, just to change the pace.
21       A     I see it's 12:40.
22       Q     Do you believe that some individuals who are
23    released, whether they're released early or not early,
24    some individuals commit crimes because of an inability to
25    find work and they do it to get money to take care of


                                                                        72

Page 65

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    their families?

2        A    Rarely.

3        Q    Do you believe that some individuals who are

4    released, whether they're released early or not, commit

5    crimes because there are inadequate programs to help them

6    overcome their substance addictions?

7        A    Let me -- you may be going through a list of

8    these.  Let me kind of get to the point, I guess.

9            People commit crimes because they choose to, not

10   because someone else fails to provide something that then

11   causes them to commit a crime.

12           So if your question is does failure to provide

13   drug treatment cause them to commit a crime, the answer

14   is no.  And maybe that should clarify my previous answer.

15   It's within the individual's choice.  I believe crime is

16   a choice.  It's not an accident.

17       Q    Then when you say, as you did before, that the

18   programs that the state and counties provide with regard

19   to jobs, housing, and drug treatment are inadequate, how

20   does the inadequacy manifest itself with regard to the

21   criminal population who would receive these services?

22       A    It can assist them in making a better choice.

23   Again, as I said before, you can provide all those

24   things, and if they choose not to utilize those services

25   or that opportunity, there's nothing you can do, based on

73

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    my own experience in the alcohol rehabilitation center.

2            We provided excellent services and excellent
                            Page 66

depo of Rod Pacheco

3      treatment.  And our best rehabilitation rate was
4      20 percent.  And that was at the end of a year.  Who
5      knows what would've happened after a year.  It could've
6      gone down even further.
7              So from that experience and my other experiences
8      in the criminal justice system, you know, 80 percent of
9      the people that we are providing tremendous treatment
10     opportunities to failed.  Not because we were failing to
11     provide those opportunities.  We did provide them.
12     80 percent of them failed because they couldn't make the
13     right choice.
14              That's why people commit crime.  They're not
15     committing crime because they can't find a job
16     necessarily.  They're committing crimes because they're
17     making a choice.
18              Some people do it because it's easier.  It's
19     easier to stick up a 7-Eleven than it is to go to work at
20     8:00 in the morning and work until 5:00.
21     Q      If the programs that you've described as being
22     inadequate earlier -- and I'm including among them
23     housing, jobs, and substance abuse treatment, all right?
24     Among others.  I won't try to specify all of them.
25              If all of those programs were adequate, were

74

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      sufficiently funded and staffed, do you have any sense of
2      by what approximate percentage the recidivism rate might
3      be reduced?
4      A      I think that's an excellent question because it
5      highlights a couple of things, one of which is you could

Page 67

depo of Rod Pacheco

6    provide those not only at an adequate basis but maybe at

7    a platinum basis, that is the best that society could

8    provide, and you would still have recidivism.

9         People are still going to re-offend because

10   they're going to reject the opportunity to redeem

11   themselves and rehabilitate themselves. It doesn't

12   matter what you provide for a large portion of these

13   individuals, these people that commit crimes.

14        However, it would, in my opinion, reduce to some

15   degree -- not that I can quantify what that is, but

16   reduce to some degree the recidivism that occurs

17   currently in society.

18        I think it's worth the effort to provide those

19   resources to attempt to reduce -- to help people make

20   better choices.

21   Q    Now, the one -- I think my last question in this

22   series, depending on how you answer it, the one thing

23   that we don't know that flows out of your last answer is

24   we don't have any history to use to help you answer that

25   question in the sense that we can't look back and say can

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    we -- this is the question part -- can we and say

2    10 years ago all of these programs were adequate at that

3    time, here's what the recidivism rate was, and then the

4    bottom fell out and there wasn't any more money and the

5    programs became inadequate.

6         In other words, can you point to any time in

7    your history where you would say these programs that you

8    just characterized in terms of their potential for

depo of Rod Pacheco

9    assisting a certain percentage of people who are released

10   were, in your view, completely adequate.

11        A    Well, two answers, two parts to my answer.

12            One is historically society has waxed and waned

13   in its efforts to rehabilitate prisoners.  In the past

14   there have been, from what I recall, sufficient

15   resources.

16            I can't quantify a particular date or a

17   particular measure.  But in the seventies, for example,

18   California was -- it was a very popular notion to make

19   efforts to rehabilitate prisoners.

20            What effect that had, I can't recall.  But there

21   have been sufficient resources provided in the past.

22            The second part of my answer is the microcosm.

23   And if you look at my experience at the alcohol

24   rehabilitation center upon which board I sat, 80 percent

25   of the people that went through that that received more

76

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    than adequate treatment re-offended.  They went back to

2    using controlled substances.

3            So, you know, that's a pretty high recidivism

4    rate in and of itself, with the adequate -- more than

5    adequate treatment that was provided.

6            This was live-in treatment, and everything was

7    provided for them.  I mean they didn't have to do

8    anything other than go to their meetings.

9            You know, so it's not a lack of adequate

10   resources that caused these people to do things.  But it

11   can assist people to make better decisions.

depo of Rod Pacheco

12    Q    All right. And that is what you believe is

13    worth it.

14    A    It is worth it. Absolutely.

15    Q    Based on all the experience that you have had.

16    A    Absolutely. Why wouldn't we assist? Because we

17    want to spend the money somewhere else? That's really

18    what it is.

19    Q    Let's talk about that. And in terms of your

20    perception of public safety, again, in Riverside County

21    based on all of your experience, do you think reducing

22    the level of crime, whatever the reduction may be,

23    through providing better assistance, will make a positive

24    contribution to public safety?

25    A    Sure. You know, but it depends. I mean are we

77

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    spending one billion dollars to save one person? You

2    know at that point --

3    Q    Well, that wasn't part of my question.

4    A    Oh, I know, but I'm qualifying my answer. It

5    depends, because what is the effort that we are making,

6    how effective is the effort, and what is the result.

7        If we spend one billion dollars to help one

8    person make a better choice, that's not very effective

9    and that's probably not something we should do.

10        That's one of the problems with the programs

11    that are used for rehabilitation. There's very little

12    accountability in those programs.

13        And there's very little measurements that people

14    use, and they usually create a line somewhere of one year

depo of Rod Pacheco

15    out to say, geez, we did pretty well. Well, what about

16    the second year and the third year?

17        Q    Well, right now we know one thing, right?  We

18    don't know how much we're going to spend to develop

19    adequate programs.  Is that fair to say?

20        A    I don't know what that means.

21        Q    We don't know how much we would have to spend to

22    develop adequate programs at this point, do we?  Do you

23    know?

24        A    To do what?

25        Q    Provide sufficiently adequate programs to assist

78

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    people to make better choices.  For you to sit here and

2    say, "I think the effort to provide housing is

3    sufficient.  I think the effort to provide -- help people

4    provide jobs is sufficient" --

5        A    I think it's less than eight billion dollars,

6    which is the request of the receiver. I think it's less

7    than that.

8        Q    Okay.

9        A    Just in my experience in the legislature.

10        Q    Okay.  That's kind of where I was going.

11        A    It's a pretty big sum.

12        Q    All right.  So -- and the eight billion dollars

13    is being suggested to do what?

14        A    From what I can tell, it's -- and when I say

15    "from what I can tell," it's a rather amorphous

16    request -- to increase medical care for prisoners.

17             And I'm not sure how that's going to be done, to

Page 71

depo of Rod Pacheco

18    be quite candid.  I don't think there's been a great deal
19    of accountability for that eight billion dollars.
20         I've reviewed the recent quarterly report of the
21    receiver, and he spent quite a bit of money.  I believe
22    it's in this fiscal year over a billion dollars already.
23    1.8 or something like that.  It's a very sizeable figure.
24    Q    Do you know what it would cost statewide to
25    build sufficient new prison facilities or to expand

79

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    existing facilities so all statewide early release
2    programs that are in place to maintain population caps
3    could be eliminated?
4    MR. MITCHELL:  I'm going to object that, first of
5    all, because you're not specifying whether you're talking
6    about state prisons or county jails or both.
7    BY MR. HEATHER:
8    Q    I'm sorry.  County jails.
9    A    Oh, I thought you meant prisons.
10   Q    Either.  I mean can you answer it?
11   A    Well, AB 900 identified a plan -- Assembly Bill
12   900 identified a plan to construct facilities sufficient
13   for our population.  That's one thing.
14        I am familiar with the general cost of prisons
15   because when I was in the legislature Corcoran II was
16   created.  That was the last prison that we've -- the
17   state has funded and built, and that was upwards of over
18   350 million dollars in the central valley.
19        So I'm aware of the cost of construction.  I'm
20   also aware that the jail in Riverside County, which is

depo of Rod Pacheco

21  set to hold 5,400 prisoners, is 350 million plus.  So I'm
22  aware of the extreme cost, yes.
23      Q    And that's for infrastructure construction
24  costs.  Then you have to hire additional correctional
25  officers and pay them, et cetera.  Correct?

80

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       A    Well, everyone that works in a jail, yes.
2   There's an annual cost of salaries and services.
3       Q    All right.  I'm sorry.  Do you know what the
4   annual -- strike that.
5           Do you know what the total cost to build or
6   expand facilities sufficient to house the entire
7   statewide prison and jail population would need to be so
8   that all early release programs could be eliminated?
9       A    I think that's contained I believe that's --
10  contained in AB 900.  And I don't recall that number.
11  But there were bonds that were proposed in AB 900.  And I
12  know it was in the billions range, but at this moment I
13  don't recall the exact number.
14      Q    Okay.  And it would cost substantially more to
15  hire the prison and jail personnel necessary to manage
16  the jail and prison populations if they were expanded and
17  new facilities were built?
18      A    Substantially more than what?
19      Q    What it would cost to build them in the first
20  place.
21      A    No.  The annualized cost is less than the
22  capital outlay cost.  If it cost you, for example, five
23  billion dollars to build the necessary facilities, your
Page 73

depo of Rod Pacheco

24    annualized cost isn't five billion dollars.

25          Your annualized cost is in the tens of millions

81

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    of dollars, maybe even in the hundreds of millions, which

2    I doubt, but it's not five billion dollars.

3          So -- capital outlay always at the beginning is

4    going to be larger.  Over a period of time, the

5    annualized costs, the salary and services, will be

6    larger.  It's kind of like a mortgage.

7          Q    Okay.  But if you combined -- but you don't know

8    what the total cost would be, you don't recall right

9    now --

10         A    Of the bonds?

11         Q    -- other than your understanding as to

12    construction costs for adequate facilities would be in

13    the billions.

14         A    Yes.

15         Q    And the annualized cost for salaries and other

16    things may in the beginning be tens, possibly hundreds of

17    millions?

18         A    Yeah, that's --

19         Q    I'm just asking whether you know that number.

20    I'm not arguing with you about the number.

21         A    I don't know the number, no, but it's

22    substantially less than the capital outlay cost.

23         Q    Do you know whether it would be more or less

24    than the costs of providing the programs that we've

25    discussed here today?

depo of Rod Pacheco

82

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      A.   I don't think that's been sufficiently

2   identified by anyone, because no one's identified the

3   programs that need to be done on a statewide level and a

4   countywide level.

5      Q   You have in general terms the kinds of programs

6   that would be needed?

7      A   Well, I have seen in my experience various

8   programs that could be used to help people from

9   re-offending, making better choices.  That involves

10   parole, probation, alcohol rehabilitation programs,

11   mental health programs --

12      Q   Drug?

13      A   -- job training, you name it.  I've seen those

14   programs, I've seen how effective they are, I've seen

15   how ineffective they are.  Has anyone put all those

16   together and said this is what we need?  Not that I

17   know of, no.

18      Q   Okay.  And consequently you don't know whether

19   the cost of doing that on a statewide basis, including

20   providing those programs at the county level, would or

21   wouldn't be equal to or less than the cost of building

22   new prisons in order to eliminate early release programs?

23   Except I think you said before it would be a lot less

24   than eight billion.

25      A   I would guess -- and maybe I shouldn't use that

83

depo of Rod Pacheco

1    verb, but I would -- you know --

2        Q    Estimate?

3        A    -- my opinion -- that's a more pleasant word.

4    My opinion would be that the cost of providing sufficient

5    programs would be more extensive than housing, the

6    annualized cost of housing people.  And --

7        Q    What about construction costs?

8        A    And less expensive than the cost of increased

9    crime for lack of housing.  The cost of crime, the

10    increased cost of crime, when you early release people,

11    for example.

12        Q    In other words, the cost of providing programs

13    that would assist people in not re-offending would be

14    less than the cost to society of not having those

15    programs and having them recommit crimes?

16        A    Not having those programs and having them --

17    yes.

18        Q    I thought that's what you just said.

19        A    Yeah.  That's fair.

20        Q    Okay.  Let me turn to the Interrogatories, and

21    I'm going to mark these as Exhibit 2.

22            (Pacheco's Exhibit 2 was marked for

23            identification, the original of which is

24            attached hereto.)

25            (Discussion off the record)

84

1    BY MR. HEATHER:

2        Q    Have you looked at these during our break?

3        A    Looked at what?

depo of Rod Pacheco

4    Q   The District Attorney Intervenors Objections and

5  Responses to Plaintiffs' First Set of Interrogatories.

6    A   I have looked at a set of Interrogatories that

7  are not Exhibit Number 2.  They appear to be the same,

8  but I haven't looked at Exhibit Number 2.  I have looked

9  at the copy provided by counsel.

10    Q   Okay.  I'm going to represent to you that this

11  is the same document --

12    A   Okay.

13    Q   -- unless somebody points out -- it's intended

14  to be the same document.

15        Have you seen these before, not in this

16  particular format but assuming the substance is the same?

17    A   Yes.

18    Q   Okay.  Did you review them before they were

19  filed, do you know --

20    A   I have reviewed so many things I don't recall.

21    Q   -- or served?

22        Did you participate in their preparation?

23    A   Oh, yes.  I participated with our counsel from

24  our office in almost everything, yes, through discussions

25  and meetings.

85

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Q   Okay.  And they aren't just the Riverside County

2  District Attorney's office responses, right, they're the

3  responses of your county as well as others, or are they

4  just Riverside County's responses?

5    A   I couldn't tell you that.  I assume that they

6  are at the very least my responses.

Page 77

depo of Rod Pacheco

 7      Q    Okay.

 8      A    But it appears that it's also for the District

 9   Attorney Intervenors.  It is a collection, fair to

10   represent, of the sentiment and opinions of the elected

11   district attorneys including myself.

12      Q    Okay.  So as far as you can remember, there's

13   nothing in here with which you disagree?

14      A    That's correct.

15      Q    I'm going to ask that you look to Interrogatory

16   number 3.

17      A    Okay.

18      Q    "State all facts supporting any contention that

19   crowding is not the primary cause of the constitutional

20   violations found to exist by the court in Plata v.

21   Schwarzenegger."

22           Do you see that question?

23      A    I do.

24      Q    And you contributed and agree with the response

25   to that Interrogatory; is that correct?

86

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

 1      A    Yes, generally speaking.

 2      Q    Okay.  Tell me, before I explore with you the

 3   response, what your understanding is of the

 4   constitutional violations that were found to exist in

 5   that case.

 6      A    I don't recall.  Other than generally.  I mean

 7   I --

 8      Q    whatever your understanding is in a summary,

 9   succinct fashion.  I'm not asking you to repeat the

depo of Rod Pacheco

10    opinion or anything like that.

11          What is your summary understanding of what the

12    constitutional violations were?

13    A     That there was insufficient medical and mental

14    health treatment in our correctional system.  As for the

15    causes, that's a different discussion.

16    Q     Okay.

17    A     But that it was insufficiently provided.

18    Q     Okay.  And do you agree with that conclusion?

19    A     I think generally so, yes.

20    Q     Okay.  Now, if I understand this answer in

21    part -- and I don't mean to -- the answer speaks for

22    itself in a sense.  But am I correct in saying that the

23    answer suggests that there are many causes for the

24    constitutional violations that were found?

25    A     Yes.  Yes.

87

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     Q     All right.  And that not -- and in fact that

2     there, in your opinion, is not one primary cause that you

3     can identify.

4     A     That's fair to say.

5     Q     Okay.  If you look at the top of the carryover

6     page for the answer.

7     A     Yes.

8     Q     The second sentence says, "Many causes other

9     than overcrowding contribute to the current state of

10    medical healthcare in CDCR's adult institutions."

11          Do you see that sentence?

12    A     Yes.

Page 79

depo of Rod Pacheco

13    Q    Do you agree with that sentence?

14    A    Yes.

15    Q    Excuse me?

16    A    The sentence says, for the record, "Many causes

17    other than overcrowding contribute to the current state

18    of medical healthcare in CDCR's adult institutions."

19         I take that sentence to mean that there are many

20    causes that contribute to the current state of medical

21    healthcare in CDCR's adult institutions, not that

22    overcrowding is one of them.

23    Q    Okay.  Do you believe that overcrowding is or

24    isn't one of the causes?

25    A    I'm not necessarily convinced of that.

88

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Q    That wasn't my question.

2    A    I thought I answered it.  "Do you believe."

3    Q    Does that mean you don't -- you don't believe

4    that overcrowding is one of the causes?

5    A    I'm not sure.

6    Q    Okay.

7    A    I'm not sure but I don't -- I don't believe that

8    it is.

9    Q    Okay.

10    A    But I'm not prepared to say that it isn't.

11    Q    And your -- so "I'm not sure" is probably the

12    most accurate?  In other words --

13    A    I think my answers are the most accurate, as

14    opposed to your questions.

15    Q    All right.  And your answers are based on what?

Page 80

depo of Rod Pacheco

16    A    My knowledge of CDCR, my knowledge of the

17    lawsuit, my knowledge of the information contained in the

18    lawsuit.

19    Q    Okay.

20    A    My experience in working with CDCR either as a

21    legislator or a prosecutor.

22    Q    There's a reference here to the need to

23    construct adequate treatment facilities.  Do you see that

24    reference?

25         MR. MITCHELL:  Are you still on the same question,

89

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    response number 3?

2         MR. HEATHER:  Yes, I am, further down in that

3    paragraph that we were just referring to.

4         THE WITNESS:  Yes.  I'm trying to find -- I don't see

5    it, but --

6    BY MR. HEATHER:

7    Q    It's the next to the last line of that same

8    paragraph we were just reading.

9    A    Okay.

10    Q    It says, "Including the need to construct

11    adequate treatment facilities."

12    A    Yes.

13    Q    Are you of the opinion that the existing

14    treatment facilities are inadequate?

15         MR. MELLO:  I'm going to interpose an objection just

16    for the record that this is an incomplete hypothetical.

17    It lacks foundation.  He's not a medical expert.  It

18    calls for speculation.

Page 81

depo of Rod Pacheco

19   BY MR. HEATHER:

20      Q   Well, my response to that is it's in a sworn

21   Interrogatory answer which you said you agree with.  And

22   so if there isn't a sufficient foundation for you to have

23   an opinion on that one way or another, then my next

24   question would be why is it in your sworn answer.

25      MR. MITCHELL:  Object to that as being argumentative.

90

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    If you read the whole sentence, it is merely directing

2    the Plaintiffs to further areas where they could find

3    this type of information regarding the other causes to

4    which is referenced in the beginning of the paragraph.

5       MR. HEATHER:  I understand that, but my question is

6    whether he agrees with that or not.

7       MR. MELLO:  And I interpose the objection for the

8    record.

9       MR. HEATHER:  Fair enough.

10   BY MR. HEATHER:

11      Q   Do you agree with the need to construct -- well,

12   do you agree that currently treatment facilities are

13   inadequate?

14      A   I'm going to give you a little longer answer

15   maybe, if you don't mind.

16      Q   We've got a long question.

17      ·A   With no disrespect intended to the Department of

18   Corrections, I think it is an extremely poorly run

19   organization and department.  It is inadequate in almost

20   any respect that you can imagine.

21           And, again, no -- certainly no disrespect

Page 82

depo of Rod Pacheco

22    intended to the legislature or to the governor or anyone

23    in CDCR.

24         It is no surprise that there is a great

25    challenge to the adequacy of medical treatment facilities

91

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    and mental health facilities.  They have problems in all

2    respects.  The problems are legion.

3         I'm aware of those not exclusively but

4    significantly through my service in the legislature and

5    interacting on those committees -- budget being one of

6    them -- where we discuss those issues in general and in

7    specifics as to various things.

8         I'm aware of those things because of my

9    discussions with several secretaries with the Department

10   of Corrections on a host of issues over my tenure in the

11   legislature but also after that, that period of time.

12        It's -- it is an incredibly poorly run

13   organization and needs dramatic reform.  Now, how best to

14   do that -- and you and I probably don't disagree on that

15   statement, but how best to do that is why we're here.

16   Q    Okay.  Is it fair to say then that for the

17   reasons you just discussed, you would agree that the

18   current treatment facilities are inadequate?

19        MR. MELLO:  Same objections.

20        THE WITNESS:  It's hard to say with any specificity.

21   But because of my knowledge of CDCR, I would agree.

22   BY MR. HEATHER:

23   Q    Okay.  Let me ask you to look at Interrogatory

24   number 5 in the answer.

Page 83

depo of Rod Pacheco
25        A      Okay.

92

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1        Q      And I understand that you may already have
2     answered this, but I want to be sure.
3               Is it your testimony that crowding is not one of
4     the causes, one of the causes, of the violations that
5     were found to exist by the court in the Coleman case?
6        A      In the violations found by the court?  I don't
7     recall the violations found by the court.  Is it my
8     belief is a separate question.
9        Q      Well, answer the latter question.
10       A      The latter question being the question I posed
11    back to you?  I'm not sure.  I'm not convinced that it
12    is, and I'm not convinced that it isn't.
13       Q      Okay.
14       A      And I would suggest --
15       Q      I just wanted to make sure I understood.  I
16    think that's what you said before, but I wanted to be
17    sure.
18       A      Yeah.  I try to be consistent, but there are
19    many causes for it.  And if you don't mind me expounding,
20    there are many causes, I believe, for it.  I would not
21    identify overcrowding as a significant one.
22               The failure to provide adequate medical
23    personnel.  I mean that is a significant one.  As it
24    compares to overcrowding that exists in our prisons and
25    whether or not that is actually a cause I think is a

93

Page 84

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    fairly easy proposition for me.

2           Failure to provide medical care through a

3    doctor, a nurse, et cetera, is significant, as opposed to

4    overcrowding and whether or not overcrowding actually

5    contributes to a lack of medical care.

6      Q    Let me ask you this.  And I'm not -- I'm not

7    trying to be argumentative, but I do need to ask this

8    question.

9      A    I don't mind when you've been.

10     Q    The question was whether crowding was the

11   primary cause of the constitutional violations found to

12   exist by the court in the Coleman case.  And I think you

13   just said you don't recall what those violations were as

14   found by the court in that case.

15          Is that correct?

16     A    As to this, yes.  I don't recall.  I'm sorry.

17     Q    Do you believe that at the time this

18   Interrogatory answer was prepared, you were aware of what

19   those violations were?

20     A    I can't recall.  I can't recall that one way or

21   the other.

22     Q    Because my question which I am compelled to ask

23   is if you didn't then know what the violations were as

24   found by the court, how do you answer an Interrogatory

25   that presumes that you know what those violations are.

94

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      A    Is that an honest question?

2      Q    That's an honest question.
                    Page 85