depo of Rod Pacheco

3        MR. MITCHELL:  Object to that as being argumentative.

4        MR. MELLO:  It's argumentative.  I mean he told you

5    his understanding of the lawsuits and the violations at

6    issue.

7    BY MR. HEATHER:

8        Q    I'm entitled to ask that question.  These are

9    sworn Interrogatories, and I'm compelled to ask it.  And

10   that's all.

11       A    Could you repeat the question, please?

12       Q    Yeah.  I asked you whether -- I believe you said

13   you're not sure what the violations were, as you sit here

14   today, as identified by the court opinion.

15       A    I don't recall whether the court made a finding

16   that the primary cause of the constitutional violations

17   was overcrowding.  It is my speculation that they may

18   have, but I don't recall.

19            I'm under oath and I'm trying to be careful --

20       Q    And I'm not --

21       A    I'm sorry.  I hadn't finished.

22            I'm trying to be careful in my responses.  I

23   don't want to make assumptions if I don't specifically

24   recall.

25            And, of course, I know what this proceeding is

95

1    about.  I know that the court is concerned with the

2    medical treatment and the mental care and the dental care

3    that these prisoners are receiving in our state prison.

4            Of course I'm familiar with that.  And of course

5    I'm familiar that they have made some findings to move to

Page 86

depo of Rod Pacheco

6       an unprecedented level in our history in this nation.

7              Now, can I sit here and specify?  Have I looked

8       at that at any recent time?  The answer is no.  Do I

9       recall it with specificity?  No.  I'm generally aware of

10      those things.

11             Whether they identified it as a primary cause or

12      a significant cause or a possible cause or a probable

13      cause I couldn't honestly say at this moment.  I'll

14      certainly look at it.

15      Q      Okay.  Thank you.

16      A      You're welcome.

17      Q      Do you believe that law enforcement officers

18      such as sheriffs' deputies are in as good a position as

19      you to -- or a better position to evaluate the effects of

20      early release orders as they see it from their place in

21      the criminal justice system?

22      A      I wouldn't say better and in many cases I'd say

23      worse position than me.

24      Q      And why is that?

25      A      I wouldn't say better because they're in no

96

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       better position than a deputy district attorney or the

2       district attorney, which is different.

3              An individual jailer, a deputy sheriff, or, in

4       our county, a correctional officer, which is less

5       significant than a deputy sheriff, is not tracking

6       everybody that comes in and out of that jail.

7              They work a shift.  They do it appropriately,

8       but they're still working a shift.

depo of Rod Pacheco

9       So in terms of identifying those causes and
10   effects and ramifications of small actions taken
11   together, I think they would have less opportunity than
12   an elected district attorney who is, in my sense,
13   required by his responsibilities or her responsibilities
14   to pay attention to that stuff.  So, no, I wouldn't agree
15   with you.
16       Q    What about someone in a sheriff's department who
17   is of a high rank whose mission is to monitor the jail
18   populations and who comes in and who goes out, would that
19   person be in as good or a better position than you?
20       A    It depends on -- as good.  I wouldn't say that
21   it would be better.  But it depends.
22       Q    On the individual?
23       A    It depends on the individual.  It depends on how
24   long they've been in that position.  It depends on what
25   they're tracking.  It depends on how they're tracking.

.97

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    It depends on what they're looking for.  It depends on
2    what they're missing.
3       It depends on a lot of things.  It depends on
4    how active they are in subjects that we've been covering
5    today or how inactive they are.
6       Q    Now, let me ask you the following hypotheticals.
7       You say that whether or not an individual -- a
8    particular individual is early released depends on the
9    assessment of that individual's level of dangerousness,
10   for want of a better term.  Is that fair?
11       In other words, those who are viewed as less
                              Page 88

depo of Rod Pacheco

12    dangerous are released earlier than those who are viewed

13    as more dangerous to the community.

14        A    Fairly.  That is the way it is done in our jail

15    system, generally speaking.

16        Q    Okay.  Now, if someone who is considered

17    eligible for early release because they're considered

18    less dangerous than others and are released, that

19    individual goes out and commits a new crime --

20        A    Like murder which we talked about today.

21        Q    For which you have one example and possibly two.

22        A    Well, no, I didn't say "possibly."  My

23    recollection is that there was two, but I'll check it.

24        Q    Right.  And that one murder that you're sure of

25    did not occur in your county, correct?

98

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1         A    Next door.  San Bernardino County.

2         Q    Right.  And it was with a co-defendant I believe

3    you testified.

4         A    I don't know if he's a co-defendant.  I didn't

5    use the word "co-defendant."  I don't know the filing

6    on -- the cohort I believe is the word I used.

7              So -- fair to assume there was a filing on the

8    cohort, but I don't know that for a fact.  I know that

9    the individual was filed.

10        Q    Okay.

11        A    Sorry.

12        Q    And when was that, by the way?

13        A    Last couple of years.

14        Q    And that individual is now doing time for

Page 89

depo of Rod Pacheco

15    murder?

16        A    No, I don't believe his case has been resolved

17    yet.  It may be, but I don't believe so.  In fact, I

18    think it happened last year in '07.  I want to say a

19    couple of years.  I shouldn't suggest that it was two

20    years ago.

21        Q    No speedy trial action.

22        A    Well, if defendants want to have a speedy trial,

23    they can have it, obviously.  But they don't typically

24    have them in our system in San Bernardino or Riverside or

25    many other counties because of the congestion.

99

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Q    Do you know what the trial date is on that?

2        A    No, I don't.

3        Q    That individual is -- and I don't mean to be in

4    any way facetious about this.  That individual is

5    presumed innocent until convicted, correct?

6        A    Well, of course.

7        Q    Okay.

8        A    But there's -- it's also fair to say that there

9    is evidence to support the filing of a murder charge

10    against him.  That's why there are charges filed against

11    him.

12        Q    Have you ever lost a case?  Has your office ever

13    lost a case?

14        A    Sure.

15        Q    Okay.  And in every one of those cases, the

16    prosecutor believed that there was sufficient evidence in

17    order to file against the individual, correct?

depo of Rod Pacheco

18      A      Just like there was -- just like when -- in

19   cases where they were convicted there was a presumption

20   of innocence.

21      Q      Right.  So there are occasions in which your

22   office believes there's sufficient evidence and the

23   system disagrees with them, correct?

24      A      Sure.

25      Q      Okay.


100


LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1      A      Absolutely.

2      Q      Now, and sometimes people are acquitted by

3   juries for murder, correct?

4      A      Yes.

5      Q      All right.  And sometimes people who are

6   convicted of murder are later exonerated because DNA

7   testing, for example, shows that they were not the person

8   who committed the crime.

9      MR. MITCHELL:  Interposition an objection on

10   relevance grounds.  At this point it seems like it's

11   developing into a debate regarding --

12      MR. HEATHER:  No.

13      MR. MITCHELL:  -- issues that have nothing to do with

14   this lawsuit.

15   BY MR. HEATHER:

16      Q      Isn't that true?

17      A      Rarely so, yes.

18      Q      Okay.  Well, let me try and get back on track to

19   where I was involving this lawsuit before I got off on

20   these questions, which I do think are relevant certainly

Page 91

depo of Rod Pacheco

21    to this broad testimony.  But --

22            Can you go back three questions?

23            (Record read)

24    BY MR. HEATHER:

25       Q    Well, forget it.  You successfully derailed me

101

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    from my line of thinking.  It is what it is.

2       A    There was no intent to do that other than to

3    respond to your questions.

4       Q    That's all right.  I'm going to look -- if I

5    may, these documents -- let me just say that there were

6    some documents produced.

7            I don't know when they were produced.  Were they

8    produced Friday?  In response to some requests for

9    documents, which seems to constantly happen in this case,

10   that they get produced right before a deposition.

11           And I frankly haven't had a chance to review

12   them until this morning.  So if you'll give me a moment,

13   I'm going to look at them quickly and --

14      A    Sure.  And I would offer I'm available later if

15   you'd like to ask questions about those documents.  I

16   don't want you to be taken by surprise or not been

17   afforded the opportunity to meaningfully evaluate that

18   information.

19      Q    Well, that's very fair of you.  And I will try

20   not to ask you to do that because I know it's a big

21   disruption to have to take time to do this.  So if you

22   will bear with me briefly, I'll try to see if I can do

23   this without requiring that.
                    Page 92

depo of Rod Pacheco

24      A    I will gladly rearrange my schedule in the next

25      few weeks to give you the opportunity.


102


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       Q    All right.  I'm going to try not to do that

2       and -- but since you are obtaining an early release

3       today, if I had to for a really good cause, I might ask

4       you.  Maybe we could do it by phone.  But I hope we

5       wouldn't have to do that.

6       A    I enjoy and have enjoyed the pleasure of your

7       company, and so I prefer to wait.

8       Q    Sure.

9       A    I like the philosophical part of your questions,

10      quite frankly, just on a personal basis.

11      Q    Well, you know, I've got to tell you that, you

12      know, while we both have jobs to do in relation to this

13      case, I guess we -- the word "job" maybe is right -- I

14      think it is a -- it's an important moment for this

15      society and this state to make some choices -- and it's

16      going to have to be through the court system -- as to

17      what we do about a situation that saps a lot of energy

18      and affects a lot of lives.  And what we do may affect

19      our future in a significant way.

20      A    Well, it shouldn't have to be through the court

21      system.  It should be through the legislature and the

22      governor.  But that appears to be fairly dysfunctional

23      right now.  And I'm not sure what the cause of that is,

24      in spite of my service there.  But it needs to be done in

25      a thoughtful manner.


Page 93

depo of Rod Pacheco

103

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     Q     And that's why I'm trying to explore those
2    issues with you even though they, in a traditional sense,
3    are sort of outside the bounds of what you would normally
4    ask in depositions because --
5     A     I haven't minded it at all.
6     Q     I just recalled, by the way, somehow it came
7    back to me what I was going to ask before that I forgot.
8    None of these questions seem to be able to be simply --
9    simply stated.
10          If you have an individual that was early
11    released in part because of an assessment that that
12    individual was less violent than others who were not
13    given that early release, and that person goes out and
14    commits another crime and are re-incarcerated, convicted
15    and re-incarcerated, will the fact that that person has
16    committed a new crime be taken into account the next time
17    that person is considered for early release?
18          In other words, will it be hard for that person
19    to be early released the next time?
20     A     It should be.  But when you use the word
21    "assessment," assessment is a guess.  And that's all it
22    is.  And it's -- it may be an educated guess, it may be
23    based on experience and training, but it's still a guess.
24          And like the burglar that was released because
25    people thought he was not dangerous enough to commit a

104

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

Page 94

depo of Rod Pacheco

1   murder, yet in fact he was.  The example I keep coming
2   back to.

3       So will it be taken into account?  It'll taken
4   into account in as many ways as it possibly can be.  It
5   will be taken into account in terms of a filing.  We will
6   file an additional allegation, 12022.1, if it applies.

7       It'll be taken into account in terms of a
8   release.  It'll be taken into account in terms of
9   sentencing.

10       It'll be taken into account in any way that the
11   system can take it into account, including the
12   assessment, in heavy quotation marks, of the individual
13   making the decision to let him out or not let him out in
14   the future.

15       Q   Okay.

16       A   And that all depends on the population of the
17   jail at that moment that he is being considered.  Is it
18   filled with murderers or is it filled with petty thieves?

19       Q   Well, let's assume for the moment that someone
20   commits new crimes when they're released, that that, if
21   they're convicted, is going to cause them to be looked at
22   as less of a candidate, all other things being equal, for
23   early release the next time around.

24       What I'm trying to ask is while that individual
25   may have committed that crime upon his early release,

105

1   because he's re-incarcerated he's not -- to use the
2   example of your murder date, that individual is not going
3   to be committing a new crime on his original release date

Page 95

depo of Rod Pacheco

4    because he's back in jail. At least in some cases,

5    correct?

6    A    I'm not following -- I didn't follow the back

7    and forth of your question.

8    Q    Let's say someone gets out in May, and they were

9    supposed to get out in July. Hypothetically. And in

10    June they commit a crime because they're not in jail.

11    They were early released.

12    A    Okay.

13    Q    And let's say for purposes of discussion they're

14    put back in jail and they're kept there and convicted in

15    July and given six more months.

16    A    Okay.

17    Q    Then they're in jail until the end of the year.

18    And they're certainly not going to be committing new

19    crimes -- assuming they stay in jail to the end of the

20    year, they're not going to be committing new crimes

21    during the time they would've been released on their

22    original release day.

23    A    You lost me right there at the end. I was

24    tracking you until you got to the end.

25    Q    All right. Let me take it this way.

106

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    The person is supposed to get out -- and I know

2    these particular dates may not be real. I'm trying to

3    illustrate a point.

4    A    You were fine with the months --

5    Q    All right. Someone is supposed to get out in

6    June. They get out in April. They commit a crime in

Page 96

depo of Rod Pacheco

7    May.  Now, had they not been early released in April,

8    they wouldn't have committed that crime.  Correct?  They

9    would've been in jail until June.

10        A    That's correct.  And we can say that with

11    certainty.

12        Q    Yeah, we can say that with certainty.

13        A    We don't need to guess about that or speculate

14    or provide an opinion.

15        Q    I agree.  They would've been in jail until June,

16    and, therefore, they couldn't have committed a crime in

17    May.  No question about it.  Correct?

18        A    Correct.

19        Q    But they would've been out in June.  We don't

20    have to speculate about that either, right?  Their

21    original -- all other things being equal, they would've

22    been out in June.

23        A    That's a probability more than a certainty.  And

24    the reason --

25        Q    They could get in trouble in jail or something

107

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    like that.

2        A    Well, they could die.  They could have a heart

3    attack and keel over.  I mean --

4        Q    All right.  But barring those events, if they

5    were released on their originally scheduled release date,

6    they'd be out in June.

7        A    Yes.

8        Q    Okay.  Now, this is what I'm trying to see if

9    it's accurate, is that the person who's released in April

Page 97

depo of Rod Pacheco

10    and commits a new crime in May, if that individual is

11    sentenced for 11 months, or whatever it is, in June,

12    which was the original release date, and put back in

13    jail, now with a longer record, right? As you just

14    described.

15         Then that person will not be on the streets in

16    June committing a new crime. They will not be able to

17    commit a new crime the way they could have had they

18    stayed in jail in June. They would be back in jail.

19    A    Your assumption is not correct.

20    Q    Why is that?

21    A    I'll give you an example. We have a woman that

22    committed a crime in our county. For the last five to

23    seven years we've been trying to get a preliminary

24    hearing on her case.

25         She's arrested the first time. She's early

108

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    released. Fed caked is what we call it in our county.

2         She's early released. She fails to appear. A

3    warrant goes out for her arrest. We wait. She gets

4    picked up a year later. We bring her back in. And they

5    say, "Oh, we early released her before," but then they

6    early released her again.

7         They've early released her five times. We still

8    have not gotten to that preliminary hearing because they

9    won't keep her in long enough to have a simple

10    preliminary hearing 10 days apart from her arraignment.

11    That is common.

12         So in your hypothetical, it doesn't typically

Page 98

depo of Rod Pacheco

13    happen that way. When they go out and commit another

14    crime, if they're only getting another six months, guess

15    what, they're going to have their sentence cut and

16    they're going to be released early again. That's how it

17    works in our county.

18         If you want to take that model and apply it to

19    the state in its correctional system, guess what, that's

20    how it's going to work. We know how to works because we

21    see it every day in Riverside County. They're going to

22    get early released on an early release.

23         If you put a sign on the door that says "no more

24    than 3,640" or "no more than 132,000" on the correctional

25    level, you're going to have another problem and many

109

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    other problems and many other impacts that we see on a

2    daily basis in Riverside County.

3         So it's not a good model to follow even though

4    that appears where we're headed.

5    Q    Well, you take a case where someone in five

6    years hasn't been reprosecuted for a new crime, that's

7    probably not typical. Because I'll ask you for the

8    statistics.

9         How many people do you have that have been

10    arrested and charged with a crime are waiting for five

11    years or more to have a trial?

12    A    A fairly high number.

13    Q    Give me a ballpark.

14    A    Oh, I --

15    Q    Thousands?

Page 99

depo of Rod Pacheco

16    A    well, we have 3,640 people in the jail.  I

17    believe 80 percent of those are pending trial.  we have

18    cases that are as old as 2003 and -- how many of them?

19    Not many, but we have more than we should.

20        2004, 2005, 2006.  we had a murder case that was

21    done a few years ago that was nine years old.  Those --

22    what happens in that system is it churns, and the case is

23    just continued and continued and continued.

24    Q    All right.  So basically -- basically what

25    you're saying is right now, right now, someone who's

110

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    early released and commits a new crime is not going to go

2    back in jail and they're going to be free to commit yet

3    additional crimes, because the way it is right now is

4    that you have no ability to put those people who are

5    recidivists behind bars and keep them there.

6        That's what you say the situation is right now.

7    And your example of that which you say is typical is the

8    woman who comes out, gets early released, commits a new

9    crime, and five years later is still on the streets.

10    A    That wasn't my example and I didn't --

11    Q    That was your example I thought.

12    A    No, it wasn't.  And I didn't say she committed a

13    new crime.  I said that every time we set it for

14    preliminary hearing she fails to appear.

15        And my point in telling you that story -- and

16    she's failed to appear five times now, and so that's why

17    the case is seven years old.  There's a warrant that goes

18    out for her, it takes us a year to pick her up again,

                            depo of Rod Pacheco
19   because it's not that big --

20       Q    You're right.

21       A    Let me finish.

22            -- it's not that big of a case, and so that case

23   churns.  That case is seven years old.  We haven't even

24   gotten it to preliminary hearing.  That is not routine,

25   but it is too common to ignore and to fail to do

                                                              111

             LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
 1   something about.

 2            That becomes -- it becomes statistically

 3   significant at some point.  It's not an aberration.  It's

 4   not an anomaly.  And those things happen with greater

 5   frequency the more you early release people.

 6            Do they go out and commit more crimes?  It

 7   depends on which crime they commit if they're going to

 8   stay in again.

 9            The guy that committed the burglary and was

10   early released then went, got out, and committed murder.

11   Has he been released from San Bernardino even though they

12   have early releases?

13            The answer is no, because his new offense was

14   much more significant than his first offense so the bail

15   is different.  All -- everything has changed for him.

16            Now, what can we say for sure about that

17   situation?  A few things, other than that woman would be

18   alive today if he hadn't been early released from our

19   jail system.  We can say that with certainty.

20            What would he have done if that had never

21   happened?  I couldn't tell you.  We can speculate about

                            Page 101

depo of Rod Pacheco

22    it based on our experience and training, but it's

23    speculation compared to the certainty of that woman's

24    murder.

25        Q    well, it depends on what the facts of the case

112

LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1    are, which we haven't discussed and I don't think need to

2    discuss because there was more than one person involved

3    in the murder, so you can't say with certainty whether

4    absent him the other individual involved might have

5    committed the same murder.  But let me ask you this.

6        A    I can state with certainty if they hadn't been

7    early released she'd be alive today.

8        Q    well, if the other individual who is the --

9    participated in the murder was there, it may have

10    occurred.  But we don't need to debate that.

11            But let me ask you this.  You're right.  The

12    woman who, in your view, committed a new crime has not

13    yet been convicted, correct?  The woman who came out that

14    you used as an example which you said --

15       A    I never said she committed a new crime.  That's

16    my point back to you.  I said she's failing to appear.

17    And the whole beginning of this question --

18       Q    She hasn't been charged with a new crime?

19       A    Let me finish.  Let me finish my answer.  At the

20    very least, for the court reporter.

21           My very point in telling you that story is

22    because your questioning began, well, isn't that taken

23    into consideration when she comes back into the jail?

24    And don't they take into consideration that she failed

Page 102

depo of Rod Pacheco
25    to -- that she didn't show up or there were

113

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

□        1    circumstances?

2              And so my point is they aren't taking it into

3    consideration, because the choices are between bad and

4    worse.  They know she's failed to appear five times.

5    They know the case is seven years old because it's in her

6    classification notes.

7              Are they taking that into consideration?  Of

8    course they are.  I'm certain they are.  And I don't need

9    to talk to them to know that.

10             But the system is so dysfunctional that they're

11   making bad choices versus worse choices.  And that's the

12   decision-making process.

13     Q    I'm trying to get just some basic facts here to

14   make sure I understand.  This woman was early released,

15   correct?

16     A    Yes, five times.

17     Q    All right.  I was asking you questions about

18   people who are early released and commit a new crime and

19   whether they go back into jail.  And you used this

20   example in response to that line of questioning.

21             And so my question to you is, if she was early

22   released from her sentence to a prior crime -- let me

23   finish the question, please.

24             If she was early released from her sentence to a

25   prior crime, which is all we've been talking about, and

114

Page 103

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

D

1    she has for five years or five times failed to appear on

2    a new charge, I don't understand how she can fail to

3    appear on a new charge unless she's been charged with a

4    new crime.

5        A    well, she's been committing a new crime every

6    time she fails to appear.

7        Q    On what charge?

8        A    Failure to appear.

9        Q    On what?

10       A    On her first case.

11       Q    well, then that's not even a relevant example.

12       A    It's a perfect example.

13       Q    we're talking about someone who is convicted and

14    in jail -- excuse me.  What I'm talking about is someone

15    who has committed a crime and been convicted and

16    sentenced and is in jail doing time for that crime and

17    then is early released.  Like your murder example.  Okay?

18           This woman isn't one of those -- we're talking

19    apples and oranges.

20           My hypothetical -- which I'm going to give up on

21    because I don't know that I need to take testimony on it

22    because it's so self-evident.  But my example is

23    concerned with individuals who have been convicted of a

24    crime, sentenced for that conviction, and are doing time

25    and then are early released, okay?

115

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

D

1        A    And?  And?

2        Q    My point is it sounds like this woman is, from
                          Page 104

depo of Rod Pacheco

3    what you're telling me -- and I'm not trying to be

4    argumentative -- is not one of these individuals because

5    she hasn't yet been convicted on the original crime.  Is

6    that correct?

7        A    No.  You're saying apples and oranges?  It's not

8    apples and oranges.

9        Q    Has she been convicted of anything?

10       A    It's not dissimilar in the concept.  It's

11   dissimilar in some facts.  No, she has not been convicted

12   yet.

13       Q    Then I don't want to ask you about that.

14       A    Well, but the practice is the same.

15       Q    It doesn't matter.  I'm not asking you about

16   that.

17       A    No, the answer is the same.

18       Q    That's the difference between this and a

19   conversation, is I'm asking you about cases in which

20   somebody has been convicted of a crime.

21       A    And what?  What are you asking about that?

22       Q    And -- we can go back and I'll try it one more

23   time.  But I would appreciate it if you would work off

24   the facts I'm trying to use and not something that's

25   factually dissimilar that you think is analogous, and

116

1    that is this:

2            If an individual has been convicted of a crime

3    and their original release date is the end of June,

4    right?  And they're early released in April, and they are

5    convicted of a new crime in May for which by the end of

Page 105

depo of Rod Pacheco

6    June, as a result of a plea bargain and whatever, they
7    are sentenced to six more months in jail.
8         Are you with me?
9    A    Yes.
10   Q    So they start serving that six months at the end
11   of June on the day they would've originally been walking
12   out of the jail, okay? They go back into jail for six
13   months. So now they have a conviction on their record.
14        That individual, according to the statistics you
15   have given me, all other things being equal, is not going
16   to be able to commit a crime on July 1st because he's
17   going to be back in jail.
18   A    That's not accurate.
19   Q    Why is that not accurate?
20   A    Because he could be early released again.
21   That's the point of the hypothetical I gave you. They're
22   early releasing multitudes. And it doesn't matter if
23   they're convicted or whether they're awaiting trial.
24   They're early releasing them.
25        And that's why it is apples to apples. It may

117

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    be a green apple to a red apple, but it's apples to
2    apples. And that's the point back to you I'm trying to
3    make to provide the clarification necessary to answer
4    your question.
5         This woman is no different than the hypothetical
6    you gave me. I'll play off your hypothetical.
7         What crime has that person committed? Have they
8    committed a new murder? They'll stay in custody. Have
                        Page 106

depo of Rod Pacheco

9    they committed another misdemeanor?  They're out.

10   They're not going to serve any time.

11       Q    Let's say a serious felony.  Let's say an armed

12   robbery of a jewelry store.

13       A    Then they're going to prison.  They're not going

14   locally.  So they're not going to serve any local time

15   other than the pending trial.

16       Q    If they commit murder, aren't they going to go

17   to prison?

18       A    They are.

19       Q    Okay.  Then why use a murder example?  No, I'm

20   not trying to play games with you.  The funny thing is in

21   these questions --

22       A    I used a murder example -- to answer your

23   question, I used a murder example to tell you what

24   happens to explain to you to some degree as best I can

25   what happens when you early release people, that there

118

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    are certain things that occur.  And they occur, and that

2    is unacceptable to folks like me.

3            The murder of a -- no, you asked me why.  I told

4    you.  And I am telling you that the murder of a -- the

5    murder of a 74-year-old woman is unacceptable, because

6    someone wants to early release them.

7        Q    I understand that, but you have no ability right

8    now to say anything other than this individual has been

9    charged.  And the fact is I'm asking you about staying in

10   your jail system.

11           And you asked me whether or not they committed
                        Page 107

depo of Rod Pacheco

12    murder.  And I said let's say it's an armed robbery.  And

13    you said, "well, armed robbery, they're not even going to

14    be in our jail system."

15        A    I didn't say that.

16        Q    So neither is a murderer --

17        A    I didn't say that.

18        Q    -- so what is the most serious type of crime

19    that is not going to send someone off to state prison?

20        MR. MITCHELL:  I object to your question as

21    mischaracterizing and misstating what his testimony has

22    been.

23    BY MR. HEATHER:

24        Q    Okay.  what is the most serious type of crime

25    for which an individual will not be sent to state prison

119

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    and will be sent to jail in your system?

2        A    I never said they wouldn't be in our jail

3    system.  Of course they're going to be in our jail system

4    pending trial.

5        Q    I understand.

6        A    And then in our county, an armed robber 99 times

7    out of a hundred is going to state prison.

8        Q    Okay.  But pending trial will be in your jail

9    facility?

10        A    Yes.  Absolutely.

11        Q    Okay.  And pending trial, is it likely or not

12    likely that an armed robber will be early released during

13    the pendency of the pretrial?

14        A    It is not likely that they will be early

Page 108

depo of Rod Pacheco

15    released, but it is possible depending on the

16    circumstances of the day when that decision is made.    It

17    depends.

18        Q    Okay.

19        A    Is crime going up, is crime going down.

20        Q    And if you go back to my original hypothetical

21    so I can finish it, even though it's been a struggle, if

22    that individual is not released on July 1 after he's

23    re-incarcerated on the charge of armed robbery, then he

24    will not be committing a crime on the streets on July 1.

25            Is that fair to say?

120

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1        A    Well, if he's in custody, he will be

2    not committing a crime -- for whatever reason he's in

3    custody, he will of course not be committing a crime in

4    jail, but he would have committed a crime that would've

5    necessitated him staying in jail for a longer period than

6    when he was early released.

7            A new crime was committed that would never have

8    occurred, because he was early released.  The fact that

9    subsequent crimes are not going to be committed on the

10    streets because he's in custody quite frankly is

11    irrelevant to me.  That's the point of incarceration.

12        Q    Yeah.  Here's the point that I don't get.  And

13    that's to a certainty, by the way, that he wouldn't

14    commit a crime on July 1 if he's in jail, correct?

15        A    On the streets.

16        Q    Correct.

17        A    Yeah.

Page 109

depo of Rod Pacheco

18     Q    Okay.  Now, you say that had he not been early

19    released he wouldn't have committed another crime.

20    That's where I'm really having some problem.

21           Are you tying all recidivism to early release or

22    the fact that some people that commit crimes are going to

23    commit crimes again regardless of whether they serve

24    their full term or not?

25     A    You can't draw bright lines like that.


121


LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1     Q    I'm not drawing any lines.  I'm asking you

2    whether you --

3     A    The lines -- you're drawing lines in your

4    questions, and you're asking me to say yes or no.  And my

5    response back to you is you can't draw a line like that.

6     Q    And what is your best answer then?

7     A    Well, I can't say with certainty that if he had

8    not been released, if he had not been released in an

9    early release program, that the crime would not have

10    occurred.

11     Q    At that time?

12     A    I can't -- absolutely, and I can say with

13    certainty.

14     Q    Okay.

15     A    Regardless of what may or may not happen in the

16    future --

17     Q    Right.

18     A    Let me finish.  Again, at least for the court

19    reporter.

20           I can't say with certainty that that crime would

Page 110

depo of Rod Pacheco

21    not have occurred, because it did occur. He was early

22    released, and it occurred. He committed the crime.

23         And I can say with certainty that had he been in

24    custody, which is your point, that crime would've never

25    occurred. And so that's my point back.

122

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1         It is a significant impact to public safety when

2    you early release someone. And that is with a certainty

3    when that crime is committed. And that's my point back

4     to answer your question.

5         Q    And because of the recidivism rate, it is --

6    well, let me strike that and say you can't say one way or

7    another whether or not that individual would have

8    committed the same identical type of crime -- by that I

9    mean whether it's assault or robbery -- at a different

10    date if they had served the full term of their sentence,

11    correct?

12        A    I could say that approximately 50 to 70 percent

13    of the folks that go to state prison commit new crimes.

14    Whether they're the same crimes, sometimes they are, many

15    times they are, sometimes they're not.

16         Sometimes they commit a first degree burglary

17    and then they commit a murder. Sometimes that occurs.

18    Sometimes it's a dope case, and then they commit a theft

19    in order to feed their dope habit. It depends.

20         So I can say that recidivism is high and that

21    people are likely to re-offend in the future.

22         So not only -- not only are we getting in an

23    early release program the 50 to 70 percent recidivism

Page 111

depo of Rod Pacheco

24    when they finally get out, which almost all of them do,

25    but we're also getting the crimes that they now have a

123

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    new opportunity to commit with an early release program.

2    So you're affording them more opportunities to commit

3    more crimes.

4        The people that I've dealt with that have been

5    sent to prison have a history of committing crimes.  It

6    is not typically a one-time affair.  Every now and then

7    it is.  But those folks typically don't go to prison.

8    They are dealt with on a local level because they've

9    committed something less significant.

10        80 percent -- 75 to 80 percent of the folks --

11    of the felons in Riverside County are treated with

12    probation.

13        So the worst ones are the ones sent to state

14    prison, the ones with negative criminal behavior, the

15    ones with a history of criminal behavior.

16        Those folks are dangerous.  It doesn't matter

17    whether they went for a drug offense or they went for a

18    murder.  They're dangerous.  So it's an additive effect

19    with an early release program.

20    Q    What I think we've established with certainty is

21    that if you early released and commit a crime, that crime

22    would not have been committed by that individual on that

23    date if on that date -- on the streets, if on that date

24    they were behind bars.  Correct?

25    A    That's a certainty.

Page 112

depo of Rod Pacheco

124

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      Q     I mean that's a certainty.  And what is also a

2   certainty is if they commit that crime because of early

3   release and are behind bars on the date on which they

4   would've originally been released if they hadn't been

5   early released, they won't commit a crime on the streets

6   then.

7          We've established that certainty, that if they

8   are in jail then, they will not commit a crime on that

9   date.

10     A     I didn't follow that second question.

11     Q     Well, we've been through it enough that I think

12   it's in the record.  The point is -- which I think you've

13   made quite powerfully, is if you're on the streets and

14   you're going to commit a crime -- well, let me strike

15   that.

16          If you're in jail, you can't commit a crime on

17   the streets.

18     A     True.

19     Q     Okay?  That, we've established as a certainty.

20   I think that's the only thing we've established as a

21   certainty.

22          Whether or not over the course of a year or six

23   months or 10 years early release programs cause over that

24   span of time more crime or not is something for which I

25   don't believe you have any studies or documents that you

125

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

Page 113

depo of Rod Pacheco

1    can show me.

2            Is that correct?

3    A    Show you what?

4    Q    Whether or not over the long course of things

5    the number of crimes that are committed because there are

6    early release programs is higher or lower than there

7    would be over the long course of things.

8    A    Well, I don't know.  I would disagree with that.

9    There have been anecdotal studies.  There have been

10   observations of various jurisdictions where they've had

11   early release programs where crime has gone up

12   dramatically.

13   Q    Well, I --

14   A    I'm sorry.  I hadn't finished.

15           And where that has created a synergetic effect

16   to the detriment of the citizens of those communities.

17   Philadelphia is a prime example.  I'm sorry.  I haven't

18   finished.  I haven't finished.

19           Philadelphia is a prime example.  Texas is

20   another example.

21           There are studies and observations of those --

22   of those jurisdictions where early release programs were

23   put in place for a whole host of reasons, and they served

24   to the detriment of the public safety of those areas.

25   Q    Let me ask you this:  Exhibit 1, which is in

126

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    front of you to your right, which was marked in

2    deposition of a San Diego County Sheriff's Department

3    official that is responsible for monitoring jail

Page 114

depo of Rod Pacheco

4    population and being aware of things -- let me phrase it

5    this way:  You know that this case isn't about conditions

6    in Philadelphia in the state prisons; is that correct?

7        A    It is.

8        Q    And it's not about whether or not the

9    constitutional violations exist in the treatment of

10   inmates in Philadelphia jail facilities.

11       A    It is.  I disagree with you.  It quite frankly

12   is.

13       Q    Okay.  And is it about the conditions which

14   exist in the prison or jail facilities in the state of

15   Texas?

16       A    It is about those things.

17       Q    Okay.  It certainly then is about the conditions

18   and programs that exist in the county of San Diego and

19   California; isn't that correct?

20       A    I don't know enough about the county of

21   San Diego, so I couldn't tell you.

22       Q    So this case --

23       A    I haven't reviewed that material.  If you'd

24   like, I can review it.

25       Q    Well, I would like you to.

127

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        A    Great.

2        Q    I'd like you to review the testimony of the

3    individual who testified about that exhibit, which has a

4    number of early release programs, who said that none of

5    them, none of them, have had a negative impact on public

6    safety.  None of them.

Page 115

depo of Rod Pacheco
7       Now, do you think it's relevant, does it pique

8   your curiosity that someone who has the responsibility to

9   monitor that in a neighboring county would testify to

10  that effect and no one has brought that to your

11  attention?

12      MR. MITCHELL:  I'm going to object to that as calling

13  for an improper opinion and argumentative.

14      MR. HEATHER:  I'll withdraw it.

15  BY MR. HEATHER:

16      Q    You're unaware of the testimony of the

17  individuals in this case from San Diego County?

18      A    Yes.

19      Q    And you're unaware of the effects that the early

20  release programs have had in San Diego County?

21      A    Yes.

22      Q    Okay.

23      A    I'm aware that there were re-entry efforts in

24  San Diego, re-entry facilities and programs, yes,

25  promulgated by the district attorney of San Diego and

128

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   others, the sheriff and others.

2       Q    Well, you're aware that they have early release

3   programs in San Diego County; is that correct?

4       A    It's a fair assumption, yes.

5       Q    Okay.  But you're not aware of the effect that

6   they've had on public safety in San Diego County.

7       A    I'm aware generally of the public safety of

8   San Diego but not the cause and effect, no.

9       Q    Okay.  And does it surprise you that a

Page 116

depo of Rod Pacheco

10    knowledgeable individual who was designated·by San Diego

11    as the person most knowledgeable testified that the early

12    release programs that are identified on what's been

13    marked as Exhibit 1 have had no negative effect on the

14    public safety in San Diego County?

15        MR. MITCHELL:  I'm going to object to that question

16    as calling for speculation.  It's also argumentative, and

17    it's also irrelevant as to whether or not he'd be

18    surprised.

19    BY MR. HEATHER:

20        Q    Would it surprise you?

21        A    "Surprise" isn't the word I would use.

22        Q    What word would you use?

23        A    I'd be shocked that --

24        Q    Okay?

25        A    I'm sorry.  Let me finish.


129


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1              I'd be shocked that someone who, as you

2    characterized, is monitoring this would state it so

3    definitively as you have.

4              The fact of the matter is early release programs

5    do cause more crime and have a significant negative

6    impact on public safety.  If this person hasn't observed

7    that, then they're clearly not doing it in a way that

8    would allow them to observe it.

9              It's unfortunate that someone in that position

10    has not observed what is so obvious to so many of us in

11    this public safety community.

12              How do I account for that opinion is -- I don't

Page 117

depo of Rod Pacheco

13    know. I'd leave that up to the D.A. of San Diego. She

14    could more adequately discuss that. It's shocking that

15    someone would have that opinion, though.

16        Q    Well, I'll represent to you that's my

17    recollection of the testimony. Maybe I'm not recalling

18    it correctly, but I'm giving you -- my best recollection

19    is going through that list, those programs have not had a

20    negative impact on public safety in San Diego County.

21    And we'll see what the district attorney says.

22        A    Well, that's a definitive statement. "Have not

23    had an effect." That means --

24        Q    No, I didn't say "effect." I said did not have

25    a negative effect on public safety.


                                                          130


LYNDEN J. AND ASSOCIATES, INC. (800) 972-3376

1        A    A negative effect. That's a definitive

2    statement. That means there has been no effect in a

3    negative fashion on the public safety in San Diego.

4            That means to me that none of the people early

5    released out of San Diego through any of these programs

6    in this exhibit have re-offended. Not one of them, in

7    any way. Not just a substantial way, but in any way.

8            If your characterization is other than that, you

9    should probably ask a different question. But I find

10    that incredibly hard to believe, and it can't be true.

11    You must have misunderstood the testimony.

12        Q    I don't think I misunderstood the testimony. I

13    think you've tried to define the question in a way that

14    allows you to discount the report of that testimony. But

15    it is what it is in the record.

Page 118

depo of Rod Pacheco

16          I mean the fact of the matter is -- the fact of

17    the matter is there is recidivism, and you've testified

18    here today there's going to be recidivism regardless of

19    whether people are early released or not.  Regardless of

20    whether they serve their full time in prison, there will

21    be recidivism.

22          So you can't define whether or not early release

23    per se, in my view -- well, I'm not here to debate you.

24    I'm here to ask you questions.  Why don't we take a break

25    right now and I withdraw that.


                                                       131

          LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1               (Recess)

2          MR. HEATHER:  Back on the record.  I'd like to mark

3     as Exhibit 3 this document.

4               (Pacheco's Exhibit 3 was marked for

5               identification, the original of which is

6               attached hereto.)

7     BY MR. HEATHER:

8          Q    Are you ready?

9          A    Sure.

10         Q    Again, as I said, I'm trying to get through

11    this.  I just got these documents.  During my questions

12    if you want to take some more time to look at this,

13    please let me know.

14         A    Sure.

15         Q    And otherwise I'm going to ask you some

16    questions about what has been marked Exhibit 3 --

17         A    Okay.

18         Q    -- which I understand was produced in response

                        Page 119

depo of Rod Pacheco

19    to the document request.  I don't know if it was to

20    solely your office or to the District Attorney

21    Intervenors generally, but this is one of the documents

22    that was produced.

23            Have you seen this document before?

24    A    I don't recall.

25    Q    Okay.


132


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     A    I'm familiar with the discussion.  I'm sorry.

2    I'm familiar with all parts of the discussion in here.

3     Q    All right.  I'm going to ask you about some

4    parts and see if I can do this without getting

5    sidetracked into a long debate.

6            There's a reference in the second paragraph on

7    the first page to the fact that Governor Schwarzenegger

8    issued a proclamation in which he stated that the health

9    and safety of 29 of 33 prisons is endangered by severe

10   overcrowding.

11           Do you see that statement?

12    A    I do.

13    Q    Do you agree with that statement?

14    A    Not entirely, no.  If it is a statement that the

15   California Department of Corrections and Rehabilitation

16   is in sad need of an overhaul, I agree with that.  I

17   don't necessarily agree with the health and safety of 29

18   of 33 prisons is in danger by severe overcrowding.

19    Q    And can you succinctly say why you don't agree

20   with that?

21    A    I guess I'm not entirely convinced.  It doesn't

Page 120

depo of Rod Pacheco
22    mean that there aren't problems with the system -- I'm

23    fully aware of that -- and that there is severe

24    overcrowding.  I'm fully aware of that.

25           I am aware that there are health and safety

133

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    issues.  The governor makes a causal connection in this

2    declarative sentence.  I'm not necessarily convinced

3    entirely of that.

4           There is severe overcrowding.  There is issue

5    about health and safety that needs to be remedied and is

6    being remedied by the receiver.  Whether it's 29 of 33 or

7    33 of 33 or 10 of 33, I'm not sure.  But I'm certainly

8    aware he made an emergency proclamation.

9      Q    Okay.  So is it fair to say, just so I make sure

10    I understand, part of your concern about agreeing with

11    this statement is you're not convinced about the causal

12    connection but you wouldn't say that you agree that there

13    is no causal connection.

14      A    It's hard to say.

15      Q    Okay.  There is a suggestion, if I read this

16    document correctly, at the bottom of page 1 and the top

17    of page 2 -- well, maybe I shouldn't limit it just to

18    that.

19           There are two points that I believe this

20    document is making.  One is that a significant portion of

21    the recidivist population is made up of people who don't

22    commit new crimes but who are returned to jail because of

23    technical probation violations.

24           I'm not asking you whether or not you agree with

Page 121

depo of Rod Pacheco

25    that.  I'm asking you whether or not that's what this

134

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    article states.

2       A    I don't think that's what this article states.

3       Q    All right.  Then give me just a moment then.

4       A    And that's not accurate in my experience and

5    training.

6       Q    Let me -- because I want to then focus on what

7    this says.  It states that, "A leading cause of

8    probationers being sent to prison -- " and I'm reading

9    from the fourth paragraph down on page 2.

10      A    I see.

11      Q    " -- is what commonly known as a technical

12   violation.  These are typically caused by a probationer

13   not complying with all of the court-ordered conditions of

14   probation, not by the commission of a new crime."

15           So that's why I asked at first this article is

16   making the point that a significant number of people who

17   are returned to incarceration are the result of probation

18   violations and not committing a new crime.

19      A    It's making the point that there are folks that

20   are returned for violations of probation.

21      Q    Okay.

22      A    Now, some might describe them -- and that's why

23   it's in quotation marks -- as a technical violation.

24   They're not considered technical, hence which is

25   obviated, self-evident, by the sentence of state prison.

135

Page 122

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          If it were a technical violation, why is
2     somebody being sent to state prison?  Which is what the
3     article is about, which is the point of the article.
4          It's not a technical violation, in my opinion,
5     and that's not the case that's being made here.  It's
6     saying that there are many reasons why people get sent
7     back to prison, one of which is what some people refer to
8     as a technical violation, which is a significant act.
9     Q     Okay.  Let me ask you this:  Do you know within
10    Riverside County what percentage of people who are
11    re-incarcerated are re-incarcerated as a result of a
12    probation violation as opposed to committing a new
13    crime?
14    A     The probation violations are much less than a
15    new crime.
16    Q     Can you approximate the percentages at all?
17    A     No.
18    Q     Are such statistics available?
19    A     I could probably find them.  When I say
20    "probably," I hedge just a bit because I might not be
21    able to find them.  But I think we could.
22    Q     If you have --
23    A     I'll try.
24    Q     Listen, I don't like to impose on a witness in a
25    deposition.  When it's over, I think everybody would like

136

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1     it to be over.
2          If there is a readily available statistic or
Page 123

depo of Rod Pacheco

3    something that you could provide and would be willing to

4    provide that indicates the volume of people that are

5    returned to incarceration because of probation

6    violations, I'd appreciate it.

7        A    Well, we'll try to find it.

8        Q    If you can.

9        A    I'm not sure we can pull it out of our system,

10   but we'll see.  I'll make the effort.  And they're all

11   the various and sundry reasons why someone's probation is

12   violated.  Sometimes it's --

13       Q    That, I understand.

14       A    Sometimes it's a new offense.  Commit a new

15   crime, probation is violated because the term limit is

16   violated.

17       Q    I understand that.  So, again, if it's not an

18   imposition, I would appreciate it.  And if you can't, you

19   can't.

20       A    We'll see.

21       Q    There is also a point which I think we discussed

22   today, but I think this reinforces it.  And I'm trying to

23   find the sentence.  I may not be able to easily do it.

24   That by having additional services to assist people in

25   not re-offending, those services can and do have an

137

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    effect.

2        A    Yes, I think we've talked that through a million

3    times today.

4        Q    Okay.

5        A    I don't disagree with that.  The problem is
                        Page 124

depo of Rod Pacheco

6     probation departments are universally underfunded

7     statewide and do not have sufficient services in my

8     county or others to provide those -- sufficient resources

9     to provide those services.

10        Q    There is one specific reference in that regard

11    I'd like to see if you agree with.  And that is the

12    reference in -- on the second paragraph of the third page

13    of this document -- the second page of this document.  It

14    begins "research shows" on page 2.

15        A    Is it page 2?

16        Q    It is page 2.

17        A    Okay.

18        Q    "Research shows implementing evidence-based

19    practices can reduce recidivism and decrease the

20    prison-bound probation population by between 10 and

21    30 percent saving the state up to 330 million annually in

22    prison costs."

23              Do you agree with the statements that are made

24    in that paragraph?

25        A    I think it's within the ballpark of

138

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     reasonableness that these services can reduce crime.  I

2     don't have any sense of the money that is the second

3     sentence in that.

4         Q    Okay.

5         A    I would doubt it actually.

6         Q    Give me just a moment if you would.

7         A    Sure.  Take as much time as you like.

8         Q    I'm going to mark as Exhibit 4 -- can I
                        Page 125

depo of Rod Pacheco

9      borrow -- off the record.

10             (Discussion off the record)

11             (Pacheco's Exhibit 4 was marked for

12        identification, the original of which is

13        attached hereto.)

14   BY MR. HEATHER:

15     Q    All right.  Before you reviewed this, let me ask

16   you -- because of the title, I think it's fair to ask

17   you.  Have you seen this document before?

18     A    Yes, uh-huh.

19     Q    Are you familiar with it?

20     A    Very, uh-huh.

21     Q    Okay.  I would like -- and do you agree with

22   this position statement?

23     A    Yes, uh-huh.

24     Q    Okay.  Did you write this position statement?

25     A    No.  Mr. Mitchell did.

139

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      Q    Is there anything --

2      A    With others.

3      Q    -- in this position statement that as you sit

4    here right now without having reread it you can recall

5    saying, "I didn't agree with that part"?

6      A    I can't recall that there is anything that I

7    would disagree with.  I reviewed it prior to its final

8    draft, talked about various things, and the final draft

9    appeared.

10     Q    Okay.  I'd like to turn your attention, if I

11   may, to the third full paragraph down on page 2.

Page 126

depo of Rod Pacheco

12    A    Page 2?

13        Q    And the second sentence of that paragraph which

14    I'll read into the record says:

15            "While the District Attorney Intervenors are not

16        opposed to measures that would reduce the prison

17        population that are well-reasoned, practicable, and

18        consistent with our responsibility to protect public

19        safety, these measures must be primarily designed to

20        encourage rehabilitation and reduce recidivism,

21        rather than simply achieving a reduction in the

22        prison population."

23            Do you agree with that statement?

24    A    Yes.

25        Q    Okay.  I recognize your answer may be to refer

140

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    to what we already talked about today, but to be sure,

2    let me ask you this:

3            What are the well-reasoned, practicable measures

4    that can be used to reduce the prison population that you

5    believe are consistent with the responsibility to protect

6    public safety?

7        A    I think the -- and I know you suggested

8    otherwise, but I think the things that we have spoken

9    about today.  And that's the rehabilitation efforts that

10   need to be provided, a restructuring of the Department of

11   Corrections.  It's a parole apparatus particularly.

12           In my opinion, they have underfunded that

13   dramatically.  It makes little sense to expect people to

14   rehabilitate when you reduce the time they're on parole

Page 127

depo of Rod Pacheco

15    and you reduce the number of parole officers to supervise
16    them and help them.
17            Additional attempts to increase the size of
18    probation officers and probation offices throughout the
19    state of California.
20    Q    As is the case in that last article?
21    A    Yes, and we've talked about that.
22            Drug treatment centers, job training, et cetera,
23    and there are a number of things that need to occur when
24    they're in custody, not waiting until the day they get
25    out.

141

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1            That's the time -- when they're in custody is
2    the time to begin the rehabilitation, with full
3    appreciation and understanding that maybe 70 to
4    80 percent of the time you're going to fail.  It may be
5    higher.
6            The rate I mentioned about our drug treatment
7    center was a 20 percent success rate after a year or at
8    the end of a year.  It's actually quite higher for most.
9    10 percent is the most -- actually it's a higher failure
10    rate.
11            So those things need to be done.  And when those
12    things are done, I think you will see that there is less
13    recidivism.  And when there's less recidivism, that will
14    on its own and naturally result in a prison population
15    that reduces per capita.
16            I say that small, little hedge because the state
17    of California is increasing in size through its
                        Page 128

depo of Rod Pacheco

18    population. That's increasing dramatically.

19         Just in the time I was at the legislature it

20    increased dramatically, and it continues. And it's

21    expected that the state that is now about 36 or 37

22    million will increase to 50 million over the next 20,

23    30 years.

24         So the raw numbers are going to increase no

25    matter what we do. Unless there's a cap on the prisons,

142

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1     and there is no new prisons being built.

2          At some point that will end, though, because at

3     some point the legislature and the governor will do their

4     jobs and build more prisons because of the public outcry

5     because of the increased crime that will result from the

6     cap and the early release.

7          That's what I mean by that sentence. That's --

8     and there's probably more that I haven't added and can't

9     recall at this time.

10    Q    I apologize. I'm taking the time to look

11    through this because I just received these when I got

12    here today, but it's better than reconvening. So if you

13    just bear with me, I think we're almost done.

14    A    I have no hesitation. That's fine. Again, I'll

15    make the offer again you can take the time now or I can

16    come back.

17    Q    Let me just take a short lapse. We're close to

18    being done.

19    A    Absolutely.

20    Q    I am going to mark -- do you have the original

Page 129

depo of Rod Pacheco

21    now of what we just marked as "4"?  I'm going to mark

22    this as "5."

23            (Pacheco's Exhibit 5 was marked for

24            identification, the original of which is

25            attached hereto.)


                                                        143


        LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    BY MR. HEATHER:

2        Q    And my question to you really is do you know

3    what that document is.

4        A    I have seen this document before, yes, I'm

5    familiar with it.  They're statistics from the jail.

6        Q    And --

7        A    In Riverside County.

8        Q    Can I borrow your copy then?  These are

9    statistics from Riverside County?

10       A    Yes.

11       Q    And why does it have at the top "Priority

12   Federal Releases"?

13       A    I didn't construct the document, so I don't

14   know.

15       Q    Okay.  So -- and that characteristic seems to be

16   used throughout the document on the next page as well.

17   So far as you know, this doesn't have anything to do with

18   release from federal custody.

19       A    No.  This is our -- this is our --

20       Q    I don't mean to be facetious.  I mean it says

21   "Priority Federal Releases," so I don't know what the

22   word "federal" means.

23       A    Let me finish.  The consent decree was a Federal
                        Page 130

depo of Rod Pacheco

24    Consent Decree.

25        Q    Okay.


144


LYNDEN J. AND ASSOCIATES, INC.    (800) 972-3376

1        A    And so when the word "federal" is used in this

2    document, it's in reference to the Federal Consent Decree

3    that operates in our county.  So it's a 2007 county -- I

4    mean I didn't -- like I said, I didn't construct this,

5    but it's a "2007 Countywide Priority Federal Release

6    Statistics."

7        Q    Okay.  Having looked at it for the first time, I

8    wasn't sure whether you were comparing it with --

9        A    This is our accounting only.

10       Q    Okay.  And it is for 2007 and '8 year-to-date;

11   is that correct?

12       A    2008, yeah.  I don't recall where -- where that

13   to date leaves off.  You know what I mean?  Whether --

14       Q    Yeah, well, there's no date on the document.

15       A    Whether it left off in May, June or July or

16   whenever it left off, I couldn't tell you.

17       MR. MITCHELL:  If I can interrupt, there's a

18   subsequent document that has the dates of January 1st and

19   August 31, '08, and that's a separate document to cover

20   2008.

21       MR. HEATHER:  Okay.  And I see that.

22           All right.  Why don't we mark that at the same

23   time.  We'll mark both of these at the same time so I can

24   understand them.  This is Exhibit 6.

25           (Pacheco's Exhibit 6 was marked for

Page 131

depo of Rod Pacheco

145

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1          identification, the original of which is

2          attached hereto.)

3          THE WITNESS:  Here you go.

4    BY MR. HEATHER:

5          Q    Thank you, sir.

6          A    Did you want me to put down "5"?

7          Q    No, I want to still use "5." And I've got "6"

8    in front of you only to the extent it may help you refer

9    to that, and I'll ask about this subsequently.

10         A    Sure.

11         Q    Unless you want to bring it there because it may

12    help you interpret "5."

13              There is an indication on the second page of

14    Exhibit 5 that there is apparently a significant

15    percentage reduction in the number of releases as

16    compared with the prior year.

17              And I'm wondering whether that is because it's

18    only year-to-date or, if not, why -- do you have an

19    understanding why the numbers are so -- so much less?

20         A    It is my understanding that they have

21    reconfigured their practices in the jail for the housing

22    of these inmates.  And that is because there is a new

23    sheriff in town both literally and figuratively.

24              The former sheriff left I believe last August,

25    August of 2007.  The new sheriff came in -- yeah, I think

146

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

depo of Rod Pacheco

1    it was August or September.  The new sheriff came in and
2    he has reconfigured things and the manner in which
3    they're housing people.
4         That, I am told by the sheriff's personnel,
5    specifically the undersheriff, that that is the reason
6    why there is -- that there are less early releases.
7         Our caseloads haven't gone down.  The number of
8    new cases coming in are still going up as they have been
9    for the last 20 years.
10   Q    Right.
11   A    It's just they're housing them differently.
12        Now, to put a fine point on it -- and I don't
13   mean in a pejorative sense, but they are considering all
14   parts of their system at the same time, I am told, when
15   last year in '07 they were not.
16        What that means is that if you were booked into
17   Riverside and Riverside was full, they would release
18   somebody, without checking Temecula, Banning Road Camp,
19   Blythe, and Indio.
20        All of those other locations have correctional
21   facilities as part of the Riverside County Jail System.
22        Now they are checking all of them.  So if you
23   are booked into Riverside and there's no room at that
24   inn, so to speak, they check Temecula.  If there's a bed
25   there, they transport somebody.

147

1    Q    Okay.
2    A    That's reduced the number of early releases.
3    Q    So they're making a more complete use of the

Page 133

depo of Rod Pacheco

4    available beds?

5        A    That's one cause, I believe.  The other cause is

6    that with 6,001 early releases last year, the local

7    police departments, of which there are many, and some of

8    them are large, are no longer arresting people.  They're

9    site releasing people.

10            And so they're not availing themselves of the

11    opportunity to put pressure on the jail system.  So there

12    aren't as many early releases.

13        Q    Okay.  And are those mostly for misdemeanors

14    or --

15        A    Mostly.

16        Q    With some felonies?

17        A    I believe so.

18        Q    And the types of felonies that would be site

19    released, do you have any idea what type of felony they

20    would be?

21        A    Sure.  They would be the low end felonies, the

22    dope felonies.

23        Q    Bar fight or a --

24        A    I wouldn't use a bar fight as an example because

25    it's an act of violence.


148


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1        Q    Okay.

2        A    But an economic crime like a second degree

3    burglary, a burglary of a commercial building, grand

4    theft auto, any type of drug crime unless it involves

5    large quantities or manufacturing.

6            Those are the types of crimes that I would

Page 134

depo of Rod Pacheco
7    expect would be site released and have been site

8    released.

9        Q    Has that program been in place long enough or

10   regardless of how long it's been in place are there any

11   studies which attempt to quantify the degree to which

12   individuals who are site released commit new crimes while

13   they're awaiting prosecution for the original crime?

14       A    I can't think of any off the top of my head, but

15   I can tell you from our experience in Riverside County

16   that when you site release people they fail to appear.

17            When they fail to appear, it increases the

18   number of warrants that have to be -- it increases the

19   number of declarations that have to be prepared and the

20   number of warrants that have to be signed and then

21   inputted into the system for subsequent arrest.

22            It also increases the number of personnel that

23   are necessary to go serve those warrants.

24            To be quite candid with you, people aren't

25   serving misdemeanor warrants in Riverside County.  That,

149

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    therefore, increases the number of motions which are

2    failure to provide due process and a pre-arraignment

3    delay.

4            Those cases are dismissed rather routinely

5    because there are so many of them and nobody is serving

6    the warrants.

7            These are all impacts of an early release

8    system, the site releases that hit another domino and

9    another domino and another domino.  All of those things

Page 135

depo of Rod Pacheco

10    add to an increase in crime, in my opinion, because the

11    system has failed to hold people accountable for their

12    violations.

13        Q    Okay.  Let me see if I can just understand

14    briefly what -- has there been any noticeable change in

15    the recidivism rate in 2008 as compared to 2007?

16            I know some of these questions may be how am I

17    supposed to know that, but --

18        A    In Riverside County you mean?  I believe that

19    it's going up, that crime is increasing.  Property crime

20    especially, because property crime is the type of crime

21    that is the subject of early releases.

22            Misdemeanors are going up.  Property crime is

23    going up because it's the subject of early releases and

24    there are less significant consequences.  People are

25    placed on probation.  There's no room for them to serve

                                              150

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    their time in the jail.

2            And so, again, the lack of accountability is --

3    if I can encapsulate it -- is most felt in those types of

4    crimes.  The violent crime has remained fairly static.

5        Q    Let me ask you this, which violates all the

6    rules of examination, but we've been very open today,

7    so --

8        A    Sounds like fun.

9        Q    Yeah.

10        A    I think you're going to -- I think you're going

11    to re-offend, though, in the future.

12        Q    I'm going to ask you how can you explain a

                          Page 136

depo of Rod Pacheco

13    question.

14        If the rate of recidivism and crime is going up

15    in 2008, as you have just said, as compared with 2007,

16    how do you explain that in light of the statistics that

17    the rate of early release has gone down dramatically in

18    2008 as compared to 2007?

19    A    I provided the information to you. I'll provide

20    it again.

21    Q    Well, you don't have to. If you just

22    cross-reference it, that will be fine. You don't have to

23    say the same thing.

24    A    Yeah. It's the site releases that are

25    dramatically increasing throughout the county.


151


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    Q    Do you have those statistics?

2    A    I don't. I can get them. I think I can get

3    them for you.

4    Q    Okay.

5    A    But they're dramatically increasing. And just

6    so you know, I mean I have routine contact with police

7    chiefs.

8        I had a meeting just the other day with five of

9    them in the Coachella Valley, and we discuss these things

10   on a regular basis. So these things are being provided

11   to me by the leaders of those departments.

12       And those are dramatically increasing. And the

13   other part is the practice that was changed. It seems so

14   intuitive that they choose the way they're currently

15   doing it, but --

Page 137

depo of Rod Pacheco

16    Q    The practice has changed with regard to what?

17    A    With regard to checking other facilities for

18 openings.

19    Q    Okay. But that keeps more people in, right?

20    A    It keeps more people in but if -- it does lower

21 early releases. If there is a vacancy, if you will, in a

22 jail in Temecula and the guy is booked into Riverside,

23 then you don't have to early release anybody --

24    Q    Well --

25    A    -- which lowers -- I'm sorry.

152

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1         -- which lowers the early release numbers. It

2 doesn't mean crime has gone down. You know, early

3 releases in crime in this instance are not necessarily,

4 you know, connected in the way that you would suggest.

5    Q    Well, you're speculating as to the way I would

6 suggest.

7    A    I draw the inference from your questions, and I

8 think you've been fairly clear in your inferences today.

9    Q    I'm just asking questions. All right.

10 Exhibit 6.

11    MR. MITCHELL:  Exhibit 6.

12 BY MR. HEATHER:

13    Q    By the way, for the record, if you do have

14 statistics on the rate of site release that are easily

15 available, I would appreciate getting that information.

16 I think it's only the second thing I've asked you for

17 today. If that's available, I would appreciate it.

18    A    Sure. We'll see if we can find it. That's

Page 138

depo of Rod Pacheco

19   going to be a little harder because site releases don't

20   come to us in the district attorney's office.  As you

21   know from your experience, they go directly to the court.

22        I don't believe the court keeps -- well, I know

23   the court does not keep records like we do.  So trying to

24   get something out of them is next to impossible.  And how

25   many site releases may be problematic because it's not

153

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1   something we keep.

2        The records in our possession are easier to draw

3   up and encapsulate.  The ones in the court typically

4   costs us money, and they don't like to do it even if they

5   could.

6   Q    So you can't tell me how many site releases

7   there were in 2007?

8   A    I'm not saying that.  I'm saying it's going to

9   be difficult to get those exact numbers.

10   Q    No --

11   A    Oh, today?

12   Q    -- I'm saying as you sit here today.

13   A    No.  No.  No.

14   Q    You can't tell me how many there are.

15   A    Exact numbers, no.

16   Q    Some of these questions I ask simply just to

17   make the record --

18   A    I understand.

19   Q    -- you know.  So as you sit here today, you

20   can't tell me how many site releases there are in 2008

21   year-to-date?

Page 139

depo of Rod Pacheco

22    A    Not a specific number, no.

23    Q    Those statistics, if I understand your last

24    couple of answers correctly, are not reported to you or

25    maintained by you.

154

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1            In other words, you don't get weekly or monthly

2    statistics to your office saying so many site releases

3    have been issued in the month of August.

4    A    That's correct.  That's correct.

5    Q    Okay.  Exhibit 6 is what?  Have you seen this

6    document before?

7    A    I have, uh-huh.

8    Q    And what is this document?  How does it differ

9    from Exhibit 5?

10    A    One obvious is page 2.

11    Q    Right.

12    A    Which is an example -- a number of examples of

13    folks that have been released from our local facilities

14    on an early release program.

15            At the top of that list is Roman Aldana.  He's

16    the burglar that we've been talking about in our examples

17    and so on and so forth.  So these are the -- some

18    examples.  They are certainly not an exhaustive list.

19    The list would fill out a great deal more paper.  The

20    first part of it --

21    Q    The first page, yeah, what is that?

22    A    The first page appears to be some attempt to

23    identify some recidivism of these individuals.  I haven't

24    seen this in a while, so --

Page 140

depo of Rod Pacheco
25      Q    I'm sorry?


155

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      A    I haven't seen this in a while so -- I have seen
2   it and I recall it, but --
3      Q    It's got a -- let me take -- let me spend some
4   time on this document, if I may.
5      A    I can give you some explanation, if I can, that
6   might help you.
7      Q    Okay.
8      A    When I talked about the alcohol rehabilitation
9   center and various other efforts to identify recidivism
10  rates, I told you that they go out a year and then they
11  stop and they don't check long-term.
12         And what I mean by highlighting that is that
13  you're not getting necessarily an accurate recidivist
14  rate; you're getting a view of it in a time period.
15         The reason why I tell you that is because this
16  document, what I believe has been marked Exhibit
17  Number 6 --
18     Q    Correct.
19     A    -- shows a sampling period which is on the first
20  page, which is from January 1st, 2008 to August 31st,
21  2008.
22         So of the folks released during that time
23  period, this is the number of them that re-offended
24  during that time period, is my understanding of this
25  document.

156

Page 141

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1          This is not, you know, a five-year study of

2     these people that were released early.  This is just in

3     that eight-month time period, these are the people that

4     were released and this is how many of those people in

5     that time period re-offended.

6          Q    Okay.  Let me see then, with that explanation,

7     if I can understand these statistics.  If you look at the

8     first box --

9          A    And not one of these crimes would have been

10    committed if they had remained in custody.

11         Q    Don't tell me.  We've already had to like slog

12    it out for an hour to establish the proposition that if

13    somebody is in jail on any given day, they're not going

14    to commit on that day a crime on the streets.

15         A    Yes.

16         Q    We both agree to that.

17         A    Yes.

18         Q    Okay.

19         A    And these numbers of crimes would not have been

20    committed, with certainty.

21         Q    On those days, with certainty.

22         A    Yes.

23         Q    I agree with you, yes.

24         A    Yes.

25         Q    They may have all occurred on different dates,

157

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1     but we don't know that.

2          A    I didn't agree to that.
                      Page 142

depo of Rod Pacheco

 3      Q    No, of course not.  But let's not go down that
 4    road.  I'm not going to take this temptation.
 5        MR. MITCHELL:  Asked and answered.
 6        MR. HEATHER:  Yeah.  Fair enough.
 7    BY MR. HEATHER:
 8      Q    Let me just make sure I understand these
 9    statistics.  In this period from January through
10    August 31, '08 there have been 2,971 people released.
11      A    Yes.
12      Q    Early.
13      A    Yes.
14      Q    Of which the majority, the vast majority, are
15    people who are awaiting trial.
16      A    Yes.
17      Q    And there are 792 individuals who have been
18    convicted who were early released.
19      A    And sentenced, yes.
20      Q    Okay.
21      A    In that time period.
22      Q    The overall recidivism rate is 28.04 percent,
23    correct?
24      A    In that time period, yes.
25      Q    Let's assume that all my questions are within

158

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
 1    this time period.  I'm not trying to play games about
 2    that.  All the questions about this document, unless
 3    otherwise specified, are referring to data that relates
 4    to the time period January 1, '08 to 8/31/08.
 5      A    Yes.
                        Page 143

depo of Rod Pacheco

6      Q    The recidivism rate for those who were released

7    after sentence is just about exactly half of the

8    recidivism rate for those who were released prior to

9    trial.

10     A    Roughly.

11     Q    Can you tell me why that is without speculating?

12    No, I'm asking can you do it.

13     A    Speculating in the legal sense or, you know, as

14    an expert witness?  Can I explain it?

15     Q    No, in a factual sense, is there an explanation

16    that you know of factually to explain this, as opposed to

17    your opinion, and then I'll ask you your opinion.

18     A    I can't at this time.

19     Q    Okay.  I don't want you to speculate.  So if you

20    want to volunteer something, you may.  But, otherwise,

21    I'm just going to leave it at that.

22          The state prison transfers, does that have

23    anything to do with early release or is that just

24    transfer numbers?

25          I mean I really don't know.  I don't want to


159


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    spend time on those statistics if they aren't relevant to

2    what we're talking about.  It says "State Prison

3    Transfers," so I don't know by that term --

4      A    Yeah, I didn't prepare this document.  "Male

5    state chain averages."  I can't recall.

6      Q    Okay.  The box on the right of page 1 that talks

7    about notable recidivist inmates that has like eight,

8    nine or 10 examples --

Page 144

depo of Rod Pacheco

9      A    Pictures in the back.

10      Q    Is that kind of summarizing the examples that
11    are contained on page 2, this box?  In other words, one
12    murder --

13      A    I haven't done the math, but I believe so.

14      Q    Okay.

15      A    Yeah, and this is obviously not -- this is an
16    attempt to be representative but not all the numbers.
17    Because if you look at it, the number of recidivists,
18    there are 701 of those -- I'm sorry, 833 of those 2,971
19    inmates who have committed new crimes and have been
20    caught for them.

21           There may be others that -- I'm confident that
22    there are others that have not committed new crimes and
23    have not been caught, for example.

24           And in terms of the difference in the numbers,
25    it might be -- as you asked earlier, it might be that

160

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1     folks that have been sentenced have failed some brunt of
2    the system to help them make a better choice versus the
3    ones that are unsentenced and recognize more fully that
4    the system is failing.

5      Q    The overall recidivism rate is 28 percent.  Is
6    that, to your knowledge, a lower rate than the statewide
7    average?

8      A    For what?

9      Q    Recidivism.

10      A    For what?  I mean there's all different kinds of
11    crimes.

Page 145

depo of Rod Pacheco

12    Q    Anything. well, this is taking all recidivism
13    in this 28.4 --
14    A    For the early releases. Not of people that have
15    served their time and been released. These are people
16    that have not served their full time. These are -- as I
17    indicated earlier --
18    Q    I understand that.
19    A    I'm sorry. I haven't finished.
20         As I indicated earlier, these are additive.
21    These are additive. This is 28.04 percent more than
22    would normally have been -- normally occurred if they had
23    never been released to begin with. That's what this is.
24    That's what this represents.
25         It is not -- I know what your question is. It

161

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

D·    1    is not, to use your phrase, apples and oranges. To
      2    compare this to recidivism rate for people that have
      3    already served their sentences is apples and oranges.
      4         I mean you can't compare it because they're not
      5    the same.
      6         Depending on what crime it is, some crimes show
      7    a recidivist rate of 25 percent, sometimes it's
      8    60 percent. It depends on what the crime is and --
      9    Q    Look, I understand. But I'm still entitled to
     10    ask you whether this is higher or lower than the overall
     11    statewide recidivism rate.
     12    A    I can't answer your -- I can't answer your
     13    question.
     14    Q    what is the overall statewide recidivism rate
                    Page 146

depo of Rod Pacheco

15    for everybody, early release and nonearly release?

16        A    I don't know the answer.

17        Q    There is an answer, correct?

18        A    Well, I don't know.  If I don't know the answer,

19    how do I know there is one?

20        Q    Well, wouldn't you assume that someone in the

21    state of California keeps statistics on recidivism since

22    the recidivism rate appears in so many documents?

23        MR. MITCHELL:  Object again as a vague question

24    because, again, you're not talking -- are we talking

25    about prisons or are we talking about county jails?

162

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1              This relates to a county jail.  The overall

2    recidivism rate for the state could relate to all the

3    county jails or to the state penal system.

4    BY MR. HEATHER:

5        Q    That's a fair objection.  So let me -- I want to

6    take it for each because I'm trying to compare what the

7    case in Riverside is with other populations.  So let me

8    take it first.  Do you know -- and I can't make a

9    comparison if I don't have the data.

10             Do you know what the overall recidivism rate is,

11    early release, nonearly release, all types of crimes,

12    within all prison and jail facilities within the state of

13    California?

14  .     A    Nobody keeps a statistic with those parameters

15    that you just laid out that I'm aware of.

16        Q    Okay.  So it's self-evident, you don't know what

17    that rate is?

                          Page 147

depo of Rod Pacheco

18    A    Well, that assumes that there is a rate.

19    Q    Well, there is a rate.  Whether or not anybody

20    knows it is a different question.

21    A    I guess on a philosophical level.

22    Q    I don't think it's philosophical.  There is a

23    recidivism rate that exists within the state of

24    California.  And if nobody tracks the statistics, then

25    you don't know what it is.


163


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    MR. MITCHELL:  I'm going to object again because your

2    question assumes a fact that's not in evidence.

3    MR. HEATHER:  which is?

4    MR. MITCHELL:  All the different counties have the

5    same type of federal release orders pending over their

6    heads and that they're employing a system similar to this

7    one to determine who gets released and who doesn't get

8    released.

9    BY MR. HEATHER:

10    Q    Yeah, I'm -- you know, that's my confusion.  I'm

11    not -- I'm not trying to make that comparison.  I'm just

12    trying to say that statewide, from people who are

13    released from custody, regardless of whether it's early

14    release or serving full term, do you know what percentage

15    of those individuals commit new crimes and are caught and

16    therefore become part of the recidivism population.

17          That's my question.  It doesn't matter whether

18    they committed a crime after they were early released or

19    if they did a hundred percent of their time.

20          The question is do you know what the degree of
                    Page 148

depo of Rod Pacheco

21    recidivism is within the state of California for all
22    released inmates regardless of whether they're released
23    early or not.
24        A    As you've relayed -- as you've set the
25    parameters for your question, I don't believe anybody

164

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1    keeps that figure.
2        Q    Okay.  And I'm not trying to presume they do.
3    I'm just asking whether they do.
4        A    I don't know of anybody that keeps a figure of
5    all circumstances, which is your question.
6        Q    Right.  And do you know how the recidivism rate
7    for early released individuals in Riverside County
8    compares with the recidivism rate say for San Diego
9    County?
10        A    I don't know if they keep it, so I don't know
11    what it compares to, especially during this time period.
12        Q    Okay.  Do you know --
13        A    Under these circumstances.
14        Q    All right.  Do you know whether during this time
15    period or any other time period how your rate compares
16    with L.A. County?  I'm really just asking whether you
17    know.
18        A    No.
19        Q    Okay.
20        A    I would assume that if San Diego keeps documents
21    such as this in the sheriff's department -- we got from
22    this the sheriff's department -- that they would be able
23    to provide that to you so that there could be a
Page 149

depo of Rod Pacheco

24    comparison.

25           Because if there are numbers like this, either

165

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

1     the same, above, or below, then I consider these negative

2     public safety impacts that would contravene the testimony

3     that you represented during our deposition today.

4        Q    Well, you know, we can debate that later.   We

5     have different definitions of what negative public safety

6     impact is.   And maybe the county has different

7     definitions too, and I understand that.   I understand

8     that.

9           Do you know if you took all 833 what are deemed

10    as the recidivists at the top in addition to these -- let

11    me just see -- nine instances that are in this box on the

12    right-hand side -- I think it's nine -- for these same

13    types of crime, if you use all 833, how these numbers on

14    the right will change?

15       A    I don't understand your question.

16       Q    Well, you've got 833 recidivists year-to-date

17    out of all people who have been early released, correct?

18       A    During this time period, yeah.

19       Q    And of those people, there are nine instances

20    that have been identified in this box on the right of

21    people committing the crimes that are identified in that

22    box, in other words, one murder, two attempted murders,

23    et cetera, which you said are examples but not a complete

24    list.

25       A    They're not necessarily examples of the 833.

Page 150

depo of Rod Pacheco

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1       Q    Okay.  Fair enough.

2       A    Okay.

3       Q    In other words, some of these may have been

4   people who were released in different time periods.

5       A    Yes.

6       Q    Okay.  If you took the 833 and put them in these

7   categories of crime, do you know what the result would

8   be?

9       A    No, I do not.

10      Q    Okay.  Do you know how many of these nine

11  examples that have been used in this box were committed

12  after these individuals -- do you know how many, if any,

13  were committed in 2008 by one or more of the 833?

14      A    It should be on page 2, and you could make the

15  comparison.  All you'd have to do is --

16      Q    Well, it doesn't have the date of crime?

17      A    It says "Date of New Arrest."

18      Q    Right.  I know.  But it doesn't have the date of

19  crime.

20      A    If the date of new arrest is -- oh, I see.  I

21  see.  So -- okay.

22      Q    I don't know.

23      A    I'm making an assumption, and it may not be fair

24  to make that the date of the new arrest is near in time

25  to the date of the offense, which is 95 percent of the

depo of Rod Pacheco

1    cases we handle, so --

2      Q    All right.

3      A    It's actually within the first 48 hours is

4    probably 95 percent or more of our cases.  It's rare that

5    somebody's not arrested within 48 hours of the commission

6    of the crime.  So just for your purposes, I thought --

7      Q    Okay.

8      A    It's somewhere between January 1st, '08 and

9    August 31st, '08.

10     Q    Okay.  So there are a couple here that are

11   outside that range?

12     A    Yes.  Anything in '06 or '07, for example.

13   There's one '06 and one '07.  The others appear to be

14   within that time period, so -- you said there were nine.

15   I didn't do the math.  So two of the nine are outside.

16   They're all early releases, but seven of them were

17   actually within the same sampling period.

18     Q    Unless there's an aberration and somebody took

19   awhile to find them or whatever to arrest them, but

20   95 percent chance that's not the case.

21         Okay.  But we don't have -- you don't maintain

22   statistics that would tell you of the 833 how many -- I

23   take it that these categories of crime here are the

24   more -- what your office considers the more serious

25   crimes.

168

1      A    On some of them, yes.  But I would note there

2    are no sexual offenses there, and our office considers

3    sexual offenses to be as significant as gang offenses and

Page 152

depo of Rod Pacheco

4    murder.

5        Q    Okay.

6        A    There are no gang offenses there, and those are

7    much more significant, along with sexual offenses.  And

8    felony evading, animal cruelty, burglary, they're some of

9    the -- we devote a lot of resources to gang work and

10   sexual assault work and homicide work.

11       Q    You may have answered this, and I apologize if

12   I'm asking you again.  You don't keep statistics that

13   would allow you to easily tell what crimes these 833

14   instances are made up of?

15       A    This is a document prepared by the Riverside

16   Sheriff's Department, not our office.

17       Q    Fair enough.  And you don't keep such

18   statistics?

19       A    I don't believe so, no.

20       Q    Okay.

21       A    Whether we can find them or not is a separate

22   question.

23       Q    Okay.  Listen, I thank you for the spirit in

24   which you've engaged in this.

25       MR. MITCHELL:  I've got one quick follow-up question,

169

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    if I may.

2        MR. HEATHER:  Sure.

3

4                         EXAMINATION

5    BY MR. MITCHELL.

6            At one point during the banter back and forth

Page 153

depo of Rod Pacheco

7      you --

8          MR. HEATHER:  Was there banter back and forth?

9      BY MR. MITCHELL:

10         Q    During the question and answer session of the

11     deposition -- find my notes here -- there was discussion

12     back and forth where you were talking about the Texas

13     situation and the Philadelphia situation.

14             And he was -- Mr. Heather was asking is this

15     case about Texas, is this case about Philadelphia, and

16     you said yes, you said yes on both occasions.

17             How is this case here about what has occurred

18     previously in Texas and Philadelphia?

19         A    Well, we don't have to guess about the future

20     because it's been played out in Philadelphia and Texas

21     and I believe in Riverside County.

22             Early releases have a negative public safety

23     impact and a significant one.  Those programs have been

24     failed experiments and have not, in my opinion -- like

25     the proposal here, will not lead to the result that is


                                                            170


LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1      intended, in fact, will create much more harm than good.

2          MR. MITCHELL:  That's it.

3          MR. HEATHER:  Is this yours?

4

5                    FURTHER EXAMINATION

6      BY MR. HEATHER:

7          Q    All right.  I have no further questions at this

8      time.  I think it highly unlikely that I'm going to look

9      at these documents and ask you additional questions.  If

                    Page 154

depo of Rod Pacheco

10    I do, should I contact you?  And maybe we could just do
11    it by phone.
12          I doubt that there's any follow-up.  I wouldn't
13    want to make you have to come back down here.  If you can
14    get me the answers to those two specifics things or let
15    me know one way or the other, I would appreciate it.
16        MR. MITCHELL:  I've got my notes here.
17    BY MR. HEATHER:
18        Q    I appreciate your -- I know this was spirited in
19    part, and I think everybody involved in this case is
20    trying to do the right thing.
21        A    You know, and I hope we can.  You know, the
22    first rule is first do no harm.  And the path that's been
23    chosen is a harmful one.
24          And that's why we're here.  Because we don't
25    think that additional harm is valuable.  We support

171

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376
1    rehabilitation.  We've made that clear in our papers, and
2    I've made that clear in my testimony.
3          You won't hear a peep out of us to the contrary.
4    In fact, quite the opposite.  We think the court
5    should -- Freudian slip.  The state should invest in
6    those things and do those things.  I fully support those
7    efforts.  A whole host of ways.
8          Releasing people when there is obviously a lack
9    of those resources available, before their sentence is
10    concluded, is the worst of all possibilities.
11          If you agree with me that those resources need
12    to be provided, how can we release people to a world that
Page 155

depo of Rod Pacheco

13  doesn't have those resources available?  That's our

14  point.

15      Q    well, and, you know, to avoid that harm, I

16  guess, you are not disturbed by the perpetuation of

17  unconstitutional conditions.

18      A    I am disturbed by it.  We are all disturbed by

19  it.

20      Q    "Unconstitutional" is a strong term.

21      A    we are disturbed by it.  We're lawyers.  We're

22  sworn to defend the Constitution and support it.

23          Of course we're disturbed by it.  And we think

24  the remedial efforts by the receiver, which is an

25  extension of the court, have been a positive development.

172

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1           The spurring of the legislature and the governor

2   to pass AB 900 have also been a positive development.

3   Those are good things.

4           But, in my opinion, they're not enough.  There

5   needs to be a more significant investment in

6   rehabilitation efforts on a statewide and local level.

7   But they have been very good developments, and we

8   appreciate that those things have occurred.

9           There needs to be more.  But, you know, you can

10  read the newspapers as much as I can.  It is a

11  dysfunctional place, Sacramento.  You know, they can't

12  agree on what color tie they're going to wear that day

13  let alone anything else.  It's a mess.

14          And the people that are being harmed are the

15  folks in prison because of the constitutional violations.

Page 156

depo of Rod Pacheco

16    And the folks potentially that exist in our society

17    outside of prison will be the victims of the people that

18    want to be released from prison.

19        Q    Well, you read the newspaper and the

20    dysfunctionality in the current day isn't limited just to

21    this.

22        A    It's seemingly everywhere.  It's throughout the

23    criminal justice system.  I mean when people don't

24    have a -- thanks.

25        MR. HEATHER:  Thanks.


173

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1            (Discussion off the record)

2        MR. HEATHER:  All right.  We've just entered into a

3    stipulation.  The original will be provided to the

4    witness's counsel, and he and the witness will have 15

5    days to review it, make any corrections.

6        THE WITNESS:  Upon receipt.

7        MR. HEATHER:  Upon receipt.  And the court reporter

8    is relieved of the obligation to file the original.  A

9    copy may be used as if it were the original.

10            Anything else?  So stipulated?

11        MR. MITCHELL:  So stipulated.  Anything else?

12        MR. MELLO:  Fine.

13            (Deposition concluded at 2:50 p.m.)

14

15

16

17

18

depo of Rod Pacheco

19
20
21
22
23
24
25

174

LYNDEN J. AND ASSOCIATES, INC.  (800) 972-3376

1    STATE OF CALIFORNIA     )
                              )
2    COUNTY OF ORANGE        )

3

4          I am the WITNESS in the foregoing deposition.  I

5    have read the foregoing deposition and having made such

6    changes and corrections as I desire, I certify that the

7    same is true of my own knowledge, except as to those

8    matters which are therein stated upon my information or

9    belief, and as to those matters, I believe it to be true.

10         I declare under penalty of perjury that the

11   foregoing is true and correct.

12            Executed on_____ _____ _____

13   at_____ _____ _____, California.

14

15

16

17

18                       _____ _____ _____

19                       RODRIC PACHECO

20

21

depo of Rod Pacheco

22

23

24

25

175

LYNDEN J. AND ASSOCIATES, INC.   (800) 972-3376

The following changes and corrections have been made in the transcript of the deposition of District Attorney Rod Pacheco:

| Page | Line | |
|------|------|---|
| 9 | 9 | Change: post changed to P.O.S.T.<br>Reason: P.O.S.T. is an acronym. |
| 21 | 20-21 | Change: add the word "violent" before crime in each line<br>Reason: for accuracy and clarification |
| 27 | 3 | Change: Colondor is corrected to Kollander<br>Reason: correct spelling of name |
| 31 | 12-13 | Change: Sprigg is changed to Spraque in both lines<br>Reason: correct spelling of name |
| 31 | 25 | Change: "in the" is replaced by "and"<br>Reason: grammatical correction |
| 39 | 22 | Change: add the word "has" between receiver and run<br>Reason: grammatical correction |
| 64 | 16 | Change: remove the word "dead"<br>Reason: unnecessary word |
| 64 | 19 | Change: remove the word "you"<br>Reason: unnecessary word |
| 67 | 9 | Change: replace the word "And" with the word "Can"<br>Reason: create a question |
| 67 | 10 | Change: change period to a question mark<br>Reason: grammatical correction |
| 74 | 5 | Change: remove word "would've"<br>Reason: unnecessary word. |
| 109 | 1 | Change: replace the word "caked" with the word "kicked" and add quotation marks around "Fed kicked"<br>Reason: correct word and recognize vernacular with the quotation marks |
| 137 | 15 | Change: remove the word "the" before "term" and replace the word "limit" with the word "one" after the word "term"<br>Reason: accuracy of statement |

| 141 | 11 | Change: remove the word "a" after "it's"<br>Reason: unnecessary word |
| 142 | 8 | Change: replace the word "for" with the word "than"<br>Reason: clarity |
| 142 | 14 | Change: remove the word "and"<br>Reason: unnecessary word |
| 148 | 9 and 18 | Change: change "site" to "cite"<br>Reason: spelling correction |
| 149 | 7, 12 and 16 | Change: change "site" to "cite"<br>Reason: spelling correction |
| 150 | 1 | Change: replace the words "which are" with the words "made for"<br>Reason: clarification |

STATE OF CALIFORNIA

COUNTY OF ORANGE

      I am the WITNESS in the foregoing deposition. I have read the foregoing deposition and having made such changes and corrections as I desire, I certify that the same is true of my own knowledge, except as to those matters which are therein stated upon my information or belief, and as to those matters, I believe it to be true.

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on __10 - 9 - 08__

at __RIVERSIDE__, California.


RODRIC PACHECO