# Sonoma County, California

# Corrections Master Plan

December 2007

David M. Bennett
David Bennett Consulting
2940 American Saddler Drive
Park City, Utah 84060
Tel: (435) 649-1999
davidbennett@mac.com

In association with

Donna Lattin
3124 Southwood Drive
Philomath, OR 97370
(541) 929-9298

# Sonoma County
# The Corrections Master Plan

## Executive Summary

In 2006, Sonoma County hired David Bennett Consulting to conduct a broad assessment of the local criminal justice system to lay the groundwork for long-term facility and system planning.

The approach taken was based on the philosophy that detention planning should be based on a *systems approach*.

This approach acknowledges that new beds alone cannot solve a county's overcrowding problem. Available beds in any correctional facility have a tendency to become filled. *"Build It and They Will Come."* However, assessing the efficiency of the criminal justice system first, as part of facility planning, can result in more comprehensive and lasting solutions.

The approach taken for this study puts system data collection up front. We collected jail data, case-processing data, studied jail alternative programs, conducted surveys, and produced jail forecast scenarios.

In addition to the data collection, we spent a year observing local criminal justice operations, met with key stakeholder and practitioners, reviewed local policies and procedures, and initiated discussions regarding fundamental system changes.

The importance of this kind of comprehensive planning becomes clear when considering the numbers.

Sonoma County spends $200 million a year on criminal justice system expenditures, including jail, prosecution, defense, courts, and probation. Last year the District Attorney made 24,000 filings, the Public Defender handled 12,000 cases, and the Probation Department supervised over 4,000 adults.

Not only is this cost high, but also the percentage of the General Fund spent on the criminal justice system has increased significantly over the last decade. What once made up 40% of the General Fund Budget now constitutes 60% of this Fund.

*A new Jail Facility could cost upwards of $200 million — and this is just the capital cost. Operating costs amount to 10x the building costs over the useful life of the facility.*

Because of this, Sonoma County made the commitment to take a comprehensive look at its criminal justice system as part of its facility planning.

Last year more than 20,000 persons were booked into the Sonoma County Jail. And, while Sheriff Cogbill is responsible for managing the Jail, the demands on the local facility are dictated by decisions largely outside his control. Given

this, the key to the long-term management of a jail is the implementation of a System Master Plan: an approach that allows a county to not just react to change, but to *shape that change.* Key areas addressed in the Master Plan include:

- Case Processing Efficiency
- Front-End System Assessment
- Diversion and Sentence Options
- Evidence-Based Supervision, Sanctions, & Programs
- A Full Continuum of Treatment Alternatives
- Integrated System Data
- An Evaluation Protocol

This Report finds that Sonoma County has the building blocks for a strong and effective system.

We were impressed by the county's commitment to a progressive system, evident in its broad array of alternative to jail programs. We commend Sonoma County for the following:

- A Culture of Teamwork
- An Integrated Data System linking the county agencies with the courts,
- Specialty Court Programs, including a quality Drug Court
- Enhanced Court and Supervision Services for Domestic Violence Cases
- Broad Array of Jail Alternative Programs
- In-Custody Treatment Program
- Substance Abuse treatment paired with Case Management Resource: TASC
- Specialized Probation Caseloads
- Commitment to progressive Mental Health Services

- A Progressive Mindset on part of Courts and all Key Stakeholders

Taken together, all this puts Sonoma County in a strong position to take its system to the next level. We believe that implementing the key concepts advanced in the Master Plan will allow Sonoma County to become a model of innovation.

# I. The Analysis

Data collected for the Sonoma County project includes the following:

*Jail Snapshot*
A Jail 'snapshot' was developed to provide a detailed profile of the in-custody population. The snapshot methodology that was developed will allow the county to monitor changes in the inmate population over time.

*Case Processing Analysis*
The analysis also included an examination of system case processing, tracking all defendants booked into the Sonoma County Jail on a new charge over a one-year period, and following their cases through to disposition.

*Jail Alternative Program Analysis*
The analysis also included an examination of alternative to jail programs. We collected snapshot data on offenders in substance abuse treatment; summarized referral source data; conducted an analysis of reasons defendants were denied treatment; examined program discharge data; distributed surveys to probation officers to review case

management issues; and distributed surveys to treatment providers for look at program characteristics and methods of treatment delivery.

*Jail Forecast Scenarios*
Long-term jail forecasts were developed based on an analysis of historical jail data and a study of county population trends.

*General System Assessment*
Finally, over the course of multiple visits to the county, time was spent meeting with key officials, reviewing system policies, and observing the operations of the system. All this has resulted in this Report, which provides the reader with a wealth of jail and system data, and concludes with recommendations for system change.

## II. Summary of Findings

To examine Sonoma County case processing we tracked all new, local arrests booked into the Sonoma County Jail from 1 July 2005 through 30 June 2006: 11,937 persons. The bookings did not include bench warrant only arrests, out of county holds, federal only cases, or probation violation only arrests. Given the state of data integration, complete case processing information was collected on all cases, not just a sample — a rare opportunity. Most counties collecting system baseline data must rely on a sampling of cases to paint a picture. In Sonoma County the only data that had to be sampled was the defendant's prior arrest history.

## System Case Processing

*The system is impacted by high pre-trial failure rates*

Felony pre-trial re-arrest rates (31%) are significantly higher than the national average.

*Pre-Trial failure rates reflect the lack of a comprehensive Pre-Trial Services program, the absence of objective risk screening, and an over-reliance on surety releases.*

Failure-to-appear rates for defendants released on a surety bond were more than two times the rate of those released to Pre-Trial program supervision. Overall, 69% of pre-trial felony defendants exited jail on a surety release.

*System case processing times and failure rates are related*

The time from booking to disposition is two times as long for defendants who have a failure-to-appear for a court hearing.

*The Jail is impacted by case processing times*

Time from booking to attorney filing of charges is 55 days for felons. The average time from booking to disposition (case resolution) for felons is 142 days.

*Case attrition takes a toll on the system*
The felony filing rate in Sonoma County is 49%. Most of the cases that end with a 'no complaint' are domestic violence cases. High rates of 'no complaint' can undermine victim confidence in the system. (A Filing indicates the intention of the District Attorney to proceed with

prosecution. A 'no complaint' is issued when the DA does not have sufficient evidence or cause to proceed with prosecution.)

*The Jail is impacted by the time to complete the Pre-sentence Investigation*

The average time from disposition to sentencing is 46 days. There was little difference in the time to complete the pre-sentence investigation between those in custody and those out of custody.

## Jail Population

A Jail 'snapshot' methodology was developed to capture and describe, in some detail, the profile of the inmates in the Sonoma County Jail on a daily basis. This methodology uses a hierarchy to determine the most significant charge for which a defendant is being held and from that determines their status. The snapshot is recorded each night at midnight and a composite is prepared at the end of the month. The data presented in the Master Plan Report is a composite of April through June 2007.

Highlights of the Jail Snapshot:

- 26% of offenders booked into jail were under 25 years
- 85% were male and 15% were female
- 53% were unemployed at the time of booking
- 58% were Caucasian, 28% Hispanic, 9% African American, and 5% were an other race or ethnicity
- 21% of felons (and 19% of misdemeanants) had 10 or more prior bookings
- 19% of felons and 20% of misdemeanants had an identifiable gang affiliation
- 38% of sentenced offenders were convicted of a narcotics or drunk driving charge
- Of those booked on a DUI charge 29% had one or more prior bookings on a DUI charge; 9% had 2 or more prior DUI bookings

*The Jail is impacted by repeat offenders* - Misdemeanor defendants had an average of 7 prior bookings into the Jail; felons had an average 6 prior bookings.

*The Jail is impacted by a high number of defendants on 'Hold' status* - Of the Jail's average daily population, 39% are in 'hold' status. Of these, more than one-third are comprised of Immigration and Customs Enforcement (ICE) holds. (Inmates with 'hold' status are counted separate from inmates counted as pre-trial or sentenced. Hold status includes: holds for other counties, holds for probation violation processing, immigration holds, holds for California Department of Corrections, and other state holds.)

*The Jail is impacted by the percentage of offenders who receive Jail time as their sentence* - 53% of convicted felony offenders received a jail sentence, higher than the national average of 28%.

*The system is impacted by DUI offenses* - 32% of felony defendants booked into the Jail had 2 or more prior bookings on a DUI charge.

## Jail Alternatives

The analysis of Sonoma County's alternative programs was

challenged, in many cases, by the lack of program and outcome data. Given this, we designed data collection efforts to shine a spotlight on several areas, developing a snapshot of persons in substance abuse treatment, examining the assessment and treatment placement process, reviewing in-custody treatment programs, conducting survey data, and collecting information regarding use of jail as a sanction for the Drug Court program. We also spent time visiting programs and observing general indicators of program quality.

*The system is significantly impacted by Methamphetamine* - 60% of outpatient treatment clients and 73% of residential clients report methamphetamine as their primary drug of choice.

*The most intensive treatment is not necessarily reserved for the higher risk offender* - The pathway to treatment can be through self-referrals (over 60% of TASC assessments are for defendants who self-referred), not through an objective assessment of criminal risk and need.

*Violent charges or history can be a barrier to treatment* - 40% of TASC (Treatment Alternatives for a Safer Community) treatment denials were because of violent charges. Other reasons for rejection include: a psychiatric problem that cannot be accommodated, the defendant's failure to admit a problem, ineligibility for those with outstanding debts to TASC, and the requirement to wait 90 days from prior TASC program exit.

*Some offenders now in residential treatment might be accommodated in intensive outpatient treatment* - Jail inmates are assessed for exit to residential treatment, and providers surveyed believe the availability of more intensive outpatient, and the flexibility to move inmates from custody to intensive treatment would provide a lower cost option. In this study, 94% of persons referred to treatment by TASC were sent to residential treatment.

*Not all treatment programs are operating at capacity* - As an example, the Drug Court program is not operating at design capacity.

*County Parole is underutilized* - This program, which allows eligible offenders early release from jail, to enhanced supervision, is only serving 13 persons. Over a four month period, 65 inmates applied for County Parole, and 68% were denied or found ineligible.

*There is a waiting list for treatment* - On February 5, 2007 there were 79 persons waiting for residential treatment. Of these, almost a third waited for women specific treatments.

*Treatment outcomes suffer when system cannot deliver swift sanctions* - Although Prop. 36 clients have relatively good completion rates, incarceration rates are roughly 2 times that of drug court participants.

*In some areas there is need for improved continuity* - Of those discharged from the in-custody treatment program, Starting Point, 43% exited without certain continuation in treatment

## Jail Capacity Forecast

Forecasting future jail population size should be a policy-based exercise. The changes that have occurred in jail populations during the last twenty-five years provide considerable evidence that shifts in local policies can bring about dramatic increases or decreases in jail populations. For example: *There is no relationship between crime and jail size.* The number of inmates in jail is determined, to a large extent, by the policy choices made the system and the availability of alternatives.

The formulation of the forecast is based on an analysis of historical rates of admission and average daily population as well as trends in county population. Incarceration rate comparisons provide a reference point. In the end, the selection of a particular forecast scenario depends upon a county's ability to implement strategies to help manage the jail population.

*Sonoma County's Incarceration Rate has increased* - It increased from 188 per 100,000 in 1988 to 247 in 2005. The County incarceration rate is virtually the same as the national average, and only slightly higher than the state and regional averages.

*The average length of stay in jail has not changed significantly*
   Last 20 years: 19 days
   Last 10 years: 22 days
   Last 5 years: 22 days
   2007: 20 days

*Admissions have been flat over the study period* - The number of persons booked into the jail in 2007 is the same as in 1988; however, the annual numbers have varied significantly, in part tied to the policies regarding booking fees charged to the law enforcement agencies. The admissions *rate* averaged 4,225 per 100,000 county population over the last 20 years.
   Last 20 years: 4,225
   Last 10 years: 3,814
   20007: 4,153

*By 2035 it is estimated that 568,900 persons will be living in Sonoma County*
A series of scenarios were developed about the need for future jail space. A mid-range forecast for 2035 suggests an admissions rate of 4,500 persons per 100,000 county population and an average length of stay of 22 days, requiring 1,725 beds. In contrast, if the average length of stay is 22 days but the admissions rate increases to 5,000 per 100,000 county population then 1,914 jail beds will be needed.

A still to be determined number of Community Corrections beds can be constructed as part of the need for secure jail beds. It is anticipated that the presence of a CCC will result in the sentencing of some offenders to the facility that otherwise would have been placed on probation. The use of a risk instrument can help determine which offenders are likely to fail on probation but would have a better chance of succeeding if placed in the CCC. The goal of this type of placement is to minimize future violations of probation, not net-widening. Thus, not all of the CCC beds can offset secure jail beds.

## III. Recommendations

The last two chapters of the Report highlight some of the key recommendations for adoption as part of a Corrections Master Plan, and provides examples of how these changes might be expected to impact the jail and the criminal justice system: demonstrating the value of these recommendations in managing the jail population, and illustrating the potential of individual and incremental change.

The recommendations advanced represent a 'systems approach' to jail management. To best respond to changing circumstances counties must have good data, proven management tools, and the flexibility to make modifications as conditions dictate.

In the end, the key to responding to changing system dynamics is a strategic Jail Master Plan. This includes short-term strategies for implementing and fine-tuning system changes, and longer-term strategies for building additional detention and program capacity.

The jail population is a function of two factors: the *number of admissions* and the *length of stay*. Factors that influence the number of admissions to jail include: county population, availability of pre-booking alternatives, pre-trial failure rate, supervision violation rate, and program effectiveness. The number of police officers on the street also significantly impacts the number of jail admissions as well as the policies on booking fees. Recommendations advanced for reducing local jail admissions include:

### Reduce Jail Admissions

- Establish comprehensive 24/7 Pre-Trial Services Program: effective front-end assessment, bail review along with monitoring, tracking and supervision to reduce pre-trial failure

- Implement procedures associated with reducing pre-trial FTA rate

- Implement supervision procedures associated with reducing re-arrest rate

- Develop Day Reporting Center

- Increase use of the issuance of citations in lieu of booking

- Expand Drug Court

- Consistent policy for charging law enforcement agencies a booking fee and/or the implementation of agreed up standards for booking an offender

- Develop expanded diversion options for mentally ill

- Strengthen Jail Discharge Planning to reduce the revolving door

- Improve program effectiveness with use of validated risk instruments

- Improve program effectiveness by targeting higher risk offenders

- Improve program effectiveness with more Intensive Outpatient treatment

- Improve program effectiveness by improving joint case planning

- Improve program effectiveness by developing Centralized Intake model

Factors that affect the length of stay in jail include: the availability of pre-trial release options, case processing times, and sentence alternatives. Recommendations for reducing length of stay in the local jail include:

### Reduce Time in Custody

- Establish Comprehensive 24/7 Pre-Trial Services Program: Expand the number and type of persons released while reducing time to pre-trial release

- Reduce pre-trial re-arrest rate

- Institute Early Case Resolution Program

- Ensure early appointment of counsel

- Establish routine bail review of in-custody pre-trial population

- Provide early pre-trial identification of diversion candidates

- Increase simultaneous resolution of 'holds' and new charges

- Review policy for ICE holds

- Streamline Pre-sentence Investigation

- Reassess Inmates in Residential In-Custody Treatment for step-down to Intensive Outpatient

- Assess all Inmates for Jail Step-Down options

- Plan a Community Corrections Center

# Key Recommendations

The following recommendations are highlighted as priority measures because of their potential to reduce demands on the jail and create a more cohesive local system.

## Early Case Resolution Program

An Early Case Resolution (ECR) Program results in increased system efficiency and helps reduce jail crowding. It is a central management tool for the criminal justice system. The program involves early case screening and timely case resolution. And, it depends on the availability of timely and accurate information on each case, information best supplied by a Pre-Trial Services Program.

The benefits of an ECR Program are many and include:

- Relieves Crowded Dockets
- Reduces Case Processing Times
- Reduces Number of Pre-trial Defendants
- Reduces Average Length of Stay
- Frees up More Time for More Serious Cases
- Reduces Jail Impact

## Comprehensive Pre-Trial Program

Pre-Trial Programs are an indispensable component of an efficient criminal justice system. They supply the system with accurate information about the defendant to inform decision making; support the early appointment of defense counsel; identify diversion candidates; monitor pre-trial jail inmates and facilitate bail reviews; and monitor, track and supervise pre-trial defendants.

The Report recommends establishing a 24/7 Pre-Trial Services program, providing centralized intake and screening for the system.

Jail population size and jail overcrowding has been directly linked to the *hours of operation of Pre-Trial programs*: the more coverage the less crowded the jail. Pre-Trial programs that provide the most extensive coverage have been shown to be the least likely to be located in a jurisdiction with a jail that exceeds its rated capacity.

A well-managed jail is, however, not only associated with access to Pre-Trial Services, but to the timeliness of those services. It has been shown that jurisdictions with Pre-Trial programs which *interview defendants prior to the initial court appearance* are less likely to have a jail that exceeds its rated capacity.

In addition, the adoption of an *objective pre-trial risk assessment* is also linked to jail management. Pre-Trial programs that rely exclusively on subjective determinations of risk

are more than twice as likely to have a jail that exceeds its rated capacity than those programs that use an objective risk assessment instrument.

Note: Pre-Trial Services and an ECR program should be viewed as two parts of the same program. Pre-Trial intake services are fundamental to the success of an ECR program. Pre-Trial provides the immediate and validated information that is a prerequisite for accelerated decision-making and swift case resolution. The two go hand in hand.

## A Community Corrections Center

A Community Corrections Center (CCC) is a minimum security residential facility that offers a structured, supervised living environment as a transition from jail to the community. It provides a lower cost option to inmates who can serve their sentence in a minimum security setting while maintaining or gaining employment and having the benefit of a range of programs.

The principal goal is to facilitate a successful transition back to the community. Individual case plans are designed to address conditions of supervision, court orders, treatment needs, community safety, victim restitution, and successful transition back to the community. Issues addressed include employment, cognitive programming and substance abuse.

A range of services are offered to address criminal risk. These may include:

- Substance abuse treatment
- Mental health evaluation and services
- Cognitive skills classes
- Employment testing and job search assistance
- GED and literacy classes
- Life skills: nutrition, parenting, money management, computer skills

The Jail and Community Corrections Center should be planned together. The two should be considered as part of a single continuum of custody to community resources. Having both facilities provides a jurisdiction with increased flexibility to manage its inmate population, while providing the offender a graduated re-entry to the community.

## Evidence Based Practices

Evidence based practices target higher risk offenders and deliver tested services in a manner designed to yield the best outcomes. Recent research demonstrates the cumulative benefit of evidence-based practices. It is recommended that Sonoma County develop quality control assessment protocols to implement and measure these practices.

Based on this research the following recommendations were advanced:

- Target the Higher Risk Offender
- Ensure Minimum Time in Treatment of 90 Days
- Use Objective Risk Assessment Instrument
- Vary Treatment Intensity by Risk Level

- Expedite Entry into Treatment
- Ensure Treatment Continuity
- Make Cognitive Curricula the Centerpiece of Jail Programs
- Review Cognitive Curricula Used Across Programs
- Ensure Swift Sanctions

The average reduction in the expected recidivism rate for alternative programs is approximately 10%. However, programs that are of the highest quality, in terms of best practices, have been shown to reduce the expected recidivism rate by up to 30%.

## Expansion of Specialty Court Programs

One program that incorporates many of the elements of research based practices is *Drug Court*. A recent analysis of the Multnomah County (Portland, Oregon) Drug Court (the second oldest program in the nation) tracked 11,000 drug court eligible offenders over a 10-year period. Results included significantly reduced recidivism for drug court participants up to 14 years after program entry compared to eligible offenders who did not participate. The incidence of re-arrest was reduced by nearly 30% for drug court participants.

The Report recommends expansion of the Drug Court program; the development of more tiers of service for the mentally ill in Mental Health Court; and supports the start-up of a DUI Court.

## Maintain Data Integration

Maintaining an integrated information system is crucial to future planning.

Not only should the County work to maintain its integrated information system, but begin to collect the kind of detailed information about clients, services, and outcomes that will allow meaningful analysis. In addition to outcome data, a quality control protocol should be developed that is designed to assess the extent to which a program is conforming to evidence based practices.

Basic data for tracking outcomes includes the following

- Number of Admissions by Risk Level
- Average length of Stay
- Number of Jail Days Used as Sanctions
- Percent Successful Program Completions
- Re-arrest/Conviction by Exit type and Risk level

Some of the recommendations require an investment in both time and money, but can be viewed as a 'pay me now or pay me later' proposition. This is because the implementation of these recommendations will result in the more efficient management of existing resources, thereby delaying the day when the county needs to start planning again for more jail beds.

Taken together, these measures form a strategic Corrections Master Plan for Sonoma County.

## IV. The Report Outline

The Sonoma County Master Plan provides a conceptual framework to inform and guide the next stages of facility and system planning. It is not meant to be a static document. The jail and system baseline data should continue to be collected and analyzed. The recommendations are only a starting point for larger system discussions.

The Report is organized in six chapters. The first three chapters provide data; chapter 4 offers jail forecast scenarios; chapter five outlines recommendations based on the system analysis; and chapter 6 presents information regarding the expected impact of key recommendations.

<u>Sonoma's Corrections Master Plan</u>

*Chapter 1*: Criminal Justice System Data

*Chapter 2*: Jail Population Breakdown

*Chapter 3*: Alternatives to Incarceration

*Chapter 4*: Jail Capacity Forecasts

*Chapter 5*: Recommendations: Jail Population Management

*Chapter 6*: Jail Reduction Strategies

The Appendices include a sample 24/7 Pre-Trial Services budget, a summary of survey feedback, additional notes on the Forecast Methodology, and brief descriptions of the programs referenced in the Report.

## The Attachments

There are two tables attached. The first, "Sonoma County Alternatives: Synopsis," highlights the data collected for the project and outlines key recommendations. The second table, "Sonoma County Alternatives: Next Steps," provides suggested steps to take to implement the Sonoma County Corrections Master Plan.