# Sonoma County
## *Corrections Master Plan*

# Chapter Three
# Alternatives to Incarceration

# *Chapter Three*
# Alternatives to Incarceration

# Table of Contents

**Introduction**................................................................5

**The Data** ..................................................................7

A. Diversion and Sentence Alternatives.............................7
  1. Pre-Trial Interviews..................................................7
  2. Diversion Programs..................................................8
  3. Alternative Sentence Programs................................9
  4. Alternative Sentence Programs: Specialty Courts ..............10
  5. County Parole Applications....................................11
  6. Electronic Monitoring and Work Furlough
  Applications..............................................................12

B. Alcohol and Drug Assessments...................................13
  1. AODS ......................................................................13
    a. Program Referral.............................................13
    b. Program Referral Source................................14
    c. Wait Lists.........................................................15
  2. TASC......................................................................17
    a. Screening .......................................................17
    b. Referral Source ..............................................18
    c. Legal Status of Defendants ...........................19
    d. Referrals by Treatment Type.........................20
    e. Residential Referrals......................................21
    f. Reason for Rejection .....................................22
    g. Office Walk-Ins...............................................23

C. AODS Snapshot.............................................................25
   1. Treatment Type .....................................................25
   2. County Treatment Beds ...........................................26
   3. Program Type.........................................................27
   4. Outpatient Treatment by Population..........................28
   5. Age......................................................................29
   6. Prior Treatment ....................................................30
   7. Drug of Choice: Methamphetamine ...........................31
      a. Program Type.................................................31
      b. Treatment Type .............................................32
   8. In Jail last 30 Days ................................................33
   9. Homeless..............................................................34
   10. Unemployed.........................................................35
   11. Children under 5 years ..........................................36
   12. Mental Health Issues.............................................37
   13. Clients on Psychotropic Medication..........................38
   14. Residential Treatment............................................39
   15. Probationers........................................................40
      a. Caseload Type ...............................................40
      b. Charge Class .................................................42

D. TASC Case Management.................................................43
   1. Total Caseload.......................................................43
   2. Pending Cases ......................................................44
      a. Overall..........................................................44
      b. In-Custody .....................................................45
      c. Waiting for Treatment......................................46
   3. Placed Cases ........................................................47

E. Treatment Discharge ....................................................48
   1. Incarceration........................................................48
   2. AODS Program Completion Rate...............................49
   3. Drug Court Sanctions.............................................50
   4. 'Starting Point' Program .........................................51
      a. Referral Source...............................................51
      b. Release Type..................................................52
      c. Program Completion........................................53

F. Treatment Provider and Probation Survey.....................................54
    1. Program Occupancy ...............................................................54
        a. Residential .................................................................54
        b. Outpatient .................................................................55
        c. Narcotic Replacement Program....................................56
        d. Other Programs...........................................................57
        e. Summary....................................................................58
    2. AODS: Clients Entering from Jail .........................................59
        a. Residential .................................................................59
        b. Outpatient .................................................................60
    3. Probationers and TASC clients: Homeless ...........................61
    4. Probationers...........................................................................62
        a. Not Fluent in English..................................................62
        b. Serious Mental Health Issue .......................................63

Summary of Findings....................................................................64

# *Chapter Three*
# Alternatives to Incarceration

## Introduction

The examination of Sonoma County's alternative programs was guided by the following questions:

Does Sonoma County have a full continuum of alternatives?
- Are programs effective in reducing the impact on the jail?
- Do programs operate in a cost-effective manner?
- How do programs operate in the context of the larger system?
- What data is necessary for on going program evaluation?

To answer these questions we first turned to existing program and outcome data. With a few exceptions, data was *not* readily available in a form that allowed detailed analysis. For some programs, such as the FACT team, the program was too new (there were six individuals participating at project start) to allow detailed review. For others program data was either incomplete or dispersed in paper files.

Given this, we adopted an approach that was multi-dimensional. We visited alternative programs; interviewed probation officers, treatment staff, and program managers; attended specialty court sessions; and spoke with clients. We read previous local evaluation studies; reviewed state reports; and tracked legislative proposals. In the course of this project we also submitted memos to the County, regarding proposed changes in SACPA funding, Prison Reform, and rehabilitation efforts for juvenile gang members. Finally, we set up some specific data collection efforts.

The following data was collected:

- Diversion and Sentence Alternatives: Number Served
- Sentence Alternatives: Number Screened/Denied
- Project Intercept: Offender Profile
- Pre-Trial Services: Bail Investigations
- Alcohol and Other Drug Services (AODS): One-Day Snapshot
- AODS Snapshot: Probationer
- AODS Program Completion Rates and Discharge Type
- 'Starting Point' In-Custody Program: Exit Analysis
- Jail Program Participation
- Drug Court Jail Sanction Usage
- TASC Caseload Review

- TASC Client Denial Analysis
- Probation Officer Survey
- Treatment Provider Survey
- AODS Residential Treatment Costs

We were assisted in these data collection effort by numerous county staff, and appreciate the time and effort of the following individuals: Nigel Brown, System Analyst with AODS; Derrick West, AODS Analyst; Gale Reeder, Administration Services Officer, Probation Department; Catherine Boyle, Deputy Probation Officer IV and Ann Batiste, Deputy Probation Officer; Tom Newell, Case Management Manager, and Cindy McDonald, TASC; and Cammie Noah, Inmate Services Coordinator, Sonoma County Sheriff's Office.

# The Data

A. Diversion and Sentence Alternatives

    1. Pre-Trial Interviews

       The first graphic presents the number of Pre-Trial Bail Investigations conducted in December 2006.



In December, 2007 judges requested bail investigations in 164 cases to help inform pre-trial release decisions and the setting of conditions. A Probation Officer per judge request conducts these investigations. Of the 164 reviews submitted to the court that month, 23 defendants (14%) were released to Pre-Trial's Supervised Own Recognizance (SOR) unit. This Report recommends adoption of a universal pre-trial screening process. (Data Source: Probation Department)

2. Diversion Programs

The next graphic shows the number enrolled in available diversion programs all, in this case, operated by the California Human Development Corporation (CHDC).



## Diversion Programs 2006-07

526 (23%)

737 (32%)

80 (3%)

2303

960 (42%)

- Adult Diversion
- Project Intercept
- Educational Sentencing
- Drug Diversion

The CHDC served 2,302 individuals in FY 2006-07. Thirty-two percent (32%) were served in the Adult Diversion Services (ADS); 42% in Project Intercept (PI); 3% in the Educational Sentencing Program (ESP); and 23% in the Deferred Entry of Judgment Drug Diversion program (DEJEP). Questions raised include how to take full advantage of the underutilized ESP program; and the extent to which the PI program might serve a broader diversion population. (Data Source: CHDC)

3. Alternative Sentence Programs

This graphic documents the average daily population of offenders in available sentence alternative programs.



## Alternative Sentence Programs
## June 2007

| | |
|---|---|
| 🔲 | **Work Release** |
| 🔲 | **Work Furlough** |
| 🔲 | **Electronic Monitoring** |
| 🔲 | **FACT** |
| 🔲 | **Speciality Court** |

458 (30%)    1521    30 (2%)    940 (62%)    46 (3%)    47 (3%)

At the end of June, 2007, 940 persons were being tracked in Work Release (in various stages of completion); 47 were in Work Furlough; 46 in Secure Electronic Confinement (SEC); 30 in the FACT program; and 458 in Drug court and Domestic Violence courts, in various stages of participation. (Source: Probation Department)

4. Alternative Sentence Programs: Specialty Courts

This graphic breaks down that population in specialty courts.

# Alternative Sentence Programs
## Speciality Court





At the end of June 2007 there were 58 individuals in Drug Court. More than 400 cases were being tracked in the Domestic Violence program: in both specialty court and probation. Counting those cases that have moved to informal supervision, the Domestic Violence Probation unit is monitoring over 700 cases. Sonoma County is set apart from other counties in California by the commitment it has made to provide a higher level of supervision to many domestic violence cases than is required by law. (Source: Probation & Program data)

5. County Parole Applications

This graphic shows the number of inmates screened and accepted for County Parole.



## County Parole Applications
## March-June 2007

Over a four-month period, from March to June 2007, 65 inmates applied for County Parole. Sixty-nine percent (69%) of applicants were either deemed ineligible or were denied; approximately one-third (32%) was accepted for early release from Jail to County Parole. We recommend that entry to the program not be by application, but that all inmates be screened, requiring more staff. And, for those not now eligible, a structured step-down facility (such as a Community Corrections Center) can facilitate movement to a lower cost, community-based alternative. (Probation Department)

6. Electronic Monitoring and Work Furlough Applications

This graphic shows the application numbers for two other early jail release/sentence alternatives.



**Electronic Monitoring and Work Furlough Applications March-June 2007**

145 (51%)    284    139 (49%)

▦ Accepted
▦ Denied

Between March 1 and June 30, 2007, 284 inmates applied for release on either Secure Electronic Confinement (SEC) of Work Furlough. Of these, 51% were denied early release to these programs and 49% were accepted. (Probation Department)

B. Alcohol and Drug Assessments

   1. AODS

      a. Program Referral

This graphic breaks down the total annual referrals to AODS programs and services.



*AODS Program Referrals*
*February 2006 to February 2007*

| | |
|---|---|
| Criminal Justice | |
| SACPA | |
| TASC | |
| Self | |
| Other | |

255 (5%)
357 (7%)
611 (12%)
1988 (39%)
5097
1886 (37%)

From February 2006 to February 2007, 5,097 referrals were made to treatment programs in Sonoma County (Data captures referrals, not unduplicated individuals). Of these, 39% originated with a criminal justice source (courts, probation officers, etc.); 37% were referrals to SACPA (prop. 36); 12% were from TASC (most of who were self-referrals); 7% were other self-referrals; and 5% met other criteria. The prominent role that SACPA has in resource utilization is clear: all the more reason to ensure treatment quality with this population. (Source: AODS data)

b. Program Referral Source

This graphic shows the referral source for three programs.



The referral type for three programs: Orenda Center, Turning Point, and Athena House are presented by referral source (Orenda, SACPA, TASC, Self-referrals, and the Criminal Justice system). The referral sources for each of the three programs totals 100%. For example, Orenda Center residential treatment receives 3% of its clients from its own outpatient services; 5% from SACPA programs; 17% from TASC; 48% are self-referrals; 19% are from the criminal justice system at large; and 8% are 'other.' For Turning Point residential, 18% are from SACPA; 40% from TASC; 4% from self; 32% from the criminal justice system; and 6% 'other.' For Athena House, 4% are from SACPA; 46% from TASC; 6% are self-referrals; 38% from the criminal justice system; and 6% 'other.' (Source: Treatment Provider Survey)

c. Wait Lists

(1) Residential Overall

The number of persons waiting for residential treatment, by type of program, is presented here.



On February 5, 2007 there were 79 individuals waiting for residential treatment. Of those, 29% were waiting for women specific programs; 4% for Spanish language programs; 59% for general residential; and 8% for out-of-county programs. (AODS data)

(2) General Residential)

This graphic breaks out the number waiting for a general residential treatment program, by name of program.



Of those waiting for general residential treatment the majority, 44 persons (94%), were waiting for a bed in the Turning Point program. (Source: AODS data)

2. TASC

a. Screening

This graphic shows the number of cases screened by TASC in a one-month period.





In March 2007, TASC screened 156 cases for treatment. Of those, 31 persons (20%) were referred to treatment. The high rejection rate reflects a combination of factors: TASC criteria (no violent charges, no psychiatric or medical problems which may interfere); the need for the defendant to admit he/she has a problem; the fact that many defendants self-refer; the lack of access to particular types of treatment (integrated substance abuse and mental health treatment, for example); ineligibility for those with an outstanding debt to TASC; and the requirement to wait 90 days from prior TASC program closing. (Source: TASC data)

b. Referral Source

This graphic provides a breakout of the referral sources for a TASC assessment.





The majority (64%) of TASC assessments were conducted for defendant's who initiated contact with TASC to request a review. Other referral sources were the courts (20%), probation officers (9%), client attorneys (4%), and 'other' sources not listed here (4%). We recommend shifting from a self-referral model to one that provides more universal front-end screening for alcohol and drug and mental health issues. (TASC data)

c. Legal Status of Defendants

In this graphic the legal status of the persons assessed in jail is shown.



The majority of persons (57%) assessed in-custody by TASC were in pre-trial status; 38% were in custody on a violation of probation; and 5% were convicted and serving a sentence. The fact that so many defendants are taking the initiative to seek assessments in the pre-trial phase is explained by their interest in taking positive measures to facilitate a more favorable sentence. (Source: TASC data)

d. Referrals by Treatment Type

This graphic shows TASC referrals by treatment type.

# TASC Referral Type



Of the 31 persons referred to treatment by TASC in March 2007, 94% were referred to residential treatment. This reflects County policy to use the jail (and the assessments conducted by TASC in-custody) as the conduit to 'jail beds': residential treatment in the community. (Source: TASC Monthly Statistics)

e. Residential Referrals

The specific residential treatment programs to which TASC referred clients are presented in this graphic.

# TASC Residential Referrals



Of those referred by TASC to residential treatment in March 2007, the majority (45%) was sent to the Turning Point program. Seventeen percent (17%) were referred to Orenda Center; 17% to Casa Calmecac; and 21% to other programs (WRS, St. Anthony's, Delancey St., Athena House, and Jericho Project). (Source: TASC Monthly Statistics)

f. Reason for Rejection

The next graphic provides a breakdown of the reason clients was denied treatment.



## TASC Rejection Reason

An examination was conducted of 56 cases that had been rejected for treatment by TASC in March 2007. In 38% of the cases the reason was a violent charge or history; in 27% of the cases the defendant was not a local resident; 13% of the cases were denied because the person had an outstanding debt to TASC; 9% of the cases had mental health issues that could not be accommodated in standard treatment; and 14% fell in an 'other' category. Where appropriate, TASC will attempt to make referrals after denial. For example, some mental health cases may be referred to the FACT team for consideration. These data, however, raises questions for the system about availability of treatment for special populations; policies regarding fees; the relationship between money owed and access to treatment; and how to best

respond to the out-of-county cases (the Probation Department does have a specialized out-of-county unit). (Source: TASC data collection)

      g. Office Walk-Ins

      (1) Referrals

The referral source for out-of-custody defendants who come to the TASC office for an assessment is presented here.



**TASC Walk-in Referrals May 2007**

Of those defendants who come to the TASC office for an assessment, the vast majority (74%) are self-referrals. One common scenario is for a defendant to bail out of jail and to then come to TASC for a treatment assessment, hoping to positively influence their case. (Source: TASC data collection)

(2) Acceptances

This graphic shows the final TASC treatment decision for walk-ins clients.

# TASC Walk-in's



Half (50%) of the individuals who come to the TASC office for an assessment are rejected for treatment; 48% are accepted; and 2% did not show up after making an appointment. Further analysis is needed to determine what happens to those who are rejected by TASC for treatment: whether or not they are able to access other treatment as they progress through the system. (Source: TASC data collection)

C. AODS Snapshot

1. Treatment Type

A one-day snapshot of criminal justice clients in treatment is shown below.



A snapshot of persons in AODS treatment programs serving criminal justice clients was taken on 6 February 2007. Data does not include detox services, narcotic replacement therapy (methadone), or out-of-county programs to which Sonoma County offenders may be referred. Data reflects number of participants in the program on that day, not program capacity. As can be seen, the majority of clients (64%) are being served in outpatient treatment; 30% are in residential treatment; and 6% are in 'Starting Point' the in-custody program. (Source: AODS data)