# Sonoma County
## *Corrections Master Plan*

# Chapter Five
# Jail Population Management

# *Chapter Five*
# Jail Population Management

# Table of Contents

I. Pre-Trial Services.................................................................... 3

II. Adjudication...................................................................... 14

III.  Jail Alternative Facility: Community Corrections
Center................................................................................. 27

IV.  Alternative to Jail Programs.......................................... 33

V. Information Systems ........................................................ 70

# *Chapter Five*
# Jail Population Management

Chapter Five presents recommendations for how to optimize existing programs and presents new programs to consider. The recommendations are organized according to six major areas:

1. Pre-Trial Services;
2. Adjudication;
3. Jail Alternative Facility: A Community Corrections Center;
4. Alternative to Jail Programs;
5. Victim Services; and
6. Information Systems.

## I. Pre-Trial Services

➢ Establish a Full-Service Pre-Trial Program

Pre-Trial Services acts as a gatekeeper for the criminal justice system. Pre-Trial Programs provide vital information to judicial officers to inform the release decision; and monitor, track, and supervise individuals who are released pending adjudication. A comprehensive Pre-Trial Services Program is an indispensable component of a criminal justice system whose benefits are realized in community safety, system integrity, and reduced system costs. A Pre-Trial program lays the groundwork for comprehensive system change.

*74% of Misdemeanors and 62% of Felony defendants in Sonoma County were released from jail prior to trial. (Chapter One)*

The pre-trial release rate for felons in Sonoma County is identical to the national rate (62%). [1] Not only is Sonoma County's pre-trial release rate in line with the national average, but it's release rate is higher than the nine California counties tracked in the national Felony Defendant Case Processing data base.[2] The release rate for felony pre-trial defendants in those counties, ranged from a low of 36% in San Mateo County, to a high of 58% in Santa Clara County.

*The pre-trial failure-to-appear (FTA) rate for felony defendants in Sonoma County is 21%. (Chapter One)*

---

[1] BJS, 'Felony Defendants in Large Urban Counties, 2002,' Feb. 2006.
[2] The counties tracked: Alameda, Contra Costa, LA, Orange, Riverside, San Bernardino, San Diego, San Mateo, and Santa Clara.

Sonoma County's FTA rate for defendants released from jail pending case disposition is identical to the national rate.[3] This rate reflects the percentage of pre-trial defendants who fail to make a scheduled court appearance. Although it is known that the majority of these 'no-shows' are apprehended, they represent a cost to the system.

Sonoma County's FTA rate is mid-range, compared to the nine California counties tracked in the federal study, with a range of FTA rates from 15% to 40%.

*At 31%, the pre-trial re-arrest rate for felons in Sonoma County is significantly higher than the national average of 18%. (Chapter One)*

Sonoma County relies heavily on surety releases, with a rate significantly higher than the national average. Nationally, 41% of all felony pre-trial releases were released on commercial surety bond. [4]

*The vast majority (69%) of pre-trial releases in Sonoma County are released on commercial surety (bail bondsman). (Chapter One)*

The high rate of surety releases may reflect the lack of front-end risk information for judges, the limits of existing pre-trial supervision resources, as well as the traditional local reliance on this form of release.

*Only 5 percent of pre-trial defendants with Misdemeanor charges, and 16 percent with Felony charges, are released from jail on to formal pre-trial supervision. (Chapter One)*

Most defendants are released from jail on either a sheriff citation release, or to a bail bondsman (surety release).

### Pre-Trial Release Type

|                  | *Misdemeanor* | *Felon* |
|------------------|---------------|---------|
| Citation         | 47%           | 0       |
| Own Recognizance | 4             | 13%     |
| Cash             | 2             | 0       |
| Surety           | 41            | 69      |
| County Pre-Trial | 5             | 16      |

We recommend that Sonoma County establish a full-service Pre-Trial Services Program.

---

[3] BJS, 2002.
[4] BJS, 'Felony Defendants in Large Urban Counties,2002,' Feb. 2006.

Although the county has funded pre-trial supervision officers, it lacks the universal front-end screening and universal verification that is the hallmark of a Pre-Trial program. It also does not provide the following:

o  Universal front-end screening and verification
o  Objective risk assessment
o  Indigent  screening for public defender assignment
o  Universal victim contact in cases of violence
o  Diversion screening
o  Routine review of jail pre-trial population/bail review
o  Comprehensive monitoring (court date notification)
o  Comprehensive tracking (failure-to-appear returns to court)
o  24/7 operations

Sonoma County has a program that depends upon one probation officer who, on a judicial request basis, provides intake information to the courts. Although her services are appreciated, she is but one person in a system that processes 20,000 annual jail bookings.

Sonoma County Pre-Trial Supervision services, which had 150 defendants under supervision in May 2007 employs a high intensity supervision model. Under this model officers make field visits, require defendants to attend AA meetings or treatment — for which the defendant can be required to pay (if no treatment is ordered staff may require the defendant to attend English as a Second Language (ESL) course), and at times visit a defendant's place of employment to conduct urinalysis tests.  This is a probation model of pre-trial supervision; and it also reflects the lack of objective risk information:  an objective basis for providing varying levels of supervision intensity as required by US v. Scott (424 F.3d 888: Fed. R. App. P. 35).

The existing program struggles with system issues:

- Cases are sometimes received with no court conditions set
- Defendants appear in court and sometimes even are ordered released and report to Pre-Trial Services prior to staff having criminal history and other defendant information (staff gathers this information afterwards)
- Lack of timely information: Can be a 3-4 day delay in getting court paperwork; 2-week delay in court information being entered into computer
- Officers do not have information regarding medications or mental health case management status

- Can receive cases after lengthy period in custody (one recent case was released to Pre-Trial Services after 9 months in custody)
- No automated case management system for pre-trial tracking

Despite these challenges, the 6 Pre-Trial supervision officers are dedicated to their work.

The proposed program will staff the jail 24/7 and screen all individuals booked, contact any necessary victims, document financial status for purposes of appointment of counsel, verify the information, and prepare risk assessments to inform judicial release decision-making.

Although, as it stands, the program is currently administered by the Probation Department, we recommend assessing the relative benefits of different administrative models as a precursor to program expansion. Whichever model is chosen, both intake and supervision services need to be consolidated under a single administrative structure.

The program will also fine-tune the monitoring and tracking functions, working with the court to develop protocols for providing court date notification and appearance tracking, monitoring compliance with release conditions and returning failure-to-appear cases to court. Finally, the program will assume a jail management function: continuously reviewing the jail population to identify individuals for on going bail review.

The benefits of implementing a full-service program are many, and include the following:

### Supports Jail Population Management

Pre-Trial programs offer a systematic, front-end mechanism for managing jail populations. This replaces the 'back-end' approach seen in many jurisdictions that depend on 'forced'/citation releases of inmates to manage the population when it nears or exceeds capacity. This is not the way to manage a jail. Pre-Trial programs help forestall jail overcrowding through a risk-based approach that reduces the need to resort to emergency releases, applying the same court approved validated release criteria regardless of the jail population.

*On any given day, approximately 32% of Sonoma County Jail inmates are in pretrial status. (Chapter One)*

Without structured, front-end approaches to jail management, small shifts in system policies or practices can undo any short-term gains. The way to sustain progress for the long run is by establishing a comprehensive Pre-Trial program.

*FTA rates for Citation releases in Sonoma County are 43% for both misdemeanor and felons. This failure rate is more than two times the FTA rate for misdemeanants on supervised release in Sonoma County; the FTA rate for defendants with felony charges on Citation release is more than 3 times that of felons on local supervised release. (Chapter One)*

National data indicate that defendants released from jail on a forced (citation) release are more than two times as likely to have a bench warrant issued because of a failure to appear in court, than those released with pre-trial conditions and supervision.[5]   This holds true in Sonoma County.  The goal of a full-service Pre-Trial Program is to prevent these types of release, replaced by a system that allows early release decisions and follow-up monitoring, tracking and supervision.

### Reduce Re-arrests for New Crimes

*In Sonoma County, 31% of those felony defendants released prior to trial were re-arrested for a new crime, almost 2 times higher than the national average. (Chapter One)*

National data indicate that re-arrest rates for defendants released from jail to pretrial supervision are significantly lower than those released on either deposit bonds or through a forced release: The national re-arrest rate for supervised defendants is almost half that of forced releases.[6]

*Both felony and misdemeanant defendants released to pre-trial supervision in Sonoma County had lower rates of re-arrest than those released on bail.*

Although the re-arrest rate for those on supervised release was lower than those released on bail, it is still high, and speaks to the need to improve program quality: better matching of risk and supervision level, ensuring quick and consistent sanctions, etc.

*A review of prior arrest histories for those on pre-trial release in Sonoma County revealed little distinction between number of prior arrests and type of release. In fact, citation releases (released with no supervision or conditions) had the highest number of prior arrests.*

<u>Prior Number of Arrests by Pre-trial Release Type</u>

*Type of release*                                  *Number of Prior Arrests*

---

[5] "Pretrial Release of Felony Defendants, 1992," Bureau of Justice Statistics, U.S. Dept. of Justice, Nov. 1994

[6] "Pretrial Release of Felony Defendants, 1992," BJS, U.S. Dept. of Justice, Nov. 1994.

| | |
|---|---|
| Citation Release | 5.8 |
| Own Recognizance | 4.8 |
| Surety | 4.4 |
| Supervised Release | 4.1 |

The lack of a relationship between criminal history (as measured by arrests) and type of supervision reflects the lack of comprehensive risk screening at first appearance.

A full-service Pre-Trial Services program supervises defendants based on a validated risk assessment.

*Of those on felony pre-trial status in Sonoma County Jail, 13% exit jail on 'own recognizance; 16% on supervised release; and 69% exit on cash or surety. (Chapter One)*

The pre-trial risk assessment structures the frequency of contact and helps inform the setting of conditions. Not only is this assessment vital for public safety considerations, but national data indicate that Pre-Trial programs that rely exclusively on subjective determinations of risk, are more than twice as likely to have a jail that exceeds its capacity than those that rely exclusively on an objective risk assessment. [7]

Sonoma County does not use a validated pre-trial risk instrument.

*Minimizes Failures-to-Appear*

Failures-to-appear are costly to the system.

*Data from the case processing study reveal that and 21 percent of felons released from the Sonoma County Jail pending case resolution failed-to-appear in court at some point in the adjudication process.*

Pre-Trial Programs contribute to reductions in FTA's through systematic case monitoring: providing court date notification, and working to return FTA cases to court without the issuance of a bench warrant. Sonoma County does not have the latter system in place.

The cost to the system can be measured in a number of ways: in expended staff time, in the issuance and enforcement of warrants, and in jail days to respond to violations.

---

[7] Clark, John and D. Alan Henry, "Pretrial Services Programming at the Start of the 21st Century: A Survey of Pretrial Services Programs," BJA, July 2003.

## Sonoma County Corrections Master Plan

Pre-Trial programs offer a way to manage that risk, as evidenced by pre-trial failure rates in Sonoma County by type of release.

*In Sonoma County, felons released to pre-trial supervision had the lowest rate of failures to appear of any release type. (Chapter One)*

### FTA Rate by Type of Pre-Trial Release
(Felony)

| | |
|---|---|
| Citation Release | 43% |
| Own Recognizance | 33% |
| Surety | 28% |
| Cash | 16% |
| Pre-trial Supervision | 12% |

These statistics speak to the value of the monitoring and tracking functions that a pre-trial program provides.

### Expedites Case Processing

Expediting case processing is predicated on the early collection of comprehensive defendant information. Jurisdictions with front-end screening protocols are in a position to make early and informed decisions about cases that result in increased diversion and expedited disposition. Examples of success include one jurisdiction, which achieved a 40% disposition of felony cases within 72 hours, with early screening and expedited case processing protocols. It all begins with a comprehensive Pre-Trial Services program.

*Based on a 'snapshot' of inmates in the Sonoma County Jail, pre-trial defendants had been in custody an average 94 days. (Chapter Two)*

In addition to expediting case processing, national data makes clear another benefit: Jurisdictions with Pre-Trial Programs which interview defendants *prior* to the initial court appearance are less likely to have a jail that exceeds its capacity[8].

Sonoma County does not have a system in place for comprehensive judicial review of cases at the First Appearance. The first step toward this is to establish the front-end collection of complete and verified information.

### Ensures Early Assignment of Defense Counsel

---

[8] Clark, John and D. Alan Henry, "Pretrial Services Programming at the Start of the 21st Century: A Survey of Pretrial Services Programs," BJA, July 2003.

*Study data from Sonoma County reveal that 49% of misdemeanor defendants and 63% of felony defendants were appointed a public defender to represent them. (Chapter One)*

Pre-Trial Programs assist in collecting financial information needed to determine indigent status. This up-front documentation of a defendant's assets and liabilities allows early assignment of a public defender, thereby accelerating case processing.

### Provides Early Identification of Diversion Candidates

Pre-Trial Programs serve another important role in the immediate identification of possible candidates for drug court, mental health court, and other diversion options. This serves to broaden the pool considered for these important programs, and to shorten the time to program entry. Importantly, time to program entry has been shown to be a predictor of positive program outcome.

*The Sonoma County Drug Court is at less than full capacity. (Sonoma Treatment data).*

At the end of June, 2007 the County Drug Court had 70 clients. The capacity is 100. Without a universal, front-end screening process, the identification of potential diversion clients is made more challenging. This is true in Sonoma County, where referrals come from different courtrooms, from district attorneys and public defenders, and from the clients themselves. A Pre-Trial intake unit consolidates what is, in many jurisdictions, a fragmented approach to identifying diversion clients.

*Inmate assessments for alcohol and drugs are often conducted per inmate request in Sonoma County Jail, not through a universal front-end screening.*

The pre-trial screening also provides an opportunity to flag underlying issues that merit further assessment, such as mental health issues or repeated entry into the jail. Pre-Trial screening can serve as the referral point for individuals in need of clinical mental health assessments and referral services.

Sonoma County does not have this kind of universal, systematic front-end screening in place at this time.

### Solicits Victim Input

A comprehensive Pre-Trial Program also ensures that victim input is universally solicited and presented to the judge making the release decision. Victims are contacted by phone and interviewed in all person-

to-person domestic abuse and battery cases. Ideally, a trained victim advocate who works alongside pre-trial staff performs this task.

Sonoma County does attempt to contact victims for the purpose of release decision-making, but not as part of a comprehensive screen.

### Provides Specialized Pre-Trial Supervision (Domestic Violence)

There are certain pre-trial populations that merit specialized attention. Domestic violence defendants are one such group.

*A higher percentage of domestic violence defendants were released pre-trial (69%) than the overall pre-trial release rate (62%). (Sonoma case processing data)*

Domestic violence defendants pose special challenges. The majority of these defendants, even if they were arrested on a felony charge, have misdemeanor charges filed. Therefore, it might be no surprise that they have a higher pre-trial release rate. On the other hand, the volatile nature of the offense, and the systems' imperfect ability to predict future violence, argues for a more specialized and intensive tracking of this population.

*The vast majority (69 percent) of those domestic violence defendants released pre-trial were released to a commercial surety (bail bondsmen). (Sonoma case processing data)*

The majority of domestic violence defendants in jail on pre-trial status were released to a commercial surety (69%). This type of release provides nothing more than the *appearance* of public safety protection. Release to a bail bondsman without conditions, or comprehensive monitoring and tracking, does nothing to address the risk posed by these individuals. Just because the offender has the means to post a surety bond does not make them less likely to re-offend.

Compared to the general pre-trial population released from the Sonoma Jail, a higher percentage of DV cases were ordered to formal pre-trial supervision (24%), compared to the overall average (16%). That more DV cases, on average, are supervised by Pre-Trial is a move in the right direction. The addition of a more formal risk screening, an expanded use of pre-trial, and specialized supervision services will provide further improvements.

### Support Family Justice Center

Any discussion of domestic violence must address the need for family and victim services. We support the District Attorney's Office interest in developing a Family Justice Center as a means to address the issue. This

proven model, pioneered in San Diego, would help balance the scales by offering needed services to help interrupt and resolve violence.

The Family Justice Center will also allow all of the agencies involved with domestic violence including law enforcement to better able coordinate services and more effectively adjudicate cases.

### Provides Specialized Pre-Trial Services (Mentally Ill)

*It is estimated that on any given day approximately 20% of jail inmates have a mental illness; roughly 8% might be considered seriously mentally ill. (Sonoma mental health staff)*

When it comes to addressing mental health issues in the criminal justice system, the goal is to identify the mentally ill defendant at the point of booking. This is accomplished in two ways: use of a specialized mental health screen; and, access to mental health information regarding current and active case status.

The GAINS Center, in conjunction with SAMSHA, has recently introduced an 8-question mental health screen, which has been validated and is being recommended for use in jails. This instrument or other similar screening tools, provide the first filter for identifying persons who require further assessment. The goal, as with the general pre-trial population, is to assess mental health issues within hours of being booked and to generate a report for the court's review.

The access to mental health status supports continuity of services: allowing the jail to alert case managers that their client is incarcerated; providing important information for continued medication and care; and informing release planning and sentencing.

We know that jail inmates with severe mental illness are more likely to spend longer periods incarcerated. Often this is because the person can't post bail, or their condition is seen as too unstable to allow release. The availability of specialized pre-trial supervision can address this. Once on pre-trial supervision the defendant is supported by a staff person with specialized mental health expertise, who works to monitor the defendant's compliance with court conditions while linking them to community services.

### Improves Utilization of Limited Jail Space

A full-service Pre-Trial program has staff ready 24/7 to interview defendants booked into the jail. This is important for jail population management because it has been shown that there is a direct correlation

between the amount of coverage offered by a program and jail crowding: Pre-Trial programs that provide the most extensive coverage (number of hours of operation) are the least likely to serve a jurisdiction with a jail that exceeds its rated capacity. [9]

*In the Sonoma County Jail, 45% of misdemeanants are released from jail within one day of booking; for felons only 22% are released within one day. (Chapter One)*

A full-service Pre-Trial program supports jail population management by expediting release; reducing failures through supervision, monitoring, and tracking; and by providing on-going bail review for those inmates not immediately released.

Routine bail review involves pre-trial staff continuously reviewing jail records, interviewing defendants who might have been overlooked during the first round of interviews, and updating and verifying information on defendants who have not been able to make bond. For those defendants who appear to be good candidates for release, a report is submitted to the court and the public defender is notified.

Sonoma County does not have a system in place to routinely review the jail population to identify individuals for bail review.

### Improves Information Sharing

The information collected by pre-trial staff can contribute to efficiencies in other areas of the system. For example, information can be used to help shape early dispositions, to set conditions for diversion programs, or inform pre-sentence investigations.

Note: Although an assessment of different Pre-Trial administrative models is recommended as part of the planning process for a new, comprehensive program, a draft budget based on current County Probation cost figures is provided in Appendix A as a reference.

---

[9] Clark, John and D. Alan Henry, "Pretrial Services Programming at the Start of the 21[st] Century: A Survey of Pretrial Services Programs," BJA, July 2003

# II. Adjudication

➤ Establish an Early Case Resolution Program

*The average time from booking to sentencing (for all cases: in-custody and out) is 67 days for misdemeanants and 142 days for felons. (Chapter One)*

Sonoma County also has a slightly higher percentage of cases booked into jail on a violent charge (27% vs. the national 25%). [10] There is, however, room to shorten the processing time.

*It is sending the wrong message to defendants (as well as victims and witnesses of crime) not to not expeditiously adjudicate cases.*

Sonoma County has already taken some steps to keep its processing times down. These data suggest that the county would benefit from other system tools, most notably a formalized Early Case Resolution (ECR) program.

*For those **not** released from jail, the time from booking to sentencing is 15 days for misdemeanants and 101 days for felons. (Chapter One)*

The establishment of a Pre-Trial program supports an ECR program. This is because Pre-Trial assumes responsibility for collecting verified defendant information, upon which negotiated decisions can be made; and Pre-Trial assists with quick assignment of public defenders, by helping screen defendants at the time of booking for eligibility. Information is the key.

*The time from arraignment to the attorney filing of charges is 55 days for felons (38 days if the person is in-custody, 72 days if out-of-custody). (Chapter One)*

A recommended centerpiece of an ECR program is the assignment of a single judge (in a jurisdiction of this size) to conduct First Appearance hearings, including bail and release decisions. Added to this is the development of case processing expectations and standards. This process structures decision-making and makes the swift resolution of low-level offenses the norm. The key is an early and meaningful offer from the district attorney that is communicated to the public defender/private defense attorney within a matter of days, not weeks.

*For those misdemeanant defendants who had a failure-to-appear, the average number of days from jail release to FTA was 52 days  (Chapter One).*

---

[10] Compared to the nine California counties tracked in the BJS study on Felony Case Processing, Sonoma has a high percentage of arrests/bookings with violent charges.

An ECR program can save the system time and money. The lack of such a program can be seen in failure-to-appear rates. These failures occur on average more than 1.5 months after release from jail for misdemeanants, and 2.5 months after release for felons: a cost to the system that would be avoided by more timely case resolution.

*For those felony defendants who had a failure-to-appear, the average number of days from jail release to FTA was 80 days. (Chapter One)*

Sonoma County would benefit from an ECR program that would streamline adjudication, reduce continuances, standardize the process of using motions, and establish new time expectations for lower level cases.

*The time from booking to disposition for those defendants with **no** FTA is roughly half that of those with an FTA. (Chapter One)*

Sonoma County
Time from Booking to Sentence
(By FTA)

|          | *Misdemeanor* | *Felony* |
|----------|---------------|----------|
| No FTA   | 51 days       | 131 days |
| Yes FTA  | 165           | 230      |

Jail demand is a product of the number of defendants who come in the front door of the jail, and how long they stay in jail. An ECR program, working hand in hand with a comprehensive Pre-Trial program is a vital tool for reducing jail demand by reducing the average length of stay.

The Sonoma County Superior Court utilizes an individual calendaring system. Cases are assigned at random to assigned criminal judges (7 criminal judges and 2 commissioners), either in the misdemeanor division (2 judges and 2 commissioners) or in the felony division (5 judges). In this arrangement, each of the criminal courts presides over the case from first appearance/arraignment until disposition.

The proposed early case resolution program changes this model. In this model a one judge, or perhaps one misdemeanor judge and one felony judge, handles all the front-end aspects of the case. The single judge sets bail, makes a release determination for those qualified for release to Pre-Trial Services, sets bail, appoints counsel, and hears bond/release motions. The process relies upon the information provided by Pre-Trial Services that is gathered and verified prior to the defendant's initial appearance in court as well as any subsequent information obtained. The

court will also have the services of the Pre-Trial program to monitor, track and supervise released defendants.

The other function that the assigned single judge will handle is the taking of pleas generated by the Early Case Resolution program. The recommendation is for the district attorney and public defender each to designate a single (or two) experienced, senior attorneys to review all new arrests daily. The criteria of cases to be considered will be established, and the goal is to negotiate the resolution of as many misdemeanors and lower level felonies the day following arrest. Available discovery will be exchanged, and for felony cases the negotiations may be extended to allow the necessary information to be generated. Where there is a likelihood of an early plea, the case stays in this front-end court.

Probation will also be involved in the post-trial supervision function. Persons who are on probation and charged with a technical violation (non-new criminal charge) of their probation will be considered for resolution using this same process. Defendant's who also have a new charge along with the probation violation will result in a probation officer providing the district attorney, public defender, and the court with recommendations on the resolution of the violations. Once again, the goal is to quickly address issues in the interest of resolving cases up-front.

The goal of the Early Case Resolution (ECR) Program is to expedite the disposition of misdemeanor and lower level felony cases. The mantra is "Same Justice Sooner."

The success of this approach can be measured in saved jail days, reduced adjudication costs, and better outcomes. The move to ECR depends, however, upon a shift in paradigm: From one of accepted continuances to one with a true expectation of swift but fair justice.

The principle benefits of Early Case Resolution are as follows:

- Relieves Crowded Dockets
- Reduces Case Processing Time
- Allows System to Focus Time and Attention on More Serious Cases
- Reduces Impact on Jail, Court and Adjudication Resources
- Builds in Meaningful Review for Alternative Sentencing


➤ Resolve Holds and New Charges at the Same Time

*In the April-June, 2007 Jail snapshot composite, 37% of the inmates were in 'hold' status. (Chapter Two)*

**Sonoma County Corrections Master Plan**

The system should set a priority on the resolution of holds. Where there are both holds and new charges, both should be resolved at the same court hearing.

Sonoma County
Time in Custody by Hold Type

| | |
|---|---|
| All | 90 days |
| Probation | 58 |
| ICE | 102 |
| CDC | 96 |
| Other County | 77 |
| Other State | 149 |
| Other | 158 |

(Chapter Two composite: April to June, 2007)

Where the hold refers to a case waiting transport to a state prison, attention should be given by all sides to take the steps necessary to expedite transfer.

*Of those in 'hold' status in the Sonoma County Jail, 12% were holds for other counties. (Chapter Two)*

For those cases, which are holds for other jurisdictions, the resolution of any underlying local charge should be expedited so that the prisoner can be released to the other county.

➢ Review Policy Regarding Immigration and Customs Enforcement (ICE) Case Processing

*34% of all Holds in the County Jail are ICE Holds. (Chapter Two)*

Sonoma County Jail is significantly impacted by federal immigration hold cases: 141 average daily population, according to the three-month composite Jail snapshot. These cases should be processed according to clear local policies. Local policies should dictate how much weight will be given to low-level local charges; the extent to which local jail will be depended on for sentencing; and the prioritization of deportation in the whole order of events.

*93% of ICE Holds also have local charges. (Chapter Two)*

The fact that the majority of ICE cases have local charges highlights the need to expedite the resolution of these charges. Quick resolution of local charges facilitates ultimate case disposition. And, when federal policy

dictates deportation, there is a clear incentive to quickly resolve local issues.

*Average Time in Custody on an ICE Hold is 102 days. (Chapter Two)*

One of the keys in resolving cases is early case status identification. This requires front-end screening and verification — assisted by a Pre-Trial Intake unit — to be able to coordinate local and federal efforts. Not only does this improve criminal justice processing efficiency, but it impacts local program effectiveness.

It is reported that too often an immigration sweep will result in immediate program termination for clients making progress in local substance abuse treatment.   This results in disruption for everyone in the program.

➢  Examine Case Attrition/Dismissal Rates

*In Sonoma County 30% of defendants booked on a felony charge resulted in a felony conviction and 9 percent resulted in a misdemeanor conviction. (Chapter One)*

Sonoma County's conviction rate from booking to disposition does not compare favorably to the national rate.  At the national level, 57% of the felony defendants whose cases were adjudicated within one year of arrest were convicted of felonies and 11 percent were convicted of misdemeanors. [11]

*The felony-filing rate in Sonoma County is 49%. (Chapter One)*

The full story of felony filing is told by examining charge attrition.  More than half (53%) of cases that was initially arrested as felonies were either reduced to misdemeanors or ended in 'no complaint.' (Following district attorney screening, 42% were reduced to a misdemeanor and 11% resulted in 'no complaint.)

The 'no complaint' group amounted to 563 cases over a one year period.

---

[11] BJS, 'Felony Defendants in Large Urban Counties, 2002,' Feb. 2006.

Sonoma County
'No Complaint' Cases
(N=563)

|  | Misdemeanor | Felony |
|---|---|---|
| Person | 34% | 57% |
| Property | 4 | 16 |
| Narcotics | 5 | 10 |
| DUI | 6 | - |
| Public Order | 47 | 16 |
| Traffic | 4 | 1 |
| Total | 100% | 100% |

*425 Domestic Violence arrests ended in 'no complaint' (Chapter One)*

The majority of 'no complaint' cases were domestic violence cases: 92% of Misdemeanor (Person charge) 'no complaint' cases, and 77% of Felony (Person charge) 'no complaint' cases had domestic violence as their most serious charge.

The bulk of the felony arrests that do not result in a conviction are those cases that are reduced or dismissed by the district attorney at case screening. Only 47 percent of felony arrests are filed as felonies. (An additional 76 misdemeanor arrests resulted in a felony filing which bring the numbers up to 49 percent of felony bookings). Once filed, 62 percent of the felony filings result in a felony conviction and an additional 18 percent are reduced to misdemeanors.

It is recommended that the district attorney work with law enforcement to establish county standards for booking a defendant on a felony as opposed to a misdemeanor, particular emphasis should be placed on domestic violence cases. District Attorney screening will be tightened as a result of the implementation of the Early Case Resolution program.

➢ Streamline Pre-sentence Investigation

The pre-sentence investigation is prepared for all felony cases and for select misdemeanor cases: DUI with injury, vehicular manslaughter, sex offenses, violence, and child endangerment). It is recommended that sentencing occur with 21 days of entrance of plea or finding of guilt for in-custody defendants and 28 days for out of custody defendants. The PSI unit has a Manager with more than 20 years experience and a group of hard-working staff. Five officers are assigned to the courts to provide information to the judges.

## Sonoma County Corrections Master Plan

*The average time for a PSI is 45.6 days. (Chapter One)*

The pre-sentence investigation process should be streamlined to allow a faster report turnaround. The Probation Department has begun to use a short-form on certain low-level cases where there has been a plea negotiation; this should be expanded.

*It is reported that there can be a 3-4 day delay in getting referral information from the court to the PSI unit. (Sonoma PSI staff)*

Delays in sentencing not only impact the jail, but they can affect treatment outcomes as well, as quick entry into treatment is associated with more positive outcomes.

In a snapshot of TASC clients in 'pending' status we collected several months ago we can see the impact. At the time of the snapshot, TASC had 125 cases in 'pending' status; of these, the majority (92%), were in-custody. And, of those in custody, half had been identified for treatment but were awaiting sentencing.

<u>TASC Pending Cases</u>
(In-custody= 115)

| | |
|---|---|
| Waiting Sentencing | 50% |
| Sentenced, Waiting Treatment | 40 |
| Sentenced, Serving Time | 10 |

### Shorten Time to Complete PSI

*Time to PSI completion is 43 days (in-custody) and 46 days (out of custody). (Chapter One)*

There should be a different time standard (earlier) for completing the reports of in-custody defendants. The goal should be 21 days for in-custody and 28 days for out-of-custody.

### Build the PSI from the Pre-Trial Report

The goal of expediting the PSI process will be served by a Pre-Trial program. Comprehensive data collection at the front-end of the system provides a foundation on which to build. The PSI writer can use verified pre-trial information as the starting point for their efforts, eliminating redundancies and improving the quality of the report. This is important because much of the information collected for the PSI is self-report.

### Provide Judges with Risk Information

Sonoma County's Probation Department will soon be adopting an objective risk instrument to guide its supervision services. This risk information can also represent another level of information to help shape sentencing options and the setting of supervision conditions.

The PSI should begin to note the criminal risk level of the offender (the risk of recidivism as measured by an objective risk instrument, such as the LS-CMI). This information can inform the setting of conditions and be valuable information, especially when considering that the charge level itself (misdemeanor or felony) is not, by itself, a good indicator of risk.

*Misdemeanant and felony defendants in the study sample share a similar profile on several variables. (Chapter One)*

|                        | Misdemeanors | Felons |
| ---------------------- | ------------ | ------ |
| Age                    | 34           | 33     |
| Prior bookings (avg.)  | 7            | 6      |
| Prior arrests (avg.)   | 6            | 7      |

Charge severity is not in itself a reliable indicator of risk for recidivism. This is where the more comprehensive risk assessment becomes valuable.

Some states, such as Utah, are making drug diversion decisions based on risk levels (using the LSI). This involves providing the judge the LSI risk scores at the time of sentencing. We recommend that the practice of providing judges the risk score be considered.

➤ Review Utilization of Diversion and Sentence Alternatives

*Study data shows that 83% of convicted felony offenders in Sonoma County were sentenced to either prison or jail. 53% of felon offenders received a jail sentence, higher than the national average for felons of 28%. (Chapter One)*

Case processing data for Sonoma County shows that jail is the most used sentence option. This may reflect the lack of community-based options for felons (treatment is difficult to access for offenders with violent charges), and lack of a full range of mental health options.

**Sonoma County Corrections Master Plan**

Sonoma County
Distribution of Felony Sentences [12]

|  | Sonoma | National Data |
|---|---|---|
| Prison | 25% | 41% |
| Jail | 53 | 28 |
| Probation | 16 | 31 |
| Work Program | 6 | - |
| Fine | - | - |
| Total | 100% | 100% |

A comparison to national data shows that a higher reliance on jail in Sonoma County is offset by a lower reliance on prison. At the same time, probation is used as a straight sentence at approximately half the national average.

*The study revealed that the average sentence length for misdemeanants was 59 day; 253 days for felons. (Chapter Two)*

Average Jail Sentence Length
(Felony)

| Sonoma | National[13] |
|---|---|
| 261 days | 210 days |

The local system has established a continuum of diversion and alternative sentences. Programs include:

- Adult Diversion Services
  Pre-filing program targets the first-time misdemeanor offender. California Human Development Corporation (CHDC) offers it. (737 enrollments fiscal year 2006/2007)

- Project Intercept
  Program is designed to work with most misdemeanors; referrals are made prior to adjudication. Services provided include counseling, job assistance, and vocational support. It is offered by CHDC. (960 enrollments fiscal year 2006/2007)

---

[12] BJS, 'State Court Sentencing of Convicted Felons, 2002,' May 2005.
[13] BJS, ibid. ,

**Sonoma County Corrections Master Plan**

- ■ <u>Educational Sentencing Program</u>
  ESP is life skills program offered through CHDC as a sentence
  condition or sentence alternative. (80 enrollments fiscal year
  2006/2007)

- ■ <u>Deferred Entry of Judgment</u> (DEJEP)
  DEJEP is a post-plea, substance abuse diversion program, designed
  to last six months, offered by CHDC.
  (526 enrollments fiscal year 2006/2007)

- ■ <u>Work Program</u>
  Alternative sentencing program (in lieu of jail) that substitutes an 8-
  hour work crew assignment for each day sentenced to jail. Program
  is overseen by the Probation Department. (There were 940
  individuals in this program at the end of June.)

*Thirty-four percent (34%) of misdemeanants who received a jail sentence satisfied
their sentence in the work program; only 5% of felons participated in this
program. (Chapter One)*

Our case processing study showed 531 individuals referred to Project
Intercept over the year. This does not include the other 400+ individuals
who entered Project Intercept without first being booked into the Jail.

<u>Project Intercept Referrals</u>
(By Charge Type)

| | |
|---|---|
| Person | 12% |
| Property | 19 |
| Narcotics | 43 |
| DUI | 1 |
| Public Order | 24 |
| Traffic | 1 |
| | |
| Total | 100% |

Other alternative programs available to shorten jail sentences include:

<u>County Parole</u>
Inmates, with at least 2 weeks remaining in their sentence, are eligible to
apply for release consideration to supervised county parole. Program is
run by the Probation Department. (There were 13 individuals in this
program at the end of June 2007)

<u>Secure Community Confinement</u> (SCC)
Sentenced inmates released early are restricted to their homes by way of
an electronic monitoring device. (There were 67 individuals in this
program at the end of June 2007. Capacity is 75)

Work Furlough
Sentenced inmates are released to continued work during the day and
return to the Jail at the end of the workday.

How these programs are used should be reviewed. They have been built
up over time, and the diversity of offerings and how they are applied
should be reassessed at this juncture. A committee should be formed to
re-examine the various programs. Questions to be asked include: For
which populations are the programs available? (Could Project Intercept be
made available for more felony offenders, for example); how are offenders
assigned?; what are the different pathways to entry (courts or probation);
is the existing organizational structure the most efficient?; what do
program outcomes indicate about service quality?; etc. The goal is to
consider how these options can be used for greatest impact.

Data on these programs was not readily available. Comparisons of
populations served (by charge type and level, and legal status) would be a
starting point. For misdemeanor offenders it was noted that, for the most
part, the populations in one program are similar to another. For some the
entryway is the courts (work release) and for others it is probation (county
parole). A few issues are mentioned below.

County Parole

That the mechanism is in place for Probation screening for this program,
begs the question of what it would take to take fuller advantage of this jail
release option.

*At this time there are only 13 inmates out on County Parole. (Probation staff
data)*

Catherine Boyd and Ann Batiste, Probation Department personnel who
work the early release programs in the Jail, note that the expansion of
drug diversion and other options has had the effect of leaving a more
complex mix of cases in jail for consideration. Still, these inmates will
eventually be released and the question to consider is how to craft a
quality transition plan.

At this time, similar to the TASC assessment, the inmate initiates the
request for county parole review — instead of having a universal screening
process in place.

The re-examination of this program should look at the eligibility criteria
(most are rejected); the screening process (staff need 2-3 weeks to

**Sonoma County Corrections Master Plan**

complete a 'mini-PSI'); the profile of those accepted and rejected; the supervision and program resources available for those released; etc.

### Work Program (Work Release)

Unlike the low numbers in County Parole, Work Release is serving a large number of individuals.

*On the first of July there were 940 persons in the Work Release program. (Probation Department data)*

Primarily a misdemeanor sentence option, offenders are sentenced by the court and perform one day of labor for each day of their sentence. Offenders are screened by County Probation (Pre-Trial unit) and are assigned to work crews. For those offenders who already hold a full-time job, the time involved to satisfy a 90-day court order can take (by working one 8-hour day each weekend) almost 2-years to complete. Some offenders opt to apply for the 'work furlough' program instead. And, for those who serve their 30-day sentence in jail the actual time served, after good time credits, can be closer to 20 days.

In addition to knowing more about the profile of participants, it would also be instructive to know about treatment involvement. As the county prepares to discuss a DUI court it should examine the manner in which DUI cases (2nd offenders) are now accessing county parole, and how those services might be structured to better compliment other DUI efforts. The quality and continuity of those services should be reviewed.

As an example, DUI inmates who apply for county parole and are accepted are released to a probation officer who supervises the person through the duration of their sentence. But when supervision ends, it just ends. The program is not designed to transition offenders to continued services. The question here, as with all the local efforts, is how to deliver programs in the most cohesive manner.

The community court concept has shown, for example, that work orders combined with service referrals and group sessions is one approach to try an interrupt future re-offending. With minor enhancements a good work program might yield improved outcomes.

➤ Review Short-Term Prison Sentences

*20% of offenders sentenced to prison from Sonoma County received a sentence of 16 months or less. (Chapter One)*