The County may want to take a closer look at this population. Knowing more about the profile of this group and a finer break-out of lengths of stay can be helpful in future discussions with the State. The issue, explored in other states, is whether the lower risk, technical violator who is sentenced to prison for short periods (many for four months or less, we are told) could be accommodated in the county with financial assistance from the state for jail and programming.

## III.  Jail Alternative Facility: Community Corrections Center

➢ Plan an Alternative 'Step-Down' Facility

Sonoma County would benefit from an alternative custody facility that
would provide the option to move inmates from custody to the
community along a structured continuum: a Community Corrections
Center (CCC).

The fact that Sonoma County already has alternative sentence programs in
place, and a mechanism, through Probation, to screen cases for step-down
from jail, positions it well to move to the next level of jail transition
services. A Community Corrections Center would provide a flexible
option to reduce pressure on the Jail, provide a structured but lower cost
alternative to incarceration, and address (through programs) the issues
that underlie offender recidivism. A CCC provides an important interim
intervention, between jail and the community: a 'step-out' to a work based
and program rich facility.

The goal is to begin to view jail as the 'gateway' to the community. For
every felony offender who enters the Jail, planning for eventual release
should begin immediately. All felony inmates should be screened for
release, and an individualized plan developed, moving them toward
release to either the CCC or to county parole. At this time, although most
inmates are eligible for release consideration after serving half their
sentence, an inmate must request a review. We propose a universal
screening of all inmates at the time of sentencing to develop a transition
plan.

*Of those booked into the Sonoma County Jail, 53% of misdemeanants and 54% of
felons reported they were unemployed. (Chapter One)*

Offenders who serve their time in a Community Corrections Center are
expected to either be involved with programming and/or be working in
the community during the day. For those who have jobs, this helps
ensure that jail time does not contribute to the loss of employment. For
the unemployed, significant programming will be offered around
developing job skills, as well as finding, interviewing, and maintaining
employment.

*Of those misdemeanants sentenced to jail, 34% were ordered to the work
program, in lieu of jail. (Chapter One)*

A Community Corrections Center (CCC) can serve as both a Day
Reporting Center for low-risk offenders who have program conditions to

satisfy; and as a facility where inmates return in the evening for lock-down, after a day of work in the community.

*43% of misdemeanants sentenced to jail served all their time in jail; 84% of felons sentenced to jail served all their time in jail. (Chapter One)*

A Community Corrections Center can serve many system goals: jail step-down; treatment for those pending residential placement (instead of waiting in a more expensive jail bed); a constructive sanction for those in programs or probation; etc. Services should focus on employment search, cognitive skills, restitution, and substance abuse.

*In Sonoma County, 5% of sentenced felons were court ordered to the work program. (Chapter One)*

A Community Corrections Center represents a lower cost jail population management option.

The nature of the facility, which is program-based and grounded in the transition to community, suggests that consideration be given to having it managed by the Probation Department.

A Community Corrections Center (CCC) prepares inmates for successful transition back to the community. It is a minimum security residential facility that offers a structured, supervised living environment as an alternative to jail. Inmates at the CCC work in the community during the day and then return to the facility for the night.

A CCC provides a lower cost option to jail and extends the limits of confinement. It is based on the philosophy that a structured progression from jail to the community can be effective in reducing risk. It provides a positive and structured environment in which to learn and test new skills and chart a path for the future.

Inmates at a CCC serve the remainder of their sentence while finding employment and having the benefit of a range of programs. The principal goal is to facilitate successful re-entry to the community. Benefits to the system include:

- ❖ Lower cost alternative to Jail
- ❖ Improved Outcomes
- ❖ Added Flexibility in Managing Inmate Population

A Community Corrections Center should be planned as part of a comprehensive 'step-down' strategy for moving inmates along a Custody-to-Community Continuum; *developing tracks out of jail*, based on inmate risk and needs.

A CCC fills a need between the Jail (reserved for the highest security population), and community-based options: such as work crews and community service (for the direct placement or step-down of lower security inmates). The CCC is reserved for the medium to high risk offender.

<u>Target Population</u>
Community Corrections Centers can serve a diverse population, and they can also function as a Day Reporting Center. Foremost, they are designed to serve sentenced jail inmates who transition to the CCC to serve the remainder of a sentence; or jail inmates who, because of their classification level, may be moved directly to the CCC to serve their time. Populations found in these facilities include:

- Jail inmates in last phase of sentence
- Probationers in the CCC on a sanction for a violation of supervision
- Drug Court or other treatment participants at risk of failure
- Pre-Trial inmates (who would be detained in jail without this option)
- Discharged jail inmates in need of voluntary, short-term stabilization
- Prisoners re-entering the community

A CCC can also serve as a Day Reporting Center, providing a hub of services where offenders may be asked to report for daily check-ins, or to access support services, such as computer labs and classes.

<u>Programs</u>
Individual case plans are designed to address conditions of supervision, court orders, treatment needs, community safety, victim restitution, and successful transition back to the community. Issues addressed include employment, cognitive programming and substance abuse. A range of services are commonly offered. These may include:

- Substance abuse treatment
- Mental health evaluation and services
- Cognitive skills classes
- Employment testing and job search assistance
- GED and literacy classes
- Life skills: nutrition, parenting, money management, computer skills

*Residential Treatment*
Some Centers, such as the one in Washington County, Oregon provide longer term residential treatment to a sub-set of the population. In

Washington County, an intensive 90-day treatment program is offered to a co-ed population within the facility.

*Work Programs*
Some Centers have made vocational advancement the centerpiece of their operations. The range of work-related services found in Centers includes:

- Aptitude testing
- Job Search Skill training
- Classroom based vocational skills development
- Occupational skills development
- Center organized or sponsored work projects (day labor)
- Job referrals or placement
- Job Clubs/support groups
- Job support: bus tokens, clothing, etc.
- Job tracking and support

There is much room for creativity in the development of this component of the Center. The importance of this aspect of the program is supported by research showing that inmates who participate in community-based industries projects have reduced recidivism and improved post-incarceration employment retention. [14]

Individualized plans for each CCC inmate should be based on the risk and needs of the offender, and the anticipated length of stay at the Center. For residents with short stays (less than a couple of weeks) the principal goal is to connect them to treatment prior to release. For those with longer stays, the goal is to work with the resident to find employment, engage in treatment, and move into drug and alcohol free housing upon exit.

Administration

Community Corrections Centers can be managed by different agencies. In a Probation model, the CCC is staffed by Corrections Specialists. In either model staff has the responsibility for monitoring the security of the facility, conducting urinalysis tests, and tracking the daily plans of the residents. Residential counselors work with residents to develop individualized plans for services.

Cost

---

[14] Marilyn Moses, "Factories Behind Fences: Do Prison 'Real Work' Programs Work?", National Institute of Justice Journal, Issue: 257, June 2007, U.S. Dept. of Justice

A big advantage to a Community Corrections Center (CCC) is the cost to build and operate one, compared with a jail. By definition, a CCC is a minimum security facility that has dormitory style housing.

It is estimated that *building costs* for a CCC are one-third less than those of a jail. [15] Moreover, the *operating costs* are less: In Washington County, Oregon the per-day cost of operating the CCC is, at $55 per day, half of the per-day jail cost of $109.46. [16]

<u>Other County Community Corrections Centers</u>

The Community Corrections Center model is not as wide-spread as Re-entry facilities/Half-way houses for prisoners. But where they do operate, they present a major management tool for local counties attempting to stretch the limited and expensive jail resource.

Counties with a CCC include:

> - Clackamas County, Oregon
> - Clatsop County, Oregon
> - Lane County, Oregon
> - Washington County, Oregon
> - Hampden County, Massachusetts
> - Suffolk County, Massachusetts
> - Davidson County, Tennessee
> - Orange County, Florida

<u>Issues to Address in Planning a CCC</u>

There are many policies and procedures to address in planning a Community Corrections Center. Some of these include:

- Eligibility/Ineligible
- Screening procedures
- Range of Populations served (State prisoners, parolees, pre-trial, etc.)
- Required Time in Jail prior to consideration (if any waiting period)
- Length of Stay remaining on sentence to be considered
- Type of Programs to offer
- Job search requirements (number of days to find work, type of work and number of hours required to work)

---

[15] Estimate given by Rosser International. 9-19-07.

[16] The Washington County CCC per day rate for the small number of residents involved in the in-house residential treatment, is $71 per day. (John Hartner, Community Corrections Director, Sept. 2007)

- ■ Urinalysis Testing and monitoring
- ■ Return to Jail, and other Sanctions for non-compliance
- ■ In Facility discipline
- ■ Step-down policies and options from CCC
- ■ Health Care
- ■ Award of Good Time and Work Credits
- ■ Program administration
- ■ Fees and collection of restitution
- ■ Information sharing between agencies
- ■ Data collection
- ■ Program evaluation

➢ Establish 'Tracks' out of Jail based on Risk and Need

A quick assessment of offender risk can guide the level of supervision and treatment received. Just as the Probation Department will be adopting a new, objective risk tool to allocate supervision resources, so too can the step-down from jail be guided by risk levels.

## IV. Alternative to Jail Programs

Sonoma County's commitment to treatment and alternative to jail programs is evident in the strong continuum of programs in place. And, these programs are supported by a group of dedicated professionals who, at all levels of this system, are interested in making a difference.

The fact that Sonoma County has many of the building blocks of a strong system puts it ahead of many other jurisdictions. This strong foundation can be seen in the continuum it has put in place over the years:

- ❖ Pre-file and post-file diversion programs
- ❖ In-jail substance abuse treatment
- ❖ A long-standing Drug Court
- ❖ TASC assessment and case management
- ❖ Specialized probation caseloads
- ❖ FACT team
- ❖ Jail discharge planning
- ❖ A range of community-based treatment

Moreover, its programs stand out for having staff with many years experience and a true interest in moving offenders toward change. Features such as the use of positive rewards, innovative program offerings, and lifetime aftercare are commendable. Some programs are tackling hard to address issues, such a female trauma.

Given this foundation, Sonoma County is now in a position to ask: How might we optimize these resources? The answer lies in three general approaches:

- ▪ Improved Front-End Services: Pre-Trial Services
- ▪ Expedited Case Processing
- ▪ Extend the Continuum: A Community Corrections Facility
- ▪ Strengthen Existing Services

➢ Create Centralized Intake Services

*"Sometimes the quiet ones fall through the cracks." (Discharge Planner on task of identifying inmates who need service)*

Pre-Trial screening, with its emphasis on risk, should be supported by an assessment of offender 'need' (criminal risk factors) as well. This is done by creating a Centralized Intake unit that can quickly provide varying levels of substance abuse and mental health screening and assessment. While these reviews now occur at various places in the system, there is

neither a systematic nor universal approach.  A Centralized Intake Unit would provide this.

### Provide universal front-end screening

Sonoma County is fortunate to have a Treatment Alternative to Street Crime (TASC) program, with staff dedicated to assessment, client advocacy, and case management.  Their assessments, conducted for the most part in the jail, are most often initiated by inmate request.  In the proposed model, this entryway into treatment would be replaced by a more unified approach.  It would join the various efforts of Pre-Trial Services, TASC, and Mental Health staff to provide better up-front case review, and more substantive information to judges to inform the setting of conditions, as well as diversion and sentencing decisions.

Building universal risk and need screening into the front end will also improve assessment efficiency.   Under the proposed model, Pre-Trial screening and judicial orders become the driver of further assessments, which can reduce time spent with dead-end cases (don't know case has 'out of county' status, for example).  Under the current system of inmate initiated requests, TASC reviews many cases that do not result in acceptance.

TASC Screening & Referral Statistics
(March 2007)

| | |
|---|---|
| Number Screened | 156 |
| Number Accepted | 53 (34%) |
| Number Not Accepted | 103(66%) |

As can be seen, 66% of the cases screened were not eventually referred for treatment.   Front-end screening as part of a Pre-Trial program should fine-tune this process.

### Shift to System-Directed Assessments

Most TASC assessments are conducted in-custody.  And, for the most part, an assessment is initiated by an inmate request.

TASC Assessment: Referral Source

| | |
|---|---|
| Self | 64% |
| Court | 20 |
| Probation | 9 |
| Defense | 4 |
| Other | 3 |
| | |
| Total | 100% |

TASC also provides assessments on a walk-in basis in the community. Here the percentage of self-referrals is even higher (75%). And, over half the walk-in cases are rejected for treatment entry.

*Of those defendants who were assessed by TASC, 57% were on pre-trial status, 38% were violation of probation cases, and 5% were sentenced. (TASC data)*

Some of the self-requests for treatment are persons following through on referrals, but most are requesting an assessment in an effort to improve their legal outcome, or because they want to advantage of treatment.

The problem with a system that is inmate driven is that it takes the reins out of the hands of the system. This results in system inefficiency when TASC must review cases that have not been pre-screened and do not, in many instances, meet basic eligibility criteria (inmate is on an out of custody hold, for example). Other persons who might qualify simply fall through the cracks and are not considered.

A more standardized up-front screening will help produce a more efficient and productive process.

### Reassess the Role of Motivation in Client Selection

*"This program saved my life. But when I started I didn't want to be here. I didn't believe that anything could change. But the man you see today is not the same man who started this program." (Graduate of local treatment program)*

A self-referral system would seem to be a natural way of targeting those who are motivated to change. And, certainly, ultimate success in any program depends upon a person having the desire for a better future. The published studies on the relationship between motivation and outcome are often incomplete: not speaking to the issue of how, not only to measure motivation, but how to foster it.

We know that coerced treatment has been proven to be as effective as voluntary treatment. Using the coercive power of the courts has been

shown to be an effective tool in encouraging treatment entry, retaining clients, and graduating higher numbers (drug court is one example).

The key question is not: 'Is the person motivated'; but 'How do we motivate them?'

*"I have found that clients who entered treatment and didn't want to be here did as well as those who volunteered." (Local Residential Treatment Program Staff)*

Motivating clients is an art, but a basic one for all criminal justice professionals. Probation and Parole departments nationwide are sending staff to trainings to teach them 'motivational interviewing' — the common principles of respectful communication, good listening, positive guidance, and guided goal setting. To see this in action one need only watch Judge Boyd and other Drug Court judges.

Trainings such as this can be helpful to both new and experienced staff. We also encourage jail staff and others to take advantage of these trainings. Communication is the most fundamental and one of the most overlooked aspects of this work.

### Integrate Risk Information into Treatment Planning

The joining of risk and offender 'need' information (criminal risk factors such as substance abuse and mental health needs) provides a framework for targeting scarce resources.

The allocation of resources becomes an important decision: who should be prioritized for the most intensive and expensive resources? Ideally, the most intensive resources should be reserved for those with a high risk for recidivism (or for those who are having a significant impact on the system because of repeat bookings).

As with the pre-trial assessment of risk, the determination of post-trial risk should be guided by objective and validated risk instruments.

Given that the Sonoma County Probation Department will soon be adopting a new risk tool, this is a good time to be talking about how to apply this information. The quantification of risk should provide a starting point for resource allocation. Lower risk offenders can be targeted for diversion or less intensive treatment. Higher risk offenders, in comparison, are the group on which a county would want to focus its most intensive and expensive treatment. Research has shown that the greatest returns are achieved when the most intensive services are reserved for the highest risk offenders.

Although no risk tool is ever a complete substitute for professional judgment, it provides an objective guide for decision-making.

### Develop a Common Case Plan

The new risk tool that Sonoma County Probation will adopt will not only produce a risk score, but will identify individual risk factors associated with recidivism. This is used to shape the supervision plan. But most offenders are also in treatment. The goal should be to develop a common supervision and treatment plan that outlines offender goals related to individual risk factors. In this way treatment and supervision staff can reinforce and compliment each others efforts.

*Probation Officers and Treatment providers both expressed an interest in improved communication.*

At this time the probation officer has sporadic input into the treatment plan and is not routinely consulted when making modifications (this varies based on caseload type and the relationships that have been established with TASC and other providers).

A core plan with shared goals and expectations, can help keep everyone 'on the same page' — literally. In this way, both parties can reinforce progress in meeting short-term goals and speak with one voice when it comes to rewards and sanctions.

➢ Enhance Existing Treatment Options

*The majority of Sonoma County Probation Officers with Intensive caseloads who were surveyed reported that treatment always, or almost always, available. (Probation Officer survey)*

Probation Officers and treatment providers list the following as needed services.

Local Treatment Needs
(According to Probation Officer & Providers)

- Vocational Training & Employment Services
- Medication for Low Income
- Drug-Free Housing
- More Intensive Outpatient, and Longer than 31 Day Treatment
- Treatment for those Not Yet in Criminal Justice System
- Dual-Diagnosis Treatment and Specialized Expertise in Programs

- Coordinated Funding for Support Services: Childcare, Transport, Housing, etc. And, program funds for support (bus fare, etc.)
- Residential Treatment for Sex Offenders, Spanish, Mentally Ill

*Barriers to treatment and services for offenders that were noted include: funds for treatment, denial for lack of motivation, transportation, and charge. (Probation Officer survey)*

### Make More Intensive Outpatient Treatment Available

Sonoma County has an array of treatment programs that is richer in offerings than many counties. It has also invested considerable resources in residential treatment. This is not unexpected, given the severity of the drugs in use (methamphetamine) and the availability, through SACPA and Drug Court of a good base of outpatient services.

Sonoma County
AODS Treatment Snapshot[17]
(Feb. 6, 2007)

| | |
|---|---|
| TASC | 144 (40%) |
| SACPA | 138 (38%) |
| Drug Court | 58 (16%) |
| Starting Point | 22 (6%) |
| Total: | 362 |

Note: TASC is primarily residential (64%) treatment; SACPA is primarily outpatient (88%); Drug Court is primarily outpatient (86%); and Starting Point is the in-custody substance abuse program.

Both ends of the spectrum of treatment intensity are available: From 1-2 group sessions per week (conventional outpatient), to 26 group sessions per week (Starting Point).

---

[17] This break-out represents AODS programs coded as 'law enforcement' related programs. It does not include out-of-county programs, sometimes accessed, or the broader pool of community, fee-based services.

**Sonoma County Corrections Master Plan**

Sonoma County
<u>AODS Snapshot: Residential vs. Outpatient</u>
(Feb. 6, 2007)

| | | |
|---|---|---|
| Residential | 135 | (37%) |
| Outpatient | 227 | (63%) |
| Total | 362 | (100%) |

Note: Snapshot data reflects the number of criminal justice clients in programs on this day, not program capacity. In-custody participants are included in residential count in this break-out; drug court participant in the outpatient.

Although Intensive Outpatient services make up the majority of treatment resources, these slots are largely dedicated to SACPA and Drug Court clients, ostensibly targeting lower risk populations. The fact that SACPA clients are not supposed to be mixed with other clients represents another complication.

<u>Sonoma County Outpatient Slots</u>
(By Criminal Justice Population Admitted)
(N=227)

| | |
|---|---|
| SACPA | 63% |
| Drug Court | 19 |
| Other | 18 |
| Total: | 100% |

As can be seen in the data above, the bulk of outpatient resource is serving a specific criminal justice clientele (SACPA and Drug Court). And, for undedicated outpatient slots, it is estimated that 98% of outpatient treatment serves those who transition from residential treatment.

There is no good mechanism for direct placement into intensive outpatient from the jail, and there is no formal provision for moving offenders from outpatient to residential treatment.

*One residential treatment provider estimated that 15-30% of clients might be appropriate for intensive outpatient services.*

TASC, which bases its assessments from the Jail, makes the vast majority of their referrals to residential treatment.

<u>TASC Referrals by Type</u>
(Feb. 2006 to Feb. 2007)

| Residential | 91% |
| Outpatient | 7 |
| Other | 2 |
| | |
| Total: | 100% |

(N= 615.  Reflects all referrals for which referral type noted)

Of those referred to residential treatment, almost half (47%), are sent to
the Turning Point program.

<u>TASC Referrals: By Residential Program</u>
(Feb. 2006 to Feb. 2007)

| Turning Point | 47% |
| Athena | 14 |
| Orenda Center | 12 |
| Latino Commission | 11 |
| Out of County | 6 |
| Other | 10 |
| | |
| Total | 100% |

(N= 560. Reflects all referrals for which residential type noted)

The pathway to residential treatment from TASC is through the Sonoma
County Jail. This has actually resulted in cases in which offenders, once
released from custody, must return to Jail in order to access residential
treatment. It was explained that this is a result of County policy that
dictates that residential treatment funds be used only to depopulate the
jail, preventing direct community access to these services. But, the
unintended consequence is that offenders must at times return to Jail to
gain access to residential services. This needs review.

*Half of local outpatient treatment providers estimated that a small percentage of
their clients would benefit from more intensive treatment.*

An expanded option of intensive outpatient should be available to help
stretch the treatment continuum. Some inmates who exit Starting Point
may, after a month or more in treatment, no longer need residential
treatment (as originally assessed) but could thrive in a less intensive
program.

*It is estimated that 30-40% of inmates in the in-custody Starting Point program
have jobs in the community. (Program staff)*

To the extent that intensive outpatient can be used, it helps inmates who are employed to retain their jobs. For those who need the additional stability offered by residential placement, an option that provides Intensive Outpatient and short-term clean and sober housing can be explored.

As a step-down from Jail, Intensive Outpatient services should also be provided in the Community Corrections Center.

Sonoma County AODS Expenditures
(Fiscal Year 05-06)

| | |
|---|---|
| Detox | 13% |
| Residential | 51% |
| Outpatient | 11% |
| Drug Court | 8% |
| SACPA | 0 |
| TASC | 17% |
| | |
| Total: | $4,567,260 |

County funds make up half (50%) of total AODS program revenue in Sonoma County that totals more than $9 million.

Sonoma County AODS Revenue Sources
($9.7million)

| | |
|---|---|
| County | 50% |
| State | 28 |
| Federal | 18 |
| Fees | 3 |
| Other | 1 |
| | |
| Total | 100% |

In the 1970's, Sonoma County had a base of treatment that was primarily Intensive Outpatient. With the increase of methamphetamine use the offender profile has become more complex, but there is still the need to actively use the least restrictive/ and less expensive option where possible.

Sonoma County has, in its prenatal program, a good example of an intensive outpatient program. Clients attend sessions five days per week

for at least 3 hours per day. More intensive outpatient, coupled with stable housing, would be an important addition to the continuum.

### Address Treatment Access for Violent Offenders

*The greatest gap in treatment, noted by Probation Officers with intensive caseloads, was for offenders with violent charges or a history of violence.*

Although outpatient treatment providers in Sonoma County generally indicated they would consider offenders with violence, on a case-by-case basis, residential treatment programs are in a more difficult position. Given the mixed populations of residential programs, a violent charge can be incompatible. However, the need does not disappear and, as is often the case in criminal justice treatment systems, those who pose the greatest public safety threat are often the least able to access care.

#### More Jail Treatment for Higher Risk Cases

*Probation Officers indicated a need for more treatment in Jail for higher risk offenders. (Probation survey)*

Providing treatment in jail presents unique challenges. Jail classification barriers may prevent some inmates from participating in the Starting Point program. This can be addressed by considering how treatment might be brought to this group in the more secure parts of the jail. Probation Officers indicated a desire for more treatment for this group.

#### Residential Treatment for Sex Offenders

Probation Officers noted that the majority of sex offenders who were indicated as needing treatment appeared to be accessing treatment, albeit usually on an outpatient basis. The need for more intensive treatment, both in the community and in Jail, was brought to our attention by the Officers. The issue here is how to make residential treatment available where clinically indicated.

*In a review of TASC reason's for rejection, Violence was the most common reason a person was denied entry into treatment. (TASC data)*

One month worth of data was collected to examine the reasons that persons assessed by TASC were turned down for residential treatment.

<u>TASC Reason for Rejection</u>

| | |
|---|---|
| Violence | 38% |
| Out of County* | 27 |
| Owe Money | 12 |
| Psychological Issues | 9 |
| Other | 14 |
| | |
| Total | 100% |

* Includes Non-Resident and ICE status.

A look at the kind of violent charges highlights the challenges posed to TASC and the system in accommodating this population. Rejections include offenders charged with: Armed Robbery, Gang involvement, Assault with Weapon, Arson, Firearm possession, child endangerment, and misdemeanor battery.

<u>Review TASC Appeal Process</u>
*Probation Officers with Domestic Violence Caseloads reported that, on average, only 50% of those in need of substance abuse treatment were accessing it. (Probation survey)*

Although TASC assesses domestic violence cases for treatment need, many of these cases are initially denied because of the violent charge. The offender may then appeal the denial and the case is again considered for acceptance. If the offense involved a weapon there is no access to treatment. Of course, these are the very cases that most need attention.

*It was estimated that of those offenders on the Gang Supervision caseload, only 1of 10 persons who needed substance abuse treatment were accessing it. (Probation survey)*

<u>Programs for Gang Members</u>
Although a smaller percentage of offenders on Gang supervision were noted to be in need of substance abuse treatment (10%) by the Probation Officer who supervises this caseload, this group represents a substantial public safety threat, and every effort should be made to link them to treatment, when needed.

*In the Sonoma County case processing study, 10% of defendants with misdemeanor charges, and 19% with felony charges had a gang affiliation.*

Level of Gang Affiliation

|  | *Misdemeanor* | *Felony* |
|---|---|---|
| Affiliated | 5% | 5% |
| Associate | 39 | 42 |
| Drop-Out | 6 | 6 |
| Member | 50 | 47 |

## Continue to Address Issue of Rural Access to Treatment

*It is estimated that 15 to 25% of treatment program clients reside outside of Santa Rosa. (Treatment providers)*

The provision of services to residents in the more rural areas is an on-going challenge. Some DUI treatment has been made available, but for the most part person in need of treatment need to come into Santa Rosa. With transportation issues to contend with, this presents a real challenge to many clients.

Attempts have been made to bring treatment out to 'The River,' but the lower number of clients in this rural area has not made it cost effective. Creative solutions should continue to be explored, including mobile treatment vans, video conferencing, etc.

➢ Expand Drug Court

*"Drug Court has been a profoundly positive experience for the system. It changed the thinking about treatment and created a common language." (Sonoma County Treatment staff)*

The Sonoma County Drug Court is doing a good job providing a solid base of services. This is a mature Drug Court, in operation for more than 10 years. It has been the beneficiary of strong judicial commitment and an energetic program coordinator. The program has a good core program presented in phases, and is exceptional in offering on-going access to services to graduates — consistent with a chronic care model.

The fact that a single judge handles both the Drug Court and the SACPA Court is also a bonus. By tracking both populations the judge is able to seamlessly move SACPA cases to Drug Court at the point of repeat failure, but short of termination.

The Program has developed a good array of programs: noteworthy is the volunteer literacy counselor (offered by a retired DA), family and relationship counseling, and a 6-week anger management curriculum.

The Program has also been accommodating more serious cases: They have accepted gang members, who are reported as doing well; has no limit on drug charges; and reviews drug sales offenses on a case-by-case basis.

For program graduates, the average length of stay is approximately 12 months.

*At the end of June, 13% of Drug Court clients were SACPA participants.*

The program also does a good job of accessing a range of treatment resources. The Drug Court Coordinator can place participants into residential treatment, usually at initial assessment into the Drug Court.

*At the end of June, 10% of Drug Court participants were in residential treatment.*

Residential treatment is used judiciously, but those who are placed will remain there for 6 months. At this time, all those in residential treatment were females (usually it is mix of males and females), and placed at either Athena House or Turning Point.

Having access to residential has worked well. Clients still attend monthly court sessions, and consideration is given to reducing the overall length of Drug Court participation for those who successfully complete the 6 month period.

*The program sees a positive difference for clients who first attend Starting Point.*

The program coordinator notes that she observes a positive difference in those clients who take advantage of the in-custody Starting Point program while waiting program entry.

### Establish Non-Attorney Staff Positions for Drug Court

The essential work of screening defendants and tracking them into Drug Court is time consuming and requires a specialized skill base. For these reasons we recommend that the District Attorney Office and the Office of Public Defender each have a non-attorney position dedicated to this work. In our experience, drugs courts which have this in place increase numbers served and improve time to program entry. Overall program efficiency and effectiveness is served.

Non-attorney staff support positions soon become indispensable. And, their involvement with the case need not end with screening. Support staff knowledge of the defendant's progress serves to support attorney recommendations.

The staff person in the public defender's office will work with the clients identified and referred by Pre-Trial Services. They will work to motivate clients to accept offers to the program as well as with the attorneys to facilitate their program entry. The staff person in the district attorney's office will work with the individual attorneys, law enforcement, and in some cases with the victim to help facilitate program entry for those qualified defendants.

These non-attorney positions are companion positions and do not replace the Drug Court Coordinator position.

### Achieve Full Drug Court Capacity

*On June 25 the Drug Court program had 70 active clients.*

The Drug Court program was designed to handle 100 clients. At the end of June the census was 70, up from 55 when we started the project.

*52 new cases admitted to the Drug Court in 2006.*

The first goal is to take full advantage of the existing capacity. The second is to expand that capacity to address that potentially eligible population who are still serving time in Jail.

*The Drug Court program graduated around 39 persons last year.*

### Consider Drug Court Treatment and Reporting Tracks

The Drug Court has a well-run program in place and is achieving good completion rates. Given this, the goal should be to make the program available to more individuals.

*Of Drug Court participants who graduated last year, 85% completed the program within one year.*

The program is moving the majority of individuals through the program in a reasonable amount of time. And, unlike some Drug Court programs, it is not holding on to individuals for lengthy terms of 14 months or longer.

At the same time, consideration should be given to the development of treatment 'tracks' of varying intensity, guided by an assessment of criminal risk. In four experimental studies, participants who were high risk for recidivism had better outcomes in drug court when scheduled to attend frequent biweekly judicial status hearings. In contrast, high-risk participants had poor outcomes when this level of contact was reduced.

However, outcomes for low risk offenders were generally equivalent regardless of how often they were required to appear before the court. [18]

## Make More Sanction Options Available for Drug Court

The Sonoma County Drug Court takes an individualized approach to sanctions. There is no set sanction formula, but offenders know that low level sanctions (increased AA meetings, increased testing, and extra homework assignments) can lead to jail time.

Jail sanctions are used in a measured way. Of the 39 persons who graduated from the program in 2006, 20% did not receive any jail sanctions. Of the total jail sanctions imposed, the break-out by length of jail time is as follows:

### Drug Court Jail Sanctions [19]
(2006)

| | |
|---|---|
| 2-3 day sanctions | 90% |
| 2 week sanctions | 8% |
| 1 month sanction | 2% |

Unlike the SACPA Court, Drug Court does not use community service as a lower level sanction: staff finds the required paperwork for community service to be cumbersome and time-consuming. This is an area where volunteer assistance might be solicited; or those agencies using community services might consider how screening and placement resources could be pooled.

For those drug court clients with repeat failures though, a more intensive community-based sanction is needed as the final step before jail. We recommend the use of work crews that are supervised by the Probation Department as an intermediate sanction option.

*Drug Court jail sanctions in 2006 resulted in 194 jail bed days.*

Filling out the sanction continuum with work crews provides more options short of jail. And, options which do not disrupt a person's work can help contribute to success. The certainty of a jail sanction is an integral part of program success, and there is evidence that shorter sanctions may be just as effective as longer sanctions. The key appears to be the swiftness and certainty of the sanction, not the duration.

---

[18] Marlowe, Douglas B. et. al, "Matching Judicial Supervision to Client's Risk Status in Drug Court," Crime and Delinquency, Volume 52: Issue 1: (January, 2006).
[19] Sanctions represent number of violations not persons: one person could have multiple violations.

➤ Pursue Development of a DUI Court

The availability of State funding for DUI courts, through the Office of Traffic Safety, has captured the attention of judges and other players in Sonoma County.   We support the development of such a Court.

Our case processing data show that, although the majority of defendants booked into jail on new misdemeanor and felony charges do not have prior DUI arrests, there is a small group with a significant background.

*32% of defendants booked into the Sonoma Jail on a felony charge had 2+prior DUI arrests.   22% of felony defendants had 3+ priors.*

### Prior DUI Arrests for those Booked

|        | Misdemeanor | Felony |
|--------|-------------|--------|
| None   | 72%         | 56%    |
| One    | 21          | 11     |
| Two    | 5           | 10     |
| Three+ | 2           | 22     |

(Case processing study data)

The key in developing such a Court is to learn from the lessons of Drug Court.  Those same principles should drive the formation of a DUI Court. In the end, careful planning is the key.  Issues to address in the planning phase for a DUI Court include:

a) Incentive for defendant to participate
b) Voluntary vs. Mandatory participation (drug courts are, by nature, voluntary)
c) Agreement about target population (High BA, multiple DUI, offenses in quick succession, etc.)
d) Exclusionary Criteria
e) Screening, assessment, and placement
f) Relationship between DUI Court and existing diversion options
g) Comprehensive approach: treatment, court, testing, probation
h) Composition and Role of DUI Team
i) Program Coordinator and Support Positions Needed
j) Sanction policy
k) Anticipated Jail and System Impact
l) Dismissal policy
m) Nature, intensity and duration of treatment
n) Probation Officer caseload size

o) Fees
p) Graduation requirements
q) Plans for Sustained funding
r) Data Collection/Evaluation

The County plans a trip to visit the Orange County, California program. The reviewing of this, and other DUI programs, can be instructive.

The Orange County program has been in operation for more than two years. It has presented data that show low rates of DUI re-arrest/any re-arrest for participants. [20] It is interesting to note that of defendants screened for participation in this program, 53% declined participation or were turned down by the team: speaking to the importance of system incentives. It is also worth noting that the program is modeled like a drug court: those who graduated had been in the program an average of 14 months; received phased treatment comparable to the intensity of an outpatient treatment program; and had to meet comprehensive criteria to graduate, including: no dirty tests for 120 days, stable living environment, employed, support group in place, and relapse prevention curriculum completed.

*In 2006, Sonoma County AODS had close to 2,500 DUI admissions; of these, over 600 were Multiple Offender Program (MOP) participants. (AODS data)*

The number of MOP participants does not include those persons who did not enroll; it is estimated that the total number is closer to 800-1,000.

*Of the MOP participants, it is estimated that the vast majority (90%), are second time offenders. (AODS data)*

**Address Quality of DUI program for 1st Offenders.**

As the County considers the formation of a DUI Court it is a good time to reassess the quality of the programming provided. The drug education model has not been proven effective, yet it is the standard approach in most jurisdictions. Sonoma County could lead the way for the State by overlaying cognitive skill/relapse skills training to this model.

➢ Standardize Offender-Based Cognitive Curricula

The Jail and other local programs all offer coursework having to do with life skills, cognitive skills, and other topics. It would be advisable for each program to be familiar with the materials and curriculum used by

---

[20] 'Superior Court of the State of California, County of Orange DUI Court Program,' presented at NADCP Conference, June 15,200.

the others, and to consider where it makes sense to adopt the same materials.

In some cases materials can compliment each other. In other cases it makes sense to try and adopt the same approach. This provides a common language for the defendant as he moves through the system (from jail to day reporting to local programs), allows the lessons to be reinforced at each stage along the continuum, and provides continuity in programming.

➢ Continue to Expand Jail Treatment Offerings

*Sonoma County Jail programs with the largest number of participants: GED courses; Self-Esteem groups; In-Motion classes (stress reduction); Religious groups; and Jail industries. (Sonoma Jail Program data)*

The Sonoma County Jail offers a broad array of programs to inmates. Probation Officers give these programs high marks. With this foundation in place the next place to turn attention to would be the more serious offenders. This would include group sessions for sex offenders and those with dual diagnosis needs.

Consideration could also be given to involving deputies in some of the programming, rotating in as co-facilitators. This is often a valuable experience in terms of broadening perspective and fostering a more cohesive approach to notions of offender reform.

### Design Jail Programs for the Higher Risk/Mentally Ill Inmate

Programs that the probation officers recommended for adding included: group sessions for sex offenders/violent offenders, and more services for the mentally ill.

*It is estimated that there are 180+ inmates in the jail at any given time have health issues. The number of inmates who might be designated as 'seriously and persistently mentally ill' (SPMI) is estimated, by mental health staff, to be closer to 8%. (Sonoma mental health staff)*

Jail program staff continues to develop new services. One of the most recent being a Pet Assistance Therapy program for the mentally ill, to allow them something to do outside their cells for a period each day. Still, the opportunity to provide more opportunities for this population to spend additional time out of their cells (21 hours per day for the most restrictive unit) should be pursued. A therapeutic step-down program is an important element of transition planning, restoration, and well-being for this population. Certainly, the lack of good recreational opportunities in the main jail is an issue that pertains to the population in general.