## Sonoma County Corrections Master Plan

*400 inmates took advantage of the Jail's Exit Planning Class over the last fiscal year. (Sonoma Jail Program data)*

Another program that should be considered for expansion is 'Exit Planning'. Inmates now volunteer for the program, and a relatively low percentage of inmates exiting the jail have availed themselves of this resource. Consideration should be given for how to incorporate this into a standard re-entry planning approach.

### Build Cognitive Curricula into Existing Jail Programs

Jail program staff is also talking about grouping programs into core sets of services. This is a good idea, and we would encourage the Jail to take it one step further and center these services in cognitive based programs proven to reduce recidivism. In addition, cognitive approaches can be inserted into existing programs. This is important in order to yield the greatest return: programs such as drug education and talk-centered groups would not, in and of themselves, be expected to sustain long term change.

### Broaden Availability of Starting Point

Now that the Starting Point program is in place, its expansion is limited only by staff and logistics. The recent program expansion to accommodate female inmates is applauded.

*219 inmates were admitted to the Starting Point program from June 2006 to June 2007. Of these, 32% volunteered and 68% had a court order for community treatment. (Starting Point data)*

Although Starting Point is largely serving inmates who have a court order for treatment, more than one-third of inmates volunteer to enter the program. While all inmates should be encouraged to take advantage of in-custody programs, where space is limited the most intensive resource should be reserved for the higher risk/higher need inmate, with Jail and program staff making that determination.

### Review Classification Exclusions for Starting Point

In the interest of making the Starting Point program available to the higher risk offender, the Jail should review classification policies that may exclude inmates in that category. At this time, the program has demonstrated that it can successfully work with a mixed group of inmates.

## Sonoma County Corrections Master Plan

*Only 11% of inmates participating in Starting Point had to be terminated for non-compliance. (Starting Point data, 2006)*

For those inmates who cannot be housed in the minimum security facility, a discussion should be had about how to bring this program, or elements of it, to the Main Facility.

Ensure Continuity of Treatment for those Exiting Starting Point

*Over the last fiscal year, 16% of inmates who entered Starting Point completed the 90+ day program.*

The Starting Point program was designed as a 'starting point' for community-based treatment. As such, it is not unexpected that a low percentage of participants remained in jail long enough to complete the program.

*Of those discharged from Starting Point over the last fiscal year, 43% exited without certain continuation in treatment. These exits included: time served, termination, pretrial release or bail, other county transfer, and sent to prison)*

Continued treatment is important to reap the full benefit of this program. This is especially important given the low number of inmates who have the opportunity to actually complete the full 90+ day program, and the significance of this minimum threshold to realizing sustained, long-term change.

### Reassess Starting Point Clients at Program Exit

*60% of persons entering Turning Point residential treatment from the Jail had participated in Starting Point, the in-custody treatment program.*

Although the Starting Point program is designed to move participants into residential treatment, the presumption need not be that this is the universal outcome. Progress in the in-custody program can result in changes that now make the person an appropriate candidate for outpatient treatment. A treatment staff member estimated that 70-80% of the clients exiting Starting Point might be considered appropriate for intensive outpatient services, instead of residential.

*It is estimated that 30-40% of participants in the Starting Point program already have a job in the community.*

To the extent that inmates can be appropriately transitioned to outpatient treatment, and thereby keep their jobs, everyone benefits.

## Sonoma County Corrections Master Plan

*Continue to Refine Program Data Collection*

The collection of outcome data is also encouraged. It would be instructive to track inmate profile information, length of time in program, whether the person exits the jail to continued treatment, and one to three year recidivism data.

➢ Extend the Detox Continuum

Sonoma County has approximately 200 admissions per month to its detox program. Law enforcement officers can bring persons for short-term holds. Police agencies are charged $50 per admission; as a county facility the sheriff does not pay.

*The average stay is 3-5 days. According to the Detox Manager, the recommended stay would be 5-7 days given the issues that attend meth use.*

It is one of the few remaining social detox models in the state. Operating at lower cost than medical model centers it is, however, dependent on good access to a medical facility. But it can accommodate most individuals. Only around 10% of persons must be transferred to the hospital for care. And, there are always those few persons who are brought directly to the Jail for detox because of complicating issues of violence.

*Approximately 10% of persons who enter the detox center move on to a residential treatment bed.*

The detox center (30 beds) is more than that; it is a program. Persons who come to the detox facility have the opportunity to transition to a 30 day residential treatment program (30 beds), after which they can take advantage of a 6-month outpatient program. For those who do not avail themselves of this, exiting the facility often means an inevitable return.

*It is estimated that 60% of persons admitted to the Sonoma County Detox program have used the service in the past.*

It is a challenge in any community to address the issue of the social inebriate. The solution depends on access to good safe and sober housing and case management, at a minimum. But the sober living options that are available locally are independently run and not regulated. The Sonoma Task Force for the Homeless is taking on tough issues, and this is one point in the system that would benefit from some creative efforts.

*It is estimated that approximately 75% of Detox clients have, at some time, been booked into the Sonoma County Jail.*

## Sonoma County Corrections Master Plan

The Detox Manager recommends consideration of an incentive-based transition program. Detox clients who agreed to remain at the Detox facility for at least 72 hours would receive transport upon release back home or to available housing. Thinking in terms of incentive-based approaches to stabilization makes sense. For sustained change the other components need to be in place as well.

➢ Make Full Use of Existing Resources

Contracted services are in large part operating at full capacity. Mention has already been made of the untapped capacity in Drug Court.

Another program that could accommodate more individuals is California Human Development Corporation's (CHDC) Educational Sentencing Program (ESD). This program is available as a sentence condition/or sentence alternative. It will accept all misdemeanor and felony offenders sent by the courts. ESP describes itself as a 'life skills' program, but it addresses a broad range of issues, including addiction and anger. The program admitted less than 90 participants last year.

*AODS treatment providers (contracted and non-contracted) are, taken together, operating at approximately 80% of capacity.*

Some non-contracted services also report having untapped capacity; although the barrier for accessing these services can be an inability to pay.

➢ Review Client Fees

*Offenders pay $338 for a TASC assessment, and 25% must be paid before it is conducted.*

Client fee structures and policies should be reviewed on a periodic basis. Care must be taken that fees do not pose a barrier to assessment and treatment — especially for the higher risk client who pose a public safety risk.

*In the one-month TASC rejection study, 12% of clients were denied treatment because of outstanding money owed to TASC.*

This issue was not examined in any detail; but given the study findings a review is recommended.

➢ Continue the Movement from In-House to Contract Programs

In-house (county operated) alcohol and drug services cost more than contracted services. On the face of it, contracted residential treatment appears to cost less than half that of county operated services in Sonoma

Sonoma County Corrections Master Plan

County (although per-day contract costs can be less than that program's actual costs; and the financial health of contract programs can depend on attracting and retaining private clients.)

Some jurisdictions have retained in-house services to provide more subsidized care, to offer specialized services not readily available through contracts, or to manage what is considered a core group of services (detox services, for example).

The existing AODS delivery structure (with the county managing the principal detox service, and outpatient and residential provided both in-house and through contracts) reflects the evolution of alcohol and drug service management at the state and county level. The trend has been toward contracted services, making any new services contract based. This makes sense.

The question is whether the county should consider shifting remaining in-house services to contract-based services, as well. Issues to consider include cost, service quality, and client access.

➢ Strengthen <u>System</u> Factors Associated with 'What Works' Research

Criminal Justice treatment programs work with a population that has complex and often long-standing issues. Because of this, programs must adopt those practices proven to improve outcomes and reduce re-offending. This means making the most of research, and addressing system issues necessary to support positive program outcomes. These include:

- Comprehensive Front-End Screening
- Integrated Information Systems
- Expedited Case Resolution
- A Continuum of Quality Treatment
- A Continuum of Support Services
- A Continuum of Sanctions
- Quality Supervision and Case Management
- One Empty Bed in Jail for Immediate Sanction

➢ Strengthen <u>Program</u> Factors Associated with 'What Works'

The research on program effectiveness is at a stage that programs can be designed and delivered according to proven principles regarding 'what works'. Program reductions in recidivism range from an average 10% reduction to a high of 30%. But poorly designed or delivered programs can actually increase recidivism.

Sonoma County Corrections Master Plan

Sonoma County programs do not uniformly track recidivism rates, and we recommend this, but discharge and type of completion is collected for report to the State. We requested one-year data for three program categories: Drug Court, SACPA, and TASC referrals.

Sonoma County AODS Total Discharges
(Feb.2006 to Feb. 2007)

|  | # Discharged | % |
|---|---|---|
| Drug Court | 78 | 6% |
| SACPA | 628 | 50 |
| TASC | 547 | 44 |
| Overall[21] | 1,253 | 100% |

The discharge numbers show that the Drug Court numbers are dwarfed by the large number of individuals coming through the system on 1210 status (SACPA) or through TASC programs, the later of which are primarily residential.

Sonoma County AODS Discharge Type
(Feb.2006 to Feb. 2007)

|  | Completed[22] | Incarcerated |
|---|---|---|
| Drug Court | 51% | 23% |
| SACPA | 43 | 40% |
| TASC | 30 | 21% |
| Overall | 38% | 30% |

N= 1,257
Note: Other discharge types are 'left before complete' (with satisfactory progress or unsatisfactory progress), and 'death'.

Not only does the Drug Court produce better results, in terms of completion rates, but the impact on the jail is less.

### Factor Criminal Risk into Case Management

Identifying the higher risk offender can help target treatment resources, but it can be used in other ways as well. Risk information can also be used to design different levels of sanctions; deliver varying levels of case management intensity; varying lengths of treatment; and different lengths

---

[21] Overall Discharge number does not include small number of Starting Point discharges.
[22] Discharge data is also broken out by those who Left Before Completion with Satisfactory/Unsatisfactory progress. 45% of all clients in these three AODS groupings met this.

Sonoma County Corrections Master Plan

of aftercare. This can improve outcomes and help make the most efficient use of existing resources.

Certainly, TASC case managers are stretched thin now trying to provide quality case management and aftercare services for everyone. At caseloads of 60 or more there is little time for more than one check-in per month in Aftercare for many offenders. The question is whether this low level of intensity can be expected to make a difference. Making distinctions based on risk would allow case managers, like probation officers, to concentrate resources on those who pose the greatest risk. This might mean making some decisions to provide aftercare for lower risk clients in a different manner: group aftercare, for example.

*In March 2007 TASC had 405 open cases, almost evenly split between clients in treatment programs and those being case managed in an Aftercare phase.*

In the interest of cost, group aftercare should be considered as well. Moreover, the benefit of making aftercare a continuation of the treatment program should be considered. That TASC does not have substantive contact with the client during treatment (they do monitor the client's progress) may not foster the continuity of relationship that can be important to success.

### Strengthen the Supervision/Treatment Team

*Probation Officers rate TASC services as Crucial.*

Neither treatment nor supervision alone produces good outcomes. For this reason having a strong collaboration between the two is essential. Sonoma County is ahead of the game by having TASC case management services that can supplement their efforts. A common case plan and a commitment on both sides to keep good communication can yield good results.

### Ensure Minimum 90 days Treatment

Research has shown that treatment must be at least 90 days to have any long-term effect on recidivism reduction. Most of the Sonoma County treatment programs are achieving a reasonable time in treatment.

*Most outpatient and residential treatment in the County is designed as phased treatment, intended to last at least 6 months.*

The county does have a 31-day residential treatment program, and the challenge here is to ensure that all clients exit the program with a plan for treatment continuation. The program is well aware of this and has a phase II of its program that involves 6 months of outpatient. The problem is

### Sonoma County Corrections Master Plan

that, without a court order to comply, there is often little incentive to continue.

Program duration is directly associated with outcomes. Although there are many factors that affect program outcomes (population served, the ability to sanction, etc.) program length is an important factor.

*Drug Court participants remain in treatment an average 24 days longer than SACPA clients.*

Short-term treatment should be offered as a first phase of an overall plan that strives for 6-9 months of treatment.

### Expedite Entry into Treatment

*The average time to wait for a TASC assessment is 2 weeks or longer.*

Long waits for assessment impact the jail and can have a detrimental affect on treatment. Closing this gap is addressed by having a better front-end information collection (reducing redundant data collection and pre-screening offenders); by expediting case processing in general (the TASC assessment timeline conforms to that of the PSI); and, in adding more assessment resource.

*The average wait for entry into outpatient treatment is 3-7 days; the average time to entry into residential treatment is 6-8 weeks.*

### Treatment Continuity

Participants in the in-custody alcohol and drug treatment program should *not* be moved back into general jail population at the end of the program.

*Not all inmates who exit jail after participating in the Starting Point program leave to continued treatment.*

There should be a mechanism to move successful participants from the jail treatment program to either a community residential or outpatient program in a step-down fashion.

### Cognitive Curricula

Research has shown that a cognitive-behavioral approach is fundamental to sustained reductions in recidivism. This approach addresses the thinking errors and rationalizations related to criminal activity, helps the person identify 'triggers' for relapse or criminal behavior, and works to develop individual strategies for change. It is based in role-playing and activities that help the person practice new behavior. This is in contrast to

### Sonoma County Corrections Master Plan

programs that simply provide information, are grounded in 'talk therapy, are designed to boost self-esteem, or that focus primarily or exclusively on environmental deficiencies (jobs, housing, etc.)

*The majority of Sonoma County programs surveyed indicated they are cognitive based.*

Where possible, program curriculum should be shared. Making use of the same cognitive skills  curriculum across programs (one designed to specifically address criminal risk factors, for example), would provide continuity of treatment for offenders moving between programs, and offers a common language for treatment providers, probation officers, and offenders alike.

Some programs have been designed specifically for offenders and are worth reviewing. The Starting Point program is using one such program. Others that have been researched and proven effective include the MRT program, and a public domain cognitive program developed by the National Institute of Corrections (NIC).

### Sanction Policies

Treatment programs are attuned to the need to provide incentives as well as sanctions, and all programs (and probation officers) were able to articulate a list of positive reinforcements used.

*Probation Officers had a wide range of responses to the question of whether treatment programs provided consistent responses to violations.*

The diversity of probation officer responses reflected program variability. Treatment providers noted diverse sanction strategies for first, second and third violations, ranging from warnings to program discharge for first violations. In part, this may reflect the different populations served in these programs. But it is worth more review.

In addition, programs most often noted a 2:1 ratio of sanctions to rewards. Criminal outcome research shows (as is the case in Drug Courts), the value of a higher ratio of rewards to punishments.

*There was interest among a good percentage of Probation Officers to strengthen the communication between themselves and the treatment community.*

### Specialized Services

Specialized services are often hard to deliver within a system already stretched thin. Sonoma County can therefore be proud of its

## Sonoma County Corrections Master Plan

accomplishments in providing a higher level of specialized offender services than many county criminal justice systems.   These include:

- ❖ Specialized Probation Caseloads
- ❖ Dedicated Latino treatment
- ❖ Female-specific and Prenatal Treatment
- ❖ Domestic Violence Court
- ❖ Specialized DA Resources
- ❖ Vertical Prosecution

Female Offenders
Good work has been done in offering services tailored for particular populations.

*Probation Officers rated the availability of services for Female offenders as Average or Above Average.*

In Sonoma County, 15% of the Jail population is female.  This reflects a national trend in increased numbers of female offenders incarcerated.  The most recent national figures show that, while mid-year jail populations grew 2.8% from 2005 to 2006, the growth rate for females was almost two times as high

Sonoma County has a good start on addressing female specific issue. It has respected programs like Athena House and DAAC's Prenatal Treatment program.

The field is increasingly devoting attention to specialized assessment and services for female offenders.  Most existing services have not paid enough attention to how to tailor their approaches.  A start is simply to ensure that all programs provide the opportunity for female only sessions, as part of the larger curricula.  Programs and probation offices that offer females an opportunity to form a safe support group report good outcomes.

Spanish-Language Services

A significant issue for Sonoma County is the provision of services for the Latino population.  The need is real across all levels of the system.

The PSI unit struggles with the need for interpreters; TASC has one Spanish speaking staff; and SACPA has one Intake worker and one counselor who speak Spanish.  There is limited treatment available for Spanish-speaking individuals, and this can lead to, what one probation officer termed 'cookie cutter' services. Spanish speaking domestic violence offenders have access to a bilingual treatment program.

*Probation Officers surveyed in Sonoma County rated the availability of services for Spanish-speaking offenders as Average to Below Average.*

Sonoma County must continue to plan for Spanish-based services population: 40% of births in the County are now Latino.

<u>Domestic Violence</u>

Sonoma County has made a tremendous commitment to domestic violence (DV) services through its specialty court, its specialized DV probation caseload (9 staff), and well integrated victim services.

*Domestic Violence offenders have court reviews at 30 days or 45 days, and then again at 60 days and 90 days. Those with problems can continue to be seen by the courts every month.*

The probation officers do not have a PSI on all domestic violence cases assigned to them, but they are required to do a Lethality Assessment on each case. Sonoma stands out in terms of the level of supervision it provides this population.

*Sonoma Count's Probation Department is tracking 797 DV cases (some of which are on warrant status).*

Although California statutes do not require formal probation for all domestic violence cases, , the local policy is to begin cases with this level of supervision. Three probation officers supervise intensive caseloads of 45-60 individuals each. Other officers who handle 'office' or 'bank' caseloads have 160 to 400 cases respectively.

*Sonoma County reports a higher DV program completion (59%) rate than the state average (54%).[23]*

The County has five DV providers with whom it works. Each program has a different way of doing business, and different approaches to communicating information.

Overall, the system would be well served by more centralized tracking of program data: admissions, missed meetings and other violations, and program completion information.

<u>Risk-Based Services</u>
In terms of specializing services, one overlooked area is the separation of treatment populations by risk level. Yet, the literature on 'what works'

---

[23] California State Auditor Report, 2005-130, "Statistics and Information on the Monitoring of Batterer Intervention Programs: as Provided by 58 County Probation Departments."

### Sonoma County Corrections Master Plan

argues for not mixing high and low risk offenders in the same treatment groups. Low risk offenders are especially impacted, with evidence of higher than expected recidivism rates for low risk offenders who are mixed with high risk offenders. While this may be ideal, it is a tall order for most jurisdictions doing the best they can to serve a diverse population.

➢ Advocate for Improvements to SACPA

SACPA has proven to be an effective program and deserves support. The research conducted for the State on Proposition 36 supports continued funding. These findings[24] include the following:

- Reduced incarceration costs (Jail costs were, at 30 months after program participation, 41% lower for those who completed the program versus those who never entered.)
- Reduced system costs ($4 saved for every $1 spent for completers)
- Improved client outcomes

Sonoma County performs favorably when compared to other counties on measures such as reported completion rates, which at 40%, is higher than the state average. This is undoubtedly a reflection of reported high levels of system collaboration, a reported willingness to work with higher risk cases, a drug court reporting model, access to residential treatment, and an attempt to provide real consequences for non-compliance.

The importance of providing substantive services is evident when one considers that, although Prop. 36 was meant to target the lower risk population, roughly half of those who entered the Sonoma County program when it started had at least 15-20 years of serious substance abuse.

Although we applaud the effort to divert more cases from a custody track, there is room for improvement. We recommend that the state/county discussion on reform include the following elements:

> ➢ <u>Make Use of Jail Sanctions</u>: Jail sanctions should be an integral part of the program in order to hold defendants accountable and improve outcomes. In Sonoma County the Drug Court program, which employs jail sanctions has, we are told, half the recidivism rate of the SACPA participants. It is striking that these two approaches to offender management co-exist. Jail sanctions do not need to be lengthy to be effective, and we advocate short, 2-3 day sanctions designed to send a message to the participant without interrupting employment. Of course, jail sanctions should be the last resort on a full continuum of

---

[24] UCLA, April 5, 2006, "SACPA Cost Analysis."

### Sonoma County Corrections Master Plan

graduated sanctions. Other sanctions, such as a dedicated Work Crew program, should be explored at the local level.

➢ Expand Eligibility: Although Proposition 36 is targeted at the non-violent first or second drug-using offender, the reality is that the actual population being served is more serious than anticipated: half have a criminal history and half have 15-20 years of alcohol and drug use. At the same time we need to make sure that treatment resources are being directed at the most serious offender. This includes all property offenders and those involved with drug sales.

➢ Incorporate Criminal Risk: Research makes the case that the most intensive resources should be reserved for the highest risk cases; and that the greatest reductions in recidivism can be achieved by targeting the higher risk criminal defendant. The Probation Department is currently receiving training on a new criminal risk tool; the use of this instrument should be used to inform the allocation of treatment resources. This is consistent with best practices.

➢ Best Practices: We recommend that attention be given to other best practices that are associated with lower recidivism: early entry into treatment (the County has taken steps to provide waiting groups); sufficient length of time in treatment (the State should mandate a therapeutic *minimum*); continuity of care; and specialized services. And, across the continuum of services, the more intensive services, such as Drug Court, should be used for the more serious offender.

➢ Jail Treatment : As part of the reform measure we encourage the use of jail treatment for a small group of offenders who need a more intensive stabilization phase, and would be well served by a jail program such as the one available in Sonoma County. Presently, this local resource is not used for the SACPA population.

➢ Data Collection: At the State level we recommend standardization in how jurisdictions define completion or 'satisfactory progress,' in order to achieve greater consistency in reporting. The State should also refine data collection so better distinctions can be made between drug possession and sales. At the County level we will be looking at the kind of data that is collected and making specific recommendations.

➢ Address Issue of Incentives: While SACPA has tremendously increased the number of treatment admissions, both statewide

### Sonoma County Corrections Master Plan

and locally, not everyone who is eligible is taking advantage of this. The truth is that, for some defendants, a 30-day jail sentence does not offer enough incentive to enter a more lengthy treatment program. For some, the program needs more 'teeth.'

➢ Reward Success: State funds are allocated to counties according to a formula that takes population, caseload and arrests into account. We would encourage a formula that also rewards counties for positive performance, as a means to encourage improvement. Sonoma County should fare well under such a system.

The other very real issue is with a state commitment to adequate levels of funding. The estimated amount needed statewide by the California Association of Alcohol and Drug Directors, is roughly two times that originally proposed by the Governor earlier this year. The level of funding to provide quality services, sanctions, and follow-up should continue to be debated.

➢ Expand Population Served in Mental Health Court

*Probation Officers gave the lowest marks for treatment availability for dual-diagnosis treatment.*

The County is challenged by the eventual loss of Sutter (Sonoma County has one of the only free-standing psychiatric units in the state), and the inpatient psychiatric unit, as well as funding shortfalls: a funding system that does not keep pace with program growth and inflation. Mental Health Service Act dollars have helped in part to address unmet needs, but these funds cannot be used to supplant existing services.

The FACT program has in the past been shown to produce good outcomes in terms of improved quality of life and reduced impact on the jail and health systems. This 24/7 program, with its investment in a team approach to case management, is one end of the therapeutic spectrum found in criminal justice programs. The Sonoma County approach, by using a mental health court model, has the framework in place to eventually address a population who needs less intensive services.

That this model can also be effective has been demonstrated by recent evaluations. One such review was conducted for the MH Court in Provo, Utah, noteworthy because of the nature of the cases accepted for participation: more than 2/3 of the mental health court participants are seriously mentally ill. Persons are only excluded for personality or psychopathic disorders, and for alcohol related dementia. Still, outcome

### Sonoma County Corrections Master Plan

data shows that participants (even without intensive case management) had more than a three-fold drop in jail days, comparing one-year prior to program involvement with time since program completion or termination.[25]

*The FACT program targets individuals with Serious and Persistent Mental Illness (SPMI) who have an AXIS I diagnosis, a history of repeat bookings into the Jail, a misdemeanor charge (and less serious felony charges), are sentenced to probation, and volunteer to participate.*

Given the successful record of the FACT team in Sonoma County, the question is whether the existing court structure can also be used to serve a less seriously ill population.  A less intensive track would be one way to address the need.  The fact that Probation has a specialized mental health caseload positions the county well to consider how to intensify services for this population.    And, the issue of risk comes into play as well: How do the populations served by FACT and on the Probation Mental Health caseload compare?  Again, the goal should be, where appropriate, the assignment of the higher criminal risk, as well as higher need, defendant to the more intensive services.

Sonoma County Probation is also dealing with some complex mental health cases: offenders who have supervision conditions that at times cannot be satisfied because of a lack of services.

There is much to be done to address this issue. Sonoma County has some excellent services in place on which to build.

### Provide Extended Jail Discharge Planning

*"It is the middle group we don't serve well: those whose problems are not yet severe enough to get them public medical benefits, but too severe to be served by many services." (Sonoma County Discharge planner)*

Sonoma County has developed discharge planning for the mentally ill exiting jail. The key to good planning is coordinated case planning, and this county has a strong history of interagency work.

Model discharge planning addresses factors necessary for community stability upon release: case management, treatment, housing, and medication.  The gold standard comes out of a class action lawsuit in New York City several years ago (Brad H. case) that was brought on behalf of the seriously mentally ill in that city's jails. The court ruling, in support of the incarcerated mentally ill, was sweeping in its remedy.

---

[25] Wastach County Mental Health, Mental Health Court outcome report.

### Sonoma County Corrections Master Plan

At minimum, discharge planning depends upon an assigned staff person stationed in the jail, who can act as a liaison between the inmate and the larger system to coordinate appropriate care upon release.

*19% of misdemeanants and 21% of felons booked into the Sonoma County Jail had 10 or more prior bookings*

Stabilizing the mentally ill upon release is a humane and responsible gesture, and it can also serve to reduce repeat bookings. A small group, usually with low-level charges, is responsible for a high number of release/re-arrests.

One of the challenges in discharge planning, not unique to this county, is that Medicaid/Medi-Cal cannot be billed for inmates in jail; benefits are terminated upon incarceration, and in-custody mental health services are not billable. Some states have addressed this (Oregon is one) by working with the legislature to pass laws requiring that benefits be suspended (not terminated) when in jail.

Another challenge is providing extended coverage after discharge for those persons who do not have access to public benefits. If a defendant in Sonoma County has SSI it is fairly easy to locate clean and sober or supported housing. But those without SSI may wait up to 9 months before being placed.

Despite all these issues, Sonoma County has done a good job of establishing a good discharge planning program.

*The Sonoma County Discharge Planning program served roughly 500 persons over its first two years.*

As with any re-entry planning, on-going case management for the more chronic cases is essential to long term success. The program could identify a sub-population of underserved, higher need/higher risk individuals who could be targeted for continued case management. While the new county outreach effort (the Community Intervention Program) helps fill this gap, specific and on-going services for the discharge population should be pursued.

Just as with all other services in the criminal justice system, resources must be stretched by building tiers of services based on risk and need.

### Expand Dual Diagnosis Treatment

Sonoma County substance abuse treatment providers are serving a population with mental health issues.

## Sonoma County Corrections Master Plan

*Sonoma County outpatient treatment providers (with the lower levels reported by Drug Court and CHD) reported that, on average, 15% of clients were taking psychotropic medications.*

The percentage of clients in local residential who are on psychotropic medication is higher, estimated to range from 30% to 50%.

The County has made an important and recent improvement to substance abuse treatment with the access to psychiatric services, through Mental Health Service Act funds (Prop. 63). But treatment resources are limited. The County has some dual-diagnosis substance abuse treatment slots, TASC will provide case management for some low-level cases, and there are a handful of residential treatment beds.

Continued efforts in this area should be pursued, with the hire of more staff with mental health expertise.

As in most jurisdictions, there is more to be done at both the local and state level when it comes to mental health services. NAMI, the national advocacy group for the mentally ill gave the state of California a C grade in 2006. [26] It applauds it for its commitment, through the Mental Health Services Act, to provide a stable source of funding for mental health services; gives praise for moving in the direction of evidence based practices, such as the adoption by some counties of the federal Assertive Community Treatment (ACT) model; and encourages the move toward the development of more supported employment — to name a few.

Sonoma County has laid a good foundation on which to build.

### Improve Mental Health and AODS Coordination

Sonoma County is not alone in the lack of fully integrated mental health and alcohol and drug services. The issues at hand are real and involve separate information systems, separate funding streams, and separate programs and approaches. But Sonoma County has proven to be successful in finding ways to work across agencies to address mental health issues common to them all. This is a tribute to all involved. A few examples of county cross-agency efforts include:

- ❖ Jail Liaison/Probation Officer
- ❖ Jail Mental Discharge Planner
- ❖ Psychologist in Jail to address 1370 issues
- ❖ FACT Interagency Model
- ❖ Psychiatric Resources for AODS (new)

---

[26] NAMI Grading the States, 2006, "A Report on America's Health Care System for Serious Mental Illness."

### Sonoma County Corrections Master Plan

❖ Multi-agency MH Review Team (MHRT)
❖ Law Enforcement Crisis Intervention Training (CIT)

Outstanding issues remain. One relates to Information Access. The need to protect individual information and conform to HIPPA regulations has also created barriers for information exchange. This can frustrate the efforts of criminal justice players who need access to information to make informed decisions at each stage of case processing. The ability to identify active mental health clients affects decisions regarding quick pre-trial release, swift access to diversion programs, and continuity of care. This issue should be revisited as part of the discussion about establishing Pre-Trial intake services.

Another issue has to do with bifurcated funding. Many residential treatment providers won't accept the mentally ill unless they have a written prescription for medication. But AODS cannot use their funds for medications. The process for mental health review of these cases should be examined, and consideration given to a dedicated fund to address dual-diagnosis clients in these circumstances.

➢ Review Supervision of Low-Level Offenders

Sonoma County's Probation Department is ahead of the curve in California. It has developed a good array of specialized services. Specialized caseloads are in place for domestic violence, drug court, sex offenders, mentally ill, and gangs. All violent cases are assigned to intensive supervision caseloads (ISP) which can serve a broad mix of persons.

A commitment has also been made to maintain smaller caseloads, reallocating the workload to achieve more manageable intensive caseloads. Intensive/specialized caseloads average 60-70 persons; medium caseloads are at 160; and case-bank caseloads are 450-500. Although these are still large numbers (the American Probation and Parole Associate has recently recommended that intensive caseloads be in the 30-35 person range), the lower caseload numbers are still good by California standards.

At the same time, the Jail is impacted by the failures (new crimes) of those offenders on informal supervision.

*In the case processing sample, 31% of felony defendants and 35% of misdemeanants were on probation at the time of booking into jail.*

The rate of probation involvement for Sonoma County defendants at booking is high. Nationally, 15% of felony defendants are on probation at the time of booking.

### Sonoma County Corrections Master Plan

*Only 10% of the misdemeanants and 18% of the felons on probation supervision at the time of booking were being supervised on a formal caseload.*

The fact that the population rearrested on new charges was, for the most part, not on formal probation raises questions about the length of supervision (offenders kept on informal supervision for long periods have an impact on the jail and system resources), and the level of supervision and services needed.

The new risk assessment tool can be an applied to this population for purposes of analysis. It may be that there is an identifiable higher risk sub-group for whom maintenance at a higher level of supervision and services may be warranted.

Sonoma County Corrections Master Plan

# V. Information Systems

➢ Maintain the Integrated Court and County Information System

The data contained in this report was produced with programming from ISD. It was made possible by the integration of the information systems between the Sheriff and the Court.

While it is understood that the Court has decided that it is important to standardize court information systems in each county throughout the state, it is critical that the new system continues to communicate with Sonoma County's system. It is crucial to have regular data about defendant processing as well as jail population issues. This kind of data supports jail management, system efficiency, defendant processing, and planning. The systems can't be looked at independently; the linkage is too important.

This goal is important both for daily input of information—as a clerk sets a court date for an in-custody defendant that the date shows up in the jail's system — as well as for producing management reports, such as displayed in this report and presented at the symposium.

It is recommended that the Court continue to work with the County to continue this important partnership.

➢ Integrate Mental Health and AODS Data

The lack of integrated mental health and AODS data causes inefficiencies, delays program placement, and can diminish continuity of care. To the extent allowable by privacy laws (HIPPA rules have been relaxed in some places to allow limited but shared access within criminal justice systems) information should be available to support quality system responses.

➢ Improve Information Sharing

Delays in the transfer of information can have negative repercussions, impacting system efficiency and service effectiveness. This is the case when the Pre-Trial supervision unit must wait days for court information; when the PSI unit does not receive immediate notice of cases in need of attention; and when TASC does not receive notification of referrals. In the case of TASC, there are times when a defendant languishes in jail because program staff is not aware that the court has referred a case. It often takes receiving a letter from the inmate to be aware of the referral. Improved information sharing serves the whole system.

Access to information can be another barrier to quick action. TASC workers noted that often they are reviewing the PSI at the time of

### Sonoma County Corrections Master Plan

sentencing; do not have access to Probation's automated files; lack good access to automated information regarding defendant treatment history (requiring a reliance on self-report information); and don't have easy access to jail files. Whether some of this information could be made available, within the limits of confidentiality laws and rules, should be reviewed.

➢ Establish Routine Data Reports

The Criminal Justice System should routinely track summary data from each component of the system. This summary information, provided on a quarterly basis, will allow the on-going assessment of system workload, trends, and outcomes.

The information presented in this Report provides baseline data for the Jail and the system. Routine review of this kind of information is recommended to track changes in population make-up, demands on the system, and improvements in case processing efficiency.

➢ Establish Evaluation Protocol

The measurement of system efficiency must be coupled with the tracking of system and program outcomes. Any data collection protocol should be simple but substantive; and the data should be reviewed on a regular basis. Some of this data is already collected, some is not. The types of data to collect are noted below:

Process Data
Tracking program admissions and discharges is the most common type of process data. We suggest that this be enhanced by additional types of information. Some information, such as 'no show' rates, can be instructive: For example, the 30% no show rate for CHDC's ADS program is thought to be related to the fact that the mailing address on the citation is often wrong. This raises the question of how to improve front-end information collection and verification.

For a Drug Court program the 'reason not admitted' can point out other issues that need to be addressed. A review of this information in one jurisdiction revealed, for example, that those offenders who turned down the drug court option often lived outside of the main town and had transportation issues. The program is now working to set up a satellite drug court program in that area of the county.

At a minimum, the following information should be available for each program.

Sonoma County Corrections Master Plan

- Number Referred
- Referral Source (including number direct from Jail)
- Number Show/No Show
- Number Admitted
- Number Not Admitted or Who Choose Not to Opt In (and reason)
- Percent Successfully Complete/Unsuccessful (and reason)
- Exit Type: whether continued in treatment and, if yes, the type
- Average Length of Stay in Program (all admits; graduates; not graduate)
- Amount of Restitution Collected/% of Restitution Ordered that is collected
- Fees collected
- For those in Outpatient Treatment, number in residential treatment

Profile Data
At a minimum the program should collect the following information. Some of this information is already required by the state and there are protocols for how it is broken out that goes beyond what is listed here.

The collection of substance abuse severity scores (ASI) and other indicators should be tracked at entry and exit from the program.

- Age, Gender, Race/Ethnicity/Marital Status/Residence Status/Employment Status
- Legal Status: pre-file, post-file not sentenced, sentenced
- Most Serious Charge/Conviction
- Charge or Conviction Level: Felony or Misdemeanor
- Criminal Risk Score
- Substance Abuse Severity Score
- Primary drug of choice
- Mental Health Diagnosis
- Mental Health Case Manager: yes/no
- Probation Status: Yes/No
- Participated in Starting Point program: if yes, length of stay
- Dependent Children: yes/no (If yes, age and place of residence)

Principles of Program Effectiveness
The most common form of study simply measures recidivism without also addressing program delivery or quality. Because research can now link certain program characteristics with positive outcomes it is imperative to review and track this information as well. In this way, outcome data can be analyzed in the context of program performance.

The importance of an objective assessment instrument is fundamental. Where valid, we recommend periodic validation of these instruments. But how these instruments are used should also be periodically reviewed. Are

the instruments being used as designed? One study of a risk assessment instrument in use at a Probation Department found that staff had been using so many over-rides that the tool had no significance. There should also be a review of the consistent application of the tool: do the users tend to arrive at the same conclusions?

Program characteristics to monitor through a quality control program include:

- Use of objective assessment instrument
- ASAM/ASI score
- Clinical supervision
- Staff turn-over
- Program Intensity
- Program Duration
- Individualized Treatment Plans
- Address Criminal Thinking
- Address Support Issues (job search, housing, etc.)
- Use of cognitive curricula
- Fair and Consistent Use of rewards/punishments
- Type and Frequency of Staff Training
- Client feedback on issues of quality of services, fairness, respect, etc.

### System Impact Data
Few programs collect data regarding how non-compliance impacts the jail. This is important information for any final cost-benefit analysis.

- Number of Jail days used during program as a sanction (by graduates; no graduate but progress; terminate.
- Number of Jail days served by clients terminated

### Outcome Data
Program outcome data needs to be tracked for several years in order to make a determination about the program.

Comparing outcome data by matched groups (matched on offense, risk, and profile) should also be made part of the ongoing analysis. One approach is to compare program graduates with those who were eligible but not admitted/did not opt – in/or dropped out. Where possible, an attempt should be made to document the level of treatment (if any) received by the comparison groups.

Pre and post test comparisons are another approach, measuring certain indicators (bookings, arrests, convictions, jail days, hospital admissions, etc.) pre and post program participation.

- New Arrests/New Convictions: at 1 year; 18 months; 2 years; 3 years (sex offenders outcomes should be tracked for 5 years)
- New Arrests/New Convictions by: graduates; no graduate by progress; unsuccessful terminate.
- New Arrests/New Convictions by length of time in program
- New Arrests/New Convictions by: felony drug; felony non-drug; misdemeanor.
- Percentage of drug-free babies born during program

Cost Data
Program cost information should address the following:
- Total cost
- Per day cost
- Average Cost per treatment episode


Conclusion

This Report contains many recommendations, which, if implemented, will go a long way toward managing the Jail population. Some of the recommendations require a real investment in both time and money, but can be viewed as a 'pay me now or pay me later' proposition. This is because the implementation of these recommendations will result in the more efficient management of existing resources, thereby delaying the day when the county again needs to start planning to build more jail beds. Taken together, these measures form a strategic Corrections Master Plan for Sonoma County.