# Sonoma County
# Corrections Master Plan

# Chapter Six
# Jail Reduction Strategies

# *Chapter Six*
# **Jail Reduction Strategies**

# **Table of Contents**

I. Introduction ................................................................. 3

II. Developing an Early Case Resolution
Program ......................................................................... 8

III. Establishing Comprehensive Pre-Trial
Services ........................................................................ 10

IV. Planning a Community Corrections Center ...... 13

V.  Applying Evidence Based Practices ................... 16

VI. Continued Expansion of Drug Court ................ 20

VII. Conclusion ............................................................ 21

# *Chapter Six*
# Jail Reduction Strategies

This chapter highlights some of the key recommendations for adoption as part of a Corrections Master Plan, and provides examples of how these changes might be expected to impact the jail and the criminal justice system. The goal is to demonstrate the value of key recommendations in managing the jail population, and to illustrate the potential of individual and incremental change.

It should be noted that any calculation of jail bed savings is a somewhat theoretical exercise. In a system as complex and dynamic as the criminal justice system, efforts to reduce the impact on the jail do not necessarily correspond to immediate vacant beds or savings in expenditures. However, over time, improved system efficiency, the availability of more jail alternatives, and increased effectiveness can, taken together, significantly reduce pressures on a detention facility and result in long-term savings.

Over time, the collective impact of progressive system initiatives should allow a county to plan lower on the forecast continuum. Mitigation examples, such as those presented in this chapter, are helpful in demonstrating the relative impact of different approaches.

This Chapter presents examples of how changes in system efficiency, program effectiveness, and the availability of detention alternatives can have a positive impact the Jail, focusing on the following recommendations: development of an Early Case Resolution program; establishment of comprehensive Pre-Trial Services; planning for a Community Corrections Center; the application of Evidence-Based Practices; and the continued expansion of Drug Court.

## I. Introduction

The factors that impact the jail are complex, and overcrowding is a symptom of the policies and practices of the larger system. The increasing demands upon jails has been driven more by policy choices than crime rates.

Policy choices drive demand. Planners working several decades ago would not have foreseen the policy shifts that have fueled the growth in incarceration: the clamp-down on drunk-driving, the adoption of mandatory arrest policies for domestic violence, the 'get tough' approach to drug crimes, and the crack cocaine and then the methamphetamine

epidemic. Nor could they have anticipated the expansion of mandatory minimum policies, the adoption of three-strikes-laws, the restriction of judicial discretion, or the affect on jails of the deinstitutionalization of the mentally ill.

Sonoma County has been impacted by these policy shifts, as well as others unique to California: Proposition 36, for example.

Because the factors that impact the jail are complex, a 'systems approach' to jail management must be adopted. To best respond to changing circumstances counties must have good data, proven management tools, and the flexibility to make modifications as conditions dictate.

In the end, the key to responding to changing system dynamics is a strategic Jail Master Plan. This includes short-term strategies for implementing and fine-tuning system changes, and longer-term strategies for building additional detention and program capacity.

Jail Mitigation Strategies

The jail population is a function of two factors: the *number of admissions* and the *length of stay*. Factors that influence the number of admissions to jail include: county population, availability of pre-booking alternatives, pre-trial failure rate, supervision violation rate, and program effectiveness. The number of police officers on the street also significantly impacts the number of jail admissions. Recommendations advanced for reducing local jail admissions include:

Reduce Jail Admissions

- Establish comprehensive 24/7 Pre-Trial Services Program: effective front-end assessment, bail review along with monitoring, tracking and supervision to reduce pre-trial failure

- Implement procedures associated with reducing pre-trial FTA rate

- Implement supervision procedures associated with reducing re-arrest rate

- Develop Day Reporting Center

- Increase use of the issuance of citations in lieu of booking

- Expand Drug Court

- Develop expanded diversion options for mentally ill including a receiving center

- Strengthen Jail Discharge Planning to reduce the revolving door

- Improve program effectiveness with use of validated risk instruments

- Improve program effectiveness by targeting higher risk offenders

- Improve program effectiveness with more Intensive Outpatient treatment

- Improve program effectiveness by improving joint case planning

- Improve program effectiveness by developing Centralized Intake model

Factors that affect the length of stay in jail include: the availability of pre-trial release options, case processing times, and sentence alternatives. Recommendations for reducing length of stay in the local jail include:

### Reduce Time in Custody

- Establish Comprehensive 24/7 Pre-Trial Services Program: Early Screening and subsequent routine jail population review to expedite release

- Reduce time to pre-trial release

- Reduce pre-trial re-arrest rate

- Institute Early Case Resolution Program

- Commit judicial resources to ensure stability in front-end decision-making, including one or two courts to handle all cases

- Ensure early appointment of counsel

- Establish routine bail review of in-custody pre-trial population

- Provide early pre-trial identification of diversion candidates

- Increase simultaneous resolution of 'holds' and new charges

- Review policy for ICE holds

- Streamline Pre-sentence Investigation

- Reassess Inmates in Residential Treatment for step-down to Intensive Outpatient

- Assess all Inmates for Jail Step-Down options

- Plan a Community Corrections Center

Criminal justice system efficiencies and improvements will reduce demand on the jail. However, because jails are complex and dynamic systems, the impact of a single system modification is difficult to quantify. Moreover, while a county can moderate its jail population growth by making changes, these improvements can be undermined by shifts in policies and practices over which it has no control.

For example, the sudden employment of more police officers, or a new state 'zero tolerance' policy for probation violators can reverse gains in holding down jail population growth. Conversely, new policies (such as Prop.36), can also render jail forecasts unreliable.

Jail forecasting is also not sensitive to the interactive factors of a complex system. For example, a successful strategy for reducing the number of offenders on abscond status can swell caseload size and negatively impact the jail. Likewise, an Early Case Resolution program would be expected to significantly reduce the length of time to disposition for target offenses.

No model is sensitive enough to quantify the effect of a single system change, let alone predict the interactive effects of multiple shifts in policy and practice.

> "Many programs that have become integral parts of the local criminal justice systems, such as those involving release on recognizance, diversion, and community service, were initially designed to reduce jail populations. In many instances, jurisdictions assumed that program implementation would solve the problem of crowding and that specific programs would serve as panaceas to deflate population pressures. Local research and experience, however, have revealed the complexity of the jail crowding problem and the futility of expecting one program or process to eliminate the phenomenon of rising jail populations and crowded cells. Long-term success requires time, patience, and the attention of the entire criminal justice community. (BJA, "A Second Look at Alleviating Jail Crowding" [1])

Because of the shifting nature of system policies, the influence of subjective decision-making within the criminal justice system, and the unpredictable nature of changes in state practices, our recommendations focus on developing a broad range of local jail population management strategies. These include: Pre-Trial Services, an Early Case Processing (ECR) program; a continuum of alternative programs and facilities, strong diversion and sentencing options; evidence based practices, and the capacity for comprehensive data collection and analysis. Taken together,

---

[1] BJA, "A Second Look at Alleviating Jail Crowding," 2000, U.S. Dept. of Justice

these management tools assist a jurisdiction in making optimal use of its jail beds.

While it is difficult to predict with any certainty how single changes will impact a county, we can look at the experience of other jurisdictions in an effort to make inferences about the effect of several key recommendations.

## II. Developing an Early Case Resolution Program

An Early Case Resolution (ECR) Program results in increased system efficiency and helps reduce jail crowding. It is a central management tool for the criminal justice system. The program involves early case screening and timely case resolution. And, it depends on the availability of timely and accurate information on each case, information best supplied by a Pre-Trial Services Program.

The benefits of an ECR Program are many and include:

- Relieves Crowded Dockets
- Reduces Case Processing Times
- Reduces Number of Pre-trial Defendants
- Reduces Average Length of Stay
- Frees up More Time for More Serious Cases
- Reduces Jail Impact

Impact on Jail

An ECR Program results in jail bed day savings through the timely resolution of cases.    Significant reductions in jail impact have been measured in counties that have adopted this approach.

Orange County, Florida implemented an *ECR program* in response to jail crowding in 2003. A series of actions were taken to achieve the timely processing of inmates, including the assignment of a permanent judge to conduct First Appearance Hearings. Within a short period of time the number of inmates processed in First Appearance Hearings increased from 77 per day to 93 per day. The result was that the Jail's average daily population dropped from 4,000 inmates to 3,413 (a 15% reduction).  In 2005 the Orange County was honored by the National Association of Counties with an Innovative Programs award for the effect that their 'Meaningful First Appearance Program' had on the Jail. [2]

---

[2] National Association of Counties, NaCo Achievement Award Program, 2005.

*In Sonoma County, a reduction in the overall average length of stay by just 3 days (from 20 to 17 days) would result in a 15% reduction in the average daily population of the Jail: 163 fewer jail beds. At an estimated $120 per bed day, the estimated savings (in jail operating costs alone) would be $7.1 million.*

*Small changes in average length of stay (ALOS) can have significant impacts on the jail. This can be seen in the relative impact of a 3 day reduction versus a 5 day reduction in overall average length of stay:*

*Reducing the ALOS by 3 days: Saves 163 beds and $7.1 million*
*Reducing the ALOS by 5 days: Saves 274 beds (ADP) and $12 million*

*(Remember that estimated bed savings may not translate into actual reductions in jail population because of the dynamic nature of the system.)*

Lucas County, Ohio, implemented elements of an *ECR Program* in the form of a special prosecutors unit dedicated to immediate screening of felony warrant-less arrests. Prosecutors review the case with the arresting officer and make an immediate filing decision. As a result about 20% of cases are either immediately dropped or reduced to misdemeanors. According to the Lucas County prosecutor, this approach has resulted in a drop in the jail population. [3]

Washoe County, Nevada implemented an *ECR program* that involves a coordinated effort at early case resolution between the judiciary, public defender, and district attorneys. Forty-one percent of felony cases are negotiated within 72 hours of arrest. The offender is released the day that the case is resolved: through diversion, drug treatment, or another alternative. This resulted in an early reduction in the jail population by 32 inmates. [4]

In another example, that involves the back-end of the adjudication process, King County, Washington expedited the time to final case dispositions through an accelerated sentencing effort that worked to *decrease the time to prepare the pre-sentence investigation (PSI)*. This effort was successful in reducing report completion time by 15 days, which resulted in a decrease in the average daily jail population by about 70 to 75 inmates. [5]

Monroe County, New York took a 'systems approach' to change that they credit with postponing the building of additional jail beds. This approach included the development pre-trial and post-trial alternatives, expediting

---

[3] BJA, 2000, 'A Second Look at Alleviating Jail Crowding,' U.S. Dept. of Justice.
[4] Ibid, (2)
[5] Ibid (2)

cases, and improving case management.  One specific effort involved *expediting the completion of Pre-Sentence Investigations* for in-custody cases. According to the County this effort was successful in reducing PSI completion time from 4 weeks to 2 weeks, saving 4,319 jail bed days in one year. [6]

Other examples of expedited processing include a project in Maricopa County, Arizona. There, the county focused on *expediting the adjudication of probation/parole violation hearings*.  This resulted in a 43% reduction in the average time for case resolution, and an associated decrease in the average daily population of jail inmates. [7]

Benchmarks

To track the progress of the ECR Program, the following indicators can be tracked:

- Number of cases processed through ECR
- Number of defendants who accept/decline participation
- Profile: charge type, charge level (felony/misdemeanor), age, race, gender
- Type of ECR case resolution
- Time from booking to case resolution
- Estimated number of bed day savings

## III. Establishing Comprehensive Pre-Trial Services

Pre-Trial Programs are an indispensable component of an efficient criminal justice system.   They supply the system with accurate information about the defendant to inform decision making; support the early appointment of defense counsel; identify diversion candidates; monitor pre-trial jail inmates and facilitate bail reviews; and monitor, track and supervise pre-trial defendants.

Impact on Jail

Jail population size and jail overcrowding has been directly linked to the *hours of operation of Pre-Trial programs*: the more coverage the less crowded the jail.  Pre-Trial programs that provide the most extensive coverage have

---

[6] Jail Utilization System Team, "Total Quality Management: Comprehensive Community Based Corrections Program," Monroe County, NY: Jail Utilization System Team, October 1994.
[7] BJA, "A Second Look at Alleviating Jail Crowding," October 2000, U.S. Dept. of Justice Office of Justice Programs.

been shown to be the least likely to be located in a jurisdiction with a jail that exceeds its rated capacity. [8]

A well-managed jail is, however, not only associated with access to Pre-Trial Services, but to the timeliness of those services. It has been shown that jurisdictions with Pre-Trial programs which *interview defendants prior to the initial court appearance* are less likely to have a jail that exceeds its rated capacity. [9]

In addition, the adoption of an *objective pre-trial risk assessment* is also linked to jail management. Pre-Trial programs that rely exclusively on subjective determinations of risk are more than twice as likely to have a jail that exceeds its rated capacity than those programs that use an objective risk assessment instrument. [10]

And, the role played by Pre-Trial program staff in the *early assignment of defense counsel* has an impact on the jail. According to one study, defendants who are not represented by an attorney at the initial appearance are less likely to be released on their own recognizance, and more likely to have an unaffordable bail set, which contributes to higher detention rates. [11]

As another example, Pima County, Arizona put together a Fast-track Program to monitor the pre-trial jail population by providing *routine bail review* for defendants not released at their initial appearance. The program involved the collection of additional information that could form the basis for a release plan. Pre-trial staff was given the authority to schedule bond hearings. In the end, the program has been credited with reducing the felony pre-trial jail population by 20 percent. [12]

Montgomery County, Maryland is another county that found concrete evidence of the cost-effectiveness of Pre-Trial Services. The result of a study conducted to measure the program's impact, concluded that having comprehensive Pre-Trial Services delayed the building of additional local jail beds. After the first year of program operation, in the early 1990's, the county measured drops in average jail days for pre-trial defendants, reductions in failure-to-appear rates for defendants released on pre-trial

---

[8] Clark, John and D. Alan Henry, "Pretrial Services Programming at the Start of the 21st Century: A Survey of Pretrial Services Programs, " BJA, July 2003.

[9] Ibid (7)

[10] Ibid (7)

[11] The Pretrial Reporter, "Maryland Lawsuit Targets Lack of Legal Representation at Bail-Setting Hearings," October/November 2006, Volume XXXII No. 5

[12] Shelby Meyer and Kim Holloway, "The Fastrack Program," Federal Probation, Vol.57,No.19, March 1993, pp. 36-41.

supervision (the lowest recorded rate in 5 years), and low re-arrest rates: all of which had a positive impact on the jail. [13]

> *Pre-Trial Programs achieve system cost savings by reducing failure-to-appear rates. Taking as an example an estimated system cost of $1346 for each defendant returned to jail on a FTA warrant (based on figures derived from a cost analysis conducted by Multnomah County, Oregon), Sonoma County's FTA's are costing the system roughly $2.7 million dollars per year.* [14]

Still, the assessment of the value of Pre-Trial Services is best understood, not in isolation, but in crucial role it plays in supporting Early Case Resolution (by providing defendant information), providing a flexible tool for assisting in the management of the jail population, and in its contribution to improving the integrity of the system.

Note: The Master Plan has recommended an investment in Pre-Trial Services. The funds needed to support a comprehensive program are dedicated to the hiring of additional staff. The Plan also recommends adding a staff attorney to the Public Defender and District Attorney's Office. The Pre-Trial staff positions are needed to provide new services. For the attorney positions, the argument is that the addition of these two positions will provide significant savings down the line, but in the meantime additional dedicated staff are needed to get the program started.

Benchmarks

- Percent of Defendants Booked, Interviewed by Pre-Trial
- Percent of Cases with Verified Info. at First Appearance
- Percent Appointed Defense Counsel
- Percent recommended for release and court action
- Pre-Trial Release Rate (misdemeanor/felony)
- Pre-Trial Release Type: percent to supervised release
- FTA Rate (by Release Type)
- Percent FTA Cases Returned to Court without Warrant
- Re-arrest Rate (by Release Type)
- Sentence Type

---

[13] Taxman, Faye S. "Pretrial Services Unit: An Evaluation of First Year Experiences," Criminal Justice Coordinating Council, Rockville, Maryland, March 26, 1992.
[14] Multnomah County's cost analysis breakdown: issuing and clearing a warrant, $52; police apprehension, $198; booking, $291; one day jail detention, $110; and court hearing, $695. Sonoma's impact calculated by taking the number of felony and misdemeanor pre-trial FTA's in 05/06 (n=1998) x $1346. Cost is $2,689,308.

# IV. Planning a Community Corrections Center

A Community Corrections Center (CCC) is a minimum-security residential facility that offers a structured, supervised living environment as a transition from jail to the community. It provides a lower cost option to inmates who can serve their sentence in a minimum security setting while maintaining employment and having the benefit of a range of programs.

The principal goal is to facilitate a successful transition back to the community. Individual case plans are designed to address conditions of supervision, court orders, treatment needs, community safety, victim restitution, and successful transition back to the community. Issues addressed include employment, cognitive programming and substance abuse.

A range of services is offered to address criminal risk. These may include:

- Substance abuse treatment
- Mental health evaluation and services
- Cognitive skills classes
- Employment testing and job search assistance
- GED and literacy classes
- Life skills: nutrition, parenting, money management, computer skills

Some Centers, such as the one in Washington County, Oregon provide longer-term residential treatment to a sub-set of the population. In Washington County, an intensive 90-day treatment program is offered to a co-ed population.

Community Corrections Centers can serve a diverse population, and can also function as a Day Reporting Center. Populations found in these facilities include:

- Jail inmates in last phase of sentence
- Prisoners re-entering the community
- Probationers in the CCC on a sanction
- Stabilization for those in Drug Court or other treatment programs

Individualized plans are based on the risk and needs of the offender and the anticipated length of stay at the Center. For residents with short stays (less than a couple of weeks) the principal goal is to connect them to treatment prior to release. For those with longer stays the goal is to work

with the resident to find employment, engage in treatment, and move into drug and alcohol free housing upon exit.

Community Corrections Centers can be managed by different agencies. In a Probation model, the CCC is staffed by Corrections Specialists. In either model staff has the responsibility for monitoring the security of the facility, conducting urinalysis tests, and tracking the daily plans of the residents. Residential counselors work with residents to develop individualized plans for services.

Impact on Jail

Community Corrections Centers have demonstrated good outcomes. In Washington County, Oregon, a 215 bed CCC serves a diverse population including: inmates transitioning from jail, short-term stabilization, direct sanctions, and re-entry from prison. The overall success rate, measured by successful completion, is 84%. Of the 16% who are unsuccessful, only 1% of the failure is for the commission of a new crime. As another indicator of success for this particular program, the Washington County CCC houses a residential treatment program for approximately 30 residents, which has been evaluated and ranked in the top 8% of programs nationwide for adherence to evidence based practices. [15]

Another way to look at savings associated with a Community Corrections Center (CCC) is to compare construction costs with a jail. By definition, a CCC is a minimum-security facility that has dormitory style housing. It is estimated that *building costs* for a CCC are one-third less than those of a jail.[16] Moreover, the *operating costs* are less: In Washington County, Oregon the per-day cost of operating the CCC is, at $55 per day, half of the per-day jail cost of $109.46. [17]

Community Corrections Center, Day Reporting, and the programs associated with them have a good track record.

In Hampden County, Massachusetts, a Pre-Release Facility serves inmates who are within six months of release. Inmates reside at the Facility but work in the community. In a move to reduce jail crowding even more a Day Reporting component was added. This program serves offenders serving shorter sentences, pre-trial defendants released with a condition to report, and also functions a s a step-down from Pre-release. Not only has the program saved jail beds for those who need them most and reduced the costs of holding inmates, but they have found that individuals who

---

[15] Washington County Community Corrections, Biennium Plan 2005-2007.

[16] Estimate given by Rosser International. 9-19-07.

[17] The Washington County CCC per day rate for the small number of residents involved in the in-house residential treatment, is $71 per day.  (John Hartner, Community Corrections Director, Sept. 2007)

earn the opportunity to participate in these programs have an improved chance of successful community re-entry. [18]

In Davidson County, Tennessee, the Sheriff sought grant funds to start a Day Reporting Center in a move to alleviate jail overcrowding. The program, designed for non-violent offenders, provides a program rich environment in order to "give someone an option to turn his or her life around in a positive manners," says the Sheriff. The program has been judged a success by the county, with a per diem rate one-third of the jail and residents actively completing program. [19]

In Connecticut, The Office of Alternative Sanctions was established with the state's judicial branch to expand alternative programs. Day Reporting Centers were developed as part of this approach. These Centers are designed as community-based alternatives to jail for defendants with more serious offenses, who need more structure than straight probation. Participants report to these Centers during the day and are under house arrest at night. It is estimated that this program saves Connecticut 700 jail beds each year. [20]

Many Community Corrections Centers also rely on community service and other community-based programs. Salt Lake County, Utah credits the expansion of alternative to jail programs, such as *community service*, as the principal factor in forestalling jail population increases. They report a significant reduction in the number of defendants serving jail time since the programs began. [21]

Sometimes special populations are targeted for community alternative programs. Quincy, Massachusetts started an alterative to jail program for first and second time *DWI* offenders. The program relies on treatment and probation supervision instead of incarceration. The program is reported to be an effective jail population control measure while yielding good rehabilitation success rates. [22]

> *For Sonoma County, the ability to consider meeting projected jail demands with a mix of CCC and Jail beds represents a significant cost savings. Using ballpark Jail/CCC per- bed construction costs for an additional 700 beds illustrates the difference in costs. As an example, building half CCC beds and half Jail beds to meet the need (vs. only*

---

[18] Richard McCarthy, "The Hampden County Day Reporting Center: Three Years' Success in Supervising Sentenced Individuals in the Community," Hampden County, Massachusetts, Sheriffs Department.

[19] "Davidson County's Day Reporting Center: An Effective Alternative," Large Jail Network Bulletin, 2000.

[20] Justice Education Center, Inc. "Longitudinal Study: Alternatives to Incarceration Sentencing Evaluation, Year 3," Hartford, CT: Justice Education Center, Inc September 1996.

[21] Ibid (2)

[22] Ibid (2)

*building jail beds), results in a cost savings of $17 million. And, this does not factor in the significant reduction in operating costs for the non-jail beds.* [23]

As a result of the Sonoma County systems analysis this Report recommends planning for a multi-purpose Community Corrections Center. One that serve the needs of a sentence alternative for those now in detention; a sanction option for those with impending failure on probation or in outpatient treatment; pre-trial day reporting; and a selective, short-term stabilization option for those discharged from jail. A facility with 300+ beds would serve the county over the coming years. At this point in time the Sonoma County Jail houses 239 minimum security sentenced inmates and 81 medium security sentenced inmates. Shifting all minimum-security offenders and half medium security offenders to a Center would result in a 280-bed need. An additional 80 beds would be reserved as sanction and discharge planning beds. It is anticipated that the court along with Probation will selectively utilize the Center for some persons who the court today is placing on straight probation. Additional work is necessary with all the criminal justice agencies to determine the use of and size of the facility.

Note: For additional information on the Community Corrections Center see the Appendices.

Benchmarks

- Number Admitted (by referral source)
- Percent Successfully Complete
- Percent Rule Violations/Walk-away/New Crime
- Percent Employed at Release
- Percent Stable Housing at Release
- Percent Active in Treatment/Successfully Completed at Release

## V. Applying Evidence Based Practices

Evidence based practices target higher risk offenders and deliver tested services in a manner designed to yield the best outcomes. Recent research demonstrates the cumulative benefit of evidence-based practices.

Based on this research the following recommendations were advanced:

- Target the Higher Risk Offender
- Ensure Minimum Time in Treatment of 90 Days

---

[23] Example assumes per-bed jail construction costs of $100,000, and $50,000 per-bed costs for CCC. (700 beds x $100,000 = $70 million, compared with 350 beds x $100,000 and 350 beds x $50,000 = $53 million)

- Use Objective Risk Assessment Instrument
- Vary Treatment Intensity by Risk Level
- Expedite Entry into Treatment
- Ensure Treatment Continuity
- Make Cognitive Curricula the Centerpiece of Jail Programs
- Review Cognitive Curricula Used Across Programs
- Ensure Swift Sanctions

The average reduction in the expected recidivism rate for alternative programs is approximately 10%. However, programs that are of the highest quality, in terms of best practices, have been shown to reduce the expected recidivism rate by up to 30%.

> *For Sonoma County, building in different assumptions can test the impact of improved program outcomes. Taking the approximately 5,000 persons who were admitted to County alternatives over one-year (diversion, sentencing alternatives, specialty courts, substance abuse treatment) and assuming a 20% failure rate and an average subsequent length of stay in jail of 60 days, one can model different outcomes. For example, the difference between the expected failure rate, and a 30% improvement on that rate (20% recidivism versus 14% recidivism), is the difference between 165 ADP and 115 ADP (a savings of 51 ADP).* [24]

*Allocate Resources Based on Risk*

To have the greatest impact on recidivism, length of supervision and services provided should be clearly linked to an offender's risk level. Research has shown that programs that achieve the greatest reductions in recidivism share common characteristics:

- Allocate resources to higher risk
- Address at least 3 factors that are predicators of criminal behavior (substance abuse, attitudes, peers, employment, etc.)
- Provide treatment of at least 3 months duration
- Provide sufficient treatment intensity (structuring at least 40% of the person's week)
- Offer more rewards than sanctions
- Deliver programs that are cognitive- behavioral in nature
- Ensure staff are well trained
- Ensure program manager is experienced and has direct oversight
- Conduct program evaluations

---

[24] 20% failure rate results in 1000 returns to jail x 60 days =165 ADP; reducing this failure rate by 30% results in a 14% return rate: 700 returns to jail x 60 days = 115 ADP.

Importantly, it has been shown that the quality of the treatment appears to be as important as the content. Not only do the most effective programs triple the reductions in recidivism, but also ineffective programs have been shown to actually increase recidivism. [25]

The significance of targeting the higher risk offender is made clear in research that shows that not only do services for this population provide the greatest public safety return, but that intensive services delivered to low risk offenders can also serve to increase recidivism. [26]

Particular treatment models have been shown to be crucial for realizing long-term gains. Cognitive-behavioral approaches that address criminal thinking and help the person understand triggers for addictive/criminal behavior and develop relapse plans have proven most effective, providing a benefit to the system after accounting for treatment costs, of $ 10,299 per person. [27]

But treatment does not operate in isolation. Effectiveness also depends upon the availability of an empty jail bed to provide a quick sanction in response to program violation. And, the importance of a coordinated system approach has also been demonstrated. For example, outcomes for substance abuse treatment are improved when criminal justice staff works as a team with treatment. [28]

*Develop Coordinated Treatment/Supervision Plans*

The greatest reductions in recidivism are achieved by providing a balance of treatment and supervision. Surveillance-only or sanction-only approaches demonstrate no positive outcome. A review of 23 control-group studies of surveillance-oriented, intensive supervision showed zero positive effect. [29]

Recent research into evidence-based practices, conducted for the Washington State Legislature is instructive. It found that while intensive supervision alone yielded no reductions in recidivism, intensive treatment-oriented supervision resulted in an almost 22 percent reduction in recidivism. After accounting for the cost of supervision and treatment, the system cost benefits per person are estimated to be $11,563. [30]

---

[25] Lowenkamp, Christopher, Latessa, Edward, Holsinger, Alexander, "The Risk Principle in Action: What Have We Learned From 13,676 Offenders and 97 Correctional Programs?" Crime and Delinquency, Vol. 52 No. 1, January 2006.

[26] Ibid, Lowenkamp

[27] Ibid, Aos

[28] NIDA (July 2006)"Principles of Drug Abuse Treatment for Criminal Justice Populations."

[29] Aos Steve, Miller Marna, and Drake Elizabeth (Oct. 2006) ,"Evidence-Based Adult Corrections Programs: What Works and What Does Not," Washington State Institute for Public Policy.

[30] Ibid; Aos.

Research has also shown that it is the swiftness and certainty of the sanction that is important, not the severity. An Oregon Department of Corrections study of sanctions confirmed this in a study that matched offender groups by risk level and delivered sanctions of different types and length. They found similar rates of re-conviction for high-risk offenders regardless of time in jail; for most medium risk offenders longer stays in jail were associated with higher recidivism; and, overall, community sanctions yielded lower reconviction rates. [31]

*Train Staff in Motivational Interviewing*

While most research on evidence-based practices has focused on the properties of effective programs, recent research is paying attention to the *quality of the interaction* between staff and the offender. Evidence suggests that the quality and nature of the interaction is as important as the program itself. This should not be surprising.

As a result, community corrections agencies are taking steps to train staff in motivational interviewing skills. This approach substitutes confrontational interactions with a model in which communication clear, respectful, and constructive.

Research is also finding that the degree of recidivism reduction is associated with other staff-related qualities such as the education and experience of the Director and the degree of staff oversight.

*Strengthen Mental Health Services*

The field has identified some evidence-based practices for the mentally ill. Federal grant dollars for corrections mental health diversion programs now require jurisdictions to build programs in accordance with approaches known to yield sustainable results. These include:

- ❖ Assertive case management
- ❖ Medication management and access
- ❖ Dual-diagnosis treatment
- ❖ Housing placement
- ❖ Vocational training
- ❖ Family Services

---

[31] Oregon Department of Corrections (Sept. 2002), Structured Sanction Study (paraphrased)

The key is to provide an integrated approach. Recent evidence from more than a dozen studies shows that comprehensive, integrated efforts reduce substance abuse, mental health symptoms and re-arrest. [32]

*Jail discharge planning* also holds promise. Providing immediate and concrete assistance is the key. As one example, a recent study found that those persons with mental illness who had Medicaid benefits upon release from jail had, on average, 16 percent fewer subsequent detentions over the following year than those who were released without Medicaid. [33]

*Mental Health Courts* and Assertive Case Management Programs have also demonstrated a real potential to lower the impact on jails and hospitals. A new study on the San Francisco Behavioral Health Court found that, 18-months after program completion, participants had a 39% lower risk of being arrested for a new offense, and a 54% lower risk for committing a violent offense than a comparable group booked into the jail that did not participate in the specialty court. [34]

Untreated mental illness has a tangible effect on jails. Defendants with low-level charges who recycle through the jail (*'frequent fliers'*) are usually individuals who are struggling with chronic and untreated mental illness, homelessness, and other complex issues. In an effort to document the impact of this population on the jail, a county in Oregon (Multnomah County) took a closer look at their top 20 'frequent fliers.' These 20 individuals had spent a combined 12,712 days in jail, or 35% of each year on average behind bars; 30% had a serious psychiatric diagnosis; all had extensive drug records; and the county had spent, on average, $70,000 for booking and jailing each of the top 20 over a five-year period.

## VI. Continued Expansion of Drug Court

One program that incorporates many of the elements of research-based practices is *Drug Court*. A recent analysis of the Multnomah County Drug Court (the second oldest program in the nation) tracked 11,000 drug court eligible offenders over a 10-year period. Results included significantly reduced recidivism for drug court participants up to 14 years after program entry compared to eligible offenders who did not participate. The incidence of re-arrest was reduced by nearly 30% for drug court

---

22. Osher, F.C. (2000), "Co-occurring addictive and mental disorders. " In Mental Health, United States, Washington, DC: Center for Mental Health Services, 91-98.

[33] Morrissey, Joseph P. "Medicaid Benefits and Recidivism of Mentally Ill Persons Released from Jail, " May, 2006. NCJ 214169

[34] American Journal of Psychiatry, "Effectiveness of a Mental Health Court in Reducing Criminal Recidivism and Violence," 164: 1395-1403, September 2007.

participants. System costs for persons in the drug court were $1,392 less than the costs for 'business-as-usual' cases. [35]

More generally, substance abuse treatment, in its many forms, has been shown over and over to be a good investment. A study of 44 treatment programs in California across 13 counties revealed that for every dollar spent on drug treatment yielded $7 in savings: a collective savings in health, criminal justice, welfare, and work productivity. [36]

Benchmarks

It is recommended that programs begin to collect the kind of detailed information about clients, services, and outcomes that will allow meaningful analysis. In addition to outcome data, a quality control protocol should be developed that is designed to assess the extent to which a program is conforming to evidence based practices (program intensity, ratio of rewards to sanctions, number of crime contributing factors addressed, staff qualifications, use of cognitive models, etc.)

Basic data for tracking outcomes includes the following

- Number of Admissions by Risk Level
- Average length of Stay
- Number of Jail Days Used as Sanctions
- Percent Successful Program Completions
- Re-arrest/Conviction by Exit type and Risk level

## VII. Conclusion

Any attempt to calculate actual jail bed-day savings by improved efficiencies is subject to the caveats already mentioned: the system is dynamic; improvements in processing may lead to an increase in cases adjudicated; and system changes outside a jurisdiction's control may undermine any gains.

The implementation of a successful Community Corrections Center will initially result in persons being sentenced to the facility who would have otherwise been placed on probation. If the proper selection process is used, the persons entering such a facility are those who would have otherwise failed on probation, resulting in new crime and/or violations that return the offender to jail. Thus the presence of the facility will result

---

[35] Finigan, Michael W. et. al, "Impact of a Mature Drug Court Over 10 Years of Operation: Recidivism and Costs (Final Report)," July, 2007, U.S. Dept. of Justice.

[36] The California Treatment Outcome Project (CalTOP) Final Report, Sept. 2002.

Sonoma County Corrections Master Plan

in an increase in prisoners incarcerated; however over time the impact will be positive.

Furthermore, experience teaches that it is usually sweeping policy changes that alter the trajectory of upward growth in jails: consider Proposition 36 in California. Even then, other system changes can easily undo any of the realized savings.

Sonoma County has, however, an opportunity to make significant system changes that should go a long way toward managing its jail population. The implementation of these measures should allow it to select a lower end of the growth trend for facility planning.