JONES & MAYER
Martin J. Mayer (SB # 73890)
Michael R. Capizzi (SB # 35864)
Kimberly Hall Barlow (SB # 149902)
Ivy M. Tsai (SB # 223168)
3777 North Harbor Boulevard
Fullerton, California 92835
(714) 446-1400; Fax (714) 446-1448
e-mail: mjm@jones-mayer.com
e-mail: mrc@jones-mayer.com
e-mail: khb@jones-mayer.com
e-mail: imt@jones-mayer.com

Attorneys for Law Enforcement
Intervenor-Defendants

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT**<br><br>[F.R.C.P. 24; 18 U.S.C. § 3626(a)(3)(F)] |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No.: C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**DECLARATION OF IVY M. TSAI REGARDING CORRECTED EXPERT REPORT OF JERRY DYER** |

-1-
TSAI DECL. RE: CORRECTED EXPERT REPORT OF JERRY DYER

I, IVY M. TSAI, declare as follows:

1. I am an attorney licensed to practice before the courts of the State of California. I admitted to practice before the United States District Courts for the Eastern and Northern Districts of California. I am employed by the law firm of Jones & Mayer, which represents the Sheriff, Police Chief, Chief Probation, and Chief Corrections Intervener-Defendants (collectively, the "Law Enforcement Intervenors") in this action. I have personal knowledge of the facts stated in this declaration and could and would competently testify thereto.

2. Attached hereto as Exhibit A is a true and correct copy of Chief Jerry Dyer's expert witness report dated September 15, 2008, with numbers added to paragraphs, a correction to Paragraph 23, and a correction to Incident #3, fourth paragraph (page 8, paragraph 3).

I declare under penalty of perjury that the foregoing is true and correct. Executed this 11th of December, 2008 in Fullerton, California.

_____
IVY M. TSAI

AMENDED EXPERT WITNESS REPORT OF JERRY DYER
CITY OF FRESNO CHIEF OF POLICE

*Colemanv. Schwarzenegger, et al.,*

No. Civ. S-90-0520 LKK

*Plata v. Schwarzenegger, et al.*

No. C01-1351 T.E.H.

September 15, 2008

I.      QUALIFICATIONS

1.      I am the Chief of Police of the Fresno Police Department. I have served as the Chief for seven years, having been appointed Chief on August 1, 2001. The City of Fresno is the sixth largest municipality in California with nearly a half million residents. The Fresno Police department has 843 authorized sworn officer positions and 476 authorized civilian positions for a workforce of 1,319 people. The Fresno Police Department is a nationally accredited law enforcement agency. On July 30, 2005 the Fresno Police Department earned its accreditation from the Commission on Accreditation for Law Enforcement Agencies (CALEA), becoming the largest municipality in California to receive national accreditation. On July 30, 2008, the Fresno Police Department earned re-accreditation from CALEA. Fewer than four percent of law enforcement agencies nationwide have been able to earn accreditation.

2.      I currently serve as the President of the California Chiefs of Police Association, having been appointed to the position March 5, 2008. Prior to my position as President of the Association I served as First Vice-President, Second Vice-President and Third Vice-President. This position has caused me to become involved in a number of statewide concerns, including the issues of prison reform and the early release of prisoners.

3.      I currently serve as the Chair for the California Central Valley "High Intensity Drug Trafficking Area" Board. This position has given me broader insight into the workings of drug trafficking organizations operating in California and those that work for them to include illegal immigrants and former state prisoners.

4.      I currently serve as an Advisory Board member of Governor Schwarzenegger's California Gang Reduction Intervention Program. I also serve as a voting member of the Sacramento Regional Threat Assessment Center Governance Board.

5.      I have earned a Bachelor of Science Degree in Criminology from California State University Fresno; a Master's Degree in Management from California Polytechnic University at Pomona: and I am a graduate of the California Command College, a graduate level program for law enforcement leadership.

6.      In my nearly thirty years as a police officer I have worked a variety of assignments that have allowed me to much better understand the impact of parolees in a community. During my first five years as a police officer I worked the streets as a patrol officer. Much of that time was spent in the central part of Fresno where we have historically had a high concentration of parolees. I therefore had many contacts with parolees, generally on a daily basis. I had the opportunity to see some parolees succeed in their efforts to reintegrate themselves back into the community. Unfortunately however, I saw a great many more fail, especially if they were poorly supervised or did not have adequate community resources in place to help them turn away from their life of crime.

7.      During my eight years as a police sergeant I worked a variety of assignments, including supervising a patrol tactical team, supervising street level narcotics officers and then later major narcotics enforcement teams. This lead me to deal frequently with career criminals,

2

many of whom were parolees or former state prisoners. I also served as a SWAT sergeant and often had to confront dangerous career criminals who had once again resumed their criminal lifestyle upon release from prison.

8. During the next four years I served as police lieutenant. One of my duties included being an Area Commander in the Central Policing District where I had management control over teams working street crime issues. As mentioned previously this district has a high concentration of parolees.

9. Later when I was promoted to police captain I was assigned as the Commander of the Southeast Policing District. It was at this time that I had an opportunity to extensively analyze crime trends and data for a large portion of the city. This research made it very clear that gang members and parolees, while a small percentage of the overall community, were responsible for a large percentage of crime occurring in Fresno.

10. On March 13, 1999 I was promoted to Deputy Chief where I was in charge of the Field Operations Division, which includes our patrol officers. I was later promoted to Assistant Chief of Police.

11. Upon being promoted to Chief of Police, knowing that parolees were involving themselves in a proportionally large percentage of crimes I put in place a Parolee Apprehension Team. This team was designed to locate and arrest parolees who were absconding from parole, knowing that getting them off the street sooner would help reduce crime in the community. This program has proven to be very successful. However it was also important to partner with various community based organizations and other government service providers to help gather the resources that a recently released prisoner would need to help mainstream them back into our community. These efforts have also proven successful and prevention and intervention are an integral part of our efforts in dealing with parolees.

12. As Chief I also caused the development and implementation of "Crime View." "Crime View" was adopted as part of our agency's Smart Policing philosophy. The goal of Crime View is to rapidly identify and respond to criminal activity, using near real time data to allow us to quickly identify emerging crime trends, develop strategies and to deploy our resources more effectively and efficiently. Much of the data and intelligence gathered from this department wide crime view effort supports our conclusions about parolees being responsible for a significant percentage of crime.

13. As an intervener for the City of Fresno on this issue I have visited various state prisons, to include Wasco, Corcoran and San Quentin. This has allowed me to take a close look at these facilities and some of the issues involved in our corrections system. I was also one of the six individuals selected by Justice Elwood Lui to participate in a working group to develop alternatives to prisoner release as part of the attempted settlement agreement in this case.

14.     It is difficult to predict the exact impact the release of forty thousand criminals released from prison would have on our communities; however, it is safe to say that in the City of Fresno, it would have an extremely detrimental effect on public safety. If the release of forty thousand prisoners occurs, it is estimated that 4.8% or 1,920 would be released to the County of Fresno with the vast majority to reside in the City of Fresno.

15.     At this time, we do not know the specifics on the prisoners that are to be released; however, it can be expected that they will have similar criminal histories as those persons being released on parole. Currently, there are approximately six thousand parolees residing within the County of Fresno, with five thousand of those residing in the City of Fresno. Each month, approximately 120 prisoners are paroled to Fresno County, with 80% residing in the city of Fresno. Commitment offenses for parolees in the County of Fresno include:

| | | |
|---|---|---|
| 1. | 16.6% | Use and Possession of Narcotics |
| 2. | 12.5% | Auto Theft |
| 3. | 12.5% | Burglary |
| 4. | 12.5% | Receiving Stolen Property |
| 5. | 8.3% | Grand Theft |
| 6. | 8.3% | Spousal Abuse |
| 7. | 8.3 | Firearms Offenses |
| 8. | 5% | Sale of Narcotics |
| 9. | 5% | Petty Theft with Priors |
| 10. | 4% | Sex Offenses |
| 11. | 2.5% | Child Abuse |
| 12. | 4.5% | Financial Crimes (fraud, identity theft) |

16.     According to Parole Agent, Daniel Renteria, the majority of these commitments are not the result of a first time conviction. Most of these offenders have multiple arrests preceding their commitment to prison. In most cases, the first two or three convictions result in diversion or probation commitments.

17.     Those offenders who are convicted and sentenced to prison can clearly be described as career criminals. Conviction data alone does not describe the harm these offenders do in a community. They are responsible for committing scores of crimes, in addition to the one they are arrested for. Statistics bear out that 10% of these offenders commit over 80% of all crime. Studies indicate the average inmate has committed twelve crimes before being arrested for their commitment offense.

18.     Of those released from prison, approximately 70% will reoffend within 3 years. However, those convicted of property crimes, to include auto theft, drug offenses, burglary and larcenies, have even higher rates of recidivism.

19.     The two major obstacles to maintaining a crime-free life style for inmates being released from prison are drug addiction and unemployment. When inmates are released from

4

prison, most do not receive adequate support in these areas and as a result, become immersed in a continuing cycle of crime. Fresno is a uniquely poor environment for a released prisoner because of the high unemployment rate and the ready supply of methamphetamine.

20. Fresno has often been referred to as the "Meth Capital of the Nation" and because of vast agricultural lands, is one of the most active methamphetamine manufacturing regions in the United States. Despite continuous aggressive seizures of large super labs, methamphetamine continues to be plentiful and affordable in the Fresno area. As efforts increase at the borders to stem the flow of methamphetamine, we have experienced an increase in manufacturing in the San Joaquin Valley.

21. The majority of methamphetamine users support their habit by committing crime. Identity theft is one of the fastest growing crimes in America, and a favorite of methamphetamine addicts because of the ease with which it can be committed. There is little chance of detection or arrest, and if arrested, sentences are light when compared with that of robbery. Our detectives conservatively estimate that 65% of all identity theft cases involve suspects who are addicted to methamphetamine. These cases can easily involve tens of thousands of dollars in loss. Methamphetamine addicts are involved in approximately 90% of our auto thefts, and 15% of the suspects in domestic violence cases are addicted to methamphetamine.

22. Currently the availability of low or no-cost methamphetamine treatment is almost non-existent. There are approximately 530 beds for residential drug treatment in the Fresno metropolitan area to serve a population of over half a million. The majority of those receiving treatment at these facilities are there pursuant to a condition of probation. Most do not attend on their own volition.

23. Fresno has the greatest concentration of urban poverty in the nation. Unemployment is currently about 2.5 percent higher in Fresno than the unemployment rate in California as a whole as of September 2008. Our current unemployment hovers around 10 percent. This high unemployment rate severely reduces the chance of a released prisoner obtaining employment, making it likely released prisoners will be involved in criminal activity to support their lifestyle.

24. Without employment and with continued drug addiction, released prisoners will quickly return to a life of crime. Property crimes, including auto theft, identity theft, burglary and larceny are the most likely crimes these released prisoners will be involved in.

25. It is expected that crimes rates in Fresno will increase dramatically if 1,920 prisoners are released into the community. When considering recidivism rates, numbers of crimes committed by offenders, and the fact that these prisoners represent the 10% of the offenders who are committing 80 % of the crime, the results are alarming. Within three years, we can expect that 1,344 released prisoners will commit a crime for which they will be arrested, and that each one of these offenders will have committed at least 12 crimes preceding their re-arrest. These 1,920 released prisoners can be expected to commit over 16,000 felony crimes, the majority of which they will never be held responsible.

26. All parts of the criminal justice system expect to be seriously challenged by the release of these prisoners.

27. Police officers will be hindered in their investigation of these crimes, especially as to those released prisoners who will not be on parole, and therefore not open to parole searches. In the majority of property crimes, there are no witnesses; therefore, the physical evidence yielded in parole searches often provides the vital evidence for prosecution. Losing the ability to conduct parole searches will be a serious impediment to investigating the crimes we expect these released prisoners to commit.

28. The Fresno County District Attorney's Office faces serious resource challenges. Their ability to process cases this year is reduced from last year and they are overwhelmed. The District Attorney's Office would be unable to accept an increased work load and would be faced with the difficult task of prioritizing cases, with the knowledge they will not be able to pursue many serious cases. Priority would be given to violent crimes, and those cases with the most sentencing exposure, thus, it is doubtful that the property crimes that we expect these released prisoners to commit, will receive aggressive prosecution.

29. The Fresno County Jail currently must comply with a federal court consent decree that limits the jail population. The jail's maximum population must not exceed 3,478 prisoners. Currently, the population hovers around 3,300 inmates. Due to budget cuts this fiscal year, the Sheriff has been forced to cut 32 correctional officer positions, which resulted in the closure of a 300 bed satellite jail facility. The closure of this facility has aggravated jail over crowding issues at the main jail. Pursuant to the consent decree, the Sheriff may release or refuse to take additional prisoners when they reach 90% capacity, and they must release and refuse prisoners when they reach 100% capacity. Any increased levels of arrests requiring booking would pose a severe challenge for the jail, and property offenders would be the first to be released or refused in the face of over-crowding.

30. The Fresno Superior Court will face challenges similar to those of the jail and the District Attorney's Office. Superior Court Judge Gary Hoff, who oversees the felony courts, said the release of 1,920 inmates would burden the courts because of the high recidivism rates of property offenders and that each case would require multiple appearances and court dates. The court services manager conservatively estimates that the workload would increase by 10% and put a drain on court services.

31. With little or no accountability, due to the over burdening of the criminal justice system, crime rates will increase. As crime rates increase, so does the fear in the community. When people become fearful, the tendency is for them to stay in their homes and limit visits to shopping and entertainment venues to avoid being a crime victim. This will have a negative impact on sales tax revenues and businesses already struggling with the lagging economy. Additionally, new businesses will be hesitant to open in Fresno if crime increases. This will exacerbate the already high unemployment rates in our city.

32. Currently, parolees in Fresno receive very little supervision. There is one parole agent assigned to one hundred parolees, with the exception of "third strikers" who are supervised at a ratio of one to 40 and sex offenders who are supervised at a ratio of one to 20. This is an overwhelming caseload, and as a result, a great deal of the crime committed in Fresno is committed by offenders on parole. It is not an understatement to say that everyday the Fresno Police Department arrests paroles for serious crimes. During 2007, the Fresno Police Department arrested 6,453 parolees. Several examples of the types of crimes these parolees are involved in are listed below.

Incident #1

On June 9, 2008, "Help Eliminate Auto Theft" task force officers located a stolen vehicle being driven by Mua Thao. Thao had been released on parole in September 2007 for PC 496, possession of stolen property, PC 459 burglary, and PC 12021 (a) felon in possession of a firearm. He was living in a motel room rented by a parolee by the name of Nina Her. Inside the room, officers located paper work in the name of Linda Fang, as well as methamphetamine paraphernalia. On June 18, 2007 "Help Eliminate Auto Theft" task force officers arrested Linda Fang in a stolen vehicle. Fang was on parole for PC 470, forgery, and was released on parole in October of 2007. Inside her motel room was another parolee, Nina Her. Her was on parole for PC 496, possession of stolen property, and HS 11377, possession of methamphetamine. Both parolees admitted to knowing the vehicle was stolen. Methamphetamine paraphernalia and multiple stolen checks and credit cards indicative of identity theft were found in the room. All three parolees, Her, Fang, and Thao are methamphetamine users.

Incident #2

On April 18, 2008, Martina Duarte was released on parole for auto theft. That same day she stole a purse from a victim who briefly walked away from her shopping cart while shopping. Over the next several weeks, Martina, her boyfriend, Daniel Maldonado, and her sister, Marcy Duarte, used the victim's credit cards and checks to defraud at least nine businesses in and around Fresno. Marcy Duarte was released on parole March 23, 2007, for PC 459, burglary, and PC 470 check forgery. Daniel Maldonado was discharged from parole on February 7, 2008. His commitment offence was PC 422, making terrorist threats. On May 6, 2008, Thomas Garcia committed a vehicle burglary in Merced County, stealing checks credit card and identification from the vehicle. Garcia was on parole for PC 459, burglary. These checks cards and identification were passed on to Martina Duarte, who along with her boyfriend, Daniel Maldonado and her sister Marcy Duarte, used them to defraud additional multiple business in Fresno and surrounding areas. During this investigation and subsequent search warrant, evidence was obtained to implicate these three suspects in numerous additional identity theft and fraud cases. Due to the complexity of the cases, and the potential of numerous unreported victims, this case is still under investigation. These three suspects have been arrested for multiple felony charges and likely face additional charges.

Incident #3

On January 20, 2006, Police officers observed Renard Brooks Jr. driving a vehicle that had been taken in an armed residential robbery. Brooks was not identified as being the suspect who committed the residential robbery, but it was learned that he had been driving the vehicle taken in the robbery for approximately one week. Brooks was arrested for driving the stolen vehicle

and on March 29, 2006, Brooks was sentenced to 3 years in State Prison after being convicted of auto theft.

On October 23, 2006, Brooks was released on parole to the Fresno Parole Office. His scheduled discharge date from parole was October 23, 2009. On October 25, 2006, two days later, a home in northeast Fresno was burglarized. The property taken during this burglary included a .40 caliber semi-automatic handgun with two 10 round magazines, an AR-15 assault rifle with four 30 round magazines, and a .22 caliber pistol. The victim arrived home and observed an African-American male suspect walking out of her home with the above property. The next day, October 26, 2006, Brooks was observed by police officers walking in a neighborhood armed with a handgun. After his arrest, the handgun was determined to be the .22 caliber pistol taken in the residential burglary the previous day. Brooks was also in possession of a .40 caliber handgun magazine taken in the same burglary.

Brooks could not be identified as the burglary suspect who was seen walking out of the victim's residence with the property. As a result, he was charged with possession of stolen property, being a convicted felon in possession of a handgun, and violating his parole. On March, 20, 2007, Brooks was convicted of being a felon in possession of a firearm and sentenced to 3 years in state prison.

On June 18, 2008, Brooks was again paroled to the Fresno Parole Office. On June 20, 2008, two days after being released on parole, Brooks was detained by officers after he was observed knocking on several doors of residences. The officers believed he was in the process of looking for a residence to burglarize. During his detention, he provided a false name to officers and denied being on parole. Brooks was arrested for providing a false name to officers during a detention and violating his parole. Brooks was released by his parole agent on June 23, 2008.

July 1, 2008, Brooks forced his way into a car occupied by two elderly females in the parking lot at a shopping center. Brooks physically forced the females out of the vehicle then fled in their vehicle. Brooks was located by officers driving the vehicle and a vehicle pursuit ensued. During the pursuit, Brooks was involved in three separate traffic collisions. One of the collisions resulted in the driver being injured. Brooks fled from the vehicle on foot and shortly thereafter, he was taken into custody. Brooks was found to be in possession of property belonging to the victims.

      33.    In summarizing the impact the premature release of these prisoners will have in the City of Fresno, it is safe to say, the impact will be extremely detrimental to public safety. The relationship between, property crimes offenders, methamphetamine use, and unemployment can not be overstated. These inmates will certainly continue to pose a

hazard to the public safety unless they are able to kick their drug addiction and find employment.

Based on my knowledge of cities within the central valley and their demographics, as well as conversations I have had with police chiefs from these cities, it is my belief that central valley cities such as Stockton, Modesto, Merced, Visalia, etc. will experience the same impact as Fresno in terms of crime should the premature release of inmates occur. These cities have officer to population ratios that are very similar to that of the Fresno Police department, similar unemployment rates to that of the city of Fresno, and a population ratio of methamphetamine addicts that is also similar to ours.

Date: September 15, 2008

Jerry Dyer