# EXHIBIT

# A

1

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

          Plaintiffs,

     vs.                    CASE NO. 2:90-cv-00520
                                  LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

                            THREE-JUDGE COURT

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

MARCIANO PLATA, et al.,

          Plaintiffs,

     vs.                    CASE NO. C01-1351 TEH

ARNOLD SCHWARZENEGGER, et al.,   THREE-JUDGE COURT

          Defendants.

~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~~

DEPOSITION OF

ARTHUR LAWRENCE REINGOLD, M.D.

SEPTEMBER 23, 2008
9:12 a.m.

425 Market Street, 26th Floor
San Francisco, California

Reported by Quyen N. Do, RPR, CSR No. 12447

2

1                        APPEARANCES OF COUNSEL
2
         For Plaintiff:
3
                  PRISON LAW OFFICE
4                 SARA L. NORMAN, ESQ.
                  1917 5th Street
5                 Berkeley, California 94710
                  510.280.2621
6                 510.280.2704 Fax
                  snorman@prisonlaw.com
7
8        For Defendants:
9                 HANSON BRIDGETT LLP
                  S. ANNE JOHNSON, ESQ.
10                425 Market Street, 26th Floor
                  San Francisco, California 94105
11                415.995.5068
                  415.995.3523 Fax
12                ajohnson@hansonbridgett.com
13
         For Legislator Intervenors:
14
                  AKIN GUMP STRAUSS HAUER & FELD LLP
15                CHAD E. STEGEMAN, ESQ.
                  580 California Street, Suite 1500
16                San Francisco, California 94104-1036
                  415.765.9526
17                415.765.9501 Fax
                  cstegeman@akingump.com
18
19
20
21
22
23
24
25

5

1           ~~SAN FRANCISCO, CALIFORNIA~~

2           TUESDAY, SEPTEMBER 23, 2008; 9:12 A.M.

3           ~~ARTHUR LAWRENCE REINGOLD, M.D.,~~

4    having been first duly ~~sworn, testifies as follows:~~

5

6                         EXAMINATION

      ~~BY MS. JOHNSON:~~

8           Q     Could you state and spell your name for the

9    record?

10          A     My name is Arthur Lawrence Reingold,

11   R-e-i-n-g-o-l-d.

12          ~~Q     Good morning, Mr. Reingold.  My name is Kimi~~

13   ~~Jo~~hnson.  I represent the Plata and Coleman

14   defendants --

15          A     Good morning.

16          Q     -- in this matter.

17                Have you ever been deposed before?

18          A     Yes.

19          Q     How many times?

20          A     In my life, oh, perhaps a couple dozen.

21          Q     When's the most recent time you were deposed?

22          A     It was sometime in two -- either early 2008 or

23   the end of 2007.

24          Q     And what type of case was that in?

25          ~~A     I think -- provided a list, actually, of cases~~

1  ~~tomatoes or not, and whether everyone in the population~~

2  had gotten salmonella or not, I wouldn't do any

3  statistical testing.  I would have information about

4  everybody.  But that's completely impractical.  So I

5  take a sample of the cases.  Sometimes I take all the

6  cases, but I invariably take a sample of healthy people

7  to serve as controls.  And that's where we get into

8  statistical testing, because I've taken a sample.

9       Q    Do you know if the -- the concept of

10 confidence limits is more widely spread in other areas

11 of statistical analysis?

12      A    I don't know the answer to that.  I would hope

13 it is, but -- but certainly within biostatistics and --

14 and application of statistical testing to human health

15 events, I would say that's more or less the standard

16 ~~ protocol, yes.~~

17      Q    In paragraph 8 of your report ...

18      A    Yes.

19      Q    You wrote, "The report," referring to the

20 medical causes of death in state prisons 2001 to 2004 by

21 Chris Mumola, "demonstrates that, as expected, age is

22 the most significant predictor of death rates among

23 prisoners."  Do you see that?

24      A    Yes.

25      Q    Age is one of the most significant predictors

1     of demographic data that you list for death rates, but

2     are there other predictors that could be more

3     significant that aren't identified?

4          A     I suppose that's, in theory, possible, but

5     everything we know about human health, in any setting

6     that I know of, the single most important predictor of

7     your risk of dying is your age.

8          Q     What about your illness?

9          A     Well, clearly, your illness status is another

10    very important predictor of your likelihood of dying.

11    So, there are clearly other important factors, yes.

12         Q     So, when you say that age is the most

13    significant predictor of death rates, that's of the

14    variables that you're discussing, which don't include

15    illness?

16         A     That's correct.  It's -- it's among the

17    variables that are covered in this report, yes.  Sorry.

18    ~~respect to those death rates that you~~

19    ~~the site which you got from the report itself, they~~

20    ~~have the death rates kind of by race in one paragraph~~

21    ~~and death rates by age in another paragraph, and you've~~

22    ~~analyzed them separately.  And what I'm wondering is, if~~

23    ~~you analyze them together, could that draw a different~~

24    ~~conclusion for you that age is the most significant~~

25    ~~prediction; that you'd see that maybe young black men are~~

37

~~[struck through illegible line]~~

2    not presented here, but I would -- I would fairly -- be

3    fairly confident that ~~once you~~ did that, you would see

4    that all ~~of these~~ factors are important ~~predictors~~ of

~~[struck through illegible line]~~

6    Q    So, does the report demonstrate that age is

7    the most significant predictor of death rates among

8    prisoners?

9    A    Well, in terms of the range -- the very large

10   range of -- of death rates in different categories, I

11   think the answer is, yes; that is, there is a much

12   bigger difference in death rates in different age groups

13   than there is a difference in death rates by different

14   gender groups or different race/ethnicity groups.  So,

15   in that sense, I think what I've said is correct.

16   Q    But you don't know whether age is more

17   significant predictor than, for example, illness?

18   A    No.  I certainly can't say that based on the

19   data that are presented here, no.

20   Q    In paragraph 10, you wrote, "Some may argue

21   from the fact that California's prisoner death rate

22   appears to be 23 percent lower than the national average

23   than" -- strike that.  Let me start over.

24              "Some may argue from the fact that

25              California's prisoner death rate appears to be

1              23 percent lower than the national average

2              that California state prisoners' risk of death

3              from inadequate health care is lower than that

4              of prisoners in other state prison systems.

5              In fact, no such conclusion may be drawn."

6              Can the opposite conclusion be drawn from this

7    data that California's prisoner death rate shows that

8    the health care is inadequate?

9         A    No.

10        Q    What would you have to do to show that, from

11   looking at death rates, that California's health care

12   was inadequate compared to other state prisons?

13        A    Well, I -- I basically don't think you can

14   infer anything about the quality of care based on death

15   rates.  So -- so I think that's a fundamental problem.

16   But -- but if you were interested in trying to use death

17   rates to compare the quality of care -- is that the

18   question?

19        Q    Sure.

20        A    Okay.  Then what I think you'd have to do is

21   something similar to what hospitals in the state of

22   California do or that people do when they're comparing

23   the quality of care in hospitals.  They take people with

24   the exact same illnesses such as, let's say, diabetes or

25   congestive heart failure, and they control for important

1    factors such as age and gender and race and severity of
2    their illness, and then they compare the mortality
3    experience in different hospitals for people with the
4    same illness. And even when they do that, if you
5    look -- if you read about these comparisons in the
6    newspaper, you'll see that people then argue whether or
7    not that's a fair comparison to make and whether they
8    have adequately controlled for what we call potentially
9    confounding factors. And you won't be surprised to know
10   that hospitals with higher death rates tend to suggest
11   that that's because they have sicker patients in the
12   first place and that these analyses have not adequately
13   controlled for confounding factors.

14          So, even when you do the very best job you
15   can, it's still susceptible to a lot of argument as to
16   whether that's good enough. But I think death rates
17   really only help you if you can really compare people
18   with the same illnesses, controlling for many, many
19   other things, and that certainly is not done here, and I
20   would guess is pretty much impossible, frankly.

21     Q    You think it would be impossible to do that?
22     A    Well, I think it would be so difficult that I
23   have a hard time believing anyone would actually
24   undertake it, because the -- the -- the -- the -- the
25   specificity of the data you would need from people in

40

1    multiple prison systems, if the idea is to compare

2    what's happening in one prison system with another

3    prison system, the -- the quantity and specificity of

4    the data you would need would be so enormous I have a

5    hard time believing anyone would undertake such a study.

6    I would guess that, in theory, it's possible, but the

7    resources would be extraordinary.

8         Q    Well, absent doing a study like that, how

9    could you statistically determine, using statistical

10   analysis, determine whether one state prison's health

11   care system was performing better than another's?

12        A    I have to tell you quality of care is not

13   something that I directly study, so I don't know that I

14   have a simple answer for that.  I think the -- the --

15   the best answer I can give you is the one that I already

16   did, which is that you would have to do something

17   similar to what hospitals do, which is to compare the --

18   the mortality experience of patients with the same

19   conditions, controlling for all of these factors that

20   influence the risk of dying.

21             For example, taking people with congestive

22   heart failure and looking at what their mortality

23   experience is in different prison systems or people with

24   advance diabetes or something like that.  That's how I

25   would do it if I were being asked to do it, but it's a

1     very complicated issue.

2          Q    Short of doing that study, would you feel

3     comfortable concluding that one state prison system was

4     providing better or worse care compared to others?

5               MS. NORMAN:  Objection.  It's well beyond the

6     scope of his expertise as he's already told you.

7               THE WITNESS:  So I can answer?

8               MS. JOHNSON:  [Nodding.]

9               THE WITNESS:  Okay.  I -- I -- I think that I

10    personally would not focus on mortality indicators.  I

11    would find other indicators that -- that are not based

12    on who dies and who doesn't but are based on morbidity

13    and -- and -- and the things that don't -- are not

14    measured by death or not death.

15    BY MS. JOHNSON:

16         Q    Why would you choose morbidity over death or

17    not death?

18         A    Well, morbidity is a much -- is -- is a -- is

19    a term that again may not connote the same thing to you

20    that it does to me, but morbidity in the sense means

21    just how sick are you as measured by, you know, how many

22    days you spend in bed or whether you're incapacitated or

23    many, many other ways of measuring just how sick you

24    are, and those get into very complicated comparisons.

25    But -- but they presumably would be a better indicator

43

thousands of records?

1

2      A    Well, of course, one of the problems is that

3   you'd be interested in the quality of care for different

4   diseases, different -- so, you can't just talk about the

5   overall quality of care.  You'd need to think about it

6   in terms of quality of care among people with heart

7   disease, quality of care among people with lung cancer,

8   quality of care among people with hepatitis.  So, in

9   order to really make comparisons in cross systems, you'd

10  need to look at a large number of records for people

11  with many, many types of illnesses unless you wanted to

12

13      Q    In paragraph 11, you state:

14           "Any comparison of mortality rates between

15           prison systems that does not adjust for (i.e.,

16           take into account) age and other crucial

17           factors such as gender, ethnicity and length

18           of stay is meaningless."

19           Did you really mean meaningless?  Does it

20  provide no insight whatsoever?

21      A    How about uninterpretable?

22      Q    Tell me what uninterpretable means.

23      A    Well, let me give you a concrete example.

24  Suppose my prison system has entirely prisoners over the

25  age of a hundred, and your prison system has entirely

44

1    prisoners between the ages of 20 and 25, and I say the
2    mortality rate in the first prison system is higher than
3    the mortality rate in the second prison system.  You
4    probably won't be surprised by that, because people over
5    the age of a hundred have a much greater likelihood of
6    dying in the next year than people between the age of 20
7    and 25.  So, to make a comparison of the mortality rate
8    between those two systems without taking into account
9    the age distribution is uninterpretable.

10        Q    I understand that in your extreme example, but
11   I would posit that I think that we probably could all
12   agree that there's no prison system where everybody's
13   over a hundred, and there's no prison system where
14   everybody's under 25.  So, outside of that extreme
15   example, is it uninterpretable?

16        MS. NORMAN:  Objection.  Vague.  Is what
17   uninterpretable?

18        MS. JOHNSON:  The comparison in mortality
19   rates between prison systems that does not adjust for
20   age and other crucial factors.

21        THE WITNESS:  So, I would say it's
22   uninterpretable because there are no data presented here
23   that tell me anything about the -- the -- the
24   demographic characteristics of the people in the
25   different prison systems.  So I don't know how much

45

1    the -- the age structure, the gender, the race/ethnicity

2    distribution differs between one prison system and

3    another.   So that's why I say it's -- the -- the --

4    the -- it's -- you cannot interpret or make inferences

5    comparing one rate with another without that

6    information.

7    

8         Q    Now, when you say there's no data presented

9    here to tell you anything about the demographics in

10   different prison systems, is there some level of data

11   that you could have that you'd be able to interpret it

12   even if -- with less accuracy than if you had more

13   detailed data?

14        A    Well, I think the -- the -- the quick answer,

15   at least based on -- on what is -- -- is in this report

16   or -- is -- is no.   I mean, fundamentally, what's

17   provided here are the number of deaths, number of deaths

18   in different disease categories and the rates of death

19   in different groups.   But -- but the, when making

20   comparisons between State A and State B or states in the

21   western United States versus the eastern United States

22   or whatever it is, none of those comparisons then take

23   into account these -- these other very, very important

24   factors.   Simply say that the rate in this system is

46

1    maintain that you simply cannot come to any conclusions

2    about the quality of care based on those comparisons.

3         Q    Okay.  Well, we're getting closer to what I

4    meant by, did you really mean meaningless?  Because

5    you're saying you can't come to any conclusions

6    regarding the quality of care, and I guess what I'm

7    asking, are there any conclusions that you can draw from

8    this data?

9         A    Well, I -- I think you can conclude that --

10   that the -- that -- that the mortality rates are

11   different in the different prison systems.  That seems

12   to me to be a reasonable conclusion.

13        Q    Anything else that you could conclude from it?

14        A    There's nothing else that I would safely

15   

16        Q    Well, so let's say that you knew what

17   California's demographics were and then you knew what

18   Pennsylvania's demographics were.  Could you then use

19   this data to draw any conclusions?  With respect to the

20   state prison population.

21        A    So, if -- if -- if one took these data and

22   took into account age and gender and race/ethnicity and

23   length of incarceration and then compared the death

24   rates, I would still maintain it is unlikely to be

25   interpretable in terms of the quality of medical care.

47

1        Q       Can you explain why you still maintain that?

2        A       Because the underlying health and -- and

3    medical conditions that might be present in people in

4    different prison systems might be very different.   To

5    take something simple like the proportion of prisoners

6    with HIV infection or the proportion of prisoners with

7    diabetes or the proportion of prisoners with

8    hypertension or heart disease might be quite different.

9    And, as I think you pointed out earlier in my

10   deposition, if I were to compare the mortality

11   experience in one group, all of whom were HIV-infected

12   and another group are not HIV-infected, even though

13   they're the same age and gender and race, they might

14   have very different mortality experiences that have

15   nothing to do with the quality of care and everything to

16   do with the fact that one group is HIV-infected and the

17   other group is not.

18       Q       If you look at -- they're not numbered, so I'm

19   kind of at a disadvantage here, but it is Exhibit C to

20   your report.   I think I have that right.

21       A       Yes, okay, I have it.

22       Q       It's supplemental information that we received

23   from the U.S. Department of Justice, Bureau of Justice

24   Statistics.

25       A       Yes.

1    Q    And it is ... one, two, three, four, four

2    pages in.  There's a table called Attachment 2.

3    A    Yes.

4    Q    The footnote 3 says:

5              "The rate of death from AIDS in California

6              prisons was lower than that of all other

7              States [sic] combined in each year as well,

8              averaging about one-third lower over the

9              entire period (11 AIDS deaths per 100,000

10             inmates vs. 17 AIDS deaths per 100,000

11             inmates)."

12        Do you see that?

13   A    Yes.

14   Q    Do you believe there are any conclusions that

15   could be drawn from that?

16   A    No.

17   Q    Why not?

18   A    Because it doesn't tell us anything about how

19   many prisoners have AIDS or how many prisoners have HIV

20   infection.  So, to know, we would call this a -- a -- a

21   cause-specific death rate, that is, the death rate

22   attributable to -- to AIDS.  And the death rate

23   attributable to AIDS is obviously in part a function of

24   how many people in the system have HIV infection or

25   AIDS, and then obviously is also going to be affected by

1  the quality of care.  I don't dispute that.  But I don't
2  think you can disentangle how much of this might be due
3  to the quality of care, because we have no idea how many
4  of the prisoners have HIV or AIDS in the first place.
5          Q    You think it's likely that California has, as
6  a percentage, fewer prisoners with HIV and AIDS than
7  other states?
8          A    I have absolutely no idea.
9          Q    If you did have an idea, would you be able to
10 draw some conclusions about the impact of quality of
11 care on this particular --
12         A    It would --
13         Q    -- piece of data?
14         A    It would still be difficult because that still
15 might not take into account how long people have been
16 HIV-infected, and we know that your likelihood of dying
17 with HIV is, in part, determined certainly by the
18 quality of your care, but it's also dependent on how
19 long you have been HIV-infected.  So it's not just a
20 question of how many HIV-infected people there are, but
21 also how long they've been infected.
22         Q    As an epidemiologist, do you have any sense of
23 what are some of the factors that would cause one
24 state's population of prisoners with HIV to have been
25 infected longer than another state's?

1        A    Well, of course, the primary routes of HIV

2    infection in the United States are injection drug use

3    and -- and men having sex with men.  So -- and -- and we

4    know that -- that AIDS appeared earlier in some parts of

5    the United States than other parts of the United States.

6    So, there may well be variation on a state-by-state

7    basis in terms of -- of when HIV or AIDS came into a

8    population and therefore how long people have had the

9    condition.

10       Q    HIV and AIDS came into the population in

11   California among the first of the states, wasn't it?

12       A    That appears to be the case, yes.

13       Q    Okay.  So based on that fact, it would be more

14   likely that people in California would have had HIV/AIDS

15   longer than perhaps in other states.

16       A    That might be the case, although many of the

17   people with HIV/AIDS in the early days of the epidemic

18   died because there was no antiretroviral treatment

19   available then.  So it's a little difficult to know.

20       Q    I'm, unfortunately, very aware of that fact.

21            But it sounds like with some more information,

22   looking at data such as in footnote 3 that we were just

23   looking at, you might be able to draw some conclusions

24   about the impact of the quality of care.

25       A    Well, this goes back to what I was saying

51

1   before.   If you were interested in the quality of care,

2   you could, for example, say we're interested in what

3   are -- what -- what is the quality of care for people

4   with HIV/AIDS.  And that would be a complicated thing to

5   do and would require abstracting data from medical

6   records, but it would be a more tractable problem than

7   looking at quality of care broadly written for all

8   medical conditions, because it would be much more

9   limited to the question of people who have HIV/AIDS.

10

11  o  for lack of better term, hallmark illnesses that

12  could  e markers for the overall quality of care

13          S. NORMAN:  I'm going to object a  in.  This

14  is outside the scope of his testimony and his expertise

15  as described to yo  with this case.

16          THE WITNESS:   I -- I don't know the answer to

17  that question.  I -- I thi    obviously, one would be

18  worried about the quality of c  e for a range of

19  different conditions  ranging from heart disease to

20  cancer, which are the two leading caus   of death among

21  prisoners, to infectious disease like hepa  tis C and --

22  and HIV/A  S.  So, I don't know that -- how ea   it

23  would be to pull out selected diseases as indicato   of

24  the quality of care.

25

1    Q    In paragraph 12, you state:

2              "Additionally, the death rates of a state

3         prison system will reflect, to some extent,

4         the death rates for the state's population at

5         large."

6         Can you see that?

7    A    Yes.

8    Q    Can you tell me what you meant by the

9    qualification "to some extent"?

10   A    Well, I think what -- what I -- what I meant

11   by this was that, in -- in essence, if I'm correct in my

12   understanding that most people in a state prison system

13   came from that state, it would be reasonable to assume

14   that the -- the underlying health condition of people in

15   a prison system, to a certain extent, is related to the

16   underlying health condition of people in the source

17   population from which they came.

18   Q    What I guess I'm interested in that is this

19   again qualification you made in your testimony now of

20   "to a certain extent."  What do you mean by "to a

21   certain extent"?  You're qualifying the relationship.

22   So what are the qualifying factors?

23   A    Well, I think -- I think no one would claim

24   that the people who end up in prison are representative

25   of the people who are not in prison in terms of

Arthur Lawrence Reingold, M.D.                    September 23, 2008
Case 2:90-cv-00520-KJM-SCR    Document 3404-1    Filed 12/16/08    Page 22 of 28

53

1    anything, but certainly not in terms of their health

2    status.  So, I think this effect will be present, but

3    perhaps not very great, but it will be difficult to

4    quantify.

5        Q    So in paragraph 13, you wrote:

6                  "Because California state prisons

7              incarcerate primarily California ...

8              residents, I would expect the death rate for

9              California state prisoners to be lower than

10             the rate for prisoners from other states with

11             higher general population death rates."

12             Do you see that?

13       A    Yes.

14       Q    But your testimony is, you couldn't quantify

15   how much lower.

16       A    That's correct.

17       Q    And, if your expectation were met and the

18   California state prison rate was actually higher than

19   the rate for prisoners from other states, would you be

20   able to draw any conclusions from that difference?

21       A    No.

22       Q    So, in paragraph 14, you write:

23                 "While California has a very low death

24             rate for its general population, its death

25             rate for state prisoners is relatively

54

1          higher."

2          You see that?

3     A    Yes.

4     Q    But there aren't any conclusions that you can

5   draw from that relationship.

6     A    I -- I think comparing these death rates is

7   basically uninterpretable for the reasons I've already

8   laid out.

9     Q    So, that does mean that there aren't any

10  conclusions that you can draw from this difference in

11  its very low death rates for its general population and

12  its relatively higher death rate for its state

13  prisoners.

14    A    I would not conclude very much based on that,

15  no.

16    Q    Would you conclude anything at all?

17    A    Well, as I said, I'm really not comfortable

18  making conclusions about either -- certainly, about

19  quality of care based on these types of comparisons, no.

20    Q    In paragraph 15, when you state:

21          "Comparison between state prison systems

22          should take into account the differences in

23          death rates for the populations from which the

24          prisoners are drawn for the comparisons to be

25          significant," do you see that?

55

1      A      Yes.

2      Q      Those comparisons would also need to be

3  controlled for age, gender, ethnicity, length -- well,

4  not length of stay, but at least age, gender, ethnicity

5  and other variables, correct?

6      A      Yes.

7      Q      And what did you mean by the term "to be

8  significant"?

9      A      Well, that -- that's probably a -- a

10  misstatement.  "To be meaningful" would probably be a

11  better statement.  I -- I -- I typically reserved the

12  word significant for statistical significance.  So, if I

13  were to rewrite this, I would say, "for the comparisons

14  to be meaningful."

15      Q      What you've explained here means interpretable

16  for purposes of drawing conclusions.

17      A      Yes.

18      Q      Seems that you brought a copy of Mr. Mumola's

19  deposition transcript with you?

20      A      Yes.

21      Q      You refer to the role of unintentional injury

22  and deaths when comparing the state prison population

23  rates with the general population death rates.

24      A      Yes.

25      Q      Now, Mr. Mumola, specifically in his

59

1   [struck through text] say is that I think attempting to say

2   something about the quality of health care based on a

3   comparison of mortality rates in and out of prison is --

4   is hopelessly ... it -- it's hopeless in terms of coming

5   to any reasonable conclusions about the quality of care

6   because of these types of problems or potential

7   [struck through text]

8        Q    If I read Mr. Mumola's report correctly -- or,

9   actually, his deposition testimony correctly, he seemed

10  to be concluding that young black men are less likely to

11  die in prison than they are outside of prison.  Is that

12  correct?

13       A    I believe that that is what he said, yes.

14       Q    And I think you said you agreed with that.

15       A    Well, I mean, the -- the -- if you just look

16  at age, leaving race aside for a moment, there is

17  Appendix Table 11, which shows -- that's on page 10 of

18  this Bureau of Justice Statistics data brief, what it

19  shows is that, among prisoners, there is a lower death

20  rate if you're under the age of 35, pretty comparable

21  death rate between 35 and 44 and a much higher death

22  rate if you're over the age of -- if you're 45 or older

23  if you're in prison.  So, clearly, among young people in

24  prison, the death rate is, in fact, lower in prison than

25  it is out of prison.  That's correct.

62

1    ~~Attorney. ... I. Somebody made funding available. I~~

2    suspect you could entice someone into doing that study.

3         Q    Well, I guess my question was more directed

4    at, is an epidemiologist the type of expert/academic

5    that would do that sort of research?

6         A    Well, I think the -- the reality is that --

7    that, you know, some epidemiologic research is done by

8    academics.  Much of it is done by people in health

9    departments or other research organizations.  There is

10   no reason that it can't be done in prison systems or in

11   other systems, you know.  So it -- it's a question of

12   what resources you have, what -- what priorities

13   ~~you're ... you're given.~~

14        Q    In paragraph 22, you indicate that homicides

15   are present to a far greater degree outside of prison

16   than inside.  So someone's more likely to be killed in

17   the general population than they are in prison?

18        A    Well, I -- presumably, that's in part -- might

19   vary with -- with gender or race/ethnicity or age.  It

20   wouldn't surprise me, but I would like to think that --

21   that the security arrangements in prison are good enough

22   to make homicides relatively infrequent in prison.  And,

23   obviously, there are parts of our society where homicide

24   is, unfortunately, a common cause of death in young

25   people.

1    Q    Okay, on page 6, paragraph 24 of your

2    conclusion, you write:

3              "In sum, it is impossible to draw any

4              meaningful conclusions about the risk of death

5              from inadequate health care in California

6              prisons from Mr. Mumola's deposition testimony

7              or the data to which he refers."

8         You aren't concluding there that there is

9    inadequate health care in California prisons, are you?

10    A    No.

11    Q    Do you have any intention of testifying

12    on this before testifying at trial?

13    A    Not to my knowledge, no.

14    Q    And do you have any intention of offering any

15    opinions on subjects other than contained in your report

16    or discussed at this deposition?

17    A    No.

18    Q    So we've covered everything that you would

19    have an intention to testify about?

20    A    Yes.

21    Q    Look at the -- I think it's Exhibit E, the

22    list of the documents you reviewed.

23    A    Yes.

24    Q    Have you reviewed any other documents in

25    connection with preparing this report or preparing for

Arthur Lawrence Reingold, M.D.
September 23, 2008

68

REPORTER'S CERTIFICATION

1
2
3     I, Quyen N. Do, Certified Shorthand Reporter, in
4  and for the State of California, do hereby certify:
5
6     That the foregoing witness was by me duly sworn;
7  that the deposition was then taken before me at the time
8  and place herein set forth; that the testimony and
9  proceedings were reported stenographically by me and
10 later transcribed into typewriting under my direction;
11 that the foregoing is a true record of the testimony and
12 proceedings taken at that time.
13     IN WITNESS WHEREOF, I have subscribed my name
14 this 29th day of September 2008.
15
16        /S/
17

        Quyen N. Do, RPR, CSR No. 12447

18
19
20
21
22
23
24
25

PAULSON
REPORTING & LITIGATION SERVICES, LLC
www.paulsonreporting.com

Telephone: 415.591.3333
Facsimile: 415.591.3335

44 Montgomery Street
Suite 1100
San Francisco, CA 94104