

COUNTY OF SAN MATEO

# Office of the Sheriff

**GREG MUNKS**
SHERIFF

**CARLOS G. BOLANOS**
UNDERSHERIFF

400 COUNTY CENTER • REDWOOD CITY • CALIFORNIA 94063-1662   TELEPHONE (650) 599-1664   www.smcsheriff.com

ADDRESS ALL COMMUNICATIONS TO THE SHERIFF

August 15, 2008

Carol L. Woodward
Deputy County Counsel
San Mateo County Counsel's Office
400 County Center
Redwood City, CA 94063

Dear Ms. Woodward;

You have asked me to determine the impact that a prisoner release order would have on the San Mateo County Sheriff's Office and the County's criminal justice system. I am confident that the areas under the control of my organization, including our already overcrowded jail system, would be significantly negatively impacted by such an order.

In preparing this report, I considered the following reference materials:

    1. The California recidivism rate from the Governors website for January 2008
    http://gov.ca.gov/index.php?/fact-sheet/1084/
    2. Facility recidivism rate (chart) from the Sheriff's Own Recognizance Program.
    3. Legislative Analyst Office website regarding parole re-alignment.

In addition, several senior staff members provided information for this response.

My experience and training as the Sheriff of the County are as follows:

| | |
|---|---|
| January 8, 2007 | **Sheriff of San Mateo County**<br>Chief Law Enforcement Officer for County of San Mateo.<br>Elected June 6, 2006.<br><br>As Sheriff, I oversee a large, full- service organization that provides Law Enforcement services to the unincorporated county areas as well as contract law enforcement services to municipalities and a three-county transit system. Beyond this, I provide security to County buildings and to the court system. And as with most Sheriffs in the state I operate all of the adult correctional facilities within the county. |

1

| | |
|---|---|
| 1993 to 2007 | **Undersheriff, San Mateo County Sheriff's Office**<br>Second-in-Command of 600 person law enforcement agency. Assist in planning, organizing, directing and reviewing the activities of the Sheriff's Office including patrol, investigations, corrections, civil and records management, search and rescue, bomb detection and disposal, narcotics enforcement, internal affairs, personnel and training, and fiscal management. Assist in the preparation and oversight of a $100 million annual operating budget. Act as Sheriff in his absence. |
| 1990 to 1993 | **Human Resources Manager, City of Palo Alto**<br>Responsible for various human resources functions including Training and Development, Recruitment, Labor Relations, etc. |
| 1981 to 1990 | **Promoted through the ranks to Lieutenant, Palo Alto Police Department**<br>Assignments included: Patrol Officer, Field Training Officer, Burglary Suppression Detective, Robbery/Homicide Investigator, Manager of Crime Prevention Division, Patrol Watch Commander, Manager of Personnel and Training Division, Commander of Field Training Officer Program, Commander of Hostage Negotiations Team, Commander of Public Information Officer Unit, Liaison to Human Relations Commission, Member of Management Negotiations Team during contract negotiations with both Police and Fire Unions. |
| 1977 to 1981 | **Deputy Sheriff, San Mateo County Sheriff's Office**<br>Assignments included Main Jail, Honor Camp, and Manpower Pool |
| 1975 to 1977 | **Reserve Police Officer, Palo Alto Police Department** |

The following are my conclusions related to your inquiry:

1) *We know releasing prison inmates before their sentences have been completed, will negatively impact our overall criminal justice system in San Mateo County.*

California's recidivism rate is, at 70 percent, the nation's highest. In San Mateo County we do not have an information management system that calculates recidivism. However, if we look at a snapshot of those inmates re-booked with old ID numbers from our database system we come up with a recidivism rate of 68.3 %.

| March-08 | | |
|---|---|---|
| Total Reported Bookings for March = | | 1647 |
| New ID #s Issued = | 570 | 34.6% |
| Old ID #s Returning = | 1077 | 65.4% |

| April-08 | | |
|---|---|---|
| Total Reported Bookings for April = | | 1582 |
| New ID #s Issued = | 478 | 30.2% |
| Old ID #s Returning = | 1104 | 69.8% |

| May-08 | | |
|---|---|---|
| Total Reported Bookings for May = | | 1741 |
| New ID #s Issued = | 528 | 30.3% |
| Old ID #s Returning = | 1213 | 69.7% |

**2)** *We are using the figure of approximately 1000 inmates being released into SMC based on the percentage of total inmates in the state prison population that come from our county.*

Recent parole realignment discussions assumed 70,000 early releases from the state population. Using the figure of 1.5% of California prison inmates that come from San Mateo County, approximately 1,050 of the 70,000 would come to San Mateo County. We rounded that estimate to 1,000. If we use the settlement discussion figure of 40,000 releasees, and use 1.5% for San Mateo County's share, we are looking at 600 inmates that would come into our county.

**3.** *Of those 1000 inmates, we estimate 65%, or 650, would re-offend in a short period of time.*

We would keep in mind that not everyone would re-offend at the same time. We have limited information about who would be booked into our facility and which cases would or would not be filed. We assume some inmates would be going back to state prison, and some would go to other counties where they may re-offend.

**4.** *There would be an increase in population that would exacerbate our currently overcrowded jails.*

San Mateo County's rated capacity in the men's main jail is 688 inmates. Currently, our Average Daily Population (ADP) is 981 in the men's main jail. On a daily basis, we are now very close to reaching our maximum bed capacity, which is far above the rated capacity of 688 inmates.

3

The Women's Jail is rated for 84 inmates while our current ADP is 129.

We are opening and closing a temporary emergency overflow housing unit (OHU) almost every weekend in an effort to provide safe and secure beds based on classification concerns. The emergency facility has only 29 beds.

As a result of the severe overcrowding, we are very limited as to areas where we can house additional inmates. The increased gang population in our County has compounded this issue. If the Court were to order state prisoners released into our community as described above, we would expect some of these released inmates would re- offend. Adding the new category of inmates to our already strained jail system likely would put us over our <u>actual</u> bed count. In addition, such an order would further decrease the already limited options we have when housing inmates. The CDCR released inmates would likely not be eligible for County alternative sentences, such Sheriff's Work Program (SWP), Electronic Monitoring (EMP) or the Work Furlough Facility (WFF) due to their criminal history and status.

Currently most of our jail housing units (PODS) program rooms are already unusable for programs, because they have been modified to contain additional beds. With any more inmates the few remaining program spaces too would be converted to housing units, and we would no longer be able to offer the programming that has been proven effective in preventing recidivism.

These program rooms and common areas where we are forced to set up overflow beds do not have toilets, sinks, or showers so the doors must be left unlocked so the inmates have access to the facilities in the POD day room. This arrangement compromises the safety and security of the facility, as rival gang members have consistently behaved in a violent manner around their adversaries.

Our current and highly successful re-entry program would be impacted in the following manner: CDCR Parolees would be the first to get the community based treatment beds before county inmates, because they are funded at a higher rate by the State. This will result in fewer spaces for county inmates. Our county inmates will remain in custody longer, causing further clogging in our rehabilitation efforts.

**5.** *If the state separately places a cap on its incarcerated population and would not allow any new intakes at the state CDC facilities, our jail population would be further backlogged, and we would incur further classification risks for our inmate population. We would expect to see more assaults on staff and the necessity for more keep away orders, and that would give even us less flexibility in housing additional inmates.*

Earlier this year, CDC San Quentin was placed on a lock down due to an illness breakout. Each week our County sends approx. 12-15 new commitments to CDCR. In addition we have approx. the same number (12-15) of parole violators which are picked up by CDCR transportation. It is reasonable to conclude that a cap on the CDCR population would increase our backlog quickly. When San Quentin was closed to new commitments it only took a couple of weeks before we had a list of 40 inmates waiting to be transported.

While we waited to transport those inmates, our facility had to house those inmates, and the jails were further overcrowded.

Inmates in CDCR have been convicted of felonies which often are related to violence. These inmates have higher risk factors in their classification and keeping them in our jails posses an undue threat to staff, visitors, and other inmates as well as a financial burden to our County budget. If the Court orders CDCR to stop taking parole violators, the risks are exacerbated.

**Fiscal Issues:**

*A prisoner release order would adversely impact the County Sheriff's budget.*

Our local average cost per inmate, per day is $110.00. Because of our housing arrangements the cost for staff is based on a fixed ratio of staff to inmate. Meals and medical care are averaged as some inmates require more medical treatment while others do not.

If San Mateo County is forced to rent additional bed space to house our jail population, it would cost us $110 per day, per inmate, not including transportation that would be necessary for court and other appointments and appearances, or transportation back to San Mateo County for release.

**Conclusion**

Thank you for the interesting and intriguing questions regarding our agency as it relates to this pressing issue. Opportunities such as this allow me to evaluate our system and make necessary adjustments. I insist my staff perform at their highest level of efficiency and professionalism at all times, even as the burdens of overcrowding threatens us daily. But as you can see, we do not have room for additional inmates that would likely come from a prisoner release order. Our daily population is already stretching our operation, which endangers our staff and the safety of the inmates. Moreover, I believe it is my responsibility to offer programming and opportunities that have proven successful in reducing recidivism and in assisting inmates to make a better life for themselves upon release from custody. Overcrowding decreases and sometimes precludes my ability to offer these programs and opportunities.

In summary, I believe that releasing inmates into our community prior to their completing their sentences would only shift the problems the CDCR is experiencing to the local level, which will effect public safety at all levels.

Please feel free to contact me if you have any further questions.

Sincerely,

Greg Munks
Sheriff

5