MICHAEL P. MURPHY, COUNTY COUNSEL (SBN 083887)
By: CAROL L. WOODWARD, DEPUTY (SBN 084197)
Hall of Justice and Records
400 County Center, 6th Floor
Redwood City, CA  94063
Telephone: (650) 363-4746
Facsimile:  (650) 363-4034
E-mail:  cwoodward@co.sanmateo.ca.us

Attorneys for Intervenor
COUNTY OF SAN MATEO

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.<br><br>  Plaintiffs,<br><br>  vs.<br><br>ARNOLD SCHWARZENEGGER, et al.<br><br>  Defendants. | Case No. CIV S-90-0520 LKK JFM P<br><br><u>THREE-JUDGE COURT</u> |
| MARCIANO PLATA, et al.<br><br>  Plaintiffs,<br><br>  vs.<br><br>ARNOLD SCHWARZENEGGER, et al.<br><br>  Defendants. | Case No. C01-1351 THE<br><br><u>THREE-JUDGE COURT</u><br><br>**DECLARATION OF LOREN BUDDRESS FOR TRIAL**<br><br>**TRIAL:  NOVEMBER 17, 2008** |

I, LOREN BUDDRESS, declares as follows:

I am the Chief Probation Officer for the County of San Mateo. The following is within my personal knowledge. I submit this declaration in lieu of direct live testimony for the trial of these cases. In preparing the following remarks, I rely on my over 30 years of combined experience as a parole

officer, probation officer—both federal and county government, and as a Chief Probation Officer—both federal and county government as well.

1. If a "mass parole release" is used to reduce the CDCR population, and probation is not charged with supervision duties, such a release would have a very negative impact on counties and Probation departments. This is due to the fact that with a 70% recidivism rate, many of these parolees will commit new offenses. Parolees who commit new offenses negatively affect local law enforcement agencies, Sheriff's Departments and their overcrowded jails. These arrests also would have a negative impact on the Court, the District Attorney, and the Private Defender, Health/Mental Health Departments, Human Services Agencies, and a number of community based treatment providers. When these parolees are referred to the Probation Department, we must complete a pre-sentence investigation and a pre-sentence report, and then the department provides new supervision services for those placed on probation.

2. Probation resources in San Mateo County are already stretched to their maximum capacity. The Probation Department and the other County agencies and the Court are unable to absorb new parolee recidivism cases without additional resources. Without new resources, we would be forced to cut services elsewhere. This would have a very negative impact on the County and our local communities.

3. Prison overcrowding could be addressed in a very positive manner and without the State having to "build their way out of the problem" by using the recommendations contained in the document prepared by Dr. Barry Krisberg (President of the National Council on Crime and Delinquency, [NCCD]) for the Legislature during their special summer session in 2006. (See San Mateo County Exhibit SMC-C.) Dr Krisberg's report focused upon:

   a. Reducing women's imprisonment;
   b. Improving parole practices;
   c. Focusing on successful community reentry;
   d. Adopting evidence-based assessment and supervision practices;
   e. Implementing a comprehensive Intermediate Sanctions Program;
   f. Implementing a structured mandatory decision making process;
   g. Reallocating resources to fund necessary programs and services for parolees;

    h. Creating a new State-local corrections partnership; and

    i. Creating a California Sentencing Policy Commission

The report opens stating:

> "For three decades, most California elected officials and the voters have radically transformed the penal system by enacting tough new sentencing laws, building 22 new prisons, and until recently, making punishment the sole purpose of the penal system. For almost 30 years there has been scant attention paid to adequate funding for rehabilitation services or successful programming to permit inmates to successfully return home. The fiscal and social costs of these policies were neither examined nor sufficiently shared with the electorate. And so, we are close to a boiling point which most observers believe could lead to a prison catastrophe."

Dr. Krisberg's report concludes noting:

> "A smart reform program must balance emergency steps, short-term measures, and a longer-term strategic vision. The NCCD believes that the proposals in this report represent a start in that direction. Fundamental to viable solutions is a continued movement toward a corrections system that combines effective rehabilitation and reentry programs that reduce recidivism with appropriate public protection considerations and sensitivity to the plight of victims.
>
> There are evidence-based pathways out of the deep prison crisis that we have created. A comprehensive approach is needed that includes realistic forecasts of the impact of policy and law changes on state and local corrections. We need to understand the true financial implications to fixing the corrections imbroglio. Reforms must include a new alliance of state and local justice officials, and an exploration of proven safe alternatives to state confinement. California must expand its commitment to employ research and rigorous evaluation to determine if the taxpayers are getting value for their massive investments in the corrections system. A clear plan that achieves bipartisan support and includes all three branches of government is the standard we should uphold."

  4. The CDCR parole system could be improved, thus reducing the parole recidivism rate by looking at implementing the PEW Charitable Trusts recent document entitled, "When Offenders

Break the Rules—Smart Responses to Parole and Probation Violations." (Please San Mateo County Exhibit SMC-D.) The PEW Report notes that:

> "Innovative judges and correctional administrators believe that many individuals who have violated the conditions of their release can be managed safely and cost-effectively in the community rather than returned to expensive prison cells. They increasingly are relying upon a strategic approach that includes incarceration of high risk offenders who present an imminent danger of reoffending and a problem-solving combination of penalties, rewards and services to those who pose less risk to public safety. The strategy seeks to protect the community, to hold violators accountable with interventions that address the reasons for the violations, and to reduce reincarceration and the resulting costs to taxpayers."

5. Dr. Krisberg's literature review regarding the "Effect of Early Release from Prison on Public Safety"(See San Mateo County Exhibit SMC-E) notes in his review of studies from nine states and Canada that:

> "Most of the cited studies and reports found: No significant difference in rates of recidivism among early release and full-term offenders. Some studies found lower recidivism rates among early releases that those who served a full-term in prison. NCCD reviewed annual crime rates throughout the different regions reported in the studies during the same time the studies took place. Crime data in the states where studies took place show decreases even as early release was being implemented."

"What worked?" showed that selecting non-violent offenders for early release, designing ER as an incentive for non-violent behavior in prisons, allocating probation officers to maintain contact with ER groups (accountability), and linking ER groups to community-based services and programs (e.g., employment, housing, substance abuse and mental health treatment") all worked.

The State could release parolees 6 months before their release date, which would reduce the CDCR population, but it would be done in a manner that would not increase recidivism. (Also from Exhibit SMC-E.)

6. When the Legislative Analyst's Office (LAO) recently proposed releasing somewhere between 50,700 and 71,000 "low risk" parolees, to be supervised by county Probation Departments, San Mateo County did an analysis of the fiscal and personnel impact such a release would

have on San Mateo County in order to provide the needed services for these parolees, which for the most part had not been provided to parolees for decades. This is why California parolees have the highest recidivism rate of any state in the United States. (70% of California's parolees become recidivists within a two year period.)

7. In order to provide needed services for approximately 1,000 parolees, the Probation Department would need approximately $7,600,000 intended for new probation and support staff to provide the parole supervision. In addition to the personnel costs, other needs would be office space rental, office furniture for new parole staff, computers, cell phones, training, vehicles for field supervision, electronic monitoring equipment, drug testing equipment, and office supplies. (Please see San Mateo County Exhibit SMC-F.)

In addition to the costs to probation to supervise these 1,000 parolees, San Mateo County determined that it would also cost "Behavioral Health" to provide mental health and substance abuse services, approximately $9 million dollars, and it would cost the Sheriff[s Office approximately $4.3 million dollars for re-incarceration expenses. Therefore, for Probation, Mental Health, Substance Abuse, and Jail services, it would cost San Mateo County $20.9 million dollars to provide services for 1,000 parolees. (See Exhibit SMC-F.) This does not count the additional costs to the Court, the District Attorney, the Private Defender's Office, to the Human Services Division, and to community based treatment organizations.

8. In my judgment, local Probation departments could supervise State parolees and create far better recidivism rates as well as other more positive outcome results, however, the success of such a "realignment" process would absolutely hinge upon the fact of whether the State would be willing to compensate counties properly for their new parole responsibilities.

Criminal justice research clearly shows that "treatment" is what changes criminal, delinquent, and recidivist behavior, and reduces crime and community victimization. The research also shows that if you merely lock people up and "warehouse" them and provide NO treatment, recidivism actually increases by approximately 7%.

9. San Mateo County is a unique county, in that all of the key stakeholders in the county (the Court, the Board of Supervisors, the County Manager, the Sheriff, the District Attorney, the

Probation Department, the Health/Mental Health Department, and Human Services) understand that what changes criminal behavior and recidivism and reduces community victimization is "treatment."

10. One very effective way to reduce prison overcrowding is to invest in probation resources that have already proven to be not only effective, but cost effective. (Between 1992 and 2002, juvenile felony crime was reduced 48% according to a Rand Corporation three year study.) (See San Mateo County Exhibit SMC-G.)

Similarly, juvenile misdemeanor offenses declined 26%, when the juvenile population for the state increased 26% over the same time frame, according to the same Rand study. These significant reductions in juvenile crime, according to the Rand report was due to the treatment programs implemented by Probation departments throughout California using TANF funding.

11. If given appropriate funding, Probation departments throughout the State could provide similar services for youthful adult offenders, ages 18 to 25, in addition to older offenders. Using treatment programs on the "front end of the criminal justice system," similar to the ones we use to reduce juvenile crime would have a significant impact in reducing the number of adult probation violators who are sent to state prison on probation violations (approximately 17,000 per year, according to the Chief Probation Officers of California (CPOC) organization.)

Additionally, on the "back end of the criminal justice system," for those probation violations that did occur, if Probation departments and counties were given additional resources, and sufficient funding for treatment, many of these probation violators could be kept locally and not sent to prison.

As was noted above, I believe that Probation departments could provide much more effective parole supervision services if counties were provided appropriate fiscal resources by the state. However, if parole services remain with the State, one key change in how parole violations are handled could have a substantial impact on prison overcrowding. According to the CDCR, approximately 70,000 to 80,000 parole violators are returned to prison each year, and approximately one-half of those parole violations are for "technical" violations. (A "technical" violation is for a violation of their conditions of parole, e.g., missing an appointment with a therapist or their parole officer; however, the "technical" violation does NOT entail a new law violation.)

12. Sending most parole violators to prison, in my judgment is an enormous waste of

state prison resources. Professor Joan Petersilia has done research that showed that "technical" parole/probation violators were no more likely to commit new offenses than non-technical violators. Additionally, these technical violators serve an average of approximately four months. The processing of these violations through the CDCR's "Reception Centers" costs the state approximately $2 billion dollars per year, according to Jeanne Woodford, a long term CDCR administrator. Such "technical" violators (35,000 to 40,000 per year) should be kept locally in treatment programs or "Day Reporting Centers" (please see attachment 6) instead of unnecessarily clogging up the State's prison system. However, this process could only work if the state used a good portion of the savings that would accrue by having these violators kept locally, to compensate counties and Probation departments who would be keeping violators locally and providing them with treatment resources so they do not have to go back into the state prison system.

      13.     In summary, if the State wishes to reduce the prison overcrowding problem without having to pay an enormous amount to "build their way out of the problem" and even FAR more to run the newly built prisons, they should strongly consider the roadmap for such a reduction provided by Dr. Krisberg and the NCCD. They should also use the information provided by the PEW Trust to see how to improve parole outcomes and reduce parole violations. Finally, if the state were to provide counties and Probation departments with funding for both "front end" and " back end" criminal justice services, departments could employ treatment services which have already proven to be both effective (in terms of reducing crime and community victimization) and cost effective. In so doing, many more offenders would be kept locally, instead of being sent to State prison, which would be another means of reducing the state prison population without building new prisons. This approach would save the state millions, if not billions of dollars, and such a process would reduce crime throughout the state.

      I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed at Redwood City, California, on October 31, 2008.

                                                                                  LOREN BUDDRESS

L:\LITIGATE\C_CASES\Coleman\TRIAL\Decl. of Loren Buddress.doc

DECLARATION OF LOREN BUDDRESS FOR TRIAL