# EXHIBIT N

PRISON LAW OFFICE
DONALD SPECTER, Bar No. 83925
STEVEN FAMA, Bar No. 99641
E. IVAN TRUJILLO, Bar No. 228790
SARA NORMAN, Bar No. 189536
ALISON HARDY, Bar No. 135966
REBEKAH EVENSON, Bar No. 207825
1917 Fifth Street
Berkeley, CA 94710
Telephone: (510) 280-2621

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California 94104
Telephone: (415) 433-6830

K&L GATES LLP
JEFFREY L. BORNSTEIN, Bar No. 99358
EDWARD P. SANGSTER, Bar No. 121041
RAYMOND E. LOUGHREY, Bar No. 194363
55 Second Street, Suite 1700
San Francisco, CA 94105-3493
Telephone: (415) 882-8200

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California 94111
Telephone: (415) 393-2000

THE LEGAL AID SOCIETY –
EMPLOYMENT LAW CENTER
CLAUDIA CENTER, Bar No. 158255
600 Harrison Street, Suite 120
San Francisco, CA 94107
Telephone: (415) 864-8848

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants | No.: Civ S 90-0520 LKK-JFM P<br><br>**THREE-JUDGE COURT**<br><br>**PLAINTIFF COLEMAN'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT SCHWARZENEGGER** |
| MARCIANO PLATA ,et al.,<br><br>Plaintiffs,<br><br>v.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>v.<br><br>Defendants | No. C01-1351 TEH<br><br>**THREE-JUDGE COURT** |

PLAINTIFF COLEMAN'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT SCHWARZENEGGER, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

[242716-1]

**PROPOUNDING PARTIES:**    Plaintiff Ralph Coleman

**RESPONDING PARTIES:**    Defendant Arnold Schwarzenegger

**SET NUMBER:**    **TWO**

### TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE that, pursuant to Federal Rules of Civil Procedure Rule 36, Plaintiff Ralph Coleman hereby requests that Defendant Schwarzenegger answer the following requests for admission separately and fully in writing under oath within twenty-one (21) days after service pursuant to Magistrate Judge Moulds' 10/30/07 Order [Docket 2495].

### DEFINITIONS

1.    "YOU" and "YOUR" refers to Defendant Schwarzenegger, his agents, representatives, attorneys, and all other persons or entities acting on his behalf.

2.    "ADVERSE IMPACT ON PUBLIC SAFETY" refers to the term as used in the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A).

3.    "ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM" refers to the term as used in the Prison Litigation Reform Act, 18 U.S.C. § 3626(a)(1)(A).

### REQUESTS FOR ADMISSION

**Request for Admission No. 1:**

Admit that the document excerpt attached as Exhibit A is a true and correct copy of page 178 of YOUR January 10, 2008 Governor's Budget Summary 2008-2009.

**Request for Admission No. 2:**

Admit that YOUR proposal set forth in Exhibit A was to release specified non-violent, non-serious, non-sex offenders without prior serious or violent offenses or strikes, 20 months earlier than their original release date.

**Request for Admission No. 3:**

Admit that your proposal set forth in Exhibit A was not intended to cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

-1-

[242716-1]

**Request for Admission No. 4:**

Admit that YOUR proposal in Exhibit A was not intended to cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 5:**

Admit that the document attached as Exhibit B is a true and correct copy of a transcript of YOUR December 21, 2006 press conference at which YOU unveiled YOUR Comprehensive Prison Reform Proposal.

**Request for Admission No. 6:**

Admit that YOUR December 21, 2006 proposal for a sentencing commission was not intended to cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

**Request for Admission No. 7:**

Admit that YOUR December 21, 2006 proposal for a sentencing commission was not intended to cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 8:**

Admit that YOUR December 21, 2006 proposal for parole reform (see Exhibit B, attached) was not intended to cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

**Request for Admission No. 9:**

Admit that YOUR December 21, 2006 proposal for parole reform was not intended to cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 10:**

Admit that 15 CCR, section 3040.2 requires each prison to establish "Bridging Education Programs as work/training incentive assignments to provide education programming."

**Request for Admission No. 11:**

Admit that 15 CCR, section 3040.2 provides that prisoners who are undergoing reception center processing, and are day-for-day credit eligible under Penal Code section 2933,

-2-

[242716-1]

1  are assigned to the Bridging Program upon arrival at the reception centers.

2  **Request for Admission No. 12:**

3      Admit that, under 15 CCR section 3040.2, assignment to an approved Bridging

4  Education Program qualifies as a full-time assignment in Work Group A-1, entitling the

5  prisoner to day-for-day credit.

6  **Request for Admission No. 13:**

7      Admit that the Bridging Program does not cause an ADVERSE IMPACT ON PUBLIC

8  SAFETY in California.

9  **Request for Admission No. 14:**

10      Admit that the Bridging Program does not cause an ADVERSE IMPACT ON THE

11  CRIMINAL JUSTICE SYSTEM in California.

12  **Request for Admission No. 15:**

13      Admit that some prisoners receive pre-sentence conduct credits, under Penal Code

14  section 4019, for time periods spent in jail or in a residential treatment program.

15  **Request for Admission No. 16:**

16      Admit that the pre-sentence conduct credits under Penal Code section 4019, for time

17  periods spent in jail do not cause an ADVERSE IMPACT ON PUBLIC SAFETY in

18  California.

19  **Request for Admission No. 17:**

20      Admit that pre-sentence conduct credits under Penal Code section 4019 do not cause an

21  ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

22  **Request for Admission No. 18:**

23      Admit that some prisoners receive post-sentence, pre-prison conduct credits, under

24  Penal Code section 4019, for time periods spent in jail.

25  **Request for Admission No. 19:**

26      Admit that post-sentence, pre-prison conduct credits under Penal Code section 4019 for

27  time periods spent in jail do not cause an ADVERSE IMPACT ON PUBLIC SAFETY in

28  California.

-3-

[242716-1]

**Request for Admission No. 20:**

Admit that post-sentence, pre-prison conduct credits under Penal Code section 4019, for time periods spent in jail do not cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 21:**

Admit that some prisoners receive worktime credits under Penal Code section 2933.

**Request for Admission No. 22:**

Admit that worktime credits under Penal Code section 2933 do not cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

**Request for Admission No. 23:**

Admit that worktime credits under Penal Code section 2933 do not cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 24:**

Admit that some prisoners receive "S-time" credits under 15 CCR section 3045.3.

**Request for Admission No. 25:**

Admit that "S-time" credits do not cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

**Request for Admission No. 26:**

Admit that "S-time" credits do not cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

**Request for Admission No. 27:**

Admit that prisoners who are transferred to the Department of Mental Health receive credits under 15 CCR section 3043.6(b).

**Request for Admission No. 28:**

Admit that credits for prisoners who are transferred to the Department of Mental Health do not cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

**Request for Admission No. 29:**

Admit that credits for prisoners who are transferred to the Department of Mental Health

-4-

[242716-1]

1   do not cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

2   **Request for Admission No. 30:**

3       Admit that some prisoners who are diagnosed by a physician or psychiatrist as totally

4   medically disabled receive credits under Title 15 CCR section 3044(b)(2)(E).

5   **Request for Admission No. 31:**

6       Admit that credits for prisoners who are diagnosed by a physician or psychiatrist as

7   totally medically disabled under Title 15 CCR section 3044(b)(2)(E) do not cause an

8   ADVERSE IMPACT ON PUBLIC SAFETY in California.

9   **Request for Admission No. 32:**

10      Admit that credits for prisoners who are diagnosed by a physician or psychiatrist as

11  totally medically disabled under Title 15 CCR section 3044(b)(2)(E) do not cause an

12  ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

13  **Request for Admission No. 33:**

14      Admit that prisoners who perform heroic acts in a life-threatening situation or who

15  provide exceptional assistance in maintaining the safety and security of a prison are eligible for

16  a grant of up to twelve months credit under Penal Code section 2935.

17  **Request for Admission No. 34:**

18      Admit that credits for prisoners who perform heroic acts in a life-threatening situation

19  or who provide exceptional assistance in maintaining the safety and security of a prison do not

20  cause an ADVERSE IMPACT ON PUBLIC SAFETY in California.

21  **Request for Admission No. 35:**

22      Admit that credits for prisoners who perform heroic acts in a life-threatening situation

23  or who provide exceptional assistance in maintaining the safety and security of a prison do not

24  cause an ADVERSE IMPACT ON THE CRIMINAL JUSTICE SYSTEM in California.

25  **Request for Admission No. 36:**

26      Admit that YOU have proposed no legislation to eliminate statutory credits for prisoners

27  during YOUR tenure as governor.

28

[242716-1]

**Request for Admission No. 37:**

Admit that YOU have proposed no legislation to reduce statutory credits for prisoners during YOUR tenure as governor.

**Request for Admission No. 38:**

Admit that YOU have proposed no legislation to eliminate regulatory credits for prisoners during YOUR tenure as governor.

**Request for Admission No. 39:**

Admit that YOU have proposed no legislation to reduce regulatory credits for prisoners during YOUR tenure as governor.

**Request for Admission No. 40:**

Admit that the document excerpt attached as Exhibit C is a true and correct copy of YOUR September 23, 2008, Veto Message, as found on the Internet at http://www.ebudget.ca.gov/pdf/Enacted/BudgetSummary/FullBudgetSummary.pdf, at pages 77-87 of the PDF.

**Request for Admission No. 41:**

Admit that YOUR direction contained in the language quoted below from page 5 of Exhibit C is intended to reduce adult inmate population levels:

> I am directing the Secretary of the California Department of Corrections and Rehabilitation to implement a Parole Decision-Making Instrument (PDMI) that provides guidelines on how to respond to technical parole violations based on the risk-to-reoffend level of the offender and the seriousness of the violation. I believe that the use of the PDMI by parole agents will facilitate the reintegration into society of low-risk parolees by providing community-based sanctions and programs. By providing alternatives to incarceration for parolees who commit minor technical parole violations, the Department will be able to reduce prison overcrowding. Consistent with this direction, I am reducing $22,000,000 from this item to reflect lower adult inmate population levels.

**Request for Admission No. 42:**

Admit that YOUR direction quoted above from Exhibit C in REQUEST FOR

-6-

[242716-1]

1  ADMISSION 41 was not intended to cause an ADVERSE IMPACT ON PUBLIC SAFETY.

2  **Request for Admission No. 43:**

3      Admit that YOUR direction quoted above from Exhibit C in REQUEST FOR

4  ADMISSION 41 was not intended to cause an ADVERSE IMPACT ON THE CRIMINAL

5  JUSTICE SYSTEM.

6  **Request for Admission No. 44:**

7      Admit that the state of emergency in the California prison system that you declared,

8  pursuant to your October 4, 2006 overcrowding proclamation, is not over.

9  **Request for Admission No. 45:**

10      Admit that the substantial risk to the health and safety of staff and inmates in CDCR

11  prisons caused by the severe overcrowding in CDCR prisons that you cited in your October 4,

12  2006 overcrowding proclamation is still present.

13  **Request for Admission No. 46:**

14      Admit that the substantial risk of violence in CDCR prisons caused by the severe

15  overcrowding in CDCR prisons that you cited in your October 4, 2006 overcrowding

16  proclamation is still present.

17  **Request for Admission No. 47:**

18      Admit that the substantial risk of transmission of infectious diseases in CDCR prisons

19  caused by the severe overcrowding in CDCR prisons that you cited in your October 4, 2006

20  overcrowding proclamation is still present.

21  **Request for Admission No. 48:**

22      Admit that the substantial security risk in CDCR prisons caused by the severe

23  overcrowding in CDCR prisons that you cited in your October 4, 2006 overcrowding

24  proclamation is still present.

25  **Request for Admission No. 49:**

26      Admit that the burdens on infrastructure (electrical systems and/or wastewater/sewer

27  systems) caused by the severe overcrowding in CDCR prisons that you cited in your October 4,

28  2006 overcrowding proclamation are still present.

1  **Request for Admission No. 50:**

2      Admit that the effects of overcrowding that you described in your October 4, 2006

3  overcrowding proclamation as harm to people and property, inmate unrest and misconduct,

4  reduction or elimination of programs, and increased recidivism are still present.

5  **Request for Admission No. 51:**

6      Admit that the use of non-traditional beds for inmate housing that you cited in your

7  October 4, 2006 overcrowding proclamation has not been eliminated from CDCR prisons.

8  **Request for Admission No. 52:**

9      Admit that the severe overcrowding in CDCR prisons that you cited in your October 4,

10  2006 overcrowding proclamation is still causing reduced inmate participation in academic,

11  vocational, and rehabilitation programs.

12  **Request for Admission No. 53:**

13      Admit that the document attached hereto as Exhibit D is a true and correct copy of a

14  transcript of your remarks on or about June 26, 2006, as posted on YOUR website at

15  http://gov.ca.gov/speech/1088/, under the title "Schwarzenegger Calls Special Session to

16  Address Prison Crowding, Recidivism."

17  **Request for Admission No. 54:**

18      Admit that the video filed named "Exhibit E.mpg" and starting with a title frame

19  "Prison Overcrowding/KGO, Ch. 7/6:00 PM News/9/24/07/LENGTH 2:23" on the attached

20  optical disk labeled "PLTF 2D SET RFAS TO DEFENDANT SCHWARZENEGGER,

21  Exhibits E & F 9/29/08" includes comments made by YOU regarding California prisons

22  starting after the statement: "It could take years for the new facilities to be built."

23  **Request for Admission No. 55:**

24      Admit that the video filed named "Exhibit F.mpg" on the attached optical disk labeled

25  "PLTF 2D SET RFAS TO DEFENDANT SCHWARZENEGGER, Exhibits E & F 9/29/08"

26  includes YOUR speech delivered at California Rehabilitation Center at Norco, California, on

27  or about March 6, 2007, as posted on YOUR website at http://www.gov.ca.gov/speech/5568/.

28

[242716-1]

1 | **Request for Admission No. 56:**

2 |     Admit that the document attached hereto as Exhibit G is a true and correct copy of the

3 | text of your speech delivered at California Rehabilitation Center at Norco, California, on or

4 | about March 6, 2007, as posted on YOUR website at http://www.gov.ca.gov/speech/5568/.

5 |

6 | Dated:  September 29, 2008             Respectfully submitted,

7 |                           ROSEN BIEN & GALVAN, LLP

8 |

9 |                           By:

10 |                             ERNEST GALVAN
                            Attorneys for Plaintiffs

11 |

12 |

13 |

14 |

15 |

16 |

17 |

18 |

19 |

20 |

21 |

22 |

23 |

24 |

25 |

26 |

27 |

28 |

[242716-1]

# EXHIBIT A.

CORRECTIONS AND REHABILITATION

During the current fiscal year, the Administration will continue to aggressively pursue all strategies designed to maximize federal funding for the incarceration of undocumented felons.

## PROPOSED BUDGET-BALANCING REDUCTIONS

- Total budget balancing reductions for the CDCR amount to $17.9 million and 200 positions in 2007-08 and $378.9 million and 5,854 positions in 2008-09. This grows to $782.7 million in 2009-10.

- Programs exempted from reductions include lease payments securing lease revenue bonds, costs related to juvenile offenders, medical expenditures controlled by the federal Receiver, and the Corrections Standards Authority, for a total exemption of $2.4 billion.

- The major reductions are described below:

  - $4.3 million and 66 positions in 2007-08 and $256.4 million and 4,194 positions in 2008-09 resulting from the CDCR releasing specified non-violent, non-serious, non-sex offenders without prior serious or violent offenses or strikes, 20 months earlier than their original release date. This proposal would result in an institutional average daily population reduction of 22,159 in 2008-09. This reduction assumes the necessary statutory changes will be enacted by March 1, 2008. Due to the CDCR's recent success in filling vacant correctional officer positions, layoffs will be necessary to achieve this reduction and the savings reflects a lag time related to the state layoff process. Once the layoff process has been completed, this savings grows to $526.7 million in 2009-10.

  - $13.6 million and 134 positions in 2007-08 and $97.9 million and 1,660 positions in 2008-09 resulting from the CDCR placing non-serious, non-violent, non-sex offenders on summary parole. Summary parole will have minimal conditions of parole and involve no active supervision. These offenders would be subject to searches and drug testing, but would not return to prison without first being prosecuted locally for any new offenses they commit. This proposal would result in a parole average daily population reduction of 18,522 in 2008-09 and an institutional average daily population reduction of 6,249. This savings grows to $231.5 million in 2009-10. This reduction assumes the necessary statutory changes will be enacted by March 1, 2008.

EXHIBIT B.

Case 2:90-cv-00520-KJM-SCR    Document 3434-2    Filed 12/23/08    Page 15 of 56
http://gov.ca.gov/index.php?/print-version/speech/7175/



# Office of the Governor

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

## GOVERNOR'S REMARKS

Thursday, 12/21/2006 4:19 pm

### Transcript of Governor Arnold Schwarzenegger's Press Conference to Unveil Comprehensive Prison Reform Proposal

GOVERNOR SCHWARZENEGGER:

Hello, everybody, and thank you for being here. Today we want to talk a little bit about prison reform. Now, everyone in this room knows that our prisons are in a crisis and in desperate need of reform. For years state government has failed to deal with this problem, and my administration has inherited a system that was dangerously overcrowded, poorly managed, and totally out of control.

Since I took office we have put forward a variety of different proposals, whether it was through the budget or through our strategic growth plan, or a special session in the legislature to create extra space and also to create other reforms.

Now we are at the point where if we don't clean up the mess the federal court is going to do the job for us. Now, that means bad news, because they will order the immediate release of criminals, and they will dig into our general funds, which means they will take money away from education and from health care. Now, as governor, I cannot let that happen, and I know that if all of us put our heads together and if we have the will, and if we put everything on the table and really focus on this problem, we can be very successful in solving this. And that is why I am so happy to see Democrats and Republicans, as well as some of our partners in law enforcement, standing up here on the stage with me, and they're all here today to pledge their support to make sure that we are successful in this. We are all committed to working on this problem until we get it solved.

Now, today I am putting forward three broad proposals:

1. A building program that will add 78,000 new beds, and I call them desperately needed beds

2. Changes in our broken parole system that will bring California into alignment with other states and reduce our recidivism rate, our unacceptably high recidivism rate, and also without jeopardizing public safety. These changes will also allow us to designate an additional 200 parole agents to enforce Jessica's Law, which increases parole time for the most serious sex crimes. With additional money in our budget we will also make sure that sex offenders don't prey on our children here in California. And;

3. We are proposing a sentencing commission to make recommendations on further sentencing guidelines and parole policies so that we can continue to be tough on criminals but at the same time be prudent with our money.

These are tough challenges, but we have to face them and we must solve those problems. We have no choice. We can no longer tolerate prisons that are dangerous to staff, dangerous to our inmates, and dangerous to the public. And we can no longer tolerate a broken parole system, outmoded sentencing laws, and prisons that are so overcrowded that rehabilitation programs are being squeezed out because of a lack of space.

So I have total faith, and I have confidence, that if both Democrats and Republicans come together on that that we can solve this problem. And now I would like to hear and have a few words said by Senator Gloria Romero. Please.

SENATOR ROMERO:

Thank you, Mr. Governor, for once again having the opportunity to work with me on prison reform. I have told people this is an opportunity for a sequel, so let's be successful in that.

And I'm here today really as a demonstration of a commitment, a commitment to continuing to engage in prison reform, both in helping to shape and also helping to shepherd a comprehensive package of prison reform for this 2007 legislative session. I applaud the Governor for actually spending a great deal of time during the interim in talking not only with myself but other members of the Legislature, advocates for prison reform, and many others who have a common concern, and that is making sure that we address the dire circumstances that stand before us or face those dire consequences.

I've had an opportunity to discuss with the Governor a number of opportunities, and what excites me is that this sets the parameters for a broad discussion, a comprehensive discussion, including a number of factors that we all know needs to be done. I emphasize, and I believe that others do emphasize, that this will be a package. Hopefully it will be a strong, bipartisan package, and I think a package that seeks not just to work things out in order to avoid judges' threats of takeover, but really to move us forward in a fashion that California needs to move forward.

Some people have asked me, "Well, what's new?" After all, last year's packages blew up. Some, in fact, this year have even suggested to me, "Just let the Governor do it. Sit back and wait," others have said, "Just let the courts do it." And I reject both of those approaches. Neither inertia nor cynicism will, or should, define how we deal with the 2007 legislative session when it comes to prison reform. Many of us have worked too hard for too long, and the stakes are too high. It's a new year, it's a new opportunity for us once again to recommit ourselves, and that's the reason why I'm here today.

We know what needs to be done; the experts have told us what needs to be done over and over. We do have to address prison capacity, and not just to build, but to use that space wisely. Depending upon how we structure that capacity we can move California's system of corrections in a way that offers further opportunities for rehabilitation and successful re-entry into our communities.

Secondly, I think that part of this discussion recognizes that this is a criminal justice system in California, and that what happens at the state level doesn't just stay at the state level; it impacts and it affects local jails and local communities. So this package, this discussion that is underway, recognizes that we've got to form partnerships with our local elected officials and our local law enforcement officials in order to realize safer communities. I'm from Los Angeles County, and I will tell you, the pressure to release early from our county jails is overwhelming in the public discourse in Los Angeles.

We know we've got to talk about parole reform, and we've debated for some time about locking folks up. I think that we have historically paid too little attention to what happens after that; you get that 200 dollars and a bus ticket out. And if these ex-prisoners are not able to lead law abiding lives, we all pay the price in new crimes that are being committed and new taxes that are going to rectify wrongs that are basically created within our own system.

We all know that California has a billion dollar parole failure, and we will never merely build ourselves out of the problem. But this package, this discussion then on parole reform is a vital part of moving us forward in a way that emphasizes not only re-entry into a community, but I would emphasize earned re-entry, and that's part of the discussion I think we're going to have when we talk about parole reform, the earned and the opportunity for parole success, even more so than just talking about parole reform.

And finally, the part that really I come to the table really eager and optimistic over, and that is about sentencing reform. This, to some extent though, is where the debate does get tough, but I will work with the Governor this year to create a sentencing commission for California. Eighteen other states have already done so, and I believe as we examine other models—and I look forward to having folks at the table to give their views—this has brought about jurisdiction-wide uniformity in sentencing. It's also reduced disparities in prison sentences, it has resulted in greater certainty of punishment. I think it brings about much logic and rationality in sentencing. And this is not just about shortening sentences; far from it. In fact, if it works well, we probably will see a lengthening of sentences where those sentences need to be lengthened. And as the new Chair of Public Safety Committee for the Senate, I fully intend to make this a major source of work, and an opportunity for all to dialogue.

Some folks have asked if this will be an abdication of legislative authority, to create a sentencing commission.

Case 2:90-cv-00520-KJM-SCR    Document 3434-2    Filed 12/23/08    Page 18 of 56

http://gov.ca.gov/index.php?/print-version/speech/7175/

Absolutely not. In fact, I would argue that, to the contrary, creating a sentencing commission is an exercise of legislative authority. Criminal sentencing is one of the most important areas the legislature addresses, and we must be responsible to our constituents to ensure that our sentencing decisions are based not on political whims but on real, reasoned judgment and evidence that links that sentence to reduce recidivism and enhance public safety. That's what good sentencing really is about.

So I look forward to participating in this next year with the Governor, my colleagues. There are 120 legislators, and I'm just one of them, and each one has an equal vote. But I will tell you that with this mandate, and with this pressure, but more so with the leadership and the recognition from the administration, through the legislature, and even from the courts, there is no reason why we cannot move expeditiously and wisely to restore the sheen to California's correctional system and really make it a system that enhances and moves for public safety, not just locks folks up.

So, Mr. Governor, thank you for your leadership. I look forward to working with you once again. You've got to be the eternal optimist to do prison reform, and that optimism has never faded. And it's even, I think, with a stronger sense of commitment that I will enter Sacramento in January with a strong mission and mandate before me. Thank you.

SENATOR RUNNER:

Good afternoon, Senator George Runner. I think we all know that the clock is ticking for us here in the State of California. If, I guess, this was a basketball game, we'd be in the final minutes. And we are being asked to make some decisions and we are needing to do those, because that is our job. And so I appreciate greatly the fact that the Governor has stepped up, has not only continued his commitment to dealing with the crisis that we have in California prisons, but has now even gone even farther in regards to expanding a comprehensive package in regards to how we can do that.

I'm glad to be standing here with colleagues both from the Senate and the Assembly, because it is our job to begin to help deal with this issue. Some of these issues are very difficult. Some of these are difficult for us as Republicans; some of them are difficult, I'm sure, for my Democratic colleagues. But the fact is, we're at the table, and we need to come to resolution on this issue.

First of all, let me just say we cannot delay. Like I said, the clock is ticking for us. We must work together, move forward to enact a plan that will solve these problems. There's no doubt in my mind, and I think for many of my colleagues, and I think for Californians in general, that public safety is the Number 1 role for us as policy makers. That's why we have government, in order to keep our families safe. And we all know that it's dangerous to release felons into our communities when they should be staying in prison. The issue of sentence reform is a challenge for us. It's going to be an issue much debated within our caucuses. The fact is, when Californians have had a choice about sentencing, Californians consistently vote to increase sentences, because they believe that their streets should be safe, and they believe criminals should be behind bars. So as we open up that door of discussion, we're going to be there, we're going to be at that table. But I must tell you, sentencing commission is a challenge for us, and we

hope it's not a codeword for a lessened sentence, less sentence, less time in prison.

The other issue that I appreciate about this, and that is that we must understand that there is a direct link and a relationship between what happens in our jails, and what happens in our prisons, that the two are very much the same system. And so I think it's important and right for the state to step up and take a role of leadership and partner with our counties as they deal with their challenges in their jails. And I believe that goes beyond just the idea of construction. We must address the idea and the issue of ongoing cost, because if we're going to be putting state prisoners in those areas, then we have an obligation to step up and take on some of those issues, and not just shift that cost to the local governments.

It's very clear that in all of these systems, that what we're talking about is more personnel. We're talking about more parole agents, we're talking about more probation agents, we're talking about more correctional peace officers. All of those folks have got to be a part of this solution. We cannot move forward with this plan, we cannot implement a plan successfully, unless we have the line officers, whether it be parole, probation, whether it be correctional peace officers, on board making and rolling in the same direction. It is essential if we are to have a successful implanted program.

I also would like to thank the Governor specifically for his commitment, both in passing and helping with the passage of Jessica's Law, Proposition 83, and now following through on the commitment. Because when voters voted for Proposition 83 they said a couple of things. They want their children safe, but they also knew it was going to be expensive. And so when they voted for it, they said this is how we want our tax dollar spent. And this is what it is that the Governor is bringing to the table, and we appreciate that greatly.

We need to work every day, and hard, until we get this reform package done. We must continue to prioritize public safety. The Legislature has clearly run out of time, and we are in the final moments and we must work together in order to see it accomplished successfully.

Let me introduce to you Assemblymember Greg Aghazarian, a follow-up from the Republican side of the Assembly.

ASSEMBLYMEMBER AGHAZARIAN:

Thank you very much. We have a system on the verge of collapse, and I applaud the Governor's efforts, I applaud everything he's doing to address this problem before it turns disastrous. We made progress last year as we began the discussions of what to do with this looming crisis with the prison system. We made a lot of progress, we defined a lot of issues, we isolated a lot of questions.

This is the year we have to put the meat on the bones of the skeleton we created last year. This is the time to act. If the Legislature and the Governor working together in a bipartisan fashion does not act this year, we run the risk of not only abdicating our roles as the legislative and executive process, but handing it over to the judge, handing it over to someone that's not accountable to the hardworking families and voters of this state. And what does that mean? We're elected. The Governor is elected, 120 of us are elected to represent the people. And as we all can agree, the most important role of state government is the public safety, the safety and security of our communities. I would even go so far as to say it's a right that we have to feel safe and secure in our own homes. After all, all the economic prosperity, all the work we're doing on the environment, all the work we're doing in transportation, what does it matter if we can't feel safe in our homes, in our communities, in our schools, when we're on the streets?

That's why it's important we take this initiative and we act now to solve this problem. I applaud the Governor for his bold, decisive leadership. I look forward to working with him on a bipartisan nature, because we do need to address these issues. We need to work to make sure there are an appropriate number of beds to house these violent criminals that need to be off the streets. We need to make sure we modernize, and we make sure we have an effective parole and probation system that takes into account the needs of what is going on, and make sure the people of our streets are safe from violent criminals. We need to do what it takes, and this is the time to do it.

You know, there are a lot of details in this proposal, and there is going to be a lot of debate on what things say, what they should say, what they shouldn't say, and there's going to be a lot of partisan rancor back and forth. But at the end of the day we know what our Job 1 is this year. We know that public safety is where we need to be. We need to increase the number of beds, we need to build more prisons. Yes, we get that.

But it's also important that we open the dialogue with the local communities. The counties are very integral in this. The local jails, the local communities, the decision makers at the local levels, they need to be an integral part of this discussion. We can't expect them to be handed mandates and not have the appropriate funds to fulfill those mandates. We need to make sure they have the appropriate tools to handle this. They're an equal partner with us in handling this crisis.

When it comes to sentencing, we need to be careful as we proceed with that. Previous proposals have, let's face it, not passed muster. Previous proposals have not given a level of satisfaction that sentences would be hard, sentences will be fulfilled, and sentences will be increased where they need to be increased. We need to make sure, as we're looking at the proposal, that we're not moving backwards, we're moving forward; this is about the safety of our communities.

When it comes to death row improvements, that's a function of this, and this is a great opportunity, and I applaud the Governor for taking immediate action to address the issues that were raised this past week with the death penalty system. It's important that we take a look and address that, to make sure justice is carried out. There are many people that have been given the death penalty, and we need to make sure that is addressed in this. It's an excellent opportunity to address those questions and we need to make sure that is addressed.

But in general, I'm looking forward to working in a bipartisan nature, to make sure the right thing is done. We

cannot abdicate our responsibility here. We cannot leave this to a federal judge with a blank check drawing out of the general funds of the State of California. We were all elected to do a job, and let's work together and do it.

Right now I want to introduce one of our local county sheriffs, Sacramento's own Sheriff John McGinness, to say a few words.

SHERIFF McGINNESS:

Thank you. First of all, on behalf of the California State Sheriffs Association I'd like to sincerely thank Governor Schwarzenegger for having the leadership and drive to recognize that this is not a particularly popular issue. People want to have better schools, they want to have parks, they want to have nice communities where you can enjoy the quality of life, and these are not the kinds of things that people see in a positive area, that they want to see their tax dollars spent on. But reality tells us, experience tells us, that there are those people within society who have so graphically demonstrated and illustrated their tendency to behave in a dangerous manner that you need to be protected from them, and that protection comes through incarceration and it's absolutely essential to quality of life.

There are three component parts to this comprehensive plan that are terribly important. The, first of all, brick and mortar to build new facilities and expand those existing facilities so we have the bed space to house those people to whom I refer.

In addition to that, we know that not everybody who is incarcerated, or sentenced to periods of incarceration, is going to be there forever. They're going to come back into your communities, and our communities, and as a result of that, if we're going to be effective in the future we need to invest in programs today that will absolutely make a difference and reduce recidivism in the future.

Case 2:90-cv-00520-KJM-SCR     Document 3434-2     Filed 12/23/08     Page 22 of 56

And finally, the third component part that's absolutely critical, and we've heard a lot about that this week, is youthful offenders, juveniles in the criminal justice system, those who behave in a manner outside the accepted norm, that draw attention to themselves and absolutely mandate that those of us who are entrusted with the responsibility in the criminal justice system take appropriate steps to make sure that they are in a position where they can have access to programs, and again, society can be protected from them in the most extreme cases.

We have a report that we have completed some time back on this. It's available to members of the media, the full report. It's called "Do the Crime, Do the Time, Maybe," and it's at the State Sheriffs website at www.calsheriffs.org and I encourage you to take a look at that.

And once again, a very sincere thanks to the Governor, the Members of the Legislature, and the staff, for taking this matter seriously. And I think the efforts of this comprehensive plan are very likely going to make a difference, a significant difference, in the quality of life that we all enjoy in the future. So thank you very much.

GOVERNOR SHWARZENEGGER:

Thank you. Someone has taken my folder, but that's okay. Maybe it was here?

SHERIFF McGINNESS:

I think George has it.

SENATOR RUNNER:

I was holding it for you, Governor.

GOVERNOR SCHWARZENEGGER:

Thank you very much.

SENATOR RUNNER:

Protecting it.  I didn't want the Sheriff to take it.

GOVERNOR SCHWARZENEGGER:

You have the papers, though.  Thank you very much, I really appreciate it.  George always take care of my papers.  Very nice.

SHERIFF McGINNESS:

Oh, I'm never coming to one of these again.

GOVERNOR SCHWARZENEGGER:

I really appreciate it.  Any questions about any of this?  Yes, please.

QUESTIONS/ANSWERS

Q:    Yesterday in federal court former Corrections Secretary, Acting Secretary Woodford, said that sentencing reform was postponed earlier this year out of political considerations. Was that accurate?

GOVERNOR:    No, but I'm not here to talk about what she said, and what I say, and all those things. I think we are way beyond that. I think the important thing is that you should know that this comes out of a discussion that Senator Romero and I had where Senator Romero, when I talked to her after the elections were over, I said, "Look, we got stuck in our special session. Where did we fall short?" And she said, "Well, you know, time was short, and also I think not everything was on the table." And so I turned to her and I said, "Well, if that's the problem, I will put everything on the table. I think we should address all of the issues." And we had a long, great conversation about building prisons. We have talked about creating a sentencing commission. We talked about paroles, we talked about all kinds of issues, and talked about for an hour. And I think that this conversation was really crucial. So this is actually where this came from, when we talk about building more local jails and talking about the sentencing commission and all those ideas.

Q:    Governor?

GOVERNOR:    Yes?

Q:    In proposing a sentencing commission, what are your concerns currently about sentencing in California?

GOVERNOR:    I think we want to move forward in a way like other states have shown us. I mean, there are many states that have sentencing commissions—I think there are 17 or so states that have sentencing commissions—and I think that we can learn from that. I think that we don't have to redesign the wheel. We just think that the key thing is just who do we appoint to that, that we really have the most experienced people in the profession that really can help us with looking at that and making recommendations.

Q:    Are you open to any change to three strikes? I mean, that's the sentencing issue that seems to come up a lot in terms of non-violent offenders getting lengthy sentences. You've obviously campaigned against the proposition a few years ago. What are your thoughts now about that, and do you think the sentencing commission should look at three strikes?

GOVERNOR:    I don't want to tamper with the three strike system.

Q:  Governor, can you tell us how much money you were talking about in terms of spending and how we're going to pay for it?

GOVERNOR:  Yes.  I think there is approximately 10.9 billion dollars, approximately 11 billion dollars, that we are talking about for the whole package.  And we're talking here about 45,000 local beds and we'll also talk about moving the 17-some thousand inmates that are right now in bad beds out of there as quickly as possible.  We are building facilities, like I said, for 78,000 new beds, and that's the key thing.  Now, the ones in the prisons on the state level, there will be not new jails, but we are going to add on to the facilities that are already existing.  And I think that the key thing to this whole thing is to create really a good partnership with the sheriffs, with the local law enforcement, and with the local community.

Q:  And how are we paying for this?  Is it revenue bonds?

GOVERNOR:  Yes, lease revenue bonds is one, and some of it comes from the budget, some of the ideas when it comes to parole, or probation officers I should say, comes a certain amount, 50 million dollars or so, and bonds.  And the key thing is again that we do it the right way, and that we think about—to save money, I think, is the key thing here, because we want to do it in a way where we create the vision, Democrats and Republicans, rather than a judge coming in and creating his vision.

And you know, when we talk about sentencing reform and all of those kind of things—I mean, let's just think about, and not forget, that right now there are approximately 18,000 inmates that are being released every month, because there is a shortage of space.  Think about the amount of people that are being sentenced and are not even put in jail because there is not enough space.  I mean, think about all of that.  So we have to really put all of this into the mix when we make decisions.

And I think the key thing as we move forward is that we keep the people also safe, because we don't' want to have the wrong people go out, and right now, you know, there really is no way of judging.  I mean, people are just released.  They say, you know, "We are 18,000 short of beds, so let's get 18,000 out."  That's the way the decisions are made now.  So with a sentencing reform and all of those things I think we will really—we will guide in which direction we want to go.

And also, like I said, when it comes to spending money—I mean, think about when the federal court will go into our general fund.  I mean, they can take out whatever they want.  And I think that is a huge danger, because that will take money away from education, and that will take money away from health care, because those are the three big components, is health care, education, and prisons, when you talk about the budget.  So that's not what we want.

So it's, again, I think, one of those things. Do we want to take charge of it and take control pretty much like the infrastructure bonds?  Do we want other forces out there always to make the decisions over how we're going to spend our money?  Or should we in this building make the decisions and create a great direction and think ahead, where do we want to be 10 years from now with this prison system?

Q:   Governor --

GOVERNOR:   Yes?

Q:   How many prisoners have we sent to other states, to other jails?

GOVERNOR:   Maybe Jim, you can answer that?

TILTON: Sure can.  We've got about 120 that have gone to date.  We've got about 600 additional inmates that are getting ready to go.

Q:   Are you going to continue with this?

GOVERNOR:   Yes.  We will continue to do everything we can, to look in every way possible to free up beds, because as I've said earlier in my speech, and as you have heard everyone else mention, tha we can't keep squeezing out rehabilitation programs.  It's again something that Senator Runner and I talked about, that rehabilitation is important, because as you have heard, every one of those inmates—except if you are on death row—eventually you come out into your neighborhoods.

So do we want to have someone just get his 200 dollars and a bus ticket and he doesn't know how to connect and how to get a job?  Do we want this person to be trained, educated and prepared for getting out and getting a job and being good at that job so they can continue keeping that job?  That's how we cut down the recidivism rate.

And like I said, it's unacceptable, the recidivism rate we have. It's probably the highest —Jim, would you say it's the highest in the nation? I think it's the highest in the nation. We have, like we were talking here about anywhere between 65 and 70 percent. And imagine, that means that every—out of 10 people that go out, 7 come back in again. This is unacceptable. We can do better. I mean, we are such an innovative state, such a creative state, and we have shown this past year that we can make the impossible possible if we work together, and I think this is such a great spirit now of all of us coming together, Democrats and Republicans.

And like I said, Senator Romero and I, we had great discussions where we just said, "Okay we've got to the extra step. Let's not get stuck with our party kind of philosophies. Let's go beyond that and let's really go and move forward with it and come to some kind of an agreement that works for everyone. And the key thing is, it keeps the people, the public, safe, because that's the key thing; keep the public safe and not have someone go in to our general funds. Okay?

Q:    Governor, I noticed some sort of nuanced differences between the way that various legislators on stage are describing how the sentencing commission or the parole thing might work. I mean, how hard is it going to be to come together on some really tough topics?

GOVERNOR:    You have heard it. It's going to be tough—it's going to be tough. But it is possible. Why is it possible? Because decisions will be made this coming year, just like the decisions that were made this year, and that is what is best for California rather than what is best for your party. We've got to go beyond our philosophy in order to meet and in order to come to an agreement.

And I think this is what everyone is willing to do, because we have learned from this past year that we could do things because people went a little bit beyond, and that's how we can make things happen. And we are a model to the rest of the nation because of what our legislators have done, and I always say thank you to them because of the great work they have done.

And I know that this year they will do the same thing, that they will come through. Yes, it will be tough. It is not easy when you are stuck in something for so many years, and you don't want to bend here or bend there. But they will do it, they will break through that, and this is what is so great about this whole new atmosphere here.

Thank you very much. Thank you.

EXHIBIT C.

Arnold Schwarzenegger                                          September 23, 2008
Governor

### State of California
Governor's Office

I object to the following appropriations contained in Assembly Bill 88.

Item 0690-001-0001—For support of Office of Emergency Services.

I am sustaining Provision 4, which suspends the Government Code Section 8581.5 requirement for the biennial report on emergency preparedness for catastrophic disasters, which was scheduled to be published in 2008-09. However, I am directing the Office of Emergency Services to prepare this report to the extent possible using existing resources.

Item 0690-102-0001—For local assistance, Office of Emergency Services. I revise this item by deleting Provisions 3 and 5.

Provision 3 requires the Office of Emergency Services to allocate $800,000 to the Central Coast Rural Crime Prevention Program. Funding for this program was reduced by 10 percent, but this language was not amended to reflect the reduced amount. This technical veto is necessary to ensure that all grant recipients receive the same level of reduction. Therefore, I am directing the Office of Emergency Services to allocate the grant funding in a manner consistent with this budget language adjusted for the 10 percent reduction.

Provision 5 would require the Office of Emergency Services to use a competitive grant process for allocating funds to California Multijurisdictional Methamphetamine Enforcement Teams, and would create limitations on the minimum and maximum amounts of grants awarded under this program. This language is unnecessarily restrictive; therefore, I am vetoing this provision.

Item 2640-101-0046—For local assistance, State Transit Assistance. I reduce this item from $406,434,000 to $306,434,000.

I am reducing this item by $100,000,000 for the State Transit Assistance program so that sufficient funding will be available in the Public Transportation Account to provide full reimbursement of the General Fund for its Home-to-School Transportation costs. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward. At the same time, constitutional requirements, federal law, and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending. As a result, I have an obligation to reduce spending when my veto power is adequate to do so. Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

With the $5 billion in transit and intercity rail funding provided in Proposition 1B, this will allow a substantial increase in the capacity, safety, and reliability of public transportation throughout the state. The amount I am retaining in this item also continues program funding at a sustainable level.

Item 2660-001-0042—For support of Department of Transportation.

I am sustaining the Legislature's funding for capital outlay support. In the May Revision, I proposed a reduction in positions and dollars for engineering, design, environmental studies, and other work. For the declining amount of ongoing work, I proposed to use an increased share of contractual services, consistent with the provisions of Proposition 35, approved by the voters in 2000.

The Legislature, however, funded 90 percent state staff and 10 percent contract staff. Because it will take a year or more to hire and train state staff as existing staff leave, I am concerned that this action will delay projects by a year or more and end up costing more than using contractual services. Moreover, because the funding from Proposition 1B is one-time and will be exhausted over the next four years, the hiring of new permanent state staff could lead to the need for future layoffs. An appropriate balance between state staff and contract staff will enable the state to improve its highways, roads, bridges, and railroad crossings immediately. Therefore, I am directing the Director of the Department of Transportation to take all steps necessary to deliver these projects as quickly as possible, including an increased use of contractual services beyond the level reflected in the budget action, but within the funding level the Legislature has provided.

Item 3540-001-0001—For support of Department of Forestry and Fire Protection. I reduce this item from $560,045,000 to $557,896,000 by reducing:

(3)     12-Resource Management from $62,597,000 to $60,448,000;

(4)     20.01-Administration from $67,198,000 to $66,911,000; and

(5)     20.02-Distributed Administration from -$66,536,000 to -$66,249,000.

I am reducing this item by $2,149,000. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward. At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending. As a result, I have an obligation to reduce spending when my veto power is adequate to do so. Consequently -- and in order to further ensure that this budget remains in balance --- I am taking the difficult but necessary action reflected in this veto to further control state spending.

However, I am sustaining $1,093,000 and 10.0 positions in the Resource Management program to fund vegetation management efforts because fuel reduction projects are a cost-effective way to reduce the number and size of catastrophic wildfires.

Item 3900-001-0044—For support of State Air Resources Board. I revise this item by reducing:

(2)     25-Stationary Source from $57,232,000 to $55,232,000.

(6)     Amount payable from the General Fund (Item 3900-001-0001) from -$2,189,000 to -$189,000

I am revising this item to conform to the action I have taken in Item 3900-001-0001.

<u>Item 4260-101-0001</u>—For local assistance, Department of Health Care Services. I revise this item by reducing:

(1)      20.10.001-Eligibility (County Administration) from $2,697,119,000 to $2,689,743,000,

(9)      Amount payable from the Federal Trust Fund (Item 4260-101-0890) from -$21,448,993,000 to -$21,441,617,000;

and by deleting Provision 14.

I am revising this item to conform to the action I have taken in Item 4260-101-0890.

I am also deleting Provision 14 from this item, which directs the Department of Health Care Services to provide the Legislature with specific options for improving the Medi-Cal fee-for-service program. While I share the Legislature's interest in improving the coordination of care for Medi-Cal beneficiaries and believe that such efforts will better serve clients and reduce costs, I am deleting the provision as it would limit my discretion in developing a budget proposal.

<u>Item 4260-101-0890</u>—For local assistance, Department of Health Services. I reduce this item from $21,448,993,000 to $21,441,617,000.

I am reducing this item by $7,376,000 to conform to my action in Items 4170-101-0001, 4200-001-0001, 4265-111-0001, 4440-001-0001, and 5180-001-0001.

<u>Item 4300-101-0001</u>—For local assistance, Developmental Services. I reduce this item from $2,384,027,000 to $2,382,799,000 by reducing:

(2)      10.10.020-Purchase of Services from $3,372,900,000 to $3,370,854,000, and

(4)      Reimbursements from -$1,308,405,000 to -$1,307,587,000.

I am reducing this item by $2,046,000 ($1,228,000 General Fund and -$818,000 Reimbursements). This technical veto is consistent with the pass through of the January 1, 2009 federal Supplemental Security Income cost of living adjustment.

<u>Item 4440-101-0001</u>—For local assistance, Department of Mental Health. I reduce this item from $480,163,000 to $480,111,000 by reducing:

(5)      10.97–Community Services—Healthy Families from $24,805,000 to $24,653,000, and

(6)      Reimbursements from -$1,208,165,000 to -$1,208,065,000.

I am reducing this item by $152,000 ($52,000 General Fund and $100,000 Reimbursements) for the Healthy Families program. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward. At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending. As a result, I have an obligation to reduce spending when my veto power is adequate to do so. Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

Item 5180-101-0001—For local assistance, Department of Social Services.  I reduce this item from $2,808,386,000 to $2,738,386,000 by reducing:

(1)      16.30-CalWORKs from $5,290,712,000 to $5,220,712,000.

I am reducing this item by $70,000,000 for the CalWORKs program.  This funding would have been available to counties as part of their single allocation, which can be used for county administration, employment services, and child care.  Even with this reduction in funding, the single allocation provided to counties still increases from 2007-08 to 2008-09.  While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward.  At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending.  As a result, I have an obligation to reduce spending when my veto power is adequate to do so.  Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

Item 5180-141-0001—For local assistance, Department of Social Services.  I reduce this item from $480,516,000 to $478,478,000 by reducing:

(1)      16.75-County Administration and Automation Projects from $1,194,774,000 to $1,192,736,000.

I am reducing this item by $2,038,000 for the Work Incentive Nutritional Supplement program.  By eliminating this funding, I am delaying implementation of this program for one year.  This will allow the Department of Social Services to study this program and ensure it is consistent with federal rules.  Further, while this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward.  At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending.  As a result, I have an obligation to reduce spending when my veto power is adequate to do so.  Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

Item 5180-151-0001—For local assistance, Department of Social Services.  I reduce this item from $757,135,000 to $750,727,000 by reducing:

(1)      25.30-Children and Adult Services and Licensing from $2,151,082,000 to $2,139,650,000;

(2)      25.35-Special Programs from $22,682,000 to $22,101,000;

(3)      Reimbursements from -$143,894,000 to -$138,589,000; and

(6)      Amount payable from the Federal Trust Fund (Item 5180-151-0890) from -$1,263,716,000 to -$1,263,416,000.

I am reducing this item by $11,432,000 ($6,127,000 General Fund) for the Adult Protective Services program, and by $581,000 ($281,000 General Fund) for the Deaf Access program.

While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward.  At the same time, constitutional requirements, federal law, and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending.  As a result, I have an obligation to reduce spending when my veto power is adequate to do so.  Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

Item 5180-151-0890—For local assistance, Department of Social Services.  I reduce this item from $1,263,716,000 to $1,263,416,000.

I am reducing this item to conform to the action I have taken in 5180-151-0001 related to the Deaf Access program.

Item 5225-001-0001—For support of the California Department of Corrections and Rehabilitation.  I reduce this item from $7,173,074,000 to $7,145,074,000 by reducing:

(8)    25-Adult Corrections and Rehabilitation Operations from $4,974,568,000 to $4,946,568,000.

I am directing the Secretary of the California Department of Corrections and Rehabilitation to implement a Parole Decision-Making Instrument (PDMI) that provides guidelines on how to respond to technical parole violations based on the risk-to-reoffend level of the offender and the seriousness of the violation.  I believe that the use of the PDMI by parole agents will facilitate the reintegration into society of low-risk parolees by providing community-based sanctions and programs.  By providing alternatives to incarceration for parolees who commit minor technical parole violations, the Department will be able to reduce prison overcrowding.  Consistent with this direction, I am reducing $22,000,000 from this item to reflect lower adult inmate population levels.

I am also reducing this item by an additional $6,000,000 to reflect a delay in the activation of Female Rehabilitative Community Correctional Center beds that resulted from the state's late budget.

Item 6110-001-0001—For support of Department of Education.  I revise this item by reducing:

(2)    20-Instruction Support from $174,201,000 to $173,909,000;

(3)    30-Special Programs from $54,659,000 to $54,351,000; and

(9)    Amount payable from Federal Trust Fund (Item 6110-001-0890) from -$171,015,000 to -$170,415,000.

I am revising this item to conform to the action I have taken in Item 6110-001-0890.

Item 6110-001-0890—For support of Department of Education.  I reduce this item from $171,015,000 to $170,415,000.

I am deleting the legislative augmentation of $600,000 federal Title I funds to enhance an evaluation of the Migrant Education program.  The Budget Act of 2007 provided $800,000 for

completing a comprehensive needs assessment, developing the state educational agencies service delivery plan, and contracting for an evaluation to meet federal requirements.  The appropriation provided in 2007 should be sufficient for producing a useful program evaluation.

I am deleting Provision 30 to conform to this action.

I am deleting provisional language that would appropriate $1,200,000 of Title III funds proposed for unspecified English learner state level activities (state operations) in 2009-10 as it is premature to appropriate funds for 2009-10, for projects that have not been developed or justified.

I am deleting provision 34 to conform to this action.

Item 6110-130-0001—For support of the Department of Education, Instructional Support. I reduce this item from $9,035,000 to $8,131,000.

I am reducing this item by $904,000 for the Advancement Via Individual Determination program. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward.  At the same time, constitutional requirements, federal law, and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending.  As a result, I have an obligation to reduce spending when my veto power is adequate to do so.  Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

I am revising Provision 1 to conform to this action as follows:

"1. Of the funds appropriated, $~~1,300,000~~ *$1,170,000* is available for administration of the Advancement Via Individual Determination (AVID) centers."

Item 6110-196-0001—For local assistance, Department of Education.  I revise this item by deleting Provisions 4(e) and 9(b).

I am deleting Provision 4(e), which would specify principles for the State Department of Education (SDE) to follow when developing the 2008-09 expenditure plan for state and local activities to improve child care.  The language is unnecessary and does not specify any clear priorities for development of the expenditure plan.

I am deleting Provision 9(b), which would restrict the start point on the family fee schedule to 40 percent of the State Median Income as adjusted for family size.  This Provision is inconsistent with the prior agreement reached between the Administration and the Legislature that families currently paying fees continue to do so as income eligibility is adjusted. Additionally, this language would result in lower fee revenues, increased costs in child care programs, and reduced capacity to serve children.

I am sustaining Provision 2(b), which would provide details for the expenditures of the appropriation and specify the rate limits for alternative payment and other voucher-based programs based on the 85th percentile of the 2007 Regional Market Rate Survey with an effective date of March 1, 2009.  While I must sustain this provision because a statute would otherwise control the appropriation and drive the rates, I am concerned that this language will

Page 6

drive considerably higher costs per case in the future, similar to the rate increases experienced in 2007-08.

I am also sustaining Provision 14, which specifies intent to fully fund the third stage (Stage 3) of child care for former CalWORKS families. This intent statement duplicates statutory intent language and, while it reflects a goal to provide sufficient funds, I want to be clear that inclusion of this language in the budget bill is not a commitment to fund any deficiency that might occur.

Item 6110-202-0001—For local assistance, Department of Education. I reduce this item from $11,742,000 to $10,880,000 by reducing:

(1)      30.20.010-Child Nutrition Programs from $11,742,000 to $10,880,000.

I am reducing this item by $862,000. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward. At the same time, constitutional requirements, federal law, and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending. As a result, I have an obligation to reduce spending when my veto power is adequate to do so. Consequently – and in order to further ensure that this budget remains in balance – I am taking the difficult but necessary action reflected in this veto to further control state spending.

Item 6110-488—Reappropriation, Proposition 98, Department of Education. I revise this item from $163,051,000 to $146,651,000, and by deleting:

I am deleting the $16,400,000 augmentation to Stage 2 child care to align expenditures with updated caseload estimates. With this reduction, a total of $516,611,000 still remains in the budget to support the CalWORKs Stage 2 program which should be sufficient for the estimated caseload under the authorized eligibility, copayment, and subsidy policies.

I am revising Provision 3 to conform to this action.

"3. The sum of $163,051,000 $146,651,000 is hereby reappropriated to the State Department of Education for transfer by the Controller to Section A of the State School Fund for allocation by the Superintendent of Public Instruction for the purpose of funding CalWORKs Stage 2 child care. The amount reappropriated pursuant to this provision is for use in the 2008-09 fiscal year."

I am deleting the one-time legislative augmentation of $295,000 for assessments of the Oakland Unified, Vallejo City Unified, and West Fresno Elementary School Districts. Current law specifies that these emergency loan districts are responsible for the costs of these reports. Therefore, I am eliminating this augmentation.

I am deleting Provision 2 to conform to this action.

Item 6440-001-0001—For support of University of California. I reduce this item from $3,000,920,000 to $2,995,520,000 by decreasing:

(1) Support from $3,123,516,000 to $3,118,116,000,

and by revising Provisions 14 and 24 and by deleting Provision 16.

I am reducing this item by $5,400,000 to eliminate funding that supports research on labor and employment and labor education. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward. At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending. As a result, I have an obligation to reduce spending when my veto power is adequate to do so. Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

I am also revising Provision 24 of this item to conform as follows:

"24. Of the funds appropriated in Schedule (1), $5,400,000 *$0* is to support research on labor and employment and labor education throughout the University of California system. ~~Of these funds, 60 percent shall be for labor research and 40 percent shall be for labor education~~."

Further, while I am sustaining the Legislature's action to earmark funding for student academic preparation and education programs (SAPEP), I am vetoing the language requiring the university to report on its use of funds for SAPEP activities. This reporting requirement would result in an expenditure increase without regard to the availability of revenues. Nevertheless, in recognition of the Legislature's desire to obtain this information. I am instructing the President of the University of California to comply with this legislative request for this report to the extent compliance can be achieved using existing resources and without impairing the university's ability to perform its essential functions.

I am revising Provision 14 to conform as follows:

"14. Of the funds appropriated in Schedule (1), $19,300,000 is for student academic preparation and education programs (SAPEP) and is to be matched with $12,000,000 from existing university resources, for a total of $31,300,000 for these programs. The University of California shall provide a plan to the Department of Finance and the fiscal committees of each house of the Legislature for expenditure of both state and university funds for SAPEP by September 1 of each year. ~~It is the intent of the Legislature that the university report on the use of state and university funds provided for these programs, including detailed information on the outcomes and effectiveness of academic preparation programs consistent with the accountability framework developed by the university in April 2005. The report shall be submitted to the fiscal committees of each house of the Legislature no later than April 1, 2009.~~"

Finally, I am deleting the legislative redirection of $15,000,000 from funds budgeted for administrator compensation to support salary increases and a step pay system for low-wage service employees. Given the 10 percent reduction to the university's institutional support budget that was adopted by the Legislature, the University should be provided the flexibility to allocate its resources to preserve core administrative functions. Further, employee salaries should be negotiated in collective bargaining agreements between the University and its service employees.

I am deleting Provision 16 to conform to this action.

<u>Item 7980-001-0001</u>—For support of California Student Aid Commission.  I reduce this item from $14,206,000 to $13,527,000 by decreasing:

(1.5)    50-California Loan Program from $1,000,000 to $500,000;

(3.5)    97.20.001 Unallocated Reduction from -789,000 to -1,468,000;

(4.5)    Amount payable from the Student Loan Operating Fund (7980-001-0784) from
         -$1,000,000 to -$500,000;

and by revising Provision 4.

I am reducing this item by $679,000.  However, I am sustaining the remaining $111,000 legislative augmentation for the purpose of funding additional ongoing telephone system and Department of Technology Services costs that were identified after the January budget proposal. While this budget bill provides for a modest reserve in 2008-09, it fails to make the necessary statutory spending reductions and revenue increases needed to eliminate the state's structural budget deficit going forward.  At the same time, constitutional requirements, federal law and court required payments drive the majority of the spending in any budget, and limit my ability to reduce spending.  As a result, I have an obligation to reduce spending when my veto power is adequate to do so.  Consequently -- and in order to further ensure that this budget remains in balance -- I am taking the difficult but necessary action reflected in this veto to further control state spending.

I am also revising Provision 4 of this item to conform to the action I have taken in Item 7980-001-0784 as follows:

"4. (a)  This item reflects $1,000,000 $500,000 payable from the Student Loan Operating Fund for the purpose of funding, on a limited-term basis, 6.0 positions in the Federal Policy and Programs Division. Those positions shall be continued until a sale or other authorized transaction is completed pursuant to Chapter 182 of the Statutes of 2007, which is anticipated to occur in-the 2009-10 fiscal year.
(b)  Additionally, this item reflects an increase of $1,010,000 available on a one-time basis for necessary moving costs, furnishings, and equipment associated with relocation of the Student Aid Commission.  Not later than August 1, 2008, the commission shall detail and submit for approval to the Department of Finance, and for informational purposes to the Chairperson of the Joint Legislative Budget Committee, all one-time costs estimated to be necessary for relocation of the commission. Any funds remaining shall be available for any expenses that may be necessary or convenient to further the intent of the sale or other authorized transaction of EdFund pursuant to Chapter 182 of the Statutes of 2007 upon the written approval of the Department of Finance."

<u>Item 7980-101-0001</u>—For support of California Student Aid Commission.  I revise this item by revising Provision 1.

I am deleting the legislative augmentation to Provision 1(d), which increased the number of Assumption Program of Loans for Education (APLE) awards by 800.  The remaining amount of authorized awards in the budget is 7,200.  I proposed fewer APLE awards to curb the growth in required APLE payments in the context of budget balancing reductions and because the Student Aid Commission has historically not utilized all the awards.  This reduction is necessary

to limit future ongoing expenditures in line with ongoing resources as we work towards resolving the structural budget imbalance.

I am revising Provision 1 as follows:

"1.  Funds appropriated in Schedule (1) are for purposes of all of the following:
(a) Awards in the Cal Grant Program under Chapter 1.7 (commencing with Section 69430) and Article 3 (commencing with Section 69530) of Chapter 2 of Part 42 of Division 5 of Title 3 of the Education Code.
(b) Grants under the Law Enforcement Personnel Dependents Scholarship Program pursuant to Section 4709 of the Labor Code.
(c) California Student Opportunity and Access Program contract agreements under Article 4 (commencing with Section 69560) of Chapter 2 of Part 42 of Division 5 of Title 3 of the Education Code.
(d) The purchase of loan assumptions under Article 5 (commencing with Section 69612) of Chapter 2 of Part 42 of Division 5 of Title 3 of the Education Code. The Student Aid Commission shall issue 8,000 7,200 new warrants.
(e) The purchase of loan assumptions under the Graduate Assumption Program of Loans for Education pursuant to Article 5.5 (commencing with Section 69618) of Chapter 2 of Part 42 of Division 5 of Title 3 of the Education Code.
(f) The purchase of loan assumptions under the State Nursing Assumption Program of Loans for Education (SNAPLE) Employees of State Facilities Program pursuant to Article 2 (commencing with Section 70120) of Chapter 3 of Part 42 of Division 5 of Title 3 of the Education Code.
(g) The purchase of loan assumptions under the State Nursing Assumption Program of Loans for Education (SNAPLE) pursuant to Article 1 (commencing with Section 70100) of Chapter 3 of Part 42 of Division 5 of Title 3 of the Education Code.
(h) The Student Aid Commission shall report by April 1, 2009, on the State Nursing Assumption Program of Loans for Education, pursuant to the reporting requirements of Section 70108 of the Education Code.
(i) Of the amount appropriated in Schedule (1), $297,000 is provided for loan assumption payments to participants in the National Guard Assumption Program of Loans for Education pursuant to Article 12.5 (commencing with Section 69750) of Chapter 2 of Part 42 of the Education Code.
(j) Notwithstanding subdivision (c) of Section 69613.8 of the Education Code, any Assumption Program of Loans for Education participant who meets the requirements of subdivision (a) or (b) of Section 69613.8 of the Education Code may receive the additional loan assumption benefits authorized by those subdivisions."

Item 8380-001-0001—For support of Department of Personnel Administration.

I am revising this item in order to correct a technical error in the Budget Bill:

(1)    10-Classification and Compensation from $6,442,000 to $6,414,000;

(2)    20-Labor Relations from $3,480,000 to $3,464,000;

(3)    25-Legal from $7,947,000 to $7,919,000;

(5)     40.02-Distributed Administration from -$4,457,000 to -$4,370,000; and

(6)     54-Benefits Administration from $32,972,000 to $32,957,000.

With the above deletions, revisions, and reductions, I hereby approve Assembly Bill 88.

/s/  ARNOLD SCHWARZENEGGER

ARNOLD SCHWARZENEGGER

EXHIBIT D.

[239657-1]

# Office of the Governor

ARNOLD SCHWARZENEGGER
THE PEOPLE'S GOVERNOR

## GOVERNOR'S REMARKS

Monday, 06/26/2006 2:24 pm

### Schwarzenegger Calls Special Session to Address Prison Crowding, Recidivism

Well, thank you very much. Thank you for this nice reception, and thank you, Jan for the wonderful introduction. I mean, this woman is incredible, I tell you, I just love her. We have had such a great working relationship. And this weekend she calls me. It was Saturday, it was just before I went to Disneyland to watch with my kids the pirate movie, the new one that's coming out. AndWell, thank you very much. Thank you for this nice reception, and thank you, Jan for the wonderful introduction. I mean, this woman is incredible, I tell you, I just love her. We have had such a great working relationship.

And this weekend she calls me. It was Saturday, it was just before I went to Disneyland to watch with my kids the pirate movie, the new one that's coming out. And she calls me and she says, "You know, besides your coming down there and speaking to us, there's one other thing I need." And I said, "What do you need now? There's always something when you call," I said, "It's never easy." So she says, "Well, we are doing an auction for a charity which is benefiting," what? For the criminal justice system, exactly. She said, "We are raising a lot of money for that. Can you give us an auction item? Because I imagine an item from you will sell for a lot of money." So I said, "Well, like what? Maybe to have lunch with you, or dinner, or maybe a workout with you, or maybe you can give us some of your governor's cigars or something. I mean, come on." So I said, "Okay, let me think about this for a second." I said, "Oh, you know what? How about this? I have an idea. How about—there are only five humidors that were made with the governor's seal on it, that I had made for special gifts. How about giving you one of those big humidors to auction off?" So she, of course, was very excited." (IA) come on out here with that thing. I want to—(Applause)

So in there is the humidor. I'm not going to unpack it now and show it, but in there is the humidor with the governor's seal engraved inside the top of the thing. So those that are into humidors, or those that are into smoking cigars, here is an item that you can buy. Don't even start below 5,000 dollars, okay? We want to make sure—(Applause)

That's the kind of relationship we all have here. This is really great. But it is great to be here today with so many of the dedicated public servants. And I think my father-in-law said it best when he said that being a public servant is the most noble profession, and this is exactly what it is.

But I have to admit that before I came here today I was a little bit nervous being with that many prosecutors in one room. This is a lot of prosecutors, especially when I started thinking a little bit about my earlier movies, like Hercules in New York or Red Sonja, or Jingle All the Way, and stuff like that. So I immediately had, of course, to check with my legal office in Sacramento, but they assured me that the statute of limitations for cruel and unusual punishment of movie fans has expired, so I felt a little bit safer here today. (IA) make a difference, you know, because those movies, if they are doing well, then they are a big asset. And if they don't, it can go the other way. I saw that with the election, our recall election. I don't know if you have heard that in San Diego. There were like 80 percent of the people in San Diego that voted for me, and the other 20 percent were really mad at my early movies, so they—eventually I'm going to win them over.

But anyway, seriously, though, I love speaking to you today, and this is really great. I like giving speeches, of course. Like the other day, I gave a speech, I felt really good about myself, it was a great speech. My wife came running up to me, she said, "Oh, this was fantastic. You're becoming more and more Kennedyesque." So I said, "What does that mean, I talk like John F. Kennedy and like Robert Kennedy?" And she said, "No, you've gained weight like Teddy Kennedy." So anyway, these are the kinds of things that you hear. It's not easy.

But seriously, though, I'm very happy to share this time with all of you as officers of the court. And of course no one understands better than you the incredible trust that the public have in district attorneys, to keep the people and to keep the property safe. As governor, of course there is nothing that is more important—this is my No. 1 priority—is, of course, public safety and protecting the people, and that's why you and I have had such an incredible relationship and such a great partnership, and I'm very proud of that.

I mean, look at the things that we have together. I think that Jan has just touched on some of those things. I am very proud of the way we worked together to defeat Proposition 66, and that we were able to hold press conferences together and to raise that money that we needed, 5 million dollars, just shortly before the election. And the great thing about 66 was that the press said that they are going to win by two-thirds of the votes, and then within two weeks we turned it around and they lost their proposition by two-thirds of the vote, so that is really great. (Applause)

And like Jan said, you can count on me, that I will oppose any effort to weaken the three-strike law. It doesn't matter how many times they try to do it, because the three strike works, it makes sure to keep our most dangerous criminals where they belong, and that is behind bars. (Applause)

And I'm also very happy how we worked together to make sure that Proposition 69 passes, because to expand the DNA database was important, to make it easier to solve crimes using the DNA evidence.

And I've also signed a number of tough on crime bills that I'm very proud of, if it is Megan's Law, which is now much stronger, so that Californians have more internet information on the website about the sexual offenders, sex offenders.

Or we have also expanded the victims' rights, giving them a strong voice at parole hearings. And this week, of course, I'm appointing a Victim's Advocate in my office, which is very important, to safeguard victims' rights. So this is something that is going to be great, and so it is great also to see you here today.

And we have increased also restitution that inmates now pay to crime victims. They are paying now a record amount of 5.1 million dollars a month—just imagine, it's more than 100 million dollars total so far that they have paid, which is also, I think, a great, great accomplishment.

And of course as father of four children there is nothing that I care more deeply about than the safety and the welfare of our children. That's why I have been proud to sign bills that toughen our sexual predator laws. Because of legislation that I signed, child molesters are now prohibited from living within a half a mile from any public or private school. I also signed legislation that prohibits courts from granting child custody to a parent who lives with a registered sex offender.

And Jessica's Law, an initiative that I co-sponsored, is on the November ballot. It will give California some of the toughest sex offender laws in the nation.

And in May, I issued an executive order creating the High-Risk Sex Offender Task Force, to review all statutory and departmental policies on the release and placement of high-risk offenders. I've also called for recommendations by August 15th on specific steps that we can take to better protect the public from those offenders. I know that this bipartisan team, this bipartisan task force, is doing a great work right now, and I'm looking forward to hearing their proposals.

Now, in criminal justice, in the criminal justice arena, I know all of you realize that we have another very serious problem on our hands that needs to get swift and dramatic action and attention, and I'm talking about our prisons. We all know that we have a lack of prisons. We don't have enough prisons, and we have a recidivism rate of 70 percent. Our prisons are at a crisis point right now because the State of California has not planned adequately for its future. This is just another one of those infrastructure needs California has fallen way behind on. As of last Friday our prison population—I mean, think about this number here—was at 171,527, and this is at a prison system that was really built only for 100,000 inmates. And this is at an all-time high right now, and we are rapidly running out of space. California has authorized and built just one prison in the last 10 years—1 prison in the last 10 years. And with tougher sentencing and state population increasing to 37 million, our prisons are dangerously overcrowded right now.

Because of that, we are double and triple bunking inmates and housing them in parts of our prisons that were not meant to house any inmates. This is not only increasing tension, and makes our prisons unsafe for staff and inmates alike, but it also takes away space that we need for programs that can help rehabilitate and give our inmates the skills that they need to go to the outside. Right now, 16,300 inmates are housed in prison gyms and in day rooms. Any Correction experts will tell you that this is a recipe for disaster. Without the programs, we will are never going to lower our recidivism rate, which is now, like I said, at 70 percent, which is the highest in the nation.

If we don't address this very dangerous situation as quickly as possible, the courts may very well take over the entire prison system and will order us the early release of tens of thousands of prisoners. I know that you agree that this is something we cannot tolerate. We are working around the clock to make sure that this does not happen, and that we solve those problems as quickly as possible.

The bottom line is that California prisons were a mess when I took office, and we have worked on prison reform ever since Day 1. Last year I proposed and signed legislation that reorganizes our Correction system to increase efficiency and control at all of our institutions. But reform is an ongoing thing. Now we need bold and effective action on overcrowding and recidivism.

I inherited this problem, but I do not for a minute shy away from solving it. And that is why today I signed a proclamation for a special session of the legislature to deal with this issue. Now, I'm proposing four very specific prison proposals, that if the legislature passes them will give us significant relief on overcrowding and reducing recidivism. My administration has been working on those proposals for a month, and I'm very happy to say that now we are ready to move forward on those issues.

First, we desperately need more prisons—we need new prisons. And to provide that additional capacity, I'm proposing to use lease revenue bonds. Speaker Núñez has already introduced an Assembly Bill, 2902, to look at this approach, and we will work diligently with him and other members of the legislature to build additional prisons. This type of financing will allow us to build these prisons more quickly, which will give us the fast relief on overcrowding.

And No. 2, to make sure that we can move on this and other reforms as quickly as possible, I'm also asking the

Case 2:90-cv-00520-KJM-SCR    Document 3434-2    Filed 12/23/08    Page 44 of 56

legislature to expedite purchasing, spending, and program implementations when it comes to prisons. Because these measures, we don't want to have them be slowed down because of red tape.

My third proposal transfers 4,500 low risk women inmates out of the state prisons into community correctional facilities. The Los Angeles Times wrote that this reform, if adopted, it would make California a leader among states, remaking their prison systems to reflect differences between the sexes. This reform would also allow these low-risk, nonviolent inmates, women who are about to be released anyway, to be closer to their families in their final month of custody. Experts agree that this is a key to reducing recidivism. And on top of that, this move alone will free up an entire prison, which is space that could be used for the male prisoners.

And my fourth proposal concerns community-based reentry facilities, another progressive idea to relieve overcrowding and reduce recidivism. In the 90 days before an inmate's release from state prison he will be sent to a secure re-entry facility where they will receive psychological counseling and other help, so they can re-enter society safely and productively. The day when they are released, inmates get, as you know, 200 bucks and a bus ticket, and that's the end of it. Our communities will be much safer if they come out better prepared. These facilities will also hold minor parole violators, who now are sent back to state prisons. This will free up prison space for more dangerous inmates and help with overcrowding.

Relieving prison overcrowding and reducing recidivism are monumental challenges, but they are challenges that we will not retreat from. Some people believe that they way to reduce prison overcrowding is by weakening the three strike. I can say, not on my watch. (Applause)

Some other people think that reducing prison overcrowding is to release thousands of criminals early, before they are serving their time. I say once again, not on my watch. (Applause)

And as you may know, in January when I introduced my infrastructure package, I included the construction of new prisons. I also had the transfer of women inmates to transitional facilities in my original budget proposal. At that time, of course, because of the compromise that we have reached, we were not able to get those things in as part of that package. At that time the legislature weren't ready to go along with those ideas. But now I believe they will join me in moving those ideas forward.

The four proposals that I have just laid out offer a comprehensive approach to prison overcrowding and recidivism, and a special session of the legislature devoted exclusively to those four tightly focused proposals allow us to truly dig in on a very, very tough and important subject. I look forward to working once again with both parties, with Democrats and Republicans, to enact meaningful reform that ensures the safety of our Corrections staff and inmates, and makes sure that more of our parolees stay out of prison after they are released.

As I have said at the start of my remarks, you all have been great partners, and I love working with you together. The kinds of things that we have accomplished this last two and a half years together, well, let's continue this way. Now as we get into the special session, I need your help once again. Let us work together the same way as we have done. Some of you will testify at the legislative hearings. Some of you will be talking to individual lawmakers about our proposal. I know from the many, many meetings that we have had together how much this issue means to all of you. And you know something? With your continued help, there is nothing that we cannot solve and we can also solve this big problem.

Office of the Governor of the State of California                    http://gov.ca.gov/index.php?/print-version/speech/1088/

California is the greatest place in the world.  With these reforms we can keep our prison system safe, and we can make sure that they are efficient, and that they are the model for the rest of the country.  Our great state deserves and demands nothing but the best.  This is the greatest place, like I said, in the world.  Let's also fix this problem. Together we can do it.

Thank you very much for listening.  Thank you.  (Applause)

9/29/2008 12:27 PM

# EXHIBITS E & F

[239657-1]



EXHIBIT G.



**Office of the Governor**   ARNOLD SCHWARZENEGGER
                             THE PEOPLE'S GOVERNOR

# GOVERNOR'S REMARKS

Tuesday, 03/06/2007 3:08 pm

### Gov. Schwarzenegger Tours Overcrowded State Prison in Norco

**GOVERNOR:** Good morning, everybody, thanks for being here. I just took a little tour here of the Norco Facility, and I want to thank Warden Hall and Secretary Tilton, and also Assemblyman Spitzer for taking me around here, and seeing firsthand what is going on here.

As you know, that Norco is like every other prison in California, which means that they're overcrowded. Here, for instance, you have a huge overcrowding problem. Statewide we have 171,000 prisoners, and they're housed in facilities that are for 100,000 inmates, and so this creates a big crisis. Norco is one of those typical facilities that is meant to be for 2,300 inmates, but they have 4,500 inmates, so almost double. And one of the things that we have just seen, for instance, is the gymnasium; it's supposed to be for rehabilitation, but it is being used for double-bunking. There are almost 300 inmates that are sleeping every day in that gymnasium.

Now, this facility is an old facility; it dates back to 1928 when it was a luxury hotel, actually, and then in 1941 it became a naval hospital, and then in the '60s it became a prison. But like other prisons, Norco has the double-bunking problem, and it is of course dangerous for the inmates and dangerous for the staff, and that's what we want to avoid. There is no room for rehabilitation in some of those facilities. Here they are actually doing the best job in rehabilitation, but they all would tell you right away—as I've heard from Warden Hall—that if we would have more beds available and more space available, we could do a much, much better job with rehabilitation.

Now, what does that mean? It means that when you have a lack of rehabilitation you increase the recidivism rate, and this is why, in California, we have a 70 percent recidivism rate. As anyone that works in those institutions can tell you, when you don't have the room and the space for rehabilitation, then you send inmates out on the streets again, they are released, and they come right back in again. 70 percent come right back because they are not prepared to go out, they're not ready to have a job, they haven't been educated here to do a specific skill or anything like this, or got general education, or went through a drug program, and so on. So they come right back in again, which costs us as a state a fortune, and this is what creates partially the overcrowding problem.

If we don't solve this problem—and the reason why we're here today is to let everyone know there is really an urgency, because we have been going around this, and trying to fix this problem now ever since I've come into office, and even before I came into office, to try to fix it. But, you know, the Legislature has not really yet committed to really solving this problem. Hopefully we will be able to do that this year, because there is a good atmosphere of working together. But the fact of the matter is that if we don't solve the problem, the federal court will solve the problem for us. And what does that mean? That means that they will go and put a cap on our prisons in California and they will say, you know, 171,000 inmates is too much, so you can only have, let's say, 140,000. So we have to then release 30 some thousand, and you will have criminals roaming on the streets. And on top of that, they will take money from education and from health care and will start building prisons, and to do it their way.

So we really need to solve this, and the purpose and the solution, we have to come up with right now with the Legislature. Now is the time for action. Last December I put forward a 10.9 billion dollar building plan, included in a comprehensive reform package, to create and to build 16,000 new beds at existing prisons, 10,000 new medical and mental health beds, and 5,000 to 7,000 re-entry beds, 4,500 contract beds for female inmates, and 5,000 inmates will be sent, or transferred, out of the state, which I think is a case that we will win in court.

So if my proposals are adopted, right here at Norco, we have space then for an additional 1,000 beds, meaning that 200 new beds will be built and provided, and then up to 800 beds will be created for men, because they will be freed up when women are being re-located to female community correctional facilities. So there are all kinds of great things in this plan that will allow us to move, and expand also drug follow-up programs that are now run on a local level, which is very important. My proposal will also keep selected short-term, low-risk inmates in county jails.

Creating also a Sentencing Commission is very important. We have worked together and talked to the Democrats and Republican Party to create a Sentencing Commission. We just have to work out the details, how much teeth that commission will have. And also at the same time have parole reform. So those are the kind of things that we want to accomplish this next few weeks.

And I hope that the Legislature recognizes the fact that there is a certain urgency, because by June we have to be able to show to the federal court that we have our act together, and we know and can move forward with this program. These are moves that will make our prisons and our state safer, and of course public safety is the most important thing for us. So let's go and really all work together, Democrats and Republicans, to solve this problem.

Now I would like to bring out and introduce Assemblyman Todd Spitzer, who is someone that comes from law enforcement and is a big believer in solving this prison crisis. So please, Todd, if you'd come up here and say a few words please?

**ASSEMBLYMAN SPITZER:** Well, thank you very much. My name is Todd Spitzer; I'm the Chairman of the Select Committee on Prison Operations and Prison Construction for the State Assembly. This is also my Assembly district, and I want to thank the Governor and his staff for coming here today. I also want to thank Secretary Tilton, the warden and the assistant warden, and all the fine men and women, the correctional officers here who are doing an unbelievable work under, in my opinion, the most dire circumstances.

While it may be a beautiful day out here, the Governor knows, and we all know standing here, that one, it's not beautiful on the inside of this correctional institution. What is happening inside this correctional institution is completely inappropriate for the safety of correctional officers, and it's completely inappropriate for those who are going to end up coming back out of these facilities if we're going to ensure, as a society, their potential success to rehabilitate.

I think there has been a thought in this state that we are incarcerating, on average, more people in California than the rest of the nation. That's just not true; in fact, our incarceration rate is below the average. But let me make something very clear; the Governor said it—we are not going to jeopardize public safety. This institution is 200 percent of capacity. There is no room to do the kinds of rehabilitation programs that are necessary if we're going to protect society. But let's make something clear; there are some individuals at certain institutions in the state of California that need to be locked up for long periods of time in order to protect society.

At 204th Street and Harvard in the City of Los Angeles, in the 504th reporting district of LAPD, I was a ten-year

LAPD officer. In that reporting district, 11-year old Marcus Mark Wilbert was gunned down by the Harvard Street Gang, and Sheryl Green, 14 years old, was shot to death by the Harvard Street Gang. You don't need to tell us, but we need to tell the public, that as a result of overcrowding in our prisons our streets are not safe. Gang members have taken over our streets, they're killing our children, and we do not have appropriate institutions to house them. And that is not acceptable. And as a member of the Legislature, I sat there when this Governor called the special session last year and the Legislature did not act. And we have been in session since December 5th of 2006, and we have not acted.

Violent crime is going up at an escalating rate. This chart by the Department of Corrections proves that we are housing people in our prisons who are violent criminals. Do we—as the Governor said—do we have a responsibility to rehabilitate and do the best we can as a society in the state for those who are incarcerated so that they have the greatest likelihood of success upon release? Absolutely, but there's a balance; instituting those who are dangerous, and trying to help those who want to help themselves. And that's why Governor Schwarzenegger is here today, and why we are here today, because we want the people of the state of California to understand that. We want a balance, and we're not getting a balance, and little children are dying in the streets because we are not getting a balance in California.

Thank you, Governor.

**GOVERNOR:** Thank you. All right. Thank you very much, and if you have any questions about this, please feel free.

**Q:** Governor, you've talked about transferring low-risk prisoners to county facilities. Los Angeles, Orange County, San Bernardino, they seem to be overcrowded. Are you going to transfer them from their counties to other smaller county facilities?

**GOVERNOR:** No, no. As I was just saying, that we have a building program of 10.9 billion dollars, which is part of the overall reform package, which is the Sentencing Commission, creation of a Sentencing Commission, and the creation of reforming paroles and all of those things. It's a whole comprehensive plan that I have proposed already in December. And one of the things I proposed was a 10.9 billion dollar infrastructure to rebuild and to add the capacity of 40 some thousand—actually 78,000 beds.

But the beds that I just mentioned here, those will be already over 40,000 beds. And that's what we need to do, because as soon as we build the facilities, we will free up some room. And as soon as we free up some room, we can do the rehabilitation and we can get inmates ready to give them another chance, because their term is up. We can then send them to local facilities, we can send them out there, but let's give them the programs that they need so they can learn a certain skill, a job, or something like that, be a carpenter, or a plumber, whatever, a mechanic, or whatever it is. And also, let them have the drug rehabilitation program so that we can give them the rehab that they need to get off drugs so when they go out there they don't go back on drugs, or start selling drugs and all this.

So what we are doing is by a lack of providing the kind of rehabilitation, we create a recidivism rate that is, like I said, 70 percent. And so they go out and they come back in, they go out and they come back in. Well, who are we hurting here? We're hurting the people, because as soon as we let them out and they're not ready to be out there, they're dangerous again for society, and we always want to make sure that the people are protected.

And this is why we are having this press conference here today, to put the spotlight on the urgency of solving this

problem immediately, because if the federal court comes in, or a federal judge, and says, "We're going to put a cap on it," they're going to release criminals, and we're not going to have a chance to really sort it out and say who is the least dangerous and who is the most dangerous and all of those things. There will be just a cap put on it and they will be released, so that is dangerous and we have to protect the people.

**Q:** Governor, I believe it was back in October when you declared a state of emergency. Can you talk about some of the things that maybe you saw firsthand today with your own eyes that spoke to that urgency?

**GOVERNOR:** Well, I think that when you go through it, and I think Warden Hall was kind enough to show me all of the things, you know, the obstacles that she's facing here, and how could she do a better job, because she is an extraordinary leader here and a great warden that really shows that she can pull the team together and run this prison efficiently. But she can only go so far if we don't give her the money to expand. And so she just showed me, for instance, a facility—the gymnasium. There's a gymnasium in there that they can use for vocational training, for drug rehabilitation, for doing some—to let off some steam, to do some exercises in there and so on. But almost 300 beds—double-bunking, inmates are double-bunking in there every night, so she can not really run the program well.

So those are the kind of things that you see, if you go to this location here at Norco, or if you go to another facility, all over the state of California we have facilities for 100,000 inmates, and we have 171,000 inmates. And for years, and years, and years, the Legislature has been debating over should we build more or not, and they have not built more, and it is getting dangerous for people, it's getting dangerous for the inmates, dangerous for the staff that is working here, the security and the prison guards and so on, and dangerous for the public.

**Q:** How about what you talked about, sending prisoners out of state to other facilities? It seems by reading that this problem is not only California, being overcrowded, the jails being overcrowded. Other states are having the same problem.

**GOVERNOR:** Well, Secretary Tilton did a great job, because when I told him, I said, "Look, we've got to do something that ought to be done right away, so let's go and look into sending inmates out of the state to facilities, temporarily, just so we get rid of the overcrowding problem until we get the money and until we get an agreement with both of the parties so we can start building." And he immediately found tens of thousands of beds available in various different states. And so they were looking for getting inmates; we were looking for shipping some of the inmates, so it was a perfect situation of supply and demand, again. And it is also not that expensive, so we felt that that was the best way to go.

And even though we were challenged in court, I think that we're going to win that case, and that we will be able to continue shipping inmates out of the state to, again, relieve temporarily. It's not our ideal situation. Our ideal situation is to leave everyone in this state, to build more prisons. Let's build the extra 78,000 beds, let's reform the system, let's create a sentencing commission, let's have parole reform and all of those kinds of things that Assemblyman Todd Spitzer was also talking about. But we've got to get our act together and we've got to do it, and both of the parties have to work together. Now is the time to do it, because in June it will be too late.

**STAFF:** Last question.

**Q:** Governor, can you share with us any information with regards to the health care in relation to medical, dental and mental health programs?

**GOVERNOR:** Well, I think that Secretary Tilton can come out here and say a few words, because he just had some extensive conversations about that yesterday.

**SECRETARY TILTON:** I think it's very important. As far as services, you're right; we've been working with the various mental health court, we're working with the Plata receiver, because in addition to space for program, we need to have space for staff to provide medical services, and office space for those. So we're working with the receivers to develop a capital outlay plan to do that. You know, he's increased salaries. That's not the only solution, to increase salaries to recruit that staff; we need to provide appropriate facilities to provide those services too. So we talk about overcrowding in programs, and we talk about program, one of the issues we have here is to make sure we provide space for our medical staff to work and provide those services in the prison. If we can do that in the prisons, we save money and are more efficient from the (Inaudible) standpoint, as well as not having those inmates transferred to the community. So it's cheaper, and a safer situation, so we're working with the courts to provide that.

**GOVERNOR:** I just want to say also, in the end, that I want to thank all the officers that work in those prisons, because they are risking their lives, it's much more dangerous now because of overcrowding than it has ever been, and so we just want to thank them for their incredible work and for their great dedication. Thank you.

**PROOF OF SERVICE**

I, Kate Richardson, declare that I am a resident of the State of California, am over the age of eighteen years and am not a party to the within action. I am employed with Rosen, Bien & Galvan LLP, whose address is 315 Montgomery Street, Tenth Floor, San Francisco, California 94104. On September 29, 2008, I served the following documents:

**PLAINTIFF COLEMAN'S SECOND SET OF REQUESTS FOR ADMISSION TO DEFENDANT SCHWARZENEGGER**

All documents were sent to the following persons in the following manner:

| | |
|---|---|
| [ X ] | **By messenger service**. I served the documents by placing them in an envelope or package addressed to the persons listed below and providing them to a professional messenger service for service. (A declaration by the messenger is attached hereto as a separate document.) |
| [ X ] | **By United States mail**. I enclosed the documents in a sealed envelope or package addressed to the persons listed below and placed the envelope or package for collection and mailing in accordance with our ordinary business practices. I am readily familiar with my firm's practice for collecting and processing correspondence for mailing. On the same day that correspondence is placed for collection and mailing, it is deposited in the ordinary course of business with the United States Postal Service, in a sealed envelope with postage fully prepaid. I am a resident or employed in the county where the mailing occurred. The envelope or package was placed in the mail at San Francisco, California. |
| [ ] | **By overnight delivery**. I enclosed the documents in a sealed envelope or package provided by Federal Express and addressed it to the persons listed below. I placed the envelope or package for collection and overnight delivery at an office or a regularly utilized drop box of the overnight delivery carrier and I arranged to pay for all fees for delivery. |
| [ ] | **By fax transmission**. Based on an agreement of the parties to accept service by fax transmission, I faxed the documents to the persons at the fax numbers listed below from Rosen Bien & Galvan's facsimile transmission telephone number, (415) 433-7104. No error was reported by the fax machine that I used. A copy of the record of the fax transmission, which I printed out, is attached. |
| [ ] | **By e-mail or electronic transmission**. Based on a court order or an agreement of the parties to accept service by e-mail or electronic transmission, I caused the documents to be sent to the persons at the e-mail addressed listed below. I did not receive, within a reasonable time after the transmission, any electronic message or other indication that the transmission was unsuccessful. |

PROOF OF SERVICE

[240273-1]

**VIA US MAIL**
Lisa A. Tillman
Deputy Attorney General
1300 I Street
Sacramento, CA 95814

**VIA MESSENGER**
Rochelle East
Office of the Attorney General
455 Golden Gate, Suite 11000
San Francisco, CA 94102-7004

**VIA US MAIL**
Lead Counsel for County Intervenors
Ann Miller Ravel
Theresa Fuentes
Office of the County Counsel
70 West Hedding, East Wing, 9th Floor
San Jose, CA 95110

**VIA MESSENGER**
Paul B. Mello, Esq.
Hanson & Bridgett LLP
425 Market Street, 26th Floor
San Francisco, CA 94105

**VIA US MAIL**
California Correctional Peace Officers'
Association (CCPOA) Intervenors
Natalie Leonard
Gregg MacClean Adam
Carroll, Burdick & McDonough, LLP
44 Montgomery Street, Suite 400
San Francisco, CA 94104

**VIA US MAIL**
Republican Assembly and Senate Intervenors
Steven S. Kaufhold
Akin, Gump Strauss Hauer & Feld, LLP
580 California Street, 15th Floor
San Francisco, CA 94104

**VIA US MAIL**
District Attorney Intervenors
William E. Mitchell
Assistant District Attorney
Riverside County District Attorney's
Office
4075 Main Street, First Floor
Riverside, CA 92501

**VIA US MAIL**
County of Sonoma Intervenors
Anne L. Keck, Deputy County Counsel
Steven Woodside
575 Administration Drive, Room 105A
Santa Rosa, CA 95403

**VIA US MAIL**
California Sheriff, Probation, Police
Chief and Corrections Intervenors
Jones & Mayer LLP
Martin J. Mayer
Kimberly Hall Barlow
3777 North Harbor Boulevard
Fullerton, CA 92835

/

/

/

[240273-1]

1

2        I declare under penalty of perjury under the laws of the State of California that the

3   foregoing is true and correct, and that this Proof of Service was executed on this __th day of

4   September, 2008, at San Francisco, California.

5                                                    Kate Richardson

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

---

PROOF OF SERVICE

[240273-1]