# EXHIBIT Q

EDMUND G. BROWN JR.
Attorney General of the State of California
DAVID S. CHANEY
Chief Assistant Attorney General
FRANCES T. GRUNDER
Senior Assistant Attorney General
ROCHELLE C. EAST
Supervising Deputy Attorney General
LISA A. TILLMAN – State Bar No. 126424
Deputy Attorney General
SAMANTHA TAMA – State Bar No. 240280
Deputy Attorney General
455 Golden Gate Avenue, Suite 11000
San Francisco, CA 94102-7004
Telephone: (415) 703-5708
Facsimile: (415) 703-5843
rochelle.east@doj.ca.gov
lisa.tillman@doj.ca.gov
samantha.tama@doj.ca.gov

Attorneys for Defendants

HANSON BRIDGETT MARCUS
VLAHOS & RUDY, LLP
JERROLD C. SCHAEFER - 39374
PAUL B. MELLO - 179755
425 Market Street, 26th Floor
San Francisco, CA 94105
Telephone: (415) 777-3200
Facsimile: (415) 541-9366
jschaefer@hansonbridgett.com
pmello@hansonbridgett.com

**RECEIVED**

NOV 1 4 2007

Rosen, Bien & Galvan

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | No. 2:90-cv-00520 LKK JFM P <br><br> **THREE-JUDGE COURT** |
| MARCIANO PLATA, et al., <br><br> Plaintiffs, <br><br> v. <br><br> ARNOLD SCHWARZENEGGER, et al., <br><br> Defendants. | No. C01-1351 THE <br><br> **THREE-JUDGE COURT** <br><br> DEFENDANT JAMES E. TILTON'S RESPONSES TO PLAINTIFF MARCIANO PLATA'S FIRST SET OF INTERROGATORIES |

| | |
|---|---|
| PROPOUNDING PARTY: | Plaintiff **MARCIANO PLATA** |
| RESPONDING PARTY: | Defendant **JAMES E. TILTON** |
| SET NUMBER: | **ONE** |

## DEFINITIONS

In construing these discovery responses, the following definitions shall apply:

1. "PLAINTIFFS" shall mean class representatives Marciano Plata (sic), et. al., the named PLAINTIFFS in the action *Plata v. Schwarzenegger*, Case No. C 01 1351 TEH (N.D. Cal.) (*Plata*).

2. "DEFENDANT" shall mean James Tilton, a named defendant in *Plata*.

3. "DEFENDANTS" shall mean each of the named DEFENDANTS in *Plata*.

4. "PROCEEDING" shall mean the three-judge panel proceeding convened under 28 U.S.C. Section 2284 in the cases of *Coleman v. Schwarzenegger*, Case No. 90-0520 LKK JFM (E.D. Cal.) (*Coleman*) and *Plata*.

## PRELIMINARY STATEMENT AND GENERAL OBJECTIONS

1. DEFENDANTS have not completed their investigation of the facts relating to this case, have not completed their discovery in this action and have not completed their preparation for trial. This case is in an early stage of discovery. As of the date of DEFENDANTS' response, PLAINTIFFS have only identified a fraction of the documents that will be produced to DEFENDANTS, and have not yet provided many, if any, substantive discovery responses. Therefore, these responses, while based on diligent factual exploration, reflect only DEFENDANTS' current state of knowledge, understanding, and belief with regard to the matters about which inquiry has been made. DEFENDANTS reserve the right to supplement these responses with subsequently obtained or discovered information. With regard to each Interrogatory, DEFENDANTS reserve the right, notwithstanding these answers and responses, to employ at trial or in any pretrial proceeding herein information subsequently obtained or discovered, information the materiality of which is not presently ascertained, or information DEFENDANTS do not regard as coming within the scope of the Interrogatories as DEFENDANTS understand them.

2. These responses are made solely for the purpose of this action. Each answer is subject to all objections to competence, relevance, materiality, propriety, admissibility, privacy, privilege, and any and all other objections that would require exclusion of any statement contained herein if any such Interrogatories were asked of, or any statement contained herein were made by, a witness present and testifying in court, all of which objections and grounds are reserved and may be interposed at the time of trial.

3. Except for explicit facts admitted herein, no incidental or implied admissions are intended hereby. DEFENDANTS' answers or objections to any interrogatory are not an admission of any fact set forth or assumed by that interrogatory. In addition, each of DEFENDANTS' answers to an Interrogatory or part of any Interrogatory is not a waiver of part or all of any objection he or it might make to that form of interrogatory, or an admission that such answer or objection constitutes admissible evidence. DEFENDANTS assert these objections without waiving or intending to waive any objections as to competency, relevancy, materiality or privilege.

4. DEFENDANTS object to each and every Interrogatory to the extent that PLAINTIFFS are requesting information that is privileged pursuant to the attorney-client privilege, the work-product doctrine, the deliberative process privilege, the right to privacy, or any other applicable privilege or doctrine. DEFENDANTS object to the Instructions provided by PLAINTIFFS insofar as they specifically call for information protected by the attorney-client privilege and work-product doctrine.

5. DEFENDANTS object to each and every Interrogatory to the extent that PLAINTIFFS are requesting information that is neither relevant to the subject matter of this action nor reasonably calculated to lead to the discovery of admissible evidence.

6. DEFENDANTS object to the Interrogatories to the extent that they seek information available to PLAINTIFFS through public sources or records, and on the grounds that they subject DEFENDANTS to unreasonable and undue annoyance, oppression, burden and expense. DEFENDANTS further object to the Interrogatories to the extent that such Interrogatories are unduly burdensome because much or all of the information requested in the

- 3 -

Interrogatories is in the possession of PLAINTIFFS, has been filed with the Court, or is otherwise equally or more available to PLAINTIFFS than to DEFENDANTS.

7.      DEFENDANTS object that the discovery seeks information outside of DEFENDANTS' control. To the extent the discovery seeks information known only to the Receiver appointed in *Plata*, PLAINTIFFS should direct said discovery to the Receiver and not DEFENDANTS.

8.      DEFENDANTS object to the Interrogatories to the extent that they are vague and ambiguous and do not include adequate definition, specificity, or limiting factors.

9.      DEFENDANTS object generally to each Interrogatory to the extent that it seeks information prepared by expert consultants. DEFENDANTS will disclose their experts and serve the reports of experts on November 9, 2007, as required by the Three-Judge Court's October 10 2007 Order Bifurcating Proceedings and Setting Deadlines for Phase. I. Many of PLAINTIFFS' Interrogatories request information that will be provided in whole or in part by expert testimony.

10.     DEFENDANTS object generally to each Interrogatory that involves an opinion or contention that relates to fact or the application of law to fact upon the ground that such Interrogatories are premature and inappropriate until after discovery has been completed. DEFENDANTS moreover object to PLAINTIFFS' contention Interrogatories because they are unduly burdensome, oppressive, and especially inappropriate at this early state in the discovery process.

11.     DEFENDANTS object to the Definitions provided by PLAINTIFFS, including the term "PRISONER RELEASE ORDER." This term is defined by reference to the statutory definition. The statute has rarely, if ever, been interpreted by the federal courts, and the question of whether a particular order is a "Prisoner Release Order" depends on a range of complex factual and legal elements, including deciding whether an order "has the purpose or effect" of "reducing or limiting population" or "directing the release from or non-admission of prisoners."

**RESPONSES TO INTERROGATORIES**

Subject to the foregoing qualifications and general responses and objections, Defendant Tilton objects and responds to PLAINTIFFS' Interrogatories, Set One as follows:

**RESPONSE TO INTERROGATORY NO. 9:**

In addition to the General Objections stated above, which are incorporated herein, DEFENDANTS object to this interrogatory on the grounds that it is vague and ambiguous as to the terms "obstacles" and "barriers." DEFENDANTS additionally object that this request as it seeks information that is not reasonably available to DEFENDANTS as this interrogatory should be propounded on the Receiver. In addition, DEFENDANTS object to this interrogatory to the extent it seeks information covered by the attorney-client privilege or work-product doctrine. DEFENDANTS additionally object to this interrogatory to the extent it seeks early disclosure of DEFENDANTS' experts. DEFENDANTS will disclose experts as required by this three-judge court. Finally, DEFENDANTS object that this interrogatory seeks information directed at phase two issues as bifurcated by this Court. Subject to and without waiving the foregoing objections, DEFENDANTS respond as follows:

As set forth in response to interrogatory numbers 6, 7 and 8, DEFENDANTS believe that the *Plata* Court has already issued less intrusive orders to a PRISONER RELEASE ORDER, including the Orders appointing the Receiver and granting the Receiver's requests for waivers of State law. DEFENDANTS believe that these orders will eventually, with adequate time, allow the Receiver and CDCR to develop a constitutionally adequate medical care delivery system. The PLAINTIFFS should propound this interrogatory on the Receiver to determine whether the Receiver believes additional waivers of State law will be necessary to overcome any barriers.

**INTERROGATORY NO. 10:**

IDENTIFY each action, program, policy or procedure that YOU have adopted since October 2006 that YOU contend will limit or reduce the number of *PLATA* CLASS MEMBERS housed in CDCR PRISONS.

**RESPONSE TO INTERROGATORY NO. 10:**

In addition to the General Objections stated above, which are incorporated herein, DEFENDANTS object to this interrogatory on the grounds that it is vague and ambiguous as to the terms "action," "program," "policy," "procedure," "limit," and "reduce." In addition, DEFENDANTS object to this interrogatory to the extent it seeks information covered by the

- 16 -

attorney-client privilege or work-product doctrine. Finally, DEFENDANTS object that this interrogatory seeks information directed at phase two issues as bifurcated by this Court. Subject to and without waiving the foregoing objections, DEFENDANTS respond as follows:

The State is working on many fronts to reduce overcrowding in California's Prisons. The Governor and the Legislature recently approved a historic, bipartisan plan to reduce prison overcrowding, increase rehabilitation programs, and provide more beds for all inmates, including those requiring medical care. Assembly Bill 900, signed in May 2007, creates a comprehensive plan to immediately relieve overcrowding by providing for additional out-of-state inmate transfers (CDCR anticipates transferring 8,000 inmates by March 2009, to date approximately 1,722 inmates have been transferred), as well as the construction of 40,000 prison beds including much-needed medical beds, in addition to approximately 13,000 new jail beds. AB 900 also provides for new rehabilitation programs and re-entry facilities to ease parolees' transition back into California communities, thereby reducing recidivism, relieving prison overcrowding, and ensuring public safety. AB 900's comprehensive plan and CDCR's parole reforms effectively address prison overcrowding without encouraging or causing the early release of dangerous criminals.

The Governor also established two strike teams -- one for construction and another for rehabilitation -- to expedite the implementation of AB 900's mandates, including construction and the improvement of programs for rehabilitation, substance abuse, education, and job training. These strike teams will report to the Governor's Cabinet to ensure that AB 900's reforms are successful and swift. CDCR is also immediately implementing administrative parole changes that reward successful rehabilitation, which will further reduce overcrowding. In short, the Governor is committed not only to prison reform, but to the long-term management efforts that are needed to ensure that the reforms are successful.

Phase I of AB 900 provides for 7,484 in-fill beds at existing enumerated prisons, plus an additional 4,516 in-fill beds once site assessments have been done for other facilities, for a total of 12,000 Phase I in-fill beds. AB 900 specifies that the purpose of the infill beds is to replace the non-traditional beds currently in use. Phase I also provides for 6,000 re-entry beds and 6,000

medical, dental, and mental health beds. The construction of all Phase I beds will total 24,000 beds. Phase II of AB 900 provides for an additional 4,000 in-fill beds; 2,000 medical, dental, and mental health beds; and 10,000 re-entry beds. The construction of all Phase II beds will total 6,000 beds. However, AB 900 specifies that funds for Phase II construction shall not be released unless specific enumerated progress in construction, rehabilitation programs, management planning, and parole review has been confirmed by a panel consisting of the State Auditor, the Inspector General and an appointee of the Judicial Council of California. AB 900 also provides for construction of approximately 13,000 county jail beds.

AB 900 ties prison bed construction to rehabilitation, requiring that each new bed have appropriate programming for inmates, including education, vocational programs, substance abuse treatment programs, employment programs, and pre-release planning. These programs will address overcrowding by reducing the recidivism rate.

AB 900 also requires CDCR to develop and implement, by January 15, 2008, a plan to address management deficiencies within the department. Among other things, the plan must address (1) filling vacancies in management positions, (2) improving accountability, (3) standardizing processes to improve management, (4) improving communications within the Department, and (5) developing and implementing more comprehensive plans for management of the prison and parole populations. AB 900 authorizes CDCR to contract with outside management experts to assist in identifying and addressing deficiencies.

The management assessment and plan required by AB 900 is not Defendants' only tool for addressing management and administrative concerns. The Governor has already established two expert strike teams – one for facilities and one for rehabilitation –composed of numerous experts from universities, community organizations, and state government to ensure that California's prisons are managed effectively and that bed construction and rehabilitation programs are implemented expeditiously.

The Facilities Construction Strike Team will restore CDCR's major project management capability and will work to expedite in-fill, re-entry, medical/dental/mental-health, and jail beds authorized by AB 900. The Facilities Construction Strike Team will (1) consider all available

options for housing inmates and improving inmate housing, (2) evaluate alternative construction methods, (3) work to overcome impediments to expedited construction, and (4) work with local communities impacted by prison facilities.

At the same time, the Rehabilitation Strike Team will provide expertise on creating and expediting the implementation of rehabilitation programs. Such programs are integral to increasing successful community re-entry and reducing recidivism. The Rehabilitation Strike Team will be responsible for (1) assessing existing CDCR rehabilitation programs and space, (2) designing an integrated rehabilitation services delivery plan for inmates and parolees which includes substance abuse treatment, education, job training, counseling, and life skills, (3) developing a plan for inmate job training, (4) quickly implementing inmate intake and prerelease needs assessment tools, (5) developing incentives for program participation; (6) developing a plan to immediately reduce the number of lockdown days so that inmates can participate in rehabilitative programming; and (7) developing the $50 million in rehabilitation and treatment funds that are authorized by AB 900. The Rehabilitation Strike Team expects to reduce recidivism by 10%, which would eliminate 8,100 prison returns in a single year.

The construction of 16,000 in-fill beds will provide additional capacity at existing prisons in a way that ensures proper facilities, support, and services. Creating in-fill beds will not require the construction of new prisons; rather, there will be construction of new facilities at existing prisons. In-fill beds, like the out-of-state transfer of inmates, will eliminate non-traditional beds and provide better care and services for inmates.

The Facilities Construction Strike Team will expedite construction. As required by AB 900, these beds will be constructed to fully integrate rehabilitative programs into the new facilities. The Facilities Construction Strike Team will work to finish construction as quickly as possible, but at a minimum it is expected that construction of the 12,000 Phase I in-fill beds will be completed in 2009. As new in-fill beds are constructed, AB 900 mandates the reduction in a proportionate number of non-traditional beds until non-traditional bed use is entirely eliminated.

AB 900 also provides for the creation of 16,000 re-entry beds. The focused of the reentry beds is to provide rehabilitation services and prepare inmates for re-entry into society. These

- 19 -
DEF. TILTON'S RESP TO PLATA'S FIRST SET OF INTERROGATORIES (CASE NOS. 90-00520 LKK JFM P AND C01-01351 TEH)

1376652.3

1  beds will be located in small, secured facilities (500 inmates maximum per facility) operated by CDCR. The facilities will be located close to established communities to better serve their rehabilitative and re-entry mission. The Facilities Construction Strike Team will expedite the construction of 6,000 Phase I re-entry beds.

AB 900 states that a total of 8,000 medical/mental health beds will be created. The Facilities Construction Strike Team will expedite construction of these beds to bring them on line as soon as possible. Defendants are coordinating construction of medical and mental health beds coordination with the Receiver.

Parole reform strategies will also play a large role in the reduction of prison overcrowding. In tandem with the implementation of AB 900, CDCR has launched a set of parole changes to reward successful rehabilitation. CDCR is actively pursuing strategies to release parolees from their statutory parole periods as soon as is appropriate and anticipates discharging between 2,000 and 4,000 additional parolees from parole in the next twelve months. By discharging more parolees from supervision, CDCR expects to experience a reduction in the number of parolees returned to custody for various parole violations. Further, CDCR implemented a risk and needs assessment tool in each of the 33 institutions: the Correctional Offender Management Profiling for Alternative Sanctions (COMPAS). The predictive validity of COMPAS in terms of its ability to effectively identify key risk and needs factors in the parole population is currently being studied. Additionally, CDCR has undertaken extensive research into the use and effectiveness of a parole-violation decision-making matrix. This tool has been shown to improve organizational decision-making consistency, as well as help to establish a culture of determining sanctions based on policy driven rationale and then tailoring the sanction to the specific risk and needs of the parolee. When supported by evidence-based programs, such as COMPAS, this type of matrix has been proven to play a meaningful role in the overall reduction of recidivism rates among the parolee population. CDCR anticipates that a decision-making matrix will be ready for a pilot deployment by the end of 2007. Once implemented, these tools will result in even more discharges from parole.

///

DEF. TILTON'S RESP. TO PLATA'S FIRST SET OF INTERROGATORIES (CASE NOS. 90-00520 LKK JFM P AND C01-01351 TEH)

1376652.3

**INTERROGATORY NO. 13:**

IDENTIFY any and all lockdowns or partial lockdowns, including dates and duration, that affected housing units housing PLATA CLASS MEMBERS at CDCR PRISONS since March 3, 2006.

**RESPONSE TO INTERROGATORY NO. 13:**

In addition to the General Objections stated above, which are incorporated herein, DEFENDANTS object to this interrogatory on the grounds that it is vague and ambiguous as to the terms "lockdowns" and "partial lockdowns' In addition, DEFENDANTS object to this interrogatory because it is compound and calls for private and/or confidential information. Subject to and without waiving the foregoing objections, DEFENDANTS respond as follows:

*See* the business records attached as Exhibit A which identify the lockdowns and partial lockdowns since March 3, 2006. Exhibit A also contains CDCR policies and procedures that provide that inmates must be taken to medical appointments, and must receive appropriate medical care, when a facility is in a lockdown or partial lockdown. All of the business records produced in Exhibit A are produced pursuant to the *Plata* Protective Order.

DATED: November 9, 2007

HANSON BRIDGETT MARCUS
VLAHOS & RUDY, LLP

By: _____
PAUL B. MELLO
Attorneys for DEFENDANTS

DATED: November 9, 2007

EDMUND G. BROWN JR.
Attorney General of the State of California

By: _____/s/_____
ROCHELLE C. EAST
Supervising Deputy Attorney General
Attorneys for DEFENDANTS