# EXHIBIT 1

# Deposition of David Bennett, September 9, 2008 (Designations)

David Bennett                                                    9-9-08

Page 1

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

--oOo--

RALPH COLEMAN, et al.,     No. Civ S 90-0520 LLK JFM P

            Plaintiffs,   THREE-JUDGE COURT

vs.

ARNOLD SCHWARZENEGGER,
et al.,

            Defendants.
                        /
MARCIANO PLATA, et al.,   No. C01-1531 TEH

            Plaintiffs,   THREE-JUDGE COURT

vs.

ARNOLD SCHWARZENEGGER,
et al.,
            Defendants.
                     /

                    Deposition of

                    DAVID BENNETT

            Tuesday, September 9, 2008


Reported by:
THOMAS J. LANGE, CSR No. 4689
Registered Merit Reporter
Job No.: 20022LR

David Bennett                          9-9-08

Page 5

1          BE IT REMEMBERED that on Tuesday, the 9th day of

2     September, 2008, commencing at the hour of 3:02 p.m. at

3     the offices of K&L Gates, 55 Second Street, Suite 1700,

4     San Francisco, California, before me, THOMAS J. LANGE, a

5     Certified Shorthand Reporter in and for the State of

6     California, personally appeared

7                         DAVID BENNETT

8     called as a witness herein, who, having been duly sworn,

9     was thereupon examined and interrogated as hereinafter

10    set forth.

11                         --oOo--

12                    EXAMINATION BY MR. BORNSTEIN

13    Q.        Will you please state and spell your name for

14    the record?

15    A.        David Bennett, B-e-n-n-e-t-t.

16    Q.        Mr. Bennett, my name is Jeff Bornstein.  I

17    represent the plaintiffs in this prison overcrowding

18    case.  I'll be asking you a series of questions today.

19    You are under oath and the testimony that you're giving

20    is obviously subject to penalty of perjury.

21              Do you understand that?

22    A.        I do.

23    Q.        And, of course, the court reporter is here and

24    will be taking down everything that's said.  Very

25    important that you answer audibly.

David Bennett                                    9-9-08

Page 11

1    A.        Well, I had this discussion with the sheriff.

2    I did not review my specific report, so it's too many

3    years ago to try to -- I do remember that specific

4    issue, but I don't remember all of the other

5    recommendations that I made.

6    Q.        And the purpose in your meeting with him was to

7    kind of refresh your memory --

8    A.        Correct.

9    Q.        -- as to what happened?

10             Let me finish my question, if you could, and

11   I'll let you finish your answer so that we don't talk

12   over each other for the court reporter.  Okay?

13   A.        Okay.

14   Q.        Thanks.

15             If I understood your report, your view is that

16   in order to deal with jail overcrowding, you really need

17   to have a systems approach.  Did I say that correctly?

18   A.        Correct.

19   Q.        And that it requires looking at both the sort

20   of front end, if you will, pretrial, and as well as what

21   happens when somebody is sentenced and they are actually

22   serving time?

23   A.        Correct.

24   Q.        Then also on the back end, what happens on

25   either probation or parole as it relates to stresses on

David Bennett                                           9-9-08

Page 12

1    the system in terms of recidivism and/or technical
2    violations?
3    A.        Correct.
4    Q.        Okay.  Do you agree with the basic premises
5    that California's prisons are overcrowded?
6    A.        I do.
7    Q.        How serious do you think that is?
8             MS. KECK:  Objection.  It's vague and ambiguous
9    as to the word "serious."
10   Q.        BY MR. BORNSTEIN:  Go ahead.
11   A.        From the reports that I've read -- I have not
12   toured the facilities.  From the reports that I have
13   read of the plaintiffs' experts and the various
14   commissions that have been convened over the years, my
15   opinion is that the overcrowding in the California
16   prison system is as severe as it could possibly be.
17   Q.        In your report you said there is no doubt that
18   dramatic action needs to be taken to deal with that
19   situation; is that right?
20   A.        Correct.
21   Q.        What kind of dramatic action do you envision
22   that needs to be taken?
23   A.        Well, as I've recommended in my report, a
24   restructuring of the system.
25   Q.        Similar to what you did in Sonoma County?

David Bennett                                    9-9-08

Page 75

1          MS. FRITZ:  Calls for a legal conclusion.

2          MS. KECK:  As determined by -- I'll object as

3    same.  As determined by a court or his own opinion?

4    Q.      BY MR. BORNSTEIN:  Do you understand my

5    question?

6    A.      I have worked in numerous jurisdictions that

7    have operated overcrowded jails as determined either by

8    a court or a local determination.

9    Q.      Well, let's take -- let me refine the question.

10   In this case, the court has already determined

11   that the California prison system is in violation of the

12   Constitution because of its failure to provide adequate

13   medical and mental healthcare to inmates.  Are you aware

14   of that?

15   A.      Yes.

16   Q.      Do you believe that that is a function of

17   overcrowding?

18          MS. KECK:  I'm going to object that this calls

19   not only for a legal conclusion, but something that is

20   outside the scope of this witness's testimony and his

21   expected testimony.  He's not been engaged to render an

22   expert opinion in this regard.

23   Q.      BY MR. BORNSTEIN:  Go ahead.

24   A.      In part.

25   Q.      What do you mean?

David Bennett                                              9-9-08

Page 76

1    A.         As has been documented in the expert reports,

2    with the level of overcrowding in the prison just

3    logistically, it has proven to be very difficult, if not

4    impossible, to provide that level of care that is

5    required.  But it's not just the fact that there isn't

6    the physical space to do that, that it is -- and/or that

7    the number of prisoners prohibits that, but it's also

8    having in place the structure, the structure to

9    systematically provide the risk and needs assessment of

10   the offenders, the structure in place to provide that

11   subsequent identification and referral to treatment,

12   that ability to provide services both within the

13   facility and, just as importantly, out in the community.

14   Q.         Would you agree that when a prison is -- has a

15   rated capacity, I don't know, 80,000 beds, and yet it is

16   housing 176,000 inmates or 156,000 inmates -- I don't

17   know the number right now -- that that increases the --

18   or exacerbates, I should say, the problem of providing

19   adequate medical and mental healthcare?

20           MS. KECK:  Same objection.  Outside the scope.

21           THE WITNESS:  Yes.

22   Q.         BY MR. BORNSTEIN:  And would you agree that

23   reducing the number of prisoners is at least one of the

24   first steps that needs to be taken while you're doing --

25   while you're kind of working on the infrastructure of

David Bennett                                          9-9-08

Page 77

1    risk and needs and subsequent identification and
2    referral and in the facility and out of the facility?
3    Basically you've got to bring the population down to a
4    more manageable size so that you can implement those
5    things.
6            MS. KECK:  Objection as to scope and vague and
7    ambiguous.
8            THE WITNESS:  Yes.
9    Q.      BY MR. BORNSTEIN:  In -- okay.  Let me take --
10   let me --
11           I want to go back to something that we talked
12   about earlier.  AB 900, in your opinion, is that a
13   solution to the overcrowding problem that will work?
14   A.      No.
15   Q.      Why not?
16           MS. KECK:  Objection.  Outside the scope.
17           Go ahead.
18           THE WITNESS:  As I previously discussed, the
19   idea of a secure reentry facility in my opinion is an
20   oxymoron, and that what is proposed is simply nothing
21   more, new or different than the construction of
22   satellite prisons within -- throughout the state.
23   Q.      BY MR. BORNSTEIN:  I think you mentioned in
24   your report that you can't -- if you build -- whatever
25   you build, they will come and live in it, or I don't

REPORTER'S CERTIFICATE

I certify that the foregoing proceedings in the within-entitled cause were reported at the time and place therein named; that said proceedings were reported by me, a duly Certified Shorthand Reporter of the State of California, and were thereafter transcribed into typewriting.

I further certify that I am not of counsel or attorney for either or any of the parties to said cause of action, nor in any way interested in the outcome of the cause named in said cause of action.

IN WITNESS WHEREOF, I have hereunto set my hand this 22nd day of September, 2008.

_____
THOMAS J. LANGE, Calif. CSR No. 4689
Registered Merit Reporter