# EXHIBIT 2

## Deposition of Victor Brewer, September 4, 2008 (Designations)

## Part A

Confidential Transcript

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE  28 UNITED STATES CODE


RALPH COLEMAN, et al.,

        Plaintiffs,

vs.                    No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

        Defendants.

_____/

MARCIANO PLATA, et al.

        Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.

        Defendants.

_____/


Deposition of VICTOR F. BREWER

MARKED CONFIDENTIAL (Pages 1 through 197)


DATE:             SEPTEMBER 4, 2008

TIME:             9:34 A.M.

LOCATION:       ROSEN, BIEN & GALVAN
                    315 Montgomery Street, 10th Floor
                    San Francisco, California 94104

REPORTED BY:    Cari L. Waters-Drewry
                    Certified Shorthand Reporter
                    License Number 12401

Confidential Transcript

1    reimbursement of a $10,000 watch he lost while on duty.

2         Q.    And were you also working for the Community

3    Hospital of Northern Las Vegas at that time?

4         A.    No.

5         Q.    Where were you working?

6         A.    Women's Hospital of Las Vegas.

7         Q.    And the deposition in 1995, can you explain

8    what case that related to?

9         A.    I don't recall.

10         Q.    Was it also within the context of your

11    employment at that time?

12         A.    Yes.

13         Q.    And what was your employment?

14         A.    No, that's an incorrect answer.  It was in

15    context with my previous employment at Community

16    Hospital, but I don't recall the case.

17         Q.    Can you just go very briefly through your

18    educational history and also your history with these

19    hospitals, so we can get a time frame in mind, starting

20    from college, please.

21              MS. O'BANNON:  That's a lot of history.

22              MS. WHELAN:  Q.  It's not a memory contest,

23    so, you know, if a couple dates are murky, that's okay.

24              MS. O'BANNON:  Want him to start from college?

25              MS. WHELAN:  Q.  College.  That would be

Confidential Transcript

Page 11

1    great.

2        A.    Graduated from college in 1967.  I spent from

3    1967 to 1970 as a chemist in the United States Navy, was

4    discharged in 1970 and went back to graduate school to

5    get my clinical chemist license at Santa Clara Valley

6    Medical Center, completed it in 1971, was hired by

7    Merced Pathology Lab from 1971 through 1975.

8            1972, I went back to graduate school for my

9    master's degree in business administration.  1975, I

10    graduated and started as a CEO of a small hospital in

11    Chowchilla, Chowchilla District Memorial Hospital, and I

12    was there from 1975 to 1979.  1979, I was recruited by

13    National Medical Enterprises to run Lodi Community

14    Hospital, which I was the CEO until 1986.

15            In 1986, I was recruited by American

16    Healthcare Management to run their largest hospital in

17    Las Vegas, Nevada.  I was there from 1986 to 1990.  I

18    was recruited by Paracelsus Healthcare Corporation in

19    1990, and I stayed with them until 1992.

20            I returned to California in 1992 to enter law

21    school, and I ran Bakersfield Community Hospital until I

22    joined the State.  In 1989, I came to the State, to the

23    California Department of Corrections.

24        Q.    Did you ever get your JD?

25        A.    Three years.  I didn't finish the last year,

Confidential Transcript

1    due to family obligations.

2         Q.    You said that in 1989 you joined the

3    California Department of Corrections?

4         A.    Yes.

5         Q.    And what was your position at that time?

6         A.    Staff services analyst.

7         Q.    How long were you in that position?

8         A.    Eleven months.

9         Q.    What did you do after that?

10        A.    Became a Correctional Hospital

11   Administrator II and was redeployed to run the hospital

12   and medical institution at CIM.  I was recruited by

13   John Rodriguez in 2001.

14        Q.    You worked for the CDCR from approximately

15   1989 until 2001; is that correct?

16        A.    I'm off by 10 years.  1999.

17        Q.    1999, okay.  So you worked for the CDCR --

18        A.    Three years.

19        Q.    -- from 1999 until 2001 when you were

20   recruited by John Rodriguez --

21        A.    Deputy Director, Department of Mental Health.

22        Q.    What is your title, as you sit here today?

23        A.    Executive Director, Salinas Valley and

24   Vacaville Psychiatric programs.

25        Q.    Who is your direct boss or bosses?

Confidential Transcript

1       A.    Cindy Radavsky, and I'm on loan to

2    Roland Ives.

3       Q.    And Cindy Radavsky is the director of

4    long-term care services for the Department of Mental

5    Health; is that correct?

6       A.    Correct.

7       Q.    Can you explain what Roland Ives' title is?

8       A.    He's a Deputy Director of an outpatient unit,

9    but I don't know the exact title.  I think it's

10   Community Psychiatric Programs.

11      Q.    Where is that outpatient unit?

12      A.    It's numerous outpatient facilities across the

13   State.

14      Q.    Within the Department of Mental Health; is

15   that correct?

16      A.    Correct.

17      Q.    Did you review any documents in preparation

18   for today's deposition?

19      A.    No.

20      Q.    Did you meet with your attorneys?

21      A.    Yes.

22      Q.    How many times did you meet with your

23   attorneys?

24            MS. O'BANNON:  In regards to the deposition?

25            MS. WHELAN:  Yes.

Confidential Transcript

Page 14

1          THE WITNESS:  Two discussions.

2          MS. WHELAN:  Q.  When did those discussions

3   happen?

4      A.   The second one was, I believe, two days ago,

5   telephonically, and the other was approximately five

6   days prior to my previously scheduled deposition.

7      Q.   Were both of those meetings with Ms. Brandon

8   [sic]?

9          MS. O'BANNON:  O'Bannon.

10          MS. WHELAN:  O'Bannon.  Sorry.

11          THE WITNESS:  The first one was with

12   Lisa Tillman.  The latter was with Lisa Tillman and

13   Ms. O'Bannon.

14          MS. WHELAN:  Q.  Do you have any professional

15   licenses?

16      A.   Not at this time.

17      Q.   Have you had licenses in the past?

18      A.   Yes.

19      Q.   Can you describe what those were?

20      A.   Clinical chemist.

21      Q.   Is that the only one?

22      A.   Correct.

23      Q.   How long did you have that license for?

24      A.   Fifteen or 16 years.

25      Q.   Could you describe, in general terms, and then

Confidential Transcript

Page 15

1    we may -- we will get into more detail, but could you

2    describe in general terms what programs and units you

3    are responsible for within the CDCR.

4        A.    Salinas Valley Psychiatric Program currently

5    consists of 176 operational intermediate inpatient

6    mental health beds.  The Vacaville Psychiatric Program

7    currently is comprised of 150 acute beds, 84 beds

8    designated to Level III intermediate care and Day

9    Treatment, and 66 high custody intermediate beds.

10       Q.    The 176 ICF beds at the SVPP, can you explain

11   where those beds are?

12       A.    Sixty-four beds are in a freestanding

13   treatment center, 56 beds are located in Delta-5, and 56

14   beds are located in Delta-6.

15       Q.    I think I have a document that sets these out,

16   so I'll just introduce that as an exhibit, the first

17   exhibit, which is the Healthcare Placement Oversight

18   Program, DMH Utilization Summary for May 28th, 2008.

19                        (Whereupon, Plaintiffs'

20                        Exhibit No. 1 was marked for

21                        identification.)

22            THE WITNESS:  (Witness reviewing document.)

23            MS. WHELAN:  Q.   Do you recognize this

24   document?

25       A.    No.

Confidential Transcript

Page 16

1      Q.   I believe this document -- it looks like it

2    comes from the Healthcare Placement Unit.  Does that

3    appear to be correct, given the title?

4           MS. O'BANNON:   If you know.

5           THE WITNESS:   I don't know.

6           MS. WHELAN:   Q.  Okay.  Well, I just want to

7    ask you if this accurately describes the programs that

8    you know of.

9      A.   No.

10     Q.   What are the errors in here?

11     A.   CMF/APP is listed as capacity of 130 beds.  It

12   is 150 under the license.

13     Q.   Are there any other errors that you see on

14   this document?

15          MS. O'BANNON:   I just want to object to errors

16   on the document.  There may have been changes at that

17   point in time, and he doesn't know where the document

18   came from.

19          MS. WHELAN:   Yes.  Sorry.

20     Q.   This document is dated May 2008, so it's a

21   couple of months old, which may also describe the

22   numbers on this document.

23     A.   (Witness reviewing document.)

24     Q.   I'm primarily interested in the units that you

25   oversee, so if you go down to the CMF-ICF beds, which

Confidential Transcript

1      are listed as 106.

2              Do you see that?

3      A.   Um-hum.

4      Q.   And then it breaks those down into the CMF-ICF

5      cells and the CMF-ICF dorms?

6      A.   CMF has 40 beds on A-3 on Day Treatment, 44

7      beds on A-2, and 66 beds on P-2 and P-3.   That is

8      accurate.

9      Q.   Moving down to the SVPP, it lists 175 beds.   I

10     think you said earlier it's 174?

11     A.   176.

12     Q.   176.   The SVPP-1 cells and dorms, which are

13     listed as 64; is that correct?

14     A.   Correct.

15     Q.   And the SVPP-2 cells, which I believe are the

16     D-5 and D-6 units, listed as 111; is that --

17     A.   112.

18     Q.   Should be 112?

19     A.   Correct.

20     Q.   Could you explain, briefly, the goals of --

21     you mentioned two programs, the acute programs and the

22     ICF programs.   Could you just mention, briefly, the

23     general goals of those programs and what the lengths of

24     stay are, generally, for those programs.

25     A.   Acute Psychiatric Program is for short-term

Confidential Transcript

Page 18

1   intervention of disorders related to Axis I and mental

2   health diagnosis.  The average length of stay is

3   targeted to be less than 60 days and is currently

4   running approximately 54 days.

5            Intermediate programs are a skill level

6   patient care of moderate duration with a target of eight

7   months for a length of stay.  Currently, Vacaville is

8   running at 7.9 months, and Salinas Valley Psychiatric

9   Program is running at 8.1 months.

10           The goal of the intermediate program is to

11  transition the patient back into the outpatient level of

12  care, which predominantly is a referral back to CDC

13  Enhanced Outpatient Program.

14      Q.   Could you also explain the Day Treatment

15  Program.

16      A.   Day Treatment Program comes from the Gates

17  Decree, some years ago, which is an unlicensed program.

18  From a structural basis, the therapeutic modalities are

19  identical to the intermediate care; however, the

20  patients, in general, are a higher functioning mental

21  health patient.

22      Q.   I've heard that unit described as kind of a

23  step-down unit from ICF or acute care, or a transitional

24  unit from ICF or acute care, back into, for instance, an

25  EOP; is that accurate?

Confidential Transcript

1       A.   That's accurate, but intermediate is also a

2   transitional unit back into EOP.

3       Q.   And you would say, generally, that the

4   patients in the Day Treatment Program are a higher level

5   of functioning than the patients in a regular ICF

6   program; is that correct?

7       A.   Correct.

8       Q.   And, I'm sorry, did you say what the length of

9   stay goal is for the Day Treatment Program?

10      A.   Eight months.

11      Q.   Eight months.

12          MS. WHELAN:   I'm going to mark as Exhibit 2 a

13   draft document for the Vacaville Psychiatric Program,

14   which is a briefing document directed to Robert Sillen,

15   the Receiver at that time, with Victor Brewer and

16   Stirling Price's names on the bottom.

17                          (Whereupon, Plaintiffs'

18                          Exhibit No. 2 was marked for

19                          identification.)

20          MS. O'BANNON:   Just for the record, I want to

21   interpose an objection.   This is Document

22   No. E_PRIV_160970.   This document was apparently

23   determined to be privileged by defense counsel, and at

24   this time, we would like to re-assert all previous

25   privileges to that document.

Confidential Transcript

1    essentially have flexibility when there are people

2    moving in and out of units?

3              MS. O'BANNON:  I think you already asked that

4    question.  I think he has already answered that.  He

5    said there shouldn't be any wiggle room in the private

6    sector.

7              Do you want to know if he feels the same way

8    within the CDCR if there should be wiggle room for

9    patients?  Is that the new question?

10             MS. WHELAN:  Q.  Do you understand my

11   question?

12       A.    Yes.

13       Q.    Can you answer it?

14       A.    I think you should look at your current

15   licensed beds, your waiting list, population mix, your

16   projections for increased diagnosis of mental health

17   patients, and consider those factors.

18             MS. O'BANNON:  Can we take a quick five

19   minutes?

20             MS. WHELAN:  Yes.

21             (Recess taken.)

22             MS. WHELAN:  Q.  Mr. Brewer, we talked a

23   little bit in passing about the D-5 and D-6 units and

24   the P-2 and P-3 units, and my understanding is, D-5 and

25   D-6 are at Salinas Valley, and P-2 and P-3 are at CMF;

Golden Gate Reporting
(415) 499-DEPO

Confidential Transcript

Page 50

1    is that correct?

2        A.    Correct.

3        Q.    Can you explain a little bit about the

4    history, and we'll start with D-5 and D-6, of those

5    units and when they came online and what prompted the

6    use of those units as ICF beds?

7            MS. O'BANNON:    That's a loaded question.

8            THE WITNESS:    Limited specifically to D-5 and

9    D-6?

10            MS. WHELAN:    Q.    Yeah, let's start with D-5

11    and D-6 for now; although, we can start with P-2 and 3,

12    if you want, instead.

13        A.    No.    Approximately three years ago, the

14    Coleman court was concerned over the waiting list that

15    was growing at Salinas and requested that CDCR come up

16    with plans to add beds, and that was unfruitful, because

17    they are small units scattered throughout the State,

18    which are not feasible to operate.

19            So damage [sic] presented the idea of

20    converting two housing units for temporary use, one to

21    three years, while they built the other 128 beds we had

22    requested.

23            And approximately two-plus years ago, Delta-6

24    was converted and licensed under a temporary license as

25    an intermediate care facility under Chapter 12 of

Golden Gate Reporting
(415) 499-DEPO

Confidential Transcript

Page 51

1    Title 22.  Also, there were plans in -- CDCA started a

2    renovation of Delta-5, which opened, I believe,

3    somewhere six to eight months later, and that was to

4    meet the expanding wait list.

5        Q.   Do you recall, generally, what the wait list

6    was before those units came online?

7        A.   Generally.

8        Q.   Well, you if know specifically, but that's...

9        A.   My best recollection is, the wait list was

10   between 60 and 80 at that time.

11       Q.   And what is the wait list as of today, or this

12   week?

13       A.   I believe, if I recall, it's 166 as of

14   yesterday.

15       Q.   You said that those D-5 and D-6 units were

16   intended to be temporary, which you said this one to

17   three years.  Is that still the plan?

18       A.   They're still licensed as temporary beds, and

19   DMH's current intent is to continue to operate them as

20   intermediate beds until told otherwise.

21       Q.   So is it correct to say that while they were

22   originally intended to be temporary, there are no

23   current plans to take the D-5 and the D-6 beds offline?

24       A.   That is accurate.

25       Q.   You also said that those units were intended

Confidential Transcript

Page 52

```
 1    to be temporary until the 128-bed unit was constructed;
 2    is that correct?
 3         A.    Actually, it would be two 64-bed structures.
 4         Q.    So they were intended to be temporary until
 5    the two 64-bed structures were constructed; is that
 6    correct?
 7         A.    That is accurate.
 8         Q.    And are those two 64-bed structures still in
 9    the plans?
10         A.    No.
11         Q.    What happened with the plans for those beds?
12         A.    In 2006, CDC removed them from their plans.
13         Q.    Did you have an opinion at that time as to
14    whether those units should be removed from the plans?
15         A.    Yes.
16         Q.    What was your opinion?
17         A.    I was not happy with the thought of removing
18    them from the plans.
19         Q.    And why were you not happy with that removal?
20         A.    I had an 80-patient waiting list.
21         Q.    Did you voice your concerns about the removal
22    of that project from the plans, or those two 64-bed
23    projects from the plan?
24         A.    Yes.
25         Q.    How did you voice those concerns?
```

Confidential Transcript

```
 1      A.   Carefully.

 2      Q.   And --

 3      A.   In writing and verbally to headquarters.

 4      Q.   Did you receive a response from headquarters?

 5      A.   They concurred that the building should be

 6   built; however, CDCR persisted and removed them from the

 7   plans, over our objections.

 8           MS. O'BANNON:  "Our" being DMH?

 9           THE WITNESS:  Our being DMH.

10           MS. WHELAN:  Q.  So when you say that you

11   contacted headquarters, you're referring to DMH

12   headquarters?

13      A.   Absolutely.

14      Q.   So DMH headquarters concurred with your

15   opinion that those two 64-bed units should be built; is

16   that correct?

17      A.   Yes.

18      Q.   But the CDCR headquarter staff disagreed and

19   removed those projects from the planning phase; is that

20   correct?

21      A.   Correct.

22      Q.   Now, moving on to the P-2 and the P-3 units at

23   CMF, can you explain in a similar way that you explained

24   D-5 and D-6 where those came from?

25      A.   Again, Special Master Michael Keating asked us
```

Confidential Transcript

Page 54

1   for solutions to lower the waiting list specifically for

2   maximum custody Level IV patients, and we suggested

3   taking P-2 and converting it as a 36-bed unit,

4   temporarily, while they started the planning on a new

5   facility, the 64-bed facility.

6           In April --

7       Q.   Of 2007?

8       A.   In that area, several months after we planned

9   it, we were planning to start closing the unit because

10  there was no air conditioning.  The court ordered us to

11  keep it open, which we did, and, subsequently, when

12  requested for additional ideas, suggested P-3, which we

13  opened 30 beds.

14      Q.   At that time the P-2 and P-3 beds were opened,

15  do you recall what the waiting list was?  That would

16  have been back in mid-2007.

17      A.   I'd have to speculate.  I really don't know.

18      Q.   You've talked about how the P-2 and P-3, as

19  well as the D-5 and D-6 units, are temporary.  Can you

20  explain why they're temporary units and how they differ

21  from the permanent ICF bed units?

22      A.   Yes.  In the construction of a new facility,

23  it must be based on Title 24 current structural

24  standards, and then licensed under Title 22, depending

25  on which chapter.  CMF nor Delta-5 met the current

Golden Gate Reporting
(415) 499-DEPO

Confidential Transcript

Page 55

1    standards at the time.

2              So in order to get them temporarily licensed,

3    we requested, and were granted, program flexes.  I think

4    there are somewhere around 12 or 14 program flexes we

5    received in order to open the new structures.

6         Q.   Can you explain a little bit for us lay people

7    what a program flex is?

8         A.   Under current code, a nursing station must be

9    a specific amount of square feet, depending on the size

10   of the unit.  The structure at CMF does not accommodate

11   that square footage, so we get a program flex for that.

12             There's also a deviation at Vacaville.  Your

13   furthest room from the nursing station cannot be greater

14   than 90 feet.  That's Title 22 and Title 24 requirement.

15   Our quarters are longer than 90 feet, so we get a

16   program flex to accommodate that.  Those are the type of

17   issues.  There were, if I remember, 12 or 14 of them.

18        Q.   Are there also problems with the treatment

19   space in these temporary units?

20             MS. O'BANNON:  Object to the characterization

21   of problems.

22             THE WITNESS:  Can you be more specific?

23             MS. WHELAN:  Q.  Is there adequate treatment

24   space in these units?

25        A.   Which unit?

Confidential Transcript

Page 56

1      Q.    Is it appropriate to deal with D-5 and D-6,

2    together?  They're very similar units; is that correct?

3      A.    Correct.

4      Q.    So let's start with D-5 and D-6, which are at

5    Salinas Valley.  Is there appropriate treatment space in

6    those units?

7      A.    No.

8      Q.    In what way is the treatment space lacking in

9    those units?

10      A.    There are no treatment rooms for group or

11    individual therapy in any of the six Pods.

12      Q.    Where is group and individual therapy

13    conducted in those units?

14      A.    Groups are conducted in the Pod itself.

15    Individual therapy is conducted in a vacated dining

16    room.

17      MS. WHELAN:  Let's have this marked as

18    Exhibit 4, a March 1st, 2007, memorandum to

19    Doug McKeever from Victor Brewer regarding group rooms

20    Delta-5 and Delta-6.

21                      (Whereupon, Plaintiffs'

22                      Exhibit No. 4 was marked for

23                      identification.)

24      MS. WHELAN:  For the record, this is Bates

25    stamped DMH000295 through 297.

Confidential Transcript

Page 57

```
 1            THE WITNESS:  (Witness reviewing document.)
 2            MS. O'BANNON:  No objections.
 3            Take a look at it.
 4            MS. WHELAN:  Q.  Do you recognize this
 5   memorandum?
 6       A.   Yes.
 7       Q.   In this memo, you discuss some of the problems
 8   we've just been discussing about group and treatment
 9   rooms in the D-5 and D-6 units; is that correct?
10       A.   Correct.
11       Q.   And according to the memorandum, you state,
12   "As Delta-6 was being activated, it became apparent that
13   the continued use of each Pod for the provision of
14   patient group activities became increasingly problematic
15   because of the potential for patients who are not
16   participating in therapeutic group but had the ability
17   to hear confidential patient information by their cell
18   location being in the immediate proximity."
19            Is that still a problem in the D-5 and D-6
20   units?
21       A.   Yes.
22       Q.   The memo also refers to a conversation you had
23   with George Sifuentes.  Can you explain what
24   George Sifuentes' position was?
25       A.   He was a CEA-4 in charge of CDC's construction
```