# EXHIBIT 2

# Deposition of Victor Brewer, September 4, 2008 (Designations)

# Part B

Confidential Transcript

Page 58

1    and design department.

2         Q.    The memo states, "On or around June 12th,

3    2006, a conversation was held between George Sifuentes,

4    you," meaning Doug McKeever, "and myself regarding the

5    construction of the requested temporary group and

6    interview rooms.  At this time, Mr. Sifuentes opposed

7    the addition of the group rooms; however, was willing to

8    re-discuss the issue at a future date."

9              Do you recall why Mr. Sifuentes opposed

10   construction of the group rooms at that time?

11             MS. O'BANNON:  Calls for speculation.

12             THE WITNESS:  I don't accurately recall him

13   stating his opinion why.

14             MS. WHELAN:  Q.  Do you have a general

15   recollection of why he opposed building those group

16   rooms at that time?

17        A.    Lack of funding.

18        Q.    Was it also a workload issue with his

19   department?

20             MS. O'BANNON:  Same objection.

21             THE WITNESS:  I don't recall.

22             MS. WHELAN:  Q.  The memo goes on to state,

23   "Of major concern to SVPP staff is the lack of

24   confidentiality because interviews are currently

25   conducted in the dining room between Delta-5 and

Confidential Transcript

Page 59

1    Delta-6, which is open to Salinas Valley State Prison

2    nonclinical staff."

3            And then you go on to note that, "This is a

4    direct violation of acceptable patient care and is

5    clearly a violation of the HIPPA and State statutes."

6            Is that still true for today?

7    A.    Yes.

8    Q.    At the very end of this memo, you state that

9    you're again requesting that the group rooms and

10   interview rooms be constructed in the best interest of

11   patient care, compliance with Federal and State statutes

12   and regulations, and expectations set by the Coleman

13   Federal Court.

14           Is that correct, based on this memo?

15   A.    Yes.

16   Q.    Are those group and interview rooms under

17   construction now?

18   A.    No.

19   Q.    Are there any plans to construct adequate

20   group and interview rooms in the D-5 and D-6 units?

21   A.    I signed and approved the structural plans on

22   June 20th, 2008.

23   Q.    Do you know when those group rooms and

24   interview rooms will be completed?

25   A.    CDC is currently drafting a BCP for funding in

Confidential Transcript

Page 60

```
 1    2011.
 2         Q.    For funding in 2011?
 3         A.    Correct.
 4         Q.    Does that mean that the project won't be
 5    funded until 2011?
 6         A.    Correct.
 7         Q.    Do you know when the rooms will actually be
 8    built based on that schedule?
 9         A.    Sometime after the funding is approved.
10         Q.    So sometime after 2011; is that correct?
11         A.    My best estimate.
12         Q.    Shifting into the P-2 and P-3 units at CMF, I
13    can't remember if you stated how long those were
14    intended to be open.  Was there an original plan for
15    those in terms of how long they were going to be
16    temporary units?
17         A.    Until a new 64-bed facility could be planned
18    and constructed.
19         Q.    Meaning at CMF?
20         A.    Correct.
21         Q.    And is that project currently in the planning
22    phase, or is it part of the bed-planning effort?
23         A.    No, it's part of the planning efforts.
24    Structural plans are being done at this time.
25         Q.    Do you know when that project is set to be
```

Confidential Transcript

Page 79

1    the patient, which went over the 10-day length of stay.

2        Q.    In your opinion, that might be appropriate

3    based on the clinical attributes of that patient; is

4    that correct?

5        A.    If you can keep the patient with the same

6    treating physician and clinical team, generally

7    speaking, it's in the best interest of the patient.

8        Q.    Ms. Schulz then talks about what she refers to

9    as an operational dilemma within the CDCR and DMH at

10   this time, and she writes, "If it is determined that the

11   appropriate level of care is to transfer the patient

12   from MHCB to an APP bed, the question arises, is the

13   MHCB patient to take priority over the current patients

14   on the APP wait list?  If this is the direction the

15   Special Master elects to take, then the negative aspect

16   is that any patient in the MHCB within VPP will take

17   priority over the current wait list, which will result

18   in additional days before the non-VPP MHCB patients will

19   be admitted to the APP."

20            Can you explain what this --

21       A.    Where are you, specifically?

22            MS. O'BANNON:    I'm sorry.  We're lost --

23            THE WITNESS:    I have no idea where you are.

24            MS. O'BANNON:    -- because you talked about the

25   current operation dilemma, which is the last sentence of

Confidential Transcript

Page 80

1   a different paragraph, and then I think you moved on to

2   a completely different section after that.

3              THE WITNESS:  Where are you reading?

4              MS. WHELAN:  Sorry.  I was reading from the

5   first big paragraph.

6              MS. O'BANNON:  Do you know how many sentences

7   down?

8              MS. WHELAN:  Yeah, it's beginning with the

9   sixth line, starting with, "However, if it is..."

10             MS. O'BANNON:  If we can just read it for a

11  second.

12             MS. WHELAN:  Sure.  Yes.

13             THE WITNESS:  (Witness reviewing document.)

14  Okay.

15             MS. WHELAN:  Q.  Could you just explain in

16  your own words what the dilemma is that Ms. Schulz is

17  referring to here.

18      A.  Of 130 acute beds, 20 additional licensed

19  acute beds, but operational as a crisis bed.

20          The dilemma is, what was the court's

21  expectation for me to transfer the patient from a higher

22  level of care, crisis bed, to acute, or do I take

23  somebody from a lower level of care and put them in

24  acute?  Who gets there first?  That is a dilemma.

25      Q.  Was that dilemma resolved after you and

Confidential Transcript

Page 81

1    Ms. Schulz issued this memorandum?

2         A.    I don't recall ever seeing anything coming

3    back in writing from the Special Master.

4         Q.    Do you know what, in practice, happened in

5    terms of how to prioritize people either coming off of

6    the waiting list or people coming out of the MHCB units?

7         A.    Base it on the clinical information we have

8    and take the most acute patient and place them in a bed.

9         Q.    Would you agree that the dilemma stems from a

10   shortage of beds?

11        A.    Yes.

12        Q.    In the last paragraph, let me direct you --

13   I'm reading from the last three sentences.  She says,

14   "However, the simple fact is that the previous bed plan

15   approved by the court demonstrated the need for

16   additional APP and Level IV ICF beds.  The current delay

17   in completing the plans that included 350 APP and 128

18   Level IV ICF beds and initiating the construction is a

19   major factor that drives the current and continued bed

20   shortage.  The simple fact is that the bed shortage

21   places both CDCR and VPP in the current operational

22   dilemma."

23             Do agree with that characterization as it

24   applies to the situation today?

25        A.    Yes; otherwise, you wouldn't have a waiting

Confidential Transcript

Page 82

1    list.

2           Q.    Do you know what the CDCR and DMH's plans are

3    to resolve this dilemma?

4           A.    To my knowledge, the only plans currently on

5    the drawing board is the 64 beds for maximum custody ICF

6    patients at VPP.

7           Q.    So the 64 beds that will be built at the CMF

8    VPP; is that correct?

9           A.    To be operational in 2011.

10          Q.    So is it safe to say this dilemma will

11   continue until at least 2011?

12                MS. O'BANNON:   Calls for speculation, but if

13   you have an opinion...

14                THE WITNESS:   It's safe to say that until such

15   time as there's an adequate number of beds, the wait

16   list will continue.

17                MS. WHELAN:   Q.   Are you familiar,

18   generally -- and then we'll get into specifics -- with

19   the Coleman bed-planning efforts?

20          A.    Yes.

21          Q.    Do you recall how many of the bed plans you've

22   been involved in?

23          A.    I've been involved in every bed plan since

24   2001.

25          Q.    And what is your role, generally, in the

Confidential Transcript

Page 83

1   bed-planning efforts?

2       A.   The Deputy Director, Cindy Radavsky, and I

3   have been the spokesperson for DMH.

4           MS. WHELAN:   Let's mark as Exhibit 7 the

5   California Department of Corrections and

6   Rehabilitation's Mental Health Bed Plan, dated July 16,

7   2008.

8                       (Whereupon, Plaintiffs'

9                       Exhibit No. 7 was marked for

10                      identification.)

11          THE WITNESS:   (Witness reviewing document.)

12          MS. WHELAN:  Q.   Are you familiar with this

13  bed plan?

14      A.   Yes.

15      Q.   Were you involved in any way in writing this

16  bed plan?

17      A.   I submitted my comments through

18  Cindy Radavsky.

19      Q.   So just to clarify, you didn't write aspects

20  of this bed plan, but you saw it, and you commented on

21  it; is that correct?

22      A.   No, I submitted my comments directly to Cindy,

23  who, in turn, took them over to CDCR.

24      Q.   But you didn't write sections of this report;

25  is that correct?

Confidential Transcript

Page 84

1       A.    Correct.

2       Q.    Do you recall when you saw this report?

3       A.    Spring of 2008.

4       Q.    Do you recall what your comments were on the

5    bed plan at that time?

6       A.    I expressed my concern over the limited staff

7    I have at Vacaville and Salinas being tasked with

8    teaching CDCR how to run acute hospitals or intermediate

9    care licensed hospitals and becoming Joint Commission

10   accredited.

11      Q.    Are you referring to what was originally

12   intended as the mentoring plan between DMH and CDCR?

13      A.    That's correct.

14      Q.    And that's no longer a part of this bed plan;

15   is that correct?

16      A.    That's correct.

17      Q.    Do you remember any other comments that you

18   had to the bed plan?

19      A.    At this time, I don't recall.

20      Q.    On page 2, at the top, and I'm using the page

21   numbers which are in the footnote down there, it notes,

22   "In June 2008, CDCR and the DMH reached agreement that

23   the DMH would continue to provide all inpatient acute

24   and intermediate mental health services instead of

25   transferring responsibilities to provide those services

Confidential Transcript

Page 85

1    to the CDCR."

2            Does that refer, at least in part, to your

3    concerns about the mentoring aspect?

4        A.    Yes, it does.

5        Q.    Why did you have those concerns about

6    continuing to teach or mentor the CDCR to provide acute

7    and intermediate care?

8        A.    In my career as a hospital CEO, I've been

9    teaching individuals for 27 years, before I joined the

10    State, how to become a hospital administrator.  In

11    general, it's a five- to six-year process before you're

12    capable of being a hospital CEO, one year as an

13    administrative assistant, two years as an assistant

14    administrator, two years as an associate administrator,

15    and one year as a chief operating officer before you

16    have the ability to run an acute care hospital.

17            And I had substantial concerns with taking

18    people who have no formal training, no degree in

19    hospital administration, and being tasked with the

20    responsibility to teach them to run a licensed

21    JCAHO-accredited hospital in one year.

22        Q.    It sounds like somebody listened to you and

23    removed that aspect of the plan; is that fair to say?

24        A.    It's fair to say it was removed from the plan.

25        Q.    Do you know what the structure of -- let's

Confidential Transcript

Page 100

1    December 2006 bed plan, and April 2007 bed plan, a

2    June 2007 plan, an updated August 2007 plan, and now

3    this new July 2008 plan; is that correct?

4        A.    That's correct.

5        Q.    Is there any reason, in your opinion, that the

6    July 2008 bed plan will actually move forward?

7             MS. O'BANNON:    Calls for speculation.  Well,

8    the bed plan as everything detailed in this particular

9    plan, per page, go forth as it is, as it sits here today

10   in front of him, is that what you're asking him?  Or

11   will there be an additional change, is that what you're

12   asking?

13            MS. WHELAN:    Q.    Do you understand the

14   question?

15       A.    Not entirely.

16       Q.    Okay.  There have been one, two, three, at

17   least five bed plans issued since December of 2006.

18            Would you agree with that?

19       A.    Correct.

20       Q.    And many of those bed plans have not moved

21   forward, which has resulted in new bed plans being

22   issued at various times; is that correct?

23       A.    That's correct.

24       Q.    Do you have an opinion whether the most

25   current plan will now move forward when the previous

Confidential Transcript

Page 101

1    ones did not?

2        A.    Yes, I do have an opinion.

3        Q.    What's your opinion?

4        A.    I believe this one will move forward.

5        Q.    Why do you think that?

6        A.    In the previous bed plans, there were changes

7    in CDCR's administration.  There were changes in the bed

8    plan.  We have now coupled with the Receiver in Coleman,

9    and I believe the Receiver will be the driving force on

10   this bed plan; therefore, I believe it will occur.

11       Q.    So is it accurate to say that now that the

12   Receiver has taken over, the bed planning efforts, you

13   believe, will result in the beds actually being built at

14   some point?

15       A.    Yes, I do.

16       Q.    And it's your testimony that the first

17   facility is set to be constructed with a goal of

18   completion of construction by January 1st, 2011; is that

19   correct?

20       A.    That has been announced in our planning

21   meetings by the contractors who are working directly for

22   the Receiver; that is true.

23       Q.    Has there been any discussion of expediting

24   that time frame?

25       A.    I don't believe you can physically shorten the

Confidential Transcript

Page 120

1    the unit would be established?

2         A.    It was predicated on being provided private

3    group rooms and interview rooms.

4         Q.    Do you mean group rooms or interview rooms

5    within a Delta Pod?

6         A.    Yes, I do.

7         Q.    Which Delta Pod?

8         A.    Group rooms would not be in the Delta Pods

9    themselves.  Designed to go into the vacated dining

10   room, the current plan that I signed on June the 20th

11   has three large group rooms, two interview rooms, and a

12   dining room, one large group room and one -- two

13   interview rooms in each of the enclosed concrete yards,

14   giving us a total of nine rooms.

15              If those are constructed, my plan would still

16   be to establish a 1370 unit.

17        Q.    Are those the rooms that you previously stated

18   were set to be constructed by 2011?

19        A.    That is correct.

20        Q.    So, as you sit here today, the 1370s are not

21   in any specific designated unit; is that correct?

22        A.    That's correct.

23        Q.    Under No. 2 on that same page, it states --

24   I'm skipping a sentence or two.  "With the recent

25   expansions, sixty six Level IV ICF beds at the Vacaville

Confidential Transcript

Page 121

1    Psychiatric Program and the Delta Yard Expansion, the

2    wait list predictably dropped to approximately 80

3    patients," and that's from 120 patients?

4         A.    Um-hum.

5         Q.    "As predicted, the wait list is continuing to

6    grow and has increased to 96 within the current wait

7    list and referrals received as of this date."

8         A.    Um-hum.

9         Q.    Do you expect that a similar decrease in the

10   wait list will occur when the 64-bed unit opens and

11   begins accepting patients?

12        A.    Yes.

13        Q.    Do you expect that the wait list will then

14   continue to grow once those beds begin to fill?

15        A.    Yes.

16        Q.    And why do you expect that that will happen?

17        A.    CDCR has been very successful over the last

18   10 years in increasing the diagnosis rate of the

19   mentally ill.  It's increased from approximately

20   10 percent to over 22 percent, which approaches the

21   national average.

22              Because their diagnosis rate has improved, my

23   referral rate parallels that.  And when we opened

24   Delta-5, the 6 had dropped temporarily, climbed.  When

25   we opened Delta-5, it dropped temporarily, climbed.  We

Confidential Transcript

Page 122

1    opened P-2, it dropped temporarily and climbed.  We

2    opened P-3, it dropped temporarily and climbed.

3              So based on a continued opening of additional

4    beds, I see nothing to indicate that it won't climb back

5    to previous levels.

6         Q.    No. 3 also states, "Considering with each

7    expansion the SVPP wait list has only temporarily

8    decreased with a continued increase approaching the

9    previous levels.  SVPP management believes that due to

10   the nature of a relatively long wait time between

11   referral and admission, the referring institutions are

12   reluctant to send referrals.  Only after they experience

13   a bed increase do they again submit appropriate referral

14   packages with the expectation of admission into the

15   program due to the additional operational beds."

16             Do you still agree with the statements in that

17   paragraph?

18        A.    Yes.

19        Q.    Can you explain what you mean about clinicians

20   increasing referrals after they experience a bed

21   increase?

22        A.    To refer a patient to a DMH program, they must

23   provide a reasonable amount of clinical information to

24   support the mental health diagnosis, and when the

25   clinicians see their referrals sit on a wait list for a

Confidential Transcript

Page 123

1    substantial amount of time, they appear to be reluctant

2    to continue to send referrals.

3              As new beds open, they see the ability for DMH

4    to increase our inpatient population; therefore, they

5    start referring again.

6        Q.    Under No. 4 -- and, again, this memo was

7    written on August 22nd, 2007, or dated August 22nd,

8    2007 -- you state, "Now that the plan submitted to the

9    Coleman Court eliminates the permanent structures for

10   the 128 beds, it becomes imperative that CDCR construct

11   appropriate group rooms within the Delta Yard to provide

12   appropriate patient care and confidentiality according

13   to HIPPA statutes."

14             Does that refer to the group rooms that you

15   spoke about a couple of minutes ago that are scheduled

16   to be constructed by 2011?

17       A.    Yes.

18       Q.    Are there any plans to expedite construction

19   of those group rooms, that you know of?

20       A.    I have no knowledge of that.

21       Q.    Under Sub-part A of No. 4, moving on to the

22   next page, you wrote, "In addition to the necessary

23   patient group rooms, the current facilities assigned for

24   office space are not conducive to quality patient care

25   in that professional and clinical staff do not have

Confidential Transcript

Page 126

1   happens to know the time frame for expedition, then he

2   can say that.

3               THE WITNESS:  I believe that they would be

4   installed within 60 days of the budget being approved.

5               MS. WHELAN:  Q.  With respect to the patients

6   who DMH receives into its acute and ICF beds from CDCR,

7   has it been your experience that there are medication

8   management problems with those patients?

9          A.    In approximately 2006, I had the clinical

10  staff at Salinas order blood values on all incoming

11  patients, and we've consistently obtained these values

12  for all patients who consented to the blood draw or

13  which we had a due process order to draw the blood.

14  Currently, it shows 83 percent of the patients are not

15  medicated.

16         Q.    Just to clarify, when DMH receives patients

17  from CDCR, and they do blood level evaluations, the

18  current data shows that 83 percent of those patients do

19  not have sufficient medication in their system to be

20  effective; is that accurate?

21         A.    It means that the pharmaceutical companies

22  have established minimum reference levels and maximum

23  reference levels as a range.  There are no normal limits

24  for anti-psychotic medications.  What this data says is

25  83 percent of the patients tested have blood values less

Confidential Transcript

Page 127

1    than the minimum reference level or not at all.

2        Q.    How does this affect the DMH programs in terms

3    of having to stabilize these patients and/or, I assume,

4    initiate Keyhea orders?

5        A.    Our method of administration of medications is

6    utilizing injectables first, liquids if it does not come

7    in the injectable form as a second method of

8    administration, and crushing the tablet and giving it to

9    them in pudding or apple sauce, unless it is

10   time-released capsules.  It has been very effective.

11           Generally, it takes anywhere from one to two

12   weeks to stabilize the patient, and Salinas has been

13   very successful in doing this.

14       Q.    Would you agree that an 83 percent rate of

15   having either no medication or minimal levels of

16   medication is a serious problem?

17       A.    I agree that not medicating patients is a

18   serious problem; however, there is an extreme

19   distinction between administering medications in an

20   inpatient setting versus providing medications in an

21   outpatient setting.

22       Q.    So taking the outpatient setting, are you

23   saying that it's more difficult to administer

24   medications in an outpatient setting?

25       A.    Yes, it is.