# EXHIBIT 2

## Deposition of Victor Brewer, September 4, 2008 (Designations)

## Part C

Confidential Transcript

Page 128

1      Q.    And why is that?

2      A.    You have a very mobile population.  For a team

3   of nurses to go out into a yard that has a population of

4   1,000 patients and to administer medications to them in

5   an eight-hour period would be, at best, a daunting task.

6           Also, you have patient movement.  If you give

7   them tablets, there may be drug issues on the yard where

8   the inmate is forced to give those medications to

9   another person.  There are all kinds of contributing

10  factors, so it's very difficult for CDC, or anyone, to

11  adequately medicate people under that set of conditions.

12     Q.    There are direct observation medications, even

13  in the outpatient units, though; is that correct?

14     A.    That's correct.

15     Q.    So why would direct observation be less

16  effective in an outpatient setting than in an inpatient

17  setting?

18     A.    That's why we use injectables.  If we inject

19  it into a person's arm, we know it's there.  If we give

20  them a pill, I've had patients stand there 10,

21  15 minutes and laughingly hand me back the pill after

22  they drank four ounces of water.  They're very good at

23  not taking it.

24     Q.    Is there any reason why medication can't be

25  administered in these alternative formats that you

Confidential Transcript

1    described like injectables, liquids, or crushed

2    medications in an outpatient setting?

3        A.    It's my understanding that CDC is preparing to

4    start initiating that program.

5        Q.    So it's your understanding that they will now

6    try to move into administering the medications in

7    alternative formats, including injectables, liquids, and

8    crushed medications?

9        A.    Dr. Swanson has been assigned to that project

10   by CDC.

11       Q.    Do you have any sense as to whether they'll be

12   successful administering medications in that way in an

13   outpatient setting?

14            MS. O'BANNON:  Objection.  Calls for

15   speculation.  Assumes facts not currently in evidence,

16   that you know the details of the plan.

17            You may answer.

18            THE WITNESS:  I don't know that I can answer

19   that question.

20            MS. WHELAN:  Q.  Is that because you don't

21   have knowledge of CDCR's administering of medication?

22       A.    No, it's because I don't have any control over

23   it.  It has to be in a very controlled environment and a

24   very dedicated and tenacious staff to do it.

25       Q.    Would you agree that distributing medications

Confidential Transcript

Page 135

1      Q.   With respect to the first issue that you

2   mentioned, which is working with Dr. Swanson to address

3   the medication compliance issues?

4      A.   Um-hum.

5           MS. WHELAN:   Let's mark as Exhibit 9 a draft

6   memorandum to various chiefs of mental health and other

7   mental health staff members, with the subject:

8   Directive Medication Compliance Monitoring and Ordering

9   Reference Psychotropic Blood Levels For Mental Health

10  Services Delivery System Inmate Patients.

11                    (Whereupon, Plaintiffs'

12                    Exhibit No. 9 was marked for

13                    identification.)

14          THE WITNESS:   (Witness reviewing document.)

15          MS. WHELAN:   Q.   Have you seen this memorandum

16  before?

17     A.   No.

18     Q.   I'll just ask you questions about information

19  in it, since it contains information from DMH, and see

20  if you agree with the way it's characterized.

21          In the first paragraph, there's a reference,

22  and it states, "In ongoing samplings of patients

23  transferred to the Department of Mental Health facility

24  for inpatient care, data indicates that a significant

25  number of CDCR Inmate-Patients have sub-referenced blood

Confidential Transcript

Page 136

1   levels of their prescribed medications when measured on

2   admission.  From July 2005 to January 2008, there was a

3   finding of 222 samples from a total of 279 blood draw

4   samples returned at the range of no level detected to at

5   the minimum level of the laboratory reference for the

6   psychotropic medication."

7            Are you aware of the blood samples that this

8   refers to between July of 2005 and January 2008?

9       A.    It came off our report.

10      Q.    So you were involved in getting that

11  information to the CDCR; is that correct?

12      A.    No, we provide a cumulative report from the

13  first day of testing to current, and our average for the

14  two-plus years is now 82, 83 percent.  His numbers for

15  that smaller time period appear to parallel that.

16      Q.    Yeah, if I do my math correctly, his number at

17  that point is 79.6 percent, and you're saying that

18  recent data shows between 82 and 83 percent; is that

19  accurate?

20      A.    Correct, but his is a snapshot from -- well,

21  no, it isn't.  It is two years, but we just had the data

22  since January, last five months, and it's a two and a

23  half percent variance.  That's fairly close.

24      Q.    On the second page of the memorandum, there

25  are directions to psychiatrists and then directions

Confidential Transcript

Page 137

1    about better medication adherence that you and I have

2    been talking about, including, "Discussing with patient

3    possible barriers and solutions to effect better

4    compliance, conferring with the case manager and other

5    IDTT members to better ensure compliance, discuss

6    ordering liquid or IM formulations with the patient,

7    consider crushing or direct observation medication,

8    assess if Keyhea is warranted and transfer to a higher

9    level of care if the mental health condition warrants

10   that."

11              Do you see that?

12       A.    Yes.

13       Q.    Do you agree with all of the strategies to

14   deal with medication compliance issues?

15       A.    Based on this, he's doing everything in his

16   power to parallel the system we've got on the inpatient

17   side, so I do agree with it.

18       Q.    Is it fair to say, though, in the two-year

19   period between 2006 and now, 2008 -- we're now in

20   September -- that the problem has not gotten any better?

21       A.    It has been consistent.  Originally, it ranged

22   from 70 to 80 percent, and then the range changed from

23   70 to 75 percent and stabilized for a year, and then it

24   slowly progressed up to 80, so that shows a pattern of

25   being reasonably consistent.

Confidential Transcript

Page 138

1     Q.    And in terms of your experience running

2    hospitals and working, also, for several years within

3    the Department of Mental Health, would you consider this

4    82 to 83 percent level to be a serious problem?

5     A.    That's why I pointed it out.

6     Q.    What would be a more acceptable level, in your

7    opinion?

8     A.    On Keyhea patients, you should have greater

9    than the 95 percent compliance rate.  On patients who

10   take the medication voluntarily, I don't have an answer.

11    Q.    Do you have any knowledge as to whether part

12   of the problem in terms of medication compliance within

13   the CDCR has to do with staffing shortages?

14            MS. O'BANNON:  Calls for speculation.

15            THE WITNESS:  I have no direct knowledge.

16            MS. WHELAN:  Q.  Do you have any knowledge as

17   to whether or not this memorandum or anything similar to

18   it has actually been issued to chiefs of mental health,

19   healthcare managers, chief medical officers,

20   psychiatrists, and directors of nursing within the CDCR?

21    A.    I have not seen the memo issue.

22            MS. WHELAN:  Should we take a little break.

23            MS. O'BANNON:  Um-hum.

24            (Recess taken.)

25            MS. WHELAN:  Let's mark as Exhibit 10 a

Confidential Transcript

Page 147

1   of the medication and/or selling it or sharing it with

2   other inmates, correct?

3       A.   Correct.

4       Q.   How does DMH avoid that kind of abuse within

5   its own units?

6       A.   We use injectable, liquids, or crushed tablets

7   that they eat in some form of solid foods, and it's done

8   under the observation of a nurse.

9       Q.   And do you know why CDCR doesn't currently

10  utilize those methods for distributing medication?

11          MS. O'BANNON:  Calls for speculation.

12          THE WITNESS:  I believe Dr. Swanson's memo is

13  paralleling our pattern in attempting to do just that.

14          MS. WHELAN:  Q.  But is it true you don't have

15  any knowledge as to whether that memo has been

16  distributed?

17      A.   I answered that I had no knowledge that it had

18  been distributed.

19      Q.   Do you have any knowledge as to whether CDCR

20  clinicians are utilizing liquid, crushed, or injectable

21  medications more frequently now than they were back in,

22  for instance, 2006?

23      A.   I have no knowledge about how they're

24  administering medications now.

25      Q.   We talked about the SVPP waiting lists, and

Golden Gate Reporting
(415) 499-DEPO

Confidential Transcript

1    you described, in some detail, how you prioritize

2    patients coming into units off of that wait list.  In

3    terms of the acute wait list, can you describe what

4    prioritization you use to bring patients off of that

5    list?

6        A.    Acuity only.

7        Q.    Can you describe the most -- the mental health

8    attributes that would get a patient off of that wait

9    list the fastest?

10       A.    Suicidal behavior versus suicidal ideations

11   versus bizarre behavior, in that order.

12       Q.    Who came up with how to prioritize taking

13   people into units off of the acute wait list?

14       A.    I don't think it can be targeted to an

15   individual.  It's our collective knowledge using our

16   clinical staffs' recommendations, and we've asserted

17   that a person who has attempted suicide is the highest

18   priority.

19            A person who is thinking about suicide but has

20   not made an attempt, but has a plan, is second priority;

21   and someone who is just acting bizarrely will follow

22   suicidal patients.

23       Q.    Would you agree that in a system that had

24   adequate acute beds, you wouldn't prioritize patients in

25   this way?

Confidential Transcript

Page 149

1      A.    In any healthcare system, if there are

2  adequate beds, all patients will be admitted.

3      Q.    Would you agree that the reason that you have

4  to prioritize patients in this way has to do with a

5  shortage of acute beds?

6      A.    Has to do with supply and demand.  The demand

7  is greater than the supply.

8      Q.    In other words, there are more patients who

9  need beds than there are beds for those patients; is

10  that correct?

11      A.    That's accurate.

12      Q.    You've also talked a little bit about

13  seeing -- and I don't recall if you said it's an

14  increase or not -- but you talked about seeing patients

15  who have both Axis I and Axis II diagnoses; is that

16  correct?

17      A.    That's correct.

18      Q.    In your experience with DMH, are you seeing an

19  increase in those patients?

20      A.    In which patients?

21      Q.    Are patients who have an Axis I and an Axis II

22  diagnosis also referred to as co-morbid patients?

23      A.    Called dual diagnosis.  It appears to remain

24  consistent with approximately 70 percent.

25      Q.    And has that percentage changed over the

Confidential Transcript

Page 161

1    Q.   Okay.  Thank you.

2         Do you recall -- again, I want to be careful

3    about using patient names, so I'll just ask for your

4    patience.  Cooperating with me, so I'm going to try and

5    avoid using patient names.

6         But do you recall that there was a suicide in

7    an acute unit back in January of 2007?

8    A.   I recall having two suicides within 72 hours

9    in 2007.

10   Q.   Okay.  Did one of those suicides occur in the

11   Q-Wing of CMF?

12   A.   They both occurred in the Q-wing of CMF.

13   Q.   Can you tell me where the two suicides

14   occurred?

15   A.   In their cell.

16   Q.   In which Q unit did those suicides occur?

17   A.   I don't recall particularly which of the three

18   units.

19   Q.   Did both of those suicides occur by hanging?

20   A.   Yes.

21   Q.   Did both of the men hang themselves from holes

22   in the window mesh coverings?

23   A.   No.

24   Q.   Can you explain where each of the patients

25   hanged themselves from?

Confidential Transcript

Page 162

1        A.    The first patient hung himself from the desk

2    by placing a noose around the desk, tying it to his

3    neck, put his feet against the seat as a brace and

4    strangled himself.  The second patient hung from the

5    window, from the screen material.

6        Q.    Since those suicides occurred in January of

7    2007; is that correct?

8        A.    (Witness nods affirmatively.)  Uh-huh.

9        Q.    Have the desks and the windows -- window mesh

10   screens been fixed in those units?

11       A.    No.

12       Q.    Is there a time frame within which those desks

13   and the window mesh screens will be fixed?

14       A.    Our plan of correction was to replace the

15   beds, remove the desk, remove the stools, replace the

16   screen, and cover the beds, and to place new doors, as

17   approved by the Coleman Court.

18             Three months ago, I asked the Coleman Court to

19   allow me to take four beds offline and start the

20   retrofit, and I was denied that, so the beds are sitting

21   in the warehouse, the screen is sitting in the

22   warehouse, and we cannot do the retrofit at this time.

23       Q.    When you say that you requested to the Coleman

24   Court to do the retrofit, how did you do that?

25       A.    Sent a memo to Cindy Radavsky, who established

Confidential Transcript

Page 163

1    a meeting with Lisa Tillman and the Court Master.

2         Q.    Are you referring to Manny Lopes?

3         A.    Yes, I am.

4         Q.    Did you receive a response directly from

5    Manny Lopes about that issue?

6         A.    We received a verbal response at the

7    conclusion of the meeting that pending a 19-patient

8    waiting list, he was unwilling to take the risk of not

9    having 100 percent of the beds online.

10        Q.    So, in other words, it was the Special

11   Master's position that because there's a waiting list

12   for those beds, he couldn't afford to take any of them

13   offline to make these adjustments so that there aren't

14   hanging dangers; is that correct?

15        A.    At that time, he said, you may come back and

16   request it in the future, but as of today, I will not

17   allow you to take four beds offline.  It will take

18   repeatedly taking a series of four beds offline for a

19   year to retrofit all acute units.

20        Q.    So in order to do the full three units, it

21   would take a year period taking four offline at a time?

22        A.    Five units.

23        Q.    Sorry.

24        A.    150 beds.

25        Q.    So the whole process is anticipated to take

Confidential Transcript

Page 164

1    about a year to retrofit these cells and remove the

2    dangerous furniture and the vent mesh screens with four

3    cells at a time coming down; is that correct?

4         A.    That's correct.

5         Q.    Is it accurate to say that in the interim,

6    there are mesh vents and furniture in these cells that

7    makes it easier for someone to commit suicide?

8         A.    That is accurate.

9         Q.    Do you have an opinion about whether or not

10   the cells should be retrofitted immediately?

11        A.    We had a serious suicide attempt last week,

12   and I sent another request to Cindy Radavsky, to

13   Lisa Tillman, to Matt Lopes to allow us to retrofit the

14   facility.

15        Q.    Did you receive a response to that memo?

16        A.    Not yet.

17        Q.    So it sounds like it's your position that the

18   retrofit needs to be done, and that it should be done as

19   soon as possible; is that correct?

20        A.    That's accurate.

21             MS. WHELAN:  Do you guys need a break?

22             MS. O'BANNON:  Hum-um.

23             MS. WHELAN:  Q.  Were you involved, at all, in

24   the unidentified needs study that was conducted back in

25   and around 2003 and 2004?

Confidential Transcript

Page 165

1      A.   Yes.

2      Q.   In what way were you involved in that study?

3      A.   They requested our statistical information.

4      Q.   Did you provide that information at that time?

5      A.   Yes.

6      Q.   Did you see the results of the study when it

7  was completed?

8      A.   Yes.

9      Q.   Do you recall what the general results were of

10 the study?

11     A.   In numbers, no.

12     Q.   How about just in general, not utilizing

13 numbers?

14     A.   I believe it understated the need, and that's

15 why the court has rejected the six studies.

16     Q.   When you say, the six studies, which studies

17 do you mean?

18     A.   They were doing, simultaneously over the last

19 10 years, six studies prior to Navigant, all rejected.

20     Q.   Do you have any opinion as to whether or not

21 the UNA studies should be replicated and/or repeated on

22 some sort of periodic basis?

23     A.   With the pending advent of the new beds

24 associated with the Receiver, when they're fully staffed

25 and operational, you would be able to assess the need if

1    there's a waiting list.  If there's no waiting list, you

2    may negate the need to do another study.

3        Q.   So, in other words, if I understand you

4    correctly, if there's a waiting list, there's a higher

5    probability that people are under-referring or not

6    referring patients who might show up in an unidentified

7    need study; is that correct?

8        A.   I believe you will find a repeated pattern, as

9    beds become available, referrals increase markedly.

10       Q.   And why is that, in your opinion?

11       A.   I think we discussed it earlier, that the

12   clinicians are reluctant to go through the referral

13   process if they believe the patient will not get in for

14   a substantial amount of time.

15           MS. WHELAN:  I'm going to take a break.

16           (Recess taken.)

17           MS. WHELAN:  Mark as Exhibit 12 an August 4th,

18   2008, report from Jean Baraured on force and

19   Cynthia Radavsky regarding Monthly Staffing and Staffing

20   Vacancies Report for all DMH State Hospitals, Vacaville

21   Psychiatric Program, Salinas Valley Psychiatric Program.

22                   (Whereupon, Plaintiffs'

23                   Exhibit No. 12 was marked for

24                   identification.)

25           THE WITNESS:  (Witness reviewing document.)

Confidential Transcript

1    those are used for emergency purposes, so I think both

2    facilities work collaboratively.

3         Q.    Just curious, how does having an air

4    conditioner help in the delivery of mental healthcare?

5         A.    When you're on antipsychotic medications, and

6    the temperature in a room reaches greater than

7    95 percent, it can cause brain damage.  That's why

8    there's a heat plan that CDC invokes.  We invoke it five

9    degrees before they do.

10              We ensure that our patients get ice and a

11   substantial amount of water, if their temperature is

12   increasing.  And by bringing in two or three portable

13   air conditioning units per floor, it may drain some of

14   the power, but it keeps the rooms less than 85 degrees.

15              MS. KNOTZ:  Okay.  Thank you.  No more

16   questions.

17              FURTHER EXAMINATION BY MS. WHELAN

18              MS. WHELAN:  Just have one more.

19        Q.    In terms of your units both at CMF and Salinas

20   Valley, let's take Salinas Valley first, you have the

21   64-bed freestanding unit, has anyone ever asked you to

22   accept more patients or expand that unit by more beds?

23              MS. O'BANNON:  More beds than it can handle?

24              THE WITNESS:  Are you referring to increasing

25   the number of licensed beds within the facility?

Confidential Transcript

Page 191

1           MS. WHELAN:  Q.  Yes.

2       A.    It would not need licensing requirements.

3       Q.    So you have a 64-bed limit, and you can't

4   accept any more than 64 patients?

5       A.    Not under licensing standards.

6       Q.    And as to the D-5 and D-6 units, which each, I

7   think, have 56 beds; is that correct?

8       A.    Correct.

9       Q.    You cannot put more than 56 patients in each

10  of those units; is that correct?

11      A.    We received the program flex for the reduced

12  square footage in those cells to get the 56 in.

13      Q.    So you've already put more beds into that unit

14  than would otherwise be licensed if you didn't have a

15  flex; is that correct?

16      A.    We have doubled the beds that would normally

17  be licensed.

18      Q.    And you've doubled the beds within each unit;

19  is that correct?

20      A.    No, it's a square footage per bed.  I recall

21  it's 180-square feet per bed for a single cell.  Those

22  cells are about 90-square feet.  Licensing worked with

23  us and gave us a program flex to place a patient in a

24  90-square foot room.

25      Q.    And, originally, that was supposed to be for a

Confidential Transcript

Page 192

1    one- to three-year period; is that correct?

2         A.    Yes, it was.

3         Q.    But, now, it's for an indefinite period; is

4    that correct?

5         A.    Until the Coleman Court relinquishes those

6    beds, yes.

7         Q.    And as to the units at CMF, is it similar that

8    you have a license for a particular number of beds, and

9    you cannot accept patients in excess of that license

10   capacity?

11        A.    Based on the necessary square footage for the

12   patient, and the cells at Vacaville are six-by-eight, so

13   they're substantially below the standard.

14        Q.    Just so I understand, you described the cells

15   in the D-5 and D-6 unit as 90-square feet, so the cells

16   at CMF are how many square feet?

17        A.    Eight-by-six.

18        Q.    Eight-by-six feet cells; is that correct?

19        A.    (Witness nods head affirmatively.)

20        Q.    Do you know what it's supposed to be, the same

21   180-square foot cell; is that correct?

22        A.    Correct.

23        Q.    And, again, the reason you were permitted to

24   do that is because of flexes that you were granted in

25   the licensing; is that correct?

Confidential Transcript

Page 193

1         A.    That is accurate.

2              MS. WHELAN:   That's all I have.

3              (Whereupon, the deposition was concluded at

4    4:49 p.m.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION OF DEPOSITION OFFICER

    I, CARI L. WATERS-DREWRY, duly authorized to administer oaths pursuant to Section 2093 (b) of the California Code of Civil Procedure, hereby certify that the witness in the foregoing deposition was by me sworn to testify to the truth, the whole truth and nothing but the truth in the within-entitled cause; that said deposition was taken at the time and place therein stated; that the testimony of the said witness was thereafter transcribed by means of computer-aided transcription; that the foregoing is a full, complete and true record of said testimony; and that the witness was given an opportunity to read and correct said deposition and to subscribe the same.

    I further certify that I am not of counsel or attorney for either or any of the parties in the foregoing deposition and caption named, or in any way interested in the outcome of this cause named in said caption.

CARI L. WATERS-DREWRY, CSR 12401