# EXHIBIT 4

# Deposition of Matthew Cate, August 29, 2008 and September 12, 2008 (Designations)

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

- - -oOo- - -

RALPH COLEMAN, et al.,                    )
                                          )
              Plaintiffs,                 )
         vs.                              )
                                          ) No. 2:90-CV-00520
                                          )      LKK JFM P
ARNOLD SCHWARZENEGGER, et                 )
al.,                                      )
                                          )
              Defendants.                 )
_____          )
MARCIANO PLATA, et al.,                   )
                                          )
              Plaintiffs,                 )
                                          )
         vs.                              ) No. C:01 1351 TEH
                                          )
ARNOLD SCHWARZENEGGER, et                 )
al.,                                      )
                                          )
              Defendants.                 )
_____          )

VIDEOTAPED DEPOSITION OF

MATTHEW L. CATE

_____

FRIDAY, AUGUST 29, 2008

REPORTED BY:  HOLLY THUMAN, CSR No. 6834, RMR, CRR

(1-412303)

MATTHEW L. CATE        August 29, 2008

Page 90

| 11:54:32 | 1 | You can answer. |
| 11:54:32 | 2 | THE WITNESS:  Again, to the extent that my |
| 11:54:35 | 3 | previous answer relating to each -- you know, our |
| 11:54:40 | 4 | concerns about individual victims or concerns about |
| 11:54:42 | 5 | larger groups and our long-term concerns about |
| 11:54:46 | 6 | reducing recidivism, recognizing that there may be a |
| 11:54:49 | 7 | different impact on each of those things, yes, we |
| 11:54:53 | 8 | are implementing these in a way that we think is |
| 11:54:55 | 9 | consistent with public safety. |
| 11:54:57 | 10 | MR. SPECTER:  Q.  The first recommendation |
| 11:54:58 | 11 | says, reduce overcrowding.  And the status of it is, |
| 11:55:04 | 12 | in process. |
| 11:55:05 | 13 | A.  Right. |
| 11:55:05 | 14 | Q.  What level of overcrowding do you believe |
| 11:55:12 | 15 | would be necessary to fulfill this recommendation? |
| 11:55:21 | 16 | MR. MELLO:  The recommendation is to reduce |
| 11:55:24 | 17 | overcrowding. |
| 11:55:25 | 18 | MR. SPECTER:  Yeah, but it's vague as to |
| 11:55:26 | 19 | how -- what the level is. |
| 11:55:27 | 20 | Q.  You could reduce it -- is it to reduce it |
| 11:55:30 | 21 | by -- do you believe to reduce the number of people |
| 11:55:33 | 22 | by one prisoner would fulfill the recommendation of |
| 11:55:37 | 23 | the Expert Panel? |
| 11:55:38 | 24 | MR. MELLO:  Objection.  It's vague, |
| 11:55:40 | 25 | ambiguous, it calls for speculation as to what the |

MATTHEW L. CATE          August 29, 2008

| | | |
|--|--|--|
| 11:55:42 | 1 | Expert Panel was thinking.  It lacks foundation. |
| 11:55:45 | 2 | You can answer it if you understand. |
| 11:55:49 | 3 | THE WITNESS:  Reducing it by one inmate |
| 11:55:52 | 4 | would meet the literal recommendation. |
| 11:55:59 | 5 | I think the intent was to reduce |
| 11:56:02 | 6 | overcrowding to such an extent that you can |
| 11:56:05 | 7 | effectively -- or more effectively address the other |
| 11:56:11 | 8 | issues in the institutions related to providing |
| 11:56:16 | 9 | evidence-based programs for our offenders. |
| 11:56:20 | 10 | MR. SPECTER:  Q.  Okay.  So what's your |
| 11:56:21 | 11 | goal in terms of the level of population that you |
| 11:56:26 | 12 | want to reduce it to so that you can accomplish the |
| 11:56:31 | 13 | things that you just mentioned? |
| 11:56:32 | 14 | MR. MELLO:  That misstates his testimony, |
| 11:56:34 | 15 | lacks foundation, and calls for speculation.  It's |
| 11:56:36 | 16 | an incomplete hypothetical. |
| 11:56:37 | 17 | THE WITNESS:  I don't have -- my |
| 11:56:41 | 18 | correctional experts have not provided me with a |
| 11:56:45 | 19 | certain percentage that they think is absolutely |
| 11:56:48 | 20 | necessary to -- in order to reach -- to reduce |
| 11:56:52 | 21 | overcrowding to the extent that you could accomplish |
| 11:56:54 | 22 | these. |
| 11:56:55 | 23 | It's basically -- I mean, common sense |
| 11:56:59 | 24 | tells you that as you reduce overcrowding, these |
| 11:57:04 | 25 | become easier to implement.  The example is the |

MATTHEW L. CATE      August 29, 2008

| 11:57:07 | 1 | nontraditional bed.  If you have nontraditional beds |
|----------|---|---|
| 11:57:11 | 2 | in a gymnasium, then you can't run a recreational |
| 11:57:15 | 3 | program, or you can't hold an anger management class |
| 11:57:19 | 4 | in that area, and so that makes it more difficult to |
| 11:57:22 | 5 | implement the rest. |

11:57:25  6        I don't -- I can't tell you exactly what

11:57:27  7   percentage is necessary.  It's all a matter of --

11:57:31  8   it's a sliding scale of efficiencies, basically.

11:57:40  9        Q.  I understood all of that except the sliding

11:57:43 10   scale part.  Could you elaborate on that a little

11:57:45 11   bit?

11:57:46 12        A.  Only that reduction by one prisoner does

11:57:50 13   almost nothing.

11:57:51 14        Q.  Right.

11:57:52 15        A.  Reduction by 5,000 does more.  And

11:57:55 16   reduction of all your bad beds, all your

11:57:58 17   nontraditional beds, is even more helpful than that,

11:58:01 18   and it goes on from there.

11:58:03 19        The problem, of course, is that as you

11:58:08 20   reduce overcrowding, you become less efficient, it

11:58:12 21   becomes more expensive, et cetera.  If we had one

11:58:16 22   inmate, clearly you -- we'd have plenty of room, and

11:58:20 23   that's what -- I just meant that it's -- I mean,

11:58:22 24   again, it's a common-sense conversation about that

11:58:26 25   you need -- you need space, and fewer inmates allows

MATTHEW L. CATE        August 29, 2008

Page 93

| | | |
|---|---|---|
| 11:58:29 | 1 | to do that.  I just can't tell you the percent -- |
| 11:58:34 | 2 | the perfect percent is X. |
| 11:58:35 | 3 | Q.  Okay.  Do you have anybody working on that |
| 11:58:38 | 4 | question about what your -- what percent you would |
| 11:58:42 | 5 | like to drop the population to? |
| 11:58:45 | 6 | A.  No.  Because that's not our -- we can't |
| 11:58:49 | 7 | control that.  So -- all of that.  We can control |
| 11:58:53 | 8 | only pieces of that.  And so, you know, to the |
| 11:58:58 | 9 | extent that we can reform parole, then that piece, |
| 11:59:04 | 10 | we can see our population be reduced. |
| 11:59:07 | 11 | But I can't control the criminal laws, |
| 11:59:11 | 12 | obviously; I can't control the activities of local |
| 11:59:15 | 13 | district attorneys or the courts.  And so it doesn't |
| 11:59:18 | 14 | do me any good to say, my goal is X, when I can't |
| 11:59:22 | 15 | control the influx of inmates coming in.  All -- |
| 11:59:26 | 16 | what I can do, though, is say, we have a goal to |
| 11:59:29 | 17 | eliminate our nontraditional beds, for example, |
| 11:59:32 | 18 | because we know that those make correctional |
| 11:59:35 | 19 | practices more difficult. |
| 11:59:40 | 20 | Q.  But you've been the Inspector General, |
| 11:59:45 | 21 | you've done audits to hold people accountable to -- |
| 11:59:49 | 22 | for implementing programs.  Correct? |
| 11:59:51 | 23 | A.  Correct. |
| 11:59:52 | 24 | Q.  And when you're the chairman of the C-ROB |
| 11:59:57 | 25 | board, you're responsible for leading that body |

MATTHEW L. CATE     August 29, 2008

Page 95

| | | |
|---|---|---|
| 12:01:31 | 1 | related to overcrowding.  Neither has the |
| 12:01:37 | 2 | legislature.  Again, I think it's because the |
| 12:01:41 | 3 | Department can't control that issue.  And so for me |
| 12:01:45 | 4 | to set a goal of, I want to be at 172 percent of |
| 12:01:51 | 5 | capacity, if that -- I can't control that, and so it |
| 12:01:55 | 6 | doesn't help me as a manager to say to my people, |
| 12:01:59 | 7 | you haven't met this goal, when they tell me, well, |
| 12:02:01 | 8 | that's because LA County sent an extra 5,000 inmates |
| 12:02:04 | 9 | over the weekend.  They can't control that. |
| 12:02:06 | 10 | We have set a goal to remove all our |
| 12:02:09 | 11 | nontraditional beds, because we know that makes |
| 12:02:11 | 12 | correctional practice more difficult.  And it will |
| 12:02:14 | 13 | increase the safety of our officers and our inmates |
| 12:02:17 | 14 | and allow us additional space for programming.  And |
| 12:02:20 | 15 | so that's a concrete goal that we can do. |
| 12:02:24 | 16 | Setting a goal on something we can't |
| 12:02:25 | 17 | control like that doesn't help us. |
| 12:02:27 | 18 | MR. SPECTER:  Q.  Okay.  I understand it |
| 12:02:29 | 19 | doesn't help you.  I understand that answer. |
| 12:02:31 | 20 | But the intent of the Expert Panel's |
| 12:02:36 | 21 | recommendations, as I understand it, was to provide |
| 12:02:42 | 22 | more rehabilitative programming to prisoners. |
| 12:02:46 | 23 | Correct? |
| 12:02:47 | 24 | A.  Correct. |
| 12:02:48 | 25 | Q.  That's you're understanding, too? |

MATTHEW L. CATE       August 29, 2008

Page 141

13:53:08  1        more beds, you need more medical facilities,

13:53:10  2        you've got too many people in cells.   In

13:53:12  3        fact, the numbers are running well over 100

13:53:16  4        percent now, I think, in terms of what the

13:53:20  5        capacity is supposed to hold, aren't they?"

13:53:23  6             And your answer was, "That's right."

13:53:26  7             Correct?

13:53:27  8        A.  Yes.

13:53:27  9        Q.  And you believe that to be true?

13:53:29  10       A.  Well, I think that my answer here speaks

13:53:33  11  for itself.  I wasn't necessarily saying that's

13:53:37  12  right to everything he said above, but I agree that

13:53:43  13  overcrowding makes everything more difficult in the

13:53:47  14  institutions.   I mean, I think that's a common --

13:53:51  15  that's a common-sense, non-expert view.  But when it

13:53:56  16  comes to providing program, we need space to provide

13:54:04  17  program, and the same thing is true for provision of

13:54:07  18  medical care.  You've got to transport inmates and

13:54:11  19  provide space for them and so forth.

13:54:13  20            And so crowding, if you're overcrowded,

13:54:16  21  that's a challenge that has to be overcome in order

13:54:19  22  to do those things.  That's what I was tying to get

13:54:21  23  across.

13:54:22  24       Q.  I see.  So you said:  It's a challenge for

13:54:24  25  mental and medical healthcare because, again, of the

MATTHEW L. CATE      August 29, 2008

Page 142

| | | |
|---|---|---|
| 13:54:29 | 1 | clinical spaces needed. |
| 13:54:31 | 2 | Did you see that on line -- |
| 13:54:33 | 3 | A. Yes. |
| 13:54:33 | 4 | Q. -- 10 through 11?  And you called |
| 13:54:37 | 5 | overcrowding a difficult issue on the next line.  Is |
| 13:54:39 | 6 | that right? |
| 13:54:39 | 7 | A. Yes. |
| 13:54:40 | 8 | Q. You believe that to be true? |
| 13:54:42 | 9 | A. I think it is a difficult issue. |
| 13:54:47 | 10 | Q. And since it -- and your testimony is, is |
| 13:54:51 | 11 | that it affects everything you do. |
| 13:54:54 | 12 | A. Yes.  In one degree or another. |
| 13:54:56 | 13 | Q. So it's a pervasive problem.  Correct? |
| 13:55:01 | 14 | A. In the extent that it has some impact on a |
| 13:55:04 | 15 | number of our efforts in the institutions, yes. |
| 13:55:08 | 16 | Q. Right.  So -- okay.  So in terms of |
| 13:55:30 | 17 | overcrowding -- well, I'll lay that -- if you turn |
| 13:55:35 | 18 | to page 7 -- have you turned to page 7? |
| 13:55:42 | 19 | A. I have. |
| 13:55:43 | 20 | Q. Before I even asked you to? |
| 13:55:45 | 21 | A. There's a checkmark here. |
| 13:55:50 | 22 | MR. MELLO:  If you want to give your |
| 13:55:52 | 23 | outline to him, we might get done faster. |
| 13:55:57 | 24 | MR. SPECTER:  Q.  It says -- on line 4, it |
| 13:56:01 | 25 | says: |

MATTHEW L. CATE       August 29, 2008

Page 161

| | | |
|---|---|---|
| 14:20:20 | 1 | A.  I do. |
| 14:20:23 | 2 | Q.  And you understand also that there's mental |
| 14:20:26 | 3 | healthcare which is at issue, too.   Right? |
| 14:20:28 | 4 | A.  Correct. |
| 14:20:29 | 5 | Q.  And that's been found unconstitutional. |
| 14:20:31 | 6 | Correct? |
| 14:20:32 | 7 | A.  Correct. |
| 14:20:32 | 8 | Q.  And doesn't have a Receiver.  Correct? |
| 14:20:34 | 9 | A.  That's right. |
| 14:20:35 | 10 | Q.  And there's -- the -- are you of the |
| 14:20:39 | 11 | opinion that one of the ways around the -- to solve |
| 14:20:48 | 12 | the healthcare problem -- well, the medical care |
| 14:21:01 | 13 | problem is to, you know, just let the Receiver do |
| 14:21:07 | 14 | what he's doing, or -- or -- this is a pretty |
| 14:21:11 | 15 | inarticulate question.  Let me start over again. |
| 14:21:27 | 16 | We have an overcrowding crisis now. |
| 14:21:30 | 17 | Correct? |
| 14:21:30 | 18 | A.  Yes. |
| 14:21:30 | 19 | Q.  And the Receiver's construction plans are |
| 14:21:35 | 20 | going to take years to complete.  Correct? |
| 14:21:38 | 21 | MR. MELLO:  Objection.  Vague as to |
| 14:21:39 | 22 | "construction plans" and "years."  I think it's a |
| 14:21:43 | 23 | multifaceted plan. |
| 14:21:45 | 24 | But you can answer the question. |
| 14:21:48 | 25 | THE WITNESS:  I think he's right.  It's a |

MATTHEW L. CATE    August 29, 2008

Page 162

14:21:50    1    multifaceted plan.

14:21:54    2        MR. SPECTER:  Q.  You looked at the

14:21:54    3    turnaround plan on your way here today.

14:21:56    4        A.  Right.

14:21:57    5        Q.  It talks in terms of years.  It doesn't

14:21:59    6    talk in terms of months or weeks, does it?

14:22:02    7        A.  Well, again, at some institutions he's

14:22:04    8    already working.

14:22:04    9        Q.  Right.

14:22:05    10       A.  But to reach all the institutions, it'll

14:22:07    11   certainly take years.

14:22:09    12       Q.  Right.  So is it your position as the

14:22:12    13   secretary that the -- the population shouldn't be

14:22:25    14   reduced to provide care in the interim between the

14:22:28    15   time -- between now and the time he completes his

14:22:35    16   turnaround plan?

14:22:36    17       MR. MELLO:  It lacks foundation, it calls

14:22:38    18   for speculation.  He's not an expert, so it's an

14:22:40    19   incomplete hypothetical.

14:22:43    20       I think it's vague as to what you're

14:22:46    21   getting at.  If you understand the question, go

14:22:48    22   ahead and answer it.

14:22:54    23       THE WITNESS:  I think we need to reduce

14:22:56    24   overcrowding, because it makes everything easier to

14:23:01    25   do in a prison.  It'll have the impact, I assume, of

MATTHEW L. CATE      August 29, 2008

Page 163

14:23:09  1    easing somewhat the Receiver's job.

14:23:14  2          But my point was, is that he's -- that

14:23:17  3    doesn't mean it can't be done at the current level.

14:23:20  4    And I think he's planning to make the provision of

14:23:23  5    healthcare constitutional at the current level.

14:23:25  6          My assumption as a layman is that it

14:23:29  7    takes -- it'll take more money to do that, and I

14:23:35  8    think that's the best I can say about that.

14:23:37  9          MR. SPECTER:  Q.  I see.  Your lawyers, at

14:23:43 10    least, have put forth the position in court that the

14:23:48 11    courts should not issue a prisoner release order.

14:23:54 12    Instead, they should wait for the Receiver's plan to

14:23:56 13    be fully implemented.

14:24:00 14          Is that your position?

14:24:01 15       A.  It is.

14:24:02 16       Q.  And you are aware, although there is some

14:24:07 17    overlap, that the receivership only covers medical

14:24:11 18    care.  It doesn't cover mental healthcare.  Correct?

14:24:15 19          MR. MELLO:  Objection to the term "overlap"

14:24:17 20    and "some" as being vague and ambiguous.  And I

14:24:21 21    think it's more than some overlap.

14:24:24 22          You can answer.

14:24:25 23          THE WITNESS:  I understand that the

14:24:27 24    Receiver and the Court in Coleman are working

14:24:32 25    cooperatively, especially on the facilities portion

MATTHEW L. CATE    August 29, 2008

Page 174

```
14:41:37   1    went out.  Correct?
14:41:41   2        A.  Just give me one second.
14:41:42   3        Q.  No.  Sure.
14:42:08   4        A.  Okay.  It appears to be the press release
14:42:11   5    of an audit that the Office of the Inspector General
14:42:15   6    put out in April of 2006.
14:42:18   7        Q.  Right.  And you were still the Inspector
14:42:20   8    General at that time?
14:42:21   9        A.  I was.
14:42:22  10        Q.  And the statements in here attributed to
14:42:26  11    you are true.  Correct?
14:42:27  12        A.  Yes.
14:42:29  13        Q.  You said that the -- at that time, that the
14:42:32  14    department has still not addressed three of its most
14:42:34  15    troubling problems:  Fulfilling its broader public
14:42:37  16    safety mission of preparing inmates for release.
14:42:40  17            Is that still true?
14:42:43  18            MR. MELLO:  Where is this?
14:42:44  19            MR. SPECTER:  On the first paragraph,
14:42:45  20    second sentence.
14:42:49  21            THE WITNESS:  Again, I believe the
14:42:50  22    department is doing much more now than it was then.
14:42:55  23    But I don't believe that we're doing enough yet.
14:43:00  24            MR. SPECTER:  Q.  Okay.  Overhauling its
14:43:03  25    antiquated technology system.
```

MATTHEW L. CATE          August 29, 2008

Page 175

| 14:43:07 | 1 | | That was true then.  Correct? |
|---|---|---|---|
| 14:43:09 | 2 | A. | It was true then. |
| 14:43:10 | 3 | Q. | It's still true now? |
| 14:43:12 | 4 | A. | Yes.  It's being overhauled now, but it's |
| 14:43:15 | 5 | | not there yet. |
| 14:43:17 | 6 | Q. | And providing inmates with adequate medical |
| 14:43:20 | 7 | | care in a fiscally sound manner. |
| 14:43:24 | 8 | | That was true then.  Correct? |
| 14:43:25 | 9 | A. | That was true then. |
| 14:43:27 | 10 | Q. | It's still true now? |
| 14:43:29 | 11 | A. | I don't know. |
| 14:43:29 | 12 | Q. | Okay.  Can you turn to the next page, |
| 14:43:34 | 13 | | please?  Second paragraph, it says: |
| 14:43:40 | 14 | | Severely hampering the department's |
| 14:43:42 | 15 | | ability to address its problems, the |
| 14:43:44 | 16 | | Inspector General noted, is an inmate |
| 14:43:46 | 17 | | population that has prisons straining at |
| 14:43:49 | 18 | | almost double design capacity. |
| 14:43:55 | 19 | | Was that true then? |
| 14:43:56 | 20 | A. | Yes. |
| 14:43:56 | 21 | Q. | Is that true now? |
| 14:43:57 | 22 | A. | Yes. |
| 14:43:57 | 23 | Q. | As the inmate population increases, the |
| 14:44:00 | 24 | | inspector said -- I'm sorry, the Inspector General |
| 14:44:04 | 25 | | said, the Department's problems -- controlling |

MATTHEW L. CATE        August 29, 2008

| | | |
|---|---|---|
| 14:44:06 | 1 | violence, offering education, delivering healthcare, |
| 14:44:08 | 2 | managing overcrowding and controlling costs -- |
| 14:44:10 | 3 | become more difficult. |
| 14:44:12 | 4 | Is that true? |
| 14:44:13 | 5 | A. Yes. |
| 14:44:14 | 6 | Q. And is that true now? |
| 14:44:16 | 7 | A. Yes. |
| 14:44:16 | 8 | Q. And in the next paragraph you say: The |
| 14:44:19 | 9 | department can't solve these problems alone. |
| 14:44:23 | 10 | And you go on to talk about how it requires |
| 14:44:26 | 11 | policymakers and the public to address available |
| 14:44:29 | 12 | options. |
| 14:44:30 | 13 | Do you see that? |
| 14:44:30 | 14 | A. Yes. |
| 14:44:31 | 15 | Q. And you believed that then. Right? |
| 14:44:33 | 16 | A. Yes. |
| 14:44:33 | 17 | Q. And one of those options was increasing |
| 14:44:36 | 18 | prison capacity. Correct? |
| 14:44:38 | 19 | A. Right. |
| 14:44:38 | 20 | Q. And they have addressed that in your mind |
| 14:44:40 | 21 | by AB 900. Correct? |
| 14:44:44 | 22 | A. And the out-of-state prison -- well, I |
| 14:44:48 | 23 | guess that's a temporary -- it provides additional |
| 14:44:51 | 24 | capacity to send inmates out of state. But that and |
| 14:44:54 | 25 | AB 900, yes. |

MATTHEW L. CATE        August 29, 2008

Page 219

| | | |
|---|---|---|
| 15:53:18 | 1 | Even before I issued this plan to the |
| 15:53:21 | 2 | public, I said, could you do this if we built it? |
| 15:53:25 | 3 | Q.  Could you do what? |
| 15:53:26 | 4 | A.  Could you staff it with medical providers |
| 15:53:29 | 5 | and make sure that the inmates get care. |
| 15:53:32 | 6 | Q.  If you built what? |
| 15:53:33 | 7 | A.  The in-fill projects. |
| 15:53:34 | 8 | Q.  Oh, okay.  And he said he could? |
| 15:53:37 | 9 | A.  Yes.  It would be -- you know, he would |
| 15:53:40 | 10 | have to jump through hoops and take care of things |
| 15:53:42 | 11 | and those kinds of things, but he thought we could |
| 15:53:46 | 12 | get it done. |
| 15:53:58 | 13 | Q.  Robin December reports to you, or -- you |
| 15:54:02 | 14 | talk to Robin about mental healthcare? |
| 15:54:05 | 15 | A.  I do. |
| 15:54:06 | 16 | Q.  And does he give you reports on the state |
| 15:54:09 | 17 | of compliance with the court orders? |
| 15:54:12 | 18 | A.  He reports through Ms. Jett formally.  But |
| 15:54:16 | 19 | I talk informally with Robin from time to time, yes. |
| 15:54:20 | 20 | Q.  And is he satisfied with the progress that |
| 15:54:23 | 21 | the Department is making? |
| 15:54:26 | 22 | A.  He's indicated our challenges are building |
| 15:54:30 | 23 | the clinical space that the Court's ordered, and |
| 15:54:34 | 24 | recruiting sufficient clinicians to provide the |
| 15:54:38 | 25 | mental healthcare that's needed. |

MATTHEW L. CATE      August 29, 2008

Page 220

| 15:54:41 | 1 | Q. And did he have any proposals about how to |
| 15:54:43 | 2 | increase the recruitment efforts, recruitment and |
| 15:54:47 | 3 | retention efforts? |
| 15:54:48 | 4 | A. Yeah. There's some what I would call, you |
| 15:54:54 | 5 | know, soft ideas, meaning like not hard cash ideas, |
| 15:55:00 | 6 | but soft ideas, like recruiting at the universities |
| 15:55:03 | 7 | and out of state, and, you know, improving employee |
| 15:55:09 | 8 | morale and wellness, and kind of all those things |
| 15:55:12 | 9 | that go around HR to make a job more attractive. |
| 15:55:14 | 10 | And then there's just the -- the down-and-dirty pay |
| 15:55:20 | 11 | them more, and eventually they'll come. |
| 15:55:23 | 12 | So I mean, those are kind of your two |
| 15:55:25 | 13 | options for recruiting and retaining staff. |
| 15:55:30 | 14 | Q. And did he have a recommendation as to |
| 15:55:32 | 15 | which one or whether you should use both or one |
| 15:55:35 | 16 | or -- |
| 15:55:36 | 17 | A. Well, his recommendation is, is that we |
| 15:55:39 | 18 | need to get this -- that -- well first of all, he |
| 15:55:41 | 19 | indicated it's been about a year now since we raised |
| 15:55:45 | 20 | salaries, and so it may be time to evaluate -- |
| 15:55:50 | 21 | re-evaluate whether that raise in salaries was |
| 15:55:53 | 22 | sufficient to draw the clinicians. And then look at |
| 15:55:56 | 23 | that issue again. |
| 15:55:58 | 24 | And, you know, it was more a discussion |
| 15:56:02 | 25 | where he and I shared ideas about that, recognizing |

MATTHEW L. CATE     August 29, 2008

| | | |
|---|---|---|
| 15:56:04 | 1 | that there's a shortage of clinicians in California |
| 15:56:11 | 2 | in both the private and public sector, that, in my |
| 15:56:15 | 3 | view, our inmates are more important than -- for the |
| 15:56:20 | 4 | department, than -- well, I guess I shouldn't put it |
| 15:56:24 | 5 | that way. |
| 15:56:26 | 6 | The truth is that all mental healthcare is |
| 15:56:28 | 7 | important to all Californians.  And so it's a |
| 15:56:31 | 8 | difficult deal, but it seems to me if you raise |
| 15:56:33 | 9 | salaries enough, you can draw out-of-state |
| 15:56:35 | 10 | clinicians into California to work in the California |
| 15:56:39 | 11 | prisons. |
| 15:56:40 | 12 | It's supply and demand.  And we've got a |
| 15:56:43 | 13 | constitutional obligation to do that, to do |
| 15:56:46 | 14 | whatever's necessary to make sure they are cared |
| 15:56:48 | 15 | for.  So -- but there's lots of other things you can |
| 15:56:51 | 16 | do.  And we don't want to hurt the Department of |
| 15:56:53 | 17 | Mental Health, for example, during that process, so |
| 15:56:58 | 18 | it's got to be carefully done. |
| 15:57:01 | 19 | Q.  But don't you agree with me that all those |
| 15:57:03 | 20 | other things you could do have either been tried or |
| 15:57:06 | 21 | you can't do them or it's been ineffective?  I mean, |
| 15:57:10 | 22 | it's been 13 years, you know -- |
| 15:57:12 | 23 | MR. MELLO:  Misstates the facts, misstates |
| 15:57:14 | 24 | the -- it's argumentative, calls for speculation. |
| 15:57:16 | 25 | Lacks foundation. |

MATTHEW L. CATE      September 12, 2008

Page 228

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

--oOo--

RALPH COLEMAN, et al.,        )
                              )
            Plaintiffs,       )CASE NO.
                              )CIV S-90-0520 LKK JFM P
vs.                           )
                              )
ARNOLD SCHWARZENEGGER, et al.,)
                              )
            Defendants.       )
_____)
MARCIANO PLATA, et al.        )
                              )
            Plaintiffs,       )
                              )
ARNOLD SCHWARZENEGGER, et al.,)
                              )
            Defendants.       )
_____)

VOLUME 2 IN THE DEPOSITION OF MATTHEW L. CATE

_____
Friday, September 12, 2008
(Pages 228 - 298)

REPORTED BY:  ELIZABETH A. WILLIS-LEWIS, RPR, CSR 12155
              (2001-412920)

MATTHEW L. CATE       September 12, 2008

Page 250

1     Q.    Um-hum.  So he -- would it be fair to say that

2   you understood at least that he -- he agreed that you

3   could both reduce the level of crowding and do it

4   safely?

5          MR. MELLO:  Lacks foundation, calls for

6   speculation, misstates his testimony.  You can answer.

7          THE DEPONENT:  Again, I certainly said that

8   that should be our effort and I think, for example, that

9   our Parole Reform Measure can do just that if handled

10  correctly.  And he -- he seemed to agree with that.  I

11  mean, I think that is my -- I walked out of the meeting

12  thinking we had agreement on that.

13       BY MR. SPECTER:

14     Q.    Okay.  In terms of the level of crowding that

15  exists today, did you discuss that with him at any

16  point?

17          MR. MELLO:  Vague as to time.

18          MR. SPECTER:  I said, "at any time."  That is

19  not vague as to time.

20          MR. MELLO:  But today -- he is not speaking to

21  Mr. Dunmoyer today.  He can answer the question.

22          MR. SPECTER:  I understand.

23          THE DEPONENT:  Yes.

24       BY MR. SPECTER:

25     Q.    And what were the nature of those discussions?

MATTHEW L. CATE    September 12, 2008

Page 251

1      A.    We talked about the fact that the prison

2  population had gone down slightly since the Governor's

3  emergency proclamation was issued, that the

4  administration was concerned about the level of crowding

5  and that it impacted our ability to provide, you know,

6  effective -- to effectively administrate the prisons.

7  It made everything more difficult.

8      Q.    Did that include -- did you discuss delivery of

9  health care?

10     A.    We didn't specifically.

11     Q.    But it was -- at least from your end that was

12  part of the -- I forget what noun you used.

13     A.    Yeah, I was speaking generally of the entire

14  system and that just on a common-sense basis it -- that

15  if you are -- the more crowded you are the more

16  logistical issues you face in doing all of your tasks.

17     Q.    Okay.  Did you ever tell Mr. Dunmoyer that --

18  did you ever express to him a level of overcrowding that

19  you would like to reduce the population to?

20         MR. MELLO:  Asked and answered.

21         THE DEPONENT:  I did not give him a specific

22  percentage that I wanted to reduce it to, no.

23  BY MR. SPECTER:

24     Q.    In the last few questions I have been talking

25  generally about your conversations with Mr. Dunmoyer,

MATTHEW L. CATE    September 12, 2008

Page 255

1    decisions.

2        Q.    Right.  I understand.  In terms of the parole

3    reform -- that the way you have -- the method that you

4    proposed, which you just described -- did you discuss

5    with him what effect that would have on the population?

6    Did you quantify it?

7        A.    At some meeting along the way in describing

8    this document I said that we thought that -- that we

9    counted on that for -- I think it is 8,000 reduction in

10   population.

11       Q.    And did you tell him kind of -- well, in -- the

12   time period that you would get that 8,000 would be in

13   those charts that accompanied this document; is that

14   right?

15       A.    Right.

16       Q.    So, I won't test your memory, but it is not

17   8,000 reduction in one year.  It is over at least two or

18   three years?

19       A.    Right.

20       Q.    Did you have any discussions with Mr. Dunmoyer

21   about medical or mental health care?

22       A.    At any time in the last four months?

23       Q.    Yeah.

24       A.    Yes.

25       Q.    And why don't you just tell me as best you can

MATTHEW L. CATE    September 12, 2008

Page 256

1    recollect what the substance of those discussions were

2    and I will ask follow-up questions?

3              MR. MELLO:  Calls for a narrative.  You can

4    answer if you understand.

5              THE DEPONENT:  We have had a dozen discussions

6    concerning those two cases over the last four months,

7    more on Plata than on Coleman.  Regarding Coleman, I --

8    in the discussions I have indicated to him that we

9    needed to expand our mental health beds and that we

10   needed to recruit and retain competent mental health

11   professionals and that those were the two biggest

12   hurdles to ending the Plata -- or the Coleman lawsuit in

13   my view -- indicated that we could do that through the

14   Receiver's beds he is building or if we could get

15   funding from the legislature we could do that too.  But

16   it was really about -- Coleman was mostly just about,

17   "What do we have to do to get those orders terminated?"

18        BY MR. SPECTER:

19        Q.    Is there any discussion about what you had to

20   do to provide adequate care?

21        A.    That was the --

22              MR. MELLO:  Objection to the term, "adequate

23   care," as vague and ambiguous.

24              THE DEPONENT:  No, I don't think I framed the

25   discussion that way.

MATTHEW L. CATE    September 12, 2008

Page 272

```
 1              MR. MELLO:  Objection.  Vague.  Do you mean the

 2   non-settlement conversations?

 3              MR. SPECTER:  Right, the non-settlement

 4   conversations.

 5              MR. MELLO:  I think it calls for speculation.

 6   I think he has testified to what he remembered.  You can

 7   answer.

 8              THE DEPONENT:  I think it was just a backdrop

 9   related to all the other issues that had come up over

10   the course of the last four months.

11        BY MR. SPECTER:

12        Q.   So has Susan Kennedy ever given you any

13   direction about reducing the level of overcrowding?

14        A.   Not that I recall.

15        Q.   Have you ever expressed to her concern about

16   the level of overcrowding?

17        A.   Yes.

18        Q.   What was -- and was that similar to what you

19   said to Mr. Dunmoyer?

20        A.   Before and after taking the job I have

21   expressed my concern and she agreed with my -- that it

22   is a concern, that it is something we have to work on.

23        Q.   Okay.  Did you -- did she -- did you talk to

24   her about parole reform?

25        A.   Yes.
```

```
 1              CERTIFICATE OF REPORTER

 2              I, HOLLY THUMAN, a Certified Shorthand

 3    Reporter, hereby certify that the witness in the

 4    foregoing deposition was by me duly sworn to tell the

 5    truth, the whole truth, and nothing but the truth in the

 6    within-entitled cause; that said deposition was taken

 7    down in shorthand by me, a disinterested person, at the

 8    time and place therein stated, and that the testimony of

 9    the said witness was thereafter reduced to typewriting,

10    by computer, under my direction and supervision;

11              That before completion of the deposition,

12    review of the transcript [ ] was [X] was not requested.

13    If requested, any changes made by the deponent (and

14    provided to the reporter) during the period allowed are

15    appended hereto.

16              I further certify that I am not of counsel or

17    attorney for either or any of the parties to the said

18    deposition, nor in any way interested in the event of

19    this cause, and that I am not related to any of the

20    parties thereto.

21

22        DATED  September 8, 2008.

23

24

25        HOLLY THUMAN, CSR No. 6834
```