# EXHIBIT 5

# Deposition of Matthew Cate, August 29, 2008 and September 12, 2008 (Counter-Designations)

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

---oOo---

RALPH COLEMAN, et al.,

        Plaintiffs,

vs.

        No. 2:90-CV-00520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

MARCIANO PLATA, et al.,

        Plaintiffs,

vs.

        No. C:01 1351 TEH

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

VIDEOTAPED DEPOSITION OF

MATTHEW L. CATE

FRIDAY, AUGUST 29, 2008

REPORTED BY:   HOLLY THUMAN, CSR No. 6834, RMR, CRR

(1-412303)

1  nontraditional bed. If you have nontraditional beds
2  in a gymnasium, then you can't run a recreational
3  program, or you can't hold an anger management class
4  in that area, and so that makes it more difficult to
5  implement the rest.
6     I don't -- I can't tell you exactly what
7  percentage is necessary. It's all a matter of --
8  it's a sliding scale of efficiencies, basically.
9     Q. I understood all of that except the sliding
10 scale part. Could you elaborate on that a little
11 bit?
12    A. Only that reduction by one prisoner does
13 almost nothing.
14    Q. Right.
15    A. Reduction by 5,000 does more. And
16 reduction of all your bad beds, all your
17 nontraditional beds, is even more helpful than that,
18 and it goes on from there.
19    The problem, of course, is that as you
20 reduce overcrowding, you become less efficient, it
21 becomes more expensive, et cetera. If we had one
22 inmate, clearly you -- we'd have plenty of room, and
23 that's what -- I just meant that it's -- I mean,
24 again, it's a common-sense conversation about that
25 you need -- you need space, and fewer inmates allows

```
 1    to do that.  I just can't tell you the percent --
 2    the perfect percent is X.
 3         Q.  Okay.  Do you have anybody working on that
 4    question about what your -- what percent you would
 5    like to drop the population to?
 6         A.  No.  Because that's not our -- we can't
 7    control that.  So -- all of that.  We can control
 8    only pieces of that.  And so, you know, to the
 9    extent that we can reform parole, then that piece,
10    we can see our population be reduced.
11             But I can't control the criminal laws,
12    obviously; I can't control the activities of local
13    district attorneys or the courts.  And so it doesn't
14    do me any good to say, my goal is X, when I can't
15    control the influx of inmates coming in.  All --
16    what I can do, though, is say, we have a goal to
17    eliminate our nontraditional beds, for example,
18    because we know that those make correctional
19    practices more difficult.
20         Q.  But you've been the Inspector General,
21    you've done audits to hold people accountable to --
22    for implementing programs.  Correct?
23         A.  Correct.
24         Q.  And when you're the chairman of the C-ROB
25    board, you're responsible for leading that body
```

1  which is overseeing the implementation of these
2  recommendations.  Right?
3      A.  Yes.
4      Q.  And in terms of determining -- and when you
5  were Inspector General, it was very important to you
6  to find out what the -- whether the practice was
7  consistent with the Department's policy or their
8  goals.  Correct?  That's how you measured progress.
9  Correct?
10     A.  Correct.
11     Q.  So wouldn't you say that it's important for
12 the Department to have a goal so that the C-ROB and
13 the public and the legislature can evaluate your
14 progress in meeting the -- this recommendation?
15     MR. MELLO:  Objection.  I think it's asked
16 and answered.  I think he's answered this question.
17     I also think it is argumentative, and I
18 think it's an incomplete hypothetical and it lacks
19 foundation.
20     You can answer.
21     THE WITNESS:  The general premise that I --
22 you need to -- a manager should set a goal and then
23 try to meet that goal is true.
24     The California Rehabilitation Oversight
25 Board has not asked the Department to set a goal

1  related to overcrowding. Neither has the
2  legislature. Again, I think it's because the
3  Department can't control that issue. And so for me
4  to set a goal of, I want to be at 172 percent of
5  capacity, if that -- I can't control that, and so it
6  doesn't help me as a manager to say to my people,
7  you haven't met this goal, when they tell me, well,
8  that's because LA County sent an extra 5,000 inmates
9  over the weekend. They can't control that.
10          We have set a goal to remove all our
11  nontraditional beds, because we know that makes
12  correctional practice more difficult. And it will
13  increase the safety of our officers and our inmates
14  and allow us additional space for programming. And
15  so that's a concrete goal that we can do.
16          Setting a goal on something we can't
17  control like that doesn't help us.
18          MR. SPECTER: Q. Okay. I understand it
19  doesn't help you. I understand that answer.
20          But the intent of the Expert Panel's
21  recommendations, as I understand it, was to provide
22  more rehabilitative programming to prisoners.
23  Correct?
24     A. Correct.
25     Q. That's you're understanding, too?

```
 1   occasions that I've had.
 2           So you gave an interview a few weeks --
 3   about a month or so ago with KQED.  Correct?
 4       A.  I did.
 5       Q.  And that was on the Forum show by Michael
 6   Krasny.  Correct?
 7       A.  Yes.
 8       Q.  And what we've done, the exhibit I've given
 9   you, is a transcript of that interview.  And I will
10   ask you -- I will point you to particular pages
11   to -- you know, that I want to talk about.
12           But in general, when you answered
13   Mr. Krasny's questions, you were trying to be as
14   truthful and honest as you could be.  Correct?
15       A.  Yes.
16       Q.  Okay.  So first, we wrote the page numbers
17   down at the bottom.  So if you go to page 5, and
18   line 22, do you see where Mr. Krasny asks you that
19   question?
20       A.  Yes.
21       Q.  And this is in the context of the
22   Receiver's request for $7 billion.
23           Mr. Krasny says, quote:
24           "The real problem seems to be
25   overcrowding, to a great degree.  You need
```

1    more beds, you need more medical facilities,
2    you've got too many people in cells.  In
3    fact, the numbers are running well over 100
4    percent now, I think, in terms of what the
5    capacity is supposed to hold, aren't they?"
6         And your answer was, "That's right."
7         Correct?
8    A.   Yes.
9    Q.   And you believe that to be true?
10   A.   Well, I think that my answer here speaks
11   for itself.  I wasn't necessarily saying that's
12   right to everything he said above, but I agree that
13   overcrowding makes everything more difficult in the
14   institutions.  I mean, I think that's a common --
15   that's a common-sense, non-expert view.  But when it
16   comes to providing program, we need space to provide
17   program, and the same thing is true for provision of
18   medical care.  You've got to transport inmates and
19   provide space for them and so forth.
20        And so crowding, if you're overcrowded,
21   that's a challenge that has to be overcome in order
22   to do those things.  That's what I was tying to get
23   across.
24   Q.   I see.  So you said:  It's a challenge for
25   mental and medical healthcare because, again, of the

1  multifaceted plan.

2        MR. SPECTER: Q. You looked at the
3  turnaround plan on your way here today.

4        A. Right.

5        Q. It talks in terms of years. It doesn't
6  talk in terms of months or weeks, does it?

7        A. Well, again, at some institutions he's
8  already working.

9        Q. Right.

10       A. But to reach all the institutions, it'll
11 certainly take years.

12       Q. Right. So is it your position as the
13 secretary that the -- the population shouldn't be
14 reduced to provide care in the interim between the
15 time -- between now and the time he completes his
16 turnaround plan?

17       MR. MELLO: It lacks foundation, it calls
18 for speculation. He's not an expert, so it's an
19 incomplete hypothetical.

20       I think it's vague as to what you're
21 getting at. If you understand the question, go
22 ahead and answer it.

23       THE WITNESS: I think we need to reduce
24 overcrowding, because it makes everything easier to
25 do in a prison. It'll have the impact, I assume, of

1   easing somewhat the Receiver's job.
2           But my point was, is that he's -- that
3   doesn't mean it can't be done at the current level.
4   And I think he's planning to make the provision of
5   healthcare constitutional at the current level.
6           My assumption as a layman is that it
7   takes -- it'll take more money to do that, and I
8   think that's the best I can say about that.
9           MR. SPECTER:  Q.  I see.  Your lawyers, at
10  least, have put forth the position in court that the
11  courts should not issue a prisoner release order.
12  Instead, they should wait for the Receiver's plan to
13  be fully implemented.
14          Is that your position?
15      A.  It is.
16      Q.  And you are aware, although there is some
17  overlap, that the receivership only covers medical
18  care.  It doesn't cover mental healthcare.  Correct?
19          MR. MELLO:  Objection to the term "overlap"
20  and "some" as being vague and ambiguous.  And I
21  think it's more than some overlap.
22          You can answer.
23          THE WITNESS:  I understand that the
24  Receiver and the Court in Coleman are working
25  cooperatively, especially on the facilities portion

174

```
1    went out.  Correct?
2         A.   Just give me one second.
3         Q.   No.  Sure.
4         A.   Okay.  It appears to be the press release
5    of an audit that the Office of the Inspector General
6    put out in April of 2006.
7         Q.   Right.  And you were still the Inspector
8    General at that time?
9         A.   I was.
10        Q.   And the statements in here attributed to
11   you are true.  Correct?
12        A.   Yes.
13        Q.   You said that the -- at that time, that the
14   department has still not addressed three of its most
15   troubling problems:  Fulfilling its broader public
16   safety mission of preparing inmates for release.
17             Is that still true?
18             MR. MELLO:  Where is this?
19             MR. SPECTER:  On the first paragraph,
20   second sentence.
21             THE WITNESS:  Again, I believe the
22   department is doing much more now than it was then.
23   But I don't believe that we're doing enough yet.
24             MR. SPECTER:  Q.  Okay.  Overhauling its
25   antiquated technology system.
```

```
 1               That was true then.  Correct?
 2       A.  It was true then.
 3       Q.  It's still true now?
 4       A.  Yes.  It's being overhauled now, but it's
 5   not there yet.
 6       Q.  And providing inmates with adequate medical
 7   care in a fiscally sound manner.
 8               That was true then.  Correct?
 9       A.  That was true then.
10       Q.  It's still true now?
11       A.  I don't know.
12       Q.  Okay.  Can you turn to the next page,
13   please?  Second paragraph, it says:
14               Severely hampering the department's
15   ability to address its problems, the
16   Inspector General noted, is an inmate
17   population that has prisons straining at
18   almost double design capacity.
19               Was that true then?
20       A.  Yes.
21       Q.  Is that true now?
22       A.  Yes.
23       Q.  As the inmate population increases, the
24   inspector said -- I'm sorry, the Inspector General
25   said, the Department's problems -- controlling
```

```
1    violence, offering education, delivering healthcare,
2    managing overcrowding and controlling costs --
3    become more difficult.
4            Is that true?
5       A.  Yes.
6       Q.  And is that true now?
7       A.  Yes.
8       Q.  And in the next paragraph you say:  The
9    department can't solve these problems alone.
10           And you go on to talk about how it requires
11   policymakers and the public to address available
12   options.
13           Do you see that?
14      A.  Yes.
15      Q.  And you believed that then.  Right?
16      A.  Yes.
17      Q.  And one of those options was increasing
18   prison capacity.  Correct?
19      A.  Right.
20      Q.  And they have addressed that in your mind
21   by AB 900.  Correct?
22      A.  And the out-of-state prison -- well, I
23   guess that's a temporary -- it provides additional
24   capacity to send inmates out of state.  But that and
25   AB 900, yes.
```

220

1   Q. And did he have any proposals about how to
2   increase the recruitment efforts, recruitment and
3   retention efforts?
4   A. Yeah. There's some what I would call, you
5   know, soft ideas, meaning like not hard cash ideas,
6   but soft ideas, like recruiting at the universities
7   and out of state, and, you know, improving employee
8   morale and wellness, and kind of all those things
9   that go around HR to make a job more attractive.
10  And then there's just the -- the down-and-dirty pay
11  them more, and eventually they'll come.
12       So I mean, those are kind of your two
13  options for recruiting and retaining staff.
14  Q. And did he have a recommendation as to
15  which one or whether you should use both or one
16  or --
17  A. Well, his recommendation is, is that we
18  need to get this -- that -- well first of all, he
19  indicated it's been about a year now since we raised
20  salaries, and so it may be time to evaluate --
21  re-evaluate whether that raise in salaries was
22  sufficient to draw the clinicians. And then look at
23  that issue again.
24       And, you know, it was more a discussion
25  where he and I shared ideas about that, recognizing

1   that there's a shortage of clinicians in California
2   in both the private and public sector, that, in my
3   view, our inmates are more important than -- for the
4   department, than -- well, I guess I shouldn't put it
5   that way.
6           The truth is that all mental healthcare is
7   important to all Californians.  And so it's a
8   difficult deal, but it seems to me if you raise
9   salaries enough, you can draw out-of-state
10  clinicians into California to work in the California
11  prisons.
12          It's supply and demand.  And we've got a
13  constitutional obligation to do that, to do
14  whatever's necessary to make sure they are cared
15  for.  So -- but there's lots of other things you can
16  do.  And we don't want to hurt the Department of
17  Mental Health, for example, during that process, so
18  it's got to be carefully done.
19      Q.  But don't you agree with me that all those
20  other things you could do have either been tried or
21  you can't do them or it's been ineffective?  I mean,
22  it's been 13 years, you know --
23          MR. MELLO:  Misstates the facts, misstates
24  the -- it's argumentative, calls for speculation.
25  Lacks foundation.

```
 1                    CERTIFICATE OF REPORTER
 2            I, HOLLY THUMAN, a Certified Shorthand
 3    Reporter, hereby certify that the witness in the
 4    foregoing deposition was by me duly sworn to tell the
 5    truth, the whole truth, and nothing but the truth in the
 6    within-entitled cause; that said deposition was taken
 7    down in shorthand by me, a disinterested person, at the
 8    time and place therein stated, and that the testimony of
 9    the said witness was thereafter reduced to typewriting,
10    by computer, under my direction and supervision;
11            That before completion of the deposition,
12    review of the transcript [ ] was [X] was not requested.
13    If requested, any changes made by the deponent (and
14    provided to the reporter) during the period allowed are
15    appended hereto.
16            I further certify that I am not of counsel or
17    attorney for either or any of the parties to the said
18    deposition, nor in any way interested in the event of
19    this cause, and that I am not related to any of the
20    parties thereto.
21
22            DATED September 8, 2008.
23
24                              _____
25                              HOLLY THUMAN, CSR No. 6834
```