# EXHIBIT 6

**Deposition of Shama Chaiken, August 29, 2008
(Designations)**

**Part A**

Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.                              No. Civ S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER,
et al.,

    Defendants.
_____/

MARCIANO PLATA, et al.,

    Plaintiffs,

vs.                              No. C01-1351 TEH

ARNOLD SCHWARZENEGGER,
et al.,

    Defendants.
_____/

DEPOSITION OF SHAMA CHAIKEN

| | |
|---|---|
| DATE: | August 29, 2008 |
| TIME: | 9:28 a.m. |
| LOCATION: | ROSEN, BIEN & GALVAN, LLP<br>315 Montgomery Street, Tenth Floor<br>San Francisco, California |
| REPORTED BY: | Brenda L. Marshall<br>Certified Shorthand Reporter<br>License Number 6939 |

Golden Gate Reporting

Page 6

```
 1                    SHAMA CHAIKEN,
 2   called as a witness by the Plaintiffs, who, having been
 3   duly sworn by me, was examined and testified as
 4   hereinafter set forth.
 5                        --oOo--
 6
 7         EXAMINATION BY COUNSEL FOR THE PLAINTIFFS
 8   BY MR. BIEN:
 9       Q.   Could you please state your name for the record.
10       A.   Shama Chaiken.
11       Q.   Okay.  And what's your position?
12       A.   Chief psychologist for policy and program
13   development.
14       Q.   Okay.  Have you been deposed before,
15   Dr. Chaiken?
16       A.   No.
17       Q.   And that's for the Department of Corrections?
18       A.   Correct.
19       Q.   Okay.  You understand that you're here in the
20   deposition today in the Coleman and Plata overcrowding
21   case?
22       A.   Yes.
23       Q.   Okay.  Let me just go over a little bit in terms
24   of the rules of a deposition and what's going on here.
25            Have you had a chance to talk to an attorney
```

1    Q.   Okay.  What about just as a psychologist in
2  terms of a treatment relationship?  Move away from prison
3  for a second.  If you were a treating psychologist and you
4  were meeting with a patient, do you think it -- would it
5  be important to you, as a professional, to be able to talk
6  to the patient in a confidential setting?
7    A.   In a confidential setting?
8    Q.   Yes.
9         MR. ANTONEN:  Again, that's -- I object as to
10  vague, but from your personal perspective, go ahead.
11         THE WITNESS:  It depends on the situation.
12  Sometimes you engage in family therapy with other people
13  in the room, or group therapy, which is not confidential,
14  which can be beneficial.
15         But, in certain circumstances, you establish a
16  situation where you can talk to an individual alone, in a
17  confidential setting, with limits, and it's important for
18  them to understand the limits of what you can and will
19  keep confidential.
20  BY MR. BIEN:
21    Q.   Okay.  Is it -- what are you trying -- is there
22  some information that you might elicit in a psychological
23  interview with a patient that they might be more willing
24  to share if they were in a confidential setting?
25         MR. ANTONEN:  Objection.  Calls for speculation

```
 1   and appears to be an incomplete hypothetical.  Please
 2   don't speculate, but based on your experience.
 3   BY MR. BIEN:
 4        Q.   Were you trained to interview patients, as a
 5   psychologist, in public settings?
 6             MR. ANTONEN:  Objection as to "public."  If you
 7   can provide some parameters.
 8   BY MR. BIEN:
 9        Q.   You can answer, if you understand.
10             MR. ANTONEN:  To the extent you understand the
11   question.
12             THE WITNESS:  I was trained to provide certain
13   types of services in confidential settings and other types
14   of services in nonconfidential settings.
15   BY MR. BIEN:
16        Q.   Okay.  What services were you trying to provide
17   in confidential settings?
18        A.   Individual psychotherapy.
19        Q.   Okay.  Do you understand why it was good
20   practice, in psychology, to provide individual therapy in
21   confidential settings?
22        A.   Yes.
23        Q.   Okay.  And why was that?  Why is that?  Do you
24   believe that to be the case?
25        A.   Yes.  Because it facilitates a therapeutic
```

1  relationship where the rules of our society apply that
2  people can disclose information without worrying that it
3  could be later used against them in a harmful way.
4      Q.   Okay.  May it also result in -- would a
5  confidential setting -- were you ever trained that a
6  confidential setting might make it more likely the person
7  would share things that they would be embarrassed to share
8  in a public setting?
9      A.   I was trained that there are different
10 conditions that facilitate disclosure.  Sometimes, in
11 group therapy, having others disclose would help people
12 overcome shame or embarrassment, and sometimes, being
13 alone in a room could facilitate that.  Sure.
14     Q.   Okay.  Are you aware that -- any other reasons
15 why you'd want to be in a confidential setting for
16 individual therapy that you can think of?
17     A.   I think it helps people be able to concentrate
18 and have a thread of conversation without interruption.
19     Q.   In a prison setting, a correctional setting, are
20 you aware of any reasons why individual clinical contact
21 should be held in a confidential setting?
22     A.   Yes.
23     Q.   And what are those?
24     A.   For the same reasons as in the community.
25     Q.   Which are what?

Page 44

1    A.    You can have a conversation that's
2  uninterrupted, that the rules of confidentiality and
3  disclosure of information apply when the information is
4  disclosed within a patient-psychotherapist communication
5  that's not intended to be overheard by other people, that
6  individuals may disclose information in a confidential
7  setting that they would worry about could be harmful to
8  them if other people had that information.
9    Q.    Okay.  Are you aware that there is a -- can be a
10  stigma associated with seeking mental health services for
11  people in society?
12    A.    My -- your question is am I aware that --
13    Q.    Some people are embarrassed about seeking mental
14  health care.
15    A.    Am I aware that some people are embarrassed by
16  seeking mental health care?  Yes, I have heard people say
17  they are embarrassed about seeking mental health care.
18    Q.    Are you also aware that is true in prison?
19    A.    Yes.
20    Q.    Okay.  Have you ever heard that certain -- have
21  you ever heard clinicians say that certain members of
22  certain ethnic groups are more or less likely to seek
23  mental health care than others, in prison?
24    A.    Have I heard clinicians say that?  I'm going to
25  take that broadly.  We've had conversations.  Clinicians

1  confidential setting versus a nonconfidential setting?
2           MR. ANTONEN:  Objection as to "confidential
3  setting."  And, again, calls for speculation.  To the
4  extent you --
5           MR. BIEN:  By confidential, I mean that the
6  people in the group can talk to each other and people who
7  are not in the group can't hear them.
8           THE WITNESS:  It would be my assumption that
9  certain group therapies would be provided in rooms where
10 other people couldn't hear what was being discussed in the
11 group, but other group therapies would be provided in an
12 open space, for example, an exercise or recreational
13 group.
14 BY MR. BIEN:
15      Q.   All right.  But group therapies that involved
16 verbal communications and sharing of problems, you would
17 expect them to be in confidential settings, wouldn't you?
18      A.   Yes.  I would expect that if there was a group
19 therapy where people were disclosing sensitive information
20 and that the -- they were told that that information would
21 only be disclosed to the people in the group, that it
22 would be held in a setting where other people could not
23 overhear the group.
24      Q.   When -- you've been involved in the design of
25 staffing packages and for EOP programs; is that correct?

Page 56

1  inpatient care than an acute psychiatric program.
2      Q.   Okay.  And do you know, is it correct that
3  intermediate care facilities in the CDC are operated by
4  the Department of Mental Health at this time?
5      A.   Yes.
6      Q.   Okay.  And do you know the circumstances under
7  which D5 and D6 were established?
8      A.   Yes.
9      Q.   Okay.  And when was that?
10     A.   When was that?
11     Q.   What was that?  What were the circumstances?
12     A.   The circumstances were that the Salinas Valley
13 psychiatric program, which operates under DMH at the
14 same -- on the same grounds as Salinas Valley State
15 Prison, had a significant wait list, and additional space
16 was needed to provide intermediate care at that time.  And
17 so these -- we call them 180 design buildings -- were
18 designated as housing and treatment space for intermediate
19 care.
20     Q.   So the department took a -- what was otherwise a
21 regular custodial housing unit and converted it to an
22 inpatient psychiatric facility to deal with this shortage
23 of beds?
24     A.   Correct.
25     Q.   Okay.  And that was in response to a Coleman

1   takes place in a confidential setting?
2          MR. ANTONEN:  Objection.  Asked and answered,
3   Counsel.
4   BY MR. BIEN:
5       Q.  I just don't -- I'm having a hard time believing
6   that you can compartmentalize your job as much as you are
7   claiming to.
8       A.  So, in my experience at Pelican Bay State Prison
9   and at California State Prison Sacramento, I never had to
10  provide group therapy in an environment that was not where
11  I wanted to provide it.  And I would have to look at the
12  specific situation under which people are providing group
13  therapy to know whether it was a matter of professional
14  practice.
15          It's a large organization, and I believe that
16  people need to define the scope of the work related to the
17  things that they are trained to do, and I'm not trained in
18  physical plant design, space design.  I'm not assigned to
19  anything related to that.
20      Q.  Do you think it's important that a clinician
21  have an office?
22      A.  It depends on what they do.
23      Q.  Okay.  Has anyone ever complained to you that
24  they didn't want to work -- had difficulty doing their job
25  at a CDC prison, a clinician, because they didn't have

1  appropriate office space?
2      A.   I can't recall anyone complaining to me
3  particularly about that.
4      Q.   But you've heard that complaint?
5      A.   There was a survey done recently in a different
6  part of the organization, related to staff satisfaction,
7  and I heard the results of that study were clinicians
8  stated that they were not afforded sufficient office space
9  in some locations.
10     Q.   Do you share your office with anyone?
11     A.   Currently?
12     Q.   Yes.
13     A.   No.
14     Q.   Do you think if you had to share your office
15 with two or three other clinicians, it would affect your
16 quality of your experience as a professional?
17     A.   I have shared my office with other clinicians at
18 Sac.  I shared my office with another senior psychologist
19 supervisor; I appreciated doing that.  We developed a
20 collegial relationship, we talked to each other more.
21          During the phase of construction at Pelican Bay,
22 we worked in open warehouse areas with desks in the
23 warehouse.  It, to some degree, facilitated better
24 communication and better relationships between staff than
25 having individual offices.  I think there's pros and cons

Page 92

1  should move.

2      But waiting for a CCAT phone conference has not
3  met the needs of the inmate-patient population, and we've
4  developed a new system where clinicians can be contacted
5  any day of the week, weekends or holidays, during work
6  hours, to consult about those cases and to make a decision
7  about prioritizing placement into mental health crisis
8  beds.

9      And then for the DMH programs, the rules are
10 clear, and the memorandum of understanding, with the
11 Department of Mental Health about prioritization, and new
12 information is sent -- it's documented and sent to the
13 program so that the clinical assessment team at the
14 program can discuss the case and whether it should be
15 prioritized.

16     And then, if there are questions, the role of
17 CCAT is occasionally to bring the clinicians onto the
18 phone together so that if there's a disagreement, we can
19 explore the reasons why there's a disagreement and come to
20 a consensus about best care.

21     Q.   Okay.  There's a couple of questions I have.
22 You talked about the list for MHCBs.  Is there a list of
23 patients maintained somewhere in CDCR of patients who are
24 waiting for MHCB beds?
25     A.   Yes.

1  Q. And what is that list, and where is it?
2  A. The health care population oversight program
3  maintains a list of people who have been referred for
4  placement into a mental health crisis bed.
5  Q. Okay. And when you say that CCAT used to help
6  manage that list, can you explain what CCAT's function
7  was?
8  A. Sure. For example, if the inmate-patient had a
9  sudden change in their symptoms and became self-injurious,
10 for example, at a location that doesn't normally have a
11 mental health services delivery system program like it
12 does, or institution, or if an inmate was persistently
13 self-injurious at a location where there was no mental
14 health crisis bed program, the clinicians or the chief of
15 mental health could call and ask for the case to be
16 discussed by me and with the mental health crisis bed that
17 would be receiving them so that we could expedite their
18 placement into the next available mental health crisis bed
19 and facilitate having the correct staff who understood
20 very clearly what the clinical condition was and what the
21 treatment plan was that was recommended.
22 Q. Okay. So, basically, there's a -- is it correct
23 that there are -- at any moment in time, for the last, at
24 least, couple of years, have been more patients who are
25 referred for mental health crisis bed care than can

```
 1  immediately access the care?
 2       A.   There have and will always be.  Given that we
 3  don't have mental health crisis beds at every location,
 4  not every inmate-patient could have access to a mental
 5  health crisis bed at -- immediately.
 6       Q.   Okay.  What's the program guide standard for
 7  access to mental health crisis beds?
 8       A.   Within 24 hours of referral.
 9       Q.   Okay.  So isn't it correct that for the past, at
10  least, let's just say, two years, there have been more
11  patients referred for mental health crisis beds than can
12  access them within 24 hours?
13       A.   Yes.
14       Q.   And one of the functions that you were involved
15  with at CCAT was to help deal with this issue to make sure
16  that the most seriously ill and, I guess, dangerous to
17  themselves or other patients were prioritized?  Am I
18  saying that right?  Or what was your function?  How did
19  you -- how --
20       A.   It's somewhat unrelated to the wait list.  It's
21  a clinical process by which we make sure that the
22  clinicians at the receiving institution understand the
23  safety issues or the severity of the -- of the behavior or
24  symptoms or condition of an inmate-patient who is
25  transferring to them and make sure that they hold a bed
```

1    and that -- so, for example, we make sure that they
2    designate a bed for that person and that nobody -- there's
3    no misunderstanding, that nobody else would get admitted
4    into that bed in the meantime --
5         Q.   Right.
6         A.   -- that they understand this is our highest
7    priority, to get this person into a bed.
8         Q.   Right.  So it's really -- it's a triaging
9    function, and it's a prioritizing function in terms of
10   people waiting and helping clinicians get care to the
11   people who need it the most; is that right?
12        A.   Yes.
13        Q.   Okay.  That's an extremely important vital
14   function that you're performing.
15             And you are saying that that's no longer done by
16   CCAT.  And how is it done now?
17        A.   It's done by a phone call that's made to -- I'm
18   hesitating because it is in the moment, in the process of
19   new training and processes.  So I'm trying to figure out
20   where we are right at this second.
21             Any chief of mental health or designated
22   clinician can call a senior headquarter's clinical staff
23   person or the health care placement oversight program who
24   would refer to a senior headquarter's person to -- then
25   the senior headquarter's person would contact the

1  clinician at the institution to find out what's going on,
2  and together, they would make a recommendation to the
3  health care placement oversight program about who needs to
4  go into the next bed.
5          And part of it has to do with geographically.
6  For example, if there's a bed available at Pelican Bay,
7  you don't necessarily want to transfer somebody from RJD
8  in San Diego to a bed that that -- is that far away.
9          So it's a clinical decision process about the
10 timing and the location of the best available mental
11 health crisis bed.
12     Q.   Right.  So it's not -- so the function -- what
13 was the reasoning for moving it away from CCAT to this new
14 function?
15     A.   It's faster.
16     Q.   To be faster?
17     A.   CCAT only happens on Tuesdays and Thursday, and
18 this process can happen any day of the week or weekend or
19 holiday.
20     Q.   Okay.  And is it correct that you're in the --
21 department is in the midst of implementing this new
22 system?
23     A.   No.  The new system that's being implemented is
24 to give direction to chiefs of mental health to always
25 call the health care placement oversight program so

Golden Gate Reporting

Page 97

1   they're aware of these cases and to have a designated
2   clinician on each day that is called related to cases and
3   consulting with the clinicians about those cases so that
4   it's more organized than just the clinicians or the chiefs
5   in the field calling the person that they know.
6           And then we have kind of a centralized
7   repository so we know all the cases that have been
8   referred, and they're all referred in the same way, if
9   there's an issue like this.
10      Q.   Okay.  So there's a single list that any of you
11  in headquarters can access; is that correct?
12      A.   Yes.
13      Q.   Does that reside on a computer, I hope?
14      A.   Yes.
15      Q.   Or --
16      A.   We're -- yes.  It resides with Rick Johnson's
17  group.
18      Q.   Okay.  And can you access that on -- on
19  computers, or are you guys handed a list of names when
20  you're working?
21      A.   We contact each other by phone or e-mail to --
22  because the list changes on a moment by moment basis.
23      Q.   Okay.
24      A.   And it's confidential; so it's not kept in a
25  public server area.

Page 98

1    Q.   Okay.  The question is, can you access that list
2    from a computer on your desk?
3    A.   If somebody sends it to me by e-mail, a current
4    list, sure.
5    Q.   Is that what happens when you're the person on
6    duty and you need to look at the list?
7    A.   No.  I don't actually look at the list.  I just
8    discuss -- if it's the only case that's being referred to
9    be expedited for placement.  And I want to clarify, it's
10   not me anymore who is getting these calls.  We have three
11   regional chief psychologists.  Marion Chiurazzi and Andrew
12   Swanson, as the deputy directors, are now taking these
13   calls.
14           But when I was doing it, or as a backup, if I
15   were to do it, I would call and find out if there's
16   anybody else that has been referred to be prioritized to a
17   crisis bed, then I call and talk to the clinician and find
18   out what the situation is and help them make a decision
19   about the treatment plan, and if there's something they
20   could do immediately related to patient care and how
21   quickly the person needs to be transferred.
22   Q.   Everyone on the list has been referred for MCD
23   care; is that correct?
24   A.   Yes.
25   Q.   And to some extent, each one of them is a