# EXHIBIT 6

**Deposition of Shama Chaiken, August 29, 2008
(Designations)**

**Part B**

1  priority case; isn't that correct?
2      A.   Right.  Each one of them is a -- each one of
3  them is a priority case, and some of them are being
4  referred within that 24-hour period, that we have to
5  transfer them to be sent even quicker than 24 hours, for
6  example.
7      Q.   Okay.  And some of them are waiting for several
8  days at places because there just aren't enough beds?
9      A.   That's correct.
10     Q.   And the ones that you got -- you're dealing with
11 at headquarters are the ones where a clinician has gotten
12 on the phone and said, "I've already referred this person
13 for MHCB care, but I really, really need him to go now,
14 he's getting worse," or something; is that right?
15     A.   Correct.
16     Q.   Okay.  And if a clinician doesn't call you from
17 a particular institution, then they're not going to be
18 prioritized; is that correct?
19         MR. ANTONEN:  Objection.  Misstates the
20 witness's testimony.  And it's also a little compound.
21 But go ahead.
22 BY MR. BIEN:
23     Q.   I mean, if -- you prioritize the calls that you
24 receive, and you check -- you said before you take action
25 on a particular case -- and see if there are any other

1    Q.    And why would that be?
2    A.    That would be because the clinicians believe
3 that it's not safe to discharge the person from a mental
4 health crisis bed and that they're keeping them in that
5 program, pending transfer to the APP.
6    Q.    Okay. So the clinicians -- because the
7 clinicians in the MHCB where the patient is residing made
8 a clinical determination that he or she could be moved out
9 of the MHCB to some other housing, that was indicia to
10 that their acuity level might have stabilized or they
11 might not be as seriously ill as someone else who is still
12 in MHCB?
13    A.    Correct.
14    Q.    What if they're housed -- what if the patient
15 who is being referred on to the APP is being housed in
16 a -- have you heard the term alternative housing --
17    A.    I have heard that term.
18    Q.    -- location?
19         What does that mean to you, alternative housing?
20    A.    What that means is -- so there's placements
21 where inmate-patients are housed because that's the level
22 of care that we've decided that they needed, like a mental
23 health crisis bed.
24         There's people who are appropriately placed in
25 outpatient housing units, pending evaluation of whether

1  they need a mental health crisis bed, which needs to be
2  done within 48 hours, and then there's places where
3  neither a mental health crisis bed nor an outpatient
4  housing unit is available at that time, and the
5  inmate-patient needs to be placed in an alternative
6  location because a medical setting is not available.
7      Q.   Is it correct that over -- that to address this
8  issue of the fact that sometimes patients who need MHCB
9  care or a higher level of care cannot be placed promptly,
10 that the department has developed, you know, a plan for,
11 you know, which -- for each institution as to where they
12 should place inmates who might need these alternative
13 locations?
14     A.   Yes.
15     Q.   Okay.  And so that's designed to deal with the
16 fact that, at least at present, there are insufficient
17 numbers of locations that meet program guide standards
18 within program guide time frames to meet the needs of the
19 population?
20          MR. ANTONEN:  Objection.  Calls for speculation.
21          To the extent you know.
22          THE WITNESS:  Yes.
23 BY MR. BIEN:
24     Q.   Okay.  The department opened 50 new MHCB beds at
25 CMF recently; is that correct?

1     A.    Yes.
2     Q.    Okay. Now, if you move over, there's a --
3  there's a line called "Capacity," and you said -- I --
4  correct me if I'm wrong, but did you say that that's
5  called -- that means the staffed capacity? Is that the
6  word you used?
7     A.    Yeah. I don't compile this data, but on most of
8  our documents, what capacity means is the staff capacity
9  of the -- those programs.
10          I know for CCCMS and EOP and PSU that it refers
11 to staffed capacity, and I believe it's the same for
12 mental health crisis beds. I'm not sure how the
13 Department of Mental Health measures capacity.
14    Q.    Okay. So when you say -- let's just talk about
15 CCCMS for a moment. Is there a formula for what -- how
16 much mental health staff would be provided for a
17 particular number of CCCMS patients at a location?
18    A.    Can you specify the time period for "is there a
19 formula"?
20    Q.    Okay. Are you aware of any time when there's
21 been a formula used to decide how much clinical staff
22 should be allocated to a particular CCCMS program?
23    A.    Yes.
24    Q.    Okay. And when is the last time that you are
25 aware of such a formula?

```
 1       A.   Yesterday.
 2       Q.   Okay.  So how does that work?  Is there a ratio?
 3  Or how does that work?
 4       A.   I don't think I can answer that honestly without
 5  some -- giving it historically over time --
 6       Q.   Context?
 7       A.   -- giving context to it.
 8       Q.   Go ahead.
 9       A.   So with the 1997 version of the mental health
10  services delivery system program guide, there was -- there
11  were staffing ratios that were released based on the
12  number of -- for CCCMS -- based on the general number of
13  population inmates because we don't know, with any number
14  of general population inmate-patients, how many of them
15  will be in CCCMS level of care.
16            Then, in order to implement the 2006 version of
17  the mental health services delivery systems program guide,
18  there was a budget change proposal which was written, and
19  there was a court order to implement that in 2006.  And
20  that didn't change the ratios of how -- of ongoing
21  decisions about how staff were allocated because it was a
22  one-time allocation of a certain number of positions,
23  based on the court order.
24            So it was the positions that were requested in
25  that one budget change proposal.  It didn't court order
```

 1   the thinking or the rationale or the ratios behind that,
 2   but within that budget change proposal was the request for
 3   a workload study, which was conducted and concluded last
 4   year.
 5           And the workload study is a mathematical model
 6   that has on one axis all of the different types of people
 7   who work in the mental health services delivery system
 8   and, on another axis, all of the tasks that are completed
 9   in the mental health services delivery system and some
10   complicated mathematical formulas with population drivers
11   and assumptions about different things, like how many
12   people somebody should supervise and -- so, various
13   assumptions, data population drivers, and the workload
14   study is the current methodology that, if approved in this
15   budget, will take over the decision-making process about
16   staffing allocated for any particular program.
17       Q.   But you're not quite there yet?  That's not
18   approved yet?
19       A.   I have not heard that it's been approved.
20       Q.   Okay.  So when you are looking at the census
21   number here the staff capacity is based on, if I
22   understand you correctly, based on the original program
23   guide ratios for general population for a particular
24   program, in addition to an augmentation by the court order
25   in 2006, and there's probably other court orders added for

1  ad seg and stuff, but, basically, is there a capacity for
2  each prison of mental health staff that you're aware of
3  right now?
4     A.   The capacity refers to the number of inmates.
5  So there's a different grid that has every CCCMS program
6  and the staffed capacity of that program --
7     Q.   Right.
8     A.   -- that drove the original staffing, plus the
9  augmented staffing decisions, about how many staff are
10 allocated at that prison.
11    Q.   Okay.  And is it correct that there's a similar
12 kind of analysis that went into the EOP programs; in other
13 words, there was an original staffing allocation that has
14 been augmented?
15    A.   Yes.
16    Q.   Okay.  And so the capacity again here is what --
17 what -- what do you understand the staff capacity number
18 to be in this column here on Exhibit 4?
19    A.   Just read it.  3,667 --
20    Q.   Okay.
21    A.   -- as of August 6.
22    Q.   And that is -- and what does that number mean to
23 you in terms of staffing?
24    A.   That means, in total, in all, 33 prisons
25 combined, that staffing has been allocated for a total of

1  3,667 inmate-patients.
2      Q.   And that that is how many positions were
3  allocated to those institutions; is that correct?
4      A.   Correct.
5      Q.   And allocated means that there's -- the
6  government has authorized people to be hired for those
7  positions at those institutions; is that correct?
8      A.   Correct.
9      Q.   Okay.  Is it also correct that not all of those
10 positions would be filled at any moment in time at CDC?
11     A.   Historically, yes.  Correct.
12     Q.   Now, census, the census column, the next one
13 over to the right, is that -- that reflects the actual
14 population of inmates in each of those classifications, as
15 you understand?
16     A.   Correct.
17     Q.   Okay.  And what do you understand the wait list
18 column to be?  Let's just look at the CCCMS column.  How
19 would someone be on a wait list for CCCMS?
20     A.   So they may be in a reception center awaiting
21 transfer to a program that has a specific staff capacity
22 for CCCMS level of care.
23     Q.   That's fine.  So, in other words, they've
24 arrived in a reception center, they've been screened,
25 they've been identified by clinicians as needing a CCCMS

1   level of care and they're awaiting transfer to that level?
2       A.   Correct.
3       Q.   Okay.  And would the same apply for -- well,
4   what do you understand about the EOP wait list?
5       A.   I -- I understand the same thing about the EOP
6   wait list, that they're waiting to be transferred to a
7   program that has a staff capacity for providing EOP level
8   of care.
9       Q.   Okay.  Now, if you look at the census for CCCs,
10  it's at 28,672, and the capacity is at 24,922.  How is it
11  that the census is larger than the capacity?
12              MR. ANTONEN:  Objection.  Calls for speculation.
13              MR. BIEN:  If you know.
14              MR. ANTONEN:  To the extent you know.
15              THE WITNESS:  The census is larger than the
16  capacity because there are more inmates identified as
17  needing CCCMS level of care than the institutions that are
18  designated to provide CCCMS level of care have been
19  allocated staff --
20  BY MR. BIEN:
21      Q.   Okay.
22      A.   -- to provide.
23      Q.   But this is different from the wait list, isn't
24  it?  These -- these people -- the 28,672 are actually at
25  CCC programs; isn't that your understanding?

1   the June 20th, 2008, version of this report, but I used
2   this report that's released on various dates for various
3   reasons.
4       Q.   You use this kind of report showing this
5   information in your work?
6       A.   Yes.
7       Q.   Okay.  And is this -- if you'd look at the page
8   that has "Confidential" stamped on the top, Mental Health
9   Population, Placement Per Institution, Download Date June
10  20th, 2008, does that show -- let's just go over -- what's
11  the columns on the left?  Those -- are those prisons?
12      A.   Those are names of institutions, and they're
13  broken down by administrative segregation, reception
14  center, security housing unit, and, in some cases, male
15  and female.
16      Q.   Okay.  And going across, let's just look at the
17  first institution there, ASP.  Is that Avenal State
18  Prison?
19      A.   Yes.
20      Q.   So it has a capacity, CCCMS capacity, of 1,099?
21      A.   Yes.
22      Q.   Do you understand that to be the staffed
23  capacity?
24      A.   Yes.
25      Q.   And we just talked about what that was; right?

```
 1       A.   We did.
 2       Q.   Okay.  And the current population, would that be
 3  the actual number of CCCs at that institution?
 4       A.   Yes.
 5       Q.   And is it correct that Avenal, as of this date,
 6  according to this report, has 108 percent of its staff
 7  CCCMS capacity?
 8       A.   Yes.
 9       Q.   So that they've been sent more CCCMS patients
10  than they're staffed to handle?
11       A.   Correct.
12            MR. ANTONEN:  Objection.  The document speaks
13  for itself.
14  BY MR. BIEN:
15       Q.   And if you go across, the next -- the next data
16  is about EOP patients.  There's a zero capacity for EOP;
17  is that correct?
18            MR. ANTONEN:  Again, the document speaks for
19  itself, Counsel.
20            THE WITNESS:  Correct.  Where there's no number,
21  it means zero.
22  BY MR. BIEN:
23       Q.   And does that mean that there's no particular
24  allocation of mental health staff for EOP at that
25  institution?
```

```
 1        A.   Yes.
 2        Q.   And there's a current population of 22.  Did you
 3   understand that means there were 22 EOP inmates at Avenal
 4   State Prison as of this time?
 5        A.   There were 22 individuals who are identified by
 6   the treatment team as requiring the EOP level of care.
 7        Q.   If you would just jump down to CIM, if you
 8   would, is it correct there's a staffed capacity for CCCMS
 9   that -- there's three entries for CIM; is that correct?
10   CIM, CIM reception center, and CIM reception center ad
11   seg.  Do you see those?
12        A.   Yes.
13        Q.   Looking at the first entry, you understand that
14   would be CIM other than the reception center?
15        A.   Yes.
16        Q.   Okay.  There's a staff capacity of 366 for the
17   CCCMS; is that correct?
18        A.   That's what it says.
19        Q.   And there's a current population of 540?
20        A.   That's what it says.
21        Q.   Okay.  That's 148 percent of the staffed
22   capacity.
23             Now, just going down to CIW for a moment, is
24   that California Institute For Women?
25        A.   Yes.
```

```
 1        Q.   Okay.  And on the EOP side, there's a staff
 2   capacity of 75; is that correct?
 3        A.   That's what it says.
 4        Q.   And 103 EOP patients; is that correct?
 5        A.   That's what it says.
 6        Q.   Okay.  That's 137 percent of the staff capacity.
 7             Were you ever involved in any discussions of how
 8   far above 100 percent of capacity is appropriate to run a
 9   CCCMS program?
10        A.   At one time, and this was at the point when
11   Dr. Fishback and Dr. McAloon were working at headquarters
12   with me before Doug McKeever was our director, there was a
13   weekly meeting which Dr. McAloon was responsible for
14   attending, but I occasionally attended as her backup,
15   where decisions were made about opening and closing
16   programs for intake, and decisions were made based on
17   input from the chief of mental health about how many and
18   how quickly inmate-patients could be transferred there.
19   But I have not been involved in those meetings for more
20   than a year.
21        Q.   You're aware that a decision was made that it
22   was permissible to send patients to a CCCMS program beyond
23   a hundred percent of the staff capacity?
24             MR. ANTONEN:  Object.  Assumes facts not in
25   evidence.
```

1    A.    Yes.

2    Q.    Okay. And they allocated -- they recommended, according to this chart, 532 -- it's not just clinicians, but 532 additional physicians; is that correct?

    MR. ANTONEN: Objection. The document speaks for itself.

    THE WITNESS: I don't know if that -- I see the column where you're reading 532 under "Indirect Proposed Staffing," and I don't believe that that means that that's the total number of staff that are recommended by the workload study.

BY MR. BIEN:

    Q.    Okay. What did you understand their conclusion to be?

    A.    So, I can answer that question, but it requires a clarification and a little bit of background.

    MR. ANTONEN: Remember, also, please be careful about speculation because to the extent you've been actively involved in this or not, that may --

    THE WITNESS: Okay.

BY MR. BIEN:

    Q.    Go ahead.

    A.    So I have been actively involved in this process. The -- what the contractors did is they created a mathematical model, and the mathematical model can be

1  easily modified, based on population drivers and based on
2  different assumptions.
3            There was a change in leadership, during which
4  there was a part of the budget cycle that occurred when
5  the workload study was submitted with specific numbers.  I
6  do not believe that these specific numbers are -- are
7  fixed in the mind of department of finance or the
8  legislature or CDCR.
9            I believe that this is an example of given the
10 assumptions and given the population drivers, the kinds of
11 numbers that came out, and you have to read and
12 understand -- it's a complicated mathematical model.  You
13 have to read and understand all of those factors that can
14 be changed, based on the population and based on the
15 different assumptions, and come to a conclusion about what
16 those appropriate numbers are to put the data in, to know
17 what is recommended when it comes out.
18           And the contractors were very careful to say
19 that they were recommending a certain mathematical model,
20 not specific numbers to go into that model, although this
21 was submitted through the budget system, it was submitted
22 so that the model could be reviewed and so that we could
23 start to familiarize the department of finance and the
24 legislature with the model.
25           And so I don't think that too much -- I don't

1  think that a lot of attention should be paid to exact
2  numbers coming out because they can be modified based on
3  assumptions and population drivers.  And I don't think
4  that they can be compared directly to current staffing
5  because the current staffing was based on population
6  drivers from a much earlier time, which was before 2006.
7  The 2006 budget change proposal was based on 2003
8  population because it was written in 2004, and then it was
9  court ordered, just that number, not the rationale behind
10 it, remember.
11         So we have a system right now, and it's partly
12 because of the court order, for that work -- for that
13 budget change proposal to be implemented with those
14 positions.  And then the workload study to be conducted,
15 that has stopped us from being able to catch up and apply
16 our new population numbers to provided staffing.
17         So I think that what is at hand is a
18 mathematical model, and if the mathematical model is
19 approved by everybody, then we can put the right numbers
20 in and get to the correct staffing.
21    Q.   Okay.  You are aware that the workload study was
22 submitted to legislature for approval?
23    A.   Correct.
24    Q.   Okay.  And along with that was a request for
25 some reallocated positions?

Page 140

1    A.   Correct.

2    Q.   Okay.  And that's 400 additional positions; is
3 that correct?

4    A.   Correct.

5    Q.   Okay.  So the department has asked the
6 legislature, based on the workload study to date, to do
7 two things.  One is to accept the workload study as a
8 process and move forward; is that correct?

9    A.   Correct.

10   Q.   And then also to now allocate 400 additional
11 positions?

12   A.   Correct.

13   Q.   Okay.  And you agree that's a reasonable
14 request, based on your knowledge of the workload study?

15         MR. ANTONEN:  Objection.  Calls for speculation.
16 But -- and vague as to "reasonable."  But --

17         THE WITNESS:  The request is based on numbers
18 that came out of the workload study without necessarily
19 clarifying all of the assumptions and making great
20 decisions about the data that was going in from my
21 opinion, but my opinion is that that can be fixed and that
22 it will -- fixing numbers will only increase the number
23 and, therefore, it was reasonable to request that starting
24 number.

25         MR. BIEN:  Okay.  Let me mark as Exhibit 8 the