# EXHIBIT 6

**Deposition of Shama Chaiken, August 29, 2008
(Designations)**

**Part C**

1  but I do see one that says 5.
2      Q.  Okay.  You see one that says page 2 of 5?
3      A.  I do.
4      Q.  Thank you.  Right above "State Level
5  Considerations," let's see, it says, "The Mental Health
6  Staffing Workload Study was completed in June 2007."  Is
7  that correct, that the study was completed and department
8  interviewed by June 2007?
9      A.  There's two parts of your question.
10     Q.  Okay.  Was it -- that's right.  Was the study
11 completed by June 2007?
12     A.  Yes.
13     Q.  Okay.  But the department wasn't ready to move
14 forward with it at that time; is that correct?
15     A.  Correct.
16     Q.  Okay.  If you turn to the next page, under
17 "Justification," second paragraph from the bottom says,
18 (Reading) After 13 years of implementing the court's
19 orders and mandated services, the implementation of the
20 MHSDS revised program guide and the development of and in
21 concurrence with the mental health staffing workload
22 study, the DCHCS has determined that current resources are
23 insufficient to comply with required levels of care for
24 mentally ill inmates.
25         Do you agree with that, Dr. Chaiken?

1    A.    Yes.
2    Q.    Next sentence says, "Partial implementation of
3  the MHSDS Revised Program Guide suggests a tolerance for
4  insufficient treatment of mentally ill inmates -
5  undiscovered, undiagnosed, and untreated, while being
6  subjected to conditions that aggravate
7  conditions/illnesses.  Due to limited resources, mentally
8  ill inmate-patients who are receiving treatment suffer
9  needless extended and medically harmful delays accessing
10 necessary psychiatric care."
11           Do you agree with that, Dr. Chaiken?
12   A.    Not all of it.
13   Q.    Which part don't you agree with?
14   A.    Well, I'm not sure what partial implementation
15 of the MHSDS revised program suggests a tolerance for
16 insufficient treatment, I'm not sure who it suggests is
17 tolerating insufficient treatment.  It's a complex and, I
18 would say, poorly written sentence that I couldn't agree
19 with written in the way that it's written.  I didn't write
20 it.
21   Q.    Do you agree that prisoners who are not -- who
22 may not be receiving appropriate psychiatric care and are
23 housed in inappropriate conditions may be subject to
24 conditions that aggravate their conditions and their
25 illnesses?

```
 1        A.    Yes.
 2        Q.    And the last sentence there in that paragraph,
 3   quote, due to limited resources, mentally ill
 4   inmate-patient who are receiving treatment suffer needless
 5   extended and medically harmful delays accessing necessary
 6   psychiatric care, do you agree with that statement?
 7        A.    Yes.
 8        Q.    You mentioned that -- I think I got it right --
 9   that you think the workload study is a process rather than
10   a finished product; is that correct?
11        A.    Yes.
12        Q.    Okay.  And that it would be beneficial to the
13   department to continue this process as it moves forward
14   with implementing the program guides; is that correct?
15        A.    Yes.
16        Q.    And is it correct that when you reviewed the
17   product, the initial product, of the consultants, that you
18   believed that there were some things that they had missed
19   or some assumptions that were incorrect in their work?
20        A.    Yes.
21        Q.    And you provided feedback to them about those
22   things; is that correct?
23        A.    Yes.
24              MR. BIEN:  I'm not going to go into great
25   detail.  I'd just like to have marked as the next document
```

Page 146

1  communications with Department of Corrections and with the
2  outside consultants about the study?
3       A.   Yes.
4       Q.   And that based on those communications and their
5  review, special master made recommendations to the
6  department about the study?
7       A.   Yes.
8       Q.   Okay.  And did -- do you understand that
9  consistent with your testimony here today, that the
10 special master has recommended that the workload study
11 process continue and that it is an excellent tool to be
12 used by the department, going forward, in staffing?  Do
13 you understand that to be his recommendation?
14      A.   Yes.
15      Q.   Okay.  Do you understand that he also
16 recommended that additional work be performed to correct
17 some omissions and mistaken assumptions in the workload
18 study?
19      A.   Yes.
20      Q.   Okay.  Were you aware that one of the -- one of
21 the areas that the special master pointed out that
22 appeared to be a mistaken assumption was that
23 approximately -- was that the workload study assumed that
24 approximately a third of the CCCMS caseload was on
25 psychotropic medications?  Do you recall that?

```
 1        A.    Yes.
 2        Q.    Okay.  And do you agree that, in fact, it's
 3   closer to 80 percent of the population that's CCC that
 4   would be on medications?
 5        A.    Yes.
 6        Q.    Okay.  And Special Master Lopes pointed out that
 7   that change in assumption, given the large size of the
 8   CCCMS population, would have a large effect on the number
 9   of psychiatrists and other staff projected as necessary by
10   the workload study?
11        A.    Yes.
12        Q.    And do you agree with that recommendation of
13   special master for that change in that assumption in the
14   workload study?
15        A.    Yes.  Can I make one comment?
16        Q.    Sure.
17        A.    I think there are certain data points that were
18   put in the workload study that were never meant to be
19   final, and that was one of them, that you have to put in a
20   certain mandatory -- the mandatory numbers, data points
21   have to be filled in in order for the model to run.  And
22   so I think that there was always the intention of doing
23   that additional work, and it just didn't happen.
24        Q.    Okay.  So it's a giant spreadsheet; is that
25   correct?
```

```
 1      A.   Correct.
 2      Q.   A giant spreadsheet.  And that some of the basic
 3 assumptions are put in, and then the idea was to go to the
 4 field and investigate, and then, based on that
 5 investigation, come up with a better estimate for each
 6 task; is that correct?
 7      A.   So I can't answer that question without a little
 8 clarification.  There's different kinds of data points.
 9 There are some that are decision points, like managerial
10 decisions about how things are done, for example, what
11 percentage of group therapy is delivered by different
12 classifications or clinically driven data points, like,
13 how medication is delivered, and then there's other pieces
14 that are part data that the consultants were aware needed
15 to be collected from the field.
16           But they put in just some numbers so that the
17 model could run, so that people could see how the model
18 runs, and then, with the change of leadership, those data
19 points that needed clarification were never communicated.
20      Q.   Okay.  Is it also correct that because the study
21 was done at a certain point in time, that certain changes
22 to the program guide and certain additional court orders
23 subsequently were not taken into account?
24      A.   Yes.
25      Q.   For example, the court ordered the department to
```

1  implement a program called Reception Center EOP Care; is
2  that correct?
3      A.  I believe that the court ordered the department
4  to develop a plan.  I don't know whether that plan was
5  ever approved and court-ordered.
6      Q.  Okay.  But is it correct that the workload study
7  did not take into account the reception center EOP program
8  that is now -- the department is now implementing?
9      A.  Correct.
10     Q.  Okay.  So that would be additional workload that
11 consultants didn't take into account in developing this
12 plan?
13     A.  Correct.
14     Q.  Okay.  Is it correct that in, I think it was,
15 2006, that a large salary increase for mental health
16 clinicians was ordered and implemented in the Department
17 of Corrections?
18     A.  Yes.
19     Q.  Okay.  And is it correct that, at the same time,
20 that a decision was made to eliminate differentials for
21 clinicians who worked at different prisons, R&R bonuses,
22 recruitment, and retention bonuses?
23     A.  Yes.
24     Q.  So before that big raise came into effect,
25 certain prisons had extra compensation for mental health

1   any way in the preparation of this document?
2        A.   Yes.
3        Q.   And what was your participation in this project?
4        A.   I wrote the first four pages. I edited the
5   compilation of the data and placed it in a format for
6   submission. I collected the teleconferences from regional
7   chiefs of mental health and compiled the reports, and
8   under my supervision -- well, let's see. There's
9   Attachment D. I added the information from construction
10  projects that were sent to me and, under my supervision,
11  standardized treatment materials for ad seg EOP were
12  determined, and I attached information about what
13  standardized treatment materials were purchased.
14       Q.   Is it correct that the ad seg EOP program is an
15  effort by the department to bring EOP level care inside of
16  ad seg units?
17       A.   I wouldn't phrase it that way, no.
18       Q.   Okay. How would you phrase it? What is the ad
19  seg EOP program?
20       A.   The ad seg EOP program provides EOP level of
21  care to inmate-patients who need it while they're housed
22  in administrative segregation units.
23       Q.   Okay. Is it correct that the administrative
24  segregation units where ad seg EOP programs are now being
25  run were not originally designed to run ad seg EOP

1  programs?
2      A.   Correct.
3      Q.   Is it also correct that the department has
4  determined that additional treatment space and office
5  space will be required to provide EOP level of care in at
6  least some of these ad seg EOP programs?
7      A.   Yes.
8      Q.   And one of the documents that's attached to
9  Exhibit 13 deals with proposed construction projects to
10 provide this necessary space in these ad seg EOP programs;
11 is that correct?
12     A.   Yes.
13     Q.   And that's Attachment D?
14     A.   Yes.
15     Q.   Okay.  And Attachment D has page 66 on the
16 bottom of my version, at least.  I'm hoping it does on
17 yours.  I don't know anymore.
18     A.   Yes.
19     Q.   Okay.  And the first set of projects on page 66
20 are projects -- let's just look at them.  I mean, let me
21 just look -- first, jump to the bottom of it.  There's
22 something called "Small Management Yards."  What are small
23 management yards?
24     A.   When a person is housed in an administrative
25 segregation unit, they don't go to yard where they have

```
                                                        Page 165
 1   contact with other people.  In general, they go to yard in
 2   an enclosed space where they can walk around and exercise
 3   on their own, and those are called small management yards.
 4       Q.   And would you describe a small management yard
 5   as being a concrete pad with a fencing around it on four
 6   sides?
 7       A.   I don't know if they all have concrete pads,
 8   but, yes, it's a space with fencing around it, on four
 9   sides.
10       Q.   Okay.  And you told me you're not good at
11   estimating size.
12            MR. ANTONEN:  Mike, look at it this way.  A
13   prison has fencing around all four sides, too.  So it's a
14   little vague in general.
15   BY MR. BIEN:
16       Q.   Would you agree it's a space about 10 feet by 12
17   feet, roughly?  Couple yards?
18       A.   I don't know.
19       Q.   Okay.  Have you seen small management yards set
20   up outside of ad seg units?
21       A.   Yes.
22       Q.   Have you seen men in them?
23       A.   Yes.
24       Q.   Okay.  Is it correct that many of the ad seg EOP
25   programs are unable to provide 10 hours a week of
```

```
 1   out-of-yard time currently, due to shortages of small
 2   management yards?
 3       A.   Yes.
 4       Q.   So that means that the men in those ad seg units
 5   are getting less than 10 hours a week of outside exercise?
 6       A.   Yes.
 7       Q.   Would you agree that that is -- that small
 8   amount of outdoor exercise can be detrimental to a
 9   mentally ill patient's functioning and health?
10           MR. ANTONEN:  Objection.  Calls for speculation
11   as each, probably, individual is different.  But to the
12   extent you can provide a generalization, Dr. Chaiken,
13   please go ahead.
14           THE WITNESS:  The question is whether lack of
15   access to outdoor yard time can be detrimental?
16   BY MR. BIEN:
17       Q.   That's correct.
18       A.   -- to -- I think it can -- could be detrimental
19   to anyone.  Yes.
20       Q.   Okay.  And would you agree that for someone who
21   has been diagnosed by mental health clinicians as
22   requiring EOP level of care, that the inability to access
23   yard can be -- also be an exacerbating factor in their
24   mental illness?
25           MR. ANTONEN:  Same objection.
```

```
 1            THE WITNESS:  I don't know.
 2   BY MR. BIEN:
 3       Q.   Are you aware that, due to lockdowns, some ad
 4   seg programs have no yard whatsoever for 60 or 90 days in
 5   CDCR?
 6       A.   Your statement doesn't make sense to me.
 7       Q.   Okay.  Are you aware that there are programs in
 8   CDCR that, due to lockdowns, or other modifications, give
 9   no yard whatsoever to the inmates for extended periods of
10   time that can last months?
11       A.   That there are programs -- there are places
12   within CDCR that inmates don't get yard for long periods
13   of time, yes.
14       Q.   Okay.
15       A.   Yes.
16       Q.   Would you agree that that is -- violates basic
17   human standards of decency?
18            MR. ANTONEN:  Objection.  Argumentative.  And
19   calls for speculation, and is vague as to "basic human
20   standards of decency."  To the extent you feel comfortable
21   responding, or counsel can further clarify, please feel
22   free.
23            THE WITNESS:  I agree that it violates basic
24   correctional standards for care that has been agreed upon
25   that is -- that correctional environments are responsible
```

1  to provide.

2  BY MR. BIEN:

3      Q.   Looking back at this -- at these construction
4  projects on page 66, on the first part of the -- on the
5  right side is the status of the projects.  Is it correct
6  that some of the projects are listed as Consolidated Care
7  Center?  What does that mean?

8      A.   So I believe that name has changed since then,
9  and that refers to the 10,000 beds that are being built by
10 the receiver in conjunction with mental health programs.

11     Q.   Okay.  So, in other words, whatever is going to
12 happen with that project is going to happen through the
13 receiver's project?

14     A.   Correct.

15     Q.   Okay.  Now, going back to the first page of the
16 report, you said you wrote --

17     A.   I did.

18     Q.   -- the first couple pages.  And you took -- and
19 the status, it says "Compliant."  And the plan requirement
20 you're compliant with is beginning September 3rd, 2007,
21 all inmate-patients requiring EOP level of care housed in
22 ASU hubs for more than 90 days will be reviewed every 30
23 days.  So status compliant, you're saying that -- what are
24 you saying that they are compliant with?

25     A.   The plan requirement.

```
 1       Q.   Which plan requirement?
 2       A.   That beginning September 3rd, 2007, all
 3  inmate-patients requiring EOP level of care, housed in ASU
 4  hubs more than 90 days, will be reviewed every 30 days.
 5       Q.   Okay.  So there's been a review of them.
 6  Doesn't mean that they've met transfer timelines or
 7  anything; is that correct?
 8       A.   Correct.
 9       Q.   So you're saying that someone has looked at
10  their case every 30 days?
11       A.   Correct.
12       Q.   Okay.  And then the next sentence says, "From
13  December 2007 to March 2008, the number of ASU EOP
14  inmate-patients in the hub institution for more than 90
15  days decreased more than 22%."
16            Is it correct that -- what were you saying
17  there?  That's not the -- just the rounding.  You're
18  saying there actually was an improvement in conditions?
19       A.   I'm saying that between -- from December 2007 to
20  March 2008, the number of ASU EOP inmate-patients in the
21  hub institutions who were there for more than 90 days
22  decreased more than 22 percent.
23       Q.   Okay.  And has that continued to be the case?
24  Have you tracked this information?
25       A.   That's two questions.
```

1    Q.    Okay.  Have you -- you wrote this report in May
2    about data through March.  I assume you chose not to
3    include April data, but what happened in April, May, and
4    June and July?  Has it continued to decrease?
5         MR. ANTONEN:  Objection.  Foundation.  If you
6    want to establish if there's tracking, that might --
7         THE WITNESS:  So, April data compiled from March
8    is included in this report.  So it's compiled a month
9    after.  I have not seen data from July yet, and the data
10   after March did not show a continued decrease in the
11   number of inmates in -- that were in ad seg EOP for more
12   than 90 days.
13   BY MR. BIEN:
14   Q.    I'm not sure if I followed your double
15   negatives.  Have things gotten worse or better for my
16   clients?  Are they staying there longer or shorter?  I
17   don't understand.
18   A.    They are in -- there are fewer inmates in ad seg
19   EOP for more than 90 days than there were in December of
20   2007.  The percentage did not continue to decline after
21   the March 2008 data.
22   Q.    Okay.
23   A.    So we achieved approximately a 22 percent
24   decrease, and then it stabilized at that point.
25   Q.    Okay.  Having looked at this issue and studied

Page 196

```
 1     Q.   He's a clinician from Massachusetts that's
 2  working for the state in this case.  No?
 3     A.   Did he consult on the suicide prevention -- I'm
 4  sorry.
 5     Q.   I don't know.
 6     A.   I don't know.
 7     Q.   Okay.  Did you read Dr. Packer's report that was
 8  prepared in defense of the state in this overcrowding
 9  case?
10     A.   No.
11     Q.   Are you aware that EOP prisoners are housed
12  currently in -- some EOP prisoners are housed in CDC in
13  what are referred to as bad beds or alternative housing
14  placements, such as gyms and day rooms?
15     A.   In CDCR, yes.
16     Q.   Okay.  And you're also aware that CCCMS are
17  housed in bad beds in alternative placements, such as gyms
18  and day rooms that were not designed for housing?
19     A.   I'm aware that inmates who require CCCMS level
20  of care are housed in dorms and gyms.
21     Q.   Have you discussed with other mental health
22  clinicians what special services or other mental health
23  care may be required to address mental health issues that
24  may arise due to housing in gyms and dorms for mental
25  health patients?
```

1    A.    No.
2    Q.    Are you aware that EOPs in reception centers are
3  not -- are housed separately from other prisoners in the
4  reception centers?
5    A.    Aware that individuals are in the process of
6  being identified as requiring EOP level of care and are
7  housed with others, and then once they're identified as
8  needing EOP level of care, that they may be housed with
9  others pending transfer to an EOP-designated program.
10   Q.    Okay.  And so are you aware that the EOP -- in
11 the EOP reception center program, that EOP patients
12 sometimes spend their whole terms in the reception
13 centers?
14   A.    Yes.
15   Q.    Okay.  And that might be a matter of six months
16 or so --
17   A.    Right.
18   Q.    -- is that correct?
19   A.    I'm not aware of specific cases and how long.
20   Q.    Okay.  But in those cases, those EOP's spend
21 their entire term in CDCR, mixed with other populations;
22 is that correct?
23   A.    Yes.
24   Q.    In your work in the -- is it called the SPRFIT?
25 Is that what you call the committee?

```
 1            CERTIFICATION OF DEPOSITION OFFICER

 2

 3       I, BRENDA L. MARSHALL, duly authorized to

 4  administer oaths pursuant to Section 2093(b) of the

 5  California Code of Civil Procedure, hereby certify that

 6  the witness in the foregoing deposition was by me sworn

 7  to testify to the truth, the whole truth and nothing but

 8  the truth in the within-entitled cause; that said

 9  deposition was taken at the time and place therein

10  stated; that the testimony of said witness was thereafter

11  transcribed by means of computer-aided transcription;

12  that the foregoing is a full, complete and true record of

13  said testimony; and that the witness was given an

14  opportunity to read and correct said deposition and to

15  subscribe the same.

16       I further certify that I am not of counsel or

17  attorney for either or any of the parties in the

18  foregoing deposition and caption named, or in any way

19  interested in the outcome of this cause named in said

20  caption.

21

22

23
                      _____
24                    BRENDA L. MARSHALL, CSR 6939

25
```