# EXHIBIT 7

# Deposition of Shama Chaiken, August 29, 2008
# (Counter-Designations)

1                    IN THE UNITED STATES DISTRICT COURTS
                FOR THE EASTERN DISTRICT OF CALIFORNIA
2                    AND THE NORTHERN DISTRICT OF CALIFORNIA
           UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
3          PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
4
5          RALPH COLEMAN, et al.,
6                Plaintiffs,
7          vs.                          No. Civ S 90-0520 LKK-JFM P
8          ARNOLD SCHWARZENEGGER,
           et al.,
9
                Defendants.
10         _____/
           MARCIANO PLATA, et al.,
11
                Plaintiffs,
12
           vs.                          No. C01-1351 TEH
13
           ARNOLD SCHWARZENEGGER,
14         et al.,
15              Defendants.
           _____/

16
17                    DEPOSITION OF SHAMA CHAIKEN
18         DATE:               August 29, 2008
19         TIME:               9:28 a.m.
20
21         LOCATION:           ROSEN, BIEN & GALVAN, LLP
                               315 Montgomery Street, Tenth Floor
22                             San Francisco, California
23
           REPORTED BY:        Brenda L. Marshall
24                             Certified Shorthand Reporter
                               License Number 6939
25

1      Q.   I'd like to -- sort of changing topics a little

2    bit from the structure of the Department of Mental Health

3    Services.  As a psychologist, can you explain to me why

4    confidentiality in communicating with a patient is

5    important.

6          MR. ANTONEN:  Objection.  Calls for an expert

7    opinion.  To the extent you're comfortable from your own

8    personal experience, please go ahead, but I don't believe

9    Dr. Chaiken is offered as an expert in that area.

10         THE WITNESS:  So our society has created a legal

11    structure where people can talk to specific other people

12    that they have a certain type of relationship with and

13    have that communication be privileged communication that

14    is under -- in my understanding -- under different rules

15    for disclosure in a court of law.

16         For example, people can speak with their

17    attorney or a clergy person or their spouse or mental

18    health clinician or their doctor, and there's different

19    rules about how -- when that information can be disclosed

20    to other people.  And the purpose of having those rules is

21    so that individuals can speak openly, without worrying

22    that the information that they give to a specific other

23    person will be disclosed in a way that could be harmful to

24    them in the future.

25    BY MR. BIEN:

1    office and treatment space for mental health staff?

2         MR. ANTONEN:  Again, same objection.  Calls for

3    speculation.  To the extent you know.

4         THE WITNESS:  Have not been involved in any of

5    those requests.

6    BY MR. BIEN:

7         Q.   Okay.  You don't know about them?

8         A.   I don't know any specifics about those requests.

9         Q.   Okay.

10        MR. ANTONEN:  Can we go off the record for a

11   moment?

12        MR. BIEN:  Sure.

13        (Recess taken.)

14        (Plaintiffs' Exhibit Nos. 1, 2 and 3

15        were marked for identification.)

16   BY MR. BIEN:

17        Q.   You understand you're still under oath?

18        A.   I do.

19        Q.   Okay.  I've asked the court reporter to mark as

20   the first exhibit, Exhibit 1, a letter from Lisa Tillman

21   to Matt Lopes, dated February 14th, 2008.  It is one,

22   two -- four pages in length.  I've got copies.  A couple

23   copies at least.  Take a moment and take a look at that.

24   It's pretty short.

25        Do you understand this to be a copy of a

1    proposal for the department to go ahead with building
2    additional mental health treatment and counseling space at
3    Salinas Valley State Prison?
4         A.   I just got through the cover letters.  Can I
5    look at that?
6         Q.   Sure.  Please, take as much time as you like.
7         A.   Okay.  Can you repeat the question.
8         Q.   Do you know what this is, this document is?
9         A.   Do I know what it is?  I've just read it.
10        Q.   Okay.  Have you seen it before?
11        A.   No.
12        Q.   Okay.  Were you aware that the department was
13   proposing to go ahead with a program to enhance treatment
14   office space at Salinas Valley State Prison?
15        A.   Peripherally, I've heard about it.
16        Q.   There are -- there are two parts to the Salinas
17   Valley proposal, as you see.  There's part one for the EOP
18   program general population.  You see that?
19        A.   Yes.
20        Q.   Okay.  Were you aware that -- that this Salinas
21   Valley general population EOP program required additional
22   treatment space to provide program guide standards to its
23   population?
24        A.   No.
25        Q.   Were you aware that clinicians were providing

1    groups in -- on the yard at Salinas Valley State Prison?

2         A.   No.

3         Q.   Do you think it's appropriate to provide group

4    therapy on a yard?

5              MR. ANTONEN:   Objection.   Calls for speculation

6    and incomplete hypothetical.   Are you asking in all

7    circumstances?   Particular circumstances?

8    BY MR. BIEN:

9         Q.   Do you think it's appropriate, Dr. Chaiken, for

10   group therapy to be provided to patients at Salinas Valley

11   State Prison in the GP EOP on the yard?

12        A.   Occasionally, it's a good idea to provide group

13   therapy outside, for example, if you're doing an exercise

14   group or if it's recreational therapy.   I've provided

15   group therapy, for example, on the Pelican Bay State

16   Prison exercise yard.   It depends on the circumstances.

17        Q.   Okay.   Do you think in those occasions where you

18   provided group therapy outside, in the exercise yards, was

19   that your choice, or was that a matter of a lack of space

20   inside?

21        A.   That was my choice.

22        Q.   Okay.   Do you think if the clinicians desired

23   indoor confidential space for their groups at Salinas

24   Valley State Prison to provide EOP care that that should

25   be provided to them?

```
 1                    MR. ANTONEN:  Objection.  Calls for speculation.
 2                    THE WITNESS:  If -- if clinicians and their
 3       supervisors agree that something is clinically
 4       appropriate, for example, space, then it's generally my
 5       experience that that is -- the recommendations could be
 6       clinically appropriate.  But I'm speculating about the
 7       space and the yards and the clinicians.  I'd have to know
 8       the specific situation.
 9       BY MR. BIEN:
10            Q.   Okay.  Would it concern you to learn that 40
11       percent of the groups at Salinas Valley State Prison
12       general population EOP were being held outside, in a yard?
13            A.   Can you clarify "concern" for me?
14            Q.   As a supervisor at headquarters, do you think
15       that that would be a problem for complying with program
16       guide standards?
17            A.   So I want to clarify that the scope of my job is
18       not about operations and how services are delivered at
19       this point, that I'm responsible for the development of
20       the wording of policies and negotiation around how
21       policies and programs are designed, and there's other
22       people who were responsible for implementation and space.
23            Q.   Okay.  Let's just talk about the wording.  Under
24       the wording of the program guide, is there something in it
25       that says you can provide care in a nonconfidential
```

1      confidential setting versus a nonconfidential setting?

2           MR. ANTONEN:  Objection as to "confidential

3      setting."  And, again, calls for speculation.  To the

4      extent you --

5           MR. BIEN:  By confidential, I mean that the

6      people in the group can talk to each other and people who

7      are not in the group can't hear them.

8           THE WITNESS:  It would be my assumption that

9      certain group therapies would be provided in rooms where

10     other people couldn't hear what was being discussed in the

11     group, but other group therapies would be provided in an

12     open space, for example, an exercise or recreational

13     group.

14     BY MR. BIEN:

15          Q.   All right.  But group therapies that involved

16     verbal communications and sharing of problems, you would

17     expect them to be in confidential settings, wouldn't you?

18          A.   Yes.  I would expect that if there was a group

19     therapy where people were disclosing sensitive information

20     and that the -- they were told that that information would

21     only be disclosed to the people in the group, that it

22     would be held in a setting where other people could not

23     overhear the group.

24          Q.   When -- you've been involved in the design of

25     staffing packages and for EOP programs; is that correct?

```
 1        A.   Correct.

 2        Q.   Okay.  And in doing so, have you also been

 3   involved in the design of office space and treatment space

 4   for EOP programs?

 5        A.   No.

 6        Q.   Okay.  So you only looked at the staffing and

 7   never at the treatment space?

 8        A.   Correct.

 9        Q.   Okay.  Have you ever been to Salinas Valley

10   State Prison?

11        A.   No.

12        Q.   The second project on Exhibit 1 is -- refers to

13   the D5/D6 intermediate care facility operated by the

14   Department of Mental Health.  Do you know what that

15   facility is?

16        A.   Yes.

17        Q.   And can you describe what it is?

18        A.   Sure.  The intermediate care facility is a

19   licensed inpatient program that offers 24-hour-a-day

20   nursing services, as well as mental health treatment

21   services for people who do not require acute psychiatric

22   services, they're not an immediate danger to themselves or

23   others or gravely disabled in a way that requires acute

24   psychiatric services, but they're not ready to return to

25   an outpatient program, and they require longer term
```

1    they're aware of these cases and to have a designated

2    clinician on each day that is called related to cases and

3    consulting with the clinicians about those cases so that

4    it's more organized than just the clinicians or the chiefs

5    in the field calling the person that they know.

6         And then we have kind of a centralized

7    repository so we know all the cases that have been

8    referred, and they're all referred in the same way, if

9    there's an issue like this.

10        Q.   Okay.  So there's a single list that any of you

11   in headquarters can access; is that correct?

12        A.   Yes.

13        Q.   Does that reside on a computer, I hope?

14        A.   Yes.

15        Q.   Or --

16        A.   We're -- yes.  It resides with Rick Johnson's

17   group.

18        Q.   Okay.  And can you access that on -- on

19   computers, or are you guys handed a list of names when

20   you're working?

21        A.   We contact each other by phone or e-mail to --

22   because the list changes on a moment by moment basis.

23        Q.   Okay.

24        A.   And it's confidential; so it's not kept in a

25   public server area.

1          Q.   Okay.  The question is, can you access that list

2     from a computer on your desk?

3          A.   If somebody sends it to me by e-mail, a current

4     list, sure.

5          Q.   Is that what happens when you're the person on

6     duty and you need to look at the list?

7          A.   No.  I don't actually look at the list.  I just

8     discuss -- if it's the only case that's being referred to

9     be expedited for placement.  And I want to clarify, it's

10    not me anymore who is getting these calls.  We have three

11    regional chief psychologists.  Marion Chiurazzi and Andrew

12    Swanson, as the deputy directors, are now taking these

13    calls.

14              But when I was doing it, or as a backup, if I

15    were to do it, I would call and find out if there's

16    anybody else that has been referred to be prioritized to a

17    crisis bed, then I call and talk to the clinician and find

18    out what the situation is and help them make a decision

19    about the treatment plan, and if there's something they

20    could do immediately related to patient care and how

21    quickly the person needs to be transferred.

22         Q.   Everyone on the list has been referred for MCD

23    care; is that correct?

24         A.   Yes.

25         Q.   And to some extent, each one of them is a

1    they need a mental health crisis bed, which needs to be

2    done within 48 hours, and then there's places where

3    neither a mental health crisis bed nor an outpatient

4    housing unit is available at that time, and the

5    inmate-patient needs to be placed in an alternative

6    location because a medical setting is not available.

7        Q.   Is it correct that over -- that to address this

8    issue of the fact that sometimes patients who need MHCB

9    care or a higher level of care cannot be placed promptly,

10   that the department has developed, you know, a plan for,

11   you know, which -- for each institution as to where they

12   should place inmates who might need these alternative

13   locations?

14       A.   Yes.

15       Q.   Okay.  And so that's designed to deal with the

16   fact that, at least at present, there are insufficient

17   numbers of locations that meet program guide standards

18   within program guide time frames to meet the needs of the

19   population?

20              MR. ANTONEN:  Objection.  Calls for speculation.

21              To the extent you know.

22              THE WITNESS:  Yes.

23   BY MR. BIEN:

24       Q.   Okay.  The department opened 50 new MHCB beds at

25   CMF recently; is that correct?

```
1          A.   Correct.

2          Q.   Have you seen that new unit?

3          A.   Not yet.

4          Q.   Me neither.  Mike got to see it.

5               MR. ANTONEN:  Also -- go off the record.

6               (Discussion held off the record.)

7    BY MR. BIEN:

8          Q.   Is it correct that there still remains a

9    substantial list of patients that require MHCB beds, even

10   though the 50 beds at CMF have now been opened?

11              MR. ANTONEN:  Object.  Vague to "substantial."

12   And I don't know if the witness is familiar with the

13   current list for mental health crisis beds, but to the

14   extent you are.

15              THE WITNESS:  Can you define "substantial"?

16   BY MR. BIEN:

17         Q.   Well, are there -- are you aware of how many

18   people remain on the list today?

19         A.   No.

20         Q.   Okay.  Are more than 50 people on the list for

21   MHCB care today?

22         A.   I don't know.

23         Q.   Okay.  Would it surprise you to hear that there

24   were more than 50?

25         A.   More than 50, yes.
```

1          Q.   Okay.  How many do you think are on the list?

2          A.   I don't know.

3          Q.   Do you believe that the addition of the 50 MHCB

4     beds at CMF has satisfied the demand for mental health

5     crisis beds in CDCR --

6               MR. ANTONEN:  Objection.

7     BY MR. BIEN:

8          Q.   -- for today's population?

9               MR. ANTONEN:  Objection.  The witness, I

10    believe, has testified she's not familiar with the list

11    or --

12               MR. BIEN:  I think she testified she runs the

13    program.

14               MR. ANTONEN:  She runs the program, but we've --

15    in the last couple questions, she's not been familiar with

16    how many people are on the list or where the location of

17    these individuals are.

18               To the extent you have any knowledge.

19               THE WITNESS:  Wait.  I want to -- I want to be

20    clear that I don't run the program, that referrals for

21.   expedited mental health crisis beds are now going to

22    regional chief psychologists, there's three of them, and

23    to Marion Chiurazzi and Andrew Swanson.

24               So I'm not getting any daily calls about the

25    list.  And that I am aware that the CMF 50 beds opened and

1    that they were taking inmates. I don't know how many a

2    day, but a certain number a day. And I expected that that

3    would reduce the list substantially. So -- and I have not

4    looked at the list in the last two weeks.

5    BY MR. BIEN:

6         Q.    Are you aware that there are additional --

7    anyway, let's take a break for lunch now.

8

9              (Luncheon recess taken at 12:32 p.m.)

10                          --oOo--

11    AUGUST 29, 2008        AFTERNOON SESSION        1:20 P.M.

12    EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (RESUMED)

13             MR. BIEN: Can you mark this as the next.

14                  (Plaintiffs' Exhibit No. 4 was marked

15                  for identification.)

16    BY MR. BIEN:

17         Q.    Dr. Chaiken, I've marked, as the next exhibit in

18    order, a two-page document that bears a production number

19    DSU -- it's hard to read -- PP002775 and 2776. It is the

20    MHSDS weekly MIS summary report, dated August 6, 2008,

21    that was produced to us by defendants in the last couple

22    days.

23             Is this a report that you see from time to time?

24         A.    Yes.

25         Q.    Okay. And can you explain what this report

1    shows?

2         A.   Under "Program," it shows the different mental

3    health services delivery system levels of care, and the

4    column on capacity, it shows the -- I'm familiar with the

5    ones from CDCR, the staffed capacity of those programs.

6         Q.   Okay.

7         A.   The census is how many inmate-patients are in

8    those programs.  The wait list shows how many

9    inmate-patients are endorsed to those programs or in

10   programs that you are not -- that don't require

11   endorsement, how many are on the wait list.  And then the

12   source shows where the information is from.

13        Q.   Okay.  And what does DDPS stand for, under

14   source?

15        A.   I don't know.

16        Q.   Neither do I, but Mike -- I won't put you under

17   oath.

18             Is that a -- do you understand that to be a CDCR

19   computer system of some sort?

20        A.   Yes.  It's the main computer system that tracks

21   where inmates are placed in the system.

22        Q.   Okay.  And coming under the column "Program," if

23   you'd look under there, the first one is CCCMS.  And

24   that's -- and can you describe what the CCCMS program is?

25        A.   Yes.  It's an outpatient level of care where

1    the thinking or the rationale or the ratios behind that,

2    but within that budget change proposal was the request for

3    a workload study, which was conducted and concluded last

4    year.

5              And the workload study is a mathematical model

6    that has on one axis all of the different types of people

7    who work in the mental health services delivery system

8    and, on another axis, all of the tasks that are completed

9    in the mental health services delivery system and some

10   complicated mathematical formulas with population drivers

11   and assumptions about different things, like how many

12   people somebody should supervise and -- so, various

13   assumptions, data population drivers, and the workload

14   study is the current methodology that, if approved in this

15   budget, will take over the decision-making process about

16   staffing allocated for any particular program.

17        Q.   But you're not quite there yet?  That's not

18   approved yet?

19        A.   I have not heard that it's been approved.

20        Q.   Okay.  So when you are looking at the census

21   number here the staff capacity is based on, if I

22   understand you correctly, based on the original program

23   guide ratios for general population for a particular

24   program, in addition to an augmentation by the court order

25   in 2006, and there's probably other court orders added for

1   A. I don't know whether the wait list is

2 incorporated into the census or not.

3   Q. Okay.  Is it correct that CCC programs are sent

4 more CCC patients than they are staff -- than they are

5 staffed to handle at their staff capacity?

6   A. Some of them.

7   Q. And let me just show you a -- let's mark as the

8 next exhibit in order, No. 5, a copy of a different

9 staffing report, which is still called HCPU, H-C-P-U.  It

10 was provided to us on or about July 31, 2008, by Dennis

11 Beaty.  It's one, two, three, four, five, six, seven,

12 eight -- nine pages long.

13     (Plaintiffs' Exhibit No. 5 was marked

14     for identification.)

15    MR. BIEN:  I pulled off the confidential

16 portion.

17    MR. ANTONEN:  Thank you.  Actually, the court

18 reporter thanks you.

19 BY MR. BIEN:

20   Q. Dr. Chaiken, are you familiar with this -- this

21 report, Enclosure 3?  It's called the HCPU information

22 report, health care placement unit report.

23   A. So I'm not familiar with this cover sheet.  I

24 haven't seen this piece of it before, the first three

25 pages, or the cover, Enclosure 3, and I may not have seen

1          Q.    Okay.  And what was your role in connection with

2     that?

3          A.    I was interviewed by the consultants.  I went on

4     some institution tours with them.  And I reviewed the

5     mathematical model as it was presented over time, as it

6     was developed.  And I'm currently involved in identifying

7     assumptions that require clarification.

8               MR. BIEN:  Okay.  Let me mark as the next

9     exhibit, which is No. 7, the results of the workload

10    study.  I guess one of the volume -- one of the many

11    volumes of the workload study bears production

12    Nos. E_CDCR_MH118780 through 834.

13               (Plaintiffs' Exhibit No. 7 was marked

14               for identification.)

15    BY MR. BIEN:

16         Q.    If you turn to page 5 of the document.  Have you

17    seen this document before, Dr. Chaiken?

18         A.    I have.

19         Q.    Okay.  And if you turn to page 5, there's a

20    chart that -- on the top of the page.  You see that?

21         A.    Yes.

22         Q.    Okay.  It's entitled "CDCR Mental Health

23    Staffing Comparison."  I'm sorry about the legibility.

24    Can you read that okay?

25         A.    I can read it.

1          Q.   Better than me, probably.

2               Is it correct that in evaluating the workload of

3     the CDCR mental health clinicians that the -- this -- the

4     consultant who performed the workload study concluded that

5     fewer clinicians were necessary than CDCR had allocated to

6     perform the tasks?

7               MR. ANTONEN:   Objection.   The document speaks

8     for itself.

9               THE WITNESS:   Could you define clinicians,

10    please?

11    BY MR. BIEN:

12         Q.   I'm looking at the -- define clinicians.   Mental

13    health clinicians and other -- I guess it also has -- they

14    also evaluate people who are not clinicians.   Is that what

15    you're saying, that it's confusing?

16         A.   No.   So I'll try to answer your --

17         Q.   Okay.   My question -- let me start over again,

18    and I'll ask the question again if you don't understand

19    what I'm asking.

20               Is it correct that they concluded that fewer

21    psychiatrists were necessary than what CDC had allocated?

22    I'm looking at the second column of the chart.

23               MR. ANTONEN:   And same objection, and I'll throw

24    in speculation as well.   You're asking the witness to

25    conclude what a third -- reach a conclusion of what a

1          A.    Correct.

2          Q.    Okay. And that's 400 additional positions; is

3     that correct?

4          A.    Correct.

5          Q.    Okay. So the department has asked the

6     legislature, based on the workload study to date, to do

7     two things. One is to accept the workload study as a

8     process and move forward; is that correct?

9          A.    Correct.

10         Q.    And then also to now allocate 400 additional

11    positions?

12         A.    Correct.

13         Q.    Okay. And you agree that's a reasonable

14    request, based on your knowledge of the workload study?

15               MR. ANTONEN:  Objection. Calls for speculation.

16    But -- and vague as to "reasonable." But --

17               THE WITNESS:  The request is based on numbers

18    that came out of the workload study without necessarily

19    clarifying all of the assumptions and making great

20    decisions about the data that was going in from my

21    opinion, but my opinion is that that can be fixed and that

22    it will -- fixing numbers will only increase the number

23    and, therefore, it was reasonable to request that starting

24    number.

25               MR. BIEN:  Okay. Let me mark as Exhibit 8 the

1    finance letter requesting approval of the workload study.

2    It's dated April 1, '08.

3               (Plaintiffs' Exhibit No. 8 was marked

4               for identification.)

5    BY MR. BIEN:

6         Q.   You mentioned that there was some -- a change of

7    leadership that had some effect on the department's use of

8    workload study or timing.  What was that?

9         A.   Yes.  Doug McKeever left, and Peter

10   Farber-Szekrenyi left, and Robin Dezember came in as the

11   deputy secretary, and we were missing -- the position of

12   director was vacant for a period of time.  And during the

13   budget cycle where this had to be submitted, I think that

14   there was some problems with transmission of information

15   about the actual numbers that were coming out of the

16   workload study and what they meant.

17        Q.   Okay.  The court order had required that the

18   department submit the results of the workload study to the

19   legislature a year earlier than it did.  Are you aware of

20   that?

21        A.   No.

22        Q.   If you look on page -- looks like the second

23   from the last page, says page 2 of 5 at the bottom.  Do

24   you have that page?

25        A.   The second to the last page says page 4 of 5,

143

```
 1        A.   Yes.
 2        Q.   Next sentence says, "Partial implementation of
 3   the MHSDS Revised Program Guide suggests a tolerance for
 4   insufficient treatment of mentally ill inmates -
 5   undiscovered, undiagnosed, and untreated, while being
 6   subjected to conditions that aggravate
 7   conditions/illnesses.   Due to limited resources, mentally
 8   ill inmate-patients who are receiving treatment suffer
 9   needless extended and medically harmful delays accessing
10   necessary psychiatric care."
11        Do you agree with that, Dr. Chaiken?
12        A.   Not all of it.
13        Q.   Which part don't you agree with?
14        A.   Well, I'm not sure what partial implementation
15   of the MHSDS revised program suggests a tolerance for
16   insufficient treatment, I'm not sure who it suggests is
17   tolerating insufficient treatment.   It's a complex and, I
18   would say, poorly written sentence that I couldn't agree
19   with written in the way that it's written.   I didn't write
20   it.
21        Q.   Do you agree that prisoners who are not -- who
22   may not be receiving appropriate psychiatric care and are
23   housed in inappropriate conditions may be subject to
24   conditions that aggravate their conditions and their
25   illnesses?
```