# EXHIBIT 8

## Deposition of Robin Dezember
## December 14, 2007
## (Designations)

Page 2

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,          )
                                )
          Plaintiffs,           )
                                ) Case No.
vs.                             ) Civ S 90-0520 LKK-JFM
                                ) THREE JUDGE COURT
ARNOLD SCHWARZENEGGER, et al.,) 
                                )
          Defendants.           )
_____)
MARCIANO PLATA, et al.          )
                                )
          Plaintiffs,           )
                                ) Case No.
vs.                             ) C01-1351 TEH
                                ) THREE JUDGE COURT
ARNOLD SCHWARZENEGGER, et al.,) 
                                )
          Defendants.           )
_____)

---oOo---

DEPOSITION OF ROBIN J. DEZEMBER

December 14, 2007

---oOo---

REPORTED BY:
CHERREE P. GAGE,
CSR No. 11108, RPR, CRR

**ROBIN J. DEZEMBER**

1    crowding or overcrowding.  But I don't know specifically

2    where and in what context.

3              MS. RIFKIN:  Can you mark this as the next

4    exhibit, please.

5              (Plaintiffs' Exhibit No. 9 marked for

6              identification.)

7        Q.    BY MS. RIFKIN:  What I've marked as Exhibit 9

8    is listed as -- it is part of the exhibits to the

9    declaration of Michael Bien.

10             MS. FRITZ:  So the first page is the cover

11   page?

12             MS. RIFKIN:  The first page is the cover page,

13   the second page is the exhibit page, and the third page

14   is the cover page of the Corrections Independent Review

15   Panel report from 2004.

16             MS. FRITZ:  Got it.

17             MS. RIFKIN:  What this is is specifically

18   Chapter 7 from that report.

19             THE WITNESS:  I was going to say, how did you

20   get it so small.

21       Q.    BY MS. RIFKIN:  It's titled "Inmate/Parolee

22   Population Management."  Does this look like the report

23   to you?

24       A.    Yes.

25       Q.    And you've seen this before?

**ROBIN J. DEZEMBER**

1        A.      Yes.

2        Q.      And this is Chapter 7 from the report for

3   which you were a principal consultant?

4        A.      As far as I can tell.  I haven't read this

5   whole thing.  I'm assuming you put it in in an honest

6   fashion, yeah.  It starts at page 121, according to the

7   table of contents.  Do you want to look at it?

8             MS. FRITZ:  Yeah.  Just real quick.

9        Q.      BY MS. RIFKIN:  If you turn to the second to

10  the last page of this exhibit, I hope it's a table.

11            MS. FRITZ:  Is it Table 1?

12            MS. RIFKIN:  Yes.

13       Q.      Table 1.  Have you seen this table before?

14       A.      Well, probably.  It isn't like it's familiar

15  to me as of a week ago.  But I know that I read

16  everything in the CIRP report.

17       Q.      Do you remember the report talking about

18  different definitions of capacity?

19       A.      Yes.

20       Q.      And were you involved at all with this -- with

21  this chapter of the report?

22       A.      Yes.

23            MS. FRITZ:  Vague.  Ambiguous.

24            THE WITNESS:  I was involved, yeah.  I was

25  involved with this chapter.

**ROBIN J. DEZEMBER**

Page 108

1      Q.      BY MS. RIFKIN:  What was your involvement

2   specifically?

3      A.      Well, I reviewed the chapter and there is --

4   this I think is the chapter that talks about the --

5   where we brought together a group of wardens and talked

6   about capacity issues relative to their ability to

7   operate safe and reasonable prisons.  If that's in this

8   chapter, that was my primary involvement in the

9   generation of this chapter.  And otherwise I was a

10   reviewer of this.

11      Q.      Okay.  On the last page, that's page 161 of

12   the exhibit, there are the notes for the table we just

13   looked at.  And note three defines maximum operable

14   capacity.

15      A.      Right.

16      Q.      It says it was "determined through an

17   assessment of experienced wardens."  Is that the

18   analysis that you just said that you were involved with?

19      A.      Yes.

20      Q.      Okay.  Were you -- was there -- were wardens

21   brought together for a meeting or were they -- were they

22   communicated with via conference call?  How did that

23   happen?

24      A.      They were brought together for a meeting.

25      Q.      And were you at that meeting?

**ROBIN J. DEZEMBER**

1     A.     Yes.

2     Q.     Do you remember that meeting?

3     A.     Yeah, mostly.  I can't be -- not the details,

4     I'm sure.  But for the most part.

5     Q.     What did they -- what did the wardens base

6     their assessment of capacity on?

7     A.     You mean getting to this definition?

8     Q.     Yes.

9     A.     Their experience.  It's really about all you

10     can do with that.

11     Q.     Do you remember if they considered their

12     ability to provide medical health care programming and

13     mental health care programming?

14     A.     It did not specifically deal with those

15     subjects.  It dealt with what it says here, and that is

16     operated safely and providing programming for every

17     inmate consistent with the inmate's ability.  What it

18     was pretty much directed to were rehabilitative programs

19     such as education and substance abuse and other types of

20     programs, not specifically directed toward medical,

21     mental health or dental services.

22     Q.     On table 1, the page before, the number given

23     as the maximum operable capacity --

24            MS. FRITZ:  Where are you?

25            MS. RIFKIN:  It's the bottom of page -- the

**ROBIN J. DEZEMBER**

Page 110

1    bottom of the table under total system.

2         MS. FRITZ:  Okay.

3         THE WITNESS:  Oh, under warden's proposed

4    operable capacity?  Is that the column?

5         MS. RIFKIN:  Yeah.  I just want to make sure

6    I'm referring you to exactly what I need.

7      Q.    Instead of looking at the chart, let's look at

8    page 124 of this exhibit.

9      A.    Okay.  Have I got the right one?

10     Q.    The page starts with "Maximum 'safe and

11   reasonable' capacity."  And at the end of that paragraph

12   the report gives a statement that says that it's

13   "determined that the maximum safe and reasonable

14   capacity of the State's male prisons is 137,764

15   inmates."  Do you remember if you agree -- do you

16   remember enough to have an opinion as to whether you

17   agree with the panel's assessment of the maximum safe

18   and reasonable capacity?

19        MS. FRITZ:  Assumes facts.

20     Q.    BY MS. RIFKIN:  You said you were part of the

21   process where the wardens came up with this number; is

22   that correct?

23     A.    Right.  I conducted the meeting.  I called the

24   meeting and conducted it.  But I'm not sure which part

25   of this you're referring to in asking me if I agree with

**ROBIN J. DEZEMBER**

Page 111

1    it.

2        Q.    What I'm asking, do you agree with the panel's

3    determination of the maximum safe and reasonable

4    capacity of the prisons?

5        A.    I don't independently make a judgment on that.

6    That's why I called them together, because they have the

7    experience of working in prisons and managing prisons

8    under the present -- the circumstances present at that

9    time.  So I considered them a group of experts.  I would

10   hardly interpose my own judgment on that, having never

11   been in their shoes.  That's why I relied on them.

12       Q.    And the number they came up with as the

13   operable capacity in the next paragraph, it says, "A

14   group of experienced California prison wardens told the

15   panel at a recent forum that the operable capacity of

16   the state's prisons to support full inmate programming

17   in a safe and secure environment is 111,309 inmates, or

18   145 percent of design capacity."  Does that accord with

19   your recollection of what happened?

20       A.    Yes.

21       Q.    And do you have -- do you have an opinion as

22   to whether that's a reasonable assessment by the

23   wardens?

24           MS. FRITZ:  Vague and ambiguous.

25           THE WITNESS:  I don't have an independent

**ROBIN J. DEZEMBER**

Page 112

1    opinion about what that number should be or should have

2    been.  I don't know what else to tell you.

3         Q.    BY MS. RIFKIN:  Do you endorse the findings of

4    the Corrections Independent Review Panel?

5              MS. FRITZ:  Vague and ambiguous.

6              THE WITNESS:  I can use a different word.

7         Q.    BY MS. RIFKIN:  Okay.

8         A.    I can't endorse, but I represent that as a

9    part of this overall report and that it's worthy of

10   being in this report as this was a report we believed

11   was very, very important.  I didn't just say okay, guys,

12   I call them up and get the number and put it in.  We had

13   a meeting that lasted most of the day and I was

14   convinced at the end of that that they were the best

15   source of that information and that it warranted being

16   included in the report.

17        Q.    Do you think the number that they came up with

18   for operable capacity provides a reasonable baseline for

19   talking about what a safe capacity for the prisons would

20   be?

21             MS. FRITZ:  Vague.  Ambiguous.

22             THE WITNESS:  Well, it's different than a safe

23   capacity.  It is what it says it is.  It's operable

24   capacity.  Safe and operable with programming.  It was

25   assumed that safe could be provided on a larger scale.

**ROBIN J. DEZEMBER**

EXHIBIT 1    EXHIBIT 2    EXHIBIT 3    EXHIBIT 4

## DEPOSITION OFFICER'S CERTIFICATE

STATE OF CALIFORNIA          }
                             }     ss.
COUNTY OF SAN FRANCISCO       }


I, CHERREE GAGE, hereby certify:

I am a duly qualified Certified Shorthand Reporter in the State of California, holder of Certificate Number CSR 11108 issued by the Court Reporters Board of California and which is in full force and effect. (Fed. R. Civ. P. 28(a)).

I am authorized to administer oaths or affirmations pursuant to California Code of Civil Procedure, Section 2093(b) and prior to being examined, the witness was first duly sworn by me. (Fed. R. Civ. P. 28(a), 30(f)(1)).

I am not a relative or employee or attorney or counsel of any of the parties, nor am I a relative or employee of such attorney or counsel, nor am I financially interested in this action. (Fed. R. Civ. P. 28).

I am the deposition officer that stenographically recorded the testimony in the foregoing deposition and the foregoing transcript is a true record

/ / /

207

the testimony given by the witness.  (Fed. R. Civ. P. 30(e)(1)).

Before completion of the deposition, review of the transcript [XX] was [  ] was not requested.  If requested, any changes made by the deponent (and provided to the reporter) during the period allowed, are appended hereto.  (Fed. R. Civ. P. 30(e)).

Dated:   12/28/07        ,


_____

208

BARKLEY
Court Reporters