# EXHIBIT 14

## Deposition of John Misener
## January 29, 2008
## (Designations)

1              IN THE UNITED STATES DISTRICT COURT

2           FOR THE EASTERN DISTRICT OF CALIFORNIA

3           AND THE NORTHERN DISTRICT OF CALIFORNIA

4    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5      PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6    RALPH COLEMAN, et al.,        )
                                   )
7                   Plaintiffs,    )
                                   )
8            v.                    )No. Civ S 90-0520
                                   )      LKK-JFM P
9    ARNOLD SCHWARZENEGGER,        )
     et al.,                       )
10                                 )
                    Defendants.    )
11   _____)
                                   )
12   MARCIANO PLATA, et al.,       )No. C01-1351 TEH
                                   )
13                  Plaintiffs,    )
                                   )
14           v.                    )
                                   )
15   ARNOLD SCHWARZENEGGER,        )
     et al.,                       )
16                                 )
                    Defendants.    )
17   _____)

18

19             Deposition of JOHN MISENER, taken

20             on behalf of the Plaintiffs, at

21             315 Montgomery Street, 10th Floor,

22             San Francisco, California, commencing

23             at 9:54 a.m., Tuesday, January 29, 2008,

24             before Karen Moon, Certified Shorthand

25             Reporter No. 12450.

2

JOHN MISENER

BARKLEY
Court Reporters

1      MS. TILLMAN:  So you have to be nice to him,

2  Amy.  It's his first deposition.

3      MS. WHELAN:  I will be very nice.

4  BY MS. WHELAN

5    Q   Very briefly -- I don't want to spend a lot of

6  time on it, but I will also refer you to your resume or

7  the most recent one that I have of your resume.

8      But could you just describe for me your

9  educational history.

10   A   Sure.  I have a bachelor's degree from State

11 University of New York at Buffalo, 1968, in biology.

12 And a master's of health care administration degree,

13 Georgia State University, 1977.

14     My first position in this field of health care

15 consulting was in 1977 with a firm called Langley

16 Associates.  From there I worked for the Voluntary

17 Hospitals of America consultants services, or VHA

18 Consulting, until 1988.

19     And then I went to work for McManis

20 Associates.  A version of that firm I'm currently

21 working for.  So basically there was a change in

22 ownership, but McManis Consulting is doing business --

23 is a -- is the new name, although its legal name is

24 still McManis Associates since 1988.

25   Q   Do you hold any professional licenses?

16

JOHN MISENER

BARKLEY
Court Reporters

1       A    No.

2       Q    I know that you were retained -- correct me if

3  I'm wrong -- back in about 2002 with the California

4  Department of Corrections in connection with the Tucker

5  Alan study?

6       A    That's correct.

7       Q    And then you were retained again in or around

8  2004, 2005; is that correct?

9       A    The actual initiation of the proposal was I

10 was December and November of 2005.  And I believe it was

11 finally approved early January 2006.

12      Q    Prior to your retention in 2002 by the CDCR,

13 have you done any work with the California Department of

14 Corrections?

15      A    No.

16      Q    And have you done any work with any California

17 agency prior to 2002?

18      A    Well, I don't know -- probably not in the way

19 you're thinking.

20           We -- one of my clients was UC -- UCSF in San

21 Francisco.  But that may have actually been -- I don't

22 know if that was before or after.  It was 2001 or 2002.

23 I don't think that's an agency per se, so.

24      Q    And since being retained in 2002, have you

25 done any work with any California agencies, other than

17

BARKLEY
Court Reporters

```
 1            This is a three-year contract they're working
 2    on.  They had a broader role earlier on.  They had a
 3    clinical specialist, who has since left the firm.  Mary
 4    Beth Thomas, for example, psychiatric nurse.  And she
 5    was involved in some of the early interviews.
 6            That has shifted a little bit to where I'm
 7    primarily -- you know, 99.99 percent of the time -- I
 8    guess I don't know what the actual numbers are.  And
 9    historically they were -- the Department of Corrections
10    was their client.  And I --
11            You know, it's an issue of professional
12    relationships with other firms that you subcontract
13    with.  You generally enjoy a relationship with the
14    person you subcontract with, allow them to maintain
15    their relationship with that client for this project and
16    maybe other projects.
17            MS. WHELAN:  This will be Exhibit 2.
18    BY MS. WHELAN
19        Q   Exhibit 2 is a -- consists of a cover letter
20    dated December 12th, 2006 from Maria Costa, a contract
21    analyst in the institution medical contracts section,
22    procurement and contracts branch, to Dorn K. Dean,
23    managing director of Navigant Consulting.
24            And enclosed with that letter is a contract
25    for a term through December 31st, 2009.  I understand
```

22

JOHN MISENER

BARKLEY
Court Reporters

1   there may have been other contracts between CDCR and

2   Navigant.  But is it correct to say that this is the

3   contract that set forth your three-year retention with

4   CDCR?

5       A    That's correct.

6       Q    Can you describe what your general obligations

7   are under this contract, as you understand them.

8       A    Well, in short, it's to perform the work that

9   would realize the deliverables that are outlined in the

10  tables here.

11           For example, basically there's a table 1,

12  expense schedule, with milestones and deliverables and

13  fees and -- hard to tell the pagination because

14  everything seems to be page 1, 2.

15      Q    I think one helpful way to describe it also is

16  the exhibit number in the upper right-hand corner.

17      A    Exhibit B too.  I don't know how many of those

18  are in there.

19      Q    All right.  What I'm looking at, for instance,

20  Exhibit A, which sets out the purpose of the contract.

21           MS. TILLMAN:  And I was going to say Exhibit

22  A, page 4 has the subtitle tasks and deliverables.

23           THE WITNESS:  Right.  This outlines in a

24  little more detail what the requirements would be to

25  meet the deliverables that are in the chart in Exhibit

JOHN MISENER

BARKLEY
Court Reporters

1    A.

2    BY MS. WHELAN

3        Q    So on page 4, the first deliverable is a

4    five-year mental health bed forecast using Navigant's

5    methodology.

6            And the contract sets forth that that will be

7    accomplished twice a year with due dates 30 days after

8    the contractor's receipt of CDCR's general population

9    projections, which come out in the fall and the spring;

10   is that correct?

11       A    That's what it says.  Correct.

12       Q    And have you been accomplishing the two

13   year -- the twice-per-year reports since you -- since

14   this contract was initiated?

15       A    Yeah.  There's been two created.

16           They don't fall very well under the time

17   frame, which I think is unrealistic, primarily due to

18   the client's difficulty in pulling the data together for

19   those time periods.  Basically pushes back my ability

20   to -- you know, the time frame -- my ability to complete

21   those in a fashion that would meet the requirements

22   listed here.

23           MS. TILLMAN:  5.  Is that correct?  The note 5

24   on page 4 gives an outline of the time.

25           THE WITNESS:  Oh, yeah.  Yes, that's correct.

24

BARKLEY
Court Reporters

1   to identify individuals and then extrapolate the

2   proportion that you're auditing to the whole population

3   and say, we're about 5 percent low in terms of what the

4   real needs are here.

5   BY MS. WHELAN                                    .

6       Q    So to summarize my understanding of what you

7   said, you, in your formula, consider wait list data as a

8   way to capture unmet need.  But the other piece of data

9   that you have recommended to CDCR to create is a

10  periodic update of the UNA study so that you can also

11  capture information about unmet need based on clinician

12  reviews of files and patients; is that correct?

13      A    I think that's a fair statement, yes.

14      Q    In the absence of periodic UNA type studies,

15  is it accurate to say that you have no way of

16  incorporating into your data unmet need, other than

17  through the wait list data?

18      A    I would say that's correct.

19           But during a forecast, we identify a

20  particular program that's going south or decreasing in

21  volume, and we bring it to the attention of the --

22  either the department or DMH as to why this is

23  occurring.  Because there may be reasons other than need

24  involved.

25           A good example of that is Patton State Prison.

JOHN MISENER



1          So I'm not sure that that's as much concern to
2    me as the CMF issue.  I mean, it seems to build --
3    starting to build back up.  So I'm not sure exactly
4    what's going on, the most recent data.
5          Q    Going back to our discussion about the unmet
6    needs assessment, we looked at Exhibit 3, which was an
7    E-mail back in January 2006 from you to Sharon Riegel
8    discussing the UNA study.  And at that time, it appears
9    that you were trying to tie up loose ends about what
10   happened with the inmate patients involved in that
11   study.
12             I'm trying to understand whether or not that
13   study is part of your forecast now, or whether you have
14   since stopped referring back to that unmet needs
15   assessment with respect to your current formula.
16        A    We don't have any new adjustment factors
17   associated with the old study, no.  Except that the
18   actual increase in the -- in either the discharge rate
19   or the census rate over time reflects the UNA addition
20   in 2005 and 2006.  It's the actual curve in the use of
21   the formula to look at the future forecast, takes into
22   account that higher rate.
23             But we don't have any new numbers to add to
24   2007 and 8 and going forward until -- unless there
25   happens to be another UNA type study to add on to it.

JOHN MISENER

BARKLEY
Court Reporters

1   to as M-H-O-H-U, or MHOHU, where there was a certain

2   census.  And I said, look, should we add this in.  And

3   there was -- and there's E-mails that you have access

4   to.  Go back and forth.  Rick Johnson had researched it.

5          And I said, no, we don't want to add them into

6   our numbers, because they are serving a particular

7   evaluation function right now.  And some of them end up

8   being on the wait list for crisis beds.  And so we

9   wouldn't want to double count them.  And others never

10  actually get referred to mental health crisis beds

11  either.  So.

12      Q     So it's your understanding that OHUs are not

13  counted as existing MHCB supply beds; correct?

14      A     Right.  That's correct.

15      Q     But are inmates housed in the OHUs counted as

16  being on the wait list for MHCB beds?

17      A     If they're on the wait list.  They are -- I

18  mean, I have no way of knowing which ones are, which

19  ones aren't.  But some of them will be on the wait list.

20  Right.

21          That was research done by Health Care

22  Placement Unit, because it was specifically brought up

23  by me, and when we'd see, okay, well, call -- call, you

24  know, a spade a spade.  Are these people that ought to

25  be in my demand model.

116

JOHN MISENER



```
 1            And after doing the research and talking to
 2   the people at the prisons, it was determined that they
 3   were adequately identifying inmates for reasons of
 4   screening for more higher level care in a 72-hour wait
 5   period.  Some of them might already be on the wait list.
 6   But I don't know which ones or how many.
 7            Although there is an E-mail in there that he
 8   said that they actually had one of the highest referral
 9   rates from that San Quentin MHOHU to crisis beds of any
10   of the prisons.  So in his evaluation, it was being
11   reported properly and not double counting.  Some weren't
12   ever referred on to more higher level care.
13       Q    So if an inmate is in an OHU, and a clinician
14   places them, that inmate on the MHCB wait list, you
15   count the person as being on the wait list; correct?
16       A    That's my understanding of how it's reported.
17   I don't have access to that data, so I don't know.
18       Q    I thought I saw some references also, though,
19   to including people on the MHCB wait list who have been
20   in an OHU for more than 72 hours.  Is that true?
21       A    I've not taken any of the OHU data and tried
22   to do any kind of calculation with the OHU census and
23   adding it into -- in addition to the wait list that's
24   already there for crisis beds.
25       Q    So as far as you know, anybody housed in an
```

117

JOHN MISENER

BARKLEY
Court Reporters

```
 1      OHU is counted on the MHCB wait list only if a clinician
 2      has referred that person to an MHCB?
 3          A    That's my understanding, correct.
 4          Q    And is that also true for the MHOHUs, of which
 5      I think there's only one at SAC right now?
 6          A    Yeah.  I -- my own knowledge of the
 7      differences is sort of -- sort of sketchy.  But yeah,
 8      that's correct.
 9          Q    And as to the LOU at CMC in particular, you
10      said that that unit would not be counted as an MHCB
11      unit.  But would inmates housed in that unit be counted
12      on the MHCB wait list if a clinician referred them to a
13      MHCB?
14          A    I'd say that's true.  Although this is going
15      back a couple years.  So it's very sketchy in my mind,
16      except that I think there was some discussion of it in
17      the report.  Because that was an issue that we brought
18      up.  And people going back with different opinions as to
19      what was really going on.  We thought it was important
20      to sort of vet that issue.
21               And I don't even know if it exists anymore in
22      the same way that it existed back then or not in terms
23      of the physical facility or what's actually -- the kind
24      of patients that are in there now or what.  It didn't
25      seem to come up again after this, so.
```

118

JOHN MISENER

BARKLEY
Court Reporters

1    additional reporting capabilities to add to the model.

2    I don't think there was much of a -- I think it was

3    acute wait list that didn't exist during the first

4    reporting period or something.  And then they did a

5    better job of capturing that so we could add it back in.

6        Q    If an inmate -- so if an inmate patient is

7    identified as needing, for instance, an MHCB, but that

8    patient is placed in a zz cell and has not been referred

9    to an MHCB, is it correct to say that they would not

10   show up in your data?

11           MS. TILLMAN:  Lacks foundation.  Calls for

12   speculation, since he doesn't really know what a zz cell

13   is.

14           Although I object, you can answer the question

15   if you understand it.  The objections are made for the

16   record.

17           THE WITNESS:  Yeah.  I don't know what you're

18   talking about.  So I wouldn't want to extrapolate on the

19   basis of my ignorance.

20   BY MS. WHELAN

21       Q    Okay.  I'll represent to you, so you can

22   assume my representation, that a zz cell is an

23   alternative placement that's been identified as the --

24   by the special master's team as a place where inmate

25   patients sometimes end up who are in need of mental

                          123

JOHN MISENER

1    health crisis bed care.

2              Do you understand that?

3       A    Sure.  I mean -- I understand the concept.

4       Q    And as far as you know, your data is not

5    tracking zz cells, and in fact, you've never even heard

6    that term; correct?

7       A    To my knowledge, nobody's ever mentioned that

8    from within the department.

9              And generally the way these things work is if

10   I can identify, through the data or through

11   conversations with the court experts, that I'm missing

12   something, we'll circle around and ask the department.

13   I'll say, what about, you know, the MHOHUs or the OHUs

14   or the LOUs, or whatever the places that may be where

15   they're putting overflow of people, and try to identify

16   to what extent that amount is and is it being tracked.

17             And in some cases, like I said, they have come

18   up with estimates of how to make those adjustments.  But

19   I've never heard of zz.  So I don't feel qualified to

20   answer that.

21             DEPOSITION OFFICER:  Exhibit 11.

22   BY MS. WHELAN

23      Q    Exhibit 11 is a E-mail from Rick Johnson to

24   John Misener dated January 11th, 2007 regarding MHCB

25   census data.

124

JOHN MISENER

BARKLEY
Court Reporters

1    the data generally?

2       A    I think that was fine.  But some of the other

3    stuff was -- didn't break out what I needed.  Like EOP

4    that's not broken out by general population and ad seg

5    unit.  Doesn't do me a whole lot of good, so I need it

6    broken out.

7            So yeah, I mean -- as I recall, the wait list

8    has gone up in the newer data.  Having said that, they

9    decreased the capacity again at CMF, so it's like a

10   cyclical thing.  If they closed -- I believe it's S-1,

11   which is the crisis bed unit for the system in general,

12   not for their own use.  That was 20 beds, I think, or

13   25.  Then that's going to again bump up the wait list, I

14   would think.

15           And the data that they sent me appears to

16   justify that that actually has been happening again.

17           DEPOSITION OFFICER:  13.

18   BY MS. WHELAN

19      Q    Exhibit 13 I think will confirm or at least

20   address some of the issues we were just talking about.

21           Exhibit 13 is a March 5th, 2007 E-mail from

22   Michael Barks to John Misener, in which Michael Barks

23   has embedded answers to questions that you set forth in

24   your original E-mail.

25           Do you recognize this E-mail?

                              131

JOHN MISENER

BARKLEY
Court Reporters

1    A    I recognize that, you know, Michael did -- had

2    a habit of answering my questions in this format on a

3    number of occasions.  I'd have to read it.  Let's see.

4    Yes, I remember this.

5    Q    In response to your question about San

6    Quentin, Mr. Barks wrote, San Quentin does not have any

7    MHCBs.  The CADDIS data is probably for the OHU and

8    should not be included.

9         Is that what you were referring to when you

10   mentioned San Quentin before and the decision that

11   because San Quentin does not have an MHCB unit, the OHU

12   beds would not be counted as MHCB beds?

13   A    That's correct.

14   Q    In No. 2, you asked about the MHOHU at SAC,

15   which had at that time an average daily census of ten,

16   and he wrote, not including the MHOHU numbers at SAC

17   would be consistent and the appropriate approach.

18        Is that consistent with or does that explain

19   your statement before that the MHOHUs are not included

20   as supplied MHCB beds?

21   A    That's correct.

22   Q    Then you wrote in No. 3, neither the CMF

23   crisis units or activity at CMC is in CADDIS.  They

24   provided the facility code for CMC as 83 and labeled it

25   as an OHU, but there is no data in CADDIS for it.  HCPU

132

BARKLEY
Court Reporters

```
 1   little turnover of beds, you use the census rate model,

 2   which includes the census and a wait list for those

 3   beds; correct?

 4           Is that correct?  I'm sorry.  I just want you

 5   to -- a nod won't be --

 6       A    Conceptually that's correct.

 7       Q    Would there be a situation -- are you afraid

 8   of the situation whereby the wait list information

 9   wouldn't be enough, because, for instance, if clinicians

10   know a program is full, why bother to put somebody on a

11   wait list for it?

12       A    I guess my response to that statement would be

13   that, like we discussed earlier, we're dependent on the

14   wait list information to be accurate and complete, but

15   that it's appropriate for the department to audit

16   occasionally to make sure that the clinicians are

17   adequately measuring and referring pathology to the

18   appropriate levels.

19       Q    So your answer goes back to the --

20           MS. TILLMAN:  Don't interrupt him, if you --

21           THE WITNESS:  And it is of some concern that,

22   you know, if you are full, that there's this whole issue

23   of why bother referring because they're full.

24           But you know, the -- the department has to --

25   and the clinicians that work there have to be sensitive
```

JOHN MISENER

BARKLEY
Court Reporters

```
 1   to that.  You know, for planning purposes, you need to
 2   be rigorous in adding them to the wait list.
 3   BY MS. WHELAN
 4       Q    So you're referring back to our discussion
 5   about -- and your recommendation that the department
 6   continue with periodic UNA type studies?
 7       A    Yeah.  I think that would be a good idea.
 8            MS. TILLMAN:  Just off the record for a
 9   moment.
10            (A discussion was held off the record.)
11            (A recess was taken.)
12            DEPOSITION OFFICER:  Exhibit 18.
13            (A discussion was held off the record.)
14   BY MS. WHELAN
15       Q    Exhibit 18 is a very brief E-mail from you to
16   Lisa Tillman dated April 20th, 2007.
17            Do you recognize this E-mail?
18       A    Yeah.  Well, I remember saying it was nice
19   meeting you.
20       Q    I'm sure it was very nice meeting her.
21            MS. TILLMAN:  Not many lawyers get that
22   compliment.
23            THE WITNESS:  Well, we had talked on the
24   phone.
25   BY MS. WHELAN
```

155

BARKLEY
Court Reporters

1    Possibly rotating a few prisons each year.

2          But your first recommendation is the HCPU

3    daily census be logged on a periodic basis into a

4    database for each program so that staff would not have

5    to compile data from numerous Excel files and hard

6    copies in order to respond to data requests.

7          Has that now happened?

8      A    Well, no.  The person that used to compile

9    this had left.  But the turnaround -- and there's still

10   ad hoc requests from me, but the turnaround on the Excel

11   reports from Health Care Placement Unit are quick, and

12   frankly is not the -- I don't find it to be a real

13   problem.

14     Q    So this issue has sort of passed over time,

15   because they're getting data to you in a timely manner?

16     A    It would be nice.  But yeah, they get it to me

17   in a Excel format, and they're labeled, easy to read,

18   and they have all of their sources and caveats at the

19   bottom.  Easy to read and understand, so haven't -- this

20   might not be the most important thing on the list.

21   That's for sure.

22     Q    And your second recommendation is that DMH

23   data be consistently -- and you suggest monthly --

24   entered into the access database.

25          Has that been done?

162

BARKLEY
Court Reporters

1        A    No.  It's been ad hoc.  And I think for the

2    last couple studies I may have done it myself.

3        Q    Is that a recommendation that you still have

4    and --

5        A    I think they should use it.  I think they

6    should do this on an ongoing basis, because when there's

7    a -- when Navigant departs the scene, they'll still need

8    to keep track of their bed requirements by program.  And

9    to me this is the easiest way to do it.

10       Q    Your third recommendation is that a database

11   be developed that allows for patient level of tracking

12   of EOP admissions and discharges to monitor length of

13   stay.

14            Do you recall why you made that

15   recommendation?

16       A    Well, I don't remember who made the comment

17   about that inmates enter the program and never leave.

18   But probably made it in connection with the observation,

19   and I believe in a group setting they thought it was a

20   good idea.

21       Q    And has that now been done?

22       A    Not that I know of.

23       Q    Does this touch at all on the program -- on

24   the problem you mentioned earlier, which is that your

25   data will not reflect length of stay until somebody is

JOHN MISENER

BARKLEY
Court Reporters

```
1       A    Yes, it is.

2       Q    Of supplied beds; correct?

3       A    Correct.

4       Q    So for instance, footnote 4 on this document

5  explains the existing supply for ICF beds that are not

6  celled housing.

7            Do you see that?

8            MS. TILLMAN:  And just to double-check, you're

9  looking at ICF current capacity, ASH, CSH, CMF, NSH,

10 MSH, Salinas Valley, stand-alone.  Is that the entry?

11           MS. WHELAN:  Correct.

12           THE WITNESS:  I see it says ICF current

13 capacity.  You're thinking that it has to do with non

14 celled?

15 BY MS. WHELAN

16      Q    Right.  The celled ICF beds, or it's referred

17 to as high-custody beds on this chart, are set forth in

18 footnote 5.

19           Do you see that?

20      A    Yes, uh-huh.

21      Q    So footnote 4 deals with the lower level ICF

22 available beds, which include a total of 363 beds, 231

23 of which are at ASH, 50 of which are at Coalinga, 40 are

24 at CMF, five at Napa State hospital, five at

25 Metropolitan State Hospital, and 32 at the Salinas
```

JOHN MISENER

BARKLEY
Court Reporters

1    Valley State Prison stand-alone dorms; correct?

2         A    Yeah.  That's what it says, uh-huh.

3         Q    If it turned out to be true that there weren't

4    actually 231 beds available at ASH, how would that

5    change your data?

6         A    Well, when there's -- if there's less than it

7    says in the supply number, then your -- your deficit or

8    surplus would be different.

9              And in this case, it looks like -- we're

10   talking about non celled; right?

11        Q    Correct.

12        A    According to this, it would reduce the

13   surplus.

14        Q    Has anyone ever told you that there have never

15   been 231 beds available at ASH for intermediate care

16   facility inmates?

17        A    You mean before this point?

18        Q    I mean ever.

19        A    I guess, you know, what I've dealt with was

20   reported the supplies that was given to me.

21        Q    Okay.  So you were using a number that was

22   given to you, and you don't have a basis for knowing

23   whether it's accurate or inaccurate; is that correct?

24        A    Yeah.  You know, I'm basically retained to

25   look at the needs side of the equation, not the supply

183

JOHN MISENER

BARKLEY
Court Reporters

1   side.

2        Q    Right.  Does your formula distinguish at all

3   between beds that are available at a particular level of

4   care that are temporary beds versus permanent beds?

5        A    Well, there's one situation which -- dealing

6   with intermediate at Salinas Valley where there's a

7   methodology that Michael Barks used.

8             Because the current usage of what I would call

9   semi privates are actually filled by one individual,

10  because there was a deficit of one-person celled

11  housing, I guess.  I don't know the best way to call it.

12  That takes off-line certain ability to use the

13  originally designed capacity as a semi private, let's

14  say, because only one guy can stay there.

15            And that ratio is used -- that I use in one of

16  my formulas for identifying the unmet need for -- or the

17  need for celled versus non celled housing.  That formula

18  does take place in the Salinas Valley forecast.  And

19  there's a footnote that's fairly -- it's sort of --

20       Q    So you're talking about the distinction

21  between dorm ICF?

22       A    Dorm.  That's a good term.

23       Q    Is that what you mean?  The dorms that have --

24  they house four or six or eight people?

25       A    Right.

184

JOHN MISENER

BARKLEY
Court Reporters

1   no --

2            MS. TILLMAN:  I think he just gave you his

3   answer, but you can ask the next question.

4   BY MS. WHELAN

5       Q    So my question is, if I, for instance, said to

6   you that an inmate housed in the D-6 unit at Salinas

7   Valley State Prison, which is an ICF unit, never

8   receives yard and also never receives confidential

9   clinician contacts, whereas if that same inmate were

10  housed in the stand-alone cell in Salinas Valley State

11  Prison, he would receive yard and he would receive

12  confidential client contacts, would that situation have

13  any impact on your forecast of available ICF beds?

14           MS. TILLMAN:  Lacks foundation.  Incomplete

15  hypothetical.

16           I state those objections for the record.

17  You're free to answer, if you understand the question.

18           THE WITNESS:  Well, as I understand the

19  question, that you -- there may be somebody that has --

20  has issues with the quality received, but it wouldn't

21  necessarily mean that that person -- either those two

22  populations that reside in those respective units don't

23  require intermediate care.

24  BY MS. WHELAN

25       Q    Correct.  But would it be appropriate to count

JOHN MISENER

BARKLEY
Court Reporters

```
 1    the D-6 bed as an intermediate bed?
 2              MS. TILLMAN:  Same objections.
 3    BY MS. WHELAN
 4         Q    On par with the bed that you're counting in
 5    the stand-alone unit?
 6              MS. TILLMAN:  Same objections.
 7              THE WITNESS:  I'm not counting any beds.  The
 8    department provides me the beds.
 9              So I don't really get into that level.  I'm
10    looking at the demand and need.  The only time where I
11    would maybe make a change in my methodology would be to
12    find out, for example, if we had mental health crisis
13    type patients in acute settings.  They're in the wrong
14    place.  If I had that kind of level of detail, I could
15    make adjustments.
16              But that's the first I've ever heard of it
17    where you're talking about it.  Completely new to me.
18    So.
19    BY MS. WHELAN
20         Q    And touching on your point between -- that you
21    just made about acute versus mental health crisis bed
22    stays, your point -- and I think you've made this
23    sometimes in your reports -- is that sometimes you see a
24    length of stay in one unit that actually suggests to you
25    that the person may need a different level of care; is
```

JOHN MISENER

BARKLEY
Court Reporters

1   important that the total capacity of some type of acute

2   care be captured, whether or not --

3        I mean, other institutions have similar issues

4   where they're putting the person in one category versus

5   the other.  And the experts themselves say that a lot of

6   times patients, inmates go from one service to the other

7   because, hey, this service isn't doing a whole lot of

8   good.  Let's try something else.

9        We're not talking, you know, a type of

10  medicine that's complete and a science.  Sometimes it's

11  a change of venue benefit.  This is all nonclinical

12  observations from a layman, but sometimes a change in

13  clinician or change of venue can be beneficial.  And

14  maybe we can't always depend on labeling of inmates into

15  particular services as -- as the last and most official

16  classification.

17       Q    Turn back to Exhibit 12, which is your most

18  recent final report, and going back to page 41, which

19  sets forth a summary of the program supply and bed need.

20  This report sets forth -- we're in now fiscal year

21  2008/9; correct?

22       A    Yes, uh-huh.

23       Q    So this report sets forth an acute male --

24       A    No.  You're in fiscal 8.  Fiscal year-ending

25  '08.

191

JOHN MISENER

BARKLEY
Court Reporters

1      Q    So --

2      A    So it will end -- the second column is the

3  fiscal year that ends on June 30th, '08.

4      Q    Okay.  So using the column which is talking

5  about our present time right now, which is fiscal year

6  2007 slash '08, there is a 52-bed shortage of acute male

7  beds; is that correct?

8      A    Yes.  Uh-huh.

9      Q    And a projected surplus of 75 intermediate

10  male beds?

11      A    In total.

12      Q    In total.  Correct.  And there's a deficit of

13  49 intermediate male celled housing; correct?

14      A    Yes, uh-huh.

15      Q    And the acute and intermediate female bed need

16  shows that we have exactly enough beds for the need; is

17  that correct?  There's a supply of 30 beds and a

18  forecasted need of 30 beds; is that correct?

19      A    That's correct.

20      Q    And for MHCB, men, method 2, which is your

21  recommended method, there's a surplus of 31 beds; is

22  that correct?

23      A    Yes.

24      Q    For MHCB female beds pursuant to method 1,

25  which is your recommended method, there's a surplus of

JOHN MISENER

BARKLEY
Court Reporters

1    16 beds; is that correct?

2        A    That's correct.  Now you're asking me as of

3    the publication of this report?

4        Q    Correct.

5        A    Since there's been changes in the capacity,

6    which negate the mental health crisis beds drop by 25, I

7    think.  So.  And your comment about the available

8    intermediate ASH beds not being in existence, which

9    would modify the surplus that we have there.  So these

10   are true only if the data supplied me by the department

11   is correct.

12       Q    Right.

13       A    So with that caveat.

14       Q    Yes.  And I am just going through this because

15   it's your most recent report, and we don't have an

16   updated report in which these numbers may change.

17           Continuing on, the EOP general population male

18   bed need shows a deficit of 370 beds; is that correct?

19       A    Yes.

20       Q    The EOP ASU male bed need shows a deficit of

21   42 beds; is that correct?

22       A    That's correct.

23       Q    And the male PSU bed need shows a deficit of

24   42 beds; is that correct?

25       A    Correct.

JOHN MISENER

BARKLEY
Court Reporters

```
 1       Q    The female BOP general population bed need

 2  shows a deficit of 138 beds; is that correct?

 3       A    Yes.

 4       Q    The female EOP ASU bed need shows a deficit of

 5  15 beds; is that correct?

 6       A    Yes.

 7       Q    And your PSU female bed need is undetermined

 8  at this point; is that correct?

 9       A    Yes.

10       Q    And as you mentioned, while we were discussing

11  each category, these numbers may change depending on

12  changes in available beds including, for instance,

13  available beds at ASH, which have decreased because of

14  staffing shortages; is that correct?

15            MS. TILLMAN:  If you know.

16            THE WITNESS:  I don't know.  Depending on

17  how -- what kind of reporting I get as far as available

18  beds.

19            Now that's a good question.  They're not

20  staffed.  But they exist.  Should they be reported by

21  the department.  That's a question we can ask.

22  BY MS. WHELAN

23       Q    Well, in sticking with that question, in

24  general does your model adjust for staffing shortages

25  within the CDCR?
```

194

JOHN MISENER

1    provide me with the capacities of each of these

2    programs.  You know, complete with caveats and footnotes

3    and everything else that -- you know, your argument may

4    lie in the footnotes as to are they real.  But I haven't

5    been involved in that aspect, so.

6        Q    And one thing I'm trying to understand is

7    whether something like an adjustment based on staffing

8    vacancies is something that you can reflect

9    mathematically in your model or whether it's in the

10   category that we discussed before where you would need

11   outside input by clinicians or other experts such as

12   occurred in the UNA study.

13       A    I'm not following your argument at all.  I

14   think if you got issues with the capacity, then it's an

15   adjustment that needs to take place at the department of

16   modifying the numbers to represent the current

17   operational capacity of the units.  I wouldn't fiddle

18   with the demand side at all.  It doesn't make any sense

19   to me to do that.

20       Q    Yeah.  I'm not trying to make an argument one

21   way or the other.  I'm just trying to understand whether

22   something like staffing shortages is an issue that can

23   be mathematically captured in data as opposed to

24   something that is not appropriate for a mathematical

25   model.

202

JOHN MISENER

```
 1              MS. TILLMAN:  I'm going to object vague and
 2    ambiguous.
 3              But I also think he's answered that question a
 4    couple of different ways already.  He's already said
 5    something along the lines of doing a new contract, a new
 6    model, and getting a different set of data from CDCR to
 7    create that sort of look at how staffing impacts
 8    available beds.
 9              Is that correct?
10              THE WITNESS:  I guess I would just reiterate
11    that if short-term adjustments -- and when I say
12    short-term, I mean we're looking at current capacity
13    numbers, they don't seem accurate because of staffing
14    shortages, then they need to be footnoted and/or
15    adjusted to reflect --
16              Or actually, what some people do is they'll
17    have a built supply number, and then hospital agencies
18    that deal with -- you know, state agencies, still have
19    certificate of need, will have another column that says
20    built but not operational.  It means it's a potential
21    capacity, which apparently from what you're saying --
22              And I assume this is true, that you're arguing
23    that these are built or available but not staffed.  Then
24    that can just be a separate line put in the tables to
25    say, okay, since they're not operational, the deficit
```

JOHN MISENER

BARKLEY
Court Reporters

1      goes up.  That's what I'd do.

2              It's not my purview to create that or do I

3      have the ability or context to refine what Michael Barks

4      and company have pulled together for me for these

5      previous studies.  But that would change your --

6              It's not a complex algorithm or anything.

7      It's just saying, okay, we're adjusting out the beds

8      that aren't staffed at ASH, and the supply number, the

9      need number doesn't change.  That's why I said don't be

10     making any kind of esoteric adjustment to the need.  But

11     if the supply numbers is incorrect because of staffing,

12     then we have another column that says here's the need,

13     here's the deficit after an adjustment for built, but

14     not operational.  And then that number could probably

15     pretty easily be created.

16     BY MS. WHELAN

17         Q    And is that something that the CDCR has asked

18     you to do at this point?

19         A    No.

20         Q    Which is adjust your model at all for staffing

21     vacancies?

22         A    As far as I'm concerned, it's not my model,

23     that part of it.

24              The need numbers I think are fine with some

25     caveats that I have about people possibly being in the

JOHN MISENER

BARKLEY
Court Reporters

1    wrong places, where if we can make adjustments on that

2    level, that's fine, to characterize where the inmates

3    that have -- what kind of problems they have.

4            If there's problems with the supply numbers,

5    then that needs to come from the department.  And then

6    it's because the last and easiest part of the model, I

7    guess is, as you put is, is just subtracting the

8    numbers.  So.

9        Q    You mean subtracting the --

10       A    Yeah.  They have bad supply numbers, then --

11   or different supply numbers, then you can either correct

12   those or have another column that says built but not

13   operational.  And then it will change your numbers a

14   little bit.  And maybe a lot.  I don't know.  Depending

15   on what -- with what your situations you're talking

16   about.

17       Q    So as far as you're concerned under your

18   current contract, the forecast is really your focus, and

19   the supply slash planned part of your equation is just a

20   number that is provided to you by the CDCR?

21       A    That's correct.

22            DEPOSITION OFFICER:  23.

23            MS. TILLMAN:  Just to note for the record,

24   we've been on the record about an hour-and-a-half.

25   Anybody want to just take five minutes to stand up or

                              205

                        JOHN MISENER

1    correct?

2         A    Yeah.  We haven't seen any data from this

3    prison at this point, so -- I mean, all I can do is

4    offer you some other possible explanations, but that

5    would be hypothesis.

6         Q    Well, you mention two possible explanations

7    here.  Is there a reason you chose these two for this

8    report?  And those are either patient severity slash

9    complexity or changes in the treatment model.

10         A    Well, since their admissions appear to have

11    gone down, maybe what's left are the long-termers or

12    something, so you're looking at a -- a narrower band of

13    people that don't leave.  So I don't know.  Hard to say.

14         Q    Are there any other explanations that you

15    think weren't mentioned?

16         A    I haven't talked to any of the psychiatrists

17    or anything like that, so I don't really know.

18         Q    On page 9, you summarize mental health crisis

19    bed need forecast for males, and you point out that it

20    appeared from the data that the need for MHCB beds was

21    appearing to increase with increasing supply.

22              Do you see that?

23         A    Yes.  Uh-huh.

24         Q    What are the possible explanations for why

25    need would increase as supply increases?

212

JOHN MISENER

BARKLEY
Court Reporters

```
 1          A     Well --

 2                MS. TILLMAN:  If you know within the realm of

 3     your expertise, although I do object to the question.

 4                THE WITNESS:  There's a -- there's a situation

 5     called supply-based demand, supply-based growth, which

 6     has more to do with the propensity of physicians to

 7     utilize resources if they're easy to use and out there.

 8     Sometimes in the private sector, they aren't always

 9     coincident with need.  Sometimes they're -- they have

10     other -- other motivations to -- than maybe the need of

11     the patient.

12                I don't know about this situation.  That tends

13     to be what happens in situations where physicians have

14     different financial incentives, and we see in markets

15     where the supply is higher and all of a sudden they're

16     doing more work on patients than maybe the need or

17     compared to other markets.

18                In this case, one of the possible causes is

19     continuing improvement of -- of supply meeting

20     previously unmet demand on that need.  So that's what I

21     probably would like to attribute it to.

22                The other -- the other possible option is that

23     certain programs may be attractive to clinicians,

24     which -- where previous programs were not, and they're

25     maybe trying them out to see what kind of improved
```

JOHN MISENER

BARKLEY
Court Reporters

1    results they have on the -- on the patients.

2            And I think the experts have told me that

3    before as well, that sometimes they will shift to new

4    programs, at least temporarily to see if the outcomes

5    are any better.  And that could explain some of it.

6    BY MS. WHELAN

7      Q    Are there any other possible explanations you

8    can think of as to why the data showed an increasing

9    need for MHCB beds as the supply was increasing?

10           MS. TILLMAN:  Same objections.

11           THE WITNESS:  I would have to look at the

12   older study of the three.  Not the Tucker Alan.

13           Well, the Tucker Alan, clearly everybody at

14   CMF was considered acute.  Even though during that

15   period, I'd heard that the prison might be utilizing

16   some of their resources for crisis type patients.  Some

17   of it there may be an artificial increase in use rate

18   because all of a sudden we're properly categorizing the

19   bed supply, say at CMF.  It would be interesting to see

20   what the new data show, because there's been a decrease

21   in capacity for -- that's classified as mental health

22   crisis bed at CMF.  So see if the rates are modifying or

23   slowing down.

24      Q    And do you have any plan to -- well, scratch

25   that.

214

JOHN MISENER

BARKLEY
Court Reporters

1          Will this trend that you observed here of need

2    increasing at the same time that supply was increasing,

3    will that become any part of your planned forecast that

4    you're doing now?

5        A    Well, I'll make observations.  I mean, if I

6    see that because -- and I would only classify it as

7    suspicion, maybe not cause and effect.

8          But if I see that the capacity of mental

9    health crisis has dropped, and all of a sudden the

10    demand has dropped, and yet there's an increase in

11    acute, then I can make the supposition that the inmates

12    may be receiving acute level care just in a different

13    venue.

14        Q    And would one possible explanation for this

15    phenomenon of need increasing while bed supply is

16    increasing be that clinicians may be more likely to

17    refer patients to open beds as opposed to referring

18    patients to a wait list?

19        A    Yeah.  That's certainly a possibility, I would

20    think.

21        Q    With respect to mental health crisis bed need

22    for females -- and I think we already covered this, but

23    you mentioned on page 10 that OHUs are not counted in

24    the most recent forecasts.

25          Is that consistent with our discussion earlier

                              215

JOHN MISENER

BARKLEY
Court Reporters

1          MS. TILLMAN:  The right axis.

2    BY MS. WHELAN

3          Q    All right.  I'm sorry.  So --

4          A    Right.  So we're saying it will exceed

5    21 percent, but it will be around 22 percent or so.

6    21-point something.

7          Q    Okay.  So just to clarify, the MHSDS

8    population in 2007 represented 18.7 percent of the

9    population, but you're forecasting that by 2012 the

10   MHSDS population will represent approximately 22 percent

11   of the population; is that correct?

12         A    That's correct.  And as we do additional

13   iterations of these reports, we may see the incidence

14   grow at a faster rate, and so we'll -- we'll readjust

15   the slope of the line to reflect that.

16         Q    Have you done any similar calculations for

17   other populations, such as the acute male population

18   alone?

19         A    Separating these out more into separate?

20         Q    Right.

21         A    No.

22         Q    So this represents your full calculations,

23   which were for the entire mental health services

24   delivery system, and then the mental health services

25   delivery system minus the triple CMS patients; is that

220

JOHN MISENER

BARKLEY
Court Reporters

1    correct?

2        A    That's correct.

3        Q    Would further breakdown of those categories be

4    helpful to your model?

5        A    Well, these are sort of a composite

6    after-the-fact combination of all the different factors.

7            I think you might find it intriguing, though,

8    that it may be the females that are growing faster than

9    the males, because a lot of programs are going

10   gangbusters.  Where some of the more intense ones

11   aren't.  The EOPs, the deficits there seem to be grower

12   even faster.

13       Q    Well, you point out in this report that --

14       A    But there's such a small amount of population,

15   so.

16       Q    Right.  But you point out in the report that

17   even though, for instance, the general population

18   decreased for women, the census of EOP women increased;

19   is that correct?

20       A    Triple CMS also.  Seem to be growing at a

21   rapid rate.  Those are the -- numbers wise, those are

22   the biggest programs.  Maybe not the most intense,

23   but -- just in terms of actual census.

24       Q    So you haven't broken these categories down

25   further, but you can tell from some of the data that the

                              221

BARKLEY
Court Reporters

<u>DEPOSITION OFFICER'S CERTIFICATE</u>

STATE OF CALIFORNIA          }
                             }  ss.
COUNTY OF ALAMEDA            }

         I, Karen Moon, hereby certify:

         I am a duly qualified Certified Shorthand

Reporter in the State of California, holder of

Certificate Number CSR 12450 issued by the Court

Reporters Board of California and which is in full force

and effect.   (Fed. R. Civ. P. 28(a)).

         I am authorized to administer oaths or

affirmations pursuant to California Code of Civil

Procedure, Section 2093(b) and prior to being examined,

the witness was first duly sworn by me.   (Fed. R. Civ.

P. 28(a), 30(f)(1)).

         I am not a relative or employee or attorney or

counsel of any of the parties, nor am I a relative or

employee of such attorney or counsel, nor am I

financially interested in this action.   (Fed. R. Civ. P.

28).

         I am the deposition officer that

stenographically recorded the testimony in the foregoing

deposition and the foregoing transcript is a true record

                    / / /

235

BARKLEY
Court Reporters

1  of the testimony given by the witness.  (Fed. R. Civ. P.

2  30(f)(1)).

3       Before completion of the deposition, review of

4  the transcript [xx ] was [  ] was not requested.  If

5  requested, any changes made by the deponent (and

6  provided to the reporter) during the period allowed, are

7  appended hereto.  (Fed. R. Civ. P. 30(e)).

8

9  Dated: _February 22, 2008_

10

11  _____

12

13

14

15

16

17

18

19

20

21

22

23

24

25

236

BARKLEY