# EXHIBIT 17

## Deposition of George Sifuentes
## December 15, 2007
## (Designations)

## Part B

Page 43

1  these -- the numbers above the -- strike that.

2        Do you have any understanding of whether

3  the -- the column that says intermediate male celled

4  housing refers to existing housing including

5  temporary units such as D-5 and D-6?

6      MR. McCLAIN:  Okay, objection, lacks

7  foundation, calls for speculation.

8      THE WITNESS:  I don't know what those

9  numbers --

10     BY MS. WHELAN:

11     Q. So you have no understanding of these

12 numbers or where they came from?

13     A. No, I don't -- yeah, I don't know what

14 the -- the numbers are made up of, whether they

15 include or do not include temporary housing.

16     Q. Okay, thank you.

17        Do you have any understanding of whether or

18 not since the time that Mr. Brewer's memo was

19 issued, which is Exhibit 4 for this deposition,

20 additional treatment rooms or interview rooms were

21 built in D-5 and D-6?

22     A. I do not know.

23     MS. WHELAN:  This will be marked as Exhibit 5.

24     (Plaintiffs' Exhibit No. 5 was marked for

25 identification.)

GEORGE SIFUENTES

Page 44

1    BY MS. WHELAN:

2       Q. Exhibit 5 consists of a June 26, 2007 e-mail

3    from Dean Borg to Doug McKeever, entitled mental

4    health major capital outlay projects, with an

5    attachment of the same title.  Have you ever seen

6    this document before?

7       A. I probably have.

8       Q. And you say you probably have, why do you

9    say you probably have?

10      A. We used to keep lists of what we thought

11   were current capital outlay projects, and so -- and

12   there were many of them, so I suspect that I've seen

13   this list.

14      Q. Okay.

15         This is a list showing mental health major

16   capital outlay projects as of June 26, 2007.  If you

17   could just refer back again to this last page of the

18   Navigant report also, just keep them both next to

19   you.

20         Above, midway down the page.

21      A. Okay.

22      Q. This report shows -- refers to EOP, GP, male

23   bed need.

24      MR. McCLAIN:  You're talking about the Navigant

25   report?

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

Page 45

1      MS. WHELAN:  The Navigant report.

2      Q. And it shows deficits of EOP male beds as of

3  2007.  As of July 13th, 2007 there's a deficit of

4  270 beds, fiscal year 2007-2008 there's a deficit of

5  370 beds?

6      A. Uh-hmm.

7      Q. Fiscal year 2008-2009 there's deficit of 454

8  beds and fiscal year 2009 to 2010 there's a deficit

9  of 520 beds.  And then this document shows surplus

10 beds.

11      Do you see that?

12      A. Yes, I do.

13      Q. Referring back to the 6-26-07 mental health

14 major capital outlay project document, is it correct

15 that on that document there are no EOP construction

16 projects for men under the currently under

17 construction category?

18      A. That's not correct, the very first one says

19 EOP treatment space for 384 inmates.

20      Q. I'm under the "currently under

21 construction"?

22      A. Oh, I apologize.

23      Q. That's okay.

24      A. That's correct, 50 mental crisis beds and 64

25 intermediate care facility beds.

GEORGE SIFUENTES

1      Q. Now moving to the "currently under design"

2   category, you referred to a project for treatment

3   space for EOP inmates at CSP Sacramento.

4      Do you agree that that project will not

5   create new EOP beds?

6      A. That's correct.

7      Q. Moving down to the second project under

8   "currently under design," CSP Los Angeles County,

9   EOP treatment space for 150 inmates.  Do you agree

10  that that will not add any EOP beds for male

11  inmates?

12     MR. McCLAIN:  Just a minute.  Object as to

13  lacks foundation and vague.

14     THE WITNESS:  But that's correct.

15     BY MS. WHELAN:

16     Q. And there are no other EOP projects listed

17  under the "currently under design" category, do you

18  agree?

19     A. I agree.

20     Q. Then there's a third category of projects

21  that have not began design pending funding

22  decisions.  There are four projects listed,

23  including Salinas Valley State Prison, 70 Ad Seg-EOP

24  bed project, do you see that?

25     A. Yes, I do.

GEORGE SIFUENTES

Page 54

1    Q. And do you have any knowledge whether taking

2    the Lancaster 150 treatment space project first,

3    whether that project is moving forward?

4    A. To my knowledge, it is not moving forward.

5    Q. And as to the 384 EOP treatment space

6    project at Sacramento?

7    A. To my knowledge, that one's not -- that

8    one's not moving forward either.

9    MS. WHELAN:  Should we take a break?  I think

10   we've been going for --

11   MR. McCLAIN:  That would be a good time.

12   (Recess.)

13   (Ms. Richardson exits proceedings.)

14   BY MS. WHELAN:

15   Q. Mr. Sifuentes, are you aware that in July of

16   2007 Special Master Keating -- well, first do you

17   know who Special Master Keating is?

18   A. Yes, I do.

19   Q. Okay.  And who is he?

20   A. He is the special master for the Coleman

21   court.

22   Q. Are you aware in July of 2007 that Special

23   Master Keating filed a report and recommendations

24   about reception center EOP programs?

25   A. Yes, I understand he did file a report.

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

Page 55

1    Q. And do you understand that one issue he

2    raised in that report was his finding that the

3    reception center EOP programs were not meeting

4    required standards in large part because of the lack

5    of treatment and staffing space available in those

6    units?

7    A. I'm not sure what the reasons were, but I

8    understand that he did have criticism of the EOP

9    programming reception centers.  I did not personally

10   read the report.

11   Q. Were you personally involved in any

12   construction projects regarding programming or

13   treatment space in the EOP reception centers?

14   A. No.

15   Q. So at the time that you left in -- the OFM

16   in October 2007, the OFM was not involved in any

17   projects related to programming or treatment space

18   at the EOP reception center projects; is that

19   correct?

20   A. That's correct.

21   MS. WHELAN:  This is a big one.

22   (Plaintiffs' Exhibit No. 7 was marked for

23   identification.)

24   MS. WHELAN:  Exhibit 7 is a CDCR five-year

25   infrastructure plan from 2008 to 2013.

GEORGE SIFUENTES

1    But if it has been issued, then the list of

2  priorities would have been approved by executive

3  staff members of the CDCR; is that correct?

4    A. This would have been the department's

5  priority listing, that's correct.

6    Q. And one thing that might be helpful would be

7  to determine whether or not this issue -- I mean,

8  this -- I'm sorry, this report was issued.  So do

9  you -- I assume you're going to have to do that at

10  some point anyway, and that you will let me know

11  about that, is that true?

12    MR. McCLAIN:  I don't know if it was issued or

13  not, and I don't even know.  I don't think I'm going

14  to be able to find that out for you today.

15    MS. WHELAN:  Okay.

16    MR. McCLAIN:  You're welcome to ask

17  Mr. Sifuentes if he knows of this issue, but I think

18  you've already done that.

19    MS. WHELAN:  Okay.

20    Q. If you turn to page 7105, and this is in --

21  this is the first page of the Executive Summary

22  section in this report.

23    About halfway down the page in the Executive

24  Summary there's a paragraph that says, "The most

25  urgent concern facing the CDCR is overcrowding.  The

GEORGE SIFUENTES

Page 71

1  CDCR continues to experience an increase in all

2  levels of the adult inmate population.  This has

3  created severe overcrowding and significantly

4  impacted the CDCR's ability to provide mandated

5  treatments and programming, as the CDCR is forced to

6  implement the use of nontraditional beds in

7  gymnasium rooms, dayrooms, program areas and

8  hallways."

9          Do you see that paragraph?

10  A. Yes, I do.

11  Q. Do you agree with the statement that the

12  most urgent concern facing the CDCR is overcrowding?

13  MR. McCLAIN:  Objection, lacks foundation,

14  calls for speculation.

15  THE WITNESS:  I agree that overcrowding is a

16  serious concern facing the department.

17  BY MS. WHELAN:

18  Q. Do you agree, based on your experience with

19  the Office of Facilities Management that there was

20  severe overcrowding in the CDCR when you were

21  working with the OFM?

22  MR. McCLAIN:  Objection, lacks foundation.

23  THE WITNESS:  CDCR is facing overcrowding in

24  its adult inmate population.  It is also facing a

25  staff shortage, and I think those two things are the

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

Page 72

1  most critical issues for the department.

2       BY MS. WHELAN:

3       Q. And when you say staff shortages, what do

4  you mean?

5       A. Correctional officer staff, administrative

6  staff, program staff.  And by program, I'm including

7  medical mental health, but education staff, drug

8  rehabilitation staff, all -- that's what I mean by

9  program.  The department does have a severe staffing

10 shortage at all of its levels.

11      Q. And do you agree with the statement here

12 that severe overcrowding significantly impacts the

13 CDCR's ability to provide mandated treatment?

14      (Ms. Richardson re-enters proceedings.)

15      MR. McCLAIN:  Objection, lacks foundation.

16      THE WITNESS:  I believe that overcrowding

17 impacts the department's ability to provide

18 treatment programming for two reasons, one, it takes

19 staff to get people to the program, and two, if they

20 are being housed in spaces that were designed for

21 treatment, then that is -- then that is taking space

22 away from the treatment.

23      BY MS. WHELAN:

24      Q. And do you agree that severe overcrowding

25 has also resulted in the CDCR being forced to use a

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

Page 73

1    great number of nontraditional beds?

2        MR. McCLAIN:  Objection, lacks foundation,

3    calls for speculation.

4        THE WITNESS:  Well, the overcrowding has

5    required the department to use what we call

6    nontraditional areas for housing.

7        BY MS. WHELAN:

8        Q. And at the time that you left the OFM in

9    October of this year, do you recall approximately

10   how many nontraditional beds were being used for

11   that purpose?

12       A. My recollection is -- was 25,000 beds.

13       Q. Continuing also in the Executive Summary on

14   page 7108 at the bottom.  The very last paragraph

15   refers to the OFM receiving instruction from the

16   receiver's office via CDCR healthcare, that only the

17   receiver staff and those CDCR employees within the

18   Plata unit have the authority to write plans for

19   CDCR medical care.  And it then says that that plan

20   has not yet been received.

21           Do you see that?

22       A. Yes, I do.

23       Q. Does this mean that the receiver's projects

24   are independent of the Office of Facilities

25   Management?

GEORGE SIFUENTES

1  right?

2      A. Yes, that's correct.

3      Q. Do you think that this long-term paragraph

4  is referring to those projects?

5      MR. McCLAIN:  Objection, lacks foundation.

6      THE WITNESS:  I -- the intention of that

7  paragraph was to understand that we needed to

8  under- -- well, we needed to understand that the

9  mental health population had been growing and

10  going to continue to grow.  I think even the

11  Navigant study said that.  And that we would have to

12  prepare proposals to make sure we met those needs,

13  whether it was for housing, whether it was for

14  treatment or whether it was for space.

15      MS. WHELAN:  Okay, thank you.

16      Q. Moving ahead into the program delivery

17  changes-existing section of this report.  And I'm on

18  page 7201.

19      In this chart the first category listed on

20  this page is small management exercise yards Phase

21  I.  And it's listed as priority No. 25.

22      And in the solution column it says,

23  "Construct 341 statewide small management exercise

24  yards to replace large group exercise yards in

25  administrative segregation housing units at 15 Level

GEORGE SIFUENTES

1  II and III/reception centers.  This phase will build

2  small management yards at various institutions."

3          Are you familiar with this project?

4          A. Yes.

5          Q. At the time that you left the Office of

6  Facilities Management do you recall how many of

7  these small management yards were built?

8          A. These particular ones?

9          Q. Yes. Of the 341.

10          A. I'm not aware of -- of any of the 341 being

11  built, these particular ones.

12          Q. And at the time that you left the Office of

13  Facilities Management, do you know how many small

14  management yards existed within the CDCR?

15          A. Approximately 200 or so.

16          Q. Did you have experience overseeing the

17  construction of small management yards?

18          A. Yes.

19          Q. And where did you oversee construction of

20  those yards?

21          A. Well, statewide, I mean, as a program.  With

22  the small management yards, it was approved by the

23  legislature a number of years ago for high security,

24  ad seg, Level IV -- Level IV institutions.  And they

25  authorized us to go ahead and -- and install small

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288