# EXHIBIT 17

**Deposition of George Sifuentes
December 15, 2007
(Designations)**

**Part C**

1  management yards at Level IV institutions, which we
2  did.
3        We also included the small management yards
4  in the new ad seg building, which we have. And the
5  plan for the department was to go to all the ad segs
6  statewide and build small management yards,
7  regardless of level of classification. That they
8  were going to start with Level IV, then they were
9  going to go to Level III, then they were going to go
10 to Level II, Level I and reception. And that was --
11 that was the overall plan.
12       MS. WHELAN: I'm looking for the June 1st, 2007
13 Judge Karlton order. And I think it is in here.
14       I apologize to everyone for my delay.
15       Can we mark this as No. 8.
16       (Plaintiffs' Exhibit No. 8 was marked for
17 identification.)
18       MS. WHELAN: We're marking as Exhibit 8 an
19 order issued by Judge Karlton on June 1st, 2007.
20 And this order is regarding suicide prevention and
21 administrative segregation units.
22       Q. If you'd turn to page 2 of the order.
23       First of all, have you seen this order
24 before?
25       A. Yes, I have.

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

```
 1      Q. Okay.
 2          If you'd turn to page 2, the very last
 3  partial paragraph, it says: "At present, defendants
 4  have only 719 of the 1,480 small management yards
 5  required to give necessary out of cell exercise time
 6  to inmates in administrative segregation."
 7          Does that sound accurate to you, on a
 8  statewide level?
 9      A. Yeah. I was off by 500, we had many more.
10      Q. Okay.
11          It also says that: "Eighty-six additional
12  yards are under construction, and that defendants
13  are presently seeking authority to fund 179
14  additional yards in fiscal year 2007/8."
15          On the next page it refers to defendant's
16  plan, I'm looking at the last sentence in the very
17  first paragraph. And it says: "As the Special
18  Master found, 2012 is 'simply too late.'"
19          And that's referring to defendant's plan to
20  complete building of these small management yards by
21  2012.
22          Are you familiar with defendant's recent
23  plan regarding small management yards?
24      A. No, I'm not.
25      Q. Which was -- okay.
```

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1      Do you understand where this 1,480 number
2 comes from?
3      A. Yes. They -- as I mentioned earlier, the
4 department had a plan to replace all ad seg -- not
5 to replace, excuse me, but to add all small
6 management yards to all the administrative
7 segregation units throughout the state.
8      We started with Level IVs, and we were
9 moving through doing Level IIIs and Level IIs. And
10 there is a listing of the -- there was one big list
11 that had ad segs, it had some other projects like
12 SHU, and it had, if I recall correctly, PSU. And it
13 was on one listing that -- one -- the person that
14 was a lead for that project had, and -- and that's
15 where the number, about 1,400, came from, in terms
16 of, you know, point in time, here's how many we
17 would need based upon what we know, you know, what's
18 our ad seg population; where are the ad segs being
19 run from; and how many we have.
20      And so we used that as our -- as that's
21 where we need to be. We're at 719 -- this is June,
22 we're at 719. We had a certain number under
23 construction, we had asked for, if I recall, it was
24 design funds for the 179, because that's how many we
25 thought we would do in a year.

GEORGE SIFUENTES

1    And the plan, I believe -- the plan that was
2 turned into the court was, we were going to get 179
3 in '07-'08, and then we were going to get another
4 group in '08-'09, another group in '09-'10, another
5 group in '10-'11. When it was all said and done
6 they would all be finished, the entire 1480,
7 would -- would be completed by 2012. But I'm not
8 sure when in 2012.
9    Q. And you just testified that you thought
10 about 179 of these yards could be built in a year;
11 is that correct?
12    A. That's how much we thought we could design
13 and begin construction in a year.
14    Q. Okay.
15    A. It normally takes you nine to ten months to
16 design the work.
17    Q. And so did you have an estimate about how
18 many you could build in a year?
19    A. About 100 -- within a 12-month period, we
20 would -- I think it's fairer to say that we could
21 have completed the 179 within a 24-month period.
22    Q. Okay.
23    And you testified that the 1480 number
24 included small management yards for SHUs and PSUs?
25    A. Yeah. My recollection of the listing is

GEORGE SIFUENTES

1  yes, it did.
2      Q. And are you aware that defendant's most
3  recent plan excludes small management yards for SHUs
4  and PSUs?
5      A. I'm not aware of the current plan.
6      Q. Do you know who would make the decision to
7  exclude SHUs and PSUs from the small management
8  plan?
9      MR. McCLAIN:  Objection, calls for speculation.
10     THE WITNESS:  No, I -- I -- I wasn't involved
11 in that process.
12     MS. WHELAN:  Okay.
13     Q. On page 7220 of the infrastructure plan, and
14 this is within the facilities maintenance section of
15 that plan?
16     A. 220.
17     Q. 7220.
18     You testified earlier that the Office of
19 Facilities Management is not directly responsible
20 for preventive maintenance work at the institutional
21 level and that each institution would be responsible
22 for that; is that correct?
23     A. That's correct.
24     Q. At the top of this page it states:  "The
25 facility system currently has a backlog of over

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  institution-by-institution-by-institution level.
2  And we use that information to help support and
3  defend some of their requests we were going forward
4  with, with regards to funds for repair or
5  maintenance or replacement thereof.
6      Q. Okay.
7         I've moved into the healthcare section of
8  this report, and it's page 7250.
9      A. 7250.
10     Q. Yes.
11        This section is talking about MHCBs, which
12 are mental health crisis beds. And it states that:
13 "Approximately 264 inmate patients were in an MHCB
14 as of February 20th, 2007, excluding 13
15 inmate-patients on the wait list, for which the CDCR
16 is staffed for capacity of 285 inmate patients. It
17 is important to note that MHCB capacity includes 36
18 beds at the California Men's Colony that were
19 licensed on a temporary emergency basis, and 45
20 acute beds utilized as MHCBs at CMF. Both of these
21 MHCB units must be replaced by permanent
22 facilities."
23        Are you familiar with the temporary units
24 that are referred to in this paragraph, including
25 the 36 bed unit at CMC?

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  A. Yes.
2  Q. And this is stating that that is an
3  unlicensed or it's a licensed on a temporary
4  emergency basis; is that correct?
5  A. That's correct.
6  Q. And do you --
7  A. By Judge Karlton's order.
8  Q. Okay.
9  And do you have an understanding of what
10 that means?
11 A. Yes, I do.
12 Q. Can you tell me what that means?
13 A. It meant that the department did not have to
14 bring that -- it was existing space, and it's known
15 as the LOU unit at CMC, and it -- the judge ordered
16 us to ignore the state ruling that required us to
17 shutdown the LOU because it was not a medical
18 facility or did not meet medical standards.  He
19 ordered us to reopen it as a mental health crisis
20 beds on temporary basis.  And he also did not
21 require us to bring it to licensing building
22 standards.
23 Q. And is it your understanding that Judge
24 Karlton ordered that due to a severe shortage of
25 these beds statewide?

1    A. That is my understanding.

2    Q. And are you also familiar with the 45 bed
3 acute unit at CMF that was being utilized at this
4 time as MHCBs?

5    A. Yes.

6    Q. And can you describe that unit to me?

7    A. Well, that unit is -- is -- is -- was
8 licensed as an acute care facility, and thus
9 utilizing those cells or as mental health crisis
10 beds was well within the -- within the parameters of
11 a license. There was an under utilization of acute
12 beds there, and he ordered the department to convert
13 those to mental health crisis beds. And I believe
14 we also ordered mental health to take some of the
15 folks from CMF to their facility, under some kind of
16 population movement program. That was my
17 understanding.

18    Q. And your -- when you say department's --
19 folks at the department, I think you said folks at
20 mental health, do you mean the Department of Mental
21 Health?

22    A. Yes. The Department of Mental Health
23 operates these -- well, operates a number of beds at
24 CMF, these 45 in particular. Told them to make them
25 mental health crisis beds. And then asked them or

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  required them to move some of the people that were
2  in there to some of the mental health's facilities,
3  such as Atascadero and some of the other facilities.
4      Q. And it's your understanding that the judge
5  ordered that swap of acute for MHCB beds due to
6  Coleman class member bed shortages; is that correct?
7      A. I believe -- I believe the judge approved
8  that, I believe the department came forward -- the
9  Department of -- the CDCR and the Department of
10 Mental Health came forward with this plan as a way
11 to address the shortage of mental healthcare crisis
12 beds.  And I believe Special Master Keating reviewed
13 the recommendation and made a recommendation to the
14 court to approve that.  And I believe Karlton then
15 approved that.
16     Q. Okay.
17     But it's your understanding that the
18 department volunteered that swap of beds due to bed
19 shortages in the CDCR?
20     A. Well, the department offered it as -- as a
21 plan to address the mental health crisis bed
22 shortage.
23     Q. Okay.
24     On page 7251, I'm looking at -- it's still
25 within the health plan section of this report.  I'm

1  you just explained.
2      A. Uh-hmm.
3      Q. As of the time that you left the Office of
4  Facilities Management in October of this year, had
5  you either leased or created additional staffing
6  space for headquarter mental employees?
7      A. We had engaged the Department of General
8  Services at finding more space for the mental health
9  and the dental program.
10     And I know that, that the mental health
11 group moved to some space, I want to say in July,
12 July or August. But we're still looking for more
13 space, because there's additional growth coming.
14     I don't know if they ever secured that
15 additional space.
16     Q. Okay.
17     I'm moving into the housing section of the
18 report, and it's page 7262.
19     A. 62.
20     Q. Under Adult Male Housing Capacity, it
21 talks -- it states: "The conventional wisdom of the
22 American Correctional Association and national
23 standards for prison and jail housing is one inmate
24 per cell."
25     We discussed earlier that several of the

```
 1  cells within the CDC are -- or many of them now are
 2  used for two inmates; is that correct?
 3       A.  In the cells that were built under the new
 4  prison construction program, there was the ability
 5  to house two inmates per cell.  The -- the
 6  department standards were to never go to 200 percent
 7  cell, it was to go to no more than 90 percent of the
 8  cells being double bunked, which means that some of
 9  the cells are -- do have two inmates in them, but
10  not all of them.
11       Q.  So it was the department's position that
12  they would double cell up to 90 percent of the cells
13  existing within the CDCR; is that correct?
14       A.  Depending on the population, yes.  If you go
15  back to the chart that we talked about earlier,
16  you'll see the different levels, some are 50
17  percent, some are at 40 percent, some are no
18  overcrowding.  It depends on the population and
19  admission.
20       Q.  Okay.
21       The next paragraph says:  "The CDCR has
22  developed the concept of 'a manageable level of
23  overcrowding.'  This refers to the ability of a
24  correctional facility to safely house inmates at
25  occupancy levels above the original design of one
```

1  inmate per cell, or a single level of bunks per
2  dormitory. This overcrowding level is based upon
3  California's experience, it's accompanying
4  operational policies and protocols, staffing
5  patterns, and each correctional facility's mission."
6          Earlier in the report it refers to 18,200
7  overcrowding cells; is that correct?
8      A. I think it refers to -- I think they were
9  referring to nontraditional beds.
10     Q. Okay. Do you know -- do you have an
11 understanding of whether this paragraph refers to
12 those beds, the nontraditional beds?
13     A. It's my understanding it does not apply to
14 the nontraditional beds.
15     Q. And why is that your understanding?
16     A. The management level overcrowding was always
17 applied to housing, for those spaces designed for
18 housing and built for housing. Your nontraditional
19 beds are beds in non- -- in areas not designed for
20 housing and built for housing. That's why they're
21 in the gymnasiums and that's why they're in the
22 dayrooms.
23     Q. So just to clarify, the 18,200
24 nontraditional beds are beyond the CDCR's
25 'manageable level of overcrowding'; is that correct?