# EXHIBIT 17

**Deposition of George Sifuentes
December 15, 2007
(Designations)**

**Part D**

1    MR. McCLAIN: Objection, lacks foundation,
2 vague.
3    THE WITNESS: As it applies to housing, it
4 doesn't -- it doesn't apply to nontraditional beds.
5 This concept was applied to housing.
6    BY MS. WHELAN:
7    Q. Okay. So let's take a step back.
8       Will you describe for me what the phrase
9 "manageable level of overcrowding" means?
10    A. Yes. To me it means that corrections,
11 through its experiences, has determined that at
12 certain -- for certain types of inmates, in certain
13 types of housing, whether it -- whether it be a
14 dormitory or whether it be a cell, that there were
15 certain levels of the overcrowding that were
16 acceptable, that it was safe to house those inmates.
17    Q. So going back to page 7135, and there's a
18 chart here that we discussed earlier, that refers to
19 the housing of every inmate throughout the CDCR
20 ranging from Level I through Level IV in the
21 reception centers, in the women's facilities, in the
22 administrative segregation unit, the secured housing
23 units, the EOP units, the PSU units, and condemned;
24 is that right?
25    A. That's right.

GEORGE SIFUENTES

```
 1        Q. Did these descriptions refer to the
 2   "manageable level of overcrowding"?
 3        A. Yes, they do.
 4        Q. So, for instance, in Level I, the manageable
 5   level of overcrowding is that all housing units are
 6   double bunked in dorms; is that correct?
 7        A. That's correct.
 8        Q. But it's your experience that there are now
 9   triple bunks in dorms; is that correct?
10        A. Yes, that's correct.
11        Q. Same thing for the dormitory housing in
12   reception centers, the manageable level is double
13   bunking; is that correct?
14        A. Yes, for reception centers.
15        Q. Have you observed triple bunking in
16   reception center dorms?
17        A. No, I haven't.
18        Q. Have you been to reception center dorms?
19        A. Yes, I have.
20        Q. Which ones have you been to?
21        A. Wasco, North Kern, CIM, for example.
22        Q. And were they double bunked at the time?
23        A. Yes, they were double bunked, all within the
24   dormitory -- all within the footprint for housing.
25        Q. Okay.
```

1    And when was the last time that you visited
2 one of those?
3    A. Whoa. I would went to CIM, it would have
4 been -- the last one probably in the reception
5 center area, earlier this year, February or March.
6    Q. And what about Wasco?
7    A. Wasco and North Kern was probably a year
8 prior to that.
9    Q. So February or March of 2006?
10    A. Right.
11    Q. So again, the paragraph states that 18,200
12 inmates are in nontraditional overcrowding, so that
13 means beyond the "manageable level of overcrowding"
14 that the CDCR standard assumes; is that correct?
15    A. That's correct.
16    MR. McCLAIN: Counsel, are we at a good time to
17 take another break or close to a good time?
18    MS. WHELAN: Yes.
19    MR. McCLAIN: Okay.
20    MS. WHELAN: Let me just see if I can finish up
21 this document.
22    MR. McCLAIN: All right.
23    BY MS. WHELAN:
24    Q. The last page that I'm going to talk about
25 for now is 7263.

1  generally familiar with the status of the AB 900
2  reentry program as of the time that you left OFM in
3  October of 2007?
4       A. No.
5       Q. So you had no direct involvement?
6       A. No direct involvement.
7       Q. Okay.
8       A. Purposely.
9       MS. WHELAN:  You're a wise man.
10          (Plaintiffs' Exhibit No. 30 was marked for
11  identification.)
12       BY MS. WHELAN:
13       Q. Exhibit 30 is a December 18th, 2006
14  memorandum from the Office of Facilities Management
15  Support Services regarding Significant Issues.
16          Have you seen this document before?
17       A. Yes, I created it.
18       Q. Okay.
19          Now this document was created prior to AB
20  900; is that correct?
21       A. That's correct.
22       Q. Under No. 1, which is titled Bed Capacity
23  and Population Growth, this document states:  "The
24  CDCR continues to experience severe inmate
25  overcrowding conditions and population growth.  CDCR

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  will be out of capacity this summer.  Most of our
2  institutions are overcrowded by nearly 200 percent.
3  The CDCR has proposed a plan that includes building
4  16,238 beds at existing state properties.  The
5  Office of Facilities Management will require over
6  300 staff to perform this work."
7           We've talked about staffing before, but this
8  staff relates in particular to the preAB 900 in-fill
9  program; is that correct?
10          A. Yes.
11          Q. And of the 300 staff members who were
12 required to do this work, were those positions still
13 required after AB 900 was passed?
14          A. That depends.
15          And the reason I say that is the number
16 there for 300, again, it was in December of 2006,
17 this document was prepared because we were getting a
18 new undersecretary, his name is Steve Kessler, he
19 came over from the Department of Finance, and we had
20 been asked, each division that was reporting to
21 him -- you can see the org chart, there's quite a
22 few people reporting to him -- if they could
23 designate what they thought were the top five
24 significant issues that you would want to brief
25 someone on immediately.

1  And so that's what this list represents.
2  The 300 staff there represents the in-fill
3  bed plan at -- as we had proposed in the summer of
4  2006 as part of the special session. And as we
5  believed was going to be submitted again with the
6  release of the governor's budget, and subsequently
7  it was.
8  In that, if you'll go back to a couple of --
9  go back to one of the attachments, we talked about
10 how many sites inmate ward labor would be at and how
11 many sites, I think it was 13. The inmate ward
12 labor program is -- is operated out of the Offices
13 of Facilities Management. And in that program, we
14 employ inmates to build -- to construct.
15 They don't do it by themselves, it's under
16 the supervision of state staff, and there's usually
17 state construction supervisors, and there's, you
18 know, specialists such as plumbers or electricians.
19 That three -- 200 of that staff would have
20 been working for the inmate ward labor program, when
21 the program would be ready to go.
22 The first 100 -- I talked about getting a
23 hundred. It was to get the design of the projects
24 going, to get them directed, to get them managed.
25 If inmate ward labor was still involved in

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  the program, if they were going to be doing
2  building, they were going to have to hire another
3  200 people for the construction period.
4      So, my purpose in this statement was saying,
5  this is how big the program can get for you without
6  phasing it out. Which would -- which that
7  discussion would have occurred at a later date.
8      Q. So going back to something which you said
9  was explaining why you wrote this document to begin
10 with. Correct me if I'm wrong, you said that this
11 was intended to be a -- a list of the top priority
12 items from the perspective of the Office of
13 Facilities Management existing within the CDCR at
14 this time.
15     A. Well, they were the --
16     Q. Is that correct?
17     A. They were the most significant issues that
18 we felt someone coming new into or, you know, my new
19 supervisor, coming in new, these would be where my
20 discussions would begin about issues facing
21 Facilities Management.
22     Q. And this was for the benefit of the new
23 undersecretary, Mr. Kessler?
24     A. Kessler, that's correct.
25     Q. And are these priorities in order?

GEORGE SIFUENTES

Page 207

1  A. They were in my order, yes.
2  Q. So your very top priority was bed capacity
3  and population growth; is that correct?
4  A. Yes.
5  Q. And why was that your very top priority?
6  A. Because in the infrastructure plan that we
7  had submitted previously, that was the No. 1
8  departmental priority was bed capacity.
9  Q. And you stated at that time, which was
10 December 18th, 2006, that the institutions were
11 overcrowded by nearly 200 percent; is that correct?
12 A. That's correct.
13 Q. And do you know if that's -- that level of
14 overcrowding exists today?
15 A. It's dropped a little bit, I understand the
16 department's lost -- not lost, we didn't grow by
17 about 1500 inmates. But it's still near 200
18 percent.
19 Q. And do you have an understanding of why bed
20 capacity and population growth was also the top
21 priority of the CDCR?
22 MR. McCLAIN: Objection, lacks foundation,
23 calls for speculation.
24 THE WITNESS: From the perspective of the
25 Office of Facilities Management, the population

GEORGE SIFUENTES

1  growth was out stripping the available space that
2  had been designed and constructed for housing.
3  There was no more space, and that if population
4  growth continued at the rate it was going to
5  continue, and that there was no plans or nothing in
6  the mill, shall we say, to build additional housing,
7  we were going to have more and more and more and
8  more overcrowding.
9       BY MS. WHELAN:
10      Q. And do you think that the population was
11 also taking over other space besides housing, such
12 as programming space?
13      A. Well, I knew it has, I knew it had, because
14 we had been in gymnasiums, I personally visited
15 those.  I'd seen the triple bunking, even though
16 most of the triple bunking was in the gymnasiums.
17 And I'd seen some of the triple bunking in the
18 dayroom floor.
19      MS. WHELAN:  Okay.
20      (Plaintiffs' Exhibit No. 31 was marked for
21 identification.)
22      BY MS. WHELAN:
23      Q. Exhibit 31 is a California State Auditor
24 report, entitled High Risk, The California State
25 Auditor's Initial Assessment of High Risk Issues,

```
 1  STATE OF CALIFORNIA       }
                              } ss.
 2  COUNTY OF SAN FRANCISCO   }

 3

 4          I, Nicole Holloway, hereby certify:

 5          I am an employee of Barkley Court Reporters,

 6  duly authorized agent for the deposition officer that

 7  stenographically recorded the testimony in the foregoing

 8  deposition and am authorized to execute this

 9  certificate.

10          The foregoing is a true and correct copy of

11  the original transcript of the stated proceeding.

12

13  Dated    DEC 1 8 2007      .

14

15                          _____
```

**BARKLEY**
Court Reporters