# EXHIBIT 18

**Deposition of George Sifuentes
December 15, 2007
(Counter-Designations)**

# DEPOSITION OF GEORGE SIFUENTES

RALPH COLEMAN, et al.

V.

ARNOLD SCHWARZENEGGER, et al.

DECEMBER 14, 2007

CONDENSED TRANSCRIPT AND KEYWORD INDEX

BARKLEY
Court Reporters

(310) 207.8000  Los Angeles          (916) 922.5777  Sacramento       (818) 702.0202  San Fernando Valley
(949) 955.0400  Orange County        (408) 885.0550  San Jose         (858) 455.5444  San Diego
(415) 433.5777  San Francisco        (951) 686.0606  Inland Empire    (760) 322.2240  Palm Springs

Page 13

1  you were a named defendant?
2      A. Yes.
3      Q. And have you ever been a named plaintiff in
4  a case?
5      A. No, I don't believe so.
6      Q. In preparation for your deposition today did
7  you review any documents?
8      A. No.
9      Q. Did you meet with an attorney in preparation
10 for the deposition?
11     A. Yes.
12     Q. I don't want you to tell me the content of
13 your conversations, but can you tell me when you met
14 with your attorneys?
15     A. Wednesday night.
16     Q. Wednesday night?
17     A. Yes, this past Wednesday.
18     Q. And how long did you meet?
19     A. For approximately an hour.
20     Q. And who did you meet with?
21     A. Ms. Lisa Tillman.
22     Q. And when you met with Ms. Tillman, did you
23 review any documents?
24     A. No.
25        Also Michael Stone.

Page 14

1      Q. Michael Stone?
2      A. Yeah.
3      Q. And was that the only time that you met with
4  an attorney for this deposition?
5      A. Yes.
6      MS. WHELAN: We noticed your deposition today,
7  which is why you're here. I'm going to mark as
8  Exhibit 1, your notice of deposition for the court
9  reporter.
10        (Plaintiffs' Exhibit No. 1 was marked for
11 identification.)
12     BY MS. WHELAN:
13     Q. Have you seen this before? Does it look
14 familiar to you?
15     A. Yes, I've seen it before.
16     Q. Okay.
17        I want to spend a little bit of time on your
18 general background. I know that you're -- I saw, I
19 think, a statement saying that you've been with the
20 Department for something like 20 years, is that
21 true?
22     A. I was with Department of Corrections -- I've
23 been with Corrections or was with Corrections since
24 19- -- from 1987 to this past October.
25     Q. Okay. And then what happened in October?

Page 15

1      A. Oh, I transferred over to Cal -- what's
2  known as Cal PIA, Prison Industries.
3      Q. And is that a separate state agency from the
4  CDCR?
5      A. It is part of CDCR, I'm not sure it's a
6  state agency. It's a state entity but I'm not sure
7  it's an agency, it has a funny -- funny authority.
8      Q. And what does the acronym stand for?
9      A. Cal -- well, Cal is, you know, short for
10 California, then PIA is Prison Industry Authority.
11     Q. So as of October -- strike that.
12        Before October you were with the Office of
13 Facilities Management, is that correct?
14     A. That's correct.
15     Q. And then in October of this year you moved
16 over to Cal PIA?
17     A. That's correct.
18     Q. I'm sorry, what's your position at Cal PIA
19 now, your title?
20     A. I head up the modular building enterprise.
21     Q. Okay, let's go back to that in a minute.
22     A. Okay.
23     Q. Can you just give me a brief description of
24 your educational history since high school?
25     A. Yes. I attended University of California at

Page 16

1  Davis and received a bachelor's in economics and a
2  bachelor's in political science in 1975.
3         And that's it for formal education.
4      Q. Okay, so no graduate school?
5      A. No graduate school.
6      Q. And prior to working for the California
7  Department of Corrections, where did you work?
8      A. State of California, the Department of
9  Social Services Benefit Payments.
10     Q. And what did you do in that position?
11     A. Oh, I had a number of jobs there, started
12 off as a welfare case reviewer, worked in research,
13 worked in audits, and administrative services jobs.
14     Q. How many years were you with the Department
15 of Social Services you said?
16     A. It was -- it was Benefit Payments and then
17 it got renamed Social Services. I started in '75,
18 and was there until I moved to Corrections, which
19 was in '87.
20     Q. So you did a variety of jobs within the
21 Department of Social Services?
22     A. Right.
23     Q. And what was your first position with the
24 CDCR?
25     A. My first position with the CDCR was chief of

Page 17

1  correctional officer recruitment and selection.
2      Q. How long were you in that position?
3      A. I did that job for about a year.
4      Q. What was your second position?
5      A. Then I moved over to what was known at the
6  time as Planning and Construction, which eventually
7  became the Office of Facilities Management. But
8  when I initially started with Planning Construction
9  I was a project director.
10     Q. And when you took that job as a project
11 director, did you go through any kind of licensing
12 process?
13     A. No.
14     Q. Do you have any construction related
15 licenses?
16     A. No.
17     Q. And could you give me just a brief
18 description of the various titles you've held in the
19 Office of Facilities Management?
20     A. Sure.
21         After project director, then I became the
22 chief of the construction operations branch. Then I
23 became the assistant deputy director of the Office
24 of Facilities Management. And then ultimately the
25 deputy director of facilities management.

Page 18

1      Q. And how long did you hold the position of
2  deputy director of Office of Facilities --
3      A. I started acting in that position since
4  March of 2004.
5      Q. So in March of 2004 through October of --
6      A. October.
7      Q. Of 2007?
8      A. Right.
9      MS. WHELAN: This is an organizational
10 structure chart that I just printed off from the
11 CDCR website, I'll mark it as Exhibit 2, if you
12 could.
13     (Plaintiffs' Exhibit No. 2 was marked for
14 identification.)
15     BY MS. WHELAN:
16     Q. I just want to get the structure of Office
17 of Facilities Management down.
18         It appears that it's directly under the
19 Facility Planning Construction and Management Team;
20 is that correct? I know the writing is a little
21 small.
22     A. Well, the Office of Facilities Management no
23 longer exists, it was renamed to the Facility
24 Planning Construction Management when Ms. Deborah
25 Hysen was appointed to that position.

Page 19

1      Q. Okay, I see.
2          So previously it was in this box where you
3  now see the -- the Facility Planning Construction
4  and Management position?
5      A. No. Previously the Office of Facilities
6  Management -- prior to this, I hadn't seen this org
7  chart, but was reporting to the director's division
8  of support services, if you looked at the left-hand
9  side of that chart.
10     Q. Okay.
11     A. It would have been a box reporting to the
12 director of divisions of support services.
13     Q. And who was the director of the division of
14 support services at the time that you were the
15 deputy director of the Office of Facilities
16 Management?
17     A. Well, there were twelve people that held
18 that position when I was there, but the last one, it
19 was Heidi, Heidi.
20     Q. So Heidi Lackner, who is listed on this
21 chart?
22     A. Right. Right.
23     Q. She was your direct report above --
24     A. For about -- for about no more than a week.
25     Q. Okay.

Page 20

1      A. Ms. Lackner got appointed at about the same
2  time as Hysen got appointed.
3      Q. Okay.
4      A. But prior to that would have been Sandra
5  Dubineck.
6      Q. And who was the director of the OFM when you
7  were there?
8      A. Oh, back in '80?
9      Q. No, I'm sorry.
10         Was the deputy director the highest position
11 in the OFM?
12     A. That's correct.
13     Q. Okay.
14     A. Yeah.
15     Q. What happened in October of 2007 that
16 prompted you to change jobs to a different agency?
17     A. Oh, a new opportunity for me, over at Cal
18 PIA.
19     Q. And what is your position there?
20     A. I head up the modular building enterprise
21 program.
22     Q. And you consider that to be a promotion from
23 your position at OFM?
24     A. No, not necessarily promotion, but a new
25 opportunity.

```
 1  existing Salinas Valley facility that was already
 2  there. It was -- so these were in addition to those
 3  beds. So this would have handled -- not handled,
 4  they would have housed the same level of inmates
 5  that were at the Salinas Valley facility, and those
 6  were acute level, high-level security inmates.
 7      Q. I know you're not a mental health clinician
 8  and so I want to just clarify for you and make a
 9  representation to you, because I don't want to hold
10  you to this position, but I understand that you
11  believe that acute care inmates were going to be
12  housed in this facility. But it's my understanding
13  that it is intermediate care facility beds that were
14  being built at D-5 and D-6. And that the acute beds
15  for men at this time were at the CMF Vacaville
16  hospital.
17      Does that sound correct to you?
18      A. No.
19      Q. Okay. So you -- you believe that acute men,
20  Level IV men were going to be housed in these units?
21      A. What my understanding was that the
22  department was severely short on high level acute
23  care beds. And that you could not -- you had a very
24  limited number of beds at CMF to do that.
25      The only other place that they were being
                    Page 41
```

```
 1  housed was at Salinas Valley, the original facility.
 2  And that we were -- we converted Delta 5 and Delta 6
 3  to house additional men that had the same security
 4  and same type of care required that was at Salinas
 5  Valley.
 6      Q. How many beds were there in the D-5 and D-6
 7  units?
 8      A. Oh, I want to say 52 in each, 50 or 52.
 9      So there would have been, in total, between
10  a 100 and 104.
11      Q. Okay. I'm going to represent to you that
12  the Salinas Valley D-5 and D-6 units house
13  intermediate care facility patients that are high
14  level, as you said, Level IV.
15      A. Okay.
16      Q. If you refer to this last page of the
17  Navigant, intermediate male celled housing is the
18  third category down. And you'll see that as of July
19  13th, 2007 there is a bed deficit of 29 beds, and
20  then it shows deficits of 49 beds in fiscal year
21  2007-8, five beds in fiscal year 2008-9 and 20 beds
22  in fiscal year in fiscal year 2009-10. Do you see
23  that?
24      A. Yes, I do.
25      Q. Do you have any understanding of whether
                    Page 42
```

```
 1  these -- the numbers above the -- strike that.
 2      Do you have any understanding of whether
 3  the -- the column that says intermediate male celled
 4  housing refers to existing housing including
 5  temporary units such as D-5 and D-6?
 6      MR. McCLAIN: Okay, objection, lacks
 7  foundation, calls for speculation.
 8      THE WITNESS: I don't know what those
 9  numbers --
10      BY MS. WHELAN:
11      Q. So you have no understanding of these
12  numbers or where they came from?
13      A. No, I don't -- yeah, I don't know what
14  the -- the numbers are made up of, whether they
15  include or do not include temporary housing.
16      Q. Okay, thank you.
17      Do you have any understanding of whether or
18  not since the time that Mr. Brewer's memo was
19  issued, which is Exhibit 4 for this deposition,
20  additional treatment rooms or interview rooms were
21  built in D-5 and D-6?
22      A. I do not know.
23      MS. WHELAN: This will be marked as Exhibit 5.
24      (Plaintiffs' Exhibit No. 5 was marked for
25  identification.)
                    Page 43
```

```
 1      BY MS. WHELAN:
 2      Q. Exhibit 5 consists of a June 26, 2007 e-mail
 3  from Dean Borg to Doug McKeever, entitled mental
 4  health major capital outlay projects, with an
 5  attachment of the same title. Have you ever seen
 6  this document before?
 7      A. I probably have.
 8      Q. And you say you probably have, why do you
 9  say you probably have?
10      A. We used to keep lists of what we thought
11  were current capital outlay projects, and so -- and
12  there were many of them, so I suspect that I've seen
13  this list.
14      Q. Okay.
15      This is a list showing mental health major
16  capital outlay projects as of June 26, 2007. If you
17  could just refer back again to this last page of the
18  Navigant report also, just keep them both next to
19  you.
20      Above, midway down the page.
21      A. Okay.
22      Q. This report shows -- refers to EOP, GP, male
23  bed need.
24      MR. McCLAIN: You're talking about the Navigant
25  report?
                    Page 44
```

1  MS. WHELAN: The Navigant report.
2  Q. And it shows deficits of EOP male beds as of
3  2007. As of July 13th, 2007 there's a deficit of
4  270 beds, fiscal year 2007-2008 there's a deficit of
5  370 beds?
6  A. Uh-hmm.
7  Q. Fiscal year 2008-2009 there's deficit of 454
8  beds and fiscal year 2009 to 2010 there's a deficit
9  of 520 beds. And then this document shows surplus
10 beds.
11     Do you see that?
12 A. Yes, I do.
13 Q. Referring back to the 6-26-07 mental health
14 major capital outlay project document, is it correct
15 that on that document there are no EOP construction
16 projects for men under the currently under
17 construction category?
18 A. That's not correct, the very first one says
19 EOP treatment space for 384 inmates.
20 Q. I'm under the "currently under
21 construction"?
22 A. Oh, I apologize.
23 Q. That's okay.
24 A. That's correct, 50 mental crisis beds and 64
25 intermediate care facility beds.

Page 45

1  Q. Now moving to the "currently under design"
2  category, you referred to a project for treatment
3  space for EOP inmates at CSP Sacramento.
4     Do you agree that that project will not
5  create new EOP beds?
6  A. That's correct.
7  Q. Moving down to the second project under
8  "currently under design," CSP Los Angeles County,
9  EOP treatment space for 150 inmates. Do you agree
10 that that will not add any EOP beds for male
11 inmates?
12 MR. McCLAIN: Just a minute. Object as to
13 lacks foundation and vague.
14 THE WITNESS: But that's correct.
15 BY MS. WHELAN:
16 Q. And there are no other EOP projects listed
17 under the "currently under design" category, do you
18 agree?
19 A. I agree.
20 Q. Then there's a third category of projects
21 that have not began design pending funding
22 decisions. There are four projects listed,
23 including Salinas Valley State Prison, 70 Ad Seg-EOP
24 bed project, do you see that?
25 A. Yes, I do.

Page 46

1  Q. You agree that that would add 70 EOP ad seg
2  beds, correct?
3  A. Housing beds, yes, it would.
4  Q. But it would not add any EOP general
5  population beds, correct?
6  A. I'm not sure I agree with that. It could.
7  Q. If it's an administrative segregation EOP
8  units it could house?
9  A. It would be -- yes, I do.
10 Q. And why do you say that?
11 A. Because you build it to administrative
12 segregation standards, but you could operate it as
13 anything less than that, which general population
14 celled housing would be one of those.
15 Q. Okay.
16 A. So it could provide capacity.
17 Q. Okay. And at the time that this document
18 was create, which appears to be June 26th, '07, that
19 project had no funding; is that correct?
20 A. That's correct.
21 Q. And then there is a Salinas Valley State
22 Prison EOP treatment space for 96 inmates, do you
23 agree that that would not add any EOP beds for male
24 inmates?
25 A. Yes, I agree.

Page 47

1  Q. Now referring to the one project on this
2  document that has the potential to add EOP beds for
3  men, which is the one that you and I discussed, the
4  Salinas Valley State Prison 70 administrative
5  segregation/EOP bed unit, do you know what the
6  status of that project is?
7  A. No, I do not.
8  Q. Do you know if that project has been funded?
9  A. No, I do not.
10 Q. Do you know if that project has been
11 subject -- strike that.
12     Do you know if the department has submitted
13 a budget change proposal for that project?
14 MR. McCLAIN: I'm going to object to that as
15 deliberate process privilege.
16     You can answer if you know.
17 THE WITNESS: I don't believe it has.
18 BY MS. WHELAN:
19 Q. Do you have any knowledge whether AB 900
20 will be a source of funding for that project?
21 MR. McCLAIN: Objection, lacks foundation,
22 calls for speculation.
23 THE WITNESS: AB 900 does authorize mental
24 health beds.
25 BY MS. WHELAN:

Page 48

Page 49

1  Q. Do you know if AB 900 is a funding source
2  specifically for the 70-bed administrative
3  segregation EOP unit at Salinas Valley?
4      MR. McCLAIN: Objection, lacks foundation,
5  calls for speculation.
6      THE WITNESS: That, I do not know.
7      BY MS. WHELAN:
8  Q. You testified that -- I should say, you
9  agreed that on this mental health major capital
10 outlay project list only one project would add
11 EOP -- potentially add EOP male beds?
12 A. Yeah, and I wish to correct that.
13     I also would note that the five consolidated
14 care centers that are listed at the bottom of that
15 page, the last page, which are under projects that
16 have not begun design pending funding decisions, the
17 ones listed were CSP Sac, for CSP Los Angeles, for
18 CMC, for California Institution for Men, and for RJ
19 Donovan Correctional Facility, they would have
20 added, under the concept of a consolidated care
21 center at the time that I understood it, it would
22 have added EOP beds, it would have added
23 intermediate beds, and it would have added acute
24 beds all in one consolidated care center. So there
25 would have been added capacity, if my understanding

Page 50

1  of the definition of consolidated care center still
2  is correct, so...
3  Q. But as of 6-26-07, there are no projects at
4  all that have been funded that would add EOP male
5  beds for Coleman class members; is that correct?
6      MR. McCLAIN: Objection, lacks foundation,
7  calls for speculation.
8      THE WITNESS: My understanding, there was no
9  funding for EOP housing beds.
10     BY MS. WHELAN:
11 Q. And there are no projects listed on here
12 that would create EOP beds for male inmates that are
13 funded at this time; is that correct?
14 A. That's correct.
15     MS. WHELAN: This is Exhibit 6 for the
16 deposition.
17     (Plaintiffs' Exhibit No. 6 was marked for
18 identification.)
19     BY MS. WHELAN:
20 Q. Which is a July 5th, 2007 memorandum to Jim
21 Martone from George Sifuentes, and attached to this
22 memorandum are what appear to be summaries of
23 Coleman bed plan projects, including the California
24 Men's Colony, 50-bed mental health crisis bed
25 facility on page 1 of that attachment.

Page 51

1      The Salinas Valley State Prison 70-bed
2  enhanced outpatient program/administrative
3  segregation unit on page 3.
4      The Los Angeles county 150 -- strike that.
5      The California State Prison L.A. County
6  mental health program and treatment space for 150
7  EOP patient project.
8      And on that same page, the California State
9  Prison Sacramento treatment space project for 384
10 EOP inmate patients.
11     Is that correct?
12 A. That's correct.
13 Q. Looking at the Salinas Valley State Prison
14 70-bed EOP unit, which is the same project we've
15 been discussing.
16     At the time of this memorandum, was this
17 project funded?
18 A. No.
19 Q. On the second page there's a project
20 schedule which projects an approval of preliminary
21 plans by August 2008, completion of working drawings
22 by May 2009, construction start by May 2009 and
23 construction and completion by July 2011, do you see
24 that?
25 A. Yes, I do.

Page 52

1  Q. Did you create that schedule?
2  A. No, my staff would have created that
3  schedule.
4  Q. And did they create it under your
5  supervision?
6  A. Under my direction.
7  Q. Do you know if this schedule still applies
8  to this project?
9  A. No, I do not.
10 Q. The first project listed is the 50-bed
11 mental health crisis unit at California Men's
12 Colony.
13     Do you know if this project is currently
14 funded?
15 A. No, I do not.
16 Q. Do you have any knowledge of whether or not
17 this project is under construction right now?
18 A. No, I do not.
19 Q. You do not know either way?
20 A. (Shakes head from side to side.)
21 Q. If you could just answer verbally for the
22 court reporter?
23 A. Oh, no.
24 Q. Okay.
25     Thank you.

 1  A. No, I do not.
 2  Q. And then the 150 enhanced outpatient program
 3  treatment space project at LAC, do you have any
 4  knowledge of whether that project is moving forward?
 5  A. No, I do not.
 6  Q. At the time you issued this memorandum in
 7  July, was that project funded?
 8  A. Well, I don't know if I ever issued this
 9  memo, because it's unsigned and -- and so I don't
10  know if this was ever issued. It's not uncommon for
11  me to ask staff to prepare public work board agenda
12  for upcoming August -- well, for upcoming boards,
13  and to include in it items that we may have to go
14  forward with. These would have been projects that
15  we would have had to go forward with.
16     But the -- getting back to your question
17  about the 150 EOP treatment space at CSP Lancaster
18  and 384 at CSP Sacramento, it was partially funded,
19  the preliminary plans for a phase of those projects
20  was funded.
21  Q. Does that -- is that why it says on the
22  second page next to preliminary plans, 2006 budget
23  act?
24  A. That's correct. That's -- that was the
25  funding authority for that phase of the project.

Page 53

 1  Q. And do you have any knowledge whether taking
 2  the Lancaster 150 treatment space project first,
 3  whether that project is moving forward?
 4  A. To my knowledge, it is not moving forward.
 5  Q. And as to the 384 EOP treatment space
 6  project at Sacramento?
 7  A. To my knowledge, that one's not -- that
 8  one's not moving forward either.
 9  MS. WHELAN: Should we take a break? I think
10  we've been going for --
11  MR. McCLAIN: That would be a good time.
12  (Recess.)
13  (Ms. Richardson exits proceedings.)
14  BY MS. WHELAN:
15  Q. Mr. Sifuentes, are you aware that in July of
16  2007 Special Master Keating -- well, first do you
17  know who Special Master Keating is?
18  A. Yes, I do.
19  Q. Okay. And who is he?
20  A. He is the special master for the Coleman
21  court.
22  Q. Are you aware in July of 2007 that Special
23  Master Keating filed a report and recommendations
24  about reception center EOP programs?
25  A. Yes, I understand he did file a report.

Page 54

 1  Q. And do you understand that one issue he
 2  raised in that report was his finding that the
 3  reception center EOP programs were not meeting
 4  required standards in large part because of the lack
 5  of treatment and staffing space available in those
 6  units?
 7  A. I'm not sure what the reasons were, but I
 8  understand that he did have criticism of the EOP
 9  programming reception centers. I did not personally
10  read the report.
11  Q. Were you personally involved in any
12  construction projects regarding programming or
13  treatment space in the EOP reception centers?
14  A. No.
15  Q. So at the time that you left in -- the OFM
16  in October 2007, the OFM was not involved in any
17  projects related to programming or treatment space
18  at the EOP reception center projects; is that
19  correct?
20  A. That's correct.
21  MS. WHELAN: This is a big one.
22  (Plaintiffs' Exhibit No. 7 was marked for
23  identification.)
24  MS. WHELAN: Exhibit 7 is a CDCR five-year
25  infrastructure plan from 2008 to 2013.

Page 55

 1  Q. And Mr. Sifuentes, your name is on the cover
 2  page of that document, do you see that?
 3  A. Yes.
 4  Q. Were you involved in creating this document?
 5  A. Yes, I was.
 6  Q. This document does not have a date on it
 7  that I could find, do you know when this report was
 8  issued?
 9  A. I do not know if the report has been issued.
10  Q. So it's your understanding that this report
11  may not be public, is that true?
12  A. That's correct.
13  Q. Do you know what people would have received
14  a copy of this report?
15  A. The Department of Finance, capital outlay
16  section would have received a signed copy of the
17  report.
18  Q. Okay.
19    And where would the signature page appear?
20  A. There would have been -- typically there
21  would have been a transmittal letter from -- from
22  the agency secretary to the Department of Finance
23  transmitting report.
24  Q. And who would know whether or not this
25  report was ever transmitted?

Page 56

14 (Pages 53 to 56)

GEORGE SIFUENTES

**Page 69**

1  stakeholders were in favor of were represented in
2  this report.
3      And then make sure it was completed. And
4  then to make sure that the projects from -- from
5  that matrix from priority standpoint were in fact
6  the priorities of the department. That was my role.
7      Q. And how would you make sure that those were
8  the priorities of the department?
9      A. My staff and I would meet with the
10 respective deputy directors who -- whoever put forth
11 the request, making sure that they were represented
12 in here and in the priorities. And then went to
13 executive management to say, here's what we believe
14 the priorities are. And then put that in the
15 listing. And then final approval came when it was
16 signed by the agency secretary and sent to the
17 Department of Finance.
18     Q. Okay.
19        So depending on what the status is of this
20 report, whether it was -- whether it has been issued
21 or not, the list of priorities may have, if it were
22 preliminary, been the OFM's list of priorities that
23 had not yet been approved by the --
24     A. That's correct.
25     Q. -- CDCR?

**Page 70**

1      But if it has been issued, then the list of
2  priorities would have been approved by executive
3  staff members of the CDCR; is that correct?
4      A. This would have been the department's
5  priority listing, that's correct.
6      Q. And one thing that might be helpful would be
7  to determine whether or not this issue -- I mean,
8  this -- I'm sorry, this report was issued. So do
9  you -- I assume you're going to have to do that at
10 some point anyway, and that you will let me know
11 about that, is that true?
12     MR. McCLAIN: I don't know if it was issued or
13 not, and I don't even know. I don't think I'm going
14 to be able to find that out for you today.
15     MS. WHELAN: Okay.
16     MR. McCLAIN: You're welcome to ask
17 Mr. Sifuentes if he knows of this issue, but I think
18 you've already done that.
19     MS. WHELAN: Okay.
20     Q. If you turn to page 7105, and this is in --
21 this is the first page of the Executive Summary
22 section in this report.
23        About halfway down the page in the Executive
24 Summary there's a paragraph that says, "The most
25 urgent concern facing the CDCR is overcrowding. The

**Page 71**

1  CDCR continues to experience an increase in all
2  levels of the adult inmate population. This has
3  created severe overcrowding and significantly
4  impacted the CDCR's ability to provide mandated
5  treatments and programming, as the CDCR is forced to
6  implement the use of nontraditional beds in
7  gymnasium rooms, dayrooms, program areas and
8  hallways."
9      Do you see that paragraph?
10     A. Yes, I do.
11     Q. Do you agree with the statement that the
12 most urgent concern facing the CDCR is overcrowding?
13     MR. McCLAIN: Objection, lacks foundation,
14 calls for speculation.
15     THE WITNESS: I agree that overcrowding is a
16 serious concern facing the department.
17 BY MS. WHELAN:
18     Q. Do you agree, based on your experience with
19 the Office of Facilities Management that there was
20 severe overcrowding in the CDCR when you were
21 working with the OFM?
22     MR. McCLAIN: Objection, lacks foundation.
23     THE WITNESS: CDCR is facing overcrowding in
24 its adult inmate population. It is also facing a
25 staff shortage, and I think those two things are the

**Page 72**

1  most critical issues for the department.
2  BY MS. WHELAN:
3      Q. And when you say staff shortages, what do
4  you mean?
5      A. Correctional officer staff, administrative
6  staff, program staff. And by program, I'm including
7  medical mental health, but education staff, drug
8  rehabilitation staff, all -- that's what I mean by
9  program. The department does have a severe staffing
10 shortage at all of its levels.
11     Q. And do you agree with the statement here
12 that severe overcrowding significantly impacts the
13 CDCR's ability to provide mandated treatment?
14     (Ms. Richardson re-enters proceedings.)
15     MR. McCLAIN: Objection, lacks foundation.
16     THE WITNESS: I believe that overcrowding
17 impacts the department's ability to provide
18 treatment programming for two reasons, one, it takes
19 staff to get people to the program, and two, if they
20 are being housed in spaces that were designed for
21 treatment, then that is -- then that is taking space
22 away from the treatment.
23 BY MS. WHELAN:
24     Q. And do you agree that severe overcrowding
25 has also resulted in the CDCR being forced to use a

1 great number of nontraditional beds?
2    MR. McCLAIN: Objection, lacks foundation,
3 calls for speculation.
4    THE WITNESS: Well, the overcrowding has
5 required the department to use what we call
6 nontraditional areas for housing.
7    BY MS. WHELAN:
8    Q. And at the time that you left the OFM in
9 October of this year, do you recall approximately
10 how many nontraditional beds were being used for
11 that purpose?
12    A. My recollection is -- was 25,000 beds.
13    Q. Continuing also in the Executive Summary on
14 page 7108 at the bottom. The very last paragraph
15 refers to the OFM receiving instruction from the
16 receiver's office via CDCR healthcare, that only the
17 receiver staff and those CDCR employees within the
18 Plata unit have the authority to write plans for
19 CDCR medical care. And it then says that that plan
20 has not yet been received.
21    Do you see that?
22    A. Yes, I do.
23    Q. Does this mean that the receiver's projects
24 are independent of the Office of Facilities
25 Management?

Page 73

1    BY MS. WHELAN:
2    Q. This refers to "premature degradation at
3 institutions due to a number of factors, including
4 overcrowding." I assume this means wear and tear of
5 facilities and premature ageing.
6    I'm asking if you observed those conditions
7 when you were working for the Office of Facilities
8 Management?
9    A. Yes, I did.
10    Q. And can you give me some examples of those
11 situations where you saw --
12    A. Sure.
13    Q. -- premature degradation?
14    A. Sure.
15    Most common you'd see in water systems,
16 wastewater systems, kitchens, and kitchen systems,
17 because they were having to work at an accelerated
18 pace.
19    Q. And what do you mean by accelerated?
20    A. They were designed to operate at a certain
21 level, based upon an assumption of -- of what they
22 call engineering loads, how much water was going to
23 be used, how much food would be produced or how much
24 sewage was going to be produced. And that is --
25 there's a direct relationship between those loads

Page 75

1    A. What it means is this plan will not reflect
2 those projects for whatever they are. We're not
3 authorized to speak on behalf of the receiver.
4    Q. Okay. So none of the receiver's projects
5 are listed in this plan?
6    A. That's correct.
7    Q. I'm look at page 7117 and I moved into the
8 infrastructure section of this report.
9    Under the heading institutions, the second
10 paragraph states: "Premature degradation of the
11 institutions is not limited to the older CDCR
12 facilities. Mission changes, population growth
13 leading to substantial overcrowding, excessive and
14 accelerated wear and tear caused by overcrowding,
15 rapidly changing technology, and flagrant abuse and
16 sabotage by inmates and youthful offenders has
17 resulted in the accelerated aging and failing
18 conditions of many of CDCR's facilities."
19    Do you see that?
20    A. Yes, I do.
21    Q. Did you witness that kind of deterioration
22 when you were working for the Office of Facilities
23 Management?
24    MR. McCLAIN: Objection, vague.
25    THE WITNESS: What do you mean exactly?

Page 74

1 and the number of people occupying a space.
2    When you get into numbers above and beyond
3 what your -- what you calculated your loads on,
4 which would have driven your design, you then begin
5 having accelerated wear and tear on those systems.
6    Q. And was part of the mission of the OFM to
7 deal with those kinds of infrastructure problems?
8    A. Yes.
9    Q. At the time that you were the deputy
10 director of the OFM, did you have sufficient
11 resources to deal with infrastructure problems at
12 the prison related to overcrowding?
13    A. What do you mean by resources?
14    Q. Sufficient staff or funding?
15    A. Not enough -- facilities managers did not
16 have enough funding to deal with all of the
17 maintenance and repairs that were required at the
18 institutions. It was not the responsibility of the
19 facilities management to perform the maintenance
20 and -- and funding and repair of the institutions,
21 that -- that's done by the -- the local institution.
22 So I can't say that OFM lacks staff per se. What I
23 can say is OFM did not have the money to send in the
24 institutions or have performed on their behalf any
25 maintenance or repair that was required.

Page 76

19 (Pages 73 to 76)

GEORGE SIFUENTES

**Page 85**

1 institution-based beds currently converted to house
2 mental health programming to be converted back to GP
3 housing."
4     Do you have an understanding of what
5 projects that paragraph refers to?
6     A. Well, my understanding is on the long-term
7 would be to prepare project proposals similar to --
8 well, it would have been in response to the bed
9 plan, and preparing proposals for each and
10 respective project that was approved as a result of
11 the bed plan.
12     And obtaining funding -- you know, money to
13 design and construct and implement those.
14     When those were done, according to the bed
15 plan, some of the temporary spaces -- we spoke
16 earlier of Delta 5 and Delta 6 -- that they would be
17 converted back to their original use, because they
18 were temporary. That's what that sentence means.
19     Now what I'm confused about is -- and I know
20 I'm confused because I -- is the term above it, and
21 paragraph above it, consolidated care centers. Is
22 that different than the consolidated care centers of
23 the state-wide mental health plan.
24     Q. Well, it's correct to say that there are
25 other mental health projects other than the CCCs,

**Page 86**

1 right?
2     A. Yes, that's correct.
3     Q. Do you think that this long-term paragraph
4 is referring to those projects?
5     MR. McCLAIN: Objection, lacks foundation.
6     THE WITNESS: I -- the intention of that
7 paragraph was to understand that we needed to
8 under- -- well, we needed to understand that the
9 mental health population had been growing and was
10 going to continue to grow. I think even the
11 Navigant study said that. And that we would have to
12 prepare proposals to make sure we met those needs,
13 whether it was for housing, whether it was for
14 treatment or whether it was for space.
15     MS. WHELAN: Okay, thank you.
16     Q. Moving ahead into the program delivery
17 changes-existing section of this report. And I'm on
18 page 7201.
19     In this chart the first category listed on
20 this page is small management exercise yards Phase
21 I. And it's listed as priority No. 25.
22     And in the solution column it says,
23 "Construct 341 statewide small management exercise
24 yards to replace large group exercise yards in
25 administrative segregation housing units at 15 Level

**Page 87**

1 II and III/reception centers. This phase will build
2 small management yards at various institutions."
3     Are you familiar with this project?
4     A. Yes.
5     Q. At the time that you left the Office of
6 Facilities Management do you recall how many of
7 these small management yards were built?
8     A. These particular ones?
9     Q. Yes. Of the 341.
10     A. I'm not aware of -- of any of the 341 being
11 built, these particular ones.
12     Q. And at the time that you left the Office of
13 Facilities Management, do you know how many small
14 management yards existed within the CDCR?
15     A. Approximately 200 or so.
16     Q. Did you have experience overseeing the
17 construction of small management yards?
18     A. Yes.
19     Q. And where did you oversee construction of
20 those yards?
21     A. Well, statewide, I mean, as a program. With
22 the small management yards, it was approved by the
23 legislature a number of years ago for high security,
24 ad seg, Level IV -- Level IV institutions. And they
25 authorized us to go ahead and -- and install small

**Page 88**

1 management yards at Level IV institutions, which we
2 did.
3     We also included the small management yards
4 in the new ad seg building, which we have. And the
5 plan for the department was to go to all the ad segs
6 statewide and build small management yards,
7 regardless of level of classification. That they
8 were going to start with Level IV, then they were
9 going to go to Level III, then they were going to go
10 to Level II, Level I and reception. And that was --
11 that was the overall plan.
12     MS. WHELAN: I'm looking for the June 1st, 2007
13 Judge Karlton order. And I think it is in here.
14     I apologize to everyone for my delay.
15     Can we mark this as No. 8.
16     (Plaintiffs' Exhibit No. 8 was marked for
17 identification.)
18     MS. WHELAN: We're marking as Exhibit 8 an
19 order issued by Judge Karlton on June 1st, 2007.
20 And this order is regarding suicide prevention and
21 administrative segregation units.
22     Q. If you'd turn to page 2 of the order.
23     First of all, have you seen this order
24 before?
25     A. Yes, I have.

### Page 89

1  Q. Okay.
2     If you'd turn to page 2, the very last
3  partial paragraph, it says: "At present, defendants
4  have only 719 of the 1,480 small management yards
5  required to give necessary out of cell exercise time
6  to inmates in administrative segregation."
7     Does that sound accurate to you, on a
8  statewide level?
9  A. Yeah. I was off by 500, we had many more.
10 Q. Okay.
11    It also says that: "Eighty-six additional
12 yards are under construction, and that defendants
13 are presently seeking authority to fund 179
14 additional yards in fiscal year 2007/8."
15    On the next page it refers to defendant's
16 plan, I'm looking at the last sentence in the very
17 first paragraph. And it says: "As the Special
18 Master found, 2012 is 'simply too late.'"
19    And that's referring to defendant's plan to
20 complete building of these small management yards by
21 2012.
22    Are you familiar with defendant's recent
23 plan regarding small management yards?
24 A. No, I'm not.
25 Q. Which was -- okay.

### Page 90

1     Do you understand where this 1,480 number
2  comes from?
3  A. Yes. They -- as I mentioned earlier, the
4  department had a plan to replace all ad seg -- not
5  to replace, excuse me, but to add all small
6  management yards to all the administrative
7  segregation units throughout the state.
8     We started with Level IVs, and we were
9  moving through doing Level IIIs and Level IIs. And
10 there is a listing of the -- there was one big list
11 that had ad segs, it had some other projects like
12 SHU, and it had, if I recall correctly, PSU. And it
13 was on one listing that -- one -- the person that
14 was a lead for that project had, and -- and that's
15 where the number, about 1,400, came from, in terms
16 of, you know, point in time, here's how many we
17 would need based upon what we know, you know, what's
18 our ad seg population; where are the ad segs being
19 run from; and how many we have.
20    And so we used that as our -- as that's
21 where we need to be. We're at 719 -- this is June,
22 we're at 719. We had a certain number under
23 construction, we had asked for, if I recall, it was
24 design funds for the 179, because that's how many we
25 thought we would do in a year.

### Page 91

1     And the plan, I believe -- the plan that was
2  turned into the court was, we were going to get 179
3  in '07-'08, and then we were going to get another
4  group in '08-'09, another group in '09-'10, another
5  group in '10-'11. When it was all said and done
6  they would all be finished, the entire 1480,
7  would -- would be completed by 2012. But I'm not
8  sure when in 2012.
9  Q. And you just testified that you thought
10 about 179 of these yards could be built in a year;
11 is that correct?
12 A. That's how much we thought we could design
13 and begin construction in a year.
14 Q. Okay.
15 A. It normally takes you nine to ten months to
16 design the work.
17 Q. And so did you have an estimate about how
18 many you could build in a year?
19 A. About 100 -- within a 12-month period, we
20 would -- I think it's fairer to say that we could
21 have completed the 179 within a 24-month period.
22 Q. Okay.
23    And you testified that the 1480 number
24 included small management yards for SHUs and PSUs?
25 A. Yeah. My recollection of the listing is

### Page 92

1  yes, it did.
2  Q. And are you aware that defendant's most
3  recent plan excludes small management yards for SHUs
4  and PSUs?
5  A. I'm not aware of the current plan.
6  Q. Do you know who would make the decision to
7  exclude SHUs and PSUs from the small management
8  plan?
9     MR. McCLAIN: Objection, calls for speculation.
10    THE WITNESS: No, I -- I -- I wasn't involved
11 in that process.
12    MS. WHELAN: Okay.
13 Q. On page 7220 of the infrastructure plan, and
14 this is within the facilities maintenance section of
15 that plan?
16 A. 220.
17 Q. 7220.
18    You testified earlier that the Office of
19 Facilities Management is not directly responsible
20 for preventive maintenance work at the institutional
21 level and that each institution would be responsible
22 for that; is that correct?
23 A. That's correct.
24 Q. At the top of this page it states: "The
25 facility system currently has a backlog of over

Page 93

1  280,000 preventive maintenance work orders that
2  cannot be completed due to low staffing and funding
3  levels. This list has grown from 52 million in
4  fiscal year 2000/2001 to 249 million in fiscal year
5  2006/07. These figures are conservative estimates,
6  generated by the institutions. Additionally, the
7  number of work orders that could not be completed in
8  the last fiscal year exceeded 235,000."
9      Do you have any knowledge of this problem at
10 the institutional level?
11     A. Only from a statewide level. And the reason
12 for that is because a statewide preventive
13 maintenance program is a computer program, and
14 Facilities Management has three staff that in
15 Sacramento collects this data, that's where that —
16 this is where the data came from. It's inputted —
17 inputted by the institutions, and provided to us by
18 the institutions.
19     Q. So your office monitors this to the extent
20 that you input the data that you receive from the
21 institutions?
22     A. No. The institution inputs the data, we
23 have access to the computers and we can read in
24 terms of number of, you know, maintenance work
25 orders outstanding, number completed per month on an

Page 94

1  institution-by-institution-by-institution level.
2  And we use that information to help support and
3  defend some of their requests we were going forward
4  with, with regards to funds for repair or
5  maintenance or replacement thereof.
6      Q. Okay.
7      I've moved into the healthcare section of
8  this report, and it's page 7250.
9      A. 7250.
10     Q. Yes.
11     This section is talking about MHCBs, which
12 are mental health crisis beds. And it states that:
13 "Approximately 264 inmate patients were in an MHCB
14 as of February 20th, 2007, excluding 13
15 inmate-patients on the wait list, for which the CDCR
16 is staffed for capacity of 285 inmate patients. It
17 is important to note that MHCB capacity includes 36
18 beds at the California Men's Colony that were
19 licensed on a temporary emergency basis, and 45
20 acute beds utilized as MHCBs at CMF. Both of these
21 MHCB units must be replaced by permanent
22 facilities."
23     Are you familiar with the temporary units
24 that are referred to in this paragraph, including
25 the 36 bed unit at CMC?

Page 95

1      A. Yes.
2      Q. And this is stating that that is an
3  unlicensed or it's a licensed on a temporary
4  emergency basis; is that correct?
5      A. That's correct.
6      Q. And do you —
7      A. By Judge Karlton's order.
8      Q. Okay.
9      And do you have an understanding of what
10 that means?
11     A. Yes, I do.
12     Q. Can you tell me what that means?
13     A. It meant that the department did not have to
14 bring that — it was existing space, and it's known
15 as the LOU unit at CMC, and it — the judge ordered
16 us to ignore the state ruling that required us to
17 shutdown the LOU because it was not a medical
18 facility or did not meet medical standards. He
19 ordered us to reopen it as a mental health crisis
20 beds on temporary basis. And he also did not
21 require us to bring it to licensing building
22 standards.
23     Q. And is it your understanding that Judge
24 Karlton ordered that due to a severe shortage of
25 these beds statewide?

Page 96

1      A. That is my understanding.
2      Q. And are you also familiar with the 45 bed
3  acute unit at CMF that was being utilized at this
4  time as MHCBs?
5      A. Yes.
6      Q. And can you describe that unit to me?
7      A. Well, that unit is — is — is — was
8  licensed as an acute care facility, and thus
9  utilizing those cells or as mental health crisis
10 beds was well within the — within the parameters of
11 a license. There was an under utilization of acute
12 beds there, and he ordered the department to convert
13 those to mental health crisis beds. And I believe
14 we also ordered mental health to take some of the
15 folks from CMF to their facility, under some kind of
16 population movement program. That was my
17 understanding.
18     Q. And your — when you say department's —
19 folks at the department, I think you said folks at
20 mental health, do you mean the Department of Mental
21 Health?
22     A. Yes. The Department of Mental Health
23 operates these — well, operates a number of beds at
24 CMF, these 45 in particular. Told them to make them
25 mental health crisis beds. And then asked them or

Page 97

1  required them to move some of the people that were
2  in there to some of the mental health's facilities,
3  such as Atascadero and some of the other facilities.
4      Q. And it's your understanding that the judge
5  ordered that swap of acute for MHCB beds due to
6  Coleman class member bed shortages; is that correct?
7      A. I believe -- I believe the judge approved
8  that, I believe the department came forward -- the
9  Department of -- the CDCR and the Department of
10 Mental Health came forward with this plan as a way
11 to address the shortage of mental healthcare crisis
12 beds. And I believe Special Master Keating reviewed
13 the recommendation and made a recommendation to the
14 court to approve that. And I believe Karlton then
15 approved that.
16     Q. Okay.
17        But it's your understanding that the
18 department volunteered that swap of beds due to bed
19 shortages in the CDCR?
20     A. Well, the department offered it as -- as a
21 plan to address the mental health crisis bed
22 shortage.
23     Q. Okay.
24        On page 7251, I'm looking at -- it's still
25 within the health plan section of this report. I'm

Page 98

1  looking at the paragraph referring to ICF beds.
2      A. Uh-hmm.
3      Q. And it talks about, there being the greatest
4  need for high security Level IV ICF beds. And it
5  explains that those high level ICF beds are located
6  at two prisons only, including Salinas Valley
7  psychiatric program and CMF. Is that correct?
8      A. That's correct.
9      Q. It goes on to say that: "These beds are
10 consistently occupied with a waiting list while the
11 remaining ICF beds are dormitory style and remain
12 partially occupied."
13       And the last sentence refers to: "A waiting
14 list for those beds as of March 20th, 2007 of 73
15 inmate patients."
16       Is that correct?
17     A. That's correct.
18     Q. Do you have an understanding of why the
19 dormitory style beds were only partially occupied
20 for these ICF patients?
21     A. Because of -- of concerns expressed by both
22 the Department of Mental Health staff and the CDCR
23 staff as well as the court monitors about the safety
24 and security of these Level IV inmates, in these
25 kind of settings.

Page 99

1      Q. On the next page it refers to acute
2  patients. And it states that: "The population
3  requiring these beds at any given time is quite
4  volatile and on March 21st, 2007, there were 40
5  inmate patients waiting placement into the acute
6  beds at CMF." Is that correct?
7      A. That's correct.
8      Q. You talked at one point about when we were
9  discussing the Coleman bed plan, and you said it was
10 your understanding that in part it was intended to
11 address staffing vacancies; is that correct?
12     A. The Coleman bed plan addressed shortages of
13 space, of staffing, and also addressed many things
14 related to mental health program, staffing was one
15 of the elements, I believe, that was in the -- in
16 the bed plan.
17     Q. Okay.
18       I am on page 7253.
19     A. Okay.
20     Q. The very last bullet point states: "The
21 recent authorization of approximately 806 new
22 positions for the mental health program necessitates
23 additional office and treatment space."
24       When you were working for the OFM, were you
25 involved in the project of creating office space for

Page 100

1  the 806 new mental health staff positions?
2      A. There would have been -- there would have
3  been two ways we -- we would have been involved,
4  No. 1, you know, is whether these were headquarters
5  staff or not; whether they were not located at an
6  institution.
7        One of the responsibilities of the Office of
8  Facilities Management was leasing of space for CDCR,
9  and so -- and headquarters space staff such as
10 myself at the time, we would have gone out and
11 leased space. In fact, they needed more space for
12 headquarters space, so I don't know how much of the
13 106 were headquarters staff. So we would have been
14 involved there, getting more lease space for them at
15 the time they needed the space.
16       In regards to if they were located at the
17 institution, we would have been involved in any
18 planning efforts to try to get them office space or
19 treatment space there at the institution.
20       Now, again, there's two ways to get space,
21 even at the institution. One is to lease it, you
22 could have leased modulars, and that has been used
23 in the past, or there could have been the design of
24 construction and space.
25     Q. So let's take the headquarter part of what

### Page 101

1 you just explained.
2   A. Uh-hmm.
3   Q. As of the time that you left the Office of
4 Facilities Management in October of this year, had
5 you either leased or created additional staffing
6 space for headquarter mental employees?
7   A. We had engaged the Department of General
8 Services at finding more space for the mental health
9 and the dental program.
10   And I know that, that the mental health
11 group moved to some space, I want to say in July,
12 July or August. But we're still looking for more
13 space, because there's additional growth coming.
14   I don't know if they ever secured that
15 additional space.
16   Q. Okay.
17   I'm moving into the housing section of the
18 report, and it's page 7262.
19   A. 62.
20   Q. Under Adult Male Housing Capacity, it
21 talks -- it states: "The conventional wisdom of the
22 American Correctional Association and national
23 standards for prison and jail housing is one inmate
24 per cell."
25   We discussed earlier that several of the

### Page 102

1 cells within the CDC are -- or many of them now are
2 used for two inmates; is that correct?
3   A. In the cells that were built under the new
4 prison construction program, there was the ability
5 to house two inmates per cell. The -- the
6 department standards were to never go to 200 percent
7 cell, it was to go to no more than 90 percent of the
8 cells being double bunked, which means that some of
9 the cells are -- do have two inmates in them, but
10 not all of them.
11   Q. So it was the department's position that
12 they would double cell up to 90 percent of the cells
13 existing within the CDCR; is that correct?
14   A. Depending on the population, yes. If you go
15 back to the chart that we talked about earlier,
16 you'll see the different levels, some are 50
17 percent, some are at 40 percent, some are no
18 overcrowding. It depends on the population and
19 admission.
20   Q. Okay.
21   The next paragraph says: "The CDCR has
22 developed the concept of 'a manageable level of
23 overcrowding.' This refers to the ability of a
24 correctional facility to safely house inmates at
25 occupancy levels above the original design of one

### Page 103

1 inmate per cell, or a single level of bunks, per
2 dormitory. This overcrowding level is based upon
3 California's experience, it's accompanying
4 operational policies and protocols, staffing
5 patterns, and each correctional facility's mission."
6   Earlier in the report it refers to 18,200
7 overcrowding cells; is that correct?
8   A. I think it refers to -- I think they were
9 referring to nontraditional beds.
10   Q. Okay. Do you know -- do you have an
11 understanding of whether this paragraph refers to
12 those beds, the nontraditional beds?
13   A. It's my understanding it does not apply to
14 the nontraditional beds.
15   Q. And why is that your understanding?
16   A. The management level overcrowding was always
17 applied to housing, for those spaces designed for
18 housing and built for housing. Your nontraditional
19 beds are beds in non- -- in areas not designed for
20 housing and built for housing. That's why they're
21 in the gymnasiums and that's why they're in the
22 dayrooms.
23   Q. So just to clarify, the 18,200
24 nontraditional beds are beyond the CDCR's
25 'manageable level of overcrowding'; is that correct?

### Page 104

1   MR. McCLAIN: Objection, lacks foundation,
2 vague.
3   THE WITNESS: As it applies to housing, it
4 doesn't -- it doesn't apply to nontraditional beds.
5 This concept was applied to housing.
6   BY MS. WHELAN:
7   Q. Okay. So let's take a step back.
8   Will you describe for me what the phrase
9 "manageable level of overcrowding" means?
10   A. Yes. To me it means that corrections,
11 through its experiences, has determined that at
12 certain -- for certain types of inmates, in certain
13 types of housing, whether it -- whether it be a
14 dormitory or whether it be a cell, that there were
15 certain levels of the overcrowding that were
16 acceptable, that it was safe to house those inmates.
17   Q. So going back to page 7135, and there's a
18 chart here that we discussed earlier, that refers to
19 the housing of every inmate throughout the CDCR
20 ranging from Level I through Level IV in the
21 reception centers, in the women's facilities, in the
22 administrative segregation unit, the secured housing
23 units, the EOP units, the PSU units, and condemned;
24 is that right?
25   A. That's right.

```
 1    Q. Did these descriptions refer to the
 2  "manageable level of overcrowding"?
 3    A. Yes, they do.
 4    Q. So, for instance, in Level I, the manageable
 5  level of overcrowding is that all housing units are
 6  double bunked in dorms; is that correct?
 7    A. That's correct.
 8    Q. But it's your experience that there are now
 9  triple bunks in dorms; is that correct?
10    A. Yes, that's correct.
11    Q. Same thing for the dormitory housing in
12  reception centers, the manageable level is double
13  bunking; is that correct?
14    A. Yes, for reception centers.
15    Q. Have you observed triple bunking in
16  reception center dorms?
17    A. No, I haven't.
18    Q. Have you been to reception center dorms?
19    A. Yes, I have.
20    Q. Which ones have you been to?
21    A. Wasco, North Kern, CIM, for example.
22    Q. And were they double bunked at the time?
23    A. Yes, they were double bunked, all within the
24  dormitory -- all within the footprint for housing.
25    Q. Okay.
```
Page 105

```
 1    At the top -- this is still within the
 2  housing section of the report. It refers to a --
 3  the top paragraph refers to: "A dangerous level of
 4  triple bunking to some gymnasiums and dormitories.
 5  Triple bunks represent a explosive situation and are
 6  the first to be taken down when the housing capacity
 7  overload diminishes." I just want to confirm that
 8  you personally observed those triple bunking
 9  situations, correct?
10    A. Yes, in the gymnasium.
11    MS. WHELAN: Should we take a break?
12    MR. McCLAIN: Yeah. I mean, are we going to do
13  a lunch break today?
14    MS. WHELAN: Sure.
15    MR. McCLAIN: Is that okay?
16    MS. WHELAN: What time is it?
17    THE REPORTER: 1:00.
18    MS. WHELAN: Would you like to take a --
19    THE WITNESS: It's up to you. How much longer
20  do you think we will have to go?
21    MS. WHELAN: Well, why don't we go off the
22  record here.
23    (Ms. Richardson exited proceedings.)
24    (Whereupon, a lunch recess was taken from 1:01
25  p.m. to 1:30 p.m.)
```
Page 107

```
 1    And when was the last time that you visited
 2  one of those?
 3    A. Whoa. I would went to CIM, it would have
 4  been -- the last one probably in the reception
 5  center area, earlier this year, February or March.
 6    Q. And what about Wasco?
 7    A. Wasco and North Kern was probably a year
 8  prior to that.
 9    Q. So February or March of 2006?
10    A. Right.
11    Q. So again, the paragraph states that 18,200
12  inmates are in nontraditional overcrowding, so that
13  means beyond the "manageable level of overcrowding"
14  that the CDCR standard assumes; is that correct?
15    A. That's correct.
16    MR. McCLAIN: Counsel, are we at a good time to
17  take another break or close to a good time?
18    MS. WHELAN: Yes.
19    MR. McCLAIN: Okay.
20    MS. WHELAN: Let me just see if I can finish up
21  this document.
22    MR. McCLAIN: All right.
23    BY MS. WHELAN:
24    Q. The last page that I'm going to talk about
25  for now is 7263.
```
Page 106

```
 1    AFTERNOON SESSION; 1:33 P.M.
 2    EXAMINATION RESUMED BY MS. WHELAN
 3    MS. WHELAN: I want to shift over a little bit
 4  into AB 900 projects.
 5    This will be the next exhibit.
 6    (Plaintiffs' Exhibit No. 9 was marked for
 7  identification.)
 8    BY MS. WHELAN:
 9    Q. Exhibit 9 is an e-mail chain spanning August
10  9th to August 10th of 2007 involving primarily Nancy
11  Paulus, a staff member at the LAO, and Deborah
12  Hysen, who I believe is the chief deputy secretary
13  of the Facility Planning Construction and Management
14  Office; is that correct?
15    A. Right. That's correct.
16    Q. Mr. Sifuentes, this original e-mail from
17  Nancy Paulus of the LAO refers to a project that
18  we've discussed during this deposition, which is the
19  70-bed Salinas Valley State Prison Ad Seg-EOP unit.
20  In Ms. Paulus' e-mail dated August 9th she's
21  referring to a section letter about this project
22  that the LAO received and she then goes on to state
23  that the LAO requested and received additional
24  information about the project. I assume from the
25  CDCR.
```
Page 108

```
 1    A. Yes.
 2    Q. And were you part of that core team
 3  resources team?
 4       I'm sorry, were you part of the secure
 5  reentry facility steering committee?
 6    A. No.
 7    Q. So what does this mean when it lists you as
 8  a core team member?
 9       MR. McCLAIN: Objection, lacks foundation.
10       MS. WHELAN: I'm sorry.
11    Q. A core team resource?
12    A. Resource.
13       MR. McCLAIN: Same objection.
14       THE WITNESS: It -- it -- it is an attempt by
15  whoever put this document together to indicate what
16  other organizations with -- either within CDCR or
17  outside of CDCR could be impacted by this proposal.
18  And that if it moved forward, however way, this
19  would be some of the key folks that you would have
20  to go to discuss with them whatever your initiative
21  was.
22       MS. WHELAN: Okay.
23       (Plaintiffs' Exhibit No. 28 was marked for
24  identification.)
25       BY MS. WHELAN:
```
Page 201

```
 1    Q. Document 28 is an AB 900 Secure Community
 2  Reentry Facilities Portfolio Charter, dated 5-6 --
 3  or revised 5-6-2007.
 4       Have you ever seen this document?
 5    A. No, I haven't.
 6       (Plaintiffs' Exhibit No. 29 was marked for
 7  identification.)
 8       BY MS. WHELAN:
 9    Q. Document 29 is an AB 900 Secure Reentry
10  Program Facilities Portfolio Charter, revised
11  5-22-07.
12       Have you ever seen this document?
13    A. No.
14    Q. And again, you're listed on Exhibit 29 and
15  you're listed on Exhibit 28 under the core team
16  resources section; is that correct?
17    A. Yes, I see that.
18    Q. Were you involved in the reentry portion of
19  AB 900?
20    A. No. On -- on reentry I had -- there were
21  people from Facilities Management that were
22  monitoring that for me, but I personally wasn't
23  involved in these meetings.
24    Q. Okay.
25       Are you generally familiar or were you
```
Page 202

```
 1  generally familiar with the status of the AB 900
 2  reentry program as of the time that you left OFM in
 3  October of 2007?
 4    A. No.
 5    Q. So you had no direct involvement?
 6    A. No direct involvement.
 7    Q. Okay.
 8    A. Purposely.
 9       MS. WHELAN: You're a wise man.
10       (Plaintiffs' Exhibit No. 30 was marked for
11  identification.)
12       BY MS. WHELAN:
13    Q. Exhibit 30 is a December 18th, 2006
14  memorandum from the Office of Facilities Management
15  Support Services regarding Significant Issues.
16       Have you seen this document before?
17    A. Yes, I created it.
18    Q. Okay.
19       Now this document was created prior to AB
20  900; is that correct?
21    A. That's correct.
22    Q. Under No. 1, which is titled Bed Capacity
23  and Population Growth, this document states: "The
24  CDCR continues to experience severe inmate
25  overcrowding conditions and population growth. CDCR
```
Page 203

```
 1  will be out of capacity this summer. Most of our
 2  institutions are overcrowded by nearly 200 percent.
 3  The CDCR has proposed a plan that includes building
 4  16,238 beds at existing state properties. The
 5  Office of Facilities Management will require over
 6  300 staff to perform this work."
 7       We've talked about staffing before, but this
 8  staff relates in particular to the preAB 900 in-fill
 9  program; is that correct?
10    A. Yes.
11    Q. And of the 300 staff members who were
12  required to do this work, were those positions still
13  required after AB 900 was passed?
14    A. That depends.
15       And the reason I say that is the number
16  there for 300, again, it was in December of 2006,
17  this document was prepared because we were getting a
18  new undersecretary, his name is Steve Kessler, he
19  came over from the Department of Finance, and we had
20  been asked, each division that was reporting to
21  him -- you can see the org chart, there's quite a
22  few people reporting to him -- if they could
23  designate what they thought were the top five
24  significant issues that you would want to brief
25  someone on immediately.
```
Page 204

51 (Pages 201 to 204)

GEORGE SIFUENTES

### Page 205

1  And so that's what this list represents.
2      The 300 staff there represents the in-fill
3  bed plan at -- as we had proposed in the summer of
4  2006 as part of the special session. And as we
5  believed was going to be submitted again with the
6  release of the governor's budget, and subsequently
7  it was.
8      In that, if you'll go back to a couple of --
9  go back to one of the attachments, we talked about
10 how many sites inmate ward labor would be at and how
11 many sites, I think it was 13. The inmate ward
12 labor program is -- is operated out of the Offices
13 of Facilities Management. And in that program, we
14 employ inmates to build -- to construct.
15     They don't do it by themselves, it's under
16 the supervision of state staff, and there's usually
17 state construction supervisors, and there's, you
18 know, specialists such as plumbers or electricians.
19     That three -- 200 of that staff would have
20 been working for the inmate ward labor program, when
21 the program would be ready to go.
22     The first 100 -- I talked about getting a
23 hundred. It was to get the design of the projects
24 going, to get them directed, to get them managed.
25     If inmate ward labor was still involved in

### Page 206

1  the program, if they were going to be doing
2  building, they were going to have to hire another
3  200 people for the construction period.
4      So, my purpose in this statement was saying,
5  this is how big the program can get for you without
6  phasing it out. Which would -- which that
7  discussion would have occurred at a later date.
8  Q. So going back to something which you said
9  was explaining why you wrote this document to begin
10 with. Correct me if I'm wrong, you said that this
11 was intended to be a -- a list of the top priority
12 items from the perspective of the Office of
13 Facilities Management existing within the CDCR at
14 this time.
15 A. Well, they were the --
16 Q. Is that correct?
17 A. They were the most significant issues that
18 we felt someone coming new into or, you know, my new
19 supervisor, coming in new, these would be where my
20 discussions would begin about issues facing
21 Facilities Management.
22 Q. And this was for the benefit of the new
23 undersecretary, Mr. Kessler?
24 A. Kessler, that's correct.
25 Q. And are these priorities in order?

### Page 207

1  A. They were in my order, yes.
2  Q. So your very top priority was bed capacity
3  and population growth; is that correct?
4  A. Yes.
5  Q. And why was that your very top priority?
6  A. Because in the infrastructure plan that we
7  had submitted previously, that was the No. 1
8  departmental priority was bed capacity.
9  Q. And you stated at that time, which was
10 December 18th, 2006, that the institutions were
11 overcrowded by nearly 200 percent; is that correct?
12 A. That's correct.
13 Q. And do you know if that's -- that level of
14 overcrowding exists today?
15 A. It's dropped a little bit, I understand the
16 department's lost -- not lost, we didn't grow by
17 about 1500 inmates. But it's still near 200
18 percent.
19 Q. And do you have an understanding of why bed
20 capacity and population growth was also the top
21 priority of the CDCR?
22     MR. McCLAIN: Objection, lacks foundation,
23 calls for speculation.
24     THE WITNESS: From the perspective of the
25 Office of Facilities Management, the population

### Page 208

1  growth was out stripping the available space that
2  had been designed and constructed for housing.
3  There was no more space, and that if population
4  growth continued at the rate it was going to
5  continue, and that there was no plans or nothing in
6  the mill, shall we say, to build additional housing,
7  we were going to have more and more and more and
8  more overcrowding.
9      BY MS. WHELAN:
10 Q. And do you think that the population was
11 also taking over other space besides housing, such
12 as programming space?
13 A. Well, I knew it has, I knew it had, because
14 we had been in gymnasiums, I personally visited
15 those. I'd seen the triple bunking, even though
16 most of the triple bunking was in the gymnasiums.
17 And I'd seen some of the triple bunking in the
18 dayroom floor.
19     MS. WHELAN: Okay.
20     (Plaintiffs' Exhibit No. 31 was marked for
21 identification.)
22     BY MS. WHELAN:
23 Q. Exhibit 31 is a California State Auditor
24 report, entitled High Risk, The California State
25 Auditor's Initial Assessment of High Risk Issues,