# EXHIBIT 19

# Deposition of James Tilton
# September 3, 2008
# (Designations)

# Part B

## Golden Gate Reporting

Page 77

1    to appropriately find a place for an inmate that might      11:39:25

2    have, for example, multiple needs.  He might have an        11:39:28

3    enemy at a particular prison, certain security needs,       11:39:30

4    certain medical needs, and, therefore, CDCR has to take     11:39:35

5    care of -- or attempt to take care of all of those          11:39:40

6    different requirements?                                     11:39:45

7         A.   True.                                             11:39:48

8         Q.   That becomes -- does that process of              11:39:48

9    appropriately placing inmates in housing that was           11:39:49

10   consistent with their classification requirements become    11:39:56

11   more complex as overcrowding increased?                     11:40:01

12        A.   Yes.                                              11:40:04

13        Q.   And why was that?                                 11:40:04

14        A.   Well, you have less choices, that if I need a     11:40:05

15   bed that has the following dynamics or characteristics,     11:40:10

16   do I have that bed that meets all this?  And, so,           11:40:13

17   therefore, decisions may have to be made, well, gee, I      11:40:15

18   can't address that issue.  I'll have to address the         11:40:17

19   following issues.                                           11:40:20

20             And the more overcrowded, the less flexibility    11:40:21

21   there is, the less chance you have to take in all of the    11:40:22

22   inmates' needs, not just security or those kinds of         11:40:24

23   things in terms of program, et cetera.                      11:40:28

24        Q.   Farther down on that same paragraph, the          11:40:38

25   report mentions increased security concerns based upon      11:40:45

## Golden Gate Reporting

Page 78

| | | |
|---|---|---|
| 1 | severe overcrowding and the housing of inmates in less | 11:40:48 |
| 2 | secure areas. | 11:40:52 |
| 3 | Is it your understanding, Mr. Tilton, that | 11:40:52 |
| 4 | some security concerns had arisen in terms of the use of | 11:40:56 |
| 5 | these spaces that were not initially designed for inmate | 11:41:02 |
| 6 | housing? | 11:41:06 |
| 7 | A.   Yes. | 11:41:07 |
| 8 | Q.   Can you explain what those were? | 11:41:07 |
| 9 | A.   Well, as you make decisions to put more and | 11:41:09 |
| 10 | more people into dorm environments, which most of these | 11:41:13 |
| 11 | are, you have less flexibility to manage and control if | 11:41:16 |
| 12 | there are issues. | 11:41:20 |
| 13 | And, so, the observation I had, and many | 11:41:21 |
| 14 | others had had, is that you have people in a dorm | 11:41:27 |
| 15 | setting who, in many cases, you'd rather have them in | 11:41:30 |
| 16 | cell settings, so it was a dorm cell analysis. | 11:41:34 |
| 17 | Q.   Was there also an issue of how many people | 11:41:38 |
| 18 | could be safely managed in a particular space? | 11:41:42 |
| 19 | A.   Well, I think it's that, but it's also the | 11:41:50 |
| 20 | philosophy that I had that if you had full program, you | 11:41:51 |
| 21 | could manage safer.  In other words, part of this | 11:41:56 |
| 22 | environment was that if you don't have opportunities for | 11:41:58 |
| 23 | inmates to get out of that living environment into a | 11:42:01 |
| 24 | full program space, it impacts their ability to behave | 11:42:05 |
| 25 | in that environment. | 11:42:09 |

**Golden Gate Reporting**

Page 79

1    So we -- the fact that we had overcrowding and          11:42:10

2    the lack of opportunities for program made it worse.     11:42:13

3        Q.   So if you're living in a gym, but you have --    11:42:19

4    you're on the main line and working and going to classes  11:42:22

5    all day long, it might be less of a problem than if you   11:42:25

6    are living in a gym and you have no programming?          11:42:29

7            MS. TILLMAN:  Objection.  Vague and ambiguous.    11:42:32

8    Incomplete hypothetical.                                  11:42:33

9        Go ahead.                                             11:42:33

10           THE WITNESS:  Yes, that's my point.               11:42:33

11           MR. BIEN:  Q.  Is it correct that, at times,      11:42:36

12   CDCR has used these gyms and day rooms for housing but    11:42:40

13   had greater access to programs for the inmates living in  11:42:47

14   those housing?                                            11:42:50

15       A.   Yes.                                             11:42:51

16       Q.   So that the situation, as you just explained,    11:42:52

17   it's not merely the lack of just the use of gyms, but     11:42:56

18   also the fact that a situation happened where there were  11:43:00

19   also not opportunities for programming at the same time   11:43:03

20   people were being housed in the gyms?                     11:43:07

21       A.   True.                                            11:43:12

22       Q.   Farther down that same paragraph, it states,     11:43:20

23   "In addition, the overcrowding and lack of treatment      11:43:25

24   space to service the additional populations has been a    11:43:29

25   major contributor to court intervention regarding CDCR's  11:43:32

**Golden Gate Reporting**

Page 80

```
 1    healthcare services delivery.  The CDCR is currently     11:43:34
 2    operating under stipulated court agreements for medical, 11:43:36
 3    mental health, and dental services, and is under         11:43:36
 4    receivership for medical services."                      11:43:36
 5         Can you explain how the overcrowding and lack        11:43:37
 6    of treatment space had contributed to difficulties in    11:43:51
 7    CDCR complying with the mandates of these cases?          11:43:56
 8         MS. TILLMAN:  I'll object.  It misstates the         11:43:59
 9    evidence in the document.                                 11:44:01
10         If you can answer, go ahead.                          11:44:02
11         THE WITNESS:  Well, I think what we were              11:44:05
12    raising here is the issue that the lack of space is not   11:44:07
13    only a housing issue, but it's impacting the other        11:44:10
14    factors, like delivery healthcare service, the lack of    11:44:15
15    offices, and clinical space.                              11:44:19
16         MR. BIEN:  Q.  Did you believe, in the summer        11:44:22
17    of 2006, that that was a contributing factor to CDCR's    11:44:24
18    difficulty in complying with, for example, the Coleman    11:44:31
19    Court inmates for treatment?                              11:44:37
20         MS. TILLMAN:  Misstates the evidence.  Assumes        11:44:39
21    facts not in evidence.                                    11:44:42
22         You can answer.                                       11:44:43
23         THE WITNESS:  It was clear to me that the lack       11:44:44
24    of program space was not just education, vocational.  It  11:44:46
25    also is the ability to provide the mental health and...   11:44:48
```

## Golden Gate Reporting

Page 81

| | | |
|---|---|---|
| 1 | MS. TILLMAN:  And I'll just ask, and I'm sure | 11:45:02 |
| 2 | the court reporter would appreciate it. | 11:45:04 |
| 3 | THE WITNESS:  Wait? | 11:45:12 |
| 4 | MS. TILLMAN:  Yeah, if we could all just wait | 11:45:12 |
| 5 | for each other to finish our sentences. | 11:45:14 |
| 6 | MR. BIEN:  Q.  The next paragraph refers to | 11:45:16 |
| 7 | something that you testified about already, which was | 11:45:18 |
| 8 | that CDCR was experiencing custodial staff shortages; is | 11:45:21 |
| 9 | that correct? | 11:45:26 |
| 10 | A.  That's correct. | 11:45:26 |
| 11 | Q.  Was this -- here, it says, "By October 2006, | 11:45:33 |
| 12 | we project the shortage will be 2,481 positions, | 11:45:37 |
| 13 | 11 percent of authorized positions." | 11:45:44 |
| 14 | Was that an unusual -- in your mind, was that | 11:45:44 |
| 15 | an unusual level of vacancies for CDCR? | 11:45:47 |
| 16 | MS. TILLMAN:  Objection.  Vague and ambiguous. | 11:45:53 |
| 17 | MR. BIEN:  Q.  As of 2006? | 11:45:53 |
| 18 | A.  I don't know what to -- how you would define | 11:45:53 |
| 19 | unusual, but it was certainly an issue for me that I | 11:45:56 |
| 20 | needed to close the gap in terms of filling positions. | 11:46:00 |
| 21 | Q.  As secretary, did you believe that the | 11:46:05 |
| 22 | shortages of custody officers were limiting your ability | 11:46:08 |
| 23 | to deliver a program in the CDCR prisons in 2006? | 11:46:13 |
| 24 | A.  Yes, in certain facilities, especially. | 11:46:20 |
| 25 | Q.  Did the shortages in custody officers also | 11:46:27 |

## Golden Gate Reporting

Page 124

| | | |
|---|---|---|
| 1 | administrative, and support needs." | 02:05:42 |
| 2 | I think -- is it correct that we've discussed | 02:05:48 |
| 3 | this issue this morning; is that correct? | 02:05:53 |
| 4 | A. Yes. | 02:05:56 |
| 5 | Q. You and I have been talking about this? | 02:05:58 |
| 6 | A. Yes. | 02:05:58 |
| 7 | Q. You talked about the need for additional | 02:05:58 |
| 8 | program space in facilities and emptying the | 02:06:00 |
| 9 | non-traditional beds to make those available? | 02:06:04 |
| 10 | A. Right. | 02:06:08 |
| 11 | Q. Okay. Page 20 deals with healthcare services. | 02:06:08 |
| 12 | Is it also part of the plan you were proposing in the | 02:06:26 |
| 13 | summer of 2006 to expand healthcare services for CDCR | 02:06:30 |
| 14 | prisoners? | 02:06:36 |
| 15 | A. Yes. | 02:06:37 |
| 16 | Q. Okay. And did you understand that there were | 02:06:38 |
| 17 | deficiencies in specialized housing and other necessary | 02:06:40 |
| 18 | space for healthcare services in CDCR prisons? | 02:06:47 |
| 19 | A. Yes, I would add healthcare and mental health, | 02:06:51 |
| 20 | the whole -- all three, dental, mental health, as well | 02:06:54 |
| 21 | as medical. | 02:06:58 |
| 22 | Q. There was a -- third bullet down on Page 20 | 02:07:15 |
| 23 | is, quote, "Implement a statewide plan to develop | 02:07:18 |
| 24 | Consolidated Care Centers that will concentrate patients | 02:07:22 |
| 25 | who are at greater health risk and have higher health | 02:07:24 |

## Golden Gate Reporting

Page 125

```
 1   needs at healthcare treatment facilities at DCHCS CCCs,"    02:07:24
 2   end quote.                                                  02:07:24
 3           Can you explain what that plan was?                 02:07:35
 4       A.   Well, the basic principal here was to             02:07:39
 5   identify, by location, where we could recruit quality       02:07:42
 6   mental health and dental staff and focus on high-end        02:07:46
 7   offenders in those locations, so the basic principal is     02:07:51
 8   identifying locations we thought met that expectation.      02:07:54
 9           We knew we couldn't recruit out in certain          02:07:55
10   locations, and, therefore, who do we keep trying to run     02:07:59
11   programs there?  Let's move those high-end programs to      02:08:00
12   facilities that we can, in fact, recruit and maintain       02:08:03
13   staff.                                                      02:08:08
14       Q.   So is it correct that CDCR had identified in      02:08:08
15   addition to a shortage of space, also the fact they were    02:08:14
16   having difficulty recruiting qualified clinicians?          02:08:18
17       A.   Yes.                                              02:08:24
18       Q.   How would the CCC plan assist CDCR in             02:08:25
19   recruiting clinicians?                                      02:08:29
20       A.   Well, the issue of going to locations where we    02:08:32
21   knew there was a population to recruit from, as well as     02:08:34
22   coordinate with the Department of Mental Health, as well    02:08:39
23   as the Receiver's office in terms of getting continuity     02:08:42
24   of those, because we -- even though I didn't have direct    02:08:46
25   responsibility for medical, we thought the same issues      02:08:47
```

## Golden Gate Reporting

Page 126

| | | |
|---|---|---|
| 1 | were there, and we made some recommendations to the | 02:08:48 |
| 2 | Receiver's office about how to address medical side in | 02:08:51 |
| 3 | conjunction with mental health to be consistent and | 02:08:55 |
| 4 | efficient. | 02:08:59 |
| 5 | MR. BIEN: I think we're finally finished with | 02:09:04 |
| 6 | Exhibit 1. Let me show you what's been marked as | 02:09:08 |
| 7 | Exhibit 8 to your deposition, which is a -- also from | 02:09:25 |
| 8 | CDCR publication or website -- a two-page document. It | 02:09:28 |
| 9 | doesn't appear -- it has Thursday, January 11th, 2007, | 02:09:40 |
| 10 | on it. | 02:09:44 |
| 11 | MS. TILLMAN: Thank you. | 02:09:49 |
| 12 | THE WITNESS: (Witness reviewing document.) | 02:09:51 |
| 13 | MR. BIEN: Q. Is it correct that you | 02:10:21 |
| 14 | continued, along with the administration, to advocate | 02:10:27 |
| 15 | for changes that you had sought in the next legislative | 02:10:30 |
| 16 | session, 2007/2008? | 02:10:35 |
| 17 | A. Yes. | 02:10:37 |
| 18 | Q. There's a quote in the first page of Exhibit 8 | 02:10:39 |
| 19 | that purports to be from you. Is this -- I'll read it. | 02:10:42 |
| 20 | "The Department of Corrections owns the responsibility | 02:10:48 |
| 21 | to assist inmates who are willing to change their ways | 02:10:51 |
| 22 | with the basic tools of education, life skills, drug | 02:10:51 |
| 23 | treatment, and mental health, so they can get better | 02:10:51 |
| 24 | when they leave Corrections -- not worse. But until I | 02:10:51 |
| 25 | get overcrowding reduced -- then I don't have the | 02:10:51 |

## Golden Gate Reporting

Page 131

| | | |
|---|---|---|
| 1 | overcrowding, and the first paragraph talks about | 02:16:46 |
| 2 | increased substantial risks to the health and safety of | 02:16:51 |
| 3 | CDCR staff, inmates, and the public. | 02:16:55 |
| 4 | Did you agree that conditions, as of October | 02:16:58 |
| 5 | 2006, were substantial risks to the health safety of | 02:17:00 |
| 6 | CDCR staff, inmates, and the public? | 02:17:04 |
| 7 | MS. TILLMAN:  Objection.  Lack of foundation. | 02:17:09 |
| 8 | Go ahead and answer. | 02:17:09 |
| 9 | THE WITNESS:  Yes. | 02:17:09 |
| 10 | MR. BIEN:  Q.  And then at the middle of the | 02:17:23 |
| 11 | page, there's a "whereas" clause, a, quote, "WHEREAS, | 02:17:25 |
| 12 | overcrowding causes harm to people and property, leads | 02:17:28 |
| 13 | to inmate unrest and misconduct, reduces or eliminates | 02:17:28 |
| 14 | programs, and increases recidivism as shown within this | 02:17:28 |
| 15 | state and in others." | 02:17:28 |
| 16 | Did you agree with that statement, Mr. Tilton? | 02:17:39 |
| 17 | A.   Yes.  I'd put a caveat.  It's the overcrowding | 02:17:43 |
| 18 | with the lack of program. | 02:17:51 |
| 19 | Q.   The next "whereas" clause is followed by a | 02:18:02 |
| 20 | list of prisons that goes on for several pages, and | 02:18:09 |
| 21 | lists for each prison the capacity, the current number | 02:18:14 |
| 22 | of inmates.  It also lists incidents of violence at | 02:18:20 |
| 23 | prisons, assault and battery, riots, melees M-E-L-E-E-S, | 02:18:27 |
| 24 | and weapon confiscations. | 02:18:35 |
| 25 | Do you agree, Mr. Tilton, that severe | 02:18:39 |

## Golden Gate Reporting

Page 132

```
 1    overcrowding can lead to increased violence in prisons?    02:18:42
 2             MS. TILLMAN:  Objection.  Vague and ambiguous      02:18:47
 3    as to severe.                                               02:18:47
 4             If you can answer, go ahead.                       02:18:49
 5             THE WITNESS:  I would think it's a factor,         02:18:51
 6    but, again, I would re-emphasize, the lack of program is    02:18:52
 7    as big a factor to this issue, but, yes.                    02:18:57
 8             MR. BIEN:  Q.  There are no page numbers on        02:19:17
 9    this, but if you go to the fifth page -- I'm sorry --       02:19:18
10    yeah, the fifth page.  On the bottom, there's a whereas     02:19:22
11    clause.  It says, "WHEREAS, in addition to the 1,671        02:19:26
12    incidents of violence perpetrated in these 29 severely      02:19:31
13    overcrowded prisons by inmates against CDCR staff last      02:19:31
14    year, and the 2,642 incidents of violence perpetrated in    02:19:31
15    these prisons on inmates by other inmates in the last       02:19:31
16    year, the suicide rate in these 29 prisons is               02:19:31
17    approaching an average of one per week."                    02:19:31
18             Mr. Tilton, did you agree with this statement      02:19:31
19    at the time it was written?                                 02:20:02
20        A.   I think they're just factual statements.          02:20:11
21        Q.   Do you have any reason to think they're            02:20:15
22    incorrect?                                                  02:20:17
23        A.   No.                                                02:20:17
24        Q.   On the top of the next page, there's a whereas     02:20:27
25    clause that, "The federal court in the Coleman case         02:20:30
```

**Golden Gate Reporting**

Page 193

```
1        Q.   Were you aware of any restrictions while you      04:16:41
2   were secretary to housing Coleman class members in the      04:16:44
3   non-traditional housing or bad beds?                        04:16:50
4        A.   No.                                               04:16:58
5        Q.   You don't know if there were or were not?         04:16:58
6        A.   Well, there were some EOP, I believe, in some     04:17:01
7   of those benefits.                                          04:17:04
8        Q.   And definitely were CCC's in those beds?          04:17:04
9        A.   Yes.  Down in Vacaville, a gym down there.        04:17:07
10       Q.   In your opinion, is there a risk to the           04:17:15
11  mentally ill to being housed in those kinds of              04:17:22
12  non-traditional beds that is different from the risk to     04:17:26
13  other prisoners?                                            04:17:30
14       MS. TILLMAN:  Objection.  Lack of foundation.          04:17:31
15  Calls for speculation.                                      04:17:31
16       THE WITNESS:  I can only respond to what I saw         04:17:34
17  at Vacaville, which I thought was a surprisingly well       04:17:35
18  run program done by solid correction officers in which     04:17:39
19  the inmates, patients, had a structured process and         04:17:41
20  environment and seemed to be running very well, so...       04:17:44
21       MR. BIEN:  Q.  Do you recall that one of the           04:18:19
22  options that the administration considered in addressing    04:18:22
23  the need for additional beds was using some of the beds     04:18:26
24  at the Coalinga State Hospital?                             04:18:31
25       A.   Yes.                                              04:18:35
```

## Golden Gate Reporting

Page 194

| | | |
|---|---|---|
| 1 | Q.   Were you -- do you recall what went into that | 04:18:39 |
| 2 | discussion concerning the use of those beds? | 04:18:45 |
| 3 | A.   Yes. | 04:18:47 |
| 4 | Q.   What do you recall? | 04:18:48 |
| 5 | A.   Since I was in the capital outlay side when | 04:18:50 |
| 6 | the facility was built, I knew that based on my history, | 04:18:55 |
| 7 | I thought there was a big lag between filling up that | 04:18:59 |
| 8 | facility and having a need for it, and, therefore, the | 04:19:03 |
| 9 | approach to the Department of Mental Health was, can I | 04:19:06 |
| 10 | use it temporarily?  And it was one of our | 04:19:08 |
| 11 | considerations, when we were looking at the emergency | 04:19:09 |
| 12 | bed plan. | 04:19:12 |
| 13 | Q.   Is it correct that Coalinga was built to have | 04:19:19 |
| 14 | a 1,500 patient -- licensed patient size? | 04:19:24 |
| 15 | A.   Yes. | 04:19:29 |
| 16 | Q.   And at the time you were looking at this | 04:19:30 |
| 17 | crisis in 2005/2006, that population was far under | 04:19:34 |
| 18 | 1,500? | 04:19:42 |
| 19 | A.   Yes. | 04:19:43 |
| 20 | Q.   Did you advocate for increasing the use of | 04:19:53 |
| 21 | Coalinga beds by CDCR during that period? | 04:19:57 |
| 22 | A.   Yes. | 04:20:02 |
| 23 | MR. BIEN:  Let me mark as the next in order, | 04:20:18 |
| 24 | which I think this is 21, a Population Management Plan | 04:20:21 |
| 25 | dated March 24th, 2006, E-CDCR_023431 through 436. | 04:20:26 |

## Golden Gate Reporting

Page 195

```
 1              (Whereupon, Plaintiffs'            04:20:47
 2          Exhibit No. 21 was marked for         04:20:47
 3              identification.)                   04:20:47
 4        MR. BIEN:  Q.  I'm only going to ask you 04:20:35
 5   about -- there's a reference to Coalinga on Page 6. 04:21:18
 6          My question is, does that refresh your 04:21:30
 7   recollection that CDCR, in 2006, was advocating to 04:21:31
 8   increase its use of Coalinga State Hospital beds for 04:21:38
 9   mentally ill prisoners?                       04:21:42
10        MS. TILLMAN:  Objection.  Misstates the 04:21:46
11   evidence.                                     04:21:46
12        THE WITNESS:  Well, two points.  This document 04:21:47
13   was prepared before I got to the agency.      04:21:48
14        MR. BIEN:  Q.  Okay.                     04:21:54
15     A.   And I've already stated that it was one of the 04:21:54
16   issues I was considering -- as configuration for our bed 04:21:57
17   plan.                                         04:22:01
18     Q.   What happened with the Coalinga issue, while 04:22:02
19   you were there?                               04:22:05
20     A.   When it was raised at Mental Health, I made a 04:22:07
21   case that they needed those beds, and, therefore, it was 04:22:09
22   not available for us to use.                  04:22:12
23     Q.   At the time you left CDCR in the spring of 04:22:19
24   2008, were you aware that there were still many hundreds 04:22:24
25   of empty beds at Coalinga State Hospital?     04:22:31
```

**Golden Gate Reporting**

Page 220

| | | |
|---|---|---|
| 1 | reduce the prisoner parole population, who's going to | 05:18:59 |
| 2 | take care of both police issues and supervision and | 05:19:01 |
| 3 | healthcare issues for this population? | 05:19:06 |
| 4 | A.   And for how long, yes. | 05:19:09 |
| 5 | MR. BIEN:  I think I marked as Exhibit 26 a | 05:19:40 |
| 6 | multipage document, bears Production No. CDCR_ 020803 | 05:19:47 |
| 7 | through 815.  The first page says, "AB 900's strike team | 05:19:54 |
| 8 | Issue Memo No. 1 validation of infill bed plan." | 05:20:01 |
| 9 | There's no date typed in, but written on the | 05:20:07 |
| 10 | upper right-hand corner is 8207.  You can look at the | 05:20:09 |
| 11 | whole thing, but I can ask you if you want -- see if you | 05:20:46 |
| 12 | -- you can look at it carefully Lisa.  You're reading it | 05:20:48 |
| 13 | all upfront. | 05:20:54 |
| 14 | Q.   Do you recall the issue, I think you talked | 05:20:57 |
| 15 | about earlier, about CCR had already done some infill | 05:20:59 |
| 16 | bed planning before AB 900 was passed, and then AB 900 | 05:20:59 |
| 17 | included the requirement programming for infill beds | 05:21:05 |
| 18 | that had not been anticipated? | 05:21:10 |
| 19 | A.   That's true. | 05:21:13 |
| 20 | Q.   Is it correct that the strike team that CDCR | 05:21:17 |
| 21 | worked on was how to address that requirement, AB 900 | 05:21:19 |
| 22 | and the infill beds? | 05:21:20 |
| 23 | A.   Yes. | 05:21:23 |
| 24 | Q.   Do you recall that one of the issues that was | 05:21:25 |
| 25 | presented for decision was to what level of design bed | 05:21:28 |

**Golden Gate Reporting**

Page 221

| | | |
|---|---|---|
| 1 | capacity would the infill beds be designed in terms of, | 05:21:39 |
| 2 | were you going to design them for 100 percent design bed | 05:21:43 |
| 3 | capacity, as we discussed earlier, the one inmate per | 05:21:49 |
| 4 | cell and standard basic dorm, or were you going to | 05:21:54 |
| 5 | design them for a certain level above design bed | 05:21:58 |
| 6 | capacity?  Do you recall that issue being discussed? | 05:22:00 |
| 7 |     A.   Yes. | 05:22:04 |
| 8 |     Q.   And if you look at Page 11, there's a | 05:22:04 |
| 9 | discussion titled Level of Overcrowding.  And there's | 05:22:19 |
| 10 | some presentations of alternatives.  And you may want to | 05:22:25 |
| 11 | look at Pages 11 and 12.  I'm just going to ask if you | 05:22:33 |
| 12 | recall this discussion and what decision was made. | 05:22:36 |
| 13 |     A.   (Witness reviewing document.)  Yes, I do. | 05:22:39 |
| 14 |     Q.   Okay.  What do you recall about the discussion | 05:22:43 |
| 15 | about this issue? | 05:22:47 |
| 16 |     A.   That I supported a level of overcrowding that | 05:22:48 |
| 17 | we couldn't do design.  Single cell was not efficient, | 05:22:52 |
| 18 | and we proved that if we provide program, we could do | 05:22:55 |
| 19 | more than that, but I was not comfortable doing 190 and, | 05:23:00 |
| 20 | those numbers, and asked for an analysis, not just a | 05:23:04 |
| 21 | fixed percentage, but analysis by program and type of | 05:23:07 |
| 22 | inmate. | 05:23:09 |
| 23 |     Are the institutions to give me what they | 05:23:10 |
| 24 | considered an operational goal that I would be willing | 05:23:13 |
| 25 | to champion?  So the numbers are somewhere in these | 05:23:17 |

## Golden Gate Reporting

Page 222

```
 1    ranges, but not these numbers.                          05:23:21
 2         Q.   Okay.  And do you know what -- there's a      05:23:24
 3    reference in Point B here on Page 11, "Operate the      05:23:29
 4    infill facilities at the independent review panel.  IRP 05:23:36
 5    suggested overcrowding standard of 145 percent of DBC   05:23:41
 6    and built programming space to support this number."    05:23:45
 7              Do you know what the independent review panel 05:23:50
 8    was?                                                    05:23:52
 9         A.   That was the CPR work group, when the         05:23:53
10    administration first came.  The Deukmejian Task Force, I 05:23:59
11    believe it's called.  I forget the labels of it, but,   05:24:07
12    basically, the very first parts of the administration,  05:24:07
13    there was evaluation of State government, and there was  05:24:13
14    a corrections evaluation led by former                  05:24:13
15    Governor Deukmejian.  It was in that report.            05:24:18
16         Q.   And do you recall that in that report, there  05:24:21
17    was a suggestion made that CDCR attempt to reach an      05:24:22
18    overcrowding standard of 145 percent of design bed      05:24:30
19    capacity?                                               05:24:35
20         A.   I'm assuming that's the number.  I didn't     05:24:36
21    recall from the report that that was the source of that 05:24:39
22    number, but this is what that says.                     05:24:43
23         Q.   Okay.  And Deborah Hysen listed advantages of 05:24:49
24    this, said, if you operate the infills or design them to 05:25:07
25    the 145 percent, you'll meet the full requirements of AB 05:25:10
```

**Golden Gate Reporting**

Page 223

| | | |
|---|---|---|
| 1 | 900.  She also discusses going lower than 145 to 130 or | 05:25:12 |
| 2 | even to 100 percent. | 05:25:25 |
| 3 | So based on these recommendations, what -- I'm | 05:25:27 |
| 4 | not quite -- I'm not quite sure I understand.  What did | 05:25:30 |
| 5 | you end up with in terms of -- | 05:25:33 |
| 6 | A.    Well, I didn't -- I wasn't comfortable with | 05:25:34 |
| 7 | just percentages of overcrowding because they're all | 05:25:36 |
| 8 | different based on the type of inmate, custody level, | 05:25:40 |
| 9 | and needs per services. | 05:25:43 |
| 10 | Big distinction between a Level IV SHU inmate | 05:25:46 |
| 11 | versus -- so I wanted a mix of classification, as well | 05:25:50 |
| 12 | as program needs, mental health cases, some of those | 05:25:53 |
| 13 | issues, so I wanted to have an analysis that said, it's | 05:25:55 |
| 14 | not a fixed percentage because it should change based on | 05:26:01 |
| 15 | the level of inmate from a custody perspective, as well | 05:26:05 |
| 16 | as their program needs. | 05:26:07 |
| 17 | So I would like to have standards by custody | 05:26:09 |
| 18 | level and by program needs.  Whatever those ended up | 05:26:11 |
| 19 | with, you'd end up with, so you would have a range.  And | 05:26:14 |
| 20 | if you have GP inmates, for example, you could overcrowd | 05:26:17 |
| 21 | more than if they were psych or gang members or | 05:26:21 |
| 22 | whatever. | 05:26:24 |
| 23 | So I wanted to have a methodology that based | 05:26:24 |
| 24 | on those factors, not just say, automatically, we can do | 05:26:27 |
| 25 | input, because I felt there were cases we could do | 05:26:31 |

**Golden Gate Reporting**

Page 224

| | | |
|---|---|---|
| 1 | higher than that, and there were also other cases I'd | 05:26:36 |
| 2 | want to do single cell.  So I wanted that analysis. | 05:26:37 |
| 3 | Q.   And before you left as agency secretary, was | 05:26:38 |
| 4 | that analysis completed for infill beds? | 05:26:41 |
| 5 | A.   The analysis for what the institution thought | 05:26:45 |
| 6 | would meet those definitions has been completed. | 05:26:49 |
| 7 | Q.   Do you recall how that ended up? | 05:26:54 |
| 8 | A.   Well, internally, I had a position, but did | 05:27:00 |
| 9 | not have a formal administrative position, because it's | 05:27:03 |
| 10 | expensive. | 05:27:10 |
| 11 | Q.   I'm not sure I understand your answer.  Let's | 05:27:11 |
| 12 | look at it -- one thing I think you said is that it | 05:27:13 |
| 13 | would depend on a particular project.  It wouldn't be | 05:27:17 |
| 14 | just a general standard, like -- project. | 05:27:19 |
| 15 | A.   Right. | 05:27:20 |
| 16 | Q.   So let's -- right now, the infill project that | 05:27:20 |
| 17 | I'm aware of that is part of the long is the Kern Valley | 05:27:25 |
| 18 | State Prison project.  Was that moving forward while you | 05:27:28 |
| 19 | were still -- | 05:27:32 |
| 20 | A.   Yes. | 05:27:33 |
| 21 | Q.   And do you know what decision was made as to | 05:27:33 |
| 22 | that project, as to how to -- what level of occupancy it | 05:27:36 |
| 23 | would be designed for? | 05:27:44 |
| 24 | A.   No. | 05:27:46 |
| 25 | Q.   You don't recall? | 05:27:47 |

**Golden Gate Reporting**

Page 225

```
 1       A.    (Witness nods head negatively.)            05:27:48
 2       Q.    Are you aware of a decision that it would be  05:27:54
 3  opened at 190 percent of capacity?                    05:27:57
 4            MS. TILLMAN:  Lack of foundation.  Asked and  05:28:01
 5  answered.                                             05:28:03
 6            If you can answer, go ahead.                05:28:03
 7            THE WITNESS:  I don't know.  The issue that  05:28:03
 8  you're asking me about, I raised internally and was   05:28:05
 9  not -- before I left, was not successful in getting the 05:28:08
10  policy and the administration or the legislature in   05:28:14
11  terms of their willingness to accept some definition  05:28:15
12  other than double cell.                               05:28:19
13            MR. BIEN:  Q.  There's obviously a cost to   05:28:20
14  operating a lower level of crowding; is that correct,  05:28:23
15  financial costs?                                      05:28:28
16       A.    That's correct.  In these times, that's    05:28:30
17  probably why I can get the door and have the policy    05:28:32
18  discussion.                                           05:28:36
19       Q.    So whatever you believed, as a correctional 05:28:36
20  matter, you were unable to advocate for based on the  05:28:38
21  financial constraints?                                05:28:41
22       A.    Yes.                                       05:28:42
23            MR. BIEN:  Let me mark as the next exhibit.  05:29:39
24            (Whereupon, Plaintiffs'                     05:29:56
25            Exhibit No. 27 was marked for               05:29:56
```

# Golden Gate Reporting

Page 226

```
 1              identification.)                    05:29:56
 2        MR. BIEN:  Q.   It's a two-page string of  05:29:56
 3  e-mails, Production Nos. E-CDCR_011346 to 011347. 05:30:00
 4     A.   (Witness reviewing document.)            05:30:31
 5        MS. TILLMAN:  Can I ask the court reporter  05:31:22
 6  what time we went on the record?  5:41, it would have 05:31:24
 7  been eight hours, minus time for lunch.           05:31:31
 8        MR. BIEN:  5:45 sound good.  I will do that. 05:31:37
 9     Q.   Mr. Tilton, have you had a chance to look at 05:32:28
10  Exhibit 27?                                       05:32:32
11     A.   Yes.                                      05:32:33
12     Q.   These were people discussing you.  You're not 05:32:38
13  a recipient or author of any of these e-mails, so I want 05:32:40
14  to ask you whether you recall making a decision that 05:32:44
15  mental health beds in the infill facilities would be 05:32:50
16  designed for -- program space for 500 and housing for 05:32:59
17  1,000?                                            05:33:04
18     A.   No.                                       05:33:05
19     Q.   Would you agree that would be inappropriate? 05:33:07
20     A.   Yes.                                       05:33:09
21     Q.   Why?                                       05:33:10
22     A.   My position is, we provide full program   05:33:13
23  funding for these new beds, so I'm being quoted here. 05:33:16
24  It doesn't ring a bell or seem like a decision that I, 05:33:21
25  in fact, made, but I've been quoted lots of times.  I'm 05:33:24
```

**Golden Gate Reporting**

Page 227

| | | |
|---|---|---|
| 1 | looking for, where do they come back and ask me? | 05:33:40 |
| 2 | Q.   So if, in fact, this was early in the process, | 05:33:46 |
| 3 | these e-mails were in September of 2007? | 05:33:50 |
| 4 | A.   Yes. | 05:33:51 |
| 5 | Q.   Do you recall any final decision that was made | 05:33:51 |
| 6 | while you were still secretary as to what level of | 05:33:55 |
| 7 | program space would be available for CCCMS inmates in | 05:34:01 |
| 8 | the infill facility at Kern Valley State Prison? | 05:34:04 |
| 9 | A.   No, but this was part of the sub-set of that | 05:34:06 |
| 10 | analysis I referred to.  If you look at the actual | 05:34:09 |
| 11 | populations and make decisions around that population. | 05:34:11 |
| 12 | Q.   Again, your position would be, they should | 05:34:13 |
| 13 | program for the amount of inmates that would be housed | 05:34:16 |
| 14 | there? | 05:34:19 |
| 15 | A.   That's correct. | 05:34:20 |
| 16 | Q.   Build space? | 05:34:21 |
| 17 | A.   That's correct, or find some way to | 05:34:21 |
| 18 | accommodate program within that space. | 05:34:25 |
| 19 | Q.   And on your last point, is it correct that one | 05:34:28 |
| 20 | of the methods by which CDCR has attempted to deliver | 05:34:32 |
| 21 | programming in crowded situations has been to add | 05:34:43 |
| 22 | additional programmings and other shifts such as -- | 05:34:46 |
| 23 | A.   Exactly. | 05:34:51 |
| 24 | Q.   -- third watch or -- is that correct? | 05:34:52 |
| 25 | A.   Yes. | 05:34:55 |

**Golden Gate Reporting**

Page 228

| | | |
|---|---|---|
| 1 | Q.   Traditionally, when did programming take place | 05:34:55 |
| 2 | in CDCR prisons? | 05:34:58 |
| 3 | A.   Well, it's gone different over the years, but | 05:35:00 |
| 4 | my sense is, they've gone to regular eight-hour shifts, | 05:35:07 |
| 5 | but, in my history, we've had EID programs, so that was | 05:35:07 |
| 6 | the discussion I drove, well, why can't we?  Even if it | 05:35:10 |
| 7 | takes a little more custody, why don't we take the next | 05:35:12 |
| 8 | and use the facility and provide the extended services. | 05:35:15 |
| 9 | People can work eight hours and go to 4:00 in the | 05:35:17 |
| 10 | evening, or whatever. | 05:35:20 |
| 11 | Q.   And that's an option that you believed would | 05:35:20 |
| 12 | increase the use of limited yard and program space? | 05:35:22 |
| 13 | A.   Yes. | 05:35:26 |
| 14 | Q.   So you advocated for that? | 05:35:27 |
| 15 | A.   Yes. | 05:35:29 |
| 16 | MR. BIEN:  Let me mark as the next exhibit a | 05:35:35 |
| 17 | BCP dated December of 2007.  Bears Production Nos. | 05:35:42 |
| 18 | DEFS016461 through 477. | 05:35:48 |
| 19 | (Whereupon, Plaintiff's | 05:36:19 |
| 20 | Exhibit No. 28 was marked for | 05:36:19 |
| 21 | identification.) | 05:36:19 |
| 22 | THE WITNESS:  (Witness reviewing document.) | 05:36:21 |
| 23 | MR. BIEN:  Q.  Mr. Tilton, let me start up and | 05:36:52 |
| 24 | see if you need to glance at anything else in the | 05:36:55 |
| 25 | document. | 05:36:58 |

```
 1              CERTIFICATION OF DEPOSITION OFFICER

 2

 3         I, CARI L. WATERS-DREWRY, duly authorized to

 4    administer oaths pursuant to Section 2093 (b) of the

 5    California Code of Civil Procedure, hereby certify that

 6    the witness in the foregoing deposition was by me sworn

 7    to testify to the truth, the whole truth and nothing but

 8    the truth in the within-entitled cause; that said

 9    deposition was taken at the time and place therein

10    stated; that the testimony of the said witness was

11    thereafter transcribed by means of computer-aided

12    transcription; that the foregoing is a full, complete

13    and true record of said testimony; and that the witness

14    was given an opportunity to read and correct said

15    deposition and to subscribe the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, or in any way

19    interested in the outcome of this cause named in said

20    caption.

21

22

23         _____

24         CARI L. WATERS-DREWRY, CSR 12401

25
```