# EXHIBIT 20

**Deposition of Victor Brewer
September 4, 2008
(Phase II Designations)**

**Part A**

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

vs.                        No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

    Defendants.

_____/

MARCIANO PLATA, et al.

    Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.

    Defendants.

_____/

Deposition of VICTOR F. BREWER

MARKED CONFIDENTIAL (Pages 1 through 197)

| | |
|---|---|
| DATE: | SEPTEMBER 4, 2008 |
| TIME: | 9:34 A.M. |
| LOCATION: | ROSEN, BIEN & GALVAN<br>315 Montgomery Street, 10th Floor<br>San Francisco, California 94104 |
| REPORTED BY: | Cari L. Waters-Drewry<br>Certified Shorthand Reporter<br>License Number 12401 |

Page 10

1  reimbursement of a $10,000 watch he lost while on duty.
2      Q.   And were you also working for the Community
3  Hospital of Northern Las Vegas at that time?
4      A.   No.
5      Q.   Where were you working?
6      A.   Women's Hospital of Las Vegas.
7      Q.   And the deposition in 1995, can you explain
8  what case that related to?
9      A.   I don't recall.
10     Q.   Was it also within the context of your
11 employment at that time?
12     A.   Yes.
13     Q.   And what was your employment?
14     A.   No, that's an incorrect answer. It was in
15 context with my previous employment at Community
16 Hospital, but I don't recall the case.
17     Q.   Can you just go very briefly through your
18 educational history and also your history with these
19 hospitals, so we can get a time frame in mind, starting
20 from college, please.
21          MS. O'BANNON:  That's a lot of history.
22          MS. WHELAN:  Q.  It's not a memory contest,
23 so, you know, if a couple dates are murky, that's okay.
24          MS. O'BANNON:  Want him to start from college?
25          MS. WHELAN:  Q.  College.  That would be

1  great.
2      A.   Graduated from college in 1967.  I spent from
3  1967 to 1970 as a chemist in the United States Navy, was
4  discharged in 1970 and went back to graduate school to
5  get my clinical chemist license at Santa Clara Valley
6  Medical Center, completed it in 1971, was hired by
7  Merced Pathology Lab from 1971 through 1975.
8           1972, I went back to graduate school for my
9  master's degree in business administration.  1975, I
10 graduated and started as a CEO of a small hospital in
11 Chowchilla, Chowchilla District Memorial Hospital, and I
12 was there from 1975 to 1979.  1979, I was recruited by
13 National Medical Enterprises to run Lodi Community
14 Hospital, which I was the CEO until 1986.
15          In 1986, I was recruited by American
16 Healthcare Management to run their largest hospital in
17 Las Vegas, Nevada.  I was there from 1986 to 1990.  I
18 was recruited by Paracelsus Healthcare Corporation in
19 1990, and I stayed with them until 1992.
20          I returned to California in 1992 to enter law
21 school, and I ran Bakersfield Community Hospital until I
22 joined the State.  In 1989, I came to the State, to the
23 California Department of Corrections.
24     Q.   Did you ever get your JD?
25     A.   Three years.  I didn't finish the last year,

Page 12

1    due to family obligations.
2        Q.    You said that in 1989 you joined the
3    California Department of Corrections?
4        A.    Yes.
5        Q.    And what was your position at that time?
6        A.    Staff services analyst.
7        Q.    How long were you in that position?
8        A.    Eleven months.
9        Q.    What did you do after that?
10       A.    Became a Correctional Hospital
11   Administrator II and was redeployed to run the hospital
12   and medical institution at CIM.  I was recruited by
13   John Rodriguez in 2001.
14       Q.    You worked for the CDCR from approximately
15   1989 until 2001; is that correct?
16       A.    I'm off by 10 years.  1999.
17       Q.    1999, okay.  So you worked for the CDCR --
18       A.    Three years.
19       Q.    -- from 1999 until 2001 when you were
20   recruited by John Rodriguez --
21       A.    Deputy Director, Department of Mental Health.
22       Q.    What is your title, as you sit here today?
23       A.    Executive Director, Salinas Valley and
24   Vacaville Psychiatric programs.
25       Q.    Who is your direct boss or bosses?

Page 13

```
 1        A.    Cindy Radavsky, and I'm on loan to
 2   Roland Ives.
 3        Q.    And Cindy Radavsky is the director of
 4   long-term care services for the Department of Mental
 5   Health; is that correct?
 6        A.    Correct.
 7        Q.    Can you explain what Roland Ives' title is?
 8        A.    He's a Deputy Director of an outpatient unit,
 9   but I don't know the exact title.  I think it's
10   Community Psychiatric Programs.
11        Q.    Where is that outpatient unit?
12        A.    It's numerous outpatient facilities across the
13   State.
14        Q.    Within the Department of Mental Health; is
15   that correct?
16        A.    Correct.
17        Q.    Did you review any documents in preparation
18   for today's deposition?
19        A.    No.
20        Q.    Did you meet with your attorneys?
21        A.    Yes.
22        Q.    How many times did you meet with your
23   attorneys?
24              MS. O'BANNON:  In regards to the deposition?
25              MS. WHELAN:  Yes.
```

1    2011.

2        Q.    For funding in 2011?

3        A.    Correct.

4        Q.    Does that mean that the project won't be
5    funded until 2011?

6        A.    Correct.

7        Q.    Do you know when the rooms will actually be
8    built based on that schedule?

9        A.    Sometime after the funding is approved.

10       Q.    So sometime after 2011; is that correct?

11       A.    My best estimate.

12       Q.    Shifting into the P-2 and P-3 units at CMF, I
13   can't remember if you stated how long those were
14   intended to be open.  Was there an original plan for
15   those in terms of how long they were going to be
16   temporary units?

17       A.    Until a new 64-bed facility could be planned
18   and constructed.

19       Q.    Meaning at CMF?

20       A.    Correct.

21       Q.    And is that project currently in the planning
22   phase, or is it part of the bed-planning effort?

23       A.    No, it's part of the planning efforts.
24   Structural plans are being done at this time.

25       Q.    Do you know when that project is set to be

1  funded?
2      A.    2010 for a completion of the structure in
3  2011.
4      Q.    It's your understanding that it will be funded
5  in 2010, and that it's intended to be completed in 2011;
6  is that correct?
7      A.    That's correct.
8      Q.    Do you know what the current status is?  You
9  mentioned that there are structural plans.  Does that
10 mean that the planning phase has been funded?
11     A.    The planning phase was funded two years ago,
12 and for the last two years, I participated in the design
13 of the building.
14     Q.    Is it typical that the design phase for these
15 projects would be two years?
16     A.    It is typical that the design phase takes
17 between eight and 12 months.  Then, you have
18 approximately two years of architectural drawings, six
19 months for submission of bids, and 18 months for
20 construction.
21     Q.    So within that time frame you just explained,
22 which is eight to 12 months of planning, plus two years
23 for architectural drawings, plus six months for the
24 submission of plans --
25     A.    Bids.

1          MS. O'BANNON:  Bids.
2          MS. WHELAN:  Bid, sorry.
3     Q.   -- and then 18 months for construction.  Which phase is the 64-bed unit in?
5     A.   It's in the structural architectural plannings right now.
7     Q.   Do you know how that project is going to be funded?
9     A.   I have no knowledge of that.
10    Q.   We've been talking a little bit about waiting lists.  Can you explain what wait lists you maintain for the DMH units?
13    A.   It's limited to two waiting lists, the Acute Psychiatric Program and the Level IV Intermediate Program.  In the last seven years, there has never been a waiting list for Day Treatment or Level III Intermediate.
18    Q.   And you say the last seven years because that represents your tenure with DMH; is that correct?
20    A.   Yes.
21    Q.   And I believe you testified earlier that the Level IV ICF waiting list was at 166, as of yesterday, and you did give the acute waiting list, which I forget now.  Can you restate that for the record.
25    A.   From the top of my head, I don't recall.  It

1  list.
2      Q.  Do you know what the CDCR and DMH's plans are
3  to resolve this dilemma?
4      A.  To my knowledge, the only plans currently on
5  the drawing board is the 64 beds for maximum custody ICF
6  patients at VPP.
7      Q.  So the 64 beds that will be built at the CMF
8  VPP; is that correct?
9      A.  To be operational in 2011.
10     Q.  So is it safe to say this dilemma will
11 continue until at least 2011?
12         MS. O'BANNON:  Calls for speculation, but if
13 you have an opinion...
14         THE WITNESS:  It's safe to say that until such
15 time as there's an adequate number of beds, the wait
16 list will continue.
17         MS. WHELAN:  Q.  Are you familiar,
18 generally -- and then we'll get into specifics -- with
19 the Coleman bed-planning efforts?
20     A.  Yes.
21     Q.  Do you recall how many of the bed plans you've
22 been involved in?
23     A.  I've been involved in every bed plan since
24 2001.
25     Q.  And what is your role, generally, in the

1  bed-planning efforts?
2      A.  The Deputy Director, Cindy Radavsky, and I
3  have been the spokesperson for DMH.
4      MS. WHELAN:  Let's mark as Exhibit 7 the
5  California Department of Corrections and
6  Rehabilitation's Mental Health Bed Plan, dated July 16,
7  2008.
8                  (Whereupon, Plaintiffs'
9                  Exhibit No. 7 was marked for
10                 identification.)
11     THE WITNESS:  (Witness reviewing document.)
12     MS. WHELAN:  Q.  Are you familiar with this
13  bed plan?
14     A.  Yes.
15     Q.  Were you involved in any way in writing this
16  bed plan?
17     A.  I submitted my comments through
18  Cindy Radavsky.
19     Q.  So just to clarify, you didn't write aspects
20  of this bed plan, but you saw it, and you commented on
21  it; is that correct?
22     A.  No, I submitted my comments directly to Cindy,
23  who, in turn, took them over to CDCR.
24     Q.  But you didn't write sections of this report;
25  is that correct?

1    A.    Correct.
2    Q.    Do you recall when you saw this report?
3    A.    Spring of 2008.
4    Q.    Do you recall what your comments were on the
5 bed plan at that time?
6    A.    I expressed my concern over the limited staff
7 I have at Vacaville and Salinas being tasked with
8 teaching CDCR how to run acute hospitals or intermediate
9 care licensed hospitals and becoming Joint Commission
10 accredited.
11    Q.    Are you referring to what was originally
12 intended as the mentoring plan between DMH and CDCR?
13    A.    That's correct.
14    Q.    And that's no longer a part of this bed plan;
15 is that correct?
16    A.    That's correct.
17    Q.    Do you remember any other comments that you
18 had to the bed plan?
19    A.    At this time, I don't recall.
20    Q.    On page 2, at the top, and I'm using the page
21 numbers which are in the footnote down there, it notes,
22 "In June 2008, CDCR and the DMH reached agreement that
23 the DMH would continue to provide all inpatient acute
24 and intermediate mental health services instead of
25 transferring responsibilities to provide those services

1  to the CDCR."
2       Does that refer, at least in part, to your
3  concerns about the mentoring aspect?
4       A.   Yes, it does.
5       Q.   Why did you have those concerns about
6  continuing to teach or mentor the CDCR to provide acute
7  and intermediate care?
8       A.   In my career as a hospital CEO, I've been
9  teaching individuals for 27 years, before I joined the
10 State, how to become a hospital administrator.  In
11 general, it's a five- to six-year process before you're
12 capable of being a hospital CEO, one year as an
13 administrative assistant, two years as an assistant
14 administrator, two years as an associate administrator,
15 and one year as a chief operating officer before you
16 have the ability to run an acute care hospital.
17      And I had substantial concerns with taking
18 people who have no formal training, no degree in
19 hospital administration, and being tasked with the
20 responsibility to teach them to run a licensed
21 JCAHO-accredited hospital in one year.
22      Q.   It sounds like somebody listened to you and
23 removed that aspect of the plan; is that fair to say?
24      A.   It's fair to say it was removed from the plan.
25      Q.   Do you know what the structure of -- let's

```
 1   strike that.
 2            Is the long-range plan, now, to eventually
 3   remove the intermediate and the acute units from Salinas
 4   Valley and CMF and incorporate those units into the new
 5   facilities being constructed by the Receiver?
 6            MS. O'BANNON:  If we're going to get into
 7   Receiver plans and knowledge and what may or may not be
 8   done, I know that stuff is confidential material.  It
 9   should be protected under both Coleman and Plata
10   protective orders, and if he does answer any questions
11   even closely related to that, I'm going to request that
12   the transcript be sealed because of that content.
13            MS. WHELAN:  Can we go off the record.
14            MS. O'BANNON:  Off the record.
15            (Discussion off the record.)
16            MS. WHELAN:  Q.  Can you explain what your
17   understanding is of -- strike that.
18            I think before we went off the record, I was
19   asking you whether it was your understanding that the
20   ICF and the acute units currently located at Salinas
21   Valley and California Medical Facility will be moved
22   into the Receiver's newly constructed facilities.
23            Is that your understanding?
24       A.   I can't answer that because -- do you want me
25   to explain?
```

```
 1        Q.   It's actually a part of the bed plan, so why
 2   don't I just direct you to this section of the bed plan.
 3        MS. O'BANNON:   Let's move on to the next
 4   question and see where we go from there.
 5        THE WITNESS:   (Sotto voce conference between
 6   the witness and his counsel.)
 7        MS. WHELAN:   Q.   If you refer to pages --
 8   beginning on Page 8 of the bed plan, and there's a chart
 9   on here that's titled "Delivery of Clinical Services,"
10   and the chart continues onto the next page, Page 9.
11   Under the second column, which is "Impact," it states --
12   I'm at the top of Page 9.   It states, "The current
13   inpatient ICF and acute beds at CMF VPP and Salinas
14   Valley State Prison/SVPP will be put to another use."
15        A.   Um-hum.
16        Q.   Is that accurate?
17        A.   No.
18        Q.   Can you explain how that's inaccurate?
19        A.   Then, I'm dealing with the Receiver's plan.
20        Q.   Okay.   Can you explain what the Receiver's
21   plan is?
22        A.   The current plan contained in the binder,
23   there will be seven locations.   They will have
24   approximately 10,000 beds, half will be mental health,
25   half will be medical.
```

Page 88

1    In two of the locations, DMH will be charged
2  with the responsibility of operating 1,108 acute high
3  custody and low custody intermediate beds.
4    Q.   So just to clarify, there will be a total --
5  the plan is that there will be a total of seven
6  facilities, and within two of those facilities, DMH will
7  run 1,108 acute and ICF beds; is that correct?
8    A.   That is correct.
9    Q.   And will there be any acute or ICF beds
10 anywhere else in the system for CDCR inmates?
11   A.   CDCR will operate mental health crisis beds in
12 all seven locations.  Their number is relatively small.
13   Q.   You mean the number of MHCBs?
14   A.   Per facility, correct.
15   Q.   Do you know what that number is?
16   A.   Twenty-four.
17   Q.   So 24 MHCBs within each of the seven
18 facilities; is that correct?
19   A.   Correct.
20   Q.   Do you have knowledge of what the Receiver's
21 time frame is for building those seven facilities?
22   A.   Yes.
23   Q.   Can you explain what the time frame is?
24   A.   Facility 1 is to be constructed and completed
25 by January 1, 2011.  The other facilities, they have not

1  predetermined the amount of time, but it's going to be
2  shortly thereafter.
3      Q.   Do you know where Facility 1 will be
4  constructed?
5      A.   I have an idea.  They've designated eight
6  locations, seven will be selected.  Facility 1 is to be
7  located in Northern California.  In Facility 1, we will
8  operate 490 beds.
9      Q.   Is it your understanding that Facility 1 will
10 be one of the two locations where DMH operates acute and
11 ICF beds?
12     A.   That's accurate.  490, to be specific.
13     Q.   And the 490 refers to both acute and ICF; is
14 that correct?
15     A.   It's broken down in three phases:  Acute, high
16 custody ICF and low custody ICF.
17     Q.   Do you know if there is a plan -- strike that.
18          Do you know what the time frame is for the
19 second facility that will contain DMH acute and high
20 custody and low custody ICF beds?
21     A.   They've numbered the facilities 1 through 7.
22 Facility No. 5 will be 618 beds operated by DMH.
23 There's nothing official, but it appears No. 5 will be
24 constructed as No. 2.
25     Q.   The current plan is that Facility No. 5 will

Page 90

```
 1  be second in line for construction; is that correct?
 2       A.  The discussion of the Core Planning Team,
 3  which I've been appointed to, that has been the
 4  discussion.  There's been no indication from the
 5  Receiver if that is what he's going to do.
 6       Q.  The Core Planning -- I'm sorry, what did you
 7  refer to?
 8       A.  Core Planning Team.
 9       Q.  The Core Planning Team has recommended that
10  No. 5 will be built second, but the Receiver has not yet
11  responded to that recommendation; is that accurate?
12       A.  We have discussed it, and it's been presented
13  to the Receiver.  I have no knowledge of the Receiver's
14  actual plan.
15       Q.  Let's refer to these as Facility 1 and
16  Facility 5; is that correct?
17       A.  That's how they're numbered in the document.
18       Q.  Okay.  And do either Facility 1 or Facility 5
19  also contain the acute and ICF beds for female patients?
20       A.  They both do.
21       Q.  And can you explain what the breakdown is for
22  female beds in those facilities?
23       A.  From memory, in Northern California, it's 10,
24  and in Southern California, it's 18.
25       Q.  Do you know where the Northern California site
```

```
 1   will be?
 2        A.   I'm aware of the land mass, that it will take
 3   care of this facility, and there's only one.  Is that
 4   what you're asking?
 5        Q.   I'm asking if there's a set plan for where
 6   Facility 1 will be built at this point.
 7        A.   The Receiver has eight sites selected.  Seven
 8   will actually be utilized.  I can't tell you where the
 9   Receiver is going to place it, but I can tell you
10   there's only two land masses capable of housing
11   Facility 1 and Facility 5.
12        Q.   Okay.  Just to clarify for the record, you're
13   referring to the eight sites, and those, I think, are in
14   this plan, but I want to confirm that's your
15   understanding, as well.
16             So on Page 5 of the bed plan, it lists the
17   eight sites as Northern California Youth Center in
18   Stockton; California State Prison Sacramento; Deuel
19   Vocational Institution, Tracy; the Ventura Youth
20   Facility; R.J. Donovan Correctional Facility; California
21   Institution for Men; Nellis/Whittier, and then
22   California Medical Facility/CSP-Solano.
23             Are those the eight sites you were referring
24   to?
25        A.   Yes.
```