# EXHIBIT 20

# Deposition of Victor Brewer
# September 4, 2008
# (Phase II Designations)

# Part C

Confidential Transcript

Page 109

1    timing is to be operational in 2011/2012, with a Joint

2    Commission 2012.

3        Q.    And based on your knowledge of the Joint

4    Commission accreditation process, do these time frames

5    look accurate that if the completion of construction of

6    the facility and installation of equipment, supplies,

7    furniture, staff, et cetera, is completed by 2010 to

8    2011, that the inspections by the Department of Health

9    Services Licensure would be completed on or around

10   December 2010 to January 2011?

11       A.    That's accurate.

12       Q.    Is it also accurate, based on your experience,

13   that, using that time frame, patient admissions would

14   begin in and around February 2011?

15       A.    That's accurate.

16       Q.    Are there any factors that could delay these

17   time frames?

18       A.    Delay in construction completion.

19       Q.    Are there any other factors beyond

20   construction delays that could affect licensing or

21   moving patients in?

22            MS. O'BANNON:  You are talking internal, not

23   in regards to the CMF project itself; is that correct?

24   In regard to this particular project or in general?

25            MS. WHELAN:  Just in general.

Confidential Transcript

Page 110

1          THE WITNESS:  Obtaining your license is
2    conditional upon having adequate staff to open the
3    facility.  So no facility would give their license or
4    treat patients, adequate staffing.  That's why you would
5    open unit by unit.  You may be fully licensed but have
6    20 beds operational.  So staffing is a key element.
7    Construction is the other.
8          MS. WHELAN:  Q.  Attachment B to the bed plan,
9    and I apologize that it's also very small.  The writing
10    is very small on this.
11          MS. O'BANNON:  It seems to be quite long.  It
12    is kind of small.
13          THE WITNESS:  (Witness reviewing document.)
14          MS. WHELAN:  Q.  I'm looking in Table B, which
15    is second over from the left, down at the bottom.  It
16    seems to be setting out the Receiver's sites, 1 through
17    7.
18          Do you see that?
19    A.  Um-hum.
20    Q.  And this chart is consistent, I believe, with
21    what you said before, which is that Site 1 would include
22    acute ICF and ICF high custody beds, and that Site 5
23    would also include those beds; is that correct?
24    A.  That's correct.
25    Q.  And it was your testimony that Site 1 is

Confidential Transcript

Page 111

1    currently planned to be built first; is that correct?

2        A.    That's correct.

3        Q.    And there has also been a recommendation from

4    the Core Planning Team and some discussion by the Core

5    Planning Team to build Facility 5 second; is that

6    correct?

7        A.    That's correct.

8        Q.    But as you sit here today, it's not clear

9    which facilities will be built in which order; is that

10   fair to say?

11       A.    It's fair to say the Receiver has not

12   indicated which ones he intends to build in what order.

13       Q.    And until the Receiver indicates which ones he

14   will build in what order, is it fair to say that it's

15   not established which facilities will be built first?

16       A.    I know of no published information from the

17   Receiver indicating which ones he's going to build

18   first.

19       Q.    And do you know based on your participation in

20   the Core Planning Team which ones will be built first?

21            MS. O'BANNON:   He's already answered these

22   questions a number of times.

23            THE WITNESS:   I believe I previously stated

24   that the Core Planning Team recommended Facility 1 be

25   built first and requested Facility 5 be built second.

Confidential Transcript

Page 112

1          MS. WHELAN:  Q.  And I know you said that the

2    Receiver has not yet acted on the recommendation as to

3    Facility 5, and I don't recall if you said that he also

4    has not acted on the recommendation of Facility 1.  Is

5    that also true?

6          A.    I have not seen any published information that

7    the Receiver has taken any definitive action yet.

8          Q.    And do you know, based on your knowledge from

9    Core Planning Team, whether the Receiver will build

10   Facility 1 first and Facility 5 second?

11         MS. O'BANNON:  Again, he's answered the same

12   questions over and over again.

13         MS. WHELAN:  Well, you keep saying that, I

14   don't know of any published material from the Receiver,

15   so I'm trying to understand if there's another way that

16   you have this knowledge.

17         THE WITNESS:  There is no other way I have any

18   other knowledge.

19         MS. WHELAN:  Okay.  Thank you.

20         Q.    With respect to the new 64-bed ICF unit at

21   Salinas Valley State Prison, which I believe you

22   testified is scheduled to come online based on the most

23   recent report that you've seen by -- I'm sorry, not

24   online, but scheduled to be completed in terms of

25   construction by December of 2008; is that correct?

Confidential Transcript

Page 113

1          A.    That's accurate.

2          Q.    Has that unit -- strike that.

3                Have you already determined how you're going

4    to staff that 64-bed unit?

5          A.    Yes.

6          Q.    How are you going to staff that unit?

7          A.    Same as the first 64-bed unit.

8          Q.    And have you already begun hiring staff for

9    that unit?

10         A.    July 1.

11         Q.    July 1, you began hiring staff?

12         A.    Began advertising.  No one has been hired

13   until the budget passes.  We started the process.

14         Q.    I saw some earlier documents, and I'm not sure

15   if they're still accurate, where the plan was to move

16   some of the staff from the D-5 and the D-6 units into

17   the new 64-bed unit.

18               Is that still part of staffing plan?

19         A.    That is part of the management plan.  There's

20   129 positions we'll be hiring for the new structure.

21         Q.    For the new structure, you'll be hiring 129

22   new positions?

23         A.    Yes.

24         Q.    Does that include staff members who might be

25   moved from the D-5 and the D-6 units in --

Confidential Transcript

Page 114

1    A.    No.

2    Q.    How many staff from the D-5 and D-6 units do

3    you intend to move into the new 64-bed unit?

4    A.    It has not been determined yet.

5              MS. WHELAN:  Mark as Exhibit 8 an August 22nd,

6    2007, memorandum to Cindy Radavsky from Victor Brewer

7    regarding Joint Departmental Bed Plan considerations.

8    This is Bates number DMH000289 through 294.

9                        (Whereupon, Plaintiffs' Exhibit No.

10                       8 was marked for identification.)

11             THE WITNESS:  (Witness reviewing document.)

12             MS. WHELAN:  Q.  Are you familiar with this

13   memorandum?

14   A.    Yes.

15   Q.    Did you write the memorandum?

16   A.    Yes.

17   Q.    In the memorandum, you talk about the

18   staffing -- or your recommended staffing plan for the

19   new 64-bed ICF unit at Salinas Valley; is that correct?

20   A.    Yes.

21   Q.    And under Subheading 1 -- sorry, No. 1, you

22   state, "Staff currently working within Delta-5 or

23   Delta-6, which are classified permanent full-time, will

24   need to be redirected from the temporary beds to the new

25   64-bed addition that currently is under construction."

Confidential Transcript

1    Under this plan, it was closing Delta-5 and Delta-6.

2    That is no longer the plan; therefore, all of the new

3    employees are permanent full-time.  There will be no

4    limited term.

5         Q.   So because D-5 and D-6 are no longer temporary

6    units, the staff that you hire into those units will be

7    permanent full-time; is that correct?

8         A.   No.

9              MS. O'BANNON:  That misstates his testimony.

10             THE WITNESS:  Pardon?

11             MS. O'BANNON:  That sounded like it misstated

12   your testimony.

13             THE WITNESS:  It did.  All our staff are

14   permanent full-time and have always been so.  Under

15   these conditions, if we're going to not build the 128,

16   as referenced in the first paragraph, I ultimately will

17   close Delta-5 and Delta-6.  Finance will not give us

18   permanent full-time positions.

19             But, now, we're not closing anything, so I'm

20   getting permanent full-time staff.  This was written as

21   of the time -- a year ago.

22             MS. WHELAN:  Q.  So the prospects for hiring

23   permanent employees in the Monterey area are good, as

24   far as you're concerned?

25        A.   They're challenging, but we've always met that

Golden Gate Reporting
(415) 499-DEPO

Confidential Transcript

Page 118

1    challenge.

2        Q.   So do you anticipate any problems staffing the

3    replaced positions in D-5, D-6, and the treatment center

4    and/or the new positions in the new 64-bed unit?

5        A.   When we opened the first building, we had 103

6    positions.  It took me 12 months to fill them all.  When

7    I opened Delta-5, I got another large cadre of staff.

8    It took me 12 months to fill.  When I opened Delta 5,

9    the following year, it took me over 12 months.  I

10   anticipate that pattern will remain.  We will get there,

11   but it will take time.

12       Q.   So it may take up to and around 12 months to

13   fully staff the 64-bed unit; is that correct?

14       A.   Not necessarily.  It will probably take 12

15   months to fully staff it with permanent full-time

16   employees; however, as I have three times previously, I

17   will bring in registry staff behind our staff to have a

18   full staff of 129 people.  Some of them will be registry

19   and will disappear in time, or they could convert to

20   permanent full-time State employees.

21       Q.   So while you continue to recruit permanent

22   staff, you will try and fill those positions with

23   registry staff to the extent possible and then open the

24   beds as you can, based on your staffing; is that

25   correct?

Confidential Transcript

Page 119

1          A.    That is accurate.

2          Q.    On Page 4 of this document, which is

3    Bates No. DMH 000292, under "Additional considerations

4    that we must recognize and resolve."  No. 1, there's a

5    reference to a plan to open and operate an 18-bed 1370

6    program within Delta Yard.  Has that program been

7    opened?

8          A.    No.

9          MS. O'BANNON:  I just want to object to this

10   line of questioning and this particular document, since

11   the witness already said this particular plan that was

12   prepared August 22nd of 2007 is not taking place because

13   of the Receiver's new plan, so to the extent that that's

14   still true in regards to the content of material

15   contained in here, I'd like to place an objection on the

16   record.

17         There may be a foundational question in

18   regards to whether or not, maybe, these things that are

19   on here are going to be part of the new plan or not.

20   Might be helpful.

21         MS. WHELAN:  Q.  With respect to the 18-bed

22   1370 program, is it correct to say that you presented a

23   plan to the Coleman Court for that unit?

24         A.    Yes.

25         Q.    And what was the result as to whether or not

Confidential Transcript

Page 120

1    the unit would be established?

2        A.    It was predicated on being provided private

3    group rooms and interview rooms.

4        Q.    Do you mean group rooms or interview rooms

5    within a Delta Pod?

6        A.    Yes, I do.

7        Q.    Which Delta Pod?

8        A.    Group rooms would not be in the Delta Pods

9    themselves.  Designed to go into the vacated dining

10   room, the current plan that I signed on June the 20th

11   has three large group rooms, two interview rooms, and a

12   dining room, one large group room and one -- two

13   interview rooms in each of the enclosed concrete yards,

14   giving us a total of nine rooms.

15           If those are constructed, my plan would still

16   be to establish a 1370 unit.

17       Q.    Are those the rooms that you previously stated

18   were set to be constructed by 2011?

19       A.    That is correct.

20       Q.    So, as you sit here today, the 1370s are not

21   in any specific designated unit; is that correct?

22       A.    That's correct.

23       Q.    Under No. 2 on that same page, it states --

24   I'm skipping a sentence or two.  "With the recent

25   expansions, sixty six Level IV ICF beds at the Vacaville

Confidential Transcript

Page 121

1    Psychiatric Program and the Delta Yard Expansion, the

2    wait list predictably dropped to approximately 80

3    patients," and that's from 120 patients?

4         A.   Um-hum.

5         Q.   "As predicted, the wait list is continuing to

6    grow and has increased to 96 within the current wait

7    list and referrals received as of this date."

8         A.   Um-hum.

9         Q.   Do you expect that a similar decrease in the

10   wait list will occur when the 64-bed unit opens and

11   begins accepting patients?

12        A.   Yes.

13        Q.   Do you expect that the wait list will then

14   continue to grow once those beds begin to fill?

15        A.   Yes.

16        Q.   And why do you expect that that will happen?

17        A.   CDCR has been very successful over the last

18   10 years in increasing the diagnosis rate of the

19   mentally ill.  It's increased from approximately

20   10 percent to over 22 percent, which approaches the

21   national average.

22             Because their diagnosis rate has improved, my

23   referral rate parallels that.  And when we opened

24   Delta-5, the 6 had dropped temporarily, climbed.  When

25   we opened Delta-5, it dropped temporarily, climbed.  We

Confidential Transcript

Page 122

1    opened P-2, it dropped temporarily and climbed.  We

2    opened P-3, it dropped temporarily and climbed.

3              So based on a continued opening of additional

4    beds, I see nothing to indicate that it won't climb back

5    to previous levels.

6         Q.    No. 3 also states, "Considering with each

7    expansion the SVPP wait list has only temporarily

8    decreased with a continued increase approaching the

9    previous levels.  SVPP management believes that due to

10   the nature of a relatively long wait time between

11   referral and admission, the referring institutions are

12   reluctant to send referrals.  Only after they experience

13   a bed increase do they again submit appropriate referral

14   packages with the expectation of admission into the

15   program due to the additional operational beds."

16             Do you still agree with the statements in that

17   paragraph?

18        A.    Yes.

19        Q.    Can you explain what you mean about clinicians

20   increasing referrals after they experience a bed

21   increase?

22        A.    To refer a patient to a DMH program, they must

23   provide a reasonable amount of clinical information to

24   support the mental health diagnosis, and when the

25   clinicians see their referrals sit on a wait list for a

Confidential Transcript

Page 123

1    substantial amount of time, they appear to be reluctant

2    to continue to send referrals.

3              As new beds open, they see the ability for DMH

4    to increase our inpatient population; therefore, they

5    start referring again.

6        Q.   Under No. 4 -- and, again, this memo was

7    written on August 22nd, 2007, or dated August 22nd,

8    2007 -- you state, "Now that the plan submitted to the

9    Coleman Court eliminates the permanent structures for

10   the 128 beds, it becomes imperative that CDCR construct

11   appropriate group rooms within the Delta Yard to provide

12   appropriate patient care and confidentiality according

13   to HIPPA statutes."

14             Does that refer to the group rooms that you

15   spoke about a couple of minutes ago that are scheduled

16   to be constructed by 2011?

17       A.   Yes.

18       Q.   Are there any plans to expedite construction

19   of those group rooms, that you know of?

20       A.   I have no knowledge of that.

21       Q.   Under Sub-part A of No. 4, moving on to the

22   next page, you wrote, "In addition to the necessary

23   patient group rooms, the current facilities assigned for

24   office space are not conducive to quality patient care

25   in that professional and clinical staff do not have

Confidential Transcript

Page 151

1    Valley, have you noticed any differences in the acuity
2    level of patients, generally, that you see in those
3    units?
4         A.    No, it appears to be relatively -- the acuity
5    appears to be consistent.
6         Q.    So over the past seven years, the acuity level
7    of patients in those DMH units has remained
8    approximately the same?
9         A.    Yes.
10        Q.    How do you define acuity?
11        A.    Well, again, if a person is suicidal seven
12   years ago, and he's suicidal today, the result is the
13   same outcome, same acuity level.  I don't see a change
14   in the type of patient.  I see a change in the number of
15   patients.
16        Q.    What's the change in the number of patients?
17        A.    More referrals each year.  I think that goes
18   back to the fact that I testified earlier, the CDC's
19   improved ability to diagnose the mentally ill.
20        Q.    Do you think that it also relates to having
21   more people generally in the prison system?
22             MS. O'BANNON:  Calls for speculation.
23             THE WITNESS:  I can't answer that.
24             MS. WHELAN:  Q.  You testified that there's a
25   national average in terms of the percentage of people

Confidential Transcript

Page 152

1    with mental health issues in the population; is that

2    correct?

3        A.    That's correct.

4        Q.    And I believe you said that the CDCR's current

5    population of mental health patients is about

6    22 percent; is that correct?

7        A.    That's correct.

8        Q.    And you said that's consistent, more or less,

9    with the national average; is that correct?

10       A.    That's correct.

11       Q.    So is it fair to say that as the population

12   increases, that means that the number of people with

13   mental health issues will also proportionately increase?

14       A.    Mathematically, that is true, but what I

15   referred to is CDC 10 years ago was diagnosing at

16   10 percent; therefore, my population was less, even if

17   it was the same population in prison.  But because of

18   their improved screening tools, they're diagnosing the

19   national average, thus the increase.

20       Q.    But would you also agree that increasing the

21   population from 10 years ago would also result in a

22   larger population of the Coleman class?

23       A.    It would result in a larger pool; that is

24   correct.

25       Q.    Focusing for a minute on the Salinas Valley

Confidential Transcript

Page 164

1    about a year to retrofit these cells and remove the

2    dangerous furniture and the vent mesh screens with four

3    cells at a time coming down; is that correct?

4         A.    That's correct.

5         Q.    Is it accurate to say that in the interim,

6    there are mesh vents and furniture in these cells that

7    makes it easier for someone to commit suicide?

8         A.    That is accurate.

9         Q.    Do you have an opinion about whether or not

10   the cells should be retrofitted immediately?

11        A.    We had a serious suicide attempt last week,

12   and I sent another request to Cindy Radavsky, to

13   Lisa Tillman, to Matt Lopes to allow us to retrofit the

14   facility.

15        Q.    Did you receive a response to that memo?

16        A.    Not yet.

17        Q.    So it sounds like it's your position that the

18   retrofit needs to be done, and that it should be done as

19   soon as possible; is that correct?

20        A.    That's accurate.

21             MS. WHELAN:  Do you guys need a break?

22             MS. O'BANNON:  Hum-um.

23             MS. WHELAN:   Q.  Were you involved, at all, in

24   the unidentified needs study that was conducted back in

25   and around 2003 and 2004?

Confidential Transcript

Page 165

1       A.   Yes.

2       Q.   In what way were you involved in that study?

3       A.   They requested our statistical information.

4       Q.   Did you provide that information at that time?

5       A.   Yes.

6       Q.   Did you see the results of the study when it

7   was completed?

8       A.   Yes.

9       Q.   Do you recall what the general results were of

10  the study?

11      A.   In numbers, no.

12      Q.   How about just in general, not utilizing

13  numbers?

14      A.   I believe it understated the need, and that's

15  why the court has rejected the six studies.

16      Q.   When you say, the six studies, which studies

17  do you mean?

18      A.   They were doing, simultaneously over the last

19  10 years, six studies prior to Navigant, all rejected.

20      Q.   Do you have any opinion as to whether or not

21  the UNA studies should be replicated and/or repeated on

22  some sort of periodic basis?

23      A.   With the pending advent of the new beds

24  associated with the Receiver, when they're fully staffed

25  and operational, you would be able to assess the need if

Confidential Transcript

Page 166

1    there's a waiting list.  If there's no waiting list, you

2    may negate the need to do another study.

3        Q.    So, in other words, if I understand you

4    correctly, if there's a waiting list, there's a higher

5    probability that people are under-referring or not

6    referring patients who might show up in an unidentified

7    need study; is that correct?

8        A.    I believe you will find a repeated pattern, as

9    beds become available, referrals increase markedly.

10       Q.    And why is that, in your opinion?

11       A.    I think we discussed it earlier, that the

12   clinicians are reluctant to go through the referral

13   process if they believe the patient will not get in for

14   a substantial amount of time.

15            MS. WHELAN:  I'm going to take a break.

16            (Recess taken.)

17            MS. WHELAN:  Mark as Exhibit 12 an August 4th,

18   2008, report from Jean Baraured on force and

19   Cynthia Radavsky regarding Monthly Staffing and Staffing

20   Vacancies Report for all DMH State Hospitals, Vacaville

21   Psychiatric Program, Salinas Valley Psychiatric Program.

22                        (Whereupon, Plaintiffs'

23                        Exhibit No. 12 was marked for

24                        identification.)

25            THE WITNESS:  (Witness reviewing document.)

CERTIFICATION OF DEPOSITION OFFICER

    I, CARI L. WATERS-DREWRY, duly authorized to
administer oaths pursuant to Section 2093 (b) of the
California Code of Civil Procedure, hereby certify that
the witness in the foregoing deposition was by me sworn
to testify to the truth, the whole truth and nothing but
the truth in the within-entitled cause; that said
deposition was taken at the time and place therein
stated; that the testimony of the said witness was
thereafter transcribed by means of computer-aided
transcription; that the foregoing is a full, complete
and true record of said testimony; and that the witness
was given an opportunity to read and correct said
deposition and to subscribe the same.

    I further certify that I am not of counsel or
attorney for either or any of the parties in the
foregoing deposition and caption named, or in any way
interested in the outcome of this cause named in said
caption.


CARI L. WATERS-DREWRY, CSR 12401