# EXHIBIT 22

## Deposition of Shama Chaiken
## August 29, 2008
## (Phase II Designations)

Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

     Plaintiffs,

vs.                  No. Civ S 90-0520 LKK-JFM P

ARNOLD SCHWARZENEGGER,
et al.,

     Defendants.
_____/
MARCIANO PLATA, et al.,

     Plaintiffs,

vs.                  No. C01-1351 TEH

ARNOLD SCHWARZENEGGER,
et al.,

     Defendants.
_____/


DEPOSITION OF SHAMA CHAIKEN

DATE:            August 29, 2008

TIME:            9:28 a.m.


LOCATION:      ROSEN, BIEN & GALVAN, LLP
               315 Montgomery Street, Tenth Floor
               San Francisco, California


REPORTED BY:   Brenda L. Marshall
               Certified Shorthand Reporter
               License Number 6939

Golden Gate Reporting

Page 33

1      Q.    Okay.  So, at some point in 2004, is that when

2   you moved to headquarters?

3      A.    Correct.

4      Q.    Okay.  But your position was paid for out of the

5   Sac budget; is that what you're saying?  Or you were

6   loaned to headquarters?

7      A.    Correct.  I was loaned to headquarters.

8      Q.    Okay.  And what were your responsibilities at

9   headquarters in 2004?

10      A.    I was assigned to finish compiling and

11   negotiating with you, I believe, the last changes to the

12   mental health services delivery system program guide and

13   take the steps required to implement the program guide, as

14   it was revised.

15      Q.    Did you -- what was your title at headquarters

16   when you were transferred there?  Did you come to have a

17   title there?

18      A.    I was still a senior psychologist supervisor

19   from Sac, working temporarily at headquarters.

20      Q.    Okay.  At some point, did you transfer

21   permanently to headquarters?

22      A.    Yes.

23      Q.    And when was that?

24      A.    In 2005.

25      Q.    Okay.  And what was your position at

Golden Gate Reporting

1    headquarters?

2        A.    Chief psychologist.

3        Q.    Okay.  And is that still your position now?

4        A.    Yes.

5        Q.    Okay.  Let's just jump into today.  Who do you

6    report to, Dr. Chaiken?

7        A.    Dennis Beaty.

8        Q.    And do you know what his position is?

9        A.    Yes.  He is the deputy director of program

10   services.

11       Q.    Okay.  And does anybody report to you in your

12   position?

13       A.    Yes.

14       Q.    And who is that?  Who do you supervise?

15       A.    Kim Cornish, she's a senior psychologist

16   specialist, and she's responsible for training.  Dolores

17   Shafer, she's a senior psychologist specialist.  Robert

18   Canning, he's a senior psychologist specialist,

19   responsible for suicide-prevention policy.  Connie

20   Hoglund, she's a senior psychologist specialist,

21   responsible for suicide case review.  Katherine Prudhomme,

22   and she is a senior psychologist specialist.  Brita

23   Martiny, she's a senior psychologist specialist,

24   responsible for culturally responsive and gender-sensitive

25   programming.

Golden Gate Reporting

Page 37

1    she's for new building design.  So, for example, she's

2    responsible for the development of future facilities and

3    decisions about bed planning and developing and

4    programming new facilities.

5        Q.    Okay.

6        A.    And then Andrew Swanson is the fourth deputy

7    director, and he's responsible for psychiatry services.

8    There's one other piece under Marion Chiurazzi, which is

9    forensic services.

10            So that's all the forensic evaluations that

11   happen in our system, board of parole hearings, and

12   mentally disorder offender evaluations.  And so -- but

13   Andrew Swanson signs -- he's responsible for the clinical

14   content of the mentally disorder offender evaluations, and

15   he's responsible for psychiatry services in the adult

16   prisons.

17       Q.    Okay.  When you said that Dr. Chiurazzi is the

18   indirect supervisor for the chiefs of mental health

19   services, who do they directly report to, if you know?

20       A.    I don't know.

21       Q.    Okay.  Is it correct that you've been involved

22   in planning for some of the new AB 900 programs for the

23   Department of Mental Health Services?

24       A.    Yes.

25       Q.    And those include the secured reentry facilities

Golden Gate Reporting

Page 38

1    and the infill facilities?

2        A.    Yes.

3        Q.    And why isn't that something that comes under

4    Dr. Streater's role?  I'm just trying to figure that out.

5        A.    Because Robin Dezember assigned me directly to

6    developing reentry programs, and I think in terms of the

7    time frame that those will be implemented that those will

8    be implemented in a sooner, closer time frame than the

9    actual development of new facilities for medical and

10    mental health care and that decisions are made about

11    workload based on people's skill sets.

12        Q.    Okay.  So, in other words, Robin picked you to

13    help him out, Robin Dezember.  And what's his position?

14        A.    He is the deputy secretary for the Division of

15    Correctional Health Care Services, which is currently

16    responsible for mental health and dental programs.

17        Q.    Okay.  Is it your understanding that

18    Ms. Epperly-Ellis reports to Mr. Dezember?

19        A.    Yes.

20        Q.    Okay.  And is Dennis Beaty a mental health

21    clinician?

22        A.    No.

23        Q.    Okay.  And what is his training, if you know?

24        A.    I know he's an attorney.

25        Q.    And is Robin Dezember a mental health clinician?

Golden Gate Reporting

Page 177

1    has actually been marked.  So it's an e-mail from Shama

2    Chaiken to Robin Dezember, dated October 10th, 2007.  The

3    first page is E_PRIV_156601, and it runs through 156610.

4              Can you identify this document, Dr. Chaiken?

5         A.    Yes.

6         Q.    What is it?

7         A.    It's the position paper I wrote about the

8    reentry mental health program.

9         Q.    Can you explain what kind of programs you think

10   would be appropriate in a reentry program designed for

11   this population?

12        A.    Sure.  But that could take a long time.  Could

13   you maybe be more specific or limit the question?

14        Q.    I'll try to do that.  Did you recommend in your

15   paper that prerelease planning be part of the treatment

16   program?

17        A.    I did.

18        Q.    Okay.  And why did you do that?

19        A.    Because prerelease planning is an important part

20   of recognizing that people who are reentering the

21   community require a number of things to be in place for

22   them to be successful in staying out of correctional

23   settings.  Is that enough information?

24        Q.    I notice that you -- one of the things you

25   mentioned was that there should be a connection between

1    the mental health providers in the reentry center and the

2    community providers that might be responsible for the

3    person upon release.  Do you think that is an important

4    function?

5          A.    Yes.

6          Q.    Okay.  And why is that?

7          A.    Because continuity of care is an important

8    element of mental health care.

9          Q.    What does continuity of care mean in terms of

10   mental health care?

11         A.    Means when a person moves from one setting to

12   another that they receive the same type of care and care

13   that's informed by their prior history as they move into a

14   new setting.

15         Q.    And you think it's -- did you think it was

16   important to have a -- as part of this program -- a manner

17   for clinical staff in the program to provide treatment

18   recommendations to clinicians in the community who would

19   be responsible for the patient upon release?

20         A.    Yes.

21         Q.    Okay.  And why is that?

22         A.    Because treatment providers can be informed by

23   the prior treatment providers about needs of

24   inmate-patients that they might not realize for a period

25   of time until they get to know somebody.

Golden Gate Reporting

Page 179

1      Q.     You also mentioned that there should be a
2   function for assisting with obtaining benefits, such as
3   social security or veterans' benefits.  Why is that an
4   important part of your program?
5      A.     Because people who are eligible for benefits
6   often need them in order to provide for their financial
7   needs.
8      Q.     In any of your discussions about these secure
9   reentry facilities, did you discuss whether or not they'd
10  be used also for parole violators who may be coming into
11  the system from that county?
12     A.     Yes.  That was discussed.
13     Q.     Okay.  And in the case of a parole violator
14  being admitted to a secure reentry facility for a
15  relatively short term, average parole violation is three
16  or four months, did you -- did your plan talk about what
17  kind of information you would obtain about that person
18  from the community providers?
19     A.     So we discussed that return to reentry facility
20  would have to be decided on a case by case basis,
21  depending on the reasons that led to the person's return
22  to the correctional setting and the ways that additional
23  reentry programming could be helpful.  And so implied in
24  that conversation was that we would have to have
25  information about what occurred in the community.

Golden Gate Reporting

Page 180

1     Q.    Okay.  At this point in time, are you aware of
2  any mechanism by which parole outpatient clinics can
3  provide information to reception centers about mental
4  health care their parolee who has been revoked is
5  receiving?
6     A.    Yes.
7     Q.    What is that?
8     A.    We have a new computer system that's been
9  implemented at a number of institutions where clinicians
10 can log on to parole outpatient clinic database and access
11 information.  I happen to know that the technology system
12 recently went down.  I don't profess to understand what
13 that means or what needs to be done to fix it, but I know
14 it's not available today.
15    Q.    Okay.  At the time of -- are you aware of a
16 recommendation that was made by the Office of the
17 Inspector General, Department of Corrections, that
18 recommended that the department obtain better information
19 from parole outpatient clinics about parolees with mental
20 illness who are coming into reception centers?
21    A.    No.
22    Q.    Is the computer system that you just discussed
23 available at all at CCR reception centers at this moment
24 in time?
25    A.    No.

Golden Gate Reporting

Page 181

1    Q.    Are there some reception centers that don't have
2    the computer capability to provide -- to access that
3    parole outpatient clinic information?
4    A.    I don't believe that statement is true.
5    Q.    Why isn't it being done at all reception
6    centers, to your knowledge?
7    A.    It's being phased in to various reception
8    centers.  There is a terminal, there's a computer access
9    point that has been identified in all of the reception
10   centers.  It requires things that I don't understand the
11   processes about related to information technology to get
12   it on line and to get the people trained to use it, and
13   that's being phased in, and it's not available anywhere
14   today because of some technology problem.
15   Q.    Okay.  It has been available in the past in some
16   reception centers?
17   A.    Yes.
18   Q.    Okay.  And when you say it's phased in, putting
19   aside today's technology problem, how many reception
20   centers are you aware of that actually have the system in
21   place, working now?
22   A.    I'm sure that San Quentin has it -- has had it
23   available.  That's the only one I'm positive about.
24   Q.    You're aware that San Quentin is the location
25   where a mentally ill parolee was not identified and

Golden Gate Reporting

Page 182

1    released and a violent act occurred in San Francisco as a
2    result?
3        A.    Yes.  And now I remember the IGI's report that
4    you referred to earlier.
5        Q.    OIG?
6        A.    The OIG's report that you referred to earlier.
7    I haven't read it.
8        Q.    Okay.  You have not read that report?
9        A.    No.
10       Q.    Okay.  Did you ask John Hummel, the technology
11   coordinator for the receiver, to investigate improving
12   technological access for reception centers to assist with
13   this kind of communication?
14       A.    I don't recall asking John Hummel for that.  Did
15   I?
16            MR. ANTONEN:  Well, if you did, there will be a
17   document coming shortly thereafter.
18            THE WITNESS:  Here comes the document.  I'm so
19   good.  I just don't remember how good I am.
20   BY MR. BIEN:
21       Q.    In looking at the -- did you help do the
22   staffing, the mental health staffing estimates for the
23   secured reentry facility?
24       A.    Yes.
25       Q.    Is it correct that you -- you tried to use

Golden Gate Reporting

Page 188

1   return population?

2       A.   Can you restate the question?

3       Q.   In 2006, you were involved in an effort to

4   analyze and discuss whether or not there should be a

5   program for psych return -- psych returns to CDC from

6   parole.

7       A.   So I'm going to clarify that there used to be a

8   population who were returned to CDCR for psychiatric

9   reasons, and that population used to be called the psych

10  return population, and there were discussions about

11  whether those people needed some specific care that was

12  different than what we were providing for everybody else,

13  correct.

14      Q.   And did you -- did you understand that there was

15  a -- a need for a particular program for this population

16  at the time that you were discussing creating the program?

17          MR. ANTONEN:   Question is kind of compound, but

18  to the extent you understand.

19          THE WITNESS:   You asked did I understand that a

20  different program was needed for that population.   I don't

21  know that anyone understands specifically what treatment

22  would be helpful for that population, but it was

23  discussed.

24  BY MR. BIEN:

25      Q.   Okay.   You understand that there is -- there are

Page 189

1    mentally ill people who are on parole who fail frequently

2    and return to prison reception centers and that's a

3    population that's ongoing in the CDC, even though they're

4    no longer psych returns?

5         A.    In CDCR?

6         Q.    Yes.

7         A.    Yes.

8         Q.    Okay.  And is it correct that this population,

9    the particular challenges to CDCR in managing this

10   population is reception centers?

11        A.    Yes.

12        Q.    Does that include the fact that there's very

13   little clinical information available about this

14   population to clinicians upon their arrival?

15        A.    Yes.

16        Q.    Are you aware that it can be -- it can take

17   weeks or sometimes even months before clinicians receive

18   full medical files for people returning from parole?

19        A.    Yes.

20        Q.    Have you investigated the reason that that

21   remains a problem at CDCR?

22        A.    I think "investigated" may be too strong of a

23   word.

24        Q.    Have you discussed with anyone that problem and

25   what can be done to address it?

Golden Gate Reporting

Page 190

1      A.    I have discussed the problem with people.  I
2  have not been involved specifically in efforts to look at
3  a solution to that.
4      Q.    Okay.  There was a recent suicide at DVI just a
5  couple of months ago of a person who was returned on
6  parole.  Do you recall that?
7      A.    Yes.
8      Q.    Okay.  And in investigating that suicide, is it
9  not correct that a psychologist working with you
10  determined that there were 13 pallets of unfiled medical
11  records waiting in the Northern California records center?
12      A.    I don't remember the number of pallets, but I
13  remember that there were files that had not reached the
14  clinicians who were providing treatment.
15          MR. BIEN:  I'm going to mark as the next
16  exhibit, and this is definitely going to be
17  confidential --
18          MR. ANTONEN:  Do we want to -- do you want to
19  take a break?
20          THE WITNESS:  I'm okay.
21          MR. BIEN:  Okay.
22          (Plaintiffs' Exhibit No. 16 was marked
23          for identification.)
24  BY MR. BIEN:
25      Q.    I've marked as the next exhibit in order, and

Golden Gate Reporting

Page 191

1    ask that you keep this separately from other things -- and

2    it's protected under the protective order, right, Mike --

3              MR. STONE:  Right.

4              MR. BIEN:  They've all signed on.

5              MR. STONE:  Good.

6    BY MR. BIEN:

7         Q.    -- an August 14, 2008, report from Suzan Hubbard

8    and Brenda Epperly-Ellis to Steve Moore, Warden of DVI,

9    and Robert Horel, Warden of Pelican Bay, concerning a

10   suicide of an inmate.

11             Dr. Chaiken, you've seen this report before?

12        A.   Yes, I have.

13        Q.   Okay.  Is it part of your responsibility to

14   review and discuss suicides in an effort to learn from

15   them and identify problems in clinical care and make

16   recommendations?

17        A.   Yes.

18        Q.   Is it correct that -- I'm turning to the

19   recommendations page.  Is it correct that one of the

20   recommendations, No. 2, had to do with the fact that this

21   inmate was paroled directly from a DMH facility and there

22   was not appropriate communication between DMH and the

23   parole outpatient clinic concerning his mental health

24   needs?

25        A.   Yes.

Golden Gate Reporting

Page 192

1    Q.    Turn -- I guess can you explain the first -- the

2    report we were just looking at is written as executive

3    summary of the suicide report.  And who prepares that

4    report?  It's signed by Brenda Epperly-Ellis and Suzan

5    Hubbard.

6        A.    So there's a main suicide report, and at the end

7    of that suicide report, it says who the author of the

8    report is.  So this one was written by Dr. Canning, who I

9    supervise.  And then everything from the section that

10   starts -- the section IX, 9, the summary/conclusions, that

11   gets cut and pasted into this first piece, which is called

12   the executive summary, which is the part that we expect

13   the reviewers to review.

14       Q.    Okay.

15       A.    And that has the most pertinent facts related to

16   the suicide and the quality -- a discussion, if necessary,

17   and the quality improvement recommendations.

18       Q.    Okay.  If you go to page 7 of the main suicide

19   report, if you go to the second paragraph from the bottom,

20   it talks about the fact that he had been -- this inmate

21   had been in the OHU, but they're unable to find any

22   records, any of his mental health records, from his OHU

23   stay.  Do you see that?

24       A.    He had been housed in 2007, December of 2007, in

25   the outpatient housing unit in DVI, and then he was

Golden Gate Reporting

Page 193

1    transferred to the mental health crisis bed at Pelican Bay

2    State Prison.  And DVI staff indicated that the records of

3    his stay in the outpatient housing unit were copied and

4    sent with paperwork to Pelican Bay State Prison, and

5    Pelican Bay State Prison was unable to locate those

6    copies.  Is that what you are referring to?

7         Q.    Right.  Then, if you go further down in that

8    paragraph, he went in and out, and then the original

9    records were routed by DVI to the California Department of

10   Corrections and Rehabilitation Health Records Center for

11   inclusion in inmate (name deleted from record per

12   stipulation) unit health record.

13             When DVI health records' staff attempted to

14   obtain the outpatient health unit records for this

15   evaluation, health records' center staff informed them

16   that they could not locate the records because they had,

17   quote, fifteen pallets of loose filing, end quote.

18             MR. ANTONEN:  Do you want to go back?  You did

19   say the inmate's name.  Can we just go back and say delete

20   the name on the record?  I stipulate to that, just so we

21   don't have the confidentiality issue?

22             MR. BIEN:  That's fine.

23             THE WITNESS:  So this is three degrees of

24   hearsay.  So it's somebody writing a report who heard this

25   from someone at DVI who talked to somebody at the health

Golden Gate Reporting

Page 194

1    records' center at the end of the year, last year.

2         So, yes, that's what the staff person said to

3    the suicide reviewer when they were asked if they were

4    able to obtain the past record.

5    BY MR. BIEN:

6         Q.   Okay.  And did you investigate whether or not

7    it's true that there are 15 pallets of loose medical

8    records?

9         A.   No.

10        Q.   And you had heard reports that there are

11   tremendous delays in obtaining medical records for parole

12   violators upon their return to reception centers?

13        A.   Can you define "tremendous"?

14        Q.   That there are -- I'll delete the word

15   "tremendous."  There are delays in obtaining medical

16   records for people returning from parole to reception

17   centers?

18        A.   Yes.  There are delays.

19        Q.   Okay.  And are you aware of any efforts by the

20   department to address those delays?

21             MR. ANTONEN:  Objection to the extent counsel

22   knows that the receiver in Plata has now taken over

23   medical record issues.  So I think to the extent the

24   witness knows, but I think it calls for a legal conclusion

25   in some respects.

Golden Gate Reporting

1    that, November 7, 2006?

2        A.    Uh-huh.

3        Q.    In the second sentence, you say research

4    indicates that scales measuring Axis I diagnoses (Like

5    Depression, Bipolar Disorder, Schizophrenia) on the

6    MCMI-III do not correlate with future risk of violence."

7    Can you explain to me what that means.

8        A.    So the MCMI-III is a paper and pencil

9    psychological test that is given to individuals where they

10   answer a series of questions, and their answers are

11   standardized with other populations.  And the results of

12   these tests, if they're -- if they're valid for an

13   individual, can give clinicians information about symptoms

14   that they have, clinical syndromes, and personality

15   factors and traits.

16          And so what I had researched there was any

17   evidence that the scales that we were using, or that the

18   results of the MCMI-III test specifically on scales

19   measuring Axis I diagnoses, do not correlate with future

20   risk of violence.

21       Q.    Does the CDC use the MC -- this test right now

22   in its mental health treatment?

23       A.    Yes.

24       Q.    Okay.  And what is it used for?

25       A.    Diagnostic clarification.

Page 201

1    Q.   Okay.  And so what you're saying is that while

2    the test is useful for that purpose, it's not useful for

3    predicting violence?

4    A.   Correct.  At least those scales were not useful

5    for predicting violence.  There were other scales, such as

6    those measuring antisocial and narcissistic traits,

7    anxieties, and some scales measuring substance abuse

8    disorders that other state systems, at least, felt that

9    had some impact on future of violence.

10   Q.   Okay.  Is it your understanding that mental

11   illness alone is not a good predictor of risk of future

12   violence?

13   A.   My understanding is that it's more complicated

14   than that.  So, correct, mental illness alone is not a

15   predictor of future violence risk.

16   Q.   Okay.

17   MR. BIEN:  I'd like to mark as the next one,

18   which is No. 18, Enclosure 20 to the monthly documents we

19   just received today from CDC, which is Transferred and

20   Rescinded Mental Health Crisis Bed Referrals By

21   Institution and Level of Care.  It bears -- doesn't have a

22   production number on the first page, but it's dated August

23   13, 2008, from Rick Johnson to Robin Dezember is on the

24   second page.  The first page says "Enclosure 20."

25   (Plaintiffs' Exhibit No. 18 was marked

```
1                  CERTIFICATION OF DEPOSITION OFFICER

2

3          I, BRENDA L. MARSHALL, duly authorized to

4     administer oaths pursuant to Section 2093(b) of the

5     California Code of Civil Procedure, hereby certify that

6     the witness in the foregoing deposition was by me sworn

7     to testify to the truth, the whole truth and nothing but

8     the truth in the within-entitled cause; that said

9     deposition was taken at the time and place therein

10    stated; that the testimony of said witness was thereafter

11    transcribed by means of computer-aided transcription;

12    that the foregoing is a full, complete and true record of

13    said testimony; and that the witness was given an

14    opportunity to read and correct said deposition and to

15    subscribe the same.

16         I further certify that I am not of counsel or

17    attorney for either or any of the parties in the

18    foregoing deposition and caption named, or in any way

19    interested in the outcome of this cause named in said

20    caption.

21

22

23

24    _____
      BRENDA L. MARSHALL, CSR 6939
25
```