# EXHIBIT 24

# Deposition of Karen Finn
# August 26, 2008
# (Phase II Designations)

# Part D

```
 1   safety need?
 2       A.  Depending on how it's portrayed in the
 3   documentation from the department.
 4       Q.  Okay.
 5           So, there's a certain amount of how
 6   urgent-sounding the language in the document is?
 7       A.  I guess, that, and the need that they
 8   convey -- what the project -- what need it is conveyed
 9   to fix.
10       Q.  Do you understand what a mental health crisis
11   bed is?
12       A.  I don't know specifically what it is.  I
13   couldn't convey to you exactly how it is different than
14   another type of mental health facility.
15       Q.  Okay.
16           Would the person -- would you expect, as a
17   manager, that the person doing the first-level analysis
18   at the Department of Finance would know over the course
19   of working on the Budget Change Proposal -- that they
20   would know or learn what a mental health crisis bed was?
21       A.  Yes.  Yes.
22       Q.  And would they then explain it to their
23   management as it went up the chain?
24       A.  Yes.
25       Q.  Do you recall anyone explaining to you at any
```

1   point, We've got this project for mental health crisis
2   beds, and this is what they are, and this is why it's
3   important?
4       A.  I don't recall specifically, no.
5       Q.  Do you recall if anyone did that?
6       A.  Specifically, no.  I don't recall.
7       Q.  Okay.
8           And again, you believe this has been included
9   in a budget, but you're not sure if it was in last
10  year's budget or the one that's still being debated?
11      A.  Correct.
12      Q.  Okay.
13          MS. MORRIS:  (Indicating)
14          (Whereupon Plaintiffs' Exhibit 8
15           was marked for identification.)
16          MS. MORRIS:  Exhibit 8 is a memorandum bearing
17  the Bates Nos. Priv000484 through -492.
18          MR. LEWIS:  I'll object to this on the basis
19  of deliberative process privilege.  It's a finance
20  letter, but I will allow the witness to be asked
21  questions on it.
22  BY MS. MORRIS:
23      Q.  Are you familiar with this document?
24      A.  I don't recall it specifically, but it looks
25  like a document that we at the Department of Finance got

1  what I'm defining as a problem.
2          THE WITNESS:  Again, I can't tell from this
3  piece of paper if there were any problems with this
4  request when it came to us.
5          I don't even know -- I can't even tell you if
6  this was drafted by our staff.  The Department of
7  Corrections could have drafted it for us --
8          MS. MORRIS:  Mm-hm.
9          THE WITNESS:  -- as a submittal, and along the
10 analysis, something our staff has reviewed and our
11 department is working on it.  I just can't tell from
12 this document.
13         MS. MORRIS:  Okay.
14 BY MS. MORRIS:
15    Q.  But what you are certain of is this notice has
16 not been submitted yet?
17    A.  I can say I'm certain that no projects have
18 been noticed to the legislature to be spent from any of
19 the funding from AB 900.  So, therefore, I would assume
20 this has not gone out.
21         Whether it -- I can't believe it -- there
22 could have been a situation, but I don't recollect.  It
23 could have gone out and we withdrew.  I don't know.
24    Q.  But you are absolutely certain that there has
25 been no notification to the legislature seeking release

```
 1   of any AB 900 funds to date?
 2        A.   Correct.
 3        Q.   And that no AB 900 funds, other than the 300
 4   for infrastructure and 50 million for the programs?
 5        A.   Programs.
 6        Q.   Other than that 350 million dollars, there
 7   have been no releases of AB 900 funds?
 8        A.   Correct.
 9             The San Quentin Mental Health Project we
10   talked about, the legislature made a separate allocation
11   for that.  Other than that, there's been no releases of
12   AB 900 funds.
13        Q.   Okay.
14             And no notifications that would be the
15   precursor to such a release?
16        A.   Correct.  Correct.
17        Q.   Okay.
18             How long will it take from the time of a
19   notification going to the legislature, if all goes well,
20   for that funding to be released?
21        A.   Assuming the legislature didn't have any
22   questions or ask for extension of time to review a
23   proposal, the letter is sent to the legislature, and the
24   letter says, Thirty days later, we will be releasing --
25   we will be approving -- I think it says the Public Works
```

```
 1   management exercise yards for some longer period of time
 2   than had been planned; is that correct?
 3           MR. LEWIS:  Objection.  Calls for speculation.
 4   There could be other projects the witness doesn't know
 5   about at this time.
 6           THE WITNESS:  Yeah.  I couldn't tell from
 7   this.
 8   BY MS. MORRIS:
 9       Q.  But there was no discussion of how to use that
10   9.4 percent to provide some small management exercise
11   yards in this document; is that correct?
12       A.  I don't recall that discussion.
13       Q.  Okay.
14           Do you recall any other discussions with small
15   management yards at Solano?
16       A.  No.  I don't remember any specifically.
17           MS. MORRIS:  I'd like to mark this document as
18   Exhibit 12.
19           (Whereupon Plaintiffs' Exhibit 12
20            was marked for identification.)
21           MS. MORRIS:  Actually, just one quick --
22           THE WITNESS:  This is 11.
23   BY MS. MORRIS:
24       Q.  The small management yards discussed in this
25   project --
```

Page 190

```
1        A.   In this letter.
2        Q.   -- in this letter, Exhibit 11, those are not
3   being funded out of AB 900?
4        A.   Correct.
5        Q.   Okay.
6             This one is hard to read.  And actually, I'm
7   not going to ask you about the first couple pages.
8             MR. LEWIS:  Will these still be considered
9   part of the exhibit -- these top two pages?
10            MS. MORRIS:  Yes.
11            MR. LEWIS:  Do you have an original in better
12  shape?
13            MS. MORRIS:  (Indicating)
14            MR. LEWIS:  That's the best one.
15            MS. MORRIS:  So, no.
16            MR. LEWIS:  Okay.
17            This doesn't have a Bates number.
18            Do you know where it came from?
19            MS. MORRIS:  Um, no.
20            THE WITNESS:  (Witness reviews the document.)
21            Okay.
22  BY MS. MORRIS:
23       Q.   Do you know what this document is?
24       A.   It appears to be a BCP from a project for the
25  Department of Corrections at state -- California State
```

```
 1   Prison at Sacramento, treatment and office space for 192
 2   EOP inmates -- patient-inmates.
 3        Q.   And for what year is this Budget Change
 4   Proposal?
 5        A.   The document says for '8-'9.  2008-2009.
 6        Q.   Can you tell if this has been submitted to the
 7   Department of Finance?
 8        A.   Um, I believe it has, because of our
 9   staff's -- I believe -- I'm assuming these stamps are
10   original to the Department of Finance.  It shows that
11   our staff approved it for release on October -- excuse
12   me -- April 1st, 2008.  If this is the document.
13             MR. LEWIS:  Pardon me.
14             Although it does have signatures, I'm going to
15   object to this document on the basis that we do not know
16   exactly where it came from.  I indicated I find no Bates
17   stamp on it.
18             I'll permit the witness to be questioned on
19   it, but I'd like my objection noted for the record.  We
20   don't really know where this came from.
21             According to your knowledge, do you recognize
22   any of the signatures?
23             THE WITNESS:  I recognize the signatures, but
24   I recognize more the DOF analyst's notations at the
25   bottom.
```

```
 1            MR. LEWIS:  Okay.
 2   BY MS. MORRIS:
 3       Q.  So, there's nothing to suggest to you that
 4   this is not, in fact, a BCP-produced -- BCP that was
 5   approved at the Department -- that was reviewed at the
 6   DOF?
 7       A.  Again, from the notations, it appears to be.
 8       Q.  Okay.
 9            Can you tell if this was recommended for
10   approval?
11       A.  The only reason our staff would stamp it an
12   original signed by Chris Lief and dated was if it was a
13   BCP that was approved.
14       Q.  Okay.  All right.
15            So, they would not stamp it if they were
16   providing it to the manager saying, I don't recommend
17   approving this?
18       A.  Correct.
19       Q.  Okay.  All right.
20            And does it get stamped only after it's been
21   approved all the way through the DOF, or does it get
22   stamped after it's approved by the analyst or the
23   analyst recommends approval?
24       A.  No.  All the way through.
25       Q.  Okay.
```

1           And do you know if this is -- this was
2   included in the budget -- in the Governor's budget at
3   the May revise of this year?
4       A.  I don't know if it's May revise or whether it
5   was the April finance letter.
6       Q.  Okay.
7       A.  Period.
8       Q.  Okay.
9           Do you know if it was included in what the
10  Governor sent along to the legislature?
11      A.  I just don't recall off the top of my head.
12      Q.  So, you don't know if it got through
13  Department of Finance but then didn't get through the
14  administration?
15      A.  Correct.  No.
16      Q.  Okay.
17      A.  It wouldn't have been stamped for release if
18  it didn't get all the way through and approved in the
19  whole administration.
20      Q.  Okay.
21      A.  What I'm telling you is, I don't know whether
22  it was submitted as an April finance letter or if it was
23  submitted to legislature in the May revise.
24      Q.  Okay.  All right.
25          Okay.  I'm not going to ask you to read these

1    first couple of pages, because they're dark and hard to
2    read, but you know what they are.  They're like a form
3    of some sort.
4        A.   It's a Fiscal Impact Worksheet that we at the
5    Department of Finance request departments to complete
6    when they're submitting BCPs.  It's a way to -- it's a
7    spreadsheet that uploads a tracking budget system that
8    we have for capital projects.
9        Q.   Okay.  Okay.
10            Going to page 6 of 6 of the narrative, this
11   provides that on the proposed project schedule --
12       A.   Mm-hm.
13       Q.   -- it has plan starting in 8/2008 and complete
14   in 10/2009.
15            Do you know if -- actually, I'd like to go
16   back a little ways.  Back to page 2 of the narrative.
17   No.  Page 3 of the narrative.  I'm sorry.
18       A.   That's all right.
19       Q.   Under the "Problem Statement," the second
20   paragraph.
21       A.   Mm-hm.
22       Q.   It states that preliminary plans were
23   completed in March of 2007?
24       A.   Where do you see that?
25       Q.   At the very last line of page 3.

1    A.   Oh, oh, oh.

2        (Reading)

3        Okay.  For that particular project.

4    Q.   Okay.

5        (Reading)

6        "Subsequent to legislative concerns

7    regarding scope and cost, CDC determined that

8    the project was erroneously 'overscoped/

9    programmed,'" and that it should actually be

10   192 instead of 384 EOP inmates.

11   A.   Okay.

12   Q.   Does this mean that as a result of this error,

13 CDCR missed the '07-'08 funding cycle, essentially, for

14 this project?

15   A.   The '07-'08.  Um, I'm trying to think of the

16 year '06.  March of 2007.  '7-'8.

17       Again, you can't tell from the time frame.

18 This letter says, Subsequent to legislature concerns

19 regarding cost and scope, the Department determined the

20 project was overscoped.

21       I can't tell when that happened to say if they

22 did miss -- when that determination came.  I don't know

23 if it was during the '7-'8 year or -- it's not clear

24 from this document.

25   Q.   Okay.

Golden Gate Reporting

Page 196

1           But plans were budgeted for in the 2006 Budget
2   Act.
3       A.  Correct.
4       Q.  So, that's for the budget year '06-'07?
5       A.  Correct.
6       Q.  Okay.
7           And now this BCP, if you go to the final page,
8   page 6 of 6 on the narrative --
9       A.  Mm-hm.
10      Q.  -- is looking for preliminary plans to start
11  in 8/08 and be complete in 10 of '09; is that correct?
12      A.  That's what it says.
13      Q.  So, these are plans that were first approved
14  in the budget for '06-'07 and are now going to be redone
15  and complete in October of '09, if things go according
16  to plan?
17          MR. LEWIS:  Objection.  I believe that calls
18  for a little bit of speculation on the part of the
19  witness.
20          THE WITNESS:  For me, it's a different
21  project.  It's not the same project that was funded in
22  the Budget Act of '06, according to their write-up.
23          MS. MORRIS:  Okay.
24  BY MS. MORRIS:
25      Q.  But it is 192 EOPs at SAC?

1      A.   At SAC; correct.
2           MS. MORRIS:   Okay.
3           MR. LEWIS:   And by that you mean, it is the
4    current proposed project?
5           Is that what your question was?
6           THE WITNESS:   Yeah.
7           This --
8           MS. MORRIS:   No.
9           The people who will benefit from this project,
10   and the people who would have benefitted from a project
11   budgeted with planning starting in '06-'07, are the 192
12   people classified -- or, some 192 people classified as
13   EOP at SAC.
14          THE WITNESS:   Yeah.   That's what it says here.
15   BY MS. MORRIS:
16     Q.   And if this Budget Change Proposal gets
17   through this budget and things go according to plans, it
18   will be complete in January of 2012; is that correct?
19     A.   According to this schedule, if the plans
20   started in August of 2008.
21     Q.   Right.   Okay.
22          So, when construction on a prison building is
23   complete, is that the day that they can start using it,
24   or is there a delay -- I've seen that there's -- in
25   certain documents I've seen discussion of, there's this

Golden Gate Reporting

Page 198

```
 1   time between the end of construction and actual use of
 2   the building, and I'm not sure if that's considered part
 3   of the construction phase or if it's after the
 4   construction phase.
 5           Do you know that?
 6       A.  I don't know.
 7       Q.  Okay.
 8       A.  I don't know how they refer to that.  Sorry.
 9       Q.  No problem.  Just thought I'd see.
10           Okay.  So, at this point, if this is approved,
11   this project will be complete in January of 2012;
12   correct?
13       A.  As long as the plans start in August of 2008.
14       Q.  Okay.
15           MR. LEWIS:  Can we take a break?
16           MS. MORRIS:  Okay.
17           (Off the record from 3:38 p.m.
18            until 3:48 p.m.)
19           MS. MORRIS:  I would like to mark this as
20   Exhibit 13.
21           (Whereupon Plaintiffs' Exhibit 13
22            was marked for identification.)
23           MS. MORRIS:  And Exhibit 13 is a letter from
24   Lisa Tillman to Matthew Lopes, dated February 14th,
25   attaching an August letter from Dennis Beaty, dated
```

```
 1   BY MS. MORRIS:
 2        Q.   But it's not possible that the things --
 3        A.   Yes.
 4        Q.   -- that are not funded on this have been
 5   funded since February of '08; correct?
 6        A.   Correct.
 7        Q.   Okay.
 8             On the last page, do you know -- the first
 9   sort of large category that they say is "Support."
10        A.   Mm-hm.
11        Q.   Would any of these be projects under your
12   purview?
13        A.   I can't tell.
14             I don't understand -- I don't recognize them.
15        Q.   What about the one MCSP?
16        A.   It looks like it's a temporary type of
17   situation or modular that they are purchasing or -- so,
18   it does not look like it would be under our purview.  It
19   looks like it's just a temporary until some permanent
20   solution is built.
21        Q.   Okay.  All right.
22             Have there been any efforts made at the
23   Department of Finance, that you're aware of, to speed up
24   construction of the AB 900 project?
25        A.   My efforts at Department of Finance?
```

Page 219

1     Q.   Mm-hm.
2     A.   So, speed up construction of the AB 900 -- no,
3  there's been no efforts initiated by the Department of
4  Finance.
5     Q.   Have you personally done anything to try to
6  move projects under AB 900 along faster?
7     A.   There's nothing in my ability to do that.
8     Q.   Okay.
9     A.   So -- yeah.
10    Q.   Okay.
11         Is there anything that Mr. Genest has done to
12 move projects in AB 900 along faster?
13         MR. LEWIS:  Objection.  Calls for speculation.
14 Pardon me.  Calls for speculation on the part of the
15 witness.
16         THE WITNESS:  I don't know what Mr. Genest has
17 done.
18         MS. MORRIS:  Okay.
19 BY MS. MORRIS:
20    Q.   But you're not aware of any particular events?
21    A.   I'm not personally aware, no.
22    Q.   Okay.
23         Are you aware of any particular effort on the
24 part of the DOF to speed up other Coleman-related
25 projects that are not within AB 900?

1          MR. LEWIS:  Objection.  Calls for speculation
2    on the part of the witness.
3          THE WITNESS:  Again, and I don't understand
4    your question.
5    BY MS. MORRIS:
6       Q.   Has anyone at DOF -- yourself or anyone that
7    you're aware of -- taken any efforts to try to push
8    things along faster for Coleman projects?
9       A.   Well, all I can say is when we have dealt with
10   anything having to do with the Coleman proposals; we
11   have acted in our, you know, best abilities to speed up
12   review, recommend funding.  So, we have done what we
13   can, yes, to ensure they're funded as timely as
14   possible, and included in the appropriate budget
15   processes that the Governor is involved in.
16      Q.   So, you've tried to make them go smoothly
17   through the ordinary process; is that accurate?
18      A.   Helped justify and discuss with legislature
19   staff the need and necessity for the projects, yes.
20      Q.   Mm-hm.  Okay.
21           When you're looking at infrastructure plans,
22   how do you -- do you consider population projections?
23      A.   Again, could you be more specific in your
24   question?
25           I don't know what you're --

```
 1              CERTIFICATION OF DEPOSITION OFFICER
 2
 3         I, KATY LEONARD, duly authorized to
 4   administer oaths pursuant to Section 2093(b) of the
 5   California Code of Civil Procedure, hereby certify that
 6   the witness in the foregoing deposition was by me sworn
 7   to testify to the truth, the whole truth and nothing but
 8   the truth in the within-entitled cause; that said
 9   deposition was taken at the time and place therein
10   stated; that the testimony of the said witness was
11   thereafter transcribed by means of computer-aided
12   transcription; that the foregoing is a full, complete
13   and true record of said testimony; and that the witness
14   was given an opportunity to read and correct said
15   deposition and to subscribe the same.
16         I further certify that I am not of counsel
17   or attorney for either or any of the parties in the
18   foregoing deposition and caption named, or in any way
19   interested in the outcome of this cause named in said
20   caption.
21
22
23
24   _____
25              KATY LEONARD, CSR 11599
```