# EXHIBIT 26

## Deposition of Robert Gore
## October 1, 2008
## (Phase II Designations)

## Part A

ROBERT J. GORE    October 1, 2008

Page 1

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

FOR THE EASTERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

--oOo--


RALPH COLEMAN, et al.,            )
                                  )
          Plaintiff,              )
                                  ) No.
     vs.                          ) 2:90-cv-00520 LKK JFM P
                                  )
ARNOLD SCHWARZENEGGER, et al.,)
                                  )
          Defendants.             )
_____ )
MARCIANO PLATA, et al.,           )
                                  )
          Plaintiff,              )
                                  ) No.
     vs.                          ) C01-1351 TEH
                                  )
ARNOLD SCHWARZENEGGER, et al.,)
                                  )
          Defendants.             )
_____ )


DEPOSITION OF
ROBERT J. GORE


_____

October 1, 2008



REPORTED BY:  ALESIA L. COLLINS-HUDSON, CSR 7751

(Job No. 413307)

ROBERT J. GORE      October 1, 2008

Page 49

1    were to recommend policies that you believe they would

2    be consistent with public safety?

3              MR. MELLO:  "Policies" is vague and ambiguous,

4    and the question lacks foundation  You can answer.

5              THE WITNESS:  Ask it again.

6              MR. SPECTER:  Q.  Would it be fair to say that

7    when you're making policy recommendations would you have

8    public safety in mind when you are dealing with

9    Corrections?

10       A.    Always.

11       Q.    And would that be one of the foremost concerns

12   that you have?

13             MR. MELLO:  Objection.  Vague as to the term

14   "foremost."  It's overbroad.  It's an incomplete

15   hypothetical.  Lacks foundation.  You can answer the

16   question.

17             THE WITNESS:  Public safety is a paramount

18   concern.

19             MR. SPECTER:  Q.  Okay.  So, that's it for

20   that.  This is number two, please.

21                  (Exhibit 2 marked)

22                  (Witness reviewing document.)

23             MR. SPECTER:  Q.  Mr. Gore, what I have shown

24   you is an email dated Saturday, June 30th, 2007.  Bates

25   number GOV-PRIV-001090.  It's from you to Dan Dunmoyer,

ROBERT J. GORE    October 1, 2008

Page 52

1    several key points?

2        A.    Uh-huh.

3        Q.    When you -- what do you mean by "alignment"?

4    Alignment of what or who?

5        A.    Well, on certain policy issues they concurred.

6        Q.    The commission members concurred?

7        A.    No.    The two different reports.    The expert

8    panel and the independent review panel.

9        Q.    I see.    And, so, the areas where you believe

10   that there was alignment between those two panels, were

11   they listed below?

12       A.    Yeah.

13       Q.    And that would be parolee risk assessment?

14       A.    Right.

15       Q.    And enhanced credit program participation,

16   right?

17       A.    Yeah.    Yes.

18       Q.    Formal reentry program with community partners?

19       A.    Yes.

20       Q.    Considered direct release from prison for low

21   risk?

22       A.    Yes.

23       Q.    Violation matrix?

24       A.    Uh-huh.

25       Q.    Technical violators properly don't belong in

ROBERT J. GORE     October 1, 2008

Page 53

1    prison?

2        A.    Yes.

3        Q.    And greater use of drug diversion centers?

4        A.    Right.

5        Q.    And, going back up to the first paragraph there

6    it says that -- sort of suggests that you were going to

7    ask the Governor Deukmejian to brief the Republicans and

8    perhaps the Democrats on those points.  Is that right?

9    Is that what --

10       A.    That was being considered at the time, yes.

11       Q.    Okay.  Did it ever happen?

12       A.    No.

13       Q.    Okay.  It's the last -- or next-to-the-last

14   paragraph says, "I will draft a paper with common

15   citations between his work and the expert panel for you

16   to use with Merks by Tuesday."  Who is "Merks"?

17       A.    Steven Merksamer.

18       Q.    And he was what at that point?

19       A.    He owns a law firm.  He is the managing

20   partner.

21       Q.    And why would Dan Dunmoyer talk with him about

22   those policies?

23             MR. MELLO:  Calls for speculation.  You can

24   answer.

25             THE WITNESS:  He was Governor Deukmejian's

ROBERT J. GORE     October 1, 2008

Page 57

1   about both of those reports with the legislators?

2          MR. MELLO:  When you say "the governor," it's

3   vague.  Do you mean Governor Deukmejian?

4          MR. SPECTER:  Yes, I do.  Thank you

5          THE WITNESS:  Our thinking at the time was to

6   have Governor Deukmejian speak about his independent

7   review panel's report.

8          MR. SPECTER:  Q.  Uh-huh.  Yeah.

9      A.   And, that -- the expert panel report was just

10  being issued.  It would speak for itself.

11     Q.   I see.  And you're -- the reason why you wanted

12  someone of Governor Deukmejian's stature to speak to the

13  Republican and Democratic legislature was what?

14     A.   He was the chairman of the panel.

15     Q.   But why did you want them to speak to the

16  legislature?

17     A.   As you pointed out, it had been a number of

18  months.  I don't know exactly when the independent

19  review panel was issued.  2006, 2005.  It had been a

20  number of months, and it would have served a good policy

21  purpose at that point to have his panel's conclusions

22  iterated so that it would be very clear that there was a

23  comparison between his panel and the expert panel.

24     Q.   And, was your purpose in having him reiterate

25  his panel's conclusion to further the policies listed in

ROBERT J. GORE    October 1, 2008

Page 58

1    the middle paragraph written there?

2        A.    To forward a discussion of them, yes.  And

3    refinement of whatever would be acceptable.

4        Q.    To the legislature?

5        A.    Yes.

6        Q.    Okay.  Did Mr. Dunmoyer agree with your

7    proposal?  Obviously he did, since you went to

8    Mr. Merksamer.

9        A.    Generally, yes.

10       Q.    Did you have -- do you have any contact with

11   legislators?

12            MR. MELLO:  Asked and answered.  You can

13   answer.

14            THE WITNESS:  Very seldom.

15            MR. SPECTER:  Q.  Okay.  Who would have contact

16   in your office?

17       A.    The legislators?  Legislative unit.

18       Q.    Yeah.  So, it would be fair to say that you

19   believed it would -- that public safety and prison

20   crowding could be further -- or, not -- prison crowding

21   could be reduced by the promotion of these policies; is

22   that fair?

23            MR. MELLO:  I think that lacks foundation.  You

24   can answer.  I think it's vague too.

25            MR. MAURO:  Do you understand the question?

ROBERT J. GORE    October 1, 2008

Page 59

```
 1          THE WITNESS:  Prison -- oh, yes.  Prison

 2    overcrowding could be reduced by use of these policies.

 3          MR. SPECTER:  Q.  And, again, since public

 4    safety was paramount -- of paramount importance to you

 5    and Mr. Dunmoyer you would never have sought their --

 6    sought to have them -- those policies be implemented if

 7    you believed that public safety would be at risk,

 8    correct?

 9          MR. MELLO:  It's overbroad.  It is vague.  It's

10    an incomplete hypothetical.  Lacks foundation.  You can

11    answer.

12          THE WITNESS:  Generally.

13          MR. SPECTER:  Q.  Okay.  Let's go to this.

14          (Exhibit 3 marked)

15          (Witness reviewing document.)

16          MR. SPECTER:  Q.  I have just handed to you a

17    two-page document which appears to be a letter -- or, at

18    least a draft letter to Governor Deukmejian dated July

19    16th, 2007, Bates EPRIV171287 to 171288.  Are you

20    familiar with this draft of a letter?

21    A.    Vaguely.

22    Q.    Did you draft this?

23    A.    Yes.

24    Q.    Did you send it?

25    A.    No.
```

ROBERT J. GORE    October 1, 2008

Page 64

```
 1      A.   Uh-huh.

 2      Q.   If you don't speak to the legislators, how

 3 would you know that they were strongly opposed to those?

 4      A.   The Legislative unit would have relayed the

 5 messages.

 6      Q.   I see.  Does their opposition remain to this

 7 day, to your knowledge?

 8      A.   I -- I don't know.  You have to ask the

 9 Legislative unit.

10      Q.   Uh-huh.

11      A.   It hasn't come up recently.

12      Q.   Pardon me?

13      A.   It hasn't come up recently.

14      Q.   Okay.  When was the last time it came up?

15      A.   I don't know.

16      Q.   But, you disagreed.  The next sentence says you

17 disagreed -- we disagree --

18      A.   Uh-huh.

19      Q.   Meaning yourself.  And it's using the plural.

20 Who else do you mean by "we"?

21      A.   Dan.

22      Q.   Okay.  And you adopted Sheriff Kolender -- he

23 is sheriff of what county?

24      A.   At the time he was sheriff of San Diego County.

25      Q.   He told you that, Putting an inmate on a bunk
```

Merrill Legal Solutions
(800) 869-9132

ROBERT J. GORE    October 1, 2008

Page 65

1    for four months after you have taken away his new

2    residence, connected with his family again, and perhaps

3    his new job creates more anger and actually endangers

4    public safety, correct?

5         A.    Yes.

6         Q.    And you're aware that the average time that

7    parolees are revoked for is about four months?

8         A.    Yes.

9         Q.    So, you believe that the current revocation

10    system actually endangers public safety?

11         A.    Yes.

12              MR. MELLO:  I think that lacks foundation,

13    calls for an expert opinion.  I think it misstates the

14    testimony thus far about this sentence.  You can answer

15    the question.

16              THE WITNESS:  Let's run through it again,

17    please.

18              MR. SPECTER:  All right.  Can you read the

19    question back.

20              (Record read)

21              MR. MELLO:  Same objection.

22              THE WITNESS:  That's not what this says here.

23              MR. SPECTER:  Q.  I know that, but it's a

24    logical inference from what it says.

25         A.    The current system of revocation could be

## ROBERT J. GORE    October 1, 2008

Page 68

1    reason why you would have been sending it to people?

2        A.    To reach a consensus about priority.

3        Q.    Okay.  It follows closely from the release of

4    the expert panel report, correct?

5        A.    Apparently, yes.

6        Q.    Okay.  So -- and, again, when you're writing

7    these emails, this represented your best -- strike that

8    question.

9             So, you put down nine different issues from the

10   Deukmejian report and the expert panel report, right?

11       A.    There's eight.

12       Q.    Eight.  I count nine.  Feel free to add to the

13   list.  Good point.

14            So, refine deployment of existing revocation

15   regulations is the -- regulations is the first bullet

16   point.  It refers to Senate Bill 1453.  Do you know what

17   that is about?

18       A.    Vaguely.  At the time it figured into the

19   discussions.  It's a new law that permits -- I don't

20   recall, to be honest with you, in enough detail to

21   discuss it.

22       Q.    Develop a risk revocation matrix.  One -- in

23   two phases.  One as soon as possible and two by December

24   31st of '07.  Do you see that?

25       A.    Uh-huh.

ROBERT J. GORE      October 1, 2008

Page 69

1    Q.    This -- since that time the Department has been

2    working on a risk revocation matrix; is that right?

3    A.    Correct.

4    Q.    But it's not -- still not operable; is that

5    correct?

6          MR. MELLO:  Objection.  Vague as to "operable."

7          MR. SPECTER:  Q.  Still not being implemented;

8    is that correct?

9    A.    Depends what you mean by "implemented."

10   Q.    What do you mean by "implemented"?

11   A.    In this instance?

12   Q.    Yes.

13   A.    It's under development.  If you wanted to find

14   that as part of implementation, yes, it's being

15   implemented.

16   Q.    Okay.  I'll tell you what I mean by

17   "implemented," which is that it's being used to -- you

18   know, in the real world people are actually using it as

19   it's intended to function.

20   A.    It's not being used in the field, no.

21   Q.    Okay.  That's a good way to put it, I guess.

22   Okay.

23          "Create intermediate sanctions" is the next

24   bullet point.

25          Was that something that the governor's office,

**ROBERT J. GORE    October 1, 2008**

Page 70

1    I believe was it, came to consensus on was a good

2    solution?

3        A.    It's something that I was working on to make

4    sure it got fully fleshed out as an option.

5        Q.    Right.    I understood that from your email.    My

6    question was a little different.    It was, I felt the

7    purpose of this email was to flush things out, and so I

8    wanted to know if when it was flushed out the governor's

9    office was behind the idea.

10        A.    The purpose of the email, as I stated, was to

11    arrange priority of these and decide in which order they

12    should be addressed -- or, approximate order.    And as

13    far as intermediate sanctions goes, it has subsequently

14    developed into a major option.

15        Q.    Okay.    So, the governor's office is still

16    behind that as an option; is that right?

17            MR. MELLO:    Objection.    Overbroad.    Vague.    You

18    can answer.

19            THE WITNESS:    The Department is still

20    developing it as an option.

21            MR. SPECTER:    Q.    Do you know if the governor's

22    office hasn't signed off on it yet?

23        A.    It's not done.

24        Q.    Will the governor's office be -- would it be

25    something that would be submitted to the governor's

ROBERT J. GORE    October 1, 2008

Page 71

1  office for approval once it is done?

2      A.   Perhaps.

3           MR. MELLO:  Calls for speculation but, yes.

4           MR. SPECTER:  Q.  In the normal course of

5  business would it be submitted to the governor's office

6  for approval, Mr. Gore?

7      A.   I can't say.  The secretaries have broad

8  discretion on how they run their agency.  Sometimes they

9  choose to submit things.  Sometimes they choose to take

10  particular courses of action they regard as

11  advantageous.

12      Q.   Would you be surprised if Mr. Cates --

13           MR. MELLO:  Finish your question, please.  Come

14  on.  Finish your question.  Off the record.

15           (Discussion off the record.)

16           MR. SPECTER:  Q.  Mr. Gore, would you be

17  surprised if the Department implemented a parolee

18  intermediate sanction program and Mr. Cates, who is now

19  the secretary, didn't make sure it was consistent with

20  the governor's policies?

21           MR. MELLO:  Objection.  Vague as to various

22  terms, including "surprised".  I also believe it's

23  compound, and I believe it lacks foundation, and it also

24  calls for speculation as to what Mr. Cates would do.

25  You can answer the question.

ROBERT J. GORE    October 1, 2008

Page 72

1          THE WITNESS:  The intermediate sanctions are

2    primarily placement in appropriate programs.  It's -- if

3    it's -- it's something that virtually no one opposes, so

4    if he was to proceed on a course that resulted in that,

5    no, I wouldn't be surprised.

6          MR. SPECTER:  Q.  Okay.  So, do you know are

7    they still developing intermediate sanctions?

8    A.    As part of other work, yes.

9    Q.    Do you know -- so, they're not -- do you know

10   whether they are using intermediate sanctions in the

11   field today as we speak?

12         MR. MELLO:  Any intermediate sanctions?

13   Objection.  Vague as to "intermediate sanctions."

14         THE WITNESS:  They could be.

15         MR. SPECTER:  Q.  You don't know?

16   A.    No.

17   Q.    But you are aware that they're trying to

18   improve their reliance on intermediate sanctions?  Would

19   that be fair to say?

20   A.    Yes.

21   Q.    And, do you -- do you know if there is a goal

22   of how many, or what percentage of the parole violators

23   would be able to benefit from those intermediate

24   sanctions, if "benefit" is the right word?

25   A.    I'm not aware of the goal.

ROBERT J. GORE      October 1, 2008

Page 80

1      A.    Yes.

2      Q.    And, it's -- okay.  Number two:  "Renegotiate

3  the MOU for new working conditions with Correctional

4  Officers Union."  Was that accomplished?

5      A.    No.

6      Q.    Okay.  Then you were going to put together an

7  overcrowding reduction package, right?

8      A.    Uh-huh.

9      Q.    And that included some of the -- some of the

10 policies we have just talked about from the last email

11 we discussed, right?

12     A.    Correct.

13     Q.    And includes -- also a bad bed deactivation

14 plan with specific targets.  You see that?

15     A.    Yes.

16     Q.    So, was a bad bed deactivation plan with

17 specific targets ever delivered?

18     A.    Yes.

19     Q.    And when were they supposed to be eliminated?

20     A.    I don't recall.

21     Q.    Do you have a general idea?

22     A.    No.  It was a month-by-month reduction.

23     Q.    Do you know when they were supposed to be gone?

24           MR. MELLO:  Vague as to time.  You mean as of

25 July 2007?

ROBERT J. GORE     October 1, 2008

Page 81

1          THE WITNESS:  Yeah.

2          MR. SPECTER:  Q.  At that point in the

3     deactivation plan, did you -- did they have an end date

4     when there wouldn't be anymore --  when the bad beds

5     would be eliminated?

6          A.    No.  It would have just been in the following

7     year or two.  It wouldn't have been forever.  And

8     circumstances change so much, if it was forever it

9     wouldn't have been valid anyway.

10         Q.    Okay.  So, did they ever provide you with a

11    plan in which there wouldn't be any bad beds?

12         MR. MELLO:  Ever?

13         MR. SPECTER:  Q.  Yes.

14    A.    No.  But there's -- I'm -- no.  We have had

15    discussions about timelines but, again, they vary badly

16    according to circumstances.

17         Q.    I understand.

18         A.    And population trends that no one can predict.

19    So, an end is a movable horizon.

20         Q.    Okay.  And it says that 35 -- at least in July

21    of 2007 there was some progress on discharging paroles

22    after the 12 months clean, right?

23         A.    Yes.

24         Q.    It was 3 percent, right?  I mean, it was a 3

25    percent decrease from 30 -- or increase from 35 percent

ROBERT J. GORE    October 1, 2008

Page 85

1    Q.    I don't want to mischaracterize your testimony.

2    I'm trying to understand it.  So, these two sentences

3    would be effective only if you were going to use the

4    risk assessment instrument, right?

5    A.    They would be part and parcel, yes.

6    Q.    Right.  But if you didn't use a risk assessment

7    instrument there would be no need for that sentence,

8    right?  Because right now the statute, you know, doesn't

9    -- I'm sorry.

10    MR. MELLO:  Is there a question?  I'm sorry.

11    MR. SPECTER:  Yeah.  I just stopped.

12    MR. MELLO:  Do you understand the question?

13    Vague.  Compound.  I don't understand it   You can

14    answer the question.

15    THE WITNESS:  Well, you know, to a certain

16    extent you're asking me for the answer to a situation

17    that existed 14, 15 16 months ago and it no longer

18    exists.  So, I mean, we're having a conversation in the

19    present about the past.

20    MR. MELLO:  Do you remember his question?  Don,

21    do you want to have it re-read or re-asked?

22    MR. SPECTER:  Yeah.  Sure.

23    Q.    To your knowledge, what is the current status

24    of discharging parolees after they have 13 months clean?

25    A.    It's continued to be vastly improved over what

ROBERT J. GORE    October 1, 2008

1   it once was.  It said about 36 percent of all parolees.

2   At one point -- I think it was two years ago, it was

3   about 24 percent.  It's undergone a 58 percent increase.

4        Q.   Okay.

5        A.   So, it's -- it's an excellent, excellent tool.

6        Q.   And, to your knowledge they're not using a risk

7   assessment tool before they discharge them, right?

8        A.   No.

9        Q.   They're not, right?

10       A.   Right.  Correct.  They're not using a risk

11   assessment tool.

12       Q.   Okay.  Great.

13       A.   Again, that was something that came up in July

14   2007.  May or may not be valid today.

15       Q.   Okay.  Fair enough.  I'm doing this

16   chronologically.

17       A.   I understand.  I don't want us to lose sight of

18   the fact it's a very dynamic situation.

19       Q.   Right.  I know.  Okay.

20       A.   You got two different things here, right?

21       Q.   Yes, they are.

22                 (Exhibit 6 marked)

23                 (Witness reviewing document.)

24            MR. SPECTER:  Q.  What I have handed you is an

25   email dated Friday August 24th, 2007 from you to Joan

ROBERT J. GORE    October 1, 2008

Page 92

1    satisfied with the revocation.

2        Q.    Even though that would -- even though the short

3    length of stay would have encouraged offenders to commit

4    a crime?

5        A.    I have no opinion on the street level of

6    justice.  That's simply what I was told.

7        Q.    Okay.

8                    (Exhibit 7 marked)

9                    (Witness reviewing document.)

10               MR. SPECTER:  Q.  This is an email that you

11    sent to Chris Ryan?

12        A.    Uh-huh.

13        Q.    About AB 900 cleanup, GOVPRIV001340.  And it

14    appears to say that the -- well, you tell me what this

15    is about, since Paul will object to my

16    mischaracterization.

17               MR. MELLO:  Objection to your premature fixing

18    of the question.  Do you remember the question?

19               THE WITNESS:  Yes.  I really don't recall.  AB

20    900 has gone through several attempts at a revision.

21    This was near the end of the first attempt, and it never

22    went anywhere.

23               And this comment -- I'm -- this is as best as I

24    can divine, but it would be apparent that Kathy Jett

25    wanted to be able to contract for drug diversion beds

ROBERT J. GORE    October 1, 2008

Page 93

1    quickly, which would require some waiver of States

2    procedures.  And that was what our goal was, to provide

3    her with that avenue.

4        Q.    And that never happened?

5        A.    Correct.

6                    (Exhibit 8 marked)

7                    (Witness reviewing document.)

8            MR. SPECTER:  Q.  I have a question about this

9    document.  What I have handed you is an agenda,

10   "Governor's Meeting With Legislative Leaders on

11   Prisons."  Does that look familiar to you?

12       A.    No.  It's definitely not my work.

13       Q.    Okay.  You have never seen that?  It's somebody

14   else's work?

15           MR. MELLO:  You can answer his question, but

16   just only answer the questions asked, please.

17           THE WITNESS:  Sorry.

18           It would -- yes.  It would be somebody else's

19   work.  And as to whether or not I have seen it, I --

20           MR. SPECTER:  Q.  You don't recall?

21       A.    Okay.

22       Q.    Down in section four, discussion -- "Discussion

23   of Prison and Parole Reform Alternatives."  Do you see

24   that?

25       A.    Uh-huh.  Yes.  Yes.