# EXHIBIT 26

# Deposition of Robert Gore
# October 1, 2008
# (Phase II Designations)

# Part B

ROBERT J. GORE    October 1, 2008

Page 95

1        A.    No.

2        Q.    Anybody else in your office?

3        A.    I have spoken to Chris Ryan about them

4    generally.

5        Q.    What is his position?

6        A.    He is my counterpart in the Legislative unit.

7    He is the deputy legislative secretary that handles

8    Corrections.

9        Q.    You are aware that Senator Romero proposed to

10   the sentencing commission the bill?

11       A.    Yes.

12       Q.    Did you ever speak to anyone in your office

13   about her bills?

14             MR. MELLO:  Her bills?  Sentencing Commission

15   bills?

16             MR. SPECTER:  Yes.  Yes.  Thank you.

17             THE WITNESS:  Chris and I discussed them

18   generally, what was in them, what they would do.

19             MR. SPECTER:  Q.  And did you regard the

20   Sentencing Commission as one way to get control of the

21   California prison population?

22             MR. MELLO:  Objection.  You -- I assume you're

23   asking about his opinion?

24             MR. SPECTER:  Yes.

25             MR. MELLO:  You, personally?

ROBERT J. GORE    October 1, 2008

Page 96

1         MR. SPECTER:  You, personally.

2         MR. MELLO:  It's also vague as to what

3    "Sentencing Commission" means.  You can answer the

4    question.

5         THE WITNESS:  I'm not sure a Sentencing

6    Commission would have an immediate impact on prison

7    population.  It has in other states, Virginia, for

8    example.  Or it's had the effect, at least at this

9    point, of reducing population, but at the same time

10   increasing sentences for serious crimes.

11        Is it an alternative worth considering?

12   Certainly, in my opinion.

13        MR. SPECTER:  Q.  Okay.  And in your judgment

14   if the governor asked you to make a recommendation to

15   him about the quickest and most safe way to reduce

16   prison population, what would you -- how would you

17   apply?

18        MR. MELLO:  Lacks foundation.  Calls for

19   speculation.  Incomplete hypothetical.  You can answer.

20        THE WITNESS:  If I was asked, it would be

21   something I would sit down with Andrea, Matt Cate, and a

22   couple of others, and work out a reasoned, fully fleshed

23   out proposal.  Nothing I would respond to on my own.

24        MR. SPECTER:  Q.  And nobody has asked to you

25   do that?

ROBERT J. GORE      October 1, 2008

Page 97

1      A.    No.

2      Q.    I understand you would like to consult with

3    other people, but you have been doing this now for about

4    a year and a half, and you have been intimately involved

5    with many of those issues, correct?

6      A.    Correct.

7      Q.    What is your best judgment as you sit here

8    today?

9            MR. MELLO:  Same objection.  You can answer.

10           THE WITNESS:  As to how to reduce prison

11    population?

12           MR. MELLO:  Your personal opinion.

13           THE WITNESS:  My personal opinion is there are

14    several components to it.  One is that carefully

15    reasoned parole violator policy.  Another is a well

16    administered 12-month discharge program.  And another

17    would be to review, based on how the 12-month proceeds,

18    the possibility of discharging parolees earlier --

19    certain selected parolees -- which again was suggested

20    by the Deukmejian Commission.

21           Once you get back inside the prison it's using

22    the reentry concept with a continuum of programming so

23    that there is a juncture that you're following.  The

24    offender is assessed upon entry, his or her programming

25    is adjusted on the continuum programming based on the

ROBERT J. GORE    October 1, 2008

Page 98

1    initial assessments, and at reentry -- they're provided

2    with reentry skills and put into parole, again, based on

3    an exit assessment of where they are now and if they get

4    the resources that they need.  And, this is obviously

5    also predicated on sufficient funding as well.

6           One of the -- one of my archetypical incidents

7    was -- I mean, when I had spoken to the warden, who was

8    relatively conservative, who said they had come upon an

9    inmate in the yard who has completed rehabilitation

10   training and he was most impressed with the training the

11   inmate had undergone, and his being impressed was

12   impressive upon me.  He was also a former teacher, so

13   it's -- it has an interesting perspective on life.

14      Q.   I see.  And, if all of those programs were put

15   in place tomorrow, do you have any idea over what period

16   of time you could get what reduction in the prisoner

17   population?

18          MR. MELLO:  Are you done?  Lacks foundation,

19   calls for speculation, incomplete hypothetical,

20   overbroad, calls for a narrative, and it elicits an

21   expert opinion.

22          THE WITNESS:  I'm not.  It -- Matt Cates is

23   working on estimates in those areas, and he would be a

24   good person to ask.  You would get a much better finding

25   than from myself.

ROBERT J. GORE    October 1, 2008

Page 101

1    as sheriffs are quick to blame CDCR.

2         Now, you have been blamed -- CDCR has been

3    blamed for a lot of things, but blaming CDCR for Paris

4    Hilton strikes me as not really -- I don't understand

5    the reference.

6         A.    It may seem ephemeral, but at the time she was

7    serving a sentence, and she was released substantially

8    early because of jail overcrowding.

9         Q.    Uh-huh.

10        A.    And jail overcrowding is impacted by the

11   ability of overall inmate movement among the various and

12   sundry correctional facilities.

13        Q.    Oh, I see.  All right.  So, there is a list of

14   actions.

15        A.    Yes.

16        Q.    And are those recommendations of actions do you

17   think the governor's office should take with respect to

18   CDCR?

19        A.    I believe they should have been considered in

20   combination with everything else that was going on and

21   the principals to whom I wrote knew.

22        Q.    Okay.  So, some of those we have talked about

23   before.  Direct CDCR to immediately make full use of

24   existing laws to reduce the parole load.  Right?

25        A.    I'm sorry.  Where are you?

**Merrill Legal Solutions**
**(800) 869-9132**

ROBERT J. GORE    October 1, 2008

Page 102

1    Q.    Number 3 on page 2.

2    A.    Yes.

3    Q.    Do you see that?

4    A.    Uh-huh.

5    Q.    You have to say yes.

6    A.    Yes.  I'm sorry.

7    Q.    So, the first component of that is discharging

8    them after 12 months of clean time, right?

9    A.    Yes.

10   Q.    Second one is to allow discharge of drug

11   offenders who complete in-prison program and 150 days of

12   residential community program.

13   A.    That's SB 1435, by the way.

14   Q.    Okay.  Has that been -- is that being use in

15   the field?

16   A.    Has what been?

17   Q.    Huh?

18   A.    Has what been used in the field?

19        MR. MELLO:  Objection.  Compound.

20        MR. SPECTER:  Q.  Discharging drug offenders

21   who complete in-prison programs.

22   A.    Yes.

23   Q.    Okay.  And, 150 days -- so, they don't have to

24   go through the whole 12 months; is that right?

25   A.    Correct.

**ROBERT J. GORE    October 1, 2008**

1      Q.    So, instead they get out at five months; is

2    that right?

3      A.    I'm not certain.

4      Q.    Well, 30 into 150 is five months.

5      A.    But I am not sure if they're fully released at

6    the end of 150 days or exactly what happens.

7      Q.    Do you know how many offenders it has happened

8    to?

9      A.    No.

10      Q.    Authorize on an urgency basis the use of part

11    of the 50 million dollars in AB 900 funds to fund

12    enhanced residential rehab contracts.

13          Do you know if that's been done?

14      A.    I don't know if it was done, no.

15      Q.    Okay.   Retain technical parole violators on

16    parole with graduated sanctions.   That's what we talked

17    about before, is that correct?

18      A.    Uh-huh.   Uh-huh?

19      Q.    You originally wanted the matrix to be done by

20    December of 2007; is that right?

21      A.    The partial matrix, yes.

22      Q.    It says, Full matrix by 12-1.

23      A.    Right.

24      Q.    Is that right?

25      A.    Yes.

ROBERT J. GORE    October 1, 2008

Page 104

1    Q.    But it wasn't done by then, was it?

2    A.    No.

3    Q.    Okay.    Sponsor urgency legislation to permit

4    earned direct release of non-serious, non-violent

5    offenders with 12-months' good time while retaining

6    banked parole and more research for one year.

7    A.    I lost you.

8    Q.    Number 5.

9    A.    Okay.    There we go.    Yes.

10    Q.    So, was such urgency legislation introduced?

11    A.    No.

12    Q.    Okay.    Study and determine based on risk

13    assessment which additional inmates are eligible for

14    direct release to banked parole.

15          Was that ever done?

16    A.    No.

17    Q.    When you say "banked parole," was that

18    equivalent to summary parole?

19    A.    Yes.

20    Q.    Expand good time credits to provide enhanced

21    reduced credits and program participation incentives.

22          Was such legislation introduced?

23    A.    Not to my knowledge.    I don't -- I don't know.

24    Q.    Create community beds for female offenders

25    enhanced programs.

ROBERT J. GORE    October 1, 2008

Page 105

1      I know there was legislation for female

2   offenders.  Do you know if it was passed?

3      A.    I know that the Department has subsequently

4   increased the number of community beds.

5      Q.    Uh-huh.

6      A.    So, that's been done.  Understand, these are

7   not necessarily recommendations but options offered.

8          You're obligated to provide your principals

9   with as many choices as possible.

10          So, again, they're not necessarily specific

11   recommendations, but they are...here's all of the things

12   that you need to consider.

13      Q.    But you wouldn't recommend they consider them

14   if you didn't believe that they were, A, consistent with

15   public safety and, B, would be effective in meeting the

16   goal -- your goals, right?

17          MR. MELLO:  Compound.  Vague.  Lacks

18   foundation.  Calls for speculation.  You can answer.

19   Calls for speculation.

20          THE WITNESS:  It -- yeah.  There -- I just --

21   yes.  I agree with you.

22          MR. SPECTER:  Q.  Okay.  We talked about number

23   6 before.

24          Number 7 says, Approve back -- continued back

25   channel communications with receiver's chief of staff,

ROBERT J. GORE    October 1, 2008

Page 111

```
 1              THE WITNESS:  For -- for the receiver's beds.
 2              MR. SPECTER:  Q..  And not for your beds?
 3         A.   They don't intersect.
 4         Q.   Okay.  It's 1:00 o'clock.  Would you like to
 5   take a lunch break now.
 6              (Whereupon, the lunch recess was taken
 7              from 1:02 p.m. to 1:44 p.m.)
 8              AFTERNOON SESSION
 9              EXAMINATION
10   BY MR. SPECTER:
11         Q.   In your letter -- draft letter to Governor
12   Deukmejian -- we talked about this before lunch -- you
13   said that Mr. Hagar and Mr. Sillin had said that the
14   consequences of a possible three-judge panel would be
15   that you have a short time period to release up to
16   20,000 prisoners.  Do you recall that?
17         A.   In the letter, yes.
18         Q.   And that was an accurate transmission of what
19   they had said to you?
20         A.   Yes.
21         Q.   Yes.  And, what -- has the governor's office,
22   to your knowledge, considered what options they would
23   use if such an order was issued, how they would -- how
24   they would respond to such an order?
25         A.   No.
```

**Merrill Legal Solutions**
**(800) 869-9132**

ROBERT J. GORE     October 1, 2008

Page 113

1      Q.   Has anybody asked you to develop a list of

2   options if an order -- such an order were to issue?

3      A.   No.

4      Q.   Has anybody directed you to come up with a list

5   of options to reduce the prison population by a certain

6   amount?

7           MR. MELLO:  Objection.  Compound.  You can

8   answer the question.

9           THE WITNESS:  During the period leading up to

10   the presentation of the January 10 budget, I worked with

11   Corrections to develop a budget option, but that mainly

12   consisted of Corrections developing it and myself

13   reviewing it.  I didn't -- they're the experts.  I

14   didn't have a hands-on other than to review and to ask

15   questions.  No participation in it.

16           MR. SPECTER:  Okay.  We can talk about that.

17      Q.   That -- that eventually -- well, what were the

18   options that they came up with?  Well, were they -- were

19   the -- was Corrections given directions to come up with

20   options to reduce crowding?

21           MR. MELLO:  Objection.  Vague as to time.  With

22   respect to the budget?

23           MR. SPECTER:  No.  Just open-ended question.

24           MR. MELLO:  Objection.  Overbroad.  You can

25   answer.

ROBERT J. GORE     October 1, 2008

Page 114

1          THE WITNESS:  It -- there's two answers.  One

2     is, they were asked to come up with options preparing

3     for the budget as all agencies were because they had to

4     reduce their budget by 10 percent.  And, then the second

5     answer is to reduce population overall, that's a

6     continuing goal in conversation.

7          MR. SPECTER:  Q.  Okay.  Has anybody from the

8     governor's office, to your knowledge, ever told them to

9     reduce it by a certain amount?

10         A.   Well, in the earlier emails that we looked at,

11    I mean, it was -- it was discussed, and it may have been

12    requested at some point in time.  Do I recall it?  No.

13    Not specifically.

14         Q.   Okay.  Well, for example, you testified earlier

15    today that you're familiar with the Deukmejian report,

16    correct?

17         A.   Uh-huh.

18         Q.   And you're aware that in the Deukmejian report

19    there are some what the report calls different types of

20    capacity, say, an inoperable capacity, other types of

21    capacity.  Do you remember that?

22         A.   Not specifically.

23         Q.   You haven't looked at the report.  The report

24    made some suggestions about what it thought a reasonable

25    prison population would be.  Do you recall that at all?

ROBERT J. GORE     October 1, 2008

Page 120

1    resolved several mutual differences.  It was an

2    excellent meeting.

3        Q.   So, that involved the new -- what did that

4    involve?  What facilities are you referring to?

5    Vacaville?

6        A.   The facilities that would be built pursuant to

7    the Coleman orders.

8        Q.   I see.

9        A.   We weren't talking about specific buildings and

10   specific places.  It was the facilities when they would

11   be built.  As to where, I don't know, and when, I don't

12   know.

13       Q.   And you're aware that the plaintiffs in those

14   cases -- by that mean I mean the Coleman and Plata cases

15   -- have alleged that overcrowding is having an adverse

16   affect on the ability on either the receiver of the CDCR

17   to provide adequate health care; is that correct?

18       A.   I'm aware of that, yes.

19       Q.   And, has -- have you taken any steps to reduce

20   the population so that adequate health care could be

21   provided?

22            MR. MELLO:  Objection.  Lacks foundation.

23   Misstates the record.  Vague.  You can answer.

24            THE WITNESS:  We -- we strive continuously to

25   reduce the population.

Merrill Legal Solutions
(800) 869-9132

ROBERT J. GORE    October 1, 2008

Page 127

1    like a third world country.  Do you see that?

2         A.   Uh-huh.

3         Q.   And there are quotes around that.  Is that --

4    why did you -- is that -- did you take that from

5    somebody else or was it just a phrase?

6         A.   It's a direct excerpt.

7         Q.   From the --

8         A.   From the report.

9         Q.   Okay.  That's that.

10             Are you okay?

11        A.   Yeah.

12        Q.   Okay.  Good.  The governor's budget of -- like

13   for the current year --

14        A.   Okay.

15        Q.   -- it was released in early January of this

16   year, correct?

17        A.   As always, yes.

18        Q.   Okay.  All right.  And it included a provision

19   to reduce the population by 22,000 inmates, correct?

20        A.   It contained a provision that was required of

21   all agencies to reduce their budget by 10 percent, which

22   in the case of Corrections, because they're governed

23   largely by inmate/parolee ratios, equated to reducing

24   the population by that number.  It was a decision made

25   by the Department.

ROBERT J. GORE    October 1, 2008

Page 128

```
 1      Q.   So, the Department -- and you were informed
 2  about that proposal before it was formally submitted to
 3  the legislature in the governor's final budget, were you
 4  not?
 5      A.   Yes.
 6      Q.   And, so, they -- and, did -- was Mr. Dunmoyer
 7  -- to your knowledge, was Mr. Dunmoyer and Mr. Kennedy
 8  informed about that proposal as well?
 9          MR. MELLO:  Before it went to the legislature.
10          THE WITNESS:  Yes.
11          MR. SPECTER:  Q.  And the governor -- do you
12  know if the governor was involved?
13      A.   No, I do not.
14      Q.   But, in any event, this proposal -- this
15  proposal was approved by the administration and
16  submitted to the legislature, correct?
17      A.   Yes.
18      Q.   And the administration believed that this
19  population reduction could be done safely, correct?
20          MR. MELLO:  I think it lacks foundation, calls
21  for speculation.  It's an incomplete hypothetical, vague
22  and ambiguous with respect to safety -- safely.  You can
23  answer the question.
24          THE WITNESS:  The state was at the time and
25  remains in dire fiscal straits.  It was an option -- it
```

ROBERT J. GORE     October 1, 2008

Page 129

1    was a mandate given to all agencies to reduce their

2    budgets.  The Corrections proposal was not one that

3    anyone relished or that anyone really liked, but it was

4    at that time judged to be necessary in order to meet our

5    constitutional requirement to balance the budget.

6              MR. SPECTER:  Q.  Okay.  That doesn't quite

7    answer my question.  I said -- my question was whether

8    -- whether or not the administration believed that the

9    population could be reduced safely.

10             MR. MELLO:  Same object.

11             MR. SPECTER:  Q.  Let me ask it another way:

12   You said earlier that public safety was of paramount

13   importance.

14      A.    Yes.

15      Q.    Was it of paramount importance when you

16   submitted the January 10th, 19 -- I mean, 2008, 2009

17   budget?

18      A.    Yes.

19      Q.    So, wouldn't it be fair to conclude that there

20   wouldn't be anything in there that you believed -- that

21   the administration believed would compromise public

22   safety?

23             MR. MELLO:  Lacks foundation.  Incomplete

24   hypothetical.  Assumes facts not in evidence.  It was

25   never enacted.  Wasn't in the May revised.  You can

ROBERT J. GORE    October 1, 2008

Page 133

1    am at any point in time public agencies, but I don't

2    manage the state financial structure.

3            MR. SPECTER:   Q.  But you were trying to cut

4    the Department's budget, right?

5        A.    Correct.  As we all were trying to cut.  All

6    agencies.

7        Q.    And you were trying to cut it in a way that you

8    thought would be consistent with the public safety,

9    isn't that right, what you called the paramount

10   importance?

11           MR. MELLO:  Objection.  Vague.  Lacks

12   foundation.  Calls for speculation.

13           THE WITNESS:  I wasn't trying to cut it.  Jim

14   Tilton, myself, Mike Genest and a number of others were

15   working together to reduce the budget.

16           MR. SPECTER:  Q.  And that's the proposal that

17   all of those people agreed upon and came up with to

18   submit to the legislature; is that right?

19       A.    Yes.

20       Q.    Do you know that any of them were trying to

21   endanger the public safety when they made that proposal?

22   Did you hear anything about that when they made those --

23   when they discussed that?

24           MR. MELLO:  Calls for speculation.  You can

25   answer.

ROBERT J. GORE      October 1, 2008

Page 140

1    flexibility to CDCR to build prisons?  Is that what you

2    meant?

3        A.   It meant that's what Runner meant.  Again, I'm

4    summarizing what Runner is saying.

5        Q.   Okay.  One last point on Clark.  He really does

6    need to know that the highest level of the

7    administration supports his mission.  And what brought

8    you to say that?

9        A.   Again, it was a new situation, and he was

10   needing to know that -- that Dan and Susan and Andrea

11   and some others were aware of where he was headed and

12   what he wanted.

13       Q.   I see.

14       A.   And he subsequently had meetings directly with

15   them and resolved it.

16       Q.   Okay.

17       A.   You know, this is me giving a summation of a

18   situation, as always.

19       Q.   Okay.  And now, Mr. Gore, you're aware that the

20   legislation -- AB 900 cleanup legislation, I'll call it

21   that.  You were aware that it was introduced in the

22   legislature, correct?

23       A.   I was aware of it.

24       Q.   It was supported by the administration?

25       A.   I didn't follow it closely.

ROBERT J. GORE      October 1, 2008

Page 141

1      Q.    You're aware, though, that it failed to pass?

2      A.    Yes.  Yes.

3      Q.    Okay.  And, you're also aware that without that

4    legislation the AB 900 construction program can't move

5    forward, at least part of it; is that right?

6          MR. MELLO:  I think that lacks foundation,

7    misstates the record, it's vague and ambiguous, may call

8    for a legal conclusion, and it may call for expert

9    opinion.  You can answer.

10          THE WITNESS:  I am in continuing discussions

11    with our attorneys on that subject as well as the

12    attorney general's office.

13          MR. SPECTER:  Q.  Uh-huh.  So, what is your

14    present understanding about whether the AB 900

15    construction can go forward or not, without --

16          MR. MELLO:  Without divulging any

17    communications with your counsel.

18          THE WITNESS:  I'm in discussion with our

19    attorneys.

20          MR. SPECTER:  Q.  I asked a different question.

21    I can ask you -- I can't ask you what you and Andrea, or

22    whoever you're talking to, talked about, but I can ask

23    what you understand the current situation to be.  And

24    that' what Paul just cautioned you, not to tell me what

25    they said, but I understand what you're thinking about

ROBERT J. GORE    October 1, 2008

Page 149

1    Q.    The diversion of non-serious, non-violent

2   offenders who have 12 months or less to serve in state

3   prison.

4    A.    I'm not sure what that means, "diversion".

5    Q.    It means, instead of sending them to state

6   prison they would go to the county for either some sort

7   of program or it could even be the county jail if the

8   county wanted it to be.  But, it's an option used with

9   day reporting centers, substance abuse programs, work

10  release, those kinds of things.

11         That type of diversion, has that been

12  discussed?

13    A.    Yes.

14    Q.    And, is there a reason why the administration

15  hasn't proposed that it be used to reduce the

16  population?

17         MR. MELLO:  Lacks foundation.  Calls for

18  speculation.  You can answer.

19         THE WITNESS:  It's not part of any package

20  right now simply because it doesn't save any money.

21         MR. SPECTER:  Q.  I see.

22    A.    And in the end it doesn't uncrowd the justice

23  system.  They're still in the system, and they're still

24  · · someone still has to pay for them.

25    Q.    The idea would be instead of paying for the

```
1                      CERTIFICATE OF REPORTER

2               I, ALESIA L. COLLINS-HUDSON, a Certified Shorthand

3      Reporter, hereby certify that the witness in the

4      foregoing deposition was by me duly sworn to tell the

5      truth, the whole truth, and nothing but the truth in the

6      within-entitled cause;

7               That said deposition was taken down in

8      shorthand by me, a disinterested person, at the time and

9      place therein stated, and that the testimony of the said

10     witness was thereafter reduced to typewriting, by

11     computer, under my direction and supervision;

12              That before completion of the deposition,

13     review of the transcript [X] was [ ] was not requested.

14     If requested, any changes made by the deponent (and

15     provided to the reporter) during the period allowed are

16     appended hereto.

17              I further certify that I am not of counsel or

18     attorney for either or any of the parties to the said

19     deposition, nor in any way interested in the event of

20     this cause, and that I am not related to any of the

21     parties thereto.

22          DATED:    October 10, 2008

23

24

25              ALESIA L. COLLINS-HUDSON, CSR No. 7751
```