# EXHIBIT 27

**Deposition of Robert Gore
October 1, 2008
(Phase II Counter-Designations)**

```
 1            UNITED STATES DISTRICT COURT
 2         FOR THE NORTHERN DISTRICT OF CALIFORNIA
 3          FOR THE EASTERN DISTRICT OF CALIFORNIA
 4    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 5    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
 6                        --oOo--
 7
 8   RALPH COLEMAN, et al.,           )
                                      )
 9                 Plaintiff,         )
                                      ) No.
10           vs.                      ) 2:90-cv-00520 LKK JFM P
                                      )
11   ARNOLD SCHWARZENEGGER, et al.,)
                                      )
12                 Defendants.        )
                                      )
     _____)
13   MARCIANO PLATA, et al.,          )
                                      )
14                 Plaintiff,         )
                                      ) No.
15           vs.                      ) C01-1351 TEH
                                      )
16   ARNOLD SCHWARZENEGGER, et al.,)
                                      )
17                 Defendants.        )
                                      )
     _____)
18
                         DEPOSITION OF
19                      ROBERT J. GORE
20   _____
21                    October 1, 2008
22
23
24   REPORTED BY:  ALESIA L. COLLINS-HUDSON, CSR 7751
25   (Job No. 413307)
```

```
 1   for four months after you have taken away his new
 2   residence, connected with his family again, and perhaps
 3   his new job creates more anger and actually endangers
 4   public safety, correct?
 5        A.   Yes.
 6        Q.   And you're aware that the average time that
 7   parolees are revoked for is about four months?
 8        A.   Yes.
 9        Q.   So, you believe that the current revocation
10   system actually endangers public safety?
11        A.   Yes.
12             MR. MELLO:  I think that lacks foundation,
13   calls for an expert opinion.  I think it misstates the
14   testimony thus far about this sentence.  You can answer
15   the question.
16             THE WITNESS:  Let's run through it again,
17   please.
18             MR. SPECTER:  All right.  Can you read the
19   question back.
20             (Record read)
21             MR. MELLO:  Same objection.
22             THE WITNESS:  That's not what this says here.
23             MR. SPECTER:  Q.  I know that, but it's a
24   logical inference from what it says.
25        A.   The current system of revocation could be
```

```
 1   improved.
 2        Q.   So that it would promote public safety?
 3        A.   It could be improved so that it lowered
 4   recidivism and resulted in --
 5        Q.   Less crime?
 6        A.   The right resources directed at the right
 7   parolees at the right time.
 8        Q.   And that would result in less crime, correct?
 9        A.   Hopefully.
10        Q.   And also it would result in less people going
11   back to prison?
12        A.   One would hope so, yes.
13        Q.   So, in your last sentence was -- says that I
14   was very familiar with the IRP report.  That's Governor
15   Deukmejian's report, correct?
16        A.   Uh-huh.  Uh-huh.
17        Q.   You have to say yes.  I'm sorry.
18        A.   Yes.  I'm sorry.
19             MR. MELLO:  You can say no too.
20             MR. SPECTER:  Q.  "And will continue to drive
21   to make its work a reality," correct?
22        A.   Uh-huh.  Yes.
23             MR. MELLO:  Are you done asking about this
24   draft letter that was never sent?
25             MR. SPECTER:  Now that we have that comment
```

1  I believe was it, came to consensus on was a good
2  solution?
3      A.  It's something that I was working on to make
4  sure it got fully fleshed out as an option.
5      Q.  Right.  I understood that from your email.  My
6  question was a little different.  It was, I felt the
7  purpose of this email was to flush things out, and so I
8  wanted to know if when it was flushed out the governor's
9  office was behind the idea.
10     A.  The purpose of the email, as I stated, was to
11 arrange priority of these and decide in which order they
12 should be addressed -- or, approximate order.  And as
13 far as intermediate sanctions goes, it has subsequently
14 developed into a major option.
15     Q.  Okay.  So, the governor's office is still
16 behind that as an option; is that right?
17         MR. MELLO:  Objection.  Overbroad.  Vague.  You
18 can answer.
19         THE WITNESS:  The Department is still
20 developing it as an option.
21         MR. SPECTER:  Q.  Do you know if the governor's
22 office hasn't signed off on it yet?
23     A.  It's not done.
24     Q.  Will the governor's office be -- would it be
25 something that would be submitted to the governor's

1  office for approval once it is done?
2  A. Perhaps.
3  MR. MELLO: Calls for speculation but, yes.
4  MR. SPECTER: Q. In the normal course of
5  business would it be submitted to the governor's office
6  for approval, Mr. Gore?
7  A. I can't say. The secretaries have broad
8  discretion on how they run their agency. Sometimes they
9  choose to submit things. Sometimes they choose to take
10 particular courses of action they regard as
11 advantageous.
12 Q. Would you be surprised if Mr. Cates --
13 MR. MELLO: Finish your question, please. Come
14 on. Finish your question. Off the record.
15 (Discussion off the record.)
16 MR. SPECTER: Q. Mr. Gore, would you be
17 surprised if the Department implemented a parolee
18 intermediate sanction program and Mr. Cates, who is now
19 the secretary, didn't make sure it was consistent with
20 the governor's policies?
21 MR. MELLO: Objection. Vague as to various
22 terms, including "surprised". I also believe it's
23 compound, and I believe it lacks foundation, and it also
24 calls for speculation as to what Mr. Cates would do.
25 You can answer the question.

1           THE WITNESS: The intermediate sanctions are
2  primarily placement in appropriate programs. It's -- if
3  it's -- it's something that virtually no one opposes, so
4  if he was to proceed on a course that resulted in that,
5  no, I wouldn't be surprised.
6           MR. SPECTER: Q. Okay. So, do you know are
7  they still developing intermediate sanctions?
8      A.   As part of other work, yes.
9      Q.   Do you know -- so, they're not -- do you know
10 whether they are using intermediate sanctions in the
11 field today as we speak?
12          MR. MELLO: Any intermediate sanctions?
13 Objection. Vague as to "intermediate sanctions."
14          THE WITNESS: They could be.
15          MR. SPECTER: Q. You don't know?
16     A.   No.
17     Q.   But you are aware that they're trying to
18 improve their reliance on intermediate sanctions? Would
19 that be fair to say?
20     A.   Yes.
21     Q.   And, do you -- do you know if there is a goal
22 of how many, or what percentage of the parole violators
23 would be able to benefit from those intermediate
24 sanctions, if "benefit" is the right word?
25     A.   I'm not aware of the goal.

```
1           THE WITNESS:  Yeah.
2           MR. SPECTER:  Q.  At that point in the
3  deactivation plan, did you -- did they have an end date
4  when there wouldn't be anymore -- when the bad beds
5  would be eliminated?
6      A.  No.  It would have just been in the following
7  year or two.  It wouldn't have been forever.  And
8  circumstances change so much, if it was forever it
9  wouldn't have been valid anyway.
10     Q.  Okay.  So, did they ever provide you with a
11 plan in which there wouldn't be any bad beds?
12          MR. MELLO:  Ever?
13          MR. SPECTER:  Q.  Yes.
14     A.  No.  But there's -- I'm -- no.  We have had
15 discussions about timelines but, again, they vary badly
16 according to circumstances.
17     Q.  I understand.
18     A.  And population trends that no one can predict.
19 So, an end is a movable horizon.
20     Q.  Okay.  And it says that 35 -- at least in July
21 of 2007 there was some progress on discharging paroles
22 after the 12 months clean, right?
23     A.  Yes.
24     Q.  It was 3 percent, right?  I mean, it was a 3
25 percent decrease from 30 -- or increase from 35 percent
```

1    it once was. It said about 36 percent of all parolees.
2    At one point -- I think it was two years ago, it was
3    about 24 percent. It's undergone a 58 percent increase.
4         Q.   Okay.
5         A.   So, it's -- it's an excellent, excellent tool.
6         Q.   And, to your knowledge they're not using a risk
7    assessment tool before they discharge them, right?
8         A.   No.
9         Q.   They're not, right?
10        A.   Right. Correct. They're not using a risk
11   assessment tool.
12        Q.   Okay. Great.
13        A.   Again, that was something that came up in July
14   2007. May or may not be valid today.
15        Q.   Okay. Fair enough. I'm doing this
16   chronologically.
17        A.   I understand. I don't want us to lose sight of
18   the fact it's a very dynamic situation.
19        Q.   Right. I know. Okay.
20        A.   You got two different things here, right?
21        Q.   Yes, they are.
22             (Exhibit 6 marked)
23             (Witness reviewing document.)
24             MR. SPECTER:  Q. What I have handed you is an
25   email dated Friday August 24th, 2007 from you to Joan

1          MR. SPECTER:  You, personally.

2          MR. MELLO:  It's also vague as to what

3    "Sentencing Commission" means.  You can answer the

4    question.

5          THE WITNESS:  I'm not sure a Sentencing

6    Commission would have an immediate impact on prison

7    population.  It has in other states, Virginia, for

8    example.  Or it's had the effect, at least at this

9    point, of reducing population, but at the same time

10   increasing sentences for serious crimes.

11         Is it an alternative worth considering?

12   Certainly, in my opinion.

13         MR. SPECTER:  Q.  Okay.  And in your judgment

14   if the governor asked you to make a recommendation to

15   him about the quickest and most safe way to reduce

16   prison population, what would you -- how would you

17   apply?

18         MR. MELLO:  Lacks foundation.  Calls for

19   speculation.  Incomplete hypothetical.  You can answer.

20         THE WITNESS:  If I was asked, it would be

21   something I would sit down with Andrea, Matt Cate, and a

22   couple of others, and work out a reasoned, fully fleshed

23   out proposal.  Nothing I would respond to on my own.

24         MR. SPECTER:  Q.  And nobody has asked to you

25   do that?

1    Q. So, the Department -- and you were informed
2  about that proposal before it was formally submitted to
3  the legislature in the governor's final budget, were you
4  not?
5    A. Yes.
6    Q. And, so, they -- and, did -- was Mr. Dunmoyer
7  -- to your knowledge, was Mr. Dunmoyer and Mr. Kennedy
8  informed about that proposal as well?
9         MR. MELLO: Before it went to the legislature.
10        THE WITNESS: Yes.
11        MR. SPECTER: Q. And the governor -- do you
12 know if the governor was involved?
13   A. No, I do not.
14   Q. But, in any event, this proposal -- this
15 proposal was approved by the administration and
16 submitted to the legislature, correct?
17   A. Yes.
18   Q. And the administration believed that this
19 population reduction could be done safely, correct?
20        MR. MELLO: I think it lacks foundation, calls
21 for speculation. It's an incomplete hypothetical, vague
22 and ambiguous with respect to safety -- safely. You can
23 answer the question.
24        THE WITNESS: The state was at the time and
25 remains in dire fiscal straits. It was an option -- it

1  ==was a mandate given to all agencies to reduce their==
2  ==budgets.  The Corrections proposal was not one that==
3  ==anyone relished or that anyone really liked, but it was==
4  ==at that time judged to be necessary in order to meet our==
5  ==constitutional requirement to balance the budget.==
6              MR. SPECTER:  Q.  Okay.  That doesn't quite
7  answer my question.  I said -- my question was whether
8  -- whether or not the administration believed that the
9  population could be reduced safely.
10             MR. MELLO:  Same object.
11             MR. SPECTER:  Q.  Let me ask it another way:
12 You said earlier that public safety was of paramount
13 importance.
14        A.   Yes.
15        Q.   Was it of paramount importance when you
16 submitted the January 10th, 19 -- I mean, 2008, 2009
17 budget?
18        A.   Yes.
19        Q.   So, wouldn't it be fair to conclude that there
20 wouldn't be anything in there that you believed -- that
21 the administration believed would compromise public
22 safety?
23             MR. MELLO:  Lacks foundation.  Incomplete
24 hypothetical.  Assumes facts not in evidence.  It was
25 never enacted.  Wasn't in the May revised.  You can

```
 1   answer.  It's vague.
 2              THE WITNESS:  Again, it was -- it was a
 3   decision made to meet a balanced budget.  It was
 4   something no one wanted to do, and, in fact, wasn't
 5   done.
 6              MR. MAURO:  You're asking him to speak for the
 7   entire administration.
 8              MR. SPECTER:  That's what I'm asking.  You want
 9   to let us depose the governor, we'll ask him.
10              MR. MAURO:  I just want him to understand he is
11   speaking for the governor now.
12              MR. MELLO:  Same objections.
13              THE WITNESS:  Again, it was a decision made
14   with great reluctance.  As to whether or not it would or
15   would not have endangered public safety, it never
16   happened, so it's impossible to say.
17              MR. SPECTER:  Q.  I didn't ask you whether or
18   not it happened.  I asked you whether or not the
19   administration believed it would unnecessarily
20   compromise public safety.
21              MR. MELLO:  I think it's asked and answered,
22   and now becomes argumentative.
23              MR. SPECTER:  I'm trying to get an answer.  He
24   is not answering the question.
25        Q.    So, could you just answer my question,
```

```
1    Mr. Gore.  I don't mean to oppress you.  I'm entitled to
2    an answer to the question.
3         A.   With gritted teeth and great trepidation, it
4    was something we accepted as necessary.
5         Q.   Right.  I understand that.  And you wouldn't
6    have proposed something you thought would endanger the
7    public, would you?
8              MR. MELLO:  Same objection.  I think it's an
9    incomplete hypothetical, lacks foundation, calls for
10   speculation.  It's vague.  And you are not asking for
11   his opinion but you're asking for the administration's
12   opinion, correct?  Answer the question, if you
13   understand it.
14             THE WITNESS:  It -- the act of recommending the
15   release of 20,000 inmates to reduce the Corrections
16   budget by 10 percent was the beginning of a process.  We
17   recognized that.
18             As to what would be the final outcome, we did
19   not know.
20             MR. SPECTER:  Q.  Okay.  You still haven't
21   answered my question.  I know you're dancing around it
22   as much as you can.  Either you made a proposal that you
23   thought would endanger public safety or you made a
24   proposal that you didn't think would endanger public
25   safety.  It's got to be one of those two choices.  Which
```

```
 1   am at any point in time public agencies, but I don't
 2   manage the state financial structure.
 3          MR. SPECTER:  Q.  But you were trying to cut
 4   the Department's budget, right?
 5      A.  Correct.  As we all were trying to cut.  All
 6   agencies.
 7      Q.  And you were trying to cut it in a way that you
 8   thought would be consistent with the public safety,
 9   isn't that right, what you called the paramount
10   importance?
11          MR. MELLO:  Objection.  Vague.  Lacks
12   foundation.  Calls for speculation.
13          THE WITNESS:  I wasn't trying to cut it.  Jim
14   Tilton, myself, Mike Genest and a number of others were
15   working together to reduce the budget.
16          MR. SPECTER:  Q.  And that's the proposal that
17   all of those people agreed upon and came up with to
18   submit to the legislature; is that right?
19      A.  Yes.
20      Q.  Do you know that any of them were trying to
21   endanger the public safety when they made that proposal?
22   Did you hear anything about that when they made those --
23   when they discussed that?
24          MR. MELLO:  Calls for speculation.  You can
25   answer.
```

```
 1   immediately. Some of the other prisons you've got to
 2   work your way through. That's why you can't say until
 3   you get to the end of the system of simultaneously while
 4   you're deploying other population reduction measures.
 5        Q.   I see. Do you know if Vacaville is crowded or
 6   one of the least crowded prisons in the state?
 7        A.   At this point?
 8        Q.   Yes.
 9        A.   I don't know for sure at this point.
10             MR. "MELLO" When you say "Vacaville," do you
11   mean CMF or Solano?
12             MR. SPECTER: No. Vacaville. Solano is one of
13   the most crowded.
14             THE WITNESS: It would be CMF.
15             MR. SPECTER: Why don't we take a minute or
16   two. I just got to review my notes.
17             (Recess.)
18             MR. SPECTER: Q. Okay. So, the expert panel
19   report, among others, makes recommendations --
20   recommendations to -- for measures to reduce the
21   population. I'm going to go through some of them that
22   are on the sheet, but I want you to let me know if you
23   or others in your office have discussed using these
24   options, okay?
25        A.   Yes.
```

```
 1        Q.   The diversion of non-serious, non-violent
 2   offenders who have 12 months or less to serve in state
 3   prison.
 4        A.   I'm not sure what that means, "diversion".
 5        Q.   It means, instead of sending them to state
 6   prison they would go to the county for either some sort
 7   of program or it could even be the county jail if the
 8   county wanted it to be.  But, it's an option used with
 9   day reporting centers, substance abuse programs, work
10   release, those kinds of things.
11             That type of diversion, has that been
12   discussed?
13        A.   Yes.
14        Q.   And, is there a reason why the administration
15   hasn't proposed that it be used to reduce the
16   population?
17             MR. MELLO:  Lacks foundation.  Calls for
18   speculation.  You can answer.
19             THE WITNESS:  It's not part of any package
20   right now simply because it doesn't save any money.
21             MR. SPECTER:  Q.  I see.
22        A.   And in the end it doesn't uncrowd the justice
23   system.  They're still in the system, and they're still
24   -- someone still has to pay for them.
25        Q.   The idea would be instead of paying for the
```