# EXHIBIT 28

**Deposition of Deborah Hysen**
**September 3, 2008**
**(Phase II Designations)**

**Part A**

Page 1

UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

--oOo--

RALPH COLEMAN, et al.,               )
                                     )
          Plaintiffs,                )
                                     )
     vs.                             ) No. CIV S 90-0520
                                     )    LKK-JFM P
ARNOLD SCHWARZENEGGER, et al.,       )
                                     )
          Defendants.                )
                                     )
_____)

DEPOSITION OF

DEBORAH HYSEN

September 3, 2008

REPORTED BY:  KAREN A. FRIEDMAN, CSR 5425   JOB # 412304

DEBORAH HYSEN        September 3, 2008

1        A.    It was his role to coordinate their efforts.

2        Q.    Could you please describe your duties and

3   responsibilities on the strike team.

4        A.    The strike team was created to help implement

5   the objectives and requirements of AB 900.  On my

6   particular team it was our responsibility to identify

7   ways in which to accelerate those projects.

8        Q.    Can you describe the goals and objectives of AB

9   900 that you were particularly engaged in?

10       A.    AB 900 established some requirements to build

11  something called infill beds, medical beds, and jail

12  beds, reentry beds, and my primary focus was to design

13  and construct the additional capacity in that section,

14  which in total was 53,000 beds for the state.

15       Q.    How long were you on the strike team?

16       A.    Well, the strike team eventually merged, over

17  time, into the Department, primarily, I believe, because

18  -- well, I made a recommendation that the strike team

19  efforts needed to be integrated into the Department for

20  them to own the outcomes.

21            So one of my recommendations was to quickly

22  move from investigations and reports to implementation

23  and actions.

24       Q.    So at what point did you, the strike team,

25  essentially dissolve, and did you begin working for the

DEBORAH HYSEN        September 3, 2008

Page 19

1    and monitoring those standards for compliance.

2        Q.    To whom do you report as chief deputy

3    secretary?

4        A.    Currently?

5        Q.    Yes.

6        A.    Currently I report to Scott Kernan, who is the

7    chief deputy secretary/acting undersecretary of

8    operations/acting secretary of administration.

9        Q.    Has that been changing around a fair amount

10   lately?

11       A.    Well, this occurred last week, so it's a fairly

12   new reporting structure.

13       Q.    And prior to that, who did you report to?

14       A.    Prior to that it was Dave Reynolds.

15       Q.    And what was his position?

16       A.    He was the undersecretary of operations and the

17   acting undersecretary of administration.

18       Q.    So let's talk about AB 900.  I think you might

19   have alluded to this earlier, but I just want to start

20   big.  How many beds does AB 900 authorize for CDCR

21   prisoners?

22       A.    For CDCR inmates it's 40,000.  It's a

23   combination of reentry beds, infill beds, and medical

24   beds.

25       Q.    Can you break that down for me in, I know

DEBORAH HYSEN          September 3, 2008

Page 20

1    there's phase 1 and phase 2, and the three different

2    categories of beds.

3         A.    Phase 1, infill, authorizes approximately

4    12,000 beds.  Phase 1 reentry authorizes approximately

5    6,000 beds; phase 1 medical I think is 4,000 beds.

6              Phase 2 for infill, it's approximately 6,000

7    beds; phase 2, for reentry, is approximately 10,000

8    beds, and I would assume it's 4,000 for medical phase 2.

9         Q.    You know, I don't mean to make you guess, and

10   just so we have a clean record, I'm going to show you a

11   document which I think we're going to mark as Exhibit 1.

12              (Whereupon, Deposition Exhibit No. 1

13               was marked for identification.)

14         MS. NORMAN:  Q.  Take a look at it, and I just

15   want to make sure you have a chance to look at it and

16   know what it is.  Have you seen this document before?

17        A.    Yes.

18        Q.    Is this the declaration that you signed in the

19   Plata case on May 16th, last year?

20        A.    Double-check; yes.

21        Q.    Okay.  So I think page 3, paragraph 6, has the

22   exact numbers.

23        A.    I got it right on the medical.

24        Q.    And that's for Phase 1 -- 12,000 infill, 6,000

25   medical, and 6,000 reentry, is that right?

DEBORAH HYSEN    September 3, 2008

Page 21

1      A.    Right.

2      Q.    And for Phase 2, 4,000 infill, 2,000 medical,

3    and 10,000 reentry.  And I'm saying "medical," I mean

4    medical and mental health.  So that's correct?

5      A.    Yes.

6      Q.    Let me just ask you a question I've been a

7    little curious about.  I sometimes see the figure, for

8    Phase 1 infill, instead of 12,000, something like

9    12,184, something very precise.  Have the numbers

10    bounced around a little for what AB 900 plans?

11      A.    Are you talking about the 7,484 number?

12      Q.    So that 7,484 number is sort of a Phase 1A; is

13    that right?

14      A.    I believe it was based on the number of beds

15    contemplated in the original infill bed plan program in

16    the first ten sites.  And the first 10 sites were, at

17    the time, those sites that had site assessments

18    underway.

19      Q.    And that was CDCR's January 2007 original

20    infill bed plan you're referring to?

21      A.    Correct.

22      Q.    And that was an infill bed plan that provided a

23    basis for a lot of the calculations in AB 900?

24      A.    That's my belief, yes.

25      Q.    And so a total would be that AB 900 anticipates

DEBORAH HYSEN        September 3, 2008

Page 23

1    10,500, then I heard 500, then I heard 10,000 plus 1,000

2    for an inmate work crew in kind of a supporting role.

3    So I'm not sure where he is at the current time.

4        Q.    Is the Department currently moving ahead with

5    plans to build 8,000 medical beds as set forth in AB

6    900, or is that pending, depending on the receiver's

7    action?

8        A.    The Department is looking to the receiver, who

9    we believe is the authorized entity to build those beds.

10       Q.    So is it then fair to say that CDCR's current

11   plan for implementing AB 900 is to build fewer than

12   30,000 beds?

13       A.    It is, unfortunately, our plan to build less

14   than the authorized amount, and I would say less than

15   30,000 beds is an appropriate figure.

16       Q.    So let's start --

17       A.    And those are state beds, correct?

18       Q.    State beds, correct.  We're leaving to one side

19   the whole county jail funding for now.

20             Let's start with infill.  We'll talk more

21   specifically about CDCR's plans.  So the original intent

22   as of May 2007 was to build 12,000 infill beds to be

23   completed in 2009.  Is that correct?

24       A.    You know, I believe the first ones came online

25   in 2009.  I don't have all the dates in front of me.

DEBORAH HYSEN       September 3, 2008

Page 24

1    They were staggered.

2        Q.    Why don't you take a look at your declaration

3    that's Exhibit 1, and look at paragraph 7.   I'm looking

4    at the last sentence in paragraph 7.

5        A.    Okay.

6        Q.    So in this declaration you said that the 12,000

7    Phase 1 infill beds will be completed in 2009.   Is that

8    right?

9        A.    I must have looked at a schedule, then, to

10   indicate that they would have been completed in 2009.

11       Q.    So that was the plan back in May of last year?

12       A.    The plan was predicated on design-build

13   authority, and it was an unfortunate circumstance that

14   that wasn't made more clear.   It was a notation that

15   they were predicated on design-build.   At least the

16   first 12 or 13 projects.

17            And that wasn't made clear to me right away.

18   This is my first day, by the way.

19       Q.    Welcome to the job.

20       A.    That, A, it was predicated on design-build,

21   which is a huge schedule accelerant, and B, that it was

22   communicated that way.

23       Q.    So you testified to the court as to the CDCR

24   schedule, but it turned out it was based on faulty

25   information; is that right?

DEBORAH HYSEN          September 3, 2008

1       A.    I think at the time it was planned, which was

2    in January, it was planned to be a design-build; it was

3    planned for authorization.  In fact, CDCR was proceeding

4    in that fashion by soliciting architects and contractors

5    that could participate in the design-build.

6             The final legislation did not include that, so

7    I don't know that it was a mistake.

8             And I know that this legislation came together

9    in the 11th hour.  So the gap between what they had

10   asked for and what finally got produced, this schedule

11   was never changed as a result.

12       Q.    Tell me what "design-build authority" is.

13       A.    Currently the State's capital process follows a

14   very traditional design-build.  My role, if I was to

15   follow that path, would be to get funding to produce

16   preliminary plans, and if they were approved I would

17   then get funding to produce working drawings.  And I

18   would then take those working drawings, when complete,

19   and bid those out to a contract firm.  And that process,

20   especially in the State of California's process, can be

21   very protracted.

22             Typical projects that follow that path can take

23   anywhere from three to seven years from inception to

24   occupancy.

25             Design-build collapses some of those phases

DEBORAH HYSEN          September 3, 2008

Page 26

1    together, and you would seek a team that would deliver

2    your projects as a consolidated effort.  You would get a

3    design team, a construction management team, the general

4    contractor, onboard at the earliest stage, and together

5    they would use their expertise to ferret out what the

6    design looks like, and if it's buildable "as-is," is a

7    common term.  Because oftentimes, architects don't,

8    often, parlay their work into construction.  They're not

9    necessarily in sync as to how you actually construct it.

10          This brings about the expertise so you don't

11   have to backtrack and make some changes that the

12   contractor says you couldn't build.

13          It's authority that obviously can provide a

14   huge schedule of accelerants.

15          I've looked at studies, because I've tried to

16   promote design-build, that can take a schedule and

17   accelerate it from, anywhere from 25 to 40 percent.

18       Q.   When you're talking about state construction

19   projects, does design-build require special authority?

20       A.   Yes, it does.

21       Q.   Does it require legislative action?

22       A.   Yes it does.

23       Q.   And AB 900 did not include such authority?

24       A.   Ultimately it did not.

25       Q.   When was AB 900 signed?

DEBORAH HYSEN          September 3, 2008

Page 27

1        A.    The first week or so of May 2007.

2        Q.    So AB 900 was signed; the declaration that's

3    Exhibit 1 for this deposition that you signed was May

4    16th.  So AB 900 would have been signed prior to that

5    point; correct?

6        A.    Correct.

7        Q.    Do you currently have design-build authority

8    for the AB 900 projects?

9        A.    No.

10        Q.    So it's never become, I believe the terms are

11    "cleanup bill," and "trailer bill"?  It's never come

12    through in subsequent legislation?

13        A.    Not yet.

14        Q.    And are you hoping that it comes through soon?

15        A.    I'm hoping.  I'm actively pursuing.  I've been

16    pursuing from day one and continue to pursue.

17        Q.    Is design-build authority something that's

18    currently pending in legislation?

19        A.    Yes.

20        Q.    Is it a trailer bill for the current budget?

21        A.    I believe that's the latest bill mechanism.

22        MS. NORMAN:    Okay.  Let's look at another

23    document.

24              (Whereupon, Deposition Exhibit No. 2

25               was marked for identification.)

DEBORAH HYSEN          September 3, 2008

Page 30

1          But I certainly recognize, you know, some of
2     the facilities and some of the bed counts.
3          Q.   Have any infill beds been built?
4          A.   We have not broken ground yet.
5          Q.   Have any been designed?
6          A.   We have initiated everything we can do
7     statutorily to this point.
8          Q.   What does that mean?
9          A.   We have to seek project approval through the
10    public works board and the joint legislative budget
11    committee, and we don't have that approval yet.
12         Q.   So what does that mean in layman's terms, in
13    terms of getting it designed and then built?
14         A.   What it means is, you can proceed to a point in
15    time, and that point in time for us was once called
16    programing, architectural programing.  It's setting
17    forth the general objectives, the·staffing scenarios,
18    the general space requirements, conceptual schedules,
19    conceptual cost estimates, and you literally cannot
20    proceed to preliminary plans until you have project
21    approval.
22         Q.   It sounds pretty conceptual at this stage.
23         A.   You can go fairly quickly to programing plans,
24    you're starting to lay out your architectural drawings.
25    So you can advance from concept to preliminary plans,

DEBORAH HYSEN        September 3, 2008

Page 31

1    and advance the design pretty significantly when you go

2    from that point to the next.

3        Q.   And, I'm sorry.  Did you say that you have

4    reached the preliminary-plan stage already?

5        A.   We have reached it for the first four infill

6    sites.

7        Q.   And what are those four sites?

8        A.   The former El Paso Youth Correctional Facility,

9    the Northern Kern State Prison, Kern Valley State

10   Prison, and the Wasco State Prison, on infill and on

11   reentry NCRF.

12       Q.   And the reentry facility is the former women's

13   prison in Stockton?

14       A.   That's correct.

15       Q.   So the furthest advanced you are for infill or

16   reentry is the preliminary-plan stage; is that right?

17       A.   Just before the preliminary-plan stage.

18       Q.   "Just before."  So you've not yet reached the

19   preliminary-plan stage on any site?

20       A.   We are not permitted to advance to that stage,

21   yes.

22       Q.   Are you awaiting authorization to move into the

23   preliminary-plan stage on those five sites?

24       A.   Correct.

25       Q.   And from whom do you need the authorization?

DEBORAH HYSEN        September 3, 2008

Page 35

1    detail would yield, ultimately, a project that can be
2    bonded and the bond sold to bondholders.
3         Q.    Have there been concerns with the bonds sold,
4    used to fund the construction?
5         A.    Can you be more specific.
6         Q.    Is there a reason why the Attorney General's
7    office has not issued a clean bond opinion up to now?
8              MS. JOHNSON:   Lacks foundation.
9              THE WITNESS:   I actually don't know the reason
10   for that.
11             MS. NORMAN:   Q.   I'm trying to get an
12   understanding of what's going on with the money here.
13   Is it your understanding that the funds are not ready to
14   be released yet for the construction project?
15        A.    No.   I mean, the bonds aren't sold until
16   construction is well under way, and sometimes
17   post-occupancy.   So I'm not certain all of the reasons
18   for the AG's position at this point.
19        Q.    But you are aware that you can't move forward
20   with the construction projects --
21        A.    I am aware I can't move forward.
22        Q.    -- until there's a clean bond opinion?
23        A.    That's what I've been advised.
24        Q.    Let's take a little of the guesswork out by
25   looking at another document, which we will mark Exhibit

DEBORAH HYSEN        September 3, 2008

Page 37

1      Q.    You said '10-'11?

2      A.    It is '11-'12.

3      Q.    So that means that CDCR, under CDCR's current

4    plan, the Kern Valley, North Kern, and Wasco infill beds

5    might not be online, ready for occupancy, until June

6    2012.  Is that right?

7      A.    That's correct.

8      Q.    Has the CDCR's infill bed-building project

9    changed at all in any significant way since the date of

10   this chart?

11              MS. JOHNSON:  Vague and ambiguous.

12              THE WITNESS:  No.

13              MS. NORMAN:  Q.  So this is pretty accurate,

14   based on your current understanding of what the plans

15   are.

16     A.    It's pretty accurate.  I think my, the dates

17   that I had earlier might have come from our hope that we

18   had design-build in an earlier trailer version.  So

19   these are much closer to being accurate, at this point.

20     Q.    Okay.  So you mentioned before that the dates

21   that you, CDCR currently expects occupancy to begin for

22   these first four infill projects, they could be further

23   out if there are significant delays in some of the

24   required steps.  Are there other factors that might

25   delay these projects, that we haven't yet discussed?

DEBORAH HYSEN        September 3, 2008

Page 38

1      A.    Yes.

2      Q.    What kinds of things?

3            MS. JOHNSON:  Calls for speculation.

4            MS. NORMAN:  Q.  You can go ahead.

5      A.    Well, I mean, any construction project has

6   inherently in it any number of things that could either

7   go to the good of the schedule or negatively impact the

8   schedule.  We, the EIR process is not complete for these

9   process.

10     Q.    What process is that?

11     A.    The environmental impact review process.  That

12  can sometimes be at least a schedule delay, if we get

13  into a situation where there's either litigation or

14  challenges of some kind.

15           So that's one of those critical-path issues

16  we're keeping an eye on.

17           I would say other things that could impact it

18  would be if you have materials there are certain

19  materials that we use that are very unique to prisons;

20  construction cement.  If you have a material delay, that

21  could potentially impact the schedule; those are pretty

22  common things that you find in construction, and because

23  we have very specific materials, we can't substitute

24  them, in some cases.  That's a pretty typical schedule

25  impact.

DEBORAH HYSEN       September 3, 2008

Page 43

1        A.    Correct.

2        Q.    So the total number of infill beds currently at

3    this planning stage that we've been discussing is 4,800;

4    is that right?

5        A.    Total number of beds at HOC is 4,800 in Phase

6    1, priority 1.

7        Q.    And then Phase 1 priority 2, adds another 1,900

8    beds?

9        A.    Correct.

10       Q.    But those beds are not anticipated to be coming

11   online until the 2011-2012 fiscal year for one site and

12   the 2012-2013 fiscal year for another site.  Is that

13   right?

14       A.    That's correct.

15       Q.    So the 6,700 infill beds that CDCR intends to

16   build in Phase 1, those, under the current plans, would

17   not be fully occupied until possibly June 2013.  Is that

18   right?

19       A.    That's correct.

20       Q.    And only 1,000 beds would be occupied as early

21   as the 2009-2010 fiscal year?

22       A.    That's right.  And again, that's based on the

23   traditional design bed build.  If we get unique

24   authority, these schedules would move up, presumably.

25       Q.    And if you run into some bumps along the way

DEBORAH HYSEN          September 3, 2008

Page 44

1   with the environmental impact report?

2        A.    It might go in the other direction, yes.

3              MS. NORMAN:  Let's look at another document.

4                   (Whereupon, Deposition Exhibit No. 4

5                   was marked for identification.)

6              MS. NORMAN:  Q.  This document should be

7   familiar to you.  Is this a PowerPoint presentation that

8   you gave to the Senate on February 19th of this year?

9        A.    It's a PowerPoint presentation I tried to give

10  to the Senate this year.

11       Q.    Okay.  I just want you to flip through it, make

12  sure that it's a complete, accurate notation of what you

13  tried to give to the Senate.  We will be looking at

14  pages 16 and 17.

15             So as of February of this year, CDCR

16  anticipated that Kern Valley occupancy would be December

17  2009, right?

18       A.    Can you repeat the question?

19       Q.    Okay.  As of February of this year, when you

20  tried to give this PowerPoint presentation to the

21  Senate, CDCR anticipated, planned, for occupancy at the

22  Kern Valley infill bed site, for December 2009.  Is that

23  right?

24       A.    That's correct.

25       Q.    But the current plan is for occupancy at the

Merrill Legal Solutions
(800) 869-9132

DEBORAH HYSEN          September 3, 2008

Page 45

1    Kern Valley site sometime in the 2011-2012 fiscal year.

2    Is that right?

3        A.    That's correct.

4        Q.    What happened to change the Kern Valley plan?

5        A.    We had proposed to occupy a portion of Kern

6    Valley with a small contingent of inmates, much like the

7    original prison construction program in the '80s.  They

8    would occupy in, as much as a year in advance of the

9    full occupancy, and that was our proposal for each of

10   these.

11       Q.    And you changed your mind on that?

12       A.    Well, in discussions with the Department of

13   Finance they felt the cost to partially occupy was too

14   high on the support side.  It does increase the cost on

15   the construction side as well.

16            It was our effort to accelerate the schedules

17   without the unique authority that we asked for.

18       Q.    So the word came back that it was just too

19   expensive to do it that way?

20       A.    Too expensive, correct.

21       Q.    So the date got pushed back?

22       A.    It poses operational issues, too, when you

23   partially occupy and you build around that partial

24   occupancy.

25       Q.    But you thought that it would be feasible?

DEBORAH HYSEN        September 3, 2008

Page 49

1    period of time.  It appears to be well through February,

2    at least.

3        Q.    So dorms are cheaper to build?

4        A.    Dorms are cheaper to build.

5        Q.    And CDCR believes it can overcrowd them more

6    than it can overcrowd cells?

7        A.    I don't think I can speak for CDCR.

8        Q.    Based on your testimony earlier that housing

9    overcrowding capacity for dorms that CDCR uses is 200

10   percent and cells is 190 percent.

11       A.    That's correct.

12       Q.    So you believed, back last year, when you were

13   on the strike team, that CDCR needed more high-security

14   cells?

15       A.    I think CDCR's plans indicated there was a gap

16   of level 4 cells.

17       Q.    And yet the Kern Valley infill building plan

18   was to build dorms as of January this year?

19       A.    Correct.

20       Q.    And then it has now moved back to building

21   cells facilities, right?

22       A.    Correct.

23       Q.    And that's based simply on CDCR's need for

24   cells?

25       A.    Yes.

DEBORAH HYSEN          September 3, 2008

Page 50

1          Q.    And that explains some of the changes in

2    predicted occupancy at the time?

3          A.    Well, it does, because we had architecturally

4    programed for the dorms configuration and had to go

5    back, and our funding package was based on dorms.  And

6    everything really changes when you go from that type of

7    construction to cells.  The staffing ratios change, the

8    amount of acreage changes, the location and adjacency

9    changes.  Really, everything changes when you do that.

10              So we had to reprogram to the level 4 facility.

11         Q.    Okay.  Now, moving on to Wasco.  So in February

12   of this year the plan was to have Wasco infill beds

13   occupied in July 2010, but the current plan is to have

14   Wasco infill beds occupied sometime in fiscal year

15   2011-2012.  Correct?

16         A.    That's correct.

17         Q.    What happened to change that schedule?

18         A.    There are some complications with Wasco's infra

19   structure, that we found.  In particular, our ability to

20   dispose of waste effluent.  It requires us to acquire

21   land in order to do that, so a schedule reflects the

22   need to acquire land and to design the wastewater

23   systems to meet that effluent requirement.

24         Q.    Looking at North Kern.  North Kern, in February

25   of this year, the plan was for the infill beds to be

DEBORAH HYSEN        September 3, 2008

Page 51

1    occupied March 2010, and that is currently moved to

2    fiscal year 2011-2012.  Correct?

3        A.    Correct.  One of the things we felt we could

4    gain at North Kern, we felt it was the only site where

5    we actually could construct within the secure perimeter.

6    The original foot plan based its construction that it

7    could construct a pretty secure amount of beds, based on

8    the secure perimeter.

9            Checking in and out, into a prison, is pretty

10   extensive, and you can imagine coming in with tools.

11   They all have to be checked in and out individually, not

12   just as a box of tools.  So we felt that that challenge

13   may not have been fully understood.

14           But in the case of North Kern, we felt we could

15   build wing nuts; we could fit them in, we could segment

16   off that portion of the prison, where we could create an

17   independent gate entry.

18           And when we started to lay it out with all of

19   the elements we needed, including the medical space,

20   which is significantly higher than reception size was

21   previously designed for, it simply loaded beyond the

22   parcel that we had intended.  And it ended up being, in

23   fact, we could not place it where it was located.  So

24   that, ergo, the reason why that schedule.

25       Q.    Make sure I understand that.  So it turns out

DEBORAH HYSEN      September 3, 2008

Page 53

1     Q.    Moving on to the California Correctional
2  Institution Tehachapi, the plan in February 2008 was for
3  occupancy for at least part of the infill bed housing in
4  July 2010, but that's now predicted for occupancy in the
5  2010-2011 fiscal year.  Is that right?
6     A.    That's correct.
7     Q.    What happened at CCI?
8     A.    And it has a little bit of relation to Wasco.
9  I may have to go back to Wasco in a second.  In the case
10  of CCI, in discussions with the receiver's office, we
11  had planned to build a reception center at CCI.  We did
12  a pretty detailed analysis of all the infill sites and
13  looked at things that might impede or enhance the
14  locations we ultimately picked.  So we looked at things
15  like the ability to staff the facility; the ability to
16  get community support; the ability of the infrastructure
17  to support the facility itself.
18         And as a result of all that analysis, we
19  developed our infill plan.  CCI came out as a site that
20  we believed we could put a reception center facility at,
21  and we could staff it, and ultimately we would achieve
22  whatever other objectives, such as community support, et
23  cetera, we needed.  And in conversations with the
24  receiver's office in spring of this year, the receiver
25  was adamantly opposed to CDCR building a reception

DEBORAH HYSEN        September 3, 2008

Page 55

1    the plans at Wasco and CCI.

2          So all of our programing efforts for CCI

3    stopped.  If we were not able to build a reception

4    center, all that activity, all that expense would be for

5    naught.  The same with Wasco, for that one reception

6    unit.  So we would essentially start from scratch when

7    we restart CCI, and we've already started to program

8    Wasco for the two level 4 facilities.

9          Q.   So Exhibit 3, the revised infill bed plan that

10   we have been looking at, that accounts for the changes

11   that you have made based on the receiver's objections to

12   reception centers at CCI and Wasco?

13         A.   Yes.

14         Q.   Looking at the dates again on Exhibit 3 that we

15   have been talking about, the revised infill bed plan

16   dates, CDCR's current plans for occupancy for infill

17   beds, are you confident that these dates will be met and

18   occupancy will be met, as noted on this chart?

19         A.   It's all predicated on funding.  There's been

20   quite a dialogue about the funding requirements when you

21   look at both the receiver's requested funds and CDCR's

22   authorized funds.  So this is predicated on getting the

23   funding to do that, clearly.

24              I'm pretty confident that if we don't have the

25   schedule delays that could potentially plague projects

DEBORAH HYSEN          September 3, 2008

Page 56

1    like this -- but again, we're not through our EIR, and

2    that could potentially hang up projects for years.

3              The Kern Valley, the latest prison, was held up

4    for over a year, sitting idle, waiting for the challenge

5    to be addressed.

6         Q.    That was building the entire Kern Valley?

7         A.    It was building the entire prison.  But we're

8    going for the full EIR, so the same community challenges

9    and the same stakeholder input could challenge our

10   project.

11             If we don't have those kind of schedule delays,

12   if we do get our funding, if we do get the technical fix

13   that the AG's office feels we need for a bond opinion,

14   barring any catastrophic event, I'm pretty confident we

15   can meet those dates.

16        Q.    Given all those factors, the dates are by no

17   means certain.  Is that right?

18        A.    I don't think anything's certain in life.

19        Q.    And you would include these dates in that

20   general statement?

21        A.    I guess.  My role, my job, is to be optimistic

22   about these dates because I drive staff that need to

23   feel confident that they can meet these dates.  So I

24   need to be highly confident that these dates can be met

25   and push the appropriate stakeholders to make sure we

DEBORAH HYSEN        September 3, 2008

Page 58

1      A.    "Scott: We have to resolve how we can proceed

2  from here without the level of detail normally required

3  by the LAO and JLBC, and that relates to how to fund

4  these efforts relative to the restrictions of AB 900 and

5  lease revenue financing.  If we cannot resolve this

6  fundamental dilemma, we risk the entire AB 900 program.

7  While I believe that the Legislature understands this

8  dilemma, they nonetheless expect us to provide the

9  information at the start of the project or, upon

10  agreement, key junctures along the way.  Because they

11  are not there yet, we elected to pull the SVSP project."

12      Q.    Can you describe what "funding dilemma" you're

13  talking about there?

14      A.    Not knowing what happened before this -- this

15  e-mail is part of a string of e-mails, the balance of

16  which is not attached, or the future of this e-mail.

17           You know, funding for programing is something

18  that is critical to getting the project off the ground.

19  It allows you to fund an architect and a program manager

20  to develop all the things I was telling you were

21  conceptual; which are staffing, how the facility looks,

22  how many square feet, what it's adjacent to.  It's

23  pretty significant, and it involves an effort that can

24  take three to six months to do.  It can take upwards of

25  a million dollars of architectural fees.  So it's pretty

DEBORAH HYSEN        September 3, 2008

Page 59

1   significant.

2         AB 900 did not provide for advance planning, so

3   there was no plans available to CDCR to advance the

4   initial concept beyond what you saw on this page right

5   here.

6         Q.    And you're talking about Exhibit --

7         MS. JOHNSON:   Two.

8         MS. NORMAN:   Q.   -- on the "Schedule" page.

9         A.    Yes.   Presuming this is the same chart that was

10  used in the infill bed plan, the legislation, one of the

11  technical flaws in the legislation is it did not allow

12  the ability for CDCR to obtain funding to advance this

13  concept.

14        Q.    So you couldn't pay for any planning besides a

15  very, very basic level.   Is that right?

16        A.    Couldn't pay for any planning.   We had no money

17  to start AB 900.   And that's the funding dilemma that I

18  believe this was talking about, because it's funding for

19  programing.   It's one of the fixes currently in the

20  trailer bill, is to get funding and be reimbursed for

21  funds incurred prior to project approval.

22        Q.    And you made a reference to pulling the SVSP

23  project.   What happened there?

24        A.    Let me see.   You know, I don't recall.   There

25  is a project being funded out of the $3 million general

DEBORAH HYSEN          September 3, 2008

Page 69

1   an expense we would look at.  But electrical capacity is

2   fairly easy to add.

3        Q.    What is the "construction manager at risk

4   process"?

5        A.    CM at risk is one of acceleration methods.  You

6   sort of look at a toolbox approach, design being one; CM

7   at risk, multi-prime.

8              CM at risk is, you essentially negotiate a fee

9   with the construction manager of record for the project,

10  and you proceed to build the project, and any fiscal

11  implications that may come about that might cause a

12  project to go higher will be borne by the CM.

13             And it essentially is one way to fast-track a

14  project, especially if you incentivize the CM through

15  bonus payments to meet schedules.

16       Q.    Is that a process that you have in your toolbox

17  to use for AB 900?

18       A.    It was a process that we asked for.  CM at

19  risk; it's a process I was familiar with when I was at

20  DGS; it's a process that I hired from DGS.  We were

21  familiar with and we did ask for it.

22       Q.    And did you receive that?

23       A.    We have not received that.

24       Q.    Are there other processes that you've requested

25  that would accelerate your implementation of AB 900

DEBORAH HYSEN        September 3, 2008

Page 70

1    building?

2        A.    We asked for design-build CM at risk.  We asked

3    for multi-prime.

4        Q.    What is multi-prime?

5        A.    You essentially use multiple contractors to

6    deliver all the projects contained at one site.  So you

7    sort of spread the risk from the State and you unbundle

8    a project.  You make it so that if someone's very good

9    at building housing, then they handle it.  But if

10   someone's better at building infrastructure, they handle

11   that.  So sometimes that's an approach.  It was one of

12   the requests we asked for.

13          And we've looked to some emergency authority

14   provisions that might help us.

15       Q.    Did you ever receive the multiprime capability?

16       A.    No.

17       Q.    And what about the emergency authority

18   processes you asked for?  What are those?

19       A.    We asked whether or not we could leverage the

20   Governor's emergency declaration that he signed, I

21   believe, in October 2007.

22       Q.    2006, I think?

23       A.    2006.  And absent that, we asked whether or not

24   there was legal support for our interpretation of the

25   Secretary's ability to use emergency provisions that

DEBORAH HYSEN      September 3, 2008

Page 71

1    exist in statute that the secretary could use.

2        Q.    And what specifically were you asking about?

3    What did you want the secretary to be able to do?

4        A.    Given that AB 900 was an urgency statute and

5    given that we believe that there was an emergent aspect

6    to building this capacity, we asked that the provisions

7    in the statute, and I can't remember the codes, offhand,

8    that we could look to those and the secretary could

9    therefore declare an emergency and we could operate

10   under those provisions, which would somehow bypass the

11   whole capital outlay process.

12       Q.    And have you been able to make use of those

13   emergency provisions?

14       A.    Not yet.

15       Q.    Let's go backwards to these emergency

16   provisions to allow you to bypass the capital outlay

17   process.  Who did you ask for that authority from?

18       A.    The Governor's office, the Attorney General's

19   office, the Department of Finance, the Public Works

20   Board.

21       Q.    Did anyone listen?

22       A.    They all listened.  I think there's a clear, I

23   felt, clear sense of support from all the parties I

24   asked.  I think I also asked the Legislature whether or

25   not they felt that this would rise to a level of

DEBORAH HYSEN         September 3, 2008

Page 72

1    emergency.  I felt there was clear support from all

2    those parties.

3        Q.   So why has it not happened?

4        A.   Well, support is, I think, a little different

5    than the legal interpretations surrounding the use of

6    emergency authority.  And I think that's where the

7    hangup has been as to what truly constitutes an

8    emergency, as defined in the statute.

9             Its use has been somewhat limited, I think, and

10   generally, when the use is limited, then I think folks

11   start to question whether or not it's an appropriate

12   use.

13       Q.   What about, stepping back, for the multiprime

14   authority to call it a multiprime process; making use of

15   multiprime processes.

16            Who have you asked for that authority?

17       A.   I believe in that case -- well, besides the

18   Governor's office, we approached the Legislature, some

19   legislative staffs, asking whether or not they would

20   consider amending AB 900 to include, among other things,

21   to include a multiprime.

22       Q.   Would that require legislative action?

23       A.   Yes.

24       Q.   Is that part of the current trailer bill?

25       A.   No.

DEBORAH HYSEN          September 3, 2008

Page 73

1       Q.    So that's not on the table?

2       A.    No.

3       Q.    And for construction manager at risk processes,

4    is that something that's part of the current trailer

5    bill?

6       A.    No.

7       Q.    Is that something that would require

8    legislative action?

9       A.    No.

10      Q.    So that's not on the table?

11      A.    No.

12      Q.    But design-build authority is part of the

13   trailer bill?

14      A.    Design-build is currently part of the trailer

15   bill for infill construction.

16      Q.    But not any other part of the construction?

17      A.    That's my understanding.

18      Q.    Okay.

19      A.    And part of, some of these requests also had to

20   do with requests to incentivize the contractor.  A lot

21   of people have touted the C.C. Meyers approach,

22   indicating -- it's a contractor in Sacramento that

23   happens to accelerate projects, mainly Caltrans

24   projects, and the way in which he accelerates those is,

25   he's compensated fairly handsomely by meeting or beating

DEBORAH HYSEN        September 3, 2008

Page 75

```
 1      A.   Yes.
 2      Q.   Are there waivers that it's possible to obtain
 3   to speed up the CEQA process?
 4      A.   We asked for waivers to speed up the CEQA
 5   process.
 6      Q.   From whom did you ask?
 7      A.   The usual suspects; the Department of finance,
 8   Public Works Board, Governor's office, legislative
 9   staffers.
10      Q.   And have you obtained any of those waivers?
11      A.   No.
12      Q.   Have you received support from the Governor's
13   office in these requests?
14      A.   Yes.
15      Q.   Has CDCR completed environmental approval for
16   all of the infill building sites?
17      A.   No.  We did start our EIR processes for the
18   projects in advance of our preliminary plan, stage 2,
19   accelerated.
20           You would typically wait for an EIR once you've
21   got your preliminary plans under way, but we knew we
22   could accelerate it based on the level of detail we
23   could provide, and we did so.
24           We're at the stage where we're concluding a
25   couple of those projects now.  We've gone on about a
```

DEBORAH HYSEN          September 3, 2008

Page 76

1    year.  So we're at a stage where we're wrapping those

2    up.

3         Q.   But you don't yet have approval for any of the

4    infill building projects?

5         A.   Not for infill.

6         Q.   Has the receiver's construction plans in any

7    way delayed the CDCR's infill planning and construction

8    processes?

9         A.   Yes.

10        Q.   How?

11        A.   Besides kicking my staff?

12        Q.   Well, that's one.

13        A.   That's important.  We knew early on that in the

14   pecking order of things, that the receiver had ability

15   to trump the sites that we selected.  And we generally

16   knew that they would want to go in areas with heavy

17   populations, where they could attract a pool of

18   qualified staffing personnel.  So there were some sites

19   -- and given the community opposition, we knew the

20   community wouldn't support both of us.  So we deferred

21   to the receiver at the Chino site because there was a

22   plan for a community at that location.

23           The Donovan site we did have some infill plans.

24   We were in the middle of planning for the R.J. Donovan

25   site.  We had a programing effort going on at Donovan

DEBORAH HYSEN      September 3, 2008

Page 77

1   and the receiver indicated that he in fact needs to go
2   to Donovan, and we tried to program in a co-located way
3   for a period of time, maybe a month or two.  And it
4   turned out that we both simply couldn't fit at the site.
5   So we had to drop that plan and sort of regroup.

6          I would say the fact that the receiver has some
7   concerns about the reception centers in the Central
8   Valley was an impact.  The receiver's report on the
9   Valley Fever issue in the central valley had us revisit
10  a couple of the sites that were otherwise good sites,
11  that could have supported infill; so that influenced our
12  plans.

13          I'm trying to think of any other site.  We had
14  looked at a possibility to go to CMF at one point and
15  he's of course interested in CMF now.  We didn't spend a
16  lot of time looking at that, but it was one of our
17  potential sites.

18          I think that's about it.

19     Q.   So overall, siting these infill bed building
20  projects has been an incredibly complex task, hasn't it?

21     A.   It has, actually.  And mainly because what
22  looks to many to be a lot of land, in fact, the ability
23  to place these facilities just has so many complexities
24  beyond the simple acreage requirement.

25     Q.   So you've had to consider community opposition;

DEBORAH HYSEN        September 3, 2008

Page 80

1      Q.   So his choice of site would still affect your

2   plans for locating infill beds?

3      A.   That's correct.

4      Q.   And you don't know what the environmental

5   impact report CEQA process would be like for these

6   infill facilities?

7      A.   They've gone very smoothly to date.  That's not

8   to say that something might not pop up.  But we have a

9   very competent staff, and we've had communities that

10   support us.  So there's been no significant community

11   opposition to our EIRs.

12      Q.   There have been some different assumptions

13   about the rate of overcrowding for the infill bed

14   buildings, haven't there been?

15      A.   Well, I think you have to be more specific.

16      Q.   Okay.  When AB 900 requires that all the infill

17   beds be built with full programing capacity -- isn't

18   that right?

19      A.   Correct.

20      Q.   -- but the CDCR's original infill bed plan,

21   which was developed before AB 900 passed, called for the

22   new construction to be overcrowded at something like 200

23   percent capacity but did not call for programing space

24   to be built to accommodate 200 percent capacity.  Isn't

25   that right?

DEBORAH HYSEN     September 3, 2008

Page 81

1     A.   Well, yeah.   It's an odd fact that the infill
2   plan, original infill plan, did include programing
3   space.   But this term "full programing" is something
4   that, perhaps because CDCR hadn't been in full
5   programing mode, wasn't certain what the space
6   requirements would be for full programing for that level
7   of population.   So CDCR embarked on a study with a
8   program firm expert in space requirements in February;
9   concluded that after AB 900 went into effect.

10     Q.   That was February of this year?

11     A.   February of 2007.   Concluded roughly in June,
12   July of 2007, post-AB 900 passage, and indicated that
13   the original programing space allocated for the infill
14   projects would not provide full programing as envisioned
15   by the persons engaged in that effort.   That included
16   the program manager and various OCR personnel.

17          So the infill plan recognized that my, the
18   revised infill plan recognized that and added back in
19   full programing to accommodate a larger population.

20          It's a combination of more square feet and
21   utilizing the space over a longer period of a day.

22          MS. NORMAN:   I want to take a look at an e-mail
23   from back in July of last year?

24               (Whereupon, Deposition Exhibit No. 6
25               was marked for identification.)