# EXHIBIT 28

**Deposition of Deborah Hysen
September 3, 2008
(Phase II Designations)**

**Part B**

Page 82

1          MS. NORMAN: Take a look at this and see if you
2  recognize it.
3          MS. JOHNSON: I just want to note for the
4  record, this is marked as privileged, so I'm assuming
5  from looking at it that it was a document that was
6  claimed to be dealt with as process privilege.
7          MS. NORMAN: Q. Is this an e-mail that you
8  wrote?
9      A.  Apparently.
10     Q.  Looks like it's an e-mail from you to Bob Gore,
11 sent on July 24, 2007.
12     A.  Correct.
13     Q.  So I'm looking at number 2, "Program space."
14 Could you read that paragraph out loud for the record.
15     A.  "The current budget provided for only 100
16 percent of design capacity, and if building to 200
17 percent of design program would be insufficient by half.
18 The AB 900 language clearly requires each bed built to
19 have program space. This condition must be reflected by
20 either building more space and/or double-shifting of
21 staff. The latter has operational implications that are
22 being explored. Note: As you may recall, a study
23 conducted subsequent to AB 900 suggested the proposed
24 program space is actually even more insufficient than
25 that, roughly 300 percent deficient from current

DEBORAH HYSEN          September 3, 2008

Page 83

1  estimates.  Rehab team and program staff have to work
2  closely to assess the implications of this."
3      Q.   So is this the study that you were referring
4  to?
5      A.   Correct.
6      Q.   So the study found that if AB 900 infill beds
7  were crowded to 200 percent of design capacity, the
8  programing space would be, what you're saying here, 300
9  percent deficient.  It would be, essentially, only a
10 third as much as was needed?
11     A.   Correct.  The program experts that were hired
12 outside of CDCR felt that full programing meant that it
13 needed to have additional square footage, beyond the
14 programing space allocated in the infill plan.
15          I don't believe CDCR believed, at the time that
16 the program space was allocated, it was insufficient.
17 It's my understanding that the program space
18 requirements had not been updated for over a decade.
19 And so this I think was meant to validate the space was
20 sufficient, and in the minds of the program management
21 firm that was hired, they felt it was not sufficient.
22     Q.   So did you see this as a significant problem in
23 terms of implementing AB 900?
24     A.   A problem that needed to be corrected.  I felt
25 that it was an easy fix to simply adopt the findings of

DEBORAH HYSEN        September 3, 2008

Page 89

1   Q.   Well, let's look at the document, and then we
2   can talk about semantics.
3            (Whereupon, Deposition Exhibit No. 8
4            was marked for identification.)
5        MS. NORMAN:  Q.  Are you familiar with this
6   document?
7   A.   This document had a number of revisions, and I
8   don't recall if this ended up being the final version.
9   I do recall writing this multiple times, and rewriting
10  it multiple times.
11  Q.   So this is your work?
12  A.   This is the product of a lot of people's work.
13  My team, essentially, and several CDCR staff.
14       MS. JOHNSON:  This document is also marked as
15  privileged, and reviewing it, it appears there would
16  have been a little bit of process privilege.
17            I think she also testified it was a draft.
18       MS. NORMAN:  No.  I don't think she testified
19  -- she wasn't sure which version this was, but this was
20  a product of her team.
21  Q.   Is that right?
22  A.   It could very well be a draft.  I just recall
23  revising this multiple times.
24  Q.   And this document that's Exhibit 8 is marked as
25  revision 3?

DEBORAH HYSEN                September 3, 2008

Page 90

1    A.    Correct.
2    Q.    And this is a document for which you take
3 responsibility?
4    A.    Yes.
5    Q.    Let's look at page 5.  So towards the bottom of
6 page 5 is letter "B, "Housing/program space allocations
7 and related costs."  And I believe this section is on
8 "Proposed solutions."  Is that right?  If you look at
9 page 2 you can see the subject heading.
10    A.    Yes.
11    Q.    So starting on page 5 is proposed solutions for
12 housing/program space allocations.  Right?  Is that
13 right?
14    A.    Correct.
15    Q.    Okay.  So 1a is the proposed solution to
16 "Establish new AB 900 housing goal of not to exceed 145
17 percent design bed capacity."  Right?
18    A.    Correct.
19    Q.    Could you read that paragraph for the record.
20    A.    Starting with the bold portion?
21    Q.    After that.
22    A.    "The infill bed plan, combined with the plan
23 for reentry facilities, should drastically reduce the
24 inmate overcrowding occurring in CDCR in terms of
25 overall population, but not in terms of individual

DEBORAH HYSEN                September 3, 2008

Page 91

1  housing allocations.  The infill bed plan proposed to
2  build new housing units at roughly 200 percent of design
3  capacity, thereby crowding inmates in less space than is
4  is ideally designed and operated.  This plan perpetuates
5  a past practice of CDCR in contrast to industry
6  standards and in spite of federal authorities on the
7  conditions of overcrowding.  The benefits of
8  overcrowding to a percent above DBC are the reduced
9  requirements of square footage in some proportion to the
10 number of beds.  By amending the infill beds assumptions
11 to build beds at a not to exceed figure as proposed by
12 an independent review panel, it should be clear that
13 this does not meet federal guildelines nor national
14 guidelines but does begin to moderate and control the
15 Department's overcrowding standards.  The AB 900
16 construction plans should revise the housing allocations
17 to no greater than 145 percent average of DBC for inmate
18 housing.  If the value analyses cannot reduce the
19 overall costs of construction, and/or funding cannot be
20 increased to make this change, the total number of beds
21 pursuant to AB 900 should be reduced."
22      Q.   Was this recommendation followed?
23      A.   No.
24      Q.   And in your opinion, is that a mistake?
25      A.   I, as a real estate expert, as someone who's

DEBORAH HYSEN          September 3, 2008

Page 92

1   used to building different kinds of construction, I like
2   to fall back to industry standard. Ideally, best
3   practice, but fall back to industry standard. And there
4   are standards that exist for overcrowding, because
5   jurisdictions all across the, this country and others,
6   experience overcrowding. And so it is my tendency to
7   want to defer to a standard as a benchmark for what we
8   should build to, particularly if we build new.
9           So looking to what standards are out there, we
10  saw several, the IRP being one of those.
11      Q.   The IRP is --
12      A.   The independent review panel.
13      Q.   And that's the panel you actually had some
14  experience working with?
15      A.   Some involvement, but limited, still. So I
16  would have preferred to look to a standard to guide us
17  in this construction process. But unfortunately, with
18  the costs allocated for the higher percentage, and given
19  that the cost estimates were not accurate, for lack of a
20  better word -- they were conceptual at best, and ended
21  up being much lower than reality -- we actually had to
22  reduce the beds regardless of lowering the capacity.
23  Because the cost estimates were so much higher than, in
24  reality, than what was initially proposed; the square
25  footage was less than what was initially proposed.

1          So this would have actually perpetuated that.
2     We would have reduced it that much further, but it is my
3     tendency, and it is the tendency of my staff, to want to
4     rely on standards. All things being equal, the
5     preferred world is to build to that standard.
6          Q.   Why is that the case?
7          A.   Because I think, because you look to your
8     peers, your similarly situated organizations that have
9     similar populations, similar requirements. A standard
10    is something that you use as a benchmark, and in some
11    cases you recognize you can go below that. I think
12    that's CDCR's position. They felt, over the years, they
13    could manage to a population higher than the design bed
14    capacity. That they had relatively positive experiences
15    in doing so, relatively low inmate assaults, et cetera.
16         So in their minds, CDCR believed that that
17    capacity, that standard was achievable and, indeed,
18    realistic.
19         I didn't have such an experience. I didn't
20    have this, the corrections background that they had. So
21    absent my experience with past practice, I felt most
22    comfortable relying on a standard that others have
23    employed.
24         Q.   And in fact, the CDCR is currently under a
25    state of emergency due to overcrowding. Right? Is that

DEBORAH HYSEN             September 3, 2008

Page 94

1   your understanding?
2       A.   I understand that the Governor declared an
3   emergency relating to overcrowding.
4       Q.   In your experience, is relying on industry
5   standards something that has served you well?
6            MS. JOHNSON:   Vague and ambiguous.
7            THE WITNESS:   It depends what standard.  I
8   think that's always a good place to start, and whether
9   you go below that standard or above that standard,
10  there's a lot of reasons for doing so.  So it kind of
11  fits my barometer.  It's been my barometer for
12  determining which direction I go in.
13           MS. NORMAN:   Q.   In fact, you also recommended
14  that CDCR establish a long-term goal not to exceed 130
15  percent design capacity, isn't that true?
16      A.   Correct.
17      Q.   And you recommended that part of CDCR's master
18  plan process for new construction should contain
19  planning structures that housing allocations should not
20  exceed 130 percent.
21      A.   In this case it was a federal bureau standard.
22      Q.   Before making that recommendation, you and your
23  team undertook some study of the question, didn't you?
24      A.   Correct.
25      Q.   And so you had them look carefully into the

1  matter and consider it?

2      A.    Well, interestingly enough, there's not a lot
3  of data out there that we could find that supports
4  adhering to the standard, or not.

5            And that was perhaps the dilemma in accepting
6  these recommendations, is I could point to what are the
7  ramifications if you don't.  There is the federal prison
8  model which says you shouldn't exceed 140 percent, but
9  we don't access data that said when you do, these are
10 the things that occur.

11           I think had I been able to access that data and
12 really inform myself, first of all, that maybe I was
13 wrong; that maybe the standard was not necessarily
14 required, or even ideal.  But because we couldn't access
15 that information, I think it was hard to sell.  Hard for
16 people to understand; what does it mean when you're at
17 145 or 150 or 160?  I think it's a gap in the
18 corrections industry, that if we're going to convince
19 taxpayers to fund at a higher level, we should all have
20 a greater understanding of what it means when you don't.

21           And it simply didn't exist for us.

22     Q.    The 145 percent overcrowding number, that comes
23 from the independent review panel, right?

24     A.    Correct.

25     Q.    And is it your understanding that that's made

1   up of seasoned corrections professionals?
2       A.  Well, I later learned that it was not.  That a
3   lot of the participants were more junior professionals,
4   junior wardens, junior officers.  I didn't know that at
5   the time.
6           But it's my understanding that while there were
7   some consultants that had some experience, such as
8   George Camp from the criminal justice institution and
9   Joe Gunn from Los Angeles, that some of the participants
10  in that group, and they weren't all CDCR, but some law
11  enforcement agencies, like alcohol, gun control, they
12  were more junior.
13          And the way CDCR worked is you dedicated a
14  staffperson for four to five months to do this, and we
15  saw this as a matter of course, that the staff that were
16  recommended for the CDCR teams were not the seasoned
17  executives.  That they couldn't be spared, in all cases,
18  for this kind of work.  So they ended up, for this team
19  or others, they were not the C.A. areas, necessarily;
20  they were lower level folks.
21      Q.  But the recommendations of the IRP in the end
22  were signed off by people like Mr. Gunn and Mr. Camp --
23      A.  Correct.
24      Q.  -- who are rather experienced professionals?
25      A.  Correct.

1  Q. With a tremendous amount of knowledge of
2  running correctional facilities?
3  A. That's my understanding.
4  Q. And they agreed that the 145 percent is an
5  important figure to follow in not severely overcrowding
6  facilities.
7  A. That's my understanding.
8  Q. Is that something that you relied on in coming
9  up with your own recommendations?
10 A. Well, we did rely on that. As to looking to
11 what standard could be used, that was one of those
12 standards we relied on.
13 Q. Another piece of, looking at the paragraph 1b
14 on page 6, where you talk about "130 percent design bed
15 capacity," the last sentence states, "Further
16 consideration should be given to establishing planning
17 capacity and oversight mechanisms to prevent the
18 occurrence of exceeding this threshold."
19        Why do you think it's important to have
20 oversight mechanisms to prevent exceeding overcrowding
21 thresholds?
22 A. Well, the construction process is so protracted
23 in this state that if you don't have a mechanism, a
24 plan, a strategic, far-ahead look-see, and mechanisms to
25 respond to changes, you're not going to be in a position

1   to be responsive.
2            For instance, AB 900 required CDCRs, given a
3   hundred projects, to coincide with its master plan,
4   which I thought was going to be fairly easy until I
5   learned that a master plan had not been done for CDCR in
6   over a decade. And it was a requirement. So we had to
7   actually have to hire staff that didn't exist, to
8   develop CDCR's first master plan in ten years.
9            And when you have a master plan, when you're
10  able to forecast out your population needs over a long
11  period of time, you're able to determine, in my mind,
12  what your needs will be long term. And have a far
13  enough look-see to determine what remedy would be
14  needed.
15           So let's say, for instance, you could envision
16  a population surge for a short, brief period of time.
17  You would want to have a remedy in advance, far enough
18  in advance of that surge to respond to it.
19           It may be, in that case, something like an
20  out-of-state facility, whereas a short-term spike, you
21  wouldn't need to construct for it. You would be perhaps
22  a year in advance of that because, presuming you could
23  have some out-of-state facility build it for you.
24           In the case of a population projection which is
25  sustained and you are able to see it five years out, you

1  would want the ability to know that and to have a remedy
2  immediately available to you.  And that could be putting
3  together the budget package request to build new
4  housing.  So I call them triggers.  You needed to have
5  triggers available to the Secretary of Corrections that
6  he could be responsive to when he's going over capacity.
7         And that would include providing a cushion for
8  him so that he could ensure, he or she could ensure that
9  that capacity is not exceeded, by having this extra
10 year, or whatever it might take.
11         It was meant to be really strategic, and I felt
12 CDCR had been more tactical, was more responsive
13 retroactively, and I think partly because of the funding
14 constraints that it needed to face.
15         So I was hopeful we could set some mechanism in
16 place that would require or allow the secretary to
17 respond to a capacity when he was going to exceed it.
18      Q.   And has that recommendation been followed?
19      A.   It hasn't been declined, necessarily.  It's
20 been set forth in our master plan.  We are going to be
21 doing another master plan update at the end of this
22 year, and I think we want to continue the discussion
23 about the need for the secretary to have the ability to
24 be responsive in advance of any construction needs they
25 might have.

DEBORAH HYSEN                September 3, 2008

Page 100

1   Q.   But the secretary currently does not have that
2   capacity?
3   A.   Correct.
4   Q.   Let's just jump to talking about something
5   along those lines.
6            MS. JOHNSON:  We're at 12:10, by the way.
7            MS. NORMAN:  So another ten minutes or so.
8            MS. JOHNSON:  Okay.
9            MS. NORMAN:  Q.  Are you familiar with
10  Proposition 6 and Proposition 9 going up on the November
11  ballot?
12  A.   Vaguely.
13  Q.   So Proposition 6 is the runner initiative, also
14  called the Safe Neighborhoods Act.  Proposition 9 is
15  Marsy's law, also called the Victims' Rights and
16  Protections Act.  Does that sound familiar?
17  A.   Yes, but that's the extent of my knowledge.
18  Q.   To your knowledge, has CDCR made any
19  predictions as to any prison population change as a
20  result of the possible passage of one or both of those
21  initiatives?
22           MS. JOHNSON:  Compound.
23           THE WITNESS:  Not to my knowledge,
24  specifically.
25           MS. NORMAN:  Q.  So you don't know of any

DEBORAH HYSEN          September 3, 2008

Page 102

1  the higher level.
2           MS. NORMAN:  Q.  Would it be appropriate for
3  you to be involved in any specific planning measures
4  that the Department might take in response to projected
5  population increases from those initiatives?
6           MS. JOHNSON:  Vague and ambiguous.  Calls for
7  speculation.  No foundation.
8           THE WITNESS:  I would say that when they are
9  real, when they're passed, when we have an understanding
10 of what's included, we would certainly do that.  Again,
11 if we had, if the secretary had the flexibility to be
12 responsive to anything that might occur, because those
13 things come and go on the ballots all the time, if the
14 secretary had greater authority to be responsive, and I
15 believe he should, then it would be my team's job to
16 figure out how to be responsive, either through a lease
17 or construction.
18          MS. NORMAN:  Q.  And do you think the
19 Department could work better if the secretary had that
20 authority and you were given that responsibility?
21     A.   He could clearly be responsive to those set of
22 changes.  And I don't believe that he's positioned to do
23 that as effectively now.
24          Because it's, as you know, if this were to
25 pass, I imagine it's somewhat urgent that it would

Page 103

1  happen immediately or quickly.  And if you understand
2  the cap outlay projects take five to seven years to go
3  from inception to occupancy, the ability to respond in a
4  way to meet the population needs is fairly limited.
5          So the flexibility to have multiple ways to
6  respond to that population is critical.
7      Q.   And in your opinion, the Department doesn't
8  have the flexibility to respond appropriately at this
9  point?
10     A.   You know, unless the emergency authority that I
11 believe we should be able to tap into is supported by
12 the various legal folks that need to opine on this, that
13 would be probably the only ability at this point.
14     Q.   And that hasn't happened yet?
15     A.   Not at this point.
16          MS. NORMAN:  Why don't we take a lunch break.
17     (Whereupon, a lunch break was taken at 12:15 p.m.)
18                          --oOo--
19 AFTERNOON SESSION                            1:09 p.m.
20          MS. NORMAN:  I'm going to look at another
21 e-mail.
22              (Whereupon, Deposition Exhibit No. 9
23                  was marked for identification.)
24          MS. NORMAN:  Q.  Looking at the second page of
25 this Exhibit 9, which starts, at the very top --

DEBORAH HYSEN          September 3, 2008

Page 105

```
 1   found.
 2       Q.   So we've talked a little bit about this, but I
 3   want to go into some more detail.
 4            AB 900 originally planned for the wrong mix of
 5   beds for the population needs of CDCR.  Is that right?
 6       A.   In the opinion of the strike team.
 7       Q.   And that is that it planned on building too
 8   many low security beds and not enough high-security
 9   beds?
10       A.   It planned to build too many low-level beds and
11   too many, in our minds, of the wrong high-security beds.
12       Q.   What were the wrong high-security beds?
13       A.   We weren't able to access data that indicated
14   there was this great need on the part of CDCR to build
15   administrative segregation beds.
16            So those beds came out of our plan, for the
17   most part, with the exception of a few sites.
18       Q.   So your revisions to the AB 900 mix of beds
19   involved reducing the number of low-security beds and
20   reducing the number of administrative segregation beds?
21       A.   Well, that was the outcome.  The point of our
22   research was to make sure that the spaces we were
23   building met the population needs.  And if we couldn't
24   validate that the need existed for low level or high
25   level or Ad Seg, et cetera, we didn't include that in
```