# EXHIBIT 28

**Deposition of Deborah Hysen
September 3, 2008
(Phase II Designations)**

**Part C**

DEBORAH HYSEN          September 3, 2008

Page 107

1    A.   I don't know that AB 900 defined it,
2  necessarily.  Subsequent to AB 900 we helped to flesh
3  out what that would look like, how it would function.
4  AB 900 defined it as, I think, a secure setting,
5  preferably in an urban location.  We since fleshed that
6  out to be more consistent with reentry objectives and
7  the continuum of an inmates' progression through his or
8  her incarceration.
9         So we looked at different models that existed
10 out there for reentry facilities, and out of all the
11 analysis, we came up with a facility of 500 beds or
12 less, and that was defined in the legislation that would
13 provide a secure setting and treatment-rich environment,
14 and particularly program-rich environment, that would
15 facilitate the transition from an inmate's secure
16 custody, in the prison setting, through the community.
17        So that the building itself would be designed
18 and the programs contained within it would be designed
19 to enhance the inmate's ability to succeed once they're
20 released from custody.
21   Q.   Could you outline the basic steps involved in
22 constructing or converting facilities to become reentry
23 facilities?
24   A.   Well, they're somewhat different if there's a
25 conversion than if they're new construction.

1          Our first reentry NCRF is a conversion.
2     Q.   Is that NCWF?
3     A.   It was originally the women's prison.  We did
4  not have the legislation to reopen it as a prison, but
5  we were able to get the support of legislators to open
6  it as a reentry facility.
7          We are proceeding to convert the NCWF site to a
8  secure reentry facility.
9     Q.   I see.  I call it NCWF because it used to be
10 Northern California Women's Facility and it's now a
11 reentry facility.
12    A.   Yes.  In a conversion, particularly in that
13 conversion, because it's under our ownership, we
14 proceeded through an environmental process, basically
15 indicating what impacts would occur as a result of that
16 construction.  And once that process is complete and
17 once we get the funding to progress, we would go, we
18 would take our program concept we've developed to date
19 and request funding for preliminary plans, working
20 drawings, ultimately construction.  There's no
21 requirement to build anew.  There's certainly a
22 requirement to bring it up to codes, construction codes.
23         We are working with the receiver's office to
24 bring the clinic space that exists there now up to a
25 required space that they feel is necessary to operate

1  that facility for 500 inmates. So that's the only real
2  new construction, per se, is the medical building there.
3          What it cuts out is the acquisition process
4  that is more typical of the new construction for reentry
5  facilities.
6      Q.   So where are you in that process?
7      A.   Again awaiting funding, much like the infill.
8  The package is sitting, waiting for the trailer bill to
9  pass.
10     Q.   And are you complete? Is the environmental
11 process complete?
12     A.   The process is complete in terms of the steps
13 we needed to take and to finalize our documents.
14     Q.   Has it been approved? Has it gone through?
15     A.   It's been approved. It's now under challenge.
16 But we've completed all of the necessary steps, public
17 comment, et cetera, and we filed a completion notice.
18     Q.   But CDCR currently lacks the go-ahead to
19 proceed, because of the environmental challenge?
20     A.   There is a challenge. Not that we look at the
21 ability to proceed but there is a challenge that's in
22 place at this point in time.
23     Q.   And what is that challenge?
24     A.   It's a challenge, I believe, on the merits of
25 the contents of the EIR.

```
 1      Q.   And do you know who has challenged it?
 2      A.   CCPOA.
 3      Q.   Does CDCR have an anticipated date as to the
 4   resolution of that challenge?
 5      A.   We tried to settle it earlier, I think, last
 6   month.  My understanding is it's going to court in the
 7   fall.  It's going to trial in the fall.
 8      Q.   So will any actual conversion be able to take
 9   place while that case is still pending?
10      A.   I feel that --
11           MS. JOHNSON:  Calls for a legal opinion.
12           MS. NORMAN:  Q.  I would imagine this is
13   something that you've discussed with your staff in terms
14   of your ability to proceed pending this challenge.
15      A.   Well, I think that might be a fundamental part
16   of our case, is CCPOA.  I don't know that I would be
17   obligated to share the strategies or the steps we might
18   take, with that challenge in place.
19           MS. NORMAN:  Q.  Do you plan to continue to
20   proceed, should you get the necessary funding, do you
21   plan to continue with your planning and conversion,
22   pending the lawsuit?
23      A.   I plan to proceed to the point that I'm able
24   to.
25      Q.   Are you aware you might have to stop, based on
```

1  the lawsuit?
2         MS. JOHNSON:  Calls for a legal opinion, lacks
3  foundation.
4         THE WITNESS:  I feel there's a potential.
5  That's the risk in the EIR.
6         MS. NORMAN:  Q.  Once the current budget goes
7  through, and the trailer bill, will there be any other
8  funding holdups to proceeding with this conversion?
9     A.  You know, what you do is you go through every
10 phase.  You separately request funding for every phase.
11 So there's the potential at, each time there's a Public
12 Works Board process, there's a public comment.  There's
13 the opportunity, along the way, for folks to opine as to
14 whether or not we might proceed.  Those are just steps
15 in the construction project.
16    Q.  And tell me again, once at least the initial
17 funding goes through, what are the steps to take to
18 reach occupancy?
19    A.  This funding would allow us to proceed with our
20 current plans.  We do have to go back and proceed on our
21 working drawings to get the next set of funds, and
22 ultimately request again, separately, the construction
23 phase funds.  See, there are multiple trips to the
24 Public Works Board.  I think there's only one trip to
25 the public money board.

DEBORAH HYSEN    September 3, 2008

Page 112

1    Q.    And once you get the construction funds, you
2    can proceed with the construction?
3    A.    Correct.
4    Q.    And once you build it, you can occupy it?
5    A.    That's our hope.
6    Q.    Okay. So you've not yet reached the
7    preliminary plans phase with the NCRF reentry facility,
8    right?
9    A.    We have reached it. We haven't started it.
10   Q.    And when does CDCR anticipate that occupancy
11   will happen for that facility?
12   A.    I think we, at this juncture, we're looking at
13   between December '09 and the summer of 2010. We're kind
14   of in that range right now, for lack of some additional
15   detail that needs to come out in the investigation
16   stage. Got some seismic issues we're exploring. But
17   we're in that range.
18   Q.    So it's possible that there might need to be
19   some seismic retrofitting that would put the project
20   further back?
21   A.    Potentially. It's one of those things where,
22   because when you renovate a facility, there's sometimes
23   some unforseen circumstances. So you have, want to have
24   that cushion for things that might be found that weren't
25   indicated in the drawings.

DEBORAH HYSEN          September 3, 2008

Page 113

1         As we get closer to kind of midpoint in our
2    preliminary planning, we'll be able to firm up those
3    dates. We'll have discovered all the things that need
4    to be discovered.
5         Q.   What is the current plan in terms of infill
6    beds generally? How many CDCR beds it plans to build,
7    and the time for those.
8         A.   Again, the same question?
9         Q.   The original plan was 6,000 in Phase 1, 10,000
10   in phase 2.
11        A.   For infill?
12        Q.   I'm sorry. Did I say "infill"? No, no;
13   reentry.
14        A.   So on reentry?
15        Q.   Yes.
16        A.   It was six and ten, yes.
17        Q.   That was original?
18        A.   That was original.
19        Q.   What is the current plan?
20        A.   We think approximately 3,000 in Phase 1.
21        Q.   And how many in Phase 2?
22        A.   As many as 8,000. We're going through some
23   value engineering efforts to bring the figures down, so
24   depending on, how successful our efforts are really
25   depends on how many beds we're able to build.

DEBORAH HYSEN           September 3, 2008

Page 118

1  counties were either good sites for us to build on or
2  not, at this juncture.
3      Q.  And how many do you think have good sites for
4  you to build on?
5      A.  Again, some of this is fluid because we're
6  relying on lots of board of directors supervisors
7  meetings that are occurring right now, and city council
8  meetings, and sites are being replaced by other sites.
9          It's ranged anywhere from 6 really good sites
10 up to 10 really good sites.
11         One county is offering up 3 sites in total, not
12 just alternatives, but three different sites.  So I
13 guess that can go to 14.
14     Q.  So --
15     A.  And that's just Phase 1.  There's another
16 phase, obviously, where other counties can participate,
17 because obviously, 24, 25 counties does not represent
18 the bulk of California.
19     Q.  Other than the 500 beds at NCRF, you don't know
20 where the other reentry beds will be located.  Right?
21     A.  Not with certainty.
22     Q.  Okay.  And why don't you step through -- you
23 already stepped through the process for converting NCRF,
24 which was already CDCR owned.
25         Can you step through the process you would have

1   to undergo with these county locations.
2       A.   Probably the only unique aspect is the
3   acquisition of land.  So you go through a separate
4   action through the public board of works called a site
5   selection process, where you identify the land that
6   you're interested in acquiring and you establish the
7   fair market value.  Part of the due-diligence effort
8   we're engaged in right now is to assess the liability of
9   the land, and an analysis of the fair market value.
10  Site selection process is really the only unique step.
11  Otherwise, getting community collaboration and support,
12  going through an EIR, designing, building, all that's
13  relatively the same.
14      Q.   So what is the anticipated date that any
15  reentry facility other than NCRF will be occupied?
16      A.   We have not really established those timelines
17  yet.  We are hoping to go for site selection on three
18  sites in the fall of this year.
19      Q.   So you're hoping to select three sites to start
20  the process on?
21      A.   Correct.
22      Q.   This fall?
23      A.   This fall.
24      Q.   So you don't anticipate even choosing the next
25  three sites until the fall?

1    A.   We expect to recommend at the September 18th
2  CSA board hearing which sites are ready for us to
3  acquire.  And we would recommend, I believe we will
4  recommend at this time that these sites are ready, and
5  we will proceed to the Public Works Board for site
6  selection.
7    Q.   So you don't know when any reentry beds other
8  than the first 500 will be built?
9    A.   Not with a date certain that I can give you at
10 this point.
11   Q.   But it will take at least years before
12 occupancy, correct?
13   A.   At this point we're looking at raw land.  There
14 are a couple of sites that could offer up a renovation
15 alternative.  But anticipating that we get raw land for
16 these first sites, we could be looking at several years
17 between the time that we make this recommendation to
18 acquire the land, and occupancy.
19   Q.   Has it been difficult to get counties to agree
20 to site reentry facilities?
21   A.   I think initially it was more difficult.  I
22 actually thought it would be very difficult in the
23 beginning because it's not everybody's favorite use.
24 But we really put a great emphasis on educating the
25 public as to the value of a reentry.  And the importance

```
 1   you were to look at the 32 sites divided by the $2.6
 2   billion allocation, you come up in the mid-$80 million
 3   range, and that's nowhere on the Kitchell estimates.
 4       Q.   So even at an early stage you are able to see
 5   that AB 900's funding for the reentry beds that it
 6   called to be built was way off?
 7       A.   I guessed early on that they were off.  And I
 8   actually didn't learn of the Kitchell estimates for
 9   many, many months.  So it was just my background that
10   guessed that they were off.
11       Q.   And you turned out to be right?
12       A.   Unfortunately.
13       Q.   Are the reentry beds designed to be overcrowded
14   at above design bed capacity?
15       A.   It's our intent, and it's part of the program
16   analysis, to occupy them at design bed capacity, with
17   the exception of NCRF.
18       Q.   And what will that be?
19       A.   It will be a 500-bed maximum facility.  But the
20   design bed capacity on that is lower than 500.
21       Q.   What is the design bed capacity?
22       A.   You know, I don't know that we're completely
23   done with our measuring.  I want to say it's in the,
24   like, high three's; 380, 390, somewhere in there.
25       Q.   Why is it CDCR's intent to run them at design
```

DEBORAH HYSEN          September 3, 2008

Page 131

1   space to inmates.
2          So I'm not an expert in that, but as part of
3   the programing, you allow the customer to drive some of
4   the space requirements. And the customer in this case
5   was the division of reentry and adult programs.
6          So it was really a combination of me wanting to
7   adhere to a standard and them believing that that
8   standard would be conducive to programing.
9          It's experimental, really, at this point. It
10  may prove out that it doesn't matter, but I think we
11  wanted to start with this initial concept.
12         MS. NORMAN:  Q.  If the budget and trailer bill
13  passed tomorrow what is the first day you would expect a
14  reentry bed to be occupied?
15     A.  I think we would expect NCRF to be the first
16  reentry site, and if we proceed through the logical
17  phases of construction, as I said, we're looking at
18  between December '09 and summer of 2010.
19     Q.  And when do you expect the 501st reentry bed to
20  be reoccupied by a prisoner?
21     A.  Well, in our integrated strategy we outline
22  some forecasted occupancy dates for reentry facilities.
23         MS. NORMAN:  Why don't we take a look and take
24  the guesswork out. It's right here.
25         (Whereupon, Deposition Exhibit No. 13

DEBORAH HYSEN                September 3, 2008

Page 134

1    Q.   But it's possible that some of these will end
2 up being smaller facilities, say 200-bed facilities?
3    A.   It's possible they will propose it.  I don't
4 know what our position will be, ultimately.  It's a
5 significant cost increase to go to a smaller facility,
6 and I'm not certain what the different stakeholders may
7 say about that cost differential.
8    Q.   So based on the predictions in the integrated
9 strategy, the second 500-bed facility might not go
10 online until June 2011.  Is that right?
11   A.   The second -- correct.  The latest that this
12 chart shows is June 2011.
13   Q.   And then there wouldn't be an additional 1,000
14 beds added, could be as late as June 2012?
15   A.   Could be, based on this chart.
16   Q.   Based on CDC's current predictions?
17   A.   Correct.
18   Q.   I want to talk briefly about the health care
19 beds that the receiver is building.  So, have you had
20 frequent contact with the receiver's office regarding
21 their building plans coordinating with your building
22 plans?
23   A.   Frequent contact, yes. Not a whole lot of
24 information.  But definitely frequent contact.
25   Q.   Have you been able to obtain the information

DEBORAH HYSEN                September 3, 2008

Page 144

1   earlier in the year.

2       And it caused some to question whether or not
3   we needed to build all of the AB 900 beds and what type
4   of beds, if we did need to build, we would have to
5   build.

6       So various stakeholders said it could be that
7   your AB 900 plan will change as a result of these
8   things. So on hold in some sense, in that we weren't
9   certain that the plan that we proposed, the latest
10  revision to the plan that we proposed in the early
11  spring, would in fact be the plan we would go with if
12  any of these impacts were to be realized.

13      MS. NORMAN: I want to look at another
14  document.

15          (Whereupon, Deposition Exhibit No. 15
16          was marked for identification.)
17      MS. NORMAN: Q. Take a look at this document,
18  entitled "AB 900 Barriers." Have you seen this before?
19   A.  Yes.
20   Q.  So could you describe what this document is?
21      MS. JOHNSON: Could I just, Counsel, is this
22  one integrated document that you clipped? Because it
23  has one Bates number beginning for the first two pages,
24  and then it has totally different Bates numbers with the
25  remaining pages.

DEBORAH HYSEN            September 3, 2008

Page 145

1      MS. NORMAN:  Sure.  My understanding is that it
2   is an integrated document, because you will see on the
3   cover page, number one, it's "information technology"
4   and it's the same on the narrative page.
5      Q.  But let me ask, Mrs. Hysen, is it your
6   understanding that the first page is a listing of the
7   barriers that are in the narrative page of the document?
8      A.  I didn't produce this document.  It was
9   produced by CDCR, but I think I've only seen it
10  together, on this.  I would assume they relate to each
11  other because I don't think I've ever seen this separate
12  from that.
13     Q.  In your familiarity with this document, what
14  you're holding in your hand as Exhibit 15 is in fact a
15  single document?
16     A.  It would be my assumption it was a single
17  document.
18         MS. NORMAN:  Let's act under that assumption.
19         MS. JOHNSON:  Okay.
20         MS. NORMAN:  Is this in the right order?
21         MR. STEGEMAN:  It's out of order.  I think the
22  pages are all screwed up.
23         MS. JOHNSON:  I was looking at, number 8 is
24  here, the second-to-last page, and then it goes number
25  7, and then number 6, and number 13 is in the middle.

1    infrastructure schedule."
2        A.   Yes.
3        Q.   Was the strike team able to do that?
4        A.   Well, not necessarily the strike team, per se.
5    The telecommunications group, which is really the group
6    responsible for implementing AB 900, works under my
7    program, and I made certain that I was involved.  So I
8    made myself the project sponsor for CTIP to remove this
9    barrier, and in fact the barrier is removed there, ahead
10   of schedule.
11            So there's no barrier to implementing CTIP at
12   this juncture.
13       Q.   So turning to number 2, "Contracts and
14   procurement."  This section recommends "eliminating a
15   variety of requirements in government code and public
16   contract code" -- right?
17       A.   Correct.
18       Q.   -- "in order to save time in construction
19   schedules."  Are you aware of whether that has been
20   accomplished?
21       A.   It was requested.  At this juncture we are not
22   able to eliminate those sections that require us, that
23   are part of the State Contract Act, because lease
24   revenue financing must follow the State Contract Act and
25   some of these are part of that Act.

1    Q.   So this barrier remains?
2    A.   This barrier -- I would say in the, that none
3 of these codes have been waived or eliminated.  I don't
4 know that these time frames are accurate.  Some of these
5 are concurrent time frames; they're not meant to be
6 linear.  So if you save six months here, you also save
7 six months here, for a total of twelve.
8         But none of these codes have been waived or
9 eliminated.
10   Q.   So looking at number 3, the "State Public Works
11 Board."  And this is about design production on capital
12 outlay projects being on hold until approval of the
13 preliminary plans received from the Department of
14 Finance and state Public Works Board.
15   A.   This project, this strategy, has been requested
16 in our trailer-bill language.  I do not believe it is in
17 the current version.  I could be very wrong on that.
18 But it has been requested in various versions of our
19 trailer bill.
20   Q.   So this barrier currently still exists,
21 correct?
22   A.   You know, I would hate to speculate on that.
23 Because it has been in other versions, and I simply
24 don't recall if it remains in this version.
25   Q.   But aside from whether it's in legislation

DEBORAH HYSEN             September 3, 2008

Page 149

```
 1   that's pending or not, the barrier currently exists as
 2   it did when this document was written.  Is that right?
 3       A.   The statute currently exists that requires us
 4   to stop.  And if you consider law to be a barrier, then
 5   that's a true statement.
 6       Q.   Okay.  Number 4, "Mitigation funds."  Regarding
 7   payment of non-CEQA mitigation to local government
 8   entities and local school districts.
 9       A.   The solution as proposed was not necessary in
10   the end.  We met with the Attorney General's office,
11   involved our own lawyers, and presented experts in the
12   construction industry that indicated it was a typical
13   mitigation cost to pay for off-site mitigation.
14            So we resolved, we had a favorable legal
15   resolution on this matter.  So this is a nonissue.
16       Q.   So this concern has been resolved?
17       A.   Eliminated.
18       Q.   And just to be clear, number 3 on the State
19   Public Works Board, that concern has not been
20   eliminated.  Correct?
21       A.   That's correct.  That law still requires us to
22   stop, pending approval.
23       Q.   Number 5, "Bed placement restrictions."
24       A.   For me this is a matter of interpretation.  I
25   never viewed AB 900 as limiting in that regard.  Others
```

CERTIFICATE OF REPORTER

I, KAREN A. FRIEDMAN, a Certified Shorthand Reporter, hereby certify that the witness in the foregoing deposition was by me duly sworn to tell the truth, the whole truth and nothing but the truth in the within-entitled cause;

That said deposition was taken down in shorthand by me, a disinterested person, at the time and place therein stated, and that the testimony of the said witness was thereafter reduced to typewriting, by computer, under my direction and supervision;

I further certify that I am not of counsel or attorney for either or any of the parties to the said deposition, nor in any way interested in the event of this cause, and that I am not related to any of the parties thereto.

DATED: _September 9_, 2008

_____
KAREN A. FRIEDMAN, CSR 5425