# EXHIBIT 32

# Deposition of John Misener
# January 29, 2008
# (Phase II Designations)

# Part A

1          IN THE UNITED STATES DISTRICT COURT

2          FOR THE EASTERN DISTRICT OF CALIFORNIA

3          AND THE NORTHERN DISTRICT OF CALIFORNIA

4     UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

5     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6    RALPH COLEMAN, et al.,          )
                                     )
7               Plaintiffs,          )
                                     )
8          v.                        )No. Civ S 90-0520
                                     )    LKK-JFM P
9    ARNOLD SCHWARZENEGGER,          )
     et al.,                         )
10                                   )
                Defendants.          )
11   _____  )
                                     )
12   MARCIANO PLATA, et al.,         )No. C01-1351 TEH
                                     )
13              Plaintiffs,          )
                                     )
14         v.                        )
                                     )
15   ARNOLD SCHWARZENEGGER,          )
     et al.,                         )
16                                   )
                Defendants.          )
17   _____  )

18

19          Deposition of JOHN MISENER, taken

20          on behalf of the Plaintiffs, at

21          315 Montgomery Street, 10th Floor,

22          San Francisco, California, commencing

23          at 9:54 a.m., Tuesday, January 29, 2008,

24          before Karen Moon, Certified Shorthand

25          Reporter No. 12450.

JOHN MISENER

BARKLEY
Court Reporters

1          MS. TILLMAN:  So you have to be nice to him,

2    Amy.  It's his first deposition.

3          MS. WHELAN:  I will be very nice.

4    BY MS. WHELAN

5       Q    Very briefly -- I don't want to spend a lot of

6    time on it, but I will also refer you to your resume or

7    the most recent one that I have of your resume.

8          But could you just describe for me your

9    educational history.

10       A    Sure.  I have a bachelor's degree from State

11    University of New York at Buffalo, 1968, in biology.

12    And a master's of health care administration degree,

13    Georgia State University, 1977.

14          My first position in this field of health care

15    consulting was in 1977 with a firm called Langley

16    Associates.  From there I worked for the Voluntary

17    Hospitals of America consultants services, or VHA

18    Consulting, until 1988.

19          And then I went to work for McManis

20    Associates.  A version of that firm I'm currently

21    working for.  So basically there was a change in

22    ownership, but McManis Consulting is doing business --

23    is a -- is the new name, although its legal name is

24    still McManis Associates since 1988.

25       Q    Do you hold any professional licenses?

16

JOHN MISENER

BARKLEY
Court Reporters

1      A    No.

2      Q    I know that you were retained -- correct me if

3  I'm wrong -- back in about 2002 with the California

4  Department of Corrections in connection with the Tucker

5  Alan study?

6      A    That's correct.

7      Q    And then you were retained again in or around

8  2004, 2005; is that correct?

9      A    The actual initiation of the proposal was I

10  was December and November of 2005.  And I believe it was

11  finally approved early January 2006.

12      Q    Prior to your retention in 2002 by the CDCR,

13  have you done any work with the California Department of

14  Corrections?

15      A    No.

16      Q    And have you done any work with any California

17  agency prior to 2002?

18      A    Well, I don't know -- probably not in the way

19  you're thinking.

20           We -- one of my clients was UC -- UCSF in San

21  Francisco.  But that may have actually been -- I don't

22  know if that was before or after.  It was 2001 or 2002.

23  I don't think that's an agency per se, so.

24      Q    And since being retained in 2002, have you

25  done any work with any California agencies, other than

17

BARKLEY
Court Reporters

1          The contract under which you work is actually

2    between the California Department of Corrections and

3    Navigant Consulting; is that correct?

4          A      That's correct.

5          Q      What is your relationship with Navigant

6    Consulting?

7          A      I am a subcontractor.

8          Q      And can you describe the history for me of

9    your relationship with Navigant.

10         A      Sure.  That actually dates from the period

11   where they were Tucker Alan Associates.

12                One of my colleagues from McManis Associates

13   at the time had taken a position with Tucker Alan, and

14   they were looking -- Navigant was looking for someone

15   who had experience in developing bed need forecasts for

16   hospitals or agencies.  And she put me in touch with

17   Bryce Cook and Dorn Dean, who were principals with

18   Navigant, associated with all of these studies.  We

19   proposed a budget and scope of work to Navigant, and we

20   were retained as -- McManis was retained as a

21   subcontractor to Tucker Alan.

22                So after Tucker Alan was acquired by Navigant,

23   the same relationship -- professional relationship

24   continued to exist.  And when there was an opportunity

25   to revise the study in 2005, late 2005, we again

                              19

                    JOHN MISENER

BARKLEY
Court Reporters

1  proposed to Navigant this time to do that work.

2      Q    Is it correct to say that McManis is a third

3  party contractor?

4          MS. TILLMAN:  Objection.  Lack of foundation.

5          If you understand that.  That might have a

6  legal kind of definition that may or may not be within

7  your understanding.

8          MS. WHELAN:  Let me just clarify my

9  question --

10          THE WITNESS:  I'm an employee of McManis

11  Consulting.  McManis -- as a -- and as a principal and

12  part owner of McManis Consulting -- Consulting, I -- you

13  know, I have the authority to write a proposal to

14  Navigant.

15          So I guess I'm not exactly sure what the

16  relationship would be.  But, you know, McManis

17  Consulting would be the actual subcontractor, which I am

18  an employee.

19  BY MS. WHELAN

20      Q    So your work with the California Department of

21  Corrections is as a principal of McManis and not as an

22  independent person of John Misener himself; correct?

23      A    Right.

24      Q    What role does Navigant play in connection

25  with the contract with the CDCR?

JOHN MISENER

BARKLEY
Court Reporters

1      A    Their role, in addition to helping scope out

2   the work process, helping to develop --

3           They basically wrote the contract for the

4   current contract that I'm working under.  Outlining

5   deliverables, relating to the principals with the CDCR

6   about what their requirements were and how they propose

7   to meet them.  Putting together estimates of my time and

8   ideas of how those deliverables could be achieved.

9           And they continue to review my documents in

10  terms of quality control and all of the billing

11  functions associated with my time and some of Navigant's

12  time as well.

13      Q    Does McManis Consulting have a branch that

14  could be doing what Navigant is doing under this

15  contract?

16      A    If you're asking whether I could independently

17  or McManis could independently relate to the Department

18  of Corrections, sure.  That's a possibility.

19      Q    I'm just trying to understand why Navigant is

20  still involved in the contract.  It seems like primarily

21  what they do is sort of administrative management.  So

22  I'm just wondering if there's a reason why Navigant is

23  still a part of the contract.

24      A    Well, to answer your question, they've had a

25  broader role earlier in --

                              21

                       JOHN MISENER

BARKLEY
Court Reporters

1              This is a three-year contract they're working

2    on.  They had a broader role earlier on.  They had a

3    clinical specialist, who has since left the firm.  Mary

4    Beth Thomas, for example, psychiatric nurse.  And she

5    was involved in some of the early interviews.

6              That has shifted a little bit to where I'm

7    primarily -- you know, 99.99 percent of the time -- I

8    guess I don't know what the actual numbers are.  And

9    historically they were -- the Department of Corrections

10   was their client.  And I --

11             You know, it's an issue of professional

12   relationships with other firms that you subcontract

13   with.  You generally enjoy a relationship with the

14   person you subcontract with, allow them to maintain

15   their relationship with that client for this project and

16   maybe other projects.

17             MS. WHELAN:  This will be Exhibit 2.

18   BY MS. WHELAN

19        Q    Exhibit 2 is a -- consists of a cover letter

20   dated December 12th, 2006 from Maria Costa, a contract

21   analyst in the institution medical contracts section,

22   procurement and contracts branch, to Dorn K. Dean,

23   managing director of Navigant Consulting.

24             And enclosed with that letter is a contract

25   for a term through December 31st, 2009.  I understand

                              22

                        JOHN MISENER

1    there may have been other contracts between CDCR and

2    Navigant.  But is it correct to say that this is the

3    contract that set forth your three-year retention with

4    CDCR?

5        A    That's correct.

6        Q    Can you describe what your general obligations

7    are under this contract, as you understand them.

8        A    Well, in short, it's to perform the work that

9    would realize the deliverables that are outlined in the

10   tables here.

11            For example, basically there's a table 1,

12   expense schedule, with milestones and deliverables and

13   fees and -- hard to tell the pagination because

14   everything seems to be page 1, 2.

15       Q    I think one helpful way to describe it also is

16   the exhibit number in the upper right-hand corner.

17       A    Exhibit B too.  I don't know how many of those

18   are in there.

19       Q    All right.  What I'm looking at, for instance,

20   Exhibit A, which sets out the purpose of the contract.

21            MS. TILLMAN:  And I was going to say Exhibit

22   A, page 4 has the subtitle tasks and deliverables.

23            THE WITNESS:  Right.  This outlines in a

24   little more detail what the requirements would be to

25   meet the deliverables that are in the chart in Exhibit

23

JOHN MISENER

BARKLEY
Court Reporters

1    A.

2    BY MS. WHELAN

3        Q    So on page 4, the first deliverable is a

4    five-year mental health bed forecast using Navigant's

5    methodology.

6            And the contract sets forth that that will be

7    accomplished twice a year with due dates 30 days after

8    the contractor's receipt of CDCR's general population

9    projections, which come out in the fall and the spring;

10   is that correct?

11       A    That's what it says.  Correct.

12       Q    And have you been accomplishing the two

13   year -- the twice-per-year reports since you -- since

14   this contract was initiated?

15       A    Yeah.  There's been two created.

16           They don't fall very well under the time

17   frame, which I think is unrealistic, primarily due to

18   the client's difficulty in pulling the data together for

19   those time periods.  Basically pushes back my ability

20   to -- you know, the time frame -- my ability to complete

21   those in a fashion that would meet the requirements

22   listed here.

23           MS. TILLMAN:  5.  Is that correct?  The note 5

24   on page 4 gives an outline of the time.

25           THE WITNESS:  Oh, yeah.  Yes, that's correct.

24

JOHN MISENER

BARKLEY
Court Reporters

1    list numbers as well.

2            Then, you know, the other numbers from those

3    that got paroled or died or decided they were not

4    appropriate for admitting -- for admission, for

5    custodial reasons or whatever other reasons, those got

6    added in as well.  So.

7    BY MS. WHELAN

8        Q    So it sounds like you came up with a formula

9    related to the UNA study.

10           And are you still currently using that formula

11   today as part of your population projections for the

12   CDCR?

13       A    The UNA adjustments, we call them, were

14   identified basically at a point in time, and we -- I

15   guess I don't want to say we had discussions.  There

16   were discussions between myself and myself now, but --

17   now that Mary Beth is gone -- as to whether or not the

18   actual rate of utilization of a program, if it continues

19   to remain stable or increase, basically tells me that

20   the -- the needs of the inmates in general from a

21   modeling standpoint are probably being met.  If they

22   start going down, there's some concern.

23           Now what we had added into some of our

24   recommendations in -- I don't know which reports, it may

25   be both of them -- that there ought to be a auditing

41

JOHN MISENER

BARKLEY
Court Reporters

```
 1    function similar to the UNA assessment.  Maybe not as

 2    pervasive as the UNA assessment, but maybe by selected

 3    prison or for a particular program, whether it's acute,

 4    mental health crisis, or intermediate care, done on a

 5    ongoing basis.

 6              My preference being possibly take several

 7    prisons each year, do a similar UNA study with -- maybe

 8    not as much resources as the UNA study required -- so

 9    that we can see if there's additional unmet need that

10    isn't being captured so we can add that into the model.

11              I don't know if that answers your question,

12    but --

13         Q    It does.

14              And do you know if the CDCR has taken any

15    steps to do periodic UNA type studies --

16         A    I'm not aware --

17         Q    -- that are ongoing?

18         A    -- that they have, although it was mentioned

19    to me in a setting that we did have, a group setting,

20    that that sounded like a good idea.

21              But I don't know whether they actually pursued

22    that as a -- as an option.

23         Q    And if I understand correctly why that

24    recommendation has been made -- and if I recall

25    correctly, it was also made in the UNA study itself by
```

42

JOHN MISENER

BARKLEY
Court Reporters

1     the author of that study, who was Mr. --

2          A    Alvarez.

3          Q    -- Alvarez.

4          A    I think it says here.

5          Q    Right.  William F. Alvarez.

6               The reason for that goes back to something you

7     said a minute ago, which is that the unmet needs

8     assessment was done at a point in time, and from a data

9     perspective, you would want that to be updated

10    periodically; is that correct?

11         A    Yeah.  That's correct.  Sort of outlined the

12    reasons in the annual report, the first annual report

13    that came out, in terms of the reasons why the actual

14    demand for care and the need may be somewhat different.

15    And they are also pointed out by Dr. Alvarez in his

16    study, I believe.

17              Things like clinician institutionalization, I

18    think they're called.  I may have the wrong name here.

19              But it's basically, if you have an ongoing

20    relationship, clinical relationship, with an inmate for

21    a long period of time, it becomes more difficult

22    sometimes to notice day-to-day changes in his behavior.

23    To where another clinician comes in from the outside and

24    says, oh, this guy definitely needs a higher level of

25    care.

43

JOHN MISENER

BARKLEY
Court Reporters

1          This is one of the -- one of the reasons from
2    a modeler standpoint.  And from the same issue that was
3    raised in 2002 by some of the plaintiffs is there's no
4    real way for me, as a clinician, to identify unmet need
5    other than for a clinician to go in and do chart reviews
6    and maybe interview people.  Either clinicians and staff
7    or the patient themselves.  There's really no way to do
8    that.
9          And so some of that bump-up that we saw after
10   the UNA study where the rates actually started to
11   increase -- or at least remain level.  Perhaps increase,
12   could after a time begin to go down again, because maybe
13   there's less of a propensity for the clinicians to
14   identify pathology in the same way that they may have
15   earlier when there was more attention being paid to that
16   particular situation.
17        Q    In the absence of a periodic UNA type study,
18   are you using data from -- are you continuing to use
19   data and the formula from the UNA study in your
20   projections now?
21        A    Yes.  From the standpoint that the actual 2005
22   and 2006 numbers we don't use.  We use the 2005 and 2006
23   numbers for intermediate and acute bed utilization with
24   the UNA adjustments added to them.
25          So then when we look at a trend from say 2002

BARKLEY
Court Reporters

1    to identify individuals and then extrapolate the

2    proportion that you're auditing to the whole population

3    and say, we're about 5 percent low in terms of what the

4    real needs are here.

5    BY MS. WHELAN

6       Q    So to summarize my understanding of what you

7    said, you, in your formula, consider wait list data as a

8    way to capture unmet need.  But the other piece of data

9    that you have recommended to CDCR to create is a

10   periodic update of the UNA study so that you can also

11   capture information about unmet need based on clinician

12   reviews of files and patients; is that correct?

13      A    I think that's a fair statement, yes.

14      Q    In the absence of periodic UNA type studies,

15   is it accurate to say that you have no way of

16   incorporating into your data unmet need, other than

17   through the wait list data?

18      A    I would say that's correct.

19           But during a forecast, we identify a

20   particular program that's going south or decreasing in

21   volume, and we bring it to the attention of the --

22   either the department or DMH as to why this is

23   occurring.  Because there may be reasons other than need

24   involved.

25           A good example of that is Patton State Prison.

49

JOHN MISENER

BARKLEY
Court Reporters

1          So I'm not sure that that's as much concern to

2    me as the CMF issue.  I mean, it seems to build --

3    starting to build back up.  So I'm not sure exactly

4    what's going on, the most recent data.

5          Q    Going back to our discussion about the unmet

6    needs assessment, we looked at Exhibit 3, which was an

7    E-mail back in January 2006 from you to Sharon Riegel

8    discussing the UNA study.  And at that time, it appears

9    that you were trying to tie up loose ends about what

10   happened with the inmate patients involved in that

11   study.

12          I'm trying to understand whether or not that

13   study is part of your forecast now, or whether you have

14   since stopped referring back to that unmet needs

15   assessment with respect to your current formula.

16          A    We don't have any new adjustment factors

17   associated with the old study, no.  Except that the

18   actual increase in the -- in either the discharge rate

19   or the census rate over time reflects the UNA addition

20   in 2005 and 2006.  It's the actual curve in the use of

21   the formula to look at the future forecast, takes into

22   account that higher rate.

23          But we don't have any new numbers to add to

24   2007 and 8 and going forward until -- unless there

25   happens to be another UNA type study to add on to it.

53

JOHN MISENER

BARKLEY
Court Reporters

1    histogram or a bar chart, here is the actual rate based

2    on actual data of inmates that actually were referred

3    and are either still there or discharged from there.

4    And then we added on the numbers that were from inmates

5    that should have gone but didn't.

6             But that's only true for 2005 and 6.  So like

7    I say, there's no ongoing -- ongoing new adjustment

8    upwards for 2007 and 8.

9        Q    So if I understand correctly -- and we can

10   look at the pie graph that you referred to a little

11   later, which shows the distribution of the UNA inmate

12   patients and where they ultimately ended up.

13            But my recollection is that 20 percent of

14   those patients were determined to have never reached the

15   level of care that they required.  And as you mentioned

16   earlier, that might have been for a couple different

17   reasons, including that they paroled or that they died

18   or that there was never a bed available for their

19   placement.  Is that correct?

20       A    That's correct.

21       Q    And so back in 2005 and 2006 when you

22   determined the formula for your forecast, you tried to

23   determine which percentage of that 20 percent, for

24   instance, needed acute care; is that correct?

25       A    Correct.  Or intermediate.

JOHN MISENER



1      Q    Or intermediate care.  And then you added that

2   percentage onto the forecast?

3      A    Right.

4      Q    But today you are not adding that percentage

5   onto your current forecast; is that true?

6      A    That's correct.

7      Q    And is there a reason that you're not adding

8   some sort of adjustment for unmet need at this point

9   currently?

10      A    Well, if you look at the -- and this is a

11   little extemporaneous here, but if you look at the

12   situation as it occurred during the UNA study, there was

13   a lot of pent-up demand, and then there was a major

14   increase in capacity at Salinas Valley.  Not that there

15   isn't currently a continuing waiting list.  But a lot of

16   that unmet need was an issue of capacity that wasn't

17   built yet.

18          And as those -- as that ramped up and

19   clinicians were basically advised to make sure that

20   they're identified on a waiting list -- some of those

21   are still probably on some waiting list.  It goes up and

22   down.  But it would constitute our best guess as to

23   unmet need without just taking a number out of the year

24   and say, oh, well, there's still got to be this much

25   percent.

JOHN MISENER

BARKLEY
Court Reporters

1          Because the problem -- the problem is that

2    originally there's this unmet need.  There may be

3    capacity constraints of which, you know, you fix some of

4    that capacity, some of that -- clinicians start

5    referring again, because they know they're not going to

6    be on a waiting list forever and they're going to

7    eventually get need.

8          Q    It's correct that you -- you think that your

9    forecast could be more accurate if you were able to

10   capture data about unmet need; correct?

11         A    Yeah.  I -- sorry.  My record is saying that,

12   with the department.

13         Q    And that's a recommendation that you have made

14   to the department; correct?

15         A    Yeah.  Auditing function.  Not only from a

16   numerical standpoint, but from one of better

17   relationships with, you know, the -- the clinicians and

18   the inmates as well to make sure that they're on their

19   toes to identify pathology.  From a layperson's

20   standpoint, I think that would be a very good idea.

21         Q    And so my question is, in the absence of

22   actual data about unmet need, which the CDCR could

23   obtain by doing periodic UNA type assessments, is there

24   a reason that you are not making some kind of assumption

25   about unmet need which you're including in your formula?

JOHN MISENER

BARKLEY
Court Reporters

1          And you seemed to say a minute ago that part

2     of the reason is because you're not sure what that

3     number would be.  Is that correct?

4          A     That's correct.  And I have no definitive

5     proof that there is any unmet need other than, you know,

6     it's good to look.

7          Q     So from a formula, a mathematic perspective,

8     it's difficult for you to make an assumption about unmet

9     need without knowing, from a clinical standpoint, what

10    that might be; is that correct?

11         A     Yeah.  Modelers generally don't like to put in

12    factors that are just completely hypothetical.

13            The -- the reason early on that -- and it

14    required some discussion and back and forth with the

15    department back in 2002 -- was what percentage of

16    occupancy standard to use.  Because right now we're

17    using 90 percent occupancy standard, which says, okay,

18    there's a ten -- there's 10 percent wiggle room.

19            And there's a darn good reason to have it,

20    because, you know, you have to process beds and -- you

21    can never -- it's difficult to be a hundred percent

22    occupancy at a time.  And so all these bed need

23    forecasts are based on a 90 percent occupancy standard.

24    So we say we forecast the census, and then there's a

25    cushion of 10 percent on that.

JOHN MISENER

BARKLEY
Court Reporters

1          So somebody could argue that that's -- that's

2    a margin for excess capacity or unmet need, I suppose.

3    Or that's normally what people in my career do is

4    identify what that percentage ought to be.

5          Q    And how did you reach the 90 percent figure?

6          A    Well, originally I -- I suggested a -- I

7    suggested 90, I think.  And then there was some

8    argument, well, we don't want beds laying fallow, not

9    full.  I said, well, really that wouldn't happen.

10         And I guess a better way to answer your

11   question is psychiatric hospitals in general, they tend

12   to use 90 or 95 percent occupancy standard in the

13   private sector.  But I could see that this was a little

14   more problematic.  So we went down to 90 percent, which

15   allows more flexibility.

16         Because there's way more custodial issues

17   involved in finding the appropriate setting, whether or

18   not there's a -- like a single cell available versus a

19   dual occupancy accommodation.  And travel, moving

20   inmates long distances to put in other places.

21         So it seemed like a -- a good decision to have

22   it dropped down to 90 from 95 percent for both the --

23   the major programs and as well as mental health crisis.

24   And I think we -- if I'm not mistaken, we do the same

25   thing with EOP.  95 percent, though, for them.

59

JOHN MISENER

```
 1       Q     You use a 95 percent for EOP?

 2       A     I think so.  Don't we?  I believe so.

 3       Q     Were you able to confirm?

 4       A     95 percent.

 5       Q     95 percent for EOP.  Okay.

 6       A     And if that -- I'm sorry.  In that situation,

 7  you have --

 8              My understanding of EOP type patient might be

 9  in the general population.  So we're then sort of --

10  there's a margin of error adjustment to -- to suggest a

11  higher capacity than may be actually -- that may exist

12  out there.

13       Q     And you said there was discussion about what

14  percentage to use, which ultimately resulted in a

15  90 percent number for acute and intermediate; is that

16  correct?

17       A     Correct.  That's correct.

18       Q     And who at the CDCR made the final call about

19  the 90 percent figure?

20       A     Now this was back in 2002.  I don't know who's

21  going to have the historical knowledge, because I can

22  never remember this guy's last name.  But --

23              MS. TILLMAN:  Do you remember the first name?

24              THE WITNESS:  Mike Picket [phonetic]?  Is

25  that --
```

60

BARKLEY
Court Reporters

1           MS. TILLMAN:  That's the name of a person that

2    worked there at CDCR at one point.

3           THE WITNESS:  He was the head honcho that I

4    was working for at the time.

5           And the mind-set might have been, well, we

6    just want to know what our requirements are.  You know,

7    what's a hundred percent of our requirements.  You know.

8    You got an empty bed, you're going to fill it, so why

9    would you do that.  And I said, well, you come up with a

10   litany of reasons.

11          Like any hospital administrator -- which I'm

12   trained as a hospital administrator -- would know,

13   there's always got to be some vacancy.  Otherwise you

14   can't move somebody else in there.  Transfers and other

15   reasons.

16          And like intermediate, long-term stuff tends

17   to have -- intermediate or longer length of stay

18   programs generally have a higher occupancy standard,

19   like 90 or 95 percent.  Short stay stuff generally has a

20   lower one, because you have more of this churning that

21   goes on for things like cholecystectomies and two- or

22   three-day stays kind of thing, like you see now in

23   private sector.

24          But under the kind of conditions that we're

25   looking at here, where acute might be 47 days long or 50

                           61

BARKLEY
Court Reporters

1    length of stay, the 90 percent seemed fair, seemed like

2    a good number to use.

3    BY MS. WHELAN

4         Q    One example of using the 90th percent model

5    was with the CMF acute --

6         A    Right.

7         Q    -- beds; is that correct?

8         A    That's correct.

9         Q    And it -- it appeared from your reports that

10   the explanation for that was that there were wide

11   fluctuations during the year in the CMF acute wait list;

12   is that correct?

13        A    I'm not sure I link those two things together.

14   But you're correct that there were wide fluctuations in

15   the wait list.

16        Q    So if I understand correctly, when you use the

17   90th percent model, rather than take the average, which

18   may not be accurate because of these fluctuations, you

19   take 90 percent of the highest number; is that correct?

20        A    Well, you take the average census.  There's

21   a -- let's say for argument's sake, a midnight count or

22   whenever they count the number of patients in a bed

23   every day for whatever sample you have.  365 days a year

24   or once a week, whenever you do it.  And then you take

25   the average of that and then you divide into that .9, so

62

BARKLEY
Court Reporters

1    And sometimes you can and sometimes you can't.  And some
2    of the --
3          In some cases, you know, a prison may not, for
4    one reason or another -- staffing usually -- have
5    provided the data.  So there's -- that's lost
6    information that you can't really recover.
7          On the other hand, it's an asset, specifically
8    for mental health crisis beds, because it's the only
9    source of data that is out there that will allow you to
10   look at length of stay, for example.  Mental health --
11   the HCCUP --
12         HCPU, Health Care Placement Unit, can provide
13   ready access to census by mental health crisis bed unit.
14   But they don't track how long a patient stays there or
15   much about them.  So that what's left for the HCCUP
16   data, the CADDIS data in terms of its original promise
17   to me as a consultant is pretty much limited to the
18   mental health crisis beds as an alternative forecasting
19   method for mental health crisis beds.
20         The other services, such as inpatient at CMF
21   and the intermediate at CMF and Salinas Valley I can get
22   from DMH.  And that's generally what we've done for the
23   last couple reports is relied more on what seemed to be
24   more accurate data from DMH.
25         Q    You mentioned three sources of data so far.

JOHN MISENER

BARKLEY
Court Reporters

1    The HCPU, DMH, and the HCCUP.

2         Are there any other sources?

3    A    Well, you know, you have your -- the

4    population division, you get the PDF file that includes

5    all of their forecasts for population.  That's critical.

6    You have to get that.

7    Q    And you mean the population overall of the

8    entire prison population?

9    A    Yeah.  Total males, total females.

10        Occasionally there will be data that are

11   particular -- are unique to a particular aspect of one

12   of the reports, like the -- the -- the UNA data.

13   Somebody was charged with creating a smaller subset

14   database of inmates restricted to those whatever it was,

15   740 or some inmates.  And so that -- that data came out

16   of --

17        I'm not any good at this, but I think it's the

18   planning division under health services planning.  I

19   think originally there was a lady named Gina Boyd who

20   used to have her own set of data that she got from DMH,

21   and Sharon Riegel sort of took that over.  So -- it's

22   more of a way station for data.

23        Originally I think it just generated from DMH,

24   but it comes down that way and I get it processed by

25   them.  Those are the people I've gone to to say, hey,

79

JOHN MISENER

BARKLEY
Court Reporters

1    where do I get this, or why can't I get that or

2    whatever.  So they tend to be problem solvers in terms

3    of getting information.

4              And let's see.  Who else.  Think of any

5    offhand.

6         Q    Does the DMH data include the CADDIS type data

7    also where you get CDC numbers and --

8         A    It's analogous to that, yeah.  There's not as

9    many fields as CADDIS has, but it seems to be better

10   populated, more timely.

11             Although last year, you know, we had a

12   problem.  I said, hey, you know, I got -- I've got

13   September and October -- I don't know which months, but

14   to give you an example, I got three months that are

15   missing.  So what's that.  And then went back and found

16   it and I got it.  And we stuck it into the spreadsheets

17   and calculated rates and we were fine.

18             But people aren't always aware of the fact

19   that it's not complete.  Because they're -- they tend to

20   be -- people in the department often tend to be

21   transporters of information, but they're not responsible

22   for the original generation of keying in of data that

23   DMH is.

24        Q    So you get the CADDIS data from HCCUP?

25        A    Right.

JOHN MISENER

BARKLEY
Court Reporters

1        Q    Similar type data from DMH?

2        A    That's correct.

3        Q    And can you describe what data you receive

4   from the HCPU.

5        A    Yeah.  Health Care Placement Unit, they have a

6   variety of data that we get.  And they tend to poll

7   their data off of --

8            There's a database that tracks, I guess, where

9   all of the inmates are on a daily basis.  I can't

10  remember.  It's DDBS or something like that.  I always

11  forget the acronym.  It's not one that I have direct

12  access to or ever try to deal directly with.

13           But generally they will be able to track and

14  create census counts for different periods for pretty

15  much all of the services.  Acute, intermediate, mental

16  health crisis beds, EOP.  Triple CMS.  And generally the

17  kind of data that they have is sort of point in time

18  census counts.

19           So they may be -- they could be daily or they

20  could be weekly.  They could be monthly, depending on

21  what their standard reporting format is.  And by prison.

22           Occasionally --

23       Q    What's the source of your -- sorry.  Go ahead.

24       A    Occasionally you'll find that they don't

25  collect everything.  Like OHUs.  O-H-U.  OHUs.  And I'll

JOHN MISENER

BARKLEY
Court Reporters