# EXHIBIT 33

# Deposition of John Misener
# January 29, 2008
# (Phase II Counter-Designations)

Case 2:90-cv-00520-KJM-SCR   Document 3451-4   Filed 01/08/09   Page 1 of 7

```
 1              IN THE UNITED STATES DISTRICT COURT
 2            FOR THE EASTERN DISTRICT OF CALIFORNIA
 3            AND THE NORTHERN DISTRICT OF CALIFORNIA
 4      UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
 5       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE
 6   RALPH COLEMAN, et al.,      )
                                 )
 7                Plaintiffs,    )
                                 )
 8        v.                     ) No. Civ S 90-0520
                                 )    LKK-JFM P
 9   ARNOLD SCHWARZENEGGER,      )
     et al.,                     )
10                               )
                  Defendants.    )
11   _____)
                                 )
12   MARCIANO PLATA, et al.,     ) No. C01-1351 TEH
                                 )
13                Plaintiffs,    )
                                 )
14        v.                     )
                                 )
15   ARNOLD SCHWARZENEGGER,      )
     et al.,                     )
16                               )
                  Defendants.    )
17   _____)
18
19             Deposition of JOHN MISENER, taken
20        on behalf of the Plaintiffs, at
21        315 Montgomery Street, 10th Floor,
22        San Francisco, California, commencing
23        at 9:54 a.m., Tuesday, January 29, 2008,
24        before Karen Moon, Certified Shorthand
25        Reporter No. 12450.
```

2

JOHN MISENER

BARKLEY
Court Reporters

1  to identify individuals and then extrapolate the
2  proportion that you're auditing to the whole population
3  and say, we're about 5 percent low in terms of what the
4  real needs are here.
5  BY MS. WHELAN
6     Q   So to summarize my understanding of what you
7  said, you, in your formula, consider wait list data as a
8  way to capture unmet need. But the other piece of data
9  that you have recommended to CDCR to create is a
10 periodic update of the UNA study so that you can also
11 capture information about unmet need based on clinician
12 reviews of files and patients; is that correct?
13    A   I think that's a fair statement, yes.
14    Q   In the absence of periodic UNA type studies,
15 is it accurate to say that you have no way of
16 incorporating into your data unmet need, other than
17 through the wait list data?
18    A   I would say that's correct.
19       But during a forecast, we identify a
20 particular program that's going south or decreasing in
21 volume, and we bring it to the attention of the --
22 either the department or DMH as to why this is
23 occurring. Because there may be reasons other than need
24 involved.
25       A good example of that is Patton State Prison.

49

JOHN MISENER

BARKLEY
Court Reporters

1  We don't have a bunch of data from them, other than what
2  DMH has. And for some reason, there seems to have been
3  a drop in admissions.
4      And often what we -- people think, or people
5  surmise maybe without knowing exactly, is there may be
6  other programs that are siphoning off some of the
7  patient volume. Either opening up of a new mental
8  health crisis unit in the women's prison or in -- some
9  analogies also in the men's side as well.
10     It's really clear to me to see -- clear may be
11 the wrong word. But if you look at the CMF situation
12 where there's -- first there's -- first there's an acute
13 program that doesn't break out crisis beds, and then
14 there's a new crisis bed unit, and then there's another
15 new crisis bed unit, and then now there's a closure of
16 one of those crisis bed units. And so you see inmates
17 are receiving care in one or two different modalities as
18 acute patients. Mental health crisis bed being an acute
19 type of episode.
20     And the need, breaking out of -- separating
21 the need of those two becomes extremely difficult.
22 Because my guess is what clinicians might do is a bed's
23 available, you're going to stick them in that bed
24 whether or not maybe that's the most appropriate type of
25 modality or clinical program that that inmate needs.

1  But it's there, it's available, and it's going to be
2  safe for them there.
3       But in terms of having a nice historical trend
4  where capacity isn't an issue, to show how all of those
5  trends forecast out in the future becomes difficult when
6  you're changing around bed capacities in that manner.
7    Q   That example of CMF explains something you
8  referred to earlier, which is why you recommended in the
9  most recent Navigant report that the CDCR use a prior
10 projection for acute bed need; is that correct?
11   A   Yes. That's what I felt. I felt that that --
12 there may have been a possible artificiality to a future
13 forecast that shows a dropping by 20 beds, or whatever
14 the number was, from forecast done six months before.
15 And that to be on the safe side -- like I say, we have a
16 bias for a higher number so you won't be shortchanged
17 thereon.
18   Q   And the example that you gave of Patton State
19 Hospital -- which is the state hospital set aside for
20 female acute and intermediate care patients --
21   A   That's correct.
22   Q   -- correct?
23   A   That's correct.
24   Q   Were you able to explain why the utilization
25 of those beds went down in the most recent data?

51

JOHN MISENER

BARKLEY
Court Reporters

1  basis?
2      A    I don't know. But it's a good question now
3  that he's in the operating -- directly in the operating
4  right now. I'd be anxious to see that he's making a
5  difference.
6           DEPOSITION OFFICER:  Exhibit 15.
7  BY MS. WHELAN
8      Q    Exhibit 15 is a E-mail from Robin Dezember to
9  Sharon Riegel with a CC to Doug McKeever dated June 5th,
10 2006.
11          Since this E-mail came from you, I don't know
12 if you were a BCC or there's some other way you obtained
13 it, because your name is not on it.
14     A    You think it came from my group?
15     Q    I do.
16          MS. TILLMAN:  Just to clarify --
17 BY MS. WHELAN
18     Q    But if we can figure out whether or not you
19 have ever seen it.
20          MS. TILLMAN:  Let me just clarify for the
21 record, when you say from, you mean from the disk he
22 provided you information, or because you see something
23 in here that indicates it's either on the from or to
24 line of the E-mail?
25          MS. WHELAN:  No. I'm saying his name is not

1  on the from or to.  But this is one of the text E-mails
2  he produced.
3  BY MS. WHELAN
4       Q    So I can't explain why you had it,
5  Mr. Misener.
6       A    Nor can I, actually.  I guess he BCCed me.
7  But I don't remember actually -- I'm glad he's doing
8  this.  Must have been a BCC, I guess.
9       Q    Does the E-mail look familiar to you?
10      A    Well, like I say, he talked to me over the
11 phone about wanting to do this.  So the E-mail per se is
12 not that familiar, but --
13      Q    Okay.  Well, let me ask you about some of the
14 topics he talks about, and you can tell me what your
15 understanding of them was.
16           He is writing to Sharon Riegel telling her
17 that he left a voicemail message for her, and then he
18 writes, what I want to do is establish a document --
19 sorry.
20           What I want to do is establish and document a
21 recognized and regular process for the production and
22 receipt of the data required to produce the twice yearly
23 bed demand forecast.  I assume that the data will need
24 to flow at least monthly and be retained in some form,
25 parens, comprehensive database, end parens, for use with