# EXHIBIT 34

**Deposition of George Sifuentes
December 15, 2007
(Phase II Designations)**

**Part B**

1  Q. And do you have any knowledge whether taking
2  the Lancaster 150 treatment space project first,
3  whether that project is moving forward?
4  A. To my knowledge, it is not moving forward.
5  Q. And as to the 384 EOP treatment space
6  project at Sacramento?
7  A. To my knowledge, that one's not -- that
8  one's not moving forward either.
9  MS. WHELAN: Should we take a break? I think
10 we've been going for --
11 MR. McCLAIN: That would be a good time.
12 (Recess.)
13 (Ms. Richardson exits proceedings.)
14 BY MS. WHELAN:
15 Q. Mr. Sifuentes, are you aware that in July of
16 2007 Special Master Keating -- well, first do you
17 know who Special Master Keating is?
18 A. Yes, I do.
19 Q. Okay. And who is he?
20 A. He is the special master for the Coleman
21 court.
22 Q. Are you aware in July of 2007 that Special
23 Master Keating filed a report and recommendations
24 about reception center EOP programs?
25 A. Yes, I understand he did file a report.

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

 1    Q. And do you understand that one issue he
 2 raised in that report was his finding that the
 3 reception center EOP programs were not meeting
 4 required standards in large part because of the lack
 5 of treatment and staffing space available in those
 6 units?
 7    A. I'm not sure what the reasons were, but I
 8 understand that he did have criticism of the EOP
 9 programming reception centers. I did not personally
10 read the report.
11    Q. Were you personally involved in any
12 construction projects regarding programming or
13 treatment space in the EOP reception centers?
14    A. No.
15    Q. So at the time that you left in -- the OFM
16 in October 2007, the OFM was not involved in any
17 projects related to programming or treatment space
18 at the EOP reception center projects; is that
19 correct?
20    A. That's correct.
21    MS. WHELAN: This is a big one.
22    (Plaintiffs' Exhibit No. 7 was marked for
23 identification.)
24    MS. WHELAN: Exhibit 7 is a CDCR five-year
25 infrastructure plan from 2008 to 2013.

Page 56

```
 1        Q. And Mr. Sifuentes, your name is on the cover
 2   page of that document, do you see that?
 3        A. Yes.
 4        Q. Were you involved in creating this document?
 5        A. Yes, I was.
 6        Q. This document does not have a date on it
 7   that I could find, do you know when this report was
 8   issued?
 9        A. I do not know if the report has been issued.
10        Q. So it's your understanding that this report
11   may not be public, is that true?
12        A. That's correct.
13        Q. Do you know what people would have received
14   a copy of this report?
15        A. The Department of Finance, capital outlay
16   section would have received a signed copy of the
17   report.
18        Q. Okay.
19           And where would the signature page appear?
20        A. There would have been -- typically there
21   would have been a transmittal letter from -- from
22   the agency secretary to the Department of Finance
23   transmitting report.
24        Q. And who would know whether or not this
25   report was ever transmitted?
```

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1   A. I would -- if I was trying to determine who
2   that -- who that is, I would contact the agency
3   secretary secretary, Ms. Clifford, to find out if it
4   was ever signed and released.
5       Q. I'm sorry, which agency?
6       A. California Department of Corrections and
7   Rehabilitation is an agency.
8       Q. And who would that person be?
9       A. Well, the agency secretary is James Tilton,
10  but his secretary is Linda Clifford.
11      Q. So you don't know if this plan was ever
12  distributed to the Department of Finance, but can
13  you tell me when you created this plan?
14      A. This plan would have been created over a
15  12-month period, beginning -- beginning last
16  February.
17      Q. So February of 2006?
18      A. Actually, yeah, February 2006.
19      Q. So February 2006 to approximately February
20  2007?
21      A. That's correct.
22      Q. What involvement did you have creating this
23  plan?
24      A. Well, this plan comes from our office, from
25  the Office of Facilities Management, or now the

1  facilities planning manager, construction group.
2          We -- we've always been charged with putting
3  together the five-year infrastructure plan in
4  response to the new mandate.  And it is a five year
5  plan and we are responsible for soliciting requests
6  for capital outlay needs from the various facilities
7  that we are responsible for, and putting it together
8  in accordance with the guidelines laid out by the
9  Department of Finance, and helping the department
10 prioritize those needs.  And developing schedules,
11 developing scopes, developing costs for those
12 projects.
13      Q. And how often are you supposed to create
14 this report?
15      A. Actually, twice a year.
16         There is the initial report, for example,
17 the one in front of us which is 20008-13, if it was
18 submitted, would be for 2008-2013.  And then you do
19 an amendment to this report after the budget is
20 passed, so that you can revise the report to
21 indicate what was approved, what was not approved,
22 any new projects that may have been added during the
23 legislative process so that it can properly be
24 reflected in the plan.
25      Q. Okay.  I may come back to this document, but

GEORGE SIFUENTES

1  for now, I also want to use it for one purpose,
2  which is, could you turn to page -- it's Bates
3  numbered DOF007142?
4       A. 142?
5       MR. McCLAIN:  7142?
6       MS. WHELAN:  7142.
7       THE WITNESS:  Okay, I'm sorry.
8       MS. WHELAN:  I should have tabbed your copy
9  too.
10      THE WITNESS:  That's okay.
11      BY MS. WHELAN:
12      Q. This is under a -- the page before reflects
13 that this is the project sorted by priority.
14      A. Yes.
15      Q. And is this the type of schedule that you
16 were referring to that would be part of this plan,
17 which is a schedule of specific projects?
18      A. No.  This is just a listing of the projects
19 in this particular case by department priority
20 order.  Schedules would have meant how long -- how
21 long it would take for each individual project to be
22 either designed or constructed.  There would have
23 been particular project schedules, that's what I
24 meant.  This is more of a listing of the priorities
25 of what the department thought at the time.

1  MR. McCLAIN: You know, Counsel, I'm going to
2  need to stop this line of questioning for a minute,
3  we -- we could come back to this if you want to, but
4  I need to check. My client has advised me that --
5  that this entire document might be subject to the
6  deliberative process privilege.
7  I don't know if it is or not, and I'll need to
8  check with someone to figure that out.
9  So if you want to talk about this now, if you
10  want to get into the substance of this document now,
11  I can make a phone call now and -- and get to the
12  bottom of that.
13  If -- if you want to -- if you want to put this
14  off and -- and wait until the next break to allow me
15  to do that, we could do that too.
16  MS. WHELAN: Okay, one problem I foresee with
17  that is whether or not you're going to be able to
18  get a firm answer on that. And I will note that
19  this document was produced to us by the Department
20  of Finance, which is why it has a DOF Bates
21  numbering on it.
22  MR. McCLAIN: I saw that.
23  MS. WHELAN: And so I think a better way to
24  proceed may be that we continue the line of
25  questioning and then you can make your phone call

1  and see if you can determine this information.
2       MR. McCLAIN: Okay. Well, then I'm going to
3  need to take a quick break to talk to my client
4  to -- to ask him a few questions about this
5  document.
6       MS. WHELAN: Outside of the presence of me
7  before I ask him questions about it?
8       MR. McCLAIN: Yes. Just to determine whether
9  or not the deliberative process privilege applies to
10 the document or not.
11      MS. WHELAN: Okay.
12 Well, he testified on the record that he
13 doesn't know if this document has been distributed
14 to the Department of Finance, so it sounds like he
15 won't be able to tell you that.
16      MR. McCLAIN: I need to talk to him about that
17 myself and see what he has to say.
18      MS. WHELAN: Okay. Well, why don't we take a
19 break and you can also make a phone call and see if
20 you can work this out, but it needs to be fairly
21 quick.
22      MR. McCLAIN: Okay, it can be fairly quick.
23      MS. WHELAN: Okay.
24      (Recess.)
25      MR. McCLAIN: Counsel, you can go ahead and --

1  and do your line of questioning about this document,
2  I would just like to ask if you would stipulate to a
3  running objection based on the deliberative process
4  privilege, otherwise, I can say it after every
5  question regarding this document.
6       I'm going to allow him to testify about it, but
7  at this point it's not clear to us if the Department
8  of Finance should have produced this; but they did,
9  so if you'll stipulate to that running objection.
10      MS. WHELAN: Yes, I will stipulate to the
11 running objection.
12      MR. McCLAIN: Okay, all right.
13 BY MS. WHELAN:
14      Q. So Mr. Sifuentes, we were on page 7142, and
15 you were explaining to me that this is not actually
16 a schedule of projects but, rather, just a priority
17 listing of them; is that correct?
18      A. That's correct.
19      Q. And first priority on this document is the
20 CDCR strategic growth plan, do you know what that
21 is?
22      A. That would have been the AB 900 plan.
23      Q. Okay.
24         And the second project is the 20-bed
25 psychiatric services unit at CIW?

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  A. That's correct.
2  Q. Are you familiar with that project?
3  A. Yes.
4  Q. And do you know the status of that project?
5  A. This particular project, no.
6  Q. Now, further down, I believe project numbers
7  8, 9, 10 and 11, include what appear to be
8  consolidated care centers at LAC, RJD, CIM and CMC.
9  Is that correct?
10 A. That's correct.
11 Q. As to each of these mental health
12 infrastructure projects which are listed between
13 project No. 2 and 11, do you know what the
14 funding -- do you know if any of those are funded by
15 AB 900?
16 A. I do not.
17 Q. Okay.
18 And at the point that this document was
19 created, can you tell what the status is by looking
20 at this chart of each of these projects?
21 A. Yes, you could. One can infer, if you go
22 over to the column that says phase, you'll see a --
23 a number of different letters --
24 Q. I'm sorry, the first phase, which -- there
25 are multiple columns that have "phase"?

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

```
 1        A. Oh, you're -- yes.  The first phase, column
 2   first phase right after the column that states
 3   fiscal -- it says FY, looks like '08-09.
 4        Q. Right, okay.
 5        A. If you look in that you're going to see a
 6   series of numbers, PWC and the letter S, each one of
 7   those represents a particular phase of either design
 8   or construction.
 9        Q. Okay.
10        A. Okay.
11        Q. So taking the CIW 20-bed PSU unit which is
12   No. 2 on this priority list, which is listed as WC
13   phase, what does that mean?
14        A. It means what you're asking for is for
15   fiscal year '08-'09, you're asking for approximately
16   four million dollars to complete the working drawing
17   phase of that project.  And also, you're requesting
18   construction dollars so you can construct that
19   project.
20        Q. And do you know if this project was funded.
21        A. No, I do not.  Again, it's for fiscal year
22   '08-'09, which is in the future.
23        Q. Okay.
24           And I'm sorry, the No. 3 project also
25   appears to be a consolidated care center at SAC?
```