# EXHIBIT 34

## Deposition of George Sifuentes
## December 15, 2007
## (Phase II Designations)

## Part E

And it was not uncommon for us to do these scope changes if we found a way to -- to fund that.

And the reason I say that is because the capital outlay program with the Department of Corrections comes under a special provision, and it's known as Penal Code 7000, and those sections they're in.

It requires the department, every time it does a capital outlay program, to submit special legislative submittals. And what they were unfamiliar with was that our scope letter was the first letter of intent, and that we were still required to follow a number of submittals subsequent to that, that would have answered questions as -- as she was asking later.

Now, Ms. Hysen, when she came to CDCR, was -- was unfamiliar with the requirements of Penal Code 7000 in how we put our submittals together. She was not aware that our staffing package would have been submitted later on, once we had gotten through more design of the institution. We would have called in the mental health experts, whether it was the CDCR staff or there was mental health staff, whoever was going to operate it. They would have been involved in the design.

1    And then from that design, a staffing plan
2  would have been developed.
3    And it would have been submitted to the
4  legislature at the time that the design was, so that
5  they understood, if you go forward with this
6  building, you're also going to see a request for
7  this number of staff to operate it.  So that they
8  are in a better informed position to make that
9  decision.
10    Q. So at this point, August 10th, 2007, what
11  portion of this project was funded through the --
12    A. None.
13    Q. -- budget act of 2006?
14    A. None.
15    What we were requesting through the scope
16  letter was to get it funded -- funded out of the
17  budget act of 2006 by substituting this project,
18  70-bed, for a project that had already been
19  approved.  And it would -- that would all be laid
20  out in the scope letter.
21    Q. Okay.
22    And why is she referring to this as the
23  first project?
24    A. I don't know.  She -- she was new to the
25  department at that time, my guess is, like she said,

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  even though it's not really an AB 900 project per
2  se, I think she mixed up the two. This was not an
3  AB 900 project, the checklist that she refers to
4  later on about AB 900 submittals was not applicable
5  to this project.
6      Q. But is it possible that subsequent phases of
7  this project would be funded through AB 900?
8      MR. McCLAIN:  Calls for speculation.
9      THE WITNESS:  It's possible.
10     BY MS. WHELAN:
11     Q. So this e-mail is about requesting a scope
12 change for this project for preliminary plans which
13 will be funded through the Budget Act of 2006; is
14 that correct?
15     A. It would have requested a scope change and
16 I'm not sure for what phase, I'd have to see the
17 letter. It could have been for all of design and
18 all of construction.
19     Q. Okay.
20        But as of August 10th, 2007, there's no
21 funding for this project and no planning at all; is
22 that correct?
23     A. That's correct.
24     Q. And you said that eventually you would
25 provide a staffing package. At what point in the

1  design process do you do that?
2       A. In the preliminary plans, when our
3  preliminary plans were done we, under 7000, we -- we
4  notified the legislature through a legislative
5  submittal, and included in that packet would have
6  been the plans, the drawings, cost estimate,
7  potential schedule, status of the EIR document, and
8  a proposed staffing plan.
9       Q. Okay.
10          And that gets submitted to a Department of
11 Finance?
12      A. It gets submitted from CDCR directly to
13 legislature, Department of Finance is copied. The
14 code allows the legislature 45 days upon which to
15 review and approve that submittal. No action is
16 deemed an approval. Then we move forward to the
17 state public works board and move on with the
18 project.
19      Q. Okay.
20         And do you have any idea what the current
21 status is of the 70-bed ASU project is?
22      A. No, I do not.
23      Q. You referred a couple minutes ago to the
24 changing Coleman bed plans and you referred to it I
25 think even at one point to morphing of projects

between plans. My question is whether given that these plans changed four times within one year, whether the court can be assured that the most recent plan is really the department's plan.

MR. McCLAIN: Objection, vague, lacks foundation, calls for speculation.

THE WITNESS: I don't know how to answer that question.

BY MS. WHELAN:

Q. I mean, there's an April -- there's an April 2006 plan, I represented to you earlier that there's a June 2006 plan, there's a December 2007 plan, and now there's an August -- I'm sorry, a December 2006 plan and now there's an August 2007 plan.

My question is: Why should the court at this point believe that this August 2007 plan will go forward, given that the previous plans have not?

MR. McCLAIN: Objection, vague, calls for speculation, lacks foundation, asked and answered.

THE WITNESS: In regards to the plans, the initial plan done in April of 2006 was the department's plan, submitted to the court. And it was objected to by a number of -- of folks, and it was revised. The court asked for revisions. And so the subsequent plan was in response to the court

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  order for revisions.
2      The December plan was primarily driven by the
3  department being required to go back and hire
4  Navigant and redo the -- the number -- the database
5  and the numbers, which -- which they did, and there
6  was a big objection, because the numbers changed,
7  changed significantly.
8      And the department just presented that data.
9  Through that deliberation, ultimately the December
10 2006 plan, my recollection, it was approved by the
11 court.
12     The outstanding issue for the last months, at
13 least when I was there, the outstanding issue had to
14 do with who was going to operate the new beds,
15 whether that was Department of Mental Health or
16 whether that was CDCR, because there was a proposal
17 to make a change, that I am aware of.
18     Now the only other issue that came up about --
19 it was the ad seg's -- the small management yards.
20 But the department has been pushing forward and
21 elements of the plans -- all the plans, elements of
22 some of those plans, have been moving forward, some
23 have been done.  And we continued to move forward in
24 support of that plan.  We believe that is the plan.
25 The department believes that is the plan.

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

```
 1        BY MS. WHELAN:
 2        Q. And -- but presumably the department
 3   believed that the prior plans were the plans as
 4   well, correct?
 5        A. Yes.
 6        MR. McCLAIN:  Objection, lacks foundation.
 7        THE WITNESS:  Yes.
 8        BY MS. WHELAN:
 9        Q. And presumably there are many things that
10   could potentially interfere with projects listed in
11   the most recent bed plan; is that correct?
12        A. Yes.
13        Q. For instance, you mentioned that the
14   Navigant projections have sometimes altered the
15   plans; is that correct?
16        A. Yes, they have.
17        Q. And the Navigant projections are updated on
18   a yearly basis; is that correct, at least --
19        A. That I don't know.  That I don't know.
20        I do know the department was required to
21   hire Navigant and -- for -- for that purpose of
22   updating the data, but I do not know how often.
23        Q. But it's been your experience that if
24   Navigant changes their projections, that also has an
25   effect on the bed plan; is that correct?
```

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  A. Yes, that's correct.
2  Q. And there are other things that effect the
3  bed plan, I assume; is that correct?
4  A. Yes.
5  Q. And can you name some of those things?
6  A. Yes.
7  Project approval and authority, the
8  environmental impact report are the primary --
9  primary barriers one has to overcome on any project,
10 not just on these, but on any project.
11 Q. And when you said before that an
12 environmental impact report can take 12 months, were
13 you referring to for any project?
14 A. For the -- for the larger CCCs. For some of
15 the smaller projects, they could be done six to nine
16 months, easy.
17 Q. Okay. But it's safe to say that for any
18 Coleman bed planning project, whether it's a smaller
19 project or ranging into the CCCs, that it would be
20 about a eight to 12 month process for the EIR; is
21 that correct?
22 A. I would say six to twelve month.
23 Q. Six to twelve?
24 A. Yes.
25 Q. And you also referred to a conflict between

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

1  whether or not the Department of Mental Health or
2  CDCR will run some of the projects outlined in the
3  Coleman bed plan; is that correct?
4      A. No.
5      My understanding is the department proposed
6  to run those programs and that the question of
7  whether that was wise or not was raised by
8  plaintiff's counsel.
9      Q. And are you aware that it was also raised by
10 the special master?
11     A. Yes.
12     Q. And do you know what the status of that
13 issue is or whether it's been resolved?
14     A. I have heard that the department will be
15 running the new facilities.
16     Q. And who told you that?
17     A. I believe I heard that from Doug McKeever,
18 as the issue was being resolved going forward.
19     And I also believe that was the
20 recommendation of the special master, now that I
21 remember -- kind of remember his recommendation to
22 the court. I thought it was not a necessarily
23 overwhelming recommendation, but nonetheless, the
24 recommendation.
25     Q. Now, do you have an understanding of how the

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

Page 124

1  CCCs will be funded?
2    A. No, I do not.
3    Q. And is that an issue that the Office of
4  Facilities Management was working out at the time
5  that you were working there?
6    A. No. The Office of Facilities Management
7  never -- never decided how things were going to be
8  funded.
9    Q. And do you know if there was a decision made
10 either within the department itself or within
11 Deborah Hysen's unit as to whether or not the CCCs
12 would be funded by AB 900?
13   A. No, I do not.
14      (Plaintiffs' Exhibit No. 10 was marked for
15 identification.)
16   MS. WHELAN: This is Exhibit 10. Exhibit 10 is
17 a Department of Corrections and Rehabilitation
18 capital outlay budget change proposal for the CMC
19 Consolidated Care Center.
20   THE WITNESS: Technically it's a fiscal impact
21 worksheet, it's what they call the FIW.
22   MS. WHELAN: Oh, I'm sorry, you mean the cover
23 page is. Okay, thank you.
24   THE WITNESS: Yeah.
25   BY MS. WHELAN:

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288

```
 1      Q. And then it goes on a couple pages in and
 2 there's a project cost summary, summary of costs by
 3 phase, funding data, and then we come to what is the
 4 COBCP, correct?
 5      A. Correct.
 6      Q. And on the very front page it anticipates
 7 that the start -- under the schedule section, that
 8 the start for preliminary plans will be August 1st,
 9 2007. Is that correct?
10      A. Yes, that's what's stated.
11      Q. Did preliminary plans start on this project
12 by August 1st, 2007?
13      A. No, it did not.
14      Q. Are you aware of preliminary plans starting
15 on this project since August 1st, 2007?
16      A. Not before I left.
17      Q. So as of October 2007, preliminary plans had
18 not started on this project; is that correct?
19      A. That's correct.
20      Q. Also stated here, as a project completion
21 date, is December 30th of 2012, do you see that?
22      A. Yes, I do.
23      Q. Now you testified earlier that you can't
24 really have it -- a definitive completion date until
25 you've done an environmental impact report; is that
```

GEORGE SIFUENTES

10b37d7b-165b-4502-a1a9-5f828d7aa288