# EXHIBIT 34

## Deposition of George Sifuentes
## December 15, 2007
## (Phase II Designations)

## Part J

that would have -- that because of AB 900 requires people in nontraditional beds, not necessarily moving into this bed, but resulting in less nontraditional beds statewide.

Q. So at the time that this schedule that you have in your hand was created, there was no intention of moving people in nontraditional beds into the new in-fill beds; is that correct?

A. There was not a requirement to move people out of the nontraditional beds as a first priority. AB 900 changed that. And the note at the bottom of this -- of the e-mail which numbered -- on Item 21 is -- is just a furtherance of what AB 900 wanted when they began talking about another element of AB 900, which was out of state beds.

Q. And so is there an AB 900 in-fill schedule that exists?

A. I'm not -- I am not aware of one.

Q. So as of October 2007 when you left the OFM, you had no knowledge of an AB 900 in-fill plan; is that correct?

A. I -- I understand that there was one developed, you'd have to ask Ms. Deborah Hysen what that plan is.

Q. Okay.

10b37d7b-165b-4502-a1a9-5f828d7aa288

And do you know when she developed that plan?

A. No.

Q. And so presumably you corrected her error or somebody did at some point in response to this June 7th e-mail, is that true?

A. I'm not sure what we did. I think we pointed out the -- why it was in error, and I believe -- I'm not sure anything else formal was written, other than, it's apples and oranges, they're not the same.

(Plaintiffs' Exhibit No. 22 was marked for identification.)

BY MS. WHELAN:

Q. 22 is a 6-12-2007 Office of Facilities Management document entitled action as taken related to in-fill bed program.

Does this document refer to the AB 900 in-fill bed plan?

A. This document refers to the in-fill bed plan submitted in January 2007 and then notes what is consistent or inconsistent with AB 900.

Q. So it's referring back to the January schedule we were just looking at. And the purpose of this memo is to apply AB 900 to that schedule; is

10b37d7b-165b-4502-a1a9-5f828d7aa288

see the very first bullet, it says site assessments, it said we did -- we did -- this is No. 2- -- I believe it's 22.

Q. I'm sorry, I think you're missing one page.

A. It says page 1.

MR. McCLAIN: This first page ends with Bates stamp 64.

THE WITNESS: And this was 21 which was the e-mail.

MS. WHELAN: I have no idea, I have a different document.

Maybe it's just out of order, I'm sorry. Give me one second.

THE WITNESS: No, that's okay.

BY MS. WHELAN:

Q. Okay, go on.

A. Okay.

We go to the first -- first page of Exhibit 22, if you read the first bullet, it says site -- it was kind of a status report, we've done site assessments. And if you look at the next bullet, it said the first ten sites of AB 900 are these institutions. They also happened to be where we finished the site assessments, because legislative staff knew that because we had told them.

10b37d7b-165b-4502-a1a9-5f828d7aa288

So when you look at AB 900, they said you can go ahead and build at those places because they knew we had done that.

So this document here is really a synopsis of a status report as of June of what we had done up to this point. I called it the in-fill bed plan, because it was still known to me as the in-fill bed plan. And what I tried to do in this document -- my staff and I tried to do is relate what actions we have taken up-to-date, and how they may relate to AB 900.

Q. Okay.

So let me ask you some questions about the document.

A. Sure.

Q. In bullet point four you said that final reports are available for six of the ten assessments, and that the remaining five reports should be finalized by midJuly.

Were they finalized by midJuly?

A. Yes, I believe so.

Q. Then it goes into CEQA environmental reviews, which is C-E-Q-A.

A. Yeah.

Q. And it refers to these environmental reviews

at six of the first ten prisons and it states that they'll begin in July of 2007.

Did they begin then?

A. Yes, some of them began. And then they've subsequently been stopped.

Q. And why were some of them stopped?

A. Because we were told that the plan was being revised.

Q. And who told you that?

A. Deborah Hysen.

Q. And how many of them have been stopped, of the six?

A. I believe four.

Q. Do you recall which ones they are?

A. No. But I -- I -- I can tell you which ones were still ongoing.

Q. Okay.

A. Salinas Valley and CMF.

And the reason for that is because they had mental projects in them.

Q. And do you know why Ms. Hysen stopped the other four projects?

A. Because she wanted an assessment of the in-fill -- she wanted to reassess the plan, and she was not sure at that time whether, when she was done

with her assessment, whether those projects as proposed were still viable projects.

Q. And what do you mean by viable?

A. Whether or not that's what the department still wanted to do.

Q. And so at the time that you left in October, four of them were halted and two were moving forward; is that correct?

A. That's my recollection.

Q. And do you know what has happened since you left in October?

A. No.

MR. McCLAIN: Objection, lacks foundation.

BY MS. WHELAN:

Q. On the next page, under meeting with local government, the third bullet point, you -- you -- the OFM states that in order to meet the schedule, meetings will need to be held with the following cities before the end of July 2007. And it lists six cities.

Did those meetings take place before the end of July?

A. The only meeting I am aware of that -- that -- that was held was with the city of Soledad.

Q. Do you recall when that was held?

A. There were a couple of meetings and they were to talk about their new wastewater treatment plant. And they would have been in May-June, that period of time.

Q. So to your knowledge, even at the point where you left the OFM in October of '07, no other meetings occurred with cities other than Soledad; is that correct?

A. I'm not aware of any other ones occurring.

Q. Would you have been involved in those meetings if they had occurred?

A. Prior to Deborah's appointment, yes. Not subsequent to.

Q. And at what point was she appointed?

A. She came over to the departments -- well, she was appointed as chief of the strike team -- it's in her declaration, I believe it's May of 2007, she came over to begin really operating over Facilities Management around midJune.

Q. But on the organization chart her -- I'm sorry, it's because the Office of Facilities Management turned into what is now called --

A. Facilities Planning Management Construction.

Q. Okay.

A. Something like that.

10b37d7b-165b-4502-a1a9-5f828d7aa288

Q. And then under the next heading which is Professional Services Consultants, the sixth bullet point talks about: "Scopes of work and fee negotiations will occur with the selected firms in July and August. And selected firms will receive notices to proceed upon final contract approval in October 2007."

Do you know if those deadlines were met?

A. They were not.

Q. Do you know if since -- as of the time you left the OFM in October of 2007, these goals have been met?

MR. McCLAIN: Objection, lacks foundation.

THE WITNESS: I'm not sure.

BY MS. WHELAN:

Q. On the next page bullet point No. 2 refers to an architectural firm already under contract to the CDCR.

A. What page are you on?

Q. Four.

A. Oh.

Q. And bullet point 2 refers to that firm completing a benchmark document into a site specific architectural program for the Kern valley State Prison commingled in-fill project; is that correct?

A. Yes, that's correct.

Q. Then the next bullet point says that the document would be prepared in time for use by the architectural engineering firm, and that the project was expected to commence under contract in October 2007; is that correct?

A. That's correct.

Q. And did that happen?

A. The document was prepared by the firm, but I do not know if the second half of the statement, whether the work was commenced and contracted in October 2007 actually occurred.

Q. And then under the Establishment of Project Scope and Cost, it states that: "Assembly bill 900 requires scope and cost of each project to be recognized by the Public Works Board."

And then bullet point two states: "CDCR is also requesting authority from the Public Works Board at its July meeting to seek interim financing from the pooled money investment board for these projects."

Did that occur?

MR. McCLAIN: Objection, lacks foundation.

THE WITNESS: Did what occur?

BY MS. WHELAN:

Q. Did the CDCR request authority from the Public Works Board at the July meeting for interim financing?

MR. McCLAIN: Same objection.

THE WITNESS: I don't recall.

BY MS. WHELAN:

Q. In the next page, the first bullet point?

A. What page is that?

MR. McCLAIN: We're on the last page over here.

MS. WHELAN: I'm sorry, I should have stapled this. I think we already did the last page, thank you.

THE WITNESS: Okay.

My document's four pages long.

BY MS. WHELAN:

Q. Let me go back to page 3 because I think I did not cover it.

The first bullet point refers to: "CDCR released Requests For Qualifications in May 2007 for construction management firms for services related to in-fill bed projects."

And then two bullet points down it says that: "Selected firms will receive notices to proceed upon final contract approval in November 2007."

10b37d7b-165b-4502-a1a9-5f828d7aa288

Do you know if that occurred?

MR. McCLAIN: Objection, lacks foundation.

THE WITNESS: The process to select firms was completed, the firms were selected. Some firms were provided scopes of services for CDCR construction projects, not -- not related to in-fill.

BY MS. WHELAN:

Q. So related to what?

A. Well, the -- the May -- the May 2007 RFQ was for in-fill and any other construction projects that the department may have. And because of the uncertainty of what in-fill was at that time, we continued to pursue construction management firms because we still had other construction projects that we needed to have managed. And so we continued with that process. And I know that we selected a couple of firms to do some jobs for us.

MS. WHELAN: Okay.

(Plaintiffs' Exhibit No. 23 was marked for identification.)

BY MS. WHELAN:

Q. Exhibit 23 is a September 10, 2007 e-mail from Chuck Stevens to various people, including George Sifuentes, and the attachment is entitled AB 900 in-fill bed plan implementation.

Have you seen this document before?

A. I don't recall.

Q. Do you recognize the projects listed on the document?

A. Yes.

Q. Are these projects AB 900 in-fill projects?

A. Yes.

Q. So at this point do you know why five projects are listed or I should say, only five projects are listed?

A. At that time those were the -- those were the discussion -- those were the projects of discussion for per the revised plan. You see the question marks by -- under the description?

Q. Uh-hmm.

A. People were still uncertain as to what the scope of the work was.

Q. Okay.

So as of September 10, 2007 it was still unclear where the AB 900 in-fill projects were going to occur; is that correct?

A. For this listing I think the sites were the sites chosen. I think the scope of the project on that site was still up and being discussed.

For example, Kern Valley was a site people

wanted to go to, the question mark was whether it was this configuration or some other configuration.

Q. So we already talked about Ms. Hysen's statement about the in-fill projects would be completed by 2009. And you explained that you didn't agree with that position.

Is that in part because of the uncertainty related to the in-fill bed projects as reflected in this schedule?

A. Well, what I stated was that I didn't think all 12,000 beds would be done by the end of 2009, because I believe that's what the declaration says.

And it's also because when I left there still hadn't been decisions about the entire AB 900 bed plan.

Q. And by that what do you mean?

A. Well, the AB 900 bed plan authorizes a large -- 12,000 beds, for example, in Phase I and another large number of beds for Phase II. And decisions hadn't been made where they were going, and there were deadlines and people were pushing to try to meet; don't know where you're going, don't know how you're going to get there.

Q. Okay. So as of October '07 when you left, it's safe to say there's still significant confusion

10b37d7b-165b-4502-a1a9-5f828d7aa288

about what the AB 900 bed plan would be, including in-fill beds but also including all of the beds in AB 900; is that correct?

MR. McCLAIN: Objection, vague and ambiguous, lacks foundation.

THE WITNESS: I would -- I would say it's uncertain.

MS. WHELAN: This is kind of a long document but I actually only have questions about the last page.

(Plaintiffs' Exhibit No. 24 was marked for identification.)

BY MS. WHELAN:

Q. Exhibit 24 is a September 11th, 2007 transmittal sheet from Kitchell to Chuck Stevens, the project director at the CDCR regarding the CDCR in-fill housing and program space project at Kern Valley State Prison; is that correct?

A. That's correct.

Q. Have you seen this document before?

A. Yes, my signature is on the routing page.

Q. Thank you for pointing that out.

So you signed the document on 9-13-07; is that right?

A. That's correct.

10b37d7b-165b-4502-a1a9-5f828d7aa288