# EXHIBIT 36

## Deposition of Robert Storms
## August 19, 2008
## (Phase II Designations)

## Part A

## Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

        Plaintiffs,

                Case No. Civ S 90-0520 LKK-JFM P

vs.

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

_____/

MARCIANO PLATA, et al.,

                Case No. C01-1351 TEH

        Plaintiffs,

                CONFIDENTIAL PORTION

vs.

                Pages 195 through 199

ARNOLD SCHWARZENEGGER, et al.,

        Defendants.

_____/

DEPOSITION OF ROBERT STORMS

DATE:            August 19, 2008

TIME:            9:35 a.m.

LOCATION:     ROSEN, BIEN & GALVAN, LLP
               315 Montgomery Street, Tenth Floor
               San Francisco, California  94104

REPORTED BY:  Katy Leonard
               Certified Shorthand Reporter
               License Number 11599

## Golden Gate Reporting

Page 12

```
 1                    ROBERT STORMS,

 2   called as a witness by the Plaintiffs, who, having

 3   been duly sworn by me, was examined and testified as

 4   hereinafter set forth.

 5                      ---oOo---

 6

 7

 8        EXAMINATION BY COUNSEL FOR THE PLAINTIFFS

 9

10   BY MR. GALVAN:

11        Q.   Good morning, Mr. Storms.

12        A.   Good morning.

13        Q.   I'm Ernie Galvan representing the Coleman and

14   Plata plaintiff class today.

15             And for the record, could you state your name

16   and spell your last name?

17        A.   Yes.

18             Robert Storms.  S-t-o-r-m-s.

19        Q.   Okay.

20             And could you tell us what your current title

21   is?

22        A.   Staff Services Manager II.

23        Q.   And you're employed by the?

24        A.   California Department of Corrections and

25   Rehabilitation.
```

Golden Gate Reporting

Page 14

1          A.    Thank you.

2          Q.    If you need a break for any purpose, do let us

3     know.

4                And, you know, I'll be going through topics,

5     and it's always hard to answer questions on the spot.

6     So, if after time goes by you think of something that

7     would clarify an answer, then you're perfectly free to

8     interrupt and say you want to go back and clarify

9     something.

10               I'd like to just go over your background and

11    the jobs you've had at CDCR.

12               Can you tell me what job you started in in

13    Corrections?

14          A.    Sure.

15               I actually started in July of 1992.  I started

16    as an Office Assistant in the Medical Records Unit at

17    California Medical Facility, CMF.

18               And from there I transferred to Folsom State

19    Prison as an Office Assistant as well and worked in the

20    Central Records -- Central File Records, and promoted to

21    an Office Services Supervisor, and then to a Correction

22    Case Records Analyst.  And I also served as a

23    Correctional Case Records Supervisor for the community

24    correctional facilities.

25               And from there, in 2003, I went to Division of

Golden Gate Reporting

1    Correctional Health Care Services and worked as an

2    Associate Governmental Program Analyst for only just a

3    few months -- about three months, and then promoted to a

4    Staff Services Manager I in the Division of Adult Parole

5    Operations.  That was in 2005.

6              And I've been with the Division of Adult

7    Parole Operations since late May of 2005.  Promoted

8    again in there as a Staff Services Manager II, August of

9    2007.

10         Q.   And what are your duties there now in Adult

11   Parole Operations?

12         A.   My duties are, I supervise staff.  And what my

13   staff and I do is we manage contracts for transitional

14   case management programs, medications for parolees --

15   for mentally ill parolees.  A couple of transitional

16   case management programs, both for mentally ill and for

17   the HIV AIDS population.  Do medical placement in the

18   inmates requiring continued care when they go to the

19   community.

20              I have staff that we look for that continued

21   care in the community, as well as kind of a liaison when

22   there's inmates paroling with mental health crisis,

23   needing continued care.  So, both medically and

24   mentally.

25              Work with the communities, counties, and

Golden Gate Reporting

1    working with them to try to come up with processes to

2    transition their parolee residents from incarceration

3    back to the community.

4          Q.   You say you "manage contracts."

5               What are the entities on the other side of the

6    contracts from CDCR -- who are the contracts with?

7          A.   So, who are our contractors?

8          Q.   Yes.

9          A.   We have -- right now I have about 15 contracts

10   that I manage, and some of them are public entities such

11   as county agencies, such as Kern County Public Health,

12   San Joaquin County.  I believe we have another county

13   involved.  I can't name them right now.

14              I can't think of them off the top of my head,

15   but we also work with -- out of the University of

16   California San Diego is one of our contractors.  We have

17   several nonprofits that are contractors for the TCMP-HIV

18   program.

19              TCMP is the Transitional Case Management

20   Program which I refer to as "TCMP."  So, several

21   nonprofits for the TCMP-HIV program.

22          Q.   What services do you contract for with Kern

23   County Public Health?

24          A.   Kern County Public Health currently has three

25   contracts that I deal with, and I know they have

Golden Gate Reporting

Page 17

1    another, but it's not directly in my area.  So, one is

2    the TCMP for mentally ill.  The other is the TCMP for

3    the HIV AIDS population, and more recently is our

4    preparole benefits contract.

5         Q.   Okay.

6              And what do you contract with San Joaquin for?

7         A.   TCMP-HIV.

8         Q.   And with UC San Diego, what do you contract

9    for?

10        A.   With UC San Diego the contracts I'm involved

11   in are the -- both the TCMP-HIV and TCMP-MI for mentally

12   ill.

13        Q.   And in the contracting for the TCMP-MI, are

14   those divided up by region or do the contractors divide

15   up the state somehow?

16             How does that work?

17        A.   It's divided by prisons.

18        Q.   Okay.

19             And are all 33 prisons covered?

20        A.   Yes.

21        Q.   Are the community correctional facilities

22   covered?

23        A.   No.  Not in that contract.

24        Q.   Are they covered in another contract?

25        A.   I'm not aware of that.

Golden Gate Reporting

Page 18

1       Q.   Are the DMH hospitals -- are the Department of

2   Mental Health hospitals covered?

3       A.   Our contractors are not contracted to go into

4   the DMH facilities.

5       Q.   Does someone else go into the DMH facilities?

6           MR. ANTONEN:   Objection.   Calls for

7   speculation.   He's an employee of CDCR.   Not DMH.

8           MR. GALVAN:   Okay.

9   BY MR. GALVAN:

10      Q.   Do you know if someone else goes into the DMH

11  facilities to do the transitional case management

12  interviews?

13      A.   I have no firm answer for that.   I'm not sure.

14      Q.   Moving to the -- on my outline there, the size

15  of the problem of placing parolees with mental illness,

16  have you been involved in efforts to estimate what

17  portion of the parolee population requires various

18  levels of mental health services in the community?

19      A.   I'm not sure that we've done anything like

20  that.

21      Q.   Okay.

22          Do you have -- do you know what portion of the

23  parolee population would require inpatient treatment --

24  inpatient mental health treatment?

25      A.   No, I don't.

## Golden Gate Reporting

```
 1          A.   We got funding for the contractual services,
 2     and the funding request was based on what we believed 50
 3     social workers would cost us, contractually services, so
 4     we did get the funding we requested.
 5               Whether or not that will actually pay for
 6     that, we're not a hundred percent sure yet, because
 7     costs -- salaries have increased substantially for
 8     clinical staff throughout the state as a result of the
 9     culminaries [sic].
10          Q.   Okay.
11               What's the purpose of having those social
12     workers do preparole benefits?
13          A.   To the -- the objective is to have a disabled
14     inmate qualified and approved for a benefit entitlement
15     prior to release to parole or release back to the
16     community, whether it's on parole or not.
17          Q.   Why would you do that?
18          A.   To better their chances on having a successful
19     parole period or a successful transition back to the
20     community.
21          Q.   How do you define a "successful parole
22     period"?
23          A.   To have their needs met and not commit crime.
24          Q.   Okay.
25               Right under that is a line, "TCMP-MI, 11
```

Page 25

1  to salary increases that they've incurred, some of those

2  positions are no longer remaining filled.

3        Q.   How many do you estimate that you have now?

4        A.   It is an estimate, but over -- around 50 or

5  so.

6        Q.   Okay.

7        A.   Maybe just over.

8        Q.   And what's the purpose of the job that they

9  do?

10            What's the purpose of TCMP-MI?

11       A.   The purpose of TCMP-MI is to provide

12  information about a mentally ill inmate's diagnosis,

13  medications, needs, history, to our Parole Outpatient

14  Clinic staff in the parole regions to inform and prepare

15  those staff for intake and evaluation and treatment of

16  that inmate once they parole.

17            Second to that, their mission is to advocate

18  to the inmate the importance of going to the Parole

19  Outpatient Clinic employments.

20            (To the Reporter) Outpatient.  One word.

21            And probably if I could refer to it as "POC"

22  from this point, if you don't mind.

23       Q.   And why is that important?

24       A.   Well, that's important for a couple of reasons

25  at least, one being that they are mentally ill and

Page 26

1    resource availability to them in the community is

2    scarce, and they often are not provided any type of

3    treatment or benefits due to the fact that they're on

4    parole.  So, they require some treatment to help the

5    continuation of what they're receiving in the prisons.

6    Secondly would be to reduce crime and to reduce

7    recidivism due to crime.

8         Q.   How does it reduce crime?

9              MR. ANTONEN:  Objection.  Calls for

10   speculation to the extent -- can you phrase it better?

11             MR. GALVAN:  Sure.

12   BY MR. GALVAN:

13        Q.   How do you intend for it to reduce crime?

14             MR. ANTONEN:  I'm going to pose another

15   objection.  It's not necessarily his program.  So...

16   BY MR. GALVAN:

17        Q.   Is it your program?

18        A.   It's not my program.  I don't supervise the

19   staff.

20        Q.   Mm-hm.

21        A.   I support -- support.

22        Q.   Okay.

23             I'll move on from there to two lines down on

24   the E-mail.  There's a line that says, "Medical

25   placement and continuity of care coordination."  And

Golden Gate Reporting

1        A.   We held that contract, and that was in my

2   unit, yes.

3          Q.   Okay.

4              And having taken a few minutes to look at the

5   2001 Bureau of State Audits report on the state of the

6   transitional case management program now and being

7   involved in the ongoing evaluation of it, are you aware

8   of any facts to show that it's improved since the Bureau

9   of State Audits did its review?

10             MR. ANTONEN:   Objection.   The Bureau of State

11   Audits report is from 2001 and this is 2008.   So, I

12   think that the question is misleading, as it goes to the

13   program now.   And so...

14   BY MR. GALVAN:

15         Q.   Is the program now better than it was in 2001?

16         A.   In my opinion, it is.

17         Q.   Why?

18         A.   Yes.

19             Because at the time, and since the Bureau of

20   State Audits report of 2001, we have fully implemented

21   our TCMP-MI program, we have our database for shared

22   information between our TCMP review in prison to our

23   Parole Outpatient Clinic, as well as information sharing

24   from our Parole Outpatient Clinic database to the

25   institutions upon return of the mentally ill parolee to

Golden Gate Reporting

Page 42

1    identify what's been going on with them in POC.

2         And since then, also, our Department of Parole

3    division, outside of my scope of work, have contracted

4    for services for sex offenders to help reduce the need

5    for sex offenders that are not mentally ill to go to POC

6    for case management.

7         And --

8    Q.   Is that -- sorry to interrupt you.

9         Is that last part important because the

10   caseload of nonmentally ill sex offenders was burdensome

11   to the POC?

12        MR. ANTONEN:  Objection.

13        To the extent you know, but it seems we're

14   getting a little far afield.

15        THE WITNESS:  It appeared to be a finding in

16   the report from the Bureau of State Audits, as well

17   as -- yeah, we do have high ratios of mentally ill

18   parolees to our clinicians.

19   BY MR. GALVAN:

20   Q.   So, by removing the sex offender -- some of

21   the sex offender load from POCs, did you increase the

22   capacity of POCs to serve mentally ill parolees?

23        MR. ANTONEN:  Objection.  I believe the

24   testimony was the contract for sex offenders was in a

25   different unit not handled by Mr. Storm's unit.

Page 43

1   BY MR. GALVAN:
2        Q.  Was one of the purposes of getting that
3   contract to relieve the -- to create more capacity in
4   the POCs to serve mentally ill parolees?
5             MR. ANTONEN:  Again, objection to foundation,
6   as it's not inside Mr. Storm's purview in prerelease
7   planning.
8   BY MR. GALVAN:
9        Q.  Can you answer the question?
10            MR. ANTONEN:  To the extent you know, Robert.
11            THE WITNESS:  All I can do is make an
12  assumption that the contracted services for sex
13  offenders was not primarily to reduce the case load for
14  Parole Outpatient Clinic staff, but rather to provide
15  necessary treatment in case management for the sex
16  offender population.
17            MR. GALVAN:  Okay.
18  BY MR. GALVAN:
19       Q.  You were reviewing the ways in which the
20  TCMP-MI program has improved since 2001, and I
21  interrupted you.
22            Were there any other improvements that were
23  part of your answer that you were -- in other words, in
24  addition to the things you said about how the TCMP-MI
25  program has improved from 2001 to now, was there

Page 44

1    anything else?

2        A.   Well, I think the overall process has improved

3    for transitioning mentally ill inmates to parole, not

4    specifically just because of the TMC portion of it, but

5    also in the Parole Outpatient Clinic end, because we

6    have increased staffing for the purpose of increasing

7    the appointments upon release from prison.

8            We have a higher frequency, based on research,

9    that the more POC contact, the better.

10           Also, there's a requirement for the

11   institutions to release these individuals with a 30-day

12   provision of their necessary medication.  So, that helps

13   as well.

14           Also, we have a pharmacy manager now.  So, we

15   have a larger network of pharmacies and a easier way to

16   pay them for those parolees that can't afford their own

17   medications.

18           MR. GALVAN:  I'm done with Exhibit 4.  Thank

19   you.

20           And I'd like to mark as Exhibit 5 -- here is

21   Exhibit 5.

22           (Whereupon Plaintiffs' Exhibit 5

23            was marked for identification.)

24   BY MR. GALVAN:

25       Q.   Exhibit 5, for the record, is -- I'll

Page 45

1    represent is a copy of the "Third Annual Report on the

2    Mental Health Services Continuum Program" by UCLA.

3              Mr. Storms, are you familiar with this

4    document?

5         A.   Yes, I am.

6         Q.   Does this appear to be a correct copy of the

7    Third Annual Report?

8         A.   Yes, it appears so.

9         Q.   Okay.

10             If I could turn your attention to page 20 of

11   Exhibit 5.

12             Are you familiar with the bar chart on page 20

13   that's titled, "POC Visits"?

14             And if you want to take a few minutes to look

15   at --

16        A.   Yeah.  I am familiar with this chart.

17        Q.   Okay.

18        A.   Yes.

19        Q.   Did -- could you explain what is the

20   significance of this chart?

21        A.   This chart shows that for those parolees

22   specified in this study that had -- it measures their

23   contact with our Parole Outpatient Clinic and their

24   return rate over a 12-month -- looks like a two-year

25   period -- year-and-a-half period.  And the significance

# Golden Gate Reporting

Page 46

1  of this is that those that had more contact with our

2  clinicians in the community returned to custody at a

3  lower rate. Therefore, their lengths on parole, if they

4  did return, appeared to be longer out in the community

5  than those that did not have the contact or had lesser

6  contact.

7      Q. And a note there above the chart, it says,

8  "This is for the period from July 1, 2001 to December

9  31st, 2003."

10      Have you taken any steps since 2003 to act in

11  response to this research to the findings in this chart,

12  Figure 9, on page 20?

13      A. Yes.

14      Q. What have you done?

15      A. In 2006, I prepared a proposal to increase

16  Parole Outpatient Clinic contact by increasing the

17  frequency of contact within a specified duration upon

18  release from prison. And that approval was -- that

19  proposal was approved and implemented.

20      Q. When was that implemented?

21      A. That was implemented beginning in -- we began

22  hiring additional staffing towards the end of 2006, and

23  in February of 2007, we began increasing the increased

24  frequency of contacts for EOP inmates upon release in

25  February. And then in April, we followed by increasing

Page 47

1    the contact of triple C-MS inmates upon release.

2              MR. GALVAN:  Let's see.  I'm done with

3    Exhibit 5.

4              I would like to mark an Exhibit 6.

5              (Whereupon Plaintiffs' Exhibit 6

6               was marked for identification.)

7    BY MR. GALVAN:

8         Q.  Mr. Storms, for the record, I'll represent

9    Exhibit 6 is titled, "Memorandum, Policy No. 07-07,

10   February" -- "Dated February 2nd, 2007."

11             Are you familiar with this document?

12        A.  Yes, I am.

13        Q.  And I'll note that on the back, you're the

14   person to -- "If you have any questions, please contact

15   Robert Storms," which I think is an expanded version of

16   which I'm doing here today.

17             Does this describe the implementation of the

18   procedure that you were just testifying about regarding

19   increasing POC contacts?

20        A.  Yes, it does.

21        Q.  Okay.

22             Taking a look at this document and the first

23   page of Exhibit 5 -- Exhibit 6 -- I'm sorry -- four

24   paragraphs in where it says:

25             "Effective February 5th, 2007, when an

**Golden Gate Reporting**

Page 48

1                inmate is released with an enhanced outpatient

2                program designation, he or she shall be seen

3                by a POC clinician within three working days

4                of release.  And then the designees will be

5                scheduled for at least eight consecutive

6                weekly POC appointments."

7            Was that an increase in the status quo from

8    before February 1 -- February 5th, 2007 -- that

9    frequency of visits for the EOP people?

10       A.  As a policy and standard, yes.

11       Q.  And what was the purpose of undertaking that

12   increase?

13       A.  To reduce crime and recidivism.

14       Q.  And then the second paragraph talks about:

15                "Effective April 2nd, 2007, a change for

16                the CCCMS population to schedule them for at

17                least four consecutive weekly POC appointments

18                within the first 30 days of the first

19                appointment."

20            Was that also an increase from the status quo?

21       A.  For the purpose of standardization and policy,

22   yes.

23       Q.  Okay.

24            And what was the purpose of that increase?

25       A.  As well as to reduce crime and recidivism

1    among that population.

2         Q.   Okay.

3              There's another -- the next paragraph -- oh,

4    I'm sorry.  Actually, the same paragraph, the last

5    sentence of the sixth paragraph on -- sorry -- fifth

6    paragraph on the first page of Exhibit 6, the last

7    sentence says:

8                   "If it is determined that a triple-C-MS-

9                   designated parolee requires an EOP level of

10                  care" -- and there's an acronym here -- "IDTT

11                  will initiate the higher level of treatment."

12             And that acronym is defined in the paragraph

13   above -- Interdisciplinary Treatment Team.

14             Was the use of an IDTT a change in practice as

15   of the time this policy was initiated?

16        A.   No.

17        Q.   So, the parole had already used those IDTTs?

18        A.   Yes.

19             The IDTTs are already in -- were already in

20   existence for EOP level of care.

21        Q.   And did that sentence I read about -- "If it

22   is determined that a triple-C-MS-designated parolee

23   requires an EOP level of care, the IDTT will initiate a

24   higher level" -- was that a change in policy?

25        A.   I'm not sure.

## Golden Gate Reporting

Page 52

1        "The current evaluation has focused on the

2        impact of the MHCP, Mental Health Service

3        Continuum Program, on those inmates who

4        were" -- another acronym -- "OIS listed, but

5        these offenders only account for 56.8 percent

6        of eligible releases overall."

7        Can you explain what problem that sentence is

8    identifying with the Mental Health Services Continuum

9    Program?

10        MR. ANTONEN:  Objection.  The witness has

11   testified he was not involved in the preparation of the

12   report.  Calls for speculation.

13        MR. GALVAN:  If you know.

14        MR. ANTONEN:  To the extent you know.

15        THE WITNESS:  It's my belief that this is --

16   the particular sentence that you read is referencing the

17   identification of mentally ill inmates within 90 days to

18   parole -- or, release from prison to parole, which is

19   based on automated identification.

20   BY MR. GALVAN:

21        Q.  Now, are you involved with -- are you doing

22   any work to respond to the problem identified in that

23   sentence?

24        MR. ANTONEN:  Objection.

25        Did we identify the problem actually?

Page 53

1    BY MR. GALVAN:

2         Q.   Would it be fair to say that the problem

3    identified in that sentence is not enough persons about

4    to be released on parole are being identified for the

5    Mental Health Services Continuum Program?

6              MR. ANTONEN:   Again, objection for

7    speculation.

8              To the extent you know what the problem is

9    referenced in the report.

10             THE WITNESS:   I believe that we're

11   consistently striving to improve upon identification of

12   those that are participating in the prison's mental

13   health services delivery system prior to their release

14   through several approaches.

15             One was, we are -- have increased the dates

16   for which -- parole dates for which we identify them

17   from 120 days to now 210 days.

18             We have ongoing collaboration with our

19   Division of Correctional Health Care Services mental

20   health staff, and contact by our contractors with the

21   mental health staff in the particular prisons that they

22   are assigned to.

23             And our information services branch is aware

24   that not all are identified.   There are several, just

25   for reasons that that happens that I can't necessarily

Page 54

1    explain what those are, but logistically, improvements,

2    I believe, are being made.  And I think that our

3    preparole benefits program is going to help us identify

4    those even more.

5    BY MR. GALVAN:

6         Q.   Turning to the third paragraph under

7    "Conclusion" on page 31 of Exhibit 7, the last sentence

8    is:

9              "In turn, parolees who attended a POC

10             following release from prison showed a 34

11             percent reduction in the odds of being

12             returned to prison within 12 months relative

13             to parolees who did not attend a POC."

14         Have you done anything in response to that

15    finding of this study?

16         A.   Yes.

17         Q.   What have you done?

18         A.   Number one, we implemented the increased

19    contact.  We provide training to our contractors to

20    remind them to advocate to the inmate to attend Parole

21    Outpatient Clinics.

22             We have a data source for our parole agents to

23    go to to verify their mentally ill case load parolees'

24    attendance and future appointments with POC.

25             We encourage, consistently, our Parole

Page 55

1   Outpatient Clinic staff and our parole agents to

2   communicate and work out logistical barriers such as

3   transportation and such to the best that they can.

4           MR. GALVAN:  I'm done with Exhibit 7.

5           I would like to mark an Exhibit 8.

6           (Whereupon Plaintiffs' Exhibit 8

7            was marked for identification.)

8           MR. GALVAN:  And Exhibit 8, I'll represent for

9   the record, and then I'll ask Mr. Storms to take a few

10  minutes to look at it.

11          These are taken from the pleadings in the

12  Coleman case, 90-520, and it's from Docket No. 2240 in

13  the Coleman case.

14          And there are two Budget Change Proposal

15  documents here.  The first one is at -- there are Bates

16  numbers on here that start CSP 9 to CSP 16 within

17  Exhibit 8.  And I'll ask Mr. Storms to just look at

18  those numbers and tell me if he's familiar with --

19  BY MR. GALVAN:

20      Q.  Tell me, please, if you're familiar with the

21  document.

22          MR. ANTONEN:  Did you --

23          MR. GALVAN:  We can start with 9 through 16.

24  Because within Exhibit 8 there are actually two

25  separate --

```
 1              MR. ANTONEN:   Could you repeat the question?
 2    BY MR. GALVAN:
 3         Q.   Are you familiar with this document that's at
 4    Bates No. 9 through 16?
 5         A.   I am familiar with the documents.   Um, I was
 6    an author on them.   However, I'm not sure that 15 and 16
 7    go -- are attachments with 9 through 13.
 8         Q.   Well, let's look at 9 through 13, then.
 9              Did you say 9 through 13 or 9 through 14?
10         A.   9 through 14.
11         Q.   Are you the author of what's at Bates Nos. 9
12    through 14?
13         A.   Yes.
14         Q.   And can you describe for the record what this
15    document is?
16         A.   This is a Budget Change Proposal, which is the
17    process that we utilize at the State Department when we
18    want to request funding -- for this purpose, request
19    funding to implement a program or a program change.
20         Q.   And what program were you requesting funding
21    for in this proposal at 9 through 13?
22         A.   To increase the frequency of POC contacts for
23    EOP triple C inmates for a specified duration upon their
24    release.
25         Q.   Okay.
```

Page 57

1          And when -- looking at the page that's Bates

2   numbered 9, is the first page, with an Exhibit 8 --

3   under "Background History," you wrote the sentence --

4   well, I'll ask you, did you write the sentence:

5              "Each year over 6,000 parolees suffering

6              from serious mental illness are returning to

7              prison for periods ranging for a few months up

8              to one full year or longer, if they receive a

9              new term.  This is primarily due to technical

10             violations or other criminal behavior that can

11             result from their mental illness"?

12          Did you write those two sentences?

13      A.  Yes.

14      Q.  And is that the problem that you were trying

15   to solve with this Budget Change Proposal?

16          MR. ANTONEN:  I would say objection, vague,

17   but...

18          MR. GALVAN:  Okay.

19          THE WITNESS:  I'm not sure which problem.

20   BY MR. GALVAN:

21      Q.  The problem of "6,000 parolees suffering from

22   serious mental illness are returned to prison for

23   periods ranging" -- et cetera -- "due to technical

24   violations."

25      A.  I was trying to reduce recidivism and crime

**Golden Gate Reporting**

Page 58

1    among this population.

2        Q.   Okay.

3            Was this Budget Change Proposal approved?

4        A.   The -- it was approved through the

5    reducing-recidivism strategy that our department

6    presented a plan to the legislature.

7        Q.   And the first sentence here, it recites that

8    you were requesting $4.94 million?

9        A.   Yes.

10       Q.   Did the Department receive that money for

11   this -- for the purpose described here?

12       A.   We -- the funding to implement this was for

13   positions and such -- yes, we did.

14       Q.   Okay.

15           So, looking at the positions at page 11, just

16   going through this -- through -- it recites here, "Staff

17   psychiatrist, 37 current positions.  Proposed staffing,

18   41 positions."

19           Is it correct to infer from that you were

20   looking for four more staff psychiatrists?

21       A.   Yes.

22       Q.   Okay.  It says it right under there.

23           So, is it true, then, that you received the

24   funding to add those positions?

25       A.   We have those positions, yes.

## Golden Gate Reporting

Page 59

1     Q.  Okay.

2         And do you know -- were you able -- was the

3  Department able to increase the level of POC contacts as

4  a result of this being approved?

5     A.  We put out the policy, and we have been

6  increasing the frequency.

7     Q.  Turning to another part of Exhibit 8, which is

8  the part at Bates No. -- it starts at Bates No. 18, and

9  it goes 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29,

10  30 -- it goes all the way to 33.

11        Are you the author of this Budget Change

12  Proposal?

13     A.  I was involved in the development of it.  I

14  wasn't necessarily the author, no.

15     Q.  Okay.

16        Can you describe what this Budget Change

17  Proposal is?

18     A.  Um, it's definitely in its draft stages.  It

19  was not a formal Budget Change Proposal that was

20  submitted to the Department of Finance.

21     Q.  Was it ever completed?

22     A.  No.

23     Q.  Okay.

24        MR. GALVAN:  Okay.  I'm done with Exhibit 8.

25        I'd like to mark an Exhibit 9.

Page 60

1            (Whereupon Plaintiffs' Exhibit 9

2             was marked for identification.)

3   BY MR. GALVAN:

4        Q.   For the record, I've marked as Exhibit 9 a

5   document with a Bates No. PRIV_021257 through -21260,

6   with a title on the first page, "California Department

7   of Corrections and Rehabilitation, Fiscal Year

8   2007-2008, Budget Concept Statement," with a date of May

9   2nd, 2007.

10          Mr. Storms, are you familiar with this

11  document?

12       A.   Yes, I am.

13       Q.   Are you the author of this document?

14       A.   Yes, I am.

15       Q.   Does this appear to be a correct copy of

16  your -- the document you authored?

17       A.   Yes.

18          Can I take a moment to familiarize myself with

19  it?

20       Q.   Yes, please.

21       A.   (Witness reviews the document.)

22          Yes.   I'm familiar.

23       Q.   Thank you.

24       A.   Appears to be a correct copy.

25       Q.   What is this document?

**Golden Gate Reporting**

Page 61

1      A.  This is a Budget Concept Statement which is

2  typically an internal document that state departments

3  use, that our department uses to put a proposal together

4  in a concept, and if approved to move forward, would

5  then be developed into a Budget Change Proposal.

6      Q.  Was this one approved?

7      A.  Not -- no.  Not to my knowledge.

8      Q.  And what was your purpose in writing this

9  Concept Statement?

10      A.  The purpose in writing this was, as we spoke

11  about earlier, I did estimates on what I believed it

12  would -- the population needs were for the -- if they

13  were to build a 6,000-bed medical facility and another

14  6,000 beds of reentry; and if we were to provide

15  transitional services, contracted services in those

16  facilities, and that was approved, this is the staffing

17  that we needed to support those additional contract

18  services and medical placement efforts.

19      Q.  And do you know if any substitute for the

20  staffing you were seeking has been approved?

21      A.  No, I don't.

22      Q.  Did the Department go forward with the

23  6,000-bed facility you were planning for?

24      A.  I -- I'm not aware.  It's part of the AB 900

25  objective, and I'm not really sure where they're going

Page 65

1            MR. GALVAN:   Okay.

2    BY MR. GALVAN:

3         Q.   You're aware of two approvals for SSI?

4         A.   Yes.

5         Q.   Is there a -- do you have a schedule to

6    implement that one program in any other prisons?

7         A.   Our current contractor is going to service 14

8    prisons, and we will be bringing -- our goal is to start

9    servicing eight to nine more at the beginning of

10   September.

11        Q.   Is that the beginning of September, 2008?

12        A.   Yes.

13        Q.   Okay.

14             And then do you have any other benchmarks

15   after that?

16        A.   The next two benchmarks are the continuing

17   effort to get the second contract on for the

18   remaining -- I'm sorry.  The first contract is 19

19   prisons.

20             Our benchmark is to get the second contractor

21   up for the remaining 14 adult prisons, as well as get

22   the remaining nine or ten prisons up for our first

23   contract with Kern County.

24             Timing, we are looking at now the beginning of

25   2009 with the second contract, is our hopes, if we stay

Page 66

1  on task.  And the nine to ten prisons with the Kern

2  County contract, I'm hopeful that those would be up

3  before the end of 2008.

4      Q.  Have you identified the second contractor?

5      A.  We believe we have    There's a couple that are

6  still working with us, but we believe we've narrowed it

7  down to one, if it works out.

8      Q.  Okay.

9          MR. GALVAN:  I believe I'm up to Exhibit?

10         THE REPORTER:  10.

11         MR. GALVAN:  I'd like to mark Exhibit 10.

12         (Whereupon Plaintiffs' Exhibit 10

13          was marked for identification.)

14         MR. GALVAN:  For the record, what I've marked

15  as Exhibit 10 is entitled, "Standard Agreement

16  Amendment."  And it has -- it says, "Kern County

17  Agreement No. 899-2007" at the top.

18  BY MR. GALVAN:

19      Q.  Mr. Storms, are you familiar with Exhibit

20  No. 10?

21      A.  Yes, I am.

22      Q.  Could you tell us what Exhibit 10 is?

23      A.  Exhibit 10 is a contract between the

24  California Department of Corrections and Rehabilitation

25  and Kern County Public Health.

Golden Gate Reporting

Page 67

1          Q.   Does this appear to be a correct copy of the

2     contract?

3          A.   Appears to be, yes.

4          Q.   Okay.

5               And would you summarize for us, what are the

6     services that Kern will provide under this contract?

7          A.   Yes.

8               This contract addresses two services, two

9     programs:  One being the TCMP for the mentally ill; the

10    second being the preparole benefits service.

11         Q.   And do you have an estimate of how many

12    prisoners this contractor will serve -- will serve per

13    any period of time -- per year, per month?

14         A.   I really don't, because the workload and the

15    time involved on the cases -- that information is still

16    being gathered as it implements.

17         Q.   Okay.

18              And is it correct to say that this is -- this

19    contract is the one that you were referring to in your

20    earlier testimony regarding the actual assistance with

21    the Social Security veterans and State benefits planning

22    for the prisoners --

23         A.   Yes.

24         Q.   -- about to be released?

25         A.   Yes.

## Golden Gate Reporting

Page 68

1     Q.   Okay.

2          MR. GALVAN:   I'm done with Exhibit 10.   Thank

3     you.

4          I'd like to mark an Exhibit 11.

5          (Whereupon Plaintiffs' Exhibit 11

6          was marked for identification.)

7          MR. GALVAN:   And for the record, as Exhibit 11

8     I marked a document with a Bates number CDCR 030463

9     thorough -468, which has a heading, "Agreement Between

10    the California Department of Corrections and

11    Rehabilitation and the Social Security Administration."

12    BY MR. GALVAN:

13         Q.   Mr. Storms, are you familiar with this

14    document?

15         A.   Yes, I am.

16         Q.   What's this document?

17         A.   This is the formal agreement between

18    California Department of Corrections and Rehabilitation

19    and Social Security Administration on a prerelease

20    process so that we can apply for Social Security

21    benefits on behalf of a -- of an inmate approaching

22    parole, and they on their end will process the

23    application and -- with the goal of giving us a

24    determination of eligibility prior to parole.

25         Q.   Why is that important?

1          A.   Well, because it factors in to a couple

2     things.   Number one, the nexus to this preparole

3     benefits program and my involvement in getting this

4     going was, it can sometimes help us if an inmate has a

5     resource tied to them when they're paroling and they

6     have a need for medical care and mental health

7     continuity in the community, specifically medical that

8     we can't provide for parolees, we have no authority --

9     and mental health care that is above our ability in the

10    Parole Outpatient Clinic.

11          So, supplemental security income comes with a

12    companion of state MediCal, Medicare.   MediCal in our

13    state, I believe.

14          And then that in itself can sometimes help our

15    efforts.   It's not the solve-all, but it sometimes helps

16    our efforts in securing some continuity for them prior

17    to their release.

18          But also, supplemental security income itself

19    provides for some financial benefit to the parolee that

20    can help them have success in the community.

21          Q.   How do you define "success"?

22          A.   Independent living, not relying -- being

23    homeless -- if they can get shelter.

24          I can't define success completely myself, but

25    I would think that it gives them some positive

Page 70

```
 1    self-image that they have an income.
 2            Q.   Does this appear to be a correct copy of your
 3    SSA contract?
 4            A.   It does appear so, yes.
 5            MR. GALVAN:   Okay
 6            I'm done with Exhibit 11.
 7            I'd like to mark an Exhibit 12.
 8            (Whereupon Plaintiffs' Exhibit 12
 9             was marked for identification.)
10            MR. GALVAN:   So, for the record, what I've
11    marked as Exhibit 12 has Bates Nos. CDCR 030458 to -462.
12    And at the top, is says, "Memorandum of Understanding."
13    BY MR. GALVAN:
14            Q.   Are you familiar with this document,
15    Mr. Storms?
16            A.   Yes, I am.
17            Q.   What's this document?
18            A.   Similar to the Social Security document, this
19    is an agreement with the California State Department of
20    Health Care Services with our Department of Corrections
21    and Rehabilitation -- a formal agreement for a process
22    for which we can apply for MediCal benefits for
23    potentially eligible inmates, were it such, prior to
24    their release back to the community.
25            Q.   Does it appear to be a correct copy of your
```

## Golden Gate Reporting

Page 71

1  contract?

2      A.  It does.

3      Q.  Okay.

4          And under this contract, do you -- does the

5  Department secure an advantage in terms of being able to

6  apply earlier for benefits than it would otherwise be

7  able to?

8      A.  I don't believe so.

9      Q.  Okay.

10         MR. GALVAN:  I'm done with Exhibit 12.  Thank

11  you.

12  BY MR. GALVAN:

13     Q.  Have you investigated -- or, have you done any

14  work toward securing an agreement with the Social

15  Security Administration to suspend, rather than

16  terminate benefits when a person is incarcerated?

17     A.  I have not.

18         It is my understanding that we already have

19  that agreement.  I just have not seen it, but Social

20  Security informs me that we do.

21     Q.  Okay.

22         You referred to the second contract -- second

23  contract in addition to the Kern County contract that

24  you testified about earlier, the timing for which you're

25  hoping to be early 2009; is that correct?

Page 73

1   over to try to see who we could get to do these types of

2   services, and we were able to secure Kern County.

3           And then the other contractor, secondly, that

4   we were working with for the remainder of the state, we

5   didn't necessarily come to any agreement on the scope of

6   services to where it fit within their mission and our

7   mission.

8           Then we moved into a -- negotiating with a

9   third contractor while still having communications with

10  the one that we never had a firm agreement with

11          And then the result of the increases in pay

12  started happening, and we started finding that

13  budgetarily [sic], we may not be able to get the

14  services we need for the remaining 14 prisons.

15          But now we feel that we're on track for that,

16  and we are in the midst of finalizing the scope right

17  now and budget.

18          May I take a bathroom break?

19          MR. GALVAN:  Yes, please.

20          (Off the record from 11:35 a m.

21          until 11:43 a.m.)

22          MR. GALVAN:  I'd like to mark an Exhibit 13.

23          (Whereupon Plaintiffs' Exhibit 13

24          was marked for identification.)

25          MR. GALVAN:  For the record, Exhibit 13 is

Golden Gate Reporting

Page 74

1    Bates numbered CDCR 018490 to -492, and it's entitled,

2    "Project Name PRE-PAROLE BENEFITS/PLANNING."

3    BY MR. GALVAN:

4        Q.   Mr. Storms, are you familiar with this

5    document?

6        A.   Yes, I am.

7        Q.   Could you tell us what this document is?

8        A.   Sure.

9            As part of our Project Management Unit that

10   was established within our Department of Corrections and

11   Rehabilitation, certain projects that were selected by

12   the group were required to do these project charters,

13   and this particular project was sited as needing this

14   project charter, so I actually went to some training on

15   doing it.  And this is what we put together.

16           And it just explains the project itself --

17   who's involved, the schedule of the project, the

18   objective, the benefits to the project per se.  No pun

19   intended on the benefits itself, but the benefits to

20   having this project implemented.

21           What is inside the scope of the project, and

22   what is outside the scope of the project.  The costs,

23   what the deliverables are.  The milestones or

24   "benchmarks," as you may have referred to earlier.

25           Our approach.  How we're going to implement

Golden Gate Reporting

1    the project.   What successes -- how we measure our

2    successes per se.

3          Q.   And --

4          A.   Stakeholders and such.

5          Q.   Under "Benefits" on the first page, could you

6    read the fourth bullet point there -- just read it into

7    the record?

8          A.   Sure.   (Reading)

9              "Although not all paroling inmates are

10             eligible for these benefits, for those who do

11             qualify, a pre-release application process and

12             establishment of benefits will provide

13             increased parole success, improved public

14             safety, and reduced recidivism."

15         Q.   Can you describe the mechanism by which you

16   expect that benefit to be realized?

17             MR. ANTONEN:   Objection.   Vague as to what you

18   mean by "mechanism."

19             MR. GALVAN:   If you can answer.

20             THE WITNESS:   It is my belief that if a

21   disabled parolee has any type of financial resource that

22   could help them from being homeless, and if a disabled

23   parolee who needs medical care has a resource to help

24   them obtain medical care when available to them and

25   provided, those individuals will have a higher success

**Golden Gate Reporting**

Page 76

1    on parole, and hopefully discharge from parole and be

2    more independent.

3    BY MR. GALVAN:

4         Q.   The date -- the schedule above "Benefits" on

5    the first page here is, "Start, July, 2006. End, June,

6    2007."

7              Is this project ongoing or did it end in June,

8    2007?

9         A.   It's an ongoing project.  The program itself

10   is ongoing.

11             The project charters and the project

12   management per se, they typically put an end date of

13   when the project is scheduled to be implemented.  And

14   then ongoing monitoring is not necessarily part of the

15   charter and project management.

16        Q.   On the second page of Exhibit 13, at the

17   bottom right-hand corner, there's a section called

18   "Project Issues" with three bullet points.  The first

19   one is -- I'll just read it --

20                  "Insufficient medical documentation

21              indicating disability onset and duration can

22              result in denied benefits applications."

23             Were you successful in addressing that issue?

24        A.   We're still in the implementation stage, and

25   we're still reviewing the project.

Page 79

```
 1                    (Whereupon Plaintiffs' Exhibit 14
 2                    was marked for identification.)
 3                    MR. GALVAN:   And Exhibit 14, for the record,
 4    has a title, "Division of Adult Parole Operations,
 5    Mentally Ill Parolee Population," and a date, March
 6    28th, 2008.
 7    BY MR. GALVAN:
 8         Q.   Are you familiar with this document,
 9    Mr. Storms?
10         A.   Yes, I am.
11         Q.   Are you the author of this document?
12         A.   Yes, I am.
13         Q.   Does it appear to be a correct copy of the
14    document you authored?
15         A.   It does, yes.
16         Q.   What is this document?
17         A.   This document is an informational document for
18    stakeholders, those that inquire about different things
19    about our mentally ill services and such.
20         Q.   And what was your purpose in writing it -- in
21    writing Exhibit 14?
22         A.   I initiated the document when we were doing
23    the reentry workshops throughout the state for the AB
24    900 project, and obviously my piece was the mentally
25    ill, what services are needed in the community, and
```

Golden Gate Reporting

Page 80

1  trying to partner with counties for additional services

2  as we can.

3          And I further developed the document for the

4  purpose of then-Secretary Tilton to provide to the

5  Council on Mentally Ill Offenders to a meeting -- I was

6  requested to put -- our Parole Division was requested to

7  put something together for him, so I just expanded upon

8  it.  And then, as of March 28th, made no changes, but at

9  that time, I updated it for the purpose of some more

10  community meetings.

11      Q.  Okay.

12          Looking at page 2 of the page right under the

13  cover of Exhibit 14, there's a description here in the

14  paragraph that starts with, "Consistent with the terms

15  of the Valdivia v. Schwarzenegger federal court

16  injunction..."  You describe here, if I may summarize

17  it, the -- what happens if a parolee is brought to a

18  county mental health facility under Section 5150.

19          Can you describe the problem that parole

20  agents have in that situation?

21      A.  My experience has been, when we have either an

22  inmate paroling with potentially an acute mental illness

23  or determined to be danger to self or others, or a

24  parolee out in the community who also exhibits those

25  types of behaviors and symptoms, that the -- when the

Golden Gate Reporting

Page 81

1   parole agent takes them -- or local custody, is my

2   understanding -- takes them to a facility in the

3   particular county that is certified to do a Welfare and

4   Institutions Code 5150 evaluation and potential

5   admittance and so on -- that in most cases, they're

6   released or turned out quickly within 24 hours or just

7   over.  Sometimes within just a couple hours.

8           And the -- it's further my understanding that

9   the determination -- the clinical determination on

10  whether an individual meets the criteria for a 5150

11  involuntarily placement is subjective and potentially

12  interpreted differently by different evaluators.

13          But also, there is some resistance from the

14  counties, or the provider in the county may not

15  necessarily be a county employee.  Sometimes it is;

16  sometimes it's not, be it a hospital.

17          But there's some resistance to provide

18  services or involuntarily commit an individual who's on

19  parole.  The reasons for that, I cannot specify, because

20  I don't necessarily know, but this seems to be

21  consistent with the resistance or lack of resources that

22  are out there statewide within the communities for

23  parolees for -- that have numerous needs.

24      Q.  And are you involved with efforts to solve the

25  problems you just identified?

**Golden Gate Reporting**

Page 82

1      A.  I believe I am, as I have been in numerous

2   conversations with county employees in the mental health

3   arenas and other areas within the counties, and

4   suggesting that we enter into some sort of process

5   agreements and improve communications, especially when

6   it comes to when an individual is going to be released,

7   the timeliness of the release.

8          And improve communications between our Parole

9   Outpatient Clinic staff and the county mental health

10  staff, so that they can have an understanding what the

11  individual is going through, rather than just doing an

12  on-the-face evaluation.

13         Unfortunately, at this time, we don't have any

14  formal process agreements with any counties that I'm

15  aware of for this type of improvement.

16     Q.  Okay.

17         Looking, still, at Exhibit 14, if we turn to

18  page 6 of Exhibit 14, toward the middle, there's a

19  subheading, "Implementation Status."  And it starts:

20             "The legislature set aside $4 million in

21         CDCR's FY '07-'08 budget" -- and there's an

22         item number -- "for wrap-around and

23         residential services for mentally ill

24         parolees."

25         Could you define "wrap-around and residential

Golden Gate Reporting

1    services for mentally ill parolees"?

2         A.   My belief of what wrap-around and residential

3    services are for mentally ill parolees, what I believe

4    the intent was, is to provide a full-service environment

5    which includes housing, which would be transitional to

6    hopefully permanent housing; to get them qualified for

7    benefits; to provide various services that are

8    rehabilitative in nature, whether they're social-skill

9    building, vocational, symptom management; just

10   day-to-day activities -- how to get around -- and

11   treatment.  And to have a case manager who is part of a

12   team that monitors and looks for particular resources

13   for those individuals.

14              MR. GALVAN:  Can we go off the record?

15              (Luncheon recess taken at 12:00 p.m.)

16

17                        ---oOo---

18

19

20

21

22

23

24

25

```
                                                        Page 84
    1                        ---oOo---

    2    08/19/08           AFTERNOON SESSION          1:05 P.M.

    3

    4

    5     EXAMINATION BY COUNSEL FOR THE PLAINTIFFS (RESUMED)

    6

    7    BY MR. GALVAN:

    8         Q.  Going back to Exhibit 14, turn back to page 4

    9    where you represented a chart in the middle under the

   10    heading, "Recidivism Rate of Mentally Ill Parolees."

   11         A.  Yes.

   12         Q.  I wonder if I could walk through that with

   13    you.

   14              So, the chart you have, "Mentally Ill Inmates

   15    Paroled in 2006" divided by EOP and triple C-MS.  And

   16    then the next heading you have there is, "PRTC Within 12

   17    Months of Parole."

   18              First of all, are you -- do you know where

   19    these numbers came from in the chart?

   20         A.  Yes.

   21              I got these -- the figures of the first two

   22    items you stated from our contractor who gets our

   23    information for TCMP-MI, and it's basically numbers out

   24    of our parole automated tracking system, which is the

   25    automation that we implemented after that audit.
```

Golden Gate Reporting

Page 85

1        Q.  Who's that contractor?

2        A.  University of California, San Diego.

3        Q.  Are these figures in a document -- a specific

4    document?

5        A.  These figures were on an E-mail at my request.

6        Q.  When did you get that E-mail?

7        A.  I think I got it sometime before this report.

8    Either in 2008 or 2- -- well, I'm pretty sure it was in

9    2008.

10       Q.  Who was this from?

11       A.  Our programmer.

12       Q.  Do you remember a person, a name that it was

13   from?

14           MR. ANTONEN:  To the extent you recall.

15           THE WITNESS:  Yeah.

16           I believe it's Ted McNeal.  He works for UCSD,

17   which is San Diego, as an employee, with his wages paid

18   under our contract -- the Department of Corrections'

19   contract.  Our.

20   BY MR. GALVAN:

21       Q.  And did he provide all the numbers in the

22   chart -- in this chart?

23       A.  I did the calculations.

24       Q.  Okay.

25       A.  And provided the figures of releases and

**Golden Gate Reporting**

Page 86

1    return to custodies.

2         Q.   And in the "Return to Custody" column, do you

3    know what counts as a return to custody here?

4              Does a person who is just pending revocation

5    count in there, or do you actually have to have been

6    revoked to be in those numbers?

7         A.   At this time I can't specifically answer that

8    question.

9         Q.   Do you think the answer is in the E-mail you

10   got from Ted McNeal?

11        A.   I'm not a hundred percent sure.  It's

12   possible, based on how I requested the information.  I

13   would have to -- and how the information was gathered

14   from the various sources.

15        Q.   And the column that says, "Parolees Without

16   POC Contract Prior to RTC," what do those numbers

17   represent?

18        A.   Those would be the individuals that are

19   mentally ill EOP or triple-C designated that released

20   during that specified period and returned to custody

21   within 12 months of release but had no contact recorded

22   with Parole Outpatient Clinic staff.

23        Q.   So, that 1,068 -- so, that represents all the

24   people who were returned to custody in that 12 months

25   who didn't have a POC contact.

Page 87

```
 1                Is that your answer?

 2         A.   Yes.

 3                To the best of my ability and in gathering

 4    this information, that is the number that was -- that I

 5    came up with.

 6         Q.   Okay.

 7                And then next to that, there's a rate set for

 8    that -- next to 1,068, there's a rate, which for that

 9    one is 75 percent.

10                How did you calculate that rate?

11         A.   I used another subset, I believe, of numbers.

12                Let me see.  It takes me a little bit more

13    time to analyze my backup of how I came up with this,

14    but I definitely checked these numbers, these figures

15    several times.

16         Q.   So, the rate is -- do you remember what that

17    rate -- what are the numbers that went into that rate?

18                Like, what's the numerator and what's the

19    denominator?

20         A.   There's actually some more numbers related to

21    these calculations that's not reflected in this chart.

22         Q.   Mm-hm.

23         A.   So, to glance at that chart and try to use it

24    as the complete formula to come up with these

25    percentages, it won't calculate out.
```

## Golden Gate Reporting

```
 1          Q.   Okay.
 2               So, whose recidivism rate was that meant to
 3    be?
 4               Is that 75 percent meant to apply to the
 5    people in the column right to the left of it --
 6    "Parolees Without POC Contact Prior to RTC"?
 7          A.   Correct.
 8               The recidivism rate that you're speaking to,
 9    which has the 75 percent and the 77 percent.  And it
10    speaks to those that did not have POC contact prior to
11    their return to custody.
12          Q.   Okay.
13               So, would it be reasonable to infer, then,
14    that parolees without POC contact -- so, that 1,068,
15    they were all returned to custody; right?
16               They all recidivated [sic]; is that right?
17               Or, are those all the people that didn't have
18    a POC?
19          A.   Those -- for the best that I was able to come
20    up with, 1,068 EOP inmates -- designated inmates that
21    paroled between January 1st, 2006, and December 31st,
22    2006, within 12 months of their release, 1,068 had no
23    POC contact and returned to custody within that period.
24          Q.   Okay.
25               And then the next column, "Parolees With POC
```

1    Contact Prior to Returning to Custody," what were those
2    1,015?
3           A.   That 1,015 for the same exact duration of
4    time, and time out on parole, had POC contact and ended
5    up with a lesser recidivism rate.
6           Q.   Okay.
7                Going forward in this document two pages to
8    page 6, before the lunch break we were talking about
9    this implementation status, and you had defined
10   "wrap-around" and "residential services for mentally ill
11   parolees."
12               So, what did -- you wrote here:
13                   "DAPO is currently utilizing the
14                   $4 million for fiscal year 2007-2008 as
15                   regionally dispersed case management dollars
16                   at the parole-unit level."
17               What did the parole units do with that money?
18          A.   What the parole units did with that money --
19   and they didn't spend it all due to the short
20   implementation timing -- was utilize monies as a
21   cash-assistance tool, which agents are able to do --
22   write checks up to a $500 maximum at that time.
23               And at this time, as far as I know, would
24   purchase support of services for mentally ill parolees,
25   whether -- it didn't depend on their designation to EOP

## Golden Gate Reporting

Page 90

1    or triple C-MS.  It was simply if they're mentally ill

2    and needed some support of services, that money was made

3    available to them.

4              And it would range from -- mental health

5    board-and-care was part of the mission.  There was

6    higher-level-type care in some facilities in the state,

7    as well as transportation support.  Other support of

8    services that may help them acquire food and different

9    types of things.

10         Q.  And did that money run out on July 1st, 2008?

11         A.  That money was part of the fiscal year

12   2007-2008 budget.  We had no approval to expend any of

13   that money beyond that date.

14         Q.  So, what happened to the parolees who were

15   receiving services with that money after July 1, 2008?

16              MR. ANTONEN:  Objection.  Lacks foundation.

17              To the extent you know what happened to

18   individual cases as a program manager.

19              THE WITNESS:  Yeah.

20              I couldn't really speak to what continued

21   services those individuals or any one individual

22   received in that particular venue.

23   BY MR. GALVAN:

24         Q.  Did the Department do anything to address the

25   running out of that -- of those funds for those

Golden Gate Reporting

1  parolees?

2          MR. ANTONEN:  Objection.  Vague.

3          MR. GALVAN:  If you can answer.

4          THE WITNESS:  Well, the 4 million that we --

5  that was set aside out of the Department of Corrections'

6  budget for that purpose in fiscal year '07-'08 is a

7  continued funding source in the current Department of

8  Corrections' budget -- State budget that's pending

9  approval.  And it's to supplement the request that we

10  put together for funding the Assembly Bill 900 delivery

11  of mental health services to parolees.

12          So, to answer your question, yes, we are

13  moving forward with -- in our attempts to get into

14  contracts for mental health services in California

15  communities.

16  BY MR. GALVAN:

17      Q.  So, between July 1 and whenever the State

18  budget is approved, are the parole agents without the

19  ability to make these cash assistance payments?

20      A.  I don't really think that that's my area to

21  answer.

22      Q.  Does that mean you don't know?

23      A.  Um, sure.  I don't know.

24      Q.  Um --

25      A.  I don't manage the budget for cash assistance

Golden Gate Reporting

Page 92

1   for parole agents' usage, and I don't make the decisions

2   on how they spend it.

3           I just know that we put together a -- a

4   directive to the bill to utilize this particular funding

5   that we're talking about now for that purpose.  And the

6   ongoing funding, if approved, in the California budget

7   for this purpose right now is designated solely for

8   contracted services.

9           Q.  I'm sorry.

10           The on -- which ongoing funding?

11           A.  If we continue receiving the 4 million as

12   proposed -- as approved legislatively so far -- if we

13   continue receiving that money that's in the governor's

14   budget as -- once the budget is signed, then that money

15   continually will be available this fiscal year for

16   contracted services.  That's what it's for right now --

17   targeted for.

18           Q.  Did the Department send out any directive to

19   the parole agents as to how to change their practices

20   with cash assistance as of the date that -- as of July

21   1st?

22           A.  No.

23           Q.  Did --

24           A.  Not that I'm aware of.

25           Q.  Did the Department send out any directive to

Golden Gate Reporting

Page 93

1    the field -- to the parole agents on changing their

2    practices regarding the use of this $4 million for cash

3    assistance payments at any time?

4        A.   We sent out a memorandum to the field advising

5    them of these -- this resource and informing them of how

6    to utilize it, what it's for, and that it has an end

7    date of June 30th, 2008.

8            And then we also put out an E-mail from our

9    Adult Parole headquarters' office out to the field as a

10   reminder -- after the memorandum went out -- of what

11   this money is available, that it is available, what it

12   is for, as well as how they need to track the

13   expenditures.

14       Q.   And have you received any information

15   regarding the effect on the field when the -- when this

16   payment policy expired after June 30th, 2008?

17       A.   I've received questions on if we have any

18   additional services available at this time.

19       Q.   Have you received any information -- well, you

20   received questions.

21           How did you answer those questions?

22       A.   That we're pursuing those, and that that

23   funding did end for that purpose; however, to go ahead

24   and consult with your supervisor in your field unit to

25   determine whether or not you have any resources

**Golden Gate Reporting**

Page 94

1   available for you for those particular cases.

2        Q.   Have you ever received any information about

3   parolees returning to prison because that money ran out,

4   those payments ran out?

5        A.   No.

6        Q.   Have you received any information about

7   parolees losing their housing because that money ran

8   out?

9        A.   No.

10       Q.   Going back to page 6 on Exhibit 14, you wrote

11   that:

12              "DAPO is also negotiating with several

13              counties in its efforts to enter into

14              contractual relationships with counties and

15              financially supplement their existing systems

16              of mental health care for the purpose of

17              serving an agreed-upon number of parolees at

18              any point in time during the contract period."

19              Have you entered into any contractual

20   relationships with the counties that are of the kind

21   described there?

22       A.   We have no agreed-upon approved contracts at

23   this time, no.

24       Q.   Are you close?

25       A.   We're developing scopes of work with a few

## Golden Gate Reporting

Page 95

1    counties right now.

2        Q.   Which counties?

3        A.   We're working with Santa Clara County, San

4    Bernardino County, San Diego County.  We have some

5    conversations and potential future with Los Angeles

6    County, Santa Barbara, Yolo County.  And there's also

7    some other smaller counties that I can't think of at the

8    moment.

9        Q.   And are you working on a deadline to enter

10   into those contracts?

11       A.   We're working with urgency and the need to get

12   into these -- contract for these services as soon as

13   possible -- as soon as possible.

14       Q.   Okay.

15            What are the obstacles -- what are the

16   obstacles to finishing those contracts, to entering into

17   those contracts?

18            MR. ANTONEN:  Objection  Lacks foundation.

19            The witness hasn't testified that he's

20   negotiating these contracts, just that he's aware of the

21   contracts.

22   BY MR. GALVAN:

23       Q.   Are you negotiating these contracts?

24       A.   I've been involved in most of the

25   conversations.

Page 96

```
 1        Q.  Okay.

 2            Are you aware of any obstacles to completing

 3   the contracts?

 4        A.  I don't completely understand the delays or

 5   obstacles, because they seem to be related to the

 6   counties and services that they operate and their

 7   willingness to move fast.  We've been working on this

 8   for some time.

 9        Q.  Is one of the obstacles that the state is not

10   offering enough money to the counties?

11            MR. ANTONEN:  Objection.  Calls for

12   speculation.

13   BY MR. GALVAN:

14        Q.  Have you received any information that would

15   lead you to believe that the obstacles include the state

16   not offering enough money?

17        A.  No.  I don't believe that's an obstacle.

18        Q.  Okay.

19            Moving on to that same -- on that same page

20   you wrote -- on page 6 of Exhibit 14, you wrote:

21                "For fiscal year 2008/09, the proposed

22            budget includes $5,629,000 to augment the

23            proposed continuation of the $4 million in

24            recidivism reduction funding for a combined

25            total of $9,629,000..."
```

**Golden Gate Reporting**

Page 97

1          Did you -- did that augmentation receive

2    approval from the Department of Finance?

3          A.  It's in the proposed budget that the governor

4    has before him.

5          Q.  Looking at pages 7 -- page 7 of Exhibit 14,

6    you wrote a description of Senate Bill 1651 introduced

7    on February 2nd, 2008.

8          Is DAPO endorsing Senate Bill 1651?

9          A.  I don't know that our department takes a

10    position, our division takes a position on it.

11          We analyze the bills, and try to give some

12    indication of what cost may be involved, what -- what

13    barriers or changes we might want to recommend if --

14    based on barriers.  I don't believe we have a position

15    on it.

16          Q.  Why did you include the description of SB 1651

17    in this document?

18          A.  I believe that I included that for a bigger

19    picture of this offender population, parolee population

20    that is mentally ill, to not just show what it is we do,

21    but what efforts that may exist that I'm aware of in the

22    broader picture.

23          Q.  Based on your experience, do you believe that

24    if SB 1651 were enacted -- that it would assist DAPO in

25    reducing recidivism among mentally ill parolees?

## Golden Gate Reporting

Page 98

1      A.   I think it would assist -- I don't really know

2    the answer to that question.

3      Q.   Moving on to page 8 of the Exhibit 14, you

4    wrote -- under the heading, "Current Service Needs for

5    Mentally Ill Parolees," you wrote:

6                "In the numerous conversations that DAPO

7                staff has with County representatives

8                regarding AB 900 and other enhancements sought

9                for mentally ill parolees, the question of who

10               will fund residential services and step-down

11               care such as mental health board and care is

12               posed to DAPO staff in order to provide the

13               complete wrap-around and transition services

14               required, to achieve the most positive outcome

15               in a mental health system of care model,

16               funding for temporary housing and mental

17               health board and care is required."

18               Has the Department taken any steps to secure

19    that funding for temporary housing and mental health

20    board and care that you identified here?

21      A.   Um, we haven't requested -- since the current

22    proposal for AB 900, we haven't put together a proposal

23    for more funding for this next phase of -- for fiscal

24    year '09-'10 at this time.

25               What we are doing is in our -- especially as