# EXHIBIT 36

## Deposition of Robert Storms
## August 19, 2008
## (Phase II Designations)

## Part B

Golden Gate Reporting

Page 99

1    we learn more about the counties and what their system

2    of care is, we just try to build in that housing

3    component for at least referrals and such in their --

4    what they call "full service partnerships."

5            So, we're looking to -- again, it's been a

6    learning curve as we get in deeper conversations with

7    these counties that their full-service partnerships

8    offer at some time, you know, some sort of housing

9    component to them as they can.  It's what -- what --

10   yeah.  I'll just end with that.

11       Q.   In writing this, was it your purpose to inform

12   your -- to inform the Department that the State needs to

13   provide this funding to the counties?

14       A.   No.

15       Q.   What was your purpose?

16       A.   My purpose was to explain to the best of my

17   ability what is available and what is not available to

18   this population.

19       Q.   I'm done with Exhibit 14.

20            So, are you aware of what the procedures are

21   for the Department when an inmate with a severe mental

22   illness is released on parole?

23       A.   Only to the extent that I'm involved with

24   individual cases.

25       Q.   Okay.

**Golden Gate Reporting**

Page 101

1           The majority of the cases, they can take

2     public transportation, and they can report to their

3     parole unit just like any other inmate -- typical inmate

4     that's released from an institution.

5           Q.  Are there cases where the parole agent is

6     required to actually meet the person at the gate?

7           A.  If an EOP is releasing out of either a secured

8     housing unit or a psychiatric secure unit, then they're

9     required to -- or released from some specific DMH

10    facilities, they're required to pick up the inmate at

11    time of parole.  Therefore, the institution should be

12    releasing them only to the parole agent.

13          Q.  Have you ever heard the expression "driving

14    the person around the flagpole"?

15          A.  No.

16          Q.  No?

17          MR. GALVAN:  So, I'm going to switch topics to

18    4(b), Psyche and Return.  And to do that, I'm going to

19    mark Exhibit 15.

20               (Whereupon Plaintiffs' Exhibit 15

21               was marked for identification.)

22          MR. GALVAN:  And for the record, Exhibit 15,

23    it's a document, three pages, that says, "Memorandum" at

24    the top, with a date, January 12th, 2007, "Policy No.

25    07-03."

Golden Gate Reporting

Page 102

1    BY MR. GALVAN:

2        Q.   Are you familiar, Mr. Storms, with this

3    document?

4        A.   Yes, I am.

5        Q.   And what is this document?

6        A.   This was a two-prong document.

7             This document is informing the parole staff,

8    field staff, that the Department of Corrections and

9    Rehabilitation will no longer be returning parolees to

10   custody solely for mental health care, which was

11   previously known as the "psyche return" -- "psyche and

12   return process."

13            It also serves as a tool to the field staff to

14   help them, as a resource, make decisions on what they

15   might be able to do when they have a mentally ill

16   parolee who needs some sort of services.

17       Q.   Are you aware of any -- or, do you have any

18   estimate of how many people were -- would go through the

19   psyche and return process per year before this, or, say,

20   in the year before this new policy?

21       A.   It's always been the estimates in all the

22   conversations I've been in that it may have been 50 at

23   any -- 40 to 50 at a point in time, and maybe 100 to 150

24   cycling through the year.

25       Q.   Okay.

Golden Gate Reporting

Page 104

1    incurred, that's all we can do.

2    BY MR. GALVAN:

3        Q.  Does the -- does the Department have any

4    particular funding to provide services for people in

5    that circumstance that you just described where the

6    person needs mental health treatment but there's no

7    parole violation that you could use to return them to

8    custody?

9        A.  That I'm aware of, only what we're pursuing

10   under the authority we got with AB 900.

11       Q.  What is that?

12           What are you pursuing?

13       A.  We're pursuing contracted services with the

14   counties to provide mental health rehabilitation and

15   crisis care for parolees.

16       Q.  And in pursuing those contracted services, can

17   you describe in more detail how you're pursuing them?

18           What are you doing?

19       A.  We have meetings, sometimes on-site meetings

20   and sometimes conference calls, with mental health

21   staff.  Usually the mental health directors or their

22   designee within the county.  Parole field staff, Parole

23   Outpatient Clinic staff, my parole headquarters staff,

24   and other stakeholders that the counties may bring on in

25   those conversations.

1           And to initiate those conversations, we inform

2     them of what we're able to do.  We identify some of the

3     mentally ill parolees in their community so they can

4     make an informed observance of whether or not they're

5     already at times providing services to those

6     individuals.

7           I let them know we're not trying to impose on

8     them or create something new that is outside of what

9     they're currently doing; we would just like to expand

10    upon what services they already have.

11          And I've come to find it's these full-service

12    partnership services, so that we can purchase program

13    slots to get mental health rehabilitative services to

14    the parolee residents.

15          And with that, we would -- like any

16    residential component, we can get to that -- any step

17    down and step up for level-of-care needs.  If we can get

18    a triage service and access to an inpatient facility,

19    either volunteer or nonvolunteer, and --

20        Q.  Do you have a budget for that effort you just

21    described?

22        A.  Yes.

23          In fact, we just got done talking about it.

24    It's the $9.67, or whatever, million.  What was just in

25    the last document.  And it's pending budgetary approval,

**Golden Gate Reporting**

Page 106

1   as everything is right now in our state.

2        Q.  Are you able to make -- is the Department able

3   or are you able to make any progress on this while the

4   budget -- while there's no state budget?

5             MR. ANTONEN:  Objection.  Vague as to

6   "progress."

7   BY MR. GALVAN:

8        Q.  Are you -- what is the status of your efforts

9   in this regarding the budget impasse?

10       A.  Negotiations continue.  Scope-of-service

11  development continues.  Contract formulation continues.

12       Q.  Is $9.6 million enough for this project?

13            MR. ANTONEN:  Objection.  Calls for

14  speculation.

15  BY MR. GALVAN:

16       Q.  Do you think $9.6 million is enough?

17            MR. ANTONEN:  Objection.  He's not an expert

18  witness.

19            MR. GALVAN:  If you can answer.

20            THE WITNESS:  It was the estimate we came up

21  with based on what we believed services would cost at

22  the time.  It's still to be seen whether or not it will

23  get us to our deliverable.  We believe we're close, if

24  not there.  "Deliverable" being 300 at any point in

25  time.

Page 107

1    BY MR. GALVAN:

2        Q.   300 what?

3        A.   Parolees receiving services at any point in

4    time.

5        Q.   How did you arrive at 300?

6        A.   That is what is the deliverable that's

7    specified in the Assembly Bill 900.

8        Q.   Did you have a role in choosing that number,

9    300, that ended up in AB 900?

10       A.   No, I did not.

11       Q.   Do you have any knowledge as to how that

12   number was chosen?

13       A.   No, I don't.

14       Q.   And how is the Department -- to your

15   knowledge, how has the Department interpreted that

16   number in the statute -- 300 parolees receiving

17   services?

18            And what I mean by that question is, what do

19   you define as "receiving services"?

20       A.   First of all, there was two services that were

21   specified in Assembly Bill 900.  The authority that we

22   use is Penal Code Section 3073.  And the two services

23   are day treatment programming and crisis care.

24            Our department, at the urging of

25   stakeholders -- community-based stakeholders, be it

Golden Gate Reporting

Page 108

1    counties, Mental Health Directors' Association,

2    legislative people, et cetera, have come up with a

3    definition for day-treatment program; that is, mental

4    health rehabilitative services that meet the needs of an

5    individual, mentally ill parolee.

6              That definition is not exact, but the concept

7    is the same.

8              And the crisis care is what it is.  That's

9    acute inpatient level of care for a mentally ill parolee

10   with an acute level-of-care need.

11             And the answer to your question is that our

12   interpretation of this authority and this deliverable is

13   either and/or.  Basically, 300 parolees receiving either

14   our definition of mental health rehabilitative services

15   or crisis care, or both.

16        Q.   And is there a deadline attached to this

17   deliverable?

18        A.   There's a -- I'm not really sure at this time.

19        Q.   Has the Department worked out a preferred

20   allocation between day-treatment programs or mental

21   health rehabilitative services and crisis care?

22        A.   I don't have the specifics in front of me of

23   how we came up with the estimate, but it was broke down

24   to where -- so many crisis care beds and so many

25   program-type slots in the mental health rehabilitation,

Page 109

1    which -- with a smaller amount on the crisis care.

2        Q.   Has the Department identified locations for

3    the crisis-care beds?

4        A.   Unfortunately, there doesn't seem to be that

5    resource that's been provided to us by any of the

6    partners we tried to partner up with.  And the

7    availability of inpatient mental health care has not

8    been shown to us by anybody at this time in the County

9    in our negotiations.

10       Q.   Has the Department made an estimate of the --

11   of its need for inpatient mental health care, say, the

12   number of patients at any given time, meaning, the

13   number of beds you need?

14            MR. ANTONEN:  Objection.  Vague as to time.

15   BY MR. GALVAN:

16       Q.   Does the Department now have any estimate of

17   the number of inpatient mental health beds that the

18   Department needs?

19       A.   No.

20            MR. ANTONEN:  Objection.  Vague as to "needs."

21            MR. GALVAN:  If you can answer.

22            THE WITNESS:  Not having an exact estimating

23   formula in front of me here, obviously I was real

24   integral in coming up with the estimate, and based the

25   figures of numbers of parolees on the psyche return

Page 110

1    process that we ended.

2           So, I either had 30 to 50 beds -- there may

3    have been less.  I'm not sure.  But that was kind of the

4    basis for that.

5           MR. GALVAN:  Okay.

6    BY MR. GALVAN:

7        Q.  And is that number -- 30 to 50 inpatient

8    beds -- is that number built into your $9.6 million?

9        A.  When that estimate was put together to the --

10   to our best effort with what information we had

11   available to us, yes.

12       Q.  Okay.

13          And did you have an estimate of the per-bed

14   price of that 30 to 50 beds?

15       A.  I want to believe that it was somewhere around

16   $300 a day, but I'm not sure that that number is really

17   a good number anymore.

18       Q.  Okay.

19       A.  It depends on their needs.  It really does.

20          MR. GALVAN:  Let me take back Exhibit 15,

21   unless you really need it.

22          THE WITNESS:  (Indicating)

23   BY MR. GALVAN:

24       Q.  On that 30 to 50 beds, why did you choose the

25   psyche -- the "former psyche return," I'll call it,

Page 111

1    caseload -- "caseload" defined as the need, the

2    population of a certain category at a given moment in

3    time, snapshot in time -- why did you choose the

4    psyche-and-return caseload as a guide or a proxy for

5    inpatient -- inpatient mental-health bed caseload?

6         A.   Because that was the identified parolees'

7    return to custody, because they needed inpatient acute

8    level of care, but there is no availability in the

9    community for them.  So, using that historical, if you

10   will, that number of individuals that actually needed

11   that level of care.

12        Q.   Okay.

13             MR. GALVAN:  Let's see.  I have an Exhibit 16.

14             (Whereupon Plaintiffs' Exhibit 16

15              was marked for identification.)

16             MR. GALVAN:  Exhibit 16 goes back a little

17   before AB 900.  And I'll just, for the record, say it is

18   an E-mail, two pages -- image of an E-mail, two pages.

19   It says -- with Bates number E_PRIV_0885850.

20   BY MR. GALVAN:

21        Q.   Mr. Storms, do you recognize this E-mail

22   chain?

23        A.   Let me just take a moment.

24        Q.   Sure.

25             It starts, "In time" at the second page, and

Page 114

1            MR. ANTONEN:  He's testified to two.

2    BY MR. GALVAN:

3        Q.   The -- well, actually, I'm going to withdraw

4    that question.  Let me just move forward in this E-mail

5    chain.

6            If you go back to the first page.

7        A.   Mm-hm.

8        Q.   As your discussion goes on in the E-mail

9    chain, Pam Cantelmi identifies beds at Coalinga State

10   Hospital.  And then there's an exchange between you and

11   Doug McKeever about Coalinga.

12       A.   Yes.

13       Q.   To your knowledge, are there still empty beds

14   at Coalinga State Hospital?

15       A.   I can't answer that.  I don't know.

16       Q.   Okay.

17            Is the Department making any effort to use any

18   additional beds at Coalinga State Hospital for this

19   population formerly known as the "psyche return

20   population," to your knowledge?

21            MR. ANTONEN:  Objection.  Calls for

22   speculation.

23            MR. GALVAN:  To the extent you know.

24            THE WITNESS:  To the extent I know, for us to

25   have a mentally ill parolee -- and that's basically what

Golden Gate Reporting

Page 115

1    we're referencing here -- in a state hospital requires
2    the county to conserve them, whether temporary or
3    permanent, and for the State Department of Mental Health
4    to admit them and place them in one of their facilities.
5            I'm not aware of Coalinga being utilized for
6    that population.
7    BY MR. GALVAN:
8        Q.  As you engage in the negotiating process that
9    you discussed with the counties, is the Department --
10   are you able -- or, are you offering them access to the
11   Coalinga State Hospital beds as a location for this part
12   of the population that needs inpatient hospitalization
13   in the event that the counties assist you with
14   conserving the individuals?
15           MR. ANTONEN:  Objection.  I'm going to pose a
16   quick objection here.  It's compound.  And I believe
17   there's multiple negotiations that are going on at the
18   counties.
19   BY MR. GALVAN:
20       Q.  In any of your negotiations with the counties,
21   are you offering the Coalinga beds as an option?
22           MR. ANTONEN:  And objection.  The witness has
23   previously testified Coalinga is a DMH facility, so I
24   think it calls for speculation.
25           MR. GALVAN:  To the extent you know.

Page 116

1          THE WITNESS:  I'm not aware of Coalinga being

2     available for us for Penal Code Section 2974 placements.

3     BY MR. GALVAN:

4          Q.  In your negotiations with the County, are any

5     of the DMH beds being offered as a resource?

6          A.  In our negotiations with the counties for the

7     contracted services, as well as our communications with

8     counties on placement needs, service needs,

9     communication needs, the avenue of the Penal Code

10    Section 2974 and the LPS Act are typically in the

11    conversation, yes.

12         Q.  What about the actual beds -- the actual DMH

13    beds?

14         A.  It really always comes down to availability.

15    And even when there's availability, it doesn't

16    necessarily put the County in a position to where they

17    want to do this for us.

18         Q.  Okay.

19              Is the Department of Mental Health an obstacle

20    to your achieving an agreement with the counties?

21              MR. ANTONEN:  I'm going to object.  It calls

22    for speculation again.

23              MR. GALVAN:  To the extent you know.

24              THE WITNESS:  Yeah.

25              I don't believe so, no.

Golden Gate Reporting

Page 117

1          MR. GALVAN:   I'm done with Exhibit 16.   Thank

2    you.

3               I'd like to mark an Exhibit 17.

4               (Whereupon Plaintiffs' Exhibit 17

5                was marked for identification.)

6          MR. GALVAN:   Exhibit 17, for the record, is a

7    printout from a blog entry, dated January 17th, 2007,

8    "PacoVilla's Corrections blog."

9    BY MR. GALVAN:

10        Q.  Mr. Storms, are you familiar with the

11   PacoVilla blog?

12        A.  Yes, I am.

13        Q.  Did you read this entry when it was posted

14   there?

15        A.  I have seen it.  I have read it before, yes.

16        Q.  Does this appear to be a correct copy of the

17   Entry you read?

18        A.  Appears to be, yes.

19        Q.  Okay.

20             I direct your attention to -- on the first

21   page, the fourth paragraph that reads:

22                  "Agents, you are being set up.  Paco

23              strongly urges you to arrest rejected 5150

24              placements on any and every petty technical

25              violation you may find.  If you can't find

**Golden Gate Reporting**

Page 120

```
 1              (Whereupon Plaintiffs' Exhibit 18
 2              was marked for identification.)
 3          MR. GALVAN:  Exhibit 18, for the record, is a
 4  document with -- starts with the Bates No. E_CDCR_08941.
 5  BY MR. GALVAN:
 6      Q.  Are you familiar with this document,
 7  Mr. Storms?
 8      A.  Let me take a moment.
 9      Q.  Yes, please.
10          MR. ANTONEN:  Is your exhibit Batesed?
11          MR. GALVAN:  Oh, is yours not?
12          MR. ANTONEN:  No.
13          MR. GALVAN:  Okay.
14          Well, it's an -- in that case, for the record,
15  it's an E-mail from Robert Storms sent Tuesday,
16  September 4th, 2007.
17          MR. ANTONEN:  Could you repeat the
18  Bates-label?
19          MR. GALVAN:  Yes.  It's E_CDCR_18941 [sic].
20  And actually, only the first few pages are -- only the
21  E-mail itself is Batesed, and the attachment is not on
22  my copy.
23          THE WITNESS:  (Witness reviews the document.)
24          Yeah.  I'm familiar.
25          MR. GALVAN:  Okay.
```

Golden Gate Reporting

Page 121

1    BY MR. GALVAN:

2        Q.   What is this document?

3        A.   The E-mail or the document behind it?

4        Q.   The document -- the attachment to the E-mail.

5        A.   That is the beginning version of the document

6    we looked at earlier, dated March of 2008, which

7    describes the mental health population and services.

8            This was created for the purpose of sharing

9    with the counties and other participants involved in our

10   AB 900 workshops that we had done throughout the state

11   and there was three components to.

12           One was a parole component.  The other

13   component that I wasn't a presenter on was the secured

14   reentry facility component. And the third component that

15   was I was also not a participant in was the jail bond

16   component.

17           So, this parole component addressed two

18   segments, which one, I was the presenter on.  That was

19   the mental health piece.

20       Q.   Okay.

21           And you testified that one -- I believe, that

22   one part of that -- or, the result of those efforts is

23   the $9.6 million pending funding for day treatment for

24   mental health rehabilitative services and crisis care

25   beds?

Page 123

1        A.   No.

2        Q.   Okay.

3             Did --

4        A.   Not that I'm aware of.

5        Q.   Did you draft any proposals to increase the

6   funding for any of those items that were rejected by the

7   Department of Finance?

8             MR. ANTONEN:   Objection.   Calls for

9   speculation.   I don't believe the witness testified that

10  he drafts BCPs.

11  BY MR. GALVAN:

12       Q.   Do you draft BCPs?

13       A.   Yes.

14       Q.   Did you draft any BCPs to increase the funding

15  for any of those items that you just listed -- the TCMP,

16  the benefit planning, medication and POC staffing --

17  that were rejected in the current budget cycle?

18       A.   Yeah.   Medications was one, yes.

19       Q.   Okay.

20            Can you describe the proposal that you drafted

21  for medications?

22       A.   Sure.

23            We did -- we've done a prior BCP, but we did a

24  prior finance letter to get into the current budget,

25  which is proposed to increase the allocation we get for

Golden Gate Reporting

Page 124

1   psychotropic medications for our mentally ill parolees

2   due to the continually increased costs that we incur.

3          We still pay for those medications, but we do

4   it without having the appropriated funds that, you know,

5   would come out of other types of funding line items

6   within our division.

7       Q.   And when you drafted that BCP, did you include

8   a public safety rationale?

9       A.   Yes.

10      Q.   What was it?

11      A.   Um, I can't speak to specifically what it was,

12  but typically, when dealing with this population, any

13  proposals would speak to the public safety.

14      Q.   And who rejected your BCP?

15      A.   I'm not a hundred percent sure.

16      Q.   What department of the state government

17  rejected it?

18      A.   I'm not a hundred percent sure.  I think it

19  was Department of Finance.

20      Q.   Okay.

21      A.   I think that.

22      Q.   Why was it rejected?

23          MR. ANTONEN:  Objection.  Calls for

24  speculation.

25          MR. GALVAN:  To the extent you know.

## Golden Gate Reporting

```
1                THE WITNESS:  Um, I really don't know.

2                MR. GALVAN:  Well, if you don't know, you

3      don't know.

4                THE WITNESS:  Yeah.

5                I don't know.

6                MR. GALVAN:  Okay.

7      BY MR. GALVAN:

8           Q.  Um, and just so I'm not asking the question

9      too narrowly -- I've probably been saying "BCP" -- have

10     you drafted any -- or, have you proposed any increase in

11     any form for this current budget cycle in the TCMP-MI

12     program?

13          A.  For the '08-'09 budget?

14          Q.  Yes.  '08-'09.

15          A.  No, I don't think so.

16          Q.  Okay.

17               Have you -- have you proposed any increase --

18     or, has the -- to your knowledge, has the Department

19     proposed any increase for the TCMP-MI program for this

20     budget cycle '08-'09?

21          A.  Not that I'm aware, no.

22          Q.  To your knowledge, has your department

23     proposed any increase for the Parole Outpatient Clinic

24     program for '08-'09?

25          A.  Not that I'm aware, no.
```

## Golden Gate Reporting

Page 126

```
 1          Q.   To your knowledge, has the Department proposed
 2    any increase for the Preparole Benefits Planning Program
 3    for '08-'09?
 4          A.   No.
 5          Q.   To your knowledge, has the Department proposed
 6    funding the TCMP-MI preparole benefits and POC programs
 7    for '08-'09 at the same level as was funded in '07-'08?
 8          A.   Um, we're continuing to ask for the budget
 9    authority that we had in '07-'08 to carry into '08-'09.
10          Q.   Between -- to your knowledge, between '08-'09
11    and '07-'08, between those two fiscal years, has the
12    population that is served by those three programs we've
13    been talking about -- TCMP-MI, preparole planning, and
14    the POC -- stayed the same, increased, or decreased?
15          A.   Between '07-'08 and '08-'09?
16          Q.   Yes.
17          A.   I don't know.
18          Q.   Does the budget process for those programs
19    include a population adjustment?
20          A.   Parole outpatient clinic staffing does.
21          Q.   Okay.
22          A.   The rest of the programs do not.
23          Q.   Why don't the rest of the programs include it?
24               MR. ANTONEN:   Objection.   Calls for
25    speculation.
```

Page 127

```
 1              To the extent you know.
 2              THE WITNESS:  Yeah.
 3              Just that they're not tied to the population,
 4     to the best of my knowledge.
 5     BY MR. GALVAN:
 6         Q.  Going back to this Exhibit 18, if you turn to
 7     page 5, there is a chart at the top of "Statewide Parole
 8     Outpatient Clinic Classifications, Total Authorized
 9     Positions," and June, 2007, Parolee Clinician Ratios.
10              Has the Department sought to reduce those
11     ratios in the last year?
12         A.  In a particular budget cycle or --
13         Q.  In this budget cycle.
14         A.  '08-'09?
15         Q.  Yes.  '08-'09.
16         A.  No.
17         Q.  What about in '07-'08?
18         A.  No.
19         Q.  When was -- are you aware of the Department
20     ever seeking to reduce those parolee clinician ratios?
21         A.  Yes.
22         Q.  When was that?
23         A.  I'm not a hundred percent sure on the fiscal
24     year.  It was either for -- I believe it was '05-'06
25     there was a BCP that was...
```

## Golden Gate Reporting

```
                                                    Page 128
  1          Q.  Was it approved?

  2          A.  No.

  3          Q.  Were you involved in drafting it?

  4          A.  No.

  5          Q.  Do you know who rejected it?

  6              MR. ANTONEN:  Objection.  Calls for

  7   speculation.  He wasn't involved in drafting the BCP.

  8   BY MR. GALVAN:

  9          Q.  Do you know who rejected it?

 10          A.  No, I don't.

 11          Q.  Have you been -- have you participated in

 12   discussions to go back and seek a change in this

 13   clinician ratio?

 14          A.  Yes.

 15          Q.  With whom?

 16          A.  There have been a few different discussions

 17   both in the Valdivia psyche return work group that we

 18   had for sometime, as well as discussions for the

 19   upcoming fiscal year.

 20          Q.  Which is the upcoming fiscal year -- '08-'09?

 21          A.  '09-'10.

 22          Q.  '09-'10.  Okay.

 23          A.  Yeah.

 24          Q.  Focusing on the discussion for the '09-'10

 25   fiscal year, who have you been -- who have you discussed
```

Golden Gate Reporting

Page 129

1    that with -- with whom have you discussed that?

2         A.   I've had discussions with Division about

3    parole operation staff.

4         Q.   Who specifically?

5         A.   Um, Jill Dubbs, Larry Norris.

6         Q.   What is Jill Dubbs' title?

7         A.   She is also a Staff Service Manager II like

8    myself.

9         Q.   And Larry Norris?

10        A.   He's a Staff Service Manager III.

11        Q.   And are you -- is it your intention to propose

12   a -- any decrease in the parolee clinician ratio for

13   '09-'10?

14        A.   I did propose an adjustment in the ratio for

15   '09-'10.

16        Q.   And is that going forward?

17        A.   No, it's not.  Not at this time.

18        Q.   Why not?

19        A.   Um --

20        Q.   To the extent you know.

21        A.   To the extent I know, that it was indicated to

22   me we should somehow try to tie it into the population

23   adjustments.  I'm not sure that that can be done.  I

24   thought it was a budget-change-proposal process for

25   this.

Golden Gate Reporting

Page 130

1          Q.   And for what purpose -- for what purpose did

2    you propose reducing the parolee clinician ratio?

3          A.   Because continually we hear from our chief

4    psychiatrists and such that we need better ratios to

5    provide the treatment to the population, because I know

6    that we would like to be able to provide a more

7    well-rounded resource service for them, if we can, at

8    least guiding them in the right direction to spend more

9    time with the parolees.

10          And because the -- part of the proposal was to

11   establish a base staffing to help us retain a certain

12   level of clinical staff onboard.  As our parole

13   population hopefully declines, we can -- our ratios

14   would kind of improve upon themselves.

15          In this particular proposal, I didn't ask for

16   a drastic change in the ratio.  It was -- it came down

17   to asking -- to developing a ratio, a base, a ratio,

18   moving the -- reducing the recidivism strategy money for

19   those 60 positions we implemented over permanently, and

20   three psychiatrist positions.

21          Q.   The three psychiatry positions -- psychiatrist

22   positions, those are the ones you testified earlier were

23   approved; is that right?

24          Or are you saying now that as -- those are

25   positions that weren't approved?

## Golden Gate Reporting

Page 131

1               I might be --

2          A.  We got the 60 positions approved in 2006,

3     which included four psychiatrists.

4          Q.  Okay.

5               The proposal that was rejected for '09-'10

6     would have brought in how many more -- would it have

7     brought in anymore psychiatrists?

8          A.  Three psychiatrists based on the population --

9     at-that-point-in-time population.  However, since a

10    ratio was lowered from what it currently stands, it

11    would be tied to the population.  So, if the population

12    went up, we would get more positions.  If the population

13    went down, we stand to lose some.

14         Q.  Except you referred to a base.

15              If you kept a base, you wouldn't lose them?

16         A.  Right.  To a point.  Right.

17              So, if the population declined and declined

18    and declined, we may lose positions to a point.

19         Q.  And is the purpose of having a base that you

20    can then intensify services to the people left as the

21    population declines?

22         A.  And as well as provide services to that

23    population, because we're so geographically spread

24    out -- California is -- we need a base to always make

25    sure we can cover the whole state.

Page 132

1       Q.   Okay.

2            And was there -- in your proposal for the

3   '09-'10 change in POC ratios, was there a public safety

4   rationale?

5       A.   I would stand to say yes, because every

6   proposal that I put together or have been involved with

7   that has to do with the mentally ill parolee population

8   is going to have some sort of statement at least that --

9   to reduce -- you know, public safety statement of some

10  sort.

11      Q.   Have you made a proposal at any time to

12  establish freestanding Parole Outpatient Clinics outside

13  the parole offices?

14      A.   No.

15      Q.   Are you aware of a proposal within the

16  Department being made at any time to establish

17  freestanding Parole Outpatient Clinics?

18      A.   Just the draft proposal that you showed me

19  earlier that we were working on as part of the Valdivia

20  task force.

21      Q.   And was there a public safety rationale for

22  those freestanding Parole Outpatient Clinics?

23      A.   I believe so.

24      Q.   What was it?

25      A.   Some public safety statement regarding

## Golden Gate Reporting

Page 133

```
 1    stabilizing and providing services for those
 2    individuals -- I don't know it word for word.
 3         Q.  How would freestanding Parole Outpatient
 4    Clinics improve the delivery of POC services?
 5              MR. ANTONEN:  Objection.  Calls for
 6    speculation.  The witness did not say that he drafted
 7    the BCP.
 8              MR. GALVAN:  Okay.
 9    BY MR. GALVAN:
10         Q.  Why did the task force propose freestanding
11    Parole Outpatient Clinics?
12              MR. ANTONEN:  And again, same objection.
13    Calls for speculation.
14              MR. GALVAN:  If you know.
15              MR. ANTONEN:  If you know.
16              THE WITNESS:  I'm not sure.
17              There was just a lot of people meeting and
18    coming up with ideas.
19              MR. GALVAN:  Okay.
20    BY MR. GALVAN:
21         Q.  And who rejected that freestanding POC -- if
22    you know, who rejected that freestanding POC proposal?
23         A.  I don't know.
24         Q.  Okay.
25              Do you know what level of the state government
```

Golden Gate Reporting

Page 134

1    it was rejected in?

2        And by that I mean, was it rejected within the

3    Department of Corrections or was it rejected in the

4    Department of Finance?

5        A.    I --

6            MR. ANTONEN:    Objection.    Asked and answered.

7            THE WITNESS:    Yeah.

8            It did not leave our department.

9            MR. GALVAN:    Okay.    It did not leave your

10   department.

11           THE WITNESS:    No.

12           MR. GALVAN:    Okay.

13           THE WITNESS:    What happened was, we went with

14   the proposal to increase the frequency of services

15   through the reduced-recidivism strategy.

16           MR. GALVAN:    Okay.

17           I'm done with this Exhibit 18.    Thank you.

18           MR. ANTONEN:    (Indicating)

19           MR. GALVAN:    Anyone need a break?

20           Let's take a break.

21           (Off the record from 2:20 p.m.

22            until 2:33 p.m.)

23   BY MR. GALVAN:

24       Q.    Earlier you testified that your estimate for

25   the need for inpatient care for the mentally ill

Golden Gate Reporting

Page 136

1    difference is the 250 to 270.

2            That ended up being your estimate of

3    day-treatment program, slash, mental health

4    rehabilitation service plus any higher levels of care

5    between that and inpatient, like board and care?

6        A.    The definitions that we derived out of the

7    AB 900 was mental health rehabilitative services and

8    crisis care.  We didn't really build in the in-between

9    housing, anything like that.

10       Q.    Okay.

11       A.    That's just -- we're trying to get that in

12   these programs and in negotiations, but we strictly

13   stayed within the confine of what those two definitions

14   were.

15       Q.    Okay.

16       A.    No real in-between or outside.

17       Q.    And when you say "get that" in the

18   negotiations, do you mean that the Department will

19   actually buy those services from the counties?

20       A.    The full-service partnerships that the

21   counties have provide various services, which may or may

22   not include more assistance with their ADLs, which are

23   activities of daily living, or housing.

24       Q.    Okay.

25            And what's the -- currently, as we sit here

**Golden Gate Reporting**

Page 137

```
 1    today, has the Department secured any of those 300
 2     slots?
 3              MR. ANTONEN:   Objection.  Asked and answered.
 4     BY MR. GALVAN:
 5          Q.   Can you answer?
 6          A.   We're still in negotiations.  We don't have no
 7     [sic] approved contracts for those services at this
 8     time.
 9          Q.   Okay.
10              And when did you start working it?
11          A.   Let's see.
12              Assembly Bill 900 passed, I believe, in the
13     spring of 2007.  So, right away.
14          Q.   Okay.
15              MR. GALVAN:   I have a document I want to mark
16     as Exhibit 19.
17              (Whereupon Plaintiffs' Exhibit 19
18               was marked for identification.)
19              MR. GALVAN:   And for the record, Exhibit 19
20     is -- doesn't have Bates numbers, and it's dated
21     December 27th, 2006, and it starts with, "Proposal for
22     an Intervention System."
23     BY MR. GALVAN:
24          Q.   Do you recognize this document, Mr. Storms?
25          A.   Yes, I do.
```

Page 138

1        Q.   What is this document?

2        A.   This was a proposal that was provided to us

3   when we were trying to come up with alternatives to the

4   psyche return process.

5        Q.   And does it look like a correct copy -- appear

6   to you to be a correct copy of the proposal?

7        A.   Appears to be so, yes.

8        Q.   Could you summarize what was -- what was being

9   proposed in this document?

10            MR. ANTONEN:   Objection.  The document speaks

11  for itself.  And I don't believe -- it lacks foundation,

12  because the witness did not draft the document.

13            MR. GALVAN:   If you can answer.

14            MR. ANTONEN:   To the extent you're

15  comfortable, Robert, summarizing another person's work

16  product.

17            THE WITNESS:   Okay.

18            It's my understanding the proposal was to

19  provide a 24/7 -- so, 24 hours a day, seven days a

20  week -- resource for us by way of a toll-free telephone

21  number which we would contract for services and pay for

22  to have a coordination service, if you will, that when

23  we have a mentally ill parolee who needs increased

24  services due to their mental illness, outside of what we

25  provide in our Parole Outpatient Clinics -- that --

Golden Gate Reporting

Page 139

1   specifically those that may need inpatient-type care,

2   that for however we set it up, an individual could call

3   that number and they would get involved in trying to

4   help secure those services for us, for a cost for the

5   services, as well as the provider.

6   BY MR. GALVAN:

7       Q.   Did you solicit the proposal?

8       A.   Yes.

9       Q.   Did you have a budget to work with when you

10  solicited the proposal?

11      A.   Yes.

12      Q.   How much was the budget?

13      A.   My understanding of what was approved to work

14  with was somewhere in the area of $4 million.

15      Q.   Okay.

16           Was that the same $4 million that was the case

17  management dollars that we were talking about earlier?

18           MR. ANTONEN:   Objection.   Calls for

19  speculation.

20           To the extent the witness knows.

21           MR. GALVAN:   To the extent you know.

22           THE WITNESS:   Not that I'm aware, no.

23           MR. GALVAN:   Okay.

24  BY MR. GALVAN:

25      Q.   Did the -- was this proposal approved?

## Golden Gate Reporting

Page 140

1           A.   The concept of getting this type of service,

2   to my understanding, was approved at one point.

3           Q.   Did you end up buying the services from this

4   contractor?

5           A.   The services were never contracted with or

6   purchased.

7       Q.   Okay.

8           What happened to the $4 million?

9           MR. ANTONEN:   Objection.   Calls for

10  speculation.   The witness is --

11          MR. GALVAN:   To the extent you know.

12          MR. ANTONEN:   To the extent you know, but it

13  requires you to speculate on the $4 million in CDCR's

14  general budget.

15          THE WITNESS:   That's -- to my understanding,

16  what it was, was just money that would have been within

17  our existing budget at the time that we were looking at

18  setting aside for this purpose.

19  BY MR. GALVAN:

20      Q.   To your knowledge, did the Department spend

21  that $4 million on reducing recidivism services for the

22  mentally ill parolee population, to your knowledge?

23          MR. ANTONEN:   Again, calls for speculation.

24          To the extent you know.

25          THE WITNESS:   I don't know.

## Golden Gate Reporting

```
                                              Page 141
 1              MR. GALVAN:  Okay.
 2    BY MR. GALVAN:
 3         Q.  Do you know why the Department didn't purchase
 4    the services proposed in this contract?
 5              MR. ANTONEN:  Again, speculation
 6              But to the extent you know.
 7              THE WITNESS:  No.
 8              MR. GALVAN:  Okay.
 9    BY MR. GALVAN:
10         Q.  And after the -- after this proposal was
11    rejected, what efforts did the Department undertake to
12    provide the services -- the services proposed in the
13    contract that you described?
14              MR. ANTONEN:  Objection.  It's compound.  And
15    I don't believe the witness ever testified that the
16    proposal was rejected.
17    BY MR. GALVAN:
18         Q.  Well, was the proposal rejected?
19         A.  Yeah.
20              It's just my understanding that we had
21    approval to move forward with entering into the contract
22    for this type of service, and it was my understanding
23    soon after that, we weren't going to be going this
24    direction.
25         Q.  Who made that decision?
```

Golden Gate Reporting

```
                                              Page 142
 1          A.   I don't know.
 2          Q.   And was there a public safety service in
 3     soliciting this contract?
 4          MR. ANTONEN:   To the extent you know.
 5          THE WITNESS:   The basis for this was to have
 6     an alternative to the psyche-return process.  I would
 7     testify that there's always a public safety component
 8     when you're dealing with services for mentally ill
 9     parolees.
10          MR. GALVAN:   Okay.
11          I'm done with that exhibit.
12          THE WITNESS:   (Indicating)
13          MR. GALVAN:   Thank you
14          Let me mark an Exhibit 20, if I may.  We're on
15     Exhibit 20.
16          (Whereupon Plaintiffs' Exhibit 20
17           was marked for identification.)
18          MR. GALVAN:   Exhibit 20, for the record, is a
19     memorandum with the date August 10th, 2007.
20     BY MR. GALVAN:
21          Q.   And I want to give you a chance, Mr. Storms,
22     to look at this, and then tell me if you're familiar
23     with this memo.
24          A.   (Witness reviews the document.)
25          I'm not familiar with this.  I've not seen
```

Golden Gate Reporting

```
                                                    Page 143
 1    this document.
 2              MR. GALVAN:   Okay.  I'm done with that
 3    exhibit.
 4              THE WITNESS:   (Indicating)
 5              MR. GALVAN:   Thank you.
 6    BY MR. GALVAN:
 7         Q.  I think what I'll do before I mark this one is
 8    just ask you to look at it and see if you're familiar
 9    with it.  (Indicating)
10         A.  (Witness reviews the document.)
11              All I know is our director asked the Board of
12    Regents to develop plans, so I never actually received
13    those plans.
14         Q.  So, did the director ask the Regents to
15    develop plans for AB 900 implementation?
16              That's what you mean by "develop plans"?
17         A.  I know that he gave them tasks.  Whether or
18    not they were specific to AB 900, I can't say, but I
19    just know that they each had task assignments and plans
20    to submit to him to -- to improve upon any of their
21    functions, I would suppose.
22         Q.  Okay.
23              MR. GALVAN:   So, I'm on 21.
24              (Whereupon Plaintiffs' Exhibit 21
25               was marked for identification.)
```

Page 144

```
 1                 MR. GALVAN:   I'd like to mark this as
 2    Exhibit 21.
 3                 And for the record, I marked as Exhibit 21 an
 4    E-mail from Robert Storms, Thursday, May 3rd, 2007, to
 5    several people, with an attachment.
 6    BY MR. GALVAN:
 7         Q.   And I'll ask you, Mr. Storms, to look it over
 8    and then tell me if you're familiar with it.
 9         A.   (Witness reviews the document.)
10         Q.   I'm sorry.   There are two attachments,
11    actually.   I said one.   But there are two.
12         A.   Okay.
13         Q.   Are you familiar with this document --
14    Exhibit 21?
15         A.   Yes.
16         Q.   What is this document?
17         A.   Well, the E-mail itself is just a
18    correspondence of request for the attachments, and me
19    providing them.
20                 But there's -- appears to be two Budget
21    Concept Statements here.   The first one of the
22    Transitional Housing and Board and Care Facilitation for
23    mentally ill parolees is a Concept Statement to --
24    proposal to utilize funding for case management dollars
25    kind of as we have this last fiscal year to provide
```

Golden Gate Reporting

Page 145

1    services for mentally ill parolees.

2            And the second Concept Statement is what we

3    addressed earlier as far as the services, as well as

4    support needed for those services for the secured

5    reentry facilities in the event they were to have -- as

6    I used as a premise, I believe -- the 6,000 beds --

7    medical beds.  I'm not sure of the exact number now.

8            And these documents were put together almost

9    the day or day after.  Within hours, I started drafting

10   these -- the passage of AB 900.

11       Q.  And the first one, the Transitional Housing

12   and Board and Care Facilitation title --

13       A.  Mm-hm.

14       Q.  -- at Bates No. 838, was that approved?

15       A.  Um, I'm not sure.  Um, I'm not sure where

16   these Budget Concept Statements went to for

17   consideration, but our proposal to utilize money as cash

18   assistance and our proposal to get funding for the

19   contracts with the counties for mental health services

20   are both -- were both approved, and the -- and the case

21   management dollars were approved.  And we started

22   utilizing them, I believe, in March or April of 2008.

23   And then the funding is in the budget for the AB 900

24   stuff.

25       Q.  For the first one, how did you arrive at

Page 147

1    I drafted these up from home, utilizing what resources I

2    had at the time. And knowing that I had utilized that

3    language in our proposal for the increased mental health

4    services via POC, I went ahead.

5           In my mind, it was still relevant for this

6    same Concept Statement.

7           I don't believe -- I believe I revised that

8    statement or modified it somewhat in the BCP that you

9    showed me earlier for the day treatment stuff.

10      Q.  Do you believe it's -- do you believe it's

11   still true that there are 6,000 parolees each year

12   returned to custody for the reasons you stated here in

13   Exhibit 21?

14      A.  I have no real foundation to -- that I can

15   speak of right now to determine whether the 6,000

16   number -- I just -- I don't have that type of resource

17   with me today to determine whether 6,000 is an accurate

18   number, but I think it's still accurate to say that a

19   lot of mentally ill parolees do return to custody.

20           And I think that it's fair to say that their

21   violations or new crimes can be resolved -- their mental

22   illness. I'm not saying it is. I'm saying it can be.

23   I believe that.

24      Q.  On the second Budget Concept Statement that's

25   part of Exhibit 21, the one for "Prerelease Planning

Page 148

1    Transitional Services and Placement Coordination," which

2    says it is a request for $3.02 million, do you know if

3    this was approved?

4         A.   Um, I'm not aware of where they're at in the

5    design and services for the secured reentry facilities,

6    so as far as I know, they could get some sited and

7    funded and I could be back in the loop of helping them

8    develop transitional services.  So, I'm just not sure

9    where our department is as far as getting those

10   facilities sited.

11        Q.   Has the progress stalled?

12        A.   I don't know.

13        Q.   When was the last time you were involved in a

14   meeting about the reentry facilities?

15        A.   The last involvement I had specific to the

16   reentry facilities was a need for a Parole Outpatient

17   Clinic staff to get involved in work groups for the

18   Stockton facility, which I gave them individuals to

19   participate.

20        Q.   When was that?

21        A.   That would be last year -- 2007.  That would

22   be my guess.  Early 2008, late 2007.

23        Q.   Okay.

24             That's all I wanted to ask about that exhibit.

25             Are you involved with the remedial sanctions

Page 152

```
 1                (Off the record from 3:01 p.m.
 2                until 3:04 p.m.)
 3                (Whereupon Plaintiffs' Exhibit 22
 4                was marked for identification.)
 5                MR. GALVAN:  This is No. 22.
 6                So, for the record, I marked No. 22 -- Exhibit
 7     22, which is a document that's titled, "Questions from
 8     the AB 900 Jail Construction Request for Proposal
 9     Bidders' Conference."
10     BY MR. GALVAN:
11          Q.  Mr. Storms, are you familiar with this
12     document?
13          A.  I am, yes.
14          Q.  Okay.
15                Did you -- did you write this document?
16          A.  I only had input on the items that pertain to
17     the day-treatment program in mental health services --
18     parolee mental health services.
19          Q.  Okay.
20                Does this appear to be a correct copy of the
21     questions document you're familiar with?
22          A.  To the best of my knowledge.  It's been some
23     time.
24          Q.  Okay.
25                Going to page 12 -- pages 12 and 13, are these
```

## Golden Gate Reporting

Page 155

```
 1            the state?"
 2            Have you been involved in efforts to address
 3    this concern from the counties that the state is trying
 4    to shift costs to them?
 5            MR. ANTONEN:  Objection.  Assumes facts that
 6    the counties interposed this question.
 7    BY MR. GALVAN:
 8        Q.  Did the counties interpose this question?
 9            MR. ANTONEN:  And objection.  Lacks
10    foundation.  I believe the witness has testified he had
11    input into the creation of the document, but was not at
12    the -- whatever the specific meeting was that this was
13    generated at over in relation to.
14    BY MR. GALVAN:
15        Q.  Is this a question that you have heard from
16    the counties, or a question that -- have you heard
17    substantially this question about shifting costs?
18        A.  Um, reservations to work with us, because
19    there was a fear that the funding would end, yes.
20        Q.  How have you addressed that question?
21        A.  I addressed that question that we requested
22    ongoing funding, and any contracted services that we
23    enter into with the counties, we would push forward a
24    contract for a three-year duration, knowing that their
25    partners may have to hire additional staff and such to
```

Page 156

1    provide these services.

2            However, as with anything that we contract for

3    with the state, it's subject to budget authority.

4    Although, I believe that the focus is strong to provide

5    services to mentally ill parolees and that this funding

6    will go on for some time, there is that statement that

7    must go in all our contracts.

8            MR. GALVAN:  Okay.  I'm done with that

9    document.

10           I would like to mark Exhibit 23.  This is a

11   document entitled, Frequently Asked Questions, AB 900

12   Jail Construction Funding."

13           (Whereupon Plaintiffs' Exhibit 23

14            was marked for identification.)

15   BY MR. GALVAN:

16      Q.  Mr. Storms, do you recognize this document?

17      A.  Um, yes.

18      Q.  And --

19      A.  I don't necessarily recognize the document as

20   much as I do items that pertain to my specific areas.

21      Q.  Okay.

22           Which -- well, would those include the -- on

23   page 6, Question 26?

24      A.  Yes.  I provided that information for this

25   document.

**Golden Gate Reporting**

Page 157

1        Q.   Okay.

2        A.   I believe this is a Web-based "Frequently

3   Asked Questions."

4        Q.   Mm-hm.   Okay.

5             MR. GALVAN:   That's all I have on Exhibit 23.

6   Thank you.

7   BY MR. GALVAN:

8        Q.   That exhibit, though, it did identify you as

9   the person to call with questions about mental health

10  day treatment.

11            Do you receive those calls?

12            Do you receive calls regarding AB 900 programs

13  for mental health day treatment from county officials?

14       A.   Initially I did when that first posted, and

15  off and on for a little while, but they trailed off

16  quickly.  I think that for the most part the calls I was

17  receiving were when the counties were doing the

18  proposals for the jail bonds.

19       Q.   Are those the proposals that were due in May

20  of this year?

21       A.   I'm not sure when they were due.

22       Q.   Okay.

23       A.   We also have staff that are working on this

24  effort continually.  So, they're contacting counties,

25  whether or not they call us.

Golden Gate Reporting

Page 158

1          MR. GALVAN:   This is a document I'd like to

2     mark as Exhibit 24.

3                (Whereupon Plaintiffs' Exhibit 24

4                 was marked for identification.)

5          MR. GALVAN:   Exhibit 24, for the record, is

6     dated September 11th, 2007, with an attachment.

7     BY MR. GALVAN:

8          Q.   Mr. Storms, do you recognize the document

9     marked as Exhibit 24?

10         A.   (Witness reviews the document.)

11              Yes, I do.

12         Q.   What's that document?

13         A.   The E-mail correspondence is me E-mailing our

14    Department of Corrections' Rehabilitation Legislative

15    Liaison -- what was my liaison within our Legislative

16    Division -- to recommend -- because it was my

17    understanding that they were working on some trailer

18    language for AB 900 -- to recommend that that day

19    treatment term be changed to "mental health

20    rehabilitation services."

21         Q.   And the attached Budget Concept Statement, the

22    first one, "Day Treatment Programming and Crisis Care

23    Services for Severely Mentally Ill Parolees," are you

24    the author of that Budget Concept Statement?

25         A.   Yes.

Golden Gate Reporting

Page 159

1          Q.  Can you tell us what the purpose of this

2     Budget Concept Statement was?

3          A.  This was at that stage where it was still in

4     the Budget Concept Statement, rather than a Budget

5     Change Proposal, and to obtain the funding to provide

6     the services that were deliverable described in AB 900.

7          Q.  And was this approved?

8          A.  It's -- it's in the proposed budget right now.

9          Q.  Was it -- is it in in this amount -- $2.948

10    million?

11         A.  No.

12              It's the earlier that we spoke to.  The latest

13    is almost $10 million.

14         Q.  Okay.

15         A.  With two different components.  Four million

16    for reduced recidivism and --

17         Q.  And there's a second Concept Statement there,

18    "Program Support Staffing for Day Treatment

19    Programming."

20              Is that also in the current pending budget?

21         A.  Yes.

22              We actually established those positions, not

23    as they are here.  We did not -- we have three Analysts

24    and the Staff Service Manager I that we established.

25              MR. GALVAN:  Okay.  I'm done with Exhibit 24.

**Golden Gate Reporting**

Page 160

1    Thank you.

2              So, I have an Exhibit 25.  One page.

3              (Whereupon Plaintiffs' Exhibit 25

4               was marked for identification.)

5              MR. GALVAN:  Exhibit 25, for the record, is

6    entitled, "California Department of Corrections and

7    Rehabilitation Action Plan."  It has a Bates

8    No. PRIV_021311.

9    BY MR. GALVAN:

10         Q.  Are you familiar with this document?

11         A.  Yes.

12         Q.  What is this?

13         A.  This is just an action plan.  Almost like a

14    point-in-time-picture of where we're at with

15    implementation of a particular program.  And this deals

16    with the Assembly Bill 900, Mental Health Care for

17    Parolees.  And it is where we're at at that point in

18    time, June 7th, 2007.

19         Q.  Looking at Item No. 3 --

20         A.  Mm-hm.

21         Q.  -- "Recommendations/Description, Develop and

22    execute public entity contracts."

23              What is that task?

24         A.  That was to work with counties, develop

25    agreements, and implement the services.

Golden Gate Reporting

Page 161

```
 1        Q.   Okay.
 2             And it further says under there:
 3                  "Approximately two counties in Regions 1,
 4             2, and 4, and LA County in Region 3."
 5             Does that mean that your target was to have
 6   three counties in places?
 7        A.   When initially developed, this concept, early
 8   in the stages, we were thinking that we could possibly
 9   achieve these agreements in all four parole regions with
10   two counties per region, with the exclusion of Region 3,
11   which is its own county.
12        Q.   So, I was miscounting, then.
13             To count this correctly, it would be seven
14   counties; is that right?
15        A.   Yes.
16        Q.   And the target date there is March 31, 2008 --
17        A.   Yes.
18        Q.   -- is that right?
19        A.   Yes.
20        Q.   The completion date is "To be determined."
21             What's the difference between target date and
22   completion date?
23        A.   Target date is the -- that's the date we are
24   targeting and hopeful that we'll have these services,
25   the program implemented.  And the completion date would
```

## Golden Gate Reporting

1    be your actual date.

2         Q.   Okay.

3         A.   So, if it's earlier or later, then that would

4    be the date.

5         Q.   Okay.

6         A.   It's similar to a Microsoft project

7    management-type chart.

8         Q.   Then looking at the "Comments" field, skipping

9    for now the first paragraph, there's:

10              "Estimates of parolees served is DTP

11         equals 100 per day statewide." And "Crisis

12         Management equals 25 inpatient beds per day."

13         You testified earlier about the crisis

14   management estimate being 25 to 30, in this range.

15         Is that the same -- is this the same service

16   we were talking about before -- inpatient --

17        A.   It's the same service.  However, this was -- I

18   believe when I put this together, I was not aware of the

19   300 deliverable.

20        Q.   Okay.

21        A.   That's why the numbers are lower, especially

22   in the Day Treatment Program section.

23        Q.   And then going up to the beginning of that

24   comment, it says:

25              "It is anticipated that one or more

Page 163

1          contracts will be executed in January, 2008."

2       A.   Yes.

3       Q.   But that didn't occur; did it?

4       A.   No, it did not.

5       Q.   When that didn't occur, did the Department

6    provide with you additional resources in order to

7    achieve these deliverables?

8       A.   It wasn't a resource question.  It was

9    willingness upon the counties to work with us.

10       Q.   Were you able to identify ways to remove the

11    obstacles that prevent -- that make the counties

12    unwilling to work with you?

13       A.   I believe that we've made some strides in that

14    by, again, basically informing them that these -- a lot

15    of these individuals are already in their system,

16    potentially tapping into their existing resources; and

17    learning more from them of what exists; and just

18    continually attempting to meet with various counties and

19    work towards some sort of agreement.

20       Q.   Have you asked the Department for anything

21    additional beyond what the Department has already given

22    you to address this unwillingness of the counties to

23    enter into these contracts?

24          MR. ANTONEN:  Objection.  I think it's a

25    horribly compound question.

## Golden Gate Reporting

Page 164

1    BY MR. GALVAN:

2           Q.   Have you asked the Department for anything

3    else to help you with this deliverable?

4           A.   I've asked for an analysis and opinion of

5    whether or not we can work with private providers,

6    rather than county providers, because it was our

7    interpretation of the statute that we were to work

8    direct with counties.

9           Q.   Did you get that analysis?

10          MR. ANTONEN:   And objection.   Calls for

11   potentially attorney-client privileged communication.

12   BY MR. GALVAN:

13          Q.   Did you ask for an analysis from an attorney?

14          A.   Yes.

15          Q.   Did you get an analysis from an attorney?

16          A.   With a --

17          Q.   I'm not asking you what the analysis says.

18          MR. ANTONEN:   Well, you can answer if you

19   received it or not.

20          THE WITNESS:   Yes.

21   BY MR. GALVAN:

22          Q.   You got an analysis from an attorney?

23          A.   Yes.

24          Q.   When was that?

25          A.   Couple months ago.

## Golden Gate Reporting

```
 1          Q.  And after you got the analysis from the

 2    attorney, did you proceed, then, to solicit contracts

 3    from private providers?

 4          A.  We are continuing our efforts with the

 5    counties, as we seem to have some forward movement that

 6    appears to be working out.

 7          Q.  Do you now have an estimate of when your first

 8    contract will be executed?

 9              MR. ANTONEN:  Objection.  Asked and answered.

10    He's testified multiple times that they're in progress,

11    it's still ongoing.

12    BY MR. GALVAN:

13          Q.  But do you have a date --

14          A.  No.

15          Q.  -- when you expect the first one to be

16    executed?

17          A.  No.

18              We're working as rapidly as we can.

19          Q.  In addition to the legal analysis, have you

20    asked the Department for anything else to help you with

21    this deliverable?

22          A.  Like what?

23          Q.  Anything.

24          A.  I'm not sure.

25              Not that I can think of.
```

Golden Gate Reporting

```
                                                     Page 166
 1          Q.   Have you asked for more personnel?

 2          A.   No.

 3          Q.   Have you asked for more money?

 4          A.   No.

 5          Q.   Have you asked for legislation?

 6          A.   Not pertaining to this, no.

 7          Q.   Have you asked for regulation changes?

 8          A.   No.

 9          Q.   Has -- are you aware of anyone in the

10   Department pursuing either more money, legislation, or

11   regulation to address the issue of this deliverable not

12   being met on time?

13          A.   No.

14          Q.   Is it your testimony that no one in the

15   Department is -- no.

16               Going back up to Item No. 2 in this chart,

17   "Identify Counties to contract with."

18          A.   Yes.

19          Q.   It says here, "San Francisco and Santa Clara

20   interested; Sacramento declined; Yolo potential."

21          A.   Yes.

22          Q.   Is that still the status of county interest?

23          A.   San Francisco has not been as responsive as we

24   thought they were at that time, so we've had no more

25   ongoing conversations with them at this time.  Santa
```

Golden Gate Reporting

Page 167

1    Clara is still moving forward with this.  Sacramento
2    still holds their same position of not wanting to work
3    with us.  And Yolo recently reopened conversations with
4    us.
5           Q.  And I won't make you repeat it, but you
6    testified earlier that there are additional counties
7    having conversations.
8           A.  Yes.
9           Q.  Okay.  Thank you.
10               MR. GALVAN:  I would like to mark this as
11   Exhibit 26.
12               (Whereupon Plaintiffs' Exhibit 26
13                was marked for identification.)
14   BY MR. GALVAN:
15           Q.  Mr. Storm, I marked as Exhibit 26 an E-mail,
16   dated September 20th, 2007, on which you're copied to
17   Jill Dubbs.  And it has attached to it a Budget Change
18   Proposal for '08-'09.
19               Are you familiar with this document?
20           A.  Yes.
21           Q.  And does this appear to be a correct copy of
22   the '08-'09 Budget Change Proposal for Community-based
23   Day Treatment Programming and Crisis Care Services?
24           A.  Yes, it does.
25           Q.  Are you the author or this Budget Change

Golden Gate Reporting

Page 168

1    Proposal?

2         A.   Yes.

3         Q.   And is this the -- did this result from the

4    Budget Change Concept that we looked at earlier for Day

5    Treatment Programming?

6         A.   Yes.

7         Q.   Looking at the very end of the document where

8    it has Thomas Hoffman signature line, the amounts, Total

9    funding, 1.869 million for '07-'08, and 10 million for

10   '08-'09, do you know if those amounts were approved?

11        A.   No.

12             This is not the -- this did not end up being

13   the final.  I think you showed me the final earlier

14   today.

15        Q.   So, the final was a lesser amount?

16        A.   The final is somewhere in the area of

17   9.6 million.

18             The contract monies are about the same.  The

19   positions for supporting it in our division are the

20   same.  I believe the travel for the positions is in

21   there, but not the -- I don't believe the facility

22   leasing is in there.

23        Q.   The facility leasing being just $50,000.

24             It's substantially the same as what you sought

25   is in the pending budget?

Page 169

```
 1            A.   I don't believe that that's in the final
 2    Budget Change Proposal that we put out.  That was
 3    basically for our own staff so that we can pay for our
 4    own property.
 5            Q.   And if you could turn to page 5, Bates
 6    No. 46120 of Exhibit 26, under "Justification," you
 7    wrote, in the second-to-last sentence:
 8                 "It is anticipated that enhancing the
 9                 services available to mentally ill offenders
10                 on parole by way of contracted mental health
11                 crisis and intervention and rehabilitative
12                 services will significantly reduce the
13                 recidivism of mentally ill parolees while
14                 increasing public safety."
15                 Is that still your belief?
16            A.   That's my belief, yes.
17            Q.   Did you originally seek more money for this
18    program than what ended up in this Budget Change
19    Proposal?
20                 MR. ANTONEN:  Objection.  Vague as to which
21    Budget Change Proposal.
22                 Are we talking about the one that we discussed
23    earlier? this one? the Budget Concept Statement?
24    BY MR. GALVAN:
25            Q.   Did you originally seek more than
```

## Golden Gate Reporting

Page 174

1    services contracted for within San Diego County, if that

2    is to come to light, which we are hopeful it will, any

3    parolee who has a mental health need will be considered

4    as able to participate in that program, whether they're

5    coming through the reentry program through Senate Bill

6    618, straight from prison, or out on parole.

7        Q.  Are mentally ill parolees excluded from the

8    Senate Bill 618 program now?

9        A.  I don't know that.

10       Q.  Do you know if they're included?

11       A.  I can just -- yeah.  I don't know that.

12           MR. ANTONEN:  Robert, just be careful.  You

13   don't want to speculate.

14           THE WITNESS:  That's right.  I really don't

15   know.

16           MR. GALVAN:  Okay.  Thank you very much.  I'll

17   take that.  (Indicating)

18           I'd like to mark this E-mail exchange as

19   Exhibit 29.

20           (Whereupon Plaintiffs' Exhibit 29

21            was marked for identification.)

22   BY MR. GALVAN:

23       Q.  And what I have handed you is a document,

24   Exhibit 29, E-mail chain.  It starts in -- it's all

25   around -- well, it starts in May 16th, 2007, and it ends

Golden Gate Reporting

Page 175

1    up in October 25th, 2007.

2             And I'll ask you to look at that for a moment

3    and tell me if you're familiar with this document.

4        A.   (Witness reviews the document.)

5             Okay.  Yeah.  I'm familiar.

6        Q.   Um, how did you become involved in this

7    process that's described in these E-mails, which I'll

8    characterize as "improving connectivity" between POC and

9    the reception center --

10       A.   My initial involvement was based on the

11   invitation from, I believe, Dr. Canning at Divisional

12   Correctional Health Care Services to come attend their

13   suicide prevention work group.  I think their --

14   whatever they call it.  And this particular project kind

15   of expanded from there, but that's where its initial --

16       Q.   Did you come to perceive in that project that

17   in addition to suicide prevention it also had a public

18   safety impact on the outside of prison?

19       A.   I'm not sure I understand that question.

20       Q.   Well, you referred in the -- looking at the

21   exhibit, Exhibit 29, you referred to an "SQRC incident."

22   And it's hard to -- probably 11 May or 1 May.

23       A.   Mm-hm.

24       Q.   Do you remember what incident you were talking

25   about?

Golden Gate Reporting

Page 176

1        A.   I do.

2        Q.   What was that?

3        A.   That was the incident that a parolee was at

4    the San Quentin Reception Center, and upon release --

5    there was a lot of logistical things that were findings

6    and recommendations by the Office of the Inspector

7    General.  But upon release, that particular parolee

8    committed a crime, I believe, in San Francisco.  A

9    stabbing and such.

10        Q.   And did you -- you wrote here:

11              "This need has grown since the SQRC

12              incident, and we would like to work toward

13              finalizing the project."

14              Did you write that because you perceived that

15   there was -- that that bad public safety outcome was

16   connected with the lack of connectivity in some way?

17        A.   The Office of Inspector General and their

18   findings and recommendations recommended that increased

19   communication occurs between the Parole Division and the

20   Institution Division.

21              And as part of the Corrective Action Plan, my

22   part was to develop this increased communication in

23   helping the institutions, specifically the reception

24   centers specific to San Quentin -- to help them better

25   identify parolees returned to custody that may have a

Golden Gate Reporting

Page 177

1    mental illness participate in the mental health services

2    delivery system prior to their release -- before.

3        Q.  And from October 25th, 2007, to now, how would

4    you characterize the progress in that project?

5        A.  Fully implemented at San Quentin Reception

6    Center, and in the process of actually -- actually, in

7    health care hands at the moment, and in the process of

8    getting all the mental health staff access to the report

9    in all the institutions.

10       Q.  When you say, "fully implemented at

11   San Quentin Reception Center," what, practically, does

12   that mean?

13       A.  Fully implemented from my standpoint is, I

14   have now provided them an avenue, a link to a Web-based

15   report that will provide them an overview of a

16   particular parolee's treatment at POC when they return

17   back to the Reception Center, if they were a POC client.

18           And that includes diagnosis; medications;

19   appointment history and outcomes; case notes from the

20   three disciplines; last case notes from the

21   psychiatrist, psychologist, social worker; IDTT notes,

22   if there was one; last date of release; designation upon

23   release -- EOP or triple C-MS; parole agent; parole

24   unit; and case work clinician.

25       Q.  Do you know if that's being used at the

Page 178

1    San Quentin Reception Center?

2        A.   It's my understanding it is.

3        Q.   And I'm sorry.   You may have said this

4    already.

5            Is there a plan to use it at the other

6    prisons?

7        A.   Provided our division has put together

8    security groups for the mental health -- for the IT

9    people at the prisons to put their mental health staff

10   as users in that group, as part of that group on our

11   network so that they have access to that.   Health care

12   has provided a link to give to their mental health staff

13   in the institutions.

14       Q.   The institutions, other than San Quentin, you

15   mean?

16       A.   Yes.

17       Q.   Okay.

18            But is it your testimony that you're aware

19   there is a difference between the implementation status

20   at San Quentin and the other institutions, and that you

21   testified that you believe that San Quentin is actually

22   using it?

23       A.   Yes.

24            As part of the Corrective Action Plan, we had

25   a time line to meet that at San Quentin.   We met that

Golden Gate Reporting

Page 179

1    time line at San Quentin.

2         Q.   Okay.

3              And do you have an understanding or a way of

4    explaining what the -- why it improved public safety for

5    that connection to be in place?

6              MR. ANTONEN:  Objection.  Calls for

7    speculation.  He's not offered as an expert witness on

8    public safety.

9              But to the extent you have personal knowledge.

10   Please don't speculate, Robert.

11             THE WITNESS:  Okay.

12             According to the findings and recommendations

13   of the Office of Inspector General on that particular

14   incident in San Quentin, had that inmate been identified

15   as previously participating in mental health services

16   delivery system in the prison, then there may have been

17   treatment provision that was necessary.  Therefore, the

18   individual may have been more stable when he released

19   and may have not committed the offense that he

20   committed.

21             MR. GALVAN:  Thank you.  I'm done with 29.

22             MR. ANTONEN:  Can we go off the record for a

23   second?

24             (Off the record from 3:51 p.m.

25              until 4:05 p.m.)

Golden Gate Reporting

Page 184

```
 1              I'm not sure what stage it was at, but appears
 2   to be accurate for its time.
 3         Q.   Looking at pages 10 and 11, definitions of 24
 4   and 25 -- "Day Treatment" and "Crisis Care"?
 5         A.   Yes.
 6         Q.   Those are definitions you worked on?
 7         A.   Yes.
 8         Q.   Okay.
 9              MR. GALVAN:  Thank you.  That's all I have on
10   that exhibit.
11              And I have just a few questions about an
12   exhibit to be marked as 33.  I would like to mark as 33
13   an Exhibit -- I'll stop talking.
14              (Whereupon Plaintiffs' Exhibit 33
15               was marked for identification.)
16   BY MR. GALVAN:
17         Q.   Exhibit 33 is -- has a title, "First Annual
18   Report on the Mental Health Services Continuum Program."
19              And I'll ask you to take a look at this,
20   Mr. Storms, and tell me if you're familiar with this
21   document.
22         A.   (Witness reviews the document.)
23              Yes, I'm familiar with it.
24         Q.   And does it appear to be a correct copy of the
25   First Annual Report?
```

## Golden Gate Reporting

1      A.  Appears to be, yes.

2          MR. GALVAN:  Thank you.

3          No other questions.

4          MR. STEGEMAN:  I believe this is your copy.

5    It's got some markings on it.  (Indicating)

6          MR. GALVAN:  Thank you.

7          I'd like to mark as Exhibit 34 an order --

8    Court Order.

9          (Whereupon Plaintiffs' Exhibit 34

10          was marked for identification.)

11   BY MR. GALVAN:

12       Q.  What I've handed to you as Exhibit 34 is a

13   copy of an Order in Coleman and Valdivia, dated August

14   8th, 2008.

15          I wanted to ask you, Mr. Storms, if you've

16   seen this Order.

17       A.  Yes, I have.

18       Q.  Okay.

19          And I wanted to direct your attention to

20   the -- page 4 of the order, starting at line 21.

21       A.  Yes.

22       Q.  That says:

23          "Whenever a parole agent places a parolee

24          in his custody and finds the parolee may pose

25          a danger to himself or others by virtue of his

**Confidential Transcript**

Page 198

```
 1   medical or for mental health.
 2       Q.   Um --
 3       A.   With no conservatorship put in place.
 4       Q.   And for that original group, did you succeed
 5   in securing any board-and-care placements?
 6       A.   When we coordinated the release of the final
 7   psyche return releases --
 8       Q.   Yes.
 9       A.   -- in early spring, maybe, of 2007?
10           Um, yes, there was some board-and-care-type
11   level of placements.
12       Q.   Okay.
13           What's different about what you're doing now
14   with the counties in trying to get -- to approach them
15   for the AB 900 project compared to what you were doing
16   then with the psyche return population?
17       A.   At that time, as we have continually with
18   mental health and medical needs, these are quick notices
19   to advise them that we have this particular inmate
20   returning back to their community.
21           It's their resident who has a need, and we're
22   solicitating [sic] their assistance in helping us
23   identify and place the individual potentially on
24   their -- at their cost; whereas, in the AB 900, we are
25   looking to contract for services to have those services
```

Golden Gate Reporting

Page 201

1       A.    The first time since AB 900 was passed?

2       Q.    Mm-hm.  Yes.

3       A.    Had to be within a week.

4       Q.    Okay.

5       A.    Two weeks.

6       Q.    So, in the over a year since then, what has

7    the Department done to address that concern from the

8    counties, to your knowledge?

9       A.    From my perspective and my involvement, we

10   continue to push for that level of care, and offer

11   funding for that level of care.

12      Q.    To your knowledge, are you offering more

13   funding than you offered before you heard that concern?

14      A.    We have not stated that we would underfund the

15   placement or overfund the placement.  We just simply

16   asked for availability and a process to get in there,

17   and for an agreement to where we can pay for that

18   service.

19      Q.    And have any of your -- the people you're

20   talking with on the county side said, Well, we would

21   have availability if you came up with more money?

22      A.    No.

23      Q.    Okay.

24            In your opinion, what could the Department do

25   to address these barriers?

## Golden Gate Reporting

Page 202

```
 1              MR. ANTONEN:  Objection.  Calls for
 2    speculation.
 3              He's not offered as an expert witness.
 4              MR. GALVAN:  If you can answer.  If you have a
 5    lay opinion.
 6              THE WITNESS:  I don't believe we're in a
 7    position to do anything.
 8    BY MR. GALVAN:
 9         Q.  Well, you testified that your efforts are
10    ongoing, still, to find these placements; is that
11    true -- is that correct?
12         A.  Our efforts are ongoing to initiate and
13    complete agreements with the counties for these types of
14    services.
15         Q.  Okay.
16         A.  I continually work to find placements at no
17    cost to us for medical and -- medical placements.  And
18    also, without agreements, continually recommend that
19    inmates in acute level of need for their mental illness
20    are taken to the county for an evaluation.
21         Q.  The AB 900 program would not be at no cost to
22    you; right?
23              You have money for that?
24         A.  Correct.
25         Q.  That's the $9.6 million?
```

```
 1              CERTIFICATION OF DEPOSITION OFFICER

 2

 3              I, KATY LEONARD, duly authorized to

 4    administer oaths pursuant to Section 2093(b) of the

 5    California Code of Civil Procedure, hereby certify that

 6    the witness in the foregoing deposition was by me sworn

 7    to testify to the truth, the whole truth and nothing but

 8    the truth in the within-entitled cause; that said

 9    deposition was taken at the time and place therein

10    stated; that the testimony of the said witness was

11    thereafter transcribed by means of computer-aided

12    transcription; that the foregoing is a full, complete

13    and true record of said testimony; and that the witness

14    was given an opportunity to read and correct said

15    deposition and to subscribe the same.

16              I further certify that I am not of counsel

17    or attorney for either or any of the parties in the

18    foregoing deposition and caption named, or in any way

19    interested in the outcome of this cause named in said

20    caption.

21

22

23

24    _____

25              KATY LEONARD, CSR 11599
```