# EXHIBIT 37

**Deposition of Robert Storms
August 19, 2008
(Phase II Counter-Designations)**

Golden Gate Reporting

Page 1

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN DISTRICT OF CALIFORNIA
AND THE NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

RALPH COLEMAN, et al.,

    Plaintiffs,

              Case No. Civ S 90-0520 LKK-JFM P

vs.

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/

MARCIANO PLATA, et al.,

    Plaintiffs,           Case No. C01-1351 TEH

                             CONFIDENTIAL PORTION

vs.                            Pages 195 through 199

ARNOLD SCHWARZENEGGER, et al.,

    Defendants.

_____/


DEPOSITION OF ROBERT STORMS


DATE:        August 19, 2008

TIME:        9:35 a.m.

LOCATION:    ROSEN, BIEN & GALVAN, LLP
             315 Montgomery Street, Tenth Floor
             San Francisco, California 94104

REPORTED BY: Katy Leonard
             Certified Shorthand Reporter
             License Number 11599

Page 22

1  180,000 that potentially qualify for one of the benefit
2  entitlements offered by the federal and state and —
3  yeah.
4     Q. And then the ratio, "540 to 1," what is that?
5     A. That was my ratio projection of if I was to
6  hire and have as many social workers as we hoped to
7  contractually, the 15 percent of the 180,000, which I
8  can't calculate that number right now — over 20,000, I
9  assume — I believe that we would have 540 inmates to
10 each social worker to try to provide those services.
11    So, that was a ratio of the nonexistent, still
12 implementing social worker to the potentially qualified
13 inmate.
14    Q. And then I'll represent that 20 percent of
15 180,000 is 27,000.
16    So, if I divide that by 540, would I get 50
17 social workers you were after?
18    A. That's what we were anticipating at that
19 moment, yes.
20    Q. Did you get them?
21    A. We're still implementing the program. We have
22 one contract in place with Kern County right now, so I
23 can't tell you the exact number. But it's over 20
24 social workers, I do believe, with that contract.
25    Q. Did you get funding for the 50 social workers?

Page 23

1     A. We got funding for the contractual services,
2  and the funding request was based on what we believed 50
3  social workers would cost us, contractually services, so
4  we did get the funding we requested.
5     Whether or not that will actually pay for
6  that, we're not a hundred percent sure yet, because
7  costs — salaries have increased substantially for
8  clinical staff throughout the state as a result of the
9  culminaries [sic].
10    Q. Okay.
11    What's the purpose of having those social
12 workers do preparole benefits?
13    A. To the — the objective is to have a disabled
14 inmate qualified and approved for a benefit entitlement
15 prior to release to parole or release back to the
16 community, whether it's on parole or not.
17    Q. Why would you do that?
18    A. To better their chances on having a successful
19 parole period or a successful transition back to the
20 community.
21    Q. How do you define a "successful parole
22 period"?
23    A. To have their needs met and not commit crime.
24    Q. Okay.
25    Right under that is a line, "TCMP-MI, 11

Page 24

1  percent, 333 to 1."
2     Is that — are those numbers the same — under
3  the same principle as the preparole benefits numbers?
4     A. Yes.
5     Q. Okay.
6     So, then I should understand that to mean that
7  you estimated of 180,000, 11 percent would need TCMP-MI
8  services.
9     And when you worked that out, you were looking
10 for a ratio of 333 clients — or, inmates to 1?
11    A. Yes, as an existing ratio based on our current
12 contract and social worker services, and my estimate of
13 what the mentally ill inmate population was.
14    Q. Okay.
15    So, if that's — let's see.
16    11 percent of 180K is — I'll represent it's
17 19,800 divided by 333. So, I'll represent that comes
18 out to 59 1/2 social workers.
19    A. Yeah.
20    Q. Are those social workers who do this job, or
21 what are they?
22    A. They're social workers through two of our
23 contractors, yes.
24    Q. And do you have your 60 social workers now?
25    A. We had about 60 social workers. However, due

Page 25

1  to salary increases that they've incurred, some of those
2  positions are no longer remaining filled.
3     Q. How many do you estimate that you have now?
4     A. It is an estimate, but over — around 50 or
5  so.
6     Q. Okay.
7     A. Maybe just over.
8     Q. And what's the purpose of the job that they
9  do?
10    What's the purpose of TCMP-MI?
11    A. The purpose of TCMP-MI is to provide
12 information about a mentally ill inmate's diagnosis,
13 medications, needs, history, to our Parole Outpatient
14 Clinic staff in the parole regions to inform and prepare
15 those staff for intake and evaluation and treatment of
16 that inmate once they parole.
17    Second to that, their mission is to advocate
18 to the inmate the importance of going to the Parole
19 Outpatient Clinic employments.
20    (To the Reporter) Outpatient. One word.
21    And probably if I could refer to it as "POC"
22 from this point, if you don't mind.
23    Q. And why is that important?
24    A. Well, that's important for a couple of reasons
25 at least, one being that they are mentally ill and

7 (Pages 22 to 25)

Page 38

1   Q. And in your experience, are the triple C-MS
2   parolees lower-need than the EOP parolees?
3       MR. ANTONEN: Objection to the extent, you
4   know, for the foundation.
5       He's testified that he staffs programs, but he
6   hasn't testified that he's at the POCs or meeting with
7   individual inmates.
8       THE WITNESS: I'm not clinical by nature.
9   However, the majority of the parolees that are EOP seem
10  to have more needs, higher needs than our
11  triple-C-MS-designated parolees. However, they can --
12  the triple C-MS can fluctuate into that need as well.
13  BY MR. GALVAN:
14      Q. And looking again at Dr. Chaiken's E-mail,
15  where she estimates out of a 600-bed, 15 to 20 inmate
16  patients requiring EOP, slash, day treatment.
17      In your experience, is that a reasonable
18  estimate of the EOP load for a 600-bed reentry program?
19      A. I'm not sure of the design of the reentry
20  program itself. All I could -- I look at those numbers
21  as percentages of the population as it stands.
22      Q. So, that, I just worked out. The 20 inmates
23  over 600 would be 3.3 percent of the population.
24      A. Yeah.
25      I'm not --

Page 39

1       MR. ANTONEN: Objection. He testified he's
2   not familiar with the design of the program. So --
3       MR. GALVAN: Okay.
4       MR. ANTONEN: -- it calls for speculation.
5       MR. GALVAN: All right.
6       Well, I'm done with Exhibit 3.
7   BY MR. GALVAN:
8       Q. Based on your experience, if someone said that
9   10 percent of the mentally ill parole population would
10  require inpatient mental health treatment, would you
11  consider that high or low?
12      A. I'm not really sure that I can really define
13  that percentage as being high or low.
14      Q. Okay.
15      MR. GALVAN: So, I'm about to switch topics,
16  if anybody wants a break.
17      THE WITNESS: Okay.
18      I'll take a quick break. Sounds good.
19      MR. GALVAN: Okay.
20      (Off the record from 10:18 a.m.
21      until 10:30 a.m.)
22      MR. GALVAN: Okay.
23      So, we're back on the record after a break.
24      It's about 10:30.
25      So, I want to switch to prerelease and the

Page 40

1   transitional case management program. And I'd like to
2   mark an Exhibit 4.
3       (Whereupon Plaintiffs' Exhibit 4
4       was marked for identification.)
5   BY MR. GALVAN:
6       Q. This is on the Web site of the Bureau of State
7   Audits -- their 2001 report.
8       Do you recognize this, Mr. Storms?
9       A. Um, not real familiar with it. I glanced at
10  it before. I'm just really not familiar with it.
11      Q. Would you like to take a minute to look at
12  it --
13      A. Sure.
14      Q. -- and just tell us if it's what you glanced
15  at before?
16      A. (Witness reviews the document.)
17      Very good.
18      Q. Okay.
19      Are you involved in the work of evaluating the
20  results of the transitional case management program?
21      A. What do you mean by "evaluating"?
22      Q. Um, are you involved with the project at UCLA
23  at the -- the project that David Farabee has led at UCLA
24  to study the effectiveness of the transitional case
25  management program?

Page 41

1       A. We held that contract, and that was in my
2   unit, yes.
3       Q. Okay.
4       And having taken a few minutes to look at the
5   2001 Bureau of State Audits report on the state of the
6   transitional case management program now and being
7   involved in the ongoing evaluation of it, are you aware
8   of any facts to show that it's improved since the Bureau
9   of State Audits did its review?
10      MR. ANTONEN: Objection. The Bureau of State
11  Audits report is from 2001 and this is 2008. So, I
12  think that the question is misleading, as it goes to the
13  program now. And so...
14  BY MR. GALVAN:
15      Q. Is the program now better than it was in 2001?
16      A. In my opinion, it is.
17      Q. Why?
18      A. Yes.
19      Because at the time, and since the Bureau of
20  State Audits report of 2001, we have fully implemented
21  our TCMP-MI program, we have our database for shared
22  information between our TCMP review in prison to our
23  Parole Outpatient Clinic, as well as information sharing
24  from our Parole Outpatient Clinic database to the
25  institutions upon return of the mentally ill parolee to

11 (Pages 38 to 41)

Page 50

1  Q. Okay.
2     And what is -- what's the purpose of allowing
3  the IDTT to increase the level of care for a parolee?
4  A. It is my understanding that IDTTs are used for
5  EOP-designated parolees. Therefore, to move into or
6  move out of that level of care in the parole setting
7  would require an IDTT.
8  Q. Okay.
9     Who -- who is on an IDTT -- who are the
10 members of the team?
11 A. To the best of my knowledge, it is the case
12 manager clinician, potentially another POC staff person
13 as needed that may be involved in the treatment team,
14 and the parole agent.
15 Q. On the second page, which is on the back of
16 the exhibit, the first paragraph discusses medication
17 management by a psychiatrist.
18    Do parolees see the psychiatrist in the field?
19    MR. ANTONEN: Objection. Vague.
20    To the extent you know.
21 BY MR. GALVAN:
22 Q. Do the parolees get appointments with the
23 psychiatrist?
24 A. Some do.
25 Q. Okay.

Page 51

1  MR. GALVAN: Okay. I'm done with Exhibit 6.
2     And I'd like, at this time, to mark an
3  Exhibit 7.
4     (Whereupon Plaintiffs' Exhibit 7
5     was marked for identification.)
6  BY MR. GALVAN:
7  Q. And for the record, Exhibit 7 bears a cover
8  that says, "Final Report of the" -- "Final Report on the
9  Mental Health Services Continuum Program," dated -- at
10 the bottom of the cover -- June 30th, 2006.
11    Mr. Storms, are you familiar with Exhibit 7?
12 A. Yes, I am.
13 Q. And does this appear to be a correct copy of
14 the "Final Report on the Mental Health Services
15 Continuum Program"?
16 A. Appears so, yes.
17 Q. Were you involved in the preparation of this
18 report?
19 A. No.
20 Q. Were you involved in the -- managing the
21 contract with UCLA to prepare this report?
22 A. Yes.
23 Q. Turning to page 31 of Exhibit 7, which has the
24 major heading, "Conclusions," if you take a moment to
25 look at the first sentence of the conclusion that says:

Page 52

1  "The current evaluation has focused on the
2  impact of the MHCP, Mental Health Service
3  Continuum Program, on those inmates who
4  were" -- another acronym -- "OIS listed, but
5  these offenders only account for 56.8 percent
6  of eligible releases overall."
7     Can you explain what problem that sentence is
8  identifying with the Mental Health Services Continuum
9  Program?
10    MR. ANTONEN: Objection. The witness has
11 testified he was not involved in the preparation of the
12 report. Calls for speculation.
13    MR. GALVAN: If you know.
14    MR. ANTONEN: To the extent you know.
15    THE WITNESS: It's my belief that this is --
16 the particular sentence that you read is referencing the
17 identification of mentally ill inmates within 90 days to
18 parole -- or, release from prison to parole, which is
19 based on automated identification.
20 BY MR. GALVAN:
21 Q. Now, are you involved with -- are you doing
22 any work to respond to the problem identified in that
23 sentence?
24    MR. ANTONEN: Objection.
25    Did we identify the problem actually?

Page 53

1  BY MR. GALVAN:
2  Q. Would it be fair to say that the problem
3  identified in that sentence is not enough persons about
4  to be released on parole are being identified for the
5  Mental Health Services Continuum Program?
6     MR. ANTONEN: Again, objection for
7  speculation.
8     To the extent you know what the problem is
9  referenced in the report.
10    THE WITNESS: I believe that we're
11 consistently striving to improve upon identification of
12 those that are participating in the prison's mental
13 health services delivery system prior to their release
14 through several approaches.
15    One was, we are -- have increased the dates
16 for which -- parole dates for which we identify them
17 from 120 days to now 210 days.
18    We have ongoing collaboration with our
19 Division of Correctional Health Care Services mental
20 health staff, and contact by our contractors with the
21 mental health staff in the particular prisons that they
22 are assigned to.
23    And our information services branch is aware
24 that not all are identified. There are several, just
25 for reasons that that happens that I can't necessarily

Page 62

1  with that at this time.
2      Q. Okay.
3      MR. GALVAN: I'm done with Exhibit 9.
4  BY MR. GALVAN:
5      Q. Let me get my outline to benefits planning,
6  which is 3(b) in my outline.
7      What's the purpose of your work in planning --
8  in benefits planning?
9      A. The purpose of my work?
10     Q. Could you maybe give me a more defined --
11     A. Yes.
12     Q. Could you describe -- could you describe the
13 benefits planning part of your work?
14     A. Working to get inmates preapproved for benefit
15 entitlements such as supplemental security income and/or
16 MediCal, VA benefits and such when they are qualified.
17     Q. How long have you been working on that
18 project?
19     A. Since 2005.
20     Q. And what's the current status of it?
21     MR. ANTONEN: Objection. Vague.
22     MR. GALVAN: If you can answer.
23     THE WITNESS: We got agreements with the
24 Social Security Administration, State Department of
25 Health Care Services, to -- it's formal agreements for a

Page 63

1  process in which we can apply for benefits prior to
2  parole, and with a goal of receiving some sort of
3  disposition on their eligibility prior to parole.
4      And we have a pending agreement with the
5  Veterans Affairs, as well as some funding authority to
6  contract for social work services in the prisons to work
7  with these individuals, as well as development of a
8  database.
9  BY MR. GALVAN:
10     Q. And are any of those services actually
11 implemented in the prisons -- any of the ones you just
12 described?
13     A. It's -- they are, yeah. Some.
14     Q. How many prisons are they implemented in?
15     MR. ANTONEN: I'll object to, which programs
16 are we talking about.
17     MR. GALVAN: Okay. It was a compound
18 question.
19     MR. ANTONEN: Yeah.
20 BY MR. GALVAN:
21     Q. Is the benefits planning a single program?
22     In other words, you described in your last
23 answer contracts with the SSA and the Department of --
24 the Department of Health Care Services, and pending with
25 the VA, and then contracts with the social work agencies

Page 64

1  to actually provide the planning.
2      Do you consider that all one program?
3      A. Yes.
4      Q. Okay.
5      How many prisons is that one program
6  implemented in?
7      A. One.
8      Q. Which one?
9      A. CSP Sacramento.
10     Q. When did it get implemented there?
11     A. I'm going to guess about three months ago.
12     Q. Okay.
13     Have you collected any data on how many people
14 it has served in the last three months?
15     A. Our contractor is. I have not evaluated that
16 data at this time.
17     Q. Okay.
18     Do you have an estimate of how many people it
19 has served?
20     A. No --
21     MR. ANTONEN: Objection. It calls for
22 speculation.
23     MR. GALVAN: If you can answer.
24     THE WITNESS: I don't have an estimate, but
25 I'm aware of at least two approvals for SSI.

Page 65

1      MR. GALVAN: Okay.
2  BY MR. GALVAN:
3      Q. You're aware of two approvals for SSI?
4      A. Yes.
5      Q. Is there a -- do you have a schedule to
6  implement that one program in any other prisons?
7      A. Our current contractor is going to service 14
8  prisons, and we will be bringing -- our goal is to start
9  servicing eight to nine more at the beginning of
10 September.
11     Q. Is that the beginning of September, 2008?
12     A. Yes.
13     Q. Okay.
14     And then do you have any other benchmarks
15 after that?
16     A. The next two benchmarks are the continuing
17 effort to get the second contract on for the
18 remaining -- I'm sorry. The first contract is 19
19 prisons.
20     Our benchmark is to get the second contractor
21 up for the remaining 14 adult prisons, as well as get
22 the remaining nine or ten prisons up for our first
23 contract with Kern County.
24     Timing, we are looking at now the beginning of
25 2009 with the second contract, is our hopes, if we stay

Golden Gate Reporting

Page 90

1  or triple C-MS. It was simply if they're mentally ill
2  and needed some support of services, that money was made
3  available to them.
4       And it would range from -- mental health
5  board-and-care was part of the mission. There was
6  higher-level-type care in some facilities in the state,
7  as well as transportation support. Other support of
8  services that may help them acquire food and different
9  types of things.
10  Q. And did that money run out on July 1st, 2008?
11  A. That money was part of the fiscal year
12  2007-2008 budget. We had no approval to expend any of
13  that money beyond that date.
14  Q. So, what happened to the parolees who were
15  receiving services with that money after July 1, 2008?
16      MR. ANTONEN: Objection. Lacks foundation.
17      To the extent you know what happened to
18  individual cases as a program manager.
19      THE WITNESS: Yeah.
20      I couldn't really speak to what continued
21  services those individuals or any one individual
22  received in that particular venue.
23  BY MR. GALVAN:
24  Q. Did the Department do anything to address the
25  running out of that -- of those funds for those

Page 91

1  parolees?
2      MR. ANTONEN: Objection. Vague.
3      MR. GALVAN: If you can answer.
4      THE WITNESS: Well, the 4 million that we --
5  that was set aside out of the Department of Corrections'
6  budget for that purpose in fiscal year '07-'08 is a
7  continued funding source in the current Department of
8  Corrections' budget -- State budget that's pending
9  approval. And it's to supplement the request that we
10  put together for funding the Assembly Bill 900 delivery
11  of mental health services to parolees.
12      So, to answer your question, yes, we are
13  moving forward with -- in our attempts to get into
14  contracts for mental health services in California
15  communities.
16  BY MR. GALVAN:
17  Q. So, between July 1 and whenever the State
18  budget is approved, are the parole agents without the
19  ability to make these cash assistance payments?
20  A. I don't really think that that's my area to
21  answer.
22  Q. Does that mean you don't know?
23  A. Um, sure. I don't know.
24  Q. Um --
25  A. I don't manage the budget for cash assistance

Page 92

1  for parole agents' usage, and I don't make the decisions
2  on how they spend it.
3      I just know that we put together a -- a
4  directive to the bill to utilize this particular funding
5  that we're talking about now for that purpose. And the
6  ongoing funding, if approved, in the California budget
7  for this purpose right now is designated solely for
8  contracted services.
9  Q. I'm sorry.
10      The on -- which ongoing funding?
11  A. If we continue receiving the 4 million as
12  proposed -- as approved legislatively so far -- if we
13  continue receiving that money that's in the governor's
14  budget as -- once the budget is signed, then that money
15  continually will be available this fiscal year for
16  contracted services. That's what it's for right now --
17  targeted for.
18  Q. Did the Department send out any directive to
19  the parole agents as to how to change their practices
20  with cash assistance as of the date that -- as of July
21  1st?
22  A. No.
23  Q. Did --
24  A. Not that I'm aware of.
25  Q. Did the Department send out any directive to

Page 93

1  the field -- to the parole agents on changing their
2  practices regarding the use of this $4 million for cash
3  assistance payments at any time?
4  A. We sent out a memorandum to the field advising
5  them of these -- this resource and informing them of how
6  to utilize it, what it's for, and that it has an end
7  date of June 30th, 2008.
8      And then we also put out an E-mail from our
9  Adult Parole headquarters' office out to the field as a
10  reminder -- after the memorandum went out -- of what
11  this money is available, that it is available, what it
12  is for, as well as how they need to track the
13  expenditures.
14  Q. And have you received any information
15  regarding the effect on the field when the -- when this
16  payment policy expired after June 30th, 2008?
17  A. I've received questions on if we have any
18  additional services available at this time.
19  Q. Have you received any information -- well, you
20  received questions.
21      How did you answer those questions?
22  A. That we're pursuing those, and that that
23  funding did end for that purpose; however, to go ahead
24  and consult with your supervisor in your field unit to
25  determine whether or not you have any resources

24 (Pages 90 to 93)

Golden Gate Reporting

Page 94

1  available for you for those particular cases.
2  Q. Have you ever received any information about
3  parolees returning to prison because that money ran out,
4  those payments ran out?
5  A. No.
6  Q. Have you received any information about
7  parolees losing their housing because that money ran
8  out?
9  A. No.
10 Q. Going back to page 6 on Exhibit 14, you wrote
11 that:
12     "DAPO is also negotiating with several
13     counties in its efforts to enter into
14     contractual relationships with counties and
15     financially supplement their existing systems
16     of mental health care for the purpose of
17     serving an agreed-upon number of parolees at
18     any point in time during the contract period."
19 Have you entered into any contractual
20 relationships with the counties that are of the kind
21 described there?
22 A. We have no agreed-upon approved contracts at
23 this time, no.
24 Q. Are you close?
25 A. We're developing scopes of work with a few

Page 95

1  counties right now.
2  Q. Which counties?
3  A. We're working with Santa Clara County, San
4  Bernardino County, San Diego County. We have some
5  conversations and potential future with Los Angeles
6  County, Santa Barbara, Yolo County. And there's also
7  some other smaller counties that I can't think of at the
8  moment.
9  Q. And are you working on a deadline to enter
10 into those contracts?
11 A. We're working with urgency and the need to get
12 into these -- contract for these services as soon as
13 possible -- as soon as possible.
14 Q. Okay.
15 What are the obstacles -- what are the
16 obstacles to finishing those contracts, to entering into
17 those contracts?
18 MR. ANTONEN: Objection. Lacks foundation.
19 The witness hasn't testified that he's
20 negotiating these contracts, just that he's aware of the
21 contracts.
22 BY MR. GALVAN:
23 Q. Are you negotiating these contracts?
24 A. I've been involved in most of the
25 conversations.

Page 96

1  Q. Okay.
2  Are you aware of any obstacles to completing
3  the contracts?
4  A. I don't completely understand the delays or
5  obstacles, because they seem to be related to the
6  counties and services that they operate and their
7  willingness to move fast. We've been working on this
8  for some time.
9  Q. Is one of the obstacles that the state is not
10 offering enough money to the counties?
11 MR. ANTONEN: Objection. Calls for
12 speculation.
13 BY MR. GALVAN:
14 Q. Have you received any information that would
15 lead you to believe that the obstacles include the state
16 not offering enough money?
17 A. No. I don't believe that's an obstacle.
18 Q. Okay.
19 Moving on to that same -- on that same page
20 you wrote -- on page 6 of Exhibit 14, you wrote:
21     "For fiscal year 2008/09, the proposed
22     budget includes $5,629,000 to augment the
23     proposed continuation of the $4 million in
24     recidivism reduction funding for a combined
25     total of $9,629,000..."

Page 97

1  Did you -- did that augmentation receive
2  approval from the Department of Finance?
3  A. It's in the proposed budget that the governor
4  has before him.
5  Q. Looking at pages 7 -- page 7 of Exhibit 14,
6  you wrote a description of Senate Bill 1651 introduced
7  on February 2nd, 2008.
8  Is DAPO endorsing Senate Bill 1651?
9  A. I don't know that our department takes a
10 position, our division takes a position on it.
11 We analyze the bills, and try to give some
12 indication of what cost may be involved, what -- what
13 barriers or changes we might want to recommend if --
14 based on barriers. I don't believe we have a position
15 on it.
16 Q. Why did you include the description of SB 1651
17 in this document?
18 A. I believe that I included that for a bigger
19 picture of this offender population, parolee population
20 that is mentally ill, to not just show what it is we do,
21 but what efforts that may exist that I'm aware of in the
22 broader picture.
23 Q. Based on your experience, do you believe that
24 if SB 1651 were enacted -- that it would assist DAPO in
25 reducing recidivism among mentally ill parolees?

25 (Pages 94 to 97)

Page 98

1  A. I think it would assist -- I don't really know
2  the answer to that question.
3  Q. Moving on to page 8 of the Exhibit 14, you
4  wrote -- under the heading, "Current Service Needs for
5  Mentally Ill Parolees," you wrote:
6      "In the numerous conversations that DAPO
7      staff has with County representatives
8      regarding AB 900 and other enhancements sought
9      for mentally ill parolees, the question of who
10     will fund residential services and step-down
11     care such as mental health board and care is
12     posed to DAPO staff in order to provide the
13     complete wrap-around and transition services
14     required, to achieve the most positive outcome
15     in a mental health system of care model,
16     funding for temporary housing and mental
17     health board and care is required."
18  Has the Department taken any steps to secure
19  that funding for temporary housing and mental health
20  board and care that you identified here?
21  A. Um, we haven't requested -- since the current
22  proposal for AB 900, we haven't put together a proposal
23  for more funding for this next phase of -- for fiscal
24  year '09-'10 at this time.
25      What we are doing is in our -- especially as

Page 99

1  we learn more about the counties and what their system
2  of care is, we just try to build in that housing
3  component for at least referrals and such in their --
4  what they call "full service partnerships."
5      So, we're looking to -- again, it's been a
6  learning curve as we get in deeper conversations with
7  these counties that their full-service partnerships
8  offer at some time, you know, some sort of housing
9  component to them as they can. It's what -- what --
10 yeah. I'll just end with that.
11  Q. In writing this, was it your purpose to inform
12  your -- to inform the Department that the State needs to
13  provide this funding to the counties?
14  A. No.
15  Q. What was your purpose?
16  A. My purpose was to explain to the best of my
17  ability what is available and what is not available to
18  this population.
19  Q. I'm done with Exhibit 14.
20      So, are you aware of what the procedures are
21  for the Department when an inmate with a severe mental
22  illness is released on parole?
23  A. Only to the extent that I'm involved with
24  individual cases.
25  Q. Okay.

Page 100

1  And from what you know, to the extent you're
2  involved with individual cases, what is the procedure?
3      MR. ANTONEN: I'm going to object here. I
4  don't think there's been any testimony that there is a
5  procedure.
6  BY MR. GALVAN:
7  Q. Is there a procedure when a person with severe
8  mental illness is released on parole?
9  A. I'm not -- I'm not -- I don't know for sure
10 whether or not there is a procedure. However, there's
11 collaborative efforts between the institutions and
12 parole.
13  Q. What do those collaborative efforts consist
14 of?
15  A. If an individual -- can you please describe to
16 me, possibly, what the status of the inmate paroling is
17 so I can identify their needs a little better?
18  Q. Oh, okay.
19      In the event that a person is -- was EOP in
20 the institution, and classified as high control by
21 parole's Risk and Needs Classification -- so, a
22 high-control EOP parolee.
23  A. A standard EOP-designated inmate -- all EOPs
24 are designated high control for parole supervision
25 purposes -- that paroles.

Page 101

1      The majority of the cases, they can take
2  public transportation, and they can report to their
3  parole unit just like any other inmate -- typical inmate
4  that's released from an institution.
5  Q. Are there cases where the parole agent is
6  required to actually meet the person at the gate?
7  A. If an EOP is releasing out of either a secured
8  housing unit or a psychiatric secure unit, then they're
9  required to -- or released from some specific DMH
10 facilities, they're required to pick up the inmate at
11 time of parole. Therefore, the institution should be
12 releasing them only to the parole agent.
13  Q. Have you ever heard the expression "driving
14 the person around the flagpole"?
15  A. No.
16  Q. No?
17     MR. GALVAN: So, I'm going to switch topics to
18 4(b), Psyche and Return. And to do that, I'm going to
19 mark Exhibit 15.
20     (Whereupon Plaintiffs' Exhibit 15
21     was marked for identification.)
22     MR. GALVAN: And for the record, Exhibit 15,
23 it's a document, three pages, that says, "Memorandum" at
24 the top, with a date, January 12th, 2007, "Policy No.
25 07-03."

Page 102

1  BY MR. GALVAN:
2      Q. Are you familiar, Mr. Storms, with this
3  document?
4      A. Yes, I am.
5      Q. And what is this document?
6      A. This was a two-prong document.
7      This document is informing the parole staff,
8  field staff, that the Department of Corrections and
9  Rehabilitation will no longer be returning parolees to
10 custody solely for mental health care, which was
11 previously known as the "psyche return" -- "psyche and
12 return process."
13     It also serves as a tool to the field staff to
14 help them, as a resource, make decisions on what they
15 might be able to do when they have a mentally ill
16 parolee who needs some sort of services.
17     Q. Are you aware of any -- or, do you have any
18 estimate of how many people were -- would go through the
19 psyche and return process per year before this, or, say,
20 in the year before this new policy?
21     A. It's always been the estimates in all the
22 conversations I've been in that it may have been 50 at
23 any -- 40 to 50 at a point in time, and maybe 100 to 150
24 cycling through the year.
25     Q. Okay.

Page 103

1      And what does the Department do with those 40
2  or 50 people at any given time, or 100 to 150, cycling
3  through now that you've made this change in policy?
4      MR. ANTONEN: Objection. Incomplete
5  hypothetical. It's -- it was a -- okay.
6      Go ahead.
7      THE WITNESS: Yeah.
8      I don't know that I can identify any
9  particular individual as meeting -- I'm not really sure
10 that I understand the question or can answer that
11 question.
12 BY MR. GALVAN:
13     Q. For that segment of the parole population that
14 used to be subject to this psyche return policy, what
15 does the Department employ now in order to manage them?
16     MR. ANTONEN: Objection. Assumes facts in
17 evidence as the Department continues to manage them.
18     MR. GALVAN: If you can answer.
19     THE WITNESS: If we have a mentally ill
20 parolee and they need services, we try to get services
21 to them, whether it's services we have available or
22 services we need, and we go to the counties and
23 community providers and try to get those services for
24 them, with great resistance.
25     If they have no parole violation that was

Page 104

1  incurred, that's all we can do.
2  BY MR. GALVAN:
3      Q. Does the -- does the Department have any
4  particular funding to provide services for people in
5  that circumstance that you just described where the
6  person needs mental health treatment but there's no
7  parole violation that you could use to return them to
8  custody?
9      A. That I'm aware of, only what we're pursuing
10 under the authority we got with AB 900.
11     Q. What is that?
12     What are you pursuing?
13     A. We're pursuing contracted services with the
14 counties to provide mental health rehabilitation and
15 crisis care for parolees.
16     Q. And in pursuing those contracted services, can
17 you describe in more detail how you're pursuing them?
18     What are you doing?
19     A. We have meetings, sometimes on-site meetings
20 and sometimes conference calls, with mental health
21 staff. Usually the mental health directors or their
22 designee within the county. Parole field staff, Parole
23 Outpatient Clinic staff, my parole headquarters staff,
24 and other stakeholders that the counties may bring on in
25 those conversations.

Page 105

1      And to initiate those conversations, we inform
2  them of what we're able to do. We identify some of the
3  mentally ill parolees in their community so they can
4  make an informed observance of whether or not they're
5  already at times providing services to those
6  individuals.
7      I let them know we're not trying to impose on
8  them or create something new that is outside of what
9  they're currently doing; we would just like to expand
10 upon what services they already have.
11     And I've come to find it's these full-service
12 partnership services, so that we can purchase program
13 slots to get mental health rehabilitative services to
14 the parolee residents.
15     And with that, we would -- like any
16 residential component, we can get to that -- any step
17 down and step up for level-of-care needs. If we can get
18 a triage service and access to an inpatient facility,
19 either volunteer or nonvolunteer, and --
20     Q. Do you have a budget for that effort you just
21 described?
22     A. Yes.
23     In fact, we just got done talking about it.
24 It's the $9.67, or whatever, million. What was just in
25 the last document. And it's pending budgetary approval,

27 (Pages 102 to 105)

Golden Gate Reporting

Page 106

1  as everything is right now in our state.
2      Q. Are you able to make -- is the Department able
3  or are you able to make any progress on this while the
4  budget -- while there's no state budget?
5      MR. ANTONEN: Objection. Vague as to
6  "progress."
7  BY MR. GALVAN:
8      Q. Are you -- what is the status of your efforts
9  in this regarding the budget impasse?
10     A. Negotiations continue. Scope-of-service
11 development continues. Contract formulation continues.
12     Q. Is $9.6 million enough for this project?
13     MR. ANTONEN: Objection. Calls for
14 speculation.
15 BY MR. GALVAN:
16     Q. Do you think $9.6 million is enough?
17     MR. ANTONEN: Objection. He's not an expert
18 witness.
19     MR. GALVAN: If you can answer.
20     THE WITNESS: It was the estimate we came up
21 with based on what we believed services would cost at
22 the time. It's still to be seen whether or not it will
23 get us to our deliverable. We believe we're close, if
24 not there. "Deliverable" being 300 at any point in
25 time.

Page 107

1  BY MR. GALVAN:
2      Q. 300 what?
3      A. Parolees receiving services at any point in
4  time.
5      Q. How did you arrive at 300?
6      A. That is what is the deliverable that's
7  specified in the Assembly Bill 900.
8      Q. Did you have a role in choosing that number,
9  300, that ended up in AB 900?
10     A. No, I did not.
11     Q. Do you have any knowledge as to how that
12 number was chosen?
13     A. No, I don't.
14     Q. And how is the Department -- to your
15 knowledge, how has the Department interpreted that
16 number in the statute -- 300 parolees receiving
17 services?
18     And what I mean by that question is, what do
19 you define as "receiving services"?
20     A. First of all, there was two services that were
21 specified in Assembly Bill 900. The authority that we
22 use is Penal Code Section 3073. And the two services
23 are day treatment programming and crisis care.
24     Our department, at the urging of
25 stakeholders -- community-based stakeholders, be it

Page 108

1  counties, Mental Health Directors' Association,
2  legislative people, et cetera, have come up with a
3  definition for day-treatment program; that is, mental
4  health rehabilitative services that meet the needs of an
5  individual, mentally ill parolee.
6      That definition is not exact, but the concept
7  is the same.
8      And the crisis care is what it is. That's
9  acute inpatient level of care for a mentally ill parolee
10 with an acute level-of-care need.
11     And the answer to your question is that our
12 interpretation of this authority and this deliverable is
13 either and/or. Basically, 300 parolees receiving either
14 our definition of mental health rehabilitative services
15 or crisis care, or both.
16     Q. And is there a deadline attached to this
17 deliverable?
18     A. There's a -- I'm not really sure at this time.
19     Q. Has the Department worked out a preferred
20 allocation between day-treatment programs or mental
21 health rehabilitative services and crisis care?
22     A. I don't have the specifics in front of me of
23 how we came up with the estimate, but it was broke down
24 to where -- so many crisis care beds and so many
25 program-type slots in the mental health rehabilitation,

Page 109

1  which -- with a smaller amount on the crisis care.
2      Q. Has the Department identified locations for
3  the crisis-care beds?
4      A. Unfortunately, there doesn't seem to be that
5  resource that's been provided to us by any of the
6  partners we tried to partner up with. And the
7  availability of inpatient mental health care has not
8  been shown to us by anybody at this time in the County
9  in our negotiations.
10     Q. Has the Department made an estimate of the --
11 of its need for inpatient mental health care, say, the
12 number of patients at any given time, meaning, the
13 number of beds you need?
14     MR. ANTONEN: Objection. Vague as to time.
15 BY MR. GALVAN:
16     Q. Does the Department now have any estimate of
17 the number of inpatient mental health beds that the
18 Department needs?
19     A. No.
20     MR. ANTONEN: Objection. Vague as to "needs."
21     MR. GALVAN: If you can answer.
22     THE WITNESS: Not having an exact estimating
23 formula in front of me here, obviously I was real
24 integral in coming up with the estimate, and based the
25 figures of numbers of parolees on the psyche return

28 (Pages 106 to 109)

Golden Gate Reporting

Page 114

1   MR. ANTONEN: He's testified to two.
2   BY MR. GALVAN:
3     Q. The -- well, actually, I'm going to withdraw
4   that question. Let me just move forward in this E-mail
5   chain.
6     If you go back to the first page.
7     A. Mm-hm.
8     Q. As your discussion goes on in the E-mail
9   chain, Pam Cantelmi identifies beds at Coalinga State
10  Hospital. And then there's an exchange between you and
11  Doug McKeever about Coalinga.
12    A. Yes.
13    Q. To your knowledge, are there still empty beds
14  at Coalinga State Hospital?
15    A. I can't answer that. I don't know.
16    Q. Okay.
17    Is the Department making any effort to use any
18  additional beds at Coalinga State Hospital for this
19  population formerly known as the "psyche return
20  population," to your knowledge?
21    MR. ANTONEN: Objection. Calls for
22  speculation.
23    MR. GALVAN: To the extent you know.
24    THE WITNESS: To the extent I know, for us to
25  have a mentally ill parolee -- and that's basically what

Page 115

1   we're referencing here -- in a state hospital requires
2   the county to conserve them, whether temporary or
3   permanent, and for the State Department of Mental Health
4   to admit them and place them in one of their facilities.
5   I'm not aware of Coalinga being utilized for
6   that population.
7   BY MR. GALVAN:
8     Q. As you engage in the negotiating process that
9   you discussed with the counties, is the Department --
10  are you able -- or, are you offering them access to the
11  Coalinga State Hospital beds as a location for this part
12  of the population that needs inpatient hospitalization
13  in the event that the counties assist you with
14  conserving the individuals?
15    MR. ANTONEN: Objection. I'm going to pose a
16  quick objection here. It's compound. And I believe
17  there's multiple negotiations that are going on at the
18  counties.
19  BY MR. GALVAN:
20    Q. In any of your negotiations with the counties,
21  are you offering the Coalinga beds as an option?
22    MR. ANTONEN: And objection. The witness has
23  previously testified Coalinga is a DMH facility, so I
24  think it calls for speculation.
25    MR. GALVAN: To the extent you know.

Page 116

1     THE WITNESS: I'm not aware of Coalinga being
2   available for us for Penal Code Section 2974 placements.
3   BY MR. GALVAN:
4     Q. In your negotiations with the County, are any
5   of the DMH beds being offered as a resource?
6     A. In our negotiations with the counties for the
7   contracted services, as well as our communications with
8   counties on placement needs, service needs,
9   communication needs, the avenue of the Penal Code
10  Section 2974 and the LPS Act are typically in the
11  conversation, yes.
12    Q. What about the actual beds -- the actual DMH
13  beds?
14    A. It really always comes down to availability.
15  And even when there's availability, it doesn't
16  necessarily put the County in a position to where they
17  want to do this for us.
18    Q. Okay.
19    Is the Department of Mental Health an obstacle
20  to your achieving an agreement with the counties?
21    MR. ANTONEN: I'm going to object. It calls
22  for speculation again.
23    MR. GALVAN: To the extent you know.
24    THE WITNESS: Yeah.
25    I don't believe so, no.

Page 117

1     MR. GALVAN: I'm done with Exhibit 16. Thank
2   you.
3     I'd like to mark an Exhibit 17.
4     (Whereupon Plaintiffs' Exhibit 17
5     was marked for identification.)
6     MR. GALVAN: Exhibit 17, for the record, is a
7   printout from a blog entry, dated January 17th, 2007,
8   "PacoVilla's Corrections blog."
9   BY MR. GALVAN:
10    Q. Mr. Storms, are you familiar with the
11  PacoVilla blog?
12    A. Yes, I am.
13    Q. Did you read this entry when it was posted
14  there?
15    A. I have seen it. I have read it before, yes.
16    Q. Does this appear to be a correct copy of the
17  Entry you read?
18    A. Appears to be, yes.
19    Q. Okay.
20    I direct your attention to -- on the first
21  page, the fourth paragraph that reads:
22      "Agents, you are being set up. Paco
23    strongly urges you to arrest rejected 5150
24    placements on any and every petty technical
25    violation you may find. If you can't find

30 (Pages 114 to 117)

415.499.DEPO ~ 866.936.DEPO
www.GoldenGateReporting.com                    ©2008

3177ebfe-914d-46ac-87f8-6a739c37090b

Page 118

1  one, you are a LOP."
2     What's an "LOP"?
3     MR. ANTONEN: Objection. Foundation. The
4  witness testified he's only read the article. He didn't
5  write it.
6  BY MR. GALVAN:
7     Q. Do you know what an LOP is?
8     A. I've heard LOP before. I'm not really sure
9  what it means. If it's an acronym for something, I
10 don't know what it stands for.
11    Q. Okay.
12       Are you aware of any similar reaction to the
13 policy -- and I'll say for the record that the blog
14 entry reproduces one of the exhibits that we identified
15 to the deposition, Policy No. 07-03, which ended --
16 which you testified ended the psyche-and-return policy.
17 And then what I read, where he strongly urges people to
18 reject the -- to arrest the rejected 5150 placements on
19 any and every petty technical violation.
20       Are you aware of any -- are you aware of a
21 similar reaction among the -- in parole field agents to
22 the ending of the psyche returns and to the
23 recommendation that they use the 5150 process?
24    A. First of all, I'd like to clarify that
25 memorandum you're referencing. It did not actually end

Page 119

1  the psyche return process. It was noticing the parole
2  field staff that the process had ended.
3        That ending of the psyche return process came
4  from a higher level. That came from Secretary Tilton.
5        I can't point out any specific occurrence
6  where I got individual complaints about the process
7  being ended.
8        I know that the services in the community for
9  these individuals are very limited, if at all. So,
10 it's -- it's -- it's quite complicated when you have an
11 individual like this, I would assume -- not being a
12 parole agent -- on your caseload, and they need sort of
13 facilitated care and you can't get it.
14    Q. And you think a parole agent could always find
15 a technical violation in that situation?
16    MR. ANTONEN: Objection. Improper
17 hypothetical. The witness hasn't testified he's been a
18 parole agent or is familiar with technical violations.
19    MR. GALVAN: If you can answer.
20    THE WITNESS: I don't know.
21    MR. GALVAN: I'm done with Exhibit 17. Thank
22 you.
23    THE WITNESS: (Indicating)
24    MR. GALVAN: Let's see. I'd like to mark an
25 Exhibit 18.

Page 120

1     (Whereupon Plaintiffs' Exhibit 18
2     was marked for identification.)
3     MR. GALVAN: Exhibit 18, for the record, is a
4  document with -- starts with the Bates No. E_CDCR_08941.
5  BY MR. GALVAN:
6     Q. Are you familiar with this document,
7  Mr. Storms?
8     A. Let me take a moment.
9     Q. Yes, please.
10    MR. ANTONEN: Is your exhibit Batesed?
11    MR. GALVAN: Oh, is yours not?
12    MR. ANTONEN: No.
13    MR. GALVAN: Okay.
14       Well, it's an -- in that case, for the record,
15 it's an E-mail from Robert Storms sent Tuesday,
16 September 4th, 2007.
17    MR. ANTONEN: Could you repeat the
18 Bates-label?
19    MR. GALVAN: Yes. It's E_CDCR_18941 [sic].
20 And actually, only the first few pages are -- only the
21 E-mail itself is Batesed, and the attachment is not on
22 my copy.
23    THE WITNESS: (Witness reviews the document.)
24    Yeah. I'm familiar.
25    MR. GALVAN: Okay.

Page 121

1  BY MR. GALVAN:
2     Q. What is this document?
3     A. The E-mail or the document behind it?
4     Q. The document -- the attachment to the E-mail.
5     A. That is the beginning version of the document
6  we looked at earlier, dated March of 2008, which
7  describes the mental health population and services.
8        This was created for the purpose of sharing
9  with the counties and other participants involved in our
10 AB 900 workshops that we had done throughout the state
11 and there was three components to.
12       One was a parole component. The other
13 component that I wasn't a presenter on was the secured
14 reentry facility component. And the third component that
15 was I was also not a participant in was the jail bond
16 component.
17       So, this parole component addressed two
18 segments, which one, I was the presenter on. That was
19 the mental health piece.
20    Q. Okay.
21       And you testified that one -- I believe, that
22 one part of that -- or, the result of those efforts is
23 the $9.6 million pending funding for day treatment for
24 mental health rehabilitative services and crisis care
25 beds?

Page 166

1  Q. Have you asked for more personnel?
2  A. No.
3  Q. Have you asked for more money?
4  A. No.
5  Q. Have you asked for legislation?
6  A. Not pertaining to this, no.
7  Q. Have you asked for regulation changes?
8  A. No.
9  Q. Has -- are you aware of anyone in the
10 Department pursuing either more money, legislation, or
11 regulation to address the issue of this deliverable not
12 being met on time?
13 A. No.
14 Q. Is it your testimony that no one in the
15 Department is -- no.
16    Going back up to Item No. 2 in this chart,
17 "Identify Counties to contract with."
18 A. Yes.
19 Q. It says here, "San Francisco and Santa Clara
20 interested; Sacramento declined; Yolo potential."
21 A. Yes.
22 Q. Is that still the status of county interest?
23 A. San Francisco has not been as responsive as we
24 thought they were at that time, so we've had no more
25 ongoing conversations with them at this time. Santa

Page 167

1  Clara is still moving forward with this. Sacramento
2  still holds their same position of not wanting to work
3  with us. And Yolo recently reopened conversations with
4  us.
5  Q. And I won't make you repeat it, but you
6  testified earlier that there are additional counties
7  having conversations.
8  A. Yes.
9  Q. Okay. Thank you.
10    MR. GALVAN: I would like to mark this as
11 Exhibit 26.
12    (Whereupon Plaintiffs' Exhibit 26
13    was marked for identification.)
14 BY MR. GALVAN:
15 Q. Mr. Storm, I marked as Exhibit 26 an E-mail,
16 dated September 20th, 2007, on which you're copied to
17 Jill Dubbs. And it has attached to it a Budget Change
18 Proposal for '08-'09.
19    Are you familiar with this document?
20 A. Yes.
21 Q. And does this appear to be a correct copy of
22 the '08-'09 Budget Change Proposal for Community-based
23 Day Treatment Programming and Crisis Care Services?
24 A. Yes, it does.
25 Q. Are you the author or this Budget Change

Page 168

1  Proposal?
2  A. Yes.
3  Q. And is this the -- did this result from the
4  Budget Change Concept that we looked at earlier for Day
5  Treatment Programming?
6  A. Yes.
7  Q. Looking at the very end of the document where
8  it has Thomas Hoffman signature line, the amounts, Total
9  funding, 1.869 million for '07-'08, and 10 million for
10 '08-'09, do you know if those amounts were approved?
11 A. No.
12    This is not the -- this did not end up being
13 the final. I think you showed me the final earlier
14 today.
15 Q. So, the final was a lesser amount?
16 A. The final is somewhere in the area of
17 9.6 million.
18    The contract monies are about the same. The
19 positions for supporting it in our division are the
20 same. I believe the travel for the positions is in
21 there, but not the -- I don't believe the facility
22 leasing is in there.
23 Q. The facility leasing being just $50,000.
24    It's substantially the same as what you sought
25 is in the pending budget?

Page 169

1  A. I don't believe that that's in the final
2  Budget Change Proposal that we put out. That was
3  basically for our own staff so that we can pay for our
4  own property.
5  Q. And if you could turn to page 5, Bates
6  No. 46120 of Exhibit 26, under "Justification," you
7  wrote, in the second-to-last sentence:
8     "It is anticipated that enhancing the
9     services available to mentally ill offenders
10    on parole by way of contracted mental health
11    crisis and intervention and rehabilitative
12    services will significantly reduce the
13    recidivism of mentally ill parolees while
14    increasing public safety."
15    Is that still your belief?
16 A. That's my belief, yes.
17 Q. Did you originally seek more money for this
18 program than what ended up in this Budget Change
19 Proposal?
20    MR. ANTONEN: Objection. Vague as to which
21 Budget Change Proposal.
22    Are we talking about the one that we discussed
23 earlier? this one? the Budget Concept Statement?
24 BY MR. GALVAN:
25 Q. Did you originally seek more than

43 (Pages 166 to 169)

Page 170

1 approximately $9.6 million for '08-'09 for this Day
2 Treatment and Crisis Care Proposal?
3     A. I originally sought less.
4     Q. You originally sought less?
5     A. Yes.
6     Q. How did it end up being more?
7     A. I was in a meeting where we were discussing
8 the various proposals for funding out of the AB 900
9 rehabilitation monies, and I was there with my
10 calculator and my original proposal, and calculated a
11 higher -- and said, This is what we need. And that's
12 where it went.
13     Q. Okay.
14     MR. GALVAN: I think we can finish with
15 No. 26.
16     I would like to mark as Exhibit 27 this
17 document entitled, "Reentry Mental Health Program Plan."
18     (Whereupon Plaintiffs' Exhibit 27
19     was marked for identification.)
20 BY MR. GALVAN:
21     Q. And Mr. Storms, if you'd take a moment to look
22 at that and tell me if you're familiar with this
23 document.
24     A. (Witness reviews the document.)
25     I saw it in a draft format. I had no input in

Page 171

1 it.
2     Q. Oh, you're not the author of that document?
3     A. No.
4     This pertained to inmates.
5     Q. Actually, before you give it up, did you use
6 this document in any of your work in regard to the
7 caseload scoping of the reentry mental health program
8 that we were talking about earlier?
9     A. I guess I would need -- are you referring to
10 the "secured reentry facilities"?
11     Q. Yes.
12     A. I really have no involvement in the program
13 design of those, other than the Concept Statement I put
14 together for the Transitional Case Management services.
15     Q. Okay. Thank you.
16     A. I've only seen this in a draft.
17     Q. Thank you.
18     MR. GALVAN: I would like to mark as a Exhibit
19 28 this E-mail.
20     (Whereupon Plaintiffs' Exhibit 28
21     was marked for identification.)
22     MR. GALVAN: And for the record, Exhibit 28 is
23 an E-mail chain starting August 22nd, 2007. Ending
24 August 23rd, 2007.
25     THE WITNESS: Okay.

Page 172

1 BY MR. GALVAN:
2     Q. And if you would, Mr. Storms, take a moment to
3 look at this and tell me if you're familiar with this
4 document.
5     A. (Witness reviews the document.)
6     I'm familiar with it, yes.
7     Q. Okay.
8     What -- going -- looking at the first E-mail
9 from Charles Sapien, which was then forwarded to you by
10 Del Sayles-Owen, can you tell me what this Behavioral
11 Health Scope of Work was that was forwarded to you?
12     Do you recall what that was?
13     A. I really don't.
14     Q. What was this conversation about in this
15 E-mail?
16     A. The best conclusion I can bring to this at
17 this time -- noticing one of the names in there being
18 Tom Rietz -- is that he's involved in the Senate Bill
19 619 project, the reentry project down in San Diego
20 County, and I've had numerous conversations with them on
21 mental health services for participants in that reentry
22 project.
23     Q. And are -- looking at the E-mail that you
24 wrote here on August 23rd, 2007, where you wrote:
25     "Del, since mentally ill parolees are

Page 173

1 mandated to attend POC appointments and are
2 parolee clients of DAPO's POC clinical staff,
3 we need to look at either excluding this
4 target population from POC or including
5 collaboration between POC and the contractors
6 in the scope. I will be the DAPO contact for
7 this purpose since I represent POC also."
8     Do you recall whether you ever resolved that
9 issue with regard to the SB 618 programs?
10     A. I don't believe it has been resolved.
11     And again, not seeing that scope of work right
12 now, the basis of what I was saying was, it appears that
13 they're proposing that they were going to do some sort
14 of services for the mentally ill parolees in that
15 program, and possibly not have POC involved.
16     So, I was just kind of clarifying here, we
17 either need POC involved or somehow we need to note that
18 they're in an alternative program.
19     But, again, I've had numerous conversations
20 with the -- if this is pertaining to the Senate Bill 618
21 project down in San Diego, and they are still seeking to
22 improve upon having mental health services for
23 particular clients going through their program.
24     San Diego County itself is negotiating with us
25 to contract for those services. Once we get the

44 (Pages 170 to 173)

Page 194

1  the providers at their request in our Parole Outpatient
2  Clinic staff.
3       And we're also trying to make some other
4  various improvements that have to do with location of
5  the particular parolee, if they happen to be in some
6  sort of a facilitated care or other programs, that we
7  could track them still receiving services, rather than
8  not.
9       MR. STEGEMAN: And that's all I've got.
10      MR. ANTONEN: Are we going to the confidential
11 portion?
12      MR. GALVAN: Okay.
13      MR. ANTONEN: Unless you have follow-up.
14      MR. GALVAN: Okay.
15      We can go into the confidential portion.
16      Do we have to kick Chad out?
17      MR. ANTONEN: Chad's a party to the protective
18 order.
19      MR. GALVAN: Okay.
20      (Whereupon the confidential portion of
21      the transcript commences by agreement of
22      the attorneys.)
23
24              ---oOo---
25

Page 200

1
2              ---oOo---
3
4       PROCEEDINGS (Continued)
5
6  BY MR. GALVAN:
7       Q. So, going back into the nonsealed part of the
8  record, when we were in the sealed part of the record, I
9  believe it was your testimony that you were having some
10 problems with the -- finding contractual relationships
11 with the counties for the people who need inpatient or
12 high-level care because of their mental illness --
13      A. Yes.
14      Q. -- is that correct?
15      A. Yes.
16      Q. Can you describe what the problems are that
17 you encountered?
18      A. Um, what I'm finding is that the counties are
19 informing us that they do not have bed availability for
20 that purpose.
21      Q. Okay.
22      And when did -- how long has it been since the
23 counties -- since you first heard that from the
24 counties -- the first time you can recall since AB 900
25 was passed?

Page 201

1       A. The first time since AB 900 was passed?
2       Q. Mm-hm. Yes.
3       A. Had to be within a week.
4       Q. Okay.
5       A. Two weeks.
6       Q. So, in the over a year since then, what has
7  the Department done to address that concern from the
8  counties, to your knowledge?
9       A. From my perspective and my involvement, we
10 continue to push for that level of care, and offer
11 funding for that level of care.
12      Q. To your knowledge, are you offering more
13 funding than you offered before you heard that concern?
14      A. We have not stated that we would underfund the
15 placement or overfund the placement. We just simply
16 asked for availability and a process to get in there,
17 and for an agreement to where we can pay for that
18 service.
19      Q. And have any of your -- the people you're
20 talking with on the county side said, Well, we would
21 have availability if you came up with more money?
22      A. No.
23      Q. Okay.
24      In your opinion, what could the Department do
25 to address these barriers?

Page 202

1       MR. ANTONEN: Objection. Calls for
2  speculation.
3       He's not offered as an expert witness.
4       MR. GALVAN: If you can answer. If you have a
5  lay opinion.
6       THE WITNESS: I don't believe we're in a
7  position to do anything.
8  BY MR. GALVAN:
9       Q. Well, you testified that your efforts are
10 ongoing, still, to find these placements; is that
11 true -- is that correct?
12      A. Our efforts are ongoing to initiate and
13 complete agreements with the counties for these types of
14 services.
15      Q. Okay.
16      A. I continually work to find placements at no
17 cost to us for medical and -- medical placements. And
18 also, without agreements, continually recommend that
19 inmates in acute level of need for their mental illness
20 are taken to the county for an evaluation.
21      Q. The AB 900 program would not be at no cost to
22 you; right?
23      You have money for that?
24      A. Correct.
25      Q. That's the $9.6 million?

Golden Gate Reporting

Page 203

1  A. Correct.
2     And I bring it up at every opportunity I can.
3  Q. The counties you identified as the ones that
4  you're in active negotiations with -- Santa Clara -- can
5  you tell me the person that you're negotiating with in
6  Santa Clara?
7  A. The Mental Health Director and -- I believe
8  he's the Assistant Mental Health Director of some
9  program. A supervisor.
10 Q. Do you recall the name?
11 A. Nancy Peña. And -- I'm sorry. At this
12 moment, I can't recall.
13 Q. Okay.
14    And for Santa Barbara?
15 A. Al Rodriguez.
16 Q. And for San Diego?
17 A. Philip Hanger.
18    And there's another one.
19 Q. Who did you say the other one was?
20 A. Not that I don't know the individual, but at
21 this time, I can't recall the name of the other
22 individual at San Diego we're working with.
23 Q. And according to my notes, it was your
24 testimony that the other potential counties were LA,
25 Yolo, and San Bernardino; is that correct?

Page 204

1  A. Yes.
2     And there's actually a couple more that we're
3  working with that just aren't standing out for me at
4  this moment.
5  Q. Who are you negotiating with for LA?
6  A. Dr. Daly, D-a-l-y.
7  Q. And for San Bernardino?
8  A. I think I'll misspeak the name, so I'd rather
9  not say it.
10 Q. Is he a doctor or not a doctor?
11 A. I believe he's a doctor. He's one of the
12 mental health directors. He's a Forensic Mental Health
13 Director.
14 Q. The person's title is Forensic Mental Health
15 Director?
16 A. Yeah.
17    David Denkers, I believe, is the name.
18 D-e-n-k-e-r-s. I may have that spelling wrong.
19 Q. And for Yolo?
20 A. I don't recall the person's name in Yolo.
21 Q. Do you recall the title?
22 A. No.
23 Q. And as you've been talking about it, do you
24 have any other recollection of what the other counties
25 are that you've been talking with?

Page 205

1     Well, let me ask you another question.
2     Have you talked with all 58 counties?
3  A. I believe that in some fashion we've presented
4  our ourselves to the majority, at least to the 58
5  counties through our AB 900 reentry workshops that we
6  did up and down the state, and there's been
7  communications with several counties since. And I have
8  staff contacting counties.
9  Q. How did the -- how did you narrow down from 58
10 counties to the group of six that we just talked about?
11 A. For the most of them, it's based on their
12 expression of interest to work with us when we did the
13 reentry workshops.
14 Q. When you budgeted out the money that we looked
15 at in the BCPs -- the $9.6 million -- was that intended
16 to cover all 58 counties or a select a few?
17 A. It was intended to cover 300 parolees at a
18 point in time.
19 Q. Are you aware of any plans in the Department
20 to take those same services that you're now targeting
21 for the 300 parolees and expand it to a larger group?
22 A. I am not aware of a plan at this time, no.
23 Q. Okay.
24    Are you aware of a plan at any time?
25 A. We look at --

Page 206

1     MR. ANTONEN: Objection. Calls for
2  speculation.
3     THE WITNESS: We always measure our
4  performance and our outcomes and make proposals based on
5  those outcomes.
6     MR. GALVAN: Okay.
7  BY MR. GALVAN:
8  Q. Does that mean you're aware of a plan at any
9  time to expand the 300?
10 A. That means that if something is working, then
11 we're going to -- somebody like myself, at least, would
12 propose to expand it.
13 Q. Right.
14    Looking at the six counties that you've
15 identified -- Santa Clara, Santa Barbara, San Diego, LA,
16 San Bernardino, and Yolo -- are the obstacles the same
17 for each county to entering into these contracts with
18 you, or do they each offer a unique set of barriers?
19 A. I'm not sure what their internal functions may
20 be.
21 Q. Okay.
22 A. I'm just --
23 Q. Nancy Peña, for instance, in Santa Clara, has
24 she told you that, We would be able to do this deal if
25 there was more money?

51 (Pages 203 to 206)