# EXHIBIT 38

**Deposition of James Tilton**
**September 3, 2008**
**(Phase II Designations)**

**Part A**

## Golden Gate Reporting

Page 1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE


RALPH COLEMAN, et al.,

      Plaintiffs,

vs.                      No. CIV S-90-0520 LKK JFM P

ARNOLD SCHWARZENEGGER, et al.

      Defendants.

_____/

MARCIANO PLATA, et al.

      Plaintiffs,

vs.

ARNOLD SCHWARZENEGGER, et al.

      Defendants.

_____/


Deposition of JAMES EDWIN TILTON


| | |
|---|---|
| DATE: | SEPTEMBER 3, 2008 |
| TIME: | 9:41 A.M. |
| LOCATION: | ROSEN, BIEN & GALVAN<br>315 Montgomery Street, 10th Floor<br>San Francisco, California 94104 |
| REPORTED BY: | Cari L. Waters-Drewry<br>Certified Shorthand Reporter<br>License Number 12401 |

## Golden Gate Reporting

Page 10

| | | |
|---|---|---|
| 1 | be videotaped. It is correct that the videographer was | 09:45:01 |
| 2 | ordered by counsel for CCPOA; although, I do think it's | 09:45:06 |
| 3 | a proper notice, and the videotaping is proper. | 09:45:12 |
| 4 | I do not have any intention to release the | 09:45:18 |
| 5 | videotape to the press, and I'd be glad to notify you, | 09:45:22 |
| 6 | Ms. Tillman, if I know of any such plan; although, I | 09:45:28 |
| 7 | don't know of any restriction in the protective order or | 09:45:33 |
| 8 | otherwise that would cover that. I'm just telling you, | 09:45:37 |
| 9 | as a professional, it's not my intent to do so. | 09:45:40 |
| 10 | If we use the videotape, we'd be using it at | 09:45:44 |
| 11 | trial. And my understanding is that evidence at trial | 09:45:48 |
| 12 | is public. But, in any event, it is not my intent to | 09:45:51 |
| 13 | release the videotape to the press. | 09:45:57 |
| 14 | MS. TILLMAN: I appreciate that statement. | 09:46:00 |
| 15 | Again, if I -- I'll await word from CCPOA in regards to | 09:46:02 |
| 16 | their ability to provide me with some assurance that | 09:46:07 |
| 17 | this videotape will not be used for any purpose other | 09:46:11 |
| 18 | than trial in this three-judge panel matter. | 09:46:13 |
| 19 | EXAMINATION BY MR. BIEN | 09:46:16 |
| 20 | MR. BIEN: Q. Mr. Tilton, could you please | 09:46:21 |
| 21 | state your name and current position for the record. | 09:46:25 |
| 22 | A. James Edwin Tilton, T-I-L-T-O-N, retired | 09:46:30 |
| 23 | secretary for CDCR. | 09:46:35 |
| 24 | Q. Okay. And, Mr. Tilton, when did you retire? | 09:46:37 |
| 25 | A. May 16th of this year. | 09:46:41 |

Golden Gate Reporting

Page 11

1    Q.    And are you employed in any way by the State    09:46:43
2  of California at this moment?                            09:46:48
3    A.    Well, I'm listed as a retired annuitant, and I  09:46:50
4  don't have any outstanding bills, but I probably will    09:46:54
5  start with all of the court cases that I'm working on.   09:46:57
6  Besides that, no other role.                             09:47:00
7    Q.    What does retired annuitant mean?                09:47:03
8    A.    Retired annuitant means that if you do work     09:47:07
9  for the State, and there's an ability to get paid for    09:47:10
10 that work on a part-time basis.                          09:47:14
11   Q.    Do you understand that the State will be         09:47:18
12 compensating you for your time today?                    09:47:20
13   A.    Yes.                                             09:47:24
14   Q.    And if you were called as a witness at trial,   09:47:24
15 do you understand you would be compensated by the State  09:47:27
16 for your time at trial?                                  09:47:30
17   A.    That's my understanding, yes.                    09:47:31
18   Q.    Is it your intent, if requested by the State     09:47:33
19 to do work as a retired annuitant, in addition to        09:47:39
20 testifying, are you available to the State to do other   09:47:47
21 work as a retired annuitant?                             09:47:47
22   A.    That's up in the air.  I've made no decisions,   09:47:48
23 but I'm willing to do that.                              09:47:50
24   Q.    Have you been employed by any other entity       09:47:51
25 since you left the State of California?                   09:47:57

**Golden Gate Reporting**

Page 15

1    Q.   Let's shift to your employment history.  I    09:51:24
2    know that you retired as secretary of the CDCR.  On what    09:51:31
3    date did you first become an acting secretary?    09:51:38
4    A.   April 18th of '06.    09:51:42
5    Q.   And what was your position immediately before    09:51:48
6    that?    09:51:50
7    A.   Before that, it was called -- what's called a    09:51:50
8    program budget manager with the Department of Finance.    09:51:53
9    Q.   And in your role of Department of Finance, did    09:52:05
10   you have responsibility for CDCR budget matters?    09:52:07
11   A.   Yes, I did.    09:52:11
12   Q.   Okay.  And how long did you have that position    09:52:13
13   at DOF?    09:52:19
14   A.   That position, approximately three years.    09:52:21
15   Q.   Okay.  And you were at DOF before that?    09:52:23
16   A.   Yes.    09:52:31
17   Q.   How long have you been at DOF?    09:52:31
18   A.   Since 1998.    09:52:34
19   Q.   Okay.  In various positions at the Department    09:52:36
20   of Finance?    09:52:40
21   A.   Right, two positions.  Right.    09:52:41
22   Q.   And at what point in your work at Department    09:52:44
23   of Finance did you first have any responsibility for    09:52:46
24   CDC's, Department of Corrections, budget items?    09:52:49
25   A.   Well, the last three years, I was responsible    09:52:53

## Golden Gate Reporting

Page 16

1   for their support budget.  The prior five years, I was     09:52:55

2   responsible for their capital outlay.  Their     09:53:02

3   construction program was under my purview.     09:53:07

4        Q.    And prior to 1998, where did you work?     09:53:17

5        A.    Prior to 1998, I was the deputy director for     09:53:23

6   administration for the Department of Corrections.     09:53:26

7        Q.    And how long did you have that position?     09:53:31

8        A.    That particular position, I think, since 1987.     09:53:34

9        Q.    In general, what were your responsibilities in     09:53:47

10  that time period?     09:53:50

11       A.    I was responsible for all the administrative     09:53:52

12  functions, which is procurement, accounting, budgeting,     09:53:53

13  personnel.  At one period, I had all of the IT programs.     09:53:57

14  I had health and safety, labor relations for a while,     09:54:02

15  and training.     09:54:06

16       Q.    And training?     09:54:12

17       A.    And training, right.     09:54:13

18       Q.    Who did you report to as deputy director?     09:54:14

19       A.    I reported to the chief deputy director.     09:54:17

20       Q.    And did the chief deputy director report to     09:54:32

21  the secretary during that period?     09:54:34

22       A.    No, he reported to the director of     09:54:36

23  corrections.     09:54:37

24       Q.    Director of corrections, that's right.     09:54:39

25             And during that period, there was a State     09:54:43

## Golden Gate Reporting

Page 17

1   entity called Youth and Adult Correctional Authority; is        09:54:47

2   that correct?                                                   09:54:51

3        A.    The Youth and Adult Correctional Agency?            09:54:51

4        Q.    Correctional Agency, yes.                            09:54:54

5        A.    Yes.                                                 09:54:54

6        Q.    And that was the secretary level, at that           09:54:55

7   point?                                                          09:54:57

8        A.    That's correct.                                      09:54:58

9        Q.    Prior to becoming deputy director for               09:55:02

10  administration, did you have other positions at CDCR?           09:55:04

11       A.    Yes, for the two years prior to that, I was         09:55:13

12  assistant deputy over financial operations.                     09:55:13

13       Q.    Did you ever work for CDCR in a purely              09:55:21

14  custodial position, such as warden or deputy warden?            09:55:26

15       A.    No.                                                  09:55:32

16       Q.    Were you ever a correctional officer?               09:55:34

17       A.    No.                                                  09:55:37

18       Q.    When did you first begin working at CDCR?           09:55:44

19       A.    In 1985.                                             09:55:48

20       Q.    What was your prior work experience before          09:55:50

21  that?                                                           09:55:53

22       A.    I was with the Department of Finance.              09:55:53

23  Classification was principal program budget analyst, and        09:55:54

24  I had the corrections assignment.                               09:56:04

25       Q.    Okay.  And when did you begin that period of        09:56:08

## Golden Gate Reporting

Page 30

| | | |
|---|---|---|
| 1 | A. Per project. | 10:12:47 |
| 2 | Q. And you also mentioned there is some | 10:12:48 |
| 3 | discretion in the Department to reallocate and | 10:12:50 |
| 4 | re-prioritize projects? | 10:12:52 |
| 5 | A. That's correct. | 10:12:55 |
| 6 | Q. And what does that mean? | 10:12:55 |
| 7 | A. Well, for example, with the typical is, you | 10:12:57 |
| 8 | have a project that is anticipated to be 200,000, and as | 10:12:59 |
| 9 | you get into the project, you find out, oh, it's going | 10:13:04 |
| 10 | to be 350,000. | 10:13:06 |
| 11 | There's a process that allows the Department | 10:13:09 |
| 12 | to prioritize their projects and say, well, instead of | 10:13:11 |
| 13 | completing this other project, I'm not going to do that. | 10:13:15 |
| 14 | And I'm going to use those resources to augment the | 10:13:18 |
| 15 | other project, so that it gets completed. | 10:13:18 |
| 16 | Q. And does the Department also have discretion | 10:13:20 |
| 17 | to stretch out a construction project or delay it over | 10:13:24 |
| 18 | the budget year? | 10:13:27 |
| 19 | A. Well, it's under -- all of these projects have | 10:13:31 |
| 20 | oversight on their status, but, yes, there is a process | 10:13:34 |
| 21 | to encumber the funds, and the actual completion of the | 10:13:39 |
| 22 | project could go beyond a fiscal year. | 10:13:39 |
| 23 | Q. Okay. Now, let's turn to the major capital | 10:13:39 |
| 24 | outlay process. What would be different in the major | 10:13:47 |
| 25 | capital outlay process? | 10:13:51 |

## Golden Gate Reporting

Page 31

1  A.   Major capital outlay, besides having a funding      10:13:52

2  process that is approved in the budget, unless there's   10:13:58

3  specific exemption, those projects go through what's     10:14:03

4  called a Public Works Board.  Public Works Board is a    10:14:05

5  body instructed with oversight over capital outlay       10:14:10

6  projects and have certain responsibilities in that       10:14:15

7  oversight of the project.                                10:14:18

8     Q.   So let's say, for example, there's a project     10:14:21

9  to build a new housing unit at a particular prison.  So  10:14:25

10  it would go through the BCP process, makes it through    10:14:31

11  the budget, and it's approved in the governing budget -- 10:14:34

12    A.   Right.                                            10:14:37

13    Q.   -- and approved by legislature.                   10:14:37

14        You're saying there's another step that CDCR       10:14:40

15  needs to go through with another entity before it can    10:14:45

16  commence with the project?                               10:14:46

17    A.   Yes, typically, there's, like, a series of        10:14:46

18  phases of capital outlay.  First is called preliminary   10:14:51

19  plans, in which the idea is, put the paper in terms of   10:14:53

20  the specifics of the project and used to come up with -- 10:14:58

21  verify the cost of the project.                          10:15:01

22        Those preliminary plans have to be approved by     10:15:04

23  the Public Works Board, unless they're exempt.  They     10:15:07

24  then go to a phase called working drawings, where those  10:15:12

25  documents are -- more detail is put to those preliminary 10:15:18

# Golden Gate Reporting

Page 32

1    plans.                                                              10:15:22

2         And, then, there's an authorization to go to                   10:15:23

3    construction, which is issued by the Department of                  10:15:25

4    Finance's staff to Public Works Board.  In addition, the            10:15:28

5    Public Works Board is the issuer of bonds, so if the                10:15:36

6    project is, in fact, a bond-funded project, there are               10:15:41

7    additional responsibilities of the Public Works Board in            10:15:45

8    terms of due diligence.                                             10:15:50

9         Q.    You mentioned in the -- I think in the third             10:16:11

10   phase was authorization to construction, and you                    10:16:14

11   mentioned that finance had a role in that.  Can you                 10:16:17

12   explain what that --                                                10:16:20

13        A.    Yes, the Department of Finance has a -- is a             10:16:20

14   fiscal entity on capital outlay, which approves the                 10:16:23

15   budget process and goes through that.  But, in addition,            10:16:28

16   they have project oversight responsibilities.                       10:16:30

17         In addition to being finance staff, they are                  10:16:32

18   -- the capital outlay staff are -- in addition, they are            10:16:35

19   staff to the Public Works Board to provide proper due               10:16:36

20   diligence and oversight to monitor projects, which is               10:16:42

21   different than the support responsibilities.                        10:16:43

22        Q.    Did you have any role in the -- when you were            10:16:46

23   at finance, in project oversight?                                   10:16:48

24        A.    Yes.                                                     10:16:50

25        Q.    For CDCR projects?                                       10:16:54

## Golden Gate Reporting

Page 33

| | | |
|---|---|---|
| 1 | A. Yes. | 10:16:56 |
| 2 | Q. And what types of information or review would | 10:16:57 |
| 3 | finance do in that project oversight function for CDCR | 10:17:08 |
| 4 | for major capital? | 10:17:13 |
| 5 | A. We would monitor the schedule. We'd monitor | 10:17:15 |
| 6 | costs. We would monitor that a project was staying | 10:17:18 |
| 7 | what's called scope, that it was still consistent with | 10:17:26 |
| 8 | the general approvals of the project. And if it was | 10:17:26 |
| 9 | bond-funded projects, we validated that certain due | 10:17:27 |
| 10 | diligence tasks were being followed and adhered to. | 10:17:32 |
| 11 | Q. During this project oversight function, would | 10:17:41 |
| 12 | finance also look to see whether the project was still | 10:17:45 |
| 13 | justified? | 10:17:47 |
| 14 | A. Periodically. | 10:17:49 |
| 15 | Q. So, for example, if the project was based on a | 10:17:54 |
| 16 | projected population growth or a particular kind of -- | 10:18:00 |
| 17 | type of inmate, and the population growth hadn't | 10:18:04 |
| 18 | materialized, would that be something that finance would | 10:18:08 |
| 19 | have a responsibility to point out? | 10:18:12 |
| 20 | A. Yes. | 10:18:14 |
| 21 | Q. Is it correct that the major -- a project | 10:18:38 |
| 22 | going through a major capital process for CDCR would be | 10:18:44 |
| 23 | a multi-year project -- multi-year process, excuse me? | 10:18:49 |
| 24 | A. Not necessarily. | 10:18:55 |
| 25 | Q. Okay. Could you explain your answer. | 10:18:56 |

# Golden Gate Reporting

Page 34

| | |
|---|---|
| 1 | A.   Yes.   I mean, the budget process is typically | 10:18:59 |
| 2 | funded in phases, but many capital outlay projects are | 10:19:05 |
| 3 | approved in legislation, in which case full funding is | 10:19:11 |
| 4 | normally approved at one time in a bill, and especially | 10:19:14 |
| 5 | for bond-funded projects because the total scope and | 10:19:20 |
| 6 | costs need to be identified as part of getting financing | 10:19:24 |
| 7 | for the bonds. | 10:19:29 |
| 8 | Q.   So some capital -- major capital projects that | 10:19:38 |
| 9 | CDCR seeks to construct go through phases where it might | 10:19:43 |
| 10 | take multiple approvals to get them done? | 10:19:53 |
| 11 | A.   That's correct. | 10:19:56 |
| 12 | Q.   And others go through a different process | 10:19:57 |
| 13 | where they're approved by the legislature and Governor, | 10:20:01 |
| 14 | all at once? | 10:20:04 |
| 15 | A.   That's correct. | 10:20:05 |
| 16 | Q.   And how is the distinction made between those | 10:20:06 |
| 17 | two processes, if you know? | 10:20:10 |
| 18 | A.   Well, for sure, a bond-funded project needs to | 10:20:12 |
| 19 | be fully identified and demonstrated that it is fully | 10:20:16 |
| 20 | funded, so it's very typical that bond-funded projects | 10:20:20 |
| 21 | are through -- both -- they can be through the budget -- | 10:20:22 |
| 22 | but, basically, fully funded up front and then | 10:20:25 |
| 23 | monitored. | 10:20:27 |
| 24 | Most general fund capital outlay projects | 10:20:29 |
| 25 | require a check back with the legislature on a fiscal | 10:20:32 |

## Golden Gate Reporting

Page 35

| | | |
|---|---|---|
| 1 | basis to get full funding for construction. | 10:20:35 |
| 2 | Q. Do you understand -- is there a -- is there -- | 10:20:48 |
| 3 | can you explain to me which project -- is there any | 10:20:48 |
| 4 | particular pattern as to which projects would be bond | 10:20:56 |
| 5 | funded and which projects would be funded in the annual | 10:21:00 |
| 6 | basis by legislature? | 10:21:04 |
| 7 | A. Well, there are certain restrictions to bond | 10:21:05 |
| 8 | funding, so if it's for a major improvement to a | 10:21:08 |
| 9 | facility, that it can't be leveraged or used as | 10:21:13 |
| 10 | collateral for the bond, there are many projects in the | 10:21:17 |
| 11 | Department that don't qualify for bonds. | 10:21:20 |
| 12 | Q. So one restriction is only certain types of | 10:21:27 |
| 13 | CCR projects qualify for bonds? | 10:21:32 |
| 14 | A. That's correct. | 10:21:36 |
| 15 | Q. Putting aside the bond funding, in your | 10:21:37 |
| 16 | experience working at the CDCR, both the finance and the | 10:21:43 |
| 17 | CDCR, do you understand which kinds of projects might be | 10:21:46 |
| 18 | approved all at once by legislature versus projects that | 10:21:49 |
| 19 | are approved in phases? Is there any pattern to that? | 10:21:54 |
| 20 | A. I could give you all kinds of examples where | 10:21:56 |
| 21 | they would say, there's not a pattern. | 10:21:58 |
| 22 | Q. So there's an option, many factors going to | 10:22:01 |
| 23 | it, but there are two different paths that can be used | 10:22:04 |
| 24 | to -- | 10:22:08 |
| 25 | A. That's correct. | 10:22:08 |

## Golden Gate Reporting

Page 36

```
 1        Q.    Would it be -- is it correct that if a project    10:22:09
 2   is approved all at once by legislation and not in           10:22:12
 3   phases, that it might be -- might move forward to            10:22:18
 4   construction completion more rapidly?                        10:22:23
 5        A.    Yes.                                              10:22:26
 6        Q.    Does a project need to be an emergency project    10:22:35
 7   to be proved all at once?  Is there any particular           10:22:39
 8   restriction, that you're aware of, statutorily, that         10:22:42
 9   restricts using this legislation approval all at once?       10:22:47
10        A.    No.                                               10:22:52
11        Q.    Okay.  Let's turn to this legislative approved    10:22:53
12   construction project, AB 900.                                10:24:11
13              Are you familiar with that bill?                  10:24:14
14        A.    Yes, I am.                                        10:24:16
15        Q.    And what is that?                                 10:24:17
16        A.    It's basically authorization to construct a       10:24:18
17   series of capital outlay projects.  Has some other          10:24:24
18   factors to it, but, largely, it was a capital outlay        10:24:27
19   built authorized construction for facilities, both at       10:24:33
20   the State and local level.                                  10:24:36
21        Q.    And is it correct that AB 900 authorized          10:24:37
22   several different types of construction projects?           10:24:44
23        A.    That's true.                                      10:24:48
24        Q.    And one type of construction project was major    10:24:48
25   construction of additional beds in CDCR prisons?            10:24:54
```

## Golden Gate Reporting

Page 38

```
 1    AB 900?                                              10:26:15
 2         A.    There also were approvals for what's called  10:26:17
 3    re-entry facilities and for county jails.          10:26:24
 4         Q.    What are re-entry facilities?           10:26:29
 5         A.    Re-entry facilities were facilities to be  10:26:31
 6    built in communities where inmates were paroling to, so  10:26:35
 7    they were intended to handle inmates coming in and out  10:26:43
 8    of the prison system from those communities, to make a  10:26:47
 9    better transition back into the community, and, also, in  10:26:49
10    some cases, to provide a short-stop to inmates who   10:26:54
11    otherwise may have gone back to the prison system.  They  10:26:57
12    could go into those facilities and stay in the local  10:27:02
13    community.                                          10:27:04
14         Q.    And the second use, would that be a use by a  10:27:05
15    parolee who was found to have violated a condition of  10:27:12
16    parole and be subject to a term of imprisonment?   10:27:16
17         A.    That would be an option, yes.           10:27:19
18         Q.    So instead of going to a CDCR, from regular  10:27:20
19    CDCR prisons, they could go to a re-entry facility in  10:27:24
20    their local county or community?                    10:27:28
21         A.    That's true.                            10:27:35
22         Q.    Did you personally advocate for the use of  10:27:42
23    re-entry facilities both for prisoners on their way out,  10:27:46
24    ready to be in their last six months or a year, and also  10:27:52
25    for parole violators?                               10:27:57
```

## Golden Gate Reporting

Page 39

```
 1        A.    Yes.                                        10:27:59
 2        Q.    And why do you think the parole violator    10:28:00
 3   function for re-entry facilities is important?         10:28:04
 4        A.    They're -- I have a view probably shared by 10:28:06
 5   many people, that if you move someone from their local 10:28:10
 6   community and put them in a prison for four or five     10:28:14
 7   months and bring them back, they're starting all over. 10:28:17
 8             And if you could keep them local, even though 10:28:20
 9   they had to be incarcerated for whatever offense, or    10:28:24
10   violation they had, but you could build on those        10:28:26
11   connections, which would make people more successful    10:28:27
12   when they did get out.                                  10:28:31
13        Q.    You mentioned a third type of capital project 10:28:38
14   that was authorized by AB 900.  Was that jails?        10:28:44
15        A.    Yes.                                        10:28:47
16        Q.    Could you explain what that was.            10:28:48
17        A.    Well, the AB 900 authorized, I think the    10:28:49
18   number was 13,000, but a pot of money, basically, for  10:28:54
19   funding local jails because of their needs for beds, and 10:28:58
20   those jail beds were linked and -- to the siting of     10:29:02
21   re-entry facilities.                                    10:29:10
22        Q.    What do you mean by, linked?                10:29:14
23        A.    Well, there was a preference made if you want 10:29:17
24   to get a jail bed.  Then, there was preference to giving 10:29:19
25   those counties who worked with the Department to site   10:29:24
```

## Golden Gate Reporting

Page 42

| | | |
|---|---|---|
| 1 | the Department's success in meeting the expectations of | 10:32:52 |
| 2 | the legislature. | 10:32:56 |
| 3 | Q.   Had the Department encountered some obstacles | 10:33:01 |
| 4 | in terms of the capital outlay, part of AB 900? | 10:33:05 |
| 5 | A.   Yes. | 10:33:08 |
| 6 | Q.   And what were those? | 10:33:08 |
| 7 | A.   Getting funding released for projects. | 10:33:10 |
| 8 | Q.   Were you informed why funding had not been | 10:33:15 |
| 9 | released for projects for AB 900? | 10:33:19 |
| 10 | A.   You need to talk to attorneys, but there were | 10:33:23 |
| 11 | a series of issues that were given to me in terms of | 10:33:26 |
| 12 | language in the bill, as well as other steps that | 10:33:29 |
| 13 | prevented us from getting access to the bond funds. | 10:33:30 |
| 14 | Q.   Do you understand that the Attorney General's | 10:33:39 |
| 15 | office had issued an opinion that the bond funding | 10:33:44 |
| 16 | mechanism of AB 900 needed to be modified before the | 10:33:49 |
| 17 | projects would go forward? | 10:33:54 |
| 18 | MS. TILLMAN:   I'll object to the extent that | 10:33:56 |
| 19 | it calls for any information that he might obtain | 10:33:57 |
| 20 | through the course of an attorney/client communication. | 10:33:59 |
| 21 | If he can answer without calling upon such information, | 10:34:01 |
| 22 | he's free to do so. | 10:34:02 |
| 23 | THE WITNESS:   Well, maybe I'll just answer it | 10:34:09 |
| 24 | this way:   Is, we know we need a legal opinion from the | 10:34:11 |
| 25 | Attorney General's office in order to issue bonds, and I | 10:34:17 |

## Golden Gate Reporting

Page 43

| | | |
|---|---|---|
| 1 | know there were issues that prevented them from being | 10:34:18 |
| 2 | able to issue that opinion. | 10:34:21 |
| 3 | MR. BIEN:  Q.  That's fine. | 10:34:23 |
| 4 | Were there any other reasons you're aware of | 10:34:32 |
| 5 | that stood in the way of proceeding with getting access | 10:34:35 |
| 6 | to the funds for the capital projects? | 10:34:39 |
| 7 | MS. TILLMAN:  I'll make that same objection. | 10:34:42 |
| 8 | If you can answer without any attorney/client | 10:34:44 |
| 9 | communications, feel free to. | 10:34:44 |
| 10 | MR. BIEN:  Sure. | 10:34:47 |
| 11 | THE WITNESS:  We, as part of our review of the | 10:34:47 |
| 12 | projects, we were reassessing the scope of some of those | 10:34:49 |
| 13 | projects to determine whether they -- with changing | 10:34:53 |
| 14 | population of the Department, whether they met the needs | 10:34:56 |
| 15 | of the population. | 10:35:00 |
| 16 | So there was a process of us to reassess | 10:35:01 |
| 17 | sites, for example.  Identified some sites that we | 10:35:03 |
| 18 | thought we could build that had barriers to those.  And, | 10:35:08 |
| 19 | so, we were reassessing the locations of certain sites | 10:35:12 |
| 20 | for the infill. | 10:35:15 |
| 21 | In addition, we spent a significant amount of | 10:35:16 |
| 22 | time working with the communities on the siting of | 10:35:19 |
| 23 | re-entry because that's a pot of money for it.  And, so, | 10:35:22 |
| 24 | we were -- the expectations of AB 900 is, we would go to | 10:35:25 |
| 25 | willing communities, so we spent a lot of time working | 10:35:31 |

## Golden Gate Reporting

Page 44

| | | |
|---|---|---|
| 1 | with communities to identify where, in fact, could we | 10:35:33 |
| 2 | place re-entry. Both of those were steps that needed to | 10:35:34 |
| 3 | be taken before we actually started specific projects. | 10:35:38 |
| 4 | MR. BIEN: Q. When you said the AB 900, for | 10:35:43 |
| 5 | re-entry beds, required willing communities, can you | 10:35:46 |
| 6 | explain what that means. | 10:35:50 |
| 7 | A. Well, basically, yes, we required communities | 10:35:51 |
| 8 | to -- there was an incentive to support us, but we would | 10:35:54 |
| 9 | go to communities that accepted us. And that was, | 10:35:58 |
| 10 | without that, you don't have the principals of the | 10:36:02 |
| 11 | reform, which is to provide better community ties as | 10:36:03 |
| 12 | inmates are coming out of the prison and going back in. | 10:36:04 |
| 13 | So the legislature required it, but we would | 10:36:08 |
| 14 | have had to have it anyways. Without that partnership, | 10:36:10 |
| 15 | these facilities would not reach the reform, changes | 10:36:14 |
| 16 | that we were looking forward to having an impact on the | 10:36:17 |
| 17 | population. | 10:36:19 |
| 18 | Q. When you talk about partnership, can you | 10:36:21 |
| 19 | explain to me more what you meant about what was | 10:36:24 |
| 20 | required to make the re-entry specifics work. | 10:36:25 |
| 21 | A. Well, the goal of re-entry was two-fold. The | 10:36:27 |
| 22 | basic principal was that we needed communities to | 10:36:30 |
| 23 | acknowledge that these were citizens coming back to | 10:36:34 |
| 24 | their communities, and they needed to be part of the | 10:36:34 |
| 25 | linkages back into whether it be community services or | 10:36:38 |

## Golden Gate Reporting

Page 45

1    support or jobs or whatever.                                    10:36:43

2              So we were unable to fully fund that, so part         10:36:44

3    of the model was, the communities would acknowledge that        10:36:48

4    these are their citizens coming back, and they would            10:36:51

5    play a major role in assisting these individuals, both          10:36:54

6    in terms of supervision from the police perspective.            10:36:56

7              It was also, more importantly, access to             10:36:59

8    community programs, so they could be -- have access in          10:37:02

9    terms of getting programs, who would then be successful,        10:37:06

10   and they didn't leave the prisons.                              10:37:06

11             And, so, that was a major component.  We would       10:37:10

12   build the facilities, but it required a better                  10:37:11

13   transition for inmates coming out of the prison, a              10:37:13

14   better -- whether it be jobs, drug treatment, mental            10:37:17

15   health, but there would be a better hand-off into the           10:37:21

16   communities, which we knew would make them more                 10:37:24

17   successful.                                                      10:37:27

18             MR. BIEN:  Mr. Tilton, I didn't say this in          10:37:30

19   the beginning, but anytime you'd like to take a break           10:37:30

20   for -- to get some air or some water or whatever, please        10:37:32

21   so state.                                                        10:37:37

22             THE WITNESS:  I appreciate it.                        10:37:38

23             MR. BIEN:  Okay.                                      10:37:39

24        Q.   Is it also correct that AB 900 authorized a           10:37:52

25   certain number of beds in each of these categories and          10:37:57

## Golden Gate Reporting

Page 46

1   allocated a certain amount of money for each of these                10:38:01

2   categories?                                                          10:38:05

3        A.   Yes.                                                       10:38:05

4        Q.   Okay.  And is it correct that upon review by               10:38:06

5   the Department after AB 900 was enacted that the cost of             10:38:12

6   projects were higher than anticipated in AB 900?                     10:38:20

7        A.   Yes.                                                       10:38:27

8        Q.   And as a result, has the Department reduced                10:38:28

9   the plans for how many beds in each category it plans to             10:38:31

10  construct?                                                           10:38:35

11          MS. TILLMAN:  As you knew it from your time as               10:38:36

12  secretary.                                                           10:38:38

13          THE WITNESS:  No.                                            10:38:38

14          MR. BIEN:  Q.  No.  Can you explain?                         10:38:40

15       A.   Yes, when we were reviewing projects, two                  10:38:42

16  things happened:  One is, we had to change locations                 10:38:45

17  that were factors raised.  In addition, most all of                  10:38:48

18  these are estimates, and until you get into                          10:38:52

19  construction, you don't know whether or not you can fund             10:38:56

20  or not fund.                                                         10:38:59

21          One thing that became very clear is, for the                 10:39:01

22  infill, for example, the original budgets did not                    10:39:03

23  anticipate fully providing program space for those beds.             10:39:06

24  They were simply housing and some program space.                     10:39:11

25          The mandate of AB 900 was that for every new                 10:39:12

## Golden Gate Reporting

Page 47

1    infill bed, you provided sufficient program space, so    10:39:16

2    there was a mandate there that was not anticipated in    10:39:22

3    those original budgets.    10:39:24

4            But at a point in time the capital outlay    10:39:25

5    process does allow projects to be augmented, and I was    10:39:29

6    presented with a -- updated estimates that said those    10:39:34

7    projects could be brought in if we used full funding of    10:39:38

8    the augmentation, and I was unable to do that --    10:39:41

9    unwilling to do that because you will run into project    10:39:45

10    changes.    10:39:48

11            So what we did is, we backed off and said, we    10:39:48

12    will do these in phases.  To the extent we can meet the    10:39:50

13    budgets for those projects, there would have been an    10:39:53

14    anticipation of, we could have gone and done more.    10:39:55

15            So what we decided to do is to phase the    10:39:59

16    projects.  Yes, we came out with an anticipation that    10:40:01

17    with that money, we could fund a fewer number, but there    10:40:05

18    was always an opportunity to come back with the    10:40:09

19    augmentation authority that's necessary and had some    10:40:10

20    chance to fully fund the projects, but until we got into    10:40:11

21    them, we were --    10:40:15

22            So the conclusion that we could not fund    10:40:15

23    those, I never came to.  Was there a risk that we could    10:40:18

24    not?  Absolutely, because there are more factors.    10:40:22

25    Q.   Is it correct that you, based on this -- on a    10:40:25

## Golden Gate Reporting

Page 48

| | | |
|---|---|---|
| 1 | more rigorous analysis of the requirements of AB 900 and | 10:40:28 |
| 2 | the cost of the infill beds, that you understood that to | 10:40:33 |
| 3 | build all of the beds AB 900 anticipated for infill, | 10:40:42 |
| 4 | that you would have to at least augment or come back for | 10:40:42 |
| 5 | additional funding? | 10:40:45 |
| 6 | A.    That was the projection, whether it came true | 10:40:46 |
| 7 | or not, would be, wait until we get into the projects. | 10:40:49 |
| 8 | Q.    You also mentioned, at least as to the infill, | 10:41:21 |
| 9 | that there were some issues with the sites that emerged | 10:41:25 |
| 10 | after AB 900 was enacted. | 10:41:30 |
| 11 | A.    That's correct. | 10:41:33 |
| 12 | Q.    Can you describe any of those issues? | 10:41:35 |
| 13 | A.    Well, the initial projects were identified as | 10:41:37 |
| 14 | part of a special session of legislation, very quickly. | 10:41:39 |
| 15 | It was an emergency session, and we had identified what | 10:41:43 |
| 16 | we thought, that we could build sites, but they had not | 10:41:46 |
| 17 | done the full site review and inspection. | 10:41:50 |
| 18 | And, so, as we moved into those projects, it | 10:41:53 |
| 19 | was identified that there, in fact, were barriers or | 10:41:56 |
| 20 | things we identified that prevented us from building at | 10:42:00 |
| 21 | the original sites that we had talked about. | 10:42:03 |
| 22 | Q.    And that emergency session was in the summer | 10:42:06 |
| 23 | of 2006? | 10:42:09 |
| 24 | A.    That's correct. | 10:42:11 |
| 25 | Q.    I don't have it right here to show you, but is | 10:42:19 |

## Golden Gate Reporting

Page 49

```
 1    it correct that AB 900 actually lists the names of        10:42:22
 2    certain prisons for infill sites?                         10:42:26
 3              MS. TILLMAN:  If you recall.                     10:42:29
 4              THE WITNESS:  It lists some.  I don't -- I       10:42:31
 5    just don't know whether it's all of them.                 10:42:33
 6              MR. BIEN:  Q.  Did you understand that in        10:42:36
 7    order to change locations of infill beds, that you would  10:42:39
 8    need to go back for legislative approval of changes?      10:42:46
 9         A.   I'm not sure it's approval.  I think there is   10:42:50
10    clearly a notice of requirement.                          10:42:55
11         Q.   After the enactment of AB 900, is it correct    10:43:03
12    that the Department identified various issues that        10:43:07
13    needed to be addressed legislatively to facilitate        10:43:13
14    moving forward on AB 900?                                 10:43:18
15         A.   Yes.                                            10:43:21
16         Q.   And just in general terms, was that referred    10:43:21
17    to as a cleanup bill?                                     10:43:25
18         A.   Yes.                                            10:43:27
19         Q.   Have you heard that term?                       10:43:27
20         A.   Yes.                                            10:43:28
21         Q.   Is that something that you use?                 10:43:30
22         A.   Yes.                                            10:43:31
23         Q.   Can you explain what that would be?             10:43:31
24         A.   Well, legislation, often, is, you have a lot    10:43:33
25    of cooks in the kitchen, and when you actually get to     10:43:36
```

## Golden Gate Reporting

Page 50

| | | |
|---|---|---|
| 1 | implementation, many times you find things that weren't | 10:43:41 |
| 2 | raised or addressed that need to be adjusted.  It's very | 10:43:44 |
| 3 | routine to come back and say, gee, we forgot to raise | 10:43:46 |
| 4 | this issue, or, we need to make this minor change to be | 10:43:47 |
| 5 | consistent with the policy of legislation. | 10:43:50 |
| 6 | And many bills have a series of what's called | 10:43:53 |
| 7 | cleanup just to -- technical adjustments to meet the | 10:43:56 |
| 8 | mandate of the original legislature. | 10:43:58 |
| 9 | Q.    And AB 900 was a bill that -- did you agree a | 10:44:01 |
| 10 | secretary needed some cleanup after it was enacted? | 10:44:07 |
| 11 | A.    Yes. | 10:44:11 |
| 12 | Q.    To your knowledge, has any cleanup legislation | 10:44:13 |
| 13 | ever been enacted since AB 900 was passed? | 10:44:17 |
| 14 | A.    No. | 10:44:21 |
| 15 | Q.    Does that failure to pass this cleanup | 10:44:22 |
| 16 | legislation remain a barrier to implementation of AB | 10:44:26 |
| 17 | 900? | 10:44:31 |
| 18 | MS. TILLMAN:  I'm going to object to the | 10:44:33 |
| 19 | extent that it calls -- well, lack of foundation, since | 10:44:33 |
| 20 | he's not within CDCR at this time, and, so, there is | 10:44:39 |
| 21 | certainly a lack of foundation to his ability to speak | 10:44:39 |
| 22 | about that time, but he knew what occurred at the time | 10:44:39 |
| 23 | of his tender as secretary. | 10:44:43 |
| 24 | THE WITNESS:  Up through May 16th, it was a | 10:44:44 |
| 25 | barrier. | 10:44:47 |

## Golden Gate Reporting

Page 51

| | |
|---|---|
| 1 | MR. BIEN:   Q.   Okay.   Can you explain why it | 10:44:49 |
| 2 | remained a barrier to moving forward on the projects? | 10:45:08 |
| 3 | A.    The primary issue was getting a firm legal | 10:45:12 |
| 4 | opinion so that we could get the release of loans and | 10:45:16 |
| 5 | advance of bond funds to work on projects. | 10:45:19 |
| 6 | Q.    Was the Department at a point where if it had | 10:45:22 |
| 7 | the money, it could have actually moved forward on some | 10:45:26 |
| 8 | projects at that point, when you left? | 10:45:30 |
| 9 | A.    Yes. | 10:45:31 |
| 10 | Q.    So the failure to pass the cleanup legislation | 10:45:35 |
| 11 | at the time you left as secretary of CDCR was delaying | 10:45:38 |
| 12 | AB 900 projects? | 10:45:42 |
| 13 | MS. TILLMAN:   I'm going to object to the | 10:45:46 |
| 14 | testimony.  Assumes facts not in evidence. | 10:45:46 |
| 15 | Go ahead and answer if you can. | 10:45:50 |
| 16 | THE WITNESS: My conclusion is, yes. | 10:45:51 |
| 17 | MR. BIEN:   Q.   Okay.   Did you personally ever | 10:45:56 |
| 18 | express to representatives of legislature or to | 10:45:59 |
| 19 | legislative committee your need to have this cleanup | 10:46:06 |
| 20 | legislation? | 10:46:12 |
| 21 | A.    Yes. | 10:46:13 |
| 22 | Q.    Were you ever provided with any reasons not to | 10:46:20 |
| 23 | pass the cleanup legislation by any representatives of | 10:46:27 |
| 24 | legislature? | 10:46:32 |
| 25 | A.    There were certain components that we were | 10:46:34 |

## Golden Gate Reporting

Page 54

| | | |
|---|---|---|
| 1 | ended up in any final version. | 10:49:30 |
| 2 | THE VIDEOGRAPHER:  The time now is 10:50 a.m. | 10:49:34 |
| 3 | We're off record. | 10:49:41 |
| 4 | (Whereupon, Plaintiffs' | 10:49:43 |
| 5 | Exhibit Nos. 1 through 8 were marked | 10:49:43 |
| 6 | for identification.) | 10:49:43 |
| 7 | THE VIDEOGRAPHER:  Back on the record. | 11:06:41 |
| 8 | The time is 11:07 a.m.  Please proceed. | 11:06:43 |
| 9 | MR. BIEN:  Q.  Mr. Tilton, you understand | 11:06:45 |
| 10 | you're still under oath? | 11:06:47 |
| 11 | A.    Yes. | 11:06:48 |
| 12 | Q.    You mentioned earlier today that in the | 11:06:50 |
| 13 | original plans for the infill beds, they were done in | 11:06:54 |
| 14 | connection with the emergency session in 2006; is that | 11:07:02 |
| 15 | correct? | 11:07:05 |
| 16 | A.    Correct. | 11:07:06 |
| 17 | Q.    Is it also correct that the original plans for | 11:07:07 |
| 18 | the infill beds did not include -- did not anticipate | 11:07:10 |
| 19 | the program space requirement of AB 900? | 11:07:17 |
| 20 | A.    Yes, there were some resources for program | 11:07:22 |
| 21 | space, but not anticipate to provide 100 percent for | 11:07:24 |
| 22 | every bed. | 11:07:26 |
| 23 | Q.    Could you explain the distinction between what | 11:07:31 |
| 24 | was planned for program space originally and what you | 11:07:33 |
| 25 | understood AB 900 required for program space for the | 11:07:35 |