# EXHIBIT 38

## Deposition of James Tilton
## September 3, 2008
## (Phase II Designations)

## Part C

## Golden Gate Reporting

Page 117

1  high risk to reoffend inmates.                                    01:54:54

2       And that's why this here talks about place of      01:54:55

3  parole teams, basically work together, so we know who's   01:54:57

4  coming out of prison.  And that can adjust both the       01:55:00

5  program, as well as the security concerns of that         01:55:04

6  population.                                                01:55:06

7       Q.   If you turn two more pages in, Page 13, in the  01:55:09

8  second paragraph, you talk about the need for a local     01:55:19

9  support for the parole re-entry facilities.               01:55:22

10      Between December of 2006 and the time you left      01:55:32

11 CDCR in May of 2008, is it correct that you devoted       01:55:37

12 substantial time to the effort to convince local         01:55:43

13 communities to participate in the parole reform effort?   01:55:47

14      A.   Yes.                                            01:55:53

15      Q.   And one of your goals was to have local         01:55:53

16 communities apply for jail beds and parole re-entry       01:56:00

17 beds; is that correct?                                    01:56:06

18      A.   Yes.                                            01:56:07

19      Q.   And AB 900, of course, provided the mechanism   01:56:08

20 for that in the spring of 2007, and you actually had a    01:56:17

21 program that you could show people?                       01:56:21

22      A.   Yes.                                            01:56:22

23      Q.   In discussing these issues with the local       01:56:26

24 communities, was one issue that was raised by local       01:56:32

25 communities who would operate the re-entry facilities,    01:56:36

## Golden Gate Reporting

Page 118

```
 1   would they be operated by CDC, or would they be operated    01:56:40
 2   by the local sheriffs?                                      01:56:44
 3       A.   Yes.                                               01:56:46
 4       Q.   And has that issue been decided or resolved by     01:56:47
 5   CDC?  In other words, who is -- is there an option -- I     01:56:51
 6   understand that the re-entry facilities -- that as part     01:56:57
 7   of the principals of the re-entry program in AB 900,        01:57:07
 8   local communities have a role in designing the              01:57:12
 9   facilities and deciding the locations and in designing      01:57:15
10   the programs to be offered; is that correct?               01:57:19
11       A.   Yes.                                               01:57:22
12       Q.   Now, is one of the things that is an option        01:57:29
13   available to local communities siting the entry            01:57:29
14   facilities, that they would operate the facilities?         01:57:29
15          MS. TILLMAN:  If you know.                           01:57:38
16          THE WITNESS:  In my tenure, I [sic] was on the       01:57:42
17   table as an option.                                         01:57:47
18          MR. BIEN:  Q.  Is it correct that there were         01:57:49
19   discussions about whether that would be one of the          01:57:49
20   options available to local communities?                     01:57:51
21       A.   Yes.                                               01:57:54
22       Q.   Okay.  And was that issue, at least from CDC's      01:57:54
23   side, decided in any way at the time you left CDC?          01:58:00
24       A.   We expressed a preference and not a mandate.       01:58:05
25       Q.   And what was the preference?                       01:58:08
```

## Golden Gate Reporting

Page 119

| | | |
|---|---|---|
| 1 | A.    The preference is that we would run the | 01:58:10 |
| 2 | facilities and contract for services. | 01:58:11 |
| 3 | Q.    And by contracting for services, which | 01:58:13 |
| 4 | services would you contract for? | 01:58:18 |
| 5 | A.    Those services that the inmates would then be | 01:58:20 |
| 6 | delivered when they went on parole, so there would be a | 01:58:23 |
| 7 | consistency of providers.  So we talked drug treatment. | 01:58:26 |
| 8 | We talked mental health.  We talked anger management, | 01:58:28 |
| 9 | those kind of issues that we would want the parolee to | 01:58:33 |
| 10 | continue when they went on parole. | 01:58:37 |
| 11 | Q.    And as a model that you expressed a preference | 01:58:39 |
| 12 | for from CDC's side, the same provider who is to provide | 01:58:44 |
| 13 | the program for parolees upon their discharge from the | 01:58:50 |
| 14 | re-entry facility would also provide the program while | 01:58:52 |
| 15 | they're in the facilities? | 01:58:55 |
| 16 | A.    Yes. | 01:58:56 |
| 17 | Q.    So you would have a contract with a private -- | 01:58:56 |
| 18 | for example, a drug treatment program, and they provide | 01:58:59 |
| 19 | services for both the re-entry facility and on the | 01:58:59 |
| 20 | parole? | 01:59:04 |
| 21 | A.    Yes. | 01:59:05 |
| 22 | Q.    And what was the advantage that you saw in | 01:59:05 |
| 23 | that model? | 01:59:07 |
| 24 | A.    Continuity of delivery of service and the | 01:59:09 |
| 25 | issue of a person who, for whatever reason, on parole, | 01:59:12 |

## Golden Gate Reporting

Page 120

1   had to go back into custody, there would be a                    01:59:16
2   continuity -- a continuation of those same support              01:59:19
3   services.                                                        01:59:22
4        Q.    The other issue in terms of operating                01:59:23
5   facility, though, is the custodial side of re-entry             01:59:26
6   facilities.  Am I correct that CDCR expressed its               01:59:30
7   preference that CDCR would run the custodial operations         01:59:34
8   of the re-entry facilities?                                      01:59:40
9        A.    Yes.                                                  01:59:42
10       Q.    And what was the basis for that --                    01:59:42
11       A.    Two-fold:  One, they were still CDCR inmates,         01:59:43
12  and we had a responsibility to make sure that all               01:59:46
13  existing processes and due processes, for example, what         01:59:49
14  rights the inmates had in a CDCR environment were               01:59:53
15  honored, so Title 15 and the rest of that, so it was an         01:59:57
16  issue of, they're still our responsibility, and we had         02:00:01
17  all those -- remain consistent with the program.               02:00:04
18            So if someone else took over a custody, they         02:00:04
19  would have to comply with our policies, not their local         02:00:08
20  jail or sheriff policies.                                        02:00:12
21       Q.    You do contract with other entities to provide       02:00:19
22  services -- custodial services for California prisoners,        02:00:24
23  now, don't you?                                                  02:00:25
24       A.    That's true.                                         02:00:26
25       Q.    So, for example, the community correction           02:00:26

## Golden Gate Reporting

Page 123

1   when it came to the end of the day, would they give up          02:03:28

2   jail money over this issue.                                      02:03:32

3           MR. BIEN:   Q.   Going back to Exhibit 1,                02:03:57

4   Page 13, the next paragraph talks about, "Failure on            02:03:58

5   parole is a significant contributing factor driving the         02:04:05

6   overcrowding of our prisons," end quote.                        02:04:06

7           That's the first sentence of the third                  02:04:11

8   paragraph.  Can you explain what was meant by that?             02:04:15

9       A.    Well, it's true.   If we could cut down this          02:04:26

10  revolving door of inmates coming back two or three times        02:04:26

11  a year, we would save beds, and so the issue is if we           02:04:27

12  can cut down recidivism and make them more successful           02:04:30

13  and they come out, they become productive citizens              02:04:31

14  versus getting back and creating more criminals -- or           02:04:34

15  more victims, then we can impact the population.                02:04:37

16      Q.    If you can turn to Page 19, which is the              02:04:58

17  third-from-the-last on the documents, Mr. Tilton.   It          02:05:01

18  has, on the top, "Existing Deficiencies in Healthcare           02:05:10

19  Program Changes."                                               02:05:10

20          Do you have that page?                                  02:05:10

21      A.    Yes.                                                   02:05:12

22      Q.    The first paragraph says, "In conjunction with        02:05:29

23  identifying solutions for the impending bed crisis, the         02:05:33

24  CDCR plan also identified existing deficiencies based           02:05:35

25  upon current overcrowding in the areas of program space,        02:05:39

# Golden Gate Reporting

Page 126

| | | |
|---|---|---|
| 1 | were there, and we made some recommendations to the | 02:08:48 |
| 2 | Receiver's office about how to address medical side in | 02:08:51 |
| 3 | conjunction with mental health to be consistent and | 02:08:55 |
| 4 | efficient. | 02:08:59 |
| 5 | MR. BIEN:  I think we're finally finished with | 02:09:04 |
| 6 | Exhibit 1.  Let me show you what's been marked as | 02:09:08 |
| 7 | Exhibit 8 to your deposition, which is a -- also from | 02:09:25 |
| 8 | CDCR publication or website -- a two-page document.  It | 02:09:28 |
| 9 | doesn't appear -- it has Thursday, January 11th, 2007, | 02:09:40 |
| 10 | on it. | 02:09:44 |
| 11 | MS. TILLMAN:  Thank you. | 02:09:49 |
| 12 | THE WITNESS:  (Witness reviewing document.) | 02:09:51 |
| 13 | MR. BIEN:  Q.  Is it correct that you | 02:10:21 |
| 14 | continued, along with the administration, to advocate | 02:10:27 |
| 15 | for changes that you had sought in the next legislative | 02:10:30 |
| 16 | session, 2007/2008? | 02:10:35 |
| 17 | A.  Yes. | 02:10:37 |
| 18 | Q.  There's a quote in the first page of Exhibit 8 | 02:10:39 |
| 19 | that purports to be from you.  Is this -- I'll read it. | 02:10:42 |
| 20 | "The Department of Corrections owns the responsibility | 02:10:48 |
| 21 | to assist inmates who are willing to change their ways | 02:10:51 |
| 22 | with the basic tools of education, life skills, drug | 02:10:51 |
| 23 | treatment, and mental health, so they can get better | 02:10:51 |
| 24 | when they leave Corrections -- not worse.  But until I | 02:10:51 |
| 25 | get overcrowding reduced -- then I don't have the | 02:10:51 |

## Golden Gate Reporting

Page 127

| | | |
|---|---|---|
| 1 | opportunity to provide the program that I believe is my | 02:10:51 |
| 2 | charge," end quote. | 02:10:51 |
| 3 | Is that a statement that you made in early | 02:11:10 |
| 4 | 2007? | 02:11:12 |
| 5 | A.   Yes. | 02:11:14 |
| 6 | Q.   That's something that you still believe today? | 02:11:16 |
| 7 | A.   Yes. | 02:11:19 |
| 8 | Q.   At the time you left CDCR in the spring of | 02:11:19 |
| 9 | 2008, did you believe that overcrowding had been reduced | 02:11:26 |
| 10 | sufficient to allow CDCR to provide the programs | 02:11:30 |
| 11 | necessary to prisoners? | 02:11:35 |
| 12 | A.   It's a start. | 02:11:37 |
| 13 | Q.   Made a start? | 02:11:40 |
| 14 | A.   Um-hum. | 02:11:41 |
| 15 | Q.   Did you believe that the substantial | 02:11:41 |
| 16 | additional capacity or population reduction was | 02:11:45 |
| 17 | necessary to effectively deliver programs to prisoners? | 02:11:50 |
| 18 | A.   I'm going to qualify my statement, is that | 02:11:54 |
| 19 | over time, there were improvements I could make in the | 02:11:57 |
| 20 | existing without dealing with the overcrowding and | 02:12:01 |
| 21 | space.  I identified some inefficiencies of use of our | 02:12:03 |
| 22 | program resources, and then as we reduced overcrowding, | 02:12:06 |
| 23 | we could bring in, in a systematic way, increased | 02:12:11 |
| 24 | programming. | 02:12:17 |
| 25 | So it's not a snapshot in one day, but I was | 02:12:18 |

## Golden Gate Reporting

Page 130

| | | |
|---|---|---|
| 1 | THE WITNESS: (Witness reviewing document.) | 02:14:55 |
| 2 | MR. BIEN: Q. Mr. Tilton, are you familiar | 02:15:00 |
| 3 | with this document? | 02:15:02 |
| 4 | A. Yes. | 02:15:02 |
| 5 | Q. Can you identify what it is? | 02:15:03 |
| 6 | A. This is the emergency proclamation order | 02:15:05 |
| 7 | issued by the Governor, dealing with prison | 02:15:09 |
| 8 | overcrowding. | 02:15:13 |
| 9 | Q. Did you participate in a decision to issue | 02:15:13 |
| 10 | this emergency proclamation at or near the time it was | 02:15:21 |
| 11 | issued? | 02:15:24 |
| 12 | A. Well, it's the Governor's office's decision, | 02:15:27 |
| 13 | but, absolutely, I was part of this discussion. | 02:15:29 |
| 14 | Q. And given the failure of the special session, | 02:15:33 |
| 15 | did you think it was necessary and appropriate for the | 02:15:35 |
| 16 | Governor to issue this emergency proclamation when he | 02:15:38 |
| 17 | did? | 02:15:43 |
| 18 | A. Yes. | 02:15:43 |
| 19 | Q. And why was that? | 02:15:44 |
| 20 | A. I felt it was important not to give up on the | 02:15:47 |
| 21 | reforms we were trying to put in place, and we should | 02:15:51 |
| 22 | not stop at any barrier to try every avenue to get | 02:15:55 |
| 23 | authorization to make progress. | 02:15:59 |
| 24 | Q. On the top of Page 2, there's a "whereas" | 02:16:34 |
| 25 | clause dealing with the effects of current, severe | 02:16:41 |

Page 131

```
 1    overcrowding, and the first paragraph talks about          02:16:46
 2    increased substantial risks to the health and safety of    02:16:51
 3    CDCR staff, inmates, and the public.                       02:16:55
 4              Did you agree that conditions, as of October     02:16:58
 5    2006, were substantial risks to the health safety of       02:17:00
 6    CDCR staff, inmates, and the public?                       02:17:04
 7              MS. TILLMAN:  Objection.  Lack of foundation.    02:17:09
 8              Go ahead and answer.                             02:17:09
 9              THE WITNESS:  Yes.                               02:17:09
10              MR. BIEN:  Q.  And then at the middle of the     02:17:23
11    page, there's a "whereas" clause, a, quote, "WHEREAS,      02:17:25
12    overcrowding causes harm to people and property, leads     02:17:28
13    to inmate unrest and misconduct, reduces or eliminates     02:17:28
14    programs, and increases recidivism as shown within this    02:17:28
15    state and in others."                                      02:17:28
16              Did you agree with that statement, Mr. Tilton?   02:17:39
17         A.   Yes.  I'd put a caveat.  It's the overcrowding   02:17:43
18    with the lack of program.                                  02:17:51
19         Q.   The next "whereas" clause is followed by a       02:18:02
20    list of prisons that goes on for several pages, and        02:18:09
21    lists for each prison the capacity, the current number     02:18:14
22    of inmates.  It also lists incidents of violence at        02:18:20
23    prisons, assault and battery, riots, melees M-E-L-E-E-S,   02:18:27
24    and weapon confiscations.                                  02:18:35
25              Do you agree, Mr. Tilton, that severe           02:18:39
```

# Golden Gate Reporting

Page 133

| | | |
|---|---|---|
| 1 | found mental healthcare in CDCR prisons to be below | 02:20:34 |
| 2 | federal constitutional standards due in part to the lack | 02:20:34 |
| 3 | of appropriate beds and space." | 02:20:34 |
| 4 | Did you understand that to be the case, | 02:20:34 |
| 5 | Mr. Tilton? | 02:20:43 |
| 6 | A.   Yes. | 02:20:45 |
| 7 | Q.   And then a little farther down, I think you | 02:20:46 |
| 8 | mentioned this morning, there's a whereas clause that | 02:20:49 |
| 9 | "Overcrowded prisons in other states have experienced | 02:20:52 |
| 10 | some of the deadliest prison riots in American history," | 02:20:52 |
| 11 | and it mentions Attica, New Mexico and Lucasville. | 02:20:52 |
| 12 | Did you understand that there was a risk of | 02:20:53 |
| 13 | riots or takeovers in California prisons due to the | 02:21:08 |
| 14 | level of overcrowding in October of 2006? | 02:21:12 |
| 15 | MS. TILLMAN:   Objection.   Compound in terms of | 02:21:14 |
| 16 | riot versus takeover. | 02:21:18 |
| 17 | Go ahead and answer. | 02:21:19 |
| 18 | THE WITNESS:   Yeah, I don't think the inmates | 02:21:19 |
| 19 | would take over, but the issue of incidents and riots | 02:21:21 |
| 20 | was a risk. | 02:21:23 |
| 21 | MR. BIEN:   Q.   And that was the one of the | 02:21:25 |
| 22 | things you were concerned about as secretary? | 02:21:26 |
| 23 | A.   Yes. | 02:21:32 |
| 24 | Q.   And then a little farther down after the | 02:21:38 |
| 25 | reference to Lucasville, Ohio, it says, "WHEREAS, I | 02:21:41 |

## Golden Gate Reporting

Page 134

| | | |
|---|---|---|
| 1 | believe immediate action is necessary to prevent death | 02:21:46 |
| 2 | and harm caused by California's severe prison | 02:21:49 |
| 3 | overcrowding." | 02:21:49 |
| 4 | Do you agree with the Governor's statement? | 02:21:49 |
| 5 | A.    Yes. | 02:21:56 |
| 6 | Q.    The second-to-the-last page ends the "whereas" | 02:22:20 |
| 7 | and gets to the action.  The Governor orders as a result | 02:22:27 |
| 8 | of the emergency, the -- orders the CDC to contract for | 02:22:39 |
| 9 | out-of-state correctional facilities; is that correct? | 02:22:49 |
| 10 | A.    That's correct. | 02:22:53 |
| 11 | Q.    Did you understand that CDCR was precluded | 02:22:57 |
| 12 | from contracting with out-of-state facilities but for | 02:23:01 |
| 13 | this emergency proclamation? | 02:23:05 |
| 14 | MS. TILLMAN:  Objection.  Calls for a legal | 02:23:10 |
| 15 | conclusion. | 02:23:10 |
| 16 | If you can answer, go ahead. | 02:23:10 |
| 17 | THE WITNESS:  That was my belief, yes. | 02:23:10 |
| 18 | MR. BIEN:  Q.    There could have been | 02:23:14 |
| 19 | legislation that did the same thing; is that correct? | 02:23:15 |
| 20 | MS. TILLMAN:  Same objection. | 02:23:17 |
| 21 | THE WITNESS:  Yes. | 02:23:20 |
| 22 | MR. BIEN:  Q.    That was your understanding? | 02:23:21 |
| 23 | A.    Yes. | 02:23:22 |
| 24 | Q.    Isn't it correct that you considered issuing | 02:24:00 |
| 25 | an emergency -- start that over again. | 02:24:07 |

## Golden Gate Reporting

Page 141

| | | |
|---|---|---|
| 1 | the rate it's achieved to date? | 02:33:09 |
| 2 | MS. TILLMAN: I'm sorry. Could I have that | 02:33:12 |
| 3 | read back. I didn't hear the first part. | 02:33:12 |
| 4 | MR. BIEN: Let me try it again. | 02:33:19 |
| 5 | Q. Are you aware of any efforts, while you were | 02:33:17 |
| 6 | secretary, to speed up the process of sending prisoners | 02:33:21 |
| 7 | to out-of-state prisons? | 02:33:25 |
| 8 | A. I'm not sure "speed up" is the right word I'd | 02:33:28 |
| 9 | use. We wanted to move as quick as we could to activate | 02:33:32 |
| 10 | those beds, and in a prudent fashion. So there was | 02:33:35 |
| 11 | always pressure, Bring up the beds as quick as you can. | 02:33:38 |
| 12 | And I don't know what the final results were | 02:33:42 |
| 13 | in terms of the construction schedule, but the prognosis | 02:33:45 |
| 14 | that we got from the vendor was huge compared with what | 02:33:46 |
| 15 | we thought we could do, and what we could do in | 02:33:48 |
| 16 | California to build a prison. So if they could bring us | 02:33:50 |
| 17 | 3,000 beds on board in a year, let's go as fast as we | 02:33:53 |
| 18 | can. | 02:33:57 |
| 19 | Q. At the time you left CDCR, was that prison up | 02:33:58 |
| 20 | and operating in a new facility with CCA and -- | 02:34:03 |
| 21 | A. No, I think the schedule was the summer. | 02:34:06 |
| 22 | Q. Let's shift gears here for one second. | 02:34:37 |
| 23 | We talked about parole reform earlier on. You | 02:35:56 |
| 24 | talked about the word assessments. Can you -- I'd like | 02:36:07 |
| 25 | to ask you a little bit more about that. | 02:36:13 |

Page 142

1          One was -- one thing I think you said was that          02:36:18

2     you wanted to develop a matter of doing -- of looking at     02:36:22

3     risk to reoffend assessment.  Can you explain what that      02:36:28

4     is?                                                           02:36:31

5          A.    Yes, what I learned from the experts around       02:36:31

6     the country is the mistake many of them made was to          02:36:34

7     invest program resources in low-end offenders who had        02:36:37

8     low risk to reoffend, and they ended up putting money        02:36:42

9     into people who would have been successful anyway.           02:36:47

10          And, so, different from a risk in terms of the         02:36:48

11    violence or the type of crime, we wanted to have an          02:36:52

12    assessment of individuals to say, which ones really are      02:36:54

13    going to be okay?  In fact, they said that the low risk      02:36:58

14    to reoffend offenders, you do more harm than good by         02:37:02

15    keeping a long parole tail, and those kind of issues,        02:37:06

16    because you keep reminding them that they are, in fact,      02:37:07

17    an inmate when, if you leave them alone, they will be        02:37:07

18    successful.                                                   02:37:11

19          So we wanted to take what we learned from the          02:37:12

20    other states, create an instrument, validate it, so we       02:37:15

21    had an instrument that would allow us to apply what are      02:37:18

22    very expensive program resources to those people we          02:37:20

23    could have the biggest impact.                                02:37:23

24          And to communicate with the people, This is            02:37:25

25    not an offense assessment.  It's an offense to reoffend.     02:37:27

Golden Gate Reporting

Page 143

| | | |
|---|---|---|
| 1 | Some very violent offenders, when they do get out, will | 02:37:30 |
| 2 | have a low risk to reoffend.  Some low, nonviolent folks | 02:37:33 |
| 3 | have a high risk to reoffend.  So take a different | 02:37:38 |
| 4 | perspective, not just feed on the crime that they | 02:37:42 |
| 5 | committed, but assess those individuals in terms of | 02:37:42 |
| 6 | their readiness to parole. | 02:37:46 |
| 7 | Based on that, we would apply a risk of what | 02:37:49 |
| 8 | their needs were to be successful, and then apply | 02:37:51 |
| 9 | appropriate programs to those needs.  So that was the -- | 02:37:54 |
| 10 | basically the nuts and bolts to that issue, to make sure | 02:37:56 |
| 11 | that -- as I told the legislature, You need to invest, | 02:38:02 |
| 12 | give me more money for programs, and let me show you | 02:38:04 |
| 13 | that I'll have a savings in your population and in the | 02:38:09 |
| 14 | Department's budget. | 02:38:10 |
| 15 | So that initial start of that is create risk | 02:38:12 |
| 16 | assessment instruments, and that was one of the | 02:38:15 |
| 17 | challenges that we had started in report, that an expert | 02:38:19 |
| 18 | panel finished their work to put that in place. | 02:38:22 |
| 19 | Q.    You moved ahead on this initiative to hire | 02:38:27 |
| 20 | consultants and develop a risk assessment instrument? | 02:38:33 |
| 21 | A.    Yes. | 02:38:36 |
| 22 | Q.    And you also moved ahead on the initiative to | 02:38:37 |
| 23 | validate the risk assessment instrument? | 02:38:40 |
| 24 | A.    Yes. | 02:38:43 |
| 25 | Q.    And at the time you left CDCR as secretary in | 02:38:55 |

## Golden Gate Reporting

Page 144

| | |
|---|---|
| 1 | the spring of 2008, what was the status of | 02:39:05 |
| 2 | implementation of this risk assessment instrument in | 02:39:06 |
| 3 | CDCR? | 02:39:09 |
| 4 | A.    Two-fold:  One is the experts or research | 02:39:11 |
| 5 | people had advised they need time to take the automated | 02:39:16 |
| 6 | system they have called COMPAS, re-populate that with | 02:39:17 |
| 7 | the data from the survey to basically have the COMPAS | 02:39:21 |
| 8 | factors to be consistent with the validation tool. | 02:39:25 |
| 9 | And then the next step I asked for is, give me | 02:39:29 |
| 10 | a plan to roll that out with two different levels of | 02:39:32 |
| 11 | questions or data.  How does that instrument compare to | 02:39:37 |
| 12 | existing decisions we're making?  So get the judgment of | 02:39:43 |
| 13 | both parole agents, as well as supervisors, so I could | 02:39:48 |
| 14 | compare what's happening now in the judgment of my staff | 02:39:53 |
| 15 | versus what the instrument would derive. | 02:39:53 |
| 16 | Based on that review, I would be willing to | 02:39:56 |
| 17 | make a call where within these graduated points, | 02:39:58 |
| 18 | et cetera, we would perform a policy statement about | 02:40:02 |
| 19 | decisions. | 02:40:06 |
| 20 | So my understanding was, we had validated | 02:40:06 |
| 21 | huge, 100,000 inmates, so the analytical work had been | 02:40:09 |
| 22 | done, but we wanted to technically update the automated | 02:40:14 |
| 23 | system, as well as test the results of it before we | 02:40:18 |
| 24 | actually said, we automatically jump to the assessment | 02:40:20 |
| 25 | that it was the driver for this issue. | 02:40:23 |

## Golden Gate Reporting

Page 145

1        So it was in that -- when I left, we were          02:40:23
2    right in the middle of those two exercises.            02:40:26
3        Q.    Can you explain what COMPAS is, as you        02:40:29
4    understand it?                                          02:40:30
5        A.    COMPAS is -- it's just a tool to use to do    02:40:32
6    assessments of inmates' risk.  It also has some program 02:40:37
7    need data, but if you don't know, we're not an automated 02:40:42
8    department.  And the reason we picked it was, this was   02:40:47
9    an automated system.  The vendor was willing to tweak    02:40:47
10   with us, so we'd at least have some data that we would   02:40:47
11   -- could do our assessment of, measure it of, and        02:40:54
12   actually make decisions based on data.                   02:40:58
13       So COMPAS was the tool we picked and was being       02:41:02
14   modified by this California information to update it to   02:41:07
15   be consistent for California versus what's been used in   02:41:09
16   other states.                                             02:41:13
17       Q.    And as part of the intended use of this        02:41:14
18   assessment, a process would be to -- I guess, why don't  02:41:20
19   you tell me:  Where in the process in Corrections would  02:41:26
20   this assessment instrument be used, and how would it be  02:41:30
21   used under your plan?                                     02:41:34
22       A.    Well, I'll give you the CDCR answer, and then  02:41:36
23   I'll give you the more global answer.  We wanted to have  02:41:39
24   a consistent analysis of inmates throughout the system,   02:41:43
25   and when they come in the door until when they go out,    02:41:45

Page 146

| | | |
|---|---|---|
| 1 | there was an updated process to do the assessment. | 02:41:47 |
| 2 | We wanted it automated so we could use it as a | 02:41:51 |
| 3 | measurement stick about how we were doing based on | 02:41:55 |
| 4 | policy and decisions and compliance with it so that we'd | 02:41:56 |
| 5 | have performance measurements on what we were doing with | 02:42:00 |
| 6 | who. | 02:42:04 |
| 7 | I needed that because I felt, in CDCR, I did | 02:42:05 |
| 8 | not have what I describe as levers to these issues. | 02:42:08 |
| 9 | It's all judgment of individual staff, and we wanted | 02:42:13 |
| 10 | something we could measure, so I could fully say, this | 02:42:16 |
| 11 | is my policy.  Now, it translates to decisions. | 02:42:19 |
| 12 | And it would be the backbone to -- as the | 02:42:23 |
| 13 | initial screener of inmates -- now, there's a lot more | 02:42:25 |
| 14 | other things needed in terms of -- whether it be mental | 02:42:30 |
| 15 | health or other factors, but there would be initial | 02:42:34 |
| 16 | screening documents we have that would be done, and we | 02:42:34 |
| 17 | haven't had piloted, had to have San Diego, in fact, | 02:42:37 |
| 18 | deliver the inmates with the COMPAS already done. | 02:42:41 |
| 19 | That leads to my other comment, is, my other | 02:42:45 |
| 20 | goal was to -- I had dialogues with both probation and | 02:42:48 |
| 21 | the court system to find out why don't we have a | 02:42:50 |
| 22 | consistent assessment tool in California, especially | 02:42:53 |
| 23 | this revolving door, is dropping the ball. | 02:42:58 |
| 24 | We get people coming in without a clear | 02:42:59 |
| 25 | articulation of their needs, and, yet, we knew a doctor | 02:43:02 |

## Golden Gate Reporting

Page 147

1  had seen them in mental health or something.  He was          02:43:06
2  getting certain services in the other jurisdiction, and,      02:43:06
3  all of a sudden, he starts over in ours.                      02:43:09
4          So the long-term goal was to see if we could          02:43:12
5  come up with an assessment tool that would be used            02:43:15
6  consistently in the criminal justice system, so people        02:43:17
7  we knew who were getting both custody risk assessment,        02:43:18
8  as well as program needs.                                     02:43:22
9          And the San Diego model, we get inmates with,         02:43:25
10 basically, a prescription for services, that that county      02:43:28
11 expects us to deliver, and then it's updated when they        02:43:31
12 go out to see whether or not we met those needs.  So          02:43:34
13 that's the vision, is having an instrument that provides       02:43:37
14 some consistency of assessment and services.                  02:43:38
15     Q.    Is the San Diego model under SB618?                 02:43:43
16     A.    Yes.                                                02:43:47
17     Q.    Can you explain what that program is?               02:43:48
18     A.    Well, it started off as just, why are we being      02:43:49
19 inefficient?  Local communities are assessing inmates,        02:43:52
20 and why do we get more than just the inmate?  And here's      02:43:54
21 his offense.  So we started working with San Diego            02:43:57
22 County to -- in a court system down there, to get             02:44:00
23 assessment of inmates, so when they came in the               02:44:03
24 Department, we would go straight to program and would         02:44:07
25 not have to go through the reception center process.          02:44:09

## Golden Gate Reporting

Page 148

```
 1              Worked pretty good except for one hiccup.        02:44:12
 2       Q.    What was that?                                     02:44:15
 3       A.    The medical Receiver.                              02:44:16
 4       Q.    What was the hiccup there?                         02:44:19
 5       A.    Refused to accept the medical evaluation.          02:44:21
 6  That was it, so we'd do it again.                             02:44:26
 7       Q.    As part of that program, also, that San Diego      02:44:29
 8  would work with CDCR on re-entry planning and services        02:44:32
 9  for these inmates upon their discharge?                       02:44:39
10       A.    Yes.                                               02:44:43
11       Q.    And sort of, as you've talked about earlier        02:44:43
12  this morning, be a partner in the process of taking           02:44:49
13  these people back to their communities in a way that          02:44:52
14  they could succeed?                                           02:44:54
15       A.    Yes.  In fact, I, many times, have cited           02:44:56
16  San Diego as giving me the model for re-entry.  In fact,      02:45:00
17  they tweaked our original discussion, and San Diego is a      02:45:05
18  community that worked very closely with the Department        02:45:10
19  in terms of defining this communication, and they, in         02:45:10
20  fact, had gone around the State advocating what we were       02:45:19
21  proposing.                                                    02:45:19
22       Q.    Are you aware of any efforts to expand the         02:45:19
23  funding under SB618 to apply to more counties than just       02:45:23
24  San Diego?                                                    02:45:25
25       A.    Yes.                                               02:45:26
```

## Golden Gate Reporting

Page 149

1    Q.    And what was the status of that when you left?    02:45:27

2    A.    They were denied.    02:45:29

3    Q.    Did you advocate for those programs?    02:45:31

4    A.    Yes.    02:45:33

5    Q.    Are you aware of any program to use the risk    02:45:51

6    assessment instrument to evaluate parolees to determine    02:45:57

7    whether, in the course of an alleged parole violation,    02:46:04

8    they would be appropriate for re-incarceration or for    02:46:08

9    some alternatives to incarceration?    02:46:13

10    A.    There's a linkage between the assessments and    02:46:17

11    what I call decision matrix.  So it's -- they're linked.    02:46:21

12    One is, use assessments to make decisions about    02:46:26

13    staffing, as well as risk to reoffend, to determine how    02:46:29

14    you respond to a potential parole violation.    02:46:33

15    Q.    What is a decision matrix?  Can you explain    02:46:38

16    that?    02:46:42

17    A.    Well, I've been around a long time, and I know    02:46:42

18    -- have many examples where the Department's decisions    02:46:45

19    on parole violations are based on the judgment of the    02:46:49

20    individual agent or supervisor, and there is not a    02:46:52

21    consistent -- there was not a consistent decision making    02:46:55

22    when I got into the Department.    02:46:58

23         I've had all kinds of examples where I did    02:47:00

24    audits and found out that they were inconsistent in    02:47:03

25    terms of decisions based on where you were.  Some    02:47:06

Golden Gate Reporting

Page 150

1   factors are appropriate in terms of what kind of          02:47:09
2   services you have, but I just felt there was not a        02:47:13
3   consistent mechanism to allow some framework to be put    02:47:14
4   around decisions about whether people get violated or     02:47:20
5   services provided.                                        02:47:22
6        So I put forward a project, in fact, give me         02:47:22
7   that tool, so that, as the policymaker, I could, in       02:47:27
8   fact, say, This is the criteria that I'm willing to take  02:47:32
9   risks, and these are the criteria I'm not willing to      02:47:36
10  take risks, and if you make decisions within that         02:47:36
11  spectrum, then the secretary will take responsibility     02:47:40
12  for the decision, not the individual agent.               02:47:44
13       Q.   Is it correct the Department retained           02:47:48
14  consultants to assist in developing a parole decision     02:47:52
15  making matrix?                                            02:47:57
16       A.   Yes.                                            02:47:58
17       Q.   And what is the status of that project, to      02:47:59
18  your knowledge, at the time you left?                     02:48:01
19       A.   It was getting pretty close to being            02:48:03
20  recommended -- final recommendation.  I don't think we    02:48:05
21  actually made a final call on it.                         02:48:09
22       Q.   Had it been piloted anywhere?                   02:48:13
23       A.   Not that I'm aware of.  That was the            02:48:19
24  assignment, go out and test it, so whether it had or      02:48:19
25  not, that was the direction I gave was, go run it         02:48:22

Page 151

1   simultaneously, what we're doing, so I know the impact          02:48:23

2   of decisions based on existing decisions before I pull          02:48:26

3   the lever.                                                      02:48:29

4        Q.    Is it correct another aspect of parole reform        02:48:32

5   and also of reducing overcrowding that you advocated was        02:48:36

6   to increase the options in the community for what's             02:48:42

7   called intermediate sanctions?                                  02:48:47

8        A.    Yes.                                                  02:48:50

9        Q.    And what are those intermediate sanctions?           02:48:50

10       A.    Well, I don't like the term "intermediate            02:48:52

11  sanction," so I'll use a different term for it.                 02:48:56

12       Q.    Please.   What would you call it?                    02:48:58

13       A.    Well, my belief was, if all you have is a            02:49:00

14  decision, either put them in prison or don't put them in        02:49:02

15  prison, then that's what you get.                               02:49:04

16            And, so, the issue, what I asked for is               02:49:06

17  without predicting the decision, asked the parole board         02:49:09

18  and parole agents to ask the question of whether a              02:49:12

19  program, a more structured program, would serve the            02:49:16

20  inmate better or sitting on a bunk for five months.            02:49:20

21            So we went forward to start providing options         02:49:24

22  for parole, started working with communities and doing          02:49:26

23  day reporting centers and treatment centers and services       02:49:29

24  that were linked, and started working with communities          02:49:32

25  to get parolees into certain programs; and, therefore,          02:49:35

Page 152

1    there were some options besides that.                    02:49:39

2            So the alternative tells me, Well, I made a      02:49:41

3    decision not to put them in prison.  They belong there.  02:49:44

4    I don't think that's the issue.  The issue is, is there  02:49:44

5    something else besides sitting on a bunk for five months 02:49:49

6    that would be better served, which was a public safety   02:49:52

7    for that individual, and that was what we would push     02:49:53

8    for.                                                     02:49:57

9        Q.   Okay.  And during the time you were secretary, 02:49:58

10   were you able to expand the options for these            02:50:02

11   alternatives to incarceration for parolees?             02:50:07

12       A.   Yes.                                            02:50:11

13       Q.   What efforts are you aware of that were made    02:50:11

14   in that?                                                 02:50:14

15       A.   Well, I think we contracted for almost 1,800    02:50:14

16   drug treatment beds, I believe, out of that exercise.    02:50:20

17   We were -- I don't know the number, somewhere around 200 02:50:22

18   or 300 mental health slots.  We activated, I don't know  02:50:24

19   how many -- a number of re-entry -- what they call day   02:50:31

20   reporting centers, which would be a comprehensive        02:50:32

21   process to link parolees into services.                  02:50:34

22            And all of those efforts, in my view, is,       02:50:39

23   there was a reason why the parole violations were going  02:50:43

24   down, not because we were making a decision to save the  02:50:47

25   prison bed but to make a prudent decision, and the       02:50:50

## Golden Gate Reporting

```
1   impact of that was the population went down.  Parole      02:50:54
2   violations were going down significantly in the last six  02:50:56
3   months before I left.                                     02:51:01
4        Q.   And is it your understanding and your belief    02:51:03
5   that these kind of programs could be done consistent      02:51:06
6   with public safety?                                       02:51:10
7        A.   Absolutely.                                     02:51:12
8        Q.   In fact, isn't it correct that you believe      02:51:12
9   that these kind of programs would increase public safety  02:51:15
10  over time?                                                02:51:19
11       A.   Yes.                                            02:51:19
12       Q.   And why is that?                                02:51:20
13       A.   Well, I believe that -- the adage -- I told     02:51:22
14  communities it's my selling point out of re-entry.  You   02:51:24
15  like an inmate coming out with no skills, no              02:51:24
16  interpersonal skills, anger, gang, linkage, drug          02:51:28
17  treatment, the whole gamut, and we sent them out to your  02:51:32
18  community with $200, and we shouldn't be surprised, but   02:51:35
19  if we have an opportunity to deal with anger management,  02:51:39
20  mental health, medical, whatever, the whole gamut, give   02:51:41
21  them a job and a place to live, then they have a chance   02:51:43
22  to be successful.                                         02:51:46
23           So all of those programs are addressed to try    02:51:48
24  to address an individual who is willing to change his     02:51:50
25  thought process, to take responsibility for themselves,   02:51:54
```

## Golden Gate Reporting

Page 154

| | | |
|---|---|---|
| 1 | and I'm convinced there are thousands of inmates in the | 02:51:56 |
| 2 | prison system who, when given the opportunity, will take | 02:52:05 |
| 3 | advantage of those programs. | 02:52:06 |
| 4 | Q.    Did you advocate, while you were secretary, to | 02:52:09 |
| 5 | expand these options in the community to increase the | 02:52:12 |
| 6 | options available to parole agents for placing parolees | 02:52:19 |
| 7 | with different needs, such as drug treatment or mental | 02:52:24 |
| 8 | health, in a community? | 02:52:27 |
| 9 | A.    Yes. | 02:52:29 |
| 10 | Q.    And you advocated for -- in other words, do | 02:52:29 |
| 11 | you agree that there is a greater need in the current | 02:52:34 |
| 12 | parole population than you're currently able to deliver? | 02:52:37 |
| 13 | MS. TILLMAN:  I'm going to object. | 02:52:43 |
| 14 | You said "current."  Obviously, during his | 02:52:44 |
| 15 | time as secretary? | 02:52:45 |
| -16 | MR. BIEN:  Yes. | 02:52:47 |
| 17 | THE WITNESS:  Yes. | 02:52:48 |
| 18 | MR. BIEN:  Q.  Did you receive reports, when | 02:52:58 |
| 19 | you were secretary of CDCR, that the parole division was | 02:52:59 |
| 20 | having difficulty siting or contracting for various | 02:53:09 |
| 21 | kinds of programs for parolees that wished to site? | 02:53:15 |
| 22 | A.    It's been an issue as long as I've been | 02:53:23 |
| 23 | related to an association with CDC. | 02:53:26 |
| 24 | Q.    Could you explain what kind of issues -- | 02:53:31 |
| 25 | A.    Well, that's -- in my view, that was one of my | 02:53:34 |

## Golden Gate Reporting

Page 155

```
1    major goals was to get communities to accept that they        02:53:36
2    needed to be part of the delivery system for parolees         02:53:39
3    and not because he was an ex-convict or a parolee,            02:53:44
4    therefore, blocked them from getting services.                02:53:46
5              And so this whole Nimby issue of, Not in my         02:53:50
6    backyard.  That was the principals of why we went around      02:53:54
7    the State talking about re-entry.  So I think the             02:53:58
8    communities that we talked about re-entry, part of the        02:54:02
9    expectation was that they would stand up and provide          02:54:03
10   services for that population.                                 02:54:07
11             That was one of the expectations.  That was        02:54:09
12   their responsibility, is to help us do a better job           02:54:11
13   getting other services for parolees as part of that           02:54:15
14   transition out.  So those communities that stood up and       02:54:16
15   said, yes, we're willing to do re-entry also were             02:54:20
16   saying, we're going to help you get those other programs      02:54:24
17   because we see the value of providing services to those       02:54:24
18   populations.                                                  02:54:30
19             So it was a two-way street in terms of not         02:54:31
20   just us walking around paying for 100 percent.  They          02:54:33
21   were saying they would, in fact, dedicate some of their       02:54:33
22   resources towards services.                                   02:54:37
23   Q.    And the re-entry effort, if I'm understanding           02:54:39
24   your testimony, was not merely to build these re-entry        02:54:44
25   facilities, but also, in the shorter term, to also            02:54:48
```

## Golden Gate Reporting

Page 156

1   obtain additional services such as drug treatment beds          02:54:52

2   or mental health beds in these communities?                     02:54:55

3       A.   Yes.   In fact, many of the places we                  02:54:57

4   emphasized and got services for parole were in those            02:54:59

5   communities that said, yes, we will eventually take a           02:55:03

6   re-entry, but, in the meantime, we will give you a day          02:55:03

7   reporting center, we'll give you some drug treatment            02:55:07

8   beds.                                                           02:55:08

9           And, so, if you see where we've been                    02:55:08

10  successful getting programs, I understand there are             02:55:12

11  communities that parole was not successful, but if you          02:55:14

12  look where we were successful, in many places, it's             02:55:16

13  those same communities who understood the value of              02:55:20

14  participating with us on the re-entry.                          02:55:22

15      Q.   Is it correct that LA County provides the              02:55:24

16  largest number of prisoners to the CDCR?                        02:55:30

17      A.   Between LA and Orange and San Bernardino,              02:55:35

18  they're right up there, yes.                                    02:55:40

19      Q.   And has CDCR had difficulties siting programs          02:55:42

20  in LA County?                                                   02:55:46

21          MS. TILLMAN:   Objection.   Vague and ambiguous         02:55:48

22  as to what programs.                                            02:55:49

23          MR. BIEN:   Q.   For example, drug treatment            02:55:52

24  programs.                                                       02:55:55

25      A.   There was a period of time when we were not --         02:56:03