# EXHIBIT 38

**Deposition of James Tilton
September 3, 2008
(Phase II Designations)**

**Part D**

Golden Gate Reporting

Page 162

```
 1   security.                                              03:23:33

 2      Q.   If you turn to the third page of the exhibit,  03:23:47

 3   second bullet has -- refers to AB 900 trailer bill     03:24:00

 4   language.  Do you recall that as early as August 20th of  03:24:04

 5   2007, the CDCR had identified issues that should be    03:24:08

 6   addressed in a trailer bill to AB 900?                 03:24:12

 7      A.   Yes.                                           03:24:16

 8      Q.   And, then, a few more bullets down.  The       03:24:18

 9   fourth bullet says, "Significant issue report developed  03:24:21

10   to advise Secretary Tilton of expenditure of AB 900    03:24:24

11   funds for, quote, 'non-AB 900 projects.'"              03:24:30

12            Do you recall that issue being presented to   03:24:34

13   you in August of 2007?                                 03:24:37

14      A.   Yes.                                           03:24:39

15      Q.   And what was the issue, as you understood it?  03:24:39

16      A.   Well, there was a series of -- it was general  03:24:41

17   fund.  We couldn't get bonds, and we were using that   03:24:44

18   money for projects, and it became an issue that I raised  03:24:46

19   with other people about, well, am I going to get repaid  03:24:53

20   if I do that for a short-term solution because of access  03:24:57

21   to bond funds.                                         03:25:01

22      Q.   I'm not quite sure I followed, which --  which  03:25:03

23   funds were you --                                      03:25:06

24      A.   There was $300 million in AB 900 general fund,  03:25:06

25   and that was available to use.  It didn't require a --  03:25:11
```

Golden Gate Reporting

Page 163

| | | |
|---|---|---|
| 1 | it didn't require a bond opinion. | 03:25:13 |
| 2 | Q.  Okay. | 03:25:15 |
| 3 | A.  So I don't know all the details of how that | 03:25:15 |
| 4 | was being used, but it was brought to my attention that | 03:25:18 |
| 5 | people were using that as a funding source for other | 03:25:21 |
| 6 | issues.  I said, well, that's fine, better talk to him | 03:25:24 |
| 7 | about -- my issue was, can I get -- was it a matter of a | 03:25:27 |
| 8 | cash flow issue, or are you lowering my $300 million to | 03:25:29 |
| 9 | implement the infrastructure needs of AB 900?  So that | 03:25:34 |
| 10 | was the issue they raised.  Need to know, they're making | 03:25:38 |
| 11 | us use that money for these other projects. | 03:25:38 |
| 12 | Q.  Okay.  Did you consider mental health beds to | 03:25:42 |
| 13 | be AB 900 projects or non-AB 900 projects? | 03:25:48 |
| 14 | MS. TILLMAN:  Objection.  Vague and ambiguous. | 03:25:53 |
| 15 | THE WITNESS:  There's not a clean answer | 03:25:56 |
| 16 | because we had projects that were already started. | 03:25:58 |
| 17 | Absolutely, we knew mental health would be rolled into | 03:26:01 |
| 18 | AB 900, as well, for implementation. | 03:26:04 |
| 19 | MR. BIEN:  Q.  To the extent projects had | 03:26:07 |
| 20 | already -- | 03:26:09 |
| 21 | A.  That had already started.  My assumption was, | 03:26:10 |
| 22 | they would stay with those funding sources, and AB 900 | 03:26:11 |
| 23 | would be given what was left. | 03:26:16 |
| 24 | Q.  But AB 900 itself has funding for both medical | 03:26:18 |
| 25 | and mental health for beds? | 03:26:19 |

## Golden Gate Reporting

Page 164

| | | |
|---|---|---|
| 1 | A.    No. | 03:26:20 |
| 2 | Q.    No? | 03:26:21 |
| 3 | A.    It has some funding. | 03:26:22 |
| 4 | Q.    It has some funding. | 03:26:26 |
| 5 | A.    It has a start.  It has one-eighth, one-tenth, | 03:26:28 |

6  whoever you talk to, but it was basically to get started    03:26:31

7  on -- whenever we got plans, they were signed off by the    03:26:35

8  two courts we had, a billion dollars to be used out of    03:26:38

9  AB 900.    03:26:38

10    Q.    So just to recap, there were some -- these    03:26:42

11  mental health construction projects that were underway    03:26:45

12  before AB 900 was enacted?    03:26:48

13    A.    Yes.    03:26:59

14    Q.    And you would agree that those were not AB 900    03:26:59

15  projects?    03:26:59

16    A.    Right.    03:26:59

17    Q.    Then, there was some money in AB 900 that was    03:26:59

18  general fund money that people began to tap soon after    03:26:59

19  AB 900 was passed?    03:26:59

20    A.    Yes.    03:27:05

21    Q.    And, then, there's AB 900 money for medical    03:27:07

22  and mental health beds that is bond funded and has yet    03:27:11

23  to be tapped?    03:27:16

24    A.    Yes.    03:27:17

25    Q.    And I understand from your answer that at the    03:27:18

Golden Gate Reporting

Page 165

| | | |
|---|---|---|
| 1 | time that you left the Department of Corrections, was it | 03:27:25 |
| 2 | correct that the Receiver had approached the State with | 03:27:31 |
| 3 | a far larger request than the billion dollars in AB 900 | 03:27:36 |
| 4 | for medical and mental health beds? | 03:27:42 |
| 5 | A.    Yes. | 03:27:44 |
| 6 | Q.    Do recall the magnitude of his request? | 03:27:44 |
| 7 | A.    Seven to eight billion dollars. | 03:27:48 |
| 8 | Q.    Okay.  Is it correct at the time you left the | 03:27:51 |
| 9 | CDCR, that the Receiver's request had not been approved | 03:28:01 |
| 10 | by the legislature? | 03:28:06 |
| 11 | A.    Yes. | 03:28:07 |
| 12 | Q.    And is it also correct that | 03:28:08 |
| 13 | Governor Schwarzenegger issued a letter to the | 03:28:10 |
| 14 | legislature advocating their approval of that request? | 03:28:14 |
| 15 | A.    I believe that's so. | 03:28:17 |
| 16 | Q.    Take a look, Mr. Tilton, please, at the | 03:28:35 |
| 17 | exhibit I marked as No. 10.  Is it correct that as | 03:28:38 |
| 18 | secretary of the CDCR, you also served as a chairperson | 03:28:46 |
| 19 | of a group called COMIO, or Counsel on Mentally Ill | 03:28:51 |
| 20 | Offenders? | 03:28:56 |
| 21 | A.    Yes. | 03:28:57 |
| 22 | Q.    Can you tell me what COMIO is? | 03:28:58 |
| 23 | A.    It is a counsel that was in existence when I | 03:28:59 |
| 24 | got to the Department.  I think it's fair to say that it | 03:29:02 |
| 25 | was -- its activities and continuing effort was in | 03:29:07 |

## Golden Gate Reporting

Page 166

```
 1    question.                                              03:29:12
 2              When I found out about it and started getting 03:29:12
 3    involved with who was on it and what their charge was, I 03:29:16
 4    basically put my energy behind reactivating it or at   03:29:19
 5    least making it very clear this was an important issue  03:29:24
 6    for the secretary, and, therefore, attended, I believe 03:29:29
 7    75 percent of the meetings.  I was very active with    03:29:29
 8    them.                                                  03:29:32
 9        Q.    At the bottom of the page, there's a list of 03:29:34
10    what I understand to be the makeup of COMIO; is that   03:29:39
11    correct?                                               03:29:43
12        A.    Yes.                                         03:29:43
13        Q.    And it includes the Director of California   03:29:44
14    Department of Mental Health and also representatives of 03:29:48
15    other -- might be missing the next page -- but         03:29:52
16    representatives of other healthcare and correctional   03:29:56
17    agencies?                                              03:30:00
18        A.    Yes, including courts.                       03:30:01
19        Q.    Okay.  Why did you feel it was important to  03:30:02
20    reactivate or reenergize COMIO while you were secretary? 03:30:07
21        A.    I felt that, as I've described it before, that 03:30:12
22    you think of corrections as a provider of last resort,  03:30:18
23    and I was coming to the conclusion we were the provider 03:30:21
24    of first resort for mental healthcare in this State and 03:30:25
25    thought it was important for us to talk to those folks 03:30:29
```

## Golden Gate Reporting

Page 167

1    who were knowledgeable about the mental health                03:30:33

2    population to assist us in determining, what is the best       03:30:35

3    way to approach the mental health population who has           03:30:39

4    come into contact with the criminal justice system, and       03:30:43

5    not just from the CDCR perspective, but the entire            03:30:47

6    State.                                                         03:30:47

7            This body was already set up with experts that        03:30:47

8    represented all those different groups that allowed me        03:30:51

9    to walk in and learn and get a perspective on it.             03:30:54

10       Q.   And in the middle of the second full paragraph       03:30:58

11   on Exhibit 10, there's a quote attributed to you, second      03:31:02

12   sentence, "Persons with mental illness traditionally          03:31:06

13   have been underserved and often end up in jail or prison      03:31:08

14   due to few community alternatives and a lack of               03:31:11

15   understanding of the needs of these individuals.  These       03:31:16

16   five projects are creative approaches to serving this         03:31:17

17   population."                                                  03:31:22

18            Were you giving out awards in approximately          03:31:25

19   March of 2008?                                                03:31:28

20       A.   Yes.                                                 03:31:29

21       Q.   And what was the purpose of those awards?           03:31:30

22       A.   To recognize what we determined as a group who      03:31:32

23   has best practices and had a process for people who          03:31:34

24   submitted proposals, and we approved five, what I            03:31:39

25   consider exemplary programs.                                 03:31:43

## Golden Gate Reporting

Page 169

```
1       Q.   Okay.  Have you seen this document before?        03:35:08
2       A.   I don't recall seeing it before.                  03:35:11
3       Q.   Okay.  Were you aware, through your work on        03:35:13
4   COMIO or as secretary or other work, that there were       03:35:37
5   some funding holes in terms of resources to provide        03:35:42
6   mental healthcare for the mentally ill on parole in        03:35:47
7   certain communities?                                       03:35:56
8       A.   Yes.                                              03:35:58
9       Q.   And is it correct that you identified cases       03:35:58
10  where people had ended up back in prison on parole         03:36:03
11  violations when they might have been able to succeed in    03:36:09
12  the community with appropriate housing or treatment?       03:36:12
13      A.   Yes.                                              03:36:16
14      Q.   Just turn back, if you would, for a moment, to    03:36:27
15  Exhibit 11, which are the awards.  In the adult category   03:36:30
16  of the awards, you recognize several projects by           03:36:34
17  superior courts in California; is that correct?            03:36:44
18      A.   Yes.                                              03:36:45
19      Q.   And what were these projects?                     03:36:45
20      A.   The two primary ones -- there's three listed      03:36:48
21  here, but two that I have knowledge of is the Behavioral   03:36:51
22  Health Court in San Francisco, as well as the Mental       03:36:52
23  Health Treatment Court in Santa Clara County.              03:36:56
24      Q.   What's the -- if you'd just briefly describe,     03:37:01
25  what is the project involved in those courts?              03:37:01
```

## Golden Gate Reporting

Page 170

```
 1      A.    Both of these are similar, and what they do        03:37:04
 2   is, they do triage of inmates who are in the jail system    03:37:06
 3   and identify those that have mental health or other         03:37:11
 4   behavioral issues.                                          03:37:14
 5            And the basic principal is used, the leverage      03:37:16
 6   of jail or prison time, to encourage people to get into     03:37:20
 7   programs, so they work very closely with local providers    03:37:25
 8   of services and encourage folks to stay in treatment, go    03:37:28
 9   to treatment, report on a regular basis back to those       03:37:33
10   courts, and they keep them out of the system.               03:37:38
11            In addition, the Santa Clara model has a           03:37:42
12   re-entry component which assists people when they're, in    03:37:45
13   fact, leaving prison.                                       03:37:49
14      Q.    Did you understand that these programs that        03:37:55
15   had demonstrated that they were both beneficial in terms    03:37:56
16   of public safety and in terms of budget finance saving      03:37:58
17   money in terms of jail/prison time --                       03:38:07
18      A.    Yes.                                               03:38:11
19      Q.    -- budget finance saving?                          03:38:18
20      A.    Yes.                                               03:38:18
21      Q.    Are you aware of any proposals to have parole      03:38:18
22   violator mental health specialized hearing officers or      03:38:22
23   hearings for CDCR?                                          03:38:27
24            MS. TILLMAN:  I object.  Vague and ambiguous.      03:38:30
25   I'm not quite sure that was very clear.                     03:38:31
```

## Golden Gate Reporting

Page 171

| | | |
|---|---|---|
| 1 | MR. BIEN:  I agree. | 03:38:34 |
| 2 | Q.    Are you aware of any proposals to have a | 03:38:35 |
| 3 | similar model of a mental health court that would apply | 03:38:37 |
| 4 | to parole revocation procedures? | 03:38:42 |
| 5 | A.    Yes. | 03:38:45 |
| 6 | Q.    Can you tell me about that? | 03:38:45 |
| 7 | A.    Well, we raised the -- had a discussion | 03:38:46 |
| 8 | internally about whether or not we could do the same | 03:38:49 |
| 9 | thing in terms of triage and parole, if we could get | 03:38:54 |
| 10 | appropriate services. | 03:38:59 |
| 11 | That discussion has some major fiscal policy | 03:39:00 |
| 12 | discussions, which have become problematic, but the | 03:39:03 |
| 13 | thought was, if it works when they come to jail, and | 03:39:03 |
| 14 | they still have people come into prisons in the parole | 03:39:10 |
| 15 | process, could we do the same thing?  Could we basically | 03:39:12 |
| 16 | set up a model that represented the same thing the | 03:39:14 |
| 17 | judges do and have the parole boards do the same thing. | 03:39:18 |
| 18 | Q.    What were the fiscal obstacles that you | 03:39:23 |
| 19 | encountered? | 03:39:26 |
| 20 | A.    Well, it's the policy call that's not been | 03:39:26 |
| 21 | made in this State, is whether parole is responsible and | 03:39:30 |
| 22 | the State is responsible for services for parolees.  For | 03:39:35 |
| 23 | a person on parole, the State has the responsibility to | 03:39:35 |
| 24 | buy services. | 03:39:39 |
| 25 | And my problem as the secretary was, there was | 03:39:39 |

## Golden Gate Reporting

Page 172

1  pretty clear policy that the answer was, no, and the          03:39:42

2  local communities, like mental health, have a position        03:39:46

3  that it is our responsibility to pay for all services,        03:39:50

4  especially mental health, for parolees.                       03:39:53

5          And that's the dialogue.  These two courts, I          03:39:56

6  guess I can say they've admitted to it, ignore that           03:40:00

7  issue and get locals -- the locals to pay for services.       03:40:05

8  So that's the issue is, how do you link up with               03:40:08

9  services?  How do you put the leverage of a parole            03:40:09

10  violation as an incentive for people to stay in              03:40:15

11  treatment?                                                    03:40:18

12          And that principal has worked in these two            03:40:19

13  courts very successfully, but they also have the             03:40:22

14  advantage of, the local people ignore the fact they're       03:40:24

15  parolees, can allow them to get into services.               03:40:26

16      Q.    So your understanding is that if the funding        03:40:30

17  issue was resolved one way or the other, that --             03:40:34

18  assuming the funding issue was resolved, that this would     03:40:37

19  be a beneficial program?                                      03:40:42

20      A.    Yes, this is one of the highest recidivism          03:40:45

21  rates in the Department, this population.                     03:40:47

22      Q.    By, this population, what do you mean?              03:40:51

23      A.    Mental health, people who have mental health        03:40:53

24  issues.  So if you can do that with their -- most of         03:40:53

25  them have an occurring drug issue, but if you deal with      03:40:56

# Golden Gate Reporting

Page 173

| | | |
|---|---|---|
| 1 | this population, this is evidence that you can have a | 03:41:01 |
| 2 | significant impact on their criminality. | 03:41:05 |
| 3 | Q.    When you said, this, you're referring to the | 03:41:08 |
| 4 | COMIO awards? | 03:41:10 |
| 5 | A.    The COMIO awards. | 03:41:11 |
| 6 | Q.    Exhibit 11? | 03:41:11 |
| 7 | A.    Exhibit 11.  The two I'm pointing to, one is | 03:41:12 |
| 8 | The Bay Area Health Court in San Francisco, and the | 03:41:14 |
| 9 | Mental Health Treatment Court in Santa Clara both have | 03:41:17 |
| 10 | tremendous results in terms of impacting recidivism. | 03:41:21 |
| 11 | Q.    And if this kind of program was implemented | 03:41:23 |
| 12 | for parole revocation, assuming you got the financial | 03:41:26 |
| 13 | problems resolved, do you agree that it could reduce | 03:41:33 |
| 14 | crowding in reception centers? | 03:41:38 |
| 15 | MS. TILLMAN:  Object.  Vague and ambiguous. | 03:41:42 |
| 16 | It assumes facts not in evidence about crowding. | 03:41:43 |
| 17 | MR. BIEN:  I can ask it again. | 03:41:47 |
| 18 | Q.    Would you agree that if this could be this | 03:41:49 |
| 19 | kind of program of mental health parole revocation, | 03:41:51 |
| 20 | dedicated hearings, could that have the possibility of | 03:41:56 |
| 21 | reducing the number of mentally ill parole violators who | 03:42:01 |
| 22 | went to prison? | 03:42:09 |
| 23 | A.    Yes. | 03:42:10 |
| 24 | Q.    And that could have a beneficial effect of | 03:42:10 |
| 25 | crowding of the reception centers? | 03:42:14 |

## Golden Gate Reporting

Page 174

| | | |
|---|---|---|
| 1 | A.    It could. | 03:42:20 |
| 2 | Q.    Mr. Tilton, could you look at Exhibits 12 and | 03:42:21 |
| 3 | 13.   Exhibit 12, I asked the court reporter to mark as a | 03:42:24 |
| 4 | three-page document.  On the top, it says, "Mitigation | 03:42:30 |
| 5 | of the Prison Overcrowding Through Emergency Contracts," | 03:42:32 |
| 6 | as document No. PRIV 003494 through 96. | 03:42:34 |
| 7 | And Exhibit 13 is a two-page document, has | 03:42:43 |
| 8 | Production No. CDCR 008935 and 936. | 03:42:52 |
| 9 | MS. TILLMAN:  And just for the record, I | 03:42:58 |
| 10 | notice that Exhibit 12 does have that -- PRIV along | 03:43:00 |
| 11 | those numbers, and just for the record, because I don't | 03:43:05 |
| 12 | have a chart indicating what the bases of that PRIV | 03:43:08 |
| 13 | information was, I will simply assert for the record | 03:43:10 |
| 14 | that to the extent that it's indicated that it's | 03:43:14 |
| 15 | privilege based on the process, it's executive | 03:43:14 |
| 16 | privilege, attorney-client communication. | 03:43:17 |
| 17 | We, again, assert that privilege for the | 03:43:19 |
| 18 | record but permit this witness to testify from the | 03:43:23 |
| 19 | document. | 03:43:29 |
| 20 | MR. BIEN:  Okay.  Appreciate that. | 03:43:29 |
| 21 | THE WITNESS:  (Witness reviewing document.) | 03:43:30 |
| 22 | MR. BIEN:  Q.  Mr. Tilton, looking at Exhibits | 03:44:31 |
| 23 | -- let's just deal with them one at a time.  Exhibit 12, | 03:44:33 |
| 24 | do you recall that sometime after the emergency | 03:44:38 |
| 25 | proclamation was issued on October 4, 2006, that you at | 03:44:44 |

## Golden Gate Reporting

Page 181

| | | |
|---|---|---|
| 1 | MR. BIEN:  Can I just take a look? | 03:55:25 |
| 2 | MS. TILLMAN:  No worry. | 03:55:27 |
| 3 | MR. BIEN:  Exhibit 16 is, as Ms. Tillman | 03:55:49 |
| 4 | pointed out, a section of report called The Roadmap. | 03:55:55 |
| 5 | It's Pages 9 through 54, but I'd like to mark as | 03:55:59 |
| 6 | Exhibit 17 the intro and the executive summary of the | 03:56:04 |
| 7 | report, which I thought I was marking the first time. | 03:56:08 |
| 8 | (Whereupon, Plaintiffs' | 03:56:08 |
| 9 | Exhibit No. 17 was marked for | 03:56:08 |
| 10 | identification.) | 03:56:08 |
| 11 | MR. BIEN:  Q.  Mr. Tilton, if you could look, | 03:56:50 |
| 12 | first, at Exhibit 17, which is the beginning of the | 03:56:52 |
| 13 | report. | 03:56:55 |
| 14 | Do you recall that on or about June 29th, | 03:56:59 |
| 15 | 2007, the CDCR expert panel on adult offender and | 03:57:02 |
| 16 | re-entry recidivism issued its report to the California | 03:57:08 |
| 17 | State Legislature? | 03:57:15 |
| 18 | A.    Yes. | 03:57:16 |
| 19 | Q.    Can you explain what that report was and what | 03:57:16 |
| 20 | this committee was? | 03:57:19 |
| 21 | A.    This was a committee that was authorized by | 03:57:21 |
| 22 | the legislature but requested and supported by me, to | 03:57:23 |
| 23 | bring in experts around the country to advise us about | 03:57:28 |
| 24 | addressing, largely, the program deficiencies in the | 03:57:32 |
| 25 | Department, and how -- whether they were already | 03:57:39 |

## Golden Gate Reporting

Page 182

| | | |
|---|---|---|
| 1 | existing programs that were out there. | 03:57:41 |
| 2 | And, also, since many of these were | 03:57:43 |
| 3 | practitioners, both from the program, as well as custody | 03:57:44 |
| 4 | side, I asked them to give me advice in terms of how to | 03:57:44 |
| 5 | get started.  You know, can't do it all at once.  Where | 03:57:50 |
| 6 | should I prioritize my efforts? | 03:57:55 |
| 7 | Q.   Is it correct that CDCR staff were directly | 03:57:57 |
| 8 | involved in addition to these outside experts in this | 03:58:01 |
| 9 | report? | 03:58:05 |
| 10 | A.   Yes. | 03:58:05 |
| 11 | Q.   Can you tell us who Marisela Montes is? | 03:58:13 |
| 12 | A.   At the time of this report, she was the chief | 03:58:18 |
| 13 | deputy director over programs. | 03:58:21 |
| 14 | Q.   Did she report to you? | 03:58:21 |
| 15 | A.   No, she reported to the undersecretary. | 03:58:23 |
| 16 | Q.   If you turn to the page that has Roman Numeral | 03:58:51 |
| 17 | VIII at the bottom, part of the executive summary -- | 03:58:56 |
| 18 | A.   Second page of the executive summary? | 03:59:04 |
| 19 | Q.   Yes. | 03:59:06 |
| 20 | A.   Okay. | 03:59:08 |
| 21 | Q.   -- lists some external factors preventing | 03:59:08 |
| 22 | programming success.  Do you see that section?  There's | 03:59:12 |
| 23 | a heading "External Factors"? | 03:59:17 |
| 24 | A.   Yes. | 03:59:22 |
| 25 | Q.   Yeah, is it correct that the expert panel | 03:59:22 |

# Golden Gate Reporting

Page 183

```
 1   identified overcrowding as a factor that must be          03:59:25
 2   addressed before CDCR could address -- could implement    03:59:29
 3   its rehabilitation programing?                            03:59:37
 4        A.   Yes.                                            03:59:40
 5             MS. TILLMAN:  Objection.  Misstates the         03:59:40
 6   evidence.                                                 03:59:43
 7             MR. BIEN:   Q.   Was Recommendation 1, which is 04:00:00
 8   stated on that same page, reduce overcrowding in its      04:00:02
 9   prison facilities and parole offices?                     04:00:05
10        A.   Yes.                                            04:00:10
11        Q.   In the expert panel, also made a series of      04:00:29
12   recommendations to CDCR as to how to identify and         04:00:35
13   develop and then implement rehabilitation programs?       04:00:47
14        A.   Yes.                                            04:00:51
15        Q.   And did you endorse these recommendations as    04:00:51
16   secretary?                                                04:00:56
17        A.   Yes.                                            04:00:57
18        Q.   As secretary?                                   04:00:57
19        A.   Yes, officially.  There's one part of the       04:00:58
20   report that I took exception to, but the issues that      04:01:01
21   dealt with how to put programs in place, I was            04:01:05
22   wholeheartedly supportive of and thankful.                04:01:09
23        Q.   And what part of the report did you take issue  04:01:11
24   with?                                                     04:01:12
25        A.   There's some parts to the report that deal      04:01:13
```

## Golden Gate Reporting

Page 184

1    with managing the population, which were outside the          04:01:14

2    scope of the task force, and I believe were -- I              04:01:16

3    describe them more than the minor report, that the rest       04:01:20

4    of the -- we put in the report as an appendix, but the        04:01:23

5    rest of the -- it didn't have the same liberation as the      04:01:26

6    bulk of the recommendations.                                  04:01:30

7        Q.    The second recommendation, which is on the          04:02:06

8    next page of the executive summary, is, "Enact                04:02:11

9    legislation to expand its system of positive                  04:02:13

10   reinforcements for offenders who successfully complete        04:02:17

11   the implementation program requirements and comply with       04:02:19

12   institutional rules in prison, and fulfill parole             04:02:20

13   obligations in the community."                                04:02:26

14           Did you endorse these recommendations,                04:02:27

15   Secretary Tilton?                                             04:02:29

16       A.    Yes.                                                 04:02:32

17       Q.    And at the time you left CDCR, had any              04:02:32

18   legislation to achieve these goals been enacted?              04:02:37

19       A.    Yes.                                                 04:02:45

20       Q.    And when do you recall that was?                    04:02:47

21       A.    Well, there's only been one bill in my tenure,      04:02:50

22   in 30 years, that provide reduction in the prison             04:02:54

23   sentence, basically is the bill that says you complete        04:02:57

24   drug treatment programs, you get discharged from parole.      04:03:01

25           So that's an example, and then there are other        04:03:06

# Golden Gate Reporting

Page 185

1   issues that staff were working on in terms of, what do    04:03:08

2   we do to provide, in a public safety way, incentives for    04:03:10

3   people to program and get rid of -- more importantly,    04:03:14

4   get rid of the disincentives for program that now exist    04:03:18

5   in the Department.    04:03:22

6       Q.   I forgot the number of the bill that you're    04:03:23

7   referring to, but that was the bill that established    04:03:26

8   that if you enrolled in the SAP program; is that    04:03:33

9   correct?    04:03:37

10      A.   Um-hum.    04:03:38

11      Q.   And you successfully completed it --    04:03:38

12      A.   Five months on parole, you got discharged.    04:03:41

13      Q.   Right, and that program was in prison; is that    04:03:46

14   correct, first?    04:03:53

15      A.   No, first in prison, and then while on parole.    04:03:53

16      Q.   Right, and if you completed both those phases,    04:03:53

17   you then --    04:03:54

18      A.   Got discharged from parole.    04:03:55

19      Q.   -- got discharged early from parole?    04:03:58

20           And in your mind, has that been a successful    04:04:02

21   program?    04:04:06

22      A.   I think -- well, I haven't seen the recent    04:04:07

23   stats, but my assumption is, anything you can do to get    04:04:08

24   people to complete programs will make them successful    04:04:09

25   because the evidence says that ending isn't the issue.    04:04:09

## Golden Gate Reporting

Page 186

1    It's whether they actually complete the program.                    04:04:11

2         Q.    Is it also correct that you understood and              04:04:15

3    have advocated for increasing parole programs in the                04:04:22

4    first several months upon parolee's discharge from                  04:04:29

5    prison?                                                             04:04:33

6         A.    Yes.                                                     04:04:34

7         Q.    Why is that?                                             04:04:34

8         A.    Because if you don't catch them and keep them           04:04:35

9    on the straight and narrow there, you'll lose them.  The           04:04:38

10   biggest recidivism is during those first 60 to 90 days.            04:04:39

11        Q.    Okay.  In looking at Recommendation 2, it also          04:04:46

12   talks to program reinforcements for program                         04:04:52

13   participation and good behavior in prison.                          04:04:58

14            While you were still secretary of CDCR, were             04:04:59

15   you considering any programs to reward or incent                    04:05:03

16   prisoners to complete programs while they were in                   04:05:06

17   prison, other than the ones you've discussed?                       04:05:12

18        A.    Yes, and we also had behavior as part of it.            04:05:13

19   And we, in fact, had ruled it out in a couple of prisons           04:05:17

20   in terms of rewarding good behavior, which would be an              04:05:20

21   incentive for people to be in the program.                          04:05:22

22        Q.    And what kind of rewards were you considering?          04:05:26

23        A.    They had a list of issues, many of them not             04:05:27

24   fiscal, first priority to canteen, first in line to chow           04:05:29

25   hall, priority to phones, visiting, access -- first call           04:05:34

## Golden Gate Reporting

Page 187

| | | |
|---|---|---|
| 1 | to access to programs and putting back in what used to | 04:05:38 |
| 2 | be in place, which we call privilege cards, which means | 04:05:43 |
| 3 | if you're in this, performing your program and behaving | 04:05:45 |
| 4 | yourself, you get a preferential access to the programs | 04:05:45 |
| 5 | in the facility. | 04:05:50 |
| 6 | Q. Did you also consider awarding credits for | 04:05:53 |
| 7 | prisoners who completed or graduated from various stages | 04:06:00 |
| 8 | of rehabilitation programs? | 04:06:03 |
| 9 | A. We did, and this is where the debate is for | 04:06:04 |
| 10 | me, personally, about whether to use that to get | 04:06:06 |
| 11 | existing credits, or is it on top of it? And there's a | 04:06:10 |
| 12 | proposal in the report that says, give everybody credit | 04:06:13 |
| 13 | for being good, and, on top of that, you get more credit | 04:06:13 |
| 14 | for staying in program. And I am opposed to that. | 04:06:20 |
| 15 | Q. Which part are you opposed to? | 04:06:24 |
| 16 | A. The fact that you get all of the credit for | 04:06:26 |
| 17 | doing nothing, and then you have to get more credit if | 04:06:28 |
| 18 | you actually perform. I'm an advocate for | 04:06:31 |
| 19 | performance-based credit, not everybody gets 50/50 to | 04:06:34 |
| 20 | start off with, and now you get more on top of that, | 04:06:38 |
| 21 | especially for violent offenders. | 04:06:39 |
| 22 | Q. Is it correct under CDCR's current system of | 04:06:43 |
| 23 | credits that a prisoner gets the same credit for | 04:06:48 |
| 24 | attending an educational program as he might get for | 04:06:52 |
| 25 | graduating from an educational program? | 04:06:57 |

## Golden Gate Reporting

Page 188

| | | |
|---|---|---|
| 1 | MS. TILLMAN:  Objection.  Lack of foundation, | 04:07:01 |
| 2 | to the extent that he knows -- | 04:07:01 |
| 3 | THE WITNESS:  Or not participate in programs, | 04:07:01 |
| 4 | they'll get credit.  All three. | 04:07:04 |
| 5 | MR. BIEN:  Q.  Is that correct? | 04:07:08 |
| 6 | A.  Yes. | 04:07:09 |
| 7 | Q.  So, right now, the existing system does not | 04:07:09 |
| 8 | necessarily reward or incent performance? | 04:07:12 |
| 9 | A.  And that's one of the issues we talked about | 04:07:18 |
| 10 | is providing incentives for not just being there, but | 04:07:19 |
| 11 | actually performance.  And those are recommendations | 04:07:20 |
| 12 | that are within the Department. | 04:07:22 |
| 13 | Q.  And those were still pending when you left? | 04:07:25 |
| 14 | A.  Yes. | 04:07:29 |
| 15 | MR. BIEN:  Mark as the next exhibit. | 04:07:30 |
| 16 | (Whereupon, Plaintiffs' | 04:07:55 |
| 17 | Exhibit No. 18 was marked for | 04:07:55 |
| 18 | identification.) | 04:07:55 |
| 19 | MR. BIEN:  Q.  It's a two-page document.  It's | 04:07:56 |
| 20 | dated June 27, 2007.  It's marked E_PRIV_171626 and 627. | 04:08:00 |
| 21 | And I accept for the record your objection to it, | 04:08:07 |
| 22 | Ms. Tillman. | 04:08:12 |
| 23 | MS. TILLMAN:  Thank you.  I'll simply restate | 04:08:14 |
| 24 | it for the record, just in case, and that would be, of | 04:08:15 |
| 25 | course, this document apparently does have that PRIV | 04:08:17 |

## Golden Gate Reporting

Page 193

```
1        Q.    Were you aware of any restrictions while you      04:16:41
2   were secretary to housing Coleman class members in the       04:16:44
3   non-traditional housing or bad beds?                         04:16:50
4        A.    No.                                                04:16:58
5        Q.    You don't know if there were or were not?         04:16:58
6        A.    Well, there were some EOP, I believe, in some     04:17:01
7   of those benefits.                                           04:17:04
8        Q.    And definitely were CCC's in those beds?          04:17:04
9        A.    Yes.  Down in Vacaville, a gym down there.        04:17:07
10       Q.    In your opinion, is there a risk to the          04:17:15
11  mentally ill to being housed in those kinds of               04:17:22
12  non-traditional beds that is different from the risk to      04:17:26
13  other prisoners?                                             04:17:30
14            MS. TILLMAN:  Objection.  Lack of foundation.      04:17:31
15  Calls for speculation.                                       04:17:31
16            THE WITNESS:  I can only respond to what I saw     04:17:34
17  at Vacaville, which I thought was a surprisingly well        04:17:35
18  run program done by solid correction officers in which       04:17:39
19  the inmates, patients, had a structured process and          04:17:41
20  environment and seemed to be running very well, so...        04:17:44
21            MR. BIEN:  Q.  Do you recall that one of the       04:18:19
22  options that the administration considered in addressing     04:18:22
23  the need for additional beds was using some of the beds      04:18:26
24  at the Coalinga State Hospital?                              04:18:31
25       A.    Yes.                                              04:18:35
```

## Golden Gate Reporting

Page 194

```
 1        Q.    Were you -- do you recall what went into that    04:18:39
 2   discussion concerning the use of those beds?                04:18:45
 3        A.    Yes.                                             04:18:47
 4        Q.    What do you recall?                              04:18:48
 5        A.    Since I was in the capital outlay side when      04:18:50
 6   the facility was built, I knew that based on my history,    04:18:55
 7   I thought there was a big lag between filling up that       04:18:59
 8   facility and having a need for it, and, therefore, the      04:19:03
 9   approach to the Department of Mental Health was, can I      04:19:06
10   use it temporarily?  And it was one of our                  04:19:08
11   considerations, when we were looking at the emergency       04:19:09
12   bed plan.                                                   04:19:12
13        Q.    Is it correct that Coalinga was built to have    04:19:19
14   a 1,500 patient -- licensed patient size?                   04:19:24
15        A.    Yes.                                             04:19:29
16        Q.    And at the time you were looking at this         04:19:30
17   crisis in 2005/2006, that population was far under          04:19:34
18   1,500?                                                      04:19:42
19        A.    Yes.                                             04:19:43
20        Q.    Did you advocate for increasing the use of       04:19:53
21   Coalinga beds by CDCR during that period?                   04:19:57
22        A.    Yes.                                             04:20:02
23             MR. BIEN:  Let me mark as the next in order,      04:20:18
24   which I think this is 21, a Population Management Plan       04:20:21
25   dated March 24th, 2006, E-CDCR_023431 through 436.          04:20:26
```

Golden Gate Reporting

Page 195

| | | |
|---|---|---|
| 1 | (Whereupon, Plaintiffs' | 04:20:47 |
| 2 | Exhibit No. 21 was marked for | 04:20:47 |
| 3 | identification.) | 04:20:47 |
| 4 | MR. BIEN:  Q.  I'm only going to ask you | 04:20:35 |
| 5 | about -- there's a reference to Coalinga on Page 6. | 04:21:18 |
| 6 | My question is, does that refresh your | 04:21:30 |
| 7 | recollection that CDCR, in 2006, was advocating to | 04:21:31 |
| 8 | increase its use of Coalinga State Hospital beds for | 04:21:38 |
| 9 | mentally ill prisoners? | 04:21:42 |
| 10 | MS. TILLMAN:  Objection.  Misstates the | 04:21:46 |
| 11 | evidence. | 04:21:46 |
| 12 | THE WITNESS:  Well, two points.  This document | 04:21:47 |
| 13 | was prepared before I got to the agency. | 04:21:48 |
| 14 | MR. BIEN:  Q.  Okay. | 04:21:54 |
| 15 | A.    And I've already stated that it was one of the | 04:21:54 |
| 16 | issues I was considering -- as configuration for our bed | 04:21:57 |
| 17 | plan. | 04:22:01 |
| 18 | Q.    What happened with the Coalinga issue, while | 04:22:02 |
| 19 | you were there? | 04:22:05 |
| 20 | A.    When it was raised at Mental Health, I made a | 04:22:07 |
| 21 | case that they needed those beds, and, therefore, it was | 04:22:09 |
| 22 | not available for us to use. | 04:22:12 |
| 23 | Q.    At the time you left CDCR in the spring of | 04:22:19 |
| 24 | 2008, were you aware that there were still many hundreds | 04:22:24 |
| 25 | of empty beds at Coalinga State Hospital? | 04:22:31 |

## Golden Gate Reporting

Page 201

| | | |
|---|---|---|
| 1 | look like this is testimony by me.  It looks like this | 04:34:22 |
| 2 | is copies of BCPs or proposals.  It could have been by | 04:34:26 |
| 3 | the title.  It looks like the normal budget hearing, and | 04:34:32 |
| 4 | these were topics, BCPs, that were discussed. | 04:34:36 |
| 5 | Q.    Do you recall that in early 2000, as part of | 04:34:42 |
| 6 | the 2008 budget, that administration proposed a | 04:34:46 |
| 7 | population reduction measure? | 04:34:55 |
| 8 | A.    Yes. | 04:34:58 |
| 9 | Q.    And is that reflected here on Page 2, the | 04:34:59 |
| 10 | 20-month early release of inmates and summary parole? | 04:35:05 |
| 11 | A.    Yes. | 04:35:11 |
| 12 | Q.    And did you -- is it part of your | 04:35:11 |
| 13 | responsibility to present this proposal to legislature | 04:35:12 |
| 14 | in early 2008? | 04:35:16 |
| 15 | A.    Yes. | 04:35:17 |
| 16 | Q.    Did you do so? | 04:35:17 |
| 17 | A.    Yes. | 04:35:19 |
| 18 | Q.    It's correct that this proposal excluded | 04:35:29 |
| 19 | inmates not currently convicted and who have a history | 04:35:34 |
| 20 | of conviction for serious or violent offense; there | 04:35:39 |
| 21 | account code is 11927 or 667.5(c)? | 04:35:40 |
| 22 | A.    Yes. | 04:35:46 |
| 23 | Q.    And also excluded, inmates who had a register | 04:35:46 |
| 24 | under PC290? | 04:35:50 |
| 25 | A.    That's correct. | 04:35:53 |

## Golden Gate Reporting

Page 202

```
 1      Q.   If you go back to page 6, is it correct that    04:36:07
 2   the application of this proposal would result in release  04:36:12
 3   of certain numbers of the Coleman class, along with the  04:36:22
 4   others being released?                                  04:36:26
 5      A.   I assume so, yes.                                04:36:29
 6      Q.   Look at the bottom of that.                      04:36:32
 7      A.   Yes.                                             04:36:33
 8      Q.   Page 6.                                          04:36:34
 9      A.   Um-hum.                                          04:36:35
10      Q.   Had the Department done a study showing -- or    04:36:35
11   actually -- the charge is actually at the top of Page 7.  04:36:37
12   The text is at the bottom of Page 6.                     04:36:41
13      A.   Um-hum.                                          04:36:43
14      Q.   The Department does a study as to, if this       04:36:43
15   proposal was implemented, approximately what kind of     04:36:47
16   inmates would be released and what effect it would have  04:36:50
17   on its programs?                                         04:36:53
18      A.   Yes.                                             04:36:55
19      Q.   And what part of the CDCR is responsible for     04:36:55
20   doing kinds of calculations and studies of how a change  04:37:00
21   in the law, such as is proposed here, would affect       04:37:06
22   population?                                              04:37:10
23      A.   There's a population estimate unit that's part   04:37:10
24   of our research branch.                                  04:37:14
25      Q.   And is it Mr. Chester who's head of the          04:37:21
```

## Golden Gate Reporting

Page 203

```
1    Department of Research?                              04:37:24
2         A.   No, Chapman.                               04:37:27
3         Q.   Chapman, excuse me.  Steve Chapman?        04:37:28
4         A.   Steve Chapman.                             04:37:30
5         Q.   Yes, and Department of Research appears to be  04:37:32
6    either a relatively new innovation or a newly revived   04:37:35
7    part of the Department?                              04:37:40
8         A.   Yes.                                       04:37:40
9         Q.   And when did that come to be?              04:37:41
10        A.   It was part of the reorg, and then when I got  04:37:43
11   there, I increased it even more.                     04:37:46
12        Q.   Did you come to rely on the office of research  04:37:52
13   for your work as secretary?                          04:37:55
14        A.   Yes.                                       04:37:58
15        Q.   Did the department of research also work with  04:38:00
16   outside consultants to CDCR at various universities in  04:38:04
17   California?                                          04:38:08
18        A.   Yes.                                       04:38:08
19        Q.   And did that enhance the quality of their  04:38:09
20   work, in your opinion?                               04:38:13
21        A.   I believe so, yes.                         04:38:14
22        Q.   This proposal that's reflected in Exhibit 23  04:38:29
23   refers to -- partially, one of the aspects of it is  04:38:34
24   called summary parole.                               04:38:40
25             Do you understand what that is?            04:38:42
```

## Golden Gate Reporting

Page 204

| | | |
|---|---|---|
| 1 | A.    Yes, I do. | 04:38:44 |
| 2 | Q.    What is summary parole? | 04:38:45 |
| 3 | A.    Summary parole is a process in which -- I | 04:38:47 |
| 4 | don't know the legal term in terms of whether they're | 04:38:51 |
| 5 | still on parole or not, but it allowed local law | 04:38:54 |
| 6 | enforcement to, in fact, do search and seizures of the | 04:38:58 |
| 7 | inmates.  And what the expectation was, if they | 04:39:05 |
| 8 | committed a new crime, they had to be prosecuted before | 04:39:09 |
| 9 | we would take action as a parole violation. | 04:39:13 |
| 10 | Q.    So what was the difference between summary | 04:39:19 |
| 11 | parole and just being on regular parole? | 04:39:21 |
| 12 | A.    Well, unless you prosecute, I'm not violating. | 04:39:23 |
| 13 | The issue was that there were certain law enforcement | 04:39:27 |
| 14 | DAs who had some discussions with him, and they were | 04:39:30 |
| 15 | concerned about being able to exercise certain search | 04:39:33 |
| 16 | capacity for this population. | 04:39:37 |
| 17 | We would authorize that, but before we would | 04:39:39 |
| 18 | consider it for a parole violation, we wanted them to | 04:39:43 |
| 19 | have an actual -- prosecute them.  Based on that, we | 04:39:46 |
| 20 | would consider a parole violation. | 04:39:51 |
| 21 | Q.    Is it correct that CDCR had also been | 04:39:59 |
| 22 | considering a program called earned discharged from | 04:40:04 |
| 23 | parole? | 04:40:08 |
| 24 | A.    Yes. | 04:40:08 |
| 25 | Q.    And what's earned discharge? | 04:40:09 |