# EXHIBIT 39

## Deposition of James Tilton
## September 3, 2008
## (Phase II Counter-Designations)

```
 1              UNITED STATES DISTRICT COURT

 2             EASTERN DISTRICT OF CALIFORNIA

 3          AND THE NORTHERN DISTRICT OF CALIFORNIA

 4    UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

 5     PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

 6

 7    RALPH COLEMAN, et al.,

 8              Plaintiffs,

 9    vs.                          No. CIV S-90-0520 LKK JFM P

10    ARNOLD SCHWARZENEGGER, et al.

11              Defendants.

      _____/

12

      MARCIANO PLATA, et al.

13

                Plaintiffs,

14    vs.

15    ARNOLD SCHWARZENEGGER, et al.

16              Defendants.

      _____/

17

18            Deposition of JAMES EDWIN TILTON

19

20   ·DATE:            SEPTEMBER 3, 2008

21    TIME:            9:41 A.M.

22    LOCATION:        ROSEN, BIEN & GALVAN

                       315 Montgomery Street, 10th Floor

23                     San Francisco, California 94104

24    REPORTED BY:     Cari L. Waters-Drewry

                       Certified Shorthand Reporter

25                     License Number 12401
```

```
 1    entity called Youth and Adult Correctional Authority; is        09:54:47

 2    that correct?                                                   09:54:51

 3         A.    The Youth and Adult Correctional Agency?             09:54:51

 4         Q..   Correctional Agency, yes.                            09:54:54

 5         A.    Yes.                                                 09:54:54

 6         Q.    And that was the secretary level, at that            09:54:55

 7    point?                                                          09:54:57

 8         A.    That's correct.                                      09:54:58

 9         Q.    Prior to becoming deputy director for                09:55:02

10    administration, did you have other positions at CDCR?           09:55:04

11         A.    Yes, for the two years prior to that, I was          09:55:13

12    assistant deputy over financial operations.                    09:55:13

13         Q.    Did you ever work for CDCR in a purely               09:55:21

14    custodial position, such as warden or deputy warden?           09:55:26

15         A.    No.                                                  09:55:32

16         Q.    Were you ever a correctional officer?               09:55:34

17         A.    No.                                                  09:55:37

18         Q.    When did you first begin working at CDCR?            09:55:44

19         A.    In 1985.                                             09:55:48

20         Q.    What was your prior work experience before          09:55:50

21    that?                                                           09:55:53

22         A.    I was with the Department of Finance.               09:55:53

23    Classification was principal program budget analyst, and       09:55:54

24    I had the corrections assignment.                              09:56:04

25         Q.    Okay.  And when did you begin that period of         09:56:08
```

| | | |
|---|---|---|
| 1 | time in finance? | 09:56:12 |
| 2 | A.    1984, April, I think. | 09:56:13 |
| 3 | Q.    What's your educational background? | 09:56:35 |
| 4 | A.    I have a degree from California State | 09:56:38 |
| 5 | University Sacramento, major in accounting. | 09:56:40 |
| 6 | Q.    Is that a BA? | 09:56:50 |
| 7 | A.    BS. | 09:56:52 |
| 8 | Q.    BS.  Okay. | 09:56:54 |
| 9 | As -- turning to the time right before you | 09:57:45 |
| 10 | became acting secretary, can you explain how -- what | 09:57:51 |
| 11 | role DOF has in reviewing budget items that relate to | 09:57:56 |
| 12 | corrections.  Let's just look at, for example, in 2005, | 09:58:04 |
| 13 | what's the process?  How does DOF and CDCR relate in | 09:58:11 |
| 14 | terms of budget? | 09:58:19 |
| 15 | A.    Well, generally, there's a process where the | 09:58:20 |
| 16 | Department puts proposals forward requesting | 09:58:22 |
| 17 | modifications or adjustments to their budget.  Those | 09:58:26 |
| 18 | documents are reviewed, analyzed by Department of | 09:58:30 |
| 19 | Finance staff, and recommendations are made on those | 09:58:32 |
| 20 | requests. | 09:58:35 |
| 21 | Q.    When does that process begin in a budget year? | 09:58:43 |
| 22 | A.    Well, it's kind of a continual process because | 09:58:47 |
| 23 | of the communication dialogue for the Department of | 09:58:50 |
| 24 | Finance to understand the issues the Department may | 09:58:53 |
| 25 | bring up, but it formally starts in end of August versus | 09:58:55 |

| | | |
|---|---|---|
| 1 | the Department's success in meeting the expectations of | 10:32:52 |
| 2 | the legislature. | 10:32:56 |
| 3 | Q.   Had the Department encountered some obstacles | 10:33:01 |
| 4 | in terms of the capital outlay, part of AB 900? | 10:33:05 |
| 5 | A.   Yes. | 10:33:08 |
| 6 | Q.   And what were those? | 10:33:08 |
| 7 | A.   Getting funding released for projects. | 10:33:10 |
| 8 | Q.   Were you informed why funding had not been | 10:33:15 |
| 9 | released for projects for AB 900? | 10:33:19 |
| 10 | A.   You need to talk to attorneys, but there were | 10:33:23 |
| 11 | a series of issues that were given to me in terms of | 10:33:26 |
| 12 | language in the bill, as well as other steps that | 10:33:29 |
| 13 | prevented us from getting access to the bond funds. | 10:33:30 |
| 14 | Q.   Do you understand that the Attorney General's | 10:33:39 |
| 15 | office had issued an opinion that the bond funding | 10:33:44 |
| 16 | mechanism of AB 900 needed to be modified before the | 10:33:49 |
| 17 | projects would go forward? | 10:33:54 |
| 18 | MS. TILLMAN:   I'll object to the extent that | 10:33:56 |
| 19 | it calls for any information that he might obtain | 10:33:57 |
| 20 | through the course of an attorney/client communication. | 10:33:59 |
| 21 | If he can answer without calling upon such information, | 10:34:01 |
| 22 | he's free to do so. | 10:34:02 |
| 23 | THE WITNESS:   Well, maybe I'll just answer it | 10:34:09 |
| 24 | this way:   Is, we know we need a legal opinion from the | 10:34:11 |
| 25 | Attorney General's office in order to issue bonds, and I | 10:34:17 |

| 1 | know there were issues that prevented them from being | 10:34:18 |
| 2 | able to issue that opinion. | 10:34:21 |
| 3 | MR. BIEN:  Q.  That's fine. | 10:34:23 |
| 4 | Were there any other reasons you're aware of | 10:34:32 |
| 5 | that stood in the way of proceeding with getting access | 10:34:35 |
| 6 | to the funds for the capital projects? | 10:34:39 |
| 7 | MS. TILLMAN:  I'll make that same objection. | 10:34:42 |
| 8 | If you can answer without any attorney/client | 10:34:44 |
| 9 | communications, feel free to. | 10:34:44 |
| 10 | MR. BIEN:  Sure. | 10:34:47 |
| 11 | THE WITNESS:  We, as part of our review of the | 10:34:47 |
| 12 | projects, we were reassessing the scope of some of those | 10:34:49 |
| 13 | projects to determine whether they -- with changing | 10:34:53 |
| 14 | population of the Department, whether they met the needs | 10:34:56 |
| 15 | of the population. | 10:35:00 |
| 16 | So there was a process of us to reassess | 10:35:01 |
| 17 | sites, for example.  Identified some sites that we | 10:35:03 |
| 18 | thought we could build that had barriers to those.  And, | 10:35:08 |
| 19 | so, we were reassessing the locations of certain sites | 10:35:12 |
| 20 | for the infill. | 10:35:15 |
| 21 | In addition, we spent a significant amount of | 10:35:16 |
| 22 | time working with the communities on the siting of | 10:35:19 |
| 23 | re-entry because that's a pot of money for it.  And, so, | 10:35:22 |
| 24 | we were -- the expectations of AB 900 is, we would go to | 10:35:25 |
| 25 | willing communities, so we spent a lot of time working | 10:35:31 |

| | | |
|---|---|---|
| 1 | with communities to identify where, in fact, could we | 10:35:33 |
| 2 | place re-entry.  Both of those were steps that needed to | 10:35:34 |
| 3 | be taken before we actually started specific projects. | 10:35:38 |
| 4 | MR. BIEN:  Q.  When you said the AB 900, for | 10:35:43 |
| 5 | re-entry beds, required willing communities, can you | 10:35:46 |
| 6 | explain what that means. | 10:35:50 |
| 7 | A.  Well, basically, yes, we required communities | 10:35:51 |
| 8 | to -- there was an incentive to support us, but we would | 10:35:54 |
| 9 | go to communities that accepted us.  And that was, | 10:35:58 |
| 10 | without that, you don't have the principals of the | 10:36:02 |
| 11 | reform, which is to provide better community ties as | 10:36:03 |
| 12 | inmates are coming out of the prison and going back in. | 10:36:04 |
| 13 | So the legislature required it, but we would | 10:36:08 |
| 14 | have had to have it anyways.  Without that partnership, | 10:36:10 |
| 15 | these facilities would not reach the reform, changes | 10:36:14 |
| 16 | that we were looking forward to having an impact on the | 10:36:17 |
| 17 | population. | 10:36:19 |
| 18 | Q.  When you talk about partnership, can you | 10:36:21 |
| 19 | explain to me more what you meant about what was | 10:36:24 |
| 20 | required to make the re-entry specifics work. | 10:36:25 |
| 21 | A.  Well, the goal of re-entry was two-fold.  The | 10:36:27 |
| 22 | basic principal was that we needed communities to | 10:36:30 |
| 23 | acknowledge that these were citizens coming back to | 10:36:34 |
| 24 | their communities, and they needed to be part of the | 10:36:34 |
| 25 | linkages back into whether it be community services or | 10:36:38 |

| | | |
|---|---|---|
| 1 | more rigorous analysis of the requirements of AB 900 and | 10:40:28 |
| 2 | the cost of the infill beds, that you understood that to | 10:40:33 |
| 3 | build all of the beds AB 900 anticipated for infill, | 10:40:42 |
| 4 | that you would have to at least augment or come back for | 10:40:42 |
| 5 | additional funding? | 10:40:45 |
| 6 | A.    That was the projection, whether it came true | 10:40:46 |
| 7 | or not, would be, wait until we get into the projects. | 10:40:49 |
| 8 | Q.    You also mentioned, at least as to the infill, | 10:41:21 |
| 9 | that there were some issues with the sites that emerged | 10:41:25 |
| 10 | after AB 900 was enacted. | 10:41:30 |
| 11 | A.    That's correct. | 10:41:33 |
| 12 | Q.    Can you describe any of those issues? | 10:41:35 |
| 13 | A.    Well, the initial projects were identified as | 10:41:37 |
| 14 | part of a special session of legislation, very quickly. | 10:41:39 |
| 15 | It was an emergency session, and we had identified what | 10:41:43 |
| 16 | we thought, that we could build sites, but they had not | 10:41:46 |
| 17 | done the full site review and inspection. | 10:41:50 |
| 18 | And, so, as we moved into those projects, it | 10:41:53 |
| 19 | was identified that there, in fact, were barriers or | 10:41:56 |
| 20 | things we identified that prevented us from building at | 10:42:00 |
| 21 | the original sites that we had talked about. | 10:42:03 |
| 22 | Q.    And that emergency session was in the summer | 10:42:06 |
| 23 | of 2006? | 10:42:09 |
| 24 | A.    That's correct. | 10:42:11 |
| 25 | Q.    I don't have it right here to show you, but is | 10:42:19 |

```
 1        Q.   When you say reestablishing a capital outlay      11:21:22

 2   program, had there been a major capital outlay program     11:21:25

 3   for CDCR in your tenure that had been approved and moved    11:21:29

 4   forward?                                                    11:21:33

 5        A.   Yes, I was there when we built 20 prisons.        11:21:34

 6        Q.   Okay.  And do you recall what time frame that     11:21:39

 7   was done?                                                   11:21:40

 8        A.   Well, I got there in '85.  They had started a     11:21:41

 9   couple, and we activated -- I think all of them were       11:21:45

10   activated under my watch when I was there, most of them.   11:21:48

11   I think there may have been existing prisons, two or       11:21:51

12   three, that got activated after I left in '98, but, by     11:21:54

13   and large, they were all done prior to that.               11:21:58

14        Q.   Is it correct that upon completion of that ·     11:22:05

15   very major prison construction project, that the           11:22:08

16   long-term capital planning and construction process for    11:22:11

17   CDCR stopped for a while?                                   11:22:18

18        A.   True.                                             11:22:21

19        Q.   Okay.                                             11:22:22

20             MR. BIEN:  I've asked the court reporter to       11:22:49

21   mark several exhibits during the break to kind of speed    11:22:52

22   things up a little bit.                                     11:22:56

23        Q.   Let me show you, the first document was marked    11:22:57

24   as Exhibit 1.  It is called Inmate Population              11:23:01

25   Rehabilitation, and Housing Management Plan dated July     11:23:05
```

```
 1    2006.    It bears Production Number CDCR 006341 through      11:23:09

 2    6353.                                                        11:23:12

 3              You can look at that, Mr. Tilton.                  11:23:21

 4              MR. BIEN:   I have a copy for you, Lisa and        11:23:24

 5    Bruce.                                                       11:23:28

 6              MS. TILLMAN:   Thank you.                          11:23:29

 7              THE WITNESS:   (Witness reviewing document.)       11:23:31

 8    Okay.                                                        11:23:31

 9              MR. BIEN:   Q.   Mr. Tilton, can you identify      11:25:06

10    this document?                                              11:25:09

11        A.   This was a document that was prepared at my        11:25:10

12    request to raise to people's attention the need to          11:25:12

13    provide increased facilities for the Department and was     11:25:16

14    the initial discussion point of the special session.        11:25:19

15        Q.   When you say, the special session, can you         11:25:28

16    explain what that is?                                       11:25:30

17        A.   Well, one of the issues that I identified when     11:25:32

18    I went over as a secretary, temporarily, was to address     11:25:35

19    the lack of program and the overcrowding situation, so      11:25:37

20    this was a document that was my initial raising the         11:25:41

21    issue about, what do you do to solve the problem?  And      11:25:47

22    this was the initial proposal.                              11:25:50

23        Q.   So you'd been on the job for a few months; is      11:25:52

24    that correct?                                               11:25:56

25        A.   Sixty days, I think, uh-huh.                       11:25:56
```

```
 1    challenges, to convince communities that, they are           12:31:54
 2    coming back.                                                  12:31:57
 3              I don't get to decide when they come out, and       12:31:58
 4    we all need to think about, what do we do that's smarter      12:32:00
 5    in terms of dealing with an individual who has been           12:32:03
 6    locked up for a long time, and all of a sudden, they get      12:32:05
 7    dropped off in your bus depot.                                12:32:08
 8         Q.   So is it correct that you're advocating not         12:32:12
 9    only improved programs in the prisons for prisoners           12:32:18
10    before they were released to the public, but also            12:32:23
11    programs to be provided for them once they arrived in        12:32:27
12    their counties of destination for parole?                     12:32:30
13         A.   Yes, and a clear hand-off between the two.          12:32:33
14         Q.   What do you mean?                                    12:32:37
15         A.   Well, it's -- one of the principals of a           12:32:37
16    re-entry facility is, you can have the same providers of      12:32:40
17    services that would provide services to citizens can          12:32:45
18    provide those services when you're in the re-entry           12:32:48
19    facility.                                                      12:32:52
20              So when you leave, it's a logistic                   12:32:53
21    where-you-live issue and not whether the providers would      12:32:56
22    assist you and provide that transition, so it's not a         12:32:57
23    really a hand-off.  You just move out into the community      12:33:00
24    and still get those consistency after consistency of          12:33:03
25    services, whether it be mental health, drug treatment,        12:33:03
```

| | | |
|---|---|---|
| 1 | negative management, jobs, all those issues, so there is | 12:33:03 |
| 2 | a clean transition, so it's not a delay in maintaining | 12:33:03 |
| 3 | support or service levels. | 12:33:16 |
| 4 | Q.    Was it your belief in 2006 that this kind of | 12:33:18 |
| 5 | clean transition was not being -- not occurring | 12:33:22 |
| 6 | frequently enough in -- for prisoners paroling from | 12:33:30 |
| 7 | California prisons? | 12:33:33 |
| 8 | A.    Yes. | 12:33:35 |
| 9 | Q.    And what was that based on? | 12:33:35 |
| 10 | A.    The lack of program in the facilities, the | 12:33:37 |
| 11 | lack of good planning, the lack of assessment, good | 12:33:40 |
| 12 | assessments, and just that.  It was pretty obvious. | 12:33:42 |
| 13 | There was not a clear transition, that inmates were not | 12:33:46 |
| 14 | accepted back in the communities.  They were, in fact, | 12:33:50 |
| 15 | in many cases, barred from getting services. | 12:33:52 |
| 16 | Q.    When you were secretary of CDCR, did you -- | 12:33:57 |
| 17 | did you ever receive reports that parolees had been | 12:34:03 |
| 18 | barred from receiving medical or mental health services | 12:34:07 |
| 19 | in communities around California? | 12:34:11 |
| 20 | A.    Yes. | 12:34:13 |
| 21 | Q.    Do you recall any examples of that? | 12:34:13 |
| 22 | A.    Yes.  I mean, I can't give you specific | 12:34:17 |
| 23 | titles, but, basically, it was brought to my attention | 12:34:20 |
| 24 | that we were violating parolees for the sole purpose is | 12:34:23 |
| 25 | that the parole agent cannot get them mental health | 12:34:28 |

| | | |
|---|---|---|
| 1 | services for parolees between counties and the CDCR? | 12:35:39 |
| 2 | A.    Yes. | 12:35:44 |
| 3 | Q.    Can you describe the issue, as you see it? | 12:35:45 |
| 4 | A.    Driven by the language in Prop 63, many | 12:35:46 |
| 5 | counties believe they have no responsibility to provide | 12:35:50 |
| 6 | services to parolees and that it's a state | 12:35:53 |
| 7 | responsibility.  I disagree, but that's where many | 12:35:55 |
| 8 | county mental health directors are. | 12:36:03 |
| 9 | Q.    Let me show you what's been marked Exhibit 4. | 12:36:27 |
| 10 | It is dated June 26, 2006, and it's a -- one, two, | 12:36:28 |
| 11 | three -- five-page document, which is the Governor's | 12:36:32 |
| 12 | Remarks concerning the special session. | 12:36:43 |
| 13 | MS. TILLMAN:    Thank you. | 12:36:47 |
| 14 | THE WITNESS:    (Witness reviewing document.) | 12:36:49 |
| 15 | (Discussion off the record.) | 12:39:17 |
| 16 | MR. BIEN:    Q.    Mr. Tilton, have you had a | 12:40:20 |
| 17 | chance to look at Exhibit 4? | 12:40:22 |
| 18 | A.    Yes. | 12:40:23 |
| 19 | Q.    Were you present when the Governor made these | 12:40:25 |
| 20 | remarks on June 26, 2006? | 12:40:29 |
| 21 | A.    I don't believe so. | 12:40:32 |
| 22 | Q.    If you turn to the third page, the second | 12:40:33 |
| 23 | paragraph from the top, at the end, he says, "Our | 12:40:47 |
| 24 | prisons are dangerously overcrowded right now." | 12:40:52 |
| 25 | And then he goes and describes the use of | 12:41:00 |

| | | |
|---|---|---|
| 1 | There was a re-org that took place, but no rehab, so | 12:47:43 |
| 2 | where's the R? | 12:47:49 |
| 3 | Q. Did you agree that in order to implement | 12:47:51 |
| 4 | programs that you were envisioning as necessary to | 12:47:57 |
| 5 | reduce recidivism, the Department would have to create | 12:48:02 |
| 6 | some program space by reducing overcrowding? | 12:48:06 |
| 7 | A. Yes. | 12:48:07 |
| 8 | Q. So it was difficult to implement programming | 12:48:08 |
| 9 | in the overcrowded prisons as they existed when you came | 12:48:13 |
| 10 | into office? | 12:48:17 |
| 11 | A. Yes. | 12:48:18 |
| 12 | Q. Let me show you what's been marked as | 12:48:25 |
| 13 | Exhibit 5 to your deposition, Mr. Tilton, which is a | 12:48:27 |
| 14 | document dated August 2006. It bears production numbers | 12:48:30 |
| 15 | CDCR019431 through 454. | 12:48:36 |
| 16 | MS. TILLMAN: Just for the record, it looks | 12:48:48 |
| 17 | like there's some handwriting on the copy presented. | 12:48:49 |
| 18 | Obviously, that's not part of the original document. | 12:48:52 |
| 19 | MR. BIEN: My understanding is, this is the | 12:48:58 |
| 20 | way it was produced. | 12:49:00 |
| 21 | MS. TILLMAN: Is that right? | 12:49:01 |
| 22 | MR. BIEN: Yeah. | 12:49:02 |
| 23 | MS. TILLMAN: Okay. | 12:49:02 |
| 24 | MR. BIEN: Although -- yeah. I did check that | 12:49:03 |
| 25 | out. | 12:49:09 |

| | | |
|---|---|---|
| 1 | Q. You're free to review it in detail. I'm | 12:49:43 |
| 2 | actually going to ask you only about some questions | 12:49:48 |
| 3 | beginning on Page 12. Take your time to look at | 12:49:59 |
| 4 | whatever you'd like. | 12:50:07 |
| 5 | A. Okay. | 12:50:46 |
| 6 | Q. Mr. Tilton, can you identify this document as | 12:50:51 |
| 7 | a -- can you tell us what it is? | 12:50:55 |
| 8 | A. I don't recall the details of all of it, but I | 12:50:56 |
| 9 | believe this is testimony that I presented in front of | 12:50:59 |
| 10 | the Senate. | 12:51:03 |
| 11 | Q. In August 2006? | 12:51:04 |
| 12 | A. Yes. | 12:51:06 |
| 13 | Q. This is still part of the special session? | 12:51:06 |
| 14 | A. Yes. | 12:51:11 |
| 15 | Q. Actually, if you turn to Page 15, if you will. | 12:51:14 |
| 16 | On the top of the page, it says, "Overcrowding, | 12:51:20 |
| 17 | non-traditional beds." | 12:51:24 |
| 18 | In the first sentence, there, it says, "As of | 12:51:45 |
| 19 | August 9, 2006, our population is 172,176 inmates. Of | 12:51:47 |
| 20 | that number, approximately 16,000 inmates are in | 12:51:53 |
| 21 | non-traditional overcrowding beds." | 12:51:57 |
| 22 | At the time that you retired from the | 12:52:01 |
| 23 | Department of Corrections in the spring of this year, | 12:52:02 |
| 24 | 2008, Mr. Tilton, do you know how many inmates were | 12:52:05 |
| 25 | still in non-traditional beds? | 12:52:10 |

| | | |
|---|---|---|
| 1 | high risk to reoffend inmates. | 01:54:54 |
| 2 | And that's why this here talks about place of | 01:54:55 |
| 3 | parole teams, basically work together, so we know who's | 01:54:57 |
| 4 | coming out of prison.  And that can adjust both the | 01:55:00 |
| 5 | program, as well as the security concerns of that | 01:55:04 |
| 6 | population. | 01:55:06 |
| 7 | Q.   If you turn two more pages in, Page 13, in the | 01:55:09 |
| 8 | second paragraph, you talk about the need for a local | 01:55:19 |
| 9 | support for the parole re-entry facilities. | 01:55:22 |
| 10 | Between December of 2006 and the time you left | 01:55:32 |
| 11 | CDCR in May of 2008, is it correct that you devoted | 01:55:37 |
| 12 | substantial time to the effort to convince local | 01:55:43 |
| 13 | communities to participate in the parole reform effort? | 01:55:47 |
| 14 | A.   Yes. | 01:55:53 |
| 15 | Q.   And one of your goals was to have local | 01:55:53 |
| 16 | communities apply for jail beds and parole re-entry | 01:56:00 |
| 17 | beds; is that correct? | 01:56:06 |
| 18 | A.   Yes. | 01:56:07 |
| 19 | Q.   And AB 900, of course, provided the mechanism | 01:56:08 |
| 20 | for that in the spring of 2007, and you actually had a | 01:56:17 |
| 21 | program that you could show people? | 01:56:21 |
| 22 | A.   Yes. | 01:56:22 |
| 23 | Q.   In discussing these issues with the local | 01:56:26 |
| 24 | communities, was one issue that was raised by local | 01:56:32 |
| 25 | communities who would operate the re-entry facilities, | 01:56:36 |

| | | |
|---|---|---|
| 1 | were there, and we made some recommendations to the | 02:08:48 |
| 2 | Receiver's office about how to address medical side in | 02:08:51 |
| 3 | conjunction with mental health to be consistent and | 02:08:55 |
| 4 | efficient. | 02:08:59 |
| 5 | MR. BIEN:  I think we're finally finished with | 02:09:04 |
| 6 | Exhibit 1.  Let me show you what's been marked as | 02:09:08 |
| 7 | Exhibit 8 to your deposition, which is a -- also from | 02:09:25 |
| 8 | CDCR publication or website -- a two-page document.  It | 02:09:28 |
| 9 | doesn't appear -- it has Thursday, January 11th, 2007, | 02:09:40 |
| 10 | on it. | 02:09:44 |
| 11 | MS. TILLMAN:  Thank you. | 02:09:49 |
| 12 | THE WITNESS:  (Witness reviewing document.) | 02:09:51 |
| 13 | MR. BIEN:  Q.  Is it correct that you | 02:10:21 |
| 14 | continued, along with the administration, to advocate | 02:10:27 |
| 15 | for changes that you had sought in the next legislative | 02:10:30 |
| 16 | session, 2007/2008? | 02:10:35 |
| 17 | A.   Yes. | 02:10:37 |
| 18 | Q.   There's a quote in the first page of Exhibit 8 | 02:10:39 |
| 19 | that purports to be from you.  Is this -- I'll read it. | 02:10:42 |
| 20 | "The Department of Corrections owns the responsibility | 02:10:48 |
| 21 | to assist inmates who are willing to change their ways | 02:10:51 |
| 22 | with the basic tools of education, life skills, drug | 02:10:51 |
| 23 | treatment, and mental health, so they can get better | 02:10:51 |
| 24 | when they leave Corrections -- not worse.  But until I | 02:10:51 |
| 25 | get overcrowding reduced -- then I don't have the | 02:10:51 |

| | | |
|---|---|---|
| 1 | opportunity to provide the program that I believe is my | 02:10:51 |
| 2 | charge," end quote. | 02:10:51 |
| 3 | Is that a statement that you made in early | 02:11:10 |
| 4 | 2007? | 02:11:12 |
| 5 | A.    Yes. | 02:11:14 |
| 6 | Q.    That's something that you still believe today? | 02:11:16 |
| 7 | A.    Yes. | 02:11:19 |
| 8 | Q.    At the time you left CDCR in the spring of | 02:11:19 |
| 9 | 2008, did you believe that overcrowding had been reduced | 02:11:26 |
| 10 | sufficient to allow CDCR to provide the programs | 02:11:30 |
| 11 | necessary to prisoners? | 02:11:35 |
| 12 | A.    It's a start. | 02:11:37 |
| 13 | Q.    Made a start? | 02:11:40 |
| 14 | A.    Um-hum. | 02:11:41 |
| 15 | Q.    Did you believe that the substantial | 02:11:41 |
| 16 | additional capacity or population reduction was | 02:11:45 |
| 17 | necessary to effectively deliver programs to prisoners? | 02:11:50 |
| 18 | A.    I'm going to qualify my statement, is that | 02:11:54 |
| 19 | over time, there were improvements I could make in the | 02:11:57 |
| 20 | existing without dealing with the overcrowding and | 02:12:01 |
| 21 | space.    I identified some inefficiencies of use of our | 02:12:03 |
| 22 | program resources, and then as we reduced overcrowding, | 02:12:06 |
| 23 | we could bring in, in a systematic way, increased | 02:12:11 |
| 24 | programming. | 02:12:17 |
| 25 | So it's not a snapshot in one day, but I was | 02:12:18 |

| | | |
|---|---|---|
| 1 | very pleased to see progress, population going the right | 02:12:22 |
| 2 | way, overcrowding going the right way, and the | 02:12:23 |
| 3 | implementation of certain programs which would | 02:12:26 |
| 4 | demonstrate to the legislature that more resources would | 02:12:28 |
| 5 | be effective in impacting the population in a good | 02:12:31 |
| 6 | public safety way. | 02:12:33 |
| 7 | Q.    You felt at the time you left Department of | 02:12:38 |
| 8 | Corrections there was a plan in place that would address | 02:12:41 |
| 9 | the overcrowding problems? | 02:12:46 |
| 10 | MS. TILLMAN:  Objection.  Misstates testimony. | 02:12:49 |
| 11 | Go ahead. | 02:12:50 |
| 12 | THE WITNESS:  Yes. | 02:12:51 |
| 13 | MR. BIEN:  Q.  Okay.  And by what date did you | 02:12:52 |
| 14 | understand that plan would accomplish sufficient | 02:12:59 |
| 15 | reduction of overcrowding to bring prison operations to | 02:13:05 |
| 16 | an appropriate level? | 02:13:12 |
| 17 | MS. TILLMAN:  Objection.  Vague and ambiguous | 02:13:15 |
| 18 | as to what is appropriate. | 02:13:22 |
| 19 | You can go ahead and answer the question. | 02:13:22 |
| 20 | THE WITNESS:  Yeah, no date.  There were all | 02:13:22 |
| 21 | kinds of factors in terms of population growth, as well | 02:13:22 |
| 22 | as implementation of programs, the acceptance of | 02:13:22 |
| 23 | re-entry.  And, so, it was a goal in mind and -- but saw | 02:13:23 |
| 24 | the major change and how we were addressing the | 02:13:28 |
| 25 | problems. | 02:13:34 |

| | | |
|---|---|---|
| 1 | It showed that we could, in fact, make a | 02:13:35 |
| 2 | positive success in terms of impact on recidivism. | 02:13:37 |
| 3 | Still a solid public safety way.  So enough examples | 02:13:40 |
| 4 | that we were demonstrating, we know how to do this.  We | 02:13:45 |
| 5 | can get this in place.  We can, in fact, provide | 02:13:45 |
| 6 | alternatives.  We can, in fact, provide programs that | 02:13:50 |
| 7 | will be measured in successful and not risk the public | 02:13:50 |
| 8 | because we're making decisions just to get people out of | 02:13:53 |
| 9 | the prison systems. | 02:13:57 |
| 10 | So enough evidence of that, we're on the right | 02:13:58 |
| 11 | track, enough recommendations from folks and examples | 02:13:58 |
| 12 | around the country that we could piggy-back on.  And, | 02:14:02 |
| 13 | also, in my view, a move towards a management and | 02:14:07 |
| 14 | accountability structure that would let us prove, in | 02:14:11 |
| 15 | fact, we were being successful. | 02:14:16 |
| 16 | Q.  Let me show you what has been marked as | 02:14:21 |
| 17 | Exhibit 7 to your deposition, which is the Overcrowding | 02:14:23 |
| 18 | Proclamation by the Governor on October 4th, 2006. | 02:14:30 |
| 19 | MS. TILLMAN:  I'm going to object.  That | 02:14:36 |
| 20 | misstates the evidence.  I believe it's an emergency | 02:14:36 |
| 21 | proclamation. | 02:14:39 |
| 22 | MR. BIEN:  You're correct. | 02:14:42 |
| 23 | MS. KNOTZ:  Exhibit 7. | 02:14:46 |
| 24 | MR. BIEN:  It's actually 7.  The last one was | 02:14:48 |
| 25 | 8. | 02:14:51 |

| | |
|---|---|
| 1 | THE WITNESS:   (Witness reviewing document.) | 02:14:55 |
| 2 | MR. BIEN:   Q.   Mr. Tilton, are you familiar | 02:15:00 |
| 3 | with this document? | 02:15:02 |
| 4 | A.   Yes. | 02:15:02 |
| 5 | Q.   Can you identify what it is? | 02:15:03 |
| 6 | A.   This is the emergency proclamation order | 02:15:05 |
| 7 | issued by the Governor, dealing with prison | 02:15:09 |
| 8 | overcrowding. | 02:15:13 |
| 9 | Q.   Did you participate in a decision to issue | 02:15:13 |
| 10 | this emergency proclamation at or near the time it was | 02:15:21 |
| 11 | issued? | 02:15:24 |
| 12 | A.   Well, it's the Governor's office's decision, | 02:15:27 |
| 13 | but, absolutely, I was part of this discussion. | 02:15:29 |
| 14 | Q.   And given the failure of the special session, | 02:15:33 |
| 15 | did you think it was necessary and appropriate for the | 02:15:35 |
| 16 | Governor to issue this emergency proclamation when he | 02:15:38 |
| 17 | did? | 02:15:43 |
| 18 | A.   Yes. | 02:15:43 |
| 19 | Q.   And why was that? | 02:15:44 |
| 20 | A.   I felt it was important not to give up on the | 02:15:47 |
| 21 | reforms we were trying to put in place, and we should | 02:15:51 |
| 22 | not stop at any barrier to try every avenue to get | 02:15:55 |
| 23 | authorization to make progress. | 02:15:59 |
| 24 | Q.   On the top of Page 2, there's a "whereas" | 02:16:34 |
| 25 | clause dealing with the effects of current, severe | 02:16:41 |

158

| | | |
|---|---|---|
| 1 | deposition of James Tilton. | 03:17:38 |
| 2 | Please proceed. | 03:17:40 |
| 3 | MR. BIEN:  Q.  Mr. Tilton, I've asked the | 03:17:43 |
| 4 | court reporter to mark as Exhibit 9 to your deposition a | 03:17:45 |
| 5 | four-page document.  On the front page, the title is | 03:17:49 |
| 6 | "Major AB 900 Facility-Related Activities Recap, Week of | 03:17:50 |
| 7 | 08/13/07."  The correct request for production numbers | 03:17:53 |
| 8 | ECDCR 009795.001, which has been repeated four times, | 03:17:59 |
| 9 | which is an interesting way of numbering. | 03:18:16 |
| 10 | But, anyway, do you recognize this document, | 03:18:21 |
| 11 | Mr. Tilton? | 03:18:22 |
| 12 | A.   Not specifically, no. | 03:18:23 |
| 13 | Q.   From time to time, did you receive reports | 03:18:25 |
| 14 | about AB 900 implementation activities? | 03:18:30 |
| 15 | A.   Yes. | 03:18:34 |
| 16 | MS. TILLMAN:  Just for the record, my copy has | 03:18:34 |
| 17 | different page numbers on the bottom.  Does yours -- | 03:18:36 |
| 18 | yours does not.  I'll show what you gave me.  I think | 03:18:38 |
| 19 | mine has numbers ending in 0002, 3, 4.  Okay.  I'm not | 03:18:46 |
| 20 | sure what the exhibit shows. The exhibit does have the | 03:18:53 |
| 21 | 0001 through 4, I believe. | 03:18:55 |
| 22 | MR. BIEN:  The miracle of modern technology. | 03:19:05 |
| 23 | Mine is slightly different, but it is the same. | 03:19:07 |
| 24 | Q.   So Ms. Tillman is correct.  The exhibit does | 03:19:09 |
| 25 | have consecutive numbering; is that correct, Mr. Tilton? | 03:19:15 |

1        A.    Yes.                                              03:19:19

2        Q.    On the first page of Exhibit 9, do you recall    03:19:25

3    that one issue that came up in terms of AB 900             03:19:28

4    implementation while you were secretary was the issue of   03:19:31

5    Valley Fever affecting some of the construction sites in   03:19:38

6    the Central Valley?                                         03:19:42

7        A.    Yes.                                              03:19:44

8        Q.    And what was that issue, as you understood it?   03:19:45

9        A.    Well, we received a letter from the Receiver's   03:19:46

10   office, I believe, that basically told us we could not     03:19:47

11   do construction in the Valley and made us question why     03:19:50

12   was he doing it.                                            03:19:55

13          So, yeah, it became an issue in terms of how        03:19:57

14   assessing, how do we mitigate the risk of Valley Fever     03:20:00

15   if we do construction in the Valley, which were many of    03:20:04

16   our sites.                                                  03:20:05

17       Q.    Okay.  And did you -- while you were             03:20:06

18   secretary, did you take steps to mitigate the risk of      03:20:07

19   Valley Fever in these construction projects?               03:20:13

20       A.    Yes.                                             03:20:15

21       Q.    Okay.  The next item, No. 3, is "Mental Health   03:20:16

22   Projects."  Is it correct that prior to the enactment of   03:20:21

23   AB 900, the Department had existing plans to construct     03:20:32

24   certain mental health projects?                            03:20:38

25       A.    Yes.                                             03:20:40

| | | |
|---|---|---|
| 1 | who were knowledgeable about the mental health | 03:30:33 |
| 2 | population to assist us in determining, what is the best | 03:30:35 |
| 3 | way to approach the mental health population who has | 03:30:39 |
| 4 | come into contact with the criminal justice system, and | 03:30:43 |
| 5 | not just from the CDCR perspective, but the entire | 03:30:47 |
| 6 | State. | 03:30:47 |
| 7 | This body was already set up with experts that | 03:30:47 |
| 8 | represented all those different groups that allowed me | 03:30:51 |
| 9 | to walk in and learn and get a perspective on it. | 03:30:54 |
| 10 | Q.   And in the middle of the second full paragraph | 03:30:58 |
| 11 | on Exhibit 10, there's a quote attributed to you, second | 03:31:02 |
| 12 | sentence, "Persons with mental illness traditionally | 03:31:06 |
| 13 | have been underserved and often end up in jail or prison | 03:31:08 |
| 14 | due to few community alternatives and a lack of | 03:31:11 |
| 15 | understanding of the needs of these individuals.  These | 03:31:16 |
| 16 | five projects are creative approaches to serving this | 03:31:17 |
| 17 | population." | 03:31:22 |
| 18 | Were you giving out awards in approximately | 03:31:25 |
| 19 | March of 2008? | 03:31:28 |
| 20 | A.   Yes. | 03:31:29 |
| 21 | Q.   And what was the purpose of those awards? | 03:31:30 |
| 22 | A.   To recognize what we determined as a group who | 03:31:32 |
| 23 | has best practices and had a process for people who | 03:31:34 |
| 24 | submitted proposals, and we approved five, what I | 03:31:39 |
| 25 | consider exemplary programs. | 03:31:43 |

| | | |
|---|---|---|
| 1 | Q.    Exhibit 11, if you look at it, is a list of | 03:31:48 |
| 2 | the prize winners. | 03:31:51 |
| 3 | A.    (Witness reviewing document.) | 03:31:55 |
| 4 | MS. TILLMAN:    Just for the record, that's a | 03:32:07 |
| 5 | double-sided exhibit. | 03:32:09 |
| 6 | MR. BIEN:    Okay. | 03:32:17 |
| 7 | Q.    The second side also has the full list of the | 03:32:18 |
| 8 | membership of COMIO. | 03:32:21 |
| 9 | A.    Um-hum. | 03:32:23 |
| 10 | MS. TILLMAN:    Was there a question? | 03:32:36 |
| 11 | MR. BIEN:    No.    I think that was -- I had one | 03:32:37 |
| 12 | other thing about COMIO I was going to do. | 03:32:41 |
| 13 | I'd like to mark as Exhibit 14 another page | 03:32:54 |
| 14 | from COMIO website.    I think it was printed out on | 03:32:58 |
| 15 | September 2nd, 2008. | 03:33:07 |
| 16 | (Whereupon, Plaintiffs' | 03:33:16 |
| 17 | Exhibit No. 14 was marked for | 03:33:16 |
| 18 | identification.) | 03:33:16 |
| 19 | THE WITNESS:    (Witness reviewing document.) | 03:33:23 |
| 20 | MR. BIEN:    Q.    Mr. Tilton, have you had a | 03:33:23 |
| 21 | chance to review Exhibit 14? | 03:34:52 |
| 22 | A.    Yes. | 03:34:54 |
| 23 | Q.    Okay.    Does Exhibit 14 describe a legislative | 03:34:54 |
| 24 | initiative that COMIO was considering? | 03:35:01 |
| 25 | A.    It could.    I don't know for sure. | 03:35:06 |

| | | |
|---|---|---|
| 1 | Q. Okay. Have you seen this document before? | 03:35:08 |
| 2 | A. I don't recall seeing it before. | 03:35:11 |
| 3 | Q. Okay. Were you aware, through your work on | 03:35:13 |
| 4 | COMIO or as secretary or other work, that there were | 03:35:37 |
| 5 | some funding holes in terms of resources to provide | 03:35:42 |
| 6 | mental healthcare for the mentally ill on parole in | 03:35:47 |
| 7 | certain communities? | 03:35:56 |
| 8 | A. Yes. | 03:35:58 |
| 9 | Q. And is it correct that you identified cases | 03:35:58 |
| 10 | where people had ended up back in prison on parole | 03:36:03 |
| 11 | violations when they might have been able to succeed in | 03:36:09 |
| 12 | the community with appropriate housing or treatment? | 03:36:12 |
| 13 | A. Yes. | 03:36:16 |
| 14 | Q. Just turn back, if you would, for a moment, to | 03:36:27 |
| 15 | Exhibit 11, which are the awards. In the adult category | 03:36:30 |
| 16 | of the awards, you recognize several projects by | 03:36:34 |
| 17 | superior courts in California; is that correct? | 03:36:44 |
| 18 | A. Yes. | 03:36:45 |
| 19 | Q. And what were these projects? | 03:36:45 |
| 20 | A. The two primary ones -- there's three listed | 03:36:48 |
| 21 | here, but two that I have knowledge of is the Behavioral | 03:36:51 |
| 22 | Health Court in San Francisco, as well as the Mental | 03:36:52 |
| 23 | Health Treatment Court in Santa Clara County. | 03:36:56 |
| 24 | Q. What's the -- if you'd just briefly describe, | 03:37:01 |
| 25 | what is the project involved in those courts? | 03:37:01 |

| | | |
|---|---|---|
| 1 | A. That's the date that the Public Works Board | 03:51:43 |
| 2 | would approve, whatever was being requested in the | 03:51:46 |
| 3 | letter. | 03:51:49 |
| 4 | Q. The last "Hot Issues" column says -- it says | 03:51:53 |
| 5 | the same thing, "DOF has stated they will not release | 03:51:57 |
| 6 | M/H Bed Packages until CDCR has an approved Bed Plan." | 03:51:59 |
| 7 | While you were at CDCR as secretary, did you | 03:52:00 |
| 8 | understand that DOF was holding back on approval of | 03:52:16 |
| 9 | certain mental health bed projects pending court | 03:52:20 |
| 10 | approval of a bed plan? | 03:52:25 |
| 11 | A. It was always an issue and a theme with them, | 03:52:28 |
| 12 | is this something the courts had supported and signed | 03:52:34 |
| 13 | off on as part of our justification, so I can't cite | 03:52:36 |
| 14 | these particular ones, but it was a very consistent | 03:52:39 |
| 15 | question, what are the courts' response to your | 03:52:41 |
| 16 | proposal? Is this going to satisfy the courts, yes or | 03:52:44 |
| 17 | no? | 03:52:47 |
| 18 | So it was a constant issue they would raise. | 03:52:47 |
| 19 | I don't know the particulars on this one, but that would | 03:52:51 |
| 20 | be a consistent question they would raise. | 03:52:53 |
| 21 | MR. BIEN: Okay. Mark as the next exhibit in | 03:52:58 |
| 22 | order, 16. It's a document entitled "A Roadmap for | 03:53:42 |
| 23 | Effective Offender Programming in California." | 03:53:48 |
| 24 | (Whereupon, Plaintiffs' | 03:53:51 |
| 25 | Exhibit No. 16 was marked for | 03:53:51 |

| | | |
|---|---|---|
| 1 | identification.) | 03:53:51 |
| 2 | MR. BIEN:  Q.  What I've done, for the record, | 03:53:53 |
| 3 | to save paper, is include as the exhibit the executive | 03:54:03 |
| 4 | summary and the introduction. | 03:54:10 |
| 5 | MS. TILLMAN:  So this isn't a complete roadmap | 03:54:27 |
| 6 | report, is it? | 03:54:27 |
| 7 | MR. BIEN:  It's not the complete roadmap | 03:54:27 |
| 8 | report.  I have the rest here, if you need to see it, | 03:54:27 |
| 9 | but this document has been in the record already.  If we | 03:54:27 |
| 10 | need to look at it -- I will show you more, Mr. Tilton. | 03:54:31 |
| 11 | Thought I'd try to save a little bit of paper. | 03:54:32 |
| 12 | MS. TILLMAN:  So Exhibit 1 consists of the | 03:54:36 |
| 13 | title page, and then Pages 9 through 54; is that | 03:54:39 |
| 14 | correct, or is that expert panel report?  I want to | 03:54:44 |
| 15 | double check with you, because it's all double-sided, | 03:54:48 |
| 16 | so... | 03:54:51 |
| 17 | MR. BIEN:  Is that what they gave you? | 03:54:53 |
| 18 | MS. TILLMAN:  Yeah. | 03:54:53 |
| 19 | MR. BIEN:  Oh, great.  I'm really having good | 03:54:53 |
| 20 | luck here.  I guess we're not going to do this. | 03:54:57 |
| 21 | MS. TILLMAN:  It doesn't work for you? | 03:55:09 |
| 22 | MR. BIEN:  It's every other page? | 03:55:12 |
| 23 | MS. TILLMAN:  Oh, no, it's fine.  All of the | 03:55:12 |
| 24 | pages are there between nine and 54.  Those are the | 03:55:13 |
| 25 | pages you wanted for your exhibit? | 03:55:18 |

| | | |
|---|---|---|
| 1 | MR. BIEN: Can I just take a look? | 03:55:25 |
| 2 | MS. TILLMAN: No worry. | 03:55:27 |
| 3 | MR. BIEN: Exhibit 16 is, as Ms. Tillman | 03:55:49 |
| 4 | pointed out, a section of report called The Roadmap. | 03:55:55 |
| 5 | It's Pages 9 through 54, but I'd like to mark as | 03:55:59 |
| 6 | Exhibit 17 the intro and the executive summary of the | 03:56:04 |
| 7 | report, which I thought I was marking the first time. | 03:56:08 |
| 8 | (Whereupon, Plaintiffs' | 03:56:08 |
| 9 | Exhibit No. 17 was marked for | 03:56:08 |
| 10 | identification.) | 03:56:08 |
| 11 | MR. BIEN: Q. Mr. Tilton, if you could look, | 03:56:50 |
| 12 | first, at Exhibit 17, which is the beginning of the | 03:56:52 |
| 13 | report. | 03:56:55 |
| 14 | Do you recall that on or about June 29th, | 03:56:59 |
| 15 | 2007, the CDCR expert panel on adult offender and | 03:57:02 |
| 16 | re-entry recidivism issued its report to the California | 03:57:08 |
| 17 | State Legislature? | 03:57:15 |
| 18 | A. Yes. | 03:57:16 |
| 19 | Q. Can you explain what that report was and what | 03:57:16 |
| 20 | this committee was? | 03:57:19 |
| 21 | A. This was a committee that was authorized by | 03:57:21 |
| 22 | the legislature but requested and supported by me, to | 03:57:23 |
| 23 | bring in experts around the country to advise us about | 03:57:28 |
| 24 | addressing, largely, the program deficiencies in the | 03:57:32 |
| 25 | Department, and how -- whether they were already | 03:57:39 |

| | | |
|---|---|---|
| 1 | existing programs that were out there. | 03:57:41 |
| 2 | And, also, since many of these were | 03:57:43 |
| 3 | practitioners, both from the program, as well as custody | 03:57:44 |
| 4 | side, I asked them to give me advice in terms of how to | 03:57:44 |
| 5 | get started.  You know, can't do it all at once.  Where | 03:57:50 |
| 6 | should I prioritize my efforts? | 03:57:55 |
| 7 | Q.    Is it correct that CDCR staff were directly | 03:57:57 |
| 8 | involved in addition to these outside experts in this | 03:58:01 |
| 9 | report? | 03:58:05 |
| 10 | A.    Yes. | 03:58:05 |
| 11 | Q.    Can you tell us who Marisela Montes is? | 03:58:13 |
| 12 | A.    At the time of this report, she was the chief | 03:58:18 |
| 13 | deputy director over programs. | 03:58:21 |
| 14 | Q.    Did she report to you? | 03:58:21 |
| 15 | A.    No, she reported to the undersecretary. | 03:58:23 |
| 16 | Q.    If you turn to the page that has Roman Numeral | 03:58:51 |
| 17 | VIII at the bottom, part of the executive summary -- | 03:58:56 |
| 18 | A.    Second page of the executive summary? | 03:59:04 |
| 19 | Q.    Yes. | 03:59:06 |
| 20 | A.    Okay. | 03:59:08 |
| 21 | Q.    -- lists some external factors preventing | 03:59:08 |
| 22 | programming success.  Do you see that section?  There's | 03:59:12 |
| 23 | a heading "External Factors"? | 03:59:17 |
| 24 | A.    Yes. | 03:59:22 |
| 25 | Q.    Yeah, is it correct that the expert panel | 03:59:22 |

| | | |
|---|---|---|
| 1 | identified overcrowding as a factor that must be | 03:59:25 |
| 2 | addressed before CDCR could address -- could implement | 03:59:29 |
| 3 | its rehabilitation programming? | 03:59:37 |
| 4 | A.    Yes. | 03:59:40 |
| 5 | MS. TILLMAN:   Objection.   Misstates the | 03:59:40 |
| 6 | evidence. | 03:59:43 |
| 7 | MR. BIEN:   Q.   Was Recommendation 1, which is | 04:00:00 |
| 8 | stated on that same page, reduce overcrowding in its | 04:00:02 |
| 9 | prison facilities and parole offices? | 04:00:05 |
| 10 | A.    Yes. | 04:00:10 |
| 11 | Q.    In the expert panel, also made a series of | 04:00:29 |
| 12 | recommendations to CDCR as to how to identify and | 04:00:35 |
| 13 | develop and then implement rehabilitation programs? | 04:00:47 |
| 14 | A.    Yes. | 04:00:51 |
| 15 | Q.    And did you endorse these recommendations as | 04:00:51 |
| 16 | secretary? | 04:00:56 |
| 17 | A.    Yes. | 04:00:57 |
| 18 | Q.    As secretary? | 04:00:57 |
| 19 | A.    Yes, officially.   There's one part of the | 04:00:58 |
| 20 | report that I took exception to, but the issues that | 04:01:01 |
| 21 | dealt with how to put programs in place, I was | 04:01:05 |
| 22 | wholeheartedly supportive of and thankful. | 04:01:09 |
| 23 | Q.    And what part of the report did you take issue | 04:01:11 |
| 24 | with? | 04:01:12 |
| 25 | A.    There's some parts to the report that deal | 04:01:13 |

| | | |
|---|---|---|
| 1 | with managing the population, which were outside the | 04:01:14 |
| 2 | scope of the task force, and I believe were -- I | 04:01:16 |
| 3 | describe them more than the minor report, that the rest | 04:01:20 |
| 4 | of the -- we put in the report as an appendix, but the | 04:01:23 |
| 5 | rest of the -- it didn't have the same liberation as the | 04:01:26 |
| 6 | bulk of the recommendations. | 04:01:30 |
| 7 | Q.    The second recommendation, which is on the | 04:02:06 |
| 8 | next page of the executive summary, is, "Enact | 04:02:11 |
| 9 | legislation to expand its system of positive | 04:02:13 |
| 10 | reinforcements for offenders who successfully complete | 04:02:17 |
| 11 | the implementation program requirements and comply with | 04:02:19 |
| 12 | institutional rules in prison, and fulfill parole | 04:02:20 |
| 13 | obligations in the community." | 04:02:26 |
| 14 | Did you endorse these recommendations, | 04:02:27 |
| 15 | Secretary Tilton? | 04:02:29 |
| 16 | A.    Yes. | 04:02:32 |
| 17 | Q.    And at the time you left CDCR, had any | 04:02:32 |
| 18 | legislation to achieve these goals been enacted? | 04:02:37 |
| 19 | A.    Yes. | 04:02:45 |
| 20 | Q.    And when do you recall that was? | 04:02:47 |
| 21 | A.    Well, there's only been one bill in my tenure, | 04:02:50 |
| 22 | in 30 years, that provide reduction in the prison | 04:02:54 |
| 23 | sentence, basically is the bill that says you complete | 04:02:57 |
| 24 | drug treatment programs, you get discharged from parole. | 04:03:01 |
| 25 | So that's an example, and then there are other | 04:03:06 |

```
 1    It's whether they actually complete the program.        04:04:11

 2         Q.   Is it also correct that you understood and     04:04:15

 3    have advocated for increasing parole programs in the     04:04:22

 4    first several months upon parolee's discharge from       04:04:29

 5    prison?                                                  04:04:33

 6         A.   Yes.                                           04:04:34

 7         Q.   Why is that?                                   04:04:34

 8         A.   Because if you don't catch them and keep them  04:04:35

 9    on the straight and narrow there, you'll lose them.  The 04:04:38

10    biggest recidivism is during those first 60 to 90 days.  04:04:39

11         Q.   Okay.   In looking at Recommendation 2, it also 04:04:46

12    talks to program reinforcements for program             04:04:52

13    participation and good behavior in prison.              04:04:58

14              While you were still secretary of CDCR, were  04:04:59

15    you considering any programs to reward or incent        04:05:03

16    prisoners to complete programs while they were in       04:05:06

17    prison, other than the ones you've discussed?           04:05:12

18         A.   Yes, and we also had behavior as part of it.  04:05:13

19    And we, in fact, had ruled it out in a couple of prisons 04:05:17

20    in terms of rewarding good behavior, which would be an  04:05:20

21    incentive for people to be in the program.              04:05:22

22         Q.   And what kind of rewards were you considering? 04:05:26

23         A.   They had a list of issues, many of them not   04:05:27

24    fiscal, first priority to canteen, first in line to chow 04:05:29

25    hall, priority to phones, visiting, access -- first call 04:05:34
```

1    to access to programs and putting back in what used to        04:05:38

2    be in place, which we call privilege cards, which means        04:05:43

3    if you're in this, performing your program and behaving        04:05:45

4    yourself, you get a preferential access to the programs        04:05:45

5    in the facility.                                               04:05:50

6        Q.    Did you also consider awarding credits for          04:05:53

7    prisoners who completed or graduated from various stages       04:06:00

8    of rehabilitation programs?                                    04:06:03

9        A.    We did, and this is where the debate is for         04:06:04

10    me, personally, about whether to use that to get              04:06:06

11    existing credits, or is it on top of it?  And there's a       04:06:10

12    proposal in the report that says, give everybody credit       04:06:13

13    for being good, and, on top of that, you get more credit      04:06:13

14    for staying in program.  And I am opposed to that.            04:06:20

15        Q.    Which part are you opposed to?                      04:06:24

16        A.    The fact that you get all of the credit for        04:06:26

17    doing nothing, and then you have to get more credit if        04:06:28

18    you actually perform.  I'm an advocate for                    04:06:31

19    performance-based credit, not everybody gets 50/50 to         04:06:34

20    start off with, and now you get more on top of that,          04:06:38

21    especially for violent offenders.                             04:06:39

22        Q.    Is it correct under CDCR's current system of        04:06:43

23    credits that a prisoner gets the same credit for              04:06:48

24    attending an educational program as he might get for          04:06:52

25    graduating from an educational program?                       04:06:57

| | | |
|---|---|---|
| 1 | (Whereupon, Plaintiffs' | 04:20:47 |
| 2 | Exhibit No. 21 was marked for | 04:20:47 |
| 3 | identification.) | 04:20:47 |
| 4 | MR. BIEN:  Q.  I'm only going to ask you | 04:20:35 |
| 5 | about -- there's a reference to Coalinga on Page 6. | 04:21:18 |
| 6 | My question is, does that refresh your | 04:21:30 |
| 7 | recollection that CDCR, in 2006, was advocating to | 04:21:31 |
| 8 | increase its use of Coalinga State Hospital beds for | 04:21:38 |
| 9 | mentally ill prisoners? | 04:21:42 |
| 10 | MS. TILLMAN:  Objection.  Misstates the | 04:21:46 |
| 11 | evidence. | 04:21:46 |
| 12 | THE WITNESS:  Well, two points.  This document | 04:21:47 |
| 13 | was prepared before I got to the agency. | 04:21:48 |
| 14 | MR. BIEN:  Q.  Okay. | 04:21:54 |
| 15 | A.  And I've already stated that it was one of the | 04:21:54 |
| 16 | issues I was considering -- as configuration for our bed | 04:21:57 |
| 17 | plan. | 04:22:01 |
| 18 | Q.  What happened with the Coalinga issue, while | 04:22:02 |
| 19 | you were there? | 04:22:05 |
| 20 | A.  When it was raised at Mental Health, I made a | 04:22:07 |
| 21 | case that they needed those beds, and, therefore, it was | 04:22:09 |
| 22 | not available for us to use. | 04:22:12 |
| 23 | Q.  At the time you left CDCR in the spring of | 04:22:19 |
| 24 | 2008, were you aware that there were still many hundreds | 04:22:24 |
| 25 | of empty beds at Coalinga State Hospital? | 04:22:31 |

| | | |
|---|---|---|
| 1 | A.    Not specifically, no. | 04:22:35 |
| 2 | Q.    In your discussion with community mental | 04:22:46 |
| 3 | health providers and counties, you understood that | 04:22:50 |
| 4 | they -- there's a population of -- forensic population | 04:22:55 |
| 5 | called the IST population, Incompetent to Stand Trial | 04:23:02 |
| 6 | population that has not been able to timely access DMH | 04:23:09 |
| 7 | beds? | 04:23:16 |
| 8 | MS. TILLMAN:  Is that a question? | 04:23:17 |
| 9 | MR. BIEN:  Yes. | 04:23:25 |
| 10 | Q.    Are you aware that there's a backlog of | 04:23:25 |
| 11 | referrals from counties of people who are incompetent to | 04:23:25 |
| 12 | stand trial to DMH? | 04:23:26 |
| 13 | A.    Yes. | 04:23:34 |
| 14 | Q.    Okay.  Do you recall when you were -- I guess | 04:23:36 |
| 15 | you were at the Department of Finance, but a pay raise | 04:24:12 |
| 16 | for CDCR medical and mental health clinicians was | 04:24:16 |
| 17 | implemented in late 2005? | 04:24:20 |
| 18 | A.    I don't recall. | 04:24:24 |
| 19 | MS. TILLMAN:  I am going to object.  I'm not | 04:24:25 |
| 20 | sure that was 2005.  I'll let him answer. | 04:24:26 |
| 21 | Just if you recall. | 04:24:29 |
| 22 | THE WITNESS:  I don't recall the implication. | 04:24:29 |
| 23 | I know that an issue came forward, and we were -- moved | 04:24:32 |
| 24 | forward with a recommendation to support. | 04:24:34 |
| 25 | MR. BIEN:  Q.  Do you recall that there was -- | 04:24:43 |

| | | |
|---|---|---|
| 1 | A.    Yes. | 04:31:37 |
| 2 | MS. TILLMAN:  Just for the record, it's not | 04:31:39 |
| 3 | quite adjacent. | 04:31:42 |
| 4 | THE WITNESS:  You can throw a rock at it. | 04:31:48 |
| 5 | MR. BIEN:  I think you can see it; is that | 04:31:50 |
| 6 | correct? | 04:31:51 |
| 7 | THE WITNESS:  Pretty close.  You could turn in | 04:31:52 |
| 8 | and think it's a prison. | 04:31:55 |
| 9 | MR. BIEN:  I'd like to mark as the next | 04:32:22 |
| 10 | exhibit No. 23, a Senate Budget Hearing Briefing by | 04:32:25 |
| 11 | Mr. Tilton in 2008.  Bears Production No. DEFS032628 | 04:32:35 |
| 12 | through 643. | 04:32:38 |
| 13 | (Whereupon, Plaintiffs' | 04:32:49 |
| 14 | Exhibit No. 23 was marked for | 04:32:49 |
| 15 | identification.) | 04:32:49 |
| 16 | MS. TILLMAN:  Just for the record, was there | 04:33:18 |
| 17 | any sort of Bates on this? | 04:33:20 |
| 18 | MR. BIEN:  My copy has it. | 04:33:23 |
| 19 | MS. TILLMAN:  If you could just read it into | 04:33:25 |
| 20 | the record, that would help me.  DEF? | 04:33:26 |
| 21 | MR. BIEN:  DEFS032628, on the first page. | 04:33:29 |
| 22 | MS. TILLMAN:  Okay.  Thank you. | 04:33:36 |
| 23 | MR. BIEN:  Q.  Mr. Tilton, can you identify | 04:34:14 |
| 24 | this document for the record? | 04:34:17 |
| 25 | A.  Well, it's confusing to me because it doesn't | 04:34:19 |

| | | |
|---|---|---|
| 1 | look like this is testimony by me.  It looks like this | 04:34:22 |
| 2 | is copies of BCPs or proposals.  It could have been by | 04:34:26 |
| 3 | the title.  It looks like the normal budget hearing, and | 04:34:32 |
| 4 | these were topics, BCPs, that were discussed. | 04:34:36 |
| 5 |     Q.   Do you recall that in early 2000, as part of | 04:34:42 |
| 6 | the 2008 budget, that administration proposed a | 04:34:46 |
| 7 | population reduction measure? | 04:34:55 |
| 8 |     A.   Yes. | 04:34:58 |
| 9 |     Q.   And is that reflected here on Page 2, the | 04:34:59 |
| 10 | 20-month early release of inmates and summary parole? | 04:35:05 |
| 11 |     A.   Yes. | 04:35:11 |
| 12 |     Q.   And did you -- is it part of your | 04:35:11 |
| 13 | responsibility to present this proposal to legislature | 04:35:12 |
| 14 | in early 2008? | 04:35:16 |
| 15 |     A.   Yes. | 04:35:17 |
| 16 |     Q.   Did you do so? | 04:35:17 |
| 17 |     A.   Yes. | 04:35:19 |
| 18 |     Q.   It's correct that this proposal excluded | 04:35:29 |
| 19 | inmates not currently convicted and who have a history | 04:35:34 |
| 20 | of conviction for serious or violent offense; there | 04:35:39 |
| 21 | account code is 11927 or 667.5(c)? | 04:35:40 |
| 22 |     A.   Yes. | 04:35:46 |
| 23 |     Q.   And also excluded, inmates who had a register | 04:35:46 |
| 24 | under PC290? | 04:35:50 |
| 25 |     A.   That's correct. | 04:35:53 |

| | | |
|---|---|---|
| 1 | providing incentives for people to stay in programs. | 04:41:26 |
| 2 | So we talked about credits, while they're in | 04:41:31 |
| 3 | prison, and we also talked about removing them from | 04:41:34 |
| 4 | parole if, in fact, they would demonstrate certain | 04:41:39 |
| 5 | successes.  So it was in that whole framework for | 04:41:42 |
| 6 | providing an incentive for people to stay in program and | 04:41:43 |
| 7 | complete programs. | 04:41:46 |
| 8 | THE VIDEOGRAPHER:  Off the record.  The time | 04:42:09 |
| 9 | is 4:42 p.m. | 04:42:09 |
| 10 | (Recess taken.) | 04:42:13 |
| 11 | (Whereupon, Plaintiffs' | 04:42:09 |
| 12 | Exhibit Nos. 24 through 26 were | 04:42:09 |
| 13 | marked for identification.) | 04:42:09 |
| 14 | THE VIDEOGRAPHER:  We are now on the record at | 05:01:29 |
| 15 | 5:01 p.m.  This is the beginning of Video No. 4 in the | 05:01:31 |
| 16 | deposition of James Tilton. | 05:01:36 |
| 17 | Please proceed. | 05:01:39 |
| 18 | MR. BIEN:  Q.  Mr. Tilton, I've asked the | 05:01:41 |
| 19 | court reporter to mark as Exhibit 24 to your deposition | 05:01:45 |
| 20 | a two-page document.  It says, top of the first page, | 05:01:45 |
| 21 | "Agenda Governor's meeting with Legislative Leaders on | 05:01:48 |
| 22 | Prisons.  It has numbers E-CDCR_000414 and 415. | 05:01:51 |
| 23 | Do you recall attending a meeting where the | 05:01:59 |
| 24 | Governor made a presentation to legislative leaders | 05:02:09 |
| 25 | concerning prison options? | 05:02:09 |

| | | |
|---|---|---|
| 1 | A.    Can you give me a time frame? | 05:02:09 |
| 2 | Q.    I would only guess from what you talked about | 05:02:10 |
| 3 | earlier, this was somewhere around the special session | 05:02:13 |
| 4 | because it seemed to have things that kind of dropped | 05:02:16 |
| 5 | out after that, but I don't really know.  I can't make a | 05:02:20 |
| 6 | representation to you. | 05:02:23 |
| 7 | A.    Yeah, no, there were -- I can't link this | 05:02:25 |
| 8 | document to a particular meeting, even though there were | 05:02:27 |
| 9 | meetings with staffers, as we tried to rule out the | 05:02:30 |
| 10 | emergency session.  This looks like trying to throw | 05:02:34 |
| 11 | everything on the plate and get the considerations for a | 05:02:38 |
| 12 | couple options and see what they were willing to | 05:02:39 |
| 13 | consider. | 05:02:42 |
| 14 | Q.    I understand that you can't identify this | 05:02:43 |
| 15 | document like that.  I just want to use it as a guide, | 05:02:46 |
| 16 | just to see if I can understand what some of these | 05:02:49 |
| 17 | options were that were being considered. | 05:02:52 |
| 18 | Under Point 3(a), immediate, I see -- we've | 05:02:57 |
| 19 | talked about out-of-state beds, but I also see, "Lease | 05:03:01 |
| 20 | of empty jail beds." | 05:03:05 |
| 21 | Did you undertake any investigation or one of | 05:03:07 |
| 22 | your staffers an investigation about whether there were | 05:03:10 |
| 23 | additional jail beds to lease in California? | 05:03:12 |
| 24 | A.    Yes. | 05:03:16 |
| 25 | Q.    And what did you find out? | 05:03:16 |

| | | |
|---|---|---|
| 1 | A. No. | 05:03:17 |
| 2 | Q. Is it correct that during the time that you | 05:03:18 |
| 3 | were secretary, that CDCR actually lost over 1,000 jail | 05:03:24 |
| 4 | beds, at least for that account? | 05:03:30 |
| 5 | A. Yes. | 05:03:33 |
| 6 | Q. And that reduced your overall capacities? | 05:03:33 |
| 7 | A. Went the wrong way. | 05:03:36 |
| 8 | Q. Okay. In the short-term item, Item 3(b)2, one | 05:03:38 |
| 9 | of them is, eliminate state prison diagnostic | 05:03:46 |
| 10 | evaluations. | 05:03:49 |
| 11 | Do you know what that's in reference to? | 05:03:49 |
| 12 | A. Yes, there's a process -- I think it's a | 05:03:53 |
| 13 | mental health evaluation, basically diagnostics, and it | 05:03:56 |
| 14 | ends up with very few people actually getting to us, but | 05:03:59 |
| 15 | it's a workload, and it takes up beds in our system. | 05:04:04 |
| 16 | Q. Was this a proposal to either change a State | 05:04:06 |
| 17 | law or -- | 05:04:10 |
| 18 | A. Just not do it. | 05:04:10 |
| 19 | Q. Not do it. Okay. | 05:04:12 |
| 20 | Do you recall what happened with that | 05:04:13 |
| 21 | proposal? | 05:04:14 |
| 22 | A. There wasn't support, I believe, from the | 05:04:16 |
| 23 | legislature to do it. | 05:04:18 |
| 24 | Q. Are these, like, 90-day evaluations, 60-day, | 05:04:23 |
| 25 | something like that? | 05:04:26 |

| | | |
|---|---|---|
| 1 | A.    90-day, I think, and it turned out there was | 05:04:27 |
| 2 | only a few counties that were using it (inaudible), but | 05:04:29 |
| 3 | others disagreed. | 05:04:33 |
| 4 | Q.    Do you know what the reference to temporary | 05:04:39 |
| 5 | facilities is, under short-term? | 05:04:42 |
| 6 | A.    This is, again, coming up with a list of | 05:04:44 |
| 7 | things we should go try to explore and see whether it | 05:04:47 |
| 8 | made sense to bring in temporary trailers, or whatever | 05:04:48 |
| 9 | else like that, on prison grounds. | 05:04:51 |
| 10 | Q.    Do you recall a time -- I think it was when | 05:04:55 |
| 11 | you were secretary, where I understood they were | 05:04:58 |
| 12 | actually using tents in a yard; is that correct? | 05:05:00 |
| 13 | A.    Yes, not while I was secretary. | 05:05:03 |
| 14 | Q.    Not while you were secretary? | 05:05:05 |
| 15 | A.    While I was secretary, we didn't give them | 05:05:07 |
| 16 | tents.  They just were on the yard. | 05:05:09 |
| 17 | Q.    Okay. | 05:05:13 |
| 18 | A.    Not kidding. | 05:05:14 |
| 19 | Q.    Really?  What about use of empty DJJ | 05:05:20 |
| 20 | facilities, was that something that your agency has | 05:05:23 |
| 21 | explored? | 05:05:24 |
| 22 | A.    Yes. | 05:05:25 |
| 23 | Q.    Where does that stand right now, when you | 05:05:26 |
| 24 | left? | 05:05:29 |
| 25 | A.    We're proposing to do it, Paso Robles. | 05:05:30 |

| | | |
|---|---|---|
| 1 | sentencing commission that also failed? | 05:09:13 |
| 2 | A.    Yes. | 05:09:16 |
| 3 | Q.    There's a series of other options.    I think we | 05:09:34 |
| 4 | have discussed some of them.    Selected series of | 05:09:39 |
| 5 | non-violent offenders served time locally.    Locally | 05:09:40 |
| 6 | would mean in county jails? | 05:09:46 |
| 7 | A.    Or program. | 05:09:48 |
| 8 | Q.    Or program. | 05:09:49 |
| 9 | And various early release programs for certain | 05:09:56 |
| 10 | categories of inmates, either aged or disabled.    You | 05:10:03 |
| 11 | discussed those? | 05:10:10 |
| 12 | A.    Yes. | 05:10:10 |
| 13 | Q.    Did any of those proposals go forward, to your | 05:10:11 |
| 14 | knowledge?  Were any of them approved before you left as | 05:10:15 |
| 15 | secretary? | 05:10:19 |
| 16 | A.    No. | 05:10:20 |
| 17 | Q.    No. 8 is, "Increase Work Credits for | 05:10:27 |
| 18 | Non-serious, Non-violent Inmates." | 05:10:30 |
| 19 | Can you discuss -- do you recall what any of | 05:10:35 |
| 20 | those proposals were? | 05:10:38 |
| 21 | A.    Well, generally, this is identifying, and this | 05:10:39 |
| 22 | is where I was supporting, if it's a non-violent | 05:10:42 |
| 23 | offender, we do give additional credits for performance | 05:10:45 |
| 24 | in program, and that's what this is. | 05:10:51 |
| 25 | Q.    That's the program we talked about a little | 05:10:53 |

| | | |
|---|---|---|
| 1 | responsibility for parole from the State to local | 05:16:30 |
| 2 | entities; is that correct? | 05:16:36 |
| 3 | A.    Yes. | 05:16:38 |
| 4 | Q.    And did you -- did you testify concerning that | 05:16:39 |
| 5 | proposal and your reaction to it? | 05:16:45 |
| 6 | A.    No. | 05:16:47 |
| 7 | Q.    Did you express an opinion about that proposal | 05:16:48 |
| 8 | to the LAO or to the legislature? | 05:16:53 |
| 9 | MS. TILLMAN:  Do you want to take it one by | 05:17:01 |
| 10 | one? | 05:17:03 |
| 11 | MR. BIEN:  Yeah. | 05:17:04 |
| 12 | Q.    Do you recall expressing -- speaking to any | 05:17:04 |
| 13 | legislative committees or any legislators about the LAO | 05:17:07 |
| 14 | proposal? | 05:17:11 |
| 15 | A.    All I did do is say, We're more than willing | 05:17:12 |
| 16 | to look at all options, if you want to give us something | 05:17:14 |
| 17 | that you would support.   They kept wanting us to | 05:17:16 |
| 18 | negotiate with ourselves.   And we said, not going to do | 05:17:19 |
| 19 | that.   So if you have something you'll support, I'd like | 05:17:20 |
| 20 | to hear what that is. | 05:17:24 |
| 21 | Q.    By you, you meant the legislature versus the | 05:17:25 |
| 22 | LAO? | 05:17:26 |
| 23 | A.    Legislature versus administration.   The point | 05:17:28 |
| 24 | I was asked is, so we would -- our position was, we'd | 05:17:31 |
| 25 | accept any alternative, if people were willing to -- if | 05:17:36 |

| | | |
|---|---|---|
| 1 | you have votes for something, let us know what it is, | 05:17:39 |
| 2 | but they kept wanting us to, as I described, negotiate | 05:17:40 |
| 3 | with ourselves.  Wait a minute, we have a proposal on | 05:17:43 |
| 4 | the table.  What would you support versus us keep | 05:17:48 |
| 5 | changing our position? | 05:17:49 |
| 6 |     Q.    To the extent the LAO proposal involved local | 05:17:50 |
| 7 | communities taking responsibility for people who were | 05:17:58 |
| 8 | returning to their communities, was it consistent with | 05:18:03 |
| 9 | the re-entry kind of programs that you were advocating? | 05:18:08 |
| 10 |     A.    In some ways, but it had significant funding | 05:18:12 |
| 11 | problems with their proposals.  They were advocating as | 05:18:15 |
| 12 | if they were providing resources to fund their proposal, | 05:18:19 |
| 13 | and the counties perspective, they were taking resources | 05:18:21 |
| 14 | away and putting it over here and calling it money from | 05:18:24 |
| 15 | the State. | 05:18:27 |
| 16 |     So it wasn't getting very far, because without | 05:18:27 |
| 17 | funding, it was causing a huge response from the | 05:18:31 |
| 18 | local -- same issue as our proposal.  How do you fund | 05:18:34 |
| 19 | what happens to these people if they're not in prison? | 05:18:39 |
| 20 |     Q.    In general, has that been a major issue you've | 05:18:43 |
| 21 | dealt with in your meetings with both legislative | 05:18:48 |
| 22 | leaders and community representatives about the various | 05:18:51 |
| 23 | prison and parole reform options? | 05:18:54 |
| 24 |     A.    Yes. | 05:18:57 |
| 25 |     Q.    In other words, who -- if we were going to | 05:18:58 |

| | | |
|---|---|---|
| 1 | (Whereupon, Plaintiffs' | 05:42:32 |
| 2 | Exhibit No. 29 was marked for | 05:42:32 |
| 3 | identification.) | 05:42:32 |
| 4 | MR. BIEN:  It has a Production No. of | 05:42:40 |
| 5 | DSUPP003331. | 05:42:43 |
| 6 | THE WITNESS:  (Witness reviewing document.) | 05:43:03 |
| 7 | MR. BIEN:  Q.  Turning to the second page of | 05:43:28 |
| 8 | this document, Mr. Tilton, were you aware that the -- | 05:43:52 |
| 9 | anybody inform you that the Receiver had expressed | 05:43:56 |
| 10 | concerns about the infill projects at North Kern and | 05:43:59 |
| 11 | Wasco? | 05:44:02 |
| 12 | A.  Not specifically, no. | 05:44:07 |
| 13 | Q.  I think you mentioned earlier about the Valley | 05:44:10 |
| 14 | Fever issue -- | 05:44:13 |
| 15 | A.  Right. | 05:44:14 |
| 16 | Q.  -- but in terms of the issue expressed here in | 05:44:15 |
| 17 | this document, that healthcare may be difficult.  Adding | 05:44:17 |
| 18 | additional inmates to these prisons might be difficult, | 05:44:27 |
| 19 | given the level of healthcare facilities at the prison. | 05:44:35 |
| 20 | Was that ever expressed to you? | 05:44:35 |
| 21 | A.  No. | 05:44:38 |
| 22 | MR. BIEN:  Mark as Exhibit 30, which I think | 05:45:11 |
| 23 | will be the last one. | 05:45:14 |
| 24 | (Whereupon, Plaintiffs' | 05:45:27 |
| 25 | Exhibit No. 30 was marked for | 05:45:27 |

```
 1                    identification.)                    05:45:27

 2          THE WITNESS:   (Witness reviewing document.)  05:45:30

 3          MR. BIEN:   Q.   Do you recall, Mr. Tilton,   05:46:32

 4   receiving this e-mail on or about July 10, 2007, from 05:46:34

 5   Mr. Gore?                                            05:46:38

 6          MS. TILLMAN:   Before he answers the question, 05:46:40

 7   let me just state for the record that G-O-V PRIV 001091, 05:46:42

 8   obviously, the necessary privileges of attorney/client 05:46:44

 9   privileged, a little bit of confidence privileged, and 05:46:48

10   executive privileged were asserted by defendant.   It 05:46:51

11   appears that this was a document produced pursuant to a 05:46:55

12   court order.                                         05:46:59

13          That being said, we will allow the witness to 05:47:01

14   answer certain questions regarding this document, and 05:47:04

15   we'll take it on a question-by-question basis at this 05:47:06

16   time.                                                05:47:16

17          MR. BIEN:   Okay.                             05:47:16

18          THE WITNESS:   I'm aware of this activity     05:47:16

19   taking place.   I don't recall seeing the memo, but I 05:47:16

20   probably did, since it was cc'd to me.               05:47:19

21          MR. BIEN:   Q.   Is it correct that in the    05:47:22

22   summer of 2007, CCR was exploring various methods of  05:47:23

23   reducing overcrowding, and, at the same time, trying to 05:47:29

24   improve public safety?                               05:47:35

25          A.   Yes.                                     05:47:37
```