# Achieving a
# Constitutional Level of Medical Care
# in
# California's Prisons

## Tenth Tri-Annual Report of the
## Federal Receiver's Turnaround Plan of Action

**January 15, 2009**

# California Prison Health Care Receivership

## Vision:

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

## Mission:

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

Page

1.  Introduction…………………………………………………..……...     1

2.  Executive Summary…………………………………………………...     6

3.  The Receiver's Reporting Requirements…………...............................………...     15

4.  Status and Progress Toward the Turnaround Plan Initiatives………………     17

    GOAL 1     Ensure Timely Access to Health Care Services……………………     17

    *Objective 1.1*        Screening and Assessment Processes…………………..………..     17

    *Objective 1.2*        Access Staffing and Processes...……………………………..     19

    *Objective 1.3*        Schedule and Patient-Inmate Tracking…………………………....     22

    *Objective 1.4*        Standardized Utilization Management System…………………...     23

    GOAL 2     Establish a Prison Medical Program Addressing the Full

                Continuum of Health Care Services…………………………………     26

    *Objective 2.1*        Primary Care…………………………………………………     26

    *Objective 2.2*        Chronic Care…………………………………………………     27

    *Objective 2.3*        Emergency Response…………………………………………     30

    *Objective 2.4*        Specialty Care and Hospitalization………………………………     33

    GOAL 3     Recruit, Train and Retain a Professional Quality Medical Care

                Workforce……………………………………………………     43

    *Objective 3.1*        Physicians and Nurses…………………………………………     43

    *Objective 3.2*        Clinical Leadership and Management Structure…………………     52

    *Objective 3.3*        Professional Training Program…………………………………     53

    GOAL 4     Implement a Quality Improvement Program...……………………...     56

    *Objective 4.1*        Clinical Quality Measurement and Evaluation Program...………..     56

    *Objective 4.2*        Quality Improvement Programs…………………………………     58

    *Objective 4.3*        Medical Peer Review and Discipline Process……………………     62

    *Objective 4.4*        Medical Oversight Unit…………………………………………....     64

*Objective 4.5*        Health Care Appeals Process…………………………………..        69

*Objective 4.6*        Out-of-State, Community Correctional Facilities and Re-entry

                       Oversight…………………………………………………        74

**GOAL 5        Establish Medical Support Infrastructure…………………………        79**

*Objective 5.1*        Pharmacy…………………………………………………        79

*Objective 5.2*        Medical Records…………………………………………        86

*Objective 5.3*        Radiology and Laboratory………………………………...        87

*Objective 5.4*        Clinical Information Systems……………………………        88

*Objective 5.5*        Telemedicine……………………………………………...        90

**GOAL 6        Provide for Necessary Clinical, Administrative and Housing**

                   **Facilities……………………………………………………..        92**

*Objective 6.1*        Upgrade Administrative and Clinical Facilities………………..        92

*Objective 6.2*        Expand Administrative, Clinical, and House Facilities…………..        95

*Objective 6.3*        Finish Construction at San Quentin State Prison…………………        99

**5.        Additional Successes Achieved by the Receiver………………...……..……        102**

A.        Status of the Project Management Office………………………………...        102

B.        2008 Best of California Award Winner: J. Clark Kelso………………………        103

C.        *Turnaround Lifeline* Newsletter to Staff………………………………………        103

D.        *HR Connections* Newsletter to Staff………………………………………...        104

**6.        Particular Problems Faced by the Receiver, Including Any Specific Obstacles**

**Presented By Institutions Or Individuals…………………………..……….        106**

A.        Continued Delays by the State Personnel Board………………………………        106

**7.        An Accounting of Expenditures for the Reporting Period…………………...        108**

**8.        Other Matters Deemed Appropriate for Judicial Review..………………….        109**

A.        Coordination with Other Lawsuits………………………………………        109

B.        Master Contract Waiver Related Reporting……………………………………        109

C.   Arsenic at Kern Valley State Prison…………………………………………   110

D.   Mini-Region Crisis Response Project…………………………………..   110

**9.    Conclusion…………...…………………………………………………………...   112**

# Section 1
# Introduction

During the reporting period, the Governor and Attorney General of the State of California executed a "flip-flop" and "bait and switch." The immediate victims of the State's turnabout are four federal district courts and respect for the rule of law; the ultimate victims are the tens of thousands of class members who are waiting for constitutionally required improvements in their medical care as well as the citizens of the State of California.

In four separate cases before four different federal judges - cases dealing with (1) medical care, (2) mental health care, (3) dental care, and (4) compliance with the Americans with Disabilities Act – the State has conceded that its prison healthcare system provides unconstitutional care and has agreed to dozens of court remedial orders. The State has proven itself in each of these cases to be incapable of implementing on its own the orders to which it has agreed. Since the appointment two years ago of a Receiver, and, accelerating during the early part of 2008, the four courts have sought to coordinate implementation of their remedial orders through the Office of the Receiver. Earlier this year, the Receiver produced a comprehensive Turnaround Plan of Action that, when implemented, is almost certain to end the medical care case and will contribute to the termination of the three other class actions. The Turnaround Plan of Action contains a schedule for completion (i.e., four to five years) and estimated costs of completion. The State reviewed drafts of the plan as it was being prepared and did not object to the court's adoption to the plan, no doubt because it represented then, and still represents, the only cost-effective plan anyone has produced for securing timely compliance with the binding court orders in these cases. No one else – not the Governor, not the Attorney General, and not the Secretary of the California Department of Corrections and Rehabilitation (CDCR) – has produced anything approaching a plan for compliance.

We have begun to implement the Turnaround Plan of Action, and progress is well underway on five of the six Goals. However, the Receivership now finds itself under attack from a variety of fronts, repeatedly diverted from essential tasks, and forced to devote significant resources to overcoming a renewed surge of faulty State decisions and bureaucratic ineptitude. Some of the major problems encountered by the Receivership during this reporting period can be summarized as follows:

1. Construction Delays
   Following two years of cooperation with the State, and intensified coordination between the four class actions, the Receiver's healthcare upgrade program and facility construction program are now delayed because of the Governor's and Attorney General's refusal to work with the federal court to develop a funding mechanism that is in the best interest of California's taxpayers and at the same time refusing to engage meaningfully in coordinated planning.

1

2. Overcrowding

The CDCR's overcrowding continues to increase. The CDCR population in December of 2008 exceeded 171,000 prisoners (more than 800 prisoners above the CDCR fall projections). 611 prisoners were awaiting a suitable Level IV high-security bed; 35 wheel-chair bound inmates were awaiting accessible beds; and the backlog for sensitive need inmates approached all-time highs. For example, 499 Level II inmates were backlogged in Reception Centers awaiting sensitive need yard placement; 156 of the 499 inmates required Correctional Clinical Case Management System (CCCMS) level of mental health care. 642 Level III inmates were awaiting sensitive need yard placement; 333 of the 642 were backlogged in Reception Centers and 104 required CCCMS-level mental health care. Even worse, 767 Level IV prisoners were awaiting sensitive need yard placement; 403 of the 767 required CCCMS-level of mental health care. The State's inability to manage its prison population, combined with its refusal to fund necessary medical treatment facilities, is yet another reaffirmation that the State simply does not know what to do to address prison healthcare in a cost effective manner.

3. Budget Mismanagement

Without question, the State faces serious budget shortfalls, some of which have been created by economic factors beyond the State's control and some of which are the responsibility of the Schwarzenegger Administration. The Administration's response to this crisis, in terms of how it impacts upon the delivery of healthcare in California's prison system, is scattershot, unpredictable and inappropriate. Proposed State corrective actions violate federal court orders and will, in both the short and long-term, serve only to increase existing State funding shortfalls. In essence, the Governor's response to the budget crisis ignores the inescapable fact that prisons must operate 24-hours a day, 7 days a week. Clumsy and poorly planned emergency orders have actually rendered the situation worse than it needs to be, creating chaos in the Executive Branch at a time when deliberative, realistic planning is the appropriate response.

For our part, the Receivership is accelerating implementation of a utilization management system (UM) to reduce costs of specialty and hospital care; we will soon contract with a third-party administrator to audit hospital and out-of-system provider charges; and we are already avoiding tens of millions of dollars in unnecessary drug costs by aggressively managing the pharmacy program. The solution to budget problems is careful attention to program prioritization and design, utilization of performance measures and keeping focused on task. Unfortunately, the State has for most of this decade careened from budget crisis to budget crisis.

4. Re-Runs

As the State increasingly flounders, the Receiver has been forced to deal with problem-situations for the second or third time. In other words, issues previously resolved with the State continue to arise, apparently with the approval of the State officials. For example, on December 30, 2008, the Receiver's attorneys received an e-mail from the Prison Law Office calling attention to the fact that Ray Garcia, Office Services Supervisor I, and Peter Vanni, Associate Warden, Business Services at Mule Creek State Prison denied an

inmate appeal concerning whether the Receiver is entitled to confidential legal mail status (Refer to Appendix 1). This same issue, however, arose approximately 18 months earlier. At that time, CDCR correctly conceded that inmate correspondence addressed to the Receiver is entitled to confidential mail status pursuant to law and California's regulation. George J. Giurbino's memorandum of October 5, 2007, is included as Appendix 2. Nevertheless, this issue has again arisen, diverting the Receiver's staff from more important duties and wasting valuable public resources. As another example, the Warden at Kern Valley State Prison refused to provide the mother of a prisoner (who had a lengthy mental health record) his medical documents after he was beaten to death, apparently by his cell mate. Inappropriately relying on an inexcusably delayed criminal investigation of the murder at Kern Valley State Prison, the Warden in conjunction with the Public Information Officer and a CDCR lawyer simply ignored the Receiver's policies as well as California law. In December 2007, the mother sent Kern Valley State Prison a written request for her son's health records. As of April 2008, she had not received a response to her request and the matter was brought to the attention of the Receiver. Upon contacting the Kern Valley State Prison litigation coordinator to inquire about the matter, the Receiver was first informed that the request was never received. Upon further investigation, Kern Valley State Prison staff determined that the request was received, but not responded to due to an ongoing criminal investigation. Kern Valley State Prison then sent the mother a letter denying her request. Incredibly, the decision was made by CDCR to treat the request not as a mother's request for her deceased son's health records but as a California Public Records Request. Correcting the situation required an investigation and numerous calls and meetings.

5. "Putting Out Fires" Ignited by the Schwarzenegger Administration

Instead of working to save lives and implementing cost cutting initiatives, the Receiver has been forced to utilize his limited resources to "put out fires" created by the State. Examples of problems that arose during this reporting period are set forth and include the following: (1) the State's failure to fund the healthcare monitoring of the out-of-state prison transfers; (2) the State's failure to provide water to prisoners at Kern Valley State Prison that is free of unacceptable levels of arsenic; and (3) the State's refusal fully to fund the audit program that had so carefully been negotiated between the parties and the Office of the Inspector General (OIG), an audit program that is critical to evaluating progress towards compliance with court orders.

No purpose is served attempting to prove the personal or political motivations which have led the Governor to renege on his Administration's assurances to pursue a public-private financing transaction to support the Receiver's construction program if legislation failed, or which now drive the Attorney General to attempt to rewrite the history of four federal court class action cases and wage a war against district court orders to which the State has previously agreed. However, the threat to the orderly administration of justice from their actions cannot be ignored. Court orders are not Hollywood contracts where "net profits" are meaningless tokens and promises to perform are cheaply given and then ignored when convenient. Public officials who choose to run their political campaigns for higher office against implementation of valid court orders trample the separation of

3

powers and actively promote disrespect for the courts.  There are appropriate legal processes for challenging and reconsidering court orders; however, flat out disobedience of court orders is not the appropriate course of action.

In light of the State's reversal of position, the Receiver is forced to the following conclusions:

A.  Without the needed clinical facility upgrades at the existing 33 prisons and without the needed construction of healthcare facilities, as called for in Goal 6 in the Turnaround Plan of Action, the Receiver's overall program to bring California's prison medical care into compliance with court orders cannot be effectuated at current CDCR population levels.  In short, absent the capital investment requested by the Receiver, CDCR's population must be significantly reduced.  If CDCR's substantial overcrowding is not going to be addressed by the Receiver's healthcare construction program, which was a foundational premise for the other Goals in the Turnaround Plan of Action, the Receiver can only conclude that overcrowding is, and will continue to be, the primary cause of the State's inability to provide constitutionally adequate care.

B.  Unless and until the Governor and Attorney General cease their efforts to thwart the court's orders and the objectives of the Receivership, the cost and duration of the Receivership will only increase, and perhaps significantly so.

C.  Consistent with the court's orders, the Receiver's vision statement calls for the creation of the prison medical delivery system which "the State can successfully manage and sustain."  However, the current game playing by the Governor and Attorney General provide uncontroverted evidence that the State, or at least this Administration, has neither the will nor the competence to sustain any form of constitutionally adequate healthcare in California's prisons, demonstrating, yet again and in the most unfortunate manner, the need for continued and perhaps more intrusive intervention by the federal courts.

To provide at least one example of this, the Receiver, attorneys for the parties, the court's Pro Bono Consultant, and the OIG have worked together for more than year to develop an effective, objective, and fiscally responsible method for a State oversight agency to monitor the progress made by the Receivership to deliver care within California's prisons.  Essentially, the OIG, through intensive prison audits, has developed a program which measures compliance with the Stipulated Court Orders that the State of California established as the constitutional minimum of medical delivery required for its prisons.  This unique program will enable the State, for the first time, to measure and report upon remedial plan effectiveness at the point of healthcare delivery.  Following continuous meetings, and a number of "pilot" inspections, all parties agreed that the OIG's process was sound and should immediately move forward.  However, at the last minute, the Attorney General instructed his lawyers to refuse to sign a stipulation calling for implementation of the

4

plan, a stipulation prepared not by the Receiver, but by the OIG itself. Shortly thereafter, the Schwarzenegger Administration slashed the OIG's budget, preventing the full implementation of this program.

D.  The original plan developed by the Receiver in April 2006 called for the Receivership to establish his remedial program while CDCR continued to manage the day to day medical operations in the prisons. Within only a few months, however, the Receiver concluded that the Receivership had to assume control over daily prison healthcare functions. Numerous factors justified this decision, including the following: 1) Healthcare operations were growing increasingly worse the longer they were managed by the State; 2) The Receiver uncovered serious problems with fiscal waste, long-standing issues which the State would not, and perhaps could not, remediate; and 3) Fiscal misconduct involving an illegal contract with Medical Development International, a contract inappropriately solicited by two Schwarzenegger appointees.

The Receiver's first step in the process was to create his own revitalized Human Resources, Contract, Procurement, and Budget infrastructure. For the most part, these were not new positions. Instead, staff who were managed by CDCR, yet whose budget was charged to Health Care, were simply transferred to the Receiver and managed by the Receiver. As a result, over a period of months, a number of very significant improvements were achieved, and the performance of these units had led to some of the early remedial plan successes (e.g. recruiting and filling 90 percent of established nursing positions with State employees).

The continued justification for this decision becomes more apparent every day. If the Receivership did not have its own effective support and administrative operations, there is no question that the current resistance being led by the Governor's Office and the Attorney General would have utterly undermined our ability to maintain forward momentum in the remedial process.

# Section 2
# Executive Summary

Despite various challenges during the September 15, 2008 through January 15, 2009 reporting period, progress continued toward attaining constitutionally adequate medical care for patient-inmates of the CDCR.  Highlights of progress include the following:

- The goal of filling 90 percent of State nursing positions statewide was achieved, and the goal of filling 90 percent of State physician positions is well within reach.
- Efforts related to establishing a comprehensive UM Program have commenced and have a higher and more immediate priority.  As such, the timeline for the establishing a UM program has been accelerated to support the urgent need for cost avoidance coupled with better quality clinical outcomes.
- An audit instrument was developed to formally measure custody performance in providing health care access to patient-inmates and was implemented statewide in November 2008.
- The Credentialing and Privileging Unit staff completed the conversion of paper credential files to electronic profiles within the credentialSmart IT system for all Physicians and Surgeon, Physician Assistants, and Nurse Practitioners, Dentists, Psychiatrists, Psychologists, and Social Workers.  In total, 1,498 paper files were converted to electronic profiles.
- A "Strike Team" approach to adjudicate overdue medical invoices has been formed in an effort to eliminate the invoice backlog.

While we will continue to make progress in many important areas that will bring us closer to our goal of providing a constitutional level of healthcare within California's correctional system, the Receivership still faces several significant challenges. These include the following:

- Funding for 10,000 bed program and facility upgrade projects is delayed in litigation.
- Funding for the Central Health Services Building at San Quentin State Prison has been halted due to liquidity issues with the Pooled Money Investment Board.
- Necessary funding for the OIG's audit program and positions to monitor the out-of-state program has been withheld by the Schwarzenegger Administration.
- Although there have recently been some hopeful signs, the State Personnel Board (SPB) – which itself is struggling with insufficient resources and an awkward board governance structure - continues to delay efforts of the Receiver to hire vital leadership and management personnel.

As we continue to move forward with our efforts, these challenges will prove to be more troublesome. Only so many of the Receiver's Goals can be met if adequate funding is not provided.

Not withstanding those challenges, we do however continue to improve the usability of the Tri-Annual Report.  Below is a helpful guide to better understanding the supporting elements of the report.


Format of the Report
To assist the reader, this Report provides three forms of supporting data:

1.  *Metrics*:  Metrics that measure specific Turnaround Plan of Action initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions.

    Metrics were initially included in the Ninth Quarterly Report to the court and were also published as part of the Receiver's Turnaround Plan of Action Monthly Reports beginning in October 2008.  Monthly Reports for October, November, and December 2008 are included as Appendices 3, 4, and 5 respectively and can also be viewed at the California Prison Health Care Services (CPHCS) website (http://www.cphcs.ca.gov).

    It should be noted that some Objectives are in a planning and development stage, and therefore it is premature to implement metrics.  However, other programs (e.g., the hiring of clinical personnel) can be measured by very specific metrics.  Over time, the metrics provided in the Receiver's reports will improve in terms of both quantity and quality as new measurement systems are implemented and necessary information technology (IT) systems are established in California's prisons.

2.  *Appendices*:  In addition to providing metrics, the report also references a number of documents which are provided to the reader in the included Appendices filed concurrently with this report.

3.  *Web Site References*:  Whenever possible, appendices are provided.  In some cases, however, website references are provided to the reader.

A chart summarizing the status of each of the six Goals of the Turnaround Plan of Action is provided below.  Objectives and Actions' status indicated with a "check mark" (✓) are currently on schedule to be completed by the specified finish date.  Objectives and Actions' status with an "x" (✖) are delayed from the specified finish date.  Objectives and Actions' status with a "boxed x" (☒) are not progressing.  Objectives and Actions which have been accomplished are noted as being "complete."

A new and additional chart is also provided below indicating the percent of completion for the Objectives and Actions of the Turnaround Plan of Action.  Discussion and explanations regarding progress as well as delays are included in Section 4 with the narratives for the respective Objective or Action.

# Status of Turnaround Plan of Action Goals
## As of January 15, 2009
Case 2:90-cv-00520-KJM-SCR    Document 3462-1    Filed 01/20/09    Page 13 of 118

| 1/15/09 Status ⇩ | | | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q |
| | **GOAL 1** | **Ensure Timely Access to Care** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 1.1** | **Screening and Assessment Processes** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 1.1.1 | Develop Standardize Screening and Assessment | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 1.1.2 | Implement Screening and Assessment Process | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 1.2** | **Staffing and Processes for Health Access** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 1.2.1 | Preliminary Assessment for Access Teams | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 1.2.2 | Fully Implement Health Care Access Teams — Extended to 10/2011 | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 1.3** | **Scheduling and Tracking System** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 1.3.1 | Strategic Offender Management System | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 1.4** | **Standardized UM System** | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 1.4.1 | Long-Term Care Pilot | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 1.4.2 | Implement Centralized UM System — Shortened from 10/2010 to 6/2009 | | | | | | | | | | | | | | | | | | | | | |
| | **GOAL 2** | **Establish a Medical Services Program** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 2.1** | **Access and Processes for Primary Care** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.1.1 | Redesign sick call | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.1.2 | Implement new sick call system statewide | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 2.2** | **Chronic Care** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 2.2.1 | Chronic Care Initiative — Extended to 12/2009 | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 2.3** | **Emergency Medical Response System** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 2.3.1 | Emergency Medical Response Policy — Extended to 3/2009 | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.3.2 | Certification and Training | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.3.3 | Standardize Emergency Equipment | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 2.4** | **Specialty Care and Hospitalization** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.4.1 | Utilization and Care Management Policies | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 2.4.2 | Statewide Specialty Care Contracts | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 2.4.3 | Specialty Care Invoice Payments | | | | | | | | | | | | | | | | | | | | | |

**Status of Turnaround Plan of Action Goals**
**As of January 15, 2009**
Case 2:90-cv-00520-KJM-SCR   Document 3462-1   Filed 01/20/09   Page 14 of 118

| 1/15/09 Status ⇩ | | | 2008 2nd Q | 2008 3rd Q | 2008 4th Q | 2009 1st Q | 2009 2nd Q | 2009 3rd Q | 2009 4th Q | 2010 1st Q | 2010 2nd Q | 2010 3rd Q | 2010 4th Q | 2011 1st Q | 2011 2nd Q | 2011 3rd Q | 2011 4th Q | 2012 1st Q | 2012 2nd Q | 2012 3rd Q | 2012 4th Q | 2013 1st Q | 2013 2nd Q |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **GOAL 3** | **Recruit, Train & Retain Medical Workforce** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 3.1** | **Physician and Nurse Recruitment** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.1.2 | Physician and Physician Executive Positions | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 3.2** | **Management Structure** | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 3.2.1 | Establish and Staff Executive Leadership | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 3.2.2 | Establish and Staff Regional Leadership | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 3.3** | **Professional Training for Clinicians** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 3.3.1 | Orientation and Preceptor / Proctoring | | | | Extended to 5/2009 | | | | | | | | | | | | | | | | | |
| ✔ | Act 3.3.2 | CME Accreditation | | | | | | | | | | | | | | | | | | | | | |
| | **GOAL 4** | **Quality Improvement Programs** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.1** | **Quality Measurement and Evaluation Program** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.1.1 | Measurement, Eval. and Patient Safety Programs | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 4.1.2 | OIG Audit Program | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.2** | **Quality Improvement Program** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.1 | Train and Deploy QI Advisors to Develop Model | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.2 | Establish a Policy Unit | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.2.3 | Implement Improvement Programs | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.3** | **Medical Peer Review Process** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 4.3.1 | Establish Peer Review Process | | | Extended to 3/2009 | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.4** | **Medical Oversight Unit** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.4.1 | Staff and Establish Medical Oversight Unit | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.5** | **Health Care Appeals** | | | | | | | | | | | | | | | | | | | | | |
| complete | Act 4.5.1 | Centralize Appeals, Correspondence & Habeas | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 4.5.2 | Health Care Appeals Task Force & Report | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 4.6** | **Out-of-State & Other Facilities** | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 4.6.1 | Administrative Unit for Oversight | | | | | | | | | | | | | | | | | | | | | |

**Status of Turnaround Plan of Action Goals**
**As of January 15, 2009**
Case 2:90-cv-00520-KJM-SCR    Document 3462-1    Filed 01/20/09    Page 15 of 118

| 1/15/09 Status ⇩ | | | 2008 | | | 2009 | | | | 2010 | | | | 2011 | | | | 2012 | | | | 2013 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q | 3rd Q | 4th Q | 1st Q | 2nd Q |
| | **GOAL 5** | **Medical Support Infrastructure** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 5.1** | **Pharmacy Program** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.1.1 | Drug Formulary | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.1.2 | Pharmacy Policies and Practices | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.1.3 | Central-Fill Pharmacy — Extended to 10/2009 | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 5.2** | **Health Records** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.2.1 | Roadmap for Standardized Health Records | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 5.3** | **Radiology and Lab Services** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.3.1 | Determine strategy for HR, Lab and Radiology — Extended to 1/2009 | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 5.4** | **Clinical Information Systems** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 5.4.1 | Establish Clinical Data Repository | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 5.5** | **Telemedicine Program** | | | | | | | | | | | | | | | | | | | | | |
| ✘ | Act 5.5.1 | Secure Leadership for Upgrade | | | | | | | | | | | | | | | | | | | | | |
| | **GOAL 6** | **Clinical, Administrative & Housing** | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 6.1** | **Upgrade Program** | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.1.1 | Assessment & Planning at 33 Institutions | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.1.2 | Upgraded Administrative & Clinical Facilities | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 6.2** | **10,000 Bed Expansion Program** | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.1 | Pre-Planning on All Sites | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.2 | Construction at First Site | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.2.3 | Phased Construction Program | | | | | | | | | | | | | | | | | | | | | |
| | **Obj. 6.3** | **San Quentin Construction** | | | | | | | | | | | | | | | | | | | | | |
| ✔ | Act 6.3.1 | All Construction excluding Central Health Services | | | | | | | | | | | | | | | | | | | | | |
| ☒ | Act 6.3.2 | Central Health Services | | | | | | | | | | | | | | | | | | | | | |

10

# Turnaround Plan of Action Goals
## Percent Complete
### As of January 15, 2009

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 1** | **Ensure Timely Access to Care** | | | | | | | | | | |
| **Obj. 1.1** | **Screening and Assessment Processes** | | | | | | | | | | |
| Act 1.1.1 | Develop Standardize Screening and Assessment | | | | | | | 70% | | | |
| Act 1.1.2 | Implement Screening and Assessment Process | 0% | | | | | | | | | |
| **Obj. 1.2** | **Staffing and Processes for Health Access** | | | | | | | | | | |
| Act 1.2.1 | Preliminary Assessment for Access Teams | | | | | | | | | 90% | |
| Act 1.2.2 | Fully Implement Health Care Access Teams | | 20% | | | | | | | | |
| **Obj. 1.3** | **Scheduling and Tracking System** | | | | | | | | | | |
| Act 1.3.1 | Strategic Offender Management System | 10% | | | | | | | | | |
| **Obj. 1.4** | **Standardized UM System** | | | | | | | | | | |
| Act 1.4.1 | Long-Term Care Pilot | 10% | | | | | | | | | |
| Act 1.4.2 | Implement Centralized UM System | | 20% | | | | | | | | |

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Turnaround Plan of Action Goals
## Percent Complete
### As of January 15, 2009

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 2** | **Establish a Medical Services Program** | | | | | | | | | | |
| Obj. 2.1 | **Access and Processes for Primary Care** | | | | | | | | | | |
| Act 2.1.1 | Redesign sick call | | 20% | | | | | | | | |
| Act 2.1.2 | Implement new sick call system statewide | | 20% | | | | | | | | |
| Obj. 2.2 | **Chronic Care** | | | | | | | | | | |
| Act 2.2.1 | Chronic Care Initiative | 10% | | | | | | | | | |
| Obj. 2.3 | **Emergency Medical Response System** | | | | | | | | | | |
| Act 2.3.1 | Emergency Medical Response Policy | | | | | | | | 80% | | |
| Act 2.3.2 | Certification and Training | | | 30% | | | | | | | |
| Act 2.3.3 | Standardize Emergency Equipment | | | 35% | | | | | | | |
| Obj. 2.4 | **Specialty Care and Hospitalization** | | | | | | | | | | |
| Act 2.4.1 | Utilization and Care Management Policies | | 20% | | | | | | | | |
| Act 2.4.2 | Statewide Specialty Care Contracts | | | | | | 60% | | | | |
| Act 2.4.3 | Specialty Care Invoice Payments | 15% | | | | | | | | | |
| **GOAL 3** | **Recruit, Train & Retain Medical Workforce** | | | | | | | | | | |
| Obj. 3.1 | **Physician and Nurse Recruitment** | | | | | | | | | | |
| Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | | | | | 100% |
| Act 3.1.2 | Physician and Physician Executive Positions | | | | | | | | | 90% | |
| Obj. 3.2 | **Management Structure** | | | | | | | | | | |
| Act 3.2.1 | Establish and Staff Executive Leadership | 10% | | | | | | | | | |
| Act 3.2.2 | Establish and Staff Regional Leadership | 10% | | | | | | | | | |
| Obj. 3.3 | **Professional Training for Clinicians** | | | | | | | | | | |
| Act 3.3.1 | Orientation and Preceptor / Proctoring | | | | 40% | | | | | | |
| Act 3.3.2 | CME Accreditation | | | | | 50% | | | | | |

\* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Turnaround Plan of Action Goals
## Percent Complete
### As of January 15, 2009

| | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 4** — **Quality Improvement Programs** | | | | | | | | | | |
| **Obj. 4.1** — **Quality Measurement and Evaluation Program** | | | | | | | | | | |
| Act 4.1.1 — Measurement, Eval. and Patient Safety Programs | 10% | | | | | | | | | |
| Act 4.1.2 — OIG Audit Program | | 20% | | | | | | | | |
| **Obj. 4.2** — **Quality Improvement Program** | | | | | | | | | | |
| Act 4.2.1 — Train and Deploy QI Advisors to Develop Model | | | | 40% | | | | | | |
| Act 4.2.2 — Establish a Policy Unit | | 20% | | | | | | | | |
| Act 4.2.3 — Implement Improvement Programs | 10% | | | | | | | | | |
| **Obj. 4.3** — **Medical Peer Review Process** | | | | | | | | | | |
| Act 4.3.1 — Establish Peer Review Process | | | 30% | | | | | | | |
| **Obj. 4.4** — **Medical Oversight Unit** | | | | | | | | | | |
| Act 4.4.1 — Staff and Establish Medical Oversight Unit | | | | | | | | | | 100% |
| **Obj. 4.5** — **Health Care Appeals** | | | | | | | | | | |
| Act 4.5.1 — Centralize Appeals, Correspondence & Habeas | | | | | | | | | | 100% |
| Act 4.5.2 — Health Care Appeals Task Force & Report | | | 30% | | | | | | | |
| **Obj. 4.6** — **Out-of-State & Other Facilities** | | | | | | | | | | |
| Act 4.6.1 — Administrative Unit for Oversight | | | | | 50% | | | | | |

13

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Turnaround Plan of Action Goals
## Percent Complete
### As of January 15, 2009

| | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 5** — **Medical Support Infrastructure** | | | | | | | | | | |
| **Obj. 5.1** — **Pharmacy Program** | | | | | | | | | | |
| Act 5.1.1 — Drug Formulary | | | | | | | | | 90% | |
| Act 5.1.2 — Pharmacy Policies and Practices | | | | | | 60% | | | | |
| Act 5.1.3 — Central-Fill Pharmacy | | 20% | | | | | | | | |
| **Obj 5.2** — **Health Records** | | | | | | | | | | |
| Act 5.2.1 — Roadmap for Standardized Health Records* | | | | | | 60% | | | | |
| **Obj. 5.3** — **Radiology and Lab Services** | | | | | | | | | | |
| Act 5.3.1 — Determine strategy for HR, Lab and Radiology* | | | | | | | | | 90% | |
| **Obj. 5.4** — **Clinical Information Systems** | | | | | | | | | | |
| Act 5.4.1 — Establish Clinical Data Repository | | | 30% | | | | | | | |
| **Obj. 5.5** — **Telemedicine Program** | | | | | | | | | | |
| Act 5.5.1 — Secure Leadership for Upgrade | | | | 40% | | | | | | |
| **GOAL 6** — **Clinical, Administrative & Housing** | | | | | | | | | | |
| **Obj. 6.1** — **Upgrade Program** | | | | | | | | | | |
| Act 6.1.1 — Assessment & Planning at 33 Institutions | 10% | | | | | | | | | |
| Act 6.1.2 — Upgraded Administrative & Clinical Facilities | 5% | | | | | | | | | |
| **Obj. 6.2** — **10,000 Bed Expansion Program** | | | | | | | | | | |
| Act 6.2.1 — Pre-Planning on All Sites | | | | | | 60% | | | | |
| Act 6.2.2 — Construction at First Site | 0% | | | | | | | | | |
| Act 6.2.3 — Phased Construction Program | 0% | | | | | | | | | |
| **Obj. 6.3** — **San Quentin Construction** | | | | | | | | | | |
| Act 6.3.1 — All Construction excluding Central Health Services | | | | | | | | 80% | | |
| Act 6.3.2 — Central Health Services | | | | | | 60% | | | | |

14

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Section 3
# The Receiver's Reporting Requirements

This is the tenth report filed by the Receivership, and the fourth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

    1.  All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

    2.  Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

    3.  Particular success achieved by the Receiver.

    4.  An accounting of expenditures for the reporting period.

    5.  Other matters deemed appropriate for judicial review.

(Appointing Order at p. 2-3.)

In support of the coordination efforts by the four federal courts responsible for the major health care class actions pending against the CDCR, the Receiver now files Tri-Annual Reports in four different federal court class action cases. An overview of the Receiver's enhanced reporting responsibilities is included below.

### *Plata, Coleman, Perez* and *Armstrong* Coordination Reporting Requirements

The Joint Order filed on June 28, 2007 in *Coleman v. Schwarzenegger* (mental health care), *Perez v. Tilton* (dental care) and *Plata v. Schwarzenegger* (medical care) approved various coordination agreements made between the representatives of the three health care class actions. (Order Approving Coordination Agreements Attached to Joint May 29, 2007 Order, hereinafter "Joint Coordination Order.") These coordination agreements provide for the *Plata* Receiver to assume responsibility for the following: (1) direct oversight of contracting functions for medical, dental, and mental health care; (2) implementation of long-term IT systems to include the medical, dental and mental health programs; and (3) oversight of pharmacy operations serving the medical, dental, and mental health programs. (Joint Coordination Order at 2.)

The Receiver's assumption of these responsibilities is coupled with reporting requirements which mandate that the Receiver file progress reports addressing the following: (a) all tasks and metrics necessary to the contracting functions, implementation of long-term IT, and pharmacy services for mental health care and dental care, with degree of completion and date of anticipated completion for each task and metric; (b) particular problems being faced by the Receiver in accomplishing remedial goals; and (c) particular successes achieved by the Receiver in accomplishing remedial goals. (Joint Coordination Order at 2-3.)

Additional reporting requirements were subsequently placed on the Receiver following his assumption of the management of certain coordinated functions involving the delivery of

Americans With Disability Act (ADA) related services in California prisons. (August 24, 2007 *Armstrong v. Schwarzenegger* Order Approving Coordination Statements.")

On February 26, 2008, the *Plata*, *Coleman*, *Perez* and *Armstrong* courts issued an additional joint order which provides for the Plata Receiver to manage two major prison health care construction projects: (1) upgrades to improve health care delivery at the existing 33 CDCR institutions, and (2) the construction, on existing prison sites, of health care facilities for up to 10,000 patient-inmates [Order filed February 26, 2008 (hereinafter "Order Approving Construction Agreement")]. As with the prior coordination Orders, the Receiver was ordered to file reports in each case "concerning developments pertaining to matters that are the subject of the construction agreement." (Order Approving Construction Agreement at 3:1-3.)

Modification to Receiver's Reporting Frequency
On November 19, 2008, the court issued the "Order Modifying Reporting Requirements" which modified the Receiver's requirement to file reports with the four federal courts every three months (quarterly) to every four months (tri-annually). Therefore, the Receiver will now file Tri-Annual Reports on or before January 15, May 15, and September 15 each year.

Integration of Coordination Related Reporting in This Tri-Annual Report
Pursuant to the mandates of the various coordination Orders referenced above, the Receiver's remedial umbrella now encompasses the following: the overhaul of the health care contract function; the implementation of long-term IT systems; the oversight of pharmacy operations for medical, mental health, dental and ADA patient-inmates; and the oversight of health care prison construction projects. As such, when this Tri-Annual Report describes progress and challenges facing reform of contracting functions, IT systems, pharmacy operations, and construction, all such references are referring to mental health, dental, ADA and medical care for patient-inmates. Specifically, the Receiver's Coordination-related reporting is set forth in the following sections of this Report: Credentialing and Privileging of Health Care Providers (Goal 4, Objective 4.2); Contracts (Goal 2, Objective 2.4); IT Update (Goal 1, Objective 1.3; Goal 5, Objective 5.4); Telemedicine Reform (Goal 5, Objective 5.5 ); Coordination with Other Lawsuits (Section 8.A.); and Construction (Goal 6).

Reporting Related to the Order Waiving State Contracting Statutes
On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. As ordered by the court, the Receiver provides a summary of each contract the Receiver has awarded under the substitute contracting process during the reporting period. The Receiver's contract waiver-related report is provided in Section 8.B.

# Section 4
# Status of Turnaround Plan Initiatives

## Goal 1. Ensure Timely Access to Health Care Services

**Objective 1.1.**    Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

> ### *Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*

When patient-inmates first enter the correctional system, they receive an initial health screening at a Reception Center prior to endorsement to a mainline institution. Under optimum conditions and processes, this initial health screening allows health care providers to stratify patients based upon health risk and refer patients to timely and appropriate clinical services. Without effective and timely screening at Reception Centers, the process could fail to identify patients that may have immediate or chronic life-threatening medical conditions. There is potential for disruptions in the continuity of care to occur, such as failure to fill essential prescriptions, which can have life-threatening effects, and patients may be placed at institutions ill-equipped to accommodate patients' medical needs, among other negative outcomes.

A pilot program at San Quentin State Prison was initiated in 2006 to improve the existing reception screening process and bring it into alignment with national guidelines for health screening; provide screening on the same day as the inmate's arrival to prevent lapses in care; and integrate dental, mental health, and medical screening processes. The integrated screening includes laboratory testing and medication review and administration. Implementation of the redesigned reception center process at San Quentin State Prison resulted in a reduction in sick call requests in all disciplines and a reduction in emergency care encounters and hospitalizations.

The Reception Center project is on schedule to develop, test, select and implement reception center process and policy improvements in all major Reception Centers, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:* Development of standardized reception screening and assessment processes and piloting of these processes are on schedule to be completed by January 2009.

The second Reception Center project pre-pilot work commenced at the R.J. Donovan Correctional Facility in August 2008. In collaboration with the local leadership at the institution, the Reception Center Core Team conducted a facility assessment, baseline data collection, and assisted in arranging for necessary physical space modifications. Using lessons learned from the R.J. Donovan Correctional Facility pilot project and from the pilot at San Quentin State Prison, a new, standardized reception screening process was created. R.J. Donovan Correctional Facility began live operation of these new processes in December 2008.

17

Specific improvements to the previous CDCR reception center process are as follows:

1. All Reception Center patient-inmates, regardless of security classification, are received at a single location for initial health care triage.
2. Patient-inmates with urgent or emergent conditions are immediately referred to the Treatment and Triage Area (TTA) or other treatment facility as ordered by a provider.
3. All other patient-inmates are held within the Reception Center area buildings until their health screening has been completed.

A daily intake log is maintained to collect performance data. Each inmate's name, CDCR number and date of birth is recorded and verified against the county manifest. Data collected includes bus arrival date and time, date the health screening is completed, follow up appointment date if any, date and time that priority medications were received, and notations or comments to explain any incomplete entries. The following data will be used to track the performance of the new processes against the following performance measures:

1. By January 31, 2009, 99 percent or more patient-inmates will be triaged by a Registered Nurse (RN) or provider on the day of arrival at the R.J. Donovan Correctional Facility pilot Reception Center.
2. By January 31, 2009, 95 percent or more of all patient-inmates will have received a full health screening within two business days after arrival at the R.J. Donovan Correctional Facility pilot institution Reception Center.
3. By January 31, 2009, 95 percent or more of priority medications will be delivered to the patient-inmates within 24-hours of arrival at the R.J. Donovan Correctional Facility pilot institution Reception Center.
4. By January 31, 2009, 95 percent or more of patients who needed a primary care provider-line follow up appointment will be scheduled prior to leaving the R.J. Donovan Correctional Facility pilot institution Reception Center.

A third pilot program will commence at North Kern State Prison in April 2009. Once tested, evaluated and validated (as effective improvements) or redesigned (based on the lessons learned at San Quentin State Prison, R.J. Donovan Correctional Facility, and North Kern State Prison), the new pilot processes will be introduced to the remaining Reception Centers beginning in late Spring 2009. Prior to that date, the cumulative learning, process design, and testing results from the three pilot Reception Centers will be consolidated and a new statewide Reception Center policy will be submitted to the Receiver for review and approval.

### Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons

Screening and assessment processes are on schedule to be implemented at the major Reception Centers prisons by January 2010. Following the implementation of the pilot processes at San Quentin State Prison, R.J. Donovan Correctional Facility, and North Kern State Prison, as described above, the Reception Center Core Team will fully implement the new, standardized process at the other major Reception Center prisons by the end of 2009. Major Reception

Centers are defined as those with the highest inmate volume and those where the Reception Center process is their sole mission. Major Reception Centers where the new process will be implemented in 2009 include North Kern State Prison, Wasco State Prison, Central California Women's Facility, Valley State Prison for Women, California State Prison - Los Angeles County, California Institution for Women, Deuel Vocational Institute and the California Institution for Men. These institutions, together with R.J. Donovan and San Quentin, receive approximately 85 percent of all arriving Reception Center patient-inmates. (Note: The new standardized Reception Center processes will also be implemented at the remaining non-major Reception Center sites by mid-2010.)

**Objective 1.2.** **Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

*Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution*

*Preliminary Operational Assessments:* This Action is on schedule to be completed by the end of January 2009, as set forth in the Turnaround Plan of Action. As previously reported in the Ninth Quarterly Report, Preliminary Operational Assessments have been completed at 32 CDCR institutions. The last Preliminary Operational Review is scheduled to be conducted during the week of January 26 – 30, 2009 at Pelican Bay State Prison.

*Operational Re-Assessments:* During this reporting period, the remaining five Operational Re-Assessments were completed as planned at the following institutions: Ironwood State Prison, High Desert State Prison, California Correctional Center, California State Prison - Solano, and R.J. Donovan Correctional Facility. These assessments resulted in the recommendation of 298.66 correctional officer positions for use as clinic officers, escort officers and transportation officers. An additional 41.94 supervisory/management positions were also recommended to provide the appropriate level of supervision.

As reported in previous reports to the court, after completing approximately half of the Preliminary Operational Reviews, the methodology and analysis used to determine staffing needs was perfected whereby the results effectively identified standardized staffing needs for inside the prison custody posts functions at all prisons. Therefore, the decision was made to return to the initial eight institutions where the Preliminary Operational Reviews were conducted and complete Operational Re-Assessments so that staffing for all inside the prison custody posts could be completed. Although this accelerated adaptation to the original plan has expedited the completion of fully implementing Health Care Access Units at all institutions, the change also earmarked staffing resources to each institution in much larger quantities and much sooner than was originally planned nineteen months ago. As a result, there are insufficient resources available in the current year budget for distribution to each institution in keeping with the resource needs identified through the review process. A total of 820 additional positions are

needed to complete the inside the prison staffing requirements statewide for all health care access custody needs.

To summarize, the last Preliminary Operational Assessment (Pelican Bay State Prison) will be completed by the end of January 2009. The Preliminary Operational Assessments combined with the eight Operational Re-Assessments have identified all inside the prison custody resources needed at each location to improve and facilitate patient-inmate access to various health care services such as routine care, on and off-site specialty care, on and off-site emergency care, and on-site inpatient care.

> ***Action 1.2.2 By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions***

The Health Care Access Units at Avenal State Prison, California Medical Facility, and San Quentin State Prison continue to operate effectively and efficiently and are fully supported by the institution's administrative, clinical, and custody staff.

*Progress During the Reporting Period:* As reported in the Ninth Quarterly Report, 67 posts or 108.26 new positions were recommended for the activation of the Health Care Access Unit at Correctional Training Facility. The recommended total was inclusive of all necessary positions to ensure access to care was met within the security perimeter at each of the three facilities of the institution as well as providing the necessary custody resources to provide coverage of the patient-inmates within the local community hospitals. The Receiver approved the total amount of positions, but, based on the current budgetary constraints, found it necessary to withhold the identified 54 Personnel Years (PY) for Hospital Guarding. The difference, 54.26 PY, was activated on December 1, 2008. The remaining 54 PY for custody Hospital Guarding are scheduled to be distributed later this fiscal year. Custody Support staff will continue to monitor the progress of the Health Care Access Unit at Correctional Training Facility and remedy issues as they arise.

In September 2008, Custody Support staff initiated efforts to fully implement a Health Care Access Unit for the California Institution for Men. The analysis has been completed and is currently in the finalization process. The institution is completing all necessary Operational Procedures that adequately describe the functions of the Health Care Access Unit. In addition, they are completing Post Orders of the identified staffing/posts denoting all responsibilities, duties and expectations of each post within the Health Care Access Unit. The Custody Support staff has recommended a total of 76 posts or 133.02 new positions (104.94 PY or 79 percent of which is for Hospital Guarding and 12.9 PY or 9.7 percent is for medical transportation). The Receiver has approved these positions, however, based on the current budgetary constraints the positions for the Hospital Guarding function have been withheld and will be distributed later this fiscal year or during the next fiscal year. In January 2009, the remaining 28.08 PY for inside the prison operations and transportation will be distributed to California Institution for Men for activation on March 1, 2009.

Efforts to identify the inside staffing needs at each institution are ahead of schedule, and the Custody Support staff remains on schedule to complete the assessments for Health Care Access Units at California Institution for Men, California Rehabilitation Center, California Institution for Women, and Mule Creek State Prison by June 30, 2009.  However, in light of the recent inclusion of Pelican Bay State Prison and plans to establish a Health Care Access Unit there, this action item is now slightly delayed and is scheduled to complete the implementation of Health Care Access Units statewide by October 2011.

*Monthly Health Care Access Quality Report - Data Collection Instrument:*  As previously reported to the court, an audit instrument was developed to formally measure custody performance in providing health care access to patient-inmates.  Statewide training for implementing the "Monthly Health Care Access Quality Report" (Quality Report) took place on October 14-15, 2008 and was attended by all Associate Wardens for Health Care Operations and their assigned analysts.  Although the training session was delayed from August to October 2008 due to the State's budget situation, the statewide implementation of the Quality Report did take place on November 1, 2008 with the first report submitted from each institution in December 2008.  (Refer to Appendix 6.)

The goal of the Quality Report is to collect data regarding the outcome of all health care scheduled appointments and add-on appointments.  Each outcome is recorded on the Report as "refused," "seen," or "not seen" and includes specific explanations when appointments do not occur as scheduled (e.g. patient not seen due to lack of officer, lack of transport, scheduling error; inmate moved overnight; Unit Health Record unavailable).  Half of the institutions provided viable data for the Quality Report, but unfortunately 16 institutions were unable to achieve this goal.  Follow-up was conducted with the Associate Wardens and analysts who are responsible for completion of the Quality Report and several obstacles were reported. First, given the volume of health care related ducats issued on a daily basis, some clinical schedulers do not utilize the ducat process and simply provide officers with a list of inmates to be seen. Second, clinical providers do not always coordinate with clinic officers when an inmate does not show for an appointment.  Lastly, several institutions do not have their Health Care Access positions activated and therefore relied on clinical data which does not reflect why patient-inmates are/are not seen by providers.  Custody Support staff continue to work with the institutions to resolve obstacles encountered in collecting the data for the Quality Report.  It is anticipated that data collection and reporting challenges will resolve over the next several months as the process matures.  After that point, the Custody Support staff will begin to establish benchmarks based on the data collected.

It should be noted, however, that the Turnaround Plan of Action was designed (and approved by plaintiffs and defendants) because it is an integrated plan that allowed for rapid deployment. Eliminating any critical element from the plan presents serious problems concerning timely implementation of other elements.  One of the problems insuring access to healthcare is the State's failure to staff and manage units of officers to escort prisoners from their housing unit to healthcare delivery areas.  For example, the access program is designed to move prisoners from their cell to clinical areas of the prison where healthcare is provided.  At the same time, however, the space needed to deliver services must be adequate.  Goal 6's upgrade program was designed

21

to address this problem.  Without additional clinical spaces, pill call windows, office space for support staff, and staging areas for custody Access Teams, the Receiver's Objective concerning access to health care cannot be effectuated in a timely and cost effective manner.  Simply stated, if Goal 6 is not achieved, the existing facilities will not be able to deliver health care access without population reduction and significantly increasing health care and correctional staffing to provide, for example, 18-20 hours of clinical operations per day - a far more expensive operation than the construction set forth in the Turnaround Plan of Action.

**Objective 1.3.**   **Establish Health Care Scheduling and Patient-Inmate Tracking System**

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables*

A system for the scheduling and tracking of health care appointments for patient-inmates is an essential element of providing timely access to care. General offender scheduling and movement control within the CDCR's 33 prisons and the seven new long-term care facilities will be handled by the Strategic Offender Management System (SOMS). SOMS will include four components that are critical to the success of the prison health care system: a unique identification number for each offender; real-time location information for each offender; demographic information on each offender; and a master offender schedule and scheduling prioritization system.  Specific health care scheduling needs will be handled by a new Health Care Scheduling System (HCSS), described below, which will interface with offenders' schedules in SOMS.

The SOMS project is in the vendor evaluation and selection stage of procurement. A Request for Proposals (RFP) was issued to select a system integrator and a commercially available software product for the project. Several initial proposals were received and two vendor teams were requested to submit final proposals, which are currently being evaluated.  A contract Notice of Award is scheduled to be made in January 2009. The first phase of the SOMS implementation is scheduled for early 2010 as scheduled.

The new HCSS will schedule medical, dental, and mental health care appointments for offenders based upon mandated health care requirements, offender requests, referrals, medical orders, and chronic care plans. The new system is expected to fully integrate with SOMS and the Business Information System (BIS) as well as the Clinical Data Repository (CDR) to provide a consolidated and comprehensive view of an offender's schedule.  The HCSS project is currently in the procurement phase.  For the past several months CPHCS has retained Gartner, Inc., to provide marketplace research regarding existing vendors and to learn about current practices in peer prison health care scheduling. Some of their key findings are as follows:

- No other correctional environment studied has as many offenders per institution (over 5,000 in California versus about 1,500 in states like Florida and Texas).

22

- Thirty vendors were contacted, but none offer an off-the-shelf solution encompassing Health Care, Custody, and Scheduling components that would meet CPHCS's business needs without modification.
- Fifteen correctional organizations were contacted to learn about current practices in prison health care scheduling.  Where systems were in place, a majority of organizations studied used custom-built systems for tracking and scheduling inmates, and integration between custody and health care was usually a manual process.

Gartner, Inc. also assisted CPHCS with the preparation of requirements and an RFP. The HCSS RFP was released January 2009 requesting responses from a vendor consortium that can deliver and implement an adult offender health care scheduling solution.  Contract award is scheduled to be made after July 1, 2009.   The RFP is available for review at the CPHCS website (http://www.cphcs.ca.gov). The HCSS project is on schedule, as planned.

**Objective 1.4.**   **Establish A Standardized Utilization Management System**

*Action 1.4.1. By January 2009, open long-term care units at one facility as a pilot project to assist in developing plans for other long-term chronic care facilities*

This initiative was established in the Turnaround Plan of Action as a bridge to increase the available medical beds until the Receiver's first facility of the 10,000 medical bed project is completed in 2011.  The additional beds will provide new treatment options and allow clinical staff to effectuate a number of clinical "sweeps" of Correctional Treatment Centers and other prison medical units and thereafter transfer those patients who appear the most at-risk to a higher level of care.  The California Medical Facility was identified as the pilot site for this project and planning was initiated on May 20, 2008.

During this reporting period, a number of interdisciplinary meetings have occurred including California Medical Facility executives, CPHCS clinical leaders, the Receiver's Custody Support Team and Vanir Construction Management, Inc.  The final proposal was reviewed during a stakeholder meeting on September 30, 2008, at which time the final scope was reviewed and additional options were discussed for inclusion in the project.   The options include air conditioning, epoxy flooring, furred gypsum board corridor ceilings, and handrails and were priced and submitted to the Receiver on October 17, 2008, resulting in an increased total project cost of $6.65 million to develop a total of 109 Outpatient Housing Unit (OHU) beds in "H" wing at the California Medical Facility.  In addition to the expansion of OHU beds at the California Medical Facility, the proposal will create appropriate nursing exam/treatment space, clean/soiled linen rooms, medication prep rooms, and other medical support spaces; will replace 10 Administrative Segregation cell doors within the OHU, a nurse call system, toilet/sink combo; and will provide shower area conversions and patching and painting of various walls, floors and ceilings.

This plan was approved by CDCR executive staff and the Receiver on November 5, 2008. Electrical and mechanical engineering began in late November 2008 to assess the most effective means for providing air conditioning to "H" wing and to define the electrical requirements and

impact to the project. An initial report with a recommended approach was completed at the end of December 2008 to allow the project team to proceed with bridging documents in January 2009. The project was scheduled to be advertised for bidding in February 2009, with a contract award and regulatory approvals in August 2009 (once awarded, construction will take approximately 12 months.) However, this project is now on hold due to the Governor's recent decision to oppose all prison healthcare construction regardless of necessity.

The clinical sweeps of CTCs were designed to identify the most vulnerable patients and provide them with a more protective clinical environment at California Medical Facility. Based upon the characteristics of previously identified unanticipated and preventable deaths, the Governor's recent decision to oppose funding for the Receiver's prison upgrade program will continue inappropriate conditions, continue the shortfall of desperately needed treatment beds, and thereby continue preventable prisoner deaths indefinitely.

### *Action 1.4.2. By October 2010, establish a centralized Utilization Management System*

An aggressive time frame of the UM implementation process described below is planned to begin January 2009 and be completed by June 2009. This timeline has been accelerated, from the original October 2010 completion date set forth in the Turnaround Plan of Action, to support the urgent need for cost avoidance coupled with better quality clinical outcomes. Through increased case management, miscommunication and morbidity and mortality due to lack of coordination of services should be minimized and preventable deaths decreased.

The Receiver's Turnaround Plan of Action requires the implementation of a standardized UM System. The UM System is a centralized clinical department that systematically reviews, oversees, and reports all aspects of CPHCS' use of medical and clinical resources at institutions and health care facilities within the organization. A UM program also ensures that all services which patient-inmates receive outside the organization are continuously supported and that improvement in patient care outcomes and costs are monitored.

Under the proposed organizational structure, UM processes will achieve the following:
1. Promote efficiency and increased accountability for specialist referrals, institutional bed use and community hospital admissions and discharge planning at the local, regional and Headquarters level.
2. Monitor key operating data on an ongoing basis, with appropriate distribution to key medical management so that actions can be taken to reduce unnecessary healthcare costs, and improve clinical outcomes.
3. Support institutional activity, referral, and resource management through regionally-focused teams of physicians and case managers. Outcomes and variance results will be subject to co-management, education and training.
4. Integrate centralized case management to proactively identify high risk, high cost and complex cases and coordinate the care to mitigate disease complications and lapses in care that increase morbidity and costs.

Case management will oversee clinical care coordination at all institutions so that preventive health care is regularly delivered, patients with chronic disease are seen according to recommended schedules, and referrals to specialists and community hospital activity are coordinated and tightly managed. This Action is on schedule, as set forth in the Turnaround Plan of Action. See Objective 2.4 below for an update concerning the UM pilot in the Central Region.

## Goal 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services

**Objective 2.1.   Redesign and Standardize Access and Medical Processes for Primary Care**

>   *Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models*

Access to primary care services in California's prison system is generally accomplished through a "sick call" process. Through sick call, patients submit requests for health care services, the requests are triaged, and the patient is scheduled to see a provider in accordance with timeframes specific to the acuity of the patient's medical complaint. In the Turnaround Plan of Action, the Receiver found the current sick call process to be "plagued by inconsistent local processes involving too many forms, handoffs, and opportunities for error." Additional problems included out-of-date nursing protocols, an inefficient system for diagnostic testing and follow-up, lack of access to patient records for providers evaluating patients, and insufficient scheduling and tracking mechanisms that lead to gaps in care and do not allow for effective program monitoring and evaluation.

To accomplish the Receiver's objectives pertaining to reform of the sick call process, the Access to Care Sick Call Team will implement a three-phased strategy:

- Phase I - Pilot new sick call processes and staffing models at select pilot institutions.
- Phase II - Refine pilot processes and staffing based upon the findings and lessons learned at the pilot sites.
- Phase III - Implement the approved sick call program at all CDCR institutions.

*Progress During the Reporting Period:*   The sick call program redesign is on track for completion by the target date of July 2009.  During this reporting period, the Sick Call Team continued Phase I planning to pilot redesigned sick call processes and staffing models.  In November 2008, a Project Manager joined the clinical manager, administrative team lead, correctional expert, nursing practice expert, and analysts to fully staff the Sick Call Core Team. The Sick Call Team also completed site visits at Folsom State Prison, California State Prison - Sacramento, Mule Creek State Prison, California Institution for Women, Richard J. Donovan Correctional Facility, and California Men's Colony.  The purpose of the site visits was to analyze and document current sick call triage processes and staffing models and to conduct a series of chart audits to collect baseline data to establish performance metrics.

During the reporting period, the Sick Call Team continued to research health care access programs at health care organizations such as Kaiser and the Department of Veterans' Affairs. The Team also researched established medical service access models at correctional systems including the Federal Bureau of Prisons, Texas, Oregon, Arizona and Delaware.  In addition to examining models for traditional sick call processes, the Team began to develop open access sick

call models for pilot implementation. The Team's nursing consultant, in cooperation with the pilot site nursing champions, commenced an evaluation of the existing Nursing Protocols.

During the remainder of Phase I, the Sick Call Core Team will develop and implement new sick call processes, staffing models, appropriate performance measures and program reports. Implementation at the first pilot site began in late December 2008 and will be completed by May 2009.  Phase II efforts will include an evaluation of the pilot site performance and process finalization.  Upon completion of Phase II in July 2009, the Sick Call Core Team will submit a new sick call policy, forms, and a staffing model to the Receiver for review and approval. Implementation of the approved sick call program at all CDCR institutions will be complete by July 2010, as set forth in Action 2.1.2 below.  The Sick Call implementation schedule is included as Appendix 7.

*Modifications to the Sick Call Initiative:*  In the Receiver's Ninth Quarterly Report, the Sick Call Team reported the initial strategy would be to pilot the new sick call processes at one institution. While collecting data to select the pilot site, the team documented a great deal of variation in physical plant layouts, staffing, and local processes.  Additionally, there are number of elements of overlap with the Chronic Disease Management Program project.  Sick call/primary care, for example, encompasses both patients with acute, episodic issues and chronic care patients. As a result, the Access to Care Team decided to pilot Sick Call processes and staffing models at a minimum of three of the six Chronic Disease Management Program pilot sites. (Refer to Objective 2.2 for additional information.) The six Chronic Disease Management Program pilot institutions, consisting of two institutions from each of the major geographical regions, are as follows: Folsom State Prison, Mule Creek State Prison, Central California Women's Facility, California Men's Colony, California Institution for Women, and Richard J. Donovan Correctional Facility.

### Action 2.1.2. By July 2010, implement the new system in all institutions

The redesigned sick call process action plan is on schedule for statewide implementation by the target date of July 2010.  Refer to the statewide Sick Call implementation schedule included as Appendix 7.

### Objective 2.2.   Improve Chronic Care System to Support Proactive, Planned Care

### Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered

The Receiver's Chronic Care Initiative approaches chronic disease in an entirely different manner than previously attempted by the CDCR.  The Receiver's plan includes establishing a cost effective continuum of care program through an integrated chronic care team (of different clinicians, e.g. primary care providers and nurses).  As a result, this Action calls for *both* a new patient management system and the application of adequate policies and procedures.

27

The focus of the two-phased Chronic Care Initiative is to build the infrastructure for both an effective chronic care system and an ongoing quality improvement process at each CDCR institution using a learning collaborative model. Under this initiative, each institution will learn how to establish critical elements of an effective chronic care management model, including the identification of patient subpopulations, care management and coordination, use of evidence-based treatment protocols, and implementation of patient education programs. To commence the learning process, asthma patients were selected as the sample subpopulation.

*Elements of Phase I (July 2008 through January 2009):* The pilot institutions included in Phase I are Folsom State Prison, Mule Creek State Prison, California Institution for Women, Central California Women's Facility, Richard J. Donovan Correctional Facility, and California Men's Colony. During Phase I, each of the six pilot institutions individually (1) convenes a local team to govern implementation of the chronic care model; (2) selects a pilot clinic at the institution; and (3) begins testing ways to implement the six elements of the Chronic Care Model with asthma patients as the first chronic care subpopulation using a rapid-cycle approach to ongoing quality improvement. During the six-month period of Phase I, the six institutions accomplished the items listed above and also were able to begin to spread the Chronic Care Model to additional clinics within the institution.

*Elements of Phase II (January 2009 to December 2009):* In Phase II, the original six pilot institutions will (1) form an advanced collaborative (workgroups that meet periodically to share strategies, compare outcomes, and receive technical assistance and training), moving from asthma patients to include diabetes and Hepatitis C patients over the course of 10 months; and (2) continue to fully establish the Chronic Care Model in all clinics within the institutions. Also in Phase II, the remaining 27 institutions in the CDCR, who have not yet been trained in the Chronic Care Model, will each join one of the three regional collaboratives and begin to implement the Chronic Care Model. The remaining 27 institutions' implementation will be guided by a new Chronic Disease Management Program policy and a change package which is essentially an instruction manual for program implementation with materials developed by the six pilot institutions. By February 2009, the recommended policies and forms will be submitted to the Receiver for final approval. When approved, this policy will supersede the existing Inmate Medical Services Program Chronic Care and High Risk Policy (Volume 7).

*Progress During the Reporting Period:* The Chronic Care Initiative is on schedule for completion by December 2009. The original completion date for this objective was April 2009. The reasons for the delay from the original completion date of April 2009 were outlined in the Receiver's Ninth Quarterly Report.

During the reporting period, Phase I of the Chronic Care Initiative was completed. The six pilot institutions continued to meet as a collaborative, participating in the final three of four learning sessions. During these two-day learning sessions, institution representatives shared strategies and outcomes; solved problems experienced by individual sites and collectively by the group as a whole; and received technical assistance and training with a focus on rapid-cycle improvement, the Chronic Care Model, and evidence-based treatment guidelines. Each learning session built

upon the last session to enable the implementation of the evidence-based infrastructure for managing chronic disease.

Thus far, the pilot institutions have reported great success with this Initiative, as demonstrated by both objective measures and subjective reports.

Objective Measures

During Phase I, pilot institutions monitored three key measures: 1) completion of asthma severity assessments, 2) treatment with anti-inflammatory medication per guidelines and 3) documentation of patient action plans. The pilot institutions showed a 71 percent improvement in performance in these areas during Phase I. Three of the pilot sites met the 95 percent goal in all three measures. The six pilot sites accomplished this by identifying local champions to lead change at their respective institutions, developing new physician and nurse line clinical leaders, and expanding the roles of existing clinical staff.

Subjective Reports

The change in asthma care has begun to spread by word of mouth among patients and is having a positive impact on chronic disease care as a whole. Healthcare staff are recommitting to their professions and to the power of teamwork to improve the quality of patient care. As a result, the pilot institutions are implementing the following: team-based, coordinated care; methods for continuously improving the processes of care; evidence-based standards of chronic disease care; an information system support tool – the chronic disease patient registry (detailed below); and processes to identify the sickest and most complicated of the chronically ill patients who can receive more focused case management. The Access to Care Team plans to share these additional improvements in both care delivery and the clinical work environment with the remaining institutions beginning in January 2009 using the Chronic Care Change Package which is based on the experiences of the six pilot sites.

*Electronic Care Management Registry:* Critical to the success of the Chronic Care Initiative is the implementation of an electronic patient registry which will serve as a source of quality indicators. The registry computer application automates the tracking, monitoring and managing of patient populations with chronic diseases. Patient registries can help manage panels of patients by providing three basic types of information: (1) printed patient reports with relevant clinical information provided at the point of care; (2) registry generated exception reports, which can identify those patients in need of recommended testing, procedures, or intervention (education or out of sequence visits to improve control or reassess the clinical situation); and (3) aggregate reports to assist in overall patient panel management.

The Chronic Care Initiative includes a registry customized to the needs of the yard clinics. The registry was introduced to the six pilot sites during the final Learning Session on November 19, 2008. Implementation began on December 13, 2008 at Mule Creek State Prison with lecture-based and hands-on training. The registry is being integrated into the Chronic Care Initiative statewide roll-out and is on schedule to be fully implemented by December 2009.

**Objective 2.3.**  **Improve Emergency Response to Reduce Avoidable Morbidity and Mortality**

> *Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions*

This Action is scheduled to be completed by March 2009 and is on schedule.

As indicated in the Ninth Quarterly Report, the Emergency Medical Response (EMR) Initiative is broken into five phases: Phase I – Establish emergency response policies and procedures; Phase II – Pilot the initiative in two institutions; Phase III – Modify policies and procedures based on feedback and lessons learned at the pilot institutions and from stakeholders; Phase IV – Train each institution on the new policies and procedures; and Phase V – Sustain the initiative through quarterly reviews of adherence to policy.

*Progress During the Reporting Period:*  Phase I, II, and III were completed during the prior reporting period.  During this reporting period, Phase IV of the EMR Initiative was completed which included training custody and clinical staff on the new policies and procedures.  The training was accomplished during two statewide video conference sessions on December 2 and 5, 2008.  Included in Phase IV are a pre-implementation assessment and an implementation follow-up visit.  The pre-implementation assessments identify institution specific issues/barriers in effectively implementing the EMR policies and procedures.  Following implementation of the EMR policies and procedures, each institution will have an implementation follow-up visit. Twenty-four implementation follow-up visits have been completed during the reporting period and all implementation follow-up visits will be completed by the end of January 2009.  The implementation follow-up visits are intended to address problems found during the pre-implementation assessments and to assist the institutions in implementing the policies and procedures locally.  Post-implementation reviews of the institutions have been planned and will be completed by March 2009.  The Emergency Response Initiative Deployment Schedule is included as Appendix 8.

The Receiver's Custody Support Services Division staff accompany the health care staff to the institutions and assist in the EMR policy pre-implementation, implementation follow-up, and post implementation reviews.  During these reviews, Custody Support Services Division staff acted as liaison with the local prison administration and In-Service Training staff relative to the correctional peace officer training mandates and custody's role in the EMR process.

Activities of Phase V, which focus on sustaining the EMR Initiative through quarterly reviews of adherence to policies, have commenced.  The pre-implementation assessments have been compiled into a summary "scorecard" report by region that displays percentage of compliance per institution.  These will be used as baseline measures and also to identify initial areas of focus for individual institutions.

Also, during the reporting period, the EMR team initiated revisions to the audit tool. The revised audit tool will focus on Emergency Medical Response Review Committee performance indicators which directly relate to emergency medical response. Categories of performance indicators will include response timeliness, appropriate actions taken by custody and clinical staff, outcomes of care and treatment, and documentation/review of emergency medical response incidents.

### Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff

The second component of the EMR Initiative is to develop and implement appropriate certification standards for all clinical staff and training programs for all clinical and custody staff. This action is comprised of the following elements to achieve compliance: Element I – Establish certification standards; Element II – Survey all institutions to determine the Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) training needs; Element III – Identify and/or develop training contracts for BLS, ACLS and other training that will support the overall goal of the Initiative; and Element IV – Develop a training program to sustain on-going BLS/ACLS training and certification.

This Action is on schedule to be completed by July 2009, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:* Element I - The challenge to completing Element I includes addressing impacted bargaining unit issues regarding certification standards and training. The Project Team continues to work with CPHCS's Human Resources to engage the various bargaining units to resolve these issues.

Element II - The initial survey of training needs has been completed and follow-up continues to verify BLS/ACLS training needs.

Element III – Existing contracts for BLS/ACLS training have been identified. An existing contract that provides BLS and ACLS training at 3 institutions is being expanded and a total of 18 institutions have expressed interest in participating in this contract. The new contract is a master services type contract that will enable each participating institution to choose when to schedule classes at the institution and the vendor will provide all materials needed for the training. The remaining 15 institutions not included in the master services contract will obtain BLS/ACLS training from local providers in the community. The EMR team has provided to these 15 institutions a list of the local BLS/ACLS training providers. In addition, American Heart Association certified training providers for BLS and ACLS that are in close proximity to each institution have been identified and made available to the Chief Medical Officer, Director of Nursing, and nursing educator at each institution. The CPHCS Workforce Development Unit has identified other valuable sources of training that may be able to provide online training courses. A proposal for this training is in the review/approval process.

Element IV - The ongoing BLS/ACLS training program will be developed and managed by a Workforce Development Training Officer who will begin work in January 2009.

> ### Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response

The third component of the EMR Initiative is to ensure standardization of equipment to support emergency medical response.  The successful completion of this component includes the following:  Element I – Identify critical emergency medical equipment; Element II – Inventory and deploy emergency medical treatment bags; Element III – Survey other EMR equipment needs;  Element IV – Develop procurement methods;  Element V – Procure and deploy EMR equipment;  Element VI – Develop program sustainability.  Included as Appendix 9 is the Emergency Medical Response Equipment Schedule.

This Action is on schedule to be completed by January 2009, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:*  Element I – This element has been completed.  Critical EMR equipment components have been identified and are as follows: EMR bags and standard supplies; automatic external defibrillators; defibrillators; gurneys; emergency medical response vehicles, emergency carts, pulse oximeters, and suction machines.

Element II - Deployment of EMR Bags will be completed in January 2009.  CPHCS's Procurement Services has centralized the purchase of EMR bags through the development of a procurement form for the on-going replenishment of major supplies in the bag as well as replacement of the bag.

Element III - The initial EMR equipment inventory has been completed, and staff is verifying the information collected to eliminate duplicate counts and clarify possible misinterpretation of survey questions.  Sustaining an effective EMR program also requires certain other emergency response equipment and supplies.  The Custody Support Services staff provided assistance in determining the appropriate emergency medical response equipment needs (e.g. gurneys, stair chairs) within the institution program areas and living units.

The requirement for serviceable and reliable emergency medical response vehicles has been identified for all 33 prison facilities.  Custody Support Services staff have coordinated the design, purchase, and building of two emergency medical response vehicle prototypes.  It is anticipated that the emergency medical response vehicle prototypes will be introduced as a pilot project in two prison facilities during the next reporting period.

Element IV - Development of procurement methods is complete.  CPHCS's Procurement Services has verified that all of the equipment items can be procured through existing State

procurement methods. Additionally, in order to effectively use existing staff resources, the purchase of many of the EMR items has been centralized at CPHCS Headquarters. Specific costs will be determined and total costs will be calculated based on institution need when the Element III inventory counts are verified.

Element V - Procurement and deployment of additional EMR equipment commenced during this reporting period. To effectuate a cost saving strategy, the EMR team has adopted an implementation program that will provide critical emergency medical response equipment to institutions this fiscal year to meet a minimum availability standard. Over the next several fiscal years, through attrition of existing EMR equipment, CPHCS will achieve brand/model standardization. Cost savings has been realized with the December 2008 purchase of 33 defibrillators and 71 automatic external defibrillators. This new EMR equipment will be deployed to the institutions by mid-January 2009. Procurement of the remaining EMR equipment will begin in January 2009.

## Objective 2.4.    Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals*

The UM/Case Management initiative is on schedule to be standardized statewide by June 2009, as set forth in the Turnaround Plan of Action.

Standardized UM processes will be taught, implemented and reported in the following areas:
- Referral management
- Infirmary bed management
- Community hospital admission, discharge and daily clinical review
- Case management for high risk, high cost patients and patient groups
- Care Coordination to mitigate morbidity and mortality caused by miscommunication and poor information sharing
- Utilization and cost reports

The pilots below create a program to standardize referrals and infirmary and hospital admissions so that access to care and patient outcomes can be improved and "logjams" decreased. Cost avoidance will be optimized through standardization of discharge and case management processes. Utilization and cost reports will guide clinical interventions to promote best practices and accurate decisions regarding efficient networks.

*Statewide InterQual Training:* InterQual are evidence-based clinical decision support criteria that are endorsed nationally by all Joint Commission (JCAHO) accredited hospitals. Use of InterQual criteria will help to standardize the basis for specialty care referrals and will compel providers to complete thorough patient evaluations and follow appropriate evidence-based alternatives prior to making a referral for specialty care. InterQual also provides a management reporting library that includes the Care Enhance Review Manager Enterprise will provide reports

33

which display referral outcomes and variances. This will enable monitoring of performance and institutional management effectiveness and utilization drivers and can be used as a transition application pending availability of an enterprise-wide information system. Additionally, a standardized evidence-based library of criteria to support hospital admission and discharge is available from

InterQual training for approximately 100 nurses and 50 physicians was completed on December 11, 2008 and is an integral part of the success of UM. The InterQual training includes specialty care, imaging, surgery and hospital care modules. In the future, CPHCS employees will be certified as InterQual trainers to support ongoing training needs. InterQual's 'train the trainer" program is scheduled to begin in early 2009.

*InterQual/UM Pilot:* As reported in the Ninth Quarterly Report, the InterQual UM pilot for specialty services at Folsom State Prison began in October 2008 and focused on orthopedic and imaging requests for services (RFS). To develop a baseline, RFSs were audited manually, and depending on the day, between 50 to 80 percent of RFSs retrospectively audited did not meet InterQual criteria but were referred to specialists. Then, beginning in October 2008, using InterQual for all RFS requests, only 16 percent of RFSs that did not meet InterQual criteria were referred out to a specialist. In November 2008, 22 percent of referrals that did not meet InterQual criteria were referred to specialist. Compared to the baseline data collected, this reduction in referrals is significant and creates significant cost avoidance. Similar results are expected in all institutions where InterQual is used.

*Specialty Services Pilot in the Central Region:* Learning from the experiences at Folsom State Prison, the most effective and efficient processes from that pilot are being implemented throughout the Central Region on an aggressive timeline. Implementation in the Central Region commenced in December 2008 and will be completed by early 2009.

The Central Region was selected for the next phase, as that region has the highest volume of specialty referral requests in the State and off-site providers are often great distances from institutions. Transportation challenges and the high volume of requests have created difficulties accessing specialty services in this region. Proper management will require effective oversight of UM processes and consistent application of InterQual standards. An integrated team approach with strong Headquarters support will be used in the implementation of the UM pilot process.

Medical, nursing, mental health, IT, custody, bed placement and facility support will be coordinated for this pilot as well. This interdisciplinary team will have an intensive, hands-on, "SWAT" team approach. The sustainability of the program will need ongoing support from institutional medical and nursing management and Headquarters executive and medical management. Once the UM pilot process is successfully implemented in the Central Region, the program will be replicated in the Northern and Southern Regions with a similar aggressive timeline.

*Issues Concerning Availability of Appropriate Beds:* Even with consistent application of InterQual criteria to assist in monitoring continued stays and discharges from community

hospitals, a lack of appropriate institutional beds for our complex patient population continues to produce unavoidable discharge delays and backlogs of patients awaiting appropriate institutional placement. Additionally, new patient arrivals from county jails with complex conditions that preclude housing in general populations and increased aging and chronically ill patient population compound the inaccessibility of institutional high acuity beds. Simply stated, with thousands of additional beds which can provide the necessary range of treatment options from "sheltered living" to "nursing home" to "licensed healthcare beds," adequate care and treatment cannot be provided to the thousands of aged, chronically ill, and disabled prisoner patients in the CDCR today.

*Infirmary Bed Access Pilot:* To ensure even tighter management of CPHCS infirmary beds optimizes their availability, the Infirmary Bed Access pilot began on December 4, 2008. Using a multi-disciplinary team of physicians, nurses, mental health professionals, and custody staff, regular review of all institutional beds in the Central Region will occur through clinical rounds. The Pilot objectives will include strategies to ensure standardized processes are implemented. These strategies include (1) generating standardized criteria for admission, continued stay, and discharge and (2) developing processes to accommodate both medical and mental health needs. Coordination with the clinical planning staff for the 10,000 bed project will occur to develop criteria for patient admission and discharge to the 10,000 bed project. It is anticipated that the pilot processes and criteria can be transitioned into a centralized UM department.

*Community Hospital Bed Pilot:* A separate Community Hospital Bed Pilot will focus on the identification and concurrent review of hospitalized patients in Central Region's community hospitals to ensure that discharge planning, appropriate care, and efficient services are provided. InterQual processes to admit, treat, and discharge patients to maximize continuity of care and continuity of information will be utilized. Reporting regarding these processes will profile community hospitals regarding their cost of care, and quality outcomes will increase. It is anticipated that the Community Hospital Bed Pilot will begin after the Infirmary Bed Access pilot is underway. It should be noted, however, that regardless of whether increased bed use efficiently will be achieved, given the lack of treatment beds within CDCR, healthcare staff will have no choice but to continue to use outside hospital and providers at a cost of hundreds of millions of dollars each year. Approximately 40 percent of outside provider/hospital costs could be avoided if the Governor would work with the court to develop an effective, fiscally responsible method of funding construction and activation of the Receiver's healthcare facilities.

*Clinical Care Coordinator:* Building on institutional experiences learned from the Specialty Care, Infirmary Bed Access, and Community Hospital Bed Pilots, the current UM and specialty care nursing roles at the institutions will be redesigned to a new integrated functional role of the Clinical Care Coordinator. This function is expected to replace current UM nursing positions within the institutions and will centralize coordinated and standardized reviews, assessments and management of current referral review, infirmary bed review and hospital review as well as high-risk patient case management and high-acuity patient population care coordination within one function. It is anticipated that this will decrease miscommunication and incorrect hand-offs that delay care, provide for smooth care transitions from in and out of institutions, and provide more accessible information to the primary care health team.

*Hospital Care Manager:* Concurrently, the former UM Supervisory Nursing staff will begin piloting a new functional position of Hospital Care Manager. The Clinical Care Coordinators at the institution will refer hospitalized patients to assigned Hospital Care Managers who will ensure timely discharge planning in collaboration with the hospital staff. The Hospital Care Manager will also facilitate and coordinate post-hospital discharge placement/coordination and post-discharge care with the institution's Primary Care Provider and Clinical Care Coordinator to ensure continuity of care. This pilot is expected to begin late winter 2009.

*Standardized UM Reports:* Standardized InterQual reports for the Central Region will be included in the May 2009 Tri-Annual Report. For this reporting period, the InterQual report descriptions are included as Appendix 10, and the Central Region Request for Services Reports for September, October, and November 2008 are included as Appendix 11.

### Action 2.4.2. By July 2009, establish on a statewide basis approved contracts with specialty care providers and hospitals

*Prodagio Contract Processing System:* Among the highlights of this reporting period are the continued efforts on the statewide roll-out of the Prodagio contracting system. Eleven institutions have been added for a total of 21 institutions currently online. Implementation of the remaining 12 institutions is on schedule with the target for completion in early February 2009.

*Restructuring the Health Care Invoice, Data and Provider Services and Contract Branches*: As previously reported to the court, Navigant Consulting Inc. provided CPHCS in April 2008 with a preliminary assessment of the contract and invoice processing functions. To align both the Invoice, Data and Provider Services area and the Contracts area and to transition to a best practices model as recommended in the Navigant study, CPHCS released a Request for Offer for the Healthcare Invoice Processing and Contracting Classification and Compensation Survey/Study in November 2008. No vendors responded with an offer. Subsequently, the CPS Human Resource Services was provided a copy of the Request for Offer and recently submitted an acceptable proposal. CPHCS is currently developing the Inter-Agency Agreement with CPS Human Resource Services with a mid-January 2009 effective date. CPS Human Resource Services will prepare a report that will recommend what options should be pursued along with a final package for submittals to the SPB and Department of Personnel Administration (DPA). The expected completion of the study is June 30, 2009.

*Streamlining State Contracts:* During this reporting period, efforts to update statements of work for medical specialty services and to standardize contract language have improved contract generation by reducing processing and management review times. The standardized contract boilerplates along with web-based access to contract exhibits and credential forms lessened the amount of paper and review time for our provider community as well. The Contracts Branch has experienced fewer requests for contract language modifications from providers which ultimately shortened contract processing times. These efficiencies aided in 105 non-bid medical service contracts being executed in areas such as urology, cardiology, nephrology. Twenty-eight bids for medical service master contracts for on-site temporary relief services (i.e. dentistry,

pharmacy, optometry, speech and occupational therapy) were also executed.  These contracts were executed during the current reporting period.

*Emergency Medical Services Committee:*  The CPHCS formed an Emergency Medical Services (EMS) committee in September 2008.  This multi-disciplinary body is designed to interface with community EMS entities, hospital emergency departments, fire departments and ambulance service providers statewide.  By inserting staff from CPHCS into the existing local EMS system, a proactive sense of community involvement and partnership will be accomplished.  Utilizing a phased, localized approach to initiate the program will enable CPHCS to assess the varying needs of each county and the local correctional institution.  The decisions, therefore, to interface with the local entities will be based on evidenced need, standard models and cost efficiencies.

A byproduct of the EMS committee for CPHCS will be increased knowledge of county-wide plans for services and an opportunity to participate in the decision making of those plans as they relate to correctional institutions.   Among the anticipated outcomes of the EMS committee will be to become better neighbors; implement a standardized approaches to community EMS response; and successfully negotiate rates for ambulance contracts, reducing overall emergency service costs to a reasonable level.  CPHCS's plan for implementation of these newly contracted rates will be broken into two phases with a pilot designed to evaluate positive change outcomes.  In Phase I which commenced this reporting period, CPHCS staff met with statewide external community EMS stakeholders, prepared a plan for community EMS interface, scoped the pilot, and hired a dedicated project lead. To complete Phase I, the project lead will meet with external agencies and institutions statewide to complete a preliminary performance measurement metrics, a needs assessment report and a comprehensive pilot report.  The target date for completion of Phase I is during the second quarter of 2009.   Phase II will consist of developing a comprehensive statewide plan with EMS, implementing standardized community EMS response to the institutions, and standardizing EMS provider contracts statewide. The target date for completion of Phase II is during the first quarter of 2010.

*Status of Chancellor Consulting Group Hospital and Associated Physicians Contract Negotiations:*  As of December 2008, the Chancellor Consulting Group (retained by the Receiver to re-negotiate hospital and associated physician group contracts) has successfully negotiated and executed 22 hospital letters of agreement and 11 additional letters of agreement pending approvals.  This brings the total number of hospital agreements to 33.  An associated physician provider network has been negotiated which currently totals 1,761 physicians.  At present, Chancellor Consulting Group is on schedule to complete their planned negotiations by July 2009.  To view the progress to date, Chancellor Consulting Group's December 2008 Report to the Receiver is included as Appendix 12.

> **Action 2.4.3. By July 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner**

In the past two decades, the CDCR experienced a massive increase in the number of prisoners.  This significantly affected overcrowding and the percentage of aging inmates confined to California prisons.  For example, the number of California prison inmates age 55 and over more

than doubled in an eight-year period from 1997 to 2005. A significant portion of these inmates suffer from chronic disease. At the same time, the Schwarzenegger Administration has done nothing to provide for sheltered living, nursing homes, and licensed beds for this rapidly expanding portion of the prisoner population. As a result, the CPHCS has been forced to rely upon outside contractors to provide a broad array of health care services to inmate-patients, such as hospitals for inpatient and outpatient care, specialty care physicians and laboratories.

Despite efforts to manage payments, the processing of outside provider billing has fallen behind. Several factors have contributed to the Healthcare Invoice, Data and Provider Services Branch's (HIDPSB) inability to ensure the timely processing of specialty care and hospital providers' invoices. These issues are detailed below.

*Increase in Medical Invoices:* Since Fiscal Year 2005-06, the HIDPSB has experienced an 86 percent increase in the number of medical invoices received for adjudication and data collection. HIDPSB is required to process medical invoices in compliance with the court's March 30, 2006 "Order Re State Contracts and Contract Payments Related to Service Providers for CDCR Inmate/Patients" (page 5: 10-18) and the November 8, 2006 "Supplemental Order Re State Contracts." Specifically, these Orders mandate CDCR to pay received invoices, in accordance with the California Prompt Payment Act (Government Code, Section 927 et seq.), for medical services until a plan is developed to ensure consistent and timely flow of payments. The California Prompt Payment Act requires agencies to process valid, undisputed invoices within 30 days from the date received for submission to the State Controller's Office for payment. Adhering to these mandates has been a challenge for the HIDPSB, especially considering HIDPSB has not received any staff augmentations to address the increase. Significant hours of overtime have been worked by staff in an effort to adjudicate the increased number of medical invoices. However despite their efforts, HIDPSB staff was unable to successfully absorb the increased workload or meet invoice processing goals of 30 days or less.

*Staffing Issues:* The CDCR's ancient (and entirely manual) invoice adjudication process requires numerous cumbersome processing requirements, several of which involve CDCR institution and accounting staff who were outside of HIDPSB management oversight. Although invoices are adjudicated by HIDPSB invoice processors, review and approval of the medical invoices are performed by health care staff in the various institutions. The invoices were sent via mail/courier to the institution and, depending on the institution, required numerous reviewers to verify/validate the medical services before the Approver authorizes payment. In an effort to improve management oversight and invoice processing workflow efficiencies, the decision was made, in July 2007, to move all invoice processing functions and positions to CPHCS's Headquarters location in Sacramento. As a result of this centralization, 85 percent of the experienced and knowledgeable field staff sought promotions and/or positions elsewhere rather than relocating to Sacramento. This created a void of qualified and knowledgeable invoice processors. Without experienced staff, training of new staff was extremely limited and mentoring was almost non-existent. Invoice processing was completed by existing staff in a limited capacity on an overtime basis. Nevertheless, the transition of medical invoice processing functions and positions to Headquarters was successfully completed in December 2008.

*Prodagio Invoicing System:*  Over the last year, the Prodagio system performed adequately for contract processing (as described in Action 2.4.2) but experienced ongoing performance problems with invoice processing and has consequently crippled medical invoice payments. Although software and hardware upgrades were made, as of October 2008, the Prodagio Accounts Payable continued to experience frequent periods where system response times were very slow or failed altogether.    These continuing system performance problems have significantly and negatively contributed to our ability to meet medical invoice processing goals. With only 12 institutions transitioned onto the Prodagio Accounts Payable System, HIDPSB management had grave concerns regarding the scalability of the system to all 33 institutions. Therefore, on November 17, 2008, HIDPSB discontinued processing medical invoices in the Prodagio Accounts Payable System but will continue to utilize Prodagio for contract processing. All medical invoices have transitioned back to the manual adjudication process which is completed by invoice processors located  at CPHCS Headquarters in Sacramento.

*CDCR Regional Accounting Processing Delays:* Once approved at the institution, the invoices are then handled outside of the CPHCS by the CDCR Regional Accounting Offices. The approved invoices are sent by mail/courier to the appropriate CDCR Regional Accounting Office for preparation of the claims schedule.   The Regional Accounting Office then sends by mail/courier the claim schedules to the State Controller's Office for processing of the payments. Data shows that CDCR Regional Accounting Offices have taken up to 200 days to prepare the claim schedules for submittal to the State Controller's Office.  The delays at the CDCR Regional Accounting Office can, in part, be attributed to the 86 percent increase in invoices with no staff augmentation to address the increased workload.  Also, the Schwarzenegger Administration's hiring freeze has delayed and in some cases prevented the Regional Accounting Office's ability to fill vacant positions.  Due to the Executive Order S-09-08 and Budget Letter 08-15, CDCR officials made the decision to no longer allow for overtime or hire temporary help to assist with the increased workload.  As a result, medical invoice payments have been seriously delayed and prompt payment penalties have been incurred.

The worsening situation concerning invoice processing provides a classic example of the Administration's short-sided bureaucratic thinking demonstrating again that the State is simply unable to sustain an adequate correctional system in California, and a Receiver is needed in this case.  Given the life and death necessity of maintaining contracts with specific providers and hospitals, the Administration's decision to eliminate overtime, and its refusal to hire the staff necessary to process thousands of delayed invoices, is yet another display of its new-found contempt for adequate prison health services and court orders.

Furthermore, the Administration made this decision, knowing that the Receiver is in the process of renegotiating contracts with outside specialty providers and hospital.  As a direct result of invoice processing problems, many hospitals now demand higher rates.  In the long run, the Administration's refusal to fund overtime will cost California taxpayers far more money.  CDCR accounting processes are a key component of the healthcare invoice payment system.  However, since CDCR is unable to do the job in a timely manner, and the Schwarzenegger Administration's has taken the position that it will do nothing to correct the situation, the

Receiver has no choice to move these accounting functions to CPHCS and thereby manage the backlog.

As displayed on Table 1 below, medical invoice processing days have significantly increased from July 2007 through November 2008.

**Table 1.**



**Statewide Invoice Processing Days - July 1, 2007 through December 17, 2008**

*Table 1 Results Explanation:*
*Prodagio institutions include CCWF, CMF, PBSP, SAC, SQ, VSPW, FSP, SOL, CCC, COR, HDSP and SATF.*
*Data represents invoices processed for FY 07/08 and 08/09 based on "TblInvoices" in the Contract Management Database. As of December 17, 2008, analysts no longer use the Access Contract Management Database for 08/09 invoices.*
*Analysts continue to process invoices received from contractors for prior fiscal years; therefore, the data may vary from month to month.*
*FY 07/08 - Total # of Invoices for Non- Prodagio 219,025; Prodagio 65,084.*
*FY 08/09 - Total # of Invoices for Non- Prodagio 49,211; Prodagio 9,998.*
*Total number of invoices is understated due to data entry inconsistencies with invoice numbering.*

*Prodagio numbers for FY 07/08 reflect all invoices for CCWF, CMF, PBSP, and SQ. FSP implemented Prodagio in June 2008, and SOL implemented Prodagio in July 2008. CCC, COR, HDSP, and SATF implemented Prodagio in August 2008.*
*September and November data reflects a significant increase in average days to process due to remaining 07/08 invoices with irregular circumstances.*
*As of November 18, 2008, invoice scanning ceased in Prodagio. Institutions are currently processing invoices in the Prodagio queue.*

*Solutions to the Invoice Processing Backlog:*  During this reporting period, a "Strike Team" approach to adjudicate medical invoices has been implemented in an effort to eliminate the invoice backlog.  The Strike Team focus is to expedite the processing of medical invoices that are 45 days and older from contractors with the largest volume and dollar values.  The Strike Team commenced work on December 22, 2008 with the objective to bring the backlogged invoices current (processed within 30 days). It should be noted that the CDCR Regional Accounting staff and managers have worked cooperatively on their efforts.  The problem is not State employees but decisions made for political purposes by the Administration.  The Strike Team will continue this effort for two months.  After two months, the Strike Team will reconvene to review the results of the efforts.  Depending on the results, we will either continue with the "Strike Team" approach or approach alternative strategies.

To also address the invoice processing backlog, the CPHCS issued a RFP to procure a professional Third Party Administrator for medical claims processing services. The Third Party Administrator will be responsible for transitioning the current manual medical invoice processing operation to a claims processing system based on industry best practices and standards applicable to the correctional environment.  The objective of the claims processing system is to improve the quality, efficiency, and timeliness of payments to health care contractors serving CDCR's patient population.  HIDPSB anticipates the successful bidder to commence work in late February 2009, after review of vendor proposals. This solution will be piloted for a limited period of time, and will be re-evaluated to determine the appropriateness of transitioning the medical invoice processing back to the State.

In addition, as mentioned above, over the next several months, CPHCS Administrative Support Services will be undergoing a reorganization that will transfer all the Accounting functions from CDCR to CPHCS (which includes the Regional Accounting Office responsibilities for the preparation of the claim schedules to be submitted to the State Controller's Office for payment). In addition, the pre-authorization process which involves the Institution reviewer and approvers will be discontinued with the implementation of the Third Party Administrator.  This function will be replaced with a post audit review of the claims payments.  With the transition of the Accounting and Institution functions to CPHCS management oversight, the HIDPSB anticipates very significant improvements in the medical contract processing days.

*Status of Contract Database System Upgrades:*   The redesigned web-based Contract Medical Database (CMD) has been developed and deployed.  The web-based CMD combines the 33 institutions' databases into a single centralized database providing real-time access to information and streamlines the maintenance of contracts and vendor data as well as access to

utilization and expenditure data. Staff continues to meet with the developers and to provide input for programming modifications which enhances overall CMD system operation and performance.

Because of the invoice processing problems described above, the invoice processing objective set forth in the Turnaround Plan of Action is in jeopardy at this time.

# Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1.**     Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions

### Action 3.1.1. By January 2009, fill 90% of nursing positions

This Action has been accomplished, as we have achieved the goal of filling 90 percent of our nursing positions prior to the timeframe set forth in the Turnaround Plan of Action.  As of November 30, 2008, approximately 92 percent of the nursing positions have been filled (this percentage is an average of all six State nursing classifications).

More specifically, the goal of filling 90 percent of the RN positions has been achieved at 25 institutions (75.7 percent of all prisons).  The remaining eight institutions (24 percent) have filled 80 to 89 percent of their RN positions.  The goal of filling 90 percent of the Licensed Vocational Nurse (LVN) positions has been achieved at 21 institutions (63.6 percent) and 7 institutions (21 percent) have filled 80 to 89 percent of their LVN positions.  Ten institutions (30 percent) have achieved the goal of filling 90 percent of their Psych Tech positions.  Ten institutions have filled 80 to 89 percent of their Psych Tech positions.

The following hiring related initiatives continued during the reporting period:  (1) focused recruitment continues statewide for LVNs and Psych Techs; (2) presentations at nursing schools statewide; (3) advertisements in local papers, professional trade magazines, and online; and (4) mass mailers targeting LVN classifications.  Additionally, there continues to be a push at all institutions with nursing vacancies to schedule interviews on a weekly basis and interview all interested applicants expeditiously.  A mailer was sent to all California licensed Psych Techs during this quarter.  There is a small candidate pool of Psych Techs; however, this mailer resulted in a significant increase in the number of Psych Techs eligible on the certification list.  It is expected that this will lead to an increase in the number of Psych Techs hired in the next two months.

For additional details related to vacancies and retention, refer to the Plata Human Resources Recruitment and Retention Report for November 2008.  This report is included as Appendix 13. The Human Resources Monthly Reports for September and October 2008 are included as Appendix 14, and the Workforce Development Branch Monthly Reports for September, October and November 2008 are included as Appendix 15.

It is important to emphasize, however, that action 3.1.1, which represents a remarkable success story, addresses the formal vacancies for established State positions. As previously reported, one of the more serious factors involved in the State's failures to provide adequate healthcare in its prisons, is the failure to design a staffing program necessary for a medical services operation. Simply stated, this Administration, similar to prior administrations, has ignored the fact that prisons must operate 24-hours a day, 7-days a week.  Unlike the Department of Motor Vehicles, for example, the CDCR cannot close its offices and send its inmates home the first and third

43

Friday of each month.  In order to staff a nursing position, for example, a CTC nurse position, whereby nurse coverage is required 24-hours a day, 7-days a week, nursing staff must be available for all of those hours.  In the past, the Administration allocated only three nurses to these positions, ignoring vacations, trainings, days off, the Family Medical Leave Act, and numerous other statutory provisions.  As a consequence, nurse managers are faced with an impossible task.  There are simply too few human nurses to fill the required posts.

This chronic shortage of clinical staff, which has been recognized for years by nurse managers and clinical bargaining units alike, was never corrected by the Schwarzenegger Administration, and had a direct correlation with the unconstitutional conditions which resulted.  The Receiver is in the process of developing prison-specific staffing programs and will continue to work with the Department of Finance to establish appropriate staffing formulas that relate to the real need to manage clinical posts.  The Receiver's program has accepted salutary consequences in that it will eliminate the Administration's inappropriate reliance on private registries, and thereby adding the appropriate State staffing, thereby complying with the mandates of California's Constitution. In the interim, CPHCS nursing executives manage the daily needs at the institutions through a combination of overtime and temporary registry help.  For a snapshot which shows the real staffing level required to comply with the Stipulated Court Orders, refer to Appendix 16.

The following metrics, which are a summary of the data in the November 2008 Plata Human Resources Recruitment and Retention Report, are included: Table 2 summarizes nursing filled percentages by prison; Table 3 summarizes nursing turnover rates by prison refer to Objective 3.3 for explanation); and Table 4 summarizes nursing filled percentages and turnover rates by prison.

**Table 2.**



**Table 3.**



**Table 4.**



### *Action 3.1.2. By January 2009, fill 90% of physician positions*

Physician recruitment efforts continued to focus on "hard-to-fill" institutions during the reporting period. Most urban institutions have now hired their full component of primary care providers. The focused efforts at the "Hard-to-fill" institutions have proven successful. Since the last reporting period, Correctional Training Facility, which has a long-term history of serious hiring problems, has hired two physicians resulting in over 84 percent of their physician positions being filled. Salinas Valley State Prison, another institution with a history of serious hiring problems, now has 100 percent of their physician positions filled.

As of December 31, 2008, approximately 87.5 percent of physician positions are filled (this percentage is an average of all three State physician classifications). More specifically, ninety-eight percent of the Chief Medical Officer (CMO) positions are filled; 79 percent of the Chief Physician and Surgeon (P&S) positions are filled; and 87 percent of the P&S positions are filled. Nineteen institutions (57.5 percent) have achieved the goal of filling 90 percent of their P&S positions and 16 of these institutions have filled at least 95 percent of their P&S positions. Five institutions (15 percent) have filled 80 – 89 percent of their P&S positions. With the exception of San Quentin State Prison, all institutions still proving to be "hard-to-fill" are located in the Central Valley region.

Specialized recruitment efforts for physicians continue with advertisements placed in professional periodicals, newspapers, online, direct mailers, conferences, and visits to residency programs. In addition, staff are researching recruitment initiatives that would be applicable to the "hard-to-fill" locations. Plans are underway to recommend geographic pay incentives for the remaining hard-to-recruit locations.

The goal of this Action was to obtain a 90 percent fill rate for physician positions by January 2009. The current filled rate for physicians is 87.5 percent. While we did not meet the goal of a 90 percent fill rate, it should be noted that during this reporting period 13 additional physician positions (3.5 percent) have been authorized. Had it not been for the additional positions being authorized, we would have met the 90 percent fill rate as set forth in the Turnaround Plan of Action.

For additional details related to vacancies and retention, refer to the Plata Human Resources Recruitment and Retention Report for November 2008. This report is included as Appendix 13. The Human Resources Monthly Reports for September and October 2008 are included as Appendix 14, and the Workforce Development Branch Monthly Reports for September, October and November 2008 are included as Appendix 15.

The following metrics, which are a summary of the data in the November 2008 Plata Human Resources Recruitment and Retention Report, are included: Table 5 summarizes physician filled percentages by prison; Table 6 summarizes physician turnover rates by prison (refer to Objective 3.3 for explanation); and Table 7 summarizes physician filled percentages and turnover rates by prison.

**Table 5.**



**Table 6.**



**Table 7.**



**Objective 3.2**  **Establish Clinical Leadership and Management Structure**

> *Action 3.2.1. By January 2009, establish and staff new executive leadership positions*
>
> *Action 3.2.2. By January 2009, establish and staff regional leadership structure*

Both actions 3.2.1 and 3.2.2 are addressed below.

DPA determined that it was necessary to waive merit salary adjustment salary rules in order to fully implement the proposed pay plan for the RCEAs. On November 3, 2008, the "Order Granting Receiver's Application for Order Waiving State Statutes, Regulations and Procedures Regarding Salary Grids for Receiver Career Executive Assignments" was signed and filed with the court. Thereafter, DPA issued a pay letter to formally establish the pay bands. The Receiver's Human Resources staff will work with DPA to establish a pay differential for the performance component.

As previously reported, a comprehensive marketing campaign for the Executive Leader positions was launched in July 2008. The three executive leader positions were marketed heavily with print advertisements in professional journals and web advertisements and job postings on professional association web sites. Based on the response to these advertisements, the campaign was highly successful.

Due to significant delays in the release of the Executive Leader examinations by SPB, hiring for Nurse Executives was delayed to October 2008. As of December 22, 2008, there were 147 Nurse Executives eligible on the certification list. Three Nurse Executives (Statewide, Northern, and Southern regions) have been hired and commenced work on January 2, 2009. Three additional Nurse Executive hires are in process.

The Medical Executive exam was finally launched in December 2008 after five months of repeated delays by SPB. As of December 22, 2008, there were 38 individuals eligible on the Medical Executive certification list. Fourteen Curriculum Vitae are in the review process and interviews will be scheduled shortly. In response to our marketing campaign, fifty-one candidates have contacted Workforce Development staff to express interest in these positions.

The Chief Executive Officer examination was launched on December 24, 2008. In response to our marketing campaign, 188 potential candidates have expressed interest in these positions.

Given SPB's delays and thrice renegotiation for go-live dates, all positions will not be filled by January 2009. SPB's repeated failure to meet reasonable timelines for completion of examinations has seriously hampered the Receiver's efforts to make timely progress in filling critical vacancies. The filling of future vacancies will be similarly delayed unless SPB is able to effect improvements to their automated examination service delivery.

A fourth RCEA, Clinical Executive, includes all other licensed disciplines (rehabilitation, pharmacy, laboratory, radiology, optometry, podiatry, and dietary services) and has now been

approved by DPA and SPB. Efforts are in process to obtain salary information for executives in each of the covered disciplines. When collected and analyzed, staff will seek DPA's approval for the proposed salaries. A pay plan similar to the other RCEAs is being developed and will require the same approval process as the other RCEAs. In addition, a civil service examination is being developed and should be ready by the time a pay letter is issued. This project remains on schedule, however, if past problems with SPB continue, it too may be delayed.

A fifth RCEA, Clinical Administrator to encompass all non-licensed medical administrators required to effectively manage the health care program, has been conceptually shared with DPA.

**Objective 3.3.** **Establish Professional Training Programs for Clinicians**

> ***Action 3.3.1. By January 2009, establish statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program***

The necessary steps toward establishing a standardized, quality introduction of staff into prison healthcare have been taken and continue to be monitored and reassessed for effectiveness. The Health Care New Employee Orientation (HCNEO) has been conducted since March of 2008 and continued with the first session of this year on January 5, 2009. CPHCS will be expanding the HCNEO to all CPHCS staff and inviting dental and mental health staff beginning March 2009.

*Status of New Employee Orientation and Training:* At each regional HCNEO location, feedback related to the instructor, course, and program is collected and analyzed for quality control and efficiency by the Employee Training Unit (ETU) within Human Resources' Workforce Development Branch. Many health care providers who attended this program have been very positive in their evaluation of the HCNEO program, expressing that it better prepares them for their positions in our institutions.

A performance measure that has been closely monitored is the turnover rate of new hires who attend the HCNEO versus those who did not attend. The latest performance measure continued to show a lower turnover rate for HCNEO participants than those who had not attended between March 2008 and October 2008. Just 2 percent of clinical staff who attended regional HCNEO separated from State service within the chosen time frame, while nearly 6 percent of clinical new hires who did not attend regional HCNEO separated during the same period. Although these findings were from a moderate sample, they are affirming for the HCNEO program.

The ETU assumed responsibility of the HCNEO as of September 2008. In addition to coordinating training and curriculum development, ETU has written lesson plans with subject matter expert review and training to assist in the development of an outstanding instructor cadre to deliver training for all HCNEO participants. Also, ETU in collaboration with Human Resources' Education and Professional Development Unit will be expanding its focus to support other required clinical training such as BLS, ACLS, and other Continuing Medical Education programs.

*Status of the Proctoring/Mentoring Program:*   The nursing services division of CPHCS is committed to providing qualified proctors and mentors for the purpose of orienting new staff to correctional nursing, improving job satisfaction, and reducing employee turnover.  The proctor and mentor program is designed for all new clinical CPHCS employees including RN and LVNs assigned to perform patient care functions.  This proctor and mentor program consists of a four-week program for RNs and a three week program for LVNs in addition to the four day regional new employee orientation.

The proctor and mentor program has been developed and partially implemented at some institutions based upon their staffing capacity.  During the past six months, a planning session was held at each institution to discuss the local process to implement the nursing services proctor and mentor program.  The planning session at each institution included the Nurse Consultant Program Review (NCPR)-Educator, Director of Nursing (DON), Supervising RN (as designated by the DON), and the Nursing Instructor.  Additionally, a Headquarters' NCPR to support the statewide implementation was recently approved and appointed.  As the proctor and mentor program is specific to each new employee hired by CPHCS, the implementation plan must remain flexible.  The statewide implementation of the proctor and mentor program has begun based on each institutions recent nursing hires and individual staff needs.

This Action was not fully implemented by January 2009 as set forth in the Turnaround Plan of Action.  The program will be fully operational by the end of the next reporting period.

> ### Action 3.3.2. By January 2009, win accreditation for CDCR as a CME provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education

As reported in the Ninth Quarterly Report, in an effort to maintain and enhance the level of clinical competencies with educational programs, the Office of the Receiver has established a Continuing Medical Education (CME) Committee which meets monthly.  The Committee membership is representative of clinicians providing health care services within CPHCS from each licensed practitioner group, including physician, psychiatrist, nurse, nurse practitioner and psychologist. A primary objective of the CME Committee is to obtain accreditation for CPHCS as a CME provider, recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education.  The CME Committee also oversees the planning of all CME activities.

The Interdisciplinary Professional Development (IPD) Unit within CPHCS, is providing administrative support for the CME Committee.  The IPD Unit submitted the application for accreditation, including a description of the history of the program, its purpose and mission, and detailed descriptions of how the CME program complies with standards for commercial support, to the Institute of Medical Quality on October 30, 2008.  The Institute of Medical Quality has assigned a surveyor and is anticipating a survey date in January 2009.   In addition to obtaining accreditation, the IPD Unit will be responsible for the operation and administration of the CME program once accreditation has been obtained.

One component of the accreditation application is to plan and present CME activities to establish a "track record."  During this reporting period, two CME programs, "Primary Care Introduction to Hepatitis C" and "Primary Care Introduction to Chronic Pain Management," were approved by the Institute of Medical Quality and subsequently conducted.    A total of 163 CPHCS clinicians received CME credit for attending these activities.  The IPD Unit submitted a third CME activity, "Coccidioidomycosis:  Review of 2 Atypical Cases," to the Institute of Medical Quality for review and approval on December 12, 2008.

This Action is on schedule as set forth in the Turnaround Plan of Action.

## Goal 4. Implement Quality Improvement Programs

__Objective 4.1.__  **Establish Clinical Quality Measurement and Evaluation Program**

> *Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs*

*Progress During the Reporting Period:*  During this reporting period, the Quality Improvement Section worked to further build its Research and Evaluation Unit. Specifically, new staff were hired including a Research Scientist Manager to head the Research and Evaluation Unit, a Research Scientist III, Research Analyst II, Health Program Specialist II, and other support staff. In the next few months, the Quality Improvement Section will work to fill the four remaining vacancies in the unit.

During the reporting period, staff from the Research and Evaluation Unit collaborated with Access to Care Initiative staff to develop performance objectives for pilot projects in the Reception Center, Sick Call, Chronic Care, and Specialty Care domains to measure pilot completion and level of success. The Research and Evaluation Unit also provided technical assistance to a number of special projects, including the annual death review data report, a survey for sick call data collection, and development of an electronic and centralized Care Management Registry and the associated user manual. During the next reporting period, the Research and Evaluation Unit plans to purchase statistical software and hardware that will enable staff to analyze data from numerous data sources, including the Care Management Registry, Specialty Care InterQual data, Death Statistical Master File, Death Review, Inmate Medical Scheduling and Tracking System (IMSATS), and other databases.

In November 2008, the CPHCS entered into a contract with the RAND Corporation to assess current measurement activities, collect information about other correctional and health system approaches to quality improvement, and ultimately recommend strategies for the CPHCS to routinely measure and evaluate program performance. RAND houses one of the largest private health research groups in the world, and employs a research staff of more than 170 experts, including physicians, economists, psychologists, mathematicians, organizational analysts, political scientists, psychometricians, medical sociologists, policy analysts, and statisticians. Representing RAND as Lead Investigator on this project is Steven M. Asch, M.D, MPH. Dr. Asch is, among other accomplishments, a Researcher at RAND; Associate Professor of Medicine at the University of California, Los Angeles Geffen School of Medicine; former Robert Wood Johnson Clinical Scholar; and consultant to the National Committee for Quality Assurance.

Over a twelve-month period, the RAND Corporation will assess current quality measurement activities by developing a list of existing CPHCS performance measurement and audit activities, including those conducted by the former Quality Management Assistance Team, OIG, Access to Care, and out-of-state facility program. This process will incorporate a review of existing documents, interviews with staff at all reporting levels, site visits to prisons, and an assessment of the CPHCS strengths and weakness with regard to performance measurement. Further, RAND will amass demographic and clinical need data from the prison population and compare

56

that with similar nationwide data, to establish an appropriate context for any performance measurement or patient outcome data.  To collect information about performance measurement strategies in other correctional systems and health systems RAND will convene a multi-disciplinary advisory panel of nine state and national experts.  The advisory panel will compare and catalogue implicit and explicit methods of review in these other systems.  Lastly, based upon validity and applicability to the prison health care setting, RAND will produce a list of recommended performance quality indicators and specifications.  The expert advisory panel will provide input into the development of the indicator list.

Staff from the Research and Evaluation Unit began regular meetings with RAND during November and December 2008, providing critical background documentation to RAND staff, including numerous quality-related datasets, and assisting RAND in identifying candidates for interviews and potential institutions for site visits.  During the upcoming reporting period, RAND will visit four institutions for interviews with field staff a will conduct interviews with subject matter experts regarding CDCR data collection and data systems and CPHCS health care delivery.  RAND will also convene an expert panel to develop recommendations for prison clinical performance measures.  This action item is on schedule, as set forth in the Turnaround Plan of Action.

### *Action 4.1.2. By July 2009, work with the Office of Inspector General to establish an audit program focused on compliance with Plata requirements*

This Action is divided into two phases. Phase I includes program development and pilot implementation, and Phase II included statewide roll-out and implementation.  Phase I is complete.  During Phase I, the OIG developed the inspection instruments in a collaborative process with the CDCR, Prison Law Office, CPHCS staff and other stakeholders.  The OIG conducted pilot medical inspections at five institutions.  The final pilot medical inspection was completed on June 12, 2008 and a stakeholders meeting was held on August 19, 2008 to discuss proposed revisions to the medical inspection instrument based on lessons learned during the pilot phase.

Phase II was on schedule.  In September 2008, the OIG initiated Phase II of the Medical Inspection Program with a medical inspection at California State Prison - Sacramento.  As of the close of this reporting period, the OIG has completed three additional inspections at California Medical Facility, Richard J. Donovan Correctional Facility, and Centinela State Prison, respectively.  The first year inspection results will establish a baseline that will provide an objective, clinically appropriate method to evaluate and monitor the progress of medical care delivery to inmate-patients within each institution. The Medical Inspection Results for California State Prison - Sacramento, are included as Appendix 17.  Once final inspection reports are issued, the inspection results for each institution will be available to be viewed on the OIG website (http://www.oig.ca.gov).  Based on the final report at California State Prison - Sacramento, and the draft reports at the other facilities, it is far too soon to declare victory in terms of the actual medical care being delivered in California's prisons.

As mentioned above, however, despite the success of the OIG's inspection program for prison-specific audits of *Plata* compliance, its potential to reduce overall cost of compliance monitoring, and despite the fact that this program represents the first step of the State's efforts to at least monitor (if not manage) California's prison medical delivery system, the Schwarzenegger Administration now refuses to fund the full program. If the program is not entirely eliminated, it will without question be reduced to only a fraction of what is necessary - yet another indication that the State is neither willing nor able to support its own sustainable prison health delivery program at this point in time.

## Objective 4.2.   Establish a Quality Improvement Program

Quality improvement is a hallmark of an adequate, fiscally responsible health care system. Using information from measurement and evaluation systems, as well as self-assessment and other sources of ideas for improvement, the health care system works on a continuous basis to improve both its efficiency and its outcomes. Improvements in clinical processes will also require updating of clinical policies and procedures.

The Office of the Receiver established a quality-based program to administer the CPHCS healthcare credentialing and privileging function as part of the Quality Improvement Program. Status of this Unit will be discussed below and prior to the status of the three specific Quality Improvement Program actions specified in the Turnaround Plan of Action.

*Credentialing and Privileging Unit:* The Credentialing and Privileging Unit is an entity within the CPHCS Quality Improvement Program. During this reporting period, significant progress was made including the following:

    A.    Completion of the credentialSmart IT conversion
    B.    Implementation of Policy for both the Credentials Committee and the Credentialing
          and Privileging Unit
    C.    Maintenance of the Credentials Committee
    D.    Ensuring all civil service providers have an approved credential file
    E.    Continuing two-year reappointment compliance
    F.    Tracking of license and board certification expirations
    G.    Implementation of an automated credential process

Each area of progress within the Credentialing and Privileging Unit is detailed below.

credentialSmart IT Conversion:
The Credentialing and Privileging Unit staff completed the conversion of paper credential files to electronic profiles over the course of five months, meeting the December 31, 2008 projected timeframe. This conversion process was a team effort, enlisting Human Resources assistance in providing accurate reports on all civil service providers in the following classifications: Physician and Surgeon, Dentists, Nurse Practitioner, Physician Assistant, Psychiatrist, Psychologist, and Social Workers. From these reports, the Unit staff was able to identify which provider files to convert. Not only did the Unit staff have to convert the pre-existing paper files,

58

but also converted new hires on a continuous basis.    In order to convert a file, staff manually entered the data from files that contained anywhere from 5 to 100+ pages of information and completed primary source verification of licensure to ensure that as the files were converted the provider's license was active.  In total, 1498 paper files were converted to electronic profiles.

Policy Implementation:
The Credentialing and Privileging Unit and the Credentials Committee's Policies and Procedures have been completed and approved by both the Credentials Committee and the Professional Practices Executive Committee.  The Governing Body reviewed the policies in December 2008 which resulted in necessary changes. These changes have been incorporated and will be resubmitted through the review process. Final approval of the policies was originally anticipated to be completed by September 2008; however, there were several delays in coordinating the appropriate approvals through the Governing Body and the newly established Policy Unit.  The Policy Unit will receive the revised policies by early February 2009 for their review and processing.  Once the Policy Unit has finalized the policies they will be added to the Governing Body's meeting agenda as an action item. The Governing Body meets twice a month, and is expected that these policies will be presented to the Governing Body no later than the end of February 2009.

Policy Implementation:
The Credentialing and Privileging Unit and the Credentials Committee's Policies and Procedures have been completed and approved by both the Credentials Committee and the Professional Practices Executive Committee.  The Governing Body reviewed these policies in December 2008, which resulted in additional changes. The requested changes have been incorporated and will be resubmitted through the review process and presented to the Governing Body for action in February 2009.

Credentials Committee:
The multidisciplinary Credentials Committee continues to meet on a weekly basis for the review of practitioner files, credential process, and *credentialSmart* developments.   Although the Committee is awaiting final approval of their policies, it continues to operate in a process based fashion following set standards and practice equivalent to those established by the National Committee for Quality Assurance and Joint Commission.   During this reporting period, the Committee reviewed 55 individual practitioner cases. The Committee reviews these cases prior to the hiring and or contract commitment to ensure that only those providers who meet the requirements are allowed to provide health care services.

Approved Credentials File:
During this credentialSmart IT conversion, 152 civil service employees were found not to have a credential file.   A process was implemented to ensure that these provider's complete the credential review process.   The provider's and their management have been notified that they must complete the provided credential application and return it to the Credentialing and Privileging Unit within 10 business days of notice.   To date 81 of those practitioners have completed the credential file and verification process.   The remaining 71 are being tracked for compliance, as new files arrive daily.   A delay is not expected as most providers have complied

without reservation. It is expected that by the end of January, all civil service providers will have an electronic credential profile.

As part of the Emergency Response Initiative pilot project, 125 electronic credential files were created for RNs who are assigned to the Triage Treatment Area.. This pilot was cancelled, however, due to other IT solutions that are better suited for use with nursing classifications. The RNs who have been entered into credentialSmart will remain in the system as inactive.

Two-Year Reappointment Compliance:

As part of the continued goal of establishing a Credentialing and Privileging Unit that meets National Committee for Quality Assurance and Joint Commission standards, the required two-year reappointment process continues. During this reporting period 170 two-year reappointments have been completed. The two-year reappointment process is an on-going process with new requests for provider compliance being sent out and completed every month. The Unit is establishing the review process to align with the California Medial Board's birth month renewal program. This will assist the providers in knowing when their two-year reappointments are due as well as will establish a standardized system to not only complete the two-year reappointments but to ensure no one is omitted from the process.

Tracking of License and Board Certification Expirations:

With the provider files converted into credentialSmart, the Credentialing and Privileging Unit commenced the tracking and maintenance component for credentials that expire. During this reporting period, 76 Notice of Licensure Expirations have been sent to the practitioners assisting them with the timely renewal of their license and 7 Physician and Surgeon Board Certification Expiration notices have been processed. This automation of credentialing and tracking of expirables will assist CPHCS in ensuring that our licensed independent practitioners and designated allied health practitioners have active licenses, certification and credentials to provide quality healthcare to our patient-inmate population. The tracking of expiring license and certifications is an on-going process with notifications being sent out regularly to ensure that the providers have active current credentials at all times.

Implementation of an Automated Credential Process:

In addition to the credentialSmart file conversion, the direct-apply component called *ApplySmart*, within the *credentialSmart* system, kicked off in late-December 2008 with the launch of the on-line Credentialing Application. This automated application is the first step to a paperless credentialing system. It is anticipated that by spring 2009, all civil service applicants that require credentialing will apply directly on-line. Future plans include adding the *credentialSmart* link to the CPHCS and SPB websites as a seamless transition from state application to medical staff application.

> ***Action 4.2.1. By September 2009, train and deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions.***

Activity related to this Action is on schedule, as set forth in the Turnaround Plan of Action.

During this reporting period, the Quality Improvement Section identified a cadre of CPHCS physician and nurse consultant quality advisors who will be dispatched in 2009 to support the first statewide quality improvement project:  implementation of the Patient-Centered Medical Home and Chronic Care Model at all CDCR institutions.  Each quality advisor will be assigned an average of three institutions, and during 2009 each quality advisor will conduct site visits to support institutions in establishing infrastructure for the new primary care model and incorporating rapid-cycle quality improvement into everyday clinic operations.  Quality advisors will also proving training, facilitation, and technical assistance to institutions during statewide and regional conferences held each month.

In December 2008, the identified quality advisors participated in their first training session, with additional training scheduled for January 2009.  To support quality advisors in their field work, quality improvement experts from Convergence Consulting and Health Management Associates will provide mentorship during site visits and through monthly teleconferences.  Quality Improvement Section staff are also developing a field manual for quality advisors.

> ### *Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.*

To accomplish this action item, an action plan was established and divided into two elements that are being implemented concurrently.  Element I includes the development of the organization structure and program concept, the recruitment and hiring of staff, and staff training.  Element II includes the development of policies and procedures and the procurement of a policy tracking system.

During this reporting period, the recruitment and hiring of staff was initiated and half the allocated positions have been filled.  Although several staff members have been hired, the challenge of finding candidates with relevant qualifications, excellent writing skills, and experience in policy and procedure development has delayed the filling of all of the positions within the Policy Unit.  Recruitment for remaining staff will continue and training is in progress for the current staff members.

Simultaneously, Element II is underway.  A policy tracking system was procured and training on the new system is in progress.  This policy tracking system was chosen because it is designed to address policy management and compliance in a health care setting; it automates the process of documenting, communicating and maintaining an organization's policies and procedures; and offers a centralized library for all policies, procedures and forms.  Currently, Policy Unit staff are identifying the most current versions of medical policies to begin the task of uploading them into the new policy tracking system. Once the policies are uploaded and training is complete, staff will then begin the process of updating existing policies and procedures, centralizing the policy development process, and standardizing the development of new policies and procedures.

This action item is currently on schedule to be completed by September 2009.

*Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors*

Activity related to this Action is on schedule, as set forth in the Turnaround Plan of Action.

An important part of implementing the new quality improvement program in CDCR institutions is the alignment of existing policy with the most current health care quality practices. During this reporting period, CPHCS's Quality Improvement Section conducted research to inform policy modifications by surveying institution-level Quality Management Committee activities, including frequency of meetings, membership, subcommittees, and committee support. In addition, various health plan executives were interviewed to ascertain information about current quality approaches and staffing models. The data collected will be considered during the revision of existing quality management policies scheduled for early 2009.

## Objective 4.3.   Establish Medical Peer Review and Discipline Process to Ensure Quality of Care

*Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care*

On July 9, 2008, the court issued the "Order Approving, With Modifications, and Proposed Policies Regarding Physicians Clinical Competency." During this reporting period, CPHCS completed implementation of the new policies. In September 2008, the milestones achieved were as follows: (1) establishing a number of new organizational processes to ensure policy compliance and (2) initiating the distribution of notices to physicians subject to the peer review process. In October 2008, CPHCS executed a contract with the Institute of Medical Quality to employ the use of Judicial Review Committee Panelists, as set forth in the new policies. The first Notice of Proposed Final Action under the jurisdiction of the new policies was served in October 2008. CPHCS provided training to the Office of Administrative Hearings Administrative Law Judges and the Medical Oversight Program staff regarding implementation of the policies in November 2008.

In an effort to ensure physicians are afforded their due process rights in a timely manner, CPHCS has taken affirmative steps to fully implement the entire disciplinary process to include the formal hearing. This implementation approach was necessary due to SPB's failure developing and implementing a program to effectuate disciplinary hearings for physicians according to the standards set forth in the court's July 9, 2008 Order. Because of this, CPHCS has assumed responsibility to implement the requirements of the Order. The first hearing to be held with a Judicial Review Committee is scheduled to commence in March 2009.

The Professional Practice Executive Committee (PPEC) and Peer Review Subcommittee met 21 times during the reporting period and have reviewed a total of 174 referrals/allegations. The PPEC summarily suspended the privileges of three providers, implemented 34

training/monitoring plans focused on improving provider clinical competency.  In addition, the Governing Body approved 50 case closures of physicians whose clinical practice was deemed to meet an appropriate standard of care.  The Governing Body also issued Notices of Proposed Final Action to revoke privileges and employment of two physicians, which is not reflected in the below Tables.  During this period, 16 providers separated from State service while under peer review investigation.

Graphical displays of PPEC outcomes for the period September through December 2008 is presented in Tables 8 and 9.

**Table 8.**



**Table 9.**



**Peer Review Activity by Percentage**
**September - December 2008**

- Summary Suspension 2%
- Separated 9%
- Training/Monitoring 19%
- Case Closed 29%
- Pending Cases 41%

*Tables 8 and 9 Results Explanation:*
*The data represented pertains to physicians and surgeons and mid-level providers.*
*"Case closed" is defined as physicians or mid-level providers that are deemed to be practicing at an appropriate standard of care after conclusion of a peer review investigation.*
*"Separated" status refers to employees that separate from State service after a peer review investigation is initiated by PPEC.*
*"Summary Suspension" is defined as suspending the privileges of a physician or mid-level provider by Governing Body/PPEC and the provider is not allowed to continue their clinical duties.*
*"Training/Monitoring" are issued by the Governing Body/PPEC to monitor a corrective action plan for a physician or mid-level provider.*

**Objective 4.4.   Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

> *Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations*

This Action has been accomplished as set forth in the Turnaround Plan of Action.  The Medical Oversight Program (MOP) has reached the one year milestone in conducting clinical care investigations of CPHCS providers.  The MOP team consists of staff from the CPHCS, CDCR's Office of Internal Affairs (OIA), CDCR's Employee Advocacy and Prosecution Team (EAPT) and is monitored by the OIG.   The MOP has been conducting multi-disciplinary clinical investigations since January 1, 2008, and, based on the initial staffing allocations, the MOP is fully staffed.

64

*Meeting the Stated Goals:* The MOP continuously strives to achieve its stated goal of conducting multi-disciplinary clinical investigations, by providing rapid evaluations of deaths, rapid response to sentinel events, and timely recommendations regarding patient safety issues. Some key program elements that enhance the MOP's ability to effectively achieve the stated goals include the clinical case review for timely evaluation of deaths, weekly program planning meetings with stakeholders, and the multidisciplinary team approach for investigations. .

*Sentinel Event Responses:* The MOP team primarily responds to "Sentinel Events" that encompass "Unexpected Deaths" and on occasions "Non-death" related issues. The MOP review of sentinel events has expanded to include some referrals for mental heath, pharmacy, and systemic issues). The program's ability to mobilize a multidisciplinary team has proven successful as a model in investigating the primary and expanding range of sentinel events.

*Case Status Reporting Review:* During this reporting period, the MOP Roll-Out team was activated and rolled-out on twenty-one cases. The team rolled-out on fourteen "Unexpected deaths" and seven "Non-deaths" roll-outs for possible misconduct and/or systemic issues. Four cases were "Opened for Investigation." In addition, nine cases were "Rejected for Investigation." and seven cases are "Pending" further review and presentation to the Medical Intake Panel.

*Referrals to the Peer Review Processes:* There have been eight cases referred to Nursing Practice Review (NPR) and twelve cases referred to the PPEC. The institutional health care managers submitted four CDCR Forms 989, Request for Investigation, and these cases were reviewed by MOP and referred back to the local health care manager for direct action (i.e., counseling, training, remediation or adverse action). As a safety-net, to ensure satisfactory closure to all cases, the MOP has begun developing a case follow-up process to formally track all requests for investigation and referrals to NPR and PPEC.

*Scope of Potential for Program Enhancements:* The successful implementation of the MOP has broadened the scope of potential investigations to include identification of serious systemic issues such as recent investigations of patient-inmate suicides and medication management. The MOP is defining specific types of incidents that require the investigative resources of the program, versus those warranting a referral to institutional, regional, and/or statewide clinical leadership, and/or the PPEC and NPR.

*Employee Disciplinary Matrix:* To meet one of the key program objectives, the MOP completed its review and recommendation for modifying the Employee Disciplinary Matrix to reflect clinical relevance. A final draft of the proposed Employee Disciplinary Matrix revision was developed through a collaboration of stakeholders including CPHCS, EAPT, OIA, the OIG, CDCR Division of Adult Institution, Mental Health, and Dental. However, upon further consideration by the CPHCS executive team, it was determined that the present disciplinary matrix coupled with the new court-ordered policies on clinical competency is more appropriate to address medical disciplinary matters and that no changes were necessary. In addition, the MOP team will collaborate with the appropriate programs in CPHCS to incorporate the "Just Culture" principles into the disciplinary process for all clinicians. "Just Culture" principles are a nationally-accepted approach to reviewing clinical behavior that assigns responsibility of a

negative outcome in a sentinel event to either the individual, the system in which the individual operates, or both.

*California Out-of-State Correctional Facility Program Collaboration:*  The MOP continues to collaborate with the California Out-of-State Correctional Facility program (COCF) for systemic issues identified at an out-of-state private prison.  (Refer to Objective 4.6 for additional information).  Following the on-site investigation in Mississippi, MOP has been instrumental in the development of a Corrective Action Plan (CAP) to address identified issues.  The MOP also provided ongoing clinical resources and expertise to assist the COCF in the development and implementation of the CAP with the out-of-state facility. This CAP has been a valuable model that is being considered for use with all MOP cases.

*Future Goals:*  In 2009, the MOP team will focus its attention on training the "Just Culture" model to facility clinicians and custody staff.  Continuing to integrate the "Just Culture" principles in distinguishing provider issues and systemic vulnerabilities will ensure the most appropriate and effective remedies are employed for each investigation.  A revision to the MOP Guide will be completed by the end of January 2009.  Upon approval of the Guide, formal policies and procedures for the program will be developed.

A graphical display of MOP outcomes for September thru December 2008 is presented in Tables 10 and 11.

**Table 10.**



***Table 10 Results Explanation:***

**"***Opened for Investigation" is a formal investigation conducted by MOP.***

*"Rejected for Investigation" is when a MOP inquiry does not result in a formal investigation being opened (e.g. due to insufficient facts to support an investigation).*

*"Direct Actions: are when a request for investigation is referred back to the hiring authority (health care manager) for employee remedial training, counseling, a letter of instruction, or adverse action for general administrative corrective purposes (e.g. attendance).*

*"Pending" is when a case is awaiting an investigatory assignment prior to Medical Inquiry Panel review.*

**Table 11.**



| Active Cases | NPR Referrals | PPEC Referrals | Non-Death Roll-Outs | Unexpected Death Roll-Outs | Opened For Investigation |
|---|---|---|---|---|---|
| 21 | 8 | 12 | 7 | 14 | 4 |

*Table 11 Results Explanation:*
"Active Case" is any case currently under inquiry by the MOP (i.e. under preparation for Medical Intake or in the investigative process).

"NPR Referral" is made when the Medical Intake Unit suspects substandard clinical practices by a nurse and refers the case to the Nursing Practice Review Program.

"PPEC Referral" is made when the Medical Intake Unit suspects substandard clinical practices or clinical misconduct by a physician or mid-level provider and refers the case to the PPEC.

"Non-death Roll-Outs" are defined as any act that may cause imminent danger to the patient-inmate (e.g. disruptive conduct, unethical conduct, substandard competencies, fail to perform standards of care).

"Unexpected Death Roll-Outs" are cases when a patient-inmate is one of the following: 40-years old or less and has had no history of a chronic medical condition; was seen two or more times in the TTA within the last week of life, submitted two or more request for services in the last week of life. "Unexpected death cases" also include cases where possible inappropriate, absent or untimely care is suspected; death is directly attributed to asthma or a seizure condition; the patient-inmate returned from an off-site emergency room visit or acute care inpatient stay within 14 days prior to death; or a medication error is suspected.

"Opened for Investigation" are formal investigations conducted by MOP.

68

**Objective 4.5.   Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions*

This Action was divided into two phases.  Phase I was completed in October 2007 and included the consolidation of all correspondence and habeas corpus petition responses under the Controlled Correspondence and Litigation Support Unit (CCLSU).   Phase II included the separation of health care appeals from CDCR institution appeals and the establishment of the Office of Third Level Appeals – Health Care.  Third-level health care appeals were consolidated with all other appeals for the following two reasons: (1)  the third-level health care appeals were routed through CDCR institution appeals staff which was inefficient and unnecessary, and (2) the third level appeals were responded to by CDCR custody staff who lacked the medical knowledge to appropriately respond to patient-inmates' health care issues.

Phase II was completed on August 1, 2008, when all levels of patient-inmate health care appeals were completely centralized and consolidated under the Litigation Support Unit within the Plata Field Support Division.

*Controlled Correspondence and Litigation Support:* The impact of Phase I, particularly the consolidation of correspondence, has caused a sharp and marked increase in workload for the CCLSU.  As a result of this consolidation, the workload has increased 315 percent over the past year.  CCLSU now conducts research and provides responses to all patient-inmate, family, and advocate correspondences directed to the court and the Receiver; telephone calls placed to the Inmate Health Care Inquiry Hotline; correspondence addressing health care issues for patient-inmates that are part of the COCF program; correspondence for Sacramento Headquarters; correspondence for the Western Interstate Compact programs; health care appeals arising out of COCF; and the review and routing of all Receiver website e-mail inquiries.  The dramatic increase in workload has impacted staff's ability to respond in a timely manner which has created an increase in overdue responses. Additional staffing to address the increase in workload has been requested.

Refer to Table 12 below regarding the tracking of CCLSU incoming inquiries and overdue responses for September through December of 2008.  The CCLSU Executive Summary Report for September through December 2008 is included as Appendix 18.

**Table 12.**



*Habeas Corpus Petitions:*  The development of a habeas corpus response policy was initiated as a result of multiple requests for information or action submitted by the courts to the California Prison Health Care Receivership related to petitions for writ of habeas corpus submitted by patient-inmates confined within CDCR. When a habeas writ is received, the patient-inmate's medical records are reviewed by the Chief Medical Officer of the Clinical Support Unit at CPHCS.  This evaluation includes a review of all legitimate health care issues identified in the writ and the development of a CAP, if necessary, to address the health care issues identified in the writ.

The volume of Habeas Corpus Petitions has remained relatively constant from July through September, 2008.  However, there has been a small increase in the number of CAPs that were both initiated and completed.  Additionally, there has been a reduction of overdue CAPs, from a total of two during the Second Quarter of 2008 to one for the Fourth Quarter of 2008.

Refer to Table 13 below regarding the tracking of habeas corpus cases handled by the CCLSU for September through December of 2008.

**Table 13.**



*Institutional Health Care Appeals:*  During this reporting period, the separation of health care appeals from institutional appeals occurred.  From July through September 2008, there was a marked increase in the number of health care appeals received; however, at this time, it cannot be determined if this increase is the result of the separation of health care appeals from institutional appeals or a continuation of the documented increase of health care appeals recorded over the last eight years.

Table 14 below displays data related to Health Care Appeals for September through December of 2008.

**Table 14.**



*Health Care Appeals – Office of Third Level Appeals:* CCLSU management staff completed the hiring process for all 17 newly established positions for the Office of Third Level Appeals during the Third Quarter of 2008. The staff includes one Physician, four Nurse Consultant Program Reviews and 12 support staff. On August 1, 2008, Office of Third Level Appeals began receiving all third level appeals regarding health care issues. Due to the higher than anticipated volumes, there are a significant number of overdue third level appeals at the time of this writing. During August 2008, Office of Third Level Appeals received 544 third level appeals and ended the month with no overdue appeals. In November 2008, 653 third level appeals were received; there were 310 overdue responses. Additional staffing is being requested to address higher than anticipated volumes and the significant number of overdue responses.

Table 15 below displays data related to the Office of Third Level Appeals for September through December of 2008.

**Table 15.**



***Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver***

Recommendations from the task force of stakeholders and a pilot program were approved by the Receiver's Chief of Staff on June 16, 2008. Those recommendations stemmed from the meeting of the Health Care Appeals Task Force that convened on February 13, 2008 to conduct a system-wide analysis of the statewide appeals process. Members of the Health Care Appeals Task Force included Coleman court monitors, Office of Court Compliance (*Armstrong*), *Perez* court monitors, Plaintiff's counsel (Prison Law Office and Rosen, Bien & Galvan), the Receiver's Staff Counsel, the Chief Physician Executive, the Chief of Nursing Operations, CPHCS and Division of Correctional Health Care Services Executive Staff, CDCR Inmate Appeals Branch Chief, CDCR Staff Attorneys, and Litigation Support Unit staff. Four meetings were held to discuss issues, best practices and recommended changes and improvements to the statewide health care appeals process.

The proposed improvements included the following: (1) eliminating the informal level of appeals; (2) designating a RN to triage each appeal for urgent or emergent health care issues; (3) establishing a Patient Advocate Liaison position to precipitate face-to-face communication between patient-inmates and health care staff; and (4) establishing a correspondence program to resolve problematic patient-inmate health care issues that do not meet the appeal processing criteria, to address correspondence submitted from parties other than patient-inmates, and to

73

informally resolve health care issues submitted by patient-inmates who do not have access to Patient Advocate Liaison (i.e. Administrative Segregation status, out-to-court status).

A six month pilot program began November 1, 2008, at Central California Women's Facility, Mule Creek State Prison, Pelican Bay State Prison, and California State Prison - San Quentin. The hiring process for allotted positions in the pilot program is being completed at the time of this writing.  Additionally, RN positions have been approved for all 33 institutions, with the roll-out of these positions to begin in January 2009 and the completion by January 2010.

Table 16 displayed below indicates the current progress or anticipated implementation date of pilot activities at the four pilot institutions.  Pilot components that are not in progress are due to the hiring process not being completed.

**Table 16.**

|  | Eliminate Informal Appeal | RN Appeal & Correspondence Triage | Patient Advocate Liaison Program | Correspondence Program |
|---|---|---|---|---|
| Central California Women's Facility | In progress | January 2009 | January 2009 | January 2009 |
| Mule Creek State Prison | In progress | January 2009 | January 2009 | In Progress |
| Pelican Bay State Prison | In progress | In Progress | January 2009 | In Progress |
| California State Prison - San Quentin | In progress | In Progress | In Progress | In Progress. |

**Objective 4.6.**   **Establish Out-of-State, Community Correctional Facilities and Re-entry Facility Oversight Program**

*Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities*

During this reporting period, staff assigned to the Receiver's COCF Program, Program Oversight Unit, and the Corrections Corporation of America (CCA) have continued to work collaboratively on the CAP required as a result of the death of a California patient-inmate at the Tallahatchie

74

County Correctional Facility (TCCF) in Mississippi. An update is being provided regarding the following remedial measures agreed to be implemented by CCA:

1. <u>Implement a CAP in a timely manner at TCCF.</u>
   On September 5, 2008, the CCA CAP was approved by the Receiver; however, prior to that time the CCA had already started working to address a significant number of deficiencies that were identified in the CAP. To date, CCA has submitted two updates regarding the status of the CAP. As CCA began submitting draft nursing protocols and policies for review and approval, it became clear that there was a need to have on-site meetings to actually finalize these documents. Consequently, during the week of December 8 through 12, 2008, CCA representatives visited California to review and finalize nursing protocols. As a result of that meeting, 28 nursing protocols and a Nursing Referral Guide was developed and is pending final review and approval by CPHCS Nursing Services' executives. An additional meeting has been scheduled for the week of January 12 through 16, 2009 to finalize all outstanding policies, excluding those related to professional practice, credentialing, and peer review. Additional meetings are being scheduled to finalize policies related to professional practice, credentialing, peer review, as well as meetings to address quality improvement concerns and CCA reporting requirements. It is anticipated that all policies will be finalized at that time and ready for submission to CPHCS Clinical Services' executives for final review and approval during the next reporting period.

   During the next reporting period an update regarding the status of the CCA CAP will be provided. As we finalize the various issues associated with the CAP, discussions will begin between the Office of the Receiver and CCA regarding the roll-out of the TCCF remedial plan to all CCA facilities housing California patient-inmates.

2. <u>Increase clinical staffing at TCCF.</u>
   CCA has increased the number of licensed independent practitioners at TCCF from 2.0 to 3.0, as of November 2008. Not only has the number of licensed independent practitioners increased, but the Office of the Receiver has implemented additional requirements to ensure the quality of the providers being hired meet existing California standards for those licensed independent practitioners providing medical care to California patient-inmates (i.e., new credentialing process). As the population continues to increase, CCA and the Office of the Receiver will continue to collaborate on the appropriate ratios of licensed independent practitioners.

3. <u>Seek approval by the Receiver's clinical team concerning all future physician hires that will treat California patient-inmates.</u>
   Numerous meetings and collaborative discussions have occurred between CCA and the Receiver's staff. Pending submission of final draft policies from CCA related to professional practice, credentialing and peer review, CCA has agreed and begun implementation of a process by which all potential licensed independent practitioners hires are reviewed by the Receiver's clinical staff prior to a job offer being made. In addition, the Receiver's clinical staff has conducted Clinical Performance Appraisals on all licensed independent practitioners

providing care to California patient-inmates as of November 2008 and all performance issues identified have been appropriately addressed by CCA.

Staff from the Office of the Receiver will continue to work collaboratively with CCA to ensure that a process is formalized and policies developed, which will identify the role CPHCS will continue to have in this process.

4. <u>Establish a special CCA oversight organization to monitor and manage the health care provided to California patient-inmates at all CCA facilities which house California patient-inmates.</u>
To date, the team established by CCA to specifically oversee the California patient-inmate population is as follows:

- On August 21, 2008, Keith Ivens, M.D., was appointed as the Regional Medical Director for California patient-inmates with an on-site presence at TCCF until such time as a full-time Senior Physician was recruited and trained to assume the Senior Physician duties. During this reporting period, Dr. Ivens served both a managerial oversight and an administrative role at TCCF. With the hire of Dr. Shazad Dailami-Pour, M.D., it is anticipated that Dr. Ivens will assume the full-time role of Regional Medical Director for California patient-inmates.

- On December 22, 2008, Susan Montford, was promoted to Regional Director for California patient-inmates.

Additionally, CCA has established executive leadership on-site at TCCF to ensure compliance with the CAP and to ensure that all clinical and administrative staff is functioning properly and all systems are working effectively and efficiently. The team is made up of the following staff:

- On July 26, 2008, Don Stewart was appointed as Senior Director, California Contract Compliance. Mr. Stewart will remain on-site at TCCF until the CAP is fully implemented.

- On July 3, 2008, Allen Cooper was appointed as Acting Director of Quality Assurance to provide TCCF leadership on-site on a regular basis to ensure compliance with the CAP through full CAP implementation and to ensure staff and systems are functioning effectively and efficiently.

- On July 10, 2008, Beverly Overton, Regional Director Health Services was assigned to and is on-site at TCCF to provide executive level health services oversight. Ms. Overtone will remain on-site at TCCF until the CAP is fully implemented and will continue to provide regular oversight after the CAP is fully implemented.

Finally, CCA is continuing their evaluation of the health services management structure at TCCF, Regional CCA, and National CCA levels and indicate that a permanent structure will

be modified or supplemented as appropriate. The goal is to create an internal CCA structure that will provide consistent medical care to California patient-inmates.

5. <u>Over time, CCA will implement the TCCF remedial plan to all CCA facilities which house California patient-inmates, creating an internal CCA structure which will provide consistent medical care to California patient-inmates.</u>
    As we finalize the numerous issues associated with the CAP, the Office of the Receiver and CCA will meet to discuss the plan to roll-out the CCA CAP to remaining facilities housing California patient-inmates.

*COCF Medical Screening Criteria:* As a result of the findings of the investigation at TCCF, a decision was made to close the facility to intake in July 2008, which resulted in no additional patient-inmates being transferred into TCCF. In addition, a decision was also made to revisit the existing medical screening criteria used for out-of-state placement. In mid October 2008, a new COCF Screening and Transfer procedure was developed, and then CCA and CDCR requested to re-open TCCF to intake. The request came at a time when CCA had made significant changes in clinical staffing, obtained the appropriate number of licensed independent practitioners at TCCF, and clinical performance appraisals had been completed on all licensed independent practitioners at the facility. The Office of the Receiver made the decision to allow TCCF to begin accepting new patient-inmates; however, the patient-inmates would be re-screened for out-of-state placement using the new screening criteria prior to transferring to TCCF. This process provides the Receiver's staff with feedback as to whether or not the new screening criterion was appropriate prior to rolling it out statewide.

This requirement resulted in the Receiver's nursing staff at CPHCS Headquarters re-screening approximately 410 Unit Health Records for patient-inmates housed at the Florence Correctional Center in Arizona. Three hundred forty seven inmates, or 90 percent, of the patient-inmates remained eligible for out-of-state placement and were transferred to TCCF. Five patient-inmates were returned to California and 38 inmates had medical problems (i.e. pending appointments, follow-up) that were required to be handled in Arizona prior to them being transferred to TCCF.

Based on the outcome of this process, the new screening criteria will be implemented during the next reporting period.

*"At Risk" Patient-Inmate Returns to California:* After the re-hospitalization of a patient-inmate in July 2008, there was increased concern about further deficiencies of provider care at TCCF. The Office of the Receiver requested a review of all patient-inmates in the Chronic Care Program at TCCF and an expedited return of those patient-inmates with complex or poorly controlled medical problems. This resulted in 4 out of 27 patient-inmates being returned to California due to their complex or poorly controlled medical condition. Since that time, an additional 54 chronic care program patient-inmates have been reviewed and 5 have returned to California.

A weekly meeting has been scheduled with CCA clinical leadership at all CCA facilities housing California patient-inmates, and the COCF Chief Medical Officer. During this regular meeting,

77

patient-inmates with chronic diseases or other immediate medical problems are discussed and tracked through resolution of any medical issue. It should be noted that daily discussions also occur when a medical problem arises with a patient-inmate.

*COCF Staffing*:  The Office of the Receiver submitted a staffing request for out-of-state transfer monitoring to CDCR and to the Department of Finance on October 28, 2008 (Refer to Appendix 19).  CPHCS staff devoted approximately 80 hours developing a proposal which requested resources to fund all aspects of the out-of-state program that result in a fiscal impact to the Office of the Receiver.  Although there were four areas of concern identified that have resulted in additional staffing needs, this staffing request only addressed the immediate need for the Office of the Receiver to expand its monitoring team to monitor the health care of all California patient-inmates housed in CCA facilities.  To date the Office of the Receiver has not received a formal response the Department of Finance regarding the request.  However, CDCR has agreed to provide interim position authority and funding for the requested positions.

According to State officials, the refusal to fund the Receiver's efforts to: 1) adequately screen California prisoners before they transfer out-of-State; and 2) monitor care provided by private prisons, often thousands of miles away, was made by the Governor's office.  Despite irrefutable proof that CCA did not comply with the terms of a contract totaling hundreds of millions of dollars (entered into by the Schwarzenegger Administration without competitive bidding), and despite the fact that without assistance of the Receiver, CCA was unable to establish an adequate prison medical care delivery system, the Governor now refuses to fund contract compliance monitoring.  Unless the interim funding agreement continues, and unless the funding necessary is provided by the Department of Finance during the May revise process, the Receiver will be forced to seek judicial assistance through contempt process and, unfortunately, forced to limit or end support for out-of-State transfers.

*Community Correctional Facilities:*  The Program Oversight Unit staff continue to provide direction and oversight and to monitor the Community Correctional Facilities on a limited basis. Based on workload, the Community Correctional Facilities Handbook was not modified during this reporting period as indicated it would be in the Ninth Quarterly Report; however, the Receiver's clinical staff will take the lead on modifying the screening criteria used for Community Correctional Facilities placement.  Consequently, the associated staffing model that will be required to handle the implementation of the new screening criteria will be addressed once the new screening criteria has been developed and approved.

Again, during this reporting period as well as the previous reporting period, the Receiver's ability to properly monitor Community Correctional Facilities has been very limited due to the reallocation of resources required for the investigation and remediation of health care issues in the out-of-state facilities

*Re-entry Facilities Update:*  The CDCR continues performing pre-activation activity for the Northern California Re-Entry Facility; however, the anticipated activation has been moved from approximately July 2009 to October 2009.  The CPHCS continues to attempt to work collaboratively with CDCR concerning each step of the pre-activation efforts.

# Goal 5. Establish Medical Support Infrastructure

**Objective 5.1.**  **Establish a Comprehensive, Safe and Efficient Pharmacy Program**

Implementation of the pharmacy services *Road Map to Excellence* continues to move forward and to realize progress.  The *Road Map* gives priority to achieving improved patient safety and health outcomes, developing an evidence-based pharmacy practice and increasing cost-efficiency.  Progress continues to be made in addressing each of these priorities.  During this reporting period, activities have included continuation of work to extend the GuardianRx® pharmacy operating system to additional facilities; to bring into operation a central fill pharmacy; to address pharmacy staffing needs and improve staff competencies.  The CDCR Pharmacy & Therapeutics (P&T) Committee continues to demonstrate positive momentum in developing clinical and management strategies to administer an effective pharmacy services program.  Work has also continued to maintain an active and aggressive purchasing and contracting program aimed at managing medication costs.

### Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications

Development and improvement of the Formulary is an ongoing process.  The P&T Committee meets monthly to address formulary issues, discuss and approve Disease Medication Management Guidelines, and review and approve pharmacy policies and procedures.  The CDCR Formulary is a key health care management tool oriented to the specific needs of the CDCR patient-inmate population, and reflects the goals of standardization of a contemporary, evidence-based, efficient, safe, and cost-effective correctional healthcare system.

During this reporting period, Disease Medication Management Guidelines (DMMG) for Bipolar Disorder and Hepatitis C were prepared and approved. A number of requests for formulary additions were reviewed and approved as a part of the monthly formulary updates.  All updates to the formulary are distributed to provider and pharmacist staff, posted to the CPHCS website, published in the pharmacy newsletter (*Pharmacy Horizons*) and made available through the online *Epocrates* web service.  The therapeutic interchange program now includes 19 drug classes and all major therapeutic drug classes have been initially reviewed.  A cycle of ongoing therapeutic class review will continue to ensure a regular review of all drug classes.  The P&T Committee will continue to review Formulary related requests at each of its meetings.

During this reporting period, the Clinical Pharmacy Specialists conducted multiple in-service training sessions for health care providers, nursing and pharmacy staff on pharmacy policies and procedures, formulary changes and the non-formulary process.  A renewed emphasis on provider education in formulary processes and medication utilization management was initiated in this reporting period, with participation of the Maxor Medical Director in both medical and mental health clinical leadership meetings.  During these meetings, information on the formulary and non-formulary processes was shared and data showing utilization trends and costs was provided.  This ongoing effort is intended to increase provider awareness and responsiveness to medication utilization issues.

As noted in earlier reports, the establishment of a viable P&T Committee process, the implementation of a CDCR-specific formulary and the development of evidence-based treatment medication guidelines are critical components of achieving improved cost-effectiveness in the system. This integrated approach and responsive contract strategies continue to demonstrate success in cost avoidance. As displayed in Table 17, through November of 2008, Maxor has documented cost avoidance of $14,703,872 from the use of targeted contracting strategies linked to P&T Committee decisions.

**Table 17.**



***Table 17 Results Explanation:*** *These categories represent specific P&T Committee initiatives targeting particular drugs or drug classes. Savings calculated by comparing purchases using the actual targeted contract rate to the pre-targeted contract rate.*

Contract, purchase, and inventory monitoring efforts also continue to yield results by avoiding unnecessary costs due to out-of-stock orders and ensuring that the correct contracted items are purchased. Targeted contracts, order management activities, and the implementation of a new wholesaler agreement tailored specifically to address the pharmaceutical needs of the CDCR health care system have contributed to cost avoidance. As displayed in Tables 18 and 19, total

cost avoidance in 2008 through the month of November is more than $29.9 million when compared to prior historical trends.

**Table 18.**



***Table 18 Results Explanation:*** *Cost savings/cost avoidance calculated based on comparing actual wholesaler purchases to prior historical trendline (also based on wholesaler purchases). Data pulled monthly from Wholesaler Purchase data. Maxor began managing pharmacy purchasing in April-May 2007.*

81

**Table 19.**



**Table 19 Results Explanation**: *Savings/Cost Avoidance is calculated by comparing actual wholesaler purchases to prior wholesaler purchase trend line. Maxor began managing pharmacy purchasing in April-May 2007.*

*Influenza Vaccination Program:*  Pharmacy leadership and contracting also supported a statewide influenza vaccination campaign during this reporting period.  Working with the CPCHS clinical leadership and the Public Health Unit, Maxor worked to ensure that sufficient influenza vaccine was procured and distributed in a timely manner to support the 2008 Influenza Vaccination initiative.  More than 120,000 doses of the vaccine were made available and distributed throughout the various CDCR facilities in accordance with pre-determined targeted levels, resulting in a successful influenza vaccination initiative.

> **Action 5.1.2. By June 2009, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system**

*Pharmacy Policies and Practices:*  During this reporting period, the CDCR P&T Committee has essentially completed its comprehensive review and revision of the Pharmacy Policies and Procedures.  This process involved reviewing and updating the policies to reflect improved practice standards, implement quality control measures and standardize pharmacy processes.  In the last four months of 2008, the P&T Committee approved revisions to Chapter 8-CDCR Drug Formulary, Chapter 15-Confiscated Medications, Chapter 26-Investigational Medications, Chapter 39-Transfer Medications, Chapter 30-Pharmacy Technicians and Ancillary Staff, and

Chapter 34-Heat Risk Medications. In addition, a new policy, Chapter 31-Use of Tricyclic Antidepressants was approved.

Maxor continues to support policy implementation as well as monitor compliance with pharmacy policy and procedure. Clinical Pharmacy Specialists provide in-service and implementation support to facility staff as new procedures are released. During October, the Quarterly Pharmacist-In-Charge (PIC) meeting was well attended. Topics and presentations covered during the meeting included a focus on leadership, review of the centralized hiring process, staff scheduling, purchasing versus dispensing reports, an update on the GuardianRx implementation process, review of the influenza vaccination program and a discussion on procurement of specialty pharmaceuticals.

Additionally, training and review was provided to orient the PICs to the new clinical and managed care reports routinely produced beginning in November. Monthly report sets will be auto-emailed to PICs starting the first week of November for the October reporting period. The expectation is for the PIC to distribute and review the reports with CMO/HCM and clinical staff. These reports include system-wide, facility level and provider level report cards.

*Centralized Hiring:*  Also during this reporting period, centralized hiring for Pharmacist I and Pharmacist II positions continued to show improved recruitment results. This effort is intended to assist in filling critical vacancies for pharmacists and includes updated processes for credentialing, coordination of interviews and making final selections. Since centralized hiring began in May 2008, a total of 48 interviews have been held and 26 offers made. Of these 26, 18 Pharmacists have started employment with the CDCR, six candidates declined the offer and two offers are still pending.

*Pharmacy Inspections:*  Pharmacy inspections are conducted and documented monthly, with slow but steady progress forward across the state. The number of pharmacies with an inspection rating score of "pass/problem" (not failed) has increased from 21 percent in March 2007 to 64 percent in October 2008. The Maxor team is also continuing to objectively validate the improvements for any facility moving from non-passing to passing status in their monthly inspection reports by conducting independent onsite validations (an important verification process which began in February 2008). Pharmacy inspection status data is displayed in Table 20.

**Table 20.**



*Table 20 Results Explanation: Pharmacy areas are denoted in blue, and non-pharmacy locations (medication administration locations) are denoted in red: Independent Maxor Validation of Monthly Inspection Data began in Feb 2008.*

*Roll-out of the GuardianRx® System:* The GuardianRx® pharmacy operating system has now been successfully implemented in 17 of the 33 CDCR institutions (California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison - San Quentin, California State Prison - Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women, Deuel Vocational Institution, North Kern State Prison, and Kern Valley State Prison). Group training for PICs on the GuardianRx® system and the implementation process has continued as scheduled.

A review of the GuardianRx® implementation schedule conducted by the GuardianRx® Steering Committee resulted in a decision to revise the GuardianRx® roll-out schedule in order to allow time for more training, to allow a reasonable period of time to orient newly recruited nursing implementation leadership staff, to improve efficient use of limited roll-out team resources and to allow facilities with significant infrastructure issues additional time to address those challenges. A revised schedule for the next six conversion sites has been approved, detailing conversion activities through March of 2009. A schedule for the remaining facilities will be developed by the Steering Committee. An additional schedule has been developed to return to

facilities that have already implemented GuardianRx® in order to assess their status, provide supplemental operational oversight and training and to upgrade the facilities with new system functionality. This effort is viewed as an essential component of monitoring and sustainability efforts. The following institutions are scheduled for "Go-Back" training and assessments between November 2008 and April 2009: California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison - San Quentin, California State Prison - Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women.

Maxor is on schedule to improve pharmacy policies and practices at each institution by June 2009 as set forth in the Turnaround Plan of Action. However, the roll-out of the GuardianRx® system has been delayed, as described above, and will not be implemented statewide until late in 2009. As currently planned and resourced, the system will be implemented in 23 of the 33 facilities by the end of March 2009, with the remaining ten facilities to follow between April and the end of 2009. The conversion schedule is under continual review by the GuardianRx® Steering Committee and updates to the schedule will be included in the next Tri-Annual Report.

### Action 5.1.3. By February 2009, establish a central-fill pharmacy

Establishment of the Central Fill Pharmacy is proceeding; however delays in the site selection, site acquisition and contracting processes have delayed the overall completion timeframe. The pre-centralization ambulatory model is being defined and implemented as processes are standardized and validated as part of the GuardianRx® implementation work plan.

During this reporting period, the selection of a Sacramento site location for the proposed Central Fill Facility and the recommendation of an automation vendor to design and equip the facility have been approved. With the final recommendation on the site location approved, the Department of General Services, CDCR and Maxor are working cooperatively to negotiate final lease and/or purchase terms with the property owner.

Concurrently, work has commenced to finalize a contract for automation equipment and services for the Central Fill Pharmacy facility. A draft contract document detailing the specifications and requirements has been prepared in conjunction with attorneys representing the CPHCS and with contracting specialists at CDCR. Final approval of the contract document is pending.

Preliminary work has been initiated on block diagram floor plans for the new pharmacy facility and development of build-out specifications, including the identification of specific site adaptation requirements needed to accommodate the automation system.

Opening of the Central Fill Pharmacy Facility is currently scheduled for September or October 2009.

Maxor's monthly reports for September, October and November 2008 are provided as Appendices 20, 21, and 22 respectively. Maxor's monthly reports, the pharmacy newsletter (*Pharmacy Horizons*), and the Formulary are available for review at the CPHCS website (http://www.cphcs.ca.gov).

### Objective 5.2. Establish Standardized Health Records Practice

> *Action 5.2.1. By February 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions*

To create a standardized health records practice that supports constitutionally-adequate healthcare system, CDCR's current operations need to be assessed, a roadmap for transformation of the system to support health records best practices must be created, a plan based on the road map must be established, and the plan must be implemented. This Action regarding the roadmap for remediation of health records management is on schedule as set forth in the Turnaround Plan of Action.

During the previous reporting period, the Office of the Receiver selected Sourcecorp, Inc. from a bidder's pool that included 12 highly competitive proposals, to provide health information management (HIM) professional services. Sourcecorp, Inc. initiated their work on September 1, 2008. The contract goal is to transition the current paper-based HIM operation to one based on industry best practices and standards applicable to the correctional environment. The major objectives of this initiative are to remediate health information management within CDCR to enable cost-effective, constitutionally adequate, cost-effective healthcare for all patient-inmates and to standardize records processes as a preparatory step for the eventual implementation of an electronic health record. Specifically, Sourcecorp's scope of work includes establishment of effective leadership and management oversight over CDCR's health record services; preservation of the integrity and continuity of the health record; updated policy and procedures regarding the security and confidentiality of the health record; updated policies and procedures; development of the structure of the HIM organization at the local and Headquarters levels; evaluation and, as necessary, remediation of the physical infrastructure of, the 33 prison health record departments; evaluation of the HIM automation infrastructure of all prison medical record departments; and establishment of management controls over HIM processes.

During this reporting period, SourceCorp, Inc. conducted the Phase I (HIM Assessment) kick-off meeting and successfully completed two out of three of the Phase I deliverables: the Best Practice and Standards Recommendations Report and the Current State Assessment Report. Both documents are available for review at the CPHCS website (http://www.cphcs.ca.gov). In September 2008, the HIM consultant initiated the project with a kick-off meeting and held the first HIM Executive Steering Committee meeting in October 2008. The HIM Best Practice and Standards document/deliverable was submitted in October 2008 and reviewed and approved by the HIM Executive Sponsors and Steering Committee in November 2008. In November 2008, the second deliverable, the Current State Assessment Report, was submitted and subsequently received by the HIM Steering Committee for review and approval in December 2008.

In addition to completing the work on the first two deliverables, the HIM consultant, continues to provide support to other Receiver projects with HIM dependencies. The HIM manager is currently developing the Health Information Privacy Policy; providing consultation for the 10,000 bed construction projects; evaluating electronic document management and scanning solutions; and continuing to conduct HIM assessments at the remaining CDCR facilities. In December 2008, the HIM Manager also met with dental program leadership to discuss concerns and issues associated with the organization of dental forms within the Unit Health Record. HIM subject matter experts are currently engaged with the Dental program staff conducting a business needs assessment to assist with Phase II (HIM Management) remediation planning.

SourceCorp, Inc. is currently working on developing deliverable three – the Remediation Road Map. In the early part of January 2009, the HIM Manager will present an abstract of the HIM Remediation Road Map to the HIM Executive Sponsors and Steering Committee and submit a final draft on January 23, 2009. The electronic document management solution recommendations will be submitted in January 2009 as well. In January and February 2009, the HIM Manager will be conducting remediation plan meetings and will be seeking the Receivership's review and approval on the HIM remediation road map in February 2009.

## <u>Objective 5.3.</u>   Establish Effective Radiology and Laboratory Services

### *Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants*

<u>Medical Records</u>
The status report on the strategy for improving medical records is detailed above in Goal 5, Objective 5.2.

<u>Radiology Services</u>
In late July, the Receiver's radiology consultants, McKenzie-Stephenson, Inc. presented CPHCS with a comprehensive assessment of CDCR's medical imaging services and a road map for future improvement. Pursuant to the assessment and recommendations made by McKenzie Stephenson, Inc., CPHCS issued a RFP for implementation of a Enterprise Imaging Program as outlined in the roadmap for remediation presented my McKenzie Stephenson, Inc. CPHCS leadership approved the RFP and released it on October 6, 2008.

Consistent with State protocol, a bidder's conference was held on October 17, 2008 to answer questions and clarify CPHCS' expectations. Three respondents delivered proposals on, or before the November 7, 2008 final submission date. A selection committee composed of medical, dental and operations leadership reviewed all proposals. The selection committee convened on November 25, 2008 for a comparative discussion of findings on the submitted proposals. The proposals were discussed at length, with one proposal emerging as the clear choice for contract award based on staff credentials, project approach and projected costs to implement.

The committee prepared a list of questions for the successful bidder to answer during a scheduled December 8, 2008 "Question and Answer" session. The bidder attended the December 8, 2008, meeting with their proposed senior staff members and answered all questions to the satisfaction of the selection committee during the meeting, resulting in a formal Intent to Award announcement.

A formal Agreement is currently in development and is anticipated to be ready for the Receiver's review and approval in early January 2009. The winning bidder will be announced after both parties have signed the Agreement.

The RFP is available for review at the CPHCS website (http://www.cphcs.ca.gov). All bidder proposals will be available for review at the same website location after the Agreement has been signed by all parties.

Laboratory Services

As reported in the Ninth Quarterly Report, the Receiver has achieved the objective of forming a strategy for laboratory services. This objective was achieved through the Receiver's adoption of the Navigant Report recommendations. The next phase of this objective is the implementation of those recommendations.

Pursuant to the recommendations made by Navigant, Inc., CPHCS has prepared a RFP for implementation of system-wide lab management services. CPHCS leadership plans to approve and release this RFP in January 2009.

Delays in establishing the appropriate RCEA positions by SPB continue to present a challenge in securing administrative leadership. The candidate search for a CMO, Laboratory Services, resulted in few viable candidates and the Receiver is no longer pursing this option. In the interim, CPHCS has awarded Nichols Management Group a contract for consulting services to provide support and make recommendations regarding utilization of space, staffing, workflow processes, supplies and equipment procurement, and other technical assistance for projects that impact clinical laboratory services.

**Objective 5.4.   Establish Clinical Information Systems**

*Action 5.4.1. By July 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems*

The clinical data repository project is on schedule, as set forth in the Turnaround Plan of Action. The goal of the project is to store key patient health information, such as current medications, allergies, lab results, encounters, problems, etc., in a standardized manner and make this information available to providers at the point-of-care to support clinical decision making.

At the end of September 2008, the clinical data repository project team produced the first project deliverable – "Clinical Data Repository and Portal Solution Outline" document. The "Solution

88

Outline" deliverable established the overall goals, design, and requirements of the CDR, including use cases, logical and physical architectures of the solution, functional and non-functional requirements, etc. It also documented other key aspects of the project, such as assumptions, dependencies, risk assessment, and strategies related to training, testing, etc. The "Solution Outline" deliverable was accepted by the Receivership, and the CDR project team subsequently initiated the second phase of the project - Solution Design.

During Solution Design, the CDR project team is focused on building-out the design details of the solution. The team has been conducting in-depth discussions and interviews with numerous stakeholders and business partners. The Receivership established a clinical user advisory group to assist with the development of functional requirements and has continued to engage this group to confirm these requirements and assist the project's development team in the design of the user interface. The CDR project team initiated and has had ongoing discussions with key trading partners - Foundation Laboratory, Maxor, Quest Diagnostics - regarding the electronic exchange of patient allergy, laboratory, and medication data. In support of this effort, the Receivership's health informatics team has been establishing the preliminary set of healthcare terminology and messaging standards that will enable interoperability of clinical information systems and health information exchange. Finally, the team is meeting with CDCR's Enterprise Information Services (EIS) group to work out the mechanisms for the exchange of patient information critical to clinical operations.

Also during this reporting period, the CDR project team commenced other key activities. First, the team began implementing the hardware/software environments necessary to support the CDR. To date, the development environment is complete, thereby allowing the development team to begin their programming efforts. The team is now focusing on implementing the various test environments and, upon completion, will shift its efforts to the production environment. Second, the CDR project team has, in conjunction with SourceCorp, Inc., began establishing the appropriate policies to ensure the privacy and security of patients' medical records. Third, the CDR team began coordinating its efforts with the Receivership's data center provider - Verizon Business - to ensure that the data center, as it pertains to the CDR project, is properly provisioned and that the appropriate system management, high availability, and disaster recovery plans are in place.

The Receivership intends to pilot the CDR solution at Central California Women's Facility, Valley State Prison for Women, and California State Prison - Los Angeles County. In January 2009, members of the CDR project team will conduct site visits at these institutions to educate clinical leadership and staff on the solution, initiate preparations for the pilot, and establish the change management foundation critical to the successful implementation of any information system. As part of the preparations for the pilot, the CDR project team is also in the planning phase for the delivery of end-user computing devices (e.g., workstations, laptops, tablets, etc.) to the three pilot institutions prior to CDR solution "Go-Live." The team is currently researching manufacturers of medical-grade computing devices in anticipation of procuring/deploying the appropriate devices by March 2009.

The "Solution Design" phase of the project is approximately three and a half months in duration and is scheduled to be completed by mid-January 2009. The key deliverable for this phase of the project is a detailed "Solution Design" document which upon Receivership approval, will be the blueprint for the CDR project team's subsequent system build efforts.

**Objective 5.5.**  **Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure*

This action item is partially completed.  As reported in the Ninth Quarterly Report, due to the delays created by SPB concerning the establishment of certain clinical executive RCEA positions, the Receiver has been unable to recruit an executive leader for the Telemedicine Program in a timely manner.  The SPB has not yet fully remedied this problem.  However, in December 2008 a first line supervisor was hired for the Office of Telemedicine Services.  In addition, a telemedicine steering committee will convene in January of 2009 to provide ongoing leadership and oversight for the expansion of telemedicine services.

During this reporting period, the Office of Telemedicine Services have been involved with several of the health care IT projects. For example, projects such the CDR, network infrastructure, scheduling, and electronic health records will support the expansion of telemedicine services.  The roll-out of these components within the telemedicine program is dependent upon the scheduled roll-out of technology capabilities at the institutional level.  As noted in the Ninth Quarterly Report, a majority of the recommendations contained in the University of Texas Medical Branch's roadmap still cannot be implemented until a new and robust health care information network has been rolled-out at all 33 institutions.

The Office of Telemedicine Services is currently sponsoring the "Provider On-Boarding" project. This is the process by which a network provider (hospital, medical center or physician) is brought on-board to provide telemedicine services to the patient-inmate population of the CDCR.  In November 2008, Alvarado Hospital (in San Diego) signed a contract to be the pilot program for this project.  The scheduled start date is January 2009 to begin providing telemedicine services to patient-inmates in five southern region institutions: Richard J. Donovan Correctional Facility, Ironwood State Prison, Chuckawalla Valley State Prison, Calipatria State Prison and California State Prison - Centinela.  The initial specialty services being offered during this pilot are dermatology, neurology, endocrinology and gastrointestinal.  Additional institutions and specialty services will be added, after the initial pilot period has been completed and evaluated.

In an effort to increase services and offer additional medical specialties, CPHCS has established two additional institutional hubs.  These provider centers, or hubs, are located at California State Prison - Los Angeles County and Substance Abuse Treatment Facility.  The California State Prison - Los Angeles County hub provides rheumatology services to 21 institutions, and also provides orthopedic services to five institutions.  The Substance Abuse Treatment Facility hub

currently provides infectious disease services to two institutions. In another effort to increase services and expand offered specialties, the Office of Telemedicine Services is currently distributing equipment and providing training for telemedicine cardiology which will be available in January 2009. This service will be provided by UC Davis and administered to the following six institutions: High Desert State Prison, Ironwood State Prison, Chuckawalla Valley State Prison, California State Prison - Corcoran, California Correctional Center, and North Kern State Prison.

*Telemedicine Statistics:* The telemedicine program reports the number of medical specialty patient-inmate visits have increased 41 percent from October 2007 (from 859 visits in October 2007 to. 1453 visits in October 2008). The rise in the reported number of visits can be attributed to several factors: (1) the increase in specialty services being offered; (2) the addition of California State Prison - Los Angeles County and Substance Abuse Treatment Facility as hub sites; (3) University of California San Francisco's (also a hub) data being included in the 2008 totals; and (4) of the deployment of telemedicine technology at all 33 institutions.

# Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities

**Objective 6.1.**   Upgrade administrative and clinical facilities at each of CDCR's 33 prison locations to provide patient-inmates with appropriate access to care

As previously referenced, the Governor and Attorney General's recent "bait and switch" strategy jeopardizes the Receiver's efforts to provide the appropriate treatment space and housing for class members in the four pending federal court class actions (*Armstrong*, *Coleman*, *Perez*, and *Plata*), including the most seriously ill, mentally ill, aged, and disabled prisoners.  Just as significant, the failure to address treatment space will significantly increase the cost of care, requiring thousands of prisoners to be placed in local community hospitals each year, preventing effective use of telemedicine, precluding plans to bring outside specialists into existing prisons, and thereby forcing CDCR to continue to spend hundreds of millions per year by sending prisoners from institutions to providers in the community.  This "penny wise pound foolish" response by the State's leadership serves only short-term political expediencies, dropping the bill for the Schwarzenegger Administration's neglect squarely on the shoulders of the California taxpayers.

> *Action 6.1.1. By January 2010, complete assessment and planning for upgraded administrative and clinical facilities at each of CDCR's 33 institutions.*

The assessments and planning to renovate or build new clinical space at each of the 33 prisons continues.  The Facility Master Plans for the Correctional Training Facility, California Rehabilitation Center and Mule Creek State Prison (the second, third, and fourth prisons respectively to undergo the planning process) have proceeded into implementation of the design and construction phase.  The Receiver filed and received in July 2008 Waivers of State Law from the court.  Implementation subsequently began on August 8, 2008 for Mule Creek State Prison, August 22, 2008 for Correctional Training Facility, and September 12, 2008 for California Rehabilitation Center.

As reported in the Ninth Quarterly Report, final approval of the next four Master Plans for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison, and completion of the subsequent four Master Plan Reports for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center was suspended as a result of recent considerations to integrate mental health and possibly dental space needs into the Master Plans. This effort is intended to specifically determine standards for the mental health space needs in light of the 5,000 new mental health beds being planned by the Receiver within the new health care facilities.  As these new beds come on-line over the next three to five years, mental health program space needs in the existing prisons will change.  Plans must take into account all these factors.

During the month of September 2008, a strategy was defined to gather mental health and dental program data and information to allow the planning team to evaluate the impact on the overall

scope and budget of the program, in the event both programs are integrated into the planning and implemented concurrent with the medical program. Mental health and dental program definition and modeling of the remaining 20 prisons yet to be master planned was completed in late September 2008. This will allow the development of a conceptual program budget model to describe the probable scope and cost that may be realized if all three programs were integrated into a single program. The resulting conceptual budget model was presented to the Receiver on October 20, 2008.

Following completion of the conceptual budget model, the Receiver requested that the recently defined mental health program be included in the completed master plans that have not received final approval and that consideration be given to the possible location and integration of dental as a potential future programmatic addition to the planning. To accomplish this end, the planning teams revisited and amended the four completed Master Plans for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison and developed associated addenda, as well as revised the four Master Plan Reports pending approval for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center. This additional effort included re-visiting each of the eight institutions, meeting with staff and revising some of the projects originally defined. The addenda for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison and the Master Plan Reports for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center were approved by each respective Warden, Associate Warden of Health Care Services, Chief Medical Officer, and Director of Nursing. The addenda and Master Plan Reports were then reviewed by an architectural consultant and submitted to the Receiver in December 2008.

As a result of the above conceptual budget model and revised Master Plans, the Master Schedule was revised to adjust the master planning activities based on the interim delay to begin to integrate dental and mental health programs into each master plan and develop a program budget. Although, the completion of master planning activities is still projected for January 2010. Master planning was reinitiated on December 3, 2008 with the initiation of planning at California State Prison - Solano, and continued with the initiation of planning at California Mens Colony on December 9, 2008 and Calipatria State Prison on December 16, 2008. Master planning efforts continue on schedule for completion in January, 2010.

*Salinas Valley Psychiatric Program (Intermediate Care Facility):* It was reported in the Ninth Quarterly Report that the special planning project to address inadequate treatment space at the Salinas Valley Psychiatric Program (Intermediate Care Facility) has been completed and was submitted to the Receiver for approval. The plan is completed and approved, but is now without funding. Therefore, there has been no progress during the reporting period.

***Action 6.1.2.  By January 2012, complete construction of upgraded administrative and
clinical facilities at each of CDCR's 33 institutions***

Presently, San Quentin State Prison, Avenal State Prison, Mule Creek State Prison, Correctional
Training Facility, Soledad, and Correctional Rehabilitation Center are the prisons in the
implementation phase of design and construction. The 90-day suspension and revisions to the
Master Plans has affected the Master Schedule as it relates to completion of construction across
the 33 institutions. In accordance with this delay, the Master Schedule has additionally been
revised to project that the submitted Master Plan reports will be subsequently approved in
January 2009 rather than October 2008 and will proceed with the development of site
assessments incrementally in three week intervals. The overall duration of the implementation
phase that includes bid and award and construction has additionally been modified and increased
in an attempt to more accurately anticipate the project completion based on the increased
program scope and budget coupled with the contractual approval process. The current schedule is
predicated on the stated approval of the issued Master Plans and their subsequent authorization
into bridging documents and bidding. This schedule modification revises the completion of
construction from January 2012 by a year to December 2012.  An updated Conceptual Master
Schedule has been included in this report as Appendix 23.

Since approval of the Master Plan Reports for Mule Creek State Prison, Correctional Training
Facility, Soledad, and Correctional Rehabilitation Center, further development and refinement of
health services staff organization structures and space needs have occurred.  These modifications
have been applied to planning efforts at subsequently planned institutions. In order to
accommodate for the planned staff at Mule Creek State Prison, Correctional Training Facility,
Soledad, and Correctional Rehabilitation Center, approved master plan projects have been
revised.  The addenda include the addition of space to support the Health Care Access Unit
staffing package and add administrative space to support the anticipated medical staff
organization at the institution. Addenda have been completed and are in the approval process
with CDCR executive staff and the Receiver.

*Upgrade Construction at Avenal State Prison:* During this reporting period, the implementation
phase of construction at Avenal State Prison proceeded.  The report for Valley Fever Mitigation
is complete and is in the final approval process. Communication and training materials to support
the report have been updated and are in the process of implementation. Mitigation
recommendations by the occupational health and safety consultant have been included in bid
documents prepared for ASP projects and will be contractually required to be implemented by
the contractor during related construction activities. Bids were received for the modular health
services clinics, administration and Administrative Segregation Unit clinic buildings project
(ASP-04) and the contract was awarded.  A pre-construction meeting was held on December 4,
2008 and a Notice to Proceed was issued on December 15, 2008. The contractor has started
completion of the construction documents and critical submittals.  Bid documents for the medical
supply warehouse are complete. The project is on hold as various supply chain and "just-in-time"
ordering options are analyzed and defined for use statewide that will validate the extent of
physical warehouse space each institution should need once implemented. The Infirmary and
Pharmacy renovation (ASP-03) is in progress, Building 395 is substantially complete and being

94

used as a temporary TTA to support the renovation of the TTA within Building 390. Renovations in Building 390 are in progress and on schedule at this time. Proposals for the Pharmacy furnishings have been received and a recommendation and award is in preparation for December 2008 to allow installation in advance of the Pharmacy Guardian Rx® implementation in March 2009. Design-build documents are in development for the new projects added by Addendum No. 1 to the Master Plan Report and include expansion of the Medical Records building, and canopies for the medication distribution areas outside the facility clinics. The Health Care Access Unit, Administrative Segregation Unit Clinic and Inmate Waiting project components of Addendum No. 1 have been incorporated into the project scope of Project ASP-04.

The bridging document phase of implementation for Mule Creek State Prison, Correctional Training Facility, Soledad, and Correctional Rehabilitation Center is ongoing. Preliminary field geotechnical and survey work has been completed and is being integrated into the documents. Hazardous material assessments are in progress with procedures to be included within the documents. Correctional Rehabilitation Center's first bid package to demolish two existing dormitory buildings has been completed and prepared for bidding, but it has been held to allow the Office of the Receiver to verify funds are available to support the construction and to ensure CDCR plans to continue operation and use of this facility as a State prison in the future. The bridging documents for the second bid package for Correctional Rehabilitation Center and the bid packages for Mule Creek State Prison and Correctional Training Facility, Soledad are on schedule to be finalized in January 2009 and distributed for bid. Considering the limitation in current funds, a determination of funding capacity and priority for these bid packages will need to be identified and confirmed by the Office of the Receiver to allow authorization for each to be distributed for bidding. Additional delays due to lack of funding will further impact the already delayed projected completion of December 2012.

While upgrade planning is proceeding in a timely manner, the actual upgrade construction program for all prisons is not on schedule as set forth in the Turnaround Plan of Action due to the Schwarzenegger Administration's failure to fund the prison upgrade construction program.

For additional information, Vanir Construction Management's monthly reports for Avenal State Prison are included for August, September, and October 2008 as Appendices 24, 25, and 26 respectively.

**Objective 6.2.   Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs**

In September 2008, the Receiver established a management structure responsible for planning, designing, activating, and operating the seven new health care facilities currently under development to serve up to 10,000 patient-inmates. This management structure will represent a much leaner and flat organization than the facility planning and activation program currently utilized by CDCR and other State agencies. The Receiver will file a special report comparing his transition structure to other State organizations by the second quarter of 2009.

*Integrated Care*:  On September 1, 2008, an Integrated Care (IC) Team, consisting of clinical, custody, classifications, and rehabilitation staff, moved forward with three primary directives. Comprised of Receiver's medical staff, CDCR Dental and Mental health staff, court representatives, and clinicians from the Department of Mental Health, the IC Team will first develop an integrated health care program model for seven new facilities that will deliver medical, mental health, dental, and rehabilitation services to patients from California's prison system.  These health care programs, based on "Team-based Patient Care," will be provided in the prototypical facility and will include the following: standardized goals, objectives, and outcomes; similar program structure and staffing; and a literature search of evidence-based best practices for staff.  Second, the IC Team will work closely with the Joint Venture Integrated Project Delivery Team to develop a draft facility design that is as streamlined and efficient as possible, requiring the least possible resources to activate, open, and operate on a long-term basis.  Third, the IC Team will develop an efficient staffing structure to support the integrated health care program model.

An important program component of IC Team includes evidenced-based rehabilitation program opportunities for patient-inmates in the seven new health care facilities.  State mandated rehabilitation programs developed for the facilities will be designed to improve outcomes, reduce recidivism, and will be based on the individual patient's needs.  Program designs and delivery systems will be created consistent with the core program values. Elements of the new rehabilitation model will include an evidenced-based risk and needs assessment completed for each patient upon entry into the facility.  The specific programs offered will target the patient's crime-specific needs and include vocational training, education, substance abuse treatment, life skills, faith-based programs, re-entry preparation and transition services.

*Rehabilitation Services Advisory Council:*  At present, the State is unable to develop and put in real-life-practice any effective rehabilitation program.  Therefore, a Director of Rehabilitation position was established to plan and develop the Rehabilitation concepts and program framework for the seven new facilities.  The Receiver also created a Rehabilitation Services Advisory Council to provide input and advice on rehabilitation program development.  The Rehabilitation Services Advisory Council Charter is included as Appendix 27.  Council members were recruited nationally to ensure that effective, evidenced-based programs are established that will successfully reduce recidivism.  Development of rehabilitation model concepts has begun. During the first quarter of 2009, the Rehabilitation Services Advisory Council members will be appointed and the first Rehabilitation Services Advisory Council meeting will be held.

*Administrative Services and Facilities*:  On September 1, 2008, an Administrative Services and Facilities Team was established and is charged with three primary directives.  First, the Administrative Services and Facilities Team will develop an administrative services and facility operations model that supports the health care mission of seven new facilities.  The administrative services model will be designed to minimize the practice of housing administrative functions within a secure perimeter in order to reduce the construction footprint and costs.  A new procurement model is being explored to reduce the costs associated with purchasing, inventory, and storage, including a reduction of warehouse space construction. Second, the Administrative Services and Facilities Team will work collaboratively with the Joint

96

Venture Integrated Project Delivery Teams to produce a facility design that supports the security, administration, and facility operations. During this reporting period, the Administrative Services and Facilities Team has identified more than 20 design-impact areas, facilitated executive leadership decisions for each area, and is in the process of working with the Joint Venture Integrated Project Delivery Team to incorporate the modifications into the prototypical facility design. Third, the Administrative Services and Facilities Team will develop an efficient staffing structure to support the facility operations and provide a safe and secure environment for patient-inmates and staff.

*Custody Services*: The Classification System to be used in the new facilities will be based upon the current CDCR system used to determine custody levels but will also include a clinical and behavioral assessment in order to determine actual bed placement within the new health care facilities.

The new facilities will incorporate principles of "direct supervision," allowing for patient-inmate management by continual direct contact between patient-inmates and staff. Officers posted inside each housing unit provide frequent, non-scheduled continuous observation of, and personal interaction with each patient-inmate. Rather than using CDCR's approach to inmate management by positioning officers in elevated gun posts or secure control rooms, the principles of direct supervision allow the floor or housing officer to directly interact with, rather than avoid contact, the patient-inmate population. The direct supervision approach is proactive rather than reactive to violence. Officers will know the patient-inmate populations they are supervising and will be able to intervene prior to disturbances, thereby, limiting lock-down situations that contribute to delays in services provided to patient-inmates. The direct supervision model and the facility design will greatly improve lines of sight for all staff in order to reduce vandalism, assaults, and suicides.

*Activation Planning:* During this reporting period, CPHCS staff have researched and identified activation management structures in the Federal Bureau of Prisons with private contractors and with subject matter experts who participated in previous CDCR facility activations. In addition to researching various prison activation models, the staff consulted with experts in hospital organizational development and activations inside and outside of California. Specifically, the Deputy Commissioner for the New York State's Regional Medical Model has provided access to New York medical staff to assist with the issues involved in their unit activation and the Arkansas Deputy Warden assigned to the medical and diagnostic unit has provided valuable activation insight as well. The URS/BLL and CPHCS staff have conducted site visits to the Federal Bureau of Prisons, Butner Federal Medical Center in North Carolina, as well as the Faulkenburg and Orient Road Facilities in Florida. These process reviews will provide the activation teams with solid guiding principles in planning and implementing CPHCF activation protocols.

Additionally, to eliminate processes that require extensive layers of manual labor, employ antiquated technology systems that do not interface, and cause additional workload, staffing, and costly health care mistakes, the Receiver has been exploring the use of modern IT in the new facilities to gain efficiencies. Medically-focused IT projects identified for implementation in the

seven new facilities include, but are not limited to the following: Maxor Pharmacy/ GuardianRx® system; Document Scanning and Imaging; Health Care Scheduling and Bed Management System; Health Information Management; Information Security and Privacy, and Laboratory Information System.

*Completing an efficient, effective prototypical design:*  Collectively, the Receiver's project teams have established a process for Target Value Design (TVD) to be applied to the preliminary facility design.  Beginning in January 2009, the Teams will collectively review the preliminary design and conduct focused streamlining sessions to improve operational efficiencies, reduce construction costs, improve operating costs, and identify the correct staffing needed to ensure constitutionally adequate care is provided to patient-inmates.  The IC Team will incorporate the integrated care model to ensure patient care and staffing are refined to maximize efficiency and minimize costs.  The ASF Team will incorporate a security, administrative, and facility operational model into the TVD sessions to ensure maximum efficiencies are met.

The first draft prototypical facility design to be presented to the Receiver in March 2009, will include the security plan, the integrated health care program model, the facility operational plan, and the facility staffing proposal.

*Workforce Development:*  A significant number of health care professionals will be necessary to staff the seven new health care facilities including LVNs and Psychiatric Technicians.  To prepare for the future need for these classifications, a prototype apprenticeship model for training LVNs and Psych Techs was initiated in September 2008.  "The Apprenticeship Program," will utilize community colleges to provide accredited certificate programs for clinical rotations and the California Community College Chancellor's Office for Related and Supplemental Instruction costs.  In addition, a meeting was held at Richard J. Donovan Correctional Facility to work out process details for using prisons for clinical rotations with stakeholders from the community colleges, CDCR, and CPHCS.  A second meeting will be held in January 2009 to discuss and agree on issues that must be addressed to initiate the program.

### Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible

Preplanning activities for the construction of new health care facilities are progressing. URS/Bovis Lend Lease Joint Venture (URS/BLLJV) has commenced California Environmental Quality Act (CEQA) activities on six potential CPHCF sites.  A Draft Environmental Impact Report (EIR) for Stockton was issued on October 24, 2008, and was circulated for public comment for 45 days.  A public meeting regarding the Draft EIR was conducted on November 10, 2008.  The comment period closed on December 8, 2008.  A Draft EIR for San Diego was issued on November 4, 2008, and was circulated for public comment for 45 days.  A public meeting regarding the Draft EIR was conducted on November 18, 2008.  The comment period closed on December 19, 2008. A Final EIR for San Diego is anticipated to be complete on February 18, 2009, and the Final EIR is expected to be certified on February 27, 2009.

Notices of Preparation for EIRs have been issued and circulated for public comment for prospective sites at Folsom, Chino, Vacaville, and Ventura.  Public meetings were held in each

98

of these communities between October 2, 2008 and December 10, 2008. Draft EIRs are anticipated to be published for Folsom, Chino, Vacaville, and Ventura in spring, 2009, with Final EIRs published and certified in the fall 2009.

URS/BLLJV conducted analysis of several additional sites, and it is anticipated that CEQA analysis for one or more of these additional sites will be conducted.

> *Action 6.2.2. By February 2009, begin construction at first site*

Due to the lack of funding, the schedule for groundbreaking will not be met.

> *Action 6.2.3. By July 2013, complete execution of phased construction program*

Due to a lack of funding, the schedule for completion will not be met.

**Objective 6.3.   Complete Construction at San Quentin State Prison**

Construction at San Quentin consists of Three Construction Packages.  Construction Packages One and Two are detailed under Action 6.3.1 and Construction Package Three is detailed under Action 6.3.2.

> *Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility*

Six of eight projects in Construction Package One at San Quentin State Prison are complete.  The completed projects are:  Project One- Personnel Offices, Project Two- Replacement Parking Spaces; Project Three- Relocate Exercise Yard; Project Five- the Triage and Treatment Area Renovation; Project Seven- Clinic Heat Project, and Project Eight- Addition of Re-locatable Office Space Trailer.

The following are updates on the two projects completed during this reporting period:

1.  Construction on Project One:

    Personnel Offices was complete on December 19, 2008 with a certificate of occupancy granted by the State Fire Marshal on December 21, 2008.  Completion was delayed beyond the original completion date of October, 2008 as a result of multiple site conditions and site related changes that impacted completion of paving.  The most significant delay contributing to 23 days of non-compensatory time extension to the contract included the installation of a sewer line that was required to be performed during limited work hours to keep institution operations and traffic flow open without impact by construction activities. Furnishings, equipment and staff are in preparation for move in.

2.  <u>Project Seven</u>:

Clinic Heat Projects was recently completed and consists of installing space heating in the Adjustment Center Clinic, North Segregation Clinic, TTA and installation of an electrical panel at the medical staff modular office for emergency power.  The project was completed on November 12, 2008

The following are updates on the two remaining projects in Construction Package One:

1.  <u>Project Four</u>:

Medical Supply Warehouse, is in the construction phase.  Construction documents are complete and approved for construction.  Construction of the foundation system is complete. The metal deck for the elevated slab was complete at the end of December 2008 and placement of the concrete slab was completed during the first week of January 2009. The pre-engineered building has been delivered to the site and erection will begin during January 2009. Contaminated soil and water was encountered during foundation work, requiring testing protocols to be initiated followed by determination of disposal requirements. A 49-day time extension was negotiated with the contractor as part of the change order for the contaminated materials, adjusting the contract completion date to April 15, 2009.

2.  <u>Project Six</u>:

East and West Block Rotunda Clinics, commenced construction on March 17, 2008 and is continuing to run approximately 60 days behind schedule. A unilateral change order for 43 days was issued to the contractor for construction impacts resulting from issues with the existing electrical panels and the electrical cut-overs.  The revised contract completion date was December 24, 2008.  The contractor has completed the perimeter clinic construction and enclosure and has progressed into interior framing and system rough-in within the existing rotunda area and the clinic addition. System and interior finishes are anticipated in January and February, 2009. Vanir continues to work closely with the contractor in the implementation of sequencing scenarios to recover as much lost time as possible, but due to limited resources to support timely completion of remaining contract work the best realistic completion date at this time is March 2009.

In reference to Construction Package Two, the final project within Construction Package Three is the Upper Yard Medical Modular.  Construction was complete on September 16, 2008 and the modulars were occupied shortly thereafter. Staff are operating Specialty and provider clinics on the clinic side and medical staff continue to occupy the administrative side.

***Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility***

Construction Package Three, the Central Health Services Facility at San Quentin State Prison, was progressing well and was ahead of schedule.  Installation of the pre-cast exterior wall panels is substantially complete and final window panels and roofing are in final stages of completion to

allow the building interior to be weatherized. Cold temperatures in December 2008 have affected the contractor's ability to complete all roofing. Critical interior walls have been constructed throughout the building. Building system rough-in of mechanical and plumbing has been completed on the 2nd floor and continues on the 3rd, 4th and 5th floors. Security wall panel systems have started on the 2nd floor and will continue behind system rough-in on the upper floors.

Staff have been successful in ensuring timely payments to our construction contractor for the San Quentin State Prison Central Health Services Building in order to support their completion of this essential building. This project was authorized by the Legislature to be funded with State Public Works Board lease revenue bonds and similar to other State bond funded projects, has been temporarily funded with a loan from the Pooled Money Investment Account. This successful effort is now compromised by a decision by the State Pooled Money Investment Board to curtail payments from the Pooled Money Investment Account, which, if not reversed, will stop the Central Health Services Building dead in its tracks, a stoppage which will cost California taxpayers $10 million over and above litigated related cost. In addition, a new facility designated to care for medical, mental health, and dental patients will be delayed indefinitely, a decision which may well jeopardize the use of San Quentin as a Reception Center beyond Spring 2009.

For additional information, Vanir Construction Management's monthly reports for San Quentin State Prison for August, September, October, and November 2008 are included as Appendices 28, 29, 30, and 31 respectively.

# Section 5
# Additional Successes Achieved by the Receiver

**A.    Status of the Project Management Office**

The efforts to improve the access and quality of health care for California's inmates requires initiation of many projects to improve business processes, clinical procedures and services and IT solutions.  Project Management Offices (PMO) exist across the globe in most industries to manage organizational projects and was selected to improve the project, program and portfolio management for all CPHCS projects related to the Turnaround Plan of Action.  In April of 2008, the Receiver assembled a team to develop the infrastructure to build, deploy and support the PMO efforts.   Project management processes were developed; a best-practice project management methodology was adopted; a comprehensive library of templates was published; and Clarity (an electronic project and portfolio management system) was implemented.  State and contracted project managers and staff were hired to manage the PMO and all CPHCS projects. Since the PMO was initiated, the number of projects has grown from six in April 2008, to twenty-five in August 2008, to forty-five in December 2008.   Also, in December 2008, a CPHCS "Satellite PMO," at the URS/BLLJV offices was staffed and deployed to support the projects of the 10,000 Bed Program.

Between August and November 2008, 752 resumes from 335 vendor proposal responses were reviewed by the PMO, over 80 personnel were interviewed and finally 25 project managers and 7 subject matter experts were hired.  CPHCS executives interviewed candidates from throughout California, as well as from across the country including New York, Michigan, Washington, Oregon, and Arizona.   The top candidates were hired at reasonable, competitive hourly rates. As of the close of this reporting period, more than 40 project managers and several IT subject matter experts are contracted staff working within the PMO.

The 45 various projects overseen by the fully operational and now mature PMO are summarized in the PMO Executive Data Project Sheets for December 2008.  (Refer to Appendix 32.)  Each CPHCS project is aligned with specific Goals and Objectives in the Turnaround Plan of Action. Project managers are managing IT, clinical, and business reengineering projects and are maintaining project schedules and required project management artifacts.

The PMO implemented tools to manage our projects in real-time. For example, the project and portfolio management system Clarity provides dashboard views of project information and working collaboration environments necessary to the high performing project teams.  From the data stored in Clarity, the PMO develops ongoing monthly reports and schedules that are distributed to CPHCS management and project managers.   Regular PMO monthly status meetings are also held with management and all project managers for regular information sharing, project management direction, and project dependency discussions.

The PMO has become a valuable and necessary tool which brings structure and visibility to projects and project management at CPHCS and promotes and improves communication and collaboration among stakeholders and across organizations impacted by our projects.

**B.    2008 Best of California Award Winner:  J. Clark Kelso**

In December 2008, the Receiver was selected by e.Republic, Inc. as the 2008 Best of California Award Winner in the category of *Leadership in Solving Business and Policy Problems through Technology*.    This honor is awarded to an Agency or department executive who has demonstrated extraordinary vision and leadership in solving business problems through the use of technology. The Receiver was awarded for his introduction of an IT program and project management regimen that will result in a technology-based organizational transformation. CPHCS is implementing the first comprehensive health information management system in State government through the technology-enabled Access to Care Initiative. This system will include pharmacy, imaging and laboratory, telemedicine, medical records and scheduling, health information, bed and facility management, and network and data center services to support these services.

The Receiver accepted his Best of California award at a ceremony held at the Sacramento Convention Center on December 3, 2008. During his acceptance speech, he acknowledged the efforts of CPHCS's IT management team in achieving, in less than one year, a level of technological enablement and efficiency planning not often seen on such a large scale in civil service.   The Receiver also recognized that the IT leadership team and our dedicated and hardworking clinical and business partners fully understand the importance of ongoing efforts to help bring the level of health care in California's Prison System up to constitutionally acceptable standards. The planned  application of IT in the prison medical programs and system will not only streamline the patient care process but will also significantly reduce costs to California's taxpayers.

**C.    *Turnaround Lifeline* Newsletter to Staff**

The Receiver's Communications Department concluded this reporting period by distributing the January 2009 issue of the *Turnaround Lifeline* Newsletter.   This is the sixth issue of the *Turnaround Lifeline*.   In the January 2009 edition, an interactive link is included on the electronic version of the *Turnaround Lifeline* which allows readers to see and hear a video of the Receiver explaining the established minimum constitutional standard for California prison health care reform.  This new, interactive component of the *Turnaround Lifeline* was achieved using existing resources and had no associated costs.  Similar interactive components are planned for future issues.

In general, content for the *Turnaround Lifeline* is chosen by a multi-disciplinary advisory committee of CPHCS staff which meets monthly and whose members suggest story ideas.  All readers are also regularly invited to send suggestions for "Above and Beyond" features, story ideas, and comments through a special e-mail address directed to Communications staff.  The goal is to foster two-way communication through the Newsletter, so that field staff will know

that their efforts are appreciated, their concerns are taken into account, and that help is on the way.

*Turnaround Lifeline* Newsletters for October, November and December 2008 and January 2009 are included as Appendices 33, 34, 35, and 36 respectively.  A sampling of past stories from this reporting period is as follows:

- Death Rates Decline Significantly (October 2008)
- Receiver's Corner: Justice Will be Done (November 2008)
- Avenal ADA Team Vastly Improves Service (November 2008)
- Construction & Projects will Save Lives, Boost Economy, & Save Taxpayers' Money (December 2008)
- Folsom Health Care Team Raises the Bar, Behind Bars (December 2008)
- Hep-C Training Begins for First Responders (December 2008)
- Receiver & IT Team Awarded Best of California Honor (January 2009)

15,000 hard copies of each issue of the *Turnaround Lifeline* are printed by the Receivership.  The Newsletter was previously printed at the Reproduction Unit at CDCR Headquarters; however, we have minimized costs by printing the Newsletter utilizing on-site copying resources at CPHCS.  Each month, hard copies are mailed to liaisons at the 33 institutions for distribution to all medical, mental health, and dental employees.  The Warden's offices also receive copies for the custody staff who are most involved with health-related issues. Distribution of hard copies is necessary because an estimated 50 percent of all CPHCS staff do not have on-line resources and are not connected to the internet at work.  However, in an ongoing effort to save taxpayers money and contribute to a "greener" environment, all staff members at the Sacramento Headquarters location, and others with internet connectivity, receive electronic copies only.

## D.    *HR Connections* **Newsletter to Staff**

Historically, important Human Resources-related information has not reached staff due to the CDCR's lack of access to the intranet/internet. In November 2008, the first *HR Connections* Newsletter for staff was published.  In collaboration with the Receiver's Communications Division, *HR Connections* was developed to focus on personnel information of interest to CPHCS employees.  *HR Connections* is contained within each monthly publication of the Receiver's *Turnaround Lifeline* Newsletter which is distributed statewide.

*HR Connections* has become a useful and effective tool for communicating Human Resources-related content to CPHCS staff statewide. During this reporting period, for example, topics have been covered such as Savings Plus changes, health plan and employer contribution rates, and changes to personnel policy due to Proposition 8.  Recurring in each newsletter is a section featuring a different Human Resources unit, informing readers and staff of its roles, responsibilities, and accomplishments.  Generally, content for *HR Connections* is chosen by a small advisory group within Human Resources who meet monthly and suggest story ideas as well as identify important upcoming, recurring, and sometimes time-sensitive information.

Contributions from readers are also included through an inquiry intake process and a "Frequently Asked Questions" section.

Concurrently with the *Turnaround Lifeline* Newsletter, *HR Connections* is printed on-site utilizing copying resources at CPHCS and then distributed statewide.  CPHCS employees with internet connectivity receive electronic copies only.  The newsletter is also available on the Human Resources intranet page (accessible to CPHCS employees who have connectivity) at http://intranet/phr/.  November 2008 and January 2009 issues of *HR Connections* are included as Appendices 37 and 38 respectively.  (Please note: *HR Connections* is a monthly publication; however due to the tight holiday printing timeline, a December 2008 edition of *HR Connections* was not issued.)

# Section 6
# Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

### A.    Continued Delays by the State Personnel Board

Three RCEA web-enabled examinations were finalized by SPB and testing commenced: Nurse Executive on September 18, 2008; Medical Executive on December 10, 2008; and CEO, Health Care, on December 23, 2008.  As a result, selection for these critical leadership positions is now underway. As explained above, all of the exams were delayed for months by SPB.

In addition, some classification board items have taken as much as 20 weeks to be calendared and approved by the SPB.  These delays are apparently caused by the limited staff resources at the SPB, an increased workload, as well as the SPB's meeting schedule.  Receiver's staff have met several times with SPB staff to work out streamlined procedures that relieve both staffs of burdensome paper shuffling, preserve the essence of merit principles, and yet facilitate the needs of the Receivership to rapidly hire hundreds of people.  SPB, however, has not been convinced to change, and has failed to respond to proposals in a timely manner.

In a July 29, 2008 memo to Suzanne Ambrose, Executive Officer of the SPB, CPHCS formally requested delegation of CEA establishment and management and creation of pilot position by position testing.  Following months of discussion and numerous meetings, the matter was calendared for a hearing before the SPB on November 3, 2008 at the direction of Ms. Ambrose.  The Board took the matter under submission; however,  no action was taken at that time.  The item was again listed under submission at their November 18, 2008 meeting where only three board members were in attendance. The Board subsequently met on December 2, 2008 and again no action was taken.  When we inquired as to the Board's action at the December 23, 2008 meeting, the Executive Officer indicated that it was not likely that the Board would take any action since it was not a full Board meeting.  To date, there have been neither questions asked nor requests for additional information raised by SPB staff.

Unfortunately, the SPB is a part-time board that meets 23 times a year, meetings lasting only a few hours.  The Board meets as a full board (all five members) only once a month and by policy does not conduct hearings during their mid-month board meetings where only three Board members attend. Given the limited staff resources at the SPB and the limitations outlined above, the Receiver's request for delegation with post audit and oversight by the board is urgently needed.   CPHCS is fortunate to have knowledgeable human resources staff that are able to blend the needs of the Receivership with the principles of merit and the requirements of State government.  Therefore, we are confident that we are able to manage a delegated CEA program and pilot position-by-position testing program in a credible, effective, and efficient manner.  Nevertheless, SPB continues to ignore this request.

Unless the SPB effectuates the requested delegation at its January 2009 meeting, the Receiver has no choice but to proceed forward with a waiver of State law pertaining to specific delegation issues. Appendix 39 is a summary of SPB's board meetings in 2008.  As apparent from the summary, while

some of the Receiver's requests were processed appropriately, other very important requests have simply been ignored without explanation for many months.

# Section 7
# An Accounting of Expenditure for the Reporting Period

**A.      Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four months ending December 31, 2008 were $9,842,191 and $41,742,658 respectively. A balance sheet and statement of activity and brief discussion and analysis is included as Appendix 40.

**B.      Revenues**

On October 31, 2008 and on November 18, 2008, the receiver requested a transfer of $22,000,000 and $20,000,000 respectively from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the receiver for the second quarter of the Fiscal Year 2008-2009. All funds were received in a timely manner.

# Section 8
# Other Matters Deemed Appropriate for Judicial Review

### A.     Coordination with Other Lawsuits

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman, Perez,* and *Armstrong* ("Coordination Group") class actions have continued. Coordination Group meetings were held on October 24, 2008 and January 13, 2009, and the next meeting will take place on March 24, 2009.  Progress has continued, as follows, during this period:

1.  As reported in the Receiver's Ninth Quarterly Report, the Coordination Group agreed that the Receiver in coordination with the Department of Correctional Health Care Services and subject to the oversight of the monitors in the health care class action cases would assume responsibility for all non-institutional office space statewide for the medical, mental health and dental programs.  As a result, a space planning coordination agreement was submitted to, and adopted by, the four courts.
2.  Coordination agreements have also been prepared in the areas of health care appeals, transcription and dictation, and the transition, activation and management of the Receiver's 10,000 bed project.  To date, each of these agreements has been approved by the Coordination Group and submitted to the courts for approval.

However, while efforts among the Coordination Group continue, and progress has been made concerning coordination needs of the four federal court health care class actions, the Administration's proposed budget-related solutions, as discussed above, will render future coordination efforts increasingly difficult as the State attempts to impose restrictions on salaries, hiring, use of overtime, etc., that will have a negative impact on CDCR's ability to coordinate ADA, mental health, and dental programs with the needs of the Receiver's medical programs. Efforts during the next quarter will focus on preventing the Schwarzenegger Adminstration from forcing the Coordination Group representatives to fight among themselves because of funding cuts.

### B.     Master Contract Waiver Reporting

On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts.  The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date.   The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the court's orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the court, included as Appendix 41 is a summary of each contract the Receiver has awarded during this reporting period, including a (1) brief description of each contract, (2) which project the contract pertains to, and (3) the method the Receiver utilized to award the contract (*i.e.*, expedited formal bid, urgent informal bid, sole source.)  Vendors were also engaged by the Receiver during this reporting period to assist in the operation of the Receiver's non-profit corporation, the California Prison Health Care Receivership Corporation.  While such contracts are not governed by the Master Contract Waiver, a list of contracts is provided to the court for information.

## C.    Arsenic at Kern Valley State Prison

In November 2008, based on an inquiry from the Los Angeles Times newspaper and subsequent conversations with CDCR officials, the Receiver learned that arsenic levels at Kern Valley State Prison have exceeded the allowable levels established by the Environment Protection Agency for many years.  Thereafter, the Receiver's staff performed a review of water-related issues at all of the 33 prisons.  The situation at Kern Valley State Prison is especially disturbing because many years have passed since State officials became aware of the problem.  Furthermore, despite the health risks posed, CDCR returned General Fund money allocated by the Legislature to address the problem.  The Receiver's Chief of Staff requested a CAP from the State regarding this issue on December 24, 2008.  A Los Angeles Times article from December 29, 2008 entitled "Arsenic Levels Too High in Kern Valley State Prison's Drinking Water" is included as Appendix 42, and the Receiver's Chief of Staff's related letter to CDCR is included as Appendix 43.

## D.    Mini-Region Crisis Response Project

The CPHCS field structure is currently organized into three regions:  North, Central, and South.  Four prisons clustered in the Central Valley - Avenal State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, and Pleasant Valley State Prison - have had the most serious treatment backlogs in the State.  One yard at Substance Abuse Treatment Facility, for instance, is seven weeks behind in providing primary care appointments.  This crisis has been caused by a variety of factors, including overcrowding, inadequate clinical space, rural isolation, inability to attract clinicians, and the CDCR policy of placing chronically ill populations at these remote institutions.  The Substance Abuse Treatment Facility, for instance, is a high-security prison in Kings County with 7,628 inmates in space designed for 3,424.  It has a complex medical mission including geriatrics, dialysis, the State's largest number of disabled inmates, and a large mental health population.

The Receiver has been patient over the last two and a half years, attempting to work within the current CPHCS and CDCR approaches to solving the long-standing problems at these and other institutions.  He remained patient because he believed that 10,000 additional medical beds and the Facility Upgrade Program offered the most efficient means of bringing the system up to a constitutional level of care.  However, due to the delays in funding of these programs by the Schwarzenegger Administration, the Receiver is compelled to pursue significant upgrades to the clinical delivery system in these prisons.

The Receiver will address this crisis by taking immediate steps to decrease the backlogs in primary and specialty care and by filling new management positions to support the on-the-ground delivery of care.  These four prisons will comprise a special region designated for a new pilot program called the "Mini-Region Crisis Response Project."  This project is a crisis response only.  It cannot replace the need for additional clinical space in the existing prisons to provide access to care, and will not add to the need for treatment facilities for the 10,000 prisoners with long-standing, chronic medical and mental health problems, aged conditions, serious disabilities, etc.  This plan will, however, prevent the crisis situations at the four prisons from deteriorating further.

Interventions currently under development include redeployment of clinicians from Headquarters and other regions to these institutions and use of evening and weekend clinic hours.  The new regional managers will work with the Receiver's established project teams to focus resources on clinical delivery in these institutions, drawing from human resources, IT, medical records, contracting, and procurement.  Clinical space will be augmented as needed via conversion of existing non-clinical space or deployment of mobile units or tents.

Diversion of staff and initiatives will affect timelines of the Turnaround Plan of Action.  These crisis measures will require significant adjustments in CDCR's custody support for the medical mission.  They will also have significant budgetary impact, as access to care may be increased to 18 hours per day.

The Receiver will file a special report concerning the Mini-Region Crisis Response Project within 60 days.

# Section 9
# Conclusion

Despite the prevailing headwind of politics, the Receiver's team continues to make progress towards remedying unconstitutional conditions within the healthcare system of the CDCR. Nurse and physician vacancies are at historic lows. Some efforts to make the healthcare delivery system more efficient are ahead of schedule. Overall, frontline staff feels more empowered to deliver necessary care.

Despite external pressures to halt or reverse improvements, we are resolute in our efforts. Adaptation, creativity and change are a constant. For example, even as the SPB has worked to slow our efforts to hire proper staff, we continue to engage them in a professional manner to ensure advancement of a new class of Career Executive Assignment positions.

Independent of other State agencies and departments – and in spite of the Governor and Attorney General's improper meddling – the Receiver's office continues to innovate. We are keenly aware that only cutting edge healthcare delivery will improve and help maintain a constitutionally adequate system of medical and mental health for California's inmates.

The bottom line for the Receiver is that we are revolutionizing correctional healthcare, but doing so virtually alone. In a rhetorical sea of bureaucratic morass, the Governor and Attorney General – both stated advocates of improved government service delivery – should by all accounts be staunch allies of our reforms. However, their words and deeds prove otherwise.

We teeter on the brink of success and failure as the Governor issues executive orders to cut medical staffs' pay and thwart our recruitment and retention efforts. Meanwhile, the Attorney General argues before the Three Judge Panel who are considering population caps and early releases that it should not be ordered because the Receiver will build seven new correctional healthcare facilities with 10,000 beds. Then, the same Attorney General argues in the media and other courts that these same facilities go too far and should not be built.

It is unconscionable that the State and its elected representatives who have for several years agreed with and adhered to the orders of the court and concurrent stipulations would now make every effort to thwart the delivery of a constitutional level of healthcare in our correctional system. Only champions of extreme mediocrity would look to our improvements and advances and say: "Job well done … it's time to pack it up!" I do not say that to belittle our efforts but to highlight the long road ahead.

Without systemic culture change and significant facility upgrades and additions, our every effort will have been in vain. The irony of the Governor and Attorney General's antics are that in the long run they will cost the State – and taxpayers – dearly. If we are continually thwarted in the drive to create sustainable improvements, we are destined to an extremely expensive purgatory of symptom triage. You cannot judge success merely by dumping boatloads of tax dollars on a

given emergency. The root cause of the emergency – the underlying sickness – must be addressed.

The uniqueness of the Receivership is that we were not created only to respond to one crisis after another – and garner the requisite headlines – but to roll up our sleeves and dig into a mess of a system -- and fix it. Dysfunctional prisons threaten the safety and security of all of us; nevertheless, it will prove to be neither popular nor easy fixing California's prisons. To do so will require State leaders with resolve and exceptional courage. Unfortunately, thus far, Governor Schwarzenegger and Attorney General Brown have displayed neither.