# APPENDICES 35-43

# PART 7 OF 7

# APPENDIX 35



# TURNAROUND
## *Lifeline*

### *California Prison Health Care Services*



## INSIDE THIS ISSUE

**Lives and Taxpayer's Money Saved**    1
True Benefits of the 10K Bed Project

**Do You Know?**    1
Construction Oversight Board

***▲ Above and Beyond ▶***    2
Raising the Bar Behind Bars

**Receiver's Corner :**    2
Holiday Blessings

**Combating Hepatitis C:**    3
CME Credits Offered for Training

**Combating Hepatitis C:**    3
Turning Plans into Reality

**Maxor's Guardian Implementation**    4
Lesson's Learned

**Construction Program:**    4
Preparations On-going

## DO YOU KNOW?

The Receiver has established a Construction Oversight and Advisory Board (COAB) to provide advice, expert recommendations, and transparency regarding the construction of the 10,000 bed health care facilities. The eleven-member COAB includes representatives from public and private sectors with expertise in the fields of governmental accountability, facility planning, and construction in order to obtain the highest quality of advice and to be able to ensure optimum quality and accountability for project scope, schedule, and budgets, including a representative from the United States Justice Department's National Institute of Corrections, California's State Auditor, and California's Inspector General.

# CPHCS Construction & Projects will Save Lives, Boost Economy, & Save Taxpayers' Money

The Receiver's Health Care Construction program is an investment that will save taxpayer's significant amounts of money in the long run. Upon reviewing the plan, Mitzi Higashidani, the Receiver's new Director of Administrative Services, which encompasses the Finance Department, says "When I hear anyone complain that the State simply can't afford the Receiver's Plan of Action, I realize they don't fully understand its benefits. I tell them that if they want our State to get back on the right track, they need to support the plan and explain it to everyone they know."

The construction and operation of the facilities will create what's called direct, indirect and induced jobs. Direct jobs are the total number of individual jobs, either full or part-time, at the sites. Indirect jobs include jobs that are created by suppliers of goods or services. Finally, induced jobs are those created by the purchases and consumption of goods and services by direct and indirect employees.

Here are the latest approximated figures by the Sacramento Regional Research Institute of the economic benefits that are expected to result just from the construction of the health care facilities alone:

Construction Job Impacts:

Direct construction jobs per site: 25,600
Indirect construction jobs per site: 16,000
Induced construction jobs per site: 22,800
*Total construction job impact:*
*64,400 jobs state-wide*
Once the construction is done, more lasting impacts will be felt.

Permanent Job Impacts:

Direct: 12,750   Indirect: 3,900   Induced: 7,600
*Total permanent jobs: 24,250 jobs statewide*
It's expected that each site will have an approximated annual payroll of $110,000,000. Since there are 7 sites planned, the approximate total is $800 million dollars per year and that doesn't even account for larger staffing at 2 of our sites. Benefits paid to the total amount of employees will add another 32%

of those annual salaries in economic stimulus to the state. That's another $256 million dollars. But the story of the economic benefits to the State doesn't end there.



**MITZI HIGASHIDANI**

Many of the clinical support functions that are being planned or implemented will not only save inmates' lives but will also provide California taxpayers with significant savings in the cost of health care delivery. The results are already beginning to surface. Based on a review of the first 8 months of the major clinical support function which has been implemented, the Maxor Pharmacy Project projects a cost avoidance of approximately $33 million in 2008 compared to prior drug cost trends. These cost avoidances are the result of targeted pharmaceutical contracting strategies, disease medication management, and increased pharmacy services accountability and oversight. It is expected that other planned support programs will also yield considerable cost savings.

But there's more. McKenzie-Stephenson, Inc., has concluded a comprehensive assessment of CDCR's medical imaging services including radiology, CT, MRI, and ultrasound and created a road map for future improvement. McKenzie-Stephenson, Inc. recently presented evidence that implementation of their recommendations could result in annual savings to the state of $67 million after just two years.

Additionally, consultants from the University of Texas Medical Branch estimate that an improved telemedicine program could avoid inmate transport costs totaling nearly $60 million annually.

Plus, Navigant guarantees its high-quality lab services will yield five-year cumulative savings of approximately $5 million. Navigant believes this model has the potential to additionally reduce operating costs by 10 to 15 percent over 5 years through reduction of waste, inefficiency, and unnecessary duplicated testing.


**◄Above and Beyond►**

*From Crisis to Opportunity,*

# FOLSOM HEALTH CARE TEAM RAISES THE BAR—BEHIND BARS



Folsom's Health Care Team: (Left to Right:) HCM/CMO Dr. Renee Kanan; DON-Mark Glowski; Care Manager-Darrell Kirby RN; SRNII Loretta Franklin RN; PCP Dr. John Dunlap; AGPA Barbara Shane.

**T**here is a sign displayed proudly in the Folsom State Prison Health Center. It reads: "Raising the Bar Behind Bars." Chief Executive Nurse Betsy Chang Ha says it's absolutely appropriate for the Folsom Health Care Team, "here's an institution that turned crisis into opportunity." The Folsom team has had its share of tough breaks. They were one of the first institutions to implement the Folsom State Prison Health Center. (see story page 4). It was the pharmacy pilot program that exposed the problems that can come with rapid change that's attempted without the proper preparation. Like many other institutions they suffer from a lack of connectivity and other issues common to prison sites. But they are now credited for being a model site for the roll-out of several Access to Care initiatives including the Asthma Initiative, the Specialty Care and Case Management Pilot, the Community Standards for Referrals Project and the Sick Call Pilot "They've come a long way. They are one of our stars. They embraced the new ideas and ran with them," Chang-Ha adds.

Folsom's Health Care Manager/Chief Medical Officer, Dr. Renee Kanan credits her outstanding team and says the key to their success is to "rally everyone around a common purpose and to leverage everyone's strengths," by giving them proper respect and realizing that "everyone brings something important to the table." Kanan says her team simply set out to identify their goals together and everyone on the team was asked for input on "how we should do it."

That's exactly the kind of challenge Specialty Care Nurse Champion Loretta Franklin was seeking. Loretta prides herself in heading off problems before they get serious, saving her patients needless suffering and saving taxpayers from avoidable bills.

She is fully aware that some of the public doesn't understand why inmates should get adequate health care at all. "For me, it's a patient to me- inmate to custody, but a human being to all of us." Loretta is a certified case manager who came on board to be part of the Specialty Care, Access to Care Project. She once worked as a case manager at a hospital in Northern California that was located between a State Prison that was located on the edge of one county and its contract provider which was in a different county. The ambulance service that was called for emergencies wouldn't cross county lines, so emergency prisoner cases would always end up at her non-contract provider hospital – costing taxpayers huge bills and health providers massive headaches because they weren't equipped for security. "I was looking at that and thought, oh my gosh what a waste." Now she uses her

( Continued on Page 3 )

---


# THE RECEIVER'S CORNER
## BY J. CLARK KELSO



**T**he holidays are now upon us. Amidst the turmoil of the national and global economic crisis, the state budget crisis, and the daily challenges that each of us faces in fulfilling our professional obligations, now is the time of year to make extra room in our hearts and minds for thoughts of family and friends, of home and community, and of sharing and giving.

We all have special traditions that we fall back upon during the winter holidays. Families reunite for the Thanksgiving feast. Children perform in The Nutcracker Ballet all across the nation, with visions of sugar plums dancing before our eyes. We exchange gifts and glad tidings. We remind ourselves of our common humanity, and we restoke the fires of hope and optimism.

However, for some, the holidays are not a time for happiness. For some, ironically, the happiness and joy they see around them only magnifies their own anger, resentment or insecurities. Be sensitive in your relationships and in the workplace to those who may not share your enthusiasm for the holidays.

Our patient-inmates will also have mixed emotions about this time of year. Their confinement and the conditions of confinement, particularly for those who are suffering from recurring pain or chronic illness, are constant reminders of the freedom, joy and family on the outside that they are missing. Depression will be on the rise, and this is the time of year when we see substantial increases in rates of sickness and death. Take a moment to reflect upon their circumstances and suffering. True, each of them is responsible for their own confinement. But equally true, each is a human being entitled to decent treatment and common respect. We are healers, and we can be proud that our efforts are committed to improving their lives. After all, that is one of the overriding messages of the holiday season: love of and service to others who are less fortunate than we.

Happy Holidays!

# *Combating Hepatitis "C"*

# Hep-C Training Begins for First Responders
## *Class Participants Qualify for CME Credits*



**Trainers and Students:** (Left to Right:) Shawn Mostafania, P.A.; Elizabeth Dos Santos Chen, D.O.; Cheng Cong Wu, M.D.; Paulette Finander, M.D.; Kashif Ali, M.D.; Junaid Fitter, M.D.; Wale Olukanmi, P.A.; Ann Vuletich, M.P.H.; James Gocke, N.P.; Paul Fortaleza, M.D.; Hai Le, M.D.

In another historic "first," CPHCS will soon become one of the few state correctional departments in the country to provide Continuing Medical Education (CME) credits to physicians. On October 9, Kashif Ali, MD., conducted the first lecture "Primary Care Introduction to Hepatitis C" for CME credit. Seven clinicians at California State Prison-Los Angeles County in Lancaster attended and were among the first providers in the CPHCS system to receive CME credit, which is required to maintain licensure. "This is truly exciting - the first CME lecture held by CDCR staff for CDCR staff! Hepatitis C at LAC," said Elizabeth Dos Santos Chen, D.O., Chief Medical Officer for the Southern Region, who attended the training. The Hepatitis C program is one of several developed to demonstrate a "track record" which is required before CPHCS can become accredited as a provider of CME. "Right now it's like riding a bike on training wheels," said Ann Vuletich, M.P.H., CME Program Manager. "Once we become accredited, which should happen early next year, we will be able to plan and approve all CME programs ourselves." Physicians from the Clinical Sup-

port Unit have also presented a one-hour course on "Primary Care Introduction to Chronic Pain Management." Over sixty providers in five institutions attended and received CME credit. The case-based lecture provides primary care providers with an introduction to pain management and tools they can use to better assess and manage patients with chronic pain. Participant response to the program has been overwhelmingly positive. Nearly 80% gave the lecture high marks (very good to excellent) in meeting its purpose, while over 70% listed specific changes they intended to make in their practice as a result of attending the course. One participant stated that the course was "extremely practical...it gives us some tools to use right away."

The CME Committee, chaired by Alan Frueh, M.D., Chief Medical Officer Clinical Operations, meets monthly to review and plan future program offerings. Topics in the development pipeline include coccidioidomycosis (Valley Fever), diabetes, asthma, and medical management of dental emergencies. Each program will be conducted throughout the 33 institutions in the prison health care system. Currently each session lasts for one hour but longer programs may be developed in the future. Regularly scheduled conferences, similar to case conferences and grand rounds in hospitals, are also under development. CPHCS is seeking accreditation because recruiting and retaining good physicians and keeping them abreast of medical changes is a continuing challenge. National research shows that a critical component of successful physician recruitment and retention is the quality and ease of acquiring continuing medical education. There are few CME programs focused on the unique challenges of treating patients in a correctional health care setting. Having an accredited CME program allows CPHCS to tailor its program to the health conditions that occur frequently in a patient-inmate population. CPHCS will also be one of the first organizations to undergo an accreditation survey under new, more rigorous accreditation standards. The new standards focus on evaluating changes in practice several months after physicians have attended the program, to give them an opportunity to put what they learned into practice. The increased focus on evaluation also fits well into the quality improvement culture that is being established throughout CPHCS. Participants provide feedback on how well the program resulted in changes in clinical practice; that information is then used to identify areas for improvement in future CME offerings.

## DOCTOR & NURSE CHAMPIONS MEET IN SACRAMENTO TO SHARE WAYS TO TURN HEP-C PLANS INTO REALITY IN PRISON SETTINGS



*Clinician Champions share their own successful ways to combat Hep-C at this CPCHS-sponsored seminar in Sacramento.*

Hepatitis C is a rapidly emerging infection, especially in the prison setting where nationwide the risk to inmates is 40% higher than in the general population. But as the risk is higher in the prison setting, diagnosis, and treatment are also more difficult. Just ask Dr. Lori Kohler, the Director of the Correctional Medicine Consultation Network at the University of California, San Francisco. Dr. Kohler was instrumental in coordinating a two-day seminar recently at the Pagoda Building in Sacramento where Doctor and Nurse

Champions working on the Hep-C Initiative came together to share best practices for converting treatment methods into practical use in prisons. Dr. Kohler says one of the best outcomes of the seminar will be the forming of a systemwide "network of clinical professionals that can help track inmate Hep-C patients and communicate to keep treatment consistent." She also emphasized that only other clinicians who understand their limitations of space and equipment can help overcome the unique challenges. Aside from well known national experts, such as Dr. Joanne Imperial, the seminar also featured CPCHS Hep-C Champions who have found treatment methods that work within CDCR, such as Folsom's Public Health Nurse, Eric Washburn. His self-made e-system helps him track interferon recipients while the CPCHS IT system becomes integrated. His tracking system helps avoid lapses in treatment. He says a inmate patients are getting "much better care," but there's still a long way to go in fighting Hep-C.

# *Raising the Bar*

(Continued from Page 2)
common sense to avoid similar waste of time and money as a case manager in the chronic care program pilot.

Her goal is to involve the inmates, who have chronic conditions that can turn serious or even deadly, in their own care and teach them to be partners in case management. Many have a "low socio-economic background and may not be used to actively participating in care." But she says that once they understand their condition, know the consequences of non compliance they often become motivated to be involved." For Loretta, that's a challenge that is worth taking on. Because as Dr. Kanan likes to say, "if you think good care is expensive, try bad care." That's much more expensive in dollars, more costly when it comes to human suffering and more wasteful of staff energy. And that's reason enough for the Folsom team to raise the bar-behind bars.

*Dr. Lori Kohler*

We're on the Web at:
## www.cphcs.ca.gov



# California Prison
# Health Care Services

P.O. Box 4038

Sacramento, CA  95812-4038

Phone: 916-323-1923

Story Ideas, Comments , or Questions: lifeline@cdcr.ca.gov



## Receivership's
## Mission

**R**educe unnecessary morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and coordinate the delivery of medical care with mental health, dental and disability programs.

**Recruitment :** Do you Know someone Interested in Joining our Health Care Team?

Website: ChangingPrisonHealthCare.org

Phone:  1-877-793-HIRE (4473)

---

# Phase 1 Maxor Implementation
# "Lessons Learned"

**C**PCHS has concluded a study of staff concerns following the Phase 1 implementation of Maxor's Guardian Rx™ Phase I implementation that began at the California Men's Colony and a few other institutions about one year ago.  At that time, the goal of the implementation was to control sky-rocketed pharmacy costs and waste.  But Chief Nurse Executive, Betsy Chang-Ha, who headed the study, says the experience there has left them with "a lesson learned," that haste to solve one problem can cause others.  Like most CDCR Institutions, CMC lacks IT connectivity.  A limited



dedicated network circuit was installed and Maxor's Guardian system was implemented.  But Guardian was originally designed for use in full-fledged pharmacies.  Without other upgrades such as full internet technology connectivity and an expansion of the physical space, the use of the Guardian system under Phase I, sometimes resulted in inaccuracies and often caused more paperwork for the clinical staff.  " We recognize that it was not the optimal implementation process for CMC." says Chang-Ha.

Maxor says clinicians didn't follow training protocols, but instead created 'work-arounds' to speed up the pill line distribution. Nurses argue that they did what was necessary to insure patient-inmates got their proper medications in a timely way.  Chang-Ha says the entire pilot process was a learning experience which will help improve their method of implementation for the other facilities so that a smoother transition and more extensive training can be achieved.  As a result of the study, CMC was placed on a fast-track for internet connectivity and Phase II Guardian implementation.  Soon, it's expected that in its second phase, many of the problems will be worked out and the Guardian program will become much more of a help than a hindrance, producing higher accuracy rates,  and cutting down on paperwork. CMC's Guardian Phase II upgrade began in November.

# Pre-Construction Preparations On-going



The Stockton EIR  shows where the California Prison Health Care Facility would stand among existing buildings.  For more info, go to WWW.CPHCS.CA.GOV

**I**t's an exciting, busy time at the Receiver's office in Sacramento, as our construction project management partnership with URS/Bovis moves ahead with the formal environmental review process at several potential health care facility sites.

As the Lifeline goes to print, the formal environmental review process called CEQA (California Environmental Quality Act) has been started at sites in San Diego, Stockton, Chino and Folsom. Draft environmental review reports for the Stockton and San Diego sites are currently being reviewed by those communities.

"The CEQA process is really the very beginning of the development process for each one of these sites," said Wendy Saunders, URS/Bovis' CEQA Manager. "It gives a formal, structured opportunity for the community to ask questions and give input on these projects. Also, it formalizes any physical mitigations that might be needed for things like traffic impacts."

The CEQA process can take anywhere from 9 to 12 months. Upon review and approval of the environmental impact reports (EIR), clearing and construction can begin at the sites. It is anticipated that clearing at the first site will begin in February or March of 2009.

# APPENDIX 36



Volume 2, issue 1

January 6, 2009

# TURNAROUND
## *Lifeline*



*California Prison Health Care Services*

## Inside this issue

**Kelso: The Constitutional Standard**  1
No Need for an Academic Concept

**Inspector General 's Probe Widens**  1
Doctors Accused of Grand Theft

*Encouragement for the New Year*  2
▲*Above and Beyond*▶ *Special*
An Inmate's Letter of Thanks

**Team Member Spotlight**  3
Nurses: Generations of Service

**Team Member Spotlight**  3
CMO Achieves Childhood Dream

**DON Statewide Conference**  3
Worksite Issues are Focus

**Best of California**  4
Kelso and IT Team Honored

**Mule Creek Medical Facilities**  4
Up next for construction upgrades



### Do you know?

## Flu Shot and TB Tests

CPHCS has just completed the largest Flu Shot Distribution in CDCR history. Even with 9 prisons yet to report, more than 75,000 people have received the vaccination. Vaccines are administered to inmates annually, but this year staff members were also invited to receive the injections free of charge in hopes of containing the virus from spreading through the population and among the staff.

Now, it's time for the Annual Employee Tuberculosis Testing. Testing will be done by institution so be on the look-out for your testing schedule.

# Kelso: Constitutional Standard 'Long Established'

Federal Receiver J. Clark Kelso is steadfastly answering critics such as Attorney General Jerry Brown who claim there is no established minimum constitutional standard of adequate health care for California inmates. Speaking in opposition to the Receiver's Turnaround Plan of Action, Brown, who is actively fundraising for a probable run for Governor in 2010, raised a recurring argument.  Brown was quoted in the Sacramento Bee on December 9th asking, "what is the constitutional standard for health care? When we ask the receiver and his lawyers, they say, 'We'll know it when we get there.' That's not good enough."   In his own press conference almost



J. Clark Kelso, Receiver

a month before, Kelso laid out binders of court documents on the table to emphasize the Attorney General is "wrong!" Kelso reiterated that "the term 'constitutional minimum' as used in the Facility Program Statement (FPS- the detailed plans for the construction of the 10,000 bed project,) means compliance with the orders of the Plata, Coleman, and Perez Courts. The FPS has not been developed by referencing academic or hypothetical concepts of what is a 'constitutional minimum;' indeed such an effort would create no end to debate and disagreement.   (Continued on Page 3)

## See It Yourself

**Streaming video of the Receiver detailing the Constitutional Standard is available on the CPHCS website at:**

http://www.cphcs.ca.gov/resource.aspx

# Inspector General's Timesheet Probe Widens

The State Office of the Inspector General is expanding its probe into allegations of false claim filings as a result of phone call tips received after the indictments of Dr. Charles Dudley Lee, 69, of Salinas (Chief Medical Officer at Salinas Valley State Prison) and five other contracted psychiatrists and a physician were made public.  Few details are available as to the scope of expansion of the probe or whether employees at other State institutions may be investigated. The Receiver's Chief of Staff, John Hagar said, "I have an enormous amount of trust and faith in our employees.  But it's important for everyone to understand that anyone who knowingly pads their time sheet commits career-threatening fraud against the State's taxpayers. Don't even think about it."

Dr. Lee is accused of knowingly authorizing fraudulent timesheets.  The other accused clinicians from Salinas Valley state prison are Randy Sid, 42, of Pacific Grove; Wade Exum, 60, of Las Vegas, Nev.; Pedro Eva, 43, of Soledad; Mark Herbst, 48, of Honolulu; and David Hoban, 65, of Santa Cruz. Each was indicted of five to six counts of grand theft, falsifying public records and filing false claims. They are accused of misrepresenting their work hours and falsifying timesheets. The next court hearing for the accused doctors and psychiatrists from Salinas Valley State Prison will be Jan. 13, 2009 at 10 a.m. in Salinas.

# Facility Expansion Will Bolster Retention

The Human Resources department at California Prison Health Care Services has, in cooperation with the hiring managers in the State's 33 institutions, significantly reduced the high vacancy rates of nursing and clinical providers.  There are still "hard-to-recruit" geographic locations for some classifications where it continues to be difficult to find staff; however, the fill-rate for nurse positions is now at about 91% throughout the system and for physicians it is approximately 88%.  The next challenge is retaining those nurses and primary care providers.  The turnover rate is 12 percent among Licensed Vocational Nurses, 9 percent for physicians and 11 percent for mid-level practitioners.  To counteract some of these problems, the following initiatives are currently under development:

Part-time and intermittent nursing opportunities are being advertised in an effort to reduce our dependence on the more expensive staffing companies.  "Grow Your Own Nursing Programs" are being developed in partnership with the community colleges to increase the number of Licensed Vocational Nurses and psychiatric technicians educated in the communities where new health care facilities are proposed.  And a New Employee Orientation and preceptor program specifically geared to increase the retention of health care professionals has begun and will be available for all new hires statewide by January 2009 (See story on pg. 1 *HR Connections*.)   Lastly, facility development and improvement will be a key component of the new staff retention strategy. Facility problems like lack of space and outdated     (Continued on Page 3)

# ◄ *Above and Beyond* ►

## *An Inmate's Heartfelt letter of Gratitude*

# ENTIRE CPHCS TEAM THANKED FOR COMPASSION, HARD WORK, & CARING

The letter below was received and sent to "Lifeline" by Dr. Joseph Chudy of CTF, Soledad.   Dr. Chudy says the inmate/author has been witnessing the changes in medical delivery first-hand at several institutions for many years.

Upon reading the letter, Dr. Chudy 's response to the inmate was, "it was our teamwork that has brought these changes about." He  told the inmate that "the thoughts he expressed truly apply to every one of our 33 institutions."



There was a time when you decided to enter this profession because you wanted to make a meaningful difference in the lives of others.  To lend a healing hand to those who could not help themselves. It may have begun with a conversation, an event, or an individual.  Wherever it began, it has brought you here.  Maybe you carry a stethoscope or a medical file.  Or maybe it's a medication tray or you take dental x-rays.  Whatever you do, you work for the welfare of others. Everything you work for has but one ultimate goal, to alleviate the ailments of the infirm.    It is not, however, the common individual you care for, but for the uncommon.     For this, we thank you.  Thank you for serving our particular segment of society.

Only a few years ago, a person could walk through the long corridor of CTF-Central and see common sights that should not be common.  It was not uncommon to see congested traffic as one approached the medical department.  (It still is)  It was not uncommon to see the men there afflicted with large tumors or skin lesions.  It was not uncommon to see men who could barely walk, stand, or



breathe.  And it was not uncommon for men to be bounced from prison to prison rather than receive adequate treatment.  A man could go to an MTA with a tooth infection, be diagnosed behind the glass, told nothing was wrong with him, and sent rudely away.  Discouraged, he would not return to the MTA worried he would get in trouble seeking their help again.   There were those who died on the rec-yard or their housing units because help did not arrive on time, or because no one nearby knew how to give CPR.

Then there were those who were terminally ill.  They were housed in the second floor infirmary, in pain, alone, and without hope.  Their only companion was the despairing knowledge of having to die in prison.   Perhaps, the most disheartening part of all this, was the feeling we had when we walked away from the medical department.  That we were something less than human.  We weren't men, we were inmates.  We resented anyone who worked for "the system". Some of us plotted to find new ways of manipulating medical staff to be treated.  Some

would go so far as to fake one illness to be seen by a doctor, then change and tell them what really ailed us.  None of us could define just what our relationship to the people who were supposed to help us was.  We were suspicious of anyone who treated us genuinely.  Our cynicism would be confirmed when we saw the good efforts of staff thwarted by workplace politics.

Then, something happened, relief.

We began to see lots of new faces.  New equipment like their MRI machine they bring in during the week.  We started to get treated differently from what we were accustomed to.  Rather than a glare in the corridor, a smile and a greeting.  Huh?     The shift in the change of culture was immediate.  Not only were we finding relief, but we no longer had to go to the extremes of the past to receive health care.  Be it a tumor, a liver biopsy, chronic back pain, etc. We were being seen.  It is the comfort you provide that reminds of our own humanity.  The care you provide tells us that no matter where we are, we are still men and not just inmates.  That we do not belong to an inanimate tool of justice, but to God.  RNs, more than anyone, but also LVNs, Dental Assistants, Psych Techs, are the backbone of CTF's Medical Department.  You deal with so many of us on a daily basis.  You bear the brunt of the workload.   Often, we can get on your last nerve.  Some of us have a big chip on our shoulder, or are rude.  Some of us have bad breath or smell bad.  Others of us fake it, ogle, or etc.  Forgive us.  Forgive us and have patience.

We are the men whose pain is often deeper than our physical ailments.  Many of us have been punished for so long we've forgotten what it's like to live without it.  Some of us are angry, bitter, lonely, broken-hearted, or just plain broken.  Remember that whatever we've been judged to be, we are still someone's son, brother, father, husband, or grandfather.  Because of our poor decisions, there is an empty seat at our families' dinner tables.    Some day though, most of us will be home.  We will tell our loved ones about how, "When I was in prison and was sick, there was this one…" doctor, nurse, or secretary who helped us.  How if it wasn't for you, some of us wouldn't have made it home to tell them the story.    So thank you.  There is no formal way of expressing our appreciation, but please accept our gratitude as sincere however we may express it.  It may be a young man who deep cleans your office for hours, but didn't steal as much as a paper clip. (Even though you had all of that loose candy laying around.) Or it may be the old man you see every week and has that familiar twinkle in his eye as he tells a joke or two.  It may simply be the guy in the corridor who looks you in the eye and says, "How are you?" Or just a simple thanks when you've helped someone.  We really mean it.  We know that there's still a long way to go and the road to better health care is a long and arduous one for all of us.  We're in it together and we will get there.    It has been said that a society can be measured by how it treats its prisoners and its pets.  We should hope that your treatment of us will always speak well for all of us.  Thanks.

Volume 2, Issue 1

# Team Member's Spotlight

## SERVICE, HONOR & TRADITION IN 3 GENERATIONS OF NURSING FAMILY



Ironwood's Cris Bato: Nurse, Marine, Marital Arts Champion and Master

**T**radition is very strong in the Bato household. For three generations now, the Batos served in the U.S. military. Two of those generations have produced nurses. Cris Bato, is a Supervising Registered Nurse II at Ironwood State Prison and his daughter Tamra is now a registered nurse at Desert Regional. Both nurses also follow the family tradition of practicing martial arts.

Cris Bato has been practicing martial arts since he was four years old. Bato is a seventh degree black belt who went undefeated in mixed martial arts during his six years in the Marines. His service mirrors that of his father, a martial arts expert who served 30 years in the U.S. Army and fought in World War I and II. Representing the third generation is Tamra, a retired green belt.    Master Chris Bato attended college at Philippine

College of Criminology where he studied other martial arts such as judo, boxing, wrestling, fencing and karate as part of his curriculum. He has taught Shorin Combat Mixed Martial Arts for 34 years and now has 24 students. In the family tradition, Bato's two sons are also teaching alongside him. Like Cris, son Derek served in the Marines from 2003-2007, during which time he went undefeated in mixed martial arts and served a tour of duty in Fallujah. Cris's other son, Brian, is a local volunteer firefighter in Blythe and is also a martial arts instructor.

When he is not attending to his CDCR nursing responsibilities, Cris and his students compete in martial arts tournaments all over the world. In fact, Master Bato will be hosting an Ultimate Combat Martial Arts Championship featuring full contact kickboxing and mixed martial arts cage fighting this coming year. If anyone gets hurt, help won't be far away.

The Team Member Spotlight debuts in this issue as an occasional feature to introduce us to our co-workers. Submit story ideas to: Lifeline@CDCR.ca.gov
Guest Author: Stacie Minor-Amaya, AGPA Ironwood State Prison

## New CMO for Long Term Care is Living Boyhood Dream

'**L**imiting' describes the jobs available to young men of Ashland, Kentucky during the 1960's.  Swelter at the steel mill, endure a coal mine's murkiness or breathe in noxious fumes at the local chemical company: Jim Lett wanted none of that.



James Lett M.D.

As a youngster his career choice was medicine. "It was an honorable profession," he states, recalling the respect shown to local doctors from their patients in return for their knowledgeable and caring ministrations. His aspirations solidified when a childhood friend, a brother of country superstar Naomi Judd, died of lymphoma before reaching his 18th birthday.

Currently serving as the Receiver's Chief Medical Officer for Long Term Care, Lett's early medical training included the University of Kentucky College of Medicine in Lexington. An internship in Savannah offered a diversity of medical disciplines where he eventually focused on family practice. Upon establishing a practice in the retiree-abundant city of Clearwater, Florida, his interest in geriatrics and long term care sparked and grew. "Old people are not just middle-aged people with more illnesses any more than a middle-aged person can be compared to an infant." Often afflicted with *co-morbidities*, meaning simultaneous ailments like diabetes and heart disease,

the multiple medication usage to combat afflictions also increases. Upon entering nursing homes or hospices, the elderly become members of population medicine where treatments encompass the whole unit of inhabitants not just the individual. Working on the 10,000 bed program Lett sees many similar correlations, especially with patient/inmates displaying debilitating physical conditions decades earlier than private sector health care consumers. Issues concerning dementia, increasing frailness, and safe transportation between diagnosis and treatment are just a few.

The ability to affect positive change in improving lives through more humane treatment stimulates Lett. Boyhood ambitions thrive still.

## Constitutional Minimum
(Continued from Page 1)

Instead, the FPS calls for an integrated, efficient health care delivery model that conforms to the specific Federal Court orders stipulated to by the State of California in the *Plata*, *Coleman*, and *Perez* class actions." Kelso cited as example: "the FPS calls for the staffing and program space adequate to deliver chronic disease care under the time frames and quality standards required in *Plata*. The programs defined in the FPS do not exceed those requirements."

## Staff Retention
(Continued from Page 1)

equipment are often extremely frustrating for prison health professionals and can reduce retention rates if not addressed. The new 10,000 bed project, along with renovations being done at existing facilities, clearly demonstrates to all staff that the Receiver is serious about providing them with the medical resources they need to offer adequate care. Katie Hagen, Deputy Director for Workforce Development, says "It takes a coordinated effort to attract quality applicants to the California prison health care system, but now that they have arrived, we must develop and implement a comprehensive strategy to keep them."

## DON Meeting focuses on Worksite Issues



Attendees at the Statewide DON conference celebrate unity.

**T**he Statewide Director of Nursing (DON) Conference was held in Sacramento in mid-December. Attending the 3-day conference were the Directors of Nursing from all 33 California prison facilities, as well as several Nurse Consultants for the different regions. Over 70 health officials came to the conference, which was

hosted by the nursing team from the northern medical region. Arriving from all over the state, many conference participants shared success stories while others voiced continuing concerns. The quarterly conference provides a channel of communication between statewide medical leadership and nursing management, while at the same time updating nursing staff on the status of prison health care reform. Statewide Director of Nursing Karen Rea emphasized the importance of this collaboration by recalling the frustrating bureaucratic culture that used to hinder communication on all levels of nursing administration. "That barrier has been shattered with the receivership", she says. "In the past

year, we've been able to give nurse leadership the tools they need to succeed." On the conference agenda were several items which will effect day-to-day nursing operations at all prison health care facilities. Among the most important topics was the introduction of a new utilization management program which will help govern and standardize outpatient referrals. Attendees were also asked to familiarize themselves with a new audit system from the Office of the Inspector General and to be patient with the implementation of the new Maxor Gaurdian RxTM pharmacy system. The first statewide conference to include both nursing and physician professionals is expected in April.



We're on the Web at:

www.cphcs.ca.gov

## CALIFORNIA PRISON HEALTH CARE SERVICES

P.O. Box 4038

Sacramento, CA  95812-4038

Phone: 916-323-1923

STORY IDEAS, COMMENTS , OR QUESTIONS: lifeline@cdcr.ca.gov

### RECEIVERSHIP'S MISSION

Reduce unnecessary morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and coordinate the delivery of medical care with mental health, dental and disability programs.

RECRUITMENT : DO YOU KNOW SOMEONE INTERESTED IN JOINING OUR HEALTH CARE TEAM?

Website: ChangingPrisonHealthCare.org

Phone: 1-877-793-HIRE (4473)

# RECEIVER & IT TEAM AWARDED
# Best of California Honor



Award-Winning IT Team (Left to Right:) Liana Bailey-Crimmins, Deputy Chief Information Officer, J. Clark Kelso, Receiver; Jamie Mangrum, Chief Information Officer; Ben Williams, Deputy Director-Project Management Office.

Federal Receiver J. Clark Kelso has been selected as a Best of California Award Winner for Leadership in Solving Business and Policy Problems through Technology.  The award recognizes California leaders who have demonstrated an exceptional commitment to the application of information technology (IT) in both the public and the private sector.

Kelso accepted his Best of California award at a ceremony held at the Sacramento Convention Center on December 3rd.  During his acceptance speech, the receiver thanked his IT management team, led by the Receivership's Chief Information Officer,

Jamie Mangrum, for helping the Receivership achieve a level of technological efficiency not often seen on such a large scale in civil service. Kelso says, " Our executive-level IT leadership crew and their hardworking team fully understand the importance of their efforts in helping to bring the level of health care in California's Prison System up to constitutionally acceptable standards.  They are working as if people's lives depend on their success -because they know that's exactly what is at stake here."    Kelso and his team are implementing a new system of information technology as part of his Turnaround Plan of Action.  One project they are working

on will establish a system for the electronic management of medical records and medical scheduling in some of the most difficult locations- antiquated prisons. Mangrum appreciates the Receiver's commitment to IT development, saying "it really helps to have somebody who understands that technology-enabled progress needs to play a large part in turning the prison health care system around." The application of information technology in the prison medical system will not only streamline the patient care process but will also significantly reduce costs to California's taxpayers.  Kelso has long been at the forefront of California's movement to incorporate more efficient technology as a means to improve State government.  As the State of California's Chief Information Officer, he implemented a collaborative program among California business and IT leaders to further the effective use of technology within State government. Since Kelso's appointment as Receiver, the receivership has become a successful model for demonstrating how important an effective IT management team can be to the success of any project.

## Mule Creek Next
### Medical Construction Upgrade

Mule Creek State Prison, located in Ione in Northern California's beautiful Gold Country, is the third institution after San Quentin to have significant medical facility upgrade construction started. Improvements at Mule Creek



Mule Creek State Prison

include an outside-the-perimeter administrative building, expanded clinic space, a new pharmacy and lab area, relocated and improved trauma bays, new clothing exchange, and a new health services area for the AdSeg unit.  All of these improvements are aimed at improving the delivery of medical services and cutting down on unnecessary inmate movement and trips through the sally port by staff. These efficiencies create long-term cost savings. Building an administrative building outside the security perimeter cuts down on the number of trips that staff who do not have direct inmate contact need to make through the sally port. Also, it enhances recruiting efforts and eases the burden on outside suppliers and contractors for the same reason.  The pharmacy and lab were relocated within the perimeter from the Central Health Care Services (CHS) building in order to provide adequate space for these functions. This relocation provided space within the CHS building for additional specialty services, mental health treatment, emergency dental services and an expanded triage and treatment center.

# APPENDIX 37



**C**alifornia
**P**rison
**H**ealth
**C**are
**S**ervices

# HR Connections



**THIS ISSUE**

CPHCS Human Resources Introduction **P.1**

Lump Sum Deferral to Savings Plus **P.1**

Marriage Affidavit **P.2**

Helpful Hints for Contacting Personnel **P.3**

Where to Find Personnel-Related Info **P.3**

2009 Health Plan and Employer **P.4**

Contribution Rates

Calculating Your Benefits Cost **P.4**

## MISSION

Reduce unnecessary morbidity and mortality, improve inmates' health status and functioning by providing adequate access to medical services, develop a continuum of medical delivery consistent with sound clinical services and fiscal standards, and coordinate the delivery of medical care with CDCR mental health, dental, and Americans with Disability Act programs.

## VISION

As soon as practicable, to establish a constitutionally adequate and sustainable prison medical delivery system for prisoner/patients confined by the California Department of Corrections and Rehabilitation (CDCR) that can successfully be returned to State management.

## CPHCS Human Resources Office Launches Newsletter

California Prison Health Care Services Human Resources (CPHCS-HR), formerly known as "Plata Personnel" is pleased to introduce the first edition of "HR Connections". This publication will focus on personnel information of interest to all employees of CPHCS, such as open enrollment and benefit information. It will also provide a medium to answer your personnel questions.

**CPHCS Human Resources**
**501 J Street, Suite 350**
**Sacramento, CA 95814**
**(916) 445-1378**

We strive to improve and streamline the hiring and appointment processes as well as all other Human Resources functions related to Adult Institution Medical Staff.

HR Connections is produced by the CPHCS-HR and is printed and distributed with the cooperation of the Receiver's Communications Team, which has condensed it's Turnaround Lifeline newsletter for this issue. Future editions of HR Connections will focus on introducing the various units within CPHCS-HR.

If you have any personnel questions you would like to see addressed in a future edition, please contact Sarina Calderon via email at Sarina.Calderon@cdcr.ca.gov or via fax at (916) 445-1592.

## Lump Sum Deferral to Savings Plus

As a result of recent changes to IRS rules, the Department of Personnel Administration (DPA) has revised procedures for transfers of lump sum separation pay to tax deferred retirement plans. As explained in DPA Personnel Management Liaison Memorandum 2008-030, only those employees that separate on or after **November 1st** may defer their lump sum leave credits into the next tax year. The following is effective immediately:

- Employees can defer their lump sum leave credits to a Savings Plus (SPP) 401 (k) or 457 deferred compensation plan or a 403(b) tax-sheltered annuity to the next calendar year, ONLY if they separate on or after **November 1st**.

What remains unchanged is that employees may still transfer lump sum separation pay to an SPP 401(k) and/or 457 plan or a 403(b) tax sheltered annuity for the current calendar year, regardless of separation date. *All contributions are subject to the annual deferral limits.*

All contributions are subject to the annual deferral limits. For tax year 2008, the contribution maximum is $15,500 to the 401 (k) and 457 Plan. An additional deferral of $5,000 per plan is allowed if age 50 or older ($20,500 per plan).

1

# Affidavit for All Employees — Gender Verification

*Prison Health Care Services Human Resources*

In accordance with a recent California Supreme Court decision legalizing same-sex marriage, departments are required to accept any valid marriage certificate issued in the State of California. This article relays information provided in Department of Personnel Administration Personnel Management Liaison Memorandum 2008-017, which explains how to confirm marital status in order to enroll an eligible spouse in the State's Dental Program.

A person may add a new same-sex spouse and eligible dependent children to their health enrollment within 60 days from their marriage date. The effective date will be the first day of the month following the receipt of all required documentation.

### Affidavit for All Employees – Gender Verification of Married Persons and Notice of Imputed Tax (DPA 880)

Because the Federal Government does not recognize same-sex marriage for tax purposes, the value of the additional benefits, received by a same-sex marriage, is required to be added to an employee's taxable gross income. The tax liability is an "imputed value" based on the difference between the one and two-party dental premiums (party rate one premium is used as the baseline and the spouse in a same-sex marriage is treated as the first addition to the employee's coverage). However, if the spouse in a same-sex marriage qualifies as a dependent for tax reporting requirements under the Internal Revenue Code, the value of the additional benefits will be exempt from the imputed tax upon certification from the employee.



For the purpose of the imputed taxation,  a new gender verification affidavit has been developed. The DPA 880 form is required to be completed and signed by all employees and submitted to the employee's personnel office with the completed Dental Plan Enrollment Authorization (STD. 692), when adding a spouse to an employee's dental coverage. The affidavit should be sent to:

**CPHCS Human Resources**
**P.O. Box 4038—Suite 350**
**Sacramento, CA 95812-4038**

A photocopy of the signed affidavit will be given to the employee. The DPA 880 form is available from the personnel office and can be downloaded from DPA's Web site at www.dpa.ca.gov, in the forms directory. Note: Do not send the DPA 880 form to SCO. Maintain the original form in the employee's personnel file.

### Affidavit for Domestic Partners Being Claimed As Economic Dependent (DPA 680)

There are no changes to the processes for domestic partners. The value of the additional benefits received by a domestic partner will be added to an employee's taxable income. However, as a reminder, the Affidavit for Domestic Partners Being Claimed as Economic Dependents (DPA 680) form must be completed for employees who enroll domestic partners as dependents meeting the tax reporting requirements on their State dental plan. Additionally, if an employee terminates their domestic partnership and then enters into a same-sex marriage, the marriage will not terminate their imputed taxation requirement. A photocopy of the signed affidavit should be given to the employee. The original form will be maintained in the employee's personnel file. For more information regarding the purpose of the DPA 680 you should refer to the Benefits Administration Manual (BAM) Dental Section 500.

### Vision Program

The vision premium for non Co-Ben active employees is fully paid by the State.  Therefore, at this time no additional special processing is necessary.

### FlexElect Program Medical Reimbursement Account

Under the State's FlexElect Medical Reimbursement Account (also known as a Flexible Spending Account (FSA)), current federal tax law does not include a spouse in a same-sex marriage in the definition of a dependent. This means that employees who enroll in a medical reimbursement account are unable to claim reimbursement of medical expenses for a spouse in a same-sex marriage, unless the spouse otherwise qualifies as a dependent under Internal Revenue Code Section 152. Therefore, the recent California Supreme Court decision, that legalized same-sex marriage in the state, does not amend or modify federal law which does not allow the ability to claim medical expenses through a FSA for a spouse in a same-sex marriage. Federal law does not recognize any type of relationship for same-sex couples, including domestic partnerships and same-sex marriages.

If you have any questions regarding this information, you may call Michael Sotelo, Senior Personnel Specialist, at (916) 445-8163.

# Helpful Hints for Contacting Personnel

When you need to contact your personnel office with questions or concerns, it is a good idea to have specific information on hand to assist staff with addressing your particular situation. Having this information ready can be a real time saver and will also help ensure the accuracy of the response you receive. Items to consider, depending on the nature of your questions, include your:

- **Position Number** – the main identifier of your classification and location within CDCR, this information enables personnel support staff to relay your request to the appropriate Personnel Specialist or Personnel Analyst assigned to your unit. It also contains your classification code, which helps to identify your bargaining unit and status, such as rank and file or supervisory. Your position number can be found on your Notice of Personnel Action (the State Controller's Office document you signed upon appointment to your current position).

- **Social Security Number** – your personal identification number which allows certain personnel staff to electronically access your leave balances and employment history records

- **Job Tenure** – identifies your status as a State employee and assists staff with researching issues such as your eligibility for exams, transfers and reinstatements.

- **Time Base** – assists staff with handling inquiries regarding your salary and leave accrual rates, break periods and eligibility for exams.

- **Retirement Tier and Type** – assists staff with answering basic questions related to retirement, such as state and employee contributions and standard retirement formulas. For more detailed information or assistance with your retirement plans, you should contact CalPERS directly.

If you need to contact the Human Resources Office, it is helpful to know the name of the Personnel Specialist or Analyst assigned to your program area. To obtain this information, visit the CPHCS home page on the intranet by clicking the "Health Care Services" link on the intranet home page.



## Where to Find It

The Department of Personnel Administration, State Personnel Board, State Controller's Office and the California Public Employees Retirement System all provide valuable services to State employees via their websites. Below is a listing of some of the services and information these agencies provide.

| Department of Personnel Administration (DPA) | State Personnel Board (SPB) | State Controller's Office (SCO) | California Public Employees Retirement System (CalPERS) |
|---|---|---|---|
| www.dpa.ca.gov | www.spb.ca.gov | www.sco.ca.gov | www.calpers.ca.gov |
| • Job and Salary Information<br>• Labor Relations<br>• Personnel Rules and Laws<br>• Personnel Policies<br>• Training and Consultant Services<br>• Dental and Vision Benefits<br>• Employ Assistance Program<br>• Flex Program Savings Plus Deferred Compensation Program<br>• Excluded Employees<br>• State Holiday Calendar | • Job and Salary Information<br>• State Job and Exam Announcements<br>• Employment Applications and Forms<br>• Personnel Rules and Laws<br>• Personnel Policies<br>• Links to Government Job Sites<br>• Online Exams and Exam Results<br>• Training and Consultant Services | • Payroll/Direct Deposit Posting Dates<br>• Direct Deposit Enrollment<br>• Statewide Travel Expense Reimbursement System<br>• Paycheck Calculator<br>• US Savings Bonds<br>• Unclaimed Property | • Retirement Planning<br>• Health Benefits<br>• Home Loans<br>• Long Term Care Programs<br>• Service Credit Purchase Options<br>• Retirement and Financial Planning Seminars, Workshops and Events |

*Prison Health Care Services Human Resources*

3

# 2009 Health Plan and Employer Contribution Rates

**Prison Health Care Services Human Resources**

Just a reminder to all California Prison Health Care Services (CPHCS) employees that your December 2008 pay warrant will reflect the new 2009 health benefit contract rates.  The new rates will be effective January 1, 2009 for health care premiums and the 2009 Employer Contribution Rates.  The warrant will reflect all deduction changes made for Health, Dental, CoBen, Flex-Elect, Medical and Dependent Care Reimbursements.

The State share contribution for rank file and the Co-Ben contribution for Excluded employees can be viewed at the Department of Personnel Administration (DPA) website at:

www.dpa.ca.gov/benefits/employer-contribution/2009.htm

The 2009 Health Care premium rates can be viewed at California Public Employees Retirement System (CalPERS) website at

www.calpers.ca.gov

You may also obtain a copy of the new employer contribution and health care premium rates from your institutional Plata Analyst or the CPHCS Human Resources office in Sacramento.

---

# Calculating Your Cost

**Excluded Employee**

The amount is determined by the party code which is the number of dependents you have on your benefits.  The example below is a party three or more.  To determine your cost, you would use the appropriate rates and premiums for the number of dependents covered under your plan.

| | | |
|---|---|---|
| (Health Premium) | Blue Shield Access + HMO | $1313.05 |
| (Dental Premium) | Delta Dental Premier (Enhanced) | $ 141.22 |
| (Vision Premium) | Vision Service Plan | $    9.19 |
| | | $1463.46 (Total) |
| (Employer Contribution) | CoBen Contribution Allowance | -$1061.00 |
| | **Employee Cost (pre-tax)** | **$ 402.46** |

The CoBen employee out of pocket cost is determined by totaling the premiums for the health, dental and vision and subtracting the CoBen Allowance.

**Rank and File Employee**

| | | |
|---|---|---|
| Blue Shield Access + HMO | Health Premium | $1313.05 |
| | Employer Contribution | -$ 994.00 |
| | **Employee Cost - Health** | **$ 319.05** |
| | | |
| Delta Dental Premier | Dental Premium | $ 123.75 |
| | Employer Contribution | - $  92.81 |
| | **Employee Cost -Dental** | **$ 30.94** |
| | | |
| Vision Service Plan | Vision Premium | $   9.19 |
| | Employer Contribution | $   9.19 |
| | **Employee Cost - Vision** | **$   0.00** |
| | | |
| | **TOTAL Employee Cost** | **$ 349.99** |

# APPENDIX 38



**C**alifornia
**P**rison
**H**ealth
**C**are
**S**ervices

# HR Connections



Kathy Stigall, Director of CPHCS Human Resources

**THIS ISSUE**

Spotlight: Education and Training Unit **P.1-2**

Updating Your Personal Information **P.2**

2008 Wage and Tax Statement (W-2) **P.2**

Frequently Asked Questions **P.3**

CPHCS Human Resources Intranet **P.4**

2009 Holiday Schedule for Excluded EE's **P.4**

## MISSION

Reduce unnecessary morbidity and mortality, improve inmates' health status and functioning by providing adequate access to medical services, develop a continuum of medical delivery consistent with sound clinical services and fiscal standards, and coordinate the delivery of medical care with CDCR mental health, dental, and Americans with Disability Act programs.

## VISION

As soon as practicable, to establish a constitutionally adequate and sustainable prison medical delivery system for prisoner/patients confined by the California Department of Corrections and Rehabilitation (CDCR) that can successfully be returned to State management.

## EDUCATION AND TRAINING UNIT GIVES NEW EMPLOYEE ORIENTATION A NEW START!

The Human Resources *Education and Training Unit* (ETU) serves as the central administrative coordination point for all training programs under the direction of California Prison Health Care Services.

Currently, the ETU serves Headquarters and Regional Support Staff through a range of unit endeavors, notably the Health Care New Employee Orientation (HNCEO) program. Each month, most new health care providers are attending a brand new Health Care- specific New Employee Orientation (HCNEO).

This program was developed by the Education and Professional Development Unit (EPDU) within the Nursing Services Branch. The HCNEO was transferred to ETU on September 1st 2008, and continues to process and orient new clinical employees each month. This exciting training encompasses the specific needs of health care providers who are new to California Prison Health Care and is one of the steps designed to achieve the Receiver's Turnaround Plan of Action.

The HCNEO addresses such topics as: *Introduction to CDCR; Who are Our Patients?; Litigation Precedence; Security Overview; Human Resources Overview; Substance Abuse Testing Program; EEO / Sexual Harassment; Inmate Medical Services Policy and Procedures; Professionalism and Ethics; Public Health and Infection Control in Prisons; Mental Health Delivery Services System.*

Many Health Care Providers who have attended this program since its inception have been very positive in their evaluation of the HCNEO program, while expressing that it better prepares them for their positions in our institutions. The thirty two hour HCNEO is currently offered the first Monday of each month in Rancho Cucamonga, CA for the staff in our southern region, the second Monday of each month at SATF (Corcoran, CA) for the staff in the central region, and the third Monday of each month near CPHCS headquarters in Sacramento, CA.

The ETU is currently developing a new schedule for the upcoming calendar year 2009 in anticipation of expanding the training to all medical staff.

After the thirty two hour HCNEO, clinical and nursing staff receive additional preceptorship training at their local institutions.

*(Continued on page 2)*

# THE NEW YEAR HAS COME,
## Don't Forget to Update Your Information

*Prison Health Care Services Human Resources*

Many things may have happened over the past year and with the new year ringing in, now is the perfect time to make any necessary changes to the personal information kept on file with the CPHCS Personnel office. The Employee Action Request (EAR) - STD 686 can be used to update the following crucial information:



- **Name Change**
- **Mailing Address**
- **Birthdate Correction**
- **Withholding Allowance Change**
- **Marital Status Change**

EAR forms submitted for address changes should be accompanied, if applicable, by an updated Emergency Notification Information Form (CDC 894). Also, if you are making any changes to your primary or secondary beneficiaries, use the CalPERS Beneficiary Designation form (PERS-BSD-241).

All these forms can be found on the human resources intranet forms page: http://intranet/phr/forms.asp

---

## 2008 W-2 FORM HAS BEEN RELEASED



The Form W-2 reflects wages paid by warrants/direct deposit payments that were issued during the 2008 tax year, regardless of the pay period in which the wages were earned. The 2008 Form W-2 consists of warrants/payments dated January 1, 2008 through December 31, 2008. It is anticipated that the Form W-2 will be sent out by January 15, 2009 to the address maintained on the State Controller's Office (SCO) database.

In the event you lose your W-2 or require a duplicate copy for any reason, you can request one. SCO requires a $8.50 processing fee either by money order, check or through payroll deduction. Please contact the appropriate Personnel Specialist who will submit the request to SCO on your behalf. Check or money orders should be made payable to the State Controller's Office. If you choose to pay the processing fee through payroll deduction, you must indicate this option on Standard Form 436 (Request for Duplicate Wage and Tax Statement) in the blank area below "Authorizing Signature." The fee will be deducted from your next warrant/direct deposit payment.

Any questions concerning Federal or State tax returns must be directed to the local Internal Revenue Service or the Franchise Tax Board Office.

---

## EDUCATION AND TRAINING UNIT   *(Continued from page 1)*

In addition to NEO, the ETU can assist in the development and evaluation of individual training plans, procuring general in-service and out-service training, and assist in rolling out statewide training initiatives such as Emergency Response. The ETU also develops curriculum and can provide a wide variety of in-house training.

In the next year the ETU will be expanding its training programs to all support services located at headquarters and all 33 adult institutions. Please visit the following link to see the CPHCS Annual Training Plan for more details:

http://intranet/phr/workforceEducationTraining.asp

# FREQUENTLY ASKED QUESTIONS (FAQs)

**Q: How do I sign up for the Direct Deposit program?**
A: In order to be eligible for the Direct Deposit program, you must have a balance of at least 40 hours of leave (not including sick leave), and must maintain those balances to remain in the program. To sign up, obtain the STD 699 form from your personnel office, complete and return. Normal processing time takes 60-90 days.  Retired Annuitants and other hourly employees, such as student assistants are not subject to the leave balance requirement.

**Q: Is it mandatory to include your Social Security Number (SSN) on your timesheet? I understood that the last four digits of your SSN were sufficient as long as your name and position number information was complete.**
A: It is critical to include the entire SSN as this information is needed in order to process your pay, leave credits, benefits, etc. in a timely fashion.  It is expected that all state employees handle confidential and sensitive documents in a manner that does not breach confidentiality and security of the information.  All timesheets are stored in Personnel, which is a secure and confidential environment.

**Q: How do I qualify for The Family Medical Leave Act (FMLA)?**
A: FMLA is intended to protect an eligible employee's job when leave is needed for the following reasons:
- Birth of a child.
- Care of a newborn child (bonding).
- Placement of a child in the employee's home for adoption or foster care.
- Care for the employee's child, parent, or spouse, with a serious health condition.
- Employee's own serious health condition, meaning:

  ◊ an illness, injury, impairment, or physical or mental condition that involves either inpatient care in a hospital, hospice, or residential medical care facility; or
  ◊ period of at least three calendar days of incapacity that involves continuing treatment by (or under the supervision of) a health care provider; or
  ◊ a chronic or long-term condition that is incurable or so serious that, if not treated, would likely result in a period of incapacity of more than three calendar days; or
  ◊ prenatal/postnatal care.

Employees are eligible if they have worked for their employer (State of CA) for at least one year, and for 1250 hours over the previous 12 months.

**Q: Who is eligible for an Alternate Work Schedule (AWS) and how do you sign up for it?**
A: To be considered eligible for an AWS:
- You must be in a position where such a schedule is feasible (not required to be available from 8-5, five days a week).
- You must maintain a minimum of 40 hours of leave credits (other than sick leave) while on the AWS.

If you request an AWS, you'll be asked to sign an agreement with your supervisor that defines your work hours, regular day off and concurrence with the AWS written policies and procedures. This agreement represents a contract between you and your supervisor which can be terminated for cause or for operational need.  The granting of an AWS is not always mandated and may be subject to management approval. This prerequisite ensures that necessary work will be accomplished, and productivity, service and adequate supervision will be maintained.  Some Bargaining Units specifically address requests for AWS and flexible work hours.  For clarification, refer to your Bargaining Unit contract.

Prison Health Care Services Human Resources

3

# THE HUMAN RESOURCES INTRANET IS NOW LIVE!

CPHCS Human Resources is proud to announce that human resources information is now available on the departmental network (intranet).

http://intranet/phr/

The CPHCS HR intranet pages will be dedicated to providing pertinent personnel and workforce development related policies, forms and information that you may be seeking in a manner that is clear and easily accessible.

Should you have any questions or comments about existing information on our intranet pages, please contact:



**Brendon Barnett**
Technical Web Developer
CPHCS Human Resources
(916) 322-1851
Brendon.Barnett@cdcr.ca.gov

---

# 2009 HOLIDAYS FOR EXCLUDED EMPLOYEES ANNOUNCED

The holiday schedule for Rank and File employees is determined by the collective bargaining process and have not been determined at this time. However, the Department of Personnel Administration has released the 2009 holiday schedule for excluded employees:



Thursday, January 1 — **New Year's Day**
Monday, January 19 — **Martin Luther King Jr. Day**
Thursday, February 12 — **Lincoln's Birthday**
Monday, February 16 — **Washington's Birthday**
Tuesday, March 31 — **Cesar Chavez Day**
Monday, May 25 — **Memorial Day**
Saturday, July 4 — **Independence Day**
Monday, September 7 — **Labor Day**
Monday, October 12 — **Columbus Day**
Wednesday, November 11 — **Veteran's Day**
Thursday, November 26 — **Thanksgiving Day**
Friday, November 27 — **Day after Thanksgiving**
Friday, December 25 — **Christmas Day**

In addition to the holidays listed, excluded employees receive one personnel holiday per Fiscal Year.

To be eligible for a personal holiday, an employee must either be: (a) appointed to a class that requires a probationary period; (b) appointed to an exempt position where leave credits are earned; or (c) appointed to a Career Executive Assignment (CEA) for more than six months. Once eligible employees complete six months of their initial probationary period, they are credited with a personal holiday for the current Fiscal Year. Thereafter, the personal holiday is credited on July 1 of each year.

Employees with a collective bargaining identifier "E" are ineligible to receive a personal holiday (e.g. Seasonal Clerk).

This information is subject to change due to proposed legislation by the Governor.

Prison Health Care Services Human Resources

# APPENDIX 39

| Board Meeting | Board Member Attendance | | | | | Receiver Items Under Consideration | Submitted to SPB | Date SPB Approved |
|---|---|---|---|---|---|---|---|---|
| | S Harrigan | R Costigan | A Sheehan | M Tom | P Clarey | | | |
| 1/8/2008 | X | X | X | X | X | Request from Receiver for delegation and approval of appointing power agency code for examination processes | 10/24/2007 | **NO ACTION** |
| 1/22/2008 | X | X | | X | X | Request from Receiver for delegation and approval of appointing power agency code for examination processes | 10/24/2007 | **NO ACTION** |
| | | | | | | RCEA Medical Executive (Safety) classification | 12/17/2007 | 1/22/2008 |
| 2/4-5/08 | **CANCELLED** | | **CANCELLED** | | | **ALL SCHEDULED ITEMS WILL BE CONSIDERED AT THE FEBRUARY 22 OR MARCH 4 2008 BOARD MEETING** | | |
| | | | | | | Request from Receiver for delegation and approval of appointing power agency code for examination processes | 10/24/2007 | **NO ACTION** |
| 2/22/2008 | X | X | X | X | | Request from Receiver for delegation and approval of appointing power agency code for examination processes | 10/24/2007 | **NO ACTION** |
| | | | | | | Receiver Clark Kelso addresses Board | | |
| 3/4/2008 | X | | X | X | | Request from Receiver for delegation and approval of appointing power agency code for examination processes | 10/24/2007 | 3/4/2008 |
| | | | | | | CEA - Associate Director, Support Operations | 1/8/2008 | 2/14/2008 |
| | | | | | | CEA-Chief, Business Operations Unit | 1/8/2008 | 2/14/2008 |
| 3/25/2008 | X | X | | X | X | RCEA CEO, Health Care (Safety) | 1/18/2008 | 3/4/2008 |
| 4/7/2008 | X | X | X* (left after #12) | X | X | CEA-Director of Communication | 2/15/2008 | 3/17/2008 |
| | | | | | | Receiver addresses Board re: Peer Review Process | | |
| | | | | | | RCEA Nurse Executive (Safety) class modify to add safety | 3/21/2008 | 4/7/2008 |
| 4/22/2008 | X | X | | X | | CEA-Chief Information Officer | 2/28/2008 | 3/12/2008 |
| 5/13/2008 | | X | | X | X | | | |
| 5/27/2008 | X | X | X | X | | | | |
| 6/10/2008 | X | X | X | X | X | Oral Argument -Appeal from Executive Officer disapproval of Recreation & Occupation Therapist Services Contract | | 9/3/2008 |
| | | | | | | CEA-Chief, Strategic Planning & Evaluation | 5/9/2008 | 6/11/2008 |
| | | | | | | CEA-Deputy Chief Information Officer | 5/13/2008 | 6/11/2008 |
| | | | | | | CEA-Deputy Director, Health Care Data and Provider Services | 4/1/2008 | 6/12/2008 |
| 6/24/2008 | X | | X | X | | CEA - Project Management Officer | 5/22/2008 | 6/24/2008 |
| | | | | | | CEA - Project Information Officer, New Construction | 5/23/2008 | 6/24/2008 |
| | | | | | | CEA - Director, Field Support | 5/23/2008 | 6/24/2008 |

| Board Meeting | Board Member Attendance | | | | | Receiver Items Under Consideration | Submitted to SPB | Date SPB Approved |
|---|---|---|---|---|---|---|---|---|
| | S Harrigan | R Costigan | A Sheehan | M Tom | P Clarey | | | |
| 7/8/2008 | X | X | | X | X | | | |
| 7/22/2008 | X | X | X | | X | | | |
| 8/8/2008 | X | X | X | X | X* arrived after 9:45 | CEA-Deputy Director, Facility Management | 7/8/2008 | 8/8/2008 |
| | | | | | | CEA - Deputy Director, Support Operations | 7/8/2008 | 8/8/2008 |
| | | | | | | CEA - Deputy Director, Transition Planning | 7/8/2008 | 8/8/2008 |
| | | | | | | CEA - Deputy Director, Information Technology | 7/8/2008 | 8/8/2008 |
| | | | | | | CEA - Deputy Director, Human Resources | 7/8/2008 | 8/8/2008 |
| 9/3/2008 | X | X | X | X | X | RCEA Clinical Executive (Safety) | 6/27/2008 | 9/3/2008 |
| | | | | | | Receiver's Project Manager Classification | 4/14/2008 | 9/3/2008 |
| | | | | | | CEA- Director, Administrative Support | 7/29/2008 | 9/4/2008 |
| | | | | | | CEA - Undersecretary-Corrections Services (POFF) | 8/11/2008 | 9/4/2008 |
| | | | | | | CEA - Activation Team Superintendent (7) (POFF) | 8/9/2008 | 9/4/2008 |
| | | | | | | CEA - Chief, Enterprise Architecture and Change Management | 6/27/2008 | 7/23/2008 |
| | | | | | | CEA - Director Classification & Case Records Services (POFF) | 8/11/2008 | 9/4/2008 |
| | | | | | | CEA - Director Rehabilitation Services (POFF) | 8/11/2008 | 9/4/2008 |
| | | | | | | CEA - Director, Security Services (POFF) | 8/11/2008 | 9/4/2008 |
| 9/23/2008 | X | | X | | X | | | |
| 10/2/2008 | | X | X | | X | CEA - Special Advisor to Director, Transition Team | 9/2/2008 | 10/3/2008 |
| 10/21/2008 | X | X | | | X | | | |
| 11/3/2008 | X | X | X | X | X* left at 10:40 | Hearing - Receiver's request for Delegation and Modification to Processes | 7/29/2008 | NO ACTION |
| 11/18/2008 | X | X | | X | | Hearing - Receiver's request for Delegation and Modification to Processes | 7/29/2008 | NO ACTION |
| | | | | | | CEA-Director, Human Resources | 10/9/2008 | 11/21/2008 |
| 12/2/2008 | X | X | X | X | X | Hearing - Receiver's request for Delegation and Modification to Processes | 7/29/2008 | NO ACTION |
| 12/23/2008 | | | | | | Hearing - Receiver's request for Delegation and Modification to Processes | 7/29/2008 | NO ACTION |
| | | | | | | CEA-Director, Policy & Regulations, Correctional Services | 11/10/2008 | 12/23/2008 |

SOURCE: SPB minutes

# APPENDIX 40

**CALIFORNIA HEALTHCARE RECEIVERSHIP CORPORATION**
**Discussion and Analysis of Unaudited Financial Statements**
**For the Period July 1, 2008 through December 31, 2008**

The December 31, 2008 financial statements of the California Prison Health Care Receivership Corp (CPR) are presented in compliance with the measurement focus, basis of accounting and financial presentation set forth by the Government Accounting Standards Board (GASB), and include a Statement of Net Assets and General Fund Balance (Balance Sheet) and a Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance (Revenues and Expenses). In lieu of comparing net asset and operating activities to prior period amounts, operating activities are compared to budget.

Revenues related to investment earnings are greater than what had been budgeted due to the actual draw down of cash from the appropriation to the Receivership. The draw down is completed quarterly or on an as needed basis, based on both projected operating and capital requirements of the Receivership. The amount of expected capital expenditures in any given period materially influences the amount of the draw.

A review of expenses included on the unaudited statement of activities compared to what was budgeted for the six months ended December 31, 2008 shows a total difference of $1,659,624 or 3% variance over budget. Two line items or activities in the statement account for the majority of the difference.

Legal and Professional fees were $551,285 or 7% over budget. This is primarily a result of the delay in obtaining construction financing, as it was anticipated that construction related legal fees would be capitalized. In addition, there have been unanticipated legal fees arising from the Receiver's motion to hold the Governor in contempt for failing to finance the Receiver's construction programs. Other expenses were $1,311,010 above budget. The receivership has hired the marketing and recruitment firm Bernard Hodes to assist in the campaign to recruit and hire professional medical staff to work for the CDCR. These costs of recruitment for CDCR Medical and nursing staff had originally been considered a CDCR budget item, but were paid by the Corporation to avoid delays in initiating the program.

Capital assets increased by $48.9 million for the six months ending December 31, 2008. Of the total expenditures for capital assets, $34.5 million was related to program management services for the 10,000 bed project. The remaining expenditures were primarily for various capital improvements at San Quentin, Interim Modular's for Avenal and CDCR information system improvements.

**CALIFORNIA  HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Revenues, Expenditures and Changes in Fund Balance - General Fund - Budget to Actual
For the  six months ended December 31, 2008

|  | Final Budget | Actual (Budgetary Basis) | Variance between Final Budget and Actual |
|---|---|---|---|
| **Revenues:** | | | |
| State of California appropriation to Receivership | $96,147,258 | $96,147,258 | $ - |
| Investment earnings | $424,998 | $724,040 | 299,042 |
| Total revenues | 96,572,256 | 96,871,298 | 299,042 |
| **Expenditures:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $2,606,899 | 2,478,180 | 128,719 |
| Legal and professional services | 8,316,324 | 8,867,609 | (551,285) |
| Travel | 260,288 | 169,041 | 91,247 |
| Rents and leases | 36,000 | 55,850 | (19,850) |
| Office expenses | 50,436 | 43,244 | 7,192 |
| Telephone and network | 17,400 | 33,537 | (16,137) |
| Insurance | 42,756 | 31,256 | 11,500 |
| Other | 96,224 | $1,407,234 | (1,311,010) |
| Capital outlay | 48,927,991 | 48,927,991 | - |
| Total expenditures | 60,354,318 | 62,013,942 | (1,659,624) |
| Change in fund balance | $ 36,217,938 | 34,857,356 | $ (1,360,581) |
| GAAP basis difference - compensated absences | | - | |
| Fund balance - July 1, 2008 | | 4,041,586 | |
| Fund balance - December 31, 2008 | | $ 38,898,942 | |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Net Assets and General Fund Balance Sheet
December 31, 2008

|  | General Fund | Adjustments (Note 1) | Statement of Net Assets |
|---|---|---|---|
| **Assets** | | | |
| **Current assets:** | | | |
| Cash | $49,272,862 | $           - | $    49,272,862 |
| Prepaid items | $0 | - | - |
|  | 49,272,862 | - | 49,272,862 |
| **Noncurrent assets:** | | | |
| Deposits with others | $595,916 | - | 595,916 |
| Capital assets, net | - | $84,517,004 | 84,517,004 |
| Total assets | $    49,868,778 | 84,517,004 | 134,385,782 |
| **Liabilities** | | | |
| Liabilities: | | | |
| Accounts payable | $2,697,466 | - | 2,697,466 |
| Accrued salaries and benefits | $175,123 | - | 175,123 |
| Other accrued expenses | $8,097,247 | | 8,097,247 |
| Compensated absences | - | 236,414 | 236,414 |
| Total liabilities | 10,969,836 | 236,414 | 11,206,250 |
| **Fund Balance/Net Assets** | | | |
| Fund balance: | | | |
| Reserved for prepaid items and deposits with others | 595,916 | (595,916) | - |
| Unreserved, undesignated | 38,303,026 | (38,303,026) | - |
| Total fund balance | 38,898,942 | (38,898,942) | - |
| Total liabilities and fund balance | $    49,868,778 | | |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | | 84,517,004 | 84,517,004 |
| Unrestricted | | 38,662,528 | 38,662,528 |
| Total net assets | | $   123,179,532 | $   123,179,532 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance
For the six months ended December 31, 2008

|  | General Fund | Adjustments (Note 2) | Statement of Activities |
|---|---|---|---|
| **Revenues** | | | |
| Program revenues: | | | |
| Operating grants and contributions: | | | |
| State of California appropriation to Receivership | $96,147,258 | - | 96,147,258 |
| General revenues: | | | |
| Investment earnings | $724,040 | - | 724,040 |
| Total revenues | $96,871,298 | - | 96,871,298 |
| **Expenditures/Expenses:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $2,478,180 | - | 2,478,180 |
| Legal and professional services | $8,867,609 | - | 8,867,609 |
| Travel | $169,041 | - | 169,041 |
| Rents and leases | $55,850 | - | 55,850 |
| Insurance | $31,256 | - | 31,256 |
| Other | $1,484,015 | - | 1,484,015 |
| Depreciation | $0 | $1,397,616 | 1,397,616 |
| Capital outlay - Fixed Assets | 48,927,991 | (48,927,991) | - |
| Total expenditures/expenses | 62,013,942 | (47,530,375) | 14,483,567 |
| Change in fund balance | 34,857,356 | (34,857,356) | - |
| Change in net assets | - | 47,530,375 | 82,387,731 |
| Fund balance/net assets - July 1, 2008 | 4,041,586 | 34,966,389 | 40,791,801 |
| Fund balance/net assets - December 31, 2008 | $ 38,898,942 | $ 47,639,408 | $ 123,179,532 |

**CALIFORNIA  HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Revenues, Expenditures and Changes in Fund Balance - General Fund - Budget to Actual
For the  five months ended November 30, 2008

| | Final Budget | Actual (Budgetary Basis) | Variance between Final Budget and Actual |
|---|---|---|---|
| Revenues: | | | |
| State of California appropriation to Receivership | $96,147,258 | $96,147,258 | $ - |
| Investment earnings | $354,165 | $654,396 | 300,231 |
| Total revenues | 96,501,423 | 96,801,654 | 300,231 |
| Expenditures: | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $2,172,417 | 2,054,110 | 118,307 |
| Legal and professional services | 6,930,686 | 7,640,465 | (709,779) |
| Travel | 216,908 | 148,571 | 68,337 |
| Rents and leases | 30,000 | 52,097 | (22,097) |
| Office expenses | 42,030 | 41,548 | 482 |
| Telephone and network | 14,500 | 29,378 | (14,878) |
| Insurance | 35,630 | 26,387 | 9,243 |
| Other | 80,188 | $1,204,334 | (1,124,146) |
| Capital outlay | 37,283,796 | 37,283,796 | - |
| Total expenditures | 46,806,155 | 48,480,685 | (1,674,530) |
| Change in fund balance | $ 49,695,268 | 48,320,969 | $ (1,374,299) |
| GAAP basis difference - compensated absences | | - | |
| Fund balance - July 1, 2008 | | 4,041,586 | |
| Fund balance - November 30, 2008 | | $ 52,362,555 | |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Net Assets and General Fund Balance Sheet
November 30, 2008

|  | General Fund | Adjustments (Note 1) | Statement of Net Assets |
|---|---|---|---|
| **Assets** | | | |
| **Current assets:** | | | |
| Cash | $60,367,578 | $            - | $     60,367,578 |
| Prepaid items | $0 | | - |
| | 60,367,578 | - | 60,367,578 |
| **Noncurrent assets:** | | | |
| Deposits with others | $610,768 | - | 610,768 |
| Capital assets, net | - | $73,105,745 | 73,105,745 |
| Total assets | $    60,978,346 | 73,105,745 | 134,084,091 |
| **Liabilities** | | | |
| Liabilities: | | | |
| Accounts payable | $496,859 | - | 496,859 |
| Accrued salaries and benefits | $175,123 | - | 175,123 |
| Other accrued expenses | $7,943,811 | | 7,943,811 |
| Compensated absences | - | 236,414 | 236,414 |
| Total liabilities | 8,615,793 | 236,414 | 8,852,207 |
| **Fund Balance/Net Assets** | | | |
| Fund balance: | | | |
| Reserved for prepaid items and deposits with others | 610,768 | (610,768) | - |
| Unreserved, undesignated | 51,751,786 | (51,751,786) | - |
| Total fund balance | 52,362,554 | (52,362,554) | - |
| Total liabilities and fund balance | $    60,978,346 | | |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | | 73,105,745 | 73,105,745 |
| Unrestricted | | 52,126,141 | 52,126,141 |
| Total net assets | | $    125,231,886 | $    125,231,886 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance
For the five months ended November 30, 2008

| | General Fund | Adjustments (Note 2) | Statement of Activities |
|---|---|---|---|
| **Revenues** | | | |
| Program revenues: | | | |
| Operating grants and contributions: | | | |
| State of California appropriation to Receivership | $96,147,258 | - | 96,147,258 |
| General revenues: | | | |
| Investment earnings | $654,396 | - | 654,396 |
| Total revenues | $96,801,654 | - | 96,801,654 |
| | | | |
| **Expenditures/Expenses:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $2,054,110 | - | 2,054,110 |
| Legal and professional services | $7,640,465 | - | 7,640,465 |
| Travel | $148,571 | - | 148,571 |
| Rents and leases | $52,097 | - | 52,097 |
| Insurance | $26,387 | - | 26,387 |
| Other | $1,275,260 | - | 1,275,260 |
| Depreciation | $0 | $1,164,680 | 1,164,680 |
| Capital outlay - Fixed Assets | 37,283,796 | (37,283,796) | - |
| Total expenditures/expenses | 48,480,685 | (36,119,116) | 12,361,569 |
| | | | |
| Change in fund balance | 48,320,969 | (48,320,969) | - |
| | | | |
| Change in net assets | - | 36,119,116 | 84,440,085 |
| | | | |
| Fund balance/net assets - July 1, 2008 | 4,041,586 | 34,966,389 | 40,791,801 |
| | | | |
| Fund balance/net assets - November 30, 2008 | $ 52,362,555 | $ 22,764,536 | $ 125,231,886 |

**CALIFORNIA  HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Revenues, Expenditures and Changes in Fund Balance - General Fund - Budget to Actual
For the  four months ended October 31, 2008

| | Final Budget | Actual (Budgetary Basis) | Variance between Final Budget and Actual |
|---|---|---|---|
| Revenues: | | | |
| State of California appropriation to Receivership | $76,147,258 | $76,147,258 | $            - |
| Investment earnings | $283,332 | $559,135 | 275,803 |
| Total revenues | 76,430,590 | 76,706,393 | 275,803 |
| Expenditures: | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $1,737,934 | 1,647,183 | 90,751 |
| Legal and professional services | 5,545,048 | 5,542,771 | 2,277 |
| Travel | 173,528 | 116,353 | 57,175 |
| Rents and leases | 24,000 | 50,205 | (26,205) |
| Office expenses | 33,624 | 33,606 | 18 |
| Telephone and network | 11,600 | 21,513 | (9,913) |
| Insurance | 28,504 | 21,072 | 7,432 |
| Other | 64,151 | $955,586 | (891,435) |
| Capital outlay | 26,626,786 | 26,626,786 | - |
| Total expenditures | 34,245,175 | 35,015,076 | (769,901) |
| Change in fund balance | $  42,185,415 | 41,691,317 | $       (494,098) |
| GAAP basis difference - compensated absences | | - | |
| Fund balance - July 1, 2008 | | 4,041,586 | |
| Fund balance - October 31, 2008 | | $   45,732,903 | |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Net Assets and General Fund Balance Sheet
October 31, 2008

| | General Fund | Adjustments (Note 1) | Statement of Net Assets |
|---|---|---|---|
| **Assets** | | | |
| **Current assets:** | | | |
| Cash | $56,491,310 | $ - | $ 56,491,310 |
| Prepaid items | $0 | - | - |
| | 56,491,310 | - | 56,491,310 |
| **Noncurrent assets:** | | | |
| Deposits with others | $405,923 | - | 405,923 |
| Capital assets, net | - | $62,681,671 | 62,681,671 |
| Total assets | $ 56,897,233 | 62,681,671 | 119,578,904 |
| **Liabilities** | | | |
| Liabilities: | | | |
| Accounts payable | $4,599,273 | - | 4,599,273 |
| Accrued salaries and benefits | $175,123 | - | 175,123 |
| Other accrued expenses | $6,389,936 | | 6,389,936 |
| Compensated absences | - | 236,414 | 236,414 |
| Total liabilities | 11,164,331 | 236,414 | 11,400,745 |
| **Fund Balance/Net Assets** | | | |
| Fund balance: | | | |
| Reserved for prepaid items and deposits with others | 405,923 | (405,923) | - |
| Unreserved, undesignated | 45,326,979 | (45,326,979) | - |
| Total fund balance | 45,732,902 | (45,732,902) | - |
| Total liabilities and fund balance | $ 56,897,233 | | |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | | 62,681,671 | 62,681,671 |
| Unrestricted | | 45,496,489 | 45,496,489 |
| Total net assets | | $ 108,178,160 | $ 108,178,160 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance
For the four months ended October 31, 2008

|  | General Fund | Adjustments (Note 2) | Statement of Activities |
|---|---|---|---|
| **Revenues** | | | |
| Program revenues: | | | |
| Operating grants and contributions: | | | |
| State of California appropriation to Receivership | $76,147,258 | - | 76,147,258 |
| General revenues: | | | |
| Investment earnings | $559,135 | - | 559,135 |
| Total revenues | $76,706,393 | - | 76,706,393 |
| **Expenditures/Expenses:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $1,647,183 | - | 1,647,183 |
| Legal and professional services | $5,542,771 | - | 5,542,771 |
| Travel | $116,353 | - | 116,353 |
| Rents and leases | $50,205 | - | 50,205 |
| Insurance | $21,072 | - | 21,072 |
| Other | $1,010,706 | - | 1,010,706 |
| Depreciation | $0 | $931,744 | 931,744 |
| Capital outlay - Fixed Assets | 26,626,786 | (26,626,786) | - |
| Total expenditures/expenses | 35,015,076 | (25,695,042) | 9,320,034 |
| Change in fund balance | 41,691,317 | (41,691,317) | - |
| Change in net assets | - | 25,695,042 | 67,386,359 |
| Fund balance/net assets - July 1, 2008 | 4,041,586 | 34,966,389 | 40,791,801 |
| Fund balance/net assets - October 31, 2008 | $   45,732,903 | $   18,970,114 | $   108,178,160 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Revenues, Expenditures and Changes in Fund Balance - General Fund - Budget to Actual
For the three months ended September 30, 2008

| | Final Budget | Actual (Budgetary Basis) | Variance between Final Budget and Actual |
|---|---|---|---|
| **Revenues:** | | | |
| State of California appropriation to Receivership | $54,147,258 | $54,147,258 | $ - |
| Investment earnings | $212,499 | $459,686 | 247,187 |
| Total revenues | 54,359,757 | 54,606,944 | 247,187 |
| **Expenditures:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $1,303,451 | 1,235,438 | 68,013 |
| Legal and professional services | 4,159,411 | 4,374,350 | (214,939) |
| Travel | 130,146 | 85,699 | 44,447 |
| Rents and leases | 18,000 | 27,069 | (9,069) |
| Office expenses | 25,218 | 27,713 | (2,495) |
| Telephone and network | 8,700 | 15,008 | (6,308) |
| Insurance | 21,378 | 15,977 | 5,401 |
| Other | 48,113 | $797,228 | (749,115) |
| Capital outlay | 17,770,888 | 17,770,888 | - |
| Total expenditures | 23,485,305 | 24,349,371 | (864,066) |
| Change in fund balance | $ 30,874,452 | 30,257,573 | $ (616,879) |
| GAAP basis difference - compensated absences | | - | |
| Fund balance - July 1, 2008 | | 4,041,586 | |
| Fund balance - September 30, 2008 | | $ 34,299,159 | |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Net Assets and General Fund Balance Sheet
September 30, 2008

| | General Fund | Adjustments (Note 1) | Statement of Net Assets |
|---|---|---|---|
| **Assets** | | | |
| **Current assets:** | | | |
| Cash | $44,783,599 | $ - | $ 44,783,599 |
| Prepaid items | $0 | - | - |
| | 44,783,599 | - | 44,783,599 |
| **Noncurrent assets:** | | | |
| Deposits with others | $499,925 | - | 499,925 |
| Capital assets, net | - | $54,058,709 | 54,058,709 |
| Total assets | $ 45,283,524 | 54,058,709 | 99,342,233 |
| **Liabilities** | | | |
| Liabilities: | | | |
| Accounts payable | $5,935,411 | - | 5,935,411 |
| Accrued salaries and benefits | $175,123 | - | 175,123 |
| Other accrued expenses | $4,873,832 | - | 4,873,832 |
| Compensated absences | - | 236,414 | 236,414 |
| Total liabilities | 10,984,366 | 236,414 | 11,220,780 |
| **Fund Balance/Net Assets** | | | |
| Fund balance: | | | |
| Reserved for prepaid items and deposits with others | 499,925 | (499,925) | - |
| Unreserved, undesignated | 33,799,234 | (33,799,234) | - |
| Total fund balance | 34,299,158 | (34,299,158) | - |
| Total liabilities and fund balance | $ 45,283,524 | | |
| **Net assets:** | | | |
| Invested in capital assets, net of related debt | | 54,058,709 | 54,058,709 |
| Unrestricted | | 34,062,745 | 34,062,745 |
| Total net assets | | $ 88,121,454 | $ 88,121,454 |

**CALIFORNIA HEALTH CARE RECEIVERSHIP CORPORATION**
Statement of Activities and General Fund Revenues, Expenditures and Changes in Fund Balance
For the three months ended September 30, 2008

|  | General Fund | Adjustments (Note 2) | Statement of Activities |
|---|---|---|---|
| **Revenues** | | | |
| Program revenues: | | | |
| Operating grants and contributions: | | | |
| State of California appropriation to Receivership | $54,147,258 | - | 54,147,258 |
| General revenues: | | | |
| Investment earnings | $459,686 | - | 459,686 |
| Total revenues | $54,606,944 | - | 54,606,944 |
| **Expenditures/Expenses:** | | | |
| Prison health care administration and oversight: | | | |
| Current: | | | |
| Salaries and benefits | $1,235,438 | - | 1,235,438 |
| Legal and professional services | $4,374,350 | - | 4,374,350 |
| Travel | $85,699 | - | 85,699 |
| Rents and leases | $27,069 | - | 27,069 |
| Insurance | $15,977 | - | 15,977 |
| Other | $839,949 | - | 839,949 |
| Depreciation | $0 | $698,808 | 698,808 |
| Capital outlay - Fixed Assets | 17,770,888 | (17,770,888) | - |
| Total expenditures/expenses | 24,349,371 | (17,072,080) | 7,277,291 |
| Change in fund balance | 30,257,573 | (30,257,573) | - |
| Change in net assets | - | 17,072,080 | 47,329,653 |
| Fund balance/net assets - July 1, 2008 | 4,041,586 | 34,966,389 | 40,791,801 |
| Fund balance/net assets - September 30, 2008 | $ 34,299,159 | $ 21,780,896 | $ 88,121,454 |

# APPENDIX 41

I.    Vendors Engaged by the Receiver During this Reporting Period Relating to Services to Assist the Receivership in the Development and Delivery of Constitutional Medical Care Within the California Department of Corrections and Rehabilitation ("CDCR") and its Prisons

During the last reporting period, the Receiver has engaged the following vendors relating to services to assist the Office of the Reciever in the development and delivery of constitutional care within CDCR and its prisons:[1]

A.    Recruit, Train and Retain a Professional Quality Medical Care Workforce

The Receiver issued an invitation for bids for on-line exams for clinical personnel, using the Urgent Informal process. The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to establish an effective recruitment and hiring program, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project. Bids were received from Hodes iQ, JobApps and NEOGOV. Hodes iQ was selected.

The Receiver entered a sole source agreement with Cooperative Personnel Services (CPS) related to an early start of services provided to the CDCR under a related CDCR contract. CPS provides personnel services under CDCR agreement number ICH08490, which commenced September 30, 2008. But based on the urgency of the CDCR's need for the services, the Receiver authorized the earlier commencement of services and engaged CPS for the period of July 15th through the date of the completion of the formal processing, approval and commencement of the related CDCR contract with CPS.

B.    Establishing a Medical Support Infrastructure

1.    Health Information Management

The Receiver issued a request for offers for per diem medical and mental health transcription services, under the Urgent Informal process. The Urgent Informal process was used because the contract is needed to immediately reduce the backlog of medical and mental health transcriptions, without which there would be a substantial risk endangering the health and safety of inmate-patients. Offers were received from SOAP Transcription Services, Kennedy Court Reporting, and California Court Reporting. SOAP Transcription Services was selected.

The Receiver issued a subsequent request for proposals for per diem medical transcription services using the Expedited Formal process. Responses were solicited from more than 50 medical transcription vendors. Responses were received from SOAP

---

[1] For the sake of brevity, vendor subcontracts are not listed herein. Information about subcontracts, however, can be provided to the Court upon request.

Transcription Services, Spheris, Zydoc and Premier Office Technologies.   SOAP was selected.

The Receiver issued RFPs for a medical dictation system and a medical transcription system, using the Expedited Formal process.   Proposals were solicited from BayScribe, 3M, Crescendo, Fusion, Dictaphone, Emdat, Futurenet, WebScriber, Digital Voice, WinScrib, Ecker Hill Systems, DicTran, EScription, MedRelay, MetroScript, My Docs Online, Cleveland Business Systems, and ChartNet.  Proposals were received from AllScripts, BayScribe, Crescendo, Dictaphone, Emdat, FutureNet, 3M, SOAP, and Versatile. Crescendo was selected to provide both the dictation and transcription systems.

2.    Pharmacy

The Receiver issued a request for proposals for central fill pharmacy automation, using the Expedited Formal process.  Proposals were solicited from Knapp, Juno Technologies, Operations Associates, Accu-Sort Systems, AmerisouceBergen Technology Group, Cornerstone Automation and Peach State Integrated Technologies. Proposals were received from Accu-Sort Systems, AmerisouceBergen Technology Group, Cornerstone Automation and Peach State Integrated Technologies.  Cornerstone was selected.

The Receiver awarded sole source contracts to Tiburon and Mediware Information Systems, Inc. related to upgrading and maintaining the IT system running at Pelican Bay State Prison. The system at Pelican Bay is a custom system, proprietary to Tiburon.  Tiburon's contract is for ongoing system maintenance, and Mediware's contract is to upgrade the previously installed medication management WORx IT module of the Tiburon system.  The WORx IT module is proprietary to Mediware.  Tiburon and Mediware are the only available providers of these services.  Both contracts are essential to continuing the pharmacy IT system at Pelican Bay.

The Receiver entered a sole source licensing agreement with First Databank, which is the owner of a coded pharmaceutical reference database used by Maxor—the Receiver's pharmacy management firm.  The Receiver required the license so that the CDCR's computer systems could effectively interface with Maxor's own IT system.  No other firm could have provided the required license.

3.    Radiology

The Receiver issued an RFP for enterprise imaging and radiology professional management services, using the Expedited Formal process.  Bids were solicited from Abiro Health Care, ACS Healthcare Solutions, Nufinity, RCG HealthCare, SG & A Consulting, Inc., The Thomas Group Ltd, McKesson Consulting, McKenzie Stephenson, Inc., and Navigant Consulting.  McKenzie Stephenson, Inc. (MSI), ARIS, Inc. and Navigant submitted proposals. MSI was selected.

C.    Implement a Quality Assurance and Continuous Improvement Program

       1.       Quality Measurement Technical Assistance

The Receiver issued a request for offers for quality measurement technical assistance, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to establish a valid quality measurement and improvement program, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project. Offers were solicited and received from Deloitte and Touche, RAND Corporation and Gartner.  The contract was awarded to RAND Corporation.

       D.      <u>Provide for Necessary Clinical, Administrative and Housing Facilities</u>

       1.       "10,000 Bed" Project

The Receiver issued a request for offers for laboratory consulting services regarding the design of prison health care facilities, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to plan and design new prison health care facilities, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project.  Offers were received from Nichols Management Group, BD Laboratory Consulting Services, and Navigant Consulting.  Nichols Management Group was selected.

The Receiver solicited proposals for an external review of the Chronic and Long Term Care in California Prisons: Needs Assessment conducted by Abt Associates, Inc., using the Urgent Informal process.  The urgent informal process was used because the total contract price was estimated to be less than $75,000.   Proposals were received from Steven Raphael, PhD, Charlene Harrington, RN, PhD, FAAN, and Ryken Grattet PhD. Contracts were awarded to both Mr. Raphael and Ms. Harrington.

The Receiver issued a sole source contract to Dennis Dunne for construction oversight consulting services.  Mr. Dunne had previously been engaged under a sole source contract by the CDCR and the Governor's AB 900 strike team related to CDCR construction oversight.  Mr. Dunne was selected after it was determined that there was no other reasonably available source for the services.  The Receiver is utilizing the same rate and nearly identical services as was approved under the State's prior sole source award.

The Receiver solicited proposals for photography documenting facility conditions, using the Urgent Informal process.   The urgent informal process was used because the total contract price was estimated to be less than $75,000.   Ray Chavez, John Decker and William Foster Photography submitted proposals.  Ray Chavez was selected.

The Receiver issued a request for qualifications for general building code compliance consulting services, using the Expedited Formal process.  Qualificatiosn were

solicited from R.W. Sullivan, Owen Group, 4LEAF, Harris & Associates, Willdan Engineering, P&D Consultants, SS DAnnaway, RJA Fire Protection Consultants, and Lionkis.  R.W. Sullivan, Owen Group, 4LEAF, Harris & Associates, Willdan Engineering, and P&D Consultants submitted qualifications.  The Owen Group was selected.

The Receiver issued a request for qualifications for hazardous materials consulting services, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to plan for new prison health care facilities, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project.   Qualifications were sought from Blackburn Consulting, Geocon Consulting, Kleinfelder, Ch2M Hill, Terracon Consulting and Fugro West. Qualifications were submitted by Terracon Consulting and Fugro West.  Fugro West was selected.

The Receiver issued a request for qualifications for OSHPD compliance review and consulting cervices, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to plan and design new prison health care facilities, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project.  Qualifications were received from Kitchell, Owen Group and KMD Justice.  KMD Justice was selected.

The Receiver issued a request for qualifications for lean health care delivery consulting services, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's efforts to plan and design new prison health care facilities, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger project.  Qualifications were received from Lean Advisors, California Manufacturing Technology Consulting, Hammes Company, FDI, and Navigant Consulting.  Navigant Consulting was selected.

                2.        San Quentin

The Receiver issued a sole source contract to Hitchcock Construction to strengthen a shade structure previously installed by Hitchcock.  The sole source award was necessary to maintain the Engineer of Record certifications and the warranty of the original structure.  A simple change order would have been issued. But at the time the need for the work was identified, the original work order has already been closed.

The Receiver solicited bids for Rotunda and Personnel Building power shutdowns, using the Urgent Informal process.  The Urgent Informal process was used because the contract is essential to the "critical path" of the Receiver's renovation efforts at San Quentin, and the additional delay that would result from utilizing the expedited formal bidding process would significantly interfere with timely completion of the larger

project.  Bids were obtained from Power Systems Testing, Emerson Power Electric, and Red Top Electric.  Power Systems Testing was selected.

3.    Avenal

The Receiver issued a request for bids for design-build services related to construction and renovations for modular health services clinics, administrative facilities and administrative segregation facilities, using the Expedited Formal process.  Bids were received from JL Modular, JTS, Hilbers, AMS, Roebbelen, Mallcraft and Arntz Builders.  JL Modular was selected.

4.    Correctional Training Facility (CTF), California Rehabilitation Cente (CRC), Mule Creek State Prison (MCSP)

The Receiver issued a request for proposals for site survey, plans, reports and topographic documents, using the Expedited Formal process.  Proposals were solicited and received from Rick Engineering, Mid Valley Engineering, Wallace Group, CTE, Mark Thomas & Co. Siegfried Engineering Paller-Roberts Engineering RRM Design Group and North Starr Engineering Group.  Rick Engineering was selected.

The Receiver issued a request for proposals for geotechnical services, using the Expedited Formal process.  Proposals were solicited and received from CTE, Neil O. Anderson, TGR Geotechnical, Earth Systems Pacific, Geocon Inland Empire, Buena Geotechnical Services, Krazan & Associates and Kleinfelder Group.  CTE was selected.

II.    <u>Vendors Engaged by the Receiver During the Last Reporting Period for Goods or Services to Assist the Operation of the Receiver's Non-Profit Corporation, the California Prison Health Care Receivership Corporation</u>

During the last reporting period, the Office of the Receiver has engaged the following vendors to assist in the operation of the California Prison Health Care Receivership Corporation:  United Corporate Furnishings (office furniture), Wills Brother Electric (office electrical improvement), Event Architects & Pagoda (conference/event services), Bergeson LLP (legal services), Morrison Foerster (legal services).

# APPENDIX 42

# Los Angeles Times

http://www.latimes.com/news/local/la-me-arsenic29-2008dec29,0,6539747.story
*From the Los Angeles Times*

## Arsenic levels too high in Kern Valley State Prison's drinking water

Three years past deadline, California has no solid plan to reduce the arsenic, which has been linked to cancer. Officials spent money to design a filtration plant and then decided not to build it.
By Michael Rothfeld

December 29, 2008

Reporting from Delano — Beside a field of rolling tumbleweed in this remote Central Valley town, the state opened its newest prison in 2005 with a modern design, cutting-edge security features and a serious environmental problem.

The drinking water pumped from two wells at Kern Valley State Prison contained arsenic, a known cause of cancer, in amounts far higher than a federal safety standard soon to take effect.

Yet today, nearly three years after missing the government's deadline to reduce the arsenic levels, the state has no concrete plans or funding to do so. Officials spent $629,000 to design a filtration system and then decided not to build it, while neglecting to inform staff and inmates that they were consuming contaminated water.

After the prison finally posted notices last April on orders from the state Department of Public Health, the inmates continued drinking the water, under protest.

"We have no choice," said Larry Tillman, 38, who was serving time for burglary. "We should at the very least receive bottled water, or truck in water from another city."

Most correctional officers at Kern Valley State Prison take bottled water to work -- some say they prefer it anyway -- but administrators created a form letter to reject requests for alternative water from some of the 4,800 inmates. The administrators say the health hazard from arsenic, a chemical used in industry and farming, is insignificant, and they promise to filter the water some time in the next few years.

"It's not that major of an issue," said Kelly Harrington, the prison's new warden.

But long-term exposure to arsenic, common in Central Valley communities, has been linked to cancer of the lungs, skin, kidneys, liver and bladder and to other maladies.

The situation, critics say, is emblematic of the short-sighted planning and creeping pace of the mammoth prison bureaucracy as it struggles to house 170,000 of California's most undesired residents.

The state has placed many of its lockups far from major cities, in rural areas with nothing as far as the eye can see, where they are embraced by residents desperate for jobs and commerce. But officials have sometimes ignored health threats endemic to these regions.

Between 1987 and 1994, the state built four prisons in a part of the Central Valley known as a hotbed of valley fever, a sometimes severe infection that usually affects the lungs. Health experts estimate that the state has spent millions to treat inmates for the disease, spawned by a fungus in desert soil.

In 2007, the year after five inmates died from valley fever, the state proposed expanding five prisons in the Central Valley but later backed off on two of the sites. One proposed expansion site, Pleasant Valley State Prison in Coalinga, had an outbreak that sickened 520 prisoners in 2006. A Fresno County grand jury concluded last year that the prison, built in 1994, should not have been put there.

At the California Institution for Women in Chino, the state has been buying bottled water for prisoners for five years -- at a current annual cost of $480,000 -- because of nitrate levels that violate federal standards in the water supply to the facility and to the nearby California Institution for Men. Nitrates, which are chemical compounds that often get into soil from fertilizer and manure, can cause a blood disorder in fetuses and infants.

Chino-area municipalities have built systems to filter their own water, and the state hopes to complete a similar project a year from now for both the women's and men's prisons. But Chino Mayor Dennis Yates, who says sewage from the men's prison has long polluted the Santa Ana River, is skeptical of state officials' competence.

"Even if you do give them money, they don't do anything," Yates said. "It's just a huge, bloated bureaucracy."

In 2001, four years before Kern Valley prison opened, the U.S. Environmental Protection Agency ordered a reduction in the maximum level of arsenic in drinking water from 50 parts per billion to 10. Water suppliers had until Jan. 23, 2006, to meet the new standard. Recent testing has shown the arsenic level in one prison well at 23 parts per billion and the other at 15.

One day this month, in a low-slung white building with blue doors known as Facility C, prisoners bunking in a crowded gymnasium drank from the water fountain and used water from the sinks to make their soup. Some newcomers said they had not been told about the contamination upon arrival at the prison.

"I just came from an institution where the water was just atrocious, definitely foul," said Ramon Diaz, 25, who had three years remaining on a sentence for drug dealing. "This to me is like spring water here, and you come to find out that it's not the way it should be, either."

Corrections Department officials said they could not explain why a filtration system was not included in the prison's design because most of the employees who worked on it had since left. Later, the agency developed plans to add a filtration plant. It obtained $2.5 million from lawmakers for that purpose in 2006.

But planners abandoned the idea, electing instead to incorporate the project into an overall prison expansion approved by lawmakers. Flaws in the legislation have postponed the expansion indefinitely.

State project manager Gary Lewis said the filtration plant is in the "conceptual study phase."

This year the EPA has ordered 11 California water systems to reduce excessive arsenic levels. One was the city of Delano, which serves the North Kern State Prison, a few miles from Kern Valley prison. On Dec. 12, after inquiries by The Times, the state public health department ordered Kern Valley State Prison to come up with a plan by February to comply with the arsenic law.

The prison's chief medical officer, Dr. Sherry Lopez, said there was no immediate danger from the lockup's water, based on an e-mail she received in April from a poison-control expert who said arsenic is "much more a regulatory problem than a public health problem."

"It kind of reassured me and everybody else here that everything is OK," Lopez said.

But Dr. Gina Solomon, a scientist at the Natural Resources Defense Council, an environmental advocacy group, said that the law is important and that disempowered populations, such as prisoners and poor rural workers, often suffer because of lax enforcement.

"The standard was set for a reason, and the reason is that arsenic is known to cause cancer in humans," she said. "So the clock is ticking. The longer that people are drinking the water, the higher the risk."

Many of Kern Valley's prisoners are serving life terms, but even those with shorter stints are worried.

"It's definitely a concern for us if there's an abundance of arsenic in the water and we're ingesting that," said Dylan Littlefield, 36, an inmate from Hollywood with five years remaining for attempted robbery and drug dealing. "Who knows if we're going to be treated properly?"

The healthcare system in the state's prisons has been turned over to a federal receiver by a judge who said substandard treatment has caused many needless deaths behind bars. The receiver, J. Clark Kelso, was

not alerted to the arsenic problem by the state, his top aide said.

"We're concerned about the potential health risks and we have to look into it," said John Hagar, the receiver's chief of staff. "Constructing facilities that are inadequate from the beginning is unfortunately part of a long-standing trend with the Department of Corrections, so I'm not surprised."

michael.rothfeld@latimes.com

If you want other stories on this topic, search the Archives at latimes.com/archives.

TMSReprints

Article licensing and reprint options

Copyright 2009 Los Angeles Times | Privacy Policy | Terms of Service
Home Delivery | Advertise | Archives | Contact | Site Map | Help

partners:

# APPENDIX 43

CALIFORNIA
PRISON HEALTH CARE
RECEIVERSHIP CORP.

J. Clark Kelso, Receiver

December 24, 2008

TO:        Brett Morgan
           Chief of Staff

FROM:      John Hagar
           Chief of Staff

SUBJECT:   Kern Valley State Prison Arsenic Removal Project

The Kern Valley State Prison (KVSP) water supply contains more than twice the
Environmental Protection Agency (EPA) maximum allowable levels of arsenic. This
problem has existed for years; indeed, the EPA standard was established prior to the
completion of construction. Nevertheless, California Department of Corrections and
Rehabilitation (CDCR) did not provide the appropriate filtering mechanism prior to
operationalizing this prison.

In the Fiscal Year 06/07 budget $2,477,000 was allocated for a KVSP Arsenic Removal
Project. During the fourth quarter of the Fiscal Year 06/07 budget the Kern Valley
Arsenic Removal Project was placed on hold. The $2,477,000 was subsequently reverted
out of the budget in the 2008 Budget Act for Fiscal Year 08/09. According to CDCR
press statements, the Department intents to complete the Arsenic Removal Project at
KVSP using AB 900 funding. Those plans have been delayed and AB 900 funds are not
available for this purpose at this time, nor are there any established timeframes for
availability.

While KVSP arsenic levels do not pose an immediate threat to the health of those
consuming it, without question consumption of arsenic at these levels can present a health
risk cumulatively over time. Given that the elevated arsenic levels at KVSP have been
present since the prison's opening in 2003, the clock has been ticking for six long years.
It is imperative that a viable, funded plan be implemented in a timely manner, or a
program established to provide prisoners (and staff) with alternative sources of water.

We would appreciate a written response that sets forth a timely plan to correct the current
situation at KVSP. Given that six years have past, we hope to hear from you no later than
February 01, 2009.

cc: J. Clark Kelso, Receiver, California Prison Receivership
    Terry Hill, Chief Executive Officer, California Prison Health Care Services
       (CPHCS)
    Joe McGrath, Director, Custody Support Services, CPHCS
    Sherry Lopez, Health Care Manager, KVSP
    Janet Mohle-Boetani, Chief Medical Officer, CPHCS
    Karen Rea, Statewide Director of Nursing, CPHCS