# EXHIBIT H

# Achieving a
# Constitutional Level of Medical Care
# in
# California's Prisons

## Tenth Tri-Annual Report of the
## Federal Receiver's Turnaround Plan of Action

**January 15, 2009**

# California Prison Health Care Receivership

## Vision:

As soon as practicable, provide constitutionally adequate medical care to patient-inmates of the California Department of Corrections and Rehabilitation (CDCR) within a delivery system the State can successfully manage and sustain.

## Mission:

Reduce avoidable morbidity and mortality and protect public health by providing patient-inmates timely access to safe, effective and efficient medical care, and integrate the delivery of medical care with mental health, dental and disability programs.

# Table of Contents

|  |  | Page |
|---|---|---|
| 1. | Introduction................................................................ | 1 |
| 2. | Executive Summary........................................................ | 6 |
| 3. | The Receiver's Reporting Requirements.............................. | 15 |
| 4. | Status and Progress Toward the Turnaround Plan Initiatives.................... | 17 |

**GOAL 1**   Ensure Timely Access to Health Care Services.......................... 17

| *Objective 1.1* | Screening and Assessment Processes..................................... | 17 |
|---|---|---|
| *Objective 1.2* | Access Staffing and Processes............................................ | 19 |
| *Objective 1.3* | Schedule and Patient-Inmate Tracking................................. | 22 |
| *Objective 1.4* | Standardized Utilization Management System......................... | 23 |

**GOAL 2**   Establish a Prison Medical Program Addressing the Full
Continuum of Health Care Services........................................ 26

| *Objective 2.1* | Primary Care............................................................. | 26 |
|---|---|---|
| *Objective 2.2* | Chronic Care............................................................. | 27 |
| *Objective 2.3* | Emergency Response.................................................... | 30 |
| *Objective 2.4* | Specialty Care and Hospitalization.................................... | 33 |

**GOAL 3**   Recruit, Train and Retain a Professional Quality Medical Care
Workforce.................................................................. 43

| *Objective 3.1* | Physicians and Nurses................................................... | 43 |
|---|---|---|
| *Objective 3.2* | Clinical Leadership and Management Structure..................... | 52 |
| *Objective 3.3* | Professional Training Program......................................... | 53 |

**GOAL 4**   Implement a Quality Improvement Program........................... 56

| *Objective 4.1* | Clinical Quality Measurement and Evaluation Program............ | 56 |
|---|---|---|
| *Objective 4.2* | Quality Improvement Programs......................................... | 58 |
| *Objective 4.3* | Medical Peer Review and Discipline Process......................... | 62 |
| *Objective 4.4* | Medical Oversight Unit.................................................. | 64 |

Objective 4.5    Health Care Appeals Process..............................................    69
Objective 4.6    Out-of-State, Community Correctional Facilities and Re-entry
                 Oversight..........................................................................    74
GOAL 5    Establish Medical Support Infrastructure.............................    79
Objective 5.1    Pharmacy..........................................................................    79
Objective 5.2    Medical Records................................................................    86
Objective 5.3    Radiology and Laboratory.................................................    87
Objective 5.4    Clinical Information Systems.............................................    88
Objective 5.5    Telemedicine.....................................................................    90
GOAL 6    Provide for Necessary Clinical, Administrative and Housing
          Facilities........................................................................    92
Objective 6.1    Upgrade Administrative and Clinical Facilities.....................    92
Objective 6.2    Expand Administrative, Clinical, and House Facilities.............    95
Objective 6.3    Finish Construction at San Quentin State Prison....................    99
5.    Additional Successes Achieved by the Receiver......................................    102
      A.    Status of the Project Management Office.........................................    102
      B.    2008 Best of California Award Winner: J. Clark Kelso...........................    103
      C.    Turnaround Lifeline Newsletter to Staff..........................................    103
      D.    HR Connections Newsletter to Staff..............................................    104
6.    Particular Problems Faced by the Receiver, Including Any Specific Obstacles
      Presented By Institutions Or Individuals...........................................    106
      A.    Continued Delays by the State Personnel Board..................................    106
7.    An Accounting of Expenditures for the Reporting Period..........................    108
8.    Other Matters Deemed Appropriate for Judicial Review............................    109
      A.    Coordination with Other Lawsuits................................................    109
      B.    Master Contract Waiver Related Reporting......................................    109

iii

C.    Arsenic at Kern Valley State Prison................................................    110

D.    Mini-Region Crisis Response Project..........................................    110

9.    **Conclusion**............…........................................................................    **112**

iv

# Section 1
# Introduction

During the reporting period, the Governor and Attorney General of the State of California executed a "flip-flop" and "bait and switch." The immediate victims of the State's turnabout are four federal district courts and respect for the rule of law; the ultimate victims are the tens of thousands of class members who are waiting for constitutionally required improvements in their medical care as well as the citizens of the State of California.

In four separate cases before four different federal judges - cases dealing with (1) medical care, (2) mental health care, (3) dental care, and (4) compliance with the Americans with Disabilities Act – the State has conceded that its prison healthcare system provides unconstitutional care and has agreed to dozens of court remedial orders. The State has proven itself in each of these cases to be incapable of implementing on its own the orders to which it has agreed. Since the appointment two years ago of a Receiver, and, accelerating during the early part of 2008, the four courts have sought to coordinate implementation of their remedial orders through the Office of the Receiver. Earlier this year, the Receiver produced a comprehensive Turnaround Plan of Action that, when implemented, is almost certain to end the medical care case and will contribute to the termination of the three other class actions. The Turnaround Plan of Action contains a schedule for completion (i.e., four to five years) and estimated costs of completion. The State reviewed drafts of the plan as it was being prepared and did not object to the court's adoption to the plan, no doubt because it represented then, and still represents, the only cost-effective plan anyone has produced for securing timely compliance with the binding court orders in these cases. No one else – not the Governor, not the Attorney General, and not the Secretary of the California Department of Corrections and Rehabilitation (CDCR) – has produced anything approaching a plan for compliance.

We have begun to implement the Turnaround Plan of Action, and progress is well underway on five of the six Goals. However, the Receivership now finds itself under attack from a variety of fronts, repeatedly diverted from essential tasks, and forced to devote significant resources to overcoming a renewed surge of faulty State decisions and bureaucratic ineptitude. Some of the major problems encountered by the Receivership during this reporting period can be summarized as follows:

1.  Construction Delays
    Following two years of cooperation with the State, and intensified coordination between the four class actions, the Receiver's healthcare upgrade program and facility construction program are now delayed because of the Governor's and Attorney General's refusal to work with the federal court to develop a funding mechanism that is in the best interest of California's taxpayers and at the same time refusing to engage meaningfully in coordinated planning.

1

2. Overcrowding
    The CDCR's overcrowding continues to increase. The CDCR population in December of 2008 exceeded 171,000 prisoners (more than 800 prisoners above the CDCR fall projections). 611 prisoners were awaiting a suitable Level IV high-security bed; 35 wheel-chair bound inmates were awaiting accessible beds; and the backlog for sensitive need inmates approached all-time highs. For example, 499 Level II inmates were backlogged in Reception Centers awaiting sensitive need yard placement; 156 of the 499 inmates required Correctional Clinical Case Management System (CCCMS) level of mental health care. 642 Level III inmates were awaiting sensitive need yard placement; 333 of the 642 were backlogged in Reception Centers and 104 required CCCMS-level mental health care. Even worse, 767 Level IV prisoners were awaiting sensitive need yard placement; 403 of the 767 required CCCMS-level of mental health care. The State's inability to manage its prison population, combined with its refusal to fund necessary medical treatment facilities, is yet another reaffirmation that the State simply does not know what to do to address prison healthcare in a cost effective manner.

3. Budget Mismanagement
    Without question, the State faces serious budget shortfalls, some of which have been created by economic factors beyond the State's control and some of which are the responsibility of the Schwarzenegger Administration. The Administration's response to this crisis, in terms of how it impacts upon the delivery of healthcare in California's prison system, is scattershot, unpredictable and inappropriate. Proposed State corrective actions violate federal court orders and will, in both the short and long-term, serve only to increase existing State funding shortfalls. In essence, the Governor's response to the budget crisis ignores the inescapable fact that prisons must operate 24-hours a day, 7 days a week. Clumsy and poorly planned emergency orders have actually rendered the situation worse than it needs to be, creating chaos in the Executive Branch at a time when deliberative, realistic planning is the appropriate response.

    For our part, the Receivership is accelerating implementation of a utilization management system (UM) to reduce costs of specialty and hospital care; we will soon contract with a third-party administrator to audit hospital and out-of-system provider charges; and we are already avoiding tens of millions of dollars in unnecessary drug costs by aggressively managing the pharmacy program. The solution to budget problems is careful attention to program prioritization and design, utilization of performance measures and keeping focused on task. Unfortunately, the State has for most of this decade careened from budget crisis to budget crisis.

4. Re-Runs
    As the State increasingly flounders, the Receiver has been forced to deal with problem-situations for the second or third time. In other words, issues previously resolved with the State continue to arise, apparently with the approval of the State officials. For example, on December 30, 2008, the Receiver's attorneys received an e-mail from the Prison Law Office calling attention to the fact that Ray Garcia, Office Services Supervisor I, and Peter Vanni, Associate Warden, Business Services at Mule Creek State Prison denied an

2

inmate appeal concerning whether the Receiver is entitled to confidential legal mail status (Refer to Appendix 1). This same issue, however, arose approximately 18 months earlier. At that time, CDCR correctly conceded that inmate correspondence addressed to the Receiver is entitled to confidential mail status pursuant to law and California's regulation. George J. Giurbino's memorandum of October 5, 2007, is included as Appendix 2. Nevertheless, this issue has again arisen, diverting the Receiver's staff from more important duties and wasting valuable public resources. As another example, the Warden at Kern Valley State Prison refused to provide the mother of a prisoner (who had a lengthy mental health record) his medical documents after he was beaten to death, apparently by his cell mate. Inappropriately relying on an inexcusably delayed criminal investigation of the murder at Kern Valley State Prison, the Warden in conjunction with the Public Information Officer and a CDCR lawyer simply ignored the Receiver's policies as well as California law. In December 2007, the mother sent Kern Valley State Prison a written request for her son's health records. As of April 2008, she had not received a response to her request and the matter was brought to the attention of the Receiver. Upon contacting the Kern Valley State Prison litigation coordinator to inquire about the matter, the Receiver was first informed that the request was never received. Upon further investigation, Kern Valley State Prison staff determined that the request was received, but not responded to due to an ongoing criminal investigation. Kern Valley State Prison then sent the mother a letter denying her request. Incredibly, the decision was made by CDCR to treat the request not as a mother's request for her deceased son's health records but as a California Public Records Request. Correcting the situation required an investigation and numerous calls and meetings.

5. "Putting Out Fires" Ignited by the Schwarzenegger Administration

Instead of working to save lives and implementing cost cutting initiatives, the Receiver has been forced to utilize his limited resources to "put out fires" created by the State. Examples of problems that arose during this reporting period are set forth and include the following: (1) the State's failure to fund the healthcare monitoring of the out-of-state prison transfers; (2) the State's failure to provide water to prisoners at Kern Valley State Prison that is free of unacceptable levels of arsenic; and (3) the State's refusal fully to fund the audit program that had so carefully been negotiated between the parties and the Office of the Inspector General (OIG), an audit program that is critical to evaluating progress towards compliance with court orders.

No purpose is served attempting to prove the personal or political motivations which have led the Governor to renege on his Administration's assurances to pursue a public-private financing transaction to support the Receiver's construction program if legislation failed, or which now drive the Attorney General to attempt to rewrite the history of four federal court class action cases and wage a war against district court orders to which the State has previously agreed. However, the threat to the orderly administration of justice from their actions cannot be ignored. Court orders are not Hollywood contracts where "net profits" are meaningless tokens and promises to perform are cheaply given and then ignored when convenient. Public officials who choose to run their political campaigns for higher office against implementation of valid court orders trample the separation of

3

powers and actively promote disrespect for the courts. There are appropriate legal processes for challenging and reconsidering court orders; however, flat out disobedience of court orders is not the appropriate course of action.

In light of the State's reversal of position, the Receiver is forced to the following conclusions:

A.  Without the needed clinical facility upgrades at the existing 33 prisons and without the needed construction of healthcare facilities, as called for in Goal 6 in the Turnaround Plan of Action, the Receiver's overall program to bring California's prison medical care into compliance with court orders cannot be effectuated at current CDCR population levels. In short, absent the capital investment requested by the Receiver, CDCR's population must be significantly reduced. If CDCR's substantial overcrowding is not going to be addressed by the Receiver's healthcare construction program, which was a foundational premise for the other Goals in the Turnaround Plan of Action, the Receiver can only conclude that overcrowding is, and will continue to be, the primary cause of the State's inability to provide constitutionally adequate care.

B.  Unless and until the Governor and Attorney General cease their efforts to thwart the court's orders and the objectives of the Receivership, the cost and duration of the Receivership will only increase, and perhaps significantly so.

C.  Consistent with the court's orders, the Receiver's vision statement calls for the creation of the prison medical delivery system which "the State can successfully manage and sustain." However, the current game playing by the Governor and Attorney General provide uncontroverted evidence that the State, or at least this Administration, has neither the will nor the competence to sustain any form of constitutionally adequate healthcare in California's prisons, demonstrating, yet again and in the most unfortunate manner, the need for continued and perhaps more intrusive intervention by the federal courts.

To provide at least one example of this, the Receiver, attorneys for the parties, the court's Pro Bono Consultant, and the OIG have worked together for more than year to develop an effective, objective, and fiscally responsible method for a State oversight agency to monitor the progress made by the Receivership to deliver care within California's prisons. Essentially, the OIG, through intensive prison audits, has developed a program which measures compliance with the Stipulated Court Orders that the State of California established as the constitutional minimum of medical delivery required for its prisons. This unique program will enable the State, for the first time, to measure and report upon remedial plan effectiveness at the point of healthcare delivery. Following continuous meetings, and a number of "pilot" inspections, all parties agreed that the OIG's process was sound and should immediately move forward. However, at the last minute, the Attorney General instructed his lawyers to refuse to sign a stipulation calling for implementation of the

4

plan, a stipulation prepared not by the Receiver, but by the OIG itself. Shortly thereafter, the Schwarzenegger Administration slashed the OIG's budget, preventing the full implementation of this program.

D. The original plan developed by the Receiver in April 2006 called for the Receivership to establish his remedial program while CDCR continued to manage the day to day medical operations in the prisons. Within only a few months, however, the Receiver concluded that the Receivership had to assume control over daily prison healthcare functions. Numerous factors justified this decision, including the following: 1) Healthcare operations were growing increasingly worse the longer they were managed by the State; 2) The Receiver uncovered serious problems with fiscal waste, long-standing issues which the State would not, and perhaps could not, remediate; and 3) Fiscal misconduct involving an illegal contract with Medical Development International, a contract inappropriately solicited by two Schwarzenegger appointees.

The Receiver's first step in the process was to create his own revitalized Human Resources, Contract, Procurement, and Budget infrastructure. For the most part, these were not new positions. Instead, staff who were managed by CDCR, yet whose budget was charged to Health Care, were simply transferred to the Receiver and managed by the Receiver. As a result, over a period of months, a number of very significant improvements were achieved, and the performance of these units had led to some of the early remedial plan successes (e.g. recruiting and filling 90 percent of established nursing positions with State employees).

The continued justification for this decision becomes more apparent every day. If the Receivership did not have its own effective support and administrative operations, there is no question that the current resistance being led by the Governor's Office and the Attorney General would have utterly undermined our ability to maintain forward momentum in the remedial process.

5

# Section 2
# Executive Summary

Despite various challenges during the September 15, 2008 through January 15, 2009 reporting period, progress continued toward attaining constitutionally adequate medical care for patient-inmates of the CDCR. Highlights of progress include the following:

- The goal of filling 90 percent of State nursing positions statewide was achieved, and the goal of filling 90 percent of State physician positions is well within reach.
- Efforts related to establishing a comprehensive UM Program have commenced and have a higher and more immediate priority. As such, the timeline for the establishing a UM program has been accelerated to support the urgent need for cost avoidance coupled with better quality clinical outcomes.
- An audit instrument was developed to formally measure custody performance in providing health care access to patient-inmates and was implemented statewide in November 2008.
- The Credentialing and Privileging Unit staff completed the conversion of paper credential files to electronic profiles within the credentialSmart IT system for all Physicians and Surgeon, Physician Assistants, and Nurse Practitioners, Dentists, Psychiatrists, Psychologists, and Social Workers. In total, 1,498 paper files were converted to electronic profiles.
- A "Strike Team" approach to adjudicate overdue medical invoices has been formed in an effort to eliminate the invoice backlog.

While we will continue to make progress in many important areas that will bring us closer to our goal of providing a constitutional level of healthcare within California's correctional system, the Receivership still faces several significant challenges. These include the following:

- Funding for 10,000 bed program and facility upgrade projects is delayed in litigation.
- Funding for the Central Health Services Building at San Quentin State Prison has been halted due to liquidity issues with the Pooled Money Investment Board.
- Necessary funding for the OIG's audit program and positions to monitor the out-of-state program has been withheld by the Schwarzenegger Administration.
- Although there have recently been some hopeful signs, the State Personnel Board (SPB) -- which itself is struggling with insufficient resources and an awkward board governance structure - continues to delay efforts of the Receiver to hire vital leadership and management personnel.

As we continue to move forward with our efforts, these challenges will prove to be more troublesome. Only so many of the Receiver's Goals can be met if adequate funding is not provided.

Not withstanding those challenges, we do however continue to improve the usability of the Tri-Annual Report. Below is a helpful guide to better understanding the supporting elements of the report.

Format of the Report

To assist the reader, this Report provides three forms of supporting data:

1. *Metrics*: Metrics that measure specific Turnaround Plan of Action initiatives are set forth in this report with the narrative discussion of each Goal and the associated Objectives and Actions.

   Metrics were initially included in the Ninth Quarterly Report to the court and were also published as part of the Receiver's Turnaround Plan of Action Monthly Reports beginning in October 2008. Monthly Reports for October, November, and December 2008 are included as Appendices 3, 4, 5 respectively and can also be viewed at the California Prison Health Care Services (CPHCS) website (http://www.cphcs.ca.gov).

   It should be noted that some Objectives are in a planning and development stage, and therefore it is premature to implement metrics. However, other programs (e.g., the hiring of clinical personnel) can be measured by very specific metrics. Over time, the metrics provided in the Receiver's reports will improve in terms of both quantity and quality as new measurement systems are implemented and necessary information technology (IT) systems are established in California's prisons.

2. *Appendices*: In addition to providing metrics, the report also references a number of documents which are provided to the reader in the included Appendices filed concurrently with this report.

3. *Web Site References*: Whenever possible, appendices are provided. In some cases, however, website references are provided to the reader.

A chart summarizing the status of each of the six Goals of the Turnaround Plan of Action is provided below. Objectives and Actions' status indicated with a "check mark" (✓) are currently on schedule to be completed by the specified finish date. Objectives and Actions' status with an "x" (✗) are delayed from the specified finish date. Objectives and Actions' status with a "boxed x" (☒) are not progressing. Objectives and Actions which have been accomplished are noted as being "complete."

A new and additional chart is also provided below indicating the percent of completion for the Objectives and Actions of the Turnaround Plan of Action. Discussion and explanations regarding progress as well as delays are included in Section 4 with the narratives for the respective Objective or Action.

7

# Status of Turnaround Plan of Action Goals
## As of January 15, 2009

Case 2:90-cv-00520-LKK-JFM     Document 3462-2     Filed 01/20/2009     Page 13 of 118

| 1/15/09 Status | | | Item | Schedule Notes |
|---|---|---|---|---|
| | **GOAL 1** | | **Ensure Timely Access to Care** | |
| | Obj. 1.1 | | Screening and Assessment Processes | |
| ✓ | | Act 1.1.1 | Develop Standardize Screening and Assessment | |
| ✓ | | Act 1.1.2 | Implement Screening and Assessment Process | |
| | Obj. 1.2 | | Staffing and Processes for Health Access | |
| ✓ | | Act 1.2.1 | Preliminary Assessment for Access Teams | |
| ✗ | | Act 1.2.2 | Fully Implement Health Care Access Teams | Extended to 10/2011 |
| | Obj. 1.3 | | Scheduling and Tracking System | |
| ✓ | | Act 1.3.1 | Strategic Offender Management System | |
| | Obj. 1.4 | | Standardized UM System | |
| ⊠ | | Act 1.4.1 | Long-Term Care Pilot | |
| ✓ | | Act 1.4.2 | Implement Centralized UM System | Shortened from 10/2010 to 6/2009 |
| | **GOAL 2** | | **Establish a Medical Services Program** | |
| | Obj. 2.1 | | Access and Processes for Primary Care | |
| ✓ | | Act 2.1.1 | Redesign sick call | |
| ✓ | | Act 2.1.2 | Implement new sick call system statewide | |
| | Obj. 2.2 | | Chronic Care | |
| ✗ | | Act 2.2.1 | Chronic Care Initiative | Extended to 12/2009 |
| | Obj. 2.3 | | Emergency Medical Response System | |
| ✗ | | Act 2.3.1 | Emergency Medical Response Policy | Extended to 3/2009 |
| ✓ | | Act 2.3.2 | Certification and Training | |
| ✓ | | Act 2.3.3 | Standardize Emergency Equipment | |
| | Obj. 2.4 | | Specialty Care and Hospitalization | |
| ✓ | | Act 2.4.1 | Utilization and Care Management Policies | |
| ✓ | | Act 2.4.2 | Statewide Specialty Care Contracts | |
| ✗ | | Act 2.4.3 | Specialty Care Invoice Payments | |

Timeline column headings: 2008 (2nd Q, 4th Q), 2009 (1st, 2nd, 3rd, 4th Q), 2010 (1st, 2nd, 3rd, 4th Q), 2011 (1st, 2nd, 3rd, 4th Q), 2012 (1st, 2nd, 3rd, 4th Q), 2013 (1st, 2nd Q)

# Status of Turnaround Plan of Action Goals
## As of January 15, 2009

| 1/15/09 Status | | | 2008 | 2009 | 2010 | 2011 | 2012 | 2013 |
|---|---|---|---|---|---|---|---|---|
| | GOAL 3 | Recruit, Train & Retain Medical Workforce | | | | | | |
| | Obj. 3.1 | Physician and Nurse Recruitment | | | | | | |
| ✓ | Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | |
| ✗ | Act 3.1.2 | Physician and Physician Executive Positions | | | | | | |
| | Obj. 3.2 | Management Structure | | | | | | |
| ☒ | Act 3.2.1 | Establish and Staff Executive Leadership | | | | | | |
| ☒ | Act 3.2.2 | Establish and Staff Regional Leadership | | | | | | |
| | Obj. 3.3 | Professional Training for Clinicians | | | | | | |
| ✗ | Act 3.3.1 | Orientation and Preceptor / Proctoring | | Extended to 5/2009 | | | | |
| ✓ | Act 3.3.2 | CME Accreditation | | | | | | |
| | GOAL 4 | Quality Improvement Programs | | | | | | |
| | Obj. 4.1 | Quality Measurement and Evaluation Program | | | | | | |
| ✓ | Act 4.1.1 | Measurement, Eval. and Patient Safety Programs | | | | | | |
| ✗ | Act 4.1.2 | OIG Audit Program | | | | | | |
| | Obj. 4.2 | Quality Improvement Program | | | | | | |
| ✓ | Act 4.2.1 | Train and Deploy QI Advisors to Develop Model | | | | | | |
| ✓ | Act 4.2.2 | Establish a Policy Unit | | | | | | |
| ✓ | Act 4.2.3 | Implement Improvement Programs | | | | | | |
| | Obj. 4.3 | Medical Peer Review Process | | | | | | |
| ✗ | Act 4.3.1 | Establish Peer Review Process | | Extended to 3/2009 | | | | |
| | Obj. 4.4 | Medical Oversight Unit | | | | | | |
| complete | Act 4.4.1 | Staff and Establish Medical Oversight Unit | | | | | | |
| | Obj. 4.5 | Health Care Appeals | | | | | | |
| complete | Act 4.5.1 | Centralize Appeals, Correspondence & Habeas | | | | | | |
| ✓ | Act 4.5.2 | Health Care Appeals Task Force & Report | | | | | | |
| | Obj. 4.6 | Out-of-State & Other Facilities | | | | | | |
| ☒ | Act 4.6.1 | Administrative Unit for Oversight | | | | | | |

9

**Status of Turnaround Plan of Action Goals**
**As of January 15, 2009**

Case 2:90-cv-00520-LKK-JFM     Document 3462-2     Filed 01/20/2009     Page 15 of 118

| 1/15/09 Status | | | Notes |
|---|---|---|---|
| | **GOAL 5** | **Medical Support Infrastructure** | |
| | Obj. 5.1 | **Pharmacy Program** | |
| ✓ | Act 5.1.1 | Drug Formulary | |
| ✓ | Act 5.1.2 | Pharmacy Policies and Practices | |
| ✗ | Act 5.1.3 | Central-Fill Pharmacy | Extended to 10/2009 |
| | Obj 5.2 | **Health Records** | |
| ✓ | Act 5.2.1 | Roadmap for Standardized Health Records | |
| | Obj. 5.3 | **Radiology and Lab Services** | |
| ✗ | Act 5.3.1 | Determine strategy for HR, Lab and Radiology | Extended to 1/2009 |
| | Obj. 5.4 | **Clinical Information Systems** | |
| ✓ | Act 5.4.1 | Establish Clinical Data Repository | |
| | Obj. 5.5 | **Telemedicine Program** | |
| ✗ | Act 5.5.1 | Secure Leadership for Upgrade | |
| | **GOAL 6** | **Clinical, Administrative & Housing** | |
| | Obj. 6.1 | **Upgrade Program** | |
| ☒ | Act 6.1.1 | Assessment & Planning at 33 Institutions | |
| ☒ | Act 6.1.2 | Upgraded Administrative & Clinical Facilities | |
| | Obj. 6.2 | **10,000 Bed Expansion Program** | |
| ☒ | Act 6.2.1 | Pre-Planning on All Sites | |
| ☒ | Act 6.2.2 | Construction at First Site | |
| ☒ | Act 6.2.3 | Phased Construction Program | |
| | Obj. 6.3 | **San Quentin Construction** | |
| ✓ | Act 6.3.1 | All Construction excluding Central Health Services | |
| ☒ | Act 6.3.2 | Central Health Services | |

Timeline columns (Gantt chart): 2008 (3rd Q, 4th Q); 2009 (1st–4th Q); 2010 (1st–4th Q); 2011 (1st–4th Q); 2012 (1st–4th Q); 2013 (1st Q, 2nd Q).

# Turnaround Plan of Action Goals
## Percent Complete
### As of January 22, 2009

| | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|
| **GOAL 1** | **Ensure Timely Access to Care** | | | | | | | | | |
| **Obj. 1.1** | **Screening and Assessment Processes** | | | | | | | | | |
| Act 1.1.1 | Develop Standardize Screening and Assessment | | | | | | 70% | | | |
| Act 1.1.2 | Implement Screening and Assessment Process | 0% | | | | | | | | |
| **Obj. 1.2** | **Staffing and Processes for Health Access** | | | | | | | | | |
| Act 1.2.1 | Preliminary Assessment for Access Teams | | | | | | | | 90% | |
| Act 1.2.2 | Fully Implement Health Care Access Teams | | 20% | | | | | | | |
| **Obj. 1.3** | **Scheduling and Tracking System** | | | | | | | | | |
| Act 1.3.1 | Strategic Offender Management System | 10% | | | | | | | | |
| **Obj. 1.4** | **Standardized UM System** | | | | | | | | | |
| Act 1.4.1 | Long-Term Care Pilot | 10% | | | | | | | | |
| Act 1.4.2 | Implement Centralized UM System | | 20% | | | | | | | |

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Turnaround Plan of Action Goals
## Percent Complete

Case 2:90-cv-00520-LKK-JFM    Document 3428-2   Filed 01/20/2009    Page 17 of 118

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GOAL 2 | Establish a Medical Services Program | | | | | | | | | | |
| Obj. 2.1 | Access and Processes for Primary Care | | | | | | | | | | |
| Act 2.1.1 | Redesign sick call | | 20% | | | | | | | | |
| Act 2.1.2 | Implement new sick call system statewide | | 20% | | | | | | | | |
| Obj. 2.2 | Chronic Care | | | | | | | | | | |
| Act 2.2.1 | Chronic Care Initiative | 10% | | | | | | | | | |
| Obj. 2.3 | Emergency Medical Response System | | | | | | | | | | |
| Act 2.3.1 | Emergency Medical Response Policy | | | | | | | | 80% | | |
| Act 2.3.2 | Certification and Training | | | 30% | | | | | | | |
| Act 2.3.3 | Standardize Emergency Equipment | | | | 35% | | | | | | |
| Obj. 2.4 | Specialty Care and Hospitalization | | | | | | | | | | |
| Act 2.4.1 | Utilization and Care Management Policies | | 20% | | | | | | | | |
| Act 2.4.2 | Statewide Specialty Care Contracts | | | | | | 60% | | | | |
| Act 2.4.3 | Specialty Care Invoice Payments | 15% | | | | | | | | | |
| GOAL 3 | Recruit, Train & Retain Medical Workforce | | | | | | | | | | |
| Obj. 3.1 | Physician and Nurse Recruitment | | | | | | | | | | |
| Act 3.1.1 | Nursing and Nursing Executive Positions | | | | | | | | | | 100% |
| Act 3.1.2 | Physician and Physician Executive Positions | | | | | | | | | 90% | |
| Obj. 3.2 | Management Structure | | | | | | | | | | |
| Act 3.2.1 | Establish and Staff Executive Leadership | 10% | | | | | | | | | |
| Act 3.2.2 | Establish and Staff Regional Leadership | 10% | | | | | | | | | |
| Obj. 3.3 | Professional Training for Clinicians | | | | | | | | | | |
| Act 3.3.1 | Orientation and Preceptor / Proctoring | | | | 40% | | | | | | |
| Act 3.3.2 | CME Accreditation | | | | | 50% | | | | | |

12

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Turnaround Plan of Action Goals
## Percent Complete

Case 2:90-cv-00520-LKK-JFM    As of January 12, 2009 Filed 01/20/2009    Page 18 of 118

|  |  | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GOAL 4 | Quality Improvement Programs |  |  |  |  |  |  |  |  |  |  |
| Obj. 4.1 | Quality Measurement and Evaluation Program |  |  |  |  |  |  |  |  |  |  |
| Act 4.1.1 | Measurement, Eval. and Patient Safety Programs | 10% |  |  |  |  |  |  |  |  |  |
| Act 4.1.2 | OIG Audit Program |  | 20% |  |  |  |  |  |  |  |  |
| Obj. 4.2 | Quality Improvement Program |  |  |  |  |  |  |  |  |  |  |
| Act 4.2.1 | Train and Deploy QI Advisors to Develop Model |  |  |  | 40% |  |  |  |  |  |  |
| Act 4.2.2 | Establish a Policy Unit |  | 20% |  |  |  |  |  |  |  |  |
| Act 4.2.3 | Implement Improvement Programs | 10% |  |  |  |  |  |  |  |  |  |
| Obj. 4.3 | Medical Peer Review Process |  |  |  |  |  |  |  |  |  |  |
| Act 4.3.1 | Establish Peer Review Process |  |  | 30% |  |  |  |  |  |  |  |
| Obj. 4.4 | Medical Oversight Unit |  |  |  |  |  |  |  |  |  |  |
| Act 4.4.1 | Staff and Establish Medical Oversight Unit |  |  |  |  |  |  |  |  |  | 100% |
| Obj. 4.5 | Health Care Appeals |  |  |  |  |  |  |  |  |  |  |
| Act 4.5.1 | Centralize Appeals, Correspondence & Habeas |  |  |  |  |  |  |  |  |  | 100% |
| Act 4.5.2 | Health Care Appeals Task Force & Report |  |  | 30% |  |  |  |  |  |  |  |
| Obj. 4.6 | Out-of-State & Other Facilities |  |  |  |  |  |  |  |  |  |  |
| Act 4.6.1 | Administrative Unit for Oversight |  |  |  |  | 50% |  |  |  |  |  |

13

*While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

## Turnaround Plan of Action Goals
### Percent Complete
### As of January 20, 2009

| | | 10% | 20% | 30% | 40% | 50% | 60% | 70% | 80% | 90% | 100% |
|---|---|---|---|---|---|---|---|---|---|---|---|
| GOAL 5 | Medical Support Infrastructure | | | | | | | | | | |
| Obj. 5.1 | Pharmacy Program | | | | | | | | | | |
| Act 5.1.1 | Drug Formulary | | | | | | | | | 90% | |
| Act 5.1.2 | Pharmacy Policies and Practices | | | | | | 60% | | | | |
| Act 5.1.3 | Central-Fill Pharmacy | | 20% | | | | | | | | |
| Obj 5.2 | Health Records | | | | | | | | | | |
| Act 5.2.1 | Roadmap for Standardized Health Records* | | | | | | 60% | | | | |
| Obj. 5.3 | Radiology and Lab Services | | | | | | | | | | |
| Act 5.3.1 | Determine strategy for HR, Lab and Radiology* | | | | | | | | | 90% | |
| Obj. 5.4 | Clinical Information Systems | | | | | | | | | | |
| Act 5.4.1 | Establish Clinical Data Repository | | | 30% | | | | | | | |
| Obj. 5.5 | Telemedicine Program | | | | | | | | | | |
| Act 5.5.1 | Secure Leadership for Upgrade | | | | 40% | | | | | | |
| GOAL 6 | Clinical, Administrative & Housing | | | | | | | | | | |
| Obj. 6.1 | Upgrade Program | | | | | | | | | | |
| Act 6.1.1 | Assessment & Planning at 33 Institutions | 10% | | | | | | | | | |
| Act 6.1.2 | Upgraded Administrative & Clinical Facilities | 5% | | | | | | | | | |
| Obj. 6.2 | 10,000 Bed Expansion Program | | | | | | | | | | |
| Act 6.2.1 | Pre-Planning on All Sites | | | | | | 60% | | | | |
| Act 6.2.2 | Construction at First Site | 0% | | | | | | | | | |
| Act 6.2.3 | Phased Construction Program | 0% | | | | | | | | | |
| Obj. 6.3 | San Quentin Construction | | | | | | | | | | |
| Act 6.3.1 | All Construction excluding Central Health Services | | | | | | | | 80% | | |
| Act 6.3.2 | Central Health Services | | | | | | 60% | | | | |

14

* While fact-finding has been completed and strategy planning has commenced, infrastructure needs to be developed for implementation and then the remedial plan must be implemented.

# Section 3
# The Receiver's Reporting Requirements

This is the tenth report filed by the Receivership, and the fourth submitted by Receiver Clark Kelso.

The Order Appointing Receiver (Appointing Order) filed February 14, 2006 calls for the Receiver to file status reports with the *Plata* court concerning the following issues:

    1. All tasks and metrics contained in the Plan and subsequent reports, with degree of completion and date of anticipated completion of each task and metric.

    2. Particular problems being faced by the Receiver, including any specific obstacles presented by institutions or individuals.

    3. Particular success achieved by the Receiver.

    4. An accounting of expenditures for the reporting period.

    5. Other matters deemed appropriate for judicial review.

(Appointing Order at p. 2-3.)

In support of the coordination efforts by the four federal courts responsible for the major health care class actions pending against the CDCR, the Receiver now files Tri-Annual Reports in four different federal court class action cases. An overview of the Receiver's enhanced reporting responsibilities is included below.

*Plata, Coleman, Perez* and *Armstrong* Coordination Reporting Requirements

The Joint Order filed on June 28, 2007 in *Coleman v. Schwarzenegger* (mental health care), *Perez v. Tilton* (dental care) and *Plata v. Schwarzenegger* (medical care) approved various coordination agreements made between the representatives of the three health care class actions. (Order Approving Coordination Agreements Attached to Joint May 29, 2007 Order, hereinafter "Joint Coordination Order.") These coordination agreements provide for the *Plata* Receiver to assume responsibility for the following: (1) direct oversight of contracting functions for medical, dental, and mental health care; (2) implementation of long-term IT systems to include the medical, dental and mental health programs; and (3) oversight of pharmacy operations serving the medical, dental, and mental health programs. (Joint Coordination Order at 2.)

The Receiver's assumption of these responsibilities is coupled with reporting requirements which mandate that the Receiver file progress reports addressing the following: (a) all tasks and metrics necessary to the contracting functions, implementation of long-term IT, and pharmacy services for mental health care and dental care, with degree of completion and date of anticipated completion for each task and metric; (b) particular problems being faced by the Receiver in accomplishing remedial goals; and (c) particular successes achieved by the Receiver in accomplishing remedial goals. (Joint Coordination Order at 2-3.)

Additional reporting requirements were subsequently placed on the Receiver following his assumption of the management of certain coordinated functions involving the delivery of

15

Americans With Disability Act (ADA) related services in California prisons. (August 24, 2007 *Armstrong v. Schwarzenegger* Order Approving Coordination Statements.")

On February 26, 2008, the *Plata, Coleman, Perez* and *Armstrong* courts issued an additional joint order which provides for the Plata Receiver to manage two major prison health care construction projects: (1) upgrades to improve health care delivery at the existing 33 CDCR institutions, and (2) the construction, on existing prison sites, of health care facilities for up to 10,000 patient-inmates [Order filed February 26, 2008 (hereinafter "Order Approving Construction Agreement")]. As with the prior coordination Orders, the Receiver was ordered to file reports in each case "concerning developments pertaining to matters that are the subject of the construction agreement." (Order Approving Construction Agreement at 3:1-3.)

Modification to Receiver's Reporting Frequency
On November 19, 2008, the court issued the "Order Modifying Reporting Requirements" which modified the Receiver's requirement to file reports with the four federal courts every three months (quarterly) to every four months (tri-annually). Therefore, the Receiver will now file Tri-Annual Reports on or before January 15, May 15, and September 15 each year.

Integration of Coordination Related Reporting in This Tri-Annual Report
Pursuant to the mandates of the various coordination Orders referenced above, the Receiver's remedial umbrella now encompasses the following: the overhaul of the health care contract function; the implementation of long-term IT systems; the oversight of pharmacy operations for medical, mental health, dental and ADA patient-inmates; and the oversight of health care prison construction projects. As such, when this Tri-Annual Report describes progress and challenges facing reform of contracting functions, IT systems, pharmacy operations, and construction, all such references are referring to mental health, dental, ADA and medical care for patient-inmates. Specifically, the Receiver's Coordination-related reporting is set forth in the following sections of this Report: Credentialing and Privileging of Health Care Providers (Goal 4, Objective 4.2); Contracts (Goal 2, Objective 2.4); IT Update (Goal 1, Objective 1.3; Goal 5, Objective 5.4); Telemedicine Reform (Goal 5, Objective 5.5 ); Coordination with Other Lawsuits (Section 8.A.); and Construction (Goal 6).

Reporting Related to the Order Waiving State Contracting Statutes
On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts. The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date. As ordered by the court, the Receiver provides a summary of each contract the Receiver has awarded under the substitute contracting process during the reporting period. The Receiver's contract waiver-related report is provided in Section 8.B.

16

# Section 4
# Status of Turnaround Plan Initiatives

## Goal 1. Ensure Timely Access to Health Care Services

**Objective 1.1.**   Redesign and Standardize Screening and Assessment Processes at Reception/Receiving and Release

*Action 1.1.1. By January 2009, develop standardized reception screening processes and begin pilot implementation*

When patient-inmates first enter the correctional system, they receive an initial health screening at a Reception Center prior to endorsement to a mainline institution. Under optimum conditions and processes, this initial health screening allows health care providers to stratify patients based upon health risk and refer patients to timely and appropriate clinical services. Without effective and timely screening at Reception Centers, the process could fail to identify patients that may have immediate or chronic life-threatening medical conditions. There is potential for disruptions in the continuity of care to occur, such as failure to fill essential prescriptions, which can have life-threatening effects, and patients may be placed at institutions ill-equipped to accommodate patients' medical needs, among other negative outcomes.

A pilot program at San Quentin State Prison was initiated in 2006 to improve the existing reception screening process and bring it into alignment with national guidelines for health screening; provide screening on the same day as the inmate's arrival to prevent lapses in care; and integrate dental, mental health, and medical screening processes. The integrated screening includes laboratory testing and medication review and administration. Implementation of the redesigned reception center process at San Quentin State Prison resulted in a reduction in sick call requests in all disciplines and a reduction in emergency care encounters and hospitalizations.

The Reception Center project is on schedule to develop, test, select and implement reception center process and policy improvements in all major Reception Centers, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:*  Development of standardized reception screening and assessment processes and piloting of these processes are on schedule to be completed by January 2009.

The second Reception Center project pre-pilot work commenced at the R.J. Donovan Correctional Facility in August 2008. In collaboration with the local leadership at the institution, the Reception Center Core Team conducted a facility assessment, baseline data collection, and assisted in arranging for necessary physical space modifications. Using lessons learned from the R.J. Donovan Correctional Facility pilot project and from the pilot at San Quentin State Prison, a new, standardized reception screening process was created. R.J. Donovan Correctional Facility began live operation of these new processes in December 2008.

17

Specific improvements to the previous CDCR reception center process are as follows:

1. All Reception Center patient-inmates, regardless of security classification, are received at a single location for initial health care triage.
2. Patient-inmates with urgent or emergent conditions are immediately referred to the Treatment and Triage Area (TTA) or other treatment facility as ordered by a provider.
3. All other patient-inmates are held within the Reception Center area buildings until their health screening has been completed.

A daily intake log is maintained to collect performance data. Each inmate's name, CDCR number and date of birth is recorded and verified against the county manifest. Data collected includes bus arrival date and time, date the health screening is completed, follow up appointment date if any, date and time that priority medications were received, and notations or comments to explain any incomplete entries. The following data will be used to track the performance of the new processes against the following performance measures:

1. By January 31, 2009, 99 percent or more patient-inmates will be triaged by a Registered Nurse (RN) or provider on the day of arrival at the R.J. Donovan Correctional Facility pilot Reception Center.
2. By January 31, 2009, 95 percent or more of all patient-inmates will have received a full health screening within two business days after arrival at the R.J. Donovan Correctional Facility pilot institution Reception Center.
3. By January 31, 2009, 95 percent or more of priority medications will be delivered to the patient-inmates within 24-hours of arrival at the R.J. Donovan Correctional Facility pilot institution Reception Center.
4. By January 31, 2009, 95 percent or more of patients who needed a primary care provider-line follow up appointment will be scheduled prior to leaving the R.J. Donovan Correctional Facility pilot institution Reception Center.

A third pilot program will commence at North Kern State Prison in April 2009. Once tested, evaluated and validated (as effective improvements) or redesigned (based on the lessons learned at San Quentin State Prison, R.J. Donovan Correctional Facility, and North Kern State Prison), the new pilot processes will be introduced to the remaining Reception Centers beginning in late Spring 2009. Prior to that date, the cumulative learning, process design, and testing results from the three pilot Reception Centers will be consolidated and a new statewide Reception Center policy will be submitted to the Receiver for review and approval.

*Action 1.1.2. By January 2010, implement new processes at each of the major reception center prisons*

Screening and assessment processes are on schedule to be implemented at the major Reception Centers prisons by January 2010. Following the implementation of the pilot processes at San Quentin State Prison, R.J. Donovan Correctional Facility, and North Kern State Prison, as described above, the Reception Center Core Team will fully implement the new, standardized process at the other major Reception Center prisons by the end of 2009. Major Reception

Centers are defined as those with the highest inmate volume and those where the Reception Center process is their sole mission. Major Reception Centers where the new process will be implemented in 2009 include North Kern State Prison, Wasco State Prison, Central California Women's Facility, Valley State Prison for Women, California State Prison - Los Angeles County, California Institution for Women, Deuel Vocational Institute and the California Institution for Men. These institutions, together with R.J. Donovan and San Quentin, receive approximately 85 percent of all arriving Reception Center patient-inmates. (Note: The new standardized Reception Center processes will also be implemented at the remaining non-major Reception Center sites by mid-2010.)

**Objective 1.2.   Establish Staffing and Processes for Ensuring Health Care Access at Each Institution**

> *Action 1.2.1. By January 2009, the Receiver will have concluded preliminary assessments of custody operations and their influence on health care access at each of CDCR's institutions and will recommend additional staffing, along with recommended changes to already established custody posts, to ensure all patient-inmates have improved access to health care at each institution*

*Preliminary Operational Assessments:*  This Action is on schedule to be completed by the end of January 2009, as set forth in the Turnaround Plan of Action. As previously reported in the Ninth Quarterly Report, Preliminary Operational Assessments have been completed at 32 CDCR institutions. The last Preliminary Operational Review is scheduled to be conducted during the week of January 26 – 30, 2009 at Pelican Bay State Prison.

*Operational Re-Assessments:*  During this reporting period, the remaining five Operational Re-Assessments were completed as planned at the following institutions:  Ironwood State Prison, High Desert State Prison, California Correctional Center, California State Prison - Solano, and R.J. Donovan Correctional Facility. These assessments resulted in the recommendation of 298.66 correctional officer positions for use as clinic officers, escort officers and transportation officers. An additional 41.94 supervisory/management positions were also recommended to provide the appropriate level of supervision.

As reported in previous reports to the court, after completing approximately half of the Preliminary Operational Reviews, the methodology and analysis used to determine staffing needs was perfected whereby the results effectively identified standardized staffing needs for inside the prison custody posts functions at all prisons. Therefore, the decision was made to return to the initial eight institutions where the Preliminary Operational Reviews were conducted and complete Operational Re-Assessments so that staffing for all inside the prison custody posts could be completed. Although this accelerated adaptation to the original plan has expedited the completion of fully implementing Health Care Access Units at all institutions, the change also earmarked staffing resources to each institution in much larger quantities and much sooner than was originally planned nineteen months ago. As a result, there are insufficient resources available in the current year budget for distribution to each institution in keeping with the resource needs identified through the review process. A total of 820 additional positions are

19

needed to complete the inside the prison staffing requirements statewide for all health care access custody needs.

To summarize, the last Preliminary Operational Assessment (Pelican Bay State Prison) will be completed by the end of January 2009. The Preliminary Operational Assessments combined with the eight Operational Re-Assessments have identified all inside the prison custody resources needed at each location to improve and facilitate patient-inmate access to various health care services such as routine care, on and off-site specialty care, on and off-site emergency care, and on-site inpatient care.

> ### Action 1.2.2 By July 2011, the Receiver will have fully implemented Health Care Access Units and developed health care access processes at all CDCR institutions

The Health Care Access Units at Avenal State Prison, California Medical Facility, and San Quentin State Prison continue to operate effectively and efficiently and are fully supported by the institution's administrative, clinical, and custody staff.

*Progress During the Reporting Period:* As reported in the Ninth Quarterly Report, 67 posts or 108.26 new positions were recommended for the activation of the Health Care Access Unit at Correctional Training Facility. The recommended total was inclusive of all necessary positions to ensure access to care was met within the security perimeter at each of the three facilities of the institution as well as providing the necessary custody resources to provide coverage of the patient-inmates within the local community hospitals. The Receiver approved the total amount of positions, but, based on the current budgetary constraints, found it necessary to withhold the identified 54 Personnel Years (PY) for Hospital Guarding. The difference, 54.26 PY, was activated on December 1, 2008. The remaining 54 PY for custody Hospital Guarding are scheduled to be distributed later this fiscal year. Custody Support staff will continue to monitor the progress of the Health Care Access Unit at Correctional Training Facility and remedy issues as they arise.

In September 2008, Custody Support staff initiated efforts to fully implement a Health Care Access Unit for the California Institution for Men. The analysis has been completed and is currently in the finalization process. The institution is completing all necessary Operational Procedures that adequately describe the functions of the Health Care Access Unit. In addition, they are completing Post Orders of the identified staffing/posts denoting all responsibilities, duties and expectations of each post within the Health Care Access Unit. The Custody Support staff has recommended a total of 76 posts or 133.02 new positions (104.94 PY or 79 percent of which is for Hospital Guarding and 12.9 PY or 9.7 percent is for medical transportation). The Receiver has approved these positions, however, based on the current budgetary constraints the positions for the Hospital Guarding function have been withheld and will be distributed later this fiscal year or during the next fiscal year. In January 2009, the remaining 28.08 PY for inside the prison operations and transportation will be distributed to California Institution for Men for activation on March 1, 2009.

Efforts to identify the inside staffing needs at each institution are ahead of schedule, and the Custody Support staff remains on schedule to complete the assessments for Health Care Access Units at California Institution for Men, California Rehabilitation Center, California Institution for Women, and Mule Creek State Prison by June 30, 2009. However, in light of the recent inclusion of Pelican Bay State Prison and plans to establish a Health Care Access Unit there, this action item is now slightly delayed and is scheduled to complete the implementation of Health Care Access Units statewide by October 2011.

*Monthly Health Care Access Quality Report - Data Collection Instrument:* As previously reported to the court, an audit instrument was developed to formally measure custody performance in providing health care access to patient-inmates. Statewide training for implementing the "Monthly Health Care Access Quality Report" (Quality Report) took place on October 14-15, 2008 and was attended by all Associate Wardens for Health Care Operations and their assigned analysts. Although the training session was delayed from August to October 2008 due to the State's budget situation, the statewide implementation of the Quality Report did take place on November 1, 2008 with the first report submitted from each institution in December 2008. (Refer to Appendix 6.)

The goal of the Quality Report is to collect data regarding the outcome of all health care scheduled appointments and add-on appointments. Each outcome is recorded on the Report as "refused," "seen," or "not seen" and includes specific explanations when appointments do not occur as scheduled (e.g. patient not seen due to lack of officer, lack of transport, scheduling error; inmate moved overnight; Unit Health Record unavailable). Half of the institutions provided viable data for the Quality Report, but unfortunately 16 institutions were unable to achieve this goal. Follow-up was conducted with the Associate Wardens and analysts who are responsible for completion of the Quality Report and several obstacles were reported. First, given the volume of health care related ducats issued on a daily basis, some clinical schedulers do not utilize the ducat process and simply provide officers with a list of inmates to be seen. Second, clinical providers do not always coordinate with clinic officers when an inmate does not show for an appointment. Lastly, several institutions do not have their Health Care Access positions activated and therefore relied on clinical data which does not reflect why patient-inmates are/are not seen by providers. Custody Support staff continue to work with the institutions to resolve obstacles encountered in collecting the data for the Quality Report. It is anticipated that data collection and reporting challenges will resolve over the next several months as the process matures. After that point, the Custody Support staff will begin to establish benchmarks based on the data collected.

It should be noted, however, that the Turnaround Plan of Action was designed (and approved by plaintiffs and defendants) because it is an integrated plan that allowed for rapid deployment. Eliminating any critical element from the plan presents serious problems concerning timely implementation of other elements. One of the problems insuring access to healthcare is the State's failure to staff and manage units of officers to escort prisoners from their housing unit to healthcare delivery areas. For example, the access program is designed to move prisoners from their cell to clinical areas of the prison where healthcare is provided. At the same time, however, the space needed to deliver services must be adequate. Goal 6's upgrade program was designed

21

to address this problem. Without additional clinical spaces, pill call windows, office space for support staff, and staging areas for custody Access Teams, the Receiver's Objective concerning access to health care cannot be effectuated in a timely and cost effective manner. Simply stated, if Goal 6 is not achieved, the existing facilities will not be able to deliver health care access without population reduction and significantly increasing health care and correctional staffing to provide, for example, 18-20 hours of clinical operations per day - a far more expensive operation than the construction set forth in the Turnaround Plan of Action.

**Objective 1.3.** **Establish Health Care Scheduling and Patient-Inmate Tracking System**

*Action 1.3.1. Work with CDCR to accelerate the development of the Strategic Offender Management System with a scheduling and inmate tracking system as one of its first deliverables*

A system for the scheduling and tracking of health care appointments for patient-inmates is an essential element of providing timely access to care. General offender scheduling and movement control within the CDCR's 33 prisons and the seven new long-term care facilities will be handled by the Strategic Offender Management System (SOMS). SOMS will include four components that are critical to the success of the prison health care system: a unique identification number for each offender; real-time location information for each offender; demographic information on each offender; and a master offender schedule and scheduling prioritization system. Specific health care scheduling needs will be handled by a new Health Care Scheduling System (HCSS), described below, which will interface with offenders' schedules in SOMS.

The SOMS project is in the vendor evaluation and selection stage of procurement. A Request for Proposals (RFP) was issued to select a system integrator and a commercially available software product for the project. Several initial proposals were received and two vendor teams were requested to submit final proposals, which are currently being evaluated. A contract Notice of Award is scheduled to be made in January 2009. The first phase of the SOMS implementation is scheduled for early 2010 as scheduled.

The new HCSS will schedule medical, dental, and mental health care appointments for offenders based upon mandated health care requirements, offender requests, referrals, medical orders, and chronic care plans. The new system is expected to fully integrate with SOMS and the Business Information System (BIS) as well as the Clinical Data Repository (CDR) to provide a consolidated and comprehensive view of an offender's schedule. The HCSS project is currently in the procurement phase. For the past several months CPHCS has retained Gartner, Inc., to provide marketplace research regarding existing vendors and to learn about current practices in peer prison health care scheduling. Some of their key findings are as follows:

- No other correctional environment studied has as many offenders per institution (over 5,000 in California versus about 1,500 in states like Florida and Texas).

22

- Thirty vendors were contacted, but none offer an off-the-shelf solution encompassing Health Care, Custody, and Scheduling components that would meet CPHCS's business needs without modification.
- Fifteen correctional organizations were contacted to learn about current practices in prison health care scheduling. Where systems were in place, a majority of organizations studied used custom-built systems for tracking and scheduling inmates, and integration between custody and health care was usually a manual process.

Gartner, Inc. also assisted CPHCS with the preparation of requirements and an RFP. The HCSS RFP was released January 2009 requesting responses from a vendor consortium that can deliver and implement an adult offender health care scheduling solution. Contract award is scheduled to be made after July 1, 2009. The RFP is available for review at the CPHCS website (http://www.cphcs.ca.gov). The HCSS project is on schedule, as planned.

### Objective 1.4.    Establish A Standardized Utilization Management System

*Action 1.4.1. By January 2009, open long-term care units at one facility as a pilot project to assist in developing plans for other long-term chronic care facilities*

This initiative was established in the Turnaround Plan of Action as a bridge to increase the available medical beds until the Receiver's first facility of the 10,000 medical bed project is completed in 2011. The additional beds will provide new treatment options and allow clinical staff to effectuate a number of clinical "sweeps" of Correctional Treatment Centers and other prison medical units and thereafter transfer those patients who appear the most at-risk to a higher level of care. The California Medical Facility was identified as the pilot site for this project and planning was initiated on May 20, 2008.

During this reporting period, a number of interdisciplinary meetings have occurred including California Medical Facility executives, CPHCS clinical leaders, the Receiver's Custody Support Team and Vanir Construction Management, Inc. The final proposal was reviewed during a stakeholder meeting on September 30, 2008, at which time the final scope was reviewed and additional options were discussed for inclusion in the project. The options include air conditioning, epoxy flooring, furred gypsum board corridor ceilings, and handrails and were priced and submitted to the Receiver on October 17, 2008, resulting in an increased total project cost of $6.65 million to develop a total of 109 Outpatient Housing Unit (OHU) beds in "H" wing at the California Medical Facility. In addition to the expansion of OHU beds at the California Medical Facility, the proposal will create appropriate nursing exam/treatment space, clean/soiled linen rooms, medication prep rooms, and other medical support spaces; will replace 10 Administrative Segregation cell doors within the OHU, a nurse call system, toilet/sink combo; and will provide shower area conversions and patching and painting of various walls, floors and ceilings.

This plan was approved by CDCR executive staff and the Receiver on November 5, 2008. Electrical and mechanical engineering began in late November 2008 to assess the most effective means for providing air conditioning to "H" wing and to define the electrical requirements and

impact to the project. An initial report with a recommended approach was completed at the end of December 2008 to allow the project team to proceed with bridging documents in January 2009. The project was scheduled to be advertised for bidding in February 2009, with a contract award and regulatory approvals in August 2009 (once awarded, construction will take approximately 12 months.) However, this project is now on hold due to the Governor's recent decision to oppose all prison healthcare construction regardless of necessity.

The clinical sweeps of CTCs were designed to identify the most vulnerable patients and provide them with a more protective clinical environment at California Medical Facility. Based upon the characteristics of previously identified unanticipated and preventable deaths, the Governor's recent decision to oppose funding for the Receiver's prison upgrade program will continue inappropriate conditions, continue the shortfall of desperately needed treatment beds, and thereby continue preventable prisoner deaths indefinitely.

### *Action 1.4.2. By October 2010, establish a centralized Utilization Management System*

An aggressive time frame of the UM implementation process described below is planned to begin January 2009 and be completed by June 2009. This timeline has been accelerated, from the original October 2010 completion date set forth in the Turnaround Plan of Action, to support the urgent need for cost avoidance coupled with better quality clinical outcomes. Through increased case management, miscommunication and morbidity and mortality due to lack of coordination of services should be minimized and preventable deaths decreased.

The Receiver's Turnaround Plan of Action requires the implementation of a standardized UM System. The UM System is a centralized clinical department that systematically reviews, oversees, and reports all aspects of CPHCS' use of medical and clinical resources at institutions and health care facilities within the organization. A UM program also ensures that all services which patient-inmates receive outside the organization are continuously supported and that improvement in patient care outcomes and costs are monitored.

Under the proposed organizational structure, UM processes will achieve the following:
1. Promote efficiency and increased accountability for specialist referrals, institutional bed use and community hospital admissions and discharge planning at the local, regional and Headquarters level.
2. Monitor key operating data on an ongoing basis, with appropriate distribution to key medical management so that actions can be taken to reduce unnecessary healthcare costs, and improve clinical outcomes.
3. Support institutional activity, referral, and resource management through regionally-focused teams of physicians and case managers. Outcomes and variance results will be subject to co-management, education and training.
4. Integrate centralized case management to proactively identify high risk, high cost and complex cases and coordinate the care to mitigate disease complications and lapses in care that increase morbidity and costs.

24

Case management will oversee clinical care coordination at all institutions so that preventive health care is regularly delivered, patients with chronic disease are seen according to recommended schedules, and referrals to specialists and community hospital activity are coordinated and tightly managed. This Action is on schedule, as set forth in the Turnaround Plan of Action. See Objective 2.4 below for an update concerning the UM pilot in the Central Region.

# Goal 2. Establish A Prison Medical Program Addressing The Full Continuum of Health Care Services

**Objective 2.1.**  Redesign and Standardize Access and Medical Processes for Primary Care

*Action 2.1.1. By July 2009, complete the redesign of sick call processes, forms, and staffing models*

Access to primary care services in California's prison system is generally accomplished through a "sick call" process. Through sick call, patients submit requests for health care services, the requests are triaged, and the patient is scheduled to see a provider in accordance with timeframes specific to the acuity of the patient's medical complaint. In the Turnaround Plan of Action, the Receiver found the current sick call process to be "plagued by inconsistent local processes involving too many forms, handoffs, and opportunities for error." Additional problems included out-of-date nursing protocols, an inefficient system for diagnostic testing and follow-up, lack of access to patient records for providers evaluating patients, and insufficient scheduling and tracking mechanisms that lead to gaps in care and do not allow for effective program monitoring and evaluation.

To accomplish the Receiver's objectives pertaining to reform of the sick call process, the Access to Care Sick Call Team will implement a three-phased strategy:

- Phase I - Pilot new sick call processes and staffing models at select pilot institutions.
- Phase II - Refine pilot processes and staffing based upon the findings and lessons learned at the pilot sites.
- Phase III - Implement the approved sick call program at all CDCR institutions.

*Progress During the Reporting Period:*  The sick call program redesign is on track for completion by the target date of July 2009.  During this reporting period, the Sick Call Team continued Phase I planning to pilot redesigned sick call processes and staffing models.  In November 2008, a Project Manager joined the clinical manager, administrative team lead, correctional expert, nursing practice expert, and analysts to fully staff the Sick Call Core Team. The Sick Call Team also completed site visits at Folsom State Prison, California State Prison - Sacramento, Mule Creek State Prison, California Institution for Women, Richard J. Donovan Correctional Facility, and California Men's Colony.  The purpose of the site visits was to analyze and document current sick call triage processes and staffing models and to conduct a series of chart audits to collect baseline data to establish performance metrics.

During the reporting period, the Sick Call Team continued to research health care access programs at health care organizations such as Kaiser and the Department of Veterans' Affairs. The Team also researched established medical service access models at correctional systems including the Federal Bureau of Prisons, Texas, Oregon, Arizona and Delaware.  In addition to examining models for traditional sick call processes, the Team began to develop open access sick

26

call models for pilot implementation. The Team's nursing consultant, in cooperation with the pilot site nursing champions, commenced an evaluation of the existing Nursing Protocols.

During the remainder of Phase I, the Sick Call Core Team will develop and implement new sick call processes, staffing models, appropriate performance measures and program reports. Implementation at the first pilot site began in late December 2008 and will be completed by May 2009. Phase II efforts will include an evaluation of the pilot site performance and process finalization. Upon completion of Phase II in July 2009, the Sick Call Core Team will submit a new sick call policy, forms, and a staffing model to the Receiver for review and approval. Implementation of the approved sick call program at all CDCR institutions will be complete by July 2010, as set forth in Action 2.1.2 below. The Sick Call implementation schedule is included as Appendix 7.

*Modifications to the Sick Call Initiative:* In the Receiver's Ninth Quarterly Report, the Sick Call Team reported the initial strategy would be to pilot the new sick call processes at one institution. While collecting data to select the pilot site, the team documented a great deal of variation in physical plant layouts, staffing, and local processes. Additionally, there are number of elements of overlap with the Chronic Disease Management Program project. Sick call/primary care, for example, encompasses both patients with acute, episodic issues and chronic care patients. As a result, the Access to Care Team decided to pilot Sick Call processes and staffing models at a minimum of three of the six Chronic Disease Management Program pilot sites. (Refer to Objective 2.2 for additional information.) The six Chronic Disease Management Program pilot institutions, consisting of two institutions from each of the major geographical regions, are as follows: Folsom State Prison, Mule Creek State Prison, Central California Women's Facility, California Men's Colony, California Institution for Women, and Richard J. Donovan Correctional Facility.

### Action 2.1.2. By July 2010, implement the new system in all institutions

The redesigned sick call process action plan is on schedule for statewide implementation by the target date of July 2010. Refer to the statewide Sick Call implementation schedule included as Appendix 7.

## Objective 2.2.    Improve Chronic Care System to Support Proactive, Planned Care

### Action 2.2.1. By April 2009, complete a comprehensive, one-year Chronic Care Initiative to assess and remediate systemic weaknesses in how chronic care is delivered

The Receiver's Chronic Care Initiative approaches chronic disease in an entirely different manner than previously attempted by the CDCR. The Receiver's plan includes establishing a cost effective continuum of care program through an integrated chronic care team (of different clinicians, e.g. primary care providers and nurses). As a result, this Action calls for *both* a new patient management system and the application of adequate policies and procedures.

The focus of the two-phased Chronic Care Initiative is to build the infrastructure for both an effective chronic care system and an ongoing quality improvement process at each CDCR institution using a learning collaborative model. Under this initiative, each institution will learn how to establish critical elements of an effective chronic care management model, including the identification of patient subpopulations, care management and coordination, use of evidence-based treatment protocols, and implementation of patient education programs. To commence the learning process, asthma patients were selected as the sample subpopulation.

*Elements of Phase I (July 2008 through January 2009):* The pilot institutions included in Phase I are Folsom State Prison, Mule Creek State Prison, California Institution for Women, Central California Women's Facility, Richard J. Donovan Correctional Facility, and California Men's Colony. During Phase I, each of the six pilot institutions individually (1) convenes a local team to govern implementation of the chronic care model; (2) selects a pilot clinic at the institution; and (3) begins testing ways to implement the six elements of the Chronic Care Model with asthma patients as the first chronic care subpopulation using a rapid-cycle approach to ongoing quality improvement. During the six-month period of Phase I, the six institutions accomplished the items listed above and also were able to begin to spread the Chronic Care Model to additional clinics within the institution.

*Elements of Phase II (January 2009 to December 2009):* In Phase II, the original six pilot institutions will (1) form an advanced collaborative (workgroups that meet periodically to share strategies, compare outcomes, and receive technical assistance and training), moving from asthma patients to include diabetes and Hepatitis C patients over the course of 10 months; and (2) continue to fully establish the Chronic Care Model in all clinics within the institutions. Also in Phase II, the remaining 27 institutions in the CDCR, who have not yet been trained in the Chronic Care Model, will each join one of the three regional collaboratives and begin to implement the Chronic Care Model. The remaining 27 institutions' implementation will be guided by a new Chronic Disease Management Program policy and a change package which is essentially an instruction manual for program implementation with materials developed by the six pilot institutions. By February 2009, the recommended policies and forms will be submitted to the Receiver for final approval. When approved, this policy will supersede the existing Inmate Medical Services Program Chronic Care and High Risk Policy (Volume 7).

*Progress During the Reporting Period:* The Chronic Care Initiative is on schedule for completion by December 2009. The original completion date for this objective was April 2009. The reasons for the delay from the original completion date of April 2009 were outlined in the Receiver's Ninth Quarterly Report.

During the reporting period, Phase I of the Chronic Care Initiative was completed. The six pilot institutions continued to meet as a collaborative, participating in the final three of four learning sessions. During these two-day learning sessions, institution representatives shared strategies and outcomes; solved problems experienced by individual sites and collectively by the group as a whole; and received technical assistance and training with a focus on rapid-cycle improvement, the Chronic Care Model, and evidence-based treatment guidelines. Each learning session built

upon the last session to enable the implementation of the evidence-based infrastructure for managing chronic disease.

Thus far, the pilot institutions have reported great success with this Initiative, as demonstrated by both objective measures and subjective reports.

Objective Measures
During Phase I, pilot institutions monitored three key measures: 1) completion of asthma severity assessments, 2) treatment with anti-inflammatory medication per guidelines and 3) documentation of patient action plans. The pilot institutions showed a 71 percent improvement in performance in these areas during Phase I. Three of the pilot sites met the 95 percent goal in all three measures. The six pilot sites accomplished this by identifying local champions to lead change at their respective institutions, developing new physician and nurse line clinical leaders, and expanding the roles of existing clinical staff.

Subjective Reports
The change in asthma care has begun to spread by word of mouth among patients and is having a positive impact on chronic disease care as a whole. Healthcare staff are recommitting to their professions and to the power of teamwork to improve the quality of patient care. As a result, the pilot institutions are implementing the following: team-based, coordinated care; methods for continuously improving the processes of care; evidence-based standards of chronic disease care; an information system support tool – the chronic disease patient registry (detailed below); and processes to identify the sickest and most complicated of the chronically ill patients who can receive more focused case management. The Access to Care Team plans to share these additional improvements in both care delivery and the clinical work environment with the remaining institutions beginning in January 2009 using the Chronic Care Change Package which is based on the experiences of the six pilot sites.

*Electronic Care Management Registry:* Critical to the success of the Chronic Care Initiative is the implementation of an electronic patient registry which will serve as a source of quality indicators. The registry computer application automates the tracking, monitoring and managing of patient populations with chronic diseases. Patient registries can help manage panels of patients by providing three basic types of information: (1) printed patient reports with relevant clinical information provided at the point of care; (2) registry generated exception reports, which can identify those patients in need of recommended testing, procedures, or intervention (education or out of sequence visits to improve control or reassess the clinical situation); and (3) aggregate reports to assist in overall patient panel management.

The Chronic Care Initiative includes a registry customized to the needs of the yard clinics. The registry was introduced to the six pilot sites during the final Learning Session on November 19, 2008. Implementation began on December 13, 2008 at Mule Creek State Prison with lecture-based and hands-on training. The registry is being integrated into the Chronic Care Initiative statewide roll-out and is on schedule to be fully implemented by December 2009.

**Objective 2.3.** Improve Emergency Response to Reduce Avoidable Morbidity and Mortality

*Action 2.3.1. Immediately finalize, adopt and communicate an Emergency Medical Response System policy to all institutions*

This Action is scheduled to be completed by March 2009 and is on schedule.

As indicated in the Ninth Quarterly Report, the Emergency Medical Response (EMR) Initiative is broken into five phases: Phase I – Establish emergency response policies and procedures; Phase II – Pilot the initiative in two institutions; Phase III – Modify policies and procedures based on feedback and lessons learned at the pilot institutions and from stakeholders; Phase IV – Train each institution on the new policies and procedures; and Phase V – Sustain the initiative through quarterly reviews of adherence to policy.

*Progress During the Reporting Period:* Phase I, II, and III were completed during the prior reporting period. During this reporting period, Phase IV of the EMR Initiative was completed which included training custody and clinical staff on the new policies and procedures. The training was accomplished during two statewide video conference sessions on December 2 and 5, 2008. Included in Phase IV are a pre-implementation assessment and an implementation follow-up visit. The pre-implementation assessments identify institution specific issues/barriers in effectively implementing the EMR policies and procedures. Following implementation of the EMR policies and procedures, each institution will have an implementation follow-up visit. Twenty-four implementation follow-up visits have been completed during the reporting period and all implementation follow-up visits will be completed by the end of January 2009. The implementation follow-up visits are intended to address problems found during the pre-implementation assessments and to assist the institutions in implementing the policies and procedures locally. Post-implementation reviews of the institutions have been planned and will be completed by March 2009. The Emergency Response Initiative Deployment Schedule is included as Appendix 8.

The Receiver's Custody Support Services Division staff accompany the health care staff to the institutions and assist in the EMR policy pre-implementation, implementation follow-up, and post implementation reviews. During these reviews, Custody Support Services Division staff acted as liaison with the local prison administration and In-Service Training staff relative to the correctional peace officer training mandates and custody's role in the EMR process.

Activities of Phase V, which focus on sustaining the EMR Initiative through quarterly reviews of adherence to policies, have commenced. The pre-implementation assessments have been compiled into a summary "scorecard" report by region that displays percentage of compliance per institution. These will be used as baseline measures and also to identify initial areas of focus for individual institutions.

30

Also, during the reporting period, the EMR team initiated revisions to the audit tool. The revised audit tool will focus on Emergency Medical Response Review Committee performance indicators which directly relate to emergency medical response. Categories of performance indicators will include response timeliness, appropriate actions taken by custody and clinical staff, outcomes of care and treatment, and documentation/review of emergency medical response incidents.

### Action 2.3.2. By July 2009, develop and implement certification standards for all clinical staff and training programs for all clinical and custody staff

The second component of the EMR Initiative is to develop and implement appropriate certification standards for all clinical staff and training programs for all clinical and custody staff. This action is comprised of the following elements to achieve compliance: Element I – Establish certification standards; Element II – Survey all institutions to determine the Basic Life Support (BLS) and Advanced Cardiac Life Support (ACLS) training needs; Element III – Identify and/or develop training contracts for BLS, ACLS and other training that will support the overall goal of the Initiative; and Element IV – Develop a training program to sustain on-going BLS/ACLS training and certification.

This Action is on schedule to be completed by July 2009, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:* Element I - The challenge to completing Element I includes addressing impacted bargaining unit issues regarding certification standards and training. The Project Team continues to work with CPHCS's Human Resources to engage the various bargaining units to resolve these issues.

Element II - The initial survey of training needs has been completed and follow-up continues to verify BLS/ACLS training needs.

Element III – Existing contracts for BLS/ACLS training have been identified. An existing contract that provides BLS and ACLS training at 3 institutions is being expanded and a total of 18 institutions have expressed interest in participating in this contract. The new contract is a master services type contract that will enable each participating institution to choose when to schedule classes at the institution and the vendor will provide all materials needed for the training. The remaining 15 institutions not included in the master services contract will obtain BLS/ACLS training from local providers in the community. The EMR team has provided to these 15 institutions a list of the local BLS/ACLS training providers. In addition, American Heart Association certified training providers for BLS and ACLS that are in close proximity to each institution have been identified and made available to the Chief Medical Officer, Director of Nursing, and nursing educator at each institution. The CPHCS Workforce Development Unit has identified other valuable sources of training that may be able to provide online training courses. A proposal for this training is in the review/approval process.

31

Element IV - The ongoing BLS/ACLS training program will be developed and managed by a Workforce Development Training Officer who will begin work in January 2009.

***Action 2.3.3. By January 2009, inventory, assess and standardize equipment to support emergency medical response***

The third component of the EMR Initiative is to ensure standardization of equipment to support emergency medical response. The successful completion of this component includes the following: Element I – Identify critical emergency medical equipment; Element II – Inventory and deploy emergency medical treatment bags; Element III – Survey other EMR equipment needs; Element IV – Develop procurement methods; Element V – Procure and deploy EMR equipment; Element VI – Develop program sustainability. Included as Appendix 9 is the Emergency Medical Response Equipment Schedule.

This Action is on schedule to be completed by January 2009, as set forth in the Turnaround Plan of Action.

*Progress During the Reporting Period:* Element I – This element has been completed. Critical EMR equipment components have been identified and are as follows: EMR bags and standard supplies; automatic external defibrillators; defibrillators; gurneys; emergency medical response vehicles, emergency carts, pulse oximeters, and suction machines.

Element II - Deployment of EMR Bags will be completed in January 2009. CPHCS's Procurement Services has centralized the purchase of EMR bags through the development of a procurement form for the on-going replenishment of major supplies in the bag as well as replacement of the bag.

Element III - The initial EMR equipment inventory has been completed, and staff is verifying the information collected to eliminate duplicate counts and clarify possible misinterpretation of survey questions. Sustaining an effective EMR program also requires certain other emergency response equipment and supplies. The Custody Support Services staff provided assistance in determining the appropriate emergency medical response equipment needs (e.g. gurneys, stair chairs) within the institution program areas and living units.

The requirement for serviceable and reliable emergency medical response vehicles has been identified for all 33 prison facilities. Custody Support Services staff have coordinated the design, purchase, and building of two emergency medical response vehicle prototypes. It is anticipated that the emergency medical response vehicle prototypes will be introduced as a pilot project in two prison facilities during the next reporting period.

Element IV - Development of procurement methods is complete. CPHCS's Procurement Services has verified that all of the equipment items can be procured through existing State

procurement methods. Additionally, in order to effectively use existing staff resources, the purchase of many of the EMR items has been centralized at CPHCS Headquarters. Specific costs will be determined and total costs will be calculated based on institution need when the Element III inventory counts are verified.

Element V - Procurement and deployment of additional EMR equipment commenced during this reporting period. To effectuate a cost saving strategy, the EMR team has adopted an implementation program that will provide critical emergency medical response equipment to institutions this fiscal year to meet a minimum availability standard. Over the next several fiscal years, through attrition of existing EMR equipment, CPHCS will achieve brand/model standardization. Cost savings has been realized with the December 2008 purchase of 33 defibrillators and 71 automatic external defibrillators. This new EMR equipment will be deployed to the institutions by mid-January 2009. Procurement of the remaining EMR equipment will begin in January 2009.

**Objective 2.4.    Improve the Provision of Specialty Care and Hospitalization to Reduce Avoidable Morbidity and Mortality**

*Action 2.4.1. By June 2009, establish standard utilization management and care management processes and policies applicable to referrals to specialty care and hospitals*

The UM/Case Management initiative is on schedule to be standardized statewide by June 2009, as set forth in the Turnaround Plan of Action.

Standardized UM processes will be taught, implemented and reported in the following areas:
- Referral management
- Infirmary bed management
- Community hospital admission, discharge and daily clinical review
- Case management for high risk, high cost patients and patient groups
- Care Coordination to mitigate morbidity and mortality caused by miscommunication and poor information sharing
- Utilization and cost reports

The pilots below create a program to standardize referrals and infirmary and hospital admissions so that access to care and patient outcomes can be improved and "logjams" decreased. Cost avoidance will be optimized through standardization of discharge and case management processes. Utilization and cost reports will guide clinical interventions to promote best practices and accurate decisions regarding efficient networks.

*Statewide InterQual Training:* InterQual are evidence-based clinical decision support criteria that are endorsed nationally by all Joint Commission (JCAHO) accredited hospitals. Use of InterQual criteria will help to standardize the basis for specialty care referrals and will compel providers to complete thorough patient evaluations and follow appropriate evidence-based alternatives prior to making a referral for specialty care. InterQual also provides a management reporting library that includes the Care Enhance Review Manager Enterprise will provide reports

33

which display referral outcomes and variances. This will enable monitoring of performance and institutional management effectiveness and utilization drivers and can be used as a transition application pending availability of an enterprise-wide information system. Additionally, a standardized evidence-based library of criteria to support hospital admission and discharge is available from

InterQual training for approximately 100 nurses and 50 physicians was completed on December 11, 2008 and is an integral part of the success of UM. The InterQual training includes specialty care, imaging, surgery and hospital care modules. In the future, CPHCS employees will be certified as InterQual trainers to support ongoing training needs. InterQual's 'train the trainer" program is scheduled to begin in early 2009.

*InterQual/UM Pilot:* As reported in the Ninth Quarterly Report, the InterQual UM pilot for specialty services at Folsom State Prison began in October 2008 and focused on orthopedic and imaging requests for services (RFS). To develop a baseline, RFSs were audited manually, and depending on the day, between 50 to 80 percent of RFSs retrospectively audited did not meet InterQual criteria but were referred to specialists. Then, beginning in October 2008, using InterQual for all RFS requests, only 16 percent of RFSs that did not meet InterQual criteria were referred out to a specialist. In November 2008, 22 percent of referrals that did not meet InterQual criteria were referred to specialist. Compared to the baseline data collected, this reduction in referrals is significant and creates significant cost avoidance. Similar results are expected in all institutions where InterQual is used.

*Specialty Services Pilot in the Central Region:* Learning from the experiences at Folsom State Prison, the most effective and efficient processes from that pilot are being implemented throughout the Central Region on an aggressive timeline. Implementation in the Central Region commenced in December 2008 and will be completed by early 2009.

The Central Region was selected for the next phase, as that region has the highest volume of specialty referral requests in the State and off-site providers are often great distances from institutions. Transportation challenges and the high volume of requests have created difficulties accessing specialty services in this region. Proper management will require effective oversight of UM processes and consistent application of InterQual standards. An integrated team approach with strong Headquarters support will be used in the implementation of the UM pilot process.

Medical, nursing, mental health, IT, custody, bed placement and facility support will be coordinated for this pilot as well. This interdisciplinary team will have an intensive, hands-on, "SWAT" team approach. The sustainability of the program will need ongoing support from institutional medical and nursing management and Headquarters executive and medical management. Once the UM pilot process is successfully implemented in the Central Region, the program will be replicated in the Northern and Southern Regions with a similar aggressive timeline.

*Issues Concerning Availability of Appropriate Beds:* Even with consistent application of InterQual criteria to assist in monitoring continued stays and discharges from community

hospitals, a lack of appropriate institutional beds for our complex patient population continues to produce unavoidable discharge delays and backlogs of patients awaiting appropriate institutional placement. Additionally, new patient arrivals from county jails with complex conditions that preclude housing in general populations and increased aging and chronically ill patient population compound the inaccessibility of institutional high acuity beds. Simply stated, with thousands of additional beds which can provide the necessary range of treatment options from "sheltered living" to "nursing home" to "licensed healthcare beds," adequate care and treatment cannot be provided to the thousands of aged, chronically ill, and disabled prisoner patients in the CDCR today.

*Infirmary Bed Access Pilot:* To ensure even tighter management of CPHCS infirmary beds optimizes their availability, the Infirmary Bed Access pilot began on December 4, 2008. Using a multi-disciplinary team of physicians, nurses, mental health professionals, and custody staff, regular review of all institutional beds in the Central Region will occur through clinical rounds. The Pilot objectives will include strategies to ensure standardized processes are implemented. These strategies include (1) generating standardized criteria for admission, continued stay, and discharge and (2) developing processes to accommodate both medical and mental health needs. Coordination with the clinical planning staff for the 10,000 bed project will occur to develop criteria for patient admission and discharge to the 10,000 bed project. It is anticipated that the pilot processes and criteria can be transitioned into a centralized UM department.

*Community Hospital Bed Pilot:* A separate Community Hospital Bed Pilot will focus on the identification and concurrent review of hospitalized patients in Central Region's community hospitals to ensure that discharge planning, appropriate care, and efficient services are provided. InterQual processes to admit, treat, and discharge patients to maximize continuity of care and continuity of information will be utilized. Reporting regarding these processes will profile community hospitals regarding their cost of care, and quality outcomes will increase. It is anticipated that the Community Hospital Bed Pilot will begin after the Infirmary Bed Access pilot is underway. It should be noted, however, that regardless of whether increased bed use efficiently will be achieved, given the lack of treatment beds within CDCR, healthcare staff will have no choice but to continue to use outside hospital and providers at a cost of hundreds of millions of dollars each year. Approximately 40 percent of outside provider/hospital costs could be avoided if the Governor would work with the court to develop an effective, fiscally responsible method of funding construction and activation of the Receiver's healthcare facilities.

*Clinical Care Coordinator:* Building on institutional experiences learned from the Specialty Care, Infirmary Bed Access, and Community Hospital Bed Pilots, the current UM and specialty care nursing roles at the institutions will be redesigned to a new integrated functional role of the Clinical Care Coordinator. This function is expected to replace current UM nursing positions within the institutions and will centralize coordinated and standardized reviews, assessments and management of current referral review, infirmary bed review and hospital review as well as high-risk patient case management and high-acuity patient population care coordination within one function. It is anticipated that this will decrease miscommunication and incorrect hand-offs that delay care, provide for smooth care transitions from in and out of institutions, and provide more accessible information to the primary care health team.

*Hospital Care Manager:* Concurrently, the former UM Supervisory Nursing staff will begin piloting a new functional position of Hospital Care Manager. The Clinical Care Coordinators at the institution will refer hospitalized patients to assigned Hospital Care Managers who will ensure timely discharge planning in collaboration with the hospital staff. The Hospital Care Manager will also facilitate and coordinate post-hospital discharge placement/coordination and post-discharge care with the institution's Primary Care Provider and Clinical Care Coordinator to ensure continuity of care. This pilot is expected to begin late winter 2009.

*Standardized UM Reports:* Standardized InterQual reports for the Central Region will be included in the May 2009 Tri-Annual Report. For this reporting period, the InterQual report descriptions are included as Appendix 10, and the Central Region Request for Services Reports for September, October, and November 2008 are included as Appendix 11.

> **Action 2.4.2. By July 2009, establish on a statewide basis approved contracts with specialty care providers and hospitals**

*Prodagio Contract Processing System:* Among the highlights of this reporting period are the continued efforts on the statewide roll-out of the Prodagio contracting system. Eleven institutions have been added for a total of 21 institutions currently online. Implementation of the remaining 12 institutions is on schedule with the target for completion in early February 2009.

*Restructuring the Health Care Invoice, Data and Provider Services and Contract Branches*: As previously reported to the court, Navigant Consulting Inc. provided CPHCS in April 2008 with a preliminary assessment of the contract and invoice processing functions. To align both the Invoice, Data and Provider Services area and the Contracts area and to transition to a best practices model as recommended in the Navigant study, CPHCS released a Request for Offer for the Healthcare Invoice Processing and Contracting Classification and Compensation Survey/Study in November 2008. No vendors responded with an offer. Subsequently, the CPS Human Resource Services was provided a copy of the Request for Offer and recently submitted an acceptable proposal. CPHCS is currently developing the Inter-Agency Agreement with CPS Human Resource Services with a mid-January 2009 effective date. CPS Human Resource Services will prepare a report that will recommend what options should be pursued along with a final package for submittals to the SPB and Department of Personnel Administration (DPA). The expected completion of the study is June 30, 2009.

*Streamlining State Contracts:* During this reporting period, efforts to update statements of work for medical specialty services and to standardize contract language have improved contract generation by reducing processing and management review times. The standardized contract boilerplates along with web-based access to contract exhibits and credential forms lessened the amount of paper and review time for our provider community as well. The Contracts Branch has experienced fewer requests for contract language modifications from providers which ultimately shortened contract processing times. These efficiencies aided in 105 non-bid medical service contracts being executed in areas such as urology, cardiology, nephrology. Twenty-eight bids for medical service master contracts for on-site temporary relief services (i.e. dentistry,

pharmacy, optometry, speech and occupational therapy) were also executed. These contracts were executed during the current reporting period.

*Emergency Medical Services Committee:* The CPHCS formed an Emergency Medical Services (EMS) committee in September 2008. This multi-disciplinary body is designed to interface with community EMS entities, hospital emergency departments, fire departments and ambulance service providers statewide. By inserting staff from CPHCS into the existing local EMS system, a proactive sense of community involvement and partnership will be accomplished. Utilizing a phased, localized approach to initiate the program will enable CPHCS to assess the varying needs of each county and the local correctional institution. The decisions, therefore, to interface with the local entities will be based on evidenced need, standard models and cost efficiencies.

A byproduct of the EMS committee for CPHCS will be increased knowledge of county-wide plans for services and an opportunity to participate in the decision making of those plans as they relate to correctional institutions. Among the anticipated outcomes of the EMS committee will be to become better neighbors; implement a standardized approaches to community EMS response; and successfully negotiate rates for ambulance contracts, reducing overall emergency service costs to a reasonable level. CPHCS's plan for implementation of these newly contracted rates will be broken into two phases with a pilot designed to evaluate positive change outcomes. In Phase I which commenced this reporting period, CPHCS staff met with statewide external community EMS stakeholders, prepared a plan for community EMS interface, scoped the pilot, and hired a dedicated project lead. To complete Phase I, the project lead will meet with external agencies and institutions statewide to complete a preliminary performance measurement metrics, a needs assessment report and a comprehensive pilot report. The target date for completion of Phase I is during the second quarter of 2009. Phase II will consist of developing a comprehensive statewide plan with EMS, implementing standardized community EMS response to the institutions, and standardizing EMS provider contracts statewide. The target date for completion of Phase II is during the first quarter of 2010.

*Status of Chancellor Consulting Group Hospital and Associated Physicians Contract Negotiations:* As of December 2008, the Chancellor Consulting Group (retained by the Receiver to re-negotiate hospital and associated physician group contracts) has successfully negotiated and executed 22 hospital letters of agreement and 11 additional letters of agreement pending approvals. This brings the total number of hospital agreements to 33. An associated physician provider network has been negotiated which currently totals 1,761 physicians. At present, Chancellor Consulting Group is on schedule to complete their planned negotiations by July 2009. To view the progress to date, Chancellor Consulting Group's December 2008 Report to the Receiver is included as Appendix 12.

### Action 2.4.3. By July 2009, ensure specialty care and hospital providers' invoices are processed in a timely manner

In the past two decades, the CDCR experienced a massive increase in the number of prisoners. This significantly affected overcrowding and the percentage of aging inmates confined to California prisons. For example, the number of California prison inmates age 55 and over more

37

than doubled in an eight-year period from 1997 to 2005. A significant portion of these inmates suffer from chronic disease. At the same time, the Schwarzenegger Administration has done nothing to provide for sheltered living, nursing homes, and licensed beds for this rapidly expanding portion of the prisoner population. As a result, the CPHCS has been forced to rely upon outside contractors to provide a broad array of health care services to inmate-patients, such as hospitals for inpatient and outpatient care, specialty care physicians and laboratories.

Despite efforts to manage payments, the processing of outside provider billing has fallen behind. Several factors have contributed to the Healthcare Invoice, Data and Provider Services Branch's (HIDPSB) inability to ensure the timely processing of specialty care and hospital providers' invoices. These issues are detailed below.

*Increase in Medical Invoices:* Since Fiscal Year 2005-06, the HIDPSB has experienced an 86 percent increase in the number of medical invoices received for adjudication and data collection. HIDPSB is required to process medical invoices in compliance with the court's March 30, 2006 "Order Re State Contracts and Contract Payments Related to Service Providers for CDCR Inmate/Patients" (page 5: 10-18) and the November 8, 2006 "Supplemental Order Re State Contracts." Specifically, these Orders mandate CDCR to pay received invoices, in accordance with the California Prompt Payment Act (Government Code, Section 927 et seq.), for medical services until a plan is developed to ensure consistent and timely flow of payments. The California Prompt Payment Act requires agencies to process valid, undisputed invoices within 30 days from the date received for submission to the State Controller's Office for payment. Adhering to these mandates has been a challenge for the HIDPSB, especially considering HIDPSB has not received any staff augmentations to address the increase. Significant hours of overtime have been worked by staff in an effort to adjudicate the increased number of medical invoices. However despite their efforts, HIDPSB staff was unable to successfully absorb the increased workload or meet invoice processing goals of 30 days or less.

*Staffing Issues:* The CDCR's ancient (and entirely manual) invoice adjudication process requires numerous cumbersome processing requirements, several of which involve CDCR institution and accounting staff who were outside of HIDPSB management oversight. Although invoices are adjudicated by HIDPSB invoice processors, review and approval of the medical invoices are performed by health care staff in the various institutions. The invoices were sent via mail/courier to the institution and, depending on the institution, required numerous reviewers to verify/validate the medical services before the Approver authorizes payment. In an effort to improve management oversight and invoice processing workflow efficiencies, the decision was made, in July 2007, to move all invoice processing functions and positions to CPHCS's Headquarters location in Sacramento. As a result of this centralization, 85 percent of the experienced and knowledgeable field staff sought promotions and/or positions elsewhere rather than relocating to Sacramento. This created a void of qualified and knowledgeable invoice processors. Without experienced staff, training of new staff was extremely limited and mentoring was almost non-existent. Invoice processing was completed by existing staff in a limited capacity on an overtime basis. Nevertheless, the transition of medical invoice processing functions and positions to Headquarters was successfully completed in December 2008.

*Prodagio Invoicing System:* Over the last year, the Prodagio system performed adequately for contract processing (as described in Action 2.4.2) but experienced ongoing performance problems with invoice processing and has consequently crippled medical invoice payments. Although software and hardware upgrades were made, as of October 2008, the Prodagio Accounts Payable continued to experience frequent periods where system response times were very slow or failed altogether.  These continuing system performance problems have significantly and negatively contributed to our ability to meet medical invoice processing goals. With only 12 institutions transitioned onto the Prodagio Accounts Payable System, HIDPSB management had grave concerns regarding the scalability of the system to all 33 institutions. Therefore, on November 17, 2008, HIDPSB discontinued processing medical invoices in the Prodagio Accounts Payable System but will continue to utilize Prodagio for contract processing. All medical invoices have transitioned back to the manual adjudication process which is completed by invoice processors located at CPHCS Headquarters in Sacramento.

*CDCR Regional Accounting Processing Delays:* Once approved at the institution, the invoices are then handled outside of the CPHCS by the CDCR Regional Accounting Offices. The approved invoices are sent by mail/courier to the appropriate CDCR Regional Accounting Office for preparation of the claims schedule.  The Regional Accounting Office then sends by mail/courier the claim schedules to the State Controller's Office for processing of the payments. Data shows that CDCR Regional Accounting Offices have taken up to 200 days to prepare the claim schedules for submittal to the State Controller's Office.  The delays at the CDCR Regional Accounting Office can, in part, be attributed to the 86 percent increase in invoices with no staff augmentation to address the increased workload.  Also, the Schwarzenegger Administration's hiring freeze has delayed and in some cases prevented the Regional Accounting Office's ability to fill vacant positions.  Due to the Executive Order S-09-08 and Budget Letter 08-15, CDCR officials made the decision to no longer allow for overtime or hire temporary help to assist with the increased workload.  As a result, medical invoice payments have been seriously delayed and prompt payment penalties have been incurred.

The worsening situation concerning invoice processing provides a classic example of the Administration's short-sided bureaucratic thinking demonstrating again that the State is simply unable to sustain an adequate correctional system in California, and a Receiver is needed in this case.  Given the life and death necessity of maintaining contracts with specific providers and hospitals, the Administration's decision to eliminate overtime, and its refusal to hire the staff necessary to process thousands of delayed invoices, is yet another display of its new-found contempt for adequate prison health services and court orders.

Furthermore, the Administration made this decision, knowing that the Receiver is in the process of renegotiating contracts with outside specialty providers and hospital.  As a direct result of invoice processing problems, many hospitals now demand higher rates.  In the long run, the Administration's refusal to fund overtime will cost California taxpayers far more money.  CDCR accounting processes are a key component of the healthcare invoice payment system.  However, since CDCR is unable to do the job in a timely manner, and the Schwarzenegger Administration's has taken the position that it will do nothing to correct the situation, the

Receiver has no choice to move these accounting functions to CPHCS and thereby manage the backlog.

As displayed on Table 1 below, medical invoice processing days have significantly increased from July 2007 through November 2008.

**Table 1.**



Statewide Invoice Processing Days - July 1, 2007 through December 17, 2008

*Table 1 Results Explanation:*
*Prodagio institutions include CCWF, CMF, PBSP, SAC, SQ, VSPW, FSP, SOL, CCC, COR, HDSP and SATF.*
*Data represents invoices processed for FY 07/08 and 08/09 based on "TblInvoices" in the Contract Management Database. As of December 17, 2008, analysts no longer use the Access Contract Management Database for 08/09 invoices.*
*Analysts continue to process invoices received from contractors for prior fiscal years; therefore, the data may vary from month to month.*
*FY 07/08 - Total # of Invoices for Non- Prodagio 219,025; Prodagio 65,084.*
*FY 08/09 - Total # of Invoices for Non- Prodagio 49,211; Prodagio 9,998.*
*Total number of invoices is understated due to data entry inconsistencies with invoice numbering.*

*Prodagio numbers for FY 07/08 reflect all invoices for CCWF, CMF, PBSP, and SQ. FSP implemented Prodagio in June 2008, and SOL implemented Prodagio in July 2008. CCC, COR, HDSP, and SATF implemented Prodagio in August 2008.*

*September and November data reflects a significant increase in average days to process due to remaining 07/08 invoices with irregular circumstances.*

*As of November 18, 2008, invoice scanning ceased in Prodagio. Institutions are currently processing invoices in the Prodagio queue.*

*Solutions to the Invoice Processing Backlog:*   During this reporting period, a "Strike Team" approach to adjudicate medical invoices has been implemented in an effort to eliminate the invoice backlog.  The Strike Team focus is to expedite the processing of medical invoices that are 45 days and older from contractors with the largest volume and dollar values.  The Strike Team commenced work on December 22, 2008 with the objective to bring the backlogged invoices current (processed within 30 days). It should be noted that the CDCR Regional Accounting staff and managers have worked cooperatively on their efforts.  The problem is not State employees but decisions made for political purposes by the Administration.  The Strike Team will continue this effort for two months.  After two months, the Strike Team will reconvene to review the results of the efforts.  Depending on the results, we will either continue with the "Strike Team" approach or approach alternative strategies.

To also address the invoice processing backlog, the CPHCS issued a RFP to procure a professional Third Party Administrator for medical claims processing services. The Third Party Administrator will be responsible for transitioning the current manual medical invoice processing operation to a claims processing system based on industry best practices and standards applicable to the correctional environment.  The objective of the claims processing system is to improve the quality, efficiency, and timeliness of payments to health care contractors serving CDCR's patient population.  HIDPSB anticipates the successful bidder to commence work in late February 2009, after review of vendor proposals. This solution will be piloted for a limited period of time, and will be re-evaluated to determine the appropriateness of transitioning the medical invoice processing back to the State.

In addition, as mentioned above, over the next several months, CPHCS Administrative Support Services will be undergoing a reorganization that will transfer all the Accounting functions from CDCR to CPHCS (which includes the Regional Accounting Office responsibilities for the preparation of the claim schedules to be submitted to the State Controller's Office for payment). In addition, the pre-authorization process which involves the Institution reviewer and approvers will be discontinued with the implementation of the Third Party Administrator.  This function will be replaced with a post audit review of the claims payments.  With the transition of the Accounting and Institution functions to CPHCS management oversight, the HIDPSB anticipates very significant improvements in the medical contract processing days.

*Status of Contract Database System Upgrades:*   The redesigned web-based Contract Medical Database (CMD) has been developed and deployed.  The web-based CMD combines the 33 institutions' databases into a single centralized database providing real-time access to information and streamlines the maintenance of contracts and vendor data as well as access to

41

utilization and expenditure data. Staff continues to meet with the developers and to provide input for programming modifications which enhances overall CMD system operation and performance.

Because of the invoice processing problems described above, the invoice processing objective set forth in the Turnaround Plan of Action is in jeopardy at this time.

42

# Goal 3. Recruit, Train and Retain a Professional Quality Medical Care Workforce

**Objective 3.1.**     Recruit Physicians and Nurses to Fill Ninety Percent of Established Positions

*Action 3.1.1. By January 2009, fill 90% of nursing positions*

This Action has been accomplished, as we have achieved the goal of filling 90 percent of our nursing positions prior to the timeframe set forth in the Turnaround Plan of Action. As of November 30, 2008, approximately 92 percent of the nursing positions have been filled (this percentage is an average of all six State nursing classifications).

More specifically, the goal of filling 90 percent of the RN positions has been achieved at 25 institutions (75.7 percent of all prisons). The remaining eight institutions (24 percent) have filled 80 to 89 percent of their RN positions. The goal of filling 90 percent of the Licensed Vocational Nurse (LVN) positions has been achieved at 21 institutions (63.6 percent) and 7 institutions (21 percent) have filled 80 to 89 percent of their LVN positions. Ten institutions (30 percent) have achieved the goal of filling 90 percent of their Psych Tech positions. Ten institutions have filled 80 to 89 percent of their Psych Tech positions.

The following hiring related initiatives continued during the reporting period: (1) focused recruitment continues statewide for LVNs and Psych Techs; (2) presentations at nursing schools statewide; (3) advertisements in local papers, professional trade magazines, and online; and (4) mass mailers targeting LVN classifications. Additionally, there continues to be a push at all institutions with nursing vacancies to schedule interviews on a weekly basis and interview all interested applicants expeditiously. A mailer was sent to all California licensed Psych Techs during this quarter. There is a small candidate pool of Psych Techs; however, this mailer resulted in a significant increase in the number of Psych Techs eligible on the certification list. It is expected that this will lead to an increase in the number of Psych Techs hired in the next two months.

For additional details related to vacancies and retention, refer to the Plata Human Resources Recruitment and Retention Report for November 2008. This report is included as Appendix 13. The Human Resources Monthly Reports for September and October 2008 are included as Appendix 14, and the Workforce Development Branch Monthly Reports for September, October and November 2008 are included as Appendix 15.

It is important to emphasize, however, that action 3.1.1, which represents a remarkable success story, addresses the formal vacancies for established State positions. As previously reported, one of the more serious factors involved in the State's failures to provide adequate healthcare in its prisons, is the failure to design a staffing program necessary for a medical services operation. Simply stated, this Administration, similar to prior administrations, has ignored the fact that prisons must operate 24-hours a day, 7-days a week. Unlike the Department of Motor Vehicles, for example, the CDCR cannot close its offices and send its inmates home the first and third

Friday of each month. In order to staff a nursing position, for example, a CTC nurse position, whereby nurse coverage is required 24-hours a day, 7-days a week, nursing staff must be available for all of those hours. In the past, the Administration allocated only three nurses to these positions, ignoring vacations, trainings, days off, the Family Medical Leave Act, and numerous other statutory provisions. As a consequence, nurse managers are faced with an impossible task. There are simply too few human nurses to fill the required posts.

This chronic shortage of clinical staff, which has been recognized for years by nurse managers and clinical bargaining units alike, was never corrected by the Schwarzenegger Administration, and had a direct correlation with the unconstitutional conditions which resulted. The Receiver is in the process of developing prison-specific staffing programs and will continue to work with the Department of Finance to establish appropriate staffing formulas that relate to the real need to manage clinical posts. The Receiver's program has accepted salutary consequences in that it will eliminate the Administration's inappropriate reliance on private registries, and thereby adding the appropriate State staffing, thereby complying with the mandates of California's Constitution. In the interim, CPHCS nursing executives manage the daily needs at the institutions through a combination of overtime and temporary registry help. For a snapshot which shows the real staffing level required to comply with the Stipulated Court Orders, refer to Appendix 16.

The following metrics, which are a summary of the data in the November 2008 Plata Human Resources Recruitment and Retention Report, are included: Table 2 summarizes nursing filled percentages by prison; Table 3 summarizes nursing turnover rates by prison refer to Objective 3.3 for explanation); and Table 4 summarizes nursing filled percentages and turnover rates by prison.'

Table 2.



**Table 3.**



Table 4.



### *Action 3.1.2. By January 2009, fill 90% of physician positions*

Physician recruitment efforts continued to focus on "hard-to-fill" institutions during the reporting period. Most urban institutions have now hired their full component of primary care providers. The focused efforts at the "Hard-to-fill" institutions have proven successful. Since the last reporting period, Correctional Training Facility, which has a long-term history of serious hiring problems, has hired two physicians resulting in over 84 percent of their physician positions being filled. Salinas Valley State Prison, another institution with a history of serious hiring problems, now has 100 percent of their physician positions filled.

As of December 31, 2008, approximately 87.5 percent of physician positions are filled (this percentage is an average of all three State physician classifications). More specifically, ninety-eight percent of the Chief Medical Officer (CMO) positions are filled; 79 percent of the Chief Physician and Surgeon (P&S) positions are filled; and 87 percent of the P&S positions are filled. Nineteen institutions (57.5 percent) have achieved the goal of filling 90 percent of their P&S positions and 16 of these institutions have filled at least 95 percent of their P&S positions. Five institutions (15 percent) have filled 80 – 89 percent of their P&S positions. With the exception of San Quentin State Prison, all institutions still proving to be "hard-to-fill" are located in the Central Valley region.

Specialized recruitment efforts for physicians continue with advertisements placed in professional periodicals, newspapers, online, direct mailers, conferences, and visits to residency programs. In addition, staff are researching recruitment initiatives that would be applicable to the "hard-to-fill" locations. Plans are underway to recommend geographic pay incentives for the remaining hard-to-recruit locations.

The goal of this Action was to obtain a 90 percent fill rate for physician positions by January 2009. The current filled rate for physicians is 87.5 percent. While we did not meet the goal of a 90 percent fill rate, it should be noted that during this reporting period 13 additional physician positions (3.5 percent) have been authorized. Had it not been for the additional positions being authorized, we would have met the 90 percent fill rate as set forth in the Turnaround Plan of Action.

For additional details related to vacancies and retention, refer to the Plata Human Resources Recruitment and Retention Report for November 2008. This report is included as Appendix 13. The Human Resources Monthly Reports for September and October 2008 are included as Appendix 14, and the Workforce Development Branch Monthly Reports for September, October and November 2008 are included as Appendix 15.

The following metrics, which are a summary of the data in the November 2008 Plata Human Resources Recruitment and Retention Report, are included: Table 5 summarizes physician filled percentages by prison; Table 6 summarizes physician turnover rates by prison (refer to Objective 3.3 for explanation); and Table 7 summarizes physician filled percentages and turnover rates by prison.

48

**Table 5.**



Table 6.



**Table 7.**



**Objective 3.2**  **Establish Clinical Leadership and Management Structure**

> *Action 3.2.1. By January 2009, establish and staff new executive leadership positions*

> *Action 3.2.2. By January 2009, establish and staff regional leadership structure*

Both actions 3.2.1 and 3.2.2 are addressed below.

DPA determined that it was necessary to waive merit salary adjustment salary rules in order to fully implement the proposed pay plan for the RCEAs. On November 3, 2008, the "Order Granting Receiver's Application for Order Waiving State Statutes, Regulations and Procedures Regarding Salary Grids for Receiver Career Executive Assignments" was signed and filed with the court. Thereafter, DPA issued a pay letter to formally establish the pay bands. The Receiver's Human Resources staff will work with DPA to establish a pay differential for the performance component.

As previously reported, a comprehensive marketing campaign for the Executive Leader positions was launched in July 2008. The three executive leader positions were marketed heavily with print advertisements in professional journals and web advertisements· and job postings on professional association web sites. Based on the response to these advertisements, the campaign was highly successful.

Due to significant delays in the release of the Executive Leader examinations by SPB, hiring for Nurse Executives was delayed to October 2008. As of December 22, 2008, there were 147 Nurse Executives eligible on the certification list. Three Nurse Executives (Statewide, Northern, and Southern regions) have been hired and commenced work on January 2, 2009. Three additional Nurse Executive hires are in process.

The Medical Executive exam was finally launched in December 2008 after five months of repeated delays by SPB. As of December 22, 2008, there were 38 individuals eligible on the Medical Executive certification list. Fourteen Curriculum Vitae are in the review process and interviews will be scheduled shortly. In response to our marketing campaign, fifty-one candidates have contacted Workforce Development staff to express interest in these positions.

The Chief Executive Officer examination was launched on December 24, 2008. In response to our marketing campaign, 188 potential candidates have expressed interest in these positions.

Given SPB's delays and thrice renegotiation for go-live dates, all positions will not be filled by January 2009. SPB's repeated failure to meet reasonable timelines for completion of examinations has seriously hampered the Receiver's efforts to make timely progress in filling critical vacancies. The filling of future vacancies will be similarly delayed unless SPB is able to effect improvements to their automated examination service delivery.

A fourth RCEA, Clinical Executive, includes all other licensed disciplines (rehabilitation, pharmacy, laboratory, radiology, optometry, podiatry, and dietary services) and has now been

approved by DPA and SPB. Efforts are in process to obtain salary information for executives in each of the covered disciplines. When collected and analyzed, staff will seek DPA's approval for the proposed salaries. A pay plan similar to the other RCEAs is being developed and will require the same approval process as the other RCEAs. In addition, a civil service examination is being developed and should be ready by the time a pay letter is issued. This project remains on schedule, however, if past problems with SPB continue, it too may be delayed.

A fifth RCEA, Clinical Administrator to encompass all non-licensed medical administrators required to effectively manage the health care program, has been conceptually shared with DPA.

### Objective 3.3. Establish Professional Training Programs for Clinicians

*Action 3.3.1. By January 2009, establish statewide organizational orientation for all new health care hires and institution-specific clinical orientation through a nursing preceptor or proctoring program*

The necessary steps toward establishing a standardized, quality introduction of staff into prison healthcare have been taken and continue to be monitored and reassessed for effectiveness. The Health Care New Employee Orientation (HCNEO) has been conducted since March of 2008 and continued with the first session of this year on January 5, 2009. CPHCS will be expanding the HCNEO to all CPHCS staff and inviting dental and mental health staff beginning March 2009.

*Status of New Employee Orientation and Training:* At each regional HCNEO location, feedback related to the instructor, course, and program is collected and analyzed for quality control and efficiency by the Employee Training Unit (ETU) within Human Resources' Workforce Development Branch. Many health care providers who attended this program have been very positive in their evaluation of the HCNEO program, expressing that it better prepares them for their positions in our institutions.

A performance measure that has been closely monitored is the turnover rate of new hires who attend the HCNEO versus those who did not attend. The latest performance measure continued to show a lower turnover rate for HCNEO participants than those who had not attended between March 2008 and October 2008. Just 2 percent of clinical staff who attended regional HCNEO separated from State service within the chosen time frame, while nearly 6 percent of clinical new hires who did not attend regional HCNEO separated during the same period. Although these findings were from a moderate sample, they are affirming for the HCNEO program.

The ETU assumed responsibility of the HCNEO as of September 2008. In addition to coordinating training and curriculum development, ETU has written lesson plans with subject matter expert review and training to assist in the development of an outstanding instructor cadre to deliver training for all HCNEO participants. Also, ETU in collaboration with Human Resources' Education and Professional Development Unit will be expanding its focus to support other required clinical training such as BLS, ACLS, and other Continuing Medical Education programs.

*Status of the Proctoring/Mentoring Program:* The nursing services division of CPHCS is committed to providing qualified proctors and mentors for the purpose of orienting new staff to correctional nursing, improving job satisfaction, and reducing employee turnover. The proctor and mentor program is designed for all new clinical CPHCS employees including RN and LVNs assigned to perform patient care functions. This proctor and mentor program consists of a four-week program for RNs and a three week program for LVNs in addition to the four day regional new employee orientation.

The proctor and mentor program has been developed and partially implemented at some institutions based upon their staffing capacity. During the past six months, a planning session was held at each institution to discuss the local process to implement the nursing services proctor and mentor program. The planning session at each institution included the Nurse Consultant Program Review (NCPR)-Educator, Director of Nursing (DON), Supervising RN (as designated by the DON), and the Nursing Instructor. Additionally, a Headquarters' NCPR to support the statewide implementation was recently approved and appointed. As the proctor and mentor program is specific to each new employee hired by CPHCS, the implementation plan must remain flexible. The statewide implementation of the proctor and mentor program has begun based on each institutions recent nursing hires and individual staff needs.

This Action was not fully implemented by January 2009 as set forth in the Turnaround Plan of Action. The program will be fully operational by the end of the next reporting period.

> ### Action 3.3.2. By January 2009, win accreditation for CDCR as a CME provider recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education

As reported in the Ninth Quarterly Report, in an effort to maintain and enhance the level of clinical competencies with educational programs, the Office of the Receiver has established a Continuing Medical Education (CME) Committee which meets monthly. The Committee membership is representative of clinicians providing health care services within CPHCS from each licensed practitioner group, including physician, psychiatrist, nurse, nurse practitioner and psychologist. A primary objective of the CME Committee is to obtain accreditation for CPHCS as a CME provider, recognized by the Institute of Medical Quality and the Accreditation Council for Continuing Medical Education. The CME Committee also oversees the planning of all CME activities.

The Interdisciplinary Professional Development (IPD) Unit within CPHCS, is providing administrative support for the CME Committee. The IPD Unit submitted the application for accreditation, including a description of the history of the program, its purpose and mission, and detailed descriptions of how the CME program complies with standards for commercial support, to the Institute of Medical Quality on October 30, 2008. The Institute of Medical Quality has assigned a surveyor and is anticipating a survey date in January 2009. In addition to obtaining accreditation, the IPD Unit will be responsible for the operation and administration of the CME program once accreditation has been obtained.