# EXHIBIT H (cont)

One component of the accreditation application is to plan and present CME activities to establish a "track record." During this reporting period, two CME programs, "Primary Care Introduction to Hepatitis C" and "Primary Care Introduction to Chronic Pain Management," were approved by the Institute of Medical Quality and subsequently conducted.   A total of 163 CPHCS clinicians received CME credit for attending these activities.  The IPD Unit submitted a third CME activity, "Coccidioidomycosis:  Review of 2 Atypical Cases," to the Institute of Medical Quality for review and approval on December 12, 2008.

This Action is on schedule as set forth in the Turnaround Plan of Action.

## Goal 4. Implement Quality Improvement Programs

**Objective 4.1.**  Establish Clinical Quality Measurement and Evaluation Program

> *Action 4.1.1. By July 2011, establish sustainable quality measurement, evaluation and patient safety programs*

*Progress During the Reporting Period:* During this reporting period, the Quality Improvement Section worked to further build its Research and Evaluation Unit. Specifically, new staff were hired including a Research Scientist Manager to head the Research and Evaluation Unit, a Research Scientist III, Research Analyst II, Health Program Specialist II, and other support staff. In the next few months, the Quality Improvement Section will work to fill the four remaining vacancies in the unit.

During the reporting period, staff from the Research and Evaluation Unit collaborated with Access to Care Initiative staff to develop performance objectives for pilot projects in the Reception Center, Sick Call, Chronic Care, and Specialty Care domains to measure pilot completion and level of success. The Research and Evaluation Unit also provided technical assistance to a number of special projects, including the annual death review data report, a survey for sick call data collection, and development of an electronic and centralized Care Management Registry and the associated user manual. During the next reporting period, the Research and Evaluation Unit plans to purchase statistical software and hardware that will enable staff to analyze data from numerous data sources, including the Care Management Registry, Specialty Care InterQual data, Death Statistical Master File, Death Review, Inmate Medical Scheduling and Tracking System (IMSATS), and other databases.

In November 2008, the CPHCS entered into a contract with the RAND Corporation to assess current measurement activities, collect information about other correctional and health system approaches to quality improvement, and ultimately recommend strategies for the CPHCS to routinely measure and evaluate program performance. RAND houses one of the largest private health research groups in the world, and employs a research staff of more than 170 experts, including physicians, economists, psychologists, mathematicians, organizational analysts, political scientists, psychometricians, medical sociologists, policy analysts, and statisticians. Representing RAND as Lead Investigator on this project is Steven M. Asch, M.D, MPH. Dr. Asch is, among other accomplishments, a Researcher at RAND; Associate Professor of Medicine at the University of California, Los Angeles Geffen School of Medicine; former Robert Wood Johnson Clinical Scholar; and consultant to the National Committee for Quality Assurance.

Over a twelve-month period, the RAND Corporation will assess current quality measurement activities by developing a list of existing CPHCS performance measurement and audit activities, including those conducted by the former Quality Management Assistance Team, OIG, Access to Care, and out-of-state facility program. This process will incorporate a review of existing documents, interviews with staff at all reporting levels, site visits to prisons, and an assessment of the CPHCS strengs and weakness with regard to performance measurement. Further, RAND will amass demographic and clinical need data from the prison population and compare

56

that with similar nationwide data, to establish an appropriate context for any performance measurement or patient outcome data. To collect information about performance measurement strategies in other correctional systems and health systems RAND will convene a multi-disciplinary advisory panel of nine state and national experts. The advisory panel will compare and catalogue implicit and explicit methods of review in these other systems. Lastly, based upon validity and applicability to the prison health care setting, RAND will produce a list of recommended performance quality indicators and specifications. The expert advisory panel will provide input into the development of the indicator list.

Staff from the Research and Evaluation Unit began regular meetings with RAND during November and December 2008, providing critical background documentation to RAND staff, including numerous quality-related datasets, and assisting RAND in identifying candidates for interviews and potential institutions for site visits. During the upcoming reporting period, RAND will visit four institutions for interviews with field staff a will conduct interviews with subject matter experts regarding CDCR data collection and data systems and CPHCS health care delivery. RAND will also convene an expert panel to develop recommendations for prison clinical performance measures. This action item is on schedule, as set forth in the Turnaround Plan of Action.

> ### Action 4.1.2. By July 2009, work with the Office of Inspector General to establish an audit program focused on compliance with Plata requirements

This Action is divided into two phases. Phase I includes program development and pilot implementation, and Phase II included statewide roll-out and implementation. Phase I is complete. During Phase I, the OIG developed the inspection instruments in a collaborative process with the CDCR, Prison Law Office, CPHCS staff and other stakeholders. The OIG conducted pilot medical inspections at five institutions. The final pilot medical inspection was completed on June 12, 2008 and a stakeholders meeting was held on August 19, 2008 to discuss proposed revisions to the medical inspection instrument based on lessons learned during the pilot phase.

Phase II was on schedule. In September 2008, the OIG initiated Phase II of the Medical Inspection Program with a medical inspection at California State Prison - Sacramento. As of the close of this reporting period, the OIG has completed three additional inspections at California Medical Facility, Richard J. Donovan Correctional Facility, and Centinela State Prison, respectively. The first year inspection results will establish a baseline that will provide an objective, clinically appropriate method to evaluate and monitor the progress of medical care delivery to inmate-patients within each institution. The Medical Inspection Results for California State Prison - Sacramento, are included as Appendix 17. Once final inspection reports are issued, the inspection results for each institution will be available to be viewed on the OIG website (http://www.oig.ca.gov). Based on the final report at California State Prison - Sacramento, and the draft reports at the other facilities, it is far too soon to declare victory in terms of the actual medical care being delivered in California's prisons.

As mentioned above, however, despite the success of the OIG's inspection program for prison-specific audits of *Plata* compliance, its potential to reduce overall cost of compliance monitoring, and despite the fact that this program represents the first step of the State's efforts to at least monitor (if not manage) California's prison medical delivery system, the Schwarzenegger Administration now refuses to fund the full program. If the program is not entirely eliminated, it will without question be reduced to only a fraction of what is necessary - yet another indication that the State is neither willing nor able to support its own sustainable prison health delivery program at this point in time.

## Objective 4.2.  Establish a Quality Improvement Program

Quality improvement is a hallmark of an adequate, fiscally responsible health care system. Using information from measurement and evaluation systems, as well as self-assessment and other sources of ideas for improvement, the health care system works on a continuous basis to improve both its efficiency and its outcomes. Improvements in clinical processes will also require updating of clinical policies and procedures.

The Office of the Receiver established a quality-based program to administer the CPHCS healthcare credentialing and privileging function as part of the Quality Improvement Program. Status of this Unit will be discussed below and prior to the status of the three specific Quality Improvement Program actions specified in the Turnaround Plan of Action.

*Credentialing and Privileging Unit:*  The Credentialing and Privileging Unit is an entity within the CPHCS Quality Improvement Program.  During this reporting period, significant progress was made including the following:

A.     Completion of the credentialSmart IT conversion
B.     Implementation of Policy for both the Credentials Committee and the Credentialing and Privileging Unit
C.     Maintenance of the Credentials Committee
D.     Ensuring all civil service providers have an approved credential file
E.     Continuing two-year reappointment compliance
F.     Tracking of license and board certification expirations
G.     Implementation of an automated credential process

Each area of progress within the Credentialing and Privileging Unit is detailed below.

credentialSmart IT Conversion:
The Credentialing and Privileging Unit staff completed the conversion of paper credential files to electronic profiles over the course of five months, meeting the December 31, 2008 projected timeframe. This conversion process was a team effort, enlisting Human Resources assistance in providing accurate reports on all civil service providers in the following classifications: Physician and Surgeon, Dentists, Nurse Practitioner, Physician Assistant, Psychiatrist, Psychologist, and Social Workers. From these reports, the Unit staff was able to identify which provider files to convert. Not only did the Unit staff have to convert the pre-existing paper files,

58

but also converted new hires on a continuous basis. In order to convert a file, staff manually entered the data from files that contained anywhere from 5 to 100+ pages of information and completed primary source verification of licensure to ensure that as the files were converted the provider's license was active. In total, 1498 paper files were converted to electronic profiles.

Policy Implementation:
The Credentialing and Privileging Unit and the Credentials Committee's Policies and Procedures have been completed and approved by both the Credentials Committee and the Professional Practices Executive Committee. The Governing Body reviewed the policies in December 2008 which resulted in necessary changes. These changes have been incorporated and will be resubmitted through the review process. Final approval of the policies was originally anticipated to be completed by September 2008; however, there were several delays in coordinating the appropriate approvals through the Governing Body and the newly established Policy Unit. The Policy Unit will receive the revised policies by early February 2009 for their review and processing. Once the Policy Unit has finalized the policies they will be added to the Governing Body's meeting agenda as an action item. The Governing Body meets twice a month, and is expected that these policies will be presented to the Governing Body no later than the end of February 2009.

Policy Implementation:
The Credentialing and Privileging Unit and the Credentials Committee's Policies and Procedures have been completed and approved by both the Credentials Committee and the Professional Practices Executive Committee. The Governing Body reviewed these policies in December 2008, which resulted in additional changes. The requested changes have been incorporated and will be resubmitted through the review process and presented to the Governing Body for action in February 2009.

Credentials Committee:
The multidisciplinary Credentials Committee continues to meet on a weekly basis for the review of practitioner files, credential process, and *credentialSmart* developments. Although the Committee is awaiting final approval of their policies, it continues to operate in a process based fashion following set standards and practice equivalent to those established by the National Committee for Quality Assurance and Joint Commission. During this reporting period, the Committee reviewed 55 individual practitioner cases. The Committee reviews these cases prior to the hiring and or contract commitment to ensure that only those providers who meet the requirements are allowed to provide health care services.

Approved Credentials File:
During this credentialSmart IT conversion, 152 civil service employees were found not to have a credential file. A process was implemented to ensure that these provider's complete the credential review process. The provider's and their management have been notified that they must complete the provided credential application and return it to the Credentialing and Privileging Unit within 10 business days of notice. To date 81 of those practitioners have completed the credential file and verification process. The remaining 71 are being tracked for compliance, as new files arrive daily. A delay is not expected as most providers have complied

without reservation. It is expected that by the end of January, all civil service providers will have an electronic credential profile.

As part of the Emergency Response Initiative pilot project, 125 electronic credential files were created for RNs who are assigned to the Triage Treatment Area.. This pilot was cancelled, however, due to other IT solutions that are better suited for use with nursing classifications. The RNs who have been entered into credentialSmart will remain in the system as inactive.

Two-Year Reappointment Compliance:
As part of the continued goal of establishing a Credentialing and Privileging Unit that meets National Committee for Quality Assurance and Joint Commission standards, the required two-year reappointment process continues. During this reporting period 170 two-year reappointments have been completed. The two-year reappointment process is an on-going process with new requests for provider compliance being sent out and completed every month. The Unit is establishing the review process to align with the California Medial Board's birth month renewal program. This will assist the providers in knowing when their two-year reappointments are due as well as will establish a standardized system to not only complete the two-year reappointments but to ensure no one is omitted from the process.

Tracking of License and Board Certification Expirations:
With the provider files converted into credentialSmart, the Credentialing and Privileging Unit commenced the tracking and maintenance component for credentials that expire. During this reporting period, 76 Notice of Licensure Expirations have been sent to the practitioners assisting them with the timely renewal of their license and 7 Physician and Surgeon Board Certification Expiration notices have been processed. This automation of credentialing and tracking of expirables will assist CPHCS in ensuring that our licensed independent practitioners and designated allied health practitioners have active licenses, certification and credentials to provide quality healthcare to our patient-inmate population. The tracking of expiring license and certifications is an on-going process with notifications being sent out regularly to ensure that the providers have active current credentials at all times.

Implementation of an Automated Credential Process:
In addition to the credentialSmart file conversion, the direct-apply component called *ApplySmart*, within the *credentialSmart* system, kicked off in late-December 2008 with the launch of the on-line Credentialing Application. This automated application is the first step to a paperless credentialing system. It is anticipated that by spring 2009, all civil service applicants that require credentialing will apply directly on-line. Future plans include adding the *credentialSmart* link to the CPHCS and SPB websites as a seamless transition from state application to medical staff application.

> **Action 4.2.1. By September 2009, train and deploy a cadre of quality improvement advisors to develop model quality improvement programs at selected institutions.**

Activity related to this Action is on schedule, as set forth in the Turnaround Plan of Action.

During this reporting period, the Quality Improvement Section identified a cadre of CPHCS physician and nurse consultant quality advisors who will be dispatched in 2009 to support the first statewide quality improvement project: implementation of the Patient-Centered Medical Home and Chronic Care Model at all CDCR institutions. Each quality advisor will be assigned an average of three institutions, and during 2009 each quality advisor will conduct site visits to support institutions in establishing infrastructure for the new primary care model and incorporating rapid-cycle quality improvement into everyday clinic operations. Quality advisors will also proving training, facilitation, and technical assistance to institutions during statewide and regional conferences held each month.

In December 2008, the identified quality advisors participated in their first training session, with additional training scheduled for January 2009. To support quality advisors in their field work, quality improvement experts from Convergence Consulting and Health Management Associates will provide mentorship during site visits and through monthly teleconferences. Quality Improvement Section staff are also developing a field manual for quality advisors.

> ### Action 4.2.2. By September 2009, establish a Policy Unit responsible for overseeing review, revision, posting and distribution of current policies and procedures.

To accomplish this action item, an action plan was established and divided into two elements that are being implemented concurrently. Element I includes the development of the organization structure and program concept, the recruitment and hiring of staff, and staff training. Element II includes the development of policies and procedures and the procurement of a policy tracking system.

During this reporting period, the recruitment and hiring of staff was initiated and half the allocated positions have been filled. Although several staff members have been hired, the challenge of finding candidates with relevant qualifications, excellent writing skills, and experience in policy and procedure development has delayed the filling of all of the positions within the Policy Unit. Recruitment for remaining staff will continue and training is in progress for the current staff members.

Simultaneously, Element II is underway. A policy tracking system was procured and training on the new system is in progress. This policy tracking system was chosen because it is designed to address policy management and compliance in a health care setting; it automates the process of documenting, communicating and maintaining an organization's policies and procedures; and offers a centralized library for all policies, procedures and forms. Currently, Policy Unit staff are identifying the most current versions of medical policies to begin the task of uploading them into the new policy tracking system. Once the policies are uploaded and training is complete, staff will then begin the process of updating existing policies and procedures, centralizing the policy development process, and standardizing the development of new policies and procedures.

This action item is currently on schedule to be completed by September 2009.

*Action 4.2.3. By January 2010, implement process improvement programs at all institutions involving trained clinical champions and supported by regional and statewide quality advisors*

Activity related to this Action is on schedule, as set forth in the Turnaround Plan of Action.

An important part of implementing the new quality improvement program in CDCR institutions is the alignment of existing policy with the most current health care quality practices. During this reporting period, CPHCS's Quality Improvement Section conducted research to inform policy modifications by surveying institution-level Quality Management Committee activities, including frequency of meetings, membership, subcommittees, and committee support. In addition, various health plan executives were interviewed to ascertain information about current quality approaches and staffing models. The data collected will be considered during the revision of existing quality management policies scheduled for early 2009.

**Objective 4.3.** **Establish Medical Peer Review and Discipline Process to Ensure Quality of Care**

*Action 4.3.1. By July 2008, working with the State Personnel Board and other departments that provide direct medical services, establish an effective Peer Review and Discipline Process to improve the quality of care*

On July 9, 2008, the court issued the "Order Approving, With Modifications, and Proposed Policies Regarding Physicians Clinical Competency." During this reporting period, CPHCS completed implementation of the new policies. In September 2008, the milestones achieved were as follows: (1) establishing a number of new organizational processes to ensure policy compliance and (2) initiating the distribution of notices to physicians subject to the peer review process. In October 2008, CPHCS executed a contract with the Institute of Medical Quality to employ the use of Judicial Review Committee Panelists, as set forth in the new policies. The first Notice of Proposed Final Action under the jurisdiction of the new policies was served in October 2008. CPHCS provided training to the Office of Administrative Hearings Administrative Law Judges and the Medical Oversight Program staff regarding implementation of the policies in November 2008.

In an effort to ensure physicians are afforded their due process rights in a timely manner, CPHCS has taken affirmative steps to fully implement the entire disciplinary process to include the formal hearing. This implementation approach was necessary due to SPB's failure developing and implementing a program to effectuate disciplinary hearings for physicians according to the standards set forth in the court's July 9, 2008 Order. Because of this, CPHCS has assumed responsibility to implement the requirements of the Order. The first hearing to be held with a Judicial Review Committee is scheduled to commence in March 2009.

The Professional Practice Executive Committee (PPEC) and Peer Review Subcommittee met 21 times during the reporting period and have reviewed a total of 174 referrals/allegations. The PPEC summarily suspended the privileges of three providers, implemented 34

training/monitoring plans focused on improving provider clinical competency. In addition, the Governing Body approved 50 case closures of physicians whose clinical practice was deemed to meet an appropriate standard of care. The Governing Body also issued Notices of Proposed Final Action to revoke privileges and employment of two physicians, which is not reflected in the below Tables. During this period, 16 providers separated from State service while under peer review investigation.

Graphical displays of PPEC outcomes for the period September through December 2008 is presented in Tables 8 and 9.

**Table 8.**



**Table 9.**



**Tables 8 and 9 Results Explanation:**
*The data represented pertains to physicians and surgeons and mid-level providers.*
*"Case closed" is defined as physicians or mid-level providers that are deemed to be practicing at an appropriate standard of care after conclusion of a peer review investigation.*
*"Separated" status refers to employees that separate from State service after a peer review investigation is initiated by PPEC.*
*"Summary Suspension" is defined as suspending the privileges of a physician or mid-level provider by Governing Body/PPEC and the provider is not allowed to continue their clinical duties.*
*"Training/Monitoring" are issued by the Governing Body/PPEC to monitor a corrective action plan for a physician or mid-level provider.*

**Objective 4.4.   Establish Medical Oversight Unit to Control and Monitor Medical Employee Investigations**

*Action 4.4.1. By January 2009, fully staff and complete the implementation of a Medical Oversight Unit to control and monitor medical employee investigations*

This Action has been accomplished as set forth in the Turnaround Plan of Action.  The Medical Oversight Program (MOP) has reached the one year milestone in conducting clinical care investigations of CPHCS providers.  The MOP team consists of staff from the CPHCS, CDCR's Office of Internal Affairs (OIA), CDCR's Employee Advocacy and Prosecution Team (EAPT) and is monitored by the OIG.  The MOP has been conducting multi-disciplinary clinical investigations since January 1, 2008, and, based on the initial staffing allocations, the MOP is fully staffed.

*Meeting the Stated Goals:*    The MOP continuously strives to achieve its stated goal of conducting multi-disciplinary clinical investigations, by providing rapid evaluations of deaths, rapid response to sentinel events, and timely recommendations regarding patient safety issues. Some key program elements that enhance the MOP's ability to effectively achieve the stated goals include the clinical case review for timely evaluation of deaths, weekly program planning meetings with stakeholders, and the multidisciplinary team approach for investigations.  .

*Sentinel Event Responses:*    The MOP team primarily responds to "Sentinel Events" that encompass "Unexpected Deaths" and on occasions "Non-death" related issues.    The MOP review of sentinel events has expanded to include some referrals for mental heath, pharmacy, and systemic issues).    The program's ability to mobilize a multidisciplinary team has proven successful as a model in investigating the primary and expanding range of sentinel events.

*Case Status Reporting Review:*    During this reporting period, the MOP Roll-Out team was activated and rolled-out on twenty-one cases.   The team rolled-out on fourteen "Unexpected deaths" and seven "Non-deaths" roll-outs for possible misconduct and/or systemic issues. Four cases were "Opened for Investigation." In addition, nine cases were "Rejected for Investigation." and seven cases are "Pending" further review and presentation to the Medical Intake Panel.

*Referrals to the Peer Review Processes:*    There have been eight cases referred to Nursing Practice Review (NPR) and twelve cases referred to the PPEC. The institutional health care managers submitted four CDCR Forms 989, Request for Investigation, and these cases were reviewed by MOP and referred back to the local health care manager for direct action (i.e., counseling, training, remediation or adverse action).   As a safety-net, to ensure satisfactory closure to all cases, the MOP has begun developing a case follow-up process to formally track all requests for investigation and referrals to NPR and PPEC.

*Scope of Potential for Program Enhancements:*   The successful implementation of the MOP has broadened the scope of potential investigations to include identification of serious systemic issues such as recent investigations of patient-inmate suicides and medication management.   The MOP is defining specific types of incidents that require the investigative resources of the program, versus those warranting a referral to institutional, regional, and/or statewide clinical leadership, and/or the PPEC and NPR.

*Employee Disciplinary Matrix:*   To meet one of the key program objectives, the MOP completed its review and recommendation for modifying the Employee Disciplinary Matrix to reflect clinical relevance.   A final draft of the proposed Employee Disciplinary Matrix revision was developed through a collaboration of stakeholders including CPHCS, EAPT, OIA, the OIG, CDCR Division of Adult Institution, Mental Health, and Dental.   However, upon further consideration by the CPHCS executive team, it was determined that the present disciplinary matrix coupled with the new court-ordered policies on clinical competency is more appropriate to address medical disciplinary matters and that no changes were necessary.   In addition, the MOP team will collaborate with the appropriate programs in CPHCS to incorporate the "Just Culture" principles into the disciplinary process for all clinicians.   "Just Culture" principles are a nationally-accepted approach to reviewing clinical behavior that assigns responsibility of a

65

negative outcome in a sentinel event to either the individual, the system in which the individual operates, or both.

*California Out-of-State Correctional Facility Program Collaboration:*  The MOP continues to collaborate with the California Out-of-State Correctional Facility program (COCF) for systemic issues identified at an out-of-state private prison.   (Refer to Objective 4.6 for additional information).  Following the on-site investigation in Mississippi, MOP has been instrumental in the development of a Corrective Action Plan (CAP) to address identified issues.  The MOP also provided ongoing clinical resources and expertise to assist the COCF in the development and implementation of the CAP with the out-of-state facility. This CAP has been a valuable model that is being considered for use with all MOP cases.

*Future Goals:*  In 2009, the MOP team will focus its attention on training the "Just Culture" model to facility clinicians and custody staff.  Continuing to integrate the "Just Culture" principles in distinguishing provider issues and systemic vulnerabilities will ensure the most appropriate and effective remedies are employed for each investigation.  A revision to the MOP Guide will be completed by the end of January 2009.  Upon approval of the Guide, formal policies and procedures for the program will be developed.

A graphical display of MOP outcomes for September thru December 2008 is presented in Tables 10 and 11.

**Table 10.**



***Table 10 Results Explanation:***
*"Opened for Investigation" is a formal investigation conducted by MOP.*
*"Rejected for Investigation" is when a MOP inquiry does not result in a formal investigation being opened (e.g. due to insufficient facts to support an investigation).*
*"Direct Actions: are when a request for investigation is referred back to the hiring authority (health care manager) for employee remedial training, counseling, a letter of instruction, or adverse action for general administrative corrective purposes (e.g. attendance).*
*"Pending" is when a case is awaiting an investigatory assignment prior to Medical Inquiry Panel review.*

**Table 11.**



| Active Cases | NPR Referrals | PPEC Referrals | Non-Death Roll-Outs | Unexpected Death Roll-Outs | Opened For Investigation |
|---|---|---|---|---|---|
| 21 | 8 | 12 | 7 | 14 | 4 |

***Table 11 Results Explanation:***

*"Active Case" is any case currently under inquiry by the MOP (i.e. under preparation for Medical Intake or in the investigative process).*

*"NPR Referral" is made when the Medical Intake Unit suspects substandard clinical practices by a nurse and refers the case to the Nursing Practice Review Program.*

*"PPEC Referral" is made when the Medical Intake Unit suspects substandard clinical practices or clinical misconduct by a physician or mid-level provider and refers the case to the PPEC.*

*"Non-death Roll-Outs" are defined as any act that may cause imminent danger to the patient-inmate (e.g. disruptive conduct, unethical conduct, substandard competencies, fail to perform standards of care).*

*"Unexpected Death Roll-Outs" are cases when a patient-inmate is one of the following: 40-years old or less and has had no history of a chronic medical condition; was seen two or more times in the TTA within the last week of life, submitted two or more request for services in the last week of life. "Unexpected death cases" also include cases where possible inappropriate, absent or untimely care is suspected; death is directly attributed to asthma or a seizure condition; the patient-inmate returned from an off-site emergency room visit or acute care inpatient stay within 14 days prior to death; or a medication error is suspected.*

*"Opened for Investigation" are formal investigations conducted by MOP.*

**Objective 4.5.  Establish a Health Care Appeals Process, Correspondence Control and Habeas Corpus Petitions Initiative**

*Action 4.5.1. By July 2008, centralize management over all health care patient-inmate appeals, correspondence and habeas corpus petitions*

This Action was divided into two phases.  Phase I was completed in October 2007 and included the consolidation of all correspondence and habeas corpus petition responses under the Controlled Correspondence and Litigation Support Unit (CCLSU).  Phase II included the separation of health care appeals from CDCR institution appeals and the establishment of the Office of Third Level Appeals – Health Care.  Third-level health care appeals were consolidated with all other appeals for the following two reasons: (1)  the third-level health care appeals were routed through CDCR institution appeals staff which was inefficient and unnecessary, and (2) the third level appeals were responded to by CDCR custody staff who lacked the medical knowledge to appropriately respond to patient-inmates' health care issues.

Phase II was completed on August 1, 2008, when all levels of patient-inmate health care appeals were completely centralized and consolidated under the Litigation Support Unit within the Plata Field Support Division.

*Controlled Correspondence and Litigation Support:* The impact of Phase I, particularly the consolidation of correspondence, has caused a sharp and marked increase in workload for the CCLSU.  As a result of this consolidation, the workload has increased 315 percent over the past year.  CCLSU now conducts research and provides responses to all patient-inmate, family, and advocate correspondences directed to the court and the Receiver; telephone calls placed to the Inmate Health Care Inquiry Hotline; correspondence addressing health care issues for patient-inmates that are part of the COCF program; correspondence for Sacramento Headquarters; correspondence for the Western Interstate Compact programs; health care appeals arising out of COCF; and the review and routing of all Receiver website e-mail inquiries.  The dramatic increase in workload has impacted staff's ability to respond in a timely manner which has created an increase in overdue responses. Additional staffing to address the increase in workload has been requested.

Refer to Table 12 below regarding the tracking of CCLSU incoming inquiries and overdue responses for September through December of 2008.  The CCLSU Executive Summary Report for September through December 2008 is included as Appendix 18.

69

**Table 12.**



*Habeas Corpus Petitions:* The development of a habeas corpus response policy was initiated as a result of multiple requests for information or action submitted by the courts to the California Prison Health Care Receivership related to petitions for writ of habeas corpus submitted by patient-inmates confined within CDCR. When a habeas writ is received, the patient-inmate's medical records are reviewed by the Chief Medical Officer of the Clinical Support Unit at CPHCS. This evaluation includes a review of all legitimate health care issues identified in the writ and the development of a CAP, if necessary, to address the health care issues identified in the writ.

The volume of Habeas Corpus Petitions has remained relatively constant from July through September, 2008. However, there has been a small increase in the number of CAPs that were both initiated and completed. Additionally, there has been a reduction of overdue CAPs, from a total of two during the Second Quarter of 2008 to one for the Fourth Quarter of 2008.

Refer to Table 13 below regarding the tracking of habeas corpus cases handled by the CCLSU for September through December of 2008.

**Table 13.**



*Institutional Health Care Appeals:*  During this reporting period, the separation of health care appeals from institutional appeals occurred.  From July through September 2008, there was a marked increase in the number of health care appeals received; however, at this time, it cannot be determined if this increase is the result of the separation of health care appeals from institutional appeals or a continuation of the documented increase of health care appeals recorded over the last eight years.

Table 14 below displays data related to Health Care Appeals for September through December of 2008.

**Table 14.**



| | Total Informal and Formal Appeals Received | Number of Appeals Processed | Total Overdue |
|---|---|---|---|
| ▣ September-08 | 11517 | 11655 | 1681 |
| ■ October-08 | 11579 | 12027 | 1806 |
| ▢ November-08 | 9468 | 9181 | 1870 |
| ▢ December-08 | 11652 | 9181 | 1743 |

*Health Care Appeals – Office of Third Level Appeals:*  CCLSU management staff completed the hiring process for all 17 newly established positions for the Office of Third Level Appeals during the Third Quarter of 2008. The staff includes one Physician, four Nurse Consultant Program Reviews and 12 support staff. On August 1, 2008, Office of Third Level Appeals began receiving all third level appeals regarding health care issues.   Due to the higher than anticipated volumes, there are a significant number of overdue third level appeals at the time of this writing. During August 2008, Office of Third Level Appeals received 544 third level appeals and ended the month with no overdue appeals. In November 2008, 653 third level appeals were received; there were 310 overdue responses. Additional staffing is being requested to address higher than anticipated volumes and the significant number of overdue responses.

Table 15 below displays data related to the Office of Third Level Appeals for September through December of 2008.

**Table 15.**



*Action 4.5.2. By August 2008, a task force of stakeholders will have concluded a system-wide analysis of the statewide appeals process and will recommend improvements to the Receiver*

Recommendations from the task force of stakeholders and a pilot program were approved by the Receiver's Chief of Staff on June 16, 2008. Those recommendations stemmed from the meeting of the Health Care Appeals Task Force that convened on February 13, 2008 to conduct a system-wide analysis of the statewide appeals process. Members of the Health Care Appeals Task Force included Coleman court monitors, Office of Court Compliance (*Armstrong*), *Perez* court monitors, Plaintiff's counsel (Prison Law Office and Rosen, Bien & Galvan), the Receiver's Staff Counsel, the Chief Physician Executive, the Chief of Nursing Operations, CPHCS and Division of Correctional Health Care Services Executive Staff, CDCR Inmate Appeals Branch Chief, CDCR Staff Attorneys, and Litigation Support Unit staff. Four meetings were held to discuss issues, best practices and recommended changes and improvements to the statewide health care appeals process.

The proposed improvements included the following: (1) eliminating the informal level of appeals; (2) designating a RN to triage each appeal for urgent or emergent health care issues; (3) establishing a Patient Advocate Liaison position to precipitate face-to-face communication between patient-inmates and health care staff; and (4) establishing a correspondence program to resolve problematic patient-inmate health care issues that do not meet the appeal processing criteria, to address correspondence submitted from parties other than patient-inmates, and to

73

informally resolve health care issues submitted by patient-inmates who do not have access to Patient Advocate Liaison (i.e. Administrative Segregation status, out-to-court status).

A six month pilot program began November 1, 2008, at Central California Women's Facility, Mule Creek State Prison, Pelican Bay State Prison, and California State Prison - San Quentin. The hiring process for allotted positions in the pilot program is being completed at the time of this writing. Additionally, RN positions have been approved for all 33 institutions, with the roll-out of these positions to begin in January 2009 and the completion by January 2010.

Table 16 displayed below indicates the current progress or anticipated implementation date of pilot activities at the four pilot institutions. Pilot components that are not in progress are due to the hiring process not being completed.

**Table 16.**

|  | Eliminate Informal Appeal | RN Appeal & Correspondence Triage | Patient Advocate Liaison Program | Correspondence Program |
|---|---|---|---|---|
| Central California Women's Facility | In progress | January 2009 | January 2009 | January 2009 |
| Mule Creek State Prison | In progress | January 2009 | January 2009 | In Progress |
| Pelican Bay State Prison | In progress | In Progress | January 2009 | In Progress |
| California State Prison - San Quentin | In progress | In Progress | In Progress | In Progress. |

**Objective 4.6.** **Establish Out-of-State, Community Correctional Facilities and Re-entry Facility Oversight Program**

*Action 4.6.1. By July 2008, establish administrative unit responsible for oversight of medical care given to patient-inmates housed in out-of-state, community correctional or re-entry facilities*

During this reporting period, staff assigned to the Receiver's COCF Program, Program Oversight Unit, and the Corrections Corporation of America (CCA) have continued to work collaboratively on the CAP required as a result of the death of a California patient-inmate at the Tallahatchie

County Correctional Facility (TCCF) in Mississippi. An update is being provided regarding the following remedial measures agreed to be implemented by CCA:

1.  Implement a CAP in a timely manner at TCCF.
    On September 5, 2008, the CCA CAP was approved by the Receiver; however, prior to that time the CCA had already started working to address a significant number of deficiencies that were identified in the CAP. To date, CCA has submitted two updates regarding the status of the CAP. As CCA began submitting draft nursing protocols and policies for review and approval, it became clear that there was a need to have on-site meetings to actually finalize these documents. Consequently, during the week of December 8 through 12, 2008, CCA representatives visited California to review and finalize nursing protocols. As a result of that meeting, 28 nursing protocols and a Nursing Referral Guide was developed and is pending final review and approval by CPHCS Nursing Services' executives. An additional meeting has been scheduled for the week of January 12 through 16, 2009 to finalize all outstanding policies, excluding those related to professional practice, credentialing, and peer review. Additional meetings are being scheduled to finalize policies related to professional practice, credentialing, peer review, as well as meetings to address quality improvement concerns and CCA reporting requirements. It is anticipated that all policies will be finalized at that time and ready for submission to CPHCS Clinical Services' executives for final review and approval during the next reporting period.

    During the next reporting period an update regarding the status of the CCA CAP will be provided. As we finalize the various issues associated with the CAP, discussions will begin between the Office of the Receiver and CCA regarding the roll-out of the TCCF remedial plan to all CCA facilities housing California patient-inmates.

2.  Increase clinical staffing at TCCF.
    CCA has increased the number of licensed independent practitioners at TCCF from 2.0 to 3.0, as of November 2008. Not only has the number of licensed independent practitioners increased, but the Office of the Receiver has implemented additional requirements to ensure the quality of the providers being hired meet existing California standards for those licensed independent practitioners providing medical care to California patient-inmates (i.e., new credentialing process). As the population continues to increase, CCA and the Office of the Receiver will continue to collaborate on the appropriate ratios of licensed independent practitioners.

3.  Seek approval by the Receiver's clinical team concerning all future physician hires that will treat California patient-inmates.
    Numerous meetings and collaborative discussions have occurred between CCA and the Receiver's staff. Pending submission of final draft policies from CCA related to professional practice, credentialing and peer review, CCA has agreed and begun implementation of a process by which all potential licensed independent practitioners hires are reviewed by the Receiver's clinical staff prior to a job offer being made. In addition, the Receiver's clinical staff has conducted Clinical Performance Appraisals on all licensed independent practitioners

providing care to California patient-inmates as of November 2008 and all performance issues identified have been appropriately addressed by CCA.

Staff from the Office of the Receiver will continue to work collaboratively with CCA to ensure that a process is formalized and policies developed, which will identify the role CPHCS will continue to have in this process.

4. <u>Establish a special CCA oversight organization to monitor and manage the health care provided to California patient-inmates at all CCA facilities which house California patient-inmates.</u>
To date, the team established by CCA to specifically oversee the California patient-inmate population is as follows:

- On August 21, 2008, Keith Ivens, M.D., was appointed as the Regional Medical Director for California patient-inmates with an on-site presence at TCCF until such time as a full-time Senior Physician was recruited and trained to assume the Senior Physician duties. During this reporting period, Dr. Ivens served both a managerial oversight and an administrative role at TCCF. With the hire of Dr. Shazad Dailami-Pour, M.D., it is anticipated that Dr. Ivens will assume the full-time role of Regional Medical Director for California patient-inmates.

- On December 22, 2008, Susan Montford, was promoted to Regional Director for California patient-inmates.

Additionally, CCA has established executive leadership on-site at TCCF to ensure compliance with the CAP and to ensure that all clinical and administrative staff is functioning properly and all systems are working effectively and efficiently. The team is made up of the following staff:

- On July 26, 2008, Don Stewart was appointed as Senior Director, California Contract Compliance. Mr. Stewart will remain on-site at TCCF until the CAP is fully implemented.

- On July 3, 2008, Allen Cooper was appointed as Acting Director of Quality Assurance to provide TCCF leadership on-site on a regular basis to ensure compliance with the CAP through full CAP implementation and to ensure staff and systems are functioning effectively and efficiently.

- On July 10, 2008, Beverly Overton, Regional Director Health Services was assigned to and is on-site at TCCF to provide executive level health services oversight. Ms. Overtone will remain on-site at TCCF until the CAP is fully implemented and will continue to provide regular oversight after the CAP is fully implemented.

Finally, CCA is continuing their evaluation of the health services management structure at TCCF, Regional CCA, and National CCA levels and indicate that a permanent structure will

be modified or supplemented as appropriate. The goal is to create an internal CCA structure that will provide consistent medical care to California patient-inmates.

5.  <u>Over time, CCA will implement the TCCF remedial plan to all CCA facilities which house California patient-inmates, creating an internal CCA structure which will provide consistent medical care to California patient-inmates.</u>
    As we finalize the numerous issues associated with the CAP, the Office of the Receiver and CCA will meet to discuss the plan to roll-out the CCA CAP to remaining facilities housing California patient-inmates.

*COCF Medical Screening Criteria:*  As a result of the findings of the investigation at TCCF, a decision was made to close the facility to intake in July 2008, which resulted in no additional patient-inmates being transferred into TCCF. In addition, a decision was also made to revisit the existing medical screening criteria used for out-of-state placement. In mid October 2008, a new COCF Screening and Transfer procedure was developed, and then CCA and CDCR requested to re-open TCCF to intake. The request came at a time when CCA had made significant changes in clinical staffing, obtained the appropriate number of licensed independent practitioners at TCCF, and clinical performance appraisals had been completed on all licensed independent practitioners at the facility. The Office of the Receiver made the decision to allow TCCF to begin accepting new patient-inmates; however, the patient-inmates would be re-screened for out-of-state placement using the new screening criteria prior to transferring to TCCF. This process provides the Receiver's staff with feedback as to whether or not the new screening criterion was appropriate prior to rolling it out statewide.

This requirement resulted in the Receiver's nursing staff at CPHCS Headquarters re-screening approximately 410 Unit Health Records for patient-inmates housed at the Florence Correctional Center in Arizona. Three hundred sixty seven inmates, or 90 percent, of the patient-inmates remained eligible for out-of-state placement and were transferred to TCCF. Five patient-inmates were returned to California and 38 inmates had medical problems (i.e. pending appointments, follow-up) that were required to be handled in Arizona prior to them being transferred to TCCF.

Based on the outcome of this process, the new screening criteria will be implemented during the next reporting period.

*"At Risk" Patient-Inmate Returns to California:*  After the re-hospitalization of a patient-inmate in July 2008, there was increased concern about further deficiencies of provider care at TCCF. The Office of the Receiver requested a review of all patient-inmates in the Chronic Care Program at TCCF and an expedited return of those patient-inmates with complex or poorly controlled medical problems. This resulted in 4 out of 27 patient-inmates being returned to California due to their complex or poorly controlled medical condition. Since that time, an additional 54 chronic care program patient-inmates have been reviewed and 5 have returned to California.

A weekly meeting has been scheduled with CCA clinical leadership at all CCA facilities housing California patient-inmates, and the COCF Chief Medical Officer. During this regular meeting,

patient-inmates with chronic diseases or other immediate medical problems are discussed and tracked through resolution of any medical issue. It should be noted that daily discussions also occur when a medical problem arises with a patient-inmate.

*COCF Staffing*: The Office of the Receiver submitted a staffing request for out-of-state transfer monitoring to CDCR and to the Department of Finance on October 28, 2008 (Refer to Appendix 19). CPHCS staff devoted approximately 80 hours developing a proposal which requested resources to fund all aspects of the out-of-state program that result in a fiscal impact to the Office of the Receiver. Although there were four areas of concern identified that have resulted in additional staffing needs, this staffing request only addressed the immediate need for the Office of the Receiver to expand its monitoring team to monitor the health care of all California patient-inmates housed in CCA facilities. To date the Office of the Receiver has not received a formal response the Department of Finance regarding the request. However, CDCR has agreed to provide interim position authority and funding for the requested positions.

According to State officials, the refusal to fund the Receiver's efforts to: 1) adequately screen California prisoners before they transfer out-of-State; and 2) monitor care provided by private prisons, often thousands of miles away, was made by the Governor's office. Despite irrefutable proof that CCA did not comply with the terms of a contract totaling hundreds of millions of dollars (entered into by the Schwarzenegger Administration without competitive bidding), and despite the fact that without assistance of the Receiver, CCA was unable to establish an adequate prison medical care delivery system, the Governor now refuses to fund contract compliance monitoring. Unless the interim funding agreement continues, and unless the funding necessary is provided by the Department of Finance during the May revise process, the Receiver will be forced to seek judicial assistance through contempt process and, unfortunately, forced to limit or end support for out-of-State transfers.

*Community Correctional Facilities:* The Program Oversight Unit staff continue to provide direction and oversight and to monitor the Community Correctional Facilities on a limited basis. Based on workload, the Community Correctional Facilities Handbook was not modified during this reporting period as indicated it would be in the Ninth Quarterly Report; however, the Receiver's clinical staff will take the lead on modifying the screening criteria used for Community Correctional Facilities placement. Consequently, the associated staffing model that will be required to handle the implementation of the new screening criteria will be addressed once the new screening criteria has been developed and approved.

Again, during this reporting period as well as the previous reporting period, the Receiver's ability to properly monitor Community Correctional Facilities has been very limited due to the reallocation of resources required for the investigation and remediation of health care issues in the out-of-state facilities

*Re-entry Facilities Update:* The CDCR continues performing pre-activation activity for the Northern California Re-Entry Facility; however, the anticipated activation has been moved from approximately July 2009 to October 2009. The CPHCS continues to attempt to work collaboratively with CDCR concerning each step of the pre-activation efforts.

# Goal 5. Establish Medical Support Infrastructure

## Objective 5.1.  Establish a Comprehensive, Safe and Efficient Pharmacy Program

Implementation of the pharmacy services *Road Map to Excellence* continues to move forward and to realize progress. The *Road Map* gives priority to achieving improved patient safety and health outcomes, developing an evidence-based pharmacy practice and increasing cost-efficiency. Progress continues to be made in addressing each of these priorities. During this reporting period, activities have included continuation of work to extend the GuardianRx® pharmacy operating system to additional facilities; to bring into operation a central fill pharmacy; to address pharmacy staffing needs and improve staff competencies. The CDCR Pharmacy & Therapeutics (P&T) Committee continues to demonstrate positive momentum in developing clinical and management strategies to administer an effective pharmacy services program. Work has also continued to maintain an active and aggressive purchasing and contracting program aimed at managing medication costs.

### Action 5.1.1. Continue developing the drug formulary for the most commonly prescribed medications

Development and improvement of the Formulary is an ongoing process. The P&T Committee meets monthly to address formulary issues, discuss and approve Disease Medication Management Guidelines, and review and approve pharmacy policies and procedures. The CDCR Formulary is a key health care management tool oriented to the specific needs of the CDCR patient-inmate population, and reflects the goals of standardization of a contemporary, evidence-based, efficient, safe, and cost-effective correctional healthcare system.

During this reporting period, Disease Medication Management Guidelines (DMMG) for Bipolar Disorder and Hepatitis C were prepared and approved. A number of requests for formulary additions were reviewed and approved as a part of the monthly formulary updates. All updates to the formulary are distributed to provider and pharmacist staff, posted to the CPHCS website, published in the pharmacy newsletter (*Pharmacy Horizons*) and made available through the online *Epocrates* web service. The therapeutic interchange program now includes 19 drug classes and all major therapeutic drug classes have been initially reviewed. A cycle of ongoing therapeutic class review will continue to ensure a regular review of all drug classes. The P&T Committee will continue to review Formulary related requests at each of its meetings.

During this reporting period, the Clinical Pharmacy Specialists conducted multiple in-service training sessions for health care providers, nursing and pharmacy staff on pharmacy policies and procedures, formulary changes and the non-formulary process. A renewed emphasis on provider education in formulary processes and medication utilization management was initiated in this reporting period, with participation of the Maxor Medical Director in both medical and mental health clinical leadership meetings. During these meetings, information on the formulary and non-formulary processes was shared and data showing utilization trends and costs was provided. This ongoing effort is intended to increase provider awareness and responsiveness to medication utilization issues.

79

As noted in earlier reports, the establishment of a viable P&T Committee process, the implementation of a CDCR-specific formulary and the development of evidence-based treatment medication guidelines are critical components of achieving improved cost-effectiveness in the system. This integrated approach and responsive contract strategies continue to demonstrate success in cost avoidance. As displayed in Table 17, through November of 2008, Maxor has documented cost avoidance of $14,703,872 from the use of targeted contracting strategies linked to P&T Committee decisions.

**Table 17.**



**Table 17 Results Explanation:** *These categories represent specific P&T Committee initiatives targeting particular drugs or drug classes. Savings calculated by comparing purchases using the actual targeted contract rate to the pre-targeted contract rate.*

Contract, purchase, and inventory monitoring efforts also continue to yield results by avoiding unnecessary costs due to out-of-stock orders and ensuring that the correct contracted items are purchased. Targeted contracts, order management activities, and the implementation of a new wholesaler agreement tailored specifically to address the pharmaceutical needs of the CDCR health care system have contributed to cost avoidance. As displayed in Tables 18 and 19, total

cost avoidance in 2008 through the month of November is more than $29.9 million when compared to prior historical trends.

**Table 18.**



***Table 18 Results Explanation:*** *Cost savings/cost avoidance calculated based on comparing actual wholesaler purchases to prior historical trendline (also based on wholesaler purchases). Data pulled monthly from Wholesaler Purchase data. Maxor began managing pharmacy purchasing in April-May 2007.*

Table 19.



*Table 19 Results Explanation: Savings/Cost Avoidance is calculated by comparing actual wholesaler purchases to prior wholesaler purchase trend line. Maxor began managing pharmacy purchasing in April-May 2007.*

*Influenza Vaccination Program:*    Pharmacy leadership and contracting also supported a statewide influenza vaccination campaign during this reporting period.    Working with the CPCHS clinical leadership and the Public Health Unit, Maxor worked to ensure that sufficient influenza vaccine was procured and distributed in a timely manner to support the 2008 Influenza Vaccination initiative.    More than 120,000 doses of the vaccine were made available and distributed throughout the various CDCR facilities in accordance with pre-determined targeted levels, resulting in a successful influenza vaccination initiative.

**Action 5.1.2. By June 2009, improve pharmacy policies and practices at each institution and complete the roll-out of the GuardianRx® system**

*Pharmacy Policies and Practices:*  During this reporting period, the CDCR P&T Committee has essentially completed its comprehensive review and revision of the Pharmacy Policies and Procedures.  This process involved reviewing and updating the policies to reflect improved practice standards, implement quality control measures and standardize pharmacy processes.  In the last four months of 2008, the P&T Committee approved revisions to Chapter 8-CDCR Drug Formulary, Chapter 15-Confiscated Medications, Chapter 26-Investigational Medications, Chapter 39-Transfer Medications, Chapter 30-Pharmacy Technicians and Ancillary Staff, and

Chapter 34-Heat Risk Medications. In addition, a new policy, Chapter 31-Use of Tricyclic Antidepressants was approved.

Maxor continues to support policy implementation as well as monitor compliance with pharmacy policy and procedure. Clinical Pharmacy Specialists provide in-service and implementation support to facility staff as new procedures are released. During October, the Quarterly Pharmacist-In-Charge (PIC) meeting was well attended. Topics and presentations covered during the meeting included a focus on leadership, review of the centralized hiring process, staff scheduling, purchasing versus dispensing reports, an update on the GuardianRx implementation process, review of the influenza vaccination program and a discussion on procurement of specialty pharmaceuticals.

Additionally, training and review was provided to orient the PICs to the new clinical and managed care reports routinely produced beginning in November. Monthly report sets will be auto-emailed to PICs starting the first week of November for the October reporting period. The expectation is for the PIC to distribute and review the reports with CMO/HCM and clinical staff. These reports include system-wide, facility level and provider level report cards.

*Centralized Hiring:* Also during this reporting period, centralized hiring for Pharmacist I and Pharmacist II positions continued to show improved recruitment results. This effort is intended to assist in filling critical vacancies for pharmacists and includes updated processes for credentialing, coordination of interviews and making final selections. Since centralized hiring began in May 2008, a total of 48 interviews have been held and 26 offers made. Of these 26, 18 Pharmacists have started employment with the CDCR, six candidates declined the offer and two offers are still pending.

*Pharmacy Inspections:* Pharmacy inspections are conducted and documented monthly, with slow but steady progress forward across the state. The number of pharmacies with an inspection rating score of "pass/problem" (not failed) has increased from 21 percent in March 2007 to 64 percent in October 2008. The Maxor team is also continuing to objectively validate the improvements for any facility moving from non-passing to passing status in their monthly inspection reports by conducting independent onsite validations (an important verification process which began in February 2008). Pharmacy inspection status data is displayed in Table 20.

**Table 20.**



***Table 20 Results Explanation:*** *Pharmacy areas are denoted in blue, and non-pharmacy locations (medication administration locations) are denoted in red: Independent Maxor Validation of Monthly Inspection Data began in Feb 2008.*

*Roll-out of the GuardianRx® System:* The GuardianRx® pharmacy operating system has now been successfully implemented in 17 of the 33 CDCR institutions (California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison - San Quentin, California State Prison - Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women, Deuel Vocational Institution, North Kern State Prison, and Kern Valley State Prison). Group training for PICs on the GuardianRx® system and the implementation process has continued as scheduled.

A review of the GuardianRx® implementation schedule conducted by the GuardianRx® Steering Committee resulted in a decision to revise the GuardianRx® roll-out schedule in order to allow time for more training, to allow a reasonable period of time to orient newly recruited nursing implementation leadership staff, to improve efficient use of limited roll-out team resources and to allow facilities with significant infrastructure issues additional time to address those challenges. A revised schedule for the next six conversion sites has been approved, detailing conversion activities through March of 2009. A schedule for the remaining facilities will be developed by the Steering Committee. An additional schedule has been developed to return to

facilities that have already implemented GuardianRx® in order to assess their status, provide supplemental operational oversight and training and to upgrade the facilities with new system functionality. This effort is viewed as an essential component of monitoring and sustainability efforts. The following institutions are scheduled for "Go-Back" training and assessments between November 2008 and April 2009: California Correctional Center, High Desert State Prison, Folsom State Prison, Mule Creek State Prison, California State Prison - San Quentin, California State Prison - Sacramento, California Men's Colony, Chuckawalla Valley State Prison, Ironwood State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, Central California Women's Facility, Valley State Prison for Women, and California Institution for Women.

Maxor is on schedule to improve pharmacy policies and practices at each institution by June 2009 as set forth in the Turnaround Plan of Action. However, the roll-out of the GuardianRx® system has been delayed, as described above, and will not be implemented statewide until late in 2009. As currently planned and resourced, the system will be implemented in 23 of the 33 facilities by the end of March 2009, with the remaining ten facilities to follow between April and the end of 2009. The conversion schedule is under continual review by the GuardianRx® Steering Committee and updates to the schedule will be included in the next Tri-Annual Report.

### Action 5.1.3. By February 2009, establish a central-fill pharmacy

Establishment of the Central Fill Pharmacy is proceeding; however delays in the site selection, site acquisition and contracting processes have delayed the overall completion timeframe. The pre-centralization ambulatory model is being defined and implemented as processes are standardized and validated as part of the GuardianRx® implementation work plan.

During this reporting period, the selection of a Sacramento site location for the proposed Central Fill Facility and the recommendation of an automation vendor to design and equip the facility have been approved. With the final recommendation on the site location approved, the Department of General Services, CDCR and Maxor are working cooperatively to negotiate final lease and/or purchase terms with the property owner.

Concurrently, work has commenced to finalize a contract for automation equipment and services for the Central Fill Pharmacy facility. A draft contract document detailing the specifications and requirements has been prepared in conjunction with attorneys representing the CPHCS and with contracting specialists at CDCR. Final approval of the contract document is pending.

Preliminary work has been initiated on block diagram floor plans for the new pharmacy facility and development of build-out specifications, including the identification of specific site adaptation requirements needed to accommodate the automation system.

Opening of the Central Fill Pharmacy Facility is currently scheduled for September or October 2009.

Maxor's monthly reports for September, October and November 2008 are provided as Appendices 20, 21, and 22 respectively. Maxor's monthly reports, the pharmacy newsletter (*Pharmacy Horizons*), and the Formulary are available for review at the CPHCS website (http://www.cphcs.ca.gov).

## Objective 5.2. Establish Standardized Health Records Practice

*Action 5.2.1. By February 2009, create a roadmap for achieving an effective management system that ensures standardized health records practice in all institutions*

To create a standardized health records practice that supports constitutionally-adequate healthcare system, CDCR's current operations need to be assessed, a roadmap for transformation of the system to support health records best practices must be created, a plan based on the road map must be established, and the plan must be implemented. This Action regarding the roadmap for remediation of health records management is on schedule as set forth in the Turnaround Plan of Action.

During the previous reporting period, the Office of the Receiver selected Sourcecorp, Inc. from a bidder's pool that included 12 highly competitive proposals, to provide health information management (HIM) professional services. Sourcecorp, Inc. initiated their work on September 1, 2008. The contract goal is to transition the current paper-based HIM operation to one based on industry best practices and standards applicable to the correctional environment. The major objectives of this initiative are to remediate health information management within CDCR to enable cost-effective, constitutionally adequate, cost-effective healthcare for all patient-inmates and to standardize records processes as a preparatory step for the eventual implementation of an electronic health record. Specifically, Sourcecorp's scope of work includes establishment of effective leadership and management oversight over CDCR's health record services; preservation of the integrity and continuity of the health record; updated policy and procedures regarding the security and confidentiality of the health record; updated policies and procedures; development of the structure of the HIM organization at the local and Headquarters levels; evaluation and, as necessary, remediation of the physical infrastructure of, the 33 prison health record departments; evaluation of the HIM automation infrastructure of all prison medical record departments; and establishment of management controls over HIM processes.

During this reporting period, SourceCorp, Inc. conducted the Phase I (HIM Assessment) kick-off meeting and successfully completed two out of three of the Phase I deliverables: the Best Practice and Standards Recommendations Report and the Current State Assessment Report. Both documents are available for review at the CPHCS website (http://www.cphcs.ca.gov). In September 2008, the HIM consultant initiated the project with a kick-off meeting and held the first HIM Executive Steering Committee meeting in October 2008. The HIM Best Practice and Standards document/deliverable was submitted in October 2008 and reviewed and approved by the HIM Executive Sponsors and Steering Committee in November 2008. In November 2008, the second deliverable, the Current State Assessment Report, was submitted and subsequently received by the HIM Steering Committee for review and approval in December 2008.

In addition to completing the work on the first two deliverables, the HIM consultant, continues to provide support to other Receiver projects with HIM dependencies. The HIM manager is currently developing the Health Information Privacy Policy; providing consultation for the 10,000 bed construction projects; evaluating electronic document management and scanning solutions; and continuing to conduct HIM assessments at the remaining CDCR facilities. In December 2008, the HIM Manager also met with dental program leadership to discuss concerns and issues associated with the organization of dental forms within the Unit Health Record. HIM subject matter experts are currently engaged with the Dental program staff conducting a business needs assessment to assist with Phase II (HIM Management) remediation planning.

SourceCorp, Inc. is currently working on developing deliverable three – the Remediation Road Map. In the early part of January 2009, the HIM Manager will present an abstract of the HIM Remediation Road Map to the HIM Executive Sponsors and Steering Committee and submit a final draft on January 23, 2009. The electronic document management solution recommendations will be submitted in January 2009 as well. In January and February 2009, the HIM Manager will be conducting remediation plan meetings and will be seeking the Receivership's review and approval on the HIM remediation road map in February 2009.

## <u>Objective 5.3.</u>  Establish Effective Radiology and Laboratory Services

*Action 5.3.1. By August 2008, decide upon strategy to improve medical records, radiology and laboratory services after receiving recommendations from consultants*

<u>Medical Records</u>
The status report on the strategy for improving medical records is detailed above in Goal 5, Objective 5.2.

<u>Radiology Services</u>
In late July, the Receiver's radiology consultants, McKenzie-Stephenson, Inc. presented CPHCS with a comprehensive assessment of CDCR's medical imaging services and a road map for future improvement. Pursuant to the assessment and recommendations made by McKenzie Stephenson, Inc., CPHCS issued a RFP for implementation of a Enterprise Imaging Program as outlined in the roadmap for remediation presented my McKenzie Stephenson, Inc. CPHCS leadership approved the RFP and released it on October 6, 2008.

Consistent with State protocol, a bidder's conference was held on October 17, 2008 to answer questions and clarify CPHCS' expectations. Three respondents delivered proposals on, or before the November 7, 2008 final submission date. A selection committee composed of medical, dental and operations leadership reviewed all proposals. The selection committee convened on November 25, 2008 for a comparative discussion of findings on the submitted proposals. The proposals were discussed at length, with one proposal emerging as the clear choice for contract award based on staff credentials, project approach and projected costs to implement.

The committee prepared a list of questions for the successful bidder to answer during a scheduled December 8, 2008 "Question and Answer" session. The bidder attended the December 8, 2008, meeting with their proposed senior staff members and answered all questions to the satisfaction of the selection committee during the meeting, resulting in a formal Intent to Award announcement.

A formal Agreement is currently in development and is anticipated to be ready for the Receiver's review and approval in early January 2009. The winning bidder will be announced after both parties have signed the Agreement.

The RFP is available for review at the CPHCS website (http://www.cphcs.ca.gov). All bidder proposals will be available for review at the same website location after the Agreement has been signed by all parties.

Laboratory Services

As reported in the Ninth Quarterly Report, the Receiver has achieved the objective of forming a strategy for laboratory services. This objective was achieved through the Receiver's adoption of the Navigant Report recommendations. The next phase of this objective is the implementation of those recommendations.

Pursuant to the recommendations made by Navigant, Inc., CPHCS has prepared a RFP for implementation of system-wide lab management services. CPHCS leadership plans to approve and release this RFP in January 2009.

Delays in establishing the appropriate RCEA positions by SPB continue to present a challenge in securing administrative leadership. The candidate search for a CMO, Laboratory Services, resulted in few viable candidates and the Receiver is no longer pursing this option. In the interim, CPHCS has awarded Nichols Management Group a contract for consulting services to provide support and make recommendations regarding utilization of space, staffing, workflow processes, supplies and equipment procurement, and other technical assistance for projects that impact clinical laboratory services.

**Objective 5.4.** **Establish Clinical Information Systems**

*Action 5.4.1. By July 2009, establish a clinical data repository available to all institutions as the foundation for all other health information technology systems*

The clinical data repository project is on schedule, as set forth in the Turnaround Plan of Action. The goal of the project is to store key patient health information, such as current medications, allergies, lab results, encounters, problems, etc., in a standardized manner and make this information available to providers at the point-of-care to support clinical decision making.

At the end of September 2008, the clinical data repository project team produced the first project deliverable – "Clinical Data Repository and Portal Solution Outline" document. The "Solution

88

Outline" deliverable established the overall goals, design, and requirements of the CDR, including use cases, logical and physical architectures of the solution, functional and non-functional requirements, etc. It also documented other key aspects of the project, such as assumptions, dependencies, risk assessment, and strategies related to training, testing, etc. The "Solution Outline" deliverable was accepted by the Receivership, and the CDR project team subsequently initiated the second phase of the project - Solution Design.

During Solution Design, the CDR project team is focused on building-out the design details of the solution. The team has been conducting in-depth discussions and interviews with numerous stakeholders and business partners. The Receivership established a clinical user advisory group to assist with the development of functional requirements and has continued to engage this group to confirm these requirements and assist the project's development team in the design of the user interface. The CDR project team initiated and has had ongoing discussions with key trading partners - Foundation Laboratory, Maxor, Quest Diagnostics - regarding the electronic exchange of patient allergy, laboratory, and medication data. In support of this effort, the Receivership's health informatics team has been establishing the preliminary set of healthcare terminology and messaging standards that will enable interoperability of clinical information systems and health information exchange. Finally, the team is meeting with CDCR's Enterprise Information Services (EIS) group to work out the mechanisms for the exchange of patient information critical to clinical operations.

Also during this reporting period, the CDR project team commenced other key activities. First, the team began implementing the hardware/software environments necessary to support the CDR. To date, the development environment is complete, thereby allowing the development team to begin their programming efforts. The team is now focusing on implementing the various test environments and, upon completion, will shift its efforts to the production environment. Second, the CDR project team has, in conjunction with SourceCorp, Inc., began establishing the appropriate policies to ensure the privacy and security of patients' medical records. Third, the CDR team began coordinating its efforts with the Receivership's data center provider - Verizon Business - to ensure that the data center, as it pertains to the CDR project, is properly provisioned and that the appropriate system management, high availability, and disaster recovery plans are in place.

The Receivership intends to pilot the CDR solution at Central California Women's Facility, Valley State Prison for Women, and California State Prison - Los Angeles County. In January 2009, members of the CDR project team will conduct site visits at these institutions to educate clinical leadership and staff on the solution, initiate preparations for the pilot, and establish the change management foundation critical to the successful implementation of any information system. As part of the preparations for the pilot, the CDR project team is also in the planning phase for the delivery of end-user computing devices (e.g., workstations, laptops, tablets, etc.) to the three pilot institutions prior to CDR solution "Go-Live." The team is currently researching manufacturers of medical-grade computing devices in anticipation of procuring/deploying the appropriate devices by March 2009.

The "Solution Design" phase of the project is approximately three and a half months in duration and is scheduled to be completed by mid-January 2009. The key deliverable for this phase of the project is a detailed "Solution Design" document which upon Receivership approval, will be the blueprint for the CDR project team's subsequent system build efforts.

**Objective 5.5.    Expand and Improve Telemedicine Capabilities**

*Action 5.5.1. By September 2008, secure strong leadership for the telemedicine program to expand the use of telemedicine and upgrade CDCR's telemedicine technology infrastructure*

This action item is partially completed. As reported in the Ninth Quarterly Report, due to the delays created by SPB concerning the establishment of certain clinical executive RCEA positions, the Receiver has been unable to recruit an executive leader for the Telemedicine Program in a timely manner. The SPB has not yet fully remedied this problem. However, in December 2008 a first line supervisor was hired for the Office of Telemedicine Services. In addition, a telemedicine steering committee will convene in January of 2009 to provide ongoing leadership and oversight for the expansion of telemedicine services.

During this reporting period, the Office of Telemedicine Services have been involved with several of the health care IT projects. For example, projects such the CDR, network infrastructure, scheduling, and electronic health records will support the expansion of telemedicine services. The roll-out of these components within the telemedicine program is dependent upon the scheduled roll-out of technology capabilities at the institutional level. As noted in the Ninth Quarterly Report, a majority of the recommendations contained in the University of Texas Medical Branch's roadmap still cannot be implemented until a new and robust health care information network has been rolled-out at all 33 institutions.

The Office of Telemedicine Services is currently sponsoring the "Provider On-Boarding" project. This is the process by which a network provider (hospital, medical center or physician) is brought on-board to provide telemedicine services to the patient-inmate population of the CDCR. In November 2008, Alvarado Hospital (in San Diego) signed a contract to be the pilot program for this project. The scheduled start date is January 2009 to begin providing telemedicine services to patient-inmates in five southern region institutions: Richard J. Donovan Correctional Facility, Ironwood State Prison, Chuckawalla Valley State Prison, Calipatria State Prison and California State Prison - Centinela. The initial specialty services being offered during this pilot are dermatology, neurology, endocrinology and gastrointestinal. Additional institutions and specialty services will be added, after the initial pilot period has been completed and evaluated.

In an effort to increase services and offer additional medical specialties, CPHCS has established two additional institutional hubs. These provider centers, or hubs, are located at California State Prison - Los Angeles County and Substance Abuse Treatment Facility. The California State Prison - Los Angeles County hub provides rheumatology services to 21 institutions, and also provides orthopedic services to five institutions. The Substance Abuse Treatment Facility hub

currently provides infectious disease services to two institutions. In another effort to increase services and expand offered specialties, the Office of Telemedicine Services is currently distributing equipment and providing training for telemedicine cardiology which will be available in January 2009. This service will be provided by UC Davis and administered to the following six institutions: High Desert State Prison, Ironwood State Prison, Chuckawalla Valley State Prison, California State Prison - Corcoran, California Correctional Center, and North Kern State Prison.

*Telemedicine Statistics:* The telemedicine program reports the number of medical specialty patient-inmate visits have increased 41 percent from October 2007 (from 859 visits in October 2007 to 1453 visits in October 2008). The rise in the reported number of visits can be attributed to several factors: (1) the increase in specialty services being offered; (2) the addition of California State Prison - Los Angeles County and Substance Abuse Treatment Facility as hub sites; (3) University of California San Francisco's (also a hub) data being included in the 2008 totals; and (4) of the deployment of telemedicine technology at all 33 institutions.

# Goal 6. Provide for Necessary Clinical, Administrative and Housing Facilities

**Objective 6.1.**  Upgrade administrative and clinical facilities at each of CDCR's 33 prison locations to provide patient-inmates with appropriate access to care

As previously referenced, the Governor and Attorney General's recent "bait and switch" strategy jeopardizes the Receiver's efforts to provide the appropriate treatment space and housing for class members in the four pending federal court class actions (*Armstrong, Coleman, Perez,* and *Plata*), including the most seriously ill, mentally ill, aged, and disabled prisoners. Just as significant, the failure to address treatment space will significantly increase the cost of care, requiring thousands of prisoners to be placed in local community hospitals each year, preventing effective use of telemedicine, precluding plans to bring outside specialists into existing prisons, and thereby forcing CDCR to continue to spend hundreds of millions per year by sending prisoners from institutions to providers in the community. This "penny wise pound foolish" response by the State's leadership serves only short-term political expediencies, dropping the bill for the Schwarzenegger Administration's neglect squarely on the shoulders of the California taxpayers.

> *Action 6.1.1. By January 2010, complete assessment and planning for upgraded administrative and clinical facilities at each of CDCR's 33 institutions.*

The assessments and planning to renovate or build new clinical space at each of the 33 prisons continues. The Facility Master Plans for the Correctional Training Facility, California Rehabilitation Center and Mule Creek State Prison (the second, third, and fourth prisons respectively to undergo the planning process) have proceeded into implementation of the design and construction phase. The Receiver filed and received in July 2008 Waivers of State Law from the court. Implementation subsequently began on August 8, 2008 for Mule Creek State Prison, August 22, 2008 for Correctional Training Facility, and September 12, 2008 for California Rehabilitation Center.

As reported in the Ninth Quarterly Report, final approval of the next four Master Plans for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison, and completion of the subsequent four Master Plan Reports for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center was suspended as a result of recent considerations to integrate mental health and possibly dental space needs into the Master Plans. This effort is intended to specifically determine standards for the mental health space needs in light of the 5,000 new mental health beds being planned by the Receiver within the new health care facilities. As these new beds come on-line over the next three to five years, mental health program space needs in the existing prisons will change. Plans must take into account all these factors.

During the month of September 2008, a strategy was defined to gather mental health and dental program data and information to allow the planning team to evaluate the impact on the overall

92

scope and budget of the program, in the event both programs are integrated into the planning and implemented concurrent with the medical program. Mental health and dental program definition and modeling of the remaining 20 prisons yet to be master planned was completed in late September 2008. This will allow the development of a conceptual program budget model to describe the probable scope and cost that may be realized if all three programs were integrated into a single program. The resulting conceptual budget model was presented to the Receiver on October 20, 2008.

Following completion of the conceptual budget model, the Receiver requested that the recently defined mental health program be included in the completed master plans that have not received final approval and that consideration be given to the possible location and integration of dental as a potential future programmatic addition to the planning. To accomplish this end, the planning teams revisited and amended the four completed Master Plans for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison and developed associated addenda, as well as revised the four Master Plan Reports pending approval for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center. This additional effort included re-visiting each of the eight institutions, meeting with staff and revising some of the projects originally defined. The addenda for California Institution for Women, California Institution for Men, Richard J. Donovan Correctional Facility, and Folsom State Prison and the Master Plan Reports for California State Prison - Sacramento, California Correctional Center, High Desert State Prison, and Sierra Conservation Center were approved by each respective Warden, Associate Warden of Health Care Services, Chief Medical Officer, and Director of Nursing. The addenda and Master Plan Reports were then reviewed by an architectural consultant and submitted to the Receiver in December 2008.

As a result of the above conceptual budget model and revised Master Plans, the Master Schedule was revised to adjust the master planning activities based on the interim delay to begin to integrate dental and mental health programs into each master plan and develop a program budget. Although, the completion of master planning activities is still projected for January 2010. Master planning was reinitiated on December 3, 2008 with the initiation of planning at California State Prison - Solano, and continued with the initiation of planning at California Mens Colony on December 9, 2008 and Calipatria State Prison on December 16, 2008. Master planning efforts continue on schedule for completion in January, 2010.

*Salinas Valley Psychiatric Program (Intermediate Care Facility):* It was reported in the Ninth Quarterly Report that the special planning project to address inadequate treatment space at the Salinas Valley Psychiatric Program (Intermediate Care Facility) has been completed and was submitted to the Receiver for approval. The plan is completed and approved, but is now without funding. Therefore, there has been no progress during the reporting period.

***Action 6.1.2. By January 2012, complete construction of upgraded administrative and clinical facilities at each of CDCR's 33 institutions***

Presently, San Quentin State Prison, Avenal State Prison, Mule Creek State Prison, Correctional Training Facility, Soledad, and Correctional Rehabilitation Center are the prisons in the implementation phase of design and construction. The 90-day suspension and revisions to the Master Plans has affected the Master Schedule as it relates to completion of construction across the 33 institutions. In accordance with this delay, the Master Schedule has additionally been revised to project that the submitted Master Plan reports will be subsequently approved in January 2009 rather than October 2008 and will proceed with the development of site assessments incrementally in three week intervals. The overall duration of the implementation phase that includes bid and award and construction has additionally been modified and increased in an attempt to more accurately anticipate the project completion based on the increased program scope and budget coupled with the contractual approval process. The current schedule is predicated on the stated approval of the issued Master Plans and their subsequent authorization into bridging documents and bidding. This schedule modification revises the completion of construction from January 2012 by a year to December 2012. An updated Conceptual Master Schedule has been included in this report as Appendix 23.

Since approval of the Master Plan Reports for Mule Creek State Prison, Correctional Training Facility, Soledad, and Correctional Rehabilitation Center, further development and refinement of health services staff organization structures and space needs have occurred. These modifications have been applied to planning efforts at subsequently planned institutions. In order to accommodate for the planned staff at Mule Creek State Prison, Correctional Training Facility, Soledad, and Correctional Rehabilitation Center, approved master plan projects have been revised. The addenda include the addition of space to support the Health Care Access Unit staffing package and add administrative space to support the anticipated medical staff organization at the institution. Addenda have been completed and are in the approval process with CDCR executive staff and the Receiver.

*Upgrade Construction at Avenal State Prison:* During this reporting period, the implementation phase of construction at Avenal State Prison proceeded. The report for Valley Fever Mitigation is complete and is in the final approval process. Communication and training materials to support the report have been updated and are in the process of implementation. Mitigation recommendations by the occupational health and safety consultant have been included in bid documents prepared for ASP projects and will be contractually required to be implemented by the contractor during related construction activities. Bids were received for the modular health services clinics, administration and Administrative Segregation Unit clinic buildings project (ASP-04) and the contract was awarded. A pre-construction meeting was held on December 4, 2008 and a Notice to Proceed was issued on December 15, 2008. The contractor has started completion of the construction documents and critical submittals. Bid documents for the medical supply warehouse are complete. The project is on hold as various supply chain and "just-in-time" ordering options are analyzed and defined for use statewide that will validate the extent of physical warehouse space each institution should need once implemented. The Infirmary and Pharmacy renovation (ASP-03) is in progress, Building 395 is substantially complete and being

94

used as a temporary TTA to support the renovation of the TTA within Building 390. Renovations in Building 390 are in progress and on schedule at this time. Proposals for the Pharmacy furnishings have been received and a recommendation and award is in preparation for December 2008 to allow installation in advance of the Pharmacy Guardian Rx® implementation in March 2009. Design-build documents are in development for the new projects added by Addendum No. 1 to the Master Plan Report and include expansion of the Medical Records building, and canopies for the medication distribution areas outside the facility clinics. The Health Care Access Unit, Administrative Segregation Unit Clinic and Inmate Waiting project components of Addendum No. 1 have been incorporated into the project scope of Project ASP-04.

The bridging document phase of implementation for Mule Creek State Prison, Correctional Training Facility, Soledad, and Correctional Rehabilitation Center is ongoing. Preliminary field geotechnical and survey work has been completed and is being integrated into the documents. Hazardous material assessments are in progress with procedures to be included within the documents prior to bidding. Correctional Rehabilitation Center's first bid package to demolish two existing dormitory buildings has been completed and prepared for bidding, but it has been held to allow the Office of the Receiver to verify funds are available to support the construction and to ensure CDCR plans to continue operation and use of this facility as a State prison in the future. The bridging documents for the second bid package for Correctional Rehabilitation Center and the bid packages for Mule Creek State Prison and Correctional Training Facility, Soledad are on schedule to be finalized in January 2009 and distributed for bid. Considering the limitation in current funds, a determination of funding capacity and priority for these bid packages will need to be identified and confirmed by the Office of the Receiver to allow authorization for each to be distributed for bidding. Additional delays due to lack of funding will further impact the already delayed projected completion of December 2012.

While upgrade planning is proceeding in a timely manner, the actual upgrade construction program for all prisons is not on schedule as set forth in the Turnaround Plan of Action due to the Schwarzenegger Administration's failure to fund the prison upgrade construction program.

For additional information, Vanir Construction Management's monthly reports for Avenal State Prison are included for August, September, and October 2008 as Appendices 24, 25, and 26 respectively.

**Objective 6.2.  Expand administrative, clinical and housing facilities to serve up to 10,000 patient-inmates with medical and/or mental health needs**

In September 2008, the Receiver established a management structure responsible for planning, designing, activating, and operating the seven new health care facilities currently under development to serve up to 10,000 patient-inmates. This management structure will represent a much leaner and flat organization than the facility planning and activation program currently utilized by CDCR and other State agencies. The Receiver will file a special report comparing his transition structure to other State organizations by the second quarter of 2009.

*Integrated Care*:  On September 1, 2008, an Integrated Care (IC) Team, consisting of clinical, custody, classifications, and rehabilitation staff, moved forward with three primary directives. Comprised of Receiver's medical staff, CDCR Dental and Mental health staff, court representatives, and clinicians from the Department of Mental Health, the IC Team will first develop an integrated health care program model for seven new facilities that will deliver medical, mental health, dental, and rehabilitation services to patients from California's prison system.  These health care programs, based on "Team-based Patient Care," will be provided in the prototypical facility and will include the following: standardized goals, objectives, and outcomes; similar program structure and staffing; and a literature search of evidence-based best practices for staff.  Second, the IC Team will work closely with the Joint Venture Integrated Project Delivery Team to develop a draft facility design that is as streamlined and efficient as possible, requiring the least possible resources to activate, open, and operate on a long-term basis.  Third, the IC Team will develop an efficient staffing structure to support the integrated health care program model.

An important program component of IC Team includes evidenced-based rehabilitation program opportunities for patient-inmates in the seven new health care facilities.  State mandated rehabilitation programs developed for the facilities will be designed to improve outcomes, reduce recidivism, and will be based on the individual patient's needs.  Program designs and delivery systems will be created consistent with the core program values. Elements of the new rehabilitation model will include an evidenced-based risk and needs assessment completed for each patient upon entry into the facility.  The specific programs offered will target the patient's crime-specific needs and include vocational training, education, substance abuse treatment, life skills, faith-based programs, re-entry preparation and transition services.

*Rehabilitation Services Advisory Council:*  At present, the State is unable to develop and put in real-life-practice any effective rehabilitation program.  Therefore, a Director of Rehabilitation position was established to plan and develop the Rehabilitation concepts and program framework for the seven new facilities.  The Receiver also created a Rehabilitation Services Advisory Council to provide input and advice on rehabilitation program development. The Rehabilitation Services Advisory Council Charter is included as Appendix 27.  Council members were recruited nationally to ensure that effective, evidenced-based programs are established that will successfully reduce recidivism.  Development of rehabilitation model concepts has begun. During the first quarter of 2009, the Rehabilitation Services Advisory Council members will be appointed and the first Rehabilitation Services Advisory Council meeting will be held.

*Administrative Services and Facilities*:  On September 1, 2008, an Administrative Services and Facilities Team was established and is charged with three primary directives.  First, the Administrative Services and Facilities Team will develop an administrative services and facility operations model that supports the health care mission of seven new facilities.  The administrative services model will be designed to minimize the practice of housing administrative functions within a secure perimeter in order to reduce the construction footprint and costs.  A new procurement model is being explored to reduce the costs associated with purchasing, inventory, and storage, including a reduction of warehouse space construction. Second, the Administrative Services and Facilities Team will work collaboratively with the Joint

Venture Integrated Project Delivery Teams to produce a facility design that supports the security, administration, and facility operations. During this reporting period, the Administrative Services and Facilities Team has identified more than 20 design-impact areas, facilitated executive leadership decisions for each area, and is in the process of working with the Joint Venture Integrated Project Delivery Team to incorporate the modifications into the prototypical facility design. Third, the Administrative Services and Facilities Team will develop an efficient staffing structure to support the facility operations and provide a safe and secure environment for patient-inmates and staff.

*Custody Services*: The Classification System to be used in the new facilities will be based upon the current CDCR system used to determine custody levels but will also include a clinical and behavioral assessment in order to determine actual bed placement within the new health care facilities.

The new facilities will incorporate principles of "direct supervision," allowing for patient-inmate management by continual direct contact between patient-inmates and staff. Officers posted inside each housing unit provide frequent, non-scheduled continuous observation of, and personal interaction with each patient-inmate. Rather than using CDCR's approach to inmate management by positioning officers in elevated gun posts or secure control rooms, the principles of direct supervision allow the floor or housing officer to directly interact with, rather than avoid contact, the patient-inmate population. The direct supervision approach is proactive rather than reactive to violence. Officers will know the patient-inmate populations they are supervising and will be able to intervene prior to disturbances, thereby, limiting lock-down situations that contribute to delays in services provided to patient-inmates. The direct supervision model and the facility design will greatly improve lines of sight for all staff in order to reduce vandalism, assaults, and suicides.

*Activation Planning:* During this reporting period, CPHCS staff have researched and identified activation management structures in the Federal Bureau of Prisons with private contractors and with subject matter experts who participated in previous CDCR facility activations. In addition to researching various prison activation models, the staff consulted with experts in hospital organizational development and activations inside and outside of California. Specifically, the Deputy Commissioner for the New York State's Regional Medical Model has provided access to New York medical staff to assist with the issues involved in their unit activation and the Arkansas Deputy Warden assigned to the medical and diagnostic unit has provided valuable activation insight as well. The URS/BLL and CPHCS staff have conducted site visits to the Federal Bureau of Prisons, Butner Federal Medical Center in North Carolina, as well as the Faulkenburg and Orient Road Facilities in Florida. These process reviews will provide the activation teams with solid guiding principles in planning and implementing CPHCF activation protocols.

Additionally, to eliminate processes that require extensive layers of manual labor, employ antiquated technology systems that do not interface, and cause additional workload, staffing, and costly health care mistakes, the Receiver has been exploring the use of modern IT in the new facilities to gain efficiencies. Medically-focused IT projects identified for implementation in the

97

seven new facilities include, but are not limited to the following: Maxor Pharmacy/ GuardianRx® system; Document Scanning and Imaging; Health Care Scheduling and Bed Management System; Health Information Management; Information Security and Privacy, and Laboratory Information System.

*Completing an efficient, effective prototypical design:* Collectively, the Receiver's project teams have established a process for Target Value Design (TVD) to be applied to the preliminary facility design. Beginning in January 2009, the Teams will collectively review the preliminary design and conduct focused streamlining sessions to improve operational efficiencies, reduce construction costs, improve operating costs, and identify the correct staffing needed to ensure constitutionally adequate care is provided to patient-inmates. The IC Team will incorporate the integrated care model to ensure patient care and staffing are refined to maximize efficiency and minimize costs. The ASF Team will incorporate a security, administrative, and facility operational model into the TVD sessions to ensure maximum efficiencies are met.

The first draft prototypical facility design to be presented to the Receiver in March 2009, will include the security plan, the integrated health care program model, the facility operational plan, and the facility staffing proposal.

*Workforce Development:* A significant number of health care professionals will be necessary to staff the seven new health care facilities including LVNs and Psychiatric Technicians. To prepare for the future need for these classifications, a prototype apprenticeship model for training LVNs and Psych Techs was initiated in September 2008. "The Apprenticeship Program," will utilize community colleges to provide accredited certificate programs for clinical rotations and the California Community College Chancellor's Office for Related and Supplemental Instruction costs. In addition, a meeting was held at Richard J. Donovan Correctional Facility to work out process details for using prisons for clinical rotations with stakeholders from the community colleges, CDCR, and CPHCS. A second meeting will be held in January 2009 to discuss and agree on issues that must be addressed to initiate the program.

### Action 6.2.1. Complete pre-planning activities on all sites as quickly as possible

Preplanning activities for the construction of new health care facilities are progressing. URS/Bovis Lend Lease Joint Venture (URS/BLLJV) has commenced California Environmental Quality Act (CEQA) activities on six potential CPHCF sites. A Draft Environmental Impact Report (EIR) for Stockton was issued on October 24, 2008, and was circulated for public comment for 45 days. A public meeting regarding the Draft EIR was conducted on November 10, 2008. The comment period closed on December 8, 2008. A Draft EIR for San Diego was issued on November 4, 2008, and was circulated for public comment for 45 days. A public meeting regarding the Draft EIR was conducted on November 18, 2008. The comment period closed on December 19, 2008. A Final EIR for San Diego is anticipated to be complete on February 18, 2009, and the Final EIR is expected to be certified on February 27, 2009.

Notices of Preparation for EIRs have been issued and circulated for public comment for prospective sites at Folsom, Chino, Vacaville, and Ventura. Public meetings were held in each

of these communities between October 2, 2008 and December 10, 2008. Draft EIRs are anticipated to be published for Folsom, Chino, Vacaville, and Ventura in spring, 2009, with Final EIRs published and certified in the fall 2009.

URS/BLLJV conducted analysis of several additional sites, and it is anticipated that CEQA analysis for one or more of these additional sites will be conducted.

### Action 6.2.2. By February 2009, begin construction at first site

Due to the lack of funding, the schedule for groundbreaking will not be met.

### Action 6.2.3. By July 2013, complete execution of phased construction program

Due to a lack of funding, the schedule for completion will not be met.

## Objective 6.3.    Complete Construction at San Quentin State Prison

Construction at San Quentin consists of Three Construction Packages.  Construction Packages One and Two are detailed under Action 6.3.1 and Construction Package Three is detailed under Action 6.3.2.

### Action 6.3.1. By December 2008, complete all construction except for the Central Health Services Facility

Six of eight projects in Construction Package One at San Quentin State Prison are complete.  The completed projects are:  Project One- Personnel Offices, Project Two- Replacement Parking Spaces; Project Three- Relocate Exercise Yard; Project Five- the Triage and Treatment Area Renovation; Project Seven- Clinic Heat Project, and Project Eight- Addition of Re-locatable Office Space Trailer.

The following are updates on the two projects completed during this reporting period:

1.  Construction on Project One:

Personnel Offices was complete on December 19, 2008 with a certificate of occupancy granted by the State Fire Marshal on December 21, 2008.  Completion was delayed beyond the original completion date of October, 2008 as a result of multiple site conditions and site related changes that impacted completion of paving.  The most significant delay contributing to 23 days of non-compensatory time extension to the contract included the installation of a sewer line that was required to be performed during limited work hours to keep institution operations and traffic flow open without impact by construction activities. Furnishings, equipment and staff are in preparation for move in.

99

2.  Project Seven:

Clinic Heat Projects was recently completed and consists of installing space heating in the Adjustment Center Clinic, North Segregation Clinic, TTA and installation of an electrical panel at the medical staff modular office for emergency power. The project was completed on November 12, 2008

The following are updates on the two remaining projects in Construction Package One:

1.  Project Four:

Medical Supply Warehouse, is in the construction phase. Construction documents are complete and approved for construction. Construction of the foundation system is complete. The metal deck for the elevated slab was complete at the end of December 2008 and placement of the concrete slab was completed during the first week of January 2009. The pre-engineered building has been delivered to the site and erection will begin during January 2009. Contaminated soil and water was encountered during foundation work, requiring testing protocols to be initiated followed by determination of disposal requirements. A 49-day time extension was negotiated with the contractor as part of the change order for the contaminated materials, adjusting the contract completion date to April 15, 2009.

2.  Project Six:

East and West Block Rotunda Clinics, commenced construction on March 17, 2008 and is continuing to run approximately 60 days behind schedule. A unilateral change order for 43 days was issued to the contractor for construction impacts resulting from issues with the existing electrical panels and the electrical cut-overs. The revised contract completion date was December 24, 2008. The contractor has completed the perimeter clinic construction and enclosure and has progressed into interior framing and system rough-in within the existing rotunda area and the clinic addition. System and interior finishes are anticipated in January and February, 2009. Vanir continues to work closely with the contractor in the implementation of sequencing scenarios to recover as much lost time as possible, but due to limited resources to support timely completion of remaining contract work the best realistic completion date at this time is March 2009.

In reference to Construction Package Two, the final project within Construction Package Three is the Upper Yard Medical Modular. Construction was complete on September 16, 2008 and the modulars were occupied shortly thereafter. Staff are operating Specialty and provider clinics on the clinic side and medical staff continue to occupy the administrative side.

***Action 6.3.2. By April 2010, complete construction of the Central Health Services Facility***

Construction Package Three, the Central Health Services Facility at San Quentin State Prison, was progressing well and was ahead of schedule. Installation of the pre-cast exterior wall panels is substantially complete and final window panels and roofing are in final stages of completion to

allow the building interior to be weatherized. Cold temperatures in December 2008 have affected the contractor's ability to complete all roofing. Critical interior walls have been constructed throughout the building. Building system rough-in of mechanical and plumbing has been completed on the 2nd floor and continues on the 3rd, 4th and 5th floors. Security wall panel systems have started on the 2nd floor and will continue behind system rough-in on the upper floors.

Staff have been successful in ensuring timely payments to our construction contractor for the San Quentin State Prison Central Health Services Building in order to support their completion of this essential building. This project was authorized by the Legislature to be funded with State Public Works Board lease revenue bonds and similar to other State bond funded projects, has been temporarily funded with a loan from the Pooled Money Investment Account. This successful effort is now compromised by a decision by the State Pooled Money Investment Board to curtail payments from the Pooled Money Investment Account, which, if not reversed, will stop the Central Health Services Building dead in its tracks, a stoppage which will cost California taxpayers $10 million over and above litigated related cost. In addition, a new facility designated to care for medical, mental health, and dental patients will be delayed indefinitely, a decision which may well jeopardize the use of San Quentin as a Reception Center beyond Spring 2009.

For additional information, Vanir Construction Management's monthly reports for San Quentin State Prison for August, September, October, and November 2008 are included as Appendices 28, 29, 30, and 31 respectively.

# Section 5
# Additional Successes Achieved by the Receiver

### A.    Status of the Project Management Office

The efforts to improve the access and quality of health care for California's inmates requires initiation of many projects to improve business processes, clinical procedures and services and IT solutions. Project Management Offices (PMO) exist across the globe in most industries to manage organizational projects and was selected to improve the project, program and portfolio management for all CPHCS projects related to the Turnaround Plan of Action. In April of 2008, the Receiver assembled a team to develop the infrastructure to build, deploy and support the PMO efforts. Project management processes were developed; a best-practice project management methodology was adopted; a comprehensive library of templates was published; and Clarity (an electronic project and portfolio management system) was implemented. State and contracted project managers and staff were hired to manage the PMO and all CPHCS projects. Since the PMO was initiated, the number of projects has grown from six in April 2008, to twenty-five in August 2008, to forty-five in December 2008. Also, in December 2008, a CPHCS "Satellite PMO," at the URS/BLLJV offices was staffed and deployed to support the projects of the 10,000 Bed Program.

Between August and November 2008, 752 resumes from 335 vendor proposal responses were reviewed by the PMO, over 80 personnel were interviewed and finally 25 project managers and 7 subject matter experts were hired. CPHCS executives interviewed candidates from throughout California, as well as from across the country including New York, Michigan, Washington, Oregon, and Arizona. The top candidates were hired at reasonable, competitive hourly rates. As of the close of this reporting period, more than 40 project managers and several IT subject matter experts are contracted staff working within the PMO.

The 45 various projects overseen by the fully operational and now mature PMO are summarized in the PMO Executive Data Project Sheets for December 2008. (Refer to Appendix 32.) Each CPHCS project is aligned with specific Goals and Objectives in the Turnaround Plan of Action. Project managers are managing IT, clinical, and business reengineering projects and are maintaining project schedules and required project management artifacts.

The PMO implemented tools to manage our projects in real-time. For example, the project and portfolio management system Clarity provides dashboard views of project information and working collaboration environments necessary to the high performing project teams. From the data stored in Clarity, the PMO develops ongoing monthly reports and schedules that are distributed to CPHCS management and project managers. Regular PMO monthly status meetings are also held with management and all project managers for regular information sharing, project management direction, and project dependency discussions.

The PMO has become a valuable and necessary tool which brings structure and visibility to projects and project management at CPHCS and promotes and improves communication and collaboration among stakeholders and across organizations impacted by our projects.

## B.    2008 Best of California Award Winner:  J. Clark Kelso

In December 2008, the Receiver was selected by e.Republic, Inc. as the 2008 Best of California Award Winner in the category of *Leadership in Solving Business and Policy Problems through Technology.*  This honor is awarded to an Agency or department executive who has demonstrated extraordinary vision and leadership in solving business problems through the use of technology. The Receiver was awarded for his introduction of an IT program and project management regimen that will result in a technology-based organizational transformation. CPHCS is implementing the first comprehensive health information management system in State government through the technology-enabled Access to Care Initiative. This system will include pharmacy, imaging and laboratory, telemedicine, medical records and scheduling, health information, bed and facility management, and network and data center services to support these services.

The Receiver accepted his Best of California award at a ceremony held at the Sacramento Convention Center on December 3, 2008. During his acceptance speech, he acknowledged the efforts of CPHCS's IT management team in achieving, in less than one year, a level of technological enablement and efficiency planning not often seen on such a large scale in civil service.  The Receiver also recognized that the IT leadership team and our dedicated and hardworking clinical and business partners fully understand the importance of ongoing efforts to help bring the level of health care in California's Prison System up to constitutionally acceptable standards. The planned  application of IT in the prison medical programs and system will not only streamline the patient care process but will also significantly reduce costs to California's taxpayers.

## C.    *Turnaround Lifeline* Newsletter to Staff

The Receiver's Communications Department concluded this reporting period by distributing the January 2009 issue of the *Turnaround Lifeline* Newsletter.  This is the sixth issue of the *Turnaround Lifeline.*  In the January 2009 edition, an interactive link is included on the electronic version of the *Turnaround Lifeline* which allows readers to see and hear a video of the Receiver explaining the established minimum constitutional standard for California prison health care reform.  This new, interactive component of the *Turnaround Lifeline* was achieved using existing resources and had no associated costs.  Similar interactive components are planned for future issues.

In general, content for the *Turnaround Lifeline* is chosen by a multi-disciplinary advisory committee of CPHCS staff which meets monthly and whose members suggest story ideas.  All readers are also regularly invited to send suggestions for "Above and Beyond" features, story ideas, and comments through a special e-mail address directed to Communications staff.  The goal is to foster two-way communication through the Newsletter, so that field staff will know

103

that their efforts are appreciated, their concerns are taken into account, and that help is on the way.

*Turnaround Lifeline* Newsletters for October, November and December 2008 and January 2009 are included as Appendices 33, 34, 35, and 36 respectively. A sampling of past stories from this reporting period is as follows:

- Death Rates Decline Significantly (October 2008)
- Receiver's Corner: Justice Will be Done (November 2008)
- Avenal ADA Team Vastly Improves Service (November 2008)
- Construction & Projects will Save Lives, Boost Economy, & Save Taxpayers' Money (December 2008)
- Folsom Health Care Team Raises the Bar, Behind Bars (December 2008)
- Hep-C Training Begins for First Responders (December 2008)
- Receiver & IT Team Awarded Best of California Honor (January 2009)

15,000 hard copies of each issue of the *Turnaround Lifeline* are printed by the Receivership. The Newsletter was previously printed at the Reproduction Unit at CDCR Headquarters; however, we have minimized costs by printing the Newsletter utilizing on-site copying resources at CPHCS. Each month, hard copies are mailed to liaisons at the 33 institutions for distribution to all medical, mental health, and dental employees. The Warden's offices also receive copies for the custody staff who are most involved with health-related issues. Distribution of hard copies is necessary because an estimated 50 percent of all CPHCS staff do not have on-line resources and are not connected to the internet at work. However, in an ongoing effort to save taxpayers money and contribute to a "greener" environment, all staff members at the Sacramento Headquarters location, and others with internet connectivity, receive electronic copies only.

**D.    *HR Connections* Newsletter to Staff**

Historically, important Human Resources-related information has not reached staff due to the CDCR's lack of access to the intranet/internet. In November 2008, the first *HR Connections* Newsletter for staff was published. In collaboration with the Receiver's Communications Division, *HR Connections* was developed to focus on personnel information of interest to CPHCS employees. *HR Connections* is contained within each monthly publication of the Receiver's *Turnaround Lifeline* Newsletter which is distributed statewide.

*HR Connections* has become a useful and effective tool for communicating Human Resources-related content to CPHCS staff statewide. During this reporting period, for example, topics have been covered such as Savings Plus changes, health plan and employer contribution rates, and changes to personnel policy due to Proposition 8. Recurring in each newsletter is a section featuring a different Human Resources unit, informing readers and staff of its roles, responsibilities, and accomplishments. Generally, content for *HR Connections* is chosen by a small advisory group within Human Resources who meet monthly and suggest story ideas as well as identify important upcoming, recurring, and sometimes time-sensitive information.

Contributions from readers are also included through an inquiry intake process and a "Frequently Asked Questions" section.

Concurrently with the *Turnaround Lifeline* Newsletter, *HR Connections* is printed on-site utilizing copying resources at CPHCS and then distributed statewide. CPHCS employees with internet connectivity receive electronic copies only. The newsletter is also available on the Human Resources intranet page (accessible to CPHCS employees who have connectivity) at http://intranet/phr/. November 2008 and January 2009 issues of *HR Connections* are included as Appendices 37 and 38 respectively. (Please note: *HR Connections* is a monthly publication; however due to the tight holiday printing timeline, a December 2008 edition of *HR Connections* was not issued.)

# Section 6
# Particular Problems Faced by the Receiver, Including Any Specific Obstacles Presented by Institutions or Individuals

### A.    Continued Delays by the State Personnel Board

Three RCEA web-enabled examinations were finalized by SPB and testing commenced: Nurse Executive on September 18, 2008; Medical Executive on December 10, 2008; and CEO, Health Care, on December 23, 2008.  As a result, selection for these critical leadership positions is now underway. As explained above, all of the exams were delayed for months by SPB.

In addition, some classification board items have taken as much as 20 weeks to be calendared and approved by the SPB.  These delays are apparently caused by the limited staff resources at the SPB, an increased workload, as well as the SPB's meeting schedule.  Receiver's staff have met several times with SPB staff to work out streamlined procedures that relieve both staffs of burdensome paper shuffling, preserve the essence of merit principles, and yet facilitate the needs of the Receivership to rapidly hire hundreds of people.  SPB, however, has not been convinced to change, and has failed to respond to proposals in a timely manner.

In a July 29, 2008 memo to Suzanne Ambrose, Executive Officer of the SPB, CPHCS formally requested delegation of CEA establishment and management and creation of pilot position by position testing.  Following months of discussion and numerous meetings, the matter was calendared for a hearing before the SPB on November 3, 2008 at the direction of Ms. Ambrose.  The Board took the matter under submission; however, no action was taken at that time.  The item was again listed under submission at their November 18, 2008 meeting where only three board members were in attendance. The Board subsequently met on December 2, 2008 and again no action was taken.  When we inquired as to the Board's action at the December 23, 2008 meeting, the Executive Officer indicated that it was not likely that the Board would take any action since it was not a full Board meeting.  To date, there have been neither questions asked nor requests for additional information raised by SPB staff.

Unfortunately, the SPB is a part-time board that meets 23 times a year, meetings lasting only a few hours.  The Board meets as a full board (all five members) only once a month and by policy does not conduct hearings during their mid-month board meetings where only three Board members attend. Given the limited staff resources at the SPB and the limitations outlined above, the Receiver's request for delegation with post audit and oversight by the board is urgently needed.   CPHCS is fortunate to have knowledgeable human resources staff that are able to blend the needs of the Receivership with the principles of merit and the requirements of State government.  Therefore, we are confident that we are able to manage a delegated CEA program and pilot position-by-position testing program in a credible, effective, and efficient manner.  Nevertheless, SPB continues to ignore this request.

Unless the SPB effectuates the requested delegation at its January 2009 meeting, the Receiver has no choice but to proceed forward with a waiver of State law pertaining to specific delegation issues. Appendix 39 is a summary of SPB's board meetings in 2008.  As apparent from the summary, while

some of the Receiver's requests were processed appropriately, other very important requests have simply been ignored without explanation for many months.

# Section 7
# An Accounting of Expenditure for the Reporting Period

**A.    Expenses**

The total net operating and capital expenses of the Office of the Receiver for the four months ending December 31, 2008 were $9,842,191 and $41,742,658 respectively. A balance sheet and statement of activity and brief discussion and analysis is included as Appendix 40.

**B.    Revenues**

On October 31, 2008 and on November 18, 2008, the receiver requested a transfer of $22,000,000 and $20,000,000 respectively from the State to the California Prison Health Care Receivership Corporation (CPR) to replenish the operating fund of the office of the receiver for the second quarter of the Fiscal Year 2008-2009. All funds were received in a timely manner.

# Section 8
# Other Matters Deemed Appropriate for Judicial Review

### A.    Coordination with Other Lawsuits

During the reporting period, regular meetings between the Receiver and the monitors of the *Coleman, Perez,* and *Armstrong* ("Coordination Group") class actions have continued. Coordination Group meetings were held on October 24, 2008 and January 13, 2009, and the next meeting will take place on March 24, 2009.  Progress has continued, as follows, during this period:

1.  As reported in the Receiver's Ninth Quarterly Report, the Coordination Group agreed that the Receiver in coordination with the Department of Correctional Health Care Services and subject to the oversight of the monitors in the health care class action cases would assume responsibility for all non-institutional office space statewide for the medical, mental health and dental programs.  As a result, a space planning coordination agreement was submitted to, and adopted by, the four courts.

2.  Coordination agreements have also been prepared in the areas of health care appeals, transcription and dictation, and the transition, activation and management of the Receiver's 10,000 bed project.  To date, each of these agreements has been approved by the Coordination Group and submitted to the courts for approval.

However, while efforts among the Coordination Group continue, and progress has been made concerning coordination needs of the four federal court health care class actions, the Administration's proposed budget-related solutions, as discussed above, will render future coordination efforts increasingly difficult as the State attempts to impose restrictions on salaries, hiring, use of overtime, etc., that will have a negative impact on CDCR's ability to coordinate ADA, mental health, and dental programs with the needs of the Receiver's medical programs. Efforts during the next quarter will focus on preventing the Schwarzenegger Adminstration from forcing the Coordination Group representatives to fight among themselves because of funding cuts.

### B.    Master Contract Waiver Reporting

On June 4, 2007, the court approved the Receiver's Application for a more streamlined, substitute contracting process in lieu of State laws that normally govern State contracts.  The substitute contracting process applies to specified project areas identified in the June 4, 2007 Order and, in addition, to those project areas identified in supplemental orders issued since that date.  The approved project areas, the substitute bidding procedures and the Receiver's corresponding reporting obligations are summarized in the Receiver's Seventh Quarterly Report and are fully articulated in the court's orders, and therefore, the Receiver will not reiterate those details here.

As ordered by the court, included as Appendix 41 is a summary of each contract the Receiver has awarded during this reporting period, including a (1) brief description of each contract, (2) which project the contract pertains to, and (3) the method the Receiver utilized to award the contract (*i.e.*, expedited formal bid, urgent informal bid, sole source.) Vendors were also engaged by the Receiver during this reporting period to assist in the operation of the Receiver's non-profit corporation, the California Prison Health Care Receivership Corporation. While such contracts are not governed by the Master Contract Waiver, a list of contracts is provided to the court for information.

## C.    Arsenic at Kern Valley State Prison

In November 2008, based on an inquiry from the Los Angeles Times newspaper and subsequent conversations with CDCR officials, the Receiver learned that arsenic levels at Kern Valley State Prison have exceeded the allowable levels established by the Environment Protection Agency for many years. Thereafter, the Receiver's staff performed a review of water-related issues at all of the 33 prisons. The situation at Kern Valley State Prison is especially disturbing because many years have passed since State officials became aware of the problem. Furthermore, despite the health risks posed, CDCR returned General Fund money allocated by the Legislature to address the problem. The Receiver's Chief of Staff requested a CAP from the State regarding this issue on December 24, 2008. A Los Angeles Times article from December 29, 2008 entitled "Arsenic Levels Too High in Kern Valley State Prison's Drinking Water" is included as Appendix 42, and the Receiver's Chief of Staff's related letter to CDCR is included as Appendix 43.

## D.    Mini-Region Crisis Response Project

The CPHCS field structure is currently organized into three regions: North, Central, and South. Four prisons clustered in the Central Valley - Avenal State Prison, California State Prison - Corcoran, Substance Abuse Treatment Facility, and Pleasant Valley State Prison - have had the most serious treatment backlogs in the State. One yard at Substance Abuse Treatment Facility, for instance, is seven weeks behind in providing primary care appointments. This crisis has been caused by a variety of factors, including overcrowding, inadequate clinical space, rural isolation, inability to attract clinicians, and the CDCR policy of placing chronically ill populations at these remote institutions. The Substance Abuse Treatment Facility, for instance, is a high-security prison in Kings County with 7,628 inmates in space designed for 3,424. It has a complex medical mission including geriatrics, dialysis, the State's largest number of disabled inmates, and a large mental health population.

The Receiver has been patient over the last two and a half years, attempting to work within the current CPHCS and CDCR approaches to solving the long-standing problems at these and other institutions. He remained patient because he believed that 10,000 additional medical beds and the Facility Upgrade Program offered the most efficient means of bringing the system up to a constitutional level of care. However, due to the delays in funding of these programs by the Schwarzenegger Administration, the Receiver is compelled to pursue significant upgrades to the clinical delivery system in these prisons.

The Receiver will address this crisis by taking immediate steps to decrease the backlogs in primary and specialty care and by filling new management positions to support the on-the-ground delivery of care.  These four prisons will comprise a special region designated for a new pilot program called the "Mini-Region Crisis Response Project."  This project is a crisis response only.  It cannot replace the need for additional clinical space in the existing prisons to provide access to care, and will not add to the need for treatment facilities for the 10,000 prisoners with long-standing, chronic medical and mental health problems, aged conditions, serious disabilities, etc.  This plan will, however, prevent the crisis situations at the four prisons from deteriorating further.

Interventions currently under development include redeployment of clinicians from Headquarters and other regions to these institutions and use of evening and weekend clinic hours.  The new regional managers will work with the Receiver's established project teams to focus resources on clinical delivery in these institutions, drawing from human resources, IT, medical records, contracting, and procurement.  Clinical space will be augmented as needed via conversion of existing non-clinical space or deployment of mobile units or tents.

Diversion of staff and initiatives will affect timelines of the Turnaround Plan of Action.  These crisis measures will require significant adjustments in CDCR's custody support for the medical mission.  They will also have significant budgetary impact, as access to care may be increased to 18 hours per day.

The Receiver will file a special report concerning the Mini-Region Crisis Response Project within 60 days.

111

# Section 9
# Conclusion

Despite the prevailing headwind of politics, the Receiver's team continues to make progress towards remedying unconstitutional conditions within the healthcare system of the CDCR. Nurse and physician vacancies are at historic lows. Some efforts to make the healthcare delivery system more efficient are ahead of schedule. Overall, frontline staff feels more empowered to deliver necessary care.

Despite external pressures to halt or reverse improvements, we are resolute in our efforts. Adaptation, creativity and change are a constant. For example, even as the SPB has worked to slow our efforts to hire proper staff, we continue to engage them in a professional manner to ensure advancement of a new class of Career Executive Assignment positions.

Independent of other State agencies and departments – and in spite of the Governor and Attorney General's improper meddling – the Receiver's office continues to innovate. We are keenly aware that only cutting edge healthcare delivery will improve and help maintain a constitutionally adequate system of medical and mental health for California's inmates.

The bottom line for the Receiver is that we are revolutionizing correctional healthcare, but doing so virtually alone. In a rhetorical sea of bureaucratic morass, the Governor and Attorney General – both stated advocates of improved government service delivery – should by all accounts be staunch allies of our reforms. However, their words and deeds prove otherwise.

We teeter on the brink of success and failure as the Governor issues executive orders to cut medical staffs' pay and thwart our recruitment and retention efforts. Meanwhile, the Attorney General argues before the Three Judge Panel who are considering population caps and early releases that it should not be ordered because the Receiver will build seven new correctional healthcare facilities with 10,000 beds. Then, the same Attorney General argues in the media and other courts that these same facilities go too far and should not be built.

It is unconscionable that the State and its elected representatives who have for several years agreed with and adhered to the orders of the court and concurrent stipulations would now make every effort to thwart the delivery of a constitutional level of healthcare in our correctional system. Only champions of extreme mediocrity would look to our improvements and advances and say: "Job well done … it's time to pack it up!" I do not say that to belittle our efforts but to highlight the long road ahead.

Without systemic culture change and significant facility upgrades and additions, our every effort will have been in vain. The irony of the Governor and Attorney General's antics are that in the long run they will cost the State – and taxpayers – dearly. If we are continually thwarted in the drive to create sustainable improvements, we are destined to an extremely expensive purgatory of symptom triage. You cannot judge success merely by dumping boatloads of tax dollars on a

given emergency.   The root cause of the emergency – the underlying sickness – must be addressed.

The uniqueness of the Receivership is that we were not created only to respond to one crisis after another – and garner the requisite headlines – but to roll up our sleeves and dig into a mess of a system -- and fix it.   Dysfunctional prisons threaten the safety and security of all of us; nevertheless, it will prove to be neither popular nor easy fixing California's prisons.   To do so will require State leaders with resolve and exceptional courage.   Unfortunately, thus far, Governor Schwarzenegger and Attorney General Brown have displayed neither.