1   EDMUND G. BROWN JR.
    Attorney General of the State of California
2   DAVID S. CHANEY
    Chief Assistant Attorney General
3   ROCHELLE C. EAST
    Senior Assistant Attorney General
4   JONATHAN L. WOLFF
    Senior Assistant Attorney General
5   LISA A. TILLMAN – State Bar No. 126424
    Deputy Attorney General
6   KYLE A. LEWIS – State Bar No. 201041
    Deputy Attorney General
7   455 Golden Gate Avenue, Suite 11000
    San Francisco, CA 94102-7004
8   Telephone: (415) 703-5708
    Facsimile: (415) 703-5843
9   lisa.tillman@doj.ca.gov
    kyle.lewis@doj.ca.gov
10
    HANSON BRIDGETT LLP
    JERROLD C. SCHAEFER - 39374
    PAUL B. MELLO – 179755
    S. ANNE JOHNSON – 197415
    SAMANTHA D. TAMA – 240280
    RENJU P. JACOB - 242388
    425 Market Street, 26th Floor
    San Francisco, CA 94105
    Telephone: (415) 777-3200
    Facsimile: (415) 541-9366
    jschaefer@hansonbridgett.com
    pmello@hansonbridgett.com
    ajohnson@hansonbridgett.com
    stama@hansonbridgett.com
    rjacob@hansonbridgett.com

    Attorneys for Defendants
11

12              UNITED STATES DISTRICT COURT

13        FOR THE EASTERN DISTRICT OF CALIFORNIA

14        AND THE NORTHERN DISTRICT OF CALIFORNIA

15   UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

16       PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

17

18   RALPH COLEMAN, et al.,                No. 2:90-cv-00520 LKK JFM P

19              Plaintiffs,                **THREE-JUDGE COURT**

20        v.

21   ARNOLD SCHWARZENEGGER, et al.,

22              Defendants.

     ─────────────────────────────────────────────────────────

22   MARCIANO PLATA, et al.,              No. C01-1351 TEH

23              Plaintiffs,               **THREE-JUDGE COURT**

24        v.                              **DEFENDANTS' PROPOSED FINDINGS
                                          OF FACT AND CONCLUSIONS OF LAW
25   ARNOLD SCHWARZENEGGER, et al.,       RE RULING ON PLAINTIFFS' REQUEST
                                          FOR A PRISONER RELEASE ORDER**
26              Defendants.

27                                        **To:  Three-Judge Panel**

28
                                  - 1 -

1   According to the Three-Judge Panel's January 9, 2009 Order, Defendants offer

2   the attached proposed Findings of Fact and Conclusions of Law in support of their

3   request that this Three-Judge Panel deny Plaintiffs' request for a prisoner release order

4   under the Prison Litigation Reform Act, 18 U.S.C. §3626.  Defendants' submission of

5   these proposed Findings of Fact and Conclusions of Law is not, and should not be

6   construed as, a concession or waiver of any legal or factual argument.

7   DATED:  January 23, 2009                    HANSON BRIDGETT LLP

8

9                                               By: /s/ Paul B. Mello
10                                               PAUL B. MELLO
                                                 Attorneys for Defendants
11                                               Arnold Schwarzenegger, et al.

12  DATED:  January 23, 2009                    EDMUND G. BROWN JR.
                                                 Attorney General of the State of California
13

14

15                                              By: /s/ Lisa A. Tillman
                                                 LISA A. TILLMAN
16                                               Deputy Attorney General
                                                 Attorneys for Defendants
17                                               Arnold Schwarzenegger, et al.

18

19

20

21

22

23

24

25

26

27

28
                                         - 2 -

1    IN THE UNITED STATES DISTRICT COURTS

2    FOR THE EASTERN DISTRICT OF CALIFORNIA

3    AND THE NORTHERN DISTRICT OF CALIFORNIA

4    UNITED STATES DISTRICT COURT COMPOSED OF THREE-JUDGES

5    PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

6

| | |
|---|---|
| 7  RALPH COLEMAN, et al., | No. 2:90-cv-00520 LKK JFM P |
| 8                Plaintiffs, | **THREE-JUDGE COURT** |
| 9        v. | |
| 10  ARNOLD SCHWARZENEGGER, et al., | |
|                   Defendants. | |
| 11 | No. C01-1351 TEH |
| 12  MARCIANO PLATA, et al., | |
|                   Plaintiffs, | **THREE-JUDGE COURT** |
| 13        v. | **[PROPOSED] FINDINGS OF FACT AND** |
| 14  ARNOLD SCHWARZENEGGER, et al., | **CONCLUSIONS OF LAW RE DENIAL OF** |
| 15                Defendants. | **PLAINTIFFS' REQUEST FOR A** |
| 16 | **PRISONER RELEASE ORDER** |

17

18

19

20

21

22

23

24

25

26

27

28

## I.    INTRODUCTION

Plaintiffs seek a prisoner release order of approximately 52,000 inmates over a 2-year period, and they seek to require California to maintain its prison population at that level once the reduction is achieved. (Pls.' Trial Br., 11/05/08, *Plata* Dock. No. 1766, at 3:8-11, Trial Tr., 12/2/08, at 1026:21-1027:17.)[1]  Plaintiffs contend that this "prisoner release order" would remedy constitutional violations with respect to the delivery of medical and mental health care to inmates in California's 33 prisons. (Pls.' Trial Br. at 1.)  Plaintiffs' request for a prisoner release order is governed by the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626.  Under the PLRA, a prisoner release order is the remedy of last resort.

Trial of Plaintiffs' request for a prisoner release order took place for fourteen days before this Three-Judge Panel, with evidence presented to the Court by all parties, including Defendant Intervenors. (*See* Minute Entries re: Bench Trials, *Plata* Dock. Nos. 1826, 1831, 1839, 1844, 1876, 1878, 1881, 1896, 1917, 1926, 1930, 1938, 1965, 1971.) Having reviewed and considered the evidence and the governing law, this Court denies Plaintiffs' request for a prisoner release order.

As detailed in the Findings of Fact and Conclusions of Law set forth below, this Court finds that Plaintiffs did not meet their burden under the PLRA of establishing by clear and convincing evidence that crowding is the primary cause of constitutional violations in the prison medical and mental health care system, and that a prisoner release order is the only remedy that can address the violations.

Prison overcrowding is a concern to the State of California.  (*See* Pls.' Trial Ex. 1 - Governor's Emergency Proclamation Regarding Overcrowding, October 4, 2006; Scott Kernan Aff., 10/30/08, *Plata* Dock. No. 1636, 1:20-2:6; Trial Tr., 12/9/08 at 1668:4-22.) Overcrowding has resulted in the use of non-traditional beds, where inmates have been bunked in gymnasiums and day rooms. (Kernan Aff., ¶¶ 4, 14; Defs.' Tr. Exs. 1303,

---

[1] These findings of fact reference *Plata* docket numbers for Three-Judge Panel docket entries.

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.' REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

1    1304.) However, the existing record does not establish that overcrowding is "the primary

2    cause of" existing inadequacies in the delivery of prison medical and mental health care.

3    Moreover, the record establishes that, through methods that are much less intrusive than

4    a prisoner release order, the conditions in the prisons are improving. The use of non-

5    traditional beds is declining. (*Id.*) At the same time, and as detailed below, substantial

6    improvements have been achieved in the delivery of prison medical and mental health

7    care. (*See, e.g.,* Trial Trs., 11/20/08 at 441:18-24, 442:2-7, 450:5-12, 450:20-451:2,

8    454:21-455:12; 454:21-455:12; 12/2/08, at 846:2-10; 12/3/08, at 1212:22-1213:15;

9    12/10/07 Dep. of Ronald Shansky at 117:12-118:2; Defs.' Tr. Ex. 1100 – Receiver's

10   Ninth Quarterly Report, 09/15/08, *Plata* Dock. No. 1472 at 8-12, 15-24, 33-34, 40-41, 51-

11   58; Defs. Trial Ex. 1112, *Coleman* Special Master's 20th Monitoring Report, 9/12/08,

12   *Coleman* Dock. No. 3029, internal p. 6.) Further improvements are anticipated.

13           These facts lead this Court to conclude that while overcrowding may complicate

14   the inadequacies in the delivery of medical and mental health care, it is not the root

15   cause of the violations and even a substantial reduction in the prison population would

16   not remedy them.

17           Additionally, in determining whether to issue a prisoner release order, this Court is

18   required to give substantial weight to any adverse impact on public safety or the criminal

19   justice system. 18 U.S.C. § 3626(a)(1)(A). Plaintiffs seek a substantial, approximately

20   one-third, reduction in the prison population. Plaintiffs provided evidence about different

21   methods by which the prison population could be reduced. Plaintiffs' own expert, Dr.

22   Austin, testified that these methods could not achieve a reduction of 50,000 or more

23   unless legislative reforms were implemented to release second strikers or lifers before

24   the end of their sentences. (Trial Tr., 12/4/08 at 1435:15-1436:22; 1439:8-1440:11.)

25   Based upon the record, this Court concludes that the prisoner release order Plaintiffs

26   request would likely result in the occurrence of additional crimes in the community and

27   may result in an increase in the crime rate. This is due, in part, to the fact that

28   California's local governments do not have the needed resources to reduce the

1    likelihood that former inmates will reoffend. Additional arrests, jail admissions,

2    prosecutions, and probationers would strain already thinly stretched local resources, as

3    would the necessity to retain or release inmates at the local level if a State prison

4    population cap were in place. (*See, e.g.,* Am. Expert Report of Jerry Dyer, 12/12/2008,

5    *Plata* Dock. No. 1937, ¶¶ 26-30.)

6         This Court does not have the power to order the appropriation or allocation of

7    resources needed to fix overcrowding problems or to mitigate or eliminate the likely

8    adverse impact of a prisoner release order on public safety and local criminal justice

9    systems. That is the domain of the legislative and executive branches. *See Rhem v.*

10    *Malcom*, 507 F.2d 333, 341 (2d Cir. 1974).

11         This Court concludes that Plaintiffs' requested prisoner release order is not

12    narrowly drawn, extends further than necessary, and is not the least intrusive means

13    necessary to correct the existing constitutional inadequacies in the delivery of medical

14    and mental health care. Plaintiffs' requested prisoner release order is broad, not narrow,

15    relief. It calls for a one-third reduction in the overall population and is directed at the

16    general prison population, not the *Plata* and *Coleman* classes. Under these

17    circumstances and on this record, the relief requested by Plaintiffs is barred by the

18    PLRA.

19                        II.    **PROCEDURAL BACKGROUND**

20    **A.    *Plata***

21         Plaintiffs filed the *Plata* lawsuit on April 5, 2001. (Pls.' Compl., 4/5/01, *Plata* Dock.

22    No. 1.) Plaintiffs amended their complaint on August 20, 2001. (Defs.' Tr. Ex. 1059 -

23    Pls.' Am. Compl., 8/20/01, *Plata* Dock. No. 20.) *Plata* is a class action lawsuit

24    concerning the constitutional adequacy of medical care provided to those California

25    Department of Corrections and Rehabilitation (CDCR) inmates with "serious medical

26    needs." (Defs.' Tr. Ex. 1059 - Pls.' Am. Compl., 8/20/01, *Plata* Dock. No. 20.52:22-53:4;

27    55:16-23; Defs.' Tr. Ex. 1060 - Stip. for Inj. Relief, 6/13/02, *Plata* Dock. No. 68 at 5:7.)

28    The *Plata* class consists of inmates with serious medical needs. (Joint Statement re:

3

1   Statement of Undisputed Facts Regarding Phase I Issues (UF), 11/17/08, *Plata* Dock.

2   No. 1815, *Coleman* Dock. No. 3301 at No. 1.)

3        In the *Plata* case, the parties negotiated a settlement of the litigation which is

4   encompassed in the Stipulation and Order for Injunctive Relief (Stipulation) which was

5   approved by the Court on June 13, 2002.  (UF No. 3.)

6        The Court ordered the appointment of a Receiver to take control of CDCR's

7   medical care system.  This appointment became effective April 17, 2006.  (UF No. 4.)

8   **B.    *Coleman***

9        In 1990, the *Coleman* Plaintiffs filed this class action under 42 U.S.C. § 1983

10  alleging that the mental health care services provided by CDCR were so inadequate that

11  the class members' rights under the Eighth and Fourteenth Amendments were violated.

12  (Defs.' Tr. Ex. 1035- Pls.' Compl.; Ex. 1036 - Pls.' Am. Compl., 07/25/1991, *Coleman*

13  Dock. No. 60, ¶ 30.)  The *Coleman* class consists of inmates with serious mental

14  disorders.  (UF No. 2.)

15       In 1995, the *Coleman* Court entered a judgment of injunctive relief and appointed

16  a Special Master to oversee the development of a constitutionally compliant mental

17  health care system.  (UF No. 5.)  *Coleman v. Wilson*, 912 F. Supp. 1282 (E.D. Cal.

18  1995).  The *Coleman* Court directed Defendants to establish the elements of a

19  constitutionally adequate mental health care system: (a) uniform policies and procedures

20  for the delivery of mental health care; (b) appropriately licensed and credentialed clinical

21  staff and support staff, both in the prisons and in central office headquarters, with

22  sufficient number to perform their responsibilities; (c) appropriate space for the provision

23  of mental health services to the inmate-patient population that can accommodate

24  services of a growing population, especially for the higher treatment levels that require

25  residential care; and (d) an adequate information management system for recordkeeping

26  and medication management; and an adequate suicide prevention protocol.  *Id.* at 1298,

27  n. 10; Dezember Aff., ¶ 11.

28  / / /

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)     1816796.1

**C.    Three-Judge Panel Proceedings**

On November 13, 2006, Plaintiffs filed their motion to convene a Three-Judge Panel. Over Defendants' objections, the *Plata* and *Coleman* Courts held a joint hearing on June 27, 2007. On July 23, 2007, the Court granted Plaintiffs' motion to convene this Three-Judge Panel. (UF No. 6.) On September 19, 2007, the Three-Judge Panel granted motions to intervene to the following groups of intervenors: (1) County Intervenors, (2) Sonoma County and officials from Sonoma County, (3) Legislative Intervenors, (4) Law Enforcement Intervenors, and (5) District Attorney Intervenors. In addition, CCPOA was also granted intervenor status. (Order, *Plata* Dock. No. 857 at 6-7.)

Trial in the Three-Judge Panel proceedings began on November 18, 2008, and the last day of trial was December 19, 2008. The Court held fourteen days of trial. (*See* Minute Entries re: Bench Trials, *Plata* Dock. Nos. 1826, 1831, 1839, 1844, 1876, 1878, 1881, 1896, 1917, 1926, 1930, 1938, 1965, 1971.)

**III.    FINDINGS OF FACT**

**A.    Crowding Is Not the Primary Cause of the Constitutional Violations Regarding Prison Medical and Mental Health Care, and a Prisoner Release Order Is Not the Only Remedy that Can Address the Violations.**

**(1)    Background**

1.    As of the end of August 2008, there were 156,352 inmates in California's 33 prisons (excluding camps and contracted beds). (Trial Aff. of Scott Kernan, 10/30/08, (Kernan Aff.) *Plata* Dock. No. 1636, ¶ 4; Trial Aff. of Matthew Cate, 10/30/08, (Cate Aff.) *Plata* Dock. No. 1717 ¶ 10.) Overall, the California Department of Corrections and Rehabilitation housed 167,269 inmates in its adult institutions, including contracted out-of-state prisons. (Kernan Aff. ¶ 13.) The other 15,705 inmates not housed in in-state prisons were housed as follows: 4,788 in out-of-state prisons, 6,312 in community correctional facilities, 4,386 in Fire Camps, and 219 in Department of Mental Health state hospitals. (Defs.' Ex. 1203 - August 27, 2008 Weekly Population Report; Cate Aff. ¶ 10.) Community correctional facilities, Fire Camps, and Department of Mental Health

5

1   hospitals are not overcrowded.  (Cate Aff. ¶ 13; Radavsky Aff. ¶ 17.)

2          2.      The number of non-traditional beds has decreased from 19,618 in August

3   2007 to 14,539 (13,467 male and 802 female) in August 2008.  (Kernan Aff. ¶¶ 4, 14;

4   Defs.' Tr. Exs. 1303 – Master Bed Rosters, 1304 – Institution Activation Schedules.)

5          3.      There is no clear relationship between percentage of design capacity and

6   the ability to deliver a constitutionally adequate level of medical and mental health care.

7   (Trial Tr., 11/20/08 at 483:7-18.)  Six of Plaintiffs' experts testified that it was possible to

8   provide adequate medical and mental health care in overcrowded prisons.  (Trial Trs.,

9   11/19/08 at 241:2-6 (Beard); 286:4-18 (Lehman); 336:10-17 (Haney); 405:19-406:14

10  (Woodford); 11/20/08 at 437:1-20, 483:13-17 (Shansky); 11/18/08 at 115:5-9 (Stewart).)

11         4.      Four of Plaintiffs' experts spoke in terms of "operable" capacity and not

12  design capacity.  (Trial Trs., 12/5/08, 1346:8-12 (Beard); 12/2/08 at 950:15-952:17

13  (Haney); 12/11/08 at 2222:14-21 (Stewart); Trial Tr., 11/20/08 (Shansky).)  There was no

14  evidence regarding what the "operable" capacity of CDCR's prisons is in connection with

15  the delivery of medical or mental health care.  (Trial Tr., 12/5/08 at 1590:18-1591:1.)

16  California's prison population has decreased since October 2006.  (Kernan Aff.,

17  10/30/08, *Plata* Dock. No. 1636, ¶ 4.)

18         **(2)   *Plata***

19                **(a)    Improvements in the Delivery of Medical Care**

20         5.      Plaintiffs' witness, Jeffrey Beard, the Secretary of the Pennsylvania

21  Department of Corrections, testified that a system's death rate is an important factor in

22  evaluating the level of care being provided by the system.  He also acknowledged that

23  CDCR had the 14th best rate nationally, while his system, Pennsylvania, fell in the

24  bottom 5 nationally.  (Trial Tr., 11/19/08, at 244:7-27.)

25         6.      As explained through the testimony of Christopher Mumola (entered as

26  written deposition testimony), the average annual mortality rate for all illnesses per

27  100,000 state prisoners from 2001 to 2004 was 223 nationwide, 181 for States in the

28  west region, and 170 for California.  Thirty-six states had higher mortality rates than

                                            6

1 | California during this period. (Trial Tr., 12/3/08, at 1271:9-1272:21.) From 2001 to 2005,

2 | this rate was 224 nationwide, 184 for the west region, and 172 for California. (*Id.* at

3 | 1276:15-1277:23.) The average annual rate of mortality from all causes for California

4 | prisoners, during 2001 to 2004, was 34 percent lower than the average annual rate of

5 | death from all causes for U.S. Residents age 15 to 64, during 2001 to 2003. After

6 | excluding transportation accidents, the rate was 30% lower. (*Id.* at 1271:3-18.)

7 |      7.    The Receiver has been in control of CDCR's medical care delivery system

8 | since April 2006. (UF No. 4.) Since that time, the State's spending on health care has

9 | increased by approximately 80 percent, from $1.635 billion in the Fiscal Year 2006/2007

10 | to $2.249 billion in the Fiscal Year 2008/2009. (Trial Tr., 12/3/08, at 1210:4-13; 1213:17-

11 | 22; 1215:20-1216:20.)

12 |      8.    During the Receivership, peer review and death review programs have

13 | improved. (Trial Tr., 11/20/08 at 450:5-12, 454:21-455:12; 454:21-455:12; 12/10/07

14 | Dep. of Ronald Shansky at 117:12-118:2.) The number of alleged preventable asthma

15 | deaths went from 6 in 2006 to 0 in 2007. (Trial Tr., 11/20/08, at 450:20-451:2.) The

16 | number of alleged preventable deaths went from 18 in 2006 to 3 in 2007. (*Id.* at 486:16-

17 | 22; 487:2-5; 12/10/07 Shanksy Dep. at 74:7:16.) Deaths have trended down in the last

18 | 10 quarters. (Trial Tr., 11/20/08, at 454:21-455:12.)

19 |      9.    Plaintiffs' correctional medical care expert, Dr. Ronald Shansky, testified

20 | that some prisons may currently provide constitutional levels of care and that the level of

21 | care varies from prison to prison and unit to unit within the CDCR's prisons. (*Id.* at

22 | 456:11-15.)

23 |      10.    Post-tour letters written by Plaintiffs' counsel describe significant

24 | improvements in the delivery of medical care. For example, at Mule Creek State Prison

25 | and Kern Valley State Prison, Plaintiffs' own attorneys found the following:

26 |          Mule Creek State Prison's compliance with key access to
27 |          care time frame requirements, including for registered nurse triage and PCP appointments, including chronic care as well as for specialty care is generally very good at present time.
28 |          (*Id.* at 441:18-24.)

7

1816796.1

1    Certain exceptions are mentioned below. This is due to,
      among other things, diligent efforts by staff, including the
2    schedulers, a relatively large number of PCP's allowing at
      times for the scheduling of double PCP lines in clinics and the
3    low vacancy rate among RN's. (*Id.* at 442:2-7.)

4    While there were a number of requirements of the policies
      and procedures that had not yet been put into place on this
5    tour, I am optimistic that KVSP will continue to speedily
      improve its *Plata* compliance. The dedication and
6    competence of staff at KVSP was visible in the following
      areas: Utilization management, where there was no backlog,
7    and a nurse who was very knowledgeable about the
      individual patients whose medical issues I raised. Pharmacy,
8    which was clearly running very smoothly under the
      supervision of two skilled pharms ones. Appeals, which have
9    made significant improvements and had been much helped
      by frequent visits by HCSD. Medical Records, where the
10   loose filings and Olsen requests were carefully monitored and
      controlled. And specialty, which is tracking the relatively
11   small number of pending appointments properly despite
      lacking the specialty acknowledging report system used in
12   other institutions. (*See* Trial Tr., 12/3/08, at 1212:22-
      1213:15.)

13

14   11.    Staffing of health care and custodial personnel has increased substantially:

15          a.    Physicians: CDCR's physician staffing has increased dramatically,

16   and is within 5% of the Receiver's goal to fill 90% of physician positions. (Trial Tr.,

17   11/20/08, at 445:7-446:14; 447:9-448:5.) Between November 2007 and August 2008

18   the CDCR hired 62 full-time state employed primary care physicians. (Defs.' Tr. Ex.

19   1235 – Staffing Progress for Medical and Mental Health at 3.)

20          b.    Chief Physicians and Surgeons: Since October 2005, the time the

21   *Plata* court issued its findings of fact and conclusions of law regarding the appointment

22   of a receiver, the number of full-time state employed Chief Physicians and Surgeons

23   rose from 10 to 28 in August 2008. (*Id.* at 2.)

24          c.    Physician Assistants: The number of Physician Assistants, also

25   referred to as physician extenders, rose from 1 in April 2006 to 13 in August 2008. (*Id.*

26   at 4.)

27          d.    Nurse Practitioners: Nurse Practitioners, also physician extenders,

28   rose from 11 in October 2005 to 44 in August 2008. (*Id.* at 5.)

8

1          e.    Registered Nurses:  The number of registered nurses rose from 818

2    in October 2005 to 1556 in August 2008.  This is despite the fact that there is a national

3    shortage of RNs.  Staffing of registered nurses has increased and is now within 2% of

4    the Receiver's statewide goal to fill 90% of nursing positions.  (Trial Tr., 11/20/08, at

5    445:7-446:14; 447:9-448:5.)

6          f.    Licensed Vocational Nurses:  The number of licensed vocational

7    nurses rose from 4 in May 2007 to 937 in August 2008.  (Defs.' Tr. Ex. 1235 at 7.)

8          g.    Correctional Officers:  The number of correctional officers employed

9    by the department rose from 20,741 in October 2005 to more than 24,090 in August

10    2008.  (Id. at 8.)

11        12.    In addition to full-time state employees, large numbers of registry

12    physicians and nurses fill much of the remaining vacancies in CDCR healthcare

13    positions.  Likewise, the far reduced number of correctional officer vacancies is largely

14    filled by overtime.  (Trial Tr., 12/10/08, at 1904:21-1905:3.)

15        13.    During the Receivership, other improvements include: (a) New screening

16    and assessment processes at reception and release; (b) New health care access units --

17    that include large numbers of correctional officers charged will ensuring inmate access to

18    medical care; (c) Establishing new and better health care scheduling and patient-inmate

19    tracking systems; (d) Redesigning and improving sick call processes, forms and staffing

20    models; (e) Improved chronic care systems -- for example, the number of inmates whose

21    asthma deaths that were deemed to be preventable by the Receiver went from 6 in 2006

22    to 0 in 2007; (f) Improved emergency response plans and systems; (g) Improved

23    provision of and access to specialty care and hospital services; (h) Improved medical

24    clinical leadership and management; (i) Improved peer review and death review

25    programs; (j) Establishment of a comprehensive, safe, and efficient pharmacy program --

26    including continued development of the drug formulary and the rollout of a computerized

27    pharmacy operating system designed to improve medication management in CDCR

28    institutions; (k) Establishing standardized health records practices -- ultimately leading to

9

1  the use of electronic medical records; and (l) Establishing effective radiology and

2  laboratory services. (Defs.' Tr. Ex. 1100 – Receiver's Ninth Quarterly Report, 09/15/08,

3  *Plata* Dock. No. 1472 at 8-12, 15-24, 33-34, 40-41, 51-58.)

4      14.    The *Plata* Receiver has identified overcrowding as a significant barrier to

5  quality care, but through the close of evidence had never opined that overcrowding is the

6  primary barrier to the delivery of better medical care to California's inmate patients.

7  (*See, e.g.,* Plan of Action, Turnaround Plan of Action, Shansky Dep. 12/10/07 at 65:20-

8  24.) He has stated that a prisoner release order will not cure problems in the delivery of

9  medical care. (Ex. 1092 - Receiver's Overcrowding Report, May 15, 2007, *Plata* Dock.

10  No. 673 at 42:11-43:1.) The Receiver has noted that failure is not an option and that

11  CDCR's medical delivery system will be raised to constitutional levels even with

12  overcrowding conditions. (*Id.* at 41:13-25.)

13      15.    Thomas Hoffman, CDCR's Director of the Division of Parole Operations,

14  testified that the California Static Risk Assessment used by the Department shows that

15  approximately 17-22% of the property, drug, non-violent, and non-sex offenders with

16  California prisons present a low risk to reoffend. (Trial Tr., 12/9/08 at 1749:14-25.) The

17  risk tool further shows that of the low risk group that will reoffend, approximately 4% will

18  commit a violent crime. (*Id.* at 1751:24-1752:3.) The upshot of this is that any prisoner

19  release, even one strictly limited to low risk offenders, if possible, will likely result in the

20  commission of violent crimes in the community that would not have otherwise occurred if

21  the offenders remained incarcerated.

22              **(b)    Expert Testimony Regarding Primary Cause and Medical Care**

23      16.    Many of Plaintiffs' experts' reports were drafted by Plaintiffs' counsel. (Trial

24  Trs., 11/18/08 at 157:19-23; 11/19/08 at 279:7-23; 390:24-391:14; 11/20/08 at 471:12-

25  17; 473:4-6.) Many of Plaintiffs' experts, with the exception of Dr. Shansky, were

26  experienced in overall prison administration, but did not have specific experience with

27  correctional medical care. (Trial Trs., 11/18/08 at 154:5-19; 155:12-15; 155:8-11;

28  11/19/08 at 200:6-11; 274:12-275:1; 387:2-4; 11/20/08 at 320:21-24; 11/9/07 Expert

10

1   Report at 1.) Several of Plaintiffs' correctional experts — Wayne Scott, Jeffrey Beard,

2   Joseph Lehman, Jeanne Woodford, and Craig Haney — are not experienced in

3   correctional medical care itself. Mr. Haney's testimony focused on *Coleman* issues.  No

4   expert proffered by Plaintiffs has any evidence that overcrowding has caused an

5   adverse medical consequence to any California inmate patient. (Trial Tr., 11/18/08, at

6   174:18-23; 11/19/08 at 247:40-44; 285:4-20; 398:8-400:8; 11/20/08 at 480:3-481:3.)

7                         **(i)     Wayne Scott**

8         17.     Wayne Scott is the former head of the Texas Department of Corrections.

9   (Trial Tr., 11/18/08, at 138:24-139:10.)  He testified that he has no medical training and

10  has no experience providing medical care to inmates. (*Id.* at 154:5-19; 155:8-15.)  Mr.

11  Scott did not visit each one of CDCR's 33 adult prisons before arriving at his opinions.

12  (*Id.* at 155:8-11.)  Mr. Scott testified that Plaintiffs' counsel drafted his report. (*Id.* at

13  157:19-23.)  Mr. Scott admitted, as he must, that he does not know the quality of medical

14  care at CDCR's prisons as of August 2008. (*Id.* at 162:15-20.)

15        18.     Mr. Scott testified that he did not even evaluate the numbers of medical

16  clinicians providing medical care to inmate patients in CDCR's prisons. (*Id.* at 176:4-

17  177:13.)  Mr. Scott testified that he does not know the numbers of correctional officers or

18  the vacancy rate for correctional officers as of August 2008. (*Id.* at 178:17-179:3.)  Mr.

19  Scott testified that he only evaluated correctional officer staffing – even though

20  correctional officer staffing is only one part of the delivery of medical care to inmate

21  patients.  Mr. Scott did not know of a single inmate in California's prisons who suffered

22  an adverse medical or mental health consequence as a result of overcrowding. (*Id.* at

23  174:18-23; 175:2-15.)

24                        **(ii)    Jeffrey Beard**

25        19.     Jeffrey Beard is the head of the Pennsylvania Department of Corrections.

26  (Trial Tr., 11/19/08 at 200:15-18.)  He is not medically trained and has never been a

27  clinical provider of medical care. (*Id.* at 233:12-14.)  Secretary Beard testified that he

28  never evaluated the  deficiencies in California's medical or mental health care delivery

                                              11

1    systems. (*Id.* at 234:18-22; 236:4-11.) Secretary Beard has never evaluated the

2    operable capacity of California's prisons and testified that he would need to visit each

3    prison to do so. (*Id.* at 239:25-240:5.) Secretary Beard testified that constitutional

4    medical and mental health care can be provided in overcrowded prisons. (*Id.* at 241:2-

5    6.)

6        20.    Secretary Beard testified that the dramatic increases in correctional officer

7    and clinical staffing have undoubtedly improved medical and mental health care in

8    California's prisons. (*Id.* at 180:21-25.) Secretary Beard testified that a system's death

9    rate is an important factor in evaluating the level of care being provided by the system.

10    (*Id.* at 244:7-27.) He also acknowledged that CDCR had the 14th best rate nationally,

11    while his system, Pennsylvania, fell in the bottom 5 nationally. (*Id.* at 244:7-27.) Again,

12    like Mr. Scott, Secretary Beard testified that he was not aware of any CDCR inmate in

13    the last three years who suffered an adverse medical or mental health consequence as

14    a result of overcrowding. (*Id.* at 247:40-44.)

15                    **(iii)    Joseph Lehman**

16        21.    Joseph Lehman is the former head of the Maine, Pennsylvania, and

17    Washington departments of correction. (Trial Tr., 11/19/08, at 260:22-261:1.) He too

18    testified that he has no medical or mental health training. (*Id.* at 274:12-275:1.) Mr.

19    Lehman does not know the status of the delivery of medical or mental health care in

20    CDCR's prisons as of August 2008. (*Id.* at 279:4-10.) Like Mr. Scott and Secretary

21    Beard, Mr. Lehman testified that he did not know of a single inmate being denied

22    medical care or mental health care due to overcrowding or a lockdown. (*Id.* at 283:2-

23    284:20; 285:4-20.)

24                    **(iv)    Jeanne Woodford**

25        22.    Jeanne Woodford, the former acting head of CDCR, also testified. (Trial

26    Tr., 11/19/08 at 363:8-13.) She, too, admitted that she has no medical or mental health

27    training and has never been a clinician. (*Id.* at 387:2-4; Expert Report of Jeanne

28    Woodford, 11/19/2007, at 1.) Ms. Woodford testified that Plaintiffs' counsel drafted her

                                        12

1   first report. (Trial Tr., at 390:24-391:14.) Ms. Woodford testified that she has no

2   knowledge of any CDCR inmate becoming sick or being denied medical or mental health

3   care due to a lockdown or overcrowding. (*Id.* at 403:21-404:15.)

4                        **(v)    Ronald Shansky, M.D.**

5          23.    Plaintiffs' sole correctional medical expert, Dr. Shansky, also testified that

6   he did not draft his initial report -- Plaintiffs' counsel did. (Trial Tr., 11/20/08 at 471:12-

7   17; 473:4-6.) Dr. Shansky testified about the numerous improvements in the delivery of

8   medical care to California's inmate patients. He testified that there have been dramatic

9   improvements in staffing. He acknowledged that CDCR's physician staffing has

10  increased dramatically, and is within 5% of the Receiver's goal to fill 90% of physician

11  positions. Likewise, staffing of registered nurses has increased and is now within 2% of

12  the Receiver's statewide goal to fill 90% of nursing positions. He noted that these

13  dramatic staffing increases have undoubtedly led to better care. (*Id.* at 445:7-446:14;

14  447:9-448:5.)

15         24.    Dr. Shansky (like Defendants' correctional medical expert Dr. Thomas)

16  also testified that culture is important to the delivery of quality medical care. (*Id.* at

17  465:22-466:5.) Dr. Shansky noted that it appears that CDCR's culture is different and

18  that there is better coordination between medical and custody staff – again leading to

19  better care than when he was a consultant for the Defendants in *Plata*. (*Id.* at 449:21-

20  22.)

21         25.    Dr. Shansky testified that effective peer review and death review programs

22  are key to improved care and that during the Receivership, these important quality

23  control devices have improved. (*Id.* at 450:5-12; 454:21-455:12; Dep. of Ronald

24  Shansky, 12/10/07 at 117:12-118:2.) Dr. Shansky testified that the number of alleged

25  preventable asthma deaths went from 6 in 2006 to 0 in 2007. (Trial Tr., 11/20/08 at

26  450:20-451:2.) He testified that the number of alleged preventable deaths went from 18

27  in 2006 to 3 in 2007 and that deaths have trended down in the last 10 quarters. (*Id.* at

28  454:21-455:12; 486:16-22; 487:2-5; Shansky Dep. at 74:7:16.)

                                          13

1       26.    Dr. Shansky stated that many barriers to better care can be accomplished

2  without a prisoner release order by increasing staffing, improving medical records,

3  improving information technology, and implementing health care access teams -- to

4  name just of the few improvements occurring or planned. (Trial Tr., 11/20/08 at 457:1-

5  13; 458:11-23; 468:22-469:6; 478:20-22; 479:11-16.)

6       27.    Dr. Shansky testified that he is aware of no outbreaks of disease in the

7  proceeding years caused by the use of non-traditional beds or overcrowding. (*Id.* at

8  474:23-475:6.)

9       28.    Dr. Shansky testified that CDCR could release 40,000 inmates and it would

10  not solve the deficiencies in medical care. He stated that the State would still need to

11  address the other interrelated components involved in the delivery of quality medical

12  care, like staffing, medical escorts, medical records, and medication management, in

13  order to improve medical care. (*Id.* at 483:7-18.)

14       29.    Dr. Shansky testified at his deposition that he could not opine on whether

15  overcrowding is the primary cause of the unconstitutional delivery of medical care at

16  each one of California's prisons. (*Id.* at 484:1-485:13.)

17                 **(vi)    David Thomas, M.D.**

18       30.    Defendants' expert, Dr. Thomas, is a practicing physician and has been

19  practicing for just under 40 years. He is board certified by the American Board of

20  Ophthalmology. (Trial Tr., 12/3/08 at 1193:6-9.) Dr. Thomas currently is a Professor

21  and Chairman of the Department of Surgery and Professor and Chairman of the Division

22  of Correctional Medicine at Nova Southeastern University. (*Id.* at 1194:4-7.) Dr.

23  Thomas worked for the Florida Department of Corrections for nine years and held

24  several positions at the Department, ultimately becoming Assistant Secretary for Health

25  Services. (*Id.* at 1195:13-1196:9.) Dr. Thomas has also served as a surveyor for the

26  National Commission of Correctional Healthcare, has been the Chairman and a member

27  of the Commission on Accreditation in Corrections, and is currently on the Board of

28  Governors of the American Correctional Association. (*Id.* at 1199:13-22.)

14

31.    Dr. Thomas explained that private hospitals also experience similar challenges as experienced in the correctional healthcare setting. Preventable death is a death that occurs because of a failure of the medical system or an individual provider. It is a death that should not have happened. Preventable deaths occur in private medical practice at a rate of between 44,000 to 98,000 annually. (*Id.* at 1204:23-1206:5.) Outbreaks of infectious disease, particularly of MRSA, occur in private hospitals. (*Id.* at 1206:10-24.)

32.    Dr. Thomas noted several improvements made during the Receivership, including significant improvements to improve the quality of care, and establishing chronic illness clinics with defined intervals and regular appointments with an integrated pharmacy. (*Id.* at 1207:20-1208:8.) The culture has started to improve. CDCR staff are empowered and desire to provide better care. (*Id.* at 1210:1216:20.)

33.    There are several other factors besides overcrowding that impact whether healthcare is being adequately delivered in correctional settings. These factors are being addressed and improved despite population pressures. (*Id.* at 1209:24-1210:3.) The single most important factor in the delivery of adequate healthcare is the culture of the system. (*Id.* at 1212:16-1216:20.) Constitutionally adequate medical care can be provided in CDCR institutions despite population pressures. (*Id.* at 1216:21-3.) While there may be some connection between overcrowding and medical care, overcrowding is not the primary cause of the problems within CDCR. Even after addressing overcrowding issues, there are myriad of additional issues that must be addressed to achieve a constitutionally adequate medical system. (*Id.* at 1217:4-1218:16.)

34.    Dr. Thomas explained that other systems, such as the Florida system which he directed, have created medical classification systems that assign inmates to prisons based upon an evaluation of the intensity of their medical needs, so that inmates with more intensive medical needs are matched up with facilities with the resources to better meet those needs. (*Id.* at 1196:10-1197:13.)

/ / /

15

1          (c)    **Factual Conclusions**

2          35.    No evidence was presented that Plaintiffs' requested relief of a reduction in

3    the prison population by 52,000 inmates over two years and the imposition of a cap at

4    130% design capacity is necessary to remedy the constitutional violations with respect to

5    medical care or that more narrowly drawn and less intrusive relief does not exist.

6          36.    This Court finds as a factual matter that crowding is not the primary cause

7    of the constitutional violations in the delivery of medical care in California's prisons and

8    that neither a release of prisoners nor a population cap will remedy the constitutional

9    violations with respect to the delivery of medical care.

10         37.    This Court further finds as a factual matter that relief other than a prisoner

11   release order can remedy the constitutional violations with respect to the delivery of

12   medical and mental health care to California's prison inmates.  Specifically, the delivery

13   of medical care will continue to improve, even at current population levels.

14         **(3)    *Coleman***

15              (a)    **Improvements in the Mental Health Care Delivery System**

16                   (i)    **Enhancement of Screening, Diagnosis and Treatment Procedures**

17

18         38.    Since 1997, Defendants have used a uniform set of policies and

19   procedures to provide care to mentally ill inmates.  (Trial Aff. of Robin Dezember,

20   10/30/08, (Dezember Aff.) *Coleman* Dock. No. 3228 at ¶ 15.)  Those policies and

21   procedures, known as the Program Guide, were provisionally approved by the *Coleman*

22   Court.

23         39.    After years of discussion and negotiation between the parties and the

24   *Coleman* Special Master, that set of provisional policies matured into a final set of

25   policies and procedures approved by the *Coleman* Court in March 2006.  (Dezember

26   Aff., ¶¶ 16-17; *see* Defs.' Trial Ex. 1041 - *Coleman* Court Order, filed 3/3/06, *Coleman*

27   Dock. No. 1773; Defs' Trial Ex. 1147- 2006 Program Guide.)

28         40.    According to the *Coleman* Special Master, the court-approved 2006

16

1   Revised Program Guide for mental health services provides for enhanced mental health

2   care standards in all CDCR institutions. (Defs.' Trial Ex. 1109 - *Coleman* Special

3   Master's 17th Report, Part A, 5/4/07, *Coleman* Dock. No. 2274 at internal pp. 3-4;

4   Dezember Aff. ¶ 18.) Defendants have implemented those standards statewide.

5   (Dezember Aff. ¶ 23; Trial Tr., 12/2/08, at 846:2-10.) The *Coleman* Special Master

6   observed in September 2008 that at least several institutions are in "substantial

7   compliance" with them. (Trial Tr., 12/2/08, at 846:2-10; Defs.' Trial Ex. 1112, *Coleman*

8   Special Master's 20th Monitoring Report, 9/12/08, *Coleman* Dock. No. 3029, internal p.

9   6.)

10      41.    CDCR now identifies and classifies a significantly greater proportion of its

11  inmates as belonging to the *Coleman* class than it did when the *Coleman* litigation

12  began. In August 2008, CDCR classified 20% of its inmates as severely mentally ill, up

13  from 7.9% in 1994. (Dezember Aff., 10/30/08, *Plata* Dock. No. 1715, ¶¶ 70, 71.)

14      42.    The treatment programs or 'levels of care' provided by Defendants have

15  increased in size and in specificity. In 1995, the trial court found the following levels of

16  care existed: inpatient hospital care, Enhanced Outpatient Program care, mental health

17  crisis beds (provided on an "informal" basis within each institution, depending upon

18  available resources) and outpatient care (provided on an "informal" basis and primarily

19  limited to medication only, with psychological services dependant upon the availability of

20  staff). (Defs.' Trial Ex. 1273 -*Coleman* F&Rs, 6/6/94 at 43-44; *see also* Dezember Aff., ¶

21  70.)

22      43.    Under the Revised Program Guide, Defendants now provide distinct levels

23  of care and programs reflecting the mental health care and housing needs of *Coleman*

24  class members. A single level of care provides for the delivery of services within general

25  population housing: the Correctional Clinical Case Management System (CCCMS) level.

26  The Correctional Clinical Case Management System delivers care to inmates able to

27  function well in the General Population with some mental health treatment. (Dezember

28  Aff., ¶¶ 20, 71.)

                                            17

44.     In contrast, Defendants' six other mental health levels of care involve the separation of mentally ill inmates from the general population as part of their treatment. The Enhanced Outpatient Program (EOP) involves the segregation from the general population of those mentally ill inmates who are receiving significant services in order to function well.  The Psychiatric Services Unit (PSU) involves the delivery of Enhanced Outpatient Services to those mentally ill inmates who are receiving significant services in order to function well, and who are serving a security housing unit term.  Inmates within Mental Health Crisis Beds receive short-term, intensive mental health care services, generally not to exceed 10 days.  Inpatient mental health care, at acute and intermediate levels, is provided by Department of Mental Health staff at state hospitals and at CDCR sites.  The Day Treatment Program, operated by the DMH at the California Medical Facility, provides step-down outpatient care for patients moving from intermediate to Enhanced Outpatient Program level of care.  (Dezember Aff., ¶¶ 20, 71.)

### (ii)     Mental Health Bed Increases

45.     In 1994, the CDCR mental health care system was limited to a few institutions and involved some 3,200 designated mental health care beds.  (Defs.' Trial Ex. 1273 - *Coleman* F&Rs, 6/6/94, at 43-44; Dezember Aff., ¶ 70.)

46.     Now, the CDCR mental health care system extends to each CDCR institution across the State and involves some 30,382 beds across all levels of care. (Dezember Aff., ¶ 75; Defs.' Trial Ex. 1247 - Chart of CDCR Facilities.)

47.     Inpatient hospital care has expanded beyond Atascadero State Hospital and California Medical Facility.  (Dezember Aff., ¶ 71; 14; *see also* Def. Tr. Ex. 1247 - Map of CDCR Institutions; Defs.' Tr. Ex. 1243 - Map of DMH Institutions.)  There are now three state mental hospitals and two psychiatric programs available for the inpatient care.  (Trial Tr., 11/21/08, at 758:13-22; 759:9-760: 5.)  These facilities include Atascadero, Coalinga, and Patton State Hospitals and psychiatric programs at CDCR's California Medical Facility and Salinas Valley State Prison institutions.  (Trial. Aff. of Cynthia Radavsky, 10/30/08 (Radavsky Aff.) *Coleman* Dock. No. 3160 at ¶ 14; Trial Tr.,

18

1   11/21/08, at 758:13-22, 759:9-760:5.)

2        48.    The design of the CDCR prisons and DMH hospitals has challenged

3   Defendants' mental health care system. (Defs.' Trial Ex. 1292 - *Coleman* Special

4   Master's May 31, 2007 Response to Court's May 17, 2007 Request for Information, filed

5   5/31/07, *Coleman* Dock. 2253, at 5, 8; Radavsky Aff., ¶ 21.)

6        49.    That challenge has been met, in part, by the adoption and implementation

7   of a validated mental health forecasting methodology provided by Navigant Forecasting.

8   This methodology allows CDCR to project the number of and type of mental health care

9   beds required to provide adequate mental health care services to its mentally ill inmates

10  over the next five years. (Dezember Aff., ¶ 82, 83; Defs.' Trial Ex. 1139, Defs.' August

11  2007 Mental Health Bed Plan.)

12       50.    The challenge has also been met by retrofitting certain interior spaces into

13  mental health care space. (Trial Tr., 12/2/08, at 839:13-20; Defs.' Trial Ex. 1292,

14  *Coleman* Special Master's Response to Request for Information, filed 5/31/07, p. 6.)

15       51.    For instance, general population cells have been converted into clinician

16  offices and mental health care housing. (Trial Tr., 12/2/08 at 841:13-842:5.)  The hiring

17  of staff has progressed during these arrangements. (*Id.* at 859:7-16.) These offices and

18  housing spaces have enabled adequate care to be provided. (*Id.* at 842:7-9.)

19       52.    A case in point is the California Men's Colony locked observation unit.  This

20  facility was unable to meet certain licensure requirements yet, by *Coleman* court order,

21  was directed to provide mental health crisis bed care because adequate care could be

22  provided in that facility. (Trial Tr., 12/2/08 at 842:19- 843:5; 868:23-869:11; Defs.' Trial

23  Ex. 1044, *Coleman* Ct. Order, filed 5/2/06, *Coleman* Dock. No. 1800.)

24       53.    Whether by retrofitted space or by new construction over the years,

25  Defendants have systematically added mental health beds at individual institutions, with

26  a resulting decrease in wait lists for mental health beds.  The activation of 64 Psychiatric

27  Services Unit beds in 2008 resulted in a decrease in the waiting list from 79 to 22.

28  Likewise, the activation of 50 Mental Health Crisis beds in 2008 contributed to a

                                        19

1   decrease in the waiting list for such beds from 301 to 16. Kern Valley State Prison

2   recently added 96 sensitive need EOP beds, which allowed EOP patients to be moved

3   from administrative segregation to those beds. (Dezember Aff., ¶ 74; Defs.' Trial Ex.

4   1186 - Kern Valley State Prison Activation Mem., Aug. 2008.)

5          54.    Correctional Clinical Case Management System Beds: The vast majority

6   of the mentally ill inmates receiving Correctional Clinical Case Management Services are

7   housed in appropriate beds. (Dezember Aff., ¶ 78; Trial Tr., 12/2/08 at 909:20-910:1-

8   11.)

9          55.    To the extent non-traditional space has been used to house class

10  members, the *Coleman* Special Master has indicated that it has no impact on CDCR's

11  ability to provide constitutionally adequate mental health care to CCCMS inmates.

12  (Trial Tr., 12/2/08 at 921:16-922:1.)

13         56.    Even so, the use of non-traditional beds has declined from 19,618 in

14  August 2007 to 14,359 (13,467 male and 802 female) in August 2008. (Kernan Aff., ¶ 4,

15  1:23-26; ¶14, 5:17-23; Defs.' Trial Ex. 1303 - Master Bed Roster; Defs.' Trial Ex. 1304 -

16  Institution Activation Schedule.)

17         57.    Enhanced Outpatient Beds: While awaiting the construction of additional

18  Enhanced Outpatient Program beds, Defendants have addressed the wait lists for

19  Enhanced Outpatient Program beds by, with the *Coleman* Court's approval, bringing that

20  level of care to the Reception Center patients while they wait for transfer to such a bed in

21  a mainline institution. (Dezember Aff., ¶ 79.) Defendants' expert, Ira Packer, has stated

22  that the Enhanced Outpatient Program care provided in reception areas is improving.

23  (Defs.' Trial Ex. 1020, Packer Report, 8/15/08, at 3.)

24         58.    Inpatient Beds: Defendants have already undertaken efforts to create

25  more inpatient beds. Defendants already converted two units at California Medical

26  Facility in 2007 into 66 intermediate care beds for Level III and Level IV inmates. (Trial

27  Aff. Dezember, ¶ 73; Defs.' Trial Ex. 1111 - *Coleman* Special Master's 19th Round

28  Report, filed July 25, 2008, *Coleman* Dock. 2895 at 20.) Funding for another 64-bed

                                        20

1  intermediate care facility at California Medical Facility is now being sought.  (Trial Tr.,

2  11/21/08 at 801:14-23, Trial Tr., 12/2/08 at 848:15-24.)  Likewise, Defendants added 112

3  inpatient intermediate care beds for high custody inmates to Salinas Valley State Prison

4  in 2006, and plan to activate an additional 64 inpatient beds at the same facility in 2009.

5  (Dezember Aff., ¶ 73; Defs.' Trial Ex. 1109, *Coleman* Special Master's 17th Report, Part

6  A, filed February 9, 2007, 2007, *Coleman* Dock. No. 2138, at 114; Trial Tr. 11/23/08 at

7  762:23-763:11; 793:22-794:21; Defs.' Trial Ex. 1043 - *Coleman* Order, filed 3/3/06,

8  *Coleman* Dock. No. 1772.)  A 50-bed mental health crisis unit at California Men's Colony

9  is also planned.  (Trial Tr. 12/2/08 at 848:15-24; Defs.' Trial Ex. 1050, *Coleman* Order,

10  filed 3/27/07, *Coleman* Dock. No. 2173.)

11      59.    Both the *Coleman* court and Defendants recognize the construction of

12  additional secure facilities for the care of high-custody inmates requiring inpatient care

13  will remediate the wait list for such inpatient care.  (Radavsky Aff., ¶ 23-25, 29; Trial Tr.

14  11/21/08, 762:16-764:5; Defs.' Trial Ex. 1043 - *Coleman* Order, filed 3/3/06, *Coleman*

15  Dock. No. 1772; Defs.' Trial Ex. 1296 - *Coleman* Order, filed 5/2/06, *Coleman* Dock. No.

16  1800.)

17              (iii)    **Mental Health Staffing Increases**

18      60.    CDCR has increased its number of mental health clinicians, including

19  psychiatrists, psychologists, and social workers, from 314 positions in 1994 to 2396

20  positions today.  (Dezember Aff. ¶ 48; *see* Defs.' Ex. 1269 - Chart of 1994 Mental Health

21  Care Positions; Defs.' Trial Ex. 1235 - CDCR 2008 Mental Health Care Positions; Defs.'

22  Trial Ex. 1246, CDCR Chart of Mental Health Positions.)  In his September 2008 report,

23  the *Coleman* Special Master noted that at least four CDCR institutions have nearly all of

24  the mental health clinicians they need.  (Trial Tr., 12/2/08 at 928:12-929:22; Defs.' Trial

25  Ex. 1112 - *Coleman* Special Master's 20th Monitoring Report, filed 9/12/08, *Coleman*

26  Dock. No. 3029 at 24, 70, 259, 306, 329, 330.)  The DMH facilities that serve CDCR

27  inmates now have as many psychiatrists as they need.  (Trial Tr., 11/21/08, at 814:4-10.)

28      61.    Both CDCR and DMH have used new pay parity packages to drive

21

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

1816796.1

1    stronger recruiting strategies for mental health clinical staff. (Dezember Aff., ¶¶ 57, 58;

2    Radavsky Aff., ¶ 28;  Trial Tr., 11/21/08 at 812:11-813:13.)  Further, CDCR developed

3    and, in conjunction, with the Special Master's staff, finalized a workload methodology to

4    measure mental health staffing needs biannually.  (Dezember Aff., ¶ 65.)

5         62.    CDCR now employs approximately 2400 correctional officers in dedicated

6    "access to care" units to provide escort for inmates to their medical and mental health

7    appointments.  (Trial Tr., 12/10/08, at 1894:20-1895:6.)

8                   (iv)    **Suicide Prevention Program Improvements**

9         63.    At the underlying trial, the *Coleman* court found that Defendants' 1990

10   suicide prevention program for CDCR institutions would have been sufficient if

11   adequately staffed.  (Dezember Aff. ¶ 30; Defs.' Trial Ex. 1273 - *Coleman* F & R, 6/6/94,

12   *Coleman* Dock. No. 547 at 75:1-6.)  Defendants have significantly increased mental

13   health staffing since the underlying trial.  (Dezember Aff., ¶ 48; *see* Defs.' Trial Ex. 1269

14   - Chart of 1994 Mental Health Care Positions; Defs.' Trial Ex. 1235.)

15        64.    The *Coleman* court found in 2005 that suicides occurred at higher rates

16   within administrative segregation areas.  CDCR worked with the *Coleman* Special

17   Master and Plaintiffs' counsel to develop improved suicide prevention strategies for

18   administrative segregation areas.  The *Coleman* court approved and Defendants have

19   implemented a multidisciplinary and comprehensive approach to reducing suicides.

20   (Dezember Aff., ¶¶ 32-41; *see* Defs.' Trial Ex. 1279 - *Coleman* Order, 6/9/05, *Coleman*

21   Dock. No. 1668; Defs.' Trial Ex. 1280 - *Coleman* Stipulated Order, 2/13/06, *Coleman*

22   Dock. No. 1760; Defs.' Trial Ex. 1282 -*Coleman* Order, 6/8/06, *Coleman* Dock. No. 1830;

23   Defs.' Trial Ex. 1311 - *Coleman* Stipulated Order, 7/5/06, *Coleman* Dock. No. 1872.)

24        65.    The performance and efficacy of these suicide prevention programs is

25   measured by CDCR's internal investigations and analyses of any inmate suicides within

26   its institutions.  (Dezember Aff. ¶¶ 35-36.)

27                   (v)    **Mental Health Records System**

28        66.    Defendants are continuing to work to improve CDCR's mental health

                                        22

1  recordkeeping systems.  According to current estimates, new information technology will

2  be implemented within 18-24 months.  (Dezember Aff. ¶¶ 90-91.)

3              (vi)    **Pharmacy System**

4       67.    The Coordinated Courts vested the *Plata* Receiver with leadership

5  responsibility over the pharmacy function of the medical and mental health services

6  delivery system.  (Defs.' Trial Ex. 1299, Coordinated Cts' Order, 6/28/07.)  The *Plata*

7  Receiver has contracted with Maxor National Pharmacy Services Corporation to install

8  the necessary pharmacy services in each institution.  (*Id.*)

9       68.    The *Coleman* Special Master has already found, at least at one institution,

10  that "Pharmacy operations were transformed by a 100 percent increase in staffing and

11  installation of Maxor National Pharmacy Services Corporation's (Maxor's) new

12  management information system."  (Defs.' Trial Ex. 1112, *Coleman* Special Master's

13  20th Monitoring Report, filed 9/12/08, *Coleman* Dock. No. 3029 at 58.)

14       69.    The efforts to improve pharmacy served to improve the medication

15  management of *Coleman* class members.  (Dezember Aff., ¶ 92.)

16          (b)    **The Mental Health Care System and the Overcrowding of CDCR**

17       70.    The *Coleman* Special Master has never recommended reducing inmate

18  population in order to improve mental health care in CDCR institutions.  Instead, he has

19  stated that appropriate and uniform policies and procedures, bed availability, staffing

20  levels, and suicide prevention are the components to a constitutionally adequate mental

21  health care system.  (Defs.' Trial Ex. 1108 - Summary of *Coleman* Special Master

22  Reports.)

23       71.    Most *Coleman* class members are not housed in overcrowded conditions:

24          a.    According to both CDCR data and Plaintiffs' evidence, the vast

25  majority of CCCMS outpatient inmates are housed in appropriate beds, not in "non-

26  traditional" housing areas.  (Dezember Aff., ¶ 78; Defs.' Trial Ex. 1252 - CDCR Chart of

27  Non-Traditional Beds; Trial Tr., 12/2/08, at 909:20-910:11.)  Even when some CCCMS

28  inmates have been housed in non-traditional beds, neither the *Coleman* Special Master

                                        23

1  nor the *Coleman* court has ever criticized CDCR for such placement.  (Trial Tr., 12/2/08,

2  at 921:16-922:1.)

3           b.       Inmates receiving EOP care are not housed in non-traditional

4  housing areas, and they are separated from the general inmate population.  They are

5  provided EOP care even when separately housed in Secured Housing Units for

6  disciplinary reasons.  (Dezember Aff., ¶¶ 20, 20b, 76.)

7           c.       Inmates receiving inpatient services are not housed in non-

8  traditional housing areas, and they are separated from the general inmate population.

9  (*See* Defs.' Tr. Ex. 1295 - Map of DMH Institutions; Radavsky Aff., ¶ 14, 6:6-8; Trial Tr.,

10  11/21/08 at 761:15-18.)  These patients dine separately, they are treated in separate

11  therapeutic environments, they participate in separate individual and therapeutic groups,

12  and they are provided separate times for yard and recreation apart from the general

13  population.  (Trial Tr., 11/21/08, at 761:4-14; Radavsky Aff., ¶ 17, 7:4-16.)  These

14  patients are not housed with non-patient inmates in traditional or even non-traditional

15  housing areas, such as dayrooms and gymnasiums.  (*Id.*)

16       The inpatient hospital care provided by DMH at Atascadero State Hospital and

17  Patton State Hospital is licensed under state regulations and accredited by the national

18  Joint Commission on the Accreditation of Healthcare Organizations.  (Radavsky Aff., ¶

19  18, 7:26-17.)  Coalinga State Hospital is currently licensed and working toward Joint

20  Commission accreditation.  (*Id.* at ¶ 18, 7:26-17.)  Under these accreditation standards,

21  the patients are provided either single rooms or two-person or four-person dormitories,

22  depending on their treatment needs and acuity level, in areas designed for patient

23  housing.  (*Id.* at ¶ 18, 7:26-17.)  No patients are housed in non-traditional housing areas,

24  such as gymnasiums or dayrooms, within DMH hospitals.  (*Id.* at ¶ 18, 7:26-17; Trial Tr.,

25  11/21/08, 761:15-18.)  The undisputed evidence shows that the overall population of

26  inmates within CDCR institutions has not caused any crowding of CDCR patients within

27  DMH programs at CDCR sites or within DMH hospitals.

28       As a result, whether housed at a CDCR facility or a state mental hospital,

1   *Coleman* class members receiving inpatient care are not subjected to overcrowded

2   conditions.  (Radavsky Aff., ¶ 17, 7:4-16; Trial Tr., 12/21/08, 768:10-12.)

3          d.    Building additional high-security mental health facilities will remedy

4   any existing shortage of inpatient beds for high-custody inmates.  (Radavsky Aff., ¶¶ 21,

5   23-25, 29; Trial Tr., 11/21/08, 762:16-22; Defs.' Trial Ex. 1043 - *Coleman* Order, 3/3/06,

6   *Coleman* Dock. No. 1042.)

7   72.    Therapeutic modules have been designed and approved by the *Coleman*

8   Special Master's team to enable high-custody inmates to participate in individual and

9   group therapy without risk to staff and other patients.  (Trial Tr., 12/2/08 at 927:13-

10   928:5.)

11   73.    The use of holding cells for a short-term monitoring of an inmate pending

12   transfer to a mental health crisis bed has been found appropriate by the *Coleman*

13   Special Master.  (Trial Tr., 12/2/08 at 926:7-927:11.)

14   74.    Pay inequity and workload imbalances, not population levels, have caused

15   mental health staffing shortfalls:

16          a.    The *Coleman* Special Master has stated that a failure to evenly

17   distribute pay and to use a validated methodology for determining staffing levels caused

18   CDCR's mental health clinician staffing shortfalls.  (Defs.' Trial Ex. 1305, *Coleman*

19   Special Master's 16th Monitoring Report, 12/14/06; *Coleman* Dock. No. 2081 at pp. 430-

20   432.)

21          b.    After developing pay parity packages and a workload instrument to

22   distribute work according to need, CDCR has achieved nearly full staffing of at least four

23   institutions and significantly improved staffing at other institutions, and DMH has

24   sufficient psychiatrist staff to serve CDCR inmates—despite current population levels.

25   (Dezember Aff., ¶¶ 55-65; Radavsky Aff., ¶¶ 27-28; Trial Tr., 11/21/08 at 814:4-10; Trial

26   Tr., 12/2/08 at 897:15-898:2, 901:22-902:3, 928:12-929:22; Defs.' Trial Ex. 1112,

27   *Coleman* Special Master's 20th Monitoring Report, filed 9/12/08, *Coleman* Dock. No.

28   3029, pp. 24, 30, 40, 51, 55, 70, 222, 259, 286, 306.)

25

75.    No clear evidence links inmate suicides to overpopulation:

a.    Suicide rates within CDCR vary according to a complex interplay of multiple factors, particularly demographic factors.. (Defs.' Trial Ex. 1281 - Patterson & Hughes, Review of Completed Suicides in the CDCR, 1999 to 2004, Psychiatric Services (June 2008) Volume 59, Number 6, p. 677; *see also* Trial Tr., 12/3/08 at 1287:6-16 (excerpted testimony from Christopher Mumola showing the risk of suicide among inmates within correctional institutions varied by demographic factors.)

b.    The *Coleman* Special Master has observed that suicides in CDCR facilities occur most often among inmates celled by themselves, not those housed in overcrowded conditions. (Defs.' Trial Ex. 1292 - *Coleman* Special Master's Report on Suicides Completed Within CDCR in Calendar Year 2004, 11/26/07, *Coleman* Dock. Nos. 2566 at 4, 13; Defs.' Trial Ex. 1268, *Coleman* Special Master's Plan to Prevent Suicides in Administrative Segregation, 12/18/06, *Coleman* Dock. 2084, at 1.) Court monitors found that 73% of suicides occurred in single cells, most of them in administrative segregation or secure housing units. (Defs.' Trial Ex. 1281 at 678.)

**(c)    Expert Testimony Regarding Primary Cause and Mental Health Care**

76.    Plaintiffs' experts, Craig Haney and Pablo Stewart, testified that a population reduction would not remedy the deficiencies in the mental health care system. (Trial Tr. 12/2/08, at 963:24-964:20; Trial Tr. 12/12/08, at 2226:22-2227:10.) Defendants would still have to obtain sufficient staff and sufficient beds to address outstanding deficiencies. (*Id.*)

a.    Craig Haney, a professor of psychology, was offered as an expert on the psychology of imprisonment and the impact of prison conditions. (Trial Tr. 11/19/08, at 292:8-293:9.) He has a doctorate degree in psychology, but is not a licensed psychologist. (Trial Tr. 11/19/08, at 321:1-8) He has a juris doctorate degree, but is not a licensed attorney. (*Id.*) He has never worked in a prison system in any capacity. (Trial Tr. 11/19/08, at 320:15-25.) He did not tour all the CDCR institutions, just eight, and did not tour any DMH hospitals in preparing his opinion in this proceeding.

26

1    (Trial Tr. 11/19/08, at 299:3-6.) He testified at the underlying trial of the *Coleman* case in

2    1994. (Trial. Tr., 12/2/08, at 961:19-963:1.) Even at that time of his 1994 trial testimony,

3    he found CDCR was overcrowded. (*Id.*) In this proceeding, he agreed that Defendants

4    had created additional levels of care, uniform treatment protocols, and a system of

5    mental health care since 1994. (Trial Tr., 11/19/08, at 321:17-322:16.) In his report and

6    testimony, he explained that a population reduction would not remedy the deficiencies in

7    the mental health care system. (Trial Tr., 11/19/08, at 333:24-345:5; 346:8-347:9;

8    12/2/08, 963:24-964:20.) Additional beds and additional staff would be necessary to

9    remedy the deficiencies. (Trial Tr., 12/2/08, at 963:24-964:20.) He acknowledged that

10   even a correctional system operating at less than capacity could still be deficient if

11   mental health resources were inadequate. (Trial. Tr., 11/19/08, at 333:24-335:5; 12/2/08,

12   964:21-965:4.)

13           b.    Pablo Stewart, a professor of psychiatry, was proffered as an expert

14   on prison psychiatry by Plaintiffs. (Trial Tr., 11/18/08, at 64:16-17; 81:24-82:14.) His

15   only experience in a correctional setting occurred some twenty years ago in a local jail,

16   shortly after completing his residency. (Trial Tr., 11/18/08, at 81:24-82:14; 84: 5-13.) He

17   toured only five of the 33 CDCR prisons and toured no DMH hospitals. (Trial Tr.

18   11/18/08, at 64:20-65:14.) He could not identify a specific population level that would

19   remedy the deficiencies in the mental health care system. (Trial Tr., 12/12/08, at

20   2221:10- 23, 2223:16-22.)

21           c.    In contrast, former Special Master Keating found, "Even the release

22   of a hundred thousand inmates would likely leave the defendants with a largely

23   unmitigated need to provide intensive mental health services to program populations that

24   would remain undiminished by a reduction of some 19,000 CCCMS [Correctional Clinical

25   Care Management Services] inmates." (Defs.' Trial Ex. 1292, Special Master's Report

26   on Population, 5/31/07, *Coleman* Dock. 2253 p. 15; Trial Tr. 12/2/08 at 929:23-930: 24.)

27   Former Special Master Keating added that the release of 50,000 inmates "would still not

28   raise staffing resources into equilibrium with the mental health caseload needs." (Defs.'

27

1   Trial Ex. 1292, Special Master's Report on Population, 5/31/07, *Coleman* Dock. 2253 p.

2   15; *see also* Trial Tr., 12/2/08 at 930:25-931:1-10.)  He explained "Clinicians cannot be

3   spread out like butter over the MHSDS [Mental Health Services Delivery System]

4   caseload." (Defs.' Trial Ex. 1292, Special Master's Report on Population, 5/31/07,

5   *Coleman* Dock. 2253 p. 15; *see also* Trial Tr., 12/2/08 at 931:11-14.)

6                   **(d)    Factual Conclusions**

7          77.    No evidence was presented that Plaintiffs' requested relief of a reduction in

8   the prison population by 52,000 inmates over two years and the imposition of a cap at

9   130% design capacity is necessary to remedy the constitutional violations with respect to

10  mental health care or that more narrowly drawn and less intrusive relief does not exist.

11         78.    This Court finds as a factual matter that crowding is not the primary cause

12  of the constitutional violations in the delivery of mental health care in California's prisons

13  and that neither a release of prisoners nor a population cap will remedy the constitutional

14  violations with respect to mental health care.

15         79.    This Court further finds as a factual matter that relief other than a prisoner

16  release order will remedy the constitutional violations with respect to the delivery of

17  mental health care to California's prison inmates.  Specifically, the evidence shows

18  CDCR has and will continue to improve the delivery of mental health care under the

19  supervision of the *Coleman* Special Master.

20  **B.    A Prisoner Release Order Will Have a Significant Adverse Impact on Public
        Safety and the Operation of Local Criminal Justice Systems.**
21

22         **(1)    California's Current Incarceration Rate and Sentencing Practices**

23         80.  .  California does not incarcerate felons at an unusually high rate.  Currently,

24  California sends fewer than 20% of convicted felons to prison - the national average is

25  40%. (Cate Aff., 10/30/2008, *Plata* Dock. No. 1717, *Coleman* Dock. No. 3320 at ¶¶ 23-

26  24.) California's incarceration rate - the number of prison inmates per state residents –

27  is only slightly above the national average.  California's incarceration rate is about 470

28  per 100,000.  The national average is 445 per 100,000.  (Cate Aff. ¶ 22, Defs.' Tr. Ex.

                                            28

1257 – Prisoners in 2006 Bulletin, Appendix Table No. 6.)

81.    California does not keep people in prison longer than average.  The average prison sentence imposed in California is 47.2 months and the average amount of time served is 23.9 months.  (Cate Aff. ¶ 25.)  The average prison sentence imposed nationwide for all state courts is 57 months and the average amount of time served is 32 months.  (*Id.;* Defs.' Trial Ex. 1221 – State Court Sentencing of Convicted Felons 2004 – Statistical Tables.)

82.    The increase in the prison population from 1997 to 2007 is almost exclusively made up of an increase in the number of inmates convicted of crimes against persons.  (Cate Aff. ¶ 18.)  There has been a decrease in the number of drug offenders in California's prisons in the same 10 year period - from 41,459 to 33,738.  (Cate Aff. ¶ 18.)

83.    According to an article by Ryan Fisher entitled: "Are California's Recidivism Rates Really The Highest In The Nation?," which Plaintiffs' expert Dr. Austin relied upon in forming his opinions, a higher percentage of inmates in California than in other states had 10 or more prior arrests.  Moreover, California parolees are more likely to have their minor and major criminal misdeeds detected.  (Trial Tr., 12/4/08 at 1468:8-1469:19.)

### (2)    Relationship of Incarceration Rates to Crime Rates

84.    Some researchers, including James Q. Wilson and William Spellman, have indicated that increased incarceration has reduced crime.  (Trial Tr., 12/4/08 at 1447:18-1448:2.)  Mr. Spellman concluded that 25% of the reduction in violent crime that has occurred in the last 20 years is due to the nationwide increase of the prison population.  (Trial Tr., 12/4/08 at 1448:3-1450:23.)

85.    According to a report by the Washington State Institute for Public Policy entitled "Evidence Based Public Policy Options to Reduce Future Prison Construction, Criminal Justice Costs and Crime Rates," published in October 2006, which Plaintiffs' expert Joseph Lehman cited, a 10 percent increase (or decrease) in the incarceration rate leads to a statistically significant 3.3 percent decrease (or increase) in crime rates.

29

1   (Trial Tr., 12/10/08 at 2029:15-2032:19; Ex. 1331, at 10.)

2      86.    According to Plaintiff's expert, Jeffrey Beard, incarceration rates up to 470

3   per 100,000 can result in a decrease in crime rate. (Trial Tr., 12/5/08, at 1581:4-1583:2.)

4      87.    According to Plaintiffs' expert, Dr. Austin, the prisoner release order

5   requested by Plaintiffs would result in a reduction in California's incarceration rate from

6   about 470 per 100,000 to about 350 per 100,000, which would be a reduction of

7   California's incarceration rate by at least 25%. (Trial Tr., 12/4/08, at 1443:2-1434:1.)

8      **(3)**     **Plaintiffs' Population Reduction Proposals**

9      88.    Plaintiffs' proposals for how to reduce California's prison population are the

10   following:

11      a.    Divert potential prisoners from prison to probation by sending even a

12   lower percentage of convicted felons to prison than it already does, which is already less

13   than 1/2 the national average. (Cate Aff., 10/30/2008, *Plata* Dock. No. 1717, *Coleman*

14   Dock. No. 3320 at ¶¶ 23-24.) Dr. Austin initially estimated that 35% of those diverted

15   from prison to parole or probation would be rearrested within 12 months. (Austin Report,

16   8/15/08, p. 40, Table 10.) Dr. Austin later revised that percentage to 50%. (Austin

17   Report, 8/27/08, ¶¶ 10-12; Trial Tr., 12/4/08, at 1504:12-1506:24.) Dr. Austin estimated

18   that this proposal would result in a CDCR prisoner reduction of 12,147 inmates. (Austin

19   Report, 8/27/08, Table 10; Trial Tr., 12/4/08 at 1505:7-11.)

20      b.    Do not send technical parole violators back to prison. In his report,

21   Dr. Austin claimed that this could result in a population reduction of 6,500 to 9,500 at any

22   given time. (Austin Report, 8/15/08, ¶ 55.) In his trial testimony, Dr. Austin revised the

23   estimated reduction upward to 10,000 to 15,000. (Trial Tr., 12/4/08 at 1435:15-25.) As

24   of June 30, 2008, 43,111 (25.2%) are new admissions, and 19,282 (11.3%) are technical

25   parole violators. (Cate Aff., ¶ 5.) The vast majority - 84% - of inmates sent to prison for

26   technical parole violations are for alleged commission of a new crime. Only 16% of

27   those are purely technical violations. (Cate Aff. ¶ 15.)

28      c.    Discharge from parole after 12 good months. Dr. Austin did not

30

1   estimate the prison population reduction that might result from early discharge from

2   parole.  (Trial Tr., 12/5/08 at 1470:8-22.)

3           d.      Early release through good time credits.  Dr. Austin first estimated

4   that during the initial four month period the shortened length of stay proposal were

5   implemented, approximately 5% of the released prisoners would be re-arrested or

6   returned to prison for a technical violation.  (Austin Report, 8/15/08, ¶ 95, Table 11.)  Dr.

7   Austin later revised that percentage to 50%.  (Austin Report, 8/27/08, ¶¶ 8-9, Revised

8   Table 11.).  Dr. Austin estimated that a prisoner reduction of 9,500 could be achieved

9   through the increased shortened length of stay proposal.  (Austin Report, 8/15/08, ¶ 73.)

10  Dr. Austin testified that CDCR could not achieve a prison population reduction of

11  approximately 50,000 in two years unless it applied the shortened length of stay policy to

12  two strikers or lifers, which would require legislative reform.  (Trial Tr., 12/4/08, at

13  1435:15-1436:22; 1439:8-1440:11.)

14          **(4)    Impact of Proposed Reduction on Local Criminal Justice Systems
                    and Public Safety**

15

16          **(a)    Additional crimes will occur**

17          89.     According to the testimony of Plaintiffs' expert Dr. Austin, additional arrests

18  will occur in connection with the proposals to reduce the prison population.  As set forth

19  in Dr. Austin's Table 11, in Los Angeles County alone, 1,398 additional arrests would

20  occur in the first 4 months of implementation of the proposed shortened length of stay

21  policy which would not have otherwise occurred during that period.  Dr. Austin could

22  have, but did not calculate statewide numbers.  (Trial Tr., 12/4/08, at 1478:17-19.)  As

23  set forth in Dr. Austin's Table 10, the diversion of additional offenders from prison to

24  probation or parole would result in a reduction of the CDCR institutional population of

25  12,147 and correlate with 10,412 rearrests statewide within one year.  (*Id.* at 1505:7-18.)

26  The number of crimes that occur is greater than the number of arrests.  (*Id.* at 1506:21-

27  1507:20.)

28          90.     Richard Word, Police Chief, City of Vacaville, testified that increased crime

                                        31

1    is a better measure of public safety impact than increased arrests. Chief Word testified

2    that criminals "often commit more crimes tha(n) they are caught for." Recent reductions

3    in local police staffing means that arrest numbers may be suppressed because of lack of

4    manpower to make the arrests. (Trial Tr., 12/9/08, at 1848:15-16, 1864:2-5, Word's Aff.,

5    7:26-27.)

6        91.    Jerry Dyer, Chief of Police for the City of Fresno, explained that in 2005, as

7    part of a "bridging program," an increased number of parolees were released into the

8    City of Fresno when compared to other years. That year, the City experienced an 11.5%

9    increase in violent crime. In contrast, the violent crime rate dropped in 2002, 2003,

10   2004, 2006, and 2007, when there was no such release. (Trial Tr., 12/12/08, at

11   2329:25-2330:11.)

12       92.    Steve Smith, Lieutenant, from the Los Angeles County Sheriff's

13   Department, testified that between approximately 2002 and 2006, approximately 10% of

14   prisoners released early from Los Angeles County jail for population reasons were

15   rearrested, 16 of them for murder. (Trial Tr., 12/9/08 at 1799:2-4, 1811:18-23, 1812:2-4,

16   1825:7-10.)

17       93.    Even if the number of crimes committed by prisoners released early from

18   the state prisons would amount to less than 1% of overall arrests, the Riverside County

19   District Attorney, Rodric Pacheco, still believes that those crimes would have a

20   significant detrimental effect on public safety. (*Id.* at 2372:11-2373:12, 2381:22-51,

21   2382:4-11.)

22       **(b)    Additional crimes, inmates, probationers, and parolees at the
              local level would further strain limited local resources**

23

24       94.    As detailed below, a reduction in the prison population and an ongoing cap

25   would have a substantial impact on all aspects of the local criminal justice systems. As

26   summarized by Jerry Dyer, the Chief of Police of the Fresno Police Department, a

27   prisoner release order will severely impact the operation of the criminal justice system.

28   Police officers will be hindered because released prisoners not on parole will not be

                                              32

1  subject to parole searches, thereby hindering the ability of police to investigate and

2  apprehend these individuals for involvement in criminal activity.  The District Attorneys

3  do not have adequate resources and as a result will need to prioritize the crimes they

4  prosecute, resulting in less aggressive prosecution of nonviolent crimes and property

5  crimes.  The release of inmates will also adversely affect the courts and the jails.  The

6  jails and courts do not have the resources and/or space to handle the additional

7  caseload.  (Am. Expert Report of Jerry Dyer, 12/12/2008, *Plata* Dock. No. 1937, ¶¶ 26-

8  30.)

9               **(i)      Police and jail resources are already strained.**

10      95.      Thirty-two of California's Fifty-eight Counties have court-ordered or self-

11  imposed jail population caps or control measures in place.  (Trial Tr., 12/11/2008, at

12  2198:3-9.)  Additionally, as explained by Chief Word, police departments across

13  California are currently losing officers.  (Trial Tr., 12/9/08, at 1856:15-17.)

14      96.    Amador County:

15             a.      Martin Ryan, the Sheriff/Coroner of Amador County, explained that
   the Amador County Sheriff's Department is subject to a hiring freeze, and is understaffed
16  in the positions of correctional officer, transfer officer, and sergeant.  (Trial Tr., 12/18/08
   at 2682:12-14, 2685:26-27, 2686:3-4.)
17
             b.      Amador County jails regularly exceed their rated capacity by 10-
18  15%, and have done so for some time.  The County estimates that it will need 165 beds
   to meet demand by 2010, more than double the current number of beds.  (Ryan Aff.,
19  10/30/08, *Plata* Dock. No. 1726, at 5:15-16, Trial Tr., 12/18/08, at 2684:24-25, 2686:15-
   18.)
20
      97.    Fresno County:  According to Chief Dyer, the Fresno County jail must
21
   comply with a federal court consent decree that limits the jail population.  The jail's
22
   maximum population must not exceed 3,478 prisoners.  Currently, the population hovers
23
   around 3,300 inmates.  Due to budget cuts this fiscal year, the Sheriff has been forced to
24
   cut 32 correctional officer positions, which resulted in the closure of a 300 bed satellite
25
   jail facility.  The closure of this facility has aggravated jail overcrowding issues at the
26
   main jail.  Pursuant to the consent decree, the Sheriff may release or refuse to take
27
   additional prisoners when they reach 90% capacity, and they must release and refuse
28

33

1   prisoners when they reach 100% capacity. Any increased levels of arrests requiring

2   booking would pose a severe challenge for the jail, and property offenders would be the

3   first to be released or refused in the face of over-crowding. (Am. Dyer Aff., ¶29.)

4       98.   Los Angeles County:

5           a.   Alexander Yim, Chief of the Correctional Services Division for Los

6   Angeles County testified that the Los Angeles County jails operate under a court-ordered

7   population cap. The court lowered the cap by 2000 inmates in 2007. As a result of the

8   cap, the County must occasionally release prisoners early in order to keep the jail

9   population under the cap. (Yim Aff., 10/30/08, *Plata* Dock. No. 1725 at 1:14-20, 4:21-

10  28.) Lieutenant Smith explained that in 2007, due to a population cap, Los Angeles

11  County released 9959 pretrial detainees who would not otherwise have been released

12  and 40,830 sentenced jail inmates before their sentences were ended. (Trial Tr.,

13  12/9/08, at 1803:23-1804:1-5.) The Los Angeles County jail system cannot

14  accommodate any additional prisoners "and is struggling to handle the workload it is

15  currently experiencing." (Yim Aff. ¶ 6:17-19.)

16          b.   Los Angeles County currently plans to construct approximately

17  1000-2000 beds. However, the county would need an additional 5000 beds in addition

18  to these 1000-2000 to eliminate the current overcrowding problem. (Trial Tr., 12/9/08, at

19  1802:20-25, 1803:1-2.)

20          c.   Los Angeles County is currently unable to provide all of the services

21  required by mentally ill inmates in the County's jails. (*Id.* at 1817:21-23.)

22      99.   Orange County:

23          a.   Michael James, Assistant Sheriff, Orange County testified that an
    influx of state prison releasees into Orange County jails would force the County to
24  sacrifice programming space or to release more inmates early who would not otherwise
    qualify for early release. (James Aff., 10/30/08, *Plata* Dock. 1728 at 9:20-28, 10:1-3.)
25
            b.   Orange County does not have sufficient staff or funding to provide
26  mental health services to all inmates in the County jails who need them. (*Id.* at 5:7-10.)

27      100.  Riverside County:

28          a.   As explained by Mr. Pacheco, Riverside County jails are subject to a

                                      34

1   court-ordered population cap. In 2007, due to lack of capacity in the jail, the County released 3823 pretrial detainees who would not otherwise have been released and 2178
2   sentenced jail inmates before their sentences were ended. (Trial Tr., 12/12/08 at 2377:23-22, 2389:22-26, Pacheco Affidavit at 4:13-15, 5:18-20, 24-27, 6:2-4.).

3
    b.      During the first eight months of 2008, 32% of pre-trial detainees
4   released early from Riverside County jails due to overcrowding were re-arrested before the eight months had ended. (Pacheco Aff., 10/30/08, *Plata* Dock. No. 1709 at 4:18-21.)
5
    c.      The addition of early released parolees to the Riverside County jail
6   system may require the Sheriff to release detainees accused of violent or sexual crimes pretrial in order to comply with the population cap. (Trial Testimony, 12/12/08, at
7   2389:22-26.)

8   101.   San Diego County:

9       a.      According to San Diego Commander John Ingrassia, San Diego
    County jails are subject to a state-court-ordered population cap. In 2007, due to lack of
10  capacity in the jail, the County released 9855 pretrial detainees who would not otherwise
    have been released and 9007 sentenced jail inmates before their sentences were
11  ended. (Ingrassia Aff., 10/30/08, *Plata* Dock. No. 1673 at 5:7-9, 7:9-11, Ingrassia
    Stipulation, 12/15/08, *Plata* Dock. No. 1941 at 3:18-28, 4:1-9.)
12
        b.      The San Diego County Sherriff's Department uses a number of
13  programs and methods to control inmate population and comply with its court-ordered
    population cap, including early release and diversion programs, sentence reduction and
14  furloughs, and electronic monitoring. (Ingrassia Stipulation, *Plata* Dock. No. 1921
    12/10/08 at 3:18-28, 4:1-9.) San Diego County has exhausted all available programs
15  and methods for complying with its population cap. There are very few additional low
    risk inmates in the County's jail who can be released to make room for new arrestees. If
16  new parolees flow into the jail system, the County will be forced to release higher-risk
    inmates from the jail in order to comply with the cap. (Ingrassia Aff., 6:1-2, 19-24.)
17
    102.   San Mateo County:
18
        a.      David Boesch, Assistant County Manager for San Mateo County,
19  and Greg Munks, San Mateo County Sheriff, testified that San Mateo County jails are
    currently operating around 140% of rated capacity. (Boesch Aff., 10/30/08 *Plata* Dock.
20  No. 1698 at 12:9-10; 12/9/08 Trial Tr. at 1777:6-10, Munks Aff., 10/30/08, *Plata* Dock.
    1698 at 4:4-5.) The functional capacity of a jail is approximately 5-10% below its rated
21  capacity. The functional capacity represents the capacity needed to properly classify,
    transfer, and move inmates as needed, and for maintenance. (Trial Tr., 12/9/08, at
22  1776:15-25.)

23      b.      Due to overcrowding, San Mateo County jails have had to convert
    program space to bed space. This limits the jails' ability to operate rehabilitation and
24  reentry programs in the jails, and reduces jail safety because program facilities do not
    have sufficient security to operate as bed space. (Munks Aff., 5:7-12; Trial Tr., 12/19/09,
25  at 1777:18-25; Munks Report, p. 4.) San Mateo County jails lack space for effective
    reentry programs. (Boesch Aff., 12:17.)
26
    c.      San Mateo County has made a concerted effort to identify inmates
27  who are good candidates to be released into sentencing alternative programs and move
28
                                    35

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'      1816796.1
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

them into those programs. As a result, among the current County jail population, only an average of about 10-20 inmates at any given time are eligible to be released into such programs. (Trial Tr., 12/9/08, at 1781:24-25, 1782:1-3.). If additional early releasees enter the San Mateo County jail system, the Sheriff may be forced to release county inmates to alternative sentencing programs who would not otherwise qualify for them because of their risk to public safety. This would adversely impact public safety. (Munks Aff., 6:20-24.)

       d.    Inmates released under a prisoner release order, if they were arrested for further crimes, would likely not be eligible for San Mateo County's alternative sentencing programs. (Munks Report, p. 4.) If, due to early release or a population cap, the San Mateo County jails reach maximum capacity, the Sheriff will be forced to release sentenced inmates before they complete their sentences and without completing a rehabilitation or reentry program. (Munks Aff., 8:25-28.)

       e.    During two weeks in 2007 when CDCR would not accept new prisoners to San Quentin, San Mateo County jails developed a 40 inmate backlog of prisoners waiting to be transported there. (Munks Aff., 7:8-13.) San Mateo County sends about 30-35 inmates to CDCR each week. If CDCR refused to accept these inmates due to a population cap, the County would have to house these prisoners, worsening its overcrowding problem. (Munks Aff., 7:4-13, Trial Tr., 12/9/08 at 1785:24-25, 1786:1-2.) Under those circumstances, the County Sherriff "would expect to see more assaults on staff and the necessity for more keep away orders, and that would give us even less flexibility in housing additional inmates." (Munks Report, p. 4.)

    103.   <u>Santa Clara County</u>:

       a.    According to Nancy Pena, Director of the Mental Health Department of Santa Clara Valley Health and Hospital System, Santa Clara County lacks the resources to provide adequate clinical assessments, counseling and treatment beds for its current inmate population. There is a backlog for access to those services among current prisoners. (Pena Report, 10/30/08, *Plata* Dock. No. 1646 at 4.)

       b.    Gary Graves, Acting County Executive for Santa Clara County, explained that the release of state prisoners would ultimately cause "overwhelming" jail overcrowding in Santa Clara County, even if state inmates were released into the County

36

1   "phased over a period of time." (Graves Report, 10/30/08, *Plata* Dock. No. 1643 at 2-3.)

2        104.   Solano County/Vacaville:  Chief Word explained that the number of patrol

3   officers in the Vacaville police department has recently been reduced from 52 to 48.

4   There is also currently a hiring freeze for the police department, so further staff losses

5   can be expected through attrition.  (Trial Tr., 12/9/08, at 1872:13-19; 1873: 4-13.)

6        105.   Sonoma County:    A prisoner release order would have an adverse

7   impact on the operation of the criminal justice system in Sonoma County.  Sonoma

8   County has developed a plan to reduce recidivism through jail reforms.  A prisoner

9   release order will have a negative impact on this plan because the County will need to

10  divert necessary funds and resources for releasees that chose to reside in Sonoma

11  County.  (Trial Aff. of William Cogbill, 10/30/08, *Plata* Dock. No. 1676 at ¶ 9.)

12       106.   Stanislaus County:

13            a.    Adam Christianson, Sheriff-Coroner of Stanislaus County, testified

14  that the budget for the Stanislaus County Sheriff's Department was cut by 2.8% in

15  December 2008.  (Trial Tr., 12/18/08, at 2671:14-18.)  Stanislaus County jails are

16  currently overcrowded and understaffed, and operate under a federally-posed population

17  cap of 1492 due to conditions of confinement, access to programs and medical care in

18  the jails.  The County has had to release prisoners due to this cap 48 times since 2006.

19  (Christianson's Aff., 10/30/08, *Plata* Dock. No. 1727 at 5:26-27, Ex. 2, p. 18.)

20            b.    Stanislaus County has determined that it needs to add 420 medium

21  security beds immediately, and ultimately increase its capacity to 2200, to meet current

22  needs, not taking into account any potential population increases resulting from a state

23  population cap.  (Trial Tr., 12/18/08, at 2669:3-8.)  The County does not currently have

24  funding available to add the additional bed capacity it needs.  Even if funding becomes

25  available, it will take approximately 4-5 years to add these additional beds.  (*Id.* at

26  2669:21-24, 2670:3-6.)

27            c.    Stanislaus County does not possess sufficient resources, facilities,

28  or funding to provide adequate health care to additional inmates.  (Christianson's Aff., p.

                                              37

1 │ 17, Ex. 2.)

2 │     107.  <u>Yolo County</u>: Don Meyer, Chief Probation Officer for Yolo County,

3 │ explained that Yolo County jails are subject to a court-ordered population cap. In order

4 │ to stay under that cap, the jail must regularly release prisoners whom it would not

5 │ otherwise release, "sometimes on a daily basis." (Trial Tr., 12/9/08, at 2768:50, 2769:3-

6 │ 9.)

7 │               **(ii)**      **County services needed to reduce recidivism are already**

8 │                       **strained.**

9 │                         **(a)**      **Services are needed to reduce recidivism.**

10 │     108.  Key factors impacting recidivism include substance abuse, housing status,

11 │ literacy, family environment and support, and employment status. (Word's Aff., 7:4-6.)

12 │ Mr. Pacheco explained that the failure to provide services such as job training and drug

13 │ treatment to probationers increases the likelihood of recidivism. (Trial Tr., 12/12/08 at

14 │ 2382:11-13, 2385:15-17.) Mr. Conklin testified that releasing inmates early without

15 │ providing for services and a plan for transition, will have an adverse impact on public

16 │ safety. (Conklin's Trial Aff. ¶ 39; Trial Tr., 12/10/08, 2059:9-2060:7, 2070:23-2071:12.)

17 │ These services and plan must be administered appropriately to reduce adverse impacts

18 │ on public safety, meaning it should start early in the incarceration process and that the

19 │ inmate should agree to the plan. (Conklin Aff., ¶ 40.)

20 │     109.  Karen Dalton, Director of the Bureau of Operations of Offender Programs

21 │ and Services for Los Angeles, testified that when released inmates reenter the

22 │ community, they are unable to financially support themselves, which eventually leads to

23 │ increased crime. (Am. Trial Aff. of Karen Dalton, 10/31/08, *Plata* Dock. No. 1745, ¶ 30.)

24 │ Drugs and unemployment are significant factors that contribute to released inmates

25 │ reoffending. Fresno County is uniquely a poor environment due to its high

26 │ unemployment rate and high drug supply. (Am. Expert Report of Jerry Dyer,

27 │ 12/12/2008, *Plata* Dock. No. 1937, ¶¶ 19-24.) Insufficient funding for local rehabilitative

28 │ services at the county level also contributes to recidivism. (James Aff., 10:24-26.)

110.    According to the head of the Santa Clara County Department of Mental Health, Nancy Pena, untreated mentally ill persons are highly likely to deteriorate in their ability to function.  This impacts their ability to control their own behavior.  As a result, they suffer "psychiatric decompensation," and frequently act in unsafe ways and harm others, posing a public safety risk.  (Trial Tr., 12/12/08 at 2433:12-15, 2434:1-28.)

111.    Releasees from state prison are likely to be homeless and unemployed, without stable family supports, and will probably have difficulty finding housing and employment due to their criminal history.  Those with mental illness, without support to meet their physical, economic, and psychiatric needs, may suffer "psychiatric decompensation," which leads to hospitalization and rapid recidivism. (Pena Aff., 7:7-22.)  "Releasing additional prisoners into a community without resources in treatment. . . will result in a negative impact on public safety because these individuals will go untreated and will decompensate in the community."  Specific dangers include recidivism and danger to others.  (*Id.* at 8:15-22.)

(b)    **Financial limitations on Counties**

112.    Counties have limited flexibility to reallocate financial resources, and limited control over their own finances, because more than half of their revenue comes directly from the state and federal governments.  Mr. Graves testified that Santa Clara County, for example, gets about 55% of its revenues from the state and federal governments.  (Trial Tr., 12/11/08, at 2249:23-25, 2250:1-4.)  As the Acting County Executive of Santa Clara County put it, "in many ways we really don't determine our own (financial) priorities. . . and our own destiny."  (*Id.* at 2250:2-4.)  Santa Clara County has been facing budget deficits for the past five years, and is projecting significant deficits through at least 2012.  As a result, the county has reduced its funding for public safety, social services, health services, mental health services, and every other area of services.  (*Id.* at 2248:6-15; Graves Aff., 2:24-26.)  Any additional funds Counties needed in order to house and support inmates in County jails would have to be diverted from other County programs, including programs such as substance abuse treatment,

39

1   housing, and mental health programs which provide rehabilitative support to released

2   prisoners. (Graves' Report, p. 4.)

3                    (c)     **Mental health and substance abuse services**

4          113.   In many counties, including San Mateo County, county mental health

5   departments provide services to inmates.  If a population cap prevents these counties

6   from transferring prisoners to the state, the county mental health departments will have

7   to provide mental health services for those inmates.  (Boesch Aff., 10:8-13.)

8          114.   Approximately 70% of releasees would likely have substance abuse

9   problems severe enough to require treatment.  (Graves Report at 5.)  Approximately 70-

10  75% of the mentally ill offender population has a co-occurring substance abuse disorder.

11  (Trial Tr., 12/18/08 at 2514:6-13; Trial Tr., 12/5/08 at 1624:3-12.)  This co-occurring

12  substance abuse can be a significant factor in additional psychiatric crises and will cause

13  decompensation in the mental health population.  (Trial Tr., 12/18/08 at 2514:14-17.)

14  Prior substance abuse is also recognized as a predictive factor of increased violence

15  and harm to self or others.  (Battaile Report at 20; Trial Tr., 12/5/08 at 1625:10-24.)

16  County mental health centers do not have the capacity or staff to offer services to an

17  additional number of released prisoners seeking services (Trial Tr., 12/18/08 at 2518:25-

18  2519:13.)  Without receiving services, these mentally ill offenders could become victims,

19  homeless, or die.  (*Id.* at 2523:23-2524:12.)

20         115.   Amador County: Amador County Behavioral Health Department currently

21  has a 6-8 week waiting list for appointments with psychiatrists.  Clients must currently

22  wait two weeks after requesting aid from the Department until they can receive services.

23  (Ryan Aff., 9:12-17.)

24         116.   Orange County: Orange County maintains a diversion program that sends

25  Defendants with mental illnesses to mental health treatment facilities instead of jail.  This

26  program, however, suffers from a lack of resources and cannot meet the current demand

27  for mental health services.  (James Aff., 4:25-28, 5:4-6.)  "There are not enough mental

28  health beds existing to house the mentally ill currently living in" Orange County, and "not

                                            40

1    enough mental health care professionals to provide services to. . . the currently present

2    mentally ill population." As a result, "(i)f there were more mentally ill persons in the

3    County. . . there would be nobody to treat them." (*Id.* at 11:28-29.)

4        117.    San Diego County: Simply releasing inmates, particularly the mentally ill,

5    and requiring them to integrate themselves into the community will not be successful.

6    San Diego, like other counties, does not have the resources to fund programs necessary

7    for the inmates that will arrive in this County as a result of a prisoner release order.

8    (Conklin Trial Aff., ¶¶ 29, 41.) There is a lack of resources to treat drug addiction to

9    those who need it, so they can stop committing crimes. There is also a lack of resources

10   to treat individuals in the county that need treatment for mental health. (Trial Tr.,

11   12/10/08 at 2073:15-2074:6.) Given other regulations, even if San Diego had sufficient

12   financial resources, these programs could not be provided immediately as other

13   regulations would delay immediate implementation of these programs. (Conklin Trial

14   Aff., ¶ 42.)

15       118.    San Mateo County:  Charlene Silva, Director of the San Mateo County

16   Health Department explained that the San Mateo County public healthcare and mental

17   health systems are currently "stretched in meeting the needs of current residents."

18   (Silva's Aff., 10/30/08, *Plata* Dock. No. 1698 at 2:16-17, 3:5-28.) Clients in need of

19   primary care appointments must currently wait 2-4 months. The County cannot fill long-

20   standing vacancies in certain needed specialty areas, such as psychiatry. The County

21   can serve only one in five current residents in need of substance abuse treatment. No

22   publicly subsidized assisted living capacity exists, and clients in need of long-term care

23   must be placed on a waiting list. State budget cuts to Medi-Cal will likely result in

24   reductions of current capacity. (*Id.*)

25       119.    Santa Clara County:  Santa Clara County cannot meet the mental health

26   and substance abuse treatment needs of its current population of prisoners. There are

27   only enough resources to provide such services to 700 out of 2000-2500 inmates in

28   need of them annually. (Pena Report at 4-5, Pena Aff., 25-28.)

41

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

1816796.1

1    120.    Mr. Graves explained that during the past 8 years, Santa Clara County has

2    reduced funding for mental health services by at least $30 million.  As a result, the

3    system can now serve only clients with acute needs, and has had to stop serving about

4    4000 clients.  (Trial Tr., 12/11/08, 2248:24-25, 2249:1-3.)  In early December, Santa

5    Clara County Board of Supervisors recently cut $4 million from the County Department

6    of Mental Health budget due to the state budget crisis.  The Department has been asked

7    to cut an additional $22.5 million from its budget effective mid-2009.  (Trial Tr., 12/12/08,

8    at 2427:18-28, 2428:5-6.)  Almost 500 people were on Santa Clara County's waiting list

9    for mental health services in the 2008 fiscal year.  The County stopped maintaining that

10    list because the people on it would "most likely never get" services in any event.  (Pena

11    Report at 3; Pena's Aff., 5:3-6.)

12    121.    The Santa Clara County Department of Drug and Alcohol Services has

13    suffered $800,000 in budget cuts and is expected to reduce its $50 million budget by $9

14    million by mid-2009.  Robert Garner, Director of Alcohol and Drug Services for Santa

15    Clara County, anticipates millions of dollars in further budget cuts due to cuts in the

16    overall state budget.  (Garner Aff., 2:20-22, Trial Tr., 12/12/08 at 2487:41-50.)  Demand

17    exceeds supply for all adult drug treatment services offered by Santa Clara County.

18    There are waiting lists for all such services: an average 33 days for outpatient treatment,

19    9 days for residential treatment, and 7-14 days for transitional housing.  Additionally,

20    because not everyone who needs services will place themselves on a waiting list, the

21    unmet demand for services likely exceeds the number of people on the list.  (Garner's

22    Report, 10/30/08, *Plata* Dock. No. 1641 at 4; Trial Tr., 12/12/08 at 2490:19-28.)  Santa

23    Clara County's drug and alcohol treatment system cannot support more clients without

24    additional resources.  (Graves' Report at 5.)

25                                   **(d)    Housing**

26    122.    Approximately 30-50% of state parolees are homeless at any given time.

27    At least some of these parolees are likely to seek aid from the counties' general funds for

28    social services, and/or direct financial aid.  (Boesch Aff., 8:21-24.)

42

123.    Even employed, healthy, motivated and sober residents have difficulty finding affordable housing in San Mateo County, and parolees are more likely to have barriers to finding housing than those residents.  (Bay Stipulation at 2:5-9, 16-21.) During July 2008, San Mateo County opened its Section 8 waiting list for one week. 23,000 additional households signed up for the waiting list during that week.  (Id. at 2:10-11.)  Released inmates who cannot find open-market housing will be forced to seek shelter with relatives or acquaintances, transitional treatment facilities, or homeless shelters.  (Bay Aff., 2:17-19.)  Because demand for shelter and treatment facility beds in San Mateo County exceeds supply by approximately 2:1, many early-released prisoners will become homeless.  (Id. at 2:20-24.)

(iii)    **Existing parole services are insufficient and cannot support additional parolees.**

124.    Nancy Pena explained that CDCR cannot provide needed outpatient services to its existing parolee population in Santa Clara County, and discussed with the County the possibility of the County providing additional services to compensate.  (Trial Tr., 12/12/08 at 2432:16-28.)  According to one sample, approximately 60% of parolees receiving state outpatient services also accessed County services.  (Id. at 2432:16-22.) Even Plaintiffs' expert Craig Haney opined that there should not be a one-time or immediate release of prisoners.  (Trial Tr. Haney, 12/2/08, 972: 7-973: 25.)  Any release should be commensurate with available community resources.  (Id.)

125.    Bonnie Dumanis, District Attorney of San Diego, testified that a prisoner release order will result in the release of inmates into the community and would result in little or no supervision from the parole department as they lack sufficient resources to provide adequate supervision.  (Trial Aff. of Bonnie Dumanis, 10/30/08, Plata Dock. No. 1711, ¶ 22.)

126.    Rod Pacheco explained that CDCR parole efforts are currently "overwhelmed: and "cannot meaningfully provide assistance (to parolees) in any significant way."  (Trial Tr., 12/12/08 at 2382:22-28.)  The parole system is greatly

43

1   overburdened and as a result adequate parole supervision is not possible.  Due to the

2   inadequate parole supervision, many crimes are committed by individuals on parole.

3   (Am. Expert Report of Jerry Dyer, 12/12/2008, *Plata* Dock. No. 1937, ¶ 32.)

4          127.   Chief Dyer testified that parole supervision in Fresno County is "not

5   adequate."  Parole agents carry a caseload of approximately 100 parolees (although the

6   ratio is higher for parolees in danger of their third strikes, or sex offenders).  (Trial Tr.,

7   12/12/08 at 2306:24-28.)  The reduction of parole supervision will likely result in an

8   increase in crime.  (Conklin Aff., ¶ 43.)

9          128.   CDCR's Director of the Division of Parole Operations, Thomas Hoffman, is

10  also concerned that a prisoner release order resulting in a release of additional mentally

11  ill offenders from prison onto parole would overwhelm the current resources available to

12  CDCR's Parole Outpatient Clinic system.  If these additional mentally ill parolees did not

13  receive mental health services, Mr. Hoffman foresees a risk of increased recidivism

14  among that population.  (Trial Tr., 12/9/08 at 1770:11-23.)  Additionally, as Defendants'

15  expert Gale Battaile testified, studies have shown that mentally ill parolees who have

16  contact with outpatient services in the months immediately after their release

17  demonstrate a much lower rate of recidivism than mentally ill parolees who do not have

18  contemporaneous outpatient contact and care.  (Trial Tr. 12/18/08 at 2517:21 - 2518:24;

19  Defs.' Trial Ex. 1308 - Mentally Ill Parolee Population, Mar. 28, 2008.)  Furthermore, a

20  release of approximately 2,500 additional parolees per month would severely hamper

21  CDCR's ability to "front load" services and programs for offenders recently released onto

22  parole, which may have detrimental effects on attempts to reduce recidivism among

23  parolees.  (Trial Tr., 12/9/08 at 1757:18 - 1758:20.)

24  **C.    Alternatives Other Than a Prisoner Release Order Exist to Reduce the**

25  **Prison Population.**

26         129.   San Diego's model Mentally Ill Offender Crime Reduction Program

27  (MIOCR) provides five levels of treatment, focuses on the client, and increases

28  accountability.  After comparing with a control group, those that went through this

                                            44

1  program were more apt to utilize services and transition into community living. This also

2  resulted in reduced convictions and bookings. (Conklin Aff., ¶¶ 17-24.).

3      130.   Senate Bill 618 is a multi-agency plan that prepares non-violent offenders

4  for re-entry into their communities upon release from parole. Probation Officers,

5  Counselors, and others work with the individual do develop a life plan. The results of

6  this program have been promising. Since the program's inception, 99 inmates have

7  been released. Only three have returned to prison on parole violations and three have

8  committed new crimes. (Conklin Aff., ¶¶ 31-34.) Ms. Dumanis testified that SB 618 is

9  an effective program that will reduce the prison population. If expanded it will reduce the

10 number of people that enter prisons. These individuals are being assessed for drug

11 treatment and programs and they develop a life plan which provides them with the help

12 they need and reduces recidivism. In particular, they will not languish in the reception

13 centers which integrates them with other inmates that are more dangerous than they are

14 and may force them to join gangs. (Trial Tr., 12/12/08 at 2411:17-2413:11.)

15     131.   Other local programs like SB 618. One is the Head Start program which is

16 implemented in San Francisco. Offenders that are set for release are connected with

17 employers for employment and the program has proven to be successful. Another

18 similar program exists in Santa Barbara. (Id. at 2416:15-2418:1.)

19     132.   Senate Bill 718 allows County sheriffs to obtain money from the County

20 Welfare Fund to assist indigent inmates, after release with the reentry process.

21 Implementation of this program assists inmates in staying out of trouble upon release.

22 (Am. Trial Aff. of Karen Dalton, 10/31/08, Plata Dock. No. 1745, ¶ 18; Stipulation

23 Regarding Test. of Karen Dalton, 12/17/08, Plata Dock. No. 1954 at 2:6-10 .)

24     133.   Community Based Corrections Act of 1994   This Act allows counties to

25 implement alternatives to jail tying people to the appropriate programs and services.

26 (Am. Trial Aff. of Karen Dalton, 10/31/08, Plata Dock. No. 1745, ¶¶ 19-21.)

27     134.   In the area of parole operations, CDCR has recently adopted evidence-

28 based practices that will send parolees to programs and resources that will serve their

                                        45

1   needs, divert parolees to alternative sanctions program instead of returning them to

2   California's prisons, and provide for more consistent parole revocation decisions.

3   (Hoffman Aff., 4:12-27.) Utilizing the COMPAS tool, CDCR assesses the risk that a

4   parollee represents based on a variety of factors and develops a parole plan to best

5   serve the individual's needs. (Trial Tr., 12/9/08 at 1740:77-1741:8; Hoffman Aff. 8:23-

6   9:5.) CDCR has also increased the availability and use of Alternative Sanctions

7   Programs, in which eligible parolees are sent to intermediate custody settings or

8   community-based programs in lieu of returning to prison. (Hoffman Aff. 10:3-17; Trial

9   Tr., 12/9/08 at 1742:24 -1743:8.) CDCR has recently developed and piloted the Parole

10  Violations Decision Making Instrument, an evidence-based tool that will provide greater

11  uniformity to parole violation decision and foster increased use of Alternative Sanctions

12  in lieu of return to prison. (Hoffman Aff. 6:17-26; Trial Tr., 12/9/08 at 1742:15-24). This

13  parole violations instrument has been developed after intense study of similar tools in a

14  variety of state correctional systems, including Texas, New Jersey, Kansas, Ohio, and

15  Florida, all of whom have seen a reduction in the use of the revocation process and a

16  reduction in prison populations. (Trial Tr., 12/9/08 at 1743:9-21, 1745:4-9.) Mr. Hoffman

17  testified that he "absolutely" believed the use of the parole violations tool in California will

18  eventually result in less recidivism and fewer parole revocations. (*Id.* at 22-25.)

19      135.  <u>AB 900</u>: AB 900 includes provides for reduction of overcrowding and non-

20  traditional beds that take up programming space to make room for more rehabilitative

21  programming. AB 900 also provides for the construction of reentry facilities to allow

22  offenders to be housed closer to their communities, to reduce overcrowding and facilitate

23  reintegration into society. (Kernan Aff., ¶¶ 5, 10-11.)

24      136.  <u>Population Reduction Measures Underway by CDCR</u>: CDCR has made

25  efforts to address overcrowding, including transferring inmates out of state, and has

26  ongoing plans in place to help stabilize and reduce the size of the prison population,

27  including parole reform, expansion of rehabilitative programming, and development of re-

28  entry facilities. (Cate Aff., ¶ 8, 35-38, 39-44, 46, and 47; *see also* Kernan, Hoffman, and

46

1  Jett Affs.)

2  ## IV.    CONCLUSIONS OF LAW

3  **A.    Plaintiffs Have Failed to Meet Their Burden of Establishing by Clear and
   Convincing Evidence that Crowding Is the Primary Cause of the
4  Constitutional Violations Regarding Prison Medical and Mental Health Care,
   and that a Prisoner Release Order Is the Only Remedy that Can Address the
5  Violations.**

6      To obtain a prisoner release order, Plaintiffs have the burden to prove by clear

7  and convincing evidence that "crowding is the primary cause of the violation of a Federal

8  right" *and* that "no other relief will remedy the violation of the Federal right." 18 U.S.C. §

9  3626(a)(3)(E); *Roberts v. Mahoning County*, 495 F. Supp. 2d 713, 716 (N.D. Ohio 2006)

10 (per curiam) (noting that the burden of proof to establish the prerequisites for a prisoner

11 release order is on the plaintiff class) (*Roberts I*). Clear and convincing evidence is an

12 exacting standard "which produces in the mind of the trier of fact a firm belief or

13 conviction as to the truth of the allegations sought to be established, evidence so clear,

14 direct and weighty and convincing as to enable the factfinder to come to a clear

15 conviction, without hesitancy, of the truth of the precise facts in issue." *Cruzan v. Dir.,*

16 *Mo. Dep't of Health*, 497 U.S. 261, 285 n11 (1990) (internal quotations and citations

17 omitted).

18     In the *Plata* case, the Federal right at issue is the delivery of a constitutional level

19 of medical care in California's prisons. In the *Coleman* case, the Federal right at issue is

20 the delivery of a constitutional level of mental health care in California's prisons.

21     **(1)    "The Primary Cause" Means "the Chief, Principal or Root" Cause**.

22     The PLRA does not define "primary," and thus the Court must look to the ordinary

23 meaning of this term. *See United States v. Jackson*, 480 F.3d 1014, 1022 (9th Cir.

24 2007). "Primary" commonly means "first or highest in rank or importance; chief;

25 principal." *Random House Webster's Unabridged Dictionary* 1537 (2d ed. 1998); accord

26 *American Heritage College Dictionary* 1106 (4th ed. 2002) ("First or highest in rank,

27 quality, or importance; principal."). The term "the primary cause" must also be read in

28 conjunction with the second, related requirement that "no other relief will remedy the

47

1  violation of the Federal right." In other words, crowding must be so central to the

2  condition complained of that it is the only remedy for the problem. *See Roberts I*, 495 F.

3  Supp. 2d at 715 (describing the statutory question as whether "a prisoner release order

4  is *the only way* to stop the unconstitutional behavior."). The two requirements read

5  together reveal a meaning of "primary" consistent with the common definition, i.e., for a

6  prisoner release order to issue, crowding must be the most important, or principal, cause

7  of the violation.

8       Further, the statute's use of the word "the," which the dictionary defines as "so as

9  to exceed all others," emphasizes that crowding has to be the main cause, rather than

10  one of the causes of the violation of a Federal right. *Id.* at 2389. "In construing statute,

11  definite article 'the' particularizes the subject which it precedes and is word of limitation

12  as opposed to indefinite or generalizing force 'a' or 'an.'" *In re Dow Corning Corp.*, 237

13  B.R. 380, 404 (Bankr. E.D. Mich. 1999) (quoting *Black's Law Dictionary* 1477 (6th ed.

14  1990)). Similarly, in *Roberts v. Mahoning County*, the only other post-PLRA case

15  addressing a prisoner release order, the court defined the burden of proof as a showing

16  that "crowding is . . . *the root cause* of a constitutional violation and that there is no other

17  viable remedy to cure the constitutional violation." *Roberts v. Mahoning County*, 2007

18  U.S. Dist. LEXIS 70344 *11 (N.D. Ohio May 17, 2007) (emphasis added).

19       The plain meaning of "the primary cause" is consistent with the legislative intent of

20  the PLRA, which was to impose a strict causal standard between crowding and the

21  claimed violation before a prisoner release order could issue. Senator Dole, the principal

22  sponsor of the PLRA, characterized the provisions on prisoner release orders as "tough

23  new guidelines for Federal courts when evaluating legal challenges to prison conditions"

24  and "tough new conditions that a Federal court must meet before issuing a prison cap

25  order." The purpose of the bill was to restrain "(p)erhaps the most pernicious form of

26  judicial micro-management . . . the so-called prison population cap" and to "help slam-

27  shut the revolving prison door." 141 Cong. Rec. S14413 (daily ed. Sept. 27, 1995)

28  (Statement of Sen. Dole).

48

1    Thus, the phrase "the primary cause" means "the chief, principal or root cause,"

2  as distinguished from *one* of the main causes, or simply *a* cause.

3    **(2)    Crowding Must Be the Primary Cause of the Violation Existing as of the Time of the Relief.**

4

5    The PLRA makes it clear that prospective relief must be necessary to correct "*a*

6  *current and ongoing violation* of the Federal right." 18 U.S.C. § 3626(b)(3).  The Eighth

7  Circuit in *Tyler v. Murphy*, 135 F.3d 594, 597 (8th Cir. 1998), wrote that "Section

8  3626(b)(3) expressly permits the district court to continue appropriately tailored

9  prospective relief that the court finds necessary to remedy a *current* violation of federal

10  rights." (emph. added.)

11    Accordingly, to enter a prisoner release order, this Court must find by clear and

12  convincing evidence that crowding is "the chief, principal or root " cause, or "the highest

13  in importance" causal factor of, the violation of a Federal right, rather than one of the

14  causes of such violation, such that no other relief will remedy the violation as it exists at

15  this time.

16    Based upon the record and the Findings of Fact in Section III.A above, this Court

17  concludes that Plaintiffs have not met their burden of showing by clear and convincing

18  evidence that crowding is the primary cause of constitutional violations in the prison

19  medical and mental health care system, and that a prisoner release order is the only

20  remedy that can address the violations.  First, in both *Plata* and *Coleman*, significant

21  improvements have been made under the court's existing remedies.  The evidence

22  shows that improvements can and will continue.

23    Second, Plaintiffs have not established by clear and convincing evidence that the

24  prisoner release order they request will remedy the existing constitutional inadequacies

25  in the delivery of medical and mental health care.  Significantly, Plaintiffs have not

26  established a clear link between the specific population level they seek—a prisoner

27  release order of approximately 52,000 inmates or 130% of design capacity—and the

28  quality of the delivery of medical or mental health care.  According to Plaintiffs' own

49

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

1816796.1

1   witnesses, "design capacity" is not the appropriate measure for a prison system's

2   capacity to deliver constitutionally adequate medical and mental health care, and other

3   prison systems deliver constitutionally adequate medical and mental health when

4   operated above "design capacity." Plaintiffs have offered no evidence about what the

5   "operable capacity" of California's prison system must be to provide adequate medical

6   and mental health care. Plaintiffs have also failed to draw a clear link between the size

7   of the overall prison population and its impact on the delivery of mental health care to the

8   *Coleman* class, inmates with serious mental disorders, of whom those with the most

9   intensive needs are housed separately from the general population.

10      Having fewer prisoners would make all prison operations easier, but that is not the

11   standard under the PLRA. The elimination of non-traditional beds is already a priority for

12   Defendants. Non-traditional beds have already come down by the thousands, and more

13   non-traditional beds come down regularly. There is no clear and convincing evidence

14   that the existence of non-traditional beds is the root cause of inadequacies in the

15   delivery of medical and mental and mental health care. Neither is there clear evidence

16   establishing that 50,000 fewer prisoners (or any lesser number) would remedy the

17   deficiencies in prison medical and mental health care. In fact, the evidence at trial was

18   to the contrary.

19      Because Plaintiffs have failed to meet their burden of clearly and convincingly

20   proving that a prisoner release order would remedy the deficiencies in prison medical

21   and mental health care, their request for a prisoner release order is denied.

22   **B.    Giving Substantial Weight to the Likely Adverse Impacts on Public Safety
           and Local Criminal Justice Systems Precludes Issuance of a Prisoner**
23   **Release Order.**

24      The PLRA provides that the court shall give substantial weight to any adverse

25   impact on public safety or the operation of a criminal justice system caused by the

26   requested relief. 18 U.S.C. § 3626(a)(1)(A). This provision constitutes a further

27   limitation on the authority of a court to fashion relief in a conditions of confinement case.

28   In the *Roberts* case, the district court issued a prisoner release order based on the

50

1  parties' consent, but only after it "considered and weighed any adverse impact on public

2  safety and the effect on the operation of a criminal justice system." *Roberts*, 2007 U.S.

3  Dist. LEXIS 70344 at *13-14. The House of Representatives Report notes that this

4  subsection "requires the court to give appropriate consideration, *in selecting or*

5  *approving a remedy*, to any potential impact on public safety or the criminal justice

6  system." H.R. Rep. No. 104-21, at 24 (1995) (emphasis added). Such consideration to

7  public safety and the impact on the criminal justice system is mandatory: "Use of the

8  word 'shall' in this provision creates a mandatory, not a discretionary duty on the part of

9  the federal judge to limit relief in prison conditions suits as directed by Congress." *Id.* at

10  24 n.3.

11     In considering the potential adverse impact on public safety and the criminal

12  justice system, this Court must be mindful of the limitations on its powers. This Court

13  does not have the power to order relief such as the appropriation or allocation of funds

14  or the creation of programs and services that might mitigate the impact of a prisoner

15  release order. The power to raise and allocate money is left to the executive and

16  legislative bodies. *Rhem v. Malcom*, 507 F.2d 333, 341 (2d Cir. 1974).

17     In *Rhem*, the district court determined that the conditions in the "Tombs" (the

18  Manhattan House of Detention for Men) were so violative of the constitution that the City

19  was enjoined from housing any inmates in the Tombs. The City had been ordered to

20  devise a plan to bring the facility up to constitutional standards but refused to do so, so

21  the Court enjoined the City from housing any inmates there. The case was appealed to

22  the Second Circuit which affirmed the Court's finding that the conditions were

23  unconstitutional, but remanded for the district court to re-fashion appropriate equitable

24  relief. The Second Circuit stated that although courts can require prisons to undergo

25  extensive changes, this particular case was unusual because the constitutional

26  violations required substantial physical changes to a jail in a major metropolitan area

27  with financial problems. The Second Circuit found that the district court should have

28  limited the use of the jail to certain narrow functions by a fixed date unless specified

51

1   standards were met. The Second Circuit stated that the District Court could, in its

2   discretion, postpone any order to close the jail or limit its use if the City can show by

3   clear and convincing evidence that there is adequate planning and funding of

4   improvements. The Second Circuit noted that this approach may not differ significantly

5   from the district court's approach, but at least this approach has the advantage of "not

6   putting the judge in the difficult position of trying to enforce a direct order to the City to

7   raise and allocate large sums of money . . . steps traditionally left to appropriate

8   executive and legislative bodies responsible to the voters." *Id.* at 341.

9          In *Anderson v. Redman*, 429 F. Supp. 1105, 1130-31 (D. Del. 1977), the court

10  grappled with the correctional officer to inmate ratio and the costs associated with

11  incarceration, particularly of inmates awaiting bail or inmates who are not a danger to

12  society. The court asked, "Can the State of Delaware afford the financial and social

13  costs of incarcerating individuals who do not require incarceration and incarcerating

14  others longer than is necessary to protect society?" The court concluded that even if it

15  would be an enormous cost savings to parole inmates rather than house them, it was not

16  for the court to make that determination because "the answers to these questions are

17  properly resolved through the political process, not by opinion of this Court." *Id.* at 1131.

18  The *Anderson* court examined various options available to the state to reduce its prison

19  overcrowding such as work release, halfway houses, furlough, changes to sentencing,

20  and diversion, but ultimately only ordered a reduction in the state's prison population

21  because the other alternatives were for the legislature, not the court, to implement. *Id.* at

22  1136. Notably, the *Anderson* court issued a prisoner release order before the strict

23  standards of the PLRA were enacted.

24          Based upon the record and the Findings of Fact in Section III.B above, this Court

25  concludes that evidence exists of a likely adverse impact of the requested prisoner

26  release order on public safety and local criminal justice systems. Plaintiffs seek a

27  substantial reduction in California's prison population. Plaintiffs' experts acknowledged

28  that research exists showing that a substantial decrease in a State's incarceration rate

52

1 may result in an increase in the crime rate. Plaintiffs' expert, Dr. Austin, also

2 acknowledged that additional arrests would likely occur as a result of a prison population

3 reduction. This Court must give substantial weight to the likelihood that additional crimes

4 would occur and the possibility that an increase in the crime rate may occur.

5      This Court must also give substantial weight to the overwhelming evidence that

6 California's local criminal justice systems are already strained. An increase in arrests

7 would use more police, prosecutorial, and court services, which are in short supply in

8 many Counties. Also, a majority of California Counties have population caps or control

9 measures in place on their jails. An influx of more jail inmates due to additional arrests

10 would adversely affect these jail systems, as would the inability of the jails to transfer

11 inmates to prison if a State prison population cap were in place. Many, if not most of,

12 California Counties also do not have the resources to absorb more probationers, an

13 alternative to incarceration suggested by Plaintiffs.

14      Counties across California are facing budget cuts. Many, if not most of, California

15 Counties lack the community-based services needed to reduce the chance of reoffense

16 by persons convicted of felonies who would be in prison if not for the prisoner release

17 order. Sufficient jobs and housing are likely not available. Neither are sufficient

18 behavioral health and substance abuse treatment services. Without these resources, a

19 significant percentage of persons who would otherwise be in prison will commit a new

20 crime or crimes. As noted above, the Court does not have the authority to order the

21 appropriation of State funds to the Counties to create and provide the necessary

22 resources.

23      Having given substantial weight to the likely adverse impacts on public safety and

24 local criminal justice systems of the prisoner release order Plaintiffs seek, this Court

25 denies Plaintiffs' request.

26 ///

27 ///

28

53

1

2   **C.   Plaintiffs' Requested Relief Is Not Narrowly Drawn, Extends Further Than**
        **Necessary, and Is Not the Least Intrusive Means Necessary to Correct the**
3       **Violations With Respect to Delivery of Medical and Mental Health Care to**
        **Prisoners.**
4

5           Under the PLRA prospective relief must be narrowly drawn, extend no further

6   than necessary to correct the violation of the Federal right, and be the least intrusive

7   means necessary to correct the violation of the Federal right. 18 U.S.C. § 3626(a)(1)(A).

8   The PLRA "amended § 3626 to impose greater procedural and substantive restrictions

9   on federal court authority to issue broad injunctions regulating conditions at state and

10  local prisons." *Tyler v. Murphy*, 135 F.3d 594, 595 (8th Cir. 1998).  The statute "limits

11  remedies to those necessary to remedy the proven violation of federal rights." *Id.* at 596

12  (quoting H.R. Rep. No. 104-21, at 24 n.2 (1995)).  This provision "stops judges from

13  imposing remedies intended to effect an overall modernization of local prison systems or

14  provide an overall improvement in prison conditions." *Plyler v. Moore*, 100 F.3d 365, 369

15  (4th Cir. 1996) (quoting H.R. Rep. No. 104-21, at 24 n.2).

16          Under the PLRA, a prisoner release order is the remedy of last resort.  It is by

17  definition not the least intrusive means to correct a violation, unless all other means have

18  failed.  In both *Plata* and *Coleman*, the courts have issued relief which is less intrusive

19  than a prisoner release order.  It cannot be said that these remedies have failed.  To the

20  contrary, substantial improvements in the delivery of medical and mental health care to

21  California's inmates have been made as a result of these ongoing remedies.  Further

22  substantial improvements are expected.

23          Plaintiffs have also failed to establish the necessary connection between the

24  substantial population reduction of over 50,000 prisoners they seek and the existing

25  inadequacies in the delivery of medical and mental health care.  This Court cannot

26  conclude that a prisoner release order extends no further than necessary.

27          Last, Plaintiffs' requested prisoner release order is not narrowly drawn.  It is

28  directed at the general prison population, not the *Plata* and *Coleman* classes, and it

                                        54

1   seeks a one-third reduction in the overall population. This is broad, not narrow, relief,

2   the granting of which is not supported by the record.

3          Based upon the record and the Findings of Fact in Sections III.A and C above,

4   this Court concludes that Plaintiffs' requested relief is not narrowly drawn, extends

5   further than necessary, and is not the least intrusive means necessary to correct the

6   violations with respect to delivery of medical and mental health care to prisoners.

7   ///

8   ///

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)

1816796.1

1

2                    **V.    CONCLUSION**

3          Based upon the record and the Findings of Fact and Conclusions of Law above,

4    this Court concludes that Plaintiffs have not met their burden of showing by clear and

5    convincing evidence that crowding is the primary cause of constitutional violations in the

6    prison medical and mental health care system, and that a prisoner release order is the

7    only remedy that can address the violations.  Additionally, having given substantial

8    weight to the likely adverse impacts on public safety and local criminal justice systems

9    precludes issuance of a prisoner release order.  Last, this Court concludes that Plaintiffs'

10   requested relief is not narrowly drawn, extends further than necessary, and is not the

11   least intrusive means necessary to correct the violations with respect to delivery of

12   medical and mental health care to prisoners.

13         Plaintiffs' request for a prisoner release order is denied.

14

15   **IT IS SO ORDERED.**

16

17   Dated:  February ___, 2009

18                                              _____
                                                STEPHEN REINHARDT
19                                              UNITED STATES CIRCUIT JUDGE
                                                NINTH CIRCUIT COURT OF APPEALS
20

21   Dated:  February ___, 2009
                                                _____
22                                              LAWRENCE K. KARLTON
                                                SENIOR UNITED STATES DISTRICT JUDGE
23                                              EASTERN DISTRICT OF CALIFORNIA

24   Dated:  February ___, 2009
                                                _____
25                                              THELTON E. HENDERSON
                                                SENIOR UNITED STATES DISTRICT JUDGE
26                                              NORTHERN DISTRICT OF CALIFORNIA

27

28
                                         56

[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW RE DENIAL OF PLS.'     1816796.1
REQ. FOR A PRISONER RELEASE ORDER (2:90-CV-00520 LKK JFM)(C01-1351 TEH)