STEVEN M. WOODSIDE #58684
County Counsel
ANNE L. KECK #136315
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
Telephone: (707) 565-2421
Fax: (707) 565-2624
swoodsid@sonoma-county.org
akeck@sonoma-county.org

Attorneys for Intervenors THE COUNTY OF SONOMA, SONOMA COUNTY SHERIFF/CORONER WILLIAM COGBILL, SONOMA COUNTY DISTRICT ATTORNEY STEPHAN PASSALACQUA, and SONOMA COUNTY CHIEF PROBATION OFFICER ROBERT OCHS

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>Defendants. | No. C-01-1351 TEH<br><br>**SONOMA COUNTY INTERVENORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW; PROPOSED FORM OF RELIEF** |

Intervenors the County of Sonoma, Sonoma County Sheriff William Cogbill, Sonoma County District Attorney Stephan Passalacqua, and Sonoma County Chief Probation Officer

Robert Ochs (collectively, "Sonoma County Intervenors") hereby submit their Proposed Findings of Fact and Conclusions of Law, and Proposed Form of Relief, pursuant to this Court's Order re: Proposed Findings of Fact and Conclusions of Law, entered January 8, 2009 (Northern Dist. Docket No. 1998), as well as statements made by the Court at the trial of this matter on December 19, 2008.

# I.

# FINDINGS OF FACT

## A. A Prison Population Cap, By Itself, Would Not Solve the Federal Violations and Would Shift the Problems to the Local Level

1. Prison crowding is a systems problem that cannot be resolved by releasing state prisoners through the back door or preventing them from coming in the front door; not only does such a population cap fail to resolve the problems, but the adverse impacts it creates on local communities far outweigh its benefits. [Bennett,[1] p. 21, ¶60]

2. A formulaic prison population cap is not a solution to overcrowding: the wholesale release of inmates would only shift the crowding problem to the counties and provide nothing more than temporary relief to the state. [Bennett Supp.,[2] p. 5, §2; p. 6, §3]

3. We now have new knowledge about practices proven to effect positive change within the penal system and reduce overcrowding; California counties and the state have started to develop such practices and are in the process of implementing parts of them. [Bennett, p.27, ¶83; 12/11/08 Trial Tr., Bennett, pp. 2194, 2200]

4. However, entry of a formulaic prison population cap will steer both the state and the counties away from being able to effectuate true prison reform using evidence-based

---

[1] See Expert Report of David M. Bennett (Submitted by Sonoma County Intervenors), dated August 15, 2008, filed on October 30, 2008 [Northern Dist. Docket No. 1664], and admitted into evidence on December 11, 2008 (hereinafter referred to as "Bennett").

[2] See Supplemental Expert Report of David M. Bennett (Submitted by Sonoma County Intervenors)(FRCP 26(e)(2)), dated October 16, 2008, filed on October 30, 2008 [Northern Dist. Docket No. 1667], and admitted into evidence on December 11, 2008 (hereinafter referred to as "Bennett Supp.").

practices aimed at long-lasting and beneficial effects not only for the inmates, but for the public at large. [Bennett, p. 27, ¶83]

### B. A Prison Population Cap, By Itself, Would Adversely Impact County Jail Operations and Management

5. A primary consequence of a prison population cap will be the prisons' inability to accept new or return prisoners sent by local jurisdictions: closing the front door of the prisons will result in a backup of prisoners in local jails. [Bennett, p. 7, ¶18]

6. The impact of a prison population cap on jails would thus be a shift of the population from state prisons to local jails, which would result in jail overcrowding and overtaxed jail services, programs, personnel and other resources. [Bennett, p. 8, ¶22.]

   a. This scenario has already occurred on a smaller scale in the area of mental health, as demonstrated by the State Mental Hospitals' lack of available bed space for inmates committed to them under Penal Code Section 1370 to restore their competency; Sonoma County is currently facing a back-up of such inmates because the state has no space for them. [Bennett, p. 7, ¶18; Cogbill,[3] p.7, ¶11]

   b. The time the jail must continue to house these inmates before they are accepted into the State Mental Hospital has increased dramatically in the last two fiscal years, from an average wait of 60 days in fiscal year 2006/2007, to an average wait of 95 days in fiscal year 2007-2008. [Cogbill, p. 7, ¶23]

7. Another significant consequence of a prison population cap will be an increased likelihood of future crime, caused by overcrowding in local jails for both pre-trial and sentenced inmates. [Bennett, p. 13, ¶41]

   a. Jail overcrowding will force the state trial courts to take other action to reduce jail population, which will lead to inappropriate pre-trial releases and/or placement of

---

[3] See Trial Declaration of Sonoma County Sheriff-Coroner William Cogbill (Submitted by Sonoma County Intervenors), dated and filed on October 30, 2008 [Northern Dist. Docket No. 1676] (hereinafter referred to as "Cogbill"); stipulated to be entered into evidence via parties' Stipulation Regarding Testimony of William Cogbill, filed on December 17, 2008 [Northern Dist. Docket No. 1955].

non-qualified defendants on probation, or will result in a failure to sentence/failure to serve time for misdemeanors. [Bennett, p. 8, ¶24]

  b. Jail overcrowding strains jail resources, compromising services to lower level/misdemeanor offenders, thereby increasing the likelihood of future crime: failures to provide services/deterrence to lower level offenders will prevent the system from being able to interrupt the cycle of wrongdoing to prevent future criminal behavior. [Bennett, p. 13, ¶41]

  c. Jail overcrowding thus causes an increase in recidivism for misdemeanants, as the Court is unable to impose a jail sentence for misdemeanors, which impairs a system's ability to hold offenders accountable and erodes system credibility. [Bennett, p. 14, ¶45]

  d. Such loss of deterrence due to jail overcrowding causes more victims to be created, especially due to misdemeanants released prematurely who are then arrested for another crime. [Bennett, p. 13, ¶40]

 8. These consequences of a releasing thousands of state prisoners back to the local communities will thus negatively impact Sonoma County by shifting the burden of responsibility, incarceration and treatment from the state to the local level. [Cogbill, p. 5, ¶11]

 9. The overcrowding and resource availability/allocation problems that currently exist in the state prisons will consequently be placed in the laps of county jails; because counties have more limited resources to address these issues than the state, counties are less able to accommodate the requirements and needs of this population – resulting in a worse situation than we have today. [Cogbill, p.5, ¶11]

  a. California county jails are not in a position to accommodate new unfunded demands: 32 California counties have jails with population caps. [Bennett, p. 7, ¶20; Cogbill, p.6, ¶14]

  b. In addition, in 2005, 155,000 sentenced jail inmates were released early in California due to overcrowding, and jail bookings were at a 10-year high. [Bennett, p. 7, ¶20; Cogbill, p.6, ¶14]

10. Another consequence of such overcrowding in the local jails will be a loss of flexibility that will prevent jail officials from effectively managing their own jail population consistent with classification requirements, thereby compromising the safety of inmates and staff confined within an increasingly volatile environment. [Bennett, p. 8, ¶25; p. 9 ¶26]

11. Crowding-driven releases are not an acceptable method to manage jail population – it is evidence of a system failure: it requires the jail manager to assume something akin to a judicial role in shortening time served on sentences, and also fails to protect the community or interrupt the costly cycle of failures-to-appear. [Bennett, p. 10, ¶31]

12. The affects of jail overcrowding causes criminal courts, district attorneys and public defenders to face abruptly increasing workloads with no additional resources to manage the system: this ripple effect can have a negative effect on system functioning and undermine local efforts at streamlining adjudication efforts. [Bennett, p. 13, ¶42]

### C. A Prison Population Cap, By Itself, Would Adversely Impact Probation Supervision

13. Currently, Sonoma County's probation caseload is too large for its probation officers to effectively supervise: 25-30 probation officers presently supervise approximately 3,074 probationers (the number of individual probationers supervised per probation officer ranges from 50 to 380). [Cogbill, p. 9, ¶35]

14. Due to insufficient treatment, education and supervision resources, Sonoma County probation officers do not have adequate tools to properly supervise probationers and lower recidivism rates. [Cogbill, p. 9, ¶36]

15. A prison population cap would only cause additional pressure on such resources and would negatively impact an already burdened system that struggles to provide meaningful services. [Bennett, p. 9, ¶¶27, 28]

   a. Lack of jail space will cause the court to release an ever-increasing number of defendants on supervised Own Recognizance ("OR"), [Bennett, p. 9, ¶27]

   b. Probation will have insufficient resources to ensure that the OR defendants are crime-free and make their court dates, [Bennett, p. 9, ¶27]

c. This will result in an increase in crime, increase in bench warrants, additional court processes and time, an inability to adjudicate cases due to absconding of defendants who should have been in jail pre-trial. [Bennett, p. 9, ¶27]

### D. A Prison Population Cap, By Itself, Would Cause a Loss of System Integrity and a Concomitant Reduction in Public Safety

16. Release of thousands of ill-prepared and often dangerous offenders into the community without sufficient re-entry resources can be expected to result in an increase in recidivism: such release without attention to the reforms necessary to interrupt cycles of offending is simply setting up counties, and the larger system, for continued failure. [Bennett, p. 14, ¶44]

17. Of the prison inmates released each year in California, about 70% are re-incarcerated within 3 years – a figure almost two times the national average; many such individuals end up back in the Sonoma County jails after previously being sent to State prison, either on parole violations or on new charges. [Cogbill, p. 8, ¶28]

  a. This recidivism rate represents the number of parolees returned to prison for both new criminal violations as well as "technical" parole violations. [Bennett, p. 14, ¶44]

18. The 3-year return rate to prison for all adult felons paroled from California State custody after commitment of a new crime range from 24% for those convicted of manslaughter to 71% for those convicted of vehicle theft. [Bennett, p. 14, ¶44]

19. The overarching affect of a prison population cap on counties will thus be a loss of system integrity, as the consequences of such a cap will compromise the criminal justice system's ability to hold offenders accountable. [Bennett, p. 9, ¶29; p. 10, ¶30]

  a. Loss of system integrity occurs when inmates are not held accountable for criminal behavior, or are turned loose from the jail through emergency "citation releases," thereby undermining the deterrent effect of criminal laws. [Bennett, p. 10, ¶30]

  b. System integrity is compromised when, due to inadequate jail space, there is no guarantee that the sentence rendered will be the sentence served. [Bennett, p. 10, ¶30]

        c.      It can take years to reverse the public's perception of a broken criminal justice system and reverse the loss of deterrence. [Bennett, p. 10, ¶30]

20. Such a loss of integrity and "system failure" is evident in Sonoma County's jail citation release program (used to manage the jail population), which showed a 43 percent failure-to-appear rate for both misdemeanors and felonies – a figure that is more than twice the national average. [Cogbill, p. 7, ¶24]

21. During their citation and release period, these pre-trial offenders commit a substantial number of new crimes: Sonoma County's re-arrest rate for the population released by the jail on its citation release program (meaning an arrest for a new crime prior to the disposition of the case for which the person had been released from jail) is approximately 29% for misdemeanors and 50% for felonies. [Cogbill, p. 8, ¶25]

22. This loss of the integrity of the criminal justice system undermines its purpose and intent of deterring crime and holding wrongdoers accountable; the end result is a system that goes through the motions of dispensing justice without the means to impose it in the manner that judges order. [Bennett, p. 10, ¶30, p. 12, ¶12]

23. It is not overstating the case to say that the effect of a prison population cap on public safety and local criminal justice systems, absent more, would be absolutely devastating, due to the loss of system integrity. [12/11/08 Trial Tr., Bennett, p. 2188]

E. **A Prison Population Cap, By Itself, Would Adversely Impact Efforts to Reform Local Criminal Justice Systems**

24. Sonoma County's past and current lack of resources to address the needs of its jail inmates (regarding substance abuse treatment, education, job training, etc.) and adequately supervise and provide treatment programs for probationers, has caused Sonoma County to suffer a significant amount of criminal recidivism – which causes even more strain on the criminal justice system and attendant resources. [Cogbill, p. 3, ¶7]

25. In addition, the unavailability of mental health care in the community has caused the jail to essentially become a mental health facility, which must care for those mental health patients who have not received proper treatment, decompensated, and committed crimes. [Cogbill, pp. 3-4, ¶7]

26. To address these problems before they reach crisis level, Sonoma County has invested substantial funds, energies and resources in the last few years to develop and implement criminal justice reforms that it believes will have a significant impact on the local and state inmate populations (see Corrections Master Plan, attached to the Expert Report of David M. Bennett, August 15, 2008 (Exhibit "C")). [Cogbill, p. 4, ¶8]

27. These reforms will not only better utilize the County's limited resources, but also effectuate a reduction in recidivism and an overall healthier, safer community; such effects will ultimately result in fewer criminals being sent to state prison, which in turn will assist in lessening prison overcrowding. [Cogbill, p. 4, ¶8]

28. A prison population cap, by itself, would severely jeopardize and likely prevent Sonoma County from being able to implement its intended reforms. [Cogbill, p. 4, ¶9]

   a. An influx of state prisoners into Sonoma County would require it to divert its funds and resources dedicated to its reform efforts to instead manage the increased impact such release would have on the County. [Cogbill, p. 4, ¶9]

   b. Due to the high rate of recidivism of state prisoners, a release of inmates would have significant negative public safety impacts, requiring the County to dedicate more resources to address new crimes committed, increased jail bookings, and further tax the County's limited mental health and drug/alcohol treatment programs. [Cogbill, p. 4, ¶9]

   c. Even if the prisoner release was a one-time release, or a limited release over time, the impact of such release would be felt by the County over an extended period, requiring such a diversion of resources that the County would be unable to accomplish any significant reform. [Cogbill, p. 4, ¶10]

   d. This likely result is due to the fact that an early release of prisoners – without proper diversion, treatment, supervision and programming – would just permit them to cycle through the local criminal justice system more times in a given period, requiring dedication of more system resources, without addressing the underlying recidivism problems. [Cogbill, pp. 4-5, ¶10]

29. An increase in the number of re-arrests for those who have been released early, or diverted, may not have statistical significance when it comes to the overall crime rate, but it has real significance as it impacts local services and costs. [Bennett Supp., p. 2, §1]

30. Consequently, a prison population cap and concomitant shift of offenders from the state to the counties will have a negative impact on Sonoma County's reform efforts, as the funds necessary to such reform will have to be shifted to address the needs of the released prisoners and resulting increase in jail population. [Bennett, p. 17, ¶52]

### F. To Prevent Adverse Impacts, Any Prison Population Cap Must be Accompanied by a Plan to Provide for the Risk and Needs of Inmates, Including Treatment, Programs, and Services Which Are Currently Unavailable at the Local Level

31. Simply limiting inmates' time in prison without the benefit of meaningful supervision and quality treatment will not reduce individual failure: no long-term change is possible without building an approach based on an attention to risk and resources, including the availability of supervision, treatment, and local short-term incarceration options. [Bennett Supp., p. 5, §2]

32. Research shows that supervision alone does not reduce recidivism, but meaningful supervision and quality treatment (of sufficient duration), targeted to the higher risk offender can achieve significant reductions in recidivism. [Bennett Supp., p. 5, §2]

33. The state prison system cannot be changed and the prison population reductions cannot be sustained without the services in place to change individual behavior. [Bennett Supp., p. 3, §2]

34. Approximately 20% of inmates released from California prisons to parole have mental health needs, 65% have substance abuse problems, 22% are known gang members, 70% are unemployed, and a large percentage are in need of stable housing. [Bennett, p. 15, ¶46]

35. The parolee population is a high-needs group: for example, state data demonstrates that less than 15% of California parolees are currently in formal treatment for alcohol and drug issues, while 35% of parolees say the would benefit from such treatment, and 45% were using drugs when arrested for their current offense. [Bennett Supp., p. 4, §2,

relying on COMPAS data, presented in supplemental report of James Marquart, Ph.D., September 22, 2008]

36. Counties cannot be expected to provide the necessary programs to the released parole population without additional resources – they are simply not available. [Bennett Supp., p. 3, §2]

    a. Local substance abuse programs could not accommodate a new influx of offenders, for in Sonoma County, there are substantial waiting lists for substance abuse treatment programs reserved for offenders: in 2002, on any given day, approximately 412 Sonoma County residents were seeking publicly-funded alcohol and drug treatment that was not available – such number has only increased over time. [Cogbill, p. 9, ¶34]]

    b. Lack of treatment resources causes a back-up in the jail: inmates who are ordered to residential treatment programs are often required to stay in jail either in the absence of jail sentences or well past their jail terms – in 2005, the average wait in jail for inmates enrolled in TASC (Treatment Accountability for Safer Communities Program) for residential treatment programs was 9 weeks. [Cogbill, p. 9, ¶33]

    c. Inpatient mental health services are not available to the parolee population in Sonoma County: there is not County inpatient psychiatric facility within the county – it transports patients to a facility in Fairfield, Solano County, which does not guarantee space for Sonoma County residents. [Bennett Supp., p. 4, §2]

    d. Because the County's only inpatient emergency psychiatric hospital closed in June of 2007, the Sonoma County jails must now continue to house misdemeanor defendants who have been declared incompetent to stand trial, but who have been ordered to be treated for the purpose of rendering them competent under the provisions of Penal Code Section 1370. [Cogbill, p. 8, ¶31]

    e. Local Community Medical Services are also not prepared to meet the additional medical costs of a population that would be returning to the jail, due to the increase in expense of medications and medical services. [Bennett Supp., p. 4, §2]

37. Due to the current fiscal crisis, Sonoma County simply does not have the funds to provide the necessary services to an influx of state parolees:

    a. Sonoma County tax revenues have decreased in the last two years, requiring that both the Sheriff's Department and Probation Department scale back on their budgets – resulting in fewer available resources. [Cogbill, p. 9, ¶37]

    b. The Sonoma County Administrative Office has informed the Sheriff's Department that it will be required to reduce its budget for the 2009/2010 fiscal year by 12 % – an amount of $8,598,862; the Probation Department and other county departments are facing similar cuts. [Cogbill, p. 9, ¶38]

38. California has been a leader in developing programs in lieu of incarceration – but there are currently not enough available program spaces, which is straining the programs to the breaking point; unless the programs are expanded to make more spaces available, a prisoner release order is going to fail and it's going to hit hardest on the local criminal justice systems. [12/11/08 Trial Tr., Bennett, pp. 2198-9]

### G. Alternatives to a Prison Population Cap Exist that Would Not Create Adverse Impacts on Public Safety or Local Criminal Justice Systems

39. Prison population management plans must be developed concurrently with the development of local county plans for services; absent such plans, a prison population cap would overwhelm already overburdened local jails and cause a loss in system integrity – which will result in higher failure rates and ultimately an increase in returns to prison. [Bennett Supp., p. 5, §2; p. 6, §3]

40. A responsible and sustainable prison reduction plan must aim to have programs in place to address the risk and needs of offenders, in order to address the underlying issues that recycle offenders back through our jails and prisons to prevent the cycle of recidivism. [Bennett Supp., p. 5, §2; p. 6, §3; 12/11/08 Trial Tr., Bennett, p. 2192]

41. Any responsible plan for reducing the prison population should include the following three elements:

  a.  *Provide Funding for Programs Founded on Evidence-Based Practices*: Programs must be developed and implemented to address the basic needs of inmates to treat alcohol and drug dependency, treat mental health issues, address lack of education, lack of housing, and unemployment – which programs should be started during incarceration and carried out into the community during reentry [12/11/08 Trial Tr., Bennett, pp. 2189, 2191];

  b.  *Apply a Risk and Needs Assessment to Set Parole Conditions*: Validated Risk and Needs Assessment Instruments must be used to determine the appropriate level of supervision and necessary programs/services to assist parolees in reentering their communities, with appropriate implementation [12/11/08 Trial Tr., Bennett, p. 2193]; and

  c.  *Implement a Structured Sanctions Process*: To prevent technical violators from repeatedly recycling through prison and to reduce recidivism, implement a sanctions process to provide a certain, immediate, and appropriate sanctions for parole violations – which sanctions could be provided at the local level through a state-county partnership. [12/11/08 Trial Tr., Bennett, p. 2195]

42. The state will need to fund locally-developed programs and work toward a systems reform to achieve any lasting positive change, to prevent the individuals from returning to the state prison system. [Bennett Supp., p. 5, §2; p. 6, §3]

43. Such a systems reform will require a new partnership between the state and the counties with regard to funding, policies, and attention to front-end assessment and diversion options at the local level. [Bennett Supp., p. 6, §3]

44. Releasing prison inmates absent adopting a responsible prison reform plan will simply lead to a recycling of the released parolees back into the criminal justice system like a revolving door – thereby increasing recidivism, victims, and the demands on the local criminal justice systems. [12/11/08 Trial Tr., Bennett, pp. 2199-2100]

45. Without a state-county partnership, the efforts of individual counties – such as Sonoma County – to reform their criminal justice systems (so as to provide for the efficient use of resources and effective provision of justice) will be doomed to failure. [Bennett Supp., p. 5, §2]

## II.

## CONCLUSIONS OF LAW

A. A prison population cap, by itself, would adversely impact public safety and local criminal justice systems. (18 U.S.C. §3626(a)(1)(A).)

B. The adverse impacts a prison population cap creates, by itself, outweigh the benefits that could be realized from such a cap. (18 U.S.C. §3626(a)(1)(A).)

C. A prison population cap, by itself, is not narrowly drawn, extends further than necessary to correct the violation of the Federal right, and is not the least intrusive means necessary to correct the violation of the Federal right. (18 U.S.C. §3626(a)(1)(A).)

D. Any prisoner release order must be accompanied by implementation of a plan for the responsible release of parolees into the community to prevent adversely impacting public safety and local criminal justice systems. (18 U.S.C. §3626(a)(1)(A).)

## III.

## PROPOSED FORM OF RELIEF

Upon the close of oral testimony at the trial of this matter on December 19, 2008, the Court had asked Defendants and Defendant-Intervenors to proffer to the Court their suggestions for a form of relief in the event that the Court determined that some form of prisoner release order was necessary herein. Accordingly, while Sonoma County Intervenors oppose the entry of a prison population cap, they submit the following alternate form of relief, during the performance of which any prison population cap would be stayed and held in abeyance:

A. <u>PRISON SYSTEM REFORM PLAN</u>: Within 6 months, State to develop and present to the Court a plan to reform its prison system that reflects the recommendations contained in the California Department of Corrections and Rehabilitation Expert Panel on Adult Offender and Recidivism Reduction Programming Report to the California State Legislature: *A Roadmap for Effective Offender Programming in California*, dated June 29, 2007 (attached hereto as Exhibit "A"). At a minimum, the plan must be designed to implement evidence-based practices designed to reduce recidivism (see Exhibit "A", No. 9)

to ultimately lower prison population, and must address reforming the penal system in each of the following three separate stages:

    1.    Local Criminal Justice System (Pre-Prison): Create partnerships with local criminal justice systems to address local facility needs and to implement treatment, services, and programs for inmates designed to reduce recidivism, with a means for necessary funding (see, e.g., Exhibit "A", Nos. 6, 8, 10);

    2.    California Department of Corrections and Rehabilitation (Prison): Implement risk and needs assessment instruments and provide appropriate treatment, services, and programs to prison inmates, with appropriate incentives for participation (See, e.g., Exhibit A, Nos. 2, 3, 4, 5, 6, 10); and

    3.    Parole (Post-Prison): Utilize risk and needs assessment data to reform parole system, provide appropriate level of meaningful supervision, and provide for structured sanctions for parole violators, with a means for necessary funding (see, e.g., Exhibit "A", Nos. 1, 3, 6, 7, 10).

    B.    PLAN IMPLEMENTATION: Within one year, State to take necessary actions to implement the plan developed per Section III.A, including but not limited to, appropriating and allocating funding necessary for state and counties to effectuate the plan, making any necessary administrative and procedural changes, and making any necessary legislative changes.

Respectfully submitted,

Dated: January 23, 2009        STEVEN M. WOODSIDE, County Counsel

By:    /s/ Anne L. Keck
ANNE L. KECK
Deputy County Counsel
Attorneys for Intervenors the County of Sonoma, the Sonoma County Sheriff-Coroner William Cogbill, the Sonoma County District Attorney Stephan Passalacqua, and Sonoma County Chief Probation Officer Robert Ochs

## PROOF OF SERVICE

I am employed in the County of Sonoma, California; I am over the age of 18 years and not a party to the within action; my business address is 575 Administration Dr., Rm. 105A, Santa Rosa, California. I am readily familiar with my employer's business practice for collection and processing of correspondence for mailing with the United States Postal Service.

On January 23, 2009, following ordinary business practice, I served the "SONOMA COUNTY INTERVENORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW" on the parties in said cause, by placing on that date at my place of business, a true copy thereof, enclosed in a sealed envelope, for collection and delivery by Federal Express in the ordinary course of business, addressed as follows:

Honorable Stephen Reinhardt
United States Courthouse
312 North Spring Street, Suite 1747
Los Angeles, CA 90012

Honorable Thelton E. Henderson
United State District Court
450 Golden Gate Avenue
San Francisco, CA 94102

Honorable Lawrence K. Karlton
Robert T. Matsui United States Courthouse
501 I Street
Sacramento, CA 95814

I declare under penalty of perjury under the laws of the State of California that the foregoing is true and correct, and that this declaration was executed on January 23, 2009, at Santa Rosa, California.

_Eileen Shired_
Eileen Shired