STEVEN S. KAUFHOLD (SBN 157195)  skaufhold@akingump.com
CHAD A. STEGEMAN (SBN 225745)  cstegeman@akingump.com
TERESA WANG (SBN 252961)  twang@akingump.com
GALIT A. KNOTZ (SBN 252962)  gknotz@akingump.com
Akin Gump Strauss Hauer & Feld LLP
580 California, 15th Floor
San Francisco, California 94104-1036
Telephone:     415-765-9500
Facsimile:      415-765-9501

Attorneys for Republican Assembly and Senate
Intervenors

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>             Plaintiffs,<br><br>     vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>             Defendants. | Case No.: CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT** |
| MARCIANO PLATA, et al.,<br><br>             Plaintiffs,<br><br>     vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>             Defendants. | Case No.:  C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW SUBMITTED BY THE LEGISLATOR INTERVENORS** |

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

The Legislator Intervenors join in and adopt the Proposed Findings of Fact and Conclusions of Law submitted by the *Plata* and *Coleman* Defendants. The Legislator Intervenors also request that the Three-Judge Court refrain from issuing a prisoner release order and make the following findings of fact and conclusions of law:

## I.  FINDINGS OF FACT

1.  As of August 27, 2008, California's in-state adult institutions housed 156,352 inmates. Pretrial Conference Statement, *Plata* Dkt. No. 1815.

2.  In these consolidated proceedings, the Three-Judge Court has not heard any evidence of the presence of ongoing constitutional violations. 11/18/2008 Transcript of Proceedings ("Tr.") at 6:24- 7:9; 57:11- 22.

3.  The *Plata* Receiver has significantly improved the provision of health care services since his appointment. The *Plata* Court appointed a Receiver to take control of the California Department of Corrections and Rehabilitation's ("CDCR") medical health care system on February 14, 2006. *Plata* Dkt. No. 473. This appointment became effective April 17, 2006. *Id.* The *Plata* Court appointed the current Receiver, J. Clark Kelso, on January 23, 2008. *Plata* Dkt. No. 1063. The *Plata* Court approved the Receiver's Turnaround Plan of Action on June 16, 2008. *Plata* Dkt. No. 1245.

The Receiver has made tremendous improvements in the health care and mental health care in CDCR facilities. For example, preventable deaths in CDCR facilities have decreased dramatically since the appointment of the Receiver. Receiver's Ninth Quarterly Report, Sept. 15, 2008, *Plata* Dkt. No. 1473. California also has one of the lowest prisoner mortality rates within the United States. 12/3/2008 Tr. 1271:25 – 1272:7; 1272:16-21 (Mumola). In fact, even compared to non-correctional settings, the average mortality rate from all causes of death for California prisoners between ages 15 to 64, between 2001 to 2004, was 30% lower than the U.S. resident rate (excluding deaths from transportation accidents). *Id.* at 1275:4-18 (Mumola).

4.  California has invested heavily in the improvement of CDCR's health care system since the underlying proceedings began. CDCR's health care expenditures increased 550% from Fiscal Year (FY) 1994-95 to FY 2007-08. Trial Declaration of Todd Jerue ("Jerue Dec.") ¶ 4; Defs. Trial Exh. 1244. During that period, the in-state inmate population increased less than 30%. *Id.* Per inmate

1
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

health care spending rose from $2,714 in 1995 to an estimated $13,887 per inmate in 2009. *Id.*

   *5.*     It is difficult to determine the importance and effect of any single facet of the medical and mental health care system on the constitutional delivery of medical and mental health care services in the CDCR. 1/20/2008 Tr. at 464:5 – 466:6 (Shansky). There are multiple, interrelated components of a constitutionally adequate correctional health care system. *Id.* at 464:5 – 466:6 (Shansky); *see also* Findings of Fact and Conclusions of Law re Appointment of Receiver, at 38, *Plata* Dkt. No. 435.

   It is difficult to rank these interrelated components in terms of importance and very hard to single out the most important component. 11/20/2008 Tr. 463:22- 464:1 (Shansky). Moreover, the delivery of medical care in California's prison system is a polycentric problem. *Id.* at 463:2- 19. The definition of a polycentric problem is one that has "multiple sources that are simultaneously impacting it." *Id.*

   6.     Continuation of the Receiver's work is a less intrusive alternative to a prisoner release order. The Receiver stated that he can remedy any unconstitutional conditions in medical and mental health care, regardless of the population. Spitzer Trial Decl. ¶¶ 26-28; 12/12/2008 Tr. 2465:12- 2466:24 (Spitzer); Defendant Intervenors' ("DI") Exh. 405. The Receiver's Turnaround Plan of Action, which calls for extensive construction of medical and mental health beds and hiring of health care staff, states that the Receiver will provide constitutional medical and mental health care in three to five years. Tr. 11/20/2008 491:1- 492:4 (Shansky); 493:1-5 (Shansky). Judge Henderson has recognized that the Receiver's phased plan will "address the major treatment and housing concerns" in the four class actions involving prison medical health care (*Plata*), prison mental health care (*Coleman*), prison dental care (*Perez*), and prison disability access issues (*Armstrong*). DI Exh. 404; 12/12/2008 Tr. 2467:20 -2468:9 (Spitzer).

   The Receiver has stated publicly that CDCR's provision of health care delivery is not contingent upon the population level. Spitzer Trial Decl. ¶¶ 26-28; DI Exh. 405 at 30:00 min. Mr. Kelso stated, in response to a question regarding the effects of overcrowding on health care provision, "I'm just not seeing difficulty in providing medical services no matter what the population is." *Id.* ¶ 28 (citing DI Exh. 405 at 30:00 min.). Provision of adequate medical health care does not hinge upon population size; rather, "it's a question of how much you're willing to spend for it." Spitzer Trial Decl.

2
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

¶ 28 (citing DI Exh. 405 at 30:00 min.).

7. Continuation of the *Coleman* Special Master's efforts is a less intrusive alternative to a prisoner release order. The Special Master was appointed on December 11, 1995. *Coleman* Dkt. No. 639.

8. Full implementation of Assembly Bill 900 ("AB 900") is a less intrusive alternative to a prisoner release order.

Governor Schwarzenegger signed AB 900 into law on May 3, 2007. DI Exh. 402. AB 900, a bipartisan bill, authorized funding to build thousands of prison beds, strengthen inmate health care delivery, and improve rehabilitation programs in state prisons and county jails. *Id*; Spitzer Trial Decl. ¶¶ 12-16; 12/19/2008 Tr. 2732:7-2733:9 (Runner). When fully implemented, AB 900 will remedy the overcrowding crisis in California prisons by removing "bad beds" in gyms and dayrooms that take up valuable programming space. Freeing up this programming space will enable CDCR to conduct the rehabilitative programming necessary to reduce recidivism, lower crime rates and protect the public's safety. Spitzer Trial Decl. ¶¶ 12-16; 12/19/2008 Tr. 2732:7-2733:9 (Runner).

AB 900 is a comprehensive plan, and in addition to funding bed construction, it also authorizes funding for vocational and education programs, substance abuse treatment programs, and other rehabilitative programming that will curb California's rampant recidivism rate. DI Exh. 402; Spitzer Trial Decl. ¶¶ 12-16. California has a 70% recidivism rate, which means that 70% of released offenders return to CDCR custody. Spitzer Trial Decl. ¶ 13. Providing sufficient space and resources to conduct rehabilitative programming in state prisons and county jails is essential to lower California's recidivism rate and ensure public safety. *Id.*

AB 900 also allocated funding for construction of thousands of medical, mental, and dental health care beds, which will address the underlying constitutional concerns in the *Plata* and *Coleman* actions. Spitzer Trial Decl. ¶ 15.

While portions of AB 900 arguably required clarifying legislation to allow for the sale of bonds to fund construction, the CDCR was authorized and has begun moving forward with the portion of AB 900 involving construction of reentry facilities. This crucial aspect of AB 900, the construction of reentry facilities that will house offenders in the last eighteen months of their incarceration, will

3
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

facilitate offenders' reintegration into their communities. Spitzer Trial Decl. ¶ 14; 12/12/2008 Tr. 2459:19- 2460:2 (Spitzer). These state-run facilities will provide county-based services to rehabilitate offenders who are currently churning in and out of the prison system without undergoing any rehabilitative programming. Equipped with these services and programs, released offenders will be less likely to commit new crimes. *Id.* CDCR is in the process of beginning construction of reentry facilities authorized by AB 900, and negotiations with counties regarding these facilities are currently underway. 12/19/2008 Tr. 2748:3 – 23 (Runner).

On December 18, 2008, during a special legislative session on the California budget, both houses of the California Legislature passed the legislation clarifying the language in AB 900, to facilitate the sale of bonds to fund the remaining portions of AB 900. 12/19/2008 Tr. 2734: 16-20 (Runner).

9. Transferring certain prisoners out of state is a less intrusive alternative to a prisoner release order that would have the same effect as a prisoner release order. AB 900 authorizes the transfer of up to 8,000 inmates to out of state institutions. DI Exh. 400; 12/19/2008 Tr. 2734:21- 2375:8 (Runner).

Based on the weekly total population report, the total number of inmates housed in out of state institutions was 4,788 on August 27, 2008. Pretrial Conference Statement, *Plata* Dkt. No. 1815.

10. Remand of prisoners who are illegal aliens to federal custody is a less intrusive alternative to a prisoner release order that would have the same effect as a prisoner release order. CDCR houses roughly 30,200 illegal immigrant inmates. Trial Declaration of Senator George Runner ("Runner Decl.") ¶¶ 6, 19; 12/19/2008 Tr. 2728:19-2729:9 (Runner). If illegal alien prisoners were housed in federal prisons, California would save over $1 billion each year in costs, and considerable space would free up in CDCR institutions. *See* Runner Decl. ¶¶ 6, 19.

In the state of Pennsylvania, under the leadership of one of Plaintiffs' experts, the transfer of prisoners to federal custody was one means of reducing the prison population and avoiding a prisoner release order. 11/19/2008 Tr. 265:17 – 22 (Lehman).

11. Another effective alternative to a prisoner release order is the house arrest and GPS monitoring of parole violators instead of incarceration. 12/19/2008 Tr. 2729:15- 2730:08 (Runner).

4
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1   Legislation establishing house arrest programs has been introduced in the past, and the Legislature
2   debated this measure as recently as December 2008.  *Id.*

3         12.    In current budget negotiations, the California Legislature and Governor
4   Schwarzenegger's office are considering good time credit and parole reforms that would significantly
5   reduce the California prison population.  12/19/2008 Tr. 2730:18- 2731:12-20 (Runner); Defendants'
6   Response to the Court's Order, Jan. 16, 2009, *Plata* Dkt. No. 2009.  This is also a potential alternative
7   to a prisoner release order.

8         13.    A prisoner release order will adversely affect public safety.  At minimum, an early
9   release would result in at least a temporary increase in crime.  12/4/2008 Tr. 1477:17 – 1481:2
10  (Austin).  Increasing good time credits, one means of reducing the prison population recommended by
11  Plaintiffs, would result in a temporary surge of inmates returning to their communities, and a
12  corresponding increase in arrests during that surge period.  *Id.* at 1477:17 – 1481:2.  Even a small, less
13  than one percent increase in overall arrests would be a significant adverse impact on public safety.
14  12/12/2008 Tr. 2381:16-2382:14 (Pacheco).  Even a small number of additional homicides, for
15  example, are a significant adverse public safety consequence.  *Id*.  Moreover, the number of crimes
16  committed exceeds the number of crimes reported to the authorities.  12/4/2008 Tr. 1506: 21-24
17  (Austin).  The number of crimes committed exceeds the number of arrests made.  *Id.* at 1507:16-20.

18      The relief that Plaintiffs have requested, a population reduction of 50,000 in a two year span,
19  would necessarily involve early release of inmates with "Two Strikes," and inmates with life sentences.
20  12/04/2008 Tr. 1440:5-11 (Austin).

21      Lowering the incarceration rates of so-called "technical parole violators" is one of Plaintiffs'
22  recommended means of reducing the prison population.  12/04/2008 Tr. 1451:14 -22 (Austin).
23  "Technical parole violators" include individuals arrested for new crimes.  *Id.* at 1451:19-22.  Only
24  approximately 14,500 of the 69,000 "technical" parole violations each year involve purely technical
25  violations of the terms of parole.  *Id.* at 1453:14-25.  "Technical parole violators" include hundreds of
26  individuals arrested for rape and homicide.  *Id.*  1455:25 - 1456:24.

27      At the local level, early release of prisoners individuals from county jails has clogged the
28  criminal justice system, led to an increase in crime, and enabled offenders to commit crimes that would

not have been committed had they not been early released.  12/12/2008 Tr. 2378:13 - 2379:11 (Pacheco).   Early release of prisoners from CDCR would harm the criminal justice system by sending a message to criminals that they will not be held accountable for their crimes and by weakening the public's confidence in the justice system.  12/12/2008 Tr. 2392:10-22 (Pacheco); 12/12/2008 Tr. 2411:9-10 (Dumanis).

## II.     CONCLUSIONS OF LAW

Congress recognized the dangers inherent in prisoner release orders, and enacted the PLRA to ensure that they would be issued only as a last resort.  Prisoner release orders may only be issued when no alternatives exist, and only in a manner consistent with public safety.  Specifically, even where constitutional violations exist, the PLRA provides that no court may enter a prisoner release order unless (1) a court has previously entered an order for less intrusive relief that has failed to remedy the deprivation of the constitutional rights sought to be remedied through the prisoner release order; and (2) the defendant has had a reasonable amount of time to comply with the previous court orders.  18 U.S.C. § 3626(a)(3)(A).  In addition  to these prerequisites, a court can enter a prisoner release order only if the Plaintiffs can prove by clear and convincing evidence that (1) crowding is the primary cause of the constitutional violation, and (2) no other relief will remedy this violation.  18 U.S.C. § 3626(a)(3)(E)(i-ii).  Finally, a court considering a prisoner release order must give "substantial weight to any adverse impact on public safety" resulting from a prisoner release order.  18 U.S.C. 3626(a)(1).

### 1.     Plaintiffs did not prove that the CDCR has failed to provide constitutional levels of medical and mental health care.

In these consolidated *Coleman/Plata* proceedings, the Three-Judge Court has not heard evidence as to the presence of current constitutional violations.  Proposed Fact ("PF") 2.  Thus, Plaintiffs have not established that the CDCR is currently failing to provide constitutionally adequate medical and mental health care.

Even if Plaintiffs had tried to demonstrate that CDCR is not providing constitutionally adequate health care, the Receiver's progress, the low mortality rates in CDCR institutions, and the resources California has poured into CDCR's health care system all suggest that health care provision likely meets minimum constitutional standards.  The Receivership has dramatically reduced the number of

6
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

1   preventable deaths in state prisons caused by inadequate access to care. PF 3. The death rate of
2   California prisoners has dropped almost 30% since the beginning of 2006, when inmate health care
3   was seized from state control by the Receiver. PF 3. Moreover, California prisoners already have far
4   lower mortality rates than prisoners in other states, and even have lower mortality rates than the
5   general, non-prisoner population. PF 3. Finally, California has heavily invested in CDCR's health care
6   system. PF 4. A system like CDCR's, which provides prisoners with greater access to medical and
7   mental health care than that afforded to the average Californian, likely meets and even surpasses
8   minimum constitutional standards.

   **2.     Plaintiffs did not establish that the Court's Orders appointing a Receiver and Special Master have already failed to remedy any constitutional violations.**

   A prisoner release order should not issue because it is premature to conclude that the orders appointing the Receiver, approving his Turnaround Plan of Action (TPA) and ordering funding for his TPA have failed to remedy the any constitutional violations of medical and mental health care. See 18 U.S.C. § 3626(a)(3)(A). Defendants have not had adequate time to comply with the orders appointing the Receiver and approving of his TPA. The current Plata Receiver was appointed only this year, on January 23, 2008. PF 3. The Receiver must have more time to implement his TPA, which Judge Henderson approved on June 16, 2008. PF 3. Plaintiffs' medical expert, Dr. Ronald Shansky, affirmed that implementation of the Receiver's Turnaround Plan of Action would bring CDCR's medical health care system into constitutional compliance. PF 6. Moreover, Judge Henderson has recognized that the Receiver's court-approved construction program has not yet failed; to the contrary, the Receiver's phased plan will "address the major treatment and housing concerns" in the four class actions involving prison medical health care (*Plata*), prison mental health care (*Coleman*), prison dental care (*Perez*), and prison disability access issues (*Armstrong*). PF 6.

   As these court orders seeking to improve health care have not yet failed, and in fact, are still being implemented, a prisoner release order is premature.

   **3.     Plaintiffs did not prove by clear and convincing evidence that overcrowding is the primary cause of any constitutional violations.**

7
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Plaintiffs own medical expert, Dr. Ronald Shansky, testified that the components of a constitutionally adequate health care system are interrelated, and it is difficult to single out the most important component. PF 5. The problem of delivering constitutionally adequate health care is a polycentric one, with "multiple sources that are simultaneously impacting it." PF 5. Thus characterized, the task of determining the primary cause is challenging, if not impossible. Tellingly, the *Plata* Receiver has stated publicly that he does not see a problem providing constitutionally adequate health care, regardless of population size. PF 6. Thus, while any overcrowding may be *impacting* the provision of health care, it stretches the imagination to conclude that population pressures are the *primary cause* of any constitutional rights violations, when the Receiver himself believes that he can provide constitutional health care at any population level.

  **4.**   **Plaintiffs did not prove by clear and convincing evidence that no relief other than a prisoner release order will remedy any constitutional violations.**

    **a.**   **Plaintiffs did not prove that the Receiver and Special Master will fail to provide constitutionally adequate medical and mental health care.**

A prisoner release order should not issue because several alternatives to this extreme remedy exist. The Receiver's Turnaround Plan of Action, approved by Judge Henderson earlier this year, calls for construction of beds and hiring more health care staff. PF 6. Both of these measures are remedies other than a prisoner release order that are far better suited to addressing the underlying violations at issue in Coleman and Plata than a population-reducing remedy. The Receiver himself has expressed his confidence that, in due time, his Plan will improve conditions in CDCR: "I think we've discovered that you actually can provide care and certainly our Plan and Turnaround Plan—we believe we can provide constitutional levels of care no matter what the population is." PF 6. Thus, as a less intrusive alternative to a prisoner release order, this Court should allow the Receiver and Special Master continue the work they are doing in improving the delivery of health care in CDCR institutions. PF 6, 7; *see also* PF 3.

These positions are far different from the previous Receiver's suggestion that overcrowding and its consequences could "render adequate medical care impossible." Receiver's Suppl. Report Re: Overcrowding at 10 (cited by Plata Order Granting Plaintiffs' Motion to Convene Three-Judge Court,

8
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

at 7), *Plata* Dkt No.705.  To the contrary, the current Receiver has stated that the opposite is true.  PF 6.

### b. Plaintiffs did not prove that a prisoner release order will be more effective at remedying any constitutional violations than the full implementation of AB 900.

Another less intrusive alternative to a prisoner release order is the full implementation of AB 900.  AB 900 seeks to ease overcrowded conditions in California's prisons by authorizing funding to build thousands of prison and jail beds and secure community reentry facilities that will house offenders in their last eighteen months of incarceration in order to facilitate offenders' reintegration into their communities.  These reentry facilities will ease overcrowding while also providing inmates with county services and rehabilitation programs.  The reentry facility portion of AB 900 is currently underway.  PF 8.  Additionally, both houses of the California Legislature have now passed the fix for the language in AB 900 to facilitate the sale of bonds needed to implement the remaining portions of AB 900.  PF 8.  As funding for reentry facilities has already been approved, and the Legislature has passed the clarifying language relating to the remaining portions of AB 900, a prisoner release order is premature.  PF 8.

### c. Plaintiffs did not prove that a prisoner release order will be more effective at remedying any constitutional violations than the out of state transfer of CDCR inmates.

The transfer of California inmates to out-of-state facilities is a less intrusive alternative to a prisoner release order that is presently easing overcrowding.  As of August 2008, nearly five thousand inmates had been transferred, thereby reducing the number of "bad beds" needed by CDCR.  PF 9.  AB 900 authorizes the transfer of up to 8,000 inmates.  PF 9.  Thus, out-of-state transfers are one alternative to a prisoner release order that is already well underway.  Plaintiffs have not established that these transfers are not a viable less intrusive alternative to a prisoner release order.

### d. Plaintiffs did not prove that a prisoner release order will be more effective at remedying any constitutional violations than remanding illegal alien prisoners to federal custody.

If the Court ordered the State to remand the thousands of illegal alien prisoners in the California State prison system to federal custody, CDCR would save facility space and money that can be used to improve delivery of constitutional medical and mental health care to inmates. CDCR currently supports more than 30,200 illegal alien prisoners who should be in federal prisons. PF 10. If these illegal alien prisoners were housed in federal prisons, California would save over $1 billion a year that could be spent on improving CDCR facilities and programming. In addition, such a remand would free up considerable space for inmate housing and programming. See PF 10. Transfer of inmates to federal custody has been used by at least one other state to avoid a prisoner release order. PF 10.

### e. Plaintiffs did not prove that a prisoner release order will be more effective at remedying any constitutional violations than the reform of good time credits and parole systems.

Plaintiffs have not demonstrated that other legislative alternatives to a prisoner release order cannot remedy any alleged constitutional violations. PFs 11, 12. Measures to monitor parole violators instead of re-incarcerating them are viable alternatives. PF 11. Current credit and parole reforms in discussion in the State Legislature and Governor Schwarzenegger's administration are also alternatives to a prisoner release order. PF 12.

## 5. Issuance of a Prison Release Order as requested by Plaintiffs would be contrary to public safety.

Plaintiffs have yet to present evidence that would support a prisoner release order under the PLRA. Even if they do, however, the Court must consider the likely adverse affect a prisoner release order will have on public safety. 18 U.S.C. 3626(a)(1). The prisoner release order measures contemplated by plaintiffs' experts would have devastating effects on public safety. One suggested measure, increasing good time credits and consequently releasing certain inmates before their sentences are completed, would result in at least a temporary increase in arrests. PF 13. Because the

10
**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**

number of crimes committed exceeds the number of crimes reported and arrests made, even a small increase in arrests signals a larger increase in crimes committed. PF 13. Another measure, lowering the incarceration rates of so-called "technical parole violators, would harm public safety as well. Only a small number of the 69,000 "technical parole violators" sent to prison each year are sent back due to "purely technical violations." PF 13. The pool of "technical parole violators" includes a large number of individuals arrested on new crimes that are not purely technical violations of the terms of parole. PF 13. In fact, technical parole violators include individuals arrested for rape and homicide. PF 13.

The specific relief requested by Plaintiffs, a population reduction of 50,000 inmates in a two year period, would necessarily involve early release of not only low-level nonviolent offenders, but also inmates incarcerated on their second strike under California's Three Strike law and inmates sentenced to life imprisonment. PF 13. Release of these inmates would have drastic public safety consequences.

Finally, a prisoner release order would harm public safety by impeding local criminal justice enforcement. PF 13. A prisoner release order would increase crime, as offenders released early will be able to commit crimes they would not otherwise commit. PF 13. A prisoner release order would also lower the deterrent value of sentencing and decrease public confidence in the criminal justice system. PF 13.

For the foregoing reasons, the Legislator Intervenors request that the Three-Judge Court refrain from issuing a prisoner release order in the *Plata* and *Coleman* actions.

Respectfully submitted,

Dated: January 23, 2009                AKIN GUMP STRAUSS HAUER & FELD LLP

                                       By:   _____/s/_____
                                             Steven S. Kaufhold
                                             Attorney for Republican Assembly and Senate Intervenors

**[PROPOSED] FINDINGS OF FACT AND CONCLUSIONS OF LAW**