Gregg McLean Adam, No. 203436
Natalie Leonard, No. 236634
James W. Henderson, Jr., No. 071170
**CARROLL, BURDICK & McDONOUGH LLP**
Attorneys at Law
44 Montgomery Street, Suite 400
San Francisco, CA 94104
Telephone: 415.989.5900
Facsimile: 415.989.0932
Email: gadam@cbmlaw.com

Daniel M. Lindsay, No. 142895
**CALIFORNIA CORRECTIONAL PEACE OFFICERS' ASSOCIATION**
755 Riverpoint Drive, Suite 200
West Sacramento, CA 95605-1634
Telephone: 916.372.6060
Facsimile: 916.340.9372
E-Mail: dan.lindsay@ccpoa.org

Attorneys for Plaintiff Intervenor California Correctional Peace Officers' Association

IN THE UNITED STATES DISTRICT COURTS
FOR THE NORTHERN AND EASTERN DISTRICTS OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| MARCIANO PLATA, *et al.*,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, *et al.*,<br>Defendants. | No. Civ C01-1351 TEH (N.D. Cal.) *and*<br>No. Civ S90-0520 LKK-JFM (E.D. Cal.)<br>**THREE-JUDGE COURT** |
| RALPH COLEMAN, *et al.*,<br>Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, *et al.*,<br>Defendants. | **PLAINTIFF INTERVENOR CALIFORNIA CORRECTIONAL PEACE OFFICERS' ASSOCIATION'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The California Correctional Peace Officers' Association ("CCPOA") submits its Proposed Findings of Fact and Conclusions of Law in response to this Court's Order of January 8, 2009. (Docket No.1998.)

CCPOA intervened in this proceeding because the impact of the severe overcrowding in California's state prisons falls squarely on CCPOA members with a force second only to that experienced by the inmates themselves. Daily, CCPOA members witness the damaging consequences that overcrowding has on inmates' ability to remain healthy or access medical and mental health care. CCPOA members suffer their own risks due to overcrowding. (See *Plata* Docket Nos. 828, 857; *Coleman* Docket Nos. 2402, 2427.) During trial, CCPOA supplemented the Plaintiffs' testimony by conveying the day-to-day reality of current prison conditions to the Court.

The testimony in this trial establishes that overcrowding is *the primary cause* of the violation of Plaintiffs' Eighth Amendment Constitutional right to be free from cruel and unusual punishment.

## I

## PROCEDURAL HISTORY

Plaintiffs are classes of inmates incarcerated in correctional facilities run by the California Department of Corrections and Rehabilitation ("CDCR") in two separate lawsuits. *Ralph Coleman, et al. v. Arnold Schwarzenegger, et al.*, U.S. District Court, (E.D. Cal.), Case No. 2:90-CV-00520 and *Marciano Plata, et al.*, *v. Arnold Schwarzenegger, et al.*, U.S. District Court, (N.D. Cal.), Case No. C01-1351 TEH. Defendants are violating Plaintiffs' Eighth Amendment rights due to the inadequate medical and mental health care Defendants provide to inmates.

The Court identified the constitutional violations in the *Coleman* case on September 13, 1995, while the findings of fact issued in *Plata* on October 3, 2005. (See *Plata* Docket No. 378; see also *Coleman*, 912 F. Supp at 1282 (E.D. Cal. 1995))

When the violations continued, each Plaintiff class filed a Motion to Convene a Three Judge-Panel to Limit Prison Population pursuant to 18 U.S.C. §§ 3626, *et seq.* and

28 U.S.C § 2284 (The Prison Litigation Reform Act or "PLRA") on November 13, 2006. Both those motions were eventually granted on July 23, 2007, and the Ninth Circuit consolidated the proceedings here before one Three Judge-Panel. (*Plata* Docket No. 784; Coleman Docket No. 2328.)

This Three-Judge Panel has a single focus, defined by statute: to determine whether overcrowding is the primary cause of the violation and whether only a prisoner release order can remedy the violation.[1] Specifically, the PLRA states:

> (E) The three-judge court shall enter a prisoner release order only if the court finds by clear and convincing evidence that --
>
> (i) crowding is the primary cause of the violation of a Federal right; and
>
> (ii) no other relief will remedy the violation of the Federal right.

18 U.S.C. § 3626 (a)(E)(i-ii)

The Three Judge Panel bifurcated its proceedings into two phases and heard testimony from November 18, 2008 through December 19, 2008. Phase I addressed whether overcrowding is the primary cause of the unconstitutional conditions, while Phase II evaluated whether a prisoner release order, as defined by the statute, should issue in this case. CCPOA provided testimony only with respect to Phase I issues and confines its proposed findings to Phase I.

## II

## HISTORICAL BACKGROUND AND CONTEXT

In October 2006, the Governor issued a Proclamation declaring a Prison Overcrowding State of Emergency. See http://gov.ca.gov/index.php?/proclamation/4278/, last visited January 23, 2009. The Legislature responded in 2007 with a package of bills known as AB900 (2003-2004 Reg. Sess.) designed to increase the number of general

[1] This Three Judge Panel was not convened to determine whether there is constitutional compliance. (R.T. 6:24-25; 7:1-9.) Instead, the Three Judge Panel advised the Defendants to submit any such evidence of constitutional compliance to the *Coleman* and *Plata* courts directly. *Id.*

prison beds available, but not specifically focusing on medical or mental health care facilities. (R.T. 2468:13-16.) Now, nearly two years later, not a single bed has been built under that legislation and further meaningful legislative action has not occurred. *Id.* During trial, the legislature passed language that would have released part of the funding under AB900, but did so in a bill vetoed by the Governor. *Id.*

## III

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### A. Overcrowding is the Primary Cause of the Constitutional Violations by Clear and Convincing Evidence.

The PLRA requires that this Court determine whether clear and convincing evidence establishes that overcrowding is the primary cause of the constitutional violations at issue. For the reasons highlighted below, taken in concert with the findings of fact that Plaintiffs propose, and considering the limited actions that Defendants have been willing or able to take to date, the Court should find that overcrowding is the primary cause of the violation by clear and convincing evidence.

Overcrowding overwhelms available treatment space and slows down delivery of care due to lockdowns and other impediments. Overcrowding wears down the prison buildings and the people who staff them. The following facts provide a representative, but not exhaustive, list of the ways the overcrowding perpetuates the constitutional violations.

#### 1. Overcrowding Makes Prisons Unnecessarily Unsanitary and Unhealthy.

Overcrowding in California's prisons leads to more significant illness than one would find in a properly run prison with proper population. (R.T. 305:24-25; 306:1-3.) The conditions can also cause mental illness, or cause mental health conditions to further deteriorate. (R.T. 304:16-19.)

Diseases spread unnecessarily due to the close quarters in CDCR prisons. CDCR does not tell staff or inmates which inmates have infection diseases. Moreover, there is no room to quarantine infected inmates. These circumstances increase the spread

of infection and increase mistrust between inmates. (R.T. 696:18-23.) One correctional officer testified that he contracted a serious life-threatening infection at work that caused serious permanent medical problems. (R.T. 605:1-10; 695:1-10; 1669:6-19.) Inmates routinely wash their clothes in toilets to protect themselves from infection. (R.T. 570:2-17.) Infected inmates often fail to report disease, fearing that seeking treatment will cause other inmates to victimize or shun them in their close living quarters. (R.T. 694:14-25.) One inmate treated his infection with a spoon in his cell, rather than seeking treatment. (R.T. 693:7-13.)

It is also hard to keep the facilities clean. For example, bathrooms are dirty just moments after they are cleaned and often have broken equipment, further stressing inadequate facilities. (R.T. 699:11-18; 707:2-13.)

**2. Overcrowding delays access to care and reduces quality of care.**

**a. Staff and space shortages make transporting inmates to their appointments more difficult.**

Overcrowding impacts access to the appropriate levels of care. (R.T. 304:11-12.) At California Medical Facility -- one of the ***less*** crowded facilities -- a pool of twelve escorts takes inmates to their medical appointments. (R.T. 504:9.) On any given day, as many as half these escort officers may be pulled away from this duty to take inmates to off-site hospitals, which slows access to appointments back at the prison. (R.T. 504:9: 506:3-25.) Two officers must escort each inmate taken off-site and wait with the inmate for the duration of his care. (R.T. 505:11-506:11.) Officers from other posts may be pulled away from their duties to cover the shortfall, impacting other areas of the prisons. (R.T. 506:23-25.) This is very disruptive in a situation where inmates may already be waiting hours for medical and mental health care appointments. (R.T. 509:4.)

**b. Overcrowding makes it more difficult to monitor inmates who may need assistance.**

San Mateo County Sheriff Greg Munks opined that prisons become dangerous and difficult to operate when they approach their "functional capacity," which is five to

ten percent below their "rated capacity." (R.T. 1776:7-1777:2.) By comparison, CDCR prisons are at approximately 195% of "designed bed capacity" (which is equivalent to rated capacity). (R.T. 270:1-3.) This level of overcrowding makes it difficult for correctional officers to monitor inmates for safety or health due to the crowding because it is hard to see past the triple height bunks in many of the dorms. (R.T. 693:15-21.)

**c. Overcrowding forces prisons to use inappropriate spaces to provide care.**

The prisons utilize inappropriate spaces to provide medical or mental health care due to lack of space. At Salinas Valley, for example, inmates on suicide watch wait for a crisis bed while standing in cages in a utility room where noise from the machinery in the immediate area is so loud that it is difficult even to converse. (R.T. 308:8-12.) At Solano State Prison, doctors share an examination room with a secretary who witnesses all exams. (R.T. 664:6-16.)

The Director of Long-Term Care Services at the California Department of Mental Health admitted she had heard that some clinicians had stopped referring their inmate clients to the Department of Mental Health because they believed that there would not be room for them. (R.T. 821:1-9.)

Medical waiting areas are dangerous, inmates of multiple security levels are forced to wait together for hours in hallways or cages for their scheduled appointments. (R.T. 508:1-509:17.) This causes both health and security concerns for inmates and staff alike.

**d. Frequent lockdowns exacerbate transport problems and decrease medical privacy.**

Plaintiffs' expert Dr. Haney opined as follows:

> Lockdowns are used in the California Department of Corrections … because of the profound level of overcrowding … [p]risoners … are essentially with out programs during the periods of time that the lockdown is in place. There are housing units in the California Department of Corrections that are locked down more often than they are unlocked.

(R.T. 316:21-25; 317:1-14.) One correctional officer explained, "A lockdown actually increases the number of inmates I have to go get, because the fact the institution is on lockdown, the inmates can't just come on their own. So even a general population or mainline inmate might require an escort." (R.T. 525:2-5.) Thus, it takes more resources and time to provide care during a lockdown.

Even during non-lockdown days, errors occur due to insufficient time to check, crush and administer medicine. (R.T. 670, 672-673.) At Solano State Prison, a trained nurse witnessed daily errors related to insulin delivery and mis-delivery of prescription drugs, such as confusing prednisone with penicillin. (R.T. 661:19-663:8; 668:10-21.)

Frequent lockdowns increase logistical problems and decrease medical privacy. At Chuckawalla Valley State Prison, during lockdowns, the intercom announces that "hotmeds" have arrived and instructs inmates to report to the nurse in full view of other inmates to pick up those pills at the center of their housing units. (R.T. 670; 672-673.) In higher security areas, nurses must leave the clinics and deliver medicine from tool carts to each cell, with each inmate's cellmates viewing the entire exchange. (R.T. 672:24-673:20; 680:15-681:11; 682:8-13.) Also at Solano State Prison, inmates stand in two lines for tuberculosis tests, with one of the lines specifically for those who have previously tested positive. (R.T. 664:21- 665:10.)

**3. Overcrowding makes it difficult to recruit and retain staff.**

Plaintiffs' expert Dr. Craig Haney remarked, "I heard accounts of overcrowding caused staff shortages and understaffing in virtually every prison that I visited and with whom I discussed this issue with staff." (R.T. 310:2-4.) Mental health clinicians see patients in open stand-up cages, without the privacy deemed standard for treatment. (R.T. 304:1-3.) One doctor shared an office space with a secretary who witnessed all exams including hemorrhoid screenings. (R.T. 663:22; 664:6-16.) Entire housing units with over two hundred inmates are staffed by just two correctional officers. (R.T. 1932:4-15.) State prison staff must work forced overtime shifts without meal breaks or prior notice, emotionally impacting nurses' ability to do their jobs and causing

correctional officers to drink pots of coffee daily to remain alert. (R.T. 674:1-6; 701:24-702:9.) Only in the last eight months has there been major progress in filling mental health care vacancies. (R.T. 847:8-12.) Under these conditions, challenges in recruiting or retention are not surprising.

**4. Overcrowding damages the State's ability to house inmates in medically appropriate settings.**

**a. Crowded reception centers frequently misclassify inmates.**

The head of the Pennsylvania Department of Corrections, Dr. Jeff Beard testified about inmate reception centers:

> When you have such huge numbers coming into the system and staying for, in some cases, relatively short periods of time, you don't have the capacity to identify people who have mental health problems and then to properly slot those people where they need to go. And you may miss people who have medical problems. Because of this huge throughput that's coming in, you may miss people who have certain needs and certain care needs that aren't being dealt with.

(R.T. 225:4-15.)

For example, some inmates take medication that makes them prone to seizures in the heat. (R.T. 700:10-12.) Those prisoners should not be sent to the warmer institutions located in the desert. (R.T. 713:6-7.) Yet, at one desert institution, there is a housing unit designed specifically for people taking these medications, suggesting that inmates are misclassified into this prison with some regularity. (R.T. 711:1-7.) Inmates may have to wait months to transfer from that prison to a facility with lower temperatures. (R.T. 713:6-22.)

Overcrowding prevents policy changes from having meaningful effect. For example, inmates on suicide watch often wait overnight in stand-up cages for a crisis bed. A new policy limited the allowable time in a cage to four hours. Because of overcrowding, this new policy does not shorten the time that an inmate waits for a crisis bed. (R.T. 576:1-25.) Staff simply "change[s] the guy in the cage to the waiting room,

and the guy in the waiting room to the cage" over and over every four hours. (R.T. 577:1-3.)

**b. CDCR has intentionally designed facilities that have just half the program and medical space that is needed.**

CDCR has invariably designed prisons with program and medical space based on housing a certain number of prisoners, but immediately housed a much larger number of inmates as the facilities opened. (R.T. 521: 23-25; 543: 1-21.) CDCR appeared to know they would overcrowd the facilities immediately, because they designed records rooms to be large enough to hold the files of the inmates housed there, even though they did not design program and treatment spaces that were large enough. (R.T. 542: 21, 23-25; 543:1-21.) Solving these problems through building will be difficult and expensive.

## IV

## CONCLUSION

Taken together, these proposed findings of fact and other testimony at trial establish by clear and convincing evidence that overcrowding is the primary cause of the constitutional violations at issue. CCPOA respectfully submits these proposed findings to assist the court in reaching a decision.

Dated: January 23, 2009.

CARROLL, BURDICK & McDONOUGH LLP

By /s/ Natalie Leonard
Gregg McLean Adam
Natalie Leonard
James W. Henderson, Jr.
Attorneys for Plaintiff Intervenor California Correctional Peace Officers' Association