1  PRISON LAW OFFICE
   DONALD SPECTER, Bar No. 83925
2  STEVEN FAMA, Bar No. 99641
   E. IVAN TRUJILLO, Bar No. 228790
3  SARA NORMAN, Bar No. 189536
   ALISON HARDY, Bar No. 135966
4  REBEKAH EVENSON, Bar No. 207825
   1917 Fifth Street
5  Berkeley, CA  94710
   Telephone:  (510) 280-2621
6
   K&L GATES LLP
7  JEFFREY L. BORNSTEIN, Bar No. 99358
   EDWARD P. SANGSTER, Bar No. 121041
8  RAYMOND E. LOUGHREY, Bar No. 194363
   4 Embarcadero Center, Suite 1200
9  San Francisco, CA  94111-5994
   Telephone:  (415) 882-8200
10 THE LEGAL AID SOCIETY –
   EMPLOYMENT LAW CENTER
11 CLAUDIA CENTER, Bar No. 158255
   600 Harrison Street, Suite 120
12 San Francisco, CA  94107
   Telephone:  (415) 864-8848

ROSEN, BIEN & GALVAN, LLP
MICHAEL W. BIEN, Bar No. 96891
JANE E. KAHN, Bar No. 112239
ERNEST GALVAN, Bar No. 196065
AMY WHELAN, Bar No. 215675
LISA ELLS, Bar No. 243657
MARIA V. MORRIS, Bar No. 223903
315 Montgomery Street, 10th Floor
San Francisco, California  94104
Telephone: (415) 433-6830

BINGHAM, McCUTCHEN, LLP
WARREN E. GEORGE, Bar No. 53588
Three Embarcadero Center
San Francisco, California  94111
Telephone: (415) 393-2000

13 Attorneys for Plaintiffs

14  IN THE UNITED STATES DISTRICT COURTS

15  FOR THE EASTERN DISTRICT OF CALIFORNIA

    AND THE NORTHERN DISTRICT OF CALIFORNIA

16  UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

17  PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| 18 RALPH COLEMAN, et al., | No. Civ S 90-0520 LKK-JFM P |
| 19    Plaintiffs, | **THREE-JUDGE COURT** |
| 20    v. | |
| 21 ARNOLD SCHWARZENEGGER, et al., | |
| 22    Defendants | |
| 23 MARCIANO PLATA ,et al., | No. C01-1351 TEH |
| 24    Plaintiffs, | **THREE-JUDGE COURT** |
| 25    v. | **PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| 26 ARNOLD SCHWARZENEGGER, et al., | |
| 27    Defendants. | |
| 28 | |

1

**TABLE OF CONTENTS**

2

**Page**

3

I.    INTRODUCTION...........................................................................................1

4

A.    Procedural History ...........................................................................1

5

B.    Three Judge Court Trial ...................................................................4

6

7

II.   THE EVIDENCE IS CLEAR AND CONVINCING THAT CROWDING IS
THE PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS.................6

8

A.    Effects Of Overcrowding On Prison Operations ...............................9

9

1.    General Effects.......................................................................9

10

11

2.    Overcrowding Makes It Impossible For Prison Administrators
To Provide Access To Health Care.......................................16

12

III.  OVERCROWDING IS THE PRIMARY CAUSE OF MEDICAL CARE

13

VIOLATIONS.........................................................................................20

14

A.    Introduction, Expert Opinion, And Impact On Prisoners ................20

15

B.    Evidence of Overcrowding as Primary Cause of Particular Medical

16

Care Inadequacies. ........................................................................23

17

1.    Medical Clinic And Related Space .......................................23

18

2.    Medical Staffing....................................................................27

19

3.    Specialty Services ................................................................32

20

4.    Medication ...........................................................................32

21

5.    Medical Records and Patient Scheduling .............................33

22

23

6.    Custody Officers for Medical Escorts and Access ...............34

7.    Specialized Medical Housing ...............................................35

24

25

C.    Overcrowding Causes Disease and Makes Control of Disease Harder ..........36

26

D.    Overcrowding Is The Primary Cause Of The Constitutional Violations
Because Medical Care Cannot Be Improved Without Reducing The

27

Number Of Prisoners.......................................................................37

28

[272055-1]
PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, NOS.: CIV S 90-0520 LKK-JFM, C01-1351 TEH

E.   Defendants' Assertions Regarding Primary Cause...........................................37

1.   Dr. Thomas................................................................37

2.   Defendants' Other Assertions Regarding Primary Cause.....................40

IV.   OVERCROWDING IS THE PRIMARY CAUSE OF MENTAL HEALTH CARE VIOLATIONS...................................................................44

A.   Overview Of The Mental Healthcare Delivery System.................................45

B.   Specialized Program Populations.........................................................49

1.   Chronic Shortage Of 10-Day Mental Health Crisis Beds....................50

2.   Inpatient Hospital Care ..................................................57

3.   Enhanced Outpatient Program ............................................62

4.   Segregation...................................................................66

a.   Overuse Of Segregation Units For Coleman Class ...................70

b.   Inadequate Care In Segregation Units ...............................71

5.   Reception Centers ........................................................73

C.   Resources For All Coleman Populations ...............................................77

1.   Increased Lockdowns And Violence .......................................78

2.   Bad Beds ..................................................................80

3.   Suicides And Suicide Prevention Measures ...............................84

4.   Office And Treatment Space ..............................................88

5.   Medication Management System...........................................92

6.   Staffing..................................................................93

7.   Mental Health Care Records ..............................................96

V.   THE EVIDENCE IS CLEAR AND CONVINCING THAT NO OTHER RELIEF WILL REMEDY THE VIOLATIONS ...........................................98

A.   Defendants Propose No "Other Relief" To Correct The Constitutional Violations .................................................................................99

B. Defendants Suggested Alternatives To A Prisoner Release Order Lack Merit ........................................................................................................100

1. Neither The Defendants Nor The Special Master Nor The Receiver Can Implement Meaningful Reform Until The Population Is Reduced ........................................................................100

2. Clear And Convincing Evidence Shows That The Receiver And Special Master Cannot Remedy Violations Without Population Reduction ........................................................................103

   a. Defendants Oppose The Receiver's Work ................................104

   b. The Receiver's Plan Will Take Years ......................................105

   c. Coleman Defendants Have Proven Unable To Obtain Necessary Treatment Resources ..........................................106

3. Clear And Convincing Evidence Shows That Defendants' Plan To Address Overcrowding Cannot Remedy Constitutional Violations Absent A Population Reduction Order ..........................108

   a. Prison Construction ................................................................108

   b. Out-Of-State Transfers ............................................................111

   c. Parole Reform ........................................................................112

   d. In-Prison Rehabilitative Programming ....................................113

   e. Governor's Proposals ..............................................................113

   f. Increased Expenditures On Health Care Are Irrelevant To Whether No Other Relief Will Remedy The Violations ..............................................................................114

4. Senate Bill 618 Is Not An Alternative To A Prisoner Release Order ................................................................................................115

5. The State Is Paralyzed In Its Efforts To Address The Crowding. ......115

6. Further Delay Is Not Warranted ..........................................................118

VI. DEFENDANTS CAN REDUCE THE PRISON POPULATION WITHOUT ADVERSELY IMPACTING PUBLIC SAFETY OR THE OPERATION OF LOCAL CRIMINAL JUSTICE SYSTEMS. ..........................................119

-iii-

A.  The Population Reduction Measures Proposed By The Governor And Identified By Plaintiffs Do Not Increase Crime And Would Not Have An Adverse Impact On Public Safety Or The Operation Of A Criminal Justice System. ..................................................................................125

　　1.  Expanded Good Time Credits ..............................................125

　　2.  Diversion Of Technical Parole Violators ............................131

　　3.  Diversion Of Offenders With Short Sentences ...................136

　　4.  Shortening Length Of Parole Supervision .........................139

B.  Evidence-Based Rehabilitative Programs Reduce The Prison Population And Improve Public Safety By Reducing Recidivism And Reducing Crime ....................................................................142

C.  Defendant-Intervenors Have Exaggerated The Potential Impact Of A Reduction In The Prison Population ..........................................144

　　1.  A Minor, Short-Term Increase In Arrests Does Not Mean An Increase In Overall Crime. ...................................................144

　　2.  Defendant-Intervenors Exaggerated The Amount Of Crime Committed By Parolees .......................................................146

　　3.  There Is No Relationship Between The Crime Rate And Either The Rate Of Parolees In A Community Or The Rate Of Incarceration ......................................................................149

　　4.  Defendants And Defendant Intervenors Exaggerated The Impact Of Releasing Prisoners With Mental Illness ..........................153

　　5.  Lack Of Resources For Rehabilitative Programs In The Community Does Not Make A Population Reduction Unsafe ...........158

　　6.  Defendant-Intervenors Exaggerated The Impact On County Criminal Justice Systems ....................................................162

　　7.  A Prison Population Cap Would Not Require Closing The "Front Doors" To Prison ...................................................169

D.  Crowding Has A Negative Impact On Public Safety ..............................169

VII.  NECESSARY LIMITS ON CALIFORNIA'S PRISON POPULATION ...............172

VIII.  CONCLUSIONS OF LAW ..................................................178

-iv-

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

A.   Statutory Background.................................................................................178

B.   This Court Has Authority To Issue A Prisoner Release Order......................179

C.   Prisoner Release Order...............................................................................183

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

[272055-1]

1

# TABLE OF AUTHORITIES

2

**Page**

3

**Cases**

4

*Bylinski v. City of Allen Park*,
5    8 F.Supp.2d 965 (E.D. Mich. 1998) .............................................................................187

6

*Coleman v. Wilson*,
7    912 F. Supp. 1282 (E.D.Cal. 1995) ..............................................................66, 70, 94, 99

8

*Ewing v. California*,
9    538 U.S. 11 (2003).......................................................................................................183

10

*Farmer v. Brennan*,
    511 U.S. 825, 114 S. Ct. 1970, 128 L.Ed.2d 811 (1994)............................................183

11

*Gore v. United States*,
12    357 U.S. 386 (1958).....................................................................................................183

13

*Harmelin v. Michigan*,
14    501 U.S. 957 (1991).....................................................................................................183

15

*Helling v. McKinney*,
    509 U.S. 25, 113 S. Ct. 2475, 125 L.Ed.2d 22 (1993)................................................183

16

*Hook v. Arizona Dept. of Corrections*,
17    107 F.3d 1397 (9th Cir. 1997) .....................................................................................187

18

*Lewis v. Casey*,
19    518 U.S. 343 (1996)..............................................................................................183, 184

20

*Madrid v. Gomez*,
21    889 F. Supp. 1146 (N.D. Cal. 1995) ....................................................................183, 184

22

*Missouri v. Jenkins*,
    495 U.S. 33 (1990).......................................................................................................187

23

*Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*,
24    61 F. Supp. 2d 1058 (N.D. Cal. 1999) ........................................................................125

25

*Payne v. Tennessee*,
26    501 U.S. 808 (1991).....................................................................................................183

27

*Preiser v. Rodriquez*,
28    411 U.S. 475 (1973).....................................................................................................183

*Rhodes v. Chapman,*
    452 U.S. 337, 101 S. Ct. 2392, 69 L.Ed.2d 59 (1981)....................................183

*Rufo v. Inmates of the Suffolk County Jail,*
    502 U.S. 367 (1992)....................................................................183, 186

*Rummel v. Estelle,*
    445 U.S. 263 (1980)............................................................................183

*Solem v. Helm,*
    463 U.S. 277 (1983)............................................................................183

*Stone v. City and County of San Francisco,*
    968 F.2d 850 (9th Cir. 1992) ..............................................................186

*Toussaint v. McCarthy,*
    801 F.2d 1080 (9th Cir. 1986) ............................................................186

*Weems v. U.S.,*
    217 U.S. 349 (1910)............................................................................183

## Statutes

18 U.S.C. § 3626(a)(1) ..........................................................................184, 185

18 U.S.C. § 3626(a)(1)(A) ............................................................................120

18 U.S.C. § 3626(a)(1)(B) ............................................................................187

18 U.S.C. § 3626(a)(3) ..........................................................................179, 180

18 U.S.C. § 3626(a)(3)(B) ............................................................................179

18 U.S.C. § 3626(a)(3)(C)............................................................................1, 2

18 U.S.C. § 3626(a)(3)(E) ............................................................................180

18 U.S.C. § 3626(a)(3)(E)(i) ........................................................................100

18 U.S.C. § 3626(a)(3)(E)(ii) ......................................................................100

18 U.S.C. § 3626(a)(3)(F) ................................................................................3

18 U.S.C. § 3626(g)(4) ..........................................................................passim

18 U.S.C. § 3626(g)(9)................................................................................100

Cal. Penal Code § 2962 ..............................................................................156

Cal. Penal Code § 2974 ...................................................................................................156

Cal. Welfare & Institutions Code §§ 6600 *et seq.*................................................................156

**Rules**

Fed. R. Evid. 201 ............................................................................................. passim

Fed. R. Evid. 706............................................................................................187, 188

[272055-1]

1

# TABLE OF ABBREVIATIONS AND ACRONYMS

2

ACA...................................... American Correctional Association

3

APP...................................... Acute Psychiatric Program

ASH or Atascadero............ Atascadero State Hospital

4

ASP or Avenal.................... Avenal State Prison

ASU ..................................... Administrative Segregation Unit

5

BCP ..................................... Budget Change Proposal

6

CAL or Calipatria.............. Calipatria State Prison

CCC ..................................... California Correctional Center

7

CCCMS .............................. Correctional Clinical Case Manager System

8

CCI ...................................... California Correctional Institution

CCPOA................................ California Correctional Peace Officers Association

9

CCWF.................................. Central California Women's Facility

CDCR................................... California Department of Corrections and Rehabilitation

10

CEN or Centinela .............. Centinela State Prison

11

CIM ..................................... California Institute for Men

CIW ..................................... California Institute for Women

12

CMC ..................................... California Men's Colony

CMF...................................... California Medical Facility

13

CMO..................................... Chief Medical Officer

14

COR or Corcoran............... California State Prison/Corcoran

CPR ..................................... Cardiopulmonary Resuscitation

15

CRC ..................................... California Rehabilitation Center

16

CSH or Coalinga ............... Coalinga State Hospital

CTC ..................................... Correctional Treatment Center

17

CTF....................................... California Training Facility/Soledad

18

CVSP or Chuckawalla....... Chuckawalla Valley State Prison

DMH..................................... Department of Mental Health

19

DOT...................................... Direct Observation Therapy

DVI or Deuel ...................... Deuel Vocational Institute

20

EOP ...................................... Enhanced Outpatient Program

21

EOP ASU Hub.................... Enhanced Outpatient Program Administrative Segregation Unit

FOL or Folsom ................... Folsom State Prison

22

HDSP or High Desert........ High Desert State Prison

23

ICF....................................... Intermediate Care Facility

ISP or Ironwood ................ Ironwood State Prison

24

KVSP or Kern Valley........ Kern Valley State Prison

LAC or Lancaster .............. California State Prison/Lancaster

25

LVN...................................... Licensed Vocational Nurse

26

MCSP or Mule Creek ........ Mule Creek State Prison

MHCB ................................. Mental Health Crisis Bed

27

MHOHU .............................. Mental Health Outpatient Housing Unit

28

MHSDS ............................... Mental Health Services Delivery System

NKSP or North Kern ......... North Kern State Prison
OHU ................................... Outpatient Housing Unit
OIG ..................................... Office of the Inspector General
PBSP or Pelican Bay ......... Pelican Bay State Prison
PCP ..................................... Primary Care Provider
PLRA .................................. Prison Litigation Reform Act
PSH or Patton .................... Patton State Hospital
PSU ..................................... Psychiatrist Services Unit
PVSP or Pleasant Valley ... Pleasant Valley State Prison
R&R ..................................... Reception and Receiving
RC ......................................... Reception Center
RJD or Donovan ................ Richard J. Donovan Correctional Facility
RN ......................................... Registered Nurse
SAC or Sacramento ........... California State Prison/Sacramento
SATF .................................. California Substance Abuse Treatment Facility (II)
SCC or Sierra ..................... Sierra Conservation Center
SHU .................................... Segregated Housing Unit
SM ....................................... Special Master in the *Coleman* case
SOL or Solano ................... California State Prison/Solano
SQ or San Quentin ............. California State Prison/San Quentin
SVPP ................................. Salinas Valley Psychiatric Program
SVSP or Salinas Valley ..... Salinas Valley State Prison
TB ....................................... Tuberculosis
TTA .................................... Triage and Treatment Area
UHR .................................... Unit Health Records
VSPW or Valley State ....... Valley State Prison for Women
VPP ..................................... Vacaville Psychiatric Program
WSP or Wasco .................. Wasco State Prison
ZZ Cell .............................. Makeshift temporary cells outside of clinic areas

# I.    INTRODUCTION

In two separate cases, *Coleman v. Schwarzenegger*, No. 2:90-CV-00520-LKK-JFM (E.D. Cal.), and *Plata v. Schwarzenegger*, No. C-01-1351-TEH (N.D. Cal.), prisoner-plaintiffs and the classes they represent sued the Governor and other officials responsible for operating the state's prison system for deliberate indifference to their serious medical and mental health needs in violation of the Eighth Amendment to the United States Constitution.  Both cases were resolved in favor of plaintiffs, *Coleman* in 1995, after a trial, and *Plata* through a stipulated injunction in 2002.

This proceeding adjudicates a request filed simultaneously by plaintiffs in both cases for a prisoner release order pursuant to 18 U.S.C. § 3626(a)(3)(C) as a remedial measure for the ongoing violations of the Eighth Amendment that were long ago found to be the cause of widespread injury and, at times, death in California's prisons.  Plaintiffs' motion was filed on the heels of the Governor's Proclamation of a Prison Overcrowding State of Emergency, declaring that "immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding…"  Pls.' Exh. P-1 at 6.

Despite the continuing and serious harm to the plaintiff classes, but because of the gravity of the relief sought and the potential for intrusion into core areas of the state's responsibilities, this Court proceeded cautiously and granted multiple stays of the litigation to permit defendants time to adopt a viable alternative to judicial intervention that could resolve the overcrowding crisis in California's prisons.  In addition, the parties, with the Court's encouragement and assistance, spent more than six months in intensive settlement negotiations that ultimately failed.  As the hope of a non-judicial solution has evaporated, this Court proceeded to trial and below makes findings of facts and conclusions of law.

## A.    Procedural History

In 1991 and 2001, plaintiffs in *Coleman* and *Plata*, respectively, filed amended complaints alleging defendants, various state officials responsible for the operation of California's prison system, were inflicting on them and the classes they represent cruel and unusual punishment in violation of the Eighth Amendment to the United States Constitution by

-1-

1  depriving them of constitutionally adequate medical and mental health care.  In 1995, the

2  *Coleman* Court found the conditions unconstitutional and ordered injunctive relief.  In 2002,

3  the *Plata* parties stipulated that defendants were not providing constitutionally adequate

4  medical care to the plaintiff class and the *Plata* Court issued an injunction, stipulated to by the

5  parties, designed to remedy the constitutional violations.

6        During the last eighteen and six years, respectively, the Courts in both cases have issued

7  multiple orders designed to ensure compliance with the Constitution.  In *Coleman*, the Court

8  has issued over seventy such orders, and in *Plata*, the Court has, among other things, appointed

9  a Receiver to operate the state's prison medical care system.

10        On November 13, 2006, the *Coleman* and *Plata* plaintiffs moved to convene a three-

11  judge court pursuant to 18 U.S.C. § 3626(a)(3)(C) on the grounds that the overcrowding crisis

12  has prevented defendants from implementing and obeying the numerous orders issued by the

13  *Coleman* and *Plata* courts to address the ongoing constitutional violations, and that no relief

14  short of a prisoner release order could cure the deficiencies.

15        After full briefing and oral argument, the *Coleman* and *Plata* Courts continued the

16  matter for six months "for the purpose of allowing the State to develop its own solution to the

17  overcrowding crisis."  7/23/07 Order at 10:7-9 (*Coleman* Docket No. 2320); *see also* 12/12/06

18  Order at 1:19-22 (*Coleman* Docket No. 2074).  In the interim, and at the Courts' request, both

19  the Special Master and the Receiver filed reports describing how overcrowding impacts the

20  CDCR's mental health and medical care systems.

21        On July 23, 2007, the *Plata* and *Coleman* Courts both issued orders requesting the

22  convening of a three judge court.  In doing so, the *Coleman* Court noted, "The orders of this

23  court issued from 1995 through the present have failed to remedy the constitutionally

24  inadequate delivery of mental health care to CDCR inmates.  That failure appears to be directly

25  attributable to overcrowding and the consequent inability to staff the caseload."  Defs.' Exh.

26  D-1037 at 7-8 (7/23/07 *Coleman* Order) (*Coleman* Docket No. 2320).  The *Coleman* Court

27  therefore determined that "the overcrowding crisis in the CDCR is preventing the delivery of

28  constitutionally adequate mental health care to the plaintiff class and, therefore, that some form

-2-

1   of limitation on the inmate population must be considered." *Id*. at 13:19-21.  Noting its

2   "extreme reluctance but firm conviction" that the step was necessary, the Court called for the

3   convening of a three judge court under 18 U.S.C. § 3626(a)(3).  *Id.* at 13:18-19, 21-23.

4   Nonetheless, the Court reaffirmed the hope that judicial intervention could be avoided, and

5   "urge[d] the State to find its own solution to the crisis." *Id.* at 14:4-6.

6          Similarly, in its order calling for the convening of a three judge court, the *Plata* Court

7   found, among other things, that "[i]t is clear to the Court that the crowded conditions of

8   California's prisons, which are now packed well beyond their intended capacity, are having –

9   and in the absence of any intervening remedial action, will continue to have – a serious impact

10  on the Receiver's ability to complete the job for which he was appointed: namely, to eliminate

11  the unconstitutional conditions surrounding delivery of inmate medical health care."  Pls.' Exh.

12  P-321 at 8 (7/23/07 Order, *Plata* Docket 780).

13         Between August and September 2007, more than 140 entities and persons from across

14  the state, including police chiefs, probation officers, district attorneys, counties, sheriffs, and

15  Republican legislators, sought to intervene as defendants to the proceedings pursuant to 18

16  U.S.C. § 3626(a)(3)(F).  Motions to Intervene (*Plata* Docket No. 803, 811, 816, 830, 835, 840,

17  841, 848, 849, *Coleman* Docket No. 2362, 2367, 2368, 2404, 2411, 2410, 2419, 2421, 2420).

18  Additionally, the California Correctional Peace Officers' Association ("CCPOA") sought to

19  intervene as a plaintiff pursuant to Federal Rule of Civil Procedure 24(a)(2), arguing that the

20  overcrowding in the prisons endangers CCPOA's members on a daily basis.  CCPOA Motion

21  to Intervene (*Plata* Docket No. 828, *Coleman* Docket No. 2402).  The Three-Judge Court

22  granted all of the motions to intervene.  8/17/08 Order (*Plata* Docket No. 817, *Coleman*

23  Docket No. 2376); 9/19/07 Order (*Plata* Docket No. 857, *Coleman* Docket No. 2427).

24         Starting in November 2007, and with the Court's full encouragement, the parties began

25  to engage in significant settlement discussions, aided by the Court-appointed Settlement

26  Referee, Elwood Lui, and Settlement Consultant, Peter Siggins.  With a stay of the litigation in

27  place, the parties shifted their focus to settlement discussions and negotiations.

28         At defendants' and defendant-intervenors' request, on May 30, 2008, the Court stayed

-3-

1  discovery in the case for an additional thirty days, set an additional status conference on

2  June 27, 2008, and set a trial date of November 17, 2008.  5/30/08 Order (*Plata* Docket No.

3  1219); 6/2/08 Order (*Coleman* Docket No. 2808).  The Court stayed discovery so the parties

4  could focus exclusively on settlement in a final effort to resolve the case without judicial

5  intervention.  At the June 2008 status conference, the parties and Referee Lui informed the

6  Court that no hope of settlement remained, despite the parties' focused efforts over the past

7  seven months.  Accordingly, the case proceeded to discovery and pretrial preparation.

8        **B.     Three Judge Court Trial**

9        The case was tried before the three judge court over the course of fourteen court days

10  between November 18, 2008 and December 19, 2008.  During the trial, the Court heard

11  testimony from forty-three expert witnesses, nineteen lay witnesses, including class members,

12  intervenors, defendants and other high-ranking state officials, and correctional employees.  The

13  parties also submitted into evidence over 1,200 trial exhibits, including documents,

14  photographs, video recordings, and demonstrative exhibits, as well as excerpts from seventeen

15  depositions.

16        Nearly all direct expert and percipient witness testimony was presented through written

17  declaration, totaling over 14,000 pages (exclusive of exhibits).  With the exception of two of

18  plaintiffs' witnesses, percipient witnesses were limited to fifteen minutes and expert witnesses

19  to thirty minutes of direct examination.

20        Plaintiffs presented twelve experts:  Dr. Pablo Stewart; Wayne Scott; Jeffrey Beard,

21  Ph.D.; Joseph Lehman; Craig Haney, Ph.D.; Jeanne Woodford; Dr. Ronald Shansky; James

22  Austin, Ph.D.; Barry Krisberg, Ph.D.; Dr. Arthur Reingold; Michael Hennessey; and Dr. James

23  Gilligan.

24        Defendants offered five expert witnesses:  Ira K. Packer, Ph.D., ABPP; Dr. David

25  Thomas, M.D. J.D.; Christopher Mumola, a Policy Analyst and Program Manager in Custody

26  Reporting Program for the Bureau of Justice Statistics; James Marquart, Ph.D.; and Gale

27  Bataille, M.S.W.

28        The County Intervenors offered nine expert witnesses:  Robert Garner, Director of the

-4-

Department of Alcohol and Drug Services for Santa Clara County; Nancy Peña, Director of Mental Health Department for the Santa Clara Valley Health and Hospital System; Charlene Silva, Director of the Health Department and Interim Chief of the Health System for San Mateo County; Gary Graves, Acting County Executive for Santa Clara County; Gregory Munks, San Mateo County Sheriff; David Boesch, Assistant County Manager for San Mateo County; Loren Buddress, Chief Probation Officer for San Mateo County; Beverly Beasley-Johnson, Agency Director of Human Services for San Mateo County; and Duane Bay, Director of the Department of Housing for San Mateo County.

The District Attorney Intervenors offered three expert witnesses:  Lisa Rodriguez, Deputy District Attorney of San Diego County; Bonnie Dumanis, District Attorney for San Diego County; and Roderic Pacheco, District Attorney for Riverside County.

The Law Enforcement Intervenors offered twelve expert witnesses:  Jerry Powers, Chief Probation Officer of Stanislaus County; Stephen M. Smith, Lieutenant for the Los Angeles County Sheriff's Department; Richard Word, Police Chief for Vacaville; Richard Conklin, Detentions Chief Mental Health Clinician for the San Diego County Sheriffs Department; Jerry Dyer, Fresno Chief of Police; Donald Meyer, Chief Probation Officer of the Yolo County Probation Department; Martin Ryan, Sheriff-Coroner of Amador County; Adam Christianson, Sheriff-Coroner of Stanislaus County; Alexander R. Yim, Division Chief for the Los Angeles County Sheriff's Department; John Ingrassia, Sheriffs Commander assigned to the Detention Services Bureau in the San Diego County Sheriffs Office; Michael James, Assistant Sheriff for Orange County; and Karen Dalton, Director of Bureau Operations for the Bureau of Offender Programs and Services, serving under the Correctional Services Division of the Los Angeles County Sheriff's Department.

Sonoma County offered two expert witnesses: David Bennett, an independent criminal justice consultant with extensive experience in analyzing and advising local criminal justice systems throughout the United States; and William Cogbill, Sheriff-Coroner of Sonoma

County.

The parties were provided the opportunity to cross-examine each witness,[1] and much of the trial was consumed by cross-examination, often by several different attorneys. This, plus the live direct examination, provided the Court with the ability to assess the credibility of most of the witnesses. The following findings of fact are based, in part, on that assessment.

## II.    THE EVIDENCE IS CLEAR AND CONVINCING THAT CROWDING IS THE PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS.

On October 4, 2006, the Governor of the State of California declared a state of emergency because prison overcrowding is so severe it endangers the health and safety of prisoners, staff, and the public. Pls.' Exh. P-1 at CDCR006976, CDCR006977. The Governor found that Californians are at "extreme peril" from the threat of infectious disease, wide-scale violence, and massive infrastructure failure in the state prison system, none of which can be fully contained behind prison walls. Pls.' Exh. P-1 at CDCR006983. He proclaimed that "immediate action is necessary to prevent death and harm caused by California's severe prison overcrowding." *Id.* at 6. CDCR's Director of Adult Institutions told the State Senate that "the risk of catastrophic failure in a system strained from severe overcrowding is a constant threat … [I]t is my professional opinion this level of overcrowding is unsafe and we are operating on borrowed time." Pls.' Exh. P-72 at CDCR006267.

More than two years later, the state of emergency continues and conditions remain the same, with nearly 160,000 prisoners crammed into facilities designed for half that number.[2] Pls.' Exh. P-135 (population figures as of August 27, 2008); Pls.' Exh. P-388 at Certification

---

[1] By stipulation of all the parties, several witnesses testified only by written declaration.

[2] The overcrowding has long been a feature of California prisons. For decades, California's rate of incarceration has outstripped even its extensive prison building project. As the *Plata* Court has stated, "[o]ver the past 25 years, the California correctional system has undergone a vast expansion in size and complexity… Since 1980, the inmate population has grown well over 500 percent and the number of institutions has nearly tripled from 12 to 33…" Pls.' Exh. P-420 (*Plata* Docket No. 371) at 4; *see also* Haney at RT 298:11-18 (California prisons have been overcrowded for decades and seriously overcrowded for at least 10 years).

1   of Operational Necessity (according to the CDCR Chief of Staff, as of October 9, 2008, since

2   the facts underlying the emergency proclamation still exist, "[t]he state of emergency continues

3   to exist today and the emergency proclamation has therefore not been terminated"). With the

4   exception of a few thousand prisoners transferred out of state, the extreme disparity between

5   the population the system can safely incarcerate and the population that is in fact incarcerated

6   has not abated. Pls.' Exh. P-1 at CDCR006983 (discussing "conditions of extreme peril to the

7   safety of persons and property exist … due to severe overcrowding, and … the magnitude of

8   the circumstances exceeds the capabilities of the services, personnel, equipment, and facilities

9   of any geographical area in this state"); Pls.' Exh. P-388 (same, as of October 9, 2008).

10      This disparity has a profound impact on the delivery of medical and mental health care.

11   It was uncontested at trial that the overcrowding impedes all aspects of prison operations,

12   including medical and mental health care. *See, e.g.,* Mello at RT 46:17-19; Pls.' Exh. P-186 at

13   1 (then-CDCR Secretary Tilton defined "program" to include mental health care and stated that

14   "until I get overcrowding reduced – then I don't have the opportunity to provide the program

15   that I believe is my charge"); Cate at RT 1683:11-20 (according to CDCR Secretary Cate,

16   overcrowding "severely hamper[s]" CDCR's ability "to address its problem"); Cate Dep. at

17   175:23-176:7 (stating that "[a]s the inmate population increases,…delivering healthcare,

18   managing overcrowding and controlling costs become more difficult"); Packer at RT 1092:23-

19   1094:6 (according to defendants' mental health expert, overcrowding, defined as lack of beds,

20   is the primary cause of the mental health care violations); Bennett Dep. at 75:10-17, 75:24-

21   76:13 (defendant intervenor expert opines that unconstitutional health care is in part a function

22   of overcrowding). The only disagreement lay on the degree of causation – whether

23   overcrowding is the primary cause of the unconstitutional conditions or merely one of many

24   reasons health care remains below constitutional standards. *See* Mello at RT 46:17-21.

25      As discussed below, the evidence demonstrates that California's prisons currently hold

26   far too many people for the space available to house and treat them, for the staff available to

27   ensure their health care needs are met, and for the infrastructure and administration to ensure

28   that the institutions function safely and appropriately to allow access to care. *See, e.g.*, Pls.'

-7-

1   Exh. P-1 at CDCR006983 (citing "conditions of extreme peril to the safety of persons and

2   property exist … due to severe overcrowding, and … the magnitude of the circumstances

3   exceeds the capabilities of the services, personnel, equipment, and facilities of any

4   geographical area in this state"); Pls.' Exh. P-338 (same, as of October 9, 2008); Tilton Dep. at

5   80:11-15 ("the lack of space is not only a housing issue, but it's impacting the other factors,

6   like delivery of healthcare service, the lack of offices, and clinical space"); Pls.' Exh. P-124 at

7   E_PRIV_16133 (according to CDCR's Chief Deputy Secretary for Facility Planning and

8   Construction Management, "[c]urrently, there is simply not enough space in the prisons to

9   meet the basic medical, mental health and dental needs of prisoners"); Pls.' Exh. P-55 at

10  GOV000160 (according to the *Plata* Receiver, "[i]t will not be possible to raise access to, and

11  quality of, medical care to constitutional levels with overpopulation at its current levels").

12  Seven of plaintiffs' experts, one of defendants' experts, and one of defendant-intervenors'

13  experts opined that overcrowding is the primary cause of the constitutional violations.  Haney

14  at RT 963:19-23; Haney Report at ¶ 17; Stewart at RT 67:5-6; Stewart Report at ¶¶ 23, 196;

15  Shansky at RT 423:10-12; Shansky Report at ¶ 136; Beard at RT 1583:15-22; Woodford

16  Report at ¶ 6; Woodford Supp. Report at ¶ 3; Scott Report at ¶ 80; Lehman at RT 271:3-11;

17  Packer at RT 1092:23-1094:6 (defendants' mental health expert opines that overcrowding is

18  the primary cause of the violations) and 1120:8-16 (overcrowding is primary cause of

19  difficulties providing mental health care in Reception Centers); Bennett at RT 2190:16-2191:2

20  (defendant-intervenor expert states that population reduction is necessary in order to provide

21  constitutional health care) and 2201:24-2202:6 (cannot provide constitutional medical and

22  mental health services with current overcrowding).

23      The Court heard extensive documentary and testimonial evidence on the effects of

24  overcrowding on health care services from three perspectives: general prison operations and

25  administration, specific medical care requirements, and specific mental health care

26  requirements.  All of these divergent perspectives point to the same conclusion: crowding is

27  the primary cause of the constitutional violations in health care delivery.  Taken separately,

28  each of these perspectives independently provides clear and convincing evidence to justify that

-8-

1   conclusion.  Taken together, the evidence is overwhelming, and the Court so finds, that

2   crowding is the primary cause of the medical and mental health care constitutional violations in

3   these cases.

4          **A.      Effects Of Overcrowding On Prison Operations**

5          In order to understand how overcrowding affects prison administrators' management of

6   access to medical and mental health care delivery, it is necessary first to understand the

7   peculiarities of California's prison system and the ways in which chronic, severe overcrowding

8   affects all of its operations.

9                  **1.      General Effects**

10         California is a system of extremes: it is one of the largest prison systems in the world.

11  Scott Report at ¶ 4.  Even its individual prisons are unusually large, most housing between

12  5,000 and 7,000 prisoners.  Pls.' Exh. P-135.  These factors alone make the prisons difficult to

13  manage, according to experienced corrections chiefs who testified at trial.  Beard at RT 214:4-

14  10 (according to Pennsylvania Corrections Secretary, a prison with 3,300 prisoners is hard to

15  manage; would not want to run a prison with 7,000 prisoners) and 215:14-18 (if you put 7,000

16  prisoners in a prison designed for 4,000, your population is so huge that management cannot

17  do a good job and ability to provide all services suffers); Scott Report at ¶ 76 (according to

18  former Texas prison head, 3,000-person prison nearly unmanageable and "[t]he sheer size and

19  complexities of managing a prison [of 7,000] would be overwhelming for one manager

20  especially with the limited resources in the areas of staffing and inadequate space for services

21  to the offenders that I observed at all of the prisons I toured in California").  That is because

22  prisons are essentially small cities that must provide for every need of those they incarcerate.

23  Beard at RT 216:3-7.  In these completely self-contained environments, prison administrators

24  must coordinate and prioritize multiple complex tasks: they must ensure provision of basic life

25  needs such as food and water and clothing and exercise; educational and vocational and other

26  rehabilitative programming; and ensure safety and security for prisoners, staff, and the public

27  at all times.  Beard at RT 215:13-216:7, 222:10-13; Woodford at RT 383:11-24.

28         Prison officials must also ensure access to medical and mental health services.  Health

-9-

1   care delivery in California prisons is an enormous undertaking: more than a two billion-dollar

2   system responsible for providing medical care for over 160,000 people and mental health care

3   for more than 34,000 people.  Jerue at RT 734:4-20 (CDCR health care budget in 2007-2008

4   more than $2 billion); Pls.' Exh. P-243 at 900124 (as of August 2008, 34,319 patients with

5   serious mental illness in California prisons).  Health care delivery involves many complicated

6   processes, such as screening and identification of conditions, primary care, specialty care,

7   emergency response, chronic care, specialized housing for the sickest patients, public health

8   concerns, among others, as well as tremendous numbers of staff, including doctors,

9   psychiatrists, psychologists, nurses, pharmacists, and x-ray technicians.  In addition to all these

10  requirements, prisoners must have access to care – they must be escorted to appointments, both

11  inside and outside prison walls; they must be placed appropriately for their medical and mental

12  health needs; prison staff must be able to provide appropriate rapid responses to medical and

13  mental health emergencies.

14          Superimpose on these complex "cities" a level of overcrowding that is "extraordinary"

15  (Haney at RT 298:11-20) and "unprecedented" (Scott Report at ¶ 3), and prison administrators

16  are overwhelmed.  As Jeanne Woodford, former head of California's prison system, testified:

17  "[r]unning a prison is a coordinated effort ….  The more overcrowded you are, the more

18  difficult it is to meet the basic, basic needs of inmates.  And it even gets to be impossible to get

19  [] them [to] their mental health treatment and healthcare exams when you're trying to do just

20  basic operations in an overcrowded setting."  Woodford at RT 383:15-384:2.  Ms. Woodford's

21  successor, James Tilton, agreed, explaining that although the state must provide prisoners with

22  programs, including mental health care, "until I get overcrowding reduced – then I don't have

23  the opportunity to provide the program that I believe is my charge."  Pls.' Exh. P-186 at 1; s*ee*

24  *also* Beard at RT 218:23-25 (Pennsylvania's prison chief agreed, explaining that under

25  overcrowded conditions, administrators lose the "ability to properly deliver any service within

26  an institution, including mental health care and medical services").

27          As one response to the severe overcrowding, California officials have chosen to house

28  prisoners in "bad beds," which are spaces never intended for human habitation, such as

-10-

1  dayrooms, gymnasiums, and hallways.  According to the 2004 report of the Corrections

2  Independent Review Panel appointed by Governor Arnold Schwarzenegger,

> [S]ome inmates are triple-bunked – stacked three deep in bunk beds – others are living two-to a-cell in cells designed for one, and beds for both low-and medium-risk inmates are crammed into gyms and dayrooms that were never meant for housing.  These "ugly beds," as prison administrators call them … create difficult, unsanitary living conditions where ventilation is poor, toilet access is limited, and as many as 200 people might share six showers.

Pls.' Exh. P-4, Chapter 9 at 200.  Pls.' Exh. P-342 (Mule Creek State Prison, July 19, 2006)



1   Pls.' Exh. P-345 (Lancaster, August 8, 2006)



Pls.' Exh. P-343 (California Institution for Men, August 7, 2006)



-12-

1  Pls.' Exh. P-339-4B, (Mule Creek, August 1, 2008, A-yard Gym Dorm)



15    There are currently approximately 14,000 prisoners in such "ugly beds." Kernan at RT

16  1911:9-13. On November 26, 2008, CDCR postponed many previously scheduled

17  deactivations of bad beds "[d]ue to the population being significantly above fall projections."

18  Pls.' Exh. P-839 at 1; see also Kernan at RT 1917:19-22.

19    This reliance of "ugly beds" is unheard of in other overcrowded systems. Scott Report

20  at ¶¶ 1, 10-11 (former Texas prison chief who has acted as an expert consultant in seven

21  correctional systems has, "[i]n more than 35 years of prison work experience, … never seen

22  anything like" some of the ugly beds); Lehman at RT 265:11-266:2. It is clear why: According

23  to the Governor, such placements "pose substantial safety risks" (Pls.' Exh. P-1 at

24  CDCR006976), and according to CDCR Secretary Cate, they make running the prisons more

25  difficult. Cate at RT 1680:9-12. As the Governor described,

26      [W]e are double and triple bunking inmates and housing them in
       parts of our prisons that were not meant to house any inmates. This
27      is not only increasing tension it makes our prisons unsafe for staff
       and inmates alike, but it also takes away space that we need for

> programs that can help rehabilitate and give our inmates the skills that they need to go to the outside.  Right now 16,300 inmates are housed in prison gyms and in dayrooms.  Any correction experts will tell you that this is a recipe for disaster.

Pls.' Exh. P-373 at 13:41-14:15; *see also* Pls.' Exh. P-13 at E_CDCR_008479 (Senate Budget and Fiscal Review Committee Subcommittee No. 4, Agenda of April 12, 2007).  According to Special Master Keating,

> All inmates must spend increasingly larger chunks of their days in their cells, or much more dangerously, in one of those triple-bunked "non-traditional" spaces.  None of this is conducive to the health or well-being of any inmate, much less a seriously mentally disordered inmate/patient; it inevitably escalates the incidence of mental illness and exacerbates the condition of those already fragile and vulnerable.

Pls.' Exh. P-35 at 7-8; *see also* Haney Report at ¶¶ 339-343; Stewart Report at ¶¶ 29, 176-80. On the medical side, the *Plata* Receiver found that the "conditions in gyms and hallways converted to housing units" are a factor leading to a serious risk of system-wide outbreaks of infectious and communicable diseases.  Pls.' Exh. P-26 (Receiver's Report on Overcrowding) at 30; *see also* Shansky Report at ¶ 135 (noting that "[t]he housing conditions I observed and, in particular, the converted gymnasiums at ASP, VSPW and San Quentin, create textbook breeding grounds for infectious diseases"); Scott at RT 148:6-149:1; Woodford at RT 380:1-381:7, 382:14-383:3 (staff cannot properly identify medical and mental health problems in overcrowded gyms and medical emergencies can go unnoticed as a result).  Thus the "bad beds" endanger prisoners' physical and mental health, further burdening an already inadequate health care delivery system, as described in more detail in Sections B and C, below.

The severe overcrowding means that staff cannot even keep prisoners in their care alive. Murders go unnoticed: One prisoner's killing in a gymnasium that had been converted to overcrowded overflow housing was not discovered by staff for hours.  Woodford at RT 382:14-383:3.  Another prisoner starved to death in a prison of more than 7,000 inmates. Woodford Report at ¶ 20; Pls.' Exh. P-135.  Another bled to death, in an institution with nearly

-14-

6,000 inmates. *Id.* These deaths occurred in places that the public expects to be the most secure and scrutinized in our society. Instead, they are overcrowded – in the Governor's words – to the point of "extreme peril" and to the point where basic life and health needs cannot be met.

Experienced prison administrators who testified at trial[3] identified several specific ways in which overcrowding impacts general prison operations that seriously impedes access to health care. California prison administrators react to overcrowding-related violence and staffing shortages with lockdowns, which impede access to care by making it extremely hard to get prisoners to health care appointments and by exacerbating mental illness. Beard at RT 217:18-218:25; Scott Report at ¶¶ 63-66; Lehman Report at ¶¶ 9-10; Woodford Report at ¶¶ 24-27; Haney Report at ¶¶ 348-350. Severe staffing shortages and overcrowding-related violence also makes it difficult to supply custody staff to act as escorts and supervise appointments. Woodford Report at ¶¶ 15-17, 19; Scott Report at ¶¶ 54-57. With excessively overcrowded housing units, particularly the triple-bunked gyms and dayrooms that have been converted to living space, staff are unable to provide appropriate emergency response and cannot adequately perform as gatekeepers to the health care systems because they simply do not know the prisoners in their care. Scott Report at ¶¶ 58-62; Woodford Report at ¶¶ 15-19. Moreover, the classification systems that determine where to place prisoners by assessing their risk levels and treatment needs break down in the face of the excessive population pressures. This breakdown leaves administrators unable properly to place prisoners – in specialized medical or mental health units or in places consistent with their vulnerabilities – as they search

---

[3] Four prison administrators testified on plaintiffs' behalf: Jeffrey Beard, Joseph Lehman, Wayne Scott, and Jeanne Woodford. Each of these witnesses has decades of experience working in prisons; together, they have run five state prison systems, including the two largest in the country (Texas and California). Beard at RT 200:15-201:7; Lehman Report at ¶ 1; Scott Report at ¶¶ 1, 4; Woodford Report at ¶ 1. Secretary Beard, Mr. Lehman, and Mr. Scott had never before testified on behalf of a prisoner. Beard at RT 230:2-7; Lehman at RT 273:6-10; Scott at RT 153:12-14. Ms. Woodford and Mr. Beard were not paid for their time as experts in this case. Woodford at RT 385:12-14; Beard at RT 230:8-10.

1 | for an empty bed, wherever it might be.  Lehman Report at ¶ 8; Woodford Report at ¶¶ 13-14;

2 | Scott Report at ¶¶ 67-75; Scott at RT 145:15-18, 149:2-151:17; Beard at RT 225:21-227:13.

3 |      Thus the overcrowding in California prisons does not simply result in longer waits for

4 | meals or showers or doctor's appointments, or prisoners being double-celled instead of single-

5 | celled; it reverberates throughout the entire complex prison infrastructure, contributing to

6 | wide-spread system failures and impacting the "ability to properly deliver any service within

7 | an institution, including mental health care and medical services."  Beard at RT 218:23-25.  As

8 | Ms. Woodford, a former *Plata* and *Coleman* defendant, described, prison administrators

9 | become firefighters, putting out the latest blaze without time and energy for looking ahead,

10 | thinking strategically, or implementing Court-ordered solutions to constitutional violations.

11 | Woodford Report at ¶ 12; Woodford at RT 370:17-371:22.  The sheer overpopulation makes

12 | operation of a complex system such as health care services impossible, according to Joseph

13 | Lehman, who ran three separate state prisons systems.  Lehman at RT 286:12-287:1.  As the

14 | *Plata* Court has already found,

> Defendants concede that this rapid growth of the correctional
> system was not accompanied by organizational restructuring to
> meet increasing system demands and that it requires fundamental
> reform in a variety of areas, including management structure,
> information technology and health care services in order to
> function effectively and in compliance with basic constitutional
> standards . . . . In the area of health care services, the consequences
> of system expansion without reform have been shocking.

Pls.' Exh. P-420 at 4-5.

### 2. Overcrowding Makes It Impossible For Prison Administrators To Provide Access To Health Care

23 |      Two past CDCR Secretaries, Jeanne Woodford and James Tilton, have admitted that

24 | prison overcrowding makes it impossible for them to provide required health care.  Woodford

25 | at RT 368:1-11; Woodford Supp. Report at ¶¶ 3, 31; Pls.' Exh. P-186 at 1.  The Governor has

26 | declared that the overcrowding is so extreme it constitutes a state of emergency and makes it

27 | impossible to provide rehabilitative programs.  Pls.' Exh. P-1; Pls.' Exh. P-373 at 13:41-14:15.

28 | The current CDCR Secretary testified that "overpopulation makes everything we do more

-16-

1  difficult."  Cate at RT 1683:11-20; *see also* Cate Dep. at 141:24-142:15, 175:23-176:7; Cate at

2  RT 1684:5-16.  Mr. Tilton and the CDCR's current Chief Deputy Secretary for Facility

3  Planning and Construction Management agree that there is inadequate treatment space in the

4  prisons to provide health care.  Pls.' Exh. P-173 at 1 (CDCR July 2006 Report "Inmate

5  Population, Rehabilitation, and Housing Management Plan"); Tilton Dep. at 80:11-15; Pls.'

6  Exh. P-124 at E_Priv_16133.  Relying solely on defendants' and former defendants' own

7  admissions[4] as to the pervasive and specific effects of the overcrowding and the impossibility

8  of compliance under such conditions, the Court finds clear and convincing evidence that

9  crowding is the primary cause of the constitutional violations.

10         Extensive evidence introduced at trial from other sources further bolsters this

11  conclusion.  The *Plata* Receiver and *Coleman* Special Master provide independent proof of the

12  primacy of overcrowding in causing the constitutional violations and the impossibility of

13  resolving those violations without first addressing the population pressures.  The Receiver has

14  announced his resolve to fix medical care in California's prisons, but has also acknowledged

15  that a solution is impossible without addressing overcrowding.  In a letter to the Governor, the

16  Receiver stated that "[i]t will not be possible to raise access to, and quality of, medical care to

17  constitutional levels with overpopulation at its current levels."  Pls.' Exh. P-55 at GOV000160;

18  *see also* Pls.' Exh. P-53 at 3 ("[m]ost California prisons operate at 200% of capacity, with no

19  effective relief in sight.  Unless and until the living conditions of some prisons and the

20  overpopulation experienced system-wide is effectively addressed, the Receiver will be

21

22  _____

    [4] Ms. Woodford appeared as an expert witness for plaintiffs and not defendants.  The Court

23  addresses her testimony in this section, however, since she is a former defendant in both the

    *Plata* and *Coleman* cases (Woodford at RT 362:21-363:1) and her testimony is consistent with

24  the testimony of her two successors in office.  Of note is the fact that she accepted no payment

    for her testimony in this case, but instead chose to offer her expertise because "I truly believe

25  that we can do better than we are in California.  I think it's unbelievable that in this state that

    we have the kind of overcrowded conditions that we have…And [] I believe overcrowding is

26  prohibiting us from providing quality medical care and mental healthcare to inmates in our

    system."  Woodford at RT 385:12-386:3.

27

28

1    impeded in applying systemic and even some *ad hoc* remedies to the medical care system").

2    According to the Receiver, medical care cannot be improved without addressing the population

3    size because overcrowding is "the root cause of many of the prison system's ills, including

4    constitutionally inadequate medical care."  Pls.' Exh. P-29 at 2; *see also* Pls.' Exh. P-55 at

5    GOV000160 ("the overcrowding and medical crises are integrally related"); Tenth Tri-Annual

6    Report of the Receiver's Turnaround Plan of Action, Jan. 15, 2009 at 3, 110-111[5]

7    (overcrowding related crises significantly slowing Receiver's work).

8        The Special Master has similarly acknowledged the negative effects of overcrowding on

9    the mental health care delivery system.  *See, e.g.,* Pls.' Exh. P-427 at 8 ("By late 2005, it was

10    evident that the reduction in population growth and then in the population itself in the first few

11    years of the decade were over, and the numbers were rising fast.  Early in 2006, defendants

12    were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly,

13    and the scramble was on to deal with the flow.  One victim of the turnaround was CDCR's

14    mental health bed plan."); Pls.' Exh. P-35 at 16-17 ("Over the past 11-plus years, much has

15    been achieved, and many of the achievements have succumbed to the inexorably rising tide of

16    population, leaving behind growing frustration and despair").

17        The Court also heard evidence from numerous state experts, agencies, and entities

18    charged with addressing prison problems that provide remarkable unanimity on the primacy of

19    overcrowding in the prison systems' failures, and the necessity of reducing the population in

20    order to implement reforms.  Two key reports, one from defendants' own Expert Panel on

21    Adult Offender and Recidivism Reduction Programming and one from the state's Little

22

23

24

25

26

27    _____

[5] The Court takes judicial notice of this document pursuant to F.R.E. 201 and Plaintiffs' Request for Judicial Notice, Ex. H.

28

-18-

1   Hoover Commission,[6] identified crowding as the primary barrier to resolving the prison crisis

2   by making overcrowding reduction their first recommendation.  Pls.' Exh. P-2 at 10 (Expert

3   Panel recommends first that the state "reduce overcrowding in [CDCR's] prison facilities and

4   parole offices"); Pls.' Exh. P-3 at iv (first recommendation in the Little Hoover Commission's

5   "Solving California's Corrections Crisis: Time Is Running Out," is that "[t]he Governor and

6   Legislature should immediately implement a comprehensive strategy to reduce prison

7   overcrowding and improve public safety in California communities").  A blue-ribbon state

8   commission headed by former Governor Deukmejian echoed this conclusion: "[t]he key to

9   reforming the system lies in reducing the numbers."  Pls.' Exh. P-4 at 123.  The state watchdog

10  Office of the Inspector General ("OIG"), under the direction of Mr. Cate, who is now CDCR

11  Secretary and a defendant in these cases, found that efforts to solve the medical care failures

12  "are severely hampered by inmate population pressures that have prisons straining at nearly

13  twice design capacity, spreading staff resources thin and leaving little facility space available

14  for programming and other purposes.  Developing sustainable solutions will require the

15  [CDCR], state policymakers, and the public to collectively address the available options" to

16  reduce overcrowding.  Pls.' Exh. P-46 at ES-1 (Office of the Inspector General, Accountability

17  Audit, Review of the Audits of the California Department of Corrections and Rehabilitation

18  Adult Operations and Adult Programs, 2000-2004, April 2006).  The California State Auditor

19  agreed: "[M]eeting the constitutional rights of inmates to receive minimum standards of

20  treatment" is a problem that "emerge[s]" from overcrowding.  Pls.' Exh. P-6 at 22-23

21  (California State Auditor's Report).

22  _____

23  [6] According to its website, the Little Hoover Commission is an "independent state oversight
    agency that was created in 1962.  The Commission's mission is to investigate state government

24  operations and—through reports, recommendations and legislative proposals—promote
    efficiency, economy and improved service…  By statute, the Commission is a balanced

25  bipartisan board composed of five citizen members appointed by the Governor, four citizen
    members appointed by the Legislature, two Senators and two Assembly members."  The Court

26  takes judicial notice of the website (*see* http://www.lhc.ca.gov/lhcdir/about.html) pursuant to

27  Fed. R. Evid. 201; *see also* Plaintiffs' Request for Judicial Notice, Ex. K.

28

-19-

[272055-1]

1    The above-cited evidence relates solely to how overcrowding affects general operations

2    and management of California's prisons and therefore access to health care.  In Sections III and

3    IV, below, the Court discusses the evidence regarding specific effects of overcrowding on the

4    CDCR's medical and mental health delivery systems.  The Court finds, however, that the

5    above-cited evidence from defendants, from state agencies and experts, from the Court-

6    appointed Receiver and Special Master, as well as from plaintiffs' correctional management

7    experts, provides an independent as well as a clear and convincing basis for the finding that

8    crowding is the primary cause of the health care violations.

9    In finding that crowding is the primary cause of the health care violations, the Court

10    notes that defendants proffer no meaningful alternative cause for the Court's consideration.

11    The other factors defendants point to, such as staffing shortages, inadequate space, poor

12    record-keeping, and faulty planning and management, are themselves simply other ways of

13    describing the effects of overcrowding, as discussed above and in greater detail in the

14    following sections.

15
16    **III.    OVERCROWDING IS THE PRIMARY CAUSE OF MEDICAL CARE VIOLATIONS**

17    **A.    Introduction, Expert Opinion, And Impact On Prisoners**

18    Clear and convincing evidence demonstrates that overcrowding is the primary cause of

19    the ongoing unconstitutional violations regarding medical care in California's prisons.  First,

20    the Court's Receiver has so indicated or stated.  Shortly after beginning work, the Receiver

21    termed overcrowding the "root cause" of the prison system's constitutionally inadequate

22    medical care.  Pls.' Exh. P-29 at 2; *see also* 10/27/06 Letter From The Receiver, Vol. 1, No. 4,

23    October 27, 2006[7] at 1 (stating "it is clear that overcrowding is at the root of many of the

24    difficulties that afflict medical care").  Most recently, the Receiver has concluded that

25
26
27
28

-20-

1  "overcrowding is, and will continue to be, the primary cause of the State's inability to provide

2  constitutionally adequate care."  Tenth Tri-Annual Report of the Federal Receiver's

3  Turnaround Plan of Action, January 15, 2009 at 4.

4         Further, every expert witness, except one, who testified regarding overcrowding and

5  inadequate medical care stated that overcrowding is the primary cause of these constitutional

6  violations.[8]  Scott at RT 152:1-6; Woodford at RT 376:3-13; Shansky at RT 423:8-12; Stewart

7  at RT 66:25-67:6; Lehman at RT 270:25-271:11; Beard at RT 219:1-10 (overcrowding is

8  "biggest inhibiting factor" to delivery of medical and mental health care); Haney at RT 298:21-

9  299:2; 346:8-16.  Many of these experts have decades of experience in managing prisons and

10  prison systems, and also include correctional medical and mental health experts.  As stated by

11  one of plaintiffs' experts, Dr. Ronald Shansky, the number of prisoners far outstrips the

12  capacity of the prison system to provide minimally adequate medical care for the prisoners

13  housed in it.  Shansky Report at ¶ 9.  The CDCR incarcerates far more prisoners than can be

14  adequately treated with the facilities, staffing, and resources available.  Shansky Second Supp.

15  Report at ¶ 7.

16         These experts' opinions are based on overwhelming evidence of the profound mismatch

17  between the resources available and the need for medical services.  As explained below, there

18  are too many prisoners for the amount of available medical clinic and medical support space,

19  the number of medical staff, particularly physicians and nurses, and the amount of specialty

20  services.  The massive numbers of prisoners also overwhelms medication distribution and

21  documentation systems, including medical records and patient scheduling processes.

22  Furthermore, there is insufficient specialized housing for prisoners with medical conditions,

23

24  _____

[7] The Court has already taken judicial notice of this document, which is available at

25  http://www.cprinc.org/docs/resources/LetterFromReceiver4_102706.pdf, pursuant to its

26  November 3, 2008 Order (*Plata* Docket No. 1757, *Coleman* Docket No. 3260).  This letter is
   Exhibit G to Plaintiffs' Request for Judicial Notice, filed concurrently herewith.

27  [8]  The testimony of the one exception, defendants' witness David Thomas, M.D., is discussed
   below.

28

1  given the numbers of prisoners who need it, and inadequate numbers of custody officers to

2  transport prisoners to medical appointments.  Overcrowding itself also creates medical

3  conditions, and makes it more difficult to control outbreaks of infectious disease.

4  As also explained below, these overcrowding-caused crises result in delays in patient

5  care, an inability to implement required policies, and significant risks of harm to prisoners.

6  But most troubling is that in addition to placing prisoners at substantial risk, the massive

7  overcrowding in California's prisons contributes to shocking numbers of extreme lapses from

8  the standard of care, including those that cause death.

9  Specifically, of the 110 prisoner deaths in calendar year 2007 that were considered

10  natural and unexpected, 44 were identified as preventable or possibly preventable by the

11  Receiver.  Pls.' Exh. P-413, Ex. G at 8, Table 1; Shansky at RT 428:23-429:7 (Dr. Shansky

12  testimony that 44 out of 110, or 40 percent, of natural, unexpected deaths were preventable or

13  possibly so).  This is an extremely high percentage.  Shansky at RT 428:23-429:7.  Even

14  among all deaths, expected or not, approximately 20 percent were identified as preventable or

15  possibly so, a rate which itself is quite high.  Shansky at RT 429:12-19.  Among these possibly

16  preventable deaths were prisoners who died of sudden cardiac arrest, cancer, or stroke.  Pls.'

17  Exh. P-413, Ex. G at 11.

18  In addition to the high percentage of preventable or possibly preventable deaths,

19  reviews of California prisoners' deaths also identify a shockingly high rate of extreme

20  departures or lapses from the community standard of care.  Dr. Shansky testified that as

21  Medical Director of the Illinois prison system, an extreme departure from the standard of care

22  would be identified in five to ten percent of inmate deaths.  Shansky at RT 428:9-17.  In

23  California, the Receiver analyzed CDCR's reviews of 395 prisoner deaths that occurred in

24  calendar year 2007.  Pls.' Exh. P-413, Ex. G at 8.  A total of 292 extreme-departure lapses

25  from the standard of care occurred in 234, or almost 60 percent, of these deaths.  *Id.* at 9

26  (extreme-departure lapses identified in reviews of 166 of the deaths classified as non-

27  preventable), 10 (extreme-departure lapses identified in all 65 deaths classified as possibly

28  preventable); at 11 (extreme-departure lapses identified in reviews of all 3 deaths classified as

-22-

[272055-1]

preventable); Shanksy at RT 428:5-17 (stating that "lapses occurred in almost 60 percent of the cases").[9]  These cases included those in which prisoner-patients presented with symptoms such as chest pain, shortness of breath, abdominal pain, severe headaches, dizziness, acute confusion, new neurological symptoms, weight loss, and abnormal vital signs including low oxygen saturations. Pls.' Exh. P-413, Ex. G at 20.  Furthermore, the extreme-departure lapses are widespread even in cases that do not result in death, and contribute to delays in diagnosis and treatment, avoidable medical emergencies, and avoidable hospitalizations.  Shansky at RT 430:9-23.

Many of these extreme departures and lapses are systemic and clearly and unquestionably relate to overcrowding.  Shansky at RT 427:17-428:4, 430:24-431:3.  These include delays in access to care, failure to adequately pursue abnormal test results, failure of provider-to-provider communication, medication delivery problems, and medication prescribing errors.  *Id*. at 427:17-428:4; *see also* Pls.' Exh. P-413, Ex. G at 19-24 (identifying and listing extreme departures).

Overcrowding is the one factor that negatively impacts almost every matter that underlies the inadequacies of California's prison medical services.  Shansky Second Supp. Report at ¶ 9.  As the *Plata* Receiver wrote to defendant Governor Schwarzenegger, "[i]t will not be possible to raise access to, and quality of, medical care to constitutional levels with overpopulation at its current levels."  Pls.' Exh. P-55 at 1.

**B.    Evidence of Overcrowding as Primary Cause of Particular Medical Care Inadequacies.**

**1.    Medical Clinic And Related Space**

Given the current number of prisoners, the CDCR lacks sufficient space to provide timely medical care with appropriate confidentiality safeguards.  Shansky Report at ¶ 10.

---

[9] Although Dr. Shansky did not perform the math on the witness stand, his characterization of the percentage is correct.  Of 395 deaths reviewed, extreme-departure lapses were identified— per the data in the accompanying text, above—in a total of 234, or approximately 59 percent,

(continued …)

1  "[A]vailable clinical space is less than half of what is necessary for daily operations."  Defs.'

2  Exh. D-1133 at 25; *see also* Pls.' Exh. P-26 at 19 (even newest prisons designed with only one-

3  half the clinic space necessary for real-life capacity).  The CDCR facilities for providing health

4  care services are, in the Receiver's words, "woefully inadequate."  Defs.' Exh. D-1133 at 25.

5  According to the Receiver, additional health care space is necessary at existing CDCR prisons

6  "primarily" because of "overcrowding" and the fact that the prisons were built without

7  adequate clinical and medical support facilities given the numbers of prisoners they house.

8  Pls.' Exh. P-26 at 27.

9          More specifically, there is inadequate space for medical encounters given the number of

10  prisoners at CDCR reception centers, where prisoners must undergo their initial medical and

11  mental health examinations.  Shansky Report at ¶¶ 11-12 (prisoners and medical providers

12  squeezed into inadequate exam rooms, with lack of privacy); Shansky Second Supp. Report at

13  ¶¶ 21-29 (at North Kern reception, critical initial health encounters take place in inadequate

14  areas lacking confidentiality, the initial physical exam by a physician or mid-level providers

15  take place in rooms too small to perform an actual exam, and no other space available at the

16  prison to conduct these necessary functions); Defs.' Exh. D-1226 at DSUPP005598 (California

17  Institution for Men's central health services building "suffers from a severe shortage of

18  appropriate specialty clinical exam rooms, clinical support spaces," and other necessary

19  medical spaces); *id.* at DSUPP005616 (California Institution for Men's Reception Center West

20  medical clinic is "drastically undersized for the medical clinic purposes and inmate population

21  it needs to serve;" three physicians work in one room with only cloth screens separating work

22  spaces, five nurses occupy one room where all patient screening is performed and there is no

23  visual or audio privacy, and pill line/medication storage room is "insufficient size for the

24  inmate population").

25          Overwhelming evidence also shows there is inadequate space for minimally adequate

26

27  of the cases.

28

medical care to be provided given the numbers of prisoners at CDCR's mainline/general

population prisons.  As the Receiver's analysis of calendar year 2007 deaths states, "[t]he

volume of care often far exceeds capacity, as at Avenal State Prison, where the 7525 inmates

get care in spaces designed for 2320."  Pls.' Exh. P-413, Ex. G at 25.  Numerous other prisons

also have too many prisoners for the space available to provide medical care given the number

of prisoners who need it.  Shansky Report at ¶¶ 16-25 (describing personal observations of

inadequate medical clinic space, given numbers of prisoners who must be treated, in general

population clinics at Valley State Prison for Women, Avenal, San Quentin, and California

Institution for Men); *id.* at ¶¶ 30-31, 33 (describing inadequate medical spaces for mainline

medical encounters at California Correctional Center, Mule Creek, and California Institution

for Men); Shansky Second Supp. Report at ¶¶ 31-46 (describing personal observations of

inadequate medical treatment spaces given numbers of prisoners who must be treated at North

Kern, SATF, Pleasant Valley, and Solano); Pls.' Exh. P-99 at 3 (Correctional Training

Facility's North Facility clinic is "very small based on the number of inmate-patients being

served," and South Facility clinic, although the newest physical plant of the three facility

clinics at the prison, was "built to support an inmate population of 510 inmates … not the

current housing of more than 1000 inmates"); Pls.' Exh. P-100 at 15 (stating "[f]or the most

part, none of the existing areas occupied by health care clinicians [at California Rehabilitation

Center] are clinically appropriate"); Pls.' Exh. P-101 at 7 (noting "[a]ll of the Facility Clinics

[at Mule Creek] are undersized for the quantity of inmate/patients seen on a daily basis and

lack[] appropriate holding/waiting space for inmate/patients ducated to be seen by health care

providers"); Pls.' Exh. P-413, Ex. G at 25 (prison clinical staff "has been working in clinical

areas that are dirty, cramped, crowded, noisy, and poorly equipped"); Kernan at RT 1923:20-

1924:14 (concedes some prison space may not be adequate); Benson at RT 601:1-13

(Correctional Officer states there are too many staff and "way too many inmates" for

Treatment and Triage Area ("TTA") medical space at Folsom); Rowlett at RT 664:6-16 (at

Solano, a room is shared simultaneously by the scheduling secretary and practitioners doing

exams, including eye exams in the dark and hemorrhoid exams); Rowlett at RT 663:22-664:5

-25-

1  (patient intakes done in hallways at Solano because of lack of other space).

2        The problem of inadequate space is so pervasive that the Receiver has determined that

3  construction improvements to existing medical clinical and administrative support facilities, or

4  the building of new such facilities, is necessary at *each* of CDCR's thirty-three prisons, and

5  that several regional care centers also must be built to provide necessary care for prisoners with

6  long-term healthcare needs.  Defs.' Exh. D-1133 at 25.  According to the Receiver, "[t]here is a

7  dire need for additional clinical space and medical beds in the prisons because the existing

8  capacity has been swamped by the number of inmates in the system."  Pls.' Exh. P-27 at 2.

9        The lack of adequate clinic and medical-related space for the numbers of prisoners

10  results in non-compliance with basic medical policy requirements and creates a substantial risk

11  of harm to prisoners, including extreme departures from the standard of care that can and has

12  resulted in death.  Because of the lack of adequate space and too many prisoners, the reception

13  center screening process breaks down, backlogs of patient appointments cannot be reduced

14  because there is no place for additional appointments to occur, medical confidentiality

15  requirements cannot be met, adequate physical exams are not performed, and clinicians' ability

16  to provide adequate care, including obtaining necessary information such as reliable patient

17  histories for treating patients, are substantially impeded, critically impaired, or impossible.

18  Shansky Report at ¶ 11 (screening process breaks down in reception centers); *id.* at ¶ 12 (at

19  California Institution for Men reception center, too many prisoner-patients and too many

20  providers squeezed into available treatment area, resulting on lack of confidentiality for

21  patients); *id.* at ¶ 17 (at Avenal, backlogs of hundreds of medical appointments cannot be

22  cleared because no place for additional appointments to occur); *id.* at ¶¶ 20-22 (at San Quentin,

23  inappropriate clinic areas, among other things, force doctors to choose between personal

24  security  and very noisy conditions not conducive to effective communication and coherent

25  thought); *id.* at ¶¶ 24-25 (at California Institution for Men mainline West, East, and Elm Hall

26  facilities, the medical clinics fail to provide for minimally adequate patient-provider privacy);

27  Shansky Second Supp. Report at ¶¶ 21-29 (at North Kern reception unit, medical facilities

28  inadequate for purposes of policy requirements for private initial health screening or for

-26-

implementation of Receiver's reception center pilot reception center process); *id.* at ¶ 38 (at North Kern A-yard, confidential encounters between patient and nurse on A facility not possible as RN sees patients in hallway within feet of other prisoners); *id.* at ¶ 39 (North Kern administrative segregation prisoners do not receive adequate care because they are seen in a meeting room that has no medical equipment); *id.* at ¶¶ 41-42 (1,200 overdue primary care appointments at Substance Abuse Treatment Facility, with physicians seeing patients at cell fronts in housing units, within earshot of other prisoners and custody officers, an inadequate substitute for clinical encounters that by policy should take place in private, medically equipped setting); *id.* at ¶ 45 (at Solano, the Annex clinic space does not provide for adequate patient confidentiality); Pls.' Exh. P-413, Ex. G at 25 ("[c]rowded patient care areas promote errors and prohibit confidentiality" and adequate care for chronic care patients is "physically impossible" in a majority of CDCR prisons because of space limitations); Beard at RT 236:20-22 (screening process in overcrowded reception centers can miss conditions); Lehman at RT 270:25-271:11 (cannot treat prisoners in space designed for half the number that need care). As even defendants' CDCR Undersecretary of Operations, with 25 years of experience and a "deep understanding of the state prison system" states, "[a] problem arises where the level of population exceeds infrastructure capacity."  Defs.' Exh. D-1002 at ¶¶ 2, 9.[10]

## 2.    Medical Staffing

As the Receiver concluded, "[m]any CDCR prisons are unable to sustain the basic delivery of medical, mental health, and dental services because of limited staffing (clinical and custody) and an overwhelming number of prisoner/patients who require care.  Every day, many California prison wardens and health care managers make the difficult decision as to which of

---

[10]  Mr. Kernan also testified that "inmates can be safely and appropriately housed at a population the exceeds design capacity *as long as the infrastructure, staffing, and programming space are available to serve the additional population*."  Defs.' Exh. D-1002 at ¶ 9 (emphasis added).  In the present case, overwhelming evidence shows that CDCR has neither the infrastructure, staffing, nor space for constitutionally adequate healthcare delivery. In essence, if Mr. Kernan's conditions were satisfied herein, there would be no overcrowding.

1  the [remedial orders in] class actions, *Coleman*, *Perez*, *Armstrong*, or *Plata* they will fail to

2  comply with because of staff shortages and patient loads."  Pls.' Exh. P-26 at 30.

3        Despite increased numbers of medical clinician hires since the Receiver was appointed,

4  there continue to be critical shortfalls in the number of primary care providers ("PCPs").[11]  In

5  April 2006, there were 302.2 total primary care provider positions established at all California

6  prisons (284.5 staff physician and surgeon positions, plus 27.7 physician assistant and nurse

7  practitioner positions).  Defs.' Exh. D-1235-2 (summary chart of positions).  At that time, 237

8  of the PCP positions were filled, meaning there were 65.2 unfilled positions and thus a vacancy

9  rate of approximately 21.5 percent.  *Id*.  As of August, 2008, there were 391.6 total PCP

10  positions established, of which 285 were filled, meaning there were 106.63 unfilled positions

11  and thus a vacancy rate of approximately 27 percent.  *Id*.  In short, despite an increase in the

12  number of PCP positions established, and the number of those positions filled, the percentage

13  of positions deemed necessary that continue unfilled has actually increased since the Receiver

14  began work (because the number of established positions has also increased).[12]

15        Within the statewide shortfall of PCPs, certain prisons have particularly egregious

16  vacancy rates.  The prisons Dr. Shansky visited in August 2008 had critical shortfalls of

17  primary care providers.  Shansky Second Supp. Report at ¶¶ 55-63 (four of five prisons had

18  critical shortfalls of PCPs).  Data published by the Receiver regarding August 2008 medical

19  staffing supports and amplifies Dr. Shansky's report, as it shows that five prisons have

20  staggering shortfalls of permanent employee PCPs, with vacancy rates of 40 percent or higher

21  among staff physician and mid-level (nurse practitioner and physician assistant) positions,

22  including two prisons with approximately 90 percent of such positions vacant.  Pls.' Exh. P-

23

---

24  [11] Primary care providers are physician and surgeons, physician assistants, and nurse
practitioners.  Shansky Report at ¶ 37.

25  [12] Further, and as discussed below, the current vacancy rate actually understates the magnitude

26  of the problem of not enough PCPs because some prisons, given the numbers of prisoner-
patients who require medical services, need additional PCP positions on top of those already

27  established.

28

408 at 15 (at Avenal, a 60 percent vacancy rate among PCP positions, with 5 of 12 positions filled); at 31 (at High Desert, an almost 40 percent vacancy rate, with 5 of 8 positions filled); at 38 (at Pleasant Valley, an 85 percent vacancy rate, with 2 of 14.8 positions filled); at 41 (at the Substance Abuse Treatment Facility, a 92 percent vacancy rate, with 1 of 13 positions filled); at 44 (at San Quentin, an almost 40 percent vacancy rate, with 9 of 14.9 positions filled). Taken together, these five prisons with critical shortages of permanent primary care providers house approximately 30,000 prisoners. Pls.' Exh. P-135 at 2 (showing inmate population as of that date of: Avenal 6,900; San Quentin 5,285; Substance Abuse Treatment Facility 7,191; High Desert 4,472; and Pleasant Valley 5,180). These prisons' design capacity, according to CDCR, would accommodate only about one-half of the actual current number of prisoners. *Id.* (showing design capacity as: Avenal 2,920; San Quentin 3,082; Substance Abuse Treatment Facility 3,424; High Desert 2,324; and Pleasant Valley 2,308).

In addition to being unable to fill currently established positions, some prisons are still allocated too few primary care providers, and thus cannot provide adequate medical care even if all positions are or could be filled. Shansky Report at ¶ 41 (prisons lack sufficient numbers of clinicians to meet level of need because allocated too few medical care workers); *id.* at ¶¶ 42-44 (two additional PCP positions needed at High Desert, up to six additional at Avenal, and additional PCP positions also reported necessary at Salinas Valley and Sacramento); Shansky Second Supp. Report at ¶ 64 (Solano needs four additional PCP positions in addition to the nine already allocated); Shansky at RT 500:22-501:2 (when he toured prisons, some Chief Medical Officers ("CMOs") said that even if all budgeted positions were filled, they would not have adequate clinical resources to meet the demand for clinical services). As the Receiver reports, "[t]he true scope of clinical staff shortfalls is actually *far worse* than the numbers" because the system has additional staffing needs not yet factored into the vacancy

-29-

1  rates.[13]  Pls.' Exh. P-26 at 12.

2      Because there are too many prisoners for the medical clinic space available, increasing

3  the number of PCPs at some prisons is not possible because even if additional PCPs were hired

4  into currently established or new PCP positions, there would be no place for those doctors to

5  work.  Shansky at RT 501:3-7 (some CMOs said that they would not have space if all budgeted

6  positions were filled); Lehman at RT 272:1-13 (even if hired more staff, wouldn't be able to

7  provide adequate care because more space is needed); *see also* Adelman at RT 509:18-510:6,

8  519:2-12 (Correctional Officer states too many inmates and medical needs for amount of staff

9  and space at CMF and that adding more medical staff at CMF will not solve problems because

10  of lack of space).

11      A number of prisons, housing tens of thousands of prisoners, also have significant

12  vacancies among licensed vocational nurses ("LVNs").  LVNs are critical medical staff

13  members, as they are primarily responsible for distributing and documenting the distribution of

14  prescribed medication.  Shansky Report at ¶ 81 (LVNs "an essential component" for CDCR

15  medication distribution).  Ten prisons have LVN vacancy rates of 20 percent or more, with

16  seven of those having vacancy rates of between 30 and 50 percent, and some of these have

17  very high turnover rates among the LVNs they do hire.  Pls.' Exh. P-408 at 15, 16, 23, 24, 27,

18  32, 38, 42, 45, and 46 (noting that California Men's Colony, California Medical Facility,

19  Correctional Training Facility, Ironwood, Pleasant Valley, Sierra Conservation Center, and

20  Salinas Valley all have LVN vacancy rates between 30 and 50 percent, while Avenal,

21

22  _____

[13]  The use of registry positions (e.g. temporary contractor) as primary care providers is not an

23  adequate solution for the critical PCP staffing shortfalls.  Shansky Report at ¶ 45; Shansky
   Second Supp. Report at ¶¶ 65-66.  Although such temporary providers can be useful in the

24  short term, they lack a long-term commitment.  Because of the rapid turnover in registry
   providers, it is also difficult to build a medical delivery program and extensive on-the-job

25  training is repeatedly required, detracting from patient care delivery.  *Id.*; *see also* Pls.' Exh. P-
   29 at 16 ("Without *permanent* and better qualified clinical personnel the Receiver will be

26  unable to develop and implement the remedial programs necessary to bring medical care up to

27  constitutional levels" (emphasis added)).

28

1   Calipatria, and Valley State Prison for Women also have vacancy rates above 20 percent).

2   These ten prisons have a total prisoner population of more than 51,000. Pls.' Exh. P-135 at 2.

3   These prisons' design capacity, according to CDCR, would accommodate only approximately

4   one-half of the actual current number of prisoners. *Id.*

5           Equally significant, the gains that have been made with respect to medical staff hiring

6   are at risk and likely to erode, and some progress will be lost given the current overcrowded

7   conditions. Pls.' Exh. P-413, Ex. G at 25 (noting "[c]rowded patient areas promote errors and

8   prohibit confidentiality. Recruitment and retention of professional staff will be problematic so

9   long as clinic environments are isolating and flagrantly unprofessional"); Shansky Report at

10  ¶¶ 16, 20 (significant problems with retention of medical staff likely given unprofessional

11  clinic areas necessitated by overcrowding); Shansky Second Supp. Report at ¶ 18 (the lack of

12  clinical and medical office space likely impedes CDCR's recruitment and retention efforts); *id.*

13  at ¶ 19 (some of the hiring gains will be lost unless need for medical services is significantly

14  reduced because systemic issues will not be resolved and newly-hired clinicians will be

15  unwilling to risk their credentials and reputations by practicing in an environment where their

16  patients are at risk of harm). As the Receiver has stated, and the Court so finds,

17  "[o]vercrowding is interfering with … the ability to recruit, hire and retain competent medical

18  personnel." Pls.' Exh. P-27 at 2.

19          The lack of sufficient medical clinicians for the number of prisoners results in

20  significant delays in prisoner-patients receiving medical appointments. Shansky Report at

21  ¶¶ 46-50; Shansky Second Supp. Report at ¶ 77. In addition, the lack of sufficient medical

22  staff results in the prisons being unable to implement or fully implement essential medical

23  programs and policies, including chronic care, initial physical exams, follow-up appointments

24  after a specialty consult, follow-up appointments after an unscheduled off-site medical

25  encounter, follow-up appointments ordered by a PCP, appointments while waiting to see a

26  specialist, and logging of urgent and emergency cases. Shansky Report at ¶¶ 51-55; Shansky

27  Second Supp. Report at ¶¶ 78-87; Woodford at RT 368:9-22 (shortage of clinical staff and

28  large intake in reception made it impossible to keep up with physicals).

### 3.    Specialty Services

There are insufficient providers of specialty medical services for the number of prisoners who require those services.  Shansky Report at ¶ 56; Shansky Second Supp. Report at ¶ 88 ("The demand for [specialty] care, particularly for the high priority cases, continues to overwhelm the resources available to the defendants"); *see also* Pls.' Exh. P-413, Ex. G at 25 ("Even when California's largely rural prisons can recruit adequate numbers of physicians and nurses, specialists and ancillary services staff are often unavailable").  The Receiver has identified "[s]ystemic and pervasive prolonged delays in specialty referrals" as one of the "[s]ystemic lapses" found when reviewing prisoner deaths (Pls.' Exh. P-34 at 8), and reports that "an increasing number of prisoners in the more remote prisons has placed a heavy burden on a very limited number of hospitals and specialty providers.…"  Pls.' Exh. P-26 at 28. Serious delays in receiving specialty care were identified at specific prisons.  Shansky Report at ¶¶ 59-77 (identifying and describing specialty care delays at fourteen prisons); Shansky Second Supp. Report at ¶¶ 89-92 (identifying and describing specialty care delays at four prisons).  The prison "specialty care system is overwhelmed by the sheer number of prisoner-patients."  Shansky Report at ¶ 78.  The demand for care, particularly for high-priority cases – when the prisoner-patient has an urgent medical need that a prison doctor has determined requires a specialty services consult within 14 days – overwhelms the resources available. Shansky Second Supp. Report at ¶ 88.

Because of the overcrowding caused lack of or delayed access to specialty services, prisoners suffer serious harm, and some have died.  Shansky Report at ¶¶ 57-58; Pls.' Exh. P-34 at 6-8 (analysis of death reviews for calendar year 2006 deaths identifies a preventable death in which there was a five-week delay in availability of an appointment for a specialist and, in eleven cases of delayed specialty referrals or delayed specialty tests among possibly preventable deaths); Pls.' Exh. P-413 at 21 (delays in access to specialty care, along with other areas of care, occurred).

### 4.    Medication

Although a system for the timely distribution of medication (and the documentation

-32-

thereof) is essential to an adequate prison medical system, the systems in place at California

prisons are inadequate for the number of patients they serve, and are plagued by short-staffing

at a number of prisons.  Shansky Report at ¶¶ 79-80; Shansky Second Supp. Report at ¶ 95.

The problems with medication distribution and documentation are rooted in overcrowding.

Shansky Report at ¶ 81; Pls.' Exh. P-67, Exh. 6 at 29 (company hired by Receiver to assist

with new medication delivery system reports that "[t]he impact of overcrowding on the

system's abilities to provide timely and effective delivery of necessary medications is

significant," and as an example describes massive inmate movement each day at San Quentin

caused by overcrowding and resulting failures of prisoners to receive prescribed medication);

*see also* Rowlett at RT 661:19-662:1, 665:12-666:3, 671:21-25 (at Solano, not enough staff to

monitor provision of insulin and narcotics, or to double-check medication distribution).

### 5.    Medical Records and Patient Scheduling

Overcrowding makes it impossible for CDCR to adequately manage and maintain

medical records and patient scheduling information, which are critical for providing adequate

care.  Shansky Report at ¶¶ 97-98; Shansky Second Supp. Report at ¶ 97.  As a result, the

prisons have dangerously incomplete and poorly maintained  medical records.  Shansky Report

at ¶¶ 101-109 (describing inadequate records at California Institution for Men, Avenal, High

Desert, and other prisons); Shansky Second Supp. Report at ¶¶ 99-101 (stating that at each of

the prisons inspected, the medical records were "unwieldy, rarely organized chronologically

and, in general, poorly maintained," including delay of "several months" in transcribing

physicians' notes at High Desert); Shansky at RT 424:5-8 (medical records disorganized);

Haney Report at ¶¶ 104, 106 (medical and mental health screenings at CIM done without

medical records because of backlog in flow of records).  These overcrowding-fueled medical

record failures significantly impede the delivery of care, create dangerous risks for patients,

and can have fatal results.  Shansky Report at ¶ 99; Shansky Second Supp. Report at ¶101;

Pls.' Exh. P-34 at 7-8 ("[i]ncomplete medical records" identified as one of the significant

systemic lapses of care; "lost medical information" identified as one of the kinds of poor

provider communication in seven possibly preventable deaths).

1    The large number of patients also is largely the cause of the prisons' inability to develop

2  effective scheduling and tracking systems, which are necessary for patients to receive timely

3  and necessary appointments with medical providers.  Shansky Report at ¶ 110; Shansky

4  Second Supp. Report at ¶ 102.  Because of these inadequate systems, medical and prison staff

5  lose track of patients, including those with chronic diseases, and are unable to identify patients

6  with chronic or communicable conditions; consequently, prisoners face a risk of harm.

7  Shansky Report at ¶ 112; Shansky Second Supp. Report at ¶¶ 102-104; Pls.' Exh. P-29 at 36

8  (discussing "primitive computerized tracking system which … continues to 'lose' patients with

9  chronic diseases"); Pls.' Exh. P-67, Ex. 1 at 5-6 (study of CDCR systems finds that "pulling

10  together a cohesive picture of [an] inmate's health status … currently is near impossible" and

11  thus continuity of care is at risk).

### 6.    Custody Officers for Medical Escorts and Access

13    Given the numbers of prisoners, there are insufficient numbers of custody staff to ensure

14  that prisoners are reliably escorted to their medical appointments.  As the Receiver states:

15    System-wide, CDCR lacks the custody staff and organizational
16    structure and processes to ensure that patient-inmates are reliably
     escorted and/or transported to medical appointments.  As a result,
17    patient-inmates are often denied timely access to health care
     services, substantially increasing the risk that patient-inmates'
18    health will further deteriorate and increasing the overall costs of
19    providing health care services.

20  Defs.' Exh. D-1133 at 5.

21    The custody escort shortage is exacerbated by the lockdowns that frequently follow

22  overcrowding-related disturbances in California prisons.  Pls.' Exh. P-26 at 29-30.  Normally

23  prisoners leave their housing units for yard clinic appointments and medication lines, but

24  "[u]nder lockdown conditions, clinical staff must go from cell to cell to see the

25  prisoner/patient, or small groups or individual prisoners must be escorted by correctional

26  officers to and from clinic areas."  Id. at 30.  Thus, "lockdowns inhibit the delivery of medical

27  care and increase the staffing necessary for such care."  Id.

28    As a result of this mismatch between population and correctional officers, prisoners are

-34-

1    often denied timely access to health care services, substantially increasing the risk that their

2    health will deteriorate.  *Id.*  Even as of August 2008, the lack of adequate numbers of custody

3    officers relative to the number of prisoners caused delays, particularly in prisons on modified

4    program or lockdown where some or all prisoners must be physically escorted to medical

5    clinics.  Shansky Second Supp. Report at ¶¶ 107-111 (describing "dramatic drop off" in

6    completed patient appointments, and lack of timely nurse triage, on Pleasant Valley yard that

7    had been locked down during previous two months, and decreased number of physician

8    appointments at High Desert clinic due to rolling lockdowns caused by insufficient custody

9    staff positions); Shansky at RT 424:1-4 (scheduled visits didn't occur because of lack of

10   officers).

### 7.    Specialized Medical Housing

12       There are more prisoners requiring specialized placement for medical reasons than there

13   are adequate placements to house those prisoners.  Shansky Report at ¶ 126; Shansky Second

14   Supp. Report at ¶ 112; Defs.' Exh. D-1133 at 27 (approximately 6 percent of CDCR's existing

15   inmate population "requires separate housing to facilitate appropriate, cost-effective access to

16   necessary health care services;" current facilities inadequate); Woodford at RT 374:20-375:11

17   (impossible because of overcrowding to move prisoners, including many with medical needs,

18   to beds where they needed to be).

19       The lack of appropriate housing for medically fragile prisoners can have dire

20   consequences.  Shansky Second Supp. Report at ¶¶ 112-114.  In 2008, there were three

21   avoidable prisoner deaths as a direct consequence of the lack of sufficient specialized

22   placement housing for medically fragile prisoners.  Pls.' Exh. P-56 at 47-49.  In one of these

23   cases, a prisoner with Ankylosing Spondylitis, an extremely painful chronic inflammatory

24   disease affecting the back, neck and hips, "should have been treated in a long-term medical

25   facility…."  *Id.* at 47.  However, because "adequate facilities for long-term medical problems

26   do not exist in CDCR," the patient was instead housed in a correctional treatment center in a

27   remote prison "that is entirely unsuitable for long-term care."  *Id.*

28       Even when death does not occur, prisoner-patients unduly suffer because of the lack of

1  suitable facilities to house and treat them.  Prisoners who use wheelchairs, for example, are

2  now located in prisons with what the Receiver's Chief Medical Officer describes as "grossly

3  inadequate housing," including "inadequate cleaning sinks for those with colostomy bags."

4  Pls.' Exh. P-413 at ¶ 26.  In another example, a research team investigating the care of aging

5  CDCR inmates found that the pressure sore rate among such prisoners at the Substance Abuse

6  Treatment Center "greatly exceeds community standards."  *Id.* at ¶¶ 6-7.  The problem with

7  these patients is exacerbated by the fact that "[m]edical personnel with the requisite expertise

8  in such conditions are notoriously difficult to recruit for that prison due to its rural, isolated

9  location."  *Id.* at ¶ 7.

10        **C.    Overcrowding Causes Disease and Makes Control of Disease Harder**

11        Overcrowding also increases the risk, rate, and seriousness of infectious disease

12  transmission.  Pls.' Exh. P-1 at 2 (overcrowding puts "large numbers of inmates" at an

13  "increased, substantial risk for transmission of infectious diseases"); Pls.' Exh. P-26 at 30

14  ("overcrowding has increased the number and seriousness of infectious and communicable

15  diseases, jeopardizing prisoners, staff, and the public" and "the risk of [a systemic] outbreak

16  cannot be underestimated"); Shansky Report at ¶ 131.  Overcrowding makes California prisons

17  highly vulnerable to outbreaks of communicable diseases, including staph infections,

18  tuberculosis, and influenza.  Shansky Report at ¶¶ 131, 135.  The converted gymnasiums that

19  CDCR uses to house prisoners create textbook breeding grounds for infectious diseases.

20  Shansky Report at ¶ 135.  Because of overcrowding, controlling potentially deadly outbreaks

21  of infectious disease is significantly more difficult, requiring massive resources, including even

22  more staff.  Pls.' Exh. P-30 at 71 (identification of infectious TB patient at Richard J. Donavan

23  Correctional Facility closed intake at the prison, creating "enormous stress" on overcrowded

24  prison and jail systems, and subsequent contact investigation described as "massive," requiring

25  "months of follow-up of potentially infected inmates and staff;" report also describes

26  dramatically higher gastroenteritis outbreaks and impact on prisons); Lehman at RT 270:7-17

27  (in overcrowded prison system, there is more disease and more need for staff to treat those

28  conditions); *see also* Leija at RT 691:2-4, 693:15-21 (CVSP too crowded to effectively

1   monitor for medical conditions, especially in buildings with triple bunks); Pls.' Exh. P-27 at 3

2   ("The risk of communicable disease outbreaks in the prisons, as well as their transference to

3   local communities, is increased substantially by overcrowding and the attendant rapid

4   movement of prisoners between prisons").

### D. Overcrowding Is The Primary Cause Of The Constitutional Violations Because Medical Care Cannot Be Improved Without Reducing The Number Of Prisoners.

7   Experienced correctional and medical professionals, including that of the former

8   Director of California's prisons, state that reducing crowding in is an absolute prerequisite for

9   remedying the medical care violations in this case. *See* Section II(A)(2), *infra* (setting forth

10  such evidence in detail). This compelling evidence shows not only that no other relief will

11  remedy the violations, but also that overcrowding is the primary cause of the violations.

### E. Defendants' Assertions Regarding Primary Cause

13  Defendants and the parties allied with them respond in three main ways to the

14  overwhelming evidence that overcrowding is the primary cause of the inadequate medical care

15  in California's prisons. They first suggest, relying on expert witness David Thomas, M.D.,

16  that the primary cause of the ongoing unconstitutional violation is not overcrowding but rather

17  a custody-dominated prison culture. As explained below, Dr. Thomas's testimony is not

18  credible.

### 1. Dr. Thomas

20  According to defendants' medical expert, Dr. David Thomas, the primary cause of the

21  constitutionally inadequate medical care is not overcrowding, but the CDCR's dysfunctional

22  culture in which the delivery of health care has been subject to "the whim of security services."

23  Defs.' Exh. D-1016 at 5. According to Dr. Thomas, "This unbalanced condition led to the

24  'learned helplessness' of all program staff." *Id.* Dr. Thomas testified that the Receiver has

25  changed the culture by "empower[ing]" health care service staff, which he says is "the crux of

26  having a constitutional level of health care" in the California prison system. *Id.* at 5, 7.

27  Dr. Thomas's testimony is not credible for several reasons. First, it is contradicted by

28  every other expert who provided testimony in this case, each of whom stated the overcrowding

-37-

1  is the primary cause of the constitutional violations.  *See* Packer at RT 1120:8-16

2  (unconstitutional mental health care in reception centers caused by overcrowding); Scott at RT

3  152:1-6; Woodford at RT 376:3-13; Shansky at RT 423:8-12; Stewart at RT 66:25-67:6;

4  Lehman at RT 270:25-271:11; Beard at RT 219:6-10 (overcrowding is "biggest inhibiting

5  factor" to delivery of medical and mental health care); Haney at RT 298:24-299:2, 346:8-16.

6  In addition, while other experts acknowledge that the CDCR prison culture presents problems

7  for health care delivery, the custody-dominated culture is in fact *caused by* the overcrowded

8  conditions.  Beard at RT 222:6-222:21.  Specifically, the overcrowded conditions breed a

9  reliance on lockdowns, "guns, gas, those kinds of things to control the prisons so they're safe

10  for the staff and for their inmates."  Beard at RT 222:9-21.  That culture will not change until

11  the population is reduced and the prison is safe.  Beard at RT 222:22-24.[14]

12      Second, Dr. Thomas's opinion that overcrowding is not the primary cause of the

13  unconstitutional violations was formed and presented without regard to certain key facts.  For

14  example, Dr. Thomas testified there had been a "shift in culture" since the appointment of the

15  Receiver.  Thomas at RT 1215:24-1216:3.  However, Dr. Thomas did not recall when the

16  Receiver was appointed.  Thomas at RT 1219:24-25.

17      Similarly, and more egregiously in terms of his lack of persuasiveness, Dr. Thomas

18  formed his opinion that culture, rather than overcrowding, causes the unconstitutional medical

19  conditions before visiting and evaluating any of the California prisons.  Thomas at RT

20  1220:20-22 (for the purposes of drafting his first report he did not tour any California prisons).

21      Although Dr. Thomas testified that his subsequent visits confirmed his opinion that

22  custody-dominated culture causes the unconstitutional conditions, his testimony regarding his

23  methods during those visits, showing that he did very little actual fact-gathering, gravely

24  discredit his opinion.  Dr. Thomas spent a half-day or less at eight prisons, where he took no

---

[14] Dr. Shansky also testified regarding the importance of "culture" in improving the delivery of
health care.  Shansky at RT 465:22-467:13.  However, Dr. Shansky's testimony concerns
"culture" among medical care professionals (*i.e.*, that staff must care about patients), not – as is
(continued …)

1   notes, nor did he make audio or video recordings during his tours.  Thomas at RT 1228:20-

2   1229:3, 1229:12-20, 1232:12-17.  Dr. Thomas could not recall how many staff he spoke to at

3   each prison, nor could he remember the questions he asked, or whether he asked staff at the

4   various prisons the same questions.  Thomas at RT 1231:6-9, 1240:2-14.  At one prison, he

5   spoke to no medical doctors.  Thomas at RT 1231:2-5.  He does not remember how many

6   prisoner medical files he reviewed at each prison, but recalls that it was probably fewer than

7   ten.  Thomas at RT 1229:25-1230:6.  He could not recall how long he spent reviewing medical

8   files.  Thomas at RT 1230:7-9.  The opinions in his reports, consistent with his methods during

9   the visits, refer to no data from such medical files; at trial he recalled no specific details about

10  any of the files he had reviewed.  Thomas at RT 1236:1-4, 1237:2-7.[15]

11      When Dr. Thomas did make specific factual statements, he often lacked a factual basis

12  for them.  For example, Dr. Thomas testified that the CDCR prisons he visited were adequately

13  staffed for the workload.  Thomas at RT 1251:9-17.  He further testified, however, that as

14  Medical Director in Florida, he determined the number of necessary staff by "outcome

15  measurements of work study programs."  Thomas at RT 1197:18-1198:6.  He testified that

16  such studies represent a "better way" for determining necessary levels of staffing.  *Id.*  These

17  work study programs involved having providers record the amount of time they spent with

18  each patient, and the patient's medical outcome.  Thomas at RT 1244:8-18.  Dr. Thomas

19  admitted that he recorded no data during his tours, and did not review any work study or

20  outcome data at the California prisons he visited.  Thomas at RT 1251:2-1251:6.  Similarly, he

21  stated that registry physicians at the prisons had long-term commitments to the prisons, but

22  admitted he neither reviewed the registry contracts nor had any information regarding how

23  long the doctors had been at the prisons.  Thomas at RT 1240:15-1241:16.

24      Dr. Thomas's opinion also is not credible because on certain key points he was either

25  _____

26  the case with Dr. Thomas – the administration of the prisons as a whole.

27  [15] In contrast, Dr. Shansky's testimony repeatedly references specific data gathered from review of medical records.  *See, e.g.*, Shansky Second Supp. Report at ¶¶ 80-94.

28

1  entirely unpersuasive or internally inconsistent.  Dr. Thomas acknowledged the medical clinics

2  at the facilities he reviewed did not have adequate space for patient care.  Thomas at RT

3  1223:23-1224:15.  He admitted that staff at North Kern, Substance Abuse Treatment Facility,

4  High Desert, Solano, Valley State Prison for Women, and Pleasant Valley prisons uniformly

5  cited the need for more space and more staff during his tours.  Thomas at RT 1232:12-20.

6  Similarly, he recalled being told at some prisons that there were patient backlogs of

7  appointments ranging from four to sixteen weeks.  Thomas at RT 1238:11-23.  Nevertheless,

8  Dr. Thomas believes the Receiver's plan to address the space shortage is unnecessary.  Thomas

9  at RT 1225:11-14.  He testified that there were alternatives to constructing basic treatment and

10  office space that included, among other things, providing care in closets and bathrooms.

11  Thomas at RT 1226:2-23.  Given the massive evidence of massive shortfalls of medical clinic

12  and related space in California's prisons, this testimony by Dr. Thomas's is itself enough to

13  discredit his opinion.

14       Similarly, Dr. Thomas acknowledged that medical records play an important part in the

15  delivery of health care because, among other things, they may include information regarding

16  drug allergies, current medication regimes and reports from specialty providers.  Thomas at RT

17  1226:24-1227:11.  Nevertheless, Dr. Thomas testified that constitutionally adequate care can

18  be provided in systems where medical records are not timely maintained, are not complete, and

19  are not available to the provider at the time of service.  Thomas at RT 1227:12-24.  This

20  inconsistent opinion also leads us to conclude that Dr. Thomas is not credible.

21      **2.**     **Defendants' Other Assertions Regarding Primary Cause**

22       Defendants and defendant-intervenors also suggest that the Court should not credit

23  Dr. Shansky's opinion that overcrowding is the primary cause of the constitutional violation.

24  In this regard, they suggest that Dr. Shansky's opinion is undermined by his statements that the

25  problem of medical care in California's prisons is polycentric, that medical care delivery in

26  prison has multiple interrelated components, and that a reduction in crowding will not alone

27  remedy unconstitutional conditions.

28       Dr. Shansky did so testify.  Shansky at RT 460:13-20, 464:6-9, 483:13-18.  However, a

-40-

1  polycentric problem can have a primary cause (Shansky at RT 464:2-4), and as explained

2  above, overcrowding is that cause with respect to unconstitutional medical care in California's

3  prisons.

4          Similarly, overcrowding can still be the primary cause of ongoing violations even

5  though it is not the sole cause and even though medical care is a complex matter.  That certain

6  measures in addition to reducing population are important or required does not prove that

7  overcrowding is not the primary cause of the problems.  When one matter or cause is

8  "primary," the implication is that there are other causes as well, albeit ones which are lower in

9  rank or subordinate.  Again, the issue is not whether overcrowding is the sole cause, but rather

10 whether it is the primary one.  Further, we need not find that reducing overcrowding is a

11 panacea, but only that crowding is the primary cause of the ongoing inadequate medical care in

12 the CDCR system.  In addition to the facts stated above, overcrowding is the primary cause

13 because it is the one factor that negatively impacts almost every other matter that must be

14 addressed to create a minimally adequate medical care delivery system for California's prisons.

15 Shansky Second Supp. Report at ¶ 9.

16         Defendants also suggest that we should reject Dr. Shansky's opinion because he did not

17 visit every prison and he could not say that overcrowding is the primary cause of the

18 constitutional violation in each specific prison.  Dr. Shansky stated that his opinion regarding

19 overcrowding as the primary cause concerned California's prison system as a whole.  Shansky

20 at RT 484:8-20, 485:7-13, 485:24-486:12.  He visited nine different prisons, reviewed

21 numerous documents related to medical care, and until December 2006 had worked for several

22 years as a consultant to CDCR.  Shansky Report at ¶¶ 2, 6-8, & Appx. B; Shansky Second

23 Supp. Report at ¶ 5 & Appx. A, B.  We fully accept Dr. Shansky's testimony that visiting

24 every prison is not necessary to reach conclusions regarding the prison system as a whole,

25 particularly since, as he explained, the Receiver's many reports extensively document the

26

27

28

1  resource-to-demand mismatch that is endemic throughout the California prison system.[16]

2  Shansky at RT 499:25-500:10.  This case, and thus plaintiffs' motion for a population

3  reduction order, concerns all California prisons, and thus Dr. Shansky appropriately focused on

4  the system as a whole.  More generally, defendants' challenges to Dr. Shansky' opinions

5  ignore that he worked for them for many years, and that his opinions are based on what he

6  learned during that time, as well as in part on undisputed written reports of the conditions at

7  numerous other prisons.  Shansky Report at ¶¶ 6-8.

8       Defendants also presented evidence regarding the death rate of California prisoners

9  compared to that of prisoners in other jurisdictions.  Defendants have not, however,

10  demonstrated the significance of this evidence to the issue of whether overcrowding is the

11  primary cause of the constitutional violations in this case.  In any event, no meaningful

12  conclusions can be drawn from the inter-jurisdiction mortality rate data presented by

13  defendants.  Reingold Report at ¶ 24.  That data did not compare mortality rates in and out of

14  prison for each individual illness, nor did that study control or analyze data for such crucial

15  factors as age, race, and gender.  *Id.*

16       Defendants also point to evidence regarding the decrease in the prisoner mortality rate

17  in California's prisons, and apparently assert that the decrease shows that crowding is not the

18  primary cause of the unconstitutional violation.  Defendants' argument, although not explicit,

19  appears to be that a lack of money was the problem, not overcrowding, and that overcrowding

20  could not be the primary cause given the improvements that have been made.[17]

21       Although the decrease in this rate is a positive development, an extremely high

22  percentage and number of natural, unexpected deaths continue to be identified as preventable

23

24  [16] Defendants' expert, Dr. Thomas, visited a total of eight prisons.  Thomas at RT 1203:18-23.
    Defendants do not assert that their own expert's opinions are in any way unpersuasive because

25  he visited only a subset of the prisons.

26  [17] Defendants also argue that the improvements show that the Receivership is working and thus
    the Receivership is all the relief necessary to remedy the unconstitutional conditions.  The facts

27  concerning this position are discussed below.

28

[272055-1]

1  or possibly so.  Shansky at RT 428:23-429:7 (44 out of 110, or 40 percent of deaths so

2  identified).  Even among all deaths, expected or not, approximately 20 percent were identified

3  as preventable or possibly so, a rate which itself is quite high.  Shansky at RT 429:12-19.

4          Further, a very high percentage of extreme-departures from the community standard of

5  care continue to be identified in California prisoner deaths.  Dr. Shansky, the former Director

6  of Correctional Health Care for the state of Illinois, stated that based on his review of every

7  death in the Illinois system during his tenure as Director, extreme departures were seen in five

8  to ten percent of inmate deaths, but that such lapses occur in sixty percent of California

9  prisoner deaths.  Shansky at RT 428:5-17.  These extreme lapses from the community standard

10 of care are not limited to cases in which a prisoner-patient dies, but are widespread in prisoner-

11 patient care.  Shansky at RT 430:9-23.  These extreme departures and lapses are systemic, and

12 many unquestionably and clearly relate to overcrowding.  Shansky at RT 430:24-431:3.  For

13 example, prison medical staff work in clinical areas that are so overcrowded that care required

14 for chronically ill patients is "physically impossible where the requisite team members cannot

15 fit in the clinical space, as is true for the majority of CDCR's yard clinics."  Pls.' Exh. P-413,

16 Exh. G at 25.

17         Defendants also presented evidence that substantial amounts of money are currently

18 spent on prison healthcare, and the amount of this spending has increased substantially in

19 recent years.  They also point to improvements that have been made in medical care, including

20 staffing.  Defendants apparently suggest that insufficient resources, not overcrowding, are the

21 primary cause of the constitutional violation.  However, no witness testified that insufficient

22 resources were the primary cause.  In addition, although improvements in medical care have

23 occurred, there remain – as explained above – enormous overcrowding-caused problems in the

24 delivery of medical care, including profoundly inadequate space for medical clinics and related

25 areas, and inadequate numbers of medical staff, including primary care providers and nurses.

26 That unconstitutional conditions persist, despite the increases in money and other resources,

27 shows that overcrowding is the primary cause – if it was not, the additional resources would

28 have solved the problems.  Instead, the profound mismatch between the resources available

-43-

1   and the need for medical services remains.

## IV.  OVERCROWDING IS THE PRIMARY CAUSE OF MENTAL HEALTH CARE VIOLATIONS

In addition to correctional and medical experts, the Court heard from three mental health experts.  The mental health experts, including plaintiffs' experts Drs. Craig Haney[18] and Pablo Stewart,[19] and defendants' expert Dr. Ira Packer, conducted comprehensive site inspections at eleven prisons.  All three mental health experts agreed that California prisons house far more prisoners with mental illness than they can provide care for.  In the words of defendants' expert psychologist, Dr. Packer: "[T]he primary cause [of the ongoing violations] is that the prison system in California and many other states, now has many more acutely mentally ill individuals and at a level of more severity than had been anticipated when the

---

[18] Craig Haney, Ph.D., is a Professor of Psychology and former Chair of the Department of Psychology at the University of California at Santa Cruz who has studied and published about institutional environments, including prisons, for 35 years.  Dr. Haney has toured, inspected, and analyzed conditions of confinement at numerous state and federal prisons across the country and around the world.  Dr. Haney has been qualified and has testified as an expert in various state and federal courts, and served as a testifying expert in both the *Gates v. Deukmejian* and the *Coleman* trials, and has evaluated and testified about the psychological effects of overcrowded conditions of confinement at the California Men's Colony, San Quentin, and Soledad prisons, as well as in other state prison systems.

[19] Pablo Stewart, M.D., is a psychiatrist and holds a Clinical Professorship at the Department of Psychiatry at the University of California, San Francisco, School of Medicine.   He has served as Director of Forensic Psychiatric Services for the San Francisco Jail and also served for ten years as a psychiatric expert working for the court-appointed neutral Mediator in the remedial phase of *Gates v. Deukmejian*, a class action concerning, among other issues, mental health care at  the California Medical Facility. Dr. Stewart has extensive clinical, research, and academic experience in forensic mental health including consultations involving prison and jail systems in other jurisdictions.

-44-

[272055-1]

1   prisons were built." Packer at RT 1079:18-21.[20] Dr. Packer also explicitly found that

2   overcrowding *is the primary cause* of the ongoing constitutional violations in two specific and

3   fundamental areas of mental health care – the deficiencies in the medical records system and

4   the provision of care to patients in reception centers. Defs.' Exh. D-1019 at 19-20.

5        The Court also heard testimony from several present and former CDCR and Department

6   of Mental Health officials responsible for mental health care delivery to CDCR prisoners. The

7   parties submitted into evidence deposition excerpts and extensive documentary evidence,

8   including the comprehensive monitoring reports filed regularly by the *Coleman* Special Master

9   and the *Plata* Receiver. Taken together, we are satisfied that the evidence clearly and

10  convincingly establishes that overcrowding is the primary cause of the ongoing constitutional

11  deficiencies in the delivery of mental health care to *Coleman* class members. *See* Scott at RT

12  152:1-6; Woodford at RT 376:9-13; Lehman at RT 271:3-11; Beard at RT 219:6-10

13  (overcrowding is "biggest inhibiting factor" to delivery of medical and mental health care);

14  Haney at RT 298:24-299:2, 346:8-16; Stewart at RT 66:25-67:6. To the extent that Dr. Packer

15  or defendants' other witnesses disagree, we address their arguments below.

16      **A.**    **Overview Of The Mental Healthcare Delivery System**

17       In 1995, the district court issued its decision in the original *Coleman* case, finding that

18  defendants were violating the constitutional rights of the plaintiff class, granting injunctive

19  relief, appointing a Special Master, and ordering defendants to develop and implement various

20

21    [20] The only difference between the plaintiffs' experts and the defendants' expert on this point

22  was a semantic one—whether the definition of "overcrowding" includes the presence of more
    mentally ill prisoners than the system can care for. Plaintiffs' counsel asked Dr. Packer at trial

23  whether, if overcrowding means "that the demand for mental health space and services exceeds

24  the existing supply for mental health space and services, would you agree that crowding is the
    primary cause of the ongoing problems in California?" Dr. Packer responded, "I believe you

25  are redefining [overcrowding] as being that the fact that there aren't enough ICF beds, crisis
    beds, acute care beds, EOP beds, given the current population, that is if that is equal to

26  overcrowding, yes. Then, I would say that is what causes it, the primary cause." Packer at RT
    1092:23-1094:6. We are satisfied that the term "crowding" as used in the PLRA includes the

27  condition of housing more seriously ill prisoners than a system can care for.

28

1    remedial plans to remedy the constitutional violations. *Coleman v. Wilson*, 912 F. Supp. 1282

2    (E.D. Cal. 1995). The decision set forth five broad elements of a minimally adequate prison

3    mental healthcare system under the Eighth Amendment, including (1) proper screening to

4    identify individuals with serious mental disorders both at the time of their admission to the

5    CDCR and over the course of their incarceration, *id.* at 1305; (2) competent staff in sufficient

6    numbers "'to identify and treat in an individualized manner those treatable inmates suffering

7    from serious mental disorders'" *id.* at 1306-8 (quoting *Balla v. Idaho State Bd. of Corr.*, 595 F.

8    Supp 1558, 1577 (D. Idaho 1984)); (3) timely access to appropriate levels of care, including

9    both beds and programs, and appropriate medication, *id.* at 1309-13; (4) an adequate medical

10   record system, *id.* at 1314-15, and (5) suicide prevention, *id.* at 1315. We find that the extreme

11   level of overcrowding has prevented defendants from satisfying any of these elements and that

12   the prison system as a whole will be incapable of providing constitutionally adequate mental

13   health care without significantly reducing the population.[21]

14

15   ─────────────────

16   [21] Defendants contend that the *Coleman* Special Master never addressed overcrowding, and ask that we infer from this premise that overcrowding is unrelated to the *Coleman* remedy. The premise, however, is contrary to the evidence of nearly ten years of *Coleman* reports and recommendations. *See, e.g.*, Defs.' Exh. D-1108 at DEFS059888, DEFS059902, DEFS059915 (4th Report, Dec. 1999, overcrowding in 3CMS), DEFS060139, DEFS060180 (13th Report, June 2004, overcrowding in 3CMS and EOP, potential solutions include "reduce the population"), DEFS060412, DEFS060438 (18th Report, July 2007, mentally ill inmates stuck in reception centers due to "department-wide overcrowding"); Defs.' Exh. D-1298 at 1-2 (documenting struggle to find mental health beds needs "from 1998 to 2005" and identifying among the obstacles "[a]n unanticipated surge in overall population that brought the number of prisoners in CDCR to some 200 percent of capacity"); Pls.' Exh. P-427 at 8 ("By late 2005, it was evident that the reduction in population growth and then in the population itself in the first few years of the decade were over, and the numbers were rising fast. Early in 2006, defendants were staring at a galloping growth rate that threatened to hit 200 percent of capacity shortly, and the scramble was on to deal with the flow. One victim of the turnaround was CDCR's mental health bed plan."); Defs.' Exh. D-1292-2 at 7 ("Excessive population, thus, results in a reduction of programming space now occupied by inmate bunks, greater competition for use of the diminishing available space; fewer escorting correctional officers to permit access to the diminishing space; and, ultimately, the increasing frustration and demoralization of clinicians trying to provide the treatment. The lack of programming space is a huge problem."); *id.* at 8 ("This Court has spent the last three years deeply immersed in the disconnect between the

(continued …)

1    As of August 2008, there were 34,319 inmate-patients with serious mental illness in the

2    California prison system.  Pls.' Exh. P-243 at 900124.  At any given time, approximately 20

3    percent of California prisoners are identified as having a severe mental illness requiring

4    various levels of treatment from the prison mental health system.  The prison mental health

5    system must also serve a significant number of prisoners who have not yet been identified as

6    having mental illness, but who suffer mental health crises or become mentally ill.  *See, e.g.,*

7    Pls.' Exh. P-586 at 2 (showing that over 10 percent of crisis care referrals come from the

8    general population of prisoners not yet identified as mentally ill).  While treatment needs vary

9    widely among the class and over time, it is predictable that on any given day some prisoners

10    will fall into life-threatening mental health crises.  In order to meet this known risk of

11    substantial harm, the prison mental health system must be able to rapidly identify persons in

12    crisis, diagnosis and prescribe the appropriate treatment, and then provide the appropriate

13    treatment in a medically appropriate and safe location at the appropriate level of care.  The

14    evidence at trial was overwhelming that overcrowding prevents the California prison mental

15    health care system from performing these life-saving tasks.  The results have included many

16    deaths that could have been prevented.  The evidence is also overwhelming that this

17    breakdown feeds on itself, as overcrowded conditions aggravate mental illness and cause

18    people to fall into life-threatening crises that may themselves have been preventable, and that

19    further tax an already broken system.

20    The defendants' operational plans for mental health care are embodied in a "Program

21

22

23    number of beds needed by defendants to provide mental health treatment for CDCR's most
seriously mentally ill inmates and the beds available to provide such care."); *id.* at 16-17

24    ("Over the past 11-plus years, much has been achieved, and many of the achievements have
succumbed to the inexorably rising tide of population, leaving behind growing frustration and

25    despair."); Defs.' Exh. D-1112-8 at 356 ("Mental health treatment space throughout the

26    system … remained severely limited. Many institutions are still not capable of substantial
remediation prior to the construction and implementation of the CHCFs [the Receiver's

27    "California Health Care Facilities"].").

28

PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW, NOS.:  CIV S 90-0520 LKK-JFM, C01-1351 TEH

1  Guide" for mental health services, which has been revised several times since 1997.[22]  A brief

2  description of the system follows, based on the plans and requirements set forth in the Program

3  Guide, the nature of which is undisputed.  When the prison mental health system identifies a

4  prisoner as having a serious mental illness,[23] those persons who are not in immediate crisis are

5  classified based on a clinical evaluation of their functional impairment.  The vast majority,

6  about 85 percent of *Coleman* class members, are placed at the Correctional Clinical Case

7  Management Services level of care, also known as "3CMS" care.  Pls.' Exh. P-478 at R1-4

8  (28,511 CCCMS patients out of total mental health population of 34,035); Pls.' Exh. P-35 at 2-

9  3 (28,154 CCCMS patients out of total mental health population of 32,958).  The CCCMS

10  class members are able to function in the prison general population with moderate mental

11  health services.  They usually have prescriptions for at least one psychiatric medication, which

12  are renewed every ninety days by a psychiatrist, and they meet with a case manager (a social

13  worker or psychologist) every three or so months.[24]  Persons initially identified with more

14  severe symptoms, as well as persons in the CCCMS group who develop more severe

15  symptoms, are to be transferred to a higher level of care that is removed from the general

16

17  [22] Pls.' Exh. P-9.  In June 1997, the Court provisionally approved the California Department of
Corrections Mental Health Services Delivery System Program Guides, a collection of the

18  standards for the delivery of mental health services within the CDCR's various levels of health
care within the different custody settings.  *Coleman* Docket No. 858 (6/27/97 Order).  In 2002,

19  the parties and the Special Master, recognizing that the original Program Guides were not a
sufficient remedy, agreed to revise and update the Program Guides.  In March 2006, the Court

20  approved the majority of defendants' Revised Program Guide and ordered its implementation

21  by the CDCR.  *Coleman* Docket No.1773 (3/3/06 Order).  All references in these findings are
to the Revised Program Guide.

22

23  [23] The Program Guide specifies that treatment shall be provided to any  prisoner who has a
diagnosis of an Axis I serious mental disorder including:  Schizophrenia, Delusional Disorders,

24  Schizophreniform Disorder, Schizoaffective Disorder, Psychotic Disorders, Major Depressive
Disorders, and Bipolar Disorders I and II.  Pls.' Exh. P-9 at 12-3-4 and 12-4-2.  Depending on

25  the patient's level of impairment, he or she will be treated at either 3CMS or EOP level of care.
*Id.*

26

27  [24] The "Specific Treatment Criteria" for 3CMS patients is outlined in defendants' MHSDS
Program Guide.  Pls.' Exh. P-9 at 12-1-5.

28

-48-

1    population, known as the Enhanced Outpatient Program ("EOP").  EOP patients have either

2    "Acute Onset or Significant Decompensation of a serious mental disorder" and/or an inability

3    to function in the general population of the prisons due to their mental disorder.  Pls. Exh. P-9

4    at 12-1-6.  Because EOP patients are by definition unable to function in the general population,

5    they must be transferred quickly from the general population to specialized housing units that

6    provide a structured mental health program.  Pls.' Exh. P-9 at 12-4-8 through 12-4-13.

7        Patients from any level of care, or persons not yet identified as patients, who experience

8    a mental health crisis are to be moved rapidly to licensed Mental Health Crisis Bed ("MHCB")

9    for stabilization and evaluation, or may, in some cases, be transferred directly to an inpatient

10   psychiatric hospital bed operated by the Department of Mental Health ("DMH").  Because

11   MHCB facilities are set up only to stabilize a patient and not to provide long-term care,

12   clinicians are supposed to transfer patients to a Department of Mental Health ("DMH")

13   inpatient hospital bed if the patients have "repeated admissions to a CDCR Mental Health

14   Crisis Bed … or have been in an MHCB for longer than 10 days."  Pls.' Exh. P-9 at 12-6-1.  A

15   clinician may discharge a patient directly to an EOP unit if he or she is stable and no longer

16   requires inpatient care.  Pls.' Exh. P-9 at 12-6-12 and 12-6-13.

17       **B.    Specialized Program Populations**

18       The Eighth Amendment requires that prison officials maintain a mental health system

19   that prevents known risks of substantial harm.  *Coleman*, 912 F. Supp at 1305.  The most

20   substantial harm in a mental health delivery system is avoidable or preventable death.  Delayed

21   or inadequate mental health care can exacerbate existing mental illness and result in

22   unnecessary and avoidable harms such as decompensation into psychosis, paranoia,

23   hallucinations and delusions.  *Id.* at 1316.  These conditions are painful and frightening to the

24   patient and dangerous and frightening to staff and other prisoners.  The evidence

25   overwhelmingly demonstrates that overcrowding is the primary cause of the mental health

26   system failures that have resulted in deaths and other serious harm and that pose a known

27   substantial risk of future deaths and harm.  *See* Stewart at RT 66:25-67:3; Haney at RT 298:21-

28   299:2.  At its most critical, life-saving level, a prison mental health system must quickly

-49-

1   identify persons in mental health crisis, and quickly get them appropriate treatment in a safe

2   location at the right level of care. *Coleman*, 912 F. Supp. at 1305. This simply cannot happen

3   when there is a substantial gap between the demand for crisis mental health services and the

4   ability of the system to provide that care. Pls.' Exh. 57 at 49, 351-352 (*Coleman* Special

5   Master's 20th Monitoring Report). It is undisputed in the record before this Court that the

6   disparity between the demand for basic and fundamental emergency mental health services and

7   the ability of the California prison system to provide those services is substantial and long-

8   lasting. *See, e.g.,* Defs.' Exh. D-1019 at 8 (Dr. Packer) ("In my professional opinion, the lack

9   of adequate intensive mental health treatment beds (EOP, Mental Health Crisis Beds, Acute

10  Psychiatric Hospital Beds, Intermediate Care beds) is the primary cause of the deficiencies in

11  providing mental health care to mentally ill inmates in the CDCR"); Stewart Supp. Report at

12  ¶ 86 (most disturbing and direct result of overcrowding is the terrible shortage of inpatient

13  beds).

### 1.    Chronic Shortage Of 10-Day Mental Health Crisis Beds

15      The first safety net for a patient falling into crisis is the 10-day Mental Health Crisis

16  Bed ("MHCB"). Pls.' Exh. P-9 at 12-5-1 to 12-5-2. No party claimed that California has

17  enough MHCB slots for its population. Defendants' expert Dr. Packer reported that "the

18  shortage of crisis beds is problematic as inmates requiring more intensive observation and/or

19  treatment must remain in other settings, which are not clinically appropriate." Defs.' Exh. D-

20  1019 at 11. The *Coleman* Special Master has found that at least since 2004, the number of

21  patients requiring crisis level care in the California prison system has "regularly and

22  significantly exceeded the number of MHCBs...." Pls.' Exh. P-35 at 3. When this happens,

23  patients who have been prescribed crisis care simply do not receive it. Pls.' Exh. P-57 at 352.

24  Between June and September of 2008, CDCR was unable to transfer the vast majority of

25  patients referred from institutions for crisis bed placement, transferring only 52 of the 355

26  referrals in June, only 104 of the 388 referrals in July, only 135 of the 322 referrals in August

27  and only 100 of 359 in September. Pls.' Exh. P-263, P-585. The rest remained at their

28  referring institutions despite a clinical finding that they needed immediate transfer to a mental

health crisis bed. *Id*.[25] Only a very small percentage of those patients were placed within 24 hours as the Program Guide requires. Pls.' Exh. P-9 at 12-5-3 to 12-5-4; Pls.' Exh. P-555 (June: 5 of 52 placed within 24 hours); Pls.' Exh. P-586 (July: 11 of 104 placed within 24 hours); Pls.' Exh. P-587 (August: 58 of 135 placed within 24 hours); Pls.' Exh. P-585 (September: 27 of 100 placed within 24 hours); Dezember at RT 934:14-935:16 (confirming September data). By definition, the patients referred for crisis care are acutely ill and many are actively suicidal. In order to deal with these extreme shortages of crisis beds, the prisons have created a series of what are euphemistically called "alternative placements," including holding cages,[26] administrative segregation units,[27] outpatient housing units ("OHUs"),[28] and temporary holding cells outside of clinic areas.[29] Pls.' Exh. P-35 at 3-4. Below are photographs of four alternative placements for mental health crisis beds located at Wasco State Prison, Mule Creek State Prison, and California Correctional Institution:

---

[25] Some patients were eventually able to access crisis beds in their current institutions.

[26] Plaintiffs submitted into evidence pictures of several of these holding cages. The ones used at Salinas Valley are Plaintiffs' Exhibit P-338 at SVSP-11, 12 and 13.

[27] Plaintiffs submitted into evidence a picture of an administrative segregation cell used as an "overflow" placement for suicide watch. *See* Pls.' Exh. P-341 at WSP-17; Haney Report at ¶ 310.

[28] Plaintiffs submitted pictures of the Outpatient Housing Unit temporarily converted for mental health purposes (the "MHOHU") at Mule Creek State Prison. Pls.' Exh. P-339 at MCSP-10 through MCSP-12. There is also an image of an Outpatient Housing Unit at California Correctional Institution. Pls.' Exh. P-337 at CCI-28.

[29] Makeshift temporary cells outside of clinic areas are sometimes referred to as "ZZ Cells," or "wet cells" (denoting the presence of a toilet and sink, as contrasted to "dry cells" or "contraband cells," which have neither). Defs.' Exh. D-1148 at 12-5-5. The term ZZ cell can be applied to various makeshift spaces, including booths set up in hallways to hold crisis patients who are waiting for a licensed crisis bed. Defs.' Exh. D-1019 at page 12. A picture of holding cells that California Correctional Institution uses for suicidal prisoners is captured in Pls.' Exh. P-337 at CCI-11. *See* Haney Report at ¶ 247 (describing the holding cells photographed in Pls.' Exh. P-337).

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Pls.' Exh. P – 341, WSP-17, August 1, 2008, Facility D, Building 6A, suicide watch cell





Pls.' Exh. P – 339
MCSP-11, August 1, 2008, MHOHU
Cell in C-13 building

-52-



Pls.' Exh. P – 337, CCI-11, July 29, 2008, Reception Center, Yard 3 Clinic Holding Cells



Pls.' Exh. P – 337, CCI-28, July 29, 2008, Outpatient Housing Unit (OHU) cell

Patients in crisis are living in these "alternative placements" on a daily and continuous basis throughout the system.  Pls.' Exh. P-57 at 352-353 (fourteen institutions had inadequate access to licensed crisis beds resorting to use of a variety of temporary placements, "most of which were grossly inappropriate alternatives to acute care"); Haney at RT 303:21-25 (saw alternative housing or waiting areas everywhere he toured).  At Salinas Valley State Prison, there are three upright holding cages about the size of a phone booth in daily use for acutely

-53-

1    suicidal patients unable to access an MHCB.  Pls.' Exh. P-36 at 153; Pls.' Exh. P-338 at SVSP-

2    11, 12, & 13.



Pls.' Exh. P – 338, (SVSP-13, July 29, 2008, CTC) (dry cages/holding cells for people waiting in MHCB)

24      Both Dr. Stewart and Dr. Haney observed these cages.  Haney Report at ¶ 156 (cages

25    used were tiny, freestanding upright cages with mesh wiring and no toilet used to house

26    suicidal prisoners during the day); Stewart Report at ¶ 141 (cages inappropriate locations to

27    access suicidality and to have confidential psychiatric interviews).  Dr. Stewart testified that

28    these cages are not only clinically inappropriate, but that they are inhumane and degrading

-54-

even for inmates not experiencing mental health crises.  Stewart at RT 75:20-24, 76:24-77:7

(difficult to comprehend that patients in mental health crisis would be placed in upright cages

without a toilet or water); Stewart at RT 125:23-126:16 (cages are "absolutely inadequate and

inappropriate for use [with] acutely mentally ill inmates").[30]  Defendants' expert psychologist

Dr. Packer encountered crisis care patients being held in makeshift placements for long periods

of time and opined that such practices "are not clinically appropriate."  Defs.' Exh. D-1019 at

11-12; Defs.' Exh. D-1020 at 5-6.

_____

[30] Defendants' expert Dr. Packer unqualifiedly endorsed the use of "Treatment Modules" to
provide group therapy in prisons.  Defs.' Exh. D-1019 at 7.  The "Treatment Modules" are
mesh cages or booths, just large enough for a prisoner to sit or stand, in which each member of
the group is enclosed.  Dr. Packer describes the Treatment Modules "as an example of the need
to evaluate mental health services in CDCR within the context of appropriate treatment in the
prison environment."  Defs.' Exh. D-1019 at 7.  We find, however, that Dr. Packer's
unqualified endorsement of these Treatment Modules itself derives from a lack of knowledge
of the context in which they emerged in the *Coleman* case.  *See* Defs.' Exh. D-1018 at 11
(admitting unfamiliarity with history of the remedy).  The evidence is clear that the Treatment
Modules have proliferated far beyond their original purpose, which was to facilitate out-of-cell
treatment in high security units where prisoner movement otherwise requires mechanical
restraints.  *See* Defs.' Exh. D-1148 at 12-7-14, 12-8-13, 12-9-12; Dezember at RT 926:9-
928:11; Pls.' Exh. P-339 at MCSP-14B (photograph of group therapy in booths that resemble
Treatment Modules, but that are in improper non-confidential setting, Haney Report at ¶ 197).
Instead of being limited to circumstances where they create new treatment opportunities, the
cages have spread throughout the prison system where they are used as holding spaces in
hallways, dayrooms, laundry rooms, converted bathrooms and offices.  They have become the
system's universal coping mechanism for lack of adequate space and custody staff.  This has
caused the common practice of subjecting mentally ill prisoners to hours and sometimes days
in cages, sometimes as a substitute for observation in a proper suicide watch cell.  *See* Stewart
at RT 75:19-77:7 (describing the use of metal cages pictured at Pls.' Exh. P-338 at SVSP-11,
12, 13 as holding cells for prisoners unable to access crisis beds), 124:2-126:13; Haney at RT
356:4-359:3; Haney Expert Report at ¶¶ 106, 156, 215, 227, 247 (holding cells at California
Correctional Institution Tehachapi clustered three to a room and used for mental health
interviews even when all three are full and each prisoner can hear the others' interview); *id.* at
250 (treatment cage in a bathroom); *id.* at 259, 263, 264, 272, 278, 288, 290 (cages with no
seats in public dayroom); *id.* at 310, 323, 340, 344; Stewart Expert Report at ¶¶ 63, 141, 180,
201; Stewart Supp. Report at ¶¶ 28, 29 (cages used to hold persons in mental health crisis and
describing Pls.' Exh. P-338 at SVSP-11, 12, 13).  The evidence is clear that the proliferation of
Treatment Modules beyond their original purpose is primarily caused by overcrowding.

-55-

[272055-1]

1       At the Wasco State Prison Reception Center, Dr. Haney visited an inmate-patient who

2   had been referred for crisis care the day before the visit, but who, 24 hours later was still in the

3   "dry cell" (a receiving cell with no toilet or sink).  Haney Report at ¶ 319.  Dr. Haney went to

4   the cell and found the man, referred to here as Inmate JJJ, "completely unresponsive, virtually

5   catatonic."  Inmate JJJ had urinated on the floor, had a fixed gaze, and could not make eye

6   contact.  *Id.* at ¶ 320.  The nurse on the unit reported that Inmate JJJ had been standing more or

7   less motionless for hours and was in the same position the day before.  *Id.*  The prison was

8   unable to provide him with crisis care, however, due to a shortage of beds.

9       Class Member W was a 31-year-old male with a history of taking psychotropic

10  medication in the community and a diagnosis of bipolar disorder.  Pls.' Exh. P-447-R at

11  000215-216.  Relying on the CDCR's official suicide report for the facts of the case,

12  Dr. Stewart noted that when Class Member W's immediate suicide risk became known to staff

13  at Folsom State Prison, CDCR transferred him to CSP-Sacramento for crisis-bed care.  Stewart

14  Report at ¶ 173.  Class Member W was not placed in a crisis bed, however, but rather in an

15  unlicensed infirmary bed.  Class Member W never made it to the crisis bed.  He was found

16  hanging in his "alternative placement" cell four days after he was placed there.  *Id.*

17      Dr. Stewart described the January 22, 2008 suicide of *Coleman* Class Member GGGG, a

18  34-year-old man with a long history of suicidal ideation, at Mule Creek State Prison.[31]  Class

19  Member GGGG's psychiatric condition deteriorated sharply due to medication problems after

20  he returned to Mule Creek in November 2007 from six weeks in an inpatient psychiatric

21  hospital bed.  In the days before his death, clinicians made several attempts to get him into a

22  crisis bed.  He hanged himself in an administrative segregation cell, a few hours after staff

23  members had again tried and failed to get him into a crisis bed.  Stewart Supp. Report at ¶ 100;

24  Pls.' Exh. P-564-R.

25      *Coleman* Class Member HHHH, a 47-year-old man, hanged himself on March 18, 2008

26

27  [31] Dr. Stewart's report mistakenly identified this Class Member as "GGG" rather than
    "GGGG."  Stewart Supp. Report at ¶ 100.

28

1   in an "alternative placement" at the Correctional Training Facility.  Pls.' Exh. P-575-R.[32]  Staff

2   had been trying to place him in a crisis bed since a prior suspected suicide attempt just a few

3   days earlier.  Stewart Supp. Report at ¶ 109.

4          Defendants assert that the crisis bed shortage will be solved by new construction.  While

5   some new beds have recently come on-line, the gap between patients and beds has persisted.

6   *See* Pls.' Exh. P-263.  It is undisputed that there is a current and substantial shortage of this

7   critical level of care that even under the most optimistic forecasts made before the current

8   fiscal crisis, will not be addressed for years.  Defs.' Exh. D-1019 at 10; Dezember at RT

9   936:15-24 (additional 50-bed crisis unit at CMC is necessary, but will not be constructed for

10  several years); Stewart Supp. Report at ¶¶ 123-124 (*Coleman* and *Plata* class members are

11  "daily suffering dangerous denials of mental health care and medical care;" construction of

12  medical and mental health beds will take too long); Haney Report at ¶ 32 (defendants

13  construction of a badly-needed 50-bed crisis unit, has stalled and been delayed; remains

14  unfunded despite two court orders).

15                **2.     Inpatient Hospital Care**

16         The second safety net for patients in serious or life-threatening crisis is the Department

17  of Mental Health inpatient psychiatric hospital system, which includes two other categories of

18  inpatient beds, Intermediate Care Facilities ("ICF") and Acute Psychiatric Care.  CDCR

19  clinicians are instructed to refer patients to ICF or acute beds who are "so severely disturbed or

20  suicidal that their treatment needs cannot be met in a CDCR treatment program or who may

21  require a comprehensive psychiatric assessment."  Pls.' Exh. 9 at 12-6-1.  The acute program is

22  a short-term intensive program with stays generally ranging from 30 to 45 calendar days long.

23  *Id.* at 12-6-2.  The ICF program provides longer-term care, targeted to be eight months long, to

24  patients who are no longer in need of acute hospitalization, but who still require inpatient

25  psychiatric services.  Brewer Dep. at 18:5-13.

26  _____

27  [32] Dr. Stewart's report mistakenly identified this Class Member as "HHH" rather than
    "HHHH."  Stewart Report at ¶ 109.

28

-57-

1    The evidence is overwhelming that the supply of inpatient hospital beds available to the

2  California prison system is far too small for its population.  Defendants' expert psychologist,

3  Dr. Packer, does not dispute the existence of this shortage.  Defs.' Exh. D-1019 at 12-13.  The

4  shortage is well-documented in defendants' own studies and projections.  Defs.' Exh. D-1162-

5  4 at 33 (showing a shortage of 54 acute beds as of May 2008 and projecting shortages ranging

6  from 41 to 50 beds through fiscal year 2011/12).[33]

7    The acute bed shortage is so severe, however, that clinicians can no longer get priority

8  for a bed for a patient who is acutely psychotic or even suicidal.  Rather, patients must first

9  actually attempt suicide in order to get priority access to the beds.  Brewer Dep. at 148:7-

10  149:11; Stewart Supp. Report at ¶ 41 (documenting DMH practice of designating acutely

11  psychotic, but non-suicidal patients "low priority").  Those who are merely "acutely psychotic"

12  often do not get a bed at all, but are simply placed low on the wait list, where they linger for

13  months and as often as not simply have their referral rescinded by the institution due to sheer

14  futility.  Pls.' Exh. P-57 at 349; *see also* Haney Report at ¶¶ 237, 257 (paranoid inmate who

15  exhibited bizarre behavior, urinating on a food tray, had been waiting five months for an acute

16  bed when Dr. Haney saw him at California Correctional Institution on July 29, 2008); Haney

17  Report at ¶¶ 237, 259 (floridly psychotic inmate who had been waiting nearly six months for

18  an acute bed when Dr. Haney saw him at California Correctional Institution on July 29, 2008);

19  Haney Report at ¶ 298 (report from North Kern psychologist that patients who are not suicidal

20  languish at prison); Packer at RT 1107:6-16 (Dr. Packer saw a patient at California

21  Correctional Institution who waited 5 months on the DMH waitlist and then was dropped when

22

23  [33] Cynthia Radavsky, the Deputy Director of Long-Term Care Services for DMH, testified at
    trial that the acute waiting list was down to three patients as of the day before her testimony.
24  Radavsky at RT 777:19-23.  We give little weight to this single day account.  The critical
    shortage of inpatient beds is well documented in this record as described above.  *See also* Pls.'
25  Exh. P-35 at 8 (Special Master's report noting that the *Coleman* court has "spent the last three
    years deeply immersed in the disconnect between the number of beds needed by defendants to
26  provide mental health treatment for CDCR's most seriously mentally ill inmates and the beds
    available to provide such care").
27

28

1    clinicians realized he would never be admitted).

2        The shortages of ICF beds are also well documented and severe.  Pls.' Exh. P-244 at

3    900129 (166 patient waiting list for the Salinas Valley Psychiatric Program ICF beds as of

4    August 31, 2008).  DMH has maintained a waiting list for Salinas Valley for more than three

5    years.  Defs.' Exh. D-1108 at DEFS060148-49, DEFS060255-56 (Compilation of Special

6    Master's Monitoring Report Recommendations).  Since November of 2007, the waiting list has

7    expanded steadily from a low of about 100 inmate-patients to a high of 173 patients.



16        We also find that clinicians have stopped referring patients to ICF care due to the long

17    waiting lists.  *See* Brewer Dep. at 120:23-123:5 (when clinicians see a bed shortage they stop

18    making futile referrals to care; when new beds come on line, pent-up demand causes waiting

19    lists to climb again); Stewart Supp. Report at ¶¶ 20-21 (two clinicians at SVSP stopped

20    referring patients to ICF because it takes a year or longer to get patients in); Pls.' Exh. P-35 at

21    10 ("clinicians often choose not to undertake the frustrating struggle for a referral that will not

22    bring movement for weeks or months").

23        Inpatient bed shortages cause further shortages down the line in the crisis beds.  A

24    hospital waiting list patient who is lucky enough to get a crisis bed ends up holding that bed for

25    months, instead of for the prescribed 10-days, making it unavailable for other prisoners who

26    fall into a mental health crisis.  Pls.' Exh. P-35 at 10.  The Department of Mental Health's

27    long-term care director, Cynthia Radavsky, testified to the unresolvable conflict between the

28

-59-

1    needs of patients in immediate crisis and the needs of patients needing step-down inpatient care

2    after a crisis, with administrators left to choose which of these vital needs they can serve with

3    their inadequate supply of beds.  Radavsky at RT 779:18-781:5, 781:15-783:4.

4          The evidence of harm from delayed access to inpatient psychiatric hospitalization care

5    was overwhelming.  This is undoubtedly one of the most harmful aspects of this case and its

6    effects are cumulative – patients linger in alternative, inhumane placements while they await

7    care and, if and when they receive that care, require more resources for longer periods of time,

8    thereby further backlogging the system.  Stewart Supp. Report at ¶ 92.  Far from establishing

9    simple isolated incidents or events, plaintiffs established systemic delays in care that result in

10   substantial harm.  *See, e.g.*, Stewart Supp. Report at ¶ 89(c) (Class Member YYY at Salinas

11   Valley State Prison, 9 months on the inpatient waiting list); *id.* at ¶ 89(d) (Class Member ZZZ

12   at Salinas Valley State Prison, one year on the inpatient waiting list with high doses of multiple

13   medications); *id.* at ¶ 89(e) (Class Member LL at Salinas Valley State Prison, referral to care

14   rescinded after 8 months on the waiting list, forcibly medicated, still floridly psychotic);

15   Woodford at RT 368:23-369:10 (patients in reception centers became more mentally ill

16   because there was no where to send them).

17         In the current emergency caused by overcrowding, even patients who reach the top of

18   the wait list and are admitted to a hospital bed are likely to find themselves not in a proper

19   inpatient hospital, but in a makeshift retrofitted prison unit that defendants' expert, Dr. Packer,

20   found inappropriate to deliver inpatient hospital care.  Defs.' Exh. P-1019 at 10 (ICF beds in

21   D-unit at Salinas Valley do not have adequate treatment space or confidentiality and are not

22   appropriate for inpatient care).  Yet the state has no plans to take these beds off-line.  Radavsky

23   at RT 789:15-791:6; Brewer Dep. at 105:4-8 (no plan to close D-5 and D-6 units even after the

24   new 64-bed ICF unit opens at Salinas Valley).

25         Even where inpatient beds have serious, demonstrated life-safety hazards that have

26   resulted in actual deaths, the state has been unable to take them off-line due to the extreme and

27   ongoing demand for this level of care.  Pls.' Exh. P-588 at p. 4 of 4/16/07 Executive Summary;

28   Pls.' Exh. P-589 at p.9 of 4/20/07 Executive Summary, #10; Radavsky at RT 778:19-779:13.

1    In January 2007, two *Coleman* class members killed themselves within days of each other in

2    the "acute psychiatric program" housings units at California Medical Facility in Vacaville.

3    Radavsky at RT 769:5-772:13, 773:16-775:9, 775:13-17. These are the units that house the

4    most acutely impaired prisoners with mental illness, Radavsky at RT 775:25-776:2, and that

5    defendants contend are the least affected by overcrowding because they are segregated from

6    the general population. Class Member D.M., a 19-year-old man serving a term for aggravated

7    battery (spitting) while in the California Youth Authority, hanged himself in a suicide watch

8    cell on January 27, 2007. Class Member R.M., a 31-year-old man, hanged himself in the same

9    unit two days later. Both D.M. and R.M. killed themselves while on suicide watch in cells that

10   CDCR had identified years before as needing retrofitting to remove attachment points that a

11   suicidal prisoner could use to affix a makeshift noose. Pls.' Exh. P-588 at p. 4 of 4/16/07

12   Executive Summary; Pls.' Exh. P-589 at p. 9 of 4/20/07 Executive Summary, #10. The

13   Department of Mental Health's Director of Long-Term Care, Cynthia Radavsky, testified these

14   retrofits could not be done "because we have to remove inmates from the cells in order to do

15   this." Radavsky at RT 772:8-11. Despite the clearly dangerous conditions in these suicide-

16   watch units, Cynthia Radavsky testified that the retrofit project was pending because the beds

17   "were needed for mental health crisis bed acute patients." Radavsky at RT 778:19-779:13;

18   Defs.' Exh. D-1175-1 at Attachment C, Row 2.

19        Defendants assert that patients at the inpatient hospital levels of care are somehow

20   immune from any effects of overcrowding because state licensing standards prevent crowding

21   of hospital beds,[34] and because the most visible indicia of crowding – bunks stacked up in

22   gyms and day rooms – are absent from the hospital units. The evidence, however, is

23   overwhelming that prisoners at the inpatient levels of care are being harmed while they wait

24

25   ─────────────────────────
     [34] Although the DMH units are not as crowded as a general population gymnasium or
26   dormitory, DMH operates several of its units on licensing waivers which permit them to house
     more patients than the law otherwise permits. Brewer Dep. at 191:6-24 (the D-5 and D-6 units
27   at SVSP operate on a "program flex" which doubled the beds that would normally be licensed
     in the space).

28

-61-

1   for that care and, as demonstrated by the suicides in the acute unit at CMF, even when they

2   make it to an inpatient bed.  Stewart Supp. Report at ¶ 100 (Class Member GGGG killed

3   himself when crisis bed was unavailable); Stewart Supp. Report at ¶ 109 (Class Member

4   HHHH hanged himself in OHU).

5          It is undisputed that approximately 80 percent of the patients who arrive at DMH

6   inpatient beds from CDCR are not properly medicated, due to the CDCR's overwhelmed

7   mental health delivery system and faulty medication management system, and that they

8   therefore arrive at the hospital sicker than they would otherwise be.  Defs.' Exh. D-1275 at 1;

9   Brewer Dep. at 126:5-15.[35]  It is also undisputed that defendants operate a large percentage of

10  their existing inpatient beds in temporary makeshift facilities that cannot provide the

11  appropriate care.  Defs.' Exh. P-1019 at 10 (ICF beds in D-unit at SVSP are not appropriate for

12  inpatient care).  These inpatient units, at Salinas Valley State Prison and CMF, were opened on

13  an emergency basis by order of the *Coleman* Court in 2006 in response to the extreme shortage

14  of licensed inpatient beds and the dangerous delays in care that resulted from the shortage.

15  Pls.' Exh. P-425 at 2, 4-5 (*Coleman* Order finding that the severe shortage of inpatient beds

16  leaves "critically mentally ill inmates languishing in horrific conditions" and ordering

17  defendants to maintain unlicensed beds at CMF and SVSP).  Based on these undisputed facts,

18  we must reject the assertion that patients at the inpatient levels of care are not impacted by

19  overcrowding.

20              **3.    Enhanced Outpatient Program**

21         The Enhanced Outpatient Program (EOP) within CDCR provides the most intensive

22  level of outpatient mental health services to prisoners.  It is characterized by separate housing

23  and structured activities for prisoners with serious mental illness who, because of their illness,

24  cannot function in the general population but do not require 24-hour inpatient care.  Pls.' Exh.

25  P-9 at 12-4-1.  EOP prisoners have serious mental disorders such as Schizophrenia, Psychotic

26

27  ────────────────────
    [35] We discuss the medication management problems in more detail below.

28

Disorders, and Major Depressive Disorders and display symptoms such as delusional thinking, hallucinatory experiences, and vegetative signs. *Id*. at 12-4-2 through 12-4-3. EOP patients are placed in specialized housing where there are provided with increased "clinical and custody support." *Id*. at 12-4-4. They are also provided with a minimum of ten hours per week of enhanced mental health services. *Id* at 12-4-8.

It is undisputed that CDCR has a backlog of approximately 1,000 persons clinically designated for EOP, but who instead linger in "alternative placements," including administrative segregation units, mainline housing in prisons without EOP programs, and reception centers. Pls.' Exh. P-264; Haney at RT 314:16-316:5 (the EOP gap has been getting worse over last two years); Chaiken Dep. at 196:11-15 (some EOPs spend their entire terms in reception centers); Haney Report at ¶ 29 (the number of EOPs lingering in reception centers without adequate care reached 786 by June of 2008); Haney Report at ¶ 129 (EOP inmates were waiting an average of 106 days at the CIM reception center, where they were housed in an administrative segregation unit that lacked staff and resources to provide adequate care). Defendants' expert, Dr. Packer, also documented the severe shortage of placements for EOPs, noting that in the summer of 2008, there continued to be "long waiting lists for EOP programs." Defs.' Exh. D-1019 at 9; Defs.' Exh. D-1020 at 4; Defs.' Exh. D-1019 at 11 ("system is 'clogged' in the sense that the higher intensity beds are usually full, creating long waiting lists at other levels").[36]

Plaintiffs' Exhibit P-264, Figure 1, illustrates the growth in the "Unmet EOP Need" since early 2007 when the gap was little more than 200 beds, but had grown to almost 1,000 EOP beds by August 2008:

---

[36] Dr. Packer is careful to say that he does not believe the backlogs are a result of overcrowding, but rather stem from "the lack of adequate beds and programs for the most seriously mentally ill." Defs.' Exh. D-1019 at 11. As previously noted in fn. 1, *supra*, we reject Dr. Packer's semantic distinction.





**Figure 1, Plaintiffs' Exhibit P-264**

Prisoners who are referred to an EOP program while housed at a prison that lacks such a program[37] are in greater danger.  Mental health staff at SATF reported that they were simply unable to transfer EOP prisoners to EOP programs:  "'We call every week – CMF, Corcoran, Salinas Valley – they are all full.  We try to get them out, but there is no room anywhere and it takes months sometime.'"  Haney Report at ¶ 216.  As a result, Dr. Haney determined that 15 of 35 EOP prisoners awaiting placement at SATF experienced mental decompensation so severe that they required crisis care, with 9 of those patients requiring multiple admissions for that care.  *Id.*  In addition, due to overcrowding, EOP patients are housed in "bad beds" – overcrowded gyms and day rooms – at some of these prisons while they wait for transfer to an EOP housing unit.  Chaiken Dep. at 196:11-15; Defendant Cate's Response to Plaintiff *Coleman*'s Interrogatories, Set One, Documents Identified in Response to Interrogatories 17

and 18 (*Coleman* Docket No. 3433-3) at Table Two, pp. 27-51; Haney Report at ¶ 220-225 (interviews with Prisoners NN, OO and PP, each EOP prisoners housed in a SATF dorm waiting for transfer to an EOP program who describe the difficulty coping with housing in dorm conditions).  *See, e.g.,* Pls.' Exh. P – 336 at SATF-10, July 28, 2008, Facility A, Building 2 Dorm, Section A:



We reject defendants' assertion that *Coleman* class members housed in EOP programs are not affected by overcrowding.  In addition to experiencing long and dangerous delays in accessing EOP beds due to the overcrowding-caused shortage of this critical resource for mental health care, plaintiffs have demonstrated that EOP patients are harmed by overcrowding even when they are housed in EOP programs.  As discussed *infra,* mental health

---

[37] Only 13 of the 33 state prisons have any EOP program at all (CCWF, CIW, CMC, CMF, COR, LAC, MCSP, PBSP, RJD, SAC, SQ, SVSP and VSPW) and two of those prisons have EOP programs only for administrative segregation inmates (SQ and VSPW).  Pls.' Exh. P-243

(continued …)

[272055-1]

1   care provided in CDCR's existing EOP programs is inadequate due to overcrowding-caused

2   shortages of clinical and custody staffing, inadequate office and treatment space, and

3   lockdowns.  In response to court orders to address these deficiencies, defendants have

4   requested funding for construction of additional office and treatment space for several of their

5   existing EOP programs, but even in the best case scenario, completion of these projects are

6   many years off.  Haney Report at ¶ 30 (discussing the SVSP and CMF EOP treatment and

7   counseling space proposals created by defendants in response to the court orders which include

8   projected completion dates stretching out to 2011 and 2012 under the best case scenarios); Pls.'

9   Exh. P-479 (CDCR response to Judge Karlton's 10/17/07 order re: adequate mental health

10  treatment and counseling space at SVSP); Pls.' Exh. P-480 (CDCR response to Judge

11  Karlton's 10/17/07 order re: adequate mental health program space at CMF); Pls.' Exh. P-390

12  (budget change proposal for treatment and office space to accommodate 192 EOP patients at

13  CSP-SAC).

14          **4.    Segregation**

15          In 2004, approximately 70 percent of all suicides in CDCR occurred in administrative

16  segregation units, where only a small percentage of the population is housed.  Pls.' Exh. P-429

17  at 1.  The dangers of housing prisoners with mental illness in the isolation and harsh conditions

18  of segregation units is known and long-standing to the CDCR and have resulted in various

19  exclusions and limitations on segregated housing.  *Coleman v. Wilson*, 912 F. Supp. 1282

20  (E.D.Cal. 1995); Pls. Exh. 9 at 12-8-1, 12-8-2 (excluding mentally ill prisoners with Axis I

21  diagnosis, severe personality disorder, mental retardation, or active suicidal ideation from

22  placement in the Pelican Bay SHU); at 12-8-10 (mandating transfer of EOP prisoners out of

23  the SHU within 30 days of designation as EOP); at 12-7-7 (requiring EOP prisoners in regular

24  segregation unit to be transferred to a specialized EOP administrative segregation unit where

25  EOP care is to be provided within 30 days of placement at EOP level of care); Pls. Exh. 248 at

26

27  ————————————

    at 900121-900124.

28

[272055-1]

1-2 (Defendants' Administrative Segregation Unit EOP Status Report, May 1, 2008, describing

efforts to reduce the stays of EOPs in segregation).[38]    In 2006, the *Coleman* Court ordered

defendants to develop a plan to reduce the escalating rate of suicides in administrative

segregation, which defendants submitted on October 2, 2006, and which the court approved in

early 2007.  Pls.' Exh. P-429 at 1; Defs.' Exh. D-1197-1 at 2.  Overcrowding has delayed or

prevented CDCR from implementing these critical, life-saving measures in its administrative

segregation units.  The plan included the following elements:  (1) retrofitting a percentage of

cells in each administrative segregation unit to remove available hanging attachment points; (2)

ensuring that prisoners were provided with basic out of cell time, outdoor exercise and

privileges; (3) ensuring confidential mental health interview space in segregation units; (4)

reducing lengths of stay in segregation; (5) implementation of additional screening, including

return-from court ("bad news"), pre-placement suicide prevention, and post-placement;[39] (6)

[38] However, a review of more recent data from CDCR reveals that the number of EOP
prisoners housed in the EOP HUB administrative segregation units for more than 90 days has
climbed back up to levels higher than in December 2007 when defendants implemented their
review plan.  *See*, Pls.' Exh. P-267 (showing that by August 2008, the number of EOP patients
housed in the EOP HUB administrative segregation units greater than 90 days was 229, which
is higher than the number in December 2007).

[39] Few institutions had implemented the "bad news" screening form, nine had not
implemented the pre-placement segregation screening, and 30 percent of the prisons remained
non-compliant with the post-placement 31-question screening. Pls.' Exh. P-57 at 339-340.

-67-

1    provision of additional property or separate housing for non-disciplinary inmates;[40] (7) custody

2    welfare checks; and (8) requiring custody officers to provide cardiopulmonary resuscitation to

3    prisoners.[41]  Pls.' Exh. P- 409 at 1-14.

4         The most simple protective measure – checking to see whether the prisoner in a

5    segregation cell is still alive on a frequent but staggered schedule – remains beyond CDCR's

6    reach due to overcrowding.  CDCR's expert suicide panel recommended in 2006 that

7    California adopt the American Correctional Association's ("ACA") standard for welfare

8    checks in administrative segregation, personally observing *all* inmates in the units at least

9    every thirty minutes on an irregular schedule.  CDCR rejected the ACA standard because

10   doing so "would further strain the resources available to the Department."  Pls.' Exh. P-409 at

11   13.  When the *Coleman* Special Master's experts checked on actual practice, they found that

12   even the welfare checks CDCR tried to do were not happening on a sustained basis system-

13   wide.  Pls.' Exh. P-57 at 340-341.

14   _____

15   [40] Defendants' expert, Dr. Packer, recommended that CDCR re-examine its practice of housing
     inmates in administrative segregation for non-disciplinary, protective custody.  Defs.' Exh. D-
16   1019 at 23.  CDCR has received this recommendation before, from a group of nationally
     recognized experts on prison suicide whom the CDCR convened to study its growing suicide
17   problem.  *See* Pls.' Exh. P-409 at 3.  The panel recommended, among other things, that inmates
     placed in administrative segregation for non-disciplinary reasons should be placed in different
18   housing and/or receive more property and services than is allowed in disciplinary segregation.
     *Id.* at 6.  CDCR rejected this recommendation, stating: "[d]ue to the Department's current
19   housing crisis, separate housing for inmates placed in Administrative Segregation Units for
     disciplinary and non-disciplinary reasons is unreasonable.  This modification would seriously
20   reduce available bed space for both Administrative Segregation and General Population
     housing."  *Id.* at 12.  Instead, defendants adopted a policy permitting personal property for
21   prisoners in administrative segregation, however, the Special Master in his monitoring found
     that only seven prisons provide prisoners in segregation with access to electrical appliances.
22   Pls.' Exh. P-57 at 341; Pls' Exh. P-429 at 6-7.

23

24

25

26

27

28

-68-

1     The 2006 suicide plan included a schedule for the construction of caged outdoor yards

2 where one or two persons could walk alone.  Pls.' Exh. P-429 at 3-4.  These are called "small

3 management yards" (a picture is provided at Pls.' Exh. P-338 at SVSP-5), and are necessary

4 because CDCR does not have enough staff or room to watch over segregation inmates in a

5 regular yard.  CDCR has not been able to build the yards on schedule, with the result that

6 prisoners in most segregation units, whether housed for disciplinary reasons or for their own

7 protection, receive less than 10 hours per week of out of cell time.  Pls.' Exh. P-57 at 341.

8     Even where CDCR has built the small management yards, they cannot staff them to

9 meet the demand.  Dr. Packer, defendants' expert, noted that "[t]he ability to utilize these yards

10 maximally is limited by shortages in custodial staffing (which is directly related to

11 overcrowding)."  Defs.' Exh. D-1019 at 13.  When Dr. Haney toured Salinas Valley State

12 Prison administrative segregation units, custody staff described the difficulty they experienced

13 running yard due to staffing shortages:  "'I don't have single escorts to run the psych, doctor,

14 CTC escorts.  I don't have the staff.  I am short at least two officers.'"  Haney Report at ¶ 177.

15 In another segregation unit where the majority of prisoners were on the mental health caseload,

16 the Sergeant informed Dr. Haney that "'in order for the men on walk-alone status in his unit to

17 receive outside exercise, they have to be placed in restraints and waist chains, escorted out of

18 their cells and out of their housing unit, and taken by correctional officers all the way to

19 another yard on Facility D, where they are put in individual cages and allowed to exercise.

20 When their exercise time is over, they are chained up again and escorted back to their unit and

21 into their cells.'"  Haney Report at ¶ 178.

22     The 2006 suicide plan required retrofitting of segregation intake cells to remove

23

24 [41] Pls.' Exh. P-58 at 10 (despite significant court intervention and monitoring of this
requirement to provide CPR, the Special Master found that CPR was not performed or was not
25 initiated in a timely manner in 39.5 percent of the 43 suicides cases reviewed).  Plaintiffs'
expert, Wayne Scott, testified that with chronic "short-staffing, these functions [such as
26 responding to 'man down' or emergency calls] sometimes are not performed, with consequent
dangers to the prisoner population."  Scott Report at ¶ 58.

27

28

[272055-1]

1   attachment points.  Pls.' Exh. P-409 at 7-8.  Crowding has prevented the proper use of

2   retrofitted cells.  Pls.' Exh. P-57 at 151, 225, 340.  The *Coleman* Special Master has reviewed

3   retrofitting compliance.  At Substance Abuse Treatment Facility in Corcoran ("SATF"), a

4   prison operating at over 200 percent of capacity, the Special Master found that none of the

5   intake cells had been retrofitted as required by the suicide plan.  Pls.' Exh. P-57 at 151.

6   Neither SATF in Corcoran nor the newest prison, Kern Valley, were even using the intake cells

7   as required in the suicide plan because "the high volume of traffic in and out of the unit

8   rendered it impossible to use the intake cells as intended."  Pls.' Exh. P-57 at 151; *see also id.*

9   at 225 (use of intake cells as intended called "impractical.").

10          **a.      Overuse Of Segregation Units For *Coleman* Class**

11          The *Coleman* Court found that "mentally ill inmates who act out are typically treated

12   with punitive measures without regard to their mental status" and that "such treatment was the

13   result of inadequate training of the custodial staff so that they are frequently unable to

14   differentiate between inmates whose conduct is the result of mental illness and inmates whose

15   conduct is unaffected by disease."  *Coleman,* 912 F. Supp. at 1320.  The Court held that the

16   defendants' use of segregation to "house mentally ill inmates violated the Eighth Amendment

17   because mentally ill inmates are placed in administrative segregation and segregated housing

18   without any evaluation of their mental status, because such placement will cause further

19   decompensation, and because inmates are denied access to necessary mental health care while

20   they are housed in administrative segregation and/or segregated housing."  *Id.*

21          Plaintiffs' expert, Dr. Haney, testified that one impact of overcrowding on a prison

22   system is that prison administrators lose "carrots" to reinforce and shape prisoner behavior and

23   must "rely increasingly on 'sticks.'"  Haney Report at ¶ 76.  Dr. Jeffrey Beard, the Secretary of

24   the Pennsylvania Department of Corrections also confirmed the impact overcrowding has on

25   custodial issues:  "They have inmates coming in, so they have to have bed space.  They have to

26   find a place to put people.  They are having a difficult time controlling their prisons, so they

27   have to take a strong custodial approach to it.  They have to rely on the lockdowns.  They have

28   to rely on guns, gas, those kind of things, to control the prisons so they're safe for the staff and

1  for their inmates." Beard at RT 222:14:21. Defendants' data shows the overrepresentation of

2  *Coleman* class members in segregation units. Pls.' Exh. P-502 (showing that, as of August

3  2007, prisoners with mental illness comprised 46 percent of the population in the

4  administrative segregation units); Pls.' Exh. P-35 at 2 (*Coleman* class was approximately 19

5  percent of the total inmate population as of May 25, 2007); Pls.' Exh. P-243 at 900054 (August

6  2007 mental health population similar to the May 2007 mental health population). As a result,

7  prisoners with mental illness often decompensate, commit rules violations because of their

8  mental illness and are placed in segregation. Haney Report at ¶¶ 84, 86.

9                    **b.      Inadequate Care In Segregation Units**

10           Due to overcrowding-related factors, including lockdowns, insufficient treatment and

11  office space, insufficient small management yards, and staffing inadequacies, CDCR remains

12  incapable of providing constitutionally adequate care to prisoners housed in administrative

13  segregation. Pls.' Exh. P-57 at 28, 63, 86, 93, 136-7, 138, 141, 149, 175, 185, 210, 220, 231,

14  257, 266, 327, 328.

15           Clinicians in California administrative segregation units generally cannot have

16  confidential interviews with their clients. This is not a luxury in mental health treatment; it is a

17  necessity, and defendants' expert Dr. Packer agrees that failure to provide it puts lives at risk.

18  Packer at RT 1102:4-9; *see also* Chaiken Dep. at 41:1-8; 43:19-44:8 (testifying to the

19  importance of confidential clinical contacts in a prison setting). Due to lack of space and lack

20  of escort staff, clinicians in California segregation units are often limited to "cell-front" contact

21  with their patients. That means the clinician sits at the cell door and talks to the prisoner

22  through the food port or whatever opening is available. This is done in full hearing of cell

23  mates and people in neighboring cells, making it difficult or impossible to get the patient to

24  talk openly about mental health issues, including suicidal feelings or plans. Dr. Packer

25  testified that this "is simply not the way to conduct a clinical interview." Packer at RT 1108:

26  16-21. CDCR clinicians have acknowledged the role of this practice in prisoner suicides. Pls.'

27  Exh. P-448-R at 000269, 000275 (cell door interview of prisoner who later killed himself

28  hampered by cellmate trying to prevent patient from participating). At Solano State Prison,

1   Dr. Stewart observed the psychiatric technician administering the 31 question mental health

2   screening survey for new intakes into the unit at cell-front.  Stewart Report at ¶ 119.

3   Dr. Stewart concluded that "this is a dangerous practice that relates to overcrowding; staff

4   members do not have the office and treatment space that they need to administer clinically

5   appropriate evaluations in a confidential setting (or there are insufficient custody staff to escort

6   the patients to an appropriate setting)."  *Id.*

7           The treatment provided in segregation units must often occur with the patient alone in a

8   small telephone-booth sized cage.  In the administrative segregation unit at Mule Creek State

9   Prison, Dr. Haney observed that the treatment cages sit on the dayroom floor in a semi-circle,

10  "completely visible to the prisoners in the unit, especially to the prisoners on the second tier of

11  the unit ….   The noise and shouting (and sometimes the taunts) of the other prisoners are

12  pervasive and distracting."  Haney Report at ¶ 197; Pls.' Exh. P-57 at 63 (MCSP:  Group

13  therapy space in administrative segregation, consisting of eight holding cells, continued to be

14  "wholly inadequate"); Pls.' Exh. P- 339-14B.  The following photograph was taken of the

15  group therapy cells in the dayroom of the administration segregation unit at Mule Creek State

16  Prison:



Pls.' Exh. P – 339, MCSP-14B, August 1, 2008, C-yard, Group Cages in ASU

27          Dr. Haney toured Salinas Valley State Prison's administrative segregation unit and

28  observed "[t]he room in which some 10 or more therapy cages were located appeared to be a

-72-

1   laundry room, with huge trays of laundry in the background … in addition, the cages

2   themselves were filthy, with rusted metal and graffiti on the sides of the cages and the tops of

3   the small tables inside." Haney Report at ¶ 176. Defendants' expert, Dr. Packer, made similar

4   observations on attempts to deliver mental health treatment in makeshift treatment space.

5   Defs.' Exh. D-1019 at 10 (agreeing with Dr. Haney that treatment in the Salinas Valley laundry

6   room is not appropriate treatment space).

7         As noted above, crowding has prevented implementation of the segregation components

8   of the 2006 suicide plan, including the construction of small management yards to prevent

9   mentally ill prisoners from being locked in a cell for 24 hours per day, seven days a week.

10  Defendants' expert Dr. Packer testified that lack of time out of cell could increase a person's

11  risk of suicide. Packer at RT 1101:14-1102:2.

12              **5.    Reception Centers**

13        Every expert witness who expressed an opinion on this subject testified that crowding is

14  the primary cause of inadequate mental health care in the twelve CDCR "Reception Centers."

15  A reception center is a specialized prison unit that is set up to receive new prisoners from the

16  counties and from parole violations. The evidence was undisputed that CDCR's system for

17  classifying prisoners and performing mental health and medical examinations in the reception

18  centers is overwhelmed. Beard at RT 224:8-225:15; 236:20-22; Haney at RT 308:18-309:1;

19  Scott at RT 175:5-10; Woodford at RT 368:9-369:15; Shansky Second Supp. Report at ¶¶ 21-

20  24, 30-31; Stewart Report at ¶¶ 74-83; Defs.' Exh. D-1019 at 20; Defs.' Exh. D-1020 at 6;

21  Packer at RT 1088:24-1089:3; Packer at RT 1120:8-16; Packer at RT 1121:16-19; Packer at

22  RT 1122:12-24 (the reception center population overwhelms their ability to provide adequate

23  services). Defendants' expert Dr. Packer stated his opinion bluntly: "In my opinion, crowding

24  is the primary cause of the particular difficulties in providing services to the *Coleman* class at

25  the reception centers." Defs.' Exh. D-1019 at 20.

26        The *Coleman* Program Guide includes mandates for transfers of mentally ill prisoners

27

28

-73-

from the reception centers to prisons with mental health program beds.[42]  It is undisputed that due to the significant shortage of EOP beds system-wide, reception centers are unable to transfer their EOP patients to EOP programs within the required timeframes.  Pls.' Exh. P-264 (EOP Unmet Need Chart); Defs.' Exh. D-1020 at 4 ("Consistent with my initial report, during this visit I obtained similar information regarding the long waiting lists for EOP programs.…"); Dezember at RT 915:24-916:2; Pls.' Exh. P-57 at 353 ("Over a third of inappropriately housed male EOP inmates waited longer than 60 days to be transferred to an EOP program … Excessive waits of many months were common and utilization of protocols for expedited, 30-day transfers were underutilized.")

Due to overcrowding, a large percentage of mentally ill parole violators serve their full terms in reception centers and parole back to the communities without the benefit of any appropriate mental health services.  Gilligan Report at ¶ 26 ("Short-term parole violators – who account for half of the annual releases to parole – are virtually certain to serve their entire revocation terms in these Reception Centers."); Defs.' Exh. D-1019 at 20 (noting the high percentage of parole violators at the male reception centers, which staff estimated to be between two-thirds to ninety percent of all admissions; "many of these inmate receive relatively short sentences, which means that they spend their entire sentence at the reception center").  As a result of the constitutional deficiencies in the reception center mental health care, this group of prisoners will cycle back and forth from CDCR prisons to parole, without ever reaching a treatment program.  Dr. Haney described this process as a cycle of "catch and release" that is "tremendously destabilizing" and which increases the probability that "they will become sicker, and that their illness will become harder to stabilize and manage."  Haney Report at ¶ 362; *see also* Gilligan Report at ¶ 63 (describing the cycle of returning a prisoner to the reception center for several months where appropriate access to mental health care and pre-

---

[42] Pls.' Exh. P-9 at 12-1-13 (3CMS should be transferred out of reception centers within 90 days of referral or 60 days if clinically indicated; EOPs should be transferred out of receptions centers within 60 days of referral or 30 days if clinically indicated).

1   release planning is not available:  "This cycle leads to further decompensation, and release of a

2   patient who is as sick as or sicker than when he or she came into prison."); Pls.' Exh. P-48

3   (filed under seal) (OIG finds San Quentin Reception Center improperly released unstable and

4   untreated mentally ill prisoner to community).

5          Plaintiffs' and defendants' mental health experts agree that overcrowding is the primary

6   cause of the on-going constitutional violations in the delivery of mental health care in the

7   reception centers.  Defs.' Exh. D-1019 at 20; Defs.' Exh. D-1020 at 6; Packer at RT 1088:24-

8   1089:3 ("my concern there is that [mentally ill prisoners] are being released from all of the

9   different facilities, but they are coming back in only to the reception centers, which are the

10  place least equipped to deal with the influx of more inmates, particularly mentally ill

11  inmates."); Packer at RT 1120:8-16; Packer at RT 1121:16-19 ("the number and type of

12  inmates in [the reception centers] overwhelms that facility's [sic] capacity to provide adequate

13  services."); Packer at RT 1122:12-24 (the reception center population overwhelms their ability

14  to provide adequate services); Stewart Report at ¶¶ 47-48, 106-9; Haney Report at ¶¶ 105, 109,

15  110-112, 129, 130, 132, 138, 246, 247, 251, 279-81, 306, 310, 317-321.

16         The Receiver reported and this Court finds that "none of the CDCR's designated

17  reception centers were designed or constructed with adequate clinical space.  To make matters

18  worse, as the original prisons designated for reception became overwhelmed by the influx of

19  parole violators, the CDCR was forced to 'convert' general population prisons into reception

20  centers" but did so without providing "adequate additions to clinical staff or clinical space."

21  Pls.' Exh. P-26 at 19.

22         At one of these recently converted reception centers, Dr. Stewart observed "a small

23  classroom where at any given time six psychologists simultaneously conduct reception center

24  mental health assessments for new arrivals," with no confidentiality among the prisoners.

25  Stewart Report at ¶ 48.  At North Kern Reception Center, which serves many Southern

26  California counties, Dr. Haney observed the Receiving and Reception area which is "a large

27  open room … with several large cells or holding tanks arranged along the perimeter.  One of

28  the psychologists … acknowledged the space problems with which the unit is plagued.  In fact,

-75-

1    the psychiatrist and the psychologist who work in the R & R unit must share a converted cell

2    that serves as their office." Haney Report at ¶ 280; Pls.' Exh. P-340 at NKSP-26. The

3    following photograph was taken at North Kern on July 31, 2008 in Reception and Receiving:



Pls.' Exh. P – 340, NKSP-26, July 31, 2008, Reception and Receiving Clinician Office

    Many patients are stuck in reception centers with virtually no mental health care.

Haney Report at ¶ 129 (documenting CCCMS inmates' prolonged stays in the reception center

at CIM without case managers or treatment plans); Defs.' Exh. D-1092 at 19 (finding that

"none of the CDCR's designated reception centers were designed or constructed with adequate

clinical space" and that other prisons were converted to reception centers without

accompanying increases in staffing or treatment space). In recent years, the *Coleman* Court

has approved the establishment of a reception center version of the Enhanced Outpatient

Program for patients who cannot be transferred due to lack of space in the mainline program.

This program, however, is merely a stopgap, providing just half of the treatment hours

required. Haney Report at ¶ 29. Crowding has caused even this stopgap program to be

strained to its limits. Between May 2007 and June 2008, the number of EOP prisoners housed

in the reception centers expanded from 463 to 707 EOPs. *Id.*

1    California's prisons are so unable to properly handle the inflow of prisoners with mental

2    illness that reception centers inappropriately transferred some of these mentally ill prisoners to

3    certain desert institutions near the Arizona border where the housing of mentally ill prisoners

4    who take heat sensitive psychotropic medications is prohibited due to the risk of death from

5    heat stroke.  Pls.' Exh. P-57 at 294 (Calipatria received influx of inappropriately transferred

6    mentally ill prisoners from RJD Reception Center, and only half were returned to mental health

7    programs within required timeframes), at 305 (at CVSP, the majority of inappropriately

8    transferred CCCMS prisoners came from the reception centers at CIM, NKSP, DVI, RJD and

9    WSP); *Coleman* 4/4/01 Court Order (*Coleman* Docket 1262) (adopting the Special Master's

10   recommendations for the *Coleman* transfer timelines); Pls.' Exh. P-9 at 12-1-6 (listing the

11   desert institutions where mentally ill prisoners are excluded), 12-1-13 (setting forth transfer

12   timelines for mentally ill prisoners inappropriately transferred to a desert institution).  Such

13   inappropriate transfers implicate poor screening and/or classification errors by overwhelmed

14   reception center staff, and place mentally ill prisoners transferred to the desert institutions at

15   serious risk of harm.[43]  Haney Report at ¶ 59 ("[O]vercrowded prison systems often respond to

16   the influx of unprecedented numbers of prisoners by reducing the amount of screening,

17   monitoring, and managing that they perform.").

18   **C.   Resources For All *Coleman* Populations**

19       In 2007, the *Coleman* Court, as part of its consideration of the motion to appoint this

20   three-judge panel, directed the Special Master to report on overcrowding.  Defs.' Exh. D-1292.

21   The Special Master investigated three essential resources that have been the focus of the

22   *Coleman* remedy since the 1990s:  Clinical programming space, mental health treatment beds,

23   and clinical and custodial staffing.  *Id.* at 4-10.  Based on the most easily quantifiable of these

24   resources, staffing, the Special Master found that CDCR cannot meet "at least a substantial

---

[43] In his most recent suicide report, filed September 12, 2008, the Special Master discusses
three suicides that occurred in the desert institutions.  Pls.' Exh P-58 at 68, 98, 211.  The
Special Master concluded that each of these disturbing suicides demonstrated a lack of

(continued …)

[272055-1]

portion, amounting in some loose amalgam to about 33%, of acknowledged mental health needs," and that chronic gaps in the other two resource areas, treatment beds and programming space "contribute further to defendants' inability to meet required mental health services." *Id.* at 14.

The evidence at trial clearly showed that this gap between resources and population is growing partly through a feedback mechanism. Persons deprived of the right levels of treatment get more acutely ill, and impose more burdens on an already overwhelmed system. We find that these failures feed on themselves and have created both a larger and more acutely ill *Coleman* class of mentally ill prisoners. *See*, *e.g.*, Stewart 8/15/08 Report at ¶ 88 (*Coleman* patients were much sicker, as a whole, than when Dr. Stewart worked as a monitor in the *Gates* case between 1990 and 2000); Stewart 8/15/08 Report at ¶ 114 (overall CDCR population grew between 2003 and 2007 at a rate of 8.9 percent while the mental health population grew by 30.2 percent); Haney at RT 956:12-19 (there is a larger number of mentally ill prisoners in the prison system and a larger number of more seriously mentally ill prisoners).

We find that the Special Master's assessment was a correct, and somewhat understated, assessment of the mismatch between resources and the population. We make separate findings in the key resource and program areas below.

### 1.    Increased Lockdowns And Violence

The correctional expert testimony confirms that overcrowding increases violence and lockdowns. Beard at RT 218:18-25, 222:14-25, 248:1-25; Scott at RT 150:2-22. Dr. Jeffrey Beard, the Secretary of the Pennsylvania Department of Corrections, testified that the homicide rate in California is extremely high, as is the suicide rate, and "[a]ll of those things show me that you have a system that isn't safe. They rely largely on lockdowns to control their system, and they have to do that. I mean, you can't have people running around hurting people." Beard at RT 248:17-20. CCPOA plaintiff-intervenor witness Officer Leija testified that in the

---

compliance with the *Coleman* Program Guide and *Coleman* Suicide Prevention standards. *Id.*

1   overcrowded dorm at Chuckawalla where he works he "[c]annot see in the cubicles as far as

2   the inmates, if there's one misbehaving.  It's extremely crowded.  It's dangerous when we have

3   to walk the tiers or walk the floor.…  There's too many corners.  The bunks fill the cubicle

4   where you can't see into them at all."  Leija at RT 691:2-692:24, 705:23-706:3.

5       Robin Dezember, Chief Deputy Secretary of the Correctional Healthcare Services

6   Division of CDCR, testified that overcrowding impacts mental health care through increased

7   violence and lockdowns.  Dezember at RT 881: 4-12.

8       At Salinas Valley on October 31, 2007, Dr. Haney interviewed a patient in the mental

9   health crisis bed unit.  Prisoner KK, a 24-year old, had attempted suicide when he was housed

10  on Facility C, a unit that had been on lockdown since he transferred to Salinas Valley on May

11  2, 2007.  Haney 8/15/08 Report at ¶¶ 164-167; Pls.' Exh. P-515.  Prisoner KK had a significant

12  psychiatric history, including psychiatric hospitalizations beginning at the age of 13, and

13  multiple suicide attempts.  Pls.' Exh. P-515 at 5.  Prisoner KK was returned to Facility C after

14  his suicide attempt despite his difficulty coping with the lockdown conditions and he

15  eventually decompensated and was referred to a higher level of care.  Pls.' Exh. P-515 at 20,

16  21, 25, 27, 34, 35.  Due to the shortage of EOP beds, he was placed in segregation and

17  remained there for almost two months waiting for an empty bed.  Haney 8/15/08 Report at

18  ¶ 165; Pls.' Exh. P-515 at 45.  After finally transferring out of segregation to the EOP unit,

19  prisoner KK told his case manager that "being on lockdown all the time "'made me go crazy.'"

20  Pls.' Exh. P-515 at 58.

21      Lockdowns impacted the Enhanced Outpatient Program at Salinas Valley "because a

22  number of the groups offered to EOP inmates on D-yard take place across the yard, and when

23  the yard is closed, inmates cannot access these treatment spaces."  Stewart 11/7/07 Report at

24  ¶ 138; Haney Report at ¶ 161, 163 (Sergeant who worked in the EOP unit reported to

25  Dr. Haney that lockdowns in the EOP housing units had increased over time and occurred as

26  frequently as lockdowns for general population prisoners.)

27      Dr. Haney and Dr. Packer jointly toured a segregation unit at California Correctional

28  Institution on July 29, 2008 that had been on complete lockdown (with no yard whatsoever)

-79-

1  since April 3, 2008, when several staff members had been attacked by two prisoners.  Haney

2  8/15/08 Report at ¶ 260; Haney at RT 354:25-355:17; Packer at RT 1105:13-25.  Dr. Haney

3  testified that the "[l]ockdown is a direct result of a system being overcrowded and

4  overwhelmed … and not having a way to manage conflicts in any other way."  Haney at RT

5  355:14-17.  Dr. Haney and Dr. Packer interviewed two prisoners in the locked down unit that

6  were acutely mentally ill and had been accepted to the highest level of inpatient psychiatric

7  care, but had remained in the locked down unit for months due to the shortage of inpatient

8  beds.  Haney 8/15/08 Report at ¶ 257, 259 (Prisoner WW was described as very paranoid and

9  refusing his mediations in segregation.  He was listed on the CCI DMH referral log as

10 "accepted to ASH APP on February 29, 2008 but was on the waitlist." *Id*. at  ¶ 257; Pls.' Exh.

11 P-577.  Prisoner XX was seen in a treatment cage in the hallway and was described by

12 Dr. Haney as floridly psychotic; Prisoner XX had been accepted to APP on February 8, 2008,

13 but currently was on the waitlist.  Haney 8/15/08 Report at ¶ 259; Pls.' Exh. P-577 (redacted

14 DMH referral log which includes Patient XX); Packer RT at 1107:6-16 (testifying that inmate

15 had been referred for inpatient psychiatric care and had been accepted by the APP unit in

16 February 2008, but in late July 2008 remained at CCI).

17        **2.    Bad Beds**

18        "Bad beds," also called "ugly beds" or "non-traditional beds," are described above in

19 Section III.  Defendants admit that mentally ill prisoners are housed in "bad beds" throughout

20 California prisons.  Defendant Cate's Response to Plaintiff *Coleman*'s Interrogatories, Set One,

21 Attachment entitled Documents Identified in Response to Interrogatories 17 and 18, at Table

22 Two (*Coleman* Docket No. 3433-3) (showing numbers of EOP and CCCMS prisoners in non-

23 traditional housing at 24 prisons as of July 1, 2008); Defs.' Exh. D-1007 at ¶ 78; Dezember at

24 RT 910:9-11 (as of December 2008, 5,000 *Coleman* class members were housed in "bad beds"

25 or "nontraditional beds"); Chaiken Dep. at 196:11-20 (acknowledging that both EOP and

26 CCCMS prisoners are housed in "bad beds", such as dorms, gyms and on dayroom floors).

27        Plaintiffs' mental health experts testified about the detrimental effects of housing

28 mentally ill prisoners in "bad beds" throughout CDCR.  *See, e.g.*, Stewart at RT 88:21-89:15.

1  Dr. Stewart toured Mule Creek State Prison on August 1, 2008, where many prisoners are

2  housed in temporary "E-Beds"[44] placed in converted gymnasiums or on dayroom floors in

3  housing units.  Stewart Supp. Report at ¶ 63; Pls.' Exh. P-339 at MCSP-16, 17.  On Facility B

4  of the prison, the gymnasium was converted to housing for 160 men, which on the day of the

5  tour included 80 *Coleman* class members.  *Id.* at ¶ 64.  Plaintiffs' experts who toured the

6  facility brought back photos of the converted B yard gym, which show a large room of

7  multiple rows of triple bunks.  *Id.* at ¶ 64, Appx. E; Pls.' Exh. P-339 at MCSP-19, 20.

8  Dr. Stewart described another gym at Mule Creek, on Facility A, as "the worst living space I

9  have seen in any correctional system, including even the H-dorm at Solano.  There were nearly

10  200 men housed in rows of triple bunks, including on all of the middle bunks as far as I could

11  tell."  Stewart Supp. Report at ¶ 65, Appx. F; Pls.' Exh. P-339 at MCSP-4B, 5B.  According to

12  Mule Creek data, there were 73 *Coleman* class members housed in the A-yard gym.  *Id.*  The

13  *Coleman* Special Master found one-third of the CCCMS population at Mule Creek was housed

14  in non-traditional beds.  Pls.' Exh. P- 57 at 54.  The following photographs were taken at Mule

15  Creek on August 1, 2008:

16

17

18

19  

20

21

22

23

24

   Pls.' Exh. P – 339, (MCSP-19, August 1, 2008, B-yard Gym Dorm)

25

26

27  ───────────────

   [44] "E-Beds" are "temporary bunk beds located on dayroom floors."  Pls.' Exh. P-57 at 54.

28

-81-

1
2
3
4
5
6
7
8
9
10
11
12
13



Pls.' Exh. P – 339, (MCSP 5-B, August 1, 2008, A-yard Gym Dorm)

14  Dr. Haney toured California Institute for Men (CIM) on October 29, 2007, at which

15  time the prison was well over 200 percent of its design capacity.  Haney Report at ¶ 102.  He

16  visited various types of non-traditional housing at CIM, which included some converted

17  dayroom dorms, where approximately 38 prisoners lived in closely arranged bunks with only

18  four toilets "largely out in the open, affording no privacy."  *Id.* at ¶ 111.  He also toured two

19  large gym dormitories, where approximately 200 prisoners were housed on double bunks

20  without even a locker in which to store personal items.  *Id.* at ¶ 112.  In both of the large gym

21  dormitories, Dr. Haney was informed that there were a small number of EOP prisoners housed

22  in the gyms, as well as numerous CCCMS prisoners.  *Id.* at ¶ 114-115.

23  Similarly, at SATF, another prison operating well over its design capacity, EOP and

24  CCCMS prisoners were scattered in many yards throughout the prison, and housed in

25  dormitories and other non-traditional housing units.  Haney Report at ¶ 216.  Dr. Haney

26  interviewed several prisoners housed on A Facility at SATF, where both EOP and CCCMS

27  prisoners are housed in dormitories.  *Id.* at ¶ 220; Pls.' Exh. P-336 at SATF-10.  Haney also

28  toured a housing unit at SATF on Facility E, where 20 extra bunk beds had been arranged on

-82-

1  each side of the unit dayroom.  Haney Report at ¶ 232; Pls.' Exh. P-336 at SATF-28.  The floor

2  officer reported: "'this is bad.  I never thought I'd see the day.  I've been in the system 16

3  years, and I never thought it could happen …. 3CMS inmates are all over the place.  Their

4  mental health status is not part of the decision about whether to house them in the dayrooms.'"

5  *Id.* at ¶ 232.

6          This photograph was taken at SATF on July 28, 2008:



          Pls.' Exh. P – 336, (SATF-28, July 28, 2008, Facility E, Building 4C Dayroom Bunks)

22          The prison system's top healthcare official, Robin Dezember, testified that CDCR has

23  no written policy for excluding CCCMS prisoners from "bad beds" or non-traditional housing

24  units.  Dezember at RT 910:24-911:1.  Shama Chaiken, CDCR Chief Psychologist for Policy

25  and Program Development, testified that while she was aware that mentally ill prisoners – both

26  CCCMS and EOP – were housed in "bad beds," she had not discussed with other mental health

27

28

-83-

1   clinical staff what types of special mental health care might be required for these mentally ill

2   prisoners housed in "bad beds."  Chaiken Dep. at 196:11-197:1.[45]

3              **3.     Suicides And Suicide Prevention Measures**

4        Overcrowding in CDCR prisons has increased the risk of suicide and has directly

5   interfered with CDCR's ability to implement suicide prevention measures.  Overcrowding

6   increases the risks of suicide directly when crisis beds and other life-saving resources are too

7   full to accept the predictable number of persons who will experience suicidal crises in a given

8   population.  Overcrowding indirectly increases the risks of suicide by preventing the overall

9   operation of the mental health system, causing more prisoners to fall into suicidal crises.  For

10  both the direct and indirect mechanisms, overcrowding is the primary cause of the failures.

11       Plaintiffs' experts, relying on defendants' post-suicide reports, concluded that the lack

12  of crisis beds has contributed to several recent losses of life.  *See supra* at Section IV(B).

13  Suicidal prisoners requiring suicide watch are currently being warehoused throughout the

14  CDCR in inappropriate and dangerous "alternative placements," including holding cells and

15  other unlicensed locations, pending mental health crisis bed placement, often at great risk of

16  harm.  Stewart Report at ¶¶ 169-170; Gibbons at RT 575:10-577:5 (SVSP Correctional

17  Officer); Defs.' Exh. D-1019 at 11; Defs.' Exh. D-1290 (Demonstrative of Waitlist Trends,

18  April 2008 through September 2008); Pls.' Exh. P-263 (Mental Health Crisis Bed Unmet

19  Need).

20

21  _____

[45] Defendants' mental health expert, Dr. Packer, admitted that he observed 3CMS prisoners

22  housed in non-traditional housing, including converted gyms and overflow dayroom housing.
    Defs.' Exh. D-1020 at 7.  In discussing the housing of EOP patients in these settings, he noted,

23  "EOP patients were to be excluded from these spaces and I was repeatedly informed that
    indeed EOP patients were either not placed there, or if they were, were quickly identified and

24  moved out."  *Id.*  However, Dr. Packer could only confirm that "EOP inmates are generally not
    housed in the 'makeshift' dormitories (that is, gyms and dayrooms which have been converted

25  to housing units)."  Defs.' Exh. D-1019 at 17.  In a system as overcrowded as this one,
    however, where it is difficult and sometimes impossible to transfer *Coleman* class members to

26  appropriate mental health beds, we find that as a result of over-crowding, thousands of

27  *Coleman* class members remain housed in "bad beds" and at risk of harm.

28

The clear and convincing links between overcrowding and suicide go far beyond the simple case of an inmate who dies while waiting for a crisis cell. *See, e.g.*, Packer at RT 1101:23-1102:09 (increased risk of suicide in segregation when overcrowding prevents out of cell time), 1102:4-9 (increased risk of suicide when overcrowding prevents clinician-patient confidentiality). Plaintiffs' experts and the Special Master's experts have identified other clear links between overcrowded conditions and increased risk of suicide. The Special Master's experts, in published six-year review of California prison suicides included among a small set of recommended next steps: "Consideration of the impact of overcrowding and staffing deficiencies." Defs.' Exh. 1281 at 681.

Across the country, prison suicide rates have dropped from 34 suicides per 100,000 in 1980 to 14 suicides per 100,000 in 2002. Defs.' Exh. D-1014 at 2. During the first 10 months of 2008, CDCR reported at least thirty-one prison suicides, or approximately three suicides per month.[46] Pls.' Exh. P-171-R; Pls.' Exh. P-506. Even assuming no more suicides after October 2008, the rate remains at approximately 20 per 100,000 for 2008, based on an institution population of approximately 160,000 – and will reach 23 per 100,000 if the death toll continued at three per month for the rest of 2008. The *Coleman* Special Master found annual suicide rates of 25.1 per 100,000 in 2006 and 26.2 per 100,000 in 2005, but has not yet issued a suicide report for 2007.[47] Pls.' Exh. P-58 at 8-9.

Although the continued high annual suicide rates are relevant, we find more probative

---

[46] Governor Schwarzenegger, in his Emergency Proclamation, directly linked the severe overcrowding in 29 of the 33 CDCR prisons with the high suicide rate in the prisons and has stated that as a result of the overcrowding "the suicide rate in these 29 prisons is approaching an average of one per week." Pls.' Exh. P-1 at 6.

[47] The Special Master noted in his most recent suicide report, "[t]he difference between the national [suicide] rates and CDCR rates has provided a standard by which the Department's record in dealing with suicides can be measured. It also provides a measure against which to determine the adequacy of the Department's suicide prevention measures." Pls.' Exh. P-58 at 9.

the high rates of suicides that could have been avoided with proper care.[48]  Using data from the CDCR's own post-death reviews and annual reports, the *Coleman* Special Master has prepared eight annual suicide reports, the most recent covering suicides in 2006.  Pls.' Exh. P-58; Defs.' Exh. D-1176-2.  For suicides in 2002, the Special Master concluded that 45 percent of suicides resulted from inadequate care and were either foreseeable[49] or preventable.[50]  In every year

[48] Defendants assert that a statistical connection between overcrowding and suicide has not been demonstrated, and moved *in limine* to exclude "any and all evidence, reference to evidence, testimony, or argument regarding the annual rate of suicides among inmates in California state prisons."  Defendants' Motion *in Limine* No. 10 to Exclude Evidence Re: Suicide Rate In California Prisons (*Coleman* Docket No. 3085).  In light of the foregoing, we see no reason to disturb our order *in limine* denying Defendants' Motion *in Limine* No.10.

Our findings do not rely on any particular "annual rate of suicides," but rather on the clear and convincing evidence that overcrowding is the primary cause of the failure of prison mental health system's suicide prevention efforts, particularly the simple inability to get suicidal patients into the proper crisis beds.

Defendants offer a chart, Defendants' Exhibit D-1236 prepared by Dr. Robert Canning, for the proposition that suicide rates are independent of population.  D-1236 shows CDCR population as constantly rising line, while bars showing each year's suicide rate go up and down.  This method of tracking annual suicide rates was specifically rejected by the *Coleman* Special Master's experts, Dr. Raymond F. Patterson and Dr. Kerry Hughes.  Defs.' Exh. D-1281 at 678 (discussing pitfalls of using annual rates of low-frequency incidents).

The "five-year moving average" on D-1236 shows that suicide rates move upward in conjunction with the prison population for every year after 2000.  *See* Defs.' Exh. D-1281 at 678 (greater reliability of five-year data).  The years before 2000 saw the initial deployment of staffing and treatment resources under *Coleman* remedy.  We infer that these new resources were effective at preventing suicides until they were swamped by out-of-control population growth.  *See* Defs.' Exh. D-1292 at 9-10 (crowding has caused a decade of previous gains in treatment capacity to slip away); Pls.' Exh. P-61 at 12 ("crisis in availability" of crisis beds a factor in 2005 suicides).

Plaintiffs' motions to strike Dr. Canning's declaration and to exclude Defendants' Exhibit 1236 are denied, and their objections, go to the weight of the evidence.

[49] Foreseeable is defined by the Special Master in his report on suicides as those cases in which available information about an inmate indicates the presence of a substantial or high risk for suicide, and requires reasonable clinical, custodial and/or administrative intervention.  Assessment of the degree of risk, whether high, moderate or low to none, is an important component in determining foresee ability.  Pls.' Exh. P-58 at 3.

-86-

since 2002, the percentage of "most probably foreseeable and/or preventable" suicides has never been below 70 percent. Pls.' Exh. P-58 at 8. Two court-appointed experts conducted a six-year study of 154 suicides from 1999 through 2004 and, in a published study, listed the major factors in foreseeable and preventable deaths:

> Major contributing factors in foreseeable or preventable deaths included inadequate clinical assessments, inappropriate interventions, incomplete referrals, missed appointments and appointments that were not rescheduled, unsupported diagnoses, failure to review records, assignments to inappropriate levels of mental health care, failure to provide protective housing, and the provision of inadequate or untimely resuscitation efforts.

Defs.' Exh. D-1281 at 680. We find clear and convincing evidence that these "major contributing factors" are themselves primarily caused by overcrowding. This is readily apparent in the cases of "failure to review records," "assignments to inappropriate levels of mental health care," and "failure to provide protective housing," as addressed elsewhere in this findings. The expert testimony in this case demonstrates that the other factors are also primarily caused by overcrowding, and that other overcrowding factors are at work as well.

Dr. Haney and Dr. Stewart testified that the probability of suicide increases with overcrowding because (1) overcrowding in prisons has been linked to widespread idleness and lack of purposeful activity; (2) mentally ill prisoners are more likely to be adversely affected by the forced intimate contact that overcrowded housing units require and may be far less adept at reading social cues, controlling their impulses, or regulating their emotional states; (3) the greater stress of severely overcrowded conditions "may overwhelm their already fragile coping mechanisms, creating fear and anxiety in what these prisoners experience as an increasingly unpredictable world" and as a result these prisoners are more likely to decompensate; (4) due to the influx of unprecedented numbers of prisoners in this

---

[50] Preventable is defined by the Special Master in his report on suicides as those cases in which the likelihood of a completed suicide might have been reduced substantially, had some additional information been gathered and/or some additional intervention(s) undertaken, usually as required in existing policy. Pls.' Exh. P-58 at 3.

1    overcrowded system, screening, monitoring and managing of psychiatric symptoms is reduced;

2    (5) prisoners living through overcrowding caused-lockdowns are not provided with enhanced

3    mental health services or out of cell time and can experience difficulty coping;[51] and

4    (6) overcrowding impacts negatively on medication management, staffing shortages, and bed

5    and treatment space shortages that pervade the CDCR prisons.  Haney Report at ¶¶ 55, 60, 63,

6    172, 354, 355, 356; Stewart Supp. Report at ¶¶ 13, 109-110.

7         We find by clear and convincing evidence that overcrowding is the primary cause of

8    failures in the mental health system that prevent prisoners at risk of suicide from receiving

9    minimally adequate care that could save their lives.

10              **4.    Office And Treatment Space**

11        It is undisputed that all of the 33 state prisons, including even the newest prison which

12   opened in 2005, were built with little or no regard for medical office and treatment space.  It is

13   important to explain the significance of this fact – even assuming 100 percent of capacity, the

14   prisons were simply not constructed with adequate medical and mental health treatment space

15   in mind.  While this would pose a significant problem if the prisons were at capacity, it creates

16   a crisis when nearly twice as many prisoners are packed into California's prisons as they were

17   intended to house.  The *Coleman* Special Master described the problem as follows:

18              The growing problems [with mental health care] reflect the impact
                of overcrowding.  The sheer number of inmates needing all sorts of

19

20   ───────────────────────
     [51] Dr. Haney discusses several suicides that occurred on Facility C at Salinas Valley during

21   lockdowns. Haney Report at ¶¶ 169-171.  In the CDCR Suicide Reports, the reviewer mentions
     the lockdowns and the difficulty the prisoners had coping with them.  Inmate BB had a history

22   of suicidal ideation and "seemed to find lock-down conditions difficult, as he tended to utilize
     mental health services primarily when he was in ASU, SHU and the modified program."

23   Haney Report at ¶ 169 (citing Pls.' Exh. P-444 at 000110).  Inmate GG was a 20-year-old

24   housed on Facility D: "His facility was in [sic] frequent and prolonged modified lockdowns
     during his time at SVSP, and had been on hard lockdown since July 14, 2005, and no

25   telephone calls or visits were permitted to any inmates during this time.  According to his
     cellmate, this lockdown situation was difficult for Inmate GG who had a lot of family support

26   and contact" from which he was cut off during lockdowns.  Haney Report at ¶ 170 (citing  Pls.'

27   Exh. P-472 at 000422).

28

───────────────────────
-88-

[272055-1]

1    time out of their cells for all sorts of reasons puts incredible
      pressure on available space.  When gyms, dayrooms or all-purpose
2    rooms are filled with bunks and inmates, past accommodations for
      the use of these spaces for group activities for mentally ill inmates
3    evaporate.  The struggle for acquisition of a meaningful portion of
      healthcare clinical space, already able to meet just half the medical
4    demand, escalates relentlessly.
5

6    Pls.' Exh. P-35 at 7-8.

7          Robin Dezember, the Chief Deputy Secretary of the Correctional Healthcare Services

8    Division within the CDCR, explained that California officials failed to do a good job planning

9    sufficient resources to address current needs for medical and mental health care treatment

10   space until 2006.  Dezember at RT 856:19-857:6.  By that time, all of the current 33 state

11   prisons were built, with even the "newest CDCR prisons … designed with clinic space which

12   is *only one-half that necessary for the real-life capacity of the prisons*."  Defs.' Exh. D-1092 at

13   19 (emphasis in original).  CDCR's planned overcrowding left mental health care in an even

14   worse situation.  In the 1980s, CDCR had still not faced up to the prevalence of mental illness

15   in the prison population.  Defs.' Exh. D-1292 at 5.  Due to CDCR's failures to acknowledge

16   the presence of mental illness in its prisons, none of the 19 institutions built in the 1980s and

17   1990s were planned and built with any thought to space for mental health treatment.  *Id.*

18         Space shortages are system-wide and result in a vast array of problems, including the

19   following representative examples:  Clinicians are forced to provide counseling and group

20   treatment in non-confidential settings on dayroom floors in front of staff and other inmates

21   alike;[52] multiple clinicians share single offices or desks;[53] other clinicians have "offices" that

22

23

24   _____

25   [52] Stewart Supp. Report at ¶ 35.  During Dr. Stewart's tour of the D-5 unit at Salinas Valley, a
      unit that is supposed to provide inpatient ICF care to its patients, he observed a group therapy
26   session in progress on the dayroom floor where other custodial and clinical staff worked at
      nearby tables.  In other words, both staff and patients alike are forced to conduct their activities
27   out in the open without any visual or auditory privacy.

28

-89-

[272055-1]

are completely open in the middle of noisy and chaotic housing units;[54] clinicians are unable to conduct group therapy sessions for inmates housed in administrative segregation units;[55] one prison that is forced to conduct 40-50 percent of its EOP groups outside on the yard due to space shortages; and[56] clinicians are forced to conduct sensitive mental health evaluations at cell front without any visual or auditory privacy.[57]  Even at California Medical Facility at Vacaville (CMF), the least overcrowded prison in the entire CDCR system, staff still struggled for adequate office and treatment space to provide care.[58]  The DMH units at that prison, which are charged with providing the highest level of mental healthcare throughout the entire system, often had the use of only a single room to conduct treatment team meetings, case manager contacts, psychological testing, all patient group therapy and admission intakes into the unit. Stewart Supp. Report at ¶ 49.  CMF determined, after conducting an analysis of its mental health space shortages prison-wide, that it needs 16 group therapy rooms, 28 interview rooms, 4 recreation therapy rooms, 6 educational classrooms and "appropriate support space for staff" in order to meet the needs of its current mental health caseload, yet construction of those spaces will not be completed until 2012, at the earliest.  *Id.* at ¶ 50.

---

[53] Haney Report at ¶ 186 (describing the mental health programming building at MCSP where four psychiatrists share one standard sized office where medical records are also stored, seven or eight recreational therapists share another office, and six nurses share another small office); Pls.' Exh. P-337 at CCI-31, 32 (Facility 4A-8 Offices); Pls.' Exh. P-339 at MCSP-14B (picture of group cages), MCSP-15 (picture of clinical contact holding cage), Pls.' Exh. P-340 at NKSP-2B, 3 (Clinician Office Space), NKSP-26 (Reception and Receiving Clinician Office), NKSP-42 (Facility D4A Group Treatment Room).

[54] Haney Report at ¶ 197.

[55] Stewart Report at ¶¶ 51, 80, 103, 191.

[56] Stewart Supp. Report at ¶ 34.  That these groups are often canceled is no surprise given inclement weather, lockdowns, or modified programs.

[57] Stewart Report at ¶¶ 110, 119, 202; Stewart Supp. Report at ¶ 13, 61; Haney Report at ¶¶ 122, 126, 316.

[58] As of August 6, 2008, CMF was the least overcrowded of all 33 prisons at 133 percent occupied.  Pls.' Exh. P-65 at 2.

1    Lack of space hinders vital treatment.  *See, e.g.,* Haney Report at ¶ 248 (CCI prison

2  lacks any real office space for most staff and uses the chapel for mental health group therapy);

3  at ¶ 249 (Chief Psychiatrist in the Outpatient Housing Unit at CCI had to give up his office for

4  other staff; at ¶ 250 (CCI staff converted a bathroom for use as a clinician office in the OHU);

5  at ¶ 250 (psychologist office at CCI consists of cramped broom closet for two people); at ¶ 302

6  (WSP staff referred to their working space as "the homeless shelter," where several clinicians

7  shared single desks with only one phone and no computers; at ¶ 302 (six staff members at WSP

8  worked inside a very small area which included a storage closet converted into clerical office

9  space); at ¶ 269 (NKSP had to convert prisoner visiting room to clinical office space, with

10  desks arranged lengthwise in a long narrow rooms where 20 staff members had access to two

11  computers and one telephone); at ¶ 270 (NKSP attempted to use chapel for treatment space but

12  was thwarted by hot weather and lack of air conditioning in the unit, which can be very

13  dangerous for patients on psychotropic medications); at ¶ 273 (NKSP EOP unit forced to use

14  benches in the middle of the unit for group therapy of 20-24 patients with no confidentiality);

15  at ¶ 214 (supervising psychiatrist of the Correctional Treatment Center at SATF must share an

16  office with three other doctors, requiring him to do dictation when the other doctors are also

17  present in the room); Pls.' Exh. P-57 at 266 (at California Institution for Men, a major

18  reception center for Los Angeles, ten clinicians shared two small offices); Pls.' Exh. P-511 at 8

19  (at Valley State Prison for Women, dental, health and medical functions compete for space in

20  areas that were never intended to house and treat the current inmate-patient population).

21    Lack of space prevents vital prisoner screening and identification, a core function of a

22  mental health system.  In the reception centers at Valley State Prison for Women and

23  California Correctional Institution, a very busy Los Angeles area facility, clinicians must do

24  sensitive mental health screening on newly arrived prisoners in the dining hall or at one of the

25  tables on a dayroom floor.  Haney Report at ¶¶ 138, 246.  In some instances, prisons have

26  submitted proposals to headquarter staff for additional office and treatment space only to have

27  the proposals linger unanswered for many months or even years.  Haney Report at ¶ 210

28  (SATF); Stewart Supp. Report at ¶ 36 (SVSP); Pls.' Exh. P-27 at 4 ("inadequacies in the health

-91-

1  care system have resulted in tension and competition between the various providers over

2  resources, space, beds and the like").

3        **5.**      **Medication Management System**

4        Overcrowding is the primary cause of failures in the medication management system for

5  psychotropic medications.  The system has too many patients to allow proper administration of

6  medication with the existing staff and space.  Brewer Dep. at 128:2-11; Rowlett at RT 662:24-

7  663:8; 668:15-23 (staff are overwhelmed by the number of patients and simply do not have the

8  time or the resources to distribute medications properly; serious mistakes occur); 669:20-

9  670:9; 672:1-5 (nurses had 1 hour to distribute medication to 1,200 prisoners at Solano State

10  Prison on daily psychotropic medications).

11        Monitoring medication non-compliance is a critical part of an adequate mental health

12  medication management system and should include a clinical assessment of the reasons for

13  non-compliance, including the prisoner's insight and self-control.  *Coleman*, 912 F. Supp at

14  1305, 1309;  *see, e.g.,* Stewart Report at ¶ 105 (example of severely decompensated prisoner

15  refusing medications).  The current system is failing to properly address patient non-

16  compliance with medication.  Pls.' Exh. 57 at 343 ("[r]esponsiveness to medication non-

17  compliance was another area in which many institutions failed to comply with guidelines." )  A

18  functioning psychiatric medication system must include measures such as Direct Observation

19  Therapy ("DOT") and prompt follow-up on noncompliance.  Overcrowding is preventing the

20  implementation of these measures.  Stewart Supp.  Report at ¶ 94 (tracking failures in non-

21  compliance referrals); Stewart at RT 77:9-80:2 (overwhelming crowding causes rushed

22  medication delivery with no oversight, sometimes forcing patients to choose between

23  medication and meals), 122:7-24 (inadequate staffing for medication management).  Coping

24  strategies for crowding, such as delivery of medication through food ports and at cell doors,

25  and over-reliance on contract employees, prevent proper compliance measures.  Stewart Supp.

26  Report at ¶ 96; Pls.' Exh. P-57 at 78-80 (CMF).  The system is too overwhelmed to address

27  side-effects and adjust medications to increase the likelihood of patient compliance.  Stewart

28  Report at ¶¶ 122, 144; Stewart Supp. Report at ¶¶ 48, 96

1    Defendants' data shows that almost 80 percent (222 out of 279) of the people admitted

2  to the Department of Mental Health have no detectable level of psychiatric medication in their

3  systems despite having prescriptions for medications.  Defs.' Exh. D-1275 at 1.  Victor

4  Brewer, the head of the DMH programs at CMF-Vacaville and Salinas Valley State Prison,

5  testified that DMH has continued to monitor the non-compliance rates and that they have

6  continued or even worsened since the 80 percent report.  Brewer Dep. at 126:5-127:1 (current

7  statistics show that 83 percent of the patients are not medicated).

8    Defendants contend that medication deficiencies are caused not by overcrowding, but

9  instead by the lack of a computerized pharmacy system.[59]  The evidence does not support such

10  a finding.  A computer system cannot perform the vital tasks of actually administering

11  psychiatric medications and responding properly to noncompliance.

12    **6.    Staffing**

13    Sufficient and competent clinical staff is "the absolutely essential and indispensable

14  ingredient" for the provision of mandated mental health care.  Pls.' Exh. P- 39 at 185 (Special

15  Master's 17th Monitoring Report).  The Special Master found that in recent years, CDCR was

16  required to make "substantial additions of allocated clinicians to meet higher standards of care

17

18  ───────────────

[59] One of defendants' primary defenses regarding medication management issues during the

19  original *Coleman* trial in 1994 was their computer tracking system to identify inmates on

20  medication.  *Coleman*, 912 F. Supp. at 1310.  The *Coleman* Court found then, more than

fourteen years ago, that because the computer system was not networked in any way between

21  the prisons, it "provides no solution to the significant problems that occur when inmates on

psychotropic medication are transferred from one institution to another."  *Id.*  Such transfers,

22  because of overcrowding, happen now more than ever before.  *See, e.g.,* Pls.' Exh. P-27 at 2

23  ("One of the consequences of overcrowding has been extraordinary movement of prisoners

between and among prisons…the rapidity of movement between prisons is continuing to create

24  chaos in the health care system.").

25    In any event, the record is void of any explanation as to why defendants have been unable

to implement a networked medication tracking system in the fourteen years since the *Coleman*

26  trial.  Dr. Packer, a psychologist and defendants' only expert witness on mental health care in

the prisons, did not offer any opinion concerning the adequacy of the psychiatric medication

27  management system.

28

───────────────

-93-

1  for the expanding relative size of the mental health caseload with the steadily rising overall

2  population." Pls.' Exh. P-35 at 10. Clinical vacancy rates for the mental health programs,

3  however, have worsened significantly. As of August 2008, defendants were unable to fill

4  system-wide shortages in every mental health care position, including 121.65 vacant psychiatry

5  positions (out of 298.70 positions, 40.7% vacancy rate), 277.60 vacant psychologist positions

6  (out of 920.40 positions, 30.2% vacancy rate), 326.61 vacant "other mental health clinical

7  staff" (out of 1253.30 positions, 26.1% vacancy rate) and 229.25 vacant "other support staff"

8  (out of 534.40 positions, 37.6% vacancy rate) yielding a total of 955.11 vacant mental health

9  program vacancies in August 2008 and an overall vacancy rate of 31 percent. Pls.' Exh. 245 at

10  900131.

11       The clinical staffing shortage, however, is even worse than this data shows as

12  defendants have concluded that they require a minimum of 407.7 additional mental health staff

13  based on a "Workload Study" of necessary mental health care functions and tasks. Pls.' Exh.

14  P-183 at DEFS014447-DEFS014448, DEFS014450. In a 2008 request to the Legislature for

15  the 407.7 positions, defendants concluded that "current [staffing] resources are insufficient to

16  comply with the required levels of care for mentally ill inmates," and that those shortages mean

17  that *Coleman* class members "suffer needless extended and medically harmful delays accessing

18  necessary psychiatric care." *Id.* at DEFS014449 (existing mental health program "is

19  understaffed, significantly overworked, and lacks a quality assurance program, places inmates

20  and inmate-patients at a high risk, and the State, CDCR, and key decision-makers in danger of

21  being found in contempt of court"). The Work Load Study apparently underestimates several

22

23

24

25

26

27

28

-94-

[272055-1]

deficiencies in mental health clinical staffing.[60]  Delivery of mental health care also depends on sufficient non-medical custody staff to provide security, escorts, and other services, which are inadequate for both medical and mental health care at the current population levels.  *See supra* at III; *see also* Haney at RT 309:3-310:10 (staffing shortage for escorts to mental health visits is a huge problem that competes with lack of space as most problematic consequence of overcrowding).  Robin Dezember, Chief Deputy Secretary of the Correctional Healthcare Services Division of CDCR, testified that an appropriate vacancy rate for a mental health care system is between eight and ten percent.  Dezember RT at 896:21-24.  CDCR's clinical staffing vacancy rate remains greater than 30 percent, without including the additional workload study positions.  Pls.' Exh. P-245 at 900131.

      As a result of these significant, system-wide vacancies, CDCR relies on registry staff to fill a portion of their vacancies.  Pls.' Exh. P-245 at 900133 (showing the monthly registry usage system-wide by mental health classification).  The use of registry or contract clinical staff, however, has itself caused significant problems in the delivery of mental health care.  Stewart Supp. Report at ¶ 13 (reliance on contract and registry clinicians interferes with continuity of care); Stewart Report at ¶ 127 (significant problems associated with use of clinical registry staff, including continuity of care, lack of staff commitment and high turn-over reported by SVSP Health Care Manager).  And even with the use of registry clinicians, CDCR was unable to fill critical psychiatry positions at seventeen prisons.  Pls.' Exh. P-57 at 329-330 (three prisons had functional vacancy rates in the range of 11 to 15 percent, eight in the range of 22 to 38 percent, three in the range of 41 to 66 percent, and three in the range of 88 to 100

---

[60] For example, defendants' assumed in the study that only 30 percent of 3CMS patients are prescribed psychotropic medications, while the actual percentage is likely closer to 80 percent.  Pls.' Exh. P-485 at DEFS027308.  This erroneous assumption resulted in an underestimation of 11 staffing positions for one prison alone.  *Id.*; *see also* Dezember at RT 905:17-23 (admitting that defendants have not even established additional positions that they need in light of the Special Master's comments); *see also* Chaiken Dep. at 139:21-140:24 (workload study should result in more than 400 positions; discussed the process), 149:6-9 (workload study did not include staffing for the new Reception Center Enhanced Outpatient Program).

1  percent vacant).

2      Crowding not only overwhelms the existing clinical staff, but is the primary cause of the

3  system's inability to add enough new staff.  Dr. Stewart, who has 26 years of experience with

4  community and correctional mental health staffing, opined that "it is extremely difficult to

5  recruit and retain good clinical staff in a correctional environment in the best of times.  In

6  overcrowded systems, with the attended violence, high acuity, shortages of office space, these

7  ordinary recruitment problems are compounded and become significantly more difficult to

8  overcome."  Stewart 11/9/07 Report at ¶ 41; Stewart at RT 81:6-11 (clinical staff are placed in

9  untenable positions due to the overwhelming population pressures they face); Stewart at RT

10  130:16-21 (seven clinicians at DVI shared one small office that used to be a broom closet).

11      The Receiver concluded and the Court finds that "[m]any CDCR prisons are unable to

12  sustain the basic delivery of medical, mental health  … services because of limited staffing

13  (clinical and custody) and an overwhelming number of prisoner/patients who require care."

14  Pls.' Exh. P-26 at 30.

15                          **7.    Mental Health Care Records**

16      Plaintiffs' and defendants' experts agreed that overcrowding is the primary cause of the

17  CDCR's inability to provide a constitutional adequate medical record system for mental health

18  care.  Defendants' sole mental health expert, Dr. Packer, concluded that overcrowding is the

19  "primary factor" related to medical record deficiencies.  Defs.' Exh. D-1019 at 23; *id.* at 19-20

20  (medical record problems are the "direct effect" of overcrowding).  At trial, Dr. Packer

21  testified that "the sheer number of inmates in the system is the most direct cause resulting in

22  the difficulty of CDCR to manage their medical records appropriately."  Packer at RT 1119:2-

23  5.  Plaintiffs' expert, Dr. Stewart, similarly concluded that overcrowding impedes defendants'

24  ability to provide a constitutionally adequate medical records system.  Stewart Supp. Report at

25  ¶¶ 13, 102.  Dr. Stewart reviewed approximately 60 medical records during his two rounds of

26  tours in November 2007 and July and August 2008, and he consistently found the records to be

27  grossly inadequate and disorganized, with loose papers floating around in the files.  Stewart

28  8/15/08 Supp. Report at ¶ 102.  He also found records for several different patients misfiled

1    together in a single patient's file.  *Id*.

2        On July 28, 2008, during a site inspection at the Substance Abuse Treatment Facility

3    (SATF) in Corcoran, plaintiffs' expert, Dr. Haney, and defendants' expert, Dr. Packer,

4    discovered misfiled records of various prisoners inside the unit health record of Prisoner VV, a

5    mentally ill patient on suicide watch in the mental health crisis bed unit.  Haney 8/15/08 Report

6    at ¶ 236; Packer at RT 1119:25-1120:7.  This type of medical record disorganization was not

7    unusual at SATF, a prison that was operating at 209 percent of its design capacity.  Haney

8    8/15/08 Report at ¶ 206; Pls.' Exh. P-57 at 154.[61]  The problems are also consistent with the

9    *Coleman* Special Master's documentation of ongoing and significant system-wide

10   inadequacies, including filing backlogs that measured up to nine feet, routine mental health

11   contacts that occurred without unit health records, records that were chronologically

12   disorganized, and unit health records containing documentation pertaining to the wrong

13   patients.  *Id*. at 16, 17, 43, 50,[62] 62, 68, 120, 154,[63] 169, 176,[64] 200-1, 221,[65] 232,[66] 258, 267,

14   274, 314, 321.

15

16   [61] SATF:  "Despite the use of overtime, UHR organization continued to be poor…UHRs often
     contained documentation belonging to the wrong inmate and that paperwork was regularly
17   filed in the wrong section of the UHR.").

18   [62] HDSP: "A substantial filing backlog, measuring some eight to nine feet, rendered UHR
     audits meaningless and often left contract clinicians without the guidance of the most current
19   orders and progress notes."

20   [63] SATF: "Despite the use of overtime, UHR organization continued to be poor…UHRs often
     contained documentation belonging to the wrong inmate and that paperwork was regularly
21   filed in the wrong section of the UHR.").

22   [64] ASP: "Staff reported and chart reviews showed that UHRs were problematic, containing
     misfiled and improperly filed items.  As a result, staff experienced major problems locating
23   relevant clinical notes in medical records."
24

25   [65] WSP: "Medical records remained noncompliant.  At the time of the monitor's visit, there
     were seven to eight feet of unfiled material.  UHRs were disorganized, and reviewed charts
26   contained information belonging to other inmates."

27   [66] KVSP: "Medical records continued to be in disarray.  Items were misfiled and documents
     were rarely in chronological order."

28

-97-

1    The medical record deficiencies directly inhibit the ability to deliver appropriate mental

2    health care.  Defs.' Exh. D-1019 at 20; Stewart 8/15/08 Supp. Report at ¶ 102 (accurate, well-

3    organized records are a critical element of mental health care).  At North Kern State Prison

4    Reception Center, which typically receives somewhere between 70 and 150 new prisoners, five

5    days a week, clinical staff reported that they, "'try to figure it out – a hundred a day – who is

6    mentally ill, who isn't.  We don't get the information we need from county and there are just

7    too many of them.'"  Haney 8/15/08 Report at ¶ 279.  At Wasco State Prison Reception Center,

8    a psychiatrist described similar difficulties in screening prisoners without records:  "'We don't

9    really catch all the people who need 3CMS and EOP that come in – the psych screening is so

10    brief.  I don't really have records.  [I] never have them before I see [a prisoner].'"  Haney

11    8/15/08 Report at ¶¶ 317-318.[67]

12    Although defendants' expert, Dr. Packer, testified that overcrowding was the primary

13    factor related to medical record deficiencies, it was his opinion that the most reasonable

14    solution to the medical record deficiencies is improved information technology, "such as an

15    electronic medical record, or at a minimum, enhanced ability to track information in an

16    accessible data base."  Defs.' Exh. D-1019 at 20; Packer at RT 1158:12-21.  The *Plata*

17    Receiver has plans for such a system, but there is no existing timeline for completion of this

18    massive project and no firm deadlines.  Defs.' Exh. D-1100 at 63.

19
20    **V.    THE EVIDENCE IS CLEAR AND CONVINCING THAT NO OTHER RELIEF
        WILL REMEDY THE VIOLATIONS**

21    Having found that crowding is the primary cause of the constitutional violations, we

22    must now consider the second condition precedent for a prisoner release order, *i.e.*, whether

23    "no other relief [other than a prisoner release order] will remedy the violation of the Federal

24

25    [67] The 1995 *Coleman* decision ordered defendants to "'develop a plan for obtaining medical
      records from county jails for inmates on their initial admission to the California Department of

26    Corrections.'"  *Coleman*, 912 F. Supp. at 1314 (quoting the Findings and Recommendations);
      *id.* at 1315 (fully adopting the Magistrate's recommendations regarding medical records).

27    Fourteen years later, defendants remain incapable or unwilling to implement this order.

28

1  right." 18 U.S.C. § 3626(a)(3)(E)(i), (ii).

2       In considering this second prong, we are guided by the statute's broad definitions of key

3  terms. The PLRA defines "relief" as "all relief in any form *that may be granted or approved*

4  *by the court*, and includes consent decrees but does not include private settlement agreements."

5  18 U.S.C. § 3626(g)(9) (emphasis added). A "prisoner release order" is defined broadly as

6  "any order, including a temporary restraining order or preliminary injunctive relief, that has the

7  purpose or effect of reducing or limiting the prison population, or that directs the release from

8  or nonadmission of prisoners to a prison.…" 18 U.S.C. § 3626(g)(4). This definition of a

9  release order substantially constrains our "no other relief" inquiry, because this Court can

10  consider only the small universe of remedies that would address the violations but would not

11  have neither the purpose nor the effect of lowering or limiting the prison population. Thus, the

12  available "other relief" then includes, but is not limited to, "such remedies as increasing the

13  number of staff, improving staff training and acquiring more or better medical equipment."

14  Order on Motion for Reconsideration and/or Clarification and Order Consolidating Republican

15  Assembly and Senate Interventions, November 9, 2007, at 4 (*Plata* Docket No. 925-2,

16  *Coleman* Docket No. 2521).

17       As set forth below, the evidence shows that the overcrowding is so pervasive and

18  crippling to the prison system as a whole that defendants will be unable to provide

19  constitutionally adequate medical and mental health care until the number of prisoners is

20  substantially reduced. After carefully weighing the extensive testimony and evidence

21  regarding the remedies in this case, we find that plaintiffs have proven by clear and convincing

22  evidence that no relief other than an injunction requiring population reduction will remedy the

23  ongoing constitutional violations.

24      **A.**    **Defendants Propose No "Other Relief" To Correct The Constitutional**
           **Violations**

25

26       Defendants have presented no evidence, nor have they made arguments, regarding relief

27  that this Court could order to remedy the constitutional violations as an alternative to a prisoner

28  release order. Although defendants have failed to identify "other relief" to address the

constitutional violations, we will consider each of the defendants' proposed "alternatives" to a prisoner release order.

**B.    Defendants Suggested Alternatives To A Prisoner Release Order Lack Merit**

Defendants claim that a population reduction order is unnecessary because "the continued efforts of the *Plata* Receiver to improve the delivery of medical care and of the CDCR to improve the delivery of mental health care, under the direction of the *Coleman* Special Master, … will remedy the alleged problems with medical and mental health care." Defs.' Joint Trial Brief, November 3, 2008, at 27 (*Plata* Docket No. 1759, *Coleman* Docket No. 3262). Defendants further assert that any order is unnecessary because the CDCR has its own plan to address overcrowding that includes transferring prisoners, instituting parole reform and rehabilitative programming to reduce recidivism, and building additional beds under Assembly Bill 900. *Id.*

To the extent they address whether "other relief" will remedy the constitutional violations, defendant intervenors generally echo defendants, except that defendant intervenors also propose that Senate Bill 618 as a possible remedy. For the reasons set forth below, we find that no relief other than a population reduction order will remedy the constitutional violations.

**1.    Neither The Defendants Nor The Special Master Nor The Receiver Can Implement Meaningful Reform Until The Population Is Reduced**

It is undisputed that the level of crowding in the California prison system is unprecedented. Haney at RT 297:1-17 ("190 percent of capacity … is almost an unheard of number, an unheard of amount of overcrowding.…"); Lehman at RT 286:23-287:1 (this level of overcrowding "just doesn't exist" in other states). This Court has already found that overcrowding is the primary cause of the constitutional violations. Based on the evidence set forth below, the Court further finds that reducing the crowding is an absolute prerequisite for remedying the violations and that efforts by the Receiver, the Special Master and the defendants will fail unless the population is reduced.

-100-

1    Jeanne Woodford is a former *Plata* and *Coleman* defendant as Secretary in charge of all

2    California prisons and, in that capacity, was responsible for attempting to comply with federal

3    court orders, including the orders in these actions.  Ms. Woodford testified from her extensive

4    knowledge of and experience in the California system that, unless the CDCR reduced

5    overcrowding, it would "never" be able to provide or sustain constitutionally adequate medical

6    or mental health care.  Woodford at RT 385:3-10.  She further described how health care

7    problems would have been solvable at San Quentin when the prison was not overcrowded, but

8    because of overcrowding cannot now be solved.  Woodford at RT 377:5-18.

9    Ms. Woodford's testimony was highly consistent with the testimony of three other

10    correctional experts who were the former or current directors of prison systems in Texas,

11    Pennsylvania, Maine and Washington.  Scott at RT 153:7-11, 180:3-11 (reducing population a

12    necessary preliminary step to get a handle on health care violations in California); Lehman at

13    RT 271:16 - 272:13 (population must be reduced, even with Receiver); Beard at RT 1583:15-

14    22 (reducing the population is "the only way" to fix the inadequacies regarding medical and

15    mental health care in California's prisons).

16    Dr. Shansky, himself a former consultant to the CDCR and federal court receiver for the

17    District of Columbia Jails' health care system, also testified similarly, stating that the CDCR

18    and Receiver "will be unable to address and resolve the critical medical care deficiencies until

19    the need for services within the system is significantly reduced."  Shansky Report at ¶¶ 3, 136;

20    *see also* Shansky Second Supp. Report at ¶ 119.  This is because overcrowding in the prisons

21    significantly interferes with and detracts from efforts to improve medical care.  Shansky Third

22    Supplemental Report at ¶ 3; Shansky Report at ¶ 138 (unless overcrowding addressed, CDCR

23    locked into "crisis response" approach where it can focus only on putting out "fires"); *see also*

24    Receiver's Tenth Tri-Annual Report at 3 ("Instead of working to save lives and implementing

25    cost cutting initiatives, the Receiver has been forced to utilize his limited resources to 'put out

26    fires' created by the state.").

27    To counter this evidence, defendants presented two experts, Dr. Ira Packer and Dr.

28    David Thomas, who testified generally that a constitutional level of care can be achieved in an

-101-

1   overcrowded system.   This is not persuasive, because the question still remains whether

2   constitutionally adequate care can be provided in a system as drastically overcrowded as

3   California's.  *See, e.g.*, Lehman at RT 286:15-287:1 (former head of three state systems opines

4   that it is possible to provide constitutional care in an overcrowded system, but not in a system

5   as overcrowded as California's).

6        Moreover, Dr. Packer qualified his opinions in ways that made them unconvincing to

7   support defendants' position that no population reduction order is needed.  Although he

8   testified that he was able to provide adequate mental health care under crowded conditions, Dr.

9   Packer acknowledged that "the most effective procedure we had was that we provided mental

10  health services at the courts, and *we diverted mentally ill people away from the jail.*"  Packer at

11  RT 1086:6-23 (emphasis added); *see also* Packer at RT 1087:4-9.  Thus, Dr. Packer's system

12  was able to provide adequate care because his system operated under the type of prisoner

13  release order that plaintiffs seek in this action.  Notably, Dr. Packer also agreed that

14  overcrowding is the primary cause of the constitutional violations in defendants' Reception

15  Centers, further strengthening the conclusion that population reduction is necessary for at least

16  part of the California system.

17       Dr. Thomas testified that adequate medical care can be provided in overcrowded

18  prisons, based in part on his experience in Florida.  Defs.' Exh. D-1015 at ¶¶ 6, 25.  The

19  Florida system, however was subject a general cap limiting population to 150% of design

20  capacity and a cap limiting population in medical and mental health units to *design capacity*.

21  Thomas at RT 1250:4-1251:1.  In any event, the Court finds that Dr. Thomas is not a credible

22  expert witness.  *See supra* at Section III.

23       Defendants' experts' testimony, rather than demonstrating that California can provide

24  constitutional health care with severe overcrowding, further illustrates the critical need to limit

25  the population.  The overwhelming weight of this evidence shows that California cannot

26  reform its medical and mental health care systems without first addressing the overcrowding

27  crisis.

28

1
2

**2.    Clear And Convincing Evidence Shows That The Receiver And Special Master Cannot Remedy Violations Without Population Reduction**

3    Defendants assert that a population reduction order is unnecessary because the Receiver

4    and monitoring by the Special Master will remedy the constitutionally inadequate health care

5    system.  This Court recognizes that the Receiver and the CDCR have achieved some

6    significant successes in improving certain aspects of health care, including the reduction of

7    physician and nursing vacancy rates at some prisons and lowering the overall mortality rate.

8    However, the fact that, even after the infusion of massive resources and, in *Coleman*, the

9    passage of more than ten years, the defendants have still been unable to implement a

10    constitutional level of care, indicates that they will not be able to reach a constitutional level of

11    care without addressing the primary cause of the violations by means of a population reduction

12    order.  *See, e.g.,* Haney at RT 317:24-318:7 (overcrowding of the degree, magnitude and

13    duration seen in California has incapacitated the system's ability to deliver constitutionally

14    adequate care, despite years of court monitoring); Haney at RT 949:10-20 (must address

15    overcrowding directly since the other reform efforts have run their course); Stewart

16    Supplemental Report at ¶¶ 120 (any "tentative progress" with reform has been "overwhelmed

17    by the massive population expansion," despite "more than ten years of intensive monitoring

18    and other remedial efforts"), 122 (more court orders such as have already been issued will be

19    ineffective due to overcrowding).

20    Both the Receiver and the Special Master themselves acknowledge overcrowding is a

21    barrier to lasting improvements.  Defs' Exh. D-1100 at 80 (Receiver's Ninth Quarterly Report)

22    ("The progress which has been made to date will be for naught unless we are able to make

23    permanent improvements to CDCR's facilities.  Right now, the facilities are simply

24    inadequate, given CDCR's population, to sustain for the long-term the improvements we are

25    seeing"); Pls.' Exh. P-35 at 16-17 (*Coleman* Special Master's Response to Court's May 17,

26    2007 Request for Information) ("[o]ver the past 11-plus years, much has been achieved, and

27    many of the achievements have succumbed to the inexorably rising tide of population, leaving

28    behind growing frustration and despair").  We find that the progress to date in both *Coleman*

-103-

1    and *Plata* is extremely fragile and highly dependent on a stable and reduced population.

2            **a.    Defendants Oppose The Receiver's Work**

3            Defendants have argued that this Court should not order population reduction, but

4    should instead permit the *Plata* Receiver to continue his work to ameliorate the

5    unconstitutional conditions.  Defendants' argument is remarkable, as on the one hand, they

6    urge this Court to defer to the Receiver, while on the other hand, their litigation has prevented

7    the Receiver from implementing the strategies that he and they have declared vital to

8    establishing a constitutional medical care delivery system.  Cate at RT 1690:6-22; *Plata v.*

9    *Schwarzenegger*, No. 08-17412 (9th Cir. Nov. 7, 2008) (order granting stay)[68]; *see also*

10   Receiver's Tenth Tri-Annual Report at 1 (Receivership "under attack from a variety of fronts,"

11   including defendants' refusal to work with the federal court to develop funding for

12   construction).

13           The Receiver's "Turnaround Plan of Action" outlines his major goals.  Defs.' Exh. D-

14   1133.  Because medical and mental health care issues overlap, the Receiver, through a series of

15   "coordination agreements," has primary responsibility to remedy certain deficiencies that

16   affect both the *Plata* and the *Coleman* classes, including the provision of adequate office and

17   treatment space at existing facilities.  Receiver's Tenth Tri-Annual Report at 16.

18           At the heart of the Receiver's plan is a construction plan that includes 10,000 badly

19   needed specialized medical and mental health care beds, as well as clinical upgrades.[69]  Defs.'

20   Exh. D-1100 at 72 (Receiver's Ninth Quarterly Report) ("prison upgrade construction and the

21   construction of new healthcare facilities is the very heart of the [Turnaround] Plan"); *see also*

22

23   _____
     [68] We take judicial notice of this document pursuant to Fed. R. Evid. 201 and Plaintiff's
24   Request for Judicial Notice, Exh. I.

25   [69] The 10,000 bed shortage was identified by two expert consultants that California hired,
     including Navigant Consulting to study mental health care shortages and Abt Associates to
26   study medical bed shortages. Pls.' Exhs. P-118 and P-150.  Defendants do not contest the
     magnitude of the bed shortage.  *See* Dezember at RT 885:10-886:7, 887:18-888:25, 943:17-
27   944:3.

28

-104-

1  Dezember at RT 862:18-863:3 (admitting that the CDCR needs "a massive construction

2  program of new high-level intense beds to meet the needs of the population" as well as a

3  "prison by prison" program to build adequate treatment and office space).  The Receiver has

4  found that he needs to upgrade spaces in existing prisons and build sufficient new beds to

5  remedy the severe mismatch between medical resources and the number of patients requiring

6  those resources.  Without such construction, the constitutional violations will continue and

7  "prisoners will continue to die unnecessarily."  Defs.' Exh. D-1099 at 46 (Receiver's Eighth

8  Quarterly Report).

9              **b.       The Receiver's Plan Will Take Years**

10         Under the best of circumstances, with necessary funding, the Receiver's 10,000 beds

11  would have been completed in 2013 at the earliest.  Defs.' Exh. D-1100 at 65 (Receiver's

12  Ninth Quarterly Report).  Due to a lack of funding, neither the scheduled February 2009

13  ground-breaking nor the July 2013 completion date for the 10,000 bed project will be met.

14  Exh. H to Plaintiffs' Request for Judicial Notice at 99 (Receiver's Tenth Tri-Annual Report).

15  The medical clinic and related facilities construction upgrades necessary at all 33 prisons are

16  now scheduled for completion in December 2012, not January 2012 as was originally planned.

17  *Id.* at 94.  Further, the "actual construction upgrade program for all prisons" is behind even this

18  revised schedule due to the state's failure to provide funding for that program.  *Id.* at 95.

19         Moreover, the overcrowded conditions are severely impacting the Receiver's capacity

20  to move forward with his Plan.  Diversion of medical and other staff to respond to a crisis

21  caused by overcrowding in four Central Valley prisons "will affect timelines of the Turnaround

22  Plan of Action."  *Id.* at 110-11.  The Receiver has also had to use his limited resources not to

23  improve care but instead to put out other related "fires" such as the failure of prison officials to

24  provide water to Kern Valley state Prison inmates that is free of unacceptable levels of arsenic.

25  *Id.* at 3.   The Receiver similarly reports a "very limited" ability to properly monitor in-state

26  facilities housing prisoners due to the need to reallocate resources to investigate and fix

27  problems with medical care at out-of-state facilities.  *Id.* at 78.  The Receiver also has reported

28  that addressing medical care problems at an out-of-state prison housing California prisoners

-105-

1   "had a serious negative impact on the office of the Receiver, drawing clinical personnel away

2   [from] other important projects and delaying 'in-state' remedial efforts.  In essence … valuable

3   clinical hours have been devoted to helping a private prison … rework its medical delivery

4   system … in order to keep the out of state transfer process from collapsing."  Defs.' Exh. D-

5   1100 at 49 (Receiver's Ninth Quarterly Report).

6

7           **c.**     *Coleman* **Defendants Have Proven Unable To Obtain Necessary Treatment Resources**

8         The *Coleman* defendants have likewise proven unable to carry out critical remedial

9   measures to achieve constitutional mental health care.  The *Coleman* defendants are under

10  numerous court orders to remedy the nearly 5,000 bed shortage of specialized mental health

11  care placements for higher levels of care.  *See, e.g.,* Pls.' Exhs. P-274, P-275, P-296, P-303, P-

12  306, P-310, P-425, P-426, P-467, and P-484.  Defendants' current plan to comply with these

13  orders, in light of the decision to oppose the Receiver's 10,000 bed projects, is to revert back to

14  their August 2007 plan to build "Consolidated Care Centers" at five prisons, with each one

15  taking between four and one half and six years from initial funding to completion.  Defs.' Exh.

16  D-1139-1 at 10.  In 2007, defendants estimated that construction of all five care centers would

17  not be completed until 2013.  *Id.* at 12.  Defendants admit that they have lost a year or more on

18  the scheduled completion (Dezember at RT 895:14-16), meaning that defendants will not

19  create adequate mental health capacity until 2014 in the best-case scenario, even assuming the

20  Legislature promptly approves and funds the bed plans[70]; a questionable assumption at best.

21  Defendants did not present evidence at trial as to how they intended to replace the other major

22  Receiver construction program:  the improvements in medical and mental health treatment and

23  office space at each of the 33 prisons.  Funding for that construction program has also been

24  _____

25  [70] Defendants acknowledge that there is no Legislative approval to construct any of the five
     CCC's.  Defs.' Exh. D-1139-1 at 10 n.11.  Not a single staff member is working on the August

26  2007 bed plan projects, however, "except on individual projects, such as preliminary planning

27  for the 64-bed at CMF and the preliminary planning for the 50-bed at CMC and other various
     small projects."  Dezember at RT 894:15-20.

28

-106-

1    halted by defendants.

2        Neither CDCR's Chief Deputy Secretary for Health Care Services nor defendants'

3    mental health expert knows the date by which any of the necessary construction projects--the

4    Receiver's 10,000 bed project, the mental health beds from defendants' 2007 bed plan or the

5    33 prison office and treatment space construction program--will be approved, much less

6    funded or constructed. Dezember at RT 896:8-20; Packer at RT 11427:16-1128:10; *see also*

7    Kernan at RT 1920:3-13.

8        As to the other aspects of the medical care system, including staffing, medication

9    management, and medical records, the evidence is overwhelming that the projects will take

10    years to complete if they can be implemented at all in this overcrowded system.

11        Reducing the general population is a necessary prerequisite to fixing the specialized

12    mental health programs. For the highest acuity programs, overcrowding relief is necessary, but

13    not in itself sufficient to bring about adequate care, due in part to the more intensive localized

14    staffing inadequacies in such programs. Pls.' Exh. P-35 at 15. Even when the population is

15    brought under control, additional measures, including construction and recruiting will be

16    necessary. Such measures, however, will not work if crowding is not brought under control.

17    Haney at RT 955:15-20, 947:16-948:14.

18        Defendants have repeatedly demonstrated that they are incapable of moving forward

19    with due diligence or of obtaining the necessary support for their plans and actions. One DMH

20    official who participated in creating five of defendants' long-range bed plans, none of which

21    proceeded, testified that he was confident the most recent plan would go forward only because

22    the Receiver took it over. Brewer Dep. at 99:20-101:15. The *Coleman* defendants have been

23    unable, in the fourteen years since the 1995 injunction, to create adequate medical records or

24    medication management systems; as a result, the Receiver has assumed control of essential

25    parts of those efforts. Defs.' Exh. D-1299 (Order adopting coordination agreement regarding

26    pharmacy and information technology). In short, defendants have been unable to bring the

27    mental health care system up to constitutional standards for more than a decade despite

28    concentrated efforts by the Special Master's team of nationally-recognized experts.

-107-

1    Defendants have proffered no persuasive evidence as to why progress is suddenly on the

2    horizon.

3            **3.    Clear And Convincing Evidence Shows That Defendants' Plan To**
                      **Address Overcrowding Cannot Remedy Constitutional Violations**
4                     **Absent A Population Reduction Order**

5            Defendants also claim that a population reduction order is unnecessary because they

6    have a plan to address overcrowding.  Defendants' plan to address the crisis has four

7    components: prison construction, out of state transfers, parole reform, and rehabilitative

8    programming.  Cate at RT 1678:10-1680:3, 1688:4-1689:4, 1689:10-24, 1692:25-1693:2; Pls.'

9    Exh. P-262 at DEFS022010-14.   In addition, the Governor introduced several prison

10   population reduction measures in the November 2008 special session: parole reform (no

11   supervision for certain parolees), additional time credits for certain prisoners, and increasing

12   the statutory monetary threshold for determining whether property crimes could be prosecuted

13   as grand theft.  Cate at RT 1694:19-1698:9.  The Court addresses each of these proposed

14   solutions to overcrowding in turn to determine whether it constitutes "other relief" than a

15   prisoner release order that could remedy the medical and mental health violations.

16            **a.    Prison Construction**

17           Defendants' plan to build prison capacity involves infill beds (at existing prisons) and

18   reentry beds (at new, smaller prisons to be located in the communities).  Pls.' Exh. P-262 at

19   DEFS022010-14; Pls.' Exh. P-316 at ¶¶ 7, 8.  Both infill and reentry beds are components of

20   the Public Safety and Offender Rehabilitation Services Act of 2007, commonly referred to as

21   Assembly Bill 900, or AB 900, which authorizes the construction of up to 40,000 new prison

22   beds.  *Id.* ¶ 6; Hysen Dep. at 19:20-24.

23           Although AB 900 became law in May 2007, not a single bed has been built.  Cate at RT

24   1679:11-1680:3; Spitzer at RT 2460:25-2461:5.  The state has not even reached the

25   preliminary plan stage for any construction.  Hysen Dep. at 31:15-21.  "Clean-up" legislation,

26   which was to have corrected flaws in AB 900 that prevented the state from moving forward,

27   did not pass until December 18, 2008, more than a year and a half after the bill became law.

28   Runner at RT 2734:11-20.  The Governor then vetoed it.  Pls.' Request for Judicial Notice,

1   Ex. C (Text of ABX1_10); Ex. D (Veto Message for ABX1_10).[71]  As a result, the state is

2   paralyzed and cannot move into the preliminary plan stage on any AB 900 construction.  Pls.'

3   Exh. P-750; Hysen Dep. at 31:15-21, 55:14-23; *see also* Cate at RT 1692:20-24 (failure of

4   clean-up legislation a "major setback" to strategy to reduce overcrowding).

5        Even if the state were to repair the flaws of AB 900 and restart its efforts, the most

6   optimistic estimates place occupancy many years away.  Construction of the first 3,000 re-

7   entry beds was not scheduled to be complete until fiscal year 2012/2013, but that schedule was

8   set before the clean-up legislation failed and construction efforts were frozen.  Pls.' Exh. P-262

9   at DEFS022015-16.  CDCR's planning and construction chief estimated in September 2008

10  that the earliest occupancy for the first 1,000 infill beds could be as early as the 2009-2010

11  fiscal year, but the remainder of the first phase of infill beds might not be occupied until June

12  2013.  Hysen Dep. at 43:15-22.  Again, that estimate was contingent on passage of the

13  necessary clean-up legislation.  Hysen Dep. at 131:12-18.

14       Moreover, the state's stated construction plans have already proven illusory.

15  Defendants have scaled back the entire building project from 40,000 beds to fewer than

16  30,000.  Hysen Dep. at 19:20-24, 23:10-15.  On infill beds, AB 900 calls for 12,000 to be

17  finished in 2009 as "Phase I" beds.  Hysen Dep. at 20:24-21:1, 23:21-24:10; Pls.' Exh. P-316

18  at ¶ 7.  As of September 2008, the number of infill beds in Phase I had been reduced to 6,700

19  and they were not scheduled to be occupied until possibly June 2013.  Hysen Dep. at 43:15-22.

20  Again, that estimate was made before the failure of the clean-up legislation in December 2008

21  froze CDCR's construction efforts.  Pls.' Exh. P-750; Hysen Dep. at 55:14-23.  Regarding

22  reentry beds, as of September 2008, CDCR's planning and construction chief did not even

23  know where any of them, with the exception of the first 500, would be located and did not

24  know when any but those first 500 would be built.  Hysen Dep. at 118:19-21, 119:14-18.  She

25  estimated it would be several years to occupancy from the time CDCR recommends the

26

27  ───────────────
    [71] We take judicial notice of these documents pursuant to Fed. R. Evid. 201 and Plaintiffs'
    Request for Judicial Notice.

28

[272055-1]

1  purchase of the land.  Hysen Dep. at 120:7-18.  Again, however, the acquisition process cannot

2  move forward without legislative action.  Pls.' Exh. P-750.

3       Even if the clean-up legislation becomes law and the state gets the necessary funding to

4  proceed, many factors could intervene and slow or stall the process further.  Environmental

5  impact reviews have not been completed for any of the proposed building sites.  Hysen Dep. at

6  37:20-38:16.  That process can stall prison construction for years, and has in fact done so in

7  California, with the construction of Kern Valley, the newest state prison.  Hysen Dep. at 55:24-

8  56:10.  Seismic retrofitting requirements could delay the building projects further.  Hysen Dep.

9  at 112:6-21.  The difficulty of obtaining prison building material typically delays such projects

10  as well.  Hyson Dep. at 38:17-25.

11       Community opposition has already been a significant problem in the siting of the

12  reentry prisons and threatens to hold up the building process even more.  *See, e.g.,* Meyer at

13  RT 2793:171-2794:3 (according to defendant intervenor, town of Madison up in arms about

14  locating reentry facility in community, issue still not resolved), 2793:8-11 (Yolo County

15  having difficulty placing reentry program).  According to defendant legislative intervenor

16  George Runner, it will be difficult to find sites for the reentry prisons.  Runner at RT 2750:20-

17  2751:1 (it is always a hurdle to site and locate reentry facilities in large cities), 2751:5-10

18  (difficult to place reentry facility near population centers in rural areas).  Jeffrey Beard, the

19  head of Pennsylvania's prison system, who has experience in this area, agrees.  *See, e.g.*, Beard

20  at RT 220:21-221:16 (siting prison construction in local communities is a serious problem).

21       Moreover, even if these beds are built, there is also no evidence that the in-fill beds

22  would either relieve overcrowding or improve medical and mental health care.  On the

23  contrary, the evidence demonstrates that in-fill beds would aggravate the effects of crowding

24  on health care delivery by adding more prisoners to already overcrowded prisons that lack

25  office and treatment space, with fraying infrastructure capabilities.  The Receiver found that

26  defendants' space allocations for health care services in the in-fill bed plan were "wildly

27  disparate, and in many cases obviously inadequate."  Pls.' Exh. P-26 at 36-37.

28       The Court heard persuasive testimony that the state's prison construction effort has not

and cannot provide a meaningful solution to the constitutional health care violations.

Defendant intervenor Jerry Powers stated that building prison capacity is not the total solution

to the crowding problem.  Powers at RT 1151:23-1152:2.  Wayne Scott, who as the head of the

Texas prison system oversaw prison construction as well as extensive population reduction

measures (Scott Report at ¶¶ 4-5; Scott at RT 180:21-25), testified that CDCR's construction

plan was flawed because it provided no relief for many years to come and because he could

have no confidence that the state, given its record, would actually fund and carry out the plan.

Scott Supplemental Report at ¶¶ 14-17, 20.  Jeffrey Beard, the current Secretary of the

Pennsylvania Department of Corrections, agreed, noting that although Pennsylvania built

prisons, it is not an adequate solution to the crisis in California.  Beard at RT 254:9-256:8.

According to Dr. Beard, construction will take years, cost "huge amounts of money," and may

not even work, given the state's performance record.  Beard at RT 219:11-25; *see also* Beard at

RT 1575:19-1577:19, 1586:17-1587:19, 219:1-220:6; Haney at RT 945:14-946:16 (alternatives

to population reduction too time-consuming for emergency like conditions); Stewart at RT

2208:25-2209:11 (other plans for relief besides population reduction will not work because

they will take too much time); Pacheco at RT 2395:24-2396:20 (more than five years to

complete a jail in Riverside that is the county's "number one priority").

The Court finds that nearly two years after its passage, AB 900 has done nothing to

alleviate the medical and mental health violations, and promises no hope of relief for years to

come, if ever.  The state's failures to implement its building program to date, the inherently

slow nature of prison construction, and the lengthy list of serious obstacles to building and

concerns about its efficacy, lead this Court to reject prison construction as a meaningful source

of relief for the plaintiff classes in *Coleman* and *Plata*.

### b.    Out-Of-State Transfers

AB 900 authorizes CDCR to transfer up to 8,000 prisoners to private correctional

facilities in other states.  Defs.' Exh. D-1002 at ¶¶ 5, 18.  As of the end of August 2008, only

4,788 prisoners were housed in other states.  Cate at RT 1694:14-18.

The numbers demonstrate that out-of-state transfers will not relieve the overcrowding

1  crisis in any meaningful way.  With nearly 5,000 of the 8,000 possible transfers completed, any

2  relief from this remedy has already been largely attained.  *See* Defs.' Exh. D-1000 at ¶ 47;

3  Defs.' Exh. D-1002 at ¶ 17.  Yet the state of emergency from prison overcrowding continues,

4  and defendants admit that the facts underlying the Governor's original proclamation still exist

5  today.  Pls.' Exh. P-388 at statement of Reasons, pp. 1-2.  The Court has already found in prior

6  sections that under current conditions, including the 4,788 prisoners housed out of state, the

7  overcrowding is the primary cause of the constitutional violations.  The Court hereby finds that

8  sending an additional 3,000 prisoners to out-of-state facilities will not reduce the population to

9  a degree that will meaningfully affect the provision of medical and mental health services.

10          Further, the Receiver has noted that the out-of-state transfer program impedes his

11  remedial work in California, since prisoners sent out of state must still receive care, and his

12  monitoring efforts have been time-consuming.  Defs.' Exh. D-1100 at 49 (addressing medical

13  care problems at an out-of-state prison housing California prisoners "had a serious negative

14  impact on the office of the Receiver, drawing critical clinical personnel away [from] other

15  important projects and delaying 'in-state' remedial efforts.  In essence …valuable clinical

16  hours have been devoted to helping a private prison … rework its medical delivery system …

17  in order to keep the out of state transfer process from collapsing"); *see also* Exh. H to

18  Plaintiffs' Request for Judicial Notice at 78 (Receiver's Tenth Tri-Annual Report).

19          Furthermore, transferring prisoners out of state reduces the in-state population.  It thus

20  has "the purpose or effect of reducing or limiting the prison population."  18 U.S.C.

21  § 3626(g)(4).  Accordingly, it is not "other relief" as defined by the statute.

22                          **c.      Parole Reform**

23          The parole reform measure described in defendants' integrated strategy to address

24  overcrowding would reduce the number of technical parole violators returned to prison for

25  short periods of time, therefore reducing the prison population.  Pls.' Exh. P-262 at

26  DEFS022014; Cate at RT 1692:25-1693:11. Defendants are currently rolling out a pilot

27  program to do just that.  Cate at RT 1693:6-17.  This is a measure that has both the "purpose"

28  and the "effect of reducing or limiting the prison population."  18 U.S.C. § 3626(g)(4).  It is

-112-

1    thus not "other relief" as defined by the statute.

2                    **d.    In-Prison Rehabilitative Programming**

3           Defendants also propose to reduce the prison population by creating rehabilitative

4    programs for prisoners.  *See, e.g.,* Defs.' Exh. D-1004 at ¶¶ 27, 37 (*Plata* Docket No. 1716);

5    Cate at RT 1702:9-12.  They claim that doing so will result in "a reduction in overcrowding

6    and recidivism."  Defs.' Exh. D-1004 at ¶ 37.  However, they have no estimate for how great

7    such a population reduction would be or when it would be accomplished (Cate at RT 1702:13-

8    1703:13; Jett at RT 1732:14-18) and the rehabilitative programs are not scheduled for full

9    implementation until 2012 (Jett at RT 1731:21- 1732:1).  The Expert Panel estimated that

10   rehabilitative programs would result in a very minor reduction in prison population.  Pls.' Exh.

11   P-2 at Appx. E at 97.  Moreover, the crowding itself poses a challenge to providing the

12   programs.  Cate at RT 1702:9-20.  Accordingly, while we find that implementing such

13   programs may reduce the prison population, we do not find that such programs, standing alone,

14   will bring the prison population down to a level at which defendants can provide

15   constitutionally-adequate medical and mental health care.

16          Moreover, because defendants have acknowledged that implementing rehabilitative

17   programs in prison is a measure with "the purpose or effect of reducing or limiting the prison

18   population" (18 U.S.C. § 3626(g)(4)), such programs do not amount to "other relief" as defined

19   by the statute.

20                    **e.    Governor's Proposals**

21          The Governor's November 2008 proposals include parole reform, already described

22   above, and credit reform.[72]  The credit reform proposal would reduce length of stay in prison

24   _____

25   [72] The Governor's November 2008 proposals also included increasing the statutory monetary
     threshold for determining whether property crimes could be prosecuted as grand theft.  Cate at
26   RT 1697:21-25.  The statutory limit had not been raised to account for inflation for many
     years.  Cate at RT 1698:1-6.  This measure would reduce the population by ensuring that fewer
27   offenders come to state prison.  Cate at RT 1698:7-9.  It is thus technically not "other relief."

28

-113-

1    by providing enhanced credit-earning for prisoners who engage in good behavior, complete

2    certain programs, or are on waiting lists to transfer to conservation camps.  Cate at RT 1695:4-

3    9, 1695:23-697:20; Pls.' Exh. P-780 at 18 (Governor's Budget, Special Session 2008-09);

4    2009-2010 Governor's Budget General Fund Proposals at 27-28, Exh. E to Pls.' Request for

5    Judicial Notice.   By reducing prisoners' length of stay in prison, this measure would reduce

6    the prison population.  This measure thus has "the purpose or effect of reducing or limiting the

7    prison population."  18 U.S.C. § 3626(g)(4).  Accordingly, it is not "other relief" as defined by

8    the statute.

### f.    Increased Expenditures On Health Care Are Irrelevant To Whether No Other Relief Will Remedy The Violations

10          Defendants presented evidence that prison healthcare spending has increased,

11   particularly since 2006 (Defs.' Exh. D-1244 at 2-3), apparently intending to demonstrate that a

12   prisoner release order is unnecessary.[73]  Despite this dramatic increase in spending, the

13   constitutional violations persist.  *See supra* Sections III and IV.   Further, there is no evidence

14   that the constitutional violations will be remedied any time in the near future through the

15   mechanisms currently pursued and funded by the state.  The evidence thus shows very clearly

16   that defendants cannot spend their way into constitutional compliance.

17          In addition, the level of spending on prison healthcare is likely to decrease.  The

18   evidence shows that Defendant Governor Schwarzenegger's proposed budget for fiscal year

19   2009-10 recommends an 8.7 percent decrease in CDCR's budget.  2009-10 Governor's Budget

20   General Fund Proposals at 27-28, Exh. E to Pls.' Request for Judicial Notice (*Plata* Docket

21   Nos. 2010-2).  The proposed decrease in the budget for the Receiver is larger:  10 percent.  *Id.*

22   The proposed decrease in CDCR funding, and the disproportionately large proposed decrease

---

[73] Defendants presented evidence that prison healthcare spending increased by some indeterminate, but significant amount from 1995 through the present, and approximately 80% from Fiscal Year 2005/2006 to Fiscal Year 2007/2008.  Jerue at RT 734:4-20, 753:16-21; Defs.' Exh. D-1244 at 2.  By Fiscal Year 2007/2008, defendants were spending $2.249 billion on prison healthcare, or approximately $13,778 per inmate.  Jerue at RT 734: 4-20; 736:1-3.

1   in the Receiver's funding, demonstrate that, even if funding on prison healthcare were enough

2   to resolve the constitutional violations, there is no certainty about the level of future funding.

3       The fact that defendants have increased their expenditures on health care significantly,

4   yet failed to achieve a constitutional level of care supports this Court's finding that population

5   reduction, not increased spending, is the only viable remedy for the constitutional violations.

6           **4.    Senate Bill 618 Is Not An Alternative To A Prisoner Release Order**

7       Defendant intervenors suggest that an alternative to a prisoner release order would be an

8   expansion of SB 618, a state statute passed in 2005 that authorizes up to three counties to

9   create comprehensive case-management plans for prisoners, with attendant programming and

10  reentry planning.  This type of program – like the rehabilitative programs authorized by AB

11  900 – has the purpose and effect of reducing the prison population by reducing recidivism, and

12  accordingly falls within the PLRA's definition of a "prisoner release order."  18 U.S.C.

13  § 3626(g)(4).  Accordingly, SB 618 does not present relief "other than" a prisoner release

14  order.

15      Moreover, while we find that SB 618 and similar evidence-based rehabilitative

16  programs will improve public safety and reduce the prison population, we have heard no

17  evidence predicting how large any potential impact on the prison population would be.  SB 618

18  was enacted in 2005, and to date has had very little impact.  Although three counties were

19  authorized to start-up programs immediately, only one did so.  Rodriguez at RT 1002:3-6.  The

20  only SB 618 program to date, in San Diego County, accommodates just six people per week,

21  and has served only 389 prisoners in all.  Rodriguez at RT 986:11-17.  Thus this program,

22  standing alone, has impacted too few prisoners to present a viable alternative to a broader

23  prisoner release order.

24          **5.    The State Is Paralyzed In Its Efforts To Address The Crowding.**

25      Defendants' history in managing the burgeoning overcrowding crisis over the last ten

26  years constitutes clear and convincing evidence that the state is incapable of addressing

27  overcrowding, absent an order from this Court.  The Governor and a succession of state-

28  appointed panels of experts have been recommending reform measures aimed at reducing

-115-

1  crowding for decades. *See* Pls.' Exh. P-2 at 77; Pls.' Exh. P-328 at 178. "Since 1990, there

2  have been more than a dozen reports published that deal with the crisis in California's adult

3  prison system. The major recommendations made in all of these reports are entirely consistent

4  with the recommendations contained in [the Expert Panel] report." Pls.' Exh. P-2 at 77.

5  However, the state has failed to take any action to meaningfully reduce the prison population.

6      Defendants have, on two separate occasions, asked a panel of consultants to review the

7  CDCR and recommend changes. The Independent Review Panel, which included former

8  Governor Deukmejian and current CDCR Secretary Matt Cate (then the Inspector General)

9  released a report in June 2004 stating: "The key to reforming the system lies in reducing the

10  numbers," and recommending numerous strategies for population reduction. Pls.' Exh. P-4 at

11  123. An expert panel appointed by the CDCR subsequently described the need to reduce

12  overcrowding as a "'pre-condition' to success." Pls.' Exh. P-2 at viii. The first

13  recommendation of that report was to "[r]educe overcrowding in its prison facilities and parole

14  offices." *Id.* Defendants have failed to implement the major recommendations in either report.

15      In 2006, Governor Schwarzenegger attempted to address the overcrowding crisis by,

16  among other things, calling a special legislative session, declaring a state of emergency, and

17  proposing various measures to reduce the prison population. Pls.' Exh. P-1. Those proposals

18  included building new prisons and infill beds, creating a sentencing commission and parole

19  reforms. Pls.' Exh. P-174 at 3-4; Pls.' Exh. P-13 at E_CDCR_008480- E_CDCR_008483;

20  Pls.' Exh. P-186; Pls.' Exh. P-357.[74]

21      No sentencing commission was created, nor were the sentencing or parole reforms

22  enacted, but in May 2007 the state enacted AB 900, a measure to address prison crowding

23

24     [74]  In his emergency proclamation, Governor Schwarzenegger specifically cited the more than

25  15,000 "non-traditional" beds as a crisis condition. Pls.' Exh. P-1. The number of bad beds —
beds in gymnasiums, day rooms, and other places not designed for human habitation —

26  continued to increase by the thousands, even after the emergency was declared. Kernan at RT
1913:23-1914:20. While the number has subsequently been reduced, there are still more than

27  14,000 non-traditional beds in the system. Kernan at RT 1911:9-13.

28

1  through rehabilitative programs and building new prison beds.  The programs are not

2  scheduled for full implementation until 2012 (Jett at RT 1731:21- 1732:1) and, as described

3  above, the building portion of that law has been entirely stymied, caught in political gridlock.

4       Last year, Governor Schwarzenegger twice proposed measures in his budget proposals

5  to permit the early release of thousands of prisoners.  Cate at RT 1680:18-1681:2, 1694:19-

6  1697:20.  However, his first proposal was removed in the May 2008 budget revision.  Cate at

7  RT 1681:3-5.  As for the second set of proposals, the legislature approved similar proposals in

8  a bill in December, but the Governor vetoed it.  Pls.' Request for Judicial Notice, Exh. A (Text

9  of ABX1_8); Exh. B (Veto Message for ABX1_8).

10       The state has also attempted to implement a number of parole reforms aimed at reducing

11  the prison population, most of which have been slowed or stopped.  CDCR recently ran a pilot

12  program for "earned discharge" from parole, wherein parolees were to be rewarded for meeting

13  certain goals by being discharged from parole after six months on parole.  Hoffman at RT

14  1765:5-9.  The pilot program was killed due to political opposition from local law

15  enforcement, and not a single parolee was given earned discharge.  Hoffman at RT 1765:5-11,

16  1764:11-15.

17       When Governor Schwarzenegger proposed parole reform measures in his May 2008

18  revised budget proposals and during a November 2008 special legislative session, the

19  legislature rejected them.  Cate at RT 1698:24-1699:6, 1699:16-18, 1694:19-1695:22, 1698:10-

20  12.  When the legislature passed a bill that would put non-serious, non-violent, non-sex

21  offenders on summary parole for only six months, the Governor vetoed it.  Pls.' Request for

22  Judicial Notice, Exh. A (Text of ABX1_8); Exh. B (Veto Message for ABX1_8).

23       In short, the political and bureaucratic paralysis within the state has stymied its every

24  effort to voluntarily remedy what all agree is a prison crowding crisis of monumental

25  proportion that is having a devastating impact on both prisoner health and on public safety at

26  large.  It is this paralysis that makes it necessary for this Court to take action in this case.

27  Indeed, defendants have long recognized the necessity for judicial involvement in this area.  In

28  2006, the Governor said that he "can use all the help [] I can get" from the Court in the area of

-117-

1  prison reform.  Pls.' Exh. P-41 at 32:25-33:1.  More recently, the Governor specifically stated

2  that "I don't blame the courts for stepping in to try to solve the health care crisis that we have,

3  the overcrowding crisis that we have, because the fact of the matter is, for decades the state of

4  California hasn't really taken it seriously. It hasn't really done something about it."  Pls.' Exh.

5  P-384.

## 6.    Further Delay Is Not Warranted

7        Defendants seek more time for the Receiver, the Special Master and the CDCR to

8  correct the constitutional violations.  Further delay is not appropriate in the circumstances of

9  this case.

10       We have found that the lives and health of more than 150,000 prisoners are at

11  substantial risk of serious harm, and even death, because decades of court orders, measures

12  initiated by the state legislature, and measures initiated by the Governor have been utterly

13  ineffective in remedying the constitutional violations.   Two years ago, Governor

14  Schwarzenegger stated "immediate action is necessary to prevent death and harm caused by

15  California's severe prison overcrowding."  Pls.' Exh. P-1 at 6.  This Court finds that Governor

16  Schwarzenegger's statement of urgency is even more relevant today, more than two years later.

17       We agree with the findings of the *Plata* Court:

18       Defendants' failure to develop and maintain a constitutionally
         adequate system of delivering medical care to California's
19       prisoners results in needless suffering and death. While the
         Receiver's efforts have undoubtedly improved the California prison
20       health care system, those improvements are only the beginning of
         curing the constitutional violations at issue in this case. The
21       Receiver has recently released an analysis of inmate deaths in
         2007, which found that three deaths were preventable and sixty-
22       five deaths were possibly preventable, and that there were nearly
         300 extreme departures from the standard of care. This means that,
23       in 2007, a preventable or possibly preventable inmate death
         occurred, on average, every five or six days. Thus, even small
24       delays in implementing the remedial plan in this case have the
         potential to result in additional needless suffering and loss of life.
25

26

27  *Plata v. Schwarzenegger*, Order Denying Defendants' Motion to Stay October 27, 2008 Order,

28

-118-

November 7, 2008, at 7-8 (*Plata* Docket No. 1778).[75]  Prison crowding and the gridlock within the state political system threaten to undermine even the incremental gains made by the Receiver.  *See* Receiver's Tenth Triannual Report at 1-5.

## VI.    DEFENDANTS CAN REDUCE THE PRISON POPULATION WITHOUT ADVERSELY IMPACTING PUBLIC SAFETY OR THE OPERATION OF LOCAL CRIMINAL JUSTICE SYSTEMS.

The PLRA requires that, in crafting appropriate relief, this Court give "substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief."  18 U.S.C. § 3626(a)(1)(A).  The Court received evidence and heard more than 9 days of testimony from plaintiffs' experts, defendants and their experts, and defendant-intervenors and their experts about measures that would reduce the prison population, and the potential impacts of those measures.

Having given substantial weight to the evidence and testimony about potential impacts on public safety and the operation of criminal justice systems, we find that Defendants can reduce the prison population using measures proposed by the Governor and the state's own experts to achieve 130 percent of design capacity without adversely impacting public safety or the operation of a criminal justice system.

Any analysis of the public safety impacts of a prisoner release order must be undertaken against the backdrop of the current situation in California prisons, wherein crowding itself is having an adverse impact on public safety.  Simply put, all parties in this litigation agree that crowding reduces the ability to provide rehabilitative programming, mixes low-risk prisoners with high-risk ones, and is overall dangerous and creates more crime.  As a result, California's parole failure rate is the highest in the nation by a large measure, leading to a three-year recidivism rate of nearly seventy percent.  Austin Report (8/15/08) at ¶¶ 7-13; Bennett Report at 19; Krisberg at RT 2132:14-15.  Despite the dire conditions caused by crowding – both for

---

[75] The Court hereby takes judicial notice of this order pursuant to Rule 201 of the Federal Rules of Evidence and Plaintiffs' Request for Judicial Notice, Exh. E.

[272055-1]

1  public safety in the community, and medical and mental health care in the prisons – the state

2  has been unsuccessful in reducing the crowding crisis, and instead has found itself paralyzed

3  into inaction by warring political factions.  It is this paralysis which has brought us to this

4  point, where the Court must consider ordering the state to address the crowding problem.

5  It would be a difficult decision indeed if this Court were required to choose between

6  protecting public safety and remedying the serious constitutional violations the *Plata* and

7  *Coleman* courts have found to exist.  Fortunately, this Court finds that no such choice is

8  required in the instant case.

9  The overwhelming evidence from plaintiffs' experts, defendants and their experts, and

10  defendant-intervenors and their experts, is that measures exist by which the state can reduce

11  the prison population without adversely impacting public safety, and that there are methods for

12  reducing the prison population that would improve public safety.  *See, e.g.*, Marquart at RT

13  1995:8-20 (defendants' public safety expert); Rodriguez at RT 1007:21-1008:4 (San Diego

14  County Deputy District Attorney); Powers at RT 1052:4-13 (Stanislaus County Chief

15  Probation Officer); Powers Report at § III; Meyer at RT 2771:4-10 (Yolo County Chief

16  Probation Officer); Bennett Report at ¶¶ 56-79 (Sonoma County corrections expert); Bennett

17  Supp. Report at 5-6; Dumanis Trial Decl. at ¶¶ 16-20 (San Diego District Attorney); Dalton

18  Trial Decl. at ¶¶ 17-27 (Los Angeles County Sheriffs' Department, Director of Bureau of

19  Operations for Bureau of Offender Programs and Services); Buddress Trial Decl. at ¶ 3 (San

20  Mateo County Chief Probation Officer); Lehman at RT 2012:20-25 (former Secretary of

21  Corrections in Pennsylvania, Washington state and Maine); Krisberg at RT 2106:8-2107:14

22  (plaintiffs' expert); Krisberg Report at 4-12; Austin Report (8/15/08), Austin Report (8/27/08),

23  and Austin Report (9/25/08) (plaintiffs' expert).

24  This case is unusual in that most of plaintiffs' experts on the public safety issues are

25  individuals previously identified by the state of California as leading correctional experts.

26  Plaintiffs' experts Dr. James Austin, Joe Lehman, Dr. Barry Krisberg, and Dr. Jeffrey Beard

27  had previously been chosen by the state to serve on CDCR's expert panel and to make

28  recommendations about how CDCR should reform the California prison system.  Pls.' Exh. P-

-120-

1  2 at ii.  Former CDCR Acting Secretary Jeanne Woodford also testified as an expert for

2  plaintiffs, affirming that the state can safely reduce its prison population.  Woodford Supp.

3  Report at ¶ 32.  Dr. Lehman, Mr. Beard, and Ms. Woodford together are current and former

4  heads of four state prison systems; they worked on this case out of commitment to the issues,

5  and neither Mr. Beard nor Ms. Woodford accepted compensation for their work.  Lehman at

6  RT 261:19-25, 273:12-18; Beard at RT 200:15-17, 230:2-231:20; Woodford at RT 363:2-13,

7  385:12-386:7.  Dr. Beard, Mr. Lehman and Mr. Austin have direct experience overseeing or

8  implementing prison population reduction reforms.  Beart at RT 1548:19-1556:20; 1561:1-

9  1562:3; Lehman Report (8/15/08) at ¶¶ 14-16, 18; Austin at RT 1379:18-1380:22.

10        Plaintiffs also introduced testimony from two mental health experts about the impact of

11  releasing mentally ill prisoners.  Dr. Stewart had previously testified about the unconstitutional

12  conditions in the prisons.  Dr. Stewart, a psychiatrist with twenty-six years of experience in

13  community mental health, testified that including mentally ill prisoners in a population

14  reduction program will not increase risks to public safety.  Stewart Report at ¶¶ 2-5, 15, 16-18;

15  Stewart Supp. Report at ¶¶ 131-145; Stewart at RT 2209:25-2216:17.  Dr. Gilligan, a

16  psychiatrist and an internationally recognized expert on mentally ill offenders and the

17  relationship between mental illness and violence, testified that contrary to widely held

18  stereotypes, persons with mental illness are not more likely to commit violent crimes than are

19  persons without mental illness.  Gilligan Report at ¶¶ 1-15, 34-49; Gilligan at RT 1608:12-

20  1613:2.  Dr. Gilligan testified to the means by which including the mentally ill in a population

21  reduction program can improve public safety by interrupting the cycle of "churning" mentally

22  ill parolees through repeated short prison terms, making it impossible for them to permanently

23  re-enter society.  Gilligan Report at ¶¶ 50-66.

24        Defendants' expert about impacts on public safety and the operation of criminal justice

25  systems was Dr. James Marquart, a criminologist at the University of Texas, Dallas.  While

26  Dr. Marquart's testimony was chiefly aimed at showing that a prisoner release order would

27  have an adverse impact on public safety, the opinions he expressed at trial in many instances

28  supported plaintiffs' theory of the case.

1    This Court has reviewed Dr. Marquart's expert reports and observed his testimony, and

2    we have grave concerns about his credibility. First, Dr. Marquart's arguments were at times

3    inconsistent. *Compare* Defs.' Exh. D-1022 at 19-20 (Marquart attacking good time credits,

4    and giving Harris County, Texas as example of adverse impact from good time credits), *with*

5    Marquart at RT 1984:16-1985:9, 1991:22-25 (agreeing that the state should consider enhancing

6    good time credits, and agreeing that adverse impacts in Harris County, Texas may not have

7    been due to good time credits). Second, many of Dr. Marquart's opinions in this case (like his

8    opinions in other cases in which he has testified – *see* Marquart at RT 1948:7-19) boil down

9    to the assertion that "anything is possible" and it is impossible to predict what the results of

10   any population reduction will be. *See* Marquart at RT 1993:19-1994:11, 1951:11-1952:17,

11   1979:15-1983:17, 1984:16-1985:9. An assertion that "anything is possible" is of no help to the

12   Court, and demonstrates Dr. Marquart's lack of considered analysis. Third, Dr. Marquart

13   testified that he had been a correctional officer in Texas at a time when the federal court there

14   found the prison system to violate the Eighth Amendment, but he disagreed with the court's

15   finding of unconstitutionality on the grounds that the prisons were not "like Dachau or

16   Auschwitz." Marquart at RT 1986:7-25. This comparison demonstrates that Dr. Marquart's

17   standards are out of line with those of the American constitutional system. Dr. Marquart is

18   defendants' sole witness on key issues in this matter; we find that defendants' evidence on

19   these issues is weak and unpersuasive.

20   Defendants also called Gail Bataille as an expert on the impact of releasing mentally ill

21   prisoners. Ms. Bataille's testimony was aimed at identifying the needs of mentally ill parolees,

22   and the potential impacts of a prisoner release order on county mental health systems. While

23   she has significant experience in county mental health programs, Ms. Bataille's testimony

24   about the impacts of a prisoner release order on such programs was vastly exaggerated; in fact,

25   those programs do not even serve parolees. Bataille at RT 2550:20-2551:19.

26   Defendant-intervenors presented expert testimony from one independent corrections

27   expert, David Bennett, who conceded that crowding is a major cause of the constitutional

28   violations, and that the crowding must be reduced. Bennett Dep. at 12:4-24, 75:10-77:8. His

-122-

1   principal focus was to recommend a holistic, community-corrections-style reform to the prison

2   system.  He also affirmed that he "supports the principal incarceration and supervision reforms

3   advanced by plaintiffs."  Bennett Supp. Report at 1.

4       Defendant-intervenors also presented the testimony, both written and oral, from more

5   than two dozen local law enforcement officials and other county employees, many of whom

6   were designated as experts.  While many of the defendant-intervenors supported plaintiffs'

7   argument that a population reduction can be accomplished safely, various others expressed

8   concern that any prison population reduction would increase crime, or overwhelm local

9   services or local law enforcement.  We take very seriously the testimony from local officials

10  about expected impacts of any prison population reduction.  However, as noted below, we find

11  that many of the negative impacts predicted by local officials were exaggerated, or were based

12  on assumptions that were factually inaccurate.

13      This Court gives particular weight to recommendations for reducing the prison

14  population that have been made by the Governor, state prison officials, local law enforcement

15  officials, and experts chosen by the state to advise it about prison matters. For these officials,

16  public safety is of paramount concern, and they would not make policy changes that would

17  endanger public safety.  *See, e.g.*, Gore Dep. at 58:18-59:12, 129:12-18 (deposition of

18  Governor's deputy cabinet secretary); Cate at RT 1685:3-11; Def. Gov. Schwarzenegger's

19  Resp. to Pl. *Coleman*'s Second Set of Requests for Admissions (October 20, 2008), Nos. 1- 43

20  (*Plata* Docket No. 1977-4-1977-5, *Coleman* Docket No. 3434-43434-5) (policies in place

21  currently, and proposed policies, should not adversely impact public safety); Powers at RT

22  1029:9-15 (Stanislaus Chief Probation Officer:  "the center philosophy is public safety.")

23      The Governor and his hand-picked panel of correctional experts have made

24  recommendations for reducing the prison population that include the following four measures

25  also identified by plaintiffs:  (1) reducing length of stay in prison by enhancing good time

26  credits; (2) diverting some technical parole violators; (3) diverting some offenders with short

27  sentences; and (4) shortening the length of parole for certain parolees who demonstrate good

28  behavior.  Pls.' Exh. P-780 at 18 (Governor's Budget, Special Session 2008-09); Pls.' RJN at

-123-

1    Exh. E (2009-2010 Governor's Budget General Fund Proposals at 27-28);[76]  Pls.' Exh. P-328

2    at 178 (Governor's Budget Summary 2008-09 (January, 2008)); Pls.' Exh. P-2 at Exh. E

3    (CDCR Expert Panel Report); Austin Report (8/15/08) at ¶¶ 43-81.[77]  The state can reduce the

4    prison population to 130 percent of design capacity using a combination of these measures, and

5    applying a risk instrument to screen out the high risk inmates.  Austin at RT 1384:3-12;

6    Woodford at RT 1321:19-1322:5 (former acting Secretary of CDCR); Krisberg Report at 18-

7    19.  And as we discuss below, none of these measures would increase crime rates.  This is so

8    regardless of whether additional rehabilitative programming is provided to the prisoners.

9    Woodford at RT 1368:17-1369:3; Austin at RT 1407:11-1410:9; Krisberg at RT 2106:17-

10   2107:14.

11       It is also undisputed that the state could also reduce its prison population by a fifth

12   means:  providing evidence-based rehabilitative programming to probationers, prisoners and

13   parolees.  All parties agree that such programming would reduce the prison population at the

14   same time that it improves public safety.  *See, e.g.*, Rodriguez Trial Decl. at ¶ 21 (*Plata* Docket

15   No. 1713, *Coleman* Docket No. 3216); Rodriguez at RT 1007:3-7; Powers at RT 1041:8-

16   1042:16 (Stanislaus County Chief Probation Officer); Powers Report at § III; Pacheco at RT

17   2385:2-14 (Riverside County District Attorney); Meyer Trial Decl. at ¶ 47 (*Plata* Docket No.

18   1733, *Coleman* Docket No. 3243); Buddress Trial Decl. at ¶¶ 3, 8, 10, 11, 13 (*Plata* Docket

19

20   [76] This Court takes judicial notice of the 2009-2010 Governor's Budget General Fund
     Proposals pursuant to Fed. R. Evid. 201.  The 2009-2010 Budget is judicially noticeable

21   because it is a public record published on December 31, 2008, and can be found on the state
     Department of Finance website at http://www.dof.ca.gov/ (site last visited January 6, 2009).

22   Fed. R. Evid. 201; *Modesto Irrigation Dist. v. Pac. Gas & Elec. Co.*, 61 F. Supp. 2d 1058,

23   1066 (N.D. Cal. 1999) (taking judicial notice of document posted on agency's website and
     "readily accessible through the Internet").

24

25

26

27

28

No. 1698, *Coleman* Docket No. 3246) (San Mateo County Chief Probation Officer); Defs.'
Exh. D-1004 at ¶ 37 (*Plata* Docket No. 1716, *Coleman* Docket No. 3229).

### A. The Population Reduction Measures Proposed By The Governor And Identified By Plaintiffs Do Not Increase Crime And Would Not Have An Adverse Impact On Public Safety Or The Operation Of A Criminal Justice System.

#### 1. Expanded Good Time Credits

Plaintiffs argue and the Court finds that defendants can safely reduce the prison
population by expanding the system of "good time" credits now awarded to prisoners, so that
prisoners who conform to prison rules and participate in rehabilitative programming can earn
additional credits. We find that such an expansion of good time credits would not adversely
impact public safety or the operation of a criminal justice system.

The state currently provides "good time" credits and other credits to prison inmates for
conforming conduct and participation in work programs and certain education programs, and
these credits have no known adverse impact on public safety. *See, e.g.*, Def. Gov.
Schwarzenegger's Resp. to Pl. *Coleman*'s Second Set of Requests for Admissions (October 20,
2008), Nos. 10-35 (*Plata* Docket No. 1977-4-1977-5, *Coleman* Docket No. 3434-4-3434-5);
Powers at RT 1152:18-1154:1 (Stanislaus County Chief Probation Officer is aware of credits,
but doesn't know of any impact on public safety). In fact, there has been no public opposition
to these programs. Woodford at RT 1367:12-1368:16.

The Governor is proposing to expand the good time credit program by providing "up to
four months of earned credit for each [rehabilitative] program successfully completed by an
eligible inmate" and also extending "consistent day-for-day credit for all eligible inmates who

---

[77] The state has also proposed reducing the population through out-of-state transfers. As we
have found (*supra* at V.3.b), out-of-state transfers have historically had only a minor impact on
population. Accordingly, they do not currently present an alternative to this Court's order
requiring a population reduction. Nonetheless, we find that this is a measure that can be
implemented without adversely impacting public safety or the operation a criminal justice
system.

[272055-1]

1   comply with institutional rules, continuous day-for-day credits for inmates who are in jail

2   pending transfer to a state prison, and enhanced credits for inmates who are awaiting

3   assignment at a conservation camp." Pls.' Exh. P-780 at 18; 2009-2010 Governor's Budget

4   General Fund Proposals at 27-28, Exh. E to Pls.' Request for Judicial Notice. By adding the

5   credits together, prisoners would be eligible to earn more than the 4-6 months of additional

6   good time credits analyzed by plaintiffs' expert. More than one year ago, the Governor

7   proposed "releasing specified non-violent, non-serious, non-sex offenders without prior serious

8   or violent offenses or strikes, 20 months earlier than their original release date." Pls.' Exh. P-

9   328 at 178. The Governor made these proposals consistent with his affirmation that public

10  safety was of paramount importance. Gore Dep. at 129:12-18 (deposition of Governor's

11  deputy cabinet secretary). He would not have made these proposals if he did not believe them

12  to be consistent with public safety. *See, e.g.*, Gore Dep. at 105:13-21; Kernan at RT 1921:14-

13  1922:1.

14      Two separate state panels of experts also proposed reducing the prison population by

15  expanding good time credits (Pls.' Exh. P-2 at 12, Exh. E, 92-93 (expert panel report); Pls.'

16  Exh. P-4 at 122, 130 (Deukmejian Report)), as did all independent experts who testified in this

17  case. Defendant-intervenors' independent expert David Bennett recommended that the state

18  consider "expediting release considerations" and "increasing good time credits" (Bennett

19  Report at ¶ 79), and generally affirmed that he "suppor[t]s the principal incarceration and

20  supervision reforms advanced by plaintiffs." Bennett Supp. Expert Report at 1; *see also*

21  Cogbill Trial Decl. at ¶ 12 (*Plata* Docket No. 1676, *Coleman* Docket No. 3196). Defendants'

22  correctional expert Dr. Marquart concurred that advancing good time credits is a "possibility"

23  that he does not oppose. Marquart at RT 1991:22-25; *see also* Rodriguez at RT 1015:21-

24  1016:2 (San Diego Deputy District Attorney: good time credits are "a better way" of reducing

25  the prison population); Buddress Trial Decl. at ¶ 5 (San Mateo County Chief Probation Officer

26  supports early release as incentive for nonviolent behavior in prisons).

27      Other correctional experts agree that the state should reduce its prison population by

28  enhancing good time credits, including the head and former heads of four state correctional

-126-

1  systems.  Lehman Report at ¶¶ 12-13 (formerly the head of state prison systems in

2  Washington, Pennsylvania and Maine); Beard at RT 1570:12-1572:15 (current head of

3  Pennsylvania corrections); Woodford at RT 1324:8-1327:6, 1361:2-13 (former head of

4  California corrections).

5       The federal prison system and nearly every state in the country grant prisoners good

6  time credits as an incentive for good behavior and for participating in programs, education, and

7  work that lowers the risk of recidivism.  Austin at RT 1398:6-1399:1; Beard at RT 1549:23-

8  1550:20.

9       The reason for the near-universal use, and overwhelming support for good time credits

10  is that it is undisputed that reducing length of stay in prison does not have any impact on

11  recidivism rates.  Marquart at RT 1995:21-24 (defendants' public safety expert); Powers at RT

12  1154:4-8 (Stanislaus County Chief Probation Officer); Smith at RT 1826:7-1827:14 (Los

13  Angeles County Sheriff's Lieutenant); Buddress Trial Decl. at ¶ 5 (San Mateo County Chief

14  Probation Officer); Krisberg Report at 5-11 (former member of expert panel who reviewed

15  data from early release studies in nine U.S states, City of Philadelphia, and Canada and found

16  that early released inmates had same or lower recidivism rates than other inmates); Krisberg at

17  RT 2102:2-2105:21; Woodford at RT 1325:8-16 (former acting Secretary of CDCR); Beard at

18  RT 1569:11-20 (Pennsylvania Secretary of Corrections); Austin Report (8/15/08) at ¶¶ 64, 28;

19  *see also* Dyer at RT 2318:3-14; Dyer Report at ¶¶ 18, 25 (assuming no change in recidivism

20  rate); Munks Trial Decl. at ¶ 4 (same); Peña at RT 2452:5-2453:4 (same); Meyer Trial Decl. at

21  ¶¶ 29-30 (same); Stip. Regarding Testimony of Michael James at ¶ 2(c) (*Plata* Docket No.

22  1967, *Coleman* Docket No. 3426) (same); Bay Trial Decl. at 3 (San Mateo County Director of

23  Department of Housing) (same); Yim at RT 2653:2-15 (Los Angeles County Sheriff's

24  Department Chief of Correctional Services concedes that any threat from releasing prisoners,

25  without having provided rehabilitative programs, exists regardless of whether prisoners are

26  released early or late).

27       We also heard credible evidence that reducing length of stay by issuing good time

28  credits for good behavior or participation in rehabilitative programs incentivizes good behavior

-127-

1   and may actually reduce recidivism rates.  Beard at RT 1552:19-1554:3; Jett at RT 1724:6-21

2   (CDCR Undersecretary of Programs).  Additionally, using a risk assessment instrument to

3   identify the low and moderate risk inmates, and making only those inmates eligible for

4   enhanced credits, can improve recidivism rates and crime rates.  Krisberg Report at 12-19;

5   Krisberg at RT 2114:20-2115:4; Austin at RT 2628:8-25; *see also* Pls.' Exh. P-113 at 79-82

6   (Governor's Strike Team Report, authored by CDCR consultant Joan Petersilia, recommends

7   use of risk instrument).  Risk assessment instruments measure the probability that an offender

8   will recidivate, and low risk inmates have a lower recidivism rate than high-risk offenders.

9   Krisberg at RT 2132:6-2134:13.[78]

10         Accordingly, we find that reducing length of stay by awarding enhanced good time

11   credits will not increase recidivism rates, and may decrease them.  Since recidivism rates will

12   not rise, and since all prisoners whose length of stay is shortened would otherwise be released

13   in a few short months, overall crime rates will not rise as a result of implementing an enhanced

14   good time credit program.  Marquart at RT 1997:8-18.  A prisoner who is released four to six

15   months earlier than originally scheduled for release will have the same likelihood of

16   committing a crime and being arrested as if he or she were released four to six months later.

17   The only thing that is changed by shortening the length of stay is the timing and the

18   circumstances of that crime and arrest, which are likely to occur in any event.  *See, e.g.*, Dyer

19

20

21

22   ───────────────
     [78] There was some confusion regarding the terms "low-level offenders" and "low-risk

23   offenders."  The term low-level offenders is used to refer to the offense category.  The term
     low risk offenders is used to refer to the risk that a given offender will reoffend.  Powers at RT

24   1170:25-1171:22.  Risk instruments measure probability of reoffense; they are not 100%
     predictive, but they do show the likelihood that prisoners or parolees will recidivate.  Krisberg

25   at RT 2128:24-2129:25.  Using a risk instrument to identify prisoners for shortened length of
     stay would make the releasees less risky than current releasees, because CDCR currently

26   makes parole decisions without regard to risk level.  Pls.' Exh. P-113 at 80-82 (Governor's

27   Strike Team Report).

28

1    at RT 2319:1-23; Powers at RT 1154:18-1155:7; Woodford at RT 1329:8-19.[79]

2          While this difference in timing and circumstance is certainly of significance to the

3    individual who is victimized during the early release window, it is of equal significance to the

4    individual who would have been victimized had the prisoner been released later, but is *not*

5    victimized.  From a societal perspective, however, there is no change in recidivism rate or the

6    crime rate.  This Court finds that the appropriate analysis under the PLRA is to consider the

7    impacts on society as a whole.  From that perspective, the enhanced good time credits will not

8    adversely impact public safety.

9          Some defense experts and defendant-intervenor experts explicitly supported good time

10   credits while opposing a generic "early release" program.  For example, Sonoma County's

11   independent expert David Bennett lobbed criticism at generic "early release" programs but

12   testified that he supported expanding California's good time credit program.  Specifically,

13   Mr. Bennett testified that early release would have a devastating impact the "integrity" of the

14   system because there would be no relationship between the individual's behavior and time

15   served.  Bennett at RT 2188:8-2189:8.[80]  However, Mr. Bennett proposed that the state

16   consider "expediting release considerations" and "increasing good time credits."  Bennett

17   Report at ¶ 79.  He affirmed that he did not believe his own proposed measures would have a

18   devastating impact on public safety.  Bennett at RT 2204:24-2205:5.

19   
20   [79] For each population reduction method, there are various ways that it could be implemented.
     Austin at RT 2570:10-25.  Dr. Austin stated that the state could consider granting some credits
21   to second strikers in order to accomplish a population reduction of 50,000, but that is not the
     only way to accomplish it.  Austin at RT 2567:1-2568-2571:12.  While we are ordering the
22   state to draft the particulars of its population reduction plan, this is one option for the state to
     consider, which would likely require a waiver of state law.  Some defendant-intervenors
23   testified that these more serious offenders are actually the least risky that is, the least likely to
     reoffend, and accordingly the best candidates for shortened length of stay.  *See, e.g.*, Powers
24   Report at 3; Powers at RT at 1172:6-9 (Stanislaus County Chief Probation Officer).

25   

26   

27   

28   

-129-

1    Defendants' correctional expert, Dr. James Marquart, similarly testified that he is "not

2    opposed to advancing good time credits to prisoners who conform to prison rules and

3    regulations" (Marquart at RT 1991:22-25), but is opposed to early release.  *See* Defs.' Exh. D-

4    1022 at 13; Defs.' Exh. D-1024.[81]

5    Other party witnesses expressed general disagreement with the concept of shortening

6    prisoners' length of stay, without distinguishing generic "early release" programs at large from

7    programs where inmates earn good time credits.  *See, e.g.*, Pacheco at RT 2378:24-2379:9.  For

8    those witnesses, it is unclear whether they intended any criticism of earned good time credits.

9    This Court rejects defendants' concern that shortening the length of stay in prison would

10   reduce the ability of prisoners to avail themselves of rehabilitative programming while in

11   prison.  Marquart Report at 20-21.  This argument makes no sense in light of the fact that

12   defendants themselves are proposing to shorten the length of stay in prison by increasing good

13   time credits.  Also, defendants admit that as of August 2008, they did not have the ability to

14   provide the right rehabilitative programs to the right prisoners (Jett at RT 1727:8-24), and that

15   half of exiting prisoners had participated in no rehabilitation or work programs for their entire

16   prison term.  Jett at RT 1731:4-8; Defs.' Exh. D-1024 at ¶ 5 (quoting testimony by CDCR

17   consultant Joan Petersilia).  There is no purpose to keeping prisoners in prison for

18   programming if CDCR is not providing the programs.  Marquart at RT 1965:8-1967:5.

19   Finally, CDCR releases nearly 140,000 parolees every year, despite this lack of programming.

20

---

21   [80] This criticism does not apply equally to good time credit programs, because good time
     credits are directly related to inmates' behavior, and, once a policy is adopted, good time
22   credits become the standard for ascertaining length of sentence, so are not a sudden or surprise
     elimination of a term of punishment.
23

24   [81] While his report seemed to attack good time credits (he wrote about problems experienced in
     Harris County, Texas when Texas implemented a good time credit program to reduce the
25   prison population in the 1970s and 1980s and at the same time crime rates rose (Defs.' Exh. D-
     1022 at 18-20)), at trial Dr. Marquart testified that he did not know what was the cause of the
26   increase in crime in Harris County, or "how much, if any, of the rise in the crime
     was…attributable to the population cap and subsequent release."  Marquart at RT 1984:16-
27   1985:9.

28

1  The lack of programming is the status quo, the product of years of policy decisions made by

2  state actors, and, as discussed further below, the product of crowding.  The state cannot use its

3  own failures as an excuse for not reducing the prison population.[82]

4                    **2.      Diversion Of Technical Parole Violators**

5       Plaintiffs also argue, and the Court finds, that California can safely reduce its prison

6  population by diverting a portion of the "technical" parole violators to alternative sanctions in

7  the community rather than prison.  Technical parole violators are individuals who have

8  violated the terms of their parole, but have not been convicted of a new offense.  Austin 1st

9  Supp. Report at ¶ 12.[83]  According to CDCR data, during fiscal year 2007-2008, California

10 returned more than 66,000 technical parole violators to prison.  Pls.' Exh. P-781 at 3.  That is

11 nearly half of the total prison admissions during that time period.  *Id.*  Technical violators only

12 spend an average of four months or less in prison (usually reception centers, where they

13 receive no rehabilitative programs) before being returned to the community on parole.  Tilton

14

15 [82] Nor do we find that the expansion of good time credits would reduce the ability of SB 618
16 program participants to get the necessary programming.  As of the time of trial fewer than 400
   prisoners and parolees were in SB 618 programs.  Rodriguez at RT 987:9-16.  SB 618
17 participants have a range of sentences, with the shortest being 8 months and the longest being
18 72 months.  Rodriguez Trial Decl. at ¶ 16.  While SB 618 participants are given case plans
   based on their expected length of incarceration, and changing the length of incarceration would
19 make it difficult to follow the plan (Rodriguez at RT 997:22-998:22), nothing prevents SB 618
20 case managers from adjusting the plan if the expected length of incarceration changes due to
   granting additional good time credits.  In fact, we would expect such adjustments need to be
21 made in any event, since the prisons currently provide good time credits to prisoners.

22 [83] Although some technical parole violators have been arrested for a crime, many may not be
   guilty of the crimes for which they were arrested.  This Court credits the testimony of
23 Riverside County District Attorney Rod Pacheco, who testified that his office has never
24 referred an offender to prison on a technical violation when they could have prosecuted a new
   crime, and he is not aware of any other district attorney who does otherwise.  Pacheco at RT
25 2386:8-2387:14.  The parole board operates under a more lenient standard of evidence, and
   returns technical parole violators to prison as a result of arrests that would not result in a
26 prosecution or a conviction in a court of law.  Austin Report (9/25/08) at ¶ 18.  Additionally, a
   large portion of the arrests for technical parole violators are reported as low-level offenses such
27 as drug use, for which a conviction would not result in a prison term.  *Id.* at ¶ 18.

28

-131-

[272055-1]

1   Dep. at 211:2-23; Woodford at RT 1316:7-1317:11; Austin Report (8/15/08) at ¶ 55.

2        This system of revocation and return to prison is often referred to as "churning" of

3   parolees, or "catch and release." It is undisputed that the churning endangers public safety

4   because it is destabilizing and breaks parolees' ties to the community, including their families,

5   homes, jobs, and substance abuse programs. *See, e.g.*, Gore Dep. at 65:9-11; Pls.' Exh. P-113

6   at 77-78 (Governor's Strike Team Report); Powers at RT 1158:13-17; Meyer at RT 2777:6-19;

7   Woodford at RT 1316:21-1317:11; Beard at RT 1562:4-19. Churning is particularly damaging

8   for parolees with mental illness, because it interrupts treatment and community adjustment in

9   ways that harm public safety. Gilligan Report at ¶ 32-33. Defendants argue that prisoners

10   with mental illness should receive six months of pre-release planning to ensure continuity of

11   care, but that kind of planning cannot be done for churners, given their short length of stay.

12   Defs.' Exh. D-1021 at 2-3.

13        The evidence also establishes that California's parole revocation policy is vastly out of

14   step with the rest of the country. California stands alone in its excessive use of prison time for

15   technical parole violators. *See, e.g.,* Pls.' Exh. P-113 at 75 (Governor's Strike Team Report);

16   Pls.' Exh. P-3 at 22 (California Little Hoover Commission); Austin Report (8/15/08) at ¶¶ 9-

17   13, 46-50. Some states actually forbid returning technical parole violators to prison. Lehman

18   Report at ¶¶ 14-16. Others reserve prison time for only the most serious technical violators.

19   Lehman Report at ¶ 18; Beard at RT 1561:1-1562:3 (Pennsylvania); Pls.' Exh. P-3 at 24.

20        Diversion of a portion of the state's technical parole violators is supported by the

21   Governor, CDCR, the state's Expert Panel, all of the independent experts, and many of the

22   defendant-intervenors who testified in this action.

23        In January 2008 the Governor proposed that "non-serious, non-violent non-sex

24   offenders" be placed on summary parole, where they "would not return to prison without first

25   being prosecuted locally for any new offenses they commit." Pls.' Exh. P-328 at 178. The

26   Governor's current budget proposal contemplates eliminating parole altogether for non-serious,

27   non-violent, non-sex offenders. 2009-2010 Governor's Budget General Fund Proposals at 27-

28   28, Exh. E to Pls.' Request for Judicial Notice. Those not on parole – or on summary parole

-132-

1   – could not be returned to prison for technical parole violations.

2       In 2007, the state's expert panel also recommended that CDCR implement a system of

3   alternative, community-based sanctions for the less serious, less risky technical parole

4   violators, and noted that this same recommendation had previously been made by more than a

5   dozen other reports on the California adult prison system as well.  Pls.' Exh. P-2 at 47-49,

6   Appx. A at 77-79, Appx. E at 88-89; *see also* Pls.' Exh. P-113 at 75-91 (Governor's Strike

7   Team Report, authored by CDCR consultant Joan Petersilia, recommends diversion of less

8   serious technical parole violators); Pls.' Exh. P-3 at 31 (California Little Hoover Commission

9   recommends same); Pls.' Exh. P-4 at 122, 144-155 (Deukmejian Report recommends same).

10  The Governor has echoed that proposal.  Def. Gov. Schwarzenegger's Resp. to Pl. *Coleman*'s

11  Second Set of Requests for Admissions (October 20, 2008), Nos. 41, 42, 43 (*Plata* Docket No.

12  1977-5, *Coleman* Docket No. 3434-5).  The state parole chief testified that the state has already

13  implemented and has plans to expand wide-range of alternative sanctions.  Hoffman Decl. at ¶¶

14  18-25; Defs.' Exh. D-1306.

15      CDCR has begun implementing a pilot program of what it calls its "Parole Violation

16  Decision Making Instrument," with the intent of carrying out this recommendation.  Defs.'

17  Exh. D-1198; Hoffman at RT 1741:12-1742:13.  This matrix establishes graduated sanctions

18  for parole violations, including electronic monitoring, community service, counseling, daily

19  reporting, mandated drug treatment, and others, with only the most serious and highest risk

20  violators eligible for return to prison.  Defs.' Exh. D-1198 at DEFS058634-40; Hoffman at RT

21  1742:14-1743:8.  According to former CDCR Secretary Tilton, this program will improve

22  public safety over time.  Tilton Dep. at 150:13-153:11.  Because this pilot program is still in its

23  initial stages, no results have yet been reported.  Cate at RT 1694:4-13; Hoffman at RT

24  1745:10-1746:18.

25      Diversion of technical parole violators is also supported by all of the independent

26  experts who testified about public safety in this case, including defendants' and defendant-

27  intervenors' independent experts.  Marquart at RT 1993:6-14; Bennett Report at ¶¶ 68-71

28  (recommending reform of parole revocation policy including the use of a variety of sanctions);

-133-

[272055-1]

1  Bennett Supp. Report at 1 (supporting "the principal incarceration and supervision reforms

2  advanced by Plaintiffs."); *see also* Packer at RT 1087:4-22 (defendants' mental health expert

3  recommends diversion for mentally ill prisoners).

4        This reform is also supported by many of the individual defendant-intervenors, and not

5  opposed by others. *See, e.g.*, Buddress Trial Decl. at ¶¶ 3-5, 12 (San Mateo County Chief

6  Probation Officer) (support); Powers at RT 1456:3-12 (Stanislaus County Chief Probation

7  Officer) (support); Dalton Trial Decl. at ¶ 29 (Los Angeles County Sheriffs' Department,

8  Director of Bureau of Operations for Bureau of Offender Programs and Services) (proposing

9  diversion of technical parole violators); Pacheco at RT 2385:15-2386:7 (Riverside County

10 District Attorney) (may support diversion, depending on what alternative sanctions are

11 proposed); Runner at RT 2727:14-2728:5 (recommending reducing prison population through

12 parole reform and stating he has introduced legislation to create intermediate sanctions for

13 parole violations).

14       Current and former heads of four state correctional systems also agree that California

15 should reduce its prison population by diverting technical parole violators.  Lehman Report at

16 ¶¶ 12-13; Woodford Supp. Report at ¶¶ 31-32; Beard at RT 1571:6-1572:15.

17       Consistent with the uncontroverted evidence, we find that diversion programs have no

18 impact on recidivism rates.  Austin August 2008 Report at ¶¶ 57, 61; Austin at RT 1398:20-22.

19 Accordingly, the Court finds that, like the enhanced good time proposals, a program that

20 diverts technical parole violators might change the time and circumstances of crimes that are

21 otherwise likely to occur, but it would not change crime rates or a citizen's likelihood of

22 victimization.  *Cf.* Meyer Amended Trial Decl. at ¶ 59.

23       No party presented any evidence demonstrating that diversion of low or moderate risk

24 technical parole violators has had or would have an adverse impact on public safety.

25       Certain intervenors suggested, however, that removing the threat of imprisonment as a

26 sanction for a parole violation would reduce the deterrent value of punishment.  The Court

27 does not credit this testimony for two reasons.  First, like the Governor's proposal and CDCR's

28 parole violation matrix, the diversion program analyzed by plaintiffs contemplates that serious

-134-

1    and/or high-risk technical parole violators would be returned to prison.  Accordingly, the

2    threat – and reality – of reimprisonment would remain.  Second, the experts agree that

3    deterrence is satisfied by immediate and certain sanction, but the sanction does not have to be

4    prison incarceration in all cases; it can include the jail time or other intermediate sanctions

5    such as electronic monitoring, mandated attendance at drug rehabilitation programs, etc.

6    Bennett at RT 2194:19-2195:18; Krisberg Expert Report at 17; Krisberg at RT 2105:22-

7    2106:7; Woodford August 15, 2008 Report at ¶ 32 (former Acting Secretary of CDCR);

8    Woodford at RT 1318:18-1319:2.

9         In the same vein, we reject the contention made by some defendant-intervenors that

10   technical parole violators should not be given alternative sanctions in the community because

11   parolees as a class pose a high risk of committing new crimes.  Defendant-intervenors look at

12   the overall return to prison rate of nearly seventy percent and conclude that all parolees are

13   high risk.  But this recidivism rate overstates the risk of crime, because it encompasses both

14   parolees who commit crimes and the far larger number who merely violate technical parole

15   rules.  *See* Pls.' Exh. P-781 at 3.  It is also an average across all parolees.  Parsing out the

16   average recidivism rate, we see that CDCR identifies only twenty-five percent of the 140,000

17   parolees who are released under current state policies as "high risk" (meaning they are more

18   likely to reoffend), thirty-one percent are identified as low risk, and another forty-four percent

19   are identified moderate risk.  Def-Ints' Exh. DI-650 at 2.  Those identified as low risk have an

20   average recidivism rate of just seventeen percent.  Hoffman at RT 1750:1-6.

21        The parole violation decisionmaking instrument that CDCR is piloting uses a risk

22   assessment instrument to identify the high risk offenders.  Defs.' Exh. 1198 at DEFS058641.

23   Using such an instrument to make high risk offenders ineligible for diversion would vastly

24   reduce the likelihood that diverted parolees would commit new crimes.  In other words,

25   diverted parole violators would be less likely to reoffend than the parolees being released under

26   current state policies.

27        Accordingly, we find that the state can implement a program to divert technical parole

28   violators that will not have an adverse impact on public safety or the operation of a criminal

1    justice system.

2    **3.    Diversion Of Offenders With Short Sentences**

3    Plaintiffs further contend, and this Court finds, that California can reduce its prison

4    population by diverting offenders with short sentences without adversely impacting public

5    safety or the operation of a criminal justice system.

6    Under a diversion program like that analyzed by plaintiffs, offenders with short

7    sentences would be screened for risk of recidivism, and those with low or moderate risk would

8    be diverted either to parole or probation, thus effectively reducing their length of stay in prison.

9    Austin Report (8/15/08) at ¶¶ 58-61.

10    This type of diversion program is in line with current practices in the state and with the

11    recommendations of the Governor.

12    Governor Schwarzenegger is proposing measures that would effectively divert certain

13    property offenders who are now being sent to prison by reclassifying their offenses as

14    misdemeanors.  Pls.' Exh. P-780 at 18; 2009-2010 Governor's Budget General Fund Proposals

15    at 27-28, Exh. E to Pls.' Request for Judicial Notice.

16    One of defendants' experts specifically recommends diverting some mentally-ill

17    prisoners.  Packer at RT 1087:4-22 (recommending diversion as a "very reasonable strategy").

18    Some defendant-intervenors, and defendant-intervenors' independent expert, also recommend

19    that the state consider "broadening the target range for prison diversion under state sentencing

20    guidelines."  Bennett August 15, 2008 Report at ¶ 79; *see also* Bennett October 17, 2008 Supp.

21    Expert Report at 1 (supporting "the principal incarceration and supervision reforms advanced

22    by Plaintiffs"); Cogbill Trial Decl. at ¶ 12 (*Plata* Docket No. 1676) (supporting reforms

23    recommended by Bennett); Dyer at RT 2368:9-2369:12 (recommending population reduction

24    through diversion, and arguing that if done right it could improve public safety).

25    Former CDCR Acting-Secretary Woodford affirmed that it would be appropriate to

26    divert some prisoners, because "California incarcerates many more prisoners than is necessary

27    for the safety of the public" and intermediate sanctions are appropriate for some offenders.

28    Woodford August 15, 2008 Supp. Report at ¶ 32.

-136-

1    Other states commonly employ diversion programs (Austin at RT 1399:2-10; Beard at

2    RT 1554:17-1556:20; Lehman at RT 2007:19-2008:5), as do most of the California counties.[84]

3

4    [84] *See, e.g.,* Defendant-intervenor Amador County Sheriff's Responses to Plaintiffs' First Set
of Interrogatories, No. 4 (*Plata* Docket No. 1977-9, *Coleman* Docket No. 3434-9) (home

5    electronic monitoring program, jail work program); Defendant-intervenor Butte County
Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1977-

6    10, *Coleman* Docket No. 3434-10) (home electronic monitoring program, work alternative
program); Defendant-intervenor El Dorado County Sheriff's Responses to Plaintiffs' First Set

7    of Interrogatories, No. 4 (*Plata* Docket No. 1978-2, *Coleman* Docket No. 3435-2) (home

8    electronic monitoring program); Defendant-intervenor Fresno County Sheriff's Responses to
Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1978-3, *Coleman* Docket No.

9    3435-3) (adult offender work program, work furlough/electronic monitoring); Defendant-

10    intervenor Humboldt County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No.

11    4 (*Plata* Docket No. 1978-4, *Coleman* Docket No. 3435-4) (county parole, school or work
furlough, sheriff's work alternative program); Defendant-intervenor Inyo County Sheriff's

12    Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1978-5, *Coleman*
Docket No. 3435-5) (work release alternative program); Defendant-intervenor Kern County

13    Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1978-6,

14    *Coleman* Docket No. 3435-6) (electronic monitoring, work release program); Defendant-
intervenor Los Angeles County Sheriff's Responses to Plaintiffs' First Set of Interrogatories,

15    No. 4 (*Plata* Docket No. 1978-7, *Coleman* Docket No. 3435-7) (weekend commitment, work
release, electronic monitoring program); Defendant-intervenor Merced County Sheriff's

16    Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1978-8, *Coleman*

17    Docket No. 3435-8) (electronic home detention, alternative work program); Defendant-
intervenor San Benito County Sheriff's Responses to Plaintiffs' First Set of Interrogatories,

18    No. 4 (*Plata* Docket No. 1979, *Coleman* Docket No. 3436) (work alternative program);

19    Defendant-intervenor San Diego County Sheriff's Responses to Plaintiffs' First Set of
Interrogatories, No. 4 (*Plata* Docket No. 1979-2, *Coleman* Docket No. 3436-2) (connections

20    program); Defendant-intervenor San Joaquin County Sheriff's Responses to Plaintiffs' First
Set of Interrogatories, No. 4 (*Plata* Docket No. 1979-3, *Coleman* Docket No. 3436-3)

21    (alternative work program, electronic monitoring program, alternative drug and alcohol

22    program); Defendant-intervenor San Mateo County Sheriff's Responses to Plaintiffs' First Set
of Interrogatories, No. 4 (*Plata* Docket No. 1979-5, *Coleman* Docket No. 3436-5) (electronic

23    monitoring program, sheriff's work program, work furlough program, sheriff's parole);

24    Defendant Santa Barbara County Sheriff's Responses to Plaintiffs' First Set of Interrogatories,
No. 4 (*Plata* Docket No. 1979-6, *Coleman* Docket No. 3436-6) (electronic monitoring

25    program, sheriff's work alternative program, work furlough program); Defendant-intervenor

26    Shasta County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata*
Docket No. 1979-7, *Coleman* Docket No. 3436-7) (work release, home electronic monitoring);

27    Defendant-intervenor Solano County Sheriff's Responses to Plaintiffs' First Set of
Interrogatories, No. 4 (*Plata* Docket No. 1980, *Coleman* Docket No. 3437) (work furlough,

28                                                                                      (continued …)

-137-

Some of the defendant-intervenors have specifically proposed diversion as an appropriate means to reduce the prison population. *See, e.g.*, Dumanis Trial Decl. at ¶¶ 16-20 (*Plata* Docket No. 1711) (San Diego District Attorney); Bennett August 15, 2008 Report at ¶ 79; James Trial Decl. at ¶ 20.

Under the diversion program analyzed by Dr. Austin, diversion would effectively reduce the length of incarceration, but not eliminate it entirely. As we have found, reducing length of stay in prison does not increase recidivism rates or crime rates. Indeed, diversion may improve public safety in some instances, because the undisputed evidence is that, in this state at least, prison itself is criminogenic, *i.e.,* sending low-risk offenders to prison may increase a felon's risk of reoffending. *See, e.g.*, Lehman at RT 2013:14-2014:1 (former head of Corrections in Pennsylvania, Washington state and Maine); Powers at RT 1167:8-1168:1, 1169:18-22 (Stanislaus County Chief Probation Officer); Beard at RT 1556:1-14 (Secretary of Corrections in Pennsylvania). If, as plaintiffs suggest, only low and moderate risk prisoners are selected for diversion, diversion may well prevent an escalation in those felons' risk levels.

---

work release, electronic monitoring); Defendant-intervenor Stanislaus County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1980-2, *Coleman* Docket No. 3437-2) (alternative work program, work furlough/school furlough/job training program, sheriff's parole); Defendant-intervenor Tehama County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1980-4, *Coleman* Docket No. 3437-4) (work furlough program, weekend work program, house arrest); Defendant-intervenor Tuolumne County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1980-5, *Coleman* Docket No. 3437-5) (jail overflow work crew program); Defendant-intervenor Ventura County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket No. 1980-6, *Coleman* Docket No. 3437-6) (alternative placement programs); Defendant-intervenor Yolo County Sheriff's Responses to Plaintiffs' First Set of Interrogatories, No. 4 (*Plata* Docket Nos. 1980-7-8, *Coleman* Docket No. 3437-7-8) (electronic surveillance program, work furlough, sheriff's working inmate program); Graves at RT 2287:17-22 (Santa Clara County diversion programs); Hennessey at RT 2798:3-24 (San Francisco Sheriff's diversion programs include parole, work alternative program, electronic monitoring, work release); James Trial Decl. at ¶¶ 6-15 (*Plata* Docket No. 1728) (describing Orange County diversion programs).

**4.    Shortening Length Of Parole Supervision**

Plaintiffs further contend, and this Court finds, that the state can develop a plan to shorten the length of parole supervision for certain offenders who have engaged in good behavior that will not have an adverse impact on public safety or the operation of a criminal justice system.  Austin Report (8/15/08) at ¶¶ 77-81.

First, the evidence presented by defendants is that California is the only state in the nation that puts all released prisoners on parole; most states don't provide any supervision to low risk offenders released from prison.  Hoffman at RT 1756:16-18, 1759:23-1760:7.  The Director of the CDCR Division of Adult Parole Operations testified that current practices are inappropriate:  "there is a percentage of the parole population that shouldn't be supervised or supervised very little; that at the low end of the [risk] spectrum, supervision is counterproductive."  Hoffman at RT 1758:8-10; *see also* Bennett at RT 2193:10-2194:2 (same).  And it is undisputed that reducing the length of parole supervision has no impact on recidivism rates.  Austin Report (8/15/08) at ¶¶ 77-78.

Current state statutes provide that CDCR can discharge from parole those parolees who are violation-free after 12 months of parole, but in practice CDCR does not do so.  Pls.' Exh. P-2 at 13; Austin Report (8/15/08) at ¶ 80; Cal. Penal Code § 3001; Gore Dep. at 85:23-86:9 (Governor's Deputy Cabinet Secretary).

The early discharge program analyzed by Dr. Austin  –  which would provide good time credits to parolees, and reduce parole supervision to 12 months for offenders who are violation-free  –  is more modest than the Governor's own proposals to reduce the length of parole supervision.  More than one year ago, the Governor proposed placing all "non-serious, non-violent non-sex offenders on summary parole.  Summary parole will have minimal conditions of parole and involve no active supervision.  These offenders would be subject to searches and drug testing, but would not return to prison without first being prosecuted locally for any new offenses they commit."  Pls.' Exh. P-328 at 178.

Currently, the Governor is proposing that the state "[f]ocus parole efforts on those offenders who have committed serious, violent, or sexual crimes.  Under this proposal,

1   offenders without current or previous convictions for serious, violent, or sexual crimes would

2   not receive parole supervision after their release from prison." Pls.' Exh. P-780 at 18; 2009-

3   2010 Governor's Budget General Fund Proposals at 27-28.

4     The Governor would not have made these proposals if he did not believe them to be

5   consistent with public safety. Gore Dep. at 105:13-21. The state's parole chief testified that

6   focusing parole resources on those who need supervision and on the first few months after

7   release ("front-loading") has been proven to improve public safety in other states. Hoffman at

8   RT 1758:18-1759:1, 1759:22-1760:24.

9     California's expert panel also proposed releasing certain prisoners without placing them

10   on parole, and awarding parolees "good time" credits to shorten their length of time on parole

11   (also called "earned discharge" from parole). Pls.' Exh. P-2 at 13, Exh. E at 90- 94. This was

12   also the recommendation of several other state panels over the last decade. *See* Pls.' Exh. P-

13   113 at 75-91 (Governor's Strike Team Report, authored by CDCR consultant Joan Petersilia,

14   recommends early discharge for certain parolees); Pls.' Exh. P-3 at 31 (California Little

15   Hoover Commission recommends same); Pls.' Exh. P-4 at 122, 144-155 (Deukmejian Report

16   recommends same).

17     These proposals for shortening the length of parole and focusing parole resources on the

18   highest risk parolees are also roundly supported by the experts, including defendants' and

19   defendant-intervenors' correctional experts. *See, e.g.*, Marquart at RT 1992:21-23; Bennett

20   Report at ¶¶ 61, 72-74 (*Plata* Docket No. 1664) (recommending reducing length of parole

21   supervision and focusing parole resources on high-risk parolees); Cogbill Trial Decl. at ¶ 12

22   (*Plata* Docket No. 1676) (supporting Sonoma County Expert Bennett Proposals); Buddress

23   Trial Decl. at ¶ 5 (*Plata* Docket No. 1698) (San Mateo County Chief Probation Officer);

24   Woodford at RT 1323:6-24 (former Acting Secretary of CDCR); Lehman at RT 2011:13-

25   2012:19.

26     While Dr. Marquart supports focusing parole resources on the highest risk parolees, he

27   also expressed concern that shortening the length of parole supervision would reduce the

28   ability of parolees to avail themselves of rehabilitative programming while on parole. Defs.'

-140-

1    Exh. D-1024 at ¶ 6.  But there are insufficient programs for parolees in the community.  *See*

2    Jett at RT 1720:13-1721:12; Pls.' Exh. P-113 at 75-76 (Governor's Strike Team Report).  Just

3    as it makes no sense to keep prisoners in prison for non-existent programming, it would be

4    inappropriate to keep parolees on parole solely to make them eligible for programs that don't

5    exist.  We find that reducing the prison population will not itself resolve the dearth of

6    programs, but as discussed below, reducing the prison population will enable the state to shift

7    resources that would otherwise be spent on imprisonment toward the creation of rehabilitative

8    programs in the communities.

9         Reducing the length of parole supervision will not substantially reduce the size of the

10   prison population, but it will enable CDCR to focus its parole resources on high-risk parolees.

11   Defendants and certain defendant-intervenors expressed concern that implementing the other

12   population control methods  –  good time credits and diversion programs  –  would increase

13   the number of parolees and therefore strain CDCR's ability to adequately supervise parolees.

14   *See, e.g.*, Defs.' Exh. D-1024 at ¶ 7.  The Court finds that any such impact on parole

15   supervision resources could be eliminated by implementing early discharge from parole, which

16   would enable parole resources to be dedicated to those parolees most in need of supervision.

17   And the defendant-intervenors agree that more intensive parole supervision for higher risk

18   offenders would have a positive impact on public safety.  *See, e.g.*, Dyer at RT 2322:2-16.

19        On the other side of the coin, some defendant-intervenors, such as Chief Dyer, argued

20   that parole terms should not be shortened because parole is "a very effective tool for law

21   enforcement"  –  because parolees have fewer rights, local law enforcement are easily able to

22   round up suspects who are parolees and gang members whenever there is a spike in crime.

23   Dyer at RT 2331:22-2332:20.  Chief Dyer's concern can be met by following the

24   recommendations of other law enforcement intervenors, and reducing the length of supervision

25   only for those violation-free parolees identified as low or moderate risk, i.e. those parolees

26   least likely to be repeat offenders.  Of course, former parolees, like all residents, are subject to

27   search and seizure pursuant to the normal rules of procedure and consistent with the

28   Constitution.

1    The Court also rejects the concern expressed by some intervenors that reducing the

2    period of parole supervision would necessarily increase the recidivism rate for parolees.

3    Conklin Trial Decl. at ¶ 43; Dyer at RT 2323:1-6.  Neither Mr. Conklin nor Chief Dyer offered

4    any factual basis for this assertion, nor do they distinguish between reducing supervision for

5    low risk versus high risk parolees.  Studies show no difference in recidivism rates between

6    states with lengthy parole supervision, and those with short parole supervision, nor was there a

7    difference between those with intensive parole supervision and those with minimal

8    supervision.  Krisberg at RT 2113:1-24.  Accordingly, we find that reducing the period of

9    supervision for low-risk parolees would not adversely impact public safety.

10

11   **B.    Evidence-Based Rehabilitative Programs Reduce The Prison Population
            And Improve Public Safety By Reducing Recidivism And Reducing Crime**

12   The overwhelming, undisputed evidence establishes, and we find, that the state and

13   local governments could reduce recidivism and reduce crime by providing evidence based

14   rehabilitative programs to probationers, prisoners and parolees.  *See, e.g.*, Pls.' Exh. P-2 at 29;

15   Defs.' Exh. D-1329 at 103-104 (testimony of defendant-intervenor Loren Buddress, Chief

16   Probation Officer of San Mateo County); Rodriguez at RT 990:17-995:3 (San Diego County

17   Deputy District Attorney); Rodriguez Trial Decl. at ¶ 21 (*Plata* Docket No. 1713); Conklin

18   Trial Decl. at ¶¶ 17-24; Powers at RT 1159:14-1160:17, 1162:18-1163:6 (Stanislaus County

19   Chief Probation Officer); Buddress Trial Decl. at ¶¶ 3, 8, 10, 11, 13 (*Plata* Docket No. 1698)

20   (San Mateo County Chief Probation Officer); Bennett Report at ¶ 59-71 (*Coleman* Docket No.

21   3178);Woodford at RT 1320:11-19 (former Acting Secretary of CDCR); Krisberg Expert

22   Report at 11-18; Krisberg at RT 2136:17-2138:8; Stewart at RT 2212:22-2214:7; Dyer at RT

23   2325:9-12 (Fresno Police Chief); Pacheco at RT 2383:17-2384:14 (Riverside County District

24   Attorney); Yim at RT 2652:14-16 (Los Angeles County Sherriff's Department Chief of

25

26

27

28

1  Correctional Services); Jett Trial Decl. at ¶ 37 (*Plata* Docket No. 1716).[85]

2      Accordingly, both state defendants and defendant-intervenors argue that the state prison

3  population will be reduced by providing evidence-based programs to probationers, prisoners

4  and parolees.  *See, e.g.*, Rodriguez Trial Decl. at ¶ 21; Rodriguez at RT 1007:3-7 (regarding

5  SB 618 Program); Powers at RT 1041:8-1042:16; Powers Expert Report at 5-6 (Stanislaus

6  County Chief Probation Officer); Pacheco at RT 2385:2-14 (Riverside County District

7  Attorney); Meyer Amended Trial Decl. at ¶ 47; Buddress Trial Decl. at ¶¶ 3, 8, 10, 11, 13

8  (*Plata* Docket No. 1698) (San Mateo County Chief Probation Officer); Defs.' Exh. D-1004.

9  Jerry Powers, Chief Probation Officer of Stanislaus County and the president of the Chief

10  Probation Officers of California testified that providing rehabilitative programs to probationers

11  alone would reduce the prison population by 20,000 to 25,000 prisoners.  Powers Expert

12  Report at 6.

13      We agree with the contention that providing evidence-based rehabilitative programs to

14  probationers, prisoners and parolees would reduce the prison population, and further find that

15  any adverse impact that might otherwise result from a prisoner release order would be

16  substantially mitigated by providing evidence-based programming to offenders in the

17  communities.[86]  Smith at RT 1827:18-1828:19; Word Trial Decl. at ¶ 22; Ryan Trial Decl. at

18  ¶ 16 (*Plata* Docket No. 1726); Beard at RT 1572:17-1574:3 (Pennsylvania Secretary of

19  Corrections); Lehman at RT 2009:15-2010:1.

20      While local law enforcement agencies and counties currently have insufficient resources

21  to provide the necessary evidence-based programs to offenders in the communities (*see, e.g.*,

22

23  [85] Evidence-based programs are rehabilitative programs that have been researched and proven
to be effective in reducing recidivism.  Powers at RT 1042:19-1043:14.  They include drug
24  treatment, anger management, employment programs, housing programs, mental health
programs, and others.  Such programs can be aimed at both non-violent offenders (Rodriguez
25  Trial Decl. at ¶ 5) and violent offenders (Hennessey at RT 2801:21-2804:4).

26  [86] Evidence-based practices do not assume that programming is appropriate for everyone; for
low-risk offenders, evidence-based practices counsel against providing any supervision or
27  programming.  Austin at RT 1465:15-19.

28

Powers at RT 1039:21-1040:6), we find that with adequate funding from the state, such programs could be delivered to the probationers, prisoners, and parolees who would benefit from them.  *See, e.g.*, Pacheco at RT 2385:2-14; Dumanis at RT 2418:3-12; Christianson Trial Decl. at ¶ 30 (*Plata* Docket No. 1727); Christianson at RT 2662:7-11.

**C.    Defendant-Intervenors Have Exaggerated The Potential Impact Of A Reduction In The Prison Population**

**1.    A Minor, Short-Term Increase In Arrests Does Not Mean An Increase In Overall Crime.**

Plaintiffs' expert Dr. Austin demonstrated that during the implementation of a good time credit program or diversion program, there would be a short-term increase in the portion of arrests of parolees, but in the aggregate, this would amount to an increase of less than one percent in overall arrests in any given county.  Austin Report (8/15/08) at ¶¶ 82-95; Austin Report (8/27/08) at ¶¶ 4-10.  That is because the population reduction measures would temporarily increase the number of parolees in the county.  This would condense the time period during which crimes (likely to occur in any event when the parolee is released) would be committed, and arrests made.  We find that an increase of arrests amounting to less than one percent is de minimis, and will not have any measurable adverse impact on local criminal justice systems.

Defendant-intervenors mistakenly attempt to derive a calculation of the number of "new" crimes that would be committed if there is an increase in arrests of less than one percent.  *See, e.g.*, Austin at RT 1513:10-1514:18, 1516:19-21 (contending a one percent increase in arrests amounts to an additional 160,000 arrests statewide, and even more crime).  The less than one percent increase is an increase in arrests during the timeframe when additional parolees are returned to the community.  But the crimes for which the arrests are made are not "new" crimes, they are crimes that would otherwise have occurred at a later date.  Thus, one cannot use Dr. Austin's estimate of an increase in arrests of less than one percent as a proxy for an increase in overall crime.

Dr. Austin also demonstrated that after the first two years of implementation, the

-144-

1   increase in arrests would disappear, and, all else being equal, arrest rates would return to their

2   pre-implementation levels.  Austin at RT 2582:14-2585:20; *see also* Powers at RT 1188:11-23.

3       Dr. Austin's model of a short-term, less than one percent increase in arrests assumed

4   that the prisoners who are diverted or whose length of stay is shortened would have the same

5   recidivism rate as current parolees.  However, if California used a risk instrument to ensure

6   that only low or moderate risk prisoners were eligible for reduced length of stay or diversion,

7   then those parolees would have a *lower* recidivism rate than the current class of parolees

8   (which includes high risk prisoners).  Austin at RT 2628:8-25.  Under those circumstances, the

9   increase in arrests would be even smaller than Dr. Austin's models indicated.  *Id.*[87]

10      Defendant-intervenors argue that Dr. Austin's analysis is belied by an earlier study that

11  he conducted in Illinois in 1986.  They contend that the Illinois study shows that early release

12  increases crime.  To the contrary, Dr. Austin conducted two studies of Illinois early release

13  programs in 1986 and 1993, both of which concluded that an early release program resulted in

14  a short-term increase in arrests of less than one percent.  Austin at RT 2604:22-2605:22,

15  2607:13-22.  Defendant-intervenors attempted to take certain language contained in the 1986

16

17

18

19

20

---

21  [87] Certain defendant-intervenors wrongly suggested that Dr. Austin's models are not accurate
22  because they compare the increase in arrests of parolees to the overall arrest rate, which
    includes both juveniles and adults, and both misdemeanors and felonies.  Dr. Austin's models
23  show the impact of any increase in arrests on local criminal justice systems overall.  Since
    juveniles and adults, misdemeanants and felons are all arrested by the police and processed by
24  the local criminal justice system, it is appropriate to consider the entire body of arrests in any
    analysis of impacts.  Austin at RT at 1512:13-19.  Similarly, since there is often a great
25  fluctuation in arrests and jail bookings on any given day during a year (Smith at RT 1830:29-
26  1831:1; *see also* Austin at RT 1524:4-15), and crime and arrest rates are calculated annually, it
    is appropriate to demonstrate the impacts of a prison population reduction on the annual arrest
27  rates, rather than arrest rates during the initial window of implementation.

28

1    Illinois study out of context to impeach Dr. Austin, but those arguments are misplaced.[88]

2              **2.    Defendant-Intervenors Exaggerated The Amount Of Crime**
                      **Committed By Parolees**

3

4          Numerous defendant-intervenors argued  –  without any credible evidentiary support  –

5    that any increase in the number of parolees in the community would cause an increase in

6    crime, and attendant impacts on local criminal justice systems.  *See, e.g.*, Ryan Trial Decl. at

7    ¶¶ 17-28 (*Plata* Docket No. 1726).  We reject that contention.

8          Contrary to popular belief, parolees constitute only between 5-6 percent of the total

9    number of arrests in California counties.  Austin Report (8/15/08) at ¶ 85.  Nationally, the

10   figure is even lower.  Krisberg at RT 2115:5-22; Austin Report (9/25/08) at ¶ 5.  Most of the

11   intervenor testimony was consistent with plaintiffs' experts in that they acknowledged that

12   parolees make up a small percentage of all arrests in their jurisdictions.  *See, e.g.*, Munks at RT

13   1788:5-1789:10 (less than three percent of jail bookings are parolees, half of which are for

14   technical parole violations); Christianson Trial Decl. at ¶ 22 (*Plata* Docket No. 1727, *Coleman*

15   Docket No. 3237) (less than seven percent of jail bookings are parolees, some of which are for

16   technical parole violations).[89]  This is not because parolees are "flying under the radar screen;"

17   _____

18   [88] Defendant-intervenors have latched-on to language in the 1986 Illinois study that they
     believe undermines Dr. Austin's testimony.  But each of the various sections they refer to are

19   taken out of context.  For example, counsel quoted sections from the report referring to career
     criminals who are likely to commit in excess of 250 crimes per year (RT 2601:8-13), but that

20   section was not Dr. Austin's findings but a summary of another researcher's hypothesis, which
     Dr. Austin disputed.  Austin at RT 2601:14-21.  Counsel also quoted various sections from

21   Dr. Austin's report when questioning Dr. Krisberg.  *See, e.g.*, RT 2154:10-2155:11.  The
     quotes counsel derived were from a section that laid out potential criticisms and possible

22   problems with early release, not actual findings from the report.

23   [89] Fresno Police Chief Dyer testified that he arrested fewer than 6,500 parolees in 2007, and

24   that this number was 30 percent of all the felony arrests in Fresno.  Dyer at RT 2331:1-8.  This
     figure is meaningless.  It does not tell us what percentage of felony arrests were parolees, since

25   presumably not every parolee was arrested for a felony (indeed, some intervenors have
     suggested that fully half of parolee arrests are for technical parole violations, *see* Munks at RT

26   1789:2-16; Ryan at RT 2698:2-7).  Nor does it tell us what percentage of all arrest were
     parolees, since the figure given is only for felony arrests.

27

28

[272055-1]

1   indeed, because the standards for searching parolees and their homes are so low, police

2   departments regularly conduct "sweeps" of parolees, catching many crimes that would go

3   undetected if committed by the general population. *See, e.g.*, Word at RT 1867:13-1868:12;

4   Dyer at RT 2309:20-2310:14, 2332:1-5. Accordingly, we find that parolees account for a very

5   small percentage of overall arrests, and, as a group, have only a minor impact on local criminal

6   justice systems.

7        We find that many defendant-intervenors vastly over-estimated the amount of crimes

8   committed by parolees, and accordingly exaggerated the potential impact of a prisoner release

9   order.

10        Some defendant-intervenors, such as Fresno Police Chief Dyer, attempted to quantify

11   the number of "new" crimes that would be committed by prisoners who are released early or

12   diverted pursuant to a prison population reduction. Chief Dyer estimated that the average

13   number of crimes committed per arrest is twelve, and estimated that if there were 1,344 arrests,

14   that would amount to 16,000 "new" crimes. Dyer Expert Report at ¶ 25 (*Plata* Docket No.

15   1932). There are several flaws with this type of analysis.

16        First, we find that if the prison population is reduced using the safe methods we have

17   described above, there will be no "new" crimes caused by the population reduction. Chief

18   Dyer and the other defendant-intervenors assumed, in their analysis, that the recidivism rate for

19   the "early releasees" would be the same as the current parolees. Since those "early releasees"

20   will all be prisoners who would otherwise be released, the crimes they commit during the

21   "early release" period are crimes statistically likely to occur at a later date in any event. Thus,

22   while there will be a short-term increase in arrests, that increase is a function of changing (and

23   condensing) the times and circumstances of crimes, not additional crimes.

24        Second, there is no accepted measure for determining how many unsolved crimes can

25

26

27

28

1    be attributed to each arrest.  Austin at RT 2601:22-2602:11, 1404:16-1405:21, 2595:17-21.[90]

2    But however many unsolved crimes correlate to each arrest, or however long it takes, all else

3    being equal, that correlation would remain the same regardless of time of release.  (Unless, of

4    course, only low-risk prisoners – who commit fewer crimes – were part of the release).  If

5    there are currently twelve crimes committed for each arrest, there is no evidence that the

6    twelve-to-one ratio would change as a result of a prisoner release order.  If there are currently

7    three crimes committed for each arrest, that three-to-one ratio would remain the same.

8    Accordingly, a .3 percent increase in arrests would account for a .3 percent increase in crime,

9    all else being equal.  Again, however, this is not "new" crimes – it is crimes that would likely

10   have been committed later being committed in an earlier, condensed timeframe.

11        Third, Chief Dyer and other defendant-intervenors used the recidivism rate of 70

12   percent to calculate the number of crimes they predict will occur.  *See, e.g.*, Dyer Expert

13   Report at ¶ 18 (*Plata* Docket No. 1932).  But the parties agree that the recidivism rate

14   calculated by CDCR is the number of parolees returned to prison over a three-year period.

15   Stipulation at RT 1373:11-20.  Some of those returned to prison are returned for purely

16   technical parole violations, and have not been arrested for a new crime.  *Id.*  Others are

17   technical parole violators who were arrested for crimes that were not prosecuted, and could not

18   otherwise result in a prison sentence.  Austin at RT 1454:18-1455:23.  If California did not

19   return technical parole violators to prison, the recidivism rate would be at the national average:

20   forty percent.  Austin at RT 1475:12-22.  Additionally, if high risk prisoners were screened

21   out, the return to prison rate would be well below seventy percent.  Accordingly, it is

22

23   [90] Chief Dyer relied upon a Rand study for his figure of twelve crimes per arrest.  Dyer at RT
     2315.  We find the Rand study inapplicable.  As Dr. Austin explained, the figures in the Rand

24   study were shown to be excessive.  Austin at RT 2602:3-11.  The Rand estimates were based
     solely on self-reported crimes by prisoners, and much of the self-reports lacked credibility —

25   after a follow-up study was conducted, the self-reported career criminals had not in fact
     committed the number of crimes predicted by Rand, and other studies demonstrated that it

26   would have been factually impossible for them to have done so.  Austin at RT 2594:11-2597:2,

27   2600:2-13.

28

1  misleading to attempt to quantify impacts on crime based on the seventy percent return to

2  prison rate.

3         Other defendant-intervenors, such as Stanislaus County Chief Probation Officer Jerry

4  Powers, contended that a person who was released early would have more time to commit

5  crimes than someone released later. *See, e.g.*, Powers at RT 1035:17-23. Mr. Powers also

6  suggested at a later point during trial that an increase in parolees would strain the policing

7  resources, resulting in more unsolved crimes, and more victims. Powers at RT 1179:5-17; *see*

8  *also* Word at RT 1863:17-21. But parolees make up a tiny fraction of all arrests even though

9  police departments focus heavily on conducting "sweeps" and "compliance checks" of

10  parolees. Word at RT 1867:13-1868:12. Mr. Powers himself conceded that early release

11  merely changes the time and circumstances of crime, but it would not change the statistical

12  likelihood of the crime taking place. Powers at RT 1155:4-7.

13        Just as there was no credible evidence showing how many unsolved crimes can be

14  attributed to each arrest, there was no credible evidence demonstrating the average length of

15  time between commission of a crime and arrest. Whatever the figure is, however, the evidence

16  suggests that early-released prisoners would have the same amount of time (albeit in an earlier

17  timeframe) as normally-released inmates to commit crime. *See, e.g.*, Woodford at RT

18  1325:17-1327:6 (former Acting Secretary of CDCR). But even if early released prisoners did

19  tax policing resources, and slightly increase the amount of time between commission of crime

20  and arrest, the impact would be very small. Mr. Powers did not quantify the impact, or identify

21  how many more unsolved crimes he estimated would take place. As we have found, parolees

22  account for less than five percent of all arrests. Under Mr. Powers' scenario, a short-term

23  increase in the number of parolees (at least a third of whom never return to prison) would have

24  only a minute impact on policing resources and the length of time between crime and arrest.

25        **3.    There Is No Relationship Between The Crime Rate And Either The
            Rate Of Parolees In A Community Or The Rate Of Incarceration**

26

27        There is some superficial appeal to the defendant-intervenor argument that public safety

28  will be imperiled by increasing the percentage of the population that is made up of ex-

-149-

offenders, or, conversely, by reducing the percentage of the population that is behind bars and incapacitated. *See, e.g.*, Graves at RT 2264:18-2265:1 (arguing the point but conceding the argument is not based on fact); Dyer at RT 2348:16-25; Pacheco at RT 2380:12-2381:22; Dumanis Trial Decl. at ¶ 23. On the other hand, plaintiffs have shown that increasing the number of parolees in a community by reducing the prison population through diversion and moderately reducing lengths of stay do not impact crime rates. We find that the best way to reconcile the testimony of defendant-intervenors and plaintiffs' experts is to look at what has actually happened in jurisdictions throughout the state and country that have actually reduced their prison populations. Krisberg at RT 2116:21-2117:21.

Plaintiffs provided overwhelming evidence showing that prison population reductions in other states and jail population reductions in California have had no impact on public safety. Plaintiffs' expert Dr. Barry Krisberg, a nationally recognized expert who was chosen by California to be a member of CDCR's own expert panel, and who has been involved in every legislatively mandated study of the California prison system since 1980 (Krisberg at RT 2101:9-19), demonstrated that prison and jail population reductions have historically not had any impact on crime rates.

In forming his opinions, Dr. Krisberg performed an exhaustive review of research concerning the actual experience of jurisdictions that implemented accelerated release programs to reduce their prison populations. He reviewed every article on the topic since the 1980s. Krisberg at RT 2102:1-6, 2102:20-2103:13. He directly participated in performing a study of accelerated release programs in Illinois. Krisberg at RT 2103:14-19. He ultimately reviewed fourteen articles, dissertations, and state agency reports concerning the impact of accelerated release programs in nine American states, the city of Philadelphia, and Canada. Krisberg at RT 2102:20-25, 2107:15-2108:17.

For each of those jurisdictions, Dr. Krisberg compared recidivism rates of inmates released early to the recidivism rates of those who served their full terms. Krisberg at RT 2103:20-2104:21. By comparing the recidivism rates, he could determine whether the criminal behavior of inmates changed if they were released prior to serving their full sentences.

1    Krisberg at RT 2104:24-2105:4.  He also reviewed statistics from the Federal Bureau of

2    Investigation to examine crime trends in the American jurisdictions during the periods of early

3    release.  Krisberg at RT 2103:20-2104:3.  None of the jurisdictions experienced an increase in

4    crime as the result of the accelerated releases, and two jurisdictions that provided programming

5    actually experienced decreased recidivism rates.  Krisberg at RT 2105:5-21.  The fourteen

6    studies used different methods and approaches, but they all reached the same conclusion:  that

7    there was no increase in criminal behavior as the result of mandatory prison population

8    reduction.  Krisberg at RT 2107:15-2108:17.

9        Dr. Krisberg also researched the impact of early releases on California counties that

10    were operating under court-imposed population caps.  He reviewed data from twenty to

11    twenty-four California counties during the three, five and ten year periods ending in 2006.[91]

12    Krisberg at RT 2108:19-2109:1.  Over the course of ten years, twenty-one counties released

13    over 1.7 million jail inmates early.  During that same period, those counties experienced an

14    eighteen percent decrease in serious and misdemeanor crimes.  Krisberg at RT 2110:6-2111:8.

15    During the five years ending in 2006, the counties released approximately 750,000 inmates

16    early while crime remained unchanged.  Krisberg at RT 2111:10-17.  During the three-year

17    period ending in 2006, the counties released 400,000 inmates early while reported crimes

18    declined seven percent.  Krisberg at RT 2111:10-21.  As a result, Dr. Krisberg opined that

19    court-ordered population reductions in California county jails did not adversely impact crime.

20    Krisberg at RT 2112:17-20.

21        The Court finds that Dr. Krisberg's testimony was credible and persuasive.  It is clear

22    that numerous other jurisdictions have engaged in mandatory prison population reductions with

23    no adverse impact on public safety.  There has been no relationship between early releases and

24    crime in California counties.  Actual experience supports the Plaintiffs' arguments that an

25    order in this case limiting the California prison population would not adversely impact public

26

27    [91] The number of counties differed, depending on the time period.  Krisberg at RT 2108:23-24.

28

1    safety.

2        Neither the defendants nor the defendant-intervenors presented any evidence showing

3    that prison population reductions in other jurisdictions increased crime, increased recidivism,

4    or adversely impacted public safety.  Thus, Dr. Krisberg's evidence not only was highly

5    credible; it was uncontroverted.

6        Defendants' Exhibit D-1332 and Plaintiffs' Exhibit P-842 provide a further, graphic

7    demonstration of the fact that crime rates do not respond to changes in the numbers or rates of

8    parolees in the community.  They show that both violent and property crime rates have gone

9    down over the last two decades in California at the same time that the number of parolees and

10   rate of parolees per 100,000 population have increased.

11       Plaintiffs' Exhibit P-842 further demonstrates the same is true in the various counties

12   examined  –  there is no relationship between parolee rates and crime rates.[92]  The crime rates

13   dropped independently of the changes in parolees.  Fresno Police Chief Dyer testified that he

14   expected crime to rise as the number of parolees increased (Dyer at RT 2348:16-25), and also

15   that he thought that the number of parolees in his county had remained steady or dropped as

16   crime rates had dropped (Dyer at RT 2352:6-9, 2357:6-13).  In fact, the number of parolees

17   released into Fresno County  –  and the proportion of the Fresno population made up of

18   parolees  –  has increased at the same time that crime rates have been dropping.  Pls.' Exh. P-

19

20

21   _____

22   [92] Defendants contended that Plaintiffs' Exhibit P-842 is confusing because the exhibit
     contains charts with a "double Y axis" — i.e. crime rates were depicted on one Y-axis, and
23   parolee rates on the other Y-axis of the same chart.  However, defendants demonstrated —
     through Defendants' Exhibit D-1332 — that there is no correlation between crime rates and
24   increasing parolee rates, regardless of whether one demonstrates this fact using a double Y axis
     (Pls.' Exh. P-842), or a single Y axis (Defs.' Exh. D-1332).  Moreover, we note that the use of
25   a double Y axis is common when demonstrating changes in two factors over time, and
     defendants themselves introduced various graphs with double Y axes.  *See* Defs.' Exh. D-1024
26   at 3-6; Defs.' Exh. D-1236.  The use of a double Y axis alone does not render plaintiffs' charts
     unreliable to show relative trends in parolee rates and crime rates over time.
27

28

1   842 (Fresno County charts); Austin Report (9/25/08) at ¶ 6.[93]

2          It cannot be said that the crime rate would have dropped faster but for the parolees,

3   because some counties with greater increases in parolees saw the same changes in crime rates.

4   (Compare, for example, Orange County, where parolees increased while violent crime

5   remained flat, with San Diego County, where parolees decreased, then increased, and violent

6   crime remained flat, and Riverside County, where parolees remained flat, then increased, while

7   violent crime rates were dropping.)  Pls.' Exh. P-842.  The bottom line is that there is no

8   relationship between the crime rate and the parolee rate.

9          The converse is also true:  Historical data shows that there is no relationship between

10  the crime rate and the incarceration rate.  Austin Report (8/15/08) at ¶¶ 19-26; Krisberg at

11  2160:20-2162:7.  Defense expert Dr. James Marquart initially suggested in his report that

12  "something is 'going on' in California with respect to the relationship between incarceration

13  rates and crime rates" (Defs.' Exh. D-1024 at ¶ 3(a)), but he admitted during his testimony that

14  there is no correlation between the rate of incarceration in California and the violent crime rate,

15  and agreed that "it would be a mistake to conclude that the decline in the California crime rate

16  is a result of its incarceration policies."  Marquart at RT 2001:9-2002:18; s*ee also* Marquart at

17  RT 1969:14-1970:8 (agreeing that "states that have reduced the length of incarceration have

18  had the same [crime] reductions at the same rates as Texas or any other state, roughly").

19              **4.      Defendants And Defendant Intervenors Exaggerated The Impact Of
20                        Releasing Prisoners With Mental Illness**

21          In assessing impacts on public safety and criminal justice, this Court has considered not

22  only the aggregate impacts of a general population reduction, but also the impact of including

23  persons with mental illness in population reduction measures.  Plaintiffs have demonstrated by

24  clear and convincing evidence, and the Court finds, that members of the *Coleman* class of

25  _____

26  [93] Chief Dyer took issue with the charts on Plaintiffs' Exhibit P-842 relating to "new parolees"
    because a single parolee might be re-released more than once, and therefore might be double-

27  counted.  Dyer at RT 2356:1-6.  Plaintiffs' Exhibit P-842 includes a separate chart showing the

28                                                                              (continued …)

1  prisoners with mental illness may be included in population-reducing measures without

2  causing any adverse impact on public safety or the operation of the criminal justice system.

3        Defendants and some defendant-intervenors contend that including prisoners with

4  mental illness in a population reduction plan would be dangerous to the public and to the

5  prisoners themselves. *See, e.g.*, Defs.' Trial Brief at 18 (*Coleman* Docket No 3262); County

6  Intervenors' Trial Brief at 5-6 (*Coleman* Docket No. 3261).  The evidence does not support

7  such a finding, but rather supports the following findings:

8        1.     Mentally ill inmates should not "by virtue of their mental illness, be considered

9  higher risk than other inmates." Defs.' Exh. D-1021 at 2.  Three expert witnesses, two for the

10 defendants and one for plaintiffs agreed on this point.  Gilligan at RT 1608:16-25; Gilligan

11 Report at ¶¶ 34-49; Defs.' Exh. D-1026 at 2 (defendants' expert Gale Bataille); Defs.' Exh. D-

12 1021 at 1 (defendants' expert Dr. Packer: "I agree that the research literature does not suggest

13 that mentally ill offenders pose a higher risk of violence than their non-mentally ill

14 counterparts.").  Persons with mental illness are more likely to be withdrawn than aggressive.

15 Gilligan at RT 1648:11-1649:6.  The risk factors for violence, such as age, prior history,

16 substance abuse, and character disorders are comparable for both the mentally ill and non-

17 mentally ill.  Gilligan Report ¶ 40; Gilligan at RT 1649:7-1651:23.

18       In assessing impacts on public safety and criminal justice, this Court has considered not

19 only the aggregate impacts of a general population reduction, but also the impact of including

20 persons with mental illness in population reduction measures.  Plaintiffs have demonstrated by

21 clear and convincing evidence, and the Court finds, that members of the *Coleman* class of

22 prisoners with mental illness may be included in population-reducing measures without

23 causing any adverse impact on public safety or the operation of the criminal justice system.

24       Defendants and some defendant-intervenors contend that including prisoners with

25 mental illness in a population reduction plan would be dangerous to the public and to the

26

27 ────────────────

    total parolee population, expressed as a rate of the total population in the jurisdiction.

28

-154-

prisoners themselves. *See, e.g.*, Defs.' Trial Brief at 18 (*Coleman* Docket No 3262); County Intervenors' Trial Brief at 5 (*Coleman* Docket No. 3261). The evidence does not support such a finding, but rather supports the following findings:

2.     Mental illness is not a valid predictor of criminal conduct or violence. Three expert witnesses, two for the defendants and one for plaintiffs, agreed on this point. Gilligan at RT 1608:16-25; Gilligan Aug. 15, 2008 Expert Report at ¶¶ 34-49; Defs.' Exh. D-1026 at 2 (Bataille Aug. 27, 2008 Rebuttal Report); Defs.' Exh. D-1021 at 1 (Packer Oct. 1, 2008 Report) ("I agree that the research literature does not suggest that mentally ill offenders post a higher risk of violence than their non-mentally ill counterparts."). The risk factors for violence, such as age, prior history and substance abuse, are distributed equally among the mentally ill and non-mentally ill. Gilligan Aug. 15, 2008 Expert Report ¶ 49; Defs.' Exh. D-1021 at 2 (Packer Oct. 1, 2008 Report).[94]

3.     The mentally ill do not score differently on defendants' validated risk assessment tool. We give substantial weight to defendants' evidence regarding the risk assessment tool that they have validated against a sample of over 100,000 California parolees. Cate at RT 1678:9-1679:7; Defs.' Exh. D-1000 at ¶¶ 36-38; Defs.' Exh. D-1005 at ¶¶ 14-15. The risk characteristics of *Coleman* class members are not materially different from those of other inmates. Austin at RT 2629:2-2630:20. Where a prisoner approaching release poses a threat to self or others due to mental disorder, the state already has several processes to initiate civil commitment before release. *See* Stewart Supp. Report at ¶¶ 138-139; Gilligan at RT 1654:12-22; Cal. Penal Code § 2962, 2974; Cal. Welfare & Institutions Code §§ 6600 *et seq.*

4.     Mentally ill parolees "recidivate," that is, return to prison, at a higher rate than non-mentally ill parolees, not because they commit more new crimes, but rather because they are more prone to technical violations, particularly those related to treatment, such as missing

1   appointments.  Gilligan Report at ¶¶ 36-37; Pls.' Exh. P-714[95]; *see also* Hoffman at RT

2   1767:1-10, 1737:22-1738:4.  Thousands of parolees with mental illness are returned to prison

3   each year primarily due to behavior related to their mental illness, including non-compliance

4   with parole conditions due to disorganization produced by their mental illness.  Hoffman at RT

5   1767:1-10; Pls.' Exh. P-715 at CDCR 002202.

6        5.      The status quo of churning of mentally ill parole violators through technical

7   parole violation terms harms public safety.  No witness contended that the current system of

8   churning is good for public safety.  *See, e.g.*, Hoffman at RT 1768:3-15 (churning merely

9   postpones future victimization but does not prevent it).  Short-term parole violations interrupt

10  mental health treatment, and result in parolees returning to the street sicker than they were

11  when they came in.  Gilligan Report at ¶¶ 32-33; Pls.' Exh. P-360 (Undersecretary Kernan

12  testifying:  "They are being sanctioned for their behavior and we are sitting them on bunks.");

13  Powers at RT 1167:7-1168:1 (criminogenic effects of prisons); Marquart at RT 1965:8-1966:9

14  (same); Yim at RT 2653:2-15 (same); Meyer at RT 2777:8-12 (same).

15       6.      Population reduction strategies that divert mentally ill prisoners from the

16  churning process can improve public safety.  The churning process prevents necessary pre-

17  release planning, which, according to defendants' expert, cannot be done in a 4-month

18  violation term, and interrupts vital treatment and re-adjustment.  Defs.' Exh. D-1021 at 2 (need

19

---

20  [94] Dr. Packer emphasizes that risk factors shared by all prisoners do not justify differential

21  treatment of the mentally ill:  "This does <u>not</u> mean that mentally ill inmates should, by virtue of

22  their mental illness, be considered higher risk than other inmates."  Defs.' Exh. D-1021 at 2

23  (Packer Oct. 1, 2008 Report).

1  for discharge planning); Gilligan Expert Report at ¶ 32-33.  Defendants' mental health expert

2  testified that the most effective population reduction measure he has used is diversion of the

3  mentally ill out of institutions and into community-based programs.  Packer at RT 1086:6-

4  1087:22.  The state's parole division has already begun efforts to divert mentally ill parolees

5  away from prison and to improve community treatment resources, and credibly contends that

6  such steps will improve public safety.  Defs.' Exh. D-1005 at ¶¶ 10, 27-35; Hoffman at RT

7  1766:15-21; Defs.' Exhs. D-1195, D-1222, D-1307; Peña at RT 2448:24-2451:7.

8            7.        The predictions of the state and county defendants that public safety will be

9  threatened due to lack of treatment resources in the community are not supported by the

10  evidence.  These predictions assume that treatment is better in prison than in the community.

11  Prisoners with mental illness are currently being released in California at a rate of

12  approximately 2,000 per month statewide.  Cate at RT 1685:25-1686:2 (10,000 releases per

13  month); Gilligan at RT 1614:4-11 (twenty percent mentally ill).  Prisons are "are not conducive

14  to the treatment of mental illness."  Defs.' Exh. D-1019 at 7 (Packer Dec. 2007 Supp. Report).

15  For most individuals with mental illness release from prison by itself will improve their

16  conditions.  Gilligan Rebuttal Report ¶ 11; Stewart at RT 2212:12-17.  The vast majority of

17  prisoners with mental illness can be treated at a case management level of care, similar to the

18  majority of the over 650,000 persons treated by community mental health each year in

19  California.  Gilligan Rebuttal Report ¶ 23; Pls.' Exh. P-743; Bataille at RT 2528:11-2533:13;

20  Stewart at RT 2210:13-2212:17.  Only a small minority of releasees requires intensive levels of

21

22  ---

[95] Defendants have made hearsay objections to Plaintiffs' Exhibit P-714, an unpublished
23  manuscript of the 2008 UC Irvine studied relied upon by Dr. Gilligan.  The study is of a type
traditionally relied upon by experts and is a permissible basis for expert opinion.  F.R.E. 703,
24  803(18).  In addition, the study is admissible as the admission of a party opponent.  The study
came from the UC Irvine Center for Evidence Based Corrections, which is funded by
25  defendant CDCR to study its programs, and is frequently consulted by CDCR.  Hoffman at RT
1756:23-1757:12.  The study was performed using data from CDCR.  Gilligan Report at ¶¶ 36-
26  37; Pls.' Exh. P-714 at E_UCI043712.  We find that statements in the study regarding CDCR's
27  data are non-hearsay party admissions of CDCR.  F.R.E. 801(d)(2)(C), (D).

28

[272055-1]

1   community care, and even fewer ever require any period of inpatient care.  Gilligan Report at

2   ¶¶ 50-54; Peña at RT 2445:22-2448:23; Stewart at RT 2212:8-21.  The state has begun

3   contracting to purchase services from county mental health departments to assist in caring for

4   the small fraction of mentally ill parolees who require services that cannot be provided by the

5   Parole Outpatient Clinics.  Defs.' Exh. D-1005 at ¶ 32; Peña at RT 2448:24-2451:7; *see also*

6   Hoffman at RT 1742:24-1743:8 ($100 million investment already made in new parole

7   programs generally).  Credible testimony established that treating mentally ill parolees is more

8   effective than treating them in prison, as well as ten times less expensive.  Gilligan Rebuttal

9   Report at ¶¶ 10-12; Hoffman at RT 1747:9-16, 1753:24-1755:2; Defs.' Exh. D-1205 at

10  DEFS055774.  A prison population reduction can free up substantial resources to enhance

11  community-based treatment.  Gilligan Rebuttal Report at ¶ 19.  The major resource in short

12  supply, clinical staff, are easier to recruit for community-based programs than for prisons.  *Id.*

13  at ¶ 17.

14        **5.      Lack Of Resources For Rehabilitative Programs In The Community**
                    **Does Not Make A Population Reduction Unsafe**

15

16        Defendants and many of the defendant-intervenors testified that currently there are

17  insufficient resources in the communities to address the needs of parolees  –  specifically, there

18  are too few programs providing mental health treatment, drug and alcohol treatment, job

19  placement, and housing.  *See, e.g.*, Conklin at RT 2073:22-2074:1; Munks at RT 1783:10-

20  1784:2; Dyer at RT 2307:16-21; Peña Trial Decl. at ¶ 18 (*Plata* Docket No. 1644, *Coleman*

21  Docket No. 3168); Garner Trial Decl. at ¶¶ 7-8 (*Plata* Docket No. 1640, *Coleman* Docket No.

22  3164); Cogbill Trial Decl. at ¶ 7 (*Plata* Docket No. 1676, *Coleman* Docket No. 3196); Boesch

23  Trial Decl. at 9-12 (*Plata* Docket No. 1698, *Coleman* Docket No. 3246); Johnson Trial Decl. at

24  ¶¶ 2-6 (*Plata* Docket No. 1698, *Coleman* Docket No. 3246); Bay Trial Decl. (*Plata* Docket

25  No. 1698, *Coleman* Docket No. 3246); Silva Trial Decl. (*Plata* Docket No. 1698, *Coleman*

26  Docket No. 3246).  Some defendant-intervenors also argued that increasing parolees when

27  there are insufficient programs would endanger public safety.  We find that this testimony was

28  exaggerated.  Nearly all of the witnesses who so argued did not even know how many parolees

1  were in the counties to begin with, or were being served by the county programs they claimed

2  would suffer the burdens of additional parolees.  *See, e.g.*, Munks at RT 1787:14-19; Graves at

3  RT 2270:6-20, 2277:15-23, 2280:5-2282:11; Peña at RT 2445:16-21; Garner at RT 2498:3-12;

4  Stip. Regarding Testimony of David Boesch at ¶¶ 3-10 (*Plata* Docket No. 1940, *Coleman*

5  Docket No. 3397); Stip. Regarding Testimony of Beverly Beasley Johnson at ¶¶ 3-5 (*Plata*

6  Docket No. 1922, *Coleman* Docket No. 3382); Stip. Regarding Testimony of Duane Bay at

7  ¶¶ 4-6 (*Plata* Docket No. 1966, *Coleman* Docket No. 3425); Stip. Regarding Testimony of

8  Charlene Silva at ¶¶ 3-8 (*Plata* Docket No. 1931, *Coleman* Docket No. 3391).

9      For example, defendants' expert Gale Bataille exaggerated when she offered dire

10  predictions that a CDCR population reduction that included mentally ill parolees would cause

11  counties to focus resources on the parolees, and reduce services to children, the elderly and

12  other vulnerable clients.  Defs.' Exh. D-1025 at 1.  Ms. Bataille admitted that California county

13  mental health programs do not now serve the parolees who appear at their facilities to seek

14  treatment; instead county mental health programs refer such persons back to the state parole

15  office for treatment in the Parole Outpatient Clinic system.  Bataille at RT 2550:20-2551:19.

16  In light of this testimony, the Court cannot credit assertions that county mental health programs

17  would respond to a population reduction order by reducing services for persons outside of the

18  parole and criminal justice systems.

19      Moreover, the parolees who need county services  –  whether they are mental health

20  services, drug treatment programs, housing programs, employment programs, or others  –  will

21  need those services regardless of when they are released, so any population reduction might

22  change the *timing* of a resource shortage, but will not cause a shortage that would not

23  otherwise exist.  *See, e.g.*, Garner at RT 2499:1-13; Stip. Regarding Testimony of Duane Bay

24  at ¶ 7 (*Plata* Docket No. 1966, *Coleman* Docket No. 3425).

25      Furthermore, it is the state's and local governments' responsibility to provide funding

26  for such programs, and it is the failure to do so that has caused the current dearth of programs.

27  CDCR currently releases nearly 140,000 parolees every year, including individuals who are

28  drug addicted, mentally ill, jobless, and homeless, despite this lack of resources in the

-159-

1    community.  The Governor, as well as numerous other public officials, has proclaimed that

2    protecting public safety is of paramount importance to the State.  Yet the programs that

3    defendants argue are necessary for public safety have not been implemented.  We find that the

4    resource shortage is a result of policy decisions that the State and local governments have

5    made, and that reflects the current state of affairs.  Dyer at RT 2359:3-14 (Fresno has too few

6    resources, but Chief Dyer never sought more funds from state or local government); Garner at

7    RT 2492:16-2493:5; Meyer at RT 2785:14-2786:5, 2788:22-2789:1, 2791:2-2792:3.[96]  While

8    creating and funding rehabilitative programs would improve outcomes, reducing the prison

9    population without such programs in place will not worsen public safety.  It will merely

10    perpetuate the status quo.[97]

11        Nonetheless, the Court finds that the state will save approximately $1 billion per year

12    when it reduces its prison population to the levels required by this Court's order, which could

13    be applied to create the needed programs both within prisons and in the communities.

14    According to CDCR's figures, for every reduction of ten thousand prisoners, the state will save

15    more than $200,000,000 (Pls.' Exh. P-2 (CDCR Expert Panel Report) at Appx. E, 97), and thus

16

17    _____

18    [96] One of the shortages cited by Defendants' community mental health expert Ms. Bataille, the
      shortage of inpatient psychiatric hospital beds, is caused in part by the state's decision to keep
19    hundreds of beds empty at the new Coalinga State Hospital, even after the state parole
      department sought access to state hospital beds to enhance options for community-based
20    treatment of parolees with mental illness.  Defs.' Exh. D-1026 at 8 (Bataille Aug. 27, 2008
      Rebuttal Report); Bataille at RT 2557:25-6; Radavsky at RT 817:19-819:3; Pls.' Exh. P-590.
21

22    [97] Defendant-intervenor Jerry Dyer, who is Chief of Police in the City of Fresno, testified that
      an increase in crime would also have serious economic consequences for the county tax
23    revenues and unemployment rates.  Dyer Expert Report at ¶ 31.  We reject this argument for
      three reasons.  First, we have found that reducing the prison population would not cause crime
24    rates to rise, so the forecasted economic consequences of crime would not occur.  Second, even
      if they did occur, impacts on county tax revenue, or unemployment rates, are not relevant to
25    any issue before this Court.  Third, in any event, we afford little weight to the opinions of
      Chief Dyer regarding economic matters, as he is not an economist and has no experience with
26    the economic impacts of crime beyond what he observed as a Fresno resident during a period
      of high crime rates.  Dyer at RT 2334:11-2335:11.
27

28

1    a reduction of 52,000 prisoners would generate savings of more than $1 billion per year.[98]  The

2    cost of supervising parolees and providing evidence-based programs to parolees is far lower

3    than the cost of imprisonment.  *See, e.g.*, Pls.' Exh. P-2, Appx. E at 96 (costs for new programs

4    for prisoners and parolees range from $3,000-$5,000 with one program for long term prisoners

5    costing $10,000); Pls.' Exh. P-113 at 75 (Governor's Strike Team Report noting  supervision

6    of parolees costs approximately $4,300 per year); Hennessey at RT 2804:5-10; Hoffman at RT

7    1754:18-1755:5; Woodford at RT 1327:16-1328:24.  This is true even for the most expensive

8    inpatient mental health care that a small fraction of parolees might require.  Peña at RT

9    2446:25, 2448:24-2450:18.

10       Defendants and defendant-intervenors can craft a population reduction plan that

11   redirects these savings toward funding the programs that defendants and defendant-intervenors

12   claim are necessary in order to protect the public from parolees.  Defendants' own hand-picked

13   expert panel has provided them with a roadmap of programs and policies that could receive

14   such diverted funding, as have the defendant-intervenors in this case.  *See* Pls.' Exh. P-2

15   (CDCR Expert Panel Report); Austin Report (8/15/08) at ¶ 43; *see also, e.g.*, Bennett Aug. 15,

16   2008 Report; Rodriguez Trial Decl.; Dumanis Trial Decl.; Powers Trial Decl.  Defendants'

17   experts in this case have presented additional program alternatives that could receive such

18   support if the funds were freed up by a reduction in the prison population.  *See* Defs.' Exh. D-

19   1026 at 10-11 (Bataille Aug. 27, 2008 Rebuttal Report); Bataille at RT 2561:18-2564:15.  The

20   evidence demonstrates that, given the state and local governments' current budget crises, the

---

[98] There are various calculations that the state uses to describe the cost of imprisonment. According to CDCR, if one divides the total costs of the prison system by the total number of prisoners, the average yearly cost of imprisonment averages out to be approximately $35,500 per prisoner. *See* http://www.cdcr.ca.gov/Divisions_Boards/Adult_Operations/ Facts_and_Figures.html (site last visited 1/14/09).  However, reducing the prison population will not necessarily save $35,500 per prisoner, because the state will still have to employ correctional officers and other personnel, and carry other overhead costs.  Accordingly, the state uses a "marginal-overcrowding rate of $20,597 per bed" per year to calculate the savings that would be generated by reducing a bed in a crowded prison.  Pls.' Exh. P-2, Appx. E at 97.

[272055-1]

1  most likely means for funding these necessary programs is a reallocation of funds saved by

2  reducing the prison population.

3      Accordingly, we find that the current lack of resources for rehabilitative programs is a

4  factor favoring a prison population reduction, and is not an obstacle to doing so safely.

5      **6.    Defendant-Intervenors Exaggerated The Impact On County Criminal Justice Systems**

6

7      The Court heard testimony from several defendant-intervenors who argued that—

8  separate and apart from any impacts on crime—a prison population reduction would have an

9  adverse impact on crowded county jails and overtaxed police, prosecutors, and courts.  While

10  we recognize that many county jails are experiencing crowding, we note that all of the local

11  officials who testified in this trial conceded that they considered it problematic when their

12  county jails were much less crowded than the state prison system.  *See, e.g.*, Smith at 1800:10-

13  23 (Los Angeles County); Munks at RT 1797:20-1798:3 (San Mateo County); Graves Expert

14  Report at 3 (*Plata* Docket No. 1643) (Santa Clara County); Dyer Expert Report at ¶ 29 (*Plata*

15  Docket No. 1932) (Fresno County jail); Ryan Trial Decl. at ¶ 11 (*Plata* Docket No. 1726)

16  (Amador County jail); Meyer Trial Decl. at ¶ 57 (*Plata* Docket No. 1733) (Yolo County jail);

17  Ingrassia Trial Decl. at ¶ 11 (*Plata* Docket No. 1673) (San Diego County jail).

18      Many county jails start releasing prisoners before they achieve 100 percent of capacity,

19  to leave space in each classification level for new inmates.  *See, e.g.*, Smith at RT 1800:10-23,

20  1083:8-22 (LA County conducts early release in order to maintain ten percent vacancy rate);

21  Dyer Expert Report at ¶ 29 (*Plata* Docket No. 1932) (Fresno County jail may release or refuse

22  to take additional prisoners when they reach ninety percent of capacity); Meyer Trial Decl. at

23  ¶ 57 (Yolo County jail releases people when they reach ninety-five percent of capacity).

24      We cannot, consistent with our obligation to uphold the Constitution, refuse to address

25  the very serious constitutional violations caused by a prison population close to 200 percent of

26  design capacity, just to protect jails from reaching crowding at levels of 100 percent of design

27  capacity.

28      Moreover, while many local law enforcement agencies are underfunded, we note that

-162-

1  the lack of funding is a result of policy decisions made by state and local governments over the

2  years.  And as we conclude below, lack of funds to remedy constitutional violations does not

3  absolve defendants and defendant-intervenors of the obligation to do so.  *See infra* Conclusions

4  of Law.

5        We are nonetheless mindful of the concerns about crowding in county jails and strains

6  on local law enforcement systems.  Fortunately, the evidence demonstrates, and this Court has

7  found, that the state can accomplish a prison population reduction without increasing overall

8  crime rates, and with only a short-term, de minimis impact on arrest rates.

9        If the prison population reduction does not lead to any significant change in crime rates

10  or arrest rates, it will not adversely impact the resources of local police forces, prosecutors,

11  courts or jails.  In fact, the evidence shows that at least one reform  –  diverting technical

12  parole violators  –  will relieve pressures on local criminal justice systems, because technical

13  parole violators who would be booked into county jails will instead receive alternative

14  sanctions.  Austin at RT 2587:3-17.

15       We have observed the demeanor and testimony of the defendant-intervenor witnesses

16  who testified to the contrary, and find that many of them exaggerated the alleged impacts, and

17  that their testimony lacks credibility.  For example, San Mateo County Sheriff Munks argued

18  in his trial declaration that a prison population reduction would cause his crowded jail to

19  overflow, and that it would cost the county millions to send an estimated two hundred jail

20  inmates out of county.  However, he admitted during trial that his methodology for reaching

21  those figures was flawed.  Munks at RT 1794:19-22.  In fact, his jail is not overcrowded  –  it

22  typically runs at 170 inmates *below* maximum capacity (Munks at RT 1791:6-12) and no jail

23  inmates would need to be sent out of county, because the number of new arrests from parolees

24

25

26

27

28

1    would not even fill the current facility.[99]

2         Another San Mateo witness, Assistant County Manager David Boesch, also exaggerated

3    his testimony about impacts of a prisoner release order, to the extent that Mr. Boesch signed a

4    trial declaration under penalty of perjury but "did not personally calculate, analyze or verify

5    the calculations used to reach his opinion that it will cost San Mateo County $21 million in

6    annual costs to provide services to 1,000 former inmates." Stip. Regarding Testimony of

7    David Boesch at ¶ 15 (*Plata* Docket No. 1940); *see also id.* at ¶¶ 2-14. Yet another San Mateo

8    County witness admitted that her estimate of the cost to the county from a prison population

9    reduction were wildly overblown, in one instance by a factor of more than twenty. Stip.

10   Regarding Testimony of Beverly Beasley Johnson at ¶¶ 6-8 (*Plata* Docket No. 1922).

11        Defendant-intervenor Graves also exaggerated when he testified that a prison population

12   reduction would overwhelm the Santa Clara County jail system. He later admitted that the jails

13   are well below capacity (Graves at RT 2272:1-6; Pls.' Exh. P-841), and that the county has

14   closed down some jail beds and rented other jail beds to nearby counties (Graves at RT 2276:5-

15   18).

16        Stanislaus County Sheriff-Coroner Adam Christianson exaggerated when he testified

17   that, if 200 to 400 parolees were returned to Stanislaus County, that would increase the average

18   daily population in county jails by 100-200. Christianson Trial Decl. at ¶¶ 23, 26 (*Plata*

19   Docket No. 1727). Sheriff Christianson admitted he had no idea how he reached the

20

21   _____

[99] Sheriff Munks admitted that parolees account for fewer than 500 of the 18,000 bookings in
22   a year, or less than three percent of all jail bookings (Munks at RT 1788:5-1789:7), which is
     consistent with the testimony of Plaintiffs' experts. He also stated that half of those 500
23   parolees are arrested for technical violations, and spend about four days in jail (Munks at RT
     1789:2-16), while the other half spend on average twenty-one days in jail (Munks at RT
24   1790:4-6). If, as Sheriff Munks assumed, 1,000 new parolees were to come to San Mateo
     County, of whom 700 would recidivate, those arrests would take place over a three-year
25   period, or approximately 230 per year. If an additional 230 parolees were arrested each year,
     half of whom spent twenty-one days in jail, and half of whom spent four days in jail, that
26   would account for fewer than ten beds per day ($(115 \times 21) + (115 \times 4) = 2875$ bed days;
     $2875 \div 365 = 7.9$).
27

28

conclusion about the increase in the jail population – his staff came up with the number via a methodology he did not understand.  Christianson at RT 2677:7-2680:7.  He did not even know the average length of stay in his county jails, which is necessary to calculate how an increase in jail admissions would impact average daily population.  Christianson at RT 2678:5-2679:1; *see also* James Trial Decl. at ¶ 33 (*Plata* Docket No. 1728) (Orange County Assistant Sheriff) (similar exaggeration).

Similarly, Vacaville Police Chief Word exaggerated when he testified that an additional 100 to 200 parolees in the city of Vacaville would strain the city's forty-eight patrol officers. Word Trial Decl. at ¶¶ 18, 23 (*Plata* Docket No. 1661); Word at RT 1872:13-17.  If the 100-200 parolees were released over a two-year period, that is only an additional five to ten parolees per month.  While the city's policing budget might be under strain given the city's financial problems, the addition of such a small number of parolees (many of whom are never arrested for new crimes) will not contribute in any meaningful way to such strain.

Los Angeles County Sheriff's Lieutenant Stephen Smith testified that a population reduction of 52,000 prison inmates would result in 11,000 commitments to LA county jails, given the seventy percent recidivism rate, which he said would have a "devastating" effect. Smith at RT 1819:15-23.  Yet he conceded that even if an additional 11,000 additional parolees were booked into LA county jails over two years (in point of fact, we know the return to prison rate is a three-year rate, and that those parolees would come back at a later date in any event), that would amount to twenty new jail admissions per day.  Smith at RT 1831:16-23.  We find an increase of twenty admissions to be inconsequential in a system the size of LA County's, where the jails typically book from 300-1,100 inmates per day (Smith at RT 1830:21-1831:1), and maintain a vacancy of more than 2,500 jail beds (Def-Ints' Exh. DI-613; Smith at RT 1829:16-1830:3).

Riverside County District Attorney Rod Pacheco similarly exaggerated the impact of a prisoner release order.  He testified that if the population reduction resulted in 1,890 parolees returning to Riverside County, and twenty-five percent of parolees are rearrested within four months of release, he would expect twenty-five percent of the 1,890 parolees to be arrested in a

-165-

single four-month period, which he argued would have a significant impact on the community

and the criminal justice system.  *See* Pacheco Trial Decl. at ¶¶ 18, 21-22 (*Plata* Docket No.

1709).  But if the parolees come over a two-year period, the re-arrests would similarly occur

over a two-year period, not all at once.  At trial, Mr. Pacheco backpedaled, arguing that even if

the impact were a less than one percent increase, that would be "significant" in terms of the toll

taken on the victims.  Pacheco at RT 2381:20-2382:14.[100]  We agree that there is a real human

toll on those victims, but we also find that there is a real benefit to those individuals who

would have been victimized had the parolee been released later; overall, we find that the

impact is neutral from a societal standpoint because there is no change in recidivism rate or the

crime rate.

Likewise, Amador County Sheriff Martin Ryan exaggerated the potential impact of a

prison population reduction on Amador County's criminal justice system.  To take just two

examples, Sheriff Ryan testified that a prison population reduction would "seriously impact

law enforcement's ability to protect their communities" and have a "negative impact on the

District Attorney's ability to move cases through the court system in an effective and expedient

manner."  Ryan Trial Decl. at ¶¶ 26-27 (*Plata* Docket No. 1726).  But he admitted that if the

prison population were reduced by 52,000 inmates, just fifty-two parolees would come back to

Amador County.  Ryan at RT 2698:8-14.  With fifty peace officers making arrests in Amador

County, the addition of fifty-two parolees over a two-year period  –  many of whom would not

---

[100] Defendant-intervenors introduced very limited testimony about actual crimes committed on
early release.  Most witnesses gave no testimony on the subject.  Two witnesses referred to a
newspaper article in the Los Angeles Times, which we have found to be inadmissible.  And
one witness had information about murder arrests made during the early release period, but
some of those were arrests for murders committed *before* the early release period, and others
were arrests of individuals who were not subsequently convicted.  Smith at RT 1824:12-
1825:10.  Defendant-intervenors also introduced as an exhibit a speech by a public official that
purported to recite data about crime on early release in Orange County.  Def-Ints' Exh. DI-628.
However, these data are inadmissible hearsay.  The data cited in the speech were apparently
drawn from a report, but the report itself was not introduced, and there was no testimony at
trial to explain the data, the source of the data, or method by which the data were prepared.

(continued …)

---

1  be arrested for new crimes – would hardly have a "serious impact" on policing resources.

2  Ryan at RT 2703:15-16.  He also admitted that even if every parolee were being prosecuted

3  simultaneously (an unlikely circumstance), those prosecutions would make up less than one

4  percent of the Amador County prosecutors' caseload.  Ryan at RT 2706:21-2708:5.

5  In his testimony in this case, defendant-intervenor Chief Dyer complained about

6  potential impacts on the criminal justice system from a prison population reduction.  But his

7  testimony was premised upon the assertion that Fresno County is in uniquely dire straits, with

8  an out-of-control drug problem driving up crime.  Dyer Corrected Expert Report at ¶¶ 19-24.

9  This was an exaggeration.  Chief Dyer admitted that, according to his own website, Fresno is

10  enjoying the lowest crime in forty-three years.  Dyer at RT 2352:10-15.

11  Other witnesses exaggerated the impact of a prison population reduction on county

12  budgets and local rehabilitative programs and services.  For example, Dr. Nancy Peña

13  exaggerated when she estimated the impact of a prisoner release order on county mental health

14  resources.  She testified that Santa Clara County could not absorb an influx of mentally ill

15  parolees, but she based her analysis on the assumption that all or substantially all of the

16  mentally ill parolees would need the highest level of treatment, even though only nine percent

17  of mentally ill people coming out of jail receive that level of care.  Peña at RT 2451:10-2452:4.

18  Richard Garner also exaggerated the impact of a prisoner release order on the Santa Clara

19  County budget.  While he testified about the county's budget crisis, and the additional costs

20  that would be accrued as a result of new parolees needing drug treatment (Garner Trial Decl. at

21  ¶¶ 4-7), he admitted that the county is reimbursed by the state for 100 percent of those costs

22  spent on parolees.  Garner at RT 2500:11-17.

23  Defendants' expert Gale Bataille also based her opinion on exaggerated assumptions

24  regarding the treatment needs of *Coleman* class members.  For example, Ms. Bataille assumed

25  that all prisoners who had received outpatient care in prison would need inpatient care in the

26

27  _____

Accordingly, we afford no weight to the data cited.

28

[272055-1]

1    community.  Defs.' Exh. D-1025 at 4 (Bataille Aug. 15, 2008 Report).  The Santa Clara

2    County witnesses engaged in much larger overestimations, assuming that one-half of all

3    individuals with mental illnesses released to parole from any level of care in prison would need

4    inpatient care.  Graves Report at 5.  These assumptions are exaggerations because

5    approximately eighty-five percent of mentally ill prisoners and parolees are diagnosed at the

6    basic, general population level of care known as the Correctional Clinical Case Management

7    System or CCCMS (Defs.' Exh. D-1292-2 at 2-3), and require no more than a case manager

8    contact once every ninety days, plus medication management if needed (Pls.' Exh. P-009 at

9    Chapter 3).  Another thirteen percent are assessed at the Enhanced Outpatient Program level of

10   care, and only a very small percentage  –  a maximum of two percent –  require any inpatient

11   care.  Defs.' Exh. D-1292-2 at 2-3; Gilligan Report (8/15/08) at ¶ 11.

12          If prisoners with mental illnesses participate in a population reduction in the same

13   proportions as they are currently released, the impacts on community mental health can be

14   expected to be far smaller than Ms. Bataille or the defendant-intervenor testimony claimed.

15   Assuming that a prison population reduction of 52,000 over two years, and assuming that

16   twenty percent of these persons have a mental illness, that would account for approximately

17   10,400 parolees with mental illness over a two-year period, just 208 of whom would require

18   inpatient care statewide.  This accounts for a tiny fraction of the 658,314 persons being served

19   by California's community mental health system, 43,435 of whom receive some type of

20   twenty-four-hour service.  Pls.' Exh. P-743.

21          In sum, while we acknowledge the dismal financial realities in the state and the

22   counties, and we understand that any increase in mentally ill parolees will require more care in

23   the community, and any increase in arrests will require local police, prosecutors and courts to

24   expend resources, we find that the defendant-intervenors contentions on this subject are

25   exaggerated, and the state can reduce its prison population without adversely impacting the

26   operation of local criminal justice systems.

27

28

1

2

### 7.    A Prison Population Cap Would Not Require Closing The "Front Doors" To Prison

3    We find that the state can reduce its prison population to 130 percent of design capacity

4    without causing "back-ups" of convicted prisoners in jails waiting for admission to prison.

5    Defendant-intervenors introduced testimony about the potential impact on county jails if

6    the Court was to impose a prison population cap, and the "front doors" to prisons were to

7    close.  *See, e.g.*, Powers Expert Report at 4; Pacheco at RT 2388:1-2390:15.  However, the

8    Court finds that a population reduction accomplished by using the diversion and good time

9    credit programs described above would not result in closing the "front doors" to the prison,

10   even if the Court also imposed a population cap.  To the contrary, plaintiffs demonstrated that

11   the population reduction measures they analyzed would reduce the flow of technical violators

12   into prison, and shorten the length of stay of other prisoners (thus temporarily increasing the

13   flow out of prison), but would not change the ability of the counties to send convicted felons to

14   prison.  Austin at RT 2582:14-2585:20.

15   Furthermore, we note that many other states have population caps on their prisons as a

16   result of legislative policy and court orders.  Those caps typically provide authority for the

17   prisons to implement population control measures, including early release, once the prisons

18   reach a specified capacity threshold.  *See, e.g.*, N.M. Stat. § 33-2A, (Pls.' Exh. P-827); Ark.

19   Code. Ann. § 12-28-601 to § 12-28-606; Fla. Stat. § 944.023 (Pls.' Exh. P-826), § 944.0231

20   and § 947.146; Ga. Code Ann., § 42-9-60; Kan. Stat. Ann. § 74-9101; Miss. Code Ann. § 47-5-

21   701 to 47-5-731; N.C. Gen. Stat. § 148-4.1; Ohio Rev. Code Ann. § 2967.18; R.I. Gen. Laws

22   § 42-26-13.3; Tenn. Code. Ann. § 41-1-501; Tex. Gov't Code Ann. § 499.021 to § 499.028;

23   Wash. Rev. Code Ann. § 9.94A.870.  There is no evidence that such caps have resulted in

24   "closing the front doors" to prison, with attendant problems for local criminal justice systems

25   that defendant-intervenors feared.

26   ### D.    Crowding Has A Negative Impact On Public Safety.

27   The evidence establishes and we find that prison crowding has a negative impact on

28   public safety in California.

1    Governor Schwarzenegger referred to California's prisons as "a powder keg" in his

2    State of the State address in January 2007, saying that the prisons are dangerous to prisoners,

3    staff, and "to the well-being of the public." Pls.' Exh. P-3 at 49. A few months earlier, the

4    Governor had identified the reason for this imminent threat: the severe prison overcrowding

5    that so endangers inmates, staff, and the public, it creates a state of emergency. Pls.' Exh. P-1.

6    According to the Governor, Californians are at "extreme peril" from the threat of infectious

7    disease, wide-scale violence, and massive infrastructure failure in the state prison system, none

8    of which can be fully contained behind prison walls. Pls.' Exh. P-1 at 2, 6. James Tilton, then

9    the Secretary of CDCR, declared that "the risk of catastrophic failure in a system strained from

10   severe overcrowding is a constant threat.… [I]t is my professional opinion this level of

11   overcrowding is unsafe and we are operating on borrowed time." Pls.' Exh. P-72 at 15.

12   The prisons are so crowded that space designed for rehabilitative programs is being

13   used to house inmates, which reduces the ability of the prisons to provide rehabilitative

14   programs and mental health treatment. *See, e.g.*, Pls.' Exh. P-2; Pls.' Exh. P-1; Tilton Dep. at

15   109:3-11; Gilligan at RT 1645:22-1646:9. Additionally, crowding leads to violence and

16   lockdowns, which causes wardens to "shut down all programming in the affected areas." Pls.'

17   Exh. P-2 at viii. Former CDCR Secretary James Tilton testified that he believed that crowding

18   poses a direct risk to public safety because it means that more prisoners are released into

19   society unprepared for successful reintegration. Tilton Dep. at 83:2-18. We find that these

20   barriers to the delivery of programs in crowded prisons contributes to California's high

21   recidivism rate, and hence to crime. *See, e.g.*, Tilton Dep. at 106:6-11; Runner at RT 2743:4-

22   14.

23   We also find that crowding results in a breakdown of the normal classification system,

24   under which high risk prisoners should be segregated from low-risk prisoners. Austin Report

25   (11/9/07) at ¶¶ 35-38. Because there are too few prison beds, CDCR is forced to house high

26   risk offenders and low risk offenders together, which the experts and law enforcement officials

27   agree causes low-risk offenders to become higher risk offenders (sometimes referred to as the

28   "contamination" effect). Beard at RT 1580:3-19 (mixing low risk and high risk prisoners

-170-

1 makes low risk prisoners worse); Cate at RT 1686:11-14 (same); Dyer at RT 2326:14-21.  This

2 escalation has an adverse impact on public safety because every year the state releases nearly

3 140,000 prisoners housed under these conditions back into the community.

4          We find that the lack of delivery of programs and the failure of the classification system

5 together cause California's prisons to be criminogenic, and low-risk offenders who are sent to

6 California prisons develop an increased risk of reoffending as a result of imprisonment.  S*ee,*

7 *e.g.*, Lehman at RT 2013:14-2014:1 (former secretary of corrections in Pennsylvania,

8 Washington State and Maine); Powers at RT 1167:8-1168:1, 1169:18-22 (Stanislaus County

9 Chief Probation Officer); Beard at RT 1556:1-14 (Secretary of Corrections in Pennsylvania).

10          We further find that crowding results in systemic failures within the prison system that

11 negatively impact public safety.  Such failures can include the release of the wrong prisoner

12 and the failure to monitor potentially-dangerous parolees.  Woodford Report (11/9/07) at

13 ¶¶ 21-23.  Additionally, crowding is the primary cause of deficiencies in providing of mental

14 health care, which can also negatively impact public safety.  *See, e.g.*, Pls.' Exh. P-48 (October

15 2007 OIG Report regarding improper release of mentally-ill inmate who had received deficient

16 mental health care and committed crime).

17          We also find that the crowding creates dangerous conditions inside prison for prisoners

18 and prison guards.  Pls.' Exh. P-1 (Governor's Emergency Proclamation).  According to a

19 document published by CDCR in October 2008:

20                    The facts supporting the Governor's 2006 emergency
                    proclamation and state of emergency continue to exist today. The
21                  extreme peril to the safety of persons and property and the
                    magnitude of the circumstances exceed the capabilities of the
22                  services, personnel, equipment, and facilities of any geographical
                    areas in this state. Overcrowding significantly impacts the CDCR's
23                  ability to appropriately house inmates directly from the local jail
                    facilities. The overcrowding in the CDCR has also negatively
24                  affected programs and rehabilitative services provided to inmates
                    housed under its jurisdiction.
25
26                    The severe overcrowding continues to pose substantial risk
27                  to the safety of the men and women who work inside these
                    institutions and the inmates housed in them. The substantial risk of
28

-171-

1

2

3

4

5

6

7

8

9

10

11

12

> violence, greater difficulty controlling large inmate populations, possible transmission of infectious diseases, and the limited space for inmate living conditions which obstructs the view of correctional staff continue to maintain an environment with enormous security risks for CDCR staff, inmates, and the public.
>
> Overcrowding leads to inmate unrest and misconduct, causes harm to people and property, reduces and eliminates programs, and frustrates rehabilitation efforts.
>
> The severe overcrowding has also strained the electrical and sewer systems that have to operate at maximum capacity. Operating at a constant maximum capacity poses a substantial health and safety risk to the CDCR staff, inmates and the public. Overloading the prison sewage and water systems has resulted in increased damage to state and private property which have resulted in multiple fines, penalties and/or notices of violations to the CDCR related wastewater/sewer system overloading groundwater contamination and environmental pollution.

13

14

15

Pls.' Exh. P-388 at Statement of Reasons at pp. 1-2; *see also* Def. Gov. Schwarzenegger's Responses to Plaintiff *Coleman*'s First Set of Interrogatories (November 9, 2007) Nos. 1, 3, 5, 7, 9, 11, 13, 15, 19, and 24 (Exh. B to *Plata* Docket No. 1976).

16

17

18

19

20

This sentiment is echoed by CDCR Undersecretary for Adult Operations Scott Kernan, who stated that "housing inmates in non-traditional quarters presents serious safety concerns for both inmates and correctional staff. The overcrowding of CDCR facilities has led to increased numbers [of] infections disease outbreaks and riots and disturbances system-wide." Pls.' Exh. P-2 (CDCR Expert Panel Report) at 9.

21

22

23

24

25

Accordingly, while the PLRA requires the Court to consider the impact of prospective relief on public safety, in this instance the impact of the relief must be judged against the current state of affairs, i.e., crowded prisons that are themselves a menace to public safety. This Court's order to reduce the crowding will substantially mitigate if not eliminate these dangerous conditions, thus improving public safety.

26

## VII.    NECESSARY LIMITS ON CALIFORNIA'S PRISON POPULATION

27

28

Having found that California's prison system is overcrowded in the extreme and that this overcrowding is the primary cause of the constitutional violations, the Court must

-172-

1  determine the maximum level at which constitutionally adequate medical and mental health

2  services can be provided to the plaintiff classes. After considering all the evidence, the Court

3  finds that the constitutional violations would be remedied most expeditiously if the general

4  prison population were limited to the design capacity and that specialized medical and mental

5  health care programs were operating with a 20 percent vacancy rate. Nevertheless, because of

6  public safety concerns and in deference to defendants, the Court finds that the population

7  should be limited to 130 percent of design capacity[101] for the general prison population and

8  that the specialized health care programs must operate at less than 100 percent of design

9  capacity.

10  It is undisputed that even the most modern California prisons were built to provide

11  medical treatment at 100 percent of design capacity level and no more. Defs.' Exh. D-1007 at

12  ¶ 72; Dezember at RT 858:7-859:16; *see also* Thomas at RT 1224:5-7 ("even the newest of

13  California prisons have inadequate space for care"). These newer prisons were designed at a

14  time when CDCR had not acknowledged the prevalence of mental illness in its population.

15  Defs.' Exh. D-1292 at 5.

16  According to the state's chief correctional healthcare administrator, the state has

17  planned for decades to house prisoners beyond 100 percent of design capacity, but did not

18  include healthcare infrastructure in its plans. Defs.' Exh. D-1007 at ¶ 72 (water, wastewater,

19  electrical and mechanical components designed for 140 percent to 190 percent overcrowding

20  with no provision for medical care space beyond 100 percent of design capacity). California's

21  newest prison, Kern Valley State Prison, built in 2005, was also planned with medical

22  treatment resources adequate for 100 percent of design capacity, despite CDCR's knowledge

23  before construction began that the facility would be housing prisoners at double its design

24

25  [101] The use of design capacity, rather than an absolute number, allows defendants the
maximum flexibility since the number of prisoners can be modified depending on the capacity

26  of the prison system. Thus, if defendants build new prisons, as contemplated through AB 900,
the design capacity would increase, thereby allowing defendants to increase the prison

27  population.

28

1  capacity.  Defs.' Exh. D-1092 at 21-22.  Even plans for prisons yet to be built do not include

2  adequate clinical resources.  Defs.' Exh. D-1092 at 36-37.

3        Jails and other correctional systems manage their populations effectively by keeping

4  them under 100 percent of design capacity.  Local law enforcement intervenors testified that

5  their jails cannot function when they are filled to capacity, such that they cannot shift prisoners

6  when needed for safety purposes and to performing necessary repairs and retrofitting of

7  facilities.  *See* Munks at RT 1776:17-1777:2, 1791:6-12, 1797:20-1798:4; Smith at RT

8  1800:10-1801:17, 1829:16-1830:3, 1837:3-24; 1845:7-24 ("A hundred percent of your

9  capacity is really a misnomer.…  You're at a hundred percent capacity when you are at 90

10  percent."); *id.* at 1846:8-11 (Los Angeles County releases jail prisoners in order to stay below

11  100 percent capacity); Graves at RT 2273:13-2275:6 (Santa Clara County maintains 15 percent

12  vacancy rate); Ryan at RT 2702:5-17 (Amador County Jail experiences problems at even 10 to

13  15 percent above capacity).

14        Although clear and convincing evidence supports a general population limit at 100

15  percent of design capacity, the Court has searched the record for any evidence to support a

16  higher limit.  The Court defers to the state's own internal evaluations of maximum population

17  capacity, and finds that a 130 percent general population limit is appropriate.  During the five

18  years from 1993 through 1998, the CDCR's own Facilities Master Planning process limited

19  celled facilities to 130 percent of design capacity and dormitory facilities to 120 percent of

20

21

22

23

24

25

26

27

28

-174-

[272055-1]

1   design capacity.[102]  Defs.' Exh. D-1092 at 11.  The head of the Governor's Facility Strike

2   Team under AB 900, Deborah Hysen, testified that after considerable study of the question,

3   she recommended that CDCR's master plan for new construction under AB 900 include a

4   long-term goal not to exceed 130 percent of design capacity.  Hysen Dep. at 94:13-24; Pls.'

5   Exh. P-123 at E_PRIV_161206; Pls.' Exh. P-128 at Priv035595.

6           Correctional experts, including the past directors of the Pennsylvania, Washington,

7   Texas and California departments of corrections, agreed with the AB 900 Strike Team

8   recommendation that new facilities be limited to 130 percent of design capacity.[103]  Lehman

9   8/15/08 Report at ¶ 20; Scott 8/15/08 Report at ¶ 18; Woodford 8/15/08 Report at ¶ 3.

10  Defendants presented no testimony by expert witnesses or others regarding the maximum level

11  above design capacity at which medical and mental health care could be brought to

12  
    _____

13  [102] The Court has also given substantial consideration to the 145 percent "maximum operable
    capacity" level recommended by the 2004 Independent Review Panel convened by Governor

14  Schwarzenegger and chaired by former Governor Deukmejian.  Pls.' Exh. P-4 at 124.  The
    Deukmejian Report defined "maximum operable capacity" as the percent of design capacity at

15  which a "prison can be operated both safely and can provide programming for every inmate,
    consistent with the inmate's ability."  Id. at 161.  In setting the "maximum operable capacity"

16  at 145 percent, the Independent Review Panel did not take into account the specific programs
    needed to provide constitutionally adequate mental health and medical treatment.  Dezember

17  Dep. 106:12-109:21.  The 145 percent maximum operable capacity also assumed that CDCR
    would end the use of all "non-traditional beds," i.e., housing in gymnasiums, classrooms,

18  dayrooms, hallways and other public spaces, so that adequate program space would be
    available.  Pls.' Exh. P-4 at 161.  The undisputed testimony at trial shows that CDCR has not,

19  four years after the Deukmejian Report, come even close to eliminating non-traditional
    housing, and has had to cancel "deactivation" of some non-traditional housing areas due to

20  population pressures.  Kernan at RT 1919:24-1921:5, 1915:13-1918:7; Defs.' Exh. D-1252-2;

21  Kernan at RT 1917:19-1918:7; Pls.' Exh. P-839.  The elimination of bad beds is just one of
    several overcrowding mitigation measures recommended by the Deukmejian Report, none of

22  which have been implemented.  Defs.' Exh. D-1092 at 10.

23  [103] They cautioned, however, that older facilities such as San Quentin and Folsom may have to
    be limited to populations lower than 130 percent of design capacity.  Scott 8/15/08 Report at

24  ¶ 18 ("some facilities might only be able to support and provide appropriate health care for

25  smaller numbers"); Woodford 8/15/08 Report at ¶ 3 ("different (and particularly older)
    facilities might require slightly lower population limitations, based on the quality of

26  infrastructure and availability of treatment space, for example").

27  

28

1    constitutional levels.  *See* Packer at RT 1125:4-7.

2         Clear and convincing evidence demonstrates that the *Coleman* class members, at all

3    levels of care, will receive substantial benefit from this general population reduction.  A limit

4    on the general population would benefit *Coleman* class members directly as the population of

5    *Coleman* class members would be reduced by approximately the same proportion that they

6    occur in the general prisoner and parolee populations.  Austin at RT 2629:21-2630:3.  Such a

7    proportionate reduction according to the Special Master, would "begin swiftly to ameliorate

8    the impact of high vacancy rates among clinicians" and "would lead to an acceptable staff

9    ratio" for most *Coleman* class members.  Pls.' Exh. P-35 at 14.  Assuming a general reduction

10   of approximately 50,000, most of the present waiting lists for *Coleman* programs would be

11   reduced or eliminated and the overall mental health prison population would approach 90

12   percent of capacity.  Austin at RT 2630:12-20; Stewart at RT 2220:1-22.  To the extent that the

13   state chooses to address the problem of short-term parole violations in order to reach the

14   population limits, such measures will most immediately affect the Reception Centers (Austin

15   First Supp. Report ¶ 97), where is it undisputed that overcrowding is the primary cause of

16   inadequate mental health care (Defs.' Exh. D-1019 at 20-21, 23).  *Coleman* class members in

17   the mainline, non-reception center prisons will also benefit from this general population

18   reduction.  Stewart at RT 2218:19-2220:22; Austin at RT 2630:4-11 (reducing length of stay

19   through earned credits will benefit *Coleman* class members outside the reception centers).

20        We address separately the maximum populations for specialized clinical programs in

21   which prisoners are housed apart from the general population for treatment purposes.  These

22   programs are clearly defined for the *Coleman* class.[104]  Although such programs have been

---

[104] The specialized clinical housing populations under *Coleman* are (a) Enhanced Outpatient Program ("EOP") (Pls.' Exh. P-9 at 12-1-6 to 7); (b) EOP Administrative Segregation Unit ("EOP ASU Hub")(*id.* at Chapter 7); (c) Psychiatric Services Unit ("PSU") (*id.* at Chapter 9); (d) Mental Health Crisis Bed Placement (*id.* at 12-1-7); (e) Department of Mental Health Inpatient Hospital Care (*id.* at 12-1-7 through 12-1-8); (f) Department of Mental Health Day Treatment Program.  Defs.' Exh. D-1007 at ¶ 20(f).

1   proposed for the *Plata* class, none are yet in existence.  Specialized clinical programs cannot

2   deliver adequate care without maintaining a population below 100 percent of design capacity.

3   The credible expert testimony was unanimous that specialty clinical programs must be

4   operated at less than 100 percent of design capacity in order to deliver adequate care.  Stewart

5   at RT 2209:12-24; Haney at RT 950:17-951:5; Beard at RT 241:2-22, 207:9-208:21; Lehman

6   at RT 271:16-272:13.  Staffing requirements for specialized medical and mental health

7   programs are more intensive than those for general population programs.  Defs.' Exh. D-1292

8   at 15.

9        The state's forecasting methods for specialized programs estimate bed need based on

10  occupancy far lower than 100 percent.  Defs.' Exh. D-1175-2 at 6, 10, 11 (Department of

11  Mental Health Bed need estimated at 90 percent occupancy); *id.* at 16, 20 (Crisis Beds need

12  estimated at 90 percent occupancy); *id.* at 21, 24 (Enhanced Outpatient Program need

13  estimated at 95 percent occupancy); *id.* at 22, 25 (Enhanced Outpatient Program Ad Seg need

14  estimated at 95 percent occupancy); *id.* at 23, 26 (Psychiatric Services Unit need estimated at

15  95 percent occupancy).

16       The Department of Mental Health intermediate ("ICF") and acute care facilities operate

17  under licensing restrictions that limit the number of patients in those units.  Defs.' Exh. D-1006

18  at ¶ 17.  The Department of Mental Health's limit on its own population contributes to long

19  waiting lists of persons who need inpatient psychiatric hospitalizations, but who wait for

20  months in CDCR prisons receiving inadequate care.  Haney Report at ¶ 34; Defs.' Exh. D-

21  1007 at ¶ 72.

22       Prison medical and mental health programs must be run at under 100 percent capacity in

23  order to provide the necessary flexibility to move patients to the right level of care promptly.

24  Stewart at RT 2209:12-24; Haney at RT 950:17-051:5; Thomas at RT 1250:18-21 (Florida

25  Department of Corrections medical and mental health facilities not permitted to exceed design

26  capacity); Pls.' Exh. P-826 (Fla. Stat. § 944.023(1)(b)(1)); Beard at RT 241:2-22, 207:9-208:21

27  (Pennsylvania corrections director testified that the highest level of mental health care is

28  allowed to operate only at 80 percent capacity in order to allow the necessary level of

-177-

1    vacancies); Lehman at RT 271:16-272:13.

2        Attempting to provide medical and mental health care in prisons crowded beyond

3    design capacity causes clinicians' prescriptions for higher levels of care to go unfilled, while

4    their patients are shunted into makeshift temporary units, holding cells, and cages.  Defs.'

5    Exh. D-1019 at 10.  Temporary makeshift treatment units, however ineffective and inadequate,

6    have quickly become permanent, are nearly always full, and consistently have waiting lists.

7    Radavsky at RT 794:23-795:2.

8        Lack of vacancies in crisis-level beds is life-threatening.  Prisoners in mental health

9    crisis face substantial risks of not being transferred to an actual crisis facility equipped to

10   handle suicidal prisoners, but rather to a makeshift replacement in "a variety of other structures

11   ranging from clinical holding cells to administrative segregation cells to telephone-booth sized

12   interview stalls typically placed in corridors."  Defs.' Exh. D-1292 at 3 (*Coleman* Special

13   Master's May 2007 Report).  Defendants' dependence on these alternative placements has

14   been a factor in a number of suicides.  *See, e.g.,* Pls.' Exh. P-61 at 12; Haney Expert Report at

15   ¶ 355.

16       Because the denial of critical services to prisoners who have been identified as needing

17   those services greatly increases the risk of harm, defendants must operate their specialized

18   health care programs with a 5 percent vacancy rate (no more than 95 percent of design

19   capacity).

20   **VIII.   CONCLUSIONS OF LAW**

21       **A.    Statutory Background**

22       The Prison Litigation Reform Act expressly contemplates that federal courts will order

23   states to reduce their prison populations.  18 U.S.C. § 3626(a)(3).  While Congress imposed

24   limits upon such relief, it did not prohibit it, instead carefully defining the circumstances under

25   which a prisoner release order may be entered.  *Id.*

26       As a preliminary matter, the PLRA provides that only a three-judge court may enter a

27   prisoner release order.  18 U.S.C. § 3626(a)(3)(B).  In order to convene a three-judge court to

28   consider a prisoner release order, a plaintiff must first demonstrate, to a single-judge court, that

-178-

1  "(i) a court has previously entered an order for less intrusive relief that has failed to remedy the

2  deprivation of the Federal right sought to be remedied through the prisoner release order; and

3  (ii) the defendant has had a reasonable amount of time to comply with the previous court

4  orders." 18 U.S.C. § 3626(a)(3). The *Plata* and *Coleman* plaintiffs made the requisite

5  showings before the single-judge courts in those cases, and the single-judge courts ordered that

6  the instant three-judge court be convened. *Plata* Order, July 23, 2007 (*Plata* Docket No. 780);

7  *Coleman* Order, July 23, 2007 (*Coleman* Docket No. 2320).

8       **B.    This Court Has Authority To Issue A Prisoner Release Order**

9       This Three Judge Court is constituted solely for purposes of crafting a remedy for the

10  constitutional violations that the *Plata* and *Coleman* courts have found to exist. The only

11  question before this Court is whether the appropriate remedy is a prisoner release order.[105]

12       The PLRA requires plaintiffs seeking a "prisoner release order" to make two

13  preliminary showings that are prerequisites to granting relief. Plaintiffs must demonstrate by

14  clear and convincing evidence that (1) "crowding is the primary cause" of the constitutional

15  violations (in this case, the rights to constitutionally adequate medical and mental health care),

16  and (2) that "no other relief" will remedy the violations. 18 U.S.C. § 3626(a)(3)(E).

17       To decide whether plaintiffs have met the first prong, we must first determine what

18

19  [105] Defendants and defendant-intervenors urge us to consider matters, including the existence

20  of a constitutional violation, or other prerequisites to constituting a three-judge court, that are
   beyond our authority. Under the PLRA, the existence of a constitutional violation, and the

21  prerequisites to constituting a three judge court, are reserved exclusively to the single-judge
   hearing the underlying case. 18 U.S.C. § 3626(a)(3)(C). Any motion seeking to adjudge the

22  prison conditions constitutional must be brought before the single-judge court pursuant to 18
   U.S.C. § 3626(b). This Three Judge Court does not have jurisdiction to make determinations

23  that must be made in the first instance by the presiding court in the underlying matters.

24  Nevertheless, it is worth noting that the factual findings made above clearly indicate that there
   remain serious, life-threatening risks to the prisoner classes from defendants' failure to provide

25  adequate medical and mental health care, and that defendants are aware of both these
   conditions and the risks. In addition, this Court would not intrude into such a sensitive issue of

26  state affairs by ordering the prison population to be reduced if it were not convinced that such

27  relief is the only way to prevent widespread and serious injury to the prisoner classes.

28

[272055-1]

1   "crowding" and "primary cause" mean.  As the Court has previously ruled, "'crowding' refers

2   to population density; it does not mean only that the prison population is large, but that it is

3   large in relation to the available resources and facilities."  Order Denying Defs.' Mtn. for

4   Dismissal or Summary Judgment, Nov. 3, 2008, at 9 (*Plata* Docket No. 1757, *Coleman* Docket

5   No. 3620).

6        We accept defendants' definition of primary as "first or highest in rank or importance;

7   chief; principal."  Defs.' Mtn. for Dismissal or Summary Judgment, Sept. 15, 2008, at 18

8   (*Plata* Docket No. 1479, *Coleman* Docket No. 3034) (citation omitted).  This does not mean,

9   as defendants argue, that plaintiffs must prove that overcrowding is the sole cause of the

10  constitutional violation.  "'Probably it cannot be said of any event that it has a single causal

11  antecedent; usually there are many.'"  Order Denying Defs.' Mtn. for Dismissal or Summary

12  Judgment at 8 (quoting 4 Harper, James and Gray on Torts § 20.2 (3d ed. 2007)).  Prisons are

13  complex institutions with multiple missions, including health care, which itself is a complex

14  undertaking.  As such, it would be highly unusual for the unconstitutional conditions at issue

15  here to derive from one single cause.  Indeed, defendants' construction is inconsistent with the

16  text of the statute.  Congress specified that only "primary" cause would justify the requested

17  relief, which strongly implies that there are other causes that would be insufficient.

18       Plaintiffs can prevail in this proceeding only if they can prove that the size of the prison

19  population in relation to the available resources and facilities is the most important or principal

20  cause of the constitutional violations.  The evidence is clear and convincing – indeed it is

21  overwhelming and beyond any serious dispute – that crowding is the most important cause of

22  the constitutional violations that have existed for many years, and in *Coleman* for close to two

23  decades, and that such crowding has put the lives and well being of more than 150,000

24  prisoners at substantial risk of serious harm.  The system may be complex and the causes

25  numerous, but it is a simple fact acknowledged by nearly everyone with knowledge of the

26  California prison system that crowding is the source of the state's failure to comply with the

27  Constitution and the previous orders of the *Plata* and *Coleman* courts.

28       Defendants also argue that insufficient resources, such as staffing and facilities, are the

-180-

1  causes of the unconstitutional conditions.  As their own expert made clear during cross-

2  examination, this disagreement is nothing more than semantics.  Packer at RT 1094:1-6.  Since,

3  as we have held, crowding is the absence of sufficient resources and facilities to treat the size

4  of the existing population, defendants' argument is another way of affirming that crowding is

5  the primary cause of the violations.

6      The second prong of § 3626(a)(3)(E) requires that plaintiffs prove that no other relief

7  will remedy the constitutional violations.  The fact that crowding is the primary cause of the

8  violations strongly indicates that no relief other than an order to resolve the crowding will be

9  effective.  Other than suggesting that the violations will be resolved through additional

10  capacity (i.e., more resources and facilities) -- whether that be accomplished by the state, the

11  Receiver or both -- defendants have not proffered any meaningful alternatives to a reduction in

12  the population.  On the other hand, the evidence presented by plaintiffs affirmatively shows

13  clearly and convincingly that given the current capacity the population must be reduced if there

14  is to be any realistic hope that the current substantial risk of serious injury and death will be

15  reduced to acceptable levels.

16      We need not resolve here the question of whether additional capacity would mitigate or

17  eliminate the need for a prisoner release order.  By defendants' own admissions, as well as the

18  testimony of the legislator-intervenors, any increase in the facilities needed to serve the

19  existing population is nothing more than a dream at worst and years away at best.  If and when

20  the state has the capacity to provide care and treatment to a population beyond the limit set by

21  our order below, the Court will promptly adjust or eliminate the cap accordingly.

22      Having concluded that crowding is the primary cause of the constitutional violations in

23  both the *Plata* and *Coleman* cases, and that no other relief will remedy the constitutional

24  violations, this Court must face the delicate question of whether a prisoner release order is

25  appropriate under these circumstances and, if so, the scope of such an order.

26      "Our courts have long acknowledged that when the State, by imprisonment, prevents a

27  person from caring for himself, the Constitution imposes "'a corresponding duty to assume

28  some responsibility for his safety and general well being.'"  *Helling v. McKinney*, 509 U.S. 25,

-181-

[32], 113 S. Ct. 2475, 2480, 125 L.Ed.2d 22 (1993). "[H]aving stripped [prisoners] of virtually every means of self-protection and foreclosed their access to outside aid," society may not simply lock away offenders and let "the state of nature take its course." *Farmer v. Brennan*, 511 U.S. 825, [833], 114 S. Ct. 1970, 1977, 128 L.Ed.2d 811 (1994). Rather, government officials must ensure that prisons, while perhaps "restrictive and even harsh," *Rhodes v. Chapman*, 452 U.S. 337, 347, 101 S. Ct. 2392, 2399, 69 L.Ed.2d 59 (1981), do not degenerate into places that violate basic standards of decency and humanity. In short, while the Eighth Amendment "'does not mandate comfortable prisons' ... neither does it permit inhumane ones." *Farmer*, 511 U.S. at [832], 114 S. Ct. at 1976 (citation omitted)." *Madrid v. Gomez*, 889 F. Supp. 1146, 1245 (N.D. Cal. 1995).

We must also be "acutely sensitive to the fact that our role in Eighth Amendment litigation is a limited one. Federal courts are not instruments for prison reform, and federal judges are not prison administrators. We must be careful not to stray into matters that our system of federalism reserves for the discretion of state officials." *Id*. at 1279. This is especially true when our decisions implicate one of the core functions of state government, the protection of the public from criminal behavior. The courts have a long "tradition of deferring to state legislatures in making and implementing" policy decisions about the terms of punishment for crimes. *Ewing v. California*, 538 U.S. 11, 24-25 (2003) (citing *Weems v. United States*, 217 U.S. 349, 379 (1910); *Gore v. United States*, 357 U.S. 386, 393 (1958); *Payne v. Tennessee*, 501 U.S. 808, 824 (1991); *Rummel v. Estelle*, 445 U.S. 263, 274 (1980); *Solem v. Helm*, 463 U.S. 277, 290 (1983); *Harmelin v. Michigan*, 501 U.S. 957, 998 (1991) (Kennedy, J., concurring in part and concurring in judgment)).

"Strong considerations of comity" require courts to "giv[e] the States the first opportunity to correct the errors" in the administration of prison systems. *Lewis v. Casey*, 518 U.S. 343, 362 (1996) (quoting *Preiser v. Rodriquez*, 411 U.S. 475, 492 (1973)); *accord Rufo v. Inmates of the Suffolk County Jail*, 502 U.S. 367, 392 (1992). The appropriate way for courts to give "adequate consideration to the views of state prison authorities" is to provide the state with the first opportunity to devise a remedy to constitutional violations. *Lewis*, 518 U.S. at

362.  "The challenge, then, in prison condition cases, is to uphold the Constitution in such a manner that respects the state's unique interest in managing its prison population.  It is a challenge that requires us to draw constitutional lines when necessary, yet minimize any intrusion into state affairs."  *Madrid,* 889 F. Supp at 1279.

Given the magnitude of the constitutional violations, the severe harm suffered by the plaintiff classes for many years and the history of the state's inability to take meaningful steps to either increase capacity or decrease the population, we conclude that plaintiffs have more than met the threshold for issuance of injunctive relief in the form of a limit on California's prison population.

We now turn to the PLRA's requirement that the Court craft narrow relief and give substantial weight to any adverse impacts on public safety and the criminal justice system.  18 U.S.C. § 3626(a)(1).

## C.    Prisoner Release Order

The "prisoner release order" that this Court is empowered to enter is defined broadly to include "any order, including a temporary restraining order or preliminary injunctive relief, that has the purpose or effect of reducing or limiting the prison population, or that directs the release from or nonadmission of prisoners to a prison."  18 U.S.C. § 3626(g)(4).  Thus, this Court is not constrained to enter an order simply setting a population cap and requiring the release of prisoners in order to achieve that cap.  Rather, this Court may enter an appropriate order that has the "effect of reducing or limiting the prison population" (18 U.S.C. § 3626(g)(4)) so long as the relief is "narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right."  18 U.S.C. § 3626(a)(1).

This Court has found and concluded by clear and convincing evidence that no relief other than a reduction in the prison population to 130 percent of design capacity for the general population and a limit of 95 percent of design capacity on the specialized programs will remedy the constitutional violations.  Having concluded that no other relief will remedy the violations, this Court also necessarily concludes that the relief meets the requirement that it be

-183-

1  narrowly tailored, extend no further than necessary, and be the least intrusive means to correct

2  the constitutional violations.

3      In formulating a remedy the Court is also required to "give substantial weight to any

4  adverse impact on public safety or the operation of a criminal justice system caused by the

5  relief." *Id.* That Congress required the Court to give substantial weight to such impacts

6  demonstrates an acknowledgement that some prospective relief that courts will enter will

7  adversely impact public safety. Congress did not specifically bar any relief that adversely

8  impacts public safety or the operation of a criminal justice system, but instead requires that the

9  Court give "substantial weight" to such impacts.

10      Unlike most prison conditions cases, the remedy sought by plaintiffs in this proceeding

11  directly implicates public safety concerns. In formulating a remedy in this case the Court has

12  given substantial weight to both the communities' substantial interest in not being subjected to

13  more crime as a result of the necessary reduction in the prison population and to the operation

14  of criminal justice systems. In fact, the Court approaches its task with extreme sensitivity to

15  those interests. It would be a difficult choice indeed if the Court were forced to choose

16  between protecting the lives of prisoners and those of the citizens in our communities.

17      Fortunately, no such choice needs to be made here. This Court has given substantial

18  weight to potential adverse impacts of a prisoner release order on public safety and the

19  operation of criminal justice systems, and we conclude that the overwhelming evidence

20  demonstrates that the state can reduce its prison population pursuant to this Court's order

21  without adversely impacting public safety or the operation of local criminal justice systems. In

22  short, the state has the means to all but guarantee that both the prisoners' constitutional

23  interests and the statutory interests of the defendant-intervenors are accommodated.

24      The overwhelming evidence shows that the accelerated release of prisoners will not

25  have a significant impact on the crime rate. Indeed, the state, recognizing that public safety is

26  of paramount importance, has followed the recommendations of its own experts and proposed

27  to accelerate the release of prisoners through the use of good time credits, to divert certain

28  offenders from prison, and to drastically reduce the period of parole supervision for non-

-184-

1   violent offenders.  This Court concludes that the following five measures can accomplish the

2   necessary population reduction without causing any adverse impact on public safety or the

3   operation of a criminal justice system:  (1) shortening length of stay through good time credits;

4   (2) diverting technical parole violators; (3) diverting inmates with short sentences; (4) early

5   discharge from parole; and (5) rehabilitative programming.  The evidence demonstrates that

6   these population methods will not impact crime rates.  The evidence also demonstrates that the

7   accelerated release may cause a short-term increase in arrests of less than 1 percent, but after

8   two years the arrest rate would return to normal.  We find and conclude that such an impact is

9   de minimis.

10      We have also found that the public safety concerns raised by defendants and defendant-

11  intervenors are largely exaggerated, and would not be realized if the population reduction were

12  accomplished using the population reducing measures that this Court has found to be safe and

13  effective.  As we have found, many defendant-intervenors exaggerated potential impacts on

14  their county jails, all of which operate well below the level of crowding found in the state

15  prison system.  We find and conclude that we cannot, consistent with our obligations to uphold

16  the Constitution, refuse to address the very serious constitutional violations caused by a prison

17  population close to 200 percent of capacity, just to protect county jails from reaching crowding

18  at levels of 100 percent of capacity.

19      Whatever small possibility of harm to the public exists from a reduction in the prison

20  population can be minimized, if not entirely eliminated, through various mechanisms, such as

21  evidence-based programs, intensive parole and probation supervision, and the use of graduated

22  sanctions for parole violations.  We recognize that many local law enforcement agencies are

23  underfunded, and the state is also facing a budget crisis.  But the lack of funding is a result of

24  policy decisions made by the state and local governments over the years.  While we consider

25  the financial constraints of the parties in crafting relief, lack of funds to remedy constitutional

26  violations does not absolve defendants and defendant-intervenors of the obligation to do so.

27  *Rufo,* 502 U.S. at 392-93; *Stone v. City and County of San Francisco*, 968 F.2d 850, 858 (9th

28  Cir. 1992); *Toussaint v. McCarthy*, 801 F.2d 1080, 1110 (9th Cir. 1986).

-185-

1   The Court is confident that the "technology" exists to accomplish the safe reduction in

2   the prison population and that the parties possess the expertise to develop a plan that will create

3   safe prisons and safe streets.  What has been lacking is not the knowledge and ability, but the

4   political will to implement reforms that all agree are necessary.

5   The appropriate exercise of the Court's equitable discretion is to proceed cautiously, but

6   deliberately, while providing the state and the defendant-intervenors with the maximum

7   flexibility appropriate under these difficult and complex circumstances.[106]

8   Here caution means that the Court will not, as it has the authority to do, order the

9   immediate release of tens of thousands of prisoners.  Instead it will require the population to be

10   reduced over a two year period to the specified level at six month intervals.  Caution also

11   requires that all parties to this action have the ability to participate in the development of a plan

12   to achieve this goal.  Therefore, the Court concludes that it will order the state to develop a

13   Population Reduction Plan in close consultation with all the parties.

14   Accordingly, good cause appearing therefor, IT IS HEREBY ORDERED that

15   defendants, their agents and employees shall reduce the prison population to 130 percent of

16   design capacity within two years from the date of this Order.  Within 60 days from the date of

17   this Order defendants shall, in consultation with the other parties to this action, file a proposed

18   Population Reduction Plan to so reduce the prison population.  The Population Reduction Plan

19   shall include a schedule setting the population at six month intervals.

20   This Court has the authority pursuant to Federal Rule of Evidence 706 to order the

21

22   [106] Any statutory impediments to full implementation of necessary remedial measures can be
waived by this Court upon a showing that such waiver is necessary to remedy the

23   constitutional violations and give full force and effect to this Court's remedial plan.  *See, e.g.*,
18 U.S.C. § 3626(a)(1)(B) (procedures for waiving state law under the PLRA); *Hook v. Ariz.*

24   *Dept. of Corrections*, 107 F.3d 1397, 1402 (9th Cir. 1997) ("[O]therwise valid state laws ...
cannot stand in the way of a federal court's remedial scheme if the action is essential to enforce

25   the scheme" (internal quotation marks and citation omitted); *see also Missouri v. Jenkins*, 495
U.S. 33, 57 (1990); *Bylinski v. City of Allen Park*, 8 F. Supp. 2d 965, 970 (E.D. Mich. 1998).

26   In drafting its Population Reduction Plan, the state shall assume that the Court will waive state
law as necessary pursuant to the PLRA and constitutional standards.

27

28

1  appointment of independent experts to assist defendants in developing the Population

2  Reduction Plan.  Should defendants so request, this Court will appoint an independent

3  expert(s) pursuant to Rule 706.  Before making any such request defendants shall meet and

4  confer with the parties to determine whether there is agreement about the need for such

5  expert(s) and, if so, the candidate(s).

6          Any objections to the Population Reduction Plan must be filed within 20 days from the

7  date of the filing of the Population Reduction Plan, and a hearing on the objections, if any, will

8  be held on _____, 2009.

9

10  Dated:  January 23, 2009                    Respectfully submitted,

11                                              ROSEN, BIEN & GALVAN, LLP

12

13                                              By:  _____/s/ *Michael W. Bien*_____
                                                     Michael W. Bien
14                                                   Attorney for *Coleman* Plaintiffs

15

16                                              PRISON LAW OFFICE

17

18                                              By:  _____/s/ *Donald Specter*_____
                                                     Donald Specter
19                                                   Attorney for *Coleman* and *Plata* Plaintiffs

20

21

22

23

24

25

26

27

28