ROD PACHECO
District Attorney
County of Riverside
4075 Main Street, First Floor
Riverside, California 92501
Telephone: (951) 955-6620
Fax: (951) 955-0190
William E. Mitchell
(CSB # 108483)

Attorneys for Intervenors
ROD PACHECO, District Attorney, Riverside
BONNIE M. DUMANIS, District Attorney, San Diego
TONY RACKAUCKAS, District Attorney, Orange
JAN SCULLY, District Attorney, Sacramento
CHRISTIE STANLEY, District Attorney, Santa Barbara
MICHAEL A. RAMOS, District Attorney, San Bernardino
ROBERT J. KOCHLY, District Attorney, Contra Costa
DAVID W. PAULSON, District Attorney, Solano
GREGG COHEN, District Attorney, Tehama
TODD RIEBE, District Attorney, Amador
BRADFORD R. FENOCCHIO, District Attorney, Placer
JOHN R. POYNER, District Attorney, Colusa
MICHAEL RAMSEY, District Attorney, Butte
GERALD T. SHEA, District Attorney, San Luis Obispo
EDWARD R. JAGELS, District Attorney, Kern
GREGORY TOTTEN, District Attorney, Ventura
VERN PIERSON, District Attorney, El Dorado
CLIFFORD NEWELL, District Attorney, Nevada
RONALD L. CALHOUN, District Attorney, Kings
DONALD SEGERSTROM, District Attorney, Tuolumne

IN THE UNITED STATES DISTRICT COURTS
FOR THE EASTERN AND NORTHERN DISTRICT OF CALIFORNIA
UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES
PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No: CIV S-90-0520 LKK JFM P<br><br>THREE-JUDGE COURT |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No.: C01-1351 TEH<br><br>THREE-JUDGE COURT<br><br>DISTRICT ATTORNEY INTERVENORS'<br>FINDINGS OF FACT AND<br>CONCLUSIONS OF LAW RE RULING ON<br>PLAINTIFFS' REQUEST FOR A<br>PRISONER RELEASE ORDER |

1

# INTRODUCTION

The Coleman and Plata cases have been pending for many years. The issues in these proceedings involve the constitutional adequacy of the mental health services and medical care provided to inmates in California prisons.

In Coleman, a trial took place in 1992 and a Special Master was appointed in 1995 to oversee the development of a constitutionally compliant mental health care system. This case is in the remedial phase, with ongoing implementation of plans that have corrected or will correct alleged constitutional violations.

In Plata, the Court ruled in June 2005 that it would establish a Receivership to oversee the delivery of medical care in all of California's penal institutions. In October 2005, the Court issued written findings of fact and conclusions of law in support of that decision and detailed the constitutional deficiencies that warranted such action.

The first Plata Receiver commenced his duties in April 2006.

In October 2006, Governor Schwarzenegger declared a state of emergency, calling California's prison system severely overcrowded, and CDCR began transferring inmates to private facilities in other states.

In November 2006, the Plaintiffs in the above-entitled actions filed motions to empanel a Three-Judge Court to consider a reduction in the prison population by means of a court-ordered prisoner release pursuant to the provisions of the federal Prison Litigation Reform Act ("PLRA") (18 U.S.C. § 3626). Consolidated evidentiary proceedings were held in the Coleman and Plata cases, over objections by the Defendants, in June 2007. On July 23, 2007, Plaintiffs' motions were granted and a consolidated Three-Judge Court was created.

1    The creation of the Three-Judge Court conferred on specific entities and

2    public officials the right to intervene in the litigation in accordance with 18 U.S.C.

3    section 3626, subdivision (a)(3)(F).

4    Twenty elected District Attorneys have intervened as Defendants in these

5    proceedings. The Law Enforcement Intervenors include 67 Sheriffs, Police Chiefs

6    and Chief Probation Officers. The Legislative Intervenors include 13 Republican

7    State Senators and 31 Assembly Members. Four separate counties have also

8    intervened in the proceedings: Sonoma, San Mateo, Santa Clara, and Santa

9    Barbara. The California Correctional Peace Officers' Association (CCPOA)

10    intervened separately and aligned with the Plaintiffs.

11    On October 10, 2007, the Three Judge Court set January 16, 2008 for a

12    pretrial conference and a trial for February 6, 2008.

13    On December 14, 2007, these dates were vacated.

14    The Plata Receiver filed his Plan of Action in November 2007. The current

15    Receiver, J. Clark Kelso, was appointed on January 23, 2008, and his Turnaround

16    Plan of Action was approved by the Plata Court on June 16, 2008. In fact, in

17    addition to developing plans that address the provision of medical health care in

18    CDCR facilities (Plata), the Receiver's plans also address mental health care

19    (Coleman), dental health care (Perez v. Schwarzenegger), and compliance with

20    Americans with Disabilities Act (Armstrong v. Schwarzenegger) in CDCR

21    institutions.

22    In July 2008, the Three-Judge Court issued a trial scheduling order

23    directing trial to commence in San Francisco on November 18, 2008 and finish by

24    December 19, 2008. The trial took place as scheduled.

25    The fundamental questions to be determined by this Court are whether

26    overcrowding is the primary cause of the allegedly inadequate delivery of medical

27    care and mental health care in California's prisons and whether any measures

28
District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling
on Plaintiffs' Request for a Prisoner Release Order

1   other than a prisoner release order can remediate those alleged inadequacies. (See

2   18 U.S.C. § 3626.) In resolving these issues, the Court must give substantial

3   weight to any adverse impacts that a proposed prisoner release order would have

4   on public safety or the operation of the criminal justice system. (See 18 U.S.C. §

5   3626(a) (1) (A)).

6       The Three-Judge Court issued a pre-trial ruling that prohibited evidence

7   and argument concerning improvements and reforms that had been made since the

8   Courts' findings of constitutional violations in 2005 that culminated with the

9   appointment of the Receiver in February 2006. The Three-Judge Court ruled that

10  the current existence or non-existence of constitutional violations were matters for

11  the individual underlying courts to decide and that such argument is inappropriate

12  in these Three-Judge Panel proceedings. This trial was to determine the

13  appropriate remedy for the constitutional violations that the Plata and Coleman

14  courts had found to exist.

15      Shortly before the start of the trial, the Plaintiffs proposed for the first time

16  a court order that (1) requires Defendants to reduce the population of CDCR

17  institutions to 130% of the design capacity over a 2-year period; and (2) orders

18  defendants to develop a reduction plan to achieve that population level within 30

19  days of the Court's order. Plaintiffs have asserted that Defendants can safely

20  reduce prison population by 1) diverting from prison those parolees who are

21  returned to prison for a short term because they violated technical parole rules; 2)

22  diverting from prison certain low-risk offenders, and 3) reducing length of stay in

23  prison by a few months by increasing "good time" credits for good behavior

24  and/or participation in rehabilitative programs.

25      Pursuant to the Court's order of January 9, 2009, the District Attorney

26  Intervenors submit the following Proposed Findings of Fact and Conclusions of

27  Law. The Proposed Findings of Fact are based on the evidence presented by the

28

1  District Attorney Intervenors and developed during cross-examination of the

2  witnesses at trial. A prisoner release order that involves the early release of state

3  prison inmates, diversion of state prison-bound felons, or the setting of a

4  population cap on the prison system will have substantial adverse impacts on

5  public safety and the operation of local criminal justice systems. These Proposed

6  Findings of Fact are intended to supplement the Proposed Findings of Fact

7  submitted by the Defendants and other Defendant Intervenors on these issues.

8      The Plaintiffs did not meet their burden of establishing by clear and

9  convincing evidence that overcrowding is the primary cause of the constitutional

10  violations found to exist by the Courts in the underlying actions, and that no relief

11  other than a prisoner release order would remediate the constitutional deficiencies

12  in prison medical and mental health care. The District Attorney Intervenors concur

13  with and adopt the Proposed Findings of Fact submitted by the Defendants on

14  these issues.

15      The District Attorney Defendant Intervenors request the Court to make the

16  following findings of fact and conclusions of law in this action:

17

18  ## FINDINGS OF FACT

19

20  **A PRISONER RELEASE ORDER WILL HAVE A SUBSTANTIAL**

21  **ADVERSE IMPACT ON PUBLIC SAFETY AND THE OPERATION OF**

22  **LOCAL CRIMINAL JUSTICE SYSTEMS**

23

24      A. The early release of state prison inmates prior to the expiration of

25      their sentenced terms will result in the commission of new crimes,

26      some of which will be violent and serious felonies, in local

27      communities.

28

1. According to the Plaintiffs' expert witness, Dr. James Austin, 25 percent of prisoners released early from their prison terms will be caught and arrested for new crimes within the first four months of release. (Austin Report, 8-27-08, p.1.)

2. According to Dr. Austin, early release programs are only a short term remedy for overcrowding and it's not a policy he endorses. (Austin, Trail Tr., 2610:8 -13.)

3. The number of new crimes that go unsolved is not considered in this 25 percent recidivism rate. The number of crimes that occur is greater than the number of arrests. (Austin, Trial Tr., at 1506:21- 1507:20.)

4. While the Plaintiffs expert witness, Dr. James Austin, has opined that the overall increase in the number of crimes committed within a particular area as a result of proposed prison population reduction measures, including early release, will be statistically insignificant in comparison with the total number of crimes reported in those areas, each new crime will involve very real and serious human consequences for the victims of these crimes. For those who will be victimized by prisoners who are released early from their prison terms, these additional crimes will be very significant and this fact cannot be ignored. (Austin Report, 8-27-08, p.1; Pacheco Affidavit at 6:25 – 7:7.)

5. Riverside County District Attorney Pacheco testified that studies of early release programs have disclosed that they have the effect of increasing crime, "violent crime as well as

6

1    non-violent crime." "More people are victimized. More

2    people are injured. Some are even murdered." (Trial Tr., 12-

3    12-08, at 2380:12 – 2381:6.)

4    6. If the Court were to grant the Plaintiffs' request for a

5    reduction of the prison population to 130 percent of design

6    capacity within two years, it could involve the early release of

7    an additional 2,500 inmates per month

8    This 25 percent recidivism rate in the first four months of

9    early release would result in the commission of over 400 new

10    crimes in Riverside County alone.  These are new crimes that

11    would not have taken place, but for the early release of the

12    perpetrators. (Pacheco Affidavit at 6:22-24.)

13    7. Plaintiffs' expert, Dr. Barry Krisberg, was retained to opine

14    that accelerated or early release measures being proposed to

15    reduce the state prison population would not endanger public

16    safety. (Krisberg, Trial Tr., at 2144:20 – 25.)

17    8. Dr. Krisberg agreed that the notion of endangering public

18    safety equates to increasing crime and victimization.

19    (Krisberg, Trial Tr., at 2145:10-17.)

20    9. There are different ways to measure or determine whether

21    early release programs endanger public safety: increases in

22    the crime rate, increases in the recidivism rate of the

23    individuals released early from their prison terms, and

24    increases in the occurrence of crime in the community.

25    (Krisberg, Trial Tr., 2145:18 – 2146:3.)

26    10. Plaintiffs' expert witness, Dr. James Austin, authored a

27    study in 1986 on early release measures implemented in

28

7

District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling
on Plaintiffs' Request for a Prisoner Release Order

Illinois between 1980 and 1983. (Def. Intervenors Trial Ex. DI-785.) This study was supervised and published by Plaintiffs' expert witness Dr. Barry Krisberg and the National Council on Crime and Delinquency.  One of the findings of this study was that early release of prisoners substantially accelerated the amount of crime suffered by the public. (Krisberg, Trial Tr. At 2153:11 -2154:1.)

11. "Although the prison system would directly benefit from lowered prison populations, the public must also suffer the increased effects of accelerated prison releases that in turn can jeopardize public safety." (Def. Intervenors Ex. DI-785, at p. 405.)  At trial, Dr. Krisberg declined to agree with this statement from Dr. Austin's 1986 study. (Krisberg, Trial Tr., 2158:9 – 14.)

12. Dr. Krisberg agreed with this statement from Dr. Austin's 1986 study: "Early release means that crimes that could not have been committed by released prisoners had they served their full terms are now likely to take place." (Krisberg, Trial Tr., 2164:22 – 2165:8.)

13. Dr. Austin discovered, in the 1986 Illinois study (Trial Ex. DI-785) that out of 21,000 inmates released 90 days prior to the expiration of their prison terms, there were approximately 4,500 arrests for new crimes committed during the early release period. (Austin, Trial Tr., at 1533:18 - 1536:4.)  These 4,500 new crimes included 23 homicides, 32 rapes, 681 robberies, 2,571 assaults, 262 arsons, and 2,472 burglaries. (Krisberg, Trial Tr., at 2163:20 – 2164:7.)

8

1    14. CDCR Adult Parole Operations Director Thomas

2    Hoffman testified that 4 percent of the group of parolees who

3    will recidivate and commit new crimes will commit violent

4    crimes. (Trial Tr., 12-10-08, at 1751:14 – 21.)

5    15. Even if only a minimal number of the new crimes that

6    will be committed by inmates who are released early in order

7    to reduce the prison population are violent or serious felonies,

8    it is not acceptable that the citizens of Riverside County, or

9    any other county, be subjected to that unnecessary risk to

10    their personal safety. (Pacheco Affidavit at 7:8 – 11; Trial Tr.,

11    2381:10 – 2382:14.)

12    16. Lessening the length of prison terms to reduce prison

13    population will have the adverse effect of increasing crime,

14    increasing congestion in the courts, and compromising the

15    integrity of the criminal justice system. Any diminution of

16    the deterrent value of punishment encourages and increases

17    recidivism, and results in additional human victims. (Pacheco

18    Affidavit, at p. 7:22 – 28.)

19    17. Studies have shown that increased incarceration and a

20    high risk of punishment reduce crime. Stanford University

21    published a study in 2000 called "The Social Benefits of

22    Confining Habitual Criminals." (Def. Intervenor Ex. DI-502;

23    Pacheco Affidavit, at p. 8:23 – 9:3) This study found that

24    between 1982 and 1997, California had more than tripled its

25    incarceration rate with a focus on habitual criminals. During

26    this time, the number of victims of serious crime dropped

27    from 4,777 per 100,000 population, to 2,381 per 100,000.

28

1    During the 1990's, California's crime rate decreased 10

2    percent from 1991 to 1994 (6,776/100,000 in 1991 to

3    6,094/100,000 in 1994.) After passage of Three-Strikes

4    legislation in 1994, the rate plummeted over 21 percent in the

5    next three years (4,807/100,000 in 1997.)

6

7    B. The diversion of state-prison-bound felons to custody,

8    supervision or programs in the local community, without increased

9    funding in support of such alternatives will result in the commission

10    of new crimes in local communities and increased recidivism.

11        1. The Plaintiffs' diversion proposal for state prison bound

12        inmates with terms of 24 months or less is intended to reduce

13        the prison population by approximately 12, 500. According

14        to Plaintiffs' expert witness Dr. James Austin, the target

15        group of offenders has a recidivism rate of approximately 26

16        percent. (Austin, Trial Tr., 2565:17 – 2566:25; 2572:23 –

17        2573:11.)

18        2. The Plaintiffs' proposals to reduce the prison population

19        through early release measures and diversion programs target

20        non-violent, non-serious, non-sex crime drug, theft and other

21        property crime offenders. Academics and CDCR statistics

22        have documented the high recidivism rates among these types

23        of offenders. (Pacheco Affidavit, at 5:16 -20.)

24        3. The defendants that fall into these categories of "low risk"

25        or "non-serious" offender that are committed to prison have

26        long records of criminal behavior. Most first, second and third

27        time offenders are dealt with at the local level and placed on

28

10

District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling
on Plaintiffs' Request for a Prisoner Release Order

1    probation. Almost without exception, those defendants who
2    are sent to prison for property or drug crimes are recidivists
3    who have failed to comply with multiple grants of probation
4    and treatment at the local level. (Pacheco Affidavit, at 5:20 –
5    6:4; Dumanis Affidavit, at 6:23 – 7:6; Trial Tr., at 2419:20 –
6    25.)
7    Plaintiffs' expert Dr. Barry Krisberg conceded that someone
8    who has three or more felony convictions is a greater risk of
9    reoffending than one who does not have such a criminal
10   history. (Krisberg, Trial Tr., 2151:10 – 13.)
11   4. Some counties have already begun to implement promising
12   rehabilitative programs designed to reduce the recidivism rate
13   among this class of offenders. The SB618 program in San
14   Diego County is a prime example. The implementation of the
15   early release and/or diversion programs suggested by the
16   Plaintiffs will compromise the effectiveness and future
17   potential of these programs. (Rodriguez Affidavit, at p. 5:5 –
18   12; Trial Tr., 997:19 – 998:21.)
19   5. A court ordered cap on the prison population will create a
20   backlog of sentenced prisoners in county jails awaiting space
21   in CDCR institutions. Potentially dangerous pre-trial
22   detainees will have to be released to accommodate increasing
23   state prisoner populations in county jails that are already
24   severely overcrowded and operating under imposed
25   population caps that mandate early releases of misdemeanor
26   and non-violent felony pre-trial detainees and sentenced
27   probationers.
28

6. In 2007, state-wide, approximately 200,000 jail inmates were released early for lack of sufficient capacity. (Austin, Trial Tr., 1529:2- 1530:3.)

Riverside County jail, like many other counties, have jail population caps that have forced local authorities to release inmates prior to the completion of their court ordered custody and to release unqualified pre-trial detainees without bail. (Pacheco Affidavit, at 4:7-11.)

7. In 2007, over 6,000 Riverside County jail inmates were early released due to jail crowding. In the first eight months of 2008, a total of 2,971 inmates have been released early from the jail, and 833 have been rearrested for new crimes; a recidivism rate of 28 percent. (Pacheco Affidavit, at 4:11 – 15; Def. Intervenor Trial Ex. DI-500.)

8. A prison population cap will result in an increasing number of pretrial detainees being displaced by a growing number of state prison sentenced inmates resulting in more serious and dangerous types of offenders being released into the community when they should be detained in custody pending adjudication of their crimes. The recidivism threat of this more serious class of offender poses a substantial risk to the safety and property of law-abiding members of the community. (Pacheco Affidavit, at 5: 6 – 15; Dumanis Affidavit, at 6:8 – 15.)

District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling on Plaintiffs' Request for a Prisoner Release Order

**ALTERNATIVES TO THE POPULATION REDUCTION MEASURES**
**PROPOSED BY THE PLAINTIFFS ARE AVAILABLE THAT WOULD**
**EFFECTIVELY REDUCE THE PRISON POPULATION WITHOUT AN**
**ADVERSE IMPACT ON PUBLIC SAFETY**

A. Recidivism reduction programs like SB 618, state funding of local probation functions and community based rehabilitative programs, full implementation of AB 900, increased out-of-state transfers of inmates to private facilities, housing inmates in private facilities in the state of California, and funding the Community-Based Punishment Act of 1994 (Pen. Code §§ 8050 – 8093) are viable alternatives to the prison population reduction measures proposed by Plaintiffs. These measures and programs would not have adverse impacts on public safety. (Dumanis Affidavit, at p.4:1 – 8, 14 – 26; 5:1- 28.)

B. SB618 will effectively reduce recidivism and thereby reduce the prison population. The SB618 Community Reentry Program is a comprehensive, multi-agency program designed to transition non-violent parolees back into the community from prison through treatment, education and vocational assistance. SB618 is intended to address the high rates of recidivism by providing an evidence-based plan for reintegration into the community. The rehabilitation process begins at the time of the plea bargain and ends eighteen months after release from prison.

The SB618 program can turn the prison and parole system into what it was intended to be, a system that attempts to rehabilitate people so

13

District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling on Plaintiffs' Request for a Prisoner Release Order

1    they do not come back through the system.  Recidivism will never be
2    eliminated, but it can be decreased by providing people with some
3    tools that will assist them in making the right choices when they are
4    released.  Replicating the SB618 program in other counties would
5    have a dramatic impact on reducing the prison population by
6    lowering the recidivism rate of nonviolent repeat offenders.
7    (Rodriguez Affidavit, at p. 2:5- 28; 6:25- 7:5; Trial Tr., 980:19 –
8    984:24)
9
10    C. The SB618 program can be implemented in other counties and is
11    a viable alternative to a prison population cap or early release order.
12    (Dumanis, Trial Tr., 2411:17 – 2415:22.)
13
14                    **CONCLUSIONS OF LAW**
15
16        Pursuant to 18 U.S.C. § 3626(a)(3)(E), a Three-Judge Court can enter a
17    prisoner release order only if it finds by clear and convincing evidence that
18    overcrowding is the primary cause of the violation of a federal right and no other
19    relief will remedy the violation of the federal right.
20        In order to succeed in this case, the plaintiffs must prove that the delivery
21    of their medical and/or mental health care is currently inadequate on a
22    constitutional level, that prison overcrowding is the primary cause of the
23    constitutional violations, and that no other relief will ensure the delivery of a
24    constitutionally adequate level of medical and mental health care delivery.
25        A Three-Judge Court must give substantial weight to any adverse impact on
26    public safety or the operation of the criminal justice system caused by the
27    proposed relief.
28                           14

1    The general orders proposed by the Plaintiffs impact the overall prison

2  population, rather than the Plaintiff classes. Such a remedy would not be narrowly

3  drawn and would extend further than necessary to correct the violations at issue in

4  this case.

5    The PLRA broadly defines a "prisoner release order" to include orders that

6  explicitly direct the release or non-admission of prisoners as well as those that can

7  indirectly lead to prison population limits or releases. See, 18 U.S.C. § 3626(g)(4)

8  (defining a "prisoner release order" to include "any order, temporary restraining

9  order or preliminary injunction that has the purpose or effect of reducing or

10  limiting the prison population, or that directs the release from or non-admission of

11  prisoners to a prison).

12    If the Court determines that the Plaintiffs have met there burden of proof

13  that overcrowding is the primary cause of the constitutional violations previously

14  determined in the underlying actions, and that there are no alternative remedies

15  other than a prisoner release order, then the potential adverse impacts on public

16  safety and local criminal justice systems of the prisoner release orders proposed by

17  plaintiffs compel the conclusion that the Court must either deny the plaintiffs

18  requests or fashion a less intrusive and more narrowly drawn remedy.

19

20

21  DATED:   January 23, 2009                Respectfully submitted,

22

23                                          ROD PACHECO, District Attorney

24                                          County of Riverside

25                                          By:_____/s/_____

26
                                            William E. Mitchell
27                                          Attorneys for Intervenors

28
                                     15

1   ROD PACHECO,
    District Attorney County of
2   Riverside
    BONNIE M. DUMANIS,
3   District Attorney, County of San
    Diego
4   TONY RACKAUCKAS,
    District Attorney, County of Orange
5   JAN SCULLY,
    District Attorney, County of
6   Sacramento
    CHRISTIE STANLEY,
7   District Attorney, County of Santa
    Barbara
8   MICHAEL A. RAMOS,
    District Attorney, County of San
9   Bernardino
    ROBERT J. KOCHLY,
10  District Attorney, County of Contra
    Costa
11  DAVID W. PAULSON,
    District Attorney, County of Solano
12  GREGG COHEN,
    District Attorney, County of Tehama
13  TODD RIEBE,
    District Attorney, County of Amador
14  BRADFORD R. FENOCCHIO,
    District Attorney, County of Placer
15  JOHN R. POYNER,
    District Attorney, County of Colusa
16  MICHAEL RAMSEY,
    District Attorney, County of Butte
17  GERALD T. SHEA,
    District Attorney, County of San
18  Luis Obispo
    EDWARD R. JAGELS,
19  District Attorney, County of Kern
    GREGORY TOTTEN,
20  District Attorney, County of Ventura
    VERN PIERSON,
21  District Attorney, County of El
    Dorado
22  CLIFFORD NEWELL,
    District Attorney, County of Nevada
23  RONALD L. CALHOUN,
    District Attorney, County of Kings
24  DONALD SEGERSTROM,
    District Attorney, County of
25  Tuolumne

26

27

28
District Attorney Intervenors' Findings of Fact and Conclusions of Law re Ruling
on Plaintiffs' Request for a Prisoner Release Order