JONES & MAYER
Martin J. Mayer (SB # 73890)
Michael R. Capizzi (SB # 35864)
Kimberly Hall Barlow (SB # 149902)
Ivy M. Tsai (SB # 223168)
3777 North Harbor Boulevard
Fullerton, California 92835
(714) 446-1400; Fax (714) 446-1448
e-mail: mjm@jones-mayer.com
e-mail: mrc@jones-mayer.com
e-mail: khb@jones-mayer.com
e-mail: imt@jones-mayer.com

Attorneys for Law Enforcement
Intervenor-Defendants

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No:  CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT**<br><br>[F.R.C.P. 24; 18 U.S.C.§3626(a)(3)(F)] |
| MARCIANO PLATA, et al.,<br><br>Plaintiffs,<br><br>vs.<br><br>ARNOLD SCHWARZENEGGER, et al.,<br><br>Defendants. | Case No.:  C01-1351 TEH<br><br>**THREE-JUDGE COURT**<br><br>**LAW ENFORCEMENT INTERVENORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

The collective Sheriff, Police Chief, Chief Probation, and Chief Corrections

Intervenor-Defendants ("Law Enforcement Intervenors") respectfully submit the

-1-

1  following proposed findings of fact and conclusions of law, pursuant to the Three-Judge

2  Court's order of January 9, 2009, and also join in the proposed findings of fact and

3  conclusions of law submitted by Defendants and by other Defendant Intervenors.

## I. FINDINGS OF FACT

**A.**  **A prisoner release order would adversely impact public safety and local criminal justice systems.**

(1)  <u>Crime will increase.</u>

1.  A number of inmates released pursuant to a prisoner release order are highly likely to reoffend and end up in local criminal justice systems.  Generally, approximately seventy percent of parolees will reoffend within three years.  (Amended Expert Report of Fresno Police Chief Jerry Dyer ("Dyer Report"),¶18.)  Utilizing the COMPAS offender risk and needs assessment tool of the California Department of Corrections and Rehabilitation (CDCR), in Amador County, out of ninety-two active parolees, thirty-nine inmates to be released back to the county within 240 days, and an additional forty-seven inmates in the short-term pipeline for release, an average sixty-two percent had a "Highly Probable" or "Probable" risk of violence and an average sixty percent had a "High" or "Medium" risk of recidivism.  (Declaration of Expert Witness Sheriff Martin Ryan ("Ryan Decl.,"),¶14.)

2.  Most inmates fall into low income categories and typically have a low and unsteady rate of employment in their history.  Upon their return to the community, ex-offenders will remain underemployed, unemployed, and/or go back to crime.  Employment is often low-paying and part-time, without employment benefits.  Many ex-offenders continue accruing child support responsibilities because, even if employed, the income is too low to support their basic living needs and other expenditures.  The inability to sustain themselves financially leads to reoffending.  (Amended Declaration of Expert Witness Karen Dalton ("Dalton Decl."),¶30., Tr. Tr. 12/10/08, 2045:24-2048:17; 2058:22-2059:16.)

3.     Much of the crime being committed is being committed by parolees.  Ten percent of criminals who end up in state prison commit eighty percent of all crime. (Dyer Report,¶17.)  In the City of Fresno, gang activity and the crimes committed by parolees constitute a large percentage of crime.  (Dyer Report,¶9 & 12.)  In 2007, the Fresno Police Department arrested 6,453 parolees, (Dyer Report,¶32.), representing 30% of all felony arrests in Fresno.  Trial Tr. 12/12/08, 2331:1-8.  Vacaville Police Chief Richard Word anticipates that even if those released from state prison are considered low risk in terms of reoffending, crime would still increase because it seems a habitual way of life for many offenders, and he believes that the number property crimes associated with drug addiction would rise.  (Word Decl.,¶23.)

4.     The recidivism rates of "low level" or "low risk" parolees are generally the highest.  Over a three-year period, fifty-seven percent of the general population of parolees will return to prison.  (Expert Report of Stanislaus County Chief Probation Officer Jerry Powers ("Powers Report"),§II,¶5; Exhibit DI-600.  However, the rate of return to prison for those who have committed burglary and robbery is over sixty percent, and for those who have committed auto theft, it is seventy percent.  (Id.)

5.     The Yolo County Inmate Statistics prepared by CDCR for the calendar year 2008 (AB 900, Re-entry Facility data), reveal that projected recidivism rates, absent any treatment or programming, would within two years result in crimes against persons and crimes of violence for 47 parolees; for property crimes, recidivism of 44 parolees; for drug crimes, recidivism of 45 parolees; and for other crimes, recidivism of 24 parolees. (Meyer Decl.,¶39.)  The two year total for parolee recidivism would be 160 parolees or nearly fifty percent of the projected 331 parolees for Yolo County in 2008.  (Id.)  This recidivism rate does not include crimes for which parolees were not arrested (those committed and undetected).  (Meyer Decl.,¶40.)

6.     It is unrealistic to conclude that each individual who is diverted from prison or released early from prison and who is rearrested will commit only one crime before being rearrested.  Some crimes occur twenty times more often than they are reported to

1  the police. (Trial Tr. 12/4/08, at 1508:11-19.) More crimes occur than are reported to

2  police (Trial Tr. 12/4/08, at 1506:21-24); more crimes are reported to police than arrests

3  are made (Trial Tr. 12/4//08, at 1506:25-1507:18; Declaration of Expert Witness Lt.

4  Stephen M. Smith, ¶8; Amended Declaration of Expert Witness Don Meyer ("Meyer

5  Decl."), ¶40 ; Stipulation Regarding Testimony of Michael James filed 12/18/08 ("James

6  Stip"), ¶2(a); Declaration of Expert Witness Michael James ("James Decl."), ¶26;

7  Declaration of Expert Witness Richard Word ("Word Decl."), ¶23); and more arrests are

8  made than convictions occur. In addition, there is only a small chance of someone being

9  arrested each time they commit a crime. A number of studies indicate, and Plaintiffs'

10  expert, Dr. Austin, agreed, that ten to fifteen percent of prisoners are "career criminals"

11  who commit upwards of 250 crimes per year each. (Trial Tr. 12/4/08, at 1356:16-23 and

12  12/18/08, 2601:7-21.) Therefore, we must presume that more crimes will occur than

13  would be represented by a pure application of the recidivism rate to the number of

14  persons diverted or released early. Indeed, Dr. Austin's earlier study in the State of

15  Illinois concluded that out of 21,000 persons released early from prison over a three year

16  period, 4500 of them were rearrested for crimes which occurred during their period of

17  early release, when they otherwise would have been in prison. Those arrests accounted

18  for 14,396 reported crimes, and 30,610 actual crimes committed during early release by

19  the early release group. (Trial Tr. 12/4/08, at 1535:12-1536:15.)

20  Those released from local custody through jail alternatives, including electronic

21  monitoring, commit crimes while out of custody. (Trial Tr. 12/3/08, at 1179:23-1180:3;

22  Trial Tr. 12/9/08, at 1804:10-22.) Crimes, largely relating to narcotics or property, have

23  been committed by individuals participating in jail alternative programs utilized by the

24  Stanislaus County Sheriff's Department to keep its jail population within a court-ordered

25  cap. (Declaration of Expert Witness Adam Christianson ("Christianson Decl."), ¶30.)

26  The Los Angeles County Sheriff's Department found that from 2003 through 2004, over

27  ten percent of those released early were rearrested during their early release period for

28  crimes committed while on early release, and sixteen released inmates were rearrested for

1    murder. (Trial Tr. 12/9/08, at 1811:18-1812:4.) A higher percentage of those released

2    early were rearrested within 90 days than those prisoners who were not released early.

3    (Trial Tr. 12/9/08, at 1816:20-1817:2.)  Orange County previously suffered serious

4    negative impacts on public safety from early releases compelled by the population cap

5    under which the county was then operating. (Declaration of Expert Witness Michael

6    James ("James Decl."), ¶22 & 25.)  From 1994 through 1996, 3,240 inmates released

7    early from Orange County jails due to court- imposed population caps and overcrowding

8    conditions were rearrested for crimes committed during the time when they should have

9    been in custody but for the early release. (Declaration of Witness Rick Dostal ("Dostal

10   Decl."), ¶11; Supplemental Declaration of Witness Rick Dostal, ¶2; Ex. DI-628.)  In 1996

11   alone, 740 inmates were rearrested for committing additional crimes during their early

12   release period, with 335 of them arrested for committing new felonies. As a result of data

13   showing that the community was harmed by early releases of county jail inmates, the Los

14   Angeles Sheriff's Department changed its early release policies to require longer

15   minimum custody stays and implement an additional check prior to early release;

16   however, these changes cannot completely prevent parolees from committing crimes

17   during their early release periods. (Trial Tr. 12/18/08, at 2641:23-2642:8.)

18              (a)    Lack of supervision, programming, and services.

19        7.    Currently, parolee caseloads are so understaffed that most parolees receive

20   very little supervision. In the City of Fresno, there is one parole agent assigned to 100

21   parolees, with the exception that "third strikers" are supervised at a ratio of one to 40 and

22   sex offenders at a ratio of one to 20. (Dyer Report, ¶32.)  Many parolees fail to

23   reintegrate into society in part because of poor supervision and lack of adequate

24   community services. (Dyer Report, ¶6.)  These contribute to drug addiction and

25   unemployment, which are factors in further commission of crimes. (Dyer Report, ¶19-

26   21; Christianson Decl., ¶23.)  These parolees commit further crimes after their release

27   from state prison. (Dyer Report, ¶7., Exhibit DI 600.)

28        8.    The parolee population is at a higher risk of reoffending than the general

-5-

population.  Only twenty-one percent of inmates participate in proven recidivism

reduction programs.  (Powers Report,§II,¶4.)  Because these inmates are in an

environment where there is a lack of classification, segregation, and programming, they

have a high risk of recidivism.  (Powers Report,§II,¶7.)

9.      Probation and parole do not offer treatment services but refer individuals

for services; however, lack of capacity already exists in the areas of documented inmate

needs.  (Dalton Decl.,¶31.)  There are insufficient resources in local communities to

provide counseling, training, mental health care, medical care, housing, drug treatment

and domestic violence counseling, and court resources in the community for existing

probationers and residents.  (Trial Tr. 12/2/08, at1038:17-1040:6; 12/10/08, 2073:15-

2075:4.)

10.    The Orange County Sheriff's Department currently has programs in its jails

to assist county inmates upon release from jail, but the programs are not and cannot be

provided to all inmates who might be eligible for them.  (Dostal Decl.,¶15.)

11.    The Orange County Sheriff's Department has an award-winning model

mental health treatment program, but because of insufficient staffing and funding, and

short custody lengths, the program is unable to provide mental health services to all

inmates in need of them.  (James Decl.,¶8.)  Under the Mentally Ill Offender Crime

Reduction Act (MIOCR), the Sheriff's Department has a program that diverts inmates

with mental health needs from the jail into appropriate mental health treatment facilities,

but this program does not and cannot serve all inmates with mental health needs.  (James

Decl.,¶7.)

(2)    Already overburdened local criminal justice systems will be further strained

by a prisoner release order, resulting in an adverse impact to public safety.

(a)    County jails are already overburdened by existing populations.

12.    Out of fifty-eight counties in California, over thirty already have court-

ordered population caps on their jails.  (Exhibit DI-774; Declaration of Sheriff Tom

Bosenko Regarding Shasta County Jail Statistics,¶2.)  Sheriff's Departments utilize a

LAW ENFORCEMENT INTERVENORS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

variety of population management programs to stay under their caps and have had to release individuals early in order to comply with the caps. (Christianson Decl.,¶13-17 & 24; Trial Tr. 12/9/08, at 1803:4-12; Declaration of Expert Witness Chief Alexander Yim ("Yim Decl."),¶8 & 17-21; Ryan Decl.,¶11; Declaration of Expert Witness John Ingrassia ("Ingrassia Decl."),¶12-13; Declaration of Expert Witness Michael James ("James Decl."),¶6.)  In Los Angeles County, there have been 770,807 inmates released from county jails, approximately twenty-nine percent of total releases (2,657,955), since the inception of the Early Release Program in 1993. (Yim Decl.,¶11.)  In 2007, 9,855 pre-trial detainees and 9,007 sentenced jail inmates were required to be released early from San Diego County jails due to the lack of housing capacity in the jail.  (Ingrassia Decl.,¶13.)  Yolo County Jail operates under a consent decree, pursuant to which it releases individuals when it reaches ninety-five percent of 450, which sometimes results in daily releases.  (Meyer Decl.,¶57.)

13.     Similar caps and capacity limitations have resulted in early release of local inmates from county facilities.  Exhibit DE-774.  In addition, local jail facilities are neither large enough nor sufficiently up to modern standards to handle any additional inmates.  Exhibits DI-782, DI-783.

14.     Although the Orange County Sheriff's Department utilizes a number of population management programs, including early release, and also partners with other local criminal justice systems in diversionary programs such as drug courts and community work programs, the county's projected jail needs will not be satisfied by currently planned facilities.  (James Decl.,¶10-18.)

15.     Currently, in Los Angeles County jails, male inmates generally complete seventy percent of their sentence and female inmates generally complete ten percent of their sentences before being released.  (Trial Tr. 12/9/08, at 1803:14-21.)  In 2007, just under 10,000 pretrial detainees and approximately 41,000 sentenced inmates were released early as a result of a cap.  (Trial Tr. 12/9/08, at 1803:23-1804:6.)

16.     The San Diego County jail system's highest single day population during

-7-

1  fiscal year 2008/2009 so far was 5,497 inmates, 695 inmates over the CSA rated

2  capacity. (Ingrassia Decl., ¶11.)

3    17.    While the Amador County Sheriff's Department utilizes a number of

4  population management programs, such as Home Electronic Monitoring, Sheriff's Parole

5  in cooperation with the courts, Work Furlough, Citation Release (Misdemeanors), and

6  Work Release, and these programs have reduced the jail population by approximately ten

7  percent, the county jail is still regularly ten to fifteen percent over capacity, creating

8  difficulties in classification and segregation of jail inmates and officer safety. ("Ryan

9  Decl."), ¶11.) Currently, eighty percent of the inmate population are serving time for

10  felony offenses. (Id.)

11    18.    County jail facilities are aging and are already straining to accommodate, or

12  are unable to accommodate, existing local custodial populations. Stanislaus County's

13  downtown facility is falling apart and is no longer cost-effective or efficient to maintain

14  and operate. (Christianson Decl., ¶27.) The Amador County Jail is approximately

15  twenty-four years old, outdated, is not capable of expansion in its existing location, and

16  does not have adequate room for currently mandated programs for inmates. (Ryan Decl.,

17  ¶11.) Amador County's needed jail capacity by 2010 is projected at 165 beds, over

18  double the current number available. (Ryan Decl., ¶13.)    Jails all over the state are in

19  similar conditions. (Exhibits DI-782, DI-783.)

20    19.    In order to serve a projected jail population based on current population,

21  the Stanislaus County Sheriff's Department will require 420 more medium to maximum

22  security beds by 2010. (Christianson Decl., ¶55.) It also currently requires additional

23  staffing. (Id.) The Los Angeles County Sheriff's Department has a plan to build new jail

24  facilities, but these new facilities would still be short at least 5,000 beds from meeting the

25  county's current jail needs. (Trial Tr., 12/9/08, at 1802:12-1803:3.)

26    20.    Orange County has five facilities in its jail system. (Dostal Decl., ¶5.) The

27  entire jail system has a rated capacity of 5,079; in 2007, the average daily inmate

28  population was 6,554. (Dostal Decl., ¶9.) The jail facilities are overcrowded by twenty

to twenty-five percent. (Dostal Decl.,¶13.) The James A. Musick facility, a very low
security facility due to its construction and original usage as an honor farm, has a rated
capacity of 713; however, the facility currently has 1,256 beds. (Dostal Decl.,¶6.) While
the County currently plans to build an additional 1,000 beds, funding of the required
$150,000,000 is unsecured, and the proposed new beds could not be made available to
new inmates, as they would be replacing existing temporary tents and wooden barracks
buildings which were originally intended to be temporary housing for inmates. (Id.) The
Theo Lacy jail, a combination of maximum security, medium security and minimum
security facilities for men, has already been expanded, and Orange County is currently
unable to expand it further due to a court ordered population cap. (Dostal Decl.,¶7.)

21.    There is currently no available capacity in the Orange County jail system
for inmates with mental health or medical treatment needs, as those beds are at or beyond
full capacity. (Dostal Decl.,¶17.) There are also no private facilities in Orange County
available to absorb additional inmates with mental health or medical treatment needs.
(Id.)

22.    The Los Angeles County Sheriff's Department is unable to meet the current
needs of its mentally ill jail population, the average daily population of inmates with
mental health needs being between two and three thousand. (Trial Tr. 12/9/08, at1818:3-
23.) The corrections mental health services in San Diego County jails are being taxed
well above the capacity for which they are funded. (Declaration of Expert Witness
Richard Conklin ("Conklin Decl."),¶41.)

23.    Amador County Jail suffers from lack of staffing as well as overcrowding.
(Ryan Decl.,¶12.)

(b)    Police

24.    Oakland City Jail has had to transfer inmates because it was near or
exceeding capacity. (Declaration of Expert Witness Richard Word ("Word Decl."),¶17.)

25.    Due to severe financial constraints, the City of Vallejo has lost thirty
percent of its police force within the past year. (Word Decl.,¶25.)

1    26.    Fresno County has approximately 5,000 parolees, eighty to eighty-five

2    percent of which live in the City of Fresno, with higher numbers frequenting the city on a

3    daily basis. (Trial Tr. 12/12/08, at 2305:23-2306:7.) All the testimony of witnesses

4    demonstrates that there will be a significant negative impact to local police departments

5    if a prison release order is issued.

6            (c)    County probation is overwhelmed by current caseloads.

7    27.    The current caseload of probation officers in Los Angeles County is

8    upwards of 1000:1, in stark contrast to the recommended caseload of between 30:1 and

9    50:1. (Dalton Decl.,¶32.)

10   28.    In July of 2008, the Yolo County Probation Department had 1100 active

11   cases assigned to 10 deputy probation officers. (Meyer Decl.,¶18.) 2,589 other cases

12   were banked, or largely unsupervised, and were assigned to one deputy probation officer.

13   (Meyer Decl.,¶20.) The workload has changed in the last year in that fewer cases have

14   been supervised, focusing on the cases that require the most intense supervision. (Meyer

15   Decl.,¶24.) Most of the adult division is reactionary; probation officers respond to

16   emergencies and have little ability to provide treatment to adult offenders. (Id.) The

17   total of probationers for July of 2008 was 3720, with 2900 not being supervised. (Meyer

18   Decl.,¶41.)

19   29.    The Stanislaus County Probation Department is responsible for

20   approximately 7,000 adult probationers. Approximately 40 officers supervise them and

21   provide court services as well. With this ratio of probationers to officers, no meaningful

22   supervision or service can be performed. The department is forced to focus on those

23   probationers determined to be at the highest risk to the community from a public safety

24   perspective and/or those with the highest needs for treatment services, and ignore the rest

25   of the probationers until they get re-arrested. (Trial Tr. 12/2/08, at 1030:7-21.)

26   30.    The current authorized staffing level for the Amador County Probation

27   Department is fourteen probation officers with an average caseload of three hundred

28   cases per officer. Most of the cases supervised are high risk offenders, of which over

-10-

ninety percent have or have had a substance abuse and/or mental health issue. Most, if
not all of the state inmates released, if placed back on probation, will likely be classified
as high risk, and therefore will require supervision. (Ryan Decl., ¶21.)

        (d)    <u>Other local criminal justice systems are already overburdened.</u>

31.    The Amador County Behavioral Health Department (BHD), which
provides mental health and substance abuse treatment services and prevention and
offender treatment programs, is so overburdened that it currently takes two weeks from a
request for services for a new client to be assessed and a psychiatrist appointment cannot
be made until six to eight weeks after the assessment. (Ryan Decl., ¶¶22-23.)

32.    The Court system in Yolo County is severely clogged with cases and is
several years behind on trials. (Meyer Decl., ¶43.)

        (e)    <u>Lack of funding.</u>

33.    The funding of adult community corrections has diminished to a point that
limited to no rehabilitation takes place at the local level. (Meyer Decl., ¶15.) Yolo
County Probation Department's lack of funding results in an inability to provide
supervision or treatment to seventy-eight percent of adult felons currently on probation.
(Meyer Decl., ¶¶41 & 54-55.)

34.    The Stanislaus County Sheriff's Department spends $6.3 million a year to
provide health care, dental care, and mental health care to the jail population.
(Christianson Decl., ¶43.)

        (d)    <u>Impact of a prisoner release order.</u>

35.    The prison population cannot be reduced to 130% of design capacity as
proposed by Plaintiffs without requiring early release of "second-strikers," which is
statutorily prohibited. (Trial Tr., 12/4/08, at 1436:11-20.) Without requiring early
release of two-strikers and persons serving life sentences, the prison population can be
reduced only by 30,000 to 35,000. (Trial Tr. 12/4/08, at 1439:8-1440:11.)

36.    Only ten percent of persons sent to prison for probation violations are so-
called "technical violators" – those who are returned to custody due to failure to comply

1  with probation conditions rather than for new crimes. (Trial Tr.12/2/8, at 1032:4-17.)

2  These persons are sent to prison because they typically have multiple probation violations

3  and there is no custodial alternative to prison. (Trial Tr. 12/2/08, at 1033:3-1034:1.)

4      37.    While Plaintiffs contended at trial that between 66,000 and 69,000 parolees

5  are returned to prison each year on "technical" parole violations, in fact Dr. Austin,

6  Plaintiffs' expert, testified that only 14,500 of this number are returned to prison for

7  purely technical violations as opposed to new crimes. (Trial Tr. 12/4/08, at 1453:22-25.)

8  Some of these parole violators were arrested for serious crimes such as rape and murder.

9  (Trial Tr. 12/4/08, at1455:15-1456:24.) Even "technical" parole violators are arrested for

10 crimes such as absconding, failed drug tests, obstruction of justice, and similar crimes.

11 (Trial Tr. 12/4/08, at 1454:1-1455:14.) Dr. Austin acknowledged that diverting technical

12 parole violators from prison results in a reduction in prison population of only 10,000 to

13 15,000 prisoners per year. (Trial Tr. 12/4/08, at 1435:22-25.)

14      38.    52,000 inmates released or diverted from state prisons, as proposed by

15 Plaintiffs, would result in an additional 2,912 offenders in Orange County. (James Stip.,¶

16 2(c).) At a recidivism rate of seventy percent, 2,038 of these would reoffend within three

17 years, a figure roughly equal to the current sentenced population of Orange County jails,

18 which is approximately thirty percent of the total population (the rest being pretrial

19 detainees). (Id.) To accommodate even a smaller increase of offenders who would be

20 serving time in county jails, the Sheriff's Department would have to eliminate

21 programming space for promising county programs and/or revert to regular and

22 substantial early releases, already demonstrated to have a disastrous effect on Orange

23 County. (James Decl.,¶25; Dostal Decl.,¶10-11.)

24      39.    Additionally, seventy to eighty percent of Orange County inmates are

25 felons as opposed to misdemeanants. (Dostal Decl.,¶12.) If the County receives a large

26 influx of offenders released from state prison, and they are rearrested at the rates

27 published by CDCR (seventy percent), Orange County's jail capacity could be taken up

28 entirely by felons and high risk misdemeanants. (Dostal Decl.,¶12 & 14.) According to

1  the most recent COMPAS risk assessment issued by the CDCR on or about September

2  16, 2008, 69% of Orange County parolees have a high to medium risk of recidivism.

3  (Dostal Decl., ¶14.)

4      40.    Plaintiffs' expert acknowledges that fully one-half of those he would

5  propose to divert from prison to either parole or probation will be rearrested within 12

6  months of their diversion. (Dr. Austin's August 27, 2008 Report, as revised (Table 10);

7  Trial Tr.12/4/08, at1504:19-1505:6.) In fact, Dr. Austin acknowledged that diversion

8  would reduce the CDCR population by 12,147 persons, but would also result in an

9  additional 10,412 arrests within a year. (Trial Tr. 12/4/08, at1505:7-18.) An additional

10  10,412 arrests statewide to achieve a prison population reduction of only 12,147 persons

11  creates an unacceptably high risk to public safety.

12      41.    One of the problems with releasing inmates early is that they have not spent

13  enough time in prison to benefit from rehabilitation programs. (Conklin Decl., ¶37.)

14      42.    Due to the high risk of their reoffending, released inmates will back up the

15  local system, and force more offenders out of custody, treatment, and supervision

16  programs, increasing the risk to public safety. (Powers Report, §II, ¶10; Meyer Decl., ¶60.)

17  In order to accommodate the increase in population while staying within caps, local jails

18  would also be forced to release more inmates, which would result in an increase of crime

19  and negative impact to public safety. For example, because San Diego County's jail

20  facilities are already at their maximum load, there are very few "low risk" or

21  misdemeanants in the existing jail population who can be released to make room for new

22  arrestees, particularly those with history of violence or those who were on parole when

23  again arrested. (Ingrassia Decl., ¶12.) This will force the release into the community of

24  anyone from newly arrested parolees to high risk/violent felony suspects/detainees in

25  order to comply with the population cap in the absence of additional jail facilities being

26  built, and would inevitably result in more high risk people being let out in the

27  community, with a commensurate need for additional probation officers, housing

28  services, district attorney and public defender services, additional mental health

-13-

1  programming, facilities and services needed, and additional need for drug and alcohol

2  programs.   (Ingrassia Decl.,¶12 & 14; James Decl.,¶22.)

3       43.    The type of inmates who would be released from prison – usually multiple

4  time offenders with a history of substance abuse, often with mental health care needs and

5  failures to comply with terms of probation or parole – upon a new arrest, would be

6  booked and housed in the Department's facility until an appropriate decision has been

7  made on whether they would be violated on parole or sentenced to a new term in prison.

8  The majority of these inmates would not meet the criteria for any of the local alternative

9  to custody programs, shortened sentence, or diversionary programs.  (Ingrassia Decl.,

10  ¶5.)

11       44.    The Los Angeles County Sheriff's Department found that, even with early

12  release of county jail inmates, public safety was adversely impacted in that a significant

13  number of early releasees were re-arrested for committing new crimes, including murder.

14  (Trial Tr. 12/9/08, at 1811:18-1812:4; 1813:2-5.)  Although the department has taken

15  steps to mitigate impacts to the local community of early releases, it cannot completely

16  do so. (Trial Tr. 12/9/08, at 1813:10-13.)  Without any provision of services before

17  release and without an increase of any kind in services in the community upon release, a

18  prisoner release order would lead to an increase in crime and a threat to public safety, and

19  would also be detrimental to those released without preparation to be returned to the

20  community.  (Dalton Decl.,¶36; Conklin Decl.,¶39.)

21       45.    A court-ordered the release of even 40,000 inmates would result in a further

22  drain on an already strained system that lacks services, has declining ratios of police

23  officers, a lack of parole officers, probation and courts that are overwhelmed in many

24  cases. (Word Decl.,¶25.)  Even a release order that slows down the release to 10,000 state

25  prisoners in 2009 and an additional 10,000 in 2010, would impact public safety in a

26  negative way in addition to normal releases and assuming all other factors remain equal.

27  There is a lack of resources now so that existing lack of resources would be further

28  strained.   There are insufficient community resources for those already in the

-14-

1    communities with mental health care needs, substance abuse needs and housing needs.

2    (Word Decl.,¶26.)

3        46.    A population cap on the state prison system will result in local jails being

4    unable to send inmates to prison, backing up their systems and causing them to displace

5    the current local custodial population, and placing an increased burden on probation,

6    which already operates at a ratio of over 200 probationers per probation officer in many

7    counties.  (Powers Report,§II,¶11.)

8        47.    The evidence also demonstrates that the persons incarcerated in County

9    jails are typically much lower risk than those who are sent to state prison.  Thus, there is a

10    greater likelihood of negative impacts to public safety from a prison release order than

11    what has occurred at the county level.  The Los Angeles County jail population is

12    different from the state prison population in terms of age, mental disposition, length of

13    stay, and the fact that the average California state prison convict has been through the

14    various county jail systems on multiple occasions before being sentenced to prison.  (Yim

15    Decl.,¶15.)

16        48.    Released state inmates can be expected to have a high rate of mental illness,

17    substance abuse and addiction, and propensity to violence that would substantially and

18    negatively impact limited local services.  (Ryan Decl.,¶24.)  In Amador County, out of

19    ninety-two active parolees, thirty-nine inmates to be released back to the county within

20    240 days, and an additional forty-seven inmates in the short-term pipeline for release, an

21    average thirty-six percent had "Highly Probable" or "Probable" vocational education

22    needs, an average forty-seven percent had a "Highly Probable" or "Probable" residential

23    instability risk, an average seventy-nine percent had  a "Highly Probable" or "Probable"

24    substance abuse risk, an average sixty-two percent had a "Highly Probable" or

25    "Probable" risk of violence, and an average sixty percent had a "High" or "Medium" risk

26    of recidivism, utilizing CDCR's COMPAS offender risk and needs assessment tool.

27    (Ryan Decl.),¶14.)

28        49.    Because there are insufficient resources in local communities to provide

-15-

1   counseling, training, mental health care, medical care, housing, drug treatment and

2   domestic violence counseling, and court resources in the community for existing

3   probationers and residents (Trial Tr. 12/2/08, at1038:17-1040:6) ; (Dalton Decl.,¶31 (as

4   amended in Stipulation Regarding Testimony of Karen Dalton filed 12/17/08) & 41;

5   Ryan Decl.,¶19; Conklin Decl.,¶¶29 & 41), an influx of additional parolees or those

6   released early from parole will impossibly strain these resources, resulting in even fewer

7   citizens, parolees and non-parolees alike, receiving necessary services and housing.

8   Currently, local resources do not exist to serve released inmates from a custody,

9   supervision, and treatment perspective. (Powers Report,§II.,¶10.) This is likely to lead

10  to more crime in the community and will be harmful to both the community at large and

11  to those released from prison without adequate resources to assist them in reintegrating

12  into society and obtaining necessary medical and mental health care treatment. (Ryan

13  Decl.,¶16.)

14      50.     Community mental health centers do not have the necessary tools or

15  capacity to meet the needs of the current population being released from jail and prison

16  that have mental health needs, and an increase in releases would only compound the

17  problem. (Dalton Decl.,¶31; Ryan Decl.,¶19-24; Conklin Decl.,¶41.) If inmates in need

18  of mental health services were released, this would result in an adverse impact to Yolo

19  County's mental health services, which laid off thirty employees during the last budget

20  cycle, and for which there are often few resources and long waiting lists of people

21  seeking services. (Meyer Decl.,¶63-65.) San Diego County's community mental health

22  service suffers from lack of staffing and there are waiting lists for all programs. (Conklin

23  Decl.,¶41.) Without receiving proper mental health services, released inmates will end

24  up again in the criminal justice system. (Meyer Decl.,¶66.)

25      51.     Amador County does not have the resources in housing, job training, job

26  opportunity, counseling, or public safety to deal effectively with a population of

27  criminally sophisticated state inmates who have not been provided the skills necessary to

28  allow them to be successful. This is not only a grave disservice to the citizens and safety

1    of this community, but also to the inmates who are destined to fail. (Ryan Decl.,¶30.)

2        52.    The Los Angeles County Sheriff's Department estimates that, if the state

3    prison population were to be reduced by just under 52,000 in a two-year period, this

4    would result in approximately 16, 400 diverted, released, or removed from parole in Los

5    Angeles County, based on the fact that between thirty-one and thirty-three percent of

6    state prisoners are from Los Angeles County. (Trial Tr. 12/9/08, at 1818:20-1819:8.)

7    Based on CDCR's return-to-custody rate, the Sheriff's Department estimates that roughly

8    11,000 will return to county jail in two years. (Trial Tr. 12/9/08, at 1819:9-18.) These

9    individuals would tend to be on their second and third strike and averaging longer stays

10   in jail, which would have a devastating impact on the sentenced population by severely

11   reducing the number of available beds. (Trial Tr. 12/9/08, at 1819:18-1820:4.) The

12   result would be that individuals would only serve about ten percent of their sentences,

13   reducing their ability to be rehabilitated through jail programs, and increasing the chances

14   of their committing new crimes upon release. (Trial Tr. 12/9/08, at 1820:4-1821:19.)

15       53.    Regardless of the number of released inmates returning to Stanislaus

16   County, the Sheriff's Department will be negatively impacted, due to the existing

17   federally mandated court cap, inadequate facilities, staffing shortage, and lack of funding

18   to adequately address these situations. (Christianson Decl.,¶33 & 36.) Sheriff

19   Christianson perceives that a prisoner release order will result in the addition to the local

20   community of individuals who have already demonstrated their capacity to commit

21   crimes, and who will place additional demands on his officers in providing services and

22   protecting the community, as well as on the jails. (Christianson Decl.,¶¶38-39.) Within

23   the Stanislaus county jails, Sheriff Christianson calculates that an average daily

24   population increase of 100 to 200 inmates would require, at minimum, four deputy

25   sheriffs to track the home detention program, another deputy to administer the increase in

26   the alternative work program, and likely another community service officer to assist in

27   the administrative tasks of both programs. (Christianson Decl.,¶40.)

28       54.    A prison release order will allow those released early an additional

-17-

1  "window of opportunity" to commit additional crimes that would have not occurred had

2  they been in custody. (Trial Tr. 12/2/08, at 1035:16-1037:1; 12/3/08, at 1157:3-12;

3  1175:6 – 1177:22; 12/9/08, at 1804:10-22 and 1816:5-18; Smith Decl.,¶7; James Decl.,¶

4  26) and the effect is cumulative (James Decl.,¶27.) In addition, with more releases, the

5  likelihood is that all those reoffending during periods of early release will not get caught

6  because the same amount of police resources will have to be spread out over greater

7  numbers of offenders and greater numbers of crimes. (Trial Tr. 12/3/08, at 1179:5-14.)

8  People will become victims of crime who otherwise would not have been victims but for

9  early release of prisoners. (Trial Tr. 12/3/08, at 1179:15-17.)

10      55.    Ordering diversion, accelerated release from prison and other population

11  reduction measures proposed by plaintiffs will have a significant negative public safety

12  impact, particularly if no programming and service increases are implemented for those

13  released. (Trial Tr. 12/3/08, at 1460:21-1461:14; James Decl.,¶25; Word Decl.,¶22 &

14  26.) Early release creates an influx of inmates within a short period of time, which would

15  tax the Yolo County Probation Department beyond its resources. (Meyer Decl.,¶59.)

16      56.    If a prison release order is issued and a cap is placed on the state prison

17  population with no increase in funding for police services or programming for offenders,

18  offenders who otherwise would go to prison will not be able to be sent to prison and there

19  will be no incapacitation effect as to them. This is already occurring at the local level due

20  to jail population caps. (Trial Tr. 12/3/08, at 1179:18-1180:3.) The inability for county

21  jails to require sentenced individuals to stay in custody will also result in a negative

22  impact to public safety. (Trial Tr. 12/9/08, at 1819:9-1821:19.)

23      57.    In many counties, probationers who violate the terms of their probation

24  cannot be held in county jails due to lack of capacity. (Trial Tr. 12/2/08, at 1040:7-

25  1041:7.) Thus, releasing additional prisoners into the communities, the majority of

26  whom will reoffend within a short time, including many who will reoffend during their

27  period of early release, will undermine the availability of sanctions for probationers in the

28  community, increasing the likelihood that their criminal behavior will worsen and not

-18-

1  improve, ultimately resulting in more persons being sent to prison, rather than fewer.

2      58.    Many offenders cannot be rehabilitated or choose not to and for those

3  offenders, the appropriate sanction is incapacitation by being held in jail or prison. (Trial

4  Tr. 12/2/08, at 1029:6-18; James Decl.,¶29.)  Some will fail even with the best

5  programming (James Decl.,¶29.)  Community engagement is a factor that can help

6  reduce and mitigate crime, but cannot eliminate it all together. (Word Decl.,¶23.)

7  Additionally, the population under psychiatric care who can function acceptably in

8  society, and appreciate and willingly fully participate in the mental health care they

9  receive, and the population that typically ends up in the criminal justice system are not

10  the same. (Conklin Decl.,¶29.)  Those who end up in jail are likely to do so because

11  they are not compliant and stable in the community with whatever treatment they may

12  receive. (Id.) These tend to be the mentally ill patients for whom purely voluntary and/or

13  consumer-run programs such as Dual Recovery Anonymous, Alcoholics Anonymous,

14  and Narcotics Anonymous are insufficient.   (Id.)

15      59.    While Plaintiffs' expert Dr. Austin originally testified through his expert

16  report that his proposal to divert non-violent "low risk" offenders with short sentences

17  from prison to parole or probation would "likely have a neutral or positive impact on

18  public safety" "if the State provided appropriate community-based treatment for" those

19  diverted from prison, we find that his credibility was substantially undermined by his

20  efforts during live testimony to change his opinion to say that there would be no negative

21  impact on public safety from such a diversion without availability or provision of

22  appropriate community based treatment for those diverted.  Austin Expert Report dated

23  August 15, 2008,¶61. We find that in fact there would be a significant negative impact to

24  public safety if the diversion and other proposals of Dr. Austin are implemented without

25  advance implementation of additional community and evidence-based programming for

26  such persons.

27      60.    The Los Angeles County's court system would be heavily impacted and

28  additional courtrooms would be necessary to handle the increase in arrests. (Dalton

-19-

1 | Decl., ¶32.)

2 |     61.    Many individuals are released from custody homeless. (Dalton Decl., ¶42.)

3 | Housing laws and other federal policies deny benefits to convicted felons (Dalton Decl., ¶¶

4 | 37 & 42.) Los Angeles County lacks available affordable housing units. (Dalton Decl.,

5 | ¶42.) An influx of parolees into the City of Vacaville could double the number of

6 | homeless from the current range of 60-100. (Word Decl., ¶26.)

7 |     62.    There are also a less obvious but harmful effect on confidence levels in law

8 | enforcement. (Word Decl., ¶26.)

9 |     63.    The Amador County District Attorney's Office is staffed with seven deputy

10 | district attorneys assigned to criminal prosecution, each with a current caseload of 389

11 | cases per year. A proposed prisoner release plan would have a negative impact on the

12 | District Attorney's ability to move cases through the court system in an effective and

13 | expedient manner. Such delays directly and negatively impact the court as well as the

14 | existing jail overcrowding problem. (Ryan Decl., ¶27.)

15 |     64.    The additional caseloads resulting from the recidivism, arrest, and

16 | prosecution of released inmates would greatly strain already burdened local courts. The

17 | Amador County Superior Court has two criminal courtrooms and two full time Superior

18 | Court Judges. On August 25, 2008, 50% of the inmates housed in the Amador County jail

19 | were un-sentenced which reflects the impact of the existing court caseload on jail

20 | overcrowding. Due to the Court's ongoing caseload, there is an agreement with the Court,

21 | where for non-violent felonies, a "Felony Agreement to Appear" exists allowing selected

22 | persons arrested for a felony offense to remain free until their court date. Additional

23 | caseload resulting from a state prisoner release would further delay court proceedings

24 | thereby causing more sentencing delays, overcrowding in the jail, and more felons at

25 | large in our community. (Ryan Decl., ¶28.)

26 |     65.    The San Diego Sheriff's Department has exhausted all means in which to

27 | control the county inmate population level in its existing facilities in order to maintain

28 | compliance with court ordered capacity limits, and any state prisoner release order that

1   changes current practices would result in the Sheriff's failure to maintain compliance

2   with the state court ordered capacity limits. (Ingrassia Decl.,¶10.)  The Sheriff's

3   Department sends as many as 900 inmates per month to state prisons and almost sixty

4   percent of these inmates are parole violators.  Returning these inmates early to the county

5   or limiting the number of inmates that can be sent to state prison will cause San Diego

6   County's inmate population numbers to rise beyond reasonable control and could result

7   in the potential doubling of the current inmate population. (Id.)

8       66.    Orange County does not currently have available space in county facilities

9   to provide treatment to mentally ill prisoners released early; there are not enough mental

10  health beds existing to house the mentally ill currently living in the community, and thus

11  I believe there would be a negative impact on the County's mental health system, both in

12  terms of space and money.  Untreated mentally ill people or inadequately treated

13  mentally ill people are an enormous source of crime in our community.  Thus releasing

14  mentally ill prisoners into a community lacking in mental health care facilities and

15  professionals will also have a negative impact on public safety.  There are not enough

16  mental health care professionals in the county to provide services to all the currently

17  present mentally ill population. If there were more mentally ill persons in the County, it is

18  my opinion that there would be nobody to treat them. (James Decl.,¶31.)

19      67.    In Orange County, part of the recidivism problem is the lack of funding,

20  and hence inadequacy of resources, to provide the extent of programs that the county

21  would like to provide to assist people in not committing new crimes.  An increase in jail

22  population could lead us to focus on more officers on the streets, more custody officers,

23  and space needs, reducing space, personnel and funds available to provide the very

24  programming which could end this vicious cycle.   (James Decl.,¶28.)

25      68.    Even if adequate funding were available to provide the additional facilities,

26  services, and staffing needed to accommodate an increased number of released inmates

27  and/or to accommodate additional needs due to inability to send offenders to state prison,

28  it would take several years for the necessary facilities, services, and staffing to be in

place.  (Ingrassia Decl., ¶12.)

69.     Plaintiffs have requested that the Court require the State to include the mentally ill in any release proposal.  The Court finds that those persons released from prison who are suffering from serious mental illness are not likely to obtain appropriate mental health care treatment on their own, are less likely to be compliant with any program they may participate in, and are more likely to commit a new offense which could return them to prison because of their mental illness.  The Court further finds that while the mental health care treatment for some prisoners may not be sufficient in prison, it is better than these prisoners ending up without treatment, medication and likely being homeless.   (Trial Tr. 12/10/08, at 2056:17 – 2062:11.)  Therefore, the mentally ill are not good candidates for early release, and the Court declines to order the State to release mentally ill inmates as part of any population reduction proposal.

70.     Releasing parolees from parole supervision would result in a negative impact to public safety because the lack of supervision would result in recidivism. (Conklin Decl., ¶43.)    Parole supervision and terms of parole also serve as valuable tools for the law enforcement community in detecting crimes committed by parolees.  (Trial Tr. 12/12/08, 2331:18-2332:20.)

**B.      Alternatives to a prisoner release order exist.**

71.     Other alternatives which are available to provide services to the mentally ill and which could reduce the number of mentally ill going into jails and prisons are available under the Mental Health Services Act.   Such programs as Mental Health Courts, multi-agency partnerships between law enforcement and probation, and similar programs designed to provide support, oversight and treatment of mentally ill offenders before they are sent to prison.  Such programs have been successfully used to effectively treat and divert offenders from prison, and such programs are currently being developed and implemented throughout the State.   (Trial Tr. 12/10/08, at 2062:12 – 2067:24.) Similar programs could prove beneficial for parolees through either changes to the Mental Health Services Act or through independent development of these programs for

1   parolees.  (Trial Tr. 12/10/08, at 2067:25-2069:4.)

2        (1) Successful local programming.

3        72.    The population management programs utilized by Sheriff's Departments to

4   manage their jail populations have been shown to be successful in reducing jail

5   population and providing inmates with services, and the expansion of such programs

6   would provide programming and treatment to the local offender population, reduce

7   recidivism, and reduce the numbers sent to state prison.  (James Decl.,¶¶20 & 24; Dalton

8   Decl.,¶34.)

9        73.    Funding and implementation of SB 718, which allows for county sheriffs to

10  authorize money from the Inmate Welfare Fund to be used for the purpose of assisting

11  indigent inmates in returning to the community after release, would reduce recidivism

12  and the number of individuals returning to state prison by providing financial aid,

13  especially in the critical time upon first release.  The Los Angeles County Sheriff's

14  Department, for example, provides "gap funding" for offenders once they are released

15  from custody.  For example, funding of the Inmate Welfare Fund would allow sheriff's

16  departments, to provide funding to an indigent released offender for the period before his

17  or her SSI benefits begin.  (Amended Declaration of Expert Witness Karen Dalton

18  ("Dalton Decl."),¶18.)

19       74.    The Fresno Police Department's Parolee Apprehension Team and the

20  department's partnerships with community-based organizations and other government

21  service providers have been successful in intervention and prevention of parolees from

22  recidivating and returning to the incarceration.  (Dyer Report,¶11.)  Stanislaus County

23  Sheriff-Coroner Adam Christianson's experience is that community-based programming

24  is effective in reintegrating the jail population into society and reducing the risk of

25  recidivism.  (Christianson Decl.,¶19.)

26       75.    Sheriff Christianson's experience with local treatment programs for the

27  mentally ill jail population such as the Mentally Ill Offender Grant Program (MIOCR) is

28  that the population responds well to such programs, when focused on very specific care

-23-

1  intervention, medication and treatment, and are less likely to reoffend and return to

2  custody. (Christianson Decl.,¶17-18.)

3       76.    Drug courts are a viable alternative to release of prisoners from state prison.

4  Drug courts are very specific, and they have elements within the drug courts that bring

5  together the public defender, the district attorney, probation and the judge.  Literature has

6  indicated that these type of substance abuse intervention/diversion programs have a

7  markedly higher success rate than Proposition 36 diversion, reportedly in the high 70% to

8  the low 80% range.  (Dalton Decl.,¶23.)

9       77.    Mental health court programs through the Department of Mental Health can

10  prove very beneficial in both reducing population and improving success rates.  (Dalton

11  Decl.,¶24.)  A mental health court could be a particularly beneficial way of addressing

12  non-violent mentally ill offenders because it offers a supervised full service partnership

13  of Assertive Community Treatment (client engagement, a single point of accountability,

14  client-driven services, a focus on strengths (high risk/high support) and a persistent,

15  individualized approach with client employment promoted), probation and court

16  supervision and wrap-around services.  (Conklin Decl.,¶13 & 17.)

17       78.    The Court finds that another viable alternative to an early release order for

18  state prisoners, especially those with mental illnesses, is implementation on a statewide

19  basis of Mentally Ill Offender Crime Reduction programs which provide Assertive

20  Community Treatment to those persons convicted of felonies and placed on probation

21  who are severely mentally ill and entails extensive supervision, treatment and placement

22  services to them.  These programs can result in much lower re-arrest rates for mentally ill

23  felons, more compliance with treatment for their mental illness and related issues, and

24  protects public safety while also reducing the number of mentally ill offenders who are

25  sent to prison.  (Trial Tr. 12/10/08, at 2048:19-2054:15; Conklin Decl.,¶17-22 & 28.)  An

26  assessment of San Diego County's Mentally Ill Offender Crime Reduction ("MIOCR")

27  Act program found that fifty-eight percent of program participants successfully

28  completed the program, receiving significantly more services than the comparison group,

-24-

and obtaining needed case management, medication support, individual counseling, crisis intervention and vocational and collateral services that enabled them to successfully transition out of jail and into community living. (Conklin Decl.,¶22.) The survey also found that participants were satisfied with the services they received, cited most often the consistent attention of the social work/law enforcement team as the "best" part of the program, and ninety-five percent reported improvement in their emotional well-being and more than eighty percent reported the same regarding improved family relationships and housing status. (Conklin Decl.,¶23.)

79.    Those who completed the program showed statistically significant gains in their overall quality of life and had significantly less bookings and convictions during and six months after program completion. Specifically there was a reduction in alcohol and drug use of forty and fifty-six percent respectively and an average of twenty-six percent gain in adequate income for food, clothing, transportation and social needs. Clients also demonstrated significant gains in their feelings of well being related to their living situation, privacy, and life in general, reflecting established living situations and having a sense of comfort and safety. Twenty seven percent fewer persons in the program were booked into jail during the time they participated in the program and their average days in jail were twenty six days fewer than those in the comparison group. This resulted in significant cost avoidance for the combined criminal justice system departments (law enforcement, jail, courts, prosecution and defense counsels). Finally, the program participants had 13% fewer convictions for new offenses than did the comparison group not receiving this level of service, and supervision and support. (Conklin Decl.,¶24.)

80.    Senate Bill 618, which authorizes counties to develop a comprehensive multi-agency plan to prepare non-violent offenders for re-entry into their communities upon their release on parole, starts the rehabilitation process from the plea of guilty to a stipulated prison sentence, has shown to be very promising in San Diego County, and could be a viable alternative to reduce the state prison population if employed beyond San Diego County. (Conklin Decl.,¶31- 36.) In San Diego County, it is a collaboration

-25-

1  of the San Diego's District Attorney's Office, Community Roundtable, Sheriff's

2  Department, Public Defender's Office, Probation Department and the California

3  Department of Corrections and Rehabilitation (CDCR), including the Parole Division.

4  (Conklin Decl.,¶32.)  These agencies work together in a process that screens participants

5  for mental and dental health; conducts vocational, literacy and substance abuse

6  assessments; classifies participants and assigning a CDCR number while still in local

7  custody to minimize the time spent in a state prison reception center; develops life plans

8  based upon the assessments; provides participants with dedicated Prison Case Managers

9  while in custody to ensure compliance with the life plan, including receiving educational,

10  treatment, and employment training services; and, six months before release on parole,

11  begins preparing participants for release, including arranging treatment, housing,

12  vocational training, education, employment, parenting classes, obtaining a driver's

13  license or visitation rights, and even tattoo removal.  (Conklin Decl.,¶33.)  A Community

14  Case Manager will meet a participant at the door of the prison upon release on parole,

15  and for the next eighteen months will work with the parolee and Parole Agent to ensure

16  the participant's successful re-entry into San Diego.  (Id.)  The services will be provided

17  even after discharge from parole.   While the program is not targeted at the mentally ill,

18  mentally ill prisoners are allowed to and do participate in the program.  (Id.)  Out of

19  ninety-nine participants released to date, only three have returned to prison on new

20  violations, demonstrating a recidivism rate markedly lower than that of CDCR's.

21  (Conklin Decl.,¶34.)

22        (2)    Increased probation services.

23        81.    If properly funded, probation services could reduce the number of

24  individuals committed to state prison to a desired level.  Over ninety percent of inmates

25  come from county probation systems.  While in the county probation systems, this

26  population tends to be lower-risk and have a lower need of services, which are less costly

27  when provided at the local level.  A properly funded community corrections program

28  consisting of community probation supervision and evidenced-based programming will

-26-

1  result in the desired decrease in prison population by reducing entry numbers. (Powers

2  Report, §III.) With proper funding, probation services could result in a statewide

3  projected reduction of prison commitments of lower-risk individuals by at least thirty

4  percent, which equates to 1,760 fewer commitments to CDCR annually. (Meyer Decl., ¶

5  27.)

6      82.    San Diego County's MIOCR program demonstrated the importance of

7  changing the role of the probation officer to being more like a case management

8  facilitator of services. When funding ended to pay for separate clinicians, because of the

9  benefits of this model, the San Diego County Probation Department altered its case

10 assignments, retained the probation officers and deputy probation officers trained in the

11 program, gave them a reduced caseload specifically of mentally ill offenders, and

12 continued a unit called the MIO (mentally ill offender) unit, which specializes in

13 supervision and support for people with serious and persistent mental illness who are on

14 probation. (Conklin Decl., ¶27.)

15     (3)    Evidenced-based programming.

16     83.    Research of the Washington State Institute of Public Policy shows that use

17 of evidence-based programs in local communities, as well as in prisons, results in

18 reduction of recidivism, decrease in prison populations, parole and probation caseloads,

19 and jail populations. (Meyer Decl., ¶44.) The experience of the Yolo County Probation

20 Department has been that the use of evidence-based programming in the juvenile

21 probation services division has resulted in a fifty percent reduction in custody and at least

22 a significant reduction in out-of-home placements. (Id.) Juvenile crime rates and

23 recidivism are the lowest in fifty years. (Meyer Decl., ¶46.) State-wide evidenced-based

24 programming at the local level would reduce the number of individuals being sent to

25 prisons in the first place, and evidence-based programming within prisons would help

26 prevent recidivism. (Meyer Decl., ¶46-51.) With funding for evidence-based

27 programming, prison commitments could be reduced by thirty percent. (Meyer Decl.,

28 ¶52.)

1   (4) <u>AB 900 with local participation.</u>

2   84. A successful re-entry program, whether under AB 900 or not, will reduce

3 both state prison and local jail overcrowding due to reduced recidivism. Thus, rather than

4 releasing prisoners early or imposing a prison population cap, ordering provision of re-

5 entry services to prisoners in the last twelve to twenty four months of their prison

6 sentences will be much more effective at reducing both prison population and crime in

7 the State of California. (Ryan Decl.,¶29.)

8   (5) <u>Community Corrections Act</u>

9   85. Funding the Community Based Corrections Act of 1994, which was

10 enacted to create a framework for community corrections in California with

11 implementation contingent upon funding, could reduce the numbers entering state prison

12 and help prevent recidivism by providing a wide range of lower cost sanction-type

13 programs with the goal of matching programs and services with individual needs.

14 (Dalton Decl.,¶19-21; Meyer Decl.,¶69.) Focusing on a therapeutic process rather than a

15 punitive process, it seeks to hold an offender accountable for his or her actions as well as

16 increasing public safety by providing services rather than putting the individual out on

17 the streets with a blanket set of terms and conditions. (Dalton Decl.,¶20.)

18   (6) <u>Uniform Risk and Needs Assessment Instruments</u>

19   86. Another penal justice reform option that could dramatically impact success

20 rates, reducing prison population and recidivism rates would be the utilization of risk and

21 needs assessment instruments to determine initial and ongoing level of supervision and

22 severity of needs. Offenders must be accurately and objectively assessed for risk and

23 needs to have an effective correctional program. (Dalton Decl.,¶25.) The current risk

24 assessment instruments use a generic adoption of terms and conditions of probation and

25 parole and are not specific to the needs or risks related to specific individuals. (<u>Id.</u>) They

26 are also not uniform, with little sharing between criminal justice systems. (<u>Id.</u>)

27   (7) <u>Programming and Services in State Prisons</u>

28   87. The population management programs utilized by Sheriff's Departments

-28-

could also be adopted for state prisons to reduce their populations. (James Decl.,¶30.)

88.    Simple steps of assisting inmates in obtaining documentation of their social security status and disability status while they are in prison so that they may apply for benefits to begin as soon as possible after they are released from incarceration would help reduce the prison population because it would provide a greater opportunity for inmates, and particularly mentally ill inmates, to successfully reintegrate into the community without violating the terms of their parole. (Trial Tr. 12/10/08, at 2045:24 – 2048:17.) Although California state prisons do not assist inmates in applying for benefits in anticipation of release, prison-based programs throughout the United States do get benefits in place prior to a prisoner's release from custody, and this has been shown to have a positive effect on recidivism. (Conklin Decl.,¶15.)

89.    The ability to have benefits in place upon release reduces recidivism. When inmates leave custody and they are homeless, and they are without any income, a large majority will have a propensity towards drug or alcohol abuse. If they have a disability such as a serious mental disorder, it affects their ability to function and they frequently relapse and commit other crimes. Having benefits in place affects this because it allows a former inmate to pay for food, clothing and shelter and they are not homeless. They can live in housing where they are not associating with people who are in the depths of addiction or homelessness. Thus, they are less likely to recidivate. (Conklin Decl.,¶16.)

90.    Focusing on programming and services rather than early release would result in less recidivism and lower prison populations. (Word Decl.,¶27.)

91.    In Los Angeles County, moving people through the Inmate Reception Center and into housing helps reduce recidivism, thus programs are critical to beginning the interventions and behavior change needed to ensure the greatest likelihood of success once released. Inmates booked into the Los Angeles County jail system spend only hours getting classified, assessed, and assigned. (Dalton Decl.,¶27.) This is dramatically different from reception center stays in state prison, which can be upwards of forty-five days, a length of time which could be a turning point for many offenders in their desire

-29-

1  and capability to engage in cognitive-behavioral interventions.  (Dalton Decl.,¶28.)

2      92.    Orange County Assistant Sheriff Michael James testified that18-25 year-old

3  men are currently experiencing the highest rate of incarceration, and there are more

4  people in this age group than in the past 20-30 years. Chief James believes that because

5  this group is likely to reoffend more often than older inmates and they have less self-

6  control, as the number of people from this age group being arrested and incarcerated

7  rises, this will result in greater pressures on the entire jail and prison system, which will

8  in turn increase the pressure for early releases to occur at both the state and local level,

9  whether these offenders are included in the early release/sentence reduction and diversion

10  programs initially or not.  (James Stip.,¶2(d).)

## II. CONCLUSIONS OF LAW

**A.    A prisoner release order may not be granted because Plaintiffs have failed to satisfy their burden of showing that such relief is necessary.**

1.    The Prison Litigation Reform Act provides that prospective relief with respect to prison conditions shall not be ordered unless the relief is necessary to correct the violation of a Federal right.  18 U.S.C.§3626(a)(1)(B)(ii).

2.    The Court concludes that Plaintiffs have not met their burden of proof to demonstrate that overcrowding is a primary cause of the failure to provide constitutionally adequate mental health care and medical care in the State's prisons. Thus, a prison release order is not necessary to correct the violations.

**B.    A prisoner release order may not be granted because Plaintiffs have failed to satisfy their burden of showing that no other relief will correct the constitutional violations.**

1.    The Prison Litigation Reform Act provides that a prisoner release order shall not be issued unless no other relief will remedy the violation of the Federal right. 18 U.S.C.§3626(a)(3)(E)(ii).

2.    The Court concludes that relief in a form other than a prisoner release order will remedy the violation of federal rights determined to exist by the individual judges in

these matters.  These include continuing with the planned construction of additional facilities, greater use of out of state prison facilities for housing inmates, continuing and expanding programming for prisoners, probationers and parolees, implementing the Community Corrections Act, expanding use of SB 618 programs, Mentally Ill Offender Crime Reduction program funding and expansion, use of the State's new Risk and Needs Assessment instrument to more carefully select those to be released voluntarily by the State, funding of increased probation services, continued use of the Mental Health Services Act to divert mentally ill offenders into appropriate treatment, implementation of programs in the prisons designed to assist those to be released with obtaining necessary documentation and eligibility for services upon release, and continued implementation of SB 718.

**C.    The adverse impact on public safety and on the operation of local criminal justice systems precludes the issuance of a prisoner release order.**

1.    The Prison Litigation Reform Act provides that in the determination of whether to grant prospective relief with respect to prison conditions, the Court shall give substantial weight to any adverse impact on public safety or the operation of a criminal justice system caused by the relief.  18 U.S.C.§3626(a)(1)(A).

2.    The Court concludes that the negative impacts to public safety and operation of criminal justice systems throughout the state are severe and weigh heavily against issuance of a prison release order.  The harm which would be caused to the public and even to some of the released and diverted prisoners, particularly those who are mentally ill, by issuance of a prison release order outweighs the harm being caused by deficiencies in medical and mental health care in the prisons.

Respectfully submitted,

DATED:    January 30, 2009              JONES & MAYER

By: _____/s/_____
Kimberly Hall Barlow
Attorneys for Sheriff, Probation, Police
Chief, and Corrections Intervenor-
Defendants

-31-