# Exhibit 1

# Independent Review of Abt Associates Needs Assessment Report

Steven Raphael
Professor
Goldman School of Public Policy
University of California, Berkeley
2607 Hearst Avenue
Berkeley, CA 94720-7320
Tel: (510) 643-0536
E-mail: stevenraphael@berkeley.edu

Prepared for

Terry Hill, MD.
CEO, Medical Services
California Prison Receivership

January 16, 2009

This memo provides an overview and evaluation of the Abt Associates research report titled "Chronic and Long-Term Care in California Prisons: Needs Assessment." The memo also includes a discussion of the June 13, 2008 update to the original report that takes into account new population projections by the California Department of Corrections and Rehabilitation (CDCR) as well as the potential impact of the early release of approximately 20,000 inmates. I first provide an overview of the goals, methodological approach and conclusions of the original assessment and the update. I then provide a critical assessment of the final estimates.

To summarize my conclusions, the sampling strategy employed by Abt is certainly sensible and likely captures inmates most in need of long term care outside of the general population. The procedures used to impute long term care need among general population inmates from a survey of medical beds are likely to include some biases, although the identifiable biases are often opposite in sign and are likely to cancel one another out. While there is substantial uncertainty in any estimate based on probabilistic imputation, the methods employed in the Abt study are certainly sound and, given the practical constraints on the research estimate, represent a sensible set of compromises.

Regarding the June 2008 update, while it does not make much of a difference to the overall numbers, I prefer the estimates based on the CDCR population projections to the original estimates based on the linear growth interpolations calculated by Abt. My assessment regarding the effect of an early release of 20,000 inmates is that in the medium to long run the impact of such a release on long term care needs is likely to be immaterial. Absent fundamental change in sentencing policy, the impact of this release on the overall prison population will be quickly undone. In light of this fact, I believe it would be a mistake to reduce estimated future needs based on a proposed one-time early release.

## 1. Overview of the original assessment and June 13, 2008 Update

The main objectives of the Abt studies reviewed here are to estimate:

- the total long-term-care (LTC) needs of the CDCR inmate population,
- the distribution of LTC inmates across alternative level of care (LOC) categories that would (or should) be housed outside of the general population, and

- the future LTC and LOC needs of the CDCR inmate population given projected changes in the overall inmate population as well as changes in the internal age composition of California's state prison inmates.

Combined with a census of existing LTC resources in California's 33 state prisons, the total needs assessment provides a gauge of the degree to which current and future LTC needs exceed existing capacity, and thus provides estimates as to how many new LTC beds should be added to the system to prepare for the future.

*Data gathering*

The estimates of current overall needs as well as future projected needs are based on two data gathering efforts undertaken by Abt with the aid of Lumetra, the CDCR medical staff, and CDCR corrections officers. The first data gathering effort was a complete census of medical beds in the system's 33 facilities. The medical bed census involved counts of all inmates in medical beds being treated for physical ailments (i.e., not for mental illness) either within the prison itself or outsourced to a local medical facility. For each inmate, information was collected on basic demographics (from prison administrative records), detailed medical histories and current diagnoses (from medical charts), information on activities of daily life (ADL) as well as prison activities of daily life (PADL) limitations from proxy interviews with medical service providers, and finally an assessment from the CDCR medical staff regarding whether the inmate required long term care and if so, the appropriate level of care.

The second data gathering effort involved a stratified random sample of the general population (GP) of inmates in nine of the 33 state prison facilities. The purpose of this second data set was to estimate LTC needs among those inmates not currently occupying a medical bed. The sampling frame for this data set was designed to maximize the likelihood of capturing GP inmates with LTC needs. Given that a relatively small proportion of GP inmates are in need of long term care (perhaps less than 1.5 percent), Abt constructed a sampling frame that over-sampled inmates with a higher likelihood of LTC needs. The basic sampling frame worked as follows. First, using data on those with LTC needs from the medical bed census as well as administrative data for all inmates in the state's 33 prisons, Abt first estimated a simple model where the probability of needing LTC was modeled as a function of variables observable in

administrative records (age, prior hospitalizations, etc). Abt then used this model to fashion a probabilistic prediction for each GP inmate in the system regarding the likelihood of needed LTC. Those inmates with relatively high predicted probabilities were deemed to be at "high risk" of needing LTC while all other inmates where deemed to be "low-risk."

Next, correctional officers in each of the nine facilities were asked to nominate GP inmates that they believed to be in need of LTC outside of general population facilities. The use of correctional officer nominations was based on the experience of an earlier data gathering effort by Lumetra that found correctional officers to be quite knowledgeable about the unmet needs of current GP inmates, and willing to make such nominations. The nomination process coupled with the pre-classification of inmates into high- and low-risk groups then defines four strata of inmates from which to sample:

- high-risk inmates nominated by correctional officers,
- high-risk inmates not nominated by correctional officers,
- low-risk inmates nominated by correctional officers, and
- low-risk inmates not nominated by correctional officers.

The sampling frame employed allocated observations across these strata in a manner designed to minimize the sampling variance of the LTC population needs estimate. This involves over-sampling stratum where the incidence of unmet LTC needs is likely to be the highest and under-sampling stratum where the incidence of unmet LTC needs is likely to be low. To maximize precision of estimate of LTC needs among the riskiest groups, Abt chose to sample from the top three strata only and employed an indirect method to estimate LTC needs emanating from the lowest risk group (the last stratum listed above).

The survey of the general population gathered much of the same data that was gathered for inmates captured by the census of medical beds, although there are some key important differences that figure prominently in the methodological imputations employed by the study. The GP survey includes information on demographics from CDCR administrative records. The survey also gathered information on medical histories and current diagnoses from medical charts. The survey also collected information on ADL, PADL and cognitive limitations from proxy

interviews (although here proxy interviews were conducted with correctional officers rather than nurses).

The main difference between the data gathered in the GP survey and that gathered in the medical bed census concerns the evaluation of LTC needs. While correctional officers were asked whether they believed the person would eventually require care outside of the general population, the GP survey included neither a LTC nor a LOC needs assessment by a medical professional.

### Estimating LTC Needs Among GP Inmates

The study combines information from the medical bed census along with information from the GP survey to estimate LTC needs among the surveyed GP inmates in the nine prisons as well as the likely LOC needs of inmates with some positive probability of needing long term care. Since the nine prisons surveyed were chosen to be representative of the 33 state facilities, and since within each stratum inmates were randomly sampled, once LTC and LOC needs are determined, total LTC and LOC needs can be estimated by multiplying each LTC and LOC probability determination by the inverse of the sampling probabilities for each GP inmate included in the survey. In other words, the sampling frame permits a determination of the number of state inmates that each inmate included in the GP survey "represents." Thus, for example, if the likelihood that a given inmate in the sample will need LTC is 0.01 and if this inmate is representative of 10,000 inmates statewide, than the contribution of inmates such as the sampled inmate to overall LTC needs is estimated to be $0.01 \times 10,000 = 100$.

The sampling probabilities (and thus the number of inmates represented by each surveyed inmate) were under the control of the researchers and thus represented the easier of the two pieces of information needed to generate the LTC population estimate. Estimating the probability of LTC need and the accompanying LOC designation for each sampled inmate is somewhat more complex and required some additional modeling. Since much of my evaluation below focuses on these imputations, here I'll discuss these modeling methods in some detail.

To impute LTC need among GP inmates, the study exploits three facts. First, the information sets of the GP survey and the medical bed census overlap quite a bit, with both including information on ADL, PADL, and cognitive limitations as well as information from medical charts. Second, among inmates in the medical bed census, not all inmates required long

term care. Third, inmates in the medical bed census received LTC and LOC assessments from medical professionals (while the GP survey inmates did not). The Abt study first uses the medical bed census data to estimate a model where the dependent variable is whether one needs long term care and the explanatory variables include all of the variables on physical and cognitive limitations as well as medical chart information that are included in both data sets. The parameters of this model are then selectively applied to high risk (to be discussed below) general population inmates to generate a LTC probability prediction.

The second probabilistic model estimated with the medical bed census data is a multinomial logit where the dependent variable is the level of care designation (specialized general population, low acuity, high acuity) among those deemed in need of LTC and the explanatory variables include all of the variables in the common information set for the two data sets. The multinomial logit model assigned a probability for each individual for each level of care, where the sum of the probabilities across the three possible levels must equal one. This second model is used to apportion all those with some positive probability of needing LTC across LOC categories. Again, the imputation involves first estimating the model with medical bed census data and then applying the model to all GP inmates with some positive predicted probability of LTC need. In conjunction with the weighting scheme derived from the sampling frame, the second stage permits a breakdown of current and future long term care projections by level of care categories.

*Generating future needs projections*

In addition to estimates of the current LTC and LOC needs, the Abt study and the follow up report present estimates of the likely future LTC needs. The estimates in the original report are based on linear interpolation of population growth rates and age-specific estimates of LTC needs from the assessment discussed above. The June 2008 update substitutes long-term population projections provided by the CDCR research staff for the population estimated calculated by the Abt researchers in the original report.

*Summary of findings*

Both the original and updated estimates place LTC bed needs for the year 2007 at more than 2,900. This exceeds current medical bed capacity of the 33-prison system. Both the original and updated estimates project LTC bed needs exceeding 5,000 by the year 2018.

## 2. Critical Evaluation of the Needs Assessment Methodology

With unlimited time and resources, the ideal manner of gauging LTC need would have been to medically assess each inmate in the system and to have a uniform assessment of (1) whether LTC is needed, and (2) the needed level of care. Of course, this would have been prohibitively expensive. The next best method would have been to draw random samples of the inmate population and have the same medical professionals that made LTC and LOC determinations for the inmates in medical beds deliver similar assessments for the sample of general population inmates. My guess is that given the vulnerability of the population in question, the human subjects hurdles associated with selective medical assessments of inmates would also have been prohibitive. Such assessments for those in medical beds was of course facilitated by the developed familiarity that the attending medical staff already possessed and thus, further examination was not necessary. The same would not apply, however, to a random sample of inmates not currently under medical supervision.

This being said, the research team probably had little choice other than to attempt to model the relationship between observable medical characteristics on the need for LTC. Moreover, since the researchers only had LTC assessments for those in medical beds, they were indeed restricted to using the medical bed census data to model this relationship and impute LTC needs for the general population of inmates. My comments on the LTC estimates for the general population focus on three aspects of this imputation. First, I discuss the likely directions of bias associated with applying the parameters of a LTC model estimated with the medical census data to the general population. Second, I discuss the multinomial logit apportioning of LTC shares across LOC categories. Finally, I discuss issues associated with the imputation of LTC need among the low-risk, not nominated strata of GP inmates that were not sampled.

*Imputing LTC needs with a model estimated with medical census data*

The main tool for imputing LTC needs to the general population is a logistic regression model of the form

Prob (LTC is needed) = F(ADL limitation, PADL limitation, cognitive impairment, age, ....)

where "Prob (LTC is needed)" refers to the likelihood that a given inmate needs long term care (with the probability bounded to being between 0 and 1), F(...) is the cumulative distribution function for a variable with a logistic distribution, and the variables within the function F(.) are the pre-specified variables that are likely to impact the need for long term care. When the model is estimated with data from the medical bed census, the estimated impact of any one variable on the LTC probability is roughly related the strength of the correlation between the variable in question and a medical assessment of LTC need after accounting for the relationship between the given explanatory variable and all other explanatory variables in the model. In most such models, a constant term is included in the specification that in this application can roughly be thought of as representing the base LTC probability of an inmate in a medical bed without any of the exacerbating or mitigating factors captured by the explanatory variables included in the analysis. Once this model is estimated, the model can be used to calculated a probability of needing LTC for any inmate so long as the researcher is able to observe values for each of the explanatory variables used in the analysis. In this instance, since the information sets of the GP survey and the medical bed census overlap, the researchers are able to apply the model estimated with the medical bed census data to the GP survey data.

The key issue of concern in making such an imputation is whether it is appropriate to apply a model estimated on a group of inmates already receiving medical care in beds housed outside of the general population to a group of inmate not receiving medical care and residing in the general population. One would suspect that even for two inmates with identical observable characteristics in terms of the variables included in the two data sets, the inmate in the medical bed is likely to be much less healthy (and perhaps more in need of LTC) than the inmate remaining in the general population. This would be the case if there are dimensions of health that are not captured by the surveys but that are readily observable by medical staff. If this is indeed the case, applying the model fit to medical census data to everyone in the GP population will likely over-estimate the LTC needs of the system.

This potential selection problem is most evident in the base probability of LTC need predicted by the Abt logistic regression. The logisitic regression predicts that someone with no

cognitive impairment, major ADL limitation or permanent PADL limitation has a base rate need of LTC of 27 percent. Given the conclusion of the study that under 2 percent of the 2007 inmate population was in need of LTC, applying such a based rate to the general population of inmates is clearly too high.

The authors of this study are well aware of this problem and take steps to attempt to mitigate the upward bias. Specifically, the authors apply the probabilistic prediction only to those sample inmates who have at least one major ADL or PADL limitation or a cognitive problem. All other sampled inmates are assumed to have an LTC probability of zero.

Note, this imputation strategy imparts two biases to the estimate of LTC needs that are of opposite sign. First, while those inmates in the general population with an observable limitation are certainly likely to have a higher base level LTC probability relative to those without such an impediment, my guess would be that it is still likely to be below the base level for those presenting in medical beds. Of course, the implied upward bias to the LTC probability estimates is smaller than it would be if the logistic model were applied to the population more generally. Nonetheless, my prior expectation would be that for the impaired among the general population, the predicted LTC probability is still biased upwards.

Second, the strategy imputes a LTC probability of zero for all inmates in the three relatively high risk strata that do not have an ADL, PADL, or cognitive impairment. Clearly, this will bias the overall needs assessment downwards. Moreover, as this population is likely to be numerically larger than the impaired GP population, this bias may be particularly significant.

Absent further information, it is impossible to gauge which bias is likely to be more severe. My guess however, would be that these biases are largely offsetting and that the imputation strategy is likely to generate estimates of LTC need among the sampled strata of the general population that is in the ballpark of the true need.

*Apportioning LTC need across LOC categories*

The second stage in the needs projection involves modeling the likelihood that an inmate who needs LTC requires a specific level of care. In other words, conditional on needing LTC, what level of care is one likely to require? The empirical model defines three levels and uses those deemed needing LTC among those in medical beds to model these probabilities. When applied for prediction purposes, the multinomial logit model will spit out the probability that a

given person will land in each of the three levels, with the sum of the probabilities equal to one. When aggregated across a target population, the sums of these probabilities provide estimates of level of care need.

This is a quite standard tool for forecasting discrete outcomes where there are more than two possibilities (often used for transportation planning and modeling of commute mode choices). The use in the current application is entirely appropriate and unlikely to suffer from the potential selection problems encountered in the LTC imputation.

### Imputing LTC need among GP inmates in the unsampled strata

Recall, the sampling strategy involves only sampling inmates who are either deemed high risk by the pre-sampling logistic regression or who are nominated by correction officers as in need of LTC. Those inmates deemed low-risk who are not nominated are not sampled. Thus, absent a further correction, such inmates would not contribute to the estimate of the long term care needs assessment.

Of course, ignoring this population could not be correct. By the authors own estimates, perhaps as much as 33 of the 164 inmates in medical beds in the nine surveyed prisons come from the general population inmates who were not sampled. Thus, the counts based on the three sampled strata must be adjusted upwards to account for the much more populous, yet un-sampled fourth stratum.

The study makes this upwards adjustment in the following manner. Assume that the ratio of low-risk to high-risk inmates in the general population needing LTC that is captured by the employed sampling strategy is equal to the comparable proportion of inmates that one would have measured in medical beds had the sampling frame been applied to all inmates inclusive of those currently receiving medical treatment outside of the GP. In the nine sample prisons, there are 164 inmates in medical beds, 33 of which are among the predefined low-risk group. The authors estimate that the correction officers' nominations correctly identify 24 percent of those inmates in need of LTC. Hence, of the 33 inmates in the low risk group in medical beds, roughly $(1-.24)*33 = 25.1$ inmates would have been missed by the sampling procedure. Thus, the sampling procedure would have correctly identified 84 percent of the inmates in medical beds $[(164-25.1)/164*100]$, and to derive a correct total for medical bed inmates, we would need to

divide the total identified (164-25.1) by 0.84. This is equivalent to multiplying the count by an adjustment factor of 1.19.

Applying this correction to the overall count essentially assumes that the ratio un-sampled to sampled inmates among those in hospital beds is equal to the comparable ratio among those in the general population who require LTC. This is an impossible identifying assumption to validate, though I can offer speculations as to its reasonableness. Absent further information, my initial instinct would be that the proportion from the un-sampled among those with LTC needs is likely to be lower among the general population than among those in medical beds. I would imagine that the inmates in medical beds from this lowest risk group are perhaps more likely to be receiving treatment due to traumatic injury or the onset of unanticipated serious illness, suggesting incidence levels of conditions requiring LTC among the general population of this group that is lower than that observed among the higher risk stratum.

Nonetheless, this un-sampled stratum clearly contributes something to LTC needs among inmates. Moreover, the number in need of LTC for 2007 attributable to this adjustment factor is only 417 beds (out of a total of roughly 2,900). If we suppose that the true needed upwards adjustment is only half this size (209 beds needed for the un-sampled GP inmates) this bias would only amount to 7 percent of projected needs for that year. Thus, while it is difficult to evaluate the direction of bias created by this assumption, the magnitude of any such bias is likely to be numerically benign.

*Summary assessment of the LTC imputations*

This section three alternative biases to the LTC assessment, two of which I believe to be positive, one of which is unambiguously negative. While it is impossible to infer the magnitude of these biases, my best assessment would be that they are likely offsetting and that the LTC needs assessment presented in this report are close to the truth.

### 3. Assessing long term needs assessments

In June of 2008, the Abt research team presented a set of updated needs assessment estimates that made two principal changes. First, the research team recalculated future needs projections using long term population projections calculated by the CDCR. Second, the research team considered the impact of a one time early release of roughly 20,000 inmates.

The new population projections are generally lower than those resulting from the linear interpolation of growth rates presented in the earlier report. However, the two projections are still quite similar to one another and thus this particular update makes very little difference. Nonetheless, it seems advisable to base projected needs on the population projections estimates by the CDCR research staff.

The update also presents a series of long term needs assessments assuming a one-time release of 20,000 prisoners. The authors present subsequent estimates with and without recidivism by the released inmates. My thinking with regards to the impact of a one time release on the state's prison population is that in the absence of meaningful reforms to sentencing and parole policy, the temporary reduction will be undone quite quickly by the return of released inmates on parole violations and by prison admissions via new court commitments. This being said, I believe that it would be a mistake to project lower needs based on a one time release. An overly simple example will serve to illustrate this point.

Imagine a fictional society where the rate at which people break the law and the rate at which they are prosecuted and sent to prison generate 10,000 prison admissions per month. Suppose further that we begin with no prison inmates and that each new prisoner admitted to the system will serve exactly one year. In the first month, 10,000 inmates will be admitted to prison while nobody will be released (since by assumption there is nobody to release), giving us a prison population of 10,000. In month 2, we would add another 10,000, but still nobody would be released, since the prior month's admissions are serving the second month of a twelve month sentence. Thus, our prison population would climb to 20,000. This process would continue until month 12 when the prison population reaches 120,000 inmates. In month 13, however, the first 10,000 prisoners admitted in month 1 will be released offsetting the 10,000 new admissions. In fact, for each month afterwards, the flow out of prison (the 10,000 inmates whose sentences expired) will be exactly matched by the flow into prison (the new 10,000 inmates) and our prison population will stabilize at 120,000.

Now suppose that from this stable point we decide to attempt to reduce the prison population through a one-time early release of all inmates who are scheduled to be released over the next six months. This will indeed reduce the prison population in the month of the early release by 50,000 inmates (the reduction is not 60,000 since the releases are offset by 10,000 new admissions). In the subsequent five months no new releases will occur, since those

previously scheduled to be released during these months were released in the one time acceleration. However, in the absence of sentencing and parole reforms, we will still experience new admissions on the order of 10,000 per month. In fact, new admissions may rise above this level, as many of those whom we released early will violate parole and be sent back to prison. In short order, new admissions during the five month period following the early release will drive the inmate population back up to 120,000. Thus, the early release bought only a temporary reduction in the prison population.

Permanently reducing the prison population requires either (a) permanently reducing the rate at which people enter the system or (b) permanently reducing the amount of time that inmates serve. In more technical terms, the "steady-state" prison population will depend on these factors alone. Any one-time releases will certainly lower the prison population in the short run, but such policy shocks will have no medium to long run effect on the state's incarceration rate.

# Exhibit 2



**Abt Associates Inc.**

# Update to the California Prison Long-term Care Needs Assessment: Impact of Prison Population Reductions

## Analysis Brief

Cambridge, MA
Lexington, MA
Hadley, MA
Bethesda, MD
Chicago, IL

January 5, 2009

*Prepared for*
Terry Hill, MD
Chief Executive Officer for Medical
Services
California Prison Health Care
Receivership
1731 Technology Drive, Suite 700
San Jose, CA 95110

*Prepared by*
Abt Associates Inc.
Stephen Resch, PhD
Bill Rhodes, PhD
Theodore Hammett, PhD

Abt Associates Inc.
55 Wheeler Street
Cambridge, MA  02138

## I.    Introduction

The Receivership plans to construct new long-term care (LTC) facilities for inmates with chronic illness and physical impairment. To assure that building plans were consistent with needs, the Receivership contracted with Abt Associates to estimate and project LTC needs over a ten-year time horizon. Abt Associates based prevalence estimates on a census of inmates in medical beds in all 33 California prisons and a probability sample of other inmates in nine of these prisons. According to that study, in 2007, nearly 3000 California inmates needed LTC (Table 1). Relying on California Department of Corrections and Rehabilitation (CDCR) projections of inmate population by age category, Abt Associates projected that demands for long-term care would increase steadily to nearly 5300 inmates by 2017.

The aging of the inmate population and the strong association between age and long-term care need (Figure 1) were identified as the underlying drivers of the projected growth in long-term care need among the prison population in the next 10 years.

**Table 1: Original Estimates of Need for Long-Term Care Beds in the California State Prison System in 2007\***

| Sub-population | Level of Long-term Care\*\* | | | |
| --- | --- | --- | --- | --- |
| | Specialized GP (number of inmates) | Low Acuity (number of inmates) | High Acuity (number of inmates) | TOTAL (number of inmates) |
| Medical Beds - all prisons | 183 | 92 | 91 | 366 |
| California Medical Facility | 173 | 43 | 18 | 233 |
| 8 other sampled facilities | 567 | 125 | 46 | 738 |
| 24 unsampled facilities | 934 | 208 | 77 | 1,219 |
| TOTAL- All prisons , unadjusted | 1,856 | 469 | 232 | 2,557 |
| Adjustment Factor for unsampled stratum | | | | 1.19 |
| **TOTAL** – All prisons, adjusted for LTC need within unsampled stratum | **2174** | **541** | **259** | **2974** |
| [†]95 percent confidence Interval (Lower Bound, Upper Bound) | | | | (2713, 3233) |

\*Based on a population of 135,863 that does not include ~28,000 inmates in reception centers or ~7500 in community corrections. *See original report for methodological detail*
\*\*Levels of care: From lowest to highest level of care, these are 1) specialized general population (equivalent to sheltered housing or congregate living), 2) low acuity medical beds (equivalent to assisted living), and 3) high-acuity medical beds (equivalent to skilled nursing beds).
[†]95% CI = E(X) +/- 1.96 \* SQRT ( Var(X) ) where X is the estimated number of beds needed

**Figure 1. Long-term Care Need by Age and Sex in General Population of Nine Sampled Prisons**



The CDCR recently reduced its five-year projections of inmate population growth. Moreover, pending legislation aims to reduce populations substantially beyond what CDCR projects. One such proposal would release 22,000 individuals convicted of non-violent offences. Such sharp reductions in prison population are likely to impact the need for LTC in prisons. However, the impact on LTC need will depend on the LTC need among inmates who are released and the rate at which released inmates return to custody.

In this Analysis Brief, we present updates to the original report that account for custody level in the projection model, incorporate CDCR Spring 2008 population projections, and consider the impact of a "mass release scenario." Specifically, we conducted the following analyses.

- We post-stratified the sample by custody level and developed estimates of LTC need that are specific to each custody level stratum. This provided new estimates of LTC needs that did not differ greatly from previous estimates that did not post-stratify by custody level. This is discussed in Section II.
- We updated the analysis using new population projections from CDCR that were not available at the time of the original study. This is discussed in Section III.
- We tested policies that release a large number of non-violent offenders who were confined at the lowest two custody levels to see how this would affect the need for LTC. This is discussed in Section IV.


## II.    Accounting for Custody Level

CDCR inmates are classified into custody levels I, II, III, and IV, based on security risk. Among the entire prison population in our original cohort 75%, 5%, and 20% of females were housed at level I, II, and III. Likewise, 14%, 29%, 35%, and 22% of males were houses at level I, II, III, and IV. However, our sample of female inmates only included inmates at custody level I and the distribution of inmates in the eight male institutions we sampled was 6%, 36%, 32%, and 26% for the four custody levels, I, II, III, and IV,

respectively. Because the custody level distribution of our sample is different from the overall population, our estimates of LTC need may be biased if they are not adjusted for custody level. Moreover, proposed policies to release large numbers of inmates generally set criteria for release that restrict eligibility to inmates that are low security risks (e.g. nonviolent offenders with custody level of I or II). If LTC need is greater among inmates at high custody levels, the release of inmates at low custody levels may have a little impact on LTC need. Conversely, if LTC need is greater among low custody levels, the release of these inmates will have a greater impact on LTC need.

In order to control for variation in the prevalence of LTC need across custody level, we augmented the projection model to explicitly consider custody level as a factor when estimating LTC need. Specifically, we calculated LTC need separately for the inmate population at each custody level, and generalized from the nine sampled facilities to the 24 unsampled facilities within each custody level group. In this way we account for variation in the prevalence of LTC need across custody level and the difference in the distribution of inmates across custody levels in our sample compared to the full population.

In the original study, general population inmates were partitioned into low- and high-risk groups based on age, prior hospitalizations, and known physical disabilities. Generalization from the sampled facilities to the unsampled facilities was carried out separately within each risk group. In the new analysis, the risk groups and corresponding generalizations are further broken out by custody level.

Table 2 show the LTC need among general population inmates by risk group and custody level. Excluding reception centers and community corrections and after adjusting for the unsampled stratum (see original report for details of sample design), we estimate that 1.73% of the general population inmates are in need of some level of LTC. The prevalence of LTC need is lowest among Level I inmates (1.18 %) and highest for Level II and IV inmates (about 2.01%). About 1.54% of Level III inmates needed LTC.

**Table 2: Long-term Care Need Among General Population Inmates by Custody Level in 2007**

| Custody Level | LTC Prevalence | Population* | Inmates with LTC Need |
|---|---|---|---|
| **LOW RISK GROUP** | | | |
| I | 0.41% | 22,468 (17.7%) | 92.3 |
| II | 0.24% | 35,610 (28.0%) | 86.9 |
| III | 0.16% | 38,133 (30.0%) | 60.4 |
| IV | 0.15% | 30,893 (24.3%) | 47.5 |
| All | 0.23% | 127,104 ( 100%) | 287.1 |
| **HIGH RISK GROUP** | | | |
| I | 23.99% | 570 (10.0%) | 136.8 |
| II | 33.25% | 1,634 (28.5%) | 543.4 |
| III | 26.39% | 1,716 (30.0%) | 452.8 |
| IV | 27.78% | 1,804 (31.5%) | 501.1 |
| All | 28.55% | 5,724 ( 100%) | 1634 |
| **TOTAL** | | | |
| I | 0.99% | 23,038 (17.3%) | 231.2 |
| II | 1.70% | 37,244 (28.0%) | 630.2 |
| III | 1.29% | 39,849 (30.0%) | 742.9 |
| IV | 1.68% | 32,697 (24.6%) | 549.9 |
| All | 1.45% | 132,828 ( 100%) | 2154.3 |

| **ADJUSTED TOTAL** | | | |
|---|---|---|---|
| Custody Level | LTC Prevalence** | Population* | Adjusted Estimate of LTC Need** |
| I | 1.18% | 23,038 (17.3%) | 272.6 |
| II | 2.02% | 37,244 (28.0%) | 749.9 |
| III | 1.54% | 39,849 (30.0%) | 610.7 |
| IV | 2.00% | 32,697 (24.6%) | 652.8 |
| All | 1.73% | 132,828 ( 100%) | 2286.1 |

*Not including reception centers, community corrections, or medical beds. 366 inmates needing LTC are currently in medical beds.
**Adjusted for unsampled stratum by multiplying unadjusted estimates by 1.19

When accounting for variation in LTC need by custody level of general population inmates, our mean estimate of current (Year 2007) LTC need is reduced by 42 specialized general population (SGP) beds and three low-acuity beds compared to the original analysis so that the total current need for LTC beds declines 1.5% from 2974 to 2930 (Table 3).

**Table 3: Updated Estimates of Need for Long-Term Care Beds in the California State Prison System in 2007***

| Sub-population | Level of Long-term Care | | | |
| | Specialized GP (number of inmates) | Low Acuity (number of inmates) | High Acuity (number of inmates) | TOTAL (number of inmates)** |
|---|---|---|---|---|
| Medical Beds - all prisons | 183 | 92 | 91 | 366 |
| CMF | 173 | 43 | 18 | 233 |
| 8 other sampled facilities | 566 | 126 | 46 | 739 |
| 24 unsampled facilities | 899 | 206 | 77 | 1,182 |
| TOTAL- All prisons , unadjusted** | 1,821 | 467 | 232 | 2,520 |
| Adjustment Factor for unsampled stratum | | | | 1.19 |
| TOTAL – All prisons, adjusted for LTC need within unsampled stratum | 2,132 | 539 | 259 | 2,930 |

## III.    Accounting for New CDCR Population Projections

According to CDCR projections at the time of the 2007 study, the total CDCR inmate population was expected to increase by 8 percent through 2012, and the over-60 age group was expected to increase by 80 percent. We extrapolated the CDCR's official projections for an additional five years (through 2017) by fitting a curve to the growth rates within age strata and projecting the change in population within these age groups. To generate projections of LTC bed need, we partitioned the current inmates needing LTC into 10 age groups. Then we applied age-group-specific prevalence of LTC need to the CDCR's age-structured population projections. The resulting projections indicated a steady rise in LTC need from 2974 inmates in 2007 to 5294 in 2017.

CDCR's most recently published semiannual update of its 5-yr prison population projections indicates that a modest *decline* in prison population is expected. According to the CDCR report, the change in the projections from Spring 2007 to Spring 2008 is "largely due to a decrease in new admissions from court and a decrease in parole violators returned to custody." Although CDCR only releases 5-year population projections to the public, their model can forecast population trends beyond that time horizon. Using the Spring 2008 modeling assumptions, CDCR generated age- and sex-stratified projections through 2018 for Abt Associates to use in updating estimates of LTC need. In Figure 2, the expected population growth for male and female inmates by age category are shown. The updated trends reflect a modest decline in the overall population (green line) over the next 5 years, followed by an equivalent increase in the subsequent 5 years[1]. As in the original analysis, the population

---

[1] CDCR Population Projection unit only publicly reported Spring 2008 projections through 2013. The extended Spring 2008 projections (through 2018) were provided to the Receivership by CDCR for this updated analysis. In the original analysis, we extrapolated the CDCR 5-year Spring 2007 projections by fitting curves to the

of older inmates (age 60 and older) is expected to grow while the youngest age group is expected to decline.

**Figure 2: Revised Estimate of Population Growth by Age Category**



Recalculating age-group specific LTC prevalence estimates and applying these estimates to the updated age- and sex- structured population projections yielded new estimates of future LTC need that are somewhat lower than originally reported. Starting from a lower level (due to the revised model that accounts for custody level as discussed in Section I above), LTC need grows over the next 6-7 years at a slightly slower rate than predicted in the original model (Figure 3). By 2012, LTC need reaches 3923 beds, as compared to 4204 beds in the original analysis. By 2017, LTC need is projected to reach 5194—100 fewer beds than originally predicted.

projected trends. In this update, we used the extended Spring 2008 projections from CDCR population projection model directly.

**Figure 3: Projected Need for Long-term Care Beds (2007-2017) Using CDCR Spring 2008 Population Projections**



## IV.    Impact of a one-time mass release policy

**Specification of Release Policy**

Using the updated model, we consider the impact of two alternative policies for the one-time release of Custody Level I and II inmates in 2009. The policies only differed in the number of inmates released; either 20,000 or 50,000.

Because of the differences in LTC need across custody level, *ceteris paribus,* releasing Level I inmates can be expected to have less impact on LTC need than releasing inmates at higher custody levels. Likewise, releasing Level II inmates will reduce LTC need the most. We assumed that any of the approximately 60,000 inmates at Custody Level I or II had an equal chance of being released under the proposed policy. If, in fact, Level I inmates are more likely to be released, then the reduction in LTC need may not be as large as we predicted. Likewise, if, within each custody level, *younger* inmates are more likely to be released under the proposed policy, then our assumption may cause us to further overestimate the reduction in LTC need.

It is likely that some portion of the cohort of released inmates will return to custody during the time horizon of the analysis. CDCR data on 1- and 2-year recidivism rates shows that 35% and 50% of inmates whose principal commitment offense is non-violent[2] were returned to custody within 1 and 2 years,

---

[2]  We assumed the following offenses were non-violent: forgery/fraud, other property, controlled substance (CS) possession, CS possession for sale, CS sales, CS manufacture, CS other, hashish possession, marijuana possession, marijuana possession for sale, marijuana sales, marijuana other.

respectively. Data from Florida[3] and other states indicate that recidivism can occur after 2 years following release. We modeled each policy with and without recidivism among the mass release cohort. For the recidivism scenario, we assumed that, irrespective of long-term care need, 65% of the released inmates would return to custody within 10 years at a rate of 0.75 per released inmate per year. At this rate, the 1- and 2-year recidivism rates match those observed for non-violent California paroles with non-violent primary commitment offenses. If, in fact, fewer inmates from the mass cohort are returned to custody, or these inmates return to custody at a slower rate, then our assumption will cause us to underestimate the reduction in LTC need due to the mass release.

**Figure 4: Probability of Returning to Custody**



## Results

A one-time release policy targeting inmates at Custody Level I and II can be expected to reduce the number of LTC beds roughly in proportion to the reduction in the overall population size. The reduction of 20,000 inmates in 2009 represents 15.5 percent of the estimated general population not in reception centers, community corrections or medical beds. The predicted reduction in LTC need by 390 inmates represents 12.0 percent of the LTC need among this population (Table 4). Likewise, the reduction of 50,000 inmates in 2009 represents 38.8 percent of the estimated general population not in reception centers, community corrections or medical beds. The predicted reduction in LTC need by 939 inmates represents 28.8 percent of the LTC need among this population (Table 4).

---

[3] http://www.dc.state.fl.us/pub/recidivism/2001/exec.html

**Table 4: Reduction in Population and Long-Term Care Inmates Due to a One-time Mass Release of Custody Level I and II inmates from General Population in 2009\***

| | RELEASE OF 20,000 | | | | | |
|---|---|---|---|---|---|---|
| | **Population** | | | **LTC Need** | | |
| **Custody Level** | Projected w/o Release* | Reduction | Remaining | Projected w/o Release* | Reduction | Remaining |
| I | 22,358 | 7,643 | 14,715 | 306 | 105 | 201 |
| II | 36,145 | 12,357 | 23,789 | 834 | 285 | 549 |
| Total Level I&II | 58,504 | 20,000 | 38,504 | 1,140 | 390 | 750 |
| All Levels | 128,910 | 20,000 | 108,910 | 3,258 | 390 | 2,868 |

| | RELEASE OF 50,000 | | | | | |
|---|---|---|---|---|---|---|
| | **Population** | | | **LTC Need** | | |
| **Custody Level** | Projected w/o Release* | Reduction | Remaining | Projected w/o Release* | Reduction | Remaining |
| I | 22,358 | 19,109 | 3,929 | 306 | 252 | 54 |
| II | 36,145 | 30,891 | 6,353 | 834 | 687 | 147 |
| Total Level I&II | 58,504 | 50,000 | 10,282 | 1,140 | 939 | 200 |
| All Levels | 128,910 | 50,000 | 78,910 | 3,258 | 939 | 2,319 |
| *Total population in 2009 not including reception centers or community corrections is estimated to be 128,910. | | | | | | |

To assess the impact over a 10-year time horizon beginning in 2009 under the recidivism scenario, we assumed that 65% of the released cohort of inmates would eventually return to custody at a rate of 0.75 per person per year. We also assumed that LTC would develop with age among the mass release cohort at the same rate experienced by the unreleased inmates. Under these assumptions, if 20,000 inmates were mass released in 2009, LTC need would be reduced by 390 from 3258 to 2868 (Figure 5). Each subsequent year, the level of LTC would be lower than if no mass release occurred. However, the rate of growth in LTC would be significantly higher in the first few years as a portion of the release cohort returns to custody. After the first 5 years, the number of inmates needing LTC will be approximately 200 beds lower under the mass release scenario compared to the updated estimates with no mass release. To illustrate the impact of recidivism, we also show, in Figure 5, the trend for LTC bed need under the assumption that no inmates from the mass release cohort return to custody. In this scenario, by 2018, LTC need is reduced to 4822, or 656 less than projected if there were no mass release.

If 50,000 inmates were released, then in 2009, the number of inmates needing LTC would drop by 939 from 3258 to 2319. If none of the mass released inmates returned to custody, then by 2018 there would be nearly 1600 fewer inmates needing LTC. However, if the release cohort returns to custody as described above, the number of inmates needing LTC over a 5-10 year horizon will only be about 550 fewer than if there had not been a mass release.

9

**Figure 5: Projected Need for Long-term Care Beds (2009-2018) after a one-time release of Custody Level I & II Inmates**



## V.     Discussion

Accounting for custody level in the estimation of current LTC need has a small impact, reducing our original estimate by 1.5% from 2974 to 2930. Updating the CDCR population projections on which LTC projections are based has a more substantial impact. The Spring 2007 CDCR Projections used for the original analysis predicted an increase of 1.5% to 1.75% per year. In contrast, the Spring 2008 CDCR projections show 4.5% decrease in prison population by 2012, followed by a rise back to 2007 levels by

2017. We estimate that these reductions in projected overall prison population growth rate may reduce LTC need by 281 beds in the next 5 years compared to our original estimates.

The overall population decline is due to fewer intakes, primarily among younger inmates. As a result, LTC need will decline only modestly over the medium term (10 year time horizon) in response to lower rate of intakes. The "stock" of people already in prison is going to continue to age. Of course, those that eventually get released may have a lower probability of being re-incarcerated, but the effect on LTC need will be small.

This logic also applied to the mass release policy. If the release criteria is only based on custody level, then the impact on LTC will be roughly proportional to the reduction in overall population size, as we have shown. However, if older or sicker inmates are more likely to be release under the policy—either by coincidence or by design--then the impact on LTC need could be substantial larger.

Finally, in order to have a lasting impact on LTC need, released inmates must not return to custody. If released inmates return to custody at rates that have been observed historically, the prison population reduction may be largely transient.

A mass release of 20,000 Level I and II released inmates may reduce LTC by about 390 beds and a mass release of 50,000 inmates may reduce LTC by about 940 beds. But, assuming that released inmates return to custody at rates that are consistent with those observed historically by CDCR, most of the initial drop in LTC need would only be temporary. The released cohort would continue to develop chronic disease and functional impairment as they age. Over 10 years, LTC need in the 20,000 inmate cohort would grow to 655 persons and LTC need in the 50,000 inmate cohort would grow to 1579 persons. If 65% of the released cohort returns to custody over a 10-year period, much of the reduction in demand for LTC in prisons will be transient. However, a release of 20,000 inmates can be expected to permanently reduce the need for LTC beds by at least 200 and a release of 50,000 can be expected to permanently reduce the need for LTC beds by about at least 500.

It is reasonable to expect that individuals needing LTC need are less likely to return to custody because functional impairment limits their ability or desire to commit crimes. However, there is no data available to estimate the relationship between health status and recidivism. Therefore, we chose estimate a "with recidivism" case in which individuals in the mass release cohort had the same probability of returning to custody regardless of their health status. This case was compared to a scenario in which there was no recidivism among the released cohort. If individuals needing LTC need are less likely to return to custody (e.g. because functional impairment limits the ability or desire to commit crimes) then the impact of the mass release policies on the demand for LTC need in prison will likely fall somewhere between the "with recidivism" and "without recidivism" cases we modeled. For example, if one were to assume that no individual from the mass release cohort with LTC need will be re-incarcerated, then the projected number of inmates needing LTC would be very close to the "without recidivism" case. In that case, the only individuals from the mass release cohort who would eventually need LTC in prison would be those who return to custody *before* they develop LTC need. However, if a portion of individuals from the mass release cohort do commit new crimes despite their functional impairments or are re-incarcerated for technical violations or new convictions for crimes committed before they needed LTC, then the demand for LTC in prison will be higher.

11

Even after accounting for differences in LTC prevalence by custody level and updating the underlying CDCR population projections to reflect newly anticipated population trends, the burden of LTC among California inmates remains high. Current need still remains over 2900 beds and is expected to increase to 3923 by 2012 and 5194 by 2017. A one-time mass release of 20,000 Level I and II inmates might reduce total LTC need further--by about 12 percent in the short-term. But, over a 10-year time horizon, recidivism among the released cohort may diminish the magnitude of the reduction to as little as 4 percent. Even if none of the inmates in the released cohort who need LTC returned to custody, the demand for LTC in prison in 2018 would remain over 4800 beds. A one-time mass release of 50,000 Level I and II inmates would reduce total LTC need substantially--by 29 percent in the short-term. But, over a 10-year time horizon, recidivism among the released cohort may diminish the magnitude of the reduction to as little as 10 percent. Even if none of the inmates in the released cohort who need LTC returned to custody, LTC need in 2018 would by 3900 beds.

# Exhibit 3



**Abt Associates Inc.**

# Functional Impairment and the Need for Long-term Care In California Prisons

## Analysis Brief

Cambridge, MA
Lexington, MA
Hadley, MA
Bethesda, MD
Chicago, IL

December 9, 2008

*Prepared for*
Terry Hill, MD
CEO for Medical Services
California Prison Receivership
P.O. Box 4038
Sacramento CA 95812

Abt Associates Inc.
55 Wheeler Street
Cambridge, MA  02138

*Prepared by*
Abt Associates Inc.
Stephen Resch, PhD
Bill Rhodes, PhD

## Introduction

A 2006 study of older inmates in California prisons[1] and the subsequent 2007 Chronic and Long-Term Care Needs Assessment (LTC Study) found that California Department of Corrections and Rehabilitation (CDCR) inmates experienced a greater burden of chronic disease and functional limitations than did individuals of the same age living in the community. The LTC Study conducted a long-term care needs assessment for every inmate housed in medical beds (724 inmates) and for a sample of 1192 inmates in the general prison population. Based on these data and prison population projections calculated by the CDCR, the LTC Study provided 10-year projections of the number of California state prison inmates needing long-term care for chronic disease and functional impairment[2]. The study estimated that nearly 3000 California prison inmates needed long-term care in 2007. The probability of needing long-term care was closely associated with age. The study found that 10 percent of inmates age 60 to 64, 20 percent of inmates 65 to 69, and 40 percent of inmates 70 to 74 needed long-term care (Figure 1). If the prison population follows the trends predicted by CDCR, then the number of inmates in need of long-term care will grow steadily to about 5000 inmates by 2017, principally due to growth in the number of older (55+) inmates with long sentences aging behind bars.

Figure 1. Long-term Care Need by Age and Sex in General Population of Nine Sampled Prisons



To accommodate inmates with long-term care needs within the California prison system, the Receivership envisions three levels of long-term care housing and programming that correspond approximately to community-based skilled nursing facilities, assisted living, and congregate living. The LTC Study found that 25 percent of inmates with long-term care needs would be housed in long-term care housing at a level comparable to a skilled nursing facility or assisted living environment. The more mild needs of 75 percent of inmates with long-term care need could be addressed in a specialized generalized population setting where the care would be comparable to that available in a community-based congregate living setting.

In this Analysis Brief, we describe disability-related conditions among inmates needing long-term care. Information on the extent of functional impairment among inmates needing long-term care will help the Receiver design facilities and programming.

2

## Methodology

### Sample

On March 14, 2007, we assessed the long-term care needs of 724 inmates in medical beds in all 33 California prisons. The medical bed survey measured functional status, medical conditions, and nursing needs; it included a clinician's assignment of the assessed inmate to a level of care and the clinician's estimate of whether that level of care would be needed long-term (i.e. for 3 or more months). The general population survey gathered the same data elements (except the clinician assignment) for a sample 1192 general population inmates from 9 prison facilities[1]. We purposefully selected prisons because resources precluded traveling across the state to visit a random sample of prisons.

The need for long-term care is rare in the general prison population, so a simple random sample of inmates of just over 1000 inmates would have been uninformative. Instead, we designed our sampling strategy for general population to allow efficient estimation of long-term care need. We partitioned general population inmates into four strata. Two data sources informed the sample stratification: (1) data on age, physical impairment, and prior healthcare utilization available for all inmates from existing CDCR databases; and (2) correctional officer (CO) identification of inmates who they felt should be housed outside the general population in a special housing unit because of medical, functional, or cognitive problems.

Using the assessments of inmates in medical beds[2], we developed a statistical model for predicting long-term care risk based on age, physical impairment, and prior healthcare utilization. Based on this estimated long-term care risk and the correctional officer nominations, we stratified the population of the nine selected prisons as follows: (1) high-risk and CO-nominated (n=288); (2) low-risk and CO-nominated (n=360); (3) high-risk and not nominated (n=2690); and (4) low-risk and not nominated (n=42,185). Because the probability of needing long-term care was expected to be near zero for inmates who were low-risk and not nominated, we did not sample any inmates from the fourth stratum.

### Assessment Data

A consultant team led by Abt Associates, in collaboration with CDCR and CPR clinicians, developed the Care Management Screening and Assessment Tools for the medical bed census and the general population survey to collect data that would provide a "snapshot" of the health and functional status of inmates. The six-page form contained sections on demographics and custody information, disease burden, medical-nursing needs and treatments, and physical functioning.

CDCR consultant nurses conducted the medical bed census with technical assistance from Abt Associates. After completing training on the data collection protocol, these nurse-assessors obtained

---

[1] Nine sampled facilities were ASP, CCI, CCWF, CEN, CMF, HDSP, SATF, SVSP, SOL

[2] Two of the 724 medical bed census inmates were dropped from the analyses presented in this memo because of incomplete data.

data from inmate medical charts and from nurses providing care to inmates who served as proxy respondents.

Consultant clinicians from the consulting firm Lumetra assessed the health and functional status of general population inmates following a protocol similar to the one used for the medical bed census, with modifications to account the use of correctional officers (instead of nurses) as proxy respondents for inmates. The medical chart abstraction provided information on disease diagnoses and nursing needs. Correctional officers provided information on the inmates current physical and cognitive functioning.

*Nursing care needs*
The assessment included a tally of 54 categories of "nursing needs." Five of these categories involved assistive technologies closely associated with physical disabilities affecting mobility: straight cane, quad cane, walker, wheelchair, mechanical lift. In addition inmates who were blind in two eyes or deaf in both ears were identified as having nursing needs associated with those functional limitations. For inmates in medical beds, information on nursing needs was gathered both from medical records and from direct questioning of clinical staff caring for the inmates. For the inmates in general population sample, nursing needs were determined primarily from the medical record since the clinical staff was not available to report on the patients care needs.

*Assessment of Physical Function*
 In addition to the information on nursing care needs related to mobility, vision, and hearing, physical function was measured in six standard activities of daily living (ADLs) and six prison activities of daily living (PADLs) using validated methodologies [3,4,5]. Inmate's ability to perform six ADLs (i.e., walking, dressing, eating, toilet use, personal hygiene, bathing/showering) was measured on a three-point scale that captures the level of support required in the previous week (independent, supervision or limited assistance, extensive assistance or total dependence, or activity did not occur).  Since ADLs generally are undertaken daily by healthy, unimpaired individuals, we assumed that if any of the ADLs did not occur, the inmate was not able to perform that ADL without extensive assistance.

 Limitations in physical function raise particular challenges for those living in prison. "Prison Activities of Daily Living" (PADLs) captured six key functional abilities specific to life in a correctional facility that may drive placement of inmates: the ability to (1) get on the floor for alarms, (2) hear orders from staff, (3) stand for head count, (4) go to the dining hall, (5) get up on a top bunk, and (6) climb one flight of stairs. Inmate's ability to perform each of the six PADLs was measured on a three-point scale (can perform the activity, temporarily cannot do activity, permanently cannot do activity).

| Physical Function: ADLs |
| --- |
| 1 Walking |
| 2 Dressing |
| 3 Eating |
| 4 Toilet use |
| 5 Personal hygiene |
| 6 Bathing or showering |

| Physical Function: PADLs |
| --- |
| 1 Getting on the floor for alarms |
| 2 Hearing orders from staff |
| 3 Standing for head count |
| 4 Going to the dining hall |
| 5 Getting up on a top bunk |
| 6 Climbing one flight of stairs |

| Cognitive Function |
| --- |
| 1 Decision-making |
| 2 Short-term memory |
| 3 Long-term memory |
| 4 Making oneself understood |

*Assessment of Cognitive Function*
Cognitive function was measured using four items: decision making,

4

short-term memory, long-term memory, and ability to make oneself understood. Decision making was measured on a four-point scale from independent to severely impaired. Both memory questions had a dichotomous response set indicating the presence or absence of memory problems. Difficulty making oneself understood was measured on a four-point scale from always understood to rarely understood.

**Estimation of the Needed Level of Long-term Care**

Care management screening of medical bed inmates by CDCR nurse-assessors included the clinician's assignment of the inmate to a level of care (high acuity, low acuity, specialized general population (SGP), general population, or hospice) and expected duration for which care at that level would be required (less than 3 months, more than 3 months). Long-term care was defined to be care requiring a high acuity, low acuity or specialized general population bed for at least 3 months.

Rather than having the clinician-assessor determine the level of long-term-care needed by inmates in the general population, we used statistical analysis to estimate the probabilities of needing long-term care at each of the three levels (SGP, low acuity, and high acuity). With input from three clinicians specializing in long-term care, the assignment algorithm was developed using data from the assessment of the medical bed inmates. Details of the assessment protocol are found in the original LTC Study report[2]. In brief, we used a two-step approach that first screened inmates for any functional limitation (serious limitation in ADL, permanent limitation in PADL, or any cognitive problem) and then estimated the probability of long-term care need using a multivariate model based on age, functional limitation, nursing needs, and disease diagnoses.

**Identifying Functional Impairment with Standardized Assessment Items**

An inmate was considered significantly impaired if he or she met any of the following six criteria measured using standard long-term care assessment items derived from the Minimum Data Set (MDS):

1. Requires extensive assistance or totally dependent on assistance to perform at least one ADL
2. Permanent inability to perform at least one PADL
3. Problem with decision-making
4. Problem with short-term memory
5. Problem with long-term memory
6. Difficulty making oneself understood

We did not include the information on nursing care needs related to mobility, vision, and hearing in the definition of impairment, because there was a concern that some prisoners who had procured assistive devices did not actually have significant limitation in physical function or had only a short-term limitation buts that would resolve within three months. Furthermore, because data on mobility-related nursing needs for general population inmates were obtained from the medical chart, these data were not considered to be as current as the ADL and PADL assessment. Finally, it was believed that most persons currently needing assistive devices or who were blind or deaf would have observable limitations in ADLs in PADLs that would be captured in the ADL and PADL assessments.

**Population-level estimates of Impairment and Functional Limitations among long-term care inmates**

Clinicians, having completed an inmate's assessment, assigned the inmate to a level of long-term care and indicated whether that level of care was expected to be needed for 3 months or more. These assignments by clinician-assessors were taken as a gold standard and were available for the complete census of medical bed inmates, so no statistical manipulations were necessary to generalize to all inmates in medical beds. Likewise, estimation of impairment among medical bed inmates needing long-term care at each level of care was straightforward.

For inmates in general population, population-level estimates were based on the general population sample. We used the survey data to estimate the probability of LTC need and functional limitations for every member of the sample. We weighted those sample-based estimates by the inverse of the sampling probabilities to generate estimates for the full CDCR general population. In doing so, we assumed the average prevalence of long-term care need in the 24 unsampled prisons stratified by high- and low- risk is the same as the average for similarly stratified inmates in the sampled prisons (excluding CMF because of its unique medical mission).

> **Sample Calculation.**
> Assume a hypothetical inmate has 1 ADL and he has an estimated probability of needing long-term care in SGP equal to 0.3 and he has a sampling weight = (1 / Pr[selection]) = 2.5, then he represent 0.75 inmates needing SGP in the full CDCR general population. Another inmate with no ADLs and an estimated probability of needing long-term care in SGP = 0.1 and a sampling weight of 1.5 represent 0.15 inmates needing SGP. If these were the only two inmates in the sample, then the estimated probability of having an ADL *given a need for long-term care in SGP* is 0.75 / (0.75 + 0.15) = 0.833.

# Results

## Medical Bed Census

### Sample
All 724 inmates in CDCR medical beds on March 14, 2007 were assessed. Three hundred thirty inmates were assigned to long-term care by clinician assessors. An additional 37 inmates were assigned to a higher level of care but clinician assessors did not indicate the duration of care required. In the original LTC Study, inmates for whom clinician assessors did not indicate the expected duration of care were assumed to need long-term care. For the current study, we examined each of these cases in order to refine the precision of our estimate of long-term care need and level of care. Thus, for this analysis, 341 inmates in medical beds were estimated to need long-term care.

### Impairment
Of the 341, 293 (86 percent) reported significant limitation in ADLs, PADLs, or cognitive function (Group A in Table 1). Inmates assigned to higher levels of care were found to be more functionally impaired; 80 percent of SGP, 88 percent of low acuity, and 96 percent of high acuity inmates in medical beds were found to be impaired. We examined the full assessment record for each of the 48 inmates who needed long-term care but apparently lacked any serious ADL, permanent PADL, or cognitive problem. We found evidence of functional limitation for 33 of these inmates (Group B in Table 1). Seven inmates had a medical condition such as hepatic encephalopathy that indicated probable cognitive impairment. Twenty-five had conditions that indicated impairment in physical function (e.g. paraplegia, frequent

falls, need for limited assistance with several ADLs, blindness, chronic pain), often combined with several daily nursing treatment needs such as intravenous medication administration or oxygen supplementation (e.g. CPAP).

Combining all medical bed inmates with evidence of long-term functional impairment, we estimate that 96% of medical bed inmates needing long-term care were functionally impaired. Fifteen inmates, for whom there was no evidence of functional limitations in the assessment data, nevertheless had a complex set of comorbidities that was judged by clinician-assessors to necessitate long-term care outside of the general population (Group C in Table 1). For example, one female inmate suffered from end-stage renal disease for which she was receiving dialysis, and also had congestive heart failure, hypertension, and systemic lupus erythematosus. While this inmate reported no serious limitations in ADLs or PADLs, clinician-assessors felt her case would be better managed if she were housed in a specialized general population unit designed for efficient delivery of long-term care services.

**Table 1. Impairment among medical bed inmates[1]**

| Impairment Status if Medical Bed Inmates | Number of Inmates (Percent[2]) | | | |
|---|---|---|---|---|
| | Special GP[3] Inmates (Pct) n=168 | Low Acuity Inmates (Pct) n=88 | High Acuity Inmates (Pct) n=85 | All LTC Beds Inmates (Pct) n=341 |
| A. Serious limitation in ADL, permanent limitation in PADL, and/or any limitation in cognitive function | 134 (80) | 77 (88) | 82 (96) | 293 (86) |
| B. Reported medical conditions implies long-term functional limitation | 26 (15) | 5 (6) | 2 (2) | 33 (10) |
| Total Inmates with Impairment (A+B) | 158 (95) | 82 (93) | 84 (99) | 324 (96) |
| | | | | |
| C. Inmates with no reported functional limitation indicating impairment, but with a complex combination of medical conditions necessitating assignment to LTC bed | 8 (5) | 6 (7) | 1 (1) | 15 (4) |

*Physical Function Limitations*

Of the inmates in medical beds across all California prisons, 45 percent had some functional limitation in ADLs (LTC Study[2]). An ADL limitation severe enough to require extensive assistance or render the inmate totally dependent on others was found in 26 percent of inmates (LTC Study[2]). Among the 341 inmates determined to need long-term care, 127 (37 percent) had a serious limitation in at least 1 ADL (Table 2). The number of ADLs in which an inmate required at least extensive assistance was strongly associated with level of care. Inmates needing specialized general population were unlikely to have any ADL limitation (mean 0.33). In contrast, low acuity and high acuity long-term care inmates, on average, experienced 1.1 and 3.3 ADL limitations, respectively.

Inmates in medical beds had more limitations in PADLs than in ADLs. Among inmates needing long-term care, 261 (77 percent) had a permanent limitation in at least 1 PADL. PADL limitations were seen in most

long-term care inmates regardless of their level of care. However, inmates needing high acuity long-term care tended to have more permanent PADL limitations.

**Cognitive Function Limitations**

Of the long-term care inmates in medical beds, 142 (42 percent) had at least one of the following: impaired decision making ability, a problem with short or long-term memory, difficulty making oneself understood (Table 4). There was a significant overlap between cognitive and physical impairment. Eighty-seven percent of those needing long-term care who had a limitation in cognitive function also had limitation in physical function (either in an ADL or PADL). As with physical limitations, we observed a trend in which higher acuity long-term care inmates reported more cognitive problems. Among inmates in medical beds, those assigned to high-acuity long-term care reported 1.7 cognitive problems on average compared to 0.47 among those assigned to specialized general population.

**Table 2. Impairment and functional limitations among inmates in medical beds needing long-term care**

| Condition | Assessed Level of Long-Term Care Need (bed type) | | | |
| --- | --- | --- | --- | --- |
| | Specialized GP[1] Inmates (Pct[2]) | Low Acuity Inmates (Pct) | High Acuity Inmates (Pct) | All LTC Beds Inmates (Pct) |
| Needing Long-term Care | 168 (100) | 88 (100) | 85 (100) | 341 (100) |
| **Number of ADL limitations[3]** | | | | |
| 0 | 138 (82) | 52 (59) | 24 (28) | **214 (63)** |
| 1 | 22 (13) | 16 (18) | 3 (4) | **41 (12)** |
| 2 | 1 (1) | 5 (6) | 8 (9) | **14 (4)** |
| 3 | 1 (1) | 2 (2) | 4 (5) | **7 (2)** |
| 4 | 1(1) | 2(2) | 8 (9) | **11 (3)** |
| 5 | 4 (2) | 5 (6) | 14 (16) | **23 (7)** |
| 6 | 1 (1) | 6 (7) | 24 (28) | **31 (9)** |
| At least 1 | 30 ( 18) | 36 (41) | 61 (72) | **127 (37)** |
| Mean (SD) | 0.34 (1.0) | 1.1 (1.9) | 3.3 (2.5) | **1.3 (2.1)** |
| **Number of PADL limitations** | | | | |
| 0 | 44 (26) | 23 (26) | 13 (15) | **80 (23)** |
| 1 | 18 (11) | 7 (8) | 1 (1) | **26 (8)** |
| 2 | 38 (23) | 11 (13) | 5 (6) | **54 (16)** |
| 3 | 25 (15) | 10 (11) | 9 (11) | **44 (13)** |
| 4 | 28 (17) | 18 (20) | 7 (8) | **53 (16)** |
| 5 | 12 (7) | 15 (17) | 36 (42) | **63 (18)** |
| 6 | 3 (2) | 4 (5) | 14 (16) | **21 (6)** |
| At least 1 | 124 (74) | 65 (74) | 72 (85) | **261 (77)** |
| Mean (SD) | 2.1 (1.7) | 2.6 (2.0) | 3.8 (2.0) | **2.7 (2.0)** |
| **Cognitive Impairments[4]** | | | | |
| Decision Making | 31 (18) | 40 (45) | 49 (58) | **120 (35)** |
| Short-term Memory | 8 (5) | 26 (30) | 32 (38) | **66 (19)** |
| Long-term Memory | 22 (13) | 24 (27) | 22 (26) | **68 (20)** |
| Making Self Understood | 18 (11) | 25 (28) | 43 (51) | **86 (25)** |
| Any Cognitive impairment | 44 (26) | 45 (51) | 53 (62) | **142 (42)** |
| Mean cognitive problems (SD) | 0.47 (.95) | 1.3 (1.5) | 1.7 (1.6) | **1.0 (1.4)** |
| | | | | |
| ADL, PADL, and/or any cognitive limitation | 134 (80) | 77 (88) | 82 (96) | **293 (86)** |
| Medical conditions implies long-term functional limitation | 26(15) | 5 (6) | 2 (2) | **33 (10)** |
| **Total with Impairment** | 158 (95) | 82 (93) | 84 (99) | **324 (96)** |

[1]Special GP = Specialized General Population, [2]Pct = Column Percentage. May not sum to 100 percent due to rounding. [3]Serious limitations are those requiring "extensive assistance" or for which inmate is "total dependent" or where "activity did not occur." [4]Decision making not fully independent (i.e. at least experiences "difficulty in decision-making when faced with new tasks or situations"), any short- or long-term memory problem, or difficulty making oneself understood (i.e. at least difficulty finding words or finishing thoughts and requiring prompting)

### Nursing care needs

Table 3 shows the distribution of nursing care needs related to mobility and sensory limitations for inmates in medical beds. These needs were much more frequent among inmates who were assessed to need long-term care. Among long-term care inmates, 215 (58 percent) had a need for an assistive device (e.g. cane, walker, wheelchair, lift). Walkers and wheelchair were more common among those assigned to specialized general population and low-acuity long-term care beds. Mechanical lifts were needed almost exclusively by patients assigned to high-acuity long-term care beds. However, no clear association between in the need for mobility-related assistive devices generally and level of care was observed. About 60% of inmates at each long-term care acuity level required some type of assistive device. There were also 15 inmates needing long-term care who were blind in both eyes. In addition to these inmates with mobility and sensory related nursing needs, there were some inmates who reported a need of an assistive device or who reported blindness or deafness in the chronic disease inventory section of the assessment. These individuals are not included in Table 3.

**Table 3. Nursing needs related to physical function among inmates in medical beds needing long-term care**

| Condition | Assessed Level of Long-Term Care Need (bed type) | | | |
|---|---|---|---|---|
| | Specialized GP[1] Inmates (Pct[2]) | Low Acuity Inmates (Pct) | High Acuity Inmates (Pct) | All LTC Beds Inmates (Pct) |
| Needing Long-term Care | 168 (100) | 88 (100) | 85 (100) | 341 (100) |
| **Mobility-related Nursing Needs** | | | | |
| Cane | 12 (7) | 5 (6) | 3 (4) | **20 (6)** |
| Walker | 29 (17) | 12 (14) | 8 (9) | **49 (14)** |
| Wheelchair | 81 (48) | 42 (48) | 35 (41) | **158 (46)** |
| Mechanical Lift | 0 (0) | 2 (2) | 21 (24) | **23 (7)** |
| Any Mobility-Related Need | 108 (64) | 53 (60) | 54 (64) | **215 (63)** |
| **Sensory-related Nursing Needs** | | | | |
| Blind 2 Eyes | 12 (7) | 1 (1) | 2 (2) | **15 (4)** |
| Deaf 2 Ears | 0 (0) | 0 (0) | 0 (0) | **0 (0)** |
| Any Sensory-Related Need | 12 (7) | 1 (1) | 2 (2) | **15 (4)** |
| [1]Special GP = Specialized General Population, [2]Pct = Column Percentage. May not sum to 100 percent due to rounding. | | | | |

### General Population Sample

### Sample

We assessed 1192 inmates from the 3 higher risk strata (which contained a total of 3338 inmates). Of the assessed inmates, 26 were excluded because they were in a medical bed at the time of the medical bed census and thus are already represented by the medical bed census.   We used a statistical assignment algorithm (instead of the direct clinician assignment used in the medical bed census) to estimate the probability that each sampled inmate needed long-term care. The algorithm assigned a zero probability of needing long-term care to individuals with no functional limitation, and then used a multivariate model to estimate a probability of needing long-term care at each level of care for all individuals having any functional limitation in ADLs, PADLs, or cognitive limitation.

Of the 1166 general population inmates sampled, we estimated that 678 had a need for long-term care. After accounting for sampling probability, we estimated that 1156 inmates in the 9 sampled prisons need long-term care. We assumed the average prevalence of long-term care need in the 24 unsampled prisons stratified by high- and low- risk is the same as the average for similarly stratified inmates in the sampled prisons (excluding CMF because of its unique medical mission). Accordingly, we estimated that 2608 inmates in the full CDCR population need long-term care: 1991 in SGP beds, 449 in low-acuity beds, and in 168 high-acuity beds. Details of the estimation of long-term care need can be found in the original report of the LTC Study [2].

### Impairment among General Population Inmates Needing Long-term Care

We used results from the general population sample to estimate impairment in the full California prison system exclusive of inmates in medical beds. We generalized the findings on functional limitations in the sample to the full general population, adjusting for sampling probability. Because, the assignment algorithm considered functional impairment a prerequisite for long-term care, all 2608 inmates in the full general population estimated to need long-term care were functionally impaired (Table 4).

Among inmates estimated to current have a need for long-term care, general population inmates who were less likely to have ADL limitations and more likely to have PADL limitations than inmates already in medical beds. Twelve percent of the inmates in general population needing long-term care had a serious ADL limitation and 88 percent permanently could not perform at least one PADL, compared to 27 percent (for ADLs) and 77 percent (for PADLs) of medical bed inmates. Cognitive limitation was more frequently observed among the medical bed inmates than general population inmates. Still, 27 percent of the inmates in general population who are estimated to current have a need for long-term care had a cognitive impairment.

As expected, and as observed among those in medical bed census, the mean number of ADL limitations increased with acuity of long-term care need. However, we did not observe similar trends for PADLs or cognitive limitations.

**Table 4. Estimated impairment and functional limitations among general population inmates needing long-term care**

| Condition | Assessed Level of Long-Term Care Need (bed type) | | | |
| --- | --- | --- | --- | --- |
| | Specialized General Population[1] Inmates (Pct[2]) | Low Acuity Inmates (Pct) | High Acuity Inmates (Pct) | All LTC Beds Inmates (Pct) |
| Needing Long-term Care | 1991 (100) | 449 (100) | 168 (100) | 2608 (100) |
| **Number of ADL limitations[3]** | | | | |
| 0 | 1765 (88.6) | 391 (87.1) | 143 (85) | 2299 (88.1) |
| 1 | 147 (7.4) | 35 (7.9) | 15 (9.2) | 198 (7.6) |
| 2 | 15 (0.8) | 4 (0.9) | 2 (1.2) | 21 (0.8) |
| 3 | 31 (1.6) | 5 (1.2) | 2 (0.9) | 38 (1.5) |
| 4 | 10 (0.5) | 2 (0.3) | 1 (0.5) | 12 (0.5) |
| 5 | 14 (0.7) | 11 (2.5) | 5 (3.2) | 31 (1.2) |
| 6 | 9 (0.4) | 0 (0.1) | 0 (0.1) | 9 (0.4) |
| At least 1 | 226 (11.4) | 58 (12.9) | 25 (15) | 309 (11.9) |
| Mean | 0.22 | 0.27 | 0.33 | 0.23 |
| **Number of PADL limitations** | | | | |
| 0 | 233 (11.7) | 59 (13.1) | 22 (13) | 314 (12.1) |
| 1 | 440 (22.1) | 89 (19.8) | 31 (18.2) | 559 (21.4) |
| 2 | 540 (27.1) | 124 (27.7) | 45 (26.9) | 710 (27.2) |
| 3 | 391 (19.6) | 88 (19.6) | 32 (19.2) | 511 (19.6) |
| 4 | 285 (14.3) | 58 (12.9) | 19 (11.6) | 362 (13.9) |
| 5 | 71 (3.5) | 17 (3.8) | 10 (6) | 98 (3.8) |
| 6 | 31 (1.6) | 13 (3) | 9 (5.3) | 54 (2.1) |
| At least 1 | 1758 (88.3) | 390 (86.9) | 146 (87) | 2294 (87.9) |
| Mean | 2.20 | 2.23 | 2.37 | 2.21 |
| **Cognitive Impairments[4]** | | | | |
| Decision Making | 379 (19) | 93 (20.7) | 32 (18.9) | 504 (19.3) |
| Short-term Memory | 208 (10.5) | 47 (10.4) | 17 (10.1) | 272 (10.4) |
| Long-term Memory | 189 (9.5) | 41 (9) | 15 (8.8) | 244 (9.4) |
| Making Self Understood | 315 (15.8) | 71 (15.7) | 24 (14.2) | 410 (15.7) |
| Any Cognitive impairment | 550 (27.6) | 131 (29.2) | 43 (25.7) | 724 (27.8) |
| | | | | |
| Any Functional Impairment | 1991 (100) | 449 (100) | 168 (100) | 2608 (100) |

[1]Special GP = Specialized General Population, [2]Pct = Column Percentage. May not sum to 100 percent due to rounding. [3]Serious limitations are those requiring "extensive assistance" or for which inmate is "total dependent" or where "activity did not occur." [4]Decision making not fully independent (i.e. at least experiences "difficulty in decision-making when faced with new tasks or situations"), any short- or long-term memory problem, or difficulty making oneself understood (i.e. at least difficulty finding words or finishing thoughts and requiring prompting)

*Nursing care needs*

Among inmates in general population, many had nursing care needs that implied physical impairment. The six most common needs were all related to physical function: straight cane, chronic pain, wheelchair, blindness, orthotic device, and hearing impaired (See original LTC Study report). Table 5 shows the estimated number of general population inmates with mobility- and sensory-related nursing needs. These needs were more likely among inmates needing higher acuity long-term care. Overall, 57 percent of inmates in general population estimated to need long-term care have a mobility-related nursing need. Approximately one-fifth of individuals with a mobility-related nursing need lacked serious limitation in ADLs or permanent PADLs (not shown in table). However, most of these individuals reported a mix of mild ADL limitations or temporary PADL limitations.

**Table 5. Nursing needs related to physical function among inmates in general population needing long-term care**

| Mobility-related Nursing Needs | | | | |
|---|---|---|---|---|
| Cane | 572 (28.7) | 128 (28.5) | 45 (27) | 745 (28.6) |
| Walker | 164 (8.2) | 43 (9.7) | 20 (12.2) | 228 (8.7) |
| Wheelchair | 624 (31.3) | 150 (33.3) | 64 (38.1) | 838 (32.1) |
| Any M.R. Nursing Need | 1125 (56.5) | 260 (57.8) | 104 (62.1) | 1489 (57.1) |
| Sensory-related Nursing Needs | | | | |
| Blind 2 Eyes | 388 (19.5) | 17 (3.8) | 14 (8.5) | 419 (16) |
| Deaf 2 Ears | 42 (2.1) | 8 (1.8) | 5 (2.7) | 54 (2.1) |

**Impairment in the Full CDCR population needing Long-term Care**

Table 6 summarizes results for prevalence of impairment and functional limitations in the full CDCR population needing long-term care. Combining the results of the medical bed census and the general population sample, we estimate that 98 percent of all inmates needing long-term care have a significant impairment comprising at least a serious limitation in 1 ADL, a permanent limitation in 1 PADL, or a serious cognitive problem. An additional 1 percent of the inmates estimated to need long-term care did not report serious ADL limitations or permanent PADL limitations or cognitive problems but had medical conditions (e.g. hepatic encephalopathy, paraplegia) that implied serious functional limitation. The remaining 1 percent of long term care inmates did not have evidence of serious functional limitation, but had a complex combination of comorbidities that warranted long-term care to ensure high-quality, efficient disease management.

Of all CDCR inmates estimated to need long-term care, 58 percent have a mobility-related nursing need. Nearly 1000 inmates require a wheelchair, and 765 need either a straight cane or a quad cane. We estimate that about 430 inmates in CDCR population are blind in two eyes. Deafness was much less common, affecting only 54 inmates.

**Table 6. Summary of estimates of impairment among all CDCR inmates needing long-term care[1]**

| Condition | Among those with long-term care need | | |
|---|---|---|---|
| | Medical Bed Inmates (Percent) | General Population Inmates (Percent) | Inmates in Full CDCR Population[2] (Percent) |
| | n =341 | n =2608 | n =2956 |
| **Impairment** | | | |
| At least 1 ADL impairment[3] | 127 (37) | 309 (12) | 436 (15) |
| At least 1 permanent PADL impairment | 261 (77) | 2294 (88) | 2555 (86) |
| At least 1 cognitive impairment | 142 (42) | 724 (28) | 866 (29) |
| Medical conditions imply long-term impairment[4] | 33 (10) | n/a | 33 (1) |
| At least 1 impairment of any kind[5] | 304 (87) | 2608 (100) | 2912 (99) |
| **Mobility-related Nursing Needs** | | | |
| Straight or Quad Cane | 20 (6) | 745 (29) | 765 (26) |
| Walker | 49 (14) | 228 (9) | 277 (9) |
| Wheelchair | 158 (46) | 838 (32) | 996 (34) |
| Mechanical Lift | 23 (7) | 0 (0) | 23 (1) |
| Any mobility-related nursing need | 215 (63) | 1489 (57) | 1704 (58) |
| **Sensory Limitation Nursing Needs** | | | |
| Blind in 2 eyes | 15 (4) | 419 (16) | 434 (15) |
| Deaf in 2 ears | 0 (0) | 54 (2) | 54 (2) |

[1]Estimates are for 2007. [2]Does not include ~28,000 inmates in reception centers or ~7500 in community corrections. [3]ADL impairment requiring "extensive supervision" or for which inmate is "totally dependent". [4]These are cases that had no major ADL or permanent PADL or cognitive limitation but had a medical condition that indicated functional impairment (see text). [5]Impaired inmates were those that needed extensive assistance or were totally dependent in at least one ADL or had a permanent inability to perform at least one PADL or had a cognitive impairment or who had medical conditions implying long-term functional limitation.

## Discussion

In the medical bed census we observed a very close relationship between impairment and long-term care need. Nearly every inmate assessed to have long-term care need was also found to have significant physical or cognitive limitations. We estimated that 99% of the target population for the new long-term care medical beds which the Receiver is planning to construct have significant functional impairment.

A small fraction of inmates (n=15) in medical beds that were determined to need long-term care did not have any major functional impairment identified by the assessment. However, these inmates had a complex combination of medical conditions that warranted long-term care. These inmates may experience modest levels of impairment not detected with our survey instrument.

Our study did not have the statistical power to detect an association between the number and severity of functional limitations and assessed level of long-term care need. However, the observed trends in the data suggest inmates needing higher level of care tend to have more functional limitation. This trend was strongest for ADLs, but also observed for PADLs.

For this analysis, we defined significant impairment as having at least a need for "extensive assistance" in at least one ADL or having a permanent limitation in at least one PADL or as having any of four problems with cognitive function. Had a more restrictive (or inclusive) definition been adopted, the estimated prevalence of impairment would have been lower (or higher). For example, among medical bed inmates it was observed that some individuals with long-term care need had ADL limitations that require more mild levels of assistance that did not meet our criteria for impairment. Conversely, 78 individuals in the general population estimated to need long-term care had no ADL or PADL limitations, and only modest cognitive limitations in decision-making or making themselves understood.

The survey instrument used to collect the needs assessment data was designed for the purpose of generating population-level estimates of long-term care need using proxy respondents and statistical methods. Specifically, each sampled general population inmate that was assessed to be impaired was assigned a *probability* of needing long-term care based on their characteristics. This approach efficiently produced valid population-based estimates of long-term care need. However, in predicting impairment and long-term care need for *individual* inmates, the method is not likely to be as precise as direct clinician assessment of inmates.

Estimates of impairment in the CDCR prison population are based on proxy assessment of ADLs, PADLs, and four items measuring cognitive function. Therefore, the margin of error in the estimates may be greater than if comprehensive diagnostic assessments involving direct interaction with inmates had been undertaken. In particular, the measure of cognitive function was limited. Proxy assessment of cognitive function is expected to underestimate cognitive problems because many decision-making and memory problems may be difficult for proxies to observe. Measurement error associated with a reliance on proxy respondents may explain the small subset of long-term care inmates whose medical conditions

15

strongly implied functional impairment but who did not report serious ADL limitations, permanent PADL limitations, or cognitive problems.

Presumably, when long-term care beds become available within CDCR prisons, decisions about long-term care placement at the individual inmate level will rely on clinical expertise aided, perhaps, by needs assessment instruments and tools design for that purpose. At an individual level, placement decisions may not match the results predicted by the model employed in this analysis. For example, this analysis assumed that no person in general population who did not have a functional impairment would need long-term care. However, data from the medical bed census suggests that there may be a small fraction of inmates who, despite not meeting the threshold level of functional impairment, still require long-term care because of a complex combination of diseases or conditions that require frequent medical attention. Clinicians making placement decisions will be able to detect these special cases with a precision that cannot be matched by a survey instrument and statistical algorithm. We assumed these special cases of long-term care need without serious functional impairment would be very rare in the general population since they are characterized by a complex combination of medical conditions that would likely have triggered placement in a medical bed. However, if these special cases do exist in the general population in the same proportion as observed in the medical bed census, our estimates of overall long-term care need may be biased downward by about 4 percent.

Despite their limitations, data on physical and cognitive function collected in the LTC Study provide a basis for estimating impairment among all CDCR inmates. The findings show that nearly 5000 inmates currently have significant cognitive of physical limitations, representing about 3.5 percent of the total inmate population (excluding reception centers and community corrections). The original LTC Study found that the number of inmates needing long-term care was expected to grow nearly 80 percent by 2017, largely due to the aging of the inmate population. Undoubtedly, a comparable growth in the prevalence of impairment can be expected as the inmate population ages over the next decade.

## References

[1] Hill T, Williams B, Cobe G, Lindquist K. Aging Inmates: Challenges for Healthcare and Custody. 2006.

[2] Resch S, Kennedy S, Moore T, et al. Chronic and Long-Term Care in California Prisons: Needs Assessment. 2007.

[3] Lum TY, Lin WC, Kane RL. Use of proxy respondents and accuracy of minimum data set assessments of activities of daily living. Journals of Gerontology Series A: Biological Sciences and Medical Sciences 2005;60(5):654-9.

[4] Finch M, Kane RL, Philip I. Developing a new metric for ADLs. Journal of the American Geriatrics Society 1995;43:877-884.

[5] Williams BA, Lindquist K, Sudore RL, Strupp HM, Willmott DJ, Walter LC. Being old and doing time: functional impairment and adverse experiences of geriatric female prisoners. Journal of the American Geriatrics Society 2006;54(4):702-7.

# Exhibit 4

# HOOPER, LUNDY & BOOKMAN, INC.

## MEMORANDUM

**TO:**                                      **FILE NO:**    12490.907

**FROM:**    Stephen K. Phillips; Greg B. Sherman

**DATE:**    January 5, 2009

**RE:**    Evaluation of Proposed Medical and Mental Health Beds Under the Americans
with Disabilities Act

## INTRODUCTION

On behalf of the California Prison Receiver ("Receiver"), we have examined whether the
inmates that would use the 5,000 medical beds and 5,000 mental health beds proposed by the
Receiver are protected under the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101 et
seq. ("ADA"). The ADA provides that no qualified individual with a disability shall, by reason
of such disability, be excluded from participation in or be denied the benefits of the services,
programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42
U.S.C. § 12132. As noted in *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997), the
Supreme Court, Third, Seventh and Ninth Circuit Court of Appeals have determined that prison
medical care and health facilities are benefits of a public entity to which ADA protection applies.

## CONCLUSIONS

Based on the analysis set forth in this memorandum of law, we conclude:

- An estimated 99% of the proposed 5,000 long-term medical beds are for inmates
  who are functionally impaired in one of three ways:

  - They require "extensive assistance" or are "totally dependent" in
    performing one or more Activities of Daily Living ("ADLs"); or

  - They are "permanently limited" in performing one or more Prison Activity
    of Daily Living ("PADLs") and require the level of care provided in a
    medical bed; or

  - They have a cognitive impairment in decision-making, short-term or long-
    term memory, or making themselves understood, and the cognitive
    impairment, either by itself or in combination with other medical
    conditions, qualifies the inmate as disabled under the ADA.

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 2

- An estimated 1% of the proposed long-term medical beds are for inmates who have a complex combination of conditions which, taken together, warrant long-term care.

- 99-100% of the inmates in the long-term medical beds would qualify as disabled under the ADA.

- The proposed 5,000 mental health beds are for inmates who:

  - require mental health care at the Enhanced Outpatient Program ("EOP") level of care, because they have a serious mental disorder or an inability to function in the general population; or

  - require mental health care at the intermediate or acute care level, because they have a serious mental disorder and either exhibit marked impairment and dysfunction in ADLs requiring 24-hour inpatient care, are a danger to self or others as a consequence of a serious disorder or are unable to carry out adequately one or more PADLs.

- All of the EOP inmates in the mental health beds would qualify as disabled under the ADA.

- All of the inmates placed in an Intermediate Care Facility would qualify as disabled under the ADA.

- Inmates placed in the acute mental health beds qualify as disabled under the ADA so long as their acute symptoms are a manifestation of an ongoing or chronic mental illness.

## FACTUAL BACKGROUND

The original Order Appointing Receiver conferred upon the Receiver all of the powers of the Secretary of the California Department of Corrections and Rehabilitation over the delivery of medical care and suspended the Secretary's exercise of those powers for the duration of the Receivership. Order Appointing Receiver at 2, *Plata v. Schwarzenegger*, No. C01-1351 (N.D.Cal. Feb. 14, 2006).

The Receiver has determined that if the prison health care system is to be brought up to federal Constitutional standards, extensive renovation of existing facilities and substantial new construction is required. California Prison Health Care Receivership Corp., *Achieving a Constitutional Level of Medical Care in California's Prisons*, June 6, 2008, p. 27 ("Plan of Action"). As a result, the Receiver seeks expanded prison health facilities and housing for

2017830.6

HOOPER, LUNDY & BOOKMAN,

INC

January 5, 2009
Page 3

approximately 10,000 existing California Department of Corrections and Rehabilitation
("CDCR") inmates whose medical or mental condition require separate, long-term housing to
facilitate appropriate, cost-effective access to necessary health care services. *Id.* Approximately
half of the proposed housing and facilities will be for medical services and the other half will be
for mental health services. *Id.*

### A.   Medical Beds

The proposed medical beds will serve inmates "requiring extensive assistance or totally
dependent in at least one ADL or with permanent limitation in at least one PADL or with any
cognitive problem (in decisionmaking, short term or long term memory, or making themselves
understood)." Abt Associates, Inc., *Chronic and Long-Term Care in California Prisons: Needs
Assessment*, August 31, 2007, p. 29 ("Abt Report"). ADLs include grooming, dressing, bathing,
toileting, ambulation and eating. *Id.* at 23. PADLs include placing oneself on the floor during
alarms, hearing orders, standing for count, getting to the dining hall, climbing to the top bunk,
and climbing stairs. *Id.* at 24. The data for these determinations was gathered March-June 2007
by CDCR staff and contractor teams led by Abt Associates. The teams collected data on all
patients in CDCR "medical beds" (infirmary-type beds) and community ones, as well as on a
random sample of CDCR inmates. Inclusion in the Abt Associates long-term care category - and
thus inclusion in the Receiver's proposed medical beds - was based primarily on having a
physical or cognitive impairment in functioning, not just being a certain age or having a given
disease such as AIDS. After including inmates in the medical long-term care category, Abt
Associates used an algorithm to assign inmates to one of three levels of care. Abt Associates
then estimated the number of beds needed currently and in the future. A small percentage of
inmates – 4% of the initial medical beds counts, leading to 1% of the final total estimate – was
included because of a complex combination of conditions which, taken together, warrant long-
term care. *Id.*

The proposed medical beds will provide three levels of care, akin to the three levels of
care in many community elder care facilities. Plan of Action, p. 27. Approximately 75 percent
of the medical beds will be "specialized general population" beds, commonly known as sheltered
living or congregate care in the community. Abt Report, at p. 8. Patients in these beds will have
functional impairments and chronic conditions that require ready access to medical care,
assistance with ADLs as needed, and exemption from the physical challenges of being in general
population, such as climbing stairs, but will not require daily care from a Registered Nurse.
Examples would be patients with advanced chronic obstructive lung disease causing a limitation
in walking and wheelchair-bound patients with spinal chord injuries.

Approximately eighteen percent of the medical beds will consist of "low-acuity" beds for
patients who have nursing needs (*e.g.*, wheelchair-bound patients with wounds that need routine
dressing, or stroke patients who need help dressing). Plan of Action, p. 27. The level of care
provided in "low-acuity medical beds" is analogous to the care provided in a board-and-care or

2017830.6

HOOPER, LUNDY & BOOKMAN,

INC

January 5, 2009
Page 4

an assisted living facility. Abt Report, at p. 8. As such, inmates placed in low-acuity beds require the availability of a Registered Nurse for 8 to 16 hours per day to assess, monitor and manage medical treatment such as IV hydration, IV antibiotics, wound care, and assistance with ADLs. *Id.*

The remaining medical beds will be "high-acuity" beds for patients that require nursing home level of care (*e.g.*, patients with complicated wounds that need nursing attention daily, pre/post transplant, patients undergoing chemotherapy, and patients who are completely bed bound.) Plan of Action, at p. 27. Inmates in high-acuity beds require a Registered Nurse to be available 24-hours per day to assess, monitor and manage complex or high-risk medication regimens or blood transfusion, complex wound care, and to provide extensive assistance with ADLs. Abt Report, at p. 8.

## B.    Mental Health Beds

Approximately ninety percent of the proposed mental health beds will be for inmates that qualify for the "enhanced outpatient program" ("EOP"), which is a form of sheltered living for mentally ill inmates that provides them with special programming and protection. Plan of Action, p. 27. The remaining mental health beds will be intermediate and acute care mental health beds, which are for more intensive care needs than EOP patients. *Id.*

To be eligible for CDCR's Mental Health Services Delivery System ("MHSDS") treatment at the EOP level of care, an inmate must suffer from a severe mental impairment. CDCR, *Mental Health Services Delivery System*, Sept. 2006, p. 12-4-1 ("CDCR Report"). Moreover, EOP inmate-patients generally suffer from "serious mental illness that is of long duration with moderate to severe and persistent functional impairments." *Id.* at p. 12-1-7. As such, inmates in the EOP program generally require assistance with ADLs, including eating, grooming, personal hygiene, and ambulation, as a result of a serious mental disorder. *Id.*, at p. 12-1-6.

To receive MHSDS treatment at any level of care, an inmate must either:

- "have current symptoms and/or require treatment for one of the following serious mental disorders: schizophrenia, delusional disorder, schizophreniform disorder, schizoaffective disorder, brief psychotic disorder, substance-induced psychotic disorder, psychotic disorder due to a general medical condition, psychotic disorder not otherwise specified, major depressive disorders, or bipolar disorders I and II; or

- "require mental health intervention to protect life and/or treat significant disability/dysfunction in an individual diagnosed with or suspected of having mental disorder."

2017830.6

HOOPER, LUNDY & BOOKMAN,
INC.

January 5, 2009
Page 5

*Id.* at 12-1-5.

To receive treatment at the EOP level of care, the individual must demonstrate:

- "an acute onset or significant decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment reality testing and or judgment; and/or

- "Inability to function in General Population based upon: (a) a demonstrated inability to program in work or educational assignments, or other correctional activities as a consequence of a serious mental disorder; (b) the presence of dysfunction or disruptive social interaction as a result of serious mental disorder; or (c) An impairment in the activities of daily living including eating, grooming and personal hygiene, maintenance of housing area, and ambulation, as a consequence of serious mental disorder."

*Id.* at p. 12-1-6.

Inmates that require mental health care at the intermediate or acute care level have a serious mental disorder and either exhibit marked impairment and dysfunction in ADLs requiring 24-hour inpatient care, are a danger to self or others as a consequence of a serious disorder or are unable to carry out adequately one or more PADLs. *Id.* at 12-6-2.

## ANALYSIS

### I.    Applicability of the ADA

The ADA seeks to provide "a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1) (2008). Specifically and pertinent to the application of the ADA to prison inmate benefits, the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity. 42 U.S.C. § 12132 (2008). Thus, to state a claim under the ADA for discrimination by a public entity, a plaintiff must allege: (1) he or she is disabled; (2) he or she is otherwise qualified and (3) a public official's actions either (a) excluded his or her participation in or denied him or her the benefits of a service, program or activity; or (b) otherwise subjected him or her to discrimination on the basis of his or her disability. *Duffy v. Riveland*, 98 F.3d 447, 455 (9th Cir. 1996); *Sanders v. Ryan*, 484 F.Supp.2d 1028, 1037 (D.Ariz. 2007) (*citing Duffy*).

2017830.6

HOOPER, LUNDY & BOOKMAN,
INC.

January 5, 2009
Page 6

"State prisons fall squarely within the statutory definition of 'public entity,' which includes 'any department, agency, special purpose district, or other instrumentality of a State or States or local government.'" *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 210 (1998) (citations omitted); *Armstrong v. Wilson*, 124 F.3d 1019, 1023 (9th Cir. 1997) (ADA applies to prisons operated by the state of California).[1]  Moreover, the provision of medical services to inmates are "benefits" to which the ADA applies. *Pennsylvania Dept. of Corrections,* 524 U.S. at 210*; Armstrong*, 124 F.3d at 1024.  Thus, under the ADA, an inmate with a "disability" may not be excluded from or denied prison health care services on the basis of his or her disability.

Moreover, on September 25, 2008, the President signed the ADA Amendments Act of 2008 into law.  Among other things, this legislation redefines the term "disability," sets forth rules of construction for the term "disability," and rejects prior Supreme Court case law that sought to narrow the definition of the term "disability" under the ADA.  Significantly, Congress found that the courts have incorrectly denied individuals the protections of the ADA.  ADA Amendments Act of 2008, Pub. L. No. 110-325, Sec. 2(a)(6), 110th Cong. (2008) ("ADA Amendments").  The ADA Amendments become effective on January 1, 2009.

## II.   Disabled Under the ADA

To receive the protections afforded by the ADA, an individual must suffer from a "disability."  Accordingly, the determination of whether an individual has a disability is key to any ADA analysis.

Under the ADA, the term disability means,

> [W]ith respect to an individual –
>
> (A) a physical or mental impairment that substantially limits one or more major life activities of such individual;
>
> (B) a record of such impairment; or

---

[1] The *Armstrong* litigation required the CDCR to develop a remedial plan to ensure compliance with the ADA.  The resulting remedial plan established the following policy: "No qualified inmate or parolee with a disability as defined in Title 42 of the United States Code Section 12102 shall, because of that disability, be excluded from participation or be denied the benefits of services, programs, or activities of the Department or be subjected to discrimination." (CDCR, *Armstrong Remedial Plan*, Jan. 31, 2001, p. 1)

2017830.6

HOOPER, LUNDY & BOOKMAN,

INC.

January 5, 2009
Page 7

(C) being regarded as having such an impairment.

42 U.S.C. § 12102(1) (2008).

### A.    Physical or Mental Impairment that Substantially Limits One Or More Life Activities

The first definition of disability stated above contains three elements: (1) physical or mental impairment; (2) major life activity and (3) substantially limits. 42 U.S.C. § 12102(2)(A) (2008); *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 194-95 (2002). Each element is interpreted by regulation.

1.    Physical or Mental Impairment

The term "physical or mental impairment" means:

> (1) Any physiological disorder, or condition, cosmetic disfigurement, or anatomical loss affecting one or more of the following body systems: neurological, musculoskeletal, special sense organs, respiratory (including speech organs), cardiovascular, reproductive, digestive, genito-urinary, hemic and lymphatic, skin, and endocrine; or
>
> (2) Any mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.

29 C.F.R. § 1630.2(h) (2008); *Fraser v. Goodale*, 342 F.3d 1032, 1038 (9th Cir. 2003).

2.    Major Life Activity

The term "major life activity" means: "functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning, and working." 29 C.F.R. § 1630.2(i) (2008). This list of major life activities is intended to be illustrative, rather than exhaustive. *Bragdon v. Abbott*, 524 U.S. 624, 639 (1998)

The ADA Amendments expand the definition of "major life activities." ADA Amendments, at Sec. 4(a)(2). Under the ADA Amendments, the term "major life activities" includes, but is not limited to, "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* Additionally, the term "major life activities" now includes the operation of "major bodily functions" including, but not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological,

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 8

brain, respiratory circulatory, endocrine, and reproductive functions." *Id.* Finally, the ADA
Amendments provide that the definition of disability "shall be construed in favor of broad
coverage of individuals under this Act, to the maximum extent permitted by the terms of the
Act." *Id.* at Sec. 4(a)(4)(A).

      3.    Substantially Limits

Regulation defines the term "substantially limits" to mean:

> (i) Unable to perform a major life activity that the average person
> in the general population can perform; or

> (ii) Significantly restricted as to the condition, manner or duration
> under which an individual can perform a particular major life
> activity as compared to the condition, manner, or duration under
> which the average person in the general population can perform
> that same major life activity.

29 C.F.R. § 1630.2(j)(1) (2008).

    Further, the following factors should be considered in determining whether an individual
is substantially limited: (1) the nature and severity of the impairment; (2) the duration or
expected duration of the impairment; and (3) the permanent or long-term impact of the
impairment. 29 C.F.R. § 1630.2(j)(2) (2008). Thus, "[w]hile the Act 'addresses substantial
limitations on major life activities, not utter inabilities' . . . it concerns itself only with limitations
that are in fact substantial." *Albertson's, Inc. v. Kirkingburg*, 527 U.S. 555, 565 (1999) (citations
omitted).

    However, the ADA Amendments make significant changes to the above-referenced
regulations and Supreme Court case law interpreting the term "substantially limits." First, the
ADA Amendments provide that the regulatory definition of "substantially limits" as
"significantly restricted" is "inconsistent with congressional intent, by expressing too high a
standard." ADA Amendments, at Sec. 2(a)(8). Second, the ADA Amendments reject the
Supreme Court's interpretation of "substantially limited" as set forth in *Toyota Motor Mfg.,
Kentucky, Inc. v. Williams*, 534 U.S. 184 (2002), because the interpretation required a greater
degree of limitation than was intended by Congress. *Id.* Specifically, it rejects the holdings in
*Toyota Motor Mfg., Kentucky, Inc.* that the terms "substantially" and "major" in the definition of
disability "need to be interpreted strictly to create a demanding standard for qualifying for
disabled," and that to be substantially limited in performing a major life activity "an individual
must have an impairment that prevents or severely restricts the individual from doing activities
that are of central importance to most people's daily lives." *Id.* at Sec. 2(b)(4). Finally, the
ADA Amendments found that as a result of these standards, lower courts have incorrectly found

HOOPER, LUNDY & BOOKMAN,

INC

January 5, 2009
Page 9

that people "with a range of substantially limiting impairments are not people with disabilities."
*Id.* at Sec. 4(2)(b)(5).

The ADA Amendments also set forth rules of construction for applying the term
"substantially limits." First, the ADA Amendments provide that an impairment that substantially
limits one major life activity need not limit other life activities to be considered a disability. *Id.*
at Sec. 4(a)(4)(C). Second, the ADA Amendments explain that an "impairment that is episodic
or in remission is a disability if it would substantially limit a major life activity. *Id.* at Sec.
4(a)(4)(D). Third, overturning Supreme Court precedent[2], Congress stated that the
determination as to whether an impairment substantially limits a major life activity should be
made without regard to the ameliorative effects of mitigating measures. *Id.* at Sec. 4(a)(4)(E).

## B. Record of Such Impairment

The second definition of "disability" provides that an individual has a disability if that
person has a record of an impairment that substantially limits a major life activity. 42 U.S.C. §
12102(1) (2008). Having a "record of such impairment" means an individual "has a history of,
or has been misclassified as having, a mental or physical impairment that substantially limits one
or more major life activities." 29 C.F.R. § 1630.2(k) (2008). Many types of records, including
educational, medical, and employment records, may contain information about an individual's
impairment so as to satisfy the definition of disability. Appendix to 29 C.F.R. § 1630.2(k)
(2008).

Having a "record of disability" was included in the definition of disability in part to
protect individuals who have recovered from a physical or mental impairment that previously
substantially limited them in a major life activity. Appendix A to 28 C.F.R. § 35.104; Appendix
B to 28 C.F.R. § 36.104. However, an individual need not establish any actual impairment to
have a record of such impairment. *Johnson v. American Chamber of Commerce Publishers, Inc.,*
108 F.3d 818, 819 (7th Cir. 1997).

Because the determination of whether an individual has a "record of impairment" is a
question of fact related to each individual, this memorandum does not endeavor to determine
whether individuals utilizing the proposed medical and mental health beds have a "record of
impairment."

---

[2] *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999)

HOOPER, LUNDY & BOOKMAN,
INC.

January 5, 2009
Page 10

## C.    Regarded As Having Such Impairment

The third definition of "disability" provides that an individual has a disability if that person is "regarded as having such an impairment." 42 U.S.C. § 12102(2)(C) (2008). This section is intended to protect people from a range of discriminatory actions that are based on myths, fears, and stereotypes about disability, which occur even when a person does not have a substantially limiting impairment. *Mastio v. Wausau Service Corp.*, 948 F. Supp. 1396, 1415 (E.D. MO. 1996.)

Although regulations interpret what is means to be "regarded as having a disability," the ADA Amendments substantially change the standard set forth in the regulations.[3] The ADA Amendments provide that an individual meets the requirement of being regarded as having such an impairment if "the individual establishes that he or she has been subjected to an action prohibited under this Act because of an actual or perceived physical or mental impairment whether or not the impairment limits or is perceived to limit a major life activity." ADA Amendments, at Sec. 4(a)(2). Thus, to be "regarded as disabled," an individual must show that he or she has been subjected to an action prohibited under the ADA because of an actual or perceived physical or mental impairment.

---

[3] 29 C.F.R. section 1630.2(l) provides that an individual is "regarded as having an impairment" if the individual:

> (1) Has a physical or mental impairment that does not substantially limit major life activities but is treated by a covered entity as constituting such limitation;
>
> (2) Has a physical or mental impairment that substantially limits major life activities only as a result of the attitudes of others toward such impairment; or
>
> (3) Has none of the impairments defined in paragraph (h) (1) or (2) of this section but is treated by a covered entity as having a substantially limiting impairment.

29 C.F.R. section 1630.2(b) defines "covered entity" as "an employer, employment agency, labor organization, or joint labor management committee."

HOOPER, LUNDY & BOOKMAN,
                  INC

January 5, 2009
Page 11

        The meaning of "regarded as having a disability" under the ADA Amendments requires a
showing that an individual has been subject to an action prohibited under the ADA.  ADA
Amendments, at Sec. 4(a)(3).  As such, an inmate's mere presence in one of the proposed
medical beds or mental health beds cannot, by itself, establish the elements of an individual who
is "regarded as" disabled.  Accordingly, this memorandum does not seek to determine whether
inmates who use the proposed medical and mental health beds are "regarded as" disabled.

### III.    The Proposed Medical Beds

        An estimated 99% of the proposed medical beds are for inmates who fall into one of three
categories of functional impairments or chronic diseases: (1) inmates that require extensive
assistance or are totally dependent in at least one ADL; (2) inmates who have a permanent
limitation in at least one PADL; and (3) inmates with cognitive problems with regard to
decision-making, memory and making themselves understood.  Abt Report, at p. 29.  Further,
each of these inmates must require a level of care that is provided in the medical beds (*e.g.*
specialized general population, low-acuity or high-acuity).  *Id.* at 8.

####         A.    Inmates that Require Extensive Assistance or Are Totally Dependent In At
                  Least One ADL

        As set forth below, inmates with functional impairments or chronic diseases that require
extensive assistance or are totally dependent in at least one ADL are disabled for the purposes of
the ADA, because they suffer from an impairment that substantially limits a major life activity.

                  1.    Impairment

        The universe of impairments that may afflict inmates who require extensive assistance or
are totally dependent in performing at least one ADL is broad, as illustrated in the Abt Report.
However, the definition of "impairment" is also broad, covering all physical conditions that
affect bodily systems. 29 C.F.R. § 1630.2(h)(1) (2008).  Thus, case law demonstrates a wide
breadth of medical conditions that qualify as "impairments."  For example, on Mar. 14-15, 2007,
CDCR medical staff conducted a census of all occupied medical beds in the prison system.  Abt
Report, at p. vii.  This census found that inmates in medical beds had an average of 3.8 disease
diagnoses.  *Id.* at 12.  The census found that the top ten diagnoses among inmates in medical
beds to be: (1) hypertension; (2); diabetes; (3) hepatitis C; (4) heart disease; (5) chronic
obstructive pulmonary disease; (6) major depression disorder; (7); cancer; (8) epilepsy; (9) low
back pain; and (10) anemia.  Each of these conditions constitutes an "impairment" under the
ADA. 29 C.F.R. § 1630.2(h); *Pennsylvania Dept. of Corrections v. Yeskey*, 524 U.S. 206, 208
(1998) (hypertension);  *Nawrot v. CPC Intern.*, 277 F.3d 896, 903 (7th Cir. 2002) (diabetes);
*Powell v. City of Pittsfield*, 221 F.Supp.2d 119, 145 (D.Mass. 2002) (hepatitis C); *Taylor v.
Nimock's Oil Co.*, 214 F.3d 957, 960 (8th Cir. 2000) (heart disease); *Ogborn v. United Food and
Commercial Workers Union, Local No. 881*, 305 F.3d 763, 767 (7th Cir. 2002) (depression);

HOOPER, LUNDY & BOOKMAN,

INC

January 5, 2009
Page 12

*Ellison v. Software Spectrum, Inc.*, 85 F.3d 187, 190 (5th Cir. 1996) (cancer); *Martinson v. Kinney Shoe Corp.*, 104 F.3d 683, 686 (4th Cir. 1997) (epilepsy); *Colwell v. Suffolk County Police Dept.*, 158 F.3d 635, 640-642 (2d Cir. 1998) (back pain). Anemia is an impairment, because it is a physiological disorder or condition affecting the hemic bodily system. 29 C.F.R. § 1630.2(h)(1) 2008. Similarly, chronic obstructive pulmonary disease is an impairment because it is a physiological disorder or condition affecting the respiratory system. *Id.*

Thus, "[a]n impairment need not appear on a specific list of disorders to qualify as a disability, nor must it affect those aspects of person's life that have a public or economic character." *Hines v. Chrysler Corp.*, 231 F.Supp.2d 1027, 1036 (D.Colo 2002). As such, inmates with functional impairments or chronic diseases that require placement in a medical bed that provides "ready access to health care service," have physiological disorders or conditions that affects a bodily system. 16 C.F.R. 1630.2(h). Moreover, given the broad definition of impairment and its applicability to any number of medical conditions, any condition rendering an inmate unable to perform one or more ADLs will also qualify as an impairment.

   2. Major Life Activities

Major life activities include, but are not limited to "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." ADA Amendments, at Sec. 4(a)(2). Additionally, the term "major life activities" also includes the operation of "major bodily functions" including, but not limited to, "functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory circulatory, endocrine, and reproductive functions." *Id.*

ADLs include grooming, dressing, bathing, toileting, ambulation and eating. Abt Report, at p. 23. Each of the above-referenced ADLs is a major life activity. ADA Amendments, at Sec. 4(a)(2) (major life activities include caring for oneself, eating, walking, bladder function, and bowel function); *Lawson v. CSX Transp. Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (eating is a major life activity); *Epstein v. Kalvin-Miller*, Inc., 100 F.Supp.2d 222, 225 (S.D.N.Y. 2000) (walking is a major life activity).

Moreover, an ADL is an "everyday routine[] generally involving functional mobility and personal care, such as bathing, dressing, toileting, and meal preparation." Stedman's Medical Dictionary, 28th Edition, Lippincott Williams & Wilkins (2006); *see also* 42 C.F.R. § 483.25 (2008) (activities of daily living include bathing, dressing, grooming, transferring and ambulating, toileting, eating, and use of speech, language, or other functional communication system). As such, ADLs are by their nature activities conducted daily to meet a person's basic needs (living).

2017830.6

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 13

        3.    <u>Substantially Limits</u>

Under existing regulation and case law,[4] the general test for substantial limitation is that one must be unable to perform a major life activity that the average person in the general population can perform, or be significantly limited in the condition, manner, or duration under which the individual can perform that activity as compared to an average person in the general population. 29 C.F.R. § 1630.2(i), (j)(1); *Webner v. Titan Distribution, Inc.*, 267 F.3d 828, 833 (8th Cir. 2001). Further, three factors should be considered in determining whether a limitation is substantial: (1) the nature and severity of impairment, (2) the duration or expected duration of impairment, and (3) the permanent or long-term impact of the impairment. 29 C.F.R. § 1630.2(j)(2); *Williams v. Philadelphia Housing Authority Police Dept.* 380 F.3d 751, 765 (3d Cir. 2004).

An inmate that requires "extensive assistance" or is "totally dependent" in one or more ADLs suffers from a substantial limitation. ADLs are "everyday routines generally involving functional mobility and personal care, such as bathing, dressing, toileting, and meal preparation. An inability to perform these renders one dependent on others, resulting in a self-care deficit." Stedman's Medical Dictionary, 28th Edition, Lippincott Williams & Wilkins, (2006). Individuals with "self-care deficits" are unable to perform major life activities that the "average person" can perform because they are unable to care for themselves. 29 C.F.R. § 1630.2(j)(1)(i) (2008). Thus, the need for "extensive assistance" or "total assistance" indicates a substantial limitation.

The substantiality of a limitation is also indicated by the level of care an inmate requires. Inmates who require "extensive assistance" or are "totally dependent" for one or more ADLs and require a high-acuity or low-acuity medical bed need a high level of care. High-acuity beds provide inmates a level of care analogous to the care provided at a skilled nursing facility. Abt Report, at p. 8. Inmates that require this level of care are substantially limited. *Wagner v. Fair Acres Geriatric Ctr.,* 49 F.3d 1002, 1010 (3d Cir. 1995) ("[n]o one would be able to meet a nursing home's admissions requirements in the absence of some handicapping condition necessitating nursing home care.").

Low-acuity beds provide inmates a level of care akin to the care provided at an assisted living facility. Abt Report, at p. 8. In general, "assisted living facilities" provide supportive services to patients in "carrying out activities of daily living, such as bathing, dressing, eating,

---

[4] The ADA Amendments significantly reduce the showing an impaired individual must make to demonstrate a "substantial limitation." As a result, existing case law requires a showing of "substantial limitation" that is greater than the showing required under the amended statute.

HOOPER, LUNDY & BOOKMAN,
        INC.

January 5, 2009
Page 14

getting in and out of bed or chairs, walking, going outdoors, using the toilet" and other activities.
12 U.S.C. § 1715w(b)(6). Low-acuity beds are also characterized by ready access to medical
care, including the availability of a Registered Nurse for 8 to 16 hours per day, the provision of
IV hydration, the provision of IV antibiotics, and wound care. Abt Report, at p. 8. Thus, an
assignment to a low-acuity bed indicates a substantial limitation marked by the need for medical
treatment and ready availability of skilled medical staff.

     Specialized general population medical beds provide ready access to medical care,
assistance with ADLs as needed, and exemption from the physical requirements of general
population inmates, such as climbing stairs. Assignment to a specialized general population bed
indicates limitations that are sufficiently substantial to necessitate separate, long-term housing
and readily available access to medical care. Abt Report, at p. 8. Moreover, the need for
separate, long-term housing and the chronic nature of the conditions afflicting inmates requiring
specialized general population beds (*e.g,* HIV/AIDS, vision impairments, hearing impairments,
frailty due to old age or medical condition) indicate that their impairments are expected to have a
permanent or long-term impact. 29 C.F.R. § 1630.2(j)(3)(i) (2008) (duration of the impairment
is a factor to consider in determining whether an impairment is substantially limiting); 29 C.F.R.
§ 1630.2(j)(3)(iii) (2008) (long-term impact of the impairment is a factor to consider in
determining substantial impairment). Thus, because inmates in specialized general population
beds require separate housing and ready access to medical care and because the nature of their
impairments are chronic, inmates in specialized general population medical beds suffer from
substantially limiting impairments.

### B.    Permanently Limited in PADLs

     A PADL is an activity that is necessary for independent functioning while in prison.
Williams, et al., *Being Old and Doing Time: Functional Impairments and Adverse Experiences
of Geriatric Female Prisoners*, The American Geriatrics Society, 2006. PADLs such as standing
for head count, hearing orders from staff, climbing stairs, and climbing to the top bunk are
analogous to the major life activities of standing, hearing, climbing stairs and getting in and out
of bed.

#### 1.    Impairment

     Inmates who cannot perform PADLs may be impaired because of conditions such as
strokes, arthritis, amputations, hearing loss or vision loss. As set forth above, inmates with
functional impairments or chronic diseases that require placement in a medical bed that provides
"ready access to health care service," have physiological disorders or conditions that affect a
bodily system. 16 C.F.R. 1630.2(h). Moreover, given the broad definition of impairment and its
applicability to any number of medical conditions, any condition rendering an inmate unable to
perform one or more PADLs will also qualify as an impairment.

HOOPER, LUNDY & BOOKMAN,
        INC

January 5, 2009
Page 15

### 2. Major Life Activity

A limitation in performing one or more PADLs indicates a limitation in one or more of the following activities: (1) standing, (2) walking, (3) hearing, (4) climbing stairs, and (5) getting in and out of bed. Each of the activities implicated by a limitation in a PADL is a major life activity. *Gallimore v. Newman Machine Co., Inc.*, 301 F.Supp.2d 431, 437 (M.D.N.C. 2004) (standing is a major life activity); *Epstein v. Kalvin-Miller, Inc.*, 100 F.Supp.2d 222, 225 (S.D.N.Y. 2000) (walking is a major life activity); *Sussle v. Sirina Protection Systems Corp.*, 269 F.Supp.2d 285, 299 (S.D.N.Y. 2003) (climbing stairs qualifies as a major life activity); 29 C.F.R. § 1630.2(i) (hearing is a major life activity). "Major life activities refer to those activities that are of central importance to daily life." *Toyota Motor Mfg., Kentucky, Inc. v. Williams*, 534 U.S. 184, 197 (2002). Under this definition, the ability to get in and out of bed is a major life activity.

The PADL of placing oneself on the floor for alarms does not correspond to an explicitly recognized major life activity, but may be akin to the major life activity of "bending," which is included in the ADA Amendments' definition of a major life activity. ADA Amendments, at Sec. 4(a)(2). Further, the "determination of whether an individual has a disability is not necessarily based on the . . . impairment the person has, but rather on the effect of that impairment on the life of the individual." *Sutton v. United Airlines, Inc.*, 527 U.S. 471, 482 (1999). The inability of an inmate to properly respond to alarms has a real and dramatic effect on that individual's life. Thus, the PADL of placing oneself on the floor is a major life activity for an inmate.

### 3. Substantially Limits

As noted above, one category of medical beds is reserved for inmates with a permanent limitation in a PADL. Although the term "permanently limited" does not necessarily equate to the term "substantially limited" for the purposes of the ADA, the determination that an inmate requires the level of care provided in the proposed medical beds indicates the substantially limiting nature of the inmate's impairment. The determination that an inmate requires placement in a medical bed because of his "permanent limitation" indicates that the limitation is substantially limiting.

With regard to the PADL of standing for count, existing case law requires a showing that the impairment restricts an individual's ability to stand as compared to the average person. For example, in *Gallimore v. Newman Machine Co., Inc.*, 301 F.Supp.2d 431, 437 (M.D.N.C. 2004), the court determined that an employee was not substantially limited in the major life activity of standing even though he could not stand for more than 45 minutes as result of a hip replacement. The court reasoned that such limitation did not substantially restrict the employee in his ability to stand as compared to the average person in the general population. *Id.* at 446. Unlike the employee in *Gallimore*, those inmates who are permanently limited in the PADL of standing for count are substantially restricted in their ability to stand as compared to an average inmate that is

HOOPER, LUNDY & BOOKMAN,
    INC

January 5, 2009
Page 16

able (and required) to stand for count. This deficiency is demonstrated by an inmate's placement in a medical bed, because placement in a medical bed indicates an impairment that is sufficiently severe to require removal from the general prison population. Thus, inmates placed in long-term medical beds because of a functional impairment or chronic disease that "permanently limits" their ability to stand are substantially limited in a major life activity.

    With regard to the PADLs of getting to the dinning hall and climbing stairs, existing case law establishes that walking long distances or climbing stairs without getting fatigued are "moderate limitations on major life activities [that] do not suffice to constitute a 'disability' under the ADA." *Weber v. Strippit, Inc.*, 186 F.3d 907, 914 (8th Cir.1999). However, an inmate that has a "permanent limitation" in the PADLs of walking and climbing stairs that is sufficiently severe to require separate housing in a long-term medical bed is more than "moderately" limited in his or her ability to walk or climb stairs. This is because an inmate that only has a moderate limitation in the PADLs of getting to the dining hall or climbing stairs would not qualify for placement in a long-term medical bed. Abt Report, at p. 8 ("if need for supervision or limited assistance is the inmate's only reason for not being in regular GP, then that inmate can be in sheltered housing with ADLs provided by cellie, buddy system, or inmate helper program"). Accordingly, inmates that are "permanently limited" in the PADLs of getting to the dining hall and climbing stairs and also require the level of care provided in a medical bed are substantially limited.

    An inmate that has a permanent limitation with regard to the PADL of hearing orders must demonstrate substantial hearing loss. "A hearing loss approaching deafness is 'a physical or mental impairment that substantially limits one or more of [her] major life activities.'" *Bryant v. Better Business Bureau of Greater Maryland, Inc.*, 923 F.Supp. 720, 743 (D.Md. 1996) (citations omitted). As noted above, the severity of an inmate's "permanent limitation" is demonstrated by the inmate's need for separate long-term housing in a medical bed. For example, an inmate with only moderate hearing loss would not qualify for a medical bed at even the lowest level of care (specialized general population bed) because that individual would not be suffering a hearing impairment "preventing residence" in the regular population. Abt Report, at p. 8. As a result, placement in a medical bed indicates a substantially limiting hearing impairment.

    Moreover, the ADA Amendments significantly reduce the showing an impaired individual must make to demonstrate a substantial limitation. The ADA Amendments included the following findings and purposes related to the interpretation of the term "substantially limited":

       •    "[T]he case of *Toyota Motor Mnf., Kentucky, Inc. v. Williams,* 534 U.S. 184 (2002), interpreted the term "substantially limits" to require a greater degree of limitation intended by Congress." ADA Amendments, at Sec. 2(a)(7).

HOOPER, LUNDY & BOOKMAN,
ᴵᴺᶜ

January 5, 2009
Page 17

- "[T]he current Equal Opportunity Employment Opportunity Commission ADA regulations defining the term 'substantially limits' as 'significantly restricted' are inconsistent with congressional intent by expressing too high a standard." ADA Amendments, at Sec. 2(a)(8).

- One purpose of the Act is to "reject the requirement enunciated by the Supreme Court in *Sutton v. United Air Lines, Inc.*, 527 U.S. 471 (1999), and its companion cases that whether an impairment substantially limits a major life activity is to be determined with reference to the ameliorative effects of mitigating measures." ADA Amendments, at Sec. 2(b)(2).

The case law discussed above is based on Supreme Court precedent that has been rejected by Congress as requiring too high of a showing to demonstrate substantial limitation. ADA Amendments, at Sec. 2(a). Thus, even if there were some question as to whether the care offered in specialized general population beds is sufficient to demonstrate substantial limitation under exiting case law (which there is not), such a showing is certain to satisfy the lower standard needed to establish the "substantially limits" prong under the ADA Amendments. *Id.* at Sec. 3(a)(4(A) ("The definition of disability in this Act shall be construed in favor of broad coverage of individuals under this Act, to the maximum extent permitted by the terms of this Act.").

    **C.**   <u>**Cognitive Disability**</u>

Cognitive impairments in decision-making, memory, and making oneself understood may, either by themselves or in conjunction with other medical problems, substantially limit an individual in major life activities. Although not all cognitive problems are severe enough to constitute disabilities under the ADA, any cognitive problem that either by itself or in conjunction with one or more other medical problems also requires the level of care provided in a high-acuity medical bed, a low-acuity medical bed, or a specialized general population bed qualifies the inmate as disabled under the ADA.

    1.   <u>Impairment</u>

A cognitive deficit is a "kind of organic brain syndrome," and "an organic brain syndrome is listed as an example of a mental or psychological disorder which constitutes an impairment under the ADA." *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.*, 115 F.Supp.2d 127, 131 (D.Mass. 2000). As such, cognitive deficits, such as memory loss, impaired decision-making and impaired communication skills, are impairments under the ADA.

    2.   <u>Major Life Activity</u>

As discussed above, the ADA Amendments provide a revised definition of "major life activity." The new definition of "major life activities" includes activities such as speaking,

HOOPER, LUNDY & BOOKMAN,
INC.

January 5, 2009
Page 18

learning, concentrating, thinking, and communicating. ADA Amendments, at Sec. 4(a)(2). The definition also provides that the operation of major bodily functions, including neurological function and brain function, are major life activities. *Id.* An individual with impaired decision-making, memory loss and impaired communication skills is limited in the major life activities of thinking, concentrating and communicating and also has an impairment in neurological or brain function. *Brown v. Cox,* 286 F.3d 1040, 1045 (8th Cir. 2002) ("The ability to perform cognitive functions on the level of an average person certainly falls within" the definition of major life activity.). As a result, cognitive deficiencies, such as impaired decision-making, memory loss, and difficulty making oneself understood, affect major life activities. *Id.*

      3.   Substantially Limits

An inmate who has a cognitive problem that by itself requires placement in a medical bed has a cognitive problem that is substantially limiting. To be "substantially limiting" a cognitive deficiency must be severe enough that it causes the individual to be unable to perform a major life activity that an average person can perform. 29 C.F.R. § 1630.2(i), (j)(1) (2008); *Webner v. Titan Distribution, Inc.,* 267 F.3d 828, 833 (8th Cir. 2001). Thus, a cognitive problem is not a disability if it is merely "mild, reversible, and short-lived." *Whitney v. Greenberg, Rosenblatt, Kull & Bitsoli, P.C.,* 258 F.3d 30, 34 (1st Cir. 2001). However, a mild cognitive problem in combination with one or more other medical problems may qualify the individual as disabled under the ADA.

The level of care provided to inmates with cognitive problems in medical beds indicates either the substantially limiting nature of the cognitive problem itself or the substantially limiting nature of the cognitive problem in conjunction with one or more other medical problems. Thus, an inmate with a cognitive problem who requires placement in a high-acuity medical bed is likely to suffer from cognitive impairments alone or in conjunction with one or more other medical problems that cause the individual to be unable to perform a major life activity that an average person can perform and to require the medical care available in a high-acuity bed. Abt Report, at p. 17. Inmates with cognitive problems who suffer from this level of impairment are unable (*e.g.,* substantially limited) to perform major life activities that the average person can perform. 29 C.F.R. § 1630.2(j) (2008) (Stating that the term substantially limited means either unable to perform a major life activity that the average person in the general population can perform or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity). As such, individuals with cognitive impairments who require the level of care provided in high-acuity medical beds are substantially impaired.

An inmate with cognitive problems who requires placement in a low-acuity medical bed is likely to suffer from cognitive problems that either by themselves or in combination with other medical problems cause the inmate to be unable to perform major life activities that the average

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 19

person can perform but to require only the medical care available in a low-acuity medical bed .
Abt Report, at p. 17; 29 C.F.R. § 1630.2(j)(1) (2008). However, the presence in a long-term
medical bed signifies cognitive impairments that are permanent or have long-term impact either
by themselves or in conjunction with one or more other medical problems. 29 C.F.R. §
1630.2(j)(3)(i) (2008) (duration of the impairment is a factor to consider in determining whether
an impairment is substantially limiting); 29 C.F.R. § 1630.2(j)(3)(iii) (2008) (long-term impact
of the impairment is a factor to consider in determining substantial impairment). As such,
individuals with cognitive impairments that require the level of care provided in low-acuity
medical beds are still substantially impaired, even if their medical needs are not as great as
individuals with cognitive impairments who are assigned to a high-acuity medical bed.

An inmate with cognitive problems who requires placement in a specialized general
population medical bed, although not as severely impaired as inmates that require treatment in a
high-acuity or low-acuity medical bed, still suffers from cognitive problems that either by
themselves or in conjunction with other medical problems prevent them from residing in the
general prison population. *Id.* at p. 8. Thus, these impairments cannot in their totality be
characterized as "mild, reversible or short lived." *Whitney v. Greenberg, Rosenblatt, Kull &
Bitsoli, P.C.*, 258 F.3d 30, 34 (1st Cir. 2001). The inmate's presence in a long-term medical bed
signifies cognitive impairment that by itself or in conjunction with other medical problems is
permanent or has long-term impact. 29 C.F.R. § 1630.2(j)(2) (2008) (Stating that the nature and
severity of the impairment, the duration or expected duration of the impairment and the
permanent or long-term impact, or the expected permanent or long-term impact, of or resulting
from the impairment should be considered in determining whether an individual is substantially
limited in a major life activity). As such, placement in a specialized general population bed
signifies that an inmate has a substantially limiting cognitive impairment or cognitive
impairment combined with other medical problems.

In sum, the determination to place an inmate with a cognitive problem in a long-term
medical bed signifies that an inmate has an impairment or combination of impairments that
substantially limits major life activities. As such, these inmates suffer from a "disability" under
the ADA.

## IV.    Mental Health Beds

### A.    Enhanced Outpatient Program ("EOP") Beds

Approximately ninety percent of the proposed mental health will be EOP beds. Plan of
Action, p. 27. An inmate must suffer from a severe mental impairment to be eligible for
MHSDS treatment at the EOP level of care. CDCR Report, at p. 12-4-1.

HOOPER, LUNDY & BOOKMAN,
INC.

January 5, 2009
Page 20

      1.     Impairment

By definition, inmates that are eligible for MHSDS services and require treatment at the EOP level of care suffer from a "mental impairment." A mental or psychological disorder, including emotional or mental illness, qualifies as a physical or mental impairment. 29 C.F.R. § 1630.2(h)(2) (2008) (Mental impairment means any "mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."). As described above, to receive treatment through the MHSDS, an inmate must either be diagnosed with a "serious mental disorder" or be suffering from an acute episode in which mental health intervention is necessary to "protect life" and/or "treat significant disability/dysfunction" in an individual diagnosed or suspected of having a mental disorder. CDCR Report, at p. 12-1-5. Each of the mental disorders that qualify for MHSDS treatment are conditions that qualify as mental impairments. *Franklin v. U.S. Postal Service*, 687 F.Supp. 1214, 1218 (S.D.Ohio 1988) (schizophrenia); *Den Hartog v. Wasatch*, 129 F.3d 1076, 1081 (bi-polar disorder); *Olsen v. General Elec. Astrospace*, 966 F.Supp. 312, 316 (D.N.J. 1997) (depression and other mental disorders may be disabilities under the ADA). As a result, inmates in the EOP program suffer from mental health impairments.

      2.     Major Life Activities

Inmates in the EOP program require assistance with ADLs, including eating, grooming, personal hygiene, and ambulation, as a result of a serious mental disorder. CDCR Report, at p. 12-1-6. Eating, grooming, personal hygiene and ambulation are each major life activities. ADA Amendments, at Sec. 4(a)(2) (eating, walking and caring for oneself are major life activities); *Lawson v. CSX Transp. Inc.*, 245 F.3d 916, 923 (7th Cir. 2001) (eating is a major life activity); *Epstein v. Kalvin-Miller*, Inc., 100 F.Supp.2d 222, 225 (S.D.N.Y. 2000) (walking is a major life activity). As such, inmates that require treatment at the EOP level of care have an impairment that adversely affects their ability to perform a major life activity. *Brady v. Wal-Mart Stores, Inc.*, 43 F. Supp.2d 652, 656 (S.D.Miss 1998) (if "a person can perform normal activities of daily living despite his alleged impairment, then the individual is not substantially limited in a major life activity").

      3.     Substantially Limits

Inmates that require an EOP level of care suffer from "acute onset or significant decompensation of a serious mental disorder characterized by increased delusional thinking, hallucinatory experiences, marked changes in affect, and vegetative signs with definitive impairment reality testing and or judgment." CDCR Report, at p. 12-1-6 (emphasis added). These conditions generally result in a Global Assessment Functioning ("GAF") score of less than 50. *Id.* "A GAF score is used to report 'the clinician's judgment of the individual's overall level of functioning.' GAF scores of 41 to 50 reflect '[s]erious symptoms (*e.g.*, suicidal ideation, severe obsessional rituals, frequent shoplifting) OR any serious impairment in social,

HOOPER, LUNDY & BOOKMAN,
            INC

January 5, 2009
Page 21

occupational, or school functioning (*e.g.*, no friends, unable to keep a job).'" *Hudson v. Barnhart*, 345 F.3d 661, 663 n.2 (8th Cir. 2003) (quoting American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000). A GAF score of 30 to 40 indicates that an individual has some impairment in reality testing or communication, or major impairment in several areas such as work, school, family relations, judgment, thinking, or mood. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed. Text Revision 2000).

Inmates eligible for the EOP level of care generally exhibit an inability "to program in work or educational assignments, or other correctional activities," an "inability to respond to staff directions," or "an impairment in the activities of daily living." *Id.* at 12-1-6. These observed functional impairments further demonstrate an inmate's inability to perform major life activities that the "average person" can perform. 29 C.F.R. § 1630.2(j) (2008).

EOP patients also tend to have "serious mental illness that is of long duration with moderate to severe and persistent functional impairments." CDCR Report, at p. 12-1-6. Thus, an inmate's presence in the EOP program indicates a mental impairment of "long duration" marked by "persistent" functional impairments. Accordingly, the duration and long-term impact of an EOP patient's severe mental impairment indicates that the impairment is substantially limiting. 29 C.F.R. § 1630.2(j)(3)(i) (2008) (duration of the impairment is a factor to consider in determining whether an impairment is substantially limiting); 29 C.F.R. § 1630.2(j)(3)(iii) (2008) (long-term impact of the impairment is a factor to consider in determining substantial impairment).

Ultimately, inmates that qualify for the EOP must exhibit behavior, caused by a severe mental impairment, that results in prison medical staff concluding that the inmate is not capable of performing the tasks necessary to survive in the general inmate population. Thus, inmates that qualify for the EOP level of care necessarily suffer from a "disability" under the ADA.

## B.    Intermediate Care Facilities

Referral to an inpatient program, like an Intermediate Care Facility, indicates that the inmate is so severely disturbed or suicidal that their treatment cannot be met by a MHSDS program. CDCR Report, at p. 12-6-1.

### 1.    Impairment

To be admitted to an Intermediate Care Facility, an inmate must have a "major (serious) mental disorder with active symptoms." CDCR Report, at p. 12-6-7. As discussed above, a "major mental disorder" is an impairment. 29 C.F.R. § 1630.2(h)(2) (2008) (Mental impairment means any "mental or psychological disorder, such as mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities."). As such, a serious

2017830.6

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 22

mental disorder requiring inpatient care at an Intermediate Care Facility is an impairment under
the ADA.

          2.     <u>Major Life Activity</u>

Inmates that require the level of care provided at the Intermediate Care Facility have
demonstrated that they are "unable to adequately function within the structure of the CDCR EOP
Level of Care" or have "serious to major impairment of functioning in most life areas." CDCR
Report, at p. 12-6-7. Both existing regulations and the ADA Amendments provide that caring
for oneself is a major life activity. 29 C.F.R. § 1630.2(i); ADA Amendments, at Sec. 4(a)(2).
Inmates that require the level of care provided in Intermediate Care Facilities have generally
demonstrated an impairments in most life areas, including performing ADLs and
communicating, even with the assistance provided at the EOP level of care. As such, placement
in an inpatient facility indicates that an inmate suffers from mental impairments that affect major
life activities.

          3.     <u>Substantially Limited</u>

Intermediate Care Facilities provide "highly structured inpatient psychiatric care with 24-
hour nursing supervision due to a major mental disorder." CDCR Report, at p. 12-6-7.
Moreover, Intermediate Care Programs are designed to provide "longer-term" treatment for
inmates. *Id.* Inmates placed in Intermediate Care Facilities are "unable to adequately function
within the structures of the CDCR EOP Level of Care." *Id.* Accordingly, inmate placed in
Intermediate Care Facility can neither function at the level of an average inmate, nor even at the
level of an inmate that has been removed from the general population and placed in the EOP
program due to a mental impairment. 29 C.F.R. § 1630.2(j)(1)(i) (substantially limited means
"[u]nable to perform a major life activity that the average person in the general population can
perform"). The inability to adequately function, even with the substantial assistance provided at
the EOP level of care, demonstrates that inmates placed in Intermediate Care Facilities are
substantially limited by their mental impairments.

    **C.**    **<u>Acute Mental Health Beds</u>**

          1.     <u>Impairment</u>

Inmates placed in acute mental health beds suffer "impairment of functioning with signs
and symptoms that may be attributed to either acute major mental disorder or an acute
exacerbation of a chronic major mental illness." CDCR Report, at p. 12-6-2. Both "major
mental disorder[s]" and "chronic major mental illness" fall within the ADA's definition of
mental impairment because they are mental or psychological disorders. *See* 29 C.F.R. §
1630.2(h)(2) (2008) (Mental impairment means any "mental or psychological disorder, such as

HOOPER, LUNDY & BOOKMAN,
INC

January 5, 2009
Page 23

mental retardation, organic brain syndrome, emotional or mental illness, and specific learning disabilities.").

### 2. Major Life Activities

An inmate that requires placement in an acute mental health bed has symptoms that render the inmate unable to carry out the normal routines of the institution, or unable to provide for his basic needs or use the supportive treatment resources available to him. CDCR Report, at p. 12-6-2. An inmate that cannot "provide for his basic needs" or adequately carry out the normal routines of this institution is limited in a major life activity. 29 C.F.R. § 1630.2(i); ADA Amendments, at Sec. 4(a)(2) (caring for oneself is a major life activity).

### 3. Substantially Limited

An inmate requiring treatment in any CDCR inpatient program exhibits "marked impairment and dysfunction" in ADLs, communication and social interaction. CDCR Report, at p. 12-6-2. As such, inmates placed in an acute mental health bed generally require significant assistance with ADLs. *Id.* at 12-1-6. The need for extensive assistance to accomplish ADLs demonstrates an inability to perform tasks an average person can perform. 29 C.F.R. § 1630.2(j) (2008) (Stating that the term substantially limited means either unable to perform a major life activity that the average person in the general population can perform or significantly restricted as to the condition, manner or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity). Thus, inmates placed in acute mental health beds are substantially limited.

However, treatment in acute mental health beds is generally limited to 30 to 45 days. CDCR Report, at p. 12-6-2. Case law prior to the enactment of the ADA Amendments found that "intermittent, episodic impairments are not disabilities." *Vande Zande v. Wisconsin Dep't of Administration*, 44 F.3d 538, 542 (7th Cir. 1995); *McDonald v. Com. of Pa., Dep't of Public Welfare*, 62 F.3d 92, 96 (3d Cir. 1995); *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 380 (3d Cir. 2002). Accordingly, one may argue that an inmate that requires treatment in the Acute Psychiatric Program is not disabled because his impairment is akin to a "broken leg" (*e.g.,* temporary).

However, the ADA Amendments provide that "an impairment that is episodic or in remission is a disability if it would substantially limit a major life activity when active." ADA Amendments, at Sec. 4(a)(4)(D). Moreover, there is no set number of days that defines whether an impairment is or is not a disability under the ADA. Duration is but one factor for a court to consider, because the determination of whether an individual has a disability is an individualized inquiry." *McWilliams v. Latah Sanitation, Inc.*, 554 F.Supp.2d 1165, 1174 (D.Idaho 2008).

2017830.6

HOOPER, LUNDY & BOOKMAN,
            INC

January 5, 2009
Page 24


Thus, the ADA Amendments and recent case law contemplate an ongoing or chronic condition that is characterized by acute episodes of substantial impairment as a disability.

Accordingly, provided that an inmate's mental health crisis is a manifestation of an ongoing mental illness, that individual is disabled under the ADA.