# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF CALIFORNIA

## AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    *Plaintiffs,*<br>    v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    *Defendants.* | Case No. CIV S-90-0520 LKK JFM P |
| MARCIANO PLATA, et al.,<br>    *Plaintiffs,*<br>    v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    *Defendants.* | Case No. C01-1351 TEH |
| CARLOS PEREZ, et al.,<br>    *Plaintiffs,*<br>    v.<br>MATTHEW CATE, et al.,<br>    *Defendants.* | Case No. C 05-05241 JSW |
| JOHN ARMSTRONG, et al.,<br>    *Plaintiffs,*<br>    v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    *Defendants.* | Case No. C94-2307 CW |

## RECEIVER'S REPORT ON OPTIONS FOR

## LONG-TERM CARE BED CONSTRUCTION

FUTTERMAN &
DUPREE LLP

# I.

## INTRODUCTION

On November 18, 2008, the Receiver provided copies of his long-term care ("10,000 Bed" Project) Facility Program Statement, Version 3 (FPS v. 3), to the public and counsel for parties in *Plata, Coleman, Armstrong* and *Perez* class actions. He also posted the documents on the California Prison Health Care Services (CPHCS) website to allow opportunity for comments, questions, and concerns. Then, for comparison purposes, on December 22, 2008, the Receiver provided copies of the out-of-date Facility Program Statement, Version 2 (FPS v. 2), to the public and counsel and posted the documents on the CPHCS website.[1]   The FPS v. 3 response deadline was established for Thursday, February 5, 2009, and as of the deadline, the Receivership received four responses.   Three of four contained comments only.  A fourth substantive response submitted by Taxpayers for Improving Public Safety (TIPS) posed several questions.  Therefore, in order to respond to TIPS, a meeting was scheduled on January 27, 2009, with TIPS representatives, Receiver's staff, and URS/Bovis Lend Lease Joint Venture (URS/Bovis) staff. During the initial meeting, a broad overview of facility plant and rehabilitative functions was provided.  A second meeting was held on February 4, 2009, to allow TIPS representatives and the Receiver's clinical staff to discuss the clinical elements of the "10,000 Bed" Project.  Another meeting is scheduled for the near future with TIPS representatives, Receiver's staff, and URS/Bovis staff to further discuss operational aspects of the planned facilities.

On Friday, January 30, 2009, the Legislative Analyst's Office (LAO) issued a report, one portion of which dealt with the Receiver's proposed long-term bed construction program.  The LAO set forth the following issues for legislative consideration:

1)    Need for 10,000 new beds remains uncertain.

2)    Cost estimates for new facilities remain high.

3)    Costs to operate new facilities are significant.

4)    Existing funding not used.

5)    No formal security assessment by CDCR.

---

[1] The current FPS v. 3, the out-of date FPS v. 2, and all supporting documents can be accessed at www.cphcs.ca.gov.

FUTTERMAN & DUPREE LLP

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION

6)      Programming needs at facilities undetermined.

The Receiver agrees with the LAO; further analysis and decision-making is necessary concerning exactly which elements of the program should proceed to construction at this time.

Pulitzer, Bogard & Associates is currently under contract with the California Department and Corrections and Rehabilitation (CDCR) to provide an independent, unbiased analysis of the FPS v. 3 and the Receiver's construction upgrade plans.  On December 9, 2008, members of the Receiver's staff and key URS/Bovis staff met with Pulitzer, Bogard & Associates and CDCR representatives to provide an overview of the FPS v. 3.  Thereafter, the Receiver, Receiver's staff, and key URS/Bovis staff met with Pulitzer, Bogard & Associates and CDCR representatives on February 3 and 4, 2009.  This intensive series of meetings provided CDCR and their consultant the opportunity to review in-depth and pose questions regarding the FPS v. 3.  The Receiver found the input helpful.  The Receiver has requested that Pulitzer, Bogard & Associates continue to assist his construction management firm concerning the "target value design" process that is proceeding at this time.

Given the input from Pulitzer, Bogard & Associates, the public comments on the FPS v. 3, the LAO report, and now that the design-phase of the long-term care project reaches completion, it is appropriate to provide the *Plata*, *Coleman*, *Armstrong* and *Perez* Courts with a history of the Receiver's efforts to establish cost-effective housing and treatment for those prisoners who require long-term care.  In addition, it is important to explain the construction options that, because of the Receiver's efforts, are now available.  Therefore, this report is filed with the *Plata*, *Coleman*, *Armstrong* and *Perez* Courts.[2]

## II.

## HISTORY OF THE LONG-TERM CARE CONSTRUCTION PROJECT

Numerous reports and unopposed motions document the history of the Receiver's efforts to provide adequate clinical space for 5,000 chronically ill, disabled, and aged California prison inmates.

---

[2] This report deals with long-term bed construction only. The Receiver will issue a separate report concerning his facility upgrade program that will provide construction options depending on whether medical alone or CDCR requested mental health and dental upgrades are included. The Receiver anticipates filing this report within fifteen business days.

1   The program commenced in late 2006, after Governor Schwarzenegger's "Special

2  Legislative Session" failed to achieve significant prison reform, when an interdisciplinary

3  program was initiated by the Receiver to ascertain whether there were existing health care

4  facilities suitable for the delivery of prisoner medical care within the State of California.  A team

5  of custody, clinical, and construction personnel traveled to a number of locations within the State

6  to determine whether abandoned correctional facilities, closed hospitals, and similar buildings

7  could be utilized for long-term care services or converted to the equivalent of a Correctional

8  Treatment Center (CTC).  After months of reviews, including discussions with CDCR and other

9  State officials, and evaluations of several county facilities, the Receiver concluded that there are

10  no "quick fixes" concerning the need for a significant number of long-term care beds.  Some

11  facilities recommended for the Receiver's evaluation had serious structural defects, including the

12  need for an entire retrofit to meet current earthquake standards; some sites presented cost

13  prohibitive barriers to renovation; while other sites were not suitable for prisoner confinement,

14  presenting a threat to public safety.  Therefore, the Receiver and his staff concluded that to

15  address the long-term care needs of California's 170,000 prisoners in the most cost-effective

16  manner possible, additional construction is necessary at existing CDCR sites.  CDCR officials

17  agreed with this decision.

18   For example, a request was submitted to CDCR Secretary, James Tilton, to identify

19  potential sites and a program to construct 5,000 medical beds (and 5,000 mental health beds) to

20  be located at up to seven sites.[3]  Mr. Tilton's responsive submission marked the beginning of an

21  almost two-year cooperative planning process between CDCR and the Receiver, a process that

22  was terminated in late 2008 by Governor Schwarzenegger.  Due to the lack of reliable CDCR

23  data concerning the most basic health care information, the Receiver contracted with Abt

24  Associates Inc. to assess the specific health care needs of California inmates.  This process was

25  necessary to ensure that no more clinical space and beds would be constructed than necessary, a

26  process never before engaged by CDCR.

27

28  [3] For additional information, refer to pages 27-28 and Exhibit 8 of the Receiver's Third Bi-Monthly filed on December 5, 2006.

FUTTERMAN & DUPREE LLP

3

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION

1    On January 24, 2007, the Receiver issued a Request for Qualifications soliciting a

2    program manager to provide design and management services for the long-term care facilities.

3    On March 15, 2007, a team of firms (URS/Bovis Lend Lease Joint Venture; Lee, Burkhard, and

4    Liu; and Robert Glass and Associates) was selected.[4]  Thereafter, additional, detailed information

5    regarding the progression of the plans to construct long-term health care facilities was provided

6    in the Receiver's periodic reports to the court.[5]

7    During the past two years, the Receiver sought two waivers of State law.  On April 17,

8    2007 the Receiver filed a master application for an order (1) waiving the requirement that the

9    Receiver comply with certain State contracting procedures with respect to certain projects

10   specified therein; and (2) approving substituted notice, bidding and contract award procedures for

11   such projects (the "Master Application").  In that Master Application, the Receiver set out in

12   some detail the complex web of State contracting procedures impeding his ability to fulfill his

13   court-ordered mandate to provide constitutional medical care to the State's prisoners, and his

14   proposed process to streamline procedures to accomplish the goals set out for him.  Among other

15   projects, the Master Application sought waivers of law for contracts related to program

16   management and preliminary planning for the construction of multi-purpose medical facilities for

17   "the thousands of inmates with chronic illness, frailty and/or functional impairments."  Master

18   Application at p. 16:27-17.

19   On June 4, 2007, the Court approved the Receiver's Master Application.  In that Order,

20   the Court noted "that absent a waiver, the Receiver would ultimately be constrained by the very

21   burdens that have impeded the State in dealing with the undisputed challenges in the prison

22   health care system.  It would indeed be a hollow gesture to appoint a Receiver only to let him to

23   become entangled in the same bureaucratic quagmire that has thwarted prior efforts to provide

24   constitutional medical care."  June 4, 2007 Order at p. 4:23-5 (quotations and citations omitted).

25

26

27
[4] Refer to the Receiver's March 20, 2007 Fourth Quarterly Report, pages 19 – 21.
[5] Refer to the Receiver's Fifth Quarterly Report filed June 20, 2007, page 7; Sixth Quarterly Report filed September 25, 2007, page 79; Seventh Quarterly Report filed March 14, 2008, page 47; Eighth Quarterly Report filed June 17, 2008, page 40; Ninth Quarterly Report filed September 15, 2008, page 62-65; and the Tenth Tri-Annual Report filed January 15, 2009, pages 92-99.

28

FUTTERMAN &
DUPREE LLP

1   The Court also approved a streamlined contracting procedure for the Receiver's use in

2   connection with the projects listed in the Master Application.

3           Following the June 4, 2007 Order, the Court issued several supplemental waiver orders,

4   including the July 2, 2008 Order Granting Receiver's Supplemental Application No. 6 for Order

5   Waiving State Contracting Statutes.  The July 2, 2008 Order authorized the next phase of the

6   Receiver's construction efforts—the "design and construction planning for the Receiver's

7   "10,000 Bed" Project to construct facilities to house and treat approximately 10,000 inmates

8   whose medical and/or mental health conditions require separate housing to facilitate appropriate

9   access to necessary health care services." July 2, 2008 Order at p. 1:21.  The State did not object

10  to either waiver request.

11          Each waiver was requested through a formal motion, and each provided the parties with

12  the opportunity for comments, questions and concerns.  All waivers were limited to the

13  development of design, site-selection, creation of possible integrated clinical delivery systems,

14  and cost effective correctional health care construction programming.  Now that the development

15  process is almost complete, and the options to move forward have been clarified, it is appropriate

16  to present these choices for consideration to the parties and the courts.

17                                              **III.**

18                              **PROJECT TRANSPARENCY**

19          As detailed above, there have been numerous public reports and formal waivers prepared

20  and filed by the Receiver, and numerous meetings over a two-year period with representatives

21  from CDCR, the Governor's Office, and Attorney General regarding the size, scope, and

22  elements of the long-term care construction project.  The Receiver's efforts and coordination has

23  been transparent to a degree which far exceeds normal State processes.  Examples of the team

24  work exhibited by the Receiver and his staff during this nearly two-year-long process include but

25  are not limited to the following:

26          1)      Bi-weekly construction meetings with representatives from the Governor's Office,

27                  CDCR construction officials, and the Receiver's construction management firm.

28

Futterman &
Dupree LLP

2)    Numerous formal and informal construction meetings with the court-appointed representatives in Plata, Coleman, Perez, and Armstrong.

3)    The filing of numerous Bi-Monthly, Quarterly, and Tri-Annual Reports to the court which discuss, in detail, the Receiver's construction program.

4)    The posting of numerous reports and construction related documents on the Receiver's website.

5)    The filing of the (former Receiver's) November 2007 Plan of Action and the filing of Receiver Clark Kelso's June 6, 2008 Turnaround Plan of Action.  During the six-month period between filing of the initial Plan of Action and the Turnaround Plan of Action, the Receiver engaged in a lengthy process soliciting and evaluating public comments concerning the draft Plans and meeting with the *Plata* Court's Advisory Board.  The meetings with the Advisory Board included participation by *Plata* counsel.

6)    Numerous meetings with and presentation by Receiver Clark Kelso to the California Legislature, Governor's Office, Department of Finance officials, and other State officials including the following:

   a.    Meeting with Governor Schwarzenegger and his staff to discuss plans for the Receivership, including the construction proposal – February 5, 2008

   b.    Joint presentation to Governor Schwarzenegger with CDCR Secretary James Tilton concerning the 10,000-bed construction project – April 9, 2008

   c.    Meetings with individual Senators – April and May 2008

   d.    Meetings with individual Assembly members – May 2008

   e.    Briefing to Senate Budget and Fiscal Review Subcommittee No. 4 – April 14, 2008

   f.    Hearing before Senate Public Safety Committee – April 29, 2008

   g.    Hearing before Senate Appropriations Committee – May 5, 2008

   h.    Briefing to the Senate Republican Caucus – May 12, 2008

FUTTERMAN &
DUPREE LLP

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION

i.   Meeting with top executives from the Department of Finance, Controller's Office and Treasurer's Office and legal representatives from the Governor's Office - June 3, 2008

j.   Meeting with legal representative from Governor's Office and Special Master in Coleman to discuss mental health bed needs - June 10, 2008

k.   Meeting with Governor's Cabinet Secretary and Legal Affairs Secretary - August 11, 2008

l.   Meeting with Secretary Matt Cate and other top CDCR executives to discuss construction sites - August 25, 2008

m.   Meeting requested by Governor's Office to discuss coordinated construction management - September 10, 2008

n.   Meeting with CDCR and DMH officials to discuss cooperative efforts - September 11, 2008

o.   "Coffee meetings" with Secretary Matt Cate to share perspectives, problems and ideas regarding construction issues - October 14, 2008; November 12, 2008; November 17, 2008; November 25, 2008; December 22, 2008; January 27, 2009; and February 2, 2009

p.   Meeting with Secretary Kim Belshe and Director Steve Mayberg of DMH to discuss construction program and siting needs - October 28, 2008

q.   Meeting with plaintiffs' counsel and state attorneys to update all on construction issues - October 30, 2008

r.   Meeting with Governor and Secretary Matt Cate - November 5, 2008

s.   Meeting to brief top legislative staff on status of funding for construction- November 11, 2008

t.   Meeting with Senator Runner - December 2, 2008

u.   Meeting with Senate President pro Tem Steinberg - December 5, 2008

v.   Meeting with Chief Deputy Attorney General James Humes - January 8, 2009

w.   Meeting with state attorneys to discuss coordinating facility transition planning - January 12, 2009

7)   The appointment of a Construction Oversight Advisory Board to provide oversight to the Receiver concerning the long-term care facility construction. Board members include the California State Auditor and Inspector General.

8)   The involvement of numerous CDCR mental health and dental clinicians and administrative officials concerning not only the design of their respective clinical treatment programs but also the very design and construction of the long term care facilities themselves.

9)   Posting the FPS v. 2 and FPS v. 3 and related documents on the CPHCS website and actually seeking public comment concerning the proposed facility.

This unprecedented team effort, an interagency process that far exceeds any form of outreach ever attempted by the CDCR, is in many ways a model to emulate.

## IV.

## MODIFICATIONS TO THE SCOPE OF LONG-TERM CARE BED CONSTRUCTION

There have been three modifications to the overall scope of the long-term health care construction project since its inception.

1)   <u>The Initial Plan: 5,000 long-term care medical beds (The *Plata* Solution):</u>

The Receiver's long-term care construction project initially addressed only *Plata* requirements. It calls for 5,000 long-term care beds, with less than ten percent of the medical beds requiring licensure, establishing a cost-effective range of care for the target population, including nursing home care for aging prisoners, adequate housing for disabled prisoners, and chronic care treatment for the chronically-ill prisoners.[6] It is estimated that 99% of prisoners to be housed in the long-term care facilities are protected by the Americans with Disabilities Act (ADA).[7] Therefore, this plan accommodates substantial numbers of CDCR disabled prisoners protected by the *Armstrong* class action.

---

[6] See Abt Associates' August 31, 2007 "Chronic and Long-Term Care in California Prisons: Needs Assessment."
[7] Refer to the December 9, 2008 Abt Analysis Brief entitled "Functional Impairment and the Need for Long-term Care in California Prisons" and January 5, 2009 Memorandum from Hooper, Lundy & Bookman, Inc. entitled "Evaluation of Proposed Medical and Mental Health Beds under the Americans with Disabilities Act."

FUTTERMAN &
DUPREE LLP

8

2)    The Medical and Mental Health Proposal (The *Plata/Coleman* Solution):

By early 2007, CDCR healthcare and construction officials and the Receiver's clinical leaders and construction management firm concluded that it would be most cost-effective and clinically appropriate to attempt to provide medical and mental health in an "integrated" fashion.[8] In many cases, especially as prisoners are aging, those with mental health problems also develop chronic medical care problems. Therefore, the most cost-effective solution is to construct facilities where prisoners can be treated for both medical and mental health (rather than being treated in different facilities). This concept was embraced by both the Governor's Office and Attorney General. For example, the Attorney General's pleadings in the *Coleman* class action request that the CDCR's mental health construction plan merge into the Receiver's medical construction plan. Therefore, with approval by State officials, the long-term care construction program expanded to 10,000 beds to encompass both medical and mental health needs.[9] For the past eighteen months, CDCR has provided numerous clinicians and health care officials (both mental health and dental) to work full-time with the Receiver's team on the 10,000 bed construction project.

Following the implementation of this cooperative, interdisciplinary process, the Court Representatives in *Plata, Coleman, Armstrong,* and *Perez* met and conferred and prepared a construction agreement to allow the Receiver to take the lead on construction related activities for *Plata, Coleman, Armstrong*, and *Perez*. This agreement was ordered by the four courts on February 26, 2008, after receiving no objections from the Schwarzenegger Administration or the Attorney General.

3)    Receiver's Proposal to Construct 10,000 Beds [The *Plata/ Coleman/ Schwarzenegger Administration/DMH* Solution]:

In Spring 2008, following the appointment of J. Clark Kelso as Receiver, the

---

[8] Related discussions, which included representatives from the *Coleman* Special Master's monitoring team and *Coleman* experts, commenced at the initiation of construction planning and continue to present.
[9] The addition of 5,000 mental health beds is based on the Navigant Consulting's July 2007 "Mental Health Bed Need Study – Based on spring 2007 Population Projections, Spring 2007." This bed study was approved by the *Coleman* Court and used to project CDCR mental health patient needs.

1   Schwarzenegger Administration and various members of the California Senate suggested

2   that the Receiver involve the Department of Mental Health (DMH) in any CDCR

3   proposal to add acute and intermediate mental health inpatient beds to the long-term care

4   construction program. One discussion included a meeting with the Receiver, the Special

5   Master in *Coleman*, and key DMH officials.  This proposal appeared to have merit,

6   providing two benefits to the State of California.  First, DMH had announced that it

7   planned to withdraw its acute and intermediate mental health inpatient services to CDCR

8   following numerous interagency disputes.  As a result, the *Coleman* Court had ordered

9   the CDCR to develop an adequate inpatient mental health delivery program.  Ending the

10  CDCR and DMH "divorce" had the potential to remedy a problem which may be very

11  difficult for CDCR to address.  Secondly, DMH presently confines approximately 500

12  CDCR prisoners in its mental health hospitals. Removing those prisoners from DMH

13  facilities and into the "10,000 bed" facilities would provide relief to DMH, as well as to

14  California counties that have attempted to house a backlog of patients awaiting a DMH

15  bed.

16      Unfortunately, the effort to integrate DMH into the construction project has

17  delayed planning of the long-term care facilities and has significantly increased the cost

18  of both construction and annual operation.  Furthermore, the Governor and the Attorney

19  General have begun a campaign to criticize the Receiver with "Cadillac care" allegations,

20  including electronic bingo boards, basketball courts, and landscaping.  These "amenities,"

21  however, are not part of the Receiver's medical bed construction.  Rather, these amenities

22  were brought to the Receiver's program by DMH and reflect the existing policies and

23  practices of DMH.

### V.

### PRIVATIZATION

26      The Receiver and his construction team also considered the possibility of privatizing this

27  program. To do so, they evaluated the services of a private prison corporation, delivering out-of-

28  state services to California's inmates, and evaluated a written proposal from another corporation

FUTTERMAN &
DUPREE LLP

1    to construct a private prison within California. After this evaluation, the Receiver concluded that

2    this privatization proposal did not conform to the requirements of the federal court remedial

3    plans at issue. In making this determination, the Receiver and his staff relied on the following

4    facts:

5    1)    No private prison corporation competed in the open market and responded to the public

6          Request for Proposal issued by the Receiver on January 24, 2007. The written submission

7          referenced above was initially addressed to the Governor's Office, 18 months after the

8          public competitive bid selection process.

9    2)    Neither private prison corporation, as presently constituted, has the requisite medical

10         expertise (in term of cost-effective clinical delivery methods, pharmacy management,

11         radiology, chronic disease care, etc.) to provide the services necessary to comply with

12         stipulated injunctions in *Plata*.

13   3)    While the proposed private prison facility had a lower overall construction cost, it was

14         more expensive per square foot to construct; the apparent cost savings resulted from an

15         attempt to build a facility that is far too small. Simply stated, it lacked the requisite

16         clinical space to comply with the *Plata* stipulated injunctions. In addition, the

17         corporation which submitted the proposal refused to reveal its facility staffing plan and

18         would not reveal the proposed location. Therefore, the Receiver was unable to determine

19         whether it could operate a health care facility in compliance with *Plata* standards and was

20         unable to determine whether it could site the facility at a location where specialty services

21         and acute care hospitals were available.[10]

22   4)    The Receiver's analysis also found legal problems with the private proposal. For

23         example, during a presentation, the corporation's California lobbyist explained that the

24         size and number of dental facilities designed by the corporation conformed to "modified"

25

26   [10] The Receiver's concerns in this regard were heightened by numerous reports of inadequate medical care at private
     facilities in other states. In early February 2009, it was reported that over 2,000 inmates rioted for several days –
     because of substandard health care – at a private prison facility in Texas. Other instances of litigation originating in
27   private prison facilities are as follows: an inmate was indicted on a murder charge for the death of another inmate
     (October 2008); an inmate alleged he was denied medical care due under the ADA (April 2008); an inmate alleged
28   he was denied appropriate medical care for severe migraine headaches (July 2008); and an inmate family alleges
     wrongful death due to inadequate care for her thyroid condition (September 2008).

1  dentist/prisoner ratios as proposed by CDCR. However, CDCR's proposed modifications

2  have not been submitted to the *Perez* Court for review and consideration.[11] Finally, the

3  proposal submitted by the private prison corporation was not limited to construction; it

4  included the requirement that all correctional and health care positions be filled by private

5  employees. In other words, the corporation did not intend to staff its California private

6  prison with State employees, a possible violation of California Civil Service Rules and

7  the California Constitution.

## VI.

## THREE CONSTRUCTION OPTIONS

10  There are at least three construction options. All have significant fiscal differences

11  concerning both cost of construction and the cost of annual operation. Options are as follows:

12  1)  5,000 Bed Proposal (The Receiver's 5,000 Bed In-Fill Solution): To address the need for

13  treatment of 5,000 long-term medical patients, the construction of three facilities and a

14  total of 5,000 beds would be necessary.

15  Advantages:

16  • This option is the least expensive of the three options.

17  • This option addresses the long-term chronic care needs of *Plata* class members and

18  the housing needed for *Armstrong* class members (and will be *Perez* compliant).

19  Disadvantage:

20  • This option does not address any *Coleman* concerns, and as stated above, a significant

21  population of prisoners with both serious medical and mental health problems exists.

22  2)  7,500 Bed Proposal (*Plata/Coleman* Solution): To address the long-term chronic care

23  needs of 5,000 medical (*Plata*) class members and 2,500 out-patient mental health

24  (*Coleman*) class members, the construction of five facilities and a total of 7,500 beds

25  would be necessary.[12]

26

---

[11] Regardless of which of the three construction options goes forward, the Receiver plans to design and construct all facilities in compliance with the dental staffing ratios as set forth in *Perez*.

[12] The figure of 2,500 mental health outpatients was selected for comparison purposes. This number could be adjusted, depending upon the number of outpatients who can be treated pursuant to *Coleman* requirements in the existing 33 CDCR institutions.

FUTTERMAN &
DUPREE LLP

12

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION

1    Advantages:

2    • This option addresses all *Plata* and *Armstrong* long-term care bed needs and a

3    significant portion of *Coleman* outpatient medical and mental health patients, and will

4    be *Perez* compliant.

5    • This option also provides integrated long-term care to prisoners with both serious

6    medical and mental health problems.  It will require, however, that CDCR continue to

7    utilize a significant number of mental health outpatient beds in those institutions that

8    have a high volume of patients in the mental health outpatient programs.

9    Disadvantage:

10    • This option does not address *Coleman* inpatient needs, and it will require that CDCR

11    assume responsibility for the acute and intermediate mental health inpatient program

12    when DMH discontinues its Memorandum of Understanding with CDCR.

13    3)    10,000 Bed Proposal (*Plata*/*Coleman*/Schwarzenegger Administration/DMH Solution):

14    To address the need for treatment of 10,000 medical and mental health patients, the

15    construction of seven facilities and a total of 10,000 beds would be necessary.

16    Advantage:

17    • This option will resolve all *Plata*, *Coleman* and *Armstrong* long-term care needs, will

18    provide relief to the DMH mental health hospital system, and will be *Perez*

19    compliant.

20    Disadvantage:

21    • This option raises serious expense issues in terms of the cost of construction, staffing,

22    and operation of acute care facilities.

23    • This option would require development of an integrated care program with DMH,

24    which thus far has proven very difficult.

25    The following table details the three construction options:

26

27

28

FUTTERMAN &
DUPREE LLP

| | Option 3 | Option 2 | Option 1 |
|---|---|---|---|
| **Description** | 10,000 Bed Proposal (*Plata/Coleman*/Schwarzenegger Administration/DMH Solution): | 7,500 Bed Proposal (*Plata/Coleman* Solution) | 5,000 Bed Proposal (The Receiver's 5,000 Bed In-Fill Solution) |
| **Program Costs** (includes planning, design, and construction) | $6.0 billion | $4.3 billion | $2.5 billion |
| **Quantity of Facilities** | 7 Facilities | 5 Facilities | 3 Facilities |
| **Total beds** | 10,068 | 7,536 | 5,000 |
| **Facility Sizes** | | | |
| *Prototypical* | 1,320 | 1,344 | 1,528 |
| *North Facility* | 1,672 | 1,756 | 1,736 |
| *South Facility* | 1,796 | 1,748 | 1,736 |
| **Annual Operating Costs** | $1.39 billion | $823 million | $480 million |
| **Annual Operating Cost Per Patient** | $138,000 | $109,000 | $96,000 |

The above figures are good faith estimates at the current stage of construction planning. Given the existing and very serious site problems, including the existing level of CDCR overcrowding and its impact on infrastructure (e.g. water, sewage, power, ingress and egress), the final determination of certain allowances, contingencies, and soft-costs may have an impact on the final figures depending upon the sites selected, the California Environmental Quality Act, and other issues.

FUTTERMAN & DUPREE LLP

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION

# VII.

## CONCLUSION AND RECOMMENDATIONS

As explained above, the Receiver did not set out to construct 10,000 health care beds on his own. The project expanded at the request of CCDR to include mental health and dental needs for well-thought-out clinical reasons and to effectuate significant long-term operational cost savings. It has continued to progress due to hard work and active participation of CDCR and DMH staff as well as the Receiver's personnel. The orders of the respective Courts are clear, and one way or another, the State must comply with these orders.

The Receiver recommends that the parties be provided an opportunity to respond to this options report and that the State defendants inform the courts concerning other construction options which they believe may be appropriate.

Dated: February 6, 2009

\_\_\_\_\_/s/ J. Clark Kelso\_\_\_\_\_
Receiver

FUTTERMAN &
DUPREE LLP

RECEIVER'S REPORT ON OPTIONS FOR LONG-TERM BED CONSTRUCSTION