STEVEN M. WOODSIDE #58684
County Counsel
ANNE L. KECK #136315
Deputy County Counsel
County of Sonoma
575 Administration Drive, Room 105A
Santa Rosa, California 95403-2815
Telephone: (707) 565-2421
Fax: (707) 565-2624
swoodsid@sonoma-county.org
akeck@sonoma-county.org

Attorneys for Intervenors THE
COUNTY OF SONOMA, SONOMA
COUNTY SHERIFF/CORONER
WILLIAM COGBILL, SONOMA
COUNTY DISTRICT ATTORNEY
STEPHAN PASSALACQUA,
and SONOMA COUNTY CHIEF
PROBATION OFFICER ROBERT OCHS

IN THE UNITED STATES DISTRICT COURTS

FOR THE EASTERN DISTRICT OF CALIFORNIA

AND THE NORTHERN DISTRICT OF CALIFORNIA

UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES

PURSUANT TO SECTION 2284, TITLE 28 UNITED STATES CODE

| | |
|---|---|
| RALPH COLEMAN, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____ /<br>MARCIANO PLATA, et al.,<br>    Plaintiffs,<br>v.<br>ARNOLD SCHWARZENEGGER, et al.,<br>    Defendants.<br>_____ / | No.   CIV S-90-0520 LKK JFM P<br><br>**THREE-JUDGE COURT**<br><br>No. C-01-1351 TEH<br><br>**SONOMA COUNTY INTERVENORS' RESPONSE TO ORDER REQUIRING FURTHER BRIEFING** |

Intervenors the County of Sonoma, Sonoma County Sheriff William Cogbill, Sonoma County District Attorney Stephan Passalacqua, and Sonoma County Chief Probation Officer

Robert Ochs (collectively, "Sonoma County Intervenors") hereby submit their response to the Court's Order Requiring Further Briefing, entered on February 4, 2009 (Northern Dist. Docket No. 2064) (the "Order"). The Order requires the parties to brief the following issues:

1. Does the Court have the authority to order the expenditure of funds for purposes of implementing any prisoner release order that it may issue?

2. Does the Court have the authority to order the State to divert funds from the prison budget to community programming or other local programs designed to facilitate the re-entry into society of prisoners released pursuant to the entry of a prisoner release order?

3. Would the answer to either of the above questions be different if the funds at issue consisted of savings to the State resulting from the issuance of a prisoner release order?

In light of the Court's Tentative Ruling issued on February 9, 2009 (Northern District Docket No. 2066), Sonoma County Intervenors submit that the responses to each of the three questions posed in the Order is, *no*: the Court does not have the authority to order funding or diversion of funds to local communities for other forms of relief because the imposition of a prison population cap is the broadest, most intrusive remedy permitted under the PLRA. However, in the absence of a population cap, this Court would have the authority to order a plan of action and to require implementation thereof, including funding, as a narrowly tailored, less intrusive prisoner release order designed to reduce overcrowding to remedy the violation of federal rights.

## I.

## SUMMARY OF ARGUMENT

As an initial matter, the questions posed in the Court's Order must be addressed in the framework of the Prison Litigation Reform Act of 1995 ("PLRA"), and analyzed consistent with its language, purpose and intent. The PLRA's requirements that any prisoner release order must be narrowly drawn, extend no further than necessary to correct the violation of the Federal right, and be the least intrusive means necessary to correct the violation of the Federal right, were intended to limit the remedial actions available to the federal courts. (See 18 U.S.C. §3626(a)(1).) The legislative history of the PLRA, as well as its express language, demonstrates that a prison population cap is the last resort allowed under the

PLRA; if other, more narrow, less intrusive forms of relief exist, the Courts are precluded from entering a population cap. (*Id.*)

If this Court, consistent with its Tentative Ruling, ultimately enters a prisoner release order that consists of a prison population cap, the PLRA does not appear to permit the Court to enter any other type of relief (including funding therefor) because a population cap is the ultimate remedy allowed under the PLRA. In other words, once the Court orders a population cap, there is no other relief that can be ordered under the PLRA, as any other relief would be a more narrow, less intrusive form of a remedy. Once a population cap is ordered, other remedies would simply be intended to ameliorate the negative consequences the population cap will have on public safety and local criminal justice systems. Accordingly, the answer to the questions the Court posed in its Order would all be negative, due to the fact that any order for funding would not be tied to implementing the actual remedy ordered by the Court in the form of the population cap.

However, if the Court determines that there are other remedies aside from a population cap that can reduce overcrowding to remedy the constitutional violations, then the Court is duty-bound under the PLRA to order such remedies in lieu of a population cap. In such circumstances, the Court can set a goal of population reduction, but could not order an actual cap. The Court has taken the first step in ordering such other forms of relief by requiring that the State devise a plan of action specifying which remedies can be instituted to reduce prison crowding. Any order approving such a plan of action could be narrowly tailored to address the causes of the overcrowding, rather than simply addressing the effect of an overburdened prison system by opening the prison doors. The authority of the Court to order such a plan of action also, of necessity, carries with it the Court's ability to order the State to implement and fund the plan, pursuant to the principles announced in *Milliken v. Bradley* [433 U.S. 267, 289-290 (1977)] and *Edelman v. Jordan* [414 U.S. 651, 667-668 (1974)]. Yet, it is unclear whether the Court could order funds from a particular source (such as the prison budget) to implement the plan, and it is also unclear whether any savings the State would realize could affect the Court's authority to order funding.

## II.

## LEGAL ARGUMENT

### A. A PRISON POPULATION CAP IS THE BROADEST, MOST INTRUSIVE FORM OF RELIEF PERMISSIBLE UNDER THE PLRA; ENTRY OF SUCH A CAP PRECLUDES OTHER FORMS OF RELIEF

As noted by the Ninth Circuit in the case of *Gilmore v. People of the State of California (Enomoto)* [220 F.3d 987 (9th Cir. 2000)], understanding the context in which the Prison Litigation Reform Act of 1995 (18 U.S.C. §3626, or "PLRA") emerged is helpful to understand how it operates. The *Gilmore* case contains a thorough and illuminating discussion of the history of prison reform litigation, beginning with the initial "hands-off doctrine," to the landmark cases in the 1960's and 70's in which the federal courts first recognized 42 U.S.C. §1983 as a vehicle for vindicating prisoners' constitutional rights, and finally to the enactment of the PLRA. (*Gilmore*, 220 F.3d at 990-997.) As the *Gilmore* Court discussed,

> The PLRA's restrictions on granting and maintaining prospective relief came largely in response to cases similar to *Thompson* [815 F.2d 1323 (9th Cir. 1987)]. The sponsors of the Act decried "overzealous Federal courts ... micro-managing our Nation's prisons," 141 Cong. Rec. S14418 (daily ed. Sept. 27, 1995)(remarks of Sen. Hatch), and "judicial orders entered under Federal law [which] have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts." *Id.* at S14419 (remarks of Sen. Abraham). From these and other pronouncements, it is clear that Congress intended the PLRA to revive the hands-off doctrine. How extensive the revival and whether the Constitution was breached in the process are questions [up for review].

(*Gilmore*, 220 F.3d at 996-997.)

The PLRA not only proscribes specific procedures for federal courts to follow that are necessary to enter a prisoner release order, but also sets conditions precedent to the entry of such orders. The *Gilmore* Court succinctly described these conditions for entry of relief:

> The PLRA establishes a comprehensive set of standards to govern prospective relief in prison conditions cases. Section 3626(a)(1) of Title 18 provides that prospective relief "shall extend no further than necessary to correct the violation of the Federal right of a particular plaintiff or plaintiffs." 18 U.S.C. §3626(a)(1). Thus a district court faced with a prison conditions suit may not grant or approve prospective relief "unless the court finds that such relief is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." *Id.* The provision closes by requiring courts to "give substantial weight to any adverse impact on public

safety or the operation of a criminal justice system caused by the relief," *id.*, and by limiting courts' power to grant preliminary injunctive relief, 18 U.S.C. §3626(a)(2), or to release prisoners as a sanction for failure to comply with other relief. 18 U.S.C. §3626(a)(3). Section 3626(a) therefore operates simultaneously to restrict the equity jurisdiction of federal courts and to protect the bargaining power of prison administrators – no longer may courts grant or approve relief that binds prison administrators to do more than the constitutional minimum.

(*Gilmore*, 220 F.3d at 998-999.)

It is apparent that the sponsors of the PLRA were especially concerned with courts setting population caps and "ordering the release of inmates as a sanction for prison administrators' failure to comply with the terms of consent decrees designed to eliminate overcrowding." (*Gilmore*, 220 F.3d at 999, fn 14.) The bill's sponsors considered population caps to be the "most pernicious form of micromanagement," as release of thousands of dangerous prisoners leads to disastrous consequences as well as a revolving prison door. (*Gilmore*, 220 F.3d at 999, fn 14, citing 141 Cong. Rec. SA14414 (daily ed. Sept. 27, 1995)(remarks of Sen. Dole).) The specific requirements of the PLRA were thus intended to establish "tough new conditions that a Federal court must meet before issuing a prison cap order" (*Id.*)

The statements made by the sponsors of the PLRA referenced above verify the fact that a prison population cap is the most drastic, most intrusive, broadest remedy that a federal court can order to remedy violations of prisoners' federal rights. Indeed, such a fact is implicit in the very PLRA provisions themselves. (See 18 U.S.C. §1326(a)(1)(B).) As a necessary condition to ordering a prison population cap, a court must find, *inter alia,* that such a cap "is narrowly drawn, extends no further than necessary to correct the violation of the Federal right, and is the least intrusive means necessary to correct the violation of the Federal right." (18 U.S.C. §3626(a)(1).) Upon determining that the PLRA requirements to enter a prison population cap have been met, and upon concluding that a prison population cap is in order, a federal court is precluded from entering other, narrower or more limited remedies – as it has effectively determined such remedies to be insufficient to reduce prison population by ordering the population cap. If other, more narrowly drawn, less intrusive

forms of relief exist that would remedy the violation of the federal right, then a prison population cap cannot be ordered under the PLRA. (*Id.*)

Once a prison population cap is ordered, all other forms of relief (such as re-entry programs) simply would be intended to ameliorate the negative consequences to public safety and local criminal justice systems that will result from such a cap – they would not, in and of themselves, be intended to reduce prison population (as the cap itself accomplishes that task). Because these other forms of relief would fall outside the definition of a prisoner release order (i.e., the purpose of the relief is not to reduce prison population), the answers to all of the questions posed in the Court's Order would be negative – once it orders a population cap, the Court does not have the authority to order any other narrower, less intrusive forms of relief, nor funding therefor.

However, if the Court were to determine that there were other, more narrowly drawn and less intrusive remedies that would effectively reduce prison population to remedy the violation of the federal right, then the Court is duty-bound under the PLRA to order such relief as initial remedies. In such an instance, the answers to the questions posed in the Court's Order can be answered generally in the affirmative, as discussed below.

### B. UNDER THE PLRA, THE COURT MAY ORDER THE STATE TO DEVELOP AND IMPLEMENT A PLAN OF ACTION TO REDUCE OVERCROWDING, INCLUDING ORDERING NECESSARY FUNDING

A prisoner release order under the PLRA that consists of a prison population cap addresses only the end result of a failed prison system that becomes overcrowded – it does not address the causes of overcrowding. At the trial of this matter, the Court was presented with evidence from numerous experts in prison management demonstrating that there are a number of less intrusive, narrower remedies that will lead to an effective reduction in prison population, aside from a population cap. These types of remedies – primarily aimed at reducing recidivism and treating prisoners for the substance abuse and other issues that led to their imprisonment in the first place – are less intrusive, narrower forms of relief that virtually all experts agree will lead to a substantial reduction in prison population.

The Court has taken the first step in requiring that the State devise a plan of action to

implement these types of remedies. If the Court were to enter such a plan of action as a prisoner release order in this case in lieu of a population cap, then the answers to the first two questions raised in the Court's Order – whether this Court has the authority to order funding and diversion of funds to local programs from the prison budget to implement these remedies – appears to be a qualified, yes. While it appears that the Court can order implementation of a plan of action that would include necessary funding under the PLRA, there does not appear to be any authority that would allow the Court to specify the source of such funding. Such responses are based on the following.

The Supreme Court has repeatedly held that the federalism principles embodied in the Eleventh Amendment to the United States Constitution[1] do not preclude suits against state officials who have violated federal law, nor apply in specific situations in which it is "necessary to permit the federal courts to vindicate federal rights and hold state officials responsible to 'the supreme authority of the United States.'" (*B.H. Papasan v. Allain*, 478 U.S. 265, 277 (1986), quoting *Pennhurst State School and Hospital v. Halderman*, 465 U.S. 89, 105 (1984) (quoting *Ex parte Young*, 209 U.S. 123, 160 (1908)).) This authority, however, cannot be extended to upset the balance of federal and state interests that it embodies. (*Id.*) Consequently, the authority of the federal courts to order relief against state officials is limited to "[r]emedies designed to end a continuing violation of federal law [that] are necessary to vindicate the federal interest in assuring the supremacy of that law." (*Id.*, at 278, quoting *Green v. Mansour*, 474 U.S. 64, 68 (1985) (citation omitted).) The line between cases permitted under the Eleventh Amendment and those that are prohibited may not always be distinct; accordingly, federal courts must look at the substance of the relief sought rather than its form, and be guided by the principles underlying the decision in *Ex*

---

[1] The Eleventh Amendment provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State."

*parte Young*. (*Papasan*, 478 U.S. at 278-279.)[2]

The underlying principles of *Ex parte Young* were perhaps best illuminated in the case of *Milliken v. Bradley* [433 U.S. 267, 289-290 (1977)]. In *Milliken*, the district court ordered the Detroit School Board and the State of Michigan to institute comprehensive educational programs by a date certain as desegregation measures, and required them to share equally the costs of implementing such programs. The Supreme Court concluded that the court's authority to enter such an order rested in equitable principles:

> Application of those 'equitable principles,' we have held, requires federal courts to focus upon three facts. In the first place, like other equitable remedies, the nature of the desegregation remedy is to be determined by the nature and scope of the constitutional violation. [cite omitted] The remedy must therefore be related to 'the condition alleged to offend the Constitution . . . .' [cite omitted] Second, the decree must indeed be remedial in nature, that is, it must be designed as nearly as possible 'to restore the victims of discriminatory conduct to the position they would have occupied in the absence of such conduct.' [cite omitted] Third, the federal courts in devising a remedy must take into account the interests of state and local authorities in managing their own affairs, consistent with the Constitution. . . . Once invoked, 'the scope of a district court's equitable powers to remedy past wrongs is broad, for breadth and flexibility are inherent in equitable remedies.' [cite omitted]

(*Milliken*, at p. 280-281.) Accordingly, "federal courts are authorized to implement plans that promise 'realistically to work now.'" (*Milliken*, at p. 281, fn 15, quoting *Green v. County School Board of New Kent County* (1968) 391 U.S. 430. 439.) At the same time, federal courts must consider the burdensome effects that would result from remedies they order, to comply with the equitable principles of flexibility and sensitivity. (*Id.*)

The *Milliken* Court also analyzed its previous decision in *Edelman v. Jordan* [414 U.S. 651 (1974)], and noted that the case stood for the proposition that a district court could order payment of state funds if doing so was a necessary consequence of future compliance

---

[2] The *Papasan* Court applied the *Ex parte Young* principles to conclude that an alleged ongoing constitutional violation consisting of the unequal distribution by the State of the benefits of the State's school lands, "is precisely the type of continuing violation for which a remedy may permissibly be fashioned under *Young* . . . . A remedy to eliminate this current disparity, even a remedy that might require the expenditure of state funds, would ensure "'compliance *in the future* with a substantive federal-question determination'" rather than bestow an award for accrued monetary liability." (*Papasan*, 478 U.S. at 282, quoting *Milliken*, 433 U.S., at 289, (quoting *Edelman*, 415 U.S. at 668) (emphasis in original).)

with a substantive federal-question determination. (*Id.*, at 289.) In finding that the district court had the authority to order the Detroit School Board and the State of Michigan to share the costs of implementing the desegregation plan ordered by the district court, the *Milliken* Court stated that such an order to share future costs fit within the *Ex parte Young* principles. In doing so, it coined the oft-repeated phrase, that federal courts may "enjoin state officials to conform their conduct to requirements of federal law, notwithstanding a direct and substantial impact on the state treasury." (*Id.*) An order for a local public agency and a state government to share costs of implementing a federal court decree offends neither the Eleventh nor the Tenth Amendments to the Constitution. (*Id.*, at 290-291; see also *Missouri v. Jenkins*, 495 U.S. 33, (1990) (Holding that the district court did not abuse its discretion in requiring that school district and state share costs of remedying desegregation.).)

This precedent demonstrates that federal courts have the authority to require states to implement prisoner release orders, which may include payment of monies necessary for such implementation. Any such order for implementation and funding is ancillary to the equitable remedies intended to reduce overcrowding, as it is intended "to vindicate the plaintiffs' civil liberties, not to establish ownership over state resources or funds." (*Idaho v. Coeur d'Alene Tribe of Idaho*, 521 U.S. 261, 279 (1997), relying on *Milliken*, 433 U.S. at 269.)

Whether federal courts can specify the source from which those funds will be paid, does not appear to have been resolved by the Supreme Court in the context of a PLRA case. The closest authority in this area is the case of *Hutto v. Finney* [437 U.S. 678 (1979)]. In the *Hutto* case, the district court had ordered attorney's fees against the State of Arkansas for its failure to remedy cruel and unusual conditions in its prisons, "to be paid out of Department of Corrections funds." (*Hutto*, 437 U.S. at 685.) The *Hutto* Court found that such fees served the same purpose as a fine imposed for civil contempt based on bad faith failure to comply with a court order. (*Id.*, at 690-691.) However, since the *Hutto* case addressed the contempt power of the district court – rather than the powers to fashion equitable remedies under the

PLRA – it is not directly applicable herein.[3] In addition, Sonoma County Intervenors located no authority indicating that a savings in a state's prison budget could affect a federal court's ability to order a state to fund remedies pursuant to a prisoner release order.

## III.

## CONCLUSION

Based on the foregoing, Sonoma County Intervenors respectfully submit that their responses to the three questions posed by the Court in its Order Requiring Further Briefing are as follows:

Question 1: Does the Court have the authority to order the expenditure of funds for purposes of implementing any prisoner release order that it may issue?

Response to Question 1: *If the prisoner release order consists of a prison population cap, then the response is, no.*

*If the prisoner release order consists of specific plans of action (other than a population cap) that are intended to reduce prison overcrowding to vindicate the violation of federal rights, then the response is a qualified, yes: the Court can enter such orders necessary to implement the plans of action, including ordering sufficient funding therefor, under the principles announced in Milliken.*

Question 2: Does the Court have the authority to order the State to divert funds from the prison budget to community programming or other local programs designed to facilitate the re-entry into society of prisoners released pursuant to the entry of a prisoner release order?

Response to Question 2: *If the prisoner release order consists of a prison population cap, then the response is, no.*

*If the prisoner release order consists of specific plans of action (other than a population cap) that are intended to reduce prison overcrowding to vindicate the violation of federal rights, then the response is a qualified, yes; the Court has the ability to order diversion of such funds to local programs under the principles announced in Milliken. Sonoma County Intervenors have found*

---

[3] It is also noteworthy that the Attorney General in the *Hutto* case did not argue that the attorney's fee awarded in the case was so large or unexpected that it interfered with the State's budgeting process. (*Id.*, at 691, fn 18.) As the Court noted, "[a]lthough the Eleventh Amendment does not prohibit attorney's fees awards for bad faith, it may counsel moderation in determining the size of the award or in giving the State time to adjust its budget before paying the full amount of the fee." (*Id.*)

*no authority under the PLRA that can provide direction as to whether the Court could order such funding directly out of the prison's budget.*

Question 3:   Would the answer to either of the above questions be different if the funds at issue consisted of savings to the State resulting from the issuance of a prisoner release order?

Response to Question 3:   *If the prisoner release order consists of a prison population cap, then the response is, no.*

*If the prisoner release order consists of specific plans of action (other than a population cap) that are intended to reduce prison overcrowding to vindicate the violation of federal rights, then the response is unknown, as Sonoma County Intervenors have find no authority that can provide direction as to how to respond to this question.*

Respectfully submitted,

Dated: February 18, 2009                    STEVEN M. WOODSIDE, County Counsel


By:   /s/ Anne L. Keck
      ANNE L. KECK
      Deputy County Counsel
      Attorneys for Intervenors the County of Sonoma, the Sonoma County Sheriff-Coroner William Cogbill, the Sonoma County District Attorney Stephan Passalacqua, and Sonoma County Chief Probation Officer Robert Ochs