1                                      VOL 1

2                                  PAGES 1 – 195

3                      UNITED STATES DISTRICT COURT

4                 FOR THE EASTERN DISTRICT OF CALIFORNIA

5                AND FOR THE NORTHERN DISTRICT OF CALIFORNIA

6        UNITED STATES DISTRICT COURT COMPOSED OF THREE JUDGES PURSUANT

7                 TO SECTION 2284, TITLE 28 UNITED STATES CODE

8
         RALPH COLEMAN, ET AL.,              )
9                                            )
                     PLAINTIFFS,             )
10                                           )
           VS.                               )  NO. CIV S-90-0520 LKK JFM P
11                                           )
         ARNOLD SCHWARZENEGGER, ET AL.       )
12                                           )  THREE-JUDGE COURT
                     DEFENDANTS.             )
13       _____)

14
         MARCIANO PLATA, ET AL.,             )
15                                           )
                     PLAINTIFFS,             )
16                                           )
         VS.                                 )  NO. C 01-1351 TEH
17                                           )
         ARNOLD SCHWARZENEGGER, ET AL.       )
18                                           )
                     DEFENDANTS.             )
19       _____)

20                       **TRANSCRIPT OF PROCEEDINGS**

21                       SAN FRANCISCO, CALIFORNIA
                         TUESDAY, NOVEMBER 18, 2008
22
         (APPEARANCES ON FOLLOWING PAGES)
23

24       *REPORTED BY:*   JOAN MARIE COLUMBINI, CSR 5435, RPR
                          KATHERINE WYATT, CSR 9866, RMR
25                        OFFICIAL COURT REPORTERS, U.S. DISTRICT COURT

 1  **APPEARANCES:**

 2  **FOR PLAINTIFFS**          PRISON LAW OFFICE
                                1917 FIFTH STREET
 3                              BERKELEY, CALIFORNIA  94710
                                **DONALD SPECTER, ESQUIRE**
 4                              **STEVEN FAMA, ESQUIRE**
                                **SARA NORMAN, ESQUIRE**
 5                              **ALISON HARDY, ESQUIRE**

 6
                                ROSEN, BIEN & GALVAN, LLP
 7                              315 MONTGOMERY STREET, TENTH FLOOR
                                SAN FRANCISCO, CALIFORNIA 94104
 8                      BY:  **MICHAEL W. BIEN, ESQUIRE**
                                **ERNEST GALVAN, ESQUIRE**
 9                              **AMY WHELAN, ESQUIRE**
                                **JANE KAHN, ESQUIRE**
10                              **MARIA V. MORRIS, ESQUIRE**
                                **LISA ELLS, ESQUIRE**
11

12  **FOR CCPOA**               CARROLL, BURDICK & MCDONOUGH
                                44 MONTGOMERY STREET, SUITE 400
13                              SAN FRANCISCO, CALIFORNIA  94104
                        BY:  **GREGG MCLEAN ADAM, ESQUIRE**
14                              **JAMES HENDERSON, ESQUIRE**
                                **NATALIE LEONARD, ESQUIRE**
15

16  **FOR DEFENDANTS**          STATE OF CALIFORNIA
                                DEPARTMENT OF JUSTICE
17                              OFFICE OF THE ATTORNEY GENERAL
                                1300 I STREET, SUITE 125
18                              P.O. BOX 944255
                                SACRAMENTO, CALIFORNIA  94244
19                      BY:  **LISA A. TILLMAN, ESQUIRE'S**

20                              STATE OF CALIFORNIA
                                DEPARTMENT OF JUSTICE
21                              OFFICE OF THE ATTORNEY GENERAL
                                455 GOLDEN GATE AVENUE, SUITE 11000
22                              SAN FRANCISCO, CALIFORNIA  94102
                        BY:  **ROCHELLE C. EAST, ESQUIRE**
23                              **KYLE A. LEWIS, ESQUIRE**

24  (APPEARANCES CONTINUED ON NEXT PAGE)

25

*JOAN MARIE COLUMBIN, CSR, RPR*
*KATHERINE WYATT, CSR, RMR*
*OFFICIAL COURT REPORTERS – USDC*
*415–255–6842*

1  **APPEARANCES (CONTINUED):**

2  **FOR DEFENDANTS**            HANSON BRIDGETT
                                425 MARKET STREET, 26TH FLOOR
3                               SAN FRANCISCO, CALIFORNIA  94105
                        BY: **PAUL MELLO, ESQUIRE**
4                           **S. ANNE JOHNSON, ESQUIRE**

5

6  **FOR DISTRICT ATTORNEY**     THE DISTRICT ATTORNEY'S OFFICE
   **INTERVENORS**              COUNTY OF RIVERSIDE
7                               82-675 HIGHWAY 111, FOURTH FLOOR
                                INDIO, CALIFORNIA  92201
                        BY: **WILLIAM E. MITCHELL, ESQUIRE**
8

9  **FOR LEGISLATOR**           AKIN, GUM, STRAUSS, HAUER & FELD, LLP
   **INTERVENORS**              580 CALIFORNIA STREET, 15TH FLOOR
10                              SAN FRANCISCO, CALIFORNIA  94104
                        BY: **STEVE SHEA KAUFHOLD, ESQUIRE**
11                          **TERESA WANG, ESQUIRE**

12

13 **FOR LAW ENFORCEMENT**       JONES & MAYER
   **INTERVENORS**              3777 NORTH HARBOR BOULEVARD
                                FULLERTON, CALIFORNIA  92835
14                      BY: **KIMBERLY HALL BARLOW, ESQUIRE**

15

16 **FOR COUNTY INTERVENORS**    OFFICE OF THE COUNTY COUNSEL
                                COUNTY OF SANTA CLARA
                                70 WEST HEDDING STREET
17                              NINTH FLOOR, EAST WING
                                SAN JOSE, CALIFORNIA  95110
18                      BY: **THERESA FUENTES, ESQUIRE'S**

19

20 **FOR SONOMA COUNTY**         COUNTY OF SONOMA
   **INTERVENORS**              575 ADMINISTRATION DRIVE, ROOM 105A
                                SANTA ROSA, CALIFORNIA  95403
21                      BY: **ANNE L. KECK, ESQUIRE**

22

23

24

25

1              <u>PROCEEDINGS; TUESDAY, NOVEMBER 18, 2008</u>

2

3         **THE CLERK:**  CALLING CIVIL CASE C01-1351, PLATA VERSUS

4    SCHWARZENEGGER; CALLING CIVIL CASE NO. CIV S-90-0520, COLEMAN

5    VERSUS SCHWARZENEGGER.

6              APPEARANCES, COUNSEL.

7         **MR. SPECTER:**  THANK YOU.  GOOD MORNING.  DONALD

8    SPECTER FROM THE PRISON LAW OFFICE FOR THE PLAINTIFFS AND SARA

9    NORMAN FROM THE PRISON LAW OFFICE.

10        **MR. BIEN:**  GOOD MORNING, YOUR HONORS.  MICHAEL BIEN

11   ON BEHALF OF THE COLEMAN PLAINTIFFS, ALONG WITH JANE KAHN, MARIA

12   MORRIS, ERNIE GALVAN, LISA ELLS, AND AMY WHELAN.

13        **MR. HENDERSON:**  GOOD MORNING, YOUR HONORS.  JIM

14   HENDERSON, NATALIE LEONARD AND GREGG ADAM FOR INTERVENOR CCPOA.

15        **MR. MELLO:**  GOOD MORNING, YOUR HONORS.  PAUL MELLO OF

16   HANSON BRIDGETT FOR PLATA DEFENDANTS, AND I'M JOINED BY MY

17   COLLEAGUE ANNE JOHNSON OF HANSON BRIDGETT.

18        **MS. TILLMAN:**  GOOD MORNING, YOUR HONOR.  LISA TILLMAN

19   OF BEHALF OF THE COLEMAN DEFENDANTS, FROM THE CALIFORNIA

20   ATTORNEY GENERAL'S OFFICE.

21        **MR. KAUFHOLD:**  GOOD MORNING, YOUR HONORS.  STEVE

22   KAUFHOLD AND TERESA WANG FROM AKIN, GUMP, STRAUSS, HAUER & FELD

23   FOR THE LEGISLATIVE INTERVENORS.

24        **MR. MITCHELL:**  GOOD MORNING, YOUR HONORS.  BILL

25   MITCHELL FOR THE DA INTERVENORS.

1          **MS. HALL:**  GOOD MORNING, YOUR HONORS.  KIMBERLY HALL,

2     BARLOW, JONES & MAYER, ON BEHALF OF THE LAW ENFORCEMENT

3     INTERVENORS.

4          **MS. WOODWARD:**  GOOD MORNING, YOUR HONORS.  CAROL

5     WOODWARD ON BEHALF OF SAN MATEO COUNTY INTERVENORS.

6          **MS. FUENTES:**  GOOD MORNING, YOUR HONORS.  THERESA

7     FUENTES, COUNTY COUNSEL WITH SANTA CLARA COUNTY, AND ALSO LEAD

8     ATTORNEY FOR COUNTY INTERVENORS.

9          **MS. KECK:**  GOOD MORNING, YOUR HONORS.  ANNE KECK,

10    DEPUTY COUNTY COUNSEL ON BEHALF OF SONOMA COUNTY INTERVENORS.

11         **JUDGE KARLTON:**  NOBODY ON THAT SIDE WANTS TO SAY

12    ANYTHING?

13         **JUDGE HENDERSON:**  JUST A REMINDER TO HAVE ALL OF THE

14    MANY COUNSEL INVOLVED SAY YOUR NAME BEFORE YOU SPEAK, UNTIL WE

15    GET USED TO YOU AT LEAST.  SO BEFORE YOU SAY ANYTHING, GO ON

16    RECORD, STATE YOUR NAME.

17         BEFORE WE HEAR OPENING STATEMENTS, AS WE WILL IN JUST

18    A FEW MINUTES, WE ARE GOING TO MAKE THE FOLLOWING PRELIMINARY

19    ORDERS:

20         FIRST, THE TIME LIMITS PROPOSED IN THE JOINT PRETRIAL

21    STATEMENT FILED YESTERDAY ARE ADOPTED AS ORDERS OF THIS COURT.

22    WHAT THIS MEANS IS THAT PLAINTIFFS AND INTERVENOR CCPOA WILL

23    CONCLUDE THEIR CASE NO LATER THAN DECEMBER 4TH, 2008, AND

24    DEFENDANTS AND DEFENDANT INTERVENORS WILL BEGIN THEIR CASE NO

25    LATER THAN THE FOLLOWING DAY, DECEMBER 5TH, 2008.  THE COURT

1  WILL CONSIDER EXTENDING THE TIME FOR PLAINTIFFS AND CCPOA ONLY

2  IF THE DEFENDANTS AGREE TO GIVE UP PART OF THEIR TIME TO

3  PLAINTIFFS.

4          WE SHOULD NOTE THAT THE JOINT PRETRIAL STATEMENT

5  CALCULATIONS ARE BASED ON 5-1/2 HOURS OF ACTUAL COURT TIME PER

6  DAY, WHILE THE COURT'S CALCULATION REFLECTS 5-3/4 HOURS PER DAY.

7  SO KEEP THAT IN MIND.

8          SECOND, THE EXCERPTS FROM ROBIN DEZEMBER'S

9  DEPOSITIONS THAT PLAINTIFF SEEKS TO INTRODUCE INTO EVIDENCE

10 APPEAR TO BE ADMISSIBLE STATEMENTS OF A PARTY OPPONENT.  THUS,

11 PURSUANT TO THE COURT'S NOVEMBER 12TH ORDER, DEFENDANT SHALL

12 HAVE FIVE COURT DAYS TO FILE AND SERVE ANY OBJECTIONS TO THESE

13 DEPOSITION EXCERPTS AND ANY COUNTERDESIGNATIONS THERETO.

14         THIRD, PLAINTIFFS AND DEFENDANTS ARE HEREBY ORDERED

15 TO FILE BY 8:30 A.M. TOMORROW MORNING REVISED COPIES OF THEIR

16 REVISED EXHIBIT LISTS THAT INCLUDE OBJECTIONS AND RESPONSES

17 THERETO.  THE ONES YOU FILED DIDN'T INCLUDE OBJECTIONS

18 RESPONSES.

19         FOURTH, DEFENDANTS' MOTION FOR RECONSIDERATION OF THE

20 COURTS' ORDER DENYING DEFENDANTS' MOTION TO DISMISS OR, IN THE

21 ALTERNATIVE, MOTION FOR SUMMARY JUDGMENT IS DENIED.  HAVING

22 CAREFULLY CONSIDERED THE DEFENDANTS' MOTION FOR RECONSIDERATION,

23 THE COURT FINDS NO BASIS FOR ALTERING ITS ORIGINAL DECISION.

24         FINALLY, DEFENDANTS' MOTION FOR RECONSIDERATION OF

25 THE COURTS' ORAL RULING PROHIBITING EVIDENCE OF CONSTITUTIONAL

1    COMPLIANCE AT TRIAL IS ALSO DENIED.  IF, AS DEFENDANTS CONTEND,

2    THERE ARE NO LONGER ANY CONSTITUTIONAL VIOLATIONS AT ISSUE IN

3    PLATA OR COLEMAN, THEN THERE WILL BE NO REASON TO CONTINUE

4    EITHER THE RECEIVERSHIP IN PLATA OR THE SPECIAL MASTERSHIP IN

5    COLEMAN.  THOSE ARE MATTERS FOR AN INDIVIDUAL COURT TO DECIDE,

6    AND DEFENDANTS SHOULD, THEREFORE, FILE MOTION FOR APPROPRIATE

7    RELIEF BEFORE ME OR JUDGE KARLTON INDIVIDUALLY IN THOSE CASES.

8    THESE THREE-JUDGE COURT PROCEEDINGS ARE NOT THE PLACE FOR THOSE

9    ARGUMENTS.

10          HAVING MADE THESE PRELIMINARY RULINGS WE WILL PROCEED

11   WITH OPENING STATEMENTS.  REMEMBER THAT EACH STATEMENT WILL BE

12   NO MORE THAN 15 MINUTES.  YOU MAY PROCEED WHEN YOU ARE READY,

13   COUNSEL.

14          AND I WILL ASK YOU, MS. ESPINOSA, TO LET COUNSEL KNOW

15   WHEN THEY HAVE FIVE MINUTES REMAINING.

16          **THE CLERK:**  I WILL.

17          **JUDGE HENDERSON:**  YOU MAY PROCEED, COUNSEL.

18          **OPENING STATEMENT BY MR. SPECTER**

19          **MR. SPECTER:**  GOOD MORNING, YOUR HONORS.  MY NAME IS

20   DONALD SPECTER.  I AM APPEARING ON BEHALF OF THE PLAINTIFFS IN

21   THIS CASE.

22          I STAND BEFORE YOU TODAY REPRESENTING MORE THAN

23   150,000 INDIVIDUALS WHO ARE COMPLETELY DEPENDENT ON THE GOVERNOR

24   AND THE OFFICIALS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS

25   AND REHABILITATION FOR ALL OF THEIR BASIC NEEDS.  AMONG THOSE

1  NEEDS IS THE NEED FOR MEDICAL AND MENTAL HEALTH SERVICES.  FOR

2  MORE THAN A DECADE THOSE BASIC NEEDS HAVE NOT BEEN MET.  THIS

3  PROCEEDING WILL DETERMINE WHETHER THAT IS PRIMARILY DUE TO

4  OVERCROWDING, AND IF IT DOES, FUTURE PROCEEDINGS WILL BE

5  NECESSARY TO DETERMINE WHETHER THE COURT SHOULD ORDER THE STATE

6  TO REDUCE THE PRISON POPULATION TO MEET THOSE BASIC NEEDS.

7          BECAUSE OF THE PUBLIC SAFETY IMPLICATIONS OF SUCH AN

8  ORDER AND THE SCALE OF THE CALIFORNIA PRISON SYSTEM, IT IS NOT A

9  STEP THAT WE URGE LIGHTLY.  WE RECOGNIZE THAT THE SIZE OF THE

10 PRISON POPULATION MAKES THIS MOTION UNUSUAL, TO SAY THE LEAST,

11 BUT THE USE OF A CAP ON THE PRISON POPULATION IS CERTAINLY

12 COMMON IN CALIFORNIA, WITH MORE THAN 20 COUNTIES OPERATING WITH

13 A LIMIT ON THEIR JAIL POPULATION.

14         INDEED, IN ENACTING THE PRISON LITIGATION REFORM ACT,

15 CONGRESS IMPLICITY RECOGNIZED THAT A REDUCTION IN THE PRISON

16 POPULATION IS THE ONLY WAY TO IMPROVE AN UNCONSTITUTIONAL PRISON

17 CONDITION.  A PRISON RELEASE ORDER IS NECESSARY HERE BECAUSE

18 WITHOUT SUCH AN ORDER, UNNECESSARY INJURY, SUFFERING AND EVEN

19 DEATH WILL CONTINUE FOR THE FORESEEABLE FUTURE.

20         THE PLRA IMPOSES A SUBSTANTIAL BURDEN ON A PARTY

21 SEEKING A PRISONER RELEASE ORDER.  IT REQUIRES PLAINTIFFS TO

22 PROVE BY CLEAR AND CONVINCING EVIDENCE THAT OVERCROWDING IS THE

23 PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS; IN THIS CASE,

24 THE FAILURE OF THE STATE TO PROVIDE ADEQUATE MEDICAL AND MENTAL

25 HEALTH CARE.  ALTHOUGH THIS BURDEN IS HIGH, THE EVIDENCE YOU

 1  WILL HEAR WILL LEAVE LITTLE QUESTION THAT, IN FACT, IT IS THE

 2  CASE HERE.

 3          MY PRESENTATION WILL CONCENTRATE MOSTLY, ALTHOUGH NOT

 4  ENTIRELY, ON THE PLATA CASE.  AND MY CO-COUNSEL, MICHAEL BIEN,

 5  WILL FOCUS ON THE COLEMAN CASE.

 6          THIRTEEN YEARS AGO MENTALLY ILL PRISONERS OF THE

 7  STATE OF CALIFORNIA WERE GRANTED RELIEF BY JUDGE KARLTON FROM

 8  THE CRUEL AND UNUSUAL CONDITIONS THAT THE COURT HELD VIOLATED

 9  THE EIGHTH AMENDMENT TO THE UNITED STATES CONSTITUTION.  AT THAT

10  TIME THE COURT HELD THAT THERE WERE INSUFFICIENT STAFF, SPACE,

11  AND SERVICES TO PROVIDE FOR THE THOUSANDS OF MENTALLY ILL

12  PRISONERS WITH MINIMAL ADEQUATE CARE TO ADDRESS THEIR SERIOUS

13  CONDITIONS.

14          SIX YEARS AGO JUDGE HENDERSON GRANTED PRISONERS WITH

15  SERIOUS MEDICAL CONDITIONS RELIEF FROM THE CRUEL AND UNUSUAL

16  PUNISHMENT THAT VIOLATED THE EIGHTH AMENDMENT THROUGH A

17  STIPULATED INJUNCTION.  AND THREE YEARS AGO JUDGE HENDERSON

18  FOUND INJUNCTIVE RELIEF INSUFFICIENT TO CURE THE HORRENDOUS

19  CONDITIONS AND IMPOSED A SEVERE BUT LESS INTRUSIVE REMEDY WE

20  SEEK HERE BY APPOINTING A RECEIVER.  IN SO RULING, THE COURT

21  FOUND A PRISONER WAS DYING NEEDLESSLY AT THE SHOCKING RATE OF

22  EVERY SIX OR SEVEN DAYS.

23          NOW, 25 MONTHS AGO THE DEFENDANT GOVERNOR OF THE

24  STATE OF CALIFORNIA ISSUED AN EMERGENCY PROCLAMATION ON PRISON

25  OVERCROWDING IN WHICH HE STATED, AMONG OTHER THINGS THAT, QUOTE:

1          "THE CURRENT SEVERE OVERCROWDING IN 29 CDCR

2          PRISONS HAS CAUSED SUBSTANTIAL RISK TO THE

3          HEALTH AND SAFETY OF THE MEN AND WOMEN WHO WORK

4          INSIDE THOSE PRISONS AND THE INMATES HOUSED IN

5          THEM."

6          HERE IS A VIDEO FROM THE DEPARTMENT OF CORRECTIONS

7 DEPICTING THOSE OVERCROWDING CONDITIONS, WHICH I'M TOLD WILL BE

8 ON THE SCREEN AT YOUR HONORS' SCREENS.

9                    (VIDEO PLAYED.)

10          MR. MELLO:  YOUR HONORS, I OBJECT.  THIS IS AN

11 EXHIBIT THAT'S BEEN OBJECTED TO BY COUNSEL IN THE RECORD.

12          JUDGE KARLTON:  WILL YOU TURN IT OFF, PLEASE?

13          MR. MELLO:  WE INTERPOSE -- PAUL MELLOW FOR

14 DEFENDANTS.  DEFENDANTS HAVE OBJECTED TO THIS EVIDENCE.  IT'S

15 NOT BEEN ADMITTED INTO TRIAL.  IT CONTAINS HEARSAY.  IT DOESN'T

16 GO TO THE ULTIMATE ISSUES IN THIS CASE, AND WE DO NOT BELIEVE IT

17 IS APPROPRIATE.  WE SPOKE TO PLAINTIFFS' COUNSEL ABOUT THIS.

18          AND THE COURT HAS NOT RULED ON THE OBJECTIONS TO

19 EVIDENCE.  THIS HAS NOT BEEN ADMITTED INTO EVIDENCE, AND IT'S

20 CLEARLY HEARSAY.  AND I APOLOGIZE, BECAUSE I DO NOT OBJECT

21 DURING OPENING STATEMENTS.  I THINK THE RECORD NEEDS TO BE

22 CLEAR.

23          MR. SPECTER:  WOULD YOU LIKE ME TO RESPOND?

24          JUDGE HENDERSON:  PLEASE.

25          MR. SPECTER:  THIS IS AN OPENING STATEMENT, YOUR

1   HONOR.  IT'S NOT ADMITTED INTO EVIDENCE.  YOU CAN -- THIS IS A

2   COURT TRIAL.  THERE'S NO PREJUDICE.  IF YOU LATER DECIDE THAT

3   IT'S NOT ADMISSIBLE, YOU CAN DISREGARD IT.

4            AND, BY THE WAY, WE DO THINK IT'S ADMISSIBLE.  THIS

5   IS SOMETHING THAT THE DEFENDANTS HAVE ON THEIR WEBSITE.  SO IT'S

6   NOT SOMETHING THAT'S -- YOU CAN ALMOST TAKE JUDICIAL NOTICE OF

7   IT.  SO I WOULD LIKE TO PROCEED.

8            **JUDGE REINHARDT:**  DEFENDANTS ARE AWARE OF IT?

9            **MR. SPECTER:**  YES, IT'S ON THE CDCR WEBSITE.

10           **JUDGE KARLTON:**  CRC WEBSITE?

11           **MR. SPECTER:**  CDCR WEBSITE, DEPARTMENT OF

12   CORRECTIONS.

13           **JUDGE KARLTON:**  IT'S ON THEIR WEBSITE?

14           **MR. SPECTER:**  YES, SIR.

15           **JUDGE HENDERSON:**  OKAY.  PROCEED.  LET'S HAVE AN

16   UNDERSTANDING THAT WE'LL DO THAT SOMETIME TODAY, BUT NO MORE

17   PROPOSED EXHIBITS UNTIL THEY'VE BEEN ADMITTED.  PROCEED WITH

18   THIS ONE.

19           **MR. SPECTER:**  MY WHOLE OPENING STATEMENT INVOLVES

20   SOME OF THESE CLIPS.  I CAN READ THEM TO YOU.  I MEAN, IF I

21   READ -- I'M GOING TO BE -- THERE ARE ADMISSIONS FROM THE

22   GOVERNOR WE ARE GOING TO SHOW YOU.  THERE ARE JUST ADMISSIONS --

23   THEY ARE STATEMENTS BY A DEFENDANT IN THIS CASE.  IT SEEMS LIKE

24   I SHOULD BE ABLE TO REFER TO THEM IN OPENING STATEMENT.

25           **JUDGE HENDERSON:**  THAT MISSES THE POINT.  AT SMALLER

1   TRIALS WE DO THIS AT PRETRIAL.  WE ARE NOT GOING TO OBJECT TO

2   EVERY EXHIBIT AS THE TRIAL GOES.  WE'LL FIND THE TIME TO ADMIT

3   THEM, RESOLVE ALL THAT, BUT LET'S GO FORWARD AS YOU PLANNED.

4           **MR. SPECTER:**  THANK YOU, YOUR HONOR.

5           **JUDGE HENDERSON:**  THE DEFENDANTS' OBJECTION WILL BE

6   RESERVED FOR THE RECORD.

7                   (VIDEO PLAYED.)

8           **MR. SPECTER:**  THANK YOU, YOUR HONOR.  I'M GOING TO

9   HAVE -- CAN I HAVE SOME MORE TIME BECAUSE THE OBJECTIONS WERE

10  ABOUT FIVE OR SO MINUTES?  SO IF I CAN FINISH?

11          LAST YEAR, AFTER TOURING ONE OF THESE OVERCROWDED

12  PRISONS, THE GOVERNOR SPOKE ABOUT THE OVERCROWDING CRISIS WHICH

13  WE ARE HERE ABOUT TODAY.

14                  (VIDEO PLAYED.)

15          **MR. SPECTER:**  WE ARE HERE TODAY, YOUR HONORS, BECAUSE

16  THE SAME OVERCROWDING CONDITIONS THAT LED TO THE EMERGENCY

17  PROCLAMATION THAT THE GOVERNOR ISSUED STILL EXISTS.  THE STATE

18  OF EMERGENCY IS STILL IN EFFECT, AND, TRAGICALLY, THE RISK TO

19  THE HEALTH AND SAFETY OF THE INMATES HOUSED AT CALIFORNIA

20  PRISONS IS SHOCKINGLY HIGH.  IN A SPEECH TO THE CALIFORNIA

21  DISTRICT ATTORNEYS' ASSOCIATION, THE GOVERNOR ACKNOWLEDGED THIS

22  DANGER.

23                  (VIDEO PLAYED.)

24          **MR. SPECTER:**  IN FACT, OVERCROWDING HAS ALREADY

25  BECOME A DISASTER, A QUIET DISASTER, THAT DOES NOT MAKE

1   HEADLINES BECAUSE IT OCCURS OVER TIME AND BEHIND PRISON WALLS.

2           THE RECEIVER RECENTLY ISSUED AN ASSESSMENT OF THE

3   MEDICAL CARE PROVIDED TO ALL THE PRISONERS WHO DIED LAST YEAR.

4   HIS OFFICE CONCLUDED THAT OF 110 UNEXPECTED DEATHS FROM NATURAL

5   CAUSES, 44, THAT'S 44 OUT OF A HUNDRED UNEXPECTED DEATHS, 44

6   WERE PREVENTABLE OR POSSIBLY PREVENTABLE.  THAT AMOUNTS TO

7   40 PERCENT OF UNEXPECTED DEATHS.  THAT FIGURE DOESN'T EVEN

8   INCLUDE AN ADDITIONAL TWO DOZEN DEATHS FROM OTHER CAUSES.

9           THIS MEANS THAT SUCH DEATHS -- WHEN YOU ADD UP ALL

10  DEATHS, IT OCCURS ONCE EVERY FIVE OR SIX DAYS.  AND IN A

11  STATISTIC THAT HAS RAMIFICATIONS FOR THE ENTIRE PLAINTIFF CLASS.

12  OF THE SMALL SET OF 395 DEATHS THAT THE RECEIVER'S OFFICE

13  REVIEWED, THERE WERE 292 EXTREME, EXTREME DEPARTURES FROM

14  GENERALLY ACCEPTED STANDARDS OF CARE.

15          LEST THERE BE ANY DOUBT THAT THE OVERCROWDING CAUSES

16  THESE LETHAL PROBLEMS, THE RECEIVER'S REPORT ATTRIBUTES

17  CAUSATION TO THE CLASSIC SYMPTOMS OF OVERCROWDING.  DELAYS IN

18  ACCESS TO CARE, THE VOLUME OF CARE NEEDED OFTEN EXCEEDS

19  CAPACITY, AND THE CROWDED CONDITIONS THEMSELVES PROMOTE ERROR

20  AND PROHIBIT CONFIDENTIALITY AND INADEQUATE STAFFING DUE IN PART

21  TO THE ISOLATING AND FLAGRANTLY UNPROFESSIONAL ENVIRONMENT.

22          WE COME BEFORE YOU TO PROVE BY CLEAR AND CONVINCING

23  EVIDENCE THAT GOVERNOR SCHWARZENEGGER IS RIGHT, THAT

24  OVERCROWDING IS CAUSING A SUBSTANTIAL RISK TO THE HEALTH AND

25  SAFETY OF PRISONERS, AND WE BELIEVE THAT RISK IS PRIMARILY DUE

1    TO THE CONSTITUTIONAL VIOLATIONS THAT PERPETUATE THIS DEADLY AND

2    DANGEROUS CONDITION.

3              THE CURRENT SECRETARY OF CORRECTIONS, MATTHEW CATE,

4    WAS RIGHT WHEN HE TESTIFIED IN HIS DEPOSITION THAT OVERCROWDING

5    IS PERVASIVE AND MAKES EVERYTHING MORE DIFFICULT IN THE

6    INSTITUTIONS, INCLUDING MEDICAL AND MENTAL HEALTHCARE.  HIS

7    PREDECESSOR JIM TILTON WAS RIGHT.  REFERRING IN PART TO MEDICAL

8    SERVICES, HE STATED:

9                   "UNTIL I GET OVERCROWDING REDUCED, THEN I

10                  DON'T HAVE THE OPPORTUNITY TO PROVIDE THE

11                  PROGRAM WHICH I BELIEVE IS MY CHARGE."

12             MR. TILTON ECHOED THAT SENTIMENT ON AN OFFICIAL CDCR

13   VIDEO.

14                       (VIDEO PLAYED.)

15        **MR. SPECTER:**  IN ADDITION TO THESE AND OTHER

16   ADMISSIONS OF THE DEFENDANTS IN THIS CASE, WE OFFER TWO OTHER

17   SOURCES OF PROOF THAT OVERCROWDING IS A PRIMARY CAUSE OF THE

18   CONSTITUTIONAL VIOLATIONS.

19             FIRST, BOTH THE CURRENT AND FORMER RECEIVERS HAVE

20   STATED THAT OVERCROWDING IS PREVENTING THE DELIVERY OF

21   CONSTITUTIONALLY ADEQUATE HEALTHCARE.

22             MR. SILLEN SAID, QUOTE:

23                  "IT IS CLEAR THAT OVERCROWDING IS AT THE

24                  ROOT OF MANY OF THE DIFFICULTIES THAT AFFLICT

25                  MEDICAL CARE."

1          THE CURRENT RECEIVER STATES THAT SOME OF THE CURRENT

2   FACILITIES ARE LITERALLY FALLING APART AND THAT THERE IS LESS

3   THAN HALF THE CLINICAL SPACE THAT IS NECESSARY IN MANY OF THE

4   PRISONS.  THE DEMAND FOR RESOURCES SO OUTSTRIPS THE SUPPLY OF

5   AVAILABLE CARE THAT HE PROPOSES TO SPEND BILLIONS OF DOLLARS

6   BUILDING MEDICAL FACILITIES FOR PRISONERS.

7          THE SECOND SOURCE OF OUR PROOF IS AN UNPARALLELED

8   GROUP OF EXPERTS.  ONE WORKED FOR THE CALIFORNIA DEPARTMENT OF

9   CORRECTIONS FOR OVER TWO DECADES BEFORE RETIRING AS THE ACTING

10  SECRETARY.  THREE OTHERS ARE EITHER THE CURRENT OR FORMER HEADS

11  OF FOUR OTHER STATE PRISON SYSTEMS, INCLUDING TEXAS, WASHINGTON

12  STATE, AND PENNSYLVANIA.

13         DR. RONALD SHANSKY RAN THE PRISON HEALTH SYSTEM IN

14  ILLINOIS.  HE WORKED FOR SEVERAL YEARS AS A MEDICAL CONSULTANT

15  TO THE DEPARTMENT OF CORRECTIONS.  HE WAS APPOINTED BY THIS

16  DISTRICT COURT AS A SPECIAL MASTER TO MONITOR OUR AGREEMENT TO

17  IMPROVE HEALTHCARE AT SAN QUENTIN, AND HE WAS THE RECEIVER OVER

18  THE WASHINGTON, D.C. PRISON MEDICAL SYSTEM.

19         ALL OF THESE EXPERTS WILL TESTIFY THAT OVERCROWDING

20  IS THE CAUSE OF THE HARM, THAT IT IS THE PRIMARY AND MOST

21  IMPORTANT FACTOR, AND THAT THE CONSTITUTIONAL LEVELS OF CARE ARE

22  NOT POSSIBLE, AT LEAST WITHIN ANY REASONABLE TIME, WITHOUT A

23  SUBSTANTIAL REDUCTION IN POPULATION.

24         NOW, WHY IS THAT?  DEFENDANTS AND SOME INTERVENORS

25  WILL SAY THAT THE RECEIVERSHIP IS REMEDY ENOUGH.  THERE ARE AT

1  LEAST TWO ANSWERS TO THAT PROBLEM.  ONE IS SIMPLE.

2          ONE OF THE ESSENTIAL ELEMENTS FOR THE RECEIVER'S PLAN

3  IS TO BUILD AND UPGRADE MEDICAL FACILITIES, BUT THE STATE HAS

4  BLOCKED THE APPROPRIATION OF FUNDS THE RECEIVER BELIEVES IS

5  NECESSARY TO PROVIDE CONSTITUTIONAL ADEQUATE CARE.  AND EVEN IF

6  IT WASN'T BLOCKED, IT WOULD TAKE MANY YEARS FOR THOSE FACILITIES

7  TO COME ON LINE.

8          THE SECOND ANSWER IS MORE COMPLICATED BUT NO LESS

9  PERSUASIVE.  PRISONS ARE CLOSED ENVIRONMENTS, WHICH MEANS THAT

10 THERE ARE LIMITS TO THE ACTIVITIES THAT CAN TAKE PLACE IN EACH

11 INSTITUTION, AND EACH ACTIVITY IS INTERRELATED AND HAS TO BE

12 COORDINATED.  SO, FOR EXAMPLE, IF YOU INCREASE THE NUMBER OF

13 ADDRESSES, YOU RUN UP AGAINST THE FACT THERE IS NOT ENOUGH SPACE

14 OR EQUIPMENT FOR THE DOCTORS TO USE.

15         ONE WITNESS WHO YOU WILL HEAR FROM IN THIS

16 PROCEEDING, SPEAKING OF REHABILITATIVE PROGRAMMING, PUT IT THIS

17 WAY:

18             "WHEN THE INFRASTRUCTURE CAPACITY CAN HANDLE

19             MORE INMATES, SUCH AS WHEN A CELL CAN ADEQUATELY

20             ACCOMMODATE TWO INMATES EVEN IF IT WAS BUILT FOR

21             ONE, THEN EXCEEDING DESIGN CAPACITY IS

22             MANAGEABLE.  A PROBLEM ARISES WHERE THE LEVEL OF

23             POPULATION EXCEEDS INFRASTRUCTURE CAPACITY."

24         PUT ANOTHER WAY, HE STATED:

25             "INMATES CAN BE SAFELY AND APPROPRIATELY

1          HOUSED AT A POPULATION THAT EXCEEDS DESIGN

2          CAPACITY AS LONG AS THE INFRASTRUCTURE,

3          STAFFING, AND SPACE ARE AVAILABLE TO SERVE THE

4          ADDITIONAL POPULATION."

5          MR. KERNAN IS NOT A WITNESS FOR US.  HE'S A WITNESS

6   FOR THE STATE, AND HE'S CURRENTLY THE UNDERSECRETARY FOR THE

7   DEPARTMENT.  HIS TESTIMONY IS EQUALLY APPLICABLE TO HEALTHCARE:

8          "INCREASED RESOURCES SUCH AS STAFFING CAN'T

9          FIX THE PROBLEM BECAUSE THE INFRASTRUCTURE

10         REMAINS INADEQUATE, AND THERE IS NO DISPUTE THAT

11         IT WILL REMAIN INADEQUATE FOR YEARS TO COME."

12         DEFENDANTS PRESENT A SINGLE MEDICAL EXPERT TO SUPPORT

13   THEIR POSITION THAT OVERCROWDING IS NOT THE PRIMARY CAUSE OF THE

14   CONSTITUTIONAL VIOLATION.

15         IN DR. THOMAS' OPINION, THE FUNDAMENTAL PROBLEM WITH

16   MEDICAL CARE IS NOT THE INFRASTRUCTURE, STAFFING, OR CLINICAL

17   SPACE; RATHER, IT IS THE CULTURE OF CUSTODIAL INTERFERENCE WITH

18   HEALTHCARE.  WELL, THERE IS NO DOUBT THIS REMAINS A SERIOUS

19   PROBLEM, BUT THE TESTIMONY WILL SHOW THAT THE CULTURE IS ITSELF

20   A FUNCTION OF OVERCROWDING, AND IT CANNOT POSSIBLY BE

21   RESPONSIBLE FOR ALL THE PROBLEMS THAT PLAGUE CALIFORNIA PRISONS.

22         IN ITS ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY

23   JUDGMENT, THIS COURT NOTED THAT CROWDING REFERS TO POPULATION

24   DENSITY.  THE COURT SAID THAT IT REFERS TO THE SITUATION WHERE

25   THE POPULATION EXCEEDS THE AVAILABLE RESOURCES AND FACILITIES.

1  IN OTHER TERMS, CROWDING OCCURS WHEN THE DEMAND FOR SERVICES,

2  WHETHER IT BE A PLACE TO SLEEP OR A NEED FOR HEALTHCARE, EXCEEDS

3  THE SUPPLY OF THAT SERVICE, WHETHER IT BE A BED OR A CLINICIAN.

4          DEFENDANTS HAVE SAID THAT OVERCROWDING ISN'T THE MAIN

5  PROBLEM, INSTEAD THE PROBLEM IS LACK OF STAFF OR SPACE IN THE

6  RECORD.  BUT AS THE COURT ANALYSIS IMPLIES, THAT IS JUST THE

7  OTHER SIDE OF THE SAME COIN.

8          THE TRUTH IS IS THAT THE LEGITIMATE DEMAND FOR

9  HEALTHCARE SERVICES HAS FAR OUTSTRIPPED THE SUPPLY FOR AT LEAST

10 A DECADE BEFORE THE COLEMAN COURT ORDERED INJUNCTIVE RELIEF FOR

11 THE LIFE OF THE PLATA INJUNCTION, INCLUDING THE RECEIVERSHIP

12 DURING THE TWO YEARS SINCE WE BROUGHT THIS MOTION, AND IT WILL

13 CONTINUE TO DO SO WITH DEADLY CONSEQUENCES FOR YEARS TO COME

14 UNLESS THE POPULATION OF CALIFORNIA PRISONS IS REDUCED TO A

15 MANAGEABLE LEVEL.

16         AS YOU, JUDGE HENDERSON, NOTED IN YOUR FINDINGS AND

17 CONCLUSIONS WHEN DECIDING TO APPOINT A RECEIVER, THERE ARE MANY

18 CAUSES OF CONSTITUTIONAL VIOLATIONS.  THERE HAVE TO BE IN A

19 SYSTEM AS LARGE AND AS COMPLEX AS THIS ONE.  BUT THE EVIDENCE

20 WILL LEAVE NO DOUBT THAT CROWDING TODAY IS THE PRIMARY CAUSE OF

21 THE CONSTITUTIONAL VIOLATIONS.

22         AND WE RECOGNIZE, IN CLOSING, THAT THE COURT

23 APPROACHES THESE PROCEEDINGS WITH THE GRAVITY APPROPRIATE TO THE

24 RELIEF WE SEEK, BUT THE STATE OF CALIFORNIA THROUGH DECADES OF

25 INACTION, INCLUDING THE LAST TWO YEARS SINCE THIS MOTION WAS

1  FILED AND IN THE 25 MONTHS SINCE THE EMERGENCY PROCLAMATION WAS

2  ISSUED, HAS LEFT THIS COURT WITH NO CHOICE.

3          GOVERNOR SCHWARZENEGGER IN COMMENTS MADE ABOUT A YEAR

4  AGO HAS SAID AS MUCH.

5                  (VIDEO PLAYED.)

6          **MR. SPECTER:**  I THINK THAT SAYS IT ALL.  THANK YOU

7  VERY MUCH.

8          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

9                  **<u>OPENING STATEMENT BY MR. BIEN</u>**

10         **MR. BIEN:**  MAY IT PLEASE THE COURT.  MY NAME IS

11  MICHAEL BIEN.  I AM A PARTNER AT THE FIRM ROSEN, BIEN & GALVAN.

12  I REPRESENT THE PLAINTIFF CLASS IN THE COLEMAN CASE, PRISONERS

13  INCARCERATED IN CALIFORNIA'S PRISON WITH SERIOUS MENTAL

14  DISORDERS.

15         TODAY THERE ARE MORE THAN 35,000 PRISONERS IN THE

16  COLEMAN CLASS.  MORE THAN ONE OF EVERY FIVE PRISONERS IS

17  PRESENTLY DIAGNOSED WITH A SERIOUS MENTAL DISORDER.  COLEMAN AND

18  PLATA CLASS MEMBERSHIP IS FLUID AND OVERLAPS.  A PRISONER MAY

19  HAVE HEART DISEASE AND SCHIZOPHRENIA, DIABETES AND DEPRESSION.

20         ANYONE IN PRISON MAY SUFFER AN ILLNESS, ACCIDENT, OR

21  A PSYCHOTIC BREAK AND REQUIRE BASIC MEDICAL AND MENTAL HEALTH

22  SERVICES.  THE ISSUE BEFORE THIS COURT TODAY IS WHAT IS A

23  PRIMARY REASON THAT THESE BASIC CONSTITUTIONAL-REQUIRED

24  FUNDAMENTAL RIGHTS ARE NOT IN PLACE TODAY IN CALIFORNIA PRISONS

25  AFTER MORE THAN A DECADE OF MORE THAN SUSTAINED EFFORTS BY TWO

1  FEDERAL COURTS CHARGED WITH THE POWER AND RESPONSIBILITY TO

2  PROTECT AND RESTORE THESE RIGHTS?

3        IT IS A GREAT RESPONSIBILITY FOR ME TO STAND HERE

4  BEFORE YOU TO ADVOCATE FOR THIS LARGE GROUP OF MEN AND WOMEN WHO

5  ARE DESPERATE, POWERLESS, AND OFTEN SUFFERING AS A RESULT OF THE

6  FAILURE OF TODAY'S INADEQUATE SYSTEMS.  THE PROMISED REMEDY HAS

7  BEEN DELAYED MANY TIMES.

8        THE PLATA AND COLEMAN COURTS, AIDED BY THE SPECIAL

9  MASTER AND RECEIVER, HAVE IDENTIFIED AND ATTEMPTED TO OVERCOME

10  OBSTACLES AND BARRIERS TO THE REMEDIAL PROCESS.

11        THE PRISON LITIGATION REFORM ACT AND THE PRINCIPLES

12  OF EQUITY, COMITY, AND FEDERALISM HAVE DIRECTED THAT

13  OVERCROWDING BE DIRECTED ONLY AS A LAST RESORT.

14        PLAINTIFFS WILL PRESENT CLEAR AND CONVINCING EVIDENCE

15  THAT THE TIME HAS COME, THE EXTREME LONG LASTING AND PERSUASIVE

16  OVERCROWDING OF THE CALIFORNIA PRISON SYSTEM MUST BE ADDRESSED

17  AND MUST BE ADDRESSED NOW SO THE REMEDIAL PROCESS IN THE COLEMAN

18  AND PLATA CASES CAN FINALLY MOVE FORWARD AND BE COMPLETED.

19  FURTHER DELAY IN ADDRESSING THE PRIMARY CAUSE OF THESE PROBLEMS

20  WILL CERTAINLY MEAN ADDITIONAL AVOIDABLE PAIN, SUFFERING AND

21  DEATH FOR OUR CLIENTS.

22        IT IS UNDISPUTED IN THE RECORD BEFORE THIS COURT THAT

23  CALIFORNIA'S PRISON SYSTEM IN NOVEMBER OF 2008, MORE THAN 13

24  YEARS AFTER THE COLEMAN COURT ISSUED ITS DECISION, CANNOT AND

25  DOES NOT PROVIDE TIMELY AND APPROPRIATE ACCESS TO MENTAL

1  HEALTHCARE SUFFICIENT TO ADDRESS THE BASIC AND FUNDAMENTAL NEEDS

2  OF THE COLEMAN CLASS.  THESE DEFICIENCIES EXACERBATE THEIR

3  MENTAL ILLNESS AND CAUSE PAIN, INJURY AND SUFFERING.

4          DEATH BY SUICIDE ALSO CONTINUES TO OCCUR FAR TOO

5  OFTEN.  ACCORDING TO THE COLEMAN SPECIAL MASTER'S MOST RECENT

6  REPORT, MORE THAN 70 PERCENT OF THE PRISON SUICIDES WERE

7  FORESEEABLE OR AVOIDABLE.  HE ALSO FOUND AGAIN THAT THE SUICIDE

8  RATE IN CALIFORNIA PRISONS CONTINUES TO BE FAR ABOVE THE

9  NATIONAL AVERAGE.  THESE PROBLEMS PERSIST DESPITE THE YEARS OF

10 COLEMAN COURT ORDERS, EXTENSIVE MONITORING BY A SKILLED SPECIAL

11 MASTER AND A TEAM OF NATIONALLY PROMINENT EXPERTS, AND AFTER

12 MULTIPLE PLANS BY DEFENDANTS.

13         WHY IS THE MENTAL HEALTH DELIVERY SYSTEM BACKSLIDING?

14 PROBLEMS GETTING WORSE RATHER THAN BETTER?  WHY ARE WE IN

15 NOVEMBER 2008 HAVING A TRIAL ABOUT MANY OF THE SAME FUNDAMENTAL

16 PROBLEMS THAT THE COURT FOUND TO EXIST IN 1995?

17         PLAINTIFFS SUBMIT AND THE EVIDENCE WILL SHOW THAT THE

18 PRIMARY CAUSE OF THE CONSTITUTIONAL VIOLATIONS NOW IS THE

19 EXTREME LEVEL OF OVERCROWDING, WHICH CONTINUES IN THE CALIFORNIA

20 PRISON SYSTEM THAT OPERATES TODAY AT MORE THAN 190 PERCENT OF

21 DESIGN CAPACITY.  THE PRISON SYSTEM SIMPLY CANNOT FUNCTION

22 SAFELY AND EFFECTIVELY AND CANNOT DELIVER HEALTHCARE AT THIS

23 LEVEL OF OVERCROWDING.  THERE IS SIMPLY FAR TOO MANY PRISONERS

24 WITH SERIOUS MENTAL ILLNESS AND FAR TOO FEW OF THE REQUIRED

25 SERVICES FOR A FUNCTIONING MENTAL HEALTH SYSTEM.

1            THE EVIDENCE IS OVERWHELMING.  FIRST, AS YOU'VE SEEN

2    A SMALL PORTION OF, THERE ARE ADMISSIONS BY THE GOVERNOR AND

3    OTHER STATE OFFICIALS, AS WELL AS BLUE RIBBON COMMISSIONS AND

4    PANELS THAT HAVE CONSISTENTLY FOUND THAT THE CALIFORNIA PRISON

5    SYSTEM IS DANGEROUS, AND BROKEN, AND THAT OVERCROWDING IS A MOST

6    URGENT ISSUE THAT HAS TO BE ADDRESSED.

7            SECOND ARE THE REPORTS BY THE COLEMAN SPECIAL MASTER

8    AND THE PLATA RECEIVER THAT DETAIL THE ONGOING SERIOUS

9    DEFICIENCIES IN THE MEDICAL AND MENTAL HEALTHCARE AND ESTABLISH

10   THAT OVERCROWDING REMAINS AN INSURMOUNTABLE BARRIER TO THE

11   REMEDIAL PROCESS IN BOTH CASES.

12           THE COLEMAN PLAINTIFFS WILL ALSO PRESENT THE

13   TESTIMONY OF TWO DISTINGUISHED AND WELL-QUALIFIED EXPERTS.

14   TODAY YOU WILL HEAR FROM DR. PABLO STEWART, A BOARD CERTIFIED

15   PSYCHIATRIST WHO WORKED FOR TEN YEARS, COURT MEDIATOR,

16   MONITORING THE *GATES VERSUS DEUKMEJIAN* CONSENT DECREE, WHICH

17   INVOLVED THE CALIFORNIA MEDICAL FACILITY.  DR. STEWART HAS BROAD

18   EXPERIENCE IN THE EVALUATION AND OPERATION OF PRISON MENTAL

19   HEALTH SYSTEMS.

20           WE WILL ALSO PRESENT THE TESTIMONY OF DR. CRAIG

21   HANEY, A PSYCHOLOGIST WHO HAS STUDIED AND WRITTEN EXTENSIVELY ON

22   THE PSYCHOLOGICAL EFFECTS OF IMPRISONMENT AND OVERCROWDING.

23   DR. HANEY HAS TESTIFIED AS AN EXPERT IN MANY PRISON CLASS

24   ACTIONS, INCLUDING AT THE TRIAL OF THIS CASE IN 1993.

25           IN MAY OF 2007, THE COLEMAN SPECIAL MASTER, MICHAEL

1  KEATING, REPORTED TO THE COURT CONCERNING THE IMPACT OF

2  OVERCROWDING ON THE COLEMAN REMEDIAL PROCESS IN THE PRISON

3  SYSTEM.  THE SPECIAL MASTER'S REPORT IS COMPELLING EVIDENCE IN

4  AND OF ITSELF ESTABLISHING THE NEXUS BETWEEN OVERCROWDING AND

5  THE ONGOING CONSTITUTIONAL VIOLATIONS IN MENTAL HEALTHCARE.

6        DR. HANEY AND DR. STEWART, THROUGH THEIR OWN

7  INVESTIGATIONS, HAVE CONFIRMED THE SPECIAL MASTER'S FINDINGS,

8  AND THAT 18 MONTHS LATER, NO MATERIAL CHANGES HAVE OCCURRED.  IN

9  ADDITION, SOME INDICATORS POINT TO A WORSENING CONDITION FOR THE

10  COLEMAN CLASS.

11        I THINK IT'S TO BE NOTED THAT MR. KEATING'S SERVICE

12  TO THIS COURT, A DOZEN YEARS AS SPECIAL MASTER, IS

13  EXTRAORDINARY, AND THAT GAVE HIM AN AMAZING PERSPECTIVE ON THE

14  CALIFORNIA SYSTEM, WHAT WAS GOING ON.  BUT, IN ADDITION,

15  MR. KEATING HAS WORKED ON SEVERAL PRIOR CLASS ACTIONS INVOLVING

16  OVERCROWDING AROUND THE COUNTRY AND IS QUITE FAMILIAR WITH HOW

17  OVERCROWDING AFFECTS SYSTEMS.

18        SPECIAL MASTER KEATING FOUND THAT OVERCROWDING SET

19  BACK THE REMEDIAL PROCESS, AND I QUOTE:

20        "OVER THE PAST 11 PLUS YEARS MUCH HAS BEEN

21        ACHIEVED, AND MANY OF THE ACHIEVEMENTS HAVE

22        SUCCUMBED TO AN INEXTRICABLY RISING TIDE OF

23        POPULATION, LEAVING BEHIND GROWING FRUSTRATION

24        AND DESPAIR," END QUOTE.

25        HE ALSO EXPLAINED HOW SEVERE OVERCROWDING HAS

1  AFFECTED THE CALIFORNIA PRISON SYSTEM.  AGAIN I QUOTE:

2              "THE INEVITABLE RESULT OF SEVERE

3          OVERCROWDING IS THAT EVERYONE ALSO SPENDS MORE

4          AND MORE TIME IN THEIR CELLS.  GYMS ARE NO

5          LONGER AN OPTION FOR RECREATION, FOR TIME OUT OF

6          CELL.  DAYROOMS SHARE MANY OF THE SAME PROBLEMS.

7          WORK OR VOCATIONAL OPPORTUNITIES SHRINK IN THE

8          EXPANDING POPULATION.  DISTURBANCES OCCUR MORE

9          FREQUENTLY WITH RESULTING INCREASES IN THE

10         NUMBER AND DURATION OF LOCKDOWNS.  ALL INMATES

11         MUST SPEND INCREASINGLY LARGE CHUNKS OF THEIR

12         DAY IN THEIR CELLS, OR MUCH MORE DANGEROUSLY, IN

13         ONE OF THOSE TRIPLE-BUNKED, NON-TRADITIONAL

14         SPACES.

15             "NONE OF THIS IS CONDUCIVE TO THE HEALTH OR

16         WELL BEING OF ANY INMATE, MUCH LESS A SERIOUSLY

17         MENTALLY DISORDERED INMATE PATIENT. IT

18         INEVITABLY ESCALATES THE INCIDENT OF MENTAL

19         ILLNESS AND EXACERBATES THE CONDITIONS OF THOSE

20         ALREADY FRAGILE AND VOLATILE," END QUOTE.

21             OVERCROWDING NOT ONLY INTERFERES WITH DELIVERY OF

22  MENTAL HEALTHCARE, BUT AT THE SAME TIME, INCREASES THE DEMAND

23  FOR SUCH CARE.  OVERCROWDING AFFECTS EVERYONE, NOT JUST THOSE IN

24  GYMS AND DAYROOM HOUSING.

25             SPECIAL MASTER KEATING'S FINDINGS CONTINUE TO BE TRUE

1    TODAY.

2              THE NUMBER OF COLEMAN CLASS NUMBERS HAS INCREASED IN

3    THE PAST 18 MONTHS EVEN THOUGH THE PRISON POPULATION HAS

4    STABILIZED.  THE ACUITY OF THE COLEMAN CLASS HAS ALSO INCREASED

5    DURING THIS PERIOD.  THAT IS, A HIGHER PERCENTAGE OF THE PRISON

6    POPULATION NOW REQUIRES MENTAL HEALTHCARE THAN THEY DID IN

7    MARCH 2007.  AND OF THAT GROUP, THE DEMAND FOR HIGHER LEVELS OF

8    CARE HAS INCREASED AT AN EVEN HIGHER RATE.  THE WAIT LIST FOR

9    ALL HIGHER LEVELS OF CARE PERSISTS, AND SOME HAVE WORSENED.

10             THERE ARE FOUR GENERAL WAYS THAT OVERCROWDING CAUSES

11   HARM TO THE MENTAL HEALTH SYSTEM.

12             FIRST, RECRUITING AND RETAINING SUFFICIENT CLINICAL

13   STAFF NECESSARY TO PROVIDE MENTAL HEALTHCARE TO THIS EXPANDING

14   POPULATION AND OVERCROWDING PRISONS HAS BEEN IMPOSSIBLE.  MENTAL

15   HEALTHCARE IS DELAYED OR INADEQUATE AS A RESULT.  ADEQUACY IN

16   CLINICAL STAFFING IS MEASURED BY A RATIO OF PATIENTS TO

17   CLINICIANS.

18             DESPITE SOME INCREASES IN THE ABSOLUTE NUMBER OF

19   MENTAL HEALTH CLINICIANS OVER TIME, DUE TO OVERCROWDING, THE GAP

20   CONTINUES TO GROW.  ACCORDING TO SPECIAL MASTER, DEFENDANTS HAVE

21   SUFFICIENT STAFFING TO TREAT TWO-THIRDS OF THE COLEMAN CLASS IN

22   2007.  THIS YEAR AN OUTSIDE CONSULTANT PERFORMED A WORKLOAD

23   STUDY AND FOUND, ONCE AGAIN, THAT THE PRISONS WERE SEVERELY

24   UNDERSTAFFED WITH MENTAL HEALTH CLINICIANS.

25             SPECIAL MASTER LOATS RECENTLY FOUND THAT THE NEW

1   STUDY UNDERESTIMATED THE MENTAL HEALTH STAFFING NEEDS.  THE

2   NECESSARY STAFFING RATIO CAN ONLY BE MET BY CONTROLLING

3   POPULATION.

4            THE SECOND MAJOR OVERCROWDING-RELATED ISSUE IS THE

5   SHORTAGE OF OFFICE AND TREATMENT SPACE.  THE SPECIAL MASTER

6   DIRECTLY LINKED OVERCROWDING TO THE SPACE DEFICITS LIMITING THE

7   ABILITY TO DELIVER MEDICAL AND MENTAL HEALTHCARE.  I QUOTE

8   AGAIN:

9            "THE GROWING PROBLEMS REFLECT THE IMPACT OF

10           OVERCROWDING.  THE SHEER NUMBER OF INMATES

11           NEEDING ALL SORTS OF TIME OUT OF THEIR CELLS FOR

12           ALL SORTS OF REASONS PUTS INCREDIBLE PRESSURE ON

13           AVAILABLE SPACE.  EXCESSIVE POPULATION, THUS,

14           RESULTS IN A REDUCTION OF PROGRAMMING SPACE NOW

15           OCCUPIED BY INMATE BUNKS, GREATER COMPETITION

16           FOR THE USE OF DIMINISHING AVAILABLE SPACE,

17           FEWER ESCORTING CORRECTIONAL OFFICERS TO PERMIT

18           ACCESS TO DIMINISHING SPACE, AND, ULTIMATELY THE

19           INCREASING FRUSTRATION AND DEMORALIZATION OF

20           CLINICIANS TRYING TO PROVIDE THE TREATMENT.  THE

21           LACK OF PROGRAMMING SPACE IS A HUGE PROBLEM."

22           END QUOTE.

23           THE TREATMENT AND OFFICE SPACE SHORTAGES THROUGH THE

24   33 PRISONS ARE ALSO A MAJOR FACTOR STANDING IN THE WAY OF

25   RECRUITMENT AND RETENTION OF CLINICIANS.  THE COMPETITION FOR

1    SPACE IN THESE CROWDED PRISONS IS NEVER ENDING.  MENTAL HEALTH

2    CLINICIANS ATTEMPT TO TREAT THEIR PATIENTS IN CAGES AND

3    HALLWAYS, ON DAYROOM FLOORS, IN CONVERTED BATHROOMS AND BROOM

4    CLOSETS, IN AD SEG UNITS, AND JURY RIGGED SPACES OF ALL TYPES.

5            AS A RESULT OF OVERCROWDING, CONFIDENTIALITY, A

6    FUNDAMENTAL ELEMENT TO MENTAL HEALTHCARE, IS FREQUENTLY

7    COMPROMISED.

8            THE THIRD MAJOR OVERCROWDING FACTOR IS DELAYED ACCESS

9    TO HIGHER LEVELS OF CARE.  AGAIN, THE SPECIAL MASTER DIRECTLY

10   LINKED OVERCROWDING TO THE BED SHORTAGES.  I QUOTE:

11            "THE CURRENT SYSTEM STILL PROVIDES

12            INSUFFICIENT BEDS, AND UNLESS AND UNTIL

13            POPULATION IS REDUCED, WILL CONTINUE TO DO SO

14            FOR YEARS TO COME.  WHATEVER THE CAUSE,

15            DEFENDANTS ARE FACING A FOUR TO FIVE-YEAR GAP IN

16            THE AVAILABILITY OF SUFFICIENT BEDS TO MEET THE

17            TREATMENT NEEDS OF MANY PATIENTS WHO REQUIRE

18            HIGHER LEVELS OF CARE.  IN THE MEANTIME, THEY

19            ARE LEFT SUFFERING.  THIS MEANS THAT NEARLY 12

20            YEARS AFTER THE DETERMINATION, THAT MENTAL

21            HEALTH SERVICES IN CDCR ARE EGREGIOUSLY

22            UNCONSTITUTIONAL.  HUNDREDS, CERTAINLY, AND

23            POSSIBLY THOUSANDS OF CDCR INMATE PATIENTS, ALL

24            MEMBERS OF THE COLEMAN CLASS CERTIFIED IN THE

25            EARLY '90S, ARE STILL LOOKING FOR BEDS AT THE

1           LEVEL OF TREATMENT THEY REQUIRE", END QUOTE.

2           **THE CLERK:** FIVE MINUTES, COUNSEL.

3           **MR. BIEN:** WAIT LISTS AND LONG DELAYS REMAIN THE RULE

4   FOR DEFERRALS TO MENTAL HEALTH CRISIS BEDS, ENHANCED OUTPATIENT

5   PROGRAMS AND IN-PATIENT PSYCHIATRIC HOSPITALIZATION PROVIDED BY

6   DEPARTMENT OF MENTAL HEALTH.

7           IN ADDITION, DUE TO THE EMERGENCY CONDITIONS OF

8   OVERCROWDING, EVEN CLASS MEMBERS WHO GET TO THESE HIGHER LEVELS

9   OF CARE, ARE LIKELY O END UP IN INADEQUATE, AD HOC TEMPORARY

10  UNITS.

11          AS A DIRECT RESULT OF OVERCROWDING, THE COLEMAN COURT

12  HAS BEEN REQUIRED TO ORDER THE STATE TO WAIVE LICENSING AND

13  HEALTH AND SAFETY STANDARDS AND OPERATE TEMPORARY MENTAL HEALTH

14  PROGRAMS IN CONVERTED PRISON HOUSING UNITS WITHOUT CLINICAL

15  OFFICES OR CONFIDENTIAL TREATMENT SPACE.  THESE, QUOTE,

16  "TEMPORARY EMERGENCY PROGRAMS," WILL BE REQUIRED TO OPERATE FOR

17  MANY YEARS, MAYBE FOREVER, UNLESS OVERCROWDING IS BROUGHT UNDER

18  CONTROL.  THESE ARE BAD BEDS TO THE SAME EXTENT THAT GYMS AND

19  DAYROOMS FILLED WITH BUNKS ARE BAD BEDS.

20          CDCR CLINICIANS WHO CANNOT TRANSFER THEIR PATIENTS TO

21  HIGHER LEVELS OF CARE ARE FORCED TO USE DANGEROUS MAKESHIFT

22  ALTERNATIVES.  THEY ARE PRACTICING BATTLEFIELD PSYCHIATRY,

23  DEALING ONLY WITH CRITICAL EMERGENCIES AND CRISES AND RISKING

24  LIVES.  THEY ARE MAKING HEROIC EFFORTS IN UNREASONABLE

25  CONDITIONS.

1          THE FOURTH OVERCROWDING FACTOR ARE THE HOUSING UNITS

2    THEMSELVES.  YOU'VE SEEN THE GYMS AND DAYROOMS.  THEY STILL

3    EXIST TODAY.  AND ACCORDING TO DEFENDANTS, 5,500 COLEMAN CLASS

4    MEMBERS ARE TODAY LIVING IN OVERCROWDED GYMS AND DAYROOMS.

5    FOURTEEN THOUSAND PRISONERS ARE STILL IN GYMS AND DAYROOMS.  THE

6    MENTALLY ILL ARE ESPECIALLY VULNERABLE TO THE TENSION AND STRESS

7    OF THESE EXTREMELY OVERCROWDED CONDITIONS.

8          BUT PLAINTIFFS WILL DEMONSTRATE THAT OVERCROWDING

9    UNDERMINES PROGRAMS AND ACTIVITIES EVERYWHERE IN THE SYSTEM, NOT

10   JUST IN THE BAD BEDS.

11         DR. HANEY INSPECTED TEHACHAPI STATE PRISON IN AUGUST.

12   HE INTERVIEWED SEVERAL PRISONERS WHO HAD BEEN REFERRED AND

13   ACCEPTED FOR THE HIGHEST LEVELS OF IN-PATIENT CARE IN THE ACUTE

14   PSYCHIATRIC PROGRAM AT CMF THAT IS OPERATED BY DEPARTMENT OF

15   MENTAL HEALTH.  RATHER THAN BEING TRANSFERRED THERE, THEY WERE

16   STILL WAITING TO GO, EVEN THOUGH THEY HAD BEEN ACCEPTED AND THEY

17   WERE WAITING FOR MONTHS, THAT'S BECAUSE DMH NOW ONLY ACCEPTS

18   PEOPLE WHO ARE ACUTELY SUICIDAL OR HOMICIDAL, BUT NOT MERELY

19   PEOPLE WHO MEET THEIR QUALIFICATIONS.  THESE MEN WERE NOT HOUSED

20   IN A MENTAL HEALTH CRISIS BED OR INFIRMARY, BUT IN AN AD SEG

21   UNIT.

22         ONE OF THE MEN TOLD DR. HANEY THAT HE HAD NOT BEEN

23   OUT OF HIS CELL FOR FOUR MONTHS.  WHEN DR. HANEY ASKED THE

24   CORRECTIONAL OFFICERS ABOUT THIS IMPOSSIBLE CLAIM, THEY

25   CONFIRMED THAT NO ONE IN THE UNIT HAD BEEN ALLOWED YARD IN FOUR

1   MONTHS.  AND THE REASON WAS THERE HAD BEEN A SERIOUS ATTACK AT

2   TEHACHAPI PRISON ON CORRECTIONAL OFFICERS IN THAT UNIT FOUR

3   MONTHS BEFORE.  THE PRISONERS RESPONSIBLE FOR THE ATTACK HAD

4   BEEN IMMEDIATELY TRANSFERRED AWAY TO ANOTHER PRISON, BUT THE

5   PRISONERS WHO REMAINED IN THE UNIT WERE ON LOCKDOWN, DEPRIVED OF

6   ALL PROGRAMMING, INCLUDING YARD, FOR FOUR MONTHS.

7            THIS TYPE OF EXTREME CORRECTIONAL RESPONSE IS A

8   DIRECT RESULT OF EXTREME OVERCROWDING.  THE EXPERTS OBSERVED

9   THIS PROBLEM THROUGHOUT THE TOURS.  THERE IS NO ESCAPE FROM THE

10  EFFECTS OF OVERCROWDING.  EVERYONE WHO LIVES OR WORKS IN THE

11  SYSTEM IS IMPACTED EVERY DAY.

12           A REDUCED AND CONTROLLED PRISON POPULATION WILL

13  REMOVE THE MAJOR BARRIER TO THE COURT'S EFFORTS TO BRING THE

14  SYSTEM TO CONSTITUTIONAL LEVEL OF CARE.  WITHOUT POPULATION

15  REDUCTION AND CONTROL, THE REMEDY WILL FOREVER REMAIN JUST A SET

16  OF PLANS ON PAPER, AND THE COLEMAN AND PLATA CLASSES WILL

17  CONTINUE TO EXPERIENCE UNNECESSARY AND AVOIDABLE PAIN,

18  SUFFERING, AND DEATH FROM INADEQUATE MEDICAL AND MENTAL

19  HEALTHCARE.

20           IF I HAVE COULD A MOMENT, I WANT TO SHOW SOME PHOTOS

21  THAT WERE TAKEN IN AUGUST, MOST CURRENT CONDITIONS.  THESE FIRST

22  TWO ARE OF GYMS.  THE FIRST IS OF A GYM AT TEHACHAPI.  OUR

23  EXPERTS IN THE TOURS IN JULY AND AUGUST ASKED TO TAKE PHOTOS,

24  AND THE PRISON OFFICIALS BROUGHT ALONG A PRISON OFFICIAL TO TAKE

25  PHOTOS FOR US WHERE OUR EXPERTS ASKED THEM TO OBTAIN.  THESE

1  EXIST IN THE RECORD AT PLAINTIFF'S EXHIBITS 336 TO 341.  THEY

2  WILL BE REFERRED TO.

3            **MS. TILLMAN:**  WE WOULD LIKE TO OBJECT FOR THE RECORD.

4  I BELIEVE WE'VE ALREADY FILED OBJECTIONS WITH THIS COURT ON

5  THESE PARTICULAR PICTURES.  WE HAVEN'T RECEIVED A RULING ON

6  QUALITY OR EVIDENTIARY NATURE.  SO WE DO LODGE THE OBJECTION

7  BEFORE THEY ARE SHOWN TO THE AUDIENCE AND TO THE COURT.

8            **JUDGE HENDERSON:**  OBJECTION WILL BE PRESERVED.

9            **MR. BIEN:**  THIS IS A GYM AT TEHACHAPI STATE PRISON

10 TAKEN ON JULY 9 AT FACILITY 4B AS PART OF EXHIBIT 337.

11            THIS SECOND PICTURE IS AT MULE CREEK STATE PRISON,

12 PLAINTIFFS' EXHIBIT 339, TAKEN AT THE B YARD GYM DORM.

13            THE NEXT SERIES OF PICTURES SHOW CLINICIANS USING

14 WHAT WE EUPHEMISTICALLY CALL ALTERNATIVE SPACES TO DELIVER

15 HEALTHCARE.  THIS PICTURE WAS TAKEN AT TEHACHAPI ON JULY 29TH IN

16 THE RECEPTION CENTER, YARD THREE, BUILDING FIVE.  THESE ARE

17 CLINICIANS DOING RECEPTION CENTER MENTAL HEALTH INTERVIEWS.

18            THE WOMAN OVER HERE ON THE RIGHT IS DOING IT AT A

19 TABLE, AND THE OTHER CLINICIAN IS INTERVIEWING INMATES IN CAGES,

20 OR, AS THEY CALL THEM, TREATMENT MODULES.

21            THE NEXT PICTURE IS TAKEN AT SALINAS VALLEY STATE

22 PRISON ON JULY 29TH, 2008.  THESE ARE HOLDING CELLS FOR PEOPLE

23 WHO CAN'T GET INTO THE MENTAL HEALTH CRISIS BED THAT IS

24 FREQUENTLY FULL.  IN OTHER WORDS, THESE PEOPLE HAVE BEEN

25 REFERRED FOR CRISIS CARE, BUT THE CRISIS BEDS ARE FULL.  THESE

1  ARE WHAT'S CALLED DRY HOLDING CELLS.  THEY'RE LITTLE CAGES.

2  THEY DON'T HAVE WATER OR BATHROOMS.

3          THE NEXT PICTURE, ALSO PART OF PLAINTIFFS' 339, IS

4  TAKEN ON AUGUST 1ST AT MULE CREEK STATE PRISON.  THIS IS A

5  CONVERTED HOUSING UNIT CONVERTED INTO SOMETHING CALLED A MHOHU,

6  A MENTAL HEALTH OUTPATIENT HOUSING UNIT.  AND, AGAIN, THIS IS

7  THE PLACE THAT THE BEDS HAVE BEEN REMOVED.  THERE IS A TOILET

8  INSIDE.  BUT A MHOHU IS AN ALTERNATIVE TO A MENTAL HEALTH CRISIS

9  BED WHERE PRISONERS ARE HELD, SOMETIMES FOR SUICIDE WATCH.

10          **THE CLERK:**  COUNSEL, YOUR TIME IS UP.

11          **MR. BIEN:**  OKAY.  TWO MORE.

12          THE NEXT ONE IS ALSO MULE CREEK STATE PRISON TAKEN ON

13  AUGUST 1ST, CR BUILDING 12.  THIS IS A PICTURE OF A CLINICIAN

14  DOING AN INTERVIEW IN A CAGE ON THE DAYROOM FLOOR.

15          AND THE FINAL PICTURE I'M GOING TO SHOW WAS TAKEN AT

16  WASCO STATE PRISON ON AUGUST 1ST, 2008.  IT'S FACILITY B,

17  BUILDING 2B.  THIS IS A RECEPTION CENTER HOUSING UNIT WHERE

18  EOP'S, ARMSTRONG CLASS MEMBERS, OTHERS WERE MIXED TOGETHER, AND

19  THESE ARE -- THOSE PEOPLE YOU SEE SITTING OUTSIDE THE CELLS ARE

20  PERFORMING SUICIDE WATCH.

21          THESE ARE TODAY'S CONDITIONS.  THIS IS WHAT THIS CASE

22  IS ABOUT.  THANK YOU, YOUR HONOR.

23          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

24          **OPENING STATEMENT BY MR. ADAM**

25          **MR. ADAM:**  GOOD MORNING, YOUR HONORS.  GREG ADAM OF

1  CARROLL, BURDICK & MCDONOUGH ON BEHALF OF CCPOA.

2          CCPOA IS A LABOR ORGANIZATION THAT REPRESENTS

3  APPROXIMATELY 30,000 CORRECTIONAL OFFICERS, CORRECTIONAL

4  SERGEANTS, CORRECTIONAL LIEUTENANTS, CORRECTIONAL COUNSELORS,

5  AND PAROLE AGENTS.  THE MEN AND WOMEN REPRESENTED BY OUR UNION

6  WORK IN EVERY CORRECTIONAL FACILITY IN THE STATE OF CALIFORNIA.

7  EVERY DAY THEY BEAR WITNESS TO THE IMPACT OF OVERCROWDING ON THE

8  CONDITIONS INSIDE THE PRISONS AS THEY AFFECT BOTH INMATES AND

9  STAFF.  ON THE FIRST VIDEO EXCERPT, THAT WAS ONE OF OUR MEMBERS

10  SPEAKING TO THE CAMERA.

11          YOUR HONORS, IN THIS OPENING STATEMENT, I WANT TO

12  COVER THREE ISSUES.  FIRST OF ALL, WHY CCPOA INTERVENED IN THIS

13  CASE; AND SECOND IS WHY CCPOA INTERVENED ON THE PLAINTIFFS' SIDE

14  IN THIS CASE; AND, THIRD IS A STATEMENT OF WHAT OUR WITNESSES

15  ARE GOING TO ATTEST TO.

16          SO TURNING TO THE FIRST QUESTION, WHY CCPOA

17  INTERVENED IN THIS CASE, THE BASIC REASON IS THAT BECAUSE OF THE

18  MASSIVE OVERCROWDING IN OUR PRISONS, WHICH IS EXACERBATED BY

19  CHRONIC UNDERSTAFFING AND DELAPIDATED FACILITIES, CALIFORNIA'S

20  PRISONS PRESENT AN INCREASINGLY UNSAFE WORKING CONDITION FOR

21  STAFF AND UNSAFE CUSTODY CONDITIONS FOR INMATES.

22          THERE ARE TWICE AS MANY INMATES IN THE SYSTEM AS THE

23  SYSTEM WAS DESIGNED FOR.  INMATES ARE ROUTINELY DOUBLE CELLED.

24  THEY ARE ROUTINELY DOUBLE AND TRIPLE BUNKED, AS THE PICTURES

25  ATTEST TO.

1          THERE ARE INCREASING INMATE-ON-INMATE ASSAULTS,

2   PRISON GANG ACTIVITY, AND INMATE-ON-STAFF ASSAULTS.  CANCELING

3   OF INMATE PROGRAMS IS ROUTINE, ALMOST INVARIABLE.  LOCKDOWNS AND

4   LIMITATIONS ON EXERCISE OF INMATES ARE THE NORMAL.  THERE'S ALSO

5   AN INCREASINGLY SUBSTANTIAL RISK FOR THE TRANSMISSION OF

6   INFECTIOUS ILLNESSES AMONG BOTH INMATES AND STAFF.  THESE

7   CONDITIONS CREATE DISCONTENT AMONG INMATES AND PRESENT SERIOUS

8   SAFETY CONCERNS FOR BOTH INMATES AND FOR STAFF.

9          FOR STAFF, WE SEE THESE PROBLEMS AS BOILING DOWN TO

10  TWO MAIN ISSUES.  FIRST IS THE SAFETY CONCERNS THAT THE

11  CORRECTIONAL STAFF ARE HAVING TO BEAR AND THE ENORMOUS PHYSICAL

12  PRICE OF THAT, AND WE HAVE AN OVERRIDING OBLIGATION AS A LABOR

13  UNION TO REPRESENT OUR MEMBERS, BUT WE THINK IT GOES BEYOND

14  THAT, YOUR HONORS.

15         WE BELIEVE THAT THESE CONDITIONS CREATE A

16  DEHUMANIZING EFFECT ON CORRECTIONAL STAFF; ONE, BY HAVING TO

17  WITNESS THESE CONDITIONS AND WORK IN THEM.  THEN, COMBINED WITH

18  THAT, COMES THE SUFFERING THAT GOES WITH HAVING AN INABILITY TO

19  DO ANYTHING ABOUT IT.  FOR THESE REASONS, YOUR HONORS, CCPOA

20  ENERGETICALLY SUPPORTED THE CONVENING OF THIS PANEL.

21         POINT NUMBER TWO, WHY DID CCPOA INTERVENE ON THE

22  PLAINTIFFS' SIDE?

23         FOR YEARS, YOUR HONORS, CCPOA PRESCRIBED TO THE

24  BUILD-TO-FIX APPROACH.  THAT WAS TRUE THROUGHOUT THE '70'S,

25  '80'S AND BEYOND.  THAT, OF COURSE, WOULD HAVE PROBABLY HAD US

1    LINING UP ON THIS SIDE OF THE COURTROOM.

2            HOWEVER, AT SOME POINT CCPOA CONCLUDED THE PRISON

3    SYSTEM WAS IRREPARABLY BROKEN, WHETHER IT WAS THE REVOLVING DOOR

4    OF AGENCY SECRETARIES COMING AND GOING WITH LITTLE OR NO

5    IMPROVEMENT, OR THE FACT THAT AB 900 A MERE 18 MONTHS AGO WAS

6    GOING TO BE THE SOLUTION TO THE MAJORITY OF THESE PROBLEMS, AND

7    TODAY WE FIND THERE'S BEEN LITTLE, IF ANY, PROBLEM.

8            BUT, MORE IMPORTANTLY TO CCPOA, IT BECAME CLEAR THE

9    DEFENDANTS LACKED THE ABILITY IN THE INSTITUTIONAL CAPACITY,

10   FIRST OF ALL, TO EFFECTIVELY ADDRESS THE OVERCROWDING, AND,

11   SECONDLY, WE BELIEVE TO EVEN FULLY RECOGNIZE THE ENORMITY OF THE

12   PROBLEMS.

13           IN ESSENCE, CALIFORNIA'S PRISONS HAVE BECOME SO

14   OVERCROWDED FOR SO LONG, THE DEFENDANTS ACCEPT OVERCROWDING

15   LEVELS OF 180, 190, AND EVEN 200 PERCENT AS AN ACCEPTABLE NORM.

16   AND, THUS, WHILE IT'S THE INDIVIDUAL PRISONERS THAT EXPERIENCE

17   THE ACTUAL OVERCROWDING, THE PROBLEMS THAT PERMIT THESE

18   OVERCROWDING CONDITIONS TO OCCUR PRIMARILY STEM FROM DECISIONS

19   MADE AT CDCR HEADQUARTERS.  WITH THESE THOUGHTS IN MIND AND WITH

20   NO OTHER FEASIBLE SOLUTION IN SIGHT, CCPOA CONCLUDED THAT AN

21   INMATE POPULATION CAP OFFERS THE ONLY MEANINGFUL SHORT TO

22   MEDIUM-TERM POSSIBILITY OF SAFER WORKING CONDITIONS FOR THE

23   STAFF THAT WE REPRESENT AND SAFER AND BETTER CUSTODY CONDITIONS

24   FOR INMATES.

25           TURNING TO OUR SIX WITNESSES AND WHAT THEY WILL SAY

1   AT THIS TRIAL.  CCPOA'S UNIQUELY SITUATED -- OR OUR WITNESSES

2   ARE UNIQUELY SITUATED IN THIS LITIGATION BECAUSE THEY ARE

3   DAY-TO-DAY IN THE PRISONS.  THEY ARE THERE WHEN THE LIGHTS GO

4   OUT, WHEN THE LIGHTS COME ON.  THEY ARE THERE WHEN TOURS ARE

5   BEING OPERATED AND WHEN PRISONS, KNOWING THAT PRISON TOURS ARE

6   COMING, PREPARE FOR PRISON TOURS.  THEY'RE ALSO THERE WHEN

7   CONDITIONS ARE ROLLING ALONG AS NORMAL.

8           OUR WITNESSES WILL PROVIDE FIRSTHAND OBSERVATIONS OF

9   THE ADVERSE CONSEQUENCES OF OVERCROWDING ON THE DELIVERY OF

10  MEDICAL AND MENTAL HEALTH SERVICES, INCLUDING SHORTAGES OF

11  EQUIPMENT, SUCH AS PRESCRIBED MEDICAL EQUIPMENT; SPECIAL

12  PILLOWS, MATTRESSES FOR SPECIFIC INMATE MEDICAL CONDITIONS; THE

13  LACK OF AVAILABLE SPACE TO CONDUCT TREATMENT; LACK OF EMERGENCY

14  VEHICLES; LACK OF HOLDING CELLS AND SAFETY CELLS; INADEQUATE

15  NUMBERS OF WORKING TOILETS, SINKS AND SHOWERS.

16          AND EVEN WHERE THE SUFFICIENT EQUIPMENT EXISTS, OUR

17  WITNESSES WILL TESTIFY TO FREQUENT DELAYS IN OBTAINING MATERIALS

18  AND SERVICES, INCLUDING FOOD, LAUNDRY, MEDICAL TREATMENT; WILL

19  TESTIFY TO THE FACT THAT INMATES WITH SCHEDULED APPOINTMENTS ARE

20  NOT ABLE TO BE SEEN BY HEALTHCARE PRACTITIONERS DUE TO THE SHEER

21  VOLUME OF INMATES WHO ARE REQUIRING MEDICAL SERVICES.  THEY WILL

22  ALSO SPEAK TO THE ATTENDANT LACK OF SPACE FOR INMATES, INCLUDING

23  ANY SPACE FOR ANY MEDICAL SUPPLIES THAT AN INMATE MAY REQUIRE.

24          IT WILL SPEAK TO CRUMBLING INFRASTRUCTURE OF OUR

25  PRISONS.  THEY WILL SPEAK TO THE UNSANITARY AND UNHEALTHY LIVING

1  CONDITIONS.  GYMS BEING USED WITH BUNKS THREE BEDS HIGH; AGAIN,

2  PICTURES SHOWED THAT, WHICH NEGATIVELY IMPACTS THEIR ABILITY TO

3  ADEQUATELY PROVIDE CUSTODY FOR INMATES.  IT'S EXACTLY WHAT THE

4  INDIVIDUAL IN THE FIRST VIDEO EXCERPT SPOKE TO.

5           THEY'LL SPEAK TO INMATES DOING LAUNDRY EITHER IN THE

6  SINK THAT'S USED FOR THE SERVICE OF FOOD OR IN THEIR TOILETS.

7  THEY'LL SPEAK TO THE SHORTAGE OF PERSONNEL, SUCH AS CORRECTIONAL

8  OFFICER ESCORTS WHO ARE NEEDED TO TAKE INMATES FROM THEIR CELLS

9  TO WHEREVER THEY'RE SUPPOSED TO RECEIVE MEDICAL TREATMENT.

10 THEY'LL SPEAK TO THE SHORTAGE OF HOLDING CELLS AND SAFETY CELLS.

11 THEY'LL ALSO SPEAK TO THE SUBSTANTIAL DELAYS IN SETTING UP AND

12 CONDUCTING FOLLOW-UP MEDICAL TREATMENT.

13           ESSENTIALLY, THERE'S TOO MANY INMATES TO BE

14 ADEQUATELY MONITORED, AND THAT INCLUDES THE INABILITY OF STAFF

15 TO VERIFY THAT INMATES ARE EVEN TAKING THEIR MEDICATIONS THAT

16 THEY'RE PRESCRIBED.

17           IN ADDITION, THEY'LL TESTIFY FOR THE HIGHER POTENTIAL

18 FOR VIOLENCE THAT INVOLVES INMATES IN MEDICAL HEALTH AND MENTAL

19 HEALTH UNITS, PARTICULARLY OF DOUBLE CELLED AS OPPOSED TO SINGLE

20 CELLED.

21           IN CONCLUSION, OUR INMATES -- PARDON ME -- OUR

22 WITNESSES ARE GOING TO SAY THAT ALL THESE PROBLEMS STEM

23 PRIMARILY FROM OVERCROWDING.  AND WHEN THEIR EVIDENCE IS

24 CONSIDERED, ALONG WITH THE EVIDENCE THE PLAINTIFFS WILL PUT ON,

25 WE BELIEVE THE INESCAPABLE CONCLUSION FOR THE COURT WILL BE THAT

1  OVERCROWDING IS THE PRIMARY CAUSE OF CONSTITUTIONAL VIOLATIONS.

2          THANK YOU.

3          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.  DO DEFENDANTS

4  WISH TO BEGIN?

5              **OPENING STATEMENT BY MR. MELLO**

6          **MR. MELLO:**  YES.

7          GOOD MORNING AGAIN, YOUR HONORS.  PAUL MELLO OF

8  HANSON BRIDGETT ON BEHALF OF THE PLATA DEFENDANTS.

9          FIRST, THIS IS NOT AN OVERCROWDING CASE.  IT'S NOT

10  ABOUT HOUSING CONDITIONS OR PROGRAMMING IN CDCR'S PRISONS.  IN

11  FACT, THERE HAS BEEN NO LAWSUIT FILED, MUCH LESS ANY JUDICIAL

12  DETERMINATION THAT THE HOUSING OR OTHER ENVIRONMENTAL CONDITIONS

13  IN CDCR'S PRISONS VIOLATE THE CONSTITUTION.  RATHER, THIS

14  THREE-JUDGE PANEL PROCEEDING RELATES TO THE DELIVERY OF MEDICAL

15  CARE TO INMATES IN CALIFORNIA'S PRISONS AND THE PURPORTED

16  BARRIERS TO THE DELIVERY OF THAT CARE.  THE EVIDENCE WILL SHOW

17  THAT OVERCROWDING IS NOT THE PRIMARY BARRIER TO THE DELIVERY OF

18  THAT CARE.

19          HERE PLAINTIFFS SEEK A PRISONER RELEASE ORDER.  IN

20  THEIR PRETRIAL BRIEF, PLAINTIFFS STATE THAT THEY SEEK A

21  POPULATION CAP ON CALIFORNIA'S PRISONS AT 130 PERCENT OF DESIGN

22  BED CAPACITY.  THAT AMOUNTS TO A CAP OF AT ABOUT 104,000 INMATES

23  ON CALIFORNIA'S PRISONS AND THE RELEASE OF MORE THAN 52,000

24  INMATES OVER A TWO-YEAR PERIOD OF TIME IN ORDER TO MEET THE CAP

25  REQUESTED BY PLAINTIFFS.

1            IN ORDER TO PREVAIL IN THIS PHASE ONE TRIAL,

2    PLAINTIFFS MUST MEET THE STRINGENT REQUIREMENTS OF THE PRISON

3    LITIGATION REFORM ACT.  SPECIFICALLY, PLAINTIFFS MUST PROVE THAT

4    CROWDING IS THE PRIMARY CAUSE OF THE VIOLATION OF A FEDERAL

5    RIGHT.  IN PLATA, THE ALLEGED UNCONSTITUTIONAL DELIVERY OF

6    MEDICAL CARE.

7            PLAINTIFFS MUST SATISFY THIS REQUIREMENT BY CLEAR AND

8    CONVINCING EVIDENCE.  CLEAR AND CONVINCING EVIDENCE IS AN

9    EXACTING STANDARD.  IT REQUIRES EVIDENCE SO CLEAR, DIRECT,

10   WEIGHTY AND CONVINCING AS TO ENABLE THE FACT FINDER TO COME TO A

11   CLEAR CONVICTION WITHOUT HESITANCY OF THE TRUTH OF THE PRECISE

12   FACTS IN ISSUE.  THE EVIDENCE WILL SHOW THAT PLAINTIFFS CANNOT

13   MEET THIS EXACTING STANDARD.

14           FIRST, THE EVIDENCE WILL SHOW THAT THE PLATA RECEIVER

15   HAS ALREADY REPORTED THAT OVERCROWDING IS NOT THE PRIMARY CAUSE

16   OF THE ALLEGED UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE.  AT

17   THE REQUEST OF THE PLATA COURT, THE PLATA RECEIVER ISSUED AN

18   OVERCROWDING REPORT IN MAY OF 2007.  IN THAT REPORT, THE

19   RECEIVER STATED THAT, QUOTE:

20           "THOSE WHO BELIEVE THAT THE CHALLENGES FACED

21           BY THE PLAN OF ACTION ARE UNCOMPLICATED AND WHO

22           THINK THAT POPULATION CONTROLS WILL SOLVE

23           CALIFORNIA'S PRISON HEALTHCARE PROBLEMS ARE

24           SIMPLY WRONG," END QUOTE.

25           HE FURTHER WROTE THAT "THE CURE," QUOTE:

1              " ... TO EXISTING HEALTHCARE PROBLEMS WILL

2         BE DIFFICULT AND COSTLY TO IMPLEMENT REGARDLESS

3         OF POPULATION CONTROLS," END QUOTE.

4         THE RECEIVER'S POINT IS CLEAR.  OVERCROWDING IS NOT

5    THE PRIMARY CAUSE OF THE ALLEGED CONSTITUTIONAL DEFICIENCIES IN

6    CALIFORNIA'S MEDICAL CARE IN ITS PRISONS.

7         THE COURT WILL HEAR FROM ONLY TWO MEDICALLY TRAINED

8    MEDICAL EXPERTS IN THIS PROCEEDING.  DEFENDANTS' EXPERT

9    DR. DAVID THOMAS AND PLAINTIFFS' EXPERT DR. RONALD SHANSKY.

10        DR. THOMAS WILL TESTIFY THAT CROWDING IS NOT THE

11   PRIMARY BARRIER TO CARE IN CALIFORNIA'S PRISONS.  HE WILL ALSO

12   TESTIFY ABOUT WHAT HE BELIEVES TO BE THE MOST IMPORTANT

13   COMPONENTS TO QUALITY CORRECTIONAL MEDICAL CARE DELIVERY SYSTEM.

14        PLAINTIFF'S SOLE CORRECTIONAL MEDICAL CARE EXPERT,

15   DR. SHANSKY, WILL TESTIFY THAT THE CONSTITUTIONAL DELIVERY OF

16   MEDICAL CARE HAS MULTIPLE INTERRELATED COMPONENTS AND THAT IT IS

17   VERY DIFFICULT TO RANK IN IMPORTANCE THESE INTERRELATED

18   COMPONENTS AND THAT THE DELIVERY OF CONSTITUTIONALLY ADEQUATE

19   MEDICAL CARE IS MULTIFACETED.

20        DR. SHANSKY WILL ALSO TESTIFY THAT THE KEY FACTORS OR

21   COMPONENTS TO IMPROVING THE DELIVERY OF MEDICAL CARE IN

22   CALIFORNIA'S PRISONS ARE ALREADY BEING ACCOMPLISHED OR IMPROVED

23   BY THE PLATA RECEIVER.

24        DR. SHANSKY WILL TESTIFY, AND THE RECEIVER HAS

25   ALREADY STATED, THAT NOT ONLY WILL OTHER MEASURES SOLVE THE

1   PROBLEMS WITH THE DELIVERY OF MEDICAL CARE IN CALIFORNIA'S

2   PRISONS, OTHER MEASURES ARE NECESSARY TO SOLVE THOSE PROBLEMS.

3           IF NOT, AS THE COURT POINTED OUT EARLIER, THE

4   RECEIVER'S EFFORTS ARE NOT NECESSARY -- WOULD NOT BE NECESSARY

5   TO REMEDY THE ALLEGED DEFICIENCIES AND THERE WOULD BE NO REASON

6   FOR THE PLATA COURT TO CONTINUE THE PLATA RECEIVERSHIP.

7           BY WAY OF BACKGROUND, IN ORDER TO ESTABLISH THAT CARE

8   IS UNCONSTITUTIONAL, IT MUST VIOLATE THE EIGHTH AMENDMENT, WHICH

9   IS SHOWN BY PROVING THAT THE STATE IS DELIBERATELY INDIFFERENT

10  TO SERIOUS MEDICAL NEEDS OF INMATE PATIENTS.

11          IN 2002 THE STATE DEFENDANTS ENTERED INTO A

12  STIPULATION AIMED AT IMPROVING CARE IN CALIFORNIA'S PRISONS.

13  THE STIPULATION FOR INJUNCTIVE RELIEF IDENTIFIED NUMEROUS

14  COMPONENTS TO QUALITY CORRECTIONAL MEDICAL CARE, AND IT INCLUDED

15  MANY OF THE IMPORTANT COMPONENTS THAT DRS. THOMAS AND SHANSKY

16  WILL TESTIFY ABOUT AT THIS TRIAL.

17          THE EVIDENCE WILL SHOW THE STATE IS FAR FROM

18  INDIFFERENT TO THE MEDICAL NEEDS OF ITS INMATE PATIENTS AND THE

19  STATE AND THE PLATA RECEIVER ARE ADDRESSING THE INTERRELATED

20  COMPONENTS IDENTIFIED IN THE STIPULATION FOR INJUNCTIVE RELIEF,

21  IDENTIFIED IN SUBSEQUENT PLATA COURT ORDERS, IDENTIFIED BY THE

22  FORMER PLATA MEDICAL EXPERTS, IDENTIFIED BY THE RECEIVER

23  HIMSELF, AND IDENTIFIED BY DRS. THOMAS AND SHANSKY IN THEIR

24  TESTIMONY AT THIS TRIAL.

25          FOR EXAMPLE, THE EVIDENCE WILL SHOW THAT THE STATE

1   HAS PUT ITS MONEY WHERE ITS MOUTH IS WITH RESPECT TO HEALTHCARE

2   SPENDING.  IN 1995 THE STATE SPENT MORE THAN $340 MILLION ON

3   PRISON HEALTHCARE.

4           BY FISCAL YEAR 2005/2006, THE YEAR THE PLATA RECEIVER

5   WAS APPOINTED, CALIFORNIA SPENT $1.252 BILLION ON PRISON

6   HEALTHCARE.  IN FISCAL YEAR 2008/2009 CALIFORNIA ANTICIPATES

7   SPENDING $2.193 BILLION ON PRISON HEALTHCARE.

8           THE AMOUNT OF MONEY SPENT ON EACH PRISONER HAS ALSO

9   GONE UP OVER TIME.  IT INCREASED FROM JUST OVER $2,700 PER

10  INMATE IN 1995 TO JUST UNDER $14,000 PER INMATE IN FISCAL YEAR

11  '08/'09.  THESE NUMBERS ARE WELL, WELL ABOVE NATIONAL AVERAGES

12  AND MULTIPLE TIMES HIGHER THAN THE AMOUNT THE FEDERAL BUREAU OF

13  PRISONS SPENDS PER INMATE PER YEAR ON MEDICAL AND MENTAL

14  HEALTHCARE SERVICES.

15          HERE IT IS UNDISPUTED THAT THERE HAVE BEEN

16  SIGNIFICANT IMPROVEMENTS IN THE DELIVERY OF MEDICAL CARE IN

17  CALIFORNIA'S PRISONS SINCE THE APPOINTMENT OF THE PLATA

18  RECEIVER.  THESE IMPROVEMENTS HAVE OCCURRED IN THE FACE OF

19  POPULATION PREDATORS, AND THIS EVIDENCES THAT POPULATION IS NOT

20  THE PRIMARY CAUSE OF THE ALLEGED UNCONSTITUTIONAL DELIVERY OF

21  MEDICAL CARE IN CALIFORNIA'S PRISONS.

22          **THE CLERK:**  FIVE MINUTES, COUNSEL.

23          **MR. MELLO:**  THANK YOU.

24          CDCR'S PHYSICIAN STAFFING HAS INCREASED DRAMATICALLY,

25  AND IT'S WITHIN FIVE PERCENT OF THE RECEIVER'S GOAL TO FILL

1   90 PERCENT OF POSITIONS.  LIKEWISE, STAFFING OF REGISTERED

2   NURSES IS NOW WITHIN TWO PERCENT OF THE RECEIVER'S STATEWIDE

3   GOAL TO FILL 90 PERCENT OF NURSING POSITIONS.  REMARKABLY,

4   BETWEEN JULY 2007 AND JULY 2008, THE STATE AND THE RECEIVER

5   HIRED MORE THAN 1,400 DOCTORS AND NURSES.

6            LET'S TALK ABOUT SOME OF THE HIRING.

7            CHIEF PHYSICIANS AND SURGEONS, IN OCTOBER 2005 WHEN

8   THE PLATA COURT ISSUED ITS FINDINGS OF FACT AND CONCLUSIONS OF

9   LAW, THERE WERE TEN STATE-EMPLOYED CHIEF PHYSICIANS AND

10  SURGEONS.  BY THE END OF AUGUST 2008, THERE WERE 28.

11           IN BETWEEN NOVEMBER 2007 AND AUGUST 2008, THE STATE

12  AND THE RECEIVER HIRED 62 FULL-TIME STATE-EMPLOYED PRIMARY CARE

13  PHYSICIANS, PHYSICIAN'S ASSISTANTS, ALSO KNOWN AS PHYSICIAN

14  EXTENDERS.  THE NUMBER OF THESE CLASSIFICATIONS ROSE FROM ONE IN

15  APRIL 2006 TO 13 IN AUGUST OF 2008.

16           NURSE PRACTITIONERS, ALSO KNOWN AS PHYSICIAN

17  EXTENDERS, THERE WERE 11 IN OCTOBER OF 2005, AND THERE ARE 44 BY

18  THE END OF AUGUST 2008.  REGISTERED NURSES, THE EVIDENCE WILL

19  SHOW THAT THE NUMBER OF REGISTERED NURSES ROSE FROM 818 IN

20  AUGUST 2005 TO 1,556 BY AUGUST 2008.  THIS IS DESPITE THE

21  FACT -- THIS ALMOST DOUBLING IS DESPITE THE FACT THAT THERE IS A

22  NATIONWIDE SHORTAGE OF REGISTERED NURSES.

23           LVNS, LICENSED VOCATIONAL NURSES, THE EVIDENCE WILL

24  SHOW THERE WERE FOUR IN MAY OF 2007 AND THERE WERE 937 BY THE

25  END OF AUGUST 2008.

1        FINALLY, THE EVIDENCE WILL SHOW THAT THE NUMBER OF

2   CORRECTIONAL OFFICES EMPLOYED BY THE DEPARTMENT ROSE FROM 20,741

3   IN OCTOBER 2005 TO JUST OVER 24,090 IN AUGUST OF 2008.

4        THE EVIDENCE WILL ALSO SHOW THAT IN ADDITION TO

5   STATE-EMPLOYED PROVIDERS, THAT THE LARGE NUMBERS OF REGISTERED

6   PHYSICIANS AND NURSES FILL OR LARGELY FILL THE REMAINING

7   VACANCIES IN HEALTHCARE POSITIONS IN CDCR'S INSTITUTIONS.

8        LIKEWISE, THE NUMBER OF CORRECTIONAL OFFICER

9   VACANCIES IN THE SYSTEM ARE BEING FILLED LARGELY BY OVERTIME.

10       THE EVIDENCE WILL SHOW THAT DEATHS ARE DOWN

11  SIGNIFICANTLY IN CDCR PRISONS, NEARLY 30 PERCENT SINCE 2006.

12  AND COUNSEL ALLUDED TO THIS EARLIER IN HIS OPENING, BUT THE

13  RECEIVER'S OFFICE HAS ISSUED TWO REPORTS RELATING TO ANALYZING

14  DEATHS.  ONE REPORT ANALYZED 2006 DEATHS.  THE OTHER ONE

15  ANALYZED 2007 DEATHS.

16       IN THOSE REPORTS, THE RECEIVER'S OFFICE USES TWO

17  TERMS:  PREVENTABLE DEATHS AND POSSIBLY PREVENTABLE DEATHS.

18  THEY DEFINE A PREVENTABLE DEATH AS ONE WHERE, QUOTE:

19           "BETTER MEDICAL MANAGEMENT OR A BETTER

20           SYSTEM OF CARE WOULD LIKELY HAVE PREVENTED THE

21           PATIENT'S DEATH," END QUOTE.

22       THEY DEFINE A POSSIBLY PREVENTABLE DEATH AS ONE

23  WHERE, QUOTE:

24           "BETTER MEDICAL MANAGEMENT OR A BETTER

25           SYSTEM OF CARE MAY HAVE PREVENTED THE PATIENT'S

1          DEATH," END QUOTE.

2          "POSSIBLY PREVENTABLE" IS SPECULATIVE BY ITS VERY

3    DEFINITION.

4          THERE WILL BE NO EVIDENCE AT THIS THREE-JUDGE TRIAL

5    THAT ON AVERAGE AN INMATE IN ONE OF CALIFORNIA'S PRISONS

6    EXPERIENCES A PREVENTABLE DEATH EVERY SIX TO SEVEN DAYS DUE TO

7    ALLEGED CONSTITUTIONAL DEFICIENCIES IN CDCR'S MEDICAL CARE

8    DELIVERY SYSTEM.  INSTEAD, THE EVIDENCE WILL SHOW THERE WERE A

9    TOTAL OF THREE ALLEGED PREVENTABLE DEATHS IN ADULT INSTITUTIONS

10   IN 2007.  THIS EQUATES TO AN ALLEGED PREVENTABLE DEATH EVERY 121

11   DAYS, AND THE THREE ALLEGED PREVENTABLE DEATHS AMOUNT TO LESS

12   THAN ONE PERCENT OF THE 395 DEATHS REVIEWED.  THIS IS

13   ASTONISHING AND EVIDENCE OF THE MAGNITUDE OF THE IMPROVEMENTS TO

14   DATE.

15         THE EVIDENCE WILL SHOW MANY OTHER IMPROVEMENTS, BUT I

16   HIGHLIGHT JUST A FEW.

17         THE RECEIVER'S DEVELOPING NEW SCREENING AND

18   ASSESSMENT PROCESSES AT INCEPTION AND RELEASE; NEW HEALTHCARE

19   ACCESS UNITS, INCLUDING LARGE NUMBERS OF CORRECTIONAL OFFICERS

20   TO ENSURE TIMELY ACCESS TO MEDICAL CARE; REDESIGNING AND

21   IMPROVING SICK CALL PROCESSES, FORMS, AND STAFFING MODELS;

22   IMPROVED CHRONIC CARE.  FOR EXAMPLE, THE NUMBER OF INMATES WHOSE

23   ASTHMA DEATHS WERE DEEMED TO BE PREVENTABLE BY THE RECEIVER WENT

24   FROM SIX IN 2006 TO ZERO IN 2007.

25         RECEIVER'S WORKING ON IMPROVED EMERGENCY RESPONSE

1  PLANS IN THE SYSTEM, IMPROVED PROVISION AND ACCESS TO SPECIALTY

2  CARE AND HOSPITAL SERVICES, IMPROVED PEER REVIEW AND DEATH

3  REVIEW PROGRAMS.  HE'S WORKING ON THE ESTABLISHMENT OF A

4  COMPREHENSIVE, SAFE AND EFFICIENT PHARMACY PROGRAM, INCLUDING

5  THE DEVELOPMENT OF THE DRUG FORMULARY AND THE ROLLOUT

6  COMPUTERIZED PHARMACY SYSTEM --

7          **THE CLERK:**  TIME'S UP, COUNSEL.

8          **MR. MELLO:**  ONE MORE MOMENT.

9          -- DESIGNED TO IMPROVEMENT MEDICATION MANAGEMENT IN

10 CDCR INSTITUTIONS.

11         CROWDING HAS NEVER BEEN IDENTIFIED AS A SIGNIFICANT

12 BARRIER TO CONSTITUTIONALLY ADEQUATE MEDICAL CARE IN

13 CALIFORNIA'S PRISONS.  IN FACT, AT NO TIME BEFORE THE FILING OF

14 THIS MOTION TO CONVENE A THREE-JUDGE PANEL WAS CROWDING

15 IDENTIFIED AS A SIGNIFICANT IMPEDIMENT TO THE DELIVERY OF CARE,

16 LET ALONE A PRIMARY BARRIER TO IT.

17         DEFENDANTS, HOWEVER, DO NOT DISPUTE THAT CROWDING

18 IMPACTS SERVICES AND PROGRAMMING IN CDCR PRISONS, INCLUDING THE

19 DELIVERY OF MEDICAL CARE.  THE EVIDENCE WILL SHOW, HOWEVER, THAT

20 CROWDING IS NOT THE PRIMARY, MOST IMPORTANT, PRINCIPAL CAUSE OF

21 THE ALLEGED UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE.

22         THE STATE TAKES VERY SERIOUSLY ITS OBLIGATIONS TO

23 INMATES AND THE PUBLIC.  THIS IS EVIDENCED BY THE FUNDING IT

24 DEVOTES TO CDCR HEALTHCARE SYSTEMS, AND IT IS UNDISPUTED THAT

25 MEDICAL CARE HAS IMPROVED DRAMATICALLY IN THE LAST FEW YEARS.

1          THE STATE HAS TAKEN STEPS TO APPROPRIATELY ADDRESS

2  OVERCROWDING IN ITS PRISON.  IT HAS REDUCED ITS RELIANCE ON

3  NON-TRADITIONAL BEDS AND HAS REDUCED THE NUMBER OF PRISONERS

4  HOUSED IN ITS IN-STATE INSTITUTIONS.

5          IN CONCLUSION, DEFENDANTS ARE CERTAIN THAT AFTER IT

6  HAS HEARD ALL THE EVIDENCE, THE COURT WILL FIND THAT PLAINTIFFS

7  HAVE NOT PROVEN BY CLEAR AND CONVINCING EVIDENCE THAT

8  OVERCROWDING IS THE PRIMARY CAUSE OF THE ALLEGED

9  UNCONSTITUTIONAL DELIVERY OF MEDICAL CARE IN CALIFORNIA'S

10 PRISONS AND ARE CERTAIN THAT THIS COURT WILL FIND IN THEIR

11 FAVOR.

12          THANK YOU.

13          **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

14          **OPENING STATEMENT BY MS. TILLMAN**

15          **MS. TILLMAN:**  MAY IT PLEASE THE COURT, COUNSEL.  MY

16 NAME IS LISA TILLMAN.  I REPRESENT THE DEFENDANTS IN THE COLEMAN

17 CASE.

18          THANK YOU FOR PROVIDING THE COLEMAN CASE, WITH ITS

19 DISCRETE POPULATION OF SERIOUSLY MENTALLY ILL INMATE PATIENTS OF

20 THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION,

21 WITH A SEPARATE OPPORTUNITY TO BE HEARD ON THIS IMPORTANT

22 MATTER, WHETHER THE CARE OF THE COLEMAN PLAINTIFFS, THOSE

23 INMATES WITH SERIOUS MENTAL DISORDERS, CAN OCCUR IN A

24 CONSTITUTIONALLY ADEQUATE MANNER, INDEPENDENT OF THE OVERALL

25 NUMBER OF CALIFORNIA DEPARTMENT OF CORRECTION AND REHABILITATION

1    INMATES.

2          DEFENDANTS RESPECTFULLY SUBMIT THAT SUCH

3    CONSTITUTIONALLY ADEQUATE CARE CAN OCCUR, INDEPENDENT OF THE

4    OVERALL POPULATION OF THE DEPARTMENT OF CORRECTIONS AND

5    REHABILITATION.  IN OTHER WORDS, PLAINTIFFS CANNOT MEET THEIR

6    BURDEN OF PROVING BY CLEAR AND CONVINCING EVIDENCE THAT THE

7    PRIMARY CAUSE OF ANY DEFICIENCIES THAT MAY EXIST IN THE MENTAL

8    HEALTHCARE SERVICES DELIVERY SYSTEM IS THE OVERALL NUMBER OF

9    INMATES WITHIN THE DEPARTMENT OF CORRECTIONS AND REHABILITATION.

10          THE EVIDENCE WILL SHOW, AS FORMER SPECIAL MASTER

11    KEATING HIMSELF FOUND JUST A YEAR AGO, MENTALLY ILL INMATES NEED

12    AND GET SPECIALIZED MENTAL HEALTHCARE BEDS FOR THEIR TREATMENT

13    SEPARATE AND APART FROM THE GENERAL POPULATION.  MENTALLY ILL

14    INMATES NEED AND GET SPECIALIZED MENTAL HEALTHCARE CLINICIANS,

15    PSYCHIATRISTS, PSYCHOLOGISTS, SOCIAL WORKERS SEPARATE AND APART

16    FROM WHAT IS PROVIDED TO THE GENERAL POPULATION OF INMATES

17    WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

18    REHABILITATION.  AND THE MOST ACUTELY ILL OF THE MENTALLY ILL,

19    ESPECIALLY THOSE WHO ARE NOT ONLY EXTREMELY ILL BUT,

20    UNFORTUNATELY, EXTREMELY VIOLENT AND POSE SECURITY RISKS BECAUSE

21    OF THAT, THEY NEED MORE OF THOSE SPECIALIZED MENTAL HEALTHCARE

22    CLINICIANS AND SPECIALIZED MENTAL HEALTHCARE BEDS, THAT NEED IS

23    NOT CAUSED BY THE OVERALL POPULATION OF THE DEPARTMENT OF

24    CORRECTIONS AND REHABILITATION.

25          MENTAL HEALTH CLINICIANS ARE NOT SPREAD LIKE BUTTER.

1   MENTAL HEALTHCARE BEDS OFTEN LICENSED UNDER STATE REGULATIONS

2   AND ACCREDITED BY THE NATIONAL ORGANIZATION DON'T SPRING FROM

3   SIMPLY VACATED EMPTY CELLS.  RATHER, THAT NEED WILL NOT BE MET,

4   EVEN WITH THE RELEASE OF A HUNDRED THOUSAND INMATES, ACCORDING

5   TO SPECIAL MASTER KEATING.

6           RATHER, A CONSTITUTIONALLY ADEQUATE SYSTEM OF MENTAL

7   HEALTHCARE IS NOT ABOUT RELEASING INMATES.  IT'S ABOUT SERVING

8   THE MENTALLY ILL INMATES.  THE EVIDENCE WILL SHOW THAT THE

9   MENTAL HEALTHCARE SYSTEM IS CREATED AND IS MAINTAINED BY ACTIONS

10  UNDERTAKEN BY DEFENDANTS WITH THE UNDERSTANDING THAT THEIR

11  MISSION IS TO INCLUDE TO CARE FOR MENTALLY ILL INMATES IN MENTAL

12  HEALTHCARE BEDS STAFFED BY MENTAL HEALTHCARE CLINICIANS.

13          THE SEPARATE COLEMAN CLASS IS ENTITLED TO AND

14  RECEIVES THE CORE ELEMENTS OF A CONSTITUTIONALLY ADEQUATE

15  SYSTEM.  THOSE CORE ELEMENTS ARE ABOUT INCLUDING BEDS AND

16  SERVICES FOR THE MENTALLY ILL, NOT EXCLUDING THE OVERALL

17  POPULATION, AND CERTAINLY NOT EXCLUDING THE MENTALLY ILL.

18          THE COLEMAN COURT'S PUBLISHED DECISION SOME YEARS AGO

19  SPOKE OF FIVE CORE ELEMENTS:  SUFFICIENT POLICIES AND PROCEDURES

20  TO ENSURE UNIFORM SCREENING AND DIAGNOSIS AND TREATMENT OF THESE

21  MENTALLY ILL INMATES; SUFFICIENT BEDS TO PROPERLY HOUSE THESE

22  INMATES; SUFFICIENT MENTAL HEALTHCARE STAFF TO PROVIDE THE

23  NECESSARY TREATMENT; SUICIDE PREVENTION PROGRAMS BECAUSE OF THE

24  HIGHER RISK OF SUICIDE; AND ADEQUATE RECORD KEEPING TO ENSURE

25  THAT THE TREATMENT WAS NOT ONLY DONE BUT RECORDED IN A MANNER TO

1   ENSURE ITS CONTINUITY AND CONSISTENCY.

2          THOSE ELEMENTS EXIST TODAY INDEPENDENT OF THE OVERALL

3   POPULATION.  YOU WILL HEAR TESTIMONY FROM ROBIN DEZEMBER, WHO IS

4   THE HEAD OF THE HEALTHCARE DIVISION WITHIN THE DEPARTMENT OF

5   CORRECTIONS AND REHABILITATION, ABOUT THE FIRST ELEMENT.  THE

6   SEPARATE SET OF MENTAL HEALTHCARE POLICIES NOW USED UNIFORMLY

7   THROUGHOUT 33 INSTITUTIONS IN THE STATE TO DETECT AND TREAT

8   MENTALLY ILL INMATES.

9          THE COLEMAN COURT APPROVED THIS UNIFORM SET OF

10  POLICIES CALLED "THE REVISED PROGRAM GUIDE" IN 2006.  THIS

11  REVISED PROGRAM GUIDE PROVIDES FOR LEVELS OF CARE BASED ON THE

12  ACUITY PRESENTED BY THE MENTALLY ILL PATIENT.

13         THE SECOND ELEMENT, DESIGNATED BEDS, ALSO PROVIDES

14  FOR APPROPRIATE BEDS TO SERVE THE MENTALLY ILL PATIENT IN ACCORD

15  WITH THEIR ACUITY LEVEL.

16         YOU WILL HEAR ROBIN DEZEMBER, AS WELL AS CINDY

17  RADAVSKY, WHO IS WITH THE DEPARTMENT OF MENTAL HEALTH AND A

18  PARTNER IN PROVIDING CARE FOR THESE INMATES, THAT THERE IS A

19  RANGE OF BEDS PROVIDED, RANGING FROM THE LOWEST OUTPATIENT CARE

20  LEVEL OF CORRECTIONAL CLINICAL CASE MANAGEMENT SERVICES, WHERE

21  THEY ARE HOUSED WITH THE GENERAL POPULATION BECAUSE THEY ARE

22  ABLE TO BE HOUSED WITH THE GENERAL POPULATION AND STILL RECEIVE

23  ADEQUATE MENTAL HEALTHCARE, TO OTHER LEVELS OF CARE WHERE THE

24  MENTALLY ILL INMATES ARE LITERALLY HOUSED SEPARATE AND APART

25  FROM THE GENERAL POPULATION.

1        THOSE IN THE ENHANCED OUTPATIENT PROGRAM ARE HOUSED

2    SEPARATE AND APART.  THOSE WHO REQUIRE IN-PATIENT HOSPITAL

3    SETTINGS LIKE INTERMEDIATE CARE, ALSO SEPARATE AND APART.  NOT

4    ONLY ARE THEY SEPARATE AND APART FROM THE GENERAL POPULATION OF

5    CDCR INMATES, BUT THEY ARE PROVIDED CARE WITHIN DMH-STAFFED

6    FACILITIES AT CDCR SITES, SUCH AS WASCO PSYCHIATRIC PROGRAM,

7    SUCH AS SALINAS VALLEY PSYCHIATRIC PROGRAM, AS WELL AS MORE

8    DISTANT SITES, LIKE DEPARTMENT OF MENTAL HEALTH HOSPITALS, LIKE

9    COALINGA STATE HOSPITAL AND ATASCADERO STATE HOSPITAL.

10        CINDY RADAVSKY WILL TELL YOU THESE HOSPITALS ARE NOT

11   OVERCROWDED.  THEY CANNOT BE.  THEY ARE SUBJECT TO STRICT

12   LICENSURE REQUIREMENTS, STRICT ACCREDITATION STANDARDS.  THERE

13   ARE NO GYMS.  THERE ARE NO DAYROOMS FILLED WITH TRIPLE BUNKS IN

14   THE HOSPITAL SITES PROVIDING CARE TO THE MOST ACUTELY ILL OF THE

15   DEPARTMENT OF CORRECTIONS' MENTALLY ILL INMATES.

16        THE EVIDENCE WILL SHOW THAT DEFENDANTS ARE COMMITTED

17   TO CREATING ADDITIONAL BEDS, AS STATED IN THEIR COURT-APPROVED

18   AUGUST 2007 MENTAL HEALTH BED PLAN, A BED PLAN THAT WAS

19   SUBMITTED EVEN AFTER THE LOWER COURT GRANTED PLAINTIFFS' MOTION

20   TO CONVENE THESE PROCEEDINGS.

21        OTHER BEDS ARE UNDERWAY.  THERE HAVE BEEN RECENT

22   OPENINGS OF ADDITIONAL MENTAL HEALTH BEDS AT VARIOUS SITES

23   THROUGHOUT THE STATE.  YOU WILL HEAR EVIDENCE ABOUT THE IMPACT

24   OF THOSE ADDITIONAL BEDS AT THE CALIFORNIA MEDICAL FACILITY AT

25   CALIFORNIA STATE PRISON SACRAMENTO AND KERN VALLEY STATE PRISON

1   ON THE CARE PROVIDED TO MENTALLY ILL INMATES.

2           THOSE BEDS ARE STAFFED BY MENTAL HEALTH CLINICIANS.

3   THIS IS THE THIRD ELEMENT OF A CONSTITUTIONALLY ADEQUATE SYSTEM,

4   MENTAL HEALTH CLINICIANS THAT ARE LICENSED PROFESSIONALS,

5   RANGING FROM PSYCHIATRIST TO SOCIAL WORKERS.

6           THE EVIDENCE WILL SHOW THAT IN 1994 WHEN THE TRIAL

7   COURT FIRST ENTERED ITS FINDINGS AND RECOMMENDATIONS IN THIS

8   MATTER, THERE WERE BARELY 300 PROFESSIONALS PROVIDING MENTAL

9   HEALTHCARE TO INMATES.  NOW THERE'S OVER 2,000.

10          THE EVIDENCE WILL SHOW THAT WITH THE BENEFIT OF

11  COURT-ORDERED PEAK PAY PACKAGES, WITH THE BENEFIT OF RECRUITMENT

12  AND RETENTION STRATEGY, BOTH DEPARTMENT OF CORRECTIONS AND

13  DEPARTMENT OF MENTAL HEALTH HAVE BENEFITED BY INCREASED STAFFING

14  OF THEIR MENTAL HEALTHCARE PROGRAMS AND, IN OTHER WORDS,

15  DECREASED VACANCIES IN THEIR AVAILABLE POSITIONS.

16          THE FOURTH ELEMENT, SUICIDE PREVENTION PROGRAMS, HAVE

17  LONG EXISTED WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS.

18  THE FINDINGS AND RECOMMENDATIONS FOUND IN 1994, THE DESIGN OF

19  THE SUICIDE PREVENTION PROGRAM WAS ADEQUATE.  IT WAS SIMPLY THEN

20  ALL ABOUT IMPLEMENTATION.

21          NOT ONLY HAS THE DESIGN REMAINED WITHIN THE

22  DEPARTMENT OF CORRECTIONS, BUT IT'S NOW BEEN EXPANDED IN LIGHT

23  OF A COLLABORATIVE WORK, WITH NOT ONLY THE SPECIAL MASTER'S TEAM

24  AND PLAINTIFF COUNSEL'S, BUT MULTI-DISCIPLINARY TEAMS WITHIN THE

25  DEPARTMENT OF CORRECTIONS, BRINGING TOGETHER NOT ONLY

1  CORRECTIONAL OFFICERS AND CLINICIANS, BUT ALSO FACILITY MANAGERS

2  AND PLANT OPERATIONS TO ENSURE A SAFE ENVIRONMENT FOR ALL

3  INMATES, BUT PARTICULARLY THOSE MOST AT RISK FOR SUICIDE.

4           THERE'S NO QUESTION THAT SUICIDE IS MULTIFACETED IN

5  ITS CAUSES AND OFTEN UNKNOWABLE IN NATURE, BUT THE EVIDENCE WILL

6  SHOW THAT THE DEFENDANTS HAVE UNDERTAKEN ACTIONS IN COURT,

7  PROVED PLANS TO REDUCE THAT RISK.

8           THE LAST AND FIFTH ELEMENT IS RECORDKEEPING OR, AS

9  THEY NOW SAY IN THE NEW MILLENNIUM, INFORMATION TECHNOLOGY.

10          THERE WILL BE EVIDENCE SHOWING THAT THE MENTAL HEALTH

11 TRACKING SYSTEM HAS EXISTED FOR MANY YEARS.  IT'S NOT THE LATEST

12 GREATEST SYSTEM.  IT IS A SYSTEM THAT WORKS.  IT ENABLES

13 CLINICIANS TO LITERALLY TRACK THOSE INMATES IN NEED OF MENTAL

14 HEALTHCARE AND WHAT SERVICES HAVE BEEN PROVIDED TO THOSE INMATES

15 IN NEED OF MENTAL HEALTHCARE.

16          DEFENDANTS ARE AWARE OF THE NEED TO ENHANCE THAT

17 SYSTEM WITH THE LATEST IN INFORMATION TECHNOLOGY AND HAVE PLANS

18 TO ENGAGE IN THAT DEVELOPMENT IN COLLABORATION WITH THE RECEIVER

19 AND IN COMPLIANCE WITH THE PLATA AND COLEMAN AND ARMSTRONG AND

20 PEREZ COURTS' ORDER TO COORDINATE THE DEVELOPMENT OF THAT

21 PROJECT.  YOU WILL HEAR EVIDENCE ABOUT THOSE PLANS.

22          ANY DEFICIENCIES IN MEETING THESE FIVE CORE ELEMENTS

23 OF A CONSTITUTIONALLY ADEQUATE SYSTEM ARISE NOT FROM THE SIZE OF

24 THE OVERALL POPULATION.  AFTER ALL, THESE ELEMENTS ARE NOT ABOUT

25 SERVING THE OVERALL POPULATION.  THEY ARE ABOUT SERVING THE

1  MENTAL HEALTH POPULATION, A DISCRETE PART OF THE DEPARTMENT OF

2  CORRECTIONS AND REHABILITATION.

3        YOU WILL HEAR EVIDENCE THAT THAT SERVICE HAS BEEN

4  INCLUSIVE, THE DEFENDANTS HAVE CONSISTENTLY ENCOURAGED MENTAL

5  HEALTHCARE CLINICIANS, EVEN CORRECTIONAL OFFICERS, EVEN INMATES

6  THEMSELVES TO REFER TO THE MENTAL HEALTH SERVICE DELIVERY SYSTEM

7  SHOULD THERE BE A DEMONSTRATED NEED OR APPARENT SYMPTOM OF

8  MENTAL HEALTH ISSUES.

9        YOU WILL HEAR EVIDENCE THAT THE NUMBER OF IDENTIFIED

10  MENTALLY ILL INMATES HAS INCREASED FROM THE 7.9 PERCENT FIGURE

11  AT TRIAL IN 1994 TO NOW NEARLY 20 PERCENT OF THE OVERALL

12  POPULATION OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION

13  IS IDENTIFIED AS RECEIVING MENTAL HEALTHCARE SERVICES.

14        THE EVIDENCE WILL SHOW THAT THAT SERVICE HAS BEEN

15  PROVIDED IN AN APPROPRIATE FASHION TO AT LEAST SOME 60 PERCENT

16  OF THE PATIENTS WITH MENTAL HEALTHCARE NEEDS, AS SPECIAL MASTER

17  KEATING HIMSELF REPORTED IN HIS MAY 2007 REPORT TO THE COLEMAN

18  COURT.

19        THOSE NOT GETTING THE CARE THEY NEED ARE, ACCORDING

20  TO THE SPECIAL MASTER'S REPORT, THOSE WHO ARE MENTALLY ILL WHO

21  NEED TO BE HOUSED SEPARATELY AND WHO NEED TO BE HOUSED NOT ONLY

22  SEPARATELY, BUT IN HIGH SECURITY FACILITIES.  THESE ARE THE MOST

23  ACUTE OF THE ACUTELY ILL AND THE MOST VIOLENT OF THOSE.  THEY

24  REQUIRE NOT ONLY HOSPITAL SETTINGS BUT HOSPITAL SETTINGS WITH

25  HIGH SECURITY ARCHITECTURE, HIGH SECURITY DESIGN.  DEFENDANTS

1  ARE DEEPLY AWARE THAT THOSE BEDS AT THIS POINT ARE IN THE

2  PLANNING STAGE, BUT IT MUST BE NOTED THAT THEY ARE IN THE

3  PLANNING STAGE.

4          AS SPECIAL MASTER KEATING SAID, THERE ARE MULTIPLE

5  FACTORS AT PLAY IN LOOKING AT THE MENTAL HEALTH SERVICES

6  DELIVERY SYSTEM.  WE CAN TALK ABOUT RESOURCES.  WE CAN TALK

7  ABOUT MANAGEABLE SKILL IN USING THOSE RESOURCES.  WE CAN TALK

8  ABOUT THE DESIGN OF PRISONS AND WE CAN TALK ABOUT EACH OF THOSE

9  FACTORS.  BUT NEVER ONCE DID HE, OR EVEN THE TRIAL COURT, SAY IT

10 WAS SIMPLE, IT WAS AS SIMPLE AS REDUCING THE OVERALL POPULATION

11 OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION.  RATHER,

12 IT'S ABOUT PROVIDING ENOUGH BEDS, ENOUGH CLINICIANS TO PROVIDE

13 APPROPRIATE MENTAL HEALTHCARE TO THE MENTALLY ILL.

14         **THE CLERK:**  FIVE MINUTES, COUNSEL.

15         **MS. TILLMAN:**  THE EVIDENCE WILL SHOW THERE IS NO

16 NEXUS BETWEEN THE OVERALL POPULATION OF THE DEPARTMENT OF

17 CORRECTIONS AND THE MENTAL HEALTHCARE OF ITS MENTALLY ILL

18 PATIENTS.  THE EVIDENCE WILL SHOW THAT THE MENTAL HEALTHCARE

19 SYSTEM IS AS INDEPENDENT OF THE OVERALL NUMBER OF CDCR INMATES.

20 INDEED, THE SUCCESS, THE CONSTITUTIONAL ADEQUACY OF THE MENTAL

21 HEALTHCARE SYSTEM RESTS NOT ON THE NUMBER OF INMATES WITHIN THE

22 DEPARTMENT OF CORRECTIONS.  IT IS INDEPENDENT OF THAT CENSUS.

23         RATHER, IT RESTS ON THE CONTINUANCE OF ITS MISSION TO

24 INCLUDE MENTALLY ILL INMATES WITHIN ITS SYSTEM TO PROVIDE THE

25 CARE AND TREATMENT NECESSARY FOR THEM BY PROVIDING SUFFICIENT

1  CLINICIANS AND SUFFICIENT BEDS.

2          IT'S NOT ABOUT THE RELEASE OF ANY INMATES, AND

3  CERTAINLY IT'S NOT ABOUT THE RELEASE OF THE MENTALLY ILL

4  INMATES.  IT'S ABOUT PROVIDING BEDS, PROVIDING THOSE SPECIALIZED

5  BEDS, THOSE SPECIALIZED MENTAL HEALTH CLINICIANS TO CARE FOR THE

6  MENTALLY ILL INMATES.

7          DEFENDANTS RESPECTFULLY THANK THIS COURT FOR HEARING

8  THE COLEMAN DEFENDANTS' SEPARATE OPENING STATEMENT.

9          **OPENING STATEMENT BY MR. KAUFHOLD**

10         **MR. KAUFHOLD:**  GOOD MORNING, MAY IT PLEASE THE COURT.

11  MY NAME IS STEVE KAUFHOLD FROM AKIN, GUMP, STRAUSS, HAUER &

12  FELD.  I AM COUNSEL FOR THE LEGISLATIVE INTERVENORS AND SPEAKING

13  THIS MORNING ON BEHALF OF THE DEFENDANT INTERVENORS IN THIS

14  ACTION THAT OPPOSE THE ISSUANCE OF A PRISONER RELEASE ORDER.

15         WE APPRECIATE HAVING THE OPPORTUNITY TO PARTICIPATE

16  IN THIS PHASE OF THE LITIGATION AND TO MAKE HEARD THE VOICES OF

17  THE SCORES OF INDIVIDUAL LAW ENFORCEMENT PERSONNEL, DISTRICT

18  ATTORNEYS, COUNTY OFFICIALS AND STATE LEGISLATORS THAT WE'RE

19  PRIVILEGED TO REPRESENT.

20         IN ORDER TO PROCEED BEYOND THIS FIRST PHASE OF THE

21  BIFURCATED PROCEEDINGS, THE PLAINTIFFS MUST DEMONSTRATE BY CLEAR

22  AND CONVINCING EVIDENCE THAT, QUOTE, "CROWDING IS THE PRIMARY

23  CAUSE OF THE VIOLATION OF A FEDERAL RIGHT," END QUOTE, AND THE

24  PLAINTIFF CLASSES MUST MEET THE BURDEN SEPARATELY IN THE PLATA

25  AND COLEMAN CASES.

1          IN ADDITION, THE LAW ENFORCEMENT, DISTRICT ATTORNEY,

2    AND LEGISLATIVE INTERVENORS ARE PARTICIPATING IN THIS PHASE IN

3    ORDER TO EMPHASIZE TWO KEY ISSUES.

4          FIRST, FROM THE EVIDENCE THAT IS PROVIDED -- HAS BEEN

5    PROVIDED TO DATE BY THE PLAINTIFF CLASSES, THE PLAINTIFFS WILL

6    NOT BE ABLE TO MAKE THE REQUISITE SHOWING THAT CROWDING IS THE

7    PRIMARY CAUSE OF ANY VIOLATION OF THEIR FEDERAL RIGHTS.  THIS IS

8    PARTICULARLY TRUE IN LIGHT OF THE TESTIMONY OF PLAINTIFFS' OWN

9    EXPERTS DURING THEIR DEPOSITIONS AND THE HIGH CLEAR AND

10   CONVINCING STANDARD AND BURDEN OF PROOF THAT THEY MUST SATISFY.

11         SECOND, THE PLAINTIFF CLASSES HAVE DISCLAIMED THE

12   NEED TO DEMONSTRATE THAT THERE ARE ANY CURRENT CONSTITUTIONAL

13   VIOLATIONS OF THEIR FEDERAL RIGHTS, AND OUR UNDERSTANDING IS

14   THAT THE COURT HAS HELD THAT NO SUCH EVIDENCE WILL BE PRESENTED

15   IN THIS PHASE OF THE PROCEEDING.  WE RESPECTFULLY BELIEVE THIS

16   RULING IS CONTRARY TO THE TERMS OF THE PRISON LITIGATION REFORM

17   ACT ACCORDINGLY --

18         **JUDGE KARLTON:**  SIR, I AM THE VERY SOURCE OF

19   PATIENCE.  IF YOU BELIEVE THAT, I'LL SELL YOU A PIECE OF THE

20   BROOKLYN BRIDGE REALLY CHEAP.  TWICE THIS COURT HAS SAID WE WILL

21   NOT RECEIVE THAT EVIDENCE.  YOU HAVE MADE AS CLEAR A RECORD AS

22   YOU CAN.  PLEASE DON'T WASTE OUR TIME.

23         **MR. KAUFHOLD:**  I AM NOT TRYING TO WASTE YOUR TIME,

24   YOUR HONOR.

25         **JUDGE KARLTON:**  BUT YOU ARE.

1          **JUDGE HENDERSON:**  MOVE ON.

2          **JUDGE KARLTON:**  MOVE ON.

3          **JUDGE HENDERSON:**  YOU PRESERVED THE RECORD.  DON'T

4    MAKE IT IN YOUR OPENING STATEMENT.  THE RECORD IS CLEAR YOU

5    DON'T LIKE THAT RULING.

6          **MR. KAUFHOLD:**  AND SINCE WE --

7          **JUDGE HENDERSON:**  MOVE ON, COUNSEL.

8          **MR. KAUFHOLD:**  YES, YOUR HONOR.  SINCE WE HAD NOT

9    RAISED THAT, I JUST WANTED TO MAKE THAT CLEAR.

10          **JUDGE KARLTON:**  MOVE ON, COUNSEL.  I THINK YOU MUST

11   HAVE SOME TROUBLE UNDERSTANDING.  MOVE ON.

12          **MR. KAUFHOLD:**  THAT WAS MY SECOND AND FINAL POINT,

13   YOUR HONOR.  THANK YOU FOR YOUR CONSIDERATION.

14          **JUDGE HENDERSON:**  OKAY.  I THINK WE WILL TAKE A

15   15-MINUTE RECESS BEFORE WE PRESENT OUR FIRST WITNESS AND --

16          **JUDGE KARLTON:**  SIR, WERE YOU SPEAKING FOR THE DA AND

17   LAW ENFORCEMENT AS WELL?

18          **MR. KAUFHOLD:**  YES, YOUR HONOR, I WAS, BUT NOT FOR

19   THE COUNTIES.

20          **JUDGE KARLTON:**  BUT NOT FOR THE COUNTIES.

21          **MS. KECK:**  MY NAME IS ANNE KECK FOR SONOMA COUNTY

22   INTERVENORS.

23          **JUDGE KARLTON:**  I'M HAVING TROUBLE HEARING YOU, ANNE.

24          **MS. KECK:**  MAY IT PLEASE THE COURT, THE COUNTIES AND

25   SONOMA COUNTY INTERVENORS ARE NOT GOING TO PRESENT A SEPARATE

1 STATEMENT, AS OUR EVIDENCE IS GOING TO BE PRESENTED IN PHASE

2 TWO.

3        HOWEVER, I WOULD LIKE TO ASK IF THE COURT WOULD

4 ENTERTAIN A QUESTION TO CLARIFY A RULING OF THIS MORNING, THAT

5 IS, WITH RESPECT TO THE DEPOSITION EXCERPTS, THE COURT STATED

6 THE DEPOSITION EXCERPTS THAT WERE IDENTIFIED BY PLAINTIFFS OF

7 ROBIN DEZEMBER WOULD BE ALLOWED, DID THE COURT IMPLIEDLY,

8 THEREFORE, REJECT ALL OF THE OTHER PROPOSED DEPOSITIONS

9 EXCERPTS, OR WOULD THE COURT HOLD ITS RULING IN ABEYANCE ON

10 THOSE OTHER EXCERPTS REQUESTED TO BE ENTERED BY THE PARTIES?

11        **JUDGE HENDERSON:**  WE ARE GOING TO HOLD THE RULING IN

12 ABEYANCE, AND WE ARE GOING TO COME UP WITH A STRATEGY, THAT WE

13 APPARENTLY HAVE NOT YET, SO WE WILL RULE ON ALL OF THESE THINGS

14 IN THE MORNING BEFORE WE START SO THAT WE DON'T DO IT PIECEMEAL.

15        ONE OF THE THINGS WE'RE GOING TO BE ASKING, IN

16 ADDITION TO IDENTIFYING THE WITNESSES EACH DAY, IS THE EXHIBITS

17 WITH THAT WITNESS, AND WE'LL CLEAR IT UP BEFORE WE START AND NOT

18 DO IT EVERY TIME WE GET TO A BUMP IN THE ROAD.

19        **MS. KECK:**  THANK YOU, YOUR HONOR.  THE REASON I RAISE

20 THIS POINT, THIS IS THE ONLY DAY I HOPE TO GRACE THIS COURT WITH

21 MY PRESENCE, AS SONOMA COUNTY INTERVENORS ARE NOT GOING TO BE

22 ENGAGED IN THE PRESENTATION OF EVIDENCE.  HOWEVER, WE DID SUBMIT

23 AN OBJECTION TO THE DEPO EXCERPTS OF DAVID BENNETT THAT

24 PLAINTIFFS HAD REQUESTED TO ADMIT AS EVIDENCE IN THEIR CASE IN

25 CHIEF.

 1          SO MY QUESTION WAS WITH RESPECT TO WHETHER OR NOT THE

 2   COURT HAD IMPLIEDLY REJECTED THEIR REQUESTED EXCERPTS OR WHETHER

 3   THE COURT WAS GOING TO RULE ON THAT IN THE FUTURE, AND, IF SO,

 4   IF I COULD HAVE SOME NOTICE OF THAT, OR IF THE COURT NEEDED

 5   FURTHER INFORMATION FROM ME.  THAT IS ALL, AS I WILL NOT BE HERE

 6   ON A DAILY BASIS.  HOWEVER, THERE WILL BE OTHER INTERVENOR

 7   COUNSEL HERE WHO WOULD BE, I'M SURE, HAPPY TO PROVIDE ME WITH

 8   THAT INFORMATION.

 9          **JUDGE HENDERSON:**  WE WILL BE RULING ON THAT IN THE

10   FUTURE, AND WE WILL BE DOING THAT AS QUICKLY AS WE CAN WITH AS

11   MUCH ADVANCE NOTICE.

12          **MS. KECK:**  THANK YOU VERY MUCH, YOUR HONORS.

13          **JUDGE HENDERSON:**  OKAY.  COURT IS IN RECESS FOR 15

14   MINUTES.

15               (RECESS TAKEN.)

16          **THE CLERK:**  COME TO ORDER.  COURT IS BACK IN SESSION.

17          **THE CLERK:**  PLEASE BE SEATED.

18          **MS. WHELAN:**  GOOD MORNING, YOUR HONORS.  AT THIS TIME

19   PLAINTIFFS CALL DR. PABLO STEWART AS THEIR WITNESS ON BEHALF OF

20   THE COLEMAN AND PLATA PLAINTIFFS.

21          **MR. MELLO:**  MAY WE BE HEARD BRIEFLY?  YOUR HONORS

22   WERE SPEAKING ABOUT SOME HOUSEKEEPING MATTERS.  AND ONE OF THE

23   ISSUES, I BELIEVE, ANOTHER ONE OF THOSE MATTERS WERE THE

24   OBJECTIONS TO THE EXPERT REPORTS.

25               AND I JUST WANTED TO KNOW IF YOU WERE GOING TO RULE

1  BEFORE THEY TESTIFIED OR AFTER?

2          THANK YOU.

3          **JUDGE KARLTON:**  THAT'S IMPORTANT.

4          **JUDGE HENDERSON:**  OKAY.  WHAT WE'VE DECIDED,

5  COUNSEL -- AND THIS WILL GO FOR THE REST OF THE TRIAL --

6  OBJECTIONS WITH REGARD TO WITNESSES, EXHIBITS AND EXPERTS WILL

7  BE PRESERVED.

8          MAKE YOUR OBJECTIONS. THEY WILL BE PRESERVED UNTIL

9  THE END OF THE TRIAL. WE CAN THINK OF NO OTHER WAY, GIVEN THE

10 EXTRAORDINARY CIRCUMSTANCES OF VOLUME THAT YOU HAD TO DEAL WITH.

11         ORDINARILY, WE WOULD HAVE LIKED TO HAVE HAD THAT

12 RESOLVED AT THE PRETRIAL.

13         SO OBJECTIONS TO WITNESSES, EXPERTS AND EXHIBITS WILL

14 BE MADE, AND THEN PRESERVED THROUGHOUT THE TRIAL.

15         **JUDGE KARLTON:**  LET'S BE CLEAR.  ANYTHING THAT YOU'VE

16 ALREADY EXPRESSED YOU DON'T HAVE TO REEXPRESS TO KEEP THE

17 OBJECTION ALIVE. ALL OF THOSE ARE JUST SIMPLY PRESERVED.  AND WE

18 WILL TRY TO FIGURE OUT WHAT TO DO AT THE END OF THE TRIAL.

19         AND, COUNSEL, I APOLOGIZE.  I DID NOT GET YOUR NAME.

20         **MS. WHELAN:**  SORRY.  I DON'T THINK I SAID IT.  I'M

21 AMY WHELAN.  I'M COUNSEL FOR THE PLAINTIFF CLASS.  AND AT THIS

22 TIME WE CALL DR. PABLO STEWART.

23         **JUDGE HENDERSON:**  PLEASE STEP FORWARD AND BE SWORN

24 IN, SIR.

25         **THE CLERK:**  PLEASE RAISE YOUR RIGHT HAND.

1                    (THEREUPON, THE WITNESS WAS SWORN.)

2            **THE CLERK:**  HAVE A SEAT.  SPEAK INTO THE MICROPHONE

3    AND STATE AND SPELL YOUR FULL NAME FOR THE RECORD.

4            **THE WITNESS:**  MY NAME IS PABLO STEWART.  P-A-L-B-O

5    S-T-E-W-A-R-T.

6            **MS. WHELAN:**  YOUR HONORS, DR. STEWART'S

7    QUALIFICATIONS ARE SET FORTH IN PARAGRAPHS 1 THROUGH 19 OF HIS

8    NOVEMBER 9TH, 2007 REPORT, AND IN HIS CV, WHICH IS APPENDED A TO

9    BOTH HIS INITIAL NOVEMBER 9, 2007 REPORT AND HIS AUGUST 15, 2008

10   SUPPLEMENTAL REPORT.

11           WE OFFER BOTH OF HIS REPORTS INTO EVIDENCE AT THIS

12   TIME.  AND THEY APPEAR AS COLEMAN DOCKET NUMBERS 3217 AND 3221

13   THROUGH 3221-2.

14           **MS. TILLMAN:**  YOUR HONORS, LISA TILLMAN ON BEHALF OF

15   THE COLEMAN DEFENDANTS.  WE STATE THE OBJECTIONS WE PREVIOUSLY

16   FILED WITH THIS COURT IN REGARDS TO THOSE EXPERT REPORTS.

17           **JUDGE KARLTON:**  THAT'S FINE.  YOU REALLY DON'T HAVE

18   TO DO THAT ANYMORE.  IF YOU STATED IT, WE'RE AWARE.

19           WE WILL BECOME AWARE OF IT, IF WE HADN'T, WHEN WE SIT

20   DOWN AND TRY TO RESOLVE THIS CASE.

21   THEREUPON --

22                        **DR. PABLO STEWART**

23   WAS CALLED AS A WITNESS ON BEHALF OF THE PLAINTIFFS, AND AFTER

24   HAVING BEEN FIRST DULY SWORN, WAS EXAMINED AND TESTIFIED AS

25   FOLLOWS:

**DIRECT EXAMINATION**

1

2 **BY MS. WHELAN**

3 **Q.**  DR. STEWART, YOUR REPORTS DETAIL YOUR EXPERIENCE, BUT COULD

4 YOU BRIEFLY EXPLAIN YOUR EXPERIENCE IN PRISON PSYCHIATRY AND

5 MEDICAL CARE?

6 **A.**  I'M A PSYCHIATRIST CURRENTLY EMPLOYED AS A CLINICAL

7 PROFESSOR OF PSYCHIATRY, UNIVERSITY OF CALIFORNIA, SAN

8 FRANCISCO.

9           I'M ALSO CURRENTLY ACTING AS A PRIVATE PSYCHIATRIC

10 CONSULTANT.  MY PARTICULAR EXPERIENCE AROUND PRISON MENTAL

11 HEALTH AND PRISON MEDICAL CARE BEGAN WHEN I FIRST COMPLETED BY

12 FORMAL PSYCHIATRIC TRAINING AT UNIVERSITY OF CALIFORNIA IN 1986,

13 WHERE MY FIRST JOB WAS RUNNING THE INPATIENT JAIL PSYCHIATRIC

14 UNIT AT THE SAN FRANCISCO GENERAL HOSPITAL.

15           THIS WAS THE HIGH SECURITY INPATIENT UNIT FOR ALL OF

16 THE INMATES THAT WERE HOUSED IN VARIOUS JAILS WITHIN THE CITY

17 AND COUNTY OF SAN FRANCISCO.

18           THAT WAS A POSITION THAT I HELD FOR A LITTLE OVER

19 FOUR YEARS. DURING THE PERIOD OF TIME, APPROXIMATELY 18 MONTHS

20 DURING THAT FOUR YEARS, I WAS ALSO THE DIRECTOR OF FORENSIC

21 PSYCHIATRIC SERVICES FOR THE CITY AND COUNTY OF SAN FRANCISCO.

22           AND IN THAT CAPACITY I WAS RESPONSIBLE FOR OVERSEEING

23 THE PROVISION OF PSYCHIATRIC CARE WITHIN THE JAILS IN THE CITY

24 AND COUNTY OF SAN FRANCISCO, IN ADDITION TO SUPERVISING THE

25 PRISON, THE PSYCHIATRIC UNITS IN THE HOSPITAL.

1             I ALSO HAVE ADDITIONAL EXPERIENCE AS A

2    COURT-APPOINTED MEDICAL AND PSYCHIATRIC EXPERT IN THE GATES

3    VERSUS DEUKMEJIAN MATTER, WHICH INVOLVED APPROPRIATE PSYCHIATRIC

4    CARE AT THE CALIFORNIA MEDICAL FACILITY. I WAS ONE OF THE

5    COURT-APPOINTED PSYCHIATRIC EXPERTS DURING THE PERIOD OF 1990

6    UNTIL APPROXIMATELY 2000.

7             I ALSO HAVE EXPERIENCE IN THE MADRID V. GOMEZ CONSENT

8    DECREE WHERE I WAS ONE OF THE PSYCHIATRIC TEAM WHO EVALUATED

9    CONDITIONS AT PELICAN BAY STATE PRISON.

10            IN ADDITION TO THAT, I HAVE ACTED AS PSYCHIATRIC

11   EXPERT FOR THE U.S. DEPARTMENT OF JUSTICE IN MONITORING THE

12   CONDITIONS OF JUVENILE JUSTICE SYSTEM IN THE STATE OF GEORGIA.

13   I DID THAT FOR APPROXIMATELY SIX YEARS, AS WELL AS MONITORING

14   JUVENILE JUSTICE SYSTEMS FOR THE STATE OF CALIFORNIA AND THE

15   STATE OF MICHIGAN.

16            **MS. WHELAN:**  PLAINTIFFS OFFER DR. STEWART AS AN

17   EXPERT ON PRISON PSYCHIATRY AND PRISON MEDICAL CARE.

18            **JUDGE HENDERSON:**  COURT FINDS HIM SO QUALIFIED.

19   **BY MS. WHELAN**

20   **Q.**  DR. STEWART, YOU PRESENT SEVERAL OPINIONS IN YOUR REPORTS.

21   BUT BEFORE I GET TO THE SUBSTANCE OF THOSE, COULD YOU DESCRIBE

22   BRIEFLY WHAT YOU DID IN ORDER TO REACH YOUR OPINIONS IN THIS

23   CASE?

24   **A.**  IN ORDER TO ARRIVE AT MY OPINIONS IN THIS MATTER, I DID A

25   VARIETY OF THINGS. I REVIEWED VOLUMINOUS MATERIALS THAT INVOLVED

1    SPECIAL MASTER REPORTS, REPORTS FROM THE RECEIVER.  I ALSO

2    VIEWED A VARIETY OF COURT DOCKETS, THE PROGRAM GUIDE, VARIOUS

3    AND NUMEROUS DOCUMENTS REGARDING PSYCHIATRIC CARE WITHIN THE

4    CALIFORNIA DEPARTMENT OF CORRECTIONS.

5            IN ADDITION, I DID SIX TOURS OF VARIOUS PRISONS IN

6    THE STATE OF CALIFORNIA, A TOTAL OF FIVE PRISONS, IN THAT I WENT

7    TO THE SALINAS VALLEY STATE PRISON TWICE. MY FIRST SET OF TOURS

8    OCCURRED IN OCTOBER AND NOVEMBER OF 2007 WHERE I TOURED  THE DVI

9    RECEPTION CENTER.  I ALSO LOOKED AT THE SALINAS VALLEY STATE

10   PRISON AS WELL AS THE SOLANO STATE PRISON.

11           AND MY FOLLOW-UP SET OF TOURS OCCURRED IN JULY AND

12   AUGUST OF 2008, WHERE I WENT BACK AND REVISITED SALINAS VALLEY

13   STATE PRISON. I ALSO REVISITED THE CALIFORNIA MEDICAL FACILITY

14   AS WELL AS THE MULE CREEK STATE PRISON.

15           DURING THE COURSE OF THESE TOURS, THE TYPICAL DAY, IF

16   YOU WILL, OF MY TOURS WERE WE BEGAN WITH A MORNING MEETING OF

17   BOTH PRISON OFFICIALS, HEALTH STAFF, MENTAL HEALTH STAFF,

18   REPRESENTATIVES FROM CUSTODY STAFF, AND WE WERE PRESENTED AN

19   OVERVIEW OF WHAT THE PRISON'S MISSION WAS, THE TYPE OF PRISONER,

20   ET CETERA, THE TYPE OF CARE.

21           WE WERE GIVEN REVIEWS, GIVEN PRESENTATIONS ON

22   STAFFING, ON SECURITY ISSUES, ON VARIOUS ISSUES. AND I WAS ALSO

23   ABLE TO ASK QUESTIONS OF THE STAFF AT THESE MORNING MEETINGS.

24           AFTER THESE MEETINGS, I PROCEEDED ON A TOUR OF THE

25   FACILITY, AND I LOOKED AT THE VARIOUS HOUSING UNITS WHERE

1  COLEMAN CLASS MEMBERS WERE HOUSED AND ALSO HOUSING UNITS WHERE

2  COLEMAN CLASS MEMBERS WERE NOT HOUSED.

3           DURING THE COURSE OF THESE -- OF MY WALKING PORTION

4  OF THE TOUR, I WAS ABLE TO SPEAK WITH A VARIETY OF CUSTODY

5  STAFF, AS WELL AS CLINICAL STAFF, ASKING THEM VERY PARTICULAR

6  QUESTIONS ON THE PROVISION OF MENTAL HEALTHCARE.  AND ALSO

7  DURING THESE WALKING TOURS I HAD THE OPPORTUNITY TO CONDUCT --

8  AND, AGAIN, THIS IS OVER THE COURSE OF ALL OF MY TOURS --

9  APPROXIMATELY 60, WHAT I'LL DESCRIBE AS FORMAL INTERVIEWS, WHERE

10 I HAD PRIVATE INTERVIEWS WITH VARIOUS MEMBERS OF THE COLEMAN

11 CLASS.  AND THOSE PEOPLE I ALSO HAD THE OPPORTUNITY TO REVIEW

12 THEIR UNIT HEALTH RECORD, AND, YOU KNOW, TO REVIEW THEIR MEDICAL

13 CARE AND PSYCHIATRIC CARE.

14          IN THE ADDITION TO THESE FORMAL INTERVIEWS, WHICH WAS

15 APPROXIMATELY 60 OVER THE COURSE OF THESE SIX PRISONS THAT I

16 VISITED, I HAD AN OPPORTUNITY TO SPEAK WITH AT LEAST 100

17 INMATES, SOME OF THEM IN THE COLEMAN CLASS, SOME OF THEM NOT IN

18 THE COLEMAN CLASS.

19          AND THESE WERE I WOULD DESCRIBE AS VERY INFORMAL.  I

20 WOULD SEE PEOPLE WAITING IN THE PILL LINE, AND I WOULD TALK WITH

21 THEM.

22          I WOULD GO TO VARIOUS HOUSING UNITS AND SPEAK WITH

23 VARIOUS MEMBERS OF THE COLEMAN CLASS. AND AGAIN, THAT TOTALED TO

24 AROUND 100.

25 Q.  YOU WERE ASKED TO FORM AN OPINION AS TO WHETHER OVERCROWDING

1    IN THE CALIFORNIA PRISON SYSTEM IS THE PRIMARY CAUSE OF

2    CONSTITUTIONAL VIOLATIONS IN THE DELIVERY OF MEDICAL AND MENTAL

3    HEALTHCARE.

4          WHAT DID YOU CONCLUDE?

5    **A.**  I CONCLUDED THAT OVERCROWDING WAS THE PRIMARY CAUSE OF THE

6    ONGOING CONSTITUTIONAL VIOLATIONS.

7    **Q.**  CAN YOU EXPLAIN WHY YOU REACHED THAT CONCLUSION?

8    **A.**  A VARIETY OF REASONS THAT I USED TO REACH THIS -- THAT

9    OPINION. I'M VERY AWARE THAT THE COLEMAN CLASS HAS HAD THE

10   ABILITY OF BEING MONITORED BY THE COLEMAN COURT FOR A NUMBER OF

11   YEARS. I BELIEVE IT BEGAN AROUND 1994, 1995.

12          **UNIDENTIFIED SPEAKER:**  YOUR HONOR, WE CAN'T HEAR THE

13   WITNESS, IF YOU COULD ASK HIM TO SPEAK UP.

14          **JUDGE KARLTON:**  CAN YOU SPEAK UP?  I MUST CONFESS

15   THERE'S A LOT OF ECHO, SO IT'S HARD FOR ME TO FULLY HEAR.

16          **THE WITNESS:**  YOUR HONOR, I'M SORRY.  IS THIS BETTER

17   HERE?

18          I'M RARELY ACCUSED OF BEING SOFT SPOKEN, SO I WAS

19   TAKEN A LITTLE ABACK BY THAT.

20          GETTING BACK TO WHAT I -- WHY I FELT THAT THE

21   OVERCROWDING WAS THE PRIMARY CAUSE OF THE ONGOING CONSTITUTIONAL

22   VIOLATIONS IS THAT BASED ON MY EXPERIENCE AS BEING A

23   COURT-APPOINTED MONITOR DURING A FEDERAL OVERSIGHT OF AN

24   INSTITUTION REGARDING MENTAL HEALTHCARE, IT'S REMARKABLE TO ME

25   THAT AFTER OVER 10 YEARS OF VERY CLOSE MONITORING AND HUNDREDS

1  OF THOUSANDS OF HOURS OF CONSULTATION ON THE PART OF A GROUP OF

2  NATIONALLY-RECOGNIZED PSYCHIATRIC PRISON EXPERTS THAT THESE

3  CONDITIONS PERSIST AFTER THIS CLOSE SCRUTINY OVER ALL THESE MANY

4  YEARS.

5            THAT WAS ONE THING THAT I NOTED. ANOTHER ISSUE IS

6  THAT THE SPECIAL MASTER, I BELIEVE WAS MASTER KEATING AT THE

7  TIME, NOTED THAT POPULATION PRESSURES THAT HAVE OCCURRED

8  MID-TO-LATTER PART OF THIS DECADE HAVE UNDERMINED -- HAD

9  UNDERMINED PROGRESS THAT DEFENDANTS WERE MAKING TOWARDS

10  ADDRESSING THEIR ACKNOWLEDGED DIFFICULTIES AND PROBLEMS IN

11  PROVIDING CONSTITUTIONALLY-ADEQUATE PSYCHIATRIC CARE.

12            ANOTHER POINT THAT I THINK IS IMPORTANT TO REMEMBER

13  IS THAT THE ACTUAL COLEMAN CLASS -- AND LOOKING AT A PERIOD FROM

14  2003 TO 2007, THE COLEMAN CLASS ITSELF HAS INCREASED AT A MUCH

15  GREATER RATE THAN THE OVERALL POPULATION OF CDCR. DURING THE

16  TIME FRAME, AGAIN, APPROXIMATELY, I BELIEVE, JANUARY, 2003, TO

17  JULY 2007, THE OVERALL CDC POPULATION INCREASED AROUND 8 TO

18  ALMOST 9 PERCENT. DURING THE SAME TIME FRAME COLEMAN CLASS

19  MEMBERS HAVE INCREASED OVER 30 PERCENT.

20            AND, IN FACT, BETWEEN MY FIRST -- BETWEEN MY FIRST

21  TOURS, WHICH WERE IN OCTOBER, NOVEMBER, OF 2007, AND MY SECOND

22  SET OF TOURS, JULY AND AUGUST, 2008, THE ACTUAL POPULATION OF

23  THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

24  DECREASED.

25            IT DECREASED BY APPROXIMATELY 6,000 INMATES. DURING

1  THIS SAME TIME FRAME, THE NUMBER OF THE COLEMAN CLASS MEMBERS

2  INCREASED BY 1996 PEOPLE.  EVEN WHEN THERE WAS A SLIGHT

3  POPULATION DIP, THE COLEMAN CLASS CONTINUED TO GROW.

4         AND, AGAIN, I ATTRIBUTE THIS DIRECTLY TO THE

5  OVERCROWDING CONDITIONS THAT EXIST.

6         AND, FINALLY, THE BASIS, THE LAST BASIS OF THIS

7  OPINION IS THE FACT THAT THE OVERCROWDING CONDITIONS

8  THEMSELVES -- AND I WOULD USED THE WORD "OVERWHELMING"

9  OVERCROWDING CONDITIONS THEMSELVES CREATE SITUATIONS THAT

10 CONTRIBUTE TO THE INABILITY OF THE CDCR TO PROVIDE

11 CONSTITUTIONAL CARE.  AND BY THAT I MEAN THE NECESSITY TO HOUSE

12 INMATES IN DORMS, THE NECESSITY TO USE OTHER WHAT I WOULD KINDLY

13 REFER TO AS "OVERFLOW UNITS."

14         FOR EXAMPLE, THERE'S NOT ENOUGH MENTAL HEALTH CRISIS

15 BEDS IN THE SYSTEM, AND THE DEFENDANTS HAVE ACKNOWLEDGED THIS.

16         AND BECAUSE OF THAT, THEY HAVE CREATED A VARIETY OF

17 OVERFLOW UNITS TO THESE MENTAL HEALTH CRISIS BEDS WHERE COLEMAN

18 CLASS MEMBERS IN PSYCHIATRIC CRISIS ARE HOUSED.  AND THESE

19 CONDITIONS THEMSELVES CONTRIBUTE TO THE ONGOING CONSTITUTIONAL

20 VIOLATIONS.

21         THE FACT THAT COLEMAN CLASS MEMBERS ARE LITERALLY

22 STUCK IN THE RECEPTION CENTER.  WHEN I VISITED THE RECEPTION

23 CENTER AT DVI, THE PROGRAM GUIDE SAYS AN EOP MEMBER OF THE

24 COLEMAN CLASS SHOULD BE PLACED IN AN EOP PRISON WITHIN 60 DAYS

25 OF ARRIVAL AT RECEPTION CENTER.

1          THERE WERE INMATES THAT I INTERVIEWED AND CHARTS THAT

2  I ALSO REVIEWED THAT PEOPLE HAD BEEN THERE SIX AND SEVEN MONTHS.

3  SO THEY HAVE CREATED THESE DEFACTO ADSEG UNITS.

4          THE FACT THAT THERE'S TOO MANY INMATES AT THE SALINAS

5  VALLEY STATE PRISON IN THE GENERAL POPULATION YARD THAT HAD

6  RESULTED IN AN ALMOST CONTINUOUS LOCKDOWN.  THE STAFF CALL IT

7  "MODIFIED PROGRAM."  BUT BASICALLY IT'S A LOCKDOWN WHERE

8  PRISONERS ARE NOT ALLOWED OUT OF THEIR CELLS.  THIS ALMOST

9  CONTINUOUS LOCKDOWN FOR A PERIOD OF SEVERAL YEARS, THIS

10 SIGNIFICANTLY IMPACTS THE MENTAL HEALTH OF COLEMAN CLASS MEMBERS

11 THAT ARE ASSIGNED TO THESE YARDS AT SALINAS VALLEY STATE PRISON,

12 FOR EXAMPLE.

13 **Q.**  YOU MENTIONED USING ALTERNATIVE PLACEMENTS FOR PEOPLE IN

14 PARTICULAR WHO REQUIRE MENTAL HEALTH CRISIS PLACEMENT. WERE

15 YOU -- CAN YOU EXPLAIN IN MORE DETAIL WHAT YOU FOUND DURING YOUR

16 TOURS?

17 **A.**  DURING MY TOURS -- AND I SAW THIS AT THE DVI STATE PRISON. I

18 SAW THIS AT MULE CREEK.  I SAW IT AT SALINAS VALLEY STATE PRISON

19 WHERE, BECAUSE OF THE FACT THAT COLEMAN CLASS MEMBERS ARE UNABLE

20 TO ACCESS APPROPRIATE LEVELS OF MENTAL HEALTHCARE, THEY ARE

21 UNABLE TO ACCESS INPATIENT SERVICES IN A TIMELY MANNER, THEY ARE

22 UNABLE TO ACCESS MENTAL HEALTH CRISIS BEDS IN A TIMELY MANNER,

23 THAT THEY ARE HOUSED IN THESE ALTERNATIVE SETTINGS THAT, TO MY

24 OPINION, ARE VERY INADEQUATE AND CAUSE DANGER AND SUFFERING TO

25 THE COLEMAN CLASS MEMBERS.

1          I THINK WE HAVE SOME PICTURES.  ARE WE GOING TO SHOW

2    THOSE NOW?

3          **JUDGE KARLTON:**  BEFORE YOU DO THAT, THEY CAUSE DAMAGE

4    AND SUFFERING.  THE QUESTION IS:  DO THEY CAUSE DECOMPENSATION?

5    THAT IS, ARE THEY CONTRIBUTING FACTORS IN THE INCREASE WHICH YOU

6    NOTED IN THE NUMBER OF COLEMAN CLASS MEMBERS?

7          **THE WITNESS:**  I WOULD SAY YES, YOUR HONOR, THEY

8    ABSOLUTELY DO.  AND I THINK IF THE COURT WOULD SEE THESE, THE

9    SETTINGS THAT I'M TALKING ABOUT, YOU CAN ARRIVE AT YOUR OWN

10   OPINIONS WHETHER OR NOT -- IT'S CERTAINLY MY OPINION THAT THESE

11   SETTINGS ARE UNACCEPTABLE FOR ANY SORT OF PSYCHIATRIC TREATMENT,

12   ESPECIALLY SOMEONE WHO IS IN A PSYCHIATRIC CRISIS.

13          WE'RE NOT TALKING ABOUT NONCOLEMAN CLASS INMATES.

14   WE'RE NOT TALKING ABOUT EVEN COLEMAN CLASS INMATES THAT ARE NOT

15   IN CRISIS.  THESE ARE PEOPLE THAT HAVE BEEN IDENTIFIED AS

16   NEEDING A HIGHER LEVEL OF PSYCHIATRIC CARE, AND THEY ARE PLACED

17   IN THESE SETTINGS.

18          **MS. WHELAN:**  PART OF PLAINTIFF'S EXHIBIT P339 ARE

19   PICTURES OF -- FROM A TOUR THAT DR. STEWART CONDUCTED AT MULE

20   CREEK STATE PRISON.  IF WE COULD SHOW PICTURES 10, 11 AND 12.

21   **BY MS. WHELAN**

22   Q.  DR. STEWART, COULD YOU EXPLAIN WHAT WE'RE LOOKING AT HERE?

23   **A.**  THIS PICTURE IS WHAT IS REFERRED TO -- EXCUSE ME.  THIS

24   PICTURE IS WHAT IS REFERRED TO AS A MENTAL HEALTH OUTPATIENT

25   HOUSING UNIT. THESE ARE USED TO HOUSE COLEMAN CLASS MEMBERS WHO

1  ARE IN PSYCHIATRIC CRISIS AND THAT HAVE BEEN IDENTIFIED WHO NEED

2  MENTAL HEALTH CRISIS BEDS.

3          SO THOSE ARE THE PEOPLE THAT UTILIZE THESE, AND THIS

4  IS WHAT THEY ARE.

5  **Q.**  AND DID YOU HAVE AN OPPORTUNITY TO SPEAK WITH ANY CLASS

6  MEMBERS WHO HAD BEEN HOUSED IN THESE CELLS, IN PARTICULAR,

7  DURING YOUR TOURS?

8          **MR. MELLO:**  OBJECTION, YOUR HONOR.  HEARSAY, YOUR

9  HONOR.

10          **THE WITNESS:**  I DID HAVE AN OPPORTUNITY TO SPEAK TO

11  MANY CLASS MEMBERS.  ONE IN PARTICULAR WAS TALKING ABOUT BEING

12  HOUSED IN THIS SETTING.

13          **MS. TILLMAN:**  SAME OBJECTION, YOUR HONOR.

14          **JUDGE KARLTON:**  I'M SORRY?

15          **MS. TILLMAN:**  OBJECTION.  HEARSAY, YOUR HONOR, TO THE

16  EXTENT HE INDICATES TO THE COURT OUT OF COURT STATEMENTS OF

17  INMATES.

18          **JUDGE HENDERSON:**  I'M SORRY.  I WAS PREOCCUPIED.  SAY

19  THAT AGAIN, COUNSEL

20          **MS. TILLMAN:**  I'M SORRY.  I'M LISA TILLMAN, AND I'M

21  OBJECTING ON THE BASIS OF HEARSAY TO HIS TESTIMONY CONCERNING

22  THE STATEMENTS MADE TO HIM DURING HIS TOURS BY INMATES.

23          **JUDGE KARLTON:**  I'M ASSUMING THAT THAT'S WHAT

24  PSYCHIATRIC EXPERTS DO IS TALK TO PEOPLE AND FIND OUT WHAT THE

25  CIRCUMSTANCES ARE.

1          **JUDGE HENDERSON:**  OKAY.

2          **JUDGE KARLTON:**  WHAT IS THE POSITION OF THE

3    DEFENDANT?  I THINK I MISUNDERSTOOD.

4          **MS. TILLMAN:**  I RECOGNIZE THAT HE'S QUALIFIED UNDER

5    JUDGE HENDERSON'S OR THIS COURT'S RULING.  HOWEVER, I ALSO

6    RECOGNIZE TO THE EXTENT THIS STATEMENT IS BEING OFFERED TO PROVE

7    THE TRUTH, IT IS HEARSAY.

8          **THE COURT:**  OKAY. I'M GOING TO OVERRULE THE

9    OBJECTION, COUNSEL.

10          **MS. WHELAN:**  THANK YOU.

11          **THE WITNESS:**  YES, THE METHOD IN WHICH I UTILIZED TO

12    INTERVIEW AND ARRIVE AT OPINIONS WAS THE SAME METHOD THAT I'VE

13    ALWAYS USED WHEN I'VE BEEN COURT APPOINTED, AS WELL AS THE

14    CURRENT METHOD USED BY COLEMAN CLASS EXPERTS INTERVIEWING

15    INMATES.

16          SO IN INTERVIEWING THIS ONE PARTICULAR GENTLEMAN WHO

17    HAD BEEN IN THIS SETTING -- AND YOU CAN'T GET A REAL FEEL FROM

18    IT FROM THAT ANGLE. I BELIEVE THERE MIGHT BE OTHER PICTURES THAT

19    SHOW IT A LITTLE MORE, A LITTLE BETTER.

20          THESE ARE CONCRETE CELLS THAT HAVE BEEN RETROFITTED

21    FOR THE USE FOR MENTALLY ILL PEOPLE IN CRISIS.  THE ONE

22    GENTLEMAN THAT I SPOKE WITH HAD BEEN IN THERE FOR EIGHT DAYS

23    AWAITING MENTAL HEALTH CRISIS PLACEMENT.  AND HE DECOMPENSATED

24    TO THE POINT WHERE HE ENDED UP HAVING -- HE ENDED UP SPREADING

25    FECES AND FINALLY WAS ABLE TO BE REMOVED FROM THIS SETTING.

1          I ALSO INTERVIEWED A VARIETY OF PEOPLE WHO WERE

2    CURRENTLY HOUSED IN THESE OUTPATIENT HOUSING UNITS, AS THEY ARE

3    REFERRED TO.  AND THEY HAD BEEN THERE FOR A NUMBER OF DAYS, ALL

4    OF THEM WAITING TO BE PLACED IN A MENTAL HEALTH CRISIS BED.

5    **BY MS. WHELAN**

6    **Q.**  AND THIS CELL APPEARS TO BE EMPTY.  WAS THIS HOW THEY WERE

7    WHEN YOU WERE THERE?

8    **A.**  YES.  THAT'S HOW THE CELLS ARE. AND IT'S IMPORTANT TO NOTE

9    THAT WHEN A PERSON IS PLACED IN THIS CELL, THEY ARE WEARING A

10   SUICIDE SMOCK, AND THAT IS IT. NO UNDERWEAR, NO SHOES, NO

11   BLANKET, NO MATTRESS.  AND, IN FACT, THE ONE INMATE THAT I SPOKE

12   WITH HAD BEEN THERE FOR SEVEN, EIGHT DAYS UNTIL HE FINALLY WAS

13   GIVEN ONE OF THESE LITTLE THIN MATTRESSES TO LIE ON.  BUT,

14   AGAIN, NO BLANKETS.

15          AND THIS IS IMPORTANT TO REMEMBER THAT THESE ARE

16   SETTINGS THAT ARE USED TO HOUSE MENTALLY ILL PEOPLE IN CRISIS.

17   THESE AREN'T JUST GENERAL COLEMAN CLASS MEMBERS.  THESE ARE

18   PEOPLE THAT HAVE BEEN IDENTIFIED AS NEEDING A HIGHER LEVEL OF

19   CARE.

20   **Q.**  CAN YOU EXPLAIN WHY THE CONDITIONS THAT YOU JUST DESCRIBED

21   IN PARTICULAR ARE TROUBLING FROM A MENTAL HEALTH PERSPECTIVE?

22   **A.**  WELL, FROM A MENTAL HEALTH PERSPECTIVE THEY ARE TROUBLING

23   FOR MANY REASONS IN THAT I KNOW OF NO OTHER SETTING WHERE PEOPLE

24   WOULD BE HOUSED THERE FOR AN EXTENDED PERIOD OF TIME WAITING TO

25   ACCESS APPROPRIATE LEVELS OF MENTAL HEALTHCARE.

1          BUT AS EQUALLY AS DANGEROUS IS THE FACT THAT IN A

2   PRISON WORD GETS OUT REALLY QUICKLY BASED ON MY EXPERIENCE. SO

3   IT'S THE PEOPLE WHO WOULD UTILIZE MENTAL HEALTH SERVICES ARE

4   VERY AWARE THAT THESE ARE THE CONDITIONS IN WHICH THEY WOULD BE

5   PLACED IF THEY COME FORWARD EXPRESSING THEIR SUICIDAL THOUGHTS

6   TO A STAFF MEMBER, TO A CUSTODY OFFICER, TO ANOTHER INMATE WHO

7   WOULD THEN REPORT IT.

8          AND IN MY EXPERIENCE, THIS SIGNIFICANTLY INHIBITS

9   PEOPLE FROM COMING FORWARD TO EXPRESSING THEIR TRUE STATE OF

10  THEIR MENTAL ILLNESS, THEIR TRUE LEVELS OF SUICIDAL IDEATION OR

11  PLAN, ET CETERA.

12          SO THAT'S, TO MY VIEW, A VERY DANGEROUS ASPECT OF THE

13  PROLONGED USE OF THESE VERY INADEQUATE HOUSING MODULES.

14  Q.  YOU ALSO MENTIONED YOUR TOUR AT SALINAS VALLEY STATE PRISON.

15          **MS. WHELAN:**  AND I BELIEVE WE ALSO HAVE SOME PICTURES

16  FROM THAT TOUR, IF WE COULD SHOW PLAINTIFFS' TRIAL EXHIBIT 338,

17  PICTURES 11, 12 AND 13.

18  **BY MS. WHELAN:**

19  Q.  DR. STEWART, COULD YOU DESCRIBE WHAT WE'RE SEEING HERE?

20  **A.**  WHAT WE'RE SEEING THERE IS -- IT'S REALLY DIFFICULT TO

21  COMPREHEND. THIS IS WHERE PEOPLE WHO CANNOT -- WHO ARE IN MENTAL

22  HEALTH CRISIS, WHO ARE UNABLE TO ACCESS MENTAL HEALTH CRISIS

23  BEDS BECAUSE OF THE FACT OF OVERCROWDING HAVE TO WAIT. THESE ARE

24  CAGES.  PEOPLE NEED TO SIT UPRIGHT.

25          **MS. TILLMAN:**  OBJECTION.  MISCHARACTERIZES THE

1 EVIDENCE BY USE OF THE TERM "CAGES."

2           **JUDGE HENDERSON:**  I DIDN'T HEAR YOU, COUNSEL.

3           **MS. TILLMAN:**  I'M SORRY.  LISA TILLMAN SPEAKING.

4 OBJECTION TO THE TERM "CAGES."  THAT MISCHARACTERIZES THE

5 EVIDENCE.  IT'S INFLAMMATORY AND ARGUMENTATIVE.

6           **JUDGE HENDERSON:**  WELL, I DON'T KNOW HOW TO

7 CHARACTERIZE IT.

8           **JUDGE KARLTON:**  IT IS WHAT IT IS.

9           **MS. TILLMAN:**  I BELIEVE THE COURT SPECIAL MONITOR

10 HAS FOUND THIS TO BE HOLDING CELLS, AND OTHER ARRANGEMENTS ARE

11 CALLED "THERAPEUTIC MODULES."

12           **MS. WHELAN:**  YOUR HONORS, THESE ARE ALSO PART OF

13 THEIR OBJECTIONS.

14           **JUDGE HENDERSON:**  LET'S CALL IT THAT A ROSE BY ANY

15 OTHER NAME --

16           **THE WITNESS:**  THESE THERAPEUTIC MODULES THAT ARE VERY

17 CAGE-LIKE ARE USED TO --

18           **MS. TILLMAN:**  I'M GOING TO OBJECT TO THE USE OF THE

19 TERM "THERAPEUTIC MODULE."  THIS PICTURE IS NOT OF A THERAPEUTIC

20 MODULE.  IT IS OF A HOLDING CELL.

21           **THE WITNESS:**  THESE HOLDING CELLS --

22           **MS. TILLMAN:**  I'M SORRY THAT THE EXPERT DOESN'T

23 RECOGNIZE THE DIFFERENCE.

24           **THE WITNESS:**  YOUR HONOR, REGARDLESS OF WHAT THEY ARE

25 CALLED, THE COLEMAN CLASS MEMBER WHO IS IN PSYCHIATRIC CRISIS

1  WHO HAS BEEN IDENTIFIED AS NEEDING TO BE HOUSED IN A MENTAL

2  HEALTH CRISIS BED IS FORCED TO SIT UPRIGHT IN THESE CAGES --

3  EXCUSE ME -- IN THESE UNITS DURING THE DAY WHERE THERE'S NO

4  TOILET.  THERE'S NO WATER.  THERE'S NO HEALTH OR SAFETY

5  FACILITIES THERE, AND WHILE THEY ARE WAITING FOR PLACEMENT IN A

6  MENTAL HEALTH CRISIS BED. AND THIS OCCURS AT THE SALINAS VALLEY

7  STATE PRISON.

8  **BY MS. WHELAN**

9  **Q.**  DR. STEWART, YOU'RE ALSO A PSYCHIATRIST. WERE YOU ABLE TO

10  MONITOR AND VISIT AND LOOK INTO THE MEDICATION MANAGEMENT

11  SYSTEMS AT THE PRISONS DURING YOUR TOURS AND THROUGH YOUR REVIEW

12  OF DOCUMENTS?

13  **A.**  YES.

14  **Q.**  AND CAN YOU DESCRIBE TO THE COURT WHAT YOU FOUND AND WHAT

15  YOUR CONCLUSIONS WERE?

16  **A.**  REGARDING THE MEDICATION MANAGEMENT SYSTEM, IT IS MY OPINION

17  THAT THE MEDICATION MANAGEMENT SYSTEM CURRENTLY AS IT EXISTS IN

18  THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION IS

19  OVERWHELMED.  THERE ARE JUST TOO MANY PEOPLE THAT ARE PRESCRIBED

20  TOO MANY MEDICATIONS FOR THE SYSTEM TO ADEQUATELY ADDRESS.

21          AT SOLANO STATE PRISON INMATES HAVE TO ROUTINELY

22  CHOOSE BETWEEN GOING TO MORNING BREAKFAST VERSUS GETTING THEIR

23  PILLS.

24          IN OTHER SETTINGS, WHERE THERE IS PERSISTENT

25  LOCKDOWNS THE STAFF TAKE THE MEDICINES TO THE CELLS AND

1    ADMINISTER IT THROUGH THE FOOD PORTS.  AND THEY SPEND LITERALLY

2    SECONDS, AS FAST AS IT TAKES TO POP OUT WHATEVER PILLS THERE ARE

3    FROM THE BLISTER PACK, AND HAND THEM TO THE FOOD PORT IS HOW

4    LONG THE PERSON STAYS -- THE STAFF STAYS IN FRONT OF THE COLEMAN

5    CLASS MEMBER WHO IS BEING PRESCRIBED A VARIETY OF VERY POTENT

6    ANTIPSYCHOTIC ANTIDEPRESSANT AND MOOD STABILIZING MEDICATIONS.

7            THE PILL LINES, PEOPLE WAITING LONG PERIODS OF TIME

8    AND, AGAIN, WHEN THEY GET TO THE FRONT OF IT THEY ARE THERE FOR

9    A FEW SECONDS TO GET THEIR MEDICATIONS.

10           I SAW NO EVIDENCE OF -- THE TERM THAT I USE IS

11   "CLINICAL MANAGEMENT."

12           THERE'S NO EVIDENCE THAT THE PERSON ADMINISTERING THE

13   MEDICATION HAS THE TIME OR THE OPPORTUNITY TO ASK THE PERSON

14   ABOUT THE PRESENCE OF ANY UNTOWARD SIDE EFFECTS; OF ANY PROBLEMS

15   THEY HAVE IN TAKING THE MEDICATIONS, IN GENERAL; MEDICATION

16   ADHERENCE OR COMPLIANCE; AS WELL AS DOING A QUICK CHECK ON THE

17   EFFICACY OF THE MEDICINE.

18           SO THIS GETS BACK TO THE FACT THAT SPEAKING WITH THE

19   CHIEF PSYCHIATRIST AT MULE CREEK STATE PRISON, DOCTOR FOWLER,

20   SAYS THAT THERE'S NO OBJECTIVE OUTCOME MEASURES THAT LOOK AT

21   WHETHER OR NOT ANYTHING THAT THE PSYCHIATRISTS DO, ANY

22   THERAPEUTIC INTERVENTIONS -- AND IN THIS CASE MEDICATIONS -- ARE

23   HAVING ANY POSITIVE EFFECT FOR THEIR CLIENTS, BECAUSE THERE'S NO

24   FEEDBACK LOOP BECAUSE OF THE OVERWHELMING NUMBER OF PEOPLE THAT

25   ARE SUPPOSED TO BE GIVEN MEDICATIONS IN THESE LITERALLY SECONDS

1    A PERSON STANDS IN FRONT OF YOU.

2            THERE'S NO FEEDBACK LOOP TO THE PRESCRIBER.  THERE'S

3    NO FEEDBACK LOOP FROM THE PRESCRIBER TO THE PERSON GIVEN THE

4    MEDICATION.  IT'S CLEAR TO ME THE SYSTEM IS OVERWHELMED.

5            THIS IS FURTHER EVIDENCED BY MY DISCUSSIONS WITH THE

6    DMH STAFF.  DR. GHANDI, WHO IS IN CHARGE OF THE DMH PROGRAMS AT

7    THE VACAVILLE PSYCHIATRIC PROGRAM LOOKED AT PEOPLE BEING

8    ADMITTED TO THE DMH UNITS THERE. AND IT WAS OVER 70 PERCENT, I

9    BELIEVE.  IT WAS A VERY LARGE NUMBER, 70 OR 80 PERCENT OF THE

10   COLEMAN CLASS MEMBERS THAT WERE BEING ADMITTED TO THE DMH UNITS

11   HAD NO EVIDENCE OR MINIMAL EVIDENCE IN THEIR BLOODSTREAM OF ANY

12   OF THEIR PRESCRIBED MEDICATIONS, WHICH FURTHER EVIDENCED TO ME

13   THAT WILL MEDICATION SYSTEM CANNOT --

14           **MS. TILLMAN:**  OBJECT TO THE EXTENT THAT GOES INTO

15   HEARSAY, YOUR HONORS.

16           **JUDGE HENDERSON:**  WE JUST CAN'T HEAR YOU, COUNSEL.

17   I'M SORRY.

18           **MS. TILLMAN:**  OBJECTION, HEARSAY. HE'S OFFERING IT

19   NOW FOR THE PROOF.

20           **JUDGE HENDERSON:**  OVERRULED.

21           **THE WITNESS:**  MY CONVERSATIONS WITH DR. GHANDI, AS

22   WELL AS OTHER STAFF MEMBERS, WERE JUST PART OF MY BASIS OF MY

23   OPINION STATING THAT MEDICATION MANAGEMENT SYSTEM IS COMPLETELY

24   OVERWHELMED.

25           **JUDGE KARLTON:**  DOCTOR, HOW IS IT -- I DON'T

1  UNDERSTAND HOW IS IT THAT THE BLOODSTREAM DOESN'T REFLECT THE

2  TAKING OF THE DRUGS.  WHAT DO YOU UNDERSTAND THAT TO MEAN?

3           **THE WITNESS:**  THE MOST OBVIOUS ANSWER TO THAT, YOUR

4  HONOR, IS THAT, IN FACT, WHEN THESE PEOPLE COME -- THE COLEMAN

5  CLASS MEMBERS COME IN FRONT OF THE PILL DISTRIBUTING STAFF, THAT

6  THEY CANNOT ENSURE THAT THEY ARE, IN FACT, TAKING IT.

7           THE FACT THAT THERE'S NO MEDICATION EVIDENCED IN

8  THEIR BLOODSTREAM MEANS THAT THEY ARE NOT TAKING THE MEDICATION

9  BECAUSE THERE'S NOT ENOUGH TIME SPENT BY THE CLINICAL STAFF TO

10 ENSURE THAT, IN FACT, PEOPLE ARE TAKING THE MEDICINE.

11           AND THIS IS FURTHER EVIDENCED, YOUR HONOR, BY

12 VERY -- A VERY WELL-USED PSYCHIATRIC MEDICATION.  IT GOES BY THE

13 BRAND NAME OF "WELLBUTRIN."  IT'S A VERY GOOD ANTIDEPRESSANT.

14 AND IT HAS BEEN TAKEN OFF THE FORMULARY, MEANING THAT THE

15 INMATES CAN NO LONGER BE PRESCRIBED THAT BECAUSE IT DOES HAVE A

16 VERY SMALL RISK OF ABUSE.

17           IF YOU STORE THEM UP, YOU TAKE A BUNCH OF THEM AT

18 ONCE, YOU CAN SORT OF GET A LITTLE BIT OF A HIGH, KIND OF LIKE A

19 PSYCHOSTIMULANT.

20           THIS MEDICATION HAS BEEN TAKEN OFF THE FORMULARY.

21 AND TO ME, THAT'S JUST ADMISSION ON THE PART OF THE CDCR THAT

22 THEY CAN'T ADEQUATELY SUPERVISE THE DISTRIBUTION OF MEDICATION.

23 **BY MS. WHELAN**

24 **Q.**  WE ONLY HAVE A COUPLE OF MINUTES LEFT.  AND I KNOW IN YOUR

25 REPORTS YOU TALK ABOUT CHALLENGES THAT CLINICIANS AND STAFF

1  MEMBERS FACE.  AND CAN YOU TALK ABOUT HOW THESE CONDITIONS

2  AFFECT CLINICIANS ON A DAILY BASIS?

3  **A.**  WHAT I WAS STRUCK WITH -- AND, AGAIN, I HAD THE BENEFIT OF

4  BEING INVOLVED IN THE GATES MATTER AND THE MADRID MATTER BACK IN

5  THE '90'S.  AND SO I WAS ABLE TO COMPARE MY TWO EXPERIENCES.

6          WHAT I FOUND OVERWHELMINGLY, AGAIN, DUE TO THE

7  OVERWHELMING POPULATION PRESSURES PLACED ON THE SYSTEM, THAT

8  CLINICAL STAFF ARE PLACED IN THESE UNTENABLE SITUATIONS WHERE

9  THEY HAVE -- THEY ARE FORCED TO MAKE THESE DECISIONS TO PUT A

10 PERSON IN PSYCHIATRIC CRISIS IN A UNIT THAT IS STILL UP HERE ON

11 THE STAND -- ON THE SCREEN.

12         I MEAN, THAT'S AN UNTENABLE POSITION TO BE PLACED IN

13 AS A CLINICIAN. I MEAN, SOMETHING LIKE THIS COULD EVEN

14 JEOPARDIZE SOMEONE'S LICENSURE, TO PARTICIPATE IN THIS TYPE OF

15 CARE.  AND I SAW IT TIME AND AGAIN THAN CLINICAL STAFF ARE

16 FORCED INTO MAKING THESE VERY, VERY DIFFICULT DECISIONS BECAUSE

17 OF THE FACT OF OVERCROWDING.

18         **MS. WHELAN:**  THANK YOU.

19         **THE COURT:**  CROSS-EXAMINATION?

20                **CROSS-EXAMINATION**

21 **BY MS. TILLMAN:**

22 **Q.**  GOOD MORNING, DR. STEWART.

23 **A.**  GOOD MORNING.

24 **Q.**  I UNDERSTAND THAT YOU ARE A BOARD CERTIFIED PSYCHIATRIST,

25 CORRECT?

1  **A.**  YES, I AM.

2  **Q.**  YOU ARE NOT AN INTERNIST, CORRECT?

3  **A.**  I'M SORRY?

4  **Q.**  YOU'RE NOT AN INTERNAL MEDICINE SPECIALIST?

5  **A.**  AN INTERNAL MEDICINE SPECIALIST?  I'M NOT AN INTERNAL

6  MEDICINE SPECIALIST.  I DID A YEAR OF INTERNAL MEDICINE BEFORE I

7  STARTED MY PSYCHIATRIC TRAINING, BUT I'M NOT AN INTERNIST.

8  **Q.**  AND THAT YEAR WAS OVER 25 YEARS AGO; WOULD THAT BE RIGHT?

9  **A.**  IT WAS ACTUALLY 26 YEARS AGO.

10  **Q.**  WHO'S COUNTING?

11      YOUR CAREER HAS BEEN DEDICATED WORKING AS A BOARD

12  CERTIFIED PSYCHIATRIST.  PRESENTLY YOU HOLD AN ACADEMIC TEACHING

13  POSITION WITH UNIVERSITY OF CALIFORNIA, CORRECT?

14  **A.**  YES.

15  **Q.**  AND YOU OCCASIONALLY CONSULT ON VARIOUS LITIGATION MATTERS,

16  CORRECT?

17  **A.**  I CONSULT ON A VARIETY OF MATTERS.  SOME OF THEM INCLUDE

18  LITIGATION, YES.

19  **Q.**  YOU MENTIONED EARLIER THAT YOU WORKED ON WHAT WAS KNOWN AS

20  THE GATES CASE, WHICH WAS ONE OF THE FIRST-CLASS ACTION CASES

21  BROUGHT AGAINST THE DEPARTMENT OF CORRECTIONS AND REHABILITATION

22  INVOLVING JUST ONE INSTITUTION, CORRECT?  THE CALIFORNIA MEDICAL

23  FACILITY AT VACAVILLE?

24  **A.**  YES, IT DID JUST INVOLVE THE CALIFORNIA MEDICAL FACILITY.

25  **Q.**  AND IT INVOLVED A MULTIPLICITY OF ISSUES RANGING FROM

1  MEDICAL CARE, MENTAL HEALTHCARE TO OTHER ISSUES INVOLVING

2  DIFFERENT INMATES WITH DISABILITIES UNDER THE AMERICANS WITH

3  DISABILITIES ACT, CORRECT?

4  **A.**  YES, IT DID.

5          **JUDGE KARLTON:**  I'M HAVING A LITTLE TROUBLE HEARING

6  YOU.  I'M TRYING TO READ IT OFF THE SCREEN BECAUSE I'M HAVING A

7  LITTLE TROUBLE UNDERSTANDING YOU.  I'M NOT SURE IF IT'S

8  CORRECTABLE.

9          **MS. TILLMAN:**  I'LL SEE IF I CAN GET A LITTLE CLOSER

10 TO THE MICROPHONE, OKAY?

11         **THE CLERK:**  SPEAK INTO THE MICROPHONE, COUNSEL.

12         **MS. TILLMAN:**  BETTER?

13         **THE CLERK:**  INTO IT.

14         **MS. TILLMAN:**  OKAY.  THANK YOU.

15 **BY MS. TILLMAN:**

16 **Q.**  NOW, YOU MENTIONED IN YOUR REPORT THAT YOU'VE WORKED ON

17 VARIOUS CORRECTIONAL MATTERS INVOLVING THE CORRECTIONAL SYSTEM

18 OF MICHIGAN, CORRECT?

19 **A.**  A JUVENILE INSTITUTION IN MICHIGAN, YES.

20 **Q.**  AND A CORRECTIONAL SYSTEM IN GEORGIA, CORRECT?

21 **A.**  THAT WAS THE JUVENILE JUSTICE SYSTEM IN THE STATE OF

22 GEORGIA, YES.

23 **Q.**  AND CORRECTIONAL SYSTEM IN NEW MEXICO, CORRECT?

24 **A.**  I WAS DEFENDANT'S EXPERT IN NEW MEXICO.

25 **Q.**  AND OBVIOUSLY NONE OF THOSE SYSTEMS THAT YOU WORKED ON IN

1  MICHIGAN, GEORGIA, AND NEW MEXICO INVOLVED THE CORRECTIONAL

2  SETTING THAT WE HAVE HERE IN CALIFORNIA IN TERMS OF THE BREADTH

3  AND THE SIZE OF THE SYSTEM; IS THAT CORRECT?

4  **A.**  THAT'S ABSOLUTELY CORRECT.

5  **Q.**  NOW, SOME 20 YEARS AGO, JUST AS YOU WERE FINISHING YOUR

6  RESIDENCY, YOU WORKED AS THE DIRECTOR OF FORENSIC SERVICES FOR

7  THE CITY AND COUNTY OF SAN FRANCISCO, CORRECT?

8  **A.**  YES, FOR A PERIOD OF TIME.

9  **Q.**  AND THAT PERIOD OF TIME WAS FROM 1988 TO 1989, CORRECT?

10 **A.**  WHEN I WAS THE OVERALL FORENSIC DIRECTOR, YES.

11 **Q.**  AND YOU HAD JUST COMPLETED YOUR RESIDENCY AT UNIVERSITY OF

12 CALIFORNIA, SAN FRANCISCO, SOMETIME IN 1986, CORRECT?

13 **A.**  YES.

14 **Q.**  AND IN THE COURSE OF THAT WORK, YOU PROVIDED CARE FOR A

15 NUMBER OF DIFFERENT TYPES OF MENTALLY ILL PATIENTS, CORRECT?

16 **A.**  I'M NOT SURE WHAT YOU MEAN "DIFFERENT TYPES."  WE PROVIDED

17 MENTAL HEALTHCARE TO ANYONE WHO NEEDED IT.

18 **Q.**  AND AS PART OF THAT CARE PACKAGE, YOUR ROLE WAS --

19          **MS. TILLMAN:**  STRIKE THAT.

20 **BY MS. TILLMAN**

21 **Q.**  AS PART OF THAT CARE PACKAGE, THE CITY AND COUNTY OF SAN

22 FRANCISCO AT THAT TIME SEPARATED OUT THOSE PATIENTS NEEDING WHAT

23 WE WOULD CALL IN THE DEPARTMENT OF CORRECTIONS "ENHANCED

24 OUTPATIENT PROGRAM CARE" FROM THE GENERAL POPULATION, CORRECT?

25 **A.**  WE HAD A VARIETY OF WHAT WE REFERRED TO THEN AS "PSYCH

1  TANKS."  THERE WERE UNITS THAT WERE EXCLUSIVELY USED FOR THE

2  PLACEMENT OF PEOPLE WE WERE TREATING, YES.

3  **Q.**  AND THAT TYPE OF SEPARATION OF THESE ENHANCED OUTPATIENT

4  PROGRAM PATIENTS WAS SOMETHING THAT YOU FOUND APPROPRIATE FOR

5  THEIR CARE, CORRECT?

6  **A.**  YES.

7  **Q.**  AND YOU'RE AWARE, AREN'T YOU, THAT THE SAME SEPARATION OF

8  ENHANCED OUTPATIENT PROGRAM PATIENTS FROM THE GENERAL POPULATION

9  OCCURS WITHIN THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

10 REHABILITATION, RIGHT?

11 **A.**  YES, IT DOES.

12 **Q.**  AND, IN FACT, IN RETROSPECT NOW THAT YOU HAVE THE

13 OPPORTUNITY OF LOOKING BACK AT THE TIME PERIOD WHEN YOU SERVED

14 AS THE DIRECTOR OF FORENSIC SERVICES FOR THE CITY AND COUNTY OF

15 SAN FRANCISCO, NOW SOME 20 ODD YEARS LATER YOU FOUND THAT THAT

16 SYSTEM MET THE CONSTITUTIONAL ELEMENTS LAID OUT BY THE COLEMAN

17 COURT AND WAS, INDEED, CONSTITUTIONALLY ADEQUATE, CORRECT?

18 **A.**  YES.  WE HAVE TALKED ABOUT THIS BEFORE WHERE DURING THE

19 PERIOD OF TIME IN THE LATE '80'S -- AROUND '88, '89 -- I

20 REMEMBER, BECAUSE THE GIANTS WERE IN THE WORLD SERIES THAT YEAR,

21 AND IT WAS THE EARTHQUAKE YEAR, THAT IT WAS MY OPINION -- AGAIN,

22 RETROSPECTIVELY -- THAT THE CITY AND COUNTY WAS MEETING THEIR

23 CONSTITUTIONAL REQUIREMENTS THAT HAVE SUBSEQUENTLY BEEN LAID OUT

24 BY THE COLEMAN COURT.

25 **Q.**  AND THAT IS THE ONLY CORRECTIONAL SYSTEM THAT YOU ARE AWARE

1  OF; ISN'T THAT RIGHT, THAT IS OR WAS MEETING THOSE

2  CONSTITUTIONAL MANDATES?

3  **A.**  IT WAS THE ONLY SYSTEM THAT I HAD PERSONAL EXPERIENCE WITH,

4  YES.

5  **Q.**  AND YOU WOULD AGREE THAT THE ELEMENTS OF A CONSTITUTIONALLY

6  COMPLIANT MENTAL HEALTHCARE SYSTEM INVOLVE UNIFORM POLICIES AND

7  PROCEDURES TO PROVIDE CARE, SUFFICIENT BEDS TO PROVIDE CARE,

8  SUFFICIENT CLINICAL STAFF, AND COMPETENT STAFF TO PROVIDE CARE,

9  A SUICIDE PREVENTION PROGRAM AND A RECORDKEEPING SYSTEM,

10  CORRECT?

11  **A.**  WELL, IN ADDITION TO THOSE THINGS THAT YOU MENTIONED IT ALSO

12  CALLS TO HAVE AN ADEQUATE SYSTEM FOR THE IDENTIFICATION, THE

13  SCREENING AND REFERRAL OF PEOPLE WHO REQUIRE MENTAL HEALTHCARE

14  WITHIN THE SYSTEM. AND ALSO STATES THAT PEOPLE WITHIN THE SYSTEM

15  HAVE ACCESS TO APPROPRIATE LEVELS OF PSYCHIATRIC CARE, INCLUDING

16  MEDICATIONS. AND THAT THEY NEED TO HAVE AN ADEQUATE

17  RECORDKEEPING SYSTEM, AS WELL AS A SUICIDE PREVENTION PROGRAM.

18  **Q.**  NOW, IN TERMS OF ADEQUATE SCREENING AND IDENTIFICATION OF

19  THE MENTALLY ILL INMATES, WOULDN'T YOU AGREE THAT THE FACT THAT

20  THE COLEMAN MENTAL HEALTH POPULATION HAS INCREASED OVER THE

21  YEARS, EVEN INCREASED AT A TIME WHEN THE GENERAL POPULATION WAS

22  DECREASING, WOULD INDICATE THAT, INDEED, MENTAL HEALTH

23  CLINICIANS ARE DOING THEIR JOB IN SCREENING AND IDENTIFYING

24  THOSE INMATES WHO ARE NEEDING MENTAL HEALTHCARE SERVICES?

25  **A.**  I DON'T KNOW IF YOU CAN NECESSARILY MAKE THAT LEAP, BASED ON

1  WHAT I PERSONALLY OBSERVED AT THE DVI RECEPTION CENTER WHERE

2  THEY HAVE OVER 500 INTAKES ON AVERAGE A WEEK.  AND ABOUT

3  25 PERCENT OF THOSE INMATES, BASED ON MY CONVERSATIONS WITH DR.

4  COPPOLA, THE CHIEF PSYCHIATRIST, ACKNOWLEDGED THAT THEY ARE

5  MENTALLY ILL.

6            THAT THE SCREENINGS THAT I SAW WERE DONE IN

7  NONCONFIDENTIAL SETTINGS.  THEY WERE DONE IN GROUP ROOMS. THEY

8  HAD A HIGH POSSIBILITY OF NOT CATCHING EVERYONE WHO COULD

9  SERIOUSLY BE SUFFERING FROM MENTALLY ILLNESS.

10 **Q.**  BUT THEY ARE CATCHING MORE THAN EVER, AREN'T THEY?

11 **A.**  WELL, I THINK WHAT THAT SPEAKS OF, AGAIN, THAT SHOWS WHAT

12 I'VE BEEN TRYING TO SAY ALL MORNING IS THAT THE SYSTEM IS SO

13 OVERWHELMED THAT IT'S CREATING MORE AND MORE MENTALLY ILL.  THAT

14 EVEN IN THIS OVERWHELMED SYSTEM THEY ARE IDENTIFYING SOME OF

15 THEM.

16 **Q.**  WHEN YOU SPEAK --

17            **JUDGE KARLTON:**  EXCUSE ME.

18            IS IT YOUR VIEW THAT IT IS LIKELY THAT THERE IS MORE

19 THAN 25 PERCENT OF THE PRISON POPULATION IS SUFFERING SERIOUS

20 MENTAL ILLNESSES?

21            **THE WITNESS:**  YOUR HONOR, BASED ON WHAT I SAW AT THE

22 RECEPTION CENTER THE STAFF THERE ARE ABSOLUTELY OVERWHELMED ON A

23 DAILY BASIS BY THE NUMBER OF PEOPLE WHO COME IN TO BE SCREENED.

24 AND THEN, THE SCREENINGS THAT DO OCCUR OCCUR IN A GROUP SETTING

25 WHERE THERE'S NO CONFIDENTIALITY.

1        SO IN LOOKING AT THE SHEER NUMBER, AS WELL AS THE

2   MANNER IN WHICH THE SCREENINGS ARE DONE, ONE COULD OPINE THAT

3   THEY ARE NOT CATCHING EVERYONE, AND YOU'RE ONLY GETTING THE MOST

4   SEVERE.

5   **BY MS. TILLMAN**

6   **Q.**  YOU WERE SPEAKING ABOUT THE SCREENING THAT OCCURS IN A

7   RECEPTION CENTER, CORRECT?

8   **A.**  YES.

9   **Q.**  AND YOU SAW A SINGLE RECEPTION, CORRECT?

10  **A.**  YES.

11  **Q.**  THAT WAS AT A DUAL LOCATION INSTITUTION, CORRECT?

12  **A.**  YES, CORRECT.

13  **Q.**  YOU HAVEN'T TOURED THE OTHER RECEPTION CENTERS THROUGHOUT

14  THE 33 INSTITUTIONS OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS,

15  HAVE YOU?

16  **A.**  I HAVE NOT.

17  **Q.**  AND HAVE YOU COLLECTED ANY DATA SHOWING THAT AS A PERSON

18  STAYS WITH THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND

19  REHABILITATION FOR A LONGER AND LONGER PERIOD OF TIME THERE'S AN

20  INCREASED LIKELIHOOD OF THAT PERSON BECOMING MENTALLY ILL?

21  **A.**  I DON'T KNOW EXACTLY WHAT YOU MEAN BY "DATA," BUT DURING THE

22  COURSE OF MY TOUR -- AND NOW I'M SPEAKING SPECIFICALLY OF MY

23  TOUR OF THE SOLANO STATE PRISON -- WHERE THERE WAS IN USE ONE OF

24  THESE DORMS, TRIPLE-BUNK DORMS WHERE THERE ARE JUST TREMENDOUS

25  NUMBER OF PEOPLE IN THERE GIVEN THE SPACE, I INTERVIEWED SEVERAL

1  CLASS MEMBERS THAT ONE -- TWO -- TWO OF THE CLASS MEMBERS WERE

2  SUFFERING FROM STAPH INFECTIONS THAT THEY GOT WHILE LIVING IN

3  THESE UNHEALTHY CONDITIONS.

4       BUT IN ADDITION, THAT THEY ADMITTED THAT THEY HAD NO

5  HISTORY OF MENTAL ILLNESS PRIOR TO BEING PLACED IN THESE DORMS.

6  AND THAT DURING THE COURSE OF THEIR HOUSING IN THESE DORMS WHERE

7  THERE'S AN ABSOLUTE LACK OF PRIVACY, THERE'S AN ABSOLUTE LACK OF

8  ANY SORT OF ADEQUATE SPACE, THE LIGHTS ARE ON ALL THE TIME,

9  THERE'S THIS -- IT SOUNDS LIKE YOU'RE ON A RUNWAY OF AN AIRPORT,

10  HOW LOUD IT IS IN THERE.  THAT THESE PEOPLE OVER   TIME -- THIS

11  ONE PERSON IN PARTICULAR IS REPORTING THAT AFTER AWHILE THEY ARE

12  RUNNING THESE FANS BECAUSE IT'S SO HOT THERE DURING THE

13  SUMMERTIME THAT HE STARTED HEARING VOICES WITHIN THE FANS.

14       HE STARTED GETTING DELUSIONAL.  HE STARTED GETTING

15  PARANOID JUST BECAUSE OF THE HOUSING SETTING.

16  Q.  BUT YOU WOULD ADMIT, WOULDN'T YOU, THAT YOU'VE NOT ACTUALLY

17  COMPARED THE PERCENTAGES OF INMATES WITH MENTAL ILLNESS AT

18  RECEPTION CENTERS VERSUS THE PERCENTAGE OF INMATES AT MAIN LINE

19  INSTITUTIONS THAT HAVE BEEN TRANSFERRED FROM RECEPTION TO A MAIN

20  LINE INSTITUTION WHO HAVE A MENTAL ILLNESS, CORRECT?

21  A.  I'M SORRY.  I LOST YOUR QUESTION IN THERE.

22  Q.  YOU WOULD AGREE, WOULDN'T YOU, THAT YOU'VE MADE NO ANALYSIS

23  COMPARING THE NUMBER OR PERCENTAGE OF INMATES AT A RECEPTION

24  CENTER WHO HAVE MENTAL ILLNESS VERSUS THE NUMBER OR PERCENTAGE

25  OF INMATES AT A MAIN LINE INSTITUTION WHO HAVE MENTAL ILLNESS,

1  HAVE YOU?

2  **A.**  I HAVE NOT.

3  **Q.**  YOU'VE TALKED TO A LOT OF DIFFERENT PEOPLE DURING YOUR TOURS

4  OF -- WHAT WAS IT -- FIVE INSTITUTIONS, CORRECT?

5  **A.**  FIVE DIFFERENT INSTITUTIONS, SIX TOURS.

6  **Q.**  AND DURING THOSE TOURS, WHAT, YOU SPENT A DAY, SOMETIMES A

7  HALF A DAY AT EACH INSTITUTION?

8  **A.**  YES.

9  **Q.**  SOME OF YOUR OPINIONS WERE BASED ON TALKING TO INMATES,

10  CORRECT?

11  **A.**  YES.

12  **Q.**  AND SOME OF THESE INMATES WERE NOT PEOPLE THAT YOU WOULD

13  FIND TO BE NORMALLY TRUSTWORTHY, WOULD YOU?

14  **A.**  I DON'T KNOW WHAT YOU MEAN BY THAT.

15  **Q.**  SOME OF THE PEOPLE THAT YOU SPOKE TO WERE STAFF OF THE

16  CALIFORNIA DEPARTMENT OF CORRECTIONS, CORRECT?

17  **A.**  I'M SORRY.  WERE STAFF AT THE CALIFORNIA DEPARTMENT OF

18  CORRECTIONS?

19  **Q.**  STAFF, YES.

20  **A.**  THAT I DIDN'T BELIEVE WHAT THEY WERE TELLING ME?

21  **Q.**  I SAID:

22              "SOME OF THE PEOPLE THAT YOU SPOKE TO WERE STAFF

23        OF THE DEPARTMENT OF CORRECTIONS, CORRECT?"

24  **A.**  YES.

25  **Q.**  BUT YOU HAVEN'T HAD THE OPPORTUNITY, HAVE YOU, TO LOOK AT

1  ONGOING SET OF MEASUREMENTS OR DATA REGARDING THE ACTUAL

2  DELIVERY OF MENTAL HEALTHCARE SERVICES, HAVE YOU?

3  **A.**  WELL, NO. I THINK I HAVE. I'VE EXTENSIVE REVIEW OF THE

4  MASTER'S REPORTS OF VARIOUS REPORTS THAT THE MASTER HAS PUT OUT.

5  IN ADDITION TO -- I DON'T KNOW IF HE REFERS TO THEM AS

6  "QUARTERLY REPORTS," BUT SUICIDE REPORT, MASTER'S REPORT ON

7  OVERCROWDING.

8          SO -- AND THE MASTER IN COLEMAN HAS DONE EXTENSIVE

9  DATA COLLECTION, IF YOU WILL, AROUND THE ACTUAL PROVISION OF

10 CARE THROUGHOUT THE SYSTEM. SO I WOULD DISAGREE WITH THAT.

11 **Q.**  BUT YOU WOULD DEFER TO THE SPECIAL MASTER'S FINDINGS OF FACT

12 CONCERNING VARIOUS MEASUREMENTS OF THESE DIFFERENT ELEMENTS OF A

13 CONSTITUTIONALLY-ADEQUATE MENTAL HEALTHCARE SYSTEM?

14 **A.**  I CERTAINLY WOULD TAKE THAT INTO CONSIDERATION.

15 **Q.**  YOU UNDERSTAND THAT THE SPECIAL MASTER HAS A TEAM OF

16 PSYCHIATRISTS AS WELL AS PSYCHOLOGISTS AND ATTORNEYS THAT WORK

17 TO MONITOR THESE INSTITUTIONS, CORRECT?

18 **A.**  YES.

19 **Q.**  YOU WOULD AGREE THAT THE SPECIAL MASTER HAS PROVIDED

20 MONITORING REPORTS ALMOST EVERY SIX TO NINE MONTHS SINCE THE

21 INCEPTION OF THE MONITORING IN THIS CASE, CORRECT?

22 **A.**  I COULDN'T SWEAR TO WHAT THE FREQUENCY IS. I KNOW THAT I

23 THINK HE'S UP TO 19 OR 20.  SO HOW MANY THAT IS, SPREAD OVER THE

24 TIME.

25 **Q.**  YOU HAVEN'T RECEIVED ALL THOSE REPORTS, HAVE YOU?

1  **A.**  I HAVE NOT.

2  **Q.**  YOU'VE RECEIVED AND REVIEWED, WHAT, THE 19TH AND THE 20TH

3  MONITORING REPORTS?

4  **A.**  I'VE CERTAINLY LOOKED AT THE 19TH AND 20TH, YES.

5  **Q.**  AND IN THOSE MONITORING REPORTS FROM THE 19TH TO THE 20TH,

6  DID YOU SEE ANY EXPRESS LANGUAGE FINDING --

7                  **MS. TILLMAN:**  LET ME STRIKE THAT.

8  **BY MS. TILLMAN:**

9  **Q.**  IN THE COURSE OF YOUR WORK IN REVIEWING THESE MONITORING

10  REPORTS FROM THE 19TH ROUND AND THE 20TH ROUND, ISN'T IT CORRECT

11  THAT THOSE MONITORING REPORTS MADE NO RECOMMENDATION TO THE

12  COURT TO DO -- TO UNDERTAKE ANY ACTION TO REDUCE THE OVERALL

13  POPULATION OF THE DEPARTMENT OF CORRECTIONS?

14  **A.**  I'M NOT THAT FAMILIAR WITH WHAT THE FINAL RECOMMENDATIONS

15  WERE, SO I CAN'T SWEAR TO THAT. I DON'T BELIEVE THERE WERE,

16  HOWEVER.

17  **Q.**  DO YOU RECALL THE SPECIAL MASTER'S LAST MONITORING REPORT,

18  THE 20TH ROUND MONITORING REPORT, ACTUALLY FOUND THAT SEVERAL

19  INSTITUTIONS WERE IN SUBSTANTIAL COMPLIANCE WITH THE

20  COURT-APPROVED POLICIES AND PROCEDURES FOR PROVIDING MENTAL

21  HEALTHCARE?

22  **A.**  I WASN'T FAMILIAR WITH THAT.

23  **Q.**  YOU DON'T RECALL THAT AT ALL?

24  **A.**  I DON'T RECALL THAT.

25  **Q.**  ANY REASON TO DISPUTE THAT?

1  **A.**  AGAIN, I JUST DON'T RECALL IT.

2  **Q.**  YOU ARE AWARE THAT THE DEFENDANTS HAVE OBTAINED COURT

3  APPROVAL OF THEIR UNIFORM POLICIES AND PROCEDURES FOR PROVIDING

4  CARE TO THE MENTALLY ILL, AREN'T YOU?

5            **MS. WHELAN:**  OBJECTION, YOUR HONOR.

6            JUST BECAUSE THIS IS A VERY OVERBROAD QUESTION, COULD

7  YOU SPECIFY WHAT ORDER YOU'RE TALKING ABOUT?

8            **JUDGE KARLTON:**  I ASSUME SHE'S TALKING ABOUT THE

9  PROTOCOLS.

10  **BY MS. TILLMAN:**

11  **Q.**  THE REVISED PROGRAM GUIDE WAS APPROVED BY THIS COLEMAN COURT

12  IN MARCH, 2006.

13  **A.**  THAT'S MY UNDERSTANDING, YES.

14  **Q.**  AND LET ME JUST TAKE A BREAK AND SEE IF THE COURT WOULD LIKE

15  TO TAKE A LUNCH BREAK AT SOME POINT?

16            **JUDGE HENDERSON:**  WE'RE THINKING OF 12:30, COUNSEL.

17  **BY MS. TILLMAN:**

18  **Q.**  YOU'VE ADMITTED THAT YOU'RE NOT VERY FAMILIAR WITH THE

19  REVISED PROGRAM GUIDE, CORRECT?

20  **A.**  I'M SORRY?

21  **Q.**  YOU'RE NOT VERY FAMILIAR WITH THE REVISED PROGRAM GUIDE,

22  CORRECT?

23  **A.**  I DON'T KNOW THAT I EVER SAID THAT.

24  **Q.**  I BELIEVE YOU SAID IT AT YOUR DEPOSITION, ACTUALLY.

25            WOULD YOU LIKE ME TO REFRESH YOUR RECOLLECTION?

1  **A.**  I BELIEVE THE QUESTIONS AROUND THE REVISED PROGRAM GUIDE IS

2  I'M MOST CERTAINLY AWARE OF THE PROVISION OF THE PROGRAM GUIDE.

3  I WASN'T AWARE THAT THE CURRENT ONE IS REFERRED TO AS A "REVISED

4  PROGRAM GUIDE."

5          SO WE HAD THAT DISCUSSION, IF I REMEMBER, FROM OUR

6  DEPOSITION.

7  **Q.**  I THINK THE QUESTION WAS AT PAGE 52 OF YOUR DEPOSITION:

8          "IS IT YOUR UNDERSTANDING THAT THE REVISED

9          PROGRAM GUIDE" --

10          THE COURT REPORTER:  I'M SORRY?

11          **JUDGE KARLTON:**  I DIDN'T UNDERSTAND YOU.

12          **MS. TILLMAN:**  LET ME START OVER.

13  **BY MS. TILLMAN:**

14  "IS IT YOUR UNDERSTANDING THAT THE REVISED

15          PROGRAM GUIDE" --

16          **MS. WHELAN:**  I'M JUST GOING TO OBJECT.

17          IF YOU COULD SHOW HIM THE DEPOSITION IF YOU WANT TO

18  ASK HIM A QUESTION ABOUT IT.

19          **JUDGE KARLTON:**  YOU MAY PROCEED, MA'AM.

20  **BY MS. TILLMAN:**

21  **Q.**  "IS IT YOUR UNDERSTANDING THAT THE REVISED PROGRAM GUIDE

22          PROVIDES THE POLICIES AND PROCEDURES FOR DETERMINING

23          THE LEVEL OF CARE TO PROVIDE TO A MENTALLY ILL

24          INMATE?

25          "ANSWER:  I AM AWARE THAT THE PROGRAM GUIDE

1          DOES. I'M NOT THAT FAMILIAR WITH THE REVISED PROGRAM

2          GUIDE."

3          SO YOU WOULD DEFER TO THE SPECIAL MASTER'S FINDING

4    CONCERNING SUBSTANTIAL COMPLIANCE WITH THE REVISED PROGRAM GUIDE

5    BY SEVERAL INSTITUTIONS, WOULDN'T YOU.

6    **A.**  AGAIN, I'M NOT DISPUTING THE FACT THE SPECIAL MASTER MAY

7    HAVE SAID THAT IN CERTAIN INSTITUTIONS REGARDING CERTAIN ASPECTS

8    OF THE CONSTITUTIONAL CARE THAT CDCR MAY BE MEETING THE

9    CONSTITUTIONAL REQUIREMENTS.

10          I'M NOT DISPUTING THAT FACT.

11   **Q.**  YOU'RE ALSO NOT DISPUTING THAT THIS COURT IN 1994 FOUND THE

12   SUICIDE PREVENTION PLAN TO BE ADEQUATELY DESIGNED, CORRECT?

13   **A.**  SAY IT AGAIN, PLEASE?

14          **JUDGE KARLTON:**  I WANT TO INTERRUPT SAYING: NOT THIS

15   COURT; THE COLEMAN COURT.

16          **MS. TILLMAN:**  THANK YOU, YOUR HONOR.

17   **BY MS. TILLMAN:**

18   **Q.**  YOU'RE ALSO NOT DISPUTING THE FACT THAT THE COLEMAN COURT IN

19   1994 FOUND THE SUICIDE PREVENTION PROGRAM TO BE ADEQUATELY

20   DESIGNED.

21   **A.**  THAT THE COLEMAN COURT FOUND THAT, YES.

22   **Q.**  AND YOU'RE NOT DISPUTING THAT THE DEFENDANTS HAVE MET WITH

23   THE PLAINTIFFS' COUNSEL, WITH THE SPECIAL MASTER'S TEAM IN 2006

24   TO EXPAND THE SUICIDE PREVENTION PROGRAM AND OBTAINED APPROVAL

25   OF THAT EXPANDED SUICIDE PREVENTION PLAN?

1  **A.**  AND YOUR QUESTION IS?  I'M SORRY.

2  **Q.**  YOU'RE NOT DISPUTING THE FACT THAT THE DEFENDANTS

3  COLLABORATED WITH THE SPECIAL MASTER'S TEAM, WITH THE PLAINTIFFS

4  AND THEIR EXPERTS IN DEVELOPING AN EXPANDED SUICIDE PREVENTION

5  PLAN, CORRECT?

6  **A.**  AGAIN, I'M NOT FAMILIAR, BUT I'M NOT DISPUTING THAT.

7  **Q.**  AND YOU'RE NOT DISPUTING THAT THAT EXPANDED SUICIDE

8  PREVENTION PLAN HAS BEEN APPROVED BY THE COLEMAN COURT, CORRECT?

9  **A.**  YES.

10  **Q.**  YOU DON'T DISPUTE THAT SUICIDES CAN OCCUR EVEN UNDER THE

11  BEST OF CIRCUMSTANCES?

12  **A.**  BY THE "BEST OF CIRCUMSTANCES," IF YOU MEAN THAT

13  EVERYTHING -- THAT THERE WAS AN ADEQUATE PSYCHIATRIC DELIVERY

14  CARE SYSTEM IN PLACE WHERE THERE WAS ACCESS TO APPROPRIATE

15  LEVELS OF PSYCHIATRIC CARE; THAT THERE WAS A MEDICATION SYSTEM

16  THAT COULD ENSURE THAT, IN FACT, THE PATIENT WAS TAKING THE

17  MEDICINE; THAT THERE WAS A RECORD SYSTEM IN PLACE TO DOCUMENT

18  THE FACT OF CURRENT CLINICAL SITUATIONS, THEN, IN FACT, YES,

19  SUICIDE STILL CAN OCCUR WHEN ALL THE PIECES ARE IN PLACE.

20  **Q.**  WE SEE IT OCCUR IN THE GENERAL COMMUNITY, SADLY, AND WE ALSO

21  SEE IT OCCUR IN CORRECTIONAL SETTINGS, CORRECT?

22  **A.**  YES.

23  **Q.**  AND, IN FACT, THERE ARE KNOWN RISK FACTORS FOR SUICIDE,

24  AREN'T THERE?

25  **A.**  IT SEEMS THAT BEING ADMITTED TO THE DEPARTMENT OF

1  CORRECTIONS IS A RISK FACTOR, AS SPECIAL MASTER HAS FOUND THAT

2  OVER 72 PERCENT OF SUICIDES WERE FORESEEABLE AND PREVENTABLE.

3       **MS. TILLMAN:**  I'M GOING TO MOVE TO STRIKE THAT AS

4  NONRESPONSIVE AND ARGUMENTATIVE.

5  **BY MS. TILLMAN:**

6  Q.  WOULDN'T YOU AGREE THAT A JAIL POPULATION THAT IS COMPOSED

7  OF PRISONERS AGING 45 OR OLDER HAS A HIGHER RISK OF SUICIDE?

8  **A.**  PSYCHIATRIC LITERATURE AND MY PERSONAL EXPERIENCE CONFIRMS

9  THAT SUICIDE RATES ARE HIGHER FOR THE ELDERLY. AND MY DEFINITION

10 OF "ELDERLY" CHANGES BY THE DAY.

11 **Q.**  I'M SORRY. I COULDN'T QUITE HEAR YOU.

12 **A.**  MY DEFINITION OF "ELDERLY" CHANGES BY THE DAY.

13 **Q.**  I THINK YOU WOULD AGREE, THOUGH, IS THAT THE OLDER A PERSON

14 GETS THE GREATER THE RISK OF SUICIDE?

15 **A.**  THERE'S A CORRELATION, YES.

16 **Q.**  AS YOU PUT IT IN YOUR DEPOSITION SOMETIMES THE SUICIDE RATE

17 IS A MEASURE OF HOW GOOD YOUR SUICIDE PREVENTION PLAN IS, AND

18 SOMETIMES, AS YOU PUT IT IN YOUR DEPOSITION, YOU JUST GET LUCKY?

19 **A.**  SOMETIMES YOU DO.

20 **Q.**  NOW, AS MUCH AS WE'VE HEARD ABOUT INMATES REPORTING TO YOU

21 OF CONCERNS ABOUT THEIR MENTAL HEALTH WHILE HOUSED IN

22 TRIPLE-BUNK AREAS, NONTRADITIONAL HOUSING, WHAT WE'VE SEEN FROM

23 THE SPECIAL MASTER IS A FOCUS ON ADMINISTRATIVE SEGREGATION

24 UNITS.

25      ISN'T IT CORRECT THAT THE SPECIAL MASTER HAS

1  INDICATED MORE THAN ONCE THAT THE DEFENDANTS ARE TO ADDRESS

2  SUICIDE TRENDS THAT OCCUR IN ADMINISTRATIVE SEGREGATION UNITS?

3  **A.**  YES, I'M AWARE THAT SPECIAL MASTER HAS INSTRUCTED THEM TO

4  ADDRESS THAT.

5  **Q.**  AND, IN FACT, THE RISK OF SUICIDE IN ADMINISTRATIVE

6  SEGREGATION UNITS EXISTS BECAUSE INMATES ARE HOUSED ALONE IN

7  SINGLE CELLS IN THOSE UNITS; ISN'T THAT RIGHT?

8  **A.**  WELL, THAT ISN'T THE ONLY FACTOR. THE FACTOR THAT I

9  ENCOUNTERED ON MY TOURS IS THAT ADMINISTRATIVE SEGREGATION UNITS

10  ARE ROUTINELY USED TO HOUSE PEOPLE AS AN OVERFLOW HOUSING

11  BECAUSE THEY CAN'T ACCESS MENTAL HEALTH CRISIS BEDS. THAT OCCURS

12  ROUTINELY AT DVI, AND THAT OCCURS ROUTINELY AT MULE CREEK STATE

13  PRISON.

14          SO THAT NEEDS TO BE TAKEN INTO CONSIDERATION WHEN

15  YOU'RE LOOKING AT SUICIDE RISKS IN ADMINISTRATIVE SEGREGATION

16  UNITS.

17  **Q.**  AND WHAT ALSO NEEDS TO BE TAKEN INTO CONSIDERATION WHEN

18  LOOKING AT THE ISSUE OF OVERCROWDING IS THE FACT THAT THERE'S NO

19  DATA SHOWING A HIGHER NUMBER OF SUICIDES IN THE TRIPLE-BUNK

20  AREAS AS OPPOSED TO THE ADSEG AREAS, CORRECT?

21          **JUDGE KARLTON:**  LET ME -- I DIDN'T GET THE QUESTION.

22  LET ME TRY AND READ IT.

23          OKAY.  DID YOU GET THE QUESTION?

24          **THE WITNESS:**  I DID A SECOND AGO, YOUR HONOR.

25          CAN YOU SAY IT AGAIN, PLEASE?

1  **BY MS. TILLMAN:**

2  **Q.**  AND WHAT ALSO NEEDS TO BE TAKEN INTO CONSIDERATION IN

3  LOOKING AT THE SUICIDE RATE AND THE IMPACT OF OVERCROWDING IS

4  THE FACT THAT THERE'S NO DATA SHOWING THAT THERE'S A HIGHER RATE

5  OF SUICIDES WITHIN THOSE VERY AREAS PLAINTIFFS COMPLAIN ABOUT

6  MOST:  THE AREAS WHERE THERE'S OVER -- WHERE THERE'S TRIPLE

7  BUNKS, GYMS AND DAY ROOMS.  THERE'S NO HIGHER SUICIDE TRENDS IN

8  THOSE AREAS AS OPPOSED TO THE AREAS WHERE THERE'S SINGLE CELL IN

9  ADSEG UNIT.

10          **MS. WHELAN:**  OBJECTION AS COMPOUND.

11          **JUDGE HENDERSON:**  BREAK IT DOWN, COUNSEL.

12  **BY MS. TILLMAN:**

13  **Q.**  ISN'T IT CORRECT THAT THERE'S NO DATA SHOWING THAT THE AREAS

14  OF TRIPLE-BUNK HOUSING, SUCH AS THE GYMS AND THE DAY ROOM, POSE

15  GREATER SUICIDE TRENDS THAN THOSE IN ADMINISTRATIVE SEGREGATION

16  UNITS WHERE PEOPLE ARE HOUSED SINGLE CELL?

17  **A.**  YOU KNOW, I'M NOT FAMILIAR WITH WHETHER OR NOT THE LAST

18  SUICIDE REPORT I REVIEWED, WHICH WAS THE 2006 REPORT, BROKE IT

19  DOWN BY DIFFERENT AREAS LIKE THAT, SO I JUST DON'T KNOW.

20  **Q.**  AND, IN FACT, THERE'S NO ORDER ADDRESSING SUICIDE TRENDS IN

21  THESE TRIPLE-BUNK, GYM OR DAY ROOM AREA OF DEPARTMENT OF

22  CORRECTIONS, IS THERE?

23  **A.**  I'M NOT AWARE OF ONE.

24  **Q.**  AND THERE'S NO ORDER CONCERNING SUICIDE TRENDS FOR THOSE

25  PATIENTS WHO WERE PROVIDED INPATIENT HOSPITAL CARE AT THE DMH

1  FACILITIES, IS THERE?

2  **A.**  NO.

3         IF I MAY ANSWER THE OTHER QUESTION, I DIDN'T GET TO

4  ANSWER IT FULLY FROM MY PERSPECTIVE.

5         SUICIDE IS NOT THE ONLY MEASURE OF SUFFERING.

6  CERTAINLY THAT'S THE ULTIMATE MEASURE. BUT JUST BECAUSE THERE

7  MAY NOT BE A HIGHER RATE OF SUICIDE, WHICH IS YET TO BE

8  DETERMINED, IN THE COLEMAN CLASS MEMBERS THAT ARE HOUSED IN

9  THESE TRIPLE-BUNK DORMS DOESN'T MEAN THEY ARE NOT SUFFERING.

10        **MS. TILLMAN:**  I'M GOING TO FILE A MOTION TO STRIKE.

11  THAT IS NONRESPONSIVE. THE QUESTION WAS SIMPLY ABOUT DATA, NOT

12  ABOUT ANY ARGUMENT FROM THE WITNESS CONCERNING SUFFERING.

13        **JUDGE HENDERSON:**  HE'S RESPONDING TO THE INFERENCE.

14  I'LL ALLOW THE QUESTION.

15  **BY MS. TILLMAN:**

16  **Q.**  YOU WOULD ALSO AGREE, WOULDN'T YOU, THAT THE ETHNICITY OF AN

17  INMATE AND THE RACE OF AN INMATE CAN ALSO BE RISK FACTORS FOR

18  SUICIDE?

19  **A.**  THERE ARE TRENDS ASSOCIATED WITH DIFFERENT ETHNIC GROUPS

20  THAT CAUCASIANS TEND TO HAVE A HIGHER RATE OF SUICIDE THAN OTHER

21  ETHNIC GROUPS.

22  **Q.**  AND WOULDN'T YOU AGREE THAT THE HISPANIC INMATES HAVE SHOWN

23  AN INCREASED LIKELIHOOD OF SUICIDE OVER THE PAST FEW YEARS?

24  **A.**  I'M NOT FAMILIAR WITH THAT.

25  **Q.**  YOU DON'T HAVE ANY CRITICISM, DO YOU, OF THE DEFENDANTS'

1  PLAN TO CREATE SAFER ENVIRONMENTS FOR INMATES WITHIN

2  ADMINISTRATIVE SEGREGATION UNITS BY REMOVING ATTACHMENT POINTS,

3  BY ENABLING INCREASED ROUNDING, BY DOING ADDITIONAL PRESCREENING

4  BEFORE THEY ARE PLACED IN ADSEG UNITS?

5          **MS. WHELAN:**  OBJECTION, COMPOUND.

6          **JUDGE HENDERSON:**  YOU MAY ANSWER THE QUESTION,

7  DOCTOR.

8          **THE WITNESS:**  I CERTAINLY, AS I SIT HERE TODAY,

9  WOULDN'T ARGUE WITH THE DEPARTMENT'S ATTEMPTS TO MAKE THE ADSEG

10 HOUSING UNITS SAFER.

11 **BY MS. TILLMAN:**

12 **Q.**  YOU WOULD AGREE, WOULDN'T YOU, WITH SPECIAL MASTER KEATING'S

13 ILLUSTRATION OF THE MENTAL HEALTHCARE PATIENTS AND THEIR LEVELS

14 OF CARE AS DESCRIBED IN HIS MAY, 2007 REPORT, WHERE HE MENTIONED

15 THE INMATE OR PATIENTS WITH THE LOWEST CARE NEEDS, CALLED THE

16 "CORRECTIONAL CLINICAL AND CASE MANAGEMENT  SYSTEM" ARE AT THE

17 BASE OF THE PYRAMID.  THE NEXT LEVEL UP SMALLER IN THIS

18 POPULATION ARE THOSE INMATE PATIENTS WHO RECEIVE ENHANCED

19 OUTPATIENT PROGRAM CARE.  GOING TOWARDS THE APEX OF THE PYRAMID

20 ARE THOSE PATIENTS WHO NEED INTERMEDIATE INPATIENT CARE.  AND AT

21 THE TOP OF THIS PYRAMID ARE THOSE PATIENTS WHO NEED ACUTE

22 INPATIENT HOSPITAL CARE.

23 **A.**  AND THE QUESTION WAS?

24 **Q.**  DO YOU AGREE WITH THAT ILLUSTRATION OF THE MENTAL HEALTH

25 CASELOAD WITHIN THE DEPARTMENT OF CORRECTIONS?

1  **A.**  IN THE MOST GENERAL SENSE, YES, THAT IS AN ACCURATE

2  CHARACTERIZATION.

3  **Q.**  AND YOU WOULD AGREE, WOULDN'T YOU, WITH THE SPECIAL MASTER'S

4  ANALYSIS OF THE BED NEEDS OF THAT POPULATION IN TERMS OF HIS

5  FOCUS ON THE NEED FOR ADDITIONAL BEDS TO SERVE THOSE PATIENTS AT

6  THE APEX OF THE PYRAMID, THOSE WHO NEED THE INPATIENT HOSPITAL

7  CARE?

8           **JUDGE KARLTON:**  I'M SORRY.  YOU AREN'T SUGGESTING --

9  MAYBE YOU ARE SUGGESTING.  YOU AREN'T -- ARE YOU SUGGESTING THAT

10 THE SPECIAL MASTER SAYS:

11           "DISREGARD THE PEOPLE AT THE LOWER END, AND

12           WE WILL JUST TAKE CARE OF THE FOLKS AT THE TOP"?

13           THAT'S NOT WHAT -- IS THAT WHAT YOU'RE SAYING?

14      **MS. TILLMAN:**  I'M NOT SUGGESTING THAT.  I'M

15 SUGGESTING THAT THERE WAS A FOCUS.

16           **JUDGE KARLTON:**  WHAT THE SPECIAL MASTER WAS SAYING

17 WAS THERE'S THIS CRITICAL NEED AT THE VERY TOP. WE'VE GOT TO --

18 I'M SORRY. I DON'T WANT TO --

19           **MS. TILLMAN:**  LET ME REFRAME THE QUESTION.

20           **JUDGE KARLTON:**  IT JUST -- I DON'T UNDERSTAND WHERE

21 YOU'RE GOING, MS. TILLMAN.  BUT GO AHEAD.

22 **BY MS. TILLMAN:**

23 **Q.**  YOU'D AGREE WITH THE SPECIAL MASTER'S ANALYSIS THAT THE

24 PATIENTS WHO NEED THE HIGHEST LEVEL OF CARE, THIS APEX OF THE

25 PYRAMID, AND THOSE WITHIN THAT GROUP WHO POSE THE HIGHEST

1   SECURITY ISSUES ARE THE ONES WHO ARE OFTEN NOT ABLE TO ACCESS

2   THE TYPE OF CARE THEY NEED IN A TIMELY FASHION, RIGHT?

3              **MS. WHELAN:**  OBJECTION.  MISCHARACTERIZES THE SPECIAL

4   MASTER'S REPORT.

5              **JUDGE HENDERSON:**  I DON'T KNOW.  DO YOU UNDERSTAND

6   THE QUESTION?

7              **THE WITNESS:**  I BELIEVE SO, YOUR HONOR.

8              **JUDGE HENDERSON:**  YOU MAY ANSWER.

9              **THE WITNESS:**  WHAT I'M AWARE OF IS WHAT I SAW ON MY

10  TOURS. AND THAT THERE WAS OVER 170 PEOPLE WAITING TO ACCESS

11  INTERMEDIATE CARE FACILITIES, INTERMEDIATE AT LEVEL FOUR

12  INSTITUTIONS AT THE SALINAS VALLEY PSYCHIATRIC PROGRAM.

13             SO I GUESS THAT AGREES WITH WHAT YOU'RE SAYING THAT

14  THERE ARE PEOPLE THAT NEED HIGHER LEVELS OF CARE THAT ALSO HAVE

15  HIGHER SECURITY LEVELS THAT CURRENTLY AREN'T GETTING IT.

16  **BY MS. TILLMAN:**

17  **Q.**  AND EVEN WITH THE RELEASE OF A HUNDRED THOUSAND INMATES,

18  THOSE PATIENTS MIGHT STILL BE WAITING FOR CARE BECAUSE OF A LACK

19  OF APPROPRIATE INPATIENT BEDS WITH THE SECURITY ENVIRONMENT THAT

20  THEY NEED, CORRECT?

21  **A.**  AND WHO IS SAYING THIS?

22  **Q.**  FORMER SPECIAL MASTER KEATING.

23             **JUDGE KARLTON:**  SAID WHAT?  IF YOU RELEASE A HUNDRED

24  THOUSAND INMATES THERE ARE GOING TO BE A LOT MORE BEDS.  I'M

25  SORRY, MA'AM.  I'M COMPLETELY -- I THINK I'VE MISUNDERSTOOD YOUR

1  QUESTION.

2            LET ME READ IT AGAIN.

3            **MS. TILLMAN:**  IF I MIGHT JUST STEP TO MY TABLE TO GET

4  THAT REPORT.

5            **JUDGE KARLTON:**  WAIT.  WAIT.  WAIT.  THE QUESTION I

6  THINK IS:

7                 "AND EVEN" -- WELL, I'M READING IT:

8                 "AND EVEN WITH THE RELEASE OF A HUNDRED THOUSAND

9            INMATES, THOSE PATIENTS MIGHT STILL BE WAITING FOR

10           CARE BECAUSE OF A LACK OF APPROPRIATE INPATIENT BEDS

11           WITH THE SECURITY ENVIRONMENT THAT THEY NEED,

12           CORRECT?"

13           AND I GUESS THAT'S THE QUESTION.

14           DO YOU HAVE A VIEW OF THAT PROBLEM?

15           **THE WITNESS:**  YOUR HONOR, TO BETTER INFORM THE COURT

16  ON THIS I WOULD LIKE TO BE MORE CLEAR EXACTLY WHAT THE SPECIAL

17  MASTER SAID.

18           **JUDGE KARLTON:**  WELL, FORGET ABOUT THE SPECIAL

19  MASTER. YOU FOUND A WHOLE BUNCH OF FOLKS WHO WERE AWAITING CARE

20  AND NEEDED CARE.

21           **THE WITNESS:**  YES, YOUR HONOR.

22           **JUDGE KARLTON:**  AND THE QUESTION IS:  EVEN IF YOU

23  RELEASED A HUNDRED THOUSAND, AND THOSE PEOPLE WERE PEOPLE WITH

24  SERIOUS MENTAL ILLNESSES WHO ALSO REQUIRED HEAVY SECURITY, THE

25  QUESTION IS IF YOU -- EVEN IF YOU RELEASED A HUNDRED THOUSAND

1  OTHER FOLKS, WOULD YOU STILL HAVE A PROBLEM BECAUSE THERE WOULD

2  BE INSUFFICIENT BEDS WITH THE APPROPRIATE SECURITY NEEDS?

3           IS THIS THE POINT, MS. TILLMAN?

4           **MS. TILLMAN:**  YES.

5           **JUDGE KARLTON:**  IS THAT YOUR VIEW?  DO YOU KNOW?

6           **THE WITNESS:**  YOUR HONOR, I DON'T HAVE AN OPINION ON

7  THAT BECAUSE IT'S -- I MEAN, IT'S OUT OF -- IT'S PRETTY

8  FANTASTIC TO CONSIDER THAT. AND TO HAVE A HUNDRED THOUSAND

9  PEOPLE RELEASED IT WOULD NECESSARILY FREE UP MANY RESOURCES.

10          BUT I'M UNABLE TO FULLY ANSWER THAT. I DON'T HAVE ALL

11 THE DATA.

12 **BY MS. TILLMAN:**

13 **Q.**  LET ME GIVE YOU ADDITIONAL DATA FROM THE SPECIAL MASTER'S

14 REPORT OF MAY 31, 2007, PAGE 15.

15          HE INDICATED THAT:

16              "BECAUSE STAFFING RATIOS ARE MORE INTENSIVE IN

17              THE HIGHER LEVEL CARE BEDS, SUCH AS MENTAL HEALTH

18              CRISIS BED UNITS, PSYCHIATRIC SERVICE UNITS, ENHANCED

19              OUTPATIENT PROGRAMS THAN IN THE GENERAL CORRECTIONAL

20              CLINICAL CASE MANAGEMENT PROGRAMS, EVEN THE RELEASE

21              OF A HUNDRED THOUSAND INMATES WOULD LIKELY LEAVE THE

22              DEFENDANTS WITH A LARGELY UNMITIGATED NEED TO PROVIDE

23              INTENSIVE MENTAL HEALTH SERVICES TO PROGRAM

24              POPULATIONS THAT WOULD REMAIN UNDIMINISHED BY A

25              REDUCTION OF SOME 19,000 CORRECTIONAL CLINICAL CASE

1              MANAGEMENT SYSTEM PATIENTS."

2              DOES THAT PROVIDE YOU WITH ENOUGH DATA TO --

3         **MR. BIEN:**  YOUR HONOR, COULD SHE COMPLETE READING THE

4    NEXT TWO SENTENCES?

5         **JUDGE HENDERSON:**  READ THOSE, MS. TILLMAN, THE NEXT

6    SENTENCES.

7         **MS. TILLMAN:**  CERTAINLY.

8              "ONLY THE TARGETED RELEASE OF SERIOUSLY MENTALLY

9              ILL INMATES WILL SERVE QUICKLY TO REDUCE CURRENT

10             DEFICIENCIES, ESPECIALLY OF BED AND PROGRAM SPACE.

11             STILL THE MOST SERIOUSLY MENTALLY ILL INMATE PATIENTS

12             IN THE DEPARTMENT OF CORRECTIONS AND REHABILITATION

13             ARE UNLIKELY TO BE AMONG THOSE RELEASED PURSUANT TO

14             ANY OF THE PROVISIONS OF DEFENDANTS' ASSEMBLY BILL

15             900," END QUOTE.

16        **THE WITNESS:**  SO IS THERE A QUESTION PENDING?

17        **JUDGE KARLTON:**  NO.  SHE'S JUST CALLING THAT TO THE

18   COURTS' ATTENTION, I THINK.

19   **BY MS. TILLMAN:**

20   **Q.**  I HAD A QUESTION AT SOME POINT.

21             DO YOU AGREE WITH THAT ANALYSIS THAT YOU'VE JUST

22   HEARD FROM THOSE FOUR SENTENCES READ TO YOU?

23   **A.**  I AGREE THAT -- WHAT I AGREE WITH IS THAT THE CURRENT STATE

24   OF OVERCROWDING IN THE CALIFORNIA DEPARTMENT OF CORRECTIONS IS

25   THE PRIMARY CAUSE OF THE UNCONSTITUTIONAL UNMET NEEDS OF MENTAL

1  ILLNESS, OKAY?

2          IF THERE WERE SOME SORT OF TARGETED POPULATION

3  REDUCTION THAT WOULD OCCUR, IN FACT THERE MAY BE -- AND THIS IS

4  YET TO BE SEEN -- THERE MAY BE UNMET NEEDS THAT CONTINUED TO

5  EXIST, BUT WE WOULDN'T KNOW.

6          THE DEPARTMENT DOESN'T HAVE A CHANCE OF EVEN COMING

7  CLOSE TO ADDRESSING THESE UNTIL WE GET SOME POPULATION RELIEF.

8  THERE'S JUST TOO MANY PEOPLE IN THE CURRENT SYSTEM FOR THE

9  PEOPLE TO ADEQUATELY TREAT.

10          AND I'M NOT THE ONLY ONE THAT AGREES WITH THAT.

11  **Q.**  ARE YOU SAYING THERE'S TOO MANY MENTALLY ILL PEOPLE?

12  **A.**  THERE ARE TOO MANY PEOPLE.  AND AS MENTAL ILLNESS IS A

13  PROPORTION OF THE OVERALL POPULATION, THERE ARE, HENCE, TOO MANY

14  MENTALLY ILL PEOPLE FOR THE SYSTEM TO ADEQUATELY TREAT.

15          **JUDGE KARLTON:**  DOCTOR, THE POINT THAT I THINK IS

16  BEING INQUIRED IS:  IF YOU HAD A RELEASE ORDER, AND THE RELEASE

17  ORDER DID NOT REACH THOSE PERSONS WHO WERE SEVERELY IN NEED, BUT

18  ALSO VIOLENT -- WHICH IS LIKELY TO BE THE CASE, THOSE ARE

19  UNLIKELY TO BE PEOPLE RELEASED -- WOULD YOU BY VIRTUE OF THE

20  RELEASE OF OTHER PEOPLE IN SOME WAY BE AFFECTING THE DELIVERY OF

21  SERVICES TO THOSE IN NEED WHO ARE NOT PRESENTLY BEING TREATED?

22          **THE WITNESS:**  I BELIEVE IT WOULD, YOUR HONOR.

23          **JUDGE KARLTON:**  CAN YOU EXPLAIN TO US WHY?

24          THAT WAS THE THRUST OF YOUR QUESTION, RIGHT?

25          **THE WITNESS:**  I BELIEVE THAT AS BEEN STATED HERE

1  ALREADY TODAY IS THAT THE CURRENT STATE OF OVERCROWDING LEADS TO

2  GREATER NUMBER OF ASSAULTS, BOTH INMATE-ON-INMATE AND

3  INMATE-ON-STAFF, WHICH WOULD NECESSARILY INCREASE THEIR SECURITY

4  LEVEL.

5        AND AS THE SYSTEM WOULD GET INTO A MORE MANAGEABLE

6  POPULATION LEVEL, I THINK IT'S FAIR TO SAY THAT THOSE SORTS OF

7  INCIDENCES WOULD DECREASE, AND THAT COLEMAN CLASS MEMBERS WOULD

8  NECESSARILY BE AFFECTED BY THAT WHERE THEY WOULDN'T ALWAYS BE

9  ROCKETED TO THE HIGHEST LEVEL OF SECURITY BECAUSE OF ACTING OUT

10  BECAUSE OF THEIR UNMET MENTAL HEALTH NEEDS.

11        **JUDGE KARLTON:**  HANG ON JUST A SECOND.  I THINK WHAT

12  YOU'RE SAYING, DOCTOR -- FORGIVE ME IF I'VE GOT IT WRONG -- IS

13  BECAUSE OF THE OVERCROWDING, THERE IS AN INCREASE IN MENTAL

14  ILLNESS AND IN SECURITY BREACHES WHICH INCREASES THE NUMBER OF

15  PEOPLE WHO NEED TREATMENT WHO ARE NOT RECEIVING TREATMENT.  IS

16  THAT WHAT YOU'RE SAYING?

17        **THE WITNESS:**  YES, YOUR HONOR. AND THAT BECAUSE OF

18  UNMET MENTALLY ILL NEEDS THERE IS ACTING OUT ON THE PART OF THE

19  COLEMAN CLASS MEMBERS, MEANING BEHAVIORAL PROBLEMS DUE TO MENTAL

20  HEALTH PROBLEMS THAT ENDS UP PUTTING THEM AT HIGHER SECURITY

21  LEVELS.

22        AND THEN, THEY GET STUCK BECAUSE ONCE YOU GET A

23  SECURITY LEVEL YOU HAVE TO MAINTAIN GOOD BEHAVIOR IN ORDER TO

24  GET DOWN.  AND IF YOU'RE GETTING ADEQUATE MENTAL HEALTHCARE

25  YOU'RE STUCK IN THIS LOOP.

1           SO I THINK IT'S FAIR TO SAY THAT ONCE THE SYSTEM WILL

2   RETURN TO SOME SORT OF CONSTITUTIONAL CARE THAT THOSE INCIDENCES

3   WOULD DECREASE.

4   **BY MS. TILLMAN:**

5   **Q.**  DOCTOR, ISN'T IT CORRECT THAT THE RELEASE OF INMATES WILL

6   NOT RENDER THE MENTAL HEALTHCARE SYSTEM AUTOMATICALLY

7   CONSTITUTIONALLY COMPLIANT?

8   **A.**  I AGREE WITH YOU, YES.

9   **Q.**  IT'S SIMPLY WHAT YOU CALL THE FIRST STEP TOWARDS

10  CONSTITUTIONAL COMPLIANCE, ISN'T IT?

11  **A.**  WELL, AGAIN, REMEMBER MY WORDS:

12              "THE PRIMARY CAUSE OF THE ONGOING

13              CONSTITUTIONAL VIOLATIONS," OKAY?

14          THERE MAY BE OTHER CAUSES IN THERE, BUT THIS IS A

15  PRIMARY CAUSE.

16  **Q.**  AND THE OTHER CAUSES MAY WELL BE THE SHORTAGE OF APPROPRIATE

17  BEDS OF INPATIENT SETTINGS FOR THOSE INMATE PATIENTS IN THE

18  HIGHEST LEVELS OF CARE, CORRECT?

19  **A.**  IT MAY BE.

20  **Q.**  AND ANOTHER CAUSE MAY WELL BE THE FACT THAT THE DEPARTMENT

21  OF CORRECTIONS, AS WELL AS THE DEPARTMENT OF MENTAL HEALTH, HAVE

22  HAD TO WORK VERY, VERY HARD OVER THE PAST YEAR TO REDUCE THEIR

23  VACANCY RATES AMONGST THEIR TOP LEVEL OF PROFESSIONALS, LIKE

24  PSYCHIATRISTS?

25  **A.**  I AGREE THAT THEY HAVE HAD TO WORK VERY HARD TO MAINTAIN

1  STAFFING LEVELS BECAUSE OF THE CHAOTIC CONDITIONS THAT CURRENTLY

2  EXIST.

3  **Q.**  AND ALSO BECAUSE -- ALSO BECAUSE THEY HAVE STAFF POSITIONS

4  THAT AREN'T GETTING FILLED FOR ANY NUMBER OF REASONS, THIS

5  COLEMAN COURT HAS ALSO ADDRESSED THE ISSUE OF PAY AND ENHANCED

6  THE PAY TO ATTRACT CLINICIANS.  ISN'T THAT CORRECT, THAT THAT'S

7  A GOOD STEP TO TAKE, TO ENHANCE PAY, TO ATTRACT CLINICIANS TO

8  TAKE THESE JOBS?

9  **A.**  IT'S A GOOD FIRST STEP IN THAT, YOU KNOW, RECRUITING PEOPLE

10 TO WORK IN PRISONS IS VERY DIFFICULT ON A GOOD DAY, ALL RIGHT?

11             BUT THEN, GIVEN THE CURRENT STATE OF AFFAIRS IT'S

12 EXCEEDINGLY DIFFICULT.  YOU ADD LEVELS OF DIFFICULTY TO IT

13 BECAUSE OF THE POPULATION PRESSURES THAT ARE PUT ON STAFF AND

14 THEIR ATTEMPTS TO DELIVER CONSTITUTIONAL CARE.

15 **Q.**  AND THAT IS WHY THE DEPARTMENT OF MENTAL HEALTH HAS

16 HISTORICALLY DONE BETTER IN ITS RECRUITMENT EFFORTS THAN THE

17 DEPARTMENT OF CORRECTIONS BECAUSE THE PATIENTS THAT THEY PROVIDE

18 CARE TO, INCLUDING THE CDCR INMATES, ARE PROVIDED CARE IN

19 HOSPITAL SETTINGS THAT ARE NOT OVERCROWDED, THAT DO NOT INVOLVE

20 TRIPLE BUNKS IN GYMS OR DAY ROOMS, CORRECT?

21 **A.**  WELL, YES, WITH A PROVISO. I ABSOLUTELY AGREE WITH YOU IN

22 THAT THE HISTORY OF RECRUITING HAS BEEN EASIER FOR DMH, THE

23 DEPARTMENT OF MENTAL HEALTH, BECAUSE THERE ARE A SET NUMBER OF

24 BEDS, OKAY?

25             AND SO THEY ARE CURRENTLY NOT OVER TRIPLE-BUNKED IN

1  THE DEPARTMENT OF MENTAL HEALTH.  BUT THE WHOLE SYSTEM IS SO

2  OVERSUBSCRIBING THESE BEDS IS THAT IT BACKS UP THE ENTIRE

3  SYSTEM.

4          THERE'S A WAITING LIST TO GET INTO THE HOSPITAL. AS I

5  MENTIONED EARLIER, THERE'S 171 PEOPLE WAITING TO GET INTO LEVEL

6  FOUR INTERMEDIATE CARE FACILITIES AT SALINAS VALLEY'S

7  PSYCHIATRIC PROGRAM DURING MY TOURS.  THAT'S NOT GOING TO

8  CHANGE.

9  **Q.**  IT WILL CHANGE, WON'T IT, THOUGH, IF THE DEFENDANTS' PLAN TO

10  CREATE ADDITIONAL INPATIENT, AS WELL AS OUTPATIENT, BEDS IN

11  THEIR AUGUST 2007 BED PLAN IS PERMITTED TO GO FORWARD?

12  **A.**  THAT'S NOT GOING TO DO ANYTHING FOR THAT INMATE THAT I SAW

13  THAT WAS HOUSED IN ONE OF THESE UPRIGHT HOUSING SMALL THINGS

14  THAT LOOK LIKE A CAGE, OKAY?

15  **Q.**  I'M TALKING ABOUT THAT PICTURE THAT YOU SAW --

16  **A.**  LET ME FINISH, PLEASE.  I'M NOT DONE.  I'M NOT FINISHED

17  ANSWERING THE QUESTION.

18          SO ANY BUILDING PLANS ARE EXACTLY THAT:  PLANS ON A

19  PIECE OF PAPER THAT AREN'T GOING TO IMMEDIATELY AFFECT THE FACT

20  THAT PEOPLE IN ACUTE PSYCHIATRIC CRISIS ARE BEING HOUSED IN

21  ADSEG, BECAUSE THERE'S NO OTHER PLACE FOR THEM, OKAY?

22          THAT THEY HAVE TO WAIT THERE WITHOUT A MATTRESS OR A

23  BLANKET.  AND THEY ARE HOUSED IN THESE OTHER SETTINGS WHERE

24  THERE'S NO TOILET. THIS IS -- A BUILDING PLAN IS NOT GOING TO

25  CHANGE THAT.

1  **Q.**  BUT YOU WERE PROBABLY GLAD TO SEE, WEREN'T YOU, TOURING YOUR

2  TOUR OF CALIFORNIA MEDICAL FACILITY THAT THERE HAD RECENTLY BEEN

3  THE ACTIVATION OF 50 MENTAL HEALTH CRISIS BEDS TO SERVE THE

4  NEEDS OF THESE COLEMAN PATIENTS IN CRISIS, AND THAT WAS

5  ACTIVATED IN JUNE, 2008?

6  **A.**  CERTAINLY, YOU KNOW, 50 ADDITIONAL MENTAL HEALTH CRISIS BEDS

7  IS CERTAINLY 50 ADDITIONAL MENTAL HEALTH CRISIS BEDS.  BUT IF WE

8  LOOK TO THE NUMBER OF REFERRALS THAT OCCUR IN THAT MONTH

9  REFERRALS HAD BEEN GOING INTO THE MID-TO-HIGH TWO HUNDREDS.  AND

10 FOR THE MONTH THAT UNIT OPENED THEY EXCEEDED 350.

11          **JUDGE HENDERSON:**  LET'S FIND A COMFORTABLE PLACE TO

12 BREAK FOR LUNCH, WHEREVER THAT MIGHT BE FOR YOU.

13          **MS. TILLMAN:**  I'M SORRY?

14          **JUDGE HENDERSON:**  LET'S FIND A COMFORTABLE PLACE TO

15 BREAK FOR LUNCH WHEREVER THAT COMFORTABLE PLACE MAY BE FOR YOU.

16          **MS. TILLMAN:**  THIS IS FINE RIGHT HERE, YOUR HONOR.

17          **JUDGE HENDERSON:**  IS THIS OKAY?

18          **MS. TILLMAN:**  THANK YOU.

19          **THE COURT:**  COURT IS RECESS.  WE WILL RESUME IN AN

20 HOUR WITH THIS TESTIMONY.

21          COURT'S ADJOURNED.

22                  (THEREUPON, THE LUNCHEON RECESS WAS FROM

23                  12:16 P.M. UNTIL TAKEN 1:34 P.M.)

24          **JUDGE HENDERSON:**  WHILE YOU'RE CONTINUING TO SET UP,

25 COUNSEL, WE'RE GOING TO READ THIS ANNOUNCEMENT:

1        HAVING SEEN THE COMPLETE SET OF EXHIBITS IN THE

2   COURTROOM, THE COURT'S RECONSIDERED THE PROVISION OF COURTESY

3   COPIES TO CHAMBERS.  WE'LL NOW ACCEPT ELECTRONIC COPIES OF THE

4   EXHIBITS IN LIEU OF PAPER COPIES.  CD-ROM SHOULD BE SENT TO OUR

5   INDIVIDUAL CHAMBERS BY THE END OF THE TRIAL.

6        **MR. BIEN:**  YOU WANT THEM ALL HERE IN SAN FRANCISCO OR

7   WOULD YOU LIKE THEM TO THE INDIVIDUAL CHAMBERS?

8        **JUDGE HENDERSON:**  INDIVIDUAL CHAMBERS, YES.  UNLESS,

9   IF YOU GET THEM HERE BEFORE THE TRIAL IS OVER, YOU CAN JUST HAND

10  THEM.

11       YOU MAY BEGIN WHEN YOU'RE READY, COUNSEL.

12       **MS. TILLMAN:**  THANK YOU, YOUR HONORS.

13              **CROSS-EXAMINATION BY MS. TILLMAN**

14  BY MS. TILLMAN

15  **Q**   GOOD AFTERNOON, DR. STEWART.

16  **A**   GOOD AFTERNOON.

17  **Q**   BEFORE WE ENDED FOR OUR LUNCH BREAK, I BELIEVE WE WERE

18  TALKING ABOUT THE ISSUE OF PRISONER RELEASE AND WHETHER OR NOT

19  THAT WOULD HAVE AN IMPACT ON THE DELIVERY OF MENTAL HEALTHCARE

20  SERVICES.  YOU AGREE, DON'T YOU, THAT EVEN WITH THE RELEASE OF

21  INMATES, DEFENDANTS WILL STILL HAVE TO ADDRESS THE HOUSING NEED

22  FOR THE MENTALLY ILL PATIENTS?

23  **A**   EVEN GIVEN PRISONER REDUCTION ORDER, THAT THE DEFENDANTS

24  WOULD STILL NEED TO PROVIDE ADEQUATE MENTAL HEALTHCARE?  YES.

25  **Q**   NOT ONLY WILL HAVE TO PROVIDE ADEQUATE MENTAL HEALTHCARE,

1  BUT IN ORDER TO DO SO, THEY'LL HAVE TO TAKE STEPS TO ENSURE

2  THERE'S AN ADEQUATE SUFFICIENT NUMBER OF MENTAL HEALTHCARE BEDS

3  AVAILABLE TO THE MENTALLY ILL POPULATION, CORRECT?

4  **A**   THAT'S CORRECT.

5  **Q**   EVEN WITH THE RELEASE OF INMATES, DEFENDANTS WILL STILL HAVE

6  TO TAKE STEPS TO ENSURE THERE'S AN ADEQUATE NUMBER OF COMPETENT,

7  TRAINED MENTAL HEALTHCARE PROFESSIONALS TO SERVE THE MENTALLY

8  ILL INMATES, CORRECT?

9  **A**   THAT'S CORRECT.

10          **JUDGE REINHARDT:**  COUNSEL, ARE YOU ASKING ABOUT THIS

11  FOR THE PURPOSE OF REMEDY OR TO SHOW THAT OVERCROWDING IS NOT

12  THE PRIMARY CAUSE?

13          **MS. TILLMAN:**  TO SHOW IT IS NOT THE PRIMARY CAUSE,

14  YOUR HONOR.  AS MUCH AS DR. STEWART HAS INDICATED THAT PRISONER

15  REDUCTION OR RELEASE IS THE FIRST STEP, HE'S ALSO TESTIFIED IT

16  DOES NOT ACTUALLY RENDER THE SYSTEM CONSTITUTIONALLY ADEQUATE,

17  SO WE ARE PURSUING THAT CONCEPT.

18  BY MS. TILLMAN

19  **Q**   NOW, DR. STEWART, YOU ARE AWARE, AREN'T YOU, THAT THE

20  DEFENDANT CREATED A DECENTRALIZED MODE OR MODEL PROVIDING MENTAL

21  HEALTHCARE TO ITS INMATE PATIENTS?

22  **A**   HOW DO YOU MEAN, DECENTRALIZED MODE OF MENTAL HEALTHCARE?

23  **Q**   BY DECENTRALIZED, I'M REFERRING TO THE FACT THAT THERE ARE

24  33 INSTITUTIONS OF CDCR, CALIFORNIA DEPARTMENT OF CORRECTIONS

25  STATEWIDE, AND, AS PART OF THE MENTAL HEALTHCARE SERVICES

1  DELIVERY SYSTEM, MANY OF THOSE INSTITUTIONS, IN FACT, NEARLY ALL

2  OF THEM, ARE ENGAGED IN PROVIDING MENTAL HEALTHCARE SERVICES TO

3  MENTALLY ILL PATIENTS.

4  **A**   AND?

5  **Q**   THAT WOULD BE DECENTRALIZED CARE, WOULDN'T IT?

6  **A**   BY MEANING THAT EVERY INSTITUTION NEEDS TO PROVIDE

7  CONSTITUTIONALLY ADEQUATE CARE AS DECENTRALIZED FROM WHAT OR

8  WHERE, I'M NOT SURE.  BUT YOU ARE RIGHT, IT'S NOT ALL DONE IN

9  ONE SPOT.

10 **Q**   I THINK THAT'S PROBABLY THE BEST WAY TO PUT IT.  THANK YOU.

11          AS PART OF THAT MOTIF OF DECENTRALIZED CARE, YOU'VE

12 ENCOUNTERED EVEN ON YOUR TOURS, HAVEN'T YOU, THAT THERE'S A

13 DIFFERENT VARIETY OF BEDS AVAILABLE TO MENTALLY ILL PATIENTS

14 DEPENDING UPON THEIR LEVEL OF ACUITY, CORRECT?

15 **A**   I WOULD SAY THAT THERE'S A VARIETY OF BEDS THAT ARE

16 UNAVAILABLE TO THE COLEMAN CLASS BASED ON CERTAIN ACUITY, AND

17 THE HIGHER ACUITY IT IS, THE MORE ACUTE DIFFICULTIES PEOPLE HAVE

18 OF ACCESSING IT.

19 **Q**   YOU ARE AWARE THAT FOR THOSE THAT AT THE HIGHER LEVEL OF

20 CARE, LIKE THOSE REQUIRING INPATIENT INTERMEDIATE CARE, THOSE

21 REQUIRING INPATIENT ACUTE CARE, THOSE PATIENTS RECEIVE CARE AT

22 SITES SEPARATE AND APART FROM THE GENERAL POPULATION OF CDCR,

23 CORRECT?

24 **A**   THAT'S CORRECT.

25 **Q**   AND, IN FACT, SOME OF THESE PATIENTS ARE ACTUALLY

1  TRANSFERRED TO THE DEPARTMENT OF MENTAL HEALTH TO OBTAIN CARE AT

2  STATE HOSPITALS, LIKE COALINGA STATE HOSPITAL, ATASCADERO STATE

3  HOSPITAL, PATTON STATE HOSPITAL, CORRECT?

4  **A**   I AM AWARE THOSE ARE AVAILABLE, YES.

5  **Q**   YOU DIDN'T TOUR ATASCADERO STATE HOSPITAL AS PART OF YOUR

6  WORK IN THIS CASE, DID YOU?

7  **A**   I DID NOT.

8  **Q**   AND YOU DIDN'T TOUR COALINGA STATE HOSPITAL AS PART OF YOUR

9  WORK IN THIS CASE, DID YOU?

10  **A**   I DID NOT.

11  **Q**   NOR DID YOU TOUR PATTON STATE HOSPITAL AS PART OF YOUR WORK

12  IN THIS CASE, CORRECT?

13  **A**   I DID NOT.

14  **Q**   TO THE EXTENT YOU DID TOUR FACILITIES, THEY WERE ALL LOCATED

15  WITHIN THE DEPARTMENT OF CORRECTIONS AND REHABILITATION,

16  CORRECT?

17  **A**   THAT'S CORRECT.

18  **Q**   AND THEY NUMBERED ABOUT FIVE OF THE 33 INSTITUTIONS,

19  CORRECT?

20  **A**   YES.

21  **Q**   AND TO THE EXTENT YOU TALKED TO INMATES OF THE CALIFORNIA

22  DEPARTMENT OF CORRECTIONS DURING THESE TOURS OF FIVE FACILITIES,

23  THOSE INMATE INTERVIEWS WERE NOT FULL-FLEDGED PSYCHIATRIC

24  EVALUATIONS OF EACH INDIVIDUAL PATIENT THAT YOU TALKED TO, WERE

25  THEY?

1  **A**   THEY WERE NOT, AS YOU SAID, FULL-FLEDGED DIAGNOSTIC

2  INTERVIEWS, YES.

3  **Q**   WHAT YOU HEARD FROM THE INMATES YOU TOOK AS TRUE, AND YOU

4  RECORDED IT IN TERMS OF WHAT THEIR CONCERNS WERE REGARDING THE

5  MENTAL HEALTHCARE SERVICES DELIVERY SYSTEM, CORRECT?

6  **A**   WELL, NOT EXACTLY.  THE PURPOSES OF MY FORMAL INTERVIEWS WAS

7  BASICALLY TO DOCUMENT THE CURRENT PSYCHIATRIC CONDITION OF THE

8  INMATE, SO I NOTED IF THEY WERE DEPRESSED, SUICIDAL, PSYCHOTIC,

9  COGNITIVELY IMPAIRED, ET CETERA.  THEN BASED ON A COMPREHENSIVE

10 REVIEW OF THEIR HEALTH RECORD, I WAS ABLE TO NOTE WHAT CDCR

11 CLINICIANS WERE DIAGNOSING THESE PEOPLE AS AND ALSO WHAT

12 TREATMENTS THEY WERE BEING PROVIDED.

13 **Q**   WERE YOU ABLE TO ACCOMPLISH ALL THIS WITHIN A ONE-DAY TOUR

14 OF EACH FACILITY?

15 **A**   YES.

16 **Q**   NOW, WHEN YOU SAID YOU SPOKE TO SOME 60 COLEMAN CLASS

17 MEMBERS AND A HUNDRED OTHER INMATES OF THE CALIFORNIA DEPARTMENT

18 OF CORRECTIONS, I TRIED TO DO A LITTLE MATH.  IT LOOKS LIKE YOU

19 THEN INTERVIEWED SOME 160 INMATES OF THE DEPARTMENT OF

20 CORRECTIONS, CORRECT?

21 **A**   APPROXIMATELY.

22 **Q**   AND ACCORDING TO WHAT I UNDERSTAND PLAINTIFFS' COUNSEL

23 REPRESENTED IN HIS OPENING STATEMENT, THERE'S SOME 35,000

24 INMATES WITHIN THE COLEMAN CASELOAD, CORRECT?

25 **A**   THAT'S MY UNDERSTANDING.

1  **Q**   SO YOUR INTERVIEWS OF EVEN JUST 60 COLEMAN CASELOAD MEMBERS

2  WAS, WELL, FAR LESS THAN ONE PERCENT OF THE POPULATION OF

3  COLEMAN CLASS MEMBERS, WEREN'T THEY?

4  **A**   I HAVEN'T DONE THE MATH, BUT, YES, I THINK YOU'RE RIGHT.

5  **Q**   AND WHEN YOU ADD UP THESE NUMBERS AND LOOK AT JUST THE SHEER

6  NUMBER OF PEOPLE OR INMATES THAT YOU INTERVIEWED AND COMPARE IT

7  TO THE TOTAL NUMBER OF INMATES WITHIN THE DEPARTMENT OF

8  CORRECTIONS AND REHABILITATION, AGAIN, WE'RE LOOKING AT SOME 160

9  PEOPLE INTERVIEWED BY YOU, VERSUS A TOTAL POPULATION SOMEWHERE

10 IN THE 170,000 AREA, AND, AGAIN, YOUR INTERVIEWS INVOLVED LESS

11 THAN ONE PERCENT OF THE POPULATION, CORRECT?

12 **A**   YES.

13 **Q**   NOW, YOU DON'T DISPUTE THE FACT, DO YOU, THAT MENTALLY ILL

14 INMATES WHO NEED HIGHER LEVELS OF CARE WITHIN INPATIENT BEDS

15 SHOULD BE PLACED IN INPATIENT BEDS THAT ARE APPROPRIATELY

16 LICENSED AND GOVERNED BY THE USUAL HOSPITAL REQUIREMENTS THAT

17 APPLY TO SUCH BEDS, DO YOU?

18 **A**   THAT INMATE PATIENTS WHO REQUIRE INPATIENT LEVEL OF CARE

19 SHOULD RECEIVE IT IN THE SETTING THAT YOU JUST DESCRIBED?  YES,

20 I BELIEVE THEY SHOULD.

21 **Q**   AND YOU UNDERSTAND THAT THE DEPARTMENT OF MENTAL HEALTH

22 PROVIDES THOSE SORTS OF LICENSED MENTAL HEALTH BEDS FOR THE CARE

23 OF DEPARTMENT OF CORRECTIONS INMATE PATIENTS, CORRECT?

24 **A**   THEY DO, BUT THE PROBLEM THAT I ENCOUNTERED ON MY TOURS IS

25 THAT PEOPLE WEREN'T ABLE TO ACCESS THIS LEVEL OF CARE IN A

1  TIMELY MANNER IN A WAY THAT ACTUALLY FACILITATED THEIR MENTAL

2  HEALTH TREATMENT.  OFTENTIMES, THEY WERE LEFT IN LESSER LEVELS

3  OF CARE WHERE THEIR ILLNESS WAS NOT BEING ADEQUATELY ADDRESSED.

4  **Q**   AND YOU WOULD WANT EVERY INMATE REQUIRING HOSPITAL LEVEL

5  CARE TO GET THAT CARE IN A TIMELY WAY AND BENEFIT FROM WHAT SOME

6  PEOPLE CALL THE DEPARTMENT OF MENTAL HEALTH THERAPEUTIC

7  ENVIRONMENT MILIEU, WOULDN'T YOU?

8  **A**   YES.  IT'S FAIR TO SAY I WOULD WANT DEPARTMENT OF

9  CORRECTIONS AND REHABILITATION TO FOLLOW ITS OWN PROGRAM GUIDE.

10 **Q**   AND YOU WOULD ALSO WANT DEPARTMENT OF CORRECTIONS AND

11 REHABILITATION TO FOLLOW THROUGH ON ITS PLAN TO CREATE

12 ADDITIONAL INPATIENT MENTAL HEALTH HOSPITAL BEDS FOR ITS INMATES

13 THAT WILL BE STAFFED BY THE DEPARTMENT OF MENTAL HEALTH AND

14 GIVEN THAT THERAPEUTIC ENVIRONMENT, WOULDN'T YOU?

15 **A**   I WOULD CERTAINLY HOPE THAT AS PART OF THE CONSTITUTIONAL

16 CARE, THERE WOULD BE AN ADEQUATE NUMBER OF BEDS THAT CURRENTLY

17 DOES NOT EXIST, SO THAT INMATES CAN ACCESS THESE SERVICES IN A

18 TIMELY MANNER.

19 **Q**   AND YOU UNDERSTAND THAT EVEN WITH THE TRANSFER OF INMATES TO

20 OUT-OF-STATE LOCATIONS, INMATES BEING NOT THE MENTAL HEALTH

21 CASELOAD INMATES, BUT OTHER INMATES WITHIN THE CUSTODY OF

22 DEPARTMENT OF CORRECTIONS AND REHABILITATION, WITH THE TRANSFER

23 OF THOSE INMATES, THERE HAVE BEEN REDUCED USAGE OF THE

24 NON-TRADITIONAL BEDS, THE TRIPLE BUNKS IN SOME OF THE GYMS AND

25 DAYROOMS; YOU UNDERSTAND, DON'T YOU?

1          **JUDGE KARLTON:**  I DIDN'T EVEN UNDERSTAND THE

2    QUESTION.

3          **MS. TILLMAN:**  LET ME TRY AGAIN.

4          **JUDGE KARLTON:**  TRY AGAIN.

5          **MS. TILLMAN:**  THANK YOU.

6          **JUDGE KARLTON:**  YOU KNOW THAT PEOPLE ARE BEING

7    TRANSFERRED OUT OF STATE?

8          **THE WITNESS:**  I DO, YOUR HONOR.

9          **JUDGE KARLTON:**  AND DO YOU KNOW THAT I HAVE NOT

10   ALLOWED THEM TO TRANSFER OUT OF STATE COLEMAN CLASS MEMBERS?

11         **THE WITNESS:**  THAT'S MY UNDERSTANDING.

12         **JUDGE KARLTON:**  NONETHELESS, THOSE TRANSFERS HAVE NOT

13   RESULTED IN A SIGNIFICANT REDUCTION OF THE TRIPLE BUNKING; IS

14   THAT THE QUESTION?

15         **MS. TILLMAN:**  ACTUALLY NOT, YOUR HONOR.  I APPRECIATE

16   YOUR INQUIRY.

17         **JUDGE KARLTON:**  ALL RIGHT.  GO AHEAD.

18   BY MS. TILLMAN

19   **Q**   YOU WANT TO SEE THE MENTALLY ILL PATIENTS IN THE RIGHT BED

20   AT THE RIGHT TIME, DON'T YOU?

21   **A**   I THINK, AS I SAID, I CERTAINLY WOULD, AND, YOU KNOW, A

22   STARTING POINT, IT WOULD BE NICE IF THE DEPARTMENT COULD FOLLOW

23   ITS OWN COURT-APPOINTED ADVISED PROGRAM GUIDE.

24   **Q**   AND ANOTHER STARTING POINT WOULD BE IF THE DEFENDANTS WOULD

25   GO AHEAD AND IMPLEMENT THE COURT-APPROVED AUGUST 2007 BED PLAN

1  TO CREATE MORE LICENSED MENTAL HEALTH BEDS AS WELL AS MORE

2  ENHANCED OUTPATIENT PROGRAM BEDS, CORRECT?

3  **A**   YOU KNOW, I'M CERTAINLY NOT GOING TO SIT HERE AND SAY THAT

4  DEFENDANTS SHOULDN'T PROVIDE ADEQUATE NUMBERS OF CARE, BUT THIS

5  BED PLAN AND OTHER PLANS THAT YOU'VE TALKED ABOUT DON'T DO

6  ANYTHING FOR THE PERSON WHO'S CURRENTLY IN THIS MENTAL HEALTH

7  OUTPATIENT CONCRETE SLAB UP IN MULE CREEK WITHOUT A MATTRESS,

8  WITHOUT A BLANKET, WAITING TO ACCESS MENTAL HEALTHCARE.  IT

9  DOESN'T DO ANYBODY ANY GOOD FOR THIS ACUTELY PSYCHOTIC GUY WHO

10 HAS TO BE LOWER PRIORITIZED BECAUSE OF THE OVERSUBSCRIPTION OF

11 INPATIENT BEDS.  IT DOESN'T DO ANYTHING FOR THAT PERSON NOW.

12 **Q**   NOR WILL THEIR RELEASE, ISN'T THAT RIGHT, BECAUSE ACTUALLY

13 THE RELEASE OF INMATES WILL NOT ACTUALLY CAUSE APPROPRIATE BEDS

14 TO SOMEHOW SPRING FROM THESE EMPTY CELLS; ISN'T THAT RIGHT?

15 **A**   WELL, SEE, BUT THAT'S YET TO BE SEEN.  WE DON'T KNOW.  ALL I

16 KNOW RIGHT NOW IS THAT, BASED ON WHAT I REVIEWED AND BASED ON

17 WHAT I TOURED, THE SYSTEM HAS TOO MANY PEOPLE.  I'VE SAID THAT

18 ALREADY.  AND THAT THE DEPARTMENT CANNOT MEET ITS CONSTITUTIONAL

19 OBLIGATIONS AS FAR AS MENTAL HEALTHCARE.

20 **Q**   AND IT'S -- BASED UPON WHAT YOU'VE SEEN, YOU'RE SAYING

21 THERE'S TOO MANY PEOPLE BECAUSE THERE'S NOT ENOUGH BEDS FOR THE

22 MENTALLY ILL TO TREAT THEM AT THE RIGHT TIME, IN THE RIGHT

23 PLACE, AND THERE'S NOT ENOUGH MENTAL HEALTHCARE PROVIDERS TO

24 STAFF THOSE BEDS, CORRECT?

25 **A**   CORRECT, BUT THOSE FACTORS THAT YOU LIST ARE A REFLECTION OF

1   THE OVERCROWDING.  THE FACT THAT YOU CAN'T RETAIN -- MAINTAIN AN

2   ADEQUATE NUMBER OF COMPETENT PERMANENT STAFF HAS EVERYTHING TO

3   SAY ABOUT THE LEVEL OF OVERCROWDING.  THE FACT THAT THERE IS NOT

4   ADEQUATE NUMBER OF BEDS FROM THE EOP LEVEL ON UP IS A REFLECTION

5   OF THE OVERCROWDING.  SO EVERYTHING GOES BACK TO THE

6   OVERCROWDING.

7   **Q**   EITHER IT IS A REFLECTION OF THE OVERCROWDING, OR WOULDN'T

8   YOU AGREE THAT STATISTICALLY WHAT WE'RE SEEING IS A GREATER

9   NUMBER OF CLINICIANS THAN EVER BEFORE, AS I SAID IN MY OPENING,

10  I THINK YOU WERE HERE FOR IT?  IN 1994 WE NUMBERED OUR

11  CLINICIANS IN THE HUNDREDS, NOW DEFENDANT CAN NUMBER THEM IN THE

12  THOUSANDS.  DON'T YOU THINK WITH THAT ARRAY OF CLINICIANS OUT IN

13  THE FIELD, YOU ARE GOING TO HAVE BETTER DETECTION,

14  IDENTIFICATION, AND TREATMENT OF MENTALLY ILL PERSONS, PERHAPS

15  NOT ALWAYS IN THE RIGHT BED OR AT THE RIGHT TIME, BUT THEY'LL

16  GET THE TREATMENT?  THEY'RE BEING FOUND?

17  **A**   I DIDN'T FIND THAT IN MY TOURS.  I FOUND THE FACT THAT CCCMS

18  INMATES AT SALINAS VALLEY STATE PRISON OVER THE COURSE OF TEN

19  MONTHS SAW SEVEN DIFFERENT PSYCHIATRISTS AND HAD THEIR

20  MEDICATION CHANGED MANY TIMES.  I SAW EOP INMATES THAT

21  COMPLAINED TO ME THAT EVERY TIME THEY SEE A PSYCHIATRIST, IT'S A

22  DIFFERENT PERSON, AND THEY CHANGE THEIR MEDICATIONS, AND THEY

23  HAVE NOBODY TO GO TO AS FAR AS COMPLAINING ABOUT SIDE AFFECTS

24  BECAUSE NO ONE ASKS THEM.  THAT'S WHAT I SAW.

25  **Q**   I KNOW THAT YOU'VE INDICATED A CONCERN ABOUT WHAT ARE CALLED

1  THE MENTAL HEALTH OUTPATIENT HOUSING UNITS.  ARE YOU AWARE

2  WHETHER OR NOT -- LET ME STRIKE THAT.

3          ARE YOU AWARE THAT THOSE MENTAL HEALTH HOUSING --

4  MENTAL HEALTH OUTPATIENT HOUSING UNITS HAVE BEEN MONITORED BY

5  THE COLEMAN SPECIAL MASTER'S TEAM?

6  **A**  I BELIEVE THEY HAVE.

7  **Q**  ARE YOU AWARE THAT THEY HAVE BEEN APPROVED BY THE COLEMAN

8  SPECIAL MASTER'S TEAM?

9  **A**  I BELIEVE THEY HAVE.

10 **Q**  AND YOU'RE NOT AWARE OF ANY ORDERS FROM THE COLEMAN COURT TO

11 SHUT THOSE CELLS DOWN, ARE YOU?

12 **A**  I AM NOT AWARE OF ANY ORDERS, BUT I AM AWARE OF WHAT I SAW

13 IN MY TOURS.

14 **Q**  SO YOU DIFFER WITH THE COLEMAN SPECIAL MASTER'S TEAM ABOUT

15 THE UTILITY OF THESE MENTAL HEALTH OUTPATIENT HOUSING UNITS,

16 DON'T YOU?

17 **A**  WHAT I HAVE STATED ALREADY AND WHAT I WILL STATE AGAIN IS

18 THAT THE HOUSING UNITS THAT WE SAW HERE EARLIER, THOSE LITTLE

19 CONCRETE BUNKERS WHERE YOU PUT PEOPLE WHO ARE ACUTELY MENTALLY

20 ILL, ARE ABSOLUTELY INADEQUATE GIVEN WHY THE PEOPLE ARE PLACED

21 THERE.  THAT'S WHAT I'M SAYING.

22 **Q**  YOU WOULD LIKE TO SEE NEW AND BETTER AND PARTICULARLY

23 APPOINTED CELLS FOR THAT PURPOSE, WOULDN'T YOU?

24 **A**  I WOULD LIKE TO SEE THE DEPARTMENT BE ABLE TO OFFER INMATES

25 THE APPROPRIATE LEVEL OF PSYCHIATRIC CARE THAT THEIR CLINICAL

1  CONDITION DICTATES, AND THEY HAVEN'T BEEN ABLE TO DO THAT.

2  **Q**    NOW, YOU ALSO MENTIONED A CONCERN ABOUT HOLDING CELLS.  WE

3  SAW A PICTURE UP ON THE SCREEN A LITTLE WHILE AGO, AND THERE'S

4  ALSO SOME MENTION OF THERAPEUTIC MODULES.  AGAIN, ISN'T IT

5  CORRECT THAT THE COLEMAN SPECIAL MASTER'S TEAM REGULARLY TOURS

6  THESE FACILITIES AND IS AWARE OF THOSE HOLDING CELLS?

7  **A**    THEY MAY OR MAY NOT BE.

8  **Q**    YOU'VE SEEN MENTION OF THE HOLDING CELLS' USAGE IN THE

9  MONITORING REPORTS FROM THE COLEMAN SPECIAL MASTER?

10 **A**    YES, AND WHERE I'VE SEEN THEM MENTIONED, HE ALSO MENTIONS

11 THAT THEY ARE UNACCEPTABLE FOR ACUTE PSYCHIATRIC CARE.

12 **Q**    AND ISN'T IT CORRECT THAT THERE'S BEEN NO ORDER TO REMOVE

13 THOSE HOLDING CELLS, BECAUSE WHEN THEY ARE USED APPROPRIATELY,

14 THEN THE COURT APPROVES THEIR USE?

15 **A**    I CAN'T SPEAK FOR THE COURT.  ALL I CAN TELL YOU, FROM A

16 CLINICAL STANDPOINT, THOSE ARE HORRIBLE SETTINGS.  THOSE ARE

17 INADEQUATE.  THERE'S NOTHING GOOD.  YOU WOULDN'T PUT PEOPLE IN

18 THERE THAT REQUIRE PSYCHIATRIC CARE, WAITING THERE FOR SEVERAL

19 DAYS.

20 **Q**    NOW, ARE YOU AWARE OF WHAT ARE CALLED THE THERAPEUTIC

21 MODULES TO ENABLE GROUP THERAPY TO OCCUR AMONGST INMATE PATIENTS

22 WHO POSE VERY HIGH RISK OF ASSAULT TOWARDS OTHERS OR ESCAPE

23 ATTEMPTS?

24 **A**    I AM AWARE THAT THE DEPARTMENT USES WHAT YOU REFER TO AS

25 THERAPEUTIC MODULES, WHAT I REFER TO AS CAGES.

1  **Q**   ISN'T IT CORRECT THAT DR. METZNER, WHO'S BEEN ON THE COLEMAN

2  SPECIAL MASTER'S TEAM AS A COURT-APPOINTED EXPERT FOR MANY

3  YEARS, WAS PERSONALLY INVOLVED IN THE SPECIFICATIONS USED IN

4  THOSE THERAPEUTIC MODULES?

5  **A**   I AM.  I'M AWARE THAT DR. METZNER IS INVOLVED IN THE COLEMAN

6  MONITORING TEAM.  DR. METZNER AND I WORKED BRIEFLY TOGETHER ON

7  THE MADRID CASE, AND IT'S MY UNDERSTANDING THAT IT'S HIS OPINION

8  THAT THESE, QUOTE/UNQUOTE, "THERAPEUTIC MODULES" ARE ADEQUATE

9  TREATMENT, ARE ADEQUATE SPACES TO PUT MENTALLY ILL INMATES.

10            **JUDGE KARLTON:**  I'M SORRY.  ARE OR AREN'T INADEQUATE?

11            **THE WITNESS:**  IT'S MY UNDERSTANDING, YOUR HONOR, THAT

12  DR. METZNER FEELS THAT WAY.

13  BY MS. TILLMAN

14  **Q**   SO WHEN WE TALKED ABOUT THE HOUSING OF INMATE PATIENTS,

15  THERE MAY BE DIFFERENCES OF OPINIONS AMONGST THE EXPERTS ON WHAT

16  IS APPROPRIATE, ISN'T THAT RIGHT?

17  **A**   NOW, HOUSING OR THESE VARIOUS DEVICES THAT ARE USED TO HOLD

18  PEOPLE IN?  HOUSING IS VERY DIFFERENT THAN WHAT WE'RE TALKING

19  ABOUT HERE.

20  **Q**   WE'LL TAKE THE LATTER.  WHEN IT COMES TO THERAPEUTIC MODULES

21  AND HOLDING CELLS, YOU APPARENTLY DIFFER WITH THE

22  COURT-APPOINTED EXPERTS, DON'T YOU?

23  **A**   WELL, AGAIN, I COME IN FROM MY PERSPECTIVE OF BEING ON THE

24  GATES MONITORING TEAM WHEN THE COLEMAN -- WHEN THE ORIGINAL

25  PROGRAM GUIDE WAS IMPLEMENTED AS FAR AS CCCMS, EOP, ET CETERA.

1   THERE WAS NEVER A USE OF THESE THERAPEUTIC MODULES AT THAT

2   POINT.

3            IN STEPPING AWAY FROM THEM AND COMING BACK OVER TEN

4   YEARS LATER, I FEEL THEY'RE ABSOLUTELY INADEQUATE AND

5   INAPPROPRIATE FOR USE IN ACUTELY MENTALLY ILL INMATES.  LET'S

6   MAKE SURE WE UNDERSTAND THAT'S WHAT WE'RE TALKING ABOUT.

7            PEOPLE THAT ARE MENTALLY ILL -- AND IF THE SECURITY

8   OF THE INSTITUTION IS AT RISK BECAUSE PEOPLE ARE SO MENTALLY ILL

9   THAT THEY HAVE TO BE PUT IN THESE MODULES, AS YOU'RE CALLING

10  THEM, THEN THAT SPEAKS TO HOW BAD THE QUALITY OF THE MENTAL

11  HEALTHCARE IS, BECAUSE IF THE MENTAL HEALTHCARE WAS BEING

12  ADEQUATELY PROVIDED TO PEOPLE, THEY WOULDN'T BE AT SUCH A GREAT

13  RISK OF ACTING OUT.

14           SO, IN FACT, YOU COULD LOOK AT IT AS AN ADMISSION ON

15  THE FACT OF THE INADEQUACY OF THE MENTAL HEALTHCARE THAT, IN MY

16  OPINION, IS STRICTLY DUE, PRIMARILY DUE TO THE OVERCROWDING.

17  Q   IT'S INTERESTING THE COLEMAN SPECIAL MASTER'S TEAM HAS NEVER

18  INDICATED THAT THE USE OF THE HOLDING CELLS OR THE THERAPEUTIC

19  MODULES --

20           **JUDGE KARLTON:**  ARE YOU TESTIFYING?

21           **MS. TILLMAN:**  LET ME STRIKE THAT.

22           **JUDGE KARLTON:**  I'M SORRY, MA'AM?

23           **MS. TILLMAN:**  I'LL STRIKE THAT.  THANK YOU.

24  BY MS. TILLMAN

25  Q   YOU'RE FAMILIAR WITH THE REVISED PROGRAM GUIDES' REQUIREMENT

1  THAT A PERSON -- INMATE PATIENT ON SUICIDE WATCH BE PLACED UNDER

2  AN ORDER CALLED PARTICULAR PRECAUTIONS, CORRECT?

3  **A**   YES.

4  **Q**   AND ONE OF THOSE PRECAUTIONS IS THEIR USUAL CLOTHING IS

5  REMOVED, AND THEY'RE GIVEN A SUICIDE SMOCK, CORRECT?

6  **A**   I UNDERSTAND UNDER CERTAIN CIRCUMSTANCES A SUICIDE SMOCK IS

7  THERAPEUTICALLY INDICATED, YES.

8  **Q**   SO THEY DON'T USE THEIR OWN CLOTHING TO IN ANY WAY HARM

9  THEMSELVES, CORRECT?

10  **A**   THAT IS THE INTENT OF A SUICIDE SMOCK, MEANT TO BE A VERY

11  SHORT-TERM INTERVENTION, PREVENT SOMEONE FROM HARMING

12  THEMSELVES; NOT MEANT AS THE PERSON'S CLOTHING ISSUE FOR THE

13  NEXT WEEK WHILE THEY'RE WAITING TO ACCESS A MENTAL HEALTH CRISIS

14  BED.  THAT WAS NEVER INTENDED.

15  **Q**   WHEN YOU SPEAK OF MEDICATION MANAGEMENT, IS IT CORRECT THAT

16  YOUR CONCERN IS THAT THE DEPARTMENT OF CORRECTIONS AND

17  REHABILITATION ENGAGE IN AUDITING INMATE PATIENTS' CONSUMPTION

18  OF PRESCRIBED MEDICATIONS IN AN APPROPRIATE MANNER?

19  **A**   I'M SORRY.  I DIDN'T FOLLOW YOUR QUESTION.

20  **Q**   ISN'T IT CORRECT THAT YOUR CONCERN ABOUT MEDICATION

21  MANAGEMENT IS, IN PART, THAT SOME PATIENTS APPARENTLY ARE NOT

22  TAKING THEIR MEDICATIONS?

23  **A**   NON-COMPLIANCE HAS BEEN DOCUMENTED BY DEPARTMENT OF MENTAL

24  HEALTH AND, YES, THAT IS ONE OF THE ASPECTS OF WHAT I BASE MY

25  OPINION ON, THAT THE MEDICATION MANAGEMENT SYSTEM IS

1  OVERWHELMED.

2  **Q**   ARE YOU AWARE THAT THE DEPARTMENT OF MENTAL HEALTH AND

3  DEPARTMENT OF CORRECTIONS HAVE WORKED TOGETHER ON THE ISSUE OF

4  ENSURING PATIENTS DO TAKE THEIR MEDICATIONS?

5  **A**   IF THEY HAVE, IT'S NOT INDICATED BY THE STAFF THAT I SPOKE

6  TO OR THE DATA THAT WAS COLLECTED.  IT STILL SHOWED THAT OVER

7  70 PERCENT OF INMATES ADMITTED TO DEPARTMENT OF MENTAL HEALTH

8  UNITS HAD NO EVIDENCE OF THEIR PRESCRIBED MEDICATIONS IN THEIR

9  BLOODSTREAM.

10  **Q**   ISN'T IT CORRECT THAT THE DEPARTMENT OF CORRECTIONS RECENTLY

11  SENT OUT A MEMORANDA TO FIELD CLINICIANS INDICATING THAT FOR ANY

12  PATIENT WHO'S REFERRED TO A HIGHER LEVEL OF CARE, THAT PATIENT

13  SHOULD UNDERGO A BLOOD TEST TO ENSURE THEY'VE GOT A CERTAIN

14  AMOUNT OF PRESCRIBED MEDICATION IN THEIR BODY?

15  **A**   I DON'T KNOW IF THAT MEMORANDUM HAS GONE OUT.

16          **JUDGE KARLTON:**  WOULD IT MAKE ANY DIFFERENCE?

17          **THE WITNESS:**  YOUR HONOR, WHAT THAT –– IF THAT

18  MEMORANDUM HAS GONE OUT, WHAT IT IS IS AN ADMISSION, IN MY

19  OPINION, ON THE PART OF THE CALIFORNIA DEPARTMENT OF CORRECTIONS

20  THAT THEY CANNOT, BASED ON WHAT THEY'RE CURRENTLY DOING, ENSURE

21  THAT INMATES HAVE THE APPROPRIATE AMOUNT OF MEDICATION

22  COMPLIANCE.

23  BY MS. TILLMAN

24  **Q**   ARE YOU AWARE OF THE DEFENDANTS' WORK WITH THE RECEIVER TO

25  ENHANCE THE PHARMACY?

1   **A**   I AM AWARE THE RECEIVER'S INVOLVED IN A VARIETY OF MATTERS

2   AROUND THE PHARMACY, YES.

3   **Q**   ARE YOU AWARE WHEN THE RECEIVER'S PLANS FOR THE PHARMACY

4   WILL BE COMPLETELY ROLLED OUT?

5   **A**   I DO NOT.

6   **Q**   YOU'VE HAD THE OPPORTUNITY TO REVIEW THE SPECIAL MASTER'S

7   20TH ROUND PART A REPORT, HAVEN'T YOU?

8   **A**   THE 20TH ROUND, WHAT WORD DID YOU SAY AFTER THAT?

9   **Q**   PART A.

10   **A**   PART A?  I'M NOT SURE WHAT PART A IS.

11   **Q**   IT'S BASICALLY THE FIRST INSTALLATION OF THE 20TH ROUND

12   REPORT, AND, QUITE FRANKLY, THERE'S BEEN NO OTHER INSTALLATIONS

13   YET.

14   **A**   OKAY.

15   **Q**   SO YOU HAVE REVIEWED THAT, CORRECT?

16   **A**   I BELIEVE I HAVE, YES.

17   **Q**   NOW, DO YOU AGREE WITH THE SPECIAL MASTER'S STATEMENT IN

18   THAT 20TH ROUND REPORT AT PAGE 161, THAT STAFFING SHORTAGES

19   AMONG SUPERVISORY AND LINE PSYCHIATRISTS AND CLINICIANS REMAINED

20   THE SINGLE MOST SIGNIFICANT BARRIER TO THE EFFECTIVE DELIVERY OF

21   MENTAL HEALTH SERVICES IN CDCR INSTITUTIONS?

22   **A**   AM I AWARE OF THAT, OR DO I AGREE WITH IT, OR WHAT?

23   **Q**   DO YOU AGREE WITH IT?

24   **A**   I AGREE WITH THE FACT THAT THE SHORTAGES EXIST.  BUT, AGAIN,

25   MY VIEW OF THAT IS THAT THE FACT THAT YOU CAN'T HIRE SUPERVISORY

1   PEOPLE IS A REFLECTION OF HOW BAD THE SYSTEM IS DUE TO

2   OVERCROWDING THAT YOU CAN'T HIRE PEOPLE.  MY UNDERSTANDING IS

3   THESE ARE VERY GOOD JOBS AS FAR AS MENTAL HEALTH JOBS GO, AND IF

4   YOU CAN'T FILL THESE JOBS, THEN IT REALLY REFLECTS ON HOW

5   CHAOTIC THE CURRENT SITUATION IS.

6   **Q**   YOU WOULD AGREE THERE'S A NATIONAL SHORTAGE OF HIGHLY

7   SKILLED MENTAL HEALTH CLINICIANS LIKE PSYCHIATRISTS, WOULDN'T

8   YOU?

9   **A**   I UNDERSTAND WE CERTAINLY ARE NOT -- THERE'S NOT ENOUGH

10  PSYCHIATRISTS TO MEET THE CURRENT NEEDS NATIONWIDE.

11  **Q**   AND SO EVEN WITH THE RELEASE OF INMATES FROM THE DEPARTMENT

12  OF CORRECTIONS, DEFENDANTS WILL STILL ENCOUNTER THE CHALLENGE OF

13  RECRUITING AND RETAINING HIGHLY SOUGHT-AFTER PROFESSIONAL

14  PSYCHIATRISTS FOR THE CARE OF MENTALLY ILL INMATES, WON'T THEY?

15  **A**   IT CERTAINLY WILL REQUIRE THAT THEY CONTINUE TO PUT FORTH

16  EFFORT.  BUT WHEN THE SYSTEM IS NOT SO OVERWHELMINGLY CROWDED

17  AND WHEN THE WORKING CONDITIONS ARE BETTER -- RIGHT NOW I WAS AT

18  DVI, AND SEVEN CLINICIANS HAD TO SHARE ONE LITTLE, SMALL, WHAT

19  USED TO BE A BROOM CLOSET.  I DON'T CARE WHO YOU ARE, YOU ARE

20  NOT GOING TO -- THAT'S NOT A VERY NICE WORKING CONDITION TO WORK

21  IN.

22          SO, IT'S MORE THAN JUST THE NUMBER OF CLINICIANS;

23  IT'S THE OVERALL SYSTEM IN WHICH THEY'RE WORKING IN.

24  **Q**   SO THAT WOULD BE YOUR EXPLANATION FOR WHY THE DEPARTMENT OF

25  MENTAL HEALTH IS MORE SUCCESSFUL AT RECRUITING MENTAL HEALTH

1  CLINICIANS THAN THE DEPARTMENT OF CORRECTIONS, BECAUSE THE

2  DEPARTMENT OF MENTAL HEALTH IS NOT OVERCROWDED, CORRECT?

3  **A**   WELL, TO ANSWER THAT QUESTION I WOULD HAVE TO SAY THAT THE

4  DEPARTMENT OF MENTAL HEALTH HAS A SET NUMBER OF BEDS, I BELIEVE,

5  IF WE LOOK AT THE ACUTE BEDS, WHICH IS THE HIGHEST LEVEL, OF

6  APPROXIMATELY 130.  SO BECAUSE THERE'S NO MORE BEDS, THAT'S AS

7  HIGH AS THEIR POPULATION GOES.  SO, IN FACT, THEY DON'T EXCEED

8  THAT NUMBER.

9           BUT THE SYSTEM ITSELF IS VERY OVERCROWDED, AND THE

10  FACT THAT THESE PLACES ARE FULL MEANS THAT PEOPLE CAN'T ACCESS

11  THEM IN A TIMELY WAY.  THEY WAIT TWO WEEKS, FOUR WEEKS.

12           I INTERVIEWED A YOUNG MAN AT CALIFORNIA MEDICAL

13  FACILITY INPATIENT UNIT THAT HAD TO WAIT APPROXIMATELY TWO

14  MONTHS FOR AN ACUTE BED, AND HE WAS THERE SIX MONTHS AND

15  REMAINED EXCEEDINGLY PSYCHOTIC.  SO JUST THE FACT THAT THERE'S

16  NOT, QUOTE/UNQUOTE, OVERCROWDED DEPARTMENT OF CORRECTIONS -- I

17  MEAN DEPARTMENT OF MENTAL HEALTH DOESN'T MEAN IT DOESN'T AFFECT

18  THE WHOLE SYSTEM.

19  **Q**   SO IT WOULD BE YOUR STATEMENT THAT EVEN IF PRISONERS ARE

20  RELEASED BY WAY OF A COURT ORDER, THE DEPARTMENT OF MENTAL

21  HEALTH WOULD STILL HAVE WAIT LISTS FOR ITS ACUTE CARE BEDS AND

22  ITS INTERMEDIATE CARE BEDS THAT EXIST TODAY, CORRECT?

23  **A**   WE DON'T KNOW THAT FOR A FACT.  YOU DON'T KNOW THAT.

24  **Q**   WE DON'T KNOW THAT BECAUSE YOU DON'T KNOW IF THE MENTALLY

25  ILL WILL BE RELEASED, IS THAT WHAT IT IS?

1  **A**   NO, WE DON'T KNOW WHAT EFFECT REDUCTION IN POPULATION WOULD

2  HAVE ON THE OVERALL DEGREE TO WHICH THESE ACUTE BEDS ARE BEING

3  ACCESSED.  IT'S MY OPINION THAT THEY WOULD BE LOWER, SO WE DON'T

4  KNOW IF, IN FACT, THEY WOULD NEED TO BUILD MORE BEDS, NOT ENOUGH

5  BEDS.  WE JUST DON'T KNOW.

6  **Q**   IF THE PRISONER RELEASE ORDER EXCLUDED MENTALLY ILL

7  PATIENTS, THEN WOULDN'T IT BE CORRECT THAT EVEN WITH THE RELEASE

8  OF INMATES FROM THE DEPARTMENT OF CORRECTIONS REHABILITATION,

9  THE EXISTING POOL, THE EXISTING SUBSET OF THE POPULATION

10 CONSISTING OF THE COLEMAN CASELOAD MEMBERS, WOULD STILL HAVE TO

11 BE PROVIDED MENTAL HEALTHCARE IN A SETTING WHERE DEFENDANTS HAVE

12 ACKNOWLEDGED THERE'S A NEED FOR MORE BEDS, PARTICULARLY OF

13 INPATIENT VARIETY, OF HIGH SECURITY VARIETY, AND THERE'S A NEED

14 FOR MORE CLINICIANS?

15 **A**   IF I UNDERSTAND YOUR QUESTION, THEY CERTAINLY WOULD HAVE THE

16 RESPONSIBILITY TO STILL PROVIDE THOSE HIGH LEVEL OF ACUITY BEDS.

17 HOWEVER, I BELIEVE THAT A REDUCTION IN THE OVERALL PRISON

18 POPULATION WOULD RESULT IN A SMALLER COLEMAN CLASS, BECAUSE THE

19 POPULATION ITSELF CREATES A SITUATION WHERE MENTAL ILLNESS IS

20 EITHER CAUSED OR EXACERBATED.

21 **Q**   AND YET HAVE YOU SHOWN US ANY DATA IN YOUR REPORTS OR

22 TODAY'S TESTIMONY, I DON'T BELIEVE SO, WHERE LONGITUDINAL

23 STUDIES HAVE SHOWN THAT, SAY AT RECEPTION A PERSON COMES IN

24 HEALTHY, AND BY THE TIME THEY STAYED WITH THE DEPARTMENT OF

25 CORRECTIONS REHABILITATION AND MAINLINE INSTITUTION, THEIR

1  CASELOADING MADE SUFFERING FROM A MENTAL ILLNESS?

2  **A**   I HAVEN'T SHOWN YOU ANY DATA ADDRESSING THAT, BUT THE

3  SCIENTIFIC LITERATURE IS VERY CLEAR ON THE FACT THAT CROWDING

4  CREATES MENTAL HEALTH PROBLEMS, THAT CROWDING CREATES SUICIDAL

5  SITUATIONS, OKAY?

6          AND, ALSO, IT IS MY EXPERIENCE AS WORKING AS A COURT

7  MONITOR FOR GATES AND FOR MADRID AND FOR THE U.S. DEPARTMENT OF

8  JUSTICE, THAT THE MORE CROWDED A SITUATION IS, THE MORE CROWDED

9  A SETTING IS, THE GREATER DEGREE OF MENTAL ILLNESS AND GREATER

10  ACUITY OF MENTAL ILLNESS.  SO BY LOWERING THE OVERALL

11  POPULATION, YOU ARE GOING TO LOWER THE ACUITY AND PROBABLY LOWER

12  THE INCIDENCE.

13  **Q**   OF COURSE, THAT MEANS YOU ARE NOT IN ANY WAY FACTORING INTO

14  YOUR ANALYSIS THE SEPARATE HOUSING PROVIDED TO THOSE PATIENTS IN

15  INPATIENT HOSPITAL SETTINGS AND ENHANCED OUTPATIENT PROGRAM

16  BEDS; YOUR CONCERN IS NOT AT ALL WITH THOSE PEOPLE?

17  **A**   NO.  MY CONCERN IS CERTAINLY WITH THOSE PEOPLE AND

18  OVERCROWDING.  YOU ACT AS IF OVERCROWDING DOESN'T AFFECT PEOPLE

19  IN THE DMH BEDS OR THE EOP BEDS, WERE QUITE THE CONTRARY,

20  THAT -- LET'S LOOK AT IT THIS WAY:

21          WHEN I EVALUATED -- WHEN I WENT THROUGH SALINAS

22  VALLEY STATE PRISON, THERE WAS 171 PEOPLE WAITING TO ACCESS THE

23  INTERMEDIATE CARE FACILITIES.  NOW, AS A CLINICIAN AT THE

24  INTERMEDIATE FACILITY AT SALINAS VALLEY STATE PRISON, YOU CAN'T

25  HELP BUT THINK THERE'S AN OVERWHELMING PRESSURE ON THESE PEOPLE

1  TO GET THOSE FOLKS OUT OF THAT INTERMEDIATE CARE FACILITY SO NEW

2  PEOPLE CAN COME IN.

3          **MS. TILLMAN:**  I OBJECT TO THE EXTENT THAT CALLS FOR

4  SPECULATION.

5          **JUDGE KARLTON:**  OVERRULED.  YOU MAY PROCEED.

6          **JUDGE HENDERSON:**  I WOULD HAVE DONE THE EXACT SAME

7  THING.

8          **THE WITNESS:**  THE FACT THAT THESE INDIVIDUAL UNITS

9  ARE NOT, AS YOU SAY, OVERCROWDED, THEY ARE STILL IMPACTED BY THE

10 OVERCROWDING IN THE SYSTEM.  THESE EOP UNITS THAT I EVALUATED,

11 THERE'S NOT ENOUGH ADEQUATE TREATMENT SPACE FOR THEM BECAUSE OF

12 THE FACT OF OVERCROWDING.

13          THE EOP UNIT, THE MAINLINE AT SALINAS VALLEY STATE

14 PRISON HAS TO RUN THEIR GROUPS OUTSIDE.  THEY DON'T HAVE ANY

15 INDOOR GROUP ROOMS.  SO IF THERE'S INCLEMENT WEATHER, IF THERE'S

16 ANY SORT OF WHAT THE DEPARTMENT REFERS TO AS MODIFIED

17 PROGRAMMING, WHICH, IN MY WORDS, ARE LOCKDOWNS, THEN ALL GROUPS

18 STOP BECAUSE OF OVERCROWDING.  SO THE OVERCROWDINGS DO AFFECT

19 THE EOP UNITS.  OVERCROWDING DOES AFFECT THE DMH UNITS.

20 BY MS. TILLMAN

21 Q   YOU WOULD DEFER TO THE COURT'S RESPONSE ON THOSE ISSUES,

22 WOULDN'T YOU, WHERE THE COURT HAS RESPONDED TO THOSE ISSUES BY

23 INDICATING TO DEFENDANTS TO CREATE BED PLANS, INTERIM BED PLANS,

24 LONG-TERM BED PLANS, INTERMEDIATE BED PLANS TO RESOLVE THE

25 BEDDING ISSUES FOR THESE MENTALLY ILL PATIENTS; WOULDN'T YOU

1   DEFER TO THAT?

2   **A**   I WOULD CERTAINLY DEFER TO THAT, BUT I WOULD ALSO USE THAT

3   AS AN INDICATOR TO ME THAT THERE'S A REALIZATION ON THE FACT

4   THAT THEY DON'T HAVE ENOUGH RESOURCES TO MEET THE CURRENT LEVEL

5   OF PEOPLE THAT NEED IT BECAUSE OF OVERCROWDING, AND SO IT'S AN

6   ADMISSION OF OVERCROWDING AND THE EFFECTS OF OVERCROWDING,

7   BECAUSE THEY'RE SAYING WE NEED TO BUILD MORE GROUP ROOMS, WE

8   NEED TO BUILD MORE TREATMENT SPACES, BECAUSE CURRENTLY WE DON'T

9   HAVE THEM BECAUSE WE HAVE TOO MANY PEOPLE.  IT'S AN ADMISSION OF

10  OVERCROWDING.

11  **Q**   WOULDN'T YOU AGREE WITH SPECIAL MASTER KEATING'S REMARKS AND

12  HIS REPORT ON THE AUGUST 2000 BED PLAN IN WHICH HE NOTED THAT

13  THE DEFENDANTS' DESIGN OF PRISONS IN THE, QUOTE, "PRISON

14  CONSTRUCTION YEARS OF THE 1980'S," DID NOT INVOLVE MENTAL HEALTH

15  SPACE AND SO NOW DEFENDANTS ARE LEFT WITH PRISONS THAT DO NOT

16  HAVE APPROPRIATE SPACE FOR MENTAL HEALTHCARE?

17  **A**   THEY DON'T HAVE APPROPRIATE SPACE FOR MENTAL HEALTHCARE

18  BASED ON THE NUMBER OF PEOPLE THEY NEED TO TREAT, YES, I AGREE

19  WITH THAT, ABSOLUTELY.

20  **Q**   WOULDN'T YOU AGREE ACTUALLY THAT WHAT MR. KEATING WAS SAYING

21  WAS THAT DEFENDANTS DON'T HAVE APPROPRIATE MENTAL HEALTHCARE

22  SPACES BECAUSE THE PRISONS WERE NEVER DESIGNED IN THE EARLY

23  '80'S TO PROVIDE MENTAL HEALTHCARE SPACE REGARDLESS OF THE

24  POPULATION AT THE TIME OR EVEN TODAY?

25  **A**   BUT IT CAN'T BE HELD IRREGARDLESS OF THE POPULATION, BECAUSE

1    IF THERE WAS A MANAGEABLE POPULATION, THEN THERE WOULD BE ENOUGH

2    SPACE, EVEN IN THE PRISONS THAT THE SPECIAL MASTER ADMITTED WERE

3    POORLY DESIGNED BACK IN THE '80'S, OR WHENEVER THEY WERE BUILT.

4    IF THERE WAS A MANAGEABLE NUMBER OF PATIENTS, THEN THERE WOULD

5    BE ENOUGH ROOM AND THERE ISN'T ENOUGH ROOM.

6    **Q**    YOUR TESTIMONY TODAY IS THAT THE FIRST STEP IS A PRISONER

7    RELEASE ORDER AND THAT THAT FIRST STEP WILL NOT AUTOMATICALLY

8    CREATE A CONSTITUTIONALLY ADEQUATE MENTAL HEALTHCARE SYSTEM,

9    CORRECT?

10   **A**    MY OPINION TODAY IS THAT OVERCROWDING IS A PRIMARY CAUSE OF

11   THE ONGOING CONSTITUTIONAL VIOLATIONS IN CDCR.

12   **Q**    RELIEVING THAT OVERCROWDING BY WAY OF A PRISONER RELEASE

13   ORDER WILL NOT REMEDY THOSE VIOLATIONS, WOULD IT?

14   **A**    I MENTIONED A PRISONER REDUCTION ORDER LOWERING THE NUMBER

15   OF PEOPLE THERE CURRENTLY REQUIRING SERVICES WOULDN'T

16   NECESSARILY BRING THE SYSTEM INTO CONSTITUTIONAL COMPLIANCE JUST

17   BY THAT.

18           **MS. TILLMAN:**   THANK YOU.  NOTHING FURTHER.

19           **JUDGE HENDERSON:**   THANK YOU, COUNSEL.

20           **JUDGE KARLTON:**   HANG ON.  THERE'S SOMEONE ELSE.

21           **JUDGE HENDERSON:**   INTERVENORS, DEFENDANT INTERVENORS.

22           **MS. JOHNSON:**   GOOD AFTERNOON, YOUR HONORS.  ANNE

23   JOHNSON ACTUALLY ON BEHALF OF THE PLATA DEFENDANTS.  WE HAVE A

24   MOTION WE WOULD LIKE TO BRING WITH RESPECT TO DR. STEWART'S

25   TESTIMONY.  THE PLATA DEFENDANTS NOTE DR. STEWART IS A

1    PSYCHIATRIST, NOT AN INTERNIST OR GENERAL PRACTITIONER, AND HAS

2    ONLY OFFERED A BARE CONCLUSION REGARDING OVERCROWDING AS THE

3    PRIMARY CAUSE OF THE ALLEGED DEFICIENCIES IN MEDICAL DELIVERY IN

4    CALIFORNIA'S PRISONS AND THE ALLEGED CONSTITUTIONAL VIOLATIONS

5    IN THE PLATA CASE.  DR. STEWART'S TESTIMONY AND REPORT

6    FOCUSED --

7            **JUDGE HENDERSON:**  WE'VE LISTENED TO IT.  WHAT'S THE

8    OBJECTION?  NOT A SPEECH, BUT WHAT'S THE OBJECTION?

9    INADMISSIBLE?

10           **MS. JOHNSON:**  WE'RE MOVING TO STRIKE HIS BARE

11   CONCLUSION REGARDING OVERCROWDING AS THE PRIMARY CAUSE OF THE

12   ALLEGED CONSTITUTIONAL VIOLATIONS IN THE PLATA CASE AS LACKING

13   ANY FACTUAL BASIS OR EXPLANATION.

14           **JUDGE HENDERSON:**  OKAY.  OVERRULED.  IT GOES TO THE

15   WEIGHT OF THAT TESTIMONY.  LET'S PROCEED.  IF IT GOES TO

16   ANYTHING.

17           **MS. WANG:**  TERESA WANG FOR THE LEGISLATIVE

18   INTERVENORS, YOUR HONOR.  THE DEFENDANT INTERVENORS HAVE NO

19   FURTHER QUESTIONS.

20           **JUDGE HENDERSON:**  OKAY.  OKAY.  THEN REDIRECT.

21           **MS. WHELAN:**  YOUR HONOR, ON BEHALF OF THE PLAINTIFFS,

22   WE HAVE NO FURTHER QUESTIONS.

23           THANK YOU, DR. STEWART.

24           **JUDGE HENDERSON:**  OKAY.  THEN THANK YOU VERY MUCH FOR

25   APPEARING, DR. STEWART.  YOU'RE EXCUSED.

1          **THE WITNESS:**  THANK YOU, YOUR HONORS.

2          **JUDGE HENDERSON:**  OKAY.  YOU MAY CALL YOUR NEXT

3   EXPERT, DR. SCOTT.

4          **MS. NORMAN:**  PLAINTIFFS CALL DR. –– MR. DOYLE WAYNE

5   SCOTT.

6          **JUDGE HENDERSON:**  MISTER.  THANK YOU.

7                        **WAYNE SCOTT,**

8   HAVING BEEN CALLED AS A WITNESS BY THE PLAINTIFFS WAS FIRST

9   DULY SWORN AND EXAMINED AS FOLLOWS:

10         **THE WITNESS:**  I WILL.

11         **THE CLERK:**  PLEASE HAVE A SEAT.

12         **JUDGE KARLTON:**  PLEASE STATE YOUR NAME.

13         **THE CLERK:**  STATE AND SPELL YOUR FULL NAME FOR THE

14  RECORD.

15         **THE WITNESS:**  MY NAME IS WAYNE SCOTT, W–A–Y–N–E

16  S–C–O–T–T.

17              **DIRECT EXAMINATION BY MS. NORMAN**

18         **MS. NORMAN:**  GOOD MORNING, YOUR HONORS.  SARA NORMAN

19  FROM THE PRISON LAW OFFICE FOR PLAINTIFFS.  I'M SORRY.  GOOD

20  AFTERNOON.

21  BY MS. NORMAN

22  **Q**   AND GOOD AFTERNOON, MR. SCOTT.

23  **A**   GOOD AFTERNOON.

24  **Q**   HOW LONG DID YOU WORK FOR THE TEXAS DEPARTMENT OF CRIMINAL

25  JUSTICE?

1  **A**   APPROXIMATELY 30 YEARS.

2  **Q**   AND THAT'S THE AGENCY THAT RUNS THE TEXAS PRISON SYSTEM,

3  RIGHT?

4  **A**   YES, MA'AM.  CORRECT.

5  **Q**   WHAT WAS THE HIGHEST RANK YOU ACHIEVED IN THAT SYSTEM?

6  **A**   I WAS THE EXECUTIVE DIRECTOR OF THE AGENCY.

7  **Q**   AND WHEN WERE YOU THE EXECUTIVE DIRECTOR?

8  **A**   I BEGAN TEMPORARILY IN OCTOBER OF 1995.  I BECAME THE

9  PERMANENT DIRECTOR IN JANUARY OF '96, AND RETIRED IN JULY OF

10  2001.

11  **Q**   SINCE THAT TIME, HOW HAVE YOU BEEN EMPLOYED?

12  **A**   I DID ABOUT A YEAR WITH THE STATE PAROLE BOARD.  THE

13  GOVERNOR ASKED ME TO TAKE AN APPOINTMENT AFTER I RETIRED FROM

14  THE TEXAS DEPARTMENT OF CRIMINAL JUSTICE.  I STAYED THERE ALMOST

15  A YEAR.  AND FROM THAT POINT FORWARD, I BECAME A CORRECTIONS

16  CONSULTANT.

17  **Q**   IN WHAT AREAS HAVE YOU SERVED AS A CORRECTIONS CONSULTANT?

18  **A**   YOU MEAN WHAT JURISDICTIONS HAVE I BEEN --

19  **Q**   YES.

20  **A**   -- EMPLOYED?

21       I HAVE BEEN IN THE STATES OF INDIANA, KENTUCKY,

22  OKLAHOMA, MASSACHUSETTS, NEW MEXICO, PUERTO RICO.  I'M SURE

23  THERE ARE OTHERS.

24  **Q**   IN THOSE JURISDICTIONS, WHO HAS SOUGHT YOUR EXPERTISE?

25  **A**   I'M SORRY?

1  **Q**   WHO HAS SOUGHT YOUR EXPERTISE?  WHO HIRED YOU TO COME IN AS

2  A CONSULTANT?

3  **A**   IT VARIES.  I WORKED FOR THE FEDERAL JUDGE IN PUERTO RICO.

4  I WORKED FOR THE STATE LEGISLATURE IN OKLAHOMA AND WORKED FOR

5  THE DEPARTMENT OF CORRECTIONS IN THE OTHER JURISDICTIONS.

6  **Q**   AND --

7  **A**   ALSO COOK COUNTY JAIL.

8  **Q**   AND AS A CONSULTANT, YOU'VE ANALYZED AND REVIEWED STAFFING

9  AND SECURITY IN OTHER CORRECTIONAL MANAGEMENT OPERATIONS; IS

10 THAT RIGHT?

11 **A**   YES, I HAVE.  THANK YOU.

12 **Q**   THE TEXAS PRISON SYSTEM HAS ABOUT 150,000 PRISONERS, ISN'T

13 THAT RIGHT?

14 **A**   YES.

15 **Q**   SO THAT MAKES IT LIKE CALIFORNIA, ONE OF THE LARGEST PRISON

16 SYSTEMS IN THE WORLD?

17 **A**   I BELIEVE IT'S PROBABLY SECOND ONLY TO CALIFORNIA AT THIS

18 POINT.

19 **Q**   IN THIS COUNTRY?  IN THIS COUNTRY?

20 **A**   YES.

21 **Q**   AS THE EXECUTIVE DIRECTOR IN THE TEXAS SYSTEM, MEDICAL AND

22 MENTAL HEALTHCARE WERE UNDER YOUR ULTIMATE AUTHORITY, RIGHT?

23 **A**   YES.

24 **Q**   SO YOU DIDN'T MAKE CLINICAL DECISIONS, BUT YOU RAN THE

25 OPERATIONAL SUPPORT STRUCTURE TO ENSURE THAT CARE WAS DELIVERED

1  TO PRISONERS; IS THAT RIGHT?

2  **A**   THAT'S CORRECT, YES.

3  **Q**   HOW DID YOU ENSURE THAT THE PRISONERS IN YOUR CUSTODY HAD

4  ACCESS TO MEDICAL AND MENTAL HEALTHCARE?

5  **A**   VARIOUS WAYS.  ONE IS WE COMPILED A LOT OF REPORTS ON ACCESS

6  TO MEDICAL CARE THAT WERE FORWARDED TO MY OFFICE FOR REVIEW.  I

7  MET WITH THE MEDICAL DIRECTOR WEEKLY.

8         THERE WAS A COMMITTEE FORMED BY THE LEGISLATURE TO

9  OVERSEE INMATE MEDICAL CARE BECAUSE OF THE INVOLVEMENT OF THE

10  TWO UNIVERSITY TEACHING SCHOOLS THAT WE'RE DOING THE MEDICAL AND

11  MENTAL HEALTHCARE FOR OUR SYSTEM.  THEY HELD MONTHLY MEETINGS,

12  AND I ALWAYS ATTENDED THOSE MEETINGS.

13  **Q**   SO, SPECIFICALLY, COULD YOU DESCRIBE THE ROLE THAT'S PLAYED

14  IN -- BY NON-CLINICAL PRISON ADMINISTRATORS IN ENSURING THAT

15  PRISONERS GET SEEN AND PROVIDED WITH THE APPROPRIATE MEDICAL AND

16  MENTAL HEALTHCARE?

17  **A**   STARTING WITH CORRECTIONAL OFFICERS?

18  **Q**   SURE.

19  **A**   OKAY.  CORRECTIONAL OFFICERS ARE REALLY THE FIRST LINE.

20  THEY ARE THE ONES THAT HAVE THE MOST DIRECT CONTACT WITH THE

21  OFFENDERS ON A DAILY BASIS.  THEY'RE THE ONES THAT OBSERVE THEIR

22  BEHAVIOR.  IF THEY'RE EVIDENCING ANY SYMPTOMS, THE CORRECTIONAL

23  OFFICER IS THE FIRST TO USUALLY SEE THAT AND THEN REPORT THAT OR

24  ENCOURAGE THE OFFENDER TO GO SEEK MEDICAL CARE.

25         THE WARDEN -- EVERYBODY, THE MID LEVEL MANAGERS AND

1  THE WARDENS MONITOR VERY CAREFULLY THE STATISTICS THAT ARE

2  GENERATED BY THEIR ACCESS TO CARE GROUP AT THE FACILITY, AND

3  THOSE ARE THEN FORWARDED UP THROUGH THE RANKS ALL THE WAY UP TO

4  THE EXECUTIVE DIRECTOR'S OFFICE.

5  **Q**   DO CUSTODIAL STAFF ALSO PLAY A ROLE IN PROVIDING ESCORTS AND

6  SECURITY FOR APPOINTMENTS?

7  **A**   YES, THEY DO.  IN FACT, THEY ESCORT THE OFFENDERS TO AND

8  FROM THE MEDICAL APPOINTMENTS IN SOME CASES.  SOME CASES THEY

9  ISSUE A PASS, DEPENDING ON THE CUSTODY LEVEL.  THEY DRIVE THE

10 VEHICLES TO TAKE THE OFFENDERS TO THE OFFSITE SPECIALTY

11 APPOINTMENTS.  IN FACT, IN TEXAS WE HAD A SPECIAL GROUP OF

12 TRANSPORTATION OFFICERS THAT DID NOTHING BUT MEDICAL

13 TRANSPORTATION.

14 **Q**   DO CUSTODIAL MANAGEMENT STAFF ALSO RUN CLASSIFICATION

15 SYSTEMS TO ENSURE THAT PRISONERS ARE HOUSED IN THE APPROPRIATE

16 PLACES TO RECEIVE MEDICAL AND MENTAL HEALTHCARE?

17 **A**   WE DO HAVE STAFF.  I WOULDN'T CALL THEM CUSTODIAL STAFF.

18 THEY ARE FREE WORLD STAFF, WHAT I WOULD CALL, BUT WE DO HAVE

19 CLASSIFICATION MANAGERS AT EACH OF OUR INSTITUTIONS, YES.

20 **Q**   YOU'RE FAMILIAR WITH THE RUIZ CASE IN TEXAS?

21 **A**   OH, YES.

22 **Q**   IN THAT PRISONERS -- PRISONER REFORM LAWSUIT, THE COURT

23 FOUND CRUEL AND UNUSUAL PUNISHMENT EXISTING IN THE TEXAS PRISONS

24 AS A RESULT OF OVERCROWDING, RIGHT?

25 **A**   YES, THEY DID.

1  Q    AND THE COURT FOUND SEVERE OVERCROWDING IN THE TEXAS SYSTEM

2  SOMETHING LIKE 200 PERCENT?

3  A    YES, THEY DID.

4  Q    THE COURT ALSO FOUND UNCONSTITUTIONAL MEDICAL AND MENTAL

5  HEALTHCARE DELIVERED IN THE SYSTEM, CORRECT?

6  A    THAT'S CORRECT.

7  Q    AND AFTER THE FINDINGS IN THE RUIZ COURT CAME DOWN, TEXAS

8  UNDERWENT DECADES OF COURT-ORDERED REFORMS; IS THAT RIGHT?

9  A    ABOUT TWO DECADES, YES.

10 Q    AND YOU AND TEXAS DID HAVE SUCCESS IN ENDING THE COURT

11 ORDERS REGARDING MEDICAL AND MENTAL HEALTHCARE BECAUSE YOU

12 BROUGHT MEDICAL AND MENTAL HEALTHCARE UP TO CONSTITUTIONAL

13 LEVELS, ISN'T THAT RIGHT?

14 A    YES.

15 Q    WHAT WERE -- IN TEXAS WHAT WERE THE OPERATIONAL PROBLEMS?

16 AND YOU LIVED THROUGH ALL OF THIS IN THE TEXAS SYSTEM, DIDN'T

17 YOU?

18 A    (NODS HEAD.)

19 Q    WHAT WERE THE OPERATIONAL PROBLEMS CAUSED BY THE SEVERE

20 OVERCROWDING IN THE TEXAS SYSTEM?

21 A    WELL, MUCH, MUCH OF THE SAME PROBLEMS WE HAD ARE THE

22 PROBLEMS THAT I SEE HERE.  IT'S THE INABILITY TO GET THE

23 OFFENDERS OUT TO MEET THEIR MEDICAL APPOINTMENTS BECAUSE OF LACK

24 OF STAFF AND BECAUSE STAFF IS SOMETIMES OTHERWISE OCCUPIED WITH

25 OVERCROWDING ISSUES; INABILITY TO GET STAFF TO OFFSITE

1   APPOINTMENTS -- I'M SORRY -- TO GET INMATES TO OFFSITE

2   APPOINTMENTS BY STAFF THAT ARE TASKED TO DO THAT.

3           WE RAN INTO SOME ISSUES WITH MISCLASSIFYING OFFENDERS

4   AND PUT THEM IN THE WRONG SPOT, WHICH MEANS THAT THEY DIDN'T GET

5   THE PROPER MEDICAL AND MENTAL HEALTH ATTENTION THAT THEY NEEDED.

6   Q   DID OVERCROWDING ALSO IMPACT YOUR MANAGEMENT SYSTEMS?

7   A   YES.  FROM THE LOWEST LEVEL CORRECTIONAL OFFICER TO THE

8   SYSTEM ADMINISTRATOR, THE FACILITY ADMINISTRATOR TO THE SYSTEM

9   ADMINISTRATOR.  IT WAS REALLY A CRISIS MANAGEMENT SITUATION.

10          EVERY DAY SOMETHING WAS BREAKING DOWN AT YOUR

11  FACILITY BECAUSE OF THE OVERCROWDING AND THE IMPACT IT WAS

12  HAVING ON YOUR INFRASTRUCTURE OR YOUR TIMELINES TO GET THINGS

13  DONE, AND YOU WERE ALWAYS IN A CRISIS MODE TRYING TO RESOLVE

14  THOSE ISSUES.

15  Q   YOU HAVE BEEN TO EIGHT CALIFORNIA PRISONS IN THE LAST YEAR

16  OR SO; IS THAT RIGHT?

17  A   YES, MA'AM.

18  Q   AND YOU TOURED THE PRISONS, WENT TO THE LIVING UNITS, YOU

19  TALKED TO STAFF AND PRISONERS AND ADMINISTRATORS?

20  A   YES, I DID.

21  Q   YOU'VE ALSO -- WELL, BEFORE WE MOVE ON, WERE YOU SURPRISED

22  BY THE CONDITIONS THAT YOU SAW IN THE CALIFORNIA PRISONS?

23  A   I REALLY WAS.  I HAVE BEEN IN A LOT OF JURISDICTIONS OVER

24  THE LAST FIVE YEARS, AND I HAVEN'T SEEN THIS LEVEL OF

25  OVERCROWDING IN ANY OF THOSE JURISDICTIONS.

1          **JUDGE KARLTON:**  I'M SORRY.  LET ME INTERRUPT FOR A

2   MOMENT.

3          YOU HAVE BEEN IN A LOT OF PRISONS.  YOU'VE NEVER SEEN

4   A PRISON WITH THIS KIND OF OVERCROWDING.  DO YOU PERCEIVE THAT

5   THE OVERCROWDING, SETTING ASIDE WHETHER THE OVERCROWDING ITSELF

6   IS UNDESIRABLE, THE QUESTION ULTIMATELY BECOMES THE RELATIONSHIP

7   OF OVERCROWDING TO THE DELIVERY OF MENTAL AND PHYSICAL CARE.

8   WERE YOU ABLE TO PERCEIVE OR DO YOU PERCEIVE THAT THERE IS SUCH

9   A RELATIONSHIP?

10          **THE WITNESS:**  YES, I DO.

11          **JUDGE KARLTON:**  GO AHEAD.  I HOPE YOU'LL GET TO THE

12   POINT OF THIS TRIAL EVENTUALLY.

13          **MS. NORMAN:**  ALL RIGHT.  LET'S GET TO IT DIRECTLY.

14   BY MS. NORMAN

15   **Q**   IN WHAT WAYS DID YOU SEE OVERCROWDING IN CALIFORNIA

16   IMPACTING MEDICAL AND MENTAL HEALTHCARE PROVISION?

17   **A**   WELL, I DID SEE A LOT OF PROBLEMS WITH THE CLASSIFICATION

18   SYSTEM.  I SAW LACK OF STAFF IN ALL OF THE AREAS THAT I

19   PERSONALLY VISITED.  IN TALKING TO STAFF AND OFFENDERS, I KNOW

20   THAT ACROSS THE BOARD THERE WAS A LOT OF FRUSTRATION ON BOTH

21   SIDES.  THEY WERE, IN SOME CASES, ANGRY BECAUSE THEY COULDN'T

22   GET IN IN A TIMELY FASHION TO SEE THE MEDICAL DOCTOR OR THE

23   PSYCHIATRIC CLINICIAN.  SOME OF THEM MISSED THEIR OFFSITE

24   SPECIALTY APPOINTMENTS.

25          STAFF IS FRUSTRATED ALSO BECAUSE OF HAVING TO DEAL

1    WITH THE SHEER MAGNITUDE OF BODIES THAT THEY WERE HAVING TO DEAL

2    WITH.  A NUMBER OF THE AREAS THAT I WENT INTO, PARTICULARLY DORM

3    AREAS, WERE REALLY, REALLY OVERCROWDED.

4              **MR. MELLO:**  OBJECTION.

5              **THE WITNESS:**  I'M SORRY.  REALLY, REALLY OVERCROWDED.

6              **MR. MELLO:**  THIS IS PAUL MELLO FOR DEFENDANTS.

7    OBJECTION; HEARSAY TO THE EXTENT --

8              **JUDGE KARLTON:**  USE THE MICROPHONE.

9              **MR. MELLO:**  SORRY.  PAUL MELLO FOR PLATA DEFENDANTS.

10              OBJECTION; HEARSAY TO THE EXTENT THAT THE INFORMATION

11   HE'S TESTIFYING TO ABOUT HIS CONVERSATIONS WITH OTHERS ARE BEING

12   OFFERED FOR THE TRUTH OF THE MATTER ASSERTED.

13             **JUDGE KARLTON:**  MAYBE WE OUGHT TO GET THIS DONE

14   QUICK.

15              SIR, YOU HAVE BEEN TO ALL THESE INSTITUTIONS AND

16   HIRED BY PEOPLE.  ONE OF THE THINGS THAT YOU DO GO TALK TO THE

17   STAFF?

18             **THE WITNESS:**  YES.

19             **JUDGE KARLTON:**  AND WHEN YOU TALK TO THE STAFF,

20   THAT'S PART OF HOW YOU MAKE YOUR DECISIONS ABOUT WHAT'S GOING

21   ON?

22             **THE WITNESS:**  CORRECT.

23             **JUDGE KARLTON:**  AND THAT'S TRUE OF ANYBODY WHO'S IN

24   YOUR POSITION?

25             **THE WITNESS:**  YES.

1                **JUDGE HENDERSON:**  OVERRULED.

2   BY MS. NORMAN

3   **Q**   WHAT DID STAFF AT THE INSTITUTIONS YOU VISITED IN CALIFORNIA

4   TELL YOU ABOUT OVERCROWDING?

5   **A**   WELL, FROM THE VERY LOWEST CORRECTIONAL OFFICER TO THE

6   FACILITY SUPERINTENDENTS, EVERYBODY THAT I SPOKE TO ALWAYS

7   VOICED THEIR DISPLEASURE WITH THE OVERCROWDING THAT THEY WERE

8   HAVING TO DEAL WITH AT THEIR PARTICULAR INSTITUTION.

9   **Q**   DID THEY GIVE YOU ANY --

10              **MR. MELLO:**  I DO NOT WANT TO BELABOR THE POINT, BUT

11  CAN I HAVE A STANDING OBJECTION WITH RESPECT TO HEARSAY SO I

12  DON'T HAVE TO JUMP UP EVERY TIME?

13             **JUDGE HENDERSON:**  YOU MAY HAVE A STANDING OBJECTION.

14  AND I ASSURE YOU WHEN WE RULE, WE WON'T FIND THAT THAT STATEMENT

15  THAT THE GUARD GAVE MR. SCOTT WAS TRUE THAT --

16             **MR. MELLO:**  UNDERSTOOD, YOUR HONOR.  I JUST WANT TO

17  MAKE SURE TO PRESERVE THE RECORD.  THANK YOU.

18             **JUDGE HENDERSON:**  YOU'VE GOT A STANDING OBJECTION

19  THROUGHOUT THE TRIAL, NOT JUST ON THIS WITNESS.

20             **MR. MELLO:**  THANK YOU, YOUR HONOR.

21             **JUDGE HENDERSON:**  ON THAT ISSUE.

22  BY MS. NORMAN

23  **Q**   WERE YOU ABLE TO DRAW ANY CONCLUSIONS ABOUT THE EXTENT TO

24  WHICH OVERCROWDING IMPACTED THE ACCESS TO MEDICAL AND MENTAL

25  HEALTHCARE BASED ON WHAT STAFF TOLD YOU AT THE INSTITUTIONS?

1  A   WELL, AGAIN, THEY WERE FRUSTRATED BECAUSE THEY WERE

2  OVERWHELMED WITH THEIR DUTIES, A LOT OF THE TIMES THEY COULDN'T

3  GET OUT TO TAKE THE OFFENDERS TO THEIR MEDICAL APPOINTMENT, TO

4  THE MENTAL HEALTH APPOINTMENTS SIMPLY BECAUSE THEY WERE

5  OVERWHELMED WITH OTHER TASKS.

6  Q   DID YOU SEE EVIDENCE OF BREAKDOWNS AND PROBLEMS WITH

7  INFRASTRUCTURE DUE TO OVERCROWDING IN CALIFORNIA PRISONS?

8  A   YES, I DID.

9  Q   WHAT KINDS OF INFRASTRUCTURE PROBLEMS DID YOU SEE?

10  A   I SAW IN MANY CASES GYMNASIUMS, OVERCROWDED DORMITORIES,

11  DAYROOMS, PROGRAM SPACE THAT WERE BEING USED TO HOUSE PRISONERS

12  IN DOUBLE AND TRIPLE BUNK BEDS WHERE THERE WERE VERY SPARSE

13  AMOUNTS OF TOILET FIXTURES, SHOWERS, LAVATORIES FOR THEM TO USE

14  FOR SANITARY PURPOSES.

15  Q   AND IN WHAT WAYS DOES THAT LEVEL OF OVERCROWDING THAT YOU

16  JUST DESCRIBED, IN WHAT WAYS DOES THAT IMPACT ACCESS TO MEDICAL

17  AND MENTAL HEALTHCARE?

18  A   WELL, FOR ONE THING, PUTTING OFFENDERS IN A REALLY DENSELY

19  COMPACTED AREA SUCH AS WHAT I'VE DESCRIBED REALLY CREATES THE

20  PROBABILITY OF SPREAD OF INFECTIOUS DISEASE, ESPECIALLY WHEN THE

21  TOILETS, THE SHOWERS AND THE WASHBASINS AREN'T VERY SANITARY,

22  WHICH, IN MOST CASES, I FOUND THAT TO BE THE CASE.

23         I ALSO FOUND THAT A NUMBER OF THE TOILETS WERE BROKEN

24  FROM OVERUSE, A NUMBER OF THE SHOWERS WERE BROKEN FROM OVERUSE,

25  AND THERE WERE A LOT OF OFFENDERS COMPETING FOR THOSE SCARCE

1   RESOURCES.

2   **Q**   IN YOUR OPINION, DO THE FACTORS YOU JUST DESCRIBED THAT YOU

3   SAW IN CALIFORNIA RENDER CALIFORNIA UNABLE TO PROVIDE

4   CONSTITUTIONAL MEDICAL AND MENTAL HEALTHCARE?

5   **A**   YES, AND OTHERS.  I MEAN, I THINK ONE OF THE THINGS WE

6   HAVEN'T DISCUSSED VERY MUCH IN THE TESTIMONY, THE OBJECTIVE

7   CLASSIFICATION PLAN AND HOW THAT IMPACTS MEDICAL AND MENTAL

8   HEALTHCARE HERE IN THE STATE.

9   **Q**   AND CAN YOU DESCRIBE WHAT YOU FOUND WITH REGARDS TO

10  CLASSIFICATION SYSTEMS IN CALIFORNIA?

11  **A**   SURE, SURE.  WELL, FIRST LET ME SAY, MANAGING A PRISON, NO

12  MATTER WHAT CUSTODY LEVEL, IS A VERY RISKY PROPOSITION, AND THE

13  BEST TOOL IN THE WARDEN'S ARSENAL TO MANAGE THAT IS AN OBJECTIVE

14  CLASSIFICATION PLAN.  THAT HELPS THE WARDEN SPREAD THE RISK

15  APPROPRIATELY.

16         **JUDGE KARLTON:**  I'VE READ YOUR DIRECT -- WHAT EXACTLY

17  IS A CLASSIFICATION SYSTEM AND WHAT DOES IT DO?

18         **THE WITNESS:**  CLASSIFICATION SYSTEM IS AN INSTRUMENT.

19  IT'S AN OBJECTIVE TOOL THAT PROVIDES AN -- A RISK ASSESSMENT ON

20  EVERY INDIVIDUAL OFFENDER.  IT TAKES INTO CONSIDERATION SUCH

21  FACTORS AS AGE, CRIMINAL HISTORY, EDUCATIONAL LEVELS OR

22  DEFICIENCIES, MENTAL HEALTH ISSUES, MEDICAL ISSUES, SO ON, SO

23  THAT YOU CAN PROPERLY CLASSIFY AND PLACE OFFENDERS IN THE

24  APPROPRIATE CUSTODY HOUSING LEVEL.

25

1  BY MS. NORMAN

2  **Q**    AND WHAT IMPACT DID YOU SEE THE OVERCROWDING IN CALIFORNIA

3  HAVE ON THE CLASSIFICATION PROCESS?

4  **A**    WELL, IT'S PRETTY STANDARD ACROSS THE COUNTRY TO HAVE ABOUT

5  A TEN PERCENT OVERRIDE ON CLASSIFICATION -- OBJECTIVE

6  CLASSIFICATION DECISIONS THAT ARE GIVEN OUT BY YOUR INSTRUMENT.

7  IN CALIFORNIA IT WAS MUCH HIGHER THAN THAT, WHICH MEANS YOU'RE

8  TAKING ON RISK THAT YOU DON'T NEED TO ASSUME.  AND ONE OF THE

9  FACTORS, ONE I'VE NEVER SEEN BEFORE THAT THEY USE HERE, IS A

10  VALIDATING FACTOR TO OVERRIDE IS POPULATION CONTROL.  THAT'S NOT

11  A VALIDATING FACTOR IN ANY OTHER JURISDICTION THAT I'VE EVER

12  SEEN, WHICH TELLS ME THAT YOU DON'T HAVE THE APPROPRIATE CUSTODY

13  CLASSIFICATION BED TO PUT THE OFFENDER IN, SO FOR POPULATION

14  CONTROL REASONS, YOU PLACE THEM WHERE YOU CAN.

15  **Q**    SO IS IT FAIR TO SAY THAT IN CALIFORNIA, DUE TO

16  OVERCROWDING, PRISONERS ARE BEING PLACED INCONSISTENT WITH

17  APPROPRIATE CLASSIFICATION TECHNIQUES AND TOOLS?

18  **A**   YES, I THINK IT WAS NOTED IN MY REPORT THAT THEIR OVERRIDE

19  LEVEL IS ABOUT 25 PERCENT, WHICH IS MUCH, MUCH HIGHER THAN THE

20  NORM.  AND, AGAIN, YOU ARE ASSUMING RISK THAT YOU REALLY DON'T

21  NEED TO ASSUME.  IN TEXAS, FOR INSTANCE, OUR OVERRIDE PERCENTAGE

22  WAS ABOUT THREE PERCENT DURING THE TIME I WAS THERE.

23  **Q**    AFTER YOU HAD GOTTEN THE OVERCROWDING UNDER CONTROL?

24  **A**    YES.

25  **Q**    AND HOW DOES THAT IMPACT MEDICAL AND MENTAL HEALTHCARE

1 DELIVERY WHEN PRISONERS ARE BEING MISCLASSIFIED AND MISPLACED?

2 **A**   OKAY.   SEVERAL WAYS.   ONE IS IF YOU MISCLASSIFY A LOWER

3 LEVEL OFFENDER TO A HIGHER CUSTODY LEVEL, YOU SUBJECT THEM TO

4 THE PREDATORY BEHAVIOR OF PEOPLE IN THAT HIGHER CUSTODY LEVEL.

5 IF THE OPPOSITE IS TRUE, IF YOU TAKE A HIGHER CUSTODY LEVEL

6 OFFENDER AND YOU PUT THEM IN A LOWER CUSTODY LEVEL, THEY CAN

7 BECOME PREDATORS.

8            A GOOD OBJECTIVE CLASSIFICATION SYSTEM DRAWS

9 ATTENTION TO MENTAL HEALTH AND MEDICAL DEFICIENCIES, AND YOU

10 SHOULD BE HOUSED ACCORDINGLY.  THAT'S A VERY STRONG FACTOR AND

11 THAT RECOMMENDS A HOUSING ACCORDING TO TREATMENT FOR THOSE KINDS

12 OF DEFICIENCIES.

13            NOW, IF YOU'RE PLACED IN AN AREA THAT THE OFFICERS OR

14 THE STAFF DON'T KNOW THAT THIS PERSON POSSESSES ANY MENTAL OR

15 MEDICAL DEFICIENCIES, IF THEY SEE A PERSON ACTING OUT, THEY MAY

16 MISTAKE THEIR ACTING OUT FOR DEFIANCE OF AUTHORITY INSTEAD OF

17 PROBLEMS ASSOCIATED WITH THEIR MEDICAL OR MENTAL HEALTH HISTORY.

18 **Q**   YOU TALKED ABOUT CRISIS DECISION MAKING HAPPENING IN TEXAS

19 AS A RESULT OF THE OVERCROWDING THERE.  DID YOU ALSO SEE CRISIS

20 DECISION MAKING IN CALIFORNIA IN WAYS THAT IMPACTED THE DELIVERY

21 OF MEDICAL AND MENTAL HEALTHCARE?

22 **A**   AGAIN, THE WARDENS WERE VERY VOCAL ABOUT THE DEMANDS THAT

23 OVERCROWDING WAS PLACING ON THEM AND THEIR STAFFS AND THE

24 PROBLEMS IT WAS CREATING FOR THEM, AND ALL OF THAT LEADS TO

25 CRISIS DECISION MAKING ON A DAILY BASIS.

1   **Q**   BASED ON YOUR EXPERTISE FROM YOUR DECADES IN TEXAS AND YOUR

2   REVIEWS OF OTHER CORRECTIONAL SYSTEMS AROUND THE COUNTRY AND

3   YOUR OBSERVATIONS AND RESEARCH ON CALIFORNIA, IS IT YOUR OPINION

4   THAT OVERCROWDING IS THE PRIMARY CAUSE OF THE MEDICAL AND MENTAL

5   HEALTHCARE VIOLATIONS IN CALIFORNIA PRISONS?

6   **A**   YES.   EVERYTHING REVOLVES AROUND OVERCROWDING.   THE

7   DEFICIENCIES IN THE CLASSIFICATION PLAN, THE DEFICIENCIES IN THE

8   UNAVAILABILITY OF STAFF BECAUSE THEY ARE DOING OTHER TASKS

9   ASSOCIATED WITH OVERCROWDING PROBLEMS TO DO ONSITE MEDICAL

10  APPOINTMENTS OR OFFSITE MEDICAL APPOINTMENTS, THE WEAR AND TEAR

11  ON THE INFRASTRUCTURE.   I KNOW THERE HAVE BEEN ELECTRICAL

12  OUTAGES BECAUSE OF THE OVERLOAD THAT THE LARGE NUMBER OF

13  OFFENDERS IS CAUSING AT INSTITUTIONS.   THERE'S ALSO BEEN WATER

14  PROBLEMS AT A NUMBER OF THE INSTITUTIONS, AND I THINK THE

15  GOVERNOR'S PROCLAMATION CLEARLY DESCRIBED A LOT OF THOSE ISSUES.

16          SO THOSE WERE JUST SOME OF THE ISSUES, THAT

17  OVERCROWDING CREATES PROBLEMS FOR MEDICAL AND MENTAL HEALTH

18  DELIVERY.

19  **Q**   AS EXECUTIVE DIRECTOR OF THE TEXAS PRISON SYSTEM, YOU

20  OVERSAW ON YOUR WATCH THE STATE'S EMERGENCE FROM COURT ORDERS

21  OVER UNCONSTITUTIONAL MEDICAL AND MENTAL HEALTHCARE, RIGHT?

22  **A**   I DID.

23  **Q**   COULD YOU HAVE DONE THAT IF THE POPULATION REMAINED AT

24  200 PERCENT CAPACITY?

25  **A**   I'M CONVINCED NO.   ONCE WE GOT OUR POPULATION DOWN TO THE

1    APPROPRIATE SIZE FOR THE SPACE AND INFRASTRUCTURE THAT WE HAD AT

2    EACH FACILITY, WITH SOME FLEXIBILITY SPACE FOR CLASSIFICATION

3    PURPOSES AND ALSO FOR MAINTENANCE, ROUTINE MAINTENANCE, SOME

4    CELLS WERE DOWN, ONCE WE ALIGNED ALL THOSE PROBLEMS, THEN WE

5    BEGAN TO REALLY MAKE PROGRESS IN ELIMINATING ALL OF THE

6    OUTSTANDING ISSUES THAT WE HAD WITH THE COURT.

7    **Q**    IN YOUR OPINION, IS THAT PRELIMINARY STEP OF POPULATION

8    REDUCTION, IS THAT ALSO ESSENTIAL IN CALIFORNIA IN ORDER TO GET

9    A HANDLE ON THE MEDICAL AND MENTAL HEALTHCARE VIOLATIONS?

10   **A**    BASED ON MY EXPERIENCE IN TEXAS AND WHAT I HAVE SEEN, I

11   WOULD SAY YES TO THAT.

12   **Q**    ONE LAST QUESTION, MR. SCOTT.  WHEN WAS THE LAST TIME THAT

13   YOU TESTIFIED ON BEHALF OF A PRISONER OR A CLASS OF PRISONERS?

14   **A**    I'VE NEVER TESTIFIED IN THEIR BEHALF.

15             **MS. NORMAN:**  THANK YOU.

16             **THE WITNESS:**  YOU'RE WELCOME.

17             **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

18             CROSS-EXAMINATION.

19             **MR. MELLO:**  DO YOU WANT ME TO START?

20             **JUDGE HENDERSON:**  YES.

21                      **CROSS-EXAMINATION BY MR. MELLO**

22   BY MR. MELLO

23   **Q**    GOOD AFTERNOON, MR. SCOTT.  PAUL MELLO FOR PLATA DEFENDANTS.

24             MR. SCOTT, YOU DO NOT HOLD ANY DEGREES BEYOND YOUR

25   BACHELOR'S DEGREE IN BUSINESS ADMINISTRATION?

1          **JUDGE KARLTON:**  I'M SORRY.  I'M HAVING TROUBLE.  LIFT

2     THAT THING UP IF YOU CAN.

3          **MR. MELLO:**  I PROBABLY AM, TOO.

4     BY MR. MELLO

5     **Q**   MR. SCOTT, YOU DO NOT HAVE ANY DEGREES BEYOND YOUR

6     BACHELOR'S DEGREE IN BUSINESS ADMINISTRATION, DO YOU?

7     **A**   NO.

8     **Q**   YOU DO NOT HAVE ANY DEGREES IN THE MEDICAL FIELD, CORRECT?

9     **A**   NO, I DO NOT.

10    **Q**   YOU DO NOT HAVE ANY DEGREES IN THE MENTAL HEALTH FIELD

11    CORRECT?

12    **A**   NO, I DO NOT.

13    **Q**   YOU HAVE NEVER BEEN A CLINICIAN WHO PROVIDED MEDICAL OR

14    MENTAL HEALTHCARE TO PATIENTS, CORRECT?

15    **A**   THAT'S RIGHT, I NEVER HAVE.

16    **Q**   MR. SCOTT, YOU DON'T HAVE ANY EXPERIENCE ANALYZING PRISON

17    STAFFING OR STAFFING RATIOS AS THEY RELATE TO MEDICAL CLINICIANS

18    OR MENTAL HEALTH CLINICIANS, DO YOU?

19    **A**   NO.

20    **Q**   MR. SCOTT, WHEN YOU WERE THE EXECUTIVE DIRECTOR OF THE TEXAS

21    DEPARTMENT OF CRIMINAL JUSTICE, YOU DID NOT DIRECTLY MANAGE

22    MEDICAL AND MENTAL HEALTHCARE SERVICES, CORRECT?

23    **A**   NO, I DID NOT.

24    **Q**   OKAY.  WHEN YOU WERE THE EXECUTIVE DIRECTOR OF THE TEXAS

25    DEPARTMENT OF CRIMINAL JUSTICE, BOTH MEDICAL AND MENTAL HEALTH

1  SERVICES WERE RUN BY A MEDICAL DIRECTOR WHO WAS A PHYSICIAN,

2  CORRECT?

3  **A**    THAT'S CORRECT.  I SUPERVISED HER ADMINISTRATIVELY, BUT I

4  DID NOT DEAL IN ANY CLINICAL DECISIONS AT ALL.

5  **Q**    AND, IN FACT, THAT MEDICAL DIRECTOR ACTUALLY REPORTED TO A

6  DEPUTY OF YOURS, CORRECT?

7  **A**    THAT'S CORRECT.

8  **Q**    MR. SCOTT, YOU WERE NEVER QUALIFIED TO BE THE MEDICAL

9  DIRECTOR OF THE TEXAS SYSTEM, WERE YOU?

10  **A**    COULD YOU ASK THAT AGAIN?

11  **Q**    SURE.

12          WERE YOU EVER QUALIFIED IN YOUR MIND TO BE THE

13  DIRECTOR OF THE MEDICAL SYSTEM IN THAT POSITION THAT REPORTED TO

14  YOU?  WERE YOU EVER QUALIFIED TO DO THAT?

15  **A**    NO.  IT CALLED FOR A PHYSICIAN.

16  **Q**    OKAY.  I BELIEVE YOU TESTIFIED OR SPOKE ABOUT IN ONE OF YOUR

17  DEPOSITIONS OR IN YOUR REPORT THAT -- YOUR REPORTS THAT YOU

18  PERFORMED ANALYSIS OF SEVERAL STATES REGARDING HOW MANY

19  CORRECTIONAL OFFICERS WERE NEEDED FOR MEDICAL EXPORTS -- PARDON

20  ME -- ESCORTS TO TRANSFER INMATES TO BOTH ONSITE AND OFFSITE

21  MEDICAL SERVICES, CORRECT?

22  **A**    THAT'S CORRECT.

23  **Q**    OKAY.  AND YOU DID THAT IN FLORIDA?

24  **A**    YES.

25  **Q**    AND YOU DID THAT IN OKLAHOMA?

1  A   YES.

2  Q   AND YOU DID IT IN KENTUCKY?

3  A   YES.

4  Q   DID YOU ALSO DID IT IN INDIANA?

5  A   YES.

6  Q   AND NEW MEXICO?

7  A   YES.

8  Q   AND PUERTO RICO?

9  A   YES.

10 Q   OKAY.  WHEN YOU DID THAT TYPE OF ANALYSIS IN FLORIDA IN

11 2006, YOU VISITED EIGHT INSTITUTIONS, SPENDING TWO FULL DAYS AT

12 EACH INSTITUTION, CORRECT?

13 A   THAT'S RIGHT.

14 Q   IN THIS CASE YOU'VE OFFERED OPINIONS REGARDING THE EFFECTS

15 OF OVERCROWDING ON MEDICAL AND MENTAL HEALTHCARE ACROSS

16 CALIFORNIA'S 33 PRISONS, CORRECT?

17 A   YES, I HAVE.

18 Q   OKAY.  IN FORMING THOSE OPINIONS, DID YOU VISIT EACH ONE OF

19 CALIFORNIA'S 33 PRISONS?

20 A   NO, I VISITED EIGHT.

21 Q   YOU VISITED EIGHT, CORRECT?

22 A   I DID, YES.

23 Q   AND YOU VISITED FIVE LAST YEAR, CORRECT?

24 A   IT WAS FOUR AND FOUR.

25 Q   FOUR AND FOUR?

1   **A**   YES.

2   **Q**   I'M SORRY.

3          SO IN 2007, WHICH FOUR INSTITUTIONS DID YOU VISIT?

4   **A**   CIM, AVENAL, VALLEY STATE AND SAN QUENTIN.

5   **Q**   DID YOU SPEND TWO DAYS AT EACH ONE OF THOSE INSTITUTIONS IN

6   2007?

7   **A**   NO, I DID NOT.

8   **Q**   IN FACT, YOU SPENT LESS THAN A FULL DAY AT EACH OF THOSE

9   INSTITUTIONS, CORRECT?

10  **A**   I THINK I SPENT A FULL DAY AT CIM, BUT THAT WAS THE ONLY

11  ONE, YES, SIR.

12  **Q**   APPROXIMATELY HOW LONG DID YOU SPEND AT VALLEY STATE?

13  **A**   A HALF A DAY.

14  **Q**   OKAY.  DID YOU ALSO SPEND A HALF DAY AT AVENAL?

15  **A**   AVENAL WAS VERY LARGE.  IT WAS A LITTLE LONGER.  FIVE OR SIX

16  HOURS PROBABLY.

17  **Q**   AND HOW ABOUT AT SAN QUENTIN?

18  **A**   FIVE OR SIX, SEVEN HOURS.  IT'S PRETTY LARGE ALSO.

19  **Q**   OKAY.  MR. SCOTT, DID YOU PREPARE THE FIRST DRAFT OF EITHER

20  ONE OF YOUR REPORTS IN THIS CASE?

21  **A**   DID I PREPARE THE DRAFT MYSELF?  NO.

22  **Q**   OKAY.  WHO PREPARED THE FIRST DRAFT OF YOUR REPORTS?

23  **A**   MS. NORMAN.

24  **Q**   I'M SORRY?

25  **A**   MS. NORMAN.

1  Q    PLAINTIFFS' COUNSEL?

2  A    YES.

3  Q    IN YOUR FIRST REPORT, YOUR NOVEMBER 2007 REPORT, AT PAGE 44,

4  PARAGRAPH 79 -- PUT IT UP ON THE SCREEN.  I ALSO HAVE A HARD

5  COPY IF THAT'S EASIER FOR YOU, BUT I BELIEVE IT'S RIGHT IN FRONT

6  OF YOU.

7                    (DOCUMENT DISPLAYED.)

8  BY MR. MELLO

9  Q    YOU SAID IN PARAGRAPH 79:

10              "IT IS IMPOSSIBLE UNDER CURRENT CONDITIONS

11           TO PROVIDE ADEQUATE MEDICAL AND MENTAL

12           HEALTHCARE TO CALIFORNIA'S PRISONERS."

13           DO YOU SEE THAT?

14  A    YES, I DO.

15  Q    AND YOU -- AT THE TIME YOU ISSUED THAT STATEMENT, THAT WAS

16  BASED UPON VISITS AT FOUR INSTITUTIONS, CORRECT?

17  A    YES.

18  Q    OKAY.  NEXT WE ARE GOING TO GO TO PARAGRAPH 59 OF YOUR

19  REPORT ON APPROXIMATELY PAGE 33.  IN THAT SECTION OF YOUR REPORT

20  YOU WROTE THAT:

21              "AN OFFICER ALONE WITH SEVERAL HUNDRED

22           INMATES IS UNLIKELY, FOR EXAMPLE, TO PERFORM

23           EMERGENCY FIRST AID OR CPR.  IT IS SIMPLY UNSAFE

24           TO DO SO WITH NO BACKUP WHEN PRISONERS COULD

25           EASILY SIMULATE AN EMERGENCY AS A CONSEQUENCE --

1          AS A DIVERSION.  THIS INABILITY TO PERFORM BASIC

2          LIFESAVING FUNCTIONS COULD HAVE POTENTIALLY

3          DEVASTATING CONSEQUENCES ON THE LIFE AND HEALTH

4          OF A PRISONER UNDERGOING A MEDICAL OR MENTAL

5          HEALTH EMERGENCY."

6          DO YOU REMEMBER THAT BEING IN YOUR REPORT?

7    **A**    YES.

8    **Q**    OKAY.  AT THE TIME THIS WAS WRITTEN, YOU WERE NOT AWARE OF

9    EVEN A SINGLE INCIDENT WHERE AN INMATE IN ANY OF CALIFORNIA'S

10   PRISONS WAS DENIED MEDICAL CARE DUE TO THE LACK OF CUSTODIAL

11   STAFF, WERE YOU?

12   **A**    NO.  THAT STATEMENT WAS BASED UPON MY EXPERIENCE IN TEXAS

13   WHEN WE WERE UNDERGOING THE OVERCROWDING THERE.

14   **Q**    IT WASN'T BASED ON ANYTHING YOU LEARNED DURING YOUR TOURS OR

15   INVESTIGATION IN THIS MATTER?

16   **A**    NO.  I WOULD SAY, THOUGH, THAT IT'S VERY LIKELY THAT THE

17   SAME SITUATION COULD OCCUR AS IT OCCURRED IN TEXAS MORE THAN

18   ONCE.

19   **Q**    BUT YOU CAN'T TELL ME ONE INMATE WHO HAD SUCH A

20   CIRCUMSTANCE, CORRECT?

21   **A**    NOT FROM PERSONAL KNOWLEDGE, NO.

22   **Q**    OKAY.  IN FORMING YOUR OPINIONS IN THIS CASE, DID YOU RELY

23   ON THE RECEIVER'S ANALYSIS OF CDCR DEATH REVIEWS FOR 2006 OR

24   2007?  THE 2006 REPORT IS DEFENDANTS' EXHIBIT 1107, AND WE'LL

25   PUT UP THE FRONT PAGE IF POSSIBLE.

1                    (DOCUMENT DISPLAYED.)

2    BY MR. MELLO

3    Q    I DON'T BELIEVE YOU REVIEWED THIS PRIOR TO DRAFTING EITHER

4    ONE OF YOUR REPORTS; IS THAT CORRECT?

5    A    I DID NOT.

6    Q    OKAY.  AND LET'S PULL UP THE 2008 -- I MEAN, THE 2007

7    REVIEW.  I'M SORRY.  IT'S 1233, DEFENDANTS' 1233.

8                    (DOCUMENT DISPLAYED.)

9    BY MR. MELLO

10   Q    DID YOU REVIEW THIS DOCUMENT BEFORE ARRIVING AT ANY OF YOUR

11   OPINIONS IN THIS CASE?

12   A    NO.

13   Q    OKAY.  AT THE TIME YOU WROTE YOUR STATEMENT IN PARAGRAPH 59

14   OF YOUR NOVEMBER 2007 REPORT THAT WAS JUST QUOTED EARLIER BY ME,

15   YOU WERE NOT AWARE OF THE ALLEGED 18 PREVENTABLE DEATHS

16   IDENTIFIED IN THE 2006 REPORT, WERE YOU?

17   A    NO.

18   Q    AND YOU WERE NOT AWARE IF NONE OF THOSE 18 PREVENTABLE

19   DEATHS WERE THE RESULT OF POOR RESPONSE TO EMERGENCY OR MAN-DOWN

20   SITUATIONS, WERE YOU?

21   A    NO.

22   Q    AND, IN FACT, AND I BELIEVE YOU'VE ALREADY TESTIFIED TO

23   THIS, YOU DID NOT BASE YOUR STATEMENT JUST QUOTED ON ANY DATA

24   ABOUT INCIDENTS IN CALIFORNIA'S PRISONS, DID YOU?

25   A    WELL, I SAW, OBVIOUSLY SAW A LOT OF THE INDIVIDUAL CASES

1  THAT WERE PRESENTED IN THE RECEIVER'S REPORTS THAT I HAD

2  REVIEWED PRIOR TO GIVING BOTH DEPOSITIONS.  SO I'M SURE THAT HAD

3  SOME IMPACT ON MY DECISION MAKING.

4  **Q**   BUT YOU'RE NOT AWARE OF THE FACT OF THOSE 18 DEATHS,

5  PREVENTABLE DEATHS OR ALLEGEDLY PREVENTABLE DEATHS IN 2006, THE

6  RECEIVER DID NOT REPORT THAT ANY OF THEM WERE THE RESULT OF POOR

7  RESPONSE TO EMERGENCY OR MAN-DOWN SITUATIONS?

8  **A**   NO, I DIDN'T REVIEW THAT REPORT.

9  **Q**   OKAY.  DO YOU KNOW THE STATE OF MEDICAL OR MENTAL HEALTHCARE

10 DELIVERY AT AVENAL STATE PRISON AS OF AUGUST 2008?

11 **A**   THAT'S A BROAD QUESTION.  CAN YOU -- THAT'S A BROAD

12 QUESTION.  CAN YOU CLARIFY IT A LITTLE BIT?

13 **Q**   WHEN WAS THE LAST TIME YOU WERE AT AVENAL STATE PRISON?

14 **A**   LATE OCTOBER, EARLY NOVEMBER OF 2007.

15 **Q**   HAVE YOU REVIEWED ANY DOCUMENTS RELATING TO AVENAL STATE

16 PRISON SINCE THAT TIME?

17 **A**   ONLY IN REGARDS TO WHAT HAS BEEN IN THE RECEIVER'S REPORTS

18 OR ANY EXPERT REPORTS I REVIEWED.

19 **Q**   AS YOU SIT HERE TODAY, CAN YOU TELL ME SPECIFICALLY ABOUT

20 THE QUALITY OF CARE AT AVENAL STATE PRISON AS OF AUGUST 2008?

21 **A**   THE QUALITY OF CARE, NO, THAT WAS NOT MY CHARGE.  I DIDN'T

22 LOOK AT QUALITY OF CARE ISSUES.

23 **Q**   WHEN I USE THE TERM "QUALITY OF CARE," I MEAN WHETHER

24 MEDICAL AND MENTAL HEALTHCARE ROSE TO CONSTITUTIONAL LEVELS.  IS

25 THAT YOUR UNDERSTANDING, TOO?

1    **A**    AGAIN, I'M NOT EXACTLY SURE WHAT YOU'RE SAYING, BUT I DIDN'T

2    LOOK AT QUALITY OF CARE ISSUES.

3    **Q**    OKAY.

4    **A**    I LOOKED AT IMPEDIMENTS TO DELIVERY OR ACCESS TO THE CARE

5    ONLY.

6    **Q**    AND YOU DON'T FEEL QUALIFIED TO TESTIFY ABOUT THE QUALITY OF

7    MEDICAL OR MENTAL HEALTHCARE, CORRECT?

8    **A**    WELL, ONLY AS A LAYMAN WHO HAS ACTUALLY SUPERVISED AS A

9    WARDEN MENTAL HEALTH IN A HOSPITAL AT MY INSTITUTION, AND AS THE

10   EXECUTIVE DIRECTOR OF AN AGENCY, I HAD TO OVERSEE CONSTITUTIONAL

11   LEVELS OF CARE IN BOTH OF THOSE AREAS.

12   **Q**    HAVE YOU BEEN -- WHEN WAS THE LAST TIME YOU WERE AT CIM OR

13   CALIFORNIA INSTITUTE OF MEN?

14   **A**    AT THAT SAME TIME PERIOD.

15   **Q**    DO YOU KNOW THE QUALITY OF MEDICAL OR MENTAL HEALTHCARE AT

16   CIM AS OF AUGUST 2008?

17   **A**    NO.  AGAIN, I DIDN'T LOOK AT QUALITY OF CARE ISSUES.

18   **Q**    OKAY.  DO YOU KNOW THE NUMBER OF CUSTODIAL STAFF AT AVENAL

19   STATE PRISON AS OF AUGUST 2008?

20   **A**    AUGUST 2008, NO, I DON'T.

21   **Q**    DID YOU KNOW THE NUMBER OF CUSTODIAL STAFF AS OF ANY TIME IN

22   2007 AT AVENAL STATE PRISON?

23   **A**    DID I KNOW?  YES, IT WAS IN MY NOTES.

24   **Q**    WAS IT REFLECTED IN YOUR REPORT?

25   **A**    I DON'T REMEMBER IF I PUT IT IN THE REPORT OR NOT.

1  Q    IF I REPRESENTED TO YOU THAT I DID NOT BELIEVE THOSE NUMBERS

2  WERE IN YOUR REPORT, WOULD YOU BE SURPRISED BY THAT?

3  A    I DON'T REMEMBER, SO I WOULD TAKE YOUR WORD FOR IT.  I DO

4  REMEMBER TAKING THE NOTES.

5  Q    I DON'T KNOW IF I'D DO THAT.

6  A    I DO REMEMBER SPECIFICALLY ASKING THE QUESTION AT EACH

7  INSTITUTION AND MAKING NOTATIONS IN MY HANDWRITTEN NOTES THAT I

8  KEPT.

9  Q    DO YOU KNOW THE NUMBER OF CORRECTIONAL OFFICERS AT VALLEY

10 STATE PRISON FOR WOMEN AS OF AUGUST 2008?

11 A    NO, I DON'T.

12 Q    OKAY.  DO YOU KNOW THE NUMBER OF MEDICAL AND MENTAL HEALTH

13 STAFF AT AVENAL OR ANY OF THE PRISONS YOU VISITED IN 2007 AS OF

14 AUGUST 2008?

15 A    NO, I DIDN'T LOOK AT MEDICAL OR CLINICAL STAFF AT ALL.

16 Q    OKAY.  AND, AGAIN, I'M GUESSING I KNOW THE ANSWER HERE, BUT

17 YOU DO NOT KNOW THE STATE OF MEDICAL OR MENTAL HEALTH DELIVERY

18 AT CALIFORNIA STATE PRISON SAN QUENTIN AS OF AUGUST 2008 EITHER,

19 DO YOU?

20 A    I THINK YOU ASKED THAT QUESTION DIFFERENTLY THAN YOU DID IN

21 THE PAST.  YOU USED THE WORD "DELIVERY" THAT TIME.

22 Q    I DID USE THE WORD "DELIVERY."  DO YOU KNOW THE STATUS OF

23 MEDICAL DELIVERY AT SAN QUENTIN AS OF AUGUST 2008?

24 A    AS OF ONLY WHAT I HAVE SEEN IN THE RECEIVER'S REPORTS.

25 Q    AND YOU DON'T KNOW THE STATUS OF MENTAL HEALTHCARE DELIVERY

1  AT SAN QUENTIN AS OF AUGUST 2008 EITHER, CORRECT?

2  **A**   AGAIN, IT WOULD BE WHAT I READ IN THE RECEIVER'S REPORTS.

3  **Q**   AND I ASSUME YOU DO NOT KNOW THE NUMBER OF CUSTODIAL STAFF

4  AT SAN QUENTIN AS OF AUGUST 2008, CORRECT?

5  **A**   NO, I DON'T.

6  **Q**   YOU TOURED FOLSOM PRISON IN JUNE 2008, CORRECT?

7  **A**   YES.

8  **Q**   SO IN 2008, YOU TOURED FOLSOM.  WHICH THREE OTHER PRISONS

9  DID YOU TOUR IN 2008?

10  **A**   SACRAMENTO, SOLANO, AND THE LAST ONE ESCAPES ME.

11  **Q**   THE LAST ONE DOES?

12  **A**   FOLSOM, SACRAMENTO, SOLANO.  OH, DVI.

13  **Q**   OKAY.  WHEN YOU TOURED FOLSOM IN JUNE 2008, NEITHER THE

14  MEDICAL STAFF NOR THE WARDEN TOLD YOU ANYTHING ABOUT THE STATUS

15  OF DELIVERY OF MEDICAL OR MENTAL HEALTHCARE AT FOLSOM, DID THEY?

16  **A**   NOT THAT I RECALL.

17  **Q**   OKAY.  DO YOU KNOW THE -- DID YOU KNOW THE NUMBER OF

18  CUSTODIAL STAFF AT FOLSOM PRISON AFTER JUNE 2008?

19  **A**   AFTER JUNE -- NO, I DON'T.

20  **Q**   HOW ABOUT IN JUNE 2008?

21  **A**   WHEN I DID MY TOUR, I ASKED THE QUESTION AND TOOK THE NOTES.

22  **Q**   AND DID YOU -- STRIKE THAT.

23           HOWEVER, YOUR REPORT DID NOT INDICATE THE NUMBER OF

24  CORRECTIONAL STAFF AT FOLSOM PRISON, CORRECT?

25  **A**   AGAIN, I DON'T RECALL.

1  **Q**   WHEN YOU TOURED CAL STATE PRISON SOLANO IN JUNE 2008,

2  NEITHER THE MEDICAL STAFF, NOR THE WARDEN TOLD YOU ANYTHING

3  ABOUT THE STATUS OF DELIVERY OF MEDICAL OR MENTAL HEALTHCARE AT

4  SOLANO, DID THEY?

5  **A**   I DIDN'T SEE THE WARDEN.

6  **Q**   DID ANYBODY -- DID THE MEDICAL OR MENTAL HEALTH STAFF TELL

7  YOU THE STATUS OF DELIVERY OF MEDICAL OR MENTAL HEALTHCARE AT

8  SOLANO DURING YOUR JUNE TOUR?

9  **A**   NO.

10 **Q**   AND, AGAIN, DID YOU KNOW THE NUMBER OF CORRECTIONAL STAFF AT

11 SOLANO IN JUNE 2008?

12 **A**   I DID ON THE DAY OF THE TOUR.

13 **Q**   HOWEVER, YOU DID NOT PLACE THOSE NUMBERS IN YOUR REPORT,

14 CORRECT?

15 **A**   I'LL TAKE YOUR WORD FOR IT.  IF YOU SAY THEY ARE NOT THERE,

16 THEY'RE NOT THERE.

17 **Q**   OKAY.  AND DO YOU KNOW THE NUMBER OF CORRECTIONAL STAFF

18 SINCE JUNE 2008 AT SOLANO?

19 **A**   NO, I DON'T.

20 **Q**   OKAY.  YOU TOURED DVI IN JUNE 2008?

21 **A**   I DID.

22 **Q**   AND YOU DID NOT LEARN OF ANY SPECIFIC DELAYS IN THE DELIVERY

23 OF MEDICAL OR MENTAL HEALTHCARE WHEN YOU TOURED THAT FACILITY,

24 CORRECT?

25 **A**   NO, THAT'S NOT TRUE.

1  **Q**    OKAY.  WHAT WERE YOU TOLD, OR WHAT DID YOU LEARN?

2  **A**    OKAY.  BY BOTH OFFENDERS AND STAFF, IT'S A RECEPTION CENTER,

3  AND THERE WERE A LARGE BODY OF OFFENDERS WAITING TO GET THROUGH

4  THE RECEPTION AND DIAGNOSTIC PROCESS.  AND IN TALKING WITH BOTH

5  THE RECEPTION OFFENDERS AND THE NON-RECEPTION OFFENDERS THAT

6  WERE PERMANENTLY ASSIGNED THERE, ONE, I LEARNED FROM THE

7  RECEPTION OFFENDERS THAT THEY WERE -- THE PROCESS WAS DRAGGING

8  OUT VERY LONG, AND THAT THEY WERE ANXIOUS TO BE CLASSIFIED AND

9  MOVE ALONG TO THEIR PERMANENT LEVEL OF ASSIGNMENT.

10           AND, SECONDLY, FROM THE PERMANENT OFFENDERS THERE,

11  PERMANENTLY ASSIGNED OFFENDERS THERE, THEY WERE FRUSTRATED

12  BECAUSE THEY COULDN'T GET IN FOR THEIR MEDICAL APPOINTMENT

13  BECAUSE ALL THE PROCESSING WAS TAKING PLACE AND THERE WAS NOT

14  TIME FOR THEM TO RECEIVE THEIR REGULAR APPOINTMENTS.

15  **Q**    DID ANY OF THOSE INDIVIDUALS TELL YOU HOW LONG THE DELAYS

16  WERE?

17  **A**    THEY DID, AND THE ANSWERS VARIED FROM WEEKS TO MONTHS.

18  **Q**    OKAY.  DID ANY OF THE INDIVIDUALS THAT YOU SPOKE TO WHO

19  SPOKE OF DELAYS IN ACCESS TO MEDICAL OR MENTAL HEALTHCARE TELL

20  YOU THAT THEY SUFFERED AN ADVERSE MEDICAL CONSEQUENCE AS A

21  RESULT OF THOSE DELAYS?

22  **A**    NO, BUT I DIDN'T ASK THAT QUESTION.

23  **Q**    AND NOBODY OFFERED THAT TO YOU EITHER?

24  **A**    NO.

25  **Q**    DO YOU KNOW THE NUMBER OF CUSTODIAL STAFF AT DVI SINCE YOU

1   LAST VISITED THERE?

2   **A**   NO, I DO NOT.

3   **Q**   SO YOU DON'T KNOW IT AS OF THE END OF AUGUST 2008, CORRECT?

4   **A**   NO.

5   **Q**   THAT'S CORRECT?

6   **A**   THAT'S CORRECT.

7   **Q**   YOU TOURED CAL STATE OR CAL –– THE PRISON AT SACRAMENTO,

8   CORRECT?

9   **A**   YES.

10   **Q**   IN JUNE 2008?

11   **A**   YES.

12   **Q**   AND NEITHER THE MEDICAL STAFF NOR THE WARDEN TOLD YOU

13   ANYTHING ABOUT THE STATUS OF DELIVERY OF MEDICAL OR MENTAL

14   HEALTHCARE AT SAC, DID THEY?

15   **A**   NO.

16   **Q**   THAT'S CORRECT?

17   **A**   THAT IS CORRECT.

18   **Q**   WHEN YOU TOURED SAC IN JUNE 2008, WAS IT OVERCROWDED, IN

19   YOUR OPINION?

20   **A**   YES.

21   **Q**   WHEN YOU TOURED –– WHEN YOU TOURED SAC IN JUNE 2008, YOU

22   CONCLUDED THAT THE CORRECTIONAL TREATMENT CENTER AT THE PRISON

23   WAS IN EXCELLENT CONDITION, DIDN'T YOU?

24   **A**   SANITATION–WISE, YES.

25   **Q**   WHAT DO YOU MEAN BY THAT?

1  **A**   IT MEANS THAT IT WAS MORE SANITARY THAN THE OTHER AREAS THAT

2  I HAD VISITED IN THAT PARTICULAR FACILITY AND ALL THE OTHER

3  FACILITIES THAT I HAD BEEN IN.  THAT'S THE REASON I MADE A NOTE

4  OF IT, BECAUSE IT STOOD OUT.

5  **Q**   WAS THAT FACILITY OVERCROWDED?

6  **A**   YES.

7  **Q**   I HATE TO BE REPETITIVE, BUT YOU HAVE NO IDEA WHAT THE

8  NUMBERS OF CORRECTIONAL STAFF IN AUGUST 2008 WERE AT SAC?

9  **A**   NO.

10 **Q**   THAT'S RIGHT?

11 **A**   NO, I DON'T KNOW.

12 **Q**   IN FORMING YOUR OPINION REGARDING THE EFFECTS OF

13 OVERCROWDING IN MEDICAL AND MENTAL HEALTHCARE, YOU SPOKE WITH

14 PRISON STAFF, CORRECT?

15 **A**   YES.

16 **Q**   DID YOU TAKE ANY -- OR STRIKE THAT.

17        YOU DID NOT TAKE ANY SPECIFIC ACTION AFTER SPEAKING

18 WITH STAFF TO CONFIRM THE ACCURACY OF THEIR PARTICULAR

19 STATEMENTS, DID YOU?

20 **A**   IN REGARDS TO WHAT?

21 **Q**   IN REGARDS TO THE INFORMATION THAT THEY CONVEYED TO YOU

22 WHICH FORM THE BASIS OF YOUR OPINIONS IN THIS CASE?

23 **A**   NO, I COMPARED THEIR ANSWERS WITH OTHER ANSWERS THAT STAFF

24 HAD GIVEN ME.  THEY WERE ALL VERY CONSISTENT.

25 **Q**   IN FORMING YOUR OPINION REGARDING THE EFFECTS ON MEDICAL AND

1  MENTAL HEALTHCARE, YOU SPOKE WITH INMATES?

2  **A**   YES.

3  **Q**   DID YOU TAKE ANY ACTION TO CONFIRM THE ACCURACY OF THEIR

4  PARTICULAR STATEMENTS IN ARRIVING AT YOUR OPINIONS IN THIS CASE?

5  **A**   AGAIN, THE SAME RESPONSE.  IN TALKING TO A NUMBER OF THE

6  OFFENDERS, THEIR RESPONSES WERE VERY CONSISTENT.  I HAD NO

7  REASON TO DISBELIEVE.

8  **Q**   AND DID YOU FEEL LIKE BOTH STAFF AND INMATES WERE FORTHRIGHT

9  WHEN THEY SPOKE TO YOU?

10  **A**   I DID.

11  **Q**   YOU THOUGHT THEY WERE TELLING YOU THE TRUTH?

12  **A**   YES.

13  **Q**   I'M NOW GOING TO TAKE YOU TO PARAGRAPH FOUR OF YOUR

14  AUGUST 2008 REPORT, AND THAT SHOULD POP UP ON THE SCREEN.

15          IN THAT PARAGRAPH, YOU OPINE THAT THE USE OF

16  INAPPROPRIATE PLACES FOR HOUSING PRISONERS, QUOTE, "HAS REDUCED

17  THE AVAILABILITY OF PROGRAM AND RECREATION SPACE," END QUOTE,

18  RESULTING IN -- AND LATER YOU USE THE TERM "CHRONIC ILLNESS."

19  DO YOU SEE THAT?  "CHRONIC IDLENESS."  PARDON ME.

20  **A**   YES.

21  **Q**   YOU DON'T KNOW OF EVEN ONE INSTANCE WHERE AN INMATE BECAME

22  ILL DUE TO THE REDUCED AVAILABILITY OF PROGRAMMING OR RECREATION

23  SPACE, DO YOU?

24  **A**   NO, I -- AGAIN, I DIDN'T LOOK AT INDIVIDUAL CASES.  I LEFT

25  THAT UP TO THE MEDICAL EXPERTS AND THE RECEIVER TO REPORT ON

1    THAT.  I ONLY LOOKED AT IMPEDIMENTS TO THE DELIVERY OF CARE.

2    **Q**    SO THE ANSWER IS YOU ARE NOT AWARE OF ONE INMATE WHO

3    SUFFERED AN ADVERSE CONSEQUENCE, CORRECT?

4    **A**    I THINK I ANSWERED THAT I DID NOT.

5    **Q**    OKAY.  YOU DO NOT EVEN KNOW OF ONE INSTANCE WHERE AN INMATE

6    BECAME ILL DUE TO CHRONIC IDLENESS, DO YOU?

7    **A**    NO.

8    **Q**    YOU DO NOT KNOW OF EVEN ONE INSTANCE WHERE AN INMATE WAS

9    DENIED NEEDED MEDICAL CARE DUE TO A REDUCED AVAILABILITY OF

10   PROGRAMMING OR RECREATION SPACE, DO YOU?

11   **A**    NO.

12   **Q**    YOU DO NOT KNOW OF EVEN ONE INSTANCE WHERE AN INMATE WAS

13   DENIED MEDICAL CARE DUE TO CHRONIC IDLENESS, DO YOU?

14   **A**    NO.

15            **JUDGE HENDERSON:**  EXCUSE ME, MR. MELLO.  I JUST

16   RECEIVED A NOTE THAT OUR REPORTER'S FINGERS ARE GETTING TIRED.

17   LET'S FIND A CONVENIENT PLACE TO TAKE A 15-MINUTE RECESS.

18            **MR. MELLO:**  SURE.  COUPLE MORE QUESTIONS.

19   BY MR. MELLO

20   **Q**    ON PAGE 3, PARAGRAPH 5 OF YOUR AUGUST 2008 REPORT, YOU

21   OPINED THAT, QUOTE, "IT IS INHUMANE TO WAREHOUSE PRISONERS TWO

22   TO A CELL UNDER SUCH CONDITIONS," END QUOTE; DO YOU SEE THAT?

23   **A**    YES.

24   **Q**    YOU DO NOT KNOW OF EVEN ONE INSTANCE WHERE AN INMATE BECAME

25   SICK DUE TO DOUBLE CELLING, DO YOU?

1  **A**   NO.

2  **Q**   YOU DO NOT KNOW OF EVEN ONE INSTANCE WHERE AN INMATE WAS

3  DENIED MEDICAL CARE DUE TO DOUBLE CELLING, DO YOU?

4  **A**   NO.  FROM PERSONAL KNOWLEDGE, NO.

5          **MR. MELLO:**  WE CAN BREAK.

6          **JUDGE HENDERSON:**  OKAY.  COURT IS ADJOURNED FOR 15

7  MINUTES.

8                  (RECESS TAKEN.)

9          **THE CLERK:**  PLEASE COME TO ORDER. COURT IS IN

10  SESSION.

11          PLEASE BE SEATED.

12          **JUDGE HENDERSON:**  OKAY.  YOU MAY RESUME WHEN YOU'RE

13  READY, COUNSEL.

14          **MR. MELLO:**  THANK YOU.

15  **BY MR. MELLO:**

16  **Q.**  MR. SCOTT, I'M GOING TO ASK YOU QUESTIONS ABOUT PARAGRAPH

17  SEVEN OF YOUR AUGUST, 2008 REPORT.

18          IN THAT REPORT AT PARAGRAPH SEVEN YOU OPINE THAT

19  FOLSOM'S BUILDING FIVE HAD SOLID METAL DOORS, DOOR CELLS MAKING,

20  QUOTE:

21          "DIRECT SUPERVISION EXTREMELY DIFFICULT," END

22  QUOTE AND MAKING STAFF, QUOTE:

23          "EVEN LESS LIKELY TO BE ABLE TO RESPOND

24          APPROPRIATELY TO MEDICAL AND MENTAL HEALTHCARE

25          EMERGENCIES," END QUOTE.

1           DO YOU SEE THAT?

2  **A.**  YES, I DO.

3  **Q.**  MR. SCOTT, YOU DO NOT KNOW OF EVEN A SINGLE INSTANCE IN ANY

4  CALIFORNIA PRISONS WHERE AN INMATE BECAME SICK OR WAS DENIED

5  NEEDED CARE OF ANY KIND DUE TO THE EXISTENCE OF SOLID METAL

6  DOORS THAT YOU DESCRIBED, DO YOU?

7  **A.**  NOT FROM PERSONAL KNOWLEDGE.  ONLY FROM BASED ON MY

8  EXPERIENCE I KNOW THESE THINGS ARE LIKELY TO HAPPEN.

9  **Q.**  OKAY.  BUT YOU DON'T KNOW OF IT HAPPENING IN CALIFORNIA,

10  CORRECT?

11  **A.**  I DON'T KNOW THAT IT HAPPENED HERE.

12  **Q.**  OKAY.

13           PARAGRAPH EIGHT OF THAT SAME REPORT YOU OPINE THAT

14  FOLSOM'S BUILDING FIVE HAD SOLID METAL DOOR CELLS ON THE FIRST

15  TIERS THAT WERE ALSO INDIVIDUALLY KEYED MAKING A QUICK EXIT IN

16  AN EMERGENCY EXTREMELY DIFFICULT AND ESCORTS MORE TIME-CONSUMING

17  AND STAFF-INTENSIVE.

18           DO YOU SEE THAT?

19  **A.**  YES.

20  **Q.**  OKAY. YOU DO NOT KNOW OF EVEN A SINGLE INSTANCE IN ANY

21  CALIFORNIA PRISON WHERE AN INMATE WAS INJURED OR BECAME SICK OR

22  WAS DENIED NEEDED MEDICAL CARE OR MENTAL HEALTHCARE DUE TO THE

23  FACT THAT CELL DOORS WERE INDIVIDUALLY KEYED, DO YOU?

24  **A.**  NO.  AGAIN, BASED ON MY EXPERIENCE I MADE THIS OPINION. I

25  HAVE SEEN IT IN THE PAST, AND I FULLY EXPECT IT HAS HAPPENED

1  HERE.  I JUST DON'T HAVE PERSONAL KNOWLEDGE OF IT.

2  Q.  AND THAT'S YOUR EXPERIENCE IN TEXAS AND OTHER JURISDICTIONS,

3  CORRECT?

4  A.  THAT'S CORRECT.

5  Q.  AND THAT'S NOT YOUR EXPERIENCE HERE IN CALIFORNIA, CORRECT?

6  A.  NO.  I HAVEN'T SEEN IT IN CALIFORNIA IN THIS PARTICULAR

7  AREA, NO.

8  Q.  ALL RIGHT.  OKAY. SAME REPORT, PARAGRAPH SIX.

9          **JUDGE HENDERSON:**  I'M WONDERING, COUNSEL -- I DON'T

10  WANT TO DO YOUR CROSS FOR YOU -- BUT I'M WONDERING IF THERE

11  ISN'T SOME INCLUSIVE QUESTION INSTEAD OF STEP-BY-STEP. MAYBE HE

12  DOESN'T KNOW ANY INMATE WHOSE HAD ANYTHING HAPPEN TO THEM --

13          **MR. MELLO:**  RIGHT.

14          **JUDGE HENDERSON:**  -- WHICH WOULD SAVE US ALL OF THESE

15  BABY STEPS.

16          **MR. MELLO:**  OKAY.  I CAN TRY.  BUT I THINK WE'RE

17  GETTING CLOSE, FRANKLY, YOUR HONOR. I DON'T HAVE MUCH MORE.

18  **BY MR. MELLO:**

19  Q.  PARAGRAPH SIX OF YOUR REPORT YOU REPORTED THAT YOU BELIEVED

20  THAT ADMINISTRATIVE SEGREGATION PRISONERS AT SOLANO DO NOT

21  RECEIVE, QUOTE:

22              "THE REQUIRED 10 HOURS PER WEEK OF RECREATION

23              BECAUSE THERE'S SIMPLY NOT ENOUGH SPACE AVAILABLE TO

24              PROVIDE THEM ACCESS TO SAFE EXERCISE."

25              DO YOU SEE THAT?

1   A.   YES.

2   Q.   AND MUCH TO THE CHAGRIN OF JUDGE HENDERSON, YOU DO NOT KNOW

3   OF EVEN A SINGLE INSTANCE IN ANY CALIFORNIA PRISON WHERE AN

4   INMATE BECAME SICK OR WAS DENIED MEDICAL OR MENTAL HEALTHCARE

5   DUE TO A LACK OF SPACE TO PROVIDE EXERCISE; IS THAT CORRECT?

6   A.   NO.

7   Q.   THAT'S CORRECT?

8   A.   YES, THAT'S CORRECT.

9   Q.   PARAGRAPH NINE OF YOUR REPORT ON PAGE FOUR, THE SAME AUGUST

10  REPORT, YOU STATED THAT:

11               "A CONVERTED GYMNASIUM IN SOLANO, H BUILDING

12          CONTAINED 225 TRIPLE-BUNKS, A WALL OF SOUND AND

13          BODIES AND NOISE," END QUOTE.

14          DO YOU SEE THAT?

15  A.   YES.

16          MR. MELLO:   SORRY, YOUR HONOR.

17  BY MR. MELLO:

18  Q.   DO YOU KNOW OF EVEN A SINGLE INSTANCE IN ANY CALIFORNIA

19  PRISON WHERE AN INMATE BECAME SICK OR WAS DENIED NEEDED MEDICAL

20  OR MENTAL HEALTHCARE DUE TO TRIPLE-BUNKING?

21  A.   NO.   AGAIN, THAT OPINION IS BASED ON MY PAST EXPERIENCE.

22  Q.   IN OTHER JURISDICTIONS?

23  A.   CORRECT.

24  Q.   IN PARAGRAPH 10 OF YOUR AUGUST REPORT YOU DESCRIBE DVI AS

25  EXTREMELY OVERCROWDED, CORRECT?

1  **A.**  YES.

2  **Q.**  DO YOU KNOW OF ANY INMATE AT DVI WHO SUFFERED AN ADVERSE

3  MEDICAL OR MENTAL HEALTH CONSEQUENCE AS A RESULT OF THE

4  OVERCROWDING YOU DESCRIBED AS "EXTRAORDINARY"?

5  **A.**  WELL, I DID -- IN MY EARLIER TESTIMONY I TALKED ABOUT

6  INMATES NOT COMPLAINING ABOUT NOT GETTING IN TO SEE THE DOCTORS

7  AND TO COMPLETE THE PROCESSING, AND ALSO THE

8  PERMANENTLY-ASSIGNED OFFENDERS NOT BEING ABLE TO KEEP THEIR

9  MEDICAL APPOINTMENTS BECAUSE THE PROCESSING INMATES WERE TAKING

10 ALL THE LICENSED CLINICIANS' TIME.

11          I WOULD ASSUME THAT THERE WAS SOME NEGATIVE IMPACTS

12 FROM THAT, BUT I DON'T HAVE PERSONAL KNOWLEDGE OF ANY ONE

13 INMATE.

14 **Q.**  OKAY. SO YOU ASSUME IT, BUT YOU DON'T KNOW IT?

15 **A.**  I THINK THAT'S WHAT I SAID.

16 **Q.**  AND I BELIEVE YOU TESTIFIED ABOUT THIS SUBJECT ON YOUR

17 DIRECT, BUT IN PARAGRAPH 12 OF YOUR AUGUST REPORT, YOU OPINE

18 THAT THESE OVERCROWDED CONDITIONS BREED FEAR, ANONYMITY AND

19 MISTRUST ON THE PART OF CUSTODY STAFF WHICH LEAD TO AN INCREASED

20 RISK OF INAPPROPRIATE RESPONSES BY SUCH STAFF TO MEDICAL AND

21 MENTAL HEALTHCARE NEEDS, ESPECIALLY IN EMERGENCIES.

22          DO YOU SEE THAT?

23 **A.**  YES, I DO.

24 **Q.**  AND, AGAIN, YOU DO NOT KNOW OF EVEN A SINGLE SPECIFIC

25 INSTANCE WHERE AN INMATE WAS DENIED NEEDED MEDICAL CARE BECAUSE

1  OF FEAR OF ANONYMITY OR MISTRUST BY CUSTODY STAFF, DO YOU?

2  **A.**  NOT IN CALIFORNIA.  I SAW A GREAT DEAL OF THIS IN TEXAS WHEN

3  WE WERE VERY OVERCROWDED SUCH AS CALIFORNIA IS NOW.

4  **Q.**  WHEN YOU FORMED YOUR OPINIONS YOU DID NOT KNOW THE INMATE TO

5  MENTAL HEALTHCARE CLINICAL STAFF RATIO IN CDCR'S PRISONS, DID

6  YOU?

7  **A.**  I DID NOT LOOK AT THAT.

8  **Q.**  AND WHEN YOU FORMED YOUR OPINIONS YOU DID NOT KNOW THE

9  STAFFING LEVELS FOR PHYSICIANS IN CALIFORNIA'S PRISONS, DID YOU?

10  **A.**  NO, I HAVEN'T LOOKED AT THAT.

11  **Q.**  AND WHEN YOU FORMED YOUR OPINIONS IN THIS CASE, YOU DID NOT

12  KNOW THE STAFFING LEVELS FOR REGISTERED NURSES AT CALIFORNIA'S

13  PRISONS, EITHER, CORRECT?

14  **A.**  NO.  I MEAN, I CAN TELL YOU BASED ON MY EXPERIENCE AS AN

15  EXECUTIVE DIRECTOR THAT RAN AN AGENCY ALMOST AS LARGE AS

16  CALIFORNIA I HAD THE RESPONSIBILITY OF MAKING SURE THAT

17  CONSTITUTIONAL LEVELS OF MENTAL HEALTH AND MEDICAL CARE WERE

18  GIVEN, AND I KEPT -- I UNDERSTAND THAT IT TAKES CLINICIANS AND

19  IT TAKES NURSES AND IT TAKES PHYSICIANS TO DO THAT.

20         SO IN THAT REGARD I THINK I CAN MAKE SOMEWHAT OF AN

21  OPINION.

22  **Q.**  OKAY.

23         **MR. MELLO:**  AND I'D MOVE TO STRIKE THAT AS

24  NONRESPONSIVE.

25

 1  **BY MR. MELLO:**

 2  **Q.**  MY QUESTION IS MUCH MORE BASIC THAN THAT. WHEN YOU FORMED

 3  YOUR OPINIONS, YOU DID NOT KNOW THE STAFFING LEVEL FOR

 4  REGISTERED NURSES AT CALIFORNIA'S PRISONS, DID YOU?

 5  **A.**  NO, DIDN'T LOOK AT IT.

 6  **Q.**  WHEN YOU FORMED YOUR OPINIONS IN THIS CASE, YOU DID NOT KNOW

 7  THE STAFFING LEVELS FOR LICENSED VOCATIONAL NURSES AT

 8  CALIFORNIA'S PRISONS, EITHER, CORRECT?

 9  **A.**  NO, I ONLY LOOKED AT CUSTODY ISSUES AND IMPEDIMENTS IN

10  REGARDS TO OPERATIONAL CUSTODY ISSUES. I DID NOT LOOK AT

11  CLINICAL STAFFING LEVELS WHATSOEVER.

12  **Q.**  OKAY.  OR RATIOS?

13  **A.**  OR RATIOS.

14  **Q.**  IN FACT, MR. SCOTT, THERE ARE MANY OTHER FACTORS THAT IMPACT

15  THE ABILITY OR INABILITY TO DELIVER MEDICAL AND MENTAL

16  HEALTHCARE TO CALIFORNIA'S INMATES BEYOND THE NUMBER OF

17  CUSTODIAL STAFF TO PROVIDE ESCORTS OR TAKE INMATES TO OFF-SITES

18  APPOINTMENTS, CORRECT?

19  **A.**  THERE ARE A NUMBER OF FACTORS INVOLVED, YES.

20  **Q.**  IN FORMING YOUR OPINION THAT OVERCROWDING WAS THE PRIMARY

21  CAUSE OF MEDICAL AND MENTAL HEALTHCARE CONSTITUTIONAL VIOLATIONS

22  IN CALIFORNIA'S PRISONS, YOU ONLY LOOKED AT THE ROLE OF

23  CORRECTIONAL STAFF IN FACILITATING MEDICAL AND MENTAL

24  HEALTHCARE, CORRECT?

25  **A.**  I LOOKED AT, AGAIN, THE IMPEDIMENTS TO THE DELIVERY OF

1  ADEQUATE MEDICAL AND MENTAL HEALTHCARE PRESENTED BY ANY SYSTEMS

2  FAILURES IN THE OPERATIONS AREA.

3  **Q.**  AND BY THAT, YOU MEANT CORRECTIONAL STAFF, CORRECT?

4  **A.**  YES.

5  **Q.**  YOU HAVE NOT DONE ANY FORMAL ANALYSIS OF CUSTODIAL STAFFING

6  NEEDS FOR MEDICAL ESCORTS AND MENTAL HEALTHCARE ESCORTS ON AND

7  OFF-SITE TRANSFERS AND THE LIKE FOR CALIFORNIA'S PRISONS, HAVE

8  YOU?

9  **A.**  NO, OTHER THAN WHAT I EYEBALLED ON MY TOURS.

10 **Q.**  OKAY.  OTHER THAN WHAT YOU EYEBALLED ON THE FOUR TOURS IN

11 2007 AND THE FOUR TOURS IN 2008?

12 **A.**  YES.

13 **Q.**  BUT NO FORMAL ACTUAL ANALYSIS OF ALL 33 INSTITUTIONS AND

14 ACCESS TO CARE AND USE OF CORRECTIONAL OFFICERS TO ACCESS CARE,

15 CORRECT?

16 **A.**  I DID NOT DO THAT.

17 **Q.**  AT THE TIME YOU FORMED YOUR OPINIONS, YOU WERE NOT AWARE OF

18 THE STAFFING VACANCY PERCENTAGE OF CORRECTIONAL OFFICERS IN

19 CDCR, WERE YOU?

20 **A.**  I WAS TO AN EXTENT. I READ SCOTT KERNAN'S DECLARATION. I

21 BELIEVE HE QUOTED THAT THEY WERE 4,000 SHORT WHENEVER HE GAVE

22 HIS DECLARATION.  I BELIEVE IT MAY HAVE BEEN MID-2007.

23 **Q.**  AND YOU DON'T KNOW WHAT THOSE VACANCY RATES ARE TODAY, DO

24 YOU?

25 **A.**  NO, I HAVEN'T SEEN ANY RECENT STATISTICS.

1   Q.  AND YOU HAVE NO IDEA HOW MANY OF THOSE VACANCIES ARE FILLED

2   BY WAY OF OVERTIME, CORRECT?

3   A.  NO, I DO NOT.

4           JUDGE KARLTON:  SIR, IN YOUR VIEW, IS OVERTIME USE OF

5   CORRECTIONAL OFFICERS A PROPER SUBSTITUTION FOR INADEQUATE

6   STAFFING?

7           THE WITNESS:  TO A DEGREE. AND LET ME EXPLAIN THAT.

8   IF YOU USE A LOT OF OVERTIME IN A VERY STRESSFUL SITUATION,

9   STAFF GETS WORN DOWN VERY, VERY QUICKLY, AND THEY BECOME

10  INEFFECTIVE.

11          IF YOU USE IT VERY SPARINGLY, THEN YOU CAN PROBABLY

12  DO THAT.

13          MR. MELLO:  MAY I?

14          JUDGE KARLTON:  YES.

15  BY MR. MELLO:

16  Q.  AND YOU HAVE NO KNOWLEDGE AS TO THE LEVEL AND AMOUNT OF USE

17  OF OVERTIME WITH RESPECT TO CORRECTIONAL OFFICERS IN

18  CALIFORNIA'S PRISONS AS OF AUGUST, 2008, CORRECT?

19  A.  NO, I HAVEN'T SEEN THOSE STATS.

20  Q.  AT THE TIME YOU DID YOUR REPORTS --

21          MR. MELLO:  STRIKE THAT.

22  BY MR. MELLO:

23  Q.  IN YOUR OPINION, THE LACK OF THE APPROPRIATE NUMBER OF

24  CUSTODIAL STAFF IS NOT THE SINGLE MOST IMPORTANT FACTOR, BUT

25  ONLY ONE OF THE FACTORS INVOLVED IN ADEQUATE MEDICAL AND MENTAL

1  HEALTHCARE DELIVERY, CORRECT?

2  **A.**  LET ME SEE IF I UNDERSTAND. DID YOU SAY -- IT WAS GARBLED.

3         DID YOU SAY THAT THE LACK OF CUSTODY STAFF WAS ONLY

4  ONE FACTOR?

5  **Q.**  YES.

6  **A.**  YES, I WOULD AGREE WITH THAT.

7  **Q.**  AND IT'S NOT THE SINGLE MOST IMPORTANT FACTOR, IS IT?

8  **A.**  NO, OVERCROWDING IS THE SINGLE MOST IMPORTANT FACTOR.

9  **Q.**  MORE IMPORTANT THAN DOCTORS?

10  **A.**  CAN'T REALLY DO ANYTHING UNTIL YOU GET YOUR OVERCROWDING

11  DOWN. THAT'S MY OPINION.

12  **Q.**  AND THAT'S BASED UPON YOUR EXPERIENCE IN TEXAS?

13  **A.**  YES.

14  **Q.**  AND THAT'S BASED UPON YOUR REVIEW OF OR VISITS TO 8 OF THE

15  33 PRISONS IN CALIFORNIA?

16  **A.**  YES, AND MY REVIEW OF THE RECEIVER'S REPORT, THE SPECIAL

17  MASTER'S REPORTS, THE OTHER EXPERTS' REPORTS.

18  **Q.**  AND YOUR DISCUSSIONS WITH PLAINTIFFS' COUNSEL?

19  **A.**  I DON'T KNOW THAT THEY HAVE OPINED ON THAT TO ME OR ASKED ME

20  TO ADOPT THEIR OPINION.

21  **Q.**  AND YOU TESTIFIED BRIEFLY ABOUT YOUR EXPERIENCE GETTING OUT

22  FROM UNDER THE COURT ORDERS IN TEXAS.

23  **A.**  YES.

24  **Q.**  AND THAT INVOLVED BUILDING NEW PRISONS, CORRECT?

25  **A.**  YES.

1          **MR. MELLO:**  I HAVE NO FURTHER CROSS AT THIS TIME.

2          I'LL RESERVE THE REST OF MY CROSS, IF THERE IS ANY

3  REDIRECT.

4          **JUDGE HENDERSON:**  OKAY.  THANK YOU, COUNSEL.

5          **MR. MELLO:**  THANK YOU.

6          **JUDGE HENDERSON:**  DEFENDANT INTERVENOR CROSS?

7          **MR. KAUFHOLD:**  STEVE KAUFHOLD FOR THE LEGISLATIVE

8  INTERVENORS. THE INTERVENORS DO NOT HAVE ANY QUESTIONS FOR MR.

9  SCOTT.

10         **JUDGE HENDERSON:**  THANK YOU, COUNSEL.

11         REDIRECT.

12         **MS. NORMAN:**  THANK YOU.

13         SARA NORMAN FROM THE PRISON LAW OFFICE.

14                    **REDIRECT EXAMINATION**

15  BY MS. NORMAN:

16  **Q.**  MR. SCOTT, ARE THE OPINIONS THAT YOU EXPRESSED IN YOUR

17  REPORTS YOUR OWN?

18  **A.**  THEY ARE MINE AND ONLY MINE.

19  **Q.**  WERE THE REPORTS PREPARED UNDER YOUR DIRECTION?

20  **A.**  YES, THEY WERE.

21  **Q.**  DID YOU REVIEW EVERY WORD OF YOUR TWO REPORTS AND MAKE ALL

22  EDITS TO ENSURE THAT THEY ACCURATELY REFLECTED YOUR OPINIONS

23  BEFORE SIGNING THEM?

24  **A.**  ALL THE WAY DOWN TO THE GRAMMATICAL REMARKS.

25  **Q.**  AND WERE THOSE REPORTS PREPARED BASED UPON YOUR DICTATION,

1  ESSENTIALLY?

2  **A.**  YES, THE FIRST REPORT I DICTATED MY OBSERVATIONS AND

3  OPINIONS TO THE LEAD ATTORNEY.  AND THE SECOND REPORT I HAD A

4  TELEPHONE CONVERSATION WITH YOU AFTER I GOT BACK FROM THE TOURS

5  AND GAVE YOU MY THOUGHTS AND OPINIONS.

6  **Q.**  DID YOU SIGN YOUR TOUR REPORTS?

7  **A.**  I'M SORRY?

8  **Q.**  DID YOU SIGN YOUR TOUR REPORTS?

9  **A.**  YES.

10  **Q.**  OKAY. MR. MELLO ASKED YOU A LITTLE BIT ABOUT YOUR WORK IN

11  FLORIDA WHERE YOU LOOKED AT SEVERAL INSTITUTIONS AND SPENT TWO

12  DAYS AT EACH PRISON.

13  **A.**  THAT'S CORRECT.

14  **Q.**  WHY DID YOU SPEND LONGER IN THE FLORIDA PRISONS THAN YOU

15  SPENT IN THE CALIFORNIA PRISONS?

16  **A.**  BECAUSE I DID A FAR MORE COMPREHENSIVE REVIEW THERE THAN

17  WHAT I DID HERE.  I ALSO HAD TWO OTHER PEOPLE WITH ME, SO THERE

18  WERE ACTUALLY THREE PEOPLE SPENDING TWO DAYS THERE.  WE LOOKED

19  AT EVERY OPTIONAL ASPECT OF THEIR SYSTEM AND MADE

20  RECOMMENDATIONS FOR IMPROVEMENTS TO THE DIRECTOR OF THE AGENCY.

21  **Q.**  AND YOU BASED YOUR OPINIONS RENDERED IN THIS CASE ON

22  OBSERVATIONS AND INFORMATION LEARNED ON YOUR PRISON TOURS, BUT

23  ALSO ON OTHER SOURCES, DIDN'T YOU?

24  **A.**  YES.

25  **Q.**  I THINK YOU'VE REFERENCED SEVERAL OF THEM:  MANY, MANY

1  REPORTS FROM THE RECEIVER AND THE SPECIAL MASTER IN THESE CASES?

2  **A.** YES, THE GOVERNOR'S PROCLAMATION, SCOTT KERNAN'S

3  DECLARATION, THE OTHER EXPERTS' REPORTS.

4  **Q.** YOU'VE REVIEWED REPORTS FROM THE LEGISLATURE, HAVEN'T YOU?

5  **A.** OH, THAT'S TRUE. I DID THAT ALSO, YES.

6  **Q.** AND THE DEUKMEJIAN COMMISSION?

7  **A.** YES, THE HOOVER GROUP.

8  **Q.** THE LITTLE HOOVER?

9  **A.** YES.  I'M NOT SURE WHAT THE EXACT TITLE OF THAT GROUP IS.

10 **Q.** AND YOU LISTED ALL OF THE DIFFERENT SOURCES THAT YOU

11 REVIEWED IN RENDERING YOUR OPINION IN YOUR TWO REPORTS, RIGHT?

12 **A.** YES.  YES, I DID.

13 **Q.** MR. MELLO ASKED YOU ABOUT STAFFING, CUSTODIAL STAFFING. WHAT

14 DID YOU FIND ON YOUR OCTOBER, 2007 TOURS WITH REGARDS TO

15 CUSTODIAL STAFFING?

16 **A.** THAT THEY WERE VASTLY UNDERSTAFFED EVERYWHERE I WENT.

17 **Q.** AND WHAT -- COULD YOU DESCRIBE HOW YOU CAME TO THAT OPINION

18 --

19 **A.** YES.

20 **Q.** -- WHAT YOU SAW?

21 **A.** WELL, FOR ONE THING I HAVE A LOT OF EXPERIENCE IN THIS AREA

22 GOING THROUGH ALL THE JURISDICTIONS THAT I'VE GONE THROUGH

23 PREPARING STAFFING ANALYSES.  IT'S REALLY SECOND NATURE TO ME AT

24 THIS POINT.  AND I DID A VERY COMPREHENSIVE STAFFING REVIEW OF

25 THE STATE OF TEXAS, ALSO, WHICH IS WHERE I FIRST BECAME VERY

1  KNOWLEDGEABLE ABOUT STAFFING.

2          EVEN WHEN THEY SAY THAT THEY ARE FULLY STAFFED, IN MY

3  OPINION THEY ARE NOT. THEY DON'T HAVE ENOUGH STAFF FOR THE

4  OVERCROWDED CELL BLOCKS AND DORMITORIES AND GYMNASIUMS AND

5  PROGRAM SPACE AND DAY ROOMS THAT I SAW.

6          STAFF WAS SIMPLY OVERWHELMED. THEY COULDN'T PERFORM.

7  **Q.**  AND COULD YOU DESCRIBE SOME OF THE CONDITIONS WITH REGARDS

8  TO STAFFING IN SOME OF THE HOUSING UNITS YOU WENT INTO?

9  **A.**  WELL, THE THING THAT IS MOST TROUBLING TO ME, IN PARTICULAR,

10  WHEN I WENT INTO THE DORMITORIES THEY WERE STACKED SO HIGH WITH

11  DOUBLE AND TRIPLE-BUNKS, AND THEY WERE SO CROWDED AND THERE WERE

12  NO CLEAR SIGHT LINES.  SO EVEN --

13          **JUDGE KARLTON:**  NO CLEAR WHAT, SIR?

14          **THE WITNESS:**  SIGHT LINES.

15          **JUDGE KARLTON:**  SIGHT LINES.

16          **THE WITNESS:**  YES, SIR.  WHICH MEANS THAT STAFF FROM

17  THE CONTROL AREA AT THE FRONT, USUALLY LOCATED AT THE FRONT, DID

18  NOT HAVE ANY DIRECT OBSERVATION OF WHAT WAS GOING ON BEHIND

19  THOSE DOUBLE AND TRIPLE-BUNKS.

20          AND ANYBODY CAN TELL YOU THAT'S BEEN IN THIS BUSINESS

21  FOR A LONG TIME THERE'S A LOT OF PREDATORY BEHAVIOR THAT GOES ON

22  IN PRISON SETTINGS IF STAFF AREN'T THERE TO CONTROL IT.

23  **BY MS. NORMAN:**

24  **Q.**  AND WHAT KINDS OF -- WHAT NUMBERS ARE WE TALKING ABOUT HERE?

25  WHEN YOU WENT INTO A DORMITORY OR GYM WITH SEVERAL HUNDRED

1  PRISONERS, HOW MANY STAFF ARE YOU SEEING WORKING IN THOSE UNITS?

2  **A.**  USUALLY I SAW ONE OR TWO. ON SOME OCCASIONS I SAW THREE ON

3  THE VERY, VERY LARGE DORMS.

4        BUT, AGAIN, I SAW STAFF HANGING CLOSE TO THE FRONT.

5  THEY WERE REALLY OVERWHELMED BECAUSE THE NUMBER OF OFFENDERS

6  THAT KEPT COMING UP ASKING THEM QUESTIONS AND TAKING THEIR TIME,

7  THEY REALLY HAD NO TIME TO TAKE PEOPLE OUT FOR APPOINTMENTS, TO

8  TAKE PEOPLE OUT TO RECREATION, TO DO THEIR ROUNDS, TO DO THEIR

9  INSPECTIONS, AND TO TRY TO CONTROL WHAT BEHAVIOR WAS GOING ON

10 THAT THEY COULDN'T SEE.

11 **Q.**  IN YOUR OPINION AND IN YOUR EXPERIENCE, IS ONE OR TWO OR

12 EVEN THREE CUSTODY STAFF IN A DORM OR GYM WITH SEVERAL HUNDRED

13 PRISONERS, IS THAT ADEQUATE STAFFING TO RESPOND TO MEDICAL OR

14 MENTAL HEALTH EMERGENCIES?

15 **A.**  NO. AGAIN, THEY JUST DIDN'T HAVE CONTROL OF THE ENVIRONMENT

16 THAT THEY WERE TRYING TO MANAGE. AND THEY WERE UNABLE. I

17 WOULDN'T SAY "UNWILLING," BUT THEY WERE UNABLE TO GO TO THE BACK

18 AND DO THEIR ROUNDS, SIMPLY BECAUSE THEY ARE OVERWHELMED WITH

19 OTHER TASKS ASSOCIATED WITH THE HEAVY NUMBER OF OFFENDERS THAT

20 THEY WERE TRYING TO MANAGE.

21 **Q.**  IN YOUR EXPERIENCE COULD STAFF IN SUCH SETTINGS MAKE GOOD

22 DECISIONS WITH REGARD TO, SAY, MEDICAL OR MENTAL HEALTHCARE

23 NEEDS OF PRISONERS?

24        **MR. MELLO:**  OBJECTION.  PAUL MELLO. OBJECTION.  IT

25 CALLS FOR SPECULATION.

1          **JUDGE KARLTON:**  OVERRULED.

2          **JUDGE HENDERSON:**  OVERRULED, COUNSEL.

3          **THE WITNESS:**  YES, I HAVE ACTUALLY BEEN ONE OF THOSE

4    STAFF IN TEXAS THAT'S TRIED TO MANAGE AN OVERCROWDED DORMITORY

5    AND CELL BLOCK.  AND I CAN TELL YOU THAT IT WAS A BURDEN ON ME

6    TO MAKE THE PROPER DECISIONS WHEN I WAS TRYING TO MANAGE THAT.

7    AND I EXPECT THE SAME THING IS HAPPENING WITH THE STAFF IN THE

8    CALIFORNIA DEPARTMENT OF CORRECTIONS.

9    **BY MS. NORMAN:**

10   **Q.**  AND, IN FACT, ON YOUR -- ON YOUR PRISON TOURS, SOME OF THE

11   WARDENS TOLD YOU THAT THEY DIDN'T HAVE VERY HIGH VACANCY RATES

12   FOR CUSTODIAL STAFFING; ISN'T THAT RIGHT?

13   **A.**  THAT'S CORRECT.

14   **Q.**  AND YET, AS I BELIEVE YOU MENTIONED EARLIER, YOU STILL FOUND

15   THAT THEY HAD INADEQUATE CUSTODIAL STAFFING?

16   **A.**  IN MY OPINION THEY HAD INADEQUATE STAFFING IN ALMOST EVERY

17   HOUSING AREA THAT I WENT TO.

18   **Q.**  OKAY. MR. MELLO QUOTED PARAGRAPH FOUR OF YOUR AUGUST, 2008

19   REPORT. AND I'D LIKE YOU TO TAKE A LOOK AT THAT.

20          I'M SORRY.  I DON'T HAVE A FANCY SCREEN ARRANGEMENT.

21   BUT IN PARAGRAPH FOUR OF YOUR --

22   **A.**  WHICH REPORT?

23   **Q.**  THE AUGUST, 2008 REPORT.

24   **A.**  OKAY.

25   **Q.**  SO THE SUPPLEMENTAL REPORT.

1  **A.**  OKAY. ALL RIGHT.

2  **Q.**  MR. MELLO QUOTED YOU QUOTING SOMEBODY ELSE.

3  **A.**  THAT'S CORRECT.

4  **Q.**  TALKING ABOUT WIDESPREAD AGREEMENT AMONG CORRECTIONAL

5  EXPERTS THAT CHRONIC IDLENESS PRODUCES NEGATIVE PSYCHOLOGICAL

6  AND BEHAVIORAL EFFECTS IN PRISON.

7          DO YOU SEE THAT?

8  **A.**  YES.

9  **Q.**  AND YOU AGREE WITH THAT OPINION, RIGHT?

10  **A.**  YES, I CERTAINLY BELIEVE THAT.  AND I TOOK A QUOTE FROM

11  MR. TILTON, WHO WAS THE SECRETARY OF CORRECTIONS HERE IN

12  CALIFORNIA, AND HE OPINED THE SAME THING.

13  **Q.**  MR. MELLO ASKED YOU A LOT ABOUT INDIVIDUAL CASES, WHETHER

14  YOU KNEW OF INDIVIDUALS WHO HAD BEEN HARMED BY SPECIFIC BARRIERS

15  AND IMPEDIMENTS YOU OBSERVED IN CALIFORNIA.

16          I'D LIKE YOU TO LOOK, AGAIN, IN THE SAME REPORT, YOUR

17  SUPPLEMENTAL REPORT.  AND IN THE SAME PARAGRAPH, MOVING DOWN THE

18  PARAGRAPH, I'D LIKE YOU TO LOOK AT THE PART WHERE IN QUOTE MARKS

19  IT STATES:

20          "THE RISK OF CATASTROPHIC FAILURE -- THE RISK OF

21          CATASTROPHIC FAILURE IN A SYSTEM STRAINED FROM SEVERE

22          OVERCROWDING IS A CONSTANT THREAT.  IT IS MY

23          PROFESSIONAL OPINION THIS LEVEL OF OVERCROWDING IS

24          UNSAFE, AND WE ARE OPERATING ON BORROWED TIME."

25          DO YOU SEE THAT?

1  A.  YES.

2  Q.  AND DO YOU AGREE WITH THAT OPINION?

3  A.  I DO VERY MUCH.

4  Q.  AND WHOSE OPINION WAS THAT?

5  A.  THAT WAS, AGAIN, MR. TILTON'S OPINION.

6          **MS. NORMAN:**  NO FURTHER QUESTIONS.

7          **JUDGE HENDERSON:**  FURTHER CROSS OR RECROSS?

8                    **RECROSS–EXAMINATION**

9  BY MR. MELLO:

10 Q.  MR. SCOTT, YOU QUOTED MR. TILTON IN YOUR REPORT. WHO

11 SELECTED THAT QUOTE TO GO INTO YOUR REPORT?

12 A.  MS. NORMAN.  SHE CALLED IT TO MY ATTENTION, AND I APPROVED

13 IT.

14          **MR. MELLO:**  THANK YOU.

15          **MS. NORMAN:**  NO FURTHER QUESTIONS.

16          **JUDGE HENDERSON:**  OKAY. THANK YOU FOR YOUR TESTIMONY,

17 MR. SCOTT. YOU MAY STEP DOWN.

18          **THE WITNESS:**  THANK YOU, JUDGE.

19          **MR. SPECTER:**  YOUR HONOR, I KNOW THIS IS A COURTROOM

20 AND NOT A CHURCH, BUT I HAVE TO CONFESS THAT WE COMMITTED A SIN

21 IN NOT HAVING A WITNESS HERE FOR YOU FOR THE LAST HALF HOUR. WE

22 THOUGHT IT WOULD GO ABOUT THIS LONG, AND WE WEREN'T SURE.  SO WE

23 WILL BE READY TO START AT 9:15 TOMORROW WITH -- WE HAVE THREE

24 WITNESSES.

25          **JUDGE HENDERSON:**  OKAY. AND I THINK WE'RE LEARNING

1  HOW THINGS ARE GOING, AND WE WILL CONTINUE TO LEARN HOW LONG

2  THESE ARE REALLY GOING TO TAKE.

3          **MR. SPECTER:**  OKAY.  THANK YOU.

4          **JUDGE HENDERSON:**  OKAY.

5          **JUDGE REINHARDT:**  WOULDN'T DO ANY HARM TO HAVE AN

6  EXTRA WITNESS.

7          **JUDGE HENDERSON:**  YES.  ERR ON THE SIDE OF --

8          **MR. SPECTER:**  YES, WE DID, BUT THEY ARE COMING FROM

9  ALL OVER THE COUNTRY SO IT'S --

10          **JUDGE HENDERSON:**  RIGHT.

11          **JUDGE REINHARDT:**  SO ARE SOME OF US.

12          **MR. SPECTER:**  PARDON ME?

13          **JUDGE REINHARDT:**  SO ARE SOME OF US.

14          **JUDGE HENDERSON:**  BE WARNED, COUNSEL, WE MAY AND

15  PROBABLY WILL RECESS A LITTLE EARLIER THAN WE PLANNED ON FRIDAY,

16  PERHAPS AN HOUR EARLIER THAN SCHEDULED.

17          **MR. SPECTER:**  OKAY.

18          **JUDGE HENDERSON:**  BUT WE WILL TALK ABOUT THAT ON

19  THURSDAY.

20          **MR. SPECTER:**  SURE.  AND I JUST SHOULD TELL YOU WHO

21  IS DOING WHAT TOMORROW.

22          **JUDGE HENDERSON:**  OKAY.

23          **MR. SPECTER:**  DR. BEARD WILL START.

24          **JUDGE HENDERSON:**  OKAY.

25          **MR. SPECTER:**  THEN, IT WILL BE MR. LEHMAN.  AND THEN,

1  IF WE HAVE TIME IT WILL BE DR. HANEY.

2        **JUDGE KARLTON:**  DOCTOR?

3        **MR. SPECTER:**  HANEY, H-A-N-E-Y.

4        **JUDGE HENDERSON:**  OKAY.

5        **MS. JOHNSON:**  YOUR HONOR, ANNE JOHNSON FOR THE PLATA

6  DEFENDANTS.  BECAUSE WE HAVE A LITTLE BIT OF EXTRA TIME THERE

7  WAS A HOUSEKEEPING MATTER WE NEED TO ADDRESS WITH RESPECT TO

8  DEFENDANTS' EXPERT, DR. THOMAS.

9        WE HAD SPOKEN AT THE PRETRIAL CONFERENCE --

10       **JUDGE HENDERSON:**  THAT'S THE DOCTOR THAT HAS SOME

11 MEDICAL PROBLEM?

12       **MS. JOHNSON:**  THAT'S CORRECT.  AND WE HAD THOUGHT

13 THAT HE COULD COME ON THE 11TH OF DECEMBER AND TESTIFY OUT OF

14 ORDER.  BUT AT THIS TIME WE'RE NOT CERTAIN THAT THIS CASE IS

15 GOING TO GO THAT LONG. SO WE NEED TO KEEP IN MIND WHAT WE'RE

16 GOING TO DO.

17       HE'S UNDERGOING A NONDISCRETIONARY SURGICAL PROCEDURE

18 TODAY, SO HE WILL NOT BE AVAILABLE FOR LIVE TESTIMONY UNTIL THE

19 SECOND WEEK OF DECEMBER IN CALIFORNIA.

20       HE CAN BE AVAILABLE BY VIDEO CONFERENCING THE FIRST

21 WEEK OF DECEMBER.  HE COULD GO TO A FACILITY IN FLORIDA WHERE HE

22 LIVES, BUT HE'S NOT GOING TO BE IN A CONDITION TO FLY OUT HERE

23 FOR TRIAL.

24       THERE MAY ALSO BE A SCHEDULING ISSUE WITH DR. PACKER.

25 SO WE HAVE THE OPTION OF HAVING DR. THOMAS TESTIFY THE SECOND

1  WEEK -- I'M SORRY -- THE FIRST WEEK OF DECEMBER BY VIDEO

2  CONFERENCING, OR WE COULD MAYBE HAVE ONE SPECIAL DAY WHERE DR.

3  PACKER AND DR. THOMAS COULD TESTIFY DURING THAT SECOND WEEK OF

4  DECEMBER.  BUT WE NEED TO FIGURE OUT HOW TO HANDLE THAT.

5         **JUDGE KARLTON:**  SPEAKING FOR MYSELF AND NOT FOR MY

6  COLLEAGUES, I DON'T KNOW WHY HE HAS TO FLY OUT HERE. WE CAN JUST

7  TAKE HIM BY VIDEO, IF THAT'S ACCEPTABLE.

8         **MS. JOHNSON:**  WE HAVE NO PROBLEM WITH THAT. THE

9  PLAINTIFFS HAVE OBJECTED TO THAT, YOUR HONOR.

10        **JUDGE KARLTON:**  I'M SORRY.  YOU HAVE A PROBLEM?

11        **MS. JOHNSON:**  WE HAVE NO PROBLEM WITH THAT. WE HAVE

12  SUGGESTED THAT.  PLAINTIFFS HAVE OBJECTED TO THAT SUGGESTION.

13        **MR. SPECTER:**  WE JUST WANTED TO MAKE -- IF IT'S

14  MEDICALLY NECESSARY -- SORRY.

15        **JUDGE HENDERSON:**  WHY DON'T YOU MEET AND CONFER,

16  THEN?

17        **MR. SPECTER:**  YES, SIR.

18        **JUDGE HENDERSON:**   AND CHECK ON YOUR CONCERNS ABOUT

19  MEDICAL NECESSITY.

20        **MR. SPECTER:**  YES.

21        **JUDGE HENDERSON:**  SPEAKING ONLY FOR MYSELF, I WOULD

22  BE SO DELIGHTED IF IT DOESN'T GO UNTIL DECEMBER 11TH, THAT I'LL

23  AGREE TO ALMOST ANYTHING.

24        **JUDGE KARLTON:**  NOT ONLY THAT.  IT'S REALLY IMPORTANT

25  IF THE GENTLEMAN IS NOT WELL THAT YOU RECOGNIZE THAT REALITY --

1          **JUDGE HENDERSON:**  YES.

2          **JUDGE KARLTON:**  -- AND, YOU KNOW, NOT BE --

3          **JUDGE HENDERSON:**  YES.  MAYBE GET WHAT VALIDATION YOU

4    NEED FROM HIS DOCTOR.

5          **MR. SPECTER:**  THAT'S WHAT -- I THINK WHEN WE MET AND

6    CONFERRED BEFORE HE HADN'T HAD THE OPERATION.  WE WANTED TO KNOW

7    WHAT HAPPENED.  WE WILL DO THAT.  WE WILL TALK TO THEM.

8          **MS. HARDY:**  AND, YOUR HONORS, THERE IS ACTUALLY ONE

9    REBUTTAL WITNESS.  I'M ALISON HARDY FOR THE PLAINTIFFS.

10          WE DO HAVE ONE REBUTTAL WITNESS WHO IS A PROFESSOR AT

11    CAL WHICH YOU WOULD THINK WOULD BE EASIER TO SCHEDULE, BUT

12    UNFORTUNATELY HE'S IN GREAT DEMAND.  AND HE IS AVAILABLE ONLY ON

13    THE MORNING OF DECEMBER 9 SO -- BECAUSE HE'S OUT OF TOWN.

14    THAT'S WELL WITHIN THE DECEMBER 19TH CUTOFF, BUT DECEMBER 9 IS

15    WHEN HE'S AVAILABLE. AND HE'S REBUTTAL.

16          **JUDGE REINHARDT:**  HE'S IN GREAT DEMAND FOR WHAT?

17          **MS. HARDY:**  HE'S AN EPIDEMIOLOGIST, YOUR HONOR.

18          **JUDGE REINHARDT:**  HE'S WHAT?

19          **MS. HARDY:**  HE'S AN EPIDEMIOLOGIST, AND HE'S A

20    CONSULTANT ALL OVER THE COUNTRY.

21          **JUDGE HENDERSON:**  OKAY.  WE STARTED SOMETHING HERE.

22          **JUDGE KARLTON:**  I MIGHT SAY ABOUT YOUR DOCTOR YOU

23    MIGHT FIND SOME WAY TO VIDEO HIM IN, AS WELL, BECAUSE THAT WOULD

24    BE A VERY GOOD THING TO DO.

25          **MS. TILLMAN:**  MY NAME IS LISA TILLMAN.  I JUST WANTED

1  TO INFORM THE COURT ABOUT DR. PACKER'S UNAVAILABILITY DUE TO A

2  TRIAL IN ANOTHER PROCEEDING. WE WILL WORK WITH PLAINTIFF COUNSEL

3  TO SEE WHAT WE CAN COME UP WITH BY WAY OF A WORKABLE SOLUTION.

4  RIGHT NOW HE'S ONLY AVAILABLE THAT SECOND WEEK OF DECEMBER

5  BECAUSE OF ANOTHER PROCEEDING.

6          BUT WE WILL TRY TO WORK WITH PLAINTIFF COUNSEL ON

7  THAT.

8          **JUDGE HENDERSON:**    GOOD.

9          **MS. LEONARD:**  NATALIE LEONARD, CALIFORNIA

10  CORRECTIONAL PEACE OFFICERS' ASSOCIATION.

11          THIS MORNING THE COURT APPROVED 15 MINUTES OF DIRECT

12  AND 30 MINUTES OF REDIRECT FOR OUR WITNESSES. IN THE MEANTIME,

13  WE LEARNED THAT THE COURT INTENDS TO RULE ON OBJECTIONS AT THE

14  VERY END.

15          WE RECEIVED WITH RESPECT TO OUR DECLARATIONS 12 PAGES

16  OF OBJECTIONS THIS MORNING, PRIMARILY LACK OF FOUNDATION. UNDER

17  THAT CIRCUMSTANCE, WE'D BE REQUIRED TO USE OUR 15 MINUTES SOLELY

18  TO ADDRESS THE FOUNDATIONAL ISSUES.

19          WE WOULD REQUEST THAT THE COURT NOT INCREASE OUR

20  TOTAL TIME OF 45 MINUTES, BUT GIVE US LEAVE TO REALLOCATE THAT

21  TIME, 30 MINUTES OF DIRECT, 15 MINUTES OF REDIRECT OR SOMETHING

22  ELSE THAT THE COURT FEELS APPROPRIATE IN LIGHT OF THIS NEW

23  INFORMATION.

24          **JUDGE HENDERSON:**  OKAY. THAT'S A REASONABLE -- AND

25  LET ME ASK YOU TO, AGAIN, MEET AND CONFER, SEE IF YOU CAN AGREE

1   UPON THE REALLOCATION.

2              BUT NO OBJECTION TO THAT REALLOCATION.

3         **MR. MELLO:**  WE WILL MEET AND CONFER FURTHER ABOUT IT.

4         **JUDGE HENDERSON:**  OKAY.

5         **MR. MELLO:**  MY INCLINATION WAS NO, BUT I'M A DEFENSE

6   ATTORNEY, SO I'LL THINK ABOUT IT.

7         **JUDGE HENDERSON:**  WELL, WE'RE PROFESSIONAL

8   TIE-BREAKERS.  MEET AND CONFER, AND WE WILL BREAK ANY TIES.

9         **MR. MELLO:**  UNDERSTOOD.

10        **MS. LEONARD:**  THANK YOU, YOUR HONORS.

11        **JUDGE HENDERSON:**  OKAY. COURT IS ADJOURNED UNTIL 9:15

12  TOMORROW MORNING.

13              (THEREUPON, THIS TRIAL WAS RECESSED UNTIL

14              WEDNESDAY, NOVEMBER 19, 2008, AT 9:15

15              O'CLOCK A.M.)

16

17

18

19

20

21

22

23

24

25

# **I N D E X**

**OPENING STATEMENT**                                    **PAGE**      **VOL.**

MR. SPECTER                                                7           1
MR. BIEN                                                  19           1
MR. ADAM                                                  32           1
MR. MELLO                                                 38           1
MS. TILLMAN                                               47           1
MR. KAUFHOLD                                              56           1


**PLAINTIFF'S WITNESSES**                                **PAGE**      **VOL.**


**DR. PABLO STEWART**

DIRECT EXAMINATION BY MS. WHELAN                          63           1
CROSS-EXAMINATION BY MS. TILLMAN                         113           1


**WAYNE SCOTT**

DIRECT EXAMINATION BY MS. NORMAN                         138           1
CROSS-EXAMINATION BY MR. MELLO                           153           1
REDIRECT EXAMINATION BY MS. NORMAN                       181           1
RECROSS-EXAMINATION BY MR. MELLO                         188           1

## CERTIFICATE OF REPORTER

WE, JOAN MARIE COLUMBINI AND KATHERINE WYATT, OFFICIAL REPORTERS FOR THE UNITED STATES COURT, NORTHERN DISTRICT OF CALIFORNIA, HEREBY CERTIFY THAT THE FOREGOING PROCEEDINGS IN CIV S-90-0520 LKK JPM P, RALPH COLEMAN, ET AL V. ARNOLD SCHWARZENEGGER AND C 01-1351 TEH, MARCIANO PLATA V. ARNOLD SCHWARZENEGGER, WERE REPORTED BY US, CERTIFIED SHORTHAND REPORTERS, AND WERE THEREAFTER TRANSCRIBED UNDER OUR DIRECTION INTO TYPEWRITING; THAT THE FOREGOING IS A FULL, COMPLETE AND TRUE RECORD OF SAID PROCEEDINGS AS BOUND BY US AT THE TIME OF FILING.

THE VALIDITY OF THE REPORTER'S CERTIFICATION OF SAID TRANSCRIPT MAY BE VOID UPON DISASSEMBLY AND/OR REMOVAL FROM THE COURT FILE.

/S/ JOAN MARIE COLUMBINI

JOAN MARIE COLUMBINI, CSR 5435, RPR

S/ KATHERINE WYATT

KATHERINE WYATT, CSR 9866, RMR

TUESDAY, NOVEMBER 18, 2008